# Federal Prosecution of Election Offenses

## Seventh Edition

## May 2007

Written by:

Craig C. Donsanto, Director
Election Crimes Branch
Public Integrity Section

and

Nancy L. Simmons
Senior Counsel for Policy
Public Integrity Section





# TABLE OF CONTENTS

Page

**PREFACE**........................................ xiii

**CHAPTER ONE:  OVERVIEW**........................ 1

    A.  INTRODUCTION............................. 1
    B.  TYPES OF ELECTION CRIMES................ 2
        1.  Election Fraud.......................... 2
        2.  Patronage Crimes...................... 3
        3.  Campaign Financing Crimes.................. 4
        4.  Civil Rights Crimes...................... 5
    C.  FEDERAL JURISDICTION.................... 5
    D.  ADVANTAGES OF FEDERAL
        PROSECUTION............................ 8
    E.  FEDERAL ROLE:  PROSECUTION,
        NOT INTERVENTION....................... 9
    F.  EVALUATING AN ELECTION FRAUD
        ALLEGATION............................. 10
    G.  INVESTIGATIVE CONSIDERATIONS
        IN ELECTION FRAUD CASES................ 11
    H.  EVALUATING A CAMPAIGN
        FINANCING ALLEGATION.................. 13
    I.  INVESTIGATIVE CONSIDERATIONS
        IN CAMPAIGN FINANCING CASES........... 15
    J.  CONSULTATION REQUIREMENTS
        AND RECOMMENDATIONS.................. 16
        1.  Consultation Requirements for Election
            Frauds and Patronage Crimes............... 17
        2.  Consultation Requirements for
            Campaign Financing Crimes............... 18

i

**CHAPTER TWO:  CORRUPTION OF THE
ELECTION PROCESS**. . . . . . . . . . . . . . . . . . . . . . . .  21

A.  HISTORICAL BACKGROUND. . . . . . . . . . . . . . . .  21
B.  WHAT IS ELECTION FRAUD?. . . . . . . . . . . . . . .  24
    1.  In General. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24
    2.  Conduct that Constitutes Federal
        Election Fraud. . . . . . . . . . . . . . . . . . . . . . . . . .  26
    3.  Conduct that Does Not Constitute
        Federal Election Fraud. . . . . . . . . . . . . . . . . . . .  29
    4.  Conditions Conducive to Election Fraud. . . . . . . .  30
    5.  Voter Participation Versus Nonvoter
        Participation Cases. . . . . . . . . . . . . . . . . . . . . . . .  31
        (a)  Election frauds not involving
             the participation of voters. . . . . . . . . . . . . . .  31
        (b)  Election frauds involving the
             participation of voters. . . . . . . . . . . . . . . . . .  32
C.  JURISDICTIONAL SUMMARY. . . . . . . . . . . . . . . .  33
    1.  Statutes Applicable to Nonfederal Elections. . . . .  34
    2.  Statutes Applicable to Federal Elections. . . . . . . .  36
D.  STATUTES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  37
    1.  Conspiracy Against Rights.
        18 U.S.C. § 241. . . . . . . . . . . . . . . . . . . . . . . . . .  37
    2.  Deprivation of Rights under
        Color of Law.  18 U.S.C. § 242. . . . . . . . . . . . . .  41
    3.  False Information in, and Payments
        for, Registering and Voting.
        42 U.S.C. § 1973i(c). . . . . . . . . . . . . . . . . . . . . .  41
        (a)  The basis for federal jurisdiction. . . . . . . . . .  42
        (b)  False information to an election official. . . . .  44
        (c)  Commercialization of the vote. . . . . . . . . . . .  47
        (d)  Conspiracy to cause illegal voting. . . . . . . . .  49

4.  Voting More than Once.
    42 U.S.C. § 1973i(e). . . . . . . . . . . . . . . . . . . . . . .  50
5.  Voter Intimidation. . . . . . . . . . . . . . . . . . . . . . .  54
    (a)  Intimidation in voting and
         registering to vote.
         42 U.S.C. § 1973gg-10(1). . . . . . . . . . . . . .  55
    (b)  Intimidation of voters.
         18 U.S.C. § 594. . . . . . . . . . . . . . . . . . . . . .  56
    (c)  Coercion of political activity.
         18 U.S.C. § 610. . . . . . . . . . . . . . . . . . . . . .  57
    (d)  Conspiracy against rights and
         deprivation of constitutional rights.
         18 U.S.C. § 241 and § 242. . . . . . . . . . . . . .  58
    (e)  Federally protected activities.
         18 U.S.C. § 245(b)(1)(A). . . . . . . . . . . . . .  60
6.  Voter Suppression.
    18 U.S.C. § 241 and § 242. . . . . . . . . . . . . . . . .  61
7.  Fraudulent Registration or Voting.
    42 U.S.C. § 1973gg-10(2). . . . . . . . . . . . . . . . .  63
    (a)  Fraudulent registration.
         § 1973gg-10(2)(A). . . . . . . . . . . . . . . . . . .  64
    (b)  Fraudulent voting.
         § 1973gg-10(2)(B). . . . . . . . . . . . . . . . . . .  65
8.  Voting by Noncitizens. . . . . . . . . . . . . . . . . . . .  66
    (a)  Fraudulent registration and voting
         under the NVRA.
         42 U.S.C. § 1973gg-10(2). . . . . . . . . . . . . .  67
    (b)  False claims to register or vote.
         18 U.S.C. § 1015(f). . . . . . . . . . . . . . . . . .  68
    (c)  False claims of citizenship.
         18 U.S.C. § 911. . . . . . . . . . . . . . . . . . . . . .  68
    (d)  Voting by aliens.  18 U.S.C. § 611. . . . . . . . .  69

9.  Travel Act.  18 U.S.C. § 1952. . . . . . . . . . . . . .  70
10. Mail Fraud.  18 U.S.C. § 1341. . . . . . . . . . . . . .  72
    (a)  Background.. . . . . . . . . . . . . . . . . . . . . . . . . .  73
    (b)  Salary theory of mail fraud. . . . . . . . . . . . . .  74
    (c)  "Honest services" fraud.
         18 U.S.C. § 1346. . . . . . . . . . . . . . . . . . . .  77
    (d)  "Cost-of-election" theory.
         18 U.S.C. § 1341. . . . . . . . . . . . . . . . . . . .  78
11. Troops at Polls.  18 U.S.C. § 592. . . . . . . . . . . .  79
12. Campaign Dirty Tricks.. . . . . . . . . . . . . . . . . . . . .  80
    (a)  Election communications and
         solicitations.  2 U.S.C. § 441d. . . . . . . . . . .  80
    (b)  Fraudulent misrepresentation.
         2 U.S.C. § 441h. . . . . . . . . . . . . . . . . . . . . .  80
13. Retention of Federal Election Records.
    42 U.S.C. § 1974. . . . . . . . . . . . . . . . . . . . . . . . .  81
    (a)  Legislative purpose and background. . . . . . .  82
    (b)  The basic requirements of Section 1974. . . .  83
    (c)  Section 1974 requires document
         preservation, not document generation.. . . . .  84
    (d)  Originals must be retained. . . . . . . . . . . . . . .  85
    (e)  Election officials must supervise storage.. . .  85
    (f)  Retention not required for certain records. . .  86
    (g)  Retention under Section 1974
         versus retention under the
         National Voter Registration Act. . . . . . . . . . .  86
E.  POLICY AND PROCEDURAL
    CONSIDERATIONS.. . . . . . . . . . . . . . . . . . . . . . . . .  87
    1.  Consultation Requirements. . . . . . . . . . . . . . . . .  87
    2.  Urgent Reports and Press Releases. . . . . . . . . . .  90
    3.  Federal Seizure of State Election Materials.. . . . .  91
    4.  Noninterference with Elections. . . . . . . . . . . . . .  91
    5.  Limitations on Federal Poll Watching. . . . . . . . . .  93

iv

　　　6.　Selective Prosecution Issues. . . . . . . . . . . . . . . .　94
　F.　SUGGESTIONS FOR SUCCESSFUL ELECTION
　　　FRAUD CASE INVESTIGATIONS. . . . . . . . . . . . .　94
　　　1.　Getting Started. . . . . . . . . . . . . . . . . . . . . . . . . . .　95
　　　　　(a)　Publicize your intent to prosecute
　　　　　　　election fraud. . . . . . . . . . . . . . . . . . . . . . .　95
　　　　　(b)　Be aware of the importance of
　　　　　　　voting documentation. . . . . . . . . . . . . . . . . .　96
　　　　　(c)　Consider the advantages of federal
　　　　　　　prosecution. . . . . . . . . . . . . . . . . . . . . . . . .　98
　　　　　(d)　Focus on areas vulnerable to
　　　　　　　election fraud. . . . . . . . . . . . . . . . . . . . . . .　99
　　　　　(e)　Develop your investigative
　　　　　　　strategy early. . . . . . . . . . . . . . . . . . . . . . .　99
　　　2.　The Investigation. . . . . . . . . . . . . . . . . . . . . . . . .　99
　　　　　(a)　Preliminary investigation. . . . . . . . . . . . . .　100
　　　　　(b)　Grand jury and FBI full-field
　　　　　　　investigations. . . . . . . . . . . . . . . . . . . . . . .　101
　　　3.　Investigating Two Types of
　　　　　Election Fraud. . . . . . . . . . . . . . . . . . . . . . . . . . .　101
　　　　　(a)　Absentee ballot frauds. . . . . . . . . . . . . . . .　101
　　　　　(b)　Ballot-box stuffing cases. . . . . . . . . . . . . .　103
　　　4.　A Few Cautions. . . . . . . . . . . . . . . . . . . . . . . . . .　104
　　　5.　Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .　106

CHAPTER THREE:　PATRONAGE CRIMES. . . . . . . . . . .　107

　A.　HISTORICAL BACKGROUND. . . . . . . . . . . . . . .　107
　B.　STATUTES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .　109
　　　1.　Limitations Based on Federal
　　　　　Employment or Workspace. . . . . . . . . . . . . . . .　109
　　　　　(a)　Solicitation of political contributions.
　　　　　　　18 U.S.C. § 602 . . . . . . . . . . . . . . . . . . . . .　109

v

      (b)  Making political contributions.
          18 U.S.C. § 603. . . . . . . . . . . . . . . . . . . . . .  111
      (c)  Intimidation to secure political
          contributions.  18 U.S.C. § 606. . . . . . . . . .  111
      (d)  Coercion of political activity.
          18 U.S.C. § 610. . . . . . . . . . . . . . . . . . . . . .  112
      (e)  Place of solicitation.
          18 U.S.C. § 607. . . . . . . . . . . . . . . . . . . . . .  114
  2.  Limitations Based on Federal
     Programs and Benefits. . . . . . . . . . . . . . . . . . . .  115
      (a)  Promise or deprivation of federal
          employment or other benefit for
          political  activity.
          18 U.S.C. § 600 and § 601. . . . . . . . . . . . .  115
      (b)  Promise of appointment by
          candidate. 18 U.S.C. § 599. . . . . . . . . . . . .  119
      (c)  Interference in election by employees of
          federal, state, or territorial governments.
          18 U.S.C. § 595. . . . . . . . . . . . . . . . . . . . . .  119
      (d)  Coercion by means of relief
          appropriations.  18 U.S.C. § 598. . . . . . . . .  120
      (e)  Solicitation from persons on relief.
          18 U.S.C. § 604. . . . . . . . . . . . . . . . . . . . . .  120
      (f)  Disclosure of names of persons on
          relief.  18 U.S.C. § 605. . . . . . . . . . . . . . . .  121
  3.  Permissible Political Activity under the
     Hatch Act, as Amended.
     5 U.S.C. § 7323 and § 7324. . . . . . . . . . . . . . .  121
C.  POLICY AND PROCEDURAL
     CONSIDERATIONS. . . . . . . . . . . . . . . . . . . . . . . . .  124

**CHAPTER FOUR:  ELECTION DAY
PROCEDURES.** . . . . . . . . . . . . . . . . . . . . . . . . . . .  125

**CHAPTER FIVE:  CAMPAIGN FINANCING
CRIMES.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  133

A. INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . .  133
B. STATUTORY SCOPE. . . . . . . . . . . . . . . . . . . . . .  136
   1. Types of Statutes. . . . . . . . . . . . . . . . . . . . . . . .  136
   2. Basic Statutory Definitions. . . . . . . . . . . . . . . .  137
   3. Statutory Presumptions. . . . . . . . . . . . . . . . . . .  140
C. HISTORICAL BACKGROUND:
   1907 to 2002. . . . . . . . . . . . . . . . . . . . . . . . . . . . .  141
   1. Overview. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  141
   2. Campaign Financing Laws.. . . . . . . . . . . . . . . .  142
   3. Campaign Reporting Laws.. . . . . . . . . . . . . . . .  144
   4. The Bipartisan Campaign Reform Act
     of 2002. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  145
     (a) Headline features of the 2002
        campaign reforms. . . . . . . . . . . . . . . . . . . . . .  146
     (b) BCRA's criminal enforcement
        enhancements. . . . . . . . . . . . . . . . . . . . . . . . .  148
D. STATUTES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  151
   1. Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . .  151
   2. The "Heartland" Provisions of the
     Campaign Financing Laws.. . . . . . . . . . . . . . . .  151
   3. Campaign Financing Crimes. . . . . . . . . . . . . . .  154
   4. Substantive Statutes. . . . . . . . . . . . . . . . . . . . . .  155
     (a) 2 U.S.C. § 441a.  Limitations on
        contributions and expenditures.. . . . . . . . . .  155

vii

     (b)  2 U.S.C. § 441b.  Prohibition on contributions and expenditures by national banks, corporations, and labor organizations.. . . . . . . . . . . . . . .   159

     (c)  2 U.S.C. § 441c.  Prohibition on contributions by government contractors. . . . . . . . . . . . . . . . . . . . . .   162

     (d)  2 U.S.C. § 441d.  Attribution of sponsors of political communications and solicitations. . . . . . . . . . . . . . . . . . . . . .   163

     (e)  2 U.S.C. § 441e.  Prohibition on contributions, donations, and expenditures by foreign nationals. . . . . . . . .   164

     (f)  2 U.S.C. § 441f.  Prohibition on contributions through conduits . . . . . . . . . .   166

     (g)  2 U.S.C. § 441g.  Limitation on contribution of currency. . . . . . . . . . . . . . .   168

     (h)  2 U.S.C. § 441h.  Fraudulent misrepresentation of campaign authority. . .   169

     (i)  2 U.S.C. § 441i.  Prohibition against soft money of political parties. . . . . . . . . . .   170

     (j)  2 U.S.C. § 439a.  Prohibition on conversion of campaign funds. . . . . . . . . . .   174

     (k)  2 U.S.C. § 432, 433, 434.  Organization, recordkeeping, and reporting requirements. . . . . . . . . . . . . . . . . . . . . . . . .   176

E.  ENFORCEMENT. . . . . . . . . . . . . . . . . . . . . . . . .   176

  1.  Three Types of Enforcement. . . . . . . . . . . . . . .   176

  2.  General Observations. . . . . . . . . . . . . . . . . . . . . .   177

  3.  Criminal Prosecution. . . . . . . . . . . . . . . . . . . . . .   178

     (a)  Intent. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   179

     (b)  Aggregate Value. . . . . . . . . . . . . . . . . . . . . .   180

     (c)  Penalties. . . . . . . . . . . . . . . . . . . . . . . . . . . . .   182

viii

4. Felony Theories for FECA Crimes. . . . . . . . . . 184
   (a) Willfully causing submission of
        false information to the Federal
        Election Commission.
        18 U.S.C. § 1001 and § 2. . . . . . . . . . . . . . . 184
   (b) Conspiracy to defraud the United States.
        18 U.S.C. § 371. . . . . . . . . . . . . . . . . . . . 187
5. Public Financing Crimes Relating to
    Presidential Campaigns. . . . . . . . . . . . . . . . . . . . 188
6. Violations of State Campaign
    Financing Laws. . . . . . . . . . . . . . . . . . . . . . . . . 191
   (a) Honest services frauds.
        18 U.S.C. § 1346. . . . . . . . . . . . . . . . . . . . 191
   (b) Mail Fraud.  18 U.S.C. § 1341. . . . . . . . . . . 193
7. Schemes to Divert Campaign Funds. . . . . . . . . 194
   (a) FECA conversion. . . . . . . . . . . . . . . . . . . . . 195
   (b) Deprivation of honest services. . . . . . . . . . . 197
   (c) Reporting offenses. . . . . . . . . . . . . . . . . . . . 197
8. Administrative and Civil Enforcement
    by the Federal Election Commission. . . . . . . . . . 198
9. Criteria for Prosecutive Evaluation
    of FECA Violations. . . . . . . . . . . . . . . . . . . . . . . 198
10. Venue for FECA Offenses. . . . . . . . . . . . . . . . . . 199
11. Statute of Limitations for Campaign
     Financing Offenses. . . . . . . . . . . . . . . . . . . . . . . 200
F. POLICY AND PROCEDURAL
   CONSIDERATIONS. . . . . . . . . . . . . . . . . . . . . . . . . 201
1. Consultation Requirements and
    Recommendations. . . . . . . . . . . . . . . . . . . . . . . . 201
2. Investigative Jurisdiction. . . . . . . . . . . . . . . . . . . 202
3. Nonwaiver of the Federal Election
    Commission's Civil Enforcement
    Authority. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 202

    4. Dealings with the Federal Election
       Commission.............................. 203
    5. Federal Election Officials as
       Prosecution Witnesses..................... 203
    6. Memorandum of Understanding between the
       Federal Election Commission and the
       Department of Justice. .................... 205

**CHAPTER SIX:  SENTENCING OF ELECTION
CRIMES**...................................... 207

A. OVERVIEW. .............................. 207
    1. Categories of Election Crimes............... 207
B. CONVICTIONS INVOLVING
CORRUPTION OF THE
ELECTORAL PROCESS. .................... 208
C. CONVICTIONS INVOLVING
VIOLATIONS OF THE FEDERAL
ELECTION CAMPAIGN ACT . ............... 214
    1. Campaign Financing Crimes Before the
       Bipartisan Campaign Reform Act of 2002. ..... 215
    2. Campaign Financing Crimes after the
       Bipartisan Campaign Reform Act of 2002. .... 218
    3. Examples of Application of FECA
       Sentencing Guideline..................... 223
       Example 1:  The Conduit................... 224
       Example 2:  The Typical FECA Crime –
         Laundered Corporate Contributions. ....... 225
       Example 3:  Corporate Contributor to Multiple
         Candidates through Threats and Coercion. .. 227
       Example 4:  Fundraiser Possessing
         Special Skill.......................... 228

x

Example 5:  Major Political Party Donor
Seeking a Benefit from the Government..... 229
Example 6:  Foreign Agent Who Gives
Funds from Foreign Government to
Nonfederal Candidates to Obtain a
Specific Benefit from the Government...... 231
D.  CONVICTIONS OF CAMPAIGN
FINANCING VIOLATIONS ADDRESSED
UNDER  ALTERNATIVE THEORIES OF
PROSECUTION. ........................ 232
1.  Conspiracy to Disrupt and Impede the
Federal Election Commission................ 232
2.  False Statements to the Federal
Election Commission ..................... 233
3.  Embezzlement of Campaign Funds........... 233
E.  OBLIGATION TO REPORT FELONY
CONVICTIONS TO STATE
ELECTION OFFICIALS...................... 234

**CHAPTER SEVEN:  CONCLUSION – WHY
PROSECUTING ELECTION CRIMES
IS IMPORTANT.** ........................... 237

**APPENDIX A:  Excerpt from *McConnell v.
Federal Election Commission*.** ........... 243

**APPENDIX B:  Department of Justice and
Federal Election Commission
Memorandum of Understanding.** ........ 259

**APPENDIX C:  Statutes.**............................. 263

**APPENDIX D:  Table of Cases.** ........................ 319

xi

xii

# PREFACE

Welcome to the Seventh Edition of <u>Federal Prosecution of Election Offenses</u>, a project that has been in the works for over two years. This book replaces the Sixth Edition, which was published in 1995, and represents a complete re-write of that last book.

There have been a number of significant developments in the law dealing with elections and election finance – and, accordingly, in the Department's enforcement approach in this area – since we last wrote on these subjects.

In 2002, Congress passed the Bipartisan Campaign Reform Act (BCRA). One of the goals of this legislation was to close major loopholes involving so-called "soft money" and "issue advocacy" that had developed since enactment of the original Federal Election Campaign Act (FECA) in 1971. Another of BCRA's goals was to provide enhanced criminal penalties for knowing and willful FECA violations. Yet another goal was to put in place a strong sentencing guideline for FECA crimes. The following year the United States Sentencing Commission obliged, promulgating a sentencing guideline, U.S.S.G. § 2C1.8, that recommends imprisonment for most campaign financing offenses. Subsequent First Amendment challenges to BCRA's broad provisions were resoundingly rejected by the Supreme Court, which upheld the landmark provisions as constitutional anti-corruption measures designed to address public corruption and the appearance of public corruption. *McConnell v. Federal Election Commission*, 540 U.S. 93 (2003).

In addition to these legislative efforts, in 2002 then-Attorney General John Ashcroft established a Department-wide Ballot Access and Voting Integrity Initiative to increase the Department's efforts and effectiveness in addressing election crimes and voting rights violations. As a result of this ongoing Initiative, there has been a

xiii

marked increase in nationwide prosecutions and convictions for ballot fraud and campaign financing fraud. The Department's objectives in bringing these cases are two-fold: to convict those who attempt to corrupt elections, and to protect the integrity of the election process by deterring others from corrupting future elections. Each of these events will be discussed fully in this volume.

This is the latest in a series of books on the criminal enforcement of federal election laws with which we are proud to have been associated. However, projects this vast could not succeed without the strong support of our superiors and the dedicated help of several special colleagues here in the Public Integrity Section.

We would be derelict were we not to recognize with sincere gratitude the significant contributions that were made to this book by The Honorable Noel L. Hillman, our Chief from 2002 to 2006, who is now a federal district judge. Noel's personal involvement and support during its drafting reflected his view of this book as a forceful tool for federal prosecutors and investigators in the pursuit of crimes that corrupt and subvert our representative form of government. Our thanks further go to Public Integrity Section Trial Attorney Richard C. Pilger for his valuable input.

We are also extremely indebted to Forensic Accountant Christine M. Cartwright for her editorial assistance and tireless dedication to the formidable task of preparing this book for publication, as well as to Supervisory Litigation Support Specialist Danny P. Foster and to Office Support Specialist James E. Wedge for their work on this project.

Finally, we acknowledge with appreciation the contributions to the Department's law enforcement efforts in this area that have been made over the years by the Assistant United States Attorneys who have served, some for decades, as District Election Officers, and by the special agents of the Federal Bureau of Investigation who have assisted in these cases. We are pleased to recognize the FBI's

xiv

increased enforcement efforts in this area, which led to the Bureau's establishment in 2006 of its own Campaign Finance and Ballot Fraud Initiative with specially trained agents serving as election crime coordinators in all its Field Offices. The implementation of this Initiative has been due in large measure to the dedication of Supervisory Special Agent Michael B. Elliott of the Public Corruption Unit at FBI Headquarters.

The materials that are contained between the covers of this book represent the knowledge of elections, and of election law, that the two of us have gathered over the cumulative total of sixty years we have been privileged to serve our country at the United States Department of Justice. It is our sincere hope that this book will contribute to the understanding and appreciation of the important legal and tactical issues and challenges presented by the effective criminal enforcement of federal election laws.

CRAIG C. DONSANTO
NANCY L. SIMMONS

Public Integrity Section
Criminal Division
May 2007

xv

xvi

# CHAPTER ONE

# OVERVIEW

This book was written to help federal prosecutors and investigators discharge the responsibility of the United States Department of Justice in attacking corruption of the election process with all available statutes and theories of prosecution. It addresses how the Department handles all federal election offenses, other than those involving civil rights, which are enforced by the Department's Civil Rights Division. This Overview summarizes the Department's policies, as well as key legal and investigative considerations, related to the investigation and prosecution of election offenses.

## A.   INTRODUCTION

In the United States, as in other democratic societies, it is through the ballot box that the will of the people is translated into government that serves rather than oppresses. It is through elections that the government is held accountable to the people and political conflicts are channeled into peaceful resolutions. And it is through elections that power is attained and transferred.

Our constitutional system of representative government only works when the worth of honest ballots is not diluted by invalid ballots procured by corruption. As the Supreme Court stated in a case upholding federal convictions for ballot box stuffing: "Every voter in a federal . . . election, . . . whether he votes for a candidate with little chance of winning or for one with little chance of losing, has a right under the Constitution to have his vote fairly counted, without its being distorted by fraudulently cast votes." *Anderson v. United States*, 417 U.S. 211, 227 (1974). When the election process is corrupted, democracy is jeopardized. Accordingly, the effective prosecution of corruption of the election process is a significant federal law enforcement priority.

1

Although corrupt government may exist without election crime, when election crime exists, public corruption of some form is also usually present. This is so because virtually all election crime is driven by a motive to control governmental power for some corrupt purpose. Election crime cases therefore often provide effective tools for attacking other forms of public corruption. The task of the federal prosecutor and investigator is not only to vindicate the fundamental principle of fair elections by convicting those who corrupt them, but also to find the motive behind the election fraud and, when possible, to prosecute those involved in the underlying corruption.

There are several reasons why election crime prosecutions may present an easier means of obtaining convictions than do other forms of public corruption:

- Election crimes usually occur largely in public.

- Election crimes often involve many players. For example, successful voter bribery schemes require numerous voters; ballot box stuffing requires controlling all the election officials in a polling location; illegal political contributions generally involve numerous conduits to disguise the transaction.

- Election crimes tend to leave paper trails, either in state voting documentation or in public reports filed by federal campaigns.

## B.   TYPES OF ELECTION CRIMES

### 1. Election Fraud

Election fraud usually involves corruption of one of three processes: the obtaining and marking of ballots, the counting and certification of election results, or the registration of voters. Election

fraud is generally not common when one party or one faction of a party dominates the political landscape. Rather, the conditions most conducive to election fraud are close factional competition within an electoral jurisdiction for an elected position that matters. Thus, in a jurisdiction when one party is dominant, election fraud may nevertheless occur during the primary season, as various party factions vie for power.

Most election fraud aims at ensuring that important elected positions are occupied by "friendly" candidates. It occurs most often when the financial stakes involved in who controls public offices are great – as is often the case when patronage positions are a major source of employment, or when illicit activities are being conducted that require protection from official scrutiny. As noted, election crimes will typically coincide with other types of corruption.

## 2. Patronage Crimes

Patronage is a term used to describe the doctrine of "to the victor go the spoils." The Supreme Court has held that the firing, based on partisan considerations, of public employees who occupy non-confidential and non-policymaking positions violates the First Amendment. Moreover, an aggressive and pervasive patronage system can provide a fertile breeding ground for other forms of corruption. It is therefore important to root out aggravated patronage abuses wherever they occur.

Patronage crimes are most prevalent when one political faction or party dominates the political landscape but is also required to defend its position of power against a credible opposition. Patronage crimes are also common in jurisdictions where other forms of public corruption are prevalent and tolerated by the body politic.

3

### 3. Campaign Financing Crimes

The federal campaign financing laws are embodied within the Federal Election Campaign Act of 1971 (FECA), 2 U.S.C. §§ 431-455, as amended, most significantly in 1974, 1976, 1979, and 2002.

