nonfederal candidates, was viewed by the FEC as outside the reach of the law.

The "issue ad" loophole arose from a footnote in *Buckley*, in which the Supreme Court construed the critical FECA term "expenditure," in the context of public communications, to apply only to financial activity that was aimed at the general public and contained words expressly advocating the election or defeat of a clearly identified federal candidate, such as "vote for," "defeat," or "elect." 424 U.S. at 44, n. 52.

In 2002, Congress enacted broad campaign financing reforms as part of the Bipartisan Campaign Reform Act. In addition to plugging the well-publicized soft money and issue ad loopholes, BCRA provided significant enhancements to the criminal penalties for FECA crimes. This landmark campaign financing legislation will be discussed below.

## 3. Campaign Reporting Laws

The first attempt at requiring federal candidates to disclose the identities of their campaign contributors was the 1925 Federal Corrupt Practices Act. However, this statute was both imprecise and riddled with exceptions. It was replaced in 1971 with the first FECA, which closed many of these loopholes.

Until the Federal Election Commission was created in 1974, the only enforcement remedy for violations of these disclosure laws was criminal prosecution, and the Act's criminal penalty was a strict liability misdemeanor. 2 U.S.C. § 441 (repealed). For a variety of reasons, such as the frequent absence of aggravating factors, few violations were pursued criminally. Nevertheless, several of the Watergate cases were successfully prosecuted under FECA because the facts demonstrated that inaccurate reporting was a result of purposeful deceit and flouting of the law. *E.g.*, *United States v. Finance Committee to Re-Elect the President*, 507 F.2d 1194 (D.C.

144

Cir. 1974) (affirming conviction of former President Nixon's reelection committee for FECA reporting violations).

The 1976 amendments repealed the Act's strict liability criminal penalty and replaced it with a two-tiered system of sanctions for all FECA violations, including reporting violations: (1) all FECA violations were subject to civil and administrative sanctions enforced by the FEC; and (2) FECA violations that aggregated $2,000 or more and involved knowing and willful conduct were also subject to criminal misdemeanor penalties enforced by the Justice Department.

As with FECA's campaign financing laws, criminal violations of its reporting features were subject to the Act's special three-year statute of limitations. 2 U.S.C. § 455 (repealed 2002). However, because Title 18 statutes generally had a five-year statute of limitations, as well as felony penalties, the Justice Department successfully utilized several of these felony offenses in the late 1980s and 1990s to address aggravated FECA reporting violations. These prosecutive theories involved false statements reachable under 18 U.S.C. § 1001 and the "conspiracy to defraud" prong of 18 U.S.C. § 371. *United States v. Hsia*, 176 F.3d 517 (D.C. Cir. 1999)*; United States v. Curran*, 20 F.3d 560 (3d Cir. 1994); *United States v. Hopkins*, 916 F.2d 207 (5th Cir. 1990). Both theories are still valid today, and will be discussed below.

We turn now to a discussion of the 2002 campaign legislation.

### 4. The Bipartisan Campaign Reform Act of 2002

In 2002, Congress enacted the Bipartisan Campaign Reform Act (BCRA), which finally addressed most of the lapses in FECA's coverage. The following year, the Supreme Court upheld most of these reforms. *McConnell v. Federal Election Commission*, 540 U.S.

145

93 (2003).[52] Many of BCRA's reforms are of little concern to federal prosecutors and investigators, either because they address activities that do not involve a "contribution," "donation," or "expenditure" – to which the Act's criminal penalties are expressly limited – or because they concern issues that are subject to evolving regulation when the application of the law to the facts is not entirely clear.

BCRA contained three "headline" features that had been the focus of the national debate over campaign finance reform during the years leading up to its enactment. More importantly, it also contained several less publicized – yet for federal prosecutors far more significant – enhancements to the criminal enforcement penalties applicable to criminal violations of the Act. Many of these enhancements had been law enforcement priorities of the Criminal Division for over a quarter century. The headline features and criminal enforcement enhancements are summarized below.

### (a) Headline features of the 2002 campaign reforms

#### i.  Soft money ban

BCRA's principal headline feature was its soft money ban, which is codified at 2 U.S.C. § 441i. This statute eliminates the ability of national political party committees, and in most cases state and local party committees, to maintain separate accounts for money that does not comply with FECA's limitations and source prohibitions ("soft money"), and to use these unregulated funds for activities such as voter registration, get-out-the-vote drives, and "issue ads" that fall short of expressly advocating the election or defeat of a federal candidate. Under Section 441i, virtually all funds raised and spent by: (1) candidates for federal office; (2) national party committees,

---

[52] Excerpts of the Supreme Court's summary of the historical development of the federal campaign financing laws and the lapses in their coverage that were addressed by BCRA are contained in Appendix A.

146

such as the Democratic and Republican National Committees; and (3) agents of federal candidates or national party committees must be raised in accordance with FECA's limitations and prohibitions, i.e., the funds must be "hard money."

## ii. Electioneering communications

The second headline feature of BCRA is the regulation of "electioneering communications" under FECA. This feature is designed to reach "issue ads" (i.e., communications that urge the public to support or oppose a federal candidate but that do not contain words of express advocacy, such as "vote for," "elect," or "defeat").

As explained above, the term "electioneering communication" applies only to a communication disseminated through the broadcast media, not through the print media or the Internet. The term includes any broadcast communication that refers to a clearly identified federal candidate; that is made either 30 days before a primary or 60 days before a general election; and, in the case of a House or Senate candidate, is targeted to the relevant electorate. § 434(f)(3)(A).

Payments for an "electioneering communication" are generally "disbursements," not "expenditures." This distinction is important, as "disbursements" are not covered by FECA's criminal penalty, which is confined to violations that involve a "contribution, donation, or expenditure." § 437g(d)(1). Therefore most violations of this provision fall exclusively within the civil enforcement jurisdiction of the Federal Election Commission. However, there are two exceptions to this rule:

- *"Coordinated electioneering communications."* Electioneering communications that are coordinated with a candidate; a national, state, or local party committee; or an agent of a candidate or party committee are deemed a "contribution" to the candidate or committee

147

with whom or which they are coordinated, as well as an "expenditure" by that candidate or committee.   § 441a(a)(7)(C).   Because the statutory presumption transforms what otherwise would be a "disbursement" into a "contribution" and an "expenditure," these coordinated communications can be reached by the Act's criminal penalty.

- *"Corporate and union electioneering communications."*   The FECA statute prohibiting corporations and unions from making an "expenditure" in connection with federal elections has been expanded to include an "electioneering communication." § 441b(b)(2). Therefore, if corporate or union funds are used to make an "electioneering communication," the violation is an illegal expenditure covered by the Act's criminal penalty.

### iii. New contribution limits

BCRA's final headline feature is the increased amounts that individuals may contribute to federal candidates, political parties, and political committees.   These limits had not been raised since their original enactment in 1974, despite the considerable inflation that had occurred since then.   The new limits are codified at 2 U.S.C. § 441a, and will be discussed below.

### (b)  BCRA's criminal enforcement enhancements

The BCRA reforms that are of most interest to federal prosecutors and investigators are the significant enhancements to the penalties for criminal violations of FECA's substantive provisions. Specifically, BCRA:

148

- Repealed the special three-year statute of limitations that had governed FECA crimes since 1974, and replaced it with the traditional five-year limitations period that applies to most other federal crimes under 18 U.S.C. § 3282.
  2 U.S.C. § 455(a).

- Created a five-year felony offense for FECA violations aggregating $25,000 or more during a calendar year.  2 U.S.C. § 437g(d)(1)(A)(i).

- Created a two-year felony offense for violations of the FECA prohibition against conduit contributions (2 U.S.C. § 441f) that aggregate over $10,000 in a calendar year.
  2 U.S.C. § 437g(d)(1)(D)(i).

- Directed the United States Sentencing Commission to promulgate a guideline expressly covering FECA crimes.[53]  On January 25, 2003, the Sentencing Commission promulgated the new guideline on an emergency basis, and it became effective for conduct taking place after that date. U.S.S.G. § 2C1.8.   This new guideline is discussed in detail in Chapter Six.

- Clarified that FECA's ban on contributions from foreign nationals (2 U.S.C. §441e) applies to donations to nonfederal candidates as well as to contributions to federal candidates, thereby

---

[53] Congress also mandated that the guideline include a number of aggravating factors as enhancements, such as the amount involved in the offense, whether the offense involved foreign funds, and whether it was motivated by a desire to gain a specific advantage from the government.  BCRA, § 314(b)(2).

149

codifying *United States v. Kanchanalak*, 192 F.3d 1037 (D.C. Cir. 1999).

- Expanded the FECA provision that forbids agents of one federal candidate from falsely representing that they have authority to speak for another federal candidate on a matter that is damaging to the other candidate (2 U.S.C. § 441h) to include a separate prohibition against misrepresentations by *anyone* for the purpose of soliciting contributions. 2 U.S.C. § 441h(b).[54]

- Expanded the law that forbids the solicitation or receipt in federal buildings of contributions for federal elections (18 U.S.C. § 607) to include donations for nonfederal elections. 18 U.S.C. § 607(a)(1).

- Provided additional criteria for what constitutes "coordination" between interest groups and candidates or political parties, and thus transforms the value of activities done on their behalf into an "in-kind contribution" to the candidate or political party.  2 U.S.C. § 441a(a)(7).

_____

[54] Fraudulently soliciting political funds can also present violations of the mail or wire fraud statutes, 18 U.S.C. §§ 1341 or 1343. However, prosecuting fraudulent campaign solicitations under FECA's Section 441h usually results in a better sentencing calculation, and is thus the preferred approach to this sort of fraud.

150

**D.     STATUTES**

### 1. Introduction

This section will present a discussion of those substantive provisions of the Federal Election Campaign Act that are of principal interest to federal prosecutors and investigators. We do not attempt to present a thorough discussion of the entire FECA, or of all issues that might arise under the Act. The intricacy of this regulatory statute and the scope of its criminal provision confines the Justice Department's criminal jurisdiction to violations that are committed "knowingly and willfully," that is, by subjects who knew what the law required and who violated it notwithstanding that knowledge. 2 U.S.C. § 437g(d)(1); *National Right to Work Committee v. Federal Election Commission*, 716 F.2d 1401 (D.C. Cir. 1983); *AFL–CIO v. Federal Election Commission*, 628 F.2d 97 (D.C. Cir. 1980). In light of the limitation of FECA's criminal provision to offenders who flout a known statutory duty or prohibition, any situation when the application of the law to the facts is unclear does not easily produce a prosecutable FECA crime.

In view of the above considerations, the discussion that follows is confined to those substantive provisions of FECA that are clear, generally well-known, and enforceable through the Act's criminal penalties; i.e., knowing and willful violations that involve "the making, receiving, or reporting of any contribution, donation or expenditure" that falls in FECA's "heartland."

### 2. The "Heartland" Provisions of the Campaign Financing Laws

In general, to warrant criminal prosecution, a FECA violation should involve one of FECA's substantive, or "heartland," provisions. These provisions, and the principles underlying them, are:

151

- <u>Limits on amount of contributions</u>

  Large political contributions lead to perceived and actual corruption of public officials. The Act therefore has quantitative limits on the amounts that contributors can give to candidates seeking federal office and to political committees supporting federal candidates. 2 U.S.C. § 441a(a).

- <u>Ban on contributions and expenditures by corporations and unions</u>

  Financial political activism by corporations and unions can distort, and potentially corrupt, election results and issues. To avoid these adverse effects, and to protect shareholders and minority members from having their shared capital used for political purposes they may not support, unions and corporations may not make contributions or expenditures in connection with federal elections. 2 U.S.C. § 441b.

- <u>Ban on contributions from federal contractors</u>

  Persons and entities that are signatories on contracts to provide equipment, services, or supplies to the United States Government, or are negotiating for such contracts, should not seek to influence federal officials through political donations. They therefore may not make contributions or expenditures to influence the election of federal candidates. 2 U.S.C. § 441c.

- <u>Ban on contributions from foreign nationals</u>

  American elections should be shielded against foreign influence. Accordingly, persons who are not citizens of the United States or lawfully admitted for permanent residence may not make contributions or expenditures in connection with any United States election, whether at the federal, state, or local level. 2 U.S.C. § 441e.

152

- <u>Ban on disguised and cash contributions</u>
  To prevent circumvention of the Act's limits and prohibitions, and to ensure accurate public disclosure of all significant campaign data, contributions may not be laundered through conduits to conceal the true source of the funds. 2 U.S.C. § 441f. In addition, cash contributions over $100 to a federal candidate's campaign are prohibited. 2 U.S.C. § 441g.

- <u>Transparency</u>
  FECA is a "sunshine" statute as well as a regulatory and anti-corruption statute. The Act reflects Congress's belief that the public has a right to know which individuals and organizations support which federal candidates and in what amounts, so that voters can make informed decisions at the polls. Federal candidates and political committees supporting federal candidates are therefore required to register with the FEC, and to designate a treasurer who must file periodic reports with the FEC detailing all contributions received and expenditures made that aggregate over $200 in a calendar year. 2 U.S.C. §§ 432, 433, 434.

- <u>Ban on use or direction of "soft money" by political parties</u>
  To avoid circumvention of FECA's limits and prohibitions, national party committees must finance all their activities with "hard money," that is, funds raised in accordance with the Act, and may not solicit, spend, or direct to other sources "soft money." In addition, state and local party committees must use hard money for "federal election activity," including voter registration and get-out-the vote drives, and public communications that refer to and support or oppose a federal candidate. 2 U.S.C. § 441i.

153

- Theft from candidate's political committee
  No person may convert funds contributed to a federal
  candidate to his or her personal use.[55]
  2 U.S.C. § 439a.

## 3. Campaign Financing Crimes

As noted above, FECA has its own internal criminal penalty. 2 U.S.C. § 437g(d). Section 437g(d) provides that a violation of FECA is a federal crime if it is committed "knowingly and willfully" and, with two exceptions,[56] if it meets certain monetary thresholds. Specifically, if the violation involves the making, receiving, or reporting of a "contribution, donation, or expenditure" that:

- aggregates $2,000 or more in a calendar year, it is a one-year misdemeanor, § 437g(d)(1)(A)(ii);

- aggregates $25,000 or more in a calendar year, the violation is a five-year felony, §§ 437g(d)(1)(A)(i), 437g(d)(1)(D)(i); or

- aggregates over $10,000 in a calendar year and involves illegal conduit contributions, the violation is a two-year felony, § 437g(d)(1)(D)(i).

We now turn to a discussion of the Act's provisions.

---

[55] This anti-embezzlement provision does not apply to thefts from political committees that are not authorized candidate committees. However, such matters may be prosecuted as mail, wire, or honest services fraud under 18 U.S.C. §§ 1341, 1343, or 1346.

[56] The exceptions are fraudulent campaign representations and fraudulent solicitations, which have no criminal monetary threshold. 2 U.S.C. §§ 441h(a), 441h(b).

154

### 4. Substantive Statutes

### (a) 2 U.S.C. § 441a.  Limitations on contributions and expenditures

Section 441a sets quantitative limits on the amounts individuals, political committees, and other entities may contribute to federal candidates and political committees.  § 441a(a).  It also limits expenditures by party committees and presidential candidates who accept federal funding.  §§ 441a(b), 441a(d).

As noted above, "contribution" is generally defined as a gift of anything of value for the purpose of influencing a federal election.  § 431(8).  In addition, the term includes expenditures that are made in "cooperation, consultation, or concert with, or at the request or suggestion of" a candidate, a person authorized to act on behalf of a candidate, or a national, state, or local party committee.  § 441a(a)(7)(B).  An "expenditure" is a disbursement made for the purpose of influencing a federal election.  § 431(9).

The distinction between a contribution and an expenditure has constitutional significance.  Contributions are made by one person or entity to another to enable the recipient of the funds to engage in political speech of the recipient's choosing, while expenditures are made directly by the owner of the funds for political speech chosen by the owner of the funds.  Thus, contributions are indirect political speech, and as such may constitutionally be subject to more stringent regulation than expenditures, which are direct political speech.  *Buckley v. Valeo*, 424 U.S. 1, 13-59 (1976).

Section 441a contains three sets of contribution limits:

155

First, subject to a cost-of-living escalation provision discussed below,[57] under Subsection 441a(a)(1), contributions from "persons" (individuals, associations, and committees) may not exceed:

- $2,000 to a federal candidate with respect to any election (primary and general elections are treated as separate elections for the purpose of Section 441a);

- $25,000 in a calendar year to a national party committee;[58]

- $10,000 in a calendar year to a state party committee; or

- $5,000 in a calendar year to any other political committee.

Second, under Subsection 441a(a)(2), contributions from "multi-candidate political committees" (political committees registered for six months with the FEC that have received contributions from over fifty persons and that support at least five federal candidates) may not exceed:

- $5,000 to a federal candidate per election;

_____

[57] Certain limits may also be subject to increase due to the application of one of FECA's so-called "millionaire" provisions. §§ 441a(i), 441a-1.

[58] At the time this book was written, there were six national party committees: the Republican National Committee, the Democratic National Committee, the National Republican Senatorial Committee, the Democratic Senatorial Campaign Committee, the National Republican Congressional Committee, and the Democratic Congressional Campaign Committee. 11 C.F.R. § 110.1(c)(2).

- $15,000 in a calendar year to a national party committee; or

- $5,000 in a calendar year to any other political committee.

Third, under Subsection 441a(a)(3), individuals are subject to aggregate two-year contribution limits. During the period beginning January 1st of an odd-numbered year and ending December 31st of the following even-numbered year, individuals may not contribute in the aggregate more than:

- $37,500 to federal candidates; and

- $57,000 to all other political committees, of which no more than $37,500 may be contributed to political committees that are not national party committees.

The above limits do not apply to transfers between the national, state, district, and local committees of the same political party. § 441a(a)(4). However, contributions to a candidate from political committees that are subject to common control (e.g., committees affiliated with several locals of the same union, or committees affiliated with subsidiaries of the same corporation) are treated as though they were from a single political committee. § 441a(a)(5).

Finally, as a result of BCRA, the limits on contributions from persons are adjusted for inflation every two years. § 441a(c)(1)(C).[59] The increases are announced in odd-numbered years and are effective

---

[59] BCRA also authorized annual increases in the Act's limits on expenditures by candidates and party committees. § 441a(c)(1)(B).

157

for the two-year election cycle beginning with the day after the last general election.[60]

A candidate's expenditures can constitutionally be limited only if the candidate elects to participate in a public funding program. *Buckley v. Valeo*, 424 U.S. 1, 54-59 (1976); 2 U.S.C. § 441a(b). At present, only presidential candidates have the option of receiving federal funds for their campaigns; hence, these are the only candidates who may be subject to expenditure limits. There are, moreover, no limits on expenditures by a person that are made independently of the candidate being benefitted thereby. However, if such "independent expenditures" exceed certain monetary thresholds, they must be reported to the FEC. § 434(g).

There are also no limits on the amount of personal funds that a federal candidate may use in his or her campaign. Under *Buckley v. Valeo*, 424 U.S. 1 (1976), this use of personal funds represents an "expenditure" that cannot be constitutionally limited.

The contribution limits discussed above have been repeatedly upheld against First Amendment challenges, and there is no question today that they are constitutionally valid. *McConnell v. Federal Election Commission*, 540 U.S. 93 (2003); *Buckley v. Valeo*, 424 U.S. 1 (1976); *see also Nixon v. Shrink Missouri PAC*, 528 U.S. 377 (2000) (upholding similar state contribution limits).

_____

[60] Thus, for example, for the 2005-2006 election cycle the quantitative limits on contributions from individuals are as follows: $2,100 per election to a federal candidate; $26,700 per year to national party committees; $37,300 per six-year election cycle to national party senate campaigns; $40,000 per two-year election cycle to all federal candidates; and $61,400 per two-year election cycle to all other political committees.

158

Generally, cases prosecuted under Section 441a involve excessive contributions that are effected either surreptitiously (such as through conduits) or in the furtherance of some other felonious objective (such as a bribe that is disguised as a contribution to a candidate).

### (b)  2 U.S.C. § 441b.  Prohibition on contributions and  expenditures by national banks, corporations, and labor organizations

Section 441b was designed primarily to protect the integrity of the election process against potential corruption resulting from the influx of vast aggregates of corporate and union wealth. *Cort v. Ash*, 422 U.S. 66 (1975); *see also First National Bank of Boston v. Bellotti*, 435 U.S. 765 (1978) (§ 441b addresses problem of corruption of elected representatives through creation of political debts) (dictum).  The statute contains two broad prohibitions, one limited to federal elections, and one that encompasses all elections.

First, Section 441b prohibits any state-chartered corporation, or any labor organization, from making a contribution or expenditure in connection with any federal election.

Second, the statute prohibits a national bank or a federally chartered corporation from making a contribution or expenditure in connection with any election – federal, state, or local.[61]

In addition, Section 441b makes it unlawful for any officer of a corporation, labor organization, or national bank to consent to a prohibited contribution or expenditure; and for any candidate, political committee, or other person knowingly to accept such a

---

[61] This statute is one of two FECA prohibitions that extend to nonfederal elections.  The other is 2 U.S.C. § 441e, which prohibits foreign nationals from making contributions to nonfederal as well as federal elections.

159

prohibited contribution. The statute does not restrict contributions or expenditures from the personal resources of corporate or union officials, provided, of course, that the value of the funds given are not reimbursed or otherwise passed back to a corporate or a union fisc.

The heart of the statute is its ban on the use of corporate treasury funds or of monies required as a condition for membership in a labor organization for contribution to federal campaigns, or for "active electioneering" in connection with federal campaigns. *United States v. Pipefitters Local 562*, 434 F.2d 1116 (8th Cir. 1970), *rev'd on other grounds*, 407 U.S. 385 (1972); *United States v. Automobile Workers*, 352 U.S. 567 (1957).

In 1972, the Supreme Court held that Section 441b's predecessor (18 U.S.C. § 610) did not bar corporations or unions from using their treasury funds to establish and operate "separate segregated funds" – commonly known as "affiliated political action committees," or PACs – provided the PACs confined their solicitation activities to raising voluntary contributions from corporate employees or union members, respectively. *Pipefitters*, 407 U.S. at 409. Also, the statute does not apply to the use of corporate or union funds to finance communications, on any subject, between labor unions and their membership or between corporations and their stockholders. *Automobile Workers*, 352 U.S. 567 (1957). Nor does it apply to nonpartisan expenditures, or to the costs of publishing statements of editorial opinion in newspapers of general public distribution that are owned by corporations or unions. *United States v. C.I.O.*, 335 U.S. 106 (1948).

The constitutionality of Section 441b has been frequently challenged, for the most part without success, and it is now well established that the Section's prohibitions on corporate and union political activity do not violate the First Amendment. *Austin v. Michigan Chamber of Commerce*, 494 U.S. 652 (1990); *Federal Election Commission v. National Right To Work Committee*, 459 U.S. 197 (1982); *Athens Lumber Co. v. Federal Election Commission*,

718 F.2d 363 (11th Cir. 1983); *United States v. Boyle*, 482 F.2d 755 (D.C. Cir. 1973). Although the statute treats corporations and unions somewhat differently because of their fundamentally different structures and compositions, this does not offend the Constitution's Equal Protection Clause. *Austin v. Michigan Chamber of Commerce*, 494 U.S. 652 (1990); *International Association of Machinists v. Federal Election Commission*, 678 F.2d 1092 (D.C. Cir. 1982), *aff'd*, 459 U.S. 983 (1982).

The statute has been held not to apply to a limited class of nonprofit corporations established solely to promote issues. *Federal Election Commission v. Massachusetts Citizens for Life*, 479 U.S. 238 (1986). *See also First National Bank of Boston v. Bellotti*, 435 U.S. 765 (1978) (holding unconstitutional a state statute prohibiting corporate expenditures for referenda and noting that the federal prohibition in § 441b does not apply to referenda).

As with all other FECA violations, to reach the level of a Section 441b criminal violation, the act had to have been committed "knowingly and willfully." Absent direct evidence of such criminal intent, a prosecution under Section 441b will most likely be successful when funds were diverted from a corporate or union treasury and laundered in some fashion to a candidate.

Prior to the enactment of the 2002 Bipartisan Campaign Reform Act, Section 441b covered only a "contribution or expenditure," and the term "expenditure" was limited to situations when corporate or union funds were expended to expressly advocate the election or defeat of a clearly identified federal candidate. BCRA expanded Section 441b's definition of "expenditure" to include corporate or union funds expended to finance "electioneering communications." As discussed previously, this term has a broad reach and covers many forms of issue advocacy.[62] Thus, corporate

---

[62] "Electioneering communication" includes any broadcast or satellite communication which "refers to" a clearly identified federal

161

and union payments for electioneering communications constitute "expenditures" that are covered by FECA's criminal provision.

### (c) 2 U.S.C. § 441c.  Prohibition on contributions by government contractors

Section 441c prohibits any person who is a signatory to, or who is negotiating for, a contract to furnish material, equipment, services, or supplies to the United States Government, from making or promising to make a contribution "for any political purpose."  It has been construed by the FEC to reach only contributions for the purpose of influencing the nomination or election of candidates for federal office.  11 C.F.R. § 115.2(a).  The statute applies to all types of businesses, including sole proprietorships, partnerships, and corporations, and reaches gifts made from such entities' business or partnership assets.  With respect to partnerships, however, the FEC has determined that Section 441c does not prohibit donations made from the personal assets of the partners, provided of course, that the value of such contributions is not reimbursed from, or otherwise passed back to, partnership assets.  11 C.F.R. § 115.4.

The statute applies only to business entities that have negotiated or are negotiating for a contract with a department or agency of the United States.  Thus, the statute does not reach those who have contracts with nonfederal agencies to perform work under a federal program or grant.  Nor does it reach persons who provide services to third-party beneficiaries under federal programs that require the signing of agreements with the federal government, such as physicians performing services for patients under Medicare. Finally, officers and stockholders of incorporated government contractors are not usually covered by Section 441c, because the

---

candidate; is made 30 days before a primary or 60 days before a general or runoff election; and, in the case of a candidate for the United States Senate or United States House of Representatives, is targeted to the relevant electorate.  2 U.S.C. § 434(f)(3)(A)(i).

162

government contract is usually with the corporate entity, not its officers. However, individual corporate officers may be covered by Section 441c if they are individually liable on the government contract.

The same statutory exemptions that apply to Section 441b also apply to Section 441c. Thus, government contractors may make nonpartisan expenditures, may establish and administer affiliated PACs, and may communicate with their officers and stockholders on political matters. In addition, Section 441c does not reach electioneering communications. Therefore, government contractors who are not incorporated (and thus not subject to Section 441b) are allowed to make electioneering communications.

### (d)  2 U.S.C. § 441d.  Attribution of sponsors of political communications and solicitations

Section 441d requires that certain political communications include the identity of the person or entity responsible for the communication. Prior to enactment of BCRA in 2002, the statute was limited to two types of political communications: (1) communications "expressly advocating the election or defeat" of a clearly identified federal candidate, and (2) communications soliciting contributions to a federal candidate or political committee. BCRA added two more types of communications requiring this attribution: (1) general advertisements by political committees, and (2) "electioneering communications" by any person, that is, communications to a targeted electorate within certain periods before primary and general elections that refer to a federal candidate.

Section 441d does not cover anonymous communications that leave to inference the identity of a particular candidate. The FEC, acting pursuant to its advisory opinion authority under 2 U.S.C. § 437f, has excluded several categories of campaign advocacy (such as bumper stickers and skywriting) from the reach of this law. 11 C.F.R. § 110.11(a)(2).

163

Although BCRA expanded the scope of Section 441d, only violations involving the two communications originally covered by the statute are subject to prosecution, namely, communications that expressly advocate a federal candidate's election or defeat, and communications that solicit contributions. Funds expended for such communications are "expenditures" under the Act, and are therefore subject to its criminal provision, § 437g(d)(1). Electioneering communications and general political advertising by political committees, on the other hand, generally involve "disbursements," which are not reachable by the Act's criminal provision.

### (e)  2 U.S.C. § 441e.  Prohibition on contributions, donations, and expenditures by foreign nationals

Section 441e prohibits contributions and donations by foreign nationals to all United States elections, whether federal, state, or local.  It is one of the two federal campaign financing statutes that reach activities directed at both federal and nonfederal elections.[63]

Prior to the enactment of the Bipartisan Campaign Reform Act, the statute prohibited a foreign national from making, directly or through any other person, a contribution "in connection with an election to any political office."  *United States v. Kanchanalak*, 192 F.3d 1037 (D.C. Cir. 1999) (statute reaches contributions "in connection with any federal, state, or local election").  The statute also prohibited any person from knowingly soliciting or accepting a contribution from a foreign national.

BCRA retained the prohibitions of Section 441e against contributions made by or accepted from foreign nationals in connection with any United States election, and expanded the statute to prohibit four additional types of political activity by foreign

---

[63] The other is  2 U.S.C. § 441b,  discussed above,  which bars national banks and federal corporations from making a contribution in connection with an election to any political office.

164

nationals: expenditures, independent expenditures, contributions to any political party, and electioneering communications. In addition, BCRA added the term "donation" to Section 441e's prohibition (as well as to the Act's criminal provision), to leave no doubt that political donations to state and local candidates are covered by its prohibition.[64] All types of Section 441e violations are subject to prosecution except those involving electioneering communications, which are defined for purposes of Section 441e as "disbursements" and therefore are not covered by the Act's criminal penalty.

The term "foreign national" means: (1) a "foreign principal" within the meaning of the Foreign Agents Registration Act, 22 U.S.C. § 611, and (2) any person who is not a citizen of the United States, or a national of the United States who is not lawfully admitted for permanent residence. § 441e(b). A "foreign principal" includes a foreign government, a foreign political party, and a corporation organized under the laws of a foreign country. None of these entities may make contributions or donations to any candidate or political party in the United States.

