# REPORT TO CONGRESS

## ON THE ACTIVITIES AND OPERATIONS

## OF THE

## PUBLIC INTEGRITY SECTION

## FOR 2007



**Public Integrity Section**
**Criminal Division**
**United States Department of Justice**

**Submitted Pursuant to**
**Section 603 of the Ethics in Government Act of 1978**

2:13-cv-193
09/02/2014

DEF2577

DEPOSITION
EXHIBIT

Frary 56

Sylvia Kerr, CSR, CRR, RPR, TCRR

# INTRODUCTION

This Report to Congress is submitted pursuant to the Ethics in Government Act of 1978, which requires the Attorney General to report annually to Congress on the operations and activities of the Justice Department's Public Integrity Section. The Report describes the activities of the Public Integrity Section during 2007. It also provides statistics on the nationwide federal effort against public corruption during 2007 and over the previous two decades.

The Public Integrity Section was created in 1976 in order to consolidate into one unit of the Criminal Division the Department's oversight responsibilities for the prosecution of criminal abuses of the public trust by government officials. Section attorneys prosecute selected cases involving federal, state, or local officials, and also provide advice and assistance to prosecutors and agents in the field regarding the handling of public corruption cases. In addition, the Section serves as the Justice Department's center for handling various issues that arise regarding public corruption statutes and cases.

An Election Crimes Branch was created within the Section in 1980 to supervise the Department's nationwide response to election crimes, such as voter fraud and campaign-financing offenses. The Branch reviews all major election crime investigations throughout the country and all proposed criminal charges relating to election crime.

During the year, the Section maintained a staff of approximately 29 attorneys, including experts in extortion, bribery, election crimes, and criminal conflicts of interest. The section management included: William Welch, Chief; Brenda Morris, Principal Deputy Chief; Peter Ainsworth, Senior Deputy Chief for Litigation; Raymond Hulser, Deputy Chief for Policy and Administration; Craig Donsanto, Director, Election Crimes Branch and Bill Corcoran, Senior Counsel.

Part I of the Report discusses the operations of the Public Integrity Section and highlights its major activities in 2007. Part II describes the cases prosecuted by the Section in 2007. Part III presents nationwide data based on the Section's annual surveys of United States Attorneys regarding the national federal effort to combat public corruption from 1988 through 2007.

# TABLE OF CONTENTS

## PART I

### OPERATIONAL RESPONSIBILITIES OF
### THE PUBLIC INTEGRITY SECTION

A.   RESPONSIBILITY FOR LITIGATION............................... 1
    1.   Recusals by United States Attorneys' Offices...................... 1
    2.   Sensitive and Multi-District Cases............................. 3
    3.   Federal Agency Referrals.................................... 6
    4.   Requests for Assistance/Shared Cases.......................... 6
B.   SPECIAL SECTION PRIORITIES................................. 7
    1.   Election Crimes........................................... 7
    2.   Conflicts of Interest Crimes................................. 11

C.   LEGAL AND TECHNICAL ASSISTANCE.......................... 12
    1.   Training and Advice....................................... 12
    2.   Advisor to the President's Council on Integrity and Efficiency
       and the Executive Council on Integrity and Efficiency............... 12
    3.   Member of the Board Advisors of the Election Assistance Commission.. 13
    4.   Legislative Activities...................................... 13
    5.   Case Supervision and General Assistance....................... 14
    6.   International Advisory Responsibilities.......................... 14

## PART II

### PUBLIC INTEGRITY SECTION INDICTMENTS,
### PROSECUTIONS, AND APPEALS IN 2007

INTRODUCTION...................................................... 17
FEDERAL JUDICIAL BRANCH........................................... 17
FEDERAL LEGISLATIVE BRANCH....................................... 18
FEDERAL EXECUTIVE BRANCH......................................... 26
STATE AND LOCAL GOVERNMENT....................................... 44
FEDERAL ELECTION CRIMES........................................... 60

# PART III

## NATIONWIDE FEDERAL PROSECUTIONS
## OF CORRUPT PUBLIC OFFICIALS

INTRODUCTION........................................................ 64

LIST OF TABLES....................................................... 64

TABLE I:    Nationwide Federal Prosecutions of Corrupt Public Officials
            in 2007...................................................... 65

TABLE II:   Progress Over the Past Two Decades:
            Nationwide Federal Prosecutions of Corrupt Public Officials..... 66

TABLE III:  Federal Public Corruption Convictions by District
            Over the Past Decade................................... 68

TABLE IV:   Public Integrity Sections' Federal Prosecutions of
            Corrupt Public Officials in 2007. .......................... 73

iii

## PART I

## OPERATIONAL RESPONSIBILITIES OF
## THE PUBLIC INTEGRITY SECTION

### A.    RESPONSIBILITY FOR LITIGATION

The work of the Public Integrity Section focuses on public corruption, that is, crimes involving abuses of the public trust by government officials.  Most of the Section's resources are devoted to the supervision of investigations involving alleged corruption by government officials and to prosecutions resulting from these investigations.  Decisions to undertake particular matters are made on a case-by-case basis, given Section resources, the type and seriousness of the allegation, the sufficiency of factual predication reflecting criminal conduct, and the availability of federal prosecutive theories to reach the conduct.

Cases handled by the Section generally fall into one of the following categories: recusals by United States Attorneys' Offices, sensitive cases, multi-district cases, referrals from federal agencies, and shared cases.  These categories are discussed below, and examples of cases handled by the Section in 2007 under the categories are noted.  The examples are described, along with the Section's other 2007 casework, in Part II.

### 1.    Recusals by United States Attorneys' Offices

The vast majority of federal corruption prosecutions are handled by the local United States Attorney's Office for the geographic district where the crime occurred, a fact demonstrated by the statistical charts in Part III of this Report.  At times, however, it may be inappropriate for the local United States Attorney's Office to handle a particular corruption case.

Public corruption cases tend to raise unique problems of public perception that are generally absent in more routine criminal cases.  An investigation of alleged corruption by a government official, whether at the federal, state, or local level, or someone associated with such an official, always has the potential to be high profile simply because its focus is on the conduct of a public official.  In addition, these cases are often politically sensitive because their ultimate targets tend to be politicians or government officials appointed by politicians.

A successful public corruption prosecution requires both the appearance and the reality of fairness and impartiality.  This means that a successful corruption case includes not just a conviction, but public perception that the conviction was warranted, not the

1

result of improper motivation by the prosecutor, and free of conflicts of interest.  In cases when the local conflict of interest is substantial, the local office is removed from the case by a procedure called recusal.  Recusal occurs when the local office either asks to step aside, or is asked to step aside by the Department  as primary prosecutor.  Federal cases involving corruption allegations in which the conflict is substantial are usually referred to the Public Integrity Section either for prosecution or direct operational supervision.

Allegations involving possible crimes by federal judges almost always require recusal of the local office, for significant policy as well as practical reasons.  Having the case handled outside the local office eliminates the possible appearance of bias, as well as the practical difficulties and awkwardness that would arise if an office investigating a judge were to appear before the judge on other matters.  Thus, as a matter of established Department practice, federal judicial corruption cases generally are handled by the Public Integrity Section.

Similar concerns regarding the appearance of bias also arise when the target of an investigation is a federal prosecutor, a federal investigator, or other employee assigned to work in or closely with a particular United States Attorney's Office.  Thus, cases involving United States Attorneys, Assistant United States Attorneys (AUSAs), or federal investigators or employees working with AUSAs in the field generally result in a recusal of the local office.  These cases are typically referred to the Public Integrity Section.

During 2007, the Section handled a number of significant prosecutions as a result of recusals.  For example, a former Special Agent with the United States Department of Health and Human Services, Office of  Inspector General, pleaded guilty to bank fraud and forgery in a scheme to steal $1,109,159 in criminal proceeds from three fraudulent seizures.

In addition, the Section continued its investigation into corruption in the Alaska State Legislature:

- Bill Allen, Chief Executive Officer and part-owner of VECO Corporation, and Richard Smith, Vice President of Community Affairs and Government Relations, VECO Corporation, pled guilty to providing $400,000 in corrupt payments to Alaska State Legislative officials.

- Thomas Anderson, former member of the Alaska State House of Representatives, was sentenced to prison after his conviction for extortion, conspiracy, bribery, and money laundering.

2

- Victor Kohring, former Alaska State Representative, was convicted of conspiracy, bribery, and attempted extortion.

- Peter Kott, former Alaska State Representative, was sentenced to prison following his conviction for bribery, extortion, and conspiracy for corruptly soliciting and receiving financial benefits from a company in exchange for performing official acts.

- Bruce Weyhrauch, former Alaska House Member, was indicted on charges including bribery and conspiracy to commit extortion.

- Lobbyist William Bobrick pled guilty to conspiring to obtain bribery payments.

### 2.   Sensitive and Multi-District Cases

In addition to recusals, the Public Integrity Section handles other special categories of cases.  At the request of the Assistant Attorney General of the Criminal Division, the Section handles cases that are highly sensitive and cases that involve the jurisdiction of more than one United States Attorney's Office.

Cases may be sensitive for a number of reasons. Because of its importance, a particular case may require close coordination with high-level Department officials. Alternatively, it may require substantial coordination with other federal agencies in Washington.  The latter includes cases involving classified information, which require careful coordination with the intelligence agencies.  Sensitive cases may also include those that are so politically controversial on a local level that they are most appropriately handled in Washington, DC.

In addition to sensitive cases, this category encompasses multi-district cases, that is, cases that involve allegations that cross judicial district lines and hence fall under the jurisdiction of two or more United States Attorneys' Offices.  In these cases the Section is occasionally asked to coordinate the investigation among the various United States Attorneys' Offices, to handle a case jointly with one or more United States Attorneys' Offices, or, when appropriate, to assume operational responsibility for the entire case.

In 2007, the Section continued its investigation into the activities of Washington lobbyist Jack Abramoff with these results:

3

- Robert W. Ney, former Congressman, was sentenced to 30 months of imprisonment following his plea of guilty to commit multiple offenses including honest services fraud and false statements.

- J. Steven Griles, the former Deputy Secretary of the Department of the Interior, was sentenced to ten months of imprisonment and a $30,000 fine after his plea of guilty to obstruction.

- Lobbyist Neil Volz, who served as chief of staff for former Congressman Robert Ney, was sentenced to two years of probation and a $2,000 fine following his plea of guilty to conspiracy to commit honest services fraud and violation of his one-year lobbying ban.

- William J. Heaton, former chief of staff to the former Congressman Robert W. Ney and successor in that position to Volz, was sentenced to two years of probation and fined $5,000 after pleading guilty to conspiracy to commit honest services fraud.

- Former United States Department of the Interior employee Roger Stillwell was sentenced to two years of probation and a $1,000 fine following his guilty plea for falsely certifying his 2003 Confidential Financial Disclosure Report.

- Italia Federici, the President of the Council of Republicans for Environmental Advocacy, a non-profit organization, was ordered to pay $74,000 in restitution and to serve four years of probation for income tax evasion and obstruction, for which she had previously pled guilty.

The Section also worked with the Asset Forfeiture and Money Laundering Section and agents from several law enforcement agencies on substantial investigations into corruption in the reconstruction of Iraq.  The results of these investigations include:

- Philip Bloom, a contractor in Iraq, and Robert J. Stein, Comptroller and Funding Officer for Coalition Provisional Authority - South Central Region (CPA-SC) in Al-Hillah, Iraq,  previously pled guilty to conspiracy, bribery, and money laundering.  Bloom was sentenced to 46 months of imprisonment after he received over $8 million in rigged bids. Stein also pled guilty to the illegal possession of weapons and was sentenced to nine years of imprisonment and ordered to pay $3.6 million in restitution.

4

- Bruce D. Hofengardner, former Lieutenant Colonel with the United States Army Reserve, previously pled guilty to conspiracy and money laundering and was sentenced to 21 months of imprisonment and ordered to pay $144,500 in forfeiture.

- Steven Merkes, former Department of Defense employee, previously pled guilty to an illegal gratuity and was sentenced to 12 months and one day of imprisonment and ordered to pay $24,000 in forfeiture.

- Robert J. Stein, Comptroller and Funding Officer for CPA-SC, previously pled guilty to conspiracy, bribery, money laundering, possession of machine guns, and possession of a firearm as a felon. He was sentenced to nine years of imprisonment and ordered to pay $3.6 million in restitution.

- Major John Cockerham, Jr., his wife, Melissa Cockerham, and his sister, Carolyn Blake, were indicted on bribery, conspiracy, money laundering, and obstruction charges for allegedly accepting millions of dollars in bribe payments.

- A former employee in the Defense Finance and Accounting Service, Lilia Delgadillo, was sentenced to 33 months of imprisonment and forfeiture of approximately $700,000 after pleading guilty to defrauding the United States. Her co-worker, Saul Granados, also pled guilty and was sentenced.

- Terry Hall, a civilian contractor, was indicted and arrested based on accusations of $2.5 million in bribery payments he made that allegedly helped to secure his companies receiving more than $20 million in military contracts.

- Four members of the California Army National Guard who were deployed together in Iraq - Jennifer Anjakos, Lomeli Chavez, Derryl Hollier, and Luis Lopez - and Jesse Lane, former civilian employee of the Department of Defense, were sentenced based on their guilty pleas for embezzling money from the United States Army.

- A former Defense Department employee, Bonnie Murphy, was sentenced after pleading guilty to accepting illegal compensation from an Iraqi contracting firm.

5

- Gheevarghese Pappen pleaded guilty and was sentenced to imprisonment for accepting approximately $50,000 in illegal gratuities while detailed to the United States Army in Kuwait, as part of the support for operations in Iraq.

### 3.    Federal Agency Referrals

In another area of major responsibility, the Section handles matters referred to it directly by federal agencies concerning possible federal crimes by agency employees. The Section reviews these allegations to determine whether an investigation of the matter is warranted and, ultimately, whether the matter should be prosecuted.

Agency referrals of possible employee wrongdoing are an important part of the Section's mission. The Section works closely with the Offices of Inspector General (OIG) of the executive branch agencies, as well as with other agency investigative components, such as the Offices of Internal Affairs and the Criminal Investigative Divisions. In addition, the Section invests substantial time in training agency investigators in the statutes involved in corruption cases and the investigative approaches that work best in these cases. These referrals from the various agencies require close consultation with the referring agency's investigative component and prompt prosecutive evaluation.

As in previous years, in 2007 the Section handled numerous referrals from federal agencies. The United States Army referred a case in which the former Chief of the Aviation Division for the United States Army Test and Evaluation Command ensured that his friend, the owner of an aviation company, obtained a United States Army contract worth approximately $4.7 million. They used contract funds to pay off their mortgages and were subsequently convicted of honest services wire fraud, with an additional charge of obstruction of justice for one of the defendants.

Another case that was referred by the Department of State involved a Foreign Service Officer who pled guilty to the misuse of a passport.

### 4.    Requests for Assistance/Shared Cases

The final category of cases in which the Section becomes involved are cases that are handled jointly by the Section and a United States Attorney's Office or other component of the Department.

At times the available prosecutorial resources in a United States Attorney's Office may be insufficient to undertake sole responsibility for a significant corruption case. In

6

these cases the local office may request the assistance of an experienced Section prosecutor to share responsibility for prosecuting the case. On occasion, the Section may also be asked to provide operational assistance or to assume supervisory responsibility for a case due to a partial recusal of the local office. Finally, the Public Integrity Section may be assigned to supervise or assist with a case initially assigned to another Department component.

In 2007, the Section shared operational responsibility in a number of significant corruption cases. The Section worked with the United States Attorney's Office, Southern District of Mississippi, in the trial and conviction of two former state court judges and an attorney in an extensive bribery scheme. The attorney was sentenced to eleven years of imprisonment and a $2.7 million fine while the two former judges received prison terms of between five and ten years and are jointly liable for $1.5 million in restitution. In another case, the Section worked with the United States Attorney's Office for the District of Columbia in obtaining a plea of guilty from the former chief of staff for a member of the United States House of Representatives for falsifying his annual financial disclosure report after his wife received $17,500 from a company that facilitated trade with Russia.

## B.    SPECIAL SECTION PRIORITIES

In addition to the general responsibilities discussed above, in 2007 the Public Integrity Section continued its involvement in a number of additional priority areas of criminal law enforcement.

### 1.    Election Crimes

One of the Section's law enforcement priorities is its supervision of the Justice Department's nationwide response to election crimes. Under the Department's ongoing Ballot Access and Voting Integrity Initiative, the prosecution of all forms of election crime is a high Department priority, and the Department's oversight in this area is designed to ensure that the Department's nationwide response to election crime matters is uniform, impartial, and effective. In 1980, an Election Crimes Branch was created within the Section to handle this supervisory responsibility. The Branch is headed by a Director, assisted by a senior Section prosecutor, and staffed by other Section attorneys on a case-by-case basis.

The Election Crimes Branch oversees the Department's handling of all election crime allegations other than those involving federal voting rights, which are handled by two Sections of the Civil Rights Division: Voting and Criminal Sections. Specifically, the Branch supervises three types of election crime cases: (1) vote frauds, such as vote buying

7

and absentee ballot fraud; (2) campaign-financing crimes, most notably under the Federal Election Campaign Act (FECA); and (3) patronage crimes, such as political shakedowns and misuse of federal programs for political purposes. Vote frauds and campaign-financing offenses are the most significant as well as the most common types of election crimes.

The election-related work of the Section and its Election Crimes Branch falls into the following categories:

a.  Consultation and Field Support.  Under long-established Department procedures, the Section's Election Crimes Branch reviews all major election crime investigations, including all proposed grand jury investigations and FBI full-field investigations, and all  election crime charges, proposed by the various United States Attorneys' Offices for legal and factual sufficiency. United States Attorneys' Manual 9-85.210. The Branch also is often consulted before a United States Attorney's Office opens a preliminary investigation into vote fraud allegations, although this is not required.

