# REPORT TO CONGRESS

## ON THE ACTIVITIES AND OPERATIONS

## OF THE

## PUBLIC INTEGRITY SECTION

## FOR 2008



**Public Integrity Section**
**Criminal Division**
**United States Department of Justice**

**Submitted Pursuant to**
**Section 603 of the Ethics in Government Act of 1978**

2:13-cv-193
09/02/2014

DEF2578



DEPOSITION
EXHIBIT

Frank 57

Sylvia Kerr, CSR, CRR, RPR, TCRR

# INTRODUCTION

This Report to Congress is submitted pursuant to the Ethics in Government Act of 1978, which requires the Attorney General to report annually to Congress on the operations and activities of the Justice Department's Public Integrity Section. The Report describes the activities of the Public Integrity Section during 2008. It also provides statistics on the nationwide federal effort against public corruption during 2008 and over the previous two decades.

The Public Integrity Section was created in 1976 in order to consolidate into one unit of the Criminal Division the Department's oversight responsibilities for the prosecution of criminal abuses of the public trust by government officials. Section attorneys prosecute selected cases involving federal, state, or local officials, and also provide advice and assistance to prosecutors and agents in the field regarding the handling of public corruption cases. In addition, the Section serves as the Justice Department's center for handling various issues that arise regarding public corruption statutes and cases.

An Election Crimes Branch was created within the Section in 1980 to supervise the Department's nationwide response to election crimes, such as voter fraud and campaign-financing offenses. The Branch reviews all major election crime investigations throughout the country and all proposed criminal charges relating to election crime.

During the year, the Section maintained a staff of approximately twenty-nine attorneys, including experts in extortion, bribery, election crimes, and criminal conflicts of interest. The section management included: William Welch, Chief; Brenda Morris, Principal Deputy Chief; Peter Ainsworth, Senior Deputy Chief for Litigation; Raymond Hulser, Deputy Chief for Policy and Administration; and Craig Donsanto, Director, Election Crimes Branch.

Part I of the Report discusses the operations of the Public Integrity Section and highlights its major activities in 2008. Part II describes the cases prosecuted by the Section in 2008. Part III presents nationwide data based on the Section's annual surveys of United States Attorneys regarding the national federal effort to combat public corruption from 1989 through 2008 and data specific to the Public Integrity Section.

I

# TABLE OF CONTENTS

## PART I

## OPERATIONAL RESPONSIBILITIES OF
## THE PUBLIC INTEGRITY SECTION

A.   RESPONSIBILITY FOR LITIGATION ................................. 1
   1.   Recusals by United States Attorneys' Offices ....................... 1
   2.   Sensitive and Multi-District Cases ............................... 2
   3.   Federal Agency Referrals ...................................... 5
   4.   Requests for Assistance/Shared Cases ........................... 7
B.   SPECIAL SECTION PRIORITIES ................................. 7
   1.   Election Crimes .............................................. 8
   2.   Conflicts of Interest Crimes ................................... 11

C.   LEGAL AND TECHNICAL ASSISTANCE .......................... 12
   1.   Training and Advice............................................12
   2.   Advisor to the President's Council on Integrity and Efficiency
      and the Executive Council on Integrity and Efficiency ............... 13
   3.   Member of the Board Advisors of the Election Assistance Commission . 13
   4.   Legislative Activities ......................................... 14
   5.   Case Supervision and General Assistance ......................... 14
   6.   International Advisory Responsibilities ........................... 14

## PART II

## PUBLIC INTEGRITY SECTION INDICTMENTS,
## PROSECUTIONS, AND APPEALS IN 2008

INTRODUCTION ...................................................... 16
FEDERAL JUDICIAL BRANCH ........................................... 16
FEDERAL LEGISLATIVE BRANCH ........................................ 17
FEDERAL EXECUTIVE BRANCH ......................................... 24
STATE AND LOCAL GOVERNMENT ...................................... 39
FEDERAL ELECTION CRIMES ........................................... 48

# PART III

## NATIONWIDE FEDERAL PROSECUTIONS
## OF CORRUPT PUBLIC OFFICIALS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53
LIST OF TABLES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

TABLE I:    Nationwide Federal Prosecutions of Corrupt Public Officials
            in 2008. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

TABLE II:   Progress Over the Past Two Decades:
            Nationwide Federal Prosecutions of Corrupt Public Officials . . . . 55

TABLE III:  Federal Public Corruption Convictions by District
            Over the Past Decade . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

TABLE IV:   Public Integrity Sections's Federal Prosecutions of
            Corrupt Public Officials in 2008 . . . . . . . . . . . . . . . . . . . . . . . . 62

iii

# PART I

## OPERATIONAL RESPONSIBILITIES OF
## THE PUBLIC INTEGRITY SECTION

### A.    RESPONSIBILITY FOR LITIGATION

The work of the Public Integrity Section focuses on public corruption, that is, crimes involving abuses of the public trust by government officials. Most of the Section's resources are devoted to the supervision of investigations involving alleged corruption by government officials and to prosecutions resulting from these investigations. Decisions to undertake particular matters are made on a case-by-case basis, given Section resources, the type and seriousness of the allegation, the sufficiency of factual predication reflecting criminal conduct, and the availability of federal prosecutive theories to reach the conduct.

Cases handled by the Section generally fall into one of the following categories: recusals by United States Attorneys' Offices, sensitive cases, multi-district cases, referrals from federal agencies, and shared cases. These categories are discussed below, and examples of cases handled by the Section in 2008 under the categories are noted. The examples are described, along with the Section's other 2008 casework, in Part II.

### 1.  Recusals by United States Attorneys' Offices

The vast majority of federal corruption prosecutions are handled by the local United States Attorney's Office for the geographic district where the crime occurred, a fact demonstrated by the statistical charts in Part III of this Report. At times, however, it may be inappropriate for the local United States Attorney's Office to handle a particular corruption case.

Public corruption cases tend to raise unique problems of public perception that are generally absent in more routine criminal cases. An investigation of alleged corruption by a government official, whether at the federal, state, or local level, or someone associated with such an official, always has the potential of becoming a high-profile case simply because its focus is on the conduct of a public official. In addition, these cases are often politically sensitive because their ultimate targets tend to be politicians or government officials appointed by politicians.

A successful public corruption prosecution requires both the appearance and the reality of fairness and impartiality. This means that a successful corruption case involves not just a conviction but public perception that the conviction was warranted, not the result of improper motivation by the prosecutor, and is free of conflicts of interest. In cases when the local conflict of interest is substantial, the local office is removed from the case by a procedure called recusal. Recusal occurs when the local office either asks to step aside, or is asked to step aside by Department Headquarters, as primary prosecutor. Federal cases involving corruption allegations in which the conflict is substantial are usually referred to the Public Integrity Section either for prosecution or direct operational supervision.

Allegations involving possible crimes by federal judges almost always require recusal of the local office for significant policy as well as for practical reasons. Having the case handled outside the local office eliminates the possible appearance of bias, as well as the practical difficulties and awkwardness that would arise if an office investigating a judge were to appear before the judge on other matters. Thus, as a matter of established Department practice, federal judicial corruption cases generally are handled by the Public Integrity Section.

Similar concerns regarding the appearance of bias also arise when the target of an investigation is a federal prosecutor, a federal investigator, or other employee assigned to work in or closely with a particular United States Attorney's Office. Thus, cases involving United States Attorneys, Assistant United States Attorneys (AUSAs), or federal investigators or employees working with AUSAs in the field generally result in a recusal of the local office. These cases are typically referred to the Public Integrity Section.

During 2008, the Section handled several significant cases as a result of recusals. For example, United States District Court Judge Samuel B. Kent was indicted on charges of abusive sexual contact and attempted aggravated sexual abuse for his alleged repeated assaults on an employee of the Office of the Clerk of Court. Kent was nominated on August 3, 1990, and served on the federal bench for the Southern District of Texas. The indictment was the first case of a United States District Court Judge charged with a federal sexual crime and only the sixth time in the last thirty years that a federal judge has been charged with a federal crime in the United States; the last case was in 1991.

## 2.  Sensitive and Multi-District Cases

In addition to recusals, the Public Integrity Section handles other special categories of cases. At the request of the Assistant Attorney General of the Criminal Division, the

2

Section handles cases that are highly sensitive and cases that involve the jurisdiction of more than one United States Attorney's Office.

Cases may be sensitive for a number of reasons. Because of its importance, a particular case may require close coordination with high-level Department officials. Alternatively, it may require substantial coordination with other federal agencies in Washington. The latter includes cases involving classified information, which require careful coordination with intelligence agencies. Sensitive cases may also include those that are so politically controversial on a local level that they are most appropriately handled in Washington, DC.

In addition to sensitive cases, this category encompasses multi-district cases, that is, cases that involve allegations that cross judicial district lines and hence fall under the jurisdiction of two or more United States Attorneys' Offices. In these cases the Section is occasionally asked to coordinate the investigation among the various United States Attorneys' Offices, to handle a case jointly with one or more United States Attorneys' Offices, or, when appropriate, to assume operational responsibility for the entire case.

In 2008, the Section handled substantial criminal cases in Puerto Rico, the Virgin Islands, Iraq, and Kuwait.

Puerto Rico

- Jorge De Castro Font, former Puerto Rico senator, was indicted on charges of honest services wire fraud, conspiracy to commit extortion, bribery, and money laundering conspiracies related to allegedly soliciting at least $500,000 in illegal payments from individuals who had business interests pertaining to the government. Alberto Goachet, a political consultant and aide to De Castro Font, pled guilty and admitted to money laundering in order to hide illegal payments to De Castro Font and to making false statements to investigators.

- Aníbal Acevedo Vilá, Puerto Rico's governor, Luisa Inclán Bird, his senior aide, and Miguel Nazario Franco, former campaign director, and others were indicted on March 24, 2008. Vilá was charged with conspiracy, false statements, wire fraud, and program fraud; Bird was charged with conspiracy, wire fraud, and program fraud; and Franco was charged with wire fraud and program fraud. Both Vilá and Bird were also charged with conspiracy to defraud the Internal Revenue Service. A subsequent indictment on August 19, 2008, charged all three with honest services wire fraud and conspiracy to commit money laundering. Ten other individuals associated with Vilá also

3

had charges filed against them including conspiracy, false statements, wire fraud, and federal program fraud. A number of Vilá's associates allegedly served as conduits for receiving illegal campaign contributions and then ostensibly hid the true source and use of these funds.

The Virgin Islands

- Dean Plaskett and Marc Biggs, both former commissioners in the government of the Virgin Islands, were sentenced to substantial prison terms and fines for their roles in a complex bribery scheme. They used a fictitious company they had created and other companies to obtain $1.4 million in government contracts. Owners of the other companies in turn paid at least $300,000 in bribes and kickbacks to these two defendants. Plaskett was also convicted of obstruction of justice. Brent Blyden, a former director of permits, was sentenced to fourteen months of imprisonment for his role in this same scheme.

Iraq and Kuwait

- John Cockerham, a United States Army officer, and Melissa Cockerham, his wife, pled guilty to bribery, conspiracy, and money laundering in a scheme to award government contracts in return for $9 million promised in bribes, from which they received at least $1 million. John Cockerham's sister, Carolyn Blake, was also charged for her role in this scheme.

- Terry Hall, a civilian contractor, was indicted on several charges involving the alleged use of $1 million in money and jewelry to bribe two Army majors. In return Hall's companies allegedly received $17 million in contracts to deliver bottled water and to erect a security fence. James Momon, Jr., an Army officer, pled guilty for his illegal receipt of $200,000 from Hall.

- Levonda Selph, a retired lieutenant colonel, pled guilty to accepting a bribe in the form of a vacation in Thailand and $4,000 in cash for fraudulently awarding a $12 million contract.

- Curtis Whiteford, United States Army Colonel was the second-most senior official and highest ranking military officer at the Coalition Provisional Authority - South Central Region (CPA - SC), and Michael Wheeler, United States Army Lieutenant Colonel, was an advisor and project officer for CPA - SC. They were convicted of conspiracy and theft in a scheme with others to

4

rig bids in which they received bribes of over $1 million in cash and other gifts. Debra Harrison, a lieutenant colonel in the United States Army Reserves, pleaded guilty after receiving a Cadillac Escalade from Philip Bloom, the contractor in this scheme, as well as stealing over $300,000 from the CPA - SC.

In 2008, the Section continued to handle cases related to former lobbyist Jack Abramoff.

- Jack Abramoff was sentenced to 48 months of imprisonment, three years of supervised release, and was ordered to pay $23,134,695 in restitution for enriching public officials in order to obtain benefits for his clients as well as for defrauding four Native American tribes.

- David Safavian, former chief of staff for the General Services Administration, was convicted after a re-trial; Safavian aided Abramoff in his attempt to obtain government property, and Safavian took part in golf trips to Scotland and London and subsequently made false statements related to these trips.

- John Albaugh, former chief of staff to a former member of the House of Representatives, pled guilty for accepting entertainment and other gifts from Abramoff and his associates.

- Trevor Blackann, a former legislative assistant in the United States Senate, pleaded guilty for failing to report as income thousands of dollars of gifts and entertainment he received from lobbyists on his federal tax returns.

- James Hirni, former lobbyist, pleaded guilty for offering entertainment, travel, and gifts to certain public officials in attempts to obtain favorable legislation for his clients.

- Kevin Ring, former lobbyist and congressional aide, was indicted for allegedly enriching lawmakers with trips and other forms of entertainment in return for help for his firm's clients.

### 3. Federal Agency Referrals

In another area of major responsibility, the Section handles matters referred directly by federal agencies concerning possible federal crimes by agency employees.

5

The Section reviews these allegations to determine whether an investigation of the matter is warranted and, ultimately, whether the matter should be prosecuted.

Agency referrals of possible employee wrongdoing are an important part of the Section's mission.  The Section works closely with the Offices of Inspector General (OIG) of the executive branch agencies, as well as with other agency investigative components, such as the Offices of Internal Affairs and the Criminal Investigative Divisions.  In addition, the Section invests substantial time in training agency investigators in the statutes involved in corruption cases and the investigative approaches that work best in these cases.  These referrals from the various agencies require close consultation with the referring agency's investigative component and prompt prosecutive evaluation.

As in previous years, in 2008 the Section handled numerous referrals from federal agencies, including the following examples:

• A matter referred by the Department of Justice, Office of Inspector General (OIG), involved Curtis Jones, a Federal Bureau of Investigation employee. Jones pled guilty to accepting a Caribbean cruise for him and his family, valued at approximately $7,500, after recommending a particular vendor for a blanket purchase agreement worth $2 million.

