# REPORT TO CONGRESS

# ON THE ACTIVITIES AND OPERATIONS

# OF THE

# PUBLIC INTEGRITY SECTION

# FOR 2009



**Public Integrity Section**
**Criminal Division**
**United States Department of Justice**

**Submitted Pursuant to**
**Section 603 of the Ethics in Government Act of 1978**

2:13-cv-193
09/02/2014

DEF2579



DEPOSITION
EXHIBIT

Frary       58

Sylvia Kerr, CSR, CRR, RPR, TCRR

## INTRODUCTION

This Report to Congress is submitted pursuant to the Ethics in Government Act of 1978, which requires the Attorney General to report annually to Congress on the operations and activities of the Justice Department's Public Integrity Section. The Report describes the activities of the Public Integrity Section during 2009. It also provides statistics on the nationwide federal effort against public corruption during 2009 and over the previous two decades.

The Public Integrity Section was created in 1976 in order to consolidate the Department's oversight responsibilities for the prosecution of criminal abuses of the public trust by government officials into one unit of the Criminal Division. Section attorneys prosecute selected cases involving federal, state, or local officials, and also provide advice and assistance to prosecutors and agents in the field regarding the handling of public corruption cases. In addition, the Section serves as the Justice Department's center for handling various issues that arise regarding public corruption statutes and cases.

An Election Crimes Branch was created within the Section in 1980 to supervise the Department's nationwide response to election crimes, such as voter fraud and campaign-financing offenses. The Branch reviews all major election crime investigations throughout the country and all proposed criminal charges relating to election crime.

During the year, the Section maintained a staff of approximately twenty-nine attorneys, including experts in extortion, bribery, election crimes, and criminal conflicts of interest. The section management included: William Welch, Chief; Brenda Morris, Principal Deputy Chief; Peter Ainsworth, Senior Deputy Chief for Litigation; Raymond Hulser, Deputy Chief for Policy and Administration; and Craig Donsanto, Director, Election Crimes Branch.

Part I of the Report discusses the operations of the Public Integrity Section and highlights its major activities in 2009. Part II describes the cases prosecuted by the Section in 2009. Part III presents nationwide data based on the Section's annual surveys of United States Attorneys regarding the national federal effort to combat public corruption from 1989 through 2009 and data specific to the Public Integrity Section for 2009.

**TABLE OF CONTENTS**

**PART I**

**OPERATIONAL RESPONSIBILITIES OF
THE PUBLIC INTEGRITY SECTION**

A.   RESPONSIBILITY FOR LITIGATION. ............................... 1
  1.   Recusals by United States Attorneys' Offices........................ 1
  2.   Sensitive and Multi-District Cases. ............................. 3
  3.   Federal Agency Referrals. ....................................... 6
  4.   Requests for Assistance/Shared Cases. .......................... 8

B.   SPECIAL SECTION PRIORITIES. .................................. 9
  1.   Election Crimes.................................................. 9
  2.   Conflicts of Interest Crimes.................................... 12

C.   LEGAL AND TECHNICAL ASSISTANCE........................... 13
  1.   Training and Advice.............................................13
  2.   Advisor to the President's Council on Integrity and Efficiency
       and the Executive Council on Integrity and Efficiency................ 13
  3.   Member of the Board Advisors of the Election Assistance Commission. . 14
  4.   Legislative Activities........................................... 14
  5.   Case Supervision and General Assistance.......................... 15
  6.   International Advisory Responsibilities........................... 15

**PART II**

**PUBLIC INTEGRITY SECTION INDICTMENTS,
PROSECUTIONS, AND APPEALS IN 2009**

INTRODUCTION...................................................... 17
FEDERAL JUDICIAL BRANCH. ....................................... 18
FEDERAL LEGISLATIVE BRANCH..................................... 19
FEDERAL EXECUTIVE BRANCH. ..................................... 27
STATE AND LOCAL GOVERNMENT.................................... 42
FEDERAL ELECTION CRIMES........................................ 46

ii

# PART III

## NATIONWIDE FEDERAL PROSECUTIONS
## OF CORRUPT PUBLIC OFFICIALS

INTRODUCTION............................................................. 51

LIST OF TABLES. ........................................................... 51

TABLE I:    Nationwide Federal Prosecutions of Corrupt Public Officials
            in 2009................................................................. 52

TABLE II:   Progress Over the Past Two Decades:
            Nationwide Federal Prosecutions of Corrupt Public Officials..... 53

TABLE III:  Federal Public Corruption Convictions by District
            Over the Past Decade..................................... 55

TABLE IV: Public Integrity Sections's Federal Prosecutions of
            Corrupt Public Officials in 2009. .......................... 60

## PART I

## OPERATIONAL RESPONSIBILITIES OF
## THE PUBLIC INTEGRITY SECTION

### A.   RESPONSIBILITY FOR LITIGATION

The work of the Public Integrity Section focuses on public corruption, that is, crimes involving abuses of the public trust by government officials. Most of the Section's resources are devoted to the supervision of investigations involving alleged corruption by government officials and to prosecutions resulting from these investigations. Decisions to undertake particular matters are made on a case-by-case basis, given Section resources, the type and seriousness of the allegation, the sufficiency of factual predication reflecting criminal conduct, and the availability of federal prosecutive theories to reach the conduct.

Cases handled by the Section generally fall into one of the following categories: recusals by United States Attorneys' Offices, sensitive cases, multi-district cases, referrals from federal agencies, and shared cases. These categories are discussed below, and examples of cases handled by the Section in 2009 under the categories are noted. The examples are described, along with the Section's other 2009 casework, in Part II.

### 1.   Recusals by United States Attorneys' Offices

The vast majority of federal corruption prosecutions are handled by the local United States Attorney's Office for the geographic district where the crime occurred, a fact demonstrated by the statistical charts in Part III of this Report. At times, however, it may be inappropriate for the local United States Attorney's Office to handle a particular corruption case.

Public corruption cases tend to raise unique problems of public perception that are generally absent in more routine criminal cases. An investigation of alleged corruption by a government official, whether at the federal, state, or local level, or someone associated with such an official, always has the potential of becoming a high-profile case simply because its focus is on the conduct of a public official. In addition, these cases are often politically sensitive because their ultimate targets tend to be politicians or government officials appointed by politicians.

1

A successful public corruption prosecution requires both the appearance and the reality of fairness and impartiality. This means that a successful corruption case involves not just a conviction but public perception that the conviction was warranted, not the result of improper motivation by the prosecutor, and is free of conflicts of interest. In a case in which the local conflict of interest is substantial, the local office is removed from the case by a procedure called recusal. Recusal occurs when the local office either asks to step aside, or is asked to step aside by Department headquarters, as primary prosecutor. Federal cases involving corruption allegations in which the conflict is substantial are usually referred to the Public Integrity Section either for prosecution or direct operational supervision.

Allegations involving possible crimes by federal judges almost always require recusals of the local offices for significant policy as well as for practical reasons. Having the case handled outside the local offices eliminates the possible appearance of bias, as well as the practical difficulties and awkwardness that would arise if an office investigating a judge were to appear before the judge on other matters. Thus, as a matter of established Department practice, federal judicial corruption cases generally are handled by the Public Integrity Section.

Similar concerns regarding the appearance of bias also arise when the target of an investigation is a federal prosecutor, a federal investigator, or other employee assigned to work in or closely with a particular United States Attorney's Office. Thus, cases involving United States Attorneys, Assistant United States Attorneys (AUSAs), or federal investigators or employees working with AUSAs in the field generally result in a recusal of the local office. These cases are typically referred to the Public Integrity Section.

During 2009, the Section handled several significant cases as a result of recusals. As examples:

- Former United States District Court Judge Samuel B. Kent was sentenced to 33 months of imprisonment followed by 3 years of supervised release, a $1,000 fine, and restitution of $6,550. He previously pled guilty to obstructing an investigation of a judicial misconduct complaint by a special investigative committee of the United States Court of Appeals for the Fifth Circuit. He was initially indicted on charges of abusive sexual contact and attempted aggravated sexual abuse for his alleged repeated assaults on employees of his chambers and the Office of the Clerk of Court as well as obstruction of justice. As part of his plea, Kent admitted the repeated nonconsensual sexual contact with two of his employees. The United States House of Representatives voted to impeach Kent, the first impeachment of a federal judge since 1989. Kent subsequently resigned from the District Court.

2

- Alan Mendelsohn, a practicing physician, was indicted on charges of committing mail and wire fraud, aiding and abetting mail and wire fraud, and making false statements to federal agents for allegedly orchestrating a fraudulent scheme involving political fund raising and lobbying. He allegedly raised more than two million dollars for political organizations he controlled and diverted to himself more than $350,000 from these funds. Mendelsohn also allegedly made false representations that he had made corrupt arrangements with senior government officials to close criminal investigations.

## 2.   Sensitive and Multi-District Cases

In addition to recusals, the Public Integrity Section handles other special categories of cases. At the request of the Assistant Attorney General for the Criminal Division, the Section handles cases that are highly sensitive and cases that involve the jurisdiction of more than one United States Attorney's Office.

Cases may be sensitive for a number of reasons. Because of its importance, a particular case may require close coordination with high-level Department officials. Alternatively, the case may require substantial coordination with other federal agencies in Washington. The latter includes cases involving classified information that require careful coordination with  intelligence agencies. Sensitive cases may also include those that are so politically controversial on a local level that they are most appropriately handled in Washington, D.C.

In addition to sensitive cases, this category encompasses multi-district cases, that is, cases that involve allegations that cross judicial district lines and hence fall under the jurisdiction of two or more United States Attorneys' Offices. In these cases the Section is occasionally asked to coordinate the investigation among the various United States Attorneys' Offices, to handle a case jointly with one or more United States Attorneys' Offices, or, when appropriate, to assume operational responsibility for the entire case.

In 2009, the Section handled a substantial number of sensitive and multi-district cases, including one involving a state Supreme Court justice, several with crimes in Iraq and Kuwait, and further cases involving the Jack Abramoff lobbying scheme.

- Thomas J. Spargo, former New York State Supreme Court Justice, was convicted of attempted extortion and soliciting a bribe. He was sentenced to 27 months of imprisonment followed by 2 years of supervised release. Spargo solicited a

3

$10,000 payment from an attorney with cases pending before him while Spargo was serving as a state supreme court justice.

Corruption related to Iraq and Kuwait included:

- John Cockerham, a former major in the United States Army, was sentenced to 210 months of imprisonment, 3 years of supervised release, and $9.6 million in restitution for his role, along with his wife, his sister, and his niece, in a bribery and money laundering scheme related to bribes paid for contracts awarded in support of the Iraq war.

- Melissa Cockerham, John Cockerham's wife, was sentenced to 41 months of imprisonment, 3 years of supervised release, and $1.4 million in restitution.

- Carolyn Blake, John Cockerham's sister, was sentenced to 70 months of imprisonment, 3 years of supervised release, and $3.1 million in restitution.

- Nyree Pettaway, John Cockerham's niece, was sentenced to 12 months and 1 day of imprisonment, 2 years of supervised release, and $5 million in restitution.

- Tijani Ahmed Saani, a former civilian employee of the United States Department of Defense in Kuwait, was sentenced to 110 months of imprisonment for failing to report more than $2.4 million of income and interest in five foreign bank accounts on his federal income tax returns. He was also ordered to pay a fine of $1.6 million, to pay restitution of $816,485 to the Internal Revenue Service, and to serve 1 year of supervised release following his prison term. Saani pled guilty to filing a false tax return. Saani had worked with John Cockerham at Camp Arifjan, Kuwait.

- Terry Hall, a civilian contractor, was indicted for allegedly paying more than $2.8 million in bribes to a United States Army contracting official, United States Army Major Eddie Pressley, stationed at Camp Arifjan, Kuwait, and to the official's wife, Eurica Pressley. All three were charged with bribery, conspiracy to commit bribery, honest services wire fraud, money laundering, conspiracy, and engagement in monetary transactions in criminal proceedings.

- Christopher H. Murray, a retired major in the United States Army, was sentenced to 57 months of imprisonment for a bribery scheme related to Department of Defense contracts awarded in Kuwait. Murray was ordered to pay $245,000 in

4

restitution and to serve 3 years of supervised release following the prison term. In addition, Murray made false statements to federal agents investigating the matter.

- Former Lt. Col. Debra Harrison, a former controller with the Coalition Provisional Authority - South Central Region was sentenced to 30 months of imprisonment and ordered to pay $366,340 in restitution for her role in a scheme to steal more than $300,000 after pleading guilty to honest services wire fraud.

- William Driver, Harrison's husband and an accountant, pleaded guilty to money laundering charges and was sentenced to 3 years of probation and $36,000 in restitution. Driver paid home improvement contractors in cash from the funds stolen by his wife in order to evade transaction reporting requirements.

- Curtis Whiteford, a former colonel, and Michael Wheeler, a former lieutenant colonel, both formerly with the United States Army Reserves, were previously convicted of conspiracy to commit bribery and interstate transportation of stolen property. Whiteford was the second-most senior official and highest-ranking military officer at the Coalition Provisional Authority - South Central Region (CPA-SC) and Wheeler was an advisor and project officer for CPA reconstruction projects. Whiteford and Wheeler conspired with at least three others including Philip H. Bloom, a United States citizen who owned and operated several companies in Iraq and Romania, to rig bids on contracts being awarded by the CPA-SC so that more than $8 million in contracts were awarded to Bloom. In return, Bloom provided Whiteford, Wheeler, Debra Harrison, and others with more than $1 million in cash and other forms of bribes. Whiteford was sentenced to 5 years of imprisonment followed by 2 years of supervised release and was ordered to pay $16,200 in restitution.

In 2009, the Section continued to handle cases related to former lobbyist Jack Abramoff.

- Todd Boulanger, a lobbyist with Jack Abramoff, pled guilty to conspiracy to commit honest services fraud. He took part in a scheme to provide tickets for entertainment events to a staff person of a United States Senator. In total, Boulanger provided tens of thousands of dollars worth of entertainment to Capitol Hill aides in return for their assistance in getting legislation passed that was favorable to his clients.

- Ann Copland, a former congressional staff person, pleaded guilty to conspiring to

5

commit honest services fraud. She worked as an assistant on legislative and administrative matters and was lobbied by Jack Abramoff, Todd Boulanger, and another lobbyist on matters involving a Native American tribe. She received more than $25,000 worth of entertainment and meals in return for taking a variety of official actions beneficial to the lobbyists and their clients.

