# REPORT TO CONGRESS

## ON THE ACTIVITIES AND OPERATIONS

### OF THE

### PUBLIC INTEGRITY SECTION

### FOR 2011



**Public Integrity Section**
**Criminal Division**
**United States Department of Justice**

**Submitted Pursuant to**
**Section 603 of the Ethics in Government Act of 1978**

2:13-cv-193
09/02/2014

**DEF2580**


DEPOSITION
EXHIBIT

Frary 59

Sylvia Kerr, CSR, CRR, RPR, TCRR

# INTRODUCTION

This Report to Congress is submitted pursuant to the Ethics in Government Act of 1978, which requires the Attorney General to report annually to Congress on the operations and activities of the Justice Department's Public Integrity Section. The Report describes the activities of the Public Integrity Section during 2011. It also provides statistics on the nationwide federal effort against public corruption during 2011 and over the previous two decades.

The Public Integrity Section was created in 1976 in order to consolidate in one unit of the Criminal Division the Department's oversight responsibilities for the prosecution of criminal abuses of the public trust by government officials. Section attorneys prosecute selected cases involving federal, state, or local officials, and also provide advice and assistance to prosecutors and agents in the field regarding the handling of public corruption cases. In addition, the Section serves as the Justice Department's center for handling various issues that arise regarding public corruption statutes and cases.

An Election Crimes Branch was created within the Section in 1980 to supervise the Department's nationwide response to election crimes, such as voter fraud and campaign-financing offenses. The Branch reviews all major election crime investigations throughout the country and all proposed criminal charges relating to election crime.

During the year, the Section maintained a staff of approximately twenty-five attorneys, including experts in extortion, bribery, election crimes, and criminal conflicts of interest. The section management included: Jack Smith, Chief; Raymond N. Hulser, Principal Deputy Chief; Peter J. Ainsworth, Senior Deputy Chief for Litigation; Justin V. Shur, Deputy Chief; M. Kendall Day, Deputy Chief; Peter Koski, Deputy Chief; and Richard C. Pilger, Director, Election Crimes Branch.

Part I of the Report discusses the operations of the Public Integrity Section and highlights its major activities in 2011. Part II describes significant cases prosecuted by the Section in 2011. Part III presents nationwide data based on the Section's annual surveys of United States Attorneys regarding the national federal effort to combat public corruption from 1991 through 2011 and data specific to the Public Integrity Section for 2011.

# TABLE OF CONTENTS

## PART I

## OPERATIONAL RESPONSIBILITIES OF
## THE PUBLIC INTEGRITY SECTION

A.   RESPONSIBILITY FOR LITIGATION .................................................1
  1.   Recusals by United States Attorneys' Offices ................................1
  2.   Sensitive and Multi-District Cases ..........................................2
  3.   Federal Agency Referrals ....................................................3
  4.   Requests for Assistance/Shared Cases ........................................3

B.   SPECIAL SECTION PRIORITIES .....................................................3
  1.   Election Crimes .............................................................3
  2.   Conflicts of Interest Crimes ................................................6

C.   LEGAL AND TECHNICAL ASSISTANCE .................................................7
  1.   Training and Advice .........................................................7
  2.   Advisor to the Integrity Committee of the Council of Inspectors General on
       Integrity and Efficiency ....................................................8
  3.   Member of the Board Advisors of the Election Assistance Commission .......8
  4.   Legislative Activities ......................................................8
  5.   Case Supervision and General Assistance .....................................9
  6.   International Advisory Responsibilities ......................................9

## PART II

## PUBLIC INTEGRITY SECTION INDICTMENTS AND
## PROSECUTIONS IN 2011

INTRODUCTION...............................................................11
FEDERAL JUDICIAL BRANCH ...................................................12
FEDERAL LEGISLATIVE BRANCH.................................................13
FEDERAL EXECUTIVE BRANCH..................................................16
STATE AND LOCAL GOVERNMENT................................................ 19
FEDERAL ELECTION CRIMES...................................................22

# PART III

## NATIONWIDE FEDERAL PROSECUTIONS
## OF CORRUPT PUBLIC OFFICIALS

INTRODUCTION ..................................................................................................25

LIST OF TABLES ...............................................................................................25

TABLE I:    Nationwide Federal Prosecutions of Corrupt Public Officials
in 2011..................................................................................................26

TABLE II:   Progress Over the Past Two Decades:
Nationwide Federal Prosecutions of Corrupt Public Officials...........27

TABLE III:  Federal Public Corruption Convictions by District
Over the Past Decade ........................................................................29

TABLE IV:  Public Integrity Section's Federal Prosecutions of
Corrupt Public Officials in 2011 .......................................................33

## PART I

## OPERATIONAL RESPONSIBILITIES OF
## THE PUBLIC INTEGRITY SECTION

## A.   RESPONSIBILITY FOR LITIGATION

The work of the Public Integrity Section focuses on public corruption, that is, crimes involving abuses of the public trust by government officials.   Most of the Section's resources are devoted to investigations involving alleged corruption by government officials and to prosecutions resulting from these investigations.   Decisions to undertake particular matters are made on a case-by-case basis, given Section resources, the type and seriousness of the allegation, the sufficiency of factual predication reflecting criminal conduct, and the availability of federal prosecutive theories to reach the conduct.

Cases handled by the Section generally fall into one of the following categories: recusals by United States Attorneys' Offices, sensitive cases, multi-district cases, referrals from federal agencies, and shared cases.   These categories are discussed below.

### 1.   Recusals by United States Attorneys' Offices

The vast majority of federal corruption prosecutions are handled by the local United States Attorney's Office for the geographic district where the crime occurred, a fact demonstrated by the statistical charts in Part III of this Report.   At times, however, it may be inappropriate for the local United States Attorney's Office to handle a particular corruption case.

Public corruption cases tend to raise unique problems of public perception that are generally absent in more routine criminal cases.   An investigation of alleged corruption by a government official, whether at the federal, state, or local level, or someone associated with such an official, always has the potential of becoming a high-profile case simply because its focus is on the conduct of a public official.   In addition, these cases are often politically sensitive because their ultimate targets tend to be politicians or government officials appointed by politicians.

A successful public corruption prosecution requires both the appearance and the reality of fairness and impartiality.   This means that a successful corruption case involves not just a conviction but public perception that the conviction was warranted, not the result of improper motivation by the prosecutor, and is free of conflicts of interest.   In a case in which the local conflict of interest is substantial, the local office is removed from the case by a procedure called recusal.   Recusal occurs when the local office either asks

1

to step aside, or is asked to step aside by Department headquarters, as primary prosecutor. Federal cases involving corruption allegations in which the conflict is substantial are usually referred to the Public Integrity Section either for prosecution or direct operational supervision.

Allegations involving possible crimes by federal judges almost always require recusals of the local offices for significant policy as well as for practical reasons. Having the case handled outside the local offices eliminates the possible appearance of bias, as well as the practical difficulties and awkwardness that would arise if an office investigating a judge were to appear before the judge on other matters. Thus, as a matter of established Department practice, federal judicial corruption cases generally are handled by the Public Integrity Section.

Similar concerns regarding the appearance of bias also arise when the target of an investigation is a federal prosecutor, a federal investigator, or other employee assigned to work in or closely with a particular United States Attorney's Office. Thus, cases involving United States Attorneys, Assistant United States Attorneys, or federal investigators or employees working with AUSAs in the field generally result in a recusal of the local office. These cases are typically referred to the Public Integrity Section.

## 2. **Sensitive and Multi-District Cases**

In addition to recusals, the Public Integrity Section handles other special categories of cases. At the request of the Assistant Attorney General for the Criminal Division, the Section handles cases that are highly sensitive and cases that involve the jurisdiction of more than one United States Attorney's Office.

Cases may be sensitive for a number of reasons. Because of its importance, a particular case may require close coordination with high-level Department officials. Alternatively, the case may require substantial coordination with other federal agencies in Washington. The latter includes cases involving classified information that require careful coordination with intelligence agencies. Sensitive cases may also include those that are so politically controversial on a local level that they are most appropriately handled in Washington, DC.

In addition to sensitive cases, this category encompasses multi-district cases, that is, cases that involve allegations that cross judicial district lines and hence fall under the jurisdiction of two or more United States Attorneys' Offices. In these cases the Section is occasionally asked to coordinate the investigation among the various United States Attorneys' Offices, to handle a case jointly with one or more United States Attorney's Office, or, when appropriate, to assume operational responsibility for the entire case.

