# REPORT TO CONGRESS

## ON THE ACTIVITIES AND OPERATIONS

## OF THE

## PUBLIC INTEGRITY SECTION

## FOR 2012



**Public Integrity Section**
**Criminal Division**
**United States Department of Justice**

**Submitted Pursuant to**
**Section 603 of the Ethics in Government Act of 1978**

2:13-cv-193
09/02/2014

DEF2581



DEPOSITION
EXHIBIT

Sylvia Kerr, CSR, CRR, RPR, TCRR

## INTRODUCTION

This Report to Congress is submitted pursuant to the Ethics in Government Act of 1978, which requires the Attorney General to report annually to Congress on the operations and activities of the Justice Department's Public Integrity Section. The Report describes the activities of the Public Integrity Section during 2012. It also provides statistics on the nationwide federal effort against public corruption during 2012 and over the previous two decades.

The Public Integrity Section was created in 1976 in order to consolidate in one unit of the Criminal Division the Department's oversight responsibilities for the prosecution of criminal abuses of the public trust by government officials. Section attorneys prosecute selected cases involving federal, state, or local officials, and also provide advice and assistance to prosecutors and agents in the field regarding the handling of public corruption cases. In addition, the Section serves as the Justice Department's center for handling various issues that arise regarding public corruption statutes and cases.

An Election Crimes Branch was created within the Section in 1980 to supervise the Department's nationwide response to election crimes, such as voter fraud and campaign-financing offenses. The Branch reviews all major election crime investigations throughout the country and all proposed criminal charges relating to election crime.

During the year, the Section maintained a staff of approximately twenty-five attorneys, including experts in extortion, bribery, election crimes, and criminal conflicts of interest. The section management included: Jack Smith, Chief; Raymond N. Hulser, Principal Deputy Chief; M. Kendall Day, Deputy Chief; Peter M. Koski, Deputy Chief; David Harbach, Deputy Chief; and Richard C. Pilger, Director, Election Crimes Branch.

Part I of the Report discusses the operations of the Public Integrity Section and highlights its major activities in 2012. Part II describes significant cases prosecuted by the Section in 2012. Part III presents nationwide data regarding the national federal effort to combat public corruption from 1993 through 2012.

i

# TABLE OF CONTENTS

## PART I

### OPERATIONAL RESPONSIBILITIES OF
### THE PUBLIC INTEGRITY SECTION

A.   RESPONSIBILITY FOR LITIGATION................................................................1
    1.   Recusals by United States Attorneys' Offices ...............................1
    2.   Sensitive and Multi-District Cases ................................................2
    3.   Federal Agency Referrals...............................................................3
    4.   Requests for Assistance/Shared Cases ..........................................3

B.   SPECIAL SECTION PRIORITIES ...................................................................3
    1.   Election Crimes ..............................................................................3
    2.   Conflicts of Interest Crimes ..........................................................6

C.   LEGAL AND TECHNICAL ASSISTANCE........................................................7
    1.   Training and Advice........................................................................7
    2.   Advisor to the Integrity Committee of the Council of Inspectors General on
       Integrity and Efficiency.................................................................7
    3.   Member of the Board of Advisors of the Election Assistance Commission ..8
    4.   Legislative Activities......................................................................8
    5.   Case Supervision and General Assistance .....................................9
    6.   International Advisory Responsibilities .........................................9

## PART II

### PUBLIC INTEGRITY SECTION INDICTMENTS AND
### PROSECUTIONS IN 2012

INTRODUCTION ................................................................................10
FEDERAL JUDICIAL BRANCH........................................................11
FEDERAL LEGISLATIVE BRANCH..................................................12
FEDERAL EXECUTIVE BRANCH .....................................................14
STATE AND LOCAL GOVERNMENT ............................................... 17
FEDERAL ELECTION CRIMES .........................................................21

## PART III

## NATIONWIDE FEDERAL PROSECUTIONS OF CORRUPT PUBLIC OFFICIALS

INTRODUCTION ..................................................................................23

LIST OF TABLES.................................................................................23

TABLE I:    Nationwide Federal Prosecutions of Public Corruption
            in 2012 ................................................................. 24

TABLE II:   Progress Over the Past Two Decades:
            Nationwide Federal Prosecutions of Public Corruption...............................25

TABLE III:  Federal Public Corruption Convictions by District
            Over the Past Decade ..................................................................27

# PART I

## OPERATIONAL RESPONSIBILITIES OF
## THE PUBLIC INTEGRITY SECTION

### A.    RESPONSIBILITY FOR LITIGATION

The work of the Public Integrity Section focuses on public corruption, that is, crimes involving abuses of the public trust by government officials.  Most of the Section's resources are devoted to investigations involving alleged corruption by government officials and to prosecutions resulting from these investigations.  Decisions to undertake particular matters are made on a case-by-case basis, given Section resources, the type and seriousness of the allegation, the sufficiency of factual predication reflecting criminal conduct, and the availability of federal prosecutive theories to reach the conduct.

Cases handled by the Section generally fall into one of the following categories: recusals by United States Attorneys' Offices, sensitive cases, multi-district cases, referrals from federal agencies, and shared cases.  These categories are discussed below.

### 1.   Recusals by United States Attorneys' Offices

The vast majority of federal corruption prosecutions are handled by the local United States Attorney's Office for the geographic district where the crime occurred, a fact demonstrated by the statistical charts in Part III of this Report.  At times, however, it may be inappropriate for the local United States Attorney's Office to handle a particular corruption case.

Public corruption cases tend to raise unique problems of public perception that are generally absent in more routine criminal cases.  An investigation of alleged corruption by a government official, whether at the federal, state, or local level, or someone associated with such an official, always has the potential of becoming a high-profile case simply because its focus is on the conduct of a public official.  In addition, these cases are often politically sensitive because their ultimate targets tend to be politicians or government officials appointed by politicians.

A successful public corruption prosecution requires both the appearance and the reality of fairness and impartiality.  This means that a successful corruption case involves not just a conviction but public perception that the conviction was warranted, not the result of improper motivation by the prosecutor, and is free of conflicts of interest.  In a case in which the local conflict of interest is substantial, the local office is removed from the case by a procedure called recusal.  Recusal occurs when the local office either asks to step aside, or is asked to step aside by Department headquarters, as primary prosecutor.  Federal cases involving corruption allegations in which the conflict is substantial are

usually referred to the Public Integrity Section either for prosecution or direct operational supervision.

Allegations involving possible crimes by federal judges almost always require recusals of the local offices for significant policy as well as for practical reasons. Having the case handled outside the local offices eliminates the possible appearance of bias, as well as the practical difficulties and awkwardness that would arise if an office investigating a judge were to appear before the judge on other matters. Thus, as a matter of established Department practice, federal judicial corruption cases generally are handled by the Public Integrity Section.

Similar concerns regarding the appearance of bias also arise when the target of an investigation is a federal prosecutor, a federal investigator, or other employee assigned to work in or closely with a particular United States Attorney's Office. Thus, cases involving United States Attorneys, Assistant United States Attorneys (AUSAS), or federal investigators or employees working with AUSAs in the field generally result in a recusal of the local office. These cases are typically referred to the Public Integrity Section.

## 2. <u>Sensitive and Multi-District Cases</u>

In addition to recusals, the Public Integrity Section handles other special categories of cases. At the request of the Assistant Attorney General for the Criminal Division, the Section handles cases that are highly sensitive and cases that involve the jurisdiction of more than one United States Attorney's Office.

Cases may be sensitive for a number of reasons. Because of its importance, a particular case may require close coordination with high-level Department officials. Alternatively, the case may require substantial coordination with other federal agencies in Washington. The latter includes cases involving classified information that require careful coordination with intelligence agencies. Sensitive cases may also include those that are so politically controversial on a local level that they are most appropriately handled in Washington, DC.

In addition to sensitive cases, this category encompasses multi-district cases, that is, cases that involve allegations that cross judicial district lines and hence fall under the jurisdiction of two or more United States Attorneys' Offices. In these cases the Section is occasionally asked to coordinate the investigation among the various United States Attorneys' Offices, to handle a case jointly with one or more United States Attorney's Office, or, when appropriate, to assume operational responsibility for the entire case.

