**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| MARC VEASEY, *et al*, | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. 2:13-CV-00193 |
| | § | |
| RICK PERRY, *et al*, | § | |
| | § | |
| Defendants. | § | |

**DECLARATION OF NON PARTY STATE SENATOR ROYCE WEST**

My name is Royce West and I am over the age of 18 and competent in all respects to make this declaration. I have personal knowledge of the matters stated below which are true and correct.

1. I was served with a the Subpoena to Produce Documents by the State of Texas, Rick Perry, the Texas Secretary of State and Steve McGraw ("Defendants") on June 4, 2014.
2. I provided documents responsive to the Defendants' Subpoena to Produce Documents.
3. The documents identified in Exhibit A are a subset of documents included in my response to the Defendants' Subpoena to Produce Documents. These documents are kept, created, or retained in the the ordinary course of my Senate duties.

2:13-cv-193
09/02/2014
DEF2735

4. It is the regular practice to keep, create or retain the documents produced in response to Defendants' Subpoena to Produce Documents, including the documents identified in Exhibit A.

5. The responsive documents, including those identified in Exhibit A, are true copies of the records in my possession.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Dated: September 3, 2014

Senator Royce West

# EXHIBIT A

| First Bates Page # | Last Bates Page # | Description |
|---|---|---|
| RW-PRIV000159 | RW-PRIV000170 | Q and A for Republican Witnesses |
| RW-PRIV000187 | RW-PRIV000188 | Ltr. R. West to C. Herren (DOJ), dated March 7, 2011 re: SB 14 |
| RW-PRIV000202 | RW-PRIV000202 | MALDEF Questions for Bill's Author |
| RW-PRIV000299 | RW-PRIV000299 | Notes from G. Keever re: Call to DOJ |
| RW-PRIV000312 | RW-PRIV000313 | H. Cook Email, dated January 25, 2011, Subject: Republican witness list |
| RW-PRIV000314 | RW-PRIV000314 | H. Cook Email, dated January 25, 2011, Subject: HAVA funds |
| RW-PRIV000320 | RW-PRIV000321 | Email W. Nute to G. Keever, dated January 25, 2011, Subject: FW: Rush: Opposition Letter to Texas Voter ID law |

**Q. and A. for Republican Witnesses**
**(all appropriate Senators should pile on, for their expert witnesses, and ignore their public witnesses)**

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

**1. You say the law in Indiana is working…in the Supreme Court case, no party or *amicus* cited even one case of impersonation at the polls in Indiana to the Supreme Court. Would it surprise you to learn that more Indiana voters have been disenfranchised by the law in the last two years than the number of reported cases of impersonation at the polls cited to the Supreme Court – or from anywhere in the country - in the last two decades?**

- In limited-turnout local elections in Marion County, Ind. in 2007, 32 voters cast ballots that could not be counted because of the voter ID law. **Moreover, these were long-time voters: 14 of them had previously voted in at least 10 elections.**
- At **least 10 retired nuns in South Bend, Ind., were barred from voting in the 2008 Indiana Democratic primary election because** some of them were in their 80's and 90's and no longer had driver's licenses. **The supreme irony was that the nuns whose votes can't be accepted by a bunch of nuns because they don't have an ID...live with them in the polling place in their convent.**
- At least six other people also were relegated to filing provisional ballots. Among them was Lauren McCallick, an 18-year-old freshman at St. Mary's College in South Bend, who said she got ``teary-eyed'' and then angry at being rejected the first time she was old enough to vote.

**2. You and other voter ID advocates cite "studies" that attempt to show Voter ID laws do not suppress turnout, and even try to claim turnout increases in Indiana and Georgia were caused by Voter ID laws.** These "studies" compare turnout between election cycles - between 2002 and 2006 or 2004 and 2008. Obviously, turnout can vary a lot between election cycles based on enthusiasm, candidates, and other factors.

c. Honestly, **isn't the real cause for the 2008 turnout increase in Indiana really all about Barack Obama** and John McCain and the excitement they generated and resources they spent **in a state that wasn't even competitive in 2004?**

d. Wouldn't a more valid analysis compare states with and without Photo ID requirements, over a period spanning several election cycles or the same national election cycle?

