# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### CORPUS CHRISTI DIVISION

MARC VEASEY, *et al*,          §
                              §
        Plaintiffs,    §
VS.                           §          CIVIL ACTION NO. 2:13-CV-00193
                              §
RICK PERRY, *et al*,          §
                              §
        Defendants.    §

## DECLARATION OF NON PARTY STATE SENATOR KIRK WATSON

My name is Kirk Watson and I am over the age of 18 and competent in all respects to make this declaration. I have personal knowledge of the matters stated below which are true and correct.

1. I was served with a the Subpoena to Produce Documents by the State of Texas, Rick Perry, the Texas Secretary of State and Steve McGraw ("Defendants") on May 30, 2014. KᏢW

2. I provided documents responsive to the Defendants' May 30, 2014 KᏢW Subpoena to Produce Documents.

3. The documents identified in Exhibit A are a subset of documents included in my response to the Defendants' Subpoena to Produce Documents. These documents are kept, created, or retained in the the ordinary course of my Senate duties.

2:13-cv-193
09/02/2014
DEF2736

1

4. It is the regular practice to keep, create or retain the documents produced in response to Defendants' Subpoena to Produce Documents, including the documents identified in Exhibit A.

5. The responsive documents, including those identified in Exhibit A, are true copies of the records in my possession.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Dated: ~~August~~ September 2, 2014

Kirk Watson

2

# EXHIBIT A

| First Bates Page # | Last Bates Page # | Description |
|---|---|---|
| KPW-PRIV000222 | KPW-PRIV000226 | H. Cook email, January 24, 2011, Subject:  Questions to Frasier-MALDEF |
| KPW-PRIV000227 | KPW-PRIV000229 | Memo, VID Working Group:  IMPORTANT - questions to the Democratic witnesses |
| KPW-PRIV000275 | KPW-PRIV000276 | Email E. Martin to H. Cook, March 4, 2009, Subject:  Re:  Voter ID Working Group tasks and conference call today |
| KPW-PRIV000304 | KPW-PRIV000314 | Email K. O'Brien to K. Cook, dated September 13, 2011, Subject:  DEM CAUCUS:  DOJ Letter - TDP |
| KPW-PRIV000315 | KPW-PRIV000317 | Email A. Hausenfluck to S. Scheibal, dated September 7, 2011, Subject:  FW:  Senator Gallegos Request for Information on DL |
| KPW-PRIV000536 | KPW-PRIV000536 | H. Cook Email, dated March 4, 2009, Subject:  Voter ID working group:  Counterpoints to Republican Claims about Indiana's Law |
| KPW-PRIV000543 | KPW-PRIV000543 | H. Cook Email, dated March 4, 2009, Subject:  Voter ID working group:  Briefing book section on women and students |
| KPW-PRIV000564 | KPW-PRIV000567 | A. Hausenfluck Email, dated January 27, 2011, Subject:  Voter ID Amendments |
| KPW-PRIV000568 | KPW-PRIV000570 | Email A. Hausenfluck to S. Scheibal, dated September 7, 2011, Subject:  FW:  DOJ Voter ID Call for Tuesday |
| KPW-PRIV000590 | KPW-PRIV000590 | O. Garza Email, dated January 24, 2011, Subject:  Probably Hinojosa Amendments |
| KPW-PRIV000595 | KPW-PRIV000596 | O. Garza Email, dated January 24, 2011, Subject:  Another Probably Hinojosa Amendments |
| KPW-PRIV000599 | KPW-PRIV000613 | Memo to Senators, dated March 9, 2009, Subject:  Expert Witnesses:  Background and Suggested Questions |
| KPW-PRIV000667 | KPW-PRIV000669 | A. Hausenfluck to S. Scheibal, dated September 7, 2011, Subject:  FW:  Senator Gallegos Request for information on DL |
| KPW-PRIV000243 | | Typed note in Senator Watson's files |

**Steve Scheibal**

| | |
|---|---|
| **From:** | Harold Cook [hc@haroldcook.com] |
| **Sent:** | Monday, January 24, 2011 8:47 PM |
| **To:** | Amber Hausenfluck; Steve Scheibal; Ray Martinez; Debra Gonzales; David Edmonson; Will Krueger; Jason Hassay; Dan Buda; Graham Keever; Micah Rodriguez; Graham Keever_SC; Sara Gonzalez; Lara Wendler; Gonzalo Serrano; Oscar Garza; Sushma Smith |
| **Cc:** | Laurie Vanhoose; Luis Figueroa |
| **Subject:** | Questions to Frasier - MALDEF |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

The following are questions MALDEF hopes Senate Democrats will ask Senator Frasier tomorrow morning:

1.  What is the voter required to present in order to recieve the free personal identification certificate under Section 18 bill?  Is a person required to present a birth certificate or other types of identification to receive the "free" identification?

2.  Why were student id's ommitted from the list of acceptable documentation? Why were birth certificates omitted from the list?

3.  Are there any provisions to allow students who have out of state identification or who have different addresses on their DL and voter registration certificate to be able to vote a regular ballot?

4. Are there are any provisions in the bill to accomodate a voter that has a different address on their voter registration card and their photo ID?

5.  If a voter returns to the elections department to cure their provisional ballot, what are they expected to show as identification to ensure that their provisional ballot is counted?

6.)  Are there any provisions to accommodate or address eligible voters whose last name on their driver's license does not match their voter registration, such as recently married women?

7) To implement this legislation, the state must put in substantial money for training and extensive public education. How is this bill funded?

8) Why is a voter only allowed to return with 6 days rather the 10 day requirement in Indiana?

9) Would you agree that Texas has more larger proportion of minorities demographically than Indiana?

10) Texas is a covered jursidiction under section 5 of the Voting Rights because of its history of discrimination right?

11) Have any studies been done in Texas determine the impact of this bill on Latino and African

1

American voters?

KPW-PRIV000223

**Steve Scheibal**

| | |
|---|---|
| **From:** | Harold Cook [hc@haroldcook.com] |
| **Sent:** | Monday, January 24, 2011 9:54 PM |
| **To:** | Amber Hausenfluck; Steve Scheibal; Ray Martinez; Debra Gonzales; David Edmonson; Will Krueger; Jason Hassay; Dan Buda; Graham Keever; Micah Rodriguez; Graham Keever_SC; Sara Gonzalez; Lara Wendler; Gonzalo Serrano; Oscar Garza; Sushma Smith |
| **Subject:** | A really good question for the Sec of State's office |

I know Davis was interested in questioning SOS earlier, so for her info (or for whoever is ultimately questioning the Sec of State's office), Laurie just forwarded this from 2 years ago, in which only 81 counties have websites (which are apparently required under the bill).

I just re-counted, and they still only have 81 counties listed, which means that according to the chief elections officer in Texas, **173 counties would be unable to comply with the requirements of the law**.

Begin forwarded message:

**From:** Laurie Vanhoose <austintransplant@gmail.com>
**Date:** January 24, 2011 9:42:25 PM CST
**To:** Harold Cook <hc@haroldcook.com>, Amber Hausenfluck
<Amber.Hausenfluck@senate.state.tx.us>
**Subject: Counties that have websites**

When I was going through old emails I found this one from last time we debated voter ID. We should include a question asking the SOS the number of counties that have websites because the bill states that as part of voter education the county will list the new requirements on their website. If a county doesn't have a website.......

**Date**: Wed, 04 Mar 2009 17:13:02 -0000
**To:** <txelectionreform@yahoogroups.com>
**Subject:** [txelectionreform] County web sites as reported by SOS

Here is the list of county websites the SOS has on their site
http://www.sos.state.tx.us/elections/voter/links.shtml#County

There are 81 counties listed on this page. I don't know which ones are missing but if this is accurate then 173 don't have one.

1

KPW-PRIV000224

**Steve Scheibal**

| | |
|---|---|
| **From:** | Harold Cook [hc@haroldcook.com] |
| **Sent:** | Monday, January 24, 2011 9:57 PM |
| **To:** | Amber Hausenfluck; Steve Scheibal; Ray Martinez; Debra Gonzales; David Edmonson; Will Krueger; Jason Hassay; Dan Buda; Graham Keever; Micah Rodriguez; Graham Keever_SC; Sara Gonzalez; Lara Wendler; Gonzalo Serrano; Oscar Garza; Sushma Smith |
| **Subject:** | Suggested Q and A for Republican witnesses |

# Q. and A. for Republican Witnesses

**1. You say the law in Indiana is working…in the Supreme Court case, no party or *amicus* cited even one case of impersonation at the polls in Indiana to the Supreme Court. Would it surprise you to learn that more Indiana voters have been disenfranchised by the law in the last four years than the number of reported cases of impersonation at the polls cited to the Supreme Court – or from anywhere in the country - in the last two decades?**

- In limited-turnout local elections in Marion County, Ind. in 2007, 32 voters cast ballots that could not be counted because of the voter ID law. **Moreover, these were long-time voters: 14 of them had previously voted in at least 10 elections.**
- At least 10 retired nuns in South Bend, Ind., were barred from voting in the 2008 Indiana Democratic primary election because some of them were in their 80's and 90's and no longer had driver's licenses. **The supreme irony was that the nuns whose votes can't be accepted by a bunch of nuns because they don't have an ID…live with them in the polling place in their convent.**
- At least six other people also were relegated to filing provisional ballots. Among them was Lauren McCallick, an 18-year-old freshman at St. Mary's College in South Bend, who said she got ``teary-eyed'' and then angry at being rejected the first time she was old enough to vote.

**2. You and other voter ID advocates cite "studies" that attempt to show Voter ID laws do not suppress turnout, and even try to claim turnout increases in Indiana and Georgia were caused by Voter ID laws.** These "studies" compare turnout between election cycles  - between 2002 and 2006 or 2004 and 2008. Obviously, turnout can vary a lot between election cycles based on enthusiasm, candidates, and other factors.

a. Honestly, **isn't the real cause for the 2008 turnout increase in Indiana really all about Barack Obama** and John McCain and the excitement they generated and resources they spent **in a state that wasn't even competitive in 2004?**

b. Wouldn't a more valid analysis compare states with and without Photo ID requirements, over a period spanning several election cycles or the same national election cycle?

**3. How do you explain the fact that every time a thorough independent study looks into claims made repeatedly by Voter ID supporters that suggest thousands of dead people or non-citizens are registering and possibly voting, those claims are, without exception, proven to be wildly off base?**

(See briefing paper on Unsubstantiated GOP Claims for answer/facts)

1

4. **You have mentioned the Indiana experience, but** even Appeals Judge Posner, an outspoken conservative appointee, said in his opinion upholding the Indiana photo ID law: **"No doubt most people who don't have photo ID are low on the economic ladder and thus, if they do vote, are more likely to vote for Democratic than Republican candidates. Thus the new law injures the Democratic Party by compelling the party to devote resources to getting to the polls those of its supporters who would otherwise be discouraged by the new law from bothering to vote."** His comment seems to illustrate why Republicans use voter fraud claims to justify vote suppression activities that date back decades and continue today. **Do you have any evidence of systematic voter fraud to contradict findings from academic studies that suggest the only real reason for the photo ID push is to provide Republicans a partisan advantage?**

(See briefing paper on GOP Power Grab for answer/facts)

2

KPW-PRIV000226

**Subject: VID Working Group: IMPORTANT - questions to the Democratic witnesses**

Below are the questions for our invited testimony - Gary Bledsoe (NAACP), Chase Bearden (Coalition for Texans with Disabilities), and Luis Figueroa (MALDEF). Dr. Andres Tijerina (TX History Professor) is giving more of a history lesson of minority disenfranchisement, so there are no questions advanced for Dr. Tijerina. Some may occur to members in the course of his testimony.

