UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | |
|---|---|
| **MARC VEASEY,** *et al.*,<br><br>  Plaintiffs,<br><br>v.<br><br>**RICK PERRY,** *et al.*,<br><br>  Defendants. | Civil Action No. 2:13-cv-193 (NGR) |

### AMENDED SECOND SUPPLEMENTAL REBUTTAL DECLARATION OF M.V. HOOD III

I, M.V. Hood III, do hereby declare the following:

DEF2758

I.  **UPDATED ANALYSIS OF REVISED U.S. NO-MATCH LIST**

    A. The September No-Match List

On September 12, 2014, I received a revised copy of the U.S. no-match list. I will again update the section of my initial rebuttal report labeled "Additional Analysis of the U.S. No-Match List." Tables 6 and 7 in my original report have been updated using these new data.

For any analyses presented in this section of the report, I make use of the revised U.S. no-match list dataset as compiled by Professor Ansolabehere that I received on September 12th. In order to distinguish this list from subsequent no-match lists I will refer to these data as the September no-match list. From this list, the newest estimate of the number of persons recorded in Texas Secretary of State's TEAM database (the voter registration roll) that cannot be matched to a record in the databases related to the various IDs acceptable under SB 14 stands at **608,470** registrants. These Texas registrants did not return a match from the DPS or any of the federal databases. With these revised data, the size of the registrant population in this category equates to **4.51%**.[1] At the very least, slightly more than 95% of persons appearing on Texas' voter registration rolls should already have the necessary identification to comply with SB 14 as applied to in-person voting.

*Comparing the September No-Match List to the Second Combined August No-Match List*
In this section I will compare the updated September no-match list to the preceding version of the U.S. no-match list that I had labeled as the second combined August no-match list in my supplemental rebuttal declaration, submitted on August 15, 2014. The September no-match list, at 608,470, represents a drop of 178,257 registrants as compared to the previous no-match list that stood at 786,727. Well more than a fifth (22.66%) of the previous no-match list then was incorrectly assumed not to possess valid SB 14 identification. It is my understanding that these registrants were misclassified based on the license surrendered field in the DPS database. Any citizen moving from another state seeking to obtain a Texas driver's license must surrender their out of state license. The fact that an out of state license was surrendered is in no way an indication that the registrant in question lacks identification, as most in this category would now possess a Texas driver's license. I compared the supplemental file containing 183,408 VUIDs that had been transmitted on August 5, 2014 (referenced on page 5 of my August 15, 2014 supplemental rebuttal declaration) to the September no-match list. Of the 178,257 additional matches achieved on the most recent iteration in September, 99.93% (178,138) of the cases can be found on the August 5th supplemental file just referenced.[2] Turning back to the group of 183,408 registrants on the August 5th supplemental file, only 1.75% (3,214) remained on the no-match side of the equation in September.

---

[1] Professor Ansolabehere eliminated 76,822 records from the TEAM database who were recorded by DPS as being deceased. The total number of registrants now stands at 13,487,594.
[2] An additional 119 registrants not on the August 5th supplement and who were previously thought to be without ID were reclassified on the September list as being in possession of SB 14 identification.

2

*Estimating the SB 14 Affected Population*

In Table 1 of this report, I again make use of known facts about registrants to derive an estimate of the size of this group who may be affected by SB 14. The revised September U.S. no-match list contains a total of 608,470 registrants who are assumed to lack valid SB 14 identification. Of these, this same data source indicates that 73,958 (or 12.15% of the no-match list) are eligible to be exempted from the law because they have been flagged as being disabled. Registrants in this category are qualified to vote absentee by mail or can vote in person without identification by applying for and receiving a permanent disability exemption from their county voter registrar. In addition, there are 160,389 of the September no-match list who are 65 years of age or older. This group amounts to over a quarter (26.36%) of the September no-match list. Any registrant 65 or older can cast a ballot absentee by mail and is, therefore, not subject to the identification requirements of SB 14 unless they choose to vote in person.

