# IN THE UNITED STATES COURT OF APPEALS

# FOR THE FIFTH CIRCUIT

_____

No. 14-41127

_____

MARC VEASEY; JANE HAMILTON; SERGIO DELEON; FLOYD CARRIER;
ANNA BURNS; MICHAEL MONTEZ; PENNY POPE; OSCAR ORTIZ; KOBY
OZIAS; LEAGUE OF UNITED LATIN AMERICAN CITIZENS; JOHN
MELLOR-CRUMMEY, KEN GANDY; GORDON BENJAMIN,

          Plaintiffs - Appellees

TEXAS ASSOCIATION OF HISPANIC COUNTY JUDGES AND COUNTY
COMMISSIONERS,

          Intervenor Plaintiffs - Appellees

v.

GREG ABBOTT, in his Official Capacity as Governor of Texas;  CARLOS
CASCOS, Texas Secretary of State; STATE OF TEXAS; STEVE MCCRAW,
in his Official Capacity as Director of the Texas Department of Public Safety,

          Defendants - Appellants

--------------------------------------------------------

UNITED STATES OF AMERICA,

          Plaintiff - Appellee

TEXAS LEAGUE OF YOUNG VOTERS EDUCATION FUND; IMANI
CLARK,

          Intervenor Plaintiffs - Appellees

v.

STATE OF TEXAS;  CARLOS CASCOS, Texas Secretary of State; STEVE
MCCRAW, in his Official Capacity as Director of the Texas Department of
Public Safety,

                 Defendants - Appellants

---------------------------------------------------------

TEXAS STATE CONFERENCE OF NAACP BRANCHES; MEXICAN
AMERICAN LEGISLATIVE CAUCUS, TEXAS HOUSE OF
REPRESENTATIVES,

                 Plaintiffs - Appellees

v.

CARLOS CASCOS, Texas Secretary of State; STEVE MCCRAW, in his
Official Capacity as Director of the Texas Department of Public Safety,

                 Defendants - Appellants

---------------------------------------------------------

LENARD TAYLOR; EULALIO MENDEZ, JR.; LIONEL ESTRADA; ESTELA
GARCIA ESPINOSA;  MARGARITO MARTINEZ LARA; MAXIMINA
MARTINEZ LARA; LA UNION DEL PUEBLO ENTERO, INCORPORATED,

                 Plaintiffs - Appellees

v.

STATE OF TEXAS;  CARLOS CASCOS, Texas Secretary of State; STEVE
MCCRAW, in his Official Capacity as Director of the Texas Department of
Public Safety,

                 Defendants - Appellants

---------------------

Appeal from the United States District Court for the
Southern District of Texas, Corpus Christi

---------------------

O R D E R :

IT IS ORDERED that the unopposed motion of Amici Curiae American Civil Liberties Union and the American Civil Liberties Union of Texas to supplement the record on appeal with two exhibits; the excerpts from the trial transcript of Frank v. Walker, No. 11-cv-1128 (E.D. Wis. 2011), and a trial exhibit at that trial, is GRANTED.

IT IS FURTHER ORDERED that appellants' motion for leave to file reply brief in excess of the word count limitation, but not to exceed 11,500 words, is GRANTED.  Appellants are directed to ensure that the actual reply brief filed does not contain new arguments not raised in their opening brief. Any violations of this directive will be addressed to counsel during oral argument.


/s/ Lyle W. Cayce
LYLE W. CAYCE
CLERK OF COURT

ENTERED AT THE DIRECTION OF THE COURT

No. 14-41127

# In the United States Court of Appeals for the Fifth Circuit

————————————

MARC VEASEY; JANE HAMILTON; SERGIO DELEON; FLOYD CARRIER; ANNA
BURNS; MICHAEL MONTEZ; PENNY POPE; OSCAR ORTIZ; KOBY OZIAS; LEAGUE
OF UNITED LATIN AMERICAN CITIZENS; JOHN MELLOR-CRUMLEY; KEN GANDY;
GORDON BENJAMIN, Plaintiffs-Appellees,
TEXAS ASSOCIATION OF HISPANIC COUNTY JUDGES AND COUNTY
COMMISSIONERS, Intervenor Plaintiffs-Appellees,
*v.*
GREG ABBOTT, in his Official Capacity as Governor of Texas; CARLOS CASCOS, Texas
Secretary of State; STATE OF TEXAS; STEVE MCCRAW, in his Official Capacity as Director
of the Texas Department of Public Safety, Defendants-Appellants.

————————————

UNITED STATES OF AMERICA, Plaintiff-Appellee,
TEXAS LEAGUE OF YOUNG VOTERS EDUCATION FUND; IMANI CLARK,
Intervenor Plaintiffs-Appellees,
*v.*
STATE OF TEXAS; CARLOS CASCOS, Texas Secretary of State; STEVE MCCRAW, in his
Official Capacity as Director of the Texas Department of Public Safety, Defendants-Appellants.

————————————

TEXAS STATE CONFERENCE OF NAACP BRANCHES; MEXICAN AMERICAN
LEGISLATIVE CAUCUS, TEXAS HOUSE OF REPRESENTATIVES, Plaintiffs-Appellees,
*v.*
CARLOS CASCOS, Texas Secretary of State; STEVE MCCRAW, in his Official Capacity as
Director of the Texas Department of Public Safety, Defendants-Appellants.

————————————

LENARD TAYLOR; EULALIO MENDEZ, JR.; LIONEL ESTRADA; ESTELA GARCIA
ESPINOSA; MARGARITO MARTINEZ LARA; MAXIMINA MARTINEZ LARA;
LA UNION DEL PUEBLO ENTERO, INCORPORATED, Plaintiffs-Appellees,
*v.*
STATE OF TEXAS; CARLOS CASCOS, Texas Secretary of State; STEVE MCCRAW, in his
Official Capacity as Director of the Texas Department of Public Safety, Defendants-Appellants.

————————————

On Appeal from the U.S. District Court for the Southern District of Texas, Corpus Christi
Division, Nos. 2:13-cv-193, 2:13-cv-263, 2:13-cv-291, and 2:13-cv-348.

## MOTION OF *AMICI CURIAE* THE AMERICAN CIVIL LIBERTIES UNION AND THE AMERICAN CIVIL LIBERTIES UNION OF TEXAS TO SUPPLEMENT THE RECORD ON APPEAL

**SUPPLEMENTAL STATEMENT OF INTERESTED PERSONS**

Pursuant to Federal Rule of Appellate Procedure 26.1 and Fifth Circuit Rule 29.2, *amici curiae* provide this supplemental statement of interested persons in order to fully disclose all those with an interest in this brief. The undersigned counsel of record certifies that the following supplemental list of persons and entities have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

| *Amici Curiae* | Counsel |
|---|---|
| American Civil Liberties Union | Dale E. Ho<br>Sean J. Young |
| American Civil Liberties Union of Texas | Rebecca L. Robertson<br>Satinder Singh |

*Amici curiae* certify that they are 501(c)(3) nonprofit corporations. None of the *amici* has a corporate parent or is owned in whole or in part by any publicly held corporation.

*Amici curiae* the American Civil Liberties Union ("ACLU") and the American Civil Liberties Union of Texas ("ACLU-TX") respectfully move this Court to supplement the record on appeal with two exhibits that are referenced by the *amicus* brief filed last Tuesday, March 10, 2015, and are attached herein. *Amici* have consulted with counsel for all parties, who do not oppose the relief requested.

On March 10, 2015, the ACLU and ACLU-TX filed an *amicus* brief in support of Plaintiffs-Appellees and in support of affirmance. Counsel for all parties consented to the filing of this brief. Br. of *Amici Curiae* ACLU & ACLU-TX at vi. The *amicus* brief referenced two attached exhibits: Exhibit A comprised excerpts from the trial transcript of *Frank v. Walker*, No. 11-cv-1128 (E.D. Wis. 2011), and Exhibit B was a trial exhibit relied upon at that trial. These exhibits were attached for this Court's convenience.

Because the exhibits may aid this Court in deciding the instant appeal, *amici* respectfully move to supplement the record on appeal with these exhibits.

Dated this 18th day of March, 2015.          Respectfully submitted,

                                                        /s/ Sean J. Young
                                                        Dale E. Ho
                                                        Sean J. Young
                                                        AMERICAN CIVIL LIBERTIES UNION
                                                            FOUNDATION
                                                        125 Broad Street, 18th Floor
                                                        New York, NY 10004
                                                        (212) 284-7359
                                                        syoung@aclu.org

Rebecca L. Robertson
Satinder Singh
AMERICAN CIVIL LIBERTIES UNION
  FOUNDATION OF TEXAS
P.O. Box 8306
Houston, TX 77288
(713) 942-8146 ext. 116
rrobertson@aclutx.org

*Counsel for Amici Curiae*

## CERTIFICATE OF CONFERENCE

I hereby certify that on March 16-18, 2015, I conferred with counsel for all parties and they do not oppose this motion.

