# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

July 20, 2016

Lyle W. Cayce
Clerk

No. 14-41127

MARC VEASEY; JANE HAMILTON; SERGIO DELEON; FLOYD CARRIER; ANNA BURNS; MICHAEL MONTEZ; PENNY POPE; OSCAR ORTIZ; KOBY OZIAS; LEAGUE OF UNITED LATIN AMERICAN CITIZENS; JOHN MELLOR-CRUMMEY, KEN GANDY; GORDON BENJAMIN, EVELYN BRICKNER,

Plaintiffs – Appellees

TEXAS ASSOCIATION OF HISPANIC COUNTY JUDGES AND COUNTY COMMISSIONERS,

Intervenor Plaintiffs – Appellees

v.

GREG ABBOTT, in his Official Capacity as Governor of Texas;  CARLOS CASCOS, Texas Secretary of State; STATE OF TEXAS; STEVE MCCRAW, in his Official Capacity as Director of the Texas Department of Public Safety,

Defendants – Appellants

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

UNITED STATES OF AMERICA,

Plaintiff – Appellee

TEXAS LEAGUE OF YOUNG VOTERS EDUCATION FUND; IMANI CLARK,

Intervenor Plaintiffs – Appellees

v.

No. 14-41127

STATE OF TEXAS;  CARLOS CASCOS, Texas Secretary of State; STEVE
MCCRAW, in his Official Capacity as Director of the Texas Department of
Public Safety,

Defendants – Appellants

*************************************************************************

TEXAS STATE CONFERENCE OF NAACP BRANCHES; MEXICAN
AMERICAN LEGISLATIVE CAUCUS, TEXAS HOUSE OF
REPRESENTATIVES,

Plaintiffs – Appellees

v.

CARLOS CASCOS, Texas Secretary of State; STEVE MCCRAW, in his
Official Capacity as Director of the Texas Department of Public Safety,

Defendants – Appellants

*************************************************************************

LENARD TAYLOR; EULALIO MENDEZ, JR.; LIONEL ESTRADA; ESTELA
GARCIA ESPINOSA;  MARGARITO MARTINEZ LARA; MAXIMINA
MARTINEZ LARA; LA UNION DEL PUEBLO ENTERO, INCORPORATED,

Plaintiffs – Appellees

v.

STATE OF TEXAS;  CARLOS CASCOS, Texas Secretary of State; STEVE
MCCRAW, in his Official Capacity as Director of the Texas Department of
Public Safety,

Defendants – Appellants

No. 14-41127

_____

Appeal from the United States District Court
for the Southern District of Texas

_____

Before STEWART, Chief Judge, and JOLLY, DAVIS, JONES, SMITH, DENNIS, CLEMENT, PRADO, OWEN, ELROD, SOUTHWICK, HAYNES, GRAVES, HIGGINSON, and COSTA, Circuit Judges.

HAYNES, Circuit Judge, joined by STEWART, Chief Judge, and DAVIS, PRADO, SOUTHWICK, GRAVES, and HIGGINSON, Circuit Judges, in full; DENNIS and COSTA, Circuit Judges, joining in all but Part II.A.1 and concurring in the judgment.[1]

In 2011, Texas ("the State") passed Senate Bill 14 ("SB 14"), which requires individuals to present one of several forms of photo identification in order to vote. *See* Act of May 16, 2011, 82d Leg., R.S., ch. 123, 2011 Tex. Gen. Laws 619. Plaintiffs filed suit challenging the constitutionality and legality of the law. The district court held that SB 14 was enacted with a racially discriminatory purpose, has a racially discriminatory effect, is a poll tax, and unconstitutionally burdens the right to vote. *See Veasey v. Perry*, 71 F. Supp. 3d 627, 633 (S.D. Tex. 2014). The State appealed from that decision, and a panel of our court affirmed in part, vacated in part, and remanded the case for further findings. *See Veasey v. Abbott*, 796 F.3d 487, 493 (5th Cir. 2015), *reh'g en banc granted*, 815 F.3d 958 (5th Cir. 2016). The State filed a petition for this court to rehear the case en banc, which we granted.

_____

[1] Part II.A.1 as written represents the opinion of a plurality of the court. However, a majority of the court agrees that there are infirmities in the district court's opinion regarding Plaintiffs' discriminatory purpose claim, requiring reversal of the district court's judgment that SB 14 was passed with a racially discriminatory purpose. A majority of the court also agrees that, given the court's decision to reverse the district court's judgment as to this claim, the court should remand to the district court with instructions to reweigh the evidence in light of this opinion.

No. 14-41127

# I. Background

## A. *Senate Bill 14*

Prior to the implementation of SB 14, a Texas voter could cast a ballot in person by presenting a registration certificate—a document mailed to voters upon registration. TEX. ELEC. CODE §§ 13.142, 63.001(b) (West 2010). Voters appearing without the certificate could cast a ballot by signing an affidavit and presenting one of multiple forms of identification ("ID"), including a current or expired driver's license, a photo ID (including employee or student IDs), a utility bill, a bank statement, a paycheck, a government document showing the voter's name and address, or mail addressed to the voter from a government agency. *Id.* §§ 63.001, 63.0101 (West 2010).

With the implementation of SB 14, Texas began requiring voters to present certain specific forms of identification at the polls. These include: (1) a Texas driver's license or personal identification card issued by the Department of Public Safety ("DPS") that has not been expired for more than 60 days; (2) a U.S. military identification card with a photograph that has not been expired for more than 60 days; (3) a U.S. citizenship certificate with a photo; (4) a U.S. passport that has not been expired for more than 60 days; (5) a license to carry a concealed handgun issued by DPS that has not been expired for more than 60 days; or (6) an Election Identification Certificate ("EIC") issued by DPS that has not been expired for more than 60 days.[2] TEX. ELEC. CODE § 63.0101 (West Supp. 2014).[3]

---

[2] We refer to these required forms of identification under SB 14 as "SB 14 ID."

[3] SB 14 also requires the name on the photo ID to be "substantially similar" to the voter's registered name. TEX. ELEC. CODE § 63.001(c) (West Supp. 2014). If the names are not identical but are substantially similar, the voter must sign an affidavit that the voter and the registered voter are one and the same. *Id.* If the names are not substantially similar, the voter may submit a provisional ballot and within six days must go to the county registrar

No. 14-41127

SB 14 states that DPS "may not collect a fee for an [EIC] or a duplicate [EIC]," Tex. Transp. Code § 521A.001(b) (West 2013), and allows DPS to promulgate rules for obtaining an EIC, *id.* § 521A.001(f); § 521.142.  To receive an EIC, DPS rules require a registered voter to present either: (A) one form of primary ID, (B) two forms of secondary ID, or (C) one form of secondary ID and two pieces of supporting identification.  37 Tex. Admin. Code § 15.182(1).  Thus, any application for an EIC requires either one Texas driver's license or personal identification card that has been expired for less than two years, or one of the following documents, accompanied by two forms of supporting identification: (1) an original or certified copy of a birth certificate from the appropriate state agency; (2) an original or certified copy of a United States Department of State Certification of Birth for a U.S. citizen born abroad; (3) U.S. citizenship or naturalization papers without a photo; or (4) an original or certified copy of a court order containing the person's name and date of birth and indicating an official change of name and/or gender.  *Id.* § 15.182(3).[4]

Before May 27, 2015, a statutory provision distinct from SB 14 imposed a $2 or $3 fee for a certified copy of a birth certificate.[5] Tex. Health & Safety

---

with additional ID to verify his or her identity.  *Id.* §§ 63.001(g), 63.011, 65.0541(a) (West Supp. 2014).

[4] Among the forms of supporting identification are: voter registration cards, school records, insurance policies that are at least two years old, identification cards or driver's licenses issued by another state that have not been expired for more than two years, Texas vehicle or boat titles or registrations, military records, Social Security cards, W-2 forms, expired Texas driver's licenses, government agency ID cards, unexpired military dependent identification cards, Texas or federal parole or mandatory release forms, federal inmate ID cards, Medicare or Medicaid cards, immunization records, tribal membership cards from federally recognized tribes, and Veteran's Administration cards.  37 Tex. Admin. Code § 15.182(4).

[5] The Department of State Health Services ("DSHS") waived most of the fees for obtaining a birth certificate to get an EIC, but this provision separately required the Bureau of Vital Statistics, local registrars, and county clerks to collect a $2 fee for the issuance of a

No. 14-41127

CODE § 191.0045 (West 2010). As discussed below, after the district court issued its judgment and the panel conducted oral argument in this case, the Texas Legislature passed Senate Bill 983 during the 2015 legislative session and eliminated this fee.

Persons who have a disability are exempt from SB 14's photo ID requirement if they are able to provide the voter registrar with documentation of their disability from the U.S. Social Security Administration or Department of Veterans Affairs. TEX. ELEC. CODE § 13.002(i) (West Supp. 2014). Other persons may vote by provisional ballot without a photo ID if they file affidavits either asserting a religious objection to being photographed or asserting that their SB 14 ID was lost or destroyed as a result of a natural disaster occurring within 45 days of casting a ballot. *Id.* § 65.054. Additionally, voters who will be 65 or older as of the date of the election may vote early by mail. *Id.* § 82.003.

If a voter is unable to provide SB 14 ID at the poll, the voter can cast a provisional ballot after executing an affidavit stating that the voter is registered and eligible to vote. *Id.* § 63.001(a), (g). The vote counts if the voter produces SB 14 ID to the county registrar within six days of the election. *Id.* § 65.0541.

SB 14 requires county registrars to inform applicants of the new voter ID requirements when issuing voter registration certificates, *id.* § 15.005, and requires both the Secretary of State and voter registrar of each county with a website to post SB 14's requirements online. *Id.* § 31.012(a). The requirements must also be placed prominently at polling places. *Id.* § 62.016. Additionally, the Secretary of State must "conduct a statewide effort to educate

---

certified copy of a birth certificate, and permitted local registrars and county clerks to impose an additional $1 fee. TEX. HEALTH & SAFETY CODE § 191.0045(d), (e), (h) (West 2010).

No. 14-41127

voters regarding the identification requirements for voting." *Id.* § 31.012(b). The district court found that SB 14 allocated a one-time expenditure of $2 million for voter education.[6]  *Veasey v. Perry*, 71 F. Supp. 3d at 649.

## B. Procedural History

The State began enforcing SB 14 on June 25, 2013.[7]  The plaintiffs and intervenors[8] (collectively, "Plaintiffs") filed suit against Defendants to enjoin enforcement of SB 14, and their suits were consolidated before one federal district court in the Southern District of Texas.  *See Veasey v. Perry*, 71 F. Supp. 3d at 632.  Plaintiffs claim that SB 14's photo identification requirements violate the Fourteenth and Fifteenth Amendments to the United States Constitution and Section 2 of the Voting Rights Act because SB 14 was enacted with a racially discriminatory purpose and has a racially discriminatory effect. Plaintiffs also claim that SB 14's photo ID requirement places a substantial

---

[6] The district court also found that one-quarter of the $2 million was earmarked to research what type of voter education was needed.  *Veasey v. Perry*, 71 F. Supp. 3d at 649.

[7] A three-judge district court declined to grant judicial preclearance to override the United States Attorney General's denial of preclearance.  *See Texas v. Holder*, 888 F. Supp. 2d 113, 144–45 (D.D.C. 2012), *vacated and remanded*, 133 S. Ct. 2886 (2013).  The Supreme Court vacated and remanded this decision when it issued *Shelby County v. Holder*, 133 S. Ct. 2612 (2013), which held unconstitutional the coverage formula in Section 4(b) used to determine which jurisdictions were subject to the preclearance requirement in Section 5 of the Voting Rights Act.  Thereafter, Texas began enforcing SB 14.

