No. 14-41127

Second, the State relies on *Strickland* to argue that the canon of constitutional avoidance militates against requiring the State to ensure that voters of various races possess voter ID in equal measure. *See* 556 U.S. at 18. The district court's discriminatory effect finding, if affirmed, would do no such thing, nor does Section 2 mandate the sort of remedy to which the State objects. Section 2 merely prohibits the State from imposing burdens on minority voters that would disproportionately abridge their ability to participate in the political process. *Cf. Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.* ("*Inclusive Communities*"*)*, 135 S. Ct. 2507, 2524 (2015) ("Remedial orders in disparate-impact cases should concentrate on the elimination of the offending practice . . . .  If additional measures are adopted, courts should strive to design them to eliminate racial disparities through race-neutral means.  Remedial orders that impose racial targets or quotas might raise more difficult constitutional questions." (citation omitted)).

Finally, before our full court, the State refined its argument that our holding that SB 14 violates Section 2 would make Section 2 "invalid as no longer congruent and proportional to the Fifteenth Amendment."  Relatedly, the State and dissenting opinions characterize the district court's findings as resting solely on a statistical disparity in SB 14 ID rates, rather than any concrete proof that voters were denied the right to vote.  These arguments miss the mark.  In particular, the constitutionality argument by the State is short sighted and ignores the history and text of the Fifteenth Amendment.  If the State had its way, the Fifteenth Amendment and Section 2 would only prohibit outright *denial* of the right to vote and overtly purposeful discrimination.  Yet, both the Fifteenth Amendment and Section 2 also explicitly prohibit *abridgement* of the right to vote. U.S. CONST. amend. XV; 52 U.S.C. § 10301(a). Application of the *Gingles* factors then determines whether any such

No. 14-41127

abridgement is linked to social and historical conditions of discrimination such that the abridgement has occurred "on account of race." U.S. CONST. amend. XV; 52 U.S.C. § 10301(a). The standards we apply here, and our manner of applying them, show that Section 2's protections remain closely tied to the power granted Congress by the Fifteenth Amendment.[47]

Regarding the district court's findings, they rest on far more than a statistical disparity. The district court's lengthy opinion goes through the evidence supporting its findings in great detail, and we will not repeat all of that evidence here for the sake of clarity and brevity. *See Veasey v. Perry*, 71 F. Supp. 3d at 665, 667–77. However, a few examples show that the district court relied on concrete evidence regarding the excessive burdens faced by Plaintiffs in making its findings. This evidence personified the expert analysis credited by the district court regarding SB 14's discriminatory effect.

---

[47] Additionally, we note that this court and many others have upheld the constitutional validity of the Section 2 results test. *See, e.g.*, *Bush v. Vera*, 517 U.S. at 990–91 (O'Connor, J., concurring) (collecting cases assuming Section 2's constitutionality); *Jones*, 727 F.2d at 373–74; *United States v. Blaine Cty.*, 363 F.3d 897, 904–05 (9th Cir. 2004) (holding that the court remains bound to the Supreme Court's prior affirmance of Section 2's constitutionality and noting that "when the Supreme Court first announced the congruence-and-proportionality doctrine in *City of Boerne v. Flores*, 521 U.S. 507 (1997), it twice pointed to the [Voting Rights Act] as the model for appropriate prophylactic legislation" and that the Supreme Court continues to rely on the Voting Rights Act as the baseline for congruent and proportional legislation); *Johnson v. Hamrick*, 196 F.3d 1216, 1219 n.3 (11th Cir. 1999) (reaffirming the constitutionality of Section 2). We previously held that "[c]ongressional power to adopt prophylactic measures to vindicate the purposes of the fourteenth and fifteenth Amendments is unquestioned" and "[o]n those occasions when the Court has stricken enactments as exceeding congressional power under the enforcement clauses of the fourteenth or fifteenth amendments, the congressional objective has usually deviated from the central purposes of those amendments—to ensure black equality." *Jones*, 727 F.2d at 373–74 (citations omitted). Section 2, as applied here, does not deviate from that purpose, and *Jones* still binds us. *Cf. Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989).

No. 14-41127

## (c)  Evidence of the Burdens Imposed on Plaintiffs by SB 14

The individual Plaintiffs testified that they faced many specific burdens in attempting to obtain SB 14 ID or vote.  The district court found that "[t]he Plaintiffs [d]emonstrate[d] the [i]mpact" of SB 14 along several axes, including: (1) the difficulty of obtaining an EIC and voting with the proper ID because of Texas's poor implementation of this program; (2) the cost of underlying documents necessary to obtain an EIC or other SB 14 ID; (3) difficulties with delayed, nonexistent, out-of-state, or amended birth certificates due to nontraditional births and errors on birth certificates; (4) long distances and other travel issues that made getting to a registrar and DPS office problematic for many Plaintiffs; (5) a strict disability exemption[48]; and (6) a burdensome alternative of voting absentee.  *See id.*  Some of the Plaintiffs faced difficulties along multiple axes in attempting to get SB 14 ID and vote in person.

---

[48]  SB 14 exempts certain disabled persons from its photo ID requirements, if they submit an application to be exempted with written documentation, including: (1) "a statement in a form prescribed by the secretary of state that the applicant does not have a form of identification acceptable" under SB 14's codified provision, TEX. ELEC. CODE § 63.0101, and (2) documentation from either "the United States Social Security Administration evidencing the applicant has been determined to have a disability," or documentation "from the United States Department of Veterans Affairs evidencing the applicant has a disability rating of at least 50 percent." TEX. ELEC. CODE § 13.002(i).  The district court found that Plaintiffs Carrier, Espinoza, Mendez, and Taylor "may qualify for SB 14's disability exemption," but that "[t]hese Plaintiffs were not made aware of this exemption when they went to DPS or other relevant offices" and that "[a]s of January 15, 2014, only 18 voters were granted a disability exemption in Texas." *Veasey v. Perry*, 71 F. Supp. 3d at 674 (citing TEX. ELEC. CODE § 13.002(i)).  This fact evidences the increased burden SB 14 places on Plaintiffs and others on the No-Match List because of the lack of funding devoted to educating voters.  Although this is not an overwhelming burden in and of itself, the requirement and poor implementation provide one more obstacle for disabled plaintiffs to clear in attempting to vote in person without SB 14 ID.  In this case, some of the Plaintiffs who could have used this exception were turned away at the polls and were never made aware of it.

No. 14-41127

First, the record evidence disproves the State's claim that "the plaintiffs have failed to identify a single individual who faces a substantial obstacle to voting because of SB 14."[49]  For one thing, the district court found that multiple Plaintiffs were turned away when they attempted to vote, and some of those Plaintiffs were not offered provisional ballots to attempt to resolve the issue. *Id.* at 668.  One of those Plaintiffs, Floyd Carrier, "was well-known to the election workers at his polling place, but was not offered a provisional ballot and was not permitted to cast a vote."  *Id.*   Floyd Carrier had the help of his son in attempting to obtain SB 14 ID, but they faced an almost impossible bureaucratic morass when they tried to get the required underlying documentation.  Due to these obstacles and the lack of training and education about SB 14's requirements, Floyd Carrier was completely prevented from voting.  *See id.* at 668 & n.268 (noting that throughout their efforts to obtain underlying documentation and qualifying ID for Floyd Carrier, no one informed the Carriers about the EIC).

Plaintiff Bates faced a similar problem when she reported to the polls, as she was unaware that her existing ID was insufficient until she attempted to vote in person.  At that point, it was too late to cast an absentee ballot, and she was not able to obtain SB 14 ID in time to cure her provisional ballot because she could not afford to purchase her Mississippi birth certificate at its $42 cost on her $321 fixed monthly income. *Id.* at 649 & n.115, 665.  Plaintiff Gordon Benjamin was not able to obtain an EIC at the DPS because he was unable to get his Louisiana birth certificate for the hefty $81 fee online.  Eventually, his

---

[49]  Before the panel that initially heard this case, the State made an even bolder claim—that the Plaintiffs "failed to show that SB 14 prevented a single person from voting." This claim is demonstrably false, as the experiences of Plaintiffs Floyd Carrier and Sammie Louise Bates show, *see infra*.

No. 14-41127

sister was able to get his birth certificate in person on a trip through Louisiana, but he was unable to make that trip before the 2013 elections. *Id.* at 671, 673. Benjamin cast a provisional ballot that went uncured. Many more stories like these proliferate in the pages of the district court's opinion. *Id.* at 667–77.

Traveling to DPS offices to obtain EICs posed an additional obstacle for many Plaintiffs. The district court found that four Plaintiffs rely almost exclusively on public transportation. One of these Plaintiffs, Ken Gandy, faces an hour-long, one-way trip to reach the nearest DPS office. *See id.* at 673. Plaintiffs Estrada and Espinoza use family and friends for transportation, but they each face "a 60-mile roundtrip ride to the nearest DPS station." *Id.*

The State failed to contest any of this evidence, except to suggest that these Plaintiffs could vote by mail. The district court did not clearly err in finding that mail-in voting is not an acceptable substitute for in-person voting in the circumstances presented by this case.[50] We are by no means criticizing Texas for making mail-in voting available, as it represents an important bridge for many who would otherwise have difficulty appearing in person. Instead, we conclude that it is not the equivalent of in-person voting for those who are able and want to vote in person. Mail-in voting involves a complex procedure that cannot be done at the last minute. *See id.* at 688–90 (describing the complex process of obtaining and submitting a mail-in ballot).[51] It also deprives voters of the help they would normally receive in filling out ballots at

---

[50] We do not opine on the effect, under Section 2, of other possible absentee balloting arrangements, only on the inadequacy of mail-in voting in these circumstances to mitigate or eliminate the discriminatory impact of SB 14.

[51] For example, mail-in voting requires obtaining and submitting a correctly filled-out and signed application to the early voting clerk in the voter's county "on or before the 18th day before election day," TEX. ELEC. CODE § 86.008(a), *plus* receiving an absentee ballot by mail, filling out the ballot correctly, and ensuring the proper state party *receives* the ballot on or before election day, *id.* §§ 86.004–.007, 86.008(b).

No. 14-41127

the polls, which Plaintiff Naomi Eagleton cited as a reason why she prefers to vote in person. *Id.* at 689.

Elderly plaintiffs may also face difficulties getting to their mailboxes, like Plaintiff Carrier, who has to be driven to his mailbox because it is at the local post office. *Id.* at 673. Seven of the Plaintiffs further testified they are reluctant to vote by mail due to the increased risk of fraud because of people who harvest mail-in ballots from the elderly. *Id.* at 676–77. The district court credited expert testimony showing mail-in ballot fraud is a significant threat— unlike in-person voter fraud. *Id.* at 639–41, 676. Finally, with mail-in voting, voters lose the ability to account for last-minute developments, like candidates dropping out of a primary race, or targeted mailers and other information disseminated right before the election. *Id.* at 689. We discern no clear error in the district court's finding that mail-in voting for specific subsets of Texas voters does not sufficiently mitigate the burdens imposed by SB 14.

