No. 14-41127

EDITH H. JONES, Circuit Judge, joined by E. GRADY JOLLY, JERRY E. SMITH, EDITH BROWN CLEMENT, and PRISCILLA R. OWEN, concurring in part and dissenting in part:

We dissent.[1]  Requiring a voter to verify her identity with a photo ID at the polling place is a reasonable requirement widely supported by Texans of all races and members of the public belonging to both political parties.  The majority, however, today holds not only that Texas's photo voter ID law, SB 14, violates the "results test" declared in Section 2 of the Voting Rights Act,[2] but concludes that there is "more than a scintilla" of evidence to support a finding that the Texas Legislature passed the photo voter ID law with a racially discriminatory intent.  By keeping this latter claim alive, the majority fans the flames of perniciously irresponsible racial name-calling.[3]

---

[1] We join only Part IV of the majority opinion that renders judgment in favor of the State on the Plaintiffs' poll tax claim.

[2] This holding invalidates the law for that small subgroup of the subgroup of 4.5% of Texas registered voters, those who allegedly lack not only the law's approved ID (drivers licenses, veterans ID, etc.) but also lack the documentation (birth certificates) necessary to obtain a free Election Identity Card ("EIC") and are inconvenienced by obtaining the documentation and the EIC.  As I shall demonstrate, the majority offers a gravely incorrect interpretation of Section 2.

[3] Section 2 was amended to add the results test, footing liability on less than intentional conduct, in part to defuse controversy over charges of purposeful discrimination. *See Thornburg v. Gingles*, 478 U.S. 30, 44, 106 S. Ct. 2752, 2763 (1986) (explaining that one of the "principal reasons" the intent test was repudiated was that it was "unnecessarily divisive because it involves charges of racism on the part of individual officials or entire communities" (internal quotations omitted)).  The Senate Report, from which the Court in *Gingles* heavily draws, elaborates on this point from testimony and examples before Congress:

As Dr. Arthur S. Flemming, Chairman of the United States Commission on Civil Rights, testified during hearings before the Subcommittee on the Constitution:

No. 14-41127

No one doubts our unwavering duty to enforce antidiscrimination law. But in this media-driven and hyperbolic era, the discharge of that duty requires the courage to distinguish between invidious motivation and shadows. The ill-conceived, misguided, and unsupported majority opinion shuns discernment. Because of definitive Supreme Court authority, no comparable federal court precedent in over forty years has found a state legislative act motivated by purposeful racial discrimination. Even more telling, the multi-thousand page record yields not a trace, much less a legitimate inference, of racial bias by the Texas Legislature. Indeed, why would a racially biased legislature have provided for a cost-free election ID card to assist poor registered voters—of all races—who might not have drivers' licenses? Yet the majority emulates the clever capacity of Area 51 alien enthusiasts who, lacking any real evidence, espied a vast but clandestine government conspiracy to conceal the "truth."[4]

-----

(L)itigators representing excluded minorities will have to explore motivations of individual council members, mayors, and other citizens. The question would be whether their decisions were motivated by invidious racial considerations. Such inquiries can only be divisive, threatening to destroy any existing racial progress in a community. It is the intent test, not the results test, that would make it necessary to brand individuals as racist in order to obtain judicial relief.

The very concern voiced by Dr. Flemming was illustrated by two recent decisions, [*City of Mobile, Ala. v.*] *Bolden*, [446 U.S. 55, 100 S. Ct. 1490 (1980)], on remand, and *Perkins v. City of West Helena, Ark.*[, 675 F.2d 201 (8th Cir. 1982)]. In both cases, the federal courts were compelled to label the motives of recent public officials as "racial" in reaching the conclusion that an electoral system was maintained for a discriminatory purpose.

S. REP. NO. 97-417, at 36 (1982), *reprinted in* 1982 U.S.C.C.A.N. 177, 207-08 (footnotes omitted).

[4]   *See* GREGORY W. PEDLOW & DONALD E. WELZENBACH, CENT. INTELLIGENCE AGENCY, THE CENTRAL INTELLIGENCE AGENCY AND OVERHEAD RECONNAISSANCE: THE U-2 AND OXCART PROGRAMS, 1954–1974 (1992) (declassified June 25, 2013) (report debunking

No. 14-41127

Because inflammatory and unsupportable charges of racist motivation poison the political atmosphere and tarnish the images of every legislator, and the Texas Lt. Governor and Governor, who supported SB 14, we consider that majority conclusion first. We then critique the majority's Section 2 holding and discuss constitutional tensions the majority opinion fosters.

## I.   Background

Three points must be highlighted at the outset, with further discussion to follow: the true extent of the legislative process leading to passage of a photo voter ID law; the catalytic effect of the Supreme Court's decision approving these IDs; and the impact of the law's requirements on all races.

First, SB 14 was enacted in the 2011 biennial legislative session after similar bills requiring photo voter ID had failed in three previous sessions. For six years, opponents had successfully stalled measures requiring proof of a voter's identity, not just a piece of paper from the County Registrar's office or a mere affidavit of "lost voter certificate." For every shortcut the majority employed to finally pass SB 14, an equal and opposite blocking tactic had succeeded in earlier legislative sessions.

Second, the campaign for stronger voter ID laws was encouraged by *Crawford v. Marion County Election Board*, 553 U.S. 181, 128 S. Ct. 1610 (2008), which upheld Indiana's photo voter ID law and emphasized the importance of protecting the integrity of election processes. Justice Stevens's

---

Area 51 conspiracy theories). Circumstantial evidence—equally probative as that relied on by the majority—is at odds with calling SB 14 intentionally discriminatory. Lamenting the lack of Latino voter turnout in Texas elections, Gilberto Hinojosa, the Texas Democratic Chairman, was recently quoted in a news article: "Voter ID is a problem. It is. But that's fixable. . . . That's not stopping that 1 million from going out to vote . . . ." Peggy Fikac, *Texas Democratic Chair: It's 'Ridiculous' His Party Isn't Winning*, SAN ANTONIO EXPRESS NEWS (June 16, 2016), http://www.mysanantonio.com/news/local/article/Texas-Democratic-chair-It-s-ridiculous-8261873.php.

No. 14-41127

opinion rejected the claim that Indiana had to advance "proof" of actual in-person voter fraud in order to justify the statute. Fourteen states passed photo voter ID laws in the wake of *Crawford*.

Third, the range of qualifying SB 14 IDs, while narrower than that in some similar ID laws, poses no obstacle to voting for at least 95.5% of all Texas voters who have unexpired (or no later than 60 days past expiry) driver's licenses, Texas personal identification cards, military IDs with a photo, United States passports, United States citizenship certificates with a photo, or licenses to carry a handgun. For those who lack such IDs, the law offers a cost-free Election Identification Card ("EIC") obtainable at state DMV offices (like the free card available in Indiana). Photo voter IDs are not required for elderly and disabled voters, as they may vote with mail-in ballots.

At trial, the alleged adverse racial impact of SB 14 was derived from statistical estimates of the relative numbers of Anglo, Black, and Hispanic voters who "do not possess SB14-compliant IDs." That is to say, of the 4.5% who may lack qualifying IDs, a disproportionate number are Black and Hispanic voters. Still, approximately the same number of Anglo registered voters (approx. 296,000) as the total of Black (approx. 128,000) and Hispanic (approx. 175,000) voters lack the requisite IDs. Put otherwise, approximately 2% of Anglo, 5.9% of Hispanic and 8.1% of Black voters comprise the 4.5% who lack SB 14 IDs but could vote with EICs; the law poses no obstacle for over 90% of minority voters.

Despite extraordinary efforts to find voters "disenfranchised" by SB 14, the DOJ could not uncover any, and no representative of the plaintiff organizations found any of their members unable to vote because of SB 14. Three plaintiffs claimed they could not vote in person under SB 14, but two of those qualified for ballots by mail. The plaintiffs' case thus turned on the

104

No. 14-41127

extent to which it could be estimated that those who do not possess SB 14 IDs would find it difficult to acquire EICs. It was assumed that the 4.5% overwhelmingly include the poor (of all races). There was expert testimony, unsupported by any hard data, that "the poor" are less likely to have actual or certified copies of birth certificates, the principal document required for an EIC. Obtaining birth certificates was testified to be challenging for the poor, especially those who had moved from their original birthplaces, but no estimates of this class's mobility were offered. Finally, even if the poor had birth certificates or obtained them, the district court found that travelling to DMV offices to procure EICs could be time-consuming, burdensome and interfere with hourly work schedules.

## II.   The Majority's Erroneous Discussion of Discriminatory Intent

SB 14 is a facially neutral law of general applicability, whose photo ID requirement poses no obstacle to the overwhelming majority of registered Texas voters. The law has a racially disparate impact upon a subset of minority voters. But there is "no smoking gun," not even code words that suggest discriminatory intent in the thousands of pages of legislative documents and deposition transcripts that the district court compelled the state to produce. The majority entirely ignores the total absence of direct evidence and, moreover, has to exclude (by force of precedent) the evidence most heavily relied on by the district court. Still, the majority finds "more than a scintilla of evidence" that could allow the district court on remand to condemn the law as, at least in part, racially motivated. I fully agree with Judge Clement's application of the *Arlington Heights* factors and will not repeat the discussion in her separate dissent. My additional disagreements are two-fold. First, the majority fails to follow the totality of Supreme Court precedents

105

No. 14-41127

pertaining to the interpretation of legislative intent.[5]  Second, the majority butchers, when it does not ignore, the relevant facts.

### A. Applicable Legal Principles

"[O]fficial action will not be held unconstitutional solely because it results in a racially disproportionate impact . . . . Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264–65, 97 S. Ct. 555, 563 (1983).  This is shared ground, as it is that *Arlington Heights* sets out certain factors that may be relevant to proving the intent of the legislature.

*Arlington Heights*'s discourse on proving discriminatory legislative intent does not exist in a vacuum.  There, the Court upheld a zoning board decision that prevented the construction of a low-income housing project in a Chicago suburb.  The facially neutral zoning order had a discriminatory impact on minorities who were more likely to inhabit the project.  The Court attempted to catalog how a legislative decision, and the steps leading to it, might display an impermissible motive.  Notably, in each case cited to exemplify its listed factors, discriminatory motive could be easily inferred.  A county closed public (heavily minority) schools while private segregated schools received financial support.[6]  A state constitutional amendment was passed to overturn laws that

---

[5] The majority also erroneously equates finding legislative intent with finding discrimination in employment cases. The intent of the legislature is a pastiche of each individual representative's views, mixed policies and motives.  An employer, in contrast, is held to have a single motive and policy. A facile equation of these two situations elides the difficulty in legislative cases, which the Supreme Court plumbed in cases described above.

[6] *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267, 97 S. Ct. 555, 564 (1977) (citing *Griffin v. Sch. Bd.*, 377 U.S. 218, 84 S. Ct. 1226 (1964)).

No. 14-41127

had recently banned discrimination in private home sales.[7]   And zoning regulations were immediately changed, or a moratorium on new construction declared, or land rezoned to park use when a public housing project was proposed.[8]   Highly relevant to legislative purpose, the Court held, but "extraordinary" because it could not normally be compelled, would be evidence of legislative history and legislators' contemporaneous statements.  *Id.* at 268. The Court applied its newly listed factors to a very ordinary and neutral zoning process and found no racially discriminatory purpose.   *Id.* at 269–71.

Nothing in *Arlington Heights* suggests that the Court's listing of relevant factors licenses courts to string together bits of circumstantial evidence that wholly lack racial content and then undo any law with an incidental disparate impact.  In *Arlington Heights*, the Court found no basis for doing so.

*Arlington Heights* followed *Washington v. Davis*, in which the Court held that purposeful discrimination is required to establish Equal Protection violations.  Despite evidence that four times more Blacks than Whites failed the District of Columbia's verbal proficiency test for police applicants, 426 U.S. 229, 237, 96 S. Ct. 2040, 2046 (1976), the Court found no purposeful discrimination, *id.* at 246.  "The test is neutral on its face and rationally may be said to serve a purpose the Government is constitutionally empowered to pursue." *Id.*  Other facts recounted how the District was attempting to recruit minority police officers.

Critical for this case is the Court's conclusion in *Washington v. Davis*:

---

[7]  *Id.* (citing *Reitman v. Mulkey*, 387 U.S. 369, 373–76, 87 S. Ct. 1627, 1629–31 (1967)).

[8]  *Id.* at nn.16–17 (citing *Kennedy Park Homes Ass'n v. City of Lackawanna*, 443 F.2d 108 (2d Cir. 1970); *Dailey v. City of Lawton*, 425 F.2d 1037 (10th Cir. 1970); *Progress Dev. Corp. v. Mitchell*, 286 F.2d 222 (7th Cir. 1961)).

No. 14-41127

> A rule that a statute designed to serve neutral ends is nevertheless
> invalid, absent compelling justification, if in practice it benefits or
> burdens one race more than another would be far-reaching and
> would raise serious questions about, and perhaps invalidate, a
> whole range of tax, welfare, public service, regulatory, and
> licensing statutes that may be more burdensome to the poor and
> to the average black than to the more affluent white.

*Id.* at 248. For precisely this reason, courts must walk a fine line between acknowledging discriminatory impact in a neutral law and discerning discriminatory purpose from nothing more than creative inferences.

Two years after *Arlington Heights*, the Court rejected inferring discrimination against women in a Massachusetts law that conferred an absolute lifetime state employment preference for veterans. *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 99 S. Ct. 2282 (1979).[9] The district court had found no overt sex-discriminatory purpose by the legislature but concluded that the consequences of the absolute-preference formula for women's employment opportunities "were too inevitable to have been 'unintended.'" *Id.* at 261. But the Court focused on the legitimate, noninvidious purpose of the law, which broadly included both male and female veterans, and it noted that significant numbers of male nonveterans were also disadvantaged by the law. *Id.* at 274–75.[10] The adverse impact of the law was gauged according to all the affected citizens, not just the minority group.

---

[9] A finding of discrimination had been remanded for reconsideration in light of *Washington v. Davis*. *Pers. Adm'r of Mass v. Feeney*, 442 U.S. 256, 260, 99 S. Ct. 2282, 2286 (1979).

[10] Justice Stevens's concurrence pointed out that about 2.8 million women were adversely affected by the law, but so were over 1.8 million men, a comparison he found significant "to refute the claim that the rule was intended to benefit males as a class over females as a class." *Id.* at 281.

No. 14-41127

Significantly, the Court rebuffed three arguments reminiscent of contentions advanced in this case to support a finding of discriminatory purpose.  First, even though the military may have historically discriminated against women, "the history of discrimination against women in the military is not on trial in this case."  *Id.* at 278; *see also Milliken v. Bradley*, 418 U.S. 717, 745, 94 S. Ct. 3112, 3127 (1974) (remedy cannot be imposed on other government bodies not having been shown to violate Constitution).  In other words, exogenous effects of past discrimination cannot be used to impute a contemporary discriminatory purpose.

Second, the Court held, discriminatory purpose:

> implies more than intent as volition or intent as awareness of consequences . . . .  It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group.  Yet nothing in the record demonstrated that this preference for veterans was originally devised or subsequently re-enacted because it would accomplish the collateral goal of keeping women in a stereotypic and predefined place in the Massachusetts Civil Service.

*Id.* at 279.  Thus, as in *Arlington Heights,* an absence of direct evidence of discriminatory intent should be compelling.

Third, the Court rejected the plaintiffs' complaint that the law was excessively broad, unfair, and controversial with a firm reminder that "the Fourteenth Amendment 'cannot be made a refuge from ill-advised laws.'"  *Id.* at 281 (internal citation omitted).  That a law might have been written differently with respect to impact does not condemn it under the Equal Protection Clause.

No. 14-41127

In a footnote, the Court acknowledged the possibility that a strong inference of discrimination could perhaps be drawn from a stark sex-based impact, but the Court cautioned that

> [i]n this inquiry—made as it is under the Constitution—an inference is a working tool, not a synonym for proof. When, as here, the impact is essentially an unavoidable consequence of a legislative policy that has in itself always been deemed to be legitimate, and when, as here, the statutory history and all of the available evidence affirmatively demonstrate the opposite, the inference simply fails to ripen into proof.

*Id.* at 279 n.25. Inferences cannot substitute for proof where the available evidence demonstrates no invidious intent.

The case before us falls comfortably in line with *Arlington Heights, Washington v. Davis,* and *Feeney.*[11] First, the facially neutral laws in each of those cases worked a far more dramatic disparate impact on minorities than does SB 14's specification of qualifying photo voter IDs. SB 14, after all, has no disparate impact on over 90% of all registered Black and Hispanic voters. Second, as in the Supreme Court cases, SB 14 has legitimate noninvidious purposes: ensuring the integrity of in-person balloting and public confidence in election outcomes. Third, as in *Washington v. Davis,* where surrounding circumstances confirmed an absence of discriminatory intent, 426 U.S. at 246–47, 96 S. Ct. at 2051, SB 14 authorized an EIC for all voters without drivers' licenses, presumably the poor, to satisfy the photo ID requirement. Fourth, as in *Feeney,* not only minority voters but an equal number of Anglo voters are

---

[11] It is true that the primary holdings in *Washington v. Davis* and *Feeney* worked out the relationship between disparate impact and the Equal Protection clause, but in each case, to uphold the law in question, the Court necessarily had to find no purposeful discrimination by the legislature. This discussion reflects that aspect of the decisions.

No. 14-41127

within the 4.5% who do not have qualifying IDs.  Fifth, in not one of those cases
did the Court require "proof" that the challenged statute was effective or the
best choice to achieve the legislative objective.   Instead, the Court in *Feeney*
admonished that the Fourteenth Amendment is not a "refuge from ill-
advised . . . laws."  442 U.S. at 281, 99 S. Ct. at 2297 (internal citation omitted).

The majority ignores the foregoing similarities between this case and the
governing trio of Supreme Court authorities.  In fact, following this trio, no
comparable federal court decision in forty years has found that any facially
neutral state law was passed with discriminatory purpose.[12]  The majority
opinion further defies those authorities by relying excessively on exogenous

---

[12]  *Cf. Hunter v. Underwood*, 471 U.S. 222, 105 S. Ct. 1916 (1985) (overturning an
Alabama constitutional provision dating from 1901 with abundant evidence of discriminatory
intent to disenfranchise Black felons); *Garza v. Cty. of L.A.*, 918 F.2d 763 (9th Cir. 1990)
(holding that action by a county, not a state legislature, to fragment Hispanic voting
population to perpetuate incumbencies amounted to intentional discrimination); *Harris v.
Siegelman*, 695 F. Supp.  517 (M.D. Ala. 1988) (finding intentional discrimination where
policies of: appointing only White poll officials; keeping electoral process closed to Black
citizens by law and through use of fraud, force, and intimidation; and retaining provisions
from racially inspired law requiring that voter seeking assistance swear oath to inspectors
that he or she is unable to write English language and limiting to five minutes time that
voter may remain inside voting booth amounted to intentional discrimination); *Baker v. City
of Kissimmee, Fla.*, 645 F. Supp. 571 (M.D. Fla. 1986) (holding that the city intentionally
discriminated against Black citizens by providing municipal services of street paving,
resurfacing, and maintenance to identifiable Black residential neighborhoods in a disparate
and unequal manner in violation of Equal Protection Clause, where about 63% of street
footage in Black neighborhoods was unpaved compared to about 39% in White neighborhoods,
and about 95% of resurfacing programs occurred in White neighborhoods compared to about
5% in Black neighborhoods).

Judge Costa attempts to explain away the absence of any comparable case in over
forty years declaring that a state legislature acted with discriminatory intent.  The presence
of preclearance under Section 5 in some jurisdictions does not explain why there are no
findings of purposeful discrimination by a state legislature either outside the jurisdictions
covered by preclearance or beyond the subject of voting regulations.  *Washington v. Davis*,
*Feeney*, and *Arlington Heights* all rejected discrimination claims not arising from voting
rights.  Like the majority, Judge Costa continues to fear de jure discrimination by states fifty
years after passage of the major federal civil rights laws in this country.

111

No. 14-41127

effects of discrimination and "long ago" legislative actions, and by authorizing a string of inferences to become a "synonym for proof" contrary to *Feeney*. *See id.* at 279 n.25.

But even if there were merit in the majority's inadequate reading of the Supreme Court's decisions, the "proof" adduced in support of the majority opinion is nonexistent.[13]   We move on to address the errors and omissions committed in the majority's analysis of the record.

### B. *Record Analysis*

The following section tracks each of the alleged "facts" from which the majority opinion draws inferences of discriminatory intent.

1. *"the record does not contain direct evidence . . . ."*

As the majority acknowledges, the record is barren of any "direct evidence that the Texas Legislature passed SB 14 with a racially invidious

---

[13] Judge Costa's separate opinion requires special comment to the extent it admits a "different starting point" for assessing a discriminatory purpose claim. In plain English, he argues a theory never litigated in this case, unsupported by any evidence, at odds with the Supreme Court's decision in *Feeney*, and unsupported by the only cases he relies on. After his lament about the duration of the instant litigation, there is no justification for bringing up points that are unpreserved, not briefed, and therefore not entitled to consideration on remand. Judge Costa's theory is that political partisanship can be tantamount to a proxy for discriminatory intent.   That is not what the Court held in *Feeney*: "'Discriminatory purpose' . . . implies more than intent as volition or intent as awareness of consequences." 442 U.S. at 279, 99 S. Ct. at 2296. The decisionmaker must have acted in part "because of," not merely "in spite of" the adverse effects of the legislation.   *Id.*   Judge Costa points to no evidence indicating such a discriminatory purpose to "suppress votes", as opposed to ensuring the voters' identity. Further, in the single case he relies on (and only the concurring opinion, at that), the district court found direct evidence of purposeful discrimination as well as partisanship. *Garza v. City of Los Angeles*, 918 F.2d 763, 767 n.1, 771 (9th Cir. 1990). Judge Costa (and the majority in fn.30) cite *Ketchum v. Byrne*, 740 F.2d 1398, 1408 (7th Cir. 1984), for the proposition that in factually egregious circumstances, local council redistricting to protect political incumbents might intentionally discriminate against minority voters. In *Ketchum*, however, the court refused to review the question of intentional discrimination after the district court had resolved the case under Section 2.  *Id.* at 1409.

