UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION


MARC VEASEY, ET AL.,           )        CASE NO: 2:13-CV-00193
                               )
            Plaintiffs,        )             CIVIL
                               )
      vs.                      )        Corpus Christi, Texas
                               )
RICK PERRY, ET AL.,            )        Monday, September 19, 2016
                               )
            Defendants.        )        (12:02 p.m. to 1:18 p .m.)


TELEPHONIC MOTIONS HEARING

BEFORE THE HONORABLE NELVA GONZALES RAMOS,
UNITED STATES DISTRICT JUDGE



Appearances:              See Next Page

Court Recorder:           Frenchie Carbia

Case Manager:             Genay Rogan

Transcriber:              Exceptional Reporting Services, Inc.
                          P.O. Box 18668
                          Corpus Christi, TX 78480-8668
                          361 949-2988






Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

<u>APPEARANCES FOR:</u>


Plaintiffs:                      CHAD W. DUNN, ESQ.
                                 Brazil and Dunn
                                 4201 Cypress Creek Parkway, Suite 530
                                 Houston, TX 77068


                                 DANIELLE LANG, ESQ.
                                 Campaign Legal Center
                                 1411 K. St. NW, Suite 1400
                                 Washington, DC 20005


                                 J. GERALD HEBERT, ESQ.
                                 Attorney at Law
                                 191 Somervelle Street #405
                                 Alexandria, VA 22304


                                 NEIL G. BARON, ESQ.
                                 914 FM 517 Rd. West
                                 Suite 242
                                 Dickinson, TX 77539


                                 ABBY KAMIN, ESQ.

Mexican American                 EZRA D. ROSENBERG, ESQ.
Legislative Caucus,              Dechert, LLP
et al.:                          902 Carnegie Center, Suite 500
                                 Princeton, NJ 08540-6531


                                 LINDSEY B. COHAN, ESQ.
                                 Dechert, LLP
                                 300 West 6th St.
                                 Austin, TX 78701


                                 BRENDAN DOWNES, ESQ.
                                 Lawyers' Committee for Civil Rights
                                 1401 New York Ave. NW, Suite 400
                                 Washington, DC 20005


                                 JENNIFER CLARK, ESQ.
                                 Brennan Ctr. for Justice
                                 161 Avenue of the Americas
                                 12th Floor
                                 New York, NY 10013

3

<u>APPEARANCES FOR:</u>          (CONTINUED)


United States              AVNER SHAPIRO, ESQ.
of America:                BRUCE I. GEAR, ESQ.
                           JOHN SMITH, ESQ.
                           SAM OLIKER-FRIEDLAND, ESQ.
                           BRITTANY WAKE, ESQ.
                           DANIEL FREEMAN, ESQ.
                           U.S. Department of Justice
                           950 Pennsylvania Ave. NW
                           Washington, DC 20530

Ortiz Plaintiffs,          MARINDA VAN DALEN, ESQ.
et al.:                    Texas RioGrande Legal Aid, Inc.
                           531 E. St. Francis
                           Brownsville, TX 78520

                           JOSE GARZA, ESQ.
                           Texas Rio Grande Legal Aid
                           1111 N. Main Ave.
                           San Antonio, TX 78212

Texas League of Young      TANIA C. FARANSSO, ESQ.
Voters Education Fund:     Wilmer Cutler Pickering, et al.
                           1875 Pennsylvania Avenue, NW
                           Washington, DC 20006

                           LEAH ADEN, ESQ.
                           NAACP Legal Defense and Educational
                           Fund, Inc.
                           40 Rector St., 5th Floor
                           New York, NY 10006


State of Texas:            MATTHEW H. FREDERICK, ESQ.
                           ANGELA V. COLMENERO, ESQ.
                           Office of the Attorney General
                           P.O. Box 12548
                           Austin, TX 78711

4

 1      **Corpus Christi, Texas; Monday, September 19, 2016; 12:02 p.m.**

 2                         **(Call to Order)**

 3             **THE COURT:**  All right, good afternoon, counsel.

 4      Court calls Cause Number 2:13-CV-193, Veasey, et al. vs. State

 5      of Texas.  So I believe Brandy already took roll as to counsel.

 6      Everyone is appearing by phone.  So who's going to take the

 7      lead for the Veasey Lulac claimants?

 8             **MR. DUNN:**  Good morning, this is Chad Dunn.

 9             **THE COURT:**  Good morning.  Or afternoon, I guess

10      already.  For Texas NAACP and Malc?

11             **MR. ROSENBERG:**  Ezra Rosenberg, Your Honor.  And I

12      will be making the initial argument on behalf of the private

13      plaintiffs.

14             **THE COURT:**  Okay.  For Taylor?  For plaintiff Taylor?

15             **MR. GARZA:**  Jose Garza, Your Honor.

16             **THE COURT:**  Okay.  The Association of Judges, I don't

17      believe Mr. Rios is on the line.  The League of Young Voters?

18             **MS. ADEN:**  Leah Aden, Judge, thank you.

19             **THE COURT:**  Okay.  The Government, the United States

20      of America?

21             **MR. FREEMAN:**  This is Dan Freeman, Your Honor.

22             **THE COURT:**  Okay.  And we have the State of Texas.

23             **MS. COLMENERO:**  This is Angela Colmenero, Your Honor.

24             **THE COURT:**  Okay.  All right, so we're here on

25      plaintiffs -- all plaintiffs have filed a motion to enforce the

1    interim remedial order.  Two separate motions filed, but all

2    plaintiffs have joined, I believe, in the motions.  So,

3    Mr. Rosenberg, do you want to proceed?

4            **MR. ROSENBERG:**  I thought that Mr. -- if it's okay

5    with Your Honor, Mr. Freeman would proceed first with DOJ's

6    motion.

7            **THE COURT:**  Okay.

8            **MR. ROSENBERG:**  And then we'll continue with ours and

9    join with theirs.

10           **THE COURT:**  All right, Mr. Freeman.

11           **MR. FREEMAN:**  Thank you, Your Honor.  At the Court's

12   direction, the parties engaged in painstaking negotiations over

13   language that the parties had jointly presented to this Court

14   at the conclusion of its remedial order, and this Court

15   indicated that language verbatim into its interim remedial

16   order.  Nonetheless, the State's education program violates the

17   Court's remedial order by deviating from its clear language in

18   two meaningful ways.  First, the State has excised the word

19   "reasonably" to limit its communications to voters to say that

20   the remedial order is only available to those who,

21   quote --

22           **THE COURT:**  I'm going to butt in -- I'm so sorry.

23           **MR. FREEMAN:**  Absolutely.

24           **THE COURT:**  I'm going to butt in really quick because

25   it sounds like are you on speaker phone?

6

1          **MR. FREEMAN:**  I am not, Your Honor.

2          **THE COURT:**  Okay.  All right, proceed.  Are you

3   having trouble, Genay?

4          **THE ERO:**  Some of the words were not very clear.

5          **THE COURT:**  Yeah.  Okay.  Well, go ahead and proceed.

6   We're having a little bit of issues hearing you.

7          **MR. FREEMAN:**  I apologize, Your Honor.  We may be

8   having some issues with our phones, but please definitely let

9   me know.

10          **THE COURT:**  Okay, you sound better now.  So whatever

11   you're doing right now, keep doing.

12          **MR. FREEMAN:**  I'm doing the same thing, but thank

13   you.  The State has excised the word "reasonably" to limit its

14   communications to voters to state that the remedial order is

15   available only for those who, quote, cannot obtain SB 14 ID.

16          **THE COURT:**  I'm sorry, the recorder is not able to

17   take you.

18          **MR. FREEMAN:**  Would you like me to try my cell phone,

19   Your Honor?

20          **THE COURT:**  No, that will make it worse.  Maybe are

21   you really close to the phone?  Maybe step --

22          **MR. FREEMAN:**  Yes.  Is this better?

23          **THE ERO:**  That seems better.

24          **THE COURT:**  Talk to us some more.

25          **MR. FREEMAN:**  Is this better, Your Honor?

1           **THE COURT:**  Yes, it is.

2           **MR. FREEMAN:**  Okay, I switched hands.

3           **THE COURT:**  Go ahead.

4           **MR. FREEMAN:**  Thank you.  The State has excised the

5    term "reasonably" from this order -- from the language of the

6    Court's order to limit the remedy for those who, quote, cannot

7    obtain SB 14 ID.  But the reasonable impediment or difficulty

8    is the linchpin of the Court's remedy.  It is what captures the

9    type of voters who are harmed by SB 14 under the Section 2

10   results standard.  And it is troubling that the language that

11   Texas is now using in its voter education materials is the same

12   standard that Texas argued for at the liability phase, and it

13   was rejected by this Court and the Fifth Circuit.

