UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, § § | |
| *Plaintiffs,* § § | |
| § | |
| TEXAS ASSOCIATION OF HISPANIC § | |
| COUNTY JUDGES AND COUNTY § | C A No. 2:13-cv-00193 (NGR) |
| COMMISSIONERS, HIDALGO COUNTY § § | |
| *Plaintiff Intervenors*, § | |
| V. § | |
| STATE OF TEXAS § | |
| *Defendants,* § | |

**PROPOSED FACTS AND LAW ON THE ISSUE OF INTENT TO DISCRIMINATE FILED ON BEHALF OFTHE TEXAS ASSOCIATION OF HISPANIC COUNTY JUDGES AND COUNTY COMMISSIONERS**

The Fifth Circuit Court of Appeals has directed this Court to reevaluate the evidence submitted by the parties on the issue of "discriminatory intent". The Court recognized that where the potential remedy may be "broader" than the remedy the district court may fashion for the discriminatory impact violation, the issue of intent must be addressed. *Veasey v. Abbott*, No. 14-41127, Lexis 13255 * 20 ftn 11 (5th Cir. July20, 2016) (en banc)[1]. This is of

---

[1] The Fifth Circuit acknowledged that the remedy for a discriminatory intent violation may be different and more extensive than the remedy for a discriminatory effect violation, *Veasey, supra* *20, n.11 (explaining that the panel "cannot avoid ruling on the discriminatory intent claim here, where the remedy to which Plaintiffs would be entitled for a discriminatory intent violation is potentially broader than the remedy the district court may fashion for the discriminatory impact violation) (citing *City of*

1

particular importance here in Texas because Hispanic voters no longer have the preclearance[2] protections offered by Section 5 of the Federal Voting Rights Act, *Shelby County v. Holder*, 133 S. Ct. 2612 (2013).

Without hyperbole, this Court is the only obstacle standing between future Texas Legislative actions and an all-out evisceration of Hispanics' right to vote. For this reason, this brief will focus, as suggested by the Fifth Circuit, on the narrow issue of the recent history of the Texas Legislature intentionally attempting to suppress the Hispanic vote: "unless historical evidence is reasonably contemporaneous with the challenged decision, it has little probative value" *Veasey, Supra* *25

### A. BURDEN OF PROOF

"Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Arlington Heights*, 429 U.S. at 265. However, "[r]acial discrimination need only be one purpose, and not even a primary purpose," of an official action for a violation to occur. *United States v. Brown*, 561 F.3d 420, 433 (5th Cir. 2009) (citation omitted). "Legislative motivation or intent is a paradigmatic fact question." *Prejean v. Foster*, 227

---

*Richmond v. United States*, 422 U.S. 358, 378 (1975) (holding, in the discriminatory purpose context, that "[a]n official action . . . taken for the purpose of discriminating . . . on account of . . . race has no legitimacy at all")).

[2] Under Sec. 5 of the Federal Voting Rights Act, since 1972, Texas had to receive approval by the Department of Justice before any voting change was effective. The preclearance requirement was declared unconstitutional in *Shelby County v. Holder*, 133 S. Ct. 2612 (2013). In short, *Shelby* cleared the way, for the first time since 1972, for Texas to adopt whatever discriminatory statutes it desired without any federal supervision.

F.3d 504, 509 (5th Cir. 2000) (citing *Hunt v. Cromartie*, 526 U.S. 541, 549, 119 S. Ct. 1545, 143 L. Ed. 2d 731 (1999)). "Proving the motivation behind official action is often a problematic undertaking." *Hunter v. Underwood*, 471 U.S. 222, 228, 105 S. Ct. 1916, 85 L. Ed. 2d 222 (1985). *Veasey, Supra* *21.

The Fifth Circuit has provided guidance to this Court on the standards for showing proof of intent. It adopted the *Arlington Heights* standards: (1) the historical background of the decision, (2) the specific sequence of events leading up to the decision, (3) departures from the normal procedural sequence, (4) substantive departures, and (5) legislative history, especially where there are contemporary statements by members of the decision-making body." *Overton v. City of Austin, 871 F.2d 529, 540 (5th Cir. 1989)* (citing *Arlington Heights, 429 U.S. at 267-68*). The challengers bear the burden to show that racial discrimination was a "'substantial' or 'motivating' factor behind enactment of the law"; if they meet that burden, "the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor." *Hunter, 471 U.S. at 228* (citation omitted).