The 2002 Amendments to FECA were contained in a far-reaching piece of legislation called the Bipartisan Campaign Reform Act (BCRA) (popularly known as the McCain-Feingold bill after its main Senate sponsors), most of which became effective on November 6, 2002. As amended by BCRA, FECA applies to virtually all financial transactions that impact upon, directly or indirectly, the election of candidates for federal office, that is, candidates for President or Vice President or for the United States Senate or House of Representatives. Also as amended by BCRA, FECA now reaches a wide range of communications aimed at influencing the public with respect to issues that are closely identified with federal candidates, referred to in the law as "electioneering communications."

FECA contains its own criminal sanctions, which in turn provide that, to be a crime, a FECA violation must have been committed knowingly and willfully and, except for campaign misrepresentations and certain coerced contributions, must have involved at least $2,000 in a calendar year. 2 U.S.C. § 437g(d). Prior to BCRA, all FECA crimes were one-year misdemeanors. However, for FECA crimes that occur on or after November 6, 2002 (when BCRA took effect), those aggregating $25,000 or more are five-year felonies, and those that involve illegal conduit contributions and aggregate over $10,000 are two-year felonies. 2 U.S.C. §§ 437g(d)(1)(A), (D). Moreover, all criminal violations of FECA that occur after January 25, 2003, are subject to a new sentencing guideline, U.S. Sentencing Guideline § 2C1.8, that the United States Sentencing Commission promulgated in response to a specific BCRA directive.

4

FECA violations that either: (1) do not present knowing and willful violations, e.g., those resulting from negligence or mistake on the part of the offender as to what the law required or forbade, or (2) involve sums below the statutory minimums for criminal prosecution, are handled noncriminally by the Federal Election Commission (FEC) under the statute's civil enforcement provisions. 2 U.S.C. § 437g(a).

Finally, FECA violations that result in false information being provided to the FEC may present violations of 18 U.S.C. § 371 (conspiracy to disrupt and impede a federal agency), 18 U.S.C. § 1001 (false statements within the jurisdiction of a federal agency), or 18 U.S.C. § 1505 (obstruction of agency proceedings).

### 4. Civil Rights Crimes

Schemes to deprive minorities of the right to vote are federal crimes under the Voting Rights Act of 1965, as amended. 42 U.S.C. § 1973j. Discrimination based on a potential voter's race, or on ethnic factors or minority language, may also be redressed under such criminal statutes as 18 U.S.C. §§ 241 and 242. These prosecutions are handled by Criminal Section of the Civil Rights Division.

In addition to civil rights crimes, federal law provides noncriminal remedies for any conduct that diminishes an individual's voting rights based on racial, ethnic, or language minority factors. These civil remedies are incorporated within the Voting Rights Act of 1965, as amended, and other civil rights laws, and they are enforced by the Voting Section of the Civil Rights Division.

## C.    FEDERAL JURISDICTION

The federal government asserts jurisdiction over an election offense to ensure that basic rights of United States citizenship, and a fundamental process of representative democracy, remain uncorrupted. An important, Department-wide "Ballot Access and

Voting Integrity Initiative" was announced by Attorney General Ashcroft on October 1, 2002, to combat election crimes and voting-related civil rights offenses through vigorous enforcement. Under this Department Initiative, the prosecution of all federal election crimes represents an important law enforcement objective. These enhanced enforcement efforts have not only served to protect a cornerstone of American democracy against corruption and abuse, they also have helped federal law enforcement attain an investigative foothold against other criminal activities that election crimes are often committed to foster or protect.

Election crime cases tend to be long-term prosecutive projects focusing on individuals with different degrees of culpability. The ultimate goal is to move up the ladder of culpability to candidates, political operatives, public officials, and others who attempted to corrupt, or did corrupt, the public office involved.

Federal jurisdiction over election fraud is easily established in elections when a federal candidate is on the ballot. The mere listing of a federal candidate's name on a ballot is sufficient under most of the federal statutes used to prosecute voter fraud to satisfy federal jurisdiction. This generally occurs in what are called "mixed" elections, when federal and nonfederal candidates are running simultaneously. In such cases, the federal interest is based on the presence of a federal candidate, whose election may be tainted, or appear tainted, by the fraud, a potential effect that Congress has the constitutional authority to regulate under Article I, Section 2, clause 1; Article I, Section 4, clause 1; Article II, Section 1, clause 2; and the Seventeenth Amendment.

When there is no federal candidate on the ballot, federal jurisdiction is harder to attain. Before *McNally v. United States*, 483 U.S. 350 (1987), the mail fraud statute was often used to achieve federal jurisdiction over election fraud that occurred in nonfederal elections. The scheme charged was one to defraud the public of its intangible "right to a fair election." However, in *McNally*, the

6

Supreme Court held that intangible rights, including the intangible right to a fair election, were not covered by the mail fraud statute.

In response to the *McNally* decision, Congress passed 18 U.S.C. § 1346. Under Section 1346, the mail fraud statute once again applies to schemes to defraud persons of their intangible right to "honest services." However, because Section 1346 did not clearly restore mail fraud jurisdiction over local election fraud, this statute should only be used when the election fraud involved honest services fraud by a public official, such as a poll official who abuses his or her office to fraudulently manipulate the vote. In the absence of a scheme involving honest services fraud, prosecutors may also consider the mail fraud salary theory, discussed in Chapter Two, although this theory has not been well received by the courts. *See United States v. Turner*, 459 F.3d 775 (6th Cir. 2006) (holding both salary theory and honest services theories inapplicable to election fraud by local candidate).

In short, the absence of a federal candidate from the ballot can present federal law enforcement with special challenges in attaining federal jurisdiction over election crime. Those challenges can sometimes be met, provided the investigation focuses on identifying additional facts that are needed to invoke application of the federal criminal laws that potentially apply to both federal and nonfederal elections. These generally include election frauds that involve the necessary participation of public officers, notably election officials acting "under color of law," voting by noncitizens, and fraudulently registering voters.

Federal jurisdiction over campaign financing offenses under FECA also derives from Congress's authority to regulate the federal election process. While a number of the provisions added to FECA by BCRA address financial activities by state and local parties that are generic in nature in the sense that they simultaneously benefit both federal and nonfederal candidates, federal campaign financing law does not apply to violations of state campaign laws.

7

Most states have enacted laws regulating and requiring transparency of campaign financing of candidates seeking state or local office. While violations of these state statutes are not, by themselves, federal crimes, they may be evidence of other federal crimes, including Hobbs Act, Travel Act, or honest service offenses.

## D.   ADVANTAGES OF FEDERAL PROSECUTION

The Constitution confers upon the states primary authority over the election process. Accordingly, federal law does not directly address how elections should be conducted. State law historically has regulated such important activities as the registration of voters, the qualifications for absentee voting, the type of voting equipment used to tabulate votes, the selection of election officials, and the procedures and safeguards for counting ballots.

These factors might suggest that the prosecution of election crime should be left primarily to local law enforcement. However, local law enforcement often is not equipped to prosecute election offenses. Federal law enforcement might be the only enforcement option available.

Four characteristics of the federal criminal justice system support the federal prosecution of election crimes despite the primary role of the states in most facets of election administration:

- Federal grand juries, the secrecy requirements of which help protect the testimony of witnesses who tend to be vulnerable to manipulation and intimidation.

- Federal trial juries, which are drawn from a broader geographic area than are most state juries, and thus lessen the possibility of local bias.

8

- Resources to handle the labor-intensive investigations generally required for successful prosecution of election crime.

- Detachment from local political forces and interests.

## E.   FEDERAL ROLE:  PROSECUTION, NOT INTERVENTION

The principal responsibility for overseeing the election process rests with the states.  With the significant exception of violations of the Voting Rights Act involving denigration of the right to vote based on race, ethnicity, or language minority status, the federal government plays a role secondary to that of the states in election matters.[1]  It is the states that have primary authority to ensure that only qualified individuals register and vote, that the polling process is conducted fairly, and that the candidate who received the most valid votes is certified as the winner.[2]

The federal prosecutor's role in matters involving corruption of the process by which elections are conducted, on the other hand, focuses on prosecuting individuals who commit federal crimes in connection with an election.  Deterrence of future similar crimes is an important objective of such federal prosecutions.   However, this deterrence is achieved by public awareness of the Department's prosecutive interest in, and prosecution of, election fraud – not through interference with the process itself.

_____

[1] When election offenses are driven by animus based on race, ethnicity, or language-minority status, the broad protections of the 1965 Voting Rights Act and other civil rights statutes apply.   42 U.S.C. §§ 1971, 1973, 1973b(f), 1973aa-1a.  Such matters are supervised by the Civil Rights Division.

[2] Of course, U.S. presidential elections are an exception.

9

Because the federal prosecutor's function in the area of election fraud is not primarily preventative, any criminal investigation by the Department must be conducted in a way that minimizes the likelihood that the investigation itself may become a factor in the election. The mere fact that a criminal investigation is being conducted may impact upon the adjudication of election litigation and contests in state courts. Moreover, the seizure by federal authorities of documentation generated by the election process may deprive state election and judicial authorities of critical materials needed to resolve election disputes, conduct recounts, and certify the ultimate winners. Accordingly, it is the general policy of the Department not to conduct overt investigations, including interviews with individual voters, until after the outcome of the election allegedly affected by the fraud is certified.[3]

In addition, the federal prosecutor has no authority to send FBI Special Agents or Deputy U.S. Marshals to polling places. In fact, a federal statute makes it a felony for any federal official to send "armed men" to the vicinity of open polling places. 18 U.S.C. § 592. In light of these considerations, Department and FBI policy requires that any investigative action that involves an intrusion by federal investigators into the area immediately surrounding an open polling place be approved by the Criminal Division's Public Integrity Section.

## F.    EVALUATING AN ELECTION FRAUD ALLEGATION

In 2002, the Department established a Ballot Access and Voting Integrity Initiative to spearhead its increased efforts to address election crimes and voting rights violations. Under the ongoing Initiative, election crimes are a high law enforcement priority of the Department.

---

[3] This rule does not apply to covert investigative techniques.

10

However, not all irregularities in the election process are appropriate for criminal prosecution. It is, for example, not a federal crime to transport voters to the polls, or for election officials to make negligent mistakes in the administration of an election. Many of these noncriminal lapses are redressed through election contests, recounts, education programs, or disciplinary action against election officials whose mistakes are the result of negligence rather than corruption.

Determining whether an election fraud allegation warrants federal criminal investigation and possible prosecution requires that federal prosecutors and investigators answer two basic questions:

(1) Is criminal prosecution the appropriate remedy for the allegations and facts presented? Criminal prosecution is most appropriate when the facts demonstrate that the defendant's objective was to corrupt the process by which voters were registered, or by which ballots were obtained, cast, or counted.

(2) Is there potential federal jurisdiction over the conduct? Answering this question requires determining whether the conduct is cognizable under the federal criminal statutes that apply to election crimes. These generally allow for the prosecution of corrupt acts that occur in elections when the name of a federal candidate appears on the ballot, that are committed "under color of law," that involve voting by noncitizens, that focus on registering to vote, and when the election fraud is part of a larger public corruption problem reachable using general anti-corruption statutes, such as 18 U.S.C. §§ 666, 1341, 1346, 1951, and 1952.

## G.    INVESTIGATIVE CONSIDERATIONS IN ELECTION FRAUD CASES

When investigating election fraud, three considerations that are absent from most criminal investigations must be kept in mind: (1) respect for the primary role of the states in administering the

11

voting process, (2) an awareness of the role of the election in the governmental process, and (3) sensitivity to the exercise of First Amendment rights in the election context.  As a result, there are limitations on various investigative steps in an election fraud case.

In most cases, election-related documents should not be taken from the custody of local election administrators until the election to which they pertain has been certified, and the time for contesting the election results has expired.[4]   This avoids interfering with the governmental processes affected by the election.[5]

Another limitation affects voter interviews.  Election fraud cases often depend on the testimony of individual voters whose votes were co-opted in one way or another.  But in most cases voters should not be interviewed, or other voter-related investigation done, until after the election is over.  Such overt investigative steps may chill legitimate voting activities.  They are also likely to be perceived by voters and candidates as an intrusion into the election.  Indeed, the fact of a federal criminal investigation may itself become an issue in the election.[6]

---

[4] This non-interference policy assumes there is no evidence that local election administrators seek to retain the election records for a corrupt purpose or to further an ongoing election fraud scheme.

[5] In cases in which physical custody may interfere unnecessarily with local election procedures, law enforcement may still take reasonable steps to ensure that such records retain their integrity and are effectively made available to federal law enforcement.  Such steps may include the issuance of a grand jury subpoena, and formal and informal agreements concerning the custody, control, and integrity of such records.

[6] Accordingly, the Public Integrity Section must be consulted prior to any voter interviews in the preelection or balloting period.  U.S. DEP'T OF JUSTICE, U.S. ATTORNEYS' MANUAL (USAM) § 9-85.210.

12

Some election frauds implicate a voter who participates in a voting act attributed to him or her; such cases include vote-buying schemes, absentee ballot fraud, and the like. Successful prosecution of those who organize such schemes often requires the cooperation of either the voter or the person who attempted to corrupt or take advantage of the voter. Accordingly, federal prosecutors should apply standard Department policies regarding charging decisions when contemplating charges against voters who cooperate and testify truthfully in cases involving organizational voter fraud.

## H.   EVALUATING A CAMPAIGN FINANCING ALLEGATION

In general, violations of the Federal Election Campaign Act become crimes when they satisfy a monetary threshold and are committed with specific criminal intent. Noncriminal FECA violations are subject to the exclusive jurisdiction of the Federal Election Commission (FEC). To determine whether a FECA violation warrants criminal investigation, the following questions should be answered:

(1) Does the conduct involve a situation in which the application of the law to the facts is clear? That is, does it violate one of the principal prohibitions of FECA, namely, the prohibitions against:

- Excessive contributions (2 U.S.C. § 441a);

- Corporate and union contributions and expenditures (2 U.S.C. § 441b);

- Contributions from government contractors (2 U.S.C. § 441c);

- Contributions from foreign nationals (2 U.S.C. § 441e);

13

- Disguised contributions through conduits
  (2 U.S.C. § 441f);

- Cash contributions (2 U.S.C. § 441g);

- Contributions raised through fraud
  (2 U.S.C. § 441h(b));

- The solicitation or receipt of "soft money" (funds not
  raised in compliance with FECA) by national political
  parties (2 U.S.C. § 441i); or

- The conversion of campaign funds (2 U.S.C. § 439a).

And, if so:

(2)  Was the total monetary amount involved in the violation
at least $2,000?  Most FECA violations become crimes when they
aggregate $2,000 or more in a calendar year.  Offenses occurring on
or after November 6, 2002, when the Bipartisan Campaign Reform
Act (BCRA) took effect, and which aggregate at least $25,000 (or
$10,000 in the case of conduit violations) are felonies; offenses under
these amounts are misdemeanors.  2 U.S.C. § 437g(d)(1).  The
Department interprets the significant enhancements to FECA's
criminal penalties enacted in 2002 through  BCRA as reflecting a
clear congressional intent that all knowing and willful violations
involving sums that aggregate above the statutory minimums for
FECA crimes be considered for prosecution.

(3)  Was the violation committed under circumstances
suggesting that the conduct was "knowing and willful?"  FECA
violations become potential crimes when they are committed
knowingly and willfully, that is, by an offender who knew what the
law forbade and violated it notwithstanding that knowledge.  While
this is at times a difficult element to satisfy, examples of evidence
supporting the element include:  (a) an attempt to disguise or conceal

14

financial activity regulated by FECA; (b) status or experience as a campaign official, professional fundraiser, or lawyer; and (c) efforts by campaigns to notify donors of applicable campaign finance law (e.g., donor card warnings).

## I.    INVESTIGATIVE CONSIDERATIONS IN CAMPAIGN FINANCING CASES

Campaign financing cases have recently come to occupy an increasingly significant portion of the investigative and prosecutive resources that the Justice Department devotes to election crime. Because criminal FECA violations require proof that the defendant acted in conscious disregard of a known statutory duty imposed by the Act, matters investigated as possible criminal FECA violations generally must fall within one or more of FECA's heartland provisions.

If a campaign financing offense violates one of FECA's heartland prohibitions and was committed in a manner calculated to conceal it from the public, the Justice Department also may pursue the matter as a conspiracy to defraud the United States under 18 U.S.C. § 371, or as a false statement under 18 U.S.C. § 1001. The advantages of charging FECA offenses that occurred prior to November 6, 2002 (when BCRA took effect) under these Title 18 provisions include, in addition to the applicable penalty, availability of the general five-year statute of limitations under 18 U.S.C. § 3282, instead of the special three-year limitations period in 2 U.S.C. § 455 that applied to FECA crimes committed prior to BCRA's effective date.

When investigating a criminal violation of FECA, care must be taken not to compromise the FEC's civil and administrative jurisdiction under 2 U.S.C. § 437g(a). All plea agreements involving activities that concern FECA violations should therefore contain an express disclaimer regarding the FEC's civil enforcement authority.

Finally, the public disclosure features of FECA provide investigators a source of information concerning suspicious contributions. The FEC maintains public data in a manner that permits it to be sorted by contributor, date of contribution, amount of contribution, occupation and employer of contributor, and identity of donee. Data is also similarly maintained with respect to expenditures. Therefore, the FEC's public database of financial transactions can be particularly useful in the preliminary stage of campaign financing investigations to evaluate or confirm the likelihood of a FECA violation. This data can be accessed and sorted at www.fec.gov. An alternative and particularly user-friendly search capability has also been made available by an organization called the Center for Responsive Politics at www.opensecrets.org.

## J.   CONSULTATION REQUIREMENTS AND RECOMMENDATIONS

Justice Department supervision over the enforcement of all criminal statutes and prosecutive theories involving corruption of the election process, criminal patronage violations, and campaign financing crimes is delegated to the Criminal Division's Public Integrity Section. This Headquarters' consultation policy is set forth in the U.S. DEP'T OF JUSTICE, U.S. ATTORNEYS' MANUAL (USAM), Section 9-85.210. In 1980, the Election Crimes Branch was created within the Public Integrity Section to manage this supervisory responsibility. The Branch is headed by a Director and staffed on a case-by-case basis with Section prosecutors experienced in handling the investigation and prosecution of election crimes.

The Department's consultation requirements for election crime matters are designed to ensure that national standards are maintained for the federal prosecution of election crimes, that investigative resources focus on matters that have prosecutive potential, and that appropriate deference is given to the FEC's civil enforcement responsibilities over campaign financing violations. The requirements are also intended to help ensure that investigations are

16

pursued in a way that respects both individual voting rights and the states' primary responsibility for administering the electoral process. These requirements are as follows:

### 1. Consultation Requirements for Election Frauds and Patronage Crimes

United States Attorneys' Offices and FBI field offices may conduct a preliminary investigation of an alleged election fraud or patronage crime without consulting the Public Integrity Section. A preliminary investigation is limited to those investigative steps necessary to flesh out the complaint in order to determine whether a federal crime might have occurred, and, if so, whether it might warrant federal prosecution. However, a preliminary investigation does not include interviewing voters during the preelection or balloting periods concerning the circumstances under which they voted, as such interviews have the potential to interfere with the election process or inadvertently chill the exercise of an individual's voting rights.

Consultation with the Public Integrity Section is required to:

- expand an election fraud or patronage investigation beyond a preliminary stage;

- conduct interviews with individual voters during the preelection period, on election day, or immediately after the election, concerning the circumstances under which they voted;

- issue a subpoena or search warrant in connection with an election fraud or patronage matter;

- present evidence involving an election fraud or patronage matter to a grand jury;

17

- file a criminal charge involving an election fraud or patronage offense; or

- present an indictment to a grand jury that charges an election fraud or patronage offense.

It is also recommended, although not required, that the Public Integrity Section be consulted with respect to sentencing issues during any plea negotiations in order to ensure consistency with similar cases.

## 2. Consultation Requirements for Campaign Financing Crimes

Additional considerations come into play in cases involving possible campaign financing violations under FECA, notably, the concurrent jurisdiction of the FEC to conduct parallel civil proceedings in this area and the resulting need to coordinate criminal law enforcement with the Commission. Therefore, consultation with the Public Integrity Section is required to:

- conduct *any* inquiry or preliminary investigation in a matter involving a possible campaign financing offense;

- issue a subpoena or search warrant in connection with a campaign financing matter;

- present evidence involving a campaign financing matter to a grand jury;

- file a criminal charge involving a campaign financing crime; or

- present an indictment to a grand jury that charges a campaign financing crime.

18

As is the case with election frauds, it also recommended that the Section be consulted with respect to sentencing matters during any plea negotiations in order to ensure consistency with similar cases.

The Public Integrity Section and its Election Crimes Branch are available to assist United States Attorneys' Offices and FBI field offices in handling election crime matters. This assistance includes evaluating election crime allegations, structuring investigations, and drafting indictments and other pleadings. The Election Crimes Branch also serves as the point of contact between the Department of Justice and the FEC, which share enforcement jurisdiction over federal campaign financing violations. Finally, Section attorneys are available to provide operational assistance in election crime investigations and trials.

19

20

CHAPTER TWO

# CORRUPTION OF THE ELECTION PROCESS

## A.    HISTORICAL BACKGROUND

Federal concern over the integrity of the franchise has historically had two distinct areas of focus.  The first, to ensure elections that are free from corruption for the general public, is the subject of this chapter.  The second, to ensure there is no discrimination against minorities at the ballot box, involves entirely different constitutional and federal interests, and is supervised by the Justice Department's Civil Rights Division.

Federal interest in the integrity of the franchise was first manifested immediately after the Civil War.  Between 1868 and 1870, Congress passed the Enforcement Acts, which served as the basis for federal activism in prosecuting corruption of the franchise until most of them were repealed in the 1890s.  *See In re Coy*, 127 U.S. 731 (1888); *Ex parte Yarborough*, 110 U.S. 651 (1884); *Ex parte Siebold*, 100 U.S. 371 (1880).

Many of the Enforcement Acts had broad jurisdictional predicates that allowed them to be applied to a wide variety of corrupt election practices as long as a federal candidate was on the ballot.  In *Coy*, the Supreme Court held that Congress had authority under the Constitution's Necessary and Proper Clause to regulate any activity during a mixed federal/state election that exposed the federal election to potential harm, whether that harm materialized or not.  *Coy* is still applicable law.  *United States v. Carmichael*, 685 F.2d 903, 908 (4th Cir. 1982); *United States v. Mason*, 673 F.2d 737, 739 (4th Cir. 1982); *United States v. Malmay*, 671 F.2d 869, 874-75 (5th Cir. 1982); *United States v. Bowman*, 636 F.2d 1003, 1010 (5th Cir. 1981).

21

After Reconstruction, federal activism in election matters subsided. The repeal of most of the Enforcement Acts in 1894 eliminated the statutory tools that had encouraged federal activism in election fraud matters. Two surviving provisions of these Acts, now embodied in 18 U.S.C. §§ 241 and 242, covered only intentional deprivations of rights guaranteed directly by the Constitution or federal law. The courts during this period held that the Constitution directly conferred a right to vote only for federal officers, and that conduct aimed at corrupting nonfederal contests was not prosecutable in federal courts. *See United States v. Gradwell*, 243 U.S. 476 (1917); *Guinn v. United States*, 238 U.S. 347 (1915). Federal attention to election fraud was further limited by case law holding that primary elections were not part of the official election process, *Newberry* v. *United States*, 256 U.S. 232 (1918), and by cases like *United States v. Bathgate*, 246 U.S. 220 (1918), which read the entire subject of vote buying out of federal criminal law, even when it was directed at federal contests.

In 1941, the Supreme Court reversed direction, overturning *Newberry*. The Court recognized that primary elections are an integral part of the process by which candidates are elected to office. *United States v. Classic*, 313 U.S. 299 (1941). *Classic* changed the judicial attitude toward federal intervention in election matters and ushered in a new period of federal activism. Federal courts now regard the right to vote in a fairly conducted election as a constitutionally protected feature of United States citizenship. *Reynolds v. Sims*, 377 U.S. 533 (1964).

In 1973, the use of Section 241 to address election fraud began to expand. *See, e.g., United States v. Anderson*, 481 F.2d 685 (4th Cir. 1973), *aff'd on other grounds*, 417 U.S. 211 (1974). Since then, this statute has been successfully applied to prosecute certain types of local election fraud. *United States v. Wadena*, 152 F.3d 831 (8th Cir. 1998); *United States v. Howard*, 774 F.2d 838 (7th Cir.

1985); *United States v. Olinger*, 759 F.2d 1293 (7th Cir. 1985); *United States v. Stollings*, 501 F.2d 954 (4th Cir. 1974).[7]

The mail fraud statute, 18 U.S.C. § 1341, was used successfully for decades to reach local election fraud, under the theory that such schemes defrauded citizens of their right to fair and honest elections. *United States v. Clapps*, 732 F.2d 1148 (3d Cir. 1984); *United States v. States*, 488 F.2d 761 (8th Cir. 1973). However, this mail fraud theory has been barred since 1987, when the Supreme Court held that Section 1341 did not apply to schemes to defraud someone of intangible rights (such as the right to honest elections). *McNally v. United States*, 483 U.S. 350 (1987). Congress responded to *McNally* the following year by enacting a provision that expressly defined Section 1341 to include schemes to defraud someone of "honest services." 18 U.S.C. § 1346. However, Section 1346 may not have restored use of Section 1341 for most election crimes, unless they involved the element of "honest services."

Finally, over the past forty years Congress has enacted new criminal laws with broad jurisdictional bases to combat false voter registrations, vote buying, multiple voting, and fraudulent voting in elections in which a federal candidate is on the ballot. 42 U.S.C.

---

[7] As indicated in the cited cases, Section 241 has been used to prosecute election fraud that affects the vote for federal officials, as well as vote fraud directed at nonfederal candidates that involves the corruption of public officials – most often election officers – acting under color of law, i.e., ballot-box stuffing schemes. This latter type of scheme will be referred to in this book as a "public scheme." A scheme that does not involve the necessary participation of corrupt officials acting under color of law but that affects the tabulation of votes for federal candidates will be referred to as a "private scheme."

§§ 1973i(c), 1973i(e), 1973gg-10. These statutes rest on Congress's power to regulate federal elections (U.S. CONST. art. I, § 4) and on its power under the Necessary and Proper Clause (U.S. CONST. art. I, § 8, cl. 18) to enact laws to protect the federal election process from the potential of corruption. The federal jurisdictional predicate underlying these statutes is satisfied as long as either the name of a federal candidate is on the ballot or the fraud involves corruption of the voter registration process in a state where one registers to vote simultaneously for federal as well as other offices. *United States v. Slone*, 411 F.3d 643 (6th Cir. 2005); *United States v. McCranie*, 169 F.3d 723 (11th Cir. 1999); *United States v. Howard*, 774 F.2d 838 (7th Cir. 1985); *United States v. Olinger*, 759 F.2d 1293 (7th Cir. 1985); *United States v. Garcia*, 719 F.2d 99 (5th Cir. 1983); *United States v.* Mason, 673 F.2d 737 (4th Cir. 1982); *United States v. Malmay*, 671 F.2d 869 (5th Cir. 1982); *United States v. Bowman*, 636 F2d 1003 (5th Cir. 1981); United *States v. Barker*, 514 F.2d 1077 (7th Cir. 1975); *United States v. Cianciulli*, 482 F. Supp. 585 (E.D. Pa. 1979).

## B.   WHAT IS ELECTION FRAUD?

### 1.  In General

Election fraud involves a substantive irregularity relating to the voting act – such as bribery, intimidation, or forgery – which has the potential to taint the election itself. During the past century and a half, Congress and the federal courts have articulated the following constitutional principles concerning the right to vote in the United States. Any activity intended to interfere corruptly with any of the principles indicated below may be actionable as a federal crime:

- All qualified citizens are eligible to vote.