Through its regulations, advisory opinions, and civil enforcement actions, the FEC has addressed the application of Section 441e to contributions by domestic subsidiaries of foreign corporations.[65] The Commission has determined that a domestic subsidiary that is chartered under the laws of any state or United States territory, and has its principal place of business in the United States, is not a foreign principal – even though all of its capital stock

_____

[64] Although not defined in the Act, a "donation" is a political gift that is not a "contribution" – a term that is confined to federal campaigns. Hence a "donation" is a political gift that is given to a candidate for state or local office or to a political committee in connection with a state or local election.

[65] Persons who rely in good faith on an FEC advisory opinion are immune from sanctions under FECA, including criminal prosecution. § 437f(c)(2).

may be owned by foreign individuals or entities. The FEC has, however, concluded that Section 441e prohibits contributions by a domestic subsidiary if the parent foreign corporation provides funding for the contribution, or if individual foreign nationals are involved in any way in making the contribution. In 1991, the FEC rejected proposed rulemaking that would have expanded the scope of Section 441e to include domestic subsidiaries of foreign-owned entities.

In response to a congressional directive in BCRA, the United States Sentencing Commission promulgated a new sentencing guideline for FECA offenses, U.S.S.G. § 2C1.8 (eff. January 25, 2003). The guideline provides significant enhancements for FECA violations involving a foreign national or foreign government. § 2C1.8(b)(2). The guideline is discussed in Chapter Six.

### (f) 2 U.S.C. § 441f. Prohibition on contributions through conduits

Section 441f makes it unlawful for any person to make a contribution in the name of another, or for any person to permit his or her name to be used to make such a contribution. The statute also prohibits any person from knowingly accepting a contribution made by one person in the name of another.

The conduit statute is one of FECA's most frequently violated prohibitions. This is because it prohibits conduct that is often used by perpetrators to disguise other campaign financing violations, such as contributions over the Act's limits in violation of Section 441a, or from prohibited sources in violation of Section 441b or Section 441e.

Section 441f violations occur when a person gives money to straw donors, or conduits, for the purpose of having the conduits pass the funds on to a specific federal candidate as their own contributions. The motive is typically to preserve the true donor's anonymity and aggregate contribution amount, as the ostensible contributions will be reported publicly as having been made by the straw donors. A

166

common type of conduit scheme involves a corporate official who instructs the corporation's employees to make contributions to a federal candidate, and then reimburses the employees from corporate funds generally through fictitious bonuses or pay raises. In so doing, illegal corporate funds are laundered to the candidate in violation of both Sections 441f and 441b.

As discussed previously, to be subject to prosecution as a FECA crime, the act must be knowing and willful. Laundering campaign contributions through straw donors is persuasive evidence of the Act's willful intent element (conscious defiance of the law). *See AFL-CIO v. Federal Election Commission*, 628 F.2d 97, 101 (D.C. Cir. 1980) (willful violation requires knowing, conscious, and deliberate flaunting of the Act).

As noted above, the 2002 Bipartisan Campaign Reform Act included enhanced criminal penalties for FECA crimes. In formulating these new penalties, Congress gave particular attention to conduit schemes, and determined that they should be subject to a separate felony penalty with a lower monetary floor than the general felony provision contained in BCRA for FECA offenses. Specifically, conduit crimes aggregating over $10,000 in a calendar year are now punishable as felonies, and subject to two years of imprisonment and *mandatory* minimum fines. 2 U.S.C. § 437g(d)(1)(1)(D). Conduit crimes aggregating $25,000 or more are subject to FECA's other new felony provision, and are five-year felonies. 2 U.S.C. § 437g(d)(1)(A)(ii). Finally, conduit crimes aggregating between $2,000 and $10,000 are one-year misdemeanors. 2 U.S.C. § 437g(d)(1)(A)(i).

As will be discussed below, conduit violations also may be prosecuted under the federal conspiracy and false statement statutes, 18 U.S.C. §§ 371 and 1001. The courts have held that the use of conduits to disguise illegal contributions to federal candidates is evidence of an intent to interfere with the accurate reporting of campaign contributions, an intent to defraud the FEC, and an intent

167

to cause false information to be conveyed to the FEC. *United States v. Hsia*, 176 F.3d 517 (D.C. Cir. 1999). *See also United States v. Hopkins*, 916 F.2d 207, 213-15 (5th Cir. 1990) (upholding Section 1001 conviction for filing false statements on disclosure reports required by the Ethics in Government Act).

Conduit schemes often involve multi-district activity, and therefore the question of where a contribution is "made" or "received" within the meaning of Section 441f can present venue questions. For a discussion of such venue issues, *see United States v. Passodelis*, 615 F.2d 975 (3d Cir. 1980) (reversing a conviction under Section 441f's predecessor, 18 U.S.C. § 614, on venue grounds). For a discussion of statute of limitations issues that also can arise in such cases, *see United States v. Hankin*, 607 F.2d 611 (3d Cir. 1979) (reversing a conviction under 18 U.S.C. § 614 on statute of limitations grounds).

### (g) 2 U.S.C. § 441g.  Limitation on contribution of currency

Section 441g makes it unlawful for any person to contribute more than $100 in United States or foreign currency to the campaign of a federal candidate. The limitation is cumulative, and applies to the candidate's entire campaign, including the primary and general election. The limitation differs from, and is in addition to, the contribution limitations in Section 441a.

The statute does not expressly address receiving cash for political purposes, but campaign agents who knowingly solicit or receive cash in violation of Section 441g may be liable as aiders and abettors under 18 U.S.C. § 2.

### (h)  2 U.S.C. § 441h.  Fraudulent misrepresentation of campaign authority

As a result of the 2002 Bipartisan Campaign Reform Act, Section 441h now prohibits two discrete types of fraudulent misrepresentations in connection with federal campaigns:  certain campaign "dirty tricks," and fraudulent fundraising.  Specifically:

- Section 441h(a) prohibits federal candidates and their agents from fraudulently misrepresenting that they have authority to speak or act for another federal candidate or political party on a matter that is damaging to the other candidate or political party.  The statute also prohibits conspiracies to misrepresent campaign authority to damage an opponent.

- Section 441h(b), enacted by BCRA, prohibits any person from fraudulently misrepresenting, or conspiring with another to fraudulently misrepresent, that he or she is acting for a federal candidate or political party for the purpose of soliciting contributions or donations.[66]

Unlike all other FECA violations, violations of Section 441h may be prosecuted without regard to the sum of money involved. § 437g(d)(1)(C).  Violations that involve amounts under $25,000 are one-year misdemeanors and violations involving $25,000 or more are five-year felonies.  § 437g(d)(1)(A).

---

[66] Violations of Section 441h(b) involving fraudulent fund-raising that are accomplished through the use of the mails or interstate wires may also be prosecuted as fraud offenses under 18 U.S.C. § 1341 or § 1343.

169

### (i) 2 U.S.C. § 441i.  Prohibition against soft money of political parties

Section 441i was also added to FECA by BCRA, and represents perhaps the single most significant achievement of that round of campaign financing reforms.  This statute was designed to eliminate unregulated "soft money" from the federal election campaign process.  Many of its potential areas of application to specific facts are continuing subjects for clarification by the FEC through its rule-making, advisory opinions, and civil enforcement actions.

Nevertheless, the so-called "soft money ban" codified in Section 441i has several clear features that are enforceable through FECA's criminal penalty.  Specifically:

#### i. Section 441i(a)

Section 441i(a) provides that a "national committee of a political party (including a national congressional campaign committee of a political party)," an agent of such a national committee, and any entity that is established, financed, or controlled by such a national committee, may not "solicit, receive, or direct to another person" any "contribution, donation, or transfer of funds," or spend any funds, that are not subject to the limits and prohibitions of FECA.[67]  Such funds would include contributions that exceed the Act's quantitative limitations in violation of Section 441a; contributions from prohibited sources, such as corporations, labor organizations, banks, or government contractors in violation of

---

[67] At the time this book was written, the following six committees were included in this prohibition:  the Republican National Committee, the Democratic National Committee, the National Republican Senatorial Committee, the Democratic Senatorial Campaign Committee, the National Republican Congressional Committee, and the Democratic Congressional Campaign Committee.  11 C.F.R. § 110.1(c)(2).

Section 441b, Section 441c, or Section 441e; and contributions laundered through conduits or in cash in violation of Section 441f or Section 441g.

Stated differently, national committees of political parties and their agents may only solicit, receive, or direct funds that comply with the limitations and prohibitions of FECA, that is, "hard money." Any act of solicitation, receipt, or direction of "soft money" funds by a national party committee, its agents, or an entity it controls violates Section 441i(a).

Of particular significance here is the statute's inclusion of the verb "direct." It would be, for example, a violation of Section 441i(a) if an agent of a national party committee suggested to a wealthy contributor that instead of giving soft money to the national party (which is no longer permissible), the contributor give the funds to a state or local component of the national party committee. It would also be a violation of Section 441i(a) if the agent suggested that a prohibited funding source such as a corporation or a labor organization give to a recipient that is not covered by FECA, such as a candidate for nonfederal office.

ii. Section 441i(b)

Section 441i(b) prohibits state and local committees, as well as their officers and agents, from "expending or disbursing" funds that have not been raised in accordance with the limitations and prohibitions of FECA on "federal election activity." This new term was enacted by BCRA and is defined broadly to include any activity that benefits both federal and nonfederal candidates. § 431(20). Examples of "federal election activity" include get-out-the-vote efforts, voter registration drives, and generic public communications that simultaneously benefit a political party's federal and nonfederal candidates, such as, "vote for the Democratic [Republican] Party."

171

Prior to BCRA, the Federal Election Commission permitted "generic" expenses such as those noted above to be allocated between federal and nonfederal candidates, requiring that only the portion of their cost that was attributed to the promotion of federal candidates be paid from "hard money." This allocation process proved to be both weak and unenforceable. By enacting Section 441, Congress rejected the FEC's allocation rules, and plugged this loophole by statutorily deeming all such "generic" activities by state and local party committees to be entirely "federal" in nature, thus requiring that they be financed entirely from "hard money," i.e., money raised in compliance with FECA. The following year, the Supreme Court upheld this extension of FECA's coverage as a constitutional legislative effort to avoid circumvention of the Act. *McConnell v. Federal Election Commission*, 540 U.S. 93 (2003). Thus, if an agent of a state political party committee knowingly and willfully uses "soft money" to pay for "generic" party advertisements, the agent would be in violation of 441i(b).

Section 441i(b) does not cover state and local political party communications that refer entirely to nonfederal candidates. The statute also does not apply to expenditures or disbursements for generic get-out-the-vote or voter registration drives that are paid from a special fund that the Act permits state and local party committees to maintain. These special accounts – called "Levin" accounts after the Senator who sponsored this provision – may raise up to $10,000 from individual contributors, provided that national party committees, state party committees acting jointly, and, with narrow exceptions, federal candidates and officeholders are not involved in the solicitation of such funds. §§ 441i(b)(2)(C), 441i(e)(3).

### iii. Section 441i(d)

Section 441i(d) prohibits any national, state, or local committee of a political party, as well as agents thereof, from "soliciting, making, or directing" any contribution or donation to any organization that is exempt from federal taxation under the provisions

172

of 26 U.S.C. § 501 or § 527, if said tax-exempt organizations have made expenditures or disbursements to fund "federal election activities." Again, these include primarily "generic" expenses such as paying for get-out-the-vote or voter registration drives, or public communications that benefit simultaneously both federal and nonfederal candidates. This far-reaching prohibition was also upheld in *McConnell* as a necessary measure to prevent evasion of the ban on the use of soft money in federal campaigns – the principal focus of Section 441i.

### iv.  Section 441i(e)

Finally, Section 441i(e) addresses what are commonly known as "leadership PACs." Prior to BCRA, these PACs were established and controlled by a federal candidate or officeholder to raise funds for candidates at the federal, state, and local levels in the expectation that such activities would also enhance the candidate's or officeholder's own political power. Specifically, Section 441i(e) provides that a federal candidate or officeholder, or an entity controlled by such a person, may not "solicit, receive, direct, transfer, or spend" funds raised in violation of FECA's limitations and prohibitions in connection with the election of any candidate for federal, state, or local elective office. § 441i(e)(1). The statute contains an exception for a federal candidate or officeholder who is also running simultaneously for a state or local office, which permits the candidate to solicit, receive, or spend "soft money"on behalf of his or her nonfederal election campaign, provided that the transactions are permitted under state law. § 441i(e)(2). As noted above, in *McConnell* the Supreme Court upheld this broad limitation against various constitutional challenges, finding it necessary to prevent circumvention of the statute's prohibition on the use of soft money by federal candidates and officials to influence federal elections.

Knowing and willful violations of Section 441i that aggregate $2,000 or more in a calendar year are one-year misdemeanors; those

173

aggregating $25,000 or more in a calendar year are five-year felonies. § 437g(d)(1)(A).

### (j)  2 U.S.C. § 439a.  Prohibition on conversion of campaign funds

Section 439a regulates the use of funds contributed to federal candidates and officeholders.  Over the years the statute has gone through a number of substantive changes, most of which have focused on the use of campaign funds to defray the personal expenses of federal candidates and officeholders.

As originally enacted, Section 439a provided that funds contributed to a federal candidate in excess of amounts needed for campaign expenditures, and funds donated to a federal officeholder, could be used: (1) to defray the candidate's expenses in connection with his or her official duties, (2) for contributions to charities, (3) for transfers to political parties, or (4) for any other "lawful purpose." However, it was unclear whether "lawful purpose" included the use of campaign funds for personal purposes.  In 1980, the statute was amended to state expressly that such funds may not be converted by any federal candidate, federal official, or other person to any "personal use."  However, the term "personal use" was not defined.

In 2002, Congress completely revised Section 439a as part of BCRA's broad campaign reforms, and, in the process, clarified exactly what it meant by a prohibited conversion to an individual's "personal use."  The current statute applies to *all* contributions to a federal candidate – not just "excess" contributions – and is composed of two provisions:

- Section 439a(a) sets forth the permissible uses of contributed funds.  It retains three previously permissible uses – for duties as an officeholder, contributions to charities, and transfers to political parties.  In addition, Congress added another

174

permissible use relating to election campaigns: "for otherwise authorized expenditures in connection with the campaign for Federal office of the candidate." § 439a(a)(1). The former category, "for any other lawful purpose," was deleted.

- Section 439a(b) contains the statutory prohibition: a contribution to a federal candidate may not be "converted by any person to personal use." § 439a(b)(1). The provision further provides that a contribution shall be considered to be converted to personal use if it is used to fulfill any "commitment, obligation, or expense of a person that would exist irrespective of the candidate's election campaign." § 439a(b)(2). Finally, Section 439a(b)(2) lists nine specific examples of prohibited personal uses of campaign funds, such as mortgage payments, clothing expenses, vacations, and noncampaign-related car expenses.

Section 439a now reflects Congress's clear intent to bar completely the conversion of campaign funds for personal purposes. Although the statute is limited to funds contributed to federal candidates and their authorized committees, conversion of contributions to other political committees can be addressed under Title 18 fraud statutes. For example, if the conversion was by a campaign official, the conduct can be prosecuted as an honest services mail fraud under 18 U.S.C. §§ 1341 and 1346, as a scheme to deprive the campaign of the honest services of the campaign official; if the theft was by someone other than a campaign official, the matter can generally be reachable under the mail or wire fraud statutes, 18 U.S.C. § 1341 or § 1343.

In addition to prosecuting embezzlement and conversion of campaign funds under Section 439a or the fraud statutes, this conduct

175

can also be prosecuted under the false statements statute, 18 U.S.C. § 1001, for willfully causing another to submit false information to the FEC regarding the use of the funds.

### (k)  2 U.S.C. §§ 432, 433, and 434.  Organization, recordkeeping, and reporting requirements

In brief, FECA requires federal candidates and political committees supporting federal candidates to file with the FEC a statement of organization and periodic reports of receipts and disbursements.  §§ 433, 434(a).  The reports are made available to the public, and must identify, among other things, persons contributing over $200 in a calendar year.  § 434(b)(3)(A).  The Act also requires that persons making independent expenditures (as distinct from contributions) in excess of $250 to elect or to defeat a federal candidate must file reports with the FEC.  § 434(c).

Most campaign records must be maintained for three years, including records reflecting the identity of all contributors giving in excess of $50.  §§ 432(c), 432(d).  In addition, persons who collect, receive, or otherwise handle contributions to a federal candidate from other persons are required to forward these contributions to the candidate's campaign treasurer within ten days, along with the name and address of any person who contributed over $50 to the candidate. § 432(b).

## E.     ENFORCEMENT

### 1.  Three Types of Enforcement

Federal campaign financing violations are subject to three types of enforcement:

- Criminal prosecution by the Justice Department as felonies, either under FECA, as amended by BCRA (i.e., after November 5, 2002); under other federal

176

criminal statutes addressing frauds and false statements, such as 18 U.S.C. §§ 371, 1001, 1341, 1343, and 1346; or under Title 26 statutes if the matter involves a publicly funded presidential campaign;

- Criminal prosecution by the Justice Department as FECA misdemeanors (before November 6, 2002, or if the amount of the violation does not reach the post-BCRA felony thresholds); and

- Civil enforcement proceedings by the Federal Election Commission.

## 2. General Observations

Criminal prosecution under FECA can be pursued before civil and administrative remedies are exhausted. §§ 437g(a), 437g(d); *United States v. International Union of Operating Engineers*, 638 F.2d 1161 (9th Cir. 1979); *United States v. Tonry*, 433 F. Supp. 620 (E.D. La. 1977); *United States v. Jackson*, 433 F. Supp. 239 (W.D. N.Y. 1977), *aff'd*, 586 F.2d 832 (2d Cir. 1978).

Before the 1976 FECA amendments, all FECA violations were subject to prosecution under a misdemeanor provision that applied regardless of the amount of funds involved, and that, on its face, required no criminal intent. 2 U.S.C. § 441 (1972 Supp.) (repealed). In affirming convictions under the 1971 FECA's reporting provisions, one appellate court held, however, that criminal violations required proof of "knowing" conduct, that is, knowledge of operable facts. *United States v. Finance Committee to Re-Elect the President*, 507 F.2d 1194, 1197-98 (D.C. Cir. 1974) (finding the defendant's secret transactions "clear indicators of guilty intent").

The 1976 FECA amendments transferred all of the campaign financing statutes that were in Title 18 to FECA, and also created a statutory dichotomy between nonwillful violations involving any

177

amount, and knowing and willful violations involving $2,000 or more within a calendar year.  The former were expressly made subject to the exclusive civil jurisdiction of the Federal Election Commission. 2 U.S.C. §§ 437g(a), 437d(e).  The latter were made subject to both civil enforcement proceedings by the FEC and criminal prosecution by the Justice Department.  2 U.S.C. §§ 437g(a)(5)(B), 437g(d).

The 2002 FECA amendments augmented the Act's criminal misdemeanor penalty by enacting two felony penalties for FECA crimes:  knowing and willful violations aggregating $25,000 or more in a calendar year are now five-year felonies, and violations involving conduits that exceed $10,000 in a calendar year are two-year felonies. §§ 437g(d)(1)(A)(i), 437g(d)(1)(D)(i).

The FEC pursues FECA violations under the statutory scheme set forth in Section 437g(a).  In brief, civil penalties can be imposed through a "conciliation" process, which is roughly equivalent to an administrative guilty plea with a stipulated penalty agreed upon by the FEC and the respondent; civil penalties can also be imposed through a civil suit brought by the FEC in federal district court.   Civil sanctions range from "cease and desist" agreements (in which the respondent agrees not to commit a similar violation in the future) to relatively substantial fines.  The size of the civil fine depends both on the amount involved in the violation and the degree of knowledge and intent of the respondent.  §§ 437g(a)(5), (6).  The FEC possesses subpoena power and the power to administer oaths, §§ 437d(a)(3) and 437d(a)(2), powers that it has been using with increasing frequency in recent years.

### 3.  Criminal Prosecution

As noted above, FECA has an internal criminal penalty provision, Section 437g(d).  In order for a FECA violation to be a federal crime, Section 437g(d) generally requires that two elements be satisfied:  the violation must have been committed "knowingly and willfully," and, with certain exceptions, the amount involved in

178

the violation must aggregate $2,000 or more in a calendar year. Moreover, a single pattern of illegal conduct can often involve several FECA offenses, which may have different monetary thresholds. An example would be corporate contributions in violation of Section 441b that are laundered through conduits in violation of Section 441f. Prosecutions under the Act thus present three factual issues: intent, aggregate value, and applicable penalties. These topics are discussed next.

### (a)  Intent

For a FECA violation to have been committed "knowingly and willfully," the offender must have known what the law forbade or required and violated that statutory prohibition or duty notwithstanding that knowledge. *United States v. Finance Committee to Re-Elect the President*, 507 F.2d 1194, 1197-1198 (D.C. Cir. 1974); *see also National Right to Work Committee v. Federal Election Commission*, 716 F.2d 1401, 1403 (D.C. Cir. 1983) *and AFL-CIO v. Federal Election Commission*, 628 F.2d 97, 101 (D.C. Cir. 1980) (knowing and willful FECA violation requires "knowing, conscious, and deliberate flaunting" of the Act).

Examples of evidence that has been used to prove that FECA violations were committed knowingly and willfully include:

- The use of surreptitious means, such as cash, conduits, or false documentation, to conceal the violation;

- Making a prohibited "in-kind" contribution by paying directly for goods or services provided to a recipient political committee;

- Proof that the offender is active in political fund-raising and is personally well-versed in the federal campaign financing laws (such as offenders who

179

can be shown to be professional lobbyists or fundraisers);

- Proof that the substantive FECA violation took place as part of another felonious end (such as the use of corporate funds to pay a bribe to a public official in violation of 18 U.S.C. § 201, with the bribe disguised as an ostensible campaign contribution to the official's campaign committee); and

- Proof that the donor received information about FECA prohibitions and requirements directly from a candidate, political committee, or campaign, e.g., through the use and execution of what are called "donor cards."

Four provisions of FECA address acts that are *malum in se*, that is, inherently wrongful conduct from which willful intent to violate the law can be inferred from mere proof that the prohibited act was committed. These exceptional provisions are the Act's prohibitions against: conversion of campaign funds (§ 439a); misrepresentation of campaign authority to damage an opponent's campaign (§ 441h(a)); fraudulent solicitations (§ 441h(b)); and certain coerced contributions by corporations and unions (§ 441b(b)(3)(A)).

### (b)  Aggregate value

Prior to November 6, 2002, when BCRA's changes went into effect, all violations of FECA's substantive prohibitions that were committed knowingly and willfully were, with two exceptions, federal misdemeanors only if they involved conduct "aggregating" $2,000 or more in a calendar year.  2 U.S.C. § 437g(d)(2000). The exceptions to this $2,000 requirement were violations of the prohibition in Section 441b(b) against the use by corporate or union PACs of coerced contributions, and violations of the prohibition in

180

Section 441h against fraudulent misrepresentation of campaign authority to damage another candidate or political party.

In determining the aggregate value of a FECA violation, the customary practice has been to include the overall "value" of a series of violations that are committed by, and attributed to, a given offender.   For example, a $50,000 illegal corporate contribution within a given calendar year that was illegally passed through 50 individuals serving as conduits would have an aggregate value of $50,000.

BCRA retained the $2,000 jurisdictional threshold for FECA misdemeanors, as well as its two exceptions noted above.  It also added a third exception to this monetary floor for violations of the new prohibition against misrepresentation of campaign authority to solicit contributions for a candidate or political party.  2 U.S.C. § 441h(b).

In addition, BCRA added two new monetary thresholds for FECA crimes that occur after November 5, 2002 (when BCRA took effect):

- All FECA violations "aggregating" $25,000 or more in a calendar year are five-year felonies, 2 U.S.C. § 437g(d)(1)(A)(i); and

- Violations of FECA's prohibition against the use of conduit contributions (2 U.S.C. § 441f) "aggregating" over $10,000 in a calendar year are two-year felonies, 2 U.S.C. § 437g(d)(1)(D)(i).

Thus, if within the same calendar year an offender knowingly and willfully contributes $24,000 in illegal corporate funds through 12 conduits to make the transactions appear legal, that offender commits a felony violation of Section 441f, since the aggregate value of the conduit violation exceeds $10,000.  The offender also commits

181

a misdemeanor violation of the corporate contribution prohibition in Section 441b, since the violation aggregates more than $2,000, but less than $25,000.

### (c) Penalties

When this book was written, most FECA crimes prior to BCRA had expired under the special three-year statute of limitations that governed FECA offenses. Therefore, we do not focus on the penalties that previously applied to FECA crimes that took place before November 6, 2002, other than to note that such offenses were all misdemeanors subject to one year of imprisonment and a fine of the greater of (i) 300% of the aggregate value involved in the offense, or (ii) the appropriate fine under 18 U.S.C. § 3571 (i.e., $100,000 for each offense committed by an individual and $200,00 for each offense committed by an organization).[68]

For FECA offenses that take place after November 5, 2002, the following criminal penalties apply:

- All FECA violations that aggregate $25,000 or more in a calendar year are felonies subject to imprisonment for five years and, except for conduit violations, fines imposed pursuant to 18 U.S.C. § 3571 (up to $250,000 for each offense by an individual and up to $500,000 for each offense by an organization). 2 U.S.C. § 437g(d)(1)(A)(i).

- Conduit violations (2 U.S.C. § 441f) that aggregate more than $10,000 in a calendar year

---

[68] Federal prosecutors should also consider whether any conduct before November 6, 2002, may still be prosecuted under criminal statutes subject to a five-year statute of limitations, such as 18 U.S.C. §§ 1001 and 371. Such statutes also apply, of course, to conduct after BCRA's effective date.

182

are felonies: those aggregating under $25,000 are two-year felonies, and those aggregating $25,000 or more are five-year felonies. 2 U.S.C. § 437g (d)(1)(D)(i). In addition, these offenses are subject to a *mandatory* minimum fine of 300% of the amount involved in the violation, and a maximum fine that is the greater of either $50,000, or 1,000% of the aggregate value involved in the offense, or the amount provided for in 18 U.S.C. § 3571.
2 U.S.C. § 437g(d)(1)(D)(ii).

- Fraudulent misrepresentations of campaign authority to damage an opponent or to solicit funds (2 U.S.C. § 441h) involving less than $25,000 in a calendar year are misdemeanors subject to one year of imprisonment and fines imposed pursuant to 18 U.S.C. § 3571 (up to $100,000 for each offense by an individual and up to $200,000 for each offense by an organization). 2 U.S.C. § 437g(d)(1)(C).

- Violations of the prohibition against the use of coerced contributions by corporations and unions (2 U.S.C. § 441b(b)(3)(A)) that aggregate $250 or more in a calendar year are subject to one year of imprisonment and fines imposed pursuant to 18 U.S.C. § 3571, 2 U.S.C. § 437g(d)(1)(B).

- Violations of all other FECA provisions that aggregate $2,000 or more in a calendar year are misdemeanors subject to one year of imprisonment and fines imposed pursuant to 18 U.S.C. § 3571. 2 U.S.C. § 437g(d)(1)(A)(ii).

183

Of course, the actual penalties imposed for these offenses are subject to the guidance provided in the FECA sentencing guideline, U.S.S.G. § 2C1.8.

### 4. Felony Theories for FECA Crimes

Prior to BCRA, when all FECA crimes were misdemeanors and subject to a special three-year statute of limitations, prosecuting aggravated campaign financing violations as Title 18 felonies offered strategic advantages. For example, such cases were governed by the general five-year criminal statute of limitations contained in 18 U.S.C. § 3282. Also, the sentencing calculus was usually harsher for violations of Title 18 offenses than for FECA crimes. Finally, conviction of a felony carried more serious collateral consequences.

The theories of prosecution developed prior to BCRA for these purposes utilized the federal conspiracy and false statements statutes, 18 U.S.C. §§ 371 and 1001. As discussed below, these theories remain viable charging options for FECA crimes.

### (a) Willfully causing submission of false information to the Federal Election Commission. 18 U.S.C. § 1001 and § 2.

Each political committee that seeks to influence a federal election is required to have a treasurer who is required to file periodic reports with the FEC of contributions to and expenditures by the committee, including the identity of all persons contributing over $200 in a calendar year. 2 U.S.C. §§ 432(a), 434(a), 434(b)(3)(A). In addition, persons receiving a contribution to a political committee must forward it to the treasurer, along with the identity of all donors contributing over $50. 2 U.S.C. § 432(b). The treasurer's reports thus include information from individuals who have forwarded contributions to the committee.

184

A treasurer who submits information concerning contributions or expenditures to the FEC, knowing the information to be false, violates 18 U.S.C. § 1001.  A person involved in a transaction reportable under FECA who attempts to disguise it, or misrepresents its source, purpose, or amount, "willfully causes" the treasurer of the recipient committee to furnish false information concerning the transaction to the FEC in violation of 18 U.S.C. §§ 2(b) and 1001. This information is "material" to the "jurisdiction" of the FEC in that it impacts adversely upon the Commission's statutory duties to make public an accurate account of financial transactions done for the purpose of influencing a federal election (2 U.S.C. § 438(a)(4)), and, in situations when the concealed fact itself constitutes a violation of FECA, to enforce the law (§§ 437d(a)(6), 437d(a)(9), 437g(a)(5)).

The application of Section 1001 to campaign financing violations follows from *United States v. Hansen*, 772 F.2d 940 (D.C. Cir. 1985).  In this case, Congressman Hansen had been indicted and convicted under Section 1001 for filing false reports with the House Committee on Standards of Official Conduct under the 1978 Ethics in Government Act (EIGA).  Like a portion of FECA, EIGA is essentially a disclosure statute; it applies to federal officeholders and candidates, while FECA applies to persons seeking federal office. Also like FECA, EIGA has an internal penalty that provides for nonfelony sanctions.  The D.C. Circuit rejected the contention that, by enacting EIGA, Congress had repealed by implication existing felony sanctions for false reports by public officials; the court held that the civil penalty in EIGA and the felony penalty under Section 1001 "produce a natural progression in penalties," and that "those who lie on their [EIGA] forms" violate Section 1001.  *Hansen*, 772 F.2d at 945.