In the area of campaign-financing crimes, Department procedures require additional consultation before any investigation, including a preliminary investigation, is commenced by a United States Attorney's Office. U.S.A.M.  9-85-210.  The increased coordination with the Section at the initial stage of a criminal investigation of a FECA matter is the result in part of the complexity of the campaign-financing statutes.  It is also due to the fact that the Department shares jurisdiction over willful violations of these statutes with another federal agency, the Federal Election Commission (FEC), which has civil enforcement authority over FECA violations.

The Section's consultation responsibility for election matters includes providing advice to prosecutors and investigators regarding the application of federal criminal laws to vote fraud, patronage crimes, and campaign-financing crimes, and the most effective investigative techniques for particular types of election offenses.  It also includes supervising the Department's use of the federal conspiracy and false statements statutes (18 U.S.C. §§ 371 and 1001) to address schemes to subvert the federal campaign financing laws.  In addition, the Election Crimes Branch helps draft election crime charges and other pleadings when requested.

The majority of the Branch's consultations are in the following two categories:

• Vote frauds. During 2007, the Branch assisted United States Attorneys' Offices in the following states in the handling of vote fraud matters in their respective

8

districts: Alabama, Alaska, Arizona, Arkansas, California, Florida, Illinois, Kentucky, Louisiana, Massachusetts, Michigan, Mississippi, Missouri, Nevada, New Jersey, New Mexico, New York, North Carolina, Ohio, Oklahoma, Pennsylvania, Puerto Rico, Tennessee, Texas, Utah, Virginia, West Virginia, and Wisconsin. This assistance included evaluating vote fraud allegations to determine whether investigation would produce a prosecutable federal criminal case, helping to structure investigations, and providing advice on the formulation of charges.

- Campaign-financing crimes. During 2007, the Branch also continued to assist in implementing the Department's enhanced efforts to address criminal violations of FECA. As part of this effort, the Branch assisted United States Attorneys' Offices in Alabama, Arizona, California, Connecticut, the District of Columbia, Florida, Georgia, Kentucky, Maryland, Massachusetts, Michigan, Missouri, Nevada, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Puerto Rico, West Virginia, and Wisconsin in the investigation and prosecution of campaign-financing matters in their respective districts.

b. Litigation. On occasion the Section may be asked to supervise the handling of a case in the event of a partial recusal of the local United States Attorney's Office. Section attorneys also prosecute selected election crimes, either by assuming total operational responsibility for the case or by handling the case jointly with a United States Attorney's Office or other Department component.

For example, in 2007 Section attorneys obtained the conviction of the deputy manager of Lockheed Martin's PAC for wire fraud and false statements to the FEC in connection with his scheme to embezzle over $160,000 from the PAC. The defendant pled guilty to over 20 charges and was sentenced to 16 months of imprisonment and ordered to pay $163,000 in restitution. In another 2007 case handled by the Section, an official of the Women's Campaign Fund pled guilty to charges arising from her scheme to embezzle over $83,000 from the Fund and was sentenced to eight months of imprisonment, followed by eight months of home confinement and $83,000 in restitution. In a third Section case, two South Carolina businessmen pled guilty to charges arising from their scheme to contribute over $65,000 to federal candidates through conduits.

c. District Election Officer Program. The Branch also assists in implementing the Department's long-standing District Election Officer (DEO) Program. This Program is designed to ensure that each of the Department's 93 United States Attorneys' Offices has a trained prosecutor available to oversee the handling of election crime matters within the district and and coordinate district responses with Department Headquarters regarding these matters.

The DEO Program involves the appointment of an Assistant United States Attorney in each federal district to serve a two-year term as a DEO and periodic training for the DEOs in the handling of election crime and voting rights matters.

The DEO Program is also a crucial feature of the Department's nationwide Election Day Program, which takes place during the federal general elections that are held in November of even-numbered years.  The Election Day Program ensures that federal prosecutors and investigators are available both at the Department in Washington, DC, and in each district to receive complaints of election irregularities while the polls are open.  As part of the Program, press releases are issued in Washington and in each district before the November federal elections, which advise the public of the Department's enforcement interests in deterring election crimes and protecting voting rights.  The press releases also provide contact information for the DEOs, local FBI officials, and Department officials in the Criminal and Civil Rights Divisions in Washington who may be contacted on election day by members of the public who have complaints of possible vote fraud or voting rights violations.

d.  <u>Ballot Access and Voting Integrity Initiative</u>.  During 2007, the Public Integrity Section continued to assist in the implementation of the Department's Ballot Access and Voting Integrity Initiative.  This ongoing law enforcement initiative was established in 2002 to enhance the Department's criminal and civil rights efforts against vote fraud and voting rights.

The initiative includes annual training for the Assistant United States Attorneys serving as DEOs, and preelection coordination by each United States Attorney's Office with state law enforcement and election officials before the federal general elections regarding the handling of election crime matters in their respective districts.

On June 18 and 19, 2007, the Public Integrity Section and the Civil Rights Division's Voting Section co-sponsored the Department's sixth annual Ballot Access and Voting Integrity Symposium.  Approximately 100 Assistant United States Attorneys and 25 FBI special agents attended this event. Topics addressed included the history and role of the federal government in elections, the types of conduct prosecutable as federal election crimes, the federal statutes available to prosecute vote fraud and campaign financing offenses, the federal voting rights statutes and their enforcement, the federal observer program, and FBI technology for assisting in election crime investigations.

e.  <u>Inter-Agency Liaison with Federal Election Commission</u>.  The Election Crimes Branch is the formal liaison between the Justice Department and the Federal Election

Commission (FEC), an independent federal agency that shares enforcement jurisdiction with the Department over willful violations of the Federal Election Campaign Act (FECA). The FEC has exclusive civil jurisdiction over all FECA violations, while the Department has exclusive criminal jurisdiction over FECA crimes.

    f. <u>Inter-Agency Liaison with Office of Special Counsel</u>. The Branch also serves as the Department's point of contact with the United States Office of Special Counsel (OSC). The OSC has jurisdiction over noncriminal violations of the Hatch Act, 5 U.S.C. §§ 7321-7326, §§ 1501-1508, which may also involve criminal patronage crimes that are within the Department's jurisdiction.

    **2.  Conflicts of Interest Crimes**

    Conflicts of interest is a wide-ranging and complex area of law, with many layers of administrative and oversight responsibility. Moreover, the federal criminal conflicts of interest laws overlap to some extent with the sometimes broader ethics restrictions imposed by civil statutes, agency standards of conduct, Presidential orders, and, in the case of attorneys, bar association codes of conduct.

    The Public Integrity Section's work in the conflicts area falls into the following categories:

    a. <u>Criminal Referrals from Federal Agencies and Recusals</u>. The Section's criminal enforcement role comes into play with respect to a narrow group of conflicts of interest matters, namely, those that involve possible misconduct proscribed by one of the federal conflicts of interest statutes, 18 U.S.C. §§ 203-209. These crimes are prosecuted either by a United States Attorney's Office or by the Public Integrity Section. Conflicts of interest matters are often referred to the Section by the various federal agencies. If investigation of a referral is warranted, the Section coordinates the investigation with the Inspector General for the agency concerned, the FBI, or both. If prosecution is warranted, the Section prosecutes the case. If a civil remedy may be appropriate in lieu of criminal prosecution, the Section refers the case to the Civil Division of the Department of Justice for its review. On occasion the Section is also asked to handle recusals and special assignments regarding conflicts matters. In one case, a former manager with the National Security Agency was sentenced after pleading guilty to conflict of interest for using his official position to cause the awarding of contracts to his wife's business.

    b. <u>Coordination</u>. The Public Integrity Section works closely with the United States Office of Government Ethics (OGE) in order to coordinate conflicts of interest issues with OGE and other executive branch agencies and offices. The purpose of this coordination is

to ensure that the Administration's overall legislative and enforcement efforts in this area are both complementary and consistent. OGE has broad jurisdiction over noncriminal conduct by executive branch personnel, as well as the authority to provide guidance concerning the coverage of the federal criminal conflicts of interest statutes. The Section's coordination with OGE ensures that consistent guidance is provided with respect to the overlapping criminal, civil, and administrative interests implicated by the statutory and regulatory restrictions on federal personnel.

### C.    LEGAL AND TECHNICAL ASSISTANCE

#### 1.    Training and Advice

The Public Integrity Section is staffed with specialists who have considerable experience investigating and prosecuting corruption cases. Section attorneys participate in a wide range of formal training events for federal prosecutors and investigators. They are also available to provide informal advice on investigative methods, charging decisions, and trial strategy in specific cases.

The Section helps plan and staff the annual public corruption seminar at the National Advocacy Center. Speakers at this seminar typically include both the Section's senior prosecutors and Assistant United States Attorneys from the field who have handled significant corruption cases. The seminars provide training for federal prosecutors and FBI agents regarding the statutes most commonly used in corruption cases, guidance in the use of the complex and difficult investigative techniques necessary to investigate government corruption, and advice from experienced prosecutors on conducting corruption trials. In 2007, the Chief, one Deputy Chief, the Director of the Election Crimes Branch, and two trial attorneys addressed attendees on the federal laws and prosecutive theories relating to corruption, issues at trial, and congressional corruption.

#### 2.    Advisor to the President's Council on Integrity and Efficiency and the Executive Council on Integrity and Efficiency

The Public Integrity Section serves, pursuant to Executive Order 12993 (March 21, 1996), as a legal advisor to the Integrity Committee of the President's Council on Integrity and Efficiency (PCIE) and the Executive Council on Integrity and Efficiency (ECIE). The PCIE/ECIE is a body composed of the Inspectors General of the various agencies of the executive branch of the federal government. The Integrity Committee of the PCIE/ECIE is charged by the Executive Order with handling allegations against Inspectors General and senior members of their staff.

In addition, the Integrity Committee is charged by the Executive Order with establishing policies and procedures to ensure consistency in conducting administrative investigations.  The Committee's procedures, drafted with the assistance of the Public Integrity Section, provide a framework for the investigative function of the Committee. Allegations of wrongdoing by Inspectors General and their senior staff are initially reviewed by the Public Integrity Section for potential criminal prosecution.  In noncriminal matters, the procedures guide the Committee's discretion to investigate the alleged misconduct and to report on its findings. The Public Integrity Section also advises the Integrity Committee on matters of law and policy relating to its investigations.

### 3.  Member of the Board of Advisors of the Election Assistance Commission

Pursuant to the Help America Vote Act of 2002 (HAVA), the Chief of the Public Integrity Section, or his or her designee, is a member of the Board of Advisors of the Election Assistance Commission (EAC).  42 U.S.C. § 15344(a)(12).  The Commission was created to serve as a national clearinghouse for information and procedures relating to the administration of federal elections and is responsible for the adoption of voluntary voting system guidelines, testing and certification of voting system hardware and software, conducting studies regarding the effective administration of elections, and training on the management of federal grants to the states under HAVA. The Director of the Section's Election Crimes Branch serves as the designated Public Integrity member of EAC's Board of Advisors. The Director, as the Board's parliamentarian, participated in two Board meetings during 2007.

### 4.  Legislative Activities

An important responsibility of the Public Integrity Section is the review of proposed legislation that may affect, directly or indirectly, the investigation and prosecution of public officials.  The Section is often called upon to comment on legislation proposed by Congress, by the Administration, or by other departments of the executive branch; to draft or review testimony for congressional hearings; and to respond to congressional inquiries concerning legislative proposals.  On occasion, the Section drafts legislative proposals relating to various corruption matters.  For example, in 2007 the Section reviewed and commented on a number of legislative proposals addressing public corruption.  During the year the Section also commented on legislation relating to voter deception, legislative transparency and accountability, conflicts of interest, federal advisory commissions and volunteer programs, and open government, among other subjects.

5.   **Case Supervision and General Assistance**

Public corruption cases are often controversial, complex, and highly visible.  These factors may warrant Departmental supervision and review of a particular case.  On occasion Section attorneys are called upon to conduct a careful review of a sensitive public corruption case, evaluating the quality of the investigative work and the adequacy of any proposed indictments.  Based on its experience in this area, the Section can often identify tactical or evidentiary problems early on and either provide needed assistance or, if necessary, assume operational responsibility for the prosecution.

The Section also has considerable expertise in the supervision of the use of undercover operations in serious corruption cases.  The Section's Chief serves as a permanent member of the FBI's Criminal Undercover Operations Review Committee. Additionally, a number of the Section's senior prosecutors have experience in the practical and legal problems involved in such operations, and have the expertise to employ this sensitive investigative technique effectively and to advise law enforcement personnel on its use.

6.   **International Advisory Responsibilities**

The Section's responsibilities in the area of international law enforcement continued in 2007.  In addition to its routine briefings of foreign delegations on United States public corruption issues, the Section has become increasingly involved in supporting the efforts of the United States in assisting the international community in the endeavors to combat public corruption and election crime in foreign countries.  This work included both participation in international proceedings and coordination with other components of the Justice Department and the State Department on the Administration's position in this area.

The head of the Section's international initiatives, Senior Deputy Chief , Peter J. Ainsworth traveled to Paris, France, representing the Department at the Corruption Hunters Network Meeting; China to attend the United Nations Conference of the International Association of Anti-corruption Authorities (IAACA); Kiev, Ukraine, to meet with Ukrainian government officials to discuss preparation for an Office of Overseas Prosecutorial Development, Assistance and Training (OPDAT) pilot project to train and support a unit analogous to an Office of Inspector General within one of the counterpart agencies; Baku, Azerbaijan, to attend an OPDAT sponsored conference to establish an action plan for Azeri compliance with the United Nations Convention against Corruption; Jakarta, Indonesia, to give a presentation on criminal conflict of interest enforcement at a regional seminar; two trips to Vienna, Austria, the first to attend the United Nations Convention Against Corruption Working Group Meetings as the United States

14

delegation's anti-corruption expert and the second to attend the United Nations Convention Corruption Experts meeting; and Bangkok, Thailand, to give a presentation to a UNAFEI sponsored anti-corruption seminar on the Section's organization and accomplishments.

In addition, Section Senior Litigation Counsel Edward C. Nucci traveled to Malawi, Africa, and briefed judges, prosecutors, investigators, and defense attorneys, on corruption and money laundering investigation and prosecution as seen through the example of a billion dollar narcotics cartel case tried in Miami, Florida.

Section Trial Attorney, M. Kendall Day traveled to Tallinn, Estonia, and Riga, Latvia, and made presentations to judges, prosecutors, and agents, on prosecuting public corruption in the United States.  He led participants through a case study and asked them to develop and discuss investigative plans.  Also, Day traveled to Novisad, Serbia, and gave a presentation and participated in a panel discussion at a corruption conference.

Section Trial Attorney Daniel A. Schwager traveled to Recife and Sao Paulo, Brazil, as part of the State Department's International Speaker Program and made presentations to federal judges, prosecutors, court staff, law/college students, professors, civil and military police, and Department of Public Security staff, regarding "The United States Experience in Combating Corruption" at the International Seminar on Combating Corruption and International Seminar on Prevention of Organized Crime and Money Laundering.

Section Trial Attorney Nicholas A. Marsh traveled to Zlotibar, Serbia, to attend the Overseas Prosecutorial Development Assistance and Training's Anti-Corruption Conference.

Craig Donsanto, the Director of the Section's Election Crimes Branch, traveled to Yerevan, Republic of Armenia, and conducted a five-day course on the investigation and prosecution of electoral crimes.  This mission was requested by the Acting United States Ambassador to Armenia as a precursor to the national elections that were held in Armenia on May 16, 2007.

As noted above, Section experts routinely address visiting foreign officials in connection with the detection and prosecution of public corruption offenses and continued to do so throughout 2007.  These presentations are generally conducted under the auspices of the State Department's Foreign Visitor Program and the Justice Department's Office of Overseas Prosecutorial Development Assistance and Training.  During 2007, the Section made presentations on corruption topics to officials from Albania, Angola, Argentina,

Armenia, Belize, Brazil, Brunei, Burma, Cameroon, Cape Verde, Chad, China, Croatia, Cyprus, Egypt, Ethiopia, Fuji, Gabon, Ghana, Hong Kong, Indonesia, Jordan, Kenya, Kyrgyzstan, Latin America, Latvia, Lebanon, Liberia, Madagascar, Malawi, Malaysia, Maurituis, Mexico, Moldova, Mozambique, Niger, Nigeria, Peru, Philippines, Romania, Singapore, South Africa, Syria, Tanzania, Togo, Turkey, Turkmenistan, Ukraine, Yemeni, and Zimbabwe.  Also during the year Craig Donsanto addressed visiting foreign lawmakers and election officials from Austria, Bosnia-Herzegovina, Philippines, and the United Kingdom on United States election crime statutes and their enforcement.

16

## PART II

## PUBLIC INTEGRITY SECTION
### INDICTMENTS, PROSECUTIONS, AND APPEALS
### IN 2007

### INTRODUCTION

As described in Part I, the Public Integrity Section's role in the prosecution of public corruption cases ranges from sole operational responsibility for the entire case to approving an indictment or providing advice on the drafting of charges. Part II of the Report describes each corruption case for which the Section had either sole or shared operational responsibility during 2007. A "case" involves a person who has been charged by indictment or information; a "matter" is an investigation that has not resulted in a criminal charge. Part II also provides statistics on the number of matters closed by the Section without prosecution during 2007 and the number of matters pending at the end of the year in each category.

The Section's corruption cases for calendar year 2007 are separated into categories, based on the branch or level of government affected by the corruption. Election crime cases are grouped separately. Related cases are grouped together and unrelated cases are separated by double lines. In those cases for which a conviction but not a sentence is reported, the sentencing occurred in a later year and will be included in that year's report.