• The Department of the Interior, OIG, referred a matter involving Jimmy Mayberry, the former special assistant to the Associate Director of Minerals Revenue Management, Minerals Management Service.  Mayberry was sentenced to two years of probation and a $2,500 fine for criminal conflict of interest for his role in unfairly obtaining a consulting contract with the government after retirement.  In a related case, Milton K. Dial, the former Deputy Associate Director of Minerals Revenue Management at the Minerals Management Service of the DOI, pleaded guilty to a felony violation of the post-government employment restriction law.  Dial admitted that he accepted a position as a subcontractor working for and representing Mayberry's company in a contract with the DOI approximately six months after retiring from the department, although Dial had substantial involvement in the awarding of the contract.

• The Department of State referred a case in which an employee, Lawrence Yontz, improperly accessed hundreds of confidential passport application files.  Yontz pled guilty and was sentenced to 12 months of probation and 50 hours of community service.

6

### 4.   Requests for Assistance/Shared Cases

The final category of cases in which the Section becomes involved are cases that are handled jointly by the Section and a United States Attorney's Office or other components of the Department.

At times the available prosecutorial resources in a United States Attorney's Office may be insufficient to undertake sole responsibility for a significant corruption case. In these cases the local office may request the assistance of an experienced Section prosecutor to share responsibility for prosecuting the case. On occasion, the Section may also be asked to provide operational assistance or to assume supervisory responsibility for a case due to a partial recusal of the local office. Finally, the Public Integrity Section may be assigned to supervise or assist with a case initially assigned to another Department component.

In 2008, the Section shared operational responsibility in a number of significant corruption cases. Some of the joint prosecutions with United States Attorneys' Offices included these cases:

- United States Congressman Richard Renzi and his former business partner James Sandlin and businessman Andrew Beardall were indicted on insurance fraud, racketeering, and corruption charges. The United States Attorney's Office, District of Arizona, and the Public Integrity Section are sharing this prosecution.

- Jack Snyder, the former associate director of the Division of Specialized Information Services at the National Library of Medicine pleaded guilty for failing to report $165,234 in gross income through his private consulting business on his financial disclosure forms. This case was shared by the United States Attorney's Office, District of Maryland, and the Public Integrity Section.

## B.   SPECIAL SECTION PRIORITIES

In addition to the general responsibilities discussed above, in 2008 the Public Integrity Section continued its involvement in a number of additional priority areas of criminal law enforcement.

## 1. **Election Crimes**

One of the Section's law enforcement priorities is its supervision of the Justice Department's nationwide response to election crimes. Under the Department's ongoing Ballot Access and Voting Integrity Initiative, the prosecution of all forms of election crime is a high Departmental priority, and the Headquarters' oversight in this area is designed to ensure that the Department's nationwide response to election crime matters is uniform, impartial, and effective. In 1980 an Election Crimes Branch was created within the Section to handle this supervisory responsibility. The Branch is headed by a Director, assisted by a senior Section prosecutor, and staffed by other Section attorneys on a case-by-case basis.

The Election Crimes Branch oversees the Department's handling of all election crime allegations other than those involving federal voting rights, which are handled by two Sections of the Civil Rights Division: Voting and Criminal Sections. Specifically, the Branch supervises three types of election crime cases: (1) vote frauds, such as vote buying and absentee ballot fraud; (2) campaign-financing crimes, most notably under the Federal Election Campaign Act (FECA); and (3) patronage crimes, such as political shakedowns and misuse of federal programs for political purposes. Vote frauds and campaign-financing offenses are the most significant as well as the most common types of election crimes.

The election-related work of the Section and its Election Crimes Branch falls into the following categories:

a. <u>Consultation and Field Support</u>. Under long-established Department procedures, the Section's Election Crimes Branch reviews all major election crime investigations, including all proposed grand jury investigations and FBI full-field investigations, and all election crime charges, proposed by the various United States Attorneys' Offices for legal and factual sufficiency. (United States Attorneys' Manual 9-85.210.) The Branch also is often consulted before a United States Attorney's Office opens a preliminary investigation into vote fraud allegations, although this is not required.

In the area of campaign-financing crimes, Department procedures require additional Headquarters' consultation before any investigation, including a preliminary investigation, is commenced by a United States Attorney's Office. U.S.A.M. 9-85-210. The increased coordination with the Section at the initial stage of a criminal investigation of a FECA matter is the result in part of the complexity of the campaign-financing statutes. It is also due to the fact that the Department shares jurisdiction over willful

violations of these statutes with another federal agency, the Federal Election Commission (FEC), which has civil enforcement authority over FECA violations.

The Section's consultation responsibility for election matters includes providing advice to prosecutors and investigators regarding the application of federal criminal laws to vote fraud, patronage crimes, and campaign-financing crimes, and the most effective investigative techniques for particular types of election offenses. It also includes supervising the Department's use of the federal conspiracy and false statements statutes (18 U.S.C. §§ 371 and 1001) to address schemes to subvert the federal campaign financing laws. In addition, the Election Crimes Branch helps draft election crime charges and other pleadings when requested.

The majority of the Branch's consultations are in the following two categories:

- Vote frauds. During 2008, the Branch assisted United States Attorneys' Offices in the following states in the handling of vote fraud matters in their respective districts: Alabama, Arizona, Arkansas, California, District of Columbia, Florida, Georgia, Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, Mississippi, Missouri, Nevada, New Mexico, New York, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, Texas, and West Virginia. This assistance included evaluating vote fraud allegations to determine whether an investigation would produce a prosecutable federal criminal case, helping to structure investigations, and providing advice on the formulation of charges.

- Campaign-financing crimes. During 2008, the Branch also continued to assist in implementing the Department's enhanced efforts to address criminal violations of the FECA. As part of this effort, the Branch assisted United States Attorneys' Offices in Arizona, California, District of Columbia, Florida, Illinois, Indiana, Louisiana, Maryland, Massachusetts, Michigan, Mississippi, Missouri, Nevada, New York, North Carolina, Pennsylvania, Puerto Rico, Texas, and Washington in the investigation and prosecution of campaign-financing matters in their respective districts.

b. Litigation. On occasion the Section may be asked to supervise the handling of a case in the event of a partial recusal of the local United States Attorney's Office. Section attorneys also prosecute selected election crimes, either by assuming total operational responsibility for the case or by handling the case jointly with a United States Attorney's Office or other Department component.

For example, in 2008 a former United States Senate candidate from South Carolina was sentenced to 36 months of probation, 100 of community service, and $15,000 in

9

restitution for failing to report to the FEC a $15,000 contribution from the Ford Motor Company PAC and converting these funds to his personal use.

In another case, two South Carolina businessmen were sentenced in connection with their scheme to launder over $65,000 to federal candidates through conduits.  One defendant was sentenced to 5 years of probation with 120 days of electronic monitoring, 300 hours of community service, and a $5,000 fine.  The other defendant was sentenced to five years of probation, 100 hours of community service, and a $1,000 fine.

c. <u>District Election Officer Program</u>.  The Branch also assists in implementing the Department's long-standing District Election Officer (DEO) Program.  This Program is designed to ensure that each of the Department's 94 United States Attorneys' Offices has a trained prosecutor available to oversee the handling of election crime matters within the district and coordinate district responses with Department Headquarters regarding these matters.

The DEO Program involves the appointment of an Assistant United States Attorney in each federal district to serve a two-year term as a District Election Officer (DEO) and periodic training for the DEOs in the handling of election crime and voting rights matters.

The DEO Program is also a crucial feature of the Department's nationwide Election Day Program, which takes place during the federal general elections that are held in November of even-numbered years.  The Election Day Program ensures that federal prosecutors and investigators are available both at Department Headquarters in Washington, DC, and in each district to receive complaints of election irregularities while the polls are open.  As part of the Program, press releases are issued in Washington and in each district before the November federal elections that advise the public of the Department's enforcement interests in deterring election crimes and protecting voting rights. The press releases also provide contact information for the DEOs, local FBI officials, and Department officials in the Criminal and Civil Rights Divisions at Headquarters who may be contacted on election day by members of the public who have complaints of possible vote fraud or voting rights violations.

d. <u>Ballot Access and Voting Integrity Initiative</u>.  During 2008, the Public Integrity Section continued to assist in the implementation of the Department's Ballot Access and Voting Integrity Initiative.  This ongoing law enforcement initiative was established in 2002 to enhance the Department's criminal and civil rights enforcement efforts against vote fraud and voting rights violations.

The initiative includes annual training for the Assistant United States Attorneys serving as DEOs, and preelection coordination by each United States Attorney's Office with state law enforcement and election officials before the federal general elections regarding the handling of election crime matters in their respective districts.

On July 1 and 2, 2008, the Public Integrity Section and the Civil Rights Division's Voting and Criminal Sections jointly held the Department's seventh annual Ballot Access and Voting Integrity Symposium. The event was hosted by the Department's National Advocacy Center in Columbia, South Carolina, and was attended by approximately one hundred Assistant United States Attorneys and 25 FBI special agents. Topics addressed included the types of conduct prosecutable as federal election crimes, the federal statutes available to prosecute vote fraud and campaign financing offenses, the federal voting rights statutes and their enforcement, the federal observer program, and FBI technology for assisting in election crime investigations.

    e. <u>Inter-Agency Liaison with Federal Election Commission</u>. The Election Crimes Branch is the formal liaison between the Justice Department and the FEC, an independent federal agency that shares enforcement jurisdiction with the Department over willful violations of the FECA. The FEC has exclusive civil jurisdiction over all FECA violations, while the Department has exclusive criminal jurisdiction over FECA crimes.

    f. <u>Inter-Agency Liaison with Office of Special Counsel</u>. The Branch also serves as the Department's point of contact with the United States Office of Special Counsel (OSC). The OSC has jurisdiction over noncriminal violations of the Hatch Act, 5 U.S.C. §§ 7321-7326, §§ 1501-1508, which may also involve criminal patronage crimes that are within the Department's jurisdiction.

## 2. **Conflicts of Interest Crimes**

Conflicts of interest is a wide-ranging and complex area of law, with many layers of administrative and oversight responsibility. Moreover, the federal criminal conflicts of interest laws overlap to some extent with the sometimes broader ethics restrictions imposed by civil statutes, agency standards of conduct, Presidential orders, and, in the case of attorneys, bar association codes of conduct.

The Public Integrity Section's work in the conflicts area falls into the following categories:

    a. <u>Criminal Referrals from Federal Agencies and Recusals</u>. The Section's criminal enforcement role comes into play with respect to a narrow group of conflicts of

11

interest matters, namely, those that involve possible misconduct proscribed by one of the federal conflicts of interest statutes, 18 U.S.C. §§ 203-209. These crimes are prosecuted either by a United States Attorney's Office or by the Public Integrity Section. Conflicts of interest matters are often referred to the Section by the various federal agencies. If investigation of a referral is warranted, the Section coordinates the investigation with the Inspector General for the agency concerned, the FBI, or both. If prosecution is warranted, the Section prosecutes the case. If a civil remedy may be appropriate in lieu of criminal prosecution, the Section refers the case to the Civil Division of the Department of Justice for its review. On occasion the Section is also asked to handle recusals and special assignments regarding conflicts matters.

      b. <u>Coordination</u>. The Public Integrity Section works with the United States Office of Government Ethics (OGE) in order to coordinate conflicts of interest issues with OGE and other executive branch agencies and offices. The purpose of this coordination is to ensure that the Administration's overall legislative and enforcement efforts in this area are both complementary and consistent. OGE has broad jurisdiction over noncriminal conduct by executive branch personnel, as well as the authority to provide guidance concerning the coverage of the federal criminal conflicts of interest statutes. The Section's coordination with OGE ensures that consistent guidance is provided with respect to the overlapping criminal, civil, and administrative interests implicated by the statutory and regulatory restrictions on federal personnel.

## C.    LEGAL AND TECHNICAL ASSISTANCE

### 1. <u>Training and Advice</u>

The Public Integrity Section is staffed with specialists who have considerable experience investigating and prosecuting corruption cases. Section attorneys participate in a wide range of formal training events for federal prosecutors and investigators. They are also available to provide informal advice on investigative methods, charging decisions, and trial strategy in specific cases.

The Section helps plan and staff the annual public corruption seminar at the National Advocacy Center. Speakers at this seminar typically include both the Section's senior prosecutors and Assistant United States Attorneys from the field who have handled significant corruption cases. The seminars provide training for federal prosecutors and FBI agents regarding the statutes most commonly used in corruption cases, guidance in the use of the complex and difficult investigative techniques necessary to investigate government corruption, and advice from experienced prosecutors on conducting corruption trials. In 2008, the Chief, one Deputy Chief, the Director of the Election

Crimes Branch, and two Trial Attorneys addressed attendees on the federal laws and prosecutive theories relating to corruption, issues at trial, and congressional corruption.

### 2. Advisor to the President's Council on Integrity and Efficiency and the Executive Council on Integrity and Efficiency

The Public Integrity Section serves, pursuant to Executive Order 12993 (March 21, 1996), as a legal advisor to the Integrity Committee of the President's Council on Integrity and Efficiency (PCIE) and the Executive Council on Integrity and Efficiency (ECIE). The PCIE/ECIE is a body composed of the Inspectors General of the various agencies of the executive branch of the federal government. The Integrity Committee of the PCIE/ECIE is charged by the Executive Order with handling allegations against Inspectors General and senior members of their staff.

In addition, the Integrity Committee is charged by the Executive Order with establishing policies and procedures to ensure consistency in conducting administrative investigations. The Committee's procedures, drafted with the assistance of the Public Integrity Section, provide a framework for the investigative function of the Committee. Allegations of wrongdoing by Inspectors General and their senior staff are initially reviewed by the Public Integrity Section for potential criminal prosecution. In noncriminal matters, the procedures guide the Committee's discretion to investigate the alleged misconduct and to report on its findings. The Public Integrity Section also advises the Integrity Committee on matters of law and policy relating to its investigations.

### 3. Member of the Board of Advisors of the Election Assistance Commission

Pursuant to the Help America Vote Act of 2002 (HAVA), the Chief of the Public Integrity Section, or his or her designee, is a member of the Board of Advisors of the Election Assistance Commission (EAC). 42 U.S.C. § 15344(a)(12). The Commission was created to serve as a national clearinghouse for information and procedures relating to the administration of federal elections and is responsible for the adoption of voluntary voting system guidelines, testing and certification of voting system hardware and software, conducting studies regarding the effective administration of elections, and training on the management of federal grants to the states under HAVA. The Director of the Section's Election Crimes Branch serves as the designated Public Integrity member of EAC's Board of Advisors. The Director, as the Board's parliamentarian, participated in two Board meetings during 2008.