• Horace M. Cooper was indicted for conspiracy, fraudulent concealment, false statements, and obstruction of an official proceeding. During the time he worked at the Voice of America and the Department of Labor, Cooper allegedly conspired with Jack Abramoff and others to defraud the United States of Cooper's honest services. Cooper allegedly solicited and received from Abramoff and his colleagues thousands of dollars worth of meals and event tickets in return for using his official positions at these two agencies to advance Abramoff's interests and those of his clients. In addition, during the time he served as a congressional staff person, Cooper also allegedly received from Abramoff and others thousands of dollars worth of entertainment tickets.

• David H. Safavian, former General Services Administration (GSA) Chief of Staff and former Administrator for the Office of Federal Procurement Policy at the Office of Management and Budget, was sentenced to one year of imprisonment and two years of supervised release on charges of obstruction of justice and false statements. Jack Abramoff took him on a luxury golf trip to Scotland and to London and, in return, Safavian assisted Abramoff in connection with the lobbyist's attempts to acquire GSA-controlled properties. Safavian subsequently made false statements to federal officials and made a false certification on his financial disclosure form related to these gifts.

• Fraser C. Verrusio, a former staff member in the United States House of Representatives, was indicted on charges of conspiring to accept an illegal gratuity, accepting an illegal gratuity, and making a false statement on a required financial disclosure form. Verrusio was charged with accepting an all-expense paid trip to Game One of the World Series for and because of his official assistance to an equipment rental company in securing favorable amendments to the Federal Highway Bill.

## 3. Federal Agency Referrals

In another area of major responsibility, the Section handles matters referred directly by federal agencies concerning possible federal crimes by agency employees. The Section

6

reviews these allegations to determine whether an investigation of the matter is warranted and, ultimately, whether the matter should be prosecuted.

Agency referrals of possible employee wrongdoing are an important part of the Section's mission. The Section works closely with the Offices of Inspector General (OIG) of the executive branch agencies, as well as with other agency investigative components, such as the Offices of Internal Affairs and the Criminal Investigative Divisions. In addition, the Section invests substantial time in training agency investigators in the statutes involved in corruption cases and the investigative approaches that work best in these cases. These referrals from the various agencies require close consultation with the referring agency's investigative component and prompt prosecutive evaluation.

As in previous years, in 2009 the Section handled a number of referrals from federal agencies, including the following cases:

- Gi-Hwan Jeong a South Korean businessman was sentenced to 5 years of imprisonment and a $50,000 fine for honest services wire fraud and bribery. He was part of a bribery conspiracy involving a $206-million telecommunications contract that included employees of the Army and Air Force Exchange Service (AAFES). Jeong provided approximately $150,000 in cash, entertainment, and other things of value to Henry Lee Holloway and another AAFES official, in in exchange for their aid in securing and maintaining this telecommunications contract for his company, Samsung Rental Ltd.

- Henry Lee Holloway pled guilty to conspiracy and to making a false statement on his federal income tax return when he failed to disclose his receipt of the illicit bribe payments from Gi-Hwan Jeong.

- Milton K. Dial, the former deputy associate director of Minerals Revenue Management at the Minerals Management Service of the United States Department of the Interior (DOI), was sentenced to 12 months of probation and a $2,000 fine. He had pled guilty to a felony violation of the post-government employment restriction. Dial and Jimmy W. Mayberry, the former special assistant to the Associate Director of Minerals Revenue Management, Minerals Management Service, DOI, explored ways in which Mayberry could return to work for the DOI after his official retirement and decided on a contract for consulting, which he was awarded after manipulation of the bidding process. Mayberry had previously pled guilty to a criminal conflict of interest and was sentenced to 2 years of probation and a $2,500 fine.

7

- Former employees of the United States Department of State pled guilty to illegally accessing numerous confidential passport application files, which are protected by the Privacy Act of 1974. Those that pled in 2009 include:

  - Debra Sue Brown, a former file clerk and file assistant for the Bureau of Consumer Affairs;

  - Karal Busch, a former citizens service specialist, who was sentenced to 24 months of probation and 25 hours of community service;

  - William A. Celey, a former contract employee and file assistant, who was sentenced to 12 months of probation and 50 hours of community service;

  - Dwayne F. Cross, a former administrative assistant and contract specialist, who was sentenced to 12 months of probation and 100 hours of community service;

  - Susan Holloman, a former file assistant with the Bureau of Consular Affairs;

  - Gerald R. Lueders, a former foreign service officer, recruitment coordinator, and watch officer, who was sentenced to 12 months of probation and a $5,000 fine;

  - Kevin Young, a former contract representative for the Passport Special Issuance Agency, who was sentenced to 12 months of probation and 100 hours of community service.

## 4. Requests for Assistance/Shared Cases

The final category of cases in which the Section becomes involved are cases that are handled jointly by the Section and a United States Attorney's Office or other component of the Department.

At times the available prosecutorial resources in a United States Attorney's Office may be insufficient to undertake sole responsibility for a significant corruption case. In this situation the local office may request the assistance of an experienced Section prosecutor to share responsibility for prosecuting the case. On occasion, the Section may also be asked to provide operational assistance or to assume supervisory responsibility for a case due to a partial recusal of the local office. Finally, the Public Integrity Section may be assigned to supervise or assist with a case initially assigned to another Department component.

In 2009, the Section shared operational responsibility in a number of significant corruption cases. Some of the joint prosecutions with United States Attorney's Offices included these cases:

- Russell James Caso, Jr., a former chief of staff to a member of the United States House of Representatives, was sentenced to 3 years of probation, including 170 days of home detention, and to 100 hours of community service after pleading guilty to a criminal information charging him with conspiracy to commit honest services wire fraud. His wife received $19,000 from a company involved in Russian trade facilitation and, in return, Caso organized meetings in which he and others made presentations and argued to various executive branch agencies for the federal-funding of the company's proposals. Caso failed to disclose his wife's income on his required financial disclosure statements.

- Cecelia Grimes, a partner in a Pennsylvania-based lobbying firm, was sentenced to 5 months of home detention for destroying evidence in connection with a public corruption investigation. She was also sentenced to 3 years of probation and ordered to pay a $3,000 fine.

## B.    SPECIAL SECTION PRIORITIES

In addition to the general responsibilities discussed above, in 2009 the Public Integrity Section continued its involvement in a number of additional priority areas of criminal law enforcement.

### 1.  Election Crimes

One of the Section's law enforcement priorities is its supervision of the Justice Department's nationwide response to election crimes. Under the Department's ongoing Ballot Access and Voting Integrity Initiative, the prosecution of all forms of election crime is a high Departmental priority, and headquarters' oversight in this area is designed to ensure that the Department's nationwide response to election crime matters is uniform, impartial, and effective. In 1980 an Election Crimes Branch was created within the Section to handle this supervisory responsibility. The Branch is headed by a Director, assisted by a senior Section prosecutor, and staffed by other Section attorneys on a case-by-case basis.

The Election Crimes Branch oversees the Department's handling of all election crime allegations other than those involving federal voting rights, which are handled by two Sections of the Civil Rights Division: Voting and Criminal Sections. Specifically, the Branch supervises three types of election crime cases: (1) vote frauds, such as vote buying and absentee ballot fraud; (2) campaign-financing crimes, most notably under the Federal Election Campaign Act (FECA); and (3) patronage crimes, such as political

9

shakedowns and misuse of federal programs for political purposes. Vote frauds and campaign-financing offenses are the most significant as well as the most common types of election crimes.

The election-related work of the Section and its Election Crimes Branch falls into the following categories:

a. <u>Consultation and Field Support</u>. Under long-established Department procedures, the Section's Election Crimes Branch reviews all major election crime investigations, including all proposed grand jury investigations and FBI full-field investigations, and all election crime charges proposed by the various United States Attorneys' Offices for legal and factual sufficiency. (United States Attorneys' Manual 9-5.210) The Branch is also often consulted before a United States Attorney's Office opens a preliminary investigation into a vote fraud allegation, although this is not required.

In the area of campaign-financing crimes, Department procedures require consultation with headquarters before any investigation, including a preliminary investigation, is commenced by a United States Attorney's Office. (U.S.A.M. 9-85-210) The increased coordination with the Section at the initial stage of a criminal investigation of a FECA matter is the result in part of the complexity of the campaign-financing statutes. Another reason is that the Department coordinates and shares jurisdiction over willful violations of these statutes with another federal agency, the Federal Election Commission (FEC), which has civil enforcement authority over FECA violations.

The Section's consultation responsibility for election matters includes providing advice to prosecutors and investigators regarding the application of federal criminal laws to vote fraud, patronage crimes, and campaign-financing crimes, and the most effective investigative techniques for particular types of election offenses. This consultation also includes supervising the Department's use of the federal conspiracy and false statements statutes (18 U.S.C. §§ 371 and 1001) to address schemes to subvert the federal campaign financing laws. In addition, the Election Crimes Branch helps draft election crime charges and other pleadings when requested.

The majority of the Branch's consultations are in the following two categories:

•   <u>Vote frauds</u>. During 2009, the Branch assisted United States Attorneys' Offices in the following states in the handling of vote fraud matters in their respective districts: Alabama, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Illinois, Indiana, Kentucky, Louisiana, Mississippi, Missouri, Nevada, New York, Pennsylvania, Tennessee, and Virginia. This assistance included evaluating vote fraud allegations to determine whether an investigation would produce a

10

prosecutable federal criminal case, helping to structure investigations, and providing advice on the formulation of charges.

      • <u>Campaign-financing crimes</u>. During 2009, the Branch also continued to assist in implementing the Department's enhanced efforts to address criminal violations of FECA. As part of this effort, the Branch assisted United States Attorneys' Offices in Alabama, Arizona, California, District of Columbia, Florida, Illinois, Indiana, Maryland, Massachusetts, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Puerto Rico, and Texas in the investigation and prosecution of campaign-financing matters in their respective districts.

      b. <u>Litigation</u>. On occasion the Section may be asked to supervise the handling of a case in the event of a partial recusal of the local United States Attorney's Office. Section attorneys also prosecute selected election crimes, either by assuming total operational responsibility for the case or by handling the case jointly with a United States Attorney's Office or other Department component. For example, in 2009 a Section attorney obtained the conviction of a corporate executive and former assistant secretary of the Department of Housing and Urban Development for making conduit contributions to the 2004 Bush-Cheney presidential campaign.

      c. <u>District Election Officer Program</u>. The Branch also assists in implementing the Department's long-standing District Election Officer Program (DEO). This Program is designed to ensure that each of the Department's ninety-four United States Attorneys' Offices has a trained prosecutor available to oversee the handling of election crime matters within the district and coordinate district responses with Department headquarters regarding these matters.

      The DEO Program involves appointing an Assistant United States Attorney in each federal district to serve a two-year term as a DEO and providing periodic training for the DEOs in the handling of election crime and voting rights matters.

      The DEO Program is also a crucial feature of the Department's nationwide Election Day Program, which takes place during the federal general elections that are held in November of even-numbered years. The Election Day Program ensures that federal prosecutors and investigators are available both at Department headquarters in Washington, D.C., and in each district to receive complaints of election irregularities while the polls are open. As part of the Program, press releases are issued in Washington and in each district before the November federal elections that advise the public of the Department's enforcement interests in deterring election crimes and protecting voting rights. The press releases also provide contact information for the DEOs, local FBI officials, and Department officials in the Criminal and Civil Rights Divisions at headquarters who may be contacted on election day

by members of the public who have complaints of possible vote fraud or voting rights violations.

     d. <u>Ballot Access and Voting Integrity Initiative</u>. During 2009, the Public Integrity Section continued to assist in the implementation of the Department's Ballot Access and Voting Integrity Initiative. This ongoing law enforcement initiative was established in 2002 to enhance the Department's criminal and civil rights enforcement efforts against vote fraud and voting rights violations.

     The initiative includes annual training for the Assistant United States Attorneys serving as District Election Officers and preelection coordination by each United States Attorney's Office with state law enforcement and election officials before the federal general elections regarding the handling of election crime matters in their respective districts.

     On October 19 and 20, 2009, prosecutors and senior attorneys from the Public Integrity Section and the Civil Rights Division's Voting and Criminal Sections conducted video panel presentations for the Department's eighth annual election crimes and voting rights training. The event was hosted by the Department's National Advocacy Center in Columbia, South Carolina, and was viewed by approximately100 Assistant United States Attorneys and 25 FBI special agents. Topics addressed by the panels included the types of conduct prosecutable as federal election crimes, the federal statutes available to prosecute vote fraud and campaign financing offenses, the federal voting rights statutes and their enforcement, and updates on campaign financing and voting rights cases.

     e. <u>Inter-Agency Liaison with the Federal Election Commission</u>. The Election Crimes Branch is the formal liaison between the Justice Department and the Federal Election Commission (FEC), an independent federal agency that shares enforcement jurisdiction with the Department over willful violations of the Federal Election Campaign Act. The FEC has exclusive civil jurisdiction over all FECA violations, while the Department has exclusive criminal jurisdiction over FECA crimes.

     f. <u>Inter-Agency Liaison with the Office of Special Counsel</u>. The Branch also serves as the Department's point of contact with the United States Office of Special Counsel (OSC). The OSC has jurisdiction over noncriminal violations of the Hatch Act, 5 U.S.C. §§ 7321-7326, §§ 1501-1508, which may also involve criminal patronage crimes that are within the Department's jurisdiction.

## 2. **Conflicts of Interest Crimes**

     Conflicts of interest is a wide-ranging and complex area of law, with many layers of administrative and oversight responsibility. Moreover, the federal criminal conflicts of interest laws overlap to some extent with the sometimes broader ethics restrictions imposed by civil

statutes, agency standards of conduct, Presidential orders, and, in the case of attorneys, bar association codes of conduct.