### 3.   Federal Agency Referrals

In another area of major responsibility, the Section handles matters referred directly by federal agencies concerning possible federal crimes by agency employees. The Section reviews these allegations to determine whether an investigation of the matter is warranted and, ultimately, whether the matter should be prosecuted.

Agency referrals of possible employee wrongdoing are an important part of the Section's mission.  The Section works closely with the Offices of Inspector General (OIGs) of the executive branch agencies, as well as with other agency investigative components, such as the Offices of Internal Affairs and the Criminal Investigative Divisions.   In addition, the Section invests substantial time in training agency investigators in the statutes involved in corruption cases and the investigative approaches that work best in these cases.  These referrals from the various agencies require close consultation with the referring agency's investigative component and prompt prosecutive evaluation.

### 4.   Requests for Assistance/Shared Cases

The final category of cases in which the Section becomes involved is cases that are handled jointly by the Section and a United States Attorney's Office or other component of the Department.  At times the available prosecutorial resources in a United States Attorney's Office may be insufficient to undertake sole responsibility for a significant corruption case.  In this situation the local office may request the assistance of an experienced Section prosecutor to share responsibility for prosecuting the case.  On occasion, the Section may also be asked to provide operational assistance or to assume supervisory responsibility for a case due to a partial recusal of the local office.  Finally, the Public Integrity Section may be assigned to supervise or assist with a case initially assigned to another Department component.

## B.    SPECIAL SECTION PRIORITIES

In addition to the general responsibilities discussed above, in 2011 the Public Integrity Section continued its involvement in a number of additional priority areas of criminal law enforcement.

### 1.   Election Crimes

One of the Section's law enforcement priorities is its supervision of the Justice Department's nationwide response to election crimes.  Under the Department's ongoing Ballot Access and Voting Integrity Initiative, the prosecution of all forms of election crime is a high Departmental priority, and headquarters' oversight in this area is designed

to ensure that the Department's nationwide response to election crime matters is uniform, impartial, and effective. In 1980 the Election Crimes Branch was created within the Section to handle this supervisory responsibility. The Branch is headed by a Director, assisted by a senior Section prosecutor, and staffed by other Section attorneys on a case-by-case basis.

The Election Crimes Branch oversees the Department's handling of all election crime allegations other than those involving federal voting rights, which are handled by the Civil Rights Division. Specifically, the Branch supervises three types of election crime cases: (1) vote frauds, such as vote buying and absentee ballot fraud; (2) campaign-financing crimes, most notably under the Federal Election Campaign Act (FECA); and (3) patronage crimes, such as political shakedowns and misuse of federal programs for political purposes. Vote frauds and campaign-financing offenses are the most significant as well as the most common types of election crimes.

The election-related work of the Section and its Election Crimes Branch falls into the following categories:

a. <u>Consultation and Field Support</u>. Under long-established Department procedures, the Section's Election Crimes Branch reviews all major election crime investigations, including all proposed grand jury investigations and FBI full-field investigations, and all election crime charges proposed by the various United States Attorneys' Offices for legal and factual sufficiency. (United States Attorneys' Manual 9-85.210.) The Branch is also often consulted before a United States Attorney's Office opens a preliminary investigation into a vote fraud allegation, although this is not required.

In the area of campaign-financing crimes, Department procedures require consultation with headquarters before any investigation, including a preliminary investigation, is commenced by a United States Attorney's Office. U.S.A.M. 9-85.210. The increased coordination with the Section at the initial stage of a criminal investigation of a FECA matter is the result in part of the complexity of the campaign-financing statutes. Another reason is that the Department coordinates and shares jurisdiction over willful violations of these statutes with another federal agency, the Federal Election Commission, which has civil enforcement authority over FECA violations.

The Section's consultation responsibility for election matters includes providing advice to prosecutors and investigators regarding the application of federal criminal laws to vote fraud, patronage crimes, and campaign-financing crimes, and the most effective investigative techniques for particular types of election offenses. This consultation also includes supervising the Department's use of the federal conspiracy and false statements statutes (18 U.S.C. §§ 371 and 1001) to address schemes to subvert the federal campaign

financing laws.   In addition, the Election Crimes Branch helps draft election crime charges and other pleadings when requested.

The majority of the Branch's consultations are in the following two categories: vote fraud, also known as election fraud or ballot fraud; and campaign financing crimes arising under the FECA.   During 2011, the Branch assisted in evaluating allegations, helping to structure investigations, and drafting charges for United States Attorneys' Offices around the country in these areas of law enforcement.

b.  Litigation.  Section attorneys prosecute selected election crimes, either by assuming total operational responsibility for the case or by handling the case jointly with a United States Attorney's Office or other Department component.

c.  District Election Officer Program.   The Branch also assists in implementing the Department's long-standing District Election Officer (DEO) Program. This Program is designed to ensure that each of the Department's 94 United States Attorneys' Offices has a trained prosecutor available to oversee the handling of election crime matters within the district and coordinate district responses with Department headquarters regarding these matters.

The DEO Program involves appointing an Assistant United States Attorney in each federal district to serve a two-year term as a DEO and providing periodic training for the DEOs in the handling of election crime and voting rights matters.

The DEO Program is also a crucial feature of the Department's nationwide Election Day Program, which takes place during the federal general elections that are held in November of even-numbered years. The Election Day Program ensures that federal prosecutors and investigators are available both at Department headquarters in Washington, DC, and in each district to receive complaints of election irregularities while the polls are open.  As part of the Program, press releases are issued in Washington, DC, and in each district before the November federal elections that advise the public of the Department's enforcement interests in deterring and prosecuting election crimes and protecting voting rights.   The press releases also provide contact information for the DEOs, local FBI officials, and Department officials in the Criminal and Civil Rights Divisions at headquarters who may be contacted on election day by members of the public who have complaints of possible vote fraud or voting rights violations.

d.  Ballot Access and Voting Integrity Initiative.  During 2011, the Public Integrity Section continued to assist in the implementation of the Department's Ballot Access and Voting Integrity Initiative.   This ongoing law enforcement initiative was established in 2002 to enhance the Department's criminal and civil rights enforcement efforts against vote fraud and voting rights violations.   The initiative includes annual

training for the Assistant United States Attorneys serving as DEOs and pre-election coordination by each United States Attorney's Office with state law enforcement and election officials before the federal general elections regarding the handling of election crime matters in their respective districts.

In August 2011, the Director of the Election Crimes Branch and senior attorneys from the Civil Rights Division filmed updated video presentations for the Department's election crimes and voting rights training program. The filming was hosted and produced by the Department's National Advocacy Center in Columbia, South Carolina, and the videos were made available to Department personnel. Topics addressed by the panels included the types of conduct prosecutable as federal election crimes, the federal statutes available to prosecute vote fraud and campaign financing offenses, the federal voting rights statutes and their enforcement, recent discovery and ethics issues, and updates on campaign financing and voting rights cases. Continuing Legal Education credits were available for personnel in qualifying states by participation in certain broadcasts for which faculty were available to address questions.

e. <u>Inter-Agency Liaison with the Federal Election Commission</u>. The Election Crimes Branch is the formal liaison between the Justice Department and the Federal Election Commission (FEC), an independent federal agency that shares enforcement jurisdiction with the Department over willful violations of the Federal Election Campaign Act (FECA). The FEC has exclusive civil jurisdiction over all FECA violations, while the Department has exclusive criminal jurisdiction over FECA crimes.

f. <u>Inter-Agency Liaison with the Office of Special Counsel</u>. The Branch also serves as the Department's point of contact with the United States Office of Special Counsel (OSC). The OSC has jurisdiction over noncriminal violations of the Hatch Act, 5 U.S.C. §§ 7321-7326, §§ 1501-1508, which may also involve criminal patronage crimes that are within the Department's jurisdiction.

2. **Conflicts of Interest Crimes**

"Conflicts of interest" is a wide-ranging and complex area of law, with many layers of administrative and oversight responsibility. Moreover, the federal criminal conflicts of interest laws overlap to some extent with the sometimes broader ethics restrictions imposed by civil statutes, agency standards of conduct, Presidential orders, and, in the case of attorneys, bar association codes of conduct.