### 3. Federal Agency Referrals

In another area of major responsibility, the Section handles matters referred directly by federal agencies concerning possible federal crimes by agency employees. The Section reviews these allegations to determine whether an investigation of the matter is warranted and, ultimately, whether the matter should be prosecuted.

Agency referrals of possible employee wrongdoing are an important part of the Section's mission. The Section works closely with the Offices of Inspector General (OIGs) of the executive branch agencies, as well as with other agency investigative components, such as the Offices of Internal Affairs and the Criminal Investigative Divisions. In addition, the Section invests substantial time in training agency investigators in the statutes involved in corruption cases and the investigative approaches that work best in these cases. These referrals from the various agencies require close consultation with the referring agency's investigative component and prompt prosecutive evaluation.

### 4. Requests for Assistance/Shared Cases

The final category of cases in which the Section becomes involved is cases that are handled jointly by the Section and a United States Attorney's Office or other component of the Department. At times the available prosecutorial resources in a United States Attorney's Office may be insufficient to undertake sole responsibility for a significant corruption case. In this situation the local office may request the assistance of an experienced Section prosecutor to share responsibility for prosecuting the case. On occasion, the Section may also be asked to provide operational assistance or to assume supervisory responsibility for a case due to a partial recusal of the local office. Finally, the Public Integrity Section may be assigned to supervise or assist with a case initially assigned to another Department component.

## B.   SPECIAL SECTION PRIORITIES

In addition to the general responsibilities discussed above, in 2012 the Public Integrity Section continued its involvement in a number of additional priority areas of criminal law enforcement.

### 1. Election Crimes

One of the Section's law enforcement priorities is its supervision of the Justice Department's nationwide response to election crimes. Under the Department's ongoing Ballot Access and Voting Integrity Initiative, the prosecution of all forms of election crime is a high Departmental priority, and headquarters' oversight in this area is designed

to ensure that the Department's nationwide response to election crime matters is uniform, impartial, and effective. In 1980 the Election Crimes Branch was created within the Section to handle this supervisory responsibility. The Branch is headed by a Director, and staffed by other Section attorneys on a case-by-case basis.

The Election Crimes Branch oversees the Department's handling of all election crime allegations other than those involving federal voting rights, which are handled by the Civil Rights Division. Specifically, the Branch supervises three types of election crime cases: (1) vote frauds, such as vote buying and absentee ballot fraud; (2) campaign-financing crimes, most notably under the Federal Election Campaign Act (FECA); and (3) patronage crimes, such as political shakedowns and misuse of federal programs for political purposes. Vote frauds and campaign-financing offenses are the most significant as well as the most common types of election crimes.

The election-related work of the Section and its Election Crimes Branch falls into the following categories:

      a. <u>Consultation and Field Support</u>. Under long-established Department procedures, the Section's Election Crimes Branch reviews all major election crime investigations, including all proposed grand jury investigations and FBI full-field investigations, and all election crime charges proposed by the various United States Attorneys' Offices for legal and factual sufficiency. (United States Attorneys' Manual 9-85.210.) The Branch is also often consulted before a United States Attorney's Office opens a preliminary investigation into a vote fraud allegation, although this is not required.

In the area of campaign-financing crimes, Department procedures require consultation with headquarters before any investigation, including a preliminary investigation, is commenced by a United States Attorney's Office. U.S.A.M. 9-85-210. The increased coordination with the Section at the initial stage of a criminal investigation of a FECA matter enables the Department to coordinate with another federal agency, the Federal Election Commission, which has civil enforcement authority over FECA violations.

The Section's consultation responsibility for election matters includes providing advice to prosecutors and investigators regarding the application of federal criminal laws to vote fraud, patronage crimes, and campaign-financing crimes, and the most effective investigative techniques for particular types of election offenses. This consultation also includes supervising the Department's use of the federal conspiracy and false statements statutes (18 U.S.C. §§ 371 and 1001) to address schemes to subvert the federal campaign financing laws. In addition, the Election Crimes Branch helps draft election crime charges and other pleadings when requested.

4

The majority of the Branch's consultations are in the following two categories: vote fraud, also known as election fraud or ballot fraud; and campaign financing crimes arising under the FECA. During 2012, the Branch assisted in evaluating allegations, helping to structure investigations, and drafting charges for United States Attorneys' Offices around the country in these areas of law enforcement.

b. Litigation. Section attorneys prosecute selected election crimes, either by assuming total operational responsibility for the case or by handling the case jointly with a United States Attorney's Office or other Department component.

c. District Election Officer Program. The Branch also assists in implementing the Department's long-standing District Election Officer (DEO) Program. This Program is designed to ensure that each of the Department's 94 United States Attorneys' Offices has a trained prosecutor available to oversee the handling of election crime matters within the district and coordinate district responses with Department headquarters regarding these matters.

The DEO Program involves appointing an Assistant United States Attorney in each federal district to serve a two-year term as a DEO and providing periodic training for the DEOs in the handling of election crime and voting rights matters.

The DEO Program is also a crucial feature of the Department's nationwide Election Day Program, which takes place during the federal general elections that are held in November of even-numbered years. The Election Day Program ensures that federal prosecutors and investigators are available both at Department headquarters in Washington, DC, and in each district to receive complaints of election irregularities while the polls are open. As part of the Program, press releases are issued in Washington, DC, and in each district before the November federal elections that advise the public of the Department's enforcement interests in deterring and prosecuting election crimes and protecting voting rights. The press releases also provide contact information for the DEOs, local FBI officials, and Department officials in the Criminal and Civil Rights Divisions at headquarters who may be contacted on election day by members of the public who have complaints of possible vote fraud or voting rights violations.

d. Ballot Access and Voting Integrity Initiative. During 2012, the Public Integrity Section continued to assist in the implementation of the Department's Ballot Access and Voting Integrity Initiative. This ongoing law enforcement initiative was established in 2002 to enhance the Department's criminal and civil rights enforcement efforts against vote fraud and voting rights violations. The initiative includes annual training for the Assistant United States Attorneys serving as DEOs and pre-election coordination by each United States Attorney's Office with state law enforcement and election officials before the federal general elections regarding the handling of election crime matters in their respective districts.

In August 2012, the Director of the Election Crimes Branch and senior attorneys from the Civil Rights Division filmed updated video presentations for the Department's election crimes and voting rights training program. The filming was hosted and produced by the Department's National Advocacy Center in Columbia, South Carolina, and the videos were made available to Department personnel. Topics addressed by the panels included the types of conduct prosecutable as federal election crimes, the federal statutes available to prosecute vote fraud and campaign-financing offenses, the federal voting rights statutes and their enforcement, recent discovery and ethics issues, and updates on campaign-financing and voting rights cases.

e. Inter-Agency Liaison with the Federal Election Commission. The Election Crimes Branch is the formal liaison between the Justice Department and the Federal Election Commission (FEC), an independent federal agency that shares enforcement jurisdiction with the Department over willful violations of the Federal Election Campaign Act (FECA). The FEC has exclusive civil jurisdiction over all FECA violations, while the Department has exclusive criminal jurisdiction over FECA crimes.

f. Inter-Agency Liaison with the Office of Special Counsel. The Branch also serves as the Department's point of contact with the United States Office of Special Counsel (OSC). The OSC has jurisdiction over noncriminal violations of the Hatch Act, 5 U.S.C. §§ 7321-7326, §§ 1501-1508, which may also involve criminal patronage crimes that are within the Department's jurisdiction.

## 2.   Conflicts of Interest Crimes

"Conflicts of interest" is a wide-ranging and complex area of law, with many layers of administrative and oversight responsibility. Moreover, the federal criminal conflicts of interest laws overlap to some extent with the sometimes broader ethics restrictions imposed by civil statutes, agency standards of conduct, Presidential orders, and, in the case of attorneys, bar association codes of conduct.