**3. How do you explain the fact that every time a thorough independent study looks into claims made repeatedly by Voter ID supporters that suggest thousands of dead people or non-citizens are registering and possibly voting, those claims are, without exception, proven to be wildly off base?**
(See briefing paper on Unsubstantiated GOP Claims for answer/facts)

**4.You have mentioned the Indiana experience, but** even Appeals Judge Posner, an outspoken conservative appointee, said in his opinion upholding the Indiana photo ID

law: **"No doubt most people who don't have photo ID are low on the economic ladder and thus, if they do vote, are more likely to vote for Democratic than Republican candidates. Thus the new law injures the Democratic Party by compelling the party to devote resources to getting to the polls those of its supporters who would otherwise be discouraged by the new law from bothering to vote."** His comment seems to illustrate why Republicans use voter fraud claims to justify vote suppression activities that date back decades and continue today. **Do you have any evidence of systematic voter fraud to contradict findings from academic studies that suggest the only real reason for the photo ID push is to provide Republicans a partisan advantage?**
(See briefing paper on GOP Power Grab for answer/facts)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Questions for Dennis Borel (Coalition of Texans with Disabilities)**
**Primary Senator asking questions: Zaffirini**

Q. Are people with disabilities less likely to have a photo ID? If so, why?

Q. Are people with disabilities less likely to have other documents that could be used to verify identity under SB 362? If so, why?

Q. Has Advocacy, Inc. worked with any individuals who would not be able to meet the identification standards of SB 362/

Q. What is required to obtain a photo identification in Texas?

Q. What additional barriers do people with disabilities have in obtaining the forms of ID requested by this bill?

Q. Would the written notice provided for in SB 362 be sufficient to ensure access to accurate information about this new ID requirement information for the full range of people with disabilities in our state?

Q. What would be necessary to ensure that if SB 362 were passed, that the disability community would understand the new law?

Q. What affect do you believe SB 363 would have on turnout of voters with disabilities?

(Q. Could SB 363 negatively impact any voters who have a photo ID?

Q. What affect do you believe SB 363 would have on the number of provisional ballots cast by voters with disabilities?

(Q. In the hotline that Advocacy, Inc runs for voters with disabilities, what are the most pressing issues reported by voters with disabilities? And, does SB 363 address any of these issues?

Q. Are their any issues affecting Texans with disabilities that would better utilize the funds required to implement SB 362?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Questions for Dan Kohrman (AARP)**
**Primary Senator asking questions: Uresti**

Q. What are other state's experiences implementing photo identification requirements to vote?

Q. In other states that have had challenges of similar legislation, how does Texas compare regarding the implementation timeframe? In regards to outreach and notice of new requirements to voters? Relating to poll worker training?

Q. Is the training and notice in the bill sufficient to ensure older Texans will be aware of the new requirements?

Q. What are the potential barriers for older Texans to obtain photo identification? Are there any potential barriers when the state provides the identification for free?

Q. What potential barriers does this legislation pose for voters that may reside with family members or in an assisted living facility or nursing home?

Q. Can you expand on the "different forms of non-photo identification" requirements under this legislation? Does Texas issue a Medicaid card? What information does a Medicare card contain? Does everyone entitled to receive a social security check receive it via mail?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Questions for Gary L. Bledsoe (Texas NAACP)**
**Primary Senator asking questions: Ellis**

Q. Some say the Voting Rights Act is no longer needed is a thing of the past that is no longer needed in Texas. Can you cite examples or give reasons that show why we still need voting rights protections?

Q. Is there a well-documented history of voter suppression that is specifically related to race and ethnicity, and how would this Voter ID law fit into that history?

Q. How would this Voter ID law discriminate against people of color?

Q. If the Legislature exempts certain classes of voters, like seniors, from this bill, would that direct an even greater amount of its potential to disenfranchise voters at African Americans and Hispanics?

Q. Did you see the materials the Attorney General used in his highly publicized 2005-2006 campaign against "Voter Fraud"?

Q. In his anti-Voter Fraud campaign, the Attorney General used materials that included images of sickle cell stamps and photos of African Americans to illustrate signs of voter fraud – what does that tell you about the state's attitude and enforcement of voter fraud, and did the conduct and targets of Abbott's prosecutions fit into a pattern of vote suppression in Texas?