Keep in mind that since there is a time limit on invited testimony of 10 minutes, any leading questions asked by a Senator will extend our witnesses time.

**Questions for Gary L. Bledsoe (Texas NAACP)**

Q. Some say the Voting Rights Act is no longer needed is a thing of the past that is no longer needed in Texas. Can you cite examples or give reasons that show why we still need voting rights protections?

Q. Is there a well-documented history of voter suppression that is specifically related to race and ethnicity, and how would this Voter ID law fit into that history?

Q. How would this Voter ID law discriminate against people of color?

Q. If the Legislature exempts certain classes of voters, like seniors, from this bill, would that direct an even greater amount of its potential to disenfranchise voters at African Americans and Hispanics?

Q. Did you see the materials the Attorney General used in his highly publicized 2005-2006 campaign against "Voter Fraud"?

Q. In his anti-Voter Fraud campaign, the Attorney General used materials that included images of sickle cell stamps and photos of African Americans to illustrate signs of voter fraud – what does that tell you about the state's attitude and enforcement of voter fraud, and did the conduct and targets of Abbott's prosecutions fit into a pattern of vote suppression in Texas?

Q. Gary, you suggest a photo ID law would suppress African American turnout, but some Voter ID advocates claim Voter ID laws do not suppress turnout, and even claim turnout increases in Indiana and Georgia in 2008 were caused by Voter ID laws, compared to 2004 turnout when there was no photo ID law in those states. Obviously, turnout can vary a lot between election cycles based on enthusiasm, candidates, and other factors. Did African American turnout in Texas increase in

2008 without a Voter ID law, and do you think the reason might be the same as the real reason for reports of higher turnout in Indiana and Georgia?

**Questions for Luis Figueroa, MALDEF**

Q. Could you compare the legislation before us to the corresponding legislation passed in Indiana, Georgia, and Arizona?

Q. Could you go over any implementation issues or challenges of the voter ID law in Arizona, and how the law may have disenfranchised Latino voters?

Q. What do you believe the net impact of voter ID legislation on Latino voters is?

Q. Are Latino voters less likely to have the identification required by the bill? Why?

Q. Have Latino voters experienced a history of disenfranchisement in Texas? Might this longstanding history contribute to a distrust of the electoral system, and thus contribute to lowering voter turnout among this ethnicity, even among those who might possess the required identification?

**Questions for Chase Bearden (Coalition of Texans with Disabilities)**

Q.  Are people with disabilities less likely to have a current drivers license, military ID, or passport? If so, why?

Q.  What additional barriers do people with disabilities have in obtaining the forms of ID requested by this bill?

Q.  Would the voter identification required in this bill be sufficient to ensure access to accurate information about this new ID requirement information for the full range of people with disabilities in our state?

Q.  What affect do you believe SB 14 would have on turnout of voters with disabilities?

KPW-PRIV000228

Q.  Could SB 14 negatively impact any voters who have a photo ID?

Q.  What affect do you believe SB 14 would have on the number of provisional ballots cast by voters with disabilities?  What barriers are in place that would make it difficult for people with disabilities to return to the election office to cure a provisional ballot?

Q.  What are the most pressing issues reported by voters with disabilities? And, does SB 14 address any of these issues?

Q.  Are there any issues affecting Texans with disabilities that would better utilize the funds required to implement SB 14?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

## Steve Scheibal

| | |
|---|---|
| **From:** | Ed Martin [edmdem@gmail.com] |
| **Sent:** | Wednesday, March 04, 2009 11:24 AM |
| **To:** | Harold Cook |
| **Cc:** | Glenn Smith; Sam Harper; Anthony Gutierrez; Jeff Rotkoff; Katrina Mendiola; Kirsten Gray; Steve Scheibal; laurie@angleandassociates.com |
| **Subject:** | Re: Voter ID Working Group tasks and conference call today |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Red |

that would be excellent. and that's the kind of info we should share before the call or on the call so we're all on the same page.

Kirsten, could you please check with Glenn and divide up and assign press calls before the conf call?

On Wed, Mar 4, 2009 at 11:19 AM, Harold Cook <hc@haroldcook.com> wrote:

> Ed I think the Senators would like to go farther than just the study to refute the Indiana SOS, if possible. In a perfect world they'd like somebody from Indiana to show up and testify. I know Matt is working on this, and we have no idea if the effort will be successful, but that's the "perfect world" outcome they'd like.

---

**From:** Ed Martin [mailto:edmdem@gmail.com]
**Sent:** Wednesday, March 04, 2009 11:14 AM
**To:** Harold Cook; Glenn Smith; Sam Harper; Anthony Gutierrez; Jeff Rotkoff; Katrina Mendiola; Kirsten Gray
**Cc:** Steve.Scheibal@senate.state.tx.us; laurie@angleandassociates.com
**Subject:** Voter ID Working Group tasks and conference call today

All,

Matt suggested we have a working group conference call today - probably mid to late afternoon - so we can go over what we need to get done for the Senate hearing and immediately before and after Tuesday.

Before the call, we need to consider and agree on the following action items to make best use of our time. I tried to list who is working on these items below. Am I missing anything?

We are now focusing on only two public events - the hearing and a Monday afternoon press event. In the meantime, we have additional materials to prepare, private briefings to schedule, and press calls to make.

1. The Tuesday hearing
a. TDP and nonpartisan groups are working to build a crowd and get witnesses to register or testify -

3/5/2009

Anthony, Katrina, Harold
b. Expert witnesses being ID'ed and schedules arranged - Sam and Harold
c. Materials prepared - Ed, Glenn, Harold

2. Monday Press Conference
a. Steve has on Senator Watson's schedule, Senator Van de Putte positive
b. Expert witness(es) participation and prep needs to be arranged - Sam, Harold, Ed
c. Nonpartisan participation needs to be arranged - Katrina, Harold
d. materials prepared - Glenn, Ed or Harold (?) with Steve/Senate staff and Katrina with nonpartisans

3. Materials/Research Needs
a. Experts developing friendly questions for Senators - Sam, Harold
b. Questions for Republican witnesses - Experts, Ed and Harold w/ Gerry Hebert
c. ID additional Studies to Rebut to R's Indiana claims - Sam with experts
d. Bureaucratic hurdles - Glenn developing graphic, Ed straight copy if needed with help from Katrina
e. Video? - Glenn
f. additional data on Women - Ed, Sam, Katrina

4. Press contacts:
a. Kirsten, Glenn, Ed and Harold divide up list for press contacts Thursday (including TV) to ID (or encourage) anyone writing weekend or lead strories and provide them information and message
b. Nonpartisans providing and vetting "real person" for feature story or TV piece - Katrina and Harold
c. Deliver Spanish language Hispanic press "vote suppression" frame - Anthony, Rick at TDP

5. Briefings
a. Schedule experts with Senators - Harold/Sam with experts, others working issue by Harold/Senator request
b. Possibly schedule experts with selected House Members - Jeff/Sam (and Matt), others working issue by Jeff/House Member request

Ed

3/5/2009

KPW-PRIV000276

**Katie O'Brien**

| | |
|---|---|
| **From:** | Harold Cook <hc@haroldcook.com> |
| **Sent:** | Tuesday, September 13, 2011 8:24 AM |
| **To:** | Sondra Haltom |
| **Subject:** | DEM CAUCUS: DoJ Letter - TDP |
| **Attachments:** | DOJ letter - final.docx; ATT00001.htm |
| **Importance:** | High |

**Attention voting rights/voter ID policy staff, General Counsels, members:**

Texas Democratic Party has researched and written an "everything but the kitchen sink" objection letter in reaction to the voter ID law which they would like to send to the Department of Justice. They are asking Democratic House members and Senators to consider adding their names to the letter.

Since they would like to email this letter by 5 pm today, if your member agrees to sign onto this letter (preferably via electronic sig, since time is short), **please "reply to all" by 2 pm today**, so that both Sondra Haltom at TDP and I can know to include you, and so she and I can work out the logistics of your Senator's signature.

Because of a communication sent by DoJ to the South Carolina Attorney General requiring additional information regarding pre-clearance of their voter ID law, there is reason for cautious optimism regarding DoJ's attitude regarding Sec. 5 pre-clearance of Texas' voter ID law, so any additional objections received from Texans cannot hurt, and might very well be helpful, so I would recommend that Senators lend their signatures to this effort.

The letter is attached.

Begin forwarded message:

**From:** Sondra Haltom <shaltom@txdemocrats.org>
**Subject: FINAL copy of our DOJ letter**
**Date:** September 12, 2011 5:28:30 PM CDT
**To:** "Harold Cook (hc@haroldcook.com)" <hc@haroldcook.com>, Clifton Walker <cliff.w.walker@gmail.com>, "Roger Garza (roger.garza@gmail.com)" <roger.garza@gmail.com>

Gentlemen,

Attached is the final version of our letter to DOJ as approved by all our powers that be (including our legal counsel). Thank you for all your help tracking down info. I would like to send this plus copies of all the supporting docs to DOJ via email by 5pm tomorrow with a hard copy to follow. I would greatly appreciate if you could encourage your members allow us to add their names to it. If they've got digital signatures we can use that's super. If not, we'll figure it out. I will also be working on getting signatures from our SDEC members who represent minority constituencies. The more the merrier, but time is of the essence.

Please let me know if that request is do-able.

1

Sondra Haltom
Political Director
Texas Democratic Party
505 West 12th Street, Suite 200
512-478-9800 phone
512-480-2500 fax

Support the Texas Democratic Party by becoming a Texas Majority Builder at www.txdemocrats.org

KPW-PRIV000305

Mr. T. Christian Herren, Jr.
Chief, Voting Section
Civil Rights Division
Room 7254 - NWB
Department of Justice
950 Pennsylvania Ave., N.W.
Washington, DC 20530

Dear Mr. Herren,

The Texas Secretary of State's office recently submitted for pre-clearance SB 14, which imposes strict photo I.D. requirements for voting.  The people most likely to not have the types of identification required by this legislation are African Americans, Latinos, Asians, women, students, the elderly, disabled voters, low-income voters, and veterans.  We are writing to strongly urge you not to grant pre-clearance to this legislation on the grounds that it not only violates Section 2, 5 and 10 of the Voting Rights Act, we believe it to be in violation of the 14th, 15th, 19th, 24th, and 26th Amendments to the Constitution.  While the burden of proof is on the state to show that the legislation will not have the effect of denying or abridging the right to vote on account of race or color, and to date they have provided no evidence of which we are aware that proves this, we feel it is our duty to provide your office the overwhelming evidence that this legislation is in fact discriminatory, both in purpose and effect, and violates not only the VRA, but also several amendments to the Constitution.