I also re-ran the voter history files against the September no-match list to determine the numbers of these registrants who had voted since implementation of SB 14. In the first post-implementation election, there were 21,731 registrants on the no-match list who voted; for the 2014 Senate District 4 special election there were 191; for the March 2014 party primaries there were 16,340; and for the May party primary run-off elections a total of 8,110. A number of these registrants cast ballots in multiple elections. In all, across these four elections, there were a total of 21,731 unique voters, amounting to 3.57% of the September U.S. no-match list.

Of these 21,731 unique voters, 15,342 (70.60%) voted solely in-person (early or at their precinct on election-day). Another 365 (1.68%) voted absentee by mail in at least one election and in-person in at least one other election. A total of 6,024 (27.72%) votes were cast exclusively absentee by mail. Of these unique voters on the September no-match list, over 7 out of 10 voted at least once using a method (early or on election-day) requiring valid SB identification. Of those electors voting exclusively absentee by mail, 5,431 (or 90.16% of the total number of unique absentee-only voters) were 65 years of age or older. Again, any registrant 65 or older is qualified to vote absentee by mail. Only 517 absentee-only voters were under the age of 65. This amounts to 8.58% of the total number of absentee-only voters, or 2.38% of the total number of unique voters.[3] Examining these figures makes it clear that 97.62% of registrants who voted on the September no-match list are either unaffected by the law (those 65 or older choosing to vote absentee by mail) or have made adjustments to comply with the law by obtaining SB 14 identification (voted in person). Of course, a third possibility exists. It is still probable that at least some on the September no-match list are false-negatives and should not be on the list in the first place. Thus, it would be of no surprise if someone in possession of SB 14 identification and incorrectly placed on the September no-match list was determined to have voted in-person in a post-implementation election.

Combining the groups associated with disability status, age, and voting history allows for the computation of a new sub-class of no-match list registrants I will again label the *Affected Population*. Any registrant who is thought to currently lack valid SB 14 ID, who is not disabled,

---

[3] Because of missing values associated with the age variable it was not possible to categorize 1.26% of absentee-only voters as to whether they were above or below 65 years of age.

3

is under the age of 65, and who has not voted since implementation will be placed into this category as they may be affected by SB 14. On the other hand, any registrant on the September no-match list who is disabled, or over 65 years of age, or who has voted since implementation either doesn't have to be impacted by SB 14 or has already made any necessary adjustments as witnessed by the fact that they have turned out to vote since implementation. The size of the affected population stands at 371,666 registrants.

Dividing the size of the affected population by the total number of Texas registrants yields a figure of **2.76%.** To state things in the affirmative, 97.24% of registrants in Texas should be unaffected by SB 14.

Table 1. Estimating the Number of Texas Registrants who May be Affected by SB 14 (September No-Match List)

|  | Frequency | Percent of Total |
|---|---|---|
| Identified as Disabled | 73,958 | 12.15% |
| 65 or Older | 160,389 | 26.36% |
| Voted since Implementation of SB14 | 21,731 | 3.57% |
|     2013 Constitutional Amendment Election | 6,358 | 1.04% |
|     2014 Special Election-Texas Senate District 4 | 191 | 0.03% |
|     2014 Primary | 16,340 | 2.69% |
|     2014 Primary Run-Off | 8,110 | 1.33% |
| Unaffected Population | 221,860 | **36.46%** |
| Affected Population | 371,666 | **61.08%** |
| Indeterminate (Due to Missing Data) | 14,944 | 2.46% |
| Total Cases: September U.S. No-Match List | **608,470** | ---- |

Notes: Unaffected Population category comprised of any registrant on U.S. no-match list who is disabled, is 65 or older, or has voted since implementation of SB14.