/s/ Sean J. Young
Sean J. Young

## CERTIFICATE OF SERVICE

I hereby certify that on March 18, 2015, the foregoing motion was served, via the Court's CM/ECF Document Filing System, upon all counsel of record.

/s/ Sean J. Young
Sean J. Young

## CERTIFICATE OF COMPLIANCE

Counsel also certifies that on March 18, 2015, the foregoing motion was transmitted to the Clerk of the United States Court of Appeals for the Fifth Circuit via the Court's CM/ECF Document Filing System.

Counsel further certifies that the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1.

/s/ Sean J. Young
Sean J. Young

EXHIBIT A

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF WISCONSIN

----------------------------------------------------------------

RUTHELLE FRANK, et al., on behalf of themselves and all others similarly situated, )

                    Plaintiffs, )

    vs. ) Case No. 11-CV-1128

SCOTT WALKER, in his official capacity as Governor of the State of Wisconsin, et al., )

                 Defendants. )

                 ) Milwaukee, Wisconsin
------------------------------------  ) November 4, 2013

LEAGUE OF UNITED LATIN AMERICAN CITIZENS (LULAC) OF WISCONSIN, et al., )

                 Plaintiffs, )

               ) Case No. 12-CV-185
    vs. )

DAVID G. DEININGER, et al., )

                 Defendants. )

----------------------------------------------------------------

**TRANSCRIPT OF COURT TRIAL - VOLUME 1**
BEFORE THE HONORABLE LYNN ADELMAN
UNITED STATES DISTRICT JUDGE

U.S. Official Reporter:    JOHN T. SCHINDHELM, RMR, CRR,
Transcript Orders:    WWW.JOHNSCHINDHELM.COM

Proceedings recorded by computerized stenography, transcript produced by computer aided transcription.

1    Q.   Have you ever tried to get one?

2    A.   Yes.

3    Q.   When was that?

4    A.   In 2005, I believe.

10:44    5    Q.   And what happened when you tried to get that ID?

6    A.   I didn't have a birth certificate.

7    Q.   So where did you go to try and get the ID?

8    A.   Motor vehicle.

9    Q.   Okay.  And when you got to motor vehicles, what happened?

10:45    10   A.   They asked me did I have a birth certificates or anything

11   stating who I were.  And I said no, because I was born in

12   Mississippi.

13   Q.   Okay.  And did you try and get a birth certificate from

14   Mississippi?

10:45    15   A.   Yes.

16   Q.   What did you have to do to try and get a birth certificate

17   from Mississippi?

18   A.   They gave me a form at motor vehicle to send down to

19   Mississippi to try and locate a birth certificate, which I

10:45    20   filled out and sent down there.  And they sent it back in

21   15 days and said there was no such person.

22   Q.   And did you have to pay money to try and get the birth

23   certificate?

24   A.   $10.

10:45    25   Q.   Did you get your money back?

37

1    A.   No.

2    Q.   And do you have any idea why they didn't have a record of

3    you?

4    A.   Because I was -- I wasn't born in a hospital.

10:45    5    Q.   Where were you born?

6    A.   I was born at home by a midwife.

7    Q.   Ms. Weddle, are you registered to vote in Wisconsin?

8    A.   Yes.

9    Q.   How long have you been registered to vote in Wisconsin?

10:46    10    A.   Oh, about 25, 30 years.

11    Q.   And have you ever worked at the polls in Wisconsin?

12    A.   Yes, I did.

13    Q.   When was that?

14    A.   Last year.

10:46    15    Q.   And what did you do?

16    A.   I was helping people to sign in and, you know.

17    Q.   And did you vote in the 2012 presidential election?

18    A.   Yes, I did.

19    Q.   And about how many years have you been voting?

10:46    20    A.   Oh, a long time, about 25, 30 years.

21    Q.   And what's the first candidate you remember voting for?

22    A.   Oh, my God.  President Carter.  I voted for President

23    Carter, President -- I can't remember.  It's been a long time

24    ago.

10:46    25    Q.   That's fine.  And how frequently have you voted between when

38

Weddle/Cross
Court Trial - Vol 1 - 11/4/2013

1    A.   Good morning.

2    Q.   Just have a few questions for you.  You said you had voted

3    in the February of 2012 primary election.

4    A.   Yes.

10:48    5    Q.   Were you asked to show an ID for that election?

6    A.   No.

7    Q.   Where do you vote?

8    A.   I vote at the school on 68th Street near my house on Silver

9    Spring.

10:48    10    Q.   Okay.  Have you ever driven a car in Wisconsin?

11    A.   Yes.

12    Q.   But you said you don't have a driver license.

13    A.   No, I don't have one.

14    Q.   Have you ever left the United States?

10:48    15    A.   No.

16    Q.   Are you currently receiving any Social Security benefits?

17    A.   Yes.

18    Q.   Do you have a Social Security card?

19    A.   Yes.

10:48    20    Q.   Are you receiving any Medicare, Medicaid benefits?

21    A.   Yes.

22    Q.   And how did you apply for those benefits?

23    A.   I applied -- well, my mom first applied for me before she

24    died.  And then I go -- now I just -- they don't ask me for no

10:49    25    ID.

40

1    Q.   You do have a card that allows you to get those benefits?

2    A.   Yes.

3    Q.   You mentioned that you had gone to the DMV in 2005 to get an

4    ID; is that right?

10:49   5    A.   Yes.

6    Q.   Have you gone back to the DMV since that time?

7    A.   No.

8    Q.   Do you have a savings account?

9    A.   No.

10:49   10   Q.   Any other kind of account or credit card?

11   A.   No.

12   Q.   Have you ever been on an airplane?

13   A.   No.

14   Q.   Have you ever voted by absentee ballot?

10:49   15   A.   No.

16            MR. KAWSKI:  I have no further questions.  Thank you.

17            THE WITNESS:  Thank you.

18            THE COURT:  I believe you're excused.  Thank you.

19            (Witness excused at 10:49 a.m.)

10:49   20            THE COURT:  Next witness?

21        EDDIE HOLLOWAY, PLAINTIFF WITNESS, DULY SWORN

22            THE COURT:  Have a seat.  State your name for the

23   record, spell your last name.  And you gotta talk about an inch

24   from the mic.

10:50   25            THE WITNESS:  My name is Eddie Holloway,

41

1    Q.  Do you have an ID from any other state before you came to

2    Wisconsin?

3    A.  My Illinois ID, yes.

4    Q.  Is that Illinois ID expired?

10:52    5    A.  Yes.

6    Q.  What is the name on that ID?

7    A.  Eddie Lee Holloway, Jr.

8    Q.  And was there a time when you heard about the voter ID law

9    in Wisconsin?

10:52    10    A.  Yeah.  When I first got here.

11    Q.  And what do you know about it?

12    A.  That you have to have -- all I know is that you had to have

13    an ID to vote.  And I didn't understand that because I had never

14    had to have an ID before.

10:52    15    Q.  Did you -- when you say you had never had to have an ID

16    before, do you mean --

17    A.  To vote.

18    Q.  In order to vote?

19    A.  Yeah.

10:52    20    Q.  And when you learned that you needed an ID to vote at that

21    time, did you have an ID to vote?

22    A.  No.  My ID had expired.

23    Q.  And when you said your ID, which?

24    A.  My Illinois ID had expired, because I was using it.

10:53    25    Q.  And was there a time when you tried to get an ID in

Case: 14-41127    Document: 00512979924    Page: 13    Date Filed: 03/24/2015
Case 2:13-cv-00193   Document 834   Filed on 03/31/15 in TXSD   Page 16 of 57

Holloway/Direct
Court Trial - Vol 1 - 11/4/2013

1  Q.  And did the person at the DMV tell you what you had to do to

2  fix this problem?

3  A.  Yeah.  The lady helped me -- she told me to go downtown

4  to --

10:54  5  Q.  Downtown Milwaukee?

6  A.  Yeah, downtown Milwaukee to -- I forgot what they call it.

7  Q.  That's okay.  If you don't remember, you don't have to say.

8  A.  Yeah.

9  Q.  So she told you to go downtown.  Did she do anything else to

10:54  10  help you fix this problem?

11  A.  She gave me the number down there and where it was and --

12  yeah, that's -- she gave me at the DMV.

13  Q.  And after the -- you went to the DMV, did you go downtown?

14  A.  Yeah, I went down there.

10:55  15  Q.  How did you get downtown?

16  A.  My sister, she took me down there this time.

17  Q.  How did she take you down there?

18  A.  In her car.

19  Q.  Do you drive?

10:55  20  A.  No.

21  Q.  And when you went to downtown Milwaukee, what did they tell

22  you?

23  A.  I went and asked for, you know, what I need to do to get an

24  ID.  And they said that I needed to call Springfield.  That's

10:55  25  the state capitol in Illinois.  Call Springfield, and I

46

Holloway/Direct
Court Trial - Vol 1 - 11/4/2013

1    needed -- first I needed to amend my birth certificate.