[8] Plaintiff-Intervenor Texas League of Young Voters Education Fund (the "Texas League") was non-operational when the panel opinion was issued and remained so at least at the time the supplemental en banc briefs were filed in this case.  "A claim becomes moot when 'the parties lack a legally cognizable interest in the outcome.'"  *Nat'l Rifle Ass'n of Am., Inc. v. McCraw*, 719 F.3d 338, 344 n.3 (5th Cir. 2013) (quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969)).  The Texas League argues that it nonetheless has standing because many of the Texas voters whose inability to obtain SB 14 ID gave rise to the Texas League's standing remain disenfranchised by SB 14.  Because other Plaintiffs have standing to challenge SB 14 and because the court's remedy will reach all voters who do not have or cannot reasonably obtain SB 14 ID (regardless of their membership in the Texas League), we need not separately address the Texas League's standing.  *See Nat'l Rifle Ass'n*, 719 F.3d at 344 n.3 ("Only one of the petitioners needs to have standing to permit us to consider the petition for review.").

No. 14-41127

burden on the fundamental right to vote under the First and Fourteenth Amendments, and constitutes a poll tax under the Fourteenth and Twenty-Fourth Amendments. The State defends SB 14 as a constitutional requirement imposed to prevent in-person voter fraud and increase voter confidence and turnout.

The district court conducted a nine-day bench trial at which dozens of expert and lay witnesses testified by deposition or in person. Following that bench trial, the district court issued a lengthy and comprehensive opinion holding:

> SB 14 creates an unconstitutional burden on the right to vote [under the First and Fourteenth Amendments], has an impermissible discriminatory effect against Hispanics and African–Americans [under Section 2 of the Voting Rights Act], and was imposed with an unconstitutional discriminatory purpose [in violation of the Fourteenth and Fifteenth Amendments and Section 2]. [Furthermore,] SB 14 constitutes an unconstitutional poll tax [under the Fourteenth and Twenty-Fourth Amendments].

*Veasey v. Perry*, 71 F. Supp. 3d at 633. Shortly before in-person early voting was scheduled to begin for the November 2014 elections, the district court "enter[ed] a permanent and final injunction against enforcement of the voter identification provisions [of SB 14], Sections 1 through 15 and 17 through 22."[9] *Id.* at 707 & n.583. Since it struck the State's voter ID law so close to the impending November 2014 election, the district court ordered the State to "return to enforcing the voter identification requirements for in-person voting

---

[9] The district court did not enjoin enforcement of sections 16, 23, and 24 in accordance with SB 14's severability clause. Sections 16 and 23 relate to increasing the penalties and offense levels for election code violations. *See* TEX. ELEC. CODE § 64.012 historical note (West 2010 & Supp. 2014) [Act of May 16, 2011, 82d Leg., R.S., ch. 123, §§ 16, 23, 2011 Tex. Gen. Laws 619, 623, 625]. Section 24 has expired, but once related to the purposes for which the voter registrars could use certain funds disbursed under the election code. *See* Act of May 16, 2011, 82d Leg., R.S., ch. 123, § 24, 2011 Tex. Gen. Laws 619.

No. 14-41127

in effect immediately prior to the enactment and implementation of SB 14."
*Id.* at 707.  The district court retained jurisdiction to review any remedial
legislation and to pre-approve any administrative remedial measures.  *Id.* at
707–08.

In October 2014, the State appealed the district court's final judgment,
and a panel of this court granted the State's emergency motion for stay pending
appeal, grounding its decision primarily in "the importance of maintaining the
status quo on the eve of an election."  *Veasey v. Perry*, 769 F.3d 890, 895 (5th
Cir. 2014).  Plaintiffs filed emergency motions before the Supreme Court,
seeking to have this court's stay vacated.  The Supreme Court denied these
motions to vacate the stay of the district court's judgment.  *See Veasey v. Perry*,
135 S. Ct. 9 (2014).  Therefore, this court's stay of the district court's injunction
remained in place, and SB 14 continues to be enforced.

On May 27, 2015, after oral argument was heard by the panel that
initially considered this appeal, Senate Bill 983 ("SB 983") was signed into law,
eliminating the fee "associated with searching for or providing a record,
including a certified copy of a birth record, if the applicant [for the record]
states that the applicant is requesting the record for the purpose of obtaining
an election identification certificate."  Act of May 25, 2015, 84th Leg., R.S., ch.
130, 2015 Tex. Sess. Laws Serv. Ch. 130 (codified as an amendment to TEX.
HEALTH & SAFETY CODE § 191.0046(e)) (hereinafter "SB 983").  SB 983 became
effective immediately.  *Id.* §§ 2–3 (codified as note to TEX. HEALTH & SAFETY
CODE § 191.0046); *see also* S.J. of Tex., 84th Leg., R.S., 1449–50 (2015)
(reporting unanimous passage out of the Texas Senate); H.J. of Tex., 84th Leg.,
R.S., 4478–79 (2015) (reporting passage by 142 to 0, with one member absent,
in the Texas House).  SB 983 provides that "a local registrar or county clerk
who issues a birth record" required for an EIC that would otherwise be entitled

No. 14-41127

to collect a fee for that record "is entitled to payment of the amount from the [D]epartment [of State Health Services]." Act of May 25, 2015, 84th Leg., R.S., ch. 130 (codified as an amendment to TEX. HEALTH & SAFETY CODE § 191.0046(f)). SB 983 did not appropriate funds to spread public awareness about the free birth records. The parties addressed the potential effect of SB 983 on their claims before both the panel and our full court, and we have accounted for its passage.[10]

Considering the State's appeal from the district court's judgment, the panel opinion held that the district court committed legal errors in conducting its discriminatory purpose analysis; therefore, it vacated that portion of the district court's opinion and remanded the case for further proceedings. *See Veasey*, 796 F.3d at 493, 498. Noting that the finding on remand might be different, the panel opinion addressed the Plaintiffs' other claims. *Id.* at 493. It affirmed the district court's finding that SB 14 has a discriminatory effect in violation of Section 2 of the Voting Rights Act and remanded for consideration of the proper remedy. *Id.* It vacated the district court's holding that SB 14 constitutes a poll tax and rendered judgment on that claim for the State. *Id.* Finally, the panel opinion vacated the district court's determination that SB

---

[10] The parties also filed Rule 28(j) letters before the panel that initially heard this case. The parties noted the passage of SB 1934, effective on September 1, 2015, which provides that state-issued identification cards issued to individuals age 60 and older expire on a date to be specified by DPS. Act of May 29, 2015, 84th Leg., R.S., S.B. 1934 (codified as an amendment to TEX. TRANSP. CODE § 521.101(f)(1)). Before this new law, ID cards for those 60 and older did not expire. 37 TEX. ADMIN. CODE § 15.30. While Plaintiffs contended before the panel initially considering this case that SB 1934 will exacerbate the discriminatory effect of SB 14, the State insisted SB 1934 was passed merely to comply with the federal REAL ID Act. *See* 6 C.F.R. § 37.5(a). The panel opinion concluded that this issue is not yet ripe for our review. *See Texas v. United States*, 523 U.S. 296, 300 (1998) ("A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." (citation omitted)). The parties have not raised this issue again before our full court.

No. 14-41127

14 violates the First and Fourteenth Amendments of the U.S. Constitution, pursuant to the doctrine of constitutional avoidance, and dismissed those claims. *Id.*

While this case was awaiting oral argument before our full court, in light of the upcoming elections in November 2016, the parties applied to the Supreme Court to vacate the stay of the district court's injunction that a panel of this court originally entered in October 2014. The Supreme Court denied the motion to vacate the stay but noted that if, by July 20, 2016, this court had "neither issued an opinion on the merits of the case nor issued an order vacating or modifying the current stay order, an aggrieved party [could] seek interim relief from th[e Supreme] Court by filing an appropriate application." *Veasey v. Abbott*, 136 S. Ct. 1823 (2016).

## II. Section 2 of the Voting Rights Act

### A. Discriminatory Purpose

The State appeals the district court's holding that SB 14 was passed with a discriminatory purpose in violation of the Fourteenth and Fifteenth Amendments and Section 2 of the Voting Rights Act. We review this determination for clear error. "If the district court's findings are plausible in light of the record viewed in its entirety, we must accept them, even though we might have weighed the evidence differently if we had been sitting as a trier of fact." *Price v. Austin Indep. Sch. Dist.*, 945 F.2d 1307, 1312 (5th Cir. 1991) (citation omitted). However, when the district court's "findings are infirm because of an erroneous view of the law, a remand is the proper course unless the record permits only one resolution of the factual issue," *Pullman-Standard v. Swint*, 456 U.S. 273, 292 (1982), in which case reversing and rendering is the proper course, *Meche v. Doucet*, 777 F.3d 237, 246–47 (5th Cir.), *cert. denied*, 136 S. Ct. 111 (2015).

11

No. 14-41127

We apply the framework articulated in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265–68 (1977), to determine whether SB 14 was passed with a discriminatory purpose. Although the district court properly cited the *Arlington Heights* framework, we conclude that some "findings are infirm," necessitating a remand on this point. *Pullman-Standard*, 456 U.S. at 292. Since the record does not "permit[] only one resolution of the factual issue," and there is evidence that could support the district court's finding of discriminatory purpose, we must remand for a re-weighing of the evidence.[11] *See id.*

### 1. *Legal Errors in the District Court's Analysis*

"Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Arlington Heights*, 429 U.S. at 265. However, "[r]acial discrimination need only be one purpose, and not even a primary purpose," of an official action for a violation to occur. *United States v. Brown*, 561 F.3d 420, 433 (5th Cir. 2009) (citation omitted). "Legislative motivation or intent is a paradigmatic fact question." *Prejean v. Foster*, 227 F.3d 504, 509 (5th Cir. 2000) (citing *Hunt v. Cromartie*, 526 U.S. 541, 549 (1999)). "Proving the motivation behind official action is often a problematic undertaking." *Hunter v. Underwood*, 471 U.S. 222, 228 (1985).

---

[11] One of the dissenting opinions suggests that the majority opinion flouts the canon of constitutional avoidance by reaching the discriminatory purpose claim. We recognize the canon of constitutional avoidance, and where possible, we have avoided reaching constitutional claims unnecessarily, *see infra* Parts III and IV. However, we cannot avoid ruling on the discriminatory intent claim here, where the remedy to which Plaintiffs would be entitled for a discriminatory intent violation is potentially broader than the remedy the district court may fashion for the discriminatory impact violation. *See City of Richmond v. United States*, 422 U.S. 358, 378 (1975) (holding, in the discriminatory purpose context, that "[a]n official action . . . taken for the purpose of discriminating . . . on account of . . . race has no legitimacy at all").

No. 14-41127

In *Arlington Heights*, the Supreme Court set out five nonexhaustive factors to determine whether a particular decision was made with a discriminatory purpose,[12] and courts must perform a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available."[13] *See* 429 U.S. at 266–68. "Those factors include: (1) the historical background of the decision, (2) the specific sequence of events leading up to the decision, (3) departures from the normal procedural sequence, (4) substantive departures, and (5) legislative history, especially where there are contemporary statements by members of the decision-making body." *Overton*

---

[12] The State argues that, instead of applying the *Arlington Heights* standard, we should apply a "clearest proof" standard grafted from cases involving the determination of whether a legislature meant to impose criminal punishment through a civil law when the law faces an *ex post facto* challenge. *See, e.g.*, *Smith v. Doe*, 538 U.S. 84, 92–93 (2003); *Kansas v. Hendricks*, 521 U.S. 346, 360–61 (1997); *Flemming v. Nestor*, 363 U.S. 603, 613, 617–20 (1960). In those cases, courts deferred to legislatures' categorizations of laws as "civil" except upon "the clearest proof" that the laws were "so punitive either in purpose or effect as to negate" the "civil" label. *Hendricks*, 521 U.S. at 361 (citation omitted). The Supreme Court has not applied this standard in the voting rights context. *See generally Arlington Heights*, 429 U.S. 252; *Hunter*, 471 U.S. 222; *cf. Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256 (1979); *Lodge v. Buxton*, 639 F.2d 1358 (5th Cir. Unit B Mar. 1981). Instead, we have noted that discriminatory intent in this context may be shown through circumstantial evidence, as discriminatory motives are often "cleverly cloaked in the guise of propriety." *Lodge*, 639 F.2d at 1363. We decline to apply the State's proposed standard in this context.