The State further claims SB 14 has no disparate impact because the State offers "free" EICs, and after SB 983, free underlying documentation to Texas voters who were born in Texas. Yet, the record is replete with evidence that the State devoted little funding or attention to educating voters about the new voter ID requirements, resulting in many Plaintiffs lacking information about these supposed accommodations until they were informed about them during the course of this lawsuit. *See, e.g.*, *id.* at 667–69, 676 (describing the "insufficient" implementation of the EIC program, the fact that many Plaintiffs did not know about the EIC or required voter ID until being turned away at the polls, that one Plaintiff paid $22 for his birth certificate because he was not told about the reduced-cost alternative then available, and other issues with the implementation of SB 14). We find no clear error in the district court's

No. 14-41127

finding that the State's lackluster educational efforts resulted in additional burdens on Texas voters.[52]  *See, e.g.*, *id.* at 668.

We conclude that the district court did not clearly err in finding that SB 14 imposes significant and disparate burdens on the right to vote.

### 3. *The* Gingles *Factors*

We next consider the district court's finding that SB 14 "produces a discriminatory result that is actionable because [it] . . . interact[s] with social and historical conditions in Texas to cause an inequality in the electoral opportunities enjoyed by African–Americans and Hispanic voters." *Id.* at 698. The district court found *Gingles* factors 1, 2, 5, 6, 7, 8, and 9 probative.  *Id.* at 697.   Again, we conclude it was proper to utilize the *Gingles* factors to determine whether conditions engendered by current and former state-sponsored discrimination are sufficiently linked to the racial disparity in ID possession under SB 14.

---

[52] These lackluster efforts stand in stark contrast to those of other states whose voter ID laws have thus far passed Section 2 scrutiny.  *See, e.g.*, *N.C. State Conference of the NAACP v. McCrory*, ___ F. 3d ___, No. 1:13CV658, 2016 WL 1650774, at *19–20 (M.D.N.C. Apr. 25, 2016) (cataloging the myriad educational efforts of North Carolina, including: education at three elections before the law went into effect; having voters sign a ledger if they lacked required ID; targeted mailings and outreach to those voters and over 200,000 others on North Carolina's no-match list; pre-paid return mailers to obtain assistance for voters lacking required ID; and further updated advertisement, targeted mailing, and outreach after a reasonable impediment exception was enacted); *Common Cause/Ga. v. Billups*, 504 F. Supp. 2d 1333, 1378–79 (N.D. Ga. 2007) (holding that the state of Georgia's educational efforts were crucial to whether Georgia's voter ID law unduly burdened voters, that the court initially granted a preliminary injunction in part due to lack of notice and education, and finding that voters had since been educated after Georgia ran advertisements and directly contacted voters who potentially lacked valid IDs to inform them about how to get valid ID or vote absentee), *vacated in part on other grounds*, 554 F.3d 1340 (11th Cir. 2009).  Contrary to the State's hyperbolic predictions, these different outcomes show the importance of the fact-bound Section 2 analysis we employ here.  It has resulted in the approval of laws less burdensome and less discriminatory in effect than SB 14, while it holds the State of Texas accountable for the strictest and perhaps most poorly implemented voter ID law in the country.  *See, e.g.*, *Veasey v. Perry*, 71 F. Supp. 3d at 667–69, 676 (noting the many problems with the implementation of SB 14).

No. 14-41127

## (a) *Gingles* Factor 1: History of Official Discrimination

As part of this "searching practical evaluation of the past and present reality," *Gingles*, 478 U.S. at 45 (citation omitted), the district court found that Texas's history of discrimination in voting acted in concert with SB 14 to limit minorities' ability to participate in the political process. We repeat *Shelby County*'s admonishment that "history did not end in 1965," 133 S. Ct. at 2628, and emphasize that contemporary examples of discrimination are more probative than historical examples. However, even long-ago acts of official discrimination give context to the analysis,[53] and the district court credited more contemporary examples of state-sponsored discrimination. *Veasey v. Perry*, 71 F. Supp. 3d at 635–36, 700. One contemporary example is the district court's finding that "[i]n every redistricting cycle since 1970, Texas has been found to have violated the VRA with racially gerrymandered districts." *Id.* at 636 & n.23 (collecting cases). The district court further noted that, before it was vacated along with preclearance by *Shelby County*, "a three-judge court

---

[53] The district court cited many examples of Texas's long history of state-sponsored discrimination. *See Veasey v. Perry*, 71 F. Supp. 3d at 633–36. Less recent examples include all-white primary elections that persisted from 1895 to 1944 despite the Supreme Court attempting to curb the practice in 1927, literacy and secret ballot restrictions that persisted until struck down in 1970, and poll taxes that were eventually struck down in 1966. *Id.* at 633–35. When the poll tax was made unconstitutional in 1964 by the Twenty-Fourth Amendment, Texas attempted to separate federal and state ballots, so that the State could still impose a poll tax for state ballots. That effort never succeeded because it was struck down as unconstitutional after the Voting Rights Act was passed and applied to Texas. Eventually, Texas ratified the Twenty-Fourth Amendment in 2009. In the wake of Texas's inability to retain poll taxes, the district court found that Texas passed a voter re-registration requirement in 1966 that persisted in the form of purging the voter rolls after re-registration was ruled unconstitutional in the early 1970s. *Id.* at 635. Ultimately, the purging practice was enjoined under the preclearance portions of the Voting Rights Act. *Id.* While long-ago history of discrimination is of limited probative value when considering whether the Legislature acted with discriminatory intent, it cannot be ignored in the discriminatory effect analysis, because even these seemingly remote instances of State-sponsored discrimination continue to produce socioeconomic conditions that the district court found caused the racial disparities in possession of SB 14 ID.

No. 14-41127

had found that two of Texas's 2011 redistricting plans violated the VRA." *Id.* at 636 n.23. In other words, the 2011 Texas Legislature was found to have violated the Voting Rights Act by passing two redistricting plans that were found to have a retrogressive or racially discriminatory impact in the same legislative session that resulted in SB 14.[54]

The district court found that these past instances of discrimination, all the way through the 2011 legislative session that produced SB 14, were relevant in part because each time, "the Texas Legislature relied on the justification that its discriminatory measures were necessary to combat voter fraud." *Id.* at 636. The Texas Legislature relied on that same justification in passing SB 14, even though the evidence showed that in-person voter fraud "is very rare." *Id.*

Even acknowledging that long-ago evidence of discrimination has less force than more contemporary evidence under *Shelby County*, this factor and other factors support the district court's finding that SB 14 has a discriminatory effect.

### (b) *Gingles* Factor 2: Racially Polarized Voting

The district court relied primarily on the testimony of Dr. Barry Burden, a political science professor, and Mr. George Korbel, an expert on voting rights,

---

[54] Of course, the preclearance analysis differs from the Section 2 discriminatory effect analysis. The State had the burden to show it should receive preclearance in *Texas v. Holder*, whereas the Plaintiffs have the burden to show a discriminatory effect in the analysis we employ here. *Cf. Texas v. Holder*, 888 F. Supp. 2d 113, 117 (D.D.C. 2012) (noting that the preclearance analysis places the burden on the State to prove that a law does *not* have "'the effect of denying or abridging the right to vote on account of race'—i.e. . . . . a retrogressive effect"), *vacated and remanded on other grounds*, 133 S. Ct. 2886 (2013). One of the dissenting opinions seeks to discredit this case because it was vacated after *Shelby County* was decided. However, the opinion was not vacated on the merits and remains factually relevant as a contemporary example of State-sponsored discrimination based on the finding of a three-judge federal court.

No. 14-41127

in concluding that racially polarized voting exists throughout Texas. The court stated that "[r]acially polarized voting exists when the race or ethnicity of a voter correlates with the voter's candidate preference." *Id.* at 637 (citing *Gingles*, 478 U.S. at 53 n.21). For support, the district court noted that the gap between Anglo and Latino Republican support is between 30 and 40 percentage points, the Supreme Court has previously acknowledged the existence of racially polarized voting in Texas, and that in other litigation, Texas has conceded that racially polarized voting exists in 252 of its 254 counties. *Id.* at 637–38. The State did not contest these findings before the district court.[55]

### (c) *Gingles* Factor 5: Effects of Past Discrimination

Next, the district court appraised "[t]he extent to which members of the minority group . . . bear the effects of discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process." *Veasey v. Perry*, 71 F. Supp. 3d at 696 (citing *Gingles*, 478 U.S. at 45). The disparity in education, employment, and health outcomes between Anglos, African Americans, and Hispanics is manifest by the fact that the 29% of African Americans and 33% of Hispanics in Texas live below the poverty line compared to 12% of Anglos. *Id.* at 665. The unemployment rate for Anglos is also significantly lower. At trial, the court found that 6.1% of Anglos were unemployed compared to 8.5% of Hispanics and 12.8% of African Americans. *Id.* at 666. Furthermore, 91.7% of Anglo 25-year-olds in Texas have graduated from high school, compared to

---

[55] For the first time in its reply brief before the panel that initially heard this case, the State argued that the district court erred by examining whether race and voting patterns exhibited a correlated, rather than causal, link. We generally do not consider arguments raised for the first time in a reply brief. *See Baris v. Sulpicio Lines*, 932 F.2d 1540, 1546 n.9 (5th Cir. 1991). The State has not renewed this argument before our full court and we will not consider it.

No. 14-41127

85.4% of African Americans, and only 58.6% of Hispanics. *Id.* Anglos are also significantly more likely to have completed college—33.7% of Anglos hold a bachelor's degree, compared to 19.2% of African Americans and 11.4% of Hispanics. *Id.* Finally, the district court credited testimony that African Americans and Hispanics are more likely than Anglos to report being in poor health, and to lack health insurance. *Id.* at 666–67.

The district court found that the history of State-sponsored discrimination led to these disparities in education, employment, housing, and transportation. *See id.* at 636. For example, according to Dr. Vernon Burton, a professor with an expertise in race relations, past State-sponsored employment discrimination and Texas's maintenance of a "separate but equal" education system both contributed to the unequal outcomes that presently exist. *Id.* Although *Brown v. Board of Education*, 347 U.S. 483 (1954), mandated desegregated schools in 1954, Dr. Burton testified that Texas maintained segregated schools until roughly 1970. *Veasey v. Perry*, 71 F. Supp. 3d at 666 & n.258. "As a result" of systemic discrimination and the disparities in education, employment, housing, and transportation, the district court found that "Hispanics and African–Americans make up a disproportionate number of people living in poverty, and thus have little real choice when it comes to spending money on anything that is not a necessity." *Id.* at 636 (footnote omitted).

Importantly, the district court also found that "[t]hese socioeconomic disparities have hindered the ability of African–Americans and Hispanics to effectively participate in the political process. Dr. Ansolabehere testified that these minorities register and turn[ ]out for elections at rates that lag far behind

61

No. 14-41127

Anglo voters."[56]  *Id.* at 697.  This is significant because the inquiry in Section 2 cases is whether the vestiges of discrimination act in concert with the challenged law to impede minority participation in the political process.  *See League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 866–67 (5th Cir. 1993) (en banc).  The district court concluded in the affirmative, and the State does not contest these underlying factual findings on appeal.

> The district court ultimately found:
>
> SB 14's voter ID requirements interact with social and historical conditions in Texas to cause an inequality in the electoral opportunities enjoyed by African–Americans and Hispanic voters as compared to Anglo voters. *In other words, SB 14 does not disproportionately impact African–Americans and Hispanics by mere chance.* Rather, it does so by its interaction with the vestiges of past and current racial discrimination.

*Veasey v. Perry*, 71 F. Supp. 3d at 698 (emphasis added).