112

No. 14-41127

purpose." After making this observation, the court quickly pivots to cataloguing various pieces of circumstantial evidence, but the majority fails to mention that the plaintiffs unearthed no direct evidence of discriminatory intent even after they were granted wide-ranging and invasive discovery into potentially privileged[14] internal correspondence of the Legislature. Indeed, legislators, their staff, and even the Lt. Governor produced thousands of documents, including office files, bill books, personal correspondence concerning SB14, access to personal and official email accounts, and e-mail communications between legislators and lawyers at the Texas Legislative Council.[15] Additionally, the plaintiffs took weeks of seven-hour-long

---

[14] In *Arlington Heights*, the Supreme Court cautioned that "judicial inquiries into legislative or executive motivation represent a substantial intrusion into the workings of other branches of government" and that "[p]lacing a decisionmaker on the stand is therefore 'usually to be avoided.'" 429 U.S. at 268 n.18, 97 S. Ct. at 565 n.18. "In some extraordinary instances . . . members might be called to the stand at trial to testify concerning the purpose of the official action, although even then such testimony frequently will be barred by privilege." *Id.* at 268.

Since *Arlington Heights*, courts frequently rely on the legislative privilege to repel attempts by plaintiffs to subject legislators to the burdens of civil litigation. *See In re Hubbard*, 803 F.3d 1298, 1307–08 (11th Cir. 2015) (quashing subpoenas for the production of documents served on legislators and a Governor in a First Amendment retaliation case); *Reeder v. Madigan*, 780 F.3d 799, 806 (7th Cir. 2015) (dismissing, based on legislative immunity, plaintiff's claim that the Illinois Senate violated his First Amendment rights by denying him media credentials); *Brown & Williamson Tobacco Corp. v. Williams*, 62 F.3d 408 (D.C. Cir. 1995) (quashing subpoenas for disclosure of subcommittee documents served on members of a Congressional subcommittee by private defendants in an unrelated civil lawsuit); *MINPECO, S.A. v. Conticommodity Servs., Inc.*, 844 F.2d 856 (D.C. Cir. 1988) (same).

In this case, however, the district court disregarded this authority and opted to take a piecemeal, balancing approach to the legislators' legislative privilege.

[15] *See, e.g.*, ROA 83316–17 (requesting from Senator Fraser "[a]ll documents related to communications between, among, or with you, the office of the Governor, the office of the Lt. Governor, the office of the Secretary of State, the Department of Public Safety, the office of the Texas Attorney General, any Legislator or Legislators, their staff or agents, lobbyists, groups, associations, organizations, or members of the public concerning the State of Texas's consideration of a requirement that voters present identification to cast a ballot, from January 1, 2005, through November 30, 2010).

113

No. 14-41127

depositions from over two dozen witnesses, including: eleven legislators and members of their staff[16] and over a dozen individuals from state agencies such as the Department of Public Safety, the Office of the Secretary of State, the Office of the Attorney General, and the Department of State Health Services. The record also contained twenty-nine depositions of legislators, their staff, and state agency officials that were taken in the SB 14 preclearance litigation; sixteen of these depositions were of the legislators themselves. Yet, this unprecedented and probing inquisition into reams of documents and hours of testimony uncovered not a single slip of the tongue or errant statement indicative of a racially discriminatory motive behind SB 14. Were SB 14 tainted by racially discriminatory intent, one would expect to find at least some hint of such invidious intent in the thousands of files and hours of deposition testimony, which were aggregated from a diverse cross-section of state officials. Instead, the evidence demonstrated just the opposite: that SB 14 was passed to deter voter fraud and promote ballot integrity, thereby increasing voter turnout.[17]

---

[16] Lt. Gov. Dewhurst (ROA 60999); Senator Dan Patrick (ROA 620987); Senator Robert Duncan (ROA 61062); Senator Troy Fraser (ROA 61168); Senator Tommy Williams (ROA 62692); Speaker Joe Straus (ROA 65509); Rep. Debbie Riddle (ROA 62219); Rep. Patricia Harless (ROA 61343); Bryan Hebert, General Counsel to the Lt. Governor (ROA 60999); Janice McCoy, Chief of Staff to Senator Troy Fraser (ROA 64226); and Colby Beuck, Chief of Staff to Rep. Harless (ROA 60918).

[17] *See* Lt. Gov. Dewhurst Dep. at 122 (ROA 61026) ("presenting the ID listed in Senate Bill 14 is a substantial improvement towards the goals that most people have, and that is to fight voter fraud, because all of these four points will show who the person is, divert voter fraud and to provide more confidence in the election process and result in a larger voter turnout."); Senator Patrick Dep. at 106 (ROA 62122) ("To protect the integrity of the ballot box—and pass a bill that the vast majority of people had indicated they wanted passed and believed should pass."); Senator Fraser Dep. at 174, 177 (ROA 61204–05) (agreeing that the purpose of SB 14 was to deter voter fraud and to "protect the integrity of the voting box"); Senator Duncan Dep. at 127–29 (ROA 61091) ("The purpose of the bill was to preserve ballot

No. 14-41127

This is not to say that circumstantial evidence of intent may be not used in proving intentional discrimination, *Arlington Heights*, 429 U.S. at 266, 97 S. Ct. at 564.  However, in this rare case where the plaintiffs engaged in a searching inquiry into the legislative process, the circumstantial evidence would have to be overwhelming to support a theory—not borne out by any direct evidence—that there was a vast but silent conspiracy to pass a racially discriminatory law that permeated both houses of the Legislature, the Lt. Governor's office, the Governor's office, and various state agencies.  *Cf. Price v. Austin Indep. Sch. Dist.*, 945 F.2d 1307, 1318 (5th Cir. 1991) (upholding a district court's no-discriminatory-intent finding concerning a school board's adoption of a student assignment plan and noting that when decisionmakers testify without invoking the privilege, "the logic of *Arlington Heights* suggests that" such direct evidence is "stronger than the circumstantial evidence proffered by the plaintiffs"); *see also Flemming v. Nestor*, 363 U.S. 603, 617, 80 S. Ct. 1367, 1377 (1960) ("[O]nly the clearest proof could suffice to establish the unconstitutionality of a statute on [the] ground [of improper legislative motive].  Judicial inquiries into Congressional motives are at best a hazardous matter, and when that inquiry seeks to go behind objective manifestations it becomes a dubious affair indeed.").

---

integrity and to prevent people from just basically harvesting voter ID cards or voter registration cards and using them to influence primary and general elections."); Senator Williams Dep. at 115 (ROA 62709) ("I think the purpose of the bill was to prevent in-person voter fraud.  That would include people who weren't citizens of the United States who tried to vote."); Rep. Straus Dep. at 49 (ROA 65521) ("I think just general voter ballot security just to be certain that those who were casting votes were doing so legitimately."); Rep. Harless Dep. at 85 (ROA 61359) ("I can't recall the answer of all the purposes of it, but mainly to provide for the integrity of the in-person voting by showing a photo ID."); Rep. Riddle Dep. at 68 (ROA 62228) ("It is critically important for us to maintain the integrity of the ballot box and for the voters to have 100 percent confidence in the integrity of the ballot box.").

No. 14-41127

**2.** _Quoting Senator Fraser as "knowing that the law would be subject to preclearance" and Mr. Hebert, Lt. Gov. Dewhurst's General Counsel, on talking points to senators, with implication these could be construed as masks for racist motives_

To the majority, "[t]here is evidence that the proponents of SB 14 were careful about what they said and wrote about the purposes of SB 14, knowing it would be challenged during the preclearance process under the Voting Rights Act." For this proposition, they highlight a statement by Senator Fraser, one of SB 14's authors, who testified that "the public legislative record would either go to the Department of Justice or a three-judge panel as a part of the [Voting Rights Act] Section 5 review process." Because Senator Fraser was "aware that everything that [he] was saying was part of a public record," the majority imply, it is unsurprising that no direct evidence of discrimination was found in the unprecedented legislative discovery.

The district court did not rely on Fraser's statements to explain away the lack of a "smoking gun" in the legislative record or discovery. _See Veasey v. Perry_, 71 F. Supp. 3d 627, 702 (S.D. Tex. 2014). At most, his testimony reflects simple and uncontroversial facts.

Senator Fraser's deposition excerpts were read into the record by the State during the _Veasey_ trial. The majority opinion quotes from the plaintiff's "cross-examination" portion. When asked if it was his belief "that the public legislative record would either go to the Department of Justice or a three-judge panel as part of the Section 5 review process," Senator Fraser testified that he "did believe it would go one of those two places." Senator Fraser was then asked if this made him consider "what sort of statements [he] made on the Senate Floor?" Senator Fraser did _not_ respond that he was especially careful in his floor statements about SB 14 or anything even close to that. Instead, he

116

No. 14-41127

simply responded that he "was aware that everything [he] was saying was part of the public record."

Senator Fraser's testimony does not support the inference that SB 14 proponents were unusually careful about what they wrote and said. Senator Fraser's awareness that the public legislative record would be scrutinized by the Justice Department or a three-judge court under the preclearance process is a statement of fact. Between 1975 and 2013, any change in Texas voting procedures had to be "approved by federal authorities in Washington, D.C.—either the Attorney General or a court of three judges." *Shelby Cty. v. Holder*, 133 S. Ct. 2612, 2620 (2013).

Senator Fraser's statement that he was aware that his Senate Floor statements would be part of the public record is also a fact. The legislative record is a matter of public record under the Texas Constitution. *See* TEX. CONST. art. III, § 12(a). The Texas Senate Staff Services office makes the audio recordings of all Senate Floor proceedings available to the public free of charge.

Most importantly, however, the facts conveyed by Senator Fraser are not probative about why the unprecedented discovery into the private correspondence and documents of SB 14 proponents turned up no evidence of discriminatory intent. Senator Fraser's testimony deals with public records and floor statements. It says nothing about why SB 14 proponents would have censored themselves *privately*. Based on *Arlington Heights*, no one could have predicted a federal court would order such unprecedented discovery from Senator Fraser or the Legislature.

The majority also emphasizes a piece of deposition testimony by Bryan Hebert, the deputy general counsel for the Lt. Governor, that he sent an email reminding senators to emphasize the "detection and deterrence of fraud and protecting public confidence in elections as the goal of SB 14."

117

No. 14-41127

Once again, the district court did not rely on this statement of Mr. Hebert. *See Veasey v. Perry*, 71 F. Supp. 3d at 702. Hebert's statement was made in an email sent to various Senate staffers laying out plans for the floor debate on SB 14. He characterized it as "an attempt to—at best . . . outline . . . how things might go." Stressing the detection and deterrence of fraud and promoting public confidence in elections was listed as a "floor task" because, as Hebert understood it, "that was the goal of the bill."

Hebert's statement is not probative of why there would be no evidence turned up in the private legislative discovery. Hebert's statement merely urges the use of talking points in Senate Floor speeches. Politicians emphasize and reemphasize talking points because they are effective, not because they are seeking to cover up ulterior motives. *See Citizens United v. FEC*, 558 U.S. 310, 364, 130 S. Ct. 876, 912 (2010) ("[S]ound bites, talking points, and scripted messages . . . dominate the 24–hour news cycle."). Hebert's statement offers no support for the proposition that the plaintiffs' failure to uncover evidence of discrimination can be ascribed to a cover-up by SB 14 proponents.

### 3. *Legislators were "aware" of racial disparate impact*

The majority opinion also contends that SB 14 proponents were aware of the disproportionate impact it would have on minority voters. The majority relies on three statements. First, in his deposition, Representative Todd Smith, a proponent of SB 14 in the Texas House of Representatives, was asked if he recalled the conclusions of studies he read about the effect of voter ID laws on minorities. Smith testified that he did not recall the conclusions, but that "there's a study for every conclusion that you want to reach." Smith then more or less volunteered that, in his opinion, it was "common sense" that "the people

118

No. 14-41127

that do not have photo IDs [are] more likely to be minority."[18]     Second, Hebert
testified that it was "possible" that an indigency affidavit provision would have
reduced the burden on poor voters and that he suspected, but did not know,
that poor voters were disproportionately minority.     Contemporaneous with
SB 14's passage, Hebert prepared a memo for other Senate staffers in which
he opined that it was doubtful that SB 14 would be precleared by the Justice
Department without additional IDs.     His memo is entirely an opinion
predicated on a comparison of SB 14 to a Georgia voter ID law that obtained
preclearance.     It provides only some support for the proposition that the
disparate impact of SB 14 was known among legislative staffers.     Unmentioned
by the majority (or the district court) is Hebert's further opinion that though
he was "unclear" how a three-judge court might rule, they "might be more
favorable" to preclearing the law.[19]

    These three statements were the universe relied upon by the district
court for the proposition that it was "clear that the legislature knew that
minorities would be most affected by the voter ID law."     *Veasey v. Perry*,
71 F. Supp. 3d at 657–58.

    The majority opinion uses the "common sense" opinion of a member of
the Texas House of Representatives and the "suspicions" of the Lt. Governor's
deputy general counsel to leap to the conclusion that "the drafters and
proponents of SB 14 were aware of the likely disproportionate effect of the law
on minorities."     Even if these statements were enough to imply knowledge on

---

[18]  Representative Smith's "common sense" was only partially accurate because nearly
half of those lacking SB 14 ID are White.

[19]   The majority wisely does not rely—as the district court did—on the fleeting
statement of Senator Rodney Ellis, an SB 14 opponent, who speculated that "[i]n my mind, I
think . . . they knew the bill had a disparate impact."

No. 14-41127

the part of the entire Texas Legislature, however, awareness of the disparate impact of a law does not prove a legislature's intent to discriminate. *Feeney*, 442 U.S. at 279, 279 n.25, 99 S. Ct. at 2296, 2296 n.25; *Lewis v. Ascension Parish Sch. Bd.*, 662 F.3d 343, 349 (5th Cir. 2011) (per curiam).

> 4. <u>Senator Fraser believes the Voting Rights Act has outlived its useful life; Senator Fraser "not advised" about possible disparate impact; Proponents have "largely refused to explain the rejection of 'ameliorative' amendments," an attitude that was "out of character for sponsors of major bills"</u>

Senator Fraser indeed testified at his deposition that he believed the Voting Rights Act had "outlived its useful life"; the district court did not rely on this statement, and with good reason, too, since it has no probative value. Nowhere in his deposition did Senator Fraser state that SB 14 sought to defy the Voting Rights Act because of the law's perceived obsolescence. And it is odd to hold up his personal opinion of the Act's obsolescence for an inference of purposeful discrimination when it is, in part, shared by a majority of the Supreme Court. *See Shelby Cty.*, 133 S. Ct. at 2628.

Evidence that Senator Fraser answered questions about SB 14's disparate impact with "I am not advised" is also not probative of discriminatory intent. Senator Fraser was asked on the Senate floor if the "elimination of government documents as a form of ID [will] disproportionately affect African Americans and Hispanics?" He responded, "I am not advised," but he also testified that such an answer merely indicates that the speaker does "not have sufficient information to answer [the] question."

The district court relied on a statement from the bill's opponent, Senator Ellis, that answering "I am not advised" was "out of character" for the sponsor of a major bill, which indicated to him that Senator Fraser "drew the

120

No. 14-41127

straw." S*ee Veasey v. Perry*, 71 F. Supp. 3d at 647. It is frankly difficult to tell what Senator Ellis meant by the comment that Senator Fraser drew the straw. But in no way does Senator Ellis imply that Senator Fraser acted with discriminatory intent. Just the opposite, in fact. Senator Ellis refers to Senator Fraser as his "friend." Senator Ellis acknowledges that Senator Fraser stated on the Senate Floor that he did not intend SB 14 to have a disparate impact, and Senator Ellis himself said on the *Senate Floor that he did not believe Senator Fraser intended SB 14 to have a disparate impact.*

The majority states that "[a]nother senator [then-Senator Dan Patrick] admitted at his deposition that he and other proponents of SB 14 voted to table numerous amendments meant to expand the types of accepted IDs, expand the operating hours of DPS stations issuing voter IDs, delay implementation of SB 14 until an impact study had been completed, and other ameliorative measures." This is a fact; there is no doubt that a number of amendments were rejected and that the bill's opponents generally felt that these rejections were inadequately explained. *See id.* at 646–47. But it is incorrect to connect the rejection of amendments with Senator Ellis's "out of character for major bills" comment. Senator Ellis's comment referred only to Senator Fraser's "I am not advised" answers.

5. *Dr. Vernon Burton ties excuse of preventing voter fraud to "Texas's history of racial voter suppression"*

The majority notes that Dr. Vernon Burton ties the excuse of preventing voter fraud to Texas's history of racial voter suppression. In both his expert report and testimony, he specifically focused on: (1) all-White primaries; (2) secret ballots; (3) poll taxes; and (4) re-registration and voter purges. In each instance, the majority notes, Burton testified that the laws' stated

121

No. 14-41127

rationale was to prevent voter fraud. From this, the majority contends it would be possible to infer the Texas Legislature's alleged discriminatory intent in enacting SB 14 half a century later because the stated rationale was also the prevention of voter fraud.

This recitation stands at odds with the rest of the majority's opinion, which expressly disavows the district court's reliance on "Texas's use of all-[W]hite primaries from 1895–1944, literacy tests and secret ballots from 1905–1970, and poll taxes from 1902–1966" because "the district court relied too heavily on the evidence of State-sponsored discrimination dating back hundreds of years." As for the re-registration and voter purges, Dr. Burton's expert report and testimony indicate these refer to the Texas Legislature's passing a re-registration law in 1966 that was found unconstitutional in 1971[20] and to a voter purge law enacted in 1975 that was denied preclearance and immediately enjoined—41 years ago.[21] It flies in the face of the majority's conclusion that "the district court's disproportionate reliance on long-ago history was error," to now smuggle in the very same "decades-old data and eradicated practices" in support of a finding of intentional discrimination. *Shelby Cty.*, 133 S. Ct. at 2627–29; *see also Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 201–04, 129 S. Ct. 2504, 2511–12 (2009).

---

[20] *See Beare v. Smith*, 321 F. Supp. 1100 (S.D. Tex. 1971), *aff'd sub nom. Beare v. Briscoe*, 498 F.2d 244 (5th Cir. 1974).

[21] *See Flowers v. Wiley*, S-75-103-CA (E.D. Tex. 1975); *see also Flowers v. Wiley*, 675 F.2d 704, 705–06 (5th Cir. 1982) (discussing history of law in the attorneys' fees portion of the case); Robert Brischetto et al., *Texas*, *in* QUIET REVOLUTION IN THE SOUTH: THE IMPACT OF THE VOTING RIGHTS ACT, 1965-1990, 233, 240 (Chandler Davis & Bernard Grofman eds., 1994) (book cited in Burton expert report summarizing this history).

No. 14-41127

6. *"Radical departures from normal legislative process" that were "virtually unprecedented"*

The majority claims that "SB 14 was subject to numerous and radical procedural departures" that were "virtually unprecedented."  The majority has no support, except the district court's opinion, for its conclusion.  The district court, in turn, relies only on the speculations of opposition legislators, many of whom are plaintiffs in this case, as to the procedural motivations underlying SB 14's passage.  *See Veasey v. Perry*, 71 F. Supp. 3d at 647–51.  The majority expressly condemns the district court because it "mistakenly relied in part on speculation by the bill's opponents about proponents' motives," yet it condones precisely such speculation here.  Sadly, neither the majority nor the district court tells the entire legislative saga as contained in the record.

Most of the district court's pre-2011 legislative history citations are to public websites that show only the results of votes, not to the record or expert reports that chronicle the drama behind those results.  *See, e.g., id.* at 645–46 nn.71–77.  The entire story appears from expert reports offered for the plaintiffs (Drs. Lichtman and Davidson) and the testimony of Lt. Gov. Dewhurst, which are necessary to understand the 2011 actions taken by the Legislature.

First, a bit of background in how the Texas Senate considers legislation is necessary.  At the start of the session, the Senate adopts by majority vote rules that will govern its business during the session.  These rules are usually rolled over from the prior session and then tweaked accordingly.  One rule that has been consistently adopted since World War II is the "two-thirds rule."  Under ordinary rules, the Senate can only consider legislation in the order in which it appears on the calendar.  However, two-thirds of senators present and

123

No. 14-41127

voting may vote to suspend the usual order of business and consider other
business out of turn.  In practice, there is basically a two-thirds requirement
to consider bills in the Texas Senate, analogous to the cloture rule in the U.S.
Senate.  This occurs because of "blocker bills."  A blocker bill is a routine or
non-controversial bill, such as one dealing with landscaping at the Capitol or
the decorations in the Senate Chamber, that is placed first on the agenda.  It
is intentionally almost never passed.   To get around the blocker bill and
consider legislation following it on the agenda, a two-thirds vote is required to
suspend the usual order of business.  After receiving the required two-thirds
vote, the legislation can be passed by a majority vote.  In a chamber with
31 senators, 11 can block under the two-thirds rule.  As will be discussed, there
are various ways around the two-thirds rule, many of which are commonly
employed.

Beginning before the 2005 session of the Texas Legislature, opinion polls
showed that a large majority of Texans supported photo voter ID laws.
Further, Texas officials believed that some Texans simply did not vote because
they did not have confidence in the system or that their votes would matter.
To address these related concerns, proponents of a voter ID law began to
negotiate with opponents—almost uniformly Democrats—about a compromise
bill that could pass both houses and become law in accordance with the
overwhelming public opinion of the citizenry in Texas.  Despite voicing private
support for a bill, adding language they believed would address some of their
concerns, and general efforts on the part of proponents to compromise,
opponents remained intransigent.  They even voiced private concerns that they
were "upside down" in their opposition despite strong public support for a bill,
but held out because they feared primary opponents if they voted in favor of a
voter ID bill.

No. 14-41127

Against this backdrop, the Legislature proposed the first iteration of a voter ID bill in 2005. The majority ignores it, and the district court says only that "[t]he bill, after being reported out of the Elections Committee, passed the House but died in the Senate Committee on State Affairs." *Id.* at 645. What actually happened is that after the bill passed the Texas House, proponents in the Senate attached it to another elections bill in order to avoid the two-thirds rule in the Senate, which is a common legislative maneuver on related bills. Senator Rodney Ellis vowed to filibuster the combined bill, and even came to the Senate Chamber wearing tennis shoes and a catheter to comply with Senate prohibitions against sitting and restroom breaks during floor speeches. Before his filibuster could begin, however, opposition Senator Leticia Van de Putte invoked a germaneness rule and the combined bill was withdrawn. The voter ID bill was then sent to a House-Senate conference committee, but it was delayed behind several other important measures and could not be considered before the end of the session.

Voter ID was reintroduced in the 2007 legislative session and passed the Texas House. Regarding the Senate, the majority says nothing and the district court says only that it was reported out of committee and "[w]hile the rules were initially suspended to take it up out of order for second reading, the vote was reconsidered and the measure failed. The rules were not suspended, at which point the bill died." *Id.* at 646.[22] The true story is far more enthralling than the district court's sterile recitation.

Eleven opponents of the bill—all Democrats—had pledged going into the session, as was their legislative prerogative, to block any voter ID bill under

---

[22] The "rules . . . initially suspended" that the district court refers to is the two-thirds rule; thus, "suspending the rules" refers to getting two-thirds to move a bill past a blocker bill, which would be considered first under ordinary rules.