14           Voters who face a barrier to obtaining SB 14 ID that

15   might be overcome with substantial personal sacrifice are being

16   told that they cannot vote and that they cannot obtain SB 14

17   ID, and the language that the State is using will deter those

18   voters from attempting to come to the polling place and

19   attempting to vote under this Court's remedial order.

20           Second, the State has replaced the term "do not

21   possess" with the term "has not obtained" SB 14 ID.  This order

22   applies to voters who currently do not possess SB 14 ID, and a

23   question of whether a voter has ever obtained ID in the past is

24   separate and here irrelevant for whether or not that voter

25   should be able to vote under the remedial order.

1          Voters who have obtained ID in the past that have

2   lost it, have had it stolen, have surrendered it to the State

3   or who have let it expire by more than four years may vote

4   under the Court's remedial order, even though they have

5   obtained ID.  The language of the State's verification

6   materials is instructing them to the contrary.

7          More to the point, the State has no basis to deviate

8   from the clear language of the Court's remedial order.  On

9   August 10th, the Court rejected the State's request to upset

10  the balance negotiated between the parties by adding additional

11  language for reasonable impediment declaration.  Now the State

12  has simply removed a term from this Court's order, paragraph

13  11, regarding voter education and did not even request leave

14  from the Court.  They should not be permitted to alter this

15  Court's order by fait accompli.

16          In response, Texas has provided no plausible reason

17  why its further education and voter education documents cannot

18  simply conform to the remedial order.  Rather, it has presented

19  three contradictions to the Court.  First, it has described the

20  language of the Court's order as both clear and ambiguous.  On

21  August 10th, the State stated that, quote, defendants want

22  clear and definable terms in the Court's order to provide them

23  confidence that they are, in fact, complying with the Court's

24  order.  The State went on to say, quote, the terms set forth in

25  the joint submission of agreed terms and specifically the

1    requirements set forth in paragraphs 10 through 12 are

2    appropriate.

3            The State now claims that that same language is

4    ambiguous and suggests a replacement to that language that has

5    not been agreed upon by any party.  And it is not clear if that

6    language is ambiguous, how the language that the State has

7    presented is somehow also clear and consistent, which leads to

8    the second contradiction.

9            The State has claimed that the language it has

10   presented is consistent with the Court's order and yet states

11   the Court's order is somehow confusing.  If they are the same

12   language in substance, then there is no reason for the State to

13   insist on changing the language of the Court's order.  And if

14   it's confusing, the State cannot now claim that the language it

15   has presented instead is certainly consistent with the Court's

16   order.  There's a difference in substance.  There's a reason

17   why the State is insisting on changing the language.  The

18   language cannot be consistent between the clear language of the

19   Court's order, and it cannot obtain language of the State's

20   educational materials.

21           Finally, the State has claimed that there are a

22   number of voters who are unable to obtain SB 14 -- or excuse

23   me, that there are no voters who are unable to obtain SB 14 ID

24   for purposes of Section 2, and yet it claims that that same

25   language can be used to define the scope of the reasonable

1    impediment declaration.  The State maintains in its response to

2    the United States' motion that Plaintiffs failed to identify

3    the individuals who faced a substantial obstacle in voting.  If

4    they cannot obtain standards governed, then that would suggest

5    that the plaintiffs have failed to identify individuals who

6    cannot obtain SB 14 ID and can then use a reasonable impediment

7    declaration.  That was clearly not what was intended by this

8    Court.

9           The United States respectfully requests the Court

10   order the State to use the negotiated language which implements

11   this Court's remedy.  And the United States has requested a

12   remedy that is reasonable and possible.  With regard to

13   electronic documents, the United States has requested that they

14   be modified and recirculated electronically.

15          With regard to documents that have already been

16   printed, we have not asked that they be reprinted.  We have

17   asked that corrections be issued and be used to supplement

18   those printed materials.  The fact that the State would incur

19   costs to correct mass media campaigns cannot preclude a remedy

20   here.  The State was aware of the standard.  The Plaintiffs

21   made the State aware of the problem of deviating language, and

22   the State (indiscernible) commercials and sent out to print

23   publications anyway.

24          The State has claimed in its opposition that it's too

25   late to correct these materials; however, Secretary of State

1    Cascos told the Austin American-Statesman in an article that

2    was published yesterday, quote, we're pretty flexible.  If the

3    Court comes back and says we need to change something, then we

4    will do that.

5          To protect voters and to ensure an effective remedy,

6    the United States respectfully requests that this Court do just

7    that.  I'm happy to take any questions that the Court has now.

8          **THE COURT:**  Okay, thank you.  Mr. Rosenberg.

9          **MR. ROSENBERG:**  Yes, I'll just be very brief in

10   support of this motion, and then I don't know, Your Honor, if

11   you want me to continue with ours or if you want to hear the

12   State on the first motion.  But very briefly, and I'd like to

13   direct my comments primarily to this -- the issue of the "have

14   not obtained" or "cannot obtain" language.  Because the State

15   actually concedes in its brief at page 10 that there is a

16   difference between the "have not obtained" language and the

17   "does not possess" or "does not have" language, which DOJ and

18   the private plaintiffs argue is more accurate.

19         So the only issue is which of those two sets of

20   language, the obtained language or the possess or have

21   language, more accurately reflects Your Honor's interim

22   remedial order.  And it's not even a close question, Your

23   Honor.

24         The Fifth Circuit decision spoke in terms of people

25   who do not have SB 14 ID.  Your Honor's orders ECF 859 and 895,

1  which is the interim remedial order; however, 6 and 10 spoke

2  solely in terms of possession or having SB 14.  The

3  instructions to the declaration of reasonable impediment

4  specifically talk only in terms of does not possess SB 14 ID.

5  Defendant's brief, at pages 18 and 19, where they're not

6  directed to DOJ's motion but rather to private plaintiffs'

7  motion, spoke only in terms of possession or having SB 14 ID,

8  and Attorney General Paxton's statement to Fox News

9  specifically talked only in terms of do not have SB 14 ID.

10         So, Your Honor, respectfully, it is not even a close

11  question.  The State has concocted this obtained language,

12  which as DOJ explained in its brief, really distorts what the

13  interim remedial order is all about.

14         And finally, as an aside, any argument that there was

15  a failure on behalf of the plaintiffs to object to this, it's

16  completely a false argument.  Between August 11th and August

17  20th -- August 30th, there were at least ten occasions where

18  private plaintiffs and/or DOJ specifically objected to this

19  "obtain" language.

20         And that's all I have to say on this.  If Your Honor

21  has any questions.  And again, if you'd like me to address our

22  motion or if you would rather hear from the State first on

23  DOJ's motion.

24         **THE COURT:**  Why don't you go ahead and address your

25  motion, and then the State can just address both of them at the

1    same time.

2         **MR. ROSENBERG:**  Sure.  Your Honor, our motion for

3    additional relief is based upon statements attributed to state

4    and county officials, specifically to Attorney General Paxton

5    and to Stan Stanart, the Harris County clerk, which we submit

6    are contrary to the interim remedial order terms and have had,

7    and will continue to have, an intimidating and chilling effect

8    on voters who are eligible for use of the declaration of

9    reasonable impediment.

10        We have asked for very limited but necessary relief

11   to ameliorate that harm to the extent that is possible, and in

12   some cases may not even be possible for all voters at this

13   time, and I'll get to that in a few minutes.

14        The initial response that the State makes in response

15   to this motion is that there's no proof that Mr. Stanart

16   actually made the statements that were attributed to him in the

17   media.  They don't dispute that Mr. Paxton made the statements

18   that -- Paxton made the statements that he's alleged to have

19   made.  They don't dispute that Mr. Stanart did likewise, both

20   of whom raised this prospect of perjury investigations and

21   perjury prosecutions of those who are executing the declaration

22   of reasonable impediment.  And they don't dispute that the

23   statements that are paraphrased, and that's their only defense,

24   that these are paraphrased statements, not in direct quotes,

25   that are paraphrased as to Mr. Stanart, are completely

14

1    consistent with the quoted statements of Mr. Stanart and the

2    statements that he is quoted to have made in other

3    publications.

4           Now, we gave the State an opportunity to confirm

5    whether or not Mr. Stanart made those statements, and they

6    declined to do so.  In fact, they said they don't have control

7    over Mr. Stanart, and for reasons of their own decided to say

8    that, and, by the way, the Montgomery County Democratic party

9    is making inaccurate statements also.  I guess implying that

10   two wrongs may make a right.  Because the State did not

11   indicate that they were going to do anything about inaccurate

12   statements that were being made by -- in public messaging of

13   the Montgomery County Democratic party, we contacted them, even

14   though we have no control over them; and as a result, they did

15   change their public messaging to make it more accurate.