### B. RECENT HISTORY SUPPORTING A FINDING OF TEXAS' INTENT TO DISCRIMINATE

The Fifth Circuit noted that in this Court's prior decision not all "history" was "long ago" and that there were some more contemporary examples of discrimination identified by the Plaintiffs in the district court. *Veasey, Supra* *26. The evidence of relatively recent discrimination cited by the district court

3

is more probative of discriminatory intent. While the record also contains more contemporary examples the district court relied too heavily on the evidence of State-sponsored discrimination dating back hundreds of years, *Veasey, Supra* *24-25.

### 1.) *Case Law and the present existence of Racially Polarized Voting:*

As recently as 2012 a three judge court in the District Court for the District of Columbia summarized the recent history of Texas' assault on the right to vote of Hispanics: "In the last four decades, Texas has found itself in court every redistricting cycle, and each time it has lost. See, e.g., *LULAC*, 548 U.S. 399, 126 S.Ct. 2594; *Vera*, 517 U.S. 952, 116 S.Ct. 1941; *Upham v. Seamon*, 456 U.S. 37, 102 S.Ct. 1518, 71 L.Ed.2d 725 (1982); *White v. Weiser*, 412 U.S. 783, 93 S.Ct. 2348, 37 L.Ed.2d 335 (1973); *White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973); *Terrazas v. Slagle*, 789 F.Supp. 828 (W.D.Tex.1992), aff'd sub nom., *Richards v. Terrazas*, 505 U.S. 1214, 112 S.Ct. 3019, 120 L.Ed.2d 891 (1992) (mem.).

The Court went on to point out: "While a losing streak alone does not control our decision, Texas's history of failures to comply with the VRA is one of the circumstantial factors that *Arlington Heights* instructs us to consider" [in determining intentional discrimination]. *Texas v. United States*, 887 F. Supp. 2d 133, 160-161 (D.D.C. 2012),*vacated and remanded* 133 S.Ct 2885 (2013). More to the point: "the sequence of events leading to the passage of the Congressional Plan also supports an **inference** of **discriminatory purpose**. Black and Hispanic members of Congress testified at trial that they were

excluded completely from the process of drafting new maps, while the preferences of Anglo members were frequently solicited and honored." *Texas v United States, Supra at 161.* [emphasis added].

One would think that after this "inference" determination by three federal judges in 2012, the Texas Legislature would address the concerns expressed by the judges. Instead, in the next legislative session in 2013, the Texas Legislature adopted essentially the same plan that was rejected as not complying with the Federal Voting Right Act; the arrogance demonstrated by the Texas Legislature is overwhelming and purposeful[3].

The Texas Legislature began consideration and debating the Voter ID law in the early part of the last decade. Just since that time there have been dozens of Federal Court Decisions documenting violations of the Voting Rights Act or recognitions of continuing electoral discrimination against the State and local independent school districts (ISDs), cities and other special election districts from all areas of Texas.[4]

The Appeals Court cited favorably the testimony concerning racially

---

[3] That plan is presently under federal scrutiny by a three judge court in San Antonio, Texas, *Perez et. al. v. State of Texas*, SA-11-CA-360-OLG-JES-XR

[4] *See for example: OCA Greater Houston v. Texas*, No. 1:15-cv-679-RP. (W.D. Texas, Austin Division August 30, 2016.) (Texas Election Code which prohibited use of interpreter who was not a registered voter in county where the voter resided violated the language provisions of the Voting Rights Act). *Davis v Perry*, SA-11-CA-788-OLG-JES-XR (Texas State Senate Redistricting Case) final Order October 13, 2013. In settlement after trial on the merits of the Texas Senate redistricting case, Texas agreed to the implementation of a remedy plan preferred by plaintiffs *Davis* and *LULAC*; *Rodriguez v Harris County*, civ 4: 11 2907 (August 2013). Although the Court denied Plaintiffs' complaint that the 2011 redistricting of the Harris County Commissioners Court (population 4.1 million) violated Section 2 of the Voting Rights Act, the Court found "the statistical and anecdotal evidence demonstrates the existence of racial bloc voting." ;

polarized voting: "The district court relied primarily on the testimony of Dr. Barry Burden, a political science professor, and Mr. George Korbel, an expert on voting rights, in concluding that racially polarized voting exists throughout Texas." *Veasey, Supra* *99. This pattern of voting was conceded by Texas as existing in 252 of the 254 counties, *Id* at *102. It is a manifestation of past and current attitudes about race; it is within this context that the voter ID law was passed by the Texas Legislature.