- All qualified voters have the right to have their votes counted fairly and honestly.

24

- Invalid ballots dilute the worth of valid ballots, and therefore will not be counted.

- Every qualified voter has the right to make a personal and independent election decision.

- Qualified voters may opt not to participate in an election.

- Voting shall not be influenced by bribery or intimidation.

Simply put, then, election fraud is conduct intended to corrupt:

- The process by which ballots are obtained, marked, or tabulated,

- The process by which election results are canvassed and certified, or

- The process by which voters are registered.

On the other hand, schemes that involve corruption of other political processes (i.e., political campaigning, circulation of nominating petitions, etc.) do not normally serve as the basis for a federal election crime.

25

## 2. Conduct that Constitutes Federal Election Fraud[8]

The following activities provide a basis for federal prosecution under the statutes referenced in each category:

- Paying voters for registering to vote, or for voting, in elections in which a federal candidate is on the ballot (42 U.S.C. § 1973i(c), 18 U.S.C. § 597), or through the use of the mails in those states in which vote buying is a "bribery" offense (18 U.S.C. § 1952), as well as in federal elections[9] in those states in which purchased registrations or votes are voidable under applicable state law (42 U.S.C. § 1973gg-10(2)).

- Conspiring to prevent voters from participating in elections in which a federal candidate is on the ballot, or when done "under color of law" in *any* election, federal or nonfederal (18 U.S.C. §§ 241, 242).

- Voting in federal elections for individuals who do not personally participate in, and assent to, the voting act attributed to them, or impersonating voters or casting ballots in the names of voters who do not vote in federal elections (42 U.S.C. §§ 1973i(c), 1973i(e), 1973gg-10(2)).

---

[8] As used throughout this book, the terms "federal election fraud" and "election fraud" mean fraud relating to an election in which a federal criminal statute applies. As will be discussed below, these terms are not limited to frauds aimed at corrupting federal elections.

[9] For purposes of this book, the term "federal election" means an election in which the name of a federal candidate is on the ballot, regardless of whether there is proof that the fraud caused a vote to be cast for the federal candidate. A "nonfederal election" is one in which no federal candidate is on the ballot.

- Intimidating voters through physical duress in any type of election (18 U.S.C. § 245(b)(1)(A)), or through physical or economic threats in connection with their registering to vote or voting in federal elections (42 U.S.C. § 1973gg-10(1)), or their vote for a federal candidate (18 U.S.C. § 594). If the victim is a federal employee, intimidation in connection with *any* election, federal or nonfederal, is prohibited (18 U.S.C. § 610).

- Malfeasance by election officials acting "under color of law" by performing such acts as diluting valid ballots with invalid ones (ballot-box stuffing), rendering false tabulations of votes, or preventing valid voter registrations or votes from being given effect in *any* election, federal or nonfederal (18 U.S.C. §§ 241, 242), as well as in elections in which federal candidates are on the ballot (42 U.S.C. §§ 1973i(c), 1973i(e), 1973gg-10(2)).

- Submitting fictitious names to election officers for inclusion on voter registration rolls, thereby qualifying the ostensible voters to vote in federal elections (42 U.S.C. §§ 1973i(c), 1973gg-10(2)).[10]

- Knowingly procuring eligibility to vote for federal office by persons who are not entitled to vote under applicable state law, notably persons who have

---

[10] With respect to fraudulent voter registrations, election registration is "unitary" in all 50 states in the sense that a person registers only once to become eligible to cast ballots for both federal and nonfederal candidates. Therefore false information given to establish eligibility to register to vote is actionable federally regardless of the type of election that motivated the subjects to act. *United States v. Cianciulli*, 482 F. Supp. 585 (E.D. Pa. 1979).

27

committed serious crimes (approximately 40 states) (42 U.S.C. §§ 1973i(c), 1973gg-10(2)), and persons who are not United States citizens (currently all states) (42 U.S.C. §§ 1973i(c), 1973gg-10(2); 18 U.S.C. §§ 1015(f), 611).

- Knowingly making a false claim of United States citizenship to register to vote or to vote in any election (18 U.S.C. § 1015(f)), or falsely and willfully claiming U.S. citizenship for, *inter alia,* registering or voting in any election (18 U.S.C. § 911).

- Providing false information concerning a person's name, address, or period of residence in a voting district to establish that person's eligibility to register or to vote in a federal election (42 U.S.C. §§ 1973i(c), 1973gg-10(2)).

- Causing the production of voter registrations that qualify alleged voters to vote for federal candidates, or the production of ballots in federal elections, that the actor knows are materially defective under applicable state law (42 U.S.C. § 1973gg-10(2)).

- Using the mails, or interstate wire facilities, to obtain the salary and emoluments of an elected official through any of the activities mentioned above (18 U.S.C. §§ 1341, 1343). At the time this book was written, this so-called "salary theory" of mail and wire fraud had not yet received wide judicial support. However, the Criminal Division's position is that it is a viable theory for prosecutive jurisdiction to be asserted over an election fraud scheme based on the use of a federal instrumentality to carry it out,

28

regardless of the type of election involved – federal or nonfederal.[11]

- Ordering, keeping, or having under one's authority or control any troops or armed men at any polling place in *any* election, federal or nonfederal.  The actor must be an active civilian or military officer or employee of the United States Government (18 U.S.C. § 592).

### 3.   Conduct that Does Not Constitute Federal Election Fraud

Various types of conduct that may adversely affect the election of a federal candidate may not constitute a federal election crime, despite what in many instances might be their reprehensible character.  For example, a federal election crime does not normally involve irregularities relating to: (1) distributing inaccurate campaign literature, (2) campaigning too close to the polls, (3) engaging in

---

[11] 18 U.S.C. § 1346, enacted in response to the Supreme Court's decision in *McNally v. United States*, 483 U.S. 350 (1987), may not have restored use of the mail and wire fraud statutes to all election fraud schemes because its "intangible rights" concept is confined to deprivation of "honest services," a motive not usually found in election fraud schemes.  Thus, absent a public scheme or other deprivation of honest services, the utility of these statutes to address election fraud generally is confined to schemes in which the proof shows that the defendant intended, as an objective of the scheme, to obtain for the "favored" candidate the salary and emoluments of an elected position. *See generally, United States v. Webb*, 689 F. Supp. 703 (W.D. Ky. 1988); *United States v. Ingber*, Cr. No. 86-1402 (2d Cir. Feb. 4, 1987) (unpublished), *quoted in Ingber v. Enzor*, 664 F. Supp. 814, 815-16 (S.D.N.Y. 1987) (*habeas* opinion), *aff'd on other grounds* 841 F.2d 450 (2d Cir. 1988).  But see *United States v. Turner*, 459 F.3d 775 (6th Cir. 2006), rejecting the "salary theory" of mail fraud as applied to election fraud and financing situations.

29

activities to influence an opponent's withdrawal from an election, or (4) failing to comply with state-mandated voting procedures through the negligence of election officials. Also, "facilitation benefits," e.g., things of value given to voters to make it easier for them to cast a ballot that are not intended to stimulate or reward the voting act itself, such as a ride to the polls or a stamp to mail an absentee ballot, do not ordinarily involve federal crimes.

### 4. Conditions Conducive to Election Fraud

Most election fraud is aimed at corrupting elections for local offices, which control or influence patronage positions and contracting for materials and services. Election fraud schemes are thus often linked to such other crimes as protection of illegal activities, corruption of local governmental processes, and patronage abuses.

Election fraud does not normally occur in jurisdictions where one political faction enjoys widespread support among the electorate, because in such a situation it is usually unnecessary or impractical to resort to election fraud in order to control local public offices.[12] Instead, election fraud occurs most frequently when there are fairly equal political factions, and when the stakes involved in who controls public offices are weighty – as is often the case when patronage jobs are a major source of employment, or when illicit activities are being protected from law enforcement scrutiny. In sum, election fraud is most likely to occur in electoral jurisdictions where there is close factional competition for an elected position that matters.

---

[12] Election fraud might occur at the local level in districts controlled by one political faction in order to affect a contested election in a larger jurisdiction. For example, a corrupt mayor assured of his own reelection might nevertheless engage in election fraud for the purpose of affecting a state-wide election that is perceived to be close.

30

### 5. Voter Participation Versus Nonvoter Participation Cases

As a practical matter, election frauds fall into two basic categories: those in which individual voters do not participate in the fraud, and those in which they do. The investigative approach and prosecutive potential are different for each type of case.

### (a) Election frauds not involving the participation of voters

The first category involves cases when voters do not participate, in any way, in the voting act attributed to them. These cases include ballot-box stuffing cases, ghost voting cases, and "nursing home" frauds.[13] All such matters are potential federal crimes. Proof of these crimes depends largely on evidence generated by the voting process, or on handwriting exemplars taken from persons who had access to voting equipment, and thus the opportunity to misuse it. Some of the more common ways these crimes are committed include:

- Placing fictitious names on the voter rolls. This "deadwood" allows for fraudulent ballots, which can be used to stuff the ballot box.

- Casting bogus ballots in the names of persons who did not vote.

- Obtaining and marking absentee ballots without the active input of the voters involved. Absentee ballots are particularly susceptible to fraudulent

_____

[13] An example of a successfully prosecuted nursing home fraud is *United States v. Odom*, 736 F.2d 104 (4th Cir. 1984), which involved a scheme by local law enforcement officials and others to vote the absentee ballots of mentally incompetent residents.

31

abuse because, by definition, they are marked and cast outside the presence of election officials and the structured environment of a polling place.

- Falsifying vote tallies.

### (b) Election frauds involving the participation of voters

The second category of election frauds includes cases in which the voters do participate, at least to some extent, in the voting acts attributed to them. Common examples include:

- Vote-buying schemes;

- Absentee ballot frauds;

- Voter intimidation schemes;

- Migratory-voting (or floating-voter) schemes;

- Voter "assistance" frauds, in which the wishes of the voters are ignored or not sought.

Successful prosecution of these cases usually requires the cooperation and testimony of the voters whose ballots were corrupted. This requirement presents several difficulties. An initial problem is that the voters themselves might be technically guilty of participating in the scheme. However, because the voters can often be considered victims, in appropriate cases federal prosecutors should consider declining to prosecute them in exchange for truthful cooperation against organizers of such schemes.

The second difficulty encountered in cases when voters participate is that the voter's presence alone may suggest that he or she "consented" to the defendant's conduct (marking the ballot,

32

taking the ballot, choosing the candidates, etc.). *Compare United States v. Salisbury*, 983 F.2d 1369 (6th Cir. 1993) (leaving unanswered the question whether a voter who signs a ballot envelope at the defendant's instruction but is not allowed to choose the candidates has consented to having the defendant mark the ballot), *with United States v. Cole*, 41 F.3d 303 (7th Cir. 1994) (finding that voters who merely signed ballots subsequently marked by the defendant were not expressing their own electoral preferences).

While the presence of the ostensible voter when another marks his or her ballot does not negate whatever crime might be occurring, it thus may increase the difficulty of proving the crime. This difficulty is compounded because those who commit this type of crime generally target vulnerable members of society, such as persons who are uneducated, socially disadvantaged, or impoverished and dependent upon government services – precisely the types of people who are likely targets for manipulation or intimidation. Therefore, in cases when the voter is present when another person marks his or her ballot, the evidence should show that the defendant either procured the voter's ballot through means that were themselves corrupt (such as bribery or threats), or that the defendant marked the voter's ballot without the voter's consent or input. *United States v. Boards*, 10 F.3d 587, 589 (8th Cir. 1993); *Cole*, 41 F.3d at 308.

## C.    JURISDICTIONAL SUMMARY

Under the Constitution, the states retain broad jurisdiction over the elective process. When the federal government enters the field of elections, it does so to address specific federal interests, such as:  (1) the protection of the voting rights of racial, ethnic, or language-minorities, a specific constitutional right; (2) the registration of voters to vote in federal elections; (3) the standardization and procurement of voting equipment purchased with federal funds; (4) the protection of the federal election process against corruption; (5) the protection of the voting process from corruption accomplished

33

under color of law; and (6) the oversight of noncitizen and other voting by persons ineligible to vote under applicable state law.

Most federal election crime statutes do not apply to all elections. Several apply only to elections in which federal candidates are on the ballot, and a few require proof either that the fraud was intended to influence a federal contest or that a federal contest was affected by the fraud.

For federal jurisdictional purposes, there are two fundamental types of elections in which federal election crimes may occur: federal elections, in which the ballot includes the name of one or more candidates running for federal office; and nonfederal elections, in which only the names of local or state candidates are on the ballot. Elections in which the ballot includes the names of both federal and nonfederal candidates, often referred to as "mixed" elections, are "federal elections" for the purpose of the federal election crime statutes.

## 1. Statutes Applicable to Nonfederal Elections

Several federal criminal statutes apply to purely nonfederal elections.

- 42 U.S.C. § 1973i(c) and § 1973gg-10(2)(A), and 18 U.S.C. § 1015(f) – any fraud that is aimed at the process by which voters are registered, notably schemes to furnish materially false information to election registrars;

- 18 U.S.C. §§ 241 and 242 – any scheme that involves the necessary participation of public officials, usually election officers or notaries, acting "under color of law," which is actionable as a derogation of the "one

34

person, one vote" principle of the Fourteenth Amendment, i.e., "public schemes;"[14]

- 18 U.S.C. § 245(b)(1)(A) – physical threats or reprisals against candidates, voters, poll watchers, or election officials;

- 18 U.S.C. § 592 – "armed men" stationed at the polls;

- 18 U.S.C. § 609 – coercion of voting among the military;

- 18 U.S.C. § 610 – coercion of federal employees for political activity;

- 18 U.S.C. § 911 – fraudulent assertion of United States citizenship;

- 18 U.S.C. § 1341 – schemes involving the mails to corrupt elections that are predicated on the post-*McNally* "salary" or "pecuniary loss" theories; and

- 18 U.S.C. § 1952 – schemes to use the mails in furtherance of vote-buying activities in states that treat vote buying as bribery.

The statutes listed above also apply to elections in which a federal candidate is on the ballot.

---

[14] Federal prosecutors should also evaluate whether a public scheme involves a deprivation of honest services. 18 U.S.C. §§ 1341, 1343, 1346.

35

## 2. Statutes Applicable to Federal Elections

The following additional statutes apply to federal (including "mixed") elections, but not to purely nonfederal elections:[15]

- 18 U.S.C. § 594 – intimidation of voters;

- 18 U.S.C. § 597 – payments to vote, or to refrain from voting, for a federal candidate;

- 18 U.S.C. § 608(b) – vote buying and false registration under the Uniformed and Overseas Citizens Absentee Voting Act;

- 18 U.S.C. § 611 – voting by aliens;

- 42 U.S.C. § 1973i(c) – payments for registering to vote or voting, fraudulent registrations, and conspiracies to encourage illegal voting;

- 42 U.S.C. § 1973i(e) – multiple voting;

- 42 U.S.C. § 1973gg-10(1) – voter intimidation; and

- 42 U.S.C. § 1973gg-10(2) – fraudulent voting or registering.

---

[15] The name of a federal candidate on the ballot is sufficient to obtain federal jurisdiction.

36

## D.      STATUTES[16]

### 1. Conspiracy Against Rights.  18 U.S.C. § 241

Section 241 makes it unlawful for two or more persons to "conspire to injure, oppress, threaten, or intimidate any person in any State, Territory, Commonwealth, Possession, or District in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States." Violations are punishable by imprisonment for up to ten years or, if death results, by imprisonment for any term of years or for life, or by a sentence of death.

The Supreme Court long ago recognized that the right to vote for federal offices is among the rights secured by Article I, Sections 2 and 4, of the Constitution, and hence is protected by Section 241. *United States v. Classic*, 313 U.S. 299 (1941); *Ex parte Yarborough*, 110 U.S. 651 (1884). Although the statute was enacted just after the Civil War to address efforts to deprive the newly emancipated slaves of the basic rights of citizenship, such as the right to vote, it has been interpreted to include any effort to derogate any right that flows from the Constitution or from federal law.

Section 241 has been an important statutory tool in election crime prosecutions.  Originally held to apply only to schemes to corrupt elections for federal office, it has recently been successfully applied to nonfederal elections as well, provided that state action was a necessary feature of the fraud. This state action requirement can be met not only by the participation of poll officials and notaries public, but by activities of persons who clothe themselves with the appearance of state authority, e.g., with uniforms, credentials, and badges. *Williams v. United States*, 341 U.S. 97 (1951).

---

[16] The text of the statutes discussed below is printed in Appendix A.  Each statute carries, in addition to the prison term noted, fines applicable under 18 U.S.C. § 3571.

37

Section 241 embraces conspiracies to stuff a ballot box with forged ballots, *United States v. Saylor*, 322 U.S. 385 (1944); *United States v. Mosley*, 238 U.S. 383 (1915); to prevent the official count of ballots in primary elections, *Classic*, 313 U.S. 299; to destroy voter registration applications, *United States v. Haynes*, 977 F.2d 583 (6th Cir. 1992) (table) (available at 1992 WL 296782); to destroy ballots, *United States v. Townsley*, 843 F.2d 1070 (8th Cir. 1988); *United States v. Morado*, 454 F.2d 167 (5th Cir. 1972); to illegally register voters and cast absentee ballots in their names, *United States v. Weston*, 417 F.2d 181 (4th Cir. 1969); to injure, threaten, or intimidate a voter in the exercise of his right to vote, *Wilkins v. United States*, 376 F.2d 552 (5th Cir. 1967); *Fields v. United States*, 228 F.2d 544 (4th Cir. 1955); to impersonate qualified voters, *Crolich v. United States*, 196 F.2d 879 (5th Cir. 1952); to fail to count votes and to alter votes counted, *Ryan v. United States*, 99 F.2d 864 (8th Cir. 1938); *Walker v. United States*, 93 F.2d 383 (8th Cir. 1937); and to alter legal ballots, *United States v. Powell*, 81 F. Supp. 288 (E.D. Mo. 1948).

Recently, Section 241 was charged, along with telephone harassment charges under 47 U.S.C. § 223, in a scheme to jam the telephone lines of two get-out-the-vote services that were perpetrated to prevent voters from obtaining rides to the polls in the 2002 general elections. While the defendant was convicted only on the telephone harassment charges, the district court held that Section 241 applied to the facts (*United States v. Tobin*, No. 04-216-01 (SM), 2005 WL 3199672 (D.N.H. Nov. 30, 2005)). The Criminal Division continues to believe that Section 241 should be considered when addressing schemes to thwart voting in federal elections.

Section 241 does not require that the conspiracy be successful, *United States v. Bradberry*, 517 F.2d 498 (7th Cir. 1975), nor need there be proof of an overt act. *Williams v. United States*, 179 F.2d 644, 649 (5th Cir. 1950), *aff'd on other grounds*, 341 U.S. 70 (1951); *Morado*, 454 F.2d 167. Section 241 reaches conduct affecting the integrity of the federal election process as a whole, and does not

38

require fraudulent action with respect to any particular voter. *United States v. Nathan*, 238 F.2d 401 (7th Cir. 1956).

On the other hand, Section 241 does not reach schemes to corrupt the balloting process through voter bribery, *United States v. Bathgate*, 246 U.S. 220 (1918), even schemes that involve poll officers to ensure that the bribed voters mark their ballots as they were paid to do, *United States v. McLean*, 808 F.2d 1044 (4th Cir. 1987) (noting, however, that Section 241 may apply when vote buying occurs in conjunction with other corrupt practices, such as ballot-box stuffing).

Section 241 prohibits only conspiracies to interfere with rights flowing directly from the Constitution or federal statutes. This element has led to considerable judicial speculation over the extent to which the Constitution protects the right to vote for candidates running for nonfederal offices. *Oregon v. Mitchell*, 400 U.S. 112 (1970); *Reynolds v. Sims*, 377 U.S. 533 (1964); *Blitz v. United States*, 153 U.S. 308 (1894); *In re Coy*, 127 U.S. 731 (1888); *Ex parte Siebold*, 100 U.S. 371 (1880). *See also Duncan v. Poythress*, 657 F.2d 691 (5th Cir. 1981). While *dicta* in *Reynolds* casts the parameters of the federally protected right to vote in extremely broad terms, in a ballot fraud case ten years later, the Supreme Court specifically refused to decide whether the federally secured franchise extended to nonfederal contests. *Anderson v. United States*, 417 U.S. 211 (1974).

The use of Section 241 in election fraud cases generally falls into two types of situations: "public schemes" and "private schemes."

A public scheme is one that involves the necessary participation of a public official acting under the color of law. In election fraud cases, this public official is usually an election officer using his office to dilute valid ballots with invalid ballots or to otherwise corrupt an honest vote tally in derogation of the Equal

Protection and Due Process Clauses of the Fourteenth Amendment. *See, e.g., United States v. Haynes*, 977 F.2d 583 (6th Cir. 1992) (table) (available at 1992 WL 296782); *United States v. Townsley*, 843 F.2d 1070 (8th Cir. 1988); *United States v. Howard*, 774 F.2d 838 (7th Cir. 1985); *United States v. Olinger*, 759 F.2d 1293 (7th Cir. 1985); *United States v. Stollings*, 501 F.2d 954 (4th Cir. 1974); *United States v. Anderson*, 481 F.2d 685 (4th Cir. 1973), *aff'd on other grounds*, 417 U.S. 211 (1974). Another case involving a public scheme turned on the necessary participation of a notary public who falsely notarized forged voter signatures on absentee ballot materials in an Indian tribal election. *United States v. Wadena*, 152 F.3d 831 (8th Cir. 1998).

A private scheme is a pattern of conduct that does not involve the necessary participation of a public official acting under color of law, but that can be shown to have adversely affected the ability of qualified voters to vote in elections in which federal candidates were on the ballot. Examples of private schemes include: (1) voting fraudulent ballots in mixed elections, and (2) thwarting get-out-the-vote or ride-to-the-polls activities of political factions or parties through such methods as jamming telephone lines or vandalizing motor vehicles.

Public schemes may be prosecuted under Section 241 regardless of the nature of the election, i.e., elections with or without a federal candidate. On the other hand, private schemes can be prosecuted under Section 241 only when the objective of the conspiracy was to corrupt a specific federal contest, or when the scheme can be shown to have affected, directly or indirectly, the vote count for a federal candidate, e.g., when fraudulent ballots were cast for an entire party ticket that included a federal office.

40

### 2. Deprivation of Rights under Color of Law. 18 U.S.C. § 242

Section 242, also enacted as a post-Civil War statute, makes it unlawful for anyone acting under color of law, statute, ordinance, regulation, or custom to willfully deprive a person of any right, privilege, or immunity secured or protected by the Constitution or laws of the United States. Violations are one-year misdemeanors unless bodily injury occurs, in which case the penalty is ten years, unless death results, in which case the penalty is imprisonment for any term of years or for life, or a sentence of death.

Prosecutions under Section 242 need not show the existence of a conspiracy. However, the defendants must have acted illegally "under color of law," i.e., the case must involve a public scheme, as discussed above. This element does not require that the defendant be a *de jure* officer or a government official; it is sufficient if he or she jointly acted with state agents in committing the offense, *United States v. Price*, 383 U.S. 787 (1966), or if his or her actions were made possible by the fact that they were clothed with the authority of state law, *Williams v. United States*, 341 U.S. 97 (1951); *United States v. Classic*, 313 U.S. 299 (1941).

Because a Section 242 violation can be a substantive offense for election fraud conspiracies prosecutable under Section 241, the cases cited in the discussion of Section 241 that involve public schemes (i.e., those involving misconduct under color of law) apply to Section 242.

### 3. False Information in, and Payments for, Registering and Voting. 42 U.S.C. § 1973i(c)

Section 1973i(c) makes it unlawful, in an election in which a federal candidate is on the ballot, to knowingly and willfully: (1) give false information as to name, address, or period of residence for the purpose of establishing one's eligibility to register or vote; (2) pay,

offer to pay, or accept payment for registering to vote or for voting; or (3) conspire with another person to vote illegally.  Violations are punishable by imprisonment for up to five years.

### (a)  The basis for federal jurisdiction[17]

Congress added Section 1973i(c) to the 1965 Voting Rights Act to ensure the integrity of the balloting process in the context of an expanded franchise.  In so doing, Congress intended that Section 1973i(c) have a broad reach.  In fact, the original version of Section 1973i(c) would have applied to all elections.  However, constitutional concerns were raised during congressional debate on the bill, and the provision's scope was narrowed to elections that included a federal contest.    Section 1973i(c) rests on Congress's power to regulate federal elections and on the Necessary and Proper Clause. U.S. CONST. art. I, § 4; art. I, § 8, cl. 18; *United States v. Slone*, 411 F.3d 643 (6th Cir. 2005); *United States v. McCranie*, 169 F.3d 723 (11th Cir. 1999); *United States v. Cole*, 41 F.3d 303 (7th Cir. 1994); *United States v. Malmay*, 671 F.2d 869 (5th Cir. 1982); *United States v. Carmichael*, 685 F.2d 903 (4th Cir. 1982); *United States v. Bowman*, 636 F.2d 1003 (5th Cir. 1981); and *United States v. Cianciulli*, 482 F. Supp. 585 (E.D. Pa. 1979).

Section 1973i(c) has been held to protect two distinct aspects of a federal election:  the actual results of the election, and the integrity of the process of electing federal officials.  *United States v. Cole*, 41 F.3d 303 (7th Cir. 1994).  In *Cole*, the Seventh Circuit held that federal jurisdiction is satisfied so long as a single federal candidate is on the ballot – even if the federal candidate is unopposed – because fraud in a mixed election automatically has an impact on the integrity of the federal election process.  *See also United States v.*

---

[17] The discussion here concerning federal jurisdiction under Section 1973i(c) applies equally to its companion statute, 42 U.S.C. § 1973i(e), which addresses multiple voting with a federal jurisdictional predicate phrased precisely the same way.

42

*Slone*, 411 F.3d 643 (6th Cir. 2005); *and United States v. McCranie*, 169 F.3d 723 (11th Cir. 1999) (jurisdiction under Section 1973i(c) satisfied by name of unopposed federal candidate on ballot).

Section 1973i(c) is particularly useful for two reasons: (1) it eliminates the unresolved issue of the scope of the constitutional right to vote in matters not involving racial discrimination, and (2) it eliminates the need to prove that a given pattern of corrupt conduct had an actual impact on a federal election. It is sufficient under Section 1973i(c) that a pattern of corrupt conduct took place during a mixed election; in that situation it is presumed that the fraud will expose the federal race to potential harm. *United States v. Slone*, 411 F.3d 643 (6th Cir. 2005)*; United States v. Cole*, 41 F.3d 303 (7th Cir. 1994); *United States v. Olinger*, 759 F.2d 1293 (7th Cir. 1985); United *States v. Saenz*, 747 F.2d 930 (5th Cir. 1984); *United States v. Garcia*, 719 F.2d 99 (5th Cir. 1983); *United States v. Carmichael*, 685 F.2d 903 (4th Cir. 1982); *United States v. Mason*, 673 F.2d 737 (4th Cir. 1982); *United States v. Malmay*, 671 F.2d 869 (5th Cir. 1982); *United States v. Bowman*, 636 F.2d 1003 (5th Cir. 1981); *United States v. Sayre*, 522 F. Supp. 973 (W.D. Mo. 1981); *United States v. Simms*, 508 F. Supp. 1179 (W.D. La. 1979).