The use of Section 1001, in conjunction with Section 2(b), to prosecute those who willfully cause the treasurer of a political

185

committee to submit materially false data to the FEC has been upheld by every court that has decided the issue. *United States v. Hsia*, 176 F.3d 517 (D.C. Cir. 1999); *United States v. Kanchanalak*, 192 F.3d 1037 (D.C. Cir. 1999); *United States v. Curran*, 20 F.3d 560 (3d Cir. 1994); *United States v. Hopkins*, 916 F.2d 207 (5th Cir. 1990). *See also United States v. Gabriel*, 125 F.3d 89 (2d Cir. 1997) (*dicta*) (analyzing the interrelationship between Section 1001 and FECA).

In *Curran*, the Third Circuit adopted a restrictive view of this theory of prosecution, and required proof that the offender had knowledge of the underlying FECA requirement or prohibition involved in the violation, similar to the type of proof needed for a conviction under FECA's criminal provision. However, the remainder of the circuits that have addressed this issue have rejected *Curran's* narrow reading of the law and have applied to Section 1001 prosecutions involving false FEC filings the same elements that apply in other Section 1001/Section 2 cases. *United States v. Hsia*, 176 F.3d 517; *see also United States v. Gabriel, 125 F.3d 89*. These elements are:

- the defendant caused another to make a statement that was false;

- the false statement concerned a matter that was within the jurisdiction of the Federal Election Commission; that is, the false statement related to a fact that the Federal Election Campaign Act required to be accurately reported;

- the false statement was material to the FEC, that is, it had the natural tendency to influence the FEC in the performance of its official duties; and

186

- the defendant acted knowingly and willfully; that is, the defendant intended to cause the recipient of political contributions to record false statements concerning their source.   However, the government does *not* have to prove that the defendant was aware of the statutory requirements and prohibitions of FECA, that he purposefully violated the Act, or that he was aware of the federal agency's interest in the matter falsified. Proof that the defendant "acted deliberately and with knowledge that the representation was false" is sufficient. *United States v. Hopkins*, 916 F.2d at 214.

### (b)  Conspiracy to defraud the United States. 18 U.S.C. § 371

The "conspiracy to defraud" approach to FECA crimes is based on *Hammerschmidt v. United States*, 265 U.S. 182 (1924), which held that a conspiracy to defraud the United States under Section 371 includes a conspiracy "to interfere with or obstruct one of [the federal government's] lawful governmental functions by deceit, craft, or trickery, or at least by means that are dishonest." *Id.* at 188. *See also Dennis v. United States*, 384 U.S. 855, 861 (1966); *Haas v. Henkel*, 216 U.S. 462, 469 (1910).

This conspiracy theory, as applied to the functioning of the FEC, is as follows:  the FEC, an agency of the United States, has the principal statutory duties of enforcing FECA's campaign financing prohibitions and disclosure requirements and providing the public with accurate information regarding the source and use of contributions to federal candidates and expenditures supporting federal candidates. 2 U.S.C. §§ 437c, 437d.  To perform these duties

187

the FEC must receive accurate information from the candidates and political committees that are required to file reports under the Act. A scheme to infuse patently illegal funds into a federal campaign, such as by using conduits or other means calculated to conceal the illegal source of the contribution, thus disrupts and impedes the FEC in the performance of its statutory duties.

As previously stated, prosecution under FECA's criminal provision requires proof that the defendant was aware of the substantive FECA requirement he or she violated, and that he or she violated it notwithstanding this active awareness of wrongdoing. *National Right to Work Committee v. Federal Election Commission*, 716 F.2d 1401 (D.C. Cir. 1983); *AFL-CIO v. Federal Election Commission*, 628 F. 2d 97 (D.C. Cir. 1980). However, when the conduct is charged under Section 371, the proof must also show that the defendant intended to disrupt and impede the lawful functioning of the FEC. Indeed, the crux of a Section 371 FECA case is an intent on the part of the defendant to thwart the FEC. That is a higher factual burden than is required under 18 U.S.C. § 1001 in all but the Third Circuit, and is arguably a greater factual burden than is required by Section 437g(d).

The use of Section 371 in this manner has been approved by the Third and Fifth Circuits. *United States v. Curran*, 20 F.3d 560 (3d Cir. 1994); *United States v. Hopkins*, 916 F.2d 207 (5th Cir. 1990).

## 5. Public Financing Crimes Relating to Presidential Campaigns

The anti-fraud provisions of the Presidential Primary Matching Payment Account Act, 26 U.S.C. §§ 9031-9042, and the Presidential Election Campaign Fund Act, 26 U.S.C. §§ 9001-9012,

188

are five-year felonies and can be used to prosecute aggravated campaign financing schemes involving presidential campaigns. 26 U.S.C. §§ 9012, 9042.

These statutes were enacted after the Supreme Court struck down the 1974 FECA's limits on campaign expenditures by federal candidates as violative of free speech. *Buckley v. Valeo*, 424 U.S. 1 (1976). The statutes tie eligibility for federal funds to voluntary adherence to campaign expenditure limits by participating candidates. Thus, presidential candidates are given a choice between making unlimited campaign expenditures or accepting public funds for their campaigns in return for agreeing to abide by campaign expenditure limits.

The "matching payment" statute applies to the presidential primary campaign. It provides that, once certain statutory qualifications are met, a presidential candidate is entitled to receive matching payments (for contributions up to $250 from individual donors) from the United States Treasury for his or her campaign, up to half of the applicable total campaign spending limit. 26 U.S.C. § 9034(b). Presidential candidates who choose to accept primary campaign matching funds are subject to FECA's campaign expenditure limits. 2 U.S.C. § 441a(b).

The general election funding statute allows a candidate who has been nominated by a major party (i.e., the Republican Party or the Democratic Party) or by a qualifying minor or new party for the Presidency to receive all of his or her campaign funds from the United States Treasury. 26 U.S.C. § 9004(a)(1). Presidential candidates who choose to accept this federal grant are subject to the campaign expenditure limits in 2 U.S.C. § 441a(b), and are also for the most part prohibited from accepting any private contributions in

189

connection with the general election phase of their campaigns. 26 U.S.C. §§ 9003, 9012.

Both public financing statutes contain bookkeeping and reporting requirements, and also require that each campaign receiving federal funds submit to a post-election audit by the FEC. 26 U.S.C. §§ 9033, 9003. Participating candidates must also agree to pay back all funds which the FEC determines were not used for campaign purposes, or which were spent in excess of the expenditure limit, were not matchable, or were otherwise illegal. 26 U.S.C. §§ 9038, 9007.

Each of these statutes contains its own criminal provision for, among other things, providing false information to the FEC to obtain public funds, which is punishable by imprisonment for up to five years and a fine under 18 U.S.C. § 3571. 26 U.S.C. §§ 9042(c), 9012(d). Prosecutors considering false statement charges in connection with conduct violating one of these public funding laws thus have the choice of using either the public funding statute that specifically addresses the conduct or the general false statements statute, 18 U.S.C. § 1001. *See United States v. Curran*, 20 F.3d 560 (3rd Cir. 1994) (affirming Section 1001 charge for election law offense); *United States v. Hopkins*, 916 F.2d 207 (5th Cir.1990) (same); *see also United States v. Woodward*, 469 U.S. 105 (1985) (affirming Section 1001 charge for currency reporting offense).

The administration and civil enforcement of these grant programs are within the FEC's sole jurisdiction. However, since these are federal funding programs, with federal candidates as the beneficiaries, if there is evidence of an intent to defraud the United States in the implementation of these programs, criminal prosecution is warranted and should be pursued.

190

### 6. Violations of State Campaign Financing Laws

All states have campaign financing laws.  Like their federal counterpart, these state laws prohibit contributions from certain sources, in some instances they limit the amounts that can be given to state and local candidates, and in most instances they impose transparency requirements on state and local candidates and political committees that are engaged in influencing state and local elections.

Federal law does not directly criminalize violations of state campaign financing laws.  Federal prosecutors should consider, however, whether the underlying conduct violates federal criminal law.

Two federal fraud statutes (18 U.S.C. §§ 1341 and 1346) have been used in the recent past to reach certain violations of state campaign financing laws.  These are discussed below.

### (a)  18 U.S.C. § 1346.  Honest services frauds

In *McNally v. United States*, 483 U.S. 350 (1987), the Supreme Court ruled that a scheme to defraud citizens of the honest services of a public official was not, in itself and in the absence of a proven pecuniary loss, a violation of the mail fraud statute, 18 U.S.C. § 1341.  The Court in fact cited as examples several election fraud cases it believed did not present violations of the mail fraud statute in which the lower appellate courts had held that the mail fraud statute was applicable to schemes to deprive others of fair elections.[69]

_____

[69] *United States v. Clapps*, 732 F.2d 1148 (3rd Cir. 1984); *United States v. States*, 488 F.2d 761 (8th Cir. 1973).

191

Prior to *McNally*, two circuits had held that the "intangible rights" theory of mail and wire fraud also reached schemes to deprive the inhabitants of a state of information that was required to be accurately disclosed under state campaign financing and lobbying disclosure laws. *United States v. Curry*, 681 F.2d 406 (5th Cir. 1982); *United States v. Buckley*, 689 F.2d 893 (9th Cir. 1982).

In response to the *McNally* decision, Congress passed 18 U.S.C. § 1346 the following year. Section 1346 defines a "scheme or artifice to defraud" for purposes of the mail and wire fraud statutes to include a scheme to deprive another of "the intangible right of honest services."

The appellate jurisprudence that has emerged since 1988 concerning the application of Section 1346 to the relationship between public officials and the people establishes that the statute was intended to reach traditional types of public corruption (e.g., bribery, extortion, aggravated conflicts of interest, thefts, embezzlements, and some gratuities when the conduct violates state laws). *See, e.g., United States v. Brumley*, 116 F.3d 728 (5th Cir. 1997); *United States v. Czubinski*, 106 F.3d 1069 (1st Cir. 1997); *United States v. Sawyer*, 85 F.3d 713, 723-24 (1st Cir. 1996); *United States v. Bryan*, 58 F.3d 933, 939-43 (4th Cir. 1995); *United States v. Waymer*, 55 F.3d 564, 568 (11th Cir. 1995).

A few courts have suggested that Section 1346 may extend beyond traditional corruption to reach schemes to violate state campaign financing laws. *See United States v. Walker*, 97 F.3d 253 (8th Cir. 1996) (upholding mail fraud convictions under salary and intangible rights theories in a scheme to ensure a local candidate's election by secretly financing a straw candidate when application of the statute was not challenged); *United States v. Grubb*, 11 F.3d 426 (4th Cir. 1993) (upholding mail fraud convictions arising from a

192

secret bribe payment to a local candidate).  However, in *United States v. Turner*, 459 F.3d 775 (6th Cir. 2006), the Sixth Circuit held that candidates do not owe a fiduciary duty of honest services to the public in the sense that holders of public office do, and that 18 U.S.C. § 1346 does not apply to schemes by candidates for public office to violate state campaign financing laws.

In view of the *Turner* decision, federal prosecutors considering using Section 1346 to reach schemes involving voter fraud or state campaign financing violations should consult with the Public Integrity Section.

### (b)  18 U.S.C. § 1341.  Mail fraud

The federal mail fraud statute prohibits the use of the mails to further a "scheme or artifice to defraud."  18 U.S.C. §1341.[70]  As discussed above, the Supreme Court ruled in 1987 that these words were confined to schemes to obtain money or property.

A prosecutive theory that has been used with modest success permits a scheme to corrupt an election to be prosecuted as a "scheme to obtain money and property" when the scheme involves, as one of its motives, obtaining for the favored candidate an elected office that carries with it a salary and emoluments that have pecuniary value. The crux of this so-called "salary theory" of pecuniary fraud is that the perpetrators obtained for the favored candidate materially defective ballots that were void; that they intended to conceal the defective nature of the ballots in question from the election

---

[70] The federal wire fraud statute, 18 U.S.C. § 1343, is essentially identical to the mail fraud statute, except for its jurisdictional element, and thus has potential application to election fraud schemes that are furthered by interstate wires.

authorities charged with counting the votes and certifying the winner of the election; and that, since in a democracy the principal qualification for attaining elective office is that the winning candidate received the most valid votes, such a scheme had as one of its objectives obtaining the office – along with its pecuniary emoluments – for the favored candidate.

One reported decision has taken this theory of prosecution a step further and applied it to a scheme by a candidate for the New York State Senate to conceal from his state campaign finance reports that the candidate was required to file under state law the material fact that his campaign was being financed by individuals who were publicly known to have been associated with organized crime. *United States v. Schermerhorn*, 713 F. Supp. 88 (S.D. N.Y. 1989). *See also United States v. Walker*, 97 F.3d 253 (8 th Cir. 1996) (leaving undisturbed unchallenged mail fraud convictions involving false state campaign filings based on salary and honest services theories). However, as noted above, in *Turner* the Sixth Circuit analyzed the underpinnings of the "salary theory" of mail and wire fraud in the context of a vote-buying case involving false state campaign reports and concluded that the theory does not apply to schemes involving voting or campaign financing. As with situations involving the use of Section 1346 in the context of election fraud or financing schemes, in view of *Turner,* federal prosecutors anticipating using the salary theory in such situations should consult with the Public Integrity Section.

### 7. Schemes to Divert Campaign Funds

Recent years have seen a dramatic rise in the number of cases in which candidates and campaign fiduciaries steal money that has been contributed to a candidate or political committee for the purpose

194

of electing the candidate or the candidates supported by the political committee. These situations warrant aggressive federal enforcement.

Campaign fund diversion cases generally fall into three factual scenarios:

- Diversion by a candidate or campaign agent of incoming contributions to the candidate or committee before the contributions are deposited;

- Embezzlement by a campaign agent or other person of contributions to a candidate or committee that have been deposited into the campaign's account; and

- Establishment of a fictitious political organization for the purpose of raising funds to be converted to personal use.

The first two scenarios include theft of contributions to a candidate. These cases are usually prosecuted as FECA crimes under 2 U.S.C. § 439a, or as mail or honest services frauds under 18 U.S.C. §§ 1341 and 1346. Embezzlement of funds contributed to political committees may be prosecuted as mail or honest services fraud. In addition, all three scenarios may be prosecuted as reporting offenses under 2 U.S.C. § 434 or as false statements under 18 U.S.C. § 1001. These theories are discussed below.

### (a) FECA conversion

FECA regulates the use of funds contributed to a federal candidate in 2 U.S.C. § 439a. Section 439a(b) prohibits the

195

conversion "by any person to personal use"[71] of funds that were contributed to a federal candidate, and further provides that such funds may only be used:

- to support the candidate's campaign for federal office;

- to defray the candidate's expenses as a holder of federal office;

- to make contributions to charitable organizations that are exempt from federal taxation under 26 U.S.C. § 501(c)(3); and

- to make transfers – without limit – to national, state, or local committees of a political party.

Violations of Section 439a are subject to the penalties described above for criminal FECA violations. If the violations took place after January 25, 2003, they are also subject to the advisory effect of U.S.S.G. § 2C1.8. *E.g., United States v. Taff*, 400 F. Supp. 2d 1270 (D. Kan. 2005) (rejecting motion to dismiss indictment charging § 439a based on candidate's temporary use of campaign funds for house closing).

---

[71] The statute lists a number of items that would be a prohibited "personal use," such as home mortgages, clothing, or any "expense of a person that would have existed irrespective of the candidate's election campaign or individual's duties as a holder of Federal office." § 439a(b).

196

### (b)  Deprivation of honest services

Officials and fiscal agents of a candidate's campaign or any other political committee owe a fiduciary duty to the committee they serve, and they breach that fiduciary duty if they convert contributions entrusted to them to their personal use.  If the scheme is furthered by use of the mails or interstate wires, it may be charged as mail or wire fraud.  Examples of campaign embezzlement cases are *United States v. Thomas,* Cr. No. 05-0423 (D.D.C., information filed November 30, 2005); *United States v. Bracewell*, Cr. No. 91-57-N (M.D. Ala., superseding indictment filed May 9, 1991); and *United States v. Karlsen*, Cr. No. 89-353 (D. Az., indictment filed Oct. 18, 1989).[72]

### (c)  Reporting offenses

The conversion of campaign funds is generally accompanied by concealment of the embezzlement on reports filed with the FEC pursuant to 2 U.S.C. § 434(b).  In those situations, concealment of the embezzlement can be addressed through 18 U.S.C. § 1001, as discussed above, as well as under FECA's Section 434.[73]

---

[72] Copies of these charges, to which the defendants pled guilty, can be obtained from the Public Integrity Section.

[73] Several significant false reporting cases were prosecuted during the early days of FECA, before the FEC was created.  *E.g.*, *United States v. Finance Committee to Re-elect the President*, 507 F.2d 1194 (D.C. Cir. 1974) (upholding convictions for willful failure to report a $200,000 cash contribution).

197

8. **Administrative and Civil Enforcement by the Federal Election Commission**

The Federal Election Commission has exclusive authority to enforce FECA's noncriminal penalties. 2 U.S.C. §§ 437g(a)(5), 437d(e). In addition, the Commission has statutory authority to interpret the statute through regulations and advisory opinions, and its opinion should be given deference. 2 U.S.C. §§ 437c(b)(1), 437d(a)(7), 437d(a)(8), 437d(e), 437f; *Federal Election Commission v. Democratic Senatorial Campaign Committee*, 454 U.S. 27, 37 (1981).

All FECA violations, including those committed knowingly and willfully, are subject to administrative and civil sanctions enforced by the FEC. The FEC has the power to levy fines through its enforcement procedures, and to seek civil penalties in court, but it cannot prosecute FECA offenses.

FECA violations that are committed knowingly and willfully and involve aggregate values that satisfy the monetary thresholds in the Act's criminal provision, 2 U.S.C. § 437g(d), are also federal crimes. These cases are prosecuted by the Department of Justice.

9. **Criteria for Prosecutive Evaluation of FECA Violations**

As discussed above, BCRA significantly enhanced the criminal penalties for knowing and willful violations of the Federal Election Campaign Act. BCRA did so in response to identified anti-social consequences, namely, corruption and the appearance of corruption arising from FECA violations, and their adverse effect on the proper functioning of American democracy. These issues are addressed comprehensively in the excerpts from the Supreme Court's

198

decision in *McConnell v. Federal Election Commission*, 540 U.S. 93 (2003) that are contained in Appendix A.

In view of the enhanced criminal penalties for FECA crimes and the legislative history supporting their enactment, it is the Justice Department's position that all knowing and willful FECA violations that exceed the applicable jurisdictional floor specified in the Act's criminal provision should be considered for federal prosecution under one or more of the prosecutive theories presented above.

## 10. Venue for FECA Offenses

The campaign financing statutes focus on the "making" and "receiving" of contributions and expenditures, and venue generally lies where a prohibited transaction was made or received. While this presents no problems in cases involving intradistrict transactions, an appeals court has interpreted "making a contribution" so narrowly that serious difficulties may be encountered in establishing a centralized venue over multi-district FECA violations. *United States v. Passodelis*, 615 F.2d 975 (3d Cir. 1980).

In *Passodelis*, a campaign fundraiser had been convicted under 2 U.S.C. §§ 441a and 441f predecessor statutes for making excessive contributions to a presidential candidate through conduits in four states. Venue was laid in the district where the political committee to which these donations were given had its offices and bank accounts. The court of appeals held that cases against the donors had to be brought in the district where the donors "made" the prohibited donations, and that this concept did not encompass the district where the donee deposited the funds. Prosecutors facing similar fact situations should contact the Public Integrity Section to discuss potential venue problems.

199

In *United States v. Chestnut*, 533 F.2d 40 (2d Cir. 1976), the Second Circuit held that the act of "receiving" a prohibited contribution or expenditure encompassed the donee's acceptance of it. Therefore, multi-district acceptance, or "donee," cases may be brought in the district where the donee accepted the donation.

Venue for reporting offenses lies generally where the inaccurate report was prepared, dispatched, or received by the FEC. The FEC's offices are in the District of Columbia.

### 11. Statute of Limitations for Campaign Financing Offenses

Prior to the enactment of BCRA, the statute of limitations for prosecuting campaign financing violations under FECA's misdemeanor provision was three years. 2 U.S.C. § 455 (2001). This brief statute of limitations period presented substantial law enforcement problems. *E.g., United States v. Hankin*, 607 F.2d 611 (3d Cir. 1979) (proof that contribution was deposited within the limitations period held not sufficient when other acts related to making the contribution occurred outside the period); *United States v. Curran*, 20 F.3d 560 (3d Cir. 1994) (noting that conduct charged under Title 18 would have supported FECA misdemeanor charge that was barred by the Act's three-year statute of limitations).

BCRA amended Section 455 and extended FECA's criminal statute of limitations to five years, the same as the general statute of limitations for most federal crimes. 18 U.S.C. § 3282. The five-year limitations period also governs the prosecution of conduct based on FECA violations that is prosecuted under 18 U.S.C. § 371 or § 1001. *Id*. This five-year period also applies to FECA-based crimes charged as frauds under the public financing provisions governing presidential campaigns. 26 U.S.C. §§ 9012(c), 9042(b).

200

**F.      POLICY AND PROCEDURAL CONSIDERATIONS**

**1. Consultation Requirements and Recommendations**

For the past three decades, the Public Integrity Section has coordinated the Department's law enforcement efforts over campaign financing crimes with United States Attorneys' Offices.  The Section has two main goals in this area:  to provide prompt and accurate guidance regarding the prosecutive potential of campaign financing allegations, and to assist the United States Attorneys' Offices and the FBI in bringing effective criminal penalties to bear when warranted.

Not all FECA violations are federal crimes, either because they lack the requisite criminal intent or because they do not meet the applicable monetary floor for FECA crimes.  Early consultation with the Public Integrity Section assists the Department, the United States Attorneys' Offices, and the FBI by ensuring that investigative and prosecutorial resources are focused on FECA violations only when appropriate.

Accordingly, the Department requires that the Public Integrity Section be consulted before beginning any criminal investigation, including a preliminary investigation, of a matter involving possible violations of FECA.  USAM § 9-85.210.  This consultation is also required before any investigation of campaign financing activities under one of the Title 18 felony theories discussed above, as these prosecutive theories are based on FECA violations.  *Id.*  The Public Integrity Section also recommends that the Section be consulted before commencing an investigation of possible violations of the public funding programs in Title 26.

Facts reflecting possible noncriminal FECA violations, which are either reported to the Justice Department or generated during an

201

investigation of other offenses, should be brought to the attention of the Public Integrity Section, which will forward them to the FEC.

## 2. Investigative Jurisdiction

Criminal investigations of possible FECA violations, as well as violations of 26 U.S.C. §§ 9012 and 9042, are conducted by the FBI and other federal law enforcement agencies. Civil investigations are conducted by the FEC. The FEC is authorized by statute to conduct a civil inquiry parallel to an active criminal investigation involving the same matter. 2 U.S.C. §§ 437d (a)(9), 437d(e). Parallel proceedings present unique challenges to federal prosecutors and investigators. In these cases the Public Integrity Section should be consulted to ensure that any procedures or agreements regarding parallel proceedings are followed.

## 3. Nonwaiver of the Federal Election Commission's Civil Enforcement Authority

The FEC's enforcement jurisdiction over noncriminal FECA violations cannot be compromised or waived by the Department of Justice. 2 U.S.C. §§ 437d(a)(6), 437d(e). Accordingly, plea agreements with defendants who have possible noncriminal exposure for FECA violations must contain a specific disclaimer to the effect that the Department of Justice is not waiving the civil enforcement jurisdiction of the FEC, such as the following:

> Nothing in this agreement waives or limits in any way the authority of the Federal Election Commission to seek civil penalties or other administrative remedies for violations of the Federal Election Campaign Act pursuant to Section 437g(a) of Title 2, United States Code.

202

### 4. Dealings with the Federal Election Commission

As discussed above, the FEC and the Justice Department have overlapping enforcement responsibilities over willful and aggravated violations of FECA. At the same time, the FEC is an independent executive agency responsible for the oversight and civil enforcement of the federal campaign financing laws. The Commission's independent authority requires that the Department respect the FEC's enforcement efforts. Over time, the Public Integrity Section has developed good relationships with the FEC and its staff, and can help prosecutors and agents quickly obtain the information they need from the FEC. The FEC's Public Records Division has long been a helpful resource in developing campaign financing cases.

The United States Attorneys' Offices and the FBI should, whenever possible, route inquires to the FEC through the Public Integrity Section. Doing this avoids confusion and increases the likelihood of a cooperative response from the Commission. It also helps to ensure that the good working relationship between the two agencies is maintained. The Section has also had success in recent years in working with the FEC to ensure that the Commission's civil enforcement responsibilities do not interfere with the Department's overlapping criminal jurisdiction. On occasion the FEC has voluntarily delayed moving forward with its own proceedings in order to avoid potential adverse effects on a pending criminal investigation.

### 5. Federal Election Commission Officials as Prosecution Witnesses

The prosecution of criminal cases involving FECA violations generally requires testimony from expert witnesses and document custodians from the FEC. In light of the new felony penalties for FECA crimes enacted by BCRA and the continued utility of FECA

fraud cases under the *Hopkins* and *Hsia* theories, it is likely that the number of FECA criminal cases will continue to grow, as will the Department's need for such witnesses.

In order to utilize 18 U.S.C. §§ 371 or 1001 in a felony fraud under FECA, the prosecutor must prove that the filings on which the case is based were false to a point that they had the potential to mislead or disrupt the FEC's ability to discharge its statutory responsibilities.  AUSAs seeking FEC witnesses should contact the Public Integrity Section, which will arrange for an FEC official who possesses the requisite expertise to testify to these issues.  The FEC has advised that requests for FEC staff to appear as prosecution trial witnesses should be made by subpoena.[74]

In 1991, the Justice Department's Justice Management Division (JMD) concluded that the travel and subsistence expenses of FEC staff who testify for the prosecution at FECA-based criminal trials are to be borne by the Department.  Therefore, before a subpoena is served on an FEC employee to testify as a trial witness, the AUSA handling the case should prepare a JMD expert witness form (OBD 47) providing information about the case and the FEC employee's role in it.  This form is then to be submitted to JMD, which will generate a financial commitment form to accompany the trial subpoena when it is served on the prospective FEC witness.

---

[74] This is a departure from the usual practice of relying on oral or written requests for trial testimony from federal government personnel.

204

### 6. Memorandum of Understanding between the Federal Election Commission and the the Department of Justice

In 1977, the FEC and the Department of Justice entered into a Memorandum of Understanding relating to their respective law enforcement jurisdiction and responsibilities. 43 FED. REG. 5441 (1978). The text of the 1977 Memorandum of Understanding is contained in Appendix B.

However, in light of the significant statutory enhancements to the Department's ability to prosecute FECA crimes that were contained in the 2002 Bipartisan Campaign Reform Act, the 1977 Memorandum no longer reflects current congressional intent or Department policy. The Department and the FEC have begun negotiations for an updated Memorandum of Understanding.

205

206

# CHAPTER SIX

# SENTENCING OF ELECTION CRIMES

## A.     OVERVIEW

This chapter discusses the sentencing of election crimes pursuant to the United States Sentencing Guidelines promulgated by the United States Sentencing Commission.   U.  S. SENTENCING GUIDELINES MANUAL (U.S.S.G. or sentencing guidelines).

### 1.  Categories of Election Crimes

For sentencing purposes, election crimes are divided into four categories:

(1)  *Offenses involving corruption of the electoral process.* This type of offense is governed by U.S.S.G. § 2H2.1.

(2)  *Offenses that violate the Federal Election Campaign Act (FECA).*  Campaign financing offenses that occur after January 25, 2003, are governed by U.S.S.G. § 2C1.8, a new guideline that was promulgated by the United States Sentencing Commission in response to a congressional mandate in the Bipartisan Campaign Reform Act of 2002 (BCRA).  Prior to January 25, 2003, there was no guideline, or analogous guideline, that applied to FECA offenses and therefore FECA crimes were sentenced pursuant to U.S.S.G. § 2X5.1.

207

(3) *Campaign financing offenses addressed by alternative theories of prosecution.* Certain campaign financing crimes also may be prosecuted under Title 18 statutes, such as 18 U.S.C. § 371 (conspiracy), § 1001 (false statements), § 1341 (mail fraud), § 1343 (wire fraud), and § 1346 (honest services fraud).  Conspiracy and fraud offenses are governed by U.S.S.G. § 2C1.1.  False statement offenses that occur after January 25, 2003, are governed by the new FECA guideline pursuant to the cross-reference for fraudulent statements in U.S.S.G. § 2B1.1(c)(3).  In the case of false statements offenses occurring before this date, federal prosecutors should argue that the FECA guideline should be considered as a relevant sentencing factor pursuant to 18 U.S.C. § 3553(a).

(4) *Patronage offenses.*  To date, there has been no jurisprudence addressing the application of the sentencing guidelines to patronage offenses.  Some of these crimes (*e.g.,* 18 U.S.C. §§ 600, 601) may be governed by the fraud guideline, U.S.S.G. § 2B1.1.  Others (*e.g.,* 18 U.S.C. §§ 602, 606, 610) may be governed by the robbery and extortion guideline, U.S.S.G. § 2B3.1.  A few do not appear to be governed by any guideline, and thus would be handled for sentencing purposes under U.S.S.G. § 2X5.1.

## B.   CONVICTIONS INVOLVING CORRUPTION OF THE ELECTORAL PROCESS

The guideline that governs sentencing for convictions that involve corruption of the electoral process is U.S.S.G. § 2H2.1.  By its terms, this guideline applies to corruption of the electoral process regardless of the type of scheme involved or federal statute it violates.  The guideline provides for three alternative base offense levels (18, 12, or 6) depending upon the nature of the conduct involved in the offense.  Specifically, Section 2H2.1 reads as follows:

208

### §2H2.1.  Obstructing an Election or Registration

      (a)  Base Offense Level (Apply the greatest):

          (1)  **18,** if the obstruction occurred by use of force or threat of force against person(s) or property; or

          (2)  **12**, if the obstruction occurred by forgery, fraud, theft, bribery, deceit, or other means, except as provided in (3) below; or

          (3)  **6,** if the defendant (A) solicited, demanded, accepted, or agreed to accept anything of value to vote, refrain from voting, vote for or against a particular candidate, or register to vote, (B) gave false information to establish eligibility to vote, or (C) voted more than once in a federal election.