### FEDERAL JUDICIAL BRANCH

**As of December 31, 2007, five matters involving allegations of corruption affecting the federal judicial branch were pending in the Public Integrity Section. During 2007, the Section closed five matters involving crimes affecting the judicial branch.**

17

## FEDERAL LEGISLATIVE BRANCH

**As of December 31, 2007, 26 matters involving allegations of corruption in or affecting the federal legislative branch were pending in the Public Integrity Section. During 2007, the Section closed five such matters. Also during 2007, the Section handled the following cases involving the federal legislative branch, as described below:**

### The Abramoff Investigations
### District of Columbia

### <u>United States v. Abramoff</u>

Jack Abramoff, a former lobbyist, previously pleaded guilty to conspiracy to commit bribery, honest services fraud, and tax evasion. Abramoff and his business partner, Michael Scanlon, owner of a public relations firm, conspired to defraud four Native American Indian tribes by charging fees that incorporated huge profit margins and then splitting the net profits in a secret kickback arrangement. Abramoff admitted that, as one means of accomplishing results for their clients, he, Scanlon, and others engaged in a pattern of corruptly providing items of value to public officials, including trips, campaign contributions, meals, and  entertainment, with the intent to influence acts by the public officials that would benefit Abramoff and Abramoff's clients.

In addition, a tax evasion charge against Abramoff stems from his failure to report and pay taxes through hiding income in certain nonprofit entities that he controlled. These activities resulted in Abramoff evading payment of approximately $1.7 million in federal income tax from 2001 to 2003. This is in addition to Abramoff's fraudulent activities that led to a loss for his clients of approximately $25 million.

Abramoff is awaiting sentencing in this case and is currently serving a 70-month prison sentence for his guilty plea on conspiracy and fraud charges brought in Miami in which he defrauded banks of $23 million in his purchase of a casino cruise line.

**United States v. Ney**

On January 19, 2007, former Congressman Robert W. Ney was sentenced to 30 months of imprisonment, two years of supervised release, 200 hours of community service, and ordered to pay a $6,000 fine.

Ney previously pleaded guilty to conspiracy to commit multiple offenses including honest services fraud, false statements, and violations of his former chief of staff's one-year lobbying ban. His false statements included those he made to the United States House of Representatives. The named co-conspirators in the charges to which Ney pleaded guilty include Jack Abramoff, Michael Scanlon, Tony Rudy, and Ney's former chief of staff Neil Volz. All have previously pleaded guilty in this investigation and are cooperating with law enforcement officials.

Ney, a Congressman representing the 18th District of Ohio from 1995 through the present, served as chairman of the House Committee on Administration until January 2006. Ney admitted that he engaged in a conspiracy from 2000 through April 2004 in which he corruptly solicited and accepted a stream of things of value from Abramoff, Abramoff's lobbyists, and a foreign businessman. In return, Ney agreed to take and took official action to benefit these individuals.

Specifically, Ney admitted that he corruptly solicited and accepted items of value from Abramoff and his lobbyists with the intent to be influenced and induced to take official actions. These valuable items included international and domestic trips, meals and drinks, concert and sporting tickets, tens of thousands of dollars of campaign contributions, and in-kind contributions such as free fundraisers. Ney admitted that the actions he agreed to take, and took, to benefit Abramoff, his lobbyists and their clients, included opposing legislation at Abramoff's request, having statements inserted into the Congressional Record at Scanlon's request, and supporting an application of a license for a contract to install wireless telephone infrastructure in the House of Representatives.

Ney also admitted he accepted tens of thousands of dollars worth of gambling chips from a foreign businessman who was hoping to sell airplanes and airplane parts made in the United States in a foreign country. Ney agreed to help the businessman with obtaining an exemption to the United States laws prohibiting the sale of these goods to the foreign country and with obtaining a visa to travel to the United States. Ney also admitted conspiring to aid and abet violations of the federal one-year lobbying ban by his former chief of staff Neil Volz.

## United States v. Griles

On June 26, 2007, J. Steven Griles, the former Deputy Secretary of the Department of the Interior (DOI), was sentenced to ten months of imprisonment, a $30,000 fine, and three years of supervised release.  He had previously pled guilty to obstructing the investigation into corruption allegations of the United States Senate Committee on Indian Affairs surrounding former Washington, DC, lobbyist Jack A. Abramoff.

Griles was the second highest-ranking official at DOI between July 2001 and January 2005.  As part of the Senate Committee's investigation, he was interviewed by Senate investigators on October 20, 2005, and testified before Committee members during a November 2, 2005 public hearing.

Both the interview and hearing concerned Abramoff's alleged undue influence and access at DOI.  In his plea agreement, Griles admitted that during both proceedings he withheld information from and made materially false and fictitious declarations to Senators and Senate investigators concerning the true nature and extent of his relationship with Italia Federici, the person who introduced Abramoff to him, how and why his relationship with Abramoff developed, and the nature of Abramoff's access to him.

At the time, Italia Federici was the founder and operator of a purported tax-exempt organization for which Griles had actively helped raise funds before he became DOI Deputy Secretary.  Federici introduced Abramoff to Griles in early March 2001, just before Griles was nominated as DOI Deputy Secretary.  Thereafter, Abramoff sought and received the advice of Griles and intervention on various matters within the jurisdiction of DOI that directly affected Abramoff and his clients.  Moreover, between March 2001 and May 2003, Abramoff, directly and through some of his Native American tribal clients, donated a total of $500,000 to Italia Federici's organization.

---

## United States v. Federici

On December 14, 2007, Italia Federici, the President of the Council of Republicans for Environmental Advocacy (CREA), a non-profit organization, was sentenced to four years of probation and ordered to pay more than $74,000 in restitution.  She had previously pleaded guilty to income tax evasion and obstruction of justice.  The charges concern Federici's failure to pay personal income taxes while serving as CREA's president, as well as her testimony before United States Senators and Senate investigators during the Senate Indian Affairs Committee's investigation into corruption allegations.

During Federici's interviews by Senate investigators and in testimony before United States Senators during a public hearing, both under oath, Federici lied about the communications involving her, Abramoff, and J. Steven Griles, who served as the Deputy Secretary of the United States Department of the Interior (DOI). Federici admitted that she lied and withheld material information in responding to questions about the level and content of the communications involving her, Abramoff, and Griles, while Griles served as DOI Deputy Secretary.

Federici admitted that after introducing Abramoff to Griles in March 2001, she served as a conduit for information between Abramoff and Griles regarding Abramoff's clients and their issues pending before DOI. Federici's involvement as a conduit for Abramoff's advocacy hindered DOI's official record-keeping about the contacts Griles had with lobbyists, such as Abramoff, and DOI's internal ability to measure the level of Abramoff's access to Griles.

In pleading guilty to the tax charge, Federici admitted to evading individual income taxes for the calendar years 2001 through 2003. In so doing, she admitted to failing to segregate her personal finances from CREA's, using cash to handle CREA's and her own personal finances, failing to maintain proper books and records or properly report CREA's payroll, failing to file her individual income tax returns on or before the relevant due dates, and then failing to pay the income taxes owed.

---

## United States v. Volz

Neil G. Volz, a Washington lobbyist who served as chief of staff for former Congressman Robert W. Ney, was sentenced on December 12, 2007, to two years of probation and fined $2,000 on a charge of conspiracy to commit honest services fraud. Volz has cooperated extensively with the government.

Volz previously pleaded guilty to conspiracy to commit honest services fraud and violation of his one-year lobbying ban. According to court documents, Volz had worked for Ney since 1994, becoming Ney's chief of staff in 1998. After becoming Chairman of the House Administration Committee in January 2001, Ney named Volz staff director of the Committee. From February 2002 until mid-2004, Volz worked for Jack Abramoff as a lobbyist.

Volz admitted that he and Ney corruptly solicited and accepted things of value from Abramoff and his lobbyists in exchange for official action. He also admitted that after becoming a lobbyist in 2002, he and Abramoff and others gave things of value to Ney and

his staff.  The official action they attempted to influence included Ney's support for legislation as well as his contacts with executive branch agencies at Abramoff's request.

_____

**United States v. Heaton**

William J. Heaton, former chief of staff to former Congressman Robert W. Ney and successor in that position to Volz, was sentenced on August 16, 2007, to two years of probation and fined $5,000.  Heaton had previously pleaded guilty to conspiracy to commit honest services fraud and agreed to cooperate in the investigation.

Beginning in September 2001, Heaton was employed by Ney as executive assistant, and later as chief of staff.  Ney, a Congressman representing the 18th District of Ohio since 1995, resigned last fall before being sentenced to 30 months of imprisonment on charges of corruption.  Heaton's duties included managing Ney's office personnel and approving the staff's receipts and use of tickets to sporting events and entertainment events.

Heaton admitted that he joined a conspiracy with Ney and others, beginning in August 2002 and continuing through April 2004, in which he and Ney corruptly solicited and accepted a stream of things of value from Abramoff, Abramoff's lobbyists, and a foreign businessman.  In return, Ney agreed to take and took official action to benefit Abramoff, his clients, and the foreign businessman, such as supporting legislation at Abramoff's request and contacting executive branch agencies to influence those agencies at Abramoff's request.

Heaton also admitted that he and Ney accepted thousands of dollars worth of gambling chips from a foreign businessman who was hoping to sell United States-made airplanes and airplane parts in a foreign country.  Heaton admitted that he helped Ney conceal some of the money Ney had received, storing the money for Ney in a safe in Ney's congressional office and periodically opening the safe at Ney's request so that the Congressman could withdraw funds.

_____

**United States v. Zachares**

On April 24, 2007, Mark Dennis Zachares, a former high-level staffer on the United States House of Representatives Transportation & Infrastructure Committee, pleaded guilty to conspiracy to commit honest services wire fraud.

Zachares met Abramoff in the mid-1990s when Zachares was a government official for the Commonwealth of Northern Mariana Islands (CNMI), then an Abramoff lobbying client. Abramoff helped Zachares secure a series of positions as a high-level staffer to the House Transportation & Infrastructure Committee. Zachares admitted that his job search with Abramoff, which started in late 2000, marked the beginning of a conspiracy that continued through April 2004, wherein Zachares corruptly solicited and received a stream of things of value from Abramoff and his lobbyists in exchange for agreeing to take, and taking, official action to benefit Abramoff, his lobbyists, and their lobbying clients.

Zachares admitted to receiving $10,000 from an Abramoff-controlled entity shortly before he started working on Capitol Hill. Zachares also admitted that he intentionally failed to disclose the gifts he had received from Abramoff and his lobbyists, as required in annual financial reports. In addition, Zachares was promised a highly paid position as a lobbyist at Abramoff's firm after working for two years on Capitol Hill during which time he would make political contacts.

The actions Zachares took on behalf of Abramoff, his lobbyists, and their clients included securing for Abramoff non-public information, referring potential lobbying clients to Abramoff's firm, reaching out to administrative agencies on behalf of Abramoff's clients, using his position to exert "payback" on entities that had retained competing lobbying firms, and actively participating in the strategic planning of a new "maritime lobbying practice" at Abramoff's firm.

---

### United States v. Caso, District of Columbia

Russell James Caso, Jr. pleaded guilty on December 7, 2007, to conspiracy to commit honest services wire fraud. Caso served as chief of staff to a member of the United States House of Representatives from 2005 until 2007.

Caso's guilty plea stems from his relationship with a firm (the Firm) that served as a facilitator for American businesses establishing operations in Russia and assisted in promoting the flow of trade between the United States and Russia. The Firm sought to submit its proposals to various Executive Branch agencies seeking federal funding for these efforts. The Firm's General Secretary met frequently with and sought official action from Caso, the Representative for whom Caso worked (the Representative), and other staff members of the Representative, including their assistance in obtaining funding for the proposals.

During April and May 2005, the Firm's General Secretary paid Caso's wife $1,500 to edit written drafts of its proposals.  Subsequently, the Firm distributed three more checks to Caso's wife totaling $17,500 for which Caso knew his wife performed an insignificant amount of additional work.  During 2005, roughly contemporaneous with these payments to his wife, Caso organized meetings in which the Representative and Caso made presentations to various Executive Branch agencies, including high-level officials in the Departments of State and Energy and the National Security Council.  The Representative and Caso argued that the Firm's proposals should be federally funded.

As the Representative's Chief of Staff, Caso was required to submit annual financial disclosure statements, listing, among other things, the source of any income earned by his wife.  On the disclosure statement for 2005, Caso intentionally failed to disclose that his wife received any payments from the Firm, even though he knew of this reporting requirement.

This case was handled jointly by the Public Integrity Section, the Organized Crime and Racketeering Section, and the United States Attorney's Office for the District of Columbia.

### United States v. Convertino and Smith, Eastern District of Michigan

A former federal prosecutor and a Department of State Special Agent were acquitted on October 31, 2007.  The indictment alleged conspiracy, obstruction of justice, and false declarations in the *United States v. Koubriti* terrorism trial.

According to the indictment, Richard G. Convertino was the lead federal prosecutor in *United States v. Koubriti*, a criminal case in Detroit, in which four defendants were charged with providing material support for terrorism as well as document fraud.  Harry Raymond Smith III was an assistant regional security officer with the Diplomatic Security Service of the United States Department of State at the United States Embassy in Amman, Jordan, from 1999 through July 2002.  In that capacity, he assisted in the investigation of the *Koubriti* case and testified as a government witness at trial.

Counts one through three of the indictment alleged that the defendants concealed photographs of a key site from the defendants and others at trial and presented false testimony indicating that they were unable to obtain photographs of the site.  In fact, the indictment alleged, at the time Smith testified, he had already taken photographs of this site, and, as they were not clear, he asked colleagues to take additional photographs for Convertino.  The indictment charged that Convertino received additional photographs of

24

the hospital but concealed them from the defense and others.  According to the indictment, the existence of the photographs was material to Convertino's argument in *Koubriti* that the hospital closely matched a sketch, an alleged terrorist target, found in the apartment of three of the *Koubriti* defendants.

In count four of the indictment, which was severed before trial, Convertino was charged with obstructing justice in a second criminal case, *United States v. John Doe*, in which it was alleged that Convertino presented false information in a sentencing hearing of a narcotics case in order to obtain an unusual downward departure for a defendant, from a guidelines range of 108 to 135 months of imprisonment to just eight months with credit for time served.  This count was dismissed following the verdict on counts one through three.

## United States v. Kontnik, District of Colorado

On July 6, 2007, Virginia M. Kontnik, former chief of staff to Colorado's United States Senator Ben Nighthorse Campbell, was sentenced for making a false certification for which she had previously pled guilty.

As chief of staff in the United States Senate from 1995 until February 2004, Kontnik managed approximately 40 employees and was responsible for all personnel decisions.  In particular, Kontnik had discretionary authority to determine staff bonuses and negotiate staff salaries.

Kontnik admitted that, in the fall of 2002, she engineered a plan to receive $2,000 in unreported income from her personal assistant by triggering larger than normal salary payments to the personal assistant from which the personal assistant was directed to pay Kontnik $2,000.  In addition, Kontnik certified and submitted her annual financial disclosure report without disclosing the $2,000 cash payment in violation of the requirement to report gifts of $285 or more.

Kontnik was sentenced to pay a $2,500 fine, $2,000 in restitution to the Senate, and one year of probation. She was also ordered not to seek nor accept employment with the United States government for five years.

# FEDERAL EXECUTIVE BRANCH

As of December 31, 2007, 59 matters involving allegations of corruption within the federal executive branch were pending in the Public Integrity Section.  During 2007, the Section closed 24 such matters.  Also during 2007, the Section handled the following cases involving executive branch corruption:

## Corruption Related to the Reconstruction of Iraq

### United States v. Anjakos, Chavez, Hollier, and Lopez, Central District of California

On September 10, 2007, four members of the California Army National Guard were sentenced based on their pleas of guilty to conspiracy to commit wire fraud for embezzling money from the United States Army.  The defendants, Jennifer Anjakos, Lomeli Chavez, Derryl Hollier, and Luis Lopez, were all members of the 223rd Finance Detachment, a unit of the California National Guard that processes pay for Army National Guard members, and were deployed together to Iraq from March 2004 to February 2005.

Beginning in March 2005 and continuing through December 2005, Jesse Lane, a co-conspirator at the Department of Defense (DOD), accessed a DOD pay-processing computer system and entered over $340,000 in unauthorized pay and entitlements for himself and the defendants.  In return, the defendants kicked back at least $150,000 of the money they received to Lane.

Anjakos, Hollier, and Lopez were each sentenced to three years of probation and six months of home detention.  Chavez was sentenced to three years of probation.

### United States v. Lane, Central District of California

On October 15, 2007, Jesse D. Lane, Jr., a former civilian employee of the Department of Defense (DOD) and member of the California Army National Guard, was sentenced to 30 months of imprisonment and ordered to pay $323,228 in restitution.  In his

26

plea of guilty to conspiracy and honest services wire fraud, he admitted to defrauding the United States in the scheme described above.

---

### United States v. Bloom, District of Columbia

On February 16, 2007, Philip Bloom was sentenced to 46 months of imprisonment for his role in connection with a scheme to defraud the Coalition Provisional Authority - South Central Region (CPA-SC) in Al-Hillah, Iraq. Bloom, a United States citizen living in Romania and working as a contractor in Iraq, previously pleaded guilty to conspiracy, bribery, and money laundering. He was also ordered to serve two years of supervised release following his incarceration and to pay restitution of $3.6 million and forfeiture of $3.6 million.