13

### 4.  Legislative Activities

An important responsibility of the Public Integrity Section is the review of proposed legislation that may affect, directly or indirectly, the investigation and prosecution of public officials and those who seek to corrupt these officials.  The Section is often called upon to comment on legislation proposed by Congress, by the Administration, or by other departments of the executive branch; to draft or review testimony for congressional hearings; and to respond to congressional inquiries concerning legislative proposals.  On occasion, the Section drafts legislative proposals relating to various corruption matters.   For example, in 2008 the Section reviewed and commented on a number of legislative proposals addressing public corruption.  During the year, the Section also commented on legislation relating to voter deception, legislative transparency and accountability, conflicts of interest, federal advisory commissions and volunteer programs, and open government, among other subjects.

### 5.  Case Supervision and General Assistance

Public corruption cases are often controversial, complex, and highly visible.  These factors may warrant Departmental supervision and review of a particular case.  On occasion Section attorneys are called upon to conduct a careful review of a sensitive public corruption case, evaluating the quality of the investigative work and the adequacy of any proposed indictments.  Based on its experience in this area, the Section can often identify tactical or evidentiary problems early on and either provide needed assistance or, if necessary, assume operational responsibility for the prosecution.

The Section also has considerable expertise in the supervision of the use of undercover operations in serious corruption cases.  The Section's Chief serves as a permanent member of the FBI's Criminal Undercover Operations Review Committee.  Additionally, a number of the Section's senior prosecutors have experience in the practical and legal problems involved in such operations, and have the expertise to employ this sensitive investigative technique effectively and to advise law enforcement personnel on its use.

### 6.  International Advisory Responsibilities

The Section's responsibilities in the area of international law enforcement continued in 2008.  In addition to its routine briefings of foreign delegations on United States public corruption issues, the Section has become increasingly involved in supporting the efforts of the United States in assisting the international community in the endeavors to combat public corruption and election crime in foreign countries.  This work

14

included both participation in international proceedings and coordination with other components of the Justice Department and the State Department on the Administration's position in this area.

The head of the Section's international initiatives, Senior Deputy Chief Peter J. Ainsworth traveled to Bali, Indonesia, to attend the UNCAC conference of State Parties as a member of the United States delegation. He also visited Beijing, China, and San Salvador, El Salvador, to conduct a series of workshops and seminars on judicial corruption topics with prominent prosecutors and judges.  In addition, Peter Ainsworth and Senior Trial Attorney Andrew Levchuk participated in the Third Annual conference of the International Association of Anti-corruption Authorities in Kiev, Ukraine.

Senior Trial Attorney Richard Pilger traveled to Buenos Aires, Argentina, and participated with representatives from Peru in the United Nations pilot evaluation of Argentina's compliance with the United Nations Convention Against Corruption.

Trial Attorney Richard Evans traveled to Germany to attend the European Fraud conference.  The theme of the conference was Interagency Networking and Intelligence Sharing in Policing Fraud.

Senior Trial Attorney Mary Butler traveled to Poland to attend a conference with Polish prosecutors and agents concerning prosecuting public corruption.

As noted above, Section experts routinely address visiting foreign officials in connection with the detection and prosecution of public corruption offenses and continued to do so throughout 2008.  These presentations are generally conducted under the auspices of the State Department's Foreign Visitor Program and the Justice Department's Office of Overseas Prosecutorial Development Assistance and Training. During 2008, the Section made presentations on corruption topics to officials from Africa, Albania, Angola, Bahrain, Bangladesh, Brazil, Bulgaria, Canada, China, Croatia, Czech Republic, Georgia, Indonesia, Italy, Jordan, Kosovo, Kuwait, Lebanon, Mexico, Morocco, Nigeria, Oman, Poland, Qatar, Romania, Russia, Saudi Arabia, Slovakia, Sweden, Taiwan, United Kingdom, and Yemen.

# PART II

## PUBLIC INTEGRITY SECTION
## INDICTMENTS, PROSECUTIONS, AND APPEALS
## IN 2008

### INTRODUCTION

As described in Part I, the Public Integrity Section's role in the prosecution of public corruption cases ranges from sole operational responsibility for the entire case to approving an indictment or providing advice on the drafting of charges. Part II of the Report describes each corruption case for which the Section had either sole or shared operational responsibility during 2008. A "case" involves a person who has been charged by indictment or information; a "matter" is an investigation that has not resulted in a criminal charge. Part II also provides statistics on the number of matters closed by the Section without prosecution during 2008 and the number of matters pending at the end of the year in each category.

The Section's corruption cases for calendar year 2008 are separated into categories, based on the branch or level of government affected by the corruption. Election crime cases are grouped separately. Related cases are grouped together and unrelated cases are separated by triple lines. In those cases for which a conviction but not a sentence is reported, the sentencing occurred in a later year and will be included in that year's report.

### FEDERAL JUDICIAL BRANCH

As of December 31, 2008, four matters involving allegations of corruption affecting the federal judicial branch were pending in the Public Integrity Section. During 2008, the Section closed one matter involving crimes affecting the judicial branch.

16

<u>United States v. Kent</u>, **Southern District of Texas**

United States District Court Judge Samuel B. Kent was indicted on August 28, 2008, on charges of abusive sexual contact and attempted aggravated sexual abuse for his alleged repeated assaults on an employee of the Office of the Clerk of Court. Kent was nominated for the federal bench on August 3, 1990, by President George H.W. Bush.

The indictment set a precedent as the first case of a United States District Court judge charged with a federal sexual crime and only the sixth time in the last 30 years that a federal judge has been charged with a federal crime in the United States; the last case was in 1991.

## FEDERAL LEGISLATIVE BRANCH

**As of December 31, 2008, forty matters involving allegations of corruption in or affecting the federal legislative branch were pending in the Public Integrity Section. During 2008, the Section closed three such matters. Also during 2008 the Section handled the following cases involving the federal legislative branch, as described below:**

### The Abramoff Investigations
### District of Columbia

<u>United States v. Abramoff</u>

Former lobbyist Jack A. Abramoff was sentenced on September 4, 2008, to 48 months of imprisonment, three years of supervised release, and was ordered to pay $23,134,695 in restitution to victims. Abramoff had previously pled guilty to conspiracy, honest services fraud, and tax evasion.

According to the plea agreement, from 1994 through early 2004 Abramoff was employed in the Washington, DC, offices of two law firms. During this time, Abramoff lobbied public officials in the federal government, principally members of Congress. Abramoff and his business partner, Michael Scanlon, owner of a public relations firm, conspired to defraud four Native American Indian tribes by charging fees that incorporated huge profit margins and then splitting the net profits in a secret kickback arrangement.

17

Through his scheme with Scanlon, Abramoff received more than $23 million in undisclosed kickbacks and other fraudulently obtained funds. Abramoff admitted that, as part of the criminal conspiracy and as one means of accomplishing results for their clients, he and others engaged in a pattern of corruptly providing things of value to public officials, including trips, campaign contributions, meals, and entertainment, with the intent to influence acts by the public officials that would benefit Abramoff and his clients.

In addition, a tax evasion charge against Abramoff stems from his failure to report and pay taxes over a three-year period by hiding income in certain nonprofit entities that he controlled. These activities resulted in Abramoff evading payment of approximately $690,000 in federal income tax.

## United States v. Safavian

David H. Safavian, the former chief of staff for the General Services Administration (GSA), was convicted on December 19, 2008, after his appeal and re-trial. He was convicted of making false statements and obstructing a GSA internal investigation. The investigation focused on whether Safavian, the chief of staff at GSA at the time, aided Abramoff in his attempts to acquire GSA-controlled property in and around Washington. In return Abramoff took Safavian and others on a golf trip to Scotland and to London. Safavian subsequently made false statements to GSA officials and an FBI agent to cover up his activities and filed a false financial disclosure report, which excluded these travels. Safavian was found not guilty of making false statements to the Senate Committee on Indian Affairs.

## United States v. Albaugh

John C. Albaugh, former chief of staff to a former member of the United States House of Representatives pled guilty to conspiracy to commit honest services wire fraud on June 2, 2008. As part of a plea agreement, Albaugh agreed to cooperate with the ongoing investigation into the activities of former Washington, DC, lobbyist Jack Abramoff and others.

Albaugh admitted that over an approximately two-year period he corruptly accepted a stream of things of value from Abramoff, one of Abramoff's colleagues, their lobbying firm, and their clients in exchange for agreeing to take and taking official action on their behalf. Albaugh failed to disclose these gifts, including more than $4,000 worth

of sporting event tickets, concert tickets, and meals, on his annual financial disclosure form as well as in-kind campaign contributions in required filings with the Federal Election Commission.

## United States v. Blackann

Trevor L. Blackann, a former legislative assistant to a United States senator who served on a Senate committee with responsibility over the federal highway bill, pleaded guilty on November 20, 2008, to making a false statement on his 2003 federal tax returns by failing to report as income thousands of dollars in illegal gifts that he received from lobbyists.

During his plea, Blackann admitted that he received things of value worth thousands of dollars from three lobbyists in 2003, including a free trip to attend the first game of the 2003 World Series of baseball. In his plea, Blackann admitted knowing that the World Series trip and other tickets, meals, and drinks provided by the lobbyists were given to him for, or because of, official action the lobbyists were seeking from Blackann.

## United States v. Hirni

On December 12, 2008, former lobbyist James F. Hirni pleaded guilty to conspiring with others to commit honest services fraud.

One of Hirni's lobbying clients was a construction equipment rental company (Company A). Hirni and others sought an amendment to a federal highway bill on behalf of Company A that would encourage state public works agencies to rent rather than purchase construction equipment and would encourage these agencies to contract only with those companies that had large dollar amounts of liability insurance coverage–such as Company A.

Hirni admitted that he offered an all-expense-paid trip to game one of the World Series to two public officials. This trip for each official included round-trip commercial airline travel to and from New York City; use of a chauffeured, seven-passenger, sport utility vehicle for transportation while in New York City; a ticket for each official to game one of the World Series; a souvenir baseball jersey for each official; lodging, meals, drinks, and entertainment including more than $600 in charges at a gentlemen's club.

One of the public officials (Staffer D) worked on a House of Representatives committee with responsibility for the federal highway bill. The other public official was Trevor Blackann. Hirni admitted that he offered these public officials the trip in part to influence them to take official action favorable to his and others' efforts to amend the federal highway bill.

Hirni admitted that during the World Series trip, he, Blackann, and others discussed the federal highway bill and Company A. After the trip, Hirni admitted he and others proposed amendments to the bill to Blackann and Staffer D; sought to identify a public official who could insert their proposed amendments into the Senate's version of the bill; and worked to prevent the removal of one of the amendments once it was added to the bill.

## United States v. Ring

Kevin Ring, a former lobbyist and congressional aide, was arrested and indicted on September 5, 2008. Ring was charged with conspiracy, payment of an illegal gratuity, and obstruction of justice. He was also charged with engaging in a scheme to deprive citizens of the honest services of elected officials.

He was allegedly involved in providing things of value to lawmakers and other government officials in return for help for his law firm's clients. He allegedly made false statements about his knowledge of Abramoff's financial relationship with lobbyist Michael Scanlon, his alleged receipt of a $135,000 kickback, and his purported knowledge of how Abramoff obtained a job for the wife of his former boss, Representative John Doolittle.

Other guilty pleas by various lobbyists and public officials related to the investigation of Jack Abramoff 's lobbying activities have included:

- Italia Federici, president of the Council of Republicans for Environmental Advocacy, pleaded guilty to tax evasion and obstruction of the United States Senate's investigation into the Abramoff scandal. Federici received a reduced sentence based on her substantial assistance to the government's investigation and was sentenced to four years of probation and ordered to pay $74,000 in restitution.

20

- James Steven Griles, the former deputy secretary of the Department of the Interior, pleaded guilty to obstructing the United States senate's investigation into the corruption allegations surrounding Abramoff.

- William Heaton, former chief of staff for Ohio Congressman Robert Ney, pleaded guilty to conspiracy to commit honest services wire fraud. Heaton received a reduced sentence based on his substantial assistance to the government's investigation and was sentenced to two years of probation and ordered to pay a $5,000 fine.

- Robert Ney, United States Representative, pleaded guilty to conspiracy to commit multiple offenses, including committing honest services fraud and making false statements to federal agents. Ney was sentenced to 30 months of imprisonment and fined $6,000.

- Tony C. Rudy, former lobbyist and congressional staffer, pleaded guilty to conspiring with Abramoff, Scanlon, and others to commit honest services fraud, mail and wire fraud, and violation of the one-year lobbying ban.

- Michael Scanlon, Abramoff's business partner, pleaded guilty to conspiracy to commit bribery and honest services fraud.

- Roger G. Stillwell, former United States Department of the Interior (DOI) employee, was sentenced to two years of probation and ordered to pay a $1,000 fine. Stillwell had previously pleaded guilty to falsely certifying an Executive Branch Confidential Financial Disclosure Report related to his position as Desk Officer for the Commonwealth of the Northern Mariana Islands, DOI Office of Insular Affairs. Stillwell had accepted gifts from Abramoff and then failed to report them on his annual financial disclosure form, as required by federal regulation.

- Neil Volz, former lobbyist and chief of staff to Congressman Ney, pleaded guilty to one count of conspiracy to commit honest services fraud and violation of the one-year lobbying ban. Volz received a reduced sentence based on his substantial assistance to the government's investigation and was sentenced to two years of probation and ordered to pay a $2,000 fine.

- Mark D. Zachares, a former high-ranking aide to the United States House of Representatives Transportation and Infrastructure Committee, pleaded guilty to conspiracy to commit honest services wire fraud.

21

### United States v. Grimes, District of Columbia

Cecelia Grimes, a partner in a lobbying firm, pleaded guilty on July 25, 2008, to destruction of evidence in a public corruption investigation.

Grimes was a registered lobbyist whose firm submitted requests for appropriations to the office of a member of the United States House of Representatives (Representative A). The FBI was investigating whether Representative A agreed to support contracts for the clients of Grimes. In return, Grimes gained the assistance of Representative A in obtaining clients for her firm and benefitted financially when these clients paid their fees for the firm's lobbying services.

As part of that investigation, on October 16, 2006, FBI agents served Grimes with two grand jury subpoenas after questioning her in relation to the investigation. Within six days of the FBI's service of the subpoenas, Grimes placed some documents that she had stored in her house into trash bags, which she then brought to the front of her house for collection as garbage. These documents included items related to Grimes's travel and to Representative A's campaigns. FBI agents retrieved the garbage bags that contained the discarded documents, which Grimes never produced to law enforcement authorities. In addition, Grimes placed her BlackBerry device in a trash can near a restaurant in Southeastern Pennsylvania for the purpose of keeping the FBI from reviewing certain of her emails that would be of interest to the FBI.

This case was prosecuted jointly by the United States Attorney's Office, District of Columbia, and the Public Integrity Section.