The Public Integrity Section's work in the conflicts area falls into the following categories:

a. <u>Criminal Referrals from Federal Agencies and Recusals</u>. The Section's criminal enforcement role comes into play with respect to a narrow group of conflicts of interest matters, namely, those that involve possible misconduct proscribed by one of the federal conflicts of interest statutes, 18 U.S.C. §§ 203-209. These crimes are prosecuted either by a United States Attorney's Office or by the Public Integrity Section. Conflicts of interest matters are often referred to the Section by the various federal agencies. If investigation of a referral is warranted, the Section coordinates the investigation with the Inspector General for the agency concerned, the FBI, or both. If prosecution is warranted, the Section prosecutes the case. If a civil remedy may be appropriate in lieu of criminal prosecution, the Section or the Inspector General may refer the case to the Civil Division of the Department of Justice for its review. On occasion the Section is also asked to handle recusals and special assignments regarding conflicts matters.

b. <u>Coordination</u>. The Public Integrity Section works with the United States Office of Government Ethics (OGE) in order to coordinate conflicts of interest issues with OGE and other executive branch agencies and offices. The purpose of this coordination is to ensure that the overall legislative and enforcement efforts in this area are both complementary and consistent. OGE has broad jurisdiction over noncriminal conduct by executive branch personnel, as well as the authority to provide guidance concerning the coverage of the federal criminal conflicts of interest statutes. The Section's coordination with OGE ensures that consistent guidance is provided with respect to the overlapping criminal, civil, and administrative interests implicated by the statutory and regulatory restrictions on federal personnel.

## C.    LEGAL AND TECHNICAL ASSISTANCE

### 1.   Training and Advice

The Public Integrity Section is staffed with specialists who have considerable experience investigating and prosecuting corruption cases. Section attorneys participate in a wide range of formal training events for federal prosecutors and investigators. They are also available to provide informal advice on investigative methods, charging decisions, and trial strategy in specific cases. Over the course of 2009, Section attorney's provided over a hundred consultations to United States Attorneys' Offices and various other agencies.

13

2. <u>**Advisor to the President's Council on Integrity and Efficiency**</u>
   <u>**and the Executive Council on Integrity and Efficiency**</u>

Pursuant to the Inspector General Reform Act of 2008, Pub. L. No. 110-409, 122 Stat. 4302 (Oct. 14, 2008), the Public Integrity Section serves as a legal advisor to the Integrity Committee of the President's Council on Integrity and Efficiency (PCIE) and the Executive Council on Integrity and Efficiency (ECIE). The PCIE/ECIE is a body composed of the Inspectors General of the various agencies of the executive branch of the federal government. The Integrity Committee of the PCIE/ECIE is charged with handling allegations against Inspectors General and senior members of their staff.

In addition, the Integrity Committee is charged with establishing policies and procedures to ensure consistency in conducting administrative investigations. The Committee's procedures, drafted with the assistance of the Public Integrity Section, provide a framework for the investigative function of the Committee. Allegations of wrongdoing by Inspectors General and their senior staff are initially reviewed by the Public Integrity Section for potential criminal prosecution. In noncriminal matters, the procedures guide the Committee's discretion to investigate the alleged misconduct and to report on its findings. The Public Integrity Section also advises the Integrity Committee on matters of law and policy relating to its investigations.

3. <u>**Member of the Board of Advisors of the Election Assistance Commission**</u>

Pursuant to the Help America Vote Act of 2002 (HAVA), the Chief of the Public Integrity Section, or his or her designee, is a member of the Board of Advisors of the Election Assistance Commission (EAC). 42 U.S.C. § 15344(a)(12). The Commission was created to serve as a national clearinghouse for information and procedures relating to the administration of federal elections and is responsible for adopting voluntary voting system guidelines, testing and certification of voting system hardware and software, conducting studies regarding the effective administration of elections, and training on the management of federal grants to the states under HAVA. The Director of the Section's Election Crimes Branch serves as the designated Public Integrity member of EAC's Board of Advisors. The Director, as the Board's parliamentarian, participated in one Board meeting during 2009.

4. <u>**Legislative Activities**</u>

An important responsibility of the Public Integrity Section is the review of proposed legislation that may affect, directly or indirectly, the investigation and prosecution of public officials and those who seek to corrupt these officials. The Section is often called upon to comment on legislation proposed by Congress, by the Administration, or by other departments of the executive branch; to draft or review testimony for congressional hearings; and to respond to congressional inquiries concerning legislative proposals. On occasion, the Section

drafts legislative proposals relating to various corruption matters. For example, in 2009 the Section reviewed and commented on a number of legislative proposals addressing public corruption. During the year the Section also commented on legislation on the topics of legislative transparency and accountability, conflicts of interest, federal advisory committees, boards and commissions, open government, and military voting, among other subjects.

### 5. Case Supervision and General Assistance

Public corruption cases are often controversial, complex, and highly visible. These factors may warrant Departmental supervision and review of a particular case. On occasion Section attorneys are called upon to conduct a careful review of a sensitive public corruption case, evaluating the quality of the investigative work and the adequacy of any proposed indictments. Based on its experience in this area, the Section can often identify tactical or evidentiary problems early on and either provide needed assistance or, if necessary, assume operational responsibility for the prosecution.

The Section also has considerable expertise in the supervision of the use of undercover operations in serious corruption cases. The Section's Chief serves as a permanent member of the FBI's Criminal Undercover Operations Review Committee. Additionally, a number of the Section's senior prosecutors have experience in the practical and legal problems involved in such operations, and have the expertise to employ this sensitive investigative technique effectively and to advise law enforcement personnel on its use.

### 6. International Advisory Responsibilities

The Public Integrity Section actively participates in the area of international law enforcement. The Section regularly provides briefings and training on United States public corruption issues to visiting foreign delegations and continues the efforts of the United States to assist foreign countries in their quest to combat public corruption and election crime in their respective countries. This assistance includes participation in international proceedings and coordination with other components of the Justice Department and the State Department on the Administration's positions in this area.

Senior Deputy Chief Peter J. Ainsworth, who leads the Section's international efforts, traveled to El Salvador twice as a participant in the Anti-Gangs Forensics Workshop in conjunction with the International Law Enforcement Academy and the Anti-Gangs Prevention, Rehabilitation, and Prison Management Workshop. In addition, Mr. Ainsworth traveled to Tanzania to serve in the Africa Regional Anti-Corruption Seminar. He also participated in Global Forum VI held in Qatar that dealt with Fighting Corruption and Safeguarding Integrity.

Trial Attorney Gary Restaino traveled to San Luis Potosi, Mexico, and participated in training for police cadets at the National Police Academy. The training took the cadets through the various stages of a public trial, with particular emphasis on cross-examination and impeachment of testifying agents.

Section experts continue to address visiting foreign officials in investigations and prosecutions of public corruption. These presentations are generally conducted under the auspices of the State Department's Foreign Visitor Program and the Justice Department's Office of Overseas Prosecutorial Development Assistance and Training.  During 2009, the Section made presentations to officials from Afghanistan, Albania, Algeria, Argentina, Austria, Bangladesh, Bosnia-Herzegovina, Brazil, Bulgaria, China, Colombia, Dominican Republic, Ghana, Greece, Guatemala, Indonesia, Iraq, Italy, Kosovo, Kyrgyzstan, Macau, Macedonia, Mexico, Mongolia, Montenegro, Mozambique, Nicaragua, Pakistan, Paraguay, Republic of China (formerly Taiwan), Romania, Serbia, Slovak Republic, Southern Sudan, Syria, Thailand, Ukraine, Vietnam, and Zimbabwe.

# PART II

## PUBLIC INTEGRITY SECTION
## INDICTMENTS, PROSECUTIONS, AND APPEALS
## IN 2009

## INTRODUCTION

As described in Part I, the Public Integrity Section's role in the prosecution of public corruption cases ranges from sole operational responsibility for the entire case to approving an indictment or to providing advice on the drafting of charges. Part II of the Report describes each corruption case for which the Section had either sole or shared operational responsibility during 2009. A "case" involves a person who has been charged by indictment or information; a "matter" is an investigation that has not resulted in a criminal charge. Part II also provides statistics on the number of matters closed by the Section without prosecution during 2009 and the number of matters pending at the end of the year in each category.

The Section's corruption cases for calendar year 2009 are separated into categories, based on the branch or level of government affected by the corruption. Election crime cases are grouped separately. Related cases are grouped together and unrelated cases are separated by triple lines. In those cases for which a conviction but not a sentence is reported, the sentencing occurred in a later year and will be included in that year's report.

17

## FEDERAL JUDICIAL BRANCH

**As of December 31, 2009, four matters involving allegations of corruption affecting the federal judicial branch were pending in the Public Integrity Section. During 2009, the Section closed three matters involving crimes affecting the judicial branch.**

### United States v. Kent, Southern District of Texas

Former United States District Court Judge Samuel B. Kent was sentenced on May 11, 2009, to 33 months of imprisonment followed by 3 years of supervised release, a $1,000 fine, and restitution of $6,550. He pleaded guilty on February 23, 2009, to obstructing an investigation of a judicial misconduct complaint by a special investigative committee of the United States Court of Appeals for the Fifth Circuit.

Kent was previously indicted on charges of abusive sexual contact, attempted aggravated sexual abuse for his alleged repeated assaults on employees of his chambers and the Office of the Clerk of Court, and obstruction of justice. A judicial misconduct complaint was filed against Kent and when he appeared before the Fifth Circuit's special investigative committee he falsely testified about his conduct. As part of his plea, Kent admitted the repeated nonconsensual sexual contact with two of his employees. The United States House of Representatives voted to impeach Kent on June 19, 2009, the first impeachment of a federal judge since 1989. Kent resigned from the District Court on June 30, 2009.

### United States v. Gunville, Western District of Texas

Tana Gunville, a real estate agent, was indicted on September 10, 2009, on charges of access device fraud and obstruction of justice. She allegedly stole a credit card and purchased approximately $1,000 worth of goods then claimed that a government witness and a Western District court employee conspired to present false testimony against her. Allegedly she falsified an e-mail between the witness and the employee. She was tried and found not guilty on November 12, 2009.

18

## FEDERAL LEGISLATIVE BRANCH

**As of December 31, 2009, 19 matters involving allegations of corruption in or affecting the federal legislative branch were pending in the Public Integrity Section. During 2009 the Section closed 22 such matters. Also during 2009 the Section handled the following cases involving the federal legislative branch, as described below:**

### The Abramoff Investigations
### District of Columbia

### United States v. Boulanger

On January 30, 2009, Todd Boulanger, a lobbyist with Jack Abramoff, pled guilty to conspiracy to commit honest services fraud. Boulanger, along with Abramoff and others, took part in a scheme to provide tickets for concerts, ice skating, and other events to a staff person who worked for a United States Senator. He also knew and approved of an all-expense paid trip to the World Series for Trevor Blackann, a former legislative assistant in the United States Senate. In total, Boulanger provided tens of thousands of dollars worth of entertainment to Capitol Hill aides in return for their assistance in getting legislation passed that was favorable to his clients.

### United States v. Cooper

On August 21, 2009, Horace M. Cooper was indicted on conspiracy, fraudulent concealment, false statements, and obstruction of an official proceeding. Cooper was employed for approximately seven years as a staff person for a member of the United States House of Representatives. Subsequently Cooper served as the chief of staff for Voice of America (VOA), an executive branch agency of the United States government, then as chief of staff for the Employment Standards Administration of the United States Department of Labor.

During the time he worked at VOA and the Department of Labor, Cooper allegedly conspired with Jack Abramoff and others to defraud the United States of Cooper's honest services. Cooper allegedly solicited and received from Abramoff and his colleagues thousands of dollars worth of meals and event tickets in return for using his official positions at these two agencies to advance Abramoff's interests and those of his clients. In addition, during the

19

time he served as a congressional staff person, Cooper also allegedly received from Abramoff and others thousands of dollars worth of tickets to concerts and sporting events.

Cooper was charged with concealing his relationships with Abramoff and others and not reporting his receipt of gifts from Abramoff and others on his annual financial disclosure forms as required. In addition, Cooper was charged with obstructing a grand jury investigation by making false statements to federal law enforcement officials and to the grand jury. He also provided investigators with certain documents that he maintained proved his statements regarding alleged free meals were true, although the documents allegedly were falsified.

---

### United States v. Copland

Ann Copland, a former congressional staff person, pleaded guilty on March 10, 2009, to conspiring to commit honest services fraud. Copland worked as an assistant on legislative and administrative matters and was lobbied by Jack Abramoff, Todd Boulanger, and another lobbyist on matters involving a Native American tribe. She received more than $25,000 worth of entertainment event tickets, meals, and drinks in return for taking a variety of official actions beneficial to the lobbyists and their clients, including the Indian tribe.

---

### United States v. Safavian

David H. Safavian, former General Services Administration (GSA) Chief of Staff, was sentenced on October 16, 2009, to one year of imprisonment on charges of obstruction of justice and false statements in connection with the investigation into the activities of former Washington lobbyist Jack Abramoff. He was also sentenced to two years of supervised release following his prison term.

Abramoff took him on a luxury golf trip to Scotland and to London and, during this same period of time, Safavian assisted Abramoff in connection with the lobbyist's attempts to acquire GSA-controlled properties. Over a three-year period, Safavian also made false statements in an attempt to conceal the fact that he aided Abramoff with business before the GSA. The false statements included statements made to a GSA ethics officer and a special agent with the GSA Office of Inspector General (GSA-OIG) as well as falsely certifying a financial disclosure form.

Safavian's efforts to cover up the assistance he provided Abramoff continued after he left the GSA to become the Administrator for the Office of Federal Procurement Policy at the Office of Management and Budget. Safavian made false statements to a FBI special agent investigating Abramoff's lobbying activities by telling the agent that he was unable to assist

Abramoff with GSA-related activities around the time of the golf trip because he was a new employee at GSA.

---

## United States v. Verrusio

Fraser C. Verrusio, a former staff member in the United States House of Representatives, was indicted on March 6, 2009. The charges include conspiring to accept an illegal gratuity, accepting an illegal gratuity, and making a false statement on a required financial disclosure form as part of the activities associated with former lobbyist Jack Abramoff.

Verrusio worked as the policy director for the United States House of Representatives Committee on Transportation and Infrastructure, which had responsibility for the Federal Highway Bill. Verrusio is charged with conspiring with Todd Boulanger, a lobbyist associated with Abramoff, and James Hirni, former lobbyists working for an equipment rental company interested in inserting three amendments into the Federal Highway Bill, as well as Trevor Blackann, a former legislative assistant to a United States senator who served on a committee with responsibility for the Federal Highway Bill in the Senate.

Verrusio and Blackann allegedly accepted an all-expense paid trip to Game One of the World Series from Hirni, the equipment rental company that was his client, and a representative of that company. Verrusio allegedly accepted the trip for and because of his official assistance to the equipment rental company in securing favorable amendments to the Federal Highway Bill.