The Public Integrity Section's work in the conflicts area falls into the following categories:

a.  <u>Criminal Referrals from Federal Agencies and Recusals</u>.  The Section's criminal enforcement role comes into play with respect to a narrow group of conflicts of interest matters, namely, those that involve possible misconduct proscribed by one of the federal conflicts of interest statutes, 18 U.S.C. §§ 203-209.  These crimes are prosecuted either by a United States Attorney's Office or by the Public Integrity Section. Conflicts of interest matters are often referred to the Section by the various federal agencies.   If investigation of a referral is warranted, the Section coordinates the investigation with the Inspector General for the agency concerned, the FBI, or both.   If prosecution is warranted, the Section prosecutes the case.  If a civil remedy may be appropriate in lieu of criminal prosecution, the Section or the Inspector General may refer the case to the Civil Division of the Department of Justice for its review.   On occasion the Section is also asked to handle recusals and special assignments regarding conflicts matters.

b.  <u>Coordination</u>.  The Public Integrity Section works with the United States Office of Government Ethics (OGE) in order to coordinate conflicts of interest issues with OGE and other executive branch agencies and offices.   The purpose of this coordination is to ensure that the overall legislative and enforcement efforts in this area are both complementary and consistent.   OGE has broad jurisdiction over noncriminal conduct by executive branch personnel, as well as the authority to provide guidance concerning the coverage of the federal criminal conflicts of interest statutes.   The Section's coordination with OGE ensures that consistent guidance is provided with respect to the overlapping criminal, civil, and administrative interests implicated by the statutory and regulatory restrictions on federal personnel.

## C.  LEGAL AND TECHNICAL ASSISTANCE

### 1.  Training and Advice

The Public Integrity Section is staffed with specialists who have considerable experience investigating and prosecuting corruption cases.  Section attorneys participate in a wide range of formal training events for federal prosecutors and investigators.  They are also available to provide informal advice on investigative methods, charging decisions, and trial strategy in specific cases.  Over the course of 2011, Section attorneys provided over a hundred consultations to United States Attorneys' Offices and various other agencies.

The Section also conducts the annual public corruption seminar at the National Advocacy Center.  Speakers at this seminar typically include both the Section's senior prosecutors and Assistant United States Attorneys from the field who have handled significant corruption cases.  The seminars provide training for federal prosecutors and FBI agents regarding the statutes most commonly used in corruption cases, guidance in the use of the complex and difficult investigative techniques necessary to investigate

government corruption, and advice from experienced prosecutors on conducting corruption trials.

### 2. Advisor to the Integrity Committee of the Council of Inspectors General on Integrity and Efficiency

Pursuant to the Inspector General Reform Act of 2008, Pub. L. No. 110-409, 122 Stat. 4302 (Oct. 14, 2008), the Public Integrity Section serves as a legal advisor to the Integrity Committee of the Council of Inspectors General on Integrity and Efficiency (CIGIE). The CIGIE is a body composed of the Inspectors General of the various agencies of the executive branch of the federal government. The Integrity Committee of the CIGIE is charged with handling allegations against Inspectors General and senior members of their staff.

In addition, the Integrity Committee is charged with establishing policies and procedures to ensure consistency in conducting administrative investigations. The Committee's procedures, drafted with the assistance of the Public Integrity Section, provide a framework for the investigative function of the Committee. Allegations of wrongdoing by Inspectors General and their senior staff are initially reviewed by the Public Integrity Section for potential criminal prosecution. In noncriminal matters, the procedures guide the Committee's discretion to investigate the alleged misconduct and to report on its findings. The Public Integrity Section also advises the Integrity Committee on matters of law and policy relating to its investigations.

### 3. Member of the Board of Advisors of the Election Assistance Commission

Pursuant to the Help America Vote Act of 2002 (HAVA), the Chief of the Public Integrity Section, or his or her designee, is a member of the Board of Advisors of the Election Assistance Commission (EAC). 42 U.S.C. § 15344(a)(12). The Commission was created to serve as a national clearinghouse for information and procedures relating to the administration of federal elections and is responsible for adopting voluntary voting system guidelines, testing and certification of voting system hardware and software, conducting studies regarding the effective administration of elections, and training on the management of federal grants to the states under HAVA. The Director of the Section's Election Crimes Branch serves by statutory designation of the Chief as a Member of the Board of Advisors to the United States Election Assistance Commission, and participated in its 2011 annual meeting in Washington, DC.

### 4. Legislative Activities

An important responsibility of the Public Integrity Section is the review of proposed legislation that may affect, directly or indirectly, the investigation and

prosecution of public officials and those who seek to corrupt these officials. The Section is often called upon to comment on legislation proposed by Congress, by the Administration, or by other departments of the executive branch; to draft or review testimony for congressional hearings; and to respond to congressional inquiries concerning legislative proposals. On occasion, the Section drafts legislative proposals relating to various corruption matters. For example, in 2011 the Section drafted, reviewed, and commented on a number of legislative proposals addressing public corruption. During the year, the Section also commented on proposed legislation on the topics of ethics in government, legislative transparency and accountability, jurisdiction over American Samoa, federal advisory committees, and bribery statutory coverage, among other subjects.

### 5. Case Supervision and General Assistance

Public corruption cases are often controversial, complex, and highly visible. These factors may warrant Departmental supervision and review of a particular case. On occasion Section attorneys are called upon to conduct a careful review of a sensitive public corruption case, evaluating the quality of the investigative work and the adequacy of any proposed indictments. Based on its experience in this area, the Section can often identify tactical or evidentiary problems early on and either provide needed assistance or, if necessary, assume operational responsibility for the prosecution.

The Section also has considerable expertise in the supervision of the use of undercover operations in serious corruption cases. The Section serves on the FBI's Criminal Undercover Operations Review Committee. A number of the Section's senior prosecutors have experience in the practical and legal problems involved in such operations and have the expertise to employ this sensitive investigative technique effectively and to advise law enforcement personnel on its use.

### 6. International Advisory Responsibilities

The Public Integrity Section actively participates in the area of international law enforcement. The Section regularly provides briefings and training on United States public corruption issues to visiting foreign delegations and continues the efforts of the United States to assist foreign countries in their quest to combat public corruption and election crime in their respective countries. This assistance includes participation in international proceedings and coordination with other components of the Justice Department and the State Department on the Administration's positions in this area.

Section experts continue to address visiting foreign officials in investigations and prosecutions of public corruption. These presentations are generally conducted under the auspices of the State Department's Foreign Visitor Program and the Justice Department's

Office of Overseas Prosecutorial Development Assistance and Training. During 2011, the Section made presentations to officials from Afghanistan, Albania, Armenia, Bangladesh, Belarus, Benin, Bhutan, Botswana, Brazil, Bulgaria, Burkina Faso, Cameroon, the Central African Republic, the Czech Republic, the Democratic Republic of Congo, Dominica, Ethiopia, Georgia, Ghana, Greece, Grenada, Haiti, Hungary, India, Indonesia, Iraq, Italy, Jamaica, Kazakhstan, Kenya, Kosovo, Latvia, Lebanon, Liberia, Macedonia, Malaysia, Mali, Mexico, Moldova, Mozambique, Niger, Nigeria, Norway, Pakistan, the Palestinian Territories, Panama, the People's Republic of China, the Philippines, the Republic of Montenegro, Romania, Russia, Senegal, Seychelles, the Slovak Republic, Slovenia, Somalia, Spain, Sri Lanka, Swaziland, Tanzania, Togo, Uganda, Venezuela, Vietnam, Zambia, and Zimbabwe.

# PART II

## PUBLIC INTEGRITY SECTION
## INDICTMENTS AND PROSECUTIONS
## IN 2011

### INTRODUCTION

As described in Part I, the Public Integrity Section's role in the prosecution of public corruption cases ranges from sole operational responsibility for the entire case to approving an indictment or to providing advice on the drafting of charges. Part II of the Report provides examples of noteworthy public corruption cases for which the Section had either sole or shared operational responsibility during 2011. A "case" involves a person who has been charged by indictment or information; a "matter" is an investigation that has not resulted in a criminal charge. Part II also provides statistics on the number of matters closed by the Section without prosecution during 2011 and the number of matters pending at the end of the year in each category.

In 2011, the Section continued its substantial increase in trial work, obtaining trial convictions against 13 defendants in cases across the country, including Puerto Rico, Alabama, Virginia, Massachusetts, and Indiana.