The Public Integrity Section's work in the conflicts area falls into the following categories:

a. Criminal Referrals from Federal Agencies and Recusals. The Section's criminal enforcement role comes into play with respect to a narrow group of conflicts of interest matters, namely, those that involve possible misconduct proscribed by one of the federal conflicts of interest statutes, 18 U.S.C. §§ 203-209. These crimes are prosecuted either by a United States Attorney's Office or by the Public Integrity Section. Conflicts of interest matters are often referred to the Section by the various federal agencies. If investigation of a referral is warranted, the Section coordinates the investigation with the Inspector General for the agency concerned, the FBI, or both. If prosecution is warranted, the Section prosecutes the case. If a civil remedy may be appropriate in lieu

of criminal prosecution, the Section or the Inspector General may refer the case to the Civil Division of the Department of Justice for its review.  On occasion the Section is also asked to handle recusals and special assignments regarding conflicts matters.

        b. Coordination.  The Public Integrity Section works with the United States Office of Government Ethics (OGE) in order to coordinate conflicts of interest issues with OGE and other executive branch agencies and offices.  The purpose of this coordination is to ensure that the overall legislative and enforcement efforts in this area are both complementary and consistent.  OGE has broad jurisdiction over noncriminal conduct by executive branch personnel, as well as the authority to provide guidance concerning the coverage of the federal criminal conflicts of interest statutes.  The Section's coordination with OGE ensures that consistent guidance is provided with respect to the overlapping criminal, civil, and administrative interests implicated by the statutory and regulatory restrictions on federal personnel.

## C.    LEGAL AND TECHNICAL ASSISTANCE

### 1.  Training and Advice

    The Public Integrity Section is staffed with specialists who have considerable experience investigating and prosecuting corruption cases.  Section attorneys participate in a wide range of formal training events for federal prosecutors and investigators.  They are also available to provide informal advice on investigative methods, charging decisions, and trial strategy in specific cases.

    The Section also conducts the annual public corruption seminar at the National Advocacy Center.  Speakers at this seminar typically include both the Section's senior prosecutors and Assistant United States Attorneys from the field who have handled significant corruption cases.  The seminars provide training for federal prosecutors and FBI agents regarding the statutes most commonly used in corruption cases, guidance in the use of the complex and difficult investigative techniques necessary to investigate government corruption, and advice from experienced prosecutors on conducting corruption trials.

### 2.  Advisor to the Integrity Committee of the Council of Inspectors General on Integrity and Efficiency

    Pursuant to the Inspector General Reform Act of 2008, Pub. L. No. 110-409, 122 Stat. 4302 (Oct. 14, 2008), the Public Integrity Section serves as a legal advisor to the Integrity Committee of the Council of Inspectors General on Integrity and Efficiency (CIGIE).  The CIGIE is a body composed of the Inspectors General of the various agencies of the executive branch of the federal government.  The Integrity Committee of

the CIGIE is charged with handling allegations against Inspectors General and senior members of their staff.

In addition, the Integrity Committee is charged with establishing policies and procedures to ensure consistency in conducting administrative investigations. The Committee's procedures, drafted with the assistance of the Public Integrity Section, provide a framework for the investigative function of the Committee. Allegations of wrongdoing by Inspectors General and their senior staff are initially reviewed by the Public Integrity Section for potential criminal prosecution. In noncriminal matters, the procedures guide the Committee's discretion to investigate the alleged misconduct and to report on its findings. The Public Integrity Section also advises the Integrity Committee on matters of law and policy relating to its investigations.

### 3.   Member of the Board of Advisors of the Election Assistance Commission

Pursuant to the Help America Vote Act of 2002 (HAVA), the Chief of the Public Integrity Section, or his or her designee, is a member of the Board of Advisors of the Election Assistance Commission (EAC). 42 U.S.C. §15344(a)(12). The Commission was created to serve as a national clearinghouse for information and procedures relating to the administration of federal elections and is responsible for adopting voluntary voting system guidelines, testing and certification of voting system hardware and software, conducting studies regarding the effective administration of elections, and training on the management of federal grants to the states under HAVA. The Director the Section's Election Crimes Branch serves by statutory designation of the Chief as a Member of the Board of Advisors to the EAC. The activities of the Board, however, were suspended in 2012 due to the absence of a quorum of Commissioners.

### 4.   Legislative Activities

An important responsibility of the Public Integrity Section is the review of proposed legislation that may affect, directly or indirectly, the investigation and prosecution of public officials and those who seek to corrupt these officials. The Section is often called upon to comment on legislation proposed by Congress, by the Administration, or by other departments of the executive branch; to draft or review testimony for congressional hearings; and to respond to congressional inquiries concerning legislative proposals. On occasion, the Section drafts legislative proposals relating to various corruption matters. For example, in 2012 the Section drafted, reviewed, and commented on a number of legislative proposals addressing public corruption. During the year, the Section also commented on proposed legislation on the topics of ethics in government, legislative transparency and accountability, jurisdiction over American Samoa, federal advisory committees, and bribery statutory coverage, among other subjects.

### 5.  Case Supervision and General Assistance

Public corruption cases are often controversial, complex, and highly visible. These factors may warrant Departmental supervision and review of a particular case. On occasion Section attorneys are called upon to conduct a careful review of a sensitive public corruption case, evaluating the quality of the investigative work and the adequacy of any proposed indictments. Based on its experience in this area, the Section can often identify tactical or evidentiary problems early on and either provide needed assistance or, if necessary, assume operational responsibility for the prosecution.

The Section also has considerable expertise in the supervision of the use of undercover operations in serious corruption cases. The Section serves on the FBI's Criminal Undercover Operations Review Committee. A number of the Section's senior prosecutors have experience in the practical and legal problems involved in such operations and have the expertise to employ this sensitive investigative technique effectively and to advise law enforcement personnel on its use.

### 6.  International Advisory Responsibilities

The Public Integrity Section actively participates in the area of international law enforcement. The Section regularly provides briefings and training on United States public corruption issues to visiting foreign delegations and continues the efforts of the United States to assist foreign countries in their quest to combat public corruption and election crime in their respective countries. This assistance includes participation in international proceedings and coordination with other components of the Justice Department and the State Department on the Administration's positions in this area.

Section experts continue to address visiting foreign officials in investigations and prosecutions of public corruption. These presentations are generally conducted under the auspices of the State Department's Foreign Visitor Program and the Justice Department's Office of Overseas Prosecutorial Development Assistance and Training. During 2012, the Section made presentations to officials from Afghanistan, Algeria, Bahrain, Bangladesh, Brazil, Bulgaria, Burma, Croatia, the Czech Republic, Denmark, India, Iraq, Jamaica, Kuwait, Lithuania, Macedonia, Malaysia, Montenegro, Morocco, Nepal, Pakistan, Palestinian Territories, the Philippines, Qatar, Romania, Saudi Arabia, Senegal, Serbia, Sri Lanka, Sudan, Turkey, Ukraine, and Vietnam.

PART II

PUBLIC INTEGRITY SECTION
INDICTMENTS AND PROSECUTIONS
IN 2012

INTRODUCTION

As described in Part I, the Public Integrity Section's role in the prosecution of public corruption cases ranges from sole operational responsibility for the entire case to approving an indictment or to providing advice on the drafting of charges. Part II of the Report provides examples of noteworthy public corruption cases for which the Section had either sole or shared operational responsibility during 2012.

In 2012, the Section continued its substantial increase in trial work, obtaining trial convictions against 11 defendants in cases across the country, including the District of Columbia, Georgia, Kentucky, Puerto Rico, and West Virginia.

The descriptions of the Section's significant cases for calendar year 2012 are separated into categories, based on the branch or level of government affected by the corruption. Election crime cases are grouped separately. Unrelated cases in each category are separated by triple lines. When a conviction but not a sentencing took place in 2012, the sentencing will be reported in a later year's report.