Q. Gary, you suggest a photo ID law would suppress African American turnout, but some Voter ID advocates claim Voter ID laws do not suppress turnout, and even claim turnout increases in Indiana and Georgia in 2008 were caused by Voter ID laws, compared to 2004 turnout when there was no photo ID law in those states. Obviously, turnout can vary a lot between election cycles based on enthusiasm, candidates, and other factors. Did African American turnout in Texas increase in 2008 without a Voter ID law, and do you think the reason might be the same as the real reason for reports of higher turnout in Indiana and Georgia?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Questions for Gerry Hebert (Campaign Legal Center)**
**Primary Senator asking Questions: West**

Q. What examples can you provide that TX AG Abbott has administered TX election laws in an unfair manner?

Q. Are there instances of voter fraud that have not been prosecuted by AG Greg Abbott? (Highland Park)

Q. What about those who claim that there are noncitizens on the voter rolls? Will a photo ID law for voting stop that?

Q. We hear a lot about noncitizens being on the voter rolls. What can you tell us about that issue, how it happens if it does?

Q. Do you need a photo ID to board an airplane or cash a check? (Answer is no)

Q. How does the legal standard that DOJ will employ to any TX voter ID law differ from the legal standard that the Supreme Court used to decide the Indiana voter ID case?

Q. So the Indiana voter ID decision really is totally unrelated to the narrow legal issue that DOJ will decide under the Voting Rights Act? (Yes)

Q. Was AG Abbott's office aware of the voter registration barriers being put up by County officials to block the African American students at Prairie View University in Waller County and if so, what did he do to help the students and protect their voting rights?

Q. Of what relevance is it to obtaining Section 5 preclearance if the vast majority of minority legislators (Latinos, African Americans) vote against a particular bill?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Questions for Chandler Davidson (Professor Emeritus, Rice)**
**Primary Senator asking questions: Shapleigh**

Q. Dr. Davidson, could you explain to the Committee whether Texas and other Southern states have imposed restrictions on the right to vote but nonetheless characterized them as good government reforms?

Q. You agree that there has been a long history of discrimination against minority voters in Texas, correct? How would you compare the proposal to implement a photo ID as a prerequisite to voting with other efforts in Texas to impose certain restrictions on the right to vote?

Q. In practice, the enforcement and verification of additional Voter ID requirements will be left up to thousands of precinct polling place workers. Based on your studies of Texas cases, is there reason to believe that there is a serious potential for discriminatory enforcement of ID requirements at the polls?

Q. Again, based on your knowledge of vote suppression in Texas, what would the State have to do to make sure ID verification is practiced uniformly at all Texas polling places?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Questions for Adam Skaggs (Brennan Center)**
**Primary Senator asking questions: Davis**

Q. What did the Brennan Center's 2006 nationwide survey show about the % of people who cannot prove citizenship or who lack government issued photo ID.

Q. How is voter fraud not a problem if both the U.S. Department of Justice and the Texas Attorney General have launched widespread investigations and prosecutions of voter fraud?

Q. While you say that there is little evidence of voter impersonation, but what about all the examples last year of groups like ACORN submitting false registrations – like the entire roster of the Dallas Cowboys?

(the following questions for this witness are similar to those which should be asked of Republican witnesses, but we need to ask a Democratic witness in order to get the accurate answers)

**1. Regarding the Indiana case...in the Supreme Court case, no party or *amicus* cited even one case of impersonation at the polls in Indiana to the Supreme Court. Would it surprise you to learn that more Indiana voters have been disenfranchised by the law in the last two years than the number of reported cases of impersonation at the polls cited to the Supreme Court – or from anywhere in the country - in the last two decades?** [the answer includes the following bullet points]

- In limited-turnout local elections in Marion County, Ind. in 2007, 32 voters cast ballots that could not be counted because of the voter ID law. **Moreover, these were long-time voters: 14 of them had previously voted in at least 10 elections**.
- At **least 10 retired nuns in South Bend, Ind., were barred from voting in the 2008 Indiana Democratic primary election because** some of them were in their 80's and 90's and no longer had driver's licenses. **The supreme irony was that the nuns whose votes can't be accepted by a bunch of nuns because they don't have an ID...live with them in the polling place in their convent.**
- At least six other people also were relegated to filing provisional ballots. Among them was Lauren McCallick, an 18-year-old freshman at St. Mary's College in South Bend, who said she got ``teary-eyed" and then angry at being rejected the first time she was old enough to vote.