We have included with this letter supporting documents that confirm the statistics and statements referenced therein, editorials from major Texas newspapers opposing the legislation, as well as a petition signed by over 6700 registered Texas voters expressing their opposition to this law.  As you will see, 87 African Americans, 34 Latinos, 4 Asians, and many others, for a total of 226, who signed the petition indicated that they do not possess the types of identification that will be required under SB 14 and are likely to be disenfranchised.  Those are real people whose rights are being violated by this legislation, the purpose and effect of which is to suppress the vote.

## Review of the laws

Under the **Voting Rights Act of 1965**,  your office must review this legislation for pre-clearance before it can go into effect. As you know, Texas is covered by this provision due to our state's long history of discrimination.

Section 2 states "No voting qualification or prerequisite to voting, or standard, practice, or procedure shall be imposed or applied by any State or political subdivision to deny or abridge the right of any citizen of the United States to vote on account of race or color."  Texas is also required to show that the proposed change does not have the purpose or effect of discriminating against a "language minority group." Membership in a language minority group includes "persons who are American Indian, Asian American, Alaskan Natives or of Spanish heritage." Section 5 states  "Whenever a State or political subdivision with respect to which the prohibitions set forth in section 4(a) are in effect shall enact or seek to administer any voting

KPW-PRIV000306

qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1964, such State or subdivision may institute an action in the United States District Court for the District of Columbia for a declaratory judgment that *such qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, and unless and until the court enters such judgment no person shall be denied the right to vote for failure to comply with such qualification, prerequisite, standard, practice, or procedure…*"

Section 10 states "(a) The Congress finds that the requirement of the payment of a poll tax as a precondition to voting (i) precludes persons of limited means from voting or imposes unreasonable financial hardship upon such persons as a precondition to their exercise of the franchise, (ii) does not bear a reasonable relationship to any legitimate State interest in the conduct of elections, and (iii) in some areas has the purpose or effect of denying persons the right to vote because of race or color. Upon the basis of these findings, Congress declares that the constitutional right of citizens to vote is denied or abridged in some areas by the requirement of the payment of a poll tax as a precondition to voting."

We believe that SB 14 is in violation of all of these sections of the VRA. Detailed evidence will be provided in the forthcoming sections.

The **14th Amendment** states that "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."  The Supreme Court has repeatedly stated that voting is a "fundamental right" on the same plane as marriage (*Loving v. Virginia*), privacy (*Griswold v. Connecticut* (1965)), or interstate travel (*Shapiro v. Thompson* (1969)). For any abridgment of those rights to be constitutional, the Court has held, the legislation must pass strict scrutiny. Thus, on this account, equal protection jurisprudence may be appropriately applied to voting rights.  By imposing impediments to voting that disproportionately affect minorities, low-income voters, the elderly, the disabled, and others who are not as easily able to obtain the necessary id, SB 14 violates the Equal Protection Clause of the 14th Amendment.

The **15th Amendment** states that "The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude" and that "The Congress shall have power to enforce this article by appropriate legislation" which it did through the Voting Rights Act of 1965, which shall be discussed later. By requiring documentation that voters of color are less likely to possess than white voters, SB 14 violates the 15th Amendment.

The **19th Amendment** states that "The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of sex."  By requiring a strict set of documentation that is less likely to be an exact match to the voter records for women than for men, SB 14 violates the 19th Amendment.

The **24th Amendment** states that "The right of citizens of the United States to vote in any primary or other election for President or Vice President, for electors for President or Vice President, or for Senator or Representative in Congress, shall not be denied or abridged by the United States or any State by reason of failure to pay any poll tax or other tax."  Poll taxes of any kind were further declared unconstitutional in *Harper v. Virginia Board of Elections* (1966) because they violated the Equal Protection Clause of the Fourteenth Amendment.  (See above). The monetary costs of obtaining identification and/or the documents required to obtain a free Election Identification Certificate, in addition to the cost of travel and possible lost wages if a voter is required to take time off work to obtain the required I.D. are costs incurred in order to vote and are therefore equivalent to a poll tax.

The **26th Amendment** states that "The right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged by the United States or by any State on account of age."  College students and elderly voters are disproportionately negatively affected by this legislation, making it a violation of the 26th amendment.

## History of discrimination

Sadly, Texas has a long history of not wanting to enfranchise voters.  Our state challenged the 14th and 26th amendments in court, grudgingly ratified the 15th amendment as a condition for being able to re-join the union after the civil war, and only just recently ratified the 24th amendment in 2009.

Unfortunately, we don't have to reach very far back in time to provide evidence of voter intimidation and suppression targeted at minority communities right here in Texas.  The Department of Justice has been called upon several times recently to combat these practices.

In 2006, our state Attorney General went on a self-appointed crusade against voter fraud, harassing members of the African American community, ultimately to come up empty handed.

In 2008, the Texas Democratic Party was forced to file a lawsuit against the Harris County Tax Assessor Collector Paul Bettencourt over practices that denied almost 70,000 Harris County citizens the right to register and vote.  Although a settlement agreement was reached in that case, the TDP had to take his successor to court again for violating the terms of the settlement.  There remains compelling evidence that Harris County denies thousands of voter registration applications - more than any other in the nation - and that those rejections fall disproportionately on minority voters.

In 2010, the King Street Patriots, a shadowy "non-partisan" organization closely aligned with the Republican Party implemented their "True the Vote" program in Harris County. There the organization's poll watchers, predominantly white people at polling locations in minority neighborhoods, harassed and intimidated voters. Numerous complaints were filed, prompting the County Attorney's office to step in and your Department to send federal inspectors to monitor the election.

KPW-PRIV000308

Recently in Waller County, a place on which you probably have a thick file, a local African American candidate made allegations of voter fraud committed by the County Clerk; fraud which he believes cost him the election. The investigation is ongoing, but as you will read in the enclosed article, many in the county feel there is something rotten in Waller, and it wouldn't be the first time.

## The Facts

As you know, studies have shown that 11 percent of eligible voters, more than 20 million Americans, do not have a government-issued ID. This percentage is even higher for women, seniors, racial minorities, low-income voters and students. Election experts from Rutgers and Ohio State Universities have shown that the implementation of photo I.D. laws in other states caused a 3% across-the-board reduction in voter turnout during the 2004 presidential election. Their studies found a decrease in voter turnout of 5.7% among African-Americans and 10 percent among Hispanics.

Specifically here in Texas, according to estimates by the Carter-Baker commission, the photo I.D. bill is likely to disenfranchise anywhere from 150,000 to 500,000 of the 13,000,000 eligible voters. While testifying in the House Select Committee on Voter Fraud, the former Chair of the Bipartisan Indiana Election Commission stated that SB 14 is "stricter than the Indiana law" and stands to be the strictest photo I.D. bill in the country. Texas already ranks 50th in the country in the number of eligible voters who vote, and a strict photo I.D. law is likely to further reduce the number of eligible voters that participate in Texas elections.

### Who doesn't have the right types of id?

SB 14 is so restrictive in the forms of identification that are acceptable, that many people will not be able to meet such a high burden. The only acceptable forms of I.D. under SB 14 are a Texas driver's license or personal identification card issued to the person by the Department of Public Safety that has not expired or that expired no earlier than 60 days before the date of presentation; a United States military identification card that contains the person's photograph that has not expired or that expired no earlier than 60 days before the date of presentation, a United States citizenship certificate issued to the person that contains the person's photograph; a United States passport issued to the person that has not expired or that expired no earlier than 60 days before the date of presentation; a license to carry a concealed handgun issued to the person by the Department of Public Safety that has not expired or that expired no earlier than 60 days before the date of presentation, or an election identification certificate (a new, free type of identification that would be issued by DPS).

One in five senior women do not renew their drivers' licenses. Though SB 14 allows for a license that was expired in the sixty days prior to an election date to be considered valid, many senior women no longer drive and have no reason to renew their license. The Brennan Center for Justice has found that voters over 65 were eight percent less likely to have a driver's license than younger voters. Texas college students registered to vote in Texas cannot use an out-of-state driver's license. We've enclosed the costs of a Texas driver's license or personal I.D., which varies depending on age, with this packet. Requiring voters to obtain or renew a license or I.D.

KPW-PRIV000309

they would otherwise not have had to obtain creates a new hardship for voters. Also, due to recent budget cutbacks, wait times at state run driver's license offices in the most populated counties typically run 1 to 2 hours.

Further, only voters who serve in the military would be able to obtain a military id. Voters who are natural born citizens who do not intend to travel outside the United States have no reason to obtain a citizenship certificate or passport. And, only 2% of Texans have a concealed handgun license.

**Why not allow other forms of I.D.?**

The purpose of the photoI.D.is allegedly to allow poll workers to match the face of the person appearing before them wishing to vote with the name on the registration list. The I.D. card is not used to confirm residency, and therefore, the address on the I.D.is irrelevant. Even so, there are other types of photo id, including photo I.D. issued by governmental entities, that provide the same ability (to put a face with a name) that are not acceptable as valid forms of identification for voting under this law.

The Texas Secretary of State's office has recently declared that a Veterans Administration I.D. card (even though it contains the person's name and a photo) is not a valid form of photo I.D. under the new law.

College students, including those who attend state schools, are not allowed to use their school I.D. as acceptable proof of identification to vote. The University of Texas for example, provides students with a photo I.D. that has their name and a magnetic strip containing identifying information. While the student is required to produce a government-issued photo I.D.as proof of identity, the list of acceptable forms of I.D.is more extensive than SB 14 (US or Canadian driver's license, temporary license, instruction permit, passport, alien registration card with photo, U.S. citizen I.D. card, or resident citizen card), which would allow more students the opportunity to vote.

**Why is the free Election Identification certificate not enough?**

While voters who do not have the specific types of photo I.D. required by the bill can obtain an Election Identification Certificate from the Department of Public Safety for free, many of the voters impacted face transportation barriers that prevent them from getting to a DPS office, particularly in rural communities. For example, in Senator Uresti's west Texas district, thousands of voters would have to travel 137 miles round trip in order to get to a full-service DPS office. Arlington, TX (a majority-minority city) is the largest city in America with no public transit system. Many other Texans face similar challenges. Below is summary of the current availability of DPS offices currently vs this past January. Due to budget cuts, many DPS offices are expected to be closed.

**DPS FACTS** (September 2, 2011 vs January 24, 2011)
- [ ]   **Currently, 12 counties do not have DPS stations**

    o  In January 13 counties did not have DPS stations -- Over 243,000 people live in these counties

☐    Currently, **81 counties have no office with an OPEN Drivers License station (includes the 12 offices above)**
    o  In January, 83 counties were without an OPEN DPS station
    o  Many DPS stations upgrading their computer systems in January and no timeline for when stations will be re-opened

☐    DPS officials are unsure if these new computer systems will function properly.
☐    New technology involves "air-cards" and internet based systems which may not function properly in all areas.
☐   DPS stations are only open Monday - Friday, with most closed during the lunch hours, thus placing a burden on working individuals

☐    There are **15 Drivers License offices that are open one day a week or less**
    o  In January, 7 stations operated only 1 day a week

Transportation barriers may not be the only impediment to obtaining a free I.D. for eligible voters. To obtain a free EIC, the voter will have to produce documentation verifying their identity, in most cases multiple pieces of identification, many of which (such as a birth certificate, which costs $22, or passport, which costs $145) cost money and take time to obtain. The Secretary of State's office claims that the documents required to obtain an EIC will likely be similar to the documentation required to obtain a personal ID. The list of the various types of documentation that are required by DPS to obtain a personal I.D. is enclosed.