Table 2 examines the September no-match list in light of the presence of state identification numbers.[4] Again, the presence of a state ID number should be an indication that the registrant in question has, or at one time possessed, a driver's license or state ID card from the Department of Public Safety which requires underlying documentation. Even if said driver's license or state ID were now expired, registrants falling into this category should have the same necessary underlying documentation to obtain a free EIC to vote in person if necessary. Of those 608,470

---

[4]Denoted as the official_id field in the TEAM database.

4

on the September no-match list, 296,226 or 48.68% have a state ID number associated with their record. Looking at the affected population as compared to the September no-match list as a whole, 194,326 out of 608,470 do not have a state ID number associated with their record. This amounts to 29.15% of the September no-match list, which leaves more than two-thirds (68.40%) of the September no-match list who should be unaffected by SB 14 or should have/are in possession of some form of expired DPS-issued identification. Comparing the number in the affected population who lack a state identification number to the total number of registrants, one finds that it represents only 1.31% of the current number of registrants in the TEAM database.

Table 2. Revised U.S. No-Match List, the Affected Population, and State Identification Numbers (September No-Match List)

|  | Frequency | Percent within Category |
|---|---|---|
| Total Cases with State ID Number | 296,226 | 48.68% |
|     Affected Population with State ID Number | 194,326 | 52.29% |
|     Affected Population without State ID Number | 177,340 | 47.71% |
|     Unaffected Population with State ID Number | 101,748 | 45.86% |
|     Unaffected Population without State ID Number | 120,112 | 54.14% |
| Unaffected Population | 221,860 | ---- |
| Affected Population | 371,666 | ---- |
| Total Cases: September No-Match List | 608,470 | ---- |

### B. Discussion and Conclusion

*September U.S. No-Match List*
The September no-match list reveals that at least 97% of registrants in Texas are already in compliance or should be unaffected by SB 14. This figure is considerably less than the size of the affected population I calculated using the original U.S. no-match list (released in June). Furthermore, my analysis does not take into account registrants that are currently suspense voters or registrants that have been flagged by Catalist (for example, as deceased). Either could be an indication that the voter is deceased or no longer an eligible voter in Texas. While Professor Ansolabehere accounts for such voters, he does not do so while simultaneously removing registrants that are over the age of 65 or disabled. Doing so would further decrease the size of any potential affected population.

Finally, a gap in ID possession at the present time certainly cannot be directly extrapolated into a gap in turnout at some future point in time. Nearly 22,000 registrants (see Table 1) have voted in a post-implementation election. This fact is some indication that the no-match lists are less than accurate or that some registrants have made adjustments to comply with SB 14. It is still my

5

contention that registrants who need to comply with SB 14 in order to vote will continue to do so and that the size of the affected population of electors will continue to diminish with time. The 2014 midterm in Texas will feature both federal and state contests, which will increase the degree of political interest in this election cycle. Given this, I would anticipate that if SB 14 is in effect, a larger proportion of registrants on the no-match lists will make adjustments, if necessary, and turn out to cast ballots.

*Conclusion*

To date, my opinion in this case remains unchanged. In summation, it is my opinion that there is insufficient evidence to conclude that SB 14 will produce (or has produced) a disparate impact on the Texas electorate, either in total or by racial or ethnic group.

## II. <u>DECLARATION</u>

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed on September 20, 2014.

*M.V. Hood III* (signature)

_____

M.V. (Trey) Hood III
Department of Political Science
School of Public and International Affairs
The University of Georgia
104 Baldwin Hall
Athens, GA 30602
Phone: (706) 583-0554
FAX: (706) 542-4421
E-mail: th@uga.edu

**Appendix: Data Sources**

Updated Voter History Files, 2013-14 [Texas Secretary of State].

September U.S. No-Match List [created by Professor Ansolabehere].

Second August Revised U.S. No-Match List [created by Professor Ansolabehere].

August U.S. No-Match List Supplement [created by Professor Ansolabehere].