2    Q.   Did they tell you how much that would cost?

3    A.   They said four to $600.

4    Q.   Do you have four to $600?

5    A.   I don't have four to 600 cents.

6    Q.   How much money were you taking in at that time?

7    A.   I wasn't -- I was -- I really wasn't taking in money.  My

8    sister would help me because I took care of her twins.

9    Q.   So it was for baby-sitting?

10   A.   Yeah.

11   Q.   So after they -- downtown Milwaukee told you about

12   Illinois --

13   A.   Yeah.

14   Q.   -- did you contact the Illinois office?

15   A.   Yes, I called Illinois.

16   Q.   And what did they tell you first?

17   A.   First they told me that I needed to get the amendment papers

18   to amend my birth certificate.  So I caught the bus, went down

19   there --

20   Q.   Went down where?

21   A.   To Decatur, Illinois.

22   Q.   How much does it cost to get down there?

23   A.   $180 roundtrip.

24   Q.   And how long does it take to get down there?

25   A.   7 to 8 hours.

47

1    Q.   One way 7 to 8 hours?

2    A.   Yeah.

3    Q.   So after you went to Illinois, what happened?

4    A.   Okay.  I got the amendment papers, filled it out, took them

10:57  5    to Springfield.  Then when I got to Springfield, they said I

6    needed my high school records, vaccination.  And I had my Social

7    Security card and my birth certificate.  So that's what I needed

8    to get --

9    Q.   I'm sorry to interrupt you.

10:57 10    A.   Uh-huh.

11    Q.   Did you have your vaccination records?

12    A.   No.

13    Q.   Do you know where they are?

14    A.   No.

10:57 15    Q.   Did the Springfield office tell you about the school or

16    vaccination records before that time?

17    A.   No.  That's when -- the second -- when I went there, they

18    told me that's what I needed.  So I had to come back home

19    first -- I mean come here.

10:57 20    Q.   And "here," you mean Milwaukee?

21    A.   Yeah.

22    Q.   Did you end up trying to get your school records?

23    A.   I got the money back up to go back down there, and that's

24    when I got my school records.

10:57 25    Q.   And when you say "back down there," do you mean Decatur,

48

1    Illinois?

2    A.  Decatur.

3    Q.  So you got your school records.

4    A.  Yes.

5    Q.  And then what did you do with them?

6    A.  They're right there.

7    Q.  After you got your school records from Decatur, Illinois --

8    A.  I took them back to Springfield.

9    Q.  How did you get to Springfield?

10   A.  I had some friends from church take me.

11   Q.  How did they take you?

12   A.  In the car.

13   Q.  Did you do anything else -- did you give your friends

14   anything for the ride?

15   A.  Yeah.  I gave them gas money to get there.

16   Q.  Do you remember around how much that was?

17   A.  They didn't charge me nothing but $20.  That was it.

18   Q.  So when you got to Springfield with your school records --

19   A.  Uh-huh.

20   Q.  -- what happened?

21   A.  I went and showed them what I had.  Then they said I needed

22   something else.

23   Q.  And what was that something else?

24   A.  I needed a statement from the Social Security office.

25   Q.  Did they tell you about the statement from the Social

1    Security before?

2    A.   Each time I went down there, they told me one extra thing

3    that I needed.

4    Q.   So -- and did you have your Social Security statement with

5    you?

6    A.   No.  I had to come back here and get it.

7    Q.   Before you came back here -- before you came back to

8    Milwaukee --

9    A.   Uh-huh.

10   Q.   -- do you remember if you did anything else in Illinois to

11   try and get an ID?

12   A.   I went to the DMV in Illinois too.

13   Q.   What did you do there?

14   A.   I showed them what I had, and they said I needed --

15   everything that I needed for to get my one here, I needed the

16   same thing to get it there.

17   Q.   Did you get a new Illinois ID?

18   A.   No.

19   Q.   When you came back to Milwaukee, did you try to get the

20   Social Security statement that Springfield asked for?

21   A.   I got two of them.

22   Q.   Why did you get two?

23   A.   To make sure I had everything I needed.

24   Q.   And did you take the Social Security statement back to

25   Illinois?

1    A.   I don't have money to get there yet.

2    Q.   How much money are you taking in right now?

3    A.   775.

4    Q.   And what is that from?

5    A.   Disability.

6    Q.   And did you ever call Springfield to see if you could just

7    mail documents to them?

8    A.   No.   You can't mail them; you can't fax them; you can't do

9    none of that.

10   Q.   Is that what they told you?

11   A.   Yes.

12   Q.   So sitting here today, do you have a new birth certificate

13   with the correct name?

14   A.   No.

15   Q.   And do you have a Wisconsin ID?

16   A.   No.

17   Q.   Do you have a Wisconsin driver's license?

18   A.   No.

19   Q.   Do you have a military ID?

20   A.   No.

21   Q.   Do you have a tribal ID from an Indian tribe?

22   A.   No.

23   Q.   Do you have a college ID?

24   A.   No.

25   Q.   Do you have a U.S. passport?

Case: 14-41127     Document: 00512979924     Page: 19     Date Filed: 03/24/2015
Case 2:13-cv-00193   Document 834   Filed on 03/31/15 in TXSD   Page 22 of 57

Holloway/Cross
Court Trial - Vol 1 - 11/4/2013

1    A.   Right.

2    Q.   Do you have anything else with your picture on it?

3    A.   Uh-uh.

4    Q.   That's a no?

11:01    5    A.   No.

6    Q.   And how did you get your Illinois driver's license?

7    A.   I got it when I was in school.  I had them all these years.

8    Q.   And you had that renewed over the years?

9    A.   Uh-huh, until I got a DUI and that was the end of driving so

11:02    10   I just got an ID.

11   Q.   And when was that?

12   A.   Oh, Lord, that's about 20 years ago.

13   Q.   And about when did you move to Wisconsin?

14   A.   Five years ago.  It will be six years March 18th.

11:02    15   Q.   And when you went to the DMV the first time here in

16   Wisconsin, you brought a birth certificate.  That's right?

17   A.   Right.

18   Q.   And you brought your Illinois state ID card.  That's

19   correct?

11:02    20   A.   Right.

21   Q.   And you brought a Social Security card, right?

22   A.   Right.

23   Q.   And you talked to -- how many people did you talk to at DMV?

24   A.   One person.  She said 400 to $600.  I was done with all of

11:02    25   it.

53

1    Q.   Do you have a bank account, Mr. Holloway?

2    A.   No.

3    Q.   Do you receive government benefits?

4    A.   Disability.  Yeah.

11:03   5    Q.   Social Security disability?

6    A.   Yeah.  That's what they said.

7    Q.   Are you on Medicaid or BadgerCare?

8    A.   No.

9    Q.   Do you receive any FoodShare?

11:03   10   A.   If they keep cutting them, I probably won't get any.

11   Q.   When did you first apply for FoodShare?

12   A.   When I first got here, five years ago.

13   Q.   And did you need to go somewhere physically to apply for

14   FoodShare?

11:03   15   A.   Yeah.  I had to go over there on -- where the Y is.  Where

16   they let people sleep at night.

17   Q.   So somewhere in Milwaukee here?

18   A.   Yeah.

19   Q.   And what did you need to bring to get your FoodShare?

11:03   20   A.   I just -- my ID was valid then, so that's all I needed was

21   my ID.

22   Q.   Your ID was valid when you first applied for FoodShare?

23   A.   Uh-huh.

24   Q.   And that was what year again?

11:03   25   A.   Oh, boy.  I don't know exactly what year it was.  But it's

```
 1    Q.  Do you have a naturalization certificate?

 2    A.  No.

 3    Q.  Do you have a tribal ID card?

 4    A.  No, I do not.

 5    Q.  Do you have a student ID card?

 6    A.  No, I do not.

 7    Q.  Do you have a nondriver photo ID?

 8    A.  No.

 9    Q.  Have you ever had a nondriver photo ID?

10    A.  No.

11    Q.  Do you have any other type of ID with your picture on it?

12    A.  No, I do not.

13    Q.  You said you had a veterans ID card.

14           What do you use your veterans ID card for?

15    A.  Basically for hospital and medication purposes.

16    Q.  Does it have an expiration date on it?

17    A.  No.

18    Q.  Have you ever tried to get an ID from the DMV?

19    A.  Yes, I have.

20    Q.  Why did you decide to do that?

21    A.  For one, it was for voting purposes, and it was also needed

22    for job purposes also along with housing.

23    Q.  And when was that?

24    A.  Along with housing, you have to have a state ID from the

25    State of Wisconsin.
```

11:48 (line 5)
11:48 (line 10)
11:48 (line 15)
11:49 (line 20)
11:49 (line 25)

1    A.   Harold Vincent.

2    Q.   What do you do for a living?

3    A.   City of Milwaukee Department of Public Works as an inventory

4    assistant 2.

04:04    5    Q.   Who is the main person who helps to take care of your

6    mother?

7    A.   I do.

8    Q.   After the Wisconsin photo ID came out -- photo ID law came

9    out, what did you do to help your mother vote?

04:04    10    A.   Well, we made an attempt to go to the motor vehicle

11    department but without a birth certificate she wasn't able to

12    get an ID.