[13] Neither *Arlington Heights* nor our decision in *Price*, 945 F.2d 1307, requires direct evidence. The district court here allowed extensive discovery of legislative materials which did not yield a "smoking gun." The district court could have found, but was not required to find, that this lack of a smoking gun supports the State's position here. That was the situation that we addressed in *Price*, and in that case we found no clear error in the district court's decisions about what evidence to credit. As the district court explained here, SB 14's proponents knew at the time that SB 14 would be subject to the preclearance requirement, *Veasey v. Perry*, 71 F. Supp. 3d at 658, 701, so the lack of a smoking gun is not surprising. The latter point makes it even more important that *Price* noted direct evidence would be stronger than circumstantial evidence, but only "[t]o the extent that the justifications advanced in [legislators'] testimon[ies] do not demonstrate a pretext for intentionally discriminatory actions." *Price*, 945 F.2d at 1318. As we note herein, we conclude there is evidence that could support a finding that the Legislature's justification of ballot integrity was pretextual in relation to the specific, stringent provisions of SB 14.

No. 14-41127

*v. City of Austin*, 871 F.2d 529, 540 (5th Cir. 1989) (citing *Arlington Heights*, 429 U.S. at 267–68). Legislators' awareness of a disparate impact on a protected group is not enough: the law must be passed *because of* that disparate impact. *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). The challengers bear the burden to show that racial discrimination was a "'substantial' or 'motivating' factor behind enactment of the law"; if they meet that burden, "the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor." *Hunter*, 471 U.S. at 228 (citation omitted).

The State's stated purpose in passing SB 14 centered on protection of the sanctity of voting, avoiding voter fraud, and promoting public confidence in the voting process. No one questions the legitimacy of these concerns as motives. The disagreement centers on whether SB 14 was passed with impermissible motives as well. We recognize that evaluating motive, particularly the motive of dozens of people, is a difficult enterprise. We acknowledge the charged nature of accusations of racism, particularly against a legislative body, but we must also face the sad truth that racism continues to exist in our modern American society despite years of laws designed to eradicate it. We appreciate the district court's efforts to address this difficult inquiry. Nonetheless, we hold that much of the evidence upon which the district court relied was "infirm." *See Pullman-Standard*, 456 U.S. at 292.

One type of evidence on which the district court relied in seeking to discern the Legislature's intent was Texas's history of enacting racially discriminatory voting measures. *See Veasey v. Perry*, 71 F. Supp. 3d at 633–36. It noted, for instance, Texas's use of all-white primaries from 1895–1944, literacy tests and secret ballots from 1905–1970, and poll taxes from 1902–1966. *Id.* at 634–35. While the record also contains more contemporary

14

No. 14-41127

examples, s*ee id.* at 635, 636 & n.23, the district court relied too heavily on the evidence of State-sponsored discrimination dating back hundreds of years, *cf. Shelby Cty. v. Holder*, 133 S. Ct. 2612, 2628 (2013) (noting that "history did not end in 1965").

"The historical background of the decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes," *Arlington Heights*, 429 U.S. at 267, but the Supreme Court has cautioned that "unless historical evidence is reasonably contemporaneous with the challenged decision, it has little probative value," *McCleskey v. Kemp*, 481 U.S. 279, 298 n.20 (1987) (resolving that laws in force during and just after the Civil War were not probative of the legislature's intent many years later). More recently, the Court in *Shelby County* also counseled against undue reliance on noncontemporary evidence of discrimination in the voting rights context. 133 S. Ct. at 2618–19, 2631 (striking down Section 4(b) of the Voting Rights Act because "the conditions that originally justified these measures no longer characterize voting in the covered jurisdictions"). In light of these cases, the most relevant "historical" evidence is relatively recent history, not long-past history.[14] We recognize that history provides context and that historical discrimination (for example, in education) can have effects for many years. But, given the case law we describe above and the specific issue in this case, we conclude that the district court's disproportionate reliance on long-ago history was error.

---

[14] "Relatively recent" does not mean immediately contemporaneous. *Shelby County* emphasized that "things have changed" since the 1965 passage of the Voting Rights Act, 133 S. Ct. at 2625, but it did not articulate a particular time limit, *see id.* at 2625–27. Nor do we. Suffice it to say the closer in time, the greater the relevance, while always recognizing that history (even "long-ago history") provides context to modern-day events.

No. 14-41127

We also recognize that not all "history" was "long ago" and that there were some more contemporary examples of discrimination identified by the Plaintiffs in the district court.  The evidence of relatively recent discrimination cited by the district court is more probative of discriminatory intent.  *See, e.g.*, *Veasey v. Perry*, 71 F. Supp. 3d at 635, 636 & n.23.  Nonetheless, several of the relatively contemporary examples of discrimination identified by the district court are limited in their probative value in connection with discerning the Texas Legislature's intent.  For example, in a state with 254 counties, we do not find the reprehensible actions of county officials in one county (Waller County) to make voting more difficult for minorities to be probative of the intent of legislators in the Texas Legislature, which consists of representatives and senators from across a geographically vast, highly populous, and very diverse state.  *See Miss. State Chapter, Operation Push, Inc. v. Mabus* (*Operation Push*), 932 F.2d 400, 409–10 (5th Cir. 1991) (stating that "[e]vidence of disparate registration rates or similar registration rates in *individual counties* could not provide dispositive support" for the claim that plaintiffs could not participate in the political process at the *state* level (emphasis added)).

Additionally, the district court relied on contemporary examples of statewide discrimination evidenced by two redistricting cases that, taken alone, form a thin basis for drawing conclusions regarding contemporary State-sponsored discrimination.  The first, *Bush v. Vera*, 517 U.S. 952, 976 (1996), found that a Texas redistricting plan to create three majority-minority districts violated the Equal Protection Clause of the Fourteenth Amendment because race was the predominant factor, the plans ignored traditional redistricting criteria, and their shapes could only be explained as the product of unconstitutional racial gerrymandering.  The second case found voter dilution

16

No. 14-41127

affecting Hispanics in the redrawing of one congressional district. *See League of Latin Am. Citizens v. Perry* (*LULAC*), 548 U.S. 399, 439–40 (2006). Although citing discussions of the historic discrimination against Hispanics in Texas, the Court did not base its decision on a conclusion that the legislature intentionally discriminated based upon ethnicity. *Id.* at 440–42. Instead, it looked at history as a context for the disenfranchisement of voters who had grown disaffected with the Hispanic Congressman the legislature sought to protect by its redrawing of the district. *Id.* at 438–41. The Court did not find any vote dilution as to African Americans in the drawing of a different district. *Id.* at 444. Thus, these cases do not lend support for a finding of "relatively recent" discrimination.[15]

The district court's reliance on post-enactment speculation by opponents of SB 14 was also misplaced. Discerning the intent of a decisionmaking body is difficult and problematic. *Hunter*, 471 U.S. at 228. To aid in this task, courts may evaluate "contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports. In some extraordinary instances the members might be called to the stand at trial to testify concerning the purpose of the official action . . . ." *Arlington Heights*, 429 U.S. at 268. Where the court is asked to identify the intent of an entire state legislature, as opposed to a smaller body, the charge becomes proportionately more challenging. *Hunter*, 471 U.S. at 228. As *United States v. O'Brien* explains:

---

[15] Nonetheless, as discussed *infra* note 28, the Court's conclusion in *LULAC* that Texas's 2003 redistricting plan violated the Voting Rights Act does evidence a history of discrimination that is relevant to our discriminatory effect analysis, because historical instances of discrimination continue to produce socioeconomic conditions that the district court found contributed to the racial disparities in ID possession.

No. 14-41127

Inquiries into congressional motives or purposes are a hazardous matter. When the issue is simply the interpretation of legislation, the Court will look to statements by legislators for guidance as to the purpose of the legislature, because the benefit to sound decision-making in this circumstance is thought sufficient to risk the possibility of misreading Congress' purpose. It is entirely a different matter when we are asked to void a statute that is, under well-settled criteria, constitutional on its face, on the basis of what fewer than a handful of Congressmen said about it. What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork.

391 U.S. 367, 383–84 (1968) (footnote omitted).

To ascertain the Texas Legislature's purpose in passing SB 14, the district court mistakenly relied in part on speculation by the bill's opponents about proponents' motives (rather than evidence of their statements and actions). For instance, it credited the following: Representative Hernandez-Luna's simple assertion that two city council seats in Pasadena, Texas were made into at-large seats "in order to dilute the Hispanic vote and representation"; repeated testimony that the 2011 session was imbued with anti-immigrant sentiment;[16] and testimony by the bill's opponents that they believed the law was passed with a discriminatory purpose. *Veasey v. Perry*, 71 F. Supp. 3d at 637, 655–57.

"The Supreme Court has . . . repeatedly cautioned—in the analogous context of statutory construction—against placing too much emphasis on the contemporaneous views of a bill's opponents."[17] *Butts v. City of New York*, 779

---

[16]   The relevance of this evidence apparently rests partially upon the unsupported premise that a legislator concerned about border security or opposed to the entry into Texas of undocumented immigrants is also necessarily in favor of suppressing voting by American citizens of color.

[17]   Here, the problematic evidence is the speculation and conclusions of the opposing legislators. We are not suggesting that the bill opponents lack credibility because they are

18

No. 14-41127

F.2d 141, 147 (2d Cir. 1985) (citing, inter alia, *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 204 n.24 (1976)).  We too have held that such statements are entitled to "little weight."  *Mercantile Tex. Corp. v. Bd. of Governors of Fed. Reserve Sys.*, 638 F.2d 1255, 1263 (5th Cir. Unit A Feb. 1981).  The Second Circuit considered such speculation in *Butts* and held that "the speculations and accusations of . . . [a] few opponents simply do not support an inference of the kind of racial animus discussed in, for example, *Arlington Heights*."  779 F.2d at 147 (citation omitted).  We agree and conclude that the district court erred in relying on conjecture by the opponents of SB 14 as to the motivations of those legislators supporting the law.[18]

The district court also placed inappropriate reliance upon the type of post-enactment testimony which courts routinely disregard as unreliable.  *See Barber v. Thomas*, 560 U.S. 474, 486 (2010) ("And whatever interpretive force one attaches to legislative history, the Court normally gives little weight to statements, such as those of the individual legislators, made *after* the bill in question has become law."); *see also Edwards v. Aguillard*, 482 U.S. 578, 596 n.19 (1987) ("The Court has previously found the post-enactment elucidation of the meaning of a statute to be of little relevance in determining the intent of the legislature contemporaneous to the passage of the statute.").  While probative in theory, even those (after-the-fact) stray statements made by a few

---

opposing legislators, as credibility is a question for the trier of fact. Testimony found to be credible from opponents of the bill about conduct and statements by proponents would be highly probative.  Our point is simply that speculation and conclusory accusations by opposing legislators are not an appropriate foundation for a finding of purposeful discrimination.

[18] In the different but somewhat analogous realm of employment discrimination, we have similarly rejected the plaintiff's testimony that he or she believed that the motivation of his or her employer was racial or other discrimination.  *See Byers v. Dall. Morning News, Inc.*, 209 F.3d 419, 426–27 (5th Cir. 2000).