Again, the State does not dispute the underlying data or methodologies.  Instead, the State objects that the district court must have found some evidence that SB 14 directly caused a reduction in turnout.  The State insists that the district court erred by failing to ask whether SB 14 causes a racial *voting* disparity, rather than a disparity in voter ID possession.  We have never required such a showing.  Section 2 asks whether a standard, practice, or procedure results in "a denial *or abridgement* of the right . . . to vote." 52 U.S.C. § 10301(a).  Abridgement is defined as "[t]he reduction or diminution of

---

[56] According to Dr. Ansolabehere's expert report, 83 to 87% of Anglos of voting age and 84 to 88% of Anglo citizens of voting age in Texas are registered to vote, compared to 65 to 77% of Blacks of voting age and 75 to 80% of Black citizens of voting age, and 50 to 55% of Hispanics of voting age and 75 to 80% of Hispanic citizens of voting age.  Likewise, 41.8% of Anglos voted in 2010 compared to 31.3% of Blacks and 22% of Hispanics.  In 2012, 64.3% of registered Anglos voted, compared to 45% of registered Blacks and 59.8% of registered Hispanics.

No. 14-41127

something," *Abridgement*, BLACK'S LAW DICTIONARY (10th ed. 2014), while the Voting Rights Act defines "vote" to include "all action necessary to make a vote effective including, but not limited to, registration or other action required by State law prerequisite to voting, casting a ballot, and having such ballot counted." 52 U.S.C. § 10101(e). The district court's finding that SB 14 abridges the right to vote by causing a racial disparity in voter ID possession falls comfortably within this definition. Our case law dictates the same outcome. *See Operation Push*, 932 F.2d at 409, 413 (affirming the district court's finding that a voter registration law violated Section 2 when it resulted in a 25% difference in the registration rates between eligible black and white voters); *see also Chisom*, 501 U.S. at 408 (Scalia, J., dissenting) ("If, for example, a county permitted voter registration for only three hours one day a week, and that made it more difficult for blacks to register than whites, blacks would have less opportunity 'to participate in the political process' than whites, and [Section] 2 would therefore be violated . . . .").

For the same reason, we decline to require a showing of lower turnout to prove a Section 2 violation. An election law may keep some voters from going to the polls, but in the same election, turnout by different voters might increase for some other reason. *See Veasey v. Perry*, 71 F. Supp. 3d at 655 (discussing the effect of President Obama's candidacy on voter turnout). That does not mean the voters kept away were any less disenfranchised. Requiring a showing of lower turnout also presents problems for pre-election challenges to voting laws, when no such data is yet available. More fundamentally, no authority supports requiring a showing of lower turnout, since *abridgement* of the right to vote is prohibited along with denial. U.S. CONST. amend. XV; 52 U.S.C. § 10301(a). Illuminating this last point is the State's answer at oral argument to a question about whether its proposed Section 2 effects test would

No. 14-41127

prohibit literacy tests (if they were not otherwise specifically prohibited) from being imposed as a condition for voting.[57] The State contended that literacy tests "would almost certainly" be struck down under its proposed Section 2 effects test—but only if plaintiffs could show a resulting "denial of equal opportunity," i.e., a "voter turnout disparity."[58]

We decline to cripple the Voting Rights Act by using the State's proposed analysis. Doing so would unmoor the Voting Rights Act from its history and decades of well-established interpretations about its protections. *See Allen*, 393 U.S. at 565 ("The Voting Rights Act was aimed at the subtle, as well as the obvious, state regulations which have the effect of denying citizens their right

---

[57] In full, the exchange between a member of our court at the en banc oral argument and the State's counsel follows:

UConst{JUDGE:} "[I]f literacy tests weren't separately prohibited, would a literacy test be invalidated by your proposed equal treatment test?"

UConst{STATE'S COUNSEL:} "Insofar as literacy tests, you know, first of all, that would obviously be separately banned under —"

UConst{JUDGE:} "Beside[s] the separate ban."

UConst{STATE'S COUNSEL:} "I–I believe insofar as you're putting aside the separate banning, and insofar as you're putting aside a purpose claim, I think you would still ask, 'is this a denial of equal opportunity?' And in that scenario you'd have to show a prima facie case, and it would almost certainly, in the relevant jurisdictions that we're talking about, have been able to show a voter turnout disparity, ah, particularly, you know, *Operation Push v. Mabus* would have been another case like this where you had legacy systems in place, and under those legacy systems, there would have been liability."

[58] One of the dissenting opinions would require a showing of decreased turnout to prevail on a discriminatory effect claim. This argument is unsupported by case law and ignores the following points. First, such an approach would foreclose the ability to file pre-enforcement challenges, which are particularly important now that preclearance is not required. As the concurring opinion acknowledges, the Supreme Court suggested in *Shelby County* that courts could "block voting laws from going into effect" through injunctive relief under Section 2. *See Shelby Cty.*, 133 S. Ct. at 2619. Second, turnout itself does not answer the question of a particular voter being denied access: turnout of certain people might increase while turnout of others decreases, leaving overall turnout the same; yet, those denied the right to vote are still disenfranchised. Third, this argument also conflates abridgement and denial: in previous times, some people paid the poll tax or passed the literacy test and therefore voted, but their rights were still abridged.

No. 14-41127

to vote because of their race."); *Chisom*, 501 U.S. at 406 (Scalia, J., dissenting) ("This new 'results' criterion [from the 1982 amendments to the Voting Rights Act] provides a powerful, albeit sometimes blunt, weapon with which to attack even the most subtle forms of discrimination."). Instead, we will adhere to the Supreme Court's instruction to examine challenged laws and practices in an intensely fact-based and local totality-of-the-circumstances analysis. *See Gingles*, 478 U.S. at 36–38, 79.

Thus, while evidence of decreased turnout is relevant, it is not required to prove a Section 2 claim of vote denial or abridgement. In this case, the record contains evidence that minority voters generally turn out in lower numbers than non-minority voters and that State-sponsored discrimination created socioeconomic disparities, which hinder minority voters' general participation in the political process. Accordingly, the district court did not clearly err in determining that the impact of past and current discrimination on minorities in Texas favors finding that SB 14 has a discriminatory effect under Section 2.

### (d) *Gingles* Factor 6: Racial Appeals in Political Campaigns

While the existence of racial appeals in political campaigns is a factor that may be indicative of a law's disparate impact, *see Gingles*, 478 U.S. at 40, it is not highly probative here (and racial appeals seem to have been used by both minorities and non-minorities). The district court found that such appeals still exist in Texas and cited anecdotal evidence to support its finding. *See Veasey v. Perry*, 71 F. Supp. 3d at 638–39. While we do not overturn the underlying factual finding, we do not agree that such anecdotal evidence of racial campaign appeals shows that SB 14 denies or abridges the right to vote.

No. 14-41127

### (e) *Gingles* Factor 7 and Factor 8: Minority Public Officials and Responsiveness to Minority Needs

The extent to which minority candidates are elected to public office also contextualizes the degree to which vestiges of discrimination continue to reduce minority participation in the political process. *See Gingles*, 478 U.S. at 45. The district court found that African Americans comprise 13.3% of the population in Texas, but only 1.7% of all Texas elected officials are African American. *Veasey v. Perry*, 71 F. Supp. 3d at 638. Similarly, Hispanics comprise 30.3% of the population but hold only 7.1% of all elected positions. *Id.* Within the Texas Legislature, however, both groups fare better—African Americans hold 11.1% of seats in the Legislature while Hispanics hold 21.1% of seats. *Id.* Again, the State does not contest these findings. *Id.*

The district court also found that Texas's history of discrimination, coupled with SB 14's effect on minorities in Texas and the Legislature's response to ameliorative amendments, demonstrated a lack of responsiveness to minority needs by elected officials. *See Gingles*, 478 U.S. at 45. The evidence supports the district court's finding that "the legislature knew that minorities would be most affected by the voter ID law." *Veasey v. Perry*, 71 F. Supp. 3d at 657–58. For instance, Representative Todd Smith, a proponent of the legislation, stated that it was "common sense" the law would have a disproportionate effect on minorities. *See id.* at 657. Similarly, Bryan Hebert, Deputy General Counsel in the Office of the Lieutenant Governor and author of some of the provisions of SB 14, warned that SB 14 was unlikely to obtain (the now-defunct) preclearance under the Voting Rights Act without further forms of permissible ID. *Id.* at 658.

The district court noted that minority legislators and constituents testified about the likely disparate impact of SB 14, yet their amendments to

66

ameliorate that impact were rejected without explanation. *See id.* at 651, 658, 669, 698, 702. These included amendments to expand the forms of acceptable ID to include student IDs, federal IDs, state-government employee IDs, measures to fund education and training related to the law, and indigency exceptions.[59] *Id.* at 658, 708–10. While this does not necessarily prove improper intent on the part of those legislators, it nonetheless supports a conclusion of lack of responsiveness.[60]

### (f) *Gingles* Factor 9: Tenuousness of Policies Underlying the Law

The district court concluded that the policies underlying SB 14's passage were only tenuously related to the State's interests in preventing fraud and increasing voter confidence in elections. We do not deny that the State's articulated objectives are legitimate state interests, as the Supreme Court has made clear. *See Crawford*, 553 U.S. at 191. Yet, the articulation of a legitimate interest is not a magic incantation a state can utter to avoid a finding of disparate impact. Even under the least searching standard of review we employ for these types of challenges, there cannot be a total disconnect between the State's announced interests and the statute enacted. *See St. Joseph Abbey v. Castille*, 712 F.3d 215, 225–26 (5th Cir. 2013) (holding there was an impermissible "disconnect" between the state's expressed interests and the challenged regulations and noting that "[t]he great deference due state economic regulation does not demand judicial blindness to the history of a challenged rule or the context of its adoption[,] nor does it require courts to accept nonsensical explanations [from the state]"); *cf. Inclusive Cmtys. Project,*

---

[59] The indigency exception was part of SB 14 when it passed the Senate, but was stripped from the bill in the Texas House. *Veasey v. Perry*, 71 F. Supp. 3d at 652.

[60] This distinction is akin to the difference between negligence and intent.

No. 14-41127

*Inc. v. Tex. Dep't of Hous. & Cmty. Affairs*, 747 F.3d 275, 282 (5th Cir. 2014) (permitting a plaintiff to prevail on disparate impact claim under the Fair Housing Act where he "prov[es] that the [state's] substantial, legitimate, nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect"), *aff'd*, 135 S. Ct. 2507 (2015).   The Court in *Gingles* and the Senate that passed the 1982 Amendments to the Voting Rights Act acknowledged as much by including tenuousness among the factors to be considered.  *See Gingles*, 478 U.S. at 45. Along with elected officials' lack of responsiveness to minority needs, a tenuous fit between the expressed policy and the provisions of the law bolsters the conclusion that minorities are not able to equally participate in the political process.  Otherwise, elected officials would be more responsive regarding the disparate impact of a law, and a law not meaningfully related to its expressed purpose would be abandoned or ameliorated to avoid imposing a disparate impact, given the preexisting socioeconomic and political disadvantages caused by past and present discrimination.