No. 14-41127

the two-thirds rule even though Lt. Governor Dewhurst had attempted to reach a compromise with them before the session on the substance of the bill. However, opposition Senator Mario Gallegos was having complications from a liver transplant, which meant that Democrat opponents lacked the votes to block the bill in his absence. Against the advice of his doctors, Gallegos returned to Austin for the session specifically so he could vote against the voter ID bill. Senator Bob Deuell, a Republican and proponent of the bill, paid to have a medical supply company put a hospital bed in a room adjacent to the Senate chamber for Gallegos. Lt. Gov. David Dewhurst, also a Republican, agreed to give Gallegos 24-hour notice before any vote on the voter ID bill would occur.

Meanwhile, Democrat Senator Carlos Uresti became bedridden with the flu during the session. He was absent from the floor on May 15, 2007, when Senator Fraser, the voter ID bill's sponsor, moved to suspend the regular order of business to consider the bill, which required the two-thirds vote. Dewhurst testified that it is a "fairly common legislative practice" to "try and move your bill when you have the votes on the floor" and that it happens at least monthly in every legislative session. The opponents could not block the bill and it passed, with Senator Gallegos voting against it, 19-9 (just one more than two-thirds). Democrat Senator Whitmire was also not on the floor, and Lt. Governor Dewhurst called on him numerous times before skipping him in the vote. Meanwhile, Senator Uresti, alerted about the vote by another senator, hastily returned to the Senate chambers as the vote was occurring, but initially missed it.

After the vote had been held and the gavel fell, Democrat Senator Shapleigh moved to verify the vote on the grounds that Senator Whitmire had actually been present for the vote and was improperly skipped. Lt. Governor

No. 14-41127

Dewhurst testified that he accommodated the request because he knew "that this [was] an important bill to the Democrats and to the Republicans," and he "didn't want controversy."    He "bent over backwards to respect [Senator Whitmire] and his statement" that he was actually on the floor, so a verification (i.e. second) vote was held.  This allowed all 11 opposition senators to vote against it, with Senator Uresti sprinting up the Capitol steps to reach the floor just in time for the vote and Senator Whitmire also returning to the floor.  The final vote was 20-11 (just short of two-thirds).  No further action was taken on voter ID in the 2007 session after the verification vote failed under the two-thirds rule.

Before the 2009 session, where voter ID would again be on the agenda, Lt. Governor Dewhurst again reached out to Democrats in the Senate who had opposed legislation in 2005 and 2007.  This was to no avail, as opponents remained entrenched.  At the beginning of the session, to avoid the two-thirds rule that had thwarted legislation in 2007, the Senate adopted a rules change that allowed voter ID legislation to proceed under a simple majority vote instead.  The rules change was made by majority vote.  Senator Shapleigh raised two points of order objecting to the rules change, but Lt. Governor Dewhurst overruled them "[b]ecause the rules of the Senate permitted a majority of the Senators to change the Senate rules, so . . . [this change] was entirely within the tradition and rules of the Senate."   According to Karina Davis, the Senate Parliamentarian, the Senate has only designated two categories of bills for such special treatment since 1981:  redistricting and voter ID.  Notably, both of these categories have to do with elections.  This makes sense, as such matters cut to the very heart of how a representative democracy will function and concern the "highly political judgments," *Bartlett v. Strickland*, 556 U.S. 1, 17, 129 S. Ct. 1231, 1245 (2009) (citation omitted),

No. 14-41127

for which two-thirds agreement is unlikely. Further, even though the two-thirds rule has been suspended by special treatment in only these two categories, the legislative history of the Senate is replete with examples since World War II of Lt. Governors who got the Senate to pass the blocker bill, thereby enabling majority votes on later legislation under the Senate's normal rules.[23]

Beginning on March 10, 2009, the Senate held a 23-hour hearing on the proposed bill that lasted until 6 AM the next morning, at which members of the public could testify. At the hearing's conclusion, the bill passed the Senate. This time, however, the House would be the source of voter ID's demise. House leaders expressed a willingness to compromise, and included many so-called ameliorative measures and a provision to delay implementation until 2013 of whatever passed. Thwarted by opposition in both parties, House leaders instead moved the bill the Senate passed. House opponents decided on a strategy called "chubbing" to kill the bill.[24] This was successful, as House opponents chubbed for 26 hours[25] over five days and prevented over 200 bills,

---

[23] The 2009 rules change also provided that voter ID legislation would be referred to the Senate Committee of the Whole (i.e. the entire Senate) rather than traditional committee structures. More on that to come.

[24] Chubbing in the Texas House is analogous to filibustering in the Texas Senate. With a filibuster, a single senator speaks on a topic for a long amount of time in order to prevent further consideration. House rules prevent filibustering, but allow any representative the ability to speak for 10 minutes on any bill he favors. To chub, representatives use their allotted 10 minutes to speak in favor of any and all legislation, routine or not, that is considered before the target bill. When multiple representatives combine their speaking privileges across multiple bills, they are able to run the clock out on target legislation slated to be considered later in the session.

[25] There are apparently no records kept on the historical number or length of chubs in the Texas House, but information is kept on the number and length of analogous filibusters in the Texas Senate. To put the 26 hour chub into context, witness in this case and former State Senator Wendy Davis's 2013 filibuster against abortion legislation lasted just 11 hours.

No. 14-41127

including voter ID, from being passed.   Governor Perry considered, but
ultimately decided against, placing voter ID on the agenda for the special
legislative session he later called.

After the 2009 session again ended without a bill's being passed, voter
ID proponents decided that the 2011 session would be different.   After
repeatedly reaching out to opponents, incorporating some of their
amendments/suggestions, and repeatedly being rebuffed by extraordinary
legislative maneuvering, proponents decided to pass whatever law they could
that was modeled after Indiana's law that had been upheld by the Supreme
Court in *Crawford*[26] and Georgia's law that had received preclearance from the
Department of Justice.   The majority and the district court indict Texas for
supposedly being unresponsive to opposition needs and for introducing
increasingly strict bills.   At least equally plausible is that proponents perceived
a legislative necessity in the face of intransigence on this "wedge issue that the
Democrats were not going to agree to regardless of the fact . . . [that] a super
majority of Texas voters [of all races] were in favor of Voter ID."   As the district
court put it, "the political lives of some legislators depended upon" voter ID's
success.   *Veasey v. Perry*, 71 F. Supp. 3d at 658.

To that end, Governor Perry designated voter ID legislation as an
emergency.   He said in February 2010: "I might as well put [the Legislature]

---

A 26 hour chub, were it a filibuster, would be good for the sixth longest filibuster in the
history of the Texas Senate and longest since the record (43 hours) was set in 1977.   *See
Filibusters and Chubbing*, LEGISLATIVE REFERENCE LIBRARY OF TEXAS,
http://www.lrl.state.tx.us/whatsNew/client/index.cfm/2011/5/23/Filibusters-and-Chubbing
(last visited June 27, 2016).

[26]   As demonstrated by the Attorney General of Indiana as amicus in this case, the
Indiana and Texas laws are not meaningfully different.   *See* Brief of the States of Indiana, et
al. as Amici Curiae at 12–16, *Veasey v. Abbott*, No. 14-41127 (5th Cir.   Apr. 29, 2016).

No. 14-41127

on notice today: We're going to do voter ID in 2011. We can either do it early,
or we can do it late. [The Legislature's] call." The emergency designation
permitted, but did not require, voter ID legislation to be considered during the
first 60 days of the 2011 session.[27] It also meant that the Legislature could
reasonably believe it would be called back into a special session if voter ID
legislation was not passed during the regular session. Considering the
legislation early in the session, however, had a tactical advantage because it
would prevent opponents from chubbing as they had done in 2009. Both
Democrats and Republicans also thought that passing the legislation early in
the session would "get this issue behind them" so that there "wouldn't [be] spill-
over on other issues" for which there was a chance of bipartisan cooperation.[28]
Proponents also noted that opposition protestations to early consideration
were likely stall tactics similar to those employed in the prior three sessions.
The bill[29] was designated a priority of the Lt. Governor and accordingly
assigned a low bill number, but this does not "expedite consideration of the bill
in any way except for putting members on notice that it's one of [the Lt.
Governor's] priorities." The majority takes issue with the Senate's
consideration of SB 14 by the Committee of the Whole (i.e. the entire Senate)
rather than through its traditional committee structure. However, this was
done because the legislation was going to be considered on an expedited basis,

_____

[27] Eminent domain legislation, along with perhaps a couple of other topics, were also
designated emergencies for the 2011 session.

[28] Further, all of the emergency legislation was considered early in the 2011 session.

[29] Actually, nine photo voter ID bills were filed in the Senate, but Lt. Governor
Dewhurst selected Senator Fraser's and asked him to refile it as priority legislation. Senator
Fraser had been the Senate sponsor of previous bills that failed. That there were so many
bills filed demonstrates just how politically important voter ID legislation was.

No. 14-41127

and this is a commonly used and effective way to disseminate information about such legislation to the entire Senate.[30]  Far from being "unusual," as the district court described it, *Veasey v. Perry*, 71 F. Supp. 3d at 648, it had been used for issues such as school finance and redistricting within the past decade before 2011.

To avoid what happened in 2007, the Senate rolled forward the rule from the 2009 session that allowed voter ID bills to be considered by simple majority rather than two-thirds vote.  The majority faults the Legislature for this, but the decision is easily explainable on political grounds—the majority party wanted to avoid the two-thirds rule that had blocked similar legislation in a prior session.[31]  Further, as just discussed, the Legislature could reasonably believe that Governor Perry would call an emergency session to consider voter ID legislation if not passed during the regular session.  The two-thirds rule does not apply during special sessions because blocker bills cannot be filed, as

---

[30]  Additionally, legislation considered in the Committee of the Whole can be referred to the entire Senate after just 24 hours, so it is important to ensure the entire Senate has all important information it needs.

[31]  As if further evidence is necessary to show that the suspension of the two-thirds rule was for political motivations, and not racially discriminatory ones, it is notable that the Texas Senate (by majority vote) completely did away with the two-thirds rule in the 2015 session.  It is now the three-fifths rule, which has the effect of reducing from 21 to 19 the number of Senators necessary to move legislation past a blocker bill.  Under the new threshold in the 2015 session, the Texas Senate was able to pass Republican political priorities such as open carry, campus carry, moving the public integrity unit from the Travis County District Attorney's Office to the Texas Rangers, and an A-F grading system for public schools.  All of these bills had been designated, as SB 14 was in 2011, priority legislation by the Lt. Governor and assigned correspondingly low bill numbers.  Ironically, Democrats also passed a few bills out of the Senate under the new three-fifths rule that would have been blocked under the old two-thirds rule, including one that would make it easier for some state employees to work from home and have more flexible work hours.  *See* Aman Batheja, *Without Two-Thirds Rule, Senate Moving Patrick's Priorities*, TEX. TRIB. (May 19, 2015), https://www.texastribune.org/2015/05/19/loss-two-thirds-rule-senate/.

No. 14-41127

was the case in the 2011 special session that considered redistricting legislation. Voter ID was going to be considered without the two-thirds rule one way or the other.[32]

This history thoroughly explains why voter ID legislation as eventually contained in SB 14—which the majority dismisses as not "a problem of great magnitude"—was considered before what the majority believes are other "pressing matters of great importance to Texas." In addition, the 2011 bill that eventually turned into SB 14 contained several notable provisions. First, in an effort to combat multiple types of voter fraud, a provision was included that would have addressed voter registration fraud, in addition to just in-person fraud that voter ID laws combat. This provision was removed because the Senate has a one-subject rule that prohibited it from addressing this other type of fraud in SB 14. Next, several provisions in SB 14 were inserted into prior voter ID legislation at the behest of members of the Democrat minority. For example, Senators Gallegos and Shapleigh were concerned about voter ID's impact on the elderly, so proponents inserted age exemptions into the version of SB 14 that passed the Senate. Additionally, opponents' concern for the law's impact on the poor during prior iterations of the bill led soon afterwards to the elimination of charges for ID and underlying documents. Thus, contrary to what the majority asserts, SB 14 was neither unresponsive to the concerns of legislative minorities nor was there a lack of motivation to address other types of fraud besides in-person fraud.

---

[32] Additionally, in order to pass a budget, the two-thirds rule was suspended in *the 2011 session* by a procedural move different from that used to suspend it for SB 14. *See* Ross Ramsey, *Failed Budget Vote Threatens Texas Senate Tradition*, TEX. TRIB. (May 3, 2011), https://www.texastribune.org/2011/05/03/failed-budget-vote-threatens-senate-tradition/. The majority reads way too much into the suspension of the two-thirds rule.

No. 14-41127

7. *Second guessing legislative priorities and why Texas Legislature prioritized remedy for voter fraud without compelling evidence*

Ignoring the legislative history of voter ID during three previous legislative sessions, the majority chides the 2011 Legislature for prioritizing SB 14 in a busy session without—in the majority's view—sufficient evidence that there is a problem of in-person voter fraud in Texas to justify SB 14. The court critiques that SB 14 did not single out mail-in ballots for a special degree of scrutiny. Of course, as the majority itself rightly notes, "[t]he Legislature is entitled to set whatever priorities it wishes." These gratuitous observations about legislative prioritization are therefore beside the point as the federal courts lack the expertise or authority to question a legislature's prioritization of various issues. Recall too, that the Legislature also wanted to address other types of fraud, such as registration fraud, but was prevented from doing so because of one voter ID opponent's objection based on one-subject rules for legislation.

More significant, however, in *Crawford,* the Supreme Court flatly rejected the majority's intimation that record evidence of voter fraud is required to justify the State's interest in preventing voter fraud. 553 U.S. at 195–97, 128 S. Ct. at 1619–20. Indeed, the Court upheld Indiana's voter ID law in *Crawford* although the record there contained "no evidence of any such fraud actually occurring in Indiana at any time in its history." *Id.* at 194. The Court instead noted that "flagrant examples of such fraud in other parts of the country," occasional examples of more recent voter fraud, and Indiana's example of voter fraud in the 2003 Democratic primary perpetrated by absentee ballots "demonstrate that not only is the risk of voter fraud real but that it could affect the outcome of a close election." *Id.* at 195–96. *Crawford*

133

No. 14-41127

teaches that the prevention of in-person voter fraud is a valid legislative purpose irrespective of the number of instances of voter fraud in the record. Accordingly, neither the Legislature's prioritization of SB 14 nor the majority's concern that there are few instances of proven in-person voter fraud in Texas supports any reasonable inference that SB 14 was passed with racially discriminatory intent.

8. *"While cloaking themselves in the mantle of following Indiana's voter ID law . . . the proponents of SB 14 took out all the ameliorative provisions of the Indiana law"*

The majority seeks to resist the import of *Crawford* by arguing that Texas's voter ID law is different because it lacks some ameliorative provisions for indigents that were present in Indiana's law. The majority takes issue, generally, with the Legislature's rejection of various amendments that would have permitted additional forms of ID to be used and allowed the use of IDs with irregularities. The majority also takes issue, specifically, with the House of Representatives' removal of Senator Duncan's amendment, which would have required a provisional ballot to be accepted if the person simultaneously executes an affidavit stating that he or she is indigent and cannot obtain proof of identification without paying the fee. *See* S.J. of Tex., 82nd Leg., R.S. 137–38 (2011).

Setting aside the fact that the majority's criticism amounts to second-guessing the policy choices of the state legislature, the fact that the Legislature did not adopt certain ameliorative amendments tells us nothing about *why* the Legislature so acted. And it certainly provides no basis to infer that the Legislature rejected these various amendments *because* it, collectively, was motivated by racial animus; this remains true even if legislators knew that

No. 14-41127

some of the proposed amendments would make it easier for indigents to obtain ID.[33]

Even if, notwithstanding *Crawford*, the presence or absence of an indigency exception is a matter of constitutional significance, SB 14 *does* contain ameliorative provisions for indigent persons.[34] Election identification certificates, which may be properly used as a form of ID, TEX. ELEC. CODE § 63.0101 (West Supp. 2014), are available free of charge and have been since the bill was signed into law, TEX. TRANSP. CODE § 521A.001(b) (West 2013). The Legislature also passed SB 983, which eliminates the fee associated with obtaining a certified copy of a birth certificate in order to obtain an EIC. TEX. HEALTH & SAFETY CODE § 191.0046(e) (West 2015). These provisions eliminate fees associated with obtaining the underlying documents necessary to obtain the EIC. There is no showing whatsoever that the Legislature tried to authorize EICs that in practice would not facilitate indigent voters.[35]

---

[33] *See Feeney*, 442 U.S. at 279, 99 S. Ct. at 2296 (awareness of potential disparate impact is not enough to prove intent). *Feeney* also held that the legislature's failure to pass a bill with less discriminatory impact cannot evidence invidious purpose: the courts are not empowered to disapprove laws under the Equal Protection clause for this reason. *Id.* at 280–81.

[34] To reiterate, the Indiana law and the Texas law really aren't that different; and many of the "ameliorative" provisions that were rejected were in fact contained in earlier iterations of the bills introduced in 2005, 2007, and 2009, at the behest of Democrats, but the Democrats opposed those bills anyway.

[35] Furthermore, while Texas may have a comparatively strict law in terms of what ID may be presented, its election laws are quite permissive regarding encouraging voter turnout.

These provisions include: an approximately two week early voting period with no restrictions, TEX. ELEC. CODE § 85.001(a), wide availability of voter registration applications, see *Request for Voter Registration Applications*, TEX. SEC'Y OF ST., http://www.sos.state.tx.us/elections/voter/reqvr.shtml (last visited June 28, 2016) (providing online voter registration applications), and the flexibility of mail-in ballots without photo ID requirements for the elderly and disabled, TEX. ELEC. CODE §§ 82.002–003. Taken in "context," it is as easy, if not easier, to register and vote in Texas than it is in many other states.

135

No. 14-41127

9.  *"Contemporary examples of state-sponsored discrimination"*

The majority asserts that "[t]he circumstantial evidence of discriminatory intent is augmented by contemporary examples of State-sponsored discrimination in the record."  It then goes on to cite several examples, taken from the district court's opinion, of alleged recent discrimination by Texas against minorities.  This recitation is riddled with errors and on examination, disintegrates into forty-plus year old actions.

The majority first claims that "as late as 1975, Texas attempted to suppress minority voting through purging the voter rolls, after its former poll tax and re-registration requirements were ruled unconstitutional." (citing *Veasey v. Perry*, 71 F. Supp. 3d at 635).    Thus, the most "contemporary" example that the majority or district court can cite was in 1975.

In its next attempt to find recent examples of intentional discrimination on the part of Texas, the majority credits the district court's statement that "[i]n every redistricting cycle since 1970, Texas has been found to have violated the VRA with racially gerrymandered districts."  (quoting *Veasey v. Perry*, 71 F. Supp. 3d at 636 & n.23).  This assertion is just plain wrong.  The district court cites five cases as support:  *LULAC v. Perry*, 548 U.S. 399, 126 S. Ct. 2594 (2006) (2000 census redistricting); *Bush v. Vera*, 517 U.S. 952, 116 S. Ct. 1941 (1996) (1990 census redistricting); *Upham v. Seamon*, 456 U.S. 37, 102 S. Ct. 1518 (1982) (1980 census redistricting); *White v. Weiser*, 412 U.S. 783, 93 S. Ct. 2348 (1973) (1970 census federal redistricting); *White v. Regester*, 412 U.S. 755, 93 S. Ct. 2332 (1973) (1970 census state redistricting).  In *LULAC v. Perry*, the Supreme Court applied Section 2 and *upheld* a majority-Black district but struck down another district as dilutive against Latinos even though the Texas

No. 14-41127

Legislature had drawn *another* majority-Latino district to remedy the dilution. In *Bush v. Vera*, the Legislature's plan received preclearance, yet the Court found racial gerrymandering because the Legislature *increased* racial minority voting power when it drew three new majority-minority districts and reconfigured an existing one to make it a majority-Black district. In *Upham v. Seamon*, the issues related to preclearance for two districts and a district court's power sua sponte to reject legislative choices. In *White v. Weiser*, congressional districts drawn after the 1970 census were challenged on the basis of the Constitution's one-person-one-vote doctrine, *see Reynolds v. Sims*, 377 U.S. 533, 84 S. Ct. 1362 (1964), and the suit had nothing to do with race or the Voting Rights Act. Only in *White v. Regester*, did the Court find that two multi-member state legislative districts drawn in 1971 invidiously discriminated against minorities. Thus, in its attempt to find that Texas is a repeat violator of the Voting Rights Act in its decennial redistricting, the majority and district court misstate cases.

The majority next faults Texas for the Department of Justice's objection under preclearance to at least one district in each of Texas's redistricting plans between 1980 and the present. To the extent this unattributed statement is accurate, this is not probative of the legislature's intent to discriminate against minorities in 2011. Preclearance involved a "nonretrogression" standard, *see Beer v. United States*, 425 U.S. 130, 96 S. Ct. 1357 (1976), that is far less stringent than proving an intentional discrimination claim.

In short, the majority's "contemporary examples" about Texas's State-sponsored discrimination are neither contemporary nor probative.[36]

---

[36] Both the majority and the district court, *Veasey v. Perry*, 71 F. Supp. 3d at 636 n.23, cite *United States v. Texas*, 887 F. Supp.2d 133 (D.D.C. 2012) to say that two of the 2011 Texas redistricting plans (for the U.S. House and the Texas Senate) violated the Voting

No. 14-41127

10. *Many, "shifting" rationales for SB 14*

The majority also criticizes the Texas Legislature because legislators allegedly proffered various, "shifting" rationales for the law. Citing to the district court's opinion, the majority states that the reasons for the law "shifted as they were challenged or disproven by opponents." Of course, "legislators and administrators are properly concerned with balancing numerous competing considerations," *Arlington Heights*, 429 U.S. at 266, 97 S. Ct. at 563, so it would be unsurprising to hear legislators advancing different rationales for supporting a particular bill. In this case, however, the depositions of various legislators who voted in favor of SB 14 revealed a consistent purpose behind this voter ID law: to prevent voter fraud and thereby promote the integrity of the voting process; in the minds of some legislators this would improve public confidence and possibly increase voter turnout.[37] Preventing voter fraud and increasing public confidence are closely interrelated, *Crawford*, 553 U.S. at 197, 128 S. Ct. at 1620; to view the iteration of multiple

---

Rights Act. Both note, however, that the D.C. District's opinion in that case was vacated by the Supreme Court. *Texas v. United States*, 133 S. Ct. 2885 (2013). Vacated opinions have no precedential or persuasive value. *See Asgeirsson v. Abbott*, 696 F.3d 454, 459 (5th Cir. 2012). In any case, the Texas Senate redistricting plan was enjoined by a three-judge panel of the Western District of Texas and a substitute plan issued by the court in its place that fully corrected any legal infirmities in it. The 2013 Texas Legislature subsequently repealed its original plan and adopted the court's interim plan in full. *See generally Davis v. Abbott*, 781 F.3d 207, 209-13 (5th Cir. 2015), *cert. denied*, 136 S. Ct. 534 (2015). The remediation undertaken by the Texas Legislature undermines any inference of an intent to discriminate, especially when its original plan could have been kept in place after the Supreme Court vacated the D.C. District's opinion.