16          In fact, we have done that with some 88 counties, of

17   whom 45 have changed their public messaging, even though we do

18   not have control over them.  But apparently the State did not

19   think it was their responsibility, even though Your Honor's

20   interim remedial order expressly places responsibility on the

21   State to make sure that the messaging to voters and the

22   messaging to election officials is accurate and consistent with

23   the interim remedial order.

24          Now, there's been, I guess, more than two weeks that

25   have passed since we asked the State to confirm whether

1    Mr. Stanart made those statements.  The State has not confirmed

2    it, and, more important, they've not disclaimed that those

3    statements are not consistent with the terms of the interim

4    remedial order.  And the fact is the reason they've not done

5    that, and this is really the crux of our motion, is because

6    they actually agree with those statements, and they do not feel

7    that those statements are intimidating.

8              And, Your Honor, it defies common sense to take the

9    position that statements by County officials to the effect that

10   all persons are going to be investigated who sign a declaration

11   of reasonable impediment or possible perjury investigation,

12   perjury prosecutions, and may be turned over to the district

13   attorney and their names are going to be put through databases,

14   to suggest that that does not have an intimidating or chilling

15   effect really defies common sense.  And particularly in this

16   situation where the people who are intended to be protected by

17   Your Honor's interim remedial order are some of the most

18   vulnerable in our society.  They are predominantly poor, they

19   are minority populations who have been subjected to

20   discrimination and intimidation and threat in voting for

21   decades in the state of Texas.

22             It's self-evident that statements that they may be

23   prosecuted or investigated for signing a declaration will not

24   have a chilling effect.  And, in fact, we've submitted

25   declarations to the effect, one from Juanita Cox, from Lupe,

1    another from Oliver Hill, from the San Antonio branch of the

2    NAACP, each of which confirms that there already has been an

3    intimidating and chilling effect.

4            And I can represent to Your Honor that we could have

5    had more affidavits, but we did not feel that it was necessary

6    to burden the Court with something as self-evident.  In fact,

7    to use the expression that Mr. Hill did in his affidavit, it's

8    mind-boggling that the State does not understand that those

9    statements can have an intimidating effect.

10           The statements not only have an intimidating effect,

11   but they violate the interim remedial order.  The interim

12   remedial order was specifically crafted so as to prevent this

13   sort of intimidation.  For example, and as Mr. Freeman just

14   mentioned, Your Honor specifically rejected a request by the

15   State, and that was in ECF 879, to have the sworn statement

16   amended so as to include a statement that the declarant does

17   not have SB 14 ID.  And as a result, there are only two things

18   that were in the -- in the declaration.  One is a statement of

19   reasonable impediment, and the other is a statement that the

20   voter is who he says he is.  And only that latter statement,

21   that the voter says he is who he says he is, is a material

22   statement for purposes of judging the declaration.  Because the

23   declaration of reasonable impediment says in full text, right

24   above the signature, that the reasonableness of your impediment

25   or difficulty cannot be questioned, and that's what the voter

17

1    sees before he or she signs the declaration of reasonable

2    impediment.

3           So as to give the impression otherwise violates the

4    interim remedial order.  To give the impression also and to

5    deny that a person who signs the declaration of reasonable

6    impediment in good faith, believing that he or she does not

7    have SB 14 ID and has a right to execute the declaration is

8    also contrary to the law.  I don't want to even -- I don't

9    think it's necessary to talk about the criminal statutes, but

10   the fact is in Texas, under Section 37.02 of the criminal code,

11   you cannot prosecute someone for false statements unless there

12   is intent to deceive and unless there's knowledge that the

13   statement is false.

14          And that has particular resonance in the context of

15   this declaration, because as we've discussed in the papers that

16   we've submitted, there are studies, including studies from Rice

17   University, that shows that there are many people who believe

18   they do not have photo ID when, in fact, they do have photo ID.

19   And to threaten and investigate and punish people under those

20   circumstances, where it is very easy to be mistaken, is really

21   unconscionable and contrary to the terms and the intent behind

22   the interim remedial order.

23          It's also particularly appropriate here to stop this

24   sort of nonsense, Your Honor, because one of the things that --

25   another one of the remedial aspects to the interim remedial

1   order was the expansion of SB 14 IDs to include IDs that may

2   have expired up to four years before the date of the election.

3   And that could increase the possibility that people's IDs

4   perhaps have been misplaced, they think they may not have the

5   ID, when, in fact, they have the ID because it's been so long

6   since they even looked at it.  And to then suggest, as

7   Mr. Stanart is attributed to have suggested, that you can put

8   the names of these people into a database, and if it pops up

9   that they have an SB 14 ID that had been issued to them at any

10  time prior to the election, really increases the possibility

11  that there may be mistakes.  And that's the sort of thing that

12  someone should not have the fear of when they're signing a

13  declaration when the only thing they're trying to do is vote

14  and they're the person who they say they are.

15          One last point along these lines also is the admitted

16  misstatement by the attorney general to the effect that the

17  declaration of reasonable impediment calls for an oath and

18  proof of citizenship.  That obviously is not so and that is

19  another thing that should be -- should be corrected.

20          Your Honor, at this point what I can only describe

21  as, I think, somewhat careless remarks of officials, obviously

22  dissatisfied with this Court and Fifth Circuit's rulings, have

23  already had a, perhaps, irreversible impact on some of these

24  people, some of the people whom Your Honor was trying to

25  protect, and these people may simply not vote.  But to allow

1   these statements, statements that have not been disclaimed by

2   the State, not been disclaimed by Mr. Stanart, even though

3   they've had weeks and weeks to do so, to have a further

4   chilling effect may undermine totally the remedial release that

5   this Court has ordered.  And it would be very depressingly

6   ironic if the remedial structure that was negotiated so

7   carefully by the parties and approved by this Court to diminish

8   the discriminatory impact of SB 14 were used to trap unwary

9   intended beneficiaries of this Court's remedy.

10          The interim remedial order was intended to help

11   people vote, not to scare them away, and this Court should

12   issue relief that is necessary to assure them, to assure the

13   voters, and to educate the election officials that if the

14   voters execute a declaration of reasonable impediment because

15   they, in good faith, believe that they do not have SB 14 ID, so

16   long as they are who they say they are, they will not be

17   subject to investigation and prosecution.

18          I'm happy to take any questions, Your Honor.

19          **THE COURT:**  All right, thank you.  I'm going to allow

20   the State to respond if no one else is speaking for the

21   plaintiffs at this point.  Ms. Colmenero.

22          **MS. COLMENERO:**  Thank you, Your Honor.  We will begin

23   by responding first to the United States' motion to enforce.

24   And there are two points the State would like to make in

25   response:  First, the language the State has used in its voter

1    education and training materials is consistent with the Court's

2    order.  The purpose of the interim remedial order is to

3    accommodate voters who are unable to obtain a form of SB

4    14-compliant ID due to a legitimate impediment, such as a

5    financial barrier to obtaining an acceptable photo ID.

6         Relying on the language in the reasonable impediment

7    declaration, the State drafted guidance that it believed

8    accurately explains the new voting procedures and who was

9    eligible to utilize the declaration to cast a regular ballot.

10   The reasonable impediment declaration itself states that a

11   person must state he faces a reasonable impediment or

12   difficulty that prevents him from getting an acceptable form of

13   photo identification.

14        Based on this language, the State chose language that

15   would convey to voters that not having obtained a form of SB 14

16   ID is one of the prerequisites, and the existence of a

17   reasonable impediment to obtaining such an ID is the other

18   requirement.  And it chose to use the word "obtain" because it

19   is a synonym to "getting," which is used in the reasonable

20   impediment declaration itself.

21        The United States complains about the fact that the

22   word "reasonable" or "reasonably" do not appear on three

23   voter-facing documents.  These include votetexas.gov home page,

24   the secretary of state's press release issued on August the

25   19th, and on the poster that is located outside the polling

1    places.  The United States contends that by omitting the word

2    "reasonably" from these three sources, the State has rewritten

3    the language of the interim remedial order by suggesting that

4    individuals can only use the reasonable impediment declaration

5    if obtaining SB 14 is impossible.  This interpretation of the

6    State's education and training materials is misguided.

7              While the State admits that the word "reasonable" or

8    "reasonably" does not appear on the home page of votetexas.gov,

9    there is an icon on the lower left-hand side of the website

10   that's called "Voter ID FAQs."  If a visitor clicks on that

11   portion of the website, they are led to another web page with

12   very detailed information about the voter ID procedures and how

13   the reasonable impediment declaration process works.  This is

14   labeled as Exhibit E of the State's response.

15             This language in the FAQs clearly uses the word

16   "reasonable" every time the declaration (indiscernible) and

17   offers the following instructions to the public:  Voters who

18   have not been able to obtain one of the forms of acceptable

19   photo identification listed below and have a reasonable

20   impediment or difficulty to obtaining such identification, may

21   present a supporting form of identification and execute a

22   reasonable impediment declaration.