> 2.) *Letters of Objection from the Department of Justice pursuant to Section 5 of the Federal Voting Rights Act:*

To the extent that local attitudes and prejudices are reflected in the officials' they elect to the Texas legislature, there have been 11 Voting Rights Objections during that same period.[5] See also:

---

[5] See for example April 8, 2013 Section 5 Objection Letter Beaumont ISD concerning a change from single member district to an modified at large election plan. ("There is overwhelming evidence that both the campaign leading to the election as well as the issue itself carried racial overtones with the genesis of the change and virtually all of its support coming from white residents"); December 21, 2012 Section 5 Objection Letter to the Beaumont ISD;  March 12, 2012 Section 5 Objection Letter to State of Texas concerning the Voter ID Statute ("Even after submitting the data that show over 600,000 registered voters do not have either a driver's license or personal identification card issued by DPS - and that a disproportionate share of those registered voters are Hispanic - the state has failed to propose, much less adopt, any program for individuals who have to travel a significant distance to a DPS office, who have limited access to transportation, or who are unable to get to a DPS office during their hours of operation.");  March 5, 2012 Section 5 Objection Letter to Galveston County concerning redistricting ("The evidence establishes that this was a deliberate decision by the county to avoid being held to a procedural or substantive standard of conduct with regard to the manner in which it complied with the constitutional and statutory requirements of redistricting."); October 3, 2011 Section 5 Objection to the City of Galveston, Texas change from single member districts to modified at-large elections. ("Racial bloc voting continues to play a significant role in city elections" and "Indeed, in the course of our investigation, the city acknowledged that the proposed method of election will decrease the number of minority ability-to-elect districts."); June 28, 2010 Section 5 Objection Letter to Runnels County Clerk concerning changes in bilingual procedures ("[T]he county does not test the Spanish language proficiency of its bilingual poll workers, or provide training for bilingual assistance. Our information suggests that one of the individuals asserted by the county to be a bilingual poll worker is not proficient in Spanish."); March 24, 2009 Section 5 Objection to Gonzales County concerning bilingual procedures (a

6

https://www.justice.gov/crt/voting-determination-letters-texas.

    *3.) Federal Observers:*

Moreover, in the recent past, the Department of Justice has dispatched more than 1,100 Federal Election Observers and Monitors to areas determined

---

significant· number of the county's election notices and other documents containing election-related information were made available only in English over the course of the last three general elections."); March 12, 2010 Section 5 Objection Letter to Gonzales County involving changes in bilingual procedures; August 21, 2008 Section 5 Objection Letter to the State concerning a property ownership requirement for voting in fresh water supply districts ("The submitted data confirms that there are Hispanic supervisors who are known to be non-landowning residents of their district. If the proposed candidate qualifications were implemented, these individuals would be unable to run for reelection. Concerns that the proposed change may have a future retrogressive effect also are raised by statistics that reveal a significant disparity in home and agricultural land ownership rates between Caucasians and minorities in Texas."); May 5, 2006 Section 5 Objection Letter to North Harris Montgomery Community College District concerning elimination of polling places in areas of high minority concentration ("instead of 84 polling places [as in previous elections], there will be 12 polling places. These 12 polling places will serve a geographic area of well over 1,000 square miles with over 540,000 registered voters. The assignment of voters to these 12 sites is remarkably uneven: the site with the smallest proportion of minority voters will serve 6,500 voters, while the most heavily minority site (79.2% black and Hispanic) will serve over 67,000 voters.");  November 16, 2001 Section 5 Objection Letter to Waller County ([U]nder the benchmark plan, [in Commissioners] Precinct 1 and Precinct 3 ... minority persons are a majority of the voting age population... [while under the] proposed 2001 redistricting plans contain only one district in which minority persons are a majority of the voting age population....); August 12, 2002 Section 5 Objection Letter to the City of Freeport, Brazoria County change from single member district to at-large elections ("a return to an electoral system where all council offices are elected on an at-large basis will result in retrogression in [Minority] ability to exercise the electoral franchise that they enjoy currently."); November 16, 2001  Section 5 Objection Letter to the State Congressional and State House redistricting ("Our examination of the State's plan indicates that it will lead to a prohibited retrogression in the position of minorities with respect to their effective exercise of the electoral franchise by causing a net loss of three districts in which the minority community would have had the opportunity to elect its candidate of choice."); September 24, 2001  Section 5 Objection Letter to the Haskell CISD (Change to at large elections from single member districts adopted by Court order    "The school district has conceded that it will be virtually impossible for minority voters to elect [their] candidate of their choice under the board's proposed method of election..."); June 5, 2000 Section 5 Objection Letter to the Sealy ISD, Austin County ("In our view, the available information concerning voting patterns within the school district is not inconsistent with a pattern of racially polarized voting...")