Cases arising under this statute that involve corruption of the process by which individuals register, as distinguished from the circumstances under which they vote, present a different federal jurisdictional issue that is easily satisfied. This is because voter registration in every state is "unitary" in the sense that one registers to vote only once in order to become eligible to vote for all candidates on the ballot – local, state, and federal. Although a state could choose to maintain separate registration lists for federal and nonfederal elections, at the time this book was written, no state had chosen to do so. Consequently, any corrupt act that affects the voter registration process and that can be reached under 42 U.S.C. § 1973i(c) satisfies this federal jurisdictional requirement. An excellent discussion of this issue is contained in *United States v. Cianciulli*, 482 F. Supp. 585 (E.D. Pa. 1979).

43

### (b)  False information to an election official

The "false information" provision of Section 1973i(c) prohibits any person from furnishing certain false data to an election official to establish eligibility to register or vote.  The statute applies to three types of information: name, address, and period of residence in the voting district.  False information concerning other factors (such as citizenship, felon status, and mental competence) are not covered by this provision.[18]

As just discussed, registration to vote is "unitary," i.e., a single registration qualifies the applicant to cast ballots for all elections.  Thus, the jurisdictional requirement that the false information be used to establish eligibility to vote in a federal election is satisfied automatically whenever a false statement is made to get one's name on the registration rolls.  *United States v. Barker*, 514 F.2d 1077 (7th Cir. 1975); *Cianciulli*, 482 F.Supp. 585.

On the other hand, when the false data is furnished to poll officials for the purpose of enabling a voter to cast a ballot in a particular election (as when one voter attempts to impersonate another), it must be shown that a federal candidate was being voted upon at the time.  In such situations, the evidence should show that the course of fraudulent conduct could have jeopardized the integrity of the federal race, or, at a minimum, that the name of a federal candidate was on the ballot.  *Carmichael*, 685 F.2d 903*; Bowman*, 636 F.2d 1003.  *See also In re Coy*, 127 U.S. 731 (1888).

In *United States v. Boards*, 10 F.3d 587 (8th Cir. 1993), the Eighth Circuit confirmed the broad reach of the "false information"

---

[18] Such matters may, however, be charged as conspiracies to encourage illegal voting under the conspiracy clause of Section 1973i(c); as citizenship offenses under, *inter alia*, 18 U.S.C. §§ 911 and 1015(f); or under the broad "false information" provision of 42 U.S.C. §1973gg-10.  These statutes will be discussed below.

provision of Section 1973i(c). The defendants in this case, and their unindicted co-conspirators, had obtained and marked the absentee ballots of other registered voters by forging the voters' names on ballot applications and directing that the ballots be sent to a post office box without the voters' knowledge. The district court granted post-verdict judgments of acquittal as to those counts in which the defendants' roles were limited to fraudulently completing an application for an absentee ballot, based on its conclusions that:
(1) the statute did not extend to ballot applications, (2) the statute did not cover giving false information as to the names of real voters (as opposed to fictitious names), and (3) the defendants could not be convicted when the ballots were actually voted by an unidentified co-conspirator.

The court of appeals rejected each of these narrow interpretations of Section 1973i(c). It first held that an application for a ballot falls within the broad definition of "vote" in the Voting Rights Act, "because an absentee voter must first apply for an absentee ballot as a 'prerequisite to voting.'" *Id.* at 589 (quoting 42 U.S.C. § 1973l(c)(1)). The court also held that by using the names of real registered voters on the applications, the defendants "[gave] false information as to [their] name[s]" within the meaning of Section 1973i(c).[19] *Id.* Finally, the court held that one of the defendants, whose role was limited to completing absentee ballot applications for ballots that others used to fraudulently vote, was liable under 18 U.S.C. § 2 as an aider and abettor.

Subsequently, in *United States v. Smith*, 231 F.3d 800 (11th Cir. 2000), the Eleventh Circuit held that each forgery of a voter's name on a ballot document or on an application for a ballot

---

[19] The Eighth Circuit observed, "[b]ecause only registered voters are eligible to apply for and vote absentee ballots, the use of real registered voters' names was essential to the scheme to obtain and fraudulently vote absentee ballots ...." *Id.*

45

constituted a separate offense under the "false information as to name" clause of Section 1973i(c).

Section 1973i(c)'s false information clause is particularly useful when the evidence shows that a voter's signature (name) was forged on an election-related document, for example: (1) when signatures on poll lists are forged by election officials who are stuffing a ballot box, (2) when a voter's signature on an application for an absentee ballot is forged, or (3) when bogus voter registration documents are fabricated in order to get names on voter registries.

Some, but not all, states permit a practice commonly known as "bounty-hunting," that is, paying people to collect voter registrations on a per-registration basis. Where it is allowed, it is not unusual to find that this method of remuneration provides a motive for the unscrupulous to forge voter registrations and to enhance the piecework payments they can receive. While this situation usually does not result in fraudulent votes actually being cast, it does cause voter registration offices to become overloaded with the task of processing large numbers of bogus registrations immediately prior to an election, when the resources of those offices should be directed at preparing ballots and staffing polling sites. It also risks overloading voter rolls with "deadwood" names, which in turn undermines public confidence in the election process. Thus, even when no fraudulent votes result from bounty hunting, the fraudulent registrations that arise from this conduct are not victimless offenses. Federal prosecutors should be cognizant of these circumstances and, when evidence of fraudulent registrations inspired by bounty hunting is discovered, should consider prosecuting the individuals submitting the false registrations, as well as, in appropriate circumstances, the organizations that employ and pay them, under Section 1973i(c).

### (c)  Commercialization of the vote

The clause of Section 1973i(c) that prohibits "vote buying" does so in broad terms, covering any payment made or offered to a would-be voter "for registering to vote or for voting" in an election when the name of a federal candidate appears on the ballot.[20] Section 1973i(c) applies as long as a pattern of vote buying exposes a federal election to potential corruption, even though it cannot be shown that the threat materialized.

This aspect of Section 1973i(c), is directed at eliminating pecuniary considerations from the voting process.  *United States v. Garcia*, 719 F.2d 99, 102 (5th Cir. 1983); *United States v. Mason*, 673 F.2d 737, 739 (4th Cir. 1982); *United States v. Bowman*, 636 F.2d. 1003, 1012 (5th Cir. 1981).  The statute rests on the premises that potential voters can choose not to vote; that those who choose to vote have a right not to have the voting process diluted with ballots that have been procured through bribery; and that the selection of the nation's leaders should not degenerate into a spending contest, with the victor being the candidate who can pay the most voters.  *See also United States v. Blanton*, 77 F. Supp. 812, 816 (E.D. Mo. 1948).

The bribe may be anything having monetary value, including cash, liquor, lottery chances, and welfare benefits such as food stamps.  *Garcia*, 719 F.2d at 102.  However, offering free rides to the

---

[20] The  federal criminal code contains another vote-buying statute, 18 U.S.C. § 597, which has a narrower scope and provides for lesser penalties than Section 1973i(c).  Section 597 prohibits making or offering to make an expenditure to any person to vote or withhold his or her vote for a federal candidate.  Nonwillful violations of Section 597 are one-year misdemeanors; willful violations are two-year felonies.  Sections 597 and 1973i(c) are distinct offenses, since each requires proof of an element that the other does not.  *Whalen v. United States*, 445 U.S. 684 (1980); *Blockburger v. United States*, 284 U.S. 299 (1932).  Section 597 requires that the payment be made to influence a federal election; Section 1973i(c) requires that the defendant acted "knowingly and willfully."

polls or providing employees paid leave while they vote are not prohibited. *United States v. Lewin*, 467 F.2d 1132 (7th Cir. 1972). Such things are given to make it easier for people to vote, not to induce them to do so. This distinction is important. For an offer or a payment to violate Section 1973i(c), it must have been intended to induce or reward the voter for engaging in one or more acts necessary to cast a ballot. Section 1973i(c) does *not* prohibit offering or giving things having pecuniary value, such as a ride to the polls or time off from work, to help individuals who have already made up their minds to vote do so.

Moreover, payments made for some purpose other than to induce or reward voting activity, such as remuneration for campaign work, do not violate this statute. *See United States v. Canales* 744 F.2d 413 (5th Cir. 1984) (upholding conviction because jury justified in inferring that payments were for voting, not campaign work). Similarly, Section 1973i(c) does not apply to payments made to signature-gatherers for voter registrations such individuals may obtain. However, such payments become actionable under Section 1973i(c) if they are shared with the person being registered.

Finally, Section 1973i(c) does not require that the offer or payment be made with a specific intent to influence a federal contest. It is sufficient that the name of a federal candidate appeared on the ballot in the election when the payment or offer of payment occurred. *United States v. Slone*, 411 F.3d 643 (6th Cir. 2005) (unopposed Senate candidate on ballot); *United States v. McCranie*, 169 F.3d 723 (11th Cir. 1999), (payments to vote for county commissioner); *United States v. Cole*, 41 F.3d 303 (7th Cir. 1994) (unopposed House and Senate candidates on ballot); *United States v. Daugherty*, 952 F.2d 969 (8th Cir. 1991) (payments to vote for several local candidates); *United States v. Odom*, 858 F.2d 664 (11th Cir. 1988) (payments to vote for state representative); *United States v. Campbell*, 845 F.2d 782 (8th Cir. 1988); (payments to benefit a candidate for county judge); *United States v. Garcia*, 719 F.2d 99 (5th Cir. 1983) (food stamps to vote for candidate for county judge); *United States v.*

48

*Malmay*, 671 F.2d 869 (5 th Cir. 1983) (payments to influence votes for candidates for sheriff and other local offices); *United States v. Carmichael*, 685 F.2d 903 (4th Cir. 1982) (payments for sheriff). United *States v. Malmay*, 671 F.2d 869 (5th Cir. 1983) (payments to vote for school board member).

### (d)  Conspiracy to cause illegal voting

The second clause of Section 1973i(c) criminalizes conspiracies to encourage "illegal voting."  The phrase "illegal voting" is not defined in the statute.  On its face it encompasses unlawful conduct in connection with voting.  Violations of this provision are felonies.

The "illegal voting" clause of Section 1973i(c) has potential application to those who undertake to cause others to register or vote in conscious derogation of state or federal laws.  *Cianciulli*, 482 F.Supp. at 616 (noting that this clause would prohibit "vot[ing] illegally in an improper election district").  For example, all states require voters to be United States citizens, and most states disenfranchise people who have been convicted of certain crimes, who are mentally incompetent, or who possess other disabilities that may warrant restriction of the right to vote.  This provision requires that the voters participate in the conspiracy.[21]

The conspiracy provision of Section 1973i(c) applies only to the statute's "illegal voting" clause. *Olinger*, 759 F.2d at 1298-1300. Conspiracies arising under the other clauses of Section 1973i(c) (i.e., those involving vote buying or fraudulent registration) should be charged under the general federal conspiracy statute, 18 U.S.C. § 371.

-------

[21] False statements  involving any fact that is material to  registering or voting under state law may also be prosecuted under 42 U.S.C. § 1973gg-10, as will be discussed below.

#### 4. Voting More than Once.  42 U.S.C. § 1973i(e)

Section 1973i(e), enacted as part of the 1975 amendments to the Voting Rights Act of 1965, makes it a crime to vote "more than once" in any election in which a federal candidate is on the ballot. Violations are punishable by imprisonment for up to five years.

The federal jurisdictional basis for this statute is identical to that for 42 U.S.C. § 1973i(c), which is discussed in detail above.

Section 1973i(e) is most useful as a statutory weapon against frauds that do not involve the participation of voters in the balloting acts attributed to them.  Examples of such frauds are schemes to cast ballots in the names of voters who were deceased or absent, *United States v. Olinger*, 759 F.2d 1293 (7th Cir. 1985); schemes to exploit the infirmities of the mentally handicapped by casting ballots in their names, *United States v. Odom*, 736 F.2d 104 (4th Cir. 1984); and schemes to cast absentee ballots in the names of voters who did not participate in and consent to the marking of their ballots, *United States v. Smith*, 231 F.3d 800 (11th Cir. 2000).

Most cases prosecuted under the multiple voting statute have involved defendants who physically marked ballots outside the presence of the voters in whose names they were cast – in other words, without the voters' participation or knowledge.  The statute may also be applied successfully to schemes when the voters are present but do not participate in any way, or otherwise consent to the defendant's assistance, in the voting process.

However, when the scheme involves "assisting" voters who are present and who also marginally participate in the process, such as by signing a ballot document, prosecuting the case under Section 1973i(e) might present difficulties.  For instance, in *United States v. Salisbury*, 983 F.2d 1369 (6th Cir. 1993), the defendant got voters to sign their absentee ballot forms, and then instructed them how to mark their ballots, generally without allowing them to choose the

candidates – and even in some cases not disclosing the identity of the candidates on the ballot. In a few cases the defendant also personally marked others' ballots. The Sixth Circuit held that the concept "votes more than once" in Section 1973i(e) was unconstitutionally vague as applied to these facts. Because the phrase "votes more than once" was not defined in the statute, the court found the phrase did not clearly apply when the defendant did not physically mark another's ballot. The court further held that, even if the defendant did mark another's ballot, it wasn't clear this was an act of "voting" by the defendant if the defendant got the ostensible voters to demonstrate "consent" by signing their names to the accompanying ballot forms. *Id.* at 1379.[22]

In a similar multiple-voting case a year after the Sixth Circuit's *Salisbury* decision, the Seventh Circuit took a different approach, with the benefit of more detailed jury instructions. *United States v. Cole*, 41 F.3d 303 (7th Cir. 1994). In both cases, the defendants had marked absentee ballots of other persons after getting the voters to sign their ballot documents. The Seventh Circuit rejected the Sixth Circuit's contention that the term "vote" was unconstitutionally vague, finding that the term was broadly and adequately defined in the Voting Rights Act itself, 42 U.S.C. § 1973l(c)(1), and that this statutory definition was supported by both the dictionary and the commonly understood meaning of the word.

---

[22] The *Salisbury* court noted that in *United States v. Hogue*, 812 F.2d 1568 (11th Cir. 1987), the jury was instructed that illegal voting under Section 1973i(e) included marking another person's ballot without his or her "express or implied consent," but found that, based on the facts of *Salisbury*, the jury should also have been given definitions of "vote" and "consent." *United States v. Salisbury*, 983 F.2d at 1377.

51

The Seventh Circuit held that the facts established a clear violation by the defendant of the multiple voting prohibition in Section 1973i(e).[23]

In addition to their conflicting holdings, the *Salisbury* and *Cole* opinions differ in their approach to so-called voter "assistance" cases. *Salisbury* focused on the issue of voter consent – that is, whether the voters had, by their conduct, in some way "consented" to having the defendant mark, or help them mark, their own ballots. *Cole*, on the other hand, focused on whether it was the voter or the defendant who actually expressed candidate preferences.

In a more recent case, the Eleventh Circuit followed the rationale in *Cole* with respect to a scheme to obtain and cast ballots for indigent voters without their knowledge or consent. *United States v. Smith*, 231 F.3d 800 (11th Cir. 2000). The court even went so far as to note that, in its view, a Section 1973i(e) offense could exist regardless of whether the voter had consented to another's marking his ballot. *Id.* at 819, n. 20.

While the approach taken in *Cole* and *Smith* is, from a prosecutor's perspective, preferable to the approach taken in *Salisbury*, the latter's discussion of the issue of possible voter "consent" remains important, since facts suggesting the possibility of consent may weaken the evidence of fraud. Taken together, these three cases suggest the following approach to voter "assistance" frauds:

- Section 1973i(e) most clearly applies to cases of "ballot theft." Examples of such situations are when the defendant marked the ballots of others without their input, when voters did not knowingly consent to the

---

[23] "Ordinary people can conclude that the absentee voters were not expressing their wills or preferences, i.e., that Cole was using the absentee voters' ballots to vote his will and preferences." *Id.* at 308.

defendant's participation in their voting transactions; when the voters' electoral preferences were disregarded; or when the defendant marked the ballots of voters who lacked the mental capacity to vote or to consent to the defendant's activities.

- Jury instructions for a Section 1973i(e) charge should amplify the key term "votes more than once" in the context of the particular case, and specifically define the terms "vote," and, when appropriate, "consent" and "implied consent." *See, e.g.*, 42 U.S.C. § 1973l(c)(l) (containing an extremely broad definition of "vote") *and United States v. Boards*, 10 F.3d 587, 589 (8th Cir. 1993) (holding that this definition encompasses applying for an absentee ballot).

Thus, while the clearest use of Section 1973i(e) is to prosecute pure ballot forgery schemes, the statute can also apply to other types of schemes when voters are manipulated, misled, or otherwise deprived of their votes. *See, e.g.*, *Cole*, 41 F.3d at 310-311 (witness believed the defendant was merely registering her to vote, not helping her vote). Schemes to steal the votes of the elderly, infirm, or economically disadvantaged may constitute multiple voting, especially if there is a clear absence of meaningful voter participation. Because of their vulnerability, these persons are frequent targets of ballot schemes, and often do not even know that their ballots have been stolen or their voting choices ignored. Furthermore, if they have been intimidated, they are generally reluctant to say so.

There is a significant evidentiary difference between voter intimidation and multiple voting that suggests that the multiple voting statute may become the preferred charging statute for voter "assistance" frauds. Voter intimidation requires proof of a difficult element: the existence of physical or economic intimidation that is intended by the defendant. In contrast, the key element in a multiple voting offense is whether the defendant voted the ballot of another

53

person without consulting with that person or taking into account his or her electoral preferences.

In conclusion, if the facts show manipulation of "vulnerable victims" as referenced in the sentencing guidelines for the purpose of obtaining control over the victims' ballot choices, the use of Section 1973i(e) as a prosecutive theory should be considered.

### 5. Voter Intimidation

Voter intimidation schemes are the functional opposite of voter bribery schemes. In the case of voter bribery, voting activity is stimulated by offering or giving something of value to individuals to induce them to vote or reward them for having voted. The goal of voter intimidation, on the other hand, is to deter or influence voting activity through threats to deprive voters of something they already have, such as jobs, government benefits, or, in extreme cases, their personal safety. Another distinction between vote buying and intimidation is that bribery generates concrete evidence: the payment itself (generally money). Intimidation, on the other hand, is amorphous and largely subjective in nature, and lacks such concrete evidence.

Voter intimidation is an assault against both the individual and society, warranting prompt and effective redress by the criminal justice system. Yet a number of factors make it difficult to prosecute. The intimidation is likely to be both subtle and without witnesses. Furthermore, voters who have been intimidated are not merely victims; it is their testimony that proves the crime. These voters must testify, publicly and in an adversarial proceeding, against the very person who intimidated them. Obtaining this crucial testimony must be done carefully and respectfully. Because such offenses often occur in remote and insular communities, investigators should increase their efforts to maintain contact with voters, especially after charges are brought. Prosecutors should consider "locking in" testimony in grand

54

jury sessions even at the risk of creating some negative *Jenks* material.[24]

The crime of voter "intimidation" normally requires evidence of threats, duress, economic coercion, or some other aggravating factor that tends to improperly induce conduct on the part of the victim. If such evidence is lacking, an alternative prosecutive theory may apply to the facts, such as multiple voting in violation of 42 U.S.C. § 1973i(e). Indeed, in certain cases the concepts of "intimidation" and "voting more than once" might overlap and even merge. For example, a scheme that targets the votes of persons who are mentally handicapped, economically depressed, or socially vulnerable may involve elements of both crimes. Because of their vulnerability, these persons are often easily manipulated – without the need for inducements, threats, or duress. In such cases, the use of Section 1973i(e) as a prosecutive theory should be considered. *United States v. Odom*, 736 F.2d 104 (4th Cir. 1984).

The main federal criminal statutes that can apply to voter intimidation are: 42 U.S.C. § 1973gg-10(1); 18 U.S.C. §§ 241, 242, 245(b)(1)(A), 594, and 610. Each of these statutes is discussed below.

### (a) Intimidation in voting and registering to vote. 42 U.S.C. § 1973gg-10(1)

In 1993, Congress enacted the National Voter Registration Act (NVRA), 42 U.S.C. §§ 1973gg to 1973gg-10. The principal purpose of this legislation was to require that the states provide prospective voters with uniform and convenient means by which to

---

[24] Federal prosecutors should be mindful of Department resources and policies regarding the rights of victims and the concerns regarding their use as witnesses, and should consult with the victim-witness coordinator in their office or division.

55

register for the federal franchise.   In response to concerns that relaxing registration requirements may lead to an increase in election fraud, the NVRA also included a new series of election crimes, one of which prohibits knowingly and willfully intimidating or coercing[25] prospective voters in registering to vote, or for voting, in any election for federal office.[26]  42 U.S.C. § 1973gg-10(1).  Violators are subject to imprisonment for up to five years.

### (b)  Intimidation of voters.  18 U.S.C. § 594

Section 594 prohibits intimidating, threatening, or coercing anyone, or attempting to do so, for the purpose of interfering with an individual's right to vote or not vote in any election held solely or in part to elect a federal candidate.   The statute does not apply to primaries.  Violations are one-year misdemeanors.

The operative words in Section 594 are "intimidates," "threatens," and "coerces."  The *scienter* element requires proof that

---

[25] For guidance in determining what constitutes "intimidation" or "coercion" under this statute, see the discussion of 18 U.S.C. § 594 below. Voter "intimidation" accomplished through conduct not covered by this statute or Section 594 may present violations of the Voting Rights Act, 42 U.S.C. § 1973i(b), which are enforced by the Civil Rights Division through noncriminal remedies.

[26] The jurisdictional element for Section 1973gg-10(1) is "in any election for Federal office." This is slightly different phraseology than used in Sections 1973i(c) and i(e), as discussed above. In matters involving intimidation in connection with voter *registration*, this jurisdictional element is currently satisfied in every case because voter registration is unitary in all 50 states: i.e., one registers to vote only once to become eligible to vote for federal as well as nonfederal candidates. However, when the intimidation occurs in connection with *voting*, the jurisdictional situation might not be as clear. Absent case law to the contrary, federal prosecutors should advocate the position that "an election for Federal office" means any election in which a federal candidate is on the ballot.

the actor intended to force voters to act against their will by placing them in fear of losing something of value. The feared loss might be something tangible, such as money or economic benefits, or intangible, such as liberty or safety.

Section 594 was enacted as part of the original 1939 Hatch Act, which aimed at prohibiting the blatant economic coercion used during the 1930s to force federal employees and recipients of federal relief benefits to perform political work and to vote for and contribute to the candidates supported by their supervisors. The congressional debates on the Hatch Act show that Congress intended Section 594 to apply when persons were placed in fear of losing something of value for the purpose of extracting involuntary political activities. 84 CONG. REC. 9596-611 (1939). Although the impetus for the passage of Section 594 was Congress's concern over the use of threats of economic loss to induce political activity, the statute also applies to conduct which interferes, or attempts to interfere, with an individual's right to vote by placing him or her in fear of suffering other kinds of tangible and intangible losses. It thus criminalizes conduct intended to force prospective voters to vote against their preferences, or refrain from voting, through activity reasonably calculated to instill some form of fear.[27]

### (c) Coercion of political activity. 18 U.S.C. § 610

Section 610 was enacted as part of the 1993 Hatch Act reform amendments to provide increased protection against political

---

[27] The civil counterparts to Section 594, 42 U.S.C. §§ 1971(b) and 1973i(b), may also be used to combat nonviolent voter intimidation. *See, e.g., United States v. North Carolina Republican Party*, No. 91-161-Civ-5F (E.D.N.C., consent decree entered Feb. 27, 1992) (consent order entered against political organization for mailing postcards to *thousands of minority voters that contained false voting information and* a threat of prosecution).

57

manipulation of federal employees in the executive branch.[28]   It
prohibits intimidating or coercing a federal employee to induce or
discourage "any political activity" by the employee.  Violators are
subject to imprisonment for up to three years.   This statute is
discussed in detail in Chapter Three, which addresses patronage
crimes.

Although the class of persons covered by Section 610 is
limited to federal employees, the conduct covered by this statute is
broad:  it reaches political activity that relates to any public office or
election, whether federal, state, or local.   The phrase "political
activity" in Section 610 expressly includes, but is not limited to,
"voting or refusing to vote for any candidate or measure," "making or
refusing to make any political contribution," and "working or refusing
to work on behalf of any candidate."

### (d)  Conspiracy against rights and deprivation of constitutional rights.  18 U.S.C. § 241 and § 242

Section 241 makes it a ten-year felony to "conspire to injure,
oppress, threaten, or intimidate" any person in the free exercise of any
right or privilege secured by the Constitution or laws of the United
States" – including the right to vote.  The statute, which is discussed
in detail above, has potential application in two forms of voter
intimidation:  a conspiracy to prevent persons whom the subjects
knew were qualified voters from entering or getting to the polls to
vote in an election when a federal candidate is on the ballot, and a

---

[28] A similar statute addresses political intimidation within the
military.  18 U.S.C. § 609.  It prohibits officers of the United States
Armed Forces from misusing military authority to coerce members of the
military to vote for a federal, state, or local candidate.  Violations are
five-year felonies.  In addition, 18 U.S.C. § 593 makes it a five-year felony
for a member of the military to interfere with a voter in any general or
special election, and 18 U.S.C. § 596 makes it a misdemeanor to poll
members of the armed forces regarding candidate preferences.

58

conspiracy to misuse state authority to prevent qualified voters from voting for any candidate in any election.

Section 241 has been successfully used to prosecute intimidation in connection with political activities. *Wilkins v. United States*, 376 F.2d 552 (5th Cir. 1967) (*en banc*). *Wilkins* involved both violence and clear racial animus, and arose out of the shooting of a participant in the 1965 Selma-to-Montgomery voting rights march. The marchers had intended to present the Governor of Alabama with a petition for redress of grievances, including denial of their right to vote. The Fifth Circuit held that those marching to protest denial of their voting rights were exercising "an attribute of national citizenship, guaranteed by the United States," and that shooting one of the marchers therefore violated Section 241. *Id.* at 561.

Section 242 makes it a misdemeanor for any person to act "under color of any law, statute, ordinance, regulation, or custom," to willfully deprive any person in a state, territory, or district of a right guaranteed by the Constitution or federal law. For all practical purposes, this statute embodies the substantive offense for a Section 241 conspiracy, and it therefore can apply to voter intimidation.

It is the Criminal Division's position that Sections 241 and 242 may be used to prosecute schemes to intimidate voters in federal elections through threats of physical or economic duress, or to prevent otherwise lawfully qualified voters from getting to the polls in elections when a federal candidate is on the ballot. Examples of the latter include intentionally jamming telephone lines to disrupt a political party's get-out-the-vote or ride-to-the-polls efforts, and schemes to vandalize motor vehicles that a political faction or party intended to use to get voters to the polls.

### (e) Federally protected activities.
### 18 U.S.C. § 245(b)(1)(A)

The Civil Rights Act of 1968 contained a broad provision that addresses violence intended to intimidate voting in any election in this country.   18 U.S.C.  §  245(b)(1)(A).   This provision applies without regard to the presence of racial or ethnic factors.

Section 245(b)(1)(A) makes it illegal to use or threaten to use physical force to intimidate individuals from, among other things, "voting or qualifying to vote." It reaches threats to use physical force against a victim because the victim has exercised his or her franchise, or to prevent the victim from doing so. Violations are misdemeanors if no bodily injury results, ten-year felonies if there is bodily injury, and any term of years, life imprisonment, or death if death results.

Prosecutions under Section 245 require written authorization by the Attorney General, the Deputy Attorney General, the Associate Attorney General, or a specially designated Assistant Attorney General, who must certify that federal prosecution of the matter is "in the public interest and necessary to secure substantial justice." § 245(a)(1). This approval requirement was imposed in response to federalism issues that many Members of Congress believed were inherent in a statute giving the federal government prosecutive jurisdiction over what otherwise would be mere assault and battery cases. S. REP. NO. 90-721 (1967), *reprinted in* 1968 U.S.C.C.A.N. 1837-67.  In making the required certification, the standard to be applied is whether the facts of the particular matter are such that the appropriate state law enforcement authorities should, but either cannot or will not, effectively enforce the applicable state law, thereby creating an overriding need for federal intervention. *Id.* at 1845-48.