Most election frauds involve offenders who have schemed, either by themselves or with others, to cause numerous illegal ballots to be cast through such methods as forgery, fraud, bribery, voter impersonation, multiple voting, or ballot-box stuffing. Such conduct falls within U.S.S.G. § 2H2.1(a)(2) and calls for a base offense level of twelve.  Relevant conduct, as defined in U.S.S.G. § 1B1.3(a), should be considered in selecting the appropriate base offense level.

Three circuits have approved sentencing calculations under this guideline:

In *United States v. Smith*, 231 F.3d 800 (11th Cir. 2000), the Eleventh Circuit discussed the application of Section 2H2.1(a)(2) to

209

a voter fraud scheme involving a deputy voter registrar and a political activist. The defendants were charged and convicted of multiple voting (i.e., marking ballots in the names of voters without the voters' knowledge) in violation of 42 U.S.C. § 1973i(e), and forging voters' names on applications for absentee ballots and on ballots in violation of 42 U.S.C. § 1973i(c). The Eleventh Circuit approved the following guideline calculations made by the district court: (1) a base offense level of twelve for both defendants; (2) a two-level enhancement for the deputy registrar for abuse of a position of public trust under U.S.S.G. § 3B1.3; (3) a four-level enhancement for both defendants based on the court's finding that each was an "organizer or leader of criminal activity that involved five or more participants" under U.S.S.G. § 3B1.1(a); and (4) a two-level enhancement for the political activist for obstructing justice based on evidence that the defendant influenced a witness to give a false affidavit concerning material facts.

___*United States v. Cole*, 41 F.3d 303 (7th Cir. 1994), also involved a deputy voter registrar who was convicted of multiple voting in violation of 42 U.S.C. § 1973i(e). Proof at trial established that the defendant applied for and marked absentee ballots for several voters without their knowledge and consent, and that he threatened one of these voters to dissuade him from cooperating in the ensuing criminal investigation. The district judge assigned a base offense level of twelve to the offense under Section 2H2.1(a)(2), and applied enhancements for the leadership role in a conspiracy involving five or more participants under Section 3B1.1(a) (four levels), abuse of a position of public trust under Section 3B1.3 (two levels), and obstruction of justice under Section 3C1.1 (two levels), for a total offense level of twenty. The defendant was sentenced to forty-six months of imprisonment. The Seventh Circuit held that the district judge's sentencing analysis was accurate.

210

In *United States v. Haynes*, 977 F.2d 583, WL 296782 (6th Cir. 1992) (table), the defendants, party officials authorized to register voters, were convicted of conspiracy against rights and deprivation of constitutional rights in violation of 18 U.S.C. §§ 241 and 242 by destroying over 150 voter registration applications. Starting with a base level of twelve, they received upward adjustments of two levels for abuse of a position of trust, and five levels for multiple counts, resulting in a total offense level of nineteen. The trial court imposed sentences of thirty months of imprisonment. The Sixth Circuit upheld these sentences with the exception of a two-level reduction for the less culpable defendant.

Other election fraud convictions have resulted in similar calculations under the sentencing guidelines. *E.g., United States v. Slone,* 411 F.3d 643 (6th Cir. 2005) (affirming defendant's conviction for vote buying in violation of 42 U.S.C. § 1973i(c) and sentence of fifteen months' imprisonment calculated on a base offense level of twelve under § 2H2.1(a)(2), plus a two-level enhancement for obstructing justice under § 3C1.1(b) for lying to the FBI); *United States v. Sparkman*, Cr. No. 99-30 (E.D. Ky. July 12, 2000) (sentencing proceeding) (following conviction for vote buying in violation of 42 U.S.C. § 1973i(c) and lying to the FBI in violation of 18 U.S.C. § 1001, sentence of twenty-four months' imprisonment calculated on a base offense level of twelve under § 2H2.1(a)(2), a three-level enhancement for leadership role under § 3B1.1(b), and two-level enhancement for obstruction of justice under § 3C1.1(b), for a total offense level of seventeen); *United States v. Boards*, Cr. No. LR-92-183 (E.D. Ark. Sept. 12, 1994) (sentencing proceeding) (following convictions for conspiracy and providing false information under § 1973i(c); total offense level of eight; prison term of thirteen months imposed), 10 F.3d 587 (8th Cir. 1993) (reversing trial court's judgments of acquittal on several counts and affirming other convictions); *United States v. Salisbury*, Cr. No. 2-90-197 (S.D. Ohio

211

Oct. 8, 1991) (sentencing proceeding) (conviction for multiple voting in violation of 42 U.S.C. § 1973i(e); total offense level of fourteen; prison term of eighteen months imposed), *rev'd on other grounds*, 983 F.2d 1369 (6th Cir. 1993) (statute unconstitutionally vague as applied to defendant's conduct).

The *Smith* and *Cole* cases illustrate several issues prosecutors are likely to face in this area. First, all the defendants received four-level enhancements for their role in the offenses. In *Cole*, the defendant had contended that the fifteen voters involved were victims of the conspiracy, not "participants" within the meaning of Section 3B1.1. The court agreed with the government that, regardless of whether the voters were participants or outsiders, the criminal activity was "otherwise extensive" within the meaning of Section 3B1.1(a). In addition, both district courts found that a deputy voter registrar occupied a position of trust, requiring a two-level increase under Section 3B1.3. The Sixth Circuit also approved this upward adjustment in *Haynes*.

The *Smith* case presented another important sentencing issue. The defendants argued that the offense was essentially a "multiple voting" crime, and the appropriate base level for "multiple voting" was six under Section 2H2.1(a)(3) rather than twelve under Section 2H2.1(a)(2). Their argument was based on the fact that the words "multiple voting" appear in Section 2H2.1(a)(3). The Eleventh Circuit held that despite this specific reference, Section 2H2.1(a)(3) was intended to apply only to isolated instances of electoral fraud (e.g., one person voting twice), and that Subsection (a)(2), not (a)(3), governed all vote fraud schemes that entailed the casting of several corrupt ballots:

212

> *We agree with the district court that the appropriate base offense level was 12, as provided in Section 2H2.1(a)(2). The language of (a)(2) applies in any case in which a forgery, fraud, theft, bribery, deceit or other means are used to effect the vote of another person, or the vote another person was entitled to cast. By contrast, the language of (a)(3) addresses an individual who acts unlawfully only with respect to his own vote, or votes more than once in his own name. The offenses for which Smith and Tyree were convicted involved the votes of other individuals, in particular, the forging of other voters' names on applications for absentee ballot and affidavits of absentee voters. The district court did not err in applying a base offense level of 12.*

*Smith*, 231 F.3d at 817-18.

In summary, certain factors that are often involved in election frauds will increase recommended sentences under the sentencing guidelines:

- A defendant who occupies a leadership or supervisory role in an election fraud scheme may receive an additional two to four levels under Section 3B1.1.

- A defendant who abuses a position of public or private trust (such as a public official who uses his or her office to facilitate election fraud, or a private individual who fraudulently marks and submits ballots entrusted to him or her by voters) will receive two additional offense levels under Section 3B1.3. U.S.S.G. § 2H2.1, cmt. background (1998).

213

- If individual voters are viewed as vulnerable victims, separate substantive counts under Section 2H2.1 generally cannot be grouped under Section 3D1.2, so that counts involving multiple voters may result in increases of up to an additional five levels.

- Obstruction may add increased levels under Section 3C1.1. *See Slone*, 411 F.3d 643 (lying to the FBI); *Cole*, 41 F.3d 303 (threatening a witness);

- If the election fraud involved "corrupting a public official," an upward departure may be warranted under Chapter Five, Part K (Departures). U.S.S.G. § 2H2.1, cmt. n.1 (1998).

Thus, even for defendants without a criminal history, the guidelines' upward adjustments generally raise the base offense level for election fraud to a point where the imposition of significant prison terms is recommended.

## C.   CONVICTIONS INVOLVING VIOLATIONS OF THE FEDERAL ELECTION CAMPAIGN ACT

For the purpose of sentencing criminal violations of the Federal Election Campaign Act (FECA), the date January 25, 2003 is significant as this is the date that a new sentencing guideline for FECA offenses took effect: U.S.S.G. § 2C1.8. The FECA guideline was the result of a mandate to the United States Sentencing Commission contained in the Bipartisan Campaign Reform Act of 2002 (BCRA). Sentencing of FECA offenses occurring after January 2003 are handled under the FECA guideline; sentencing of FECA crimes occurring prior to this date are treated under criteria, discussed below, that the Department had established prior to BCRA.

214

### 1. Campaign Financing Crimes Before the Bipartisan Campaign Reform Act of 2002

Prior to BCRA, knowing and willful violations of FECA that met certain monetary thresholds were one-year misdemeanors. 2 U.S.C. § 437g(d)(1)(A) (2001). As noted above, no sentencing guideline addressed or was analogous to these campaign financing offenses.

For FECA crimes that had reached the sentencing stage between 1996 and January 2003, the Public Integrity Section had encouraged federal prosecutors to take the position that former U.S.S.G. § 2F1.1 (Theft, Fraud) (now § 2B1.1) did not govern FECA crimes, and therefore U.S.S.G. § 2X5.1 (Other Offenses) applied to FECA convictions. This position has been accepted in most of the cases in which it was advanced, although almost all of these dispositions have been negotiated plea agreements presented to the courts under Federal Rule of Criminal Procedure 11(c)(1)(C).

The reasoning behind this pre-BCRA sentencing position was as follows:

(1) There was no sentencing guideline for FECA crimes.

(2) FECA's criminal provision was a classic example of a regulatory offense that the guidelines were not designed to address. U.S.S.G. Preamble, Chapter One, Part A(6) 2001.

(3) A FECA offense, namely, a knowing and willful violation of a regulatory statute, was significantly different from a fraud offense designed to gain an advantage from another through deceit, which falls

215

under U.S.S.G. § 2F1.1 (now § 2B1.1), and therefore Section 2F1.1 did not govern FECA offenses.

(4) There was no analogous guideline for FECA offenses.

(5) Therefore, U.S.S.G. § 2X5.1 directed the sentencing court to examine the factors set forth in 18 U.S.C. § 3553(a) to determine the appropriate sentence.

In light of the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), holding that the federal sentencing guidelines are advisory only, federal prosecutors should argue that the FECA guideline is an appropriate sentencing factor under Section 3553(a) for FECA crimes occurring before the guideline's effective date.

Prior to the enactment of BCRA, FECA crimes were one-year misdemeanors. As such, they were viewed primarily as fiscal offenses, for which significant fiscal penalties were seen as the appropriate remedy to serve the law enforcement objectives set forth in Section 3553(a). Moreover, when Congress had carefully crafted fiscal penalties for regulatory offenses, as it had done with pre-BCRA violations of FECA, the Department considered it appropriate under Section 3553(a) for the court to consult that penalty structure when determining an appropriate criminal sanction. The penalty structure that governed FECA violations before BCRA provided that the size of the fiscal component of the penalty would be determined in part by the amount involved in the violation and by the *mens rea* with which the offender acted. Specifically:

- Nonwillful or negligent FECA violations were subject to civil enforcement action by the Federal Election Commission (FEC) and civil penalties *equal* to the

216

amount involved in the violation or $5,000, whichever was greater.  2 U.S.C. § 437g(a)(5)(A)(2001).

- All knowing and willful FECA violations were subject to FEC enforcement and civil penalties of *twice* the amount involved in the violation or $10,000, whichever was greater.  2 U.S.C. § 437g(a)(5)(B) (2001).

- Knowing and willful FECA violations that involved $2,000 or more in a calendar year were also subject to criminal prosecution by the Justice Department.  Until passage of the Crime Control Act of 1984, conviction subjected an offender to a criminal fine of *three* times the amount involved in the violation or $25,000, whichever was greater.  2 U.S.C. § 437g(d).

- Finally, the 1984 Crime Control Act – enacted eight years after FECA's penalty provision – provided that the criminal fine for an individual violation of a Class A misdemeanor, such as a FECA offense, was the amount specified in the underlying statute or $100,000, whichever was greater (18 U.S.C. § 3571 (b)(5)), while the criminal fine for an institutional violation of a Class A misdemeanor was the amount provided for in the underlying statute or $200,000, whichever was greater (18 U.S.C. § 3571(c)(5)).

This system of ascending sanctions, coupled with the repeated statutory command that the monetary sanction at each level should be the *greater* of the various sums provided, suggested that the appropriate penalties for a FECA conviction should be, for an individual defendant, $100,000 per count under 18 U.S.C.

217

§ 3571(b)(5), and, for a corporate defendant, $200,000 per count under 18 U.S.C. § 3571(c)(5).

### 2. Campaign Financing Crimes After the Bipartisan Campaign Reform Act of 2002

The 2002 Bipartisan Campaign Reform Act created two new felony offenses for knowing and willful violations of FECA. BCRA also increased the statute of limitations for FECA crimes from three to five years. Finally, BCRA directed the Sentencing Commission to promulgate a sentencing guideline that specifically addressed FECA crimes, and instructed the Commission to take into account certain aggravating conduct in formulating sentencing enhancements to this new guideline. The guideline, U.S.S.G. § 2C1.8, became effective on a temporary basis on January 25, 2003, and became permanent on November 1, 2003.

The FECA guideline reads as follows:



**§ 2C1.8.** **Making, Receiving, or Failing to Report a Contribution, Donation, or Expenditure in Violation of the Federal Election Campaign Act; Fraudulently Misrepresenting Campaign Authority; Soliciting or Receiving a Donation in Connection with an  Election While on Certain Federal Property**

(a) Base Offense Level: **8**

(b) Specific Offense Characteristics

218

(1) If the value of the illegal transactions exceeded $5,000, increase by the number of levels from the table in § 2B1.1 (Theft, Property Destruction, and Fraud) corresponding to that amount.

(2) (Apply the greater) If the offense involved, directly or indirectly, an illegal transaction made by or received from —

    (A) a foreign national, increase by **2** levels; or

    (B) a government of a foreign country, increase by **4** levels.

(3) If (A) the offense involved the contribution, donation, solicitation, expenditure, disbursement, or receipt of governmental funds; or (B) the defendant committed the offense for the purpose of obtaining a specific, identifiable non-monetary Federal benefit, increase by **2** levels.

(4) If the defendant engaged in 30 or more illegal transactions, increase by **2** levels.

(5) If the offense involved a contribution, donation, solicitation, or expenditure

219

made or obtained through intimidation, threat of pecuniary or other harm, or coercion, increase by **4** levels.

(c) Cross Reference

(1) If the offense involved a bribe or gratuity, apply § 2C1.1 (Offering, Giving, Soliciting, or Receiving a Bribe; Extortion Under Color of Official Right; Fraud Involving the Deprivation of the Intangible Right to Honest Services of Public Officials; Conspiracy to Defraud by Interference with Governmental Functions) or § 2C1.2 (Offering, Giving, Soliciting, or Receiving a Gratuity), as appropriate, if the resulting offense level is greater than the offense level determined above.

*Commentary*

*Statutory Provisions: 2 U.S.C. §§ 437g(d)(1), 439a, 441a, 441a-1, 441b, 441c, 441d, 441e, 441f, 441g, 441h(a), 441i, 441k; 18 U.S.C. § 607. For additional provision(s), see Statutory Index (Appendix A).*

*Application Notes:*

*1.    Definitions.—For purposes of this guideline:*

220

*"Foreign national" has the meaning given that term in section 319(b) of the Federal Election Campaign Act of 1971, 2 U.S.C. § 441e(b).*

*"Government of a foreign country" has the meaning given that term in section 1(e) of the Foreign Agents Registration Act of 1938 (22 U.S.C. § 611(e)).*

*"Governmental funds" means money, assets, or property, of the United States Government, of a State government, or of a local government, including any branch, subdivision, department, agency, or other component of any such government.  "State" means any of the fifty States, the District of Columbia, the Commonwealth of Puerto Rico, the United States Virgin Islands, Guam, the Northern Mariana Islands, or American Samoa. "Local government" means the government of a political subdivision of a State.*

*"Illegal transaction" means (A) any contribution, donation, solicitation, or expenditure of money or anything of value, or any other conduct, prohibited by the Federal Election Campaign Act of 1971, 2 U.S.C. § 431 et seq; (B) any contribution, donation, solicitation, or expenditure of money or anything of value made in excess of such contribution, donation, solicitation, or expenditure that may be made under such Act; and (C) in the case of a violation of 18 U.S.C. § 607, any solicitation or receipt of money or anything of value under that section.  The terms "contribution" and "expenditure" have the meaning given those terms in section 301(8) and (9) of the Federal Election Campaign Act of 1971 (2 U.S.C. § 431(8) and (9)), respectively.*

221

2. *Application of Subsection (b)(3)(B)*.—Subsection (b)(3)(B) provides an enhancement for a defendant who commits the offense for the purpose of achieving a specific, identifiable non-monetary Federal benefit that does not rise to the level of a bribe or a gratuity. Subsection (b)(3)(B) is not intended to apply to offenses under this guideline in which the defendant's only motivation for commission of the offense is generally to achieve increased visibility with, or heightened access to, public officials. Rather, subsection (b)(3)(B) is intended to apply to defendants who commit the offense to obtain a specific, identifiable non-monetary Federal benefit, such as a Presidential pardon or information proprietary to the government.

3. *Application of Subsection (b)(4)*.—Subsection (b)(4) shall apply if the defendant engaged in any combination of 30 or more illegal transactions during the course of the offense, whether or not the illegal transactions resulted in a conviction for such conduct.

4. *Departure Provision*.—In a case in which the defendant's conduct was part of a systematic or pervasive corruption of a governmental function, process, or office that may cause loss of public confidence in government, an upward departure may be warranted.

\* \* \*

In addition, the Sentencing Commission amended Section 3D1.2(d) regarding closely related counts to include Section 2C1.8, and amended Section 5E1.2 to incorporate FECA's mandatory minimum fining provisions and maximum fining range under

222

2 U.S.C. § 437g(d)(1)(D) for conduit crimes that violate 2 U.S.C. § 441f.

Finally, in commenting on the new guideline, the Sentencing Commission recognized that there might be cases in which the defendant has entered into a conciliation agreement with the FEC. The Commission stated that the existence of such a conciliation agreement, and the extent of compliance with it, are appropriate factors for a sentencing court to consider in determining at what point within the applicable fine guideline range to sentence the defendant. However, the Commission also stated that these factors are not appropriate when the defendant began negotiations toward a conciliation agreement after becoming aware of a criminal investigation.

In addition to sentencing issues, a criminal disposition for a FECA offense might present an opportunity for the defendant to obtain a concurrent settlement from the FEC of his or her civil liability for FECA violations through what is known as a "global" plea agreement. If during plea negotiations the defendant indicates a desire to settle his or her civil FECA liability as well, the Department can assist in forwarding this request to the FEC. The normal procedure is for the AUSA to contact the Public Integrity Section, which will forward the defendant's request and proposed civil settlement to the FEC for its consideration.

3.      **Examples of Application of FECA Sentencing Guideline**

The following six examples illustrate how the Department believes the guideline for campaign financing crimes would work for various FECA financing crimes. Each scenario assumes

223

conviction after trial.[75]   We have also assumed that the defendant falls under Criminal History Category I.

## Example 1:
## THE CONDUIT

    Factual Scenario:   The defendant permitted his name to be used by another person to make a contribution of $4,000 to a federal candidate ($2,000 for the primary and $2,000 for the general election) in violation of 2 U.S.C. § 441f.  The funds used to make the contribution came from the other person. The aggregate value of the conduit violations is $4,000. Because the aggregate violation is at least $2,000 but does not exceed $10,000, it is a misdemeanor under 2 U.S.C. § 437g(d)(1)(A)(ii).[76]

    Total Offense Level:  **8**

        Base Offense Level under § 2C1.8(a):  **8**

        Enhancement under § 2B1.1 for value not exceeding $5,000:  **0**

        Enhancement for number of illegal transactions under § 2C1.8(b)(4) (two conduit contributions of $2,000 each):  **0**

---

[75] As readers know, the majority of federal prosecutions result in pleas of guilty, which generally result in a reduction of two or three levels in the defendant's total offense level under § 3E1.1 for acceptance of responsibility. We have not included calculations based on guilty pleas. A two- or three-level reduction in total offense level, especially at higher total levels, may result in a significant reduction in the recommended term of imprisonment.

[76] The offense is a Class A misdemeanor, 18 U.S.C. § 3558(a)(6), to which the guidelines apply. U.S.S.G. § 1B1.2(a).

224

Recommended Sentence:

(1) *Incarceration*: 0 to 6 months in Zone A.

(2) *Fine*: A minimum fine of $1,000 and a statutory maximum fine of $100,000, calculated as follows:

   (a) Guideline fine: The maximum fine for a Class A misdemeanor under 18 U.S.C. § 3571(b)(5) is $100,000. However, the applicable guideline fine under U.S.S.G. § 5E1.2(c)(3) for an offense level of 8 would be a minimum of $1,000 and a maximum of $10,000. A fine above $10,000 for this offense would require an upward departure under § 5K2.0.

   (b) FECA mandatory fine: Not applicable. The offense of conviction involves two violations of 2 U.S.C. § 441f, totaling $4,000. Since the violations do not exceed $10,000, this is a misdemeanor that is subject to the penalty provisions of 2 U.S.C. § 438(g)(d)(1)(A)(ii) and 18 U.S.C. § 3571(b)(5). Because this is a misdemeanor, the mandatory minimum and the discretionary maximum fining provisions applicable to felony conduit violations under 2 U.S.C. § 437(g)(d)(1)(D)(i) do not apply.

## Example 2:
## THE TYPICAL FECA CRIME –
## LAUNDERED CORPORATE CONTRIBUTIONS

Factual Scenario: A corporate CEO contributes $50,000 in corporate funds to a federal candidate in violation of 2 U.S.C. § 441b by laundering the money through thirteen conduits in violation of § 441f, twelve of whom gave $4,000, and one of whom gave $2,000. The defendant's motive was to fulfill a

225

pledge. The conduct results in one § 441b felony violation under § 437g(d)(1)(A)(i) with an aggregate value of $50,000, and one § 441f felony violation under § 437g(d)(1)(D)(i) involving the thirteen conduit transactions. The combined aggregate value of the defendant's illegal conduct is $50,000. The conduct would be charged in two counts: one violation of § 441b charged under § 437g(d)(1)(A)(i), and thirteen violations of § 441f aggregated together as one offense charged under § 437g(d)(1)(D)(i).

Total Offense Level: **14**
    Base Offense Level under § 2C1.8(a): **8**
    Enhancement for value between $30,000 and $70,000 under § 2B1.1(b)(1)(D): **6**
    Enhancement for number of illegal transactions under § 2C1.8(b)(4) (fourteen violations – one § 441b corporate contribution crime and thirteen § 441f conduit crimes): **0**
Recommended Sentence:
    (1) *Incarceration*: 15 to 21 months in Zone D
    (2) *Fine*: Between $154,000 and $540,000. Since there are two counts of conviction, the total fine would be the fine on each count added together, calculated as follows:
    (a) § 441b count (corporate contribution). Based on an offense level of 14, the guideline range for a fine under this count is $4,000 to $40,000. U.S.S.G. § 5E1.2(c)(3).
    (b) § 441f count (conduit contributions). By statute, the fine imposed under this count would be a minimum fine of $150,000 (300% of aggregate violative amount) and a maximum fine of $500,000

226

(1,000% of aggregate violative amount). 2 U.S.C. § 437g(d)(1)(D). Since these are higher fines than those permitted under U.S.S.G. § 5E1.2(c)(3), they prevail. *Id.* § 5E1.2(c)(4). (c) Total combined fine:

    (i)  minimum: $4,000 + $150,000 = $154,000

    (ii)  maximum: $40,000 + $500,000 = $540,000

### Example 3:
### CORPORATE CONTRIBUTOR TO MULTIPLE CANDIDATES THROUGH THREATS AND COERCION

Factual Scenario: The defendant is an individual who controls two corporations. The defendant gives $50,000 in corporate funds to fifty federal candidates in $1,000 amounts by laundering them through fifty corporate senior management personnel, and passes the cost of these contributions back to the two corporations. The defendant makes clear to senior management that their success in his companies depends on their participation in the scheme. The defendant's motive is ideological – all the recipients represent causes in which he believes. The aggregate value involved in the defendant's conduct is $50,000. The conduct would be charged in two counts: one felony violation of Section 441b charged under § 437g(d)(1)(A)(i), and fifty violations of Section 441f aggregated together as one felony offense charged under § 437g(d)(1)(D)(i).

Total offense level: **20**

    Base Offense Level under § 2C1.8(a): **8**

    Enhancements for aggregate value of offense between

227

$30,000 and $70,000 under § 2B1.1(b)(1)(D):  **6**
Enhancements for number of illegal transactions
under § 2C1.8(b)(4) (Fifty-two offenses – two
§ 441b corporate contribution offenses and fifty
§ 441f conduit offenses):  **2**

Enhancement for intimidation and threats under
§ 2C1.8(b)(5):  **4**

Recommended Sentence:
(1) *Incarceration*: 33 to 41 months in Zone D
(2) *Fine*: Because the nature of the conduct would result
in convictions under both the criminal penalty
applicable to conduit violations of FECA
(§ 437g(d)(1)(D)), and the criminal penalty
applicable to nonconduit violations of FECA
(§ 437g(d)(1)(A)), the statutory minimum and
maximum penalties for conduit convictions will
apply and result in enhanced fines.  See Example
2 for an illustration of such a computation.

## Example 4:
## FUNDRAISER POSSESSING SPECIAL SKILL

Factual Scenario:  The defendant is a professional federal
fundraiser who has attended several training courses
sponsored by the Federal Election Commission and is
therefore intimately familiar with the requirements and
prohibitions of the Federal Election Campaign Act.  The
fundraiser has been retained by a federal candidate.  He
approaches a wealthy donor who he knows has given the
candidate the maximum amount permitted by FECA, and
suggests that the donor make a further contribution by

228

permitting the candidate and his staffers to use the donor's personal jet for campaign purposes and without billing the campaign for its use.  The ensuing illegal "in-kind" contribution is valued at $225,000, for which the fundraiser is liable as an aider and abettor.  The aggregate value of the offense is $225,000, consisting of one felony violation of 2 U.S.C. § 441(a)(1)(A), charged under Section 437g(d)(1)(A)(i) and 18 U.S.C. § 2.

Total Offense Level:  **22**
> Base Offense Level under § 2C1.8(a):  **8**
> Enhancement for value between $200,000 and $400,000 under § 2B1.1(b)(1)(D):  **12**
> Enhancement for number of transactions under § 2C1.8(b)(4) (one § 441a violation):  **0**
> Enhancement for use of special skill under § 3B1.3:  **2**

Recommended Sentence:
> (1) *Incarceration*:  41 to 51 months in Zone D.
> (2) *Fine*:  between $7,500 and $75,000, calculated under § 5B1.2(c)(3).[77]

## Example 5:
## MAJOR POLITICAL PARTY DONOR
## SEEKING A BENEFIT FROM THE GOVERNMENT

Factual Scenario:  A wealthy individual wishes to contribute $250,000 to a national political party committee in order to win political influence to obtain a pardon for his best friend.

---

[77] There were no conduit offenses involved in this example. Therefore the mandatory minimum fine and maximum fining range under Section 437g(d)(1)(D) do not apply.

229

Under FECA, as amended by the Bipartisan Campaign Reform Act, individuals may give only $25,000 per year to national political party committees, and national political party committees cannot accept soft money. The individual therefore donates the remaining $225,000 to the national party committee by giving the committee the benefit of his personal jet to fly committee staffers around the country, at a value of $225,000, in violation of 2 U.S.C. § 441a(a)(1)(B). The aggregate value of the offense is $225,000 charged under Section 437g(d)(1)(A)(i).

Total Offense Level: **22**
> Base Offense Level under § 2C1.8(a): **8**
> Enhancement for value between $200,000 and $400,000 under § 2B1.1(b)(1)(G): **12**
> Enhancement for number of illegal transactions under § 2C1.8(b)(4) (one $225,000 excessive contribution to a national party committee): **0**
> Enhancement for intent to obtain a specific nonmonetary federal benefit from the government under § 2C1.8(b)(3): **2**

Recommended Sentence:
> (1) *Incarceration*: 41 to 51 months in Zone D.
> (2) *Fine*: Between $10,000 and $100,000, pursuant to § 5E1.2(c)(3).

230

**Example 6:**
**FOREIGN AGENT WHO GIVES FUNDS FROM**
**FOREIGN GOVERNMENT**
**TO NONFEDERAL CANDIDATES TO OBTAIN**
**A SPECIFIC BENEFIT FROM THE GOVERNMENT**

Factual Scenario:  The defendant is an agent of a foreign government that is currently seeking United States diplomatic recognition of its annexation of neighboring territory it occupied during a recent military action.  In the hopes of garnering political support for this cause, the defendant is given $250,000 by his foreign government principal, which he then gives in $50,000 increments to five candidates seeking governorships of five large states within the United States that impose no limits on political contributions.  To conceal his identity, the defendant launders the funds through five individuals who have names that are ethnically identifiable with his foreign government principal, but who have resident alien status under U.S. law.  The defendant's conduct results in five violations of 2 U.S.C. § 441e having an aggregate value of $250,000, charged together as one felony violation of Section 437g(d)(1)(A)(i).[78]

Total Offense Level:  **26**
   Base Offense Level:  **8**
   Enhancements for aggregate value of offense between
      $200,000 and $400,000 under § 2B1.1(b)(1)(G):  **12**
   Enhancements for foreign government source:  **4**
   Enhancements for number of illegal transactions

---

[78] Although in BCRA Congress made clear that the prohibition in Section 441e on contributions from foreign nationals also reached donations to candidates for nonfederal office, BCRA did not extend Section 441f to encompass conduit donations to nonfederal candidates.