Bloom is a United States citizen who owned and operated several companies in Iraq and Romania. During his guilty plea and in court filings, Bloom admitted that, from December 2003 through December 2005, he conspired to rig the bids on contracts being awarded by the CPA-SC so that all of the contracts were awarded to Bloom. His co-conspirators included Robert Stein, a former soldier with the United States Army assigned to the CPA-SC, a Department of Defense contract employee, and numerous public officials including several high-ranking United States Army officers. In return, Bloom provided the public officials offers of future employment as well as over $1 million in cash, SUVs, sports cars, a motorcycle, jewelry, computers, business class airline tickets, liquor, and other items of value.

As part of scheme, Bloom laundered over $2 million in currency, designated for the reconstruction of Iraq, that his co-conspirators stole from the CPA-SC. Bloom then used his foreign bank accounts in Iraq, Romania, and Switzerland to send the stolen money to his co-conspirators in return for them awarding contracts to Bloom and his companies. In total, Bloom received over $8,641,000 in rigged contracts. Bloom's co-conspirators used stolen United States currency to purchase illegally controlled weapons including assault rifles, silencers, and grenade launchers.

---

### United States v. Stein, District of Columbia

On January 29, 2007, co-conspirator Robert J. Stein, the Comptroller and Funding Officer for the CPA-SC, was sentenced to nine years of imprisonment, three years of supervised release, and ordered to pay $3.6 million in restitution for his role in this scheme. Stein had previously pleaded guilty to conspiracy, bribery, money laundering,

27

possession of machine guns, and possession of a firearm as a felon.  He had participated in stealing $2 million in currency from the CPA-SC that had been slated to be used for the reconstruction of Iraq.

---

### United States v. Hopfengardner, District of Columbia

On June 25, 2007, Bruce D. Hopfengardner, a former Lieutenant Colonel in the United States Army Reserve, was sentenced to 21 months of imprisonment for his role in a conspiracy and money laundering scheme involving contracts in the reconstruction of Iraq. He was also ordered to forfeit $144,500 and serve a term of three years of supervised release.  Hopfengardner previously pleaded guilty to conspiracy and money laundering. Bloom funneled $2 million of money stolen from the CPA-SC to Hopfengardner and other public officials in return for awarded contracts.

---

### United States v. Driver, Harrison, Morris, Whiteford, and Wheeler, District of New Jersey

On February 1, 2007, United States Army Colonel Curtis G. Whiteford, United States Army Lt. Colonels Debra M. Harrison and Michael B. Wheeler, and civilians Michael Morris and William Driver, were indicted on charges of various crimes related to a scheme to defraud the CPA-SC in al-Hillah, Iraq.

Whiteford was once the second-most senior official at CPA-SC. Harrison, the former Comptroller at CPA-SC oversaw the expenditure of CPA-SC funds for reconstruction projects.  Wheeler was an advisor for CPA-SC projects for the reconstruction of Iraq.  They were charged with conspiracy, bribery, honest services wire fraud, interstate transportation of stolen property, and bulk cash smuggling.  Harrison was also charged with money laundering and falsification of a tax return.

Morris, a United States citizen in Romania who owns and operates a Cyprus-based financial services business, was charged with conspiracy and honest services wire fraud. Driver, Harrison's husband, was charged with money laundering.

According to the indictment, from December 2003 through December 2005, Whiteford, Harrison, Wheeler, and Morris conspired with at least three others, Bloom, Stein, and Hopfengardner, to rig the bids on contracts being awarded by the CPA-SC so that all of the contracts were awarded to Bloom.  Morris allegedly assisted Bloom in making these wire transfers of stolen CPA-SC funds and funneling those monies to the co-

28

conspirators.  Harrison and her husband, Driver, for example, allegedly received a Cadillac Escalade as a bribe and used tens of thousands of dollars for improvements to their home in Trenton, including the installation of a new deck and a hot tub.  Whiteford allegedly received at least $10,000 in cash, a $3,200 watch, and a job offer from Bloom.

The indictment further alleges that during the course of the conspiracy, Stein, Whiteford, Harrison, Wheeler, and Hopfengardner used United States currency stolen from the CPA-SC to funnel funds to Bloom for the purchase of weapons that they converted to their own personal use in the United States, including machine guns, assault rifles, silencers, and grenade launchers.

---

**United States v. Merkes, District of Columbia**

On June 1, 2007, Steven Merkes, a former Department of Defense (DOD) employee, was sentenced to 12 months and one day of imprisonment and ordered to pay $24,000 in forfeiture for accepting illegal gratuities from a government contractor. Merkes had previously pled guilty to accepting an illegal gratuity.  Beginning in early 2005, he worked as a civilian DOD employee in Stuttgart, Germany, as an operational support planner in the Future Operations Division of the United States Army Headquarters, Special Operations Command–Europe.  Merkes admitted that in early 2005 he took official acts to benefit Phillip Bloom, a United States citizen who operated and controlled construction and service companies in Romania and Iraq that did business with the United States government.  Shortly thereafter, Merkes accepted a job offer and $24,000 from Bloom, knowing that the job offer and the money were for official acts he had agreed to perform for Bloom.

---

**United States v. Rivard, Western District of Texas**

A former Major in the United States Army Reserve was sentenced on October 19, 2007, for conspiracy, bribery, and money laundering in connection with the fraudulent awarding and administration of United States government contracts in Balad, Iraq.  John Allen Rivard received ten years of imprisonment, three years of supervised release, a $1 million preliminary order of forfeiture, and a $5,000 fine.  Rivard had previously pled guilty to bribery, conspiracy to commit bribery, and money laundering in connection with the fraudulent awarding and administration of United States government contracts in Balad, Iraq.

29

As part of his earlier guilty plea, Rivard admitted that, from April 2004 through August 2005 while he was deployed to Logistical Support Area Anaconda near Balad, Iraq, he conspired with a government contractor to direct federally-funded contracts to the government contractor's company.  In exchange, Rivard received payments in the form of bribes calculated at five percent of the value of the contract awarded. Rivard awarded multi-million dollar contracts for items including tractor trailers to the government contractor's company.  The total value of the contracts awarded was approximately $21 million.

Rivard admitted to actually receiving over $220,000 in bribes in exchange for using his official position at Logistical Support Area Anaconda to facilitate the award and payment of contracts to the government contractor's company.  Rivard also admitted to conspiring with others in the United States to launder the proceeds of the bribery scheme by sending money to the others to pay for, among other things, rent on a West Hollywood, California, apartment and a down payment on a new BMW convertible.  Under the terms of his plea agreement, Rivard agreed to forfeit to the United States the property and assets he acquired during the course of his bribery and money laundering scheme.

---

### United States v. Cockerham, Cockerham, and Blake, Western District of Texas

A major in the United States Army, his wife and his sister were indicted on bribery, conspiracy, money laundering, and obstruction charges arising out of the Major's service as an Army contracting officer in Kuwait during 2004 and 2005.  The indictment, returned on August 22, 2007, charged Major John Cockerham, Jr., Melissa Cockerham, his wife, and Carolyn Blake, his sister, with conspiracy to defraud the United States and to commit bribery, conspiracy to obstruct justice, and money laundering conspiracy.  Major Cockerham was also charged with bribery.  The three defendants were arrested the previous month on similar charges in criminal complaints.

According to the indictment, from late June 2004 through late December 2005, Major Cockerham was deployed to Camp Arifjan, Kuwait, serving as a contracting officer responsible for soliciting and reviewing bids for Department of Defense (DOD) contracts in support of operations in the Middle East, including Operation Iraqi Freedom.  The contracts were for various goods and services to DOD, e.g., bottled water destined for soldiers serving in Kuwait and Iraq.

Major Cockerham, Melissa Cockerham, Blake, an unidentified co-conspirator, and others allegedly accepted millions of dollars in bribe payments in return for the Major awarding co-conspirator contractors and others DOD contracts through a rigged bidding

process.  Cockerham allegedly guaranteed that a contractor would receive a contract in return for the payment of money. Cash bribes paid to the defendants and other co-conspirators allegedly totaled $9.6 million.  The indictment also alleges that Melissa Cockerham and Carolyn Blake received millions of dollars from these contractors who then deposited the money in bank accounts and safe deposit boxes in Kuwait and Dubai.

---

## United States v. Delgadillo and Granados, Western District of Texas

On November 2, 2007, Lilia Delgadillo, former civilian employee of the Defense Finance and Accounting Service (DFAS), Department of Defense, Fort Bliss, Texas, pled guilty to wire fraud.  Her co-worker, Saul Granados, pled guilty to the same charge on September 7, 2007.

Both Delgadillo and Granados devised a scheme to defraud the United States through the misuse of a DOD pay-processing computer system.  A portion of the funds had been earmarked for operations in Iraq.

---

## United States v. Hall, District of Columbia

On November 20, 2007, Terry Hall, a civilian contractor, was indicted and arrested in Atlanta on a criminal complaint charging bribery.  Hall allegedly paid more than $2.5 million and other items of value in bribery payments to a United States military contracting officer assigned to Camp Arifjan, a United States Army base in Kuwait, in order to influence the actions of that officer, including the awarding of contracts.

Hall operated companies that had contracts with the United States military in Kuwait, including Freedom Consulting and Catering Company, United States Eagles Services Corporation, and Total Government Allegiance.  According to the indictment, those companies received more than $20 million in military contracts for providing, among other things, bottled water to the United States military in Kuwait.  Hall allegedly offered and paid money to the Army Major to influence the Major's official acts, including the awarding of the bottled water blanket purchase agreements.

---

**United States v. Murphy, Middle District of Florida**

On March 15, 2007, Bonnie Murphy, a former Department of Defense (DOD) employee, was sentenced to one year of probation and a $1,500 fine following her guilty plea for accepting illegal compensation from an Iraqi contracting firm.

Murphy deployed to Iraq in December 2003 as part of a Defense Reutilization and Marketing Service (DRMS) team. She and other DRMS employees were responsible for managing and disposing of surplus DOD property. Murphy, who worked as a civilian disposal officer at Camp Victory, Iraq, accepted several pieces of gold jewelry from the firm, which had multiple contracts with the United States government.

**United States v. Pappen, Southern District of Georgia**

On January 30, 2007, Gheevarghese Pappen was sentenced to two years imprisonment followed by one year of supervised release for soliciting and accepting an illegal gratuity. He was also ordered to pay $28,900 in restitution.

Pappen had previously pled guilty to accepting approximately $50,000 in illegal gratuities while detailed to the United States Army Area Support Group, Host Nation Office at Camp Arifjan, Kuwait, which supports United States military operations in Iraq. His official duties at Camp Arifjan included working with local companies in order to secure housing for United States Army military and civilian personnel en route to Iraq. While working in Camp Arifjan seeking apartments for United States Army employees, Pappen accepted money from a Kuwaiti realtor for assisting the realtor in obtaining contracts with the United States Army. Pappen was ordered by the United States Army Corps of Engineers to return to his domestic post in Georgia and was arrested upon his return.

**United States v. Andrews and Turner, District of Columbia**

On February 9, 2007, after a jury trial, LaTanya Andrews was sentenced to 15 months of imprisonment and two years of supervised release for conspiring to defraud the United States and committing mail fraud and bribery. Her co-defendant, Peter Turner was sentenced on September 7, 2007, to 33 months of imprisonment and a fine of $20,500.

Andrews was a payroll technician and Peter Turner was a volunteer driver for the Department of Veterans Affairs Medical Center (DVAMC). Turner and Andrews were

found to have conspired to file a forged Federal Employees Group Life Insurance form falsely designating Turner as a life-insurance beneficiary for a seriously ill employee of the DVAMC in that employee's official personnel folder. Turner then filed a fraudulent claim when the employee died and obtained a beneficiary payment of approximately $20,500. Those funds should have been paid to the deceased employee's parents. The jury further found that Andrews used her official position within the DVAMC payroll office, including her access to the official personnel folder of the deceased employee, to assist Turner in filing the false beneficiary form in that folder. In return for Andrew's assistance in the scheme, Turner paid her $1,000 from the proceeds of his fraudulent claim.

**United States v. Cross, District of Columbia**

On August 14, 2007, Mark S. Cross, was sentenced to a fine of $3,000 after pleading guilty to the misuse of a passport. Cross was a Foreign Service Officer with the United States Department of State for approximately two years and, beginning in approximately May 2002, he was stationed at the Consular Section of the United States Embassy in Caracas, Venezuela.

The investigation revealed that, during his tenure in Venezuela, Cross issued approximately forty-one non-immigrant visas to individuals without properly investigating negative information on these applicants. In addition, the investigation indicated that Cross issued a non-immigrant visa to a personal acquaintance in violation of State Department procedures and protocols. Finally, the investigation revealed that, following his resignation from the State Department, Cross used his State Department issued diplomatic passport for personal travel between the United States and the United Kingdom.

**United States v. Gompert, District of Arizona**

Scott Allen Gompert, a former Special Agent with the United States Department of Health and Human Services, Office of Inspector General, pleaded guilty on October 31, 2007, to committing bank fraud and forging the signature of a judge or court officer. As part of the plea agreement, Gompert agreed to forfeit assets equal to the criminally seized amount, including approximately $550,000 in cash, a development property in Peoria, Arizona, and a 2005 Toyota Avalon.

Gompert utilized his expertise and connections developed during more than eight years as an investigative agent specializing in Medicare fraud investigations to identify bank accounts holding criminal proceeds from fraudulent activity.  Gompert utilized this scheme to amass $1,109,159 in criminal proceeds from three fraudulent seizures.

**United States v. Gurley, Western District of Tennessee**

On December 4, 2007, Steven L. Gurley, the former General Manager of the Electronics Business Group at the Bureau of Prisons/UNICOR, was sentenced to one year of probation and a $5,000 fine.  He previously pled guilty to criminal conflict of interest. Gurley was approached by a company that offered him a position as a sales representative. The next month, the company won a sole-source contract for metal locking bars with Gurley's assistance.  Gurley did not disclose his relationship with this company to the other approving officials or to anyone else at UNICOR.

**United States v. Hackett, District of Columbia**

On June 11, 2007, Robert S. Hackett, an attorney, was sentenced to one year of probation and 40 hours of community service in connection with his prior guilty plea of misdemeanor theft.  In addition to his sentence, he agreed to make restitution to the government and not to seek or accept federal employment for five years.

According to the plea agreement, Hackett was formerly employed as an Investigator for the Office of the Federal Public Defender (FPD) for the Western District of Michigan. Hackett admitted, pursuant to the plea, that during the period of November 2001 to April 2003, he submitted monthly reimbursement requests for motor vehicle travel in which he claimed to have traveled 76,807 miles for or on behalf of the FPD, when in fact, he had only traveled 34,419 miles during that same period.  Hackett also admitted that he received approximately $15,132 in reimbursement for 42,388 more miles than his personal motor vehicle traveled during that same period.

**United States v. Harvey and Kronstein, Western District of Virginia**

On March 6, 2007, Kenneth N. Harvey was sentenced to 72 months of imprisonment and three years of supervised release and Michael G. Kronstein was sentenced to 70 months of imprisonment and three years of supervised release for their involvement in a bribery and honest services wire fraud scheme.  Both defendants were

also ordered to pay $383,621 in restitution, jointly and severally, to the United States Army, Intelligence and Security Command (INSCOM).

According to the evidence introduced at trial, Harvey was the Chief of the Acquisition Logistics and Field Support Branch within INSCOM at Fort Belvoir, Virginia, from 1998 through May 18, 2001. In this position, Harvey was responsible for recommending the award, modification, and payment of maintenance and logistics contracts in support of INSCOM missions throughout the globe. Kronstein was the owner and Chief Executive Officer of Program Contract Services Inc. (PCS), a private company he founded to receive government contracts.

At trial, the evidence showed that, in November 1998, Harvey recommended INSCOM award a sole-source, multi-million dollar maintenance and logistics contract to PCS. Following the contract award, Harvey recommended various modifications to the contract, many of which increased the total contract payout to Kronstein's company. Harvey also reviewed and approved payments to PCS, which resulted in the United States Army paying more than $4.7 million dollars to PCS. In exchange for these acts, Kronstein caused payments totaling more than $40,000 to be made to Harvey's spouse and third parties for Harvey's benefit. Kronstein also offered Harvey a position of employment with PCS at the same time Harvey oversaw a final modification to the contract. Harvey and Kronstein concealed these payments and employment offers from Harvey's superiors at INSCOM.

Karla Kronstein, Michael Kronstein's wife, had previously pled guilty to illegally supplementing Harvey's salary. On February 12, 2007, Mrs. Kronstein was sentenced to three years of probation.

## United States v. Marghi, District of Columbia

On February 8, 2007, Soraya Zinaly, known at the time of indictment as Soraya Marghi, a former Foreign Service National employee of the United States Consulate in Dubai, United Arab Emirates, was sentenced to a term of supervised probation for a period of one year. Zinaly had previously entered a plea of guilty to conspiracy to commit visa fraud.

Zinaly, who has dual Canadian and Iranian citizenship, was indicted, along with her husband and co-conspirator Shahram Shajirat, a citizen of Iran, in connection with a visas-for-sale scheme operated out of the United States Consulate in Dubai in the summer of 1999. Through this scheme, at least 25 Iranian men, women, and children purchased non-

immigrant United States visas for travel to the United States without undergoing the required security protocols.  Pursuant to the plea agreement, Zinaly persuaded her husband, Shahram Shajirat, to voluntarily come to the United States, enter a guilty plea, and cooperate with the government.

## United States v. Shajirat, District of Columbia

On August 3, 2007, Shahram Shajirat, an Iranian national, was sentenced to time served, three years of supervised release, and a fine of $30,000 after pleading guilty to conspiracy for his role in the visa fraud scheme he participated in along with his wife.