### United States v. Renzi, Sandlin, Beardall, and Lequire, District of Arizona

On November 13, 2008, Richard G. Renzi, former United States representative from Arizona's First Congressional District, was charged in a superseding indictment with  allegedly promising to support legislation in exchange for a land deal that ostensibly netted the congressman $700,000.  Also named in the superseding indictment are Renzi's former business partner and real estate investor, James W. Sandlin, lawyer Andrew Beardall, and accountant Dwayne Lequire.

Renzi allegedly conspired with Sandlin to conduct a land swap of federally owned mining land in exchange for the congressman's efforts to get approval from a House

committee for the deal. In addition, Renzi allegedly did not disclose the $700,000 he allegedly received in the deal on his required financial disclosure statement to Congress.

The indictment specifically charges Renzi and Sandlin with honest services wire fraud, extortion, money laundering, and conspiracy. Renzi and Sandlin had several business transactions together. They were co-owners of a real estate development firm until Renzi ran for a seat in Congress and sold his share of the company to Sandlin. The purchase price Sandlin paid for Renzi's interest in the firm allegedly included $200,000 and a note for $800,000. When Sandlin still owed $700,000 on the note, Renzi seemingly insisted that two separate entities doing business in Arizona purchase Sandlin's property in exchange for Renzi's support on land exchange legislation.

The indictment also alleges Renzi failed to disclose Sandlin's $700,000 debt to him as well as the monies received from Sandlin. In addition, Renzi purportedly failed to disclose his income from Sandlin in his required financial disclosure statement to Congress.

Renzi and Beardall are charged with violations of federal insurance laws through embezzling more than $400,000 in insurance premiums from clients over a period of at least six years from the trust account of the Patriot Insurance Agency, Inc., a business owned by the Renzi family in Santa Cruz County, Arizona, to fund Renzi's congressional campaigns. Andrew Beardall, former president of Renzi's insurance firm, remained as a defendant in the new indictment, which also added Dwayne Lequire, an accountant who worked at the insurance agency. Renzi and Lequire are charged with embezzling from Spirit Mountain Insurance Corporation, an insurance business also run by Renzi.

Finally, Renzi is charged with participating in the affairs of his insurance business through a pattern of racketeering.

This case is being handled jointly by the United States Attorney's Office, District of Arizona, and the Public Integrity Section.

---

## United States v. Sandlin, Eastern District of Texas

In addition to the case above, on November 25, 2008, James Sandlin was sentenced to two terms of imprisonment for three years each, to run concurrently, for submitting false statements to a federally insured financial institution in an attempt to procure a line of credit. Sandlin was also ordered to serve three years of supervised release following his imprisonment and to pay fines totaling $20,000. On two occasions,

23

Sandlin failed to disclose a $996,000 liability in personal financial statements provided to a bank.

United States v. Stevens, District of Alaska

Former Alaska Senator Theodore F. (Ted) Stevens was convicted on October 27, 2008, of making false statements on his financial disclosure forms as charged in his indictment. His conviction has since been dismissed at the request of the government. Stevens, the former chairperson of the Senate Committee on Appropriations, was charged with concealing his receipt of goods and services from VECO Corporation, a former multinational oil services company based in Alaska, as well as from the chief executive officer of VECO, Bill J. Allen.

## FEDERAL EXECUTIVE BRANCH

As of December 31, 2008, seventy-five matters involving allegations of corruption within the federal executive branch were pending in the Public Integrity Section. During 2008, the Section closed twenty-five such matters. Also during 2008, the Section handled the following cases involving executive branch corruption:

### Corruption Related to Iraq and Kuwait

United States v. Cockerham, Western District of Texas

A United States Army officer, John Cockerham, pled guilty to bribery, conspiracy, and money laundering in a scheme involving contracts awarded in support of the Iraq war. Cockerham's wife, Melissa Cockerham, and sister, Carolyn Blake, were also charged for their roles in the conspiracy to commit bribery and money laundering. John and Melissa Cockerham pleaded guilty on January 31, 2008.

John Cockerham admitted to participating in a complex bribery and money laundering scheme while working as an Army major deployed to Kuwait. He was responsible for awarding contracts for services to be delivered to troops in Iraq, including

bottled water contracts worth millions of dollars.  In return for awarding illegal contracts, John Cockerham admitted to receiving, or being promised, $9 million in bribes.  Once he agreed to take money in exchange for awarding contracts, John Cockerham directed the contractors to pay his wife, sister, and others to hide bribe payments.  Melissa Cockerham admitted that she accepted more than $1 million in illegal bribe payments on her husband's behalf.

John Cockerham and his wife are cooperating with this investigation and with the government's efforts to repatriate the money from the overseas banks.

These cases are being handled by the Public Integrity Section and the Antitrust Division's National Criminal Enforcement Section.

## United States v. Hall, District of Columbia

Terry Hall, a civilian contractor, was charged with conspiracy to commit bribery, bribery, and honest services wire fraud in a superseding indictment filed on September 4, 2008.  The original indictment charged bribery.

Hall operated several companies that had contracts with the United States military in Kuwait, including Freedom Consulting and Catering Co. (FCC) and Total Government Allegiance (TGA).  According to the superseding indictment, FCC and TGA received approximately $17 million from contracts to deliver bottled water and to erect security fencing for the Department of Defense (DOD) in Kuwait and Iraq.  Over a two-year period Hall allegedly bribed two Army majors who served as Army contracting officials at Camp Arifjan.

Further allegations of bribery involve Hall ostensibly arranging for the establishment of companies and bank accounts in the Cayman Islands, the Philippines, the United Arab Emirates, the United States, and elsewhere in the names of third parties and entities for the purpose of paying bribes to the contracting officers and others.  Hall also allegedly prepared and executed fictitious consulting agreements for the purpose of creating the appearance that certain United States Army officials and others had legitimately earned the payments, which were allegedly bribes.

**United States v. Momon, District of Columbia**

A United States Army major pleaded guilty on August 13, 2008, to bribery and conspiracy to commit bribery arising out of his activities as a contracting officer in Camp Arifjan, Kuwait. Momon took over duties at Camp Arifjan from Major John C. Cockerham, who served as a contracting officer in Kuwait.

According to the plea agreement, James Momon, Jr. was involved in a criminal conspiracy to accept cash bribes from five DOD contracting firms that supplied bottled water and other goods and services to United States military bases in Kuwait. In return, Momon awarded contracts as well as Blanket Purchase Agreements to those contractors. The agreement between Momon and his co-conspirators was for Momon to receive $5.8 million in return for his official actions.

This case was prosecuted by the Public Integrity Section and the National Criminal Enforcement Section of the Antitrust Division.

**United States v. Saani, District of Columbia**

Tijani Ahmed Saani, a United States Department of Defense civilian employee working at the United States Embassy in Kuwait City, Kuwait, was arrested on May 7, 2008, and charged with filing a false federal tax return. Saani allegedly signed a tax return in which he denied having signature or other authority for or any interest in a financial account in a foreign country. However, an investigation revealed that Saani maintained an account with HSBC Bank International Limited in the Jersey Channel Islands and that more than $700,000 passed though the account over a five-year period. Saani worked as a contracting officer on detail to Camp Arifjan, Kuwait, during this time.

This case is being handled by the Public Integrity Section and the Antitrust Division's National Criminal Enforcement Section.

**United States v. Selph, District of Columbia**

Levonda J. Selph, a retired lieutenant colonel in the United States Army pleaded guilty on June 10, 2008, for her role in a scheme to influence the award of a United States Department of Defense (DOD) contract at Camp Victory, Iraq.

26

Selph was charged with bribery and conspiracy. As part of the plea agreement, Selph consented to serve a jail sentence that will be determined by the court, pay $9,000 in restitution to the DOD, and cooperate in the government's investigation.

Selph served as chair of a selection board over an annual $12 million contract to build and operate several DOD warehouses in Iraq. She accepted fraudulent bids from a contracting firm and assisted the firm in winning the contract award. In return, Selph accepted a vacation to Thailand, hotel stays and spa treatments in Kuwait, and $4,000 in cash.

This case was prosecuted by the Public Integrity Section and the National Criminal Enforcement Section of the Antitrust Division.

**United States v. Whiteford and Wheeler,** District of New Jersey

United States Army Colonel Curtis G. Whiteford and United States Army Lieutenant Colonel Michael B. Wheeler were convicted on November 7, 2008, of conspiracy to commit bribery and interstate transportation of stolen property. The convictions stemmed from Whiteford and Wheeler's roles in a scheme involving the theft of millions of dollars from the Coalition Provisional Authority - South Central Region (CPA-SC) in Iraq.

Whiteford was the second-most senior official and highest ranking military officer at CPA-SC in Al-Hillah, Iraq, and Wheeler was an adviser and project officer for CPA reconstruction projects. Whiteford and Wheeler were acquitted of the other charges against them, including bribery and wire fraud.

Whiteford and Wheeler conspired over a two-year period with at least three others - Robert Stein, at the time the comptroller and funding officer for the CPA-SC, Philip H. Bloom, a United States citizen who owned and operated several companies in Iraq and Romania, and United States Army Lieutenant Colonel Bruce D. Hopfengardner. The conspiracy involved rigging bids on contracts being awarded by the CPA-SC to ensure the awarding of more than twenty contracts to Bloom. In total, Bloom received more than $8.6 million in rigged contracts. Bloom, in return, provided Whiteford, Harrison, Wheeler, Stein, Hopfengardner, and others with more than $1 million in cash, SUVs, sports cars, a motorcycle, jewelry, computers, business class airline tickets, liquor, promise of future employment with Bloom, and other items of value.

**United States v. Harrison, District of New Jersey, Trenton Division**

Debra Harrison, a lieutenant colonel in the United States Army Reserves, pleaded guilty to honest services wire fraud on July 28, 2008, in connection with a scheme to defraud the CPA-SC in Al-Hillah, Iraq.

Harrison admitted that she received a Cadillac Escalade from Philip Bloom, a contractor at the CPA-SC.  Bloom had purchased the Cadillac through a series of wire transfer payments.  Harrison also acknowledged that she took more than $300,000 from the CPA-SC and used some of the stolen money to make home improvements.  In addition, she helped move unregistered firearms from a hotel in North Carolina to the home of Robert Stein, a co-conspirator who worked with Harrison at the CPA-SC, according to Harrison's plea.

---

Related sentencings have included:

- Philip Bloom was sentenced to 46 months of imprisonment and was ordered to forfeit $3.6 million for his role in the conspiracy, bribery, and money laundering scheme.

- Lieutenant Colonel Bruce Hopfengardner was sentenced to 21 months of imprisonment and was also ordered to forfeit $144,500 for the conspiracy and money laundering charges related to this scheme.

- Robert Stein was sentenced to nine years of imprisonment and was ordered to forfeit $3.6 million for his role in the related charges of conspiracy, bribery, money laundering, and weapons possession charges.

In addition:

- William Driver, Debra Harrison's husband, was indicted on money laundering charges.

- Seymour Morris, Jr. was acquitted on November 7, 2008, of the charges against him for his alleged role in the scheme.

---

**United States v. Andrews and Turner, District of Columbia**

On July 15, 2008, the United States Court of Appeals affirmed the conviction of LaTanya Andrews for conspiring to defraud the United States and committing mail fraud and bribery.

Andrews was a payroll technician and Peter Turner was a volunteer driver for the Department of Veterans Affairs Medical Center (DVAMC). Turner and Andrews were found to have conspired to file a forged Federal Employees Group Life Insurance form falsely designating Turner as a life-insurance beneficiary for a seriously ill employee of the DVAMC in that employee's official personnel folder. Turner then filed a fraudulent claim when the employee died, which resulted in Turner receiving approximately $20,500 for the beneficiary payment. Those funds should have been paid to the deceased employee's parents. In addition, Andrews used her official position within the DVAMC payroll office, including her access to the official personnel folder of the deceased employee, to assist Turner in filing the false beneficiary form in that folder. In return for Andrew's assistance in the scheme, Turner paid her $1,000 from the proceeds of his fraudulent claim.

LaTanya Andrews was previously sentenced to 15 months of imprisonment and two years of supervised release.

**United States v. Childree and Stayton, Northern District of Georgia**

A Department of the Army official and a contractor based in Alabama were sentenced on February 28, 2008, to federal prison after being found guilty of an honest services wire fraud scheme and subsequent obstruction of justice.

Jeffrey H. Stayton, the former chief of the Aviation Division for the United States Army Test and Evaluation Command (ATEC), was sentenced to 63 months of imprisonment followed by three years of supervised release and a fine of $61,071.75. William C. Childree, the sole owner and operator of Maverick Aviation, Inc. (Maverick), was sentenced to 27 months of imprisonment followed by three years of supervised release and a fine of $61,071.75.

The United States government had selected Maverick to procure and deliver two helicopters in a contract worth approximately $4.7 million. Stayton, in his capacity as an ATEC official, took actions that favored Maverick's selection as the eventual contract

recipient and misled government officials about Maverick's performance under the contract.

Childree used a portion of the contract funds to pay off his mortgage on his personal residence and secretly wired a third party $61,071.75 from a Maverick bank account to satisfy the mortgage on Stayton's personal residence. Stayton failed to disclose his solicitation or receipt of this payment to other ATEC or Army personnel or in his required annual financial disclosure statement. In addition, Stayton falsely testified that Childree's $61,071.75 payment was a loan, which served as the basis for Stayton's conviction for obstruction of justice.

## United States v. Delgadillo and Granados, Western District of Texas

On January 28, 2008, two former civilian employees of the Department of Defense (DOD) were sentenced for defrauding the United States of tens of thousands of dollars. Lilia Delgadillo, who had previously pled guilty to wire fraud, was sentenced to 33 months of imprisonment followed by probation and 100 hours of community service.

Delgadillo was employed by the Defense Finance and Accounting Service, a component of DOD. She admitted that, from January through March 2007, she and co-worker Saul Granados devised a scheme to defraud the United States of up to $700,000 through the misuse of a DOD pay-processing computer system that resulted in the deposit of these funds into Delgadillo's personal bank account.

Granados, who also had previously pled guilty to wire fraud, was sentenced to three years of probation and 150 hours of community service.

## United States v. Fisher, District of Columbia

On May 13, 2008, a former employee of the General Services Administration (GSA) was sentenced in connection with a bribery scheme involving GSA contracts. James R. Fisher was sentenced to 18 months of imprisonment, two years of supervised release, and a $5,000 fine. Fisher had previously pleaded guilty to bribery and, as part of the plea agreement, he consented to forfeiting $40,000.

Fisher was employed by the GSA as a planner and estimator, and, in that capacity, he coordinated and contracted for maintenance and repair work at United States

government facilities that were supervised by his GSA field office. Between 2003 and 2007, Fisher received approximately $40,000 in cash and other things of value from a private maintenance company that had a term contract with GSA at government facilities supervised by Fisher's field office. In exchange for those payments and benefits, Fisher steered numerous work orders to this company under this GSA contract.