The all-expense paid trip allegedly accepted by Verrusio and Blackann included round-trip commercial airline travel to and from New York City; use of a chauffeured sport utility vehicle for transportation while in New York City; a ticket for each official to Game One of the World Series; a souvenir baseball jersey for each official; and lodging, meals, drinks, and entertainment at a strip club. Verrusio also allegedly made a false statement on his required annual financial disclosure form by certifying that the form was true and complete although he did not report the trip and related gifts received as required.

---

21

The following are further guilty pleas made by various lobbyists and public officials related to the investigation of Jack Abramoff 's lobbying activities:

- Jack Abramoff pled guilty to conspiracy to commit honest services fraud, to honest services fraud, and to tax evasion and was sentenced to 48 months of imprisonment.

- John C. Albaugh, previous chief of staff to a former member of the United States House of Representatives, pleaded guilty to conspiracy to commit honest services wire fraud for accepting entertainment and other gifts from Abramoff and his associates.

- Trevor L. Blackann, a former legislative assistant to a United States senator who served on a Senate committee with responsibility over the federal highway bill, pleaded guilty to making a false statement on his federal tax returns by failing to report as income thousands of dollars in illegal gifts that he received from lobbyists, including Abramoff and his associates.

- Italia Federici, President of the Council of Republicans for Environmental Advocacy, pleaded guilty to tax evasion and to obstruction of the United States Senate's investigation into the Abramoff scandal. Federici received a reduced sentence based on her substantial assistance to the government's investigation and was sentenced to 4 years of probation and ordered to pay $74,000 in restitution.

- James Steven Griles, the former Deputy Secretary of the Department of the Interior, pleaded guilty to obstructing the United States Senate's investigation into the corruption allegations surrounding Abramoff.

- William Heaton, former chief of staff for Ohio Congressman Robert Ney, pleaded guilty to conspiracy to commit honest services wire fraud. Heaton received a reduced sentence based on his substantial assistance to the government's investigation and was sentenced to 2 years of probation and ordered to pay a $5,000 fine.

- James F. Hirni, former lobbyist with Abramoff, pleaded guilty to conspiring with others to commit honest services fraud.

- Robert Ney, United States Representative, pleaded guilty to conspiracy to commit multiple offenses, including committing honest services fraud and making false statements to federal agents. He was cited as receiving valuable gifts from Abramoff and his associates. Ney was sentenced to 30 months of imprisonment and fined $6,000.

- Kevin Ring, a former lobbyist with Jack Abramoff and a congressional aide, was indicted on charges of conspiracy, payment of an illegal gratuity, and obstruction of justice. He was also charged with engaging in a scheme to deprive citizens of the honest services of elected officials. He was tried on September 11, 2009 and a mistrial was declared on October 15, 2009

- Tony C. Rudy, former lobbyist and congressional staffer, pleaded guilty to conspiring with Abramoff, Scanlon, and others to commit honest services fraud, mail and wire fraud, and to violating the one-year lobbying ban.

- Michael Scanlon, Abramoff's business partner, pleaded guilty to conspiracy to commit bribery and to honest services fraud.

- Roger G. Stillwell, former United States Department of the Interior (DOI) employee, was sentenced to 2 years of probation and ordered to pay a $1,000 fine. Stillwell had previously pleaded guilty to falsely certifying an Executive Branch Confidential Financial Disclosure Report related to his position as Desk Officer for the Commonwealth of the Northern Mariana Islands, DOI Office of Insular Affairs. Stillwell had accepted gifts from Abramoff and then failed to report them on his annual financial disclosure form, as required by federal regulation.

- Neil Volz, former lobbyist and chief of staff to Congressman Ney, pleaded guilty to conspiracy to commit honest services fraud and to violating the one-year lobbying ban. Volz received a reduced sentence based on his substantial assistance to the government's investigation and was sentenced to 2 years of probation and ordered to pay a $2,000 fine.

- Mark D. Zachares, a former high-ranking aide to the United States House of Representatives Transportation and Infrastructure Committee, pleaded guilty to conspiracy to commit honest services wire fraud for accepting tens of thousands of dollars in gifts from lobbyist in return for using his position in Congress to advance the interests of Abramoff's clients.

---

**United States v. Caso, District of Columbia**

Russell James Caso, Jr., a former chief of staff to a member of the United States House of Representatives, was sentenced on July 30, 2009, to 3 years of probation, including 170 days of home detention, and ordered to perform 100 hours of community service. Caso previous pleaded guilty to a criminal information charging him with conspiracy to commit honest services wire fraud.

23

Caso's guilty plea stems from his relationship with a company that assisted American businesses to operate in Russia and facilitated the flow of trade between the United States and Russia. The company sought to submit its proposals seeking federal funding for these efforts to various executive branch agencies. The company's general secretary met frequently with and sought official action from Caso, the Representative for whom he worked, and the Representative's staff, including their assistance in obtaining funding for the proposals.

The company's general secretary paid Caso's wife a total of $19,000. As chief of staff, Caso was required to submit annual financial disclosure statements, listing the source of any income earned by his wife, among other items. On one disclosure statement Caso intentionally failed to disclose that his wife received any payments from the company, even though he knew that he was required to do so. One motive for his failure to disclose these funds was the personal conflict of interest he had because the company making the payments was seeking his help to obtain federal funding.

## United States v. Grimes, District of Columbia

Cecelia Grimes, a partner in a Pennsylvania-based lobbying firm, was sentenced on April 3, 2009, to 5 months of home detention for destroying evidence in connection with a public corruption investigation. She was also sentenced to 3 years of probation and ordered to pay a $3,000 fine.

Grimes, a registered lobbyist, had previously pleaded guilty to the destruction of documents in a federal investigation. Her lobbying firm submitted requests for appropriations to the office of a member of the United States House of Representatives. The FBI opened an investigation into certain activities of the Representative, including whether the Representative had agreed to support appropriations requests made by the lobbying firm in return for the payment of fees to the firm by its clients.

As part of that investigation, FBI agents served Grimes with two grand jury subpoenas for documents. Grimes subsequently left as garbage some of the documents that were subpoenaed, destroyed e-mails, and threw her Blackberry device into a trash can in order to hide evidence from investigators.

## United States v. Pole, District of Columbia

On December 15, 2009, Ngozi T. Pole, a former office manager in the United States Senate, was indicted on charges of wire fraud and theft of government property for an

24

alleged scheme to defraud the United States Senate of more than $75,000.

Pole worked as the office manager for former United States Senator Edward M. Kennedy. Pole's responsibilities included transmitting salary and bonus information to the Senate Disbursing Office in order to adjust the pay of employees in the Senator's office. Pole allegedly submitted paperwork on several occasions causing the Senate to pay him salary and bonus payments greater than had been approved by either the chief of staff or Senator Kennedy. The indictment alleges that the excess payments totaled more than $75,000.

These payments routinely came in two forms: a holiday bonus paid in December or January, and a bonus for the end of the fiscal year paid after September 30th. These bonuses were not paid in lump sums, rather employee salaries were increased for a short period of time. Pole allegedly inflated his salary for more than the prescribed period, keeping more than $75,000 in excess pay and hiding these payments by submitting falsified records to successive chiefs of staff for Senator Kennedy.

**United States v. Stevens, District of Alaska**

On April 1, 2009, the United States moved to set aside the jury's verdict against former United States Senator Ted Stevens, and to dismiss the indictment with prejudice, based upon the government's failure to disclose favorable information to the defense. On April 7, 2009, the district court granted the government's motion to dismiss with prejudice, and appointed an outside counsel to conduct an investigation into the government's conduct during the prosecution.

Stevens was previously indicted for concealing his receipt of goods and services from VECO Corporation, a former multinational oil services company based in Alaska, as well as from the Chief Executive Officer of VECO, Bill J. Allen. On October 27, 2008, a jury returned a verdict of guilty on all counts.

**United States v. Valdez, District of Columbia**

Caroline Valdez, a former executive assistant to a Member of the United States House of Representatives was sentenced on September 25, 2009, to 3 years of probation based on her previous guilty plea to theft.

As an executive assistant for nearly two years, Valdez had access to various official forms for travel, salaries, and other expense requests for payment. She submitted these

reimbursement requests in order to obtain reimbursements for personal expenditures, including travel. On other reimbursement requests she inflated some legitimate expenses to obtain additional funds for her personal use. Valdez also had access to the Member's official credit card, which she used to make unauthorized purchases for her own benefit. In addition, Valdez forged the Member's signature on a reimbursement request form in order to obtain an unauthorized $3,000 bonus. The amount Valdez embezzled totaled approximately $7,000, which she has since paid back.

## FEDERAL EXECUTIVE BRANCH

As of December 31, 2009, 50 matters involving allegations of corruption within the federal executive branch were pending in the Public Integrity Section. During 2009, the Section handled the following cases involving executive branch corruption:

### Corruption Related to
### Iraq and Kuwait

#### United States v. Cockerham, Cockerham, Blake, and Pettaway,
#### Western District of Texas

A former United States Army contracting officer, his wife, his sister, and his niece were sentenced on December 2, 2009, for their participation in a bribery and money laundering scheme related to bribes paid for contracts awarded in support of the Iraq war. The individual sentences are as follows:

- John Cockerham, a former major in the United States Army, was sentenced to 210 months of imprisonment, 3 years of supervised release, and $9.6 million in restitution.

- Melissa Cockerham, John Cockerham's wife, was sentenced to 41 months of imprisonment, 3 years of supervised release, and $1.4 million in restitution.

- Carolyn Blake, John Cockerham's sister, was sentenced to 70 months of imprisonment, 3 years of supervised release, and $3.1 million in restitution.

- Nyree Pettaway, John Cockerham's niece, was sentenced to 12 months and 1 day of imprisonment, 2 years of supervised release, and $5 million in restitution.

John Cockerham had previously pleaded guilty to conspiracy, bribery, and money laundering for his participation in a complex bribery scheme while working as an Army contracting officer in Kuwait for approximately two years. Cockerham was responsible for awarding contracts for services to be delivered to troops in Iraq, including bottled water. In return for awarding contracts, Cockerham received more than $9 million in bribery proceeds. Cockerham directed the contractors to pay his wife and sister, among others, in order to conceal the receipt of these bribe payments.

Both Melissa Cockerham and Carolyn Blake had previously pleaded guilty to money laundering. They accepted $1.4 million and $3 million respectively and placed these funds in safe deposit boxes in foreign banks in an attempt to hide the illegal proceeds. They also pleaded guilty to obstruction of justice for impeding and obstructing the investigation.

Nyree Pettaway previously pleaded guilty to conspiring with John Cockerham, Carolyn Blake, and others to obstruct the money laundering investigation related to Cockerham's receipt of bribes. Pettaway assisted with the creation of cover stories for the millions of dollars Cockerham received and also gave millions of dollars to co-conspirators for safekeeping.

---

## United States v. Hall, Pressley, and Pressley, Northern District of Alabama

Terry Hall, a civilian contractor, was indicted on May 1, 2009, for allegedly paying more than $2.8 million in bribes to a United States Army contracting official, United States Army Major Eddie Pressley, stationed at Camp Arifjan, Kuwait, and to the official's wife, Eurica Pressley. All three were charged with bribery, conspiracy to commit bribery, honest services wire fraud, money laundering conspiracy, and engagement in monetary transactions in criminal proceedings.

Hall operated several companies that had contracts with the United States military in Kuwait, including Freedom Consulting and Catering Company (FCC) and Total Government Allegiance (TGA). As a result of these bribes, FCC and TGA allegedly received approximately $21 million from contracts to deliver bottled water and to erect security fencing for the Department of Defense (DOD) in Kuwait and Iraq. Eddie Pressley allegedly arranged for a blanket purchase agreement (BPA) for bottled water to be awarded to FCC and thereafter Eddie Pressley arranged for orders from Hall's companies. As a result, DOD paid FCC approximately $9.3 million. Eddie Pressley also allegedly arranged for DOD to award a contract to FCC to construct a security fence at Camp Arifjan, for which DOD paid FCC approximately $750,000. Eddie and Eurica Pressley subsequently moved funds to a possibly fictitious corporation for the purpose of transferring these bribe payments to several foreign banks, allegedly to launder these illegal proceeds.

A second contracting official, former United States Army Major James Momon, arranged for orders from TGA under the same bottled water BPA, as a result of which DOD paid Hall approximately $6.4 million. Hall allegedly paid Momon at least $200,000 in exchange for these and other official acts. Momon previously pled guilty to bribery and conspiracy to commit bribery for receiving bribes from various contracting officers at Camp Arifjan.

---

**United States v. Harrison, Driver, Whiteford, and Wheeler, District of New Jersey**

Former Lt. Col. Debra Harrison was sentenced on June 26, 2009, for her role in a scheme to steal more than $300,000 from the Coalition Provisional Authority - South Central Region (CPA-SC). She had previously pled guilty to honest services wire fraud. As part of this scheme, she also received a Cadillac Escalade from Philip Bloom, a contractor at the CPA-SC. Harrison was assigned to the CPA-SC as the deputy comptroller and acting comptroller. She stole the money from the CPA-SC and then transported it back to her home in Trenton. William Driver, her husband and an accountant, used the stolen funds, along with his wife, for home improvements and made the payments in cash to evade transaction reporting requirements. Harrison received a sentence of 30 months of imprisonment followed by 2 years of supervised release and restitution of $366,340. Driver pleaded guilty to money laundering charges on August 5, 2009, and he was sentenced on December 14, 2009, to 3 years of probation and $36,000 in restitution.

Curtis Whiteford, a former colonel, and Michael Wheeler, a former lieutenant colonel, both previously in the United States Army Reserves, were previously convicted of conspiracy to commit bribery and interstate transportation of stolen property. Whiteford was the second-most senior official and highest-ranking military officer at CPA-SC and Wheeler was an advisor and project officer for CPA reconstruction projects. Whiteford and Wheeler conspired with at least three others: Robert Stein, at the time the comptroller and funding officer for the CPA-SC; Philip H. Bloom, a United States citizen who owned and operated several companies in Iraq and Romania; and United States Army Lt. Col. Bruce D. Hopfengardner. They rigged the bids on contracts being awarded by the CPA-SC so that more than twenty contracts were awarded to Bloom. In total, Bloom received approximately $8 million in rigged contracts. Bloom, in return, provided Whiteford, Harrison, Wheeler, Stein, Hopfengardner, and others with more than $1 million in cash, SUVs, sports cars, a motorcycle, jewelry, computers, business-class airline tickets, liquor, promise of future employment with Bloom, and other items of value. Whiteford was sentenced on December 8, 2009, to 5 years of imprisonment followed by 2 years of supervised release and was ordered to pay $16,200 in restitution.