The descriptions of the Section's significant cases for calendar year 2011 are separated into categories, based on the branch or level of government affected by the corruption. Election crime cases are grouped separately. Unrelated cases in each category are separated by triple lines. Those cases for which a conviction but not a sentence is reported, the sentencing did not take place in 2011 and will be reported in a later year's report.

## FEDERAL JUDICIAL BRANCH

As of December 31, 2011, no matters involving allegations of corruption affecting the federal judicial branch were pending in the Public Integrity Section. During 2011, the Section also closed two matters involving crimes affecting the judicial branch.

The Public Integrity Section has sole responsibility for the investigation and prosecution of federal judges due to the potential appearance issues that might arise if a local United States Attorney's Office were to investigate an allegation of wrongdoing by a judge before whom that United States Attorney's Office appears on a regular basis. The investigation of allegations of criminal wrongdoing in the federal judicial branch is a very sensitive matter. These investigations may involve intrusions into pending federal cases, cooperation from parties or witnesses who are appearing before the court, or potential disruption of the normal judicial process. In addition, the Section must coordinate closely with supervisory judges and the Administrative Office of United States Courts to facilitate the assignment of magistrates and judges from outside of the judicial district to handle requests during the investigation, such as grand jury supervision, or applications for warrants or electronic surveillance. The Public Integrity Section has developed substantial experience and expertise in these matters over the years.

## FEDERAL LEGISLATIVE BRANCH

**As of December 31, 2011, 10 matters involving allegations of corruption in or affecting the federal legislative branch were pending in the Public Integrity Section. During 2011, the Section closed six such matters. Also during 2011, the Section handled several significant cases involving the federal legislative branch, as described below.**

The Public Integrity Section plays a central role in the effort to combat corruption in the federal legislative branch. These cases raise unique issues of inter-branch comity, and they are always sensitive given the high-profile stature of elected officials. The Section has developed substantial expertise regarding the unique protections provided to Members of Congress and their staff by the Speech or Debate Clause set forth in Article 1 of the Constitution, and has worked closely and effectively with House and Senate counsel and the Ethics Committees in both houses. In addition to handling its own cases, the Section routinely provides advice and guidance to prosecutors across the country regarding these sensitive investigations.

The following are examples of the Section's legislative branch cases in 2011.

<u>United States v. Pole</u>, **District of Columbia**

Ngozi Pole, former office manager in the U.S. Senate, was convicted in Washington, DC, on February 1, 2011, of five counts of wire fraud and one count of theft of government property.

Pole, who worked for former U.S. Senator Edward M. Kennedy, was responsible for transmitting salary information to the Senate Disbursing Office in order to adjust the pay of employees in the Senator's office. Evidence presented at trial showed that between at least 2003 and continuing until January 2007, Pole repeatedly submitted paperwork causing the Senate to pay him larger bonus payments than had been approved by either the chief of staff or Senator Kennedy. These bonus payments totaled more than $75,000, which evidence at trial showed Pole had concealed by repeatedly transmitting information to the chief of staff that falsely showed that he received only those payments that had been authorized.

**United States v. Verrusio, District of Columbia**

Former U.S. House of Representatives staffer Fraser C. Verrusio was convicted on February 10, 2011, by a jury in the District of Columbia, on one count of conspiring to accept an illegal gratuity, one count of accepting an illegal gratuity, and one count of making a false statement.

Verrusio was the policy director for the U.S. House of Representatives Committee on Transportation and Infrastructure. According to evidence and testimony presented at trial, Verrusio and U.S. Senate legislative assistant Trevor Blackann accepted an all-expenses-paid trip to Game One of the 2003 World Series. Evidence at trial further established that the trip was arranged with the help of a lobbyist who worked with Jack Abramoff. The trip included round-trip commercial air travel between Washington, DC and New York City, chauffeured car service while in New York City, tickets to Game One, lodging, meals, drinks, and entertainment at a strip club.

Evidence also established that the lobbyist who helped arrange the trip was working for an equipment rental company interested in inserting three amendments to the Federal Highway Bill. According to evidence presented at trial, the committee for which Verrusio worked and the senator for whom Blackann worked were responsible for the Federal Highway Bill. Testimony at trial established that Verrusio accepted the trip to New York City knowing it was in exchange for official assistance in connection with securing favorable amendments to the Federal Highway Bill.

On August 5, 2011, Verrusio was sentenced to an afternoon in prison and two years of supervised release.

**United States v. Ring, District of Columbia**

Kevin A. Ring, a former colleague of Jack Abramoff, was sentenced on October 26, 2011, in the District of Columbia to 20 months of prison and 30 months of supervised release. Ring was convicted on November 15, 2010, of conspiracy, honest services fraud, and paying gratuities in connection with an illegal lobbying scheme. According to evidence presented at trial, Ring was the "COO of Team Abramoff." He obtained business throughout the United States, and worked with his co-conspirators to shower receptive public officials with things of value in exchange for favorable treatment of his clients' interests.

The things of value Ring and his fellow co-conspirators offered included all-expenses-paid trips, such as the one for which Verrusio was convicted of accepting. Evidence at trial also showed that Ring sought $7 million for the construction of a jail from the Department of Justice and $14 million in transportation appropriations on behalf of his clients.

Todd Boulanger, who pleaded guilty in connection with his role in Abramoff's corrupt lobbying scheme and subsequently testified against Ring, was also sentenced in October to two years' probation and 30 days in a halfway house.

## FEDERAL EXECUTIVE BRANCH

As of December 31, 2011, 16 matters involving allegations of corruption within the federal executive branch were pending in the Public Integrity Section. During 2011, the Section closed 16 such matters. Also during 2011, the Section handled a number of cases involving executive branch corruption, several of which are described below.

The Public Integrity Section frequently receives allegations of corruption in the executive branch from federal law enforcement agencies, including the FBI, the Inspectors General for the various departments and agencies, and United States military investigators. These matters involve a careful balancing of the requirements of a criminal investigation and the operational needs of the executive offices involved.

### United States v. Aves, Castro, Bibb, Torres-Alvarez, Escobar, and Garcia, Western District of Texas

Six current and former members of the U.S. military were charged in a 41-count indictment in San Antonio, Texas. The indictment, unsealed on September 15, 2011, charged Xavier Aves, Christopher Castro, Grant E. Bibb, Jesus Torres-Alvarez, Paul Escobar, and Richard Garcia with one count of conspiracy. Aves was charged with 30 counts of wire fraud and 10 counts of aggravated identity theft. Castro, Bibb, Escobar, and Garcia have each been charged with five counts of wire fraud and two counts of aggravated identity theft. The charges stemmed from an alleged scheme in which the defendants fraudulently obtained recruiting bonuses for soldiers whom they did not actually recruit.

According to the indictment, the U.S. Army, U.S. Army Reserves, and the National Guard Bureau had recruiting programs in place between 2005 and 2008. Under these programs, a soldier could receive up to $2,000 in bonus payments for every person he recruited to serve in the U.S. military. These bonus payments were issued in the form of direct deposits and pre-paid debit cards.

As alleged in the indictment, between February 2006 and February 2011, Aves, Castro, Bibb, Escobar, and Garcia paid military recruiters, including Torres-Alvarez, for the names and social security numbers of potential future soldiers. Aves, Castro, Bibb, Escobar, and Garcia allegedly received a total of approximately $127,000 in fraudulent

recruiting bonuses, which they split among themselves.  According to the indictment, the defendants split the bonuses among themselves and recruited other soldiers to participate in the fraud scheme.

**United States v. Pressley and Pressley, Northern District of Alabama**

Former U.S. Army Major Eddie Pressley, and his wife, Eurica Pressley, were convicted by a jury in Decatur, Alabama, on March 1, 2011, of one count of bribery, one count of conspiracy to commit bribery, eight counts of honest services fraud, one count of money-laundering conspiracy, and eleven counts of engaging in monetary transactions with criminal proceeds.  This case was brought in connection with a bribery and money-laundering scheme related to defense contracts awarded in support of Operation Iraqi Freedom.

Between 2004 and 2005, Eddie Pressley was a U.S. Army contracting official at Camp Arifjan.  Evidence presented at trial showed that Eddie Pressley took various contracting actions to benefit certain contractors who paid him bribes, including Terry Hall.  In February 2005, Eddie Pressley arranged for Hall to obtain a blanket purchase agreement to deliver goods and services to the U.S. Department of Defense and its components in Kuwait and elsewhere.