## FEDERAL JUDICIAL BRANCH

The Public Integrity Section has sole responsibility for the investigation and prosecution of federal judges due to the potential appearance issues that might arise if a local United States Attorney's Office were to investigate an allegation of wrongdoing by a judge before whom that United States Attorney's Office appears on a regular basis. The investigation of allegations of criminal wrongdoing in the federal judicial branch is a very sensitive matter. These investigations may involve intrusions into pending federal cases, cooperation from parties or witnesses who are appearing before the court, or potential disruption of the normal judicial process. In addition, the Section must coordinate closely with supervisory judges and the Administrative Office of United States Courts to facilitate the assignment of magistrates and judges from outside of the judicial district to handle requests during the investigation, such as grand jury supervision, or applications for warrants or electronic surveillance. The Public Integrity Section has developed substantial experience and expertise in these matters over the years. During 2012, the Section brought no cases involving the federal judicial branch.

11

## FEDERAL LEGISLATIVE BRANCH

The Public Integrity Section plays a central role in the effort to combat corruption in the federal legislative branch. These cases raise unique issues of inter-branch comity, and they are always sensitive given the high-profile stature of elected officials. The Section has developed substantial expertise regarding the unique protections provided to Members of Congress and their staff by the Speech or Debate Clause set forth in Article I of the Constitution, and has worked closely and effectively with House and Senate counsel and the Ethics Committees in both houses. In addition to handling its own cases, the Section routinely provides advice and guidance to prosecutors across the country regarding these sensitive investigations. During 2012, the Section handled a number of cases involving legislative branch corruption, which are described below.

### United States v. Hampton, District of Columbia

On June 7, 2012, Doug Hampton pled guilty to violating post-employment lobbying restrictions for former senate staff members. Hampton admitted that he knew and understood that he was prohibited from lobbying any Senator or Senate employee for a period of one year after termination of his employment as a senior staffer for former Senator John Ensign. Hampton lobbied Senator Ensign on behalf of a private client days after resigning from his position on Ensign's staff. On September 5, 2012, Hampton was sentenced to one year of probation.

### United States v. Lagona, Western District of New York

On December 18, 2012, James F. Lagona pled guilty to one count of obstruction of justice in connection with a scheme in which Lagona offered to support the election campaign of U.S. Representative Kathy Hochul, who was the spouse of the U.S. Attorney for the Western District of New York, if, in return, the U.S. Attorney would drop a fraud case pending against Lagona prior to sentencing.

During his plea proceeding, Lagona admitted to obtaining a private meeting on November 2, 2012 with a campaign staffer working for Representative Hochul, who was then involved in a close re-election race. Lagona identified himself as a clergyman and

claimed he had been involved in discussions with Representative Hochul's election opponent. Lagona offered to support Representative Hochul if her husband dismissed the criminal case against him. The staffer reported this to the FBI, and under their supervision, recorded a second meeting with Lagona in which he repeated his proposal. The investigation revealed no evidence that any member of the opposing party ever considered using Lagona during the campaign.

---

### United States v. Tomsha-Miguel, Eastern District of California

On May 24, 2012, Susan Tomsha-Miguel was charged with impersonation of an officer or employee of the United States Congress. According to the indictment, Tomsha-Miguel operated a tax-consulting and bookkeeping business. She contacted the office of U.S. Representative Dennis Cardoza on behalf of a client who needed help resolving a tax dispute with the IRS. Representative Cardoza's office agreed to help, and sent paperwork to Tomsha-Miguel on the congressman's official letterhead. Tomsha-Miguel allegedly prepared a counterfeit letter by copying Representative Cardoza's official letterhead onto a blank sheet of paper. According to the indictment, the letter purported to come from an aide in Representative Cardoza's office, claiming that Tomsha-Miguel had persuaded him to take up the tax dispute with the IRS. Tomsha-Miguel allegedly sent this letter to her client to mislead him into believing his tax problems were going to be resolved.

## FEDERAL EXECUTIVE BRANCH

The Public Integrity Section frequently receives allegations of corruption in the executive branch from federal law enforcement agencies, including the FBI, the Inspectors General for the various departments and agencies, and United States military investigators. These matters involve a careful balancing of the requirements of a criminal investigation and the operational needs of the executive offices involved. During 2012, the Section handled a number of cases involving executive branch corruption, several of which are described below.

### United States v. Evick and Martin, Northern District of West Virginia

On June 25, 2012, Richard Evick and Crystal Martin were convicted for their roles in a bribery and money laundering scheme involving defense contracts awarded in support of Operation Iraqi Freedom. U.S. Army Sergeant First Class Richard Evick was found guilty of one count of conspiracy to commit bribery, two counts of bribery, one count of money laundering conspiracy, and four counts of money laundering. Crystal Martin was found guilty of one count of conspiracy to commit bribery, one count of money laundering conspiracy, and four counts of money laundering.

Evidence presented at trial established that Evick served as the Army's Non-Commissioned Officer in charge of contracting at Camp Arifjan in Kuwait between 2005 and 2006. He had the authority to arrange for the award of valuable contracts for such things as supplying the U.S. military with bottled water, catering services, maintaining Army barracks, and installing security barriers. The evidence further demonstrated that Evick and his co-conspirators, former Army Majors James Momon and Chris Murray, manipulated the contracting process to steer nearly $24 million in contracting business to certain contractors. In exchange for his participation, Evick received over $170,000 in bribes, a trip to Dubai, and invitations to various parties.

According to the evidence, Evick gave much of the bribe money to Crystal Martin, who had a concession from the Army and Air Force Exchange Service to sell merchandise at Camp Arifjan, a primarily cash business. Evidence showed that Evick and Martin converted the bribe money into Western Union wires, money orders, cashier's checks, and personal checks in order to conceal its origins. They also smuggled cash into

14

the United States on their persons.   Momon testified that Evick and Martin also participated in a scheme to help smuggle $250,000 of Momon's bribe money into the United States.   Among other things, Evick used his bribe money to purchase a pickup truck, and to purchase and construct a residence on three and a half acres in Parsons, West Virginia.

## United States v. Guerrero, Flores, Rivera, Cantu, and Rojas, Southern District of Texas

On December 13, 2012, former U.S. Customs and Border Protection (CBP) officer Juan Carlos Guerrero, his girlfriend, and two of their associates pled guilty for their participation in multi-year bribery and alien smuggling activities along the United States/Mexico Border.   Guerrero pled guilty to one count each of bribery, conspiracy to commit bribery, and alien smuggling conspiracy.   Claudia Flores, Maribel Rivera, and Rodolfo Caballero Rojas each pled guilty to one count of conspiracy to commit bribery and alien smuggling.   On July 24, 2012, Guerrero's nephew, Jose Cantu, pled guilty to conspiracy to commit bribery, alien smuggling, and a separate drug smuggling conspiracy.

The defendants were indicted on October 5, 2012.   According to court documents, between approximately January 2009 and approximately May 2011, Guerrero and Flores organized a bribery and alien smuggling operation in which they and other co-conspirators arranged for undocumented aliens to be smuggled from Mexico into the United States through Guerrero's inspection lanes at the ports of entry to which he was stationed.   In return, he received bribes ranging from $500 to $3000 per undocumented alien.   Guerrero admitted that he organized and directed approximately 80 to 150 different smuggling events, and Flores admitted to helping Guerrero with approximately 50 to 75 illegal crossings.   In total, Guerrero's scheme permitted approximately 80 to 165 undocumented aliens to gain illegal entry into the United States.

## United States v. Lustyik, Taylor, and Thaler, Utah

On October 18, 2012, former FBI Special Agent Robert Lustyik, Jr., Michael L. Taylor, and Johannes W. Thaler, were charged by indictment with one count of conspiracy, eight counts of fraud, one count of obstruction of justice, and one count of obstructing an agency proceeding.   According to the indictment, while active with the FBI, Lustyik used his position in an attempt to stave off a criminal investigation of a business partner with whom he was pursuing lucrative security and energy contracts.

Lustyik allegedly used childhood friend Johannes Thaler as a conduit to pass information and things of value between Taylor and himself.