**2. Voter ID advocates cite "studies" that attempt to show Voter ID laws do not suppress turnout, and even try to claim turnout increases in Indiana and Georgia were caused by Voter ID laws.** These "studies" compare turnout between election cycles - between 2002 and 2006 or 2004 and 2008. Obviously, turnout can vary a lot between election cycles based on enthusiasm, candidates, and other factors.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

a. Honestly, **isn't the real cause for the 2008 turnout increase in Indiana really all about Barack Obama** and John McCain and the excitement they generated and resources they spent **in a state that wasn't even competitive in 2004?**
b. Wouldn't a more valid analysis compare states with and without Photo ID requirements, over a period spanning several election cycles or the same national election cycle?

**3. How do you explain the fact that every time a thorough independent study looks into claims made repeatedly by Voter ID supporters that suggest thousands of dead people or non-citizens are registering and possibly voting, those claims are, without exception, proven to be wildly off base?**
(See briefing paper on Unsubstantiated GOP Claims for answer/facts)

**4.You have mentioned the Indiana experience, but** even Appeals Judge Posner, an outspoken conservative appointee, said in his opinion upholding the Indiana photo ID law: **"No doubt most people who don't have photo ID are low on the economic ladder and thus, if they do vote, are more likely to vote for Democratic than Republican candidates. Thus the new law injures the Democratic Party by compelling the party to devote resources to getting to the polls those of its supporters who would otherwise be discouraged by the new law from bothering to vote."** His comment seems to illustrate why Republicans use voter fraud claims to justify vote suppression activities that date back decades and continue today. **Do you know of any evidence of systematic voter fraud to contradict findings from academic studies that suggest the only real reason for the photo ID push is to provide Republicans a partisan advantage?**
(See briefing paper on GOP Power Grab for answer/facts)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Questions for Tova Wang (Common Cause)**
**Primary Senator asking questions: Gallegos**

Q. Doesn't it solve the problem for those lacking a photo ID that under this legislation you can produce two other forms of ID?

Q. Is there a great deal of voter fraud in the U.S. that justifies a voter ID?

Q. What financial costs are there to the state if enacts a voter ID requirement? [Are these costs one-time or are they recurring? Explain.]

Q. How many cases of election fraud brought by the United States Department of Justice over the last several years were of the type that would have been addressed by voter identification?

Q. Are there laws on the books right now that allow for prosecution of people who commit voter fraud? Is there any proof that these laws are not working?

Q. Do most states have a photo ID requirement? Do the states that don't impose a photo ID requirement have huge fraud problems?

Q. If the state provides a free ID to everyone, will it really be free? (Follow-up, if needed: Wasn't Indiana's ID free? How did the "free" ID work in that state?

Q. In states that have voter ID requirements, are there any studies that have been done which show that the ID requirements in those states have not been applied evenhandedly?

Q: Please discuss the problems with vesting thousands of election judges with the authority to verify additional requirements.

Q: Can you comment on the likelihood that election judges will ask African Americans, Hispanics, and Asian Americans for proof of their ID at a higher rate than other voters?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Questions for Toby Moore (Research Triangle Institute)**
**Primary Senator asking questions: Van de Putte**
**Senator Gallegos to ask a question on urban DPS offices**
**Senator Uresti to ask questions on rural DPS offices**

Q. Didn't former President Jimmy Carter advocate a photo ID for voters a few years ago as part of the Carter-Baker Commission? (*top priority question*)

Q. What evidence is there that those who lack a photo ID are more likely to be women?

Q If you were to use the AU survey approach you described and apply it to TX, do you have some idea of how many voters in TX today lack a photo ID?

Q. In seeking approval of any photo ID bill from DOJ, who bears the burden of proving the effects of a photo ID? Do those claiming it is discriminatory bear the burden or does the State have to prove that a voter ID requirement does not have a discriminatory impact?

Q. So DOJ doesn't have to produce affirmative evidence of how the photo ID law will discriminate against minority voters to deny preclearance, right? So DOJ can block the photo ID bill from taking effect if they find that the State has failed to show that the law is free of a discriminatory purpose or effect, correct?