The chart below from the Center on Public Policy Priorities shows that a significant percentage of the population does not have a birth certificate or passport. The percentage is even higher for African Americans, rural residents, and people with an income under $25,000. The entire research paper is enclosed.



Obtaining a birth certificate not only costs money, it requires the voter to present certain forms of identification, such as a photo id. If they had a photo id, they wouldn't be seeking the birth certificate just to obtain a free election identification certificate. The list of documents voters would need to produce in order to obtain a birth certificate is enclosed.

Not only do a disproportionate number of minorities lack the necessary documentation to obtain a free id, it is even more difficult for minorities without documentation to pay for the necessary documentation because a greater percentage of minorities than whites live in poverty. The chart below from the Texas Politics Project shows the breakdown of Texans living in poverty by ethnic group.

**Percentage of Total Persons in Poverty by Group, 2007**



**Difference from the Indiana Voter I.D. law**

Indiana allows voters to be exempted simply by signing an affidavit stating that they are indigent.

Indiana also has a longer period (10 days) for voters to appear to present I.D. or affirm that an exemption applies to them. They also may vote at the county election office during early voting and affirm that an exemption applies to them, without having to vote a provisional ballot and wait until the election is over as is required in the Texas law.

Voters in Indiana are also allowed to use an I.D. that has expired up to two years from the election, as opposed to 60 days for Texans.

College students in Texas are not allowed to use their school id, even those who attend state schools.

Indiana has attempted to address the DPS availability issue by requiring that full service license branches must remain open from 8:30 a.m. to 8:00 p.m. on the day before each general, municipal, primary and special election and from 6:00 a.m. to 6:00 p.m. each general, municipal, primary and special election day solely for the purpose of issuing driver's licenses and photo identification cards.

**Inadequate Funding**

The fiscal note for SB 14 claims that the legislation will only cost the state $2 million to implement. This is incredibly unrealistic. The state admits in the fiscal note that it does not know the costs that will be incurred as a result of the free election identification certificates being provided. However, if the percentage of the eligible voting population who will need a free I.D. and the cost to the state per card is assumed to be similar to Indiana, then we can make the following assumptions, according to data provided by the United States Elections Project:

Indiana Voting Eligible Pop = 4,678,739
Texas Voting Eligible Pop = 15,407,666
Indiana provided 168,000 free IDs at a cost of $1,309,093 = 3.6% of VEP = $7.79 per card
3.6% of Texas VEP = 554, 676 people needing a free I.D. at $7.79 per card = $4,320,926 in cost to the state

Beyond that, the voter education component alone is likely to cost more than $2 million if done properly. According to our estimate of reasonable saturation just on television in all Texas media markets, the cost would be $2,128,250. In 2006, when former Secretary of State Roger Williams implemented the VoTexas initiative to inform voters about changes to the voting process using television, radio, print and internet advertisements, that initiative cost $5 million.

So if the cost of providing free IDs is on par with the costs incurred by Indiana to implement their law, and the state runs a true voter education program similar to the VoTexas program it ran previously, that alone is over **$9 million**, which is money the state of Texas doesn't have. An assumption is made in the fiscal note that HAVA funds will be available to help offset their $2 million estimate, but the Secretary of State's office was not able to tell the legislators how much, if any, HAVA funds might be available.

**Flawed Legislative Process**

This legislation was passed in a hurry as one of the Governor's "emergency" measures. A "Committee on Voter I.D. and Voter Fraud" was established in the State House, consisting of 6 Republicans and 3 Democrats, where hearings were hurriedly held and a vote was taken with little discussion. Once the bill reached the House floor, many points of order were raised and overruled, numerous amendments were offered to make the bill less onerous, such as same day registration and exemptions for voters over 65, but were voted down almost always on a party line vote. Several members raised questions about the impact the bill would have on voters in their districts, but their questions were met with deflection, obfuscation, and occasionally derision from the proponents of the bill. The transcript of the floor debate in the House is enclosed.

On the Senate side, the long-standing, much revered two-thirds rule, by which no bill can be brought to the floor without the consent of two-thirds of the Senators, was changed in 2009 to exempt voter id, allowing the bill to pass on a party-line vote of 19-12. This was done because it only takes 11 Democrats to block a controversial bill from coming to the floor and Senate Democrats had previously used the two-thirds rule to prevent similar legislation. It should be noted that all African American and Latino State Senators are Democrats, and all had repeatedly voted against the legislation. So the only way to get voter I.D. passed in the Senate was to disregard decades of Senate precedent.

**Improper Implementation**

Additionally, discrimination is likely to occur due to improper implementation of the legislation. The Secretary of State's office, as of August 3, 2011, still had not established procedures for implementing the legislation. At the Election Law Seminar held for County Elections officials, many of the questions raised by the elections officials as to how they were to go about holding the election under the legislation were unable to be answered by the Secretary of State's office. Further, even for those Texans who do have photo ID, SB 14 makes an assumption that all voters look like their driver's license photo, and many of us do not. In Texas, your license is good for 6 years and you can renew your license online every other time you renew, and you can renew online up to 2 years after your license expires. This means a voter could present a driver's license with a photo that is up to 14 years old – and many of us looked very different that many years ago. To illustrate this concern, we asked some Texas Democrats to send us their driver's license photos along with a current photo. I have included just a few of those photos in this submission as crystal clear evidence that there are a great many Texans who do not resemble their license photos. Under this legislation, the thousands of election judges across the state who are already overworked and underpaid for their civic service would now have to undergo additional training to learn to deal with the validity and accuracy of photo IDs and whether or not an eligible voter gets to cast their ballot may depend on an elderly poll worker's eyesight and judgment.

**Opposition from non-partisan groups**

But don't just take our word for it. This legislation was opposed by many non-partisan organizations who work with the affected communities. The list of witnesses for and against SB 14 during House and Senate testimony on the bill is enclosed. Organizations such as the League of Women Voters, the Coalition of Texans with Disabilities, the League of United Latin American Citizens, and the National Association for the Advancement of Colored People with long histories of championing the rights of voters registered against the bill. Notice that the entities signing in "for" the bill, such as the King Street Patriots and the Harris County Tax Assessor's office, are some of the same entities referenced earlier about whom complaints have been filed for voter intimidation and suppression. This is no coincidence.

Sincerely,

**Steve Scheibal**

| | |
|---|---|
| **From:** | Amber Hausenfluck |
| **Sent:** | Wednesday, September 07, 2011 2:12 PM |
| **To:** | Steve Scheibal |
| **Subject:** | FW: Senator Gallegos Request for information on DL |
| **Importance:** | High |

Harold email below ☺

Amber Hausenfluck
Deputy Legislative Director
Senator Van de Putte, R Ph.
E1.610
512-463-0126
amber.hausenfluck@senate.state.tx.us

**From:** Harold Cook [mailto:HC@HAROLDCOOK.COM]
**Sent:** Thursday, September 01, 2011 4:46 PM
**To:** Debra Gonzales
**Cc:** Amber Hausenfluck
**Subject:** Re: Senator Gallegos Request for information on DL
**Importance:** High

Debbie, this is VERY helpful.

Folks, this is crucial to fighting the voter ID sec. 5 pre-clearance, and whichever Senator speaks with DoJ next should forward Debbie's email to them.

Here's the deal: in a Sec. 5 pre-clearance, the burden of proof is on the state to prove that the law does NOT discriminate against minorities.

The state's pre-clearance submission from SOS didn't appear to address the data at all, on the racial make-up of those who DO have voter registrations but who do NOT have DPS photo ID. Debbie's email is evidence that DPS doesn't have such data.

If data exists that shows that a disproportionate percentage of minorities are without the necessary ID (as compared to the minority make-up of Texas' population), then it would be strongly suggestive that the effect of the voter ID law would be to unduly burden minority voters, more so than non-minority voters (which is key - you must harm minorities more than non-minorities, or some at DoJ would claim there is no discrimination).

Since the burden is on the state to prove that the voter ID law is not retrogressive, the Department of Justice should demand that the state provide data which shows:

1. percent of those who are registered to vote, but who do not have the necessary DPS-issued ID; and
2. the race of those registered Texans (or at least a Hispanic surname match, since that's so easily achievable).

If the percent of those people is greater than the percent of the general minority population, then it is strong evidence that the law would be retrogressive. If the state continues to claim that it cannot produce this data, then the state cannot possibly fulfill their burden to provide information proving that the law does not retrogress.

2

KPW-PRIV000315

So, there are two state agencies which should in theory be able to provide the necessary data: DPS, and SOS. SOS failed to do so in their DoJ submission. DPS, in their reply to Debbie, claims they cannot do so. The Department of Justice should either demand that the state produce the data, or fail to pre-clear. Without the data to prove the effect of the law, the state has not met its Sec. 5 burden.

Amber: this is exactly on point with the conversation LVP and I had with the DoJ official a couple of years ago in her office, who provided broad hints that this was one very strong direction to go in (although, since he was sucking up to the Bush White House, falsely claimed that the burden of proof would not be on the state, which it is).

On Sep 1, 2011, at 4:30 PM, Debra Gonzales wrote:

Here you go, let me know if you have any questions.

**Debra Gonzales**
**Legislative Director**
**Senator Gallegos**
**512-463-0106 office**
**512-463-0346 fax**

**From:** DPS Government Relations [mailto:Government.Relations@dps.texas.gov]
**Sent:** Thursday, September 01, 2011 3:45 PM
**To:** Debra Gonzales
**Subject:** RE: Senator Gallegos Request for Information on DL

Debbie,

I have confirmed with the Driver License Division that we are unable to provide the information the Senator seeks.  DPS does not have access to the full voter registration database, so we have no way to make the requested comparison.  You may remember during Session that we were asked several times how many Voter IDs DPS may be issuing, but we were unable to provide a number because we had no way to determine that.  That still holds true.

Thank you,

Rhonda S. Trumble
Assistant Chief, Policy
Public Affairs and Policy
Texas Department of Public Safety
(512) 424-2037

**From:** Debra Gonzales [mailto:Debra.Gonzales@senate.state.tx.us]
**Sent:** Thursday, September 01, 2011 11:36 AM
**To:** DPS Government Relations
**Subject:** Senator Gallegos Request for information on DL

KPW-PRIV000316

To whom it may concern,

I am formally requesting data from the Department of Public Safety on behalf of Senator Gallegos. The Senator wanted to get a copy of the data which showed the number of Texans who do have voter registrations, but who do not have driver licenses. If you do have this information, is it also available divided by Hispanic surname?
If this is something your office does not handle or does not exist, please write back and let me know. The timeline is as soon as possible. Thank you and if you have any questions feel free to email or call.