13    Q.   What did you do to try to get a birth certificate for her?

14    A.   We sent one off to the State of Louisiana.

04:04    15    Q.   I'm going to hand you what's been marked as Frank

16    Plaintiffs' Exhibit 591.  Do you recognize this document?

17    A.   Yes.

18    Q.   What is this document?

19    A.   That's a document for request of a birth certificate for my

04:05    20    mother.

21    Q.   In which state?

22    A.   Louisiana.

23    Q.   Did you fill that out?

24    A.   Yes.

04:05    25    Q.   Why did you fill it out?

214

1    A.   Because they needed someone next of kin to fill it out and

2    pay for it and mail it off for her.

3    Q.   Why couldn't your mother?

4    A.   I believe they need someone to be a witness.

04:05   5    Q.   Did you have to submit your photo ID as part of that

6    application?

7    A.   Yes, I did.

8    Q.   Does your mother have photo ID?

9    A.   I don't believe so.

04:05   10   Q.   Did it cost money to send this form to Louisiana?

11   A.   Yes, it did.

12   Q.   How much?

13   A.   $15.

14   Q.   What did you receive from Louisiana in response?

04:06   15   A.   I received a birth certificate but it was for my Auntie June

16   Rose Brown.

17   Q.   I'm going to handled up what's been marked as Frank

18   plaintiff Exhibit 592.  Do you recognize this document?

19   A.   Yes, I do.

04:06   20   Q.   What is this document?

21   A.   It's a document from the State of Louisiana, Department of

22   Health and Hospitals.

23   Q.   Is this what you received in response?

24   A.   (No response.)

04:06   25   Q.   It's double sided if you want to take a look at the other

215

1    pages.

2            (Witness peruses document.)

3    A.  Yes.  This is correct.

4    Q.  And whose birth certificate is that?

04:07    5    A.  That's my Auntie's, June.

6    Q.  When was June born?

7    A.  I believe it says 1942.

8    Q.  And your mother was born when?

9    A.  1938.

04:07    10    Q.  Did you ever receive any other paperwork from Louisiana?

11    A.  No, I didn't.

12    Q.  Did you receive your mother's birth certificate?

13    A.  No, we did not.

14            MS. PRINC:  No further questions.  Thank you.

04:07    15                    CROSS-EXAMINATION

16    BY MR. KAWSKI:

17    Q.  Good afternoon, Mr. Brown.

18    A.  Hi.

19    Q.  My name is Clay Kawski and I represent the defendants in

04:07    20    this case.  I just have a couple questions for you about the

21    Exhibit 592 that you got back from the State of Louisiana.

22    A.  Uh-huh.

23    Q.  When you received that did you make any effort to follow up

24    with Louisiana?

04:08    25    A.  I believe I might have tried to call them, but it's been

1    awhile.  I don't know if I was able to get through to them.

2    Q.  Did it seem strange to you that they sent you the wrong

3    birth certificate?  I mean, it appeared that you filled out the

4    paperwork correctly.

5    A.  Yes, it did.

6    Q.  But you didn't follow up with them or ask why they sent you

7    the wrong one?

8    A.  Like I said, I believe that I did, I tried to contact where

9    I had sent it to but I wasn't able to get through to anybody.

10             MR. KAWSKI:  No further questions.

11             THE COURT:  Thank you, Mr. Brown.  I believe you're

12   excused.

13             (Witness excused at 4:08 p.m.)

14             MS. ROTKER:  Your Honor, I think I've been designated

15   to lay out what the situation is right now.

16             THE COURT:  Yeah.

17             MS. ROTKER:  If I might.  So, you were right and we

18   have sped through people.  We have a couple -- the Frank

19   Plaintiffs have and are prepared to introduce video depositions

20   of two witnesses who as I understand it the state is stipulating

21   are unavailable.  For right now we're talking about Ruthelle

22   Frank who lives up near Wausau and has a heart condition right

23   now and was deposed by video, and Nancy Lee Wilde who is

24   deceased.  We were going to significant to the Court that we set

25   up to play them now which we are prepared to do.  I will

217

1    Q.    Thank you.

2    A.    In my work, it's very important that I tell the truth and

3    guide people in the right way.  So I wanted to see exactly what

4    you needed to do in order to get a birth certificate in

02:27    5    Milwaukee.  By that time, there was a law that said if you were

6    born in Milwaukee, you could get a free birth certificate.

7            There were four or five gentlemen at Hadley apartments

8    who didn't have birth certificates and were not born in

9    Milwaukee, but Mr. Robertson was.  So I decided that I was going

02:28    10    to take him down to a vital records to see what the process was.

11    We went to vital records, I helped him fill out his application,

12    and we sat there for about three minutes.  And then the clerk

13    came back over to us and said that she had no record of

14    Mr. Robertson's birth.  She then said that we would have to go

02:28    15    to Madison to get a delayed birth certificate.

16    Q.    And the delayed birth certificate, did they tell you how

17    much that would cost?

18    A.    That would be $25 for the delayed birth certificate.

19    Q.    And were there any other documents that were required?

02:29    20    A.    They wanted documents, if I could remember correctly, from

21    when he was seven years old going to elementary school.

22    Q.    And how old is he today?

23    A.    He's 86-plus, I believe.  I'm not sure of his age right now.

24    Q.    So they wanted elementary school records from 80 years ago.

02:29    25    A.    Yes.

401

Johnson/Direct
Court Trial - Vol 2 - 11/5/2013

1    Q.   And $25.

2    A.   And $25.  Now, I would have helped him, but you know, that's

3    almost like doing genealogy research and I just didn't really

4    have the time to go that deep into getting a birth certificate

02:29    5    for him.

6    Q.   And so then what happened?  Was he able to get the birth

7    certificate?

8    A.   No, he was not.

9    Q.   And so then was he able to get an ID for voting purposes?

02:29    10    A.   No, he was not.

11    Q.   And so if Act 23 were in effect today, would he be able to

12    vote?

13    A.   No, he would not.

14    Q.   Now, if Act 23 were in effect, do you think that these

02:29    15    obstacles that you've been talking about would prevent other

16    African-American voters that you encountered from voting?

17    A.   It would prevent them from voting, yes.

18    Q.   I want to talk for a moment now about the February 2012

19    elections.

02:30    20        Did you and citizens action undertake any special

21    efforts related to Act 23 surrounding the February 2012

22    elections?

23    A.   Well, again, the work that we do at Citizen Action is done

24    with coalition partners.  We just can't do things by ourselves.

02:30    25    So we had a group of coalition partners that did election

402

1    helped people acquire in those seven years?

2    A.   Actually acquire, that's close to six -- somewhere between

3    six and 700.

4    Q.   Okay.  And you said that's how many you've helped -- how

05:44    5    many people you've helped acquire a birth certificate.

6              How many people do you think overall you have worked

7    with to get a birth certificate?

8    A.   It's been a lot more than that.  It's hard to get an exact

9    number because some people come up with hopeless cases and we

05:44    10   don't even initiate paperwork because we know we're not going to

11   get anywhere.  Out of about 700 applications that I've worked

12   with, there were roughly -- close to 170 that we could not

13   obtain birth certificates for.

14   Q.   So you're saying that you helped about six to 700 people

05:45    15   acquire birth certificates, and then there was another 170 or so

16   that you couldn't help, people you couldn't help?

17   A.   Right, correct.

18   Q.   Okay.  And that's over the entire time.

19   A.   Correct.

05:45    20   Q.   Okay.  And who were the people that come to you at St. Ben's

21   for birth certificates?  What's the demographics of that

22   population?

23   A.   Predominantly homeless people.  People who are in shelters,

24   people who are on the streets.  People who have recently been

05:45    25   discharged from prison or jail and people who are involved in

532

1    A.   I did.

2    Q.   How old were you when you joined around?

3    A.   18.

4    Q.   How long did you serve?

10:25   5    A.   2 years.

6    Q.   And how did you leave the army?

7    A.   Honorably discharged.

8    Q.   After you left the army did you at some point get a veterans

9    ID?

10:26   10    A.   I did.

11    Q.   Do you remember how you got it?

12    A.   I went through the VA.

13    Q.   And on your VA card is there a photo of you?

14    A.   There is.

10:26   15    Q.   Is there a name?

16    A.   Yes, sir.

17    Q.   And generally what do you use the VA card for?

18    A.   Health issues, obtaining documents pertaining to my wartime.

19    Q.   And did you eventually come to Wisconsin?

10:26   20    A.   I did.

21    Q.   Do you remember around when?

22    A.   2007.

23    Q.   And was there a time when you became homeless?

24    A.   There was.

10:26   25    Q.   Just real briefly how did that happen?

Thompson/Direct
Court Trial - Vol 3 - 11/6/2013

1    Q.   And where were you born?

2    A.   I was born in Louisville, Mississippi.

3    Q.   Were you born in a hospital?

4    A.   No, midwife.

03:21  5    Q.   Do you currently have a birth certificate?

6    A.   No, I don't.

7    Q.   Have you ever had a birth certificate?

8    A.   No, I haven't.

9    Q.   And why not?

03:21  10   A.   Pardon?