19

individual legislators voting for SB 14 may not be the best indicia of the Texas Legislature's intent. *See Operation Push*, 932 F.2d at 408 (finding "isolated and ambiguous statements made by . . . legislators" were not compelling evidence of that law's discriminatory purpose); *Jones v. City of Lubbock*, 727 F.2d 364, 371 n.3 (5th Cir. 1984) (refusing to "judge intent from the statements [made by] . . . a single member" of the legislative body).

Because the district court relied upon evidence we conclude is infirm, the district court's opinion cannot stand as written. The next question, then, is whether we reverse and render judgment for the State or remand to the district court with instructions.

### 2. *Remand for Re-Weighing of the Evidence*

While the district court's analysis contained some legal infirmities, the record also contained evidence that could support a finding of discriminatory intent. *See Meche*, 777 F.3d at 246–47 (noting in review of a district court's findings following a bench trial that "[w]here findings are infirm because of an erroneous view of the law, a remand is the proper course unless the record permits only one resolution of the factual issue"). Therefore, under *Pullman-Standard*, 456 U.S. at 292, we must remand the discriminatory intent issue to the district court to reweigh the factors in light of this opinion.

In *Pullman-Standard*, the Supreme Court reversed a panel of this court after the panel weighed the facts and rendered judgment, rather than remanding for further proceedings. *Id.* at 292–93. The *Pullman-Standard* panel of this court had concluded that the district court erred by not considering all relevant evidence and suggested that the district court might have reached a different conclusion had it properly considered the evidence. *Id.* at 284–85, 292. The Supreme Court admonished that "discriminatory intent . . . is a factual matter subject to the clearly-erroneous standard . . .

No. 14-41127

[and] when a district court's finding on such an ultimate fact is set aside for an error of law, the court of appeals is not relieved of the usual requirement of remanding for further proceedings to the tribunal charged with the task of factfinding in the first instance." *Id.* at 293. The Court expressed concern that this court would ignore such an "elementary" principle and instructed that it is not the purview of this court to produce an "independent consideration of the totality of the circumstances." *Id.* at 291–92.

Pursuant to this clear guidance, our inquiry is whether "the record permits of only one resolution of the factual issue." *Id.* at 292. We conclude that it does not.

First, although the record does not contain *direct* evidence that the Texas Legislature passed SB 14 with a racially invidious purpose, this does not mean there is no evidence that supports a finding of discriminatory intent. "[D]iscriminatory intent need not be proved by direct evidence." *Rogers v. Lodge*, 458 U.S. 613, 618 (1982); *Brown*, 561 F.3d at 433 ("To find discriminatory intent, direct or indirect circumstantial evidence, including the normal inferences to be drawn from the foreseeability of defendant's actions may be considered." (citation omitted)). Instead, courts may consider both circumstantial and direct evidence of intent as may be available. *Arlington Heights*, 429 U.S. at 266.

In this day and age we rarely have legislators announcing an intent to discriminate based upon race, whether in public speeches or private correspondence.[19] To require direct evidence of intent would essentially give

---

[19] In fact, in this case, there is evidence that the proponents of SB 14 were careful about what they said and wrote about the purposes of SB 14, knowing it would be challenged during the preclearance process under the Voting Rights Act. Senator Fraser, one of the authors of SB 14, admitted during his deposition that he believed "that the public legislative record would either go to the Department of Justice or a three-judge panel as part of the

No. 14-41127

legislatures free reign to racially discriminate so long as they do not overtly state discrimination as their purpose and so long as they proffer a seemingly neutral reason for their actions.  This approach would ignore the reality that neutral reasons can and do mask racial intent, a fact we have recognized in other contexts that allow for circumstantial evidence.

For example, in employment discrimination cases, we do not automatically find for an employer who proffers a race-neutral reason for terminating an employee; instead, the employee can show that this reason is pretextual.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804 (1973) (establishing that where an employer has offered a race-neutral reason for an adverse employment action, the employee is entitled to show that the employer's stated reason is in fact pretext); *see, e.g.*, *Evans v. City of Houston*, 246 F.3d 344, 354–56 (5th Cir. 2001) (holding that a plaintiff had provided sufficient circumstantial evidence that an employer's reasons for demoting her were pretextual to create a genuine dispute of material fact regarding whether she was wrongfully demoted and reversing the district court's grant of summary judgment for the employer).  As we were recently reminded in *Foster v. Chatman*, 136 S. Ct. 1737, 1751–52, 1754–55 (2016), people hide discriminatory intent behind seemingly legitimate reasons.  If Jane were fired from an at-will job for being late once, we might conclude that firing was legitimate, until we learned that Joe, who has the very same job as Jane, was late numerous times with no penalty.  *Cf. Evans*, 246 F.3d at 354–56.  Context

---

[Voting Rights Act] Section 5 review process," and that he was therefore "aware that everything that [he] was saying was part of a public record."  The Deputy General Counsel to the Lieutenant Governor, Bryan Hebert, testified that he sent an email "urg[ing] senators to emphasize the detection and deterrence of fraud and protect[ing] public confidence in elections" as "the goal" of SB 14, "to remind people what the point of the bill was" for their speeches on the floor of the Texas Senate.

No. 14-41127

matters.[20]  With this in mind, we now address the circumstantial evidence that could support a finding of discriminatory purpose such that the record does not permit of only one resolution of the factual issue of intent.  *Pullman-Standard*, 456 U.S. at 292.

The record shows that drafters and proponents of SB 14 were aware of the likely disproportionate effect of the law on minorities, and that they nonetheless passed the bill without adopting a number of proposed ameliorative measures that might have lessened this impact.  For instance, the Legislature was advised of the likely discriminatory impact by the Deputy General Counsel to the Lieutenant Governor and by many legislators, and such impact was acknowledged to be "common sense" by one of the chief proponents of the legislation.[21]  *See Veasey v. Perry*, 71 F. Supp. 3d at 657–58.

Additionally, although he was careful with his comments about the legislation, one of the authors of SB 14, Senator Fraser, testified that he "believe[s] today the Voting Rights Act has outlived its useful life."  When other legislators asked Senator Fraser questions about the possible disparate impact of SB 14, he simply replied "I am not advised."  *Id.* at 646–47.  Another senator admitted at his deposition that he and other proponents of SB 14 voted to table

---

[20]  Of course, employment discrimination cases are not directly supportive, but they are analogous.  One of the dissenting opinions points out that the intent of the Legislature differs from that of an employer because a legislature's intent is "a pastiche of each individual representative's views, mixed policies and motives."  Jones Dissenting Op. at 5 n.5.  But while each legislator casts his or her own vote, these votes are often cast in blocs and along party lines.  Recognition that legislatures, just as employers, may articulate pretextual reasons for discriminatory actions is not a superficial equation, but rather a realistic acknowledgment.

[21]  Representative Todd Smith, a proponent of the legislation, stated that it was "common sense" the law would have a disproportionate effect on minorities.  *Veasey v. Perry*, 71 F. Supp. 3d at 657.  Similarly, Bryan Hebert, Deputy General Counsel in the Office of the Lieutenant Governor, acknowledged that the poor and minorities were most likely to be affected by SB 14.  *Id.*  Without additional forms of identification, Hebert warned that SB 14 was unlikely to obtain (the now-defunct) preclearance under Section 5 of the Voting Rights Act.  *Id.* at 658.

No. 14-41127

numerous amendments meant to expand the types of accepted IDs, expand the
operating hours of DPS stations issuing voter IDs, delay implementation of SB
14 until an impact study had been completed, and other ameliorative
measures.  He and other proponents of SB 14 have largely refused to explain
the rejection of those amendments, both at the time and in subsequent
litigation.  *Id.*  The district court noted that this attitude "was out of character
for sponsors of major bills."  *Id.* at 647.

The district court also heard evidence that SB 14 is only tenuously
related to the legislature's stated purpose of preventing voter fraud.  For
example, the record shows that Texas has a history of justifying voter
suppression efforts such as the poll tax and literacy tests with the race-neutral
reason of promoting ballot integrity.  *See id.* at 636 & n.24.  Dr. Vernon Burton,
an expert in race relations, testified about the "history of official discrimination
in Texas voting."  He identified some devices Texas has used to deny minorities
the vote, including "the all[-]White primary, the secret ballot and the use of
illiteracy[,] . . . poll tax, re-registration and purging."  He testified as follows
regarding "the stated rationale" for each of these devices:

> Q     What, in your opinion, was the stated rationale for the
> enactment of all[-]White primaries in Texas?
>
> A     The stated rationale was voter fraud.
>
> Q     What was the stated rationale, in your opinion, for the
> use of secret ballot provisions in Texas?
>
> A     The stated rationale was to prevent voter fraud.
>
> Q     And what was the stated rationale, in your opinion, for
> the use of the poll tax in Texas?
>
> A     The stated rationale by the State was to prevent voter
> fraud.
>
> Q     And how about the stated rationale for the use in
> Texas of re-registration requirements and voter purges?
>
> A     The stated rationale was voter fraud.

24

No. 14-41127

> Q     Dr. Burton, in your expert opinion, did these devices
> actually respond to sincere concerns or incidents —
> incidences of voter fraud?
>
> A     No.

Here, too, there is evidence that could support a finding that the Legislature's race-neutral reason of ballot integrity offered by the State is pretextual. This bill was subjected to radical departures from normal procedures. Consideration of procedural departures is a difficult inquiry, because on the one hand, "[d]epartures from the normal procedural sequence . . . might afford evidence that improper purposes are playing a role." *Arlington Heights*, 429 U.S. at 267. On the other hand, "objection[s] to typical aspects of the legislative process in developing legislation," such as increasing the number of votes a law requires for passage, may not demonstrate an invidious intent, standing alone. *Cf. Operation Push*, 932 F.2d at 408–09, 408 n.6. Yet, context matters, and evidence of procedural departures provides one potential link in the circumstantial totality of evidence the district court must consider.

In this case, for example, the procedural maneuvers employed by the Texas Legislature and the State occurred, as the district court notes, only after repeated attempts to pass voter identification bills were blocked through countervailing procedural maneuvers. *See Veasey v. Perry*, 71 F. Supp. 3d at 645–46. At the same time, SB 14 was subject to numerous and radical procedural departures that may lend credence to an inference of discriminatory intent. *See id.* at 647–51. These included: (1) getting special permission to file the bill under a low number reserved for the Lieutenant Governor's legislative priorities; (2) Governor Perry's decision to designate the bill as emergency legislation so that it could be considered during the first sixty days of the legislative session; (3) suspending the two-thirds rule regarding the number of

No. 14-41127

votes required to make SB 14 a "special order"; (4) allowing the bill to bypass the ordinary committee process in the Texas House and Senate; (5) passing SB 14 with an unverified $2 million fiscal note despite the prohibition on doing so in the 2011 legislative session due to a $27 million budget shortfall; (6) cutting debate short to enable a three-day passage through the Senate; and (7) passing resolutions to allow the conference committee to add provisions to SB 14, contrary to the Legislature's rules and normal practice. *See id.* at 647–53. Such treatment was virtually unprecedented.[22]

Texas is a huge state in land mass and population and the Legislature faces great challenges in governing. The Texas Legislature meets for regular sessions for less than five months out of every two years. TEX. CONST. art. III, § 24; TEX. GOV'T CODE § 301.001 (West 2013).[23] During the session, it must pass a balanced budget that will govern until the next session, based on projected revenue for the next two years. TEX. CONST. art. VIII, § 22; *id.* art. III, § 49a. In recent years, the Legislature has faced many complex and controversial issues. The district court noted that the 2011 legislative session itself involved "critically important issues such as the $27 million budget

---

[22] One of the dissenting opinions calls into question the rationale behind these maneuvers and draws different interpretations and inferences from the evidence. However, it is the exclusive province of the district court to engage in this fact finding. *Pullman-Standard*, 456 U.S. at 291–92. We acknowledge that multiple inferences could reasonably be drawn from the record evidence, but we must leave the drawing of those inferences to the district court. Additionally, one of the dissenting opinions disagrees with reliance on opposing legislators' factual testimony about the unusual nature of the procedural maneuvers utilized to pass SB 14. There is a clear difference between opposing legislators testifying about their personal knowledge regarding the normal procedural sequence of passing legislation and opposing legislators merely speculating about the motives of SB 14's proponents.