The district court found that "the stated policies behind SB 14 are only tenuously related to its provisions."  *Veasey v. Perry*, 71 F. Supp. 3d at 698. The State is entitled to make policy choices about when and how it will address various priorities.  But in this case, the provisions of SB 14 fail to correspond in any meaningful way to the legitimate interests the State claims to have been advancing through SB 14.  For example, the Legislature claimed to model its law after those from Indiana, Georgia, Wisconsin, and other states that included many more forms of acceptable identification, plus indigency exceptions and far more extensive educational campaigns.  Yet, the Legislature rejected many ameliorative amendments that would have brought SB 14 in line with those states' voter ID laws.  *See id.* at 643, 658.  The option of mail-

No. 14-41127

in voting also showcases the dubious connection between the State's interests and SB 14's provisions. In order to prevent voter fraud, the State has pushed more vulnerable elderly voters away from in-person voting—a form of voting with little proven incidence of fraud—and toward mail-in voting, which the record shows is far more vulnerable to fraud, particularly among the elderly. *Id.* at 639–41, 653. In fact, SB 14 does nothing to address the far more prevalent issue of fraudulent absentee ballots. *Id.* at 641.

The district court likewise found that the Legislature's expressed concerns about undocumented immigrants and noncitizens voting were misplaced. It credited testimony that undocumented immigrants are unlikely to vote as they try to avoid contact with government agents for fear of being deported. *Id.* at 654. At least one Representative who voted for SB 14 conceded that he had no evidence to substantiate his fear of undocumented immigrants voting. *Id.* Additionally, the district court found that SB 14 would not prevent noncitizens from voting, since noncitizens can legally obtain a Texas driver's license or concealed handgun license, two forms of SB 14 ID. *Id.* at 654–55.

The district court also found "no credible evidence" to support assertions that voter turnout was low due to a lack of confidence in elections, that SB 14 would increase public confidence in elections, or that increased confidence would boost voter turnout. *Id.* at 655. Two State Senators and the Director of the Elections Division at the Texas Secretary of State's office were all unaware of anyone abstaining from voting out of concern for voter fraud, and the Director testified that implementing SB 14's provisional ballot process might actually undermine voter confidence. *Id.*

Rather, the district court credited testimony that SB 14 would decrease voter turnout. *Id.* at 655–56. According to a well-established formula employed by political scientists to assess individuals' likelihood of voting in an

No. 14-41127

election, increasing the cost of voting decreases voter turnout—particularly among low-income individuals, as they are most cost sensitive. *Id.* at 656. Further, the district court dismissed the argument that increased turnout during the 2008 presidential election was demonstrative of increased voter confidence in two states that had recently passed voter ID laws. *Id.* at 655. Instead, it found that the increased turnout, which occurred nationwide, was due to President Obama's candidacy. *Id.* Finally, the court also found that public opinion polls—which found high levels of support for photo ID requirements—were not demonstrative that SB 14 itself would promote voter confidence. *Id.* at 656. The district court discounted the polls because they did not evaluate whether voters supported SB 14 itself rather than some other form of voter ID law when weighed against SB 14's exceedingly burdensome requirements and attendant effect on minority voters. *Id.*

### **(g) Discriminatory Effect Conclusion**

In light of its findings regarding SB 14's disparate impact and its application of the *Gingles* factors, the district court held that SB 14 acted in concert with current and historical conditions of discrimination to diminish African Americans' and Hispanics' ability to participate in the political process. *Id.* at 695–98. We conclude that the district court performed the "intensely local appraisal" required by *Gingles*. 478 U.S. at 79. The district court clearly delineated each step of its analysis, finding that:

> (1) SB 14 specifically burdens Texans living in poverty, who are less likely to possess qualified photo ID, are less able to get it, and may not otherwise need it; (2) a disproportionate number of Texans living in poverty are African–Americans and Hispanics; and (3) African–Americans and Hispanics are more likely than Anglos to be living in poverty because they continue to bear the socioeconomic effects caused by decades of racial discrimination.

*Veasey v. Perry*, 71 F. Supp. 3d at 664.

No. 14-41127

The district court thoroughly evaluated the "totality of the circumstances," each finding was well-supported, and the State has failed to contest many of the underlying factual findings. Furthermore, the district court's analysis comports with the Supreme Court's recent instruction that "a disparate-impact claim that relies on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity."[61] *Inclusive Communities*, 135 S. Ct. at 2523. The district court here acknowledged this principle and tethered its holding to two findings. First, the court found a stark, racial disparity between those who possess or have access to SB 14 ID, and those who do not. Second, it applied the *Gingles* factors to conclude that SB 14 worked in concert with Texas's legacy of state-sponsored discrimination to bring about this disproportionate result.

We note that, because the district court's findings link Texas's state-sponsored history of discrimination to the conditions affecting minority voters

───────────────

[61] Some of the dissenting opinions argue that the majority opinion holds the Legislature "liable for racial disparities [it] did not create" by failing to show that the statistical disparity in ID possession among different races is caused by a State policy, as opposed to socioeconomic and historical conditions. In fact, as discussed above, the district court found that SB 14 creates a racial disparity by requiring the use of certain IDs to vote that minorities disproportionately lack. Certainly the passage of SB 14 did not cause fewer minorities to possess certain IDs (like driver's licenses or concealed handgun licenses). Rather, the district court found that socioeconomic and historical conditions contributed to this disparity in ID possession, which demonstrates why historical evidence of racism is relevant to the Section 2 analysis. But SB 14 *itself* caused minorities to disproportionately lack the documentation that is required to vote by dictating that the documents and IDs required would be those that minorities disproportionately lack. We cannot ignore that in passing SB 14, the Legislature carefully selected the types of IDs that would be required to vote. In doing so, the Legislature selected IDs that minorities disproportionately do not possess and excluded IDs that minorities possess in greater numbers, without providing sufficient justification for those choices. The fact that this occurred on a landscape where minorities are less likely to possess certain forms of ID or be able to obtain those IDs, at least in part as a result of past instances of State-sponsored discrimination, does not absolve the Legislature of responsibility. Accordingly, the district court's conclusion that SB 14 created racial disparities in the possession of IDs required to vote is supported by the record.

No. 14-41127

in Texas today, we need not and do not decide whether proof of such *state-sponsored* discrimination is required under the second part of this analysis. *Cf. Frank*, 768 F.3d at 755 (reasoning that the discrimination affecting minorities should be linked to the state under the second part of the two-part analysis). The evidence in this record suffices to meet even this higher standard as enunciated in *Frank*. *Id.*

We conclude that the district court did not clearly err in determining that SB 14 has a discriminatory effect on minorities' voting rights in violation of Section 2 of the Voting Rights Act. As discussed below, we remand for a consideration of the appropriate remedy in light of the impending general election.

## III. First and Fourteenth Amendment Burden on the Right to Vote

Plaintiffs argue that SB 14 also unconstitutionally burdens their right to vote, as forbidden by the First and Fourteenth Amendments. We decline to decide this question, under the "well established principle governing the prudent exercise of this [c]ourt's jurisdiction that normally th[is c]ourt will not decide a constitutional question if there is some other ground upon which to dispose of the case." *Escambia Cty. v. McMillan*, 466 U.S. 48, 51 (1984). Since the majority of the court affirms the district court's determination that SB 14 has a discriminatory effect under Section 2 of the Voting Rights Act, Plaintiffs will be entitled to the same relief they could access if they prevailed on these First and Fourteenth Amendment claims. *See Ketchum v. Byrne*, 740 F.2d 1398, 1409–10 (7th Cir. 1984) ("There appears to be no difference in the practical result or in the available remedy regardless of how the resulting discrimination is characterized. We therefore shall not explicitly decide the issue of a fourteenth amendment violation . . . ."); *cf. Nw. Austin Mun. Util.*

72

No. 14-41127

*Dist. No. One v. Holder*, 557 U.S. 193, 205–06 (2009).  Put another way, the rights and remedies are intertwined.

Accordingly, it is unnecessary for the en banc court to address this issue, and we need not and do not decide whether SB 14 violates the First and Fourteenth Amendments by placing an unconstitutional burden on the right to vote.  *See Merced v. Kasson*, 577 F.3d 578, 586–87 (5th Cir. 2009); *Jordan v. City of Greenwood*, 711 F.2d 667, 668–70 (5th Cir. 1983) (quoting *Spector Motor Serv., Inc. v. McLaughlin,* 323 U.S. 101, 105 (1944)).  We therefore vacate the district court's determination on this issue and dismiss Plaintiffs' First and Fourteenth Amendment claims.

## IV.  Poll Tax

The Veasey Plaintiffs[62] originally alleged that SB 14 imposed a poll tax in violation of the Fourteenth and Twenty-Fourth Amendments.  After the passage of SB 983, the Veasey Plaintiffs filed a Rule 28(j) Letter with this court, stating that "SB14, as amended by SB983, is no longer a poll tax."  The Veasey Plaintiffs nevertheless contend that "the poll tax issue is still alive" because SB 14 operated as a poll tax for nearly two years, preventing Plaintiffs and others from voting, and because it will take a "long time" for Texas voters to "learn about and acquire free birth certificates."  Additionally, even without the $2 to $3 fee, the Veasey Plaintiffs argue that the process of obtaining a free birth certificate and a free EIC constitutes the kind of "burdensome alternative process" that was struck down in *Harman v. Forssenius*, 380 U.S. 528 (1965).  Before our full court, the Veasey Plaintiffs continue to argue that we should

---

[62] The Veasey Plaintiffs include: Marc Veasey, Jane Hamilton, Sergio Deleon, Floyd Carrier, Anna Burns, Michael Montez Penny Pope, Oscar Ortiz, Koby Ozias, League of United Latin American Citizens, John Mellor-Crummey, Ken Gandy, Gordon Benjamin, and Evelyn Brickner.  No other plaintiff joined in making this allegation.

No. 14-41127

affirm the district court's poll tax ruling.

To the extent that the Veasey Plaintiffs have not abandoned or conceded this claim,[63] we conclude that SB 14, as amended by SB 983, does not impose a poll tax. Although SB 983 was passed when this case was already on appeal, we do not need to remand this issue to the district court for two reasons: (1) we conclude that even before SB 983, SB 14 did not create a facial poll tax; and (2) the issue of SB 983's impact on the poll tax issue is a pure question of law (at least as far as this facial challenge) that does not necessitate any reweighing of evidence or consideration of new evidence.

The Veasey Plaintiffs previously facially challenged SB 14 with respect to Texas voters born out of state (who are unaffected by SB 983's passage). Those voters could face fees in their state of birth to obtain documentation required for an EIC. We conclude that SB 14 does not facially impose a poll tax on those voters. Rather, SB 14 requires *all* Texas voters to present valid identification at the polls, exercising the State's "legitimate interest in assessing the eligibility and qualifications of voters." *Gonzalez v. Arizona*, 677 F.3d 383, 408–10 (9th Cir. 2012) (en banc); *see also Harper v. Va. Bd. of Elections*, 383 U.S. 663, 668 (1966) ("But we must remember that the interest of the State, when it comes to voting, is limited to the power to fix qualifications."). The indirect cost on voters born out of state does not constitute a poll tax.[64] *Cf. Harman*, 380 U.S. at 541 ("Thus, in order

---

[63] *Cf. Ray v. United Parcel Serv.*, 587 F. App'x 182, 186 (5th Cir. 2014) (noting plaintiff "affirmatively abandoned [his Title VII] claim on appeal by conceding" that he had not established pretext for racial discrimination).

[64] Only one plaintiff, Ken Gandy, showed that he was unable to obtain an out-of-state birth certificate due to its cost, *see Veasey v. Perry*, 71 F. Supp. 3d at 671, but he was able to vote by mail, *id.* at 677. Accordingly, Ken Gandy has suffered no injury that we must address under the poll tax rubric, and we conclude that SB 14 is not a poll tax as applied to him.