[37] *See supra* note 17 (collecting statements of purpose from the deposition testimony of legislators who were proponents of SB 14).

No. 14-41127

related purposes as a cover for hiding a racially discriminatory intent, as the majority asserts is a plausible inference, makes no sense.

The majority's contention that the legislators shifted between these purposes when the rationales were "challenged or disproven by opponents," similarly proves too much. By this statement, the majority, like the district court, presumably means that the Legislature did not, in its view, provide enough evidence to support its proffered interests in the face of opponents' criticism. *See Veasey v. Perry*, 71 F. Supp. 3d at 653 ("Although these rationales are important legislative purposes, there is a significant factual disconnect between these goals and the new voter restrictions."). This insistence upon concrete evidence of the effectiveness of legislation is, as previously noted, clearly contrary to *Crawford*. 553 U.S. at 204, 128 S. Ct. at 1624; *cf. F.C.C. v. Beach Commc'n's, Inc.*, 508 U.S. 307, 315, 113 S. Ct. 2096, 2102 (1993) ("[A] legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data . . . . Only by faithful adherence to this guiding principle of judicial review of legislation is it possible to preserve to the legislative branch its rightful independence and its ability to function."). The "shifting rationales" theory, then, offers no support for an inference that the Texas Legislature intentionally discriminated against minorities in passing SB 14.

   11. *All legislative measures have conspired to work against African-American voters*

Dr. Burton opined that, no matter the party in power, political interests have always worked to deny African-Americans the right to vote: "*every time that African-Americans have, in fact, been perceived to be increasing their ability to vote and participate in the process there has been State legislation*

No. 14-41127

to either deny them the vote or at least dilute the vote or make it much more difficult for them to participate on an equal basis as Whites in the State of Texas."

This conclusion is belied, however, by materials that Dr. Burton himself cites. For instance, the Supreme Court found that Democratic-led redistricting in the 1990s led to racial gerrymanders *favoring* African-American and Hispanic Congressional candidates. *See Bush v. Vera*, 517 U.S. at 956–57, 116 S. Ct. at 1950–51. The Supreme Court rejected a claim that early 2000s Congressional redistricting around the Dallas area diluted the African-American vote. *See LULAC v. Perry*, 548 U.S. at 443–47, 126 S. Ct. at 2624–26. In addition, an expert report credited by the district court showed African-American and Hispanic representation among state legislators to generally align with their proportion in the total population. *See Veasey v. Perry*, 71 F. Supp. 3d at 638.

### 12. *"Seismic demographic shift" spurred action by Republicans "currently in power"*

The legislative history recited above shows that the struggle over SB 14 centered on partisanship, not race. Partisanship, however, is not racism, nor is it a proxy for racism on this record. The majority, however, connects "extraordinary procedural measures accompanying the passage of SB 14 to a 'seismic demographic shift,'" and suggests that the Republicans in power could gain a partisan advantage through a voter ID law. But to repeat: even the district court acknowledged that a photo voter ID requirement had wide multiracial, bipartisan public support.

Indeed, the Supreme Court in *Crawford* specifically held that partisanship in Indiana's voter ID law, also passed on a straight party-line

No. 14-41127

basis, could not defeat the law's purposes in deterring fraud. 553 U.S. at 204, 128 S. Ct. at 1624. And although the Supreme Court in *LULAC v. Perry* found that the Texas Legislature violated Section 2 in one Congressional district it drew after the 2000 census, the Court did not accuse the Legislature of racism, but at most of partisanship. The "seismic demographic shift" has been underway for at least twenty years—as Republicans took over every major statewide office in Texas. The inference that SB 14 implies a sudden efflorescence of racial bias is contradicted by *LULAC v. Perry* and is a non-sequitur.

* * * *

For all these reasons, the weak, or unsupported inferences claimed by the majority are contradicted by the overwhelming evidence from the complete record that negated any racially discriminatory purpose behind SB 14. SB 14 may or may not be the best approach to protecting the integrity of in-person voting, but it is the approach that succeeded after more than six years of intransigent and uncompromising partisan opposition. The law reflects party politics, not racism, and the majority of this court—in their hearts—know this. *See generally* Samuel Issacharoff, *Ballot Bedlam*, 64 DUKE L.J. 1363, 1363 (2015) ("[A]lthough issues of the franchise correlate with race, as does the partisan divide between Democrats and Republicans, the new battles over ballot access do not readily lend themselves to a narrative that focuses primarily on racial exclusion.").

## III.  Section 2 of the Voting Rights Act

The majority's conclusion that SB 14 violates the "results test" defined in Section 2 of the Voting Rights Act misconstrues the law, misapplies the facts, and raises serious constitutional questions. This decision stands alone among circuit court decisions to date: two circuits have upheld photo voter ID

laws against Section 2 challenges,[38] others have upheld them as a constitutional matter,[39] but no circuit court has yet invalidated a photo voter ID law under Section 2.   The majority's errors lead it to depart from the statute's text, resulting in the adoption of non-textual and irrelevant "factors" that, in practice, amount to little more than a naked disparate impact test. *But cf. Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 135 S. Ct. 2507, 2523 (2015) ("[A] disparate-impact claim that relies on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity."). We analyze the majority's reasoning, then demonstrate why it is incompatible with a proper interpretation of Section 2, and conclude by highlighting the constitutional tension created by the majority's approach.

### A. Background and the Majority's Erroneous Approach

Section 2 of the Voting Rights Act, as amended in 1982, prohibits the imposition or application of any "voting qualification or prerequisite to voting or standard, practice, or procedure . . . *which results in* a denial or abridgement of the right . . . to vote on account of race or color. . . ."  52 U.S.C. § 10301(a) (emphasis added).   What kind of prerequisite "results in" abridgement?  The statute continues:

> *A violation of subsection (a) is established if, based on the totality of circumstances*, it is shown that *the political processes* leading to nomination or election . . . are *not equally open to participation by*

---

[38] *Frank v. Walker*, 768 F.3d 744, 751-55 (7th Cir. 2014), *reh'g denied by an equally divided court*, 773 F.3d 738, *cert. denied*, 135 S. Ct. 1551 (2014); *Gonzalez v. Arizona*, 677 F.3d 383, 405-07 (9th Cir. 2012) (en banc), *aff'd. on other grounds sub nom. Arizona v. Inter Tribal Council of Ariz. Inc.*, 133 S. Ct. 2247 (2013).

[39] *Frank*, 768 F.3d at 745-51; *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1352-55 (11th Cir. 2009), *cert. denied*, 556 U.S. 1281, 129 S. Ct. 1282; *ACLU of N.M. v. Santillanes*, 546 F.3d 1313, 1321-23 (10th Cir. 2008).

No. 14-41127

members of a class of citizens protected by subsection (a) *in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.* The extent to which members of a protected class have been elected to office . . . is one circumstance which may be considered: *Provided*, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

52 U.S.C. § 10301(b) (emphasis added).

Congress fashioned this language to overturn a then-recent Supreme Court decision limiting voting rights violations to cases of intentional state-sponsored discrimination, *City of Mobile, Ala. v. Bolden*, 446 U.S. 55, 60-61, 100 S. Ct. 1490, 1496 (1980). In so doing, Congress was focused largely, though not exclusively, on legislative districting practices whose effects often undermined minority representation. Clearly, the formula for a Section 2 violation requires less than intent, but far more than a mere racially disparate impact.

Contrary to the statute and the Supreme Court, the majority's discussion begins by misquoting the Supreme Court to say that a Section 2 voting rights violation can be "proved by showing discriminatory effect alone." The Supreme Court, however, was not misguided; quoted accurately, the Court stated that Section 2 was revised "to make clear that a violation could be proved by showing discriminatory effect alone *and to establish as the relevant legal standard the 'results test,' applied by this Court in White v. Regester* . . . ." *Thornburg v. Gingles*, 478 U.S. 30, 35, 106 S. Ct. 2752, 2758 (1986) (hereafter, *"Gingles")* (emphasis added).[40]

_____

[40] The majority next compounds its confusion in averring that mere discriminatory effect can afford a basis for a Fifteenth Amendment violation; the true test is that of

143

No. 14-41127

The majority acknowledges that in transitioning from redistricting cases, epitomized by *Gingles*, to the new generation of "vote abridgement" claims, courts have found it hard to apply the Section 2 results test.[41] Nevertheless, the majority adopts a two-part *Gingles*-heavy framework for analysis of SB 14 and other vote abridgement cases.   The framework was

---

intentional discrimination. *Bolden*, 446 U.S. at 61-65, 100 S. Ct. at 1496-98.  The current Section 2 amended the Voting Rights Act, but it could not overrule *Bolden*. Yet the majority, in another error, contends that the constitutionality of Section 2 has never been questioned. This is wrong.   *See Bush v. Vera*, 517 U.S. 952, 990, 116 S. Ct. 1941, 1968, 135 L. Ed. 2d 248 (1996) (O'Connor, J., concurring) ("In the 14 years since the enactment of [Section 2], we have interpreted and enforced the obligations that it places on States in a succession of cases, assuming but never directly addressing its constitutionality."); *Johnson v. De Grandy*, 512 U.S. 997, 1028-29, 114 S. Ct. 2647, 2666 (1994) (Kennedy, J., concurring) ("It is important to emphasize that the precedents to which I refer, like today's decision, only construe the statute, and do not purport to assess its constitutional implications."); *Georgia v. Ashcroft*, 539 U.S. 461, 491, 123 S. Ct. 2498, 2517 (2003) (Kennedy, J., concurring) (noting "[t]here is a fundamental flaw . . . in any scheme in which the Department of Justice is permitted or directed to encourage or ratify a course of unconstitutional conduct in order to find compliance with a statutory directive" under the Voting Rights Act, but that the issue had not been raised in this case); *Chisom v. Roemer*, 501 U.S. 380, 418, 111 S. Ct. 2354, 2376 (1991) (Kennedy, J., dissenting) ("Nothing in today's decision addresses the question whether [Section] 2 of the Voting Rights Act of 1965, as interpreted in [*Gingles*], is consistent with the requirements of the United States Constitution."). The majority also claims that our opinion in *Jones v. City of Lubbock*, 727 F.2d 364, 374-75 (5th Cir. 1984), supports Section 2 as "appropriate legislation" as applied in this case to enforce the Fourteenth and Fifteenth Amendments. But *Jones* predates *City of Boerne* and applied a "lawful and rational means" test that is inconsistent with the congruence and proportionality test applied today.

[41]   The Seventh Circuit found the *Gingles* factors "unhelpful in voter-qualification cases."  *Frank v. Walker*, 768 F.3d 744, 754 (7th Cir. 2014).   Other courts and prominent election law commentators have also been unsettled by the question whether the *Gingles* factors should apply beyond vote dilution claims. *See, e.g.*, *Ohio State Conference of NAACP v. Husted*, 768 F.3d at 554 ("A clear test for Section 2 vote denial claims has yet to emerge."); *Simmons v. Galvin*, 575 F.3d 24, 42 n.24 (1st Cir. 2009) ("'While *Gingles* and its progeny have generated a well-established standard for vote dilution, a satisfactory test for vote denial cases under Section 2 has yet to emerge . . . . [and] the Supreme Court's seminal opinion in *Gingles* . . . is of little use in vote denial cases.'" (quoting Daniel P. Tokaji, *The New Vote Denial: Where Election Reform Meets the Voting Rights Act*, 57 S.C. L. REV. 689, 709 (2006))).

No. 14-41127

initially articulated in a vacated Sixth Circuit decision and followed by the Fourth Circuit.  The test is as follows:

> [1] [T]he challenged standard, practice, or procedure must impose a discriminatory burden on members of a protected class, meaning that members of the protected class have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice, and
>
> [2] [T]hat burden must in part be caused by or linked to social and historical conditions that have or currently produce discrimination against members of the protected class.

*See League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 240 (4th Cir. 2014), *mandate stayed*, 135 S. Ct. 6, *cert. denied*, 135 S. Ct. 1735 (2015); *Ohio State Conference of NAACP v. Husted*, 768 F.3d 524, 554 (6th Cir. 2014), *vacated as moot*, 2014 WL 10384647 (6th Cir. 2014).

The first part of the test recapitulates Section 2, requiring a racially discriminatory burden on voting, which "mean[s] . . . less opportunity" for minority citizens "to participate in the political process."  The second part draws from the "*Gingles* factors"[42] to prove causality between "the burden on

---

[42] The nine *Gingles* factors are:

1. the extent of any history of official discrimination in the State or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the State or political subdivision is racially polarized;

3. the extent to which the State or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

No. 14-41127

voting rights and the fact that this burden affects minorities disparately because it interacts with social and historical conditions that have prevented discrimination against minorities currently, in the past, or both." (citing *Gingles*, 478 U.S. at 47, 106 S. Ct. at 2764 ("The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives.")).

Using the *Gingles* factors is error on several levels.   First, as will be elaborated on later, the statute alone sufficiently describes how violations of Section 2 vote abridgement claims are to be proved.  The Senate Report cannot claim the same legal status, if any, as that of the enacted law. For present purposes, it suffices to point out that the second step of the two-part test, linking social and historical conditions to the discriminatory burden, derives

---

4.   if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5.   the extent to which members of the minority group in the State or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6.   whether political campaigns have been characterized by overt or subtle racial appeals;

7.   the extent to which members of the minority group have been elected to public office in the jurisdiction[;]

8.   whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group[;]

9.   whether the policy underlying the State or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

*Gingles*, 478 U.S. at 44–45, 106 S. Ct. at 2763–64.

146

No. 14-41127

from *Gingles'* descriptive language, quoted immediately above, which did not purport to be a freestanding rule of law. The second step is also flawed "because it does not distinguish discrimination by the defendants from other persons' discrimination." *Frank v. Walker*, 768 F.3d 744, 755 (7th Cir. 2014), *reh'g denied by an equally divided court*, 773 F.3d 738, *cert. denied*, 135 S. Ct. 1551 (2014). Section 2 "does not require States to overcome societal effects of private discrimination," only their own discrimination. *Id.* at 753; *see also LULAC, Council No. 4434 v. Clements,* 999 F.2d 831, 867 (5th Cir. 1992) (en banc) ("[S]ocioeconomic disparities and a history of discrimination, without more," do not satisfy Section 2's legal standard).

Second, *Gingles* did *not* ascribe talismanic significance to the Senate Factors; the Court prescribed a three-part test to gauge the disparate impact of multimember legislative districts—*before* reaching the Section 2 analysis—with the Senate Factors used to confirm liability. *Gingles*, 478 U.S. at 48–51, 106 S. Ct. at 2765–67.

Third, the extra-statutory *Gingles* factors originated in the Senate Report accompanying amended Section 2 principally to guide redistricting cases.[43] Reflective of this reality, the Supreme Court, in adopting the Senate factors as an add-on to its test for vote dilution, specifically noted they are non-comprehensive and non-mandatory. *Gingles*, 478 U.S. at 45, 106 S. Ct at 2763. The majority barely alludes to these shortcomings but describes the factors as "salient guidance."

---

[43] As one commentator explains, the legislative history of the 1982 Section 2 amendments "focused so intently on representation rather than participation," Daniel P. Tokaji, *The New Vote Denial: Where Election Reform Meets the Voting Rights Act,* 57 S.C. L.REV. 689, 709 (2006), that it is a mistake to use that history, embodied in the *Gingles* factors, beyond vote dilution.

147

No. 14-41127

Applying this inherently flawed two-part test, the majority approves the district court's finding that SB 14 "disparately impacts" racial minority voters because they are "more likely than their Anglo peers to lack" qualifying ID. The underlying findings were that 2% of Anglos, 5.9% of Hispanics, and 8.1% of Blacks comprise the 4.5% of Texas voters who lack SB 14 IDs.[44] The majority cites exactly three individuals—Floyd Carrier, Sammie Louise Bates, and Gordon Benjamin—who were unable to cast ballots because they lacked SB 14 ID when they went to vote. The majority agrees with the district court that the law's ameliorative provisions, including the free EIC available at DMV offices (which Sammie Louise Bates eventually obtained), a "strict disability exemption" from the SB 14 requirement and the alternative of mail-in ballots, are "burdensome" and thus ineffective alternatives.[45] Moreover, evidence showed that nine of the fourteen plaintiffs (including Floyd Carrier and Gordon Benjamin) were qualified to vote by mail, but they did not want to. *Veasey v. Perry*, 71 F. Supp.3d at 677. It is a mystery why the majority goes out of its way to criticize the use of mail-in ballots for hundreds of thousands of senior citizens. No court has ever held that a voter has a right to cast a ballot by the method of his choice.[46]

---

[44] Largely from experts and statistically-based proof arises the finding that SB 14 "disproportionately impacted the poor" who are less likely to have an ID, less likely to avail themselves of services requiring one, and for whom "[e]ven obtaining an EIC poses an obstacle" given the difficulties for some in obtaining birth certificates and travelling to DMV offices.

[45] The majority neglects to mention other exemptions to the photo ID requirements for religious accommodation and disaster loss.

[46] *McDonald v. Bd. of Election Comm'rs of Chi.*, 394 U.S. 802, 89 S. Ct. 1404 (1969) (upholding a statute allowing some, but not other, citizens to vote absentee). Laws that require voters to cast different kinds of ballots are valid so long as there is "some rational relationship to a legitimate state end." *Id.* at 809, 1408; *see also Biener v. Calio*, 361 F.3d 206, 215 (3d Cir. 2004). The State of Oregon requires all ballots be cast by mail. Moreover, the

No. 14-41127

The majority moves on to the *Gingles* factors for proof that the disparate impact of SB 14 on ID possession "interacts with social and historical conditions" to cause unequal electoral opportunities for Blacks and Hispanics.[47] Although there are nine *Gingles* factors, from which the majority culls seven, only two really make a difference:  the "effects of past discrimination" and the "tenuousness of policies underlying the law."  Even if all of the other five *Gingles* factors favored the plaintiffs—which they do not[48]—no case could be made to invalidate SB 14 without twin conclusions that the "effects of past discrimination" led to a disparity of ID possession and that the purposes of the law are "tenuous."  Thus, these two factors form the slender core of the majority's "causal link."  And they are slender indeed.

*Gingles* Factor 5, the "effects of past discrimination," comprised on this record comparative socioeconomic data on employment rates, income, educational attainment, and health outcomes.  That these (unfortunately) reflect differences among Whites, Blacks and Hispanics is a sociological fact in Texas as elsewhere.  The majority attempts to, but does not successfully

---

greatest fraud risk exists when unauthorized persons direct an elderly, immobile voter's choices on a mail-in ballot.  That the ballots could get lost or stolen from the mail is no more of a risk than the loss of a Social Security check.

[47] Space does not permit elaboration, but the majority defends its application of the *Gingles* factors in part by repeatedly mischaracterizing and distorting the State's arguments.

[48] Two *Gingles* factors, the existence of racially polarized voting and the lack of racial campaign appeals, are plainly irrelevant here.  Another factor, the history of state-sponsored discrimination recounted by the majority has already been shown to be legally unsupported, see discussion *supra*, and "long-ago."  The Legislature that passed SB 14 had virtually proportional minority representation, rendering another *Gingles* factor, the extent of elected minority officials throughout the state, beside the point.  Finally, showing the Legislature as "unresponsive" to minorities solely with reference to the 2011 events preceding passage of SB 14 fundamentally misunderstands this *Gingles* factor, which relates to the overall conduct of representative government as it applies to legislative districting; moreover, as has been shown, the majority and district court did not read the legislative record over the past four sessions and six years.

149

No. 14-41127

connect these findings to contemporary discrimination by the state of Texas.[49]
The majority goes out of its way, however, to assert that it "does not decide"
whether this factor can only be satisfied by a legacy of official state
discrimination.  The majority is wrong yet again.  The Supreme Court recently
reaffirmed that state entities should not bear legal responsibility "for racial
disparities they did not create." *Inclusive Communities*, 135 S. Ct. at 2523; *see
also Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 278, 99 S. Ct. 2282, 2295
(1979) (refusing to hold state liable for sex discrimination in U.S. military);
*Milliken v. Bradley*, 418 U.S. 717, 745, 94 S. Ct. 3112, 3127 (1974) (remedy
cannot be imposed on other government bodies not having been shown to
violate Constitution).

　　　The majority also adopts the finding that minorities' disproportionately
lower socioeconomic status "hinders their participation in the electoral
process."  But while on one hand, the majority credits an expert opinion that
minority voters are probably inhibited by the voter ID requirement from
casting ballots, the majority forcefully disclaims, on the other hand, that
*Gingles* factor 5 embodies any actual requirement for evidence of the law's
effect on voter turnout.  Indeed, no evidence in the record supports a link
between requiring SB 14 IDs for voting and diminished turnout.  Despite
testimony from a handful of voters, not one of the plaintiff organizations in this

------------------------

[49] The majority references the district court's opinion, *Veasey v. Perry,* 71 F. Supp.3d
at 666, which adverts to general socioeconomic data and specifically recites employment
discrimination cases settled in the past twelve years by two state and two municipal entities,
and disparate school discipline procedures (which can't be attributed to the State).  The court
references desegregation of Texas schools, which occurred over forty years ago.  In sum, the
majority has no evidence of current discriminatory practices by the state in housing,
education, or employment.

No. 14-41127

case offered testimony that a single one of their members had been prevented from voting by SB 14.  The DOJ thoroughly canvassed the state of Texas in search of voters "disenfranchised" by SB 14 and found none.  The State's witness—Keith Ingram, the director of the Elections Division of the Texas Secretary of State—stated that the number of voters who have been unable to present a qualifying ID were "vanishingly small," even after three statewide elections, six special elections, and numerous local elections that have taken place under the law.[50]

Regarding *Gingles* factor 9, the "tenuousness of policies underlying the law," the majority approves of the district court's empirical analysis of SB 14 and finds "a total disconnect between the State's announced interests and the statute enacted."  *But cf. Williamson v. Lee Optical of Okla. Inc.*, 348 U.S. 483, 488, 75 S. Ct. 461, 464 (1955) ("The day is gone when [courts] . . . strike down state laws, regulatory of business and industrial conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought.").[51]  The majority pays lip service to *Crawford*, which ruled evidence of actual in-person Indiana voter fraud irrelevant to upholding a voter ID law under the Fourteenth Amendment, but pivots and concludes that this *Gingles* extra-statutory factor permits intrusive judicial second-guessing of the

---

[50]  The majority disclaims the necessity of a proven turnout effect because it is allegedly too difficult to prove.  The reality, however, is that such effects simply have not been found by researchers who have investigated voter ID law.  *See, e.g.*, Samuel Issacharoff, *Ballot Bedlam*, 64 DUKE L.J. 1363, 1377-86 (2015); Michael D. Gilbert, *The Problem of Voter Fraud*, 115 COLUM. L. REV. 739, 746-50, 749 n.53 (2015); Michael J. Pitts, *Empirically Measuring the Impact of Photo Id over Time and Its Impact on Women*, 48 IND. L. REV. 605, 605-07 (2015).