23             References to reasonable or reasonably are sprinkled

24   throughout these FAQs, which, if the Court recalls, were the

25   first substantive update made by the State on the website back

1    on August the 12th, after the entry of the Court's interim

2    order.

3              The same is true with respect to the press release

4    that the United States complains about.  The title of the press

5    release does not have the word "reasonable" or "reasonably."

6    The text of the press release makes clear that a voter who has

7    not been able to obtain one of the seven forms of photo ID can

8    sign a declaration providing a reason why at the polls and cast

9    a regular ballot.  There is nothing about this statement that's

10   inconsistent with the Court's order, and the press release also

11   directs individuals to the votetexas.gov website for more

12   information.

13             Finally, the United States complains for the first

14   time in its reply brief about the poster located outside the

15   polling locations that is required under Section 62.016 of the

16   Texas Election Code.  Like the press release, their message to

17   the voter is if you can't obtain one of the seven forms of ID,

18   you can fill out a declaration at the polls explaining why and

19   bring the supporting documents.

20             And so the State believes that really this dispute

21   boils down to the fact is the omission of the word "reasonably"

22   or "reasonable" from three of these documents and a

23   hypothetical situation posed by the United States and the

24   private plaintiffs regarding a specific category of individuals

25   who may need to utilize the reasonable impediment declaration,

1    and these individuals include those who may have lost their ID,

2    had their ID stolen, had their ID suspended or revoked.  And in

3    other aspects of the State's guidance, specifically in Exhibits

4    A through D that are attached to the State's response, those

5    scenarios are specifically addressed in terms of how election

6    officials will handle individuals at the polls who arrive who

7    have had an ID lost, stolen, suspended or revoked.

8            But even though the State believes its language in

9    all of the documents is consistent, it wants to propose a

10   solution to resolve the dispute without causing major

11   disruption to the voter education campaign that is currently

12   underway.  And so with that, the State proposes that to the

13   extent that there is any ambiguity relating the specific

14   category of individuals -- and I'll call them the lost, stolen,

15   suspended or revoked category of individuals -- we can easily

16   amend the FAQs on the voter ID -- voter ID procedures web page

17   to include a reference to this category of individuals to make

18   clear that those individuals could qualify for the reasonable

19   impediment declaration if they have a reasonable impediment --

20   if they can demonstrate they have a reasonable impediment or

21   difficulty to obtaining a new form of ID.

22           So we think that that solution would, in fact,

23   address the very concerns that are raised as the United States'

24   motion sets forth, as well as the ones raised by the private

25   plaintiffs.

1             The United States' suggestion that the State's

2    language excludes individuals who may have lost their ID from

3    the interim remedy because they have already obtained an ID but

4    they just do not possess it, once again, the United States

5    ignores that language in the State's guidance, which provides

6    instructions to individuals who may fall into this category.

7    And we direct the Court to the very guidance that is already --

8    has already been disseminated to election officials across the

9    state.

10            Election officials are instructed to ask individuals

11   at the polls two questions:  One, have you obtained an

12   acceptable photo ID; and two, if the answer to that question is

13   no, then the official is required to ask, do you have a

14   reasonable impediment or difficulty to obtaining one.  And if

15   the answer to Question 2 is yes, then the voter is presented

16   with a declaration to fill out, and at that point the

17   reasonableness of his impediment cannot be questioned and he is

18   allowed to cast a regular ballot.

19            The qualifying voter's handbook, which goes to

20   election officials, includes a specific reference to lost,

21   stolen, suspended or revoked IDs to address the very situation

22   the United States is concerned about.  The same instructions to

23   officials also appear in Exhibit F, which is the PowerPoint

24   sent to election officials in August, as well as in Exhibit G,

25   which is the elections advisory that was sent to election

1    officials at the end of August.

2         The State's language is not inconsistent with the

3    Court's order or the Fifth Circuit's opinion, and we are not

4    trying to resurrect an argument that we lost before the Fifth

5    Circuit by using the "unable to obtain" language.  The State

6    argued on appeal that SB 14 did not violate Section 2 because

7    the plaintiff failed to identify individuals who face

8    substantial obstacles to voting because of the voter

9    identification requirement, but this argument is completely

10   unrelated to the current dispute.

11        Finally, although in this reply brief the United

12   States has focused on the omission of the word "reasonably"

13   from three voter-facing documents, the State will also address

14   the other proposed language by DOJ, which includes substituting

15   the "cannot obtain language" or the "unable to obtain" language

16   with the "do not possess" language.

17        The United States has also suggested that the State

18   modify all of its other guidance to changes to the "do not

19   possess" phrase.  The State admits to the Court's order and the

20   declaration itself obtain references to obtain as well as to

21   possess, but it chose to include the word "obtain" in its

22   guidance in order to make it clear to voters and to election

23   officials that the declaration itself is not a convenience

24   document, and the State's guidance has not been restrictively

25   enforced to the detriment of those who are eligible for the

1   reasonable impediment declaration.  Instead, the State has seen

2   that the declaration is being liberally used by those

3   individuals who it is not even intended to protect.  These

4   includes individuals who left their ID at home, as well as

5   individuals who are simply refusing to show their ID.  And we

6   have attached examples of this to our response to the motion to

7   enforce.

8          And the reason this is significant is because once a

9   person says that they have a reasonable impediment declaration

10  and is presented with the declaration, the legitimacy of the

11  impediment cannot be questioned.  As a result, the last thing

12  the State desires is to provide lenient guidance in light of

13  what we have seen and encourage the improper use of the

14  reasonable impediment declaration.

15         Second, we believe that the motion to enforce should

16  be denied because making changes at this point in the election

17  cycle would, in fact, require a massive overhaul of voter

18  education materials at a critical time.  There are less than 60

19  days before the general election, 50 to be exact, and United

20  States contends that it is only requesting corrections to

21  materials that have not yet been printed, along with the

22  distribution of corrections where materials have already been

23  printed.

24         Basically, in our world this means everything SOS has

25  done since August the 10th would need to be redone in order to

27

1    insert the word "reasonably" where the United States believes

2    it should go or include a totally new phrase into the guidance.

3    This is significant because guidebooks and handbooks have been

4    distributed to election officials throughout the state.  Those

5    counties are in the process of hosting their only specific

6    training based on the new guidance, and there is great

7    ramification of redoing the current version of the media

8    campaign.  This includes any changes to a TV script, as well as

9    to radio broadcast spots, as well as to the digital ad campaign

10   on social media.  The digital and social ads are already

11   running and are using the language of a poster that we sent to

12   the plaintiffs for their review and comment on August the 11th,

13   and that poster does, in fact, include the "unable to obtain"

14   language, and they never raised an objection to that particular

15   language.

16            We have also distributed the toolkit, and that

17   distribution began on September the 2nd.  They have been

18   distributed to 798 elected officials across the state.  They've

19   also been distributed to over 1,000 community organizations.

20   And the secretary of state's office has already completed

21   projection of its television commercial, and any change in the

22   current guidance may require them to have -- may require them

23   to revise the current version of it, send the entire production

24   team back into the studio to re-record this, and the State is

25   going to lose money if it cancels the media spots it has

1   already purchased.  And in particular, the State has already

2   identified that it will lose about $140,000 in placements and

3   over 14 million impressions in the media.

4          So making changes now would bring the State's

5   election machinery to a halt in order to make an unnecessary

6   change and one that the United States could have raised over a

7   month ago, and it could cause unnecessary confusion with such a

8   short time before the general election.

9          So in conclusion with respect to the United States'

10  motion to enforce, we believe that it's really premised on a

11  hypothetical scenario that someone who has a lost, stolen,

12  suspended or revoked ID may think that they do not qualify for

13  the reasonable impediment declaration because they have already

14  obtained an ID but they may not physically possess it at the

15  time of voting.

16          Significantly, there's no evidence that anyone has

17  been denied the right to cast a regular ballot in an election

18  thus far based on the hypothetical scenario the United States

19  has proposed; but as the State has explained and the questions

20  the election officials are instructed to ask, this scenario

21  should be covered and allow these individuals to demonstrate

22  that they have a reasonable impediment or difficulty to

23  obtaining a photo ID and possibly sign a declaration.

24          There does not need to be a massive overhaul of voter

25  education and training efforts.  At the very least, the State

1    can make a modification to FAQs to address this exact scenario

2    that's being raised here.  For these reasons, the State

3    respectfully requests that the Court deny the United States'

4    motion to enforce.

5            And, Your Honor, I can move to the next -- to the

6    private plaintiffs' motion to enforce unless you have questions

7    related to the first one.

8            **THE COURT:**  Go ahead and finish up your argument.