to have potential for election discrimination. [6]

Plaintiff Texas Association of Hispanic County Judges and County Commissioners believe that the above cited record "is reasonably contemporaneous with the challenged decision" and therefor has substantial probative value. *Veasey, Supra* at * 25; moreover, this record clearly indicates that the Texas Legislature possessed, "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group.", *McCleskey v. Kemp, 481 U.S. 279, 298 n.20, 107 S. Ct. 1756, 95 L. Ed. 2d 262 (1987).*

---

[6] See Plaintiffs' Exhibit 771 Appendix 1; Tr. Day 5 page 219 ff esp 221 at 15-16: November 6, 2012 General Election–the Department of Justice sent 119 federal election observers to Dallas County, Fort Bend County, and Jefferson County; May 29, 2012 Primary Elections–the Department of Justice sent federal election observers to Dallas, Galveston, Jasper, Jefferson, and Harris Counties; May 29, 2012 Primary Elections– the Department of Justice sent federal observers to Fort Bend County, which is subject to a court order entered in 2009 which requires the jurisdiction to comply with the minority language and assistor of choice requirements of the Voting Rights Act; May 12, 2012 Municipal Electio– the Department of Justice sent 39 federal election observers to the cities of Galveston and Irving; November 4, 2008 General Election– the Department of Justice sent 113 federal election observers to Dallas County, Fort Bend County, and Galveston County; The Department of Justice sent 36 federal election observers to the City of Irving, Dallas County;   March 3, 2008 Primary Elections– the Department of Justice sent 46 federal election observers to Brazos County, Fort Bend County, and Galveston County; May 12, 2007 Municipal Elections– the Department of Justice sent 32 federal election observers to Fort Bend County and to the City of Farmers Branch in Dallas County; November 7, 2006 General Election–the Department of Justice sent 113 federal election observers to Brazos County, Ector County, Hale County, Medina County, Wilson County, Fort Bend County, and Galveston County; May 13, 2006 Municipal Elections– the Department of Justice sent 8 federal election observers to Ector County joint municipal and school district elections; March 7, 2006 Primary Elections– the Department of Justice sent 25 federal election observers to Ector County;   November 8, 2005 General Election– the Department of Justice sent 21 federal election observers to Ector County; November 2, 2004 General Election: The Department of Justice sent 99 federal election observers to Dallas County; May 14, 2004 Municipal Elections– the Department of Justice sent 46 federal election observers to Dallas County.

## C. CONCLUSION

In light of the above cited cases and public record, the most relevant "historical" evidence is recent history, not long-past history. In short, recent history tells us that the Texas Legislature has done nothing to protect minority voting rights in the past forty (40) years unless it was ordered to by federal judges or the Department of Justice.

Therefore, this record supports a finding of intentional discrimination and the Court should enter such a finding and entertain proposed remedies.

November 18, 2016                              Respectfully Submitted

    *Rolando L. Rios*
ROLANDO L. RIOS
Attorney at Law
Milam Building
115 E. Travis, Suite 1024
San Antonio, Texas 78205
TX State Bar No. 1693590
(210) 222-2102
(210) 222-2898 fax
rrios@rolandorioslaw.com

ATTORNEYS FOR PLAINTIFFS
INTERVENORS TEXAS
ASSOCIATION OF HISPANIC
COUNTY JUDGES AND COUNTY
COMMISSIONERS

**CERTIFICATE OF SERVICE**

I hereby certify that on November 18, 2016, I served a true and correct copy of the foregoing document via the Court's ECF system on all counsel of record.

                                              ___*Rolando L. Rios*_____
                                              ROLANDO L. RIOS
                                              Attorney at Law