### 6. Voter Suppression.  18 U.S.C. § 241 and § 242

Voter suppression schemes are designed to ensure the election of a favored candidate by blocking or impeding voters believed to oppose that candidate from getting to the polls to cast their ballots. Examples include providing false information to the public – or a particular segment of the public – regarding the qualifications to vote, the consequences of voting in connection with citizenship status, the dates or qualifications for absentee voting, the date of an election, the hours for voting, or the correct voting precinct.   Another voter suppression scheme, attempted recently with partial success, involved impeding access to voting by jamming the telephone lines of entities offering rides to the polls in order to prevent voters from requesting needed transportation.  This case was successfully prosecuted and is discussed below.

Currently there is no federal criminal statute that expressly prohibits this sort of voter suppression activity.[29]  Nevertheless, the conspiracy against rights statute, 18 U.S.C. § 241, has been successfully used to prosecute conspiracies to destroy valid voter registrations, *United States v. Haynes*, 977 F.2d 583 (6th Cir. 1992) (table) (available at 1992 WL 296782), and to destroy ballots, *In re Coy,* 127 U.S. 731 (1888), *United States v. Townsley*, 843 F.2d 1070 (8th Cir. 1988).  The Criminal Division believes that voter suppression conspiracies, such as those described above, are the functional equivalent of the acts involved in these prosecutions, and that voter suppression conspiracies can – and should – be pursued under Section 241 where their objective is to deter voting in a federal election (thus depriving the victim voters of their federally guaranteed right to vote for federal candidates), or in any election when they involve "state action" in their execution (thus depriving the victim voters of their

---

[29] At the time this book was written, the Congress was considering legislation that would specifically criminalize providing false information to the public and other deceptive practices to suppress voting in a federal election.

61

rights to due process and equal protection as guaranteed by the Fourteenth Amendment).  As noted above, the substantive crime for Section 241 conspiracies can be prosecuted under 18 U.S.C. § 242, deprivation of constitutional rights, where the voter suppression is carried out "under color of law."

This prosecutive theory was recently used in a high-profile case in New Hampshire.  In *United States v. Tobin,* No. 04-216-01 (SM), 2005 WL 3199672 (D.N.H. Nov. 30, 2005), a senior political party official was charged with violating Section 241 and with telephone harassment offenses under 47 U.S.C. § 223 in connection with a scheme to jam telephone lines for ride-to-the-polls services offered by the opposing political party and the local fire department during the 2002 general elections.  The object of the conspiracy was to impede certain voters from getting to the polls in order to influence what was perceived to have been a very close United States Senate contest.  The defendant challenged the Section 241 charge, claiming that the statute had never been applied to a voter suppression scheme such as the one involved in that case and that application of Section 241 to the scheme would therefore deprive him of constitutionally required notice that his activities were proscribed.  The district court disagreed and upheld the charge, stating:

> [T]he "fair warning" issue turns generally on whether a person of ordinary intelligence would know that the acts charged would violate constitutional rights.  Or, with reference to the allegations in the superseding indictment, whether a person of ordinary intelligence would understand that participating in an agreement, or conspiracy, whose purpose is to prevent qualified persons from freely exercising their right to vote, would violate Section 241.  Plainly, a reasonable person would understand that the right to vote is a right protected by the Constitution.  He or she would also understand that knowingly joining in a conspiracy with the specific intent

62

to impede or prevent qualified persons from exercising the right to vote is conduct punishable under Section 241.

*Id.* at *3.[30]

The Criminal Division believes that the prosecution of voter suppression schemes represents an important law enforcement priority, that such schemes should be aggressively investigated, and that, until Congress enacts a statute specifically criminalizing this type of conduct, 18 U.S.C. § 241 is the appropriate prosecutive tool by which to charge provable offenses.

### 7. Fraudulent Registration or Voting. 42 U.S.C. § 1973gg-10(2)

This provision was enacted as part of the National Voter Registration Act of 1993 (NVRA). As discussed above, Congress enacted the NVRA to ease voter registration requirements throughout the country. The major purpose of this legislation was to promote the exercise of the franchise by replacing diverse state voter registration requirements with uniform and more convenient registration options, such as registration by mail, when applying for a driver's license, and at various government agencies.

In addition, the NVRA sought to protect the integrity of the electoral process and the accuracy of the country's voter registration rolls. To further these goals, a new criminal statute was enacted that specifically addressed two common forms of electoral corruption: intimidation of voters (42 U.S.C. § 1973gg-10(1), discussed above), and fraudulent registration and voting (42 U.S.C. § 1973gg-10(2)). Violations are subject to imprisonment for up to five years.

---

[30] The defendant's convictions on the telephone harassment charges were reversed on appeal due to error in the jury instructions under § 223. *United States v. Tobin*, 480 F.3d 53 (1st Cir. 2007).

The NVRA's criminal statute resulted from law enforcement concerns expressed during congressional debates on the bill. Both opponents and supporters recognized that relaxing voter registration requirements was likely to increase election fraud by making it easier for the unscrupulous to pack voting rolls with fraudulent registrations, which would facilitate fraudulent ballots. Section 1973gg-10(2) thus criminalizes submitting voter registrations or ballots that contain materially false information with knowledge of the falsity. *See United States v. Prude*, No. 06-1425 (7 th Cir. June 14, 2007) (affirming conviction of disenfranchised felon who voted after notice of her ineligibility).

The constitutional basis of the NVRA is Congress's broad power to regulate the election of federal officials. NVRA's criminal provision reflects this federal focus, and is limited to conduct that occurs "in any election for Federal office." While the phrasing of this jurisdictional element differs somewhat from the jurisdictional language used by Congress in earlier election fraud statutes, the Department believes that it was intended to achieve the same result.[31]

### (a) Fraudulent registration. § 1973gg-10(2)(A)

Subsection 1973gg-10(2)(A) prohibits any person, in an election for federal office, from defrauding or attempting to defraud state residents of a fair and an impartially conducted election by procuring or submitting voter registration applications that the offender knows are materially false or defective under state law. The

---

[31] The earlier statutes, 42 U.S.C. §§ 1973i(c) and (e), contain express references to each federal office (Member of the House, Member of the Senate, President, Vice President, presidential elector) and type of election (primary, general, special) providing federal jurisdiction. The revised language seems to have been intended as a less cumbersome rephrasing of the required federal nexus.

64

scope of the statute is broader than that of the "false information" provision of Section 1973i(c), discussed above, which is limited to false information involving only name, address, or period of residence. The statute applies to any false information that is material to a registration decision by an election official. For this reason, the provision is likely to be the statute of preference for most false registration matters.

For schemes to submit fraudulent registration applications, the statute's "Federal Office" jurisdictional element is automatically satisfied, and hence does not present a problem. This is because registration to vote is unitary in all states, in the sense that in registering to vote an individual becomes eligible to vote in all elections, federal as well as nonfederal.

### (b) Fraudulent voting: § 1973gg-10(2)(B)

Subsection 1973gg-10(2)(B) prohibits any person, in an election for federal office, from defrauding or attempting to defraud the residents of a state of a fair election through casting or tabulating ballots that the offender knows are materially false or fraudulent under state law. Unlike other ballot fraud laws discussed in this chapter, the focus of this provision is not on any single type of fraud, but rather on the result of the false information: that is, whether the ballot generated through the false information was defective and void under state law. Because of the conceptual breadth of this provision, it is a useful alternative to general fraud statutes in reaching certain forms of election corruption, particularly alien and felon voting.

However, the statute's jurisdictional element, "in any election for Federal office," substantially restricts its usefulness for fraudulent voting (as opposed to fraudulent registration) schemes as it applies only to elections that include a federal candidate. Thus, its scope is similar to that of 42 U.S.C. §§ 1973i(c) and (e), and arises from the fact that fraudulent activity aimed at any race in a mixed election has the potential to taint the integrity of the federal race.

## 8.  Voting by Noncitizens

Federal law does not expressly require that persons be United States citizens to vote.  Moreover, eligibility to vote is a matter that the Constitution leaves primarily to the states.[32]  At the time this book was written, all states required that prospective voters be United States citizens.

Historically, the states have regulated both the administrative and substantive facets of the election process, including how one registers to vote and who is eligible to do so.  Federal requirements, on the other hand, generally have focused on specific federal interests, such as protecting the integrity of the federal elective process and the exercise of fundamental rights to which constitutional protection has been expressly granted.[33]

Federal laws do, however, have quite a bit to say about citizenship and voting.  Specifically, in 1993 the federal role in the election process expanded significantly with the enactment of the National Voter Registration Act (NVRA).  This legislation required, among other things, that forms used to register persons to vote in federal elections clearly state "each eligibility requirement (including citizenship)" and that persons registering to vote in federal elections affirm that they meet "each eligibility requirement (including

---

[32] U.S. CONST. art. I, § 2 and amend. XVII (electors for Members of the United States House of Representatives and the United States Senate have the qualifications for electors of the most numerous branch of the state legislatures);  art. II, § 1, cl. 2 (presidential electors chosen as directed by state legislatures).

[33] For example, the states are prohibited from depriving "citizens of the United States" of the franchise on account of any of the following factors: race (amend. XV), gender (amend. XIX), nonpayment of poll tax (amend. XXIV), age 18 or older (amend. XXVI and 42 U.S.C. § 1973bb), residency after 30 days (42 U.S.C. § 1973aa-1), or overseas residence (42 U.S.C. § 1973ff-1).

66

citizenship)." 42 U.S.C. §§ 1973gg-3(c)(2)(C), 1973gg-5(a)(6)(A)(i), 1973gg-7(b)(2). Nine years later, Congress passed the Help America Vote Act of 2002, which reemphasized these requirements in the case of voters who register to vote via mail by requiring the states to place a citizenship question on mailed registration forms.   42 U.S.C. § 15483(b)(4)(A)(i).

In addition to these federal requirements relating to voter registration, registering to vote and voting by noncitizens are covered by four separate federal criminal laws:

### (a) Fraudulent registration and voting under the NVRA.  42 U.S.C. § 1973gg-10(2)

The NVRA enacted a new criminal statute that reaches the knowing and willful submission to election authorities of false information that is material under state law. 42 U.S.C. § 1973gg-10(2).  Because all states currently make citizenship a prerequisite for voting, statements by prospective voters concerning citizenship status are automatically "material" within the meaning of this statute. Therefore, any false statement concerning an applicant's citizenship status that is made on a registration form submitted to election authorities can involve a violation of this statute.   Such violations are felonies subject to imprisonment for up to five years.

For jurisdictional purposes, the statute requires that the fraud be "in any election for Federal office."  As discussed above, voter registration in every state is unitary in the sense that an individual registers to vote only once for all elective offices – local, state, and federal.  Thus the jurisdictional element of Section 1973gg-10(2) is satisfied whenever a false statement concerning citizenship status is made on a voter registration form.

The use of the word "willful" suggests Section 1973gg-10(2) may be a specific intent offense. This means federal prosecutors may have to prove that the offender was aware that citizenship is a

67

requirement for voting, and that the registrant did not possess United States citizenship.  In most instances, proof of the first element is relatively easy because, since 1993 when the NVRA was enacted, the citizenship requirement must be stated on the voter registration form, and the form requires that the voter check a box indicating that he or she is a citizen.

### (b)  False claims to register or vote.  18 U.S.C. § 1015(f)

Section 1015(f) was enacted in 1996 to provide an additional criminal prohibition addressing the participation of noncitizens in the voting process.  This statute makes it an offense for an individual to make a false statement or claim that he or she is a citizen of the United States in order to register or to vote.  Unlike all other statutes addressing alien voting, Section 1015(f) expressly applies to all elections – federal, state, and local – as well as to initiatives, recalls, and referenda.

Jurisdictionally, Section 1015(f) rests on Congress's power over nationality (U.S. Const. art. I, § 8, cl. 4) rather than on the Election Clause (U.S. Const. art. I, § 4, cl. 1), which provides the basis for its broad reach.

Violations of Section 1015(f) are felonies, punishable by imprisonment for up to five years.

### (c)  False claims of citizenship.  18 U.S.C. § 911

Section 911 prohibits the knowing and willful false assertion of United States citizenship by a noncitizen.  *See, e.g.*, *United States v. Franklin*, 188 F.2d 182 (7th Cir. 1951); *Fotie v. United States*, 137 F.2d 831 (8th Cir. 1943).  Violations of Section 911 are punishable by up to three years of imprisonment.

As noted, all states require United States citizenship as a prerequisite for voting.  Historically, however, some states have not

68

implemented the prerequisite through voter registration forms that clearly alerted prospective registrants that only citizens may vote. Under the NVRA, all states must now make this citizenship requirement clear, and prospective registrants must sign applications under penalty of perjury attesting that they meet this requirement. Therefore, falsely attesting to citizenship in any state is now more likely to be demonstrably willful, and therefore cognizable under Section 911.

Section 911 requires proof that the offender was aware he was not a United States citizen, and that he was falsely claiming to be a citizen. Violations of Section 911 are felonies, punishable by up to three years of imprisonment.

### (d) Voting by aliens. 18 U.S.C. § 611

Section 611 is a relatively new statute that creates an additional crime for voting by persons who are not United States citizens. It applies to voting by noncitizens in an election when a federal candidate is on the ballot, except when noncitizens are authorized to vote by state or local law for nonfederal candidates or issues, and the ballot is formatted in a way that the noncitizen has the opportunity to vote solely for these nonfederal candidates or issues. Unlike Section 1015(f), Section 611 is directed at the act of voting, rather than the act of lying. But unlike Section 1015(f), Section 611 is a strict liability offense in the sense that the prosecution must only prove that the defendant was not a citizen when he or she registered or voted. Section 611 does not require proof that the offender was aware that citizenship is a prerequisite to voting.

Violations of Section 611 are misdemeanors, punishable by up to one year of imprisonment.

69

### 9. Travel Act. 18 U.S.C. § 1952

The Travel Act, 18 U.S.C. § 1952, prohibits interstate travel, the interstate use of any other facility (such as a telephone), and any use of the mails to further specified "unlawful activity," including bribery in violation of state or federal law. Violations are punishable by imprisonment for up to five years. This statute is useful in election crime matters because it applies to vote-buying offenses that occur in states where vote buying is a "bribery" offense, regardless of the type of election involved.

The predicate bribery under state law need not be common law bribery. The Travel Act applies as long as the conduct is classified as a "bribery" offense under applicable state law. *Perrin v. United States*, 444 U.S. 37 (1979). In addition, the Travel Act has been held to incorporate state crimes regardless of whether they are classified as felonies or misdemeanors. *United States v. Polizzi*, 500 F.2d 856, 873 (9th Cir. 1974); *United States v. Karigiannis*, 430 F.2d 148, 150 (7th Cir. 1970).

The first task in determining whether the Travel Act has potential application to a vote-buying scheme is to examine the law of the state where the vote-buying occurred to determine if it either: (1) is classified as a bribery offense, or (2) describes the offense of paying voters for voting in a way that requires proof of a *quid pro quo*, i.e., that a voter be paid in consideration for his or her vote for one or more candidates. If the state offense meets either of these criteria, the Travel Act potentially applies.

In the past, Travel Act prosecutions have customarily rested on predicate acts of interstate travel or the use of interstate facilities. Since election fraud is a local crime, interstate predicate acts are rarely present, and the Travel Act has not been used to prosecute election crime. However, in *United States v. Riccardelli*, 794 F.2d 829 (2d Cir. 1986), the Second Circuit held that the Act's mail predicate was satisfied by proof of an intrastate mailing.

70

In reaching this conclusion, the court conducted an exhaustive analysis of the Travel Act's legislative history and Congress's authority to regulate the mails. The Sixth Circuit subsequently reached a contrary result, holding that the Travel Act's mail predicate required an interstate mailing. *United States v. Barry*, 888 F.2d 1092 (6th Cir. 1989). In 1990 Congress resolved this conflict by adopting the *Riccardelli* holding in an amendment to the Travel Act, expressly extending federal jurisdiction to any use of the mails in furtherance of a state predicate offense.

Thus, the Travel Act should be considered as a vehicle to prosecute vote-buying schemes in which the mails were used in those states where vote buying is statutorily defined as bribery. This theory is one of the few available that do not require a federal candidate on the ballot.

As with the mail fraud statute, each use of the mails in furtherance of the bribery scheme is a separate offense. *United States v. Jabara*, 644 F.2d 574 (6th Cir. 1981). The defendant need not actually have done the mailing, so long as it was a reasonably foreseeable consequence of his or her activities. *United States v. Kelley*, 395 F.2d 727 (2d Cir.1968). Nor need the mailing have in itself constituted the illegal activity, as long as it promoted it in some way. *United States v. Bagnariol*, 665 F.2d 877 (9th Cir. 1981); *United States v. Barbieri*, 614 F.2d 715 (10th Cir. 1980); *United States v. Peskin*, 527 F.2d 71 (7th Cir. 1975); *United States v. Wechsler*, 392 F.2d 344 (4th Cir. 1968).

An unusual feature of the Travel Act is that it requires an overt act subsequent to the jurisdictional event charged in the indictment. Thus, if a Travel Act charge is predicated on a use of the mails, the government must allege and prove that the defendant subsequently acted to further the underlying unlawful activity. The subsequent overt act need not be unlawful in itself; this element has been generally held to be satisfied by the commission of a legal act as

71

long as the act facilitated the unlawful activity.  *See, e.g., United States v. Davis*, 780 F.2d 838 (10th Cir. 1985).

The Travel Act is particularly useful in voter bribery cases in nonfederal elections that involve the mailing of absentee ballot materials.  Such matters usually involve a defendant who offers voters compensation for voting, followed by the voter applying for, obtaining, and ultimately casting an absentee ballot.  Each voting transaction can involve as many as four separate mailings:  (1) when the absentee ballot application is sent to the voter, (2) when the completed application is sent to the local election board, (3) when the absentee ballot is sent to the voter, and (4) when the voter sends the completed ballot back to the election authority for tabulation.

Because the mailing must be in furtherance of the scheme, therefore, care should be taken to ensure that the voting transaction in question was corrupted by a bribe before the mailing that is charged.  If, for example, the voter was not led to believe that he or she would be paid for voting until after applying for, and receiving, an absentee ballot package, then the only mailing affected by bribery would be the transmission of the ballot package to the election authority; the Travel Act charge is best predicated on this final mailing, with some other subsequent overt act charged.

### 10.  Mail Fraud.  18 U.S.C. § 1341

The federal mail fraud statute prohibits use of the United States mails, or a private or commercial interstate carrier, to further a "scheme or artifice to defraud." 18 U.S.C. § 1341.[34]  Violations are punishable by imprisonment for up to twenty years.

------

[34] The federal wire fraud statute, 18 U.S.C. § 1343, is essentially identical to the mail fraud statute, except for its jurisdictional element, and, accordingly has potential application to election fraud schemes that are furthered by interstate wires.

At present, the most viable means of addressing election crime under the mail fraud statute is the "salary theory," which, as will be discussed below, has received only limited – and in a recent case hostile – treatment by the courts.  Under this approach, the pecuniary benefits of elective office are charged as the object of the scheme.

### (a)  Background

Until *McNally v. United States*, 483 U.S. 350 (1987), the mail fraud statute was frequently and successfully used to attain federal jurisdiction over schemes to corrupt local elections.  Because its jurisdictional basis is the broad power of Congress to regulate the mails, Section 1341 was used to address corruption of the voting process in purely local or state elections.  *See Badders v. United States*, 240 U.S. 391, 392 (1916) (the overt act of putting a letter in a United States post office is a matter Congress may regulate).

Courts had broadly interpreted the "scheme or artifice to defraud" element of Section 1341 to include nearly any effort to procure, cast, or tabulate ballots illegally under state law.  The theory was that citizens were entitled to fair and honest elections, and a scheme to corrupt an election defrauded them of this right.  *United States v. Girdner*, 754 F.2d 877, 880 (10th Cir. 1985) (scheme to cast votes for ineligible voters); *United States v. Clapps*, 732 F.2d 1148, 1152-53 (3d Cir. 1984) (scheme to usurp absentee ballots of elderly voters); *United States v. States*, 488 F.2d 761, 766 (8th Cir. 1973) (scheme to submit fraudulent absentee ballots).  The mail fraud statute was even held to reach schemes to deprive the public of information required under state campaign finance disclosure statutes. *United States v. Buckley*, 689 F.2d 893, 897-98 (9th Cir. 1982); *United States v. Curry*, 681 F.2d 406, 411 (5th Cir. 1982).

The jurisdictional mailing element of Section 1341, moreover, usually posed no substantial obstacle in election fraud cases.  The Second Circuit may have adopted the most expansive position,

73

holding in an unpublished opinion that the mail fraud statute applied to any fraudulent election practice resulting in postal delivery of a certificate of election to the winning candidate. *United States v. Ingber*, Cr. No. 86-1402 (2d Cir. Feb. 4, 1987) (unpublished), *quoted in Ingber v. Enzor*, 664 F. Supp. 814, 815-16 (S.D.N.Y. 1987) (*habeas* opinion). As most states mail such notices to victorious candidates, this theory would have allowed federal jurisdiction over election fraud by victorious politicians, both federal and nonfederal.

However, in *McNally*, the Supreme Court substantially restricted the utility of the mail fraud statute to combat election crimes. *McNally* held that "scheme to defraud" does not encompass schemes to deprive the public of intangible rights, such as the rights to good government and fair elections, but is limited to schemes to deprive others of property rights.

In 1988, Congress enacted 18 U.S.C. § 1346 in response to the *McNally* decision. Unfortunately, by its express terms, Section 1346 only applies to schemes to deprive another of the "intangible right of honest services," a concept that does not easily fit schemes to defraud the public of a fair election or of information required to be disclosed under federal or state campaign financing laws.

However, even a narrow definition of honest services fraud does not entirely foreclose use of the mail fraud statute to address election fraud. If a pecuniary interest – such as money or salary – is sought through the scheme, the mail fraud statute still applies. *See McNally*, 483 U.S. at 360 (noting that the jury was not charged on a money or property theory).

### (b)  Salary theory of mail fraud

Schemes to obtain salaried positions by falsely representing one's credentials to a hiring authority remain prosecutable under the mail fraud statute after *McNally*. The objective of such "salary schemes" is to obtain pecuniary items by fraud; such schemes are

74

therefore clearly within the scope of the common law concepts of fraud to which *McNally* sought to restrict the mail fraud statute. *See United States v. Granberry*, 908 F.2d 278, 280 (8th Cir. 1990) (scheme to obtain employment by falsifying application); *United States v. Doherty*, 867 F.2d 47, 54-57 (1st Cir. 1989) (scheme to rig police promotion exam); *United States v. Walters*, 711 F. Supp. 1435, 1442-46 (N.D. Ill. 1989) (scheme to obtain scholarships through false information), *rev'd on other grounds*, 913 F.2d 388 (7th Cir. 1990); *United States v. Ferrara*, 701 F. Supp. 39 (E.D.N.Y. 1988) (scheme to obtain hospital salaries by falsifying medical training), *aff'd*, 868 F.2d 1268 (2d Cir. 1988); *United States v. Thomas*, 686 F. Supp. 1078, 1083-85 (M.D. Pa. 1988) (scheme to rig police entrance exam), *aff'd*, 866 F.2d 1414 (3d Cir. 1988) (table); *United States v. Cooper*, 677 F. Supp. 778, 781-82 (D. Del. 1988) (wire fraud scheme to obtain pay for person not performing work).[35]

This theory of post-*McNally* mail fraud has potential application to some election fraud schemes, since most elected offices in the United States carry with them a salary and various emoluments that have monetary value. The criterion by which candidates for elected positions are selected by the public is who obtained the most valid votes. Thus, schemes to obtain salaried elected positions through procuring and tabulating invalid ballots may be capable of being charged as traditional common law frauds:  i.e., schemes to obtain the salary of the office in question by concealing from the

-------

[35] Another district court has upheld application of Section 1341 to a commercial bribery scheme to pay salary to a dishonest procurement officer. *United States v. Johns*, 742 F. Supp. 196, 204-06, 212-13 (E.D. Pa. 1990) (collecting cases in an extended discussion of the salary theory). The Third Circuit, however, reversed *Johns's* mail fraud convictions with a cursory, unpublished order that held, enigmatically, that the "convictions for mail fraud must be reversed inasmuch as the evidence was insufficient, as a matter of law, to establish that appellant had defrauded his employer of money paid to him as salary." *United States v. Johns*, 972 F.2d 1333 (3d Cir. 1991) (table) (available at 1991 U.S. App. LEXIS 18586).

75

public authority responsible for counting votes and certifying winners material facts about the critical issue of which candidate received the most valid votes.

In addition, election fraud schemes can present related issues concerning the quality and value of the public officer hired thereby. The Supreme Court observed in *McNally* that deceit concerning the quality and value of a commodity or service remains within the scope of the mail fraud statute:

> We note that as the action comes to us, there was no charge and that the jury was not required to find that the Commonwealth itself was defrauded of any money or property.  It was not charged that in the absence of the alleged scheme the Commonwealth would have paid a  lower premium or secured better insurance.

*McNally*, 483 U.S. at 360 (emphasis added).  Election fraud schemes involve an aspect of material concealment insofar as the "value" of the services the public is paying for are concerned:  the public "hired" the candidate because it was falsely led to believe this candidate received the most valid votes, and consequently received services from a qualified individual that were thus of lower value.

The "salary theory" of post-*McNally* mail fraud has been applied to election frauds in only a few cases to date, and with mixed results.  *Compare United States v. Walker*, 97 F.3d 253 (8th Cir. 1996) (mail fraud convictions affirmed under both salary theory and intangible right to honest services theory arising from scheme to secretly finance local candidate, when issue of applicability of salary theory not challenged); *United States v. Schermerhorn*, 713 F. Supp. 88 (S.D.N.Y. 1989), *aff'd*, 906 F.2d 66 (2d Cir. 1990) (scheme to conceal that state senate candidate was being financed by organized crime in violation of state campaign financing laws held actionable

76

under the salary theory); *Ingber v. Enzor*, 841 F.2d 450 (2d Cir. 1988) (post-*McNally habeas* relief appropriate for pre-*McNally* mail fraud defendant convicted of securing election to salaried township position through illegal ballots, when the reviewing court could not determine whether jury's verdict rested on salary theory or on alternative intangible rights theory); *and United States v. Webb*, 689 F. Supp. 703 (W.D. Ky. 1988) (tax dollars paid to a public official elected by fraud are a loss to the citizens, who did not receive the benefit of the bargain); *with United States v. Turner*, 459 F. 3d 775 (6th Cir. 2006) (salary theory held inapplicable to election fraud schemes); *United States v. Ratcliff*, 381 F. Supp. 2d 537 (M.D. La. 2005) (salary theory rejected), *aff'd*, __ F3d __ 2007 WL 1560084 (5th Cir. May 31, 2007); *and United States v. George*, No. CR86-0123, 1987 WL 48848 (W.D. Ky. 1987) (salary theory rejected).

### (c)  "Honest services" fraud.  18 U.S.C. § 1346

As summarized above, prior to *McNally* nearly all the circuits had held that a scheme to defraud the public of a fair and impartial election was one of the "intangible rights" schemes covered by the mail and wire fraud statutes.  *McNally* repudiated this theory in an opinion that not only rejected the intangible rights theory of mail and wire fraud, but did so by citing several election fraud cases as examples of the kinds of fraud the Court found outside these criminal laws.