231

(five § 441e offenses):  **0**

Enhancement for intent to achieve a nonmonetary benefit from the Government:  **2**

Recommended Sentence:

(1) *Incarceration*:  63 to 78 months in Zone D.  (This sentence would be capped at 60 months, the maximum term permitted under Section 437g(d)(1)(A)).

(2) *Fine*: $17,500 to $175,000, calculated under Section 5E1.2(c)(3).

## D.   CONVICTIONS   OF CAMPAIGN FINANCING VIOLATIONS ADDRESSED UNDER ALTERNATIVE THEORIES OF PROSECUTION

### 1.  Conspiracy to Disrupt and Impede the Federal Election Commission

A scheme involving two or more participants designed in part to thwart the statutory duties of the Federal Election Commission to enforce FECA's reporting requirements and prohibitions and to provide the public with accurate data regarding the financial activities by federal candidates and entities supporting them can be prosecuted as a conspiracy under 18 U.S.C. § 371.  The object of such a conspiracy would be to disrupt and to impede the FEC's ability to enforce FECA's requirements and prohibitions, and its statutory duty to make available to the public accurate information regarding contributions and expenditures made to influence the election of federal candidates.

Such offenses are governed by U.S.S.G. § 2C1.7.  This guideline carries a base offense level of ten and has an eight-level enhancement if the conduct involved an elected official or high-level

232

public policymaker.  § 2C1.7(b)(1)(B).  In addition, if the defendant's conduct involved "pervasive corruption of a governmental function, process, or office that may cause loss of public confidence in government," an upward departure may be warranted.  § 2C1.7, cmt. n.1.

## 2.  False Statements to the Federal Election Commission

Many types of campaign financing crimes may also be charged as willfully causing false statements to be made to a federal agency under 18 U.S.C. § 1001(a)(2).  Such false statement offenses occurring after January 25, 2003, are governed by the new FECA guideline, U.S.S.G. § 2C1.8, pursuant to the cross-reference in U.S.S.G. § 2B1.1(c)(3) for false statements.  For false statement offenses occurring before this date, federal prosecutors should argue that the new guideline should be considered as a relevant sentencing factor  pursuant to 18 U.S.C. § 3553(a).

## 3.  Embezzlement of Campaign Funds

On occasion, treasurers and other agents of candidates or political committees, and at times even candidates, convert campaign contributions to their personal use.  If the conversion involves funds from a candidate's committee, it is prohibited by FECA.  2 U.S.C. § 439a.  However, until the enactment of the 2002 Bipartisan Campaign Reform Act, all FECA crimes were one-year misdemeanors.  Moreover, if the embezzlement is from a political committee that is not a candidate's committee, the FECA prohibition in Section 439a does not apply.  Therefore, campaign embezzlements were commonly prosecuted under the mail fraud statute, either as a scheme to obtain money or property by deceit (18 U.S.C. § 1341), or as a scheme to deprive a political committee and its contributors of the fiduciary duty of honest services (18 U.S.C. §§ 1341, 1346), or both.

233

As a result of BCRA, Section 439a crimes aggregating $25,000 or more are now felonies and for sentencing purposes fall under the FECA guideline § 2C1.8. This is the preferred approach if the victim is a candidate's committee and the amount embezzled is at least $25,000.

For embezzlements from political committees that are not candidate committees, and for embezzlements from candidate committees involving amounts under $25,000, the mail and wire fraud statutes continue to be useful alternatives. Violations of Sections 1341 and 1343 are governed by the fraud guideline, U.S.S.G. § 2B1.1, which carries a base offense level of 6 with possible enhancements under the fraud loss table, § 2B1.1(b)(1). Embezzlement schemes that involve the deprivation of "honest services" as defined in 18 U.S.C. § 1346 also fall under the fraud guideline.

Finally, a campaign embezzlement can be addressed under the false statements statute, 18 U.S.C. § 1001, and 18 U.S.C. § 2 (willfully causing an offense). This is because the embezzlement is concealed from the committee's treasurer, who is required to file detailed reports with the FEC regarding the committee's receipts and disbursements. 2 U.S.C. § 434(b). Thus, a person who embezzles contributions from a committee willfully causes the committee's treasurer to submit false information to the FEC regarding the actual use of the funds, in violation of both the reporting requirements of FECA and 18 U.S.C. § 1001. False statements involving FECA violations fall under the FECA guideline, U.S.S.G. § 2C1.8.

## E.   OBLIGATION TO REPORT FELONY CONVICTIONS TO STATE ELECTION OFFICIALS

The National Voter Registration Act of 1993 requires United States Attorneys' Offices to send a written notice whenever a

234

defendant is convicted of a felony to the chief state election official in the state where the defendant resides.  42 U.S.C. § 1973gg-6(g). The notice must include basic information regarding the defendant, the court, the offense, and the sentence.  42 U.S.C. § 1973gg-6(g)(2). In addition, if the conviction is overturned, the election official must be sent written notice of the vacation of conviction. § 1973gg-6(g)(4).

This information is important to election authorities who determine a person's eligibility to vote.  You may identify the appropriate state election official using the website www.nased.org.

235

236

# CHAPTER SEVEN

# CONCLUSION

# WHY PROSECUTING ELECTION CRIMES IS IMPORTANT

We conclude this book with an editorial printed in the March 19, 2004 edition of <u>Big Sandy News</u>, Eastern Kentucky, concerning a series of election fraud prosecutions in a rural jurisdiction in the Appalachian Mountains of Eastern Kentucky.   The editorial comments on the sentencing of the County Judge-Executive of Knott County and a campaign worker for vote buying.  It appears here with the permission of <u>The Big Sandy News</u>, whose late Publisher and Editor, Scott Perry, led a strong charge against public corruption and took a proactive role in this difficult and ongoing fight.[79]

In Kentucky, county judge-executives are the chief operating officers of county government, and, as such, occupy a position of substantial power.  The jury's conviction of Knott County Judge-Executive Donnie Newsome was the culmination of a series of vote-buying cases that were jointly prosecuted by the United States Attorney's Office for the Eastern District of Kentucky and the Public Integrity Section during 2003 and early 2004.  The charges arose from a scheme to pay individuals for voting in the 1998 Kentucky federal primary in violation of 42 U.S.C. § 1973i(c).  The investigation

---

[79] <u>The Big Sandy News</u>,  Eastern Kentucky's oldest newspaper and the most widely circulated non-daily in Kentucky, was established in 1885 in Louisa, Kentucky.

237

ultimately resulted in the indictment of 17 defendants. Thirteen of the defendants were convicted, three were acquitted, and one defendant's case was dismissed on a motion to dismiss made by the government.

Subsequent to his conviction, Judge-Executive Newsome cooperated with the government and received a sentence reduction recommendation under U.S.S.G. § 5K1.1. On March 16, 2004, he was sentenced to serve 26 months in prison.[80]

The following editorial, reprinted here in its entirety, presents a concise and eloquent statement of why the investigation and prosecution of electoral corruption are important law enforcement priorities of the Justice Department.

*Vote fraud sentencing sad, encouraging*
*– by Susan Allen*

> *Tuesday's sentencing in federal court of Knott County Judge-Executive Donnie Newsome and campaign worker Willard Smith on vote buying charges was both a sad and encouraging day for Eastern Kentucky.*

> *Sad the people of Knott County were effectively robbed of their voting rights by Newsome and others dolling out cash to buy a public office.*

> *Sad that, as Federal Judge Danny C. Reeves pointed out, some people in Knott and other counties think that*

---

[80] The sentencing judge stated that had it not been for the prosecution's recommendation for a downward departure, he was prepared to sentence Newsome to five years of imprisonment.

238

*elections are supposed to be bought and the only reason to go to the polls is to get their pay off.*

*Sad those seeking public office in Knott County, and most assuredly in other counties, target poor, handicapped, addicted and uneducated voters to carry out their scheme to secure public office and a hefty paycheck.*

*Sad that voters in Knott and other counties have been reduced by years and years of political corruption to truly believing that selling their vote is not wrong, it's the norm.*

*Sad that Eastern Kentuckians have pretty much been left to the mercy of the political machines which serve as dictators of their lives, from their home towns all the way to Frankfort.*

*Sad that generations sacrificed their lives and their children's lives to the political bosses for mere bones from their local leaders while now their kids are dying from drug overdoses which, we strongly suspect, are directly tied to the years of iniquity and demoralization.*

*Sad that even today some elected officials continue the abuse and either refuse or can't comprehend the impact of their past and current atrocities against their own people.*

*Sad that Judge Reeves could see and completely understand during just a one week trial the utter hopelessness and apathy in the area people feel regarding the so-called democratic process.*

239

*Sad that our state lawmakers have piddled away their time during this legislative session on petty political issues without even proposing laws that would bar convicted felons, especially vote buyers from retaining their offices while appealing their verdicts.*

*Sad that Donnie Newsome continues to rule Knott County from a jail cell.*

*Tuesday's events were encouraging in that prosecutors [AUSA E.D. Ky.] Tom Self and [Public Integrity Section Trial Attorney] Richard Pilger were willing to fight the hard battle for the people of Knott County, which hopefully will lead to at least a grassroots effort for people to take back their towns.*

*Encouraging that some light has been shed on the workings of the dark political underworld which might shock the good people of Eastern Kentucky into action, at least for their children's future.*

*Encouraging that what might be perceived as a baby step with Newsome's conviction could finally lead to that giant step Eastern Kentuckians must surely be ready to take to recapture control of their own destinies.*

*Encouraging that federal authorities have pledged to continue the fight they have started to restore to the people the right to govern themselves without dealing with a stacked deck.*

*Encouraging that Judge Reeves and prosecutors did see that the Knott Countians who sold their votes, in some*

240

*cases for food, were victims of Newsome's plot and didn't need to be punished further.*

*Encouraging that there's some branch of government, in this case on the federal level, not shy about taking on political power houses, knowing the obstacles in their way will be many.*

*Encouraging that Newsome's lips have loosened regarding others involved in similar schemes to buy public office, even though we suspect it has nothing to do with righting the wrongs, only a self-serving move to spend less days behind bars.*

*Encouraging that maybe, for once, we are not in this fight alone and have a place to turn to for help when we are willing to stand up to the machine.*

*The feds have helped us take that first step toward getting back what is rightfully ours which has been traded away by others in the past in back room deals. Not only do they need our help, WE need our help.*

*This time, let's not let ourselves down.*

241

242

# APPENDIX A

## EXCERPT FROM McCONNELL
## v. FEDERAL ELECTION COMMISSION

In 2003, the Supreme Court presented a concise history of the federal campaign financing laws contained in the Federal Election Campaign Act of 1971, as amended, 2 U.S.C. §§ 431 - 455 (FECA). It did so in the context of upholding the constitutionality of the vast majority of new restrictions that were added to these laws in 2002 by the Bipartisan Campaign Reform Act (BCRA) to close large gaps in statutory coverage that had emerged over the past three decades since FECA's original enactment.   *McConnell v. Federal Election Commission*, 540 U.S. 93 (2003).  Set forth below are pertinent excerpts from the Supreme Court's discussion of our country's regulation of campaign financing and the events that led up to enactment of BCRA in 2002.  540 U.S. at 115-132.[81]

\*   \*   \*

More than a century ago the "sober-minded Elihu Root" advocated legislation that would prohibit political contributions by corporations in order to prevent " 'the great aggregations of wealth, from using their corporate funds, directly or indirectly,' " to elect legislators who would "'vote for their protection and the advancement of their interests as against those of the public.' " *United States v. Automobile Workers*, 352 U.S. 567, 571 (1957) (quoting E.

---

[81] The text presented here has been edited for conciseness. For example, all footnotes have been omitted, as have other court citations, extended recitations of legislative citations, and quotations from lower court decisions that have little direct bearing on the Court's ultimate rulings on the legal and constitutional issues involved.  Interested readers may wish to consult the full decision for the entire content of the Court's discussion.

Root, Addresses on Government and Citizenship 143 (R. Bacon & J. Scott eds.1916))....

[T]he first [campaign financing] enactment responded to President Theodore Roosevelt's call for legislation forbidding all contributions by corporations " 'to any political committee or for any political purpose.' " *Ibid.* ...The resulting 1907 statute completely banned corporate contributions of "money ... in connection with" any federal election.  Tillman Act, ch. 420, 34 Stat. 864.  Congress soon amended the statute to require the public disclosure of certain contributions and expenditures and to place "maximum limits on the amounts that congressional candidates could spend in seeking nomination and election." *Automobile Workers, supra*, at 575-576.

In 1925 Congress [enacted the Federal Corrupt Practices Act, which] extended the prohibition of "contributions" "to include 'anything of value,' and made acceptance of a corporate contribution as well as the giving of such a contribution a crime." *Federal Election Comm'n v. National Right to Work Comm.,* 459 U.S. 197, 209 (1982). During the debates preceding that amendment, a leading Senator characterized " 'the apparent hold on political parties which business interests and certain organizations seek and sometimes obtain by reason of liberal campaign contributions' " as " 'one of the great political evils of the time.' " *Automobile Workers, supra*, at 576 (quoting 65 Cong. Rec. 9507-9508 (1924)).  We upheld the amended statute against a constitutional challenge, observing that "[t]he power of Congress to protect the election of President and Vice President from corruption being clear, the choice of means to that end presents a question

244

primarily addressed to the judgment of Congress."
*Burroughs v. United States*, 290 U.S. 534, 547 (1934).

Congress' historical concern with the "political
potentialities of wealth" and their "untoward consequences
for the democratic process," *Automobile Workers*, *supra*,
at 577-578, has long reached beyond corporate money.
During and shortly after World War II, Congress reacted to
the "enormous financial outlays" made by some unions in
connection with national elections.  352 U.S., at 579.
Congress first restricted union contributions in the Hatch
Act, 18 U.S.C. § 610, and it later prohibited "union
contributions in connection with federal elections ...
altogether." *National Right to Work*, *supra*, at 209 (citing
War Labor Disputes Act (Smith-Connally Anti-Strike Act),
ch. 144, § 9, 57 Stat. 167).   Congress subsequently
extended that prohibition to cover unions' election-related
expenditures as well as contributions, and it broadened the
coverage of federal campaigns to include both primary and
general elections.  Labor Management Relations Act, 1947
(Taft-Hartley Act), 61 Stat. 136.  See *Automobile Workers*,
*supra*, at 578-584.   During the consideration of those
measures, legislators repeatedly voiced their concerns
regarding the pernicious influence of large campaign
contributions.   As we noted in a unanimous opinion
recalling this history, Congress' "careful legislative
adjustment of the federal electoral laws, in a 'cautious
advance, step by step,' to account for the particular legal
and economic attributes of corporations and labor
organizations warrants considerable deference." *National
Right to Work*, *supra*, at 209....

In early 1972 Congress continued its steady improvement
of the national election laws by enacting FECA.  As first

245

enacted, that statute required disclosure of all contributions exceeding $100 and of expenditures by candidates and political committees that spent more than $1,000 per year. *Id.*, at 11-19. It also prohibited contributions made in the name of another person, *id.*, at 19, and by Government contractors, *id.*, at 10. The law ratified the earlier prohibition on the use of corporate and union general treasury funds for political contributions and expenditures, but it expressly permitted corporations and unions to establish and administer separate segregated funds (commonly known as political action committees, or PACs) for election-related contributions and expenditures. *Id.*, at 12-13. See *Pipefitters v. United States*, 407 U.S. 385, 409-410 (1972).

As the 1972 presidential elections made clear, however, FECA's passage did not deter unseemly fundraising and campaign practices. Evidence of those practices persuaded Congress to enact the Federal Election Campaign Act Amendments of 1974. Reviewing a constitutional challenge to the amendments, the Court of Appeals for the District of Columbia Circuit described them as "by far the most comprehensive ... reform legislation [ever] passed by Congress concerning the election of the President, Vice-President and Members of Congress." *Buckley v. Valeo*, 519 F.2d 821, 831 (C.A.D.C.1975) (en banc) (*per curiam*).

The 1974 amendments closed the loophole that had allowed candidates to use an unlimited number of political committees for fundraising purposes and thereby to circumvent the limits on individual committees' receipts and disbursements. They also limited individual political contributions to any single candidate to $1,000 per election, with an overall annual limitation of $25,000 by

246

any contributor; imposed ceilings on spending by candidates and political parties for national conventions; required reporting and public disclosure of contributions and expenditures exceeding certain limits; and established the Federal Election Commission (FEC) to administer and enforce the legislation. *Id.*, at 831-834.

The Court of Appeals upheld the 1974 amendments almost in their entirety. It concluded that the clear and compelling interest in preserving the integrity of the electoral process provided a sufficient basis for sustaining the substantive provisions of the Act. The court's opinion relied heavily on findings that large contributions facilitated access to public officials and described methods of evading the contribution limits that had enabled contributors of massive sums to avoid disclosure.... *Id., at* 837-841.

The Court of Appeals upheld the provisions establishing contribution and expenditure limitations on the theory that they should be viewed as regulations of conduct rather than speech. *Id.*, at 840-841. This Court, however, concluded that each set of limitations raised serious--though different --concerns under the First Amendment. *Buckley v. Valeo*, 424 U.S. 1, 14-23 (1976) *(per curiam)*. We treated the limitations on candidate and individual expenditures as direct restraints on speech, but we observed that the contribution limitations, in contrast, imposed only "a marginal restriction upon the contributor's ability to engage in free communication." *Id.*, at 20-2. Considering the "deeply disturbing examples" of corruption related to candidate contributions discussed in the Court of Appeals' opinion, we determined that limiting contributions served an interest in protecting "the integrity of our system of representative democracy." *Id.*, at 26-27. In the end, the

247

Act's primary purpose--"to limit the actuality and appearance of corruption resulting from large individual financial contributions"--provided a constitutionally sufficient justification for the $1,000 contribution limitation." *Id.*, at 26.

We prefaced our analysis of the $1,000 limitation on expenditures by observing that it broadly encompassed every expenditure " 'relative to a clearly identified candidate.' " *Id.*, at 39 (quoting 18 U.S.C. § 608(e)(1) (1970 ed., Supp. IV)). To avoid vagueness concerns we construed that phrase to apply only to "communications that in express terms advocate the election or defeat of a clearly identified candidate for federal office." 424 U.S., at 42-44. We concluded, however, that as so narrowed, the provision would not provide effective protection against the dangers of *quid pro quo* arrangements, because persons and groups could eschew expenditures that expressly advocated the election or defeat of a clearly identified candidate while remaining "free to spend as much as they want to promote the candidate and his views." *Id.*, at 45. We also rejected the argument that the expenditure limits were necessary to prevent attempts to circumvent the Act's contribution limits, because FECA already treated expenditures controlled by or coordinated with the candidate as contributions, and we were not persuaded that independent expenditures posed the same risk of real or apparent corruption as coordinated expenditures. *Id.*, at 46-47. We therefore held that Congress' interest in preventing real or apparent corruption was inadequate to justify the heavy burdens on the freedoms of expression and association that the expenditure limits imposed.

248

We upheld all of the disclosure and reporting requirements in the Act that were challenged on appeal to this Court after finding that they vindicated three important interests: providing the electorate with relevant information about the candidates and their supporters; deterring actual corruption and discouraging the use of money for improper purposes; and facilitating enforcement of the prohibitions in the Act. *Id.*, at 66-68.  In order to avoid an overbreadth problem, however, we placed the same narrowing construction on the term "expenditure" in the disclosure context that we had adopted in the context of the expenditure limitations.  Thus, we construed the reporting requirement for persons making expenditures of more than $100 in a year "to reach only funds used for communications that expressly advocate the election or defeat of a clearly identified candidate." *Id.*, at 80.

Our opinion in *Buckley* addressed issues that primarily related to contributions and expenditures by individuals, since none of the parties challenged the prohibition on contributions by corporations and labor unions.  We noted, however, that the statute authorized the use of corporate and union resources to form and administer segregated funds that could be used for political purposes.  *Id.*, at 28-29, n. 31; see also n. 3, *supra*.

Three important developments in the years after our decision in Buckley persuaded Congress that further legislation was necessary to regulate the role that corporations, unions, and wealthy contributors play in the electoral process.  As a preface to our discussion of the specific provisions of BCRA, we comment briefly on the increased importance of "soft money," the proliferation of "issue ads," and the disturbing findings of a Senate

249

investigation into campaign practices related to the 1996 federal elections.

*Soft Money*

Under FECA, "contributions" must be made with funds that are subject to the Act's disclosure requirements and source and amount limitations. Such funds are known as "federal" or "hard" money. FECA defines the term "contribution," however, to include only the gift or advance of anything of value "made by any person for the purpose of influencing any election for *Federal* office." 2 U.S.C. § 431(8)(A)(i) (emphasis added). Donations made solely for the purpose of influencing state or local elections are therefore unaffected by FECA's requirements and prohibitions. As a result, prior to the enactment of BCRA, federal law permitted corporations and unions, as well as individuals who had already made the maximum permissible contributions to federal candidates, to contribute "nonfederal money"--also known as "soft money"--to political parties for activities intended to influence state or local elections.

Shortly after *Buckley* was decided, questions arose concerning the treatment of contributions intended to influence both federal and state elections. Although a literal reading of FECA's definition of "contribution" would have required such activities to be funded with hard money, the FEC ruled that political parties could fund mixed-purpose activities -- including get-out-the-vote drives and generic party advertising--in part with soft money. In 1995 the FEC concluded that the parties could also use soft money to defray the costs of "legislative advocacy media advertisements," even if the ads

250

mentioned the name of a federal candidate, so long as they did not expressly advocate the candidate's election or defeat. FEC Advisory Op. 1995-25.

> [Footnote 7:] ... In 1990 the FEC ... promulgat[ed] fixed allocation rates.  11 CFR § 106.5 (1991). The regulations required the Republican National Committee (RNC) and Democratic National Committee (DNC) to pay for at least 60% of mixed-purpose activities (65% in presidential election years) with funds from their federal accounts.  § 106.5(b)(2).  By contrast, the regulations required state and local committees to allocate similar expenditures based on the ratio of federal to nonfederal offices on the State's ballot, § 106.5(d)(1), which in practice meant that they could expend a substantially greater proportion of soft money than national parties to fund mixed-purpose activities affecting both federal and state elections.

As the permissible uses of soft money expanded, the amount of soft money raised and spent by the national political parties increased exponentially.  Of the two major parties' total spending, soft money accounted for 5% ($21.6 million) in 1984, 11% ($45 million) in 1988, 16% ($80 million) in 1992, 30% ($272 million) in 1996, and 42% ($498 million) in 2000.   The national parties transferred large amounts of their soft money to the state parties, which were allowed to use a larger percentage of soft money to finance mixed-purpose activities under FEC rules.  In the year 2000, for example, the national parties diverted $280 million--more than half of their soft money-- to state parties....

251

Not only were such soft-money contributions often designed to gain access to federal candidates, but they were in many cases solicited by the candidates themselves. Candidates often directed potential donors to party committees and tax-exempt organizations that could legally accept soft money.   For example, a federal legislator running for reelection solicited soft money from a supporter by advising him that even though he had already " 'contributed the legal maximum' " to the campaign committee, he could still make an additional contribution to a joint program supporting federal, state, and local candidates of his party.  Such solicitations were not uncommon.

The solicitation, transfer, and use of soft money thus enabled parties and candidates to circumvent FECA's limitations on the source and amount of contributions in connection with federal elections.

*Issue Advertising*

In *Buckley* we construed FECA's disclosure and reporting requirements, as well as its expenditure limitations, "to reach only funds used for communications that expressly advocate the election or defeat of a clearly identified candidate."  424 U.S., at 80.  As a result of that strict reading of the statute, the use or omission of "magic words" such as "Elect John Smith" or "Vote Against Jane Doe" marked a bright statutory line separating "express advocacy" from "issue advocacy." See *id.*, at 44, n. 52. Express advocacy was subject to FECA's limitations and could be financed only using hard money.  The political parties, in other words, could not use soft money to sponsor ads that used any magic words, and corporations

252

and unions could not fund such ads out of their general treasuries. So-called issue ads, on the other hand, not only could be financed with soft money, but could be aired without disclosing the identity of, or any other information about, their sponsors.

While the distinction between "issue" and express advocacy seemed neat in theory, the two categories of advertisements proved functionally identical in important respects. Both were used to advocate the election or defeat of clearly identified federal candidates, even though the so-called issue ads eschewed the use of magic words. Little difference existed, for example, between an ad that urged viewers to "vote against Jane Doe" and one that condemned Jane Doe's record on a particular issue before exhorting viewers to "call Jane Doe and tell her what you think." Indeed, campaign professionals testified that the most effective campaign ads, like the most effective commercials for products such as Coca-Cola, should, and did, avoid the use of the magic words. Moreover, the conclusion that such ads were specifically intended to affect election results was confirmed by the fact that almost all of them aired in the 60 days immediately preceding a federal election. Corporations and unions spent hundreds of millions of dollars of their general funds to pay for these ads, and those expenditures, like soft-money donations to the political parties, were unregulated under FECA. Indeed, the ads were attractive to organizations and candidates precisely because they were beyond FECA's reach, enabling candidates and their parties to work closely with friendly interest groups to sponsor so-called issue ads when the candidates themselves were running out of money....

253

Because FECA's disclosure requirements did not apply to so-called issue ads, sponsors of such ads often used misleading names to conceal their identity. "Citizens for Better Medicare," for instance, was not a grassroots organization of citizens, as its name might suggest, but was instead a platform for an association of drug manufacturers. And "Republicans for Clean Air," which ran ads in the 2000 Republican Presidential primary, was actually an organization consisting of just two individuals--brothers who together spent $25 million on ads supporting their favored candidate.

While the public may not have been fully informed about the sponsorship of so-called issue ads, the record indicates that candidates and officeholders often were. A former Senator confirmed that candidates and officials knew who their friends were and "sometimes suggest[ed] that corporations or individuals make donations to interest groups that run 'issue ads.' " As with soft-money contributions, political parties and candidates used the availability of so-called issue ads to circumvent FECA's limitations, asking donors who contributed their permitted quota of hard money to give money to nonprofit corporations to spend on "issue" advocacy.

_____ *Senate Committee Investigation*

In 1998 the Senate Committee on Governmental Affairs issued a six-volume report summarizing the results of an extensive investigation into the campaign practices in the 1996 federal elections. The report gave particular attention to the effect of soft money on the American political system, including elected officials' practice of granting special access in return for political contributions.

254

The committee's principal findings relating to Democratic Party fundraising were set forth in the majority's report, while the minority report primarily described Republican practices. The two reports reached consensus, however, on certain central propositions. They agreed that the "soft money loophole" had led to a "meltdown" of the campaign finance system that had been intended "to keep corporate, union and large individual contributions from influencing the electoral process." One Senator stated that "the hearings provided overwhelming evidence that the twin loopholes of soft money and bogus issue advertising have virtually destroyed our campaign finance laws, leaving us with little more than a pile of legal rubble."

The report was critical of both parties' methods of raising soft money, as well as their use of those funds. It concluded that both parties promised and provided special access to candidates and senior Government officials in exchange for large soft-money contributions. The committee majority described the White House coffees that rewarded major donors with access to President Clinton, and the courtesies extended to an international businessman named Roger Tamraz, who candidly acknowledged that his donations of about $300,000 to the DNC and to state parties were motivated by his interest in gaining the Federal Government's support for an oil-line project in the Caucasus. The minority described the promotional materials used by the RNC's two principal donor programs, "Team 100" and the "Republican Eagles," which promised "special access to high-ranking Republican elected officials, including governors, senators, and representatives." One fundraising letter recited that the chairman of the RNC had personally escorted a donor on appointments that " 'turned out to be very significant in

255

legislation affecting public utility holding companies' "
and made the donor " 'a hero in his industry.' "

In 1996 both parties began to use large amounts of soft
money to pay for issue advertising designed to influence
federal elections.  The committee found such ads highly
problematic for two reasons.  Since they accomplished the
same purposes as express advocacy (which could lawfully
be funded only with hard money), the ads enabled unions,
corporations, and wealthy contributors to circumvent
protections that FECA was intended to provide.  Moreover,
though ostensibly independent of the candidates, the ads
were often actually coordinated with, and controlled by,
the campaigns.  The ads thus provided a means for evading
FECA's candidate contribution limits.

The report also emphasized the role of state and local
parties.  While the FEC's allocation regime permitted
national parties to use soft money to pay for up to 40% of
the costs of both generic voter activities and issue
advertising, they allowed state and local parties to use
larger percentages of soft money for those purposes.  For
that reason, national parties often made substantial
transfers of soft money to "state and local political parties
for 'generic voter activities' that in fact ultimately
benefit[ed] federal candidates because the funds for all
practical purposes remain[ed] under the control of the
national committees." The report concluded that "[t]he use
of such soft money thus allow[ed] more corporate, union
treasury, and large contributions from wealthy individuals
into the system."

The report discussed potential reforms, including a ban on
soft money at the national and state party levels and

256

restrictions on sham issue advocacy by nonparty groups. The majority expressed the view that a ban on the raising of soft money by national party committees would effectively address the use of union and corporate general treasury funds in the federal political process only if it required that candidate-specific ads be funded with hard money.    The minority similarly recommended the elimination of soft-money contributions to political parties from individuals, corporations, and unions, as well as "reforms addressing candidate advertisements masquerading as issue ads."

*   *   *

The findings contained in the 1998 report by the Senate Committee on Governmental Affairs were the basis for the Bipartisan Campaign Reform Act passed four years later.

257

258

# APPENDIX B

## DEPARTMENT OF JUSTICE
## FEDERAL ELECTION COMMISSION
## MEMORANDUM OF UNDERSTANDING

The following is intended to serve as a guide for the Department of Justice (hereinafter referred to as the "Department") and the Federal Election Commission (hereinafter referred to as the "Commission") in the discharge of their respective statutory responsibilities under the Federal Election Campaign Act and Chapters 95 and 96 of the Internal Revenue Code:

(1) The Department recognizes the Federal Election Commission's exclusive jurisdiction in civil matters brought to the Commission's attention involving violations of the Federal Election Campaign Act and Chapters 95 and 96 of the Internal Revenue Code. It is agreed that Congress intended to centralize civil enforcement of the Federal Election Campaign Act in the Federal Election Commission by conferring on the Commission a broad range of powers and dispositional alternatives for handling nonwillful or unaggravated violations of these provisions.