## Operation Lively Green
## District of Arizona

In 2007, 53 individuals, mostly current or former military personnel and law enforcement officials, were sentenced after pleading guilty to participating in a widespread bribery and extortion conspiracy.  The convictions arose from Operation Lively Green, an undercover investigation conducted by the Federal Bureau of Investigation (FBI) that began in December 2001.

The defendants admitted to conspiring to enrich themselves by obtaining cash bribes from persons they believed to be narcotics traffickers (but who were in fact Special Agents of the FBI) in return for using their official positions to assist, protect, and participate in the activities of an illegal narcotics trafficking organization engaged in the business of transporting and distributing cocaine from Arizona to other locations in the southwestern United States.  In order to protect the shipments of cocaine, the defendants wore their official uniforms and carried their official forms of identification, used official vehicles, and used their authority to prevent police stops, searches, and seizures of the narcotics as they drove the cocaine shipments through checkpoints guarded by the United States Border Patrol, the Arizona Department of Public Safety, and Nevada law enforcement officers.  Many of the defendants also accepted additional cash bribes in return for recruiting other public officials they believed to be corrupt to further facilitate the activities of the ostensible narcotics trafficking organization.

The defendants who were sentenced in 2007 are:

- Ronricco M. Allen, a former Staff Sergeant in the United States Air Force (USAF), was sentenced to 40 months of imprisonment and three years of supervised release;
- Sheldon L. Anderson, a former Sergeant in the United States Army (USA), was sentenced to ten months of imprisonment, a $5,000 fine, and three years of supervised release;
- Michael E. Antone, a former Specialist in the Arizona Army National Guard (AANG), was sentenced to 30 months of imprisonment, a fine of $6,000, and three years of supervised release;
- Robert L. Bakerx, a former Sergeant in the AANG, was sentenced to 55 months of imprisonment, a fine of $13,000, and three years of supervised release;
- Curtis W. Boston II, a former Sergeant in the USAF, was sentenced to 37 months imprisonment, an $18,300 fine, and three years of supervised release;
- Dannielle Browders, a former Specialist in the USA, was sentenced to five years of probation, a $2,000 fine, six months of home detention, and two hundred hours of community service;
- David M. Bustamante, a former Arizona Department of Corrections (ADC) Officer, was sentenced to 45 months of imprisonment, a $5,000 fine, and three years of supervised release;
- Joel P. Bustamante, a former Corrections Officer for the United States Bureau of Prisons, was sentenced to 20 months of imprisonment, a $7,500 fine, and three years of supervised release;
- Jorge A. Calzadillas, a former Private First Class in the AANG, was sentenced to 15 months of imprisonment, a $7,000 fine, and three years of supervised release;
- Demian F. Castillo, a former Specialist First Class with the AANG, was sentenced to 30 months of imprisonment, a fine of $14,000, and three years of supervised release;
- John J. Castillo, a former United States Immigration and Naturalization Service Inspector, was sentenced to five years of imprisonment, a $32,000 fine, and three years of supervised release;
- James M. Clear, a former United States Marine Corps (USMC) Sergeant, was sentenced to 30 months of imprisonment, a $10,000 fine, and three years of supervised release;
- Derrek J. Curry, a former Staff Sergeant in the USA, was sentenced to 50 months of imprisonment, a $38,600, and three years of supervised release;

- Benjamin L. De La Garza, a former Private First Class with the AANG, was sentenced to seven months of imprisonment, a $3,000 fine, and two years of supervised release;
- Roman A. De La Mora, a former Corrections Officer with the ADC, was sentenced to seven months of imprisonment, a $3,300 fine, and three years of supervised release;
- Adrian A. Figueroa, a former Guardsman with the AANG, was sentenced to 40 months imprisonment, a $12,000 fine, and three years of supervised release;
- Mark A. Fillman, a former Sergeant in the AANG, was sentenced to 35 months of imprisonment and three years of supervised release;
- Tony Fimbres, a former Private First Class with the AANG, was sentenced to 14 months of imprisonment, a fine of $3,000, and three years of supervised release;
- Jimmy L. Ford, a former Corrections Officer for the ADC, was sentenced to 25 months of imprisonment, a $10,000 fine, and three years of supervised release;
- Guillermo German, a former Officer with the ADC, was sentenced to 40 months of imprisonment, a $13,500 fine, and three years of supervised release;
- Daryl L. Harris, a civilian who falsely pretended to be a member of the USAF, was sentenced to nine months of imprisonment, a $9,500 fine, and three years of supervised release;
- Angel S. Hernandez, a former Sergeant in the USA, was sentenced to 28 months of imprisonment and an $8,000 fine;
- Moises Hernandez, a former Guardsman with the AANG, was sentenced one year of imprisonment, a $7,000 fine, and three years of supervised release;
- Rafael Hernandez, a former Sergeant in the USA, was sentenced to 20 months of imprisonment, a $7,000 fine, and three years of supervised release;
- Viviana Hernandez, a civilian falsely purporting to be a Guardsman with the AANG, was sentenced to five years of probation and a $3,000 fine.
- Leslie Hidalgo, a former Guardsman with the AANG, was sentenced to 18 months of imprisonment, a $10,000 fine, and three years of supervised release;
- Dustin R. Huyck, a former Specialist in the AANG, was sentenced to seven months of imprisonment, a $3,000 fine, and three years of supervised release;
- Jason Kitzmiller, a former Corporal in the USA, was sentenced to 15 months of imprisonment, a $5,000 dollar fine, and three years of supervised release;
- Steven L. Lawler, a former Sergeant with the USA, was sentenced to 15 months of imprisonment and a $3,000 fine;
- Francisco A. Marinez, a former Private First Class in the AANG, was sentenced to 15 months of imprisonment, a $3,000 fine, and three years of supervised release;
- John F. Manje, a former Sergeant in the AANG, was sentenced to 45 months of imprisonment, an $8,500 fine, and three years of supervised release;

38

- Rodney Mills, a former Staff Sergeant in the USA, was sentenced to 54 months of imprisonment and three years of supervised release;
- Ciriam Montante, a former ADC Officer, was sentenced to seven months of imprisonment, a $3,000 fine, and three years of supervised release;
- Doyle R. Morrison, a former Sergeant First Class in the USA, was sentenced to seven months of imprisonment and three years of supervised release;
- Bennie Perkins III, a former Sergeant in the USAF, was sentenced to five years of probation and a $4,000 fine;
- Darius W. Perry, a former Sergeant First Class in the AANG, was sentenced to five years of imprisonment, a $52,000 fine, and three years of supervised release;
- Mario Quintana, a former Private First Class with the AANG, was sentenced to two years of imprisonment, a $7,000 fine, and three years of supervised release;
- Travor Jarrod Richardson, a civilian falsely purporting to be serving in the USAF, was sentenced to ten months of imprisonment, a $2,000 fine, and three years of supervised release;
- Brett Riddle, a former Corrections Officer with the ADC, was sentenced to seven months of imprisonment, a $3,000 fine, and three years of supervised release;
- Rocky D. Rios, a former Guardsman with the AANG, was sentenced to 51 months of imprisonment, a $19,500 fine, and three years of supervised release;
- Eddie Rosas III, a former employee of the Nogales, Arizona Police Department, was sentenced to seven months of imprisonment, a $5,000 fine, and three years of supervised release;
- Rene A. Salas, a former Private with the AANG, was sentenced to one year and one day of imprisonment and a $3,000 fine;
- David Salazar, a former Corrections Officer with the ADC, was sentenced to ten months of imprisonment, a $2,000 fine, and three years of supervised release;
- Gladys C. Sanchez, a former Corrections Officer with the ADC, was sentenced to 30 months of imprisonment, a $12,000, and three years of supervised release;
- Mark Sanchez, a former Corrections Officer with the ADC, was sentenced to 22 months of imprisonment, a $10,000 fine, and three years of supervised release;
- Raymond Segala, a former Sergeant in the AANG, was sentenced to ten months of imprisonment, a $3,000 fine, and three years of supervised release;
- Angel M. Soto, a former Corrections Officer for the ADC, was sentenced to 45 months imprisonment, an $8,000 fine, and three years of supervised release.
- Gustavo C. Soto, a former Sergeant in the AANG, was sentenced to 27 months of imprisonment and three years of supervised release;
- Christine P. Thomas, a former Test Examiner with the Office of Personnel Management, was sentenced to three years of supervised release;

- Phillip A. Varona, a former Officer with the Nogales, Arizona Police Department, was sentenced to 30 months of imprisonment, a $15,000 fine, and three years of supervised release;
- Manuel J. Vaughn, a former Specialist in the AANG, was sentenced to seven months of imprisonment, a $3,000 fine, and three years of supervised release;
- Michael A. Vildusea, a former Corrections Officer with the ADC, was sentenced to eight months of imprisonment, a $3,000 fine, and three years of supervised release;
- Jared A. Wright, a former USMC Sergeant, was sentenced to seven months of imprisonment, a $3,000 fine, and three years of supervised release.

In addition, Marc Ryan Shipley, a civilian falsely purporting to be in the AANG pled guilty to bribery conspiracy on October 10, 2007.

## United States v. Schepens, District of Maryland

On April 6, 2007, Wayne J. Schepens, former manager, National Security Agency (NSA), was sentenced to six months of home confinement, a $100,000 fine, 100 hours of community service, and two years of probation. He had previously pled guilty to conflict of interest for using his official position to cause contracts to be awarded to business entities owned or controlled by him and his spouse.

Schepens was an employee of NSA from January 1998 until his resignation in July 2007. During his government employment, Schepens co-created and directed the Cyber Defense Exercise (CDX), an annual information assurance competition between students at various military service academies. In the CDX, "blue" teams from the participating service academies were graded on their ability to protect computer networks from attacks by "red" teams of "hackers." The red teams were comprised generally of NSA employees and military reservists.

As part of his official duties, Schepens essentially directed the CDX. Schepens knew he had financial interests that were likely to be affected by his participation in the CDX. Between March 2003 and July 2005, companies owned and operated by Schepens or his spouse obtained over $770,000 in government contracts or subcontracts with the United States Military Academy, the United States Merchant Marine Academy at Kings Point, New York, and the Naval Postgraduate School at Monterey, California, to support the CDX. One of these companies is CDXperts, a corporation in which his wife served as chief executive officer and that held government contracts and subcontracts to support the CDX. Schepens did not include CDXperts as a source of income for himself and his

40

spouse on his confidential financial disclosure report for 2004, as required by federal regulation.

This case was handled jointly by the Public Integrity Section and the United States Attorney's Office for the District of Maryland.

**United States v. Stayton and Childree, Middle District of Alabama**

Jeffrey H. Stayton, the former Chief of the Aviation Division for the United States Army Test and Evaluation Command (ATEC), and William C. Childree, the sole owner and operator of Maverick Aviation, Inc. (Maverick), were convicted on December 11, 2007, of honest services wire fraud. The jury also found Stayton guilty of obstruction of justice.

The United States Army had selected Maverick to procure and deliver two helicopters for use by the United States government. The contract was worth approximately $4.7 million. Stayton, in his capacity as an ATEC official, took actions that favored Maverick's selection as the eventual contract recipient and misled government officials about Maverick's performance under the contract. Thereafter, Childree secretly wired a third party $61,071.75 from a Maverick bank account to satisfy the entire amount on a mortgage on Stayton's personal residence. Stayton also appeared before the grand jury and falsely testified that Childree's $61,071.75 payment was a loan. Stayton also failed to disclose his solicitation or receipt of this payment to other ATEC or Army personnel on his required annual financial disclosure statements.

**United States v. Stillwell, District of Columbia**

On January 9, 2007, in the District of Columbia, former United States Department of the Interior (DOI) employee Roger G. Stillwell was sentenced to two years of probation and ordered to pay a $1,000 fine. Stillwell had previously pleaded guilty to falsely certifying his Fiscal Year 2003 Executive Branch Confidential Financial Disclosure Report. Prior to resigning, effective the date of his guilty plea, Stillwell served as the Commonwealth of the Northern Mariana Islands Desk Officer within the DOI Office of Insular Affairs.

In December 2003, Stillwell accepted gifts from former Washington, DC, lobbyist Jack A. Abramoff and then concealed his receipt of them from DOI ethics officials and his supervisors. Because the value of the gifts Stillwell received exceeded the limits

41

established by federal regulation, Stillwell was required to report them on his annual
financial disclosure form.

## United States v. Taylor, District of Columbia

On June 8, 2007, John Taylor, a former Intelligence Contingency Funds (ICF)
Officer for the Department of Defense, was sentenced to one year and one day of
imprisonment and $106,226.56 in restitution for stealing over $100,000 in intelligence
funds from his former employer.

On March 2, 2007, Taylor pleaded guilty to theft and embezzlement of government
property.  A civilian DOD employee who worked as an ICF officer, Taylor was assigned
to the 500th Military Intelligence Brigade as part of the United States Army Intelligence
and Security Command.  He was located in Camp Zama, Japan, approximately 25 miles
southwest of Tokyo.  In this role, Taylor was responsible for budgeting, disbursing, and
accounting for Intelligence Contingency Funds for use by DOD intelligence agents. Taylor
was also required to manage classified bank accounts and supervise agents engaged in
classified intelligence-gathering activity.

As part of his plea agreement, Taylor admitted that, from 2003 through January
2006, he used his official position to steal at least $106,000 in DOD funds designated for
intelligence-related activities.  In addition, he concealed his acts by falsifying accounting
records.

## United States v. Yi, District of Columbia

Chang S. Yi, a former Department of Defense employee, pleaded guilty on
November 30, 2007, to a false statement charge for failing to disclose the cash payments
made to his wife on his annual financial disclosure report, as required.

Yi was formerly employed by the United States Army as a contracting officer for
the United States Army Contract Command–Korea (USA-CCK) and stationed in Seoul,
Korea. Yi's duties included overseeing the planning, bidding, and award process for
numerous government contracts, one of which was a contract to provide security guard
services at a USA-CCK facility in Seoul.  Yi maintained a personal relationship with an
individual who was employed by the Korean company that bid on and won the contract.
In July 2003, Yi admitted, his wife accepted at least $7,100 from the wife of this
individual. The money was used to purchase airfare from Seoul to Bangkok, Thailand.  All

42

four individuals later traveled to Bangkok together.  When Yi filed his financial disclosure report covering this time period, he failed to disclose the $7,100 his wife received.

**United States v. Zolik**, District of Columbia

On December 18, 2007, former Master Sergeant Pauline T. Zolik of the United States Army stationed in Seoul, Korea, was sentenced to one year of probation, 150 hours of community service, and a $1,000 fine.  She had previously pled guilty to making a false statement on a federal housing form.  Zolik admitted that she made a false statement as to the value of a parcel of real estate on a form used by the Department of Housing and Urban Development (HUD).  Specifically, Zolik admitted that she and her husband bought the real estate, located in Florida, during 1996 and sold it in 2003.  In August 2004, on a HUD form used to provide and track information relating to real estate transactions, Zolik falsely stated that the sale price was $40,000, when in fact it was $115,000.

## STATE AND LOCAL GOVERNMENT

At the end of 2007, 23 matters of alleged corruption involving state or local government were open in the Public Integrity Section. In 2007 the Section closed 10 such matters. Also during 2007, the Section prosecuted the following cases involving state or local corruption:

### Alaska Bribery Schemes
### District of Alaska

#### United States v. Allen and Smith

Bill J. Allen, Chief Executive Officer and part-owner of VECO Corporation, and Richard L. Smith, Vice President of Community Affairs and Government Relations of VECO Corporation, an international oil field services company, pleaded guilty on May 7, 2007, to providing more than $400,000 in corrupt payments to public officials from the state of Alaska. They were previously charged with bribery, conspiracy, extortion, and honest services fraud as well as conspiracy to defraud the Internal Revenue Service of the United States Department of the Treasury.

Allen and Smith each admitted to conspiring with current and former members of the Alaska State Legislature as well as other public officials to provide illegal financial benefits to multiple elected officials in exchange for the support of those officials on legislation pending before the Alaska State Legislature. They admitted to providing greater than $400,000 in benefits to public officials from the state of Alaska in connection with the scheme. Former Alaska State House of Representatives Thomas Anderson, Victor Kohring, and Peter Kott were convicted and former Representative Bruce Weyhrauch was indicted. Lobbyist William Bobrick pled guilty for his role in this scheme.

#### United States v. Anderson

Thomas T. Anderson, a former elected member of the Alaska State House of Representatives, was sentenced on October 15, 2007, to five years of imprisonment followed by two years of supervised release. He was previously convicted of extortion, conspiracy, bribery, and money laundering. Anderson solicited and received money from

44

a FBI confidential source in exchange for agreeing to perform official acts to further a business interest represented by the source.

## United States v. Kohring

Victor H. Kohring, who served in the Alaska State House of Representatives from 1994 to 2007, was found guilty on November 1, 2007, of conspiracy, bribery, and attempted extortion. On May 4, 2007, Kohring was arrested following the unsealing of an indictment charging him, Kott, Allen, and Smith with various public corruption offenses. While serving as a representative, Kohring solicited bribes from and took action to benefit the financial interests of VECO Corporation. Kohring repeatedly agreed to lobby his colleagues and, if needed, cast votes in VECO's favor on a key petroleum production tax proposal pending before the Alaska legislature. In exchange, Kohring received multiple cash payments and solicited a $17,000 payment.

## United States v. Kott

Peter Kott, former Alaska State Representative, was sentenced on December 7, 2007, to 72 months of imprisonment followed by three years of supervised release and a $10,000 fine. Kott was a member of the Alaska House from 1992 to 2006 and served as Speaker of the House from January 1, 2003 to December 31, 2004. He had previously been found guilty of bribery, extortion, and conspiracy for corruptly soliciting and receiving financial benefits from a company in exchange for performing official acts in the Alaska State Legislature on the company's behalf. On May 4, 2007, Kott was arrested following the unsealing of the indictment.