## United States v. Frazier, Middle District of Georgia

Darrick O. Frazier, the close associate of Bridgette L. Davidson, a former employee of the Department of Veterans Affairs (VA), was sentenced on November 18, 2008, for his role in a scheme to defraud the United States of Davidson's honest services. Frazier was ordered to serve 12 months of imprisonment and to pay restitution of $20,200.

He was previously indicted along with ex-associate Davidson for this scheme. Bridgette L. Davidson's position as a former social work associate with the VA involved finding suitable housing and daily care for veterans who were mentally ill and disabled. Frazier admitted that he and Davidson rented a home in Marietta, Georgia, to house military veterans who were mentally ill and disabled and were in Davidson's care, in exchange for monthly federal subsidy payments. Frazier admitted that he and Davidson then falsely represented to VA officials and to the military veterans' legal guardians and custodians that the home was independently owned and was a certified personal care home suitable to house and care for the veterans. Frazier also admitted that he and Davidson used a portion of the rental income obtained from the veterans housed at the facility for their own personal benefit, although operating this facility was a conflict of interest for Davidson.

## United States v. Gompert, District of Arizona

A former special agent with the United States Department of Health and Human Services, Office of the Inspector General (OIG), was sentenced on April 9, 2008, in connection with the theft of more than $1 million. Scott Allen Gompert was sentenced to 26 months of imprisonment followed by three years of supervised release and a $5,000 fine.

Gompert had previously pleaded guilty to committing bank fraud facilitated by his forging the signature of a judge or court officer. As part of the plea agreement, Gompert

forfeited assets, including approximately $550,000 in cash, a development property in Peoria, Arizona, and a 2005 Toyota Avalon, equal to the stolen amount.

Gompert utilized his expertise and connections developed during his eight-year career as an OIG investigative agent to identify bank accounts that held funds derived from fraudulent activity. On three occasions, Gompert prepared fraudulent seizure warrants featuring the forged signatures of United States magistrate judges and presented the warrants to federally-insured financial institutions. The fraudulent seizure warrants directed the financial institutions holding the funds to prepare cashier's checks made out to a purportedly official United States government seizure account, which Gompert had instead established for his personal use. Gompert utilized this scheme to amass $1,109,159 in criminal proceeds from the fraudulent seizures.

**United States v. Honbo, District of Columbia**

A former employee of the United States Army Corps of Engineers, David M. Honbo, was sentenced on October 31, 2008, to 36 months of probation, 150 hours of community service, and a fine of $2,500. In addition, he was barred from working for the United States government for a period of three years. He pled guilty to violating the Procurement Integrity Act by providing sensitive contract information to a bidder seeking to win a multi-billion dollar government contract.

While stationed in South Korea, Honbo, then a civilian employee of the Army Corps of Engineers, worked on the team charged with awarding the Yongsan base contract. As a result of his position, he had access to source selection and bid evaluation information. Honbo admitted he provided sensitive bid evaluation information to a consultant employed by a multi-national consortium seeking to obtain a contract to relocate the United States Army base in Yongsan, South Korea. Honbo also admitted that he gave the consultant the information in order to give that consortium a competitive advantage.

**United States v. Jeong, Northern District of Texas**

A South Korean businessman was indicted on December 16, 2008, for his alleged role in a bribery conspiracy involving employees of the Army Air Force Exchange Service (AAFES) and their role in a $206 million telecommunications contract. Gi-Hwan Jeong was arrested on a criminal complaint charging him with conspiracy and bribery.

32

AAFES provides goods and services (PX services) worth billions of dollars to United States Armed Forces service members and their families around the world.  Jeong allegedly paid bribes to AAFES employees, who are considered United States government employees, to assist his company, SSRT, in connection with a $206 million contract to provide telecommunication services to AAFES customers.  An AAFES employee apparently attempted to terminate the contract with SSRT for poor performance, but supported the contract after allegedly receiving payments from Jeong.

## United States v. Jones, District of Maryland

Curtis Jones, a FBI employee, was sentenced on September 18, 2008, to a $5,000 fine.  Jones had previously pled guilty to accepting an illegal gratuity for the performance of his official duties.  Jones was a physical security specialist and equipment program manager with the FBI, working at the Bureau's headquarters in Washington, DC.

According to the indictment, Jones was responsible for negotiating, reviewing, and making recommendations regarding a blanket purchase agreement, valued at nearly $2 million, for the purchase of upgraded shredders to meet new national security standards for the destruction of classified information.  Jones approved the final bid and shortly afterwards accepted an offer from the vendor for him and his family to join the company's top executives and sales people on a Caribbean cruise over the New Year's holiday.  The total value of the gratuity was approximately $7,500 including airfare and lodging.

## United States v. Money, United States Tax Court, District of Columbia

Daniel Money pled guilty on September 5, 2008, to bribing a government official in order to win two service contracts.

Money owned Daniel Construction, which provided maintenance, repair, electrical, construction, and other related services to government agencies.  He also worked for the United States Department of the Treasury as a planner.  Money agreed to pay a government official a total of S55,000 in bribe payments in exchange for the award of two contracts to Daniel Construction.  The first contract, in the amount of $188,000, was awarded to Money resulting in a minimum profit of $95,000.  Money was arrested before the second contract was awarded.

In addition to the bribery scheme, Money admitted that he stole diesel fuel valued at $2,250 that was the property of the United States Department of the Treasury.

## Operation Lively Green
## District of Arizona

### United States v. Haitshan

On January 4, 2008, Barnum Haitshan was sentenced for his role in a widespread bribery and extortion conspiracy.  Haitshan, a former officer with the Arizona Department of Corrections, was sentenced to 15 months of imprisonment followed by three years of supervised release and a $4,000 fine.

### United States v. Graham and Shipley

On March 24, 2008, two additional individuals were sentenced in this same scheme.

• Joy McBrayer Graham, former Arizona Army National Guardswoman, was sentenced to four years of probation and a $3,000 fine.

• Mark Ryan Shipley, a civilian, falsely purporting to be serving in the Arizona Army National Guard, was sentenced to 24 months of imprisonment followed by three years of supervised release and a $3,000 fine.

These were the most recent of 56 sentencings in Operation Lively Green, an undercover investigation conducted by the FBI.  The defendants, who operated this scheme over a two-year period, had each pleaded guilty to conspiring to enrich themselves by obtaining cash bribes from persons they believed to be narcotics traffickers, but who were in fact FBI special agents, in return for the defendants using their official positions to assist, protect, and participate in the activities of an ostensible narcotics trafficking organization engaged in the business of transporting and distributing cocaine from Arizona to other locations in the southwestern United States.  In order to protect the shipments of cocaine, the defendants wore official uniforms, carried official forms of identification, used official vehicles, and used their color of authority where necessary to prevent police stops, searches for, and seizures of the narcotics.  These shipments passed through checkpoints guarded by the United States Border Patrol, the Arizona Department of Public Safety, and Nevada law enforcement officers.  Many of the

34

defendants also accepted additional cash bribes in return for recruiting other public officials into the ostensible narcotics trafficking organization.

## United States v. Mayberry, District of Columbia

Jimmy W. Mayberry, the former special assistant to the Associate Director of Minerals Revenue Management, Minerals Management Service, United States Department of the Interior (DOI), was sentenced on November 14, 2008, to two years of probation and a $2,500 fine. He had previously pled guilty to a felony violation of criminal conflict of interest.

When Mayberry was nearing retirement from federal service, he and his supervisor explored ways in which Mayberry could return to work for the DOI after his official retirement. They decided on a consulting position that, while created and intended specifically for Mayberry, was required by law to be subject to open and fair competitive bidding procedures. Of all the bidders for the position, Mayberry was the only applicant to receive a grade of excellent on every qualification category and was awarded the contract.

## United States v. Dial, District of Columbia

In a related case, Milton K. Dial, the former Deputy Associate Director of Minerals Revenue Management at the Minerals Management Service of the DOI, pleaded guilty on September 15, 2008, to a felony violation of the post-government employment restriction. Dial admitted that he accepted a position as a subcontractor working for and representing Mayberry's company in a contract with the DOI approximately six months after retiring from the department. Dial admitted that prior to retiring from the DOI he created the evaluation criteria for the bids for this same contract, served on the evaluation committee that awarded the contract to the company, and served as the contracting officer's technical representative at the DOI for the company up until the time of his retirement.

## United States v. Snyder, District of Maryland

On December 5, 2008, Jack Snyder, former Associate Director of the Division of Specialized Information Services at the National Library of Medicine (NLM), pleaded

guilty to making false statements. He was required by law to complete both a confidential and a public annual financial disclosure form. Snyder failed to report $165,234 he made in gross income over several years from his private consulting business on these disclosure forms.

From August 25, 2002 until March 2, 2007, Snyder was the senior official at NLM, which is under the National Institutes of Health (NIH) of the United States Department of Health and Human Services. Prior to his employment with NLM, according to court documents, Snyder operated a litigation consulting business, Medico-Legal-Forensic Services (MLFS). In this business Snyder consulted and testified as an expert witness in a variety of health-related areas in criminal and civil matters in state and federal courts across the country. When he began working at NLM, Snyder was instructed by an NLM ethics employee to cease his litigation consulting business. However, without any disclosure to NLM as required, Snyder continued to operate MLFS and earn outside income throughout his NLM employment.

Snyder also used government resources in his outside consulting business that included receiving a substantial number of telephone calls and facsimiles and using NIH computers to prepare expert reports and invoices in connection with his litigation consulting business. In addition, Snyder traveled to various locations throughout the United States to meet with attorneys and testify as a witness in litigation during NIH business hours without taking annual leave. Upon leaving NIH, Snyder was paid $22,738.32 for 264 hours of unclaimed annual leave.

The prosecution in this case was handled jointly by the Public Integrity Section and the United States Attorney's Office, District of Maryland.

## United States v. Timbol, District of Columbia

Fred Fernando Timbol, Jr. pleaded guilty to conspiracy on August 14, 2008, for the rigging of non-competitive bids. Timbol held the position of Facilities Services Officer for the Facilities Management Section of the United States Tax Court in the District of Columbia (U.S. Tax Court). As part of his duties, he awarded United States government contracts for service and maintenance work at the U.S. Tax Court and authorized payments to contractors.

Timbol fraudulently awarded government contracts by rigging the bids and arbitrarily inflating the value of the contracts so that the contractor would be paid substantially more than under the usual required competitive bidding process. In

36

exchange for Timbol awarding these contracts and authorizing payments, Timbol solicited and accepted bribes of approximately $12,471 from the contractor for rigging the award of at least six government contracts.

This case was prosecuted by the Public Integrity Section and the United States Attorney's Office, District of Columbia.

---

**United States v. Walton, District of Columbia**

Constance Walton, a former employee of the Defense Logistics Agency, an agency within the United States Department of Defense (DOD), was sentenced on November 14, 2008, to two years of probation for making a false statement. Walton also was ordered to pay a $10,000 fine.

Walton failed to disclose to the DOD that she received income from a company that she owned.  Walton started the company to receive work assignments from contractors of the United States Department of the Army, Information Technology Agency, where her associate, Robert Johnson, worked.  During a period of approximately six years, Walton received more than $100,000 from the contractors.

Robert Johnson had previously pleaded guilty to wire fraud in the Eastern District of Virginia and was sentenced to 24 months of imprisonment.

---

**United States v. Williams, District of Columbia**

A former United States Department of Energy employee, Violet Williams, pleaded guilty on December 8, 2008, to a time and attendance fraud scheme that involved false overtime records. Williams admitted that for a period of three years she submitted false and fraudulent time and attendance records for approximately 2,415 overtime hours that she did not work. As a result of these falsified overtime hours, Williams received approximately $94,494 in illegal compensation.

---

**United States v. Yi, District of Columbia**

Chang S. Yi, a former Department of Defense employee, was sentenced to three months of probation on March 7, 2008.  He had previously pleaded guilty to making a

false statement for failing to disclose the cash payments made to his wife on his annual financial disclosure report, as required.

Yi was formerly employed by the United States Army as a contracting officer for the U.S. Army Contract Command–Korea (USA-CCK) and stationed in Seoul, Korea. As part of his plea, Yi admitted that his duties included overseeing the planning, bidding, and award process for numerous government contracts, one of which was a contract to provide security guard services at a USA-CCK facility in Seoul. Yi maintained a personal relationship with an individual who was employed by the Korean company that bid on and won the contract. In July 2003, his wife accepted at least $7,100 from the wife of this individual, Yi admitted. The money was used to purchase airfare from Seoul to Bangkok, Thailand. All four individuals later traveled to Bangkok together. When Yi filed his financial disclosure report covering this time period, he failed to disclose the $7,100 his wife received.

## United States v. Yontz, District of Columbia

A former Department of State employee was sentenced on December 19, 2008, to 12 months of probation and 50 hours of community service for illegally accessing hundreds of confidential passport application files. Lawrence C. Yontz pleaded guilty on September 22, 2008, to unauthorized computer access.

Yontz served as a foreign service officer for the State Department for approximately nine years. After this service he returned to the State Department as a contract employee to work as an intelligence analyst in the Bureau of Intelligence and Research.

In the regular course of his employment, Yontz had access to official State Department computer databases, which are protected by the Privacy Act of 1974. Access by State Department employees is strictly limited to official government duties. Yontz admitted that over a several-year period he logged onto a State Department database and viewed the passport applications of nearly 200 celebrities, athletes, actors, politicians and their immediate families, musicians, game show contestants, members of the media, prominent business professionals, colleagues, associates, neighbors, and individuals identified in the press. Yontz admitted that he had no official government reason to access and view these passport applications but just had idle curiosity.

## STATE AND LOCAL GOVERNMENT

At the end of 2008, twenty-six matters of alleged corruption involving state or local government were open in the Public Integrity Section. In 2008 the Section closed four such matters. Also during 2008, the Section prosecuted the following cases involving state or local corruption:

### Alaska Bribery Schemes
### District of Alaska

### United States v. Clark

James Clark, chief of staff to the former governor of Alaska, pleaded guilty on March 4, 2008, to soliciting and accepting $68,550. Clark admitted that he conspired to use these funds he received from VECO Corporation, an Alaska-based oil pipeline service and construction company, to pay for a political poll to gauge the popularity of the then-incumbent governor of Alaska.

Clark admitted to conspiring with Bill J. Allen, the former chief executive officer of VECO, Richard L. Smith, the former vice president of Community and Government Affairs of VECO, and others in the solicitation, receipt, and concealment of this payment. Clark used his official position and the Office of the Governor to continue advocating for important oil and gas legislation that Clark knew was supported by VECO and its corporate executives.