Other activity in this case has included:

- Robert Stein, co-conspirator, was previously sentenced to 9 years of imprisonment and forfeiture of $3.6 million on charges of conspiracy, bribery, money laundering, and weapons possession charges.

- Philip Bloom, contractor, was previously sentenced to 46 months of imprisonment and forfeiture of $3.6 million on charges of conspiracy, bribery, and money laundering.

- Lt. Col. Bruce Hopfengardner, co-conspirator, was previously sentenced to 21 months of imprisonment and forfeiture of $144,500 for conspiracy and money laundering.

- Seymour Morris, Jr., a civilian and businessman, who allegedly assisted Bloom in making these wire transfers of stolen CPA funds and funneling those monies to the co-conspirators, was previously acquitted at trial.

---

## United States v. Murray, Middle District of Georgia

On December 16, 2009, Christopher H. Murray, a retired major in the United States Army, was sentenced to 57 months of imprisonment for a bribery scheme related to Department of Defense (DOD) contracts awarded in Kuwait. Murray was ordered to pay $245,000 in restitution and to serve 3 years of supervised release following the prison term.

Murray had previously pled guilty to committing bribery and to making a false statement. He served as a contracting specialist in the small purchases branch of the contracting office at Camp Arifjan, Kuwait, and was responsible for soliciting bids for military contracts, evaluating the sufficiency of those bids, and then recommending the award of contracts to particular contractors. In this capacity, Murray solicited and received approximately $225,000 in bribes from DOD contractors in exchange for recommending the award of contracts for various goods and services. Murray returned to Kuwait as a contracting officer and solicited and received another $20,000 in bribes from a DOD contractor in exchange for the award of a construction contract. In addition, Murray made false statements to federal agents investigating the matter.

---

## United States v. Russell, Western District of Texas

On November 2, 2009, Theresa Russell, former staff sergeant with the United States Army, was charged with money laundering for allegedly assisting another person in the transfer of illegal proceeds in order to hide their existence.

Russell was deployed to LSA Anaconda, a United States military installation near Balad, Iraq. During the period she worked in Iraq she allegedly received approximately $31,800 in cash from an individual who allegedly accepted hundreds of thousands of dollars in bribery payments from foreign companies seeking to secure Army contracts. In return, this person allegedly used his official position to steer Army contracts to these foreign companies. Russell allegedly deposited her portion of these payments into domestic bank accounts in her name and used the funds for her own personal use with the understanding that money came from the proceeds of a bribery scheme.

**United States v. Saani, District of Columbia**

Tijani Ahmed Saani, a former civilian employee of the United States Department of Defense, was sentenced on December 10, 2009, to 110 months of imprisonment for failing to report more than $2.4 million of income on his federal income tax returns. He was also ordered to pay a fine of $1.6 million, to pay restitution of $816,485 to the Internal Revenue Service, and to serve 1 year of supervised release following his prison term. Saani pled guilty to filing a false tax return in June 2009.

Saani served as a contracting officer for the Department of Defense at Camp Arifjan, Kuwait, during which time he failed to report at least $2.4 million in taxable income. Saani also failed to report his ownership interest in foreign bank accounts in five different countries, including Ghana, Switzerland, the Jersey Channel Islands, the Netherlands, and the United Kingdom. Saani used these accounts to help conceal his unreported income and to send and receive wire transfers totaling more than $3.5 million. Saani had worked with Cockerham at Camp Arifjan, Kuwait.

**United States v. Bazan, District of Columbia**

Ramon Bazan, a former special agent of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), was charged on December 23, 2009, in an information for allegedly making false statements in connection with a series of fraudulent visa referrals.

Bazan served as the ATF assistant country attache at the United States Embassy in Mexico City, Mexico. During this time, the Embassy maintained a visa referral program which provided a means of expediting the processing of nonimmigrant visa applications for Mexican nationals and other foreign citizens whose travel to the United States would advance the national interests of the United States or the diplomatic efforts of the United States in Mexico. As the ATF assistant country attache, Bazan had the authority to make visa referrals through this program.

For over two years, Bazan allegedly submitted fraudulent visa referrals on behalf of Mexican nationals who were his friends or relatives of his colleagues. In connection with these referrals, Bazan allegedly falsely represented that the visa applicants were official ATF contacts and that the applicants provided assistance necessary to the ATF. Bazan also allegedly falsely claimed that certain applicants were associated with the ATF canine program and that the purpose of the applicants' travel to the United States was to visit the ATF canine facility in Front Royal, Virginia.

**United States v. Davidson,** Northern District of Georgia

On June 29, 2009, Bridgette L. Davidson, former Department of Veterans Affairs (VA) social work associate , was sentenced to 3 years of imprisonment followed by 3 years of supervised release and a $5,000 fine. She was previously convicted of honest services mail fraud and conflict of interest as well as making a false statement to VA officials investigating the fraudulent scheme.

Davidson and ex-boyfriend, Darrick O. Frazier, were engaged in a scheme to defraud the VA of Davidson's honest services. Davidson was employed for two years as a social work associate with the Atlanta VA Medical Center. Among her duties, Davidson was entrusted with finding suitable housing and living arrangements for mentally ill and disabled military veterans. Rather than place the veterans entrusted to her care in assisted-living facilities that were independently owned and licensed, Davidson, assisted by Frazier, secretly rented a house in which to place these veterans in exchange for monthly federal subsidy payments.

During this time, Davidson falsely represented to VA officials and to the military veterans' legal guardians and custodians that the facility was an independently owned personal-care home suitable to house and care for the veterans. Davidson and Frazier used the rental income obtained from the veterans housed at the facility to pay some of the rent, utilities, and related expenses on the rental property and kept the excess revenue for their own personal benefit.

In April 2002 a veteran died in the home and the facility was shut down. The VA launched an internal investigation into Davidson's connection to the facility. Davidson falsely stated to VA officials that she had no ownership or financial interest in the personal-care home she and Frazier secretly owned and operated.

Frazier had previously pleaded guilty to honest services mail fraud and was sentenced to 12 months and 1 day of imprisonment and ordered to pay $20,200 in restitution.

**United States v. Davis,** Northern District of Georgia

Jeffrey Davis, former Archives Technician with the United States National Archives and Records Administration (NARA), was sentenced on September 10, 2009, for receiving supplementation of his salary from a source other than the government. Davis was sentenced to 3 years of probation, a $1,500 fine, and $3,988 of restitution.

NARA is an independent agency of the United States Government charged with preserving and documenting government and historical records, as well as providing public access to those documents. Upon request, NARA employees pull and copy disclosable, archived court records and provide such records to the public for review, which Davis performed as part of his duties. While employed by NARA, Davis operated a company named Documents Archival Retrieval Transferring Services of Georgia, Inc. (DARTS). This company specialized in obtaining court documents, including archived bankruptcy, civil, and criminal court records, from NARA's records facilities. In connection with requests for such court records, DARTS charged its customers fees in addition to the fees charged by NARA and the Administrative Office of the United States Courts (AOUSC). Davis used his official position at NARA for more than a year to pull and copy the requested records in connection with DARTS's customer requests. During this time, DARTS received approximately $5,359 from its customers in connection with requests for court records. In an effort to conceal from NARA Davis's affiliation with DARTS and to increase DARTS's profits, Davis failed to pay the applicable fees charged by NARA and the AOUSC in connection with DARTS's customer requests for court records.

## United States v. Dial and Mayberry, District of Columbia

Milton K. Dial, the former deputy associate director of Minerals Revenue Management at the Minerals Management Service of the United States Department of the Interior (DOI), was sentenced on February 17, 2009, subsequent to pleading guilty to a felony violation of the post-government employment restriction. Dial received a sentence of 12 months of probation and a $2,000 fine.

Jimmy W. Mayberry was the special assistant to the Associate Director of Minerals Revenue Management, Minerals Management Service, DOI. When Mayberry was nearing retirement from federal service, he and his supervisor explored ways in which Mayberry could return to work for the DOI after his official retirement and decided on a contract for consulting, which he was awarded after manipulation of the bidding process. Prior to retiring, Dial created the evaluation criteria for the bids for this same contract, served on the evaluation committee that awarded the contract to the company, and served as the contracting officer's technical representative at the DOI for the company up until the time of his retirement. Approximately six months after retiring from the DOI, Dial accepted a position as a subcontractor working for and representing Mayberry's company in a contract with the DOI.

Mayberry previously pled guilty to a criminal conflict of interest and was sentenced to 2 years of probation and a $2,500 fine.

**United States v. Dodson, District of Columbia**

On September 10, 2009, William R. Dodson was sentenced to 15 months of imprisonment followed by 36 months of supervised release and forfeiture of $26,200 based on his guilty plea to bribery while serving as a public official.

Dodson was employed as a Building Manager for the United States General Services Administration (GSA) and, as part of his responsibilities, he had the authority to retain private contracting companies to complete maintenance projects on behalf of GSA and to pay for maintenance projects that cost $2,500 or less using his government-issued GSA credit card. Over a period of nine years, Dodson solicited and received $31,800 in cash and other forms of bribery from a contracting company that, in turn, received $294,926 in contracts from GSA. In addition, this contracting company provided construction services for personal projects to Dodson at a total cost to the company of $4,600. Dodson also took at least $3,000 in bribery payments from other contracting companies in return for influencing the award of government contracts.

**United States v. Jeong and Holloway, Northern District of Texas**

On November 10, 2009, a South Korean businessman was sentenced to 5 years of imprisonment and a $50,000 fine for his role in a bribery conspiracy involving a $206-million telecommunications contract that involved employees of the Army and Air Force Exchange Service (AAFES). Gi-Hwan Jeong had previously pleaded guilty to charges of honest services wire fraud and bribery.

AAFES is a federal entity that provides billions of dollars worth of goods and services annually to United States Armed Forces service members and their families around the world. Jeong conspired over approximately five years with Henry Lee Holloway and another AAFES official to commit bribery and honest services wire fraud when he agreed to make payments to the officials in the form of cash, travel, entertainment, and other things of value in exchange for their aid in securing and maintaining a $206-million telecommunications contract for his company, Samsung Rental Ltd. (SSRT). Holloway pled guilty on April 21, 2009, to conspiracy and to a false statement on his federal income tax return when he failed to disclose his receipt of the illicit bribe payments.

Jeong provided approximately $80,000 in cash, entertainment, and other things of value as bribes to an AAFES services program manager for the Pacific region in exchange for official action to benefit SSRT.

Jeong also gave approximately $70,000 in cash, entertainment, travel, stock options,

and other things of value as bribes to Holloway in exchange for Holloway's use of his official action to benefit SSRT. Jeong made these payments to curry favor with Holloway, who, as an AAFES general store manager for several United States military bases in Korea, was in a position to seek termination of AAFES's contract with SSRT following allegations of performance-related problems relating to SSRT's contractual obligations. After Jeong began the bribery payments, Holloway used official acts and influence to support the contractual relationship between SSRT and AAFES.

## United States v. Mendelsohn, Southern District of Florida

Alan Mendelsohn, a practicing physician, was indicted on September 30, 2009, for allegedly orchestrating a fraudulent scheme involving political fund raising and lobbying. He allegedly raised more than two million dollars for political organizations he controlled and diverted to himself more than $350,000 from these funds. Mendelsohn is also charged with fraudulently concealing an additional $274,000 in payments he allegedly directed his lobbying clients to make to third parties on his behalf, including tuition payments to his children's schools and for the purchase of a luxury automobile, in an effort to circumvent lobbying disclosure rules and other reporting requirements. The charges against Mendelsohn are committing mail and wire fraud, aiding and abetting mail and wire fraud, and making false statements to federal agents.

Mendelsohn allegedly was initially involved in lobbying members of the Florida legislature and other state officials for legislation and budget expenditures of importance mainly to ophthalmologists. He was asked by various lobbyists and business persons if he would use his political connections to assist their clients in obtaining and defeating legislation and in obtaining other favorable government action on many other matters. Subsequently, Mendelsohn allegedly created a series of political organizations and corporations for the purpose of soliciting and then secretly transferring contributions between the entities and to himself or for his benefit.

As part of the scheme, Mendelsohn also allegedly made a false representation to a contributor that he had secured agreements to bribe senior government officials to close an ongoing criminal investigation by state officials of the contributor and others in exchange for campaign donations and other payments totaling more than $1 million. Later, Mendelsohn also falsely told a contributor that senior government officials had agreed to exert pressure on federal prosecutors investigating the contributor to close that investigation in exchange for $400,000 in contributions. As a result of Mendelsohn's false representations, the contributor caused more than $1 million in payments to be made, as directed by Mendelsohn. The indictment states that, in fact, no such unlawful agreements to close any investigations had been made with any public officials.

In addition, Mendelsohn allegedly made approximately $87,000 in payments, apparently to increase his power and influence as a lobbyist, to a then-public official. These payments, which were made from the political organizations Mendelsohn controlled, were allegedly disguised as payments for consulting services rendered by an intermediary to whom the checks were written as part of the scheme.

## United States v. Money, District of Columbia

On February 5, 2009, Daniel Money, a former government contractor as well as employee of the United States Department of the Treasury (Treasury), was sentenced in connection with a bribery scheme involving contracts at the United States Tax Court (Tax Court). Money was sentenced to 30 months of imprisonment, 3 years of supervised release, and a $7,500 fine. He had previously pleaded guilty to bribery. Money was also ordered to forfeit $95,000, which constitutes the profit that Money made on the contract that he performed as part of the bribery scheme. In addition, Money was ordered to pay restitution of $2,250 to the Treasury based on his theft of diesel fuel.

## United States v. Timbol, District of Columbia

Fred Fernando Timbol, Jr., was sentenced on March 5, 2009, after pleading guilty to conspiracy to commit bribery to 18 months of imprisonment followed by 36 months of supervised release and restitution of $24,142.99.

Timbol held the position of facilities services officer for the Facilities Management Section of the United States Tax Court in the District of Columbia (U.S. Tax Court). As part of his duties Timbol awarded United States government contracts for service and maintenance work at the U.S. Tax Court and authorized payments to contractors. Timbol fraudulently awarded government contracts by rigging the bids and arbitrarily inflating the value of the contracts so that a contractor would be paid substantially more than under the usual required competitive bidding process. In exchange for Timbol awarding these contracts and authorizing payments, Timbol solicited and accepted bribes of approximately $12,471 from the contractor for rigging the award of at least six government contracts.