According to Hall's testimony and other evidence presented at trial, Pressley demanded a $50,000 bribe before he would issue orders to receive bottled water shipments from Hall's companies.  Hall and his associates arranged for the bribe money to be paid to a shell company, EGP Business Solutions, Inc.  Hall's testimony and other evidence further showed that Pressley and John Cockerham, another U.S. Army contracting official, increased the bribe demand to $1.6 million to be split evenly between them.  After Hall and others agreed to pay the bribe, Pressley and Cockerham took various official actions to benefit Hall, including submitting orders for other goods Hall's companies supplied.

Evidence at trial also showed that Eddie Pressley enlisted his wife, Eurica to receive the bribes, including traveling to Dubai and the Cayman Islands in 2005 to open bank accounts into which the bribes were paid.  Eurica Pressley also took control of the U.S.-based account in the name of EGP Business Solutions, Inc.  In a voluntary interview with a law enforcement agent, Eurica Pressley made misleading statements, including a denial that she had any foreign bank accounts.

Former U.S. Army Major James Momon testified at trial that Pressley and Cockerham recruited him into their bribe scheme, and that he took various official acts to receive bribes from some of the same contractors who paid Pressley and Cockerham.

Bank statements and wire transfer reports demonstrated that the Pressleys received approximately $2.9 million in bribe payments, approximately $1.6 million of which consisted of payments from other contractors Hall had facilitated for Eddie Pressley. Following the guilty verdict, the defendants agreed to forfeit $27,178,407.

In connection with the same scheme, Charles Joseph Bowie, Jr. pled on May 11, 2011, to accepting $400,000 from a contractor in exchange for the award of a bottled water contract. The payments were directed by Cockerham, who drew Bowie into the conspiracy to help conceal the receipt of Cockerham's bribe payments.

As of the close of 2011, Hall and Momon were awaiting sentencing. Other defendants involved in the bribery and contracting fraud scheme at Camp Arifjan include Wajdi Birjas, who pled guilty in 2010 and is awaiting sentencing; and Christopher Murray, who pled guilty and was sentenced in 2009. Lastly, Richard Evick and Crystal Martin were indicted and awaiting trial for their part in the Camp Arifjan scheme as of the end of 2011.

## STATE AND LOCAL GOVERNMENT

At the end of 2011, 39 matters of alleged corruption involving state or local government were open in the Public Integrity Section. In 2011, the Section closed 22 matters. Also during 2011, the Section prosecuted a number of cases involving state or local corruption.

The Public Integrity Section plays a major role in combating corruption at all levels of government, including corruption relating to state or local public officials. The following are examples of corruption cases handled by the Section involving state and local officials in 2011.

### United States v. Martinez Maldonado and Bravo Fernandez, District of Puerto Rico

Puerto Rico Senator Hector Martinez Maldonado and businessman Juan Bravo Fernandez were convicted by a federal jury in San Juan, Puerto Rico on March 7, 2011, of federal program bribery. Bravo Fernandez was also convicted of traveling in interstate commerce in aid of racketeering and conspiracy to travel in interstate commerce in aid of racketeering.

The jury convicted the defendants for their role in a bribery scheme in which Bravo Fernandez conspired to secure the passage of two bills favorable to his business interests by bribing Martinez Maldonado and Jorge de Castro Font, a former Puerto Rican senator. Beginning in 2005, de Castro Font served as the Chairman of the Committee on Rules and Calendars, exercising significant control over which bills, confirmations and other matters were brought to a vote on the floor of the Senate and when they were brought to a vote. Beginning in 2005, Martinez Maldonado served as Chairman of the Puerto Rico Public Safety Committee, exercising significant control over legislation related to security and community safety.

According to court documents and evidence presented at trial, Martinez Maldonado and de Castro Font exercised significant control over the fate of two bills benefitting Bravo Fernandez' business interests. Additionally, Bravo Fernandez agreed to provide to Martinez Maldonado and de Castro Font a trip to Las Vegas to watch the May 14, 2005, championship boxing match between Winky Wright and Felix "Tito" Trinidad. Evidence at trial also showed that on March 2, 2005, the day that Bravo Fernandez paid for the $1000 boxing tickets, Martinez Maldonado submitted one of the bills for consideration by the Puerto Rico Senate. Court documents established that the

day after Martinez Maldonado presided over a Public Safety Committee hearing relevant to Bravo Fernandez' business interests, Bravo Fernandez used his credit card to reserve Martinez Maldonado a room at the Mandalay Bay Resort and Casino in Las Vegas. Immediately after the Public Safety Committee hearing, Martinez Maldonado authorized a committee report in support of Bravo Fernandez' bill. According to further evidence at trial, on May 17, 2005, the day after the three men returned from their trip to Las Vegas, Martinez Maldonado and de Castro Font both cast their vote in support of one of Bravo Fernandez' bills in front of the Puerto Rico Senate. On May 18, 2005, the other bill was approved by the Public Safety Committee, chaired by Martinez Maldonado; that bill was passed by the Puerto Rico Senate on May 23, 2005.

---

**United States v. Hamilton, Eastern District of Virginia**

Phillip A. Hamilton, a former member of the Virginia House of Delegates, was convicted by a jury in Richmond, Virginia, on May 11, 2011, of one count of federal program bribery and one count of extortion under color of official right. He was sentenced on August 12, 2011, to 114 months in prison.

Hamilton was elected to the Virginia House of Delegates in 1988, and among other duties sat on the Elementary & Secondary Education Subcommittee of the Virginia House Appropriations Committee. According to evidence presented at trial, from August 2006 through February 2007, Hamilton solicited employees of Old Dominion University (ODU) for a position as director for the ODU Center for Teacher Quality and Educational Leadership. During this period, Hamilton simultaneously introduced a budget amendment that would establish and fund the center, including his salary as the director.

Evidence at trial further demonstrated that Hamilton sent an e-mail to an ODU official, telling him that the center had no funding under the current budget, Hamilton's retirement payments from another source were being reduced in May 2007, and he would need to supplement his current income. The ODU official assured Hamilton that he would have a job at the center if ODU obtained funding from the Virginia General Assembly. The day after Hamilton voted in favor of an amendment appropriating $500,000 to ODU for the center, which was passed on February 27, 2007, Hamilton and ODU officials exchanged e-mails about giving Hamilton the director position.

Evidence at trial showed that, even though three other people applied for the director's position, none was interviewed. Hamilton, who did not submit an application, was hired for the position in June 2007 at a salary of $40,000 per year. Evidence at trial also showed that Hamilton took numerous steps to conceal his arrangement with ODU officials, including instructing them not to mention his name in connection with the

center to members of the Virginia Senate Finance Committee; advising an ODU official to tell a Virginia Senate staffer that the official, not Hamilton, was the director of the center; and attempting to persuade ODU leadership not to release incriminating e-mails in response to a Freedom of Information Act request received by ODU.

## United States v. Plowman, Southern District of Indiana

A federal jury in Indianapolis, Indiana, convicted former Indianapolis and Marian County City-County Councilman Lincoln Plowman on September 15, 2011, of attempted extortion and soliciting a bribe.  Plowman was sentenced on December 1, 2011, to 40 months in prison, followed by two years of supervised release.

According to evidence presented at trial, between August 11 and December 22, 2009, Plowman solicited an undercover FBI agent to pay $5,000 in cash and to make a $1,000 campaign contribution for Plowman's benefit.  In exchange for the payments, Plowman offered official actions and influence to facilitate the opening of a strip club in Indianapolis.  At the time of the crimes, Plowman was a member of the Metropolitan Development Committee of the City-County Council and a major with the Indianapolis Metropolitan Police Department.

Other evidence presented at trial showed that Plowman had previously accepted bribes from an existing strip club, in exchange for official acts and influence against legislation to ban smoking at clubs in Indianapolis.

## FEDERAL ELECTION CRIMES

As described in Part I, during 2011 the Public Integrity Section continued its nationwide oversight of the handling of election crime investigations and prosecutions. In addition, the Section prosecuted a number of election crime cases. The Section also continued to assist in the implementation and execution of the Department's Ballot Access and Voting Integrity Initiative. The purposes of this ongoing Initiative are to increase the Department's efforts to deter and prosecute election crimes and to protect voting rights. As of December 31, 2011, eight matters involving possible election crimes were pending in the Public Integrity Section, and the Section closed five such matters.