According to the indictment, Taylor offered Lustyik $200,000 in cash and a share of the proceeds from several anticipated contracts. In exchange, Lustyik allegedly used his position in the FBI to impair and impede a criminal investigation into whether Taylor, his business, and others committed fraud in the award and performance of a contract with the U.S. Department of Defense. To this end, Lustyik allegedly designated Taylor as an FBI confidential source, texted and called the investigators and prosecutors to dissuade them from charging Taylor, and attempted to interview potential witnesses and targets of the investigation. The indictment also alleges that the three defendants attempted to conceal the extent of Lustyik's relationship with Taylor, by making and planning to make material representations and omissions to the investigators.

**United States v. Aves, Castro, Bibb, Torres-Alvarez, Escobar, and Garcia**, Western District of Texas

In 2011, six current and former members of the U.S. military were charged in a 41-count indictment in San Antonio, Texas. The charges arose from a conspiracy by the defendants to fraudulently receive recruiting bonuses offered by the U.S. Army, U.S. Army Reserves, and National Guard as part of their recruiting programs between 2005 and 2008. The defendants received approximately $244,000 in fraudulently-obtained recruiting bonuses, which they split among themselves. One of the defendants pled guilty in 2011, and the remaining five defendants pled guilty in 2012.

## STATE AND LOCAL GOVERNMENT

The Public Integrity Section plays a major role in combating corruption at all levels of government, including corruption relating to state or local public officials. The following are examples of corruption cases handled by the Section involving state and local officials in 2012.

### Operation Guard Shack, Puerto Rico

Guard Shack was the code name for an undercover operation conducted by the FBI in 2009 and 2010, in which law enforcement officers in Puerto Rico took money in exchange for providing armed security at what they believed to be cocaine deals. On October 6, 2010, an indictment was unsealed in the District of Puerto Rico, charging 90 law enforcement officers and 44 other individuals for their participation in these transactions. The U.S. Attorney's Office for the District of Puerto Rico and the Public Integrity Section jointly litigated the cases arising from this indictment. Between indictment and December 31, 2012, the Public Integrity Section secured the guilty pleas of 15 Operation Guard Shack defendants. In 2012, the Section also handled the following Operation Guard Shack trials.

### United States v. Hernandez-Soto

On March 21, 2012, Arcadio Hernandez-Soto was convicted of three counts of conspiracy to possess cocaine with intent to distribute, four counts of possession of cocaine with intent to distribute, and four counts of possession of a firearm in furtherance of a drug transaction. According to the evidence presented in court, Hernandez-Soto was employed by the San Juan Police Department when he provided security for what he believed to be illegal cocaine deals on May 8, 2009; June 4, 2009; July 23, 2009; and July 13, 2010. However, each of these deals was in fact part of Operation Guard Shack. In exchange for providing security, including frisking the purported buyer, Hernandez-Soto received cash payments of $2000 to $3000 per transaction.

17

<u>United States v. Rivera Ruperto, Gonzalez Miranda, Nieves-Velez, and Bermudez</u>
<u>Quinones</u>

On April 2, 2012, three men were convicted for their roles in providing security for a number of Operation Guard Shack drug transactions. Wendell Rivera Ruperto, a private citizen posing as a law enforcement officer, was convicted for his involvement in five cocaine transactions. Bernis Gonzalez Miranda, a former officer with the Puerto Rico Department of Corrections, was convicted for his participation in three transactions. Jose Nieves-Velez was convicted for his involvement in the sole transaction for which he provided armed security. On February 2, 2012, Jose Bermudez Quinones pled guilty to his participation in one of the transactions for which Rivera Ruperto was also convicted.

<u>United States v. Navedo Ramirez</u>

On May 14, 2012, Yamil Navedo Ramirez, a 19-year veteran of the Police of Puerto Rico, was convicted of one count of attempted possession of cocaine with intent to distribute, and one count of possession of a firearm in furtherance of a drug transaction. Evidence presented at trial showed that Navedo Ramirez received $2000 for providing armed security, along with Wendell Rivera Ruperto and another individual, for a Guard Shack transaction on April 14, 2010. On November 16, 2012, Navedo Ramirez was sentenced to 181 months in prison.

**<u>United States v. Clark and Stephenson</u>, Eastern District of Virginia**

Former Virginia state magistrate Deborah Clark and bail bondsman Ulysses Stephenson pled guilty to charges of bribery. Documents filed with the court showed that from 2009 to 2012, Deborah Clark accepted bribes of cash and gifts from Stephenson in exchange for referring arrestees to him as potential clients and accepting his advice on the amount of bond to set. Clark pled in May 2012 and was sentenced in October 2012 to 12 months in prison. Stephenson pled in July 2012 and was sentenced in November 2012 to 30 months in prison.

**<u>United States v. Miranda</u> and <u>United States v. Arredondo</u>, Arizona**

On March 14, 2012, former Arizona State Senator Richard Miranda pled guilty to wire fraud and tax evasion. According to documents filed with the court, Miranda was the executive director of Centro Adelante Campesino, Inc., a charity that provides aid to the needy of Maricopa County, Arizona. Furthermore, from 2005 to 2007, Miranda

18

wound down the charity and sold its real estate, then used the proceeds of that sale for personal expenses. On June 4, 2012, Miranda was sentenced to 27 months in prison.

On May 16, 2012, former Arizona State Representative Paul Ben Arredondo was charged by a grand jury in the District of Arizona with bribery, fraud, attempted extortion, and false statements. According to the indictment, Arredondo received over $6000 in tickets to sporting and other special events while serving on the City Council for Tempe, Arizona, and later as a member-elect of the Arizona House. On October 5, 2012, Arredondo pled guilty to fraud and bribery charges; as of December 31, 2012, Arredondo was awaiting sentencing.

## Kimberly, Alabama Bribery Conspiracy, Northern District of Alabama

In 2012, six individuals pled guilty to charges brought in connection with their involvement in a conspiracy to expand, protect, and conceal an illegal gambling business operating at multiple locations in and around Kimberly, Alabama. The conspirators bribed the mayor of Kimberly, Alabama, who unknown to them was cooperating with the FBI, to keep law enforcement officials from investigating the buildings in which their illegal gambling business was operating.

On March 15, 2012, Daniel Stone was charged by information and pled guilty to one count of conspiracy for his role in planning and operating the illegal gambling business. On May 2, 2012, Robert Taylor was charged by a grand jury with one count of each of conspiracy, bribery, and operating an illegal gambling business; on August 20, 2012, Robert Taylor pled guilty to the charges in the indictment. On May 7, 2012, John Lynwood Taylor, Carl Scoggins, and Christopher Adam McGraw were charged by information and pled guilty to one count of conspiracy. On May 17, 2012, Kyle Sloan was charged by information and pled guilty to one count of conspiracy and operating an illegal business for his part in renting one of the locations used by the illegal gambling operation. As of December 31, 2012, all six individuals were awaiting sentencing.

## United States v. Derricks, Northern District of Texas

On October 25, 2012, Nichelle Derricks was indicted on charges of wire fraud and bribery. Derricks is a Texas Department of Criminal Justice parole officer alleged to have received cash and gifts from one of her parolees in exchange for permitting him to violate the conditions of his parole. According to the indictment, this favorable treatment allowed the parolee to facilitate a massive scheme to defraud investors in an oil and gas

company the parolee owned and operated while on parole. As of December 31, 2012, Derricks's trial was pending in the Northern District of Texas.

## United States v. Solofa, District of Columbia

On January 6, 2012, Paul Solofa was convicted of witness tampering and obstruction of justice in connection with his efforts to obstruct a federal investigation into a bribery scheme. Recordings presented at trial showed that Solofa, who at the time was the chief financial officer of the Department of Education for the government of the U.S. Territory of American Samoa, told a school bus parts vendor under federal investigation how to respond when questioned by an agent. Solofa was also recorded suggesting the vendor burn documents he did not want to produce in response to a federal grand jury subpoena. On June 8, 2012, Solofa was sentenced to 35 months in prison.