Q. What are the kinds of data that the State needs to produce about voter ID to get preclearance?

Q. So those data are needed to determine if the voter ID bill complies with the VRA, correct? If those data are not known by the State or have not been produced, then the State cannot show today that the voter ID bill meets the requirements of the VRA can it?

Q. Should the state be concerned about eligible but non-registered voters?

Q. How does the Texas bill differ from the Georgia and Indiana legislation?

*Less important questions*
Q. Do you have any estimates what it will cost a state like Texas to develop and implement a public education programs to make voters aware of the new voter ID requirements?

Q. Do you have any estimates what it will cost a state like Texas to develop and implement a revamped poll worker training course to emphasize the correct enforcement of the new, more complicated ID requirements?

Q. Do you have any estimates what it will cost a state like Texas to develop and implement programs to distribute the required IDs, free of charge, to those who do not have them?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q: **(FROM GALLEGOS):** The data I have from the Texas Department of Public Safety shows that in my home city of Houston, for example, it is very inconvenient for somebody to get to a DPS office to obtain the required photo ID. [state some specifics from the data distributed last week, specific to urban DPS offices' locations]. My question is this: do you believe that a hardship such as the one I described will have a negative effect on protected minorities' ability to do what is required of them under this bill? (Gallegos can ask follow up questions if he wants, but that is the DoJ money question)

Q: **(FROM URESTI):** I have the largest Senate district in Texas by far. In fact my Senate district stretches from San Antonio to El Paso, and entails more land mass than some entire states. It is very rural, and the distances between many residents and the nearest town are great. (give 3 examples – Terlingua to Alpine being a great one) My question is, do you believe that the distances represented in what I just described, coupled with the limited hours many of those DPS offices in rural areas have, represents a negative effect on protected minorities' ability to do what is required of them under this bill? (Uresti can ask follow up questions if he wants)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

March 7, 2011

Mr. T. Christian Herren, Jr.
Chief, Voting Section
Civil Rights Division
Department of Justice
950 Pennsylvania Ave., N.W.
Room 7254 - NWB
Washington, DC 20530

Dear Mr. Herren:

Please consider the information herein as part of your evaluation of Senate Bill 14, the Texas Voter ID law.

In that bill, the state creates a free "election identification certificate", to be made available to persons without more common forms of photo identification such as driver's licenses or state IDs. This is to be offered at no charge, in an attempt to mitigate the potentially discriminatory nature of the bill's requirements (research suggests that older people and certain ethnic minorities are more likely to lack a driver's license or state ID and therefore will be disproportionately affected by the new photo ID requirement for voting). Based on my personal experience, as well as a comparison of Texas' means of issuing the new certificate to Georgia's, I submit that the "election identification certificate" will be ineffective at reducing the discriminatory effect of the Texas law.

Information provided by the Texas Department of Public Safety (DPS) shows that over the last 13 months the wait time at the Downtown Dallas Driver License Office has ranged from 39 minutes to 1 hour and 33 minutes, with times exceeding an hour in 7 of those 13 months. Given that the office is open only on weekdays, during normal business hours, even that amount of waiting is a likely deterrent to getting the new certificate. However, input from constituents and my experience at the downtown office suggests that DPS' figures understate the amount of time a person will be required to invest to get an election identification certificate.

Immediately following the Christmas holiday, my office began to receive - mostly via email and phone calls - a higher than normal number of complaints from constituents regarding long lines at area DPS

Driver License offices. These contacts peaked on Friday, February 3, when my District Office was deluged with calls over the period of a few hours. I decided to get a first-hand look by going to the DPS - Dallas City Hall location. Because people there had been in line for **three to four hours**, I called Dallas Mayor Mike Rawlings to ask him to keep City Hall open after normal hours of operation (he graciously agreed to do this). I also contacted DPS officials, who had to send additional personnel to process the remaining applicants, who would otherwise have had to return another day to receive service. These people were helped, after spending much longer in line than DPS would have you believe, only because I intervened. As my other obligations as state senator will not allow me to routinely drop in on DPS Driver License Offices to assess wait times, I believe that they will continue to be an impediment to obtaining *any* form of identification, including the election ID, and that the mere fact that it is technically available will not adequately mitigate the discriminatory impact of the voter photo ID requirement.