**Debra Gonzales**
**Legislative Director**
**Senator Gallegos**
**512-463-0106 office**
**512-463-0346 fax**

4

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Steve Scheibal**

| | |
|---|---|
| **From:** | Harold Cook <hc@haroldcook.com> |
| **Sent:** | Wednesday, March 04, 2009 2:57 PM |
| **To:** | Sara Gonzalez; Steve Scheibal; David Edmonson; Jeremy Warren; Graham Keever_SC; Warren von Eschenbach; Ian Randolph; Arturo Ballesteros; Hector Nieto; Tomas Larralde; Lara Wendler; Debra Gonzales |
| **Subject:** | Voter ID working group: Counterpoints to Republican claims about Indiana's law |
| **Attachments:** | Voter ID 09 Women and other issues.doc |
| **Importance:** | High |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |
| **Expires:** | Tuesday, August 25, 2009 12:00 AM |
| **Categories:** | Red Category |

Voter ID staff –

In anticipation of the expected Republican claim that the voter ID law did not reduce voter turnout following the initiation of the Indiana law, several members have asked for ammunition against that point. The article at the following link explains why that claim is ridiculous:

http://www.brennancenter.org/blog/archives/still_jumping_to_conclusions/

12

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

**Steve Scheibal**

| | |
|---|---|
| **From:** | Amber Hausenfluck |
| **Sent:** | Thursday, January 27, 2011 9:04 AM |
| **To:** | Graham Keever_SC; Micah Rodriguez; Harold Cook; Steve Scheibal; Ray Martinez; Debra Gonzales; David Edmonson; Will Krueger; Jason Hassay; Dan Buda; Graham Keever; Sara Gonzalez; Lara Wendler; Gonzalo Serrano; Oscar Garza; Sushma Smith |
| **Cc:** | Ida Garcia |
| **Subject:** | Voter ID Amendments |
| **Attachments:** | Voter ID Amendments.docx |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Hello all,

Attached is a list of the Vote ID Amendments presented yesterday.  Those that were accepted are in bold.  Thanks to Ida for compiling the list yesterday on the Senate Floor!

Amber Hausenfluck
Deputy Legislative Director
Senator Van de Putte, R.Ph.
E1.610
512-463-0126
amber.hausenfluck@senate.state.tx.us

---

**From:** Graham Keever **On Behalf Of** Graham Keever_SC
**Sent:** Wednesday, January 26, 2011 8:51 PM
**To:** Micah Rodriguez; Harold Cook; Amber Hausenfluck; Steve Scheibal; Ray Martinez; Debra Gonzales; David Edmonson; Will Krueger; Jason Hassay; Dan Buda; Graham Keever; Graham Keever_SC; Sara Gonzalez; Lara Wendler; Gonzalo Serrano; Oscar Garza; Sushma Smith
**Subject:** RE: Ray Martinez is famous

Rise and shine, it's a New Legislative Day!

---

**From:** Micah Rodriguez
**Sent:** Wednesday, January 26, 2011 5:04 PM
**To:** Harold Cook; Amber Hausenfluck; Steve Scheibal; Ray Martinez; Debra Gonzales; David Edmonson; Will Krueger; Jason Hassay; Dan Buda; Graham Keever; Graham Keever_SC; Sara Gonzalez; Lara Wendler; Gonzalo Serrano; Oscar Garza; Sushma Smith
**Subject:** RE: Ray Martinez is famous

Maybe we'll see Ray on the next season of Dancing with the Stars

---

**From:** Harold Cook [mailto:hc@haroldcook.com]
**Sent:** Wednesday, January 26, 2011 5:03 PM
**To:** Amber Hausenfluck; Steve Scheibal; Ray Martinez; Debra Gonzales; David Edmonson; Will Krueger; Jason Hassay; Dan Buda; Graham Keever; Micah Rodriguez; Graham Keever_SC; Sara Gonzalez; Lara Wendler; Gonzalo Serrano; Oscar Garza; Sushma Smith
**Subject:** Ray Martinez is famous

Ray Martinez is famous.

11

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Or would that be infamous? You be the judge. All I know is, Tom DeLay's mugshot looked friendlier.

12

KPW-PRIV000565

## Voter ID Amendments

1. Watson - increase penalties for voter suppression
   a. Tabled (19-11)
2. Davis - DPS shift of burden of notice if ID is for purpose of voting, then tell them for free
   a. Tabled (19-11)
3. Gallegos/Lucio/Hino - notice posting in all languages voter info available
   a. Acceptable to author; adopted
4. Lucio/Hino - posted notice in English and Spanish
   a. Pulled in light of passage of #3
5. **Zaffirni - requires photo notice to be separate from other notices**
   a. **Acceptable to author; adopted**
6. Davis - name doesn't match, then affidavit
   a. Tabled
7. LVP - college student ID
   a. Tabled (19-11); Frasier says SoS does not look at addresses
8. Davis - college ID
   a. pulled
9. Hino - extension of notice/full implementation to 2017
10. Zaffirini - affidavit to use voter reg. cert.
    a. Tabled (18-12)
11. Davis/Ellis (not in packet) - women with different names on ID's
    a. Amend to amend (Frasier) take out affidavit provision (2) b/c SoS says current policy to ask for certificate - not acceptable to Davis
    b. Tabled 18-12
12. Davis - name differences
    a. Tabled (19-11)
13. Davis - expired ID
    a. Tabled (19-11)
14. Lucio - thumbprint ID
    a. Tabled (19-11)
15. Davis - allowance for expired ID's only if expired after last general election (modeled after Indiana)
    a. Temporary w/draw
    b. Tabled
16. LVP - 2 alternate forms of ID
17. Gallegos - temporary drivers license
    a. tabled
18. **Hino - concealed hand gun**
    a. **adopted**
19. Ellis - student ID
    a. Tabled
20. West - elderly exemption
    a. Tabled 19 -11
21. West - medicare card
22. Lucio
    a. Tabled 19-11

**23. Lucio - expired license given 60 day window**
    a. **Acceptable and adopted**
24. Hino - photo/voter registration card…county option
    a. tabled
25. Gallegos
    a. Tabled 19-11
26. Gallegos - require DPS offices to be within 5 miles of public transp.
    a. tabled
27. Lucio - notice of name change
28. Ellis - same day
    a. tabled
29. Gallegos
    a. Tabled 19-11
30. Ellis/Uresti/Rodriguez - SoS annual report regarding disparate impact
    a. Tabled 19-11
31. LVP - SOS and Comp certify
    a. Tabled 19-11
**32. Watson - "ogden amendment"**
    a. **Acceptable and adopted 30 - 0**
33. West - school funding maintained
    a. Tabled
34. Ellis - effective date
    a. Tabled
**35. Patrick - if disabled and want to be exempt, just send doctor letter to SoS**
    a. **Acceptable and adopted**
36. Davis - permanent absentee status if disabled
    a. Tabled 19-11
37. Davis - Registration outreach, status, registration, voting places, ombudsman at state level re: issues
    a. Tabled 19-11
38. Davis - notice of removal from registry: death, outside country or county, cancellation
    a. Tabled 19-11
39. Davis - indigent voters provisional ballot/affidavit
    a. Pulled down
40. Duncan/Ogden/Patrick - indigent person as defined by state law then can cast provisional ballot, affidavit with registrar (or religious objection to photograph)
    a. Adopted 30-0
41. Davis (adaption of floor #6) match names, substantially similar and affidavit
    a. Acceptable and adopted 30 - 0

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Steve Scheibal**

| | |
|---|---|
| **From:** | Amber Hausenfluck |
| **Sent:** | Wednesday, September 07, 2011 2:10 PM |
| **To:** | Steve Scheibal |
| **Subject:** | FW: DOJ Voter ID Call for TUESDAY |
| **Attachments:** | SB 14 DOJ One Pager.docx |

Amber Hausenfluck
Deputy Legislative Director
Senator Van de Putte, R.Ph.
E1.610
512-463-0126
amber.hausenfluck@senate.state.tx.us

**From:** Amber Hausenfluck
**Sent:** Friday, September 02, 2011 4:28 PM
**To:** leticiavandeputte@gmail.com
**Cc:** Leticia Van De Putte
**Subject:** DOJ Voter ID Call for TUESDAY

Hi Senator,

Attached please find the important provision of SB 14 (voter id bill).  The second page is important facts I think the DOJ needs to know, especially that we have 81 counties that don't have OPEN DPS licensing stations.  Also, as Harold mentioned in his email yesterday, the SOS's office can't produce the number of minority voters this bill will affect.

Please let me know if you would like any additional information.  I have cc'd your state account in hopes that this attachment can be printed and put in your packet or printed for your use on Tuesday.

Have a great weekend.  I am going to try to get to San Antonio on Monday, but it just depends on when my parents leave Austin.  We are doing "lake house" shopping this weekend and they are scheduled to be departing sometime on Monday.

Thanks,

Amber

5

**SB 14 – Voter ID**
**IMPORTANT PROVISIONS**

**Exemption from Photo ID Requirement** (63.001 Elections Code)
- Exemption for disability from regular procedure for accepting a voter if
  - ○ documentation from US Social Security Administration evidencing applicant has been determined to have a disability; or
  - ○ US Department of Veterans Affairs determines a disability rating of at least 50 %; AND
  - ○ statement from SOS that applicant doesn't have a form of acceptable ID
- REMOVES **exemption for voters that are 70 years** or older on January 1, 2012 indicated by voter registration certificate (Senate Version)

**Forms of Acceptable ID**
- military ID card not expired over 60 days
- US passport not expired over 60 days
- license to carry a concealed handgun not expired over 60 days
- NO ID by tribal organization (House version)
- NO ID issued by the state (House version)

**Provisional Ballots**
- Provisional ballots SHALL be counted if
  - ○ a person provides affidavit for reasons for not having an ID
    - ▪ religious objection to photograph
    - ▪ natural disaster
- REMOVES option for indigent voters to execute an affidavit (Senate Version)

**NEW CHAPTER in Transportation Code (Chapter 521A)**
- creates Election Identification Certificate issued by DPS
- allows a person to obtain a free election identification certificate or a duplicate election identification certificate if the person submits a voter registration application to election identification certificate may not be used or accepted as a personal DPS
- identification certificate
- election officer may not deny the holder of an election identification certificate the ability to vote
- the identification certificate must be similar in form, but distinguishable in color from a driver's license and a personal identification certificate.
- certificate expires on a date specified by DPS except if certificate is issued to a person 70 years or older (that certificate does not expire).

**Miscellaneous**
- REMOVES a statewide effort to educate low-income and minority voters about the new voter ID requirement (House Version)

1

KPW-PRIV000569

## IMPORTANT FACTS TO BRING UP TO DOJ

**DPS FACTS** (CURRENT vs January 24, 2011)
- **Currently, 12 counties do not have DPS stations**
    - o In January 13 counties do not have DPS stations -- Over 243,000 people live in these counties
- Currently, **81 counties have no office with an OPEN  Drives License station (includes the 12 offices above)**
    - o In January, 83 counties without an OPEN DPS station
    - o DPS stations upgrading their computer systems and not timeline for when stations will be re-opened
- DPS officials are unsure if these new computer systems will function properly.
- New technology involves "air-cards" and internet based systems which may not function properly in all areas.
- DPS stations are only open Monday - Friday, with most closed during the lunch hours
    - o places  a burden on the working individuals
- There are **15 Drivers License offices that are open one day a week or less**
    - o In January, 7 stations that operate only 1 day a week b/c of the upgrades taking place
- In San Antonio the VIA bus public transport system does not run to the Pat Booker DPS Station
- In Dallas, there is no public transportation provided to the Cedar Hill DPS Station.