11   Q.   How come you never had a birth certificate?

12   A.   Because every time I send for my birth certificate they

13   claim they can't find it or something or is something wrong.

14   And I done sent money down there about four or five times trying

03:21  15   to get my birth certificate.

16   Q.   All right, we'll get to that in a second.   Where do you

17   live?

18   A.   I live 4244 North Teutonia.

19   Q.   And how long have you lived in Wisconsin?

03:22  20   A.   I lived here ever since 1970 -- '74.

21   Q.   1974?

22   A.   Uh-huh.

23   Q.   And in Milwaukee the whole time?

24   A.   Yes.

03:22  25   Q.   And what's your racial background?   What race are you?

700

1    A.   I'm black.  You can look at me and tell that.

2              (General laughter.)

3    BY MR. OSTROW:

4    Q.   Thank you, Ms. Thompson.  Do you go to Cross Lutheran

5    Church?

6    A.   Yes.

7    Q.   How often do you go?

8    A.   I go every Wednesday.  I help with the meal program.

9    Q.   And how long have you been going there?

10   A.   Oh, about 3 months and a half now, I think.

11   Q.   I want to talk to you a little bit about identifications.

12   Do you currently have a Wisconsin driver's license?

13   A.   No, I don't.

14   Q.   Have you ever had a Wisconsin driver's license?

15   A.   No.

16   Q.   Have you ever had a driver's license?

17   A.   No -- in Mississippi.  In Lewisville, Mississippi I had a

18   driver's license.

19   Q.   And when you moved to Wisconsin did you bring the license

20   with you?

21   A.   Yes.

22   Q.   Did you ever renew it?

23   A.   No.  I think I renewed it twice because I went back to

24   Mississippi and had them renewed, you know.

25   Q.   And is that license now expired?

701

Case: 14-41127    Document: 00512979924    Page: 32    Date Filed: 03/24/2015
Case 2:13-cv-00193   Document 834   Filed on 03/31/15 in TXSD   Page 35 of 57

Thompson/Direct
Court Trial - Vol 3 - 11/6/2013

1    A.  Yeah.

2    Q.  And when did it expire?

3    A.  In '80.

4    Q.  In 1980?

03:23  5    A.  Uh-huh.

6    Q.  Do you have a U.S. passport?

7    A.  No.

8    Q.  Do you have a U.S. military ID?

9    A.  No.

03:23  10    Q.  Do you have a naturalization certificate?

11    A.  No.

12    Q.  Do you have a tribal ID for Native American?

13    A.  No.

14    Q.  What about a student ID card?

03:23  15    A.  No.

16    Q.  Have you ever had a student ID card?

17    A.  No.

18    Q.  Do you have a bank account?

19    A.  I got my money on a card.  They tell me go to the bank and

03:23  20    then they put it on the card.  I don't know.

21    Q.  So you have a debit card that you use.

22    A.  Yeah.

23    Q.  And your Social Security checks.

24    A.  Yeah.

03:23  25    Q.  Do they go straight into that?

Thompson/Direct
Court Trial - Vol 3 - 11/6/2013

1    A.   Card.

2    Q.   Go right on the card?

3    A.   Uh-huh.

4    Q.   When you got that did you need to show a photo

5    identification?

6    A.   No, I didn't.

7    Q.   Do you have any other IDs?

8    A.   I got them packed up somewhere at home, some old IDs, but I

9    never found them because I got about eight boxes of papers and

10   stuff I'm saving.

11   Q.   Do you have a Medicare ID?

12   A.   Uh-huh.

13   Q.   Does it have your photo on it?

14   A.   No.

15   Q.   Can it be used for voting, do you know?

16   A.   Not as I know of.

17   Q.   Do you have a Social Security card?

18   A.   Yes.

19   Q.   Could you use that to vote?

20   A.   Yes, I reckon so because that's what I show it and my

21   Medicare card when I go.

22   Q.   Do you ever need a photo in your daily life?

23   A.   No.

24   Q.   Does anyone ever ask you they need to see a photo ID from

25   you?

1    A.   No.

2    Q.   Have you ever tried to get a photo ID from the Department of

3    Motor Vehicles?

4    A.   Here, yes.

03:25   5    Q.   Here in Milwaukee?

6    A.   Yes.

7    Q.   About how many times have you tried to do that?

8    A.   About four or five times, I think.

9    Q.   Have you ever been successful?

03:25   10   A.   No.

11   Q.   How come?

12   A.   They tell me I need my birth certificate.  And then one time

13   the lady had me to bring all of my children birth certificate,

14   take it down to her, and I carried them down there so, you know.

03:25   15   Then she said she couldn't use them.

16   Q.   Did you go by yourself?

17   A.   My daughter went with me, Carol.

18   Q.   She took you.  And when the DMV told you she couldn't use

19   all those documents to get you an ID, what did you do then?

03:25   20   A.   Go home.

21   Q.   What did she tell you you needed in order to get --

22   A.   She turned around, she told me I needed my birth certificate

23   and I told her I hadn't been able to get my birth certificate

24   because I've been sending money to Jackson, Mississippi to try

03:25   25   to get my birth certificate.

704

Thompson/Direct
Court Trial - Vol 3 - 11/6/2013

1    Q.   About how many times did you try to get your birth

2    certificate from Mississippi?

3    A.   I sent $10 twice, that's when it was $10 apiece.   And then I

4    went and I sent $12, you know.   And I showed you that letter I

5    got, they want me to send 25 now.   And every time I send my

6    money they don't send it back to me.

7    Q.   Did they ever send you a birth certificate?

8    A.   No.

9    Q.   So they kept your money and no birth certificate.

10   A.   That's right.

11   Q.   And was that a lot of money for you?

12   A.   Yes, way the time is now.   $3 is a lot of money for me.

13   Q.   Do you currently have a job?

14   A.   No, I draw my husband's pension.

15   Q.   So that money is coming from your husband --

16   A.   It's Social Security and a VA.

17   Q.   I want to switch topics a little to voting.   Are you

18   registered to vote here in Milwaukee?

19   A.   I filled out a card and I've been voting every year.

20   Q.   How long have you been voting for?   When is the first time

21   you remember voting?

22   A.   I think here it was in 1975.

23   Q.   Here in Wisconsin was the first time.

24   A.   Yes.   Uh-huh.

25   Q.   When was the first time you voted at all?

705

```
        1              (Recess taken at 10:14 a.m.)

        2                THE COURT:  Raise your right hand.

        3            DEWAYNE SMITH, PLAINTIFF WITNESS, DULY SWORN

        4                THE COURT:  Okay.  State your name, spell your name

10:16   5    and talk right into that mic real close.

        6                THE WITNESS:  Dewayne Smith, D-E-W-A-Y-N-E, S-M-I-T-H.

        7                          DIRECT EXAMINATION

        8    BY MS. PRINC:

        9    Q.  Good morning, Mr. Smith.

10:16  10    A.  Good morning.

       11    Q.  When were you born?

       12    A.  ////61.

       13    Q.  Where were you born?

       14    A.  Pine Bluff, Arkansas.

10:16  15    Q.  For the record what race are you?

       16    A.  Black.

       17    Q.  How far did you go in school?

       18    A.  Eighth.

       19    Q.  When did you move to Wisconsin?

10:16  20    A.  Back in '68, '69, one of the two.

       21    Q.  Have you lived in the Milwaukee area since then?

       22    A.  Yes.

       23    Q.  Do you work now?

       24    A.  Not at the moment.

10:17  25    Q.  How do you support yourself?
```

1    A.  Well, I get a QUEST Card.  Then I do some -- what you

2    call -- I help the landlord fix up his house.

3    Q.  How much do you receive a month with your QUEST Card?

4    A.  189 now.

10:17    5    Q.  Do you receive any other benefits?

6    A.  No.

7    Q.  Do you have health insurance?

8    A.  Forward card.

9    Q.  Mr. Smith, did you vote in last year's presidential

10:17    10    election?

11    A.  Yes.

12    Q.  Did you vote before that?

13    A.  Yes.

14    Q.  Was there ever a time when you were not allowed to vote?

10:17    15    A.  Yes.

16    Q.  About when was that?

17    A.  Back in 1990.

18    Q.  Why were you not allowed to vote?

19    A.  Had a felony on me.

10:17    20    Q.  What was that felony?

21    A.  Driving without owner's consent.

22    Q.  Did you plead guilty?

23    A.  Yeah, I had to.

24    Q.  Do you remember submitting a declaration in this case?

10:18    25    A.  Yes.

1    substantial.  I know it has to conform to the name.

2    Q.  Okay.  And the photo ID, they also have to check that the

3    photo ID reasonably resembles the voter, right?

4    A.  That's correct.

10:31  5    Q.  Some IDs can be a little bit old, right?

6    A.  Driver's licences can last eight years, yes.

7    Q.  And people's appearance can change in that time.

8    A.  Some of us have gotten better looking.

9    Q.  There you go.

10:31  10           (General laughter.)