[23] The Texas Governor also has the power to call special sessions of the Legislature, which are topically limited to the confines of the proclamation summoning the Legislature. TEX. CONST. art. IV, § 8.

No. 14-41127

shortfall and transportation funding," none of which received "a select committee or an exception from the two-thirds rule," as did SB 14.  *Veasey v. Perry*, 71 F. Supp. 3d at 657.

The Legislature is entitled to set whatever priorities it wishes.  Yet, one might expect that when the Legislature places a bill on an expedited schedule and subjects it to such an extraordinary degree of procedural irregularities, as was the case with SB 14, such a bill would address a problem of great magnitude.  Ballot integrity is undoubtedly a worthy goal.  But the evidence before the Legislature was that in-person voting, the only concern addressed by SB 14, yielded only two convictions for in-person voter impersonation fraud out of 20 million votes cast in the decade leading up to SB 14's passage.[24]  *See id.* at 639.  The bill did nothing to combat mail-in ballot fraud, although record evidence shows that the potential and reality of fraud is much greater in the mail-in ballot context than with in-person voting.[25]  *Id.* at 641, 653.

In the context of the many pressing matters of great importance to Texas that did not result in these legislative irregularities, we cannot say that the record leads to only one factual conclusion in this case.  *Pullman-Standard*, 456 U.S. at 292.  We cannot say that district court had to simply accept that legislators were really so concerned with this almost nonexistent problem.  Against a backdrop of warnings that SB 14 would have a disparate impact on

---

[24]  Representative Fischer testified that the Legislature had access to data from the 2008 and 2010 elections when considering SB 14, which showed that "of the millions of votes cast in both of those elections, there were perhaps four referrals for in person voter impersonation" and that "one, if not two individuals . . . had been officially charged and may have accepted responsibility for impersonation."

[25]  This statement is not intended as a criticism of allowing mail-in ballots, which are a vital means of enabling voting when it would otherwise be difficult or impossible for some people to exercise their right to vote in person.  It is simply an acknowledgement that the evidence supporting the need for reform was minimal on the in-person voting side.

No. 14-41127

minorities and would likely fail the (then extant) preclearance requirement, amendment after amendment was rejected. *Veasey v. Perry*, 71 F. Supp. 3d at 650–52, 698, 701–02, 708–10. While cloaking themselves in the mantle of following Indiana's voter ID law, which had been upheld against a (different) challenge in *Crawford*, the proponents of SB 14 took out all the ameliorative provisions of the Indiana law. *See, e.g., id.* at 651–52 (noting the Texas House stripped an indigency exception that had been added to SB 14 in the Texas Senate); *cf. Frank v. Walker* (*Frank II*), 819 F.3d 384, 386–87 (7th Cir. 2016) (noting that an indigency exception may be necessary for voters who face "high hurdles" to obtaining required photo identification and that the Indiana law the Court considered in *Crawford* contained such an indigency exception).[26]

This circumstantial evidence of discriminatory intent is augmented by contemporary examples of State-sponsored discrimination in the record. For

---

[26] One of the dissenting opinions claims that "the Indiana and Texas laws are not meaningfully different." Jones Dissenting Op. at 28 n.26. This ignores the district court's findings and the obvious differences between the two laws that affect the discriminatory impact analysis. The district court explained the differences well:

> Notably, while Defendants claim that SB 14 was modeled after the Indiana law, the Indiana law is more generous to voters. Unlike SB 14, it permits the use of any Indiana state-issued or federal ID and contains a nursing home resident exemption. Furthermore, Indiana is more generous in its acceptance of certain expired ID. Of particular relevance here, Indiana's accommodation of indigents, while requiring an additional trip to the county election office to claim an exemption, does not require an indigent to actually obtain, or pay any fees associated with, a qualified photo ID. This is significant, as demonstrated in this case. There was also a reference in *Crawford* to a "greater public awareness" of the law, which would prompt voters to secure qualified ID, as opposed to a relative dearth of publicity and instruction in Texas.

*Veasey v. Perry*, 71 F. Supp. 3d at 679 (footnotes omitted) (citing IND. CODE § 3-5-2-40.5(a)(3) (2014), IND. CODE § 3-11.7-5-2.5 (2011), and *Crawford*, 553 U.S. at 187–88 & n.6). The district court specifically found that the Texas Legislature stripped an indigency exception from SB 14, *id.* at 652, and that "[w]hen the legislature rejected student IDs, state government employee IDs, and federal IDs, they rejected IDs that are disproportionately held by African–Americans and Hispanics," *id.* at 658. These differences are highly salient to the discriminatory impact analysis.

No. 14-41127

example, the record shows that as late as 1975, Texas attempted to suppress minority voting through purging the voter rolls, after its former poll tax and re-registration requirements were ruled unconstitutional. *See Veasey v. Perry*, 71 F. Supp. 3d at 635.[27]  It is notable as well that "[i]n every redistricting cycle since 1970, Texas has been found to have violated the [Voting rights Act] with racially gerrymandered districts." *Id.* at 636 & n.23 (collecting cases).[28] Furthermore, record evidence establishes that the Department of Justice objected to at least one of Texas's statewide redistricting plans for each period between 1980 and the present, while Texas was covered by Section 5 of the

---

[27]  The law in question was enacted in 1975, after a previous re-registration requirement was struck down as unconstitutional in the early 1970s.  A three-judge court eventually struck down this attempt at purging and re-registration after the Department of Justice objected to the law when Texas became subject to preclearance. *See generally Veasey v. Perry*, 71 F. Supp. 3d at 635 & n.18.

[28]  In *LULAC*, the Supreme Court also noted Texas's "long, well-documented history of discrimination that has touched upon the rights of African-Americans and Hispanics to register, to vote, or to participate otherwise in the electoral process." *LULAC*, 548 U.S. at 439 (quoting *Vera v. Richards*, 861 F. Supp. 1304, 1317 (S.D. Tex. 1994)).  The Court found that Texas's 2003 redistricting plan diluted the Hispanic vote in one district such that it violated the Voting Rights Act.  Although the Court did not find that Texas had acted with discriminatory intent, it noted:

> The changes to District 23 undermined the progress of a racial group that has been subject to significant voting-related discrimination and that was becoming increasingly politically active and cohesive. . . .  In essence the State took away the Latinos' opportunity because Latinos were about to exercise it. This bears the mark of intentional discrimination that could give rise to an equal protection violation.  Even if we accept the District Court's finding that the State's action was taken primarily for political, not racial, reasons, the redrawing of the district lines was damaging to the Latinos in District 23.  The State not only made fruitless the Latinos' mobilization efforts but also acted against those Latinos who were becoming most politically active, dividing them with a district line through the middle of Laredo.

*Id.* at 439–40 (citations omitted).

29

No. 14-41127

Voting Rights Act. Texas "is the only state with this consistent record of objections to such statewide plans."[29]    Finally, the same Legislature that passed SB 14 also passed two laws found to be passed with discriminatory purpose. *See Texas v. United States*, 887 F. Supp. 2d 133, 159–66 (D.D.C. 2012) (utilizing the *Arlington Heights* analysis and concluding the 2011 Texas Legislature created two redistricting plans with a discriminatory purpose), *vacated and remanded on other grounds*, 133 S. Ct. 2885 (2013).

It is also probative that many rationales were given for a voter identification law, which shifted as they were challenged or disproven by opponents. *Veasey v. Perry*, 71 F. Supp. 3d at 653–59; *see generally Foster*, 136 S. Ct. at 1751–52, 1754–55 (reasoning that the fact that the government's "principal reasons" for its action "shifted over time . . . suggest[ed] that those reasons may [have been] pretextual"). One of those rationales included preventing noncitizens from voting, even though two forms of identification

---

[29] One of the dissenting opinions quarrels with the district court's findings on this issue, but a three-judge panel reviewing Texas's 1981 redistricting plan reached the same conclusion:

> In 1975, Congress extended the special pre-clearance provisions of the Voting Rights Act of 1965 to Texas. This decision was made on the basis of extensive hearings into the history of voting discrimination in the state. Since the pre-clearance provisions were extended to Texas in August of 1975, the Department of Justice has lodged far more objections to governmental actions affecting voting rights in Texas than any other covered state. Between August 15, 1975, and September 18, 1981, the State and its various political sub-divisions received 91 letters of objection. In this same period, no other covered state had more than 50 objections, and only three had more than thirty. The election changes objected to by the Department of Justice include the movement of polling places, proposed annexations, alteration of district lines, and a state-wide purge of voter registration lists.

*Seamon v. Upham*, 536 F. Supp. 931, 989 (E.D. Tex.) (citations omitted), *vacated on other grounds*, 456 U.S. 37 (1982).

No. 14-41127

approved under SB 14 are available to noncitizens. *Veasey v. Perry*, 71 F. Supp. 3d at 654. It is likewise relevant that SB 14's proponents refused to answer why they would not allow amendments to ameliorate the expected disparate impact of SB 14. *Id.* at 646–47, 650–51.

Further supporting the district court's finding is the fact that the extraordinary measures accompanying the passage of SB 14 occurred in the wake of a "seismic demographic shift," as minority populations rapidly increased in Texas, such that the district court found that the party currently in power is "facing a declining voter base and can gain partisan advantage" through a strict voter ID law.[30] *Id.* at 700.

In sum, although some of the evidence on which the district court relied was infirm, there remains evidence to support a finding that the cloak of ballot integrity could be hiding a more invidious purpose. As we have explained, the

---

[30] This partisan motive to suppress votes is not based on which party is in the majority. When asked about the fact that most redistricting and discriminatory laws were enacted under legislatures with a majority who were members of a different party than the current majority, the Plaintiffs' expert, Dr. Burton, agreed. He testified that this fact made his analysis "stronger because it does not matter who is in charge of State politics or the political parties in power in Texas, whether they're Republicans, Democrats[,] or Martians, every time that African–Americans have, in fact, been perceived to be increasing their ability to vote and participate in the process there has been State legislation to either deny them the vote or at least dilute the vote or make it much more difficult for them to participate on an equal basis as Whites in the State of Texas."

One of the dissenting opinions claims that we confuse partisanship for racism in our analysis of whether the Legislature acted with a discriminatory intent. Intentions to achieve partisan gain and to racially discriminate are not mutually exclusive. As another of the dissenting opinions points out, acting to preserve legislative power in a partisan manner can also be impermissibly discriminatory. *Ketchum v. Byrne*, 740 F.2d 1398, 1408 (7th Cir. 1984) (noting that "racial discrimination [may be and has been a] necessary accompaniment of [an] action taken to protect incumbencies"). In this case, the district court found that the party in power in the Texas Legislature faced "a declining voter base and [stood to] gain partisan advantage by suppressing the . . . votes of African-Americans and Latinos." *See Veasey v. Perry*, 71 F. Supp. 3d at 700. Once again, the disagreement centers in part on the fact that some of the dissenting opinions would re-weigh the evidence and disregard the district court's fact findings, which we are not entitled to do. *See Pullman-Standard*, 456 U.S. at 292.