No. 14-41127

to demonstrate the invalidity of [the challenged law], it need only be shown that it imposes a material requirement *solely* upon those who refuse to surrender their constitutional right to vote in federal elections without paying a poll tax." (emphasis added)).

Likewise, SB 14 did not impose a poll tax on voters before the passage of SB 983. It did not "impose[] a material requirement solely upon those who refuse[d]" to pay a poll tax, as proscribed by the Twenty-Fourth Amendment. *Id.* at 541–42. Rather, it drew from the State's power to set voter qualifications by requiring all voters to present a valid form of photo identification at the polls. *See Gonzalez*, 677 F.3d at 408. Under the Fourteenth Amendment, as the Supreme Court interpreted it in *Harper*, the Court has observed that a state invidiously discriminates when it imposes a cost to vote with a justification that is "irrelevant to the voter's qualifications." *Crawford*, 553 U.S. at 189. Although the questions presented to the Supreme Court in *Crawford* did not include whether Indiana's voter ID law imposed a poll tax, the Court observed that a statute would be invalid under *Harper*'s Fourteenth-Amendment poll tax analysis "if the State *required* voters to pay a tax or a fee to obtain a *new* photo identification." 553 U.S. at 198 (emphasis added). The Court implied that requiring voters to obtain photo identification and charging a fee for the required underlying documentation would not qualify as a poll tax, and we similarly conclude that SB 14's similar requirements did not operate as a poll tax. *See id.* at 198 & n.17; *see also Gonzalez*, 677 F.3d at 407–10.

As amended by SB 983, Texas law no longer imposes any direct fee for the underlying documentation required to obtain a qualifying voter ID. What remain are the requirements that such voters travel to the local registrar or county clerk's office, gather and present certain forms of documentation to receive the certified record, travel to the DPS office with that record, and

No. 14-41127

present the certified record, along with two forms of supporting identification, to receive an EIC. *See* 37 TEX. ADMIN. CODE § 15.182(3)–(4). The Veasey Plaintiffs appear to argue in their Rule 28(j) Letter that these obligations make SB 14 unconstitutional under *Harman* because they "requir[e] voters to follow a burdensome alternative process to avoid paying a . . . poll tax."[65]

To the extent the Veasey Plaintiffs now attempt to analogize SB 14 and SB 983 to the scheme in *Harman*, we reject that analogy. In *Harman*, the state of Virginia forced those who would vote in federal elections to choose between paying a poll tax and meeting a registration requirement before each election year. 380 U.S. at 531–32. The Virginia constitution mandated that federal voters file a certificate of residence within a specific date range, beginning on October 1 of the year before the federal election at issue and ending on a date six months before the date of the federal election. *Id.* at 532. On a notarized, witnessed certificate, the federal voter had to submit a current address and attest to: (1) being a resident of Virginia, both at the time of submission and since the date of voter registration, and (2) an intent not to move from the city or county of residence before the next general election. *Id.* Those voters who chose to pay federal and state poll taxes were only required to file the certificate of residence one time; those who did not pay the federal poll tax had to file a new certificate of residence in the designated time frame before each election year. *Id.*

Here, the State does not offer Texas voters a choice between paying a fee and undergoing an onerous procedural process. *Cf. id.* at 540–41. All voters

---

[65] This is somewhat in tension with the Veasey Plaintiffs' initial briefing before the panel, which claimed SB 14 was a poll tax based on the fee involved and conceded that "incidental burdens on voters are not taxes," including "[i]ncidental costs such as paying for gas to drive to the polls."

No. 14-41127

must make a trip to the DPS, local registrar, county clerk, or other government agency at some point to receive qualifying photo identification. This record reveals that Plaintiffs and those who lack both SB 14 ID and underlying documentation face more difficulty than many Texas voters in obtaining SB 14 ID. Undoubtedly, those who own vehicles, have flexible work schedules, and already possess the required documentation can more easily meet these procedural requirements than some of the Plaintiffs and others who lack these resources. Plaintiffs and others similarly situated often struggle to gather the required documentation, make travel arrangements and obtain time off from work to travel to the county clerk or local registrar, and then to the DPS, all to receive an EIC. These greater difficulties receive consideration in the Section 2 discriminatory effect analysis, but Supreme Court jurisprudence has not equated these difficulties, standing alone, to a poll tax. *See, e.g.*, *Harper*, 383 U.S. at 666. In *Harman*, the Court specifically noted:

> [I]t is important to emphasize that the question presented is not whether it would be within a State's power to abolish entirely the poll tax and require all voters—state and federal—to file annually a certificate of residence. Rather, the issue here is whether the State of Virginia may constitutionally confront the federal voter with a requirement that he either pay the customary poll taxes as required for state elections or file a certificate of residence.

380 U.S. at 538; *see also Crawford*, 553 U.S. at 198–99 (contrasting the unconstitutionality of a requirement that voters "pay a tax or a fee to obtain a new photo identification" with a requirement that voters without ID "travel to the circuit court clerk's office within 10 days [of the election] to execute the required affidavit"). Additionally, whether the qualifying identification is a driver's license, passport, or EIC, voters need not undergo this process every election year during a specific time frame six months prior to the election, as was the case in *Harman*. Instead, the record indicates that an EIC remains

77

No. 14-41127

valid for six years and must only be obtained sometime before an election.

In light of the recently-enacted SB 983, SB 14 does not impose an unconstitutional poll tax under the Fourteenth or Twenty-Fourth Amendments, nor did it impose a poll tax before SB 983's enactment. Accordingly, we vacate the district court's judgment for the Veasey Plaintiffs on their poll tax claim and render judgment in the State's favor.

## V.  Remedy

After finding that SB 14 was enacted with a racially discriminatory purpose, the district court fully enjoined SB 14's implementation, with the exception of several sections of the law that do not relate to photo identification. *See Veasey v. Perry*, 71 F. Supp. 3d at 707 & n.583. That remedy is potentially broader than the one to which Plaintiffs would be entitled if only the discriminatory effect claim were considered. *Compare Crawford*, 553 U.S. at 200, 203 (noting, in the Section 2 context, that "petitioners have not demonstrated that the proper remedy—even assuming an unjustified burden on some voters—would be to invalidate the entire statute"), *with City of Richmond*, 422 U.S. at 378 (holding, in the discriminatory purpose context, that "[a]n official action . . . taken for the purpose of discriminating . . . on account of . . . race has no legitimacy at all"), *and Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457, 465–66, 471, 487 (1982) (affirming the permanent injunction of a statewide initiative because its provisions were "effectively drawn for racial purposes" in violation of the Fourteenth Amendment).[66]

As discussed above, we (and, correspondingly, the district court) are

---

[66] We do not mean to suggest that a full injunction is *never* available as a remedy for a discriminatory effect finding. However, given the severability clause in this statute and the Supreme Court's cautions to give deference to legislative determinations even when some violation is found, the district court must examine a full range of potential remedies. *Perez*, 132 S. Ct. at 941.

No. 14-41127

acting within a short timeframe during which the district court will have to
fashion at least an interim remedy relevant to the November 2016 election.
Thus, we consider it prudent to provide some guidance regarding what would
constitute a properly tailored remedy.

"When devising a remedy to a [Section] 2 violation, the district court's
'first and foremost obligation . . . is to correct the Section 2 violation.'" *Brown*,
561 F.3d at 435 (quoting *Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1022 (8th Cir.
2006)). Yet, any remedy "should be sufficiently tailored to the circumstances
giving rise to the [Section] 2 violation," *id.*, and to the extent possible, courts
should respect a legislature's policy objectives when crafting a remedy, *see*
*Perez*, 132 S. Ct. at 940–44; *see also Inclusive Communities*, 135 S. Ct. at 2524
("Remedial orders in disparate-impact cases should concentrate on the
elimination of the offending practice that 'arbitrar[ily] . . . operate[s]
invidiously to discriminate on the basis of rac[e].'" (citation omitted)). In the
context of redistricting,[67] the Supreme Court has instructed that a legislature's
policy objectives may be discerned from the challenged legislation, and those
policy choices should be respected, even when some aspect of the underlying
law is unenforceable. *Perez*, 132 S. Ct. at 941.

When a statute contains a severability clause, courts must take special
care to attempt to honor a legislature's policy choice to leave the statute intact.
*See Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 330–31
(2006) (holding that lower courts should not have invalidated the entire
statute, but should have accounted for the legislature's policy choices and the

---

[67] We have held that Section 2 redistricting cases provide an appropriate source of
guidance for district courts attempting to craft remedies for Section 2 voter registration
violations. *See Operation Push*, 932 F.2d at 406. Likewise, we take guidance here from
precedent regarding the proper remedies for Voting Rights Act violations.

No. 14-41127

statute's severability clause).  In this case, SB 14's severability clause makes clear that the Legislature intended the photo identification system to be left intact for all valid applications.[68]  Also clearly underlying SB 14 is the concern that a voter present proper identification that cannot easily be counterfeited or used by another.

There are times when a court might give a state legislature an opportunity to cure the infirmities in the statute before permitting the district court to fashion a remedy.  *See Wise v. Lipscomb*, 437 U.S. 535, 540 (1978) ("When a federal court declares an existing apportionment scheme unconstitutional, it is therefore, appropriate, *whenever practicable*, to afford a reasonable opportunity for the legislature to meet constitutional requirements by adopting a substitute measure rather than for the federal court to devise and order into effect its own plan." (emphasis added)); *Operation Push*, 932 F.2d at 404–06 (affirming the district court after it initially issued orders requiring legislative action and then deferred to the Mississippi legislature's crafted remedy in accordance with those orders); *Westwego Citizens for Better*

---

[68]  The severability clause reads:

> Every provision in this Act and every application of the provisions in this Act are severable from each other. If any application of any provision in this Act to any person or group of persons or circumstances is found by a court to be invalid, the remainder of this Act and the application of the Act's provisions to all other persons and circumstances may not be affected. All constitutionally valid applications of this Act shall be severed from any applications that a court finds to be invalid, leaving the valid applications in force, because it is the legislature's intent and priority that the valid applications be allowed to stand alone. Even if a reviewing court finds a provision of this Act invalid in a large or substantial fraction of relevant cases, the remaining valid applications shall be severed and allowed to remain in force.

TEX. ELEC. CODE § 64.012 historical note (West Supp. 2014) [Act of May 16, 2011, 82d Leg., R.S., ch. 123, § 25, 2011 Tex. Gen. Laws 619, 625].

No. 14-41127

*Gov't v. City of Westwego*, 946 F.2d 1109, 1124 (5th Cir. 1991). Indeed, when feasible, our practice has been to "offer governing bodies the first pass at devising" remedies for Voting Rights Act violations. *Brown*, 561 F.3d at 435. Based on suggestions in oral argument, appropriate amendments might include a reasonable impediment or indigency exception similar to those adopted, respectively, in North Carolina[69] or Indiana.[70] There may also be some portion of prior state law that can reduce the discriminatory effect SB 14 has on minority voters without proper identification.