[51]  The majority's citation to *St. Joseph Abbey v. Castille*, 712 F.3d 215, 225–26 (5th Cir. 2013), is inapt because it is a one-of-a-kind ruling to the contrary, and it concerns economic regulation.

No. 14-41127

legislation.  The majority avers that there is hardly any evidence of in-person voter fraud in Texas—the Senatorial election of "Landslide Lyndon" Johnson in 1948 seems to have been forgotten—and there is no proof that voter confidence in the integrity of the ballot is enhanced by requiring voters to prove their ID at the polls—despite the opinion polls showing the overwhelming popularity of photo ID requirements.[52]   Even if the district court's findings are taken at face value, however, this conclusion proves too much.   If requiring a photo voter ID has no rational basis, as the majority concludes, the entire law, not simply its application to minority voters, would be indicted.

The sum of the majority's reasoning, despite its emphasis on "an intensely local appraisal" and its incantation of seven *Gingles* factors, boils down to these propositions:

> (1) SB 14 specifically burdens Texans living in poverty, who are less likely to possess qualified photo ID, are less able to get it, and may not otherwise need it; (2) a disproportionate number of Texans living in poverty are African–Americans and Hispanics; and (3) African–Americans and Hispanics are more likely than Anglos to be living in poverty because they continue to bear the socioeconomic effects caused by decades of racial discrimination.

(citing *Veasey v. Perry*, 71 F. Supp. 3d at 664).  As a result of finding a racial disparity among those who possess or have access to SB 14 IDs and using the *Gingles* factors, the majority affirms a Section 2 violation.  Liability therefore turns, under the majority's approach, on essentially three conclusions.  First, a particular regulation has a "disparate impact" because it creates an additional voting burden upon poor, disproportionately minority voters. Second, Texas has a history of official discrimination whose effects persist to

---

[52] Moreover, some studies actually show that voter ID laws increase voter turnout. *See* Gilbert, *supra* note 50, at 749 n.56 and accompanying text (collecting studies and discussing rationales).

No. 14-41127

the present day.  Third, the law in question could have been written more narrowly.[53]

These conclusions are incredibly open-ended.  The first conclusion can be met even though, as here, the law in question disadvantages only a small percentage of voters and contains ameliorative provisions and exemptions. The second conclusion is basically a condition of American society, although contrary to the majority opinion, current socioeconomic conditions cannot be explained in terms of any recent state-sponsored discrimination.  The third conclusion is at war with the Supreme Court's acknowledgement of the State's and public's interest in ballot integrity as well as the Texas public's approval of photo voter IDs.

Virtually any voter regulation that disproportionately affects minority voters can be challenged successfully under the majority's rationale:  polling locations; days allowed and reasons for early voting; mail-in ballots; time limits for voter registration; language on absentee ballots; the number of vote-counting machines a county must have; registering voters at a DMV (required by the federal Motor Voter law); holding elections on Tuesday.  Such challenges are occurring at the present time.[54]

---

[53] Judge Higginson's special opinion embraces and embroiders the majority's position adopting the *Gingles* factors to interpret Section 2.  Judge Higginson focuses principally on racial socioeconomic disparities as the touchstone for Section 2 liability, thus overlooking the Supreme Court's warning that states cannot be held responsible to fix disparities they did not create.  He disparages requiring plaintiffs to prove that SB 14 itself caused ("resulted in") the abridgement of voting rights—while apparently accepting the majority's legally upside-down view that the state must prove the statute's efficacy in preventing voter fraud.  Finally, Judge Higginson's disparate impact focus would create constitutional tension, to say the least, by forcing states to become race-conscious in avoiding disparate impact whenever they enact voting regulations.  This result is not a benign "evolutionary" process to "harmonize" legislative priorities with the right to vote; it is judicial micromanagement of race-neutral voting regulations consigned to the states.

[54] *See, e.g., Ne. Ohio Coal. for the Homeless v. Husted*, 2016 WL 3166251 (S.D. Ohio June 7, 2016) (enjoining under Section 2 and Equal Protection Clause a law that: requires

153

No. 14-41127

The majority's rationale, however, is flawed not only as already explained, but simply because it does not correlate with the statute itself. Section 2, as the Seventh Circuit recognized, *Frank*, 768 F.3d at 752, is "the salient guidance" for enunciating violations.

### B. The Proper Analysis

The correct answer is simple and consistent. Showing a disparate impact on poor and minority voters is a necessary but not sufficient condition to

---

full and accurate completion of absentee ballot identification envelopes before vote is counted; reduces period for correction of absentee ballot envelopes from 10 days to 7 days; requires that provisional ballot affirmation forms are completed fully and accurately; reduces period for correction of provisional ballot affirmation forms from 10 days to 7 days; and prohibits poll workers assisting in completing provisional or absentee ballot forms; challenges to other election laws part of case as well), *appeal docketed*, Nos. 16-3603, 16-3691 (4th Cir. June 8, 2016 and June 23, 2016); *Ohio Org. Collaborative v. Husted*, ---F. Supp.3d---, 2016 WL 3248030 (S.D. Ohio May 24, 2016) (Section 2 challenges to: reduction of number of days in early-in-person voting period from 35 to 28; elimination of same-day registration; limitation of early-in-person location per county; number of vote counting machines counties are required to maintain; reductions in ability to collect, pay for, and mail absentee ballots on behalf of others; addition of required information to absentee ballot envelopes and provisional ballot affirmation forms; reduction in cure period on provisional ballots and prohibition on election officials completing provisional ballot affirmation form on voter's behalf; failure to require county boards of elections to consolidate multi-precinct poll books); *Lee v. Va. State Bd. of Elections*, ---F. Supp.3d---, 2016 WL 2946181 (E.D. Va. May 19, 2016) (Section 2 challenge to voter ID), *appeal docketed*, No. 16-1605 (4th Cir. May 27, 2016); *N.C. State Conference of the NAACP v. McCrory*, ---F. Supp.3d---, 2016 WL 1650774 (M.D.N.C. Apr. 25, 2016) (Section 2 challenges to: voter ID; early voting reductions; elimination of same-day voter registration and voting; elimination of counting ballots cast in the wrong precinct; and pre-registration for those under age 18), *appeal docketed*, No. 16-1529 (4th Cir. May 9, 2016); First Amended Complaint at 70-74, *Greater Birmingham Ministries v. Alabama*, No. 2:15-cv-02193 (N.D. Ala. May 3, 2016), ECF No. 43 (Section 2 challenge to voter ID and positive ID provisions along with a request to "bail-in" the State into preclearance under the Voting Rights Act); Amended Complaint at 41-44, *Feldman v. Ariz. Sec'y of State*, No. 2:16-cv-01065-DLR (D. Ariz. Apr. 19, 2016), ECF No. 12 (Section 2 challenge to: allocation of polling places within a county; prohibition on counting ballots cast out of precinct; and criminalization of collecting of signed and sealed absentee ballots); Complaint for Declaratory and Injunctive Relief at 38-40, *Brakebill v. Jaeger*, No. 1:16-cv-08 (D.N.D. Jan. 20, 2016), ECF No. 1 (Section 2 challenge to voter ID and elimination of ameliorative provisions); *see also* Complaint at 14-17, *Stringer v. Cascos*, No. 5:16-cv-00257 (W.D. Tex. Mar. 14, 2016), ECF No. 1 (challenge under Equal Protection Clause and Motor Voter law to Texas's voter registration system).

No. 14-41127

substantiate a Section 2 vote denial or abridgement claim.  Abridgement is less than outright denial of the vote.  It is the challenged regulation, here SB 14, rather than "socioeconomic conditions" or a "history of discrimination," that must cause the disparate impact.    Moreover, Section 2(b), the "results" provision, "tells us that [Section] 2(a) does not condemn a voting practice just because it has a disparate effect on minorities. (If things were that simple, there wouldn't have been a need for *Gingles* to list nine non-exclusive factors in vote-dilution cases.)." *Frank*, 768 F.3d at 753. After all, nearly every voting regulation poses some kind of obstacle or prerequisite to casting a ballot, and nearly every one of these may be potentially more disabling for poor and minority voters.[55]    The totality of circumstances inquiry, leading to a determination whether minority voters have an equal opportunity to participate, also bears  the important caveat that perfection, in the form of proportional representation, is not mandated.  It logically follows that Section 2 is not designed to abolish every incidental impact of facially neutral voting regulations.    Finally, as the Supreme Court has made clear, no citizen may complain of "the usual burdens of voting." *Crawford*, 553 U.S. at 198, 128 S. Ct. at 1621.

Using the textualist approach to Section 2, a vote abridgement claim should be analyzed (absent proof of intentional discrimination) as follows: First, consider the total impact of the challenged regulation on the voting public.  If the regulation disparately affects minority voters, proceed to determine whether the particular burden imposed by the regulation, examined

---

[55] The majority opinion admits this in stating that, "[a]ccording to a well-established formula . . . to assess individuals' likelihood of voting in an election, increasing the cost of voting decreases voter turnout—particularly among low-income individuals, as they are most cost sensitive." (citing *Veasey v. Perry*, 71 F. Supp. 3d at 656).

No. 14-41127

under the totality of circumstances, deprives them of an equal opportunity to participate in the electoral process.  This analytical process, synthesized from *Frank*, fundamentally differs from that of the majority in three ways.  First, it dispenses with the *Gingles* factors.  Second, it requires a causal connection between the challenged regulation and the disparate impact.  Third, Section 2(b) is better read as an "equal-treatment requirement (which is how it reads)" rather than "an equal-outcome command."  *Frank*, 768 F.3d at 754.[56]

Contrary to the majority opinion, applying the statute itself in this way does not neuter or minimize minority citizens' voting rights.  The question under Section 2 is whether a regulation "needlessly" burdens those rights.  *Id.* at 753.  Justice Scalia's dissent in *Chisom v. Roemer* posed an inarguable Section 2 violation, in which a hypothetical jurisdiction limited voter registration to one hour a day three days a week, to the stark disadvantage of the minority working class.  501 U.S. 380, 408, 111 S. Ct. 2354, 2371 (1991) (Scalia, J., dissenting).  Likewise, Mississippi actually violated Section 2 with a dual voter registration law and limited registration offices, which "resulted

---

[56] How the majority can claim its interpretation is "consistent" with *Frank* is incomprehensible.  *Frank* found the *Gingles* factors "unhelpful" in vote abridgment cases, 768 F.3d at 754, and applied the two-part test only "for the sake of argument," *id.* at 755.  On rehearing, the court never mentions Section 2 liability but appears instead to foot its discussion on the *Anderson/Burdick* claim.  *See Frank v. Walker*, 819 F.3d 384, 386 (7th Cir. 2016) (*Frank II*).

Moreover, *Frank* finds no Section 2 violation where the Wisconsin voter ID law arguably had a higher disparate impact on voter ID possession than SB 14.  *Compare Frank*, 768 F.3d at 752 (92.7% of Whites, 86.8% of Blacks, and 85.1% of Hispanics possessed photo IDs), *with Veasey v. Abbott*, 796 F.3d at 509 (panel opinion discussing that plaintiffs' expert found that 98% of Whites, 91.9% of Blacks, and 94.1% of Hispanics possessed photo IDs).  In other words, far more Texas voters of each race possess the requisite photo IDs; hence one might infer that the scope of diminished opportunity to participate is far smaller across the board in Texas than in Wisconsin.  Moreover, the racial spread between Texas and Wisconsin in terms of ID possession is about the same in the case of Whites to Blacks and narrower in the case of Whites to Hispanics.  On a comparative statistical basis, then, there should be no difference in the outcome of this case and *Frank*.

No. 14-41127

in" a 25% diminution in Black voter registration. *Operation Push, Inc. v. Mabus*, 932 F.2d 400 (5th Cir. 1991).

According to the correct, textualist frame of reference, SB 14 does not violate Section 2. The majority's finding that a racial disparity "in ID possession" exists between Anglos and Blacks and Hispanics is not clearly wrong. The majority does not, however, establish that SB 14 "resulted in" or caused a diminution of the right to vote, nor does the "totality of circumstances" demonstrate that minority voters' opportunity to participate has been reduced.

A tailored causation analysis is imperative under Section 2 case law. Not only does *Gingles* offer ample support for a requirement that the challenged law causes the prohibited voting results, but six circuit courts, including this court, have clearly so held. *See Gingles*, 478 U.S. at 48 n.15, 106 S. Ct. at 2766 n.15 ("It is obvious that unless minority group members experience substantial difficulty electing representatives of their choice, they cannot prove that a challenged electoral mechanism impairs their ability 'to elect'" in violation of Section 2). The Ninth Circuit, rejecting a challenge to Arizona's voter ID law, held that "proof of 'causal connection between the challenged voting practice and a prohibited discriminatory result' is crucial" to Section 2 analysis. *Gonzalez*, 677 F.3d at 405 (quoting *Smith v. Salt River Project Agric. Imp. & Power Dist.*, 109 F.3d 586, 589 (9th Cir. 1997)); *see also Frank*, 768 F.3d at 753–54 (voter ID law did not cause minorities to have less opportunity and were treated equally); *LULAC v. Clements*, 999 F.2d at 867 (5th Cir. 1993) (en banc) (emphasizing need for proof of depressed minority voter turnout); *Salas v. Sw. Tex. Junior Coll. Dist.*, 964 F.2d 1542, 1556 (5th Cir. 1992) (rejecting challenge to at-large districts where Hispanic lack of electoral success was caused by lower turnout, not dilution); *Ortiz v. City of Phila.*, 28 F.3d 306, 310 (3d Cir. 1994) (Philadelphia voter list purge law did not cause minorities to be deprived

No. 14-41127

of equal access to the political system); *Irby v. Va. State Bd. of Elections*, 889 F.2d 1358–59 (4th Cir. 1989) (upholding appointive system for school board members where evidence "cast doubt on . . . a causal link between the appointive system and Black underrepresentation"); *Wesley v. Collins*, 791 F.2d 1255 (6th Cir. 1986) (upholding felon disenfranchisement law because the disproportionate racial impact does not "result" from the State's qualification of the right to vote).

SB 14 had no impact on voter registration, the major prerequisite to casting a ballot. SB 14 does not adversely impact over 90% of minority voters who already possess SB 14 IDs or thousands of others eligible to vote by mail or any voter who can readily obtain a free EIC. Moreover, the plaintiffs here did not show that SB 14 had any effect on voter turnout or that any disparity in voter-quality ID possession was caused by SB 14. The rate of preexisting ID possession does not prove "that participation in the political process is in fact depressed among minority citizens." *LULAC*, 999 F.2d at 867. To understand the totality of circumstances, at least three subsidiary questions had to be answered: *how many* of those without SB 14 ID already have the documents to get one? Of those without the underlying documents, *how many* would have significant trouble obtaining them? And within that much smaller group, *how many* have actually voted in the past or intend to vote in the future? The actual adverse racial impact of SB 14 is not demonstrated by gross no-match list percentages, but by the impact on these subsets of the 4.5% of Texas voters currently without SB 14 ID. The record is bereft of such information.

As the Ninth Circuit held, "a [Section] 2 challenge 'based purely on a showing of some relevant statistical disparity between minorities and whites,' without any evidence that the challenged voting qualification causes that disparity, will be rejected." *Gonzalez*, 677 F.3d at 405 (citation omitted); *see*

158

No. 14-41127

*also Frank*, 768 F.3d at 753 (Section 2 "does not condemn a voting practice just because it has a disparate effect on minorities"). The majority's opinion fundamentally turns on a statistical disparity in ID possession among different races, but instead of showing that this disparity was *caused* by SB 14, the majority relies on socioeconomic and historical conditions as the causes of this disparity. This finding conflicts with the Supreme Court's recent instruction that "a disparate-impact claim that relies on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity." *Inclusive Communities*, 135 S. Ct. at 2523. Without a showing that SB 14 caused the disparity in ID possession, the majority holds Texas "liable for racial disparities [it] did not create." *Id.* (citation omitted).

Moreover, past examples of State-sponsored discrimination are not indicative that *SB 14*, the "challenged voting qualification," caused the disparity in ID possession. After all, the majority itself discredited "long ago" evidence of State-sponsored discrimination when it reversed many parts of the district court's finding that SB 14 was enacted with discriminatory intent. The majority's attempt to shore up a finding of state-action-related discrimination with no more than socioeconomic disparities (and even alleged local differences in high school discipline, which can't be the fault of the State of Texas), fails the test of *LULAC*, *Gonzalez*, and *Inclusive Communities*.

Misplacing its reliance on the *Gingles* factors, the majority also fatally errs in discounting the State's and the public's interest in enforcing SB 14. The State's interests are weighty, they are to be treated as a matter of law, not fact as the majority does, and they outweigh the insubstantial proof of diminished minority opportunity to participate caused by SB 14.

In *Crawford*, the Supreme Court held that the State's legitimate interest in preventing voter fraud is "sufficiently strong" to justify a voter ID law even

159

No. 14-41127

without any evidence of voter fraud in the record.  553 U.S. at 204, 128 S. Ct. at 1623; *see also Voting for Am. v. Steen*, 732 F.3d 382, 394 (5th Cir. 2013). *Crawford* also approved, without requiring independent proof, Indiana's argument that voter ID laws serve the State's legitimate interest of increasing voter turnout by safeguarding voter confidence in the election process. *Crawford*, 553 U.S. at 197, 128 S. Ct. at 1620.  Nonetheless, the majority finds that these recognized State interests are only tenuously related to SB 14's provisions.

The majority inaptly attempts to distinguish *Crawford* because that case reviewed a summary judgment record and involved constitutional challenges to the right to vote, while this case is brought under Section 2 after a full trial. *Crawford*, however, carefully balanced the voters' difficulties in obtaining voter ID under the Indiana law against the State's interests, and concluded: "For most voters who need them, the inconvenience of making a trip to the [DMV], gathering the required documents, and posing for a photograph surely does not qualify as a substantial burden on the right to vote, or even represent a significant increase over the usual burdens of voting."  553 U.S. at 198, 128 S. Ct. at 1621.  Although *Crawford* does not control the instant case, its general conclusion stands at odds with the majority's implicit determination that "significant" and "substantial" burdens exist in obtaining voter ID for that small percentage of Texas's Black and Hispanic voters who do not presently possess SB 14 ID.

Further, the majority mischaracterizes the State's interests as a matter of adjudicative fact.  This court previously held en banc that the substantiality of the State's interest is a legal question to be determined as a matter of law. *LULAC*, 999 F.2d at 871.  In *Crawford*, the Supreme Court confirmed the State's strong interests as a matter of law, as it sustained Indiana's voter ID

160

No. 14-41127

law without record evidence "of any such fraud actually occurring in Indiana at any time in its history." 553 U.S. at 194, 128 S. Ct. at 1619. *Crawford* thus elevated the State's interest to a status of legislative fact, which lower courts are bound to respect. *See Frank*, 768 F.3d at 750 ("After a majority of the Supreme Court has concluded that photo ID requirements promote confidence, a single district judge cannot say as a 'fact' that they do not, even if 20 political scientists disagree with the Supreme Court."). The majority wrongly second-guesses and subjects the State's interest in preventing in-person voter fraud to routine factual examination. *But see Crawford*, 553 U.S. at 196, 128 S. Ct. at 1619 ("While the most effective method of preventing election fraud may well be debatable, the propriety of doing so is perfectly clear."). The majority was wrong to require record evidence of lack of confidence in elections without voter ID. *See id.* at 194, 1618 ("'The electoral system cannot inspire public confidence if no safeguards exist to deter or detect fraud or to confirm the identity of voters.'" (quoting Building Confidence in U.S. Elections § 2.5 (Sept. 2005) (a report prepared by a committee co-chaired by former President Jimmy Carter and former Secretary of the Treasury and White House Chief of Staff James A. Baker III)).

Finally, even weighing the State's interests as a matter of fact, the majority errs. The majority credits the district court's finding that SB 14 would *theoretically* decrease voter turnout, yet overlooked that the minimal evidence in the record that anybody was *actually* prevented from voting. There is not even evidence that any voter was actually unable to obtain the proper voter ID. *LULAC* held that "plaintiffs cannot overcome a substantial State interest by proving insubstantial dilution." 999 F.2d at 876. It follows that the majority should not reject strong State interests without *any* showing of an "abridgement of the right . . . to vote on account of race or color." 52 U.S.C.

161

No. 14-41127

§ 10301(a). The majority errs in its treatment of the State's strong interests at stake here.

## C. Constitutional Considerations

The majority claims to exercise "constitutional avoidance" by electing not to rule on the plaintiffs' assertion that SB 14 burdened their right to vote contrary to the Fourteenth Amendment. But the majority has no qualms about keeping alive the preposterous and divisive claim that SB 14 was passed with unconstitutional discriminatory intent.[57]   And the majority's extra-textual interpretation of Section 2 runs a severe risk of unconstitutionality. So much for judicial restraint.

As applied here, the majority's two-part Section 2 test authorizes judicial mischief in micromanaging a facially neutral state law implementing a Supreme Court-approved purpose in order to eliminate disparate impact (in types of qualified IDs) not caused by the law itself. This result interferes with the Constitution's assignment of the conduct of elections to the States and is not congruent and proportional as a remedy for violation of voting rights protected by the Fourteenth and Fifteenth Amendments.

The Constitution's "Elections Clause empowers Congress to regulate *how* federal elections are held, but not *who* may vote in them."

---

[57] The Supreme Court itself declined to rule on Equal Protection issues raised in a redistricting case where the lower court decision might rest on the alternative ground of the Voting Rights Act. *Escambia Cty. v. McMillan,* 466 U.S. 49, 104 S. Ct. 1577 (1984). No such forbearance by today's majority! The majority cites with approval *Ketchum v. By*rne for that opinion's broad (but fact-bound) language concerning discriminatory intent and partisanship. *Ketchum,* however, refused to rule on the constitutionality of a local council redistricting plan after the district court had found it wanting under a then recently-amended Section 2. The court noted "[t]his change in the law appears to reflect congressional impatience with the inherently speculative process of ascribing purposes to government actions involving the complex interaction of numerous individuals and conflicting interests. We think it undesirable to undertake this difficult [legislative intent] analysis when Congress has rendered it superfluous by amending the Voting Rights Act." *Ketchum*, 740 F.2d at 1409.