9            **MS. COLMENERO:**  Thank you.  The private plaintiffs'

10   motion is premised on statements by two Texas officials, the

11   Harris County clerk, as well as the attorney general, which

12   allegedly state that they will conduct a wholesale criminal

13   investigation of everyone who executes the reasonable

14   impediment declaration.  The Court should deny the motion to

15   enforce, because, one, there's no evidence that the Texas

16   officials made such a statement; and two, the public quoted

17   statements actually made by these officials do not conflict

18   with the Court's interim order.

19           The plaintiffs' motion is premised on the statements

20   made by the Harris County clerk, and they take offense to

21   language that appeared in an article by the Houston press, but

22   the precise language Plaintiffs complained about is not even a

23   direct quotation from Mr. Stanart.  It comes from a reporter

24   and is, therefore, unclear whether it is even attributed to

25   something Mr. Stanart said.

1          The other direct quotations from Mr. Stanart that are

2    identified in the article are, in fact, consistent with the

3    interim remedy order.  These statements state that if he

4    suspects someone has fraudulently signed a form saying they do

5    not have an ID, it will be up to the DA's office to determine

6    the next step.  His statements confirm that voters who have SB

7    14 ID must present it when voting in person, and his statements

8    confirm what is already in the reasonable impediment

9    declaration, that is, a voter must swear and affirm under

10   penalty of perjury that he faces a reasonable impediment that

11   prevents him from getting an acceptable form of ID.

12          The Court should reject the plaintiffs' suggestion to

13   add a good faith exception to the Court's interim order.  The

14   interim remedy applies to voters who do not have an acceptable

15   photo ID or the means to obtain one before the election, but

16   voters who mistakenly believe they lack an acceptable form of

17   ID have not suffered any harm as a result of SB 14.  They are

18   not the intended beneficiaries of the reasonable impediment

19   declaration, and Plaintiffs' suggestion and language in their

20   proposed order would inform voters that they may execute a

21   reasonable impediment declaration even if they have a

22   qualifying photo ID.  This would create confusion 60 days

23   before the election and send a conflicting message out based on

24   the guidance the State has already issued.

25          The last statement the plaintiffs complain about is

1    that the attorney general has failed to correct press

2    statements that the interim remedial order requires a

3    declaration of proof of citizenship and proof of residency at

4    the polling place.  This statement is immaterial at the end of

5    the day, even though it may have been technically incorrect,

6    and specifically it was not a response made by the attorney

7    general.  It was a question posed by the reporter.  And the

8    reason this statement is immaterial is because the election

9    code requires in-person voters to verify their residence if

10   that listed in the voter rolls is not current, and every voter

11   in the country on the federally prescribed mail-in voter

12   registration form has to attest under penalty of perjury to

13   their citizenship under federal and state law.

14          And for these reasons, Your Honor, we request that

15   the State deny the private plaintiffs' motion to enforce as

16   well.

17          **THE COURT:**  All right, is that it from the State?

18          **MS. COLMENERO:**  Yes, Your Honor.

19          **THE COURT:**  It's never a good idea to alter language

20   that's in a court order, right?  Why did the State not follow

21   the language in the order?

22          **MS. COLMENERO:**  Well, Your Honor, we believe that we

23   did follow the language in the order.

24          **THE COURT:**  No, no.  I think you agreed that you say

25   it's consistent, it differs slightly.  So all I'm saying, it's

1    never a good idea to start messing with language in a court

2    order, so I'm just not sure why the State did that.

3             **MS. COLMENERO:**  The reason that the language appears

4    in the guidance the way that it does is we were trying to

5    provide clear instructions to the voter, as well as the poll

6    worker in terms of the inquiry that will be made at the polling

7    location regarding the use of the reasonable impediment

8    declaration.  While the Court's order did use the possess

9    language, during the meet and confer process with the private

10   plaintiffs, there was a lot of back and forth as to whether or

11   not we should use does not have, does not possess.  Does not

12   obtain, from our perspective, also was a synonym to the

13   language that appeared in the reasonable impediment declaration

14   itself and provided the clearest message, from our perspective,

15   to the voter, as well as to the election official, in terms of

16   how to utilize the reasonable impediment declaration.

17            **THE COURT:**  But you guys agreed on the language, and

18   obviously you all agreed to it after this back and forth on it.

19   So I'm still not clear why the language that was agreed to and

20   incorporated into the Court's order, why that wasn't used.

21            **MS. COLMENERO:**  The reason that the State did not use

22   the exact language in the Court's order is because we were

23   looking for a better term than the word "getting" that was used

24   in the reasonable impediment declaration, and we wanted to use

25   something that was more clear and concise than the language

1   that appeared in the reasonable impediment declaration itself,

2   which is why we went with "obtain."

3           **THE COURT:**  I'm sorry, that's not a good answer.  I

4   mean, if you have a court order with language in it, you just

5   unilaterally changed it, and now we're all thrown into this

6   mess here.  I mean, that being said, if I look at the big

7   picture, if I'm looking at cannot obtain it, cannot reasonably

8   obtain, the SB 14 ID is what we're talking about, what's in

9   the -- I guess the training guides, from what I can tell for

10   the election workers, when you read that as a whole with the

11   language, it's together with language regarding the reasonable

12   impediment declaration, et cetera, it's not ideal, but that's

13   all together.

14           What concerns me is when we're using this cannot

15   obtain it language standing on its own, which is exactly what

16   the Government is bringing up on the votetexas.gov, the posters

17   that are supposed to be posted outside the polling place.

18   That's a problem because that's just standing on its own.  And,

19   okay, so you say, well, there's this little icon they can go

20   to.  That's on a different page.  That, what's getting out to

21   the public, what's actually getting out to the voters, when you

22   just have cannot obtain it, that is misleading.

23           **MS. COLMENERO:**  Well, so, Your Honor, I believe the

24   references you're making only appear three times, and that

25   would be -- the votetexas.gov home page does not have the word

34

1    "reasonable" anywhere, and it, frankly, has a scrolling banner

2    across the top that is linked to the secretary of state's press

3    release that scrolls across it.

4          So I think out of the three that you've identified,

5    the poster on the polling location is the one that has the

6    "cannot obtain" language.  It does not have the word

7    "reasonably" inserted between there or anywhere on the

8    document.  However, it does direct the voters to go to

9    votetexas.gov, which is why -- I mean, voter ID FAQs, which is

10   the most comprehensive interpretation of the new voting

11   procedures by the secretary of state.  The State is prepared to

12   add a new FAQ on there to address the hypothetical scenario

13   proposed here regarding the lost, stolen, suspended --

14         **THE COURT:**  You need to update with the word

15   "reasonable" because that's what the order said, correct?  And

16   it's also in the press releases, the headline.  What's the

17   headline, cannot obtain.  That's misleading.  That's not what

18   the Court's order said, correct?  And you all agreed to this.

19   You all agreed to the language.  I didn't force it down your

20   throat.

21         **MS. COLMENERO:**  If I could address both of those

22   points separately, Your Honor.  The poster itself, adding the

23   word "reasonably" in between "cannot" and "obtain," the State

24   can make that -- that modification for the polling location

25   poster.

35

1            Second, with respect to the press release that's

2  issued by the -- was issued by the secretary of state, we do

3  not believe that when you actually go to the language in the

4  press release itself --

5            **THE COURT:**  I'm not talking about the language.  I'm

6  talking about the headline, what grabs whoever is reading it.

7  When they see that, that's misleading.  Right?

8            **MS. COLMENERO:**  We respectfully disagree with that,

9  Your Honor, and we believe that the language of that press

10  release has been -- has been out there since October -- I'm

11  sorry, since August the 10th, as soon as the Court issued its

12  interim remedial order.

13            **THE COURT:**  It doesn't matter how long it's been out

14  there.

15            **MS. COLMENERO:**  But we don't believe that the press

16  release is inconsistent because it makes clear that the voter

17  cannot obtain one of the seven forms of ID.

18            **THE COURT:**  I think we're talking past each other.

19  I'm talking about the headline.

20            **MS. COLMENERO:**  Well, but the headline itself just

21  directs people to the press release itself, which provides the

22  explanation, which is what has been reprinted and I --

23            **THE COURT:**  It's misleading, ma'am.  You can't do

24  anything about it?

25            **MS. COLMENERO:**  Your Honor, we are not prepared to

1    change the heading of the secretary of state's press release.

2    On our own, we don't believe it's inconsistent, so we

3    respectfully disagree; but if the Court orders us to do so, we

4    will change it.

5           **THE COURT:**  Well, you're so ordered.  I just think

6    when it's standing alone, that's what I'm talking about.  When

7    they cannot reasonably obtain the SB 14 ID, when that stands

8    alone, it is misleading.  I'm kind of -- even though it's not

9    ideal, I'm saying when the State talks about that relation to

10   the language when it's together with the reasonable impediment

11   issue, that although not ideal, that's already in the training

12   manuals, we're going to have to roll with that.  But I don't

13   see how when the language stands alone, how that would not be

14   misleading.