The following year, Congress responded to *McNally* by enacting 18 U.S.C. § 1346, which defined "scheme or artifice to defraud" to include "the intangible right of honest services." However, this language did not clearly restore the use of these statutes to election frauds.  This is because Section 1346 encompasses only schemes to deprive a victim of the intangible right of "honest services," and most voter fraud schemes do not appear to involve

77

such an objective.[36]  Moreover, jurisprudence in the arena of public corruption has generally confined Section 1346 to schemes involving traditional forms of corruption that involve a clear breach of the fiduciary duty of "honest services" owed by a public official to the body politic, e.g., bribery, extortion, embezzlement, theft, conflicts of interest, and, in some instances, gratuities.  *See, e.g.*, *United States v. Panarella*, 277 F.3d 678 (3d Cir. 2002); *United States v. Sawyer*, 329 F.3d 31 (1st Cir. 2001); *United States v. Bloom*, 149 F.3d 649 (7th Cir. 1998); *United States v. Brumley*, 116 F.3d 728 (5th Cir. 1997) (*en banc*).  *See also United States v. Grubb*, 11 F.3d 426 (4th Cir. 1993) (upholding multi-count convictions of a state judge, including honest services mail fraud, arising from a scheme to extort $10,000 donation from a candidate); *United States v. D'Alessio*, 822 F.Supp. 1134 (D.N.J. 1993) (dismissing indictment due to ambiguity regarding applicability of local gift rule but recognizing candidate's duty of honesty to contributors and the public).  Federal prosecutors should consult the Public Integrity Section before using Section 1346 in the context of election fraud.

The application of the "honest services" theory of mail and wire fraud to election fraud schemes was expressly rejected by the Sixth Circuit in *United States v. Turner*, 459 F.3d 775 (6th Cir. 2006).

### (d)   "Cost-of-election" theory.   18 U.S.C.  § 1341

One case, *United States v. DeFries*, 43 F.3d 707 (D.C. Cir. 1995), has held that a scheme to cast fraudulent ballots in a labor union election, which had the effect of tainting the entire election, was a scheme to defraud the election authority charged with running the election of the costs involved.

---

[36] An  exception is  frauds involving  corrupt election officials, which deprive the body politic of their "honest services."

*DeFries* was not a traditional election fraud prosecution. Rather, it involved corruption of a union election when supporters of one candidate for union office cast fraudulent ballots for that candidate. When the scheme was uncovered, the United States Department of Labor ordered that a new election be held, thereby causing the union to incur an actual pecuniary loss. The D.C. Circuit held that the relationship between that pecuniary loss and the voter fraud scheme was sufficient to satisfy the requirements of *McNally*.

This theory of prosecution has potential validity primarily when the mail and wire fraud statutes are needed to federalize voter frauds involving the counting of illegal ballots in nonfederal elections, particularly when the fraud has led to a successful election contest and the election authority has been ordered to hold a new election, thereby incurring additional costs.

## 11. Troops at Polls. 18 U.S.C. § 592

This statute makes it unlawful for anyone in the military or federal civil service to station troops or "armed men" at the polls in a general or special election (but not a primary), except when necessary "to repel armed enemies of the United States." Violations are punishable by imprisonment for up to five years and disqualification from any federal office.

Section 592 prohibits the use of official authority to order armed personnel to the polls; it does not reach the troops who respond to those orders. The effect of this statute is to prohibit FBI Special Agents from conducting investigations within the polls on election day, and Deputy U.S. Marshals from being stationed at open polls, as both are required to carry their weapons while on duty.

This statute applies only to agents of the United States Government. It does not prohibit state or local law enforcement agencies from sending police officers to quell disturbances at polling

79

places, nor does it preempt state laws that require police officers to be stationed in polling places.

### 12. Campaign Dirty Tricks

Two federal statutes, both of which are part of the Federal Election Campaign Act (FECA), specifically address campaign tactics and practices: 2 U.S.C. §§ 441d and 441h. As is the case with all other FECA provisions, violations of these two statutes are subject to both civil and criminal penalties, 2 U.S.C. §§ 437g(a) and 437g(d) respectively. These penalties will be discussed in Chapter Five.

### (a) Election communications and solicitations. 2 U.S.C. § 441d

Section 441d provides that whenever a person or political committee makes certain types of election-related disbursements, an expenditure for the purpose of financing a public communication advocating the election or defeat of a clearly identified federal candidate, or a solicitation for the purpose of influencing the election of a federal candidate, the communication must contain an attribution clause identifying the candidate, committee, or person who authorized and/or paid for the communication. The content of the attribution, as well as its size and location in the advertisement are described in the statute.

This Section has potential application to unattributed false, inflammatory, or scurrilous campaign literature that calls for the election or defeat of a federal candidate.

### (b) Fraudulent misrepresentation. 2 U.S.C. § 441h

Section 441h prohibits fraudulently representing one's authority to speak for a federal candidate or political party. As a

80

result of the 2002 Bipartisan Campaign Reform Act (BCRA), the provision contains two specific prohibitions:

- Section 441h(a) forbids a federal candidate or an agent of a federal candidate from misrepresenting his or her authority to speak, write, or otherwise act for any other federal candidate or political party in a matter which is damaging to that other candidate or political party. For example, Section 441h(a) would prohibit an agent of federal candidate A from issuing a statement that was purportedly written by federal candidate B and which concerned a matter which was damaging to candidate B.

- Section 441h(b) forbids any person from fraudulently representing his or her authority to solicit contributions on behalf of a federal candidate or political party. This provision was added by BCRA and became effective on November 6, 2002. For example, this provision would prohibit any person from raising money by claiming that he or she represented federal candidate A when in fact the person had no such authority.

## 13. Retention of Federal Election Records. 42 U.S.C. § 1974

The detection, investigation, and proof of election crimes – and in many instances Voting Rights Act violations – often depend on documentation generated during the voter registration, voting, tabulation, and election certification processes. In recognition of this fact, and the length of time it can take for credible evidence suggesting election fraud or voting rights violations to develop, Congress enacted Section 1974 to require that documentation generated in connection with the voting and registration process be

81

retained for twenty-two months if it pertained to an election that included a federal candidate. Absent this statute, the disposition of election documentation would be subject solely to state law, which in virtually all states permits its destruction within a few months after the election is certified.

Section 1974 provides for criminal misdemeanor penalties for any election officer who willfully fails to retain records covered by the statute. Section 1974a provides similar criminal penalties for election officers or other persons who willfully steal, destroy, or alter covered records.[37] In addition to these criminal penalties, the reach of this statute to specific categories of election documentation is critical to both prosecutors and election administrators, who must often resolve election disputes and answer challenges to the fairness of elections.[38]

For this reason, a detailed discussion of Section 1974 and its application to particular types of election documentation generated in the current age of electronic voting will be presented here.

### (a)  Legislative purpose and background

The voting process generates voluminous documents and records, ranging from voter registration forms and absentee ballot applications to ballots and tally reports. If election fraud occurs, these records often play an important role in the detection and prosecution of the crime. Documentation generated by the election process also

---

[37] Election administrators, document custodians, or other persons who willfully violate Section 1974 or Section 1974a are subject to imprisonment for up to one year.

[38] Indeed, the federal courts have recognized that the purpose of this federal document retention requirement is to protect the right to vote by facilitating the investigation of illegal election practices. *Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962).

plays an equally important role in the detection, investigation, and prosecution of federal civil rights violations.

State laws generally require that voting documents be retained for sixty to ninety days.  Those relatively brief periods are usually insufficient to make certain that voting records will be preserved until more subtle forms of federal civil rights abuses and election crimes have been detected.

In 1960, Congress enacted a federal requirement that extended the document retention period for elections when federal candidates were on the ballot for *twenty-two months* after the election. Pub. L. 86-449, Title III, § 301, 74 Stat. 88; 42 U.S.C. §§ 1974-1974e.  As noted above, this documentation retention requirement is backed-up with criminal misdemeanor penalties that apply to election officers or other persons who willfully destroy covered election records before the expiration of the federal retention period.

The retention requirements of Section 1974 are aimed specifically at election administrators.  In a parochial sense, these laws place criminally sanctionable duties on election officials.  However, in a broader sense, this federal retention law assists election administrators in performing the tasks of managing elections and determining winners of elective contests.  It does this by requiring election managers to focus appropriate attention on the types of election records under their supervision and control that may be needed to resolve challenges to the election process, and by requiring that they take appropriate steps to ensure that those records will be preserved intact until such time as they may become needed to resolve legitimate questions that frequently arise involving the election process.

### (b)  The basic requirements of Section 1974

Section 1974 requires that election administrators preserve for twenty-two months "all records and papers" that come into their

83

possession relating to any "application, registration, payment of poll tax, or other act requisite to voting." This retention requirement applies to all elections in which a candidate for federal office was on the ballot, that is, a candidate for the United States Senate, the United States House of Representatives, President or Vice President of the United States, or presidential elector. Retention and disposition of records in elections with no federal candidate on the ballot are governed by state law. Section 1974 does not apply to records generated in connection with purely local or state elections.

However, Section 1974 does apply to all records generated in connection with the process of registering voters and maintaining current electoral rolls. This is because voter registration in virtually all United States jurisdictions is "unitary" in the sense that a potential voter registers only once to become eligible to vote for both local and federal candidates. *See United States v. Cianciulli*, 482 F.Supp. 585 (E.D. Pa. 1979). Thus, registration records must be preserved as long as the voter registration to which they pertain is considered an "active" one under local law and practice, and those records cannot be disposed of until the expiration of twenty-two months following the date on which the registration ceased to be "active."

This statute must be interpreted in keeping with its congressional objective: under Section 1974, all documents and records that may be relevant to the detection or prosecution of federal civil rights or election crimes must be maintained if the documents or records were generated in connection with an election that included one or more federal candidates.

### (c)   Section 1974 requires document preservation, not document generation

Section 1974 does *not* require that states or localities produce records in the course of their election processes. However, if a state or locality chooses to create a record that pertains to voting, this

84

statute requires that record be retained if it relates to voting in an election covered by the statute.

### (d)  Originals must be retained

Section 1974 further requires that the original documents be retained, even in those jurisdictions that have the capability to reduce original records to digitized replicas. This is because handwriting analysis may be difficult to perform on digitized reproductions of signatures, and because the legislative purpose advanced by this statute is to preserve election records for their evidentiary value in criminal and civil rights lawsuits. Therefore, in states and localities that employ new digitization technology to archive election forms that were originally manually subscribed by voters, Section 1974 requires that the originals be maintained for the requisite twenty-two month period.

### (e)  Election officials must supervise storage

Section 1974 requires that covered election documentation be retained either physically by election officials themselves, or under their direct administrative supervision. This is because the document retention requirements of this federal law place the retention and safekeeping duties squarely on the shoulders of election officers, and Section 1974 does not contemplate that this responsibility be shifted to other government agencies or officers.

An electoral jurisdiction may validly determine that election records subject to Section 1974 would most efficiently be kept under the physical supervision of government officers other than election officers (e.g., motor vehicle departments and social service administrators). This is particularly likely to occur following the enactment in 1993 of the National Voter Registration Act, which for the first time in many states authorizes government agencies other than election offices to play a substantive role in the voter registration process.

If an electoral jurisdiction makes such a determination, Section 1974 requires that administrative procedures be in place giving election officers ultimate management authority over the retention and security of those election records. Those administrative procedures should ensure that election officers retain ultimate responsibility for the retention and security of covered election records, that they also retain the right to physically access and dispose of them, and that the terms and conditions of storage conform to the retention requirements of the statute.

### (f)  Retention not required for certain records

Documentation generated in the course of elections held *solely* for local or state candidates, for bond issues, initiatives, referenda and the like, is not covered by Section 1974 and may be disposed of within the usually shorter time periods provided under state election laws.  However, if there is a federal candidate on the ballot in the election, the federal retention requirement of twenty-two months applies.

### (g)  Retention under Section 1974 versus retention under the National Voter Registration Act

The retention requirements of Section 1974 interface significantly with somewhat similar retention requirements of the National Voter Registration Act, 42 U.S.C. § 1973gg-6(i).  However, there are four major differences between these two provisions:

- Section 1974 applies to all records generated by the election process, while Section 1973gg-6(i) applies only to registration records generated under the NVRA.

- Section 1974's retention period is twenty-two months while Section 1973gg-6(i)'s retention period is two years.

86

- Section 1973gg-6(i) requires that, with certain exceptions, covered records also must be made available to the public for inspection for two years.

- Violations of Section 1974 are subject to criminal sanctions, while violations of Section 1973gg-6(i) are subject only to noncriminal remedies.

## E.   POLICY AND PROCEDURAL CONSIDERATIONS

Election-related allegations range from minor infractions, such as campaigning too close to the polls, to sophisticated criminal enterprises aimed at ensuring the election of corrupt public officials. Such matters present obvious and wide disparities in their adverse social consequences.  As the Department has long strived to achieve a nationally consistent response to electoral fraud, it is important that federal investigators and prosecutors avail themselves of the expertise and institutional knowledge that the Public Integrity Section possesses in this sensitive area of law enforcement.

### 1. Consultation Requirements

The Department of Justice has a long-standing consultation policy for election crime investigations involving violations of the statutes discussed in this chapter.  The policy is set forth in Section 9-85.210 of the U.S. DEP'T OF JUSTICE, UNITED STATES ATTORNEYS' MANUAL (USAM).  The purposes of the consultation policy are to assist federal prosecutors and investigators in determining whether there is a sufficient factual legal basis to commence a federal criminal investigation, and, if so, to ensure that the investigation is timed in a manner that does not interfere with the adjudication of the election itself.

Upon receipt of an election fraud allegation, a United States Attorney's Office may, if the Office considers it warranted, request

87

the FBI to conduct a preliminary investigation. Consultation with the Public Integrity Section is not required at this initial stage, although it is always welcome.

If the results of the preliminary investigation[39] suggest that further investigation is warranted, the United States Attorney's Office should contact the Public Integrity Section. Specifically, consultation with the Section, and with higher-level Department officials in the event agreement is not reached is required for all grand jury and "full-field" investigations[40] of election fraud. Consultation with Public Integrity is also required prior to filing any complaint or information, or prior to requesting a grand jury to act upon a proposed indictment, that charges any of the election fraud offenses discussed in this chapter.

In practice, consultation typically proceeds as follows:

- The results of the preliminary investigation are submitted to FBI Headquarters and the Public Integrity Section, together with the recommendation of the United States Attorney's Office as to whether further

---

[39] For purposes of election crime matters, a "preliminary investigation" includes those investigative steps necessary to flesh out the complaint in order to determine whether a federal crime may have occurred, and, if so, whether federal prosecution of that offense is appropriate. It generally involves an FBI interview of the complainant and follow-up on investigative leads arising from the interview. *See*, in this connection, the FBI's <u>Manual of Investigative Operations and Guidelines</u>, § 56-9.2.

[40] In connection with election crime matters, a "full-field" FBI investigation is, essentially, anything beyond a preliminary investigation. It is typically a broad-based investigation that often accompanies a grand jury investigation. Its purpose is to develop sufficient evidence of federal crimes to support federal charges.

88

investigation is warranted.  At this point, if the matter has merit, it is discussed informally between the Section and the Assistant United States Attorney responsible for the matter, and, on occasion, between the Section and the FBI.

- The Public Integrity Section may suggest that additional investigation be conducted before determining whether a full-field or grand jury investigation is warranted.  The Section may also request a preliminary investigation of a matter that has been declined by a United States Attorney's Office.

- If the Public Integrity Section agrees that a full-field investigation and/or grand jury investigation of an election fraud allegation is warranted, a communication, in the form of an e-mail confirming this determination, is generally sent by the Section to the Assistant United States Attorney.  At this stage, the Public Integrity Section also notifies FBI Headquarters that it has approved the initiation of a full-field or grand jury investigation of the matter.  There is usually a discussion at this point of whether the United States Attorney's Office is able to make a commitment to prosecute any case that the investigation may generate, and, if not, whether the Public Integrity Section will handle the matter either jointly with the United States Attorney's Office or by itself.

- The initiation of any grand jury process in the matter, including the issuance of subpoenas for election documentation, requires prior consultation with the Public Integrity Section.  This consultation is often done by phone, especially if speed is considered necessary to preserve voting documentation. As a rule,

89

the Public Integrity Section will approve use of a grand jury at the time it approves a full-field investigation.

- Once this consultation has occurred, the United States Attorney's Office investigates the matter as it deems appropriate. While further consultation is not required until the charging stage, the Section welcomes questions and consultations regarding ongoing investigations.

- All indictments charging election fraud must be discussed with the Public Integrity Section before submission to the grand jury, as well as all informations and criminal complaints.

- While acceptance of a plea agreement does not require consultation, this is encouraged in order to ensure that the plea agreement is consistent with those negotiated in similar cases elsewhere and with other department policies applicable with plea agreements. In addition, it is recommended that the Section be consulted in the case of pre-indictment pleas, although not required.

## 2. Urgent Reports and Press Releases

A United States Attorney's Office that is conducting an election fraud investigation should also submit urgent reports through the Executive Office for United States Attorneys at each critical stage of the investigation and ensuing prosecution. In addition, the filing of criminal charges should be accompanied by a press release that has been approved, when appropriate, by the Department's Office of Public Affairs.

90

### 3. Federal Seizure of State Election Materials

Federal custody of election materials is normally obtained by grand jury subpoena. In taking custody of election documents, election officials should not be deprived of documents necessary to tally and recount the ballots and to certify the election results.[41] Accordingly, copies in lieu of originals should be accepted until the state's need for the documentation expires. Originals may eventually be necessary for handwriting and other forensic analysis and for evidentiary purposes.

### 4. Noninterference with Elections

The Justice Department's goals in the area of election crime are to prosecute those who violate federal criminal law and, through such prosecutions, to deter corruption of future elections. The Department does not have a role in determining which candidate won a particular election, or whether another election should be held because of the impact of the alleged fraud on the election. In most instances, these issues are for the candidates to litigate in the courts or to advocate before their legislative bodies or election boards. Although civil rights actions under 42 U.S.C. § 1983 may be brought by private citizens to redress election irregularities, the federal prosecutor has no role in such suits.

In investigating an election fraud matter, federal law enforcement personnel should carefully evaluate whether an investigative step under consideration has the potential to affect the election itself. Starting a public criminal investigation of alleged election fraud before the election to which the allegations pertain has been concluded runs the obvious risk of chilling legitimate voting and campaign activities. It also runs the significant risk of interjecting the

---

[41] An exception to this rule might be warranted if the facts indicate that the election officials are involved in an ongoing election fraud scheme.

investigation itself as an issue, both in the campaign and in the adjudication of any ensuing election contest.

Accordingly, overt criminal investigative measures should not ordinarily be taken in matters involving alleged fraud in the manner in which votes were cast or counted until the election in question has been concluded, its results certified, and all recounts and election contests concluded.  Not only does such investigative restraint avoid interjecting the federal government into election campaigns, the voting process, and the adjudication of ensuing recounts and election contest litigation, but it also ensures that evidence developed during any election litigation is available to investigators, thereby minimizing the need to duplicate investigative efforts.  Many election fraud issues are developed to the standards of factual predication for a federal criminal investigation during post-election litigation.

The Department views any voter interviews in the pre-election and balloting periods, other than interviews of a complainant and any witnesses he or she may identify, as beyond a preliminary investigation.  A United States Attorney's Office considering such interviews must therefore first consult with the Public Integrity Section.  USAM 9-85.210.  This consultation is also necessary before any investigation is undertaken near the polls while voting is in progress.

The policy discussed above does not apply to covert investigative techniques, nor does it apply to investigations or prosecutions of federal crimes other than those that focus on the manner in which votes were cast or counted.  However, if there is any doubt about whether the policy may apply, we recommend that the Public Integrity Section be consulted.

Exceptions to this general rule of course exist.  For example, one exception may be appropriate when undercover techniques are justified and the Department's guidelines for undercover operations have been met.  Another exception may apply when it is possible to

92

both complete an investigation and file criminal charges against an offender prior to the period immediately before an election. All such exceptions require consultation with the Public Integrity Section, as they involve action beyond a preliminary investigation.

### 5. Limitations on Federal Poll Watching

Federal agents may not be stationed at open polling places, except in cases of discrimination covered by the Voting Rights Act, or as part of the Civil Rights Division's oversight obligations with respect to the election system mandates enacted by the Help America Vote Act.[42]

Control of polling places is governed by state laws that regulate who is authorized to be inside a polling place. Many of these laws have criminal penalties. Most states provide that no one except voters, election administrators, and perhaps party representatives may serve as poll watchers, or even approach closer than fifty to one hundred feet from an open poll. Except in Illinois, state poll access statutes do not contemplate that federal agents serve as poll watchers or otherwise enter areas when polling is taking place. Therefore, other than as specifically provided by the Voting Rights Act and other civil rights laws, there is no statutory basis for federal personnel to serve as poll watchers.

In fact, federal law provides criminal penalties for any federal official who sends "armed men" to open polling locations. 18 U.S.C. § 592. Accordingly, the FBI's <u>Manual of Investigative Operations</u>

---

[42] In such cases, the Civil Rights Division's Voting Section determines if there is a risk that voting by minorities will be impeded in a location specially covered by the Voting Rights Act. If so, the Voting Section will ask that the location be certified for "federal observers." Such observers are sent to view conduct at the polls and report back through the Voting Section; they have no role in the detection of election crimes not involving racial animus.

93

and Guidelines, at § 56-8(6), provides that investigations in the vicinity of open polls must first be approved by the Justice Department.

### 6. Selective Prosecution Issues

The prosecution of certain types of electoral corruption can occasionally present sensitive issues of selective prosecution. A definitive analysis of the law in this area, in the context of a voter fraud case, is contained in *United States v. Smith*, 231 F.3d 800 (11th Cir. 2000).

## F.    SUGGESTIONS   FOR   SUCCESSFUL   ELECTION FRAUD CASE INVESTIGATIONS

Most of the general principles and procedures that govern federal criminal investigations apply to the investigation of election crimes. This section will discuss those investigative issues and tactics that are unique to election fraud cases.

Election fraud prosecutions are usually fairly easy to present, and the Department's conviction rate has been quite good. These prosecutions have proven to be a fast and effective method of combating election corruption. Moreover, because the motive for most election fraud is to corrupt the public office sought by those committing the fraud, these cases also provide an avenue to address other serious forms of public corruption.

If properly managed, election fraud cases are generally well received by the public. Favorable public reaction is likely to generate additional investigative leads in this sensitive area of criminal law enforcement.

94

## 1. Getting Started

Several basic steps underlie most successful election fraud investigations.

### (a) Publicize your intent to prosecute election fraud

Most complaints that lead to prosecutable election fraud cases come from participants in the political process, such as voters, candidates, campaign workers, and poll officials. However, in places where election fraud has been entrenched, there is often widespread tolerance of election abuses among local law enforcement authorities. This frequently leads to public cynicism, which must be overcome if productive complaints are to be generated. The following steps can help:

- Hold press conferences before important elections and announce that prosecution of election fraud is a federal law enforcement priority.

- Ensure that Assistant United States Attorneys and FBI Special Agents are accessible to the public during and immediately after important elections by publicizing the telephone numbers through which the public can reach them.

- Contact local election administrators (registrars, county and town clerks, boards of election, etc.) and high-level state officials (the State Attorney General's Office, Secretary of State) to enlist their support in detecting and reporting election abuses. These people are generally dedicated public servants who want to eliminate criminal election abuses. They are also the custodians of important records generated during the voting process.

95

### (b) Be aware of the importance of voting documentation

The voting process generates voluminous documentary evidence. Federal law requires that all voting documentation relating to an election that includes a federal contest be retained for at least twenty-two months after the election. 42 U.S.C. § 1974. The 1993 National Voter Registration Act extended this period to two years for voter registration records generated under the Act. 42 U.S.C. § 1973gg-6(i). Because the federal retention periods are significantly longer than normally required by state law, it is important to contact all election administrators in the district at the beginning of a ballot fraud investigation to be certain that they are aware of these federal requirements.

Voting documentation includes voter registration cards, absentee ballot applications, absentee ballot envelopes, tally sheets, poll lists, and ballots. These materials are particularly important to successful election crime investigations, since they contain information that helps identify fraudulent voting transactions and potential defendants. For example:

- Most states require persons seeking to vote to provide personal information to election registrars, and to furnish a handwriting specimen for comparison with the voter's signature on the registration form. These data can be used to determine the authenticity of specific voting transactions.

- In many states, voters must sign a poll list before casting their ballots on election day. The validity of a particular voting transaction can be determined by comparing a voter's signature at the polls to the signature on his or her registration card. Persons responsible for casting fraudulent

96

votes may be identified by comparing the poll list signatures of known fraudulent voting transactions to exemplars taken from suspects.

- States generally require voters to apply for absentee ballots in writing. They also customarily require an absentee voter to sign an oath (generally on the ballot envelope) attesting to the authenticity of the vote. These signatures can be used to identify fraudulent voting transactions and might also help identify potential defendants.

- Election officials are generally required to maintain logs of absentee applications received and approved, and of ballots issued, returned, and challenged. Once a few fraudulent voting transactions have been identified, this information can be used to identify the subjects with whom the voters involved dealt, and to locate other voters who also dealt with the same subjects.

- Election day tally sheets normally contain the handwritten certification of the poll officials who prepared them, and in many states these officials are required to execute an oath attesting to the authenticity and accuracy of the returns. These documents may corroborate the identities of those persons with official access to the tally sheets.

- Many states require voters who ask for help in voting at the polls to execute affidavits identifying the person they wish to accompany them into the voting booth. This information can be used to identify patterns of voter intimidation and voter bribery.

97

### (c)  Consider the advantages of federal prosecution

Although the states have principal responsibility for administering the election process, many state law enforcement authorities are not well equipped to act effectively against ballot fraud.  State and local prosecutors should be advised of the federal interest in prosecuting election fraud, and of the following factors that favor federal prosecution of this type of case:

- Resources:  Election fraud investigations usually require a fairly large manpower commitment, which the federal government is normally better able to marshal than are local law enforcement authorities.

- Grand jury:  The development of election crime cases requires an effective grand jury process through which testimony can be secured from the vulnerable witnesses who are frequently encountered in these cases, and through which necessary documentation can be secured.

- Broadly drawn venires:  Election fraud is usually best tried by juries that are not drawn from the immediate location where the alleged fraud occurred.  Federal venires are normally drawn from wider geographic areas than are state or local venires.

- Political detachment:  State and local prosecutors are usually more closely linked to local politics than are federal prosecutors.  Federal prosecution of election crime may therefore be viewed by the public and the media as more impartial.

98

### (d) Focus on areas vulnerable to election fraud

Election crime is most apt to occur in jurisdictions where there is substantial conflict among political factions, where voters are fairly equally distributed among factions, where local officials wield substantial power, and where there is a high degree of voter apathy. Jurisdictions meeting these criteria should be identified, and complaints coming from them given special attention in allocating investigative resources.

### (e) Develop your investigative strategy early

The typical election fraud scheme involves many levels of participants performing a variety of tasks on behalf of political operatives. For example, vote-buying schemes usually have "haulers" who take voters to the polls and pay them; "lieutenants" or "bankers" who obtain and distribute the money to the haulers; "captains" who coordinate the activities of the haulers; and "checkers" who accompany the voters into the voting booth to assure that they vote "correctly."