(2) The Commission and the Department mutually recognize that all violations of the Federal Election Campaign Act and the antifraud provisions of Chapters 95 and 96 of the Internal Revenue Code, even those committed knowingly and wilfully, may not be proper subjects for prosecution as crimes under 2 U.S.C. 441; [now § 437g(d)], 26 U.S.C. 9012 or 26 U.S.C. 9042. For the most beneficial and effective enforcement of the Federal Election Campaign Act and the antifraud provisions of Chapters 95 and 96 of the Internal Revenue Code, those knowing and wilful violations which are significant and substantial and which may be described as aggravated in the intent in

259

which they were committed, or in the monetary amount involved should be referred by the Commission to the Department for criminal prosecution review.   With this framework, numerous factors will frequently affect the determination of referrals, including the repetitive nature of the acts, the existence of a practice or pattern, prior notice, and the extent of the conduct in terms of geographic area, persons, and monetary amounts among many other proper considerations.

(3)  Where the Commission discovers or learns of a probable significant and substantial violation, it will endeavor to expeditiously investigate and find whether clear and compelling evidence exists to determine probable cause to believe the violation was knowing and wilful.   If the determination of probable cause is made, the Commission shall refer the case to the Department promptly.

(4)  Where information comes to the attention of the Department indicating a probable violation of Title 2, the Department will apprise the Commission of such information at the earliest opportunity.

Where the Department determines that evidence of a probable violation of Title 2 amounts to a significant and substantial knowing and wilful violation, the Department will continue its investigation to prosecution when appropriate and necessary to its prosecutorial duties and functions, and will endeavor to make available to the Commission evidence developed during the course of its investigation subject to restricting law.   Where the alleged violation warrants the impaneling of a grand jury, information obtained during the course of the grand jury proceedings will not be disclosed to the Commission, pursuant to Rule 6 of the Federal Rules of Criminal Procedure.

Where the Department determines that evidence of a probable violation of title 2 does not amount to a significant and substantial knowing and wilful violation (as described in paragraph 2 hereof), the Department will refer the matter to the Commission as promptly as

260

possible for its consideration of the wide range of appropriate remedies available to the Commission.

(5) This memorandum of understanding controls only the relationship between the Commission and the Department.  It is not intended to confer any procedural or substantive rights on any person in any matter before the Department, the Commission or any court or agency of Government.

Dated: December 5, 1977.

For the United States Department of Justice.

> BENJAMIN R. CIVILETTI,
> Assistant Attorney General,
> Criminal Division

Dated: December 8, 1977.

For the Federal Election Commission.

> WILLIAM C. OLDAKER,
> General Counsel

_____

261

262

# APPENDIX C

## STATUTES

### A. EXCERPTS FROM TITLE 2, UNITED STATES CODE

**§ 431.  Definitions**
When used in this Act:
   **(1) Election**.  The term "election" means–
      **(A)** a general, special, primary, or runoff election;
      **(B)** a convention or caucus of a political party which has authority to nominate a candidate;
      **(C)** a primary election held for the selection of delegates to a national nominating convention of a political party;  and
      **(D)** a primary election held for the expression of a preference for the nomination of individuals for election to the office of President.
   **(2) Candidate**.  The term "candidate" means an individual who seeks nomination for election, or election, to Federal office, and for purposes of this paragraph, an individual shall be deemed to seek nomination for election, or election–
      **(A)** if such individual has received contributions aggregating in excess of  $5,000 or has made expenditures aggregating in excess of $5,000;  or
      **(B)** if such individual has given his or her consent to another person to receive contributions or make expenditures on behalf of such individual and if such person has received such contributions aggregating in excess of $5,000 or has made such expenditures aggregating in excess of $5,000.
   **(3) Federal office**.  The term "Federal office" means the office of President or Vice President, or of Senator or Representative in, or Delegate or Resident Commissioner to, the Congress.
   **(4) Political committee**.  The term "political committee" means–
      **(A)** any committee, club, association, or other group of

263

persons which receives contributions aggregating in excess of $1,000 during a calendar year or which makes expenditures aggregating in excess of $1,000 during a calendar year;  or

_____  **(B)** any separate segregated fund established under the provisions of section 441b(b) of this title;  or

**(C)** any local committee of a political party which receives contributions aggregating in excess of $5,000 during a calendar year, or makes payments exempted from the definition of contribution or expenditure as defined in paragraphs (8) and (9) aggregating in excess of $5,000 during a calendar year, or makes contributions aggregating in excess of $1,000 during a calendar year or makes expenditures aggregating in excess of $1,000 during a calendar year.

\* \* \* \* \*

**(8)(A)  Contribution**.  The term "contribution" includes–

**(i)**  any gift, subscription, loan, advance, or deposit of money or anything of value made by any person for the purpose of influencing any election for Federal office;  or

**(ii)**  the payment by any person of compensation for the personal services of another person which are rendered to a political committee without charge for any purpose.

\* \* \* \* \*

**(9)(A)  Expenditure**.  The term "expenditure" includes–

**(i)**  any purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value, made by any person for the purpose of influencing any election for Federal office;  and

**(ii)**  a written contract, promise, or agreement to make an expenditure.

\* \* \* \* \*

**(11)  Person**.  The term "person" includes an individual, partnership, committee, association, corporation, labor organization, or any other organization or group of persons, but such term

264

does not include the Federal Government or any authority of the Federal Government.

\* \* \* \* \*

**(14)  National committee**.  The term "national committee" means the organization which, by virtue of the bylaws of a political party, is responsible for the day-to-day operation of such political party at the national level, as determined by the Commission.

**(15)  State committee**.  The term "State committee" means the organization which, by virtue of the bylaws of a political party, is responsible for the day-to-day operation of such political party at the State level, as determined by the Commission.

**(16)  Political party**.  The term "political party" means an association, committee, or organization which nominates a candidate for election to any Federal office whose name appears on the election ballot as the candidate of such association, committee, or organization.

**(17)  Independent expenditure**.  The term "independent expenditure" means an expenditure by a person–

    **(A)**  expressly advocating the election or defeat of a clearly identified candidate; and

    **(B)**  that is not made in concert or cooperation with or at  the request or suggestion of such candidate, the candidate's authorized political committee, or their agents, or a political party committee or its agents.

\* \* \* \* \*

**(20)  Federal election activity**

    **(A)  In general**.  The term "Federal election activity" means–

        **(i)**  voter registration activity during the period that begins on the date that is 120 days before the date a regularly scheduled Federal election is held and ends on the date of the election;

        **(ii)**  voter identification, get-out-the-vote activity, or

265

generic campaign activity conducted in connection with
an election in which a candidate for Federal office
appears on the ballot (regardless of whether a candidate
for State or local office also appears on the ballot).

   **(iii)**  a public communication that refers to a clearly
identified candidate for Federal office (regardless of
whether a candidate for State or local office is also
mentioned or identified) and that promotes or supports a
candidate for that office, or attacks or opposes a
candidate for that office (regardless of whether the
communication expressly advocates a vote for or against
a candidate);  or

   **(iv)**  services provided during any month by an
employee of a State, district, or local  committee of a
political party who spends more than 25 percent of that
individual's compensated time during that month on
activities in connection with a Federal election.

* * * * *

   **(21)  Generic campaign activity**.  The term "generic campaign
activity" means a campaign activity that promotes a political party
and does not promote a candidate or non-Federal candidate.

   **(22)  Public communication**.  The term "public communication"
means a communication by means of any broadcast, cable, or
satellite communication, newspaper, magazine, outdoor advertising
facility, mass mailing, or telephone bank to the general public, or
any other form of general public political advertising.

* * * * *

### § 432.  Organization of political committees

   **(a)  Treasurer;  vacancy;  official authorizations**

   Every political committee shall have a treasurer.  No
contribution or expenditure shall be accepted or made by or on
behalf of a political committee during any period in which the office

266

of treasurer is vacant.  No expenditure shall be made for or on behalf of a political committee without the authorization of the treasurer or his or her designated agent.

(b) **Account of contributions;  segregated funds**

(1)  Every person who receives a contribution for an authorized political committee shall, no later than 10 days after receiving such contribution, forward to the treasurer such contribution, and if the amount of the contribution is in excess of $50 the name and address of the person making the contribution and the date of receipt.

(2)  Every person who receives a contribution for a political committee which is not an authorized committee shall–

(A)  if the amount of the contribution is $50 or less, forward to the treasurer such contribution no later than 30 days after receiving the contribution;  and

(B)  if the amount of the contribution is in excess of $50, forward to the treasurer such contribution, the name and address of the person making the contribution, and the date of receipt of the contribution, no later than 10 days after receiving the contribution.

(3)  All funds of a political committee shall be segregated from, and may not be commingled with, the personal funds of any individual.

(c) **Recordkeeping**

The treasurer of a political committee shall keep an account of–

(1)  all contributions received by or on behalf of such political committee;

(2)  the name and address of any person who makes any contribution in excess of $50, together with the date and amount of such contribution by any person;

(3)  the identification of any person who makes a

267

contribution or contributions aggregating more than $200 during a calendar year, together with the date and amount of any such contribution;

(4) the identification of any political committee which makes a contribution, together with the date and amount of any such contribution;  and

(5) the name and address of every person to whom any disbursement is made, the date, amount, and purpose of the disbursement, and the name of the candidate and the office sought by the candidate, if any, for whom the disbursement was made, including a receipt, invoice, or canceled check for each disbursement in excess of $200.

\* \* \* \* \*

**(e)  Principal and additional campaign committees; designations, status of candidate, authorized committees, etc.**

(1)  Each candidate for Federal office (other than the nominee for the office of Vice President) shall designate in writing a political committee in accordance with paragraph (3) to serve as the principal campaign committee of such candidate.  Such designation shall be made no later than 15 days after becoming a candidate.  A candidate may designate additional political committees in accordance with paragraph (3) to serve as authorized committees of such candidate.  Such designation shall be in writing and filed with the principal campaign committee of such candidate in accordance with subsection (f) (1) of this section.

(2)  Any candidate described in paragraph (1) who receives a contribution, or any loan for use in connection with the campaign of such candidate for election, or makes a disbursement in connection with such campaign, shall be considered, for purposes of this Act, as having received the contribution or loan, or as having made the disbursement, as the case may be, as an agent of the authorized committee or

268

committees of such candidate.

(3)(A)  No political committee which supports or has supported more than one candidate may be designated as an authorized committee, except that–

(i)  the candidate for the office of President nominated by a political party may designate the national committee of such political party as a principal campaign committee, but only if that national committee maintains separate books of account with respect to its function as a principal campaign committee;  and

(ii)  candidates may designate a political committee established solely for the purpose of joint fundraising by such candidates as an authorized committee.

(B)  As used in this section, the term "support" does not include a contribution by any authorized committee in amounts of $2,000 or less to an authorized committee of any other candidate.

(4)  The name of each authorized committee shall include the name of the candidate who authorized such committee under paragraph (1).  In the case of any political committee which is not an authorized committee, such political committee shall not include the name of any candidate in its name.

(5)  The name of any separate segregated fund established pursuant to section 441b(b) of this title shall include the name of its connected organization.

(f)  **Filing with and receipt of designations, statements, and reports by principal campaign committee**

(1)  Notwithstanding any other provision of this Act, each designation, statement, or report of receipts or disbursements made by an authorized committee of a candidate shall be filed with the candidate's principal campaign committee.

(2)  Each principal campaign committee shall receive all designations, statements, and reports required to be filed with it

269

under paragraph (1) and shall compile and file such designations, statements, and reports in accordance with this Act.

\* \* \* \* \*

## § 434.  Reporting requirements

### (a)  Receipts and disbursements by treasurers of political committees;  filing requirements

(1)  Each treasurer of a political committee shall file reports of receipts and disbursements in accordance with the provisions of this subsection.  The treasurer shall sign each such report.

\* \* \* \* \*

### (b)  Contents of reports

Each report under this section shall disclose–

(1)  the amount of cash on hand at the beginning of the reporting period;

(2)  for the reporting period and the calendar year (or election cycle, in the case of an authorized committee of a candidate for Federal office), the total amount of all receipts, and the total amount of all receipts in the following categories:

(A)  contributions from persons other than political committees;

(B)  for an authorized committee, contributions from the candidate....

\* \* \* \* \*

(3)  the identification of each–

(A)  person (other than a political committee) who makes a contribution to the reporting committee during the reporting period, whose contribution or contributions have an aggregate amount or value in excess of $200 within the calendar year (or election cycle, in the case of an authorized committee of a candidate for Federal office), or in any lesser amount if the reporting committee should so elect, together with the date and amount of any such contribution;

\* \* \* \* \*

270

(4)  for the reporting period and the calendar year (or election cycle, in the case of an authorized committee of a candidate for Federal office), the total amount of all disbursements, and all disbursements in the following categories:

(A)  expenditures made to meet candidate or committee operating expenses;

* * * * *

(6)(A)  for an authorized committee, the name and address of each person who has received any disbursement not disclosed under paragraph (5) in an aggregate amount or value in excess of $200 within the calendar year (or election cycle, in the case of an authorized committee of a candidate for Federal office), together with the date and amount of any such disbursement;

(B)  for any other political committee, the name and address of each–

* * * * *

(v)  person who has received any disbursement not otherwise disclosed in this paragraph or paragraph (5) in an aggregate amount or value in excess of $200 within the calendar year (or election cycle, in the case of an authorized committee of a candidate for Federal office), from the reporting committee within the reporting period, together with the date, amount, and purpose of any such disbursement;

* * * * *

(f)  Disclosure of electioneering communications
   (1)  Statement required

Every person who makes a disbursement for the direct costs of producing and airing electioneering communications in an aggregate amount in excess of $10,000 during any calendar year shall, within 24 hours of each disclosure date, file with the Commission a statement containing the information described in paragraph (2).

271

**(2)  Contents of statement**

Each statement required to be filed under this subsection shall be made under penalty of perjury and shall contain the following information:

**(A)**  The identification of the person making the disbursement, of any person sharing or exercising direction or control over the activities of such person, and of the custodian of the books and accounts of the person making the disbursement.

**(B)**  The principal place of business of the person making the disbursement, if an individual.

**(C)**  The amount of each disbursement of more than $200 during the period covered by the statement and the identification of the person to whom the disbursement was made.

**(D)**  The elections to which the electioneering communications pertain and the names (if known) of the candidates identified or to be identified.

**(E)**  If the disbursements were paid out of a segregated bank account which consists of funds contributed solely by individuals who are United States citizens or nationals or lawfully admitted for permanent residence (as defined in section 1101(a)(20) of Title 8) directly to this account for electioneering communications, the names and addresses of all contributors who contributed an aggregate amount of $1,000 or more to that account during the period beginning on the first day of the preceding calendar year and ending on the disclosure date.  Nothing in this subparagraph is to be construed as a prohibition on the use of funds in such a segregated account for a purpose other than electioneering communications.

**(F)**  If the disbursements were paid out of funds not described in subparagraph (E), the names and addresses of all contributors who contributed an aggregate amount of

272

$1,000 or more to the person making the disbursement during the period beginning on the first day of the preceding calendar year and ending on the disclosure date.

**(3) Electioneering communication**

For purposes of this subsection–

    **(A) In general**

        **(i)** The term "electioneering communication" means any broadcast, cable, or satellite communication which–

            **(i)** refers to a clearly identified candidate for Federal office;

            **(II)** is made within–

                **(aa)** 60 days before a general, special, or runoff election for the office sought by the candidate;  or

                **(bb)** 30 days before a primary or preference election, or a convention or caucus of a political party that has authority to nominate a candidate, for the office sought by the candidate;  and

            **(III)** in the case of a communication which refers to a candidate for an office other than President or Vice President, is targeted to the relevant electorate.

\* \* \* \* \*

## § 437g.  Enforcement

\* \* \* \* \*

**(d)** Penalties;  defenses;  mitigation of offenses

    **(1)(A)** Any person who knowingly and willfully commits a violation of any provision of this act which involves the making, receiving, or reporting of any contribution, donation, or expenditure

        **(i)** aggregating $25,000 or more during a calendar

273

year shall be fined under Title18, or imprisoned for not more than 5 years, or both;  or

   (ii) aggregating $2,000 or more (but less than $25,000) during a calendar year shall be fined under such title, or imprisoned for not more than 1 year, or both.

**(B)**  In the case of a knowing and willful violation of section 441b(b)(3) of this title, the penalties set forth in this subsection shall apply to a violation involving an amount aggregating $250 or more during a calendar year.  Such violation of section 441b(b)(3) of  this title may incorporate a violation of section 441c(b), 441f, or 441g of this title.

**(C)**  In the case of a knowing and willful violation of section 441h of this title, the penalties set forth in this subsection shall apply without regard to whether the making, receiving, or reporting of a contribution or expenditure of $1,000 or more is involved.

**(D)**  Any person who knowingly and willfully commits a violation of section 441f of this title involving an amount aggregating more than $10,000 during a calendar year shall be

   **(i)**  imprisoned for not more than 2 years if the amount is less than $25,000 (and subject to imprisonment under subparagraph (A) if the amount is $25,000 or more);

   **(ii)**  fined not less than 300 percent of the amount involved in the violation and not more than the greater of–

      **(i)**  $50,000;  or

      **(II)**  1,000 percent of the amount involved in the violation;  or

   **(iii)**  both imprisoned under clause (i) and fined under clause (ii).

274

**(2)**  In any criminal action brought for a violation of any provision of this Act or of chapter 95 or chapter 96 of Title 26, any defendant may evidence their lack of knowledge or intent to commit the alleged violation by introducing as evidence a conciliation agreement entered into between the defendant and the Commission under subsection (a)(4)(A) of this section which specifically deals with the act or failure to act constituting such violation and which is still in effect.

**(3)**  In any criminal action brought for a violation of any provision of this Act or of chapter 95 or chapter 96 of Title 26, the court before which such action is brought shall take into account, in weighing the seriousness of the violation and in considering the appropriateness of the penalty to be imposed if the defendant is found guilty, whether–

> **(A)**  the specific act or failure to act which constitutes the violation for which the action was brought is the subject of a conciliation agreement entered into between the defendant and the Commission under subparagraph (a)(4)(A);

> **(B)**  the conciliation agreement is in effect;  and

> **(C)**  the defendant is, with respect to the violation involved, in compliance with the conciliation agreement.

## § 439a.  Use of contributed amounts for certain purposes

### (a)  Permitted uses

A contribution accepted by a candidate, and any other donation received by an individual as support for activities of the individual as a holder of Federal office, may be used by the candidate or individual–

**(1)**  for otherwise authorized expenditures in connection with the campaign for Federal office of the candidate or individual;

**(2)**  for ordinary and necessary expenses incurred in connection with duties of the individual as a holder of Federal

275

office;

 **(3)** for contributions to an organization described in section 170(c) of Title 26;

 **(4)** for transfers, without limitation, to a national, State, or local committee of a political party;

 **(5)** for donations to State and local candidates subject to the provisions of State law;  or

 **(6)** for any other lawful purpose unless prohibited by subsection (b) of this section.

**(b)  Prohibited use**

 **(1)  In general**

  A contribution or donation described in subsection (a) of this section shall not be converted by any person to personal use.

 **(2)  Conversion**

  For the purposes of paragraph (1), a contribution or donation shall be considered to be converted to personal use if the contribution or amount is used to fulfill any commitment, obligation, or expense of a person that would exist irrespective of the candidate's election campaign or individual's duties as a holder of Federal office, including–

  **(A)** a home mortgage, rent, or utility payment;

  **(B)** a clothing purchase;

  **(C)** a noncampaign-related automobile expense;

  **(D)** a country club membership;

  **(E)** a vacation or other noncampaign-related trip;

  **(F)** a household food item;

  **(G)** a tuition payment;

  **(H)** admission to a sporting event, concert, theater, or other form of entertainment not associated with an election campaign;  and

  **(i)** dues, fees, and other payments to a health club or recreational facility.

§ **441a.   Limitations on contributions and expenditures**
  (a) **Dollar limits on contributions**

   (1)  Except as provided in subsection (i) of this section and section 441a-1 of this title, no person shall make contributions–

      (A)  to any candidate and his authorized political committees with respect to any election for Federal office which, in the aggregate, exceed $2,000;

      (B)  to the political committees established and maintained by a national political party, which are not the authorized political committees of any candidate, in any calendar year which, in the aggregate, exceed $25,000;

      (C)  to any other political committee (other than a committee described in subparagraph (D)) in any calendar year which, in the aggregate, exceed $5,000; or

      (D)  to a political committee established and maintained by a State committee of a political party in any calendar year which, in the aggregate, exceed $10,000.

   (2)  No multicandidate political committee shall make contributions–

      (A)  to any candidate and his authorized political committees with respect to any election for Federal office which, in the aggregate, exceed $5,000;

      (B)  to the political committees established and maintained by a national political party, which are not the authorized political committees of any candidate, in any calendar year, which, in the aggregate, exceed $15,000;  or

      (C)  to any other political committee in any calendar year which, in the aggregate, exceed $5,000.

   (3)  During the period which begins on January 1 of an odd-numbered year and ends on December 31 of the next even-numbered year, no individual may make contributions aggregating more than–

      (A)  $37,500, in the case of contributions to candidates

277

and the authorized committees of candidates;

(B) $57,500, in the case of any other contributions, of which not more than $37,500 may be attributable to contributions to political committees which are not political committees of national political parties.

(4) The limitations on contributions contained in paragraphs (1) and (2) do not apply to transfers between and among political committees which are national, State, district, or local committees (including any subordinate committee thereof) of the same political party for purposes of paragraph (2), the term "multicandidate political committee" means a political committee which has been registered under section 433 of this title for a period of not less than 6 months, which has received contributions from more than 50 persons, and, candidates for Federal office.

(5) For purposes of the limitations provided by paragraph (1) and paragraph (2), all contributions made by political committees established or financed or maintained or controlled by any corporation, labor organization, or any other person, including any parent, subsidiary, branch, division, department, or local unit of such corporation, labor organization, or any other person, or by any group of such persons, shall be considered to have been made by a single political committee, except that (A) nothing in this sentence shall limit transfers between political committees of funds raised through joint fund raising efforts; (B) for purposes of the limitations provided by paragraph (1) and paragraph (2) all contributions made by a single political committee established or financed or maintained or controlled by a national committee of a political party and by a single political committee established or financed or maintained or controlled by the State committee of a political party shall not be considered to have been made by a single political committee; and (C) nothing in this section shall limit the transfer of funds between the principal campaign

278

committee of a candidate seeking nomination or election to a Federal office and the principal campaign committee of that candidate for nomination or election to another Federal office if (i) such transfer is not made when the candidate is actively seeking nomination or election to both such offices; (ii) the limitations contained in this Act on contributions by persons are not exceeded by such transfer; and (iii) the candidate has not elected to receive any funds under chapter 95 or chapter 96 of Title 26. In any case in which a corporation and any of its subsidiaries, branches, divisions, departments, or local units, or a labor organization and any of its subsidiaries, branches, divisions, departments, or local units establish or finance or maintain or control more than one separate segregated fund, all such separate segregated funds shall be treated as a single separate segregated fund for purposes of the limitations provided by paragraph (1) and paragraph (2).

(6) The limitations on contributions to a candidate imposed by paragraphs (1) and (2) of this subsection shall apply separately with respect to each election, except that all elections held in any calendar year for the office of President of the United States (except a general election for such office) shall be considered to be one election.

(7) For purposes of this subsection--

(A) contributions to a named candidate made to any political committee authorized by such candidate to accept contributions on his behalf shall be considered to be contributions made to such candidate;

(B)(i) expenditures made by any person in cooperation, consultation, or concert, with, or at the request or suggestion of, a candidate, his authorized political committees, or their agents, shall be considered to be a contribution to such candidate;

(ii) expenditures made by any person (other than a candidate or candidate's authorized committee) in

279

cooperation, consultation, or concert with, or at the request or suggestion of, a national, State, or local committee of a political party, shall be considered to be contributions made to such party committee; and

   **(iii)**  the financing by any person of the dissemination, distribution, or republication, in whole or in part, of any broadcast or any written, graphic, or other form of campaign materials prepared by the candidate, his campaign committees, or their authorized agents shall be considered to be an expenditure for purposes of this paragraph;  and

 **(C)**  if–

   **(i)**  any person makes, or contracts to make, any disbursement for any electioneering communication (within the meaning of section 434(f)(3) of this title); and

   **(ii)**  such disbursement is coordinated with a candidate or an authorized committee of such candidate, a Federal, State, or local political party or committee thereof, or an agent or official of any such candidate, party, or committee; such disbursement or contracting shall be treated as a contribution to the candidate supported by the electioneering communication or that candidate's party and as an expenditure by that candidate or that candidate's party;  and

 **(D)**  contributions made to or for the benefit of any candidate nominated by a political party for election to the office of Vice President of the United States shall be considered to be contributions made to or for the benefit of the candidate of such party for election to the office of President of the United States (except a general election for such office) shall be considered to be one election.

280

(8)  For purposes of the limitations imposed by this section, all contributions made by a person, either directly or indirectly, on behalf of a particular candidate, including contributions which are in any way earmarked or otherwise directed through an intermediary or conduit to such candidate, shall be treated as contributions from such person to such candidate.  The intermediary or conduit shall report the original source and the intended recipient of such contribution to the Commission and to the intended recipient.

* * * * *

**(f)  Prohibited contributions and expenditures**

No candidate or political committee shall knowingly accept any contribution or make any expenditure in violation of the provisions of this section.  No officer or employee of a political committee shall knowingly accept a contribution made for the benefit or use of a candidate, or knowingly make any expenditure on behalf of a candidate, in violation of any limitation imposed on contributions and expenditures under this section.

## § 441b.  Contributions or expenditures by national banks, corporations, or labor organizations

**(a)**  It is unlawful for any national bank, or any corporation organized by authority of any law of Congress, to make a contribution or expenditure in connection with any election to any political office, or in connection with any primary election or political convention or caucus held to select candidates for any political office, or for any corporation whatever, or any labor organization, to make a contribution or expenditure in connection with any election at which presidential and vice presidential electors or a Senator or Representative in, or a Delegate or Resident Commissioner to, Congress are to be voted for, or in connection with any primary election or political convention or caucus held to select candidates for any of the foregoing offices, or for any

281

candidate, political committee, or other person knowingly to accept or receive any contribution prohibited by this section, or any officer or any director of any corporation or any national bank or any officer of any labor organization to consent to any contribution or expenditure by the corporation, national bank, or labor organization, as the case may be, prohibited by this section.

   **(b)(1)**  For the purposes of this section the term "labor organization" means any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work.

   **(2)**  For purposes of this section and section 79l(h) of Title 15, the term "contribution or expenditure" includes a contribution or  expenditure, as those terms are defined in section 431 of this title, and also includes any direct or indirect payment, distribution, loan, advance, deposit, or gift of money, or any services, or anything of value (except a loan of money by a national or State bank made in accordance with the applicable banking laws and regulations and in the ordinary course of business) to any candidate, campaign committee, or political party or organization, in connection with any election to any of the offices referred to in this section or for any applicable electioneering communication, but shall not include (A) communications by a corporation to its stockholders and executive or administrative personnel and their families or by a labor organization to its members and their families on any subject;  (B) nonpartisan registration and get-out-the-vote campaigns by a corporation aimed at its stockholders and executive or administrative personnel and their families, or by a labor organization aimed at its members and their families; and (C) the establishment, administration, and solicitation of contributions to a separate segregated fund to be utilized for

political purposes by a corporation, labor organization, membership organization, cooperative, or corporation without capital stock.

(3) It shall be unlawful–

    **(A)** for such a fund to make a contribution or expenditure by utilizing money or anything of value secured by physical force, job discrimination, financial reprisals, or the threat of force, job discrimination, or financial reprisal; or by dues, fees, or other moneys required as a condition of membership in a labor organization or as a condition of employment, or by moneys obtained in any commercial transaction;

    **(B)** for any person soliciting an employee for a contribution to such a fund to fail to inform such employee of the political purposes of such fund at the time of such solicitation; and

    **(C)** for any person soliciting an employee for a contribution to such a fund to fail to inform such employee, at the time of such solicitation, of his right to refuse to so contribute without any reprisal.

**(4)(A)** Except as provided in subparagraphs (B), (C), and (D), it shall be unlawful–

      **(i)** for a corporation, or a separate segregated fund established by a corporation, to solicit contributions to such a fund from any person other than its stockholders and their families and its executive or administrative personnel and their families, and

    **(ii)** for a labor organization, or a separate segregated fund established by a labor organization, to solicit contributions to such a fund from any person other than its members and their families.

    **(B)** It shall not be unlawful under this section for a corporation, a labor organization, or a separate segregated fund established by such corporation or such labor

283

organization, to make 2 written solicitations for contributions during the calendar year from any stockholder, executive or administrative personnel, or employee of a corporation or the families of such persons. A solicitation under this subparagraph may be made only by mail addressed to stockholders, executive or administrative personnel, or employees at their residence and shall be so designed that the corporation, labor organization, or separate segregated fund conducting such solicitation cannot determine who makes a contribution of $50 or less as a result of such solicitation and who does not make such a contribution.

**(C)** This paragraph shall not prevent a membership organization, cooperative, or corporation without capital stock, or a separate segregated fund established by a membership organization, cooperative, or corporation without capital stock, from soliciting contributions to such a fund from members of such organization, cooperative, or corporation without capital stock.

**(D)** This paragraph shall not prevent a trade association or a separate segregated fund established by a trade association from soliciting contributions from the stockholders and executive or administrative personnel of the member corporations of such trade association and the families of such stockholders or personnel to the extent that such solicitation of such stockholders and personnel, and their families, has been separately and specifically approved by the member corporation involved, and such member corporation does not approve any such solicitation by more than one such trade association in any calendar year.