Evidence at trial showed that Kott, while serving as a member in the state legislature, solicited bribes from and took action to benefit the financial interests of VECO Corporation. In addition, this evidence established that Kott repeatedly promised to cast votes in VECO's favor on a key petroleum production tax proposal pending before the Alaska legislature. In exchange, Kott received cash, checks, and the promise of a future job with VECO.

## United States v. Weyhrauch

Former Alaska House Member Bruce Weyhrauch was indicted on charges of bribery, conspiracy to commit extortion, and mail and wire fraud on May 3, 2007.

45

Weyhrauch, who represented Juneau in the Alaska Legislature from 2002 to 2006, was arrested after being indicted.

Weyhrauch, along with Kott and Kohring, allegedly received things of value from VECO Corporation in exchange for taking official action on behalf of VECO. Weyhrauch, specifically, wanted VECO to provide him with legal contract work for his private law practice.

In September 2007, the government filed an appeal with the Ninth Circuit regarding a pre-trial evidentiary ruling.

## United States v. Bobrick

William B. Bobrick, a lobbyist, was sentenced on May 14, 2007, to five months of imprisonment, two years of supervised release, and a $3,000 fine. He had previously pleaded guilty to conspiring to obtain bribery payments for a former elected member of the Alaska House of Representatives.

Bobrick admitted that, beginning in July 2004 and continuing until March 2005, he conspired with Thomas T. Anderson, a former member of the Alaska House of Representatives, to solicit and receive $24,000 in payments from a FBI confidential source. In return, according to Bobrick, Anderson agreed to take official action as a member of the Alaska State Legislature to further certain business projects, including securing positions on specific legislative committees and subcommittees, voting for legislation, and lobbying other state legislators for their support on legislation. Bobrick represented to one source that, in exchange for the $24,000, Anderson would "[b]e our boy in Juneau."

Bobrick also admitted that, in order to conceal the payments, he and Anderson conspired to use a company created by Bobrick, Pacific Publications, as a conduit for the payments from the FBI confidential source. During the course of the scheme, Bobrick received three payments of $8,000 each. Bobrick deposited those checks into a Pacific Publications bank account and then provided Anderson with checks drawn on the Pacific Publications account. The purpose of the company, Bobrick admitted, was in part to keep Anderson from having to list the FBI confidential informant as a source of income on Anderson's financial disclosure forms with the Alaska Public Offices Commission.

**United States v. Sunia and Lam Yuen**, District of Columbia

Lieutenant Governor Aitofele T.F. Sunia and Territorial Senator Tini Lam Yuen of the United States Territory of American Samoa were indicted on September 6, 2007 on fraud, bribery, and obstruction charges.

According to the indictment, Sunia, then-Treasurer of American Samoa, and Lam Yuen allegedly engaged in a scheme to avoid the competitive bidding process by conspiring to split a large project for furniture construction for the American Samoa school system among companies owned and operated by the defendants and a third company owned by Fa'au Seumanutafa, the Chief Procurement Officer of American Samoa. The defendants and Seumanutafa allegedly handled shared projects without competitive bidding that was worth more than $775,000 over the course of three years.

The indictment further alleges that the defendants agreed to split the projects with Seumanutafa as a bribe in exchange for his agreement not to enforce the procurement laws of American Samoa. The defendants are also charged with providing cash gifts and free contracting work to Kerisano Sili Sataua, the former Director of the American Samoa Department of Education, in exchange for his agreement to facilitate the fraudulent scheme.

Sunia and Lam Yuen were charged with fraud and bribery concerning programs receiving federal funds, and obstruction of an investigation into their conduct. Sataua was previously sentenced to 30 months of imprisonment and ordered to pay $61,000 in restitution for fraud and conspiracy in connection with this scheme and other criminal acts. Seumanutafa was previously sentenced to eight months of imprisonment and ordered to pay a $5,000 fine and $80,000 in restitution for his role in the conspiracy

---

**United States v. Armstrong, Huff, and Thompson**, Northern District of Alabama

Two former members of the City Council of Gadsden, Alabama, a former city employee, and one consultant were sentenced on August 17, 2007, for their participation in a bribery and wire fraud conspiracy.

Jimmy L. Armstrong, a former member of the Gadsden City Council, was sentenced to 18 months of imprisonment. Cathy E. Back, the former director of the Gadsden Commercial Development Authority, was sentenced to 22 months of imprisonment and ordered to pay $1,000 in restitution. Fred L. Huff, a former member of the Gadsden City Council, was sentenced to 30 months of imprisonment and ordered to

pay $1,000 in restitution and a $6,000 fine, and Larry R. Thompson, a political consultant, was sentenced to 50 months of imprisonment.

Each defendant had previously pleaded guilty to conspiracy to commit federal program bribery and honest services wire fraud in a scheme that operated from August 2005 through February 2006.  The charges stem from a bribery scheme in which Thompson, working with an individual who was cooperating with the FBI, made cash payments to influence and reward members of the Gadsden City Council for their votes in connection with a real estate development.

Armstrong and Huff each admitted that they agreed to enrich themselves by soliciting and accepting cash bribes from Thompson and the cooperating witness.  They did so with the intent of being influenced and rewarded in connection with two votes they both cast that aided a real estate development along the banks of the Coosa River in Gadsden. Armstrong and Huff admitted that they each accepted cash payments in the amounts of $800 and $1,800 respectively for their votes supporting the development. Thompson admitted that he conspired to bribe Armstrong, Huff, and two additional members of the City Council.

---

### United States v. Back, Northern District of Alabama

On August 16, 2007, Cathy E. Back, the former Director of the Gadsden Commercial Development Authority, was sentenced to 22 months of imprisonment followed by two years of supervised release and $1,000 in restitution.  Back had previously pleaded guilty to bribery and honest services wire fraud conspiracy.  Back, who worked with Larry Thompson, admitted that she conspired with Thompson to offer cash payments to four members of the Gadsden City Council with the intent to influence and reward them in connection with  real estate development in Gadsden.  They attempted to disguise the nature of the cash payments by describing them as "campaign contributions." Back also admitted that she allowed a witness, who was cooperating with the FBI, to leave cash intended for Thompson in her office.

---

### United States v. Hendrick, Southern District of Florida

On May 4, 2007, James T. Hendrick , a former attorney and named partner in the law firm of Morgan and Hendrick, was sentenced to five years of probation, 2,500 hours of community service, and a $50,000 fine.  He previously was found guilty to conspiring to obstruct a federal grand jury and witness tampering. Hendrick had served as County

48

Attorney for Monroe County, Florida.  He was taken into custody immediately after conviction.

The charges stem from a previous indictment of former Monroe County Mayor John "Jack" London on charges of tax fraud and making false statements to the FBI. London pleaded guilty to tax fraud but died before he could testify at Hendrick's trial.

Evidence in Hendrick's trial showed that London, while serving as Mayor, received a $29,000 bribe from Randall Hilliard, a political consultant who had been hired by a real estate developer to assist with obtaining building permits from the Monroe Board of County Commissioners.  Hendrick, then in the position of Monroe County Attorney, served as a conduit between London and Hilliard and participated in falsifying the true source of the bribe funds. Hendrick did so knowing that the false information would be conveyed to a federal grand jury.

This case was handled jointly by the United States Attorney's Office for the Southern District of Florida.

## United States v. McCoy, District of Iowa

Matthew William McCoy, an Iowa State Senator since 1996, was found not guilty of extortion charges on December 13, 2007.  The indictment alleged that he had used his position as a state senator to extort money from a Des Moines businessman.  McCoy claimed he had a business relationship with Thomas Vasquez, and that Vasquez had offered to pay McCoy $100 for each sale of an ADT QuietCare system that monitors the movement of in-home elderly Iowans.  Vasquez went to the FBI, which placed a hidden microphone on him and had him secretly tape conversations with McCoy.  McCoy said he only asked for the money he felt he was owed for the business relationship.  He accepted $2,000 from Vasquez.

This case was handled jointly by the Public Integrity Section and the United States Attorney's Office for the District of Iowa.

## United States v. Minor, Teel, and Whitfield, Southern District of Mississippi

A Biloxi attorney and two former Mississippi State Court judges were sentenced for their roles in an extensive bribery scheme.  On March 30, 2007, the defendants were found guilty on all 14 counts charged against them including bribery, racketeering, and fraud.

49

On September 7, 2007, Paul S. Minor, attorney, was sentenced to eleven years of imprisonment and ordered to pay a $2.7 million fine. Walter W. Teel, a former Mississippi State Chancery Court Judge, was sentenced to five years and ten months of imprisonment. Minor and Teel are also jointly and severally liable for $1.5 million in restitution. John H. Whitfield, a former Mississippi State Circuit Court Judge, was sentenced to nine years and two months of imprisonment and a $125,000 fine.

Evidence at trial showed that in November 1998, Minor guaranteed a $25,000 line of credit for Teel, purportedly for campaign expenses, at a Biloxi bank while Teel was a candidate for a judgeship in Chancery Court of Harrison County. After Teel was elected, Minor, in an effort to conceal the fact that he was paying off the loan himself, used cash and an intermediary to disguise the true source of the loan payments. Thereafter, then-Judge Teel was assigned to a civil case in chancery court in which Minor's firm represented a local bank in a bad-faith declination of coverage suit against the bank's insurance provider. The case was to be tried without a jury. As the case proceeded in 2001, Teel made favorable rulings for Minor's client on issues of discovery and summary judgment.

Around that time, then-Judge Teel and two other Chancery Court judges became the subject of a state criminal investigation for misappropriation of funds. Among the efforts Minor made to assist the judges under investigation was a meeting Minor arranged between the judges and then-Attorney General of Mississippi. Minor provided transportation to the meeting via his private jet and also hired a public relations firm to assist the judges. After Teel was indicted on state charges, Minor paid a portion of the legal expenses for Teel's defense. Teel was ultimately acquitted. Within weeks of the meeting with the Attorney General, Teel presided over a settlement conference in the lawsuit between Minor and the attorneys for the bank's insurance provider. During the negotiation, Teel made statements to the parties indicating his belief in the strength of the plaintiff's case and insinuated that, were the defendants to push the case to trial, Teel would be inclined to award punitive damages to the plaintiff. The insurance provider promptly agreed to settle the case for $1.5 million. None of the attorneys representing the insurance provider were made aware of the financial relationship between Teel and Minor.

In November 1998, Minor guaranteed a $40,000 loan, purportedly for campaign expenses, for Whitfield at a Biloxi bank while Whitfield was a candidate for re-election to the Circuit Court of Harrison County. After Whitfield was elected, Minor guaranteed an additional loan for then-Judge Whitfield for $100,000, purportedly for the down payment on a house. Minor, in an effort to conceal the fact that he was actually paying off the loans himself, used cash and an intermediary to disguise the true source of the loan payments.

50

Whitfield was later assigned to a personal injury case in circuit court in which Minor's firm represented an oil rig worker injured as a result of his employer's alleged negligence. Whitfield presided over the trial and found in favor of the client of Minor's firm. He awarded damages in the amount of $3.75 million, an award he later reduced by approximately $100,000. Minor continued to disguise the fact that he was making payments on the Whitfield loans and ultimately paid them off through the use of an intermediary.

This case was handled jointly by the Public Integrity Section and the United States Attorney's Office for the Southern District of Mississippi.

## OPERATION DOLLAR BILL
## DISTRICT OF RHODE ISLAND

The Public Integrity Section and the United States Attorney's Office for the District of Rhode Island are jointly supervising an extensive public-corruption investigation in Rhode Island known as Operation Dollar Bill. Several law enforcement agencies are conducting the investigation, which focuses on allegations of public corruption in the State of Rhode Island involving former and present members of the Rhode Island General Assembly who may have acted on legislative matters of interest to entities with whom those legislators allegedly had undisclosed financial dealings. As a result of the investigation, in 2007 two former members of the General Assembly pleaded guilty to engaging in schemes to defraud the citizens of the State of their honest services. In addition, Roger Williams Medical Center entered into a deferred-prosecution agreement that imposed a fine of $5 million and an obligation to cooperate with the investigation, and Blue Cross Blue Shield of Rhode Island entered a non-prosecution agreement, in which it agreed to cooperate and to pay $20 million into a fund that the non-profit Rhode Island Foundation will administer for the purpose of providing affordable health care services in the State.

### United States v. Martineau

Gerard M. Martineau, former Rhode Island House Majority Leader, pleaded guilty on November 2, 2007, to honest services mail fraud for engaging in extensive and undisclosed personal business dealings with a pharmacy company and a health insurer.

Blue Cross Blue Shield of Rhode Island (Blue Cross) and a corporate pharmacy chain ("the pharmacy") paid Martineau nearly $900,000 in two related schemes. Martineau formed a personal business entity called The Upland Group. Thereafter, he

51

arranged to sell paper bags to Blue Cross for promotional uses, and both plastic and paper bags to the pharmacy for its merchandising.  In return, he used his position to affect legislation that was important to these companies.  Among the most important pieces of legislation was "Pharmacy Freedom of Choice."  Blue Cross had contracted with the pharmacy for a restricted pharmacy network that required clients to use this network for their prescriptions.  This legislation would open up the network to other pharmacies. Martineau used his position as Majority Leader to prevent passage of this law.  Between 1999 and the end of the 2002 legislative session, Martineau also promoted the interests of these companies on several other pieces of legislation.  Martineau never disclosed to Rhode Island citizens his conflicts of interest with the pharmacy and the health insurer, and took steps to conceal these relationships.

## United States v. Kramer and Ortiz

John R. Kramer, former Senior Vice President for a corporate pharmacy chain (the pharmacy), and Carlos Ortiz, former Vice President for the pharmacy, were indicted on January 18, 2007, on charges of fraud and bribery.  John A. Celona, a Rhode Island State Senator who served from 1995 until his resignation in 2004, was a co-conspirator who pleaded guilty separately to the scheme charged in the indictment.

The indictment alleges that Kramer and Ortiz entered into a consulting agreement in which the pharmacy paid Celona $1,000 a month, ostensibly to improve the pharmacy's image among consumers.  However, the indictment alleges, the real purpose of the funds was to cause Celona to act upon legislation in the best interests of the pharmacy.  Celona apparently used his position as a member of the Senate Corporations Committee, and later as its Chairman, to block passage of the "Pharmacy Freedom of Choice" legislation. Kramer and Ortiz then allegedly concealed the true nature of Celona's relationship with the pharmacy.

In addition to the monthly monetary compensation, the pharmacy also gave Celona tickets to golf outings and professional sporting events as well as travel to Florida and California.

Celona previously pled guilty and is serving a prison term of two and a half years.

**United States v. Rickenbacker, District of South Carolina**

On April 2, 2007, John H. Rickenbacker, a former member and Chairman of the County Council of Orangeburg County, South Carolina, was sentenced to one year and one day of imprisonment, a $5,000 fine, three years of supervised release, and 100 hours of community service. Rickenbacker had previously pled guilty to bribery and extortion related to programs receiving federal funds.

According to the indictment, Rickenbacker solicited and received bribes between December 2005 and May 2006 totaling $50,000. The payments were made by an undercover FBI agent posing as a consultant to a company interested in acquiring the Regional Medical Center of Orangeburg and Calhoun Counties. In exchange for the money, Rickenbacker agreed to provide the undercover FBI agent with a copy of a valuation report analyzing the financial condition of the hospital. The report was being prepared at the request of the Orangeburg County Council and would assist the company as it prepared to bid on the hospital. Rickenbacker also indicated he would provide the necessary political support to get the sale approved by the Orangeburg County Council.

This case was handled jointly by the Public Integrity Section and the United States Attorney's Office for the District of South Carolina.

## Corruption Within
## San Juan, Puerto Rico

**United States v. Vazquez-Botet and Morell-Corrada**

On January 30, 2007, Vazquez-Botet (Vazquez) and Morell-Corrada (Morell), two residents of Puerto Rico, were each sentenced to five years of imprisonment for their involvement in a scheme to extort a group of contractors in connection with the Superaqueduct construction project along the north coast of Puerto Rico. Each defendant was also ordered to serve three years of supervised release upon his release from custody and to pay fines of $100,000 each. They were previously found guilty of conspiracy, extortion, as well as fraud in a scheme to deprive the Commonwealth of income tax involving unreported income.

In early 1995 and continuing into 1999, the defendants, together with Jose Granados-Navedo (Granados), a member of the Commonwealth of Puerto Rico's House of Representatives, extorted money from a group of contractors in Puerto Rico who ultimately obtained contracts for the construction of a public works project costing $372

53

million and involving the construction of a 40-mile water pipe from Arecibo to San Juan, Puerto Rico.  Vazquez, Granados, and Morell demanded more than $2 million from the contractors for assistance in securing and preserving their contracts.

Vazquez, a licensed pediatric ophthalmologist, was selected in 1991 by the New Progressive Party to be campaign director for a gubernatorial candidate and served as campaign manager for the candidate's re-election in 1996.  Vazquez demanded and received cash payments from the contractors totaling over $300,000 and directed that additional payments be made to third parties totaling approximately $60,000 to retire debts from the 1996 campaign.  In convicting the defendant of the mail and wire fraud, the jury found that Vazquez failed to declare and pay taxes due on the cash payments from the contractors as well as approximately $150,000 in cash and checks earned in his medical practice.  The fraud charge against Vazquez involved his failure to report and pay taxes on both the extortion payments and money earned in Vazquez's medical practice.

Morell, who served as the Secretary General of the same political party as Vazquez from 1991 until his resignation in 1996, demanded and received $125,000 between September 1997 and May 1999, mostly under the guise of a sham retainer for legal services.  Morell  was a licensed attorney and had worked as an administrator for the University of Puerto Rico before his term as the chief executive officer of the political party.  He resumed his private law practice when he left the party.