### United States v. Cowdery

Alaska State Senator John Cowdery, pleaded guilty on December 19, 2008, to a conspiracy bribery scheme. Cowdery admitted to conspiring to offer more than $1 0,000 in campaign contributions to another Alaska state senator (State Senator A) in exchange for State Senator A's support of oil tax legislation.

Cowdery admitted to conspiring with Bill 1. Allen, the former Chief Executive Officer, and Richard L. Smith, a former vice president, both of VECO Corporation (VECO), to offer at least $10,000 in purported campaign contributions to State Senator A in exchange for State Senator A's support of a proposed petroleum profits tax that VECO

wanted the Alaska state legislature to pass. Cowdery admitted that he and Allen met State Senator A to offer State Senator A the bribe. Cowdery admitted that he and Allen specifically conditioned receipt of the bribe, which State Senator A did not accept, on State Senator A's support for the PPT legislation sought by VECO and Allen. Allen and Smith both had previously pled guilty to multiple federal corruption charges and are awaiting sentencing.

---

## United States v. Kohring

Victor H. Kohring, a former elected member of the Alaska House of Representatives, was sentenced on May 8, 2008, to 42 months of imprisonment and was ordered to serve two years of supervised release following his prison term. He had been previously convicted of bribery, attempted extortion, and conspiracy for corruptly soliciting and receiving financial benefits from VECO Corporation in exchange for performing official acts in the Alaska State Legislature on the company's behalf.

Kohring had solicited bribes from and had taken action to benefit the financial interests of VECO while serving as a member in the state legislature. Kohring repeatedly agreed to lobby his colleagues and, if needed, cast votes in VECO's favor on a key petroleum production tax proposal pending before the Alaska legislature. In exchange, Kohring received multiple cash payments and solicited a $17,000 payment.

---

## United States v. Weimar

On November 12, 2008, a former Alaska business owner was fined $75,000 and sentenced to six months of imprisonment followed by six months of home confinement and two years of supervised release based on public corruption charges. William Weimar had previously pleaded guilty to conspiring to commit honest services mail and wire fraud as well as to structuring financial transactions.

Weimar admitted to conspiring with a candidate running for an elected position in the Alaska state legislature, the owner of a company that provided consulting and advertising services to the candidate, and others. They illegally paid approximately $20,000 to the consultant through concealed means for expenses incurred by the candidate's campaign. Weimar also manipulated and structured the illegal payments to avoid the federal currency reporting requirements of financial institutions.

Weimar admitted to making the payments to secure the candidate's election to the Alaska state legislature, to deprive the public of the honest services that the candidate would provide as a state legislator, and to gain the candidate's official support for legislation that would benefit Weimar's ongoing financial interest in a private prison project.

Other convictions and pleas arising out of the ongoing investigation into public corruption in the State of Alaska have included the following:

- Thomas T. Anderson, a former elected member of the Alaska House of Representatives, was convicted and sentenced to five years of imprisonment for extortion, conspiracy, bribery, and money laundering. He solicited and received money from an FBI confidential source in exchange for agreeing to perform official acts to further a business interest represented by the source.

- William B. Bobrick, a lobbyist, was sentenced to five months of imprisonment, two years of supervised release, and a $3,000 fine. He conspired to obtain bribery payments for a former elected member of the Alaska House of Representatives.

- Peter Kott, a former speaker of the Alaska House of Representatives, was convicted and sentenced to six years of imprisonment for extortion, bribery, and conspiracy.

- Bruce Weyhrauch, a former legislator in the Alaska State House, was indicted on bribery, extortion, conspiracy, and mail fraud charges.

- Bill J. Allen and Richard L. Smith, private individuals, pleaded guilty to felony public corruption charges.

## United States v. Chubbs, Superior Court of the District of Columbia

Kim Maric Chubbs pled guilty to attempted threats and was sentenced to 24 months of probation on July 5, 2008. Joshua Chubbs, the son of Kim Chubbs, had been sentenced in another case. After hearing the sentencing for her son, Chubbs approached the prosecutor, an Assistant United States Attorney, outside the courthouse and made threatening remarks to her.

**United States v. De Castro Font and Goachet, District of Puerto Rico**

Jorge De Castro Font, former senator, Commonwealth of Puerto Rico, was indicted on charges of honest services fraud, conspiracy to commit extortion, bribery, and money laundering conspiracies. The indictment, filed on October 2, 2008, alleged that De Castro Font solicited at least $500,000 in cash payments and other benefits.

The indictment charges that De Castro Font requested various types of illegal payments from numerous Puerto Rican and foreign business persons and lobbyists with business interests before the Puerto Rico Senate or government. In exchange, De Castro Font allegedly performed official acts in favor of these businesses, or simply did not act against their interests. He apparently began these activities when he was a member of the Puerto Rico House of Representatives and continued these activities throughout his tenure as Senator.

The indictment also alleges various instances in which some business people attempted to stop paying De Castro Font or were late with their illegal payments and, in response, De Castro Font allegedly instructed third parties to send explicit or implicit messages of a threatening nature.

During the course of his tenure in the Puerto Rican Senate, De Castro Font purportedly received from the extortion scheme approximately $525,000 either in the form of cash or the payment of his bills. The indictment alleged that De Castro Font concealed the payments and never disclosed, or falsely disclosed, them on required ethics statements, campaign disclosure forms, or his Puerto Rico tax filings.

Alberto Goachet, a political consultant and aide to De Castro Font, was also indicted on October 2, 2008, and charged with fraud, money laundering conspiracy, and false statements. Goachet pleaded guilty on December 4, 2008, and admitted that he and others laundered money by using fake invoices purportedly reflecting legitimate payments to a political consulting firm owned by Goachet. The invoices were meant to conceal the businessman's illegal payments to De Castro Font. Goachet also admitted to covering up his activities by making false statements to the FBI during the investigation.

This case is being handled jointly by the Public Integrity Section and the United States Attorney's Office, Puerto Rico.

**United States v. Kramer and Ortiz, District of Rhode Island**

On May 30, 2008, former executives of a corporate pharmacy chain ("the pharmacy") were acquitted of charges that they tried to bribe a former state senator in order to win favor in the Rhode Island State House. John R. Kramer, former Senior Vice President, and Carlos Ortiz, former Vice President, were cleared on charges of fraud and bribery. Former state Senator John A. Celona had previously pleaded guilty to charges related to this case and was sentenced to imprisonment for two and a half years.

The indictment alleged that Kramer and Ortiz entered into a consulting agreement in which the pharmacy paid Celona $1,000 a month, ostensibly to improve the pharmacy's image among consumers. However, the indictment alleged, the real purpose of the funds was to cause Celona to act upon legislation in the best interests of the pharmacy. Celona allegedly used his position as a member of the Senate Corporations Committee, and later as its Chairman, to block passage of the "Pharmacy Freedom of Choice" legislation. Kramer and Ortiz then allegedly concealed the true nature of Celona's relationship with the pharmacy. In addition to the monthly monetary compensation, the pharmacy also purportedly gave Celona tickets to golf outings and professional sporting events as well as travel to Florida and California.

This case was handled jointly by the Public Integrity Section and the United States Attorney's Office, District of Rhode Island.

**United States v. Martineau, District Court of Rhode Island**

Former Rhode Island House Majority Leader Gerard M. Martineau was sentenced to 37 months of federal imprisonment and a fine of $100,000 on February 22, 2008. Previously Martineau had pled guilty to corruption charges. He admitted that he had arranged and failed to disclose personal business dealings with a pharmacy company and a health insurer while acting on legislation in which those companies were interested.

Martineau formed a personal business entity called The Upland Group. Thereafter, he arranged to sell paper bags to Blue Cross/Blue Shield of Rhode Island (Blue Cross) for promotional uses and both plastic as well as paper bags to a corporate pharmacy chain (the pharmacy) for its merchandising. In return, he used his position to affect legislation that was important to these companies. Among the most important pieces of legislation was "Pharmacy Freedom of Choice". Blue Cross had contracted with the pharmacy for a restricted pharmacy network that required clients to use this network for their prescriptions. The legislation proposed to open the network to other

pharmacies. Martineau used his position as majority leader to prevent passage of this law. For almost four years, Martineau promoted the interests of these companies on several other pieces of legislation. Martineau never disclosed to Rhode Island citizens his conflicts of interest with the health insurer and the pharmacy and took steps to conceal these relationships. Through these schemes, Martineau received nearly $900,000 from these two companies.

This case was handled jointly by the Public Integrity Section and the United States Attorney's Office, District of Rhode Island.

## United States v. Moolenaar, Eastern District of Pennsylvania

Lucien A. Moolenaar II, DDS, former acting commissioner of the Virgin Islands Department of Health, was sentenced to 15 months of imprisonment on March 17, 2008, after his conviction on charges of stealing government funds, committing grand larceny, and making false statements. The sentence also included two years of probation, three years of supervised release following imprisonment, and a $30,883 fine. Dr. Moolenaar previously paid $102,497 in restitution.

Dr. Moolenaar was found guilty in St. Thomas, Virgin Islands converting government funds in violation of federal law, and committing grand larceny and making false statements in violation of territorial law. He found two old government payroll checks totaling $1,626 that had not been negotiated. After submitting the stale-dated checks to the Department of Finance for re-issuance, the government added $1,626 to Dr. Moolenaar's net payroll as a negative deduction. Thereafter, for almost five years, the government added $1,626 to the second payroll check Dr. Moolenaar received every month because of human or computer error. In the end, Dr. Moolenaar received and spent for his own benefit $102,497. When interviewed by officials from the Virgin Islands Office of Inspector General and Office of the Attorney General investigating the overpayments, Dr. Moolenaar falsely stated he had no knowledge of the monthly overpayments until after they were discontinued.

## United States v. Schatte and Surface, Southern District of Texas

Two Houston developers were charged on January 25, 2008, with bribing a former official of the city of Houston. Andrew A. Schatte and Michael D. Surface were indicted on charges of conspiring to bribe and depriving the citizens of Houston of the honest

services of Monique McGilbra, then-director of the city's Building Services Department (BSD). In addition, Schatte and Surface were charged with honest services wire fraud. Surface was also charged with making false statements to FBI agents investigating their relationship with McGilbra.

Allegedly, Schatte and Surface, who operated a company called The Keystone Group Inc. (Keystone Company) offered and gave McGilbra a series of things of value directly and through Ms. McGilbra's male friend to influence her in her official capacity in connection with her administration of two city contracts. The contracts included the development of the Houston Emergency Center and the development of a consolidated fire station and administrative offices for the Houston Fire Department.

McGilbra served for over three years as Director of the BSD, Houston's city department responsible for building, leasing, and maintaining city buildings. Schatte and Surface allegedly provided McGilbra cash, meals, alcohol, Houston Texans football tickets, use of a condominium in Northern California, travel expenses for a trip to San Antonio, and a $1,000 gift certificate. Additionally, Keystone Company hired McGilbra's male friend, Garland Hardeman, as a "consultant" to locate deals for Keystone Company in California for $3,000 per month plus expenses. Hardeman provided monthly payments to McGilbra out of the Keystone Company payments. Keystone Company offered Hardeman $250,000 in "incentive" pay if McGilbra's department awarded the fire station contracts to an entity owned by Keystone Company. Though a city council committee originally recommended Keystone Company to complete the project, it was cancelled before the contract was officially awarded.

This indictment is part of an on-going investigation into municipal corruption in both Houston, Texas, and Cleveland, Ohio. Previous activity included:

- Monique McGilbra previously pled guilty to conspiring to accept these things of value from Keystone Company in order to be influenced in her official capacity as well as other items from another Houston contractor Gary Thacker. McGilbra entered a guilty plea at the same time in which she also admitted similar unlawful conduct with businessman Nate Gray in connection with his attempts to obtain an energy services subcontract from the city of Houston. McGilbra was sentenced for this conduct to concurrent sentences of 36 months in Cleveland and 30 months in Houston.

- Gary Thacker pled guilty and was sentenced to ten months of imprisonment.

- Nate Gray was convicted by a jury and sentenced to 15 years of imprisonment.

45

- Garland Hardeman was convicted of unrelated charges in federal court in California and was sentenced to a one-year term of imprisonment.

This case is being prosecuted by the Public Integrity Section with assistance from the United States Attorney's Office for the Southern District of Texas. The original investigation in Cleveland was handled by the Public Integrity Section and the United States Attorney's Office, Northern District of Ohio.

===============================================================

**United States v. Spargo, Northern District of New York**

Former supreme court justice of the Third Judicial Circuit of the state of New York, Thomas J. Spargo, was indicted on December 10, 2008, and charged with attempted extortion and federal program bribery.

Spargo allegedly solicited $10,000 from an attorney who had cases pending before him. The indictment further charges that Spargo solicited the money by causing the attorney to fear that Spargo would use his influence and act officially to harm the attorney if he was not paid and, conversely, to help the attorney if he was paid.

===============================================================

**United States Virgin Islands**
**Bribery/Obstruction of Justice Scheme**
**District of the Virgin Islands**

**United States v. Plaskett and Biggs**

The former commissioners of the United States Virgin Islands Department of Planning and Natural Resources (DPNR) and the Department of Property and Procurement (DP&P) were sentenced on August 14, 2008, for their roles in a $1.4 million bribery and kickback scheme. Former DPNR Commissioner Dean C. Plaskett was sentenced to nine years of imprisonment followed by three years of supervised release and ordered to pay $1,086,237 in forfeiture. DP&P Commissioner Marc A. Biggs was sentenced to seven years of imprisonment followed by three years of supervised release and ordered to pay $960,482 in forfeiture.

Plaskett and Biggs, as well as other high-ranking officials within the Virgin Islands government, formed a fictitious business called Elite Technical Services (Elite). They

46

used this and other companies to seek and obtain awards on at least seven government contracts valued at approximately $1.4 million. These awards were granted on behalf of DPNR and the Virgin Islands Fire Service. Although little or no actual work was performed on the contracts, payments totaling more than $1.1 million were made to Elite and the other companies. Once the contract proceeds were paid, members of the corrupt scheme paid bribes and kickbacks totaling between $300,000 and $350,000 to at least four other territorial government officials. After the bribery and kickback scheme became the subject of investigation, Plaskett and others concocted and engaged in a second illicit scheme designed to obstruct justice on one of these seven government contracts.

Plaskett and Biggs were found guilty on February 27, 2008, of demanding and accepting bribes and kickbacks in connection with the award of a $650,000 government contract to Elite. In addition, Plaskett was convicted of obstruction of justice stemming from his efforts to conceal from federal and local investigators as well as a grand jury the $130,000 government contract.

Local businessman Leroy L. Marchena was acquitted on this same date of obstruction of justice charges stemming from his alleged role in thwarting the joint federal and local investigation. He was not charged in the underlying bribery scheme.