**Illegal Accessing of**
**Confidential Passport Files**
**District of Columbia**

Nine former employees of the United States Department of State have pled guilty to illegally accessing numerous confidential passport application files. They had access to the official State Department computer databases in the regular course of their jobs, including the Passport Information Electronic Records System (PIERS), which contains all imaged passport applications dating back to 1994. These confidential files are protected by the Privacy Act of 1974 and access by State Department employees is strictly limited to official government duties. These former employees viewed the passport applications of hundreds of celebrities and their families, actors, comedians, professional athletes, musicians, other individuals identified in the press, and personal friends and acquaintances. They had no official government reason to access and to view these passport applications. The following is further information on their individual cases:

- Debra Sue Brown, a former file clerk and file assistant for the Bureau of Consumer Affairs, pled guilty on December 11, 2009;

- Karal Busch, a former citizens service specialist, was sentenced on December 15, 2009, to 24 months of probation and 25 hours of community service;

- William A. Celey, a former contract employee and file assistant, was sentenced to 12 months of probation and 50 hours of community service on October 23, 2009;

- Dwayne F. Cross, a former administrative assistant and contract specialist, was sentenced to 12 months of probation and 100 hours of community service on March 23, 2009;

- Susan Holloman, a former file assistant with the Bureau of Consular Affairs, pled guilty on November 9, 2009;

- Gerald R. Lueders, a former foreign service officer, recruitment coordinator, and watch officer, was sentenced to 12 months of probation and a $5,000 fine on July 8, 2009;

- Kevin Young, a former contract representative for the Passport Special Issuance Agency, was sentenced to 12 months of probation and 100 hours of community service on December 9, 2009.

37

Lawrence C. Yontz, a former foreign service officer and intelligence analyst, was previously sentenced to 12 months of probation and 50 hours of community service.

===

### United States v. Robinson, District of Maryland

Chaundra V. Robinson, a former employee of the Nuclear Regulatory Commission (Commission), pled guilty to theft on September 10, 2009. Robinson stole approximately $2,670.91 by submitting falsified overtime and compensatory leave forms to the Commission.

===

### United States v. Ryan, District of Columbia

Bobbie Cyana Ryan, a former West Point employee, pleaded guilty on October 28, 2009, for her scheme to defraud and embezzle funds from the United States government by authorizing nearly $3 million in payments from the United States Military Academy in West Point, N.Y., to a bogus corporation she controlled. The charges include devising a scheme to defraud and transmitting funds in interstate commerce for the purpose of executing the fraud scheme; embezzling and converting government funds; and executing a financial transaction with criminally derived funds.

Ryan worked in the Information, Education and Technology Division in the Office of the Dean at West Point. She was responsible for coordinating information technology training programs for West Point staff. Ryan, acting as the requesting and approving official, used her government purchase card and cards of her unknowing subordinates to authorize approximately $2.9 million in payments to CWG Enterprises, Ryan's company. The payments were allegedly for either on-site training instructors or training reference materials when, in fact, no personnel were ever trained and no materials were ever provided. Based on false invoices created by Ryan, transfers of government funds were made to a bank account for CWG Enterprises. Ryan used these funds to pay for personal and family expenses.

===

### United States v. Saint-Joy, District of Columbia

Former United States Embassy employee Jean G. Saint-Joy was sentenced on June 9, 2009, to 18 months of imprisonment. He had previously pled guilty to theft of approximately $850,266 in government funds from the Department of State. In addition, Saint-Joy was ordered to pay restitution in the amount of the theft. An order of forfeiture was entered.

Saint-Joy's scheme took place during approximately five years while Saint-Joy, a citizen of Haiti, was employed as a cashier by the United States Embassy in Port-au-Prince, Haiti. As part of this scheme, Saint-Joy gave falsified documents to the State Department claiming that he required money to reimburse him for the payment of legitimate Embassy expenses, thereby illegally obtaining approximately $428,000. Saint-Joy further provided falsified requests for cash advances from the Embassy's cash advance accounts to banks in Port-au-Prince, Haiti, thereby illegally obtaining over $421,000 from the cash advance accounts that the Embassy was obligated to repay.

**United States v. Schroer, District of Arizona**

On August 19, 2009, Rommel I. Schroer, a former sergeant in the United States Air Force was sentenced to 28 months of imprisonment for his role in a widespread bribery and extortion conspiracy that operated for over two years. Schroer was also ordered to pay a $7,500 fine and to serve 3 years of supervised release following his prison term. The charges arose from Operation Lively Green, an undercover FBI investigation. Fifty-six additional defendants have been sentenced for their roles in the conspiracy.

Schroer had previously pleaded guilty to conspiracy to defraud the United States. He conspired to enrich himself by obtaining cash bribes from undercover agents in return for his assistance, protection, and participation in the activities of what he believed to be an illegal narcotics trafficking organization that distributed cocaine from Arizona to other locations in the southwestern United States. In order to protect the shipments of cocaine, Schroer and his co-conspirators wore official uniforms, carried official forms of identification, and used official vehicles to prevent police stops, searches, and seizures of the narcotics as they drove the cocaine shipments through checkpoints held by the United States Border Patrol, the Arizona Department of Public Safety, and Nevada law enforcement officers.

**United States v. Snyder, District of Maryland**

Jack W. Snyder was sentenced on February 9, 2009, to 1 year of probation and was ordered to perform 160 hours of community service based on a felony charge of making a false statement on his annual financial disclosure forms. He was also ordered to pay a $200,000 fine.

On the financial disclosure forms, Snyder failed to report that he had received income from a private consulting business, when in fact he had received approximately $165,234 in gross income from that business. Snyder was formerly associate director of the Division of

Specialized Information Services (SIS) at the National Library of Medicine (NLM), part of the National Institutes of Health (NIH). NIH falls under the United States Department of Health and Human Services. Snyder was the senior NLM official at SIS and reported directly to the director of the NLM. Prior to his employment with NLM Snyder operated a litigation consulting business, Medico-Legal-Forensic Services (MLFS), and consulted and testified as an expert witness in a variety of health-related areas in criminal and civil matters in state and federal courts across the country. When he began working at NLM, Snyder was instructed by an NLM ethics employee to cease his litigation consulting business. However, Snyder continued to operate MLFS and earn substantial outside income throughout his employment with NLM without disclosing these activities.

---

### United States v. Turner, District of Columbia

On September 16, 2009, Peter R. Turner was re-sentenced, after an appeal and remand, to 27 months of imprisonment followed by 2 years of supervised release and restitution of $20,500 for conspiracy and bribery.

Peter Turner was a volunteer driver for the Department of Veterans Affairs Medical Center and LaTanya Andrews was a payroll technician. Turner and Andrews were found to have conspired to place a forged Federal Employees Group Life Insurance form falsely designating Turner as a life-insurance beneficiary for a seriously ill employee of the DVAMC in that employee's official personnel folder. Turner then filed a fraudulent claim when the employee died and obtained a beneficiary payment of approximately $20,500. Those funds should have been paid to the deceased employee's parents. The jury further found that Andrews used her official position within the DVAMC payroll office, including her access to the official personnel folder of the deceased employee, to assist Turner in placing the false beneficiary form in that folder. In return for Andrews's assistance in the scheme, Turner paid her $1,000 from the proceeds of his fraudulent claim.

---

### United States v. Watkins, District of Columbia

A former United States Department of Energy (DOE) employee, Amandeus Watkins, who had previously pled guilty to making a false statement, was sentenced on July 23, 2009, to 36 months of probation, including 180 days of home detention, and 600 hours of community service.

Watkins was employed by DOE for almost two years as the resource manager in the Office of Public Affairs. In this position, Watkins was responsible for overseeing the process

through which many public affairs employees received annual performance awards. Watkins authored and submitted to DOE a performance evaluation for himself that falsely indicated he had earned the highest possible performance rating from his former supervisor in order to justify an annual performance award. He also improperly arranged to receive this award, although no DOE employee, including his former supervisor, approved a performance award for him.

**United States v. Williams, District of Columbia**

A former United States Department of Energy employee, Violet Williams, was sentenced on May 19, 2009, to 36 months of probation and $94,494.95 in restitution. She had previously pled guilty to a time and attendance fraud scheme that involved false overtime records and theft. For a period of three years she submitted false and fraudulent time and attendance records for approximately 2,415 overtime hours that she did not work. As a result of these falsified overtime hours, Williams submitted approximately $94,494 in illegal compensation.

## STATE AND LOCAL GOVERNMENT

**At the end of 2009, 30 matters of alleged corruption involving state or local government were open in the Public Integrity Section. In 2009 the Section closed 16 matters. Also during 2009, the Section prosecuted the following cases involving state or local corruption:**

### Alaska Bribery Schemes
### District of Alaska

### United States v. Allen and Smith

On October 28, 2009, Bill J. Allen and Richard L. Smith, former Officers of VECO Corporation, were sentenced for their participation in a corruption scheme in which they provided approximately $395,000 in bribery payments and other benefits to public officials in the state of Alaska. Allen, the former chief executive officer of VECO Corporation, was sentenced to 36 months of imprisonment, a $750,000 fine, and 3 years of supervised release. Smith, the former vice president of community and government affairs for VECO Corporation, was sentenced to 21 months of imprisonment, a $10,000 fine, and 3 years of supervised release.

Both defendants had previously pled guilty to charges of bribery, conspiracy to commit bribery, extortion under color of official right, honest services mail and wire fraud, as well as conspiracy to defraud the Internal Revenue Service of the United States Department of the Treasury. Allen and Smith conspired with at least five members of the Alaska legislature to provide illegal financial benefits to several Alaska elected officials in exchange for those officials' support on legislation pending before the Alaska state legislature.

### United States v. Cowdery

John Cowdery, a former elected member of the Alaska state senate, was sentenced on March 10, 2009, to 6 months of home confinement and 3 years of probation for conspiring to bribe another Alaska state legislator. He was also ordered to pay a $25,000 fine. Cowdery had previously pleaded guilty to conspiracy to commit bribery concerning programs receiving federal funds.

42

Cowdery conspired with Bill J. Allen and Richard L. Smith to offer at least $10,000 in purported campaign contributions to a state senator, which the senator refused, in exchange for the senator's support for a proposed petroleum profits tax, or PPT, beneficial to VECO.

## United States v. Masek

Beverly Masek, former Alaska state representative, was sentenced on September 24, 2009, to 6 months of imprisonment followed by 3 years of supervised release. Masek had previously pleaded guilty to conspiring to commit bribery.

Masek received multiple cash payments from Bill Allen and one of his relatives during the time she had knowledge that VECO had matters pending before the Alaska state legislature, which she knew were important to Allen's business interests. In return, Masek withdrew a piece of legislation at the request of Allen one day before she accepted a cash payment of approximately $2,000 from Allen.

Other convictions and guilty pleas arising out of the ongoing investigation into public corruption in the state of Alaska have included the following:

- Thomas T. Anderson, a former elected member of the Alaska House of Representatives, was convicted and sentenced to 5 years of imprisonment for extortion, conspiracy, bribery, and money laundering. He solicited and received money from an FBI confidential source in exchange for agreeing to perform official acts to further a business interest represented by the source.

- William B. Bobrick, a lobbyist, was sentenced to 5 months of imprisonment, 2 years of supervised release, and a $3,000 fine. He conspired to obtain bribery payments for a former elected member of the Alaska House of Representatives.

- Victor Kohring, a former member of the Alaska House of Representatives, was convicted and sentenced to 42 months of imprisonment for conspiracy, attempted extortion, and bribery. At the government's request, the Ninth Circuit remanded his case to the district court for further review on the question of whether the government adequately satisfied its discovery obligations.

- Peter Kott, a former Speaker of the Alaska House of Representatives, was convicted and sentenced to 6 years of imprisonment for extortion, bribery, and conspiracy. At the government's request, the Ninth Circuit remanded his case to the district court for further review on the question of whether the government adequately satisfied its discovery obligations.

- Bruce Weyhrauch, a former legislator in the Alaska State House, was indicted on bribery, extortion, conspiracy, and mail fraud charges. (His case is on appeal.)

## United States v. De Castro Font, District of Puerto Rico

Jorge De Castro Font, a former senator in the Commonwealth of Puerto Rico, pleaded guilty on January 21, 2009, to honest services wire fraud and conspiracy to commit extortion involving a scheme that deprived the people of Puerto Rico of his honest services as a legislator, performed free from conflict of interest, concealment, and improper influence. De Castro Font also pleaded guilty to conspiracy to commit extortion through fear of economic harm and under color of official right.

De Castro Font directly and indirectly solicited between approximately $500,000 and $525,000 in cash payments and other benefits, such as campaign contributions in excess of the legal limits, lodging, private flights, meals, and other things of value from individuals. De Castro Font engaged in official acts on behalf of some of these individuals who had provided him with these undisclosed benefits, including, but not limited to, proposing legislation, preventing legislative projects to be voted or acted upon, and persuading other legislators to vote for or against legislation.

## United States v. Goachet, District of Puerto Rico

Alberto Goachet, a political consultant and aide to De Castro Font, was sentenced on March 24, 2009, to 3 months of imprisonment, 3 months of home detention, and 3 years of supervised release. Goachet had previously pled guilty to conspiracy to launder illegal campaign contributions and other payments by falsifying invoices for a businessman's illegal payments to a political consulting firm owned by Goachet. He then made a false statement to the FBI as to the legitimacy of these invoices.

## United States v. Sherfick, Southern District of Indiana

On November 23, 2009, Michael Steven Sherfick was charged pursuant to an information with conspiracy for his role in soliciting bribes while employed at the Perry Township Constable's Office (PTCO). The local government of Perry Township received federal assistance of more than $10,000 a year over several years.

Sherfick held several positions and ranks during his employment at PTCO including Honorary Deputy Constable, Deputy Constable, Executive Assistant, Captain, and Major. He allegedly solicited and received payments of money and other things of value, totaling over $30,000, from targeted business persons in return for PTCO Deputy Constable badges, identification cards, and parking placards. These law enforcement credentials offered a variety of benefits, e.g., privileged parking, evasion of traffic tickets, free admittance to sporting events, and discounts on goods and services. In addition, Sherfick allegedly instructed a witness on more than one occasion to provide a false statement of the facts to the FBI and a grand jury investigating the matter.

---

### United States v. Spargo, Northern District of New York

On August 27, 2009, former New York State Supreme Court Justice Thomas J. Spargo was convicted of attempted extortion and soliciting a bribe. He was sentenced on December 21, 2009, to 27 months of imprisonment followed by 2 years of supervised release.