Set forth below are examples of the Section's 2011 casework in this area.

### United States v. Danielczyk and Biagi, Eastern District of Virginia

On February 16, 2011, a federal grand jury in Alexandria, Virginia, returned an indictment charging William P. Danielczyk, Jr. and Eugene R. Biagi with reimbursing $186,000 in contributions to the Senate and Presidential campaign committees of a candidate for federal office, and obstructing the Federal Election Commission (FEC) and the FBI. The indictment charges Danielczyk and Biagi each with one count of conspiracy, two counts of reimbursing contributions, one count of using corporate funds to reimburse contributions, and one count of obstructing justice. The indictment also charges Danielczyk with two counts of causing false statements to be submitted to the FEC.

According to the indictment, Danielczyk co-hosted a September 2006 fundraiser for a candidate's 2006 U.S. Senate campaign, and co-hosted a March 2007 fundraiser for the same candidate's 2008 campaign for President of the United States. The indictment further alleges that Danielczyk and Biagi reimbursed the contributions to the 2008 Presidential campaign with corporate funds. As part of the scheme, Danielczyk and Biagi allegedly created and distributed back-dated letters to 15 contributors falsely characterizing reimbursements for contributions as "consulting fees." According to the indictment, Danielczyk and Biagi also created checks to 17 contributors containing a memorandum line falsely stating that the contributor had received and would receive money for certain work. The indictment further alleges that Danielczyk caused the candidate's campaign committee to unwittingly file with the FEC a 2007 report containing false information about the source and amount of contributions to the

campaign.  Danielczyk allegedly also caused the submission of correspondence to the FEC that falsely stated that reimbursements of contributions to a candidate were bonus payments for work performed.

According to court documents and information presented in court, Danielczyk and Biagi were aided by Danielczyk's assistant, April G. Spittle. On February 4, 2011, Spittle pleaded guilty to one count of making reimbursed contributions to the 2008 Presidential campaign.  A statement of facts filed with Spittle's plea agreement described her participation in raising the $186,000 in reimbursed contributions at Danielczyk's direction, received her own contribution reimbursement from Biagi, and distributed other reimbursement checks from Biagi.  According to other court documents filed at the time of Spittle's guilty plea, she participated, at Danielczyk's direction, in creating back-dated and false letters for Biagi's signature, which sought to disguise the reimbursed contributions.

## United States v. Snapper, District of Columbia

On January 3, 2011, former wealth manager Evan H. Snapper pleaded guilty to causing a presidential campaign committee to submit false statements to the Federal Election Commission (FEC).

According to court documents, Snapper knowingly and willfully caused the Hillary Clinton for President Committee to file materially false reports with the FEC, in which a political contribution from one individual was misrepresented as having come from twenty one individuals.  The individual was a client of Snapper, who Snapper knew to support the candidate.  Snapper admitted that in March 2008, he informed the individual of a fundraising concert in New York City to benefit the committee.  The individual proposed to reimburse people he convinced to buy tickets for the concert. Snapper knew this to be illegal, but nevertheless coordinated the reimbursement payments.  Snapper further admitted that he took steps to conceal the true purpose of these payments as reimbursements for political contributions, including falsifying the account ledgers of his client.

All told, Snapper caused the source of $48,300 in individual contributions to the committee to be falsely reported to the FEC.  Snapper also admitted to causing the source of $13,800 in individual contributions to a different candidate's committees to be falsely reported to the FEC in 2007.

**<u>United States v. Edwards</u>, Middle District of North Carolina**

On June 3, 2011, a federal grand jury in the Middle District of North Carolina returned a six-count indictment against former U.S. Senator and Presidential candidate John Edwards.  The indictment charged Edwards with one count of conspiracy to violate the federal campaign finance laws and to make false statements to the Federal Election Commission (FEC);  four counts of accepting and receiving illegal campaign contributions from two donors in 2007 and 2008;  and one count of concealing those illegal donations from the FEC.  The contributions at issue amounted to $900,000, an amount exceeding the legal contribution limit from individual contributors.  The funds were allegedly used to conceal an ongoing extramarital affair and the resulting pregnancy.  The indictment alleged that Edwards and his co-conspirators concealed the alleged unlawful contributions by causing the John Edwards for President Committee to file false and misleading campaign finance reports with the FEC.

# PART III

## NATIONWIDE FEDERAL PROSECUTIONS
## OF CORRUPT PUBLIC OFFICIALS

### INTRODUCTION

The tables in this section of the Report reflect data that is compiled from annual nationwide surveys of the United States Attorneys' Offices by the Public Integrity Section.

As discussed in Part I, most corruption cases are handled by the local United States Attorney's Office in the district where the crime occurred. However, on occasion outside prosecutors are asked either to assist the local office on a corruption case, or to handle the case entirely as a result of recusal of the local office due to a possible conflict of interest. The figures in Tables I through III include all public corruption prosecutions within each district. The figures in Table IV reflect the Public Integrity Section's public corruption prosecutions for 2011 that were discussed in Part II of this report.

### LIST OF TABLES

**TABLE I:**       Nationwide Federal Prosecutions of
                   Corrupt Public Officials in 2011

**TABLE II:**      Progress Over the Past Two Decades:
                   Nationwide Federal Prosecutions of
                   Corrupt Public Officials

**TABLE III:**     Federal Public Corruption Convictions by District
                   Over the Past Decade

**TABLE IV:**      Public Integrity Section's Federal Prosecutions
                   of Corrupt Public Officials in 2011

TABLE I

## NATIONWIDE FEDERAL PROSECUTIONS
## OF CORRUPT PUBLIC OFFICIALS
## IN 2011

| Federal Officials | |
|---|---|
| Charged | 412 |
| Convicted | 392 |
| Awaiting Trial | 110 |

| State Officials | |
|---|---|
| Charged | 93 |
| Convicted | 143 |
| Awaiting Trial | 41 |

| Local Officials | |
|---|---|
| Charged | 282 |
| Convicted | 276 |
| Awaiting Trial | 127 |

| Others Involved | |
|---|---|
| Charged | 295 |
| Convicted | 296 |
| Awaiting Trial | 191 |

| Totals | |
|---|---|
| Charged | 1,082 |
| Convicted | 1,107 |
| Awaiting Trial | 469 |

TABLE II

PROGRESS OVER THE LAST TWO DECADES:
FEDERAL PROSECUTIONS BY UNITED STATES ATTORNEYS' OFFICES
OF CORRUPT PUBLIC OFFICIALS

| | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 |
|---|---|---|---|---|---|---|---|---|---|---|
| **FEDERAL OFFICIALS** | | | | | | | | | | |
| Charged | 624 | 627 | 571 | 527 | 456 | 459 | 442 | 480 | 441 | 502 |
| Convicted | 532 | 595 | 488 | 438 | 459 | 392 | 414 | 460 | 422 | 414 |
| Awaiting Trial as of 12/31 | 139 | 133 | 124 | 120 | 64 | 83 | 85 | 101 | 92 | 131 |
| **STATE OFFICIALS** | | | | | | | | | | |
| Charged | 81 | 113 | 99 | 61 | 109 | 51 | 91 | 115 | 92 | 95 |
| Convicted | 92 | 133 | 97 | 61 | 83 | 49 | 58 | 80 | 91 | 61 |
| Awaiting Trial as of 12/31 | 24 | 39 | 17 | 23 | 40 | 20 | 37 | 44 | 37 | 75 |
| **LOCAL OFFICIALS** | | | | | | | | | | |
| Charged | 232 | 309 | 248 | 236 | 219 | 255 | 277 | 237 | 211 | 224 |
| Convicted | 211 | 272 | 202 | 191 | 190 | 169 | 264 | 219 | 183 | 184 |
| Awaiting Trial as of 12/31 | 91 | 132 | 96 | 89 | 60 | 118 | 90 | 95 | 89 | 110 |
| **PRIVATE CITIZENS INVOLVED IN PUBLIC CORRUPTION OFFENSES** | | | | | | | | | | |
| Charged | 252 | 322 | 247 | 227 | 200 | 292 | 364 | 302 | 256 | 266 |
| Convicted | 246 | 362 | 182 | 188 | 170 | 243 | 278 | 306 | 242 | 261 |
| Awaiting Trial as of 12/31 | 126 | 99 | 95 | 91 | 80 | 106 | 128 | 89 | 109 | 121 |
| **TOTALS** | | | | | | | | | | |
| Charged | 1,189 | 1,371 | 1,165 | 1,051 | 984 | 1,057 | 1,174 | 1,134 | 1,000 | 1,087 |
| Convicted | 1,081 | 1,362 | 969 | 878 | 902 | 853 | 1,014 | 1,065 | 938 | 920 |
| Awaiting Trial as of 12/31 | 380 | 403 | 332 | 323 | 244 | 327 | 340 | 329 | 327 | 437 |