## United States v. Munsell and Solis, Southern District of Texas

On November 6, 2012, Jason Michael Munsell and Nazario Solis III pled guilty to their roles in a bribery and extortion conspiracy in Starr County, Texas. Munsell and Solis were deputy sheriffs in Starr County when they entered into a conspiracy with a local businessman running an illegal gambling operation, in which the two deputies received $1500 in cash payments for protecting and giving advance notice of a planned raid on the illegal gambling operation. In addition to the conspiracy and extortion charges, Solis also pled to one count of conspiracy to possess with intent to distribute 28.5 kilograms of marijuana. As of December 31, 2012, both defendants were awaiting sentencing.

## FEDERAL ELECTION CRIMES

As described in Part I, during 2012 the Public Integrity Section continued its nationwide oversight of the handling of election crime investigations and prosecutions.

Set forth below are examples of the Section's 2012 casework in this area.

### United States v. Mobley and Hohl, Middle District of Florida

On September 27, 2012, Timothy Mobley pled guilty to making illegal conduit and illegal corporate campaign contributions, and Timothy Hohl pled guilty to three counts of aiding and abetting those illegal contributions. At the plea hearing, Mobley admitted that from 2006 to 2008, he made campaign contributions in excess of the limits established by the Federal Election Campaign Act by recruiting his employees to make contributions in their own names and later reimbursing them for their contributions. Furthermore, Mobley admitted reimbursing these contributions with corporate funds, and attempting to disguise reimbursements as bonuses or advances. All told, Mobley admitted to reimbursing a total of $10,000 in contributions to the Republican Party of Florida, and over $84,000 in contributions to the campaign of an unnamed federal elected official.

During Timothy Hohl's plea hearing, he admitted that while working as an accountant for Mobley and his business entities from 2006 to 2008, he aided and abetted Mobley's scheme to make the illegal excessive contributions. Hohl further admitted that he helped Mobley reimburse other conduits, and that he sought and accepted reimbursement for his own contributions and those of his wife.

### United States v. Whittemore, Nevada

On June 6, 2012, Harvey Whittemore was indicted on charges of making excessive and illegal campaign contributions to a member of Congress, and making false statements to two federal agencies. According to the indictment, Whittemore used family members and employees as conduits to funnel his illegal contributions to the campaign

committee of an elected member of Congress. After these family members and employees made their contributions as requested, Whittemore allegedly reimbursed them with personal checks and wire transfers. For some reimbursements, Whittemore allegedly attempted to disguise them as bonus payments. As further alleged in the indictment, Whittemore attempted to conceal his crimes by causing false reports to be filed with the Federal Election Commission, and by making false statements when interviewed by the FBI.

## Breathitt County, Kentucky Vote-Buying, Eastern District of Kentucky

Arch Turner was the school superintendent in Breathitt County, Kentucky. An investigation into vote-buying in the May 2010 primary election showed that Turner organized and managed a scheme to pay voters to cast ballots in favor of state candidates Turner backed. In addition to organizing the scheme, Turner also provided much of the money used to pay voters. As a result of the investigation, seven defendants pled guilty. Paula Noble, George Daniel Strong, Joseph Strong, Richard L. Turner, co-conspirators in the vote-buying scheme, were charged by indictment in 2011. On April 12, 2012, George Daniel Strong, Joseph Strong, and Richard Turner pled guilty. On May 24, 2012, Paula Noble also pled guilty. Arch Turner and co-conspirator John L. Turner were charged by indictment on April 17, 2012; John L. Turner pled guilty on June 13, 2012, and Arch Turner pled guilty on July 24, 2012. Darrell Raleigh, another co-conspirator, was charged by information and pled guilty on June 14, 2012. All defendants were sentenced in 2012.

## US v. Salyers, Young, Johnson, and Jennings, Eastern District of Kentucky

Michael Salyers, Earl Young, Naomi Johnson, and Jackie Jennings were indicted in the Eastern District of Kentucky on a vote-buying scheme in late 2011. Salyers, who was running for office, pled guilty on February 8, 2012, pursuant to a plea agreement in which he admitted paying voters to vote for him in the election. Young, Johnson, and Jennings were scheduled for trial in April 2012 for their roles in the scheme, which involved recruiting residents to sell their votes and assisting them in getting to the polls to vote. Jennings pled to the indictment on April 9, 2012, the morning of jury selection. Young and Johnson proceeded to trial as scheduled, and on April 11, 2012, they were each convicted of one count of conspiracy to commit vote buying and one count of vote buying. On May 24, 2012, Salyers was sentenced to 60 days in prison. On July 26, 2012, Jennings and Young were sentenced to three months in prison, and Johnson was sentenced to four months in prison.

## PART III

## NATIONWIDE FEDERAL PROSECUTIONS
## OF CORRUPT PUBLIC OFFICIALS

### INTRODUCTION

The tables in this section of the Report reflect data that is compiled from annual nationwide surveys of the United States Attorneys' Offices and from the Public Integrity Section.

As discussed in Part I, most corruption cases are handled by the local United States Attorney's Office in the district where the crime occurred. However, on occasion outside prosecutors are asked either to assist the local office on a corruption case, or to handle the case entirely as a result of recusal of the local office due to a possible conflict of interest. The figures in Tables I through III include all public corruption prosecutions within each district including cases handled by the United States Attorneys' Offices and the Public Integrity Section.*

### LIST OF TABLES

TABLE I:       Nationwide Federal Prosecutions of
               Public Corruption in 2012

TABLE II:      Progress Over the Past Two Decades:
               Nationwide Federal Prosecutions of
               Public Corruption

TABLE III:     Federal Public Corruption Convictions by District
               Over the Past Decade

*Prior to 2012, Tables I through III included cases only from the United States Attorneys' Offices.

TABLE I

## NATIONWIDE FEDERAL PROSECUTIONS OF PUBLIC CORRUPTION IN 2012

| Federal Officials | |
|---|---|
| Charged | 381 |
| Convicted | 369 |
| Awaiting Trial | 108 |

| State Officials | |
|---|---|
| Charged | 100 |
| Convicted | 78 |
| Awaiting Trial | 68 |

| Local Officials | |
|---|---|
| Charged | 319 |
| Convicted | 295 |
| Awaiting Trial | 135 |

| Others Involved | |
|---|---|
| Charged | 278 |
| Convicted | 318 |
| Awaiting Trial | 144 |

| Totals | |
|---|---|
| Charged | 1,078 |
| Convicted | 1,060 |
| Awaiting Trial | 455 |

TABLE II

PROGRESS OVER THE LAST TWO DECADES:
FEDERAL PROSECUTIONS
OF PUBLIC CORRUPTION

| | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|---|---|---|---|---|---|
| **FEDERAL OFFICIALS** | | | | | | | | | | |
| Charged | 627 | 571 | 527 | 456 | 459 | 442 | 480 | 441 | 502 | 478 |
| Convicted | 595 | 488 | 438 | 459 | 392 | 414 | 460 | 422 | 414 | 429 |
| Awaiting Trial as of 12/31 | 133 | 124 | 120 | 64 | 83 | 85 | 101 | 92 | 131 | 119 |
| **STATE OFFICIALS** | | | | | | | | | | |
| Charged | 113 | 99 | 61 | 109 | 51 | 91 | 115 | 92 | 95 | 110 |
| Convicted | 133 | 97 | 61 | 83 | 49 | 58 | 80 | 91 | 61 | 132 |
| Awaiting Trial as of 12/31 | 39 | 17 | 23 | 40 | 20 | 37 | 44 | 37 | 75 | 50 |
| **LOCAL OFFICIALS** | | | | | | | | | | |
| Charged | 309 | 248 | 236 | 219 | 255 | 277 | 237 | 211 | 224 | 299 |
| Convicted | 272 | 202 | 191 | 190 | 169 | 264 | 219 | 183 | 184 | 262 |
| Awaiting Trial as of 12/31 | 132 | 96 | 89 | 60 | 118 | 90 | 95 | 89 | 110 | 118 |
| **PRIVATE CITIZENS INVOLVED IN PUBLIC CORRUPTION OFFENSES** | | | | | | | | | | |
| Charged | 322 | 247 | 227 | 200 | 292 | 364 | 302 | 256 | 266 | 249 |
| Convicted | 362 | 182 | 188 | 170 | 243 | 278 | 306 | 242 | 261 | 188 |
| Awaiting Trial as of 12/31 | 99 | 95 | 91 | 80 | 106 | 128 | 89 | 109 | 121 | 126 |
| **TOTALS** | | | | | | | | | | |
| Charged | 1,371 | 1,165 | 1,051 | 984 | 1,057 | 1,174 | 1,134 | 1,000 | 1,087 | 1,136 |
| Convicted | 1,362 | 969 | 878 | 902 | 853 | 1,014 | 1,065 | 938 | 920 | 1,011 |
| Awaiting Trial as of 12/31 | 403 | 332 | 323 | 244 | 327 | 340 | 329 | 327 | 437 | 413 |