Consider also the Georgia approach. Georgia's Voter ID law has been precleared. Like Texas, they make a free identification card available for the purpose of voting. The key distinction is that Georgia, in addition to offering the card through their version of the DPS, the Georgia Department of Driver Services (DDS), also allows people to apply for the card at local county registrar's offices. Through 2011, the State of Georgia has provided ten times (25,970) the number of free Voter ID cards through the county offices than through the DDS (around 2,000). Clearly, Georgia's citizens, by a considerable margin, prefer an option for obtaining a free election ID that does not exist in Texas. This strongly suggests that the Texas plan for offering free election identification certificates will not succeed in reducing the discriminatory effect of its Voter ID law.

I hope you find this information useful in your consideration of the Texas Voter ID law. Thank you for your consideration.

Sincerely,

Honorable Royce West
Texas State Senator, District 23

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**MALDEF QUESTIONS FOR BILL'S AUTHOR**

1. What is the voter required to present in order to recieve the free personal identification certificate under Section 18 bill? Is a person required to present a birth certificate or other types of identification to receive the "free" identification?



2. Why were student id's ommitted from the list of acceptable documentation? Why were birth certificates omitted from the list?

3. Are there any provisions to allow students who have out of state identification or who have different addresses on their DL and voter registration certificate to be able to vote a regular ballot?

4. Are there are any provisions in the bill to accomodate a voter that has a different address on their voter registration card and their photo ID? ASK SOS

5. If a voter returns to the elections department to cure their provisional ballot, what are they expected to show as identification to ensure that their provisional ballot is counted?

6.) Are there any provisions to accommodate or address eligible voters whose last name on their driver's license does not match their voter registration, such as recently married women? ASKED (ANSWER - ASK SOS)

7) To implement this legislation, the state must put in substantial money for training and extensive public education. How is this bill funded?

8) Why is a voter only allowed to return with 6 days rather the 10 day requirement in Indiana?

9) Would you agree that Texas has more larger proportion of minorities demographically than Indiana? 2009 AMERICAN COMMUNITY SURVEY (U.S. CENSUS) TEXAS 12% AFRICAN AMERICAN; 36.9% HISPANIC INDIANA 9.2% AFRICAN AMERICAN; 5.5% HISPANIC

10) Texas is a covered jursidiction under section 5 of the Voting Rights because of its history of discrimination right? ASKED

11) Have any studies been done ~~in Texas~~ BY THE TEXAS LEGISLATURE TO determine the impact of this bill on Latino and African American voters?

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY




HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Graham Keever**

**From:** Harold Cook [hc@haroldcook.com]
**Sent:** Tuesday, January 25, 2011 8:46 AM
**To:** Amber Hausenfluck; Steve Scheibal; Ray Martinez; Debra Gonzales; David Edmonson; Will Krueger; Jason Hassay; Dan Buda; Graham Keever; Micah Rodriguez; Graham Keever_SC; Sara Gonzalez; Lara Wendler; Gonzalo Serrano; Oscar Garza; Sushma Smith
**Subject:** Republican witness list

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

Begin forwarded message:

**From:** Amber Hausenfluck <Amber.Hausenfluck@senate.state.tx.us>
**Date:** January 25, 2011 8:28:35 AM CST
**To:** "hc@haroldcook.com" <hc@haroldcook.com>
**Subject: Fwd: Invited Testimony**

Sent from my Samsung Epic™ 4G

**From:** Servando Esparza <Servando.Esparza@senate.state.tx.us>
**Date:** January 25, 2011 8:26:47 AM CST
**To:** Amber Hausenfluck <Amber.Hausenfluck@senate.state.tx.us>
**Subject: Invited Testimony**

Invited Testimony

Sen. Fraser

- Jerry Bonnett, General Counsel, Indiana Secretary of State
- Christian Ward, YetterColeman LLP
- Terry Siebert, Texas Watchdog

Sen. Van de Putte

- Luis Figueroa, MALDEF
- Gary Bledsoe, NAACP
- Andres Tijerina, Professor of Texas History
- Chase Bearden, Advocate for People with Disabilities

Resource Witness Panel

- David Maxwell, Deputy Director of Law Enforcement, Office of the Attorney General
- Ann McGeehan, Director of Elections, Secretary of State's Office
- Rebecca Davio, Assistant Director for Drivers Licenses, Department of Public Safety