**MONEY**

- SOS's office sent out a letter dated January 25th, estimating that "an education program would **cost $2 million** and that the **state has sufficient HAVA funds** allocated for voter education and poll worker training that will cover this expenditure."
- The problem with this estimate is that the SOS's **office can't tell us the exact number of voters this new law will effect,** and what the racial make-up of those veterans is.
- Therefore, it **could cost way more than $2 million to educate voters** on such a big election law change.
- **The DOJ should ask the SOS's office to provide the data about the number people this change in law will affect.  If the SOS's office can't provide the data, then they can't prove that SB 14 will have a non-discriminatory effect.**

2

**Steve Scheibal**

| | |
|---|---|
| **From:** | Oscar Garza |
| **Sent:** | Monday, January 24, 2011 6:12 PM |
| **To:** | Graham Keever_SC; Dan Buda; Debra Gonzales; Harold Cook; Amber Hausenfluck; Steve Scheibal; Ray Martinez; David Edmonson; Will Krueger; Jason Hassay; Graham Keever; Micah Rodriguez; Sara Gonzalez; Lara Wendler; Gonzalo Serrano; Sushma Smith |
| **Subject:** | Probable Hinojosa Amendment |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Hinojosa is still uncertain but we drafted the following and contains two parts:

Part 1

We add (5) a voter's registration certificate containing the voter's photograph under Section 12.

Part 2

There will also be a newly created section that allows for counties to put a photograph on a voter registration card if the commissioners court chooses to do so. It reads as follows:

Sec. 15.0025. PHOTOGRAPH ON CERTIFICATE. The commissioners court of a county may authorize the county elections administrator or the county clerk, as applicable, to issue voter registration certificates that include a photograph of the voter and that may be used as proof of a voter's identification under Chapter 63.

Thanks,

_____
**Oscar Garza**
**Legislative Assistant**
**Senator Juan "Chuy" Hinojosa**
**(512) 463-0120**

---

**From:** Graham Keever **On Behalf Of** Graham Keever_SC
**Sent:** Monday, January 24, 2011 6:02 PM
**To:** Dan Buda; Debra Gonzales; Harold Cook; Amber Hausenfluck; Steve Scheibal; Ray Martinez; David Edmonson; Will Krueger; Jason Hassay; Graham Keever; Micah Rodriguez; Graham Keever_SC; Sara Gonzalez; Lara Wendler; Gonzalo Serrano; Oscar Garza; Sushma Smith
**Subject:** Amendments

As of right now, we're running with the Medicare card amendment only.

1

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Steve Scheibal**

| | |
|---|---|
| **From:** | Oscar Garza |
| **Sent:** | Monday, January 24, 2011 9:00 PM |
| **To:** | Amber Hausenfluck; David Edmonson; Graham Keever_SC; Dan Buda; Debra Gonzales; Harold Cook; Steve Scheibal; Ray Martinez; Will Krueger; Jason Hassay; Graham Keever; Micah Rodriguez; Sara Gonzalez; Lara Wendler; Gonzalo Serrano; Sushma Smith |
| **Subject:** | Another Probable Hinojosa Amendment |

Section 9 of the bill (starting on page 5, line 24) relates to providing notice of identification requirements to certain voters.

Is basically states that if a person is turned down due to insufficient identification they must be provided documentation on what are acceptable forms of identification as well as how to obtain a free ID.

This is not a problem except for the Sunset provision that makes the section expire on September 1, 2013.

We have drafted language to remove that provision by deleting Line 7 on page 6 which will require this practice to be ongoing.

Thanks,

_____

**Oscar Garza**
**Legislative Assistant**
**Senator Juan "Chuy" Hinojosa**
**(512) 463-0120**

---

**From:** Amber Hausenfluck
**Sent:** Monday, January 24, 2011 7:52 PM
**To:** David Edmonson; Graham Keever_SC; Dan Buda; Debra Gonzales; Harold Cook; Steve Scheibal; Ray Martinez; Will Krueger; Jason Hassay; Graham Keever; Micah Rodriguez; Sara Gonzalez; Lara Wendler; Gonzalo Serrano; Oscar Garza; Sushma Smith
**Subject:** RE: Amendments

Senator Van de Putte is interested in the following:

1. 2 alternative forms of ID (taken from SB 382 from the 81st)
2. Changes in the law do not take effect unless the comptroller determines that the legislature has appropriated the amount of money appropriate entities that is necessary to fully fund the implementation of this Act. The Changes in law do not take effect unless the Secretary of State has received certification from every county that they have completed the training and outreach designated in SB 14.
3. Mandating the poll workers check ID's for the sole purpose of identity and not to check where one lives

The talking points for the above amendments are attached.

I will bring the other amendments Senator Van de Putte had drafted to the floor tomorrow in case anyone wants to offer any of them.

Thanks,

Amber Hausenfluck

1

KPW-PRIV000595

Deputy Legislative Director
Senator Van de Putte, R.Ph.
E1.610
512-463-0126
amber.hausenfluck@senate.state.tx.us

**From:** David Edmonson
**Sent:** Monday, January 24, 2011 6:14 PM
**To:** Graham Keever_SC; Dan Buda; Debra Gonzales; Harold Cook; Amber Hausenfluck; Steve Scheibal; Ray Martinez; Will Krueger; Jason Hassay; Graham Keever; Micah Rodriguez; Sara Gonzalez; Lara Wendler; Gonzalo Serrano; Oscar Garza; Sushma Smith
**Subject:** RE: Amendments

Sen. Ellis is still going with the three I outlined yesterday. A few staffers have talked to me about their boss signing on to one of the amendments. **If your boss is interested in signing on, have them talk to Ellis tomorrow morning to physically sign the amendment.**

I've attached the text and a Q&A for each amendment as background. Thanks,

David

**From:** Graham Keever **On Behalf Of** Graham Keever_SC
**Sent:** Monday, January 24, 2011 6:02 PM
**To:** Dan Buda; Debra Gonzales; Harold Cook; Amber Hausenfluck; Steve Scheibal; Ray Martinez; David Edmonson; Will Krueger; Jason Hassay; Graham Keever; Micah Rodriguez; Graham Keever_SC; Sara Gonzalez; Lara Wendler; Gonzalo Serrano; Oscar Garza; Sushma Smith
**Subject:** Amendments

As of right now, we're running with the Medicare card amendment only.

2

**Memorandum**
March 9, 2009

**To:**        Senators

**From:**     Harold

**Subject:**   **Expert Witnesses: Background and Suggested Questions**

**Tova Andrea Wang**, democracy fellow at The Century Foundation, is vice president for research at Common Cause. She is a nationally known expert on election reform and works on other issues related to civil rights and liberties as well. She was the Executive Director of The Century Foundation's Post-2004 Election Reform Working Group, comprised of many of the most preeminent election law scholars in the country. In 2001, she was staff person to the National Commission on Federal Election Reform, co-chaired by former Presidents Carter and Ford, of which The Century Foundation was a co-sponsor. She is the author of several election reform reports, and wrote the widely remarked upon report on voter fraud and voter intimidation for the US Election Assistance Commission. Her commentary on election reform has appeared in the *New York Times, Washington Post, National Journal*, national *Associated Press* reports, *The Nation, Los Angeles Times, Newsday, New York Daily News, St. Louis Post Dispatch, Minneapolis Star Tribune, The American Prospect,* and *Campaigns and Elections*, among other media outlets. She has frequently appeared on national radio and television, including C-SPAN's *Washington Journal,* MSNBC, NBC, and NPR. She has spoken at number of national election reform conferences and forums, provided her expertise to members of Congress, and given expert testimony regarding the new federal election reform law before the New York State Assembly, the New York State Senate, the New York State Board of Elections and the New York City Council. twang@CommonCause.org (202) 736-5729 (office)

**Dr. Toby Moore** is an elections and voting researcher in Washington with the non-profit, nonpartisan research organization Research Triangle Institute (RTI International), where he designs and directs election research projects in the United States and abroad.  He is currently directing technical assistance to the U.S. Election Assistance Commission in support of the EAC's 2008 Election Day Survey.  Before joining RTI, he served as project manager for the Commission on Federal Election Reform at American University.  From 2000 to 2006 he was the political geographer of the Voting Section of the Civil Rights Division, U.S. Department of Justice, where he served as redistricting expert and demographer.  A geographer by training, he earned his B.A. from the University of North Carolina at Chapel Hill, his M.A. from the University of North Carolina at Charlotte, and his Ph.D. from the University of Iowa. Tobymoore@rti.org   (o) 202-728-2085 (f) 202-728-2095 (c) 202-510-1320.

**Daniel B. Kohrman** is a Senior Attorney with the AARP Foundation in Washington, DC.  Dan handles trial and appellate litigation in two major areas:  *employment discrimination;* and *voting and government integrity.*  Currently, Mr. Kohrman is one of the co-counsel for the plaintiffs in federal litigation challenging state "photo ID" voting laws in Georgia (*Common Cause Georgia v. Billups*) and Arizona (*Inter-Tribal Council of Arizona v. Brewer*).  In the Georgia case, AARP

HIGHLY CONFIDENTIAL – FOR ATTORNEYS' EYES ONLY

and its co-counsel twice succeeded in enjoining state law until the State Legislature acted to strengthen voter protections in the photo ID law.  The Arizona case now is pending before the U.S. Court of Appeals for the Ninth Circuit.

**Mr. Adam Skaggs,** Brennan Center, works on a range of election administration and voting rights concerns, including the Center's efforts to reform the process of voter registration. Before joining the Brennan Center, he was a litigation associate at Paul, Weiss, Rifkind, Wharton & Garrison LLP. In 2003, Mr. Skaggs graduated summa cum laude with a J.D. from Brooklyn Law School, where he was a member of the Brooklyn Law Review. He subsequently clerked for Judge Stanley Marcus of the U.S. Court of Appeals for the Eleventh Circuit and Judge Edward Korman, Chief Judge of the U.S. District Court for the Eastern District of New York. Mr. Skaggs received an M.S. in Urban Affairs from Hunter College of the City University of New York, and holds a B.A., awarded with distinction, from Swarthmore College.  Adam.skaggs@nyu.edu, 212-992-8976.

**Chandler Davidson,** Research Professor and Tsanoff Chair of Public Affairs Emeritus, taught at Rice from 1966 to 2003 and still occasionally teaches despite his emeritus status. He was a founding member of the Department of Sociology and served as departmental chair for fourteen years between 1979 and 2003. In the latter part of his career, he had a joint appointment with the Department of Political Science. Davidson has won five university-wide teaching prizes, including Rice's top award, the George R. Brown Excellence in Teaching Prize. In addition to many articles appearing in academic journals and popular magazines, he has written or edited a number of books. In the early 1990s he and Professor Bernard Grofman of the University of California at Irvine directed a major scholarly effort to assess the impact of the Voting Rights Act of 1965 in the South. Funded by the National Science Foundation and the Rockefeller Foundation, the project involved almost thirty political scientists, historians, sociologists, and voting rights lawyers. The resulting book, "Quiet Revolution in the South" (Princeton University Press, 1994), was co-edited by Davidson and Grofman and won the Richard Fenno Prize awarded by the American Political Science Association for the best book published on legislative behavior that year. Davidson's work on voting rights has been cited several times in U.S. Supreme Court opinions. He is also continuing research on minority voting rights. In 2005-06 Davidson was asked to serve on the National Commission on the Voting Rights Act as Congress prepared to consider reauthorizing the non-permanent provisions of the Act. In that capacity he was the primary drafter of the Commission's 2006 report, Protecting Minority Voters. He was also invited that year to testify before the U.S. Senate Judiciary regarding the Act's reauthorization. Along with three historians, he is currently writing a book on the suppression of minority voters as a result of "ballot security" programs. (703) 669-0521 fcd@rice.edu

**Gary L. Bledsoe,** President of the Texas NAACP. graduated from the University of Texas at Austin with honors in 1973 and in 1976 from the University of Texas Law School. Attorney Bledsoe has spent his professional career in law working as an Assistant City Attorney from 1976-79, Assistant Attorney General from 1979 to 1994. Then, after, he worked in private practice and also as an instructor at St. Mary's University Law School. In 1993 he was a Fellow at the University of Texas Law School Center of Public Policy Dispute Resolution. Attorney Bledsoe opened the First Texas NAACP State Office in 1991. During his tenure Texas local branches have grown, developed and collectively become the most respected civil rights

KPW-PRIV000600

organizations in Texas. He headed efforts to dismantle the Department of Public Safety's discriminatory promotion system, which led to the first African American and first woman Texas Rangers. Also he created the First Texas Corporate Diversity Partnership, an agreement with companies to increase their business with minorities, promote and hire minorities and provide scholarships and training for minorities. A former member of the U.S. Civil Rights Commission Texas Advisory Board, Attorney Bledsoe has received numerous awards, including the Attorney General of Texas Award for Lawyer of the Year for Prosecutor Assistance, the Austin Young Lawyer's Association Lawyer of the Year and the Arthur B. Dewitty Award for Contributions to Civil Rights in the Austin Area. 316 W. 12th St., Suite 307 Austin, TX 78701; 512-322-9992.

**Dennis Borel** is the Executive Director of the Coalition of Texans with Disabilities (CTD), Dennis is frequently called on for research, policy analysis and recommendations to the Texas Legislature and state agencies on issues surrounding disabilities. He serves on multiple advisory groups to state health and human services agencies and was appointed by Gov. Rick Perry to the State Independent Living Council and by HHSC Executive Commissioner Albert Hawkins to the Promoting Independence Advisory Council. He has successfully advocated for positive change in government policy and practice in employment, transportation, housing, health care and architectural barriers to promote the full inclusion of people with disabilities in community life. He was Project Director for CTD's history-making Team Everest expedition, an internationally-recognized expedition by a team of people with diverse disabilities to the world's tallest mountain. 512/478-3366. dborel@cotwd.org

**J. Gerald Hebert** is the Executive Director and Director of Litigation at the Campaign Legal center in Washington D.C. He joined the Legal Center in 2004. For the past fourteen years, Mr. Hebert has had an active federal court litigation practice specializing in redistricting and voting right issues and has worked on cases in more than two dozen states. Over the last three decades, he has served as legal counsel for parties and *amici curiae* in numerous redistricting lawsuits, including several cases decided in the Supreme Court. He served in the Department of Justice from 1973-1994 in many capacities, including Acting Chief, Deputy Chief, and Special Litigation Counsel in the Voting Section of the Civil Rights Division. From 1995 through 2007, Mr. Hebert also served as an Adjunct Professor of Law at Georgetown University Law Center where he taught election law and campaign finance regulation. ghebert@campaignlegalcenter.org 202-736-2200

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Questions for Toby Moore (Research Triangle Institute)**
**Primary Senator asking questions: Van de Putte**
**Senator Gallegos to ask a question on urban DPS offices**
**Senator Uresti to ask questions on rural DPS offices**

Q.   Didn't former President Jimmy Carter advocate a photo ID for voters a few years ago as part of the Carter-Baker Commission? (*top priority question*)

Q.   What evidence is there that those who lack a photo ID are more likely to be women?

Q If you were to use the AU survey approach you described and apply it to TX, do you have some idea of how many voters in TX today lack a photo ID?

Q. In seeking approval of any photo ID bill from DOJ, who bears the burden of proving the effects of a photo ID?  Do those claiming it is discriminatory bear the burden or does the State have to prove that a voter ID requirement does not have a discriminatory impact?

Q.  So DOJ doesn't have to produce affirmative evidence of how the photo ID law will discriminate against minority voters to deny preclearance, right?  So DOJ can block the photo ID bill from taking effect if they find that the State has failed to show that the law is free of a discriminatory purpose or effect, correct?

Q. What are the kinds of data that the State needs to produce about voter ID to get preclearance?

Q. So those data are needed to determine if the voter ID bill complies with the VRA, correct?  If those data are not known by the State or have not been produced, then the State cannot show today that the voter ID bill meets the requirements of the VRA can it?

Q.  Should the state be concerned about eligible but non-registered voters?

Q. How does the Texas bill differ from the Georgia and Indiana legislation?

*Less important questions*
Q.    Do you have any estimates what it will cost a state like Texas to develop and implement a public education programs to make voters aware of the new voter ID requirements?

Q.    Do you have any estimates what it will cost a state like Texas to develop and implement a revamped poll worker training course to emphasize the correct enforcement of the new, more complicated ID requirements?

Q.    Do you have any estimates what it will cost a state like Texas to develop and implement programs to distribute the required IDs, free of charge, to those who do not have them?

Q: **(FROM GALLEGOS):** The data I have from the Texas Department of Public Safety shows that in my home city of Houston, for example, it is very inconvenient for somebody to get to a DPS office to obtain the required photo ID. [state some specifics from the data distributed last week, specific to urban DPS offices' locations]. My question is this: do you believe that a hardship such as the one I described will have a negative effect on protected minorities' ability to do what is required of them under this bill? (Gallegos can ask follow up questions if he wants, but that is the DoJ money question)

Q: **(FROM URESTI):** I have the largest Senate district in Texas by far. In fact my Senate district stretches from San Antonio to El Paso, and entails more land mass than some entire states. It is very rural, and the distances between many residents and the nearest town are great. (give 3 examples – Terlingua to Alpine being a great one) My question is, do you believe that the distances represented in what I just described, coupled with the limited hours many of those DPS offices in rural areas have, represents a negative effect on protected minorities' ability to do what is required of them under this bill? (Uresti can ask follow up questions if he wants)

**Questions for Tova Wang (Common Cause)**
**Primary Senator asking questions: Gallegos**

Q.   Doesn't it solve the problem for those lacking a photo ID that under this legislation you can produce two other forms of ID?

Q.  Is there a great deal of voter fraud in the U.S. that justifies a voter ID?

Q.   What financial costs are there to the state if enacts a voter ID requirement?  [Are these costs one-time or are they recurring?  Explain.]

Q. How many cases of election fraud brought by the United States Department of Justice over the last several years were of the type that would have been addressed by voter identification?

Q.  Are there laws on the books right now that allow for prosecution of people who commit voter fraud?  Is there any proof that these laws are not working?

Q.  Do most states have a photo ID requirement?  Do the states that don't impose a photo ID requirement have huge fraud problems?

Q.  If the state provides a free ID to everyone, will it really be free?  (Follow-up, if needed:  Wasn't Indiana's ID free?  How did the "free" ID work in that state?

Q. In states that have voter ID requirements, are there any studies that have been done which show that the ID requirements in those states have not been applied evenhandedly?

Q: Please discuss the problems with vesting thousands of election judges with the authority to verify additional requirements.

Q: Can you comment on the likelihood that election judges will ask African Americans, Hispanics, and Asian Americans for proof of their ID at a higher rate than other voters?

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

**Questions for Adam Skaggs (Brennan Center)**
**Primary Senator asking questions: <u>Davis</u>**

Q. What did the Brennan Center's 2006 nationwide survey show about the % of people who cannot prove citizenship or who lack government issued photo ID.

Q. How is voter fraud not a problem if both the U.S. Department of Justice and the Texas Attorney General have launched widespread investigations and prosecutions of voter fraud?

Q. While you say that there is little evidence of voter impersonation, but what about all the examples last year of groups like ACORN submitting false registrations – like the entire roster of the Dallas Cowboys?

(the following questions for this witness are similar to those which should be asked of Republican witnesses, but we need to ask a Democratic witness in order to get the accurate answers)

**1. Regarding the Indiana case…in the Supreme Court case, no party or** *amicus* **cited even one case of impersonation at the polls in Indiana to the Supreme Court. Would it surprise you to learn that more Indiana voters have been disenfranchised by the law in the last two years than the number of reported cases of impersonation at the polls cited to the Supreme Court – or from anywhere in the country - in the last two decades?** [the answer includes the following bullet points]

- In limited-turnout local elections in Marion County, Ind. in 2007, 32 voters cast ballots that could not be counted because of the voter ID law. **Moreover, these were long-time voters: 14 of them had previously voted in at least 10 elections**.
- **At least 10 retired nuns in South Bend, Ind., were barred from voting in the 2008 Indiana Democratic primary election because** some of them were in their 80's and 90's and no longer had driver's licenses. **The supreme irony was that the nuns whose votes can't be accepted by a bunch of nuns because they don't have an ID…live with them in the polling place in their convent.**
- At least six other people also were relegated to filing provisional ballots. Among them was Lauren McCallick, an 18-year-old freshman at St. Mary's College in South Bend, who said she got ``teary-eyed'' and then angry at being rejected the first time she was old enough to vote.

**2. Voter ID advocates cite "studies" that attempt to show Voter ID laws do not suppress turnout, and even try to claim turnout increases in Indiana and Georgia were caused by Voter ID laws.** These "studies" compare turnout between election cycles  - between 2002 and 2006 or 2004 and 2008. Obviously, turnout can vary a lot between election cycles based on enthusiasm, candidates, and other factors.

a. Honestly, **isn't the real cause for the 2008 turnout increase in Indiana really all about Barack Obama** and John McCain and the excitement they generated and resources they spent **in a state that wasn't even competitive in 2004?**

b. Wouldn't a more valid analysis compare states with and without Photo ID requirements, over a period spanning several election cycles or the same national election cycle?

**3. How do you explain the fact that every time a thorough independent study looks into claims made repeatedly by Voter ID supporters that suggest thousands of dead people or non-citizens are registering and possibly voting, those claims are, without exception, proven to be wildly off base?**
(See briefing paper on Unsubstantiated GOP Claims for answer/facts)

**4.You have mentioned the Indiana experience, but** even Appeals Judge Posner, an outspoken conservative appointee, said in his opinion upholding the Indiana photo ID law: **"No doubt most people who don't have photo ID are low on the economic ladder and thus, if they do vote, are more likely to vote for Democratic than Republican candidates. Thus the new law injures the Democratic Party by compelling the party to devote resources to getting to the polls those of its supporters who would otherwise be discouraged by the new law from bothering to vote."** His comment seems to illustrate why Republicans use voter fraud claims to justify vote suppression activities that date back decades and continue today. **Do you know of any evidence of systematic voter fraud to contradict findings from academic studies that suggest the only real reason for the photo ID push is to provide Republicans a partisan advantage?**
(See briefing paper on GOP Power Grab for answer/facts)

**Questions for Gerry Hebert (Campaign Legal Center)**
**Primary Senator asking Questions: West**

Q. What examples can you provide that TX AG Abbott has administered TX election laws in an unfair manner?

Q. Are there instances of voter fraud that have not been prosecuted by AG Greg Abbott? (Highland Park)

Q. What about those who claim that there are noncitizens on the voter rolls? Will a photo ID law for voting stop that?

Q. We hear a lot about noncitizens being on the voter rolls. What can you tell us about that issue, how it happens if it does?

Q. Do you need a photo ID to board an airplane or cash a check? (Answer is no)

Q. How does the legal standard that DOJ will employ to any TX voter ID law differ from the legal standard that the Supreme Court used to decide the Indiana voter ID case?

Q. So the Indiana voter ID decision really is totally unrelated to the narrow legal issue that DOJ will decide under the Voting Rights Act? (Yes)

Q. Was AG Abbott's office aware of the voter registration barriers being put up by County officials to block the African American students at Prairie View University in Waller County and if so, what did he do to help the students and protect their voting rights?

Q. Of what relevance is it to obtaining Section 5 preclearance if the vast majority of minority legislators (Latinos, African Americans) vote against a particular bill?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Questions for Chandler Davidson (Professor Emeritus, Rice)**
**Primary Senator asking questions: <u>Shapleigh</u>**

Q. Dr. Davidson, could you explain to the Committee whether Texas and other Southern states have imposed restrictions on the right to vote but nonetheless characterized them as good government reforms?

Q. You agree that there has been a long history of discrimination against minority voters in Texas, correct?  How would you compare the proposal to implement a photo ID as a prerequisite to voting with other efforts in Texas to impose certain restrictions on the right to vote?

Q.  In practice, the enforcement and verification of additional Voter ID requirements will be left up to thousands of precinct polling place workers.  Based on your studies of Texas cases, is there reason to believe that there is a serious potential for discriminatory enforcement of ID requirements at the polls?

Q.  Again, based on your knowledge of vote suppression in Texas, what would the State have to do to make sure ID verification is practiced uniformly at all Texas polling places?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Questions for Gary L. Bledsoe (Texas NAACP)**
**Primary Senator asking questions: <u>Ellis</u>**

Q. Some say the Voting Rights Act is no longer needed is a thing of the past that is no longer needed in Texas. Can you cite examples or give reasons that show why we still need voting rights protections?

Q. Is there a well-documented history of voter suppression that is specifically related to race and ethnicity, and how would this Voter ID law fit into that history?

Q. How would this Voter ID law discriminate against people of color?

Q. If the Legislature exempts certain classes of voters, like seniors, from this bill, would that direct an even greater amount of its potential to disenfranchise voters at African Americans and Hispanics?

Q. Did you see the materials the Attorney General used in his highly publicized 2005-2006 campaign against "Voter Fraud"?

Q. In his anti-Voter Fraud campaign, the Attorney General used materials that included images of sickle cell stamps and photos of African Americans to illustrate signs of voter fraud – what does that tell you about the state's attitude and enforcement of voter fraud, and did the conduct and targets of Abbott's prosecutions fit into a pattern of vote suppression in Texas?

Q. Gary, you suggest a photo ID law would suppress African American turnout, but some Voter ID advocates claim Voter ID laws do not suppress turnout, and even claim turnout increases in Indiana and Georgia in 2008 were caused by Voter ID laws, compared to 2004 turnout when there was no photo ID in those states. Obviously, turnout can vary a lot between election cycles based on enthusiasm, candidates, and other factors. Did African American turnout in Texas increase in 2008 without a Voter ID law, and do you think the reason might be the same as the real reason for reports of higher turnout in Indiana and Georgia?

**Questions for Dan Kohrman (AARP)**
**Primary Senator asking questions: <u>Uresti</u>**

Q. What are other state's experiences implementing photo identification requirements to vote?

Q. In other states that have had challenges of similar legislation, how does Texas compare regarding the implementation timeframe?  In regards to outreach and notice of new requirements to voters?  Relating to poll worker training?

Q. Is the training and notice in the bill sufficient to ensure older Texans will be aware of the new requirements?

Q. What are the potential barriers for older Texans to obtain photo identification?  Are there any potential barriers when the state provides the identification for free?

Q. What potential barriers does this legislation pose for voters that may reside with family members or in an assisted living facility or nursing home?

Q. Can you expand on the "different forms of non-photo identification" requirements under this legislation?  Does Texas issue a Medicaid card?  What information does a Medicare card contain?  Does everyone entitled to receive a social security check receive it via mail?

**Questions for Dennis Borel (Coalition of Texans with Disabilities)**
**Primary Senator asking questions: Zaffirini**

Q. Are people with disabilities less likely to have a photo ID? If so, why?

Q. Are people with disabilities less likely to have other documents that could be used to verify identity under SB 362? If so, why?

Q. Has Advocacy, Inc. worked with any individuals who would not be able to meet the identification standards of SB 362/

Q. What is required to obtain a photo identification in Texas?

Q. What additional barriers do people with disabilities have in obtaining the forms of ID requested by this bill?

Q. Would the written notice provided for in SB 362 be sufficient to ensure access to accurate information about this new ID requirement information for the full range of people with disabilities in our state?

Q. What would be necessary to ensure that if SB 362 were passed, that the disability community would understand the new law?

Q. What affect do you believe SB 363 would have on turnout of voters with disabilities?

(Q. Could SB 363 negatively impact any voters who have a photo ID?

Q. What affect do you believe SB 363 would have on the number of provisional ballots cast by voters with disabilities?

(Q. In the hotline that Advocacy, Inc runs for voters with disabilities, what are the most pressing issues reported by voters with disabilities? And, does SB 363 address any of these issues?

Q. Are their any issues affecting Texans with disabilities that would better utilize the funds required to implement SB 362?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

## Q. and A. for Republican Witnesses
## (all appropriate Senators should pile on, for their expert witnesses, and ignore their public witnesses)

**1. You say the law in Indiana is working…in the Supreme Court case, no party or** *amicus* **cited even one case of impersonation at the polls in Indiana to the Supreme Court. Would it surprise you to learn that more Indiana voters have been disenfranchised by the law in the last two years than the number of reported cases of impersonation at the polls cited to the Supreme Court – or from anywhere in the country - in the last two decades?**

- In limited-turnout local elections in Marion County, Ind. in 2007, 32 voters cast ballots that could not be counted because of the voter ID law. **Moreover, these were long-time voters: 14 of them had previously voted in at least 10 elections.**
- At **least 10 retired nuns in South Bend, Ind., were barred from voting in the 2008 Indiana Democratic primary election because** some of them were in their 80's and 90's and no longer had driver's licenses. **The supreme irony was that the nuns whose votes can't be accepted by a bunch of nuns because they don't have an ID...live with them in the polling place in their convent.**
- At least six other people also were relegated to filing provisional ballots. Among them was Lauren McCallick, an 18-year-old freshman at St. Mary's College in South Bend, who said she got "teary-eyed" and then angry at being rejected the first time she was old enough to vote.

**2. You and other voter ID advocates cite "studies" that attempt to show Voter ID laws do not suppress turnout, and even try to claim turnout increases in Indiana and Georgia were caused by Voter ID laws.** These "studies" compare turnout between election cycles - between 2002 and 2006 or 2004 and 2008. Obviously, turnout can vary a lot between election cycles based on enthusiasm, candidates, and other factors.

- c. Honestly, **isn't the real cause for the 2008 turnout increase in Indiana really all about Barack Obama** and John McCain and the excitement they generated and resources they spent **in a state that wasn't even competitive in 2004?**
- d. Wouldn't a more valid analysis compare states with and without Photo ID requirements, over a period spanning several election cycles or the same national election cycle?

**3. How do you explain the fact that every time a thorough independent study looks into claims made repeatedly by Voter ID supporters that suggest thousands of dead people or non-citizens are registering and possibly voting, those claims are, without exception, proven to be wildly off base?**
(See briefing paper on Unsubstantiated GOP Claims for answer/facts)

**4.You have mentioned the Indiana experience, but** even Appeals Judge Posner, an outspoken conservative appointee, said in his opinion upholding the Indiana photo ID

law: **"No doubt most people who don't have photo ID are low on the economic ladder and thus, if they do vote, are more likely to vote for Democratic than Republican candidates. Thus the new law injures the Democratic Party by compelling the party to devote resources to getting to the polls those of its supporters who would otherwise be discouraged by the new law from bothering to vote."** His comment seems to illustrate why Republicans use voter fraud claims to justify vote suppression activities that date back decades and continue today. **Do you have any evidence of systematic voter fraud to contradict findings from academic studies that suggest the only real reason for the photo ID push is to provide Republicans a partisan advantage?**
(See briefing paper on GOP Power Grab for answer/facts)

**Steve Scheibal**

| | |
|---|---|
| **From:** | Amber Hausenfluck |
| **Sent:** | Wednesday, September 07, 2011 2:07 PM |
| **To:** | Steve Scheibal |
| **Subject:** | FW: Senator Gallegos Request for information on DL |

Amber Hausenfluck
Deputy Legislative Director
Senator Van de Putte, R.Ph.
E1.610
512-463-0126
amber.hausenfluck@senate.state.tx.us

**From:** Amber Hausenfluck
**Sent:** Thursday, September 01, 2011 4:37 PM
**To:** Debra Gonzales
**Subject:** RE: Senator Gallegos Request for information on DL

Thanks Debbie!  I emailed DPS to get the updated license station numbers.  Hopefully I will receive them before Tuesday.

Thanks again,

Amber Hausenfluck
Deputy Legislative Director
Senator Van de Putte, R.Ph.
E1.610
512-463-0126
amber.hausenfluck@senate.state.tx.us

**From:** Debra Gonzales
**Sent:** Thursday, September 01, 2011 4:31 PM
**To:** 'HC@HAROLDCOOK.COM'; MaryAnn Carrion
**Cc:** Sara Gonzalez; Amber Hausenfluck
**Subject:** FW: Senator Gallegos Request for information on DL

Here you go, let me know if you have any questions.

**Debra Gonzales**
**Legislative Director**
**Senator Gallegos**
**512-463-0106 office**
**512-463-0346 fax**

**From:** DPS Government Relations [mailto:Government.Relations@dps.texas.gov]
**Sent:** Thursday, September 01, 2011 3:45 PM

6

KPW-PRIV000667

Anchia's office wants to send letter: why wasn't't' this information provided?  why weren't cases prosecuted?

Argument: it's going to come out anyway; this keeps us from being buried in 5th Paragraph.
: if they say it's not a problem, it says fraud isn't problem
: protects Hopson

Me: we don't want to be the ones raising this: speaks to validity
        : Hispanic accusations: could try to make wedge
        : best case: Abbott says not big deal, we investigate big deals, makes look good
: better if they bring up: hey, this is how political all of this is

Danger: execution: define as questionable and suspicious
        DA letter: bullshit, discredit in advance

Docs refer to allegations of voter fraud: can't add cred to claims
can't say without saying suspicious, questionable claims