11    BY MS. ROTKER:

12    Q.  Also to clarify, the photo ID does not have to have the

13    voter's voting address, correct?

14    A.  That's correct.

10:32  15    Q.  That point as to whether or not the photo ID -- and normally

16    here we're talking about driver's licences or state ID cards --

17    that question of whether the address on the license has to be

18    the address in the poll book has been a significant source of

19    confusion, hasn't it?

10:32  20    A.  I don't know.

21    Q.  Has it been some source of confusion?

22    A.  I really could not address that.

23    Q.  Okay.  We'll get to that back again a little later.  If

24    voters don't have that photo ID all they can do is vote a

10:32  25    provisional ballot, right?

1    Q.   And the GAB at times received questions from voters about

2    how they could get a state ID if they lacked the underlying

3    documentation that the DMV required; isn't that correct?

4    A.   Yes.

10:15    5    Q.   And a particularly common question you received from voters

6    was about how they could get an ID if they lacked a birth

7    certificate, correct?

8    A.   Yes.

9    Q.   Voters asked what they should do if they cannot afford a

10:16   10    birth certificate, correct?

11    A.   Yes.

12    Q.   Voters asked what they should do if they never had a birth

13    certificate, correct?

14    A.   Yes.

10:16   15    Q.   Voters asked what they should do if their birth certificate

16    was destroyed, correct?

17    A.   Yes.

18    Q.   And voters asked what they should do if the name on their

19    birth certificate was spelled incorrectly.

10:16   20    A.   Yes.

21    Q.   Voters asked what they should do if the name on their birth

22    certificate was spelled differently than other documents they

23    had.

24    A.   Yes.

10:16   25    Q.   Prior to the photo ID law, the GAB had never previously

1   obtain is free, right, Professor Hood?

2   A.   If you're referring to the time it would require them to go

3   to the DMV office and get a free ID, yes.

4   Q.   So the answer is yes, it imposes a cost, right?

5   A.   Well, not -- again not a monetary cost.

6   Q.   It's an institutional cost, right?

7   A.   It's a cost in terms of time to the voter.

8   Q.   And it's a cost.

9            MR. KAWSKI:   Objection.   Asked and answered.

10            THE COURT:   He may answer.

11            THE WITNESS:   Yes, but it's not a monetary cost.

12   BY MR. STEINER:

13   Q.   And you found in Georgia that there was a suppressive effect

14   of the voter ID law, right?

15            MR. KAWSKI:   Objection.   Asked and answered.

16            THE COURT:   He may answer.

17            THE WITNESS:   My study of the implementation of the

18   Georgia voter ID law found that across the two election cycles

19   in which it was implemented turnout was probably down to about

20   .43 percentage points.

21   BY MR. STEINER:

22   Q.   And you keep talking about .43 percentage points as if it's

23   not that much.   But you're familiar with the fact that there are

24   over 3 million registered voters in the State of Wisconsin and

25   over 4 million eligible voters, right?

1474

Hood/Cross
Court Trial - Vol 6 - 11/12/2013

1   A.   Yes.

2   Q.   So that .43 percent, if you translate that to real terms and

3   real people, that's more than 10,000 people that you would

4   predict wouldn't be able to vote -- or would not go to vote

12:04   5   under a photo ID law, right?

6   A.   I don't think I can take that number derived for the Georgia

7   situation and apply it directly to Wisconsin.

8   Q.   So in Georgia your .43 percent translated to suppression of

9   about 20,000 voters, right, based on Georgia's voting

12:04   10   population?

11   A.   I don't remember exactly.  It may be in the article itself.

12   Q.   Sounds ballpark, right?

13   A.   I have said before I hate to do math on the stand, but --

14   Q.   How many registered voters --

12:04   15   A.   It's an academic question --

16          THE COURT:  You can't talk over.

17   BY MR. STEINER:

18   Q.   How many registered voters are there in the State of

19   Georgia?

12:04   20   A.   Well, now there are over 5 million.  Now, this was back in

21   2008.

22   Q.   And four-tenths of a percent of 5 million is 20,000 people,

23   right?

24   A.   Yes.

12:05   25   Q.   And in your professional opinion, you would predict the same

1    Q.  And if you could, turn to page 34.

2    A.  Okay.

3    Q.  Apologize.

4           (Brief pause.)

5    BY MR. STEINER:

6    Q.  So if you could, turn to page 34 of your transcript,

7    Professor Hood.

8    A.  Okay.

9    Q.  And do you recall being asked the following questions and

12:07  10  giving the following answer, starting at line 22.

11          "QUESTION:  I take it, then, that you would agree as a

12   matter of your professional opinion that the Wisconsin voter ID

13   law, if given effect, is likely to suppress voter turnout in the

14   State of Wisconsin.

12:08  15          "ANSWER:  Yes, but a very -- a very small effect, if

16   it does occur."

17          Do you remember giving that testimony, Professor Hood?

18   A.  Well, yes.

19   Q.  And it was truthful testimony when you gave it?

12:08  20  A.  Yes.

21   Q.  And you're not changing that testimony today, right?

22   A.  No.

23   Q.  By the way, you spent a lot of time this morning comparing

24   Georgia -- sorry, comparing Wisconsin not only to Georgia but

12:08  25  also to South Carolina, right?

1477

1    if there's anything that would refresh your recollection just

2    let me know if you can't remember.

3    A.   I thought it was in December or something.  Something around

4    there.

5    Q.   Okay.  Do you remember which DMV location you went to?

6    A.   Yes, the one on 76th and Mill Road.

7    Q.   Do you remember what documents you brought along?

8    A.   Yeah, we brought his birth certificate, his Social Security

9    card.  He had a picture county ID that he would use for

10   identification.

11   Q.   Okay.  Did he bring anything with his name and address on

12   it?

13   A.   Yes, and a utility bill too.

14   Q.   How long did you wait to see a customer service agent at the

15   DMV at that time?

16   A.   Probably an hour, an hour and a half, you know, with the

17   line.  Somewhere in there.

18   Q.   And what happened when your father got up to the counter to

19   try to get his ID?

20   A.   Well, we presented everything and the woman looked at it.

21   And because of his original birth certificate his name was

22   spelled A-N-D-R-O, or Andro it's almost pronounced, more of the

23   Slovak spelling of Andrew.

24   Q.   And did his Social Security card have a different name on

25   it?

1    A.   Correct.

2    Q.   Okay.  But you were aware, again as part of your job helping

3    manage photo ID implementation, that there were a lot of

4    different kinds of document-related concerns that voters raised,

05:54  5   right?

6    A.   Yes.

7    Q.   One of those also included concerns about name change

8    documentation requirements for married voters, right?

9    A.   Yes.

05:54  10   Q.   And that if a married voter changed their name they would

11   have to provide additional documents such as a marriage or a

12   divorce certificate as well as a birth certificate, right?

13   A.   That is my understanding, correct.

14   Q.   Okay.  Let's take a look at Exhibit 524, Frank 524, page 3.

05:55  15   And you were also in charge of the GAB help desk, right, or at

16   least some of the help desk staff?

17   A.   Correct.

18   Q.   If you see the third page of that, it is an e-mail that was

19   sent to you, correct?

05:55  20   A.   Yes, that's correct.

21   Q.   And this is a true and accurate copy of the e-mail?

22   A.   Yes, it appears to be.

23          MS. ROTKER:  Move to admit Frank 524.

24          MR. KAWSKI:  Just a moment.  I haven't found what

05:55  25   you're talking about yet.

Case: 14-41127    Document: 00512979924    Page: 45    Date Filed: 03/24/2015
Case 2:13-cv-00193   Document 834   Filed on 03/31/15 in TXSD   Page 48 of 57

Hein/Direct
Court Trial - Vol 6 - 11/12/2013

1          MS. ROTKER:  It's the third page of -- the document is

2     an e-mail from Nadya Perez-Reyes to Ross Hein.

3          MR. KAWSKI:  I'm still not seeing it.  Okay, I do see

4     it now.  Yes.  No objection.

05:55   5          THE COURT:  So ordered.

6          MS. ROTKER:  Okay.  Thank you.

7     BY MS. ROTKER:

8     Q.  And again, this is a concern that was raised with an

9     85-year-old woman's birth certificate with her maiden name, a

05:56  10     Social Security card and electric bill with her married name,

11     and information that DOT was requiring her to account for the

12     difference between the name on her birth certificate and the

13     other documents by providing the marriage certificate, right?

14     A.  Yes, that's correct.

05:56  15     Q.  And again, to your knowledge, someone who had to get a

16     marriage certificate or a divorce certificate would likely have

17     to pay for those documents as well, right?

18     A.  I'm not aware of the costs associated with that.  Or if

19     there is a fee.

05:56  20     Q.  Okay.  As part of your job to help voters get ID you've also

21     gotten contacts from voters who were never issued a birth

22     certificate, right?

23     A.  Yes, that is correct.

24     Q.  Where voter says DMV won't process the ID without a birth

05:56  25     certificate, and in those cases because of your limited staff

1    A.   Yes.

2    Q.   And you were inquiring about what some of the documentation

3    requirements were, right?

4    A.   Yes, that's correct.

06:03    5    Q.   And, in fact, what your first inquiry, if you go to page 2

6    of the document, you say, "The example I have heard is minor

7    name variations in the first name and also the last name where

8    there has been a slight change in the way their name is

9    presented on the Social Security card and all other personal

06:03    10    identifiers."

11         Right?

12    A.   Yes.

13    Q.   So you were asking her a general question about how DMV

14    would deal with that situation, right?

06:03    15    A.   Yes.

16    Q.   And if you go back to page 1, her response was, "First, that

17    the documentation requirements had not changed regarding proof

18    of name and date of birth or identity."  Right?

19    A.   Yes.

06:04    20    Q.   And if you look at the next paragraph it says, and the first

21    sentence reads:  "We do attempt to work with customers to review

22    their documents and provide information on how they documents

23    can be amended if appropriate."  Right?

24    A.   Yes.

06:04    25    Q.   "The name on your birth certificate is the legal name, that

1    is what we need on the product."  Right?

2    A.  Yes.

3    Q.  Now, GAB again does not provide -- is not in a position to

4    help a voter amend their birth certificate, right?

06:04    5    A.  Correct, we do not have the authority to change a birth

6    certificate directly.

7    Q.  But you also do not have the authority to sit down with the

8    voter, figure out what paperwork the voter would need to change

9    their birth certificate, help take the voter to vital records,

06:04    10    do those paperwork tasks or those kind of assistance, that kind

11    of one-on-one level of assistance for the voter, right?

12    A.  What we do is we provide them the resource to get them the

13    answer.  So we essentially refer them to vital records in this

14    case.

06:05    15    Q.  And if they have to amend it that would again be something

16    that the voter would have to figure out ultimately how to do

17    that, right?

18    A.  Correct.

19    Q.  And if there were costs involved, again those would be

06:05    20    either costs of time or costs of money that the voter would

21    bear, right?

22    A.  Correct.

23    Q.  Okay.  You also knew generally that there were concerns

24    about voters such as Amish-Mennonite communities who didn't have

06:05    25    birth certificates and Social Security cards, right?

1676

EXHIBIT B

**Video Deposition of Nancy L. Wilde - July 30, 2012**          1

```
 1              UNITED STATES DISTRICT COURT

 2        FOR THE EASTERN DISTRICT OF WISCONSIN

 3    ---------------------------------------------

 4    RUTHELLE FRANK, et al.,

 5            Plaintiffs,

 6                              VIDEO DEPOSITION OF:
              -VS-              NANCY L. WILDE
 7                             CASE NO. 2:11-cv-01128

 8    SCOTT WALKER, et al.,

 9            Defendants.

10    ---------------------------------------------

11

12             Video deposition examination of

13    NANCY L. WILDE, taken at the instance of the

14    Plaintiffs, under and pursuant to Rule 30 of the

15    Federal Rules of Civil Procedures and the acts

16    amendatory thereof and supplementary thereto,

17    pursuant to Notice upon the parties, before Monica M.

18    Hunkins, RPR, a Notary Public in and for the State of

19    Wisconsin, at the University of Wisconsin - Marathon

20    County, 518 South 7th Avenue, Wausau, Wisconsin, on

21    the 30th day of July, 2012, commencing at 2:05 p.m.

22    and ending at 3:08 p.m.

23

24

25
```

Case: 14-41127    Document: 00512979924    Page: 50    Date Filed: 03/24/2015

Case 2:13-cv-00193   Document 834   Filed on 03/31/15 in TXSD   Page 53 of 57

Ruthelle Frank, et al. v.                                    Video Deposition of Nancy L. Wilde
Scott Walker, et al.                                                              July 30, 2012

**Page 6**

1  A.  Yes.  My maiden name was Nancy Lee Jojade.
2  Q.  And how do you spell that?
3  A.  J-O-J-A-D-E.
4  Q.  And what is your date of birth?
5  A.  July 20th, 1937.
6  Q.  And where were you born?
7  A.  In Wausau, Wisconsin.
8  Q.  And have you lived in this area your whole
9  life?
10  A.  Yes, I have.
11  Q.  What is your current address?
12  A.  119 Airport Street, Schofield, Wisconsin.
13  Q.  And how long have you lived there?
14  A.  Since 1958.  '57.  I'm sorry.  Did I say
15  '58? I'm sorry. '57.
16  Q.  So you've lived there since 1957?
17  A.  Yep.
18  Q.  And does anyone live at your house with
19  you?
20  A.  My husband, Gerald Wilde.
21  Q.  And how long have you been married?
22  A.  For -- it will be 55 years this year.  As of
23  1957 we were married.
24  Q.  Did you graduate from high school?
25  A.  Yes.  From Wausau Senior High School.

**Page 7**

1  Q.  And when did you graduate?
2  A.  In 1955.
3  Q.  Have you had any other formal education?
4  A.  No.
5  Q.  Are you currently employed?
6  A.  No.
7  Q.  Did you work previously?
8  A.  Yes.  Years ago I worked for an insurance
9  company.  I was a secretary for an insurance
10  company.
11  Q.  Did you do anything else in your life?
12  A.  When my husband had a trucking business, I
13  would do financial records for him.
14  Q.  And when did you retire?
15  A.  I retired from my secretarial work in 1960
16  and five years ago from my husband's work.
17  Q.  Mrs. Wilde, I'm going to ask you a few
18  questions about your attempts to get a photo ID in a
19  bit, but first, I want to ask you about your driving
20  and ID background.  Do you currently have a driver's
21  license?
22  A.  No, I do not.
23  Q.  Have you ever had one?
24  A.  No.
25  Q.  Do you drive?

**Page 8**

1  A.  No.
2  Q.  Do you have a U.S. passport?
3  A.  No.
4  Q.  Have you ever had one?
5  A.  No.
6  Q.  Do you have any other form of photo ID?
7  A.  Not that I can think of.
8  Q.  Okay.  I want to now ask you about your
9  voting background.
10  A.  Yes.
11  Q.  When was the first time that you voted?
12  A.  In 1957.
13  Q.  And where do you typically vote?
14  A.  I vote at the Schofield City Hall.
15  Q.  How frequently do you vote?
16  A.  I voted every year that I can think of
17  anyway except for two years when I was in the
18  hospital.
19  Q.  Have you ever had your right to vote taken
20  away by a court?
21  A.  No.
22  Q.  Do you have any felony convictions?
23  A.  No.
24  Q.  Mrs. Wilde, why do you vote?
25  A.  Because I think it's a very important thing.

**Page 9**

1  I --
2     Do you want me to go on?
3     It's -- it's very important.  I do
4  believe that it will be better government.  It will
5  be -- more people will benefit from it if everyone
6  would vote.
7  Q.  Did you vote in the most recent election?
8  A.  Yes, I did.
9  Q.  Did you have to show a photo ID?
10  A.  No.  All I had to do was sign my name.
11  Q.  Okay.  Mrs. Wilde, I'd like to ask you some
12  questions about attempts you've made to get a photo
13  ID so that you can vote --
14  A.  Yes.
15  Q.  -- under the photo ID law.
16  A.  Yes.
17  Q.  Generally what attempts have you made to
18  secure a photo ID?
19  A.  I've made three attempts to get -- the first
20  one was in 19 - excuse me - 2004.
21  Q.  So you -- you made your first attempt about
22  eight or so years ago?
23  A.  Eight years ago, yes, ma'am.
24  Q.  And what did you do in 2004 to get your
25  ID?

Ruthelle Frank, et al. v.
Scott Walker, et al.

Video Deposition of Nancy L. Wilde
July 30, 2012

Page 10

1  A.  Well, the reason I was -- I got involved in
2  the first place, my sister, who lives in Florida,
3  asked me to get her a copy of her birth certificate.
4  And so I went to the Register of Deeds.  And as long
5  as I was there, being that -- for health purposes, I
6  decided to try to find mine too.  I asked if I could
7  get mine too, but they told me they had no record of
8  my birth in Marathon County.
9  Q.  In Marathon County?
10  A.  Yes.
11  Q.  Just to back up just a bit, what is your
12  sister's name?
13  A.  Leatrice.
14  Q.  And is she older than you?
15  A.  Yes.  She's ten years older than I am.
16  Q.  Did they have her birth certificate?
17  A.  Yes, they did.
18  Q.  And did she receive a copy?
19  A.  Yes, she did.  They sent it to her.
20  Q.  So what did you -- what steps did you take
21  after you found out that the Marathon County Register
22  did not have a copy of your birth certificate?
23  A.  They gave -- at the Marathon County Register
24  of Deeds, gave me a number to call in Madison, which
25  I did, asking for forms to -- to fill out so that I

Page 11

1  could receive a birth certificate.
2  Q.  Do you know who you were calling in
3  Madison?
4  A.  It was the Vital Records, Department of
5  Vital Records.
6  Q.  And so what steps did you take after they
7  told you to call?
8  A.  We called and asked for the -- for the
9  record.  We explained the situation, asked for the
10  records, and then they sent me records to -- to be
11  filled out and sent back.
12  Q.  When you say "we," who do you mean?
13  A.  My husband was there to help me.  He always
14  is.
15  Q.  And what's his name?
16  A.  Gerald.
17  Q.  Gerald Wilde?
18  A.  Yes.
19  Q.  And so you called.  And what records did
20  they -- or what documents did they send you to fill
21  out?
22  A.  They sent me a certificate to fill out for
23  an application for -- here we go again.  I'm sorry.
24  I need help.  A delayed birth certificate.  There we
25  go.

Page 12

1  Q.  So they sent you an application for a
2  delayed birth certificate?
3  A.  That's -- that's correct.
4  Q.  And what did you do when you received it?
5  A.  We -- I filled it out.  I shouldn't say we.
6  But I filled it out.  And then I sent it all back.
7  They had some other things.  And they also wanted an
8  affidavit from my sister verifying that I was born on
9  the day I was.
10  Q.  And so -- go ahead.
11  A.  Excuse me.  But she was the only one that I
12  had to provide an affidavit.  All the rest of my
13  relation are already passed.
14  Q.  So in 2004, you submitted the application?
15  A.  Yes.
16  Q.  And you submitted an affidavit from your
17  sister?
18  A.  That's correct.
19  Q.  Did you submit any other forms?
20  A.  I submitted copies of forms to identify
21  myself - my social security form, my Medicare card,
22  other cards that I had, and credit cards and our tax
23  -- copy of our tax records with my husband and my
24  name both on and our copy of -- that we owned the
25  house and everything, anything I could find that

Page 13

1  would verify who I was and where I was or how long I
2  lived there.
3  Q.  Do you -- so, Mrs. Wilde, you were unable to
4  locate your birth certificate.  Did you have any
5  other documents from your early years?
6  A.  I had a -- I got records from my church
7  being of the baptism.  I had a baptismal certificate.
8  I had a certificate from the hospital that I was
9  born.  I -- I got -- let's see.
10  Q.  Well, let's break that down.
11  A.  Okay.
12  Q.  So on your baptismal certificate, do you
13  know what information is included?
14  A.  Is my name, the date of -- of the baptism,
15  my father's name, my mother's name.
16  Q.  And what church were you baptized in?
17  A.  Grace United Church of Christ in Wausau.
18  Q.  And does that church still exist?
19  A.  Yes, it does.
20  Q.  And you also mentioned that you have a
21  hospital certificate?
22  A.  Yes, I do.
23  Q.  And what information to your knowledge does
24  that contain?
25  A.  That also has my name and my mother's name,

Ruthelle Frank, et al. v.
Scott Walker, et al.

Video Deposition of Nancy L. Wilde
July 30, 2012

**Page 14**

1 my father's name, the date, also my weight, my birth
2 weight. And I think that's -- there's maybe other
3 information, but that's -- that's about the most
4 important.
5 Q. And you submitted those documents together
6 with your application?
7 A. Yes, I did.
8 Q. And what did you receive in response?
9 A. I received -- everything came back that I
10 had filled out, and there was -- we had taken a long
11 time to get all the information. And it took a long
12 time to come back. But when it did, it -- there was
13 a letter with it saying that they could not grant me
14 any infor -- any birth certificate because I had
15 signed it wrong. I had signed it with my maiden
16 name. In parentheses in the middle I had written
17 "Nancy Lee Jojade Wilde," and they said that was
18 wrong. I was not supposed to include the Wilde, I
19 believe. Also, when my sister had -- had an
20 affidavit for this -- this, written it, she wrote it
21 the same way, and they -- they -- they would not
22 accept that either.
23 Q. Did you pay a fee when you applied?
24 A. I sent the $20 in by check, but they also
25 sent the money back.

**Page 15**

1 Q. And do you know roughly when you received
2 the negative response?
3 A. May of 2004.
4 Q. What did you do after receiving that?
5 A. I became angry reading it. We had put so
6 much effort and work into getting all these things
7 filled out and copied. I also thought, I don't think
8 I really needed -- I wasn't planning on getting a
9 driver's license. I wasn't -- I really didn't need
10 it for -- I didn't think I needed it much. I -- I
11 was -- everything -- I had my social security. I had
12 my Medicare. Everything was being taken care of
13 health-wise. I thought maybe I really don't need
14 this. I thought, I'm just going to put it off. So I
15 kept the papers, but I did not do anything else, not
16 -- not right then anyway.
17 Q. Around the same period, did you make any
18 other efforts to get a photo ID?
19 A. Well, a few -- we went to the V -- what's
20 that -- V -- oh, I'm sorry. DV -- DMV office. And
21 told them about the situation. But they told us that
22 we needed that birth certificate, and that was all
23 there is to it. So we couldn't -- they told us they
24 -- they couldn't do anything about it.
25 Q. Have you been back to the DMV since?

**Page 16**

1 A. Yes, we were.
2 Q. When did you go?
3 A. That was about two years ago.
4 Q. And what happened then?
5 A. They still said that I would need the --
6 that -- that they had told us before the birth
7 certificate or a driver's license, which I didn't
8 have neither -- neither one.
9 Q. So because you didn't have a birth
10 certificate or driver's license, you were denied a
11 photo ID card a second time?
12 A. Correct.
13 Q. And that was about two years ago?
14 A. Correct.
15 Q. Did you make any other attempts to get your
16 birth -- get a birth certificate or a copy?
17 A. I -- let's see. My husband called about a
18 year ago and called the Vital Records office thinking
19 maybe they've maybe found something now, but they, of
20 course, hadn't, and --
21 Q. And --
22 A. -- they sent us some more forms to fill
23 out.
24 Q. And why did you call them? And when I say
25 "them," why did you call the Vital Records office?

**Page 17**

1 A. Because I had read that we might be needing
2 -- people might be needing a picture ID to vote. And
3 then -- then I thought, now I need it. Before I
4 didn't think I needed it, but now I need it. It was
5 very important to me. So that was the reason I
6 thought, well, we would go back and try again, do it
7 again.
8 Q. So you said that the Vital Records office --
9 was that in Madison?
10 A. Yes, ma'am.
11 Q. And did they -- what did they send you?
12 A. They sent me some forms to fill out, about
13 the same ones I had filled out those years before.
14 Q. So they sent you an application?
15 A. Application for a delayed birth certificate,
16 yes.
17 Q. What did you do in response?
18 A. I sent -- I sent -- I -- I filled it out,
19 sent it back to Madison. And I haven't -- didn't
20 really hear anything after that from them.
21 Q. Have you made a third attempt?
22 A. Yes.
23 Q. And what was that attempt?
24 A. I called the -- that I need help with. What
25 is that?

# *United States Court of Appeals*

**FIFTH CIRCUIT**
**OFFICE OF THE CLERK**

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE**
**NEW ORLEANS, LA 70130**

March 24, 2015

MEMORANDUM TO COUNSEL OR PARTIES LISTED BELOW:

    No. 14-41127   Marc Veasey, et al v. Greg Abbott, et al
                  USDC No. 2:13-CV-193
                  USDC No. 2:13-CV-263
                  USDC No. 2:13-CV-291
                  USDC No. 2:13-CV-348

Enclosed is an order entered in this case.

                        Sincerely,

                        LYLE W. CAYCE, Clerk

                        *Jim deMontluzin*

                  By: _____
                  James deMontluzin, Deputy Clerk
                  504-310-7679

P.S. to District Court Clerk: The image of the supplemental
material with appellant's motion is included within this email
notification. Please file the supplemental record within 15 days
of this notice or by 4/8/15.

Ms. Leah Camille Aden
Mr. Vishal Agraharkar
Ms. Anna Baldwin
Mr. J. Campbell Barker
Mr. Neil G. Baron
Mr. Joshua James Bone
Mr. David J. Bradley
Ms. Jennifer Clark
Ms. Lindsey Beth Cohan
Mr. Armand G. Derfner
Mr. Robert Wayne Doggett
Mr. Kelly Patrick Dunbar
Mr. Chad Wilson Dunn
Ms. Diana Katherine Flynn
Ms. Erin Helene Flynn
Mr. Matthew Hamilton Frederick
Mr. Jose Garza
Mr. J. Gerald Hebert

Mr. Preston Edward Henrichson
Mr. Dale Edwin Ho
Ms. Sherrilyn Ann Ifill
Mr. Lawrence John Joseph
Mr. Scott A. Keller
Mr. Robert Acheson Koch
Mr. Daniel B. Kohrman
Ms. Natasha M. Korgaonkar
Ms. Sonya Ludmilla Lebsack
Ms. Christine Anne Monta
Ms. Janai S. Nelson
Mr. Rolando Leo Rios I
Ms. Rebecca L. Robertson
Mr. Ezra D. Rosenberg
Mr. Deuel Ross
Ms. Amy Lynne Rudd
Mr. Martin Jonathan Siegel
Mr. John Albert Smith III
Ms. Christina A. Swarns
Mr. Sean Young