No. 14-41127

absence of direct evidence such as a "let's discriminate" email cannot be and is not dispositive. Because we do not know how much the evidence found infirm weighed in the district court's calculus, we cannot simply affirm the decision. However, it is not an appellate court's place to weigh evidence. *See Price*, 945 F.2d at 1317 ("[T]he appellate court may not substitute its judgment for the district court's."). Thus, since there is more than one way to decide this case, and the right court to make those findings is the district court, we must remand.[31]

We therefore remand this claim to the district court to "reexamin[e] . . . the probative evidence underlying Plaintiffs' discriminatory purpose claims weighed against the contrary evidence, in accord with" the appropriate legal standards we have described. *Veasey*, 796 F.3d at 503–04; *cf. City of Richmond*

---

[31] Two of the dissenting opinions take issue with our decision on discriminatory intent, in part because this issue can be fraught and divisive. One of the dissenting opinions claims that Congress intended to prevent such divisiveness by ensuring that plaintiffs could sue for discriminatory impact. Congress amended the Voting Rights Act in 1982 to make it clear that plaintiffs could sue for discriminatory impact after Supreme Court precedent had required the showing of a discriminatory purpose under Section 2. *See* S. Rep. No. 97-417, at 15–16 (1982), *as reprinted in* 1982 U.S.C.C.A.N. 177, 192–93. Congress acted in the face of this precedent to make it *easier* for minority plaintiffs to combat discriminatory laws—not to make it more difficult. Congress did not eliminate plaintiffs' ability to sue for purposeful discrimination, so it remains our duty to consider these claims. *See* S. Rep. No. 97-417, at 17 (1982), *as reprinted in* 1982 U.S.C.C.A.N. 177, 194 & n.50 (emphasis in original) (citation omitted) (noting that Section 2 was originally understood by Congress to prohibit "any kind of practice . . . if its *purpose or effect* was to deny or abridge the right to vote on account of race or color"). In this case, although we must tread carefully in assessing the motives of the Legislature and the district court may very well agree with some of the points made by the dissenting opinions, we must be mindful of our role in this process. We are not the court to make factual findings in the first instance, and the record evidence could support more than one conclusion. We must therefore remand for reweighing of the evidence, rather than conducting that reweighing ourselves. *See Pullman-Standard*, 456 U.S. at 291 ("When an appellate court discerns that a district court has failed to make a finding because of an erroneous view of the law . . . there should be a remand for further proceedings to permit the *trial court* to make the missing findings . . . ." (emphasis added)); *N. Miss. Commc'ns, Inc. v. Jones*, 951 F.2d 652, 656–57 (5th Cir. 1992) (citing *Pullman-Standard*, 456 U.S. at 291) (remanding a case, for the fourth time, for factual findings under the proper standard).

No. 14-41127

*v. United States*, 422 U.S. 358, 378 (1975) ("[W]e should be confident of the evidentiary record and the adequacy of the lower court's consideration of it."). The parties have not asked to offer additional evidence, and we conclude that, as to this issue, the district court should not take additional evidence. The district court may, but is not required to, entertain additional oral argument prior to issuing its new findings. The district court on remand should make its discriminatory purpose findings based on the record we have, guided by this opinion and the instructions we have given the district court about the legal infirmities in its initial findings.

Time is short, though. The Supreme Court has, in effect, set a July 20 deadline for this court to act, after which it will entertain motions for relief. *Veasey v. Abbott*, 136 S. Ct. at 1823. Time is also needed to communicate those modifications to the wider public so as not to disrupt the election process. Indeed, among the findings made by the district court was that the public education campaign for SB 14 at the time of trial was "grossly insufficient." *Veasey v. Perry*, 71 F. Supp. 3d at 649. Equally necessary in the time left before early voting begins in late October is an adequate campaign to explain not only SB 14 but also court-ordered amendments to voter identification rules. We are mindful that future litigation and appeals to this court are also distinct possibilities.

Additionally, we recognize the burden our majority opinion places on the district court to implement a remedy for the discriminatory effect violation with so little time, *see infra* Part II.B. Therefore, to avoid disruption of the upcoming election, we rely on equitable principles in concluding that the district court should first focus on fashioning interim relief for the discriminatory effect violation in the months leading up to the November 2016 general election. The primary concern of this court and the district court

No. 14-41127

should be to ensure that SB 14's discriminatory effect is ameliorated as Section 2 requires in time for the November 2016 election, while respecting the policy choices made by the Legislature in passing SB 14. *See Perry v. Perez*, 132 S. Ct. 934, 940–41 (2012) (per curiam).

We instruct the district court to take the requisite time to reevaluate the evidence and determine anew whether the Legislature acted with a discriminatory intent in enacting SB 14. But it is unnecessary for the district court to undertake this task until after the November 2016 election. *See Purcell v. Gonzalez*, 549 U.S. 1, 5–6 (2006) (election permitted to continue despite unresolved issues related to disenfranchisement); *see also Reynolds v. Sims*, 377 U.S. 533, 585 (1964) (noting that a court may withhold immediate relief so as not to disturb a forthcoming election). If the district court concludes that SB 14 was passed with a discriminatory intent, the district court should fashion an appropriate remedy in accord with its findings; provided, however, that any remedy will not be made effective until after the November 2016 election.

### B. *Discriminatory Effect*

Plaintiffs allege that SB 14 has a discriminatory effect in violation of Section 2 of the Voting Rights Act, which proscribes any "voting qualification or prerequisite to voting or standard, practice, or procedure . . . which results in a denial or abridgement of the right of any citizen . . . to vote on account of race or color." 52 U.S.C. § 10301(a). Unlike discrimination claims brought pursuant to the Fourteenth Amendment, Congress has clarified that violations of Section 2(a) can "be proved by showing discriminatory effect alone." *Thornburg v. Gingles*, 478 U.S. 30, 35 (1986); *see also* 52 U.S.C. § 10301(b).[32]

---

[32] Section 2 provides in full:

No. 14-41127

In proscribing laws that have a discriminatory effect, Congress exercised its authority pursuant to the Fifteenth Amendment, which states that "[t]he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any state on account of race, color, or previous condition of servitude," and gives Congress the "power to enforce this article by appropriate legislation." U.S. CONST. amend. XV.

### 1. The Gingles Factors and Two-Part Framework

To prove that a law has a discriminatory effect under Section 2, Plaintiffs must show not only that the challenged law imposes a burden on minorities, but also that "a certain electoral law, practice, or structure interacts with social and historical conditions *to cause* an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Gingles*, 478 U.S. at 47 (emphasis added). While courts regularly utilize statistical analyses to discern whether a law has a discriminatory impact, *see, e.g.*, *Operation Push*,

---

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 10303(f)(2) of this title, as provided in subsection (b).

(b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

52 U.S.C. § 10301. We address more fully below how the factors adopted by the Supreme Court in *Gingles* and the other standards we apply effectuate the language of Section 2.

No. 14-41127

932 F.2d at 410–11, the Supreme Court has also endorsed factors ("the *Gingles* factors") enunciated by Congress to determine whether such an impact is a product of current or historical conditions of discrimination such that it violates Section 2,[33] *Gingles*, 478 U.S. at 44–45.

Although courts have often applied the *Gingles* factors to analyze claims of vote dilution,[34] perhaps because of past preclearance requirements, there is little authority on the proper test to determine whether the right to vote has been *denied* or *abridged* on account of race.  *See Ohio State Conference of NAACP v. Husted*, 768 F.3d 524, 554 (6th Cir. 2014) ("Unsurprisingly, then, the case law has developed to suit the particular challenges of vote dilution claims. A clear test for Section 2 vote denial claims—generally used to refer to any claim that is not a vote dilution claim—has yet to emerge."), *vacated on other grounds by* No. 14-3877, 2014 WL 10384647, at *1 (6th Cir. Oct. 1, 2014). However, the Fourth and Sixth Circuits have adopted a two-part framework that draws on the text of Section 2 and the Supreme Court's guidance in *Gingles* to analyze Section 2 claims.

### (a)  The Two-Part Framework

We now adopt the two-part framework employed by the Fourth and Sixth Circuits to evaluate Section 2 "results" claims.  The framework has two elements:

> [1] [T]he challenged standard, practice, or procedure must impose a discriminatory burden on members of a protected class, meaning that members of the protected class have less opportunity than

---

[33]  These are sometimes also called the "Senate Factors," as they derive from the Senate Report accompanying the 1982 amendments to the Voting Rights Act.  *See Gingles*, 478 U.S. at 43–45.

[34]  *See, e.g.*, *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 850–51 (5th Cir. 1993) (en banc); *Salas v. Sw. Tex. Junior Coll. Dist.*, 964 F.2d 1542, 1543, 1546, 1551–56 (5th Cir. 1992).

No. 14-41127

other members of the electorate to participate in the political
process and to elect representatives of their choice, [and]

[2] [T]hat burden must in part be caused by or linked to social and
historical conditions that have or currently produce discrimination
against members of the protected class.

*League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 240 (4th Cir.
2014) (citations and internal quotation marks omitted), *cert. denied*, 135 S. Ct.
1735 (2015); *see also Husted*, 768 F.3d at 554.

The first part of this two-part framework inquires about the nature of
the burden imposed and whether it creates a disparate effect in that "members
of the protected class have less opportunity than other members of the
electorate to participate in the political process and to elect representatives of
their choice"—this encompasses Section 2's definition of what kinds of burdens
deny or abridge the right to vote. *Compare* 52 U.S.C. § 10301 (proscribing
denial or abridgement of the right to vote and defining how a violation of
Section 2 may be established)*, with League of Women Voters*, 769 F.3d at 240
(outlining the two-part test, using almost identical language to describe an
impermissible burden on the right to vote).

The second part of the two-part framework draws on the Supreme
Court's guidance in *Gingles*. *See League of Women Voters*, 769 F.3d at 240
(quoting *Gingles*, 478 U.S. at 47); *Husted*, 768 F.3d at 554 (quoting *Gingles*,
478 U.S. at 47). This second part of the framework provides the requisite
causal link between the burden on voting rights and the fact that this burden
affects minorities disparately because it interacts with social and historical
conditions that have produced discrimination against minorities currently, in
the past, or both. *See Gingles*, 478 U.S. at 47 ("The essence of a § 2 claim is
that a certain electoral law, practice, or structure interacts with social and

No. 14-41127

historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives.").

### (b)  The *Gingles* Factors

As did the Fourth and Sixth Circuits, we conclude that the *Gingles* factors should be used to help determine whether there is a sufficient causal link between the disparate burden imposed and social and historical conditions produced by discrimination.[35]  In other words, the *Gingles* factors may be used to examine causality under the second part of the two-part analysis.

These factors include:

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;
2. the extent to which voting in the elections of the state or political subdivision is racially polarized;
3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;
4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;
5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;
6. whether political campaigns have been characterized by overt or subtle racial appeals;

---

[35]  *See League of Women Voters*, 769 F.3d at 240, 245 (noting the *Gingles* factors are useful in examining both elements of the two-part test, especially the causal linkage between disparate impacts and conditions of discrimination); *Husted*, 768 F.3d at 554 (noting the *Gingles* factors form part of the totality of the circumstances analysis in examining a claim of vote denial, "particularly with regard to the second element" of the two-part test).

No. 14-41127

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

*Id.* at 36–37 (quoting S. Rep. No. 97-417, at 28–29 (1982), reprinted in 1982 U.S.C.C.A.N. 177, 206–07).  Two additional considerations are:

[8.] whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group[; and]

[9.] whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

*Id.*

These factors are not exclusive, and "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other."  *Id.* at 45 (quoting S. Rep. No. 97-417, at 29).  Not every factor will be relevant in every case.  These factors provide salient guidance from Congress and the Supreme Court on how to examine the current effects of past and current discrimination and how those effects interact with a challenged law.  *Id.*; *League of Women Voters*, 769 F.3d at 240, 245; *Husted*, 768 F.3d at 554.

### (c)  This Analysis is Appropriate for Section 2 Effect Challenges

The State argues that the *Gingles* factors are inapposite in this context, and that we should apply the two-part test as it was applied in the Seventh Circuit in *Frank v. Walker*, 768 F.3d 744, 754–55 (7th Cir. 2014), *cert. denied*, 135 S. Ct. 1551 (2015).  The State also argues that if we apply the *Gingles* factors and two-part test and find a Section 2 violation in this case, all manner of neutral election laws may be struck down.  We disagree that the *Gingles* factors are inapposite here, and we have good reasons to believe that the State's gloomy forecast is unsound.

39

No. 14-41127

Use of the two-factor test and the *Gingles* factors limits Section 2 challenges to those that properly link the effects of past and current discrimination with the racially disparate effects of the challenged law. Applying the *Gingles* factors involves engaging in a multi-factor analysis, under which no one factor has determinative weight. *Gingles*, 478 U.S. at 45. Certainly, this analysis is fact dependent. Yet, in many similar contexts, we frequently employ multi-factor, totality-of-the-circumstances analyses that are highly fact bound. *See, e.g.*, *United States v. Batamula*, ___ F.3d ___, No. 12-20630, 2016 WL 2342943, at *3–4 (5th Cir. May 3, 2016) (en banc) (analyzing the totality of the circumstances to determine whether a defendant was prejudiced by a lack of competent advice during the guilty plea process); *Cannata v. Catholic Diocese of Austin*, 700 F.3d 169, 175–76 (5th Cir. 2012) (adopting a "totality-of-the-circumstances" analysis to determine whether an employee is a minister for purposes of the ministerial exception and abrogating the three-part test previously employed by this court, because the Supreme Court specifically rejected the use of a rigid, bright-line test for this issue); *Stewart v. Miss. Transp. Comm'n*, 586 F.3d 321, 330–31 (5th Cir. 2009) (applying multi-factor tests to analyze whether a supervisor created a hostile work environment or retaliated against an employee for reporting sexual harassment, and in analyzing the last factor of the hostile work environment test, looking to the totality of the circumstances to determine whether the harassment was sufficiently severe and pervasive to alter employment conditions).[36]

---

[36] *See also In re Am. Int'l Refinery, Inc.*, 676 F.3d 455, 462 (5th Cir. 2012) (rejecting a per se approach in favor of a "totality of the circumstances approach for deciding whether third-party payment of a retainer creates a disqualifying interest" in a bankruptcy case); *United States v. Jenson*, 462 F.3d 399, 406 (5th Cir. 2006) (employing a multi-factor test to determine whether consent to search was voluntary); *Cleveland v. City of Elmendorf*, 388

No. 14-41127

We conclude that the two-part framework and *Gingles* factors together serve as a sufficient and familiar way to limit courts' interference with "neutral" election laws to those that truly have a discriminatory impact under Section 2 of the Voting Rights Act. Just because a test is fact driven and multi-factored does not make it dangerously limitless in application.

The State argues that we should instead adopt a bright-line test as our limiting principle. As the State would have it, so long as the State can articulate a legitimate justification for its election law and some voters are able to meet the requirements, there is no Section 2 violation. This argument effectively nullifies the protections of the Voting Rights Act by giving states a free pass to enact needlessly burdensome laws with impermissible racially discriminatory impacts. The Voting Rights Act was enacted to prevent just such invidious, subtle forms of discrimination. *See Chisom v. Roemer*, 501 U.S. 380, 406 (1991) (Scalia, J., dissenting); *Allen v. State Bd. of Elections*, 393 U.S. 544, 565–66 (1969). We think the factors applied to the facts are a proper limiting principle, and find this analysis faithful to the purposes of the Voting Rights Act.[37]

---

F.3d 522, 528 (5th Cir. 2004) (employing a totality-of-the-circumstances analysis to determine whether workers were volunteers for the purposes of the Fair Labor Standards Act); *Brown & Root, Inc. v. NLRB*, 333 F.3d 628, 634 (5th Cir. 2003) (applying a totality-of-the-circumstances analysis to determine whether an employer made an unlawful threat related to union activity); *United States v. Rodriguez-Rivas*, 151 F.3d 377, 380–81 (5th Cir. 1998) (employing a totality-of-the-circumstances analysis to determine whether a Border Patrol agent had reasonable suspicion to stop a vehicle); *United States v. Jon-T Chems., Inc.*, 768 F.2d 686, 694 (5th Cir. 1985) (looking "to the totality of the circumstances" in a "heavily fact-specific" inquiry regarding whether a subsidiary was the alter ego of its parent); *Gonzales v. Beto*, 460 F.2d 314, 315 (5th Cir. 1972) (judging a lineup by the totality of the circumstances to determine whether it violated due process).

[37] These arguments also address the discomfort expressed by some of the dissenting opinions with how the *Gingles* factors are applied differently in different cases. As we have noted, the factors are highly fact dependent, as they must be to address different laws, different states with varying histories of official discrimination, and different populations of

No. 14-41127

In addition, two district courts have now applied the same analysis we apply here to two different states' laws and have found no discriminatory results under Section 2. *See, e.g., Lee v. Va. State Bd. of Elections*, ___ F. Supp. 3d ____, No. 3:15CV357-HEH, 2016 WL 2946181, at *5, *21–24 (E.D. Va. May 19, 2016); *N.C. State Conference of the NAACP v. McCrory*, ___ F. Supp. 3d ____, No. 1:13CV658, 2016 WL 1650774, at *73–76, *117, *122 (M.D.N.C. Apr. 25, 2016). These district court cases illustrate three principles that the State ignores in its arguments before us: (1) the analysis we employ effectively allows examination of differing fact patterns; (2) the State's prediction of vast judicial interference with election laws is unfounded; and (3) district courts are well suited to conduct this fact-intensive analysis in the first instance, as the institutions we rely on for fact finding day in and day out.

---

minority voters. Such has also been the case with the variances in decisions among the circuit courts to consider challenges to voter ID laws—our decision differs from those of other circuits in part because we are considering "the [s]trictest [l]aw in the [c]ountry" in a State with a fairly extensive history of official discrimination. *See Veasey v. Perry*, 71 F. Supp. 3d at 642; *cf. Frank*, 768 F.3d at 746 (noting that Wisconsin's law allowed the use of state ID cards, recent naturalization papers, tribal IDs, and signed college or university photo IDs); *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1346 (11th Cir. 2009) (noting that Georgia's law allowed the use of "a government employee identification card, a U.S. military identification card, or a tribal identification card"); *Gonzalez v. Arizona*, No. CV 06-1268-PHX, 2006 WL 3627297, at *6 (D. Ariz. Sept. 11, 2006) (describing a wide variety of acceptable forms of identification accepted at Arizona polls), *aff'd*, 485 F.3d 1041 (9th Cir. 2007).

Even so, the fact-dependent nature of the *Gingles* factors does not mean that "[v]irtually any voter regulation" may be struck down under our analysis. *See* Jones Dissenting Op. at 52. Undoubtedly, challenges to election laws under Section 2 have increased since *Shelby County* as states have enacted new laws and regulations that must be challenged under Section 2, if at all, because these laws no longer face preclearance. That does not mean that our analysis endangers neutral, nondiscriminatory election laws. As we explain *infra*, district courts considering these challenges have come to different conclusions based on varying fact patterns and election laws, not always with the result of striking down election laws. Indeed, the United States abandoned its Section 2 discriminatory-effect challenge to a voter ID law after the North Carolina legislature added a reasonable impediment exception to the law. *See N.C. State Conference of the NAACP v. McCrory*, ___ F. Supp. 3d ____, No. 1:13CV658, 2016 WL 1650774, at *16 (M.D.N.C. Apr. 25, 2016).

No. 14-41127

Furthermore, the Seventh Circuit's approach in *Frank* is not inconsistent with our own. The Seventh Circuit applied the two-part framework only "[f]or the sake of argument," did not apply the *Gingles* factors, and expressed skepticism about the second step of the two-part analysis "because it does not distinguish discrimination by the [government] defendants from other persons' discrimination." *Frank*, 768 F.3d at 754–55. The Seventh Circuit ultimately did not apply the second step of the two-part analysis because it concluded that the plaintiffs failed to show that Wisconsin's law imposed a discriminatory burden that gave minority voters less opportunity to participate in the political process at the first step of the analysis. *Id.* at 753, 755. Our record contains more particularized evidence of the discriminatory burden imposed by SB 14 than did the record in *Frank*.[38]

To the extent that the State argues causality may be established only where there is a finding that state action caused the social and historical conditions begetting discrimination, *see Frank*, 768 F.3d at 755, we need not and do not decide that issue. Unlike in *Frank*, the district court in this case found both historical and contemporary examples of discrimination in both employment and education by the State of Texas, and it attributed SB 14's disparate impact, in part, to the lasting effects of that State-sponsored discrimination. *See Veasey v. Perry*, 71 F. Supp. 3d at 636, 666–67. Thus, even assuming this limitation from *Frank* applied, the evidence here meets that test.

---

[38] Furthermore, Wisconsin's law, considered in *Frank*, allows for more forms of identification than does SB 14. The district court found SB 14 to be the "[s]trictest [l]aw in the [c]ountry" based on comparisons to other states' voter ID laws and on the characterization of SB 14 by one of its drafters. *Veasey v. Perry*, 71 F. Supp. 3d at 642–43, 701 & n.542.

43

No. 14-41127

Finally, we reject the argument that *Crawford* mandates upholding SB 14 simply because the State expressed legitimate justifications for passing the law.[39] *Crawford* contains no mention of Section 2 or the Voting Rights Act—in that case, the Court only considered a First and Fourteenth Amendment challenge, which involves a different analytical framework than what we use for Section 2 claims. *See generally* 553 U.S. 181. Additionally, the Court in *Crawford* analyzed only a facial challenge that had been adjudicated in the district court on summary judgment. *Crawford*, 553 U.S. at 187–88, 202–03. Here, we have a multitude of factual findings about Plaintiffs' combined challenges, based on copious evidence from a bench trial and a record that spans more than one hundred thousand pages. *See generally Veasey v. Perry*, 71 F. Supp. 3d 627. Nevertheless, the State argues that *Frank* drew on *Crawford* to conclude Wisconsin's law did not impose a discriminatory burden on voters because it appeared to be a generally-applicable election law.

*Crawford* clearly established that states have strong interests in preventing voter fraud and increasing voter confidence by safeguarding the integrity of elections. 553 U.S. at 191, 194–97. We do not deny that the State in this case may pursue those interests, nor that they are strong and valid interests. However, that acknowledgement does not address the additional as-

---

[39] One of the dissenting opinions relies heavily on *Crawford* in discussing both discriminatory purpose and impact, essentially using *Crawford*'s endorsement of "preventing voter fraud" as a talisman against objections that SB 14 does not appear even remotely well tailored to suit its stated purposes. While we acknowledge the State's legitimate interests in this case, *Crawford* did not deal with either discriminatory intent or effect under Section 2. In *Crawford*, the Court simply noted the weight of the State's interests in the First and Fourteenth Amendment balancing analysis, which differs from Section 2's inquiries into discriminatory motive and impact. As noted *infra*, even Judge Easterbrook and the Seventh Circuit do not subscribe to the dissenting opinions' views of *Crawford*'s or *Frank*'s holdings. We likewise decline to read into *Crawford* the inapposite principle that the State may invidiously discriminate or impermissibly disparately burden minorities so long as it articulates "preventing voter fraud" as one purpose of a restrictive law.

44

No. 14-41127

applied challenges Plaintiffs make in this case. *See id.* at 199–202. Even the
Seventh Circuit has acknowledged that *Crawford* does not extend as far as the
State argues, holding that *Frank* "did not decide that persons unable to get a
photo ID with reasonable effort lack a serious grievance." *Frank II*, 819 F.3d
at 386. The Seventh Circuit in this later iteration of *Frank* did not consider a
Section 2 challenge. *Id.* at 385–86; *see also Frank v. Walker*, 141 F. Supp. 3d
932, 934–36 (E.D. Wis. 2015), *vacated in part by Frank II*, 819 F.3d 384. But
the court noted that neither *Crawford* nor *Frank* foreclose the argument that
an indigency exception may be necessary to prevent an unconstitutional
burden on plaintiffs hindered from voting and obtaining photo IDs due to
financial hardship and other factors like those exhibited by the Plaintiffs in
this case.[40] *Frank II*, 819 F.3d at 386–87. The Seventh Circuit remanded the
plaintiffs' constitutional claims to the district court for further consideration of
an as-applied challenge factually similar to the one Plaintiffs make in this case.
*Id.* at 385–86, 388.

---

[40] Specifically, the Seventh Circuit noted the distinction between the general facial
challenge in *Frank* and the more particular as-applied challenge in *Frank II*:

> The argument plaintiffs now present is different. Instead of saying that
> inconvenience for some voters means that no one needs photo ID, plaintiffs
> contend that high hurdles for some persons eligible to vote entitle those
> particular persons to relief. *Plaintiffs' approach is potentially sound if even a
> single person eligible to vote is unable to get acceptable photo ID with reasonable
> effort.* The right to vote is personal and is not defeated by the fact that 99% of
> other people can secure the necessary credentials easily. Plaintiffs now accept
> the propriety of requiring photo ID from persons who already have or can get
> it with reasonable effort, while endeavoring to protect the voting rights of those
> who encounter high hurdles. This is compatible with our opinion and mandate,
> just as it is compatible with *Crawford*.

*Frank II*, 819 F.3d at 386–87 (emphasis added).

No. 14-41127

Having established that the two-part analysis and *Gingles* factors are appropriate standards for examining Plaintiffs' Section 2 claim,[41] we evaluate the district court's discriminatory effect finding for clear error. *See Operation Push*, 932 F.2d at 410.

### 2.  *SB 14's Disparate Impact*

The district court found that 608,470 registered voters, or 4.5% of all registered voters in Texas, lack SB 14 ID. *Veasey v. Perry*, 71 F. Supp. 3d at 659. Of those, 534,512 voters did not qualify for a disability exemption from SB 14's requirements. *Id.* The latter figure, which was derived by comparing the Texas Election Management System with databases containing evidence of who possesses SB 14 ID, is known as the "No-Match List."[42] *Id.* The district court credited expert analysis and testimony by the individual Plaintiffs, finding that SB 14 imposed excessive and disparate burdens on minority voters

---

[41] One of the dissenting opinions proposes a different analysis to apply in Section 2 "results" cases. This opinion asserts that the test should be "simple and consistent," meaning that we should ignore the Supreme Court's guidance in *Gingles*, Congress's intention as expressed in the Senate Factors, and, in practice, that we should require outright denial of the right to vote to show a Section 2 violation. Jones Dissenting Op. at 53. Unfortunately, assessing whether a law has a discriminatory impact is no simple matter and does not lend itself to simple formulations. As we have shown, neither do many other fact-dependent tests that we routinely apply in other contexts. We must undertake this difficult work, even if the analytical frameworks best suited to the task are not as neat and tidy as we would prefer. *See Clements*, 999 F.2d at 860 (noting that standards in Section 2 cases "must reflect the central purpose of the Voting Rights Act and its intended liberality as well as the practical difficulties of proof in the real world of trial," especially since "greater certitude frequently may be purchased only at the expense of other values").

[42] While the State's expert criticized this calculation, he conceded that the methodology used to derive this figure was well accepted. Nonetheless, he attempted to challenge the No-Match List because 21,731 people on the No-Match List later voted in the spring 2014 election. We accept the well-reasoned logic of the district court, which noted that some of those 21,731 who voted may have done so by mail, which does not require SB 14 ID, while others may have obtained SB 14 ID between the calculation of the No-Match List and the spring 2014 election. *Veasey v. Perry*, 71 F. Supp. 3d at 660.

No. 14-41127

who lack SB 14 ID, including many Plaintiffs. *Id.* at 664–77. This evidence supports the district court's findings regarding SB 14's disparate impact.

### (a) Expert Analyses of SB 14's Impact

Plaintiffs' experts relied on four distinct methods of analysis to determine the races of those on the No-Match List.[43] *Id.* at 660–62. Those included: (1) ecological regression analysis, (2) homogenous block group analysis, (3) comparing the No-Match List to a Spanish Surname Voter Registration list, and (4) reliance on data provided by Catalist LLC, a company that compiles election data. *Id.* at 661. The ecological regression analysis performed by Dr. Stephen Ansolabehere, an expert in American electoral politics and statistical methods in political science, which compared the No-Match List with census data, revealed that Hispanic registered voters and Black registered voters were respectively 195% and 305% more likely than their Anglo peers to lack SB 14 ID. *Id.* According to Dr. Ansolabehere, this disparity is "statistically significant and 'highly unlikely to have arisen by chance.'" *Id.* The homogenous block group analysis yielded similar results, and other experts arrived at similar conclusions. *Id.* at 661–62. These statistical analyses of the No-Match List were corroborated by a survey of over 2,300 eligible Texas voters, which concluded that Blacks were 1.78 times more likely than Whites, and Latinos 2.42 times more likely, to lack SB 14 ID. *Id.*

---

[43] We recognize that the terms used to describe different racial or ethnic groups inoffensively can themselves be the subject of dispute. Where we quote a witness or the district court or where we discuss a witness's testimony, we use their terms. For our part, because we are a reviewing court, while recognizing the imperfections of these terms, we use the terms used by the district court and the parties to refer to the three groups that were the subject of the evidence in this case: Anglos (used to describe non-Hispanic Caucasians), Hispanics, and African Americans. We also recognize that many Texans identify with more than one racial or ethnic group and some Texans do not fall into any of these three groups; we address the evidence and arguments as they were presented by the parties.

No. 14-41127

at 662–63. Even the study performed by the State's expert, which the district court found suffered from "significant methodological oversights," found that 4% of eligible White voters lacked SB 14 ID, compared to 5.3% of eligible Black voters and 6.9% of eligible Hispanic voters. *Id.* at 663 & n.239. The district court thus credited the testimony and analyses of Plaintiffs' three experts, each of which found that SB 14 disparately impacts African-American and Hispanic registered voters in Texas. *Id.* at 663.

The district court likewise concluded that SB 14 disproportionately impacts the poor, who are disproportionately minorities. *Id.* at 664–65. It credited expert testimony that 21.4% of eligible voters earning less than $20,000 per year lack SB 14 ID, compared to only 2.6% of voters earning between $100,000 and $150,000 per year. *Id.* at 664. Lower income respondents were also more likely to lack the underlying documents to get an EIC. *Id.* Dr. Jane Henrici, an anthropologist and professorial lecturer at George Washington University, explained that:

> [U]nreliable and irregular wage work and other income . . . affect the cost of taking the time to locate and bring the requisite papers and identity cards, travel to a processing site, wait through the assessment, and get photo identifications. This is because most job opportunities do not include paid sick or other paid leave; taking off from work means lost income. Employed low-income Texans not already in possession of such documents will struggle to afford income loss from the unpaid time needed to get photo identification.

*Id.* (alteration in original).

Furthermore, the court found that the poor are less likely to avail themselves of services that require ID, such as obtaining credit and other financial services. *Id.* They are also less likely to own vehicles and are therefore more likely to rely on public transportation. *Id.* at 665, 672–73. As a result, the poor are less likely to have a driver's license and face greater

No. 14-41127

obstacles in obtaining photo identification. *Id.* Even obtaining an EIC poses an obstacle—the district court credited evidence that hundreds of thousands of voters face round-trip travel times of 90 minutes or more to the nearest location issuing EICs. *Id.* at 672. Of eligible voters without access to a vehicle, a large percentage faced trips of three hours or more to obtain an EIC.[44] *Id.*

### (b)  The State's Challenges to the District Court's Analysis

Although the State does not dispute the underlying factual findings, it identifies several purported legal errors in the district court's decision. We address only the most relevant challenges at length herein.[45] We conclude that

---

[44] Before the panel, the State attacked the entirety of the district court's findings on the grounds that the lower court did not distinguish between SB 14's statutory provisions and the Department of Public Safety's implementing regulations. Although an issue raised for the first time on appeal, like this one, is waived, *Fruge v. Amerisure Mut. Ins. Co.*, 663 F.3d 743, 747 (5th Cir. 2011), this argument likewise fails on the merits. The State's proposed rule of law would contradict both *Gingles*'s demand that courts take a "functional view of the political process" in assessing Section 2 claims, 478 U.S. at 45, 48 n.15, and Section 2's language itself, which proscribes voting practices "imposed or applied" such that they produce a discriminatory result, 52 U.S.C. § 10301(a). Moreover, we have previously affirmed a district court's finding of discriminatory impact where the district court found the law delegated too much discretion to local officials. *See Operation Push*, 932 F.2d at 404.

[45] Other challenges brought by the State include its argument that that the analyses relied upon by the district court are unreliable because one source of data—the State's voter registration database—does not list the race or ethnicity of voters. The State contends that Plaintiffs' expert should have relied instead on data provided by the Department of Public Safety ("DPS"). The district court rightly rejected this argument. The DPS database did not allow registrants to identify themselves as "Hispanic" until May 2010. As the Texas Director of Elections conceded, the number of Hispanic registered voters is "exponentially higher" than the DPS records would suggest. We cannot fault the district court for refusing to rely on inaccurate data, particularly in light of the State's failure to maintain accurate data.

Additionally, the State suggests that conveying the disparity in ID possession in comparative percentages is misleading. *See Frank*, 768 F.3d at 755 n.3 (stating that purveying data as a comparative percentage is a "misuse" that "produces a number of little relevance to the problem"). Instead, the State believes a less deceptive method is to state that 2% of Anglo, 5.9% of Hispanic, and 8.1% of African-American registered voters lack SB 14 ID. Even assuming the State is correct, conveying the disparities in the way the State suggests does not change the analysis. The district court did not err in concluding that SB 14 disproportionately impacts Hispanic and African-American voters.

No. 14-41127

the district court did not reversibly err in determining that SB 14 violates Section 2 by disparately impacting minority voters.

First, the State disputes the propriety of using statistical analyses to determine the racial composition of the No-Match List. Relying on *Bartlett v. Strickland*, 556 U.S. 1, 17–18 (2009), the State argues that the Supreme Court foreclosed using statistical analysis to determine the racial composition of a group of voters. That is a mischaracterization. *Strickland* cautions against adopting standards that require judges to make complicated, race-based predictions in redistricting cases, a concern that is not implicated here. *Id.* It is well within the district court's purview to assess whether minorities are disproportionately affected by a change in the law based on statistical analyses. *See, e.g.*, *Operation Push*, 932 F.2d at 410–11. Using accepted statistical methodologies to estimate the racial composition of Texas voters does not require the type of race-based predictions that the Court referenced in *Strickland*.[46] Instead, this case is more akin to *Operation Push*, in which this court approved using surveys and "independent statistical tests" to project the impact on minorities of newly enacted voter registration procedures. *Id.*

---

Finally, the State argues for the first time on appeal that there is no disparate impact where, as here, the gross number of Anglos without SB 14 ID—296,156 people—almost totals the number of African-American, Hispanic, and "other" voters without SB 14 ID—312,314 people. Courts have never required the gross number of affected minority voters to exceed the gross number of affected Anglo voters. *See, e.g.*, *League of Women Voters*, 769 F.3d at 233; *see also Frank*, 768 F.3d at 753–54 (comparing the percentage of minority voters without qualifying ID to the percentage of Anglos without such ID). We decline to address this argument raised for the first time on appeal. *See Leverette v. Louisville Ladder Co.*, 183 F.3d 339, 341–42 (5th Cir. 1999).

[46] These problematic predictions included inquiries like: "What types of candidates have white and minority voters supported together in the past and will those trends continue?" *Strickland*, 556 U.S. at 17.

50