However, the Supreme Court and our court have acknowledged that when it is *not* practicable to permit a legislative body this opportunity because of an impending election, "it becomes the 'unwelcome obligation' of the federal court to devise and impose a [remedy] pending later legislative action." *Wise*, 437 U.S. at 540 (quoting *Connor v. Finch*, 431 U.S. 407, 415 (1977)); *see also Perez*, 132 S. Ct. at 939–41 (implicitly approving of a district court's decision to devise an interim redistricting plan rather than permit the legislature to impose a new plan in light of the fast-approaching election, but remanding to the district court to alter the plan to reflect the State's policy judgments); *Reynolds v. Sims*, 377 U.S. 533, 585 (1964) ("[O]nce a State's legislative apportionment scheme has been found to be unconstitutional, it would be the unusual case in which a court would be justified in not taking appropriate action to insure that no further elections are conducted under the invalid plan."); *cf. Planned Parenthood Cincinatti Region v. Taft*, 444 F.3d 502, 517 (6th Cir. 2006) (remanding to the district court to fashion an appropriate injunction and instructing the district court to account for legislative intent).

---

[69] *See* N.C. GEN. STAT. §§ 163-82.8(e), 163-166.13(c)(2), 163-166.15, 163-182.1B (2015).

[70] *See* IND. CODE § 3-11.7-5-2.5 (2015).

No. 14-41127

Such circumstances are present here: the Texas Legislature is not scheduled to be in session again until January 2017, and the November 2016 general election is fast approaching. It would be untenable to permit a law with a discriminatory effect to remain in operation for that election.[71] In fact, the State has not asked us to permit the Legislature to reconsider SB 14 before the courts fashion a remedy and, despite filing multiple briefs with this court in this case before and after the panel opinion, the State has never argued that we must defer to the Legislature in the first instance. When counsel for the State was asked about this issue during oral argument before our full court, counsel responded that so long as it was a "tailored, specific remedy," he "believe[s] this court could fashion the remedy itself." Upon further pressing by a member of the court, the State noted it also would be proper for the state legislature to act first, but repeated that this court could enact a tailored remedy and did not advocate that this court could or should order the Texas Governor to call a special session of the Legislature to craft a remedy to any Section 2 violation.

Because of the Supreme Court's order and the impending election, we would necessarily have to give only limited time for any legislative fix. Since the legislature is not scheduled to be in session this year, doing so would require that the Texas Governor call a special session of the Legislature. Accordingly, although legislative intercession may occur, it may not be feasible, and we follow the Supreme Court's guidance and permit the district court to enter an order that remedies SB 14's discriminatory effects. *See Wise*, 437 U.S. at 540; *see also Perez*, 132 S. Ct. at 939–41.

---

[71] As discussed above, the Supreme Court has also noted the time constraints of this case in light of the scheduled elections in November of 2016. *See Veasey v. Abbott,* 136 S. Ct. at 1823.

No. 14-41127

In the event that the Governor calls a special session to address this issue or should a later Legislature again address the issue of voter identification, any new law would present a new circumstance not addressed here.   Such a new law may cure the deficiencies addressed in this opinion. Neither our ruling here nor any ruling of the district court on remand should prevent the Legislature from acting to ameliorate the issues raised in this opinion.   Any concerns about a new bill would be the subject of a new appeal for another day.

On remand, the district court should refer to the policies underlying SB 14 in fashioning a remedy.   We acknowledge that the record establishes that the vast majority of eligible voters possess SB 14 ID, and we do not disturb SB 14's effect on those voters—those who have SB 14 ID must show it to vote.   The remedy must be tailored to rectify only the discriminatory effect on those voters who do not have SB 14 ID or are unable to reasonably obtain such identification.   *See Frank II*, 819 F.3d at 386 (rejecting that "because *some* voters face undue difficulties in obtaining acceptable photo IDs, Wisconsin could not require *any* voter to present a photo ID," but accepting that "high hurdles for some persons" might "entitle those particular persons to relief"). Because the parties had an opportunity to present the evidence they desired during the initial district court proceedings, the district court's determinations should be based on the current record, supplemented only by legislative action, if any, that occurs after this remand and any oral argument permitted by the district court.

Clearly, the Legislature wished to reduce the risk of in-person voter fraud by strengthening the forms of identification presented for voting.   Simply reverting to the system in place before SB 14's passage would not fully respect these policy choices—it would allow voters to cast ballots after presenting less

No. 14-41127

secure forms of identification like utility bills, bank statements, or paychecks. *See* TEX. ELEC. CODE § 63.001(b) (West 2010).  The panel opinion noted that one possibility would be to reinstate voter registration cards as documents that qualify as acceptable identification under the Texas Election Code for those individuals who do not have and cannot reasonably obtain SB 14 ID.[72]  During oral argument, counsel for the State suggested that an indigency exception, modeled after the exception in Indiana's voter ID law, would be sufficient to cure the discriminatory effect of SB 14.  These are solutions the district court may consider.  Further, in fashioning a remedy, the district court should also consider the necessity of educational and training efforts to ensure that both voters and workers at polling places are capable of making use of whatever remedy the district court selects.

In light of the impending election, we order the district court to file its order regarding the proper discriminatory effect remedy as soon as possible. The parties have expressed a willingness to work cooperatively with the district court to provide a prompt resolution of this matter, and we urge them to do so to avoid election eve uncertainties and emergencies.

## VI.  Conclusion

### A.  Discriminatory Purpose Claim

For the reasons stated above, we REVERSE the district court's judgment that SB 14 was passed with a racially discriminatory purpose and REMAND for the district court to consider this claim in light of the guidance we have provided in this opinion.  As we have discussed, to avoid disruption of the

---

[72]  While the registration card does not contain a photo, it is a more secure document than a bank statement or electric bill and, presumably, one not as easily obtained by another person.  It is sent in a nondiscriminatory fashion, free of charge, to each registered voter and therefore avoids any cost issues.

No. 14-41127

upcoming election, the district court should first focus on fashioning interim relief for the discriminatory effect violation in the months leading up to the November general election. The district court should then reevaluate the evidence relevant to discriminatory intent and determine anew whether the Legislature acted with a discriminatory intent in enacting SB 14. We encourage the district court to wait until after the November 2016 election to make this new determination. However, whether the district court waits to make its findings until after the November election or does so sooner, we instruct that, in light of the limited time prior to the November 2016 election, the district court shall not implement any remedy arising from such reevaluation before this November's election.

## B. Discriminatory Effect Claim

We AFFIRM the district court's finding that SB 14 violates Section 2 of the Voting Rights Act through its discriminatory effects and REMAND for consideration of the appropriate remedy consistent with this opinion as soon as possible. The district court must ensure that any remedy enacted ameliorates SB 14's discriminatory effect, while respecting the Legislature's stated objective to safeguard the integrity of elections by requiring more secure forms of voter identification.

## C. Other Claims

We VACATE the district court's holding that SB 14 is a poll tax under the Fourteenth and Twenty-Fourth Amendments and RENDER judgment for the State on this issue. We need not and do not address whether SB 14 unconstitutionally burdens the right to vote under the First and Fourteenth Amendments; therefore, we VACATE the district court's judgment on that issue and DISMISS those claims.

No. 14-41127

## D. Interim Relief

In sum, the district court's immediate responsibility is to ensure the implementation of an interim remedy for SB 14's discriminatory effect that disrupts voter identification rules for the 2016 election season as little as possible, yet eliminates the Section 2 discriminatory effect violation. The district court will need to reexamine the discriminatory purpose claim in accordance with the proper legal standards we have described, bearing in mind the effect any interim legislative action taken with respect to SB 14 may have. The district court's task in this respect may await the November 8, 2016 general election.

No. 14-41127

STEPHEN A. HIGGINSON, Circuit Judge, joined by GREGG COSTA, Circuit Judge, concurring:

As the Supreme Court has reminded, though great progress has been made, "voting discrimination still exists; no one doubts that," and Section 2 of the Voting Rights Act operates as a crucial "permanent, nationwide ban," *Shelby County v. Holder*, 133 S. Ct. 2612, 2619, 2631 (2013), on "even the most subtle forms of discrimination," *Chisom v. Roemer*, 501 U.S. 380, 406 (1991) (Scalia, J., dissenting).  The courts, therefore, have a vital role in protecting the right "to participate equally in the political process." *Thornburg v. Gingles*, 478 U.S. 30, 80 (1986).  Indeed, the Supreme Court has long cautioned that alleged discrimination against minorities calls for a "searching judicial inquiry," *United States v. Carolene Prods. Co.*, 304 U.S. 144, 152 n.4 (1938), and with regard to Section 2, which mandates consideration of "the totality of circumstances," 52 U.S.C. § 10301(b), Congress has made clear that, again in the Court's words, "whether the political processes are 'equally open' depends upon a searching practical evaluation of the 'past and present reality'" and "on a 'functional' view of the political process," *Gingles*, 478 U.S. at 45 (quoting S. Rep. No. 97-417, at 30 (1982)).

After a nine-day trial that saw the testimony of over forty witnesses, half of them experts, the district court concluded in a nearly one-hundred-and-fifty-page opinion that SB 14—stricter than other voter ID laws that courts have upheld, including those after which Texas's law was ostensibly modeled[1]—violates Section 2 because it abridges minorities' ability to participate equally

---

[1] *See Texas v. Holder*, 888 F. Supp. 2d 113, 128 (D.D.C. 2012) ("SB 14 is far stricter than either Indiana's or Georgia's voter ID laws."), *vacated on other grounds*, 133 S. Ct. 2886 (2013); *see also N. Car. State Conference of the NAACP v. McCrory*, --- F. Supp. 3d ---, 2016 WL 1650774, at *156 (M.D.N.C. Apr. 25, 2016) ("[North Carolina's voter ID law] is also less burdensome than the Texas ID requirement . . . .").

No. 14-41127

in the political process.  As the majority opinion shows, the district court's Section 2 finding is a permissible view of a voluminous record informed by extensive testimony.  I join the majority opinion and write separately to respond to arguments in the principal dissenting opinion because, contrary to those arguments, I perceive that the majority opinion's Section 2 analysis fits comfortably with decisions of the Supreme Court, our court, and other circuits.

I.

As the majority opinion explains, our adoption of the Fourth and Sixth Circuits' two-part test places Section 2's totality-of-circumstances inquiry in a vote-denial framework that adheres to the text of Section 2, 52 U.S.C. § 10301, and the Supreme Court's guidance in *Gingles,* 478 U.S. at 47 ("The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives."). Use of the *Gingles* (or Senate) factors as nonexhaustive tools fleshing out this framework ensures the requisite causal linkage between past discrimination and a challenged voting practice's disparate impact.  Though some of the factors may have less relevance in vote-denial cases, others, particularly "Senate factors one, three, five, and nine," aid in applying the Supreme Court's admonition to discern the relevant social and historical effects of discrimination, and their interaction with a challenged law.  *Ohio State Conference of NAACP v. Husted*, 768 F.3d 524, 555 (6th Cir. 2014), *vacated on other grounds*, 2014 WL 10384647 (6th Cir. 2014); *see also* Daniel P. Tokaji, *Applying Section 2 to the New Vote Denial*, 50 HARV. C.R.-C.L. L. REV. 439, 481–82 (2015) (concluding that most of the Senate factors are relevant to vote-denial claims, the fifth factor especially so).  And case law belies the argument that the Senate factors have no place outside the vote-dilution context.

No. 14-41127

The Senate factors have roots in this court, *see Zimmer v. McKeithen*, 485 F.2d 1297, 1305 (5th Cir. 1973) (en banc), and we have not limited them to vote-dilution cases.  To the contrary, in a vote-denial case in which we affirmed a finding that Mississippi's voter registration process violated Section 2's results test, we noted that the trial court applied those "'objective factors' to aid the courts in evaluating a § 2 claim." *Miss. State Chapter, Operation Push, Inc. v. Mabus*, 932 F.2d 400, 405 (5th Cir. 1991), *aff'g Miss. State Chapter, Operation Push v. Allain*, 674 F. Supp. 1245 (N.D. Miss. 1987) (applying all nine factors).[2]  And among our sister circuits, it is not just the Fourth and Sixth that have found the Senate factors significant in vote-denial cases.  *See Gonzalez v. Arizona*, 677 F.3d 383, 405–06 (9th Cir. 2012) (en banc) (explaining that "courts should consider" the Senate factors in vote-denial cases); *Johnson v. Governor of Fla.*, 405 F.3d 1214, 1227 n.26 (11th Cir. 2005) (en banc) (stating in dictum that the factors apply to denial cases); *Smith v. Salt River Proj. Agr. Improvement & Power Dist.*, 109 F.3d 586, 596 n.8 (9th Cir. 1997) (rejecting the argument that the Senate factors "apply only to 'vote dilution' claims").  We do well to join this near-consensus of circuits in recognizing that the Senate Report and *Gingles* provide guidance in the vote-denial context.

II.

Today's outcome is also not inconsistent with *Crawford v. Marion County Election Board*, 553 U.S. 181 (2008).  *Crawford* did not even discuss the Voting

---

[2] The *Operation Push* plaintiffs' arguments mirror some in this case.  *Compare Operation Push*, 932 F.2d at 403 (citing the argument that African-Americans' lack of access to transportation and less flexible work schedules made it more difficult for them to comply with the restrictive registration system), *with Veasey v. Perry*, 71 F. Supp. 3d 627, 664–65 (S.D. Tex. 2014) (citing evidence that low-income Texans, who are disproportionately African-American or Hispanic, not only disproportionately lack qualifying ID, but also have more difficulty taking time off from work to secure ID and "live without vehicles for their own transportation to get to ID-issuing offices").

No. 14-41127

Rights Act, and held only that the lower courts "correctly concluded that the evidence in the record [was] not sufficient to support a facial attack on the validity of the entire statute" under the constitutional *Anderson-Burdick* framework. *Id.* at 189.  Furthermore, as Justice Stevens took care to note, the record there, unlike here, (1) did not quantify the voters without qualifying ID, (2) provided no "concrete evidence of the burden imposed on voters who currently lack photo identification," and (3) said "virtually nothing about the difficulties faced by . . . indigent voters." *Id.* at 200–01.  To be sure, *Crawford* established that preventing voter fraud and safeguarding voter confidence are legitimate and important state interests. *Id.* at 194–97.  But it does not follow that assertion of those interests immunizes a voter ID law from all challenges, or that courts should be deterred from examining, as part of the Section 2 totality-of-circumstances inquiry, the tenuousness of the reasons given for the law. *See League of Women Voters of N. Car. v. North Carolina*, 769 F.3d 224, 246 (4th Cir. 2014); *cf. Husted*, 768 F.3d at 547 ("[*Crawford*] does not mean, however, that the State can, by merely asserting an interest in preventing voter fraud, establish that that interest outweighs a significant burden on voters.").[3]

Nor does our decision contravene *League of United Latin American Citizens v. Clements*, 999 F.2d 831 (5th Cir. 1993) (en banc).  Texas highlights our statements in that dilution case that socioeconomic disparities alone do not

---

[3] To the extent the dissent argues that *League of United Latin American Citizens v. Clements* forecloses consideration of the "tenuousness" factor, that case distinguished the "weight" of the state's interest "from the conventional *Zimmer* [Senate] factor of tenuousness."  999 F.2d 831, 871 (5th Cir. 1993) (en banc).  And as the Supreme Court recently reminded, that a state interest is legitimate does not necessarily mean courts should ignore evidence of whether a specific law advances that interest or imposes needless burdens. *See Whole Women's Health v. Hellerstedt*, --- S. Ct. ---, 2016 WL 3461560, at *16 (2016).

No. 14-41127

show "that minorities do not enjoy equal access to the political process," and that the Senate Report "did not dispense with proof that participation in the political process is in fact depressed among minority citizens." *Id.* at 866, 867. From this, Texas reasons that the district court erred by finding a Section 2 violation without "proof that the challenged law affects voting behavior." The cited language in *Clements*, however, discussed Senate factors one and five: "the extent of any history of official discrimination" affecting political participation, and "the extent to which members of the minority group . . . bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process." *Id.* at 866 & n.30. In that context, we noted that the plaintiffs "offered no evidence of reduced levels of black voter registration, lower turnout among black voters, or any other factor tending to show that past discrimination"—not the challenged law by itself—"ha[d] affected their ability to participate in the political process" as required by "these *Zimmer* [Senate] factors." *Id.* at 867. Here, in sharp contrast, the district court heard such evidence and found, in its discussion of factor five, that the effects of past discrimination "have hindered the ability of African-Americans and Hispanics to effectively participate in the political process"; indeed, one expert "testified that these minorities register and turnout for elections at rates that lag far behind Anglo voters." *Veasey v. Perry*, 71 F. Supp. 3d 627, 697 (S.D. Tex. 2014).

The district court also heard from witnesses who were unable to vote because they lacked the required forms of ID, from some who struggled to obtain the required forms of ID or documents needed to obtain them, and from others who help disadvantaged individuals obtain photo IDs and attested to the difficulties those individuals face in doing so. *See id.* at 667–76. The court further credited expert testimony that SB 14 "would almost certainly decrease

No. 14-41127

voter turnout, particularly among minorities," by imposing burdens that fall more heavily on African-Americans and Hispanics. *Id.* at 655–56; *see also id.* at 664–65.[4]   The majority opinion rightly rejects Texas's attempt to stretch *Clements* to require that plaintiffs wait until elections have occurred under the challenged law and then prove a direct impact on turnout.   That would make impossible pre-enforcement Section 2 challenges, which the Supreme Court recently acknowledged.   *See Shelby County*, 133 S. Ct. at 2619 ("[I]njunctive relief is available in appropriate [Section 2] cases to block voting laws from going into effect.").   And as multiple experts testified, given the myriad variables at play, it is extremely difficult to isolate the effect of a new law on voter turnout.[5]   Texas's argument that the plaintiffs were required to prove a direct impact on turnout is unsound.

---

[4] The dissent cites law review articles for the propositions that studies collected therein show no effect from voter ID laws on turnout, or even show increased turnout.  Those collected studies, which mostly date from 2009 and earlier, did not involve SB 14 and do not make the district court's acceptance of expert testimony that Texas's law likely will depress turnout clearly erroneous.  In any event, scholarship on the effects of voter ID laws is far from uniform.  *See, e.g.*, Zoltan Hajnal, et al., *Voter Identification Laws and the Suppression of Minority Votes,* at 15 (February 2016), http://pages.ucsd.edu/~zhajnal/page5/documents/voterIDhajnaletal.pdf ("For Latinos, Blacks, and multi-racial Americans there are strong signs that strict photo identification laws decrease turnout."); Bill Hobby, et al., *The Texas Voter ID Law and the 2014 Election: A Study of Texas's 23rd Congressional District*, at 13 (August 2015), https://bakerinstitute.org/media/files/files/e0029eb8/Politics-VoterID-Jones-080615.pdf (concluding that Hispanic non-voters in one Texas congressional district "were significantly more likely than Anglo non-voters to strongly agree or agree that a lack of photo ID was a reason that they did not cast a ballot in the 2014 general election"); Michael D. Gilbert, *The Problem of Voter Fraud*, 115 COLUM. L. REV. 739, 749 & n.55 (2015) ("Other studies suggest voter ID laws do depress votes." (collecting studies)).

[5] Scholars have made the same point.  *See Tokaji, supra*, at 475–76 ("Existing empirical methods are simply not up to the task of establishing the effect of a particular practice on turnout, let alone on turnout by particular subgroups, with any degree of precision."); Samuel Issacharoff, *Ballot Bedlam*, 64 DUKE L.J. 1363, 1383 (2015) ("There has not been enough time to test the observations against normal fluctuations in turnout . . . and other confounding political factors."); Michael J. Pitts, *Empirically Measuring the Impact of Photo ID Over Time and Its Impact on Women*, 48 IND. L. REV. 605, 606 (2015) ("[I]t can be

No. 14-41127

It is also mistaken to suggest that the majority opinion conflicts with the Ninth Circuit's decision in *Gonzalez*, 677 F.3d at 383. That court, after citing the Senate factors with approval and emphasizing the deference owed to a district court's factual Section 2 determinations, affirmed a finding that the plaintiff had failed to establish the disparate impact of a voter ID law where, among other things, the district court rejected as unreliable the plaintiff's expert statistical analysis and the record included no evidence that Hispanics were even less likely to possess qualifying ID. *Id.* at 406–07 & n.33. The law at issue was also much less strict, requiring a voter to present at the polls *either* (A) one of a broader range of photo IDs *or* (B) two non-photo documents showing the voter's name and address, such as a utility bill, bank statement, or voter registration card. *Gonzalez v. Arizona*, No. CV 06-1268-PHX, 2006 WL 3627297, at *1, *6 (D. Ariz. Sept. 11, 2006). Even so, two judges wrote separately to stress that the court's holding was based on "the *current record*," and that "[a] different record in a future case could produce a different outcome." *Gonzalez*, 677 F.3d at 442 (Berzon, J., concurring).[6]

The Ninth Circuit of course said that "proof of 'causal connection between the challenged voting practice and a prohibited discriminatory result' is crucial" to a Section 2 challenge. *Id.* at 405 (majority opinion) (quoting *Smith*, 109 F.3d at 595). But the district court here found that the record established that causal connection. The trial judge found that SB 14 makes voting relatively more difficult for minorities, and without ameliorative measures will

_____

difficult to determine the amount of actual disenfranchisement caused by photo identification laws."); Gilbert, *supra*, at 750 ("Gathering relevant data and designing conclusive tests presents many challenges.").

[6] The district judge, contrastingly to this case, noted that the record did not contain "adequate evidence on any of [the Senate] factors to enable an appropriate evaluation." *Gonzalez*, 2006 WL 3627297, at *8.

No. 14-41127

likely disproportionately suppress minority voting, by conditioning the right to vote on the possession of documents that, because of the effects of past discrimination, are harder for minority voters to obtain. Such interaction between present-day law and the effects of past discrimination is what Congress intended to combat. *See Gingles*, 478 U.S. at 69 ("Congress intended that the Voting Rights Act eradicate inequalities in political opportunities that exist due to the vestigial effects of past purposeful discrimination."); *see also id.* at 44 n.9 ("[T]he purpose of the Voting Rights Act was 'not only to correct an active history of discrimination, . . . but also to deal with the accumulation of discrimination.'" (quoting S. Rep. No. 97-417, at 5)).

For this reason among others, we should not be guided by *Frank v. Walker*, 768 F.3d 744 (7th Cir. 2014). In that case, Judge Easterbrook—who did not mention the applicable clear-error standard of review—overlooked many of the district court's factual findings. *See Frank v. Walker*, 773 F.3d 783, 792–93, 796–97 (7th Cir. 2014) (Posner, J., dissenting from denial of rehearing en banc); Tokaji, *supra*, at 460. Questioning other circuits' approaches to vote-denial cases without offering a clear alternative, Judge Easterbrook went on to uphold a different voter ID law on the rationales that the law did not facially "draw any line by race," and that the plaintiffs had not "show[n] a 'denial' of anything by Wisconsin, as § 2(a) requires" because the state had not directly caused minorities to be less likely or able to own qualifying IDs. *Frank*, 768 F.3d at 753. Ultimately, the Seventh Circuit read Section 2 as only "an equal-treatment requirement," and rejected the plaintiffs' challenge "because in Wisconsin everyone has the same opportunity to get a qualifying photo ID." *Id.* at 754, 755.

This reasoning ignores that Section 2 prohibits voting procedures "imposed or applied . . . in a manner which *results* in a denial *or abridgement*

No. 14-41127

of the right . . . to vote." 52 U.S.C. § 10301(a) (emphasis added). Indeed, the opinion does not mention "abridgement" aside from a single quotation of the statute. Judge Easterbrook's "equal-treatment" gloss—which he did not explain aside from saying that is "how [the statute] reads," *Frank*, 768 F.3d at 754—is puzzling because it is undisputed that, in response to a judicial ruling that Section 2 plaintiffs had to prove discriminatory intent, Congress revised the statute "to make clear that a violation could be proved by showing discriminatory effect alone," *Gingles*, 478 U.S. at 35; *cf. Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 135 S. Ct. 2507, 2513 (2015) (explaining that "disparate-treatment" plaintiffs must show a discriminatory intent or motive). And if Section 2 requires only equal treatment, or if a Section 2 burden is cognizable only if it is impossible for some minority voters to comply with the challenged law, Justice Scalia must have mistakenly stated that Section 2 would be violated if "a county permitted voter registration for only three hours one day a week, and that made it more difficult for blacks to register than whites." *Chisom*, 501 U.S. at 408 (Scalia J., dissenting). After all, ignoring disparities due to past discrimination, that law would give everyone the "same opportunity" to register.

Judge Easterbrook further seems to have reasoned that the *only* discrimination relevant to Section 2's totality-of-the-circumstances inquiry is of the state-sponsored variety. *See Frank*, 768 F.3d at 753. The dissent agrees, adding that the official discrimination must be "contemporary" or at least "recent." I have difficulty squaring that with Section 2's directive to address the "totality of circumstances," and with the Supreme Court's admonitions to probe the interaction of the challenged practice "with social and historical conditions" as well as consider "the extent to which minority group members bear the effects of past discrimination in areas such as education, employment,

No. 14-41127

and health, which hinder their ability to participate effectively in the political process." *Gingles*, 478 U.S. at 47, 45. As one of this court's notable jurists put it, "under the results standard of section 2, pervasive private discrimination should be considered, because such discrimination can contribute to the inability of [minorities] to assert their political influence and to participate equally in public life." *United States v. Marengo Cty. Comm'n*, 731 F.2d 1546, 1567 n.36 (11th Cir. 1984) (Wisdom, J.); *see also Gomez v. City of Watsonville*, 863 F.2d 1407, 1418 (9th Cir. 1988) (rejecting the argument that only discrimination by the defendant is relevant to a Section 2 vote-dilution case); *Solomon v. Liberty County*, 899 F.2d 1012, 1032 (11th Cir. 1990) (en banc) (Tjoflat, J., concurring) ("Congress . . . revised section 2 to prohibit election practices that accommodate or amplify the effect that private discrimination has in the voting process." (ellipsis in original) (quoting David L. Eades, *Recent Developments, Section 2 of the Voting Rights Act: An Approach to the Results Test*, 39 VAND. L. REV. 139, 172 (1986))).[7]

### III.

Two related final points bear mentioning. First, Judge Easterbrook warned that the *Frank* plaintiffs' interpretation of Section 2 could "sweep[] away almost all registration and voting rules." *Frank*, 768 F.3d at 754. For example, he opined, "[m]otor-voter registration, which makes it simple for

---

[7] Because Texas selected the requisite voter qualifications and the manner of implementing them, which the trial court found interact with the effects of discrimination to cause racial disparities in opportunity to vote, considering the effects of private discrimination among other factors does not violate the Supreme Court's warning against imposing disparate-impact liability when "the plaintiff cannot point to a defendant's policy or policies causing [a statistical] disparity." *Inclusive Cmtys.*, 135 S. Ct. at 2523; *cf. id.* at 2524 (opining that a Fair Housing Act plaintiff might not be able to show "a causal connection between the Department's policy and a disparate impact" if, "for instance . . . federal law substantially limits the Department's discretion").

Case: 14-41127     Document: 00513602014     Page: 97     Date Filed: 07/20/2016
Case 2:13-cv-00193   Document 858-2   Filed on 07/20/16 in TXSD   Page 47 of 50

No. 14-41127

people to register by checking a box when they get drivers' licenses, would be invalid, because black and Latino citizens are less likely to own cars and therefore less likely to get drivers' licenses." *Id.*   The dissent advances a similar point, warning that voting regulations ranging from polling locations, early voting details, and registration times "can be challenged successfully under the majority's rationale."   I agree that Section 2 challenges can be brought against a variety of election laws—but that is nothing new.  *See Holder v. Hall*, 512 U.S. 874, 922 (1994) (Thomas, J., concurring) ("The section thus covers all manner of registration requirements, the practices surrounding registration (including the selection of times and places where registration takes place and the selection of registrars), the locations of polling places, the times polls are open, the use of paper ballots as opposed to voting machines, and other similar aspects of the voting process that might be manipulated to deny any citizen the right to cast a ballot and have it properly counted."); *see also Allen v. State Bd. of Elections*, 393 U.S. 544, 566–67 (1969) ("Indicative of an intention to give the Act the broadest possible scope, Congress expanded the language in the final version of [Section] 2 to include any 'voting qualifications or prerequisite to voting, or standard, practice, or procedure.'" (quoting then-42 U.S.C. § 1973)).  Nor does it imperil our electoral system.

There is a difference between making voting *harder* in ways that interact with historical and social conditions to disproportionately burden minorities and making voting *easier* in ways that may not benefit all demographics equally (like motor-voter).  The former can be characterized as "abridging" the right to vote; the latter cannot.  Laws that neither "eliminate opportunities that racial minorities disproportionately use, [n]or impose a requirement that

they disproportionately lack,"[8] in other words, will not fail our test.  *Cf.* 52 U.S.C. § 10301(b) (explaining that Section 2 does not "establish[ ] a right to have members of a protected class elected in numbers equal to their proportion in population").  And as recent cases show, not all voter ID laws will, either.  It is simplistic to lump all such laws together, overlooking that details—such as which forms of ID are accepted at the polls,[9] what documentation is needed to get a free qualifying ID,[10] and how the law is implemented[11]—matter. Especially significant are the accommodations made for those most affected by the ID requirement.   In North Carolina, for instance, persons without qualifying ID can vote by swearing that they "subjectively believe a reasonable impediment prevented them from acquiring ID."  *N. Car. State Conference of the NAACP v. McCrory*, --- F. Supp. 3d ---, 2016 WL 1650774, at *35–36 (M.D.N.C. Apr. 25, 2016).  Only the impediment's veracity may be challenged. *Id.* at *120.  South Carolina has a similar provision, which a three-judge court

---

[8] Tokaji, *supra*, at 475.

[9] *See Veasey*, 71 F. Supp. 3d at 642 (chart showing that, in terms of types of ID accepted, SB 14 is the strictest voter ID law in the country).

[10] *Compare Veasey*, 71 F. Supp. 3d at 668–69 (explaining that SB 14 requires a birth certificate or similar document to get a free qualifying ID), *with McCrory*, 2016 WL 1650774, at *26 (explaining that a North Carolinian can secure free voter ID by supplying a Social Security number and two of approximately twenty supporting documents, including medical records, prison ID, and paycheck stubs), *and Lee v. Va. State Bd. of Elections*, --- F. Supp. 3d ---, 2016 WL 2946181, at *24 (E.D. Va. May 19, 2016) ("[E]ligible voters do not need to present any independent documentation to obtain a free voter form of identification under Virginia Code § 24.2–643 and its implementing regulations.  The statute simply requires that a registrant provide her name, address, birthdate, and social security number and sign the registration form swearing that the information provided is true and correct.").

[11] North Carolina's ID requirement, for example, had a two-year "soft rollout," and the state's more extensive educational efforts included mailings offering help to voters whom a study indicated might not have qualifying ID.  *See McCrory*, 2016 WL 1650774, at *19–26; *see also Common Cause/Ga. v. Billups*, 504 F. Supp. 2d 1333, 1378–79 (N.D. Ga. 2007) (discussing Georgia's "exceptional" educational efforts), *vacated in part on other grounds*, 554 F.3d 1340 (11th Cir. 2009).

No. 14-41127

stressed in preclearing the state's voter ID law. *See South Carolina v. United States*, 898 F. Supp. 2d 30, 35–43 (D.D.C. 2012).

Second, we should not shy away from inquiring into such details, or from judging laws in their operative contexts, merely because it will require courts to draw fact-specific and even close distinctions. States have reacted to the Supreme Court's decisions in *Crawford* and *Shelby County* by introducing a range of voting regulations that go beyond what had previously been upheld. It is healthy for these initiatives to be assessed against congressional mandates, and courts can and should distinguish between nondiscriminatory ones which safeguard voter integrity and those which, whatever their intentions, interact with the effects of past discrimination to abridge minorities' opportunities to participate in the political process. Such scrutiny should be seen not as heavy-handed judicial rejection of legislative priorities, but as part of a process of harmonizing those priorities with the fundamental right to vote—a topic with which over a quarter of our Constitution's amendments have dealt in one way or another, and an individual right that cannot be compromised because an adverse impact falls on relatively few rather than many. *See Operation Push*, 932 F.2d at 404 (noting that the Mississippi legislature responded to a finding of a Section 2 violation by adopting ameliorative changes suggested by a district court); *South Carolina*, 898 F. Supp. 2d at 35–36 (explaining that state officials adopted a broad interpretation of a voter ID law's reasonable-impediment exception as litigation progressed); *id.* at 53 (Bates, J., concurring) ("An evolutionary process has produced a law that accomplishes South Carolina's important objectives while protecting every individual's right to vote and a law that addresses the significant concerns raised about [the law's] potential impact on a group that all agree is disproportionately African-American."); *see also N.*

No. 14-41127

*Car. State Conference of the NAACP v. McCrory*, --- F. Supp. 3d ---, 2016 WL 204481, at \*2, \*11 (M.D.N.C. Ja. 15, 2016) (noting that North Carolina adopted a reasonable-impediment exception "materially indistinguishable from South Carolina's" during the course of litigation); *Milwaukee Branch of the NAACP v. Walker*, 851 N.W.2d 262, 278–79 (Wis. 2014) (construing voter ID law so as to avoid constitutional infirmity).[12]

Cognizant that the Supreme Court may itself choose to refine Section 2 law in light of *Gingles*, *Crawford*, and *Shelby County*, or that Congress may revisit the topic as other affected groups, such as young people, the working poor, and the elderly mobilize, I concur in the majority opinion, having offered these respectful responses to arguments made in dissent.

---

[12] I also disagree with the opposite criticism that this interbranch engagement ameliorates too little, though that argument is contributory. *See* Richard L. Hasen, *Softening Voter ID Laws Through Litigation: Is it Enough?*, WISC. L. REV. FORWARD (forthcoming 2016), http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2743946 (with apologies to Professor Hasen for my citation of his draft version).