No. 14-41127

*Arizona v. Inter Tribal Council of Ariz., Inc.*, 133 S. Ct. 2247, 2257 (2013)
(emphasis in original); *see* U.S. CONST. art. I, § 4, cl. 1. "Prescribing voting
qualifications, therefore, 'forms no part of the power to be conferred upon the
national government' by the Elections Clause, which is 'expressly restricted to
the regulation of the *times,* the *places,* and the *manner* of elections.'" *Arizona*,
133 S. Ct. at 2258 (emphasis in original) (quoting THE FEDERALIST No. 60, at
371 (A. Hamilton); THE FEDERALIST No. 52, at 326 (J. Madison)). This design
was for good reason. The Court explained, "[t]his allocation of authority sprang
from the Framers' aversion to concentrated power," because, as James
Madison presciently observed, "[a] Congress empowered to regulate the
qualifications of its own electorate . . . could 'by degrees subvert the
Constitution.'" *Id.* (quoting 2 Records of the Federal Convention of 1787, p.
250 (M. Farrand rev. 1966)). It is thus "obvious that the whole Constitution
reserves to the States the power to set voter qualifications in state and local
elections. . . ." *Oregon v. Mitchell*, 400 U.S. 112, 125, 91 S. Ct. 260, 265 (1970)
(Black, J. for a five member majority on this point); *see also Lassiter v.
Northampton Cty. Bd. of Elections*, 360 U.S. 45, 50, 79 S. Ct. 985, 989 (1959)
("The States have long been held to have broad powers to determine the
conditions under which the right of suffrage may be exercised. . . .").

The States' primacy in regulating elections is limited, however, by the
Fourteenth and Fifteenth Amendments, which protect different rights. The
Fifteenth Amendment secures the right to vote from denial or abridgment by
intentional discrimination on account of race or color. *City of Mobile v. Bolden*,
446 U.S. 55, 61–66, 100 S. Ct. 1490, 1496–98 (1980); *see Rice v. Cayetano*,
528 U.S. 495, 120 S. Ct. 1044 (2000) (striking down law that denied vote to
those without Native Hawaiian ancestry); *Gomillion v. Lightfoot*, 364 U.S. 339,
81 S. Ct. 125 (1960) (striking down law that denied vote via racial redistricting

No. 14-41127

of city boundaries).  The Fourteenth Amendment has been interpreted to
protect voters generally from laws that excessively burden the right to vote and
the conduct of the political process.  *See Crawford*, 553 U.S. at 189–91,
128 S. Ct. at 1615–16; *Burdick v. Takushi*, 504 U.S. 428, 432–34, 112 S. Ct.
2059, 2062–64 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 786–90, 103 S. Ct.
1564, 1568–70 (1983).  Understanding the difference between these protections
is important.  Where every aspect of a state's election code "inevitably affects—
at least to some degree—the individual's right to vote and his right to associate
with others for political ends," *Anderson*, 460 U.S. at 788, 103 S. Ct. at 1570,
invalidating ballot-access rules as overly burdensome (absent intentional
discrimination) without a compelling showing would make it impossible to run
fair and efficient elections.  *See Timmons v. Twin Cities Area New Party*,
520 U.S. 351, 358, 117 S. Ct. 1364, 1369 (1997) ("States may, and inevitably
must, enact reasonable regulations of parties, elections, and ballots to reduce
election- and campaign-related disorder.").  Accordingly, no citizen has a
Fourteenth or Fifteenth Amendment right to be free from "the usual burdens
of voting." *Crawford*, 553 U.S. at 198, 128 S. Ct. at 1621.

Because Section 2 was enacted to protect voting rights under these
amendments, it must be "appropriate legislation," for the purpose.  *See City of
Boerne v. Flores*, 521 U.S. 507, 516–20, 117 S. Ct. 2157, 2162–64 (1997).  "'[A]s
broad as the congressional enforcement power is, it is not unlimited.'"  *Id.* at
518, 2163 (quoting *Mitchell*, 400 U.S. at 128, 91 S. Ct. at 266 (Black, J.)).
Clearly, "Congress can enact legislation . . . enforcing" these constitutional
rights.  *Id.* at 519, 2163.  And prophylactic measures to deter or remedy
unconstitutional conduct are "within the sweep of Congress' enforcement
power even if in the process it prohibits conduct which is not itself
unconstitutional. . . ."  *Id.*; *see also Bd. of Trs. of Univ. of Ala. v. Garrett*,

164

No. 14-41127

531 U.S. 356, 365, 121 S. Ct. 955, 963 (2001); *South Carolina v. Katzenbach*, 383 U.S. 301, 327, 86 S. Ct. 803, 818 (1966). However, Congress's ability to enact such prophylactic legislation is cabined by an important limitation: "There must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *City of Boerne*, 521 U.S. at 520, 117 S. Ct. at 2164; *see also Garrett*, 531 U.S. at 365, 121 S. Ct. at 963. While Congress can employ "strong remedial and preventive measures to respond to the widespread and persisting deprivation of constitutional rights," *City of Boerne*, 521 U.S. at 526, 117 S. Ct. at 2167, it cannot enact "a substantive change in constitutional protections," *id.* at 532, 2170, under the guise of enforcement. *See also Coleman v. Court of Appeals of Md.*, 132 S. Ct. 1327 (2012); *Garrett*, 531 U.S. at 364–65, 121 S. Ct. at 962–63; *Mitchell*, 400 U.S. at 128–29, 91 S. Ct. at 266–67.

Section 2 is a prophylactic measure under the Fifteenth Amendment to the extent it prohibits any voting practice that "results in . . . abridgement of the right . . . to vote . . . on account of race" as further elaborated by the totality of the circumstances test. 52 U.S.C. § 10301(a). The results test is less demanding than that of intentional discrimination. The majority's two-part test, however, predicates liability not on any proven impact on voting but on disparate voter possession of qualifying IDs, a disparity caused not by this law but by exogenous circumstances. The disparity, moreover, relates to a small fraction even of minority voters and is found fatal to SB 14 notwithstanding the law's offer of free EICs to poor voters and accommodations for voters who are disabled, elderly, or have religious objections to photographic ID. This result amounts to "prophylaxis-upon-prophylaxis." *In re Cao*, 619 F.3d 410, 446 (5th Cir. 2010) (en banc) (quoting *Fed. Election Comm'n v. Wisc. Right To Life, Inc.*, 551 U.S. 449, 479, 127 S. Ct. 2652, 2672 (2007)). The majority has

165

No. 14-41127

transformed Section 2 from a provision protecting the equal right of minority
voters to exercise the franchise to a right of more convenient exercise.

Consequently, not only does this expanded right exceed the Fifteenth
Amendment, but it also threatens the balance struck by the Fourteenth
Amendment between individual rights and the public's need for fair and
efficient elections.  Under the majority's reasoning, a wide swath of racially
neutral election measures will be subject to challenge, a previously
unthinkable result under the Fourteenth Amendment and the Constitution's
federalist design.  Moreover, using Section 2 to rewrite racially neutral election
laws will force considerations of race on state lawmakers who will endeavor to
avoid litigation by eliminating any perceived racial disparity in voting
regulations.  But it is established that "subordinat[ing] traditional race-
neutral . . . principles" to "racial considerations" violates the Equal Protection
Clause. *Miller v. Johnson*, 515 U.S. 900, 916, 115 S. Ct. 2475, 2488 (1995); *see
also Inclusive Cmtys.*, 135 S. Ct. 2507, 2524 ("Courts should avoid interpreting
disparate-impact liability to be so expansive as to inject racial considerations
into" government decision-making.); *Ricci v. DeStefano*, 557 U.S. 557, 594–95,
129 S. Ct. 2658, 2681–82 (Scalia, J., concurring) (avoiding disparate impact
liability forces third parties such as states to evaluate the racial outcome of
their policies in a way that considers race, and government compulsion of this
result violates equal protection principles).  This was already a problem with
the nonretrogression doctrine in Section 5 of the Voting Rights Act, and it is a
mistake to import it to Section 2.  *See Georgia v. Ashcroft*, 539 U.S. 461, 491,
123 S. Ct. 2498, 2517 (2003) (Kennedy, J. concurring) ("Race cannot be the
predominant factor in redistricting . . . . Yet considerations of race that would
doom a redistricting plan under the Fourteenth Amendment or [Section] 2
seem to be what save it under [Section] 5.").

166

No. 14-41127

In fact, the Supreme Court has been careful to read Section 2 narrowly to avoid constitutional doubts. For example, in *LULAC v. Perry*, the Court rejected an interpretation of Section 2 that would have "unnecessarily infuse[d] race into virtually every redistricting. . . ." 548 U.S. 399, 446, 126 S. Ct. 2594, 2625 (2006); *see also Bartlett v. Strickland*, 556 U.S. 1, 21, 129 S. Ct. 1231, 1247 (2009) (reading Section 2 so as to "avoid[] serious constitutional concerns under the Equal Protection Clause."); *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 205, 129 S. Ct. 2504, 2513 (2009) (deciding case under Voting Rights Act Section 4(b) instead of reaching the constitutionality of Section 5). A faithful adherence to the statutory text of Section 2 would have avoided constitutional difficulties.

## IV.  Conclusion

Today's result moves us another step down the road of judicial supremacy by potentially subjecting virtually every voter regulation to litigation in federal court. According to the twists and turns of the majority opinions, purposeful racial discrimination can be "inferred" even without a shred of discriminatory utterance—not even one document of thousands of internal communications betrayed such purposes. Equally perversely, such a discrimination claim can be bolstered by legislative actions from forty to sixty years ago, when Texas was a Democrat-controlled state, whose legacy has been repudiated by current Republican dominance. (Not that party designation matters, but that any legislature's actions can be probative of decades-later actions when the legislature is controlled by the opposing party is bizarre.) Similarly, a Section 2 claim can rest on a marginal racially disparate impact estimated from sadly intransigent socioeconomic disparities coupled with a state's "long-ago history" of discrimination. Voting rights litigation is thus decoupled from any "results" caused by the state.

167

No. 14-41127

No doubt the majority believes that federal judges are well suited to regulate the electoral process. As with many judge-made "solutions," however, today's results will backfire. Judicial decisions will spawn inconsistent results and uncertainty, leading the public to question judges' impartiality. This decision will thus foster cynicism about the courts and more rather than less racial tension. Lawmakers at every level will be forced to be race-conscious, not race-neutral, in protecting the sanctity of the ballot and the integrity of political processes. Finally, these unauthorized and extra-legislative transfers of power to the judiciary disable the working of the democratic process, which for all its imperfections, best represents "we the people."

For these reasons, we dissent.

No. 14-41127

JERRY E. SMITH, Circuit Judge, joined by EDITH H. JONES and EDITH BROWN CLEMENT, Circuit Judges, dissenting:

We respectfully dissent for the reasons ably explained by Judges Jones, Clement, and Elrod.

The en banc court is gravely fractured and without a consensus. There is no majority opinion, but only a plurality opinion that draws six separate dissenting opinions and a special concurrence.[1]

Despite deep divisions on key questions, however, the en banc court is unanimous in roundly repudiating the district court for legal error on some issues. Most significantly, the district judge attempted to wipe the Texas voter ID law entirely off the books—a remedy that the majority rightly observes "is potentially broader than the one to which Plaintiffs would be entitled . . . ." (Page 77.) The en banc court instead leaves the voter ID requirement essentially intact. In reversing, all fifteen judges agree that, in the words of the plurality opinion, "the vast majority of eligible voters possess SB 14 ID, and we do not disturb SB 14's effect on those voters—those who have SB 14 ID must show it to vote." (Page 82.) That is a global change from what the district court ruled.

The en banc court is likewise unanimous in reversing the district judge's bizarre declaration that SB 14 is a poll tax. (Part IV.) That is a frivolous claim that never should have seen the light of day. Her holding reveals this judge's

---

[1] This case is an apt candidate for the well-worn saying, "You can't tell the players without a scorecard." Harry Stevens is credited with coming up with these words. Sometimes thought to be the inventor of the hot dog, he sold refreshments at Major League Baseball games in the early 1900s. "He also began to sell scorecards to fans with the phrase [']*You can't tell the players without a scorecard.*[']" *Harry M. Stevens*, WIKIPEDIA, https://en.wikipedia.org/wiki/Harry_M._Stevens (last modified July 5, 2016).

No. 14-41127

apparent opinion that Texas legislators and state officials are hayseed bigots determined to return minority voters to the back of the bus.

The unanimous court likewise clips the district judge's wings by vacating her gratuitous holding—in violation of the rule of constitutional avoidance—that SB 14 burdens the right to vote in violation of the First and Fourteenth Amendments.  (Part III.)  The plurality opinion properly dismisses those claims, criticizing the district court for ignoring the "well established principle governing the prudent exercise of . . . jurisdiction that [federal courts] will not decide a constitutional question if there is some other ground . . . ." (Page 71.)

The plurality opinion, although charitably allowing the district judge a second chance to review existing evidence, also roundly and repeatedly scolds her for mishandling that evidence and making erroneous findings therefrom. For example, the plurality aptly declares that "some [of the] findings are infirm."  (Page 10.)  Some "findings are infirm because of an erroneous view of the law."  (Page 10.)  "[W]e hold that much of the evidence upon which the district court relied was infirm."  (Page 13.)  "Because the district court relied upon evidence we conclude is infirm, the district court's opinion cannot stand as written."  (Page 18.)  "[T]he district court's analysis contained some legal infirmities."  (Page 19.)  "[S]ome of the evidence on which the district court relied was infirm."  (Page 30.)  The plurality gives the district court "instructions . . . about the legal infirmities in its initial findings."  (Page 32.)  The judge is told "to reevaluate the evidence" (Page 32) in accordance with "the appropriate legal standards" (Page 31).  The plurality sternly rejects the judge's use of suspect evidence: "[W]e do not agree that such anecdotal evidence of racial campaign appeals shows that SB 14 denies or abridges the right

170

No. 14-41127

to vote." (Page 64.)

In sum, the vast majority of the judges on the en banc court have declared the district judge to have substantially erred in myriad legal conclusions and use of evidence, and the court is unanimous in several of those reversals. The district court is well-advised to avoid such regrettable misadventure on remand.

No. 14-41127

JAMES L. DENNIS, Circuit Judge, concurring in part, dissenting in part, and concurring in the judgment:

I concur in all but part II.A.1 of the majority's opinion. I respectfully dissent from the majority's reversal of the district court's finding that SB 14 was enacted with a racially discriminatory purpose because, in my view, we are bound to affirm that factual finding. The majority opinion erroneously assigns legal errors to the district court and, in disturbing the district court's finding of discriminatory purpose, fails to adhere to the proper standard of review and engages in improper reweighing of the evidence.

The district court's determination that SB 14 was enacted with a racially discriminatory purpose or intent is a finding of fact. *See Rogers v. Lodge*, 458 U.S. 613, 623 (1982). In reviewing the factual findings of the district court, this court is bound by the "clearly erroneous" standard of Federal Rule of Civil Procedure 52(a). *Id.* at 622-23 (citing *Pullman-Standard v. Swint*, 456 U.S. 273 (1982)). "That Rule recognizes and rests upon the unique opportunity afforded the trial court judge to evaluate the credibility of witnesses and to weigh the evidence." *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 856 (1982). "Because of the deference due the trial judge, unless an appellate court is left with the 'definite and firm conviction that a mistake has been committed,' it must accept the trial court's findings." *Id.* at 855 (quoting *United States v. United States Gypsum*, 333 U.S. 364, 395 (1948)). Thus, if the trial court's account of the evidence is "plausible in light of the record viewed in its entirety," the appellate court must accept its findings. *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573-74 (1985).

The majority does not contend that the district court's finding of discriminatory purpose is implausible in light of the record as a whole. Indeed, the majority opinion itself appears to acknowledge that there is a considerable

No. 14-41127

amount of evidence to support this finding.  *See, e.g.*, Maj. Op. at 20-30 (discussing part of the voluminous evidence that tends to show that SB 14 was enacted with a discriminatory purpose).  Nevertheless, the majority reverses the district court because of purported legal errors, specifically, the district court's reliance on evidence that, in the majority's view, is "infirm."

Of course, Rule 52(a) does not apply to conclusions of law, and the district court's findings may be set aside if they rest on an erroneous view of the law. *Pullman-Standard*, 456 U.S. at 287.  In my view, however, examination of the district court's opinion reveals no legal error and no reliance on infirm evidence.  Instead of correcting legal errors, the majority opinion mistakenly lapses into an independent reweighing of the evidence and encroaches upon the district court's domain, in violation of Rule 52(a)'s clear instruction.  *See Inwood Labs.*, 456 U.S. at 856; *Rogers*, 458 U.S. at 622-23.

First, the majority faults the district court for relying "too heavily" on evidence of Texas's less recent history of enacting discriminatory voting measures, citing *Shelby Cty., Ala. v. Holder*, 133 S. Ct. 2612 (2013) and *McCleskey v. Kemp*, 481 U.S. 279 (1987).  Maj. Op. at 13-14.  The historical background of an official decision is "one evidentiary source for proof of intentional discrimination, particularly if it reveals a series of official actions taken for invidious purposes." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977).  Following the Supreme Court's guidance in *Arlington Heights*, the district court considered, *inter alia*, evidence of Texas's persistent history of discriminatory practices in the realm of voting rights, beginning with the inception of all-white primaries in 1895 and progressing with the continual invention of new methods designed to curb minority voting each time a prior method was blocked by the courts, including poll taxes, literacy and secret ballot restrictions, voter re-registration and purging, and

173

No. 14-41127

racial gerrymandering of electoral districts. *See Veasey v. Perry*, 71 F. Supp. 3d 627, 633-36 (S.D. Tex. 2014). The district court found that "[i]n each instance, the Texas Legislature relied on the justification that its discriminatory measures were necessary to combat voter fraud." *Id.* at 636. Contrary to the majority opinion's suggestion, neither *Shelby County* nor *McClesky* limits courts' consideration of such historical evidence in assessing discriminatory-purpose claims or proscribes the analysis employed by the district court here.

*Shelby County* concerned only the coverage formula for the preclearance requirement under section 5 of the Voting Rights Act, and the Supreme Court explicitly stated that its decision "in no way affects the permanent, nationwide ban on racial discrimination in voting found in § 2." 133 S. Ct. at 2629; *accord League of Women Voters of N. Carolina v. N. Carolina*, 769 F.3d 224, 242-43 (4th Cir. 2014) (holding in a section 2 case that the district court abused its discretion where it "failed to adequately consider North Carolina's history of voting discrimination" and instead "parroted the Supreme Court's proclamation [in *Shelby County*] that 'history did not end in 1965'") (citation and some internal quotation marks omitted).

In *McClesky*, the petitioner argued that Georgia's modern death sentencing process was unconstitutional. 481 U.S. at 291. Determining that McClesky had failed to establish that the state had acted with a discriminatory purpose, the Supreme Court concluded, *inter alia*, that state laws "in force during and just after the Civil War" were not probative of the legislature's intent a century later. *Id.* at 298 n.20. In the instant case, however, the district court did not rely solely on the more distant discriminatory practices by the state as evidence of the Texas Legislature's discriminatory purpose in passing SB 14. Rather, the district court considered the various and recurring

174

No. 14-41127

historical examples of state discrimination in Texas as evidence of the
unceasing effort and desire to enact discriminatory procedures that would
suppress the minority vote.   As the district court explained, this history
"exhibits a recalcitrance that has persisted over generations despite the
repeated intervention of the federal government and its courts on behalf of
minority citizens."   *Veasey*, 71 F. Supp. 3d at 636.   And, because of the
Legislature's repeated invocation of ballot integrity concerns to justify
discriminatory practices, the district court concluded that "[t]here has been a
clear and disturbing pattern of discrimination in the name of combatting voter
fraud in Texas."   *Id.*   Unlike the kind of isolated and remote evidence the
Supreme Court rejected in *McClesky*, evidence of a pervasive pattern of
operation is relevant to determining whether the legislature's current intent
was discriminatory.   While "history did not end in 1965," *Shelby Cty.*, 133 S.
Ct. at 2628, neither legal precedent nor logic requires that we act as if it started
in 1965 and close our eyes to the historical context surrounding challenged
state action.[1]   *See* W. FAULKNER, REQUIEM FOR A NUN 80 (Vintage Books 1975)
(1951) ("The past is never dead.   It's not even past.").

Next, the majority opinion faults the district court for its reliance on
evidence that, in the majority's view, is "limited in [its] probative value,"
including the relatively recent history of official discriminatory actions in a

---

[1] The majority opinion itself recognizes that this evidence is relevant and probative.
In surveying the evidence that tends to support the district court's discriminatory purpose
finding, the majority opinion discusses evidence of Texas' history of "justifying voter
suppression efforts," including the all-white primary, literacy and secret ballot requirements,
poll tax, and re-registration and purging, "with the race-neutral reason of promoting ballot
integrity."   Maj. Op. at 23.   Thus, the majority opinion suggests that this evidence tends to
show that the Legislature's justification of SB 14 as a measure to ensure ballot integrity was
pretext.   *See id.* at 23.   But the majority opinion does not explain why this historical evidence,
which may be used to prove pretext, cannot be used to support a more direct inference of
discriminatory intent.

No. 14-41127

particular Texas county and post-enactment testimony by proponents of the bill. Maj. Op. at 14-15, 18. In that respect, the majority opinion explicitly engages in reweighing of the evidence. *See, e.g.*, *id.* at 18 ("While probative in theory, even those (after-the-fact) stray statements made by a few individual legislators voting for SB 14 may not be the best indicia of the Texas Legislature's intent."). But determining the weight of the evidence "is the special province of the trier of fact," and this court may not reject the district court's finding simply because it would have assigned different weight to certain evidence than did the district court. *Inwood Labs.*, 456 U.S. at 856.

Finally, the majority opinion criticizes the district court for relying on conjecture and conclusory accusations by the bill's opponents in the Texas Legislature about the proponents' motives. Maj. Op. at 16-18. However, in its analysis of the discriminatory purpose claim, the district court did not rely on conjecture or conclusory assertions; instead, the court relied in part on testimony by SB 14's opponents as to particular facts and drew independent conclusions from those facts. *See, e.g.*, *Veasey*, 71 F. Supp. 3d at 702 (relying on proposed anti-immigration laws and concerns by Texas legislators about Hispanic immigrants carrying leprosy following census results showing gains in minority populations to conclude that "the 2011 legislative session was a racially charged environment"). The majority may not simply discard the district court's findings by substituting its own assessment of the evidence for that of the district court. *See Inwood Labs.*, 456 U.S. at 856.

In sum, the majority opinion identifies legal error where there is none, disturbs valid factual findings by the proper fact-finder, and thereby exceeds this court's authority under Rule 52(a). Because I believe we must affirm the district court's finding that SB 14 was enacted with a discriminatory purpose, I respectfully dissent in part. However, given that that our court has resolved

176

No. 14-41127

to reverse the discriminatory purpose finding and because of the significant evidence tending to show that SB 14 was enacted with a discriminatory purpose, I agree that this claim must be remanded to the district court for further proceedings in accordance with the judgment of the court.

No. 14-41127

EDITH BROWN CLEMENT, Circuit Judge, joined by E. GRADY JOLLY, EDITH H. JONES, JERRY E. SMITH, PRISCILLA R. OWEN, and JENNIFER WALKER ELROD, Circuit Judges, dissenting as to Part II.A.:

The Supreme Court has instructed that when a district court's findings as to discriminatory purpose are "infirm" and "the record permits only one resolution of the factual issue," we must reverse and render. *Pullman-Standard v. Swint*, 456 U.S. 273, 292 (1982). The plurality discredits "much of the evidence" relied upon by the district court, Op. at 13, yet still manages to determine that remand is the proper course. After accounting for the full extent of errors in the district court's analysis, the record permits only one resolution of the factual issue: Plaintiffs failed to prove that the Texas Legislature passed SB 14 with a discriminatory purpose. Such a resolution mandates that we reverse and render. Accordingly, I dissent.

## I.

The district court made infirm findings that rested on legal error in concluding that the Legislature passed SB 14 with a discriminatory purpose. The plurality addresses only some of these errors in a selective and disorderly fashion, failing to conduct the appropriate analysis under the *Arlington Heights* framework. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-68 (1977).

In conducting the proper analysis, it is important to bear in mind plaintiffs' heavy burden in imputing discriminatory intent to an entire legislative body. "'Discriminatory purpose' . . . implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker, in this case a state legislature, selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Pers. Adm'r of Mass. v. Feeney*,

No. 14-41127

442 U.S. 256, 279 (1979) (citation and footnote omitted); *see also Hunter v. Underwood*, 471 U.S. 222, 228 (1985) (explaining that racial discrimination must be a "'substantial' or 'motivating' factor behind enactment of the law").

First, the district court disproportionately relied on long-ago historical background evidence unrelated to SB 14 to discern a discriminatory purpose by the Legislature. *See Veasey v. Perry*, 71 F. Supp. 3d 627, 632-39, 700 (S.D. Tex. 2014). The most pernicious of the measures cited by the district court predate the passage of the Voting Rights Act in 1965. In fact, despite some bygone history of official discrimination, Texas's voting practices had so improved by 1965 that it was not included in the original preclearance requirements of the Voting Rights Act. As the plurality must admit, the district court's heavy reliance on such outdated historical evidence was error. Op. at 13-15; *see McCleskey v. Kemp*, 481 U.S. 279, 298 n.20 (1987) (noting that historical evidence not "reasonably contemporaneous with the challenged decision" has "little probative value"). Once stripped of error, the remaining historical background evidence on which the district court relied falls woefully short of "demonstrat[ing] a clear and consistent pattern of discriminatory action by the Texas Legislature." *Allstate Ins. Co. v. Abbott*, 495 F.3d 151, 160 (5th Cir. 2007). There is no substantial contemporary evidence of discrimination, and far from enough evidence to impugn the intentions of the entire Legislature in passing SB 14.

Second, the plurality fails to address the "specific sequence of events leading up [to] the challenged decision," *Arlington Heights*, 429 U.S. at 267, but an analysis of this factor makes clear that the district court erred. In *Arlington Heights*, the Supreme Court explained that courts should look to whether, for example, a legislative decision was precipitated by a sudden change in circumstances. *See id.* at 267 & n.16 (collecting cases and providing

179

No. 14-41127

example of sudden change in zoning laws after learning of plans to erect integrated housing). Here, the district court relied on evidence that SB 14 became "increasingly harsh" in each successive draft. *Veasey*, 71 F. Supp. 3d at 700. That is not the type of specific-sequence evidence, however, envisioned by the Court in *Arlington Heights*. The events leading up to the enactment of SB 14 demonstrate that lawmakers were concerned about protecting the integrity of elections, a concern backed by surveys showing that Texas voters of all races agreed with this goal and supported requiring photo IDs to vote. There is no evidence of sudden changed circumstances; in fact, the district court noted that SB 14 was debated over a lengthy six-year period. *Id.*

Third, the plurality claims that certain procedural departures by the Legislature provide a "potential link" in the "circumstantial totality of evidence" of possible discriminatory purpose. Op. at 24. But, as the plurality concedes, "context matters." *Id.* Viewed in the appropriate context, the procedural maneuvers employed by the Legislature occurred precisely because opponents of the legislation—several of whom are the very parties who brought this lawsuit—blocked three earlier iterations of voter ID legislation over the course of several years. While the Legislature made some departures from its normal procedural sequence in passing SB 14, these departures are easily explained as a way to avoid the obstructive tactics that had repeatedly defeated voter ID bills in past sessions. In other words, the political effectiveness of SB 14's opponents precipitated the Legislature's procedural departures.

The plurality makes much of the Legislature's passage of SB 14 in the midst of other "pressing matters of great importance to Texas." Op. at 26. In doing so, the plurality only feigns deference to the legislative process by claiming that the Legislature "is entitled to set whatever priorities it wishes." *Id.* at 25. We are not entitled to supplement our policy preferences for that of

180

No. 14-41127

the Legislature, and speculation such as what "one might expect" a legislature to do, *id.*, is not evidence of discriminatory purpose. It would be improper for the district court to infer discriminatory intent on behalf of the Legislature by second guessing legislative priorities. *See Arlington Heights*, 429 U.S. at 265 ("[I]t is because legislators and administrators are properly concerned with balancing numerous competing considerations that courts refrain from reviewing the merits of their decisions, absent a showing of arbitrariness or irrationality.").

Fourth, the State's purposes in passing SB 14 were protecting the sanctity of voting, avoiding voter fraud, and promoting public confidence in the voting process—motives that are unquestionably legitimate. *See Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 196 (2008) ("There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters. . . . While the most effective method of preventing election fraud may well be debatable, the propriety of doing so is perfectly clear."). The fit between the law's goals and provisions does not show it was enacted with discriminatory intent.

Fifth, the district court identified no reliable legislative history or contemporary statements that reveal discriminatory purpose. "The legislative or administrative history may be highly relevant, especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports." *Arlington Heights*, 429 U.S. at 268. "In some extraordinary instances the members might be called . . . to testify concerning the purpose of the official action . . . ." *Id.* As the Supreme Court has long recognized, however, "[p]lacing a decisionmaker on the stand is . . . 'usually to be avoided'" because "judicial inquiries into legislative or executive motivation

181

No. 14-41127

represent a substantial intrusion into the workings of other branches of government." *Id.* at 268 n.18.

The district court relied in large part on accusations by the bill's opponents about proponents' motives. *See Veasey*, 71 F. Supp. 3d at 655-57. Such biased conjecture cannot form the basis of a finding of discriminatory intent by the entire Legislature. *See United States v. O'Brien*, 391 U.S. 367, 384 (1968) ("What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork.").

Despite discrediting this unreliable evidence, the plurality still determines that "circumstantial evidence . . . could support a finding of discriminatory purpose." Op. at 21. The primary evidence cited by the plurality is that "[t]he record shows that drafters and proponents of SB 14 were aware of the likely disproportionate effect of the law on minorities . . . ." *Id.* at 22. The plurality further cites a "backdrop of warnings that SB 14 would have a disparate impact on minorities." *Id.* at 26. The plurality misunderstands the law: the Supreme Court has made clear that mere *awareness* of a disparate impact (even assuming *arguendo* it existed here) is not enough to prove discriminatory *intent. Feeney*, 442 U.S. at 279 (holding discriminatory purpose requires more than "awareness of consequences"; legislature must have "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group"); *Price v. Austin Indep. School Dist.*, 945 F.2d 1307, 1319 (5th Cir. 1991) ("*Feeney* stands directly for the proposition that foreseeability of discriminatory impact, without more, does *not* constitute the forbidden discriminatory purpose."). The plurality's mistaken understanding of the law only encourages further "infirm" findings based on "an erroneous view of the law" by the district court, whose

182

No. 14-41127

reasoning and findings even the plurality now roundly discredits. *Pullman-Standard*, 456 U.S. at 292.

The plurality also overlooks the total absence of direct evidence of a discriminatory purpose and the effect of plaintiffs' failure to unearth such evidence—despite repeated assertions that such evidence exists. The district court allowed plaintiffs to develop an extensive discovery record that included thousands of documents, numerous and lengthy depositions, and confidential email communications, all on plaintiffs' assertion that such discovery would offer critical evidence of discriminatory motive. In the end, this intrusive search—typically reserved only for "extraordinary" cases—yielded no such evidence. *See Arlington Heights*, 429 U.S. at 268. Despite no smoking gun that would show discriminatory intent in the voluminous evidence, the plurality asserts that we should instead look to circumstantial evidence to infer intent, as an "invidious purpose" may be "hiding." Op. at 30. The Court in *Arlington Heights* noted the need to consider circumstantial evidence in cases where testimony by the actual decisionmakers was "barred by privilege." 429 U.S. at 268. But, as we found in *Price v. Austin Independent School District*, where decisionmakers are called to testify about their actions and "the justifications advanced in their testimony do not demonstrate a pretext for intentionally discriminatory actions, the logic of *Arlington Heights* suggests that the [direct] evidence . . . is actually stronger than the circumstantial evidence proffered by the plaintiffs." 945 F.2d at 1318. Here too, the direct evidence, and plaintiffs' failure to demonstrate discriminatory purpose from it, overwhelmingly favor a finding of no discriminatory intent. As the panel correctly noted, it is rather unlikely that a discriminatory motive "would permeate a legislative body and not yield any private memos or emails." *Veasey v. Abbott*, 796 F.3d 487, 503 n.16 (5th Cir. 2015), *reh'g en banc granted*, 815 F.3d 958.

No. 14-41127

The Supreme Court has recognized the gravity of judicial inquiries into alleged improper motives by a legislative body. *O'Brien*, 391 U.S. at 383-84 (stating that judicial "[i]nquiries into congressional motives or purposes are a hazardous matter" and the "stakes are . . . high"). The plurality takes lightly the aspersions it casts on the Legislature by allowing such a weak evidentiary record to potentially support a finding of racial animus. When there is no "proof that a discriminatory purpose has been a motivating factor in the decision," as is the case here, we owe "judicial deference." *Arlington Heights*, 429 U.S. at 265-66. The plurality abjures such deference and encourages witch hunts for racism.

## II.

The record permits only one conclusion in this inquiry after applying the appropriate legal standards and discounting the infirm findings by the district court: Plaintiffs have not proven that the Texas Legislature acted with a discriminatory intent in enacting SB 14. *See Pullman-Standard*, 456 U.S. at 292. Despite extensive discovery of legislators' private materials, plaintiffs have brought forth no direct evidence of discriminatory intent. What evidence remains, after accounting for the district court's errors, does not suffice to conclude that SB 14 was enacted "'because of,' not merely 'in spite of,'" a disparate impact on minorities. *Feeney*, 442 U.S. at 279.

The record below was fully developed. Because plaintiffs "simply failed to carry their burden of proving that discriminatory purpose was a motivating factor in the [Legislature's] decision," the district court should not be allowed to conduct any re-weighing of the evidence. *Arlington Heights*, 429 U.S. at 270-71. There is no reason to permit plaintiffs—who have not carried their burden—another opportunity to prove their case. *See id.* at 271 ("This conclusion ends the constitutional inquiry."). Unfortunately, the plurality

No. 14-41127

chooses to provide plaintiffs another chance and leaves the district court with a disorganized, piecemeal analysis of the *Arlington Heights* factors that confuses the law and offers no clear direction on remand.

For these reasons, I would reverse the district court's holding as to discriminatory purpose and render judgment for the State on this claim.

No. 14-41127

JENNIFER WALKER ELROD, Circuit Judge, joined by SMITH, Circuit Judge, concurring in part and dissenting in part:

I dissent from all but Part IV of Judge Haynes's opinion.[1]  I agree with Judge Jones's opinion that, despite wide-reaching and invasive discovery into legislators' internal correspondence, there is no record evidence that any legislator—much less the Texas Legislature as a whole—had a racially discriminatory purpose in enacting SB 14.  The extensive history of obstruction by opponents of voter ID legislation accounts for the procedures employed to ensure passage of SB 14, and none of the circumstantial evidence relied on by Judge Haynes's opinion suggests that the Legislature acted on the basis of racism.[2]  Judgment therefore should be rendered in favor of the State on Plaintiffs' discriminatory purpose claim.

---

[1] Part IV of Judge Haynes's opinion correctly vacates the district court's opinion and renders judgment in the State's favor on Plaintiffs' claim that SB 14 imposes an unconstitutional poll tax.  Part III of Judge Haynes's opinion vacates the district court's ruling on Plaintiffs First and Fourteenth Amendment claims.  I agree that those claims should be vacated.  Because I do not agree with the treatment of the Voting Rights Act claims in Judge Haynes's opinion, I would reach the First and Fourteenth Amendment claims and reverse.  The First and Fourteenth Amendment claims fail because Plaintiffs have not shown SB 14 "imposes 'excessively burdensome requirements' on any class of voters . . . ." *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 202 (2008) (quoting *Storer v. Brown*, 415 U.S. 724, 738 (1974)) (upholding Indiana's voter ID requirements against Fourteenth Amendment challenge); *see also Burdick v. Takushi*, 504 U.S. 428, 434 (1992) ("[W]hen a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions." (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992))).

[2] Judge Costa's opinion blurs the line between discriminatory intent and discriminatory effect.  Even when a legislature acts to disadvantage an opposition party, the mere correlation between party membership and race does not create a Voting Rights Act or Equal Protection claim.  "Because of" means because of.  *See Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979) ("[Discriminatory purpose] implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group.").

No. 14-41127

Plaintiffs' claim that SB 14 violates the "results test" of Section 2 of the Voting Rights Act also fails. SB 14 does not "result[] in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a).

> [A] disparate-impact claim that relies on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity. A robust causality requirement ensures that racial imbalance does not, without more, establish a prima facie case of disparate impact and thus protects defendants from being held liable for racial disparities they did not create.

*Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 135 S. Ct. 2507, 2523 (2015) (internal alterations, quotation marks, and citation omitted). I agree with Judge Jones's opinion and Judge Easterbrook's opinion for the Seventh Circuit that the *Gingles*[3] factors—an unranked list of nonexclusive considerations that lend themselves to manipulation—are unhelpful in this context.[4] *See Frank v. Walker*, 768 F.3d 744, 755 (7th Cir. 2014) (expressing skepticism about application of *Gingles* factors to voter ID provision, because *Gingles* "does not distinguish discrimination by the defendants from other persons' discrimination. In vote-dilution cases, the

---

[3] *Thornburg v. Gingles*, 478 U.S. 30 (1986).

[4] The malleability of the *Gingles* test is visible in its implementation: different courts purporting to apply the *Gingles* factors seem to conduct very different analyses. *Compare Ohio State Conference of NAACP v. Husted*, 768 F.3d 524, 556–60 (6th Cir. 2014) (relying on *Gingles* as second step of a two-part test dependent on socioeconomic factors and historic voting practices), *vacated as moot by* 2014 WL 10384647 (6th Cir. Oct. 1, 2014), *and League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 241–44 (4th Cir. 2014) (relying on *Gingles* as second step of a two-part test dependent on sweeping contextual analysis of pre-VRA history and details of challenged bill's passage), *mandate stayed*, 135 S. Ct. 6, *cert. denied*, 135 S. Ct. 1735 (2015), *with Gonzalez v. Arizona*, 677 F.3d 383, 405–07 (9th Cir. 2012) (en banc) (citing some but not all of the *Gingles* factors without reference to a two-part test); *see also N.C. State Conference of NAACP v. McCrory*, ___ F. Supp.3d ___, No. 1:13-cv-658, 2016 WL 1650774, at *76–*80 (M.D.N.C. Apr. 25, 2016) (collecting cases). The validity of a state's voting laws ought not to rely on the outcome of a judicial Rorschach test.

No. 14-41127

domain of *Gingles*, the government itself draws the district lines; no one else bears responsibility."), *cert. denied*, 135 S. Ct. 1551 (2015).

Moreover, Plaintiffs' § 2 claim fails even if we consider the *Gingles* factors.  SB 14 has been tested many times and there is no evidence in this record that any voter has been denied the right to vote on the basis of his or her race because of its voter ID requirements.[5]   Plaintiffs' claim rests principally on the unfortunate socioeconomic disparities that exist among various racial groups in Texas as elsewhere, but Judge Haynes's opinion fails to establish any link between these disparities and any contemporary discrimination by the State of Texas.

The Voting Rights Act rests on Congress's authority to enact "appropriate legislation" to enforce the guarantees of the Fifteenth Amendment.  *Shelby Cty., Ala. v. Holder*, 133 S. Ct. 2612, 2619 (2013); *South Carolina v. Katzenbach*, 383 U.S. 301, 325–26 (1966); U.S. Const. amend. 15 §§ 1–2.  The use of that power "must be justified by current needs." *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 203 (2009).  The examples of decades-old state discrimination relied on by Plaintiffs are unavailing.  *See Shelby Cty.*, 133 S. Ct. at 2622, 2627 (explaining that the Voting Rights Act "imposes current burdens and must be justified by current needs" and rejecting reliance on "decades-old data and eradicated practices").   Nor does the existence of societal economic disparities render SB 14 unlawful.  *See Frank*,

---

[5] To establish a § 2 claim, Plaintiffs must first show that SB 14 abridges or denies an individual's ability to vote.  After an exhaustive statewide search, Plaintiffs identified three individuals who could not vote at one time because they lacked qualifying ID.  None is now prevented from voting.  Two of the three individuals are eligible to vote by mail and the third has subsequently obtained a free election ID card.  Out of the entire state of Texas, Plaintiffs have not produced anyone who cannot vote today because of SB 14's requirements.  The burden to prove discriminatory effect lies with Plaintiffs. Without a denial or abridgement, no § 2 claim can stand.

No. 14-41127

768 F.3d at 753 ("Section 2(a) forbids discrimination by 'race or color' but does not require states to overcome societal effects of private discrimination that affect the income or wealth of potential voters.").

The contrary approach taken by Judge Haynes's opinion improperly would permit challenges to virtually all aspects of the voting process simply because poverty adds to the burdens of everyday activities and wealth distribution is unequal across racial groups. This distorts the § 2 analysis and raises serious constitutional questions. *Cf. Inclusive Cmtys.*, 135 S. Ct. at 2524 ("Courts should avoid interpreting disparate-impact liability to be so expansive as to inject racial considerations" into government decision-making.).

The Supreme Court has explained that for most voters, the burdens associated with obtaining photo ID in order to vote "surely do[] not qualify as a substantial burden on the right to vote, or even represent a significant increase over the usual burdens of voting." *Crawford*, 553 U.S. at 198 (upholding Indiana's voter ID law). The requirements imposed by SB 14 are not outside the usual inconveniences expected of citizens exercising their right to vote, and, as in *Crawford*, they provide no basis for overturning a race-neutral law by which the State seeks to prevent in-person voter fraud. *See id.* at 196 ("[T]he interest in orderly administration and accurate recordkeeping provides a sufficient justification for carefully identifying all voters participating in the election process.").

Simply put, Plaintiffs have not shown that SB 14 had any effect on voter turnout, that any disparity in ID possession among racial groups was caused by SB 14, or that a single Texan is prevented from voting by SB 14. Accordingly, I would vacate the district court's opinion and render judgment for the State.

No. 14-41127

GREGG COSTA, Circuit Judge, dissenting from Part II(A)(1):

The six years of debate in the Texas Legislature before voter ID passed demonstrates that it is a controversial political question. The opinions issued today demonstrate it also raises contentious legal questions. And with respect to how to assess vote denial (as opposed to vote dilution) claims under the "effects" test of the Voting Rights Act, it is a difficult one. Although I join the majority opinion affirming the district court's holding that the Texas law has discriminatory effects in violation of the Act, the *Gingles* factors are not a perfect fit for the vote denial claims that have blossomed in the post-*Shelby County* world. But for the reasons set forth in the majority opinion and Judge Higginson's concurring opinion, it is the best guidance we have for evaluating such cases.

In contrast to the uncertain legal terrain for the discriminatory effects claim, the discriminatory purpose claim can be resolved through application of two entrenched legal principles: the deference that appellate courts owe to factfinders and the *Arlington Heights* framework for evaluating circumstantial evidence of discriminatory purpose.[1] *See Pullman-Standard v. Swint*, 456 U.S. 273, 287 (1982); *Village of Arlington Heights v. Metropolitan Housing Develop. Corp.*, 429 U.S. 252, 266–68 (1977). That deference requires that we overturn a district court's factual findings only if they are clearly erroneous, which means substantial evidence did not support the finding, the court misinterpreted the effect of the evidence, or the findings are against the preponderance of credible evidence. *See* Fed. R. Civ. P. 52(a)(6); *Water Craft*

---

[1] Even with our affirmance of the discriminatory effects finding, the purpose claim must still be resolved. Not only would a finding of discriminatory purpose lead to a different remedy with respect to the voter ID law, but it could also subject Texas to preclearance for future voting changes. 52 U.S.C. § 10302(c).

No. 14-41127

*Mgmt. LLC v. Mercury Marine*, 457 F.3d 484, 488 (5th Cir. 2006).   To reverse under the clear error standard, we must have "a definite and firm conviction that a mistake has been committed."   *Id.* (quoting *Canal Barge Co. v. Torco Oil Co.*, 220 F.3d 370, 375 (5th Cir.2000)).

That deference is the reason it is hard to find appeals of bench trials involving private law causes of action in which we have concluded that the factual findings were clearly erroneous.   This year alone, we have affirmed such findings in bankruptcy,[2] maritime,[3] Fair Labor Standards Act,[4] ERISA,[5] insurance,[6] and oil and gas[7] cases.   In none of those cases did we subject the evidence to exacting scrutiny or reweigh it.   That is not a dereliction of appellate duty.   It is as it should be.   So long as the "district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently."   *U.S. Bank Nat. Ass'n v. Verizon Commc'ns, Inc.*, 761 F.3d 409, 431 (5th Cir. 2014) (affirming district court's valuation finding in fraudulent transfer case) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74 (1985)).

---

[2] *In re Monge*, -- F.3d --, 2016 WL 3269032 (5th Cir. June 14, 2016).

[3] *Grogan v. W & T Offshore, Inc.*, 812 F.3d 376 (5th Cir. 2016); *Alebamon Marine Servs., L.L.C. v. Ocean Marine Contractors Scrap Div., L.L.C.*, 2016 WL 1358948 (5th Cir. Apr. 5, 2016); *Osprey Underwriting Agency, Ltd. v. Nature's Way Marine, L.L.C.*, -- Fed. Appx. --, 2016 WL 1178110 (5th Cir. Mar. 25, 2016).

[4] *Steele v. Leasing Enter., Ltd.*, -- F.3d --, 2016 WL 3268996 (5th Cir. June 14, 2016); *Fairchild v. All American Check Cashing, Inc.*, 815 F.3d 959 (5th Cir. 2016).

[5] *Perez v. Bruister*, -- F.3d --, 2016 WL 2343009 (5th Cir. May 3, 2016).

[6] *Seahawk Liquidating Trust v. Certain Underwriters at Lloyds London*, 810 F.3d 986 (5th Cir. 2016).

[7] *Akuna Matata Invs. Ltd. v. Texas Nom Ltd. P'ship*, 814 F.3d 277 (5th Cir. 2016).

191

No. 14-41127

But it is easier to find recent public law cases in which we have not upheld factual findings, despite the deferential standard of review.[8]  *See Aransas Project v. Shaw*, 774 F.3d 324, 326 (5th Cir. 2014) (Prado, J., dissenting from denial of rehearing en banc) (citing *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 769 F.3d 330, 335 (5th Cir. 2014) (Dennis, J., dissenting from denial of rehearing en banc)).  This case adds to the list.  That is so despite the rule that "[l]egislative motivation or intent is a paradigmatic fact question."[9]  *Prejean v. Foster*, 227 F.3d 504, 509 (5th Cir. 2000) (citing *Hunt v. Cromartie*, 526 U.S. 541, 549 (1999)).

So what are the reasons why the majority opinion, despite noting significant evidence "that could support a finding of discriminatory intent," Maj. Op. at 18, does not defer to that finding?  There are two: the district court relied "too heavily on the evidence of State-sponsored discrimination dating back hundreds of years" and "on post-enactment speculation by opponents of SB 14." Maj. Op. at 13, 16.  As discussed below, however, virtually none of this evidence that the majority opinion critiques appears in the district court's

---

[8] Because these cases often have such a significant impact (the instant case involves a law setting voting requirements for a state of more than 25 million people), it may be natural to be hesitant about giving a single district judge so much discretion in deciding the fate of a law.  Indeed, it used to be the case that lawsuits challenging the constitutionality of a state or federal law had to be heard by three-judge panels.  28 U.S.C. §§ 2281, 2282 (repealed 1976).  For better or worse, Congress did away with that system in 1976.  Act of Aug. 12, 1976, Pub. L. No. 94-381, 90 Stat. 1119; *see also* 17A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 4235 (3d ed.) (discussing history, purpose, and current status of Congressionally required three-judge panels).  With these cases now being decided by a single judge as most others are, there is no basis for altering the level of deference based on the subject matter of the case.

[9] In the context of private Title VII suits, discriminatory intent was the disputed issue in two of the leading Supreme Court cases emphasizing the deference that district courts are owed on questions of fact.  *Anderson*, 470 U.S. at 574–75 (intent to discriminate on basis of sex); *Pullman-Standard*, 456 U.S. at 290 (rejecting in race discrimination case "the Fifth Circuit rule that a trial court's finding on discriminatory intent is not subject to the clearly-erroneous standard of Rule 52(a)").

No. 14-41127

analysis of the discriminatory purpose claim.  *See Veasey v. Perry*, 71 F. Supp. 3d 627, 698–703 (S.D. Tex. 2014).

With respect to the use of history, I read not only the district court's opinion but also the case law differently.  As legal support for the view that the district court gave too much weight to "long-ago history," the majority opinion relies principally on *Shelby County v. Holder*, 133 S. Ct. 2612 (2013).  Maj. Op at 13–14 & n.14.  *Shelby County* held that Congress exceeded its power under the Fifteenth Amendment in subjecting nine states to the "extraordinary measure[]" of having to preclear every change in voting laws.  *Id.* at 2619.  It found Congress's formula for selecting these states unconstitutional because it relied on "decades-old data and eradicated practices," in particular the use of literacy tests which had long been abolished and voter registration and turnout numbers that had "risen dramatically" since 1965 when the Voting Rights Act was first enacted.  *Id.* at 2627.

*Shelby County* was not a case about purposeful discrimination under the Fourteenth Amendment or Section 2 of the Voting Rights Act.  It makes no mention of *Arlington Heights*.  For those reasons alone, *Shelby County* should not be used to curtail the use of an *Arlington Heights* factor.  *See Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overturning its own decisions.").

But even if we did have the freedom to engage in a law review-like debate about what *Shelby County* foretells for the use of history as circumstantial evidence under *Arlington Heights*, history is being used very differently in the two contexts.  *Shelby County* rejected the use of 50-year-old history alone to

No. 14-41127

impose the "stringent" requirement of preclearance.    That preclearance
requirement, which applied to new laws carrying no hint of unconstitutionality
(even ones that increased access to voting), was an exception to the normal
practice of using "case-by-case litigation" to enforce constitutional rights.  133
S. Ct. at 2624.  In the example of case-by-case litigation here that seeks to
establish a current constitutional violation, *Arlington Heights* just says that
history is one of many factors that may be considered.  And it's not just any
history that courts should consider, but a historical background that "reveals
a series of official actions taken for invidious purposes." *Arlington Heights*, 429
U.S. at 267.

That type of pattern-or-practice evidence exists here.  As the majority
opinion recognizes, most of the discriminatory laws the district court
recounted—all-white Democratic primaries; literacy tests; poll taxes; and the
annual re-registration requirement that Texas imposed after the poll tax was
abolished—were justified with the same interest cited for voter ID: prevention
of voter fraud.  Maj. Op. at 22–23.  Another thread, again recognized by the
majority opinion, running from prior restrictive voting laws to SB 14 is that
they have typically been enacted (by both political parties) in response to a
perception of increased voting power by emerging demographic groups.[10]  Maj.
Op. 29–30 & n.30; 71 F. Supp. 3d at 700.  The district court thus did not just
say "there was discrimination in the past, so there must be discrimination
today;" it tied historical patterns to features of the law being challenged, as
*Arlington Heights* contemplates.

———————————————

[10] This historical practice is not limited to Texas or other southern states.  In response
to the growth of Irish immigrants who tended to favor Democrats, the Know-Nothing
movement led to the passage of more restrictive voting laws in Connecticut, Massachusetts,
and New York during the 1850s. *See* ALEXANDER KEYSSAR, THE RIGHT TO VOTE: THE
CONTESTED HISTORY OF DEMOCRACY IN THE UNITED STATES 68 (rev. ed. 2009).

No. 14-41127

Despite recognizing that this connection was made with respect to both the voter fraud rationale and historical practice of enacting voting restrictions in response to potential increases in minority voting strength, the majority opinion nonetheless holds that the district court relied too much on "evidence of State-sponsored discrimination dating back hundreds of years." Maj. Op. at 13. To be sure, historical evidence limited to the nineteenth century is of "little probative value." *McCleskey v. Kemp*, 481 U.S. 279, 298 n.20 (1987) (discounting, under *Arlington Heights*, historical evidence focused only on "Georgia laws in force during and just after the Civil War" because it was not reasonably contemporaneous with enactment of the challenged law). But I just don't see that the district court's finding of discriminatory purpose relied on such history at all, let alone to a significant degree.

The majority opinion's contrary view seems to flow from its scrutiny of the entire district court opinion for any references to evidence that may not be probative of discriminatory intent. But the district court had before it not just the purpose question, but claims involving discriminatory effects, impact on First Amendment interests under the *Anderson/Burdick* balancing test, and whether the voter ID imposed a poll tax. As is customary with bench trial rulings, the district court first summarized the testimony and facts from the entire trial. Only after that discussion, which was lengthy given the vast record, did it proceed to analyze the particular claims and identify the evidence that supported its legal conclusions for each. In reviewing the factual sufficiency of the finding of discriminatory purpose, our review should focus on the district court's analysis of that particular claim.

One looking at that section of the district court's decision after reading today's opinions with their focus on history would be surprised that this is the only mention of it:

No. 14-41127

> Historical Background.  As amply demonstrated, the Texas Legislature
> has a long history of discriminatory voting practices.  To put the current
> events into perspective, Texas was going through a seismic demographic
> shift at the time the legislature began considering voter ID laws.
> Hispanics and African–Americans accounted for 78.7% of Texas's total
> population growth between 2000 and 2010.  In addition, it was during
> this time that Texas first became a majority-minority state, with Anglos
> no longer comprising a majority of the state's population.  As previously
> discussed, this Court gives great weight to the findings of Dr. Lichtman
> that '[t]he combination of these demographic trends and polarized voting
> patterns . . . demonstrate that Republicans in Texas are inevitably
> facing a declining voter base and can gain partisan advantage by
> suppressing the overwhelmingly Democratic votes of African–
> Americans and Latinos.'

71 F. Supp. 3d at 700 (alterations in original) (footnotes omitted).  The natural
reading of this single paragraph is that the general first sentence is providing
background, and it is only the demographic changes that the court is citing as
the *Arlington Heights* context for "the current events."  The majority opinion
not only finds no error with this latter conclusion, but endorses its relevance.
Maj. Op. at 29–30.

Even if one reads the footnote at the end of the first sentence as fully
incorporating the opening section of the opinion that chronicles "Texas's
history with respect to racial disparity in voting rights,"[11]  *id*. at 700 n.535
(citing *id*. at 633–39), I don't see that historical overview as error.[12]  Not so
long ago, the Supreme Court recited the same history of voting rights in Texas:

---

[11] Because the opening sentence of the paragraph just refers to the Texas Legislature's
history of enacting discriminatory voting laws, there is no plausible reading that would allow
it to incorporate prior summaries of testimony in the opinion that involve the discriminatory
voting acts of a single county (Waller County), another item the majority opinion criticizes.

[12] The only parts of that section that refer to events "dating back hundreds of years"
are a benign introductory statement that "On the heels of Reconstruction, freed slaves and
other minority men were just gaining access to the right to vote,"  and headings for topics
like the poll tax and literacy tests that, owing to the duty of historical accuracy, list the entire
period they were in existence ("1905–1970: Literacy and 'Secret Ballot' Restrictions"; "1902–
1966: Poll Taxes").  71 F. Supp. 3d at 634.

No. 14-41127

> Texas has a long, well-documented history of discrimination that has
> touched upon the rights of African–Americans and Hispanics to register,
> to vote, or to participate otherwise in the electoral process. Devices such
> as the poll tax, an all-white primary system, and restrictive voter
> registration time periods are an unfortunate part of this State's minority
> voting rights history. The history of official discrimination in the Texas
> election process—stretching back to Reconstruction—led to the
> inclusion of the State as a covered jurisdiction under Section 5 in the
> 1975 amendments to the Voting Rights Act. Since Texas became a
> covered jurisdiction, the Department of Justice has frequently
> interposed objections against the State and its subdivisions.

*LULAC v. Perry*, 548 U.S. 399, 439–40 (2006) (quoting *Vera v. Richards*, 861
F. Supp. 1304, 1317 (S.D. Tex. 1994)). Deeming a similar discussion here to be
legal error risks making rhetoric a basis for reversal. The natural starting
point of any historical discussion is the beginning. Maj. Op. at 14 n.14
(recognizing that "history (even 'long-ago history') provides context to modern-
day events"). And the bigger problem of locating error in sections of the district
court's opinion that do not even analyze the claim at issue is that it results in
the fact finding of judges being much more susceptible to reversal than those
of juries, which do not have to summarize the evidence or provide reasons for
their decisions.

This improper focus on the district court's summary of the evidence
rather than its later analysis of the discriminatory purpose claim is just as
pronounced when it comes to the statements of bill opponents with which the
majority opinion also finds fault. Maj. Op. at 16–17. Those comments appear
nowhere in the one-paragraph discussion of "Contemporaneous Statements,"
71 F. Supp. 3d at 702, or anywhere else in the discriminatory purpose analysis.
Instead, they appear in a section recounting testimony (from both sides) about
the "Method and Result of Passing SB 14." *Id.* at 655–57. The discussion of
"Contemporaneous Statements" that does appear in the purpose analysis is

No. 14-41127

balanced, noting that "there are no 'smoking guns' in the form of an SB 14 sponsor making an anti-African-American or anti-Hispanic statement." *Id*. at 702. The only legislator quoted is not an opponent, but bill supporter Todd Smith who admitted it was "common sense" that voter ID would have disproportionate effects on racial minorities. *Id*. The majority opinion cites that testimony as relevant evidence for the purpose claim. Maj. Op. at 22. That leaves only the district court's conclusion that the 2011 legislative session was racially charged in light of other pending legislation, *id*. at 702, which seems like an inference a factfinder should be entitled to draw.

But even if not, with that factual finding being the only one specifically mentioned in the district court's discussion of discriminatory purpose with which the majority opinion finds fault, it does not seem like a sufficient basis for reaching "a definite and firm conviction that a mistake has been committed" as to the ultimate finding. *Canal Barge Co. Inc.*, 220 F.3d at 375. That is especially so when the majority opinion endorses the district court's reliance on just about all the other evidence it actually did cite in assessing the *Arlington Heights* factors. *See* Maj. Op. at 21–30. In light of that discussion and the district court opinion, there is no value in repeating that evidence here. The only thing to add is that the district court correctly recognized that the discriminatory impact of the law (for which the majority opinion finds sufficient evidentiary support on the "effects" claim and which even Judge Jones's dissent does not dispute, *see* Jones Dissent at 5) can also be considered in evaluating discriminatory purpose. *See Arlington Heights*, 429 U.S. at 266 (noting that "[t]he impact of the official action whether it 'bears more heavily on one race than another,' may provide an important starting point" in the "sensitive inquiry into [ ] circumstantial and direct evidence of intent") (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976)); *Jim Sowell Const. Co. v. City*

198

No. 14-41127

*of Coppell*, 61 F. Supp. 2d 542, 547 (N.D. Tex. 1999) (citing *Arlington Heights*
for the proposition that "circumstantial evidence regarding the impact of its
official actions" can be evidence of discriminatory purpose). Yet the majority
opinion does not list discriminatory impact as a consideration in the purpose
inquiry, Maj. Op. at 11–12, despite recognizing that those likely effects were
known prior to enactment, which would seem to make the discriminatory
impact an even more probative consideration in determining purpose. I would
therefore conclude that there was sufficient evidence from which the district
court could have reasonably concluded that the law was enacted with a
discriminatory purpose, even if, as is usually the case in hotly contested trials,
there is also evidence to support the opposite view.

Vacating the finding of discriminatory purpose not only is at odds with
the deference owed the factfinder, but also causes delay in the ultimate
resolution of this case that could impose significant costs. Voter ID was passed
five years ago. Litigation concerning its lawfulness has been ongoing for more
than four years.[13] Even more concerning than mere delay, however, is the
possibility of Texas elections being conducted under ever-changing rules. Since
SB 14's enactment, elections have been conducted under its terms. The
upcoming November 2016 is now likely to be conducted under a remedy for the
effects violation that limits the discriminatory impact of the law but that leaves
some of it in place. Depending on how the discriminatory purpose claim is
decided on remand, the next cycle of elections might be conducted with a voided
SB 14 playing no role. Such frequent changes in the voting rules carry a

---

[13] The preclearance regime was still in effect when the law was enacted. DOJ denied
preclearance, but in 2012 Texas sought a judicial determination of that question by a three-
judge panel. *See Texas v. Holder*, 888 F. Supp. 2d 113 (D.D.C. 2012), *vacated*, 133 S. Ct. 2886
(2013). After *Shelby County*, the lawsuits we are considering were filed in 2013.

No. 14-41127

substantial risk of increased confusion.  It is that uncertainty over voting requirements that some studies—including a recent joint study from Rice University's Baker Institute for Public Policy and the University of Houston's Hobby Center for Public Policy—have found to be one of the more significant ways in which voter ID laws depress turnout.  *See* MARK JONES, ET. AL., THE TEXAS VOTER ID LAW AND THE 2014 ELECTION: A STUDY OF TEXAS'S 23RD CONGRESSIONAL DISTRICT 13 (2015) (noting that its study of voter turnout under SB 14 "suggest[s] that the most significant impact of the current Texas voter ID law is confusion and subsequently depressed voter turnout").

\* \* \*

Reluctance to hold that a legislature passed a law with a discriminatory purpose is understandable.  Maj. Op. 12 ("We acknowledge the charged nature of accusations of racism, particularly against a legislative body . . . .").  Yet courts are called upon all the time to decide difficult questions about whether state legislatures or Congress have violated other important constitutional values like, taking the First Amendment as just one example, the right to free speech or free exercise of religion.  When we find that they have done so, it doesn't exactly cast those lawmakers in the best of light.

It is also important to note that affirming the finding of discriminatory purpose[14] would not be the inflammatory "racial name-calling" that Judge Jones's dissent suggests.  Jones Dissent at 1.  Such a finding, although one of grave importance, is not tantamount to a finding that the law had a "racist

---

[14] It's also worth again emphasizing that unlike the findings of constitutional violations we usually make in cases that present purely legal questions, affirming the district court here would not be a direct ruling from this court that the law was passed with a discriminatory purpose, only that there was evidence from which a factfinder could draw that conclusion.

No. 14-41127

motivation." *Id.* at 3; Elrod Dissent at 1 (characterizing question as whether "the Legislature acted on the basis of racism"); *see also* Maj. Op. at 12–13 (also indicating that such a finding requires a showing of "racism"). As Judge Kozinski explained in a decision upholding a district court determination that a discriminatory purpose motivated a Los Angeles county reapportionment plan, nothing in an opinion finding discriminatory purpose needs to even "suggest[]" that lawmakers "harbored any ethnic or racial animus." *Garza v. Cnty. of Los Angeles*, 918 F.2d 763, 778 (9th Cir. 1990) (Kozinski, J., concurring) (explaining that "there is no indication that what the district court found to be intentional discrimination was based on any dislike, mistrust, hatred or bigotry against Hispanics or any other minority group").[15] The

---

[15] Judge Jones's dissent states that *Garza* is one of only a handful of cases in recent decades finding that a law was enacted with a discriminatory purpose. Jones Dissent at 10 n.11. Notably, it was a voting rights case from a jurisdiction not covered by the Voting Rights Act's preclearance requirements. *See also Stabler v. Cnty. of Thurston, Neb.*, 129 F.3d 1015, 1022 (8th Cir. 1997) (finding intentional discrimination in redistricting plan of non-covered Nebraska county). For the nine covered states (a number of counties from other states were also subject to preclearance), there was little incentive for a challenger to bring a claim of purposeful discrimination prior to *Shelby County*. One of the requirements for preclearance was for the public entity enacting the change to *disprove* that the voting change had a discriminatory purpose or effects. *Reno v. Bossier Parish School Bd.*, 520 U.S. 471, 477–78 (1997) (citing 42 U.S.C. § 1973c). The impact that making the typically easier-to-prove effects test an equally powerful avenue of relief has on purpose claims can be seen from the drop in the number of discriminatory purpose claims brought in voting cases after the 1982 amendments to the Voting Rights Act made effects a basis for section 2 liability in response to *City of Mobile v. Bolden*, 446 U.S. 55 (1980) (interpreting prior version of section 2 to require finding of discriminatory purpose). In cases litigated on the eve of the 1982 amendments, three courts of appeals (including ours) had found discriminatory purpose in the enactment or maintenance of local electoral systems. *See Lodge v. Buxton*, 639 F.2d 1358, 1380 (5th Cir. Unit B 1981), *aff'd sub nom. Rogers v. Lodge*, 458 U.S. 613 (1982); *N.A.A.C.P. by Campbell v. Gadsden Cnty. Sch. Bd.*, 691 F.2d 978, 982 (11th Cir. 1982); *Perkins v. City of W. Helena, Ark.*, 675 F.2d 201, 216 (8th Cir. 1982), *aff'd sub nom. City of W. Helena, Ark. v. Perkins*, 459 U.S. 801 (1982) (all finding that at-large electoral system was created or maintained for discriminatory purpose).

Outside the voting context where effects became challengers' preferred claim, there are more examples of courts finding discriminatory purpose, mostly in the area of school desegregation and housing. *See, e.g.*, *United States v. City of Yonkers*, 96 F.3d 600, 618–19

No. 14-41127

discriminatory purpose can instead be the product of "elected officials engag[ing] in the single-minded pursuit of incumbency." *Id.*; *Ketchum v. Byrne*, 740 F.2d 1398, 1408 (7th Cir. 1984) (observing that "many devices employed to preserve incumbencies are necessarily racially discriminatory"). That most basic of human instincts—self-preservation—can thus provide an explanation for enacting a law at least in part because it will have a disparate impact on protected groups that favor the out-of-power party.  71 F. Supp. 3d at 700; *see also Frank v. Walker*, 773 F.3d 783, 790–93 (7th Cir. 2014) (Posner, J., dissenting from denial of rehearing en banc) (discussing studies and other evidence supporting the view that voter ID laws, although not resulting in "huge" decreases in turnout, have an effect primarily on "low-income and minority groups" that favor Democrats).  Indeed, the highly polarized nature of voting in Texas along racial lines (according to exit polls from the last gubernatorial election, 72% of whites, 44% percent of Latinos, and 7% of African-Americans voted for the Republican winner[16]) makes depressing minority turnout a strong proxy for suppressing Democratic turnout.

A judge who agrees with Judge Jones's dissent that "partisanship, not race," is a likely reason why the Texas Legislature enacted SB 14 can thus still conclude that the law was enacted with a discriminatory purpose.  Jones Dissent at 39 ("No doubt Republicans would not have pressed for voter ID if they felt it would largely enhance Democrat voting."); *id.* at 40 ("The law

---

(2d Cir. 1996) (school); *Diaz v. San Jose Unified Sch. Dist.*, 733 F.2d 660, 675 (9th Cir. 1984) (school); *Smith v. Town of Clarkton, N.C.*, 682 F.2d 1055, 1066–67 (4th Cir. 1982) (housing); *United States v. Texas Ed. Agency*, 600 F.2d 518, 527 (5th Cir. 1979) (school); *Resident Advisory Bd. v. Rizzo*, 564 F.2d 126, 144–45 (3d Cir. 1977) (housing).

[16] *Governor: Texas (Abbott vs. Davis)—Exit Polls (2014)*, CNN: 2014 ELECTION CENTER, http://www.cnn.com/election/2014/results/state/TX/governor/.

No. 14-41127

reflects party politics, not racism . . .").  If that desire for partisan advantage (or any other underlying motivation) leads a legislature to select a "course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group,"[17] that is enough.  *See Garza*, 918 F.2d at 778 (Kozinski, J., concurring).   This different starting point for assessing the discriminatory purpose claim—that is, a mistaken premise that the record has to support a finding of outright racism—perhaps explains why today's opinions take such widely divergent views of the evidence.

---

[17] *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979).