15          **MS. COLMENERO:**  Well, Your Honor, now that you've

16   ordered us to make the change, we will move forward with that

17   change.

18          **THE COURT:**  Okay, so what has been done with the

19   media, I guess?  I mean, I really think the State put us in

20   this situation by not using the language in the court order,

21   and I still can't quite tell why that was.  So really, what is

22   the State's suggestion, then, as to what we should do?  I have

23   ordered the language, I guess, in the three separate documents,

24   the votetexas.gov, press release, the posters that are to be

25   posted at the polling places to be correct, to reflect the word

1    "reasonably" or "reasonable," right?  So what else can the

2    State do at this point where we are now?  Obviously anything

3    going forward needs to have the exact language of the order.

4         **MS. COLMENERO:**  There are three different aspects to

5    the media campaign that are relevant here.  The first is the

6    digital media messages that are being put forth over social

7    media.  Those contain a link to a poster, or I'll call it a

8    print advertisement, is more specific, that does, in fact, have

9    a statement on there that says if a voter is unable to obtain

10   one of these IDs, you can fill out a form saying why and

11   present one of the supporting forms of identification.

12        So the issue with the print advertisement is that

13   that print advertisement has already been sent to publication

14   for several newspapers for the first week of October.  So it is

15   too late for us to call those back and still maintain the media

16   spots that the State has previously purchased.  And -- and --

17   so that's one aspect of it.

18        The other aspect would be on the television and radio

19   commercials, which would require -- they're still in the

20   postproduction phase, but it would require the State to

21   re-record certain audio to include the word "reasonably."  If

22   there is a delay in terms of -- in the next couple of days, we

23   will lose the media spots that we have --

24        **THE COURT:**  Ma'am, I guess it's just not clear as to

25   what's being said on the TV, radio, on the print.  What is it?

1   Is it just this language that's not explained with anything

2   else?  I don't know what you have.  I don't know what's being

3   put out there.

4           **MS. COLMENERO:**  Yes, Your Honor, I will specifically

5   read it for you.  Just give me one second so I can pull up the

6   latest version.  I'm sorry, I'm having a little bit of computer

7   problems.  Give me one second.

8           **THE COURT:**  Okay.

9           **MS. COLMENERO:**  The language that we -- that will

10  appear in the digital advertisements on social media is -- will

11  say unable to obtain one of these IDs, and I'm paraphrasing

12  from the whole poster.

13          **THE COURT:**  Okay.

14          **MS. COLMENERO:**  And it says, if you have a reasonable

15  impediment or difficulty in obtaining an approved -- an

16  approved photo ID, fill out a declaration at the polls and show

17  one of the following supporting documents.  So within that

18  language itself, it uses a reference to the word "reasonably"

19  and when it's talking about the reasonable impediment or

20  difficulty to obtaining the photo ID.

21          **THE COURT:**  Okay.

22          **MS. COLMENERO:**  With respect to the radio and the

23  television commercials, those are 30-second time spots.  I do

24  believe that it talks about -- and I have not seen the

25  finalized language of those because they are in the

1    postproduction phase, but I believe it contains the reference

2    to the word -- a similar description of unable to obtain a form

3    of ID, fill out a declaration explaining why, and show one of

4    the seven forms of supporting identification.

5           **THE COURT:**  Does it talk about reasonable impediment?

6           **MS. COLMENERO:**  I don't believe that one of the

7    versions I saw spoke about reasonable impediment listed in

8    there.  It was more of a layman's terminology, since these are

9    going to the mass public, which was unable to fill out --

10   unable to obtain an ID, fill out a form explaining why.

11          **THE COURT:**  But that's a problem, right?  I mean,

12   that's exactly what the plaintiffs are addressing here.  Okay.

13          **MS. COLMENERO:**  The State does not believe that that

14   is a problem or would be confusing to anyone.  That's our

15   position.

16          **THE COURT:**  Okay.

17          **MS. COLMENERO:**  Then there is the newspaper

18   advertisement that will contain a similar poster to the one

19   that I just described that is also being uploaded on social

20   media sites, the same as the digital advertisement.

21          **THE COURT:**  That contains a reasonable impediment

22   language?

23          **MS. COLMENERO:**  Yes, it does.

24          **THE COURT:**  Okay.  Mr. Freeman, do you want to

25   respond, then I'll let Mr. Rosenberg.

1          **MR. FREEMAN:**  Sure.  Thank you, Your Honor.  We

2    certainly agree with the Court that it remains unclear why the

3    State refused to use the language of a reasonable impediment --

4    or, I'm sorry, the remedial order, and we appreciate the

5    Court's order.  We are concerned that the State has,

6    essentially, tried to run out the clock here and then pulled a

7    it's too late.  And we would ask the Court, respectfully

8    request the Court order the State to provide scripts and copies

9    of materials to the Court to make sure that these materials are

10   going to comply with the Court's original order.

11          We agree with the Court that language such as cannot

12   obtain and then asking the voter to give us a reason why is

13   distinct from the reasonable impediment language in the Court's

14   remedial order.  And that's the language even in the substance

15   of the press releases that's still there.  And so we would

16   request that the Court direct the defendants to modify not only

17   the headline, but also the substance of those press releases,

18   and to reissue them and make sure that the voters and the media

19   are aware of the actual standard that's at issue.

20          We think that it's necessary, as you requested, Your

21   Honor, in your initial motion that there be a broad order

22   directing the State to obey the remedial order accurately to

23   voters going forward, and I think the Court hit the nail on the

24   head when it said that especially language in isolation, so

25   headlines of press releases that don't provide any context,

1   they need to make sure they include the word "reasonably."

2   We're, obviously, not aware of the exact relationship between

3   the State and its printers and radio, but we would hope that

4   the State is going to be able to -- is going to be printing

5   print advertisements in October, can modify these

6   advertisements before then with print media, and we see no

7   reason why future digital materials can't comply with the exact

8   language of the Court's order.

9           **THE COURT:**  All right, Mr. Rosenberg.

10          **MR. ROSENBERG:**  Yes, thank you.  We agree with the

11  United States on that, and I just want to make sure that we're

12  talking about not just the inclusion of the word "reasonably,"

13  but the replacement of the "have" or "possessed" language in

14  place of the "could not have obtained" or "has not obtained"

15  because of the substantial and significant difference between

16  that and what's set forth in Your Honor's orders.

17          **THE COURT:**  Ms. Colmenero.

18          **MS. COLMENERO:**  Your Honor, it's my understanding

19  that the language that the State has used, and we used the

20  unable to obtain language, that there is reference to

21  reasonably within those voter-facing documents, that that is

22  sufficient.  What Mr. Rosenberg just mentioned, which was

23  changing the obtain language to suggesting something that does

24  not have a form of ID, would, in fact, require a massive

25  overhaul of the voter education materials, and we believe it

1    would be inconsistent with the Court's order, because what we

2    are attempting to avoid was situations where individuals go to

3    the polls and think that they qualify for the reasonable

4    impediment declaration because they have just left their ID at

5    home.

6            And so we want to make it clear that this is not a

7    convenience document.  The reasonable impediment declaration is

8    intended to help a very specific class of individuals, and it's

9    those who have a true reasonable impediment or physical

10   difficulty to obtaining one.  So we do not agree that that

11   language should be changed and there should be a massive

12   overhaul of all of the current education and training

13   materials.

14           **MR. FREEMAN:**  Your Honor, may I respond briefly?

15           **THE COURT:**  Who's speaking, I'm sorry.

16           **MR. FREEMAN:**  I apologize, this is Dan Freeman on

17   behalf of the United States.  Your Honor, the Court's order

18   clearly included the language of the reasonable impediment

19   procedure for individuals who do not possess SB 14 ID and

20   cannot reasonably obtain it.  And the State is suggesting that

21   it be allowed to replace the current question of whether a

22   voter does not possess an ID with a retrospective question of

23   whether a voter has not obtained it.  And while the State has a

24   concern regarding voters who leave their ID at home, it should

25   not be permitted to change the general language of the

1   reasonable impediment education program in order to reflect

2   that narrow concern.

3           The United States respectfully requests that the

4   Court direct the State to include the actual language of the

5   remedial order with regard to the question of current

6   possession, and if the State needs to provide additional

7   examples and poll worker training to ensure that poll workers

8   are aware that a voter who has accidently left their wallet at

9   home can't have a reasonable impediment declaration

10  (indiscernible).

11          **THE COURT:**  Didn't Ms. Colmenaro address that they

12  could do that?  What did you say, Ms. Colmenaro, in terms of

13  providing some specifics?

14          **MS. COLMENERO:**  What I proposed is that the State

15  modify the FAQs on the voter ID web page to include an FAQ

16  that's directly addressing the lost, stolen, suspended or

17  revoked scenario, which I believe is what prompted this motion

18  to enforce in the first place in terms of individuals who fell

19  into that category who may not think that they qualify for the

20  reasonable impediment declaration.

21          **THE COURT:**  But that's for the election workers also

22  somehow?

23          **MS. COLMENERO:**  No, Your Honor, that's -- that

24  language already appears in the election official's training

25  manual.

1          **THE COURT:**  Okay, okay.

2          **MS. COLMENERO:**  In terms of that specific scenario.

3     It just does not appear in the FAQs, and so that's what we

4     would be proposing, is to add similar language or similar

5     guidance to voters to address this specific scenario.

6          **THE COURT:**  Okay, Mr. Freeman.

7          **MR. FREEMAN:**  And, your Honor, if I may respond, the

8     Court has recognized what matters to voter education to a large

9     extent is the qualifying message, and the State has replaced

10    the language in the Court's remedial order with its own

11    preferred language.  And it's important that voters be aware

12    that the actual standard do not possess SB 14 ID

13    (indiscernible.)

14         **THE COURT:**  I know, we are now here, a lot of stuff

15    has been printed, and I'm just trying to figure out what we can

16    do now going forward.  So any final comments, Mr. Freeman, and

17    then Mr. Rosenberg, and then we need to see what we're going to

18    order here.

19         **MR. FREEMAN:**  Yes, Your Honor, thank you.  The United

20    States would request that the State be directed, to the extent

21    possible, to modify the language it uses to accurately reflect

22    the remedial order.  Whether or not it can change that language

23    in some documents is a separate question, but moving forward,

24    we do request that in all instances, where possible, the "have

25    not obtained" language be replaced with "do not possess," and

1   that the word "reasonably" be included, as it is included in

2   the State's -- I'm sorry, in the Court's remedial order.  Thank

3   you, Your Honor.

4          **THE COURT:**  All right, Mr. Rosenberg.

5          **MR. ROSENBERG:**  Very quickly, we agree with that, and

6   it seems to us that there are things that could be done, such

7   as errata sheets being sent out.  They don't have to reprint

8   the whole handbook or policy manuals.  There are ways of doing

9   this that are reasonable.

10         **THE COURT:**  Okay.  So then the Court is going to

11  grant the plaintiffs' motion to enforce the interim remedial

12  order in this respect:  One, going forward, the State needs to

13  use the language in the order, which is the voters who do not

14  possess and cannot reasonably obtain SB 14 ID.  So anything

15  that's going to be produced, printed from now forward.  I

16  understand there's some things that are already out there.  Any

17  questions on that, Ms. Colmenero?

18         **MS. COLMENERO:**  No, Your Honor.

19         **THE COURT:**  Okay.

20         **MS. COLMENERO:**  Just so that we're both on the same

21  page, there will be some documents, obviously, that have the

22  old language, but moving forward the State's guidance will now

23  have different language.

24         **THE COURT:**  Well, I mean, what else can we do, right?

25  So then 2, and I've already addressed this, that those -- the

1    press release, the votetexas.gov, the poster outside the

2    polling places that only talks about cannot obtain it, I

3    believe the State can change that, correct?  That should not be

4    a problem?  I know you don't want to and you don't agree with

5    me, but I didn't see where that would be -- present some of the

6    problems or issues with, say, the media things or some of the

7    training materials.

8            **MS. COLMENERO:**  Well, if the Court is ordering us to

9    do it, we will comply with the Court's order.  I would also

10   note that some of the press releases -- well, the press release

11   itself has been sent to counties, a template press release

12   similar to the one issued by the secretary himself, so there --

13   there may be other -- the secretary of state can change the

14   language of --

15           **THE COURT:**  Right, no, I understand, what's out there

16   is out there.

17           **MS. COLMENERO:**  Yeah.

18           **THE COURT:**  And then you were going to address the

19   FAQs, correct?

20           **MS. COLMENERO:**  Yes.

21           **THE COURT:**  What else did we discuss, or can we

22   address?

23           **MS. COLMENERO:**  And this is Ms. Colmenaro.  I just

24   want to confirm, with respect to the FAQs, the State is going

25   to add an FAQ to specifically address the lost, stolen,

1   revoked, suspended scenario?

2          THE COURT:  That's my understanding.

3          MR. FREEMAN:  And, Your Honor, this is Dan Freeman.

4   Just to be clear, the FAQs will also be using the "do not

5   possess" language; is that correct?

6          MS. COLMENERO:  Those -- and this is the State.  That

7   language still contains the "unable to obtain" or "cannot

8   obtain" language.  We were proposing a solution to address this

9   scenario that DOJ proposed to this class of individuals

10  (indiscernible.)

11         THE COURT:  So you can't fix those?  You can't fix

12  what's on the website?  Just to reflect the language of the

13  order.

14         MS. COLMENERO:  Your Honor, I mean, if you're going

15  to order us to do it, we will comply with the Court's order;

16  however, we just want to point out that our goal with these

17  FAQs all along was for there to be a consistent message, and

18  changing the language now in the guidance given could

19  contribute to voter confusion.

20         THE COURT:  Any response?

21         MR. FREEMAN:  Your Honor, this is Dan Freeman.  Any

22  confusion that results from a change from the actual language

23  of the Court's remedial order to -- sorry, from language that

24  deviated from the Court's order to the actual language of the

25  Court's order is solely the fault of the State of Texas.

1          **THE COURT:**  Yeah, the Court is going to order the

2    change.  You all are going to go into the FAQs, they need to be

3    cleaned up.  What else?

4          **MR. FREEMAN:**  Your Honor, the United States has

5    requested that all the electronic lead sources, anything that's

6    gone out digitally, be changed to reflect the actual language

7    of the Court's order and then all prospective communication,

8    including the mass media, be changed where possible.

9          **THE COURT:**  I think what my order is, that anything

10   going forward today reflect the Court's order.  Anything done

11   after today, I believe all the training materials and all, it

12   is the Court's impression that when read as a whole together,

13   that although not ideal because the Court's language wasn't

14   tracked, that we were going to be okay with that for now, so

15   I'm not ordering all that to be changed.

16         **MR. ROSENBERG:**  Your Honor --

17         **THE COURT:**  This is kind of a mess.  And it's obvious

18   it's a mess and confusing.  When even officials are maybe not

19   saying the right things, how can we expect the poll workers or

20   the voters to know what's supposed to happen.

21         **MR. ROSENBERG:**  Briefly, Your Honor --

22         **THE COURT:**  But I mean, we are where we were.  We

23   were just given this late July.  We're trying to work as we

24   can.  And anyway, who's that?  Mr. Rosenberg?

25         **MR. ROSENBERG:**  Yes, Your Honor.  Quickly, in order

1   to charge and make sure that this is done in an efficient

2   manner without bothering Your Honor, can we be given drafts of

3   what their proposed changes are, such as the FAQs, before

4   they're implemented and have an opportunity --

5            **THE COURT:**  Yes.  Ms. Colmenero, can you do that,

6   please.

7            **MS. COLMENERO:**  Yes, we can.

8            **MS. VAN DALEN:**  And, Your Honor, this is Marinda Van

9   Dalen for the Taylor plaintiff.  The speaking clarification,

10  the template press releases that have already gone to the

11  counties that I believe Ms. Colmenero has indicated have the

12  old language, can those be corrected?

13           **THE COURT:**  Well, they're already out there, is what

14  she was saying, although they can correct what they have.  I

15  mean, I guess she can send them out again.  Ms. Colmenero?

16           **MS. VAN DALEN:**  I think it's crucial, personally.

17           **MS. COLMENERO:**  I think what we're running into here,

18  Your Honor, is that there are a lot of documents that are

19  currently uploaded to the secretary of state's website that

20  have the "cannot obtain" or "unable to obtain" language, which

21  if we update the secretary of state's press release, it will

22  have a different message to the voter.  And, I mean, we're fine

23  with making those changes going forward.  We just want to point

24  out that there is going to be conflicting messages out there

25  with little time before the election.

1        **MR. FREEMAN:**  Your Honor, this is Dan Freeman for the

2   United States.  To the extent that there's conflict, the change

3   will be from voters being incorrectly told that they may not be

4   able to vote to being told that they are able to vote.  And any

5   confusion is going to be better than an incorrect message at

6   this point.  And we believe that if the State is active in

7   correcting all those documents that should have initially

8   reflected the Court's remedial order --

9        **THE COURT:**  Okay, we're not going back.  I've already

10  talked about what we're changing.  I'm just trying to see is

11  there anything else that needs to be cleared up?

12       **MR. FREEMAN:**  Well, the United States would believe

13  that anything that has been electronically circulated to

14  officials should be recirculated.  It's just a matter of

15  sending an e-mail, and we don't think there's a substantial

16  cost or impediment to doing that.

17       **THE COURT:**  Ms. Colmenero?

18       **MS. COLMENERO:**  Those documents have been uploaded to

19  the secretary of state's website for some time now.  They've

20  been sent and disseminated out to the county election officials

21  and the counties have started printing those materials, and we

22  don't believe that the language in there read as a whole is

23  inconsistent at all with the Court's order.  So we are fine to

24  move forward as the Court has suggested under its order and

25  ensure that future statements will have the language that the

1  Court is requiring; but to go back and change that all will

2  definitely disrupt the process.

3          THE COURT:  All right.

4          MR. FREEMAN:  And, Your Honor, this is Dan Freeman,

5  to the extent that those County officials have printed those

6  documents, as Mr. Rosenberg has suggested, errata sheets can be

7  used.  We're not asking --

8          THE COURT:  I'm not going to order that at this time.

9  What else needs to be addressed?

10          MR. FREEMAN:  I believe the mass media communication,

11  Your Honor.

12          THE COURT:  Well, she's saying it's already done,

13  that's already in place.  Right, Ms. Colmenero?

14          MS. COLMENERO:  Your Honor, there may be some

15  flexibility on the television and radio.  I need to confirm --

16          THE COURT:  Well, then that's really important,

17  because that's crucial, that's what a lot of people are going

18  to be seeing, so when can we know.

19          MS. COLMENERO:  I will, hopefully, have an update

20  from them later this afternoon when I'm able to confirm that

21  along with our consultant.

22          THE COURT:  And so you will immediately get with

23  Plaintiffs' counsel on that?

24          MS. COLMENERO:  Yes.

25          THE COURT:  Okay.

1    **MR. ROSENBERG:**  Your Honor, Dan Rosenberg.  Can they

2 also check to see if they can simply change the proofs that

3 they've sent into the print media which have not been published

4 and are not going to be published until the first week of

5 October?  It seems to me that there's a possibility of not

6 pulling the ads, just changing the proofs.

7    **THE COURT:**  I was just going to say, can you check on

8 that, Ms. Colmenero?

9    **MS. COLMENERO:**  I have already checked on the

10 specific print advertisements appearing in certain newspaper

11 publications, and it is too late to change the information that

12 has been submitted for publication.  So there are at least two

13 newspapers outlets that will be running the poster.

14    **THE COURT:**  Okay, but I thought -- and maybe I'm

15 wrong, I thought with the print it was "unable to obtain" was

16 being used with the reasonable impediment language.

17    **MS. COLMENERO:**  That is correct, Your Honor.

18    **THE COURT:**  So that's, as I said, maybe not as ideal,

19 but still at least they're read as a whole, hopefully, and

20 won't send the wrong message.  What else?

21    I'm not hearing anything else.  I'm in a jury trial.

22 My jury is --

23    **MR. ROSENBERG:**  Your Honor, our motion, the private

24 plaintiffs' motion on the intimidating --

25    **THE COURT:**  You know, that's not -- again, I keep

53

1    using the words it's not an ideal situation.  I don't know that

2    the State can tell these people what to say or do.  I think it

3    just kind of confirms that this is confusing, even the elected

4    officials don't -- or the officials, State officials don't

5    maybe quite understand what's going on.  It's unfortunate

6    because it sends a bad message to the community, to the voters

7    who we're trying to target here.  You know, it does indicate

8    some lack of interest in really trying to facilitate the

9    ability to vote for those who need that help.  But, you know,

10   the State can't tell them what to say and do, I don't think.

11            **MR. ROSENBERG:**  And that's why we very narrowly

12   tailored the release that we requested so as to ask the Court

13   to clarify that the declaration is intended to be used by a

14   voter who in good faith believes he or she does not possess a

15   SB 14 ID and has a reasonable impediment, and also that just

16   because the voter had at some time been issued one or more of

17   the IDs does not mean in and of itself the voter signing this

18   declaration is a false statement.  That does not ask the State

19   to do anything.  It is simply clarifying the order so as to

20   give some assurance to the voters who are hearing these

21   statements in the media that they're going to be investigated,

22   that, in fact, there is this this good faith belief that is

23   part and parcel of this, and that the fact that at some time

24   they may have had an SB 14 ID issued does not mean they're not

25   allowed to sign the declaration if in good faith they believe

 1    they do not have that now.

 2             THE COURT:  Ms. Colmenero, what is the State's -- we

 3    can't control what other people are saying.  What is the

 4    State's intention regarding this good faith issue?

 5             MS. COLMENERO:  Well, Your Honor, we don't believe

 6    that there needs to be a good faith exception added to the

 7    Court's interim order or any type of --

 8             THE COURT:  No, no, no, but what do you all intend to

 9    do with that declaration?

10             MS. COLMENERO:  The executed declaration?

11             THE COURT:  Yes, in terms of people signing it.  What

12    is the State's intent there?

13             MS. COLMENERO:  Well, the State itself, the secretary

14    of state doesn't have any investigatory powers itself.

15             THE COURT:  But what do you all think?  What do you

16    think?  What does the State of Texas believe about that

17    declaration in terms of how it should be read?

18             MS. COLMENERO:  Well, the way we read the declaration

19    is consistent with the language that's in there, that a person

20    who signs it must swear and affirm under penalty of perjury

21    that they face a reasonable impediment.  And so someone who

22    signs a declaration falsely should in fact --

23             THE COURT:  And that could be at the direction of the

24    poll worker, who's not going to know, really, how and why to

25    use it, as was the example that you all submitted, which the

1    person said their ID was at home, or whatever it was, and the

2    poll worker gave them the declaration, right?

3              **MS. COLMENERO:**  Your Honor, that could very well be a

4    scenario that occurs; however, in terms of getting into like

5    the subjective good faith of a person every time they sign it,

6    that's really not up to the State.  To the extent that there is

7    evidence that someone is signing a declaration falsely, the

8    county election officials can refer that to their local DA for

9    investigation, but the secretary of state's office itself is

10   not intending to take any kind of formal action.

11             **MR. DUNN:**  Your Honor, this is Chad Dunn, if I could

12   respond at some point.

13             **THE COURT:**  Yeah, we probably need to wrap up in the

14   next five minutes, I'm in a jury trial, but go ahead Mr. Dunn.

15             **MR. DUNN:**  I'm very sorry, Your Honor, but this is an

16   issue that I'm afraid is metastasizing around the state, and if

17   the Court doesn't deal with it in some way, we're going to see

18   more and more of it.  I mean, there's an active issue by

19   election officials to threaten and encourage potential criminal

20   prosecution, and now what we're hearing the State say is that

21   we're incapable of doing anything about it and, in fact, we

22   don't want to do anything about it.

23             And it's part and parcel of the problem, you can make

24   a young child clear the table, but if they don't want to, they

25   won't do a good job without close supervision.  And what the

```
 1   State is essentially saying is we'll pick up the forks, but not

 2   the knives and the dirty plates.  And people out there are

 3   being told that they can potentially be prosecuted for going

 4   down and voting, and now the State's chief lawyer on the

 5   subject has told the Court the same thing, and we beg of the

 6   Court to clarify the order that this is not some kind of dodge

 7   or hustle or trap where people need to wake up the day after

 8   election day and worry about going to jail.

 9          THE COURT:  Ms. Colmenero?

10          MS. COLMENERO:  Well, Your Honor, we don't believe

11   that the language of the reasonable impediment declaration

12   itself is intimidating.

13          THE COURT:  It's not the language, it's how people

14   are -- what they're saying about it.

15          MS. COLMENERO:  Well, and Your Honor, we don't

16   believe that any of the language that Mr. Stanart has said --

17   first of all, as you indicated, he's not under our -- well, as

18   we have indicated, he's not under our control.  All that he has

19   said is to the extent someone signs one falsely, he will refer

20   it to the appropriate --

21          THE COURT:  But why is that even necessary?  I

22   thought we're trying to help people who don't have these IDs,

23   can't reasonably obtain them, I thought we were trying to

24   facilitate their voting.  But no, that's not what it sounds

25   like where the interest is.
```

1          Anyway, I'll look at that issue further.  I think we

2   need to do something.  I may either get you back on the phone

3   or issue an order.  Anything else for today?

4          **MR. ROSENBERG:**  Thank you very much, Your Honor.

5          **MS. COLMENERO:**  No, Your Honor.

6          **MR. FREEMAN:**  Thank you, Your Honor.

7          **THE COURT:**  All right, you can be excused.  Thank

8   you.

9       **(Hearing adjourned at 1:18 p.m.)**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____                    **September 26, 2016**

          **Signed**                                                  **Dated**


*TONI HUDSON, TRANSCRIBER*