It is important to attempt at an early stage to identify as many of the participants in the scheme as possible and to assess their relative culpability. It is also helpful to identify the likely motive behind the scheme. An investigative strategy can then be developed which targets low-level participants for the purpose of encouraging them to be witnesses against more highly placed participants in the election scheme. These less culpable participants might also provide evidence and leads regarding the illegal activity or scheme motivating the election fraud.

### 2. The Investigation

Election fraud investigations fall into two stages: a preliminary investigation, followed by a grand jury investigation along with an FBI full-field investigation. Preliminary investigations are usually

99

initiated by the United States Attorney's Office or FBI office that received the complaint. Consultation with the Public Integrity Section is required before grand jury and FBI full-field investigations are initiated. FBI participation must also be approved by FBI Headquarters.

### (a)  Preliminary investigation

A preliminary investigation typically involves interviewing the complainant, then conducting a sufficient investigation to:

- Identify the crime allegedly committed;

- Determine whether that crime is prosecutable under federal law;

- Evaluate the need for federal intervention as a function of –

  - ‣ the extent to which the crime may have impacted adversely on a federal election,

  - ‣ the extent to which the crime corrupted the registration or voting process, and

  - ‣ the desire and capability of local law enforcement officials to handle the case;

- Identify persons who may have participated in the scheme; and

- Identify, if possible, a few specific fraudulent voting transactions.

After the results of the preliminary investigation are reviewed by the United States Attorney's Office, they are forwarded to the

100

Public Integrity Section and FBI Headquarters, along with the United States Attorney's recommendation as to whether further investigation is warranted. At this point, the matter will usually be discussed between attorneys in the Public Integrity Section and the United States Attorney's Office handling the matter. After this consultation, a grand jury and/or full-field investigation will be initiated in appropriate cases.

### (b)  Grand jury and FBI full-field investigations

The purposes of grand jury and FBI full-field investigations are to develop sufficient evidence against specific subjects to support criminal charges. These investigations are often time-consuming and labor-intensive, and generally involve obtaining and examining many election documents. Investigative approaches for two common types of election fraud are discussed below.

### 3.  Investigating Two Types of Election Fraud

The most frequently encountered election frauds are absentee ballot fraud and ballot-box stuffing. Strategies for investigating these frauds are similar, but not identical.

### (a)  Absentee ballot frauds

Absentee ballot frauds involve the corruption of absentee voting transactions through such means as bribery, forgery, intimidation, and voter impersonation. Investigating these frauds involves identifying specific fraudulent voting transactions, interviewing voters who were corrupted or defrauded, using these persons as witnesses to prosecute those who corrupted or defrauded them, and flipping those defendants to make cases against higher-level targets. The typical investigative approach is to:

- Subpoena relevant absentee ballot documentation. This documentation includes applications for

101

absentee ballots; absentee ballots; envelopes in which ballots are placed (usually called a "privacy" or an "oath" envelope); outer envelopes forwarding ballots for tabulation (usually called a "mailer"); logs kept by election officials of applications issued, applications received, ballots issued, ballots returned, and ballots challenged; and the permanent voter registration cards for the voters ostensibly involved.

- <u>Analyze election documents</u>.
  Ballot applications and oath envelopes generally contain three key items that often reveal questionable voting transactions: the voter's purported signature, signatures of witnesses or notaries, and the address where the ballot package was sent. Examples of significant data are common notaries and witnesses; mismatches of voters' signatures on absentee ballot applications, ballot envelopes, or registration cards; and applications directed to be sent to addresses other than the addresses of the voters.

- <u>Identify similar transactions</u>.
  If the preliminary investigation identifies specific questionable voting transactions, the document analysis should be directed at identifying voting transactions having similar characteristics, such as the same handwriting, witnesses, or addresses to which absentee ballot packages were sent.

- <u>Interview voters allegedly involved</u>.
  After identifying questionable voting transactions, the voters whose names appear on the documents should be interviewed to determine whether they voted, and if so, under what circumstances (for

102

example, whether they were paid, intimidated, or not consulted).

- Compare handwriting exemplars of subjects. Handwriting exemplars of persons suspected of forging absentee ballot documents should be obtained and compared with the handwriting on those questioned documents.

- Develop multiple witnesses. Voters involved in fraudulent voting transactions are usually poorly educated, often intimidated by defendants and courtrooms, and generally may not make strong witnesses.[43] Successful prosecution of this type of case normally requires the testimony of several voter-witnesses against each defendant.

**(b) Ballot-box stuffing cases**

These cases involve the insertion into ballot boxes of invalid, fraudulent, or otherwise illegal ballots. All ballot-box stuffing schemes necessarily involve poll officials, since access to voting documents is essential to this type of fraud and is controlled by state law. Ballot-box stuffing investigations seek to identify fraudulent voting transactions and to link specific poll officials to them. The general investigative methodology is to:

- Subpoena election documents: Obtain and examine the poll lists or other documentation that voters sign when entering the

---

[43] These very factors, on the other hand, demonstrate to the jury the susceptibility of these persons to manipulation, which is often important evidence in the case.

103

polls; the registration cards for voters residing in the target precinct, any paper or punch card ballots, and any tally sheets prepared by the poll officials reporting the election results.

- Examine election documents.
  Examine poll lists for similar handwriting, giving special attention to names entered at times when voting activity was slow (such as mid-morning and early afternoon) and shortly before the polls closed.

- Compare voters' signatures.
  Compare signatures on the poll list with corresponding permanent registration cards to identify voters who may not have cast the ballots attributed to them.

- Take handwriting exemplars.
  Take exemplars from each poll official having access to the ballot box, and then compare them with questionable signatures of alleged voters.

- Interview voters.
  Interview the voters whose ballots were used in the scheme to determine whether they voted at the polls, and, if so, under what circumstances.[44]

### 4. A Few Cautions

Election fraud investigations raise a number of issues not normally encountered in other criminal investigations. Federal

---

[44] Successful prosecution of those schemes may require the cooperation of a poll official or other "insider."

104

prosecutors and investigators should keep the following principles in mind:

- Respect the integrity of the polls.
  All states define by statute those persons entitled to be inside the polls during an election.  Most state poll access laws do not permit federal law enforcement officials access to open polling places.  Asking federal investigators to enter open polls risks violating the sovereignty that the states have in this area, and might lead to confrontations among poll officials, local police, and federal agents.  It also risks violating a federal statute that prohibits sending armed federal agents to the polls.  18 U.S.C. § 592.

- Noninterference with the voting process.
  States use many types of documentation in conducting elections (such as registration cards, voter lists, poll books, and voting machines), and in tabulating and certifying the results (such as ballots, tally sheets, and absentee voting materials).  Subpoenas for such documentation should be timed, and compliance procedures developed, so as not to deprive election officials of records they need to tabulate votes and certify election returns.

- Need for probable cause before opening sealed ballots.
  Absentee ballots might come into the possession of federal officials while still sealed in the envelopes bearing the names of the voters who ostensibly marked them.  Also, a few states provide for some types of paper ballots to be numbered in a way that corresponds with the order of signatures on a poll list.  In either situation, marked ballots can be attributed to individual voters.  This is particularly useful in cases involving suspected fraud in the marking or alteration of the

105

ballot document itself. However, since voted ballots are documents in which individuals have an expectation of privacy, sealed ballots should not be opened without satisfying the Fourth Amendment's probable cause standard. Accordingly, a search warrant should be obtained before taking investigative steps that would result in linking individual ballots to the voters who allegedly cast them. Alternatively, if the individuals whose names appear on the sealed ballot envelopes deny that they voted, these individuals may be asked if they are willing to open the ballot envelopes ostensibly "voted" by them.

## 5. Conclusion

Election fraud cases can be successful and uncomplicated. However, prosecutors and investigators should use great care to avoid the pitfalls peculiar to these types of cases. Close consultation with the Public Integrity Section and its Election Crimes Branch, although not required after grand jury and FBI full-field investigations have been approved, can help avoid those pitfalls, develop effective investigative and legal strategies, and increase the likelihood of prosecutive success.

106

# CHAPTER THREE

# PATRONAGE CRIMES

## A.    HISTORICAL BACKGROUND

Federal jurisdiction over patronage crimes is usually attained by virtue of the federal funds involved in a government job or benefit that is used to induce or reward partisan activity by government employees.  Over the past century, Congress has enacted, at roughly fifty-year intervals, three landmark pieces of legislation in this area.

Until the Hatch Act reform amendments of 1993, most federal laws dealing with patronage abuses of government personnel and programs derived from either the 1883 Pendleton Civil Service Act or the 1939 Hatch Act.  The Pendleton Act aimed at dismantling the partisan "spoils system" that existed in the executive branch of the federal government at the time; it created a merit civil service, and enacted the Civil Service Commission to ensure nonpartisan federal employment.   The Act also contained four criminal provisions designed to protect federal employees against political manipulation. These provisions, now codified at 18 U.S.C. §§ 602, 603, 606, and 607, prohibit political shakedowns of federal employees, political activity in federal workspace, and politically motivated threats and reprisals against federal employees.

In 1907, President Theodore Roosevelt promulgated an executive order, known as Civil Service Rule No. 1, that prohibited most active campaigning and electioneering by merit civil servants. Over the next thirty years, the Civil Service Commission decided approximately 2,000 administrative cases involving alleged violations of this executive order, and in the process defined the scope of permissible political activities.

107

In 1939, the Hatch Act codified this ban on active partisan campaigning by executive branch employees, and incorporated those Civil Service Commission rules that defined permissible and impermissible activities. 5 U.S.C. § 7324 (repealed 1993). The Hatch Act also provided criminal penalties for various forms of political abuses in the administration of federal law, policies, and programs; these criminal provisions are now codified at 18 U.S.C. §§ 595, 598, 600, 601, 604, and 605.

In 1993, Congress enacted its third major piece of civil service legislation, which significantly reduced the scope of the 1939 Hatch Act ban on political activities. 5 U.S.C. §§ 7321-7326. The 1993 Hatch Act amendments permit all federal employees in the executive branch (other than those working in specified law enforcement or national security agencies) to engage in overt partisan activity, including the solicitation of political contributions from colleagues under certain circumstances. Although the amendments included a new anti-patronage provision, the overall goal was to remove the statutory shield, deemed no longer necessary, that had separated partisan politics and federal employment for over half a century.

Current federal law limits patronage practices and partisan political considerations in the federal civil service and in the administration of federal laws and programs. In extreme cases, patronage abuses may constitute a conspiracy to defraud the United States in the operation of a federally funded program. *See, e.g., United States v. Pintar*, 630 F.2d 1270 (8th Cir. 1980); *Langer v. United States*, 76 F.2d 817 (8th Cir. 1935). The Supreme Court, through a line of cases dating back to the 1970s, has held that personnel decisions involving the award, termination, or modification of employment conditions of ministerial positions in the public sector cannot be made solely on the basis of partisan association or partisan loyalty. To do so violates the First Amendment rights of public employees or those seeking such positions. *Rutan v. Republican Party of Illinois*, 497 U.S. 62 (1990); *Branti v. Finkel*, 445 U.S. 507 (1980); *Elrod v. Burns*, 427 U.S. 347 (1976). On the other hand, the

108

Court recognized that partisan considerations may constitutionally play a part in personnel decisions involving public employees who occupy policymaking positions or positions involving confidential relationships to senior public officers, when partisan loyalty is a reasonably necessary element of the job. *Id.* The distinction between ministerial public positions and those that involve policy formulation is difficult, and has, in the past, been left by the courts largely to a case-by-case analysis. Nevertheless, the distinction is important in assessing the scope and purpose of federal criminal laws addressing illegal patronage.

## B.   STATUTES

The text of the criminal statutes discussed in this section is printed in Appendix C. Each of these statutes carries, in addition to the prison term noted, fines under 18 U.S.C. § 3571.

### 1.   Limitations Based on Federal Employment or Workspace

#### (a)   Solicitation of political contributions: 18 U.S.C. § 602

Section 602 prohibits a United States Senator or Representative, a candidate for Congress, officer or employee of the United States, or person receiving compensation for services from the United States Treasury, from knowingly soliciting any contribution from any other such officer, employee, or person, except as permitted under the 1993 Hatch Act amendments. The statute applies only to contributions made to influence a federal election. Violations are punishable by imprisonment for up to three years.

Section 602 has been interpreted by the courts as criminalizing aggravated forms of political "shakedowns." *United States v. Wurzbach*, 280 U.S. 396, 398 (1930) (statute prohibits exerting "pressure for money for political purpose"); *Ex parte Curtis,*

109

106 U.S. 371, 374 (1882) (statute protects federal employees against political "extractions through fear of personal loss"). *See also Brehm v. United States*, 196 F.2d 769 (D.C. Cir. 1952); *and United States v. Burleson*, 127 F. Supp. 400 (E.D. Tenn. 1954).

The Criminal Division has interpreted Section 602 as not prohibiting a federal employee's solicitation of voluntary political contributions from other nonsubordinate federal employees. However, because of the potential for coercion, express or implied, that inheres in the supervisor-subordinate relationship, contributions solicited from a *subordinate* are not considered "voluntary." The 1993 Hatch Act amendments reflect this interpretation; both the criminal and civil codes, as amended, expressly prohibit the solicitation of subordinates, while allowing certain solicitations of colleagues. The 1993 law further amended Sections 602 to exempt the soliciting activities authorized by the new civil Hatch Act provisions, 5 U.S.C. §§ 7323 and 7324.

All officers and employees of the executive, judicial, or legislative branches of the federal government are within the class reached by Section 602. The statute does not reach persons who are paid with federal funds that have lost their "federal" character, such as state or local government employees or persons paid under federal grants. However, 18 U.S.C. §§ 600 and 601 may cover such persons.

The Federal Election Campaign Act Amendments of 1979 limited Section 602 in two respects. First, the word "knowingly" was added to clarify that the solicitor must have been aware of the federal status of the person solicited. Second, the critical term "contribution" in Section 602 was linked to the definition of this term in FECA, at 2 U.S.C. § 431(8), which restricts "contributions" to financial activities intended to influence a federal election.

110

### (b)  Making political contributions:  18 U.S.C. § 603

Section 603, like Section 602, reaches only contributions made to influence federal elections.  The statute prohibits any officer or employee of the United States, or a person receiving compensation for services from money derived from the United States Treasury, from giving a contribution to any other such officer, employee, or person, or to any United States Senator or Representative, if the person receiving the contribution is the donor's "employer or employing authority."  Although modified by the 1993 Hatch Act amendments, Section 603's basic prohibition against political donations between subordinates and supervisors was retained.[45]  Section 603 applies to all congressional staff and White House employees, as well as to civil service personnel.  Violations are punishable by imprisonment for up to three years.

The Department of Justice Office of Legal Counsel has interpreted Section 603 as *not* reaching voluntary contributions made by rank-and-file employees of the executive branch of the government to campaign committees authorized by an incumbent President or Vice President, provided that such donations are given in compliance with the provisions of the 1993 Hatch Act reform amendments (i.e., voluntarily and while the donor is off duty, not in a federal office space, and not in uniform or in a government-owned vehicle).

### (c)  Intimidation to secure political contributions: 18 U.S.C. § 606

Section 606 makes it unlawful for a United States Senator, United States Representative, or federal officer or employee to discharge, demote, or promote another federal officer or employee, or

---

[45] This prohibition was also added by the 1993 law to the new civil Hatch Act provision.  5 U.S.C. § 7323(a).

111

to threaten or promise to do so, for making or failing to make "any contribution of money or other valuable thing for any political purpose." Violations are punishable by imprisonment for up to three years.

Section 606 encompasses coerced donations of anything of value (including services) from federal employees to a candidate for any elective office – federal, state, or local. This statute should be used in lieu of Section 602 whenever a federal employee is actively threatened with an adverse change to his or her conditions of employment to induce a political contribution. This is also addressed in the discussion of 18 U.S.C. § 610 below.

In the Criminal Division's view, Section 606 was not intended to prohibit the consideration of political factors (such as ideology) in the hiring, firing, or assignment of the small category of federal employees who perform policymaking or confidential duties for the President or Members of Congress. In the executive branch, these senior officials either hold jobs on Schedule C of the excepted service, which by law may be offered or terminated on the basis of such factors, or hold direct presidential appointments and by statute serve at the President's pleasure. Section 606 does, however, protect all federal officials, including senior policymakers, from being forced by job-related threats or reprisals to donate to political candidates or causes.

### (d)  Coercion of political activity:  18 U.S.C. § 610

Section 610 is a relatively new anti-intimidation statute enacted as part of the 1993 Hatch Act amendments to provide additional protections against political manipulation of the federal workforce.

The statute makes it a crime to intimidate, threaten, command, or coerce any employee of the executive branch in order to induce the

112

victim to engage or not engage in any political activity.[46]  The statute also prohibits attempts.  It applies to all elections – federal, state, and local.  Violations of Section 610 are punishable by imprisonment for up to three years.

Section 610 expressly includes within the broad phrase "any political activity" any conduct that relates to voting, to contributing, or to campaigning.  Specifically, Section 610 provides that "any political activity" includes, but is not limited to:  (1) voting or not voting for any candidate in any election; (2) making or refusing to make any political contribution; and (3) working or refusing to work on behalf of any candidate.   The statute thus encompasses intimidation directed at inducing any form of political action.

The statute complements 18 U.S.C. § 606, which addresses coerced political donations from employees in any of the three branches of the federal government.  Section 610 covers a broader range of conduct, while Section 606 protects a larger class of employees.

The inclusion of Section 610 in the 1993 Hatch Act amendments was in recognition of widely held concerns, both in Congress and in federal law enforcement agencies, that any lessening of the Hatch Act's prohibition on political activities may have the unintended effect of increasing the risk of political coercion and manipulation of federal employees.  *See* 139 CONG. REC. H6817 (daily ed. Sept. 21, 1993).

_____

[46] See  also the voter  intimidation  statute enacted by the 1993 National Voter Registration Act, 42 U.S.C. § 1973gg-10(1), discussed in Chapter Two.

113

### (e)  Place of solicitation:  18 U.S.C. § 607

Section 607 makes it unlawful for anyone to solicit or receive a political donation in any room, area, or building where federal employees are engaged in official duties.  The prohibition covers political solicitations that are delivered by mail, as well as those made in person.  *United States v. Thayer*, 209 U.S. 39 (1908).  Violations are punishable by imprisonment for up to three years.

The Bipartisan Campaign Reform Act of 2002 clarified an ambiguity concerning the reach of this statute to solicitations and receipts of political donations that were not intended to influence federal elections, i.e., donations to benefit nonfederal candidates and the nonfederal activities of political parties and other organizations.  Under the revised text, which became effective November 6, 2002, Section 607 reaches the solicitation and receipt of *all* political funds within areas where federal personnel are engaged in official duties.

Section 607 covers all three branches of the federal government.  However, it specifically exempts any contribution for a Member of Congress received by the Member's congressional staff in his or her federal office, provided that there had been no request for the contribution to be delivered to the office, and provided further that the contribution is quickly forwarded to the Member's campaign committee.

Violations of Section 607 require proof that the defendant was actively aware of the federal character of the place where the solicitation took place or was directed.  The employment status of the parties to the solicitation is immaterial; it is the employment status of the persons who routinely occupy the area where the solicitation occurs that determines whether Section 607 applies.

Prosecutable violations of Section 607 may arise from solicitations that can be characterized as "shakedowns" of federal personnel.  Thus, Section 607 reaches solicitations by nonfederal

114

employees, filling a void not covered by Section 602, and also reaches shakedowns of congressional employees, who are not covered by the anti-intimidation prohibition contained in Section 610, that was enacted as part of the 1993 Hatch Act reforms.

When federal premises are leased or rented to candidates in accordance with General Services Administration regulations, the premises are not considered "federal" for the purposes of this statute. The same holds true for United States Postal Service post office boxes. Thus, under appropriate circumstances, political events may be held in leased or rented portions of federal premises, and political contributions may be sent to and accepted in United States post office boxes.

Most matters that have arisen under Section 607 have involved computer-generated direct mail campaigns in which solicitation letters are inadvertently sent to prohibited areas. Such matters are unlikely to warrant prosecution. Instead, the Criminal Division usually advises the person or entity involved of the existence of the prohibition in Section 607, and requests that the mailing lists be purged of addresses that appear to belong to the federal government. A systematic refusal or failure to comply with formal warnings of this kind can serve as a basis for prosecution.

### 2. Limitations Based on Federal Programs and Benefits

#### (a) Promise or deprivation of federal employment or other benefit for political activity: 18 U.S.C. § 600 and § 601

Section 600 makes it unlawful for anyone to promise any employment, position, contract, or other benefit derived in whole or in part from an Act of Congress, as consideration, favor, or reward for past or future political activity, including support for or opposition to any candidate or political party in any election. The statute applies to all candidates – federal, state, and local.

115

Section 601 makes it unlawful for any person knowingly to cause or attempt to cause any other person to make a contribution on behalf of any candidate or political party by depriving or threatening to deprive the other person of employment or benefits made possible in whole or in part by an Act of Congress. The statute defines "contribution" as encompassing anything of value, including services. Like Section 600, it applies to contributions at federal, state, and local levels.

Violations of these statutes are one-year misdemeanors. Although in 1976 Congress increased the fines under Sections 600 and 601 from $1,000 to $10,000, fines under these statutes are actually governed by the general criminal fine structure in 18 U.S.C. § 3571.

Sections 600 and 601 are the two principal statutes providing federal jurisdiction over situations when corrupt public officials use government-funded jobs or programs to advance a partisan political agenda rather than to serve the public interest. Both statutes reach employment and benefits that are funded by Congress in whole or in part. The statutes are not restricted to federal jobs, although Section 601 specifically covers threats to terminate federal employment.[47] Sections 600 and 601 thus protect a broader class of employees than Section 610, which is restricted to federal employees in the executive branch. In addition, there is no minimum amount of federal funds that must be involved in the employment or benefit on which the corrupt demand focuses to trigger a violation.

The principal distinction between Sections 600 and 601 is whether the coerced political activity is demanded as a condition precedent to obtaining a publicly funded job or benefit (Section 600),

---

[47] Section 601 has a parallel provision in 18 U.S.C. § 665(b), which covers programs under the Comprehensive Employment and Training Act.

116

or occurs in the form of a threat to terminate a federal benefit or job the victim already possesses (Section 601).  Section 601 requires proof that the motive for the adverse job action was political and not inadequate performance or some other job-related factor; it is a lesser included offense of Section 606 when the threatened employee is a federal civil servant.

As with Section 606, the Criminal Division believes that Sections 600 and 601 were not intended to reach the consideration of political factors in the hiring or termination of the small category of senior public employees who perform policymaking or confidential duties for elected officials of federal, state, or local governments. With respect to such employees, a degree of political loyalty may be considered a necessary aspect of competent performance.  *Compare Connick v. Myers*, 461 U.S. 138, 148-49 (1983) (upholding dismissal of an allegedly disruptive assistant district attorney), *with Rutan v. Republican Party of Illinois*, 497 U.S. 62 (1990) (patronage promotions and hirings of rank-and-file public employees violate rights of speech and association); *Branti v. Finkel*, 445 U.S. 507, 517-19 (1980) (public employees may not be discharged based solely on their political beliefs unless party affiliation is an appropriate requirement for effective performance); *and Elrod v. Burns*, 427 U.S. 347, 367 (1976) (patronage dismissals of nonpolicymaking public employees violate the First and Fourteenth Amendments).

Although Sections 600 and 601 are misdemeanors, there are alternative felony theories of prosecution that may be applicable to conduct implicating these statutes.  Such theories include:

- The Travel Act, 18 U.S.C. § 1952, in states having statutes that broadly define bribery and extortion.

- Honest services mail fraud, 18 U.S.C. §§ 1341 and 1346, to the extent that the patronage scheme results in the breach of a public official's fiduciary duty of honesty.

117

- Conspiracy to defraud the United States, 18 U.S.C. § 371, to the extent that the evidence shows a conspiracy to defraud the public of the fair and impartial administration of a federal grant or program.

- Bribery concerning federally funded programs, 18 U.S.C. § 666. However, the Third Circuit has held Section 666 inapplicable to a scheme to demand nonpecuniary political services from public employees. *United States v. Cicco*, 938 F.2d 441 (3d Cir. 1991).

The *Cicco* case illustrates the use of alternative theories to prosecute local public officials for corrupt patronage abuses. Unfortunately, the case also illustrates the difficulties involved in prosecuting patronage crimes under current law. Although the jury convicted the defendants under both Section 601 and Section 666, the two convictions were ultimately reversed on appeal.

In *Cicco*, local public officials demanded political services from part-time public employees, and when the employees refused to perform the services, the employees were denied permanent employment. The patronage scheme was charged under Section 601, and also under Sections 666, 1341, 1346, and 1952. All four prosecutive theories went to the jury, which convicted the defendants on the Sections 601 and 666 counts. In the defendants' first appeal, the Third Circuit reversed the Section 666 convictions, holding that Congress did not intend this statute to apply to the extortion of political activity rather than money. *Id.* In a subsequent appeal, the Third Circuit held that Section 601 does not apply if there are no express threats or specific promises made to induce political services from public employees. *United States v. Cicco*, 10 F.3d 980 (3d Cir. 1993).

118

### (b) Promise of appointment by candidate:
### 18 U.S.C. § 599

This statute prohibits a candidate for federal office from promising appointments "to any public or private position or employment" in return for "support in his candidacy." It is one of the few federal criminal laws specifically addressing campaign-related activity by candidates. It is a class statute that applies only to misconduct by federal candidates. Willful violations are two-year felonies; nonwillful violations are misdemeanors.

Section 599 has potential application when one candidate attempts to secure an opponent's withdrawal, or to elicit the opponent's endorsement, by offering the opponent a public or private job. *See also* 18 U.S.C. § 600, discussed above. It also applies to offers of jobs by federal candidates to *others* to secure endorsements. While Section 599 does not reach offers or payments of *money* to secure withdrawal or endorsements, if the payment was not reported accurately, such matters may be prosecutable as a reporting violation of FECA under 2 U.S.C. §§ 434(b) and 437g(d).

### (c) Interference in election by employees of federal, state, or territorial governments: 18 U.S.C. § 595

Section 595 was enacted as part of the original 1939 Hatch Act. The statute prohibits any public officer or employee, in connection with an activity financed wholly or in part by the United States, from using his or her official authority to interfere with or affect the nomination or election of a candidate for federal office. This statute is aimed at the misuse of official authority. It does not prohibit

119

normal campaign activities by federal, state, or local employees.[48] Violations are one-year misdemeanors.

Section 595 applies to all public officials, whether elected or appointed, federal or nonfederal.   For example, an appointed policymaking government official who bases a specific governmental decision on an intent to influence the vote for or against an identified federal candidate violates Section 595.   The nexus between the official action and an intent to influence must be clear to establish a violation of this statute.

### (d)  Coercion by means of relief appropriations: 18 U.S.C. § 598

Section 598 prohibits the use of funds appropriated by Congress for relief or public works projects to interfere with, restrain, or coerce any person in the exercise of his or her right to vote in any election.   Violations are one-year misdemeanors.

### (e)  Solicitation from persons on relief: 18 U.S.C. § 604

Section 604 makes it unlawful for any person to solicit or receive contributions for any political purpose from any person known to be entitled to, or receiving compensation, employment, or other benefit provided for or made possible by an Act of Congress appropriating funds for relief purposes.   Violations are one-year misdemeanors.

---

[48] However, such political activities must be consistent with the Hatch Act restrictions on political activity, as amended by the 1993 Hatch Act amendments, which will be discussed later in this chapter.

120

### (f) Disclosure of names of persons on relief:
### 18 U.S.C. § 605

Section 605 prohibits the furnishing or disclosure, for any political purpose, to a candidate, committee, or campaign manager, of any list of persons receiving compensation, employment, or benefits made possible by any Act of Congress appropriating funds for relief purposes. It also makes unlawful the receipt of any such list for political purposes. Violations are one-year misdemeanors.

### 3. Permissible Political Activity under the Hatch Act, as Amended: 5 U.S.C. § 7323 and § 7324

Although the 1939 Hatch Act consisted mostly of criminal provisions, it became widely known as a result of its one civil provision, which limited active partisan politicking by executive branch employees. 5 U.S.C. § 7324(a)(2) (repealed). This restriction on overt politicking lasted over fifty years, during which it was challenged on both constitutional and public policy grounds. The constitutional challenges were unsuccessful. *Civil Service Commission v. Letter Carriers*, 413 U.S. 548 (1973); *United Public Workers v. Mitchell*, 330 U.S. 75 (1947). The public policy challenges were successful in part, and ultimately led to the 1993 Hatch Act reforms, which substantively changed the Hatch Act politicking restrictions.

The 1993 legislation lifted the original ban on taking "an active part in political management or in political campaigns" for most employees of the executive branch. However, it continued the ban for employees of the following law enforcement and intelligence agencies:

Federal Election Commission
Federal Bureau of Investigation
Secret Service
Central Intelligence Agency

121

National Security Council
National Security Agency
Defense Intelligence Agency
Merit Systems Protection Board
Office of Special Counsel
Office of Criminal Investigation of the Internal Revenue
    Service
Office of Investigative Programs of the United States
    Customs Service
Office of Law Enforcement of the Bureau of Alcohol,
    Tobacco, and Firearms
National Geospatial-Intelligence Agency
Office of the Director of National Intelligence.

5 U.S.C. § 7323(b)(2)(B)(i).   The ban is also retained for
career members of the Senior Executive Service, 5 U.S.C.
§ 7323(b)(2)(B)(ii), and for employees of the Criminal Division of
the Department of Justice, 5 U.S.C. § 7323(b)(3).

With the foregoing exceptions, federal employees are now
permitted to hold positions in political party organizations; however,
they are still precluded from becoming partisan candidates in
elections to public office.   5 U.S.C. § 7323(a)(3).   In addition,
although solicitations of the general public are still barred, the new
law permits, under certain circumstances, employees who are
members of a union or employee organization to solicit fellow
members for contributions to the organization's political committee.
§ 7323(a)(2).   5 C.F.R. Part 734.

A violation of the Hatch Act's politicking ban is not a federal
crime; it is a personnel infraction.   The statute is enforced by the
United States Office of Special Counsel and by the Merit Systems
Protection Board.   5 U.S.C. §§ 1204 and 1212.

Active partisan campaigning in violation of the Hatch Act can
lead to termination from federal employment, or thirty days'

122

suspension if the Merit Systems Protection Board recommends a lesser penalty.  5 U.S.C. § 7326.

The partisan activity currently prohibited for employees of the specifically designated law enforcement agencies listed above is taking "an active part in political management or in political campaigns."  Both the amended and original statutes expressly define this phrase to include those acts of "political campaigning" that were prohibited by the Civil Service Commission prior to July 19, 1940, the date the original Hatch Act went into effect. 5 U.S.C. § 7323(b)(4); 5 U.S.C. § 7324(a)(2) (repealed 1993); 5 C.F.R. §§ 733.121 – 733.124.

Although a subject of some unfortunate confusion, the Hatch Act ban was never intended to apply to an employee's expression of personal opinion, whether given privately or publicly, on political candidates and issues.  This basic right of expression was recognized in the original 1939 Hatch Act, former 5 U.S.C. § 7324(a)(2).  It was reaffirmed by two appellate decisions, which reversed Hatch Act enforcement actions based on an employee's public expression of political opinion.  *See Biller v. Merit Systems Protection Board*, 863 F.2d 1079 (2d Cir. 1988); *Blaylock v. Merit Systems Protection Board*, 851 F.2d 1348 (11th Cir. 1988).  Finally, the principle was restated in the 1993 Hatch Act amendments.  5 U.S.C. § 7323(c) (employees retain the right to express their opinions on political candidates and issues).  Thus, employees in designated law enforcement agencies who remain covered by the Hatch Act politicking ban retain the right to express their personal political views.

All inquiries concerning possible violations of the Hatch Act politicking ban should be directed to the Office of Special Counsel, 1120 Vermont Avenue, N.W., Washington, D.C. 20419 (202/653-8971).

123

## C.    POLICY AND PROCEDURAL CONSIDERATIONS

United States Attorneys' Offices must consult the Public Integrity Section before instituting grand jury proceedings, filing an information, or seeking an indictment that charges patronage crimes. USAM § 9-85.210. As with election fraud matters, these consultation requirements are intended to assist federal prosecutors in this area and to ensure nationwide uniformity in the enforcement of these criminal patronage statutes.

124

CHAPTER FOUR

# ELECTION DAY PROCEDURES

This chapter summarizes the Election Day Program that the Department of Justice implements for the federal general elections. Although this program has been in effect since 1970, it has taken on added dimensions and importance since the creation of the Department's Ballot Access and Voting Integrity Initiative in 2002. The Election Day Program is also implemented on a narrower geographic basis in connection with other significant elections when the Department determines that the need exists.

There is a substantial federal interest in ensuring that complaints of election abuses that are made during elections are reviewed carefully and that appropriate action is taken promptly. This review allows the Department to determine whether the alleged facts warrant a criminal investigation, and, if so, of what nature and scope. Accordingly, for the past 35 years the Department has implemented an Election Day Program for those elections in which the federal interest is greatest, namely, the federal general elections that occur in November of even-numbered years. During these elections, the entire United States House of Representatives and one-third of the United States Senate are elected, along with, every four years, the President and Vice President. In addition, some federal anti-corruption statutes reach conduct occurring in state and local elections. On a case-by-case basis, the Election Day Program may be expanded to include nonfederal elections when adequate predication exists to suggest a possible violation of federal criminal law.

The Election Day Program calls upon the Department's 93 United States Attorneys to designate one or more senior Assistant United States Attorneys (AUSAs) to serve a two-year term as District Election Officer (DEO) for his or her district. These AUSAs are

125

provided training and guidance by the Department in the areas of election crimes and voting rights violations.  Since 2002, the Department's Criminal Division and Civil Rights Division have conducted annual training conferences for the DEOs prior to the November general elections.

On October 8, 2002, the Department held the first of its Voting Integrity annual conferences for federal prosecutors from around the country on combating election fraud and voting rights abuses.  These annual conferences have become an important part of the Department's Ballot Access and Voting Integrity Initiative.  In his remarks to attendees at the 2002 conference, the Attorney General provided a succinct statement of the significant public policy reasons behind both the new Initiative and the Department's Election Day Program:

> *The strength of our democracy demands that we fulfill the rights of both ballot access and ballot integrity – to guarantee to every citizen, in accordance with the law, the right to vote, and to every voter the right to be counted.*

> *So we come together today to renew our democratic compact with the American people.  We gather here, in this Great Hall of Justice, to begin a new ethic of enforcement of our voting rights.*

> *On October 1st [2002], I issued a Directive to all United States Attorneys announcing a Department-wide Voting Access and Integrity Initiative.*

> *     *     *

> *We have created this precedent-setting Voting Access and Integrity Initiative for two reasons:  first, to*

126

*enhance our ability to deter discrimination and election fraud, and second, to prosecute violators vigorously whenever and wherever these offenses occur.*

- *Our goal is to work cooperatively with civil rights leaders and state and local election officials to prevent election offenses and to bring violators to justice.*

- *Our means are a national mobilization of the resources of the Department of Justice.*

- *And our message is clear and unequivocal: the Department of Justice will investigate and prosecute voting rights and election fraud offenses.*

\*   \*   \*

*I have asked each U.S. Attorney and FBI Special Agent in Charge to meet with state officials who handle election violations in each district, in order to underscore the Department's commitment to preventing – and, if necessary, investigating and prosecuting – election fraud and voting rights offenses. I am also asking U.S. Attorneys, Election Officers and FBI officials to explore ways in which the Department can work more closely with state and local election and law enforcement authorities to deter and detect discrimination, prevent electoral corruption, and bring violators to justice.*

\*   \*   \*

127

*This is our compact with the American people.  Our role is to train, to educate and ultimately to enforce – when and if the laws are violated.  Our pledge is to ensure justice for all American voters.*

As the Attorney General explained in the above-quoted remarks, the Election Day Program is designed to coordinate Department responses to election-related allegations among the United States Attorneys' Offices, FBI field offices, and Justice Department prosecutors in Washington, D.C.  The Program also alerts the public to the Department's commitment to prosecuting election fraud.

Three important principles apply to the Election Day Program:

- First, as with all election crime matters, the Election Day Program emphasizes the detection, evaluation, and prosecution of crimes.  As a general rule, except for the activities covered by the federal voting rights laws, the Department does not have authority to directly inter-cede in the election process itself.

- Second, except in matters involving alleged discrimination in the franchise that are covered by the civil rights statutes, the Justice Department generally has not heretofore placed observers inside open polling stations, even though there might be a reasonable basis for believing that criminal activity will occur there.  This arises in part from respect for state laws governing who may be inside open polls, and in part from 18 U.S.C. § 592, which prohibits federal officials from stationing armed men at places where elections are in progress.  However, there is no federal statutory bar against sending *unarmed* federal personnel, such as Assistant United States Attorneys, into open polling places as long as their presence is either allowed by

128

state law or permitted by local election administrators. Federal prosecutors and investigators are encouraged to consider this option in appropriate circumstances, in consultation with the Public Integrity Section.

- Third, the Department does not intercede on behalf of private litigants in civil election contests. Such matters are private in nature, and are customarily redressed through election contests under state law or civil rights suits under 42 U.S.C. § 1983.

The following is a general summary of the Election Day Program implemented by the Department and its District Election Officers on election day:

Before significant elections –

- The Justice Department issues a press release emphasizing the federal interests in prosecuting election crime and protecting voting rights.

- Similar press releases are then issued throughout the country by each United States Attorney. The telephone number of each AUSA serving as a District Election Officer is publicized locally, as well as the telephone numbers of the local offices of the FBI. Citizens are encouraged to bring complaints of possible election fraud to the attention of these law enforcement officials.

- Each United States Attorney and District Election Officer is encouraged to meet with the state and, if possible, local officials responsible for the administration of the election process and the prosecution of crimes against that process. The purpose of these meetings is to convey federal interest in

129

assuming an appropriate law enforcement role with respect to electoral corruption, and to make federal assets and personnel available to assist the states in such matters.

On election day –

- In each district, the District Election Officer receives and handles election fraud allegations.

- FBI Special Agents are made available in each district to receive election-related complaints from all sources.

- If warranted, the District Election Officer or United States Attorney may request the FBI to interview a person who alleges that an election crime has occurred. However, care must be taken to ensure that the interview does not affect the election itself. To avoid this potential danger, overt investigation of election-related allegations, other than taking statements from complaining witnesses, ordinarily occurs after the election is over.

- In Washington, prosecutors in the Criminal Division's Public Integrity Section are available as long as polls remain open, to provide advice to United States Attorneys, District Election Officers, and FBI personnel. Special attention is given to preserving evidence that may lose its integrity with the passage of time.

- Under certain circumstances, FBI Headquarters may authorize its agents to conduct covert operations before, during, or after the election upon request of the Public Integrity Section. However, such operations must be predicated on preexisting evidence that

130

observable or otherwise detectable illegal activities (such as vote buying) are likely to occur in that election.  Such requests require particularly close review because of the risk of chilling legitimate voting activity, especially covert operations near or around polling places.  Therefore, requests for authorization to use such techniques should be addressed to the Public Integrity Section as far before the election as is feasible.

After the election –

- A United States Attorney's Office may request the FBI to conduct a preliminary investigation into election fraud allegations that the Office believes warrant further inquiry.

- The Public Integrity Section may also request a preliminary investigation into any election-related allegations.

- The results of each preliminary investigation are reviewed by attorneys in the United States Attorney's Office and in the Public Integrity Section.  These offices then consult to determine which matters may warrant a grand jury and full-field investigation.

- The United States Attorney's Office, with the assistance of the FBI, conducts whatever additional investigation that Office deems appropriate.

- At the conclusion of the investigation, the United States Attorney's Office discusses any proposed federal charges with the Public Integrity Section.  After this consultation, the United States Attorney's Office prosecutes those charges.

131

- On its own or in collaboration with the U.S. Attorneys' Offices, the Public Integrity Section also investigates and prosecutes election crimes.

**CHAPTER FIVE**

**CAMPAIGN FINANCING CRIMES**

### A.    INTRODUCTION

The objective of campaign financing laws is to regulate the influence of money on politics.  These laws serve to fill a gap in the coverage of federal laws addressing corrupt payments to federal officials that are disguised as campaign contributions.  Since the United States and most of the states choose to finance most political campaigns through private contributions rather than public funding, campaign contributions are a necessary feature of political life.  Without private contributions to political committees, political discourse would be impeded.  Thus, the Supreme Court has held that when corrupt payments masquerade as campaign contributions, they violate federal corruption laws only if they can be shown to have been exchanged on a *quid pro quo* basis for a specific official act.  *McCormick v. United States*, 500 U.S. 257 (1991); *Evans v. United States,* 504 U.S. 255 (1992).  Campaign financing and disclosure laws fill this void by addressing situations when corrupt payments disguised as contributions are given and received on less than a *quid pro quo* basis.

There is no arguing that money and honest politics are a difficult mix.  Large contributions to political campaigns expose the processes of governance to undue influence that grows with the size of the contribution.  While they may not buy specific official acts, they surely can and do buy access to politicians and political parties.  Moreover, certain sources of political funding present a greater risk of corruption than others.  Almost everyone agrees that it is important to have access to accurate information about who campaign donors are and how much they contribute.

133

The nation's campaign financing laws are designed to address the interplay between money and politics. Their principal objective is to minimize as much as possible the corruptive influence of money in politics. They do this by limiting the size of contributions that individuals may contribute; by prohibiting contributions from entities such as corporations, unions, and banks, whose potential corrupting influence on democratic government has been historically demonstrated; and by imposing rigid disclosure requirements on those who participate in the federal campaign financing process. Transparency in campaign financing has also become a pillar of international standards for democratic elections.

In addition to the federal government, all the states have campaign financing laws. These vary from state to state, and in many instances they vary significantly from those at the federal level. Because this book is written for federal prosecutors and investigators, its focus is on the federal laws that govern this subject. In addition, because the power of the federal government in the area of campaign financing is limited primarily to regulating the financing of federal candidates, *Burroughs v. United States*, 290 U.S. 534 (1934), the focus of this chapter is further limited to federal laws that address the flow of money intended to influence election of candidates for federal office, that is, the Office of President, Vice President, or Member of Congress.[49]

Criminal violations of federal campaign financing laws require proof that the conduct was committed "knowingly and

---

[49] Violations of state campaign financing laws may, however, suggest the presence of federal corruption offenses. Consideration should be given to whether the alleged conduct may constitute, for example, possible mail, wire, or honest services fraud (18 U.S.C. §§ 1341, 1343, 1346); extortion under the Hobbs Act (18 U.S.C. § 1951); or federal program bribery (18 U.S.C. § 666). It is also important to note that those who violate state campaign financing laws might also engage in similar schemes at the federal level.

134

willfully."[50]   In the context of a regulatory scheme such as is involved here, these words of specific criminal intent require proof that the offender was aware of what the law required, and that he or she violated that law notwithstanding that knowledge, i.e., that the offender acted in conscious disregard of a known statutory duty or prohibition. *United States v. Curran*, 20 F.3d 560 (3rd Cir. 1994); *National Right to Work Committee v. Federal Election Commission*, 716 F.2d 1401 (D.C. Cir. 1983)*; AFL-CIO v. Federal Election Commission*, 628 F.2d 97 (D.C. Cir. 1980). *See also Ratzlaf v. United States,* 510 U.S. 135 (1994) ("willful" violation of *malum prohibitum* regulatory statute prohibiting the structuring of financial transactions to avoid currency reporting requirements requires proof that defendant was aware of the duty violated and violated that duty not withstanding that knowledge).

Such an elevated *scienter* element requires at the very least that there is clear application of the law to the facts in question. When there is doubt concerning whether the law applies to the facts of a particular matter, the offender is more likely to have an intent defense. Consequently, this chapter will not attempt to cover the entire scope of the federal campaign financing laws. Rather, it will focus on the features of these laws that are well defined and commonly understood by persons who participate in the modern federal campaign financing process.[51]

---

[50] Violations of these laws that are committed with lesser intent – including all violations committed negligently or because the offender did not understand the application of the law to his or her conduct – are not federal crimes. They are subject to civil and administrative enforcement by the Federal Election Commission.

[51] In light of ongoing regulatory rulemaking and possible statutory changes to the federal campaign financing laws, prosecutors and investigators who encounter a possible violation of these laws should consult the Director of the Election Crimes Branch of the Public Integrity Section.

135

## B.    STATUTORY SCOPE

### 1. Types of Statutes

There are four main types of federal campaign financing laws:

- Laws that limit the amount of contributions;

- Laws that prohibit contributions and expenditures by persons and entities whose participation in the federal election process has been deemed by Congress to present a sufficient potential for corruption as to warrant outright prohibition;

- Transparency laws that place before the voting public pertinent facts concerning the raising and spending of campaign funds; and

- Public funding laws, which, at the time this book was written, apply only to the campaigns of candidates seeking election to the Presidency.

The federal statute that regulates the financing of federal campaigns and ensures campaign transparency is the Federal Election Campaign Act of 1971, as amended (FECA or the Act).  2 U.S.C. §§ 431 - 455.  The Act was amended significantly in 1974, 1976, 1979, and most recently in 2002.  The 2002 amendments were contained in the Bipartisan Campaign Reform Act (BCRA).

Two federal statutes address public funding for presidential campaigns:  the Presidential Primary Matching Payment Account Act, 26 U.S.C. §§ 9031 - 9042, which provides for federal matching payments for presidential primary campaigns; and the Presidential Election Campaign Fund Act, 26 U.S.C. §§ 9001 - 9012, which provides for full federal funding for presidential general election campaigns.

136

As noted above, FECA limits the amounts that may be contributed to candidates and political committees and also prohibits contributions from certain sources altogether. Two terms have arisen as a result of these limits and prohibitions, "hard money" and "soft money," which are used to describe generically the two main categories of political funds raised and spent in connection with federal campaigns. Although not defined by the Act, they are used frequently and have commonly accepted meanings:

- "Hard money" refers to funds that were raised in accordance with the Act's limits and prohibitions. Hard money (sometimes referred to as "federal funds") may be used to influence federal elections.

- "Soft money" refers to funds that were not raised in compliance with the Act's limits and prohibitions. As such, soft money (sometimes referred to as "nonfederal funds") may only be used to pay for activities that do not influence federal elections, i.e., activities that FECA does not reach. Since the passage of BCRA in 2002, national political parties and their agents are prohibited from raising or spending soft money. 2 U.S.C. § 441i.

## 2. Basic Statutory Definitions

FECA defines the basic terms that apply to the Act's substantive provisions. Because these terms are critical to a general understanding of the Act, it is important to identify them at the outset. These basic definitions are codified at 2 U.S.C. § 431. The most important of these definitions are:

- "election" – a general, special, primary, or runoff election, or a convention or caucus held to nominate a candidate. § 431(1).

137

- "candidate" – an individual who seeks nomination or election to federal office and has received contributions aggregating over $5,000 or has made expenditures aggregating over $5,000 or authorized such contributions or expenditures by another.  § 431(2).

- "federal office"  – the office of President or Vice President of the United States, United States Senator, United States Representative, or Delegate or Resident Commissioner to the United States House of Representatives.  § 431(3).

- "political committee" – any committee or other group of persons that receives contributions or makes expenditures aggregating over $1,000 in a calendar year.  § 431(4).

- "contribution" – in general, any gift, loan, or anything else having pecuniary value that is made for the purpose of influencing the nomination or election of a federal candidate.  § 431(8).

- "expenditure" – in general, any purchase, payment, or anything else having pecuniary value that is made for the purpose of influencing the nomination or election of a federal candidate.  § 431(9).  In the context of public communications, the definition has been judicially limited to disbursements for communications that contain "magic words of express advocacy," such as "elect," "defeat," or "vote for," or that otherwise clearly call for elective action for or against a clearly identified federal candidate.  *Federal Election Commission v. Massachusetts Citizens for Life, Inc.*, 479 U.S. 238, 247-249 (1986); *Buckley v. Valeo*, 424 U.S. 1, 44 n. 52 (1976).

138

In addition, as amended by BCRA, FECA also contains two broad definitions that extend the Act's coverage to reach previously unregulated political communications and activities. These definitions are:

- "Electioneering communication" – a public communication made through the media within certain periods before a federal election that "refers to" a clearly identified federal candidate and, in the case of a candidate for the United States House or Senate, is targeted to the relevant electorate. 2 U.S.C. § 434(f)(3). Because these communications do not contain words of "express advocacy," they are generally not "expenditures," unless, as discussed below, a provision of the Act expressly deems them such. However, if they exceed $10,000 in a calendar year, they must be reported. § 434(f)(4).

- "federal election activity" – activity by state or local political party committees that simultaneously benefits federal and nonfederal candidates, such as get-out-the-vote and voter registration drives. § 431(20). As discussed below, these activities can no longer be paid for with "soft money," but must be paid for with funds raised in compliance with the Act. 2 U.S.C. § 441i.

With two exceptions relating to electioneering communications, the noun describing the payment for these newly covered election-related activities is "disbursement" – not "expenditure" or "contribution." This distinction is critical. As will be discussed below, conduct involving "disbursements" is not covered by FECA's criminal penalties.

139

### 3. Statutory Presumptions

Under certain circumstances, an unregulated activity will become subject to the Act because of its connection with a federal candidate or political committee.  The following definitions reflect the statutory presumptions that result in coverage – or additional coverage – under the Act:

- "coordinated expenditure" – an expenditure that is made "in cooperation, consultation, or concert with, or at the made "in cooperation, consultation, or concert with, or at the request or suggestion of" a federal candidate or an agent of a federal candidate.  Such an expenditure is deemed to be a "contribution" to the candidate – and, as such, subject to the Act's limits and prohibitions.  2 U.S.C. § 441a(a)(7)(B)(i).

- "electioneering communication"– as set forth above, this term includes broadcast communications within certain periods before primary and general elections that refer to a clearly identified federal candidate.  In general, payments for these communications are not "expenditures" because they do not expressly advocate a candidate's election or defeat.  However, there are two exceptions to this rule:

(a) If the electioneering communication is coordinated with a federal candidate or an agent of the candidate, the costs of the communication are deemed to be a "contribution" to the candidate – and thus subject to the Act's limits – as well as an "expenditure" by the candidate.  2 U.S.C. § 441a(a)(7)(C).

(b) If the electioneering communication is made by a corporation or union, it is deemed to be an "expenditure" – and thus prohibited.  2 U.S.C. §§ 441b(b)(2), 441b(C).

140

Thus, a coordinated expenditure is deemed a "contribution" that is subject to the Act's limits and prohibitions, and an electioneering communication made by a corporation or union is deemed an "expenditure" that is prohibited by the Act.

## C.   HISTORICAL BACKGROUND:  1907 to 2002

### 1.  Overview

The history of campaign finance regulation in the United States began a century ago.  It represents a gradual recognition by the public and by its elected representatives in Congress that the flow of money to politicians and political organizations induces corruption, and reflects a corresponding gradual evolution of legislative responses to this threat.

The Federal Election Campaign Act of 1971, as amended, (FECA or the Act) 2 U.S.C. §§ 431 - 455, assembles in one place the federal laws that regulate the financing of federal political campaigns. In 2002, after over two decades of unsuccessful legislative efforts, the Act was amended to close large loopholes that had allowed a significant portion of political activity relating to federal campaigns to fall outside the Act's coverage.  The 2002 amendments are part of broad legislative reforms contained in the Bipartisan Campaign Reform Act (BCRA).

With two exceptions, FECA applies only to financial activity intended to influence the campaigns of candidates running for federal office (the Senate, House of Representatives, Presidency, or Vice Presidency).  It contains two basic types of regulation:  (1) campaign financing statutes, which regulate the sources and amounts of funds given or spent to influence a federal election; and (2) campaign reporting statutes, which require disclosure by federal candidates and political committees of the sources and recipients of their campaign funds.  These two types of statutes are discussed next.

141

## 2. Campaign Financing Laws

Campaign financing statutes limit, or prohibit outright, contributions from certain sources in the interest of deterring corruption and the appearance of corruption of the election process. *Austin v. Michigan Chamber of Commerce*, 494 U.S. 652 (1990); *First National Bank of Boston v. Bellotti*, 435 U.S. 765 (1978); *Buckley v. Valeo*, 424 U.S. 1 (1976).

The first federal campaign financing statute was the Tillman Act of 1907, which prohibited corporations from making contributions to federal candidates. The 1925 Federal Corrupt Practices Act provided additional campaign financing limitations relating to federal elections. Emergency legislation during World War II prohibited labor organizations from making contributions or expenditures in connection with federal elections, a ban that was later made permanent through the Taft-Hartley Act. In 1948, government contractors were added as prohibited sources of federal campaign funds. Between 1948 and 1972, the Supreme Court defined the parameters of many of these laws. *Pipefitters Local 562 v. United States*, 407 U.S. 385 (1972); *United States v. Automobile Workers*, 352 U.S. 567 (1957); *United States v. C.I.O.*, 335 U.S. 106 (1948).

These decisions were incorporated into the original 1971 FECA. The 1974 amendments to the Act enacted limits on political contributions and expenditures, added a strict liability criminal misdemeanor penalty, and created the Federal Election Commission (FEC), a separate federal agency authorized to interpret the Act and to provide civil and administrative penalties for violations. In 1976, these limits, and the FEC's structure as a quasi-legislative agency, were subjected to rigorous constitutional scrutiny by the Supreme Court in *Buckley*. The Court upheld the Act's limits on contributions, but overturned its expenditure limits as unconstitutional infringements on First Amendment speech. The Court also held that the FEC's organizational structure, under which the majority of the

142

Commission's members were appointed by Congress, violated the Appointments Clause of the Constitution.

These constitutional defects were corrected by the 1976 FECA amendments, which also transferred nine criminal statutes dealing with campaign financing from the criminal code (where they were formerly codified as 18 U.S.C. §§ 608 and 610-617) to FECA (where they are codified at 2 U.S.C. §§ 441a - 441h). The 1976 amendments also recreated the FEC as an independent agency within the executive branch with exclusive civil enforcement jurisdiction over all FECA violations, and created a new criminal misdemeanor penalty for violations aggregating $1,000 that were committed "knowingly and willfully."

The 1979 FECA amendments increased the monetary threshold for a criminal FECA violation from $1,000 to $2,000. They also reaffirmed the two-tiered, overlapping enforcement approach to campaign finance violations: all FECA violations, whether committed knowingly and willfully, negligently, or when the application of the law to the facts was not clear, were to be subject to civil and administrative sanctions assessed by the newly created Federal Election Commission. In addition, violations involving knowing and willful conduct together with aggregate sums above a monetary minimum were to be subject to criminal misdemeanor penalties enforced by the Justice Department.

Soon after the 1979 amendments took effect, substantial loopholes developed in the Act's coverage of financial activities relating to federal elections. The most significant of these were the emergence of so-called "soft money" disbursements and "issue ads."

The "soft money" loophole arose from the fact that FECA generally applied only to financial activities for the purpose of influencing a federal election. This meant that financial activity ostensibly directed at other purposes, such as issue advocacy or party-building activities that simultaneously benefitted both federal and

143