**(c)** Rules relating to electioneering communications

  **(1) Applicable electioneering communication**

    For purposes of this section, the term "applicable electioneering communication" means an electioneering

284

communication (within the meaning of section 434(f)(3) of this title) which is made by any entity described in subsection (a) of this section or by any other person using funds donated by an entity described in subsection (a) of this section.

  **(2) Exception**

      Notwithstanding paragraph (1), the term "applicable electioneering communication" does not include a communication by a section 501(c)(4) organization or a political organization (as defined in section 527(e)(1) of Title 26) made under section 434(f)(2)(E) or (F) of this title if the communication is paid for exclusively by funds provided directly by individuals who are United States citizens or nationals or lawfully admitted for permanent residence (as defined in section 1101(a)(20) of Title 8).  For purposes of the preceding sentence, the term "provided directly by individuals" does not include funds the source of which is an entity described in subsection (a) of this section.

* * * * *

## § 441c.  Contributions by government contractors

  **(a) Prohibition**

      It shall be unlawful for any person–

  **(1)**  who enters into any contract with the United States or any department or agency thereof either for the rendition of personal services or furnishing any material, supplies, or equipment to the United States or any department or agency thereof or for selling any land or building to the United States or any department or agency thereof, if payment for the performance of such contract or payment for such material, supplies, equipment, land, or building is to be made in whole or in part from funds appropriated by the Congress, at any time between the commencement of negotiations for and the later of (A) the completion of performance under;  or (B) the termination of negotiations for, such contract or furnishing of material, supplies, equipment, land, or buildings, directly or

285

indirectly to make any contribution of money or other things of value, or to promise expressly or impliedly to make any such contribution to any political party, committee, or candidate for public office or to any person for any political purpose or use; or

   **(2)** knowingly to solicit any such contribution from any such person for any such purpose during any such period.

**(b)  Separate segregated funds**

   This section does not prohibit or make unlawful the establishment or administration of, or the solicitation of contributions to, any separate segregated fund by any corporation, labor organization, membership organization, cooperative, or corporation without capital stock for the purpose of influencing the nomination for election, or election, of any person to Federal office, unless the provisions of section 441b of this title prohibit or make unlawful the establishment or administration of, or the solicitation of contributions to, such fund.  Each specific prohibition, allowance, and duty applicable to a corporation, labor organization, or separate segregated fund under section 441b of this title applies to a corporation, labor organization, or separate segregated fund to which this subsection applies.

**(c)  "Labor organization" defined**

   For purposes of this section, the term "labor organization" has the meaning given it by section 441b(b)(1) of this title.

## § 441d.  Publication and distribution of statements and solicitations;  charge for newspaper or magazine space

**(a)**  Whenever a political committee makes a disbursement for the purpose of financing any communication through any broadcasting station, newspaper, magazine, outdoor advertising facility, mailing, or any other type of general public political advertising, or whenever any person makes a disbursement for the purpose of financing communications expressly advocating the election or defeat of a clearly identified candidate, or solicits any

286

contribution through any broadcasting station, newspaper, magazine, outdoor advertising facility, mailing, or any other type of general public political advertising or makes a disbursement for an electioneering communication (as defined in section 434(f)(3) of this title), such communication–

    **(1)**  if paid for and authorized by a candidate, an authorized political committee of a candidate, or its agents, shall clearly state that the communication has been paid for by such authorized political committee, or [82]

    **(2)**  if paid for by other persons but authorized by a candidate, an authorized political committee of a candidate, or its agents, shall clearly state that the communication is paid for by such other persons and authorized by such authorized political committee;[1]

    **(3)**  if not authorized by a candidate, an authorized political committee of a candidate, or its agents, shall clearly state the name and permanent street address, telephone number, or World Wide Web address of the person who paid for the communication and state that the communication is not authorized by any candidate or candidate's committee.

  **(b)**  No person who sells space in a newspaper or magazine to a candidate or to the agent of a candidate, for use in connection with such candidate's campaign, may charge any amount for such space which exceeds the amount charged for comparable use of such space for other purposes.

  **(c)**  Specification

    Any printed communication described in subsection (a) of this section shall–

    **(1)**  be of sufficient type size to be clearly readable by the recipient of the communication;

---

[82] So in original.  The word "or" probably should appear at the end of par. (2).

287

  **(2)** be contained in a printed box set apart from the other contents of the communication;  and

  **(3)** be printed with a reasonable degree of color contrast between the background and the printed statement.

**(d)** Additional requirements

 **(1)** Communications by candidates or authorized persons

  **(A)  By radio**

   Any communication described in paragraph (1) or (2) of subsection (a) of this section which is transmitted through radio shall include, in addition to the requirements of that paragraph, an audio statement by the candidate that identifies the candidate and states that the candidate has approved the communication.

  **(B)  By television**

   Any communication described in paragraph (1) or (2) of subsection (a) of this section which is transmitted through television shall include, in addition to the requirements of that paragraph, a statement that identifies the candidate and states that the candidate has approved the communication.

Such statement–

  **(i)** shall be conveyed by–

   **(i)** an unobscured, full-screen view of the candidate making the statement, or

   **(II)** the candidate in voice-over, accompanied by a clearly identifiable photographic or similar image of the candidate;  and

  **(ii)** shall also appear in writing at the end of the communication in a clearly readable manner with a reasonable degree of color contrast between the background and the printed statement, for a period of at least 4 seconds.

288

**(2)  Communications by others**

Any communication described in paragraph (3) of subsection (a) of this section which is transmitted through radio or television shall include, in addition to the requirements of that paragraph, in a clearly spoken manner, the following audio statement:  "_____ is responsible for the content of this advertising." (with the blank to be filled in with the name of the political committee or other person paying for the communication and the name of any connected organization of the payor).  If transmitted through television, the statement shall be conveyed by an unobscured, full-screen view of a representative of the political committee or other person making the statement, or by a representative of such political committee or other person in voice-over, and shall also appear in a clearly readable manner with a reasonable degree of color contrast between the background and the printed statement, for a period of at least 4 seconds.

## § 441e.  Contributions and donations by foreign nationals
### (a)  Prohibition

It shall be unlawful for–

**(1)**  a foreign national, directly or indirectly, to make–

**(A)**  a contribution or donation of money or other thing of value, or to make an express or implied promise to make a contribution or donation, in connection with a Federal, State, or local election;

**(B)**  a contribution or donation to a committee of a political party;  or

**(C)**  an expenditure, independent expenditure, or disbursement for an electioneering communication (within the meaning of section 434(f)(3) of this title);  or

**(2)**  a person to solicit, accept, or receive a contribution or donation described in subparagraph (A) or (B) of paragraph (1) from a foreign national.

289

(b)  **"Foreign national" defined**

As used in this section, the term "foreign national" means–

(1)  a foreign principal, as such term is defined by section 611(b) of Title 22, except that the term "foreign national" shall not include any individual who is a citizen of the United States; or

(2)  an individual who is not a citizen of the United States or a national of the United States (as defined in section 1101(a)(22) of Title 8) and who is not lawfully admitted for permanent residence, as defined by section 1101(a)(2) of Title 8.

## § 441f.   Contributions in name of another prohibited

No person shall make a contribution in the name of another person or knowingly permit his name to be used to effect such a contribution, and no person shall knowingly accept a contribution made by one person in the name of another person.

## § 441g.   Limitation on contribution of currency

No person shall make contributions of currency of the United States or currency of any foreign country to or for the benefit of any candidate which, in the aggregate, exceed $100, with respect to any campaign of such candidate for nomination for election, or for election, to Federal office.

## § 441h.   Fraudulent misrepresentation of campaign authority

(a)  In general

No person who is a candidate for Federal office or an employee or agent of such a candidate shall–

(1)  fraudulently misrepresent himself or any committee or organization under his control as speaking or writing or otherwise acting for or on behalf of any other candidate or political party or employee or agent thereof on a matter which is damaging to such other candidate or political party or

290

employee or agent thereof;  or

    **(2)**  willfully and knowingly participate in or conspire to participate in any plan, scheme, or design to violate paragraph (1).

  **(b)**  Fraudulent solicitation of funds

    No person shall–

    **(1)**  fraudulently misrepresent the person as speaking, writing, or otherwise acting for or on behalf of any candidate or political party or employee or agent thereof for the purpose of soliciting contributions or donations;  or

    **(2)**  willfully and knowingly participate in or conspire to participate in any plan, scheme, or design to violate paragraph (1).

## § 441i.  Soft money of political parties

  **(a)  National committees**

    **(1)  In general**

A national committee of a political party (including a national congressional campaign committee of a political party) may not solicit, receive, or direct to another person a contribution, donation, or transfer of funds or any other thing of value, or spend any funds, that are not subject to the limitations, prohibitions, and reporting requirements of this Act.

    **(2)  Applicability**

    The prohibition established by paragraph (1) applies to any such national committee, any officer or agent acting on behalf of such a national committee, and any entity that is directly or indirectly established, financed, maintained, or controlled by such a national committee.

  **(b)  State, district, and local committees**

    **(1)  In general**

    Except as provided in paragraph (2), an amount that is expended or disbursed for Federal election activity by a State,

district, or local committee of a political party (including an entity that is directly or indirectly established, financed, maintained, or controlled by a State, district, or local committee of a political party and an officer or agent acting on behalf of such committee or entity), or by an association or similar group of candidates for State or local office or of individuals holding State or local office, shall be made from funds subject to the limitations, prohibitions, and reporting requirements of this Act.

(2) **Applicability**

(A) **In general**

Notwithstanding clause (i) or (ii) of section 431(20)(A) of this title, and subject to subparagraph (B), paragraph (1) shall not apply to any amount expended or disbursed by a State, district, or local committee of a political party for an activity described in either such clause to the extent the amounts expended or disbursed for such activity are allocated (under regulations prescribed by the Commission) among amounts–

(i) which consist solely of contributions subject to the limitations, prohibitions, and reporting requirements of this Act (other than amounts described in subparagraph (B)(iii));  and

(ii) other amounts which are not subject to the limitations, prohibitions, and reporting requirements of this Act (other than any requirements of this subsection).

(B) **Conditions**

Subparagraph (A) shall only apply if–

(i) the activity does not refer to a clearly identified candidate for Federal office;

(ii) the amounts expended or disbursed are not for the costs of any broadcasting, cable, or satellite communication, other than a communication which

292

refers solely to a clearly identified candidate for State
or local office;

   **(iii)**  the amounts expended or disbursed which are
described in subparagraph (A)(ii) are paid from
amounts which are donated in accordance with State
law and which meet the requirements of subparagraph
(C), except that no person (including any person
established, financed, maintained, or controlled by
such person) may donate more than $10,000 to a State,
district, or local committee of a political party in a
calendar year for such expenditures or disbursements;
and

   **(iv)**  the amounts expended or disbursed are made
solely from funds raised by the State, local, or district
committee which makes such expenditure or
disbursement, and do not include any funds provided
to such committee from–

      **(i)**  any other State, local, or district committee
of any State party,

      **(II)**  the national committee of a political party
(including a national congressional campaign
committee of a political party),

      **(III)**  any officer or agent acting on behalf of
any committee described in subclause (i) or (II), or

      **(IV)**  any entity directly or indirectly
established, financed, maintained, or controlled by
any committee described in subclause (i) or (II).

  **(C)** **Prohibiting involvement of National parties,**
      **Federal candidates and officeholders, and State**
      **parties acting jointly**

    Notwithstanding subsection (e) of this section (other
than subsection (e)(3) of this section), amounts specifically

293

authorized to be spent under subparagraph (B)(iii) meet the requirements of this subparagraph only if the amounts–

(i) are not solicited, received, directed, transferred, or spent by or in the name of any person described in subsection (a) or (e) of this section;  and

(ii) are not solicited, received, or directed through fundraising activities conducted jointly by 2 or more State, local, or district committees of any political party or their agents, or by a State, local, or district committee of a political party on behalf of the State, local, or district committee of a political party or its agent in one or more other States.

**(c) Fundraising costs**

An amount spent by a person described in subsection (a) or (b) of this section to raise funds that are used, in whole or in part, for expenditures and disbursements for a Federal election activity shall be made from funds subject to the limitations, prohibitions, and reporting requirements of this Act.

\* \* \* \* \*

**(e) Federal candidates**

**(1) In general**

A candidate, individual holding Federal office, agent of a candidate or an individual holding Federal office, or an entity directly or indirectly established, financed, maintained or controlled by or acting on behalf of 1 or more candidates or individuals holding Federal office, shall not–

**(A)** solicit, receive, direct, transfer, or spend funds in connection with an election for Federal office, including funds for any Federal election activity, unless the funds are subject to the limitations, prohibitions, and reporting requirements of this Act;  or

**(B)** solicit, receive, direct, transfer, or spend funds in

294

connection with any election other than an election for Federal office or disburse funds in connection with such an election unless the funds–

    **(i)** are not in excess of the amounts permitted with respect to contributions to candidates and political committees under paragraphs (1), (2), and (3) of section 441a(a) of this title;  and

    **(ii)** are not from sources prohibited by this Act from making contributions in connection with an election for Federal office.

### § 455.  Period of limitations

  **(a)**  No person shall be prosecuted, tried, or punished for any violation of subchapter I of this chapter, unless the indictment is found or the information is instituted within 5 years after the date of the violation.

  **(b)**  Notwithstanding any other provision of law–

    **(1)**  the period of limitations referred to in subsection (a) of this section shall apply with respect to violations referred to in such subsection committed before, on, or after the effective date of this section;  and

    **(2)**  no criminal proceeding shall be instituted against any person for any act or omission which was a violation of any provision of subchapter I of this chapter, as in effect on December 31, 1974, if such act or omission does not constitute a violation of any such provision, as amended by the Federal Election Campaign Act Amendments of 1974.

## B. EXCERPTS FROM TITLE 18, UNITED STATES CODE

### § 241.  Conspiracy against rights

If two or more persons conspire to injure, oppress, threaten, or intimidate any person in any State, Territory, Commonwealth, Possession, or District in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same;  or

If two or more persons go in disguise on the highway, or on the premises of another, with intent to prevent or hinder his free exercise or enjoyment of any right or privilege so secured–

They shall be fined under this title or imprisoned not more than ten years, or both;  and if death results from the acts committed in violation of this section or if such acts include kidnapping or an attempt to kidnap, aggravated sexual abuse or an attempt to commit aggravated sexual abuse, or an attempt to kill, they shall be fined under this title or imprisoned for any term of years or for life, or both, or may be sentenced to death.

### § 242.  Deprivation of rights under color of law

Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person in any State, Territory, Commonwealth, Possession, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, or to different punishments, pains, or penalties, on account of such person being an alien, or by reason of his color, or race, than are prescribed for the punishment of citizens, shall be fined under this title or imprisoned not more than one year, or both;  and if bodily injury results from the acts committed in violation of this section or if such acts include the use, attempted use, or threatened use of a dangerous weapon, explosives, or fire, shall be fined under this title or imprisoned not more than ten years, or both;  and if death results from the acts committed in violation of this section or if such acts include

296

kidnapping or an attempt to kidnap, aggravated sexual abuse, or an attempt to commit aggravated sexual abuse, or an attempt to kill, shall be fined under this title, or imprisoned for any term of years or for life, or both, or may be sentenced to death.

## § 245.  Federally protected activities

   **(b)**  Whoever, whether or not acting under color of law, by force or threat of force willfully injures, intimidates or interferes with, or attempts to injure, intimidate or interfere with–

      **(1)**  any person because he is or has been, or in order to intimidate such person or any other person or any class of persons from–

         **(A)**  voting or qualifying to vote, qualifying or campaigning as a candidate for elective office, or qualifying or acting as a poll watcher, or any legally authorized election official, in any primary, special, or general election;

* * * * *

shall be fined under this title, or imprisoned not more than one year, or both;  and if bodily injury results from the acts committed in violation of this section or if such acts include the use, attempted use, or threatened use of a dangerous weapon, explosives, or fire shall be fined under this title, or imprisoned not more than ten years, or both;  and if death results from the acts committed in violation of this section or if such acts include kidnapping or an attempt to kidnap, aggravated sexual abuse or an attempt to commit aggravated sexual abuse, or an attempt to kill, shall be fined under this title or imprisoned for any term of years or for life, or both, or may be sentenced to death.

* * * * *

## § 371.  Conspiracy to commit offense or to defraud United States

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any

297

agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.

If, however, the offense, the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor.

* * * * *

### § 592.   Troops at polls

Whoever, being an officer of the Army or Navy, or other person in the civil, military, or naval service of the United States, orders, brings, keeps, or has under his authority or control any troops or armed men at any place where a general or special election is held, unless such force be necessary to repel armed enemies of the United States, shall be fined under this title or imprisoned not more than five years, or both;  and be disqualified from holding any office of honor, profit, or trust under the United States.

This section shall not prevent any officer or member of the armed forces of the United States from exercising the right of suffrage in any election district to which he may belong, if otherwise qualified according to the laws of the State in which he offers to vote.

* * * * *

### § 593.   Interference by armed forces

Whoever, being an officer or member of the Armed Forces of the United States, prescribes or fixes or attempts to prescribe or fix, whether by proclamation, order or otherwise, the qualifications of voters at any election in any State;  or

Whoever, being such officer or member, prevents or attempts to prevent by force, threat, intimidation, advice or otherwise any

298

qualified voter of any State from fully exercising the right of suffrage at any general or special election; or

Whoever, being such officer or member, orders or compels or attempts to compel any election officer in any State to receive a vote from a person not legally qualified to vote; or

Whoever, being such officer or member, imposes or attempts to impose any regulations for conducting any general or special election in a State, different from those prescribed by law; or

Whoever, being such officer or member, interferes in any manner with an election officer's discharge of his duties–

Shall be fined under this title or imprisoned not more than five years, or both; and disqualified from holding any office of honor, profit or trust under the United States.

This section shall not prevent any officer or member of the Armed Forces from exercising the right of suffrage in any district to which he may belong, if otherwise qualified according to the laws of the State of such district.

## § 594.  Intimidation of voters

Whoever intimidates, threatens, coerces, or attempts to intimidate, threaten, or coerce, any other person for the purpose of interfering with the right of such other person to vote or to vote as he may choose, or of causing such other person to vote for, or not to vote for, any candidate for the office of President, Vice President, Presidential elector, Member of the Senate, Member of the House of Representatives, Delegate from the District of Columbia, or Resident Commissioner, at any election held solely or in part for the purpose of electing such candidate, shall be fined under this title or imprisoned not more than one year, or both.

## § 595.  Interference by administrative employees of Federal, State, or Territorial Governments

Whoever, being a person employed in any administrative position by the United States, or by any department or agency thereof, or by

299

the District of Columbia or any agency or instrumentality thereof, or by any State, Territory, or Possession of the United States, or any political subdivision, municipality, or agency thereof, or agency of such political subdivision or municipality (including any corporation owned or controlled by any State, Territory, or Possession of the United States or by any such political subdivision, municipality, or agency), in connection with any activity which is financed in whole or in part by loans or grants made by the United States, or any department or agency thereof, uses his official authority for the purpose of interfering with, or affecting, the nomination or the election of any candidate for the office of President, Vice President, Presidential elector, Member of the Senate, Member of the House of Representatives, Delegate from the District of Columbia, or Resident Commissioner, shall be fined under this title or imprisoned not more than one year, or both.

This section shall not prohibit or make unlawful any act by any officer or employee of any educational or research institution, establishment, agency, or system which is supported in whole or in part by any state or political subdivision thereof, or by the District of Columbia or by any Territory or Possession of the United States;  or by any recognized religious, philanthropic or cultural organization.

### § 596.  Polling armed forces

Whoever, within or without the Armed Forces of the United States, polls any member of such forces, either within or without the United States, either before or after he executes any ballot under any Federal or State law, with reference to his choice of or his vote for any candidate, or states, publishes, or releases any result of any purported poll taken from or among the members of the Armed Forces of the United States or including within it the statement of choice for such candidate or of such votes cast by any member of the Armed Forces of the United States, shall be fined under this title or imprisoned for not more than one year, or both.

300

The word "poll" means any request for information, verbal or written, which by its language or form of expression requires or implies the necessity of an answer, where the request is made with the intent of compiling the result of the answers obtained, either for the personal use of the person making the request, or for the purpose of reporting the same to any other person, persons, political party, unincorporated association or corporation, or for the purpose of publishing the same orally, by radio, or in written or printed form.

### § 597.  Expenditures to influence voting

Whoever makes or offers to make an expenditure to any person, either to vote or withhold his vote, or to vote for or against any candidate;  and

Whoever solicits, accepts, or receives any such expenditure in consideration of his vote or the withholding of his vote–

Shall be fined under this title or imprisoned not more than one year, or both;  and if the violation was willful, shall be fined under this title or imprisoned not more than two years, or both.

### § 598.  Coercion by means of relief appropriations

Whoever uses any part of any appropriation made by Congress for work relief, relief, or for increasing employment by providing loans and grants for public-works projects, or exercises or administers any authority conferred by any Appropriation Act for the purpose of interfering with, restraining, or coercing any individual in the exercise of his right to vote at any election, shall be fined under this title or imprisoned not more than one year, or both.

### § 599.  Promise of appointment by candidate

Whoever, being a candidate, directly or indirectly promises or pledges the appointment, or the use of his influence or support for the appointment of any person to any public or private position or employment, for the purpose of procuring support in his candidacy shall be fined under this title or imprisoned not more than one year,

301

or both;  and if the violation was willful, shall be fined under this title or imprisoned not more than two years, or both.

## § 600.  Promise of employment or other benefit for political activity

Whoever, directly or indirectly, promises any employment, position, compensation, contract, appointment, or other benefit, provided for or made possible in whole or in part by any Act of Congress, or any special consideration in obtaining any such benefit, to any person as consideration, favor, or reward for any political activity or for the support of or opposition to any candidate or any political party in connection with any general or special election to any political office, or in connection with any primary election or political convention or caucus held to select candidates for any political office, shall be fined under this title or imprisoned not more than one year, or both.

## § 601.  Deprivation of employment or other benefit for political contribution

(a)  Whoever, directly or indirectly, knowingly causes or attempts to cause any person to make a contribution of a thing of value (including services) for the benefit of any candidate or any political party, by means of the denial or deprivation, or the threat of the denial or deprivation, of–

    (1)  any employment, position, or work in or for any agency or other entity of the Government of the United States, a State, or a political subdivision of a State, or any compensation or benefit of such employment, position, or work;  or

    (2)  any payment or benefit of a program of the United States, a State, or a political subdivision of a State; if such employment, position, work, compensation, payment, or benefit is provided for or made possible in whole or in part by an Act of Congress, shall be fined under this title, or imprisoned not more than one year, or both.

302

**(b)** As used in this section–

**(1)** the term "candidate" means an individual who seeks nomination for election, or election, to Federal, State, or local office, whether or not such individual is elected, and, for purposes of this paragraph, an individual shall be deemed to seek nomination for election, or election, to Federal, State, or local office, if he has (A) taken the action necessary under the law of a State to qualify himself for nomination for election, or election, or (B) received contributions or made expenditures, or has given his consent for any other person to receive contributions or make expenditures, with a view to bringing about his nomination for election, or election, to such office;

**(2)** the term "election" means (A) a general, special primary, or runoff election, (B) a convention or caucus of a political party held to nominate a candidate, (C) a primary election held for the selection of delegates to a nominating convention of a political party, (D) a primary election held for the expression of a preference for the nomination of persons for election to the office of President, and (E) the election of delegates to a constitutional convention for proposing amendments to the Constitution of the United States or of any State; and

**(3)** the term "State" means a State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, or any territory or possession of the United States.

## § 602.  Solicitation of political contributions

**(a)** It shall be unlawful for--

**(1)** a candidate for the Congress;

**(2)** an individual elected to or serving in the office of Senator or Representative in, or Delegate or Resident Commissioner to, the Congress;

**(3)** an officer or employee of the United States or any

303

department or agency thereof;  or

    (4)  a person receiving any salary or compensation for services from money derived from the Treasury of the United States;  to knowingly solicit any contribution within the meaning of section 301(8) of the Federal Election Campaign Act of 1971 [2 U.S.C.A. § 431(8)] from any other such officer, employee, or person.  Any person who violates this section shall be fined under this title or imprisoned not more than 3 years, or both.

**(b)**  The prohibition in subsection (a) shall not apply to any activity of an employee (as defined in section 7322(1) of title 5) or any individual employed in or under the United States Postal Service or the Postal Rate Commission, unless that activity is prohibited by section 7323 or 7324 of such title.

### § 603.  Making political contributions

**(a)**  It shall be unlawful for an officer or employee of the United States or any department or agency thereof, or a person receiving any salary or compensation for services from money derived from the Treasury of the United States, to make any contribution within the meaning of section 301(8) of the Federal Election Campaign Act of 1971 to any other such officer, employee or person or to any Senator or Representative in, or Delegate or Resident Commissioner to, the Congress, if the person receiving such contribution is the employer or employing authority of the person making the contribution.  Any person who violates this section shall be fined under this title or imprisoned not more than three years, or both.

**(b)**  For purposes of this section, a contribution to an authorized committee as defined in section 302(e) (1) of the Federal Election Campaign Act of 1971 shall be considered a contribution to the individual who has authorized such committee.

**(c)**  The prohibition in subsection (a) shall not apply to any activity of an employee (as defined in section 7322(1) of title 5) or any individual employed in or under the United States Postal

304

Service or the Postal Rate Commission, unless that activity is prohibited by section 7323 or 7324 of such title.

### § 604.   Solicitation from persons on relief

Whoever solicits or receives or is in any manner concerned in soliciting or receiving any assessment, subscription, or contribution for any political purpose from any person known by him to be entitled to, or receiving compensation, employment, or other benefit provided for or made possible by any Act of Congress appropriating funds for work relief or relief purposes, shall be fined under this title or imprisoned not more than one year, or both.

### § 605.   Disclosure of names of persons on relief

Whoever, for political purposes, furnishes or discloses any list or names of persons receiving compensation, employment or benefits provided for or made possible by any Act of Congress appropriating, or authorizing the appropriation of funds for work relief or relief purposes, to a political candidate, committee, campaign manager, or to any person for delivery to a political candidate, committee, or campaign manager;  and

Whoever receives any such list or names for political purposes–

Shall be fined under this title or imprisoned not more than one year, or both.

### § 606.   Intimidation to secure political contributions

Whoever, being one of the officers or employees of the United States mentioned in section 602 of this title, discharges, or promotes, or degrades, or in any manner changes the official rank or compensation of any other officer or employee, or promises or threatens so to do, for giving or withholding or neglecting to make any contribution of money or other valuable thing for any political purpose, shall be fined under this title or imprisoned not more than three years, or both.

305

## § 607.  Place of solicitation

### (a)  Prohibition.–

**(1)  In general.**–It shall be unlawful for any person to solicit or receive a donation of money or other thing of value in connection with a Federal, State, or local election from a person who is located in a room or building occupied in the discharge of official duties by an officer or employee of the United States.  It shall be unlawful for an individual who is an officer or employee of the Federal Government, including the President, Vice President, and Members of Congress, to solicit or receive a donation of money or other thing of value in connection with a Federal, State, or local election, while in any room or building occupied in the discharge of official duties by an officer or employee of the United States, from any person.

**(2)  Penalty.**–A person who violates this section shall be fined not more than  $5,000, imprisoned not more than 3 years, or both.

**(b)**  The prohibition in subsection (a) shall not apply to the receipt of contributions by persons on the staff of a Senator or Representative in, or Delegate or Resident Commissioner to, the Congress or Executive Office of the President, provided, that such contributions have not been solicited in any manner which directs the contributor to mail or deliver a contribution to any room, building, or other facility referred to in subsection (a), and provided that such contributions are transferred within seven days of receipt to a political committee within the meaning of section 302(e) of the Federal Election Campaign Act of 1971.

## § 608.  Absent uniformed services voters and overseas voters

**(a)**  Whoever knowingly deprives or attempts to deprive any person of a right under the Uniformed and Overseas Citizens Absentee Voting Act shall be fined in accordance with this title or imprisoned not more than five years, or both.

306

(b)  Whoever knowingly gives false information for the purpose of establishing the eligibility of any person to register or vote under the Uniformed and Overseas Citizens Absentee Voting Act, or pays or offers to pay, or accepts payment for registering or voting under such Act shall be fined in accordance with this title or imprisoned not more than five years, or both.

### § 609.  Use of military authority to influence vote of member of Armed Forces

Whoever, being a commissioned, noncommissioned, warrant, or petty officer of an Armed Force, uses military authority to influence the vote of a member of the Armed Forces or to require a member of the Armed Forces to march to a polling place, or attempts to do so, shall be fined in accordance with this title or imprisoned not more than five years, or both.  Nothing in this section shall prohibit free discussion of political issues or candidates for public office.

### § 610.  Coercion of political activity

It shall be unlawful for any person to intimidate, threaten, command, or coerce, or attempt to intimidate, threaten, command, or coerce, any employee of the Federal Government as defined in section 7322(1) of title 5, United States Code, to engage in, or not to engage in, any political activity, including, but not limited to, voting or refusing to vote for any candidate or measure in any election, making or refusing to make any political contribution, or working or refusing to work on behalf of any candidate.  Any person who violates this section shall be fined under this title or imprisoned not more than three years, or both.

### § 611.  Voting by aliens

(a)  It shall be unlawful for any alien to vote in any election held solely or in part for the purpose of electing a candidate for the office of President, Vice President, Presidential elector, Member of the

307

Senate, Member of the House of Representatives, Delegate from the District of Columbia, or Resident Commissioner, unless–

    **(1)** the election is held partly for some other purpose;

    **(2)** aliens are authorized to vote for such other purpose under a State constitution or statute or a local ordinance;  and

    **(3)** voting for such other purpose is conducted independently of voting for a candidate for such Federal offices, in such a manner that an alien has the opportunity to vote for such other purpose, but not an opportunity to vote for a candidate for any one or more of such Federal offices.

  **(b)** Any person who violates this section shall be fined under this title, imprisoned not more than one year, or both.

  **(c)** Subsection (a) does not apply to an alien if–

    **(1)** each natural parent of the alien (or, in the case of an adopted alien, each adoptive parent of the alien) is or was a citizen (whether by birth or naturalization);

    **(2)** the alien permanently resided in the United States prior to attaining the age of 16;  and

    **(3)** the alien reasonably believed at the time of voting in violation of such subsection that he or she was a citizen of the United States.


## § 911.  Citizen of the United States

  Whoever falsely and willfully represents himself to be a citizen of the United States shall be fined under this title or imprisoned not more than three years, or both.


## § 1001.  Statements or entries generally

  **(a)** Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully–

    **(1)** falsifies, conceals, or covers up by any trick, scheme, or

308

device a material fact;

    **(2)** makes any materially false, fictitious, or fraudulent statement or representation;  or

    **(3)** makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry; shall be fined under this title, imprisoned not more than 5 years or, if the offense involves international or domestic terrorism (as defined in section 2331), imprisoned not more than 8 years, or both.

  **(b)** Subsection (a) does not apply to a party to a judicial proceeding, or that party's counsel, for statements, representations, writings or documents submitted by such party or counsel to a judge or magistrate in that proceeding.

  **(c)** With respect to any matter within the jurisdiction of the legislative branch, subsection (a) shall apply only to–

    **(1)** administrative matters, including a claim for payment, a matter related to the procurement of property or services, personnel or employment practices, or support services, or a document required by law, rule, or regulation to be submitted to the Congress or any office or officer within the legislative branch;  or

    **(2)** any investigation or review, conducted pursuant to the authority of any committee,  subcommittee, commission or office of the Congress, consistent with applicable rules of the House or Senate.

## § 1015.  Naturalization, citizenship or alien registry
* * * * *

  **(f)** Whoever knowingly makes any false statement or claim that he is a citizen of the United States in order to register to vote or to vote in any Federal, State, or local election (including an initiative, recall, or referendum)–

    Shall be fined under this title or imprisoned not more than five years, or both.  Subsection (f) does not apply to an alien if

309

each natural parent of the alien (or, in the case of an adopted alien, each adoptive parent of the alien) is or was a citizen (whether by birth or naturalization), the alien permanently resided in the United States prior to attaining the age of 16, and the alien reasonably believed at the time of making the false statement or claim that he or she was a citizen of the United States.

## § 1341.  Frauds and swindles

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both.  If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

## § 1343.  Fraud by wire, radio, or television

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits

310

or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.  If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

### § 1346.  Definition of "scheme or artifice to defraud"

For the purposes of this chapter, the term "scheme or artifice to defraud" includes a scheme or artifice to deprive another of the intangible right of honest services.

### § 1952.  Interstate and foreign travel or transportation in aid of racketeering enterprises

(a)  Whoever travels in interstate or foreign commerce or uses the mail or any facility in interstate or foreign commerce, with intent to–

(1)  distribute the proceeds of any unlawful activity;  or

(2)  commit any crime of violence to further any unlawful activity;  or

(3)  otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity, and thereafter performs or attempts to perform–

(A)  an act described in paragraph (1) or (3) shall be fined under this title, imprisoned not more than 5 years, or both;  or

(B)  an act described in paragraph (2) shall be fined under this title, imprisoned for not more than 20 years, or both, and if death results shall be imprisoned for any term of years or for life.

(b)  As used in this section (i) "unlawful activity" means (1) any business enterprise involving gambling, liquor on which the Federal

311

excise tax has not been paid, narcotics or controlled substances (as defined in section 102(6) of the Controlled Substances Act), or prostitution offenses in violation of the laws of the State in which they are committed or of the United States, (2) extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States, or (3) any act which is indictable under sub-chapter II of chapter 53 of title 31, United States Code, or under section 1956 or 1957 of this title and (ii) the term "State" includes a State of the United States, the District of Columbia, and any commonwealth, territory, or possession of the United States.

(c)  Investigations of violations under this section involving liquor shall be conducted under the supervision of the Attorney General.

## 3.  EXCERPTS  FROM  TITLE  26, UNITED  STATES  CODE

### § 9012.   Criminal penalties
* * * * *

(c)  Unlawful use of payments.–

(1)  It shall be unlawful for any person who receives any payment under section 9006, or to whom any portion of any payment received under such section is transferred, knowingly and willfully to use, or authorize the use of, such payment or such portion for any purpose other than–

(A)  to defray the qualified campaign expenses with respect to which such payment  was made, or

(B)  to repay loans the proceeds of which were used, or otherwise to restore funds (other than contributions to defray qualified campaign expenses which were received and expended) which were used, to defray such qualified campaign expenses.

(2)  It shall be unlawful for the national committee of a major party or minor party which receives any payment under section 9008(b)(3) to use, or authorize the use of, such payment for any

312

purpose other than a purpose authorized by section 9008(c).

(3)  Any person who violates paragraph (1) shall be fined not more than $10,000, or imprisoned not more than five years, or both.

**(d) False statements, etc.–**

(1)  It shall be unlawful for any person knowingly and willfully–

(A)  to furnish any false, fictitious, or fraudulent evidence, books, or information to the Commission under this subtitle, or to include in any evidence, books, or information so furnished any misrepresentation of a material fact, or to falsify or conceal any evidence, books, or information relevant to a certification by the Commission or an examination and audit by the Commission under this chapter;  or

(B)  to fail to furnish to the Commission any records, books, or information requested by it for purposes of this chapter.

(2)  Any person who violates paragraph (1) shall be fined not more than $10,000, or imprisoned not more than five years, or both.

## § 9042.   Criminal penalties

* * * * *

**(b) Unlawful use of payments.–**

(1)  It is unlawful for any person who receives any payment under section 9037, or to whom any portion of any such payment is transferred, knowingly and willfully to use, or authorize the use of, such payment or such portion for any purpose other than--

(A)  to defray qualified campaign expenses, or

(B)  to repay loans the proceeds of which were used, or otherwise to restore funds (other than contributions to

313

defray qualified campaign expenses which were received and expended) which were used, to defray qualified campaign expenses.

**(2)** Any person who violates the provisions of paragraph (1) shall be fined not more than $10,000, or imprisoned not more than 5 years, or both.

\* \* \* \* \*

**(b) Unlawful use of payments.–**

It is unlawful for any person who receives any payment under section 9037, or to whom any portion of any such payment is transferred, knowingly and willfully to use, or authorize the use of, such payment or such portion for any purpose other than–

**(A)** to defray qualified campaign expenses, or

**(B)** to repay loans the proceeds of which were used, or otherwise to restore funds (other than contributions to defrayqualified campaign expenses which were received and expended) which were used, to defray qualified campaign expenses.

**(c) False statements, etc.–**

**(1)** It is unlawful for any person knowingly and willfully–

**(A)** to furnish any false, fictitious, or fraudulent evidence, books, or information to the Commission under this chapter, or to include in any evidence, books, or information so furnished any misrepresentation of a material fact, or to falsify or conceal any evidence, books, or information relevant to a certification by the Commission or an examination and audit by the Commission under this chapter, or

**(B)** to fail to furnish to the Commission any records, books, or information requested by it for purposes of this chapter.

314

(2) Any person who violates the provisions of paragraph (1) shall be fined not more than $10,000, or imprisoned not more than 5 years, or both.

* * * * *

## 4.  EXCERPTS  FROM  TITLE 42, UNITED  STATES  CODE

### § 1973i.  Prohibited acts

* * * * *

#### (c)  False information in registering or voting; penalties

Whoever knowingly or willfully gives false information as to his name, address or period of residence in the voting district for the purpose of establishing his eligibility to register or vote, or conspires with another individual for the purpose of encouraging his false registration to vote or illegal voting, or pays or offers to pay or accepts payment either for registration to vote or for voting shall be fined not more than $10,000 or imprisoned not more than five years, or both: *Provided, however*, That this provision shall be applicable only to general, special, or primary elections held solely or in part for the purpose of selecting or electing any candidate for the office of President, Vice President, presidential elector, Member of the United States Senate, Member of the United States House of Representatives, Delegate from the District of Columbia, Guam, or the Virgin Islands, or Resident Commissioner of the Commonwealth of Puerto Rico.

* * * * *

#### (e)  Voting more than once

(1)  Whoever votes more than once in an election referred to in paragraph (2) shall be fined not more than $10,000 or imprisoned not more than five years, or both.

(2)  The prohibition of this subsection applies with respect to any general, special, or primary election held solely or in part for the purpose of selecting or electing any candidate for the office of President, Vice President, presidential elector,

315

Member of the United States Senate, Member of the United
States House of Representatives, Delegate from the District of
Columbia, Guam, or the Virgin Islands, or Resident
Commissioner of the Commonwealth of Puerto Rico.

(3)  As used in this subsection, the term "votes more than
once" does not include the casting of an additional ballot if all
prior ballots of that voter were invalidated, nor does it include
the voting in two jurisdictions under section 1973aa-1 of this
title, to the extent two ballots are not cast for an election to the
same candidacy or office.

## § 1973gg-10.   Criminal penalties

A person, including an election official, who in any election for
Federal office–

(1)  knowingly and willfully intimidates, threatens, or coerces, or
attempts to intimidate, threaten, or coerce, any person for–

(A)  registering to vote, or voting, or attempting to register or
vote;

(B)  urging or aiding any person to register to vote, to vote, or
to attempt to register or vote;  or

(C)  exercising any right under this subchapter;  or

(2)  knowingly and willfully deprives, defrauds, or attempts to
deprive or defraud the residents of a State of a fair and impartially
conducted election process, by–

(A)  the procurement or submission of voter registration
applications that are known by the person to be materially false,
fictitious, or fraudulent under the laws of the State in which the
election is held;  or

(B)  the procurement, casting, or tabulation of ballots that are
known by the person to be materially false, fictitious, or
fraudulent under the laws of the State in which the election is
held, shall be fined in accordance with Title 18 (which fines
shall be paid into the general fund of the Treasury,

316

miscellaneous receipts (pursuant to section 3302 of Title 31), notwithstanding any other law), or imprisoned not more than 5 years, or both.

317

318

# APPENDIX D

# TABLE OF CASES

*AFL-CIO v. Federal Election Commission*, 628 F.2d 97
(D.C. Cir. 1980). . . . . . . . . . . . . . . . . . . . . . . . . 135, 151, 179, 188

*Anderson v. United States*, 417 U.S. 211 (1974). . . . . . . . . . . . . . 1, 2, 39

*Athens Lumber Co. v. Federal Election Commission*,
718 F.2d 363 (11th Cir. 1983). . . . . . . . . . . . . . . . . . . . . . . 160, 161

*Austin v. Michigan Chamber of Commerce*,
494 U.S. 652 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . . 142, 160, 161

*Badders v. United States*, 240 U.S. 391 (1916). . . . . . . . . . . . . . . . . . 73

*Biller v. Merit Systems Protection Board*,
863 F.2d 1079 (2d Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . 123

*Blaylock v. Merit Systems Protection Board*,
851 F.2d 1348 (11th Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . 123

*Blitz v. United States*, 153 U.S. 308 (1894). . . . . . . . . . . . . . . . . . . . 39

*Blockburger v. United States*, 284 U.S. 299 (1932). . . . . . . . . . . . . . . 47

*Branti v. Finkel*, 445 U.S. 507 (1980). . . . . . . . . . . . . . . . . . . . . 108, 117

*Brehm v. United States*, 196 F.2d 769
(D.C. Cir. 1952). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

*Buckley v. Valeo*, 424 U.S. 1 (1976). . . . . . . . . . 138, 142, 144, 155, 158,
189, 244, 246, 247, 248, 249, 250, 252

*Buckley v. Valeo*, 519 F.2d 821 (D.C. Cir. 1975). . . . . . . . . . . . 243, 244

*Burroughs v. United States*, 290 U.S. 534 (1934). . . . . . . . . . . . 134, 242

*Civil Service Commission v. Letter Carriers*,
413 U.S. 548 (1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121

*Connick v. Myers*, 461 U.S. 138 (1983). . . . . . . . . . . . . . . . . . . . . . 117

*Cort v. Ash*, 422 U.S. 66 (1975). . . . . . . . . . . . . . . . . . . . . . . . . . . 159

*Crolich v. United States*, 196 F.2d 879
(5th Cir. 1952). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Dennis v. United States*, 384 U.S. 855 (1966). . . . . . . . . . . . . . . . . . 187

*Duncan v. Poythress*, 657 F.2d 691
(5th Cir. 1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Elrod v. Burns*, 427 U.S. 347 (1976). . . . . . . . . . . . . . . . . 108, 109, 117

*Evans v. United States*, 504 U.S. 255 (1992). . . . . . . . . . . . . . . . . . 133

*Ex parte Curtis*, 106 U.S. 371 (1882). . . . . . . . . . . . . . . . . . . . . . 109, 110

*Ex parte Siebold*, 100 U.S. 371 (1880). . . . . . . . . . . . . . . . . . . . . 21, 39

*Ex parte Yarborough*, 110 U.S. 651 (1884).. . . . . . . . . . . . . . . . . . . 21, 37

*Federal Election Commission v. Democratic*
   *Senatorial Campaign Committee,*
   454 U.S. 27 (1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 198

*Federal Election Commission v. Massachusetts*
   *Citizens for Life, Inc.*, 479 U.S. 238 (1986). . . . . . . . . . . . . . 138, 161

*Federal Election Commission v. National Right*
   *To Work Committee*, 459 U.S. 197 (1982). . . . . . . . . . . . . . . . . . 244

*Fields v. United States*, 228 F.2d 544
   (4th Cir. 1955). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*First National Bank of Boston v. Bellotti,*
   435 U.S. 765 (1978). . . . . . . . . . . . . . . . . . . . . . . . . . . 142, 159, 161

*Fotie v. United States*, 137 F.2d 831
   (8th Cir. 1943). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

*Guinn v. United States*, 238 U.S. 347 (1915). . . . . . . . . . . . . . . . . . . 22

*Haas v. Henkel*, 216 U.S. 462 (1910). . . . . . . . . . . . . . . . . . . . . . . . 187

*Hammerschmidt v. United States,*
   265 U.S. 182 (1924). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 187

*In re Coy*, 127 U.S. 731 (1888). . . . . . . . . . . . . . . . . . . . . 21, 39, 44, 61

*Ingber v. Enzor*, 664 F. Supp. 814 (S.D.N.Y. 1987). . . . . . . . . . 29, 74, 77

*International Association of Machinists v. Federal*
   *Election Commission,* 678 F.2d 1092
   (D.C. Cir. 1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 161

*Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962).. . . . . . . . . . . . . . . . . 82

*Langer v. United States*, 76 F.2d 817
   (8th Cir. 1935). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

*McConnell v. Federal Election Commission,*
   540 U.S. 93 (2003). . . . . . . . . . . . . . 145, 146, 158, 172, 173, 199, 243

*McCormick v. United States*, 500 U.S. 257 (1991). . . . . . . . . . . . . . . 133

*McNally v. United States*, 483 U.S. 350
   (1987). . . . . . . . . . 6, 7, 23, 29, 35, 72, 73, 74, 75, 76, 77, 79, 191, 192

*National Right to Work Committee v.*
   *Federal Election Commission,*
   716 F.2d 1401 (D.C. Cir. 1983). . . . . . . . 135, 151, 179, 188, 245, 246

*Newberry v. United States*, 256 U.S. 232 (1918).. . . . . . . . . . . . . . . . . 22

320

*Nixon v. Shrink Missouri PAC*, 528 U.S. 377 (2000). . . . . . . . . . . . .  158

*Oregon v. Mitchell*, 400 U.S. 112 (1970). . . . . . . . . . . . . . . . . . . . . . .  39

*Perrin v. United States*, 444 U.S. 37 (1979). . . . . . . . . . . . . . . . . . . . .  70

*Pipefitters Local 562 v. United States*,
    407 U.S. 385 (1972). . . . . . . . . . . . . . . . . . . . . . . . . . . .  142, 160, 246

*Ratzlaf v. United States*, 510 U.S. 135 (1994). . . . . . . . . . . . . . . . . . . .  135

*Reynolds v. Sims*, 377 U.S. 533 (1964). . . . . . . . . . . . . . . . . . . . . . .  22, 39

*Rutan v. Republican Party of Illinois*, 497 U.S. 62 (1990). . . . . .  108, 117

*Ryan v. United States*, 99 F.2d 864 (8th Cir. 1938). . . . . . . . . . . . . . . .  38

*United Public Workers v. Mitchell*,
    330 U.S. 75 (1947). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  121

*United States v. Anderson*, 481 F.2d 685
    (4th Cir. 1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22, 40

*United States v. Automobile Workers*,
    352 U.S. 567 (1957). . . . . . . . . . . . . . . . . . . . .  142, 160, 243, 244, 245

*United States v. Bagnariol*, 665 F.2d 877
    (9th Cir. 1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  71

*United States v. Barbieri*, 614 F.2d 715
    (10th Cir. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  71

*United States v. Barker*, 514 F.2d 1077
    (7th Cir. 1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24, 44

*United States v. Barry*, 888 F.2d 1092
(6th Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  71

*United States v. Bathgate*, 246 U.S. 220 (1918). . . . . . . . . . . . . . .  22, 39

*United States v. Blanton*, 77 F. Supp. 812
    (E.D. Mo. 1948). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  47

*United States v. Bloom*, 149 F.3d 649
    (7th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  78

*United States v. Boards*, Cr. No. LR-92-183
    (E.D. Ark., Sept. 12, 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  211

*United States v. Boards*, 10 F3d 587 (8th Cir. 1993). . . . . . .  33, 44, 45, 53

*United States v. Booker*, 543 U.S. 220 (2005). . . . . . . . . . . . . . . . . . .  216

*United States v. Bowman*, 636 F.2d 1003
    (5th Cir. 1981). . . . . . . . . . . . . . . . . . . . . . . .  21, 24, 42, 43, 44, 47

*United  States v. Boyle*, 482 F.2d 755
    (D.C. Cir. 1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  161

321

*United States v. Bracewell*, Cr. No. 91-57-N
(M.D. Ala., May 9, 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 197
*United States v. Bradberry*, 517 F.2d 498
(7th Cir. 1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
*United States v. Brumley*, 116 F.3d 728
(5th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78, 192
*United States v. Bryan*, 58 F.3d 933
(4th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 192
*United States v. Buckley*, 689 F.2d 893
(9th Cir. 1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73, 192
*United States v. Burleson*, 127 F. Supp. 400
(E.D. Tenn. 1954). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110
*United States v. Campbell*, 845 F.2d 782
(8th Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
*United States v. Canales*, 744 F.2d 413
(5th Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
*United States v. Carmichael*, 685 F.2d 903
(4th Cir. 1982). . . . . . . . . . . . . . . . . . . . . . . . 21, 42, 43, 44, 49
*United States v. Chestnut*, 533 F.2d 40
(2d Cir. 1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 200
*United States v. Cianciulli*, 482 F. Supp. 585
(E.D. Pa. 1979). . . . . . . . . . . . . . . . . . . 24, 27, 42, 43, 44, 49, 84
*United States v. Cicco*, 10 F.3d 980
(3d Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118
*United States v. Cicco*, 938 F.2d 441
(3d Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118
*United States v. C.I.O.*, 335 U.S. 106 (1948). . . . . . . . . . . . . . . 142, 160
*United States v. Clapps*, 732 F.2d 1148
(3d Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 73, 191
*United States v. Classic*, 313 U.S. 299 (1941). . . . . . . . . . . 22, 37, 38, 41
*United States v. Cole*, 41 F.3d 303
(7th Cir. 1994). . . . . . . . . . . 33, 42, 43, 48, 51, 52, 53, 210, 212, 214
*United States v. Cooper*, 677 F. Supp. 778
(D. Del. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75
*United States v. Curran*, 20 F.3d 560
(3rd Cir. 1994). . . . . . . . . . . . . . . . . . . 135, 145, 186, 188, 190, 200

322

*United States v. Curry*, 681 F.2d 406
  (5th Cir. 1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73, 192
*United States v. Czubinski*, 106 F.3d 1069
  (1st Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 192
*United States v. D'Alessio*, 822 F. Supp. 1134
  (D.N.J. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78
*United States v. Daugherty*, 952 F.2d 969
  (8th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
*United States v. Davis*, 780 F.2d 838
  (10th Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72
*United States v. DeFries*, 43 F.3d 707
  (D.C. Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78
*United States v. Doherty*, 867 F.2d 47
  (1st Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75
*United States v. Ferrara*, 701 F. Supp. 39
  (E.D.N.Y. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75
*United States v. Finance Committee to Re-Elect the*
  *President*, 507 F.2d 1194 (D.C. Cir. 1974). . . . . . . 144, 145, 179, 197
*United States v. Franklin*, 188 F.2d 182
  (7th Cir. 1951). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68
*United States v. Gabriel*,
  125 F.3d 89 (2d Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 186
*United States v. Garcia*, 719 F.2d 99
  (5th Cir. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 43, 47, 48
*United States v. George*, No. CR86-00123, 1987
  WL 48848 (W.D. Ky. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . 77
*United States v. Girdner*, 754 F.2d 877
  (10th Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73
*United States v. Gradwell*, 243 U.S. 476 (1917). . . . . . . . . . . . . . . . . . 22
*United States v. Granberry*, 908 F.2d 278
  (8th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75
*United States v. Grubb*, 11 F.3d 426 (4th Cir. 1993). . . . . . . . . . 78, 192
*United States v. Hankin*, 607 F.2d 611 (3d Cir. 1979). . . . . . . . . 168, 200
*United States v. Hansen*, 772 F.2d 940 (D.C. Cir. 1985). . . . . . . . . . 185
*United States v. Haynes*, 977 F.2d 583
  (6th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 40, 61, 211, 212
*United States v. Hogue*, 812 F.2d 1568 (11th Cir. 1987). . . . . . . . . . . . 51

323

*United States v. Hopkins*, 916 F.2d 207
    (5th Cir. 1990) . . . . . . . . . . . . . . . . 145, 168, 186, 187, 188, 190, 204
*United States v. Howard*, 774 F.2d 838
    (7th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23, 24, 40
*United States v. Hsia*, 176 F.3d 517
    (D.C. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . 145, 168, 186, 204
*United States v. Ingber*, Cr. No. 86-1402
    (2d Cir. Feb. 4, 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 74
*United States v. International Union of Operating*
    *Engineers*, 638 F.2d 1161 (9th Cir. 1979) . . . . . . . . . . . . . . . . . 177
*United States v. Jabara*, 644 F.2d 574 (6th Cir. 1981) . . . . . . . . . . . . 71
*United States v. Jackson*, 433 F. Supp. 239
    (W.D. N.Y. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 177
*United States v. Johns*, 742 F. Supp. 196 (E.D. Pa. 1990) . . . . . . . . . 75
*United States v. Johns*, 972 F.2d 1333 (3d Cir. 1991) . . . . . . . . . . . . . 75
*United States v. Kanchanalak*, 192 F.3d 1037
    (D.C. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . 150, 164, 186
*United States v. Karigiannis*, 430 F.2d 148
    (7th Cir. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70
*United States v. Karlsen*, Cr. No. 89-353
    (D. Az., indictment filed Oct. 18, 1989) . . . . . . . . . . . . . . . . . . 197
*United States v. Kelley*, 395 F.2d 727 (2d Cir. 1968) . . . . . . . . . . . . . 71
*United States v. Lewin*, 467 F.2d 1132 (7th Cir. 1972) . . . . . . . . . . . . 48
*United States v. Malmay*, 671 F.2d 869
    (5th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . 21, 24, 42, 43, 48, 49
*United States v. Mason*, 673 F.2d 737
    (4th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 24, 43, 47
*United States v. McCranie*, 169 F.3d 723
    (11th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . 24, 42, 43, 48
*United States v. McLean*, 808 F.2d 1044 (4th Cir. 1987) . . . . . . . . . . 39
*United States v. Morado*, 454 F.2d 167 (5th Cir. 1972) . . . . . . . . . . . 38
*United States v. Mosley*, 238 U.S. 383 (1915) . . . . . . . . . . . . . . . . . . 38
*United States v. Nathan*, 238 F.2d 401 (7th Cir. 1956) . . . . . . . . . . . . 39
*United States v. North Carolina Republican Party*,
    No. 91-161-Civ-5F (E.D.N.C.) . . . . . . . . . . . . . . . . . . . . . . . . 57
*United States v. Odom*, 736 F.2d 104 (4th Cir. 1984) . . . . . . . . 31, 50, 55
*United States v. Odom*, 858 F.2d 664 (11th Cir. 1988) . . . . . . . . . . . . 48

*United States v. Olinger*, 759 F.2d 1293
 (7th Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . . 23, 24, 40, 43, 49, 50
*United States v. Panarella*, 277 F.3d 678 (3d Cir. 2002). . . . . . . . . . . 78
*United States v. Passodelis*, 615 F.2d 975 (3d Cir. 1980). . . . . . . 168, 199
*United States v. Peskin*, 527 F.2d 71 (7th Cir. 1975). . . . . . . . . . . . 71
*United States v. Pintar*, 630 F.2d 1270 (8th Cir. 1980). . . . . . . . . . . 108
*United States v. Pipefitters Local 562*, 434 F.2d 1116
 (8th Cir. 1970). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 160
*United States v. Polizzi*, 500 F.2d 856 (9th Cir. 1974). . . . . . . . . . . . 70
*United States v. Powell*, 81 F. Supp. 288 (E.D. Mo. 1948). . . . . . . . . . 38
*United States v. Price*, 383 U.S. 787 (1966). . . . . . . . . . . . . . . . . . . 41
*United States v. Prude*, No. 06-1425 (7th Cir. June 14, 2007). . . . . . . . 64
*United States v. Ratcliff*, 381 F. Supp. 2d 537 (M.D.La. 2005),
 *aff'd*, __ F.3d __, 2007 WL 1560084 (5th Cir. May 31, 2007). . . . . 77
*United States v. Riccardelli*, 794 F.2d 829 (2d Cir. 1986). . . . . . . . . . 70
*United States v. Saenz*, 747 F.2d 930 (5th Cir. 1984). . . . . . . . . . . . . 43
*United States v. Salisbury*, Cr. No. 2-90-197
 (S.D. Ohio, Oct. 8, 1991, 6th Cir. 1993). . . . . . . . . . . . . . . . 211, 212
*United States v. Salisbury*, 983 F.2d 1369 (6th Cir. 1993). . 33, 50, 51, 52
*United States v. Sawyer*, 85 F.3d 713 (1st Cir. 1996). . . . . . . . . . . . . 192
*United States v. Sawyer*, 329 F.3d 31 (1st Cir. 2001). . . . . . . . . . . . . 78
*United States v. Saylor*, 322 U.S. 385 (1944). . . . . . . . . . . . . . . . . . 38
*United States v. Sayre*, 522 F. Supp. 973 (W.D. Mo. 1981). . . . . . . . . 43
*United States v. Schermerhorn*, 713 F. Supp. 88
 (S.D.N.Y. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76, 194
*United States v. Simms*, 508 F. Supp. 1179 (W.D. La. 1979). . . . . . . . 43
*United States v. Slone*, 411 F.3d 643
 (6th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . 24, 42, 43, 48, 211, 214
*United States v. Smith*, 231 F.3d 800
 (11th Cir. 2000). . . . . . . . . . . . . . . . . . 45, 50, 52, 94, 209, 212, 213
*United States v. Sparkman*, Cr. No. 99-30 (E.D. Ky. 7/12/00). . . . . . . 211
*United States v. States*, 488 F.2d 761 (8th Cir. 1973). . . . . . . . 23, 73, 191
*United States v. Stollings*, 501 F.2d 954 (4th Cir. 1974). . . . . . . . . . 23, 40
*United States v. Taff*, 400 F. Supp. 2d 1270 (D. Kan., 2005). . . . . . . . 196
*United States v. Thayer*, 209 U.S. 39 (1908). . . . . . . . . . . . . . . . . . 114
*United States v. Thomas*, 686 F. Supp. 1078 (M.D. Pa. 1988). . . . . . . 75

325

*United States v. Thomas*, Cr. No. *05-0423* (D. D.C.,
    information filed November 30, 2005). . . . . . . . . . . . . . . . . . . . .  197
*United States v. Tobin*, No. 04-216-01 (SM),
    2005 WL 3199672 (D.N.H. Nov. 30, 2005). . . . . . . . . . . .  38, 62, 63
*United States v. Tonry*, 433 F. Supp. 620
    (E.D. La. 1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  177
*United States v. Townsley*, 843 F.2d 1070
    (8th Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  38, 40, 61
*United States v. Turner*,
    459 F.3d 775 (6th Cir. 2006). . . . . . . . . . . . . . . .  7, 8, 77, 78, 193, 194
*United States v. Wadena*, 152 F.3d 831 (8th Cir. 1998). . . . . . . . . .  22, 40
*United States v. Walker*, 97 F.3d 253 (8th Cir. 1996). . . . . . .  76, 192, 194
*United States v. Walters*, 711 F. Supp. 1435
    (N.D. Ill. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  75
*United States v. Waymer*, 55 F.3d 564 (11th Cir. 1995). . . . . . . . . . .  192
*United States v. Webb*, 689 F. Supp. 703 (W.D. Ky. 1988). . . . . . . .  29, 77
*United States v. Wechsler*, 392 F.2d 344 (4th Cir. 1968). . . . . . . . . . .  71
*United States v. Weston*, 417 F.2d 181 (4th Cir. 1969). . . . . . . . . . . . .  38
*United States v. Woodward*, 469 U.S. 105 (1985). . . . . . . . . . . . . . . .  190
*United States v. Wurzbach*, 280 U.S. 396 (1930). . . . . . . . . . . . . . . .  109
*Walker v. United States*, 93 F.2d 383 (8th Cir. 1937). . . . . . . . . . . . . .  38
*Whalen v. United States*, 445 U.S. 684 (1980).  . . . . . . . . . . . . . . . . .  47
*Wilkins v. United States*, 376 F.2d 552 (5th Cir. 1967). . . . . . . . . .  38, 59
*Williams v. United States,* 341 U.S. 97 (1951).  . . . . . . . . . . . . . . . . .  37
*Williams v. United States*, 179 F.2d 644 (5th Cir. 1950). . . . . . . . .  38, 41

327