---

## United States v. Granados-Navedo and Cobian-Guzman

On April 20, 2007, Jose Granados-Navedo (Granados) and Jose Cobian-Guzman (Cobian) were sentenced for their roles in the corruption scheme. Granados was sentenced to two years of imprisonment to be followed by three years of supervised release and a fine of $10,000.

Granados had previously pled guilty to conspiracy for his role in the scheme to extort approximately $2.4 million from local contractors in Puerto Rico seeking subcontracts in the construction of the Superaqueduct.  He admitted to receiving more than $175,000 during the scheme.  He was a legislator in Puerto Rico for many years and became Speaker of the House of Representatives.

Cobian was sentenced to five years of probation, with six months of house arrest, and ordered to pay restitution of $129,700. Cobian had previously pled guilty to two extortion schemes in which he and others paid officials in the Puerto Rico Commonwealth government for assistance in obtaining contracts with the government.  Cobian, a

contractor, was the former president and treasurer of an electrical and mechanical construction company that had obtained numerous government contracts.

## United States v. Siegelman and Scrushy, Middle District of Alabama

Former Alabama Governor Don Siegelman and former HealthSouth Chief Executive Officer Richard Scrushy were sentenced to prison terms on June 28, 2007, for their roles in a bribery, conspiracy, and fraud scheme. Siegelman was sentenced to 88 months of imprisonment and ordered to pay $50,000 in fines, and Scrushy was sentenced to 82 months of imprisonment and fined $150,000.

Siegelman was convicted of mail fraud arising from a pay-for-play scheme in which he exchanged official acts and influence for cash, property and services from Alabama businessman and consultant Clayton "Lanny" Young. The jury found that Siegelman took thousands of dollars in bribes from Young to aid Young's business interests, including the awarding of contracts to companies controlled by Young. The jury also found Siegelman and Scrushy guilty of crimes arising from a bribery scheme in which Scrushy paid Siegelman $500,000 in laundered funds to obtain a seat on the state regulatory board governing HealthSouth.

Others involved in this conspiracy include: 1) Businessman Clayton "Lanny" Young who was sentenced to two years of imprisonment, a $25,000 fine, and three years of supervised release; 2) Nicholas D. Bailey, an aide to Lt. Governor Siegleman, who was sentenced to 18 months of imprisonment and three years of supervised release; 3) William C. Kirsch, an architect, who was sentenced to five years of probation, one year of home confinement, and 200 hours of community service. Siegelman's former chief of staff, Paul Hamrick, and his former Highway Director, Gary "Mac" Roberts, were acquitted.

This case was handled jointly by the Public Integrity Section and the United States Attorney's Office for the Middle District of Alabama.

## United States v. Thacker, Southern District of Texas

On February 23, 2007, Floyd Gary Thacker was sentenced to five months of imprisonment, five months of home detention, two years of supervised release, and a $6,000 fine based on his previous plea of guilty to conspiracy to engage in honest services mail and wire fraud. Thacker is the owner of Thacker Operating Company, an

Atlanta-based construction and building services company, which provided energy-related services for municipal governments in Houston and Atlanta.

Between December 1998 and July 2000, Thacker provided Atlanta public officials with secret cash payments, meals, entertainment, and trips, totaling over $55,000, in exchange for favorable influence for Thacker's company seeking to do business in Atlanta. Between June and December 2002, Thacker established a similar relationship with Monique McGilbra, then-Director of Building Services for the City of Houston and provided her with cash, gifts, meals, and trips in hopes of obtaining City contracts. In April 2003, Thacker signed a Master Agreement for his company to provide energy services to Houston.

This case is one of several stemming from a multi-district probe of public corruption by city officials relating to contracting services in Atlanta, Cleveland, East Cleveland, Houston, and New Orleans.

These cases were handled jointly by the Public Integrity Section and the United States Attorney's Offices for the Southern District of Texas and the Northern District of Ohio.

<u>Others sentenced in this probe include:</u>

Monique McGilbra, former Director of Building Services for the City of Houston, was previously sentenced in both Cleveland and Houston. In Cleveland she was sentenced to three years of imprisonment and fined $5,000 and in Houston the sentence was 30 months of imprisonment, to run concurrently with the three-year term already imposed. She was charged and convicted of conspiracies to commit honest services mail and wire fraud in both cities.

Oliver Spellman, former chief of staff to the former Mayor of Houston, was previously sentenced to two years of probation and a $10,000 fine following his guilty plea to honest services mail and wire fraud conspiracy charges in Cleveland.

Gilbert Jackson, New Orleans, Louisiana, was sentenced to 82 months of imprisonment following his conviction in Cleveland for racketeering and conspiracy to commit honest services mail and wire fraud violations. Jackson was also ordered to pay $100,000 in restitution to the City of Cleveland. In addition, Jackson pleaded guilty to tax evasion in the United States District Court for the Eastern District of Louisiana and was sentenced to 27 months of imprisonment followed by three years of supervised release, a $5,000 fine, and $179,380 in restitution to the IRS. As part of his plea agreement, Jackson admitted

56

that he knowingly and willfully failed to pay income taxes on any of his income from his employer, Camp Dresser & McKee, for the period 1998 through 2002. During this time, he admitted he earned consulting income totaling in excess of $504,000, in addition to his salary and bonuses.

Cleveland businessman Nate Gray, was sentenced to 15 years of imprisonment and ordered to pay $1.5 million in restitution to the IRS for corruption and tax charges following his conviction in Cleveland.

Brent Jividen, a former employee of Honeywell Corporation, was sentenced to 30 months of imprisonment following his guilty plea in Cleveland to racketeering conspiracy charges relating to honest services wire and mail fraud.

Emmanuel Onunwor, former Mayor of East Cleveland, was sentenced to 108 months of imprisonment and ordered to pay restitution to the City of East Cleveland of more than $5.1 million. Onunwor was convicted in Cleveland of racketeering conspiracy and a variety of other charges related to his corrupt activities with Cleveland businessman Nate Gray.

Ricardo Teamor, a former attorney, was sentenced to four months of imprisonment and fined $15,000 following his guilty plea in Cleveland to corruption charges.

Joseph T. Jones, former Cleveland City Councilman, was sentenced to two years of probation following his guilty plea in Cleveland to honest services fraud involving Teamor and Gray. As part of his plea agreement, he resigned from the City Council immediately.

**United States Virgin Islands**
**Bribery Scheme**
**District of the Virgin Islands**

**United States v. Brewley, Griffin, and Modeste**

Hollis L. Griffin, the former Director of the United States Virgin Islands Department of Planning and Natural Resources (DPNR) Division of Environmental Protection was sentenced on May 3, 2007, to four years of imprisonment for conspiring to defraud the Virgin Islands government. Griffin was also ordered to serve three years of supervised release and to pay more than $1 million in restitution. Earl E. Brewley, a former United States Virgin Islands fireman, and Esmond J. Modeste, an Atlanta businessman, were sentenced on May 16, 2007. Brewley was order to serve 21 months of

imprisonment and Modeste received 30 months of imprisonment. Both defendants were held jointly and severally liable for more than $1 million in restitution and also sentenced to three years of supervised release.

The three defendants had previously pled guilty to conspiring to defraud the Virgin Islands government of over $1.4 million in federal and local funds in an elaborate bribery and kickback scheme. Based on court documents, in early 2000 and continuing for five years, Griffin, Brewley, Modeste, and others formed a fictitious company by the name of Elite Technical Services (Elite) and used the fictitious company, as well as other companies, to seek and obtain awards on at least seven government contracts. These contracts were awarded by DPNR and the Virgin Islands Department of Property and Procurement (DP&P) on behalf of DPNR and the Virgin Islands fire service. Although little or no actual work was performed on the contracts, payments totaling over $1.1 million were made to Elite and the other companies. Once these contract proceeds were paid, Brewley, Modeste, and others paid bribes and kickbacks totaling between $300,000 and $350,000 to at least four territorial government officials including Griffin, according to the plea agreements.

## United States v. Biggs, Plaskett, and Marchena

On November 8, 2007, Marc A. Biggs the former Commissioner of the Department of Property and Procurement, Dean C. Plaskett, the former Commissioner of the Department of Planning and Natural Resources, and Leroy L. Marchena, a local businessman were indicted in the United States Virgin Islands.

The indictment charges Biggs and Plaskett with demanding and accepting a series of bribes and kickbacks in exchange for awarding approximately $1.4 million in government contracts and then authorizing over $1 million in progress payments, despite little or no work having been performed. Both defendants are charged with conspiracy to violate the federal program bribery statute, honest services mail fraud, and federal program bribery. Plaskett and Biggs are also charged, along with local businessman Leroy L. Marchena, with obstruction of justice stemming from their attempts to thwart the joint federal and local investigation into the underlying bribery and kickback scheme.

## United States v. Blyden

On August 21, 2007, Brent E. Blyden, the former Director of Permits at the United States Virgin Islands Department of Planning and Natural Resources (DPNR), entered his

guilty plea to conspiring to obstruct a federal investigation into a $1.4 million bribery and kickback scheme. Blyden admitted to participating in an effort to create backdated false and fictitious documents to cover up the fact that certain contract work was never performed, and, to create the appearance of a DPNR investigation into Elite and the government contracts awarded to the sham entity. He also pled guilty to making false statements to federal and local law enforcement officials investigating the bribery and kickback scheme.

59

## FEDERAL ELECTION CRIMES

As described in Part I, during 2007 the Public Integrity Section continued its nationwide oversight of the handling of election crime investigations and prosecutions. The Section also continued to assist in the implementation and execution of the Department's Ballot Access and Voting Integrity Initiative. The purposes of this ongoing Initiative are to increase the Department's efforts to deter and prosecute election crimes, and to protect voting rights. As a result of the Initiative, during 2007, the number of election crime matters investigated by federal prosecutors and investigators throughout the country continued to increase, as did the Section's operational involvement in election crime matters. At the end of 2007, the Section was supervising and providing advice on 142 election crime matters nationwide. The Section also concurred in the closing of an additional 77 election crime matters nationwide during the year. As of December 31, 2007, 18 matters involving possible election crimes were pending in the Section.

### United States v. Cash, District of Columbia

On August 10, 2007, Monica J. Cash, a former office manager of the Women's Campaign Fund (WCF), was sentenced to eight months of imprisonment followed by eight months of home confinement. Cash had previously pled guilty to committing bank fraud, dealing in a forged security, and making false statements. Cash also must pay restitution of $83,050 and serve three years of supervised release after her term of imprisonment.

WCF is a political committee registered with the United States Federal Election Commission (FEC). The indictment alleged that Cash, between July 30, 2001, and December 2003, embezzled approximately $83,050 in cash from WCF by drafting 58 WCF checks made payable to "Monica Cash" or "Cash" and forging the signatures of her supervisors. As a result of her embezzlement scheme, Cash willfully caused WCF's treasurer to unwittingly file periodic reports with the FEC that Cash knew were false.

### United States v. Collier and Price, District of Columbia

Two South Carolina businessmen pled guilty on August 3, 2007, to causing numerous federal campaigns to make false statements to the Federal Election Commission

(FEC).  David Therrell Collier and Robert Howell Price III each pleaded guilty to causing a false statement to be made.

As part of their pleas, both defendants admitted that, beginning in 1997, they worked with a tribe of Native Americans in South Carolina to operate a tribal gaming facility. Collier and Price also sought to further the gaming interests of that tribe with certain federal elected officials.  To do so, from March 2000 through September 2004, Collier and Price solicited and obtained campaign contributions totaling over $65,000 from friends, family members, and business associates.  Collier and Price directed those contributions to candidates for federal office and federal elected officials, and then caused the contributing individuals, or conduits, to be reimbursed with tribal funds.  These actions caused the campaign committees of the candidates and officials to unwittingly file false reports with the FEC listing the individuals as the contributors, rather than the tribe.

## United States v. Fieger and Johnson, Eastern District of Michigan

Geoffrey Fieger and Vernon Johnson, both attorneys, were indicted on August 21, 2007, for campaign financing offenses and false statements relating to fundraising for the 2004 presidential campaign.  Fieger was also charged with obstruction of justice.  Fieger and Johnson are officers of the Michigan law firm Fieger, Fieger, Kenney & Johnson and have both been practicing law for more than 20 years.

According to the indictment, Fieger and Johnson conspired to funnel more than $125,000 in illegal campaign contributions to the 2004 presidential campaign of United States Senator John Edwards.  Without the knowledge of Senator Edwards or his campaign personnel, the defendants, the indictment charges, caused more than 60 persons, known as straw donors, to make contributions of $2,000 per donor – contributions that were actually paid for by the Fieger firm rather than the named donors.  The alleged straw donors included friends of Fieger, three minor children of Fieger, employees of the firm, and relatives of employees.

Also according to the indictment, Fieger tried to obstruct and impede the grand jury's investigation of the illegal campaign contributions.  Specifically, the indictment alleges that he attempted to shift responsibility for the illegal contributions to a deceased officer of the Fieger firm, attempted to mislead the grand jury by telling witnesses false information with the intent that the witnesses would repeat that false information to law enforcement authorities, and attempted to conceal an incriminating document from the grand jury.

**United States v. LeBlanc, District of Columbia**

On March 28, 2007, David B. LeBlanc, former President and CEO of a private health care company located in Plano, Texas, was sentenced to a fine of $100,000, and one year of probation. He previously had pled guilty to illegally contributing approximately $50,000 in corporate money over a five-year period to federal political campaigns in violation of the Federal Election Campaign Act.

During approximately April 1997 through December 2002, LeBlanc and the company's Director of Government Relations, Donald M. Boucher, obtained corporate funds and then used those funds to make approximately $50,000 in prohibited corporate contributions to political committees, using their individual names. LeBlanc obtained funds for these contributions, in part, by his approving periodic bonus payments for Boucher, a portion of which Boucher would return to LeBlanc.

**United States v. Boucher, District of Columbia**

On April 12, 2007, Donald M. Boucher, Director of Government Relations for the private health care company discussed above, was sentenced to a fine of $50,000 and one year of probation. He previously had pled guilty to causing the submission of false statements to the Federal Election Commission (FEC). Boucher, who reported to the President of the company, David LeBlanc, worked with LeBlanc in funneling corporate money, under the guise of using their own names, to federal political campaigns. Boucher subsequently caused numerous political committees to submit materially false statements to the FEC as these committees were not identifying the company as the true source of these contributions.

**United States v. Phelps, District of Columbia**

On October 23, 2007, Kenneth Phelps, a former deputy manager and treasurer for Lockheed Martin Corporation, was sentenced to 16 months of imprisonment and three years of supervised release, both to run concurrently for each criminal count, and $163,115.53 in restitution. Phelps had previously pled guilty to wire fraud making false statements.

From January 2002 to December 2003, Phelps carried out a scheme in which he took Lockheed PAC checks, totaling approximately $160,000, and, instead of writing the checks to federal political candidates or campaigns, wrote them to himself. Phelps then

forged the signatures of two Lockheed PAC executives, who had signatory authority, and deposited those checks into his personal bank account for his own use.  He then took further steps to evade detection of his theft by manipulating information in a computer system and falsifying information to the Federal Election Commission.

63

# PART III

## NATIONWIDE FEDERAL PROSECUTIONS
## OF CORRUPT PUBLIC OFFICIALS

### INTRODUCTION

The tables in this section of the Report reflect data that is compiled from annual nationwide surveys of the United States Attorneys' Offices by the Public Integrity Section.

As discussed in Part I, most corruption cases are handled by the local United States Attorney's Office in the district where the crime occurred.  However, on occasion outside prosecutors are asked either to assist the local office on a corruption case, or to handle the case entirely as a result of recusal of the local office due to a possible conflict of interest.  The figures in the following tables include all public corruption prosecutions within each district.

### LIST OF TABLES

**TABLE I:**      Nationwide Federal Prosecutions of Corrupt Public Officials in 2007

**TABLE II:**     Progress Over the Past Two Decades: Nationwide Federal Prosecutions of Corrupt Public Officials

**TABLE III:**    Federal Public Corruption Convictions by District Over the Past Decade

**TABLE IV:**     Public Integrity Sections's Federal Prosecutions of Corrupt Public Officials in 2007

64

## TABLE I

## NATIONWIDE FEDERAL PROSECUTIONS
## OF CORRUPT PUBLIC OFFICIALS
## IN 2007

### Federal Officials

| | |
|---|---|
| Charged | 426 |
| Convicted | 405 |
| Awaiting Trial | 116 |

### State Officials

| | |
|---|---|
| Charged | 128 |
| Convicted | 85 |
| Awaiting Trial | 65 |

### Local Officials

| | |
|---|---|
| Charged | 284 |
| Convicted | 275 |
| Awaiting Trial | 127 |

### Others Involved

| | |
|---|---|
| Charged | 303 |
| Convicted | 249 |
| Awaiting Trial | 179 |

### Totals

| | |
|---|---|
| Charged | 1141 |
| Convicted | 1014 |
| Awaiting Trial | 487 |

65

TABLE II

### PROGRESS OVER THE LAST TWO DECADES:
### NATIONWIDE FEDERAL PROSECUTIONS OF CORRUPT PUBLIC OFFICIALS

|  | 1988 | 1989 | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 |
|---|---|---|---|---|---|---|---|---|---|---|
| **FEDERAL OFFICIALS** | | | | | | | | | | |
| Charged | 629 | 695 | 615 | 803 | 624 | 627 | 571 | 527 | 456 | 459 |
| Convicted | 529 | 610 | 583 | 665 | 532 | 595 | 488 | 438 | 459 | 392 |
| Awaiting Trial as of 12/31 | 86 | 126 | 103 | 149 | 139 | 133 | 124 | 120 | 64 | 83 |
| **STATE OFFICIALS** | | | | | | | | | | |
| Charged | 66 | 71 | 96 | 115 | 81 | 113 | 99 | 61 | 109 | 51 |
| Convicted | 69 | 54 | 79 | 77 | 92 | 133 | 97 | 61 | 83 | 49 |
| Awaiting Trial as of 12/31 | 14 | 18 | 28 | 42 | 24 | 39 | 17 | 23 | 40 | 20 |
| **LOCAL OFFICIALS** | | | | | | | | | | |
| Charged | 276 | 269 | 257 | 242 | 232 | 309 | 248 | 236 | 219 | 255 |
| Convicted | 229 | 201 | 225 | 180 | 211 | 272 | 202 | 191 | 190 | 169 |
| Awaiting Trial as of 12/31 | 79 | 122 | 98 | 88 | 91 | 132 | 96 | 89 | 60 | 118 |
| **PRIVATE CITIZENS INVOLVED IN PUBLIC CORRUPTION OFFENSES** | | | | | | | | | | |
| Charged | 303 | 313 | 208 | 292 | 252 | 322 | 247 | 227 | 200 | 292 |
| Convicted | 240 | 284 | 197 | 272 | 246 | 362 | 182 | 188 | 170 | 243 |
| Awaiting Trial as of 12/31 | 109 | 109 | 71 | 67 | 126 | 99 | 95 | 91 | 80 | 106 |
| **TOTALS** | | | | | | | | | | |
| Charged | 1274 | 1348 | 1176 | 1452 | 1189 | 1371 | 1165 | 1051 | 984 | 1057 |
| Convicted | 1067 | 1149 | 1084 | 1194 | 1081 | 1362 | 969 | 878 | 902 | 853 |
| Awaiting Trial as of 12/31 | 288 | 375 | 300 | 346 | 380 | 403 | 332 | 323 | 244 | 327 |

**TABLE II (continued)**

| | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **FEDERAL OFFICIALS** | | | | | | | | | | | |
| Charged | 442 | 480 | 441 | 502 | 478 | 479 | 424 | 445 | 463 | 426 | 10586 |
| Convicted | 414 | 460 | 422 | 414 | 429 | 421 | 381 | 390 | 407 | 405 | 9434 |
| Awaiting Trial as of 12/31 | 85 | 101 | 92 | 131 | 119 | 129 | 98 | 118 | 112 | 116 | |
| **STATE OFFICIALS** | | | | | | | | | | | |
| Charged | 91 | 115 | 92 | 95 | 110 | 94 | 111 | 96 | 101 | 128 | 1895 |
| Convicted | 58 | 80 | 91 | 61 | 132 | 87 | 81 | 94 | 116 | 85 | 1679 |
| Awaiting Trial as of 12/31 | 37 | 44 | 37 | 75 | 50 | 38 | 48 | 51 | 38 | 65 | |
| **LOCAL OFFICIALS** | | | | | | | | | | | |
| Charged | 277 | 237 | 211 | 224 | 299 | 259 | 268 | 309 | 291 | 284 | 5202 |
| Convicted | 264 | 219 | 183 | 184 | 262 | 119 | 252 | 232 | 241 | 275 | 4301 |
| Awaiting Trial as of 12/31 | 90 | 95 | 89 | 110 | 118 | 106 | 105 | 148 | 141 | 127 | |
| **PRIVATE CITIZENS INVOLVED IN PUBLIC CORRUPTION OFFENSES** | | | | | | | | | | | |
| Charged | 364 | 302 | 256 | 266 | 249 | 318 | 410 | 313 | 295 | 303 | 5732 |
| Convicted | 278 | 306 | 242 | 261 | 188 | 241 | 306 | 311 | 266 | 249 | 5032 |
| Awaiting Trial as of 12/31 | 128 | 89 | 109 | 121 | 126 | 139 | 168 | 136 | 148 | 179 | |
| **TOTALS** | | | | | | | | | | | |
| Charged | 1174 | 1134 | 1000 | 1087 | 1136 | 1150 | 1213 | 1163 | 1150 | 1141 | 23415 |
| Convicted | 1014 | 1065 | 938 | 920 | 1011 | 868 | 1020 | 1027 | 1030 | 1014 | 20446 |
| Awaiting Trial as of 12/31 | 340 | 329 | 327 | 437 | 413 | 412 | 419 | 453 | 439 | 487 | |

TABLE III

## FEDERAL PUBLIC CORRUPTION CONVICTIONS BY DISTRICT
## OVER THE PAST DECADE

| U.S. Attorney's Office | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Alabama, Middle | 4 | 2 | 3 | 9 | 7 | 6 | 7 | 9 | 11 | 8 | 66 |
| Alabama, Northern | 1 | 17 | 9 | 15 | 11 | 6 | 4 | 17 | 33 | 39 | 152 |
| Alabama, Southern | 0 | 6 | 0 | 2 | 10 | 2 | 2 | 0 | 7 | 5 | 34 |
| Alaska | 1 | 4 | 16 | 6 | 5 | 0 | 0 | 1 | 3 | 15 | 51 |
| Arizona | 5 | 7 | 8 | 1 | 4 | 10 | 9 | 48 | 16 | 32 | 140 |
| Arkansas, Eastern | 4 | 5 | 7 | 0 | 0 | 18 | 18 | 4 | 8 | 8 | 72 |
| Arkansas, Western | 1 | 0 | 1 | 0 | 3 | 1 | 0 | 0 | 2 | 0 | 8 |
| California, Central | 39 | 58 | 31 | 33 | 35 | 45 | 22 | 42 | 36 | 55 | 396 |
| California, Eastern | 18 | 17 | 18 | 18 | 20 | 20 | 39 | 30 | 18 | 13 | 13 |
| California, Northern | 14 | 9 | 18 | 3 | 4 | 5 | 14 | 3 | 4 | 2 | 76 |
| California, Southern | 4 | 4 | 7 | 12 | 5 | 5 | 2 | 10 | 7 | 6 | 62 |
| Colorado | 2 | 1 | 3 | 22 | 16 | 7 | 8 | 11 | 4 | 3 | 77 |
| Connecticut | 6 | 8 | 8 | 14 | 3 | 12 | 8 | 24 | 11 | 17 | 111 |
| Delaware | 4 | 2 | 1 | 8 | 7 | 3 | 5 | 2 | 7 | 5 | 44 |
| District of Columbia | 72 | 60 | 46 | 43 | 44 | 20 | 33 | 15 | 25 | 22 | 380 |
| Florida, Middle | 12 | 24 | 28 | 8 | 9 | 14 | 10 | 13 | 39 | 28 | 185 |

TABLE III (continued)

| U.S. Attorney's Office | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Florida, Northern | 5 | 4 | 8 | 5 | 5 | 4 | 2 | 5 | 17 | 19 | 74 |
| Florida, Southern | 79 | 106 | 71 | 83 | 38 | 37 | 78 | 24 | 27 | 22 | 565 |
| Georgia, Middle | 3 | 2 | 2 | 11 | 1 | 8 | 4 | 7 | 3 | 0 | 41 |
| Georgia, Northern | 1 | 6 | Not Reported | 10 | 26 | 12 | 9 | 21 | 6 | 7 | 98 |
| Georgia, Southern | 6 | 3 | 0 | 3 | 6 | 1 | 0 | 4 | 0 | 1 | 24 |
| Guam & NMI | 6 | 7 | 19 | 19 | 13 | 16 | 9 | 5 | 2 | 0 | 96 |
| Hawaii | 6 | 2 | 3 | 2 | 10 | 4 | 14 | 4 | 5 | 1 | 51 |
| Idaho | 7 | 5 | 5 | 4 | 7 | 4 | 3 | 1 | 1 | 1 | 38 |
| Illinois, Central | 8 | 2 | 3 | 2 | 5 | 5 | 14 | 3 | 6 | 8 | 56 |
| Illinois, Northern | 55 | 53 | 49 | 24 | 19 | 54 | 22 | 51 | 30 | 28 | 385 |
| Illinois, Southern | 4 | 5 | 7 | 4 | 6 | 1 | 6 | 20 | 2 | 6 | 61 |
| Indiana, Northern | 3 | 8 | 7 | 4 | 4 | 10 | 13 | 9 | 5 | 15 | 78 |
| Indiana, Southern | 4 | 1 | 4 | 2 | 2 | 10 | 4 | 5 | 4 | 9 | 45 |
| Iowa, Northern | 3 | 2 | 0 | 0 | 1 | 1 | 1 | 3 | 0 | 0 | 11 |
| Iowa, Southern | 1 | 0 | 0 | 0 | 2 | 8 | 1 | 1 | 2 | 9 | 24 |
| Kansas | 3 | 6 | 8 | 5 | 6 | 0 | 5 | 3 | 0 | 2 | 38 |
| Kentucky, Eastern | 8 | 17 | 25 | 15 | 25 | 22 | 27 | 10 | 23 | 33 | 205 |
| Kentucky, Western | 6 | 8 | 0 | 2 | 2 | 4 | 1 | 4 | 4 | 6 | 37 |
| Louisiana, Eastern | 17 | 19 | 18 | 20 | 19 | 17 | 29 | 26 | 26 | 29 | 220 |

TABLE III (continued)

| U.S. Attorney's Office | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Louisiana, Middle | 13 | 3 | 2 | 6 | 2 | 2 | 0 | 8 | 13 | 6 | 55 |
| Louisiana, Western | 9 | 2 | 3 | 6 | 9 | 6 | 1 | 4 | 10 | 7 | 57 |
| Maine | 0 | 0 | 5 | 2 | 0 | 5 | 2 | 3 | 4 | 4 | 25 |
| Maryland | 5 | 7 | 8 | 8 | 6 | 12 | 28 | 17 | 36 | 21 | 148 |
| Massachusetts | 27 | 21 | 6 | 15 | 8 | 22 | 17 | 15 | 28 | 29 | 188 |
| Michigan, Eastern | 14 | 18 | 7 | 18 | 14 | 10 | 17 | 11 | 13 | 7 | 129 |
| Michigan, Western | 0 | 8 | 4 | 9 | 10 | 14 | 13 | 11 | 12 | 5 | 86 |
| Minnesota | 14 | 8 | 4 | 8 | 8 | 3 | 9 | 3 | 6 | 3 | 66 |
| Mississippi, Northern | 0 | 42 | 9 | 5 | 7 | 14 | 9 | 5 | 5 | 18 | 114 |
| Mississippi, Southern | 8 | 17 | 14 | 19 | 13 | 13 | 5 | 0 | 2 | 7 | 98 |
| Missouri, Eastern | 15 | 16 | 3 | 4 | 10 | 3 | 4 | 8 | 12 | 12 | 87 |
| Missouri, Western | 1 | 10 | 9 | 6 | 3 | 7 | 6 | 13 | 8 | 8 | 71 |
| Montana | 4 | 5 | 16 | 3 | 13 | 2 | 7 | 1 | 8 | 0 | 59 |
| Nebraska | 0 | 0 | 0 | 0 | 1 | 2 | 2 | 4 | 3 | 0 | 12 |
| Nevada | 7 | 9 | 6 | 5 | 6 | 6 | 0 | 0 | 3 | 4 | 46 |
| New Hampshire | 1 | 1 | 2 | 0 | 5 | 3 | 0 | 2 | 0 | 0 | 14 |
| New Jersey | 58 | 43 | 28 | 28 | 28 | 41 | 44 | 39 | 47 | 62 | 418 |
| New Mexico | 0 | Not Reported | 7 | 2 | 2 | 2 | 5 | 3 | 6 | 3 | 30 |
| New York, Eastern | 17 | 18 | 21 | 10 | 38 | 7 | 25 | 31 | 20 | 26 | 213 |

**TABLE III (continued)**

| U.S. Attorney's Office | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|
| New York, Northern | 9 | 9 | 8 | 11 | 5 | 22 | 16 | 11 | 9 | 7 | 107 |
| New York, Southern | 61 | 33 | 48 | 34 | 33 | 28 | 28 | 28 | 16 | 9 | 318 |
| New York, Western | 3 | 7 | 4 | 13 | 6 | 6 | 7 | 12 | 6 | 2 | 66 |
| North Carolina, Eastern | 5 | 4 | 0 | 7 | 4 | 9 | 18 | 2 | 20 | 18 | 87 |
| North Carolina, Middle | 8 | 7 | 4 | 5 | 12 | 6 | 0 | 3 | 2 | 5 | 52 |
| North Carolina, Western | 3 | 3 | 5 | 1 | 3 | 5 | 7 | 8 | 2 | 3 | 40 |
| North Dakota | 6 | 0 | 2 | 2 | 5 | 16 | 5 | 9 | 2 | 6 | 53 |
| Ohio, Northern | 90 | 25 | 36 | 34 | 29 | 28 | 32 | 28 | 31 | 37 | 370 |
| Ohio, Southern | 10 | 29 | 20 | 17 | 21 | 9 | 26 | 21 | 12 | 12 | 177 |
| Oklahoma, Eastern | 7 | 3 | 2 | 10 | 0 | 0 | 0 | 2 | 5 | 3 | 32 |
| Oklahoma, Northern | 4 | 2 | 3 | 2 | 5 | 3 | 0 | 2 | 3 | 3 | 27 |
| Oklahoma, Western | 0 | 7 | 4 | 0 | 2 | 1 | 4 | 17 | 10 | 3 | 48 |
| Oregon | 1 | 3 | 4 | 3 | 1 | 3 | 0 | 4 | 6 | 11 | 36 |
| Pennsylvania, Eastern | 25 | 37 | 30 | 36 | 57 | 57 | 26 | 26 | 30 | 19 | 343 |
| Pennsylvania, Middle | 7 | 12 | 14 | 20 | 9 | 13 | 12 | 19 | 27 | 16 | 149 |
| Pennsylvania, Western | 4 | 8 | 7 | 5 | 6 | 4 | 3 | 11 | 10 | 5 | 63 |
| Puerto Rico | 0 | 13 | 10 | 9 | 101 | 24 | 31 | 6 | 20 | 2 | 216 |
| Rhode Island | 1 | 3 | 5 | 2 | 6 | 0 | 2 | 4 | 2 | 1 | 26 |
| South Carolina | 13 | 11 | 13 | 8 | 5 | 8 | 8 | 0 | 3 | 4 | 73 |
| South Dakota | 7 | 1 | 2 | 2 | 4 | 3 | 2 | 3 | 13 | 4 | 41 |

**TABLE III (continued)**

| U.S. Attorney's Office | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Tennessee, Eastern | Not Reported | 4 | 3 | 2 | 9 | 8 | 6 | 9 | 7 | 12 | 60 |
| Tennessee, Middle | 0 | 6 | 0 | 0 | 4 | 6 | 8 | 5 | 9 | 6 | 44 |
| Tennessee, Western | 7 | 12 | 8 | 13 | 8 | 11 | 16 | 22 | 19 | 24 | 140 |
| Texas, Eastern | 9 | 3 | 4 | 14 | 5 | 5 | 8 | 5 | 3 | 4 | 60 |
| Texas, Northern | 7 | 9 | 6 | 3 | 13 | 33 | 14 | 22 | 16 | 6 | 129 |
| Texas, Southern | 22 | 31 | 29 | 30 | 10 | 17 | 11 | 25 | 21 | 34 | 230 |
| Texas, Western | 15 | 10 | 5 | 15 | 21 | 16 | 27 | 17 | 9 | 11 | 146 |
| Utah | 2 | 5 | 2 | 2 | 8 | 5 | 0 | 6 | 1 | 7 | 38 |
| Vermont | 1 | 2 | 2 | 2 | 0 | 3 | 0 | 2 | 0 | 1 | 13 |
| Virgin Islands | 8 | 11 | 6 | 4 | 6 | 2 | 2 | 2 | 8 | 3 | 52 |
| Virginia, Eastern | 32 | 17 | 22 | 22 | 17 | 8 | 21 | 23 | 38 | 23 | 223 |
| Virginia, Western | 2 | 8 | 7 | 3 | 13 | 3 | 16 | 2 | 13 | 13 | 80 |
| Washington, Eastern | 0 | 1 | 1 | 0 | 3 | 2 | 3 | 6 | 1 | 4 | 21 |
| Washington, Western | 10 | 10 | 16 | 10 | 3 | 1 | 15 | 7 | 1 | 5 | 78 |
| West Virginia, Northern | 1 | 3 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 0 | 7 |
| West Virginia, Southern | 8 | 3 | 6 | 3 | 4 | 8 | 10 | 14 | 9 | 2 | 67 |
| Wisconsin, Eastern | 11 | 4 | 8 | 10 | 10 | 8 | 10 | 18 | 11 | 7 | 97 |
| Wisconsin, Western | 0 | 0 | 4 | 3 | 0 | 3 | 3 | 2 | 5 | 5 | 25 |
| Wyoming | 0 | 1 | 1 | 0 | 0 | 2 | 1 | 8 | 0 | 1 | 14 |

TABLE IV

**PUBLIC INTEGRITY SECTION'S**
**FEDERAL PROSECUTIONS**
**OF CORRUPT PUBLIC OFFICIALS**
**IN 2007 ***

|  | Charged | Convicted | Awaiting Trial |
|---|---|---|---|
| **FEDERAL OFFICIALS** | 25 | 17 | 7 |
| **STATE OFFICIALS** | 4 | 6 | 1 |
| **LOCAL OFFICIALS** | 5 | 2 | 4 |
| **PRIVATE CITIZENS INVOLVED IN PUBLIC CORRUPTION OFFENSES** | 21 | 12 | 15 |
| **TOTALS** | 55 | 37 | 27 |

Note:  new table for 2007.

* Includes cases shared with United States Attorneys' Offices.

73