---

## United States v. Blyden

The former Director of Permits for DPNR was sentenced on October 29, 2008, to 14 months of imprisonment for his role in the scheme. Brent E. Blyden was ordered to pay $125,755 in restitution, a personal money judgment in the amount of $20,000, and three years of supervised release following his prison term. In addition, Blyden is banned from federal and local government employment for five years. Blyden had previously pled guilty plea to conspiracy to obstruct justice for participating in the concealment of the $130,000 government contract.

---

Six individuals have either pleaded guilty or have been convicted at trial of felony charges as a result of this investigation. Guilty pleas have included conspiring to violate the federal program bribery statute, committing honest services mail fraud, and structuring currency transactions to further the underlying bribery and kickback scheme. Additional participants were previously sentenced as follows:

47

- Hollis L. Griffin, former DPNR director of the Division of Environmental Protection was sentenced to four years of imprisonment;

- Earl E. Brewley, former Virgin Islands Fire Service employee, was sentenced to 21 months of imprisonment;

- Esmond J. Modeste, Atlanta, Georgia, businessman, was sentenced to 30 months of imprisonment.

These three individuals were also held jointly and severally liable for restitution of approximately $1.1 million.

These Virgin Island cases were handled by the Public Integrity Section in coordination with the United States Attorney's Office, District of the Virgin Islands.

## FEDERAL ELECTION CRIMES

As described in Part I, during 2008 the Public Integrity Section continued its nationwide oversight of the handling of election crime investigations and prosecutions. The Section also continued to assist in the implementation and execution of the Department's Ballot Access and Voting Integrity Initiative.  The purposes of this ongoing Initiative are to increase the Department's efforts to deter and prosecute election crimes and to protect voting rights.  As a result of the Initiative, during 2008 the number of election crime matters investigated by federal prosecutors and investigators throughout the country continued to increase, as did the Section's operational involvement in election crime matters.  At the end of 2008, the Section was supervising and providing advice on 194 election crime matters nationwide.  The Section also concurred in the closing of an additional 41 election crime matters nationwide during the year.  As of December 31, 2008, 20 matters involving possible election crimes were pending in the Public Integrity Section.

### United States v. Belk, District of Columbia

On June 20, 2008, Marcus T. Belk, a former United States Senate candidate from South Carolina, was sentenced to 37 months of probation and 100 hours of community service for failing to report to the Federal Election Commission (FEC) a contribution of $15,000 from the Ford Motor Company Civic Action Fund, as required, and converting

these funds to his personal use.  Belk was also ordered to pay $15,000 in restitution to the Ford Motor Company PAC.

The contribution had been sent to Belk in his capacity as treasurer of an entity called the National Congressional Campaign Committee, one of four political committees that Belk had registered with the FEC the previous year.  The investigation also disclosed that he had submitted numerous false FEC reports that exaggerated the contribution amounts given to his campaign.  Belk had previously pled guilty and had agreed not to work for any federal political campaign on financial or disclosure matters for ten years.

## United States v. Collier and Price, District of Columbia

Two South Carolina businessmen, David Therrell Collier and Robert Howell Price III, were sentenced on January 30, 2008, based on their pleas of guilty to causing others to make false statements to the Federal Election Commission (FEC).  Collier was sentenced to five years of probation, with a special condition of 120 days of electronic monitoring, a $5,000 fine, and 300 hours of community service. Price was sentenced to five years of probation, a $1,000 fine, and 100 hours of community service.

Collier and Price admitted that they had been engaged in business activities with Indian Tribe A, a federally recognized tribe of Native Americans located in Rock Hill, South Carolina, and were seeking to obtain expanded gambling rights for the Tribe through legislative changes.  Accordingly, they decided to make political contributions to candidates for federal elective office and elected officials who might support the necessary changes.  Collier and Price admitted that, for approximately a four-year period, they disguised $66,500 in campaign contributions by recruiting friends, family members, business associates, and their spouses to make political contributions.  Those individuals then were reimbursed by Indian Tribe A.

As a result of the actions of these defendants in disguising the contributions, numerous political committees submitted materially false statements to the FEC.  The political committees identified the contributors as these individuals rather than Indian Tribe A.

## United States v. Fieger & Johnson, Eastern District of Michigan

49

Attorney Geoffrey Fieger and his law partner Vernon Johnson, were acquitted on June 2, 2008, of charges that they violated the Federal Election Campaign Act, made false statements, and obstructed justice.

The indictment alleged that the attorneys conspired to contribute more than $125,000 in illegal campaign contributions to the 2004 presidential campaign of United States Senator John Edwards.  In addition, Fieger was charged with attempting to obstruct and impede the grand jury's investigation of the illegal campaign contributions by attempting to shift responsibility for the donations to a deceased officer of the firm, by providing misleading information to witnesses, and attempting to conceal an incriminating document.

This case was prosecuted jointly by the United States Attorney's Office, Eastern District of Michigan, and the Public Integrity Section.

===============================

### United States v. Vilá, Bird, and Franco, District of Puerto Rico

Puerto Rico Governor Aníbal Acevedo Vilá, his senior aide, Luisa Inclán Bird, and former campaign director, Miguel Nazario Franco, were indicted on August 19, 2008, on charges of honest services wire fraud and conspiracy to commit money laundering.

- Aníbal Acevedo Vilá was Puerto Rico's Resident Commissioner in the United States House of Representatives for over four years and had been the Governor of Puerto Rico since 2005.

- Luisa Inclán Bird, an attorney, was a legal advisor to the San Juan Resident Commissioner's Office during Vilá's tenure and volunteered in the finance department for the Governor's previous gubernatorial campaign.

- Miguel Nazario Franco, a businessman in Puerto Rico, was director of the finance department for Vilá's 2004 gubernatorial campaign.

Vilá, along with others connected with his gubernatorial campaign, allegedly solicited and received approximately $250,000 from a local businessperson (Collaborator 18) for the benefit of Vilá and his campaign.  The illegal actions continued after the election.  There was significant debt accumulated by this campaign and the previous Resident Commissioner's campaigns, some of which was also concealed from the Federal Election Commission and the public.  Furthermore, during his term as governor, Vilá allegedly participated in official actions intended to aid the business interests of

Collaborator 18 while apparently failing to disclose the nature and extent of their financial relationship.

---

An earlier indictment, returned on March 24, 2008, charged the same original defendants and ten other associates with conspiracy, false statements, wire fraud, federal program fraud, and tax crimes related to campaign financing for the Resident Commissioner of the Commonwealth and the gubernatorial campaigns.  The charges filed included:

- Aníbal Acevedo Vilá–conspiracy, false statements, wire fraud, federal program fraud, and tax crimes.

- Salvatore Avanzato–conspiracy.  Avanzato is a Philadelphia-area businessman.
- Luisa Inclán Bird–conspiracy, wire fraud.

- Marvin I. Block–conspiracy.  Block is a Philadelphia-area businessman and lawyer.

- Ramón Velasco Escardille–conspiracy, false statements, and wire fraud.  Escardille was Vilá's treasurer for the resident commissioner campaign.

- Robert M. Feldman–conspiracy.  Feldman is a Philadelphia-area political and business consultant and was designated by Vilá as his United States campaign finance chairman for the resident commissioner campaign.

- Miguel Nazario Franco–wire fraud.

- José González Freyre–wire fraud and false statements.  González Freyre is the owner of Pan American Grain, a Puerto Rican agricultural company, which contributed at least $50,000 to Vilá's gubernatorial campaign.

- Cándido Negrón Mella–conspiracy and false statements. Mella is a Philadelphia businessman and was designated by Vilá as his United States deputy campaign finance chairman for the resident commissioner campaign.

- Jorge Velasco Mella–conspiracy and false statements.  Mella, a cousin of Cándido Negrón Mella, received a job in Vilá's San Juan resident commissioner's office and assisted in the handling of campaign contributions.

- Ricardo Colón Padilla–wire fraud, federal program fraud, and false statements. Padilla was the finance director for Vilá's political party during his gubernatorial campaign.

- Edwin Colón Rodríguez–conspiracy and false statements. He was also charged with embezzlement in a separate indictment unsealed on March 27, 2008. Rodríguez was Vilá's resident commissioner's campaign assistant treasurer.

- Eneidy Coreano Salgado–conspiracy. Coreano Salgado was the administrative director in Vilá's Washington, DC, resident commissioner's office.

These cases are being prosecuted by the United States Attorney's Office, District of Puerto Rico, and the Public Integrity Section.

---

In addition, Salvatore Avanzato pled guilty on December 16, 2008, to conspiracy to knowingly and willfully committing offenses against the United States in violation of the Federal Election Campaign Act. Avanzato, owner of Dental One, directed employees, family, and friends to make campaign contributions to Vilá that totaled approximately $140,000. Others assisting Avanzato in obtaining these conduit contributions included Cándido Negrón Mella, Jorge Velasco Mella, and Robert M. Feldman. Avanzato also paid for expensive dinners and the cost of a hotel fundraiser for the benefit of Vilá. These payments were made to influence and to gain access to Vilá for the furthering of Avanzato's business interests and those of his clients.

## PART III

## NATIONWIDE FEDERAL PROSECUTIONS
## OF CORRUPT PUBLIC OFFICIALS

### INTRODUCTION

The tables in this section of the Report reflect data that is compiled from annual nationwide surveys of the United States Attorneys' Offices by the Public Integrity Section.

As discussed in Part I, most corruption cases are handled by the local United States Attorney's Office in the district where the crime occurred. However, on occasion outside prosecutors are asked either to assist the local office on a corruption case, or to handle the case entirely as a result of recusal of the local office due to a possible conflict of interest. The figures in Tables I through III include all public corruption prosecutions within each district. The figures in Table IV reflect the Public Integrity Section's public corruption prosecutions for 2008 and were discussed in Part II of this report.

### LIST OF TABLES

**TABLE I:**    Nationwide Federal Prosecutions of
Corrupt Public Officials in 2008

**TABLE II:**    Progress Over the Past Two Decades:
Nationwide Federal Prosecutions of
Corrupt Public Officials

**TABLE III:**  Federal Public Corruption Convictions by District
Over the Past Decade

**TABLE IV:**  Public Integrity Section's Federal Prosecutions
of Corrupt Public Officials in 2008

53

**TABLE I**

**NATIONWIDE FEDERAL PROSECUTIONS
OF CORRUPT PUBLIC OFFICIALS
IN 2008**

**Federal Officials**

| | |
|---|---|
| Charged | 518 |
| Convicted | 458 |
| Awaiting Trial | 117 |

**State Officials**

| | |
|---|---|
| Charged | 144 |
| Convicted | 123 |
| Awaiting Trial | 61 |

**Local Officials**

| | |
|---|---|
| Charged | 287 |
| Convicted | 246 |
| Awaiting Trial | 127 |

**Others Involved**

| | |
|---|---|
| Charged | 355 |
| Convicted | 302 |
| Awaiting Trial | 184 |

**Totals**

| | |
|---|---|
| Charged | 1,304 |
| Convicted | 1,129 |

54

| Awaiting Trial | 489 |
|---|---|

## TABLE II

### PROGRESS OVER THE LAST TWO DECADES: NATIONWIDE FEDERAL PROSECUTIONS OF CORRUPT PUBLIC OFFICIALS

| | 1989 | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 |
|---|---|---|---|---|---|---|---|---|---|---|
| **FEDERAL OFFICIALS** | | | | | | | | | | |
| Charged | 695 | 615 | 803 | 624 | 627 | 571 | 527 | 456 | 459 | 442 |
| Convicted | 610 | 583 | 665 | 532 | 595 | 488 | 438 | 459 | 392 | 414 |
| Awaiting Trial as of 12/31 | 126 | 103 | 149 | 139 | 133 | 124 | 120 | 64 | 83 | 85 |
| **STATE OFFICIALS** | | | | | | | | | | |
| Charged | 71 | 96 | 115 | 81 | 113 | 99 | 61 | 109 | 51 | 91 |
| Convicted | 54 | 79 | 77 | 92 | 133 | 97 | 61 | 83 | 49 | 58 |
| Awaiting Trial as of 12/31 | 18 | 28 | 42 | 24 | 39 | 17 | 23 | 40 | 20 | 37 |
| **LOCAL OFFICIALS** | | | | | | | | | | |
| Charged | 269 | 257 | 242 | 232 | 309 | 248 | 236 | 219 | 255 | 277 |
| Convicted | 201 | 225 | 180 | 211 | 272 | 202 | 191 | 190 | 169 | 264 |
| Awaiting Trial as of 12/31 | 122 | 98 | 88 | 91 | 132 | 96 | 89 | 60 | 118 | 90 |
| **PRIVATE CITIZENS INVOLVED IN PUBLIC CORRUPTION OFFENSES** | | | | | | | | | | |
| Charged | 313 | 208 | 292 | 252 | 322 | 247 | 227 | 200 | 292 | 364 |
| Convicted | 284 | 197 | 272 | 246 | 362 | 182 | 188 | 170 | 243 | 278 |
| Awaiting Trial as of 12/31 | 109 | 71 | 67 | 126 | 99 | 95 | 91 | 80 | 106 | 128 |
| **TOTALS** | | | | | | | | | | |
| Charged | 1348 | 1176 | 1452 | 1189 | 1371 | 1165 | 1051 | 984 | 1057 | 1174 |

55

| Convicted | 1149 | 1084 | 1194 | 1081 | 1362 | 969 | 878 | 902 | 853 | 1014 |
| Awaiting Trial as of 12/31 | 375 | 300 | 346 | 380 | 403 | 332 | 323 | 244 | 327 | 340 |

**TABLE II (continued)**

| | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **FEDERAL OFFICIALS** | | | | | | | | | | | |
| Charged | 480 | 441 | 502 | 478 | 479 | 424 | 445 | 463 | 426 | 518 | 10,475 |
| Convicted | 460 | 422 | 414 | 429 | 421 | 381 | 390 | 407 | 405 | 458 | 9,363 |
| Awaiting Trial as of 12/31 | 101 | 92 | 131 | 119 | 129 | 98 | 118 | 112 | 116 | 117 | |
| **STATE OFFICIALS** | | | | | | | | | | | |
| Charged | 115 | 92 | 95 | 110 | 94 | 111 | 96 | 101 | 128 | 144 | 1,973 |
| Convicted | 80 | 91 | 61 | 132 | 87 | 81 | 94 | 116 | 85 | 123 | 1,733 |
| Awaiting Trial as of 12/31 | 44 | 37 | 75 | 50 | 38 | 48 | 51 | 38 | 65 | 61 | |
| **LOCAL OFFICIALS** | | | | | | | | | | | |
| Charged | 237 | 211 | 224 | 299 | 259 | 268 | 309 | 291 | 284 | 287 | 5,213 |
| Convicted | 219 | 183 | 184 | 262 | 119 | 252 | 232 | 241 | 275 | 246 | 4,318 |
| Awaiting Trial as of 12/31 | 95 | 89 | 110 | 118 | 106 | 105 | 148 | 141 | 127 | 127 | |
| **PRIVATE CITIZENS INVOLVED IN PUBLIC CORRUPTION OFFENSES** | | | | | | | | | | | |
| Charged | 302 | 256 | 266 | 249 | 318 | 410 | 313 | 295 | 303 | 355 | 5,784 |
| Convicted | 306 | 242 | 261 | 188 | 241 | 306 | 311 | 266 | 249 | 302 | 5,094 |
| Awaiting Trial as of 12/31 | 89 | 109 | 121 | 126 | 139 | 168 | 136 | 148 | 179 | 184 | |
| **TOTALS** | | | | | | | | | | | |
| Charged | 1134 | 1000 | 1087 | 1136 | 1150 | 1213 | 1163 | 1150 | 1141 | 1,304 | 23,445 |
| Convicted | 1065 | 938 | 920 | 1011 | 868 | 1020 | 1027 | 1030 | 1014 | 1,129 | 19,508 |
| Awaiting Trial as of 12/31 | 329 | 327 | 437 | 413 | 412 | 419 | 453 | 439 | 487 | 489 | |

### TABLE III

### FEDERAL PUBLIC CORRUPTION CONVICTIONS BY DISTRICT
### OVER THE PAST DECADE

| U.S. Attorney's Office | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Alabama, Middle | 2 | 3 | 9 | 7 | 6 | 7 | 9 | 11 | 8 | 3 | 65 |
| Alabama, Northern | 17 | 9 | 15 | 11 | 6 | 4 | 17 | 33 | 39 | 17 | 168 |
| Alabama, Southern | 6 | 0 | 2 | 10 | 2 | 2 | 0 | 7 | 5 | 0 | 34 |
| Alaska | 4 | 16 | 6 | 5 | 0 | 0 | 1 | 3 | 15 | 8 | 58 |
| Arizona | 7 | 8 | 1 | 4 | 10 | 9 | 48 | 16 | 32 | 20 | 155 |
| Arkansas, Eastern | 5 | 7 | 0 | 0 | 18 | 18 | 4 | 8 | 8 | 4 | 72 |
| Arkansas, Western | 0 | 1 | 0 | 3 | 1 | 0 | 0 | 2 | 0 | 1 | 8 |
| California, Central | 58 | 31 | 33 | 35 | 45 | 22 | 42 | 36 | 55 | 41 | 398 |
| California, Eastern | 17 | 18 | 18 | 20 | 20 | 39 | 30 | 18 | 13 | 9 | 202 |
| California, Northern | 9 | 18 | 3 | 4 | 5 | 14 | 3 | 4 | 2 | 3 | 65 |
| California, Southern | 4 | 7 | 12 | 5 | 5 | 2 | 10 | 7 | 6 | 5 | 63 |
| Colorado | 1 | 3 | 22 | 16 | 7 | 8 | 11 | 4 | 3 | 4 | 79 |
| Connecticut | 8 | 8 | 14 | 3 | 12 | 8 | 24 | 11 | 17 | 5 | 110 |
| Delaware | 2 | 1 | 8 | 7 | 3 | 5 | 2 | 7 | 5 | 7 | 47 |
| District of Columbia | 60 | 46 | 43 | 44 | 20 | 33 | 15 | 25 | 22 | 66 | 374 |
| Florida, Middle | 24 | 28 | 8 | 9 | 14 | 10 | 13 | 39 | 28 | 51 | 224 |

TABLE III (continued)

| U.S. Attorney's Office | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Florida, Northern | 4 | 8 | 5 | 5 | 4 | 2 | 5 | 17 | 19 | 3 | 72 |
| Florida, Southern | 106 | 71 | 83 | 38 | 37 | 78 | 24 | 27 | 22 | 12 | 498 |
| Georgia, Middle | 2 | 2 | 11 | 1 | 8 | 4 | 7 | 3 | 0 | 7 | 45 |
| Georgia, Northern | 6 | not reported | 10 | 26 | 12 | 9 | 21 | 6 | 7 | 15 | 112 |
| Georgia, Southern | 3 | 0 | 3 | 6 | 1 | 0 | 4 | 0 | 1 | 2 | 20 |
| Guam & NMI | 7 | 19 | 19 | 13 | 16 | 9 | 5 | 2 | 0 | 3 | 93 |
| Hawaii | 2 | 3 | 2 | 10 | 4 | 14 | 4 | 5 | 1 | 2 | 47 |
| Idaho | 5 | 5 | 4 | 7 | 4 | 3 | 1 | 1 | 1 | 1 | 32 |
| Illinois, Central | 2 | 3 | 2 | 5 | 5 | 14 | 3 | 6 | 8 | 6 | 54 |
| Illinois, Northern | 53 | 49 | 24 | 19 | 54 | 22 | 51 | 30 | 28 | 43 | 373 |
| Illinois, Southern | 5 | 7 | 4 | 6 | 1 | 6 | 20 | 2 | 6 | 7 | 64 |
| Indiana, Northern | 8 | 7 | 4 | 4 | 10 | 13 | 9 | 5 | 15 | 9 | 84 |
| Indiana, Southern | 1 | 4 | 2 | 2 | 10 | 4 | 5 | 4 | 9 | 5 | 46 |
| Iowa, Northern | 2 | 0 | 0 | 1 | 1 | 1 | 3 | 0 | 0 | 0 | 8 |
| Iowa, Southern | 0 | 0 | 0 | 2 | 8 | 1 | 1 | 2 | 9 | 9 | 32 |
| Kansas | 6 | 8 | 5 | 6 | 0 | 5 | 3 | 0 | 2 | 5 | 40 |
| Kentucky, Eastern | 17 | 25 | 15 | 25 | 22 | 27 | 10 | 23 | 33 | 22 | 219 |
| Kentucky, Western | 8 | 0 | 2 | 2 | 4 | 1 | 4 | 4 | 6 | 6 | 37 |
| Louisiana, Eastern | 19 | 18 | 20 | 19 | 17 | 29 | 26 | 26 | 29 | 26 | 229 |

### TABLE III (continued)

| U.S. Attorney's Office | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Louisiana, Middle | 3 | 2 | 6 | 2 | 2 | 0 | 8 | 13 | 6 | 3 | 45 |
| Louisiana, Western | 2 | 3 | 6 | 9 | 6 | 1 | 4 | 10 | 7 | 10 | 58 |
| Maine | 0 | 5 | 2 | 0 | 5 | 2 | 3 | 4 | 4 | 8 | 33 |
| Maryland | 7 | 8 | 8 | 6 | 12 | 28 | 17 | 36 | 21 | 39 | 182 |
| Massachusetts | 21 | 6 | 15 | 8 | 22 | 17 | 15 | 28 | 29 | 19 | 180 |
| Michigan, Eastern | 18 | 7 | 18 | 14 | 10 | 17 | 11 | 13 | 7 | 20 | 135 |
| Michigan, Western | 8 | 4 | 9 | 10 | 14 | 13 | 11 | 12 | 5 | 13 | 99 |
| Minnesota | 8 | 4 | 8 | 8 | 3 | 9 | 3 | 6 | 3 | 7 | 59 |
| Mississippi, Northern | 42 | 9 | 5 | 7 | 14 | 9 | 5 | 5 | 18 | 13 | 127 |
| Mississippi, Southern | 17 | 14 | 19 | 13 | 13 | 5 | 0 | 2 | 7 | 4 | 94 |
| Missouri, Eastern | 16 | 3 | 4 | 10 | 3 | 4 | 8 | 12 | 12 | 22 | 94 |
| Missouri, Western | 10 | 9 | 6 | 3 | 7 | 6 | 13 | 8 | 8 | 9 | 79 |
| Montana | 5 | 16 | 3 | 13 | 2 | 7 | 1 | 8 | 0 | 8 | 63 |
| Nebraska | 0 | 0 | 0 | 1 | 2 | 2 | 4 | 3 | 0 | 8 | 20 |
| Nevada | 9 | 6 | 5 | 6 | 6 | 0 | 0 | 3 | 4 | 0 | 39 |
| New Hampshire | 1 | 2 | 0 | 5 | 3 | 0 | 2 | 0 | 0 | 4 | 17 |
| New Jersey | 43 | 28 | 28 | 28 | 41 | 44 | 39 | 47 | 62 | 49 | 409 |
| New Mexico | not reported | 7 | 2 | 2 | 2 | 5 | 3 | 6 | 3 | 6 | 36 |
| New York, Eastern | 18 | 21 | 10 | 38 | 7 | 25 | 31 | 20 | 26 | 14 | 210 |

TABLE III (continued)

| U.S. Attorney's Office | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|
| New York, Northern | 9 | 8 | 11 | 5 | 22 | 16 | 11 | 9 | 7 | 10 | 108 |
| New York, Southern | 33 | 48 | 34 | 33 | 28 | 28 | 28 | 16 | 9 | 9 | 266 |
| New York, Western | 7 | 4 | 13 | 6 | 6 | 7 | 12 | 6 | 2 | 15 | 78 |
| North Carolina, Eastern | 4 | 0 | 7 | 4 | 9 | 18 | 2 | 20 | 18 | 4 | 86 |
| North Carolina, Middle | 7 | 4 | 5 | 12 | 6 | 0 | 3 | 2 | 5 | 1 | 45 |
| North Carolina, Western | 3 | 5 | 1 | 3 | 5 | 7 | 8 | 2 | 3 | 12 | 49 |
| North Dakota | 0 | 2 | 2 | 5 | 16 | 5 | 9 | 2 | 6 | 4 | 51 |
| Ohio, Northern | 25 | 36 | 34 | 29 | 28 | 32 | 28 | 31 | 37 | 29 | 309 |
| Ohio, Southern | 29 | 20 | 17 | 21 | 9 | 26 | 21 | 12 | 12 | 8 | 175 |
| Oklahoma, Eastern | 3 | 2 | 10 | 0 | 0 | 0 | 2 | 5 | 3 | 8 | 33 |
| Oklahoma, Northern | 2 | 3 | 2 | 5 | 3 | 0 | 2 | 3 | 3 | 3 | 26 |
| Oklahoma, Western | 7 | 4 | 0 | 2 | 1 | 4 | 17 | 10 | 3 | 11 | 59 |
| Oregon | 3 | 4 | 3 | 1 | 3 | 0 | 4 | 6 | 11 | 3 | 38 |
| Pennsylvania, Eastern | 37 | 30 | 36 | 57 | 57 | 26 | 26 | 30 | 19 | 15 | 333 |
| Pennsylvania, Middle | 12 | 14 | 20 | 9 | 13 | 12 | 19 | 27 | 16 | 16 | 158 |
| Pennsylvania, Western | 8 | 7 | 5 | 6 | 4 | 3 | 11 | 10 | 5 | 5 | 64 |
| Puerto Rico | 13 | 10 | 9 | 101 | 24 | 31 | 6 | 20 | 2 | 37 | 253 |
| Rhode Island | 3 | 5 | 2 | 6 | 0 | 2 | 4 | 2 | 1 | 2 | 27 |
| South Carolina | 11 | 13 | 8 | 5 | 8 | 8 | 0 | 3 | 4 | 8 | 68 |
| South Dakota | 1 | 2 | 2 | 4 | 3 | 2 | 3 | 13 | 4 | 11 | 45 |

TABLE III (continued)

| U.S. Attorney's Office | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Tennessee, Eastern | 4 | 3 | 2 | 9 | 8 | 6 | 9 | 7 | 12 | 6 | 66 |
| Tennessee, Middle | 6 | 0 | 0 | 4 | 6 | 8 | 5 | 9 | 6 | 1 | 45 |
| Tennessee, Western | 12 | 8 | 13 | 8 | 11 | 16 | 22 | 19 | 24 | 5 | 138 |
| Texas, Eastern | 3 | 4 | 14 | 5 | 5 | 8 | 5 | 3 | 4 | 10 | 61 |
| Texas, Northern | 9 | 6 | 3 | 13 | 33 | 14 | 22 | 16 | 6 | 23 | 145 |
| Texas, Southern | 31 | 29 | 30 | 10 | 17 | 11 | 25 | 21 | 34 | 64 | 272 |
| Texas, Western | 10 | 5 | 15 | 21 | 16 | 27 | 17 | 9 | 11 | 15 | 146 |
| Utah | 5 | 2 | 2 | 8 | 5 | 0 | 6 | 1 | 7 | 5 | 41 |
| Vermont | 2 | 2 | 2 | 0 | 3 | 0 | 2 | 0 | 1 | 5 | 17 |
| Virgin Islands | 11 | 6 | 4 | 6 | 2 | 2 | 2 | 8 | 3 | 2 | 46 |
| Virginia, Eastern | 17 | 22 | 22 | 17 | 8 | 21 | 23 | 38 | 23 | 72 | 263 |
| Virginia, Western | 8 | 7 | 3 | 13 | 3 | 16 | 2 | 13 | 13 | 2 | 80 |
| Washington, Eastern | 1 | 1 | 0 | 3 | 2 | 3 | 6 | 1 | 4 | 5 | 26 |
| Washington, Western | 10 | 16 | 10 | 3 | 1 | 15 | 7 | 1 | 5 | 7 | 75 |
| West Virginia, Northern | 3 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 0 | 2 | 8 |
| West Virginia, Southern | 3 | 6 | 3 | 4 | 8 | 10 | 14 | 9 | 2 | 4 | 63 |
| Wisconsin, Eastern | 4 | 8 | 10 | 10 | 8 | 10 | 18 | 11 | 7 | 6 | 92 |
| Wisconsin, Western | 0 | 4 | 3 | 0 | 3 | 3 | 2 | 5 | 5 | 0 | 25 |
| Wyoming | 1 | 1 | 0 | 0 | 2 | 1 | 8 | 0 | 1 | 1 | 15 |

TABLE IV

PUBLIC INTEGRITY SECTION'S
FEDERAL PROSECUTIONS
OF CORRUPT PUBLIC OFFICIALS
IN 2008*

|  | CHARGED | CONVICTED | AWAITING TRIAL |
|---|---|---|---|
| **FEDERAL OFFICIALS** | 23 | 23 | 8 |
| **STATE OFFICIALS** | 4 | 2 | 3 |
| **LOCAL OFFICIALS** | 0 | 2 | 2 |
| **PRIVATE CITIZENS INVOLVED IN PUBLIC CORRUPTION OFFENSES** | 27 | 12 | 23 |
| **TOTALS** | 54 | 39 | 36 |

*Includes cases shared with U.S. Attorney's Office