Spargo solicited a $10,000 payment from an attorney with cases pending before him while Spargo was serving as a state supreme court justice. When the attorney declined to pay the money, Spargo increased the pressure by a second solicitation communicated through an associate. The former judge directly told the attorney in a telephone conversation that he and another judge close to him had been assigned to handle cases in the region, including the attorney's personal divorce case. The attorney testified that if he was made to feel that if he did not pay the money, both the cases handled by his law firm and his personal divorce proceeding would be in jeopardy.

## FEDERAL ELECTION CRIMES

As described in Part I, during 2009 the Public Integrity Section continued its nationwide oversight of the handling of election crime investigations and prosecutions. The Section also continued to assist in the implementation and execution of the Department's Ballot Access and Voting Integrity Initiative. The purposes of this ongoing Initiative are to increase the Department's efforts to deter and prosecute election crimes and to protect voting rights. At the end of 2009, the Section was supervising and providing advice on 174 election crime matters nationwide. The Section also concurred in the closing of an additional 38 election crime matters nationwide during the year. As of December 31, 2009, five matters involving possible election crimes were pending in the Public Integrity Section.

## Puerto Rico Corruption Cases
### District of Puerto Rico

### United States v. Velasco Mella, Velasco Escardille, Colón Rodriguez, González Freyre, Nazario Franco, Avanzato, Colón Padilla

Six defendants were sentenced for their participation in a scheme involving the resident commissioner and gubernatorial campaigns of a former governor of Puerto Rico. Aníbal Acevedo Vilá, former Puerto Rico governor, and Luisa Inclán Bird, a legal advisor for the San Juan resident commissioner office when Acevedo Vilá served as resident commissioner, were acquitted by jury on March 20, 2009, of all criminal charges related to the scheme. Velasco Mella, Velasco Escardille, and Colón Rodriguez participated in a scheme to defraud the United States and violate various Federal Election Campaign Act (FECA) provisions by having Puerto Rico and Philadelphia-area businessmen make illegal and unreported contributions to pay off large and unreported debts stemming from the former governor's 2000 campaign for resident commissioner of the Commonwealth of Puerto Rico. The scheme involved soliciting, accepting, and then reimbursing illegal conduit contributions from family members and staff of the candidate. Conduit contributions are illegal campaign contributions made by one person in the name of another person. Payments were made principally to the campaign's public relations firm.

These activities continued with the former governor's 2004 gubernatorial campaign in order to raise and spend far more than the Puerto Rican law permitted. As part of this scheme, fundraising was not reported and vendor payments were left unrecorded. Puerto Rico businessmen used large amounts of money from their personal or corporate funds to pay for large and unreported debts to the campaign's public relations firm. Transactions were made

46

in cash to keep contributions and vendor payments concealed from the Puerto Rico Treasury Department and the public. For many of the collaborator payments the public relations company created fake invoices to make the payments appear to be legitimate business expenses of the collaborators' companies. As finance director for the 2004 gubernatorial campaign, Nazario Franco became aware of this illegal activity and pleaded guilty for failing to report it. González Freyre pleaded guilty to making a false statement during the federal investigation into his illegal $50,000 contribution to the 2004 gubernatorial campaign.

In addition, Salvatore Avanzato directed employees, family, and friends to make campaign contributions to Acevedo Vilá that totaled approximately $140,000. Avanzato also paid for expensive dinners and the cost of a hotel fund-raiser for the benefit of Vilá. These payments were made to influence and to gain access to Vilá for the furthering of Avanzato's business interests and those of his clients.

These defendants were sentenced:

- Jorge Velasco Mella was sentenced on May 21, 2009, to 3 years of probation, including 12 months of home detention. Velasco Mella had previously pled guilty to conspiracy to violate FECA. Velasco Mella worked in the San Juan resident commissioner's office and assisted in handling campaign contributions.

- Ramón Velasco Escardille, former treasurer for the resident commissioner campaign, was sentenced on May 21, 2009, to 3 years of probation, including 12 months of home detention. He had previously pleaded guilty to violating FECA.

- Edwin Colón Rodríguez was sentenced on May 22, 2009, to 12 months and 1 day of imprisonment followed by 3 years of supervised release. He had previously pled guilty to making a false statement to the Federal Election Commission (FEC). Colón Rodríguez was the assistant treasurer for the resident commissioner campaign.

- José González Freyre was sentenced on May 22, 2009, to 1 year of probation, including 6 months of home detention, and a $5,000 fine. He had previously pled guilty to making a false statement to the FBI and the Internal Revenue Service. González Freyre is the owner of Pan American Grain, a Puerto Rico agricultural company that contributed at least $50,000 to the former governor's 2004 gubernatorial campaign.

- Miguel Nazario Franco was sentenced on May 22, 2009, to 1 year of probation, including 6 months of home detention, and a $5,000 fine. He had previously pled guilty to misprision of a felony. Nazario Franco, a businessman, volunteered in the finance department of the former governor's 2004 gubernatorial campaign.

47

- Salvatore Avanzato, a Philadelphia-area businessman, had previously pled guilty to conspiracy. He was sentenced on December 15, 2009, to 1 year of probation and a $5,000 fine.

- Ricardo Colón Padilla, former Finance Director for Acevedo Vilá's for the former governor's 2004 gubernatorial campaign, pleaded guilty on January 23, 2009, to providing false information to a grand jury.

In addition, one case was dismissed:

- Eneidy Coreano-Salgado, a former scheduler at the Resident Commissioner's Office in Washington, D.C., and later Administrative Director for the Resident Commissioner's D.C. office, was previously indicted on charges of conspiracy to defraud the United States for her alleged involvement in the conduit campaign contributions and non-disclosures. Her case was dismissed by the government on January 30, 2009.

---

Three related cases were transferred to a different district:

**United States v. Block and Feldman, Eastern District of Pennsylvania**

- Marvin I. Block, a Philadelphia-area businessman and lawyer, pled guilty to illegal campaign contributions and was sentenced on March 27, 2009, to a $3,000 fine.

- Robert M. Feldman, was sentenced on June 12, 2009, to a $6,000 fine. Feldman, a Philadelphia-area political and business consultant, was designated by Acevedo Vilá as his United States campaign finance chairman for the resident commissioner campaign and who assisted with obtaining conduit contributions, pled guilty to making illegal campaign contributions.

---

**Untied States v. Negrón Mella, Eastern District of Pennsylvania**

- Cándido Negrón Mella, a Philadelphia businessman who was designation by Acedvedo Vilá as his United States deputy campaign finance chairman for the resident commissioner campaign and who also assisted with obtaining conduit contributions, had previously pled guilty to conspiracy. He was sentenced on September 10, 2009, to 5 months of imprisonment followed by 7 months of supervised release and a $14,000 fine.

**United States v. Pierce-Santos, District of Columbia**

Jerry Pierce-Santos, a former assistant secretary of the United States Department of Housing and Urban Development, pleaded guilty on May 27, 2009, to illegally making conduit contributions to a candidate seeking federal office.

Pierce-Santos, the president of the Washington lobbying firm Interamerica Inc., allegedly made $17,000 in conduit contributions to a candidate seeking election to federal office. Conduit contributions are illegal campaign contributions made by one person in the name of another person. He allegedly sought assistance from ten individuals, who made between $1,000 and $2,000 each in contributions to the candidate. Pierce-Santos allegedly reimbursed these individuals for their contributions. The individual contribution limit at that time was $2,000 for a candidate seeking election to federal office.

**United States v. Thomas, District of Columbia**

On November 5, 2009, Melissa Thomas, a former political action committee (PAC) contractor, was sentenced to 60 months of probation and $216,360.12 in restitution based on her guilty plea to forgery.

Thomas was employed by a fund-raising consulting firm that managed the bank account of a PAC. The firm's owner also served as the PAC's treasurer. Thomas was involved in a scheme to embezzle more than $17,000 from the PAC. She was responsible for accounting for checks received to and dispersed from the PAC's bank account and for reconciling the monthly bank statements. Thomas wrote ten checks from the PAC's bank account, made out to either herself or to her employer, that she fraudulently signed with the treasurer's name. Thomas then deposited these checks into her personal bank account, thereby obtaining approximately $17,825 to which she was not entitled. Other components of the restitution amount include $32,000 for legal fees, $7,000 for an audit, and $158,000 for lost contracts.

## PART III

### NATIONWIDE FEDERAL PROSECUTIONS
### OF CORRUPT PUBLIC OFFICIALS

### INTRODUCTION

The tables in this section of the Report reflect data that is compiled from annual nationwide surveys of the United States Attorneys' Offices by the Public Integrity Section.

As discussed in Part I, most corruption cases are handled by the local United States Attorney's Office in the district where the crime occurred. However, on occasion outside prosecutors are asked either to assist the local office on a corruption case, or to handle the case entirely as a result of recusal of the local office due to a possible conflict of interest. The figures in Tables I through III include all public corruption prosecutions within each district. The figures in Table IV reflect the Public Integrity Section's public corruption prosecutions for 2009 that were discussed in Part II of this report.

### LIST OF TABLES

**TABLE I:**    Nationwide Federal Prosecutions of
Corrupt Public Officials in 2009

**TABLE II:**   Progress Over the Past Two Decades:
Nationwide Federal Prosecutions of
Corrupt Public Officials

**TABLE III:**  Federal Public Corruption Convictions by District
Over the Past Decade

**TABLE IV:**   Public Integrity Section's Federal Prosecutions
of Corrupt Public Officials in 2009

50

## TABLE I
## NATIONWIDE FEDERAL PROSECUTIONS
## OF CORRUPT PUBLIC OFFICIALS
## IN 2009

### Federal Officials

| | |
|---|---|
| Charged | 425 |
| Convicted | 426 |
| Awaiting Trial | 107 |

### State Officials

| | |
|---|---|
| Charged | 93 |
| Convicted | 102 |
| Awaiting Trial | 57 |

### Local Officials

| | |
|---|---|
| Charged | 270 |
| Convicted | 257 |
| Awaiting Trial | 148 |

### Others Involved

| | |
|---|---|
| Charged | 294 |
| Convicted | 276 |
| Awaiting Trial | 161 |

### Totals

| | |
|---|---|
| Charged | 1,082 |
| Convicted | 1,061 |
| Awaiting Trial | 473 |

51

TABLE II

PROGRESS OVER THE LAST TWO DECADES:
FEDERAL PROSECUTIONS BY UNITED STATES ATTORNEY'S OFFICES
OF CORRUPT PUBLIC OFFICIALS

| | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 |
|---|---|---|---|---|---|---|---|---|---|---|
| **FEDERAL OFFICIALS** | | | | | | | | | | |
| Charged | 615 | 803 | 624 | 627 | 571 | 527 | 456 | 459 | 442 | 480 |
| Convicted | 583 | 665 | 532 | 595 | 488 | 438 | 459 | 392 | 414 | 460 |
| Awaiting Trial as of 12/31 | 103 | 149 | 139 | 133 | 124 | 120 | 64 | 83 | 85 | 101 |
| **STATE OFFICIALS** | | | | | | | | | | |
| Charged | 96 | 115 | 81 | 113 | 99 | 61 | 109 | 51 | 91 | 115 |
| Convicted | 79 | 77 | 92 | 133 | 97 | 61 | 83 | 49 | 58 | 80 |
| Awaiting Trial as of 12/31 | 28 | 42 | 24 | 39 | 17 | 23 | 40 | 20 | 37 | 44 |
| **LOCAL OFFICIALS** | | | | | | | | | | |
| Charged | 257 | 242 | 232 | 309 | 248 | 236 | 219 | 255 | 277 | 237 |
| Convicted | 225 | 180 | 211 | 272 | 202 | 191 | 190 | 169 | 264 | 219 |
| Awaiting Trial as of 12/31 | 98 | 88 | 91 | 132 | 96 | 89 | 60 | 118 | 90 | 95 |
| **PRIVATE CITIZENS INVOLVED IN PUBLIC CORRUPTION OFFENSES** | | | | | | | | | | |
| Charged | 208 | 292 | 252 | 322 | 247 | 227 | 200 | 292 | 364 | 302 |
| Convicted | 197 | 272 | 246 | 362 | 182 | 188 | 170 | 243 | 278 | 306 |
| Awaiting Trial as of 12/31 | 71 | 67 | 126 | 99 | 95 | 91 | 80 | 106 | 128 | 89 |
| **TOTALS** | | | | | | | | | | |
| Charged | 1,176 | 1,452 | 1,189 | 1,371 | 1,165 | 1,051 | 984 | 1,057 | 1,174 | 1,134 |
| Convicted | 1,084 | 1,194 | 1,081 | 1,362 | 969 | 878 | 902 | 853 | 1,014 | 1,065 |
| Awaiting Trial as of 12/31 | 300 | 346 | 380 | 403 | 332 | 323 | 244 | 327 | 340 | 329 |

**TABLE II (continued)**

| | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **FEDERAL OFFICIALS** | | | | | | | | | | | |
| Charged | 441 | 502 | 478 | 479 | 424 | 445 | 463 | 426 | 518 | 425 | 10,205 |
| Convicted | 422 | 414 | 429 | 421 | 381 | 390 | 407 | 405 | 458 | 426 | 9,179 |
| Awaiting Trial as of 12/31 | 92 | 131 | 119 | 129 | 98 | 118 | 112 | 116 | 117 | 107 | |
| **STATE OFFICIALS** | | | | | | | | | | | |
| Charged | 92 | 95 | 110 | 94 | 111 | 96 | 101 | 128 | 144 | 93 | 1,995 |
| Convicted | 91 | 61 | 132 | 87 | 81 | 94 | 116 | 85 | 123 | 102 | 1,781 |
| Awaiting Trial as of 12/31 | 37 | 75 | 50 | 38 | 48 | 51 | 38 | 65 | 61 | 57 | |
| **LOCAL OFFICIALS** | | | | | | | | | | | |
| Charged | 211 | 224 | 299 | 259 | 268 | 309 | 291 | 284 | 287 | 270 | 5,214 |
| Convicted | 183 | 184 | 262 | 119 | 252 | 232 | 241 | 275 | 246 | 257 | 4,374 |
| Awaiting Trial as of 12/31 | 89 | 110 | 118 | 106 | 105 | 148 | 141 | 127 | 127 | 148 | |
| **PRIVATE CITIZENS INVOLVED IN PUBLIC CORRUPTION OFFENSES** | | | | | | | | | | | |
| Charged | 256 | 266 | 249 | 318 | 410 | 313 | 295 | 303 | 355 | 294 | 5,765 |
| Convicted | 242 | 261 | 188 | 241 | 306 | 311 | 266 | 249 | 302 | 276 | 5,086 |
| Awaiting Trial as of 12/31 | 109 | 121 | 126 | 139 | 168 | 136 | 148 | 179 | 184 | 161 | |
| **TOTALS** | | | | | | | | | | | |
| Charged | 1,000 | 1,087 | 1,136 | 1,150 | 1,213 | 1,163 | 1,150 | 1,141 | 1,304 | 1,082 | 23,179 |
| Convicted | 938 | 920 | 1,011 | 868 | 1,020 | 1,027 | 1,030 | 1,014 | 1,129 | 1,061 | 20,420 |
| Awaiting Trial as of 12/31 | 327 | 437 | 413 | 412 | 419 | 453 | 439 | 487 | 489 | 473 | |

53

TABLE III

UNITED STATES ATTORNEY'S OFFICES'
FEDERAL PUBLIC CORRUPTION CONVICTIONS
BY DISTRICT OVER THE PAST DECADE

| U.S. Attorney's Office | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Alabama, Middle | 3 | 9 | 7 | 6 | 7 | 9 | 11 | 8 | 3 | 5 | 68 |
| Alabama, Northern | 9 | 15 | 11 | 6 | 4 | 17 | 33 | 39 | 17 | 18 | 169 |
| Alabama, Southern | 0 | 2 | 10 | 2 | 2 | 0 | 7 | 5 | 0 | 5 | 33 |
| Alaska | 16 | 6 | 5 | 0 | 0 | 1 | 3 | 15 | 8 | 1 | 55 |
| Arizona | 8 | 1 | 4 | 10 | 9 | 48 | 16 | 32 | 20 | 19 | 167 |
| Arkansas, Eastern | 7 | 0 | 0 | 18 | 18 | 4 | 8 | 8 | 4 | 2 | 69 |
| Arkansas, Western | 1 | 0 | 3 | 1 | 0 | 0 | 2 | 0 | 1 | 1 | 9 |
| California, Central | 31 | 33 | 35 | 45 | 22 | 42 | 36 | 55 | 41 | 43 | 383 |
| California, Eastern | 18 | 18 | 20 | 20 | 39 | 30 | 18 | 13 | 9 | 15 | 200 |
| California, Northern | 18 | 3 | 4 | 5 | 14 | 3 | 4 | 2 | 3 | 2 | 58 |
| California, Southern | 7 | 12 | 5 | 5 | 2 | 10 | 7 | 6 | 5 | 9 | 68 |
| Colorado | 3 | 22 | 16 | 7 | 8 | 11 | 4 | 3 | 4 | 14 | 92 |
| Connecticut | 8 | 14 | 3 | 12 | 8 | 24 | 11 | 17 | 5 | 2 | 104 |
| Delaware | 1 | 8 | 7 | 3 | 5 | 2 | 7 | 5 | 7 | 1 | 46 |
| District of Columbia | 46 | 43 | 44 | 20 | 33 | 15 | 25 | 22 | 66 | 28 | 342 |
| Florida, Middle | 28 | 8 | 9 | 14 | 10 | 13 | 39 | 28 | 51 | 30 | 230 |

54

TABLE III (continued)

| U.S. Attorney's Office | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Florida, Northern | 8 | 5 | 5 | 4 | 2 | 5 | 17 | 19 | 3 | 27 | 95 |
| Florida, Southern | 71 | 83 | 38 | 37 | 78 | 24 | 27 | 22 | 12 | 12 | 404 |
| Georgia, Middle | 2 | 11 | 1 | 8 | 4 | 7 | 3 | 0 | 7 | 3 | 46 |
| Georgia, Northern | not reported | 10 | 26 | 12 | 9 | 21 | 6 | 7 | 15 | 21 | 127 |
| Georgia, Southern | 0 | 3 | 6 | 1 | 0 | 4 | 0 | 1 | 2 | 1 | 18 |
| Guam & NMI | 19 | 19 | 13 | 16 | 9 | 5 | 2 | 0 | 3 | 6 | 92 |
| Hawaii | 3 | 2 | 10 | 4 | 14 | 4 | 5 | 1 | 2 | 1 | 46 |
| Idaho | 5 | 4 | 7 | 4 | 3 | 1 | 1 | 1 | 1 | 1 | 28 |
| Illinois, Central | 3 | 2 | 5 | 5 | 14 | 3 | 6 | 8 | 6 | 6 | 58 |
| Illinois, Northern | 49 | 24 | 19 | 54 | 22 | 51 | 30 | 28 | 43 | 47 | 367 |
| Illinois, Southern | 7 | 4 | 6 | 1 | 6 | 20 | 2 | 6 | 7 | 5 | 64 |
| Indiana, Northern | 7 | 4 | 4 | 10 | 13 | 9 | 5 | 15 | 9 | 10 | 86 |
| Indiana, Southern | 4 | 2 | 2 | 10 | 4 | 5 | 4 | 9 | 5 | 8 | 53 |
| Iowa, Northern | 0 | 0 | 1 | 1 | 1 | 3 | 0 | 0 | 0 | 0 | 6 |
| Iowa, Southern | 0 | 0 | 2 | 8 | 1 | 1 | 2 | 9 | 9 | 4 | 36 |
| Kansas | 8 | 5 | 6 | 0 | 5 | 3 | 0 | 2 | 5 | 4 | 38 |
| Kentucky, Eastern | 25 | 15 | 25 | 22 | 27 | 10 | 23 | 33 | 22 | 22 | 224 |
| Kentucky, Western | 0 | 2 | 2 | 4 | 1 | 4 | 4 | 6 | 6 | 19 | 48 |
| Louisiana, Eastern | 18 | 20 | 19 | 17 | 29 | 26 | 26 | 29 | 26 | 20 | 230 |

55

## TABLE III (continued)

| U.S. Attorney's Office | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Louisiana, Middle | 2 | 6 | 2 | 2 | 0 | 8 | 13 | 6 | 3 | 10 | 52 |
| Louisiana, Western | 3 | 6 | 9 | 6 | 1 | 4 | 10 | 7 | 10 | 14 | 70 |
| Maine | 5 | 2 | 0 | 5 | 2 | 3 | 4 | 4 | 8 | 5 | 38 |
| Maryland | 8 | 8 | 6 | 12 | 28 | 17 | 36 | 21 | 39 | 32 | 207 |
| Massachusetts | 6 | 15 | 8 | 22 | 17 | 15 | 28 | 29 | 19 | 28 | 187 |
| Michigan, Eastern | 7 | 18 | 14 | 10 | 17 | 11 | 13 | 7 | 20 | 7 | 124 |
| Michigan, Western | 4 | 9 | 10 | 14 | 13 | 11 | 12 | 5 | 13 | 11 | 102 |
| Minnesota | 4 | 8 | 8 | 3 | 9 | 3 | 6 | 3 | 7 | 13 | 64 |
| Mississippi, Northern | 9 | 5 | 7 | 14 | 9 | 5 | 5 | 18 | 13 | 13 | 98 |
| Mississippi, Southern | 14 | 19 | 13 | 13 | 5 | 0 | 2 | 7 | 4 | 2 | 79 |
| Missouri, Eastern | 3 | 4 | 10 | 3 | 4 | 8 | 12 | 12 | 22 | 16 | 94 |
| Missouri, Western | 9 | 6 | 3 | 7 | 6 | 13 | 8 | 8 | 9 | 8 | 77 |
| Montana | 16 | 3 | 13 | 2 | 7 | 1 | 8 | 0 | 8 | 7 | 65 |
| Nebraska | 0 | 0 | 1 | 2 | 2 | 4 | 3 | 0 | 8 | 2 | 22 |
| Nevada | 6 | 5 | 6 | 6 | 0 | 0 | 3 | 4 | 0 | 7 | 37 |
| New Hampshire | 2 | 0 | 5 | 3 | 0 | 2 | 0 | 0 | 4 | 1 | 17 |
| New Jersey | 28 | 28 | 28 | 41 | 44 | 39 | 47 | 62 | 49 | 44 | 410 |
| New Mexico | 7 | 2 | 2 | 2 | 5 | 3 | 6 | 3 | 6 | 9 | 45 |
| New York, Eastern | 21 | 10 | 38 | 7 | 25 | 31 | 20 | 26 | 14 | 12 | 204 |

56

TABLE III (continued)

| U.S. Attorney's Office | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|
| New York, Northern | 8 | 11 | 5 | 22 | 16 | 11 | 9 | 7 | 10 | 2 | 101 |
| New York, Southern | 48 | 34 | 33 | 28 | 28 | 28 | 16 | 9 | 9 | 9 | 242 |
| New York, Western | 4 | 13 | 6 | 6 | 7 | 12 | 6 | 2 | 15 | 15 | 86 |
| North Carolina, Eastern | 0 | 7 | 4 | 9 | 18 | 2 | 20 | 18 | 4 | 4 | 86 |
| North Carolina, Middle | 4 | 5 | 12 | 6 | 0 | 3 | 2 | 5 | 1 | 3 | 41 |
| North Carolina, Western | 5 | 1 | 3 | 5 | 7 | 8 | 2 | 3 | 12 | 2 | 48 |
| North Dakota | 2 | 2 | 5 | 16 | 5 | 9 | 2 | 6 | 4 | 0 | 51 |
| Ohio, Northern | 36 | 34 | 29 | 28 | 32 | 28 | 31 | 37 | 29 | 49 | 333 |
| Ohio, Southern | 20 | 17 | 21 | 9 | 26 | 21 | 12 | 12 | 8 | 7 | 153 |
| Oklahoma, Eastern | 2 | 10 | 0 | 0 | 0 | 2 | 5 | 3 | 8 | 0 | 30 |
| Oklahoma, Northern | 3 | 2 | 5 | 3 | 0 | 2 | 3 | 3 | 3 | 12 | 36 |
| Oklahoma, Western | 4 | 0 | 2 | 1 | 4 | 17 | 10 | 3 | 11 | 10 | 62 |
| Oregon | 4 | 3 | 1 | 3 | 0 | 4 | 6 | 11 | 3 | 5 | 40 |
| Pennsylvania, Eastern | 30 | 36 | 57 | 57 | 26 | 26 | 30 | 19 | 15 | 20 | 316 |
| Pennsylvania, Middle | 14 | 20 | 9 | 13 | 12 | 19 | 27 | 16 | 16 | 16 | 162 |
| Pennsylvania, Western | 7 | 5 | 6 | 4 | 3 | 11 | 10 | 5 | 5 | 5 | 61 |
| Puerto Rico | 10 | 9 | 101 | 24 | 31 | 6 | 20 | 2 | 37 | 28 | 268 |
| Rhode Island | 5 | 2 | 6 | 0 | 2 | 4 | 2 | 1 | 2 | 1 | 25 |
| South Carolina | 13 | 8 | 5 | 8 | 8 | 0 | 3 | 4 | 8 | 7 | 64 |
| South Dakota | 2 | 2 | 4 | 3 | 2 | 3 | 13 | 4 | 11 | 8 | 52 |

57

**TABLE III (continued)**

| U.S. Attorney's Office | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Tennessee, Eastern | 3 | 2 | 9 | 8 | 6 | 9 | 7 | 12 | 6 | 7 | 69 |
| Tennessee, Middle | 0 | 0 | 4 | 6 | 8 | 5 | 9 | 6 | 1 | 4 | 43 |
| Tennessee, Western | 8 | 13 | 8 | 11 | 16 | 22 | 19 | 24 | 5 | 10 | 136 |
| Texas, Eastern | 4 | 14 | 5 | 5 | 8 | 5 | 3 | 4 | 10 | 5 | 63 |
| Texas, Northern | 6 | 3 | 13 | 33 | 14 | 22 | 16 | 6 | 23 | 41 | 177 |
| Texas, Southern | 29 | 30 | 10 | 17 | 11 | 25 | 21 | 34 | 64 | 26 | 267 |
| Texas, Western | 5 | 15 | 21 | 16 | 27 | 17 | 9 | 11 | 15 | 27 | 163 |
| Utah | 2 | 2 | 8 | 5 | 0 | 6 | 1 | 7 | 5 | 3 | 39 |
| Vermont | 2 | 2 | 0 | 3 | 0 | 2 | 0 | 1 | 5 | 0 | 15 |
| Virgin Islands | 6 | 4 | 6 | 2 | 2 | 2 | 8 | 3 | 2 | 0 | 35 |
| Virginia, Eastern | 22 | 22 | 17 | 8 | 21 | 23 | 38 | 23 | 72 | 57 | 303 |
| Virginia, Western | 7 | 3 | 13 | 3 | 16 | 2 | 13 | 13 | 2 | 5 | 77 |
| Washington, Eastern | 1 | 0 | 3 | 2 | 3 | 6 | 1 | 4 | 5 | 0 | 25 |
| Washington, Western | 16 | 10 | 3 | 1 | 15 | 7 | 1 | 5 | 7 | 3 | 68 |
| West Virginia, Northern | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 0 | 2 | 2 | 7 |
| West Virginia, Southern | 6 | 3 | 4 | 8 | 10 | 14 | 9 | 2 | 4 | 2 | 62 |
| Wisconsin, Eastern | 8 | 10 | 10 | 8 | 10 | 18 | 11 | 7 | 6 | 4 | 92 |
| Wisconsin, Western | 4 | 3 | 0 | 3 | 3 | 2 | 5 | 5 | 0 | 5 | 30 |
| Wyoming | 1 | 0 | 0 | 2 | 1 | 8 | 0 | 1 | 1 | 2 | 16 |

TABLE IV

PUBLIC INTEGRITY SECTION'S
FEDERAL PROSECUTIONS
OF CORRUPT PUBLIC OFFICIALS
IN 2009*

|  | Charged | Convicted | Awaiting Trial |
|---|---|---|---|
| **FEDERAL OFFICIALS** | 25 | 22 | 5 |
| **STATE OFFICIALS** | 1 | 3 | 3 |
| **LOCAL OFFICIALS** | 1 | 0 | 2 |
| **PRIVATE CITIZENS INVOLVED IN PUBLIC CORRUPTION OFFENSES** | 12 | 16 | 12 |
| **TOTALS** | 39 | 41 | 22 |

*Includes cases shared with U.S. Attorney's Office

59