27

**TABLE II (continued)**

| | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **FEDERAL OFFICIALS** | | | | | | | | | | | |
| Charged | 478 | 479 | 424 | 445 | 463 | 426 | 518 | 425 | 422 | 412 | 9,621 |
| Convicted | 429 | 421 | 381 | 390 | 407 | 405 | 458 | 426 | 397 | 392 | 8,720 |
| Awaiting Trial as of 12/31 | 119 | 129 | 98 | 118 | 112 | 116 | 117 | 107 | 103 | 110 | ✕ |
| **STATE OFFICIALS** | | | | | | | | | | | |
| Charged | 110 | 94 | 111 | 96 | 101 | 128 | 144 | 93 | 168 | 93 | 2,045 |
| Convicted | 132 | 87 | 81 | 94 | 116 | 85 | 123 | 102 | 108 | 143 | 1,876 |
| Awaiting Trial as of 12/31 | 50 | 38 | 48 | 51 | 38 | 65 | 61 | 57 | 105 | 41 | ✕ |
| **LOCAL OFFICIALS** | | | | | | | | | | | |
| Charged | 299 | 259 | 268 | 309 | 291 | 284 | 287 | 270 | 296 | 282 | 5,293 |
| Convicted | 262 | 119 | 252 | 232 | 241 | 275 | 246 | 257 | 280 | 276 | 4,525 |
| Awaiting Trial as of 12/31 | 118 | 106 | 105 | 148 | 141 | 127 | 127 | 148 | 146 | 127 | ✕ |
| **PRIVATE CITIZENS INVOLVED IN PUBLIC CORRUPTION OFFENSES** | | | | | | | | | | | |
| Charged | 249 | 318 | 410 | 313 | 295 | 303 | 355 | 294 | 298 | 295 | 5,858 |
| Convicted | 188 | 241 | 306 | 311 | 266 | 249 | 302 | 276 | 251 | 296 | 5,164 |
| Awaiting Trial as of 12/31 | 126 | 139 | 168 | 136 | 148 | 179 | 184 | 161 | 200 | 191 | ✕ |
| **TOTALS** | | | | | | | | | | | |
| Charged | 1,136 | 1,150 | 1,213 | 1,163 | 1,150 | 1,141 | 1,304 | 1,082 | 1,184 | 1082 | 22,817 |
| Convicted | 1,011 | 868 | 1,020 | 1,027 | 1,030 | 1,014 | 1,129 | 1,061 | 1,036 | 1107 | 20,285 |
| Awaiting Trial as of 12/31 | 413 | 412 | 419 | 453 | 439 | 487 | 489 | 473 | 554 | 469 | ✕ |

28

TABLE III

UNITED STATES ATTORNEYS' OFFICES
FEDERAL PUBLIC CORRUPTION CONVICTIONS
BY DISTRICT OVER THE PAST DECADE

| U.S. Attorney's Office | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Alabama, Middle | 7 | 6 | 7 | 9 | 11 | 8 | 3 | 5 | 1 | 9 | 66 |
| Alabama, Northern | 11 | 6 | 4 | 17 | 33 | 39 | 17 | 18 | 11 | 14 | 170 |
| Alabama, Southern | 10 | 2 | 2 | 0 | 7 | 5 | 0 | 5 | 3 | 0 | 34 |
| Alaska | 5 | 0 | 0 | 1 | 3 | 15 | 8 | 1 | 9 | 4 | 46 |
| Arizona | 4 | 10 | 9 | 48 | 16 | 32 | 20 | 19 | 16 | 18 | 192 |
| Arkansas, Eastern | 0 | 18 | 18 | 4 | 8 | 8 | 4 | 2 | 11 | 7 | 80 |
| Arkansas, Western | 3 | 1 | 0 | 0 | 2 | 0 | 1 | 1 | 6 | 1 | 15 |
| California, Central | 35 | 45 | 22 | 42 | 36 | 55 | 41 | 43 | 29 | 27 | 375 |
| California, Eastern | 20 | 20 | 39 | 30 | 18 | 13 | 9 | 15 | 12 | 20 | 196 |
| California, Northern | 4 | 5 | 14 | 3 | 4 | 2 | 3 | 2 | 3 | 3 | 43 |
| California, Southern | 5 | 5 | 2 | 10 | 7 | 6 | 5 | 9 | 0 | 2 | 51 |
| Colorado | 16 | 7 | 8 | 11 | 4 | 3 | 4 | 14 | 6 | 6 | 79 |
| Connecticut | 3 | 12 | 8 | 24 | 11 | 17 | 5 | 2 | 4 | 0 | 86 |
| Delaware | 7 | 3 | 5 | 2 | 7 | 5 | 7 | 1 | 1 | 2 | 40 |
| District of Columbia | 44 | 20 | 33 | 15 | 25 | 22 | 66 | 28 | 41 | 39 | 333 |
| Florida, Middle | 9 | 14 | 10 | 13 | 39 | 28 | 51 | 30 | 18 | 24 | 236 |
| Florida, Northern | 5 | 4 | 2 | 5 | 17 | 19 | 3 | 27 | 13 | 3 | 98 |
| Florida, Southern | 38 | 37 | 78 | 24 | 27 | 22 | 12 | 12 | 21 | 13 | 284 |
| Georgia, Middle | 1 | 8 | 4 | 7 | 3 | 0 | 7 | 3 | 0 | 11 | 44 |
| Georgia, Northern | 26 | 12 | 9 | 21 | 6 | 7 | 15 | 21 | 32 | 32 | 181 |
| Georgia, Southern | 6 | 1 | 0 | 4 | 0 | 1 | 2 | 1 | 5 | 2 | 22 |
| Guam & NMI | 13 | 16 | 9 | 5 | 2 | 0 | 3 | 6 | 3 | 5 | 62 |
| Hawaii | 10 | 4 | 14 | 4 | 5 | 1 | 2 | 1 | 0 | 3 | 44 |

**TABLE III (continued)**

| U.S. Attorney's Office | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Idaho | 7 | 4 | 3 | 1 | 1 | 1 | 1 | 1 | 0 | 3 | 22 |
| Illinois, Central | 5 | 5 | 14 | 3 | 6 | 8 | 6 | 6 | 0 | 2 | 55 |
| Illinois, Northern | 19 | 54 | 22 | 51 | 30 | 28 | 43 | 47 | 46 | 30 | 370 |
| Illinois, Southern | 6 | 1 | 6 | 20 | 2 | 6 | 7 | 5 | 6 | 9 | 68 |
| Indiana, Northern | 4 | 10 | 13 | 9 | 5 | 15 | 9 | 10 | 4 | 4 | 83 |
| Indiana, Southern | 2 | 10 | 4 | 5 | 4 | 9 | 5 | 8 | 8 | 2 | 57 |
| Iowa, Northern | 1 | 1 | 1 | 3 | 0 | 0 | 0 | 0 | 0 | 2 | 8 |
| Iowa, Southern | 2 | 8 | 1 | 1 | 2 | 9 | 9 | 4 | 11 | 1 | 48 |
| Kansas | 6 | 0 | 5 | 3 | 0 | 2 | 5 | 4 | 5 | 9 | 39 |
| Kentucky, Eastern | 25 | 22 | 27 | 10 | 23 | 33 | 22 | 22 | 28 | 25 | 237 |
| Kentucky, Western | 2 | 4 | 1 | 4 | 4 | 6 | 6 | 19 | 6 | 13 | 65 |
| Louisiana, Eastern | 19 | 17 | 29 | 26 | 26 | 29 | 26 | 20 | 26 | 29 | 247 |
| Louisiana, Middle | 2 | 2 | 0 | 8 | 13 | 6 | 3 | 10 | 4 | 13 | 61 |
| Louisiana, Western | 9 | 6 | 1 | 4 | 10 | 7 | 10 | 14 | 25 | 9 | 95 |
| Maine | 0 | 5 | 2 | 3 | 4 | 4 | 8 | 5 | 1 | 4 | 36 |
| Maryland | 6 | 12 | 28 | 17 | 36 | 21 | 39 | 32 | 21 | 58 | 270 |
| Massachusetts | 8 | 22 | 17 | 15 | 28 | 29 | 19 | 28 | 27 | 19 | 212 |
| Michigan, Eastern | 14 | 10 | 17 | 11 | 13 | 7 | 20 | 7 | 14 | 18 | 131 |
| Michigan, Western | 10 | 14 | 13 | 11 | 12 | 5 | 13 | 11 | 16 | 6 | 111 |
| Minnesota | 8 | 3 | 9 | 3 | 6 | 3 | 7 | 13 | 6 | 8 | 66 |
| Mississippi, Northern | 7 | 14 | 9 | 5 | 5 | 18 | 13 | 13 | 9 | 4 | 97 |
| Mississippi, Southern | 13 | 13 | 5 | 0 | 2 | 7 | 4 | 2 | 15 | 13 | 74 |
| Missouri, Eastern | 10 | 3 | 4 | 8 | 12 | 12 | 22 | 16 | 11 | 10 | 108 |
| Missouri, Western | 3 | 7 | 6 | 13 | 8 | 8 | 9 | 8 | 14 | 4 | 80 |
| Montana | 13 | 2 | 7 | 1 | 8 | 0 | 8 | 7 | 10 | 5 | 61 |

**TABLE III (continued)**

| U.S. Attorney's Office | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Nebraska | 1 | 2 | 2 | 4 | 3 | 0 | 8 | 2 | 4 | 2 | 28 |
| Nevada | 6 | 6 | 0 | 0 | 3 | 4 | 0 | 7 | 4 | 6 | 36 |
| New Hampshire | 5 | 3 | 0 | 2 | 0 | 0 | 4 | 1 | 1 | 0 | 16 |
| New Jersey | 28 | 41 | 44 | 39 | 47 | 62 | 49 | 44 | 47 | 28 | 429 |
| New Mexico | 2 | 2 | 5 | 3 | 6 | 3 | 6 | 9 | 7 | 4 | 47 |
| New York, Eastern | 38 | 7 | 25 | 31 | 20 | 26 | 14 | 12 | 12 | 10 | 195 |
| New York, Northern | 5 | 22 | 16 | 11 | 9 | 7 | 10 | 2 | 3 | 3 | 88 |
| New York, Southern | 33 | 28 | 28 | 28 | 16 | 9 | 9 | 9 | 12 | 24 | 196 |
| New York, Western | 6 | 6 | 7 | 12 | 6 | 2 | 15 | 15 | 10 | 15 | 94 |
| North Carolina, Eastern | 4 | 9 | 18 | 2 | 20 | 18 | 4 | 4 | 9 | 10 | 98 |
| North Carolina, Middle | 12 | 6 | 0 | 3 | 2 | 5 | 1 | 3 | 7 | 1 | 40 |
| North Carolina, Western | 3 | 5 | 7 | 8 | 2 | 3 | 12 | 2 | 2 | 2 | 46 |
| North Dakota | 5 | 16 | 5 | 9 | 2 | 6 | 4 | 0 | 6 | 2 | 55 |
| Ohio, Northern | 29 | 28 | 32 | 28 | 31 | 37 | 29 | 49 | 65 | 28 | 356 |
| Ohio, Southern | 21 | 9 | 26 | 21 | 12 | 12 | 8 | 7 | 0 | 3 | 119 |
| Oklahoma, Eastern | 0 | 0 | 0 | 2 | 5 | 3 | 8 | 0 | 3 | 11 | 32 |
| Oklahoma, Northern | 5 | 3 | 0 | 2 | 3 | 3 | 3 | 12 | 2 | 2 | 35 |
| Oklahoma, Western | 2 | 1 | 4 | 17 | 10 | 3 | 11 | 10 | 9 | 11 | 78 |
| Oregon | 1 | 3 | 0 | 4 | 6 | 11 | 3 | 5 | 1 | 7 | 41 |
| Pennsylvania, Eastern | 57 | 57 | 26 | 26 | 30 | 19 | 15 | 20 | 23 | 23 | 296 |
| Pennsylvania, Middle | 9 | 13 | 12 | 19 | 27 | 16 | 16 | 16 | 25 | 7 | 160 |
| Pennsylvania, Western | 6 | 4 | 3 | 11 | 10 | 5 | 5 | 5 | 6 | 7 | 62 |
| Puerto Rico | 101 | 24 | 31 | 6 | 20 | 2 | 37 | 28 | 17 | 130 | 396 |
| Rhode Island | 6 | 0 | 2 | 4 | 2 | 1 | 2 | 1 | 3 | 8 | 29 |

**TABLE III (continued)**

| U.S. Attorney's Office | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|
| South Carolina | 5 | 8 | 8 | 0 | 3 | 4 | 8 | 7 | 2 | 11 | 56 |
| South Dakota | 4 | 3 | 2 | 3 | 13 | 4 | 11 | 8 | 9 | 8 | 65 |
| Tennessee, Eastern | 9 | 8 | 6 | 9 | 7 | 12 | 6 | 7 | 4 | 8 | 76 |
| Tennessee, Middle | 4 | 6 | 8 | 5 | 9 | 6 | 1 | 4 | 3 | 1 | 47 |
| Tennessee, Western | 8 | 11 | 16 | 22 | 19 | 24 | 5 | 10 | 14 | 8 | 137 |
| Texas, Eastern | 5 | 5 | 8 | 5 | 3 | 4 | 10 | 5 | 4 | 2 | 51 |
| Texas, Northern | 13 | 33 | 14 | 22 | 16 | 6 | 23 | 41 | 17 | 19 | 204 |
| Texas, Southern | 10 | 17 | 11 | 25 | 21 | 34 | 64 | 26 | 23 | 43 | 274 |
| Texas, Western | 21 | 16 | 27 | 17 | 9 | 11 | 15 | 27 | 27 | 24 | 194 |
| Utah | 8 | 5 | 0 | 6 | 1 | 7 | 5 | 3 | 1 | 2 | 38 |
| Vermont | 0 | 3 | 0 | 2 | 0 | 1 | 5 | 0 | 2 | 5 | 18 |
| Virgin Islands | 6 | 2 | 2 | 2 | 8 | 3 | 2 | 0 | 7 | 3 | 35 |
| Virginia, Eastern | 17 | 8 | 21 | 23 | 38 | 23 | 72 | 57 | 60 | 57 | 376 |
| Virginia, Western | 13 | 3 | 16 | 2 | 13 | 13 | 2 | 5 | 2 | 0 | 69 |
| Washington, Eastern | 3 | 2 | 3 | 6 | 1 | 4 | 5 | 0 | 0 | 2 | 26 |
| Washington, Western | 3 | 1 | 15 | 7 | 1 | 5 | 7 | 3 | 8 | 5 | 55 |
| West Virginia, Northern | 0 | 0 | 0 | 3 | 0 | 0 | 2 | 2 | 6 | 4 | 17 |
| West Virginia, Southern | 4 | 8 | 10 | 14 | 9 | 2 | 4 | 2 | 3 | 1 | 57 |
| Wisconsin, Eastern | 10 | 8 | 10 | 18 | 11 | 7 | 6 | 4 | 5 | 5 | 84 |
| Wisconsin, Western | 0 | 3 | 3 | 2 | 5 | 5 | 0 | 5 | 2 | 5 | 30 |
| Wyoming | 0 | 2 | 1 | 8 | 0 | 1 | 1 | 2 | 1 | 5 | 21 |

TABLE IV

**PUBLIC INTEGRITY SECTION'S**
**FEDERAL PROSECUTIONS**
**OF CORRUPT PUBLIC OFFICIALS**
**IN 2011 \***

|  | Charged | Convicted | Awaiting Trial |
|---|---|---|---|
| FEDERAL OFFICIALS | 24 | 19 | 11 |
| STATE OFFICIALS | 2 | 12 | 10 |
| LOCAL OFFICIALS | 1 | 8 | 2 |
| PRIVATE CITIZENS INVOLVED IN PUBLIC CORRUPTION OFFENSES | 21 | 31 | 20 |
| **TOTALS** | **48** | **70** | **43** |

\*  Includes cases shared with United States Attorneys' Offices.