TABLE II (continued)

| | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **FEDERAL OFFICIALS** | | | | | | | | | | | |
| Charged | 479 | 424 | 445 | 463 | 426 | 518 | 425 | 422 | 412 | 381 | 9,378 |
| Convicted | 421 | 381 | 390 | 407 | 405 | 458 | 426 | 397 | 392 | 369 | 8,557 |
| Awaiting Trial as of 12/31 | 129 | 98 | 118 | 112 | 116 | 117 | 107 | 103 | 110 | 108 | ✕ |
| **STATE OFFICIALS** | | | | | | | | | | | |
| Charged | 94 | 111 | 96 | 101 | 128 | 144 | 93 | 168 | 93 | 100 | 2,064 |
| Convicted | 87 | 81 | 94 | 116 | 85 | 123 | 102 | 108 | 143 | 78 | 1,862 |
| Awaiting Trial as of 12/31 | 38 | 48 | 51 | 38 | 65 | 61 | 57 | 105 | 41 | 68 | ✕ |
| **LOCAL OFFICIALS** | | | | | | | | | | | |
| Charged | 259 | 268 | 309 | 291 | 284 | 287 | 270 | 296 | 282 | 319 | 5,380 |
| Convicted | 119 | 252 | 232 | 241 | 275 | 246 | 257 | 280 | 276 | 295 | 4,609 |
| Awaiting Trial as of 12/31 | 106 | 105 | 148 | 141 | 127 | 127 | 148 | 146 | 127 | 135 | ✕ |
| **PRIVATE CITIZENS INVOLVED IN PUBLIC CORRUPTION OFFENSES** | | | | | | | | | | | |
| Charged | 318 | 410 | 313 | 295 | 303 | 355 | 294 | 298 | 295 | 278 | 5,884 |
| Convicted | 241 | 306 | 311 | 266 | 249 | 302 | 276 | 251 | 296 | 318 | 5,236 |
| Awaiting Trial as of 12/31 | 139 | 168 | 136 | 148 | 179 | 184 | 161 | 200 | 191 | 144 | ✕ |
| **TOTALS** | | | | | | | | | | | |
| Charged | 1,150 | 1,213 | 1,163 | 1,150 | 1,141 | 1,304 | 1,082 | 1,184 | 1,082 | 1,078 | 22,706 |
| Convicted | 868 | 1,020 | 1,027 | 1,030 | 1,014 | 1,129 | 1,061 | 1,036 | 1,107 | 1,060 | 20,264 |
| Awaiting Trial as of 12/31 | 412 | 419 | 453 | 439 | 487 | 489 | 473 | 554 | 469 | 455 | ✕ |

TABLE III

## FEDERAL PUBLIC CORRUPTION CONVICTIONS
## BY DISTRICT OVER THE PAST DECADE

| U.S. Attorney's Office | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Alabama, Middle | 6 | 7 | 9 | 11 | 8 | 3 | 5 | 1 | 9 | 8 | 67 |
| Alabama, Northern | 6 | 4 | 17 | 33 | 39 | 17 | 18 | 11 | 14 | 13 | 172 |
| Alabama, Southern | 2 | 2 | 0 | 7 | 5 | 0 | 5 | 3 | 0 | 1 | 25 |
| Alaska | 0 | 0 | 1 | 3 | 15 | 8 | 1 | 9 | 4 | 4 | 45 |
| Arizona | 10 | 9 | 48 | 16 | 32 | 20 | 19 | 16 | 18 | 34 | 222 |
| Arkansas, Eastern | 18 | 18 | 4 | 8 | 8 | 4 | 2 | 11 | 7 | 12 | 92 |
| Arkansas, Western | 1 | 0 | 0 | 2 | 0 | 1 | 1 | 6 | 1 | 3 | 15 |
| California, Central | 45 | 22 | 42 | 36 | 55 | 41 | 43 | 29 | 27 | 39 | 379 |
| California, Eastern | 20 | 39 | 30 | 18 | 13 | 9 | 15 | 12 | 20 | 4 | 180 |
| California, Northern | 5 | 14 | 3 | 4 | 2 | 3 | 2 | 3 | 3 | 7 | 46 |
| California, Southern | 5 | 2 | 10 | 7 | 6 | 5 | 9 | 0 | 2 | 39 | 85 |
| Colorado | 7 | 8 | 11 | 4 | 3 | 4 | 14 | 6 | 6 | 9 | 72 |
| Connecticut | 12 | 8 | 24 | 11 | 17 | 5 | 2 | 4 | 0 | 8 | 91 |
| Delaware | 3 | 5 | 2 | 7 | 5 | 7 | 1 | 1 | 2 | 3 | 36 |
| District of Columbia | 20 | 33 | 15 | 25 | 22 | 66 | 28 | 41 | 39 | 47 | 336 |
| Florida, Middle | 14 | 10 | 13 | 39 | 28 | 51 | 30 | 18 | 24 | 25 | 252 |
| Florida, Northern | 4 | 2 | 5 | 17 | 19 | 3 | 27 | 13 | 3 | 9 | 102 |
| Florida, Southern | 37 | 78 | 24 | 27 | 22 | 12 | 12 | 21 | 13 | 28 | 274 |
| Georgia, Middle | 8 | 4 | 7 | 3 | 0 | 7 | 3 | 0 | 11 | 11 | 54 |
| Georgia, Northern | 12 | 9 | 21 | 6 | 7 | 15 | 21 | 32 | 32 | 27 | 182 |
| Georgia, Southern | 1 | 0 | 4 | 0 | 1 | 2 | 1 | 5 | 2 | 4 | 20 |
| Guam & NMI | 16 | 9 | 5 | 2 | 0 | 3 | 6 | 3 | 5 | 1 | 50 |
| Hawaii | 4 | 14 | 4 | 5 | 1 | 2 | 1 | 0 | 3 | 2 | 36 |

TABLE III (continued)

| U.S. Attorney's Office | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Idaho | 4 | 3 | 1 | 1 | 1 | 1 | 1 | 0 | 3 | 6 | 21 |
| Illinois, Central | 5 | 14 | 3 | 6 | 8 | 6 | 6 | 0 | 2 | 1 | 51 |
| Illinois, Northern | 54 | 22 | 51 | 30 | 28 | 43 | 47 | 46 | 30 | 36 | 387 |
| Illinois, Southern | 1 | 6 | 20 | 2 | 6 | 7 | 5 | 6 | 9 | 7 | 69 |
| Indiana, Northern | 10 | 13 | 9 | 5 | 15 | 9 | 10 | 4 | 4 | 25 | 104 |
| Indiana, Southern | 10 | 4 | 5 | 4 | 9 | 5 | 8 | 8 | 2 | 7 | 62 |
| Iowa, Northern | 1 | 1 | 3 | 0 | 0 | 0 | 0 | 0 | 2 | 1 | 8 |
| Iowa, Southern | 8 | 1 | 1 | 2 | 9 | 9 | 4 | 11 | 1 | 3 | 49 |
| Kansas | 0 | 5 | 3 | 0 | 2 | 5 | 4 | 5 | 9 | 8 | 41 |
| Kentucky, Eastern | 22 | 27 | 10 | 23 | 33 | 22 | 22 | 28 | 25 | 19 | 231 |
| Kentucky, Western | 4 | 1 | 4 | 4 | 6 | 6 | 19 | 6 | 13 | 13 | 76 |
| Louisiana, Eastern | 17 | 29 | 26 | 26 | 29 | 26 | 20 | 26 | 29 | 29 | 257 |
| Louisiana, Middle | 2 | 0 | 8 | 13 | 6 | 3 | 10 | 4 | 13 | 4 | 63 |
| Louisiana, Western | 6 | 1 | 4 | 10 | 7 | 10 | 14 | 25 | 9 | 19 | 105 |
| Maine | 5 | 2 | 3 | 4 | 4 | 8 | 5 | 1 | 4 | 2 | 38 |
| Maryland | 12 | 28 | 17 | 36 | 21 | 39 | 32 | 21 | 58 | 26 | 290 |
| Massachusetts | 22 | 17 | 15 | 28 | 29 | 19 | 28 | 27 | 19 | 13 | 217 |
| Michigan, Eastern | 10 | 17 | 11 | 13 | 7 | 20 | 7 | 14 | 18 | 17 | 134 |
| Michigan, Western | 14 | 13 | 11 | 12 | 5 | 13 | 11 | 16 | 6 | 0 | 101 |
| Minnesota | 3 | 9 | 3 | 6 | 3 | 7 | 13 | 6 | 8 | 0 | 58 |
| Mississippi, Northern | 14 | 9 | 5 | 5 | 18 | 13 | 13 | 9 | 4 | 9 | 99 |
| Mississippi, Southern | 13 | 5 | 0 | 2 | 7 | 4 | 2 | 15 | 13 | 0 | 61 |
| Missouri, Eastern | 3 | 4 | 8 | 12 | 12 | 22 | 16 | 11 | 10 | 11 | 109 |
| Missouri, Western | 7 | 6 | 13 | 8 | 8 | 9 | 8 | 14 | 4 | 10 | 87 |
| Montana | 2 | 7 | 1 | 8 | 0 | 8 | 7 | 10 | 5 | 2 | 50 |

28

**TABLE III (continued)**

| U.S. Attorney's Office | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Nebraska | 2 | 2 | 4 | 3 | 0 | 8 | 2 | 4 | 2 | 3 | 30 |
| Nevada | 6 | 0 | 0 | 3 | 4 | 0 | 7 | 4 | 6 | 6 | 36 |
| New Hampshire | 3 | 0 | 2 | 0 | 0 | 4 | 1 | 1 | 0 | 0 | 11 |
| New Jersey | 41 | 44 | 39 | 47 | 62 | 49 | 44 | 47 | 28 | 27 | 428 |
| New Mexico | 2 | 5 | 3 | 6 | 3 | 6 | 9 | 7 | 4 | 4 | 49 |
| New York, Eastern | 7 | 25 | 31 | 20 | 26 | 14 | 12 | 12 | 10 | 13 | 170 |
| New York, Northern | 22 | 16 | 11 | 9 | 7 | 10 | 2 | 3 | 3 | 5 | 88 |
| New York, Southern | 28 | 28 | 28 | 16 | 9 | 9 | 9 | 12 | 24 | 21 | 184 |
| New York, Western | 6 | 7 | 12 | 6 | 2 | 15 | 15 | 10 | 15 | 18 | 106 |
| North Carolina, Eastern | 9 | 18 | 2 | 20 | 18 | 4 | 4 | 9 | 10 | 4 | 98 |
| North Carolina, Middle | 6 | 0 | 3 | 2 | 5 | 1 | 3 | 7 | 1 | 0 | 28 |
| North Carolina, Western | 5 | 7 | 8 | 2 | 3 | 12 | 2 | 2 | 2 | 0 | 43 |
| North Dakota | 16 | 5 | 9 | 2 | 6 | 4 | 0 | 6 | 2 | 2 | 52 |
| Ohio, Northern | 28 | 32 | 28 | 31 | 37 | 29 | 49 | 65 | 28 | 16 | 343 |
| Ohio, Southern | 9 | 26 | 21 | 12 | 12 | 8 | 7 | 0 | 3 | 9 | 107 |
| Oklahoma, Eastern | 0 | 0 | 2 | 5 | 3 | 8 | 0 | 3 | 11 | 9 | 41 |
| Oklahoma, Northern | 3 | 0 | 2 | 3 | 3 | 3 | 12 | 2 | 2 | 5 | 35 |
| Oklahoma, Western | 1 | 4 | 17 | 10 | 3 | 11 | 10 | 9 | 11 | 12 | 88 |
| Oregon | 3 | 0 | 4 | 6 | 11 | 3 | 5 | 1 | 7 | 2 | 42 |
| Pennsylvania, Eastern | 57 | 26 | 26 | 30 | 19 | 15 | 20 | 23 | 23 | 30 | 269 |
| Pennsylvania, Middle | 13 | 12 | 19 | 27 | 16 | 16 | 16 | 25 | 7 | 7 | 158 |
| Pennsylvania, Western | 4 | 3 | 11 | 10 | 5 | 5 | 5 | 6 | 7 | 10 | 66 |
| Puerto Rico | 24 | 31 | 6 | 20 | 2 | 37 | 28 | 17 | 130 | 30 | 325 |
| Rhode Island | 0 | 2 | 4 | 2 | 1 | 2 | 1 | 3 | 8 | 2 | 25 |

**TABLE III (continued)**

| U.S. Attorney's Office | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|
| South Carolina | 8 | 8 | 0 | 3 | 4 | 8 | 7 | 2 | 11 | 2 | 53 |
| South Dakota | 3 | 2 | 3 | 13 | 4 | 11 | 8 | 9 | 8 | 9 | 70 |
| Tennessee, Eastern | 8 | 6 | 9 | 7 | 12 | 6 | 7 | 4 | 8 | 10 | 77 |
| Tennessee, Middle | 6 | 8 | 5 | 9 | 6 | 1 | 4 | 3 | 1 | 9 | 52 |
| Tennessee, Western | 11 | 16 | 22 | 19 | 24 | 5 | 10 | 14 | 8 | 12 | 141 |
| Texas, Eastern | 5 | 8 | 5 | 3 | 4 | 10 | 5 | 4 | 2 | 0 | 46 |
| Texas, Northern | 33 | 14 | 22 | 16 | 6 | 23 | 41 | 17 | 19 | 28 | 219 |
| Texas, Southern | 17 | 11 | 25 | 21 | 34 | 64 | 26 | 23 | 43 | 26 | 290 |
| Texas, Western | 16 | 27 | 17 | 9 | 11 | 15 | 27 | 27 | 24 | 47 | 220 |
| Utah | 5 | 0 | 6 | 1 | 7 | 5 | 3 | 1 | 2 | 1 | 31 |
| Vermont | 3 | 0 | 2 | 0 | 1 | 5 | 0 | 2 | 5 | 3 | 21 |
| Virgin Islands | 2 | 2 | 2 | 8 | 3 | 2 | 0 | 7 | 3 | 0 | 29 |
| Virginia, Eastern | 8 | 21 | 23 | 38 | 23 | 72 | 57 | 60 | 57 | 41 | 400 |
| Virginia, Western | 3 | 16 | 2 | 13 | 13 | 2 | 5 | 2 | 0 | 0 | 56 |
| Washington, Eastern | 2 | 3 | 6 | 1 | 4 | 5 | 0 | 0 | 2 | 0 | 23 |
| Washington, Western | 1 | 15 | 7 | 1 | 5 | 7 | 3 | 8 | 5 | 7 | 59 |
| West Virginia, Northern | 0 | 0 | 3 | 0 | 0 | 2 | 2 | 6 | 4 | 4 | 21 |
| West Virginia, Southern | 8 | 10 | 14 | 9 | 2 | 4 | 2 | 3 | 1 | 3 | 56 |
| Wisconsin, Eastern | 8 | 10 | 18 | 11 | 7 | 6 | 4 | 5 | 5 | 8 | 82 |
| Wisconsin, Western | 3 | 3 | 2 | 5 | 5 | 0 | 5 | 2 | 5 | 6 | 36 |
| Wyoming | 2 | 1 | 8 | 0 | 1 | 1 | 2 | 1 | 5 | 3 | 24 |