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Graham Keever**

**From:** Harold Cook [hc@haroldcook.com]
**Sent:** Tuesday, January 25, 2011 12:50 PM
**To:** Amber Hausenfluck; Steve Scheibal; Ray Martinez; Debra Gonzales; David Edmonson; Will Krueger; Jason Hassay; Dan Buda; Graham Keever; Micah Rodriguez; Graham Keever_SC; Sara Gonzalez; Lara Wendler; Gonzalo Serrano; Oscar Garza; Sushma Smith
**Subject:** HAVA funds

There has been so much talk about HAVA funds, it would be highly interesting to ask the Sec of State's office about the opportunity cost of that.

HAVA should be used for minority outreach, disability access training, that sort of thing. What progress will NOT be made with $2 million, because they're instead going to use this $2 million to train poll workers and educate voters on how to avoid being disenfranchised?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Graham Keever**

| | |
|---|---|
| **From:** | Wesley Nute |
| **Sent:** | Tuesday, January 25, 2011 5:08 PM |
| **To:** | Graham Keever |
| **Subject:** | FW: Rush: Opposition Letter to Texas Voter ID Law |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

---

**From:** Wesley Nute
**Sent:** Tuesday, January 25, 2011 4:52 PM
**To:** 'Ellis, Jacqueline'
**Subject:** RE: Rush: Opposition Letter to Texas Voter ID Law

Thank you so much.

---

**From:** Ellis, Jacqueline [mailto:Jacqueline.Ellis@mail.house.gov]
**Sent:** Tuesday, January 25, 2011 4:49 PM
**To:** Wesley Nute
**Cc:** Dancy, Kevin; Mayo, Renee; Saavedra, Susie
**Subject:** FW: Rush: Opposition Letter to Texas Voter ID Law

Mr. Nute, pursuant to the Senator's (Sen. Royce West) request, Congressman Green has agreed to sign on the letter below. THANKS!

Jacqueline A. Ellis
Chief of Staff
Congressman Al Green
9th Congressional District-Houston, Texas
2201 Rayburn House Office Building
Washington, DC 20515
(202) 225-7508
(202) 225-2947 (Fax)
Jacqueline.Ellis@Mail.House.Gov
Sign up for Congressman Al Green's E-Newsletter at
http://www.house.gov/algreen/


Please consider the environment before printing this e-mail.

---

**From:** Risher, Conrad
**Sent:** Tuesday, January 25, 2011 5:25 PM
**To:** Pinkele, Abigail; Murat, Bill; Mucchetti, Michael; Finney Brody, Perry; Blanco, Cesar; Humphrey, Connie; Rami,

Alastair; Ellis, Jacqueline
**Cc:** Munoz, Leo
**Subject:** Rush: Opposition Letter to Texas Voter ID Law

I believe Leo Muñoz has already spoken with you about our intention to send a letter from the Delegation to Leticia Van de Putte, Chairman of the Texas Senate Democrats, stating our opposition to the voter identification law they intend to vote on tonight. Below, you'll find a draft letter. Please let me know if your boss will sign or if you should have any questions or concerns. Because the vote is tonight, we need very rapid turnaround so as to get this letter signed and emailed down to Sen. Van de Putte's office ASAP.

Conrad Z. Risher
Legislative Aide to
Congressman Charles A. Gonzalez (TX-20)
(202) 226-7536

Chairman Van de Putte,

We are saddened that the promulgation of a misguided voter identification law has been given precedence in the 2011 Texas Legislative agenda over education, job creation, and providing Texans with access to affordable, quality healthcare. The people of Texas deserve to have their representatives focus your time on issues that will improve their lives, rather than one which is more likely to worsen them.

Study after study has found almost no evidence of organized voter fraud, in Texas or anywhere in the country. There is simply no reason to believe that voter fraud is a pressing problem for Texas. But we know with certainty that voter identification laws prevent eligible voters from exercising their constitutional rights. Research has shown that a law like SB 14 would disenfranchise tens or even hundreds of thousands of Texans, the majority of them people of color, senior citizens, the disabled, students, and low income voters.

We write to urge the Texas Senate to redirect your efforts towards legislation which would better serve your constituents and the State of Texas. There is so much good you can do. We encourage you to oppose SB 14.

Sincerely,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY