IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | |
|---|---|
| MARC VEASEY, *et al.*,<br><br>                    Plaintiffs,<br><br>          v.<br><br>GREG ABBOTT, *et al.*,<br><br>                    Defendants. | Civil Action No. 2:13-cv-193 (NGR)<br>[Lead Case] |

**PLAINTIFFS' JOINT PROPOSED FINDINGS OF FACT**

**Table of Contents**

I.  Introduction ....................................................................................................................1

II. Historical Background:  Demographics and the Political Process in Texas ...................2

    A.  Dramatic Growth of the Minority Community ........................................................2

    B.  Racially Polarized Voting ........................................................................................3

    C.  Contemporary Racial Discrimination ......................................................................5

        1.  Discrimination in Voting ...................................................................................5

        2.  Other Official Discrimination ...........................................................................9

    D.  Race and Elections .................................................................................................13

        1.  Racial Appeals .................................................................................................15

        2.  Election of Hispanics and African Americans .................................................15

        3.  Race and Voting Behavior ...............................................................................15

III. Voter Identification Before SB 14 ..............................................................................18

IV. Voter Identification Requirements Under SB 14 .........................................................19

V.  The Passage of SB 14 ..................................................................................................22

    A.  The Sequence of Events: Multiyear Efforts to Narrow Voter Identification
        Requirements ..........................................................................................................22

    B.  Procedural Departures: The Extraordinary Process to Enact SB 14 .........................25

        1.  Speed Through the Texas Senate .....................................................................25

        2.  Special Treatment in the Texas House .............................................................28

        3.  Redrafting in the Conference Committee .........................................................29

        4.  The Embargoed Impact Analysis .....................................................................30

        5.  Ignoring Concerns Raised During Preclearance Proceedings ...........................34

    C.  Substantive Departures I: The Exacting Requirements of SB 14 .............................35

        1.  SB 14 Heightens Restrictions Beyond Prior Voter Identification Proposals .......35

i

2.  SB 14 Imposes Greater Restrictions than Indiana and Georgia Voter ID Laws ...................................................................................38

D.  Substantive Departures II: The Absence of Evidence to Support SB 14 .................40

1.  In-Person Voter Impersonatoin ...............................................41

2.  The History of Pretextual Voter Fraud Claims ....................................48

3.  Voter Confidence and Constituent Priming ........................................50

4.  Absentee Ballot Fraud and Targeting .................................53

5.  Non-Citizen Voting and Shifting Justifications ...................................55

E.  Contemporary Statements: Anticipation of a Discriminatory Impact ......................60

1.  Warnings in the Legislative Record ................................................59

2.  Admissions of Bill Proponents and Absence of Candid Records ......................62

3.  Unsupported Assertions and the Lack of Meaningful Debate ...........................65

F.  Shaping the Impact: Rejection of Non-Discriminatory and Ameliorative Alternatives ..................................................................69

1.  Amendments to Facilitate Obtaining Required Identification ...........................70

2.  Amendments to Expand Acceptable Identification .............................72

3.  Refusal to Engage in Prospective Impact Analysis .................................74

4.  The Fiscal Note and Funding of Education and Training Efforts .......................75

VI.  Impact of the Official Act: Realization of an Anticipated Effect .................................77

A.  Voters Impacted By SB 14 .......................................................78

1.  Voters Who Lack SB 14 ID and the Racial Disparity .........................78

2.  Socioeconomic Characteristics of Voters Who Lack SB 14 ID .......................82

B.  The Discriminatory Impact Results from Legislative Decisions .............................85

1.  Limits on Existing Forms of Identification .........................................90

2.      Failure to Fund Voter Education ........................................................................95

3.      Failure to Craft an Effective EIC Program ......................................................98

4.      Procedural Requirements for the Disability Exemption .....................................115

5.      Exemption of Mail-In Ballots ..........................................................................117

C.     The Electoral Impact of SB 14 ...............................................................................119

D.     Failure to Reduce a Proven Impact .......................................................................122

1.      The Failing EIC Program .................................................................................122

2.      No Response to Judicial Finding of Discrimination ..........................................123

## I.   INTRODUCTION

1.      This litigation challenges Texas's photographic voter identification ("voter ID") statute, Senate Bill 14 (2011) (SB 14), under Section 2 of the Voting Rights Act, 52 U.S.C. § 10301, and the U.S. Constitution.

2.      This Court previously found that SB 14 has a discriminatory result, in violation of Section 2; was enacted with a discriminatory purpose, in violation of Section 2 and the U.S. Constitution; places an unconstitutional burden on the right to vote; and constitutes a poll tax.[1] On appeal, the en banc U.S. Court of Appeals for the Fifth Circuit affirmed on the Section 2 results claim, vacated the finding that SB 14 has a discriminatory purpose, vacated and dismissed the right to vote claim, and reversed on the poll tax claim.[2]

3.      Following clarification of the applicable law, the Court of Appeals remanded for this Court, as finder of fact, to reweigh the discriminatory purpose evidence in the first instance.[3]

4.      Based on the findings herein, this Court finds that proponents of SB 14 within the 82nd Texas Legislature were motivated, at the very least in part, *because of* and not merely *in spite of* SB 14's detrimental effects on the Hispanic and African-American electorate.

5.      This Court also finds that the Texas Legislature would not have enacted the specific provisions of SB 14 absent that discriminatory purpose.

---

[1] *Veasey v. Perry*, 71 F. Supp. 3d 627, 702 (S.D. Tex. 2014).

[2] *Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016) (en banc), *cert. pending*, No. 16-393 (U.S. docketed Sept. 27, 2016).

[3] *Id.* at 239-42.

1

## II.  HISTORICAL BACKGROUND:  DEMOGRAPHICS AND THE POLITICAL PROCESS IN TEXAS

### A.  Dramatic Growth of the Minority Community

6.      Texas legislators introduced and enacted strict voter ID legislation in the context of Texas's rapidly changing population.[4]

7.      Texas's substantial population growth over the last decade and a half has been driven largely by the State's minority population.  Texas became a majority-minority state in 2004.[5] Between 2000 and 2010, African Americans and Hispanics accounted for 78.7% of overall population growth, and by 2010, only 45% of Texas's population was Anglo, whereas 38% of the population was Hispanic and 12% of the population was African-American.[6]

8.      Anglos remain a majority of Texas's citizen voting-age population (CVAP).  Between the 2000 Census and the 2006-2010 American Community Survey (ACS), however, Anglos accounted for only 25% of CVAP growth.  Hispanics accounted for 46% of the growth, and African Americans accounted for another 18%.[7]

9.      News that Texas had become a majority-minority state was widely disseminated in the media and discussed in the Texas legislature.  Changes to the State's demography were routinely

---

[4] PL765 ¶¶ 10, 95 (Davidson Supp. Rep.).

[5] *Id.*

[6] PL454 (U.S. Req. for Judicial Notice).  The U.S. Census Bureau does not treat "Hispanic" as a racial category and, instead, asks individuals to self-identify their race and then to separately self-identify whether they are Hispanic or not.  The Court will use "Anglo" to refer to non-Hispanic white individuals and "African-American" to refer to non-Hispanic black individuals.  "Black" and "African-American" as racial categories are used interchangeably.

[7] *Id.*

discussed in the Legislature, beginning as early as 2005, and played a prominent role in the 2011

Legislature during consideration of statewide redistricting plans.[8]

### B. Racially Polarized Voting

10.     Federal courts have consistently found that elections in Texas are characterized by

polarized voting both between Anglo and Hispanic voters and between Anglo and African-

American voters.[9]

11.     Texas has conceded in other pending litigation that racially polarized voting persists in

252 of 254 counties in the State.[10]

12.     Analyses conducted in 2011 by the Office of the Texas Attorney General documented

racially polarized voting patterns in statewide elections from 2002 to 2010.[11]

13.     According to exit polling, in each of the five general elections prior to August 2014, a

majority or plurality of Anglo voters have consistently favored the Republican candidate for

president or governor, while a majority of Hispanic and African-American voters have

consistently voted against the Republican candidate.  The gap between Anglo and Hispanic

support for Republican candidates ranges from 13 percentage points in the atypical 2006 election

---

[8] PL765 ¶ 7 (Davidson Supp. Rep.); *see also Perez v. Texas*, 891 F. Supp. 2d 808, 812-13 (W.D. Tex. 2012) (three-judge court).

[9] *See, e.g.*, *LULAC v. Perry*, 548 U.S. 399, 427 (2006); *Campos v. City of Baytown*, 840 F.2d 1240, 1248-49 (5th Cir. 1988); *Jones v. City of Lubbock*, 727 F.2d 364, 381 (5th Cir. 1984); *Benavides v. Irving Indep. Sch. Dist.*, No. 3:13-CV-0087-D, slip op. at 26 (N.D. Tex. Aug. 15, 2014); *Rodriguez v. Harris Cnty.*, 964 F. Supp. 2d 686, 777 (S.D. Tex. 2013); *Fabela v. City of Farmers Branch*, No. 3:10-cv-1425, 2012 WL 3135545, at *11 (N.D. Tex. Aug. 2, 2012); *Benavides v. City of Irving*, 638 F. Supp. 2d 709, 731 (N.D. Tex. 2009); *Vera v. Richards*, 861 F. Supp. 1304, 1316-17 (S.D. Tex. 1994); *Terrazas v. Slagle*, 789 F. Supp. 828, 833 (W.D. Tex. 1991) (three-judge court), *aff'd*, 505 U.S. 1214 (1992); *see also* Trial Tr. 199:9-200:21 (Korbel) (Day 5).

[10] PL1037 at 114:18-115:17 (*Perez v. Perry*, Trial Transcript); Trial Tr. 200:22-201:8 (Korbel) (Day 5).

[11] *See* PL935 (Racially Polarized Voting Analysis: Plan S148); PL936 (Racially Polarized Voting Analysis: Plan E120); PL937 (Racially Polarized Voting Analysis: Plan H283); PL938 (Racially Polarized Voting Analysis: Plan C185).

to 38 points in the 2008 election.  The gap between Anglos and African-American voters'

support for Republican candidates is more pronounced, ranging from 28 percentage points in

2006 to 71 points in 2008.[12]

14.     Republican Party leaders and activists have tied the political success of the Republican

Party to whether minority Texans vote.  For example, in 2013, Ken Emanuelson, leader of a

Dallas political group with close ties to the Dallas County Republican Party, stated:  "Well, I'm

going to be real honest with you.  The Republican Party doesn't want black people to vote if

they're going to vote nine to one for Democrats."[13]  Also in 2013, Texas Congressman Kenny

Marchant similarly linked the voting rights of members of racial minority groups to partisan

outcomes:  "If you give the legal right to vote to 10 Hispanics in my district, seven to eight of

them are going to vote Democrat."[14]

15.     The November 2010 elections produced a landslide of historic proportions.  It also

produced a partisan divide in the Legislature that was even more reflective of the racially

polarized voting patterns in the State than the previous Legislature.  In the House, the bare 76/74

partisan divide in 2009 became a 101/49 super-majority in 2011.  Nineteen of the 23 seats the

minority political party lost in the House had been occupied by Anglos.  Over 80% of the

remaining members of the minority political party were Latino or African-American.  The

partisan composition of the Senate remained unchanged.  Seven of the 12 remaining senators

---

[12] PL758 ¶ 38 (Burden Corr. Rep.); Trial Tr. 307:12-24 (Burden) (Day 3).

[13] Trial Tr. 96:19-97:12 (Lichtman) (Day 4); PL 772 at 65-70 (Lichtman Rep.).

[14] Trial Tr. 96:8-18 (Lichtman) (Day 4); PL772 at 65-70 (Lichtman Rep.).

from the minority political party were African Americans or Latinos, and all members of the

minority political party in the Senate represented majority-minority districts.[15]

16.     As Texas's population has changed, the positions of Texas legislators have also become

increasingly tied to race.  Following the 2010 elections, nearly all legislative opponents of strict

photographic voter ID requirements were Hispanic or African-American legislators, and a super-

majority of the proponents were Anglo.[16]

### C. Contemporary Racial Discrimination

#### 1. Discrimination in Voting

17.     Texas has a long and entrenched history of racial discrimination in voting that continues

to this day.  The pretext for this discrimination has often been an ostensible need to confront

voter fraud.  For example, Texas has tried to justify all-white primary laws, poll taxes, secret

ballots, re-registration requirements, and, even, the illegal harassment of minority voters as

necessary to prevent alleged voter fraud.[17]  More recent restrictions on voting have been less

overt yet still intentionally discriminatory.

18.     In every decade since 1970, at least one of Texas's statewide redistricting plans has been

struck down or blocked on the basis of racial discrimination against African-American or

Hispanic voters under the Voting Rights Act or U.S. Constitution, including at least one Texas

---

[15] PL765 ¶¶ 37-39 (Davidson Supp. Rep.).

[16] PL765 ¶ 37 (Davidson Supp. Rep.).

[17] *See* Trial Tr. 17:15-18:6 (Johnson) (Day 3); Trial Tr. 304:7-305:15 (Burden) (Day 3); Trial Tr. 22:18-23:16, 28:23-31:15, 49:5-11 (Burton) (Day 6);  PL758 ¶ 30-32 (Burden Corr. Rep); PL760 at 10-13 (Burton Rep.); PL765 ¶ 74 (Davidson Supp. Rep.);  *LULAC v. Perry*, 548 U.S. at 439-40; *Texas v. United States*, 887 F. Supp. 2d 133 (D.D.C. 2012) (three-judge court), *vacated on other grounds*, 133 S. Ct. 2885 (2013); *White v. Regester*, 412 U.S. 755, 768 (1973) (quoting *Graves v. Barnes*, 343 F. Supp. 704, 731 (W.D. Tex. 1972)); *Texas v. United States*, 384 U.S. 155 (1966).

House redistricting plan in each decade.  This does not include cases brought pursuant to *Shaw v. Reno*, 509 U.S. 630 (1993), such as *Bush v. Vera*, 517 U.S. 952 (1996).[18]

19.     In 1973, 2006, and 2012, federal courts found that Texas redistricting plans were intentionally discriminatory or bore the mark of intentional discrimination.[19]

20.     In 1975, Texas enacted a purge law requiring re-registration of the entire electorate.  The U.S. Attorney General objected to the new law under Section 5 of the Voting Rights Act, and it was ultimately enjoined by a federal court.[20]

21.     Two federal courts found in 2012 that the same Texas Legislature that enacted SB 14 adopted redistricting plans that reflect a racially discriminatory purpose.[21]  First, the U.S. District Court for the District of Columbia denied Texas's request to preclear two redistricting plans enacted with discriminatory purpose.[22]  The D.C. District Court also declined to preclear another plan with a discriminatory effect and noted that "the full record strongly suggests that the retrogressive effect . . . may not have been accidental."[23]  Second, the U.S. District Court for the Western District of Texas found that the Legislature "may have focused on race to an

---

[18] Trial Tr. 189:6-198:5, 248:22-249:5 (Korbel) (Day 5); Trial Tr. 69:14-70:19 (Burton) (Day 6); *see also, e.g.*, *Texas v. United States*, 887 F. Supp. 2d 133, 166 (D.D.C. 2012) (three-judge court) (denying judicial preclearance); PL1130 at 5-10 (2001 Objection Letter); PL673 at 185-89 (1991 Objection Letter); PL673 at 172-75 (1982 Objection Letter); PL673 at 12-16 (1976 Objection Letter); PL673 at 17-20 (1976 Objection Letter).

[19] PL758 ¶ 34 (Burden Corr. Rep.); *see LULAC v. Perry*, 548 U.S. 399 (2006); *White v. Regester*, 412 U.S. 755 (1973); *Texas. v. United States*, 887 F. Supp. 2d 133 (D.D.C. 2012) (three-judge court), *vacated on other grounds*, 133 S. Ct. 2885 (2013); *see also* Trial Tr. 185:2-187:12 (Korbel) (Day 5).

[20] *See Flowers v. Wiley*, 675 F.2d 704, 705-06 (5th Cir. 1982); PL673 at 487-90 (Objection Letter); PL760 at 14-16 (Burton Rep.).

[21] *Texas*, 887 F. Supp. 2d at 159-62, 164-65 & n.32; *Perez v. Perry*, No. 5:11-cv-360, Slip Op. at 6 (W.D. Tex. Mar. 19, 2012) (three-judge court).

[22] *Texas*, 887 F. Supp. 2d at 159-62, 164-65 & n.32 (D.D.C. 2012).

[23] *Id.* at 177-78.

impermissible degree by targeting low-turnout Latino precincts" when drawing the 2011 Texas House plan.[24]

22.     Most recent voting discrimination litigation in Texas has challenged at-large elections, majority vote requirements, and anti-single shot provisions (*i.e.*, prohibitions on casting only one vote in a multi-seat contest).[25]

23.     Federal courts have found at-large elections in several Texas jurisdictions to violate Section 2 of the Voting Rights Act, including in the last two decades.[26]  Minority plaintiffs have also negotiated settlements and consent decrees to remedy vote dilution and other Section 2 violations, including in the last two decades.[27]

24.     Over the 38 years that Texas was covered by Section 5 of the Voting Rights Act, the U.S. Department of Justice issued over 200 objection letters blocking discriminatory voting changes enacted by the State of Texas and its sub-jurisdictions because of the changes' discriminatory purpose or retrogressive effect on the ability of minority voters to participate equally in the political process, including voting changes in more than 100 of Texas's 254 counties.  Since 2000, the Department of Justice has issued 3 objections to the State and 13 objections to local

---

[24] *Perez*, No. 5:11-cv-360, slip op. at 6.

[25] PL771 at 24-25 (Korbel Rep.).

[26] *See, e.g.*, *Benavidez v. Irving Indep. School Dist.*, No. 3:13-cv-87, 2014 WL 4055366, at *22 (N.D. Tex. 2014); *Fabela v. City of Farmers Branch*, No. 3:10-cv-1425, 2012 WL 3135545, at *14 (N.D. Tex. Aug. 2012); *Benavidez v. City of Irving*, 638 F. Supp. 2d 709, 732 (N.D. Tex. 2009); *LULAC v. N.E. Indep. Sch. Dist.*, 903 F. Supp. 1071, 1093 (W.D. Tex.1995); *see also* PL771 at 85-90 (Korbel Rep.).

[27] *See, e.g.*, *Hubbard v. Lone Star College Sys.*, No. 4:13-cv-1635 (S.D. Tex. Oct. 11, 2013); *Tobias v. Garza Cnty. Hosp. Dist.*, No. 5:00-cv-293-C (N.D. Tex. Mar. 6, 2001); *Reynoso v. Amarillo Indep. Sch. Dist.*, No. 2:98-cv-186 (N.D. Tex. Sept. 17, 1999); *Reyna v. E. Cent. Indep. Sch. Dist.*, No. 5:98-cv-433 (W.D. Tex. Dec. 9, 1998); *LULAC v. Big Spring Indep. Sch. Dist.*, No. 1:96-cv-27 (N.D. Tex. July 2, 1996).

jurisdictions.  Eight of these recent objections were explicitly based on failure to prove that the changes were not motivated by discriminatory intent.[28]

25.     The blocked changes since 1995 include, but are not limited to, racially discriminatory property-ownership qualifications for candidates (State of Texas, 2008), pre-registration proof of citizenship requirements (State of Texas, 1996), discriminatory methods of election and redistricting plans (State of Texas, 2001); annexations and reductions in the number of elected officials that diluted minority voting strength, inadequate bilingual assistance programs (State of Texas, 1995), and discriminatory election-date changes.[29]

26.     Between 2005 and 2009, the United States filed ten lawsuits against ten separate Texas jurisdictions for violations of Voting Rights Act provisions requiring assistance for Spanish-speaking limited-English-proficient voters.  Each jurisdiction entered into a consent decree.[30]

27.     A federal court recently held that Texas elections laws restricting limited-English proficient voters from selecting an interpreter of their choice violated the Voting Rights Act.[31]

---

[28] *See* PL673 (DOJ Objection Letters to Texas); PL1130 (Recent DOJ Objection Letters); Trial Tr. 220:2-12 (Korbel) (Day 5); Trial Tr. 69:14-70:19 (Burton) (Day 6); PL771 at 6 (Korbel Rep.).

[29] PL1130 at 20-22 (2008 Texas Objection Letter); PL673 at 448-51 (1996 Texas Objection Letter); PL 1130 at 6-10 (2001 Texas Objection Letter); PL673 at 435-38 (1995 Texas Objection Letter); PL 673 at 455-59 (1997 City of Webster Objection Letter); PL 1130 at 44-49 (2012 City of Galveston Objection Letter); PL 1130 at 60-66 (2013 Beaumont ISD Objection Letter).

[30] *See, e.g.*, *United States v. Fort Bend Cnty.*, No. 4:09-cv-1058 (S.D. Tex. Apr. 9, 2009); *United States v. Littlefield Indep. Sch. Dist.*, No. 5:07-cv-145 (N.D. Tex. Sept. 4, 2007); *United States v. Post Indep. Sch. Dist.*, No. 5:07-cv-146 (N.D. Tex. Sept. 4, 2007); *United States v. Seagraves Indep. Sch. Dist.*, No. 5:07-cv-147 (N.D. Tex. Sept. 4, 2007); *United States v. Smyer Indep. Sch. Dist.*, No. 5:07-cv-148  (N.D. Tex. Sept. 4, 2007); *United States v. City of Earth*, No. 5:07-cv-144 (N.D. Tex. Sept. 4, 2007); *United States v. Galveston Cnty.*, No. 3:07-cv-377 (S.D. Tex. July 20, 2007); *United States v. Brazos Cnty.*, No. 4:06-cv-2165 (S.D. Tex. June 29, 2006); *United States v. Hale Cnty.*, No. 5:06-cv-43 (N.D. Tex. Apr. 27, 2006); *United States v. Ector Cnty.*, No. 7:05-cv-131 (W.D. Tex. August 26, 2005).

[31] *OCA Greater Houston v. Texas*, No. 1:15-cv-679, 2016 WL 4597636, at *3-4 (W.D. Tex. Sept. 2, 2016), *appeal docketed*, 16-51126 (5th Cir. filed Sept. 13, 2016).

28.     Immediately after the Supreme Court invalidated the coverage formula for preclearance under Section 5 of the Voting Rights Act, several jurisdictions moved to implement potentially retrogressive voting changes, including the City of Pasadena and the Beaumont Independent School District.[32]  Most notably, Texas started to enforce SB 14 as originally enacted immediately after the Supreme Court's decision.[33]

### 2.  Other Official Discrimination

29.     Stark socioeconomic disparities persist between Anglo Texans and Hispanic Texans and between Anglo Texans and African-American Texans, including in education, employment, income, and access to motor vehicles.[34]

30.     These socioeconomic disparities are the result of a continuous pattern of racial discrimination against Hispanic and African-American residents in all measured areas of public life, particularly education, employment, housing, and transportation, including official discrimination by the State.  Because racial discrimination creates cycles of socioeconomic disadvantage, the effects of which are slow to fade from minority communities, the present socioeconomic disparities in Texas are attributable to past periods and recent acts of racial discrimination and segregation.[35]

### i.     Education

31.     The end of *de jure* school segregation in Texas was met with a policy of official resistance.  Into the 1970s, Dallas, Houston, and Austin resisted attempts at desegregation, and

---

[32] PL771 at 26 (Korbel Rep.).

[33] Trial Tr. 328:10-329:10 (Ingram) (Day 7); Dewhurst Dep. 219:4-6, July 29, 2014.

[34] Trial Tr. 310:21-313:11 (Burden) (Day 3); PL758 ¶ 46 (Burden Corr. Rep.); PL771 at 21 (Korbel Rep.).

[35] Trial Tr. 309:23- 313:311 (Burden) (Day 3); Trial Tr. 41:18-46:3 (Burton) (Day 6); PL760 at 21-33 (Burton Rep.).

minority students faced segregated schools, inadequate facilities, outdated curricula, and limited enrichment opportunities.  The United States and private litigants initiated numerous lawsuits across the State to remedy intentional discrimination in education, resulting in federal school desegregation orders across the state.[36]

32.     The intervention of federal courts was necessary to rectify this widespread discrimination:  a federal court found in 1970 that the State of Texas and the Texas Education Agency violated the U.S. Constitution by creating and maintaining segregated school districts throughout the State.[37]  In 1983, a federal court found that Texas had "still not committed itself to the elements of a desegregation plan" for its public higher education system, and Texas has been required for decades to engage in remedial action.[38]

33.     Austin and Houston resolved their desegregation lawsuits only in 1983, and Dallas did not fully eliminate the vestiges of racial discrimination in its school system until 2003.[39]  Federal courts continue to monitor and enforce the Texas Education Agency's desegregation obligations, and numerous Texas school districts remain under active desegregation orders.[40]

---

[36] *See, e.g.*, *United States v. Tex. Educ. Agency (Austin Indep. Sch. Dist.)*, 564 F.2d 162 (5th Cir. 1977); *United States. v. Midland Indep. Sch. Dist.*, 519 F.2d 60 (5th Cir. 1975); *Tasby v. Estes*, 517 F.2d 92 (5th Cir. 1975); *Cisneros v. Corpus Christi Indep. Sch. Dist.*, 467 F.2d 142 (5th Cir. 1972); *United States v. Lubbock Indep. Sch. Dist.*, 455 F. Supp. 1223 (N.D. Tex. 1978), *aff'd*, 601 F.2d 585 (5th Cir. 1979); *see also* PL771 at 47-53 (Korbel Rep.).

[37] *United States v. Texas*, 321 F. Supp. 1043 (E.D. Tex. 1970); *United States v. Texas*, 330 F. Supp. 235 (E.D. Tex. 1971), *aff'd in part and modified in part*, 447 F.2d 441 (5th Cir. 1971).

[38] *Hopwood v. Texas*, 861 F. Supp. 551, 556-57 (W.D. Tex. 1994) (citation omitted), *rev'd on other grounds*, 78 F.3d 932 (5th Cir. 1996).

[39] *See United States v. Overton*, 834 F.2d 1171, 1173-74 (5th Cir. 1987); *Ross v. Houston Indep. Sch. Dist.*, 699 F.2d 218, 223-24 (5th Cir. 1983); *Tasby v. Moses*, 265 F. Supp. 2d 757, 781 (N.D. Tex. 2003).

[40] *See, e.g.*, *United States v. Texas*, 601 F.3d 354, 373-74 (5th Cir. 2010); *United States v. Matthews*, No. 6:04-cv-291 (E.D. Tex.) (Longview ISD); *United States v. Tex. Educ. Agency*, No. 3:70-cv-4101 (N.D. Tex.) (San Angelo ISD); *United States v. Tyler Indep. Sch. Dist.*, No. 6:70-cv-5176 (E.D. Tex.); *Morales v. Shannon*, No. 3:70-cv-14 (W.D. Tex.) (Uvalde Consolidated ISD).

34.     This discrimination impaired racial minorities' educational opportunity.  Data published

on an annual basis in the Academic Excellence Indicator System by the Texas Education Agency

confirms that Hispanic and African-American Texans still perform below Anglo Texans in every

significant category relevant to education on a statewide basis.[41]

35.     African-American students are three times more likely than Anglo students to be

removed from school for comparable low-level infractions, and African-American students are

31% more likely to face school disciplinary procedures, which are linked to higher African-

American high school drop-out rates.  Texas schools are also currently experiencing re-

segregation; over 39% of African-American students currently attend schools with a minority

population of 90-100%.[42]

36.     Approximately 7.6% of Anglo Texans 25 years of age or older lack a high school

diploma or equivalent.  That figure is five times higher for Hispanic Texans (39.5%) and nearly

twice as high for African-American Texans (13.4%).[43]

      **ii.     Employment**

37.     Racial discrimination in employment by Texas state or local agencies also continues to

disadvantage African-American and Latino residents.  In the last two decades, the Texas

Department of Family and Protective Services, Matagorda County, and the cities of Austin,

Dallas, El Paso, Houston, and Lubbock have entered into consent decrees and settlements to

---

[41] PL771 at 2.

[42] PL760 at 25-26 (Burton Rep.); *see also Fisher v. Univ. of Texas at Austin*, 758 F.3d 633, 651-53 (5th Cir. 2014), *aff'd*, 136 S. Ct. 2198 (2016).

[43] Trial Tr. 310:21-311:24 (Burden) (Day 3); Trial Tr. 45:3-46:3 (Burton) (Day 6); PL454 ¶ 10 (U.S. Req. for Judicial Notice); PL758 ¶ 44 (Burden Corr. Rep.); PL771 at 20-21 (Korbel Rep.).

remedy employment discrimination on the basis of race.[44]  As recently as 1997, the police chief of the City of Galveston admitted to using racially derogatory language in the workplace.[45]

38.     This discrimination has impaired racial minorities' employment opportunities.  In 2010-2012, Texas had an unemployment rate of approximately 8.4% within the civilian labor force.  The rate was approximately 6.7% for Anglos, 9.2% for Hispanics, and 14.1% for African Americans.[46]

### iii.     Housing

39.     After decades of de jure segregation, de facto housing segregation persists into the present day, which, in turn, leads to a lack of access to state offices situated in primarily Anglo communities and to the services that these offices provide.[47]

40.     Texas enacted a statewide zoning statute in 1927 to facilitate housing segregation, and official, intentional segregation persisted into the twenty-first century through local zoning, restrictive covenants, and policies of municipal housing authorities.[48]

41.     For example, in 2000, a federal court found that the Town of Sunnyvale, a suburb of Dallas, maintained exclusionary zoning laws, including an outright ban on apartments and a one-acre zoning requirement for residential development, that were enacted with the discriminatory

---

[44] PL760 at 26-27 (Burton Rep.); *United States v. City of Lubbock*, No: 5:15-cv-234 (N.D. Tex. June 16, 2016); *United States v. City of Austin*, No. 1:14-cv-533 (W.D. Tex. Nov. 7, 2014); *United States v. Dallas*, No. 3:08-cv-1063 (N.D. Tex. Feb. 12, 2009).

[45] *See LULAC Councils 4433 & 4436 v. City of Galveston*, 979 F. Supp. 514, 520 (S.D. Tex. 1997).

[46] PL454 ¶ 13 (U.S. Req. for Judicial Notice); *see also* Trial Tr. 311:25-312:10 (Burden) (Day 3); Trial Tr. 120:3-17 (Bazelon) (Day 6).

[47] Trial Tr. 316:17-317:9 (Burden) (Day 3); Trial Tr. 45:3-19 (Burton) (Day 6); PL760 at 30-33, 45-47 (Burton Rep.).

[48] PL760 at 27-32 (Burton Rep.); *see also, e.g.*, *Walker v. City of Mesquite*, 169 F.3d 973, 976 (5th Cir. 1999); *Walker v. U.S. Dep't of Hous. and Urban Dev.*, 734 F. Supp. 1289, 1293-1312 (1989); *Villas at Parkside Partners v. City of Farmers Branch*, 577 F. Supp. 2d 858, 873 (N.D. Tex. 2008).

intent to prevent African-American families from living in Sunnyvale.  This in turn affected broader access to housing in the Dallas Metropolitan Area.[49]

42.      Discrimination in Texas's housing sector contributes to racial disparities in home ownership.  In 2010, 72.4% of Anglo heads of households owned their homes, while 27.6% rented, whereas only 45.6% of African-American heads of household and 57.9% of Latino heads of household owned their homes and 54.4% of African-American Texans and 42.1% of Latino Texans rented.[50]

### D.  Race and Elections

#### 1.  Racial Appeals

43.      Racial appeals in electoral contests illustrate the continuing salience of race in Texas elections.  Code words and phrases such as "welfare queen," "lazy," "criminal," "taking advantage," "poverty," "immigration," and "fraud" may cue implicit racial attitudes.[51]

44.      Sometimes, the appeals are overt.  In 2008, a political action committee (PAC) distributed a mailer that depicted an Anglo candidate next to minority politicians with the captions "Birds of a Feather Flock Together" and "Bad Company Corrupts Good Character." The same year, a candidate for the Texas House manipulated photographs of his Anglo opponent to darken his skin and to place a Mexican flag button on his shirt.[52]

---

[49] *Dews v. Town of Sunnnyvale*, 109 F. Supp. 2d 526, 529, 569-73 (N.D. Tex. 2000).

[50] PL760 at 31-32 (Burton Rep.).

[51] PL760 at 35-36 (Burton Rep.); PL771 at 22-23 (Korbel Rep.).

[52] ); Trial Tr. 46:8-48:16 (Burton) (Day 6); PL760 at 36-38 (Burton Rep.); PL795 (Bill Zedler mailer No. 1); PL797 (Bill Zedler mailer No. 3); PL1015 (Empower Texans mailer); *see also* PL796 (Bill Zedler mailer No. 2).

45.     The 2014 Texas Republican Party Platform called for the return of a plaque honoring the Confederacy to the Texas Supreme Court building, supported the adoption of "American English" as the official language of Texas, urged limitations on bilingual education, and called for the wholesale repeal of the Voting Rights Act of 1965.[53]

46.     Proponents of strict voter ID requirements used implicit and overt racial appeals in election campaigns to associate the poor, "inner-city" or urban residents, minority voters, and immigrants with voter fraud.  For example, both Lieutenant Governor David Dewhurst and Representative Patricia Harless, the House sponsor of SB 14, linked immigration restrictions to the need for a strict voter ID law.[54]  In 2014, then-Senator Dan Patrick, an author of SB 14, disseminated campaign materials denouncing the "invasion" of illegal immigrants in Texas, featuring images of shadowy, dark-skinned men.[55]

47.     Shortly before the November 2012 election, the King Street Patriots, a political organization based in Harris County, posted a digitally altered photograph on its website showing an African-American man holding a sign with the words "I only got to vote once," pictured next to white woman holding a sign saying "I'm with stupid."  Notably, members of this primarily Anglo group previously appeared at polling places throughout a predominately African-American congressional district, acting so as to trigger over a dozen complaints of voter intimidation.  The leader of this group also addressed the Texas Legislature in favor of strict voter ID requirements.[56]

---

[53] PL760 at 38 (Burton Rep.); PL786 at 11, 13, 19 (Texas Republican Party 2014 platform).

[54] PL688 (Harless website); PL760 at 39-40 (Burton Rep.).

[55] Trial Tr. 305:22-307:5 (Patrick) (Day 7); PL330 (Patrick website).

[56] PL760 at 40-41 (Burton Rep.); *Rodriguez v. Harris Cnty.*, 964 F. Supp. 2d 686, 784-85 (S.D. Tex. 2013).

### 2. Election of Hispanics and African Americans

48.     Hispanic and African-American Texans are elected to office in Texas at rates far below their share of the population.[57]  While the election of Hispanic and African-American candidates to the Texas Legislature is significant, it still remains below population share.  The election of minority candidates at the local level remains extremely low.[58]

49.     Hispanic Texans made up approximately 30.3% of the citizen population but held 21.1% of legislative seats at the start of the 2013 legislative session.  At the same time, African-American Texans made up 13.3% of the citizen population but held 11.1% of legislative seats.[59]

50.     Taking into account federal, state, and local offices, an analysis from 2003 indicated that Hispanic Texans make up only 7.1% of elected officials, and analysis from 2000 indicated that African-American Texans make up only 1.7% of elected officials.[60]

### 3. Race and Voting Behavior

51.     The costs that a voter must incur to cast a valid ballot are a substantial determinant of whether a voter will vote.  Such costs include the time, skill, financial resources, and effort required to overcome administrative requirements and educational and other barriers to registering to vote and casting a valid ballot.[61]

52.     Costs are especially consequential for non-habitual voters and voters who are socioeconomically disadvantaged, who may find it more difficult to overcome obstacles to

---

[57] PL771 at 26-28 (Korbel Rep.).

[58] PL758 ¶¶ 52, 55 (Burden Corr. Rep.); *see supra* ¶¶ 48-49.

[59] PL758 ¶ 53 (Burden Corr. Rep.).

[60] PL758 ¶ 54 (Burden Corr. Rep.); *see also* Trial Tr. 317:10-319:9 (Burden) (Day 3).

[61] Trial Tr. 297:14-23, 298:13-299:3 (Burden) (Day 3); PL753 at 25-28 (Barreto/Sanchez Rep.); PL758 ¶¶ 9-12 (Burden Corr. Rep.); PL759 ¶¶ 5-12 (Burden Supp. Rep.).

voting.  Because disparities in socioeconomic status do not fall upon Texas's voters equally, strict voter ID requirements disproportionately deter Hispanic and African-American participation.[62]

53.    Voter registration rates among Hispanic and African-American eligible voters in Texas are lower than among Anglo eligible voters.  According to an analysis by the Texas Legislative Council, from 2006 through 2012, Anglo voter registration rates consistently exceeded Hispanic voter registration rates by 3 to 12 percentage points and consistently exceeded African-American voter registration rates by 3 to 13 percentage points.[63]  In the same period, the Census Bureau's Current Population Survey (CPS) estimated that Anglo registration exceeded Hispanic registration by 14 to 23 percentage points and exceeded African-American voter registration rates by 5 to 8 percentage points from 2006 to 2010, after which African-American voter registration rates rose to rough parity.[64]  However, numerous studies suggest that measurement errors and certain systemic biases in the CPS likely overstate African-American registration rates relative to Anglo registration.[65]

54.    In addition to voter registration gaps, Texas elections often feature significant turnout disparities by race.[66]  Texas's own turnout records, together with ecological regression analysis, show a 24 to 33 percentage point turnout rate disparity between Anglo and Hispanic voters from

---

[62] PL758 ¶¶ 5-6 (Burden Corr. Rep.); PL759 ¶¶ 11, 29 (Burden Reply Rep.); PL753 at 26-28 (Barreto/Sanchez Rep.); Trial Tr. 299:4-9, 309:23-313:11, 323:6-324:19 (Burden) (Day 3); PL758 ¶¶ 45, 47, 50-51 (Burden Corr. Rep.); Trial Tr. 310:6-11 (Burden) (Day 3); Trial Tr. 51:24-52:13 (Burton) (Day 6).

[63] PL752R ¶¶ 114, 116, 118-19 & tbl.VIII.2b (Ansolabehere Corr. Supp. Rep.).

[64] PL752R ¶¶ 121-23 & tbl.VIII.4 (Ansolabehere Corr. Supp. Rep.).

[65] Trial Tr. 301:2-302:4 (Burden) (Day 3); PL758 ¶¶ 19-25 (Burden Corr. Rep.).

[66] Trial Tr. 130:23-131:4, 178:23-180:8 (Ansolabehere) (Day 1); Trial Tr. 299:23-302:4 (Burden) (Day 3); PL758 ¶ 21 & tbl.1 (Burden Corr. Rep.).

16

2006 to 2012 and a 17 to 22 percentage point turnout rate disparity between Anglo and African-American voters in the same period.[67]  The same general trend is repeated in the CPS, which indicates that Anglo voter turnout rates in Texas exceeded Hispanic turnout rates in the 2004-2012 statewide general elections by 15% to 20% and that African-American turnout rates fell below Anglo turnout rates in 2004, 2006, and 2010.[68]  Again, numerous studies suggest that systematic error and biases in CPS survey data likely overstates African-American political participation rates.[69]

55.     Apart from practical barriers that result in lower voter registration and turnout for minority Texans, a "regional memory" of the time when it was dangerous or impossible for African Americans to vote may persistently contribute to reduced turnout, particularly among older, undereducated, and poor African-American voters.[70]

56.     Reverend Peter Johnson, a civil rights leader sent by Dr. Martin Luther King Jr. to combat race discrimination in Texas, testified that when he first arrived in Texas, it was a tremendous challenge to get African Americans to vote because there was a "historical pattern[] of [African Americans] not participating in the political process," as it had been "embedded in them for years and years" that this was not a right to which they were entitled.[71]  Because of this

---

[67] PL752R ¶ 114 & tbl.VIII.3b (Ansolabehere Corr. Supp. Rep.).

[68] PL758 ¶¶ 19-25 & fig.1 (Burden Corr. Rep.); *see also* PL752R ¶¶ 121-127 & tbl. VIII.5 (Ansolabehere Corr. Supp. Rep.).

[69] Trial Tr. 301:2-302:4 (Burden) (Day 3); PL758 ¶¶ 19-25 (Burden Corr. Rep.).

[70] PL760 at 48-49 (Burton Rep.).

[71] Trial Tr. 11:7-20, 12:19-25, 15:24-16:23 (Johnson) (Day 3).

lack of participation for so many years, it took tremendous work, effort, and time, "to get to a level where elected officials had to respect the Black vote."[72]

57.    Reverend Johnson also testified that because of the unique history of African Americans' struggle to acquire and freely exercise the right to vote, elderly African Americans attach additional symbolic meaning to voting in person, even today, because they remember when they could not.[73]

## III.    VOTER IDENTIFICATION BEFORE SB 14

58.    Prior to the enactment of SB 14, the State of Texas did not require photo ID to vote in person.  Under Texas's prior voter ID law, a voter registration certificate constituted sufficient ID to cast a valid, in-person ballot.[74]  The Legislature enacted that requirement in 1997 (HB 331) and amended it in 2003 (HB 1549) to bring it into compliance with the federal Help America Vote Act of 2002, 52 U.S.C. § 21083.[75]

59.    A voter registration certificate is a small document confirming registration and basic voter information that election officials mail to the residence of every registered voter, free of charge and without any further administrative requirements.[76]  A voter who loses or misplaces the certificate can obtain a replacement by placing a phone call or sending an email.[77]

---

[72] Trial Tr. 12:19-13:5 (Johnson) (Day 3).

[73] Trial Tr. 19:8-13 (Johnson) (Day 3); Trial Tr. 157:14-22 (Ellis) (Day 4).

[74] Trial Tr. 342:16-343:10 (Ingram) (Day 7).

[75] Trial Tr. 323:24-324:14 (Burden) (Day 3);  PL471 (HB 331); PL472 (HB 1549); PL758 ¶¶ 60-62 (Burden Corr. Rep.);

[76] Tex. Elec. Code § 13.144(a); Trial Tr. 342:16-343:3 (Ingram) (Day 7).

[77] Tex. Elec. Code § 15.004(a).

60.     A voter registration certificate includes identifying information, such as the voter's name, gender, and year of birth.[78]

61.     Under the prior law, a voter who did not present his or her registration certificate at the polls could still cast a regular ballot, so long as he or she executed an affidavit and presented one of numerous accepted forms of photo or non-photo ID.  Permissible documents included: (a) a Texas driver license or personal ID card, current or expired, or a similar document from another State; (b) a form of ID containing a photograph establishing identity (such as an employee ID card); (c) a birth certificate or other document confirming birth that is admissible in a court of law and established identity; (d) U.S. citizenship papers; (e) a U.S. passport; (f) official mail from a governmental agency, addressed to the voter by name; (g) a copy of a current utility bill, bank statement, government check, paycheck, or other government document showing the name and address of the voter; or (h) any other form of ID approved by the Secretary of State.[79]

62.     Under the prior law, voters who had neither their registration certificate nor alternative ID could still cast a regular ballot if a poll worker attested to the voter's identity.[80]

## IV.     VOTER IDENTIFICATION REQUIREMENTS UNDER SB 14

63.     In Texas, every voter has a right to vote in person.[81]

64.     SB 14 requires nearly all in-person voters to present specified valid photo ID or ID expired within 60 days to cast a valid ballot.  These forms of ID are referred to collectively as

---

[78] PL883 (Election Advisory No. 2013-08 (July 29, 2013)).

[79] PL471 § 30 (HB 331); PL044 § 14 (SB 14) (striking relevant text).

[80] PL471 § 27 (HB 331); PL044 § 21 (SB 14) (repealing relevant provision).

[81] Trial Tr. 337:4-6 (Ingram) (Day 7).

"SB 14 ID."[82]  Statutory exemptions are either narrow in scope or burdensome for voters to meet to establish eligibility.[83]

65.    Pursuant to SB 14, voters must present one of five types of documents that existed before the law was enacted: (1) a Texas driver license or personal ID card issued by the Texas Department of Public Safety (DPS); (2) a Texas license to carry a concealed handgun issued by DPS; (3) a U.S. military ID card that contains the person's photograph; (4) a U.S. citizenship certificate that contains the person's photograph; or (5) a U.S. passport.[84]  The document must not have expired more than 60 days before the date of presentation, with the exception of U.S. citizenship certificates, which have no expiration date.[85]

66.    SB 14 also creates a new form of ID called an election identification certificate (EIC), which may only be used to establish identity for the purpose of voting.[86]  SB 14 mandates that DPS must issue EICs and must not collect a fee, but SB 14 also authorizes DPS to require each EIC applicant to furnish the same information and underlying documentation required of driver license applicants, including thumbprints and any documents DPS deems necessary to establish identity, residency, competency, and eligibility.[87]

---

[82] *Infra* ¶¶ 65-66.

[83] *Infra* ¶¶ 68-69.

[84] Tex. Elec. Code § 63.0101.

[85] Tex. Elec. Code § 63.0101; PL466 at 3-4, 9, 12, 15, 17, 19 (Acceptable ID PowerPoint).

[86] Tex. Elec. Code § 63.0101(1).

[87] Tex. Transp. Code §§ 521A.001(b),(c), 521.142.

67.     A voter who does not present SB 14 ID may cast a provisional ballot if he or she executes an affidavit stating that he or she "(1) is a registered voter in the precinct in which the person seeks to vote; and (2) is eligible to vote in the election."[88]

68.     A provisional ballot cast because a voter did not present allowable photo ID will not be counted unless the voter makes an additional trip in person to his or her county's voter registrar's office during business hours within six days of the election and presents SB 14 ID or affirms either a religious objection to being photographed or loss of ID because of a declared natural disaster in the prior 45 days.[89]

69.     Some voters with disabilities may apply for an exemption from the SB 14 photo ID requirements.  However, to do so, a voter must possess documentation of either a disability determination from the Social Security Administration or a U.S. Department of Veterans Affairs disability rating of at least 50 percent.[90]  The voter must complete and submit a form stating that he or she does not possess any other form of acceptable photo ID and a copy of his or her disability determination.[91]  The voter must obtain the exemption before Election Day or in the six-day cure period after Election Day and may not present documentation of a disability at the polls.[92]  Voters with disabilities who have obtained an exemption and subsequently move to a different county must reapply for the exemption.[93]

---

[88] Tex. Elec. Code § 63.011(a).

[89] Tex. Elec. Code §§ 65.054(b)(2), 65.0541(1), (2).

[90] Tex. Elec. Code § 13.002(i)(1).

[91] Tex. Elec. Code § 13.002(i); PL296 (Request for Disability Exemption).

[92] Trial Tr. 346:9-347:16 (Ingram) (Day 7).

[93] Trial Tr. 348:23-349:15 (Ingram) (Day 7).

70.     SB 14 also provides that in-person voters who present SB 14 ID may cast a regular ballot and have that ballot counted only if the name on the ID presented is the same as the name that appears on the registration rolls or is "substantially similar."[94]

71.     SB 14 applies only to voters who cast their ballot in person; it does not apply to early voting by mail.[95]  However, Texas limits early voting by mail to voters who: (1) are 65 or older; (2) expect to be absent from their county of residence during early voting and on Election Day; (3) cannot appear at the polling place without physical assistance due to sickness or disability; or (4) are confined in jail.[96]  Voters satisfy one of these criteria for absentee voting by affirming their reason in writing on a mail ballot application.[97]

72.     Once an election clerk receives an application to vote early by mail, the clerk has seven days to process the application and mail a ballot.[98]  The voter must then complete the ballot and mail it to the clerk sufficiently early that it is received by Election Day.[99]  Therefore, a voter must submit an application long before Election Day to ensure that his or her ballot will count.

## V.     THE PASSAGE OF SB 14

### A.     The Sequence of Events: Multiyear Efforts to Narrow Voter Identification Requirements

73.     The 2011 enactment of SB 14 was the culmination of a legislative process that stretched across four sessions.  The 2005, 2007, and 2009 sessions of the Texas Legislature featured three

---

[94] Tex. Elec. Code § 63.001(c)-(d); 1 Tex. Admin. Code § 81.71.

[95] *See* Tex. Elec. Code § 63.0101.

[96] Tex. Elec. Code §§ 82.001-.004; Trial Tr. 337:17-338:15 (Ingram) (Day 7).

[97] Trial Tr. 338:16-339:7 (Ingram) (Day 7).

[98] Trial Tr. 341:6-9 (Ingram) (Day 7).

[99] Trial Tr. 338:16-20, 341:10-18 (Ingram) (Day 7).

attempts to enact restrictive voter ID laws—HB 1706 (2005), HB 218 (2007), and SB 362 (2009)—with each more restrictive than the last.[100]

74.     During the 2005 legislative session, House Elections Committee Chair Mary Denny introduced HB 1706.  HB 1706 would have required in-person voters to show a voter registration certificate and one photo ID or two non-photo IDs, among numerous acceptable options.[101]

75.     The Texas House passed HB 1706 by a vote of 78-67, over the opposition of every African-American legislator and all but one Latino legislator.[102]  In the Senate, however, proponents needed a two-thirds vote to suspend the normal order of bill consideration and move the bill to the floor for consideration.  Proponents failed to muster the necessary consensus under the "two-thirds rule" to consider HB 1706, which prevented the bill from advancing towards passage.[103]

76.     Prior to the opening of the 2007 legislative session, Representative Betty Brown introduced HB 218.[104]  HB 218 would have required in-person voters to present a valid voter registration certificate and one of eight forms of photo ID or two of eleven forms of non-photo ID.[105]

77.     The Texas House passed HB 218 by a vote of 76 to 69, again over the opposition of all African-American members and nearly all Latino members.[106]  However, HB 218 was defeated

---

[100] Trial Tr. 185:2-5 (Ellis) (Day 4).

[101] Trial Tr. 56:4-57:12 (Lichtman) (Day 4); PL099 (HB 1706 as filed); PL765 ¶¶ 8-9 (Davidson Supp. Rep.); PL772 at 10-12 (Lichtman Rep.).

[102] PL112 at 2553-55 (House Journal, May 3, 2005).

[103] PL765 ¶ 12 (Davidson Supp. Rep.).

[104] PL859 (HB 218 as introduced); PL202 (HB 218 bill history); PL765 ¶ 16 (Davidson Supp. Rep.).

[105] PL765 ¶ 16 (Davidson Supp. Rep.); PL772 at 14 (Lichtman Rep.); PL859 (HB 218 as introduced).

[106] PL088 at 2246-47 (House Journal Apr. 24, 2007); PL765 ¶ 21 (Davidson Supp. Rep.).

in the Senate when proponents failed to gather the two-thirds support necessary to consider the bill, due to the unanimous opposition of all 11 members of the minority political party—including all African-American and most Latino senators.[107]

78.    Prior to the opening of the 2009 legislative session, Senator Troy Fraser introduced SB 362 (2009).[108]  SB 362 featured more obstacles to voters than HB 218, such as excluding employee ID cards and some student IDs from the list of acceptable photo ID.[109]  Senator Fraser developed the substantive provisions of SB 362 in coordination with Lieutenant Governor David Dewhurst, Dewhurst's then-deputy general counsel Bryan Hebert, and Jennifer Fagan, who was then counsel to the Senate State Affairs Committee.[110]

79.    After the Senate exempted voter ID bills from the two-thirds rule, allowing for consideration of voter ID bills outside of the regular order of business without a two-thirds vote of senators present, the Senate passed SB 362, with eight Hispanic or African-American senators and one Anglo Senator who represented a predominantly minority district opposing passage.[111]

80.    Although the House Committee on Elections reported out a version of SB 362 that added ameliorative provisions—including $7.5 million to encourage voter registration—several members of the House objected.  Therefore, House leadership moved the original Senate version of the bill to the House floor.[112]  After concerted opposition from all African-American members

---

[107] PL765 ¶¶ 20, 22 (Davidson Supp. Rep.); PL772 at 12-13 (Lichtman Rep.).

[108] PL842 (SB 362 as introduced); PL237 (Fraser press release Dec. 15, 2008); PL765 ¶ 22 (Davidson Supp. Rep.), 2014; PL264 (bill history for SB 362); Fraser Dep. 203:8-18, July 23, 2014.

[109] PL842 (SB 362 as filed); PL772 at 15-16 (Lichtman Rep.); Hebert Dep. 36:19-37:18, June 17, 2014;

[110] Dewhurst Dep. 58:18-24, 59:15-60:2, 60:12-22, 67:4-24; Hebert Dep. 34:16-22, 35:13-21, June 17, 2014.

[111] PL898 at 589 (Sen. Journal, Mar. 18, 2009); PL765 ¶¶ 25-26, 32 (Davidson Supp. Rep.).

[112] PL765 ¶ 35 (Davidson Supp. Rep.).

and most Hispanic members, the bill was defeated by a tactic known as "chubbing," which is akin to a filibuster and prevents a vote before the end of the session.[113]

### B. Procedural Departures: The Extraordinary Process to Enact SB 14

81.     Following defeat of voter ID bills introduced in 2005, 2007, and 2009, bill supporters changed legislative procedures in successive sessions to minimize the legislative influence of the measures' predominately African-American and Hispanic opponents.[114]  The ultimate passage of SB 14 relied on deviations from longstanding Texas legislative traditions, as well as procedural tactics that elevated SB 14 above all other bills considered by the 82nd Texas Legislature.[115]

#### 1. Speed Through the Texas Senate

82.     In the fall of 2010, Lieutenant Governor Dewhurst met with Senator Fraser to ask if he was willing to carry a voter ID bill in 2011.  Senator Fraser's chief of staff, Janice McCoy, worked with Bryan Hebert, deputy general counsel to Lieutenant Governor Dewhurst, in developing a new bill.[116]

83.     Senator Fraser's photo ID bill was originally numbered SB 178, but Lieutenant Governor Dewhurst requested that Senator Fraser re-file the bill to receive a lower bill number reserved for legislative priorities.  Senator Fraser's bill was re-numbered SB 14.[117]

---

[113] PL765 ¶ 36 (Davidson Supp. Rep.); Hebert Dep. 74:19-75:13, June 17, 2014; Fraser Dep. 319:18-321:7, July 23, 2014; Dewhurst Dep. 106:9-106:22.

[114] PL765 ¶ 96 (Davidson Supp. Rep.).

[115] PL765 ¶¶ 41-44, 52, 96 (Davidson Supp. Rep.); PL772 at 21-23 (Lichtman Rep.); D.D.C. Trial Tr. 62:16-65:3; (Kousser, Day 2, P.M. Sess.).

[116] PL765 ¶ 37 (Davidson Supp. Rep.); Brunson Dep. 63:8-14, May 30, 2012; Hebert Dep. 258:10-259:3, 264:1-12, May 29, 2012; Dewhurst Dep. 111:13-112:6, 113:24-114:6.

[117] Trial Tr. 65:15-22, 407:15-408:3 (Dewhurst, Fraser) (Day 7); PL001 (SB 14 as filed); PL1012 (SB 178 as filed); Fraser Dep. 102:6-9, 103:5-16, July 23, 2014; Hebert Dep. 105:23-106:11, June 17, 2014.

84.     Lieutenant Governor Dewhurst wanted to pass a voter ID bill early in the 82nd Legislature to preclude the possibility that bill opponents could again defeat the bill by "chubbing."  He believed that the optimal time to pass such a bill was within the first 60 days of session when, under the Texas Constitution, legislation may not be acted upon unless the governor declares the legislation the subject of an emergency.[118]

85.     At the start of the 82nd Legislature, Governor Rick Perry submitted voter ID legislation as an "emergency matter for immediate consideration."[119]  Then-Texas Elections Director Ann McGeehan, who had more than 20 years' experience in the Elections Division, was unaware of anything related to the administration of elections that would have necessitated the Legislature to consider voter ID legislation in the first 60 days of session; nor could she identify any other election legislation that had been designated an emergency matter during her career.[120]

86.     Also at the start of the session, the Senate passed Senate Resolution 36 by majority vote, which set the Senate Rules.  This included a special carve-out for voter ID legislation from the two-thirds rule, which allowed it to be considered outside of the regular order of business by a simple majority vote.  Resolution 36 also allowed for voter ID legislation alone to be considered by the Committee of the Whole and not by a standing committee.[121]

---

[118] Dewhurst Dep. 106:23-107:8, 107:23-108:7; *see also* Fraser Dep. 109:5-10, July 23, 2014; PL765 ¶ 43 (Davidson Supp. Rep.).

[119] PL004 at 54 (Sen. Journal, Jan. 24, 2011); Brunson Dep. 64:20-65:13; Trial Tr. 9:22-10:78 (Davis) (Day 4).

[120] Trial Tr. 254:18-258:6, 276:25-277:19 (McGeehan) (Day 5).

[121] PL173 at Rule 5.11(d) (Texas Sen. Rules, Jan. 19, 2011); PL176 at 43-44 (Sen. Journal, Jan 19, 2011); Hebert Dep. 153:12-20, June 17, 2014.

87.     All senators present who represented majority-minority districts voted against abrogating the traditional two-thirds rule.  For example, Senator Eddie Lucio explained on the floor that he voted against Resolution 36 because it "silences the voices of my constituents."[122]

88.     The rule change exempting voter ID legislation from the two-thirds rule was "highly unusual" and "not how the Texas Senate operates" in the ordinary course of business.[123]  The two-thirds rule was "an important tradition" in the Senate, and intended to protect the legislative minority.[124]

89.     The decision to carve out a voter ID exception from the two-thirds rule did not originate in 2011.  In 2005 and 2007, voter ID proponents had first attempted to circumvent the rule.  First, the House appended the provisions of HB 1706 (2005) to a bill that had already passed the Senate, but Senate Minority Leader Leticia Van de Putte successfully challenged this maneuver.[125]  Then, Lieutenant Governor Dewhurst and Senator Fraser considered attempting to call HB 218 (2007) while Senator Mario Gallegos was absent for a liver transplant—because at the time two-thirds of senators *present* would have voted to bring the bill up for consideration— but Senator Gallegos installed a hospital bed in the Senate building to block the bill.[126]  Later that session, Senator Fraser attempted to call HB 218 for consideration while Senator Carlos

---

[122] PL176 at 43-44, 46 (Sen. Journal, Jan. 19, 2011); PL765 ¶ 42 (Davidson Supp. Rep.).

[123] Trial Tr. 222:8-12, 223:24-224:10 (Uresti) (Day 3); McCoy Dep. 74:3-75:12, May 16, 2012.

[124] Williams Dep. 233:7-14, July 29, 2014; Trial Tr. 353:20-354:2 (Anchía) (Day 4).

[125] PL765 ¶ 12 (Davidson Supp. Rep.); PL1072 at 4321-26 (House Journal, May 24, 2005); PL1179 at 4509 (Sen. Journal, May 27, 2005).

[126] PL765 ¶ 20-22 (Davidson Supp. Rep.); Dewhurst Dep. 45:21-48:7.

Uresti was absent due to illness, but Senator Uresti received notice of a vote and arrived in time to block the bill.[127]

90.     In 2009, Senator Tommy Williams introduced Senate Resolution 14, which modified the Senate Rules to exempt voter ID legislation from the two-thirds rule and effectively permitted passage of voter ID legislation with the support of only a simple majority.[128]  The resolution also allowed for consideration of voter ID bills in the Committee of the Whole (rather than a standing committee) and to provide for expedited consideration.[129]  Senate Resolution 14 was adopted by a simple majority of senators, and Senator Williams acknowledged that the resolution generated "the most controversy there ever was over a rules resolution during [his] time in the Senate."[130]

91.     Although Lieutenant Governor Dewhurst instructed senators not to advance bills requiring expenditures, in light of the State's $27 billion budgetary shortfall, the Senate passed SB 14, notwithstanding the $2 million fiscal note attached.[131]

### 2.  Special Treatment in the Texas House

92.     On February 9, 2011, Speaker Joe Straus announced the formation of a unique "fast track" Select Committee on Voter Identification and Voter Fraud that would consider only one

---

[127] Trial Tr. 216:25-220:19 (Uresti) (Day 3); PL097 at 2, 12-17, 19-20 (Sen. Fl. Debate, Tr. 2:1-13, 12:12-13:1, 14:7-17:25, 19:2-20:07, May 15, 2007); PL098 (Sen. Journal May 15, 2007); PL765 ¶ 22 (Davidson Supp. Rep.); PL772 at 13 (Lichtman Rep.); PL202 (HB 218 bill history); Dewhurst Dep. 42:21-49:16, 51:22-52:3; Fraser Dep. 31:13-22, 198:7-10, July 23, 2014.

[128] Trial Tr. 223:20-23 (Uresti) (Day 3); Trial Tr. 112:4-113:24 (Williams) (Day 8); PL154 at 20, 24-25 (Sen. Journal, Jan. 14, 2009); PL772 at 15 (Lichtman Rep.); Dewhurst Dep. 83:9-84:17; Hebert Dep. 63:10-64:5, June 17, 2014.

[129] PL171 at Rules 5.11(d), 16.07(7) (2009 Senate Rules); *see* Trial Tr. 49:16-50:15 (Dewhurst) (Day 7); Hebert Dep. 61:20-62:4, 62:13-22, June 17, 2014; Duncan Dep. 143:22-144:10, Aug. 28, 2014.

[130] Trial Tr. 55:1-11 (Dewhurst) (Day 7); PL154 at 28 (Sen. Journal, Jan. 14, 2009); Hebert Dep. 61:20-62:4, June 17, 2014; Williams Dep. 229:7-12, 229:15-230:2, July 29, 2014.

[131] Trial Tr. 12:3-13:14 (Davis) (Day 4); PL046 at 1-2 (Fiscal Note for SB 14); PL154 at 28 (Sen. Journal, Jan. 14, 2009).

bill: SB 14.[132]  Bill opponents asserted that this process broke with legislative traditions and prevented meaningful negotiation.[133]

93.     Speaker Straus handpicked each member of the Select Committee.  Notably, the Speaker had less control over membership of the standing House Elections Committee, to which he had previously sent all other bills related to voter ID and voter fraud.[134]  Speaker Straus also personally chose Representative Harless to serve as House sponsor of SB 14.[135]

94.     Two days after passage of SB 14 in the Select Committee on Voter Identification and Voter Fraud, the House Calendars Committee placed SB 14 on the "Emergency Calendar" and set the bill for debate that same day.[136]

95.     As in the Senate, Speaker Straus instructed the House not to advance bills requiring expenditures, in light of the State's budget crisis.  Despite the $2 million fiscal note that accompanied SB 14, the House considered and passed the bill.[137]

### 3.  Redrafting in the Conference Committee

96.     Shortly thereafter, Lieutenant Governor Dewhurst appointed Senate conferees to the conference committee to resolve differences between the Senate and House versions of SB 14.[138]

---

[132]Trial Tr. 108:6-16, 239:7-23 (Martinez Fischer, Veasey) (Day 1); PL608 at 1 (Straus press release); PL1025 (reported bills); PL666 (SB 14 bill history); D. Davis Dep. 141:19-142:20, June 14, 2012.

[133] Trial Tr. 103:11-19, 108:17-109:19, 241:15-23 (Martinez Fischer, Veasey) (Day 1); Trial Tr. 354:3-8 (Anchía) (Day 4).

[134] Trial Tr. 108:11-16 (Martinez Fischer) (Day 1); PL765 ¶ 52 (Davidson Supp. Rep.); Straus Dep. 50:22-54:21, June 11, 2012; Straus Dep. 24:3-9, June 23, 2014.

[135] Harless Dep. 223:4-224:13, May 15, 2012; Straus Dep. 144:24-145:8, June 11, 2012; Bonnen Dep. 199:3-200:3, June 6, 2012.

[136] PL030 at 909 (House Journal, Mar. 21, 2011).

[137] Trial Tr. 358:18-359:3 (Anchia) (Day 4); Trial Tr. 12:17-13:1 (W. Davis) (Day 4); PL046 at 1-2 (Fiscal Note for SB 14).

[138] Hebert Dep. 238:4-9, June 17, 2014.

97.     During the House debate, Representative Martinez Fischer, Chairman of the Mexican American Legislative Caucus, raised a constitutional point of order, an objection to SB 14 under the Texas Constitution that could have blocked passage of the bill.  Although Speaker Straus overruled the point of order, the conference committee changed the language of SB 14 to address the constitutional concern, suggesting that the point of order had in fact been valid.[139]

98.     The provision of SB 14 creating the EIC originated in the conference committee.  It was "unusual" for a substantive amendment that was in neither chamber's version of the bill to emerge during conference:  It went "outside of the bounds" of harmonizing the House and Senate bills and created "a completely different" piece of legislation that had not been vetted or debated.[140]

99.     The Conference Committee also eliminated important ameliorative features included in the House and Senate versions of SB 14 that would have helped ease the burden on minority voters, including a provision to allow voters to cast a regular ballot after signing an affidavit claiming a lack of ID due to indigence and a provision targeting voter education at low-income and minority voters.[141]

### 4.  The Embargoed Impact Analysis

100.    During the legislative process, the Office of the Secretary of State generated detailed estimates of the potential impact of SB 14 on registered voters and provided those estimates to the Office of the Lieutenant Governor.  However, in a sharp deviation from ordinary legislative procedure, the Office of the Secretary of State withheld this information from other legislators

---

[139] Trial Tr. 110:10-112:1 (Martinez Fischer) (Day 1).

[140] Trial Tr. 354:9-20 (Anchía) (Day 4); Trial Tr. 280:7-282:6 (McGeehan) (Day 5).

[141] PL040 (Conf. Comm. Rep.) PL044 (signed version of SB 14).

and misled legislators who requested it.  The expedited legislative procedure outlined above then eliminated opportunities for legislators to follow up on those requests.[142]

101.    On January 24, 2011 (two days before the Senate passed SB 14), Senator Robert Duncan's staff member Jennifer Fagan wrote then-Texas Elections Director Ann McGeehan to ask whether the Secretary of State or county election officials collected information on the ethnicity of registered voters.  Ms. McGeehan advised Ms. Fagan that Spanish surname data was available.[143]  The Elections Division routinely used Spanish surname analysis.[144]

102.    As of January 25, 2011 the Elections Division had anticipated that the U.S. Department of Justice, through the Section 5 preclearance process, would seek information about the racial impact of the bill on voters because that information is at the core of the analysis under the Voting Rights Act.[145]

103.    Prior to January 25, the Elections Division had only analyzed the total number of registered voters who had not supplied either a driver license number or social security number when they registered to vote.  The Elections Division did not break down this calculation using Spanish surname analysis until the Department of Justice requested such analysis during preclearance proceedings.[146]

104.    During her Senate testimony on January 25, Ms. McGeehan noted that Senator Williams had previously requested an analysis of the Texas Election Administration Management (TEAM)

---

[142] *Supra* ¶¶ 82-95; *infra* ¶¶ 101-112.

[143] PL325 (email from Fagan to McGeehan); McGeehan Dep. 47:11-51:20, June 18, 2014.

[144] Trial Tr. 258:23-259:21 (McGeehan) (Day 5).

[145] McGeehan Dep. 63:6-64:20, June 18, 2014.

[146] Trial Tr. 289:23-290:16 (McGeehan) (Day 5); McGeehan Dep. 56:7-11, 57:2-15, 63:6-12, 75:19-76:24, June 18, 2014.

database (which includes the State's registered voter list) and the DPS driver license database to determine who among registered voters did not have a DPS record for a Texas driver license or personal ID, and Senator Williams asked Ms. McGeehan at the hearing for a status report concerning the analysis.  Ms. McGeehan responded that she hoped to have that information by week's end (*i.e.*, January 28).  The Senate proceeded to pass SB 14 the next day (*i.e.*, January 26) without waiting for the results of this analysis.[147]

105.    Also on January 25, the Secretary of State's information technology (IT) department conducted comparisons of the voter registration database and a DPS database extract to determine the number of registered voters without a record in the Texas driver license database. Using a variety of algorithms, this analysis identified between 678,560 and 844,713 registered voters who did not match a record in the Texas driver license database, and Ms. McGeehan drafted a summary of the results.[148]

106.    Shortly after February 1, Ms. McGeehan discussed this analysis and the results with her superior, Deputy Secretary of State Coby Shorter, and with John Sepehri, general counsel to the Secretary of State.  Ms. McGeehan believed that Mr. Shorter and Mr. Sepehri would transmit the analysis to Senator Williams, and she did not distribute the analysis herself.[149]

107.    Ms. McGeehan testified that this matching analysis was the most accurate analysis that the Elections Division was capable of producing, and she was comfortable providing the analysis

---

[147] Trial Tr. 128:15-129:25 (Williams) (Day 8); PL006 at 446-47, 490 (Sen. Comm. of the Whole Tr., Jan. 25, 2011); McGeehan Dep. 170:15-173:11, May 31, 2012.

[148] Trial Tr. 290:17-291:3 (McGeehan) (Day 5); McGeehan Dep. 65:2-13, 66:11-20, 68:15-70:13, June 18, 2014; Guyette Dep. 21:21-23:15, 33:24-35:12, June 19, 2012; PL432 at 3 (email from McGeehan).

[149]McGeehan Dep. 13:25-14:12, 66:11-20, 78:24-79:24, 80:14-81:9, June 18, 2014.

to the Legislature with the caveat that it was only "an estimated range of voters who appear not to have been issued a [Texas driver license]/personal ID card by the DPS."[150]

108.    Prior to the passage of SB 14 by the Senate, Lieutenant Governor Dewhurst received a briefing by his staff that between 3 to 7 percent of Texas voters did not have a Texas driver license or personal ID, a figure in line with the matching analysis conducted by the Office of the Secretary of State.[151]   Lieutenant Governor Dewhurst did not distribute these data, and Senator Williams testified that his staff never obtained the report.[152]

109.    On February 25, Ms. McGeehan sent an email to Representative Harless, the House sponsor of SB 14, and Colby Beuck, Representative Harless's chief of staff, stating that the Division's IT department was analyzing the number of registered voters who had not been issued a Texas driver license or personal ID card and hoped to have the analysis completed by February 28.  However, this analysis had been completed since February 1 and remained pending with Mr. Shorter and Mr. Sepehri.[153]

110.    On March 1, 2011, Ms. McGeehan appeared before the House Select Committee on Voter Identification and Voter Fraud and testified that her IT department was attempting to identify appropriate matching criteria for identifying registered voters lacking a Texas driver

---

[150] Trial Tr. 286:18-287:6, 292:15-293:5 (McGeehan) (Day 5); PL432 at 3 (email from McGeehan).

[151] Trial Tr. 69:21-70:11, 73:13-74:11 (Dewhurst) (Day 7); Dewhurst Dep. 186:13-187:13, 188:12-191:21.

[152] Trial Tr. 129:10-19 (Williams) (Day 8); *see also* Dewhurst Dep. 185:2-19.

[153] Trial Tr. 293:6-10, 293:24-294:15, 294:20-295:22, 297:10-298:4 (McGeehan) (Day 5); PL260 (email from McGeehan to Harless).

license or personal ID card.  However, the matches had already been conducted and the resulting data had been provided to Mr. Shorter and Mr. Sepehri.[154]

111.    Ms. McGeehan testified that she likely had sought authorization from Mr. Shorter and Mr. Sepehri to release the results of the matching analysis at the House hearing on SB 14 but that her request was denied without a substantive reason.[155]

112.    Ms. McGeehan could not recall any other instance over the course of her 20 years working for the Elections Division of the Texas Secretary of State where she had completed analysis at the request of the Legislature but not ultimately provided the analysis to the requesting legislators, rather than solely to the Lieutenant Governor.[156]

### 5.  Ignoring Concerns Raised During Preclearance Proceedings

113.    Texas submitted SB 14 to the U.S. Department of Justice for administrative preclearance under Section 5 of the Voting Rights Act, 52 U.S.C. § 10304, and filed suit for judicial preclearance while the administrative preclearance request remained pending.  On March 12, 2012, the Attorney General denied administrative preclearance because Texas had not demonstrated that SB 14 would not have a retrogressive effect on the ability of minority voters to participate equally in the political process.  Following expedited litigation, a three-judge court found that SB 14 would likely have a retrogressive effect and denied judicial preclearance.[157]

---

[154] Trial Tr. 300:20-302:11 (McGeehan) (Day 5); PL021 at 347-48 (House Comm. on Voter Identification and Voter Fraud Hearing Tr., Vol. 2, 298:8-290:3, Mar. 1, 2011).

[155] Trial Tr. 302:16-304:16 (McGeehan) (Day 5).

[156] Trial Tr. 304:21-25 (McGeehan) (Day 5).

[157] *Texas v. Holder*, 888 F. Supp. 2d 113, 115, 117 (D.D.C. 2012) (three-judge court), *vacated on other grounds*, 133 S. Ct. 2612 (2013).

114.    After the decisions denying preclearance, Lieutenant Governor Dewhurst did not propose any changes to SB 14 or urge the Senate to conduct hearings related to voter ID.  The Senate did not hold any hearings about voter ID during the 83rd Legislature or issue any interim charges concerning voter ID.[158]  Similarly, Speaker Straus did not know if the House considered the preclearance decisions.[159]

115.    On June 25, 2013—the day the U.S. Supreme Court decided *Shelby County v. Holder*, 133 S. Ct. 2612 (2013), invalidating the formula that placed Texas under Section 5 preclearance coverage—Texas began to enforce SB 14 as originally enacted.[160]

### C.  Substantive Departures I: The Exacting Requirements of SB 14

116.    SB 14 was far more restrictive than the voter ID bills the Legislature had considered from 2005 to 2009 and far more restrictive than Indiana and Georgia's photo ID laws, upon which SB 14 was purportedly modeled.[161]  The natural and probable consequences of these deviations— such as exclusion of student IDs and government employee IDs—was to disproportionately impede voting by African-American and Hispanic eligible voters.[162]

### 1.  SB 14 Heightens Restrictions Beyond Prior Voter Identification Proposals

117.    SB 14 was the strictest voter ID bill considered by the Texas Legislature since 2005.  It erected higher barriers to voting than the past proposals in 2005, 2007, and 2009, and did so in

---

[158] Trial Tr. 289:15-25 (Patrick) (Day 7); Hebert Dep. 245:21-246:8, 246:22-247:9, June 17, 2014; Duncan Dep. 275:16-276:11, 276:14-21, 277:17-278:9, Aug. 28, 2014.

[159] Straus Dep. 70:4-8, June 23, 2014; *see also* Riddle Dep. 125:17-126:1, June 18, 2014.

[160] Trial Tr. 328:10-329:10 (Ingram) (Day 7); Dewhurst Dep. 219:4-6.

[161] Trial Tr. 55:17-56:16, 58:7-59:14, 69:10-77:3, 112:6-113:12, 127:5-11 (Lichtman) (Day 4).

[162] PL772 at 23-58; 64-65 (Lichtman Rep.); Trial Tr. 67:13-69:9 (Lichtman) (Day 4).

ways that would be expected to disproportionately impact Hispanic and African-American voters.[163]

118.    In comparison to past proposals, SB 14 eliminated the use of non-photo ID entirely. It also eliminated the use of multiple forms of photo ID issued by agencies or institutions of the federal government, the State of Texas, and political subdivisions of the State (effectively excluding student IDs and public employer IDs). Thus, SB 14 allowed voters to use only five forms of pre-existing photo ID to establish identity: (1) a current Texas driver license issued by DPS, (2) a current Texas personal ID card issued by DPS, (3) a current U.S. military ID card containing the person's photograph, (4) a U.S. citizenship certificate containing the person's photograph, and (5) a current U.S. passport. In comparison to past proposals, SB 14 also reduced the period during which voters could use expired driver licenses or personal ID cards from two years to sixty days after expiration, and imposed expiration date limitations on all other forms of acceptable identification except for citizenship certificates.[164]

119.    Bryan Hebert, deputy general counsel to the Lieutenant Governor and an architect of SB 14, could not identify anything that had occurred between 2009 and 2011 that made non-photo ID that had been acceptable during consideration of SB 362 less reliable than before. Nor could he explain why SB 362 permitted all state and federal government photo IDs, as well as employee IDs, but SB 14 did not.[165]

---

[163] *See* Trial Tr. 275:7-16 (McGeehan) (Day 5); Straus Dep. 103:22-104:9, June 28, 2014; PL765 ¶ 51 (Davidson Supp. Rep.); PL772 at 19-20 (Lichtman Rep.).

[164] PL001 (SB 14 as filed); PL266 (McCoy email); PL765 ¶ 41 (Davidson Supp. Rep.).

[165] Hebert Dep. 143:15-18, 145:6-17, 146:6-24, 263:20-264:1, 264:18-265:9, June 17, 2014.

120.    Ms. McCoy, Senator Fraser's chief of staff, testified that tribal IDs were excluded from SB 14 because, after some perfunctory Google searches, she could not determine how many tribes were in Texas and concluded that "tribal IDs are too broad and easy to be faked."[166]

121.    Representative Harless introduced another voter ID bill in 2011 that allowed voters to show a variety of non-photo ID to vote.  At her deposition, Representative Harless could not explain why ID that she considered acceptable under that legislation was not acceptable under SB 14.  She also could not explain why military ID and U.S. passports were accepted under SB 14 but federal, state, and municipal photo ID and student ID were not.  When asked if she currently opposes allowing use of student ID to establish identity while voting she responded, "I don't know."[167]

122.    Data establishing that African-American and Latino Texans are more likely than Anglo Texans to be students at a public university (and therefore to possess student ID issued by a public university) and that African-American and Latino Texans are more likely than Anglo Texans to be municipal employees (and therefore to possess government employee IDs) was available to the Legislature during consideration of SB 14.[168]

123.    SB 14 also made it significantly more difficult than earlier proposals for a voter's provisional ballot to be counted.  Under prior Texas law, counties were required to count provisional ballots cast by eligible voters who had not previously voted in the election, and earlier voter ID bills did not change that law.  SB 14 newly required most provisional voters to

---

[166] McCoy Dep. 261:20-25, 262:1-5, June 9, 2014.

[167] Harless Dep. 73:10-24, 104:11-19, 104:23-105:9, 108:20-109:13, June 20, 2014.

[168] Trial Tr. 62:10-63:20, 126:24-127:4, 130:3-7, 143:18-145:6 (Lichtman) (Day 4); PL772 at 27-32 (Lichtman Rep.).

travel to the elections office within six days and present an accepted photo ID before their provisional ballot could be counted.[169]

### 2. SB 14 Imposes Greater Restrictions than Indiana and Georgia Voter ID Laws

124.    SB 14's proponents justified the restrictiveness of the bill by claiming that the bill was modeled after the Indiana and Georgia photo ID laws.  In fact, SB 14 erected higher barriers to voting than the Indiana or Georgia laws and did so in ways that would be expected to disproportionately impact Hispanic and African-American voters.[170]

125.    Senator Fraser asserted that SB 14 was modeled after the Indiana photo ID law but conceded in the same hearing that SB 14 permits fewer photo IDs than the Indiana law and that he was unaware of whether Indiana's law permitted use of student IDs.[171]  Senator Fraser's chief of staff, Ms. McCoy, never reviewed the Indiana or Georgia laws while drafting SB 14.[172]

126.    Senator Fraser also stated that SB 14 limited the forms of acceptable photo ID to make the law less confusing and easier to implement, but Senator Fraser and other proponents also argued that the Indiana law was implemented without problems.[173]

127.    During legislative debate, Representative Anchía asked whether SB 14 might reduce the electoral power of Latinos and African Americans.  House Sponsor Patricia Harless responded that SB 14 would increase turnout of all voters in Texas, purportedly based on increases in

---

[169] PL001 (SB 14 as filed); PL842 (SB 362 as filed); Dewhurst Dep. 164:5-165:14.

[170] PL772 at 38-40 (Lichtman Rep.); *see also infra* ¶¶ 129-133.

[171] PL006 at 20, 43-44 (Sen. Comm. of the Whole, Vol. 2, Tr. 96:1-5,188:11-189:6, Jan. 25 2011).

[172] McCoy Dep. 111:5-9, June 9, 2014.

[173] PL772 at 38-39 (Lichtman Rep.).

turnout in Georgia and Indiana after those states had enacted their voter ID laws, which are less restrictive than SB 14.[174]

128.    After SB 14 passed the Senate, Bryan Hebert, deputy general counsel to Lieutenant Governor Dewhurst, drafted and circulated a memo describing the Senate-passed version of SB 14 as "the strictest photo ID law in the country."[175]

129.    Unlike Texas, Georgia permits voters to establish identity using any photo ID card issued by any state in the United States or federal entity authorized to issue ID; any employee ID with a photo issued by the United States, Georgia, a Georgia sub-jurisdiction, or any other public entity in Georgia (including state colleges and universities); or a tribal ID.[176]  Georgia also permits voters to establish identity using a Georgia driver license that has expired for any length of time, but Texas does not.[177]

130.    By statute, Georgia requires each county board of registrars to provide at least one place in the county at which it shall accept applications for and issue Georgia voter ID cards without a fee.[178]  Also by statute, Georgia requires issuance of a voter ID card to individuals who present a basic set of documents, each of which may be obtained without cost.[179]  SB 14 does not contain similar provisions.[180]

---

[174] *Compare* PL031 at 36-37 (House Chambers Fl. Debate, Mar. 21, 2011) *with* PL006 at 62 (Sen. Comm. of the Whole, Vol. 2, Tr. 262:14-19, Jan. 25, 2011).

[175] PL234 (bill summary); Trial Tr. 209:24-211:24 (Hebert) (Day 8); Hebert Dep. 260:24-261:13, June 17, 2014.

[176] Ga. Code Ann. § 21-2-417(a)(2), (4), (6); PL758 ¶ 68 (Burden Corr. Rep.).

[177] Ga. Code Ann. § 21-2-417(a)(1); PL758 ¶ 69 (Burden Corr. Rep.); PL759 ¶ 17 (Burden Supp. Rep.).

[178] Ga. Code Ann. § 21-2-417.1(a); PL758 ¶ 75 (Burden Corr. Rep).

[179] Ga. Code Ann. § 21-2-417.1(e).

[180] PL001 (SB 14).

131.    Any registered voter in Georgia may cast an absentee ballot without a specified reason and without meeting an age or disability criterion.[181]

132.    Unlike Texas, Indiana permits voters to establish identity using any document issued by the United States or the State of Indiana that includes the voter's name and photograph and is valid or has expired after the most recent general election, which includes student IDs and public employee IDs.[182]  In the case of military or veterans ID, ID without an expiration date is acceptable.[183]

133.    By statute, Indiana will count a provisional ballot if the voter who cast the ballot executes an affidavit stating that he or she is indigent and unable to obtain proof of identification without payment of a fee.[184]  SB 14 does not contain a similar provision.[185]

### D.  Substantive Departures II: The Absence of Evidence to Support SB 14

134.    Proponents of SB 14 claimed that the bill was intended to protect against voter fraud and increase voter confidence.[186]  They also claimed with respect to prior bills—but rarely with respect to SB 14—that photographic voter ID requirements would ensure that only U.S. citizens could vote.[187]  In fact, SB 14 cannot be fully explained by any of these purported purposes.

---

[181] Ga. Code Ann. § 21-2-381(b).

[182] Ind. Code § 3-5-2-40.5(a); PL758 ¶ 67 (Burden Corr. Rep.).

[183] Ind. Code § 3-5-2-40.5(b).

[184] Ind. Code § 3-11.7-5-2.5(c).

[185] PL001 (SB 14).

[186] PL1014 (Fraser press release Nov. 9, 2010); PL279 (Lt. Gov. press release Jan. 26, 2011).

[187] Dewhurst Dep. 221:4-222:12.

### 1. In-Person Voter Impersonation

135.    The principal legislative purpose asserted by proponents of SB 14 was to protect against voter fraud.[188]

136.    Because in-person voter impersonation—the only type of voter fraud addressed by SB 14—is not a problem of any magnitude in Texas, because the Legislature was aware of this fact, and because the Legislature was aware that SB 14 does nothing to remedy the forms of voter fraud that have impacted Texas elections, voter fraud does not credibly explain the purpose of SB 14.[189]

137.    Some forms of ID that the Texas Legislature excluded from SB 14 are nonetheless sufficient to establish identity for purposes of obtaining SB 14 ID.  Therefore, while a voter must overcome substantial administrative burdens to obtain ID required for voting, taking underlying documents to an office that issues SB 14 ID and paying a fee to obtain that ID provides little if any practical security benefit.[190]

138.    For example, Vera Trotter, a 73-year-old African-American woman, was turned away from the polls in March 2014, after she presented her voter registration certificate and an expired driver license, without even being offered a provisional ballot.  Rather, she was required to go to DPS, where she was able to obtain an EIC using the same documentation rejected at the polling place.  She then returned to the polls with the EIC and cast her ballot.[191]

---

[188] PL006 at 3-4 (Sen. Comm. of the Whole, Vol. 2, Tr. 27:19-24, 29:7-13, Jan. 25, 2011); PL031 at 3:9-11 (House Chambers Floor Debate, Mar. 21, 2011); Dewhurst Dep. 221:4-222:12; PL279 (Lt. Gov. press release Jan. 26, 2011); PL1014 (Fraser press release Jan. 9, 2010).

[189] *See infra* ¶¶ 137-165.

[190] Trial Tr. 369:3-370:20 (Farinelli) (Day 6).

[191] Trotter Dep. 37:13-20, 59:18-60:3, 66:12-67:1, 98:3- 99:8, Aug. 22, 2014.

### i.    In-Person Voter Impersonation in Texas

139.    In-person voter impersonation is extremely rare in Texas elections.[192]  The Office of the Texas Attorney General and the Office of the Secretary of State are aware of only one conviction and one guilty plea for in-person voter impersonation in any election in the State of Texas from 2002 until trial in September 2014.[193]  Twenty million votes were cast in Texas general elections from 2002 to 2010 alone.[194]

140.    From 2000 until the passage of SB 14 in 2011, there were only two credible claims of voter impersonation fraud at the polls in Texas, as described above, along with an attempt to vote illegally by a woman who was mentally incompetent.[195]  It is also not clear whether SB 14 would have prevented each of these incidents because one involved an individual who had a fake driver license with her picture on it.[196]

141.    In January 2006, Attorney General Greg Abbott announced that he was launching a statewide initiative to combat the purported epidemic of voter fraud.[197]  The Attorney General's press release noted four sets of indictments for voter fraud in Texas since 2005, but only two individuals had been convicted, both for offenses related to mail-in absentee ballots.  None of the indictments were for in-person impersonation fraud, the only kind of fraud possibly prevented by SB 14.[198]

---

[192] PL758 ¶¶ 91-96 (Burden Corr. Rep.); Trial Tr. 319:10-320:21 (Burden) (Day 3).

[193] Trial Tr. 171:20-25, 173:6-16 (Mitchell) (Day 5); Trial Tr. 377:4-8 (Ingram) (Day 7).

[194] Trial Tr. 274:3-275:6 (Day 5) (McGeehan).

[195] Trial Tr. 134:23-135:20 (Minnite) (Day 5); PL773 at 4, 15-21 (Minnite Rep.); Trial Tr. 170:25-171-19 (Mitchell) (Day 5).

[196] Trial Tr. 136:23-137:7 (Minnite) (Day 5).

[197] PL765 ¶ 14 (Davidson Supp. Rep.).

[198] *Id.*

142.    The Attorney General also established a Special Investigations Unit (SIU) tasked with assisting local law enforcement and prosecutors to identify, investigate, and prosecute various election crimes.  However, the activities of the SIU were only undertaken in 44 counties (out of 254) that contain most of the state's African-American and Latino voters.[199]

143.    In 2008, more than two years after Attorney General Abbott had announced his initiative to uncover and prosecute voter fraud, he announced the findings to-date.  Of the 26 reported prosecutions for voter fraud, 2 had involved in-person voter impersonation.  However, he did not say whether the two impersonation prosecutions had led to convictions.  Another case, described as "non-citizen registration," pertained to a candidate for local office who was convicted of lying to non-citizens about their eligibility to register to vote.[200]

144.    Overall, the Office of the Texas Attorney General referred only 62 criminal election fraud cases for prosecution from 2002 to 2011, only two of which involved in-person voter impersonation.[201]

145.    From 2000 to 2010, there have been fewer than ten credible allegations of impersonation fraud at polling places across the country.[202]  Nationwide and in Texas, the incidence of in-person voter impersonation is exceedingly rare.[203]

146.    There is a public misconception that more voter fraud takes place than does in actual fact, largely because of inaccurate claims by advocates for strict voter ID laws.[204]

---

[199]PL765 ¶ 15 & n.29 (Davidson Supp. Rep.).

[200] PL765 ¶ 23 (Davidson Supp. Rep.).

[201] PL773 at 17 n.56 (Minnite Rep.); D.D.C. Trial Tr. 44:7-46:17, 65:20-67:12 (Mitchell) (Day 1, P.M. Sess.).

[202] Trial Tr. 129:20-132:24 (Minnite) (Day 5); PL773 at 4 (Minnite Rep.); *see also* PL085 at 160-61 (House Fl. Debate, Vol. 2 at 127:13-128:24, Apr. 23, 2007).

[203] Trial Tr. 124:2-7 (Minnite) (Day 5).

147.     Randall Buck Wood, a former Texas Elections Division Director and an attorney who has been involved in numerous election contests in Texas over a 40-year career, has never found a case of in-person voter impersonation in Texas, despite attempting to do so on behalf of clients.[205]  Mr. Wood credibly concluded that it should not be difficult to detect in-person voter impersonation if it were occurring because an imposter would be caught if the voter impersonated had already voted and would be detected if the voter impersonated subsequently attempted to vote.  Moreover, poll workers may know the imposter or the impersonated voter, and Texas's pre-SB 14 voter ID law required voters to produce ID or be affirmatively identified by a poll worker before voting a regular ballot.[206]

148.     Engineering a number of illegal votes sufficient to change the outcome of an election is easier to do with absentee ballots and extremely difficult—if not impossible—to do with in-person voter impersonation, particularly with Texas's prior voter ID law in place.[207]  Moreover, voter impersonation fraud is a second degree felony in Texas, punishable by a prison sentence of 2 to 20 years and up to a $10,000 fine.[208]

149.     Similarly, county clerks with extensive experience in administering elections believe that the previous ID requirements were sufficient to ensure secure elections.[209]

---

[204] *See* D.C.C. Trial Tr. 69:7-71:9; 115:25- 118:18 (Kousser) (Day 2, P.M. Sess.).

[205] PL776 at 5 (Wood Rep.); Trial Tr. 198:12-202:10 (Wood) (Day 2).

[206] PL776 at 4 (Wood Rep.); Trial Tr. 193:21-197:9 (Wood) (Day 2).

[207] Trial Tr. 203:18-204:1, 211:23-212:8 (Wood) (Day 2); PL776 at 5 (Wood Rep.).

[208] Tex. Elec. Code § 64.012; Tex. Pen. Code § 12.33; Trial Tr. 176:25-177:5 (Mitchell) (Day 5).

[209] Trial Tr. 177:24-178:9 (Guidry) (Day 8); Newman Dep. 72:16-73:2.

### ii. Evidence Before the Legislature

150. Proceedings before the Legislature presented no compelling evidence of recent voter corruption of the election process, let alone of in-person voter impersonation. Although hearings established a consistent legislative record that voter impersonation at the polls is extremely rare in Texas, the push for strict voter ID only grew more intense.[210]

151. During the hearing on HB 1706 (2005) before the House Elections Committee, no credible evidence of voter impersonation at the polls was presented. Moreover, long-serving Dallas County Elections Administrator Bruce Sherbet and representatives from voting rights organizations testified that the proposed requirement was unnecessary because of the absence of in-person voter fraud.[211] Witnesses testified that requiring voters to present photo ID at the polls would disenfranchise Texans who lack access to vehicles, including poor, elderly, and rural voters.[212]

152. In 2006, after the failure to enact HB 1706 (2005), the Texas Legislative Council conducted a study of election fraud. This study concluded that state and local officials cited absentee voting most consistently as a vulnerability in the state's voting system. The study did not document any voter impersonation at the polls or, more generally, any significant record of intentional corruption of the voting process by voters.[213]

---

[210] PL773 at 20-21 (Minnite Rep.); PL085 at 11:23-12:18, 14:13-15:4, 128:22-129:3 (House Comm. on Elections Tr., Apr. 23, 2007); PL765 ¶ 18 (Davidson Supp. Rep.).

[211] PL101 at 31:24-32:14, 94:1-95:8 (House Elections Subcomm. Tr., Mar. 17, 2005).

[212] PL101 at 13:2-16:15, 94:2-5, 95:9-96:8, 101:2-5 (House Elections Subcomm. Tr., Mar. 17, 2005); PL765 ¶ 10 (Davidson Supp. Rep.).

[213] PL773 at 18-19 (Minnite Rep.).

153.     The next year, at a hearing on HB 218 (2007), the state legislative chairman of the Republican County Chairmen's Association acknowledged that at that time, no person had ever been convicted in Texas of in-person voter impersonation, and the Director of the Elections Division testified that in the prior four years the Division had not received a single complaint of in-person voter impersonation.[214]

154.     During the Senate hearing on SB 362 (2009), Eric Nichols, Deputy Attorney General for Criminal Justice with the Office of the Texas Attorney General, testified that of the 192 allegations of voter fraud referred to the Attorney General's Office since 2002, just 30 had resulted in prosecutions and none of the prosecuted cases had related to voter impersonation at the polls.  Senator Eliot Shapleigh noted that in none of the 30 cases prosecuted would the charged fraud have been prevented by a photo ID requirement for in-person voting.[215]  Senator Shapleigh then asked Senator Fraser, "[A]re you aware of any other investigations, other than what Attorney General Abbott has done here in Texas, with respect to voter fraud?"  Senator Fraser answered: "I'm not advised."[216]

155.     Similarly, during the House hearing on SB 362, Representative Anchía summarized that during hearings in the 2005 and 2007 sessions and the 2006 and 2008 interim sessions, the Committee on Elections had found no documented cases of in-person voter impersonation.[217]

---

[214] Trial Tr. 261:25-263:19 (Day 5) (McGeehan); PL096 at 29:8-11(Sen. Comm. on State Affairs Tr., Apr. 30, 2007).

[215] PL054 at 234:19-235:11,747:17-750:22, 760:11-761:19 (Sen. Comm. of the Whole Tr., Mar. 10, 2009); PL765 ¶ 32 (Davidson Supp. Rep.).

[216] P054 at 96:3-7 (Sen. Comm. of the Whole Tr., Mar. 10, 2009).

[217] PL069 at 10:3-25 (House Comm. on Elections Tr., Apr. 6, 2009).

156.     In the 2010 interim session, the House Committee on Elections convened a hearing on voter fraud at which then-Elections Division Director McGeehan testified that the Elections Division had referred 24 potential violations of the election code to the Office of the Texas Attorney General in the prior two years, of which only two had involved allegations of in-person voter impersonation.  She later clarified that those two cases involved an allegation of selling votes and a voter who had possessed a driver license but had unintentionally voted under the name of his deceased father.[218]

157.     The Committee later catalogued known or suspected instances of voter fraud, but made no mention of voter impersonation at the polls.  It did include findings of voter registration fraud, mail-in ballot fraud, and vote buying.[219]

158.     Finally, during debate on SB 14, Senator Fraser and Representative Harless, the Senate and House sponsors respectively, each stated that he or she was "not advised" concerning the extent of in-person voter impersonation in Texas.[220]  In her deposition, Representative Harless could not recall whether she believed that in-person voter fraud was a problem in Texas, despite the fact that prevention of in-person voter fraud was the only legislative purpose that she claimed to remember.[221]

---

[218] PL047 at 28:7-31:11, 46:16-21, 47:11-49:14 (House Comm. on Elections Tr., June 14, 2010).

[219] PL1028 at 4, 16 (Rep. Todd Smith, Voter Identification Forum, Aug. 6, 2010); PL772 at 51 (Lichtman Rep.).

[220] PL031 at 7:3-23 (House Fl. Debate, Mar. 21, 2011); PL006 at 5-6 (Sen. Comm. of the Whole, Vol. 2, Tr. 240:6-24).

[221] Harless Dep. 23:17-24:8, 45:3-6, 86:18-87:3, 137:25-138:10, June 20, 2014.

## 2. The History of Pretextual Voter Fraud Claims

159.    The threat of voter fraud has been used to justify nearly every disenfranchising device in Texas history, including all-white primary laws, poll taxes, literacy requirements, restrictions on voter assistance, re-registration requirements, and even the harassment of minority voters.[222] Disenfranchising election laws are never racially neutral in their effects, even when presented under an ostensibly benign purpose.  In Texas history, more often than not that benign purpose has proven to be pretext.[223]

160.    For more than 50 years beginning in 1895, Texas officials implemented a series of mechanisms to exclude minority voters from participating in Democratic primary elections, then the only meaningful elections in the State.  The stated purpose of early white primary provisions was to eliminate voter fraud, based on the notion that minority voters were more likely to sell their votes.[224]  White primaries persisted until as late as 1953 and were eliminated only through repeated intervention by federal courts.[225]

161.    Texas established a poll tax in 1902 by state constitutional amendment, and proponents advanced two justifications: to remove the possibility that African-American voters would hold the balance of power between Anglo factions and to increase the "value" of a vote and thereby prevent vote-buying and other voter fraud.[226]  In 1964, the practice was eliminated as to federal

---

[222] *Infra* ¶¶ 160-165; Trial Tr. 303:7-306:6 (Burden) (Day 3); Trial Tr. 22:2-34:19 (Burton) (Day 6); PL758 ¶¶ 27-28 (Burden Corr. Rep.); PL760 at 5-20 (Burton Rep.).

[223] PL760 at 41-42 (Burton Rep.); Trial Tr. 48:20-49:23 (Burton) (Day 6).

[224] PL760 at 7-8, 10-12 (Burton Rep.); Trial Tr. 22:25-23:2, 23:17-25:6 (Burton) (Day 6).

[225] PL758 ¶ 30 (Burden Corr. Rep); Trial Tr. 303:10-304:6 (Burden) (Day 3); Trial Tr. 24:3-7, 24:18-26:15 (Burton) (Day 6); *Terry v. Adams*, 345 U.S. 461 (1953); *Smith v. Allwright*, 321 U.S. 649 (1944); *Nixon v. Condon*, 286 U.S. 73 (1932); *Nixon v. Herndon*, 273 U.S. 536 (1927); Trial Tr. 186:2-8 (Korbel) (Day 5).

[226] PL760 at 10-12 (Burton Rep.); Trial Tr. 28:23-31:16 (Burton) (Day 6).

elections when the 24th Amendment to the U.S. Constitution was adopted.  However, Texas

retained the poll tax for elections that did not include federal contests.  Texas's poll tax was

ultimately held unconstitutional in 1966, after a federal court found that a primary purpose of the

State's original poll tax was to disenfranchise African-American voters.  As late as 1963,

however, Texas voters rejected a state constitutional amendment to forbid the practice, again

based in part on the claim that the poll tax was a valid means of preventing voter fraud.[227]

162.    After elimination of the poll tax, the Texas Legislature enacted a requirement that voters

re-register annually to vote.  Contemporaneous newspaper accounts described this requirement

as "patterned on the old poll tax system, but minus the tax," and it was struck down as

unconstitutional in 1971 due to its substantial disenfranchising effect.[228]

163.    The next year, Texas enacted a purge law requiring re-registration of the entire electorate.

The U.S. Attorney General objected to the new law under Section 5 of the Voting Rights Act.[229]

164.    Until 1970, Texas prohibited illiterate voters from receiving assistance in the marking of

their ballots, in the name of fraud prevention, but these restrictions were struck down because

they reduced voting to an "empty ritual" for the disproportionate number of African-American

and Hispanic voters who were illiterate (in part because of intentional discrimination).[230]

---

[227] U.S. Const. amend. 24; *Harper v. Va. State Bd. of Elections*, 383 U.S. 663 (1966); *United States v. Texas*, 252 F. Supp. 234, 251, 255 (W.D. Tex. 1966) (three-judge court), *aff'd sub nom.* Texas v. United States, 384 U.S. 155 (1966); Trial Tr. 304:7-305:15 (Burden) (Day 3); Trial Tr. 28:23-29:25, 31:17-33:7 (Burton) (Day 6); PL758 ¶ 31 (Burden Corr. Rep); PL760 at 12-13 (Burton Rep.).

[228] PL760 at 13 (Burton Rep.); *Beare v. Smith*, 321 F. Supp. 1100 (S.D. Tex. 1971) (three-judge court), *aff'd sub nom. Beare v. Briscoe*, 498 F.2d 244, 248 (5th Cir. 1974) (per curiam).

[229] PL673 at 487-490 (Objection Letter); PL760 at 14 (Burton Rep.); *see also Flowers v. Wiley*, 675 F.2d 704, 705-06 (5th Cir. 1982).

[230] *Garza v. Smith*, 320 F. Supp. 131, 135-37 (W.D. Tex. 1970) (three-judge court), *vacated and remanded on procedural grounds sub nom Smith v. Garza*, 401 U.S. 1006 (1971), *on appeal after remand sub nom. Garza v. Smith*, 450 F.2d 790 (5th Cir. 1971).

165.     In recent decades, poll workers and police officers in Texas have used ID requirements and the pretext of "fraud prevention" to harass Hispanic and African-American voters.  In 2004, poll workers subjected African-American voters to more stringent screening processes than Anglo voters, and police officers outside of an early voting site in a heavily African-American area of Harris County demanded that voters present ID and threatened to arrest voters with outstanding warrants.[231]  Reverend Peter Johnson testified that voter intimidation still exists in Texas today in predominantly African-American precincts.[232]  And in 2013, a federal court found that poll workers had been openly hostile toward Hispanic voters and had, under Texas's prior voter ID law, improperly required Hispanic voters to show a driver license in order to vote.[233]

### 3.  Voter Confidence and Constituent Priming

166.     SB 14's proponents publicly defended it as necessary to promote voter confidence, but SB 14 does not meaningfully advance that goal.  Thus, the promotion of voter confidence does not credibly explain the purpose of SB 14.[234]

167.     Political science research has established that there is no relationship between the strictness of state voter ID laws and voter confidence.  In addition, research has shown that voter confidence in the integrity of elections does not correlate with voter turnout.[235]

---

[231] PL760 at 23 (Burton Rep.).

[232] Trial Tr. 17:5-18:6 (Johnson) (Day 3).

[233] PL760 at 19-20 (Burton Rep.); *Rodriguez v. Harris Cnty.*, 964 F. Supp. 2d 686, 783, 804 (S.D. Tex. 2013).

[234] Trial Tr. 322:16-323:23 (Burden) (Day 3); PL758 ¶¶ 90, 98-101 (Burden Corr. Rep.).

[235] PL758 ¶¶ 98-99 (Burden Corr. Rep.); Trial Tr. 320:22-321:6 (Burden) (Day 3).

168.     Voter confidence is improved when a voter is able to vote in person rather than by mail. By eliminating the right to vote in person for some absentee-eligible voters, SB 14 is likely to increase absentee voting and thereby decrease voter confidence.[236]

169.     Senator Fraser, the lead sponsor of SB 14, testified that his goal was to "secure the integrity of the ballot box so that [voters] knew that their vote would be correctly counted," but he was not aware of any voter who had not voted due to concerns about ineligible voters casting ballots.[237]  Representative Harless, the House sponsor of SB 14, similarly testified that she could not identify a single voter who had not voted due to concern that voter fraud would cancel his or her vote.[238]

170.     Senator Fraser and his staff did not conduct any analysis of whether voters' concerns about election fraud actually affected voter turnout; nor were they aware of any external analysis that would support that proposition.[239]

171.     Likewise, Elections Division Director Ann McGeehan, after more than 20 years working in the Elections Division, could not identify a single voter who had not participated in an election due to concerns about voter fraud.[240]  Ms. McGeehan could not identify any complaints from voters stating that they lacked confidence in the voting system because a voter registration certificate, which had been used as ID in Texas elections since 1997, could be used to establish identity at the polls.[241]  Ms. McGeehan conceded that a voter without SB 14 ID who appeared at

---

[236] PL758 ¶¶ 99-101 (Burden Corr. Rep.); Trial Tr. 321:7-19 (Burden) (Day 3).

[237] Fraser Dep. 278:4-19, July 23, 2014; Trial Tr. 419:2-6 (Fraser) (Day 7).

[238] Harless Dep. 113:24-114:3, June 20, 2014.

[239] McCoy Dep. 139:8-17, July 9, 2014.

[240] Trial Tr. 279:21-25 (McGeehan) (Day 5).

[241] Trial Tr. 283:16-20 (McGeehan) (Day 5).

the polls and was required to vote by provisional ballot might lose confidence in the election system.[242]

172.    In addressing whether SB 14 would have a disproportionate impact on minority voters in Texas, Senator Fraser claimed to rely exclusively on the results of polls that asked for Texans' views on voter ID legislation and on the experience of other states with photo ID legislation, specifically Georgia and Indiana.[243]   Senator Fraser claimed that he based his decision to exclude non-photo ID in SB 14 on the results of the same public opinion polls.[244]

173.    The polls followed widespread and unsubstantiated claims by members of the majority political party that voter fraud—including voter impersonation and non-citizen voting—is an epidemic in Texas.[245]   During debates over earlier voter ID proposals, bill proponents built public support for a stricter ID law by misinforming Texans about threats of voter impersonation at the polls, especially by non-citizens.[246]

174.    Bill proponents relied on polls that did not ask about specific forms of photo ID or whether respondents would support a voter ID bill that disproportionately affected poor or minority voters.[247]   Representative Ana Hernandez testified that constituents who had previously

---

[242] Trial Tr. 280:1-6 (McGeehan) (Day 5).

[243] Fraser Dep. 74:4-75:8, 167:18-168:9, 251:20-253:10, July 23, 2014.

[244] Fraser Dep. 123:8-125:8, 127:3-128:5, July 23, 2014; Dewhurst Dep. 117:5-15.

[245] PL765 ¶¶ 14, 24 (Davidson Supp. Rep.).

[246] Trial Tr. 323:15-325:12 (Anchía) (Day 4); PL085 at 181-84, 185-89 (House Floor Debate, Vol. 2, Tr. 149:23-151:10, 152:12-156:19, Apr. 23, 2007); D.C.C. Tr. 69:7-71:9; 115:25- 118:18 (Kousser) (Day 2 , P.M. Sess.).

[247] PL251 (Voter ID poll); PL433 (Voter ID poll); PL434 (Voter ID poll); PL252 (Voter ID poll); PL251 (Voter ID poll); Dewhurst Dep. 244:24-245:11; Fraser Dep. 75:25-76:17, 78:9-17, July 23, 2014; Williams Dep. 297:23, 298:22-24, 298:22-24, 301:16-19.

supported photo ID changed their minds when they learned that SB 14 permitted only very limited forms of photo ID.[248]

### 4. Absentee Ballot Fraud and Targeting

175.   The only election crime that SB 14 could even theoretically prevent is in-person voter impersonation, a fact acknowledged by bill proponents.[249]  SB 14 does not prevent a variety of other election crimes or irregularities, including clerical errors, vote-buying, voter intimidation, double-voting, absentee ballot manipulation, or voting machine errors.[250]  Nor would SB 14 prevent or deter voter registration fraud.[251]

176.   Nationwide, absentee ballot fraud is substantially more common than in-person voter impersonation, although it is still rare.[252]

177.   When the Legislature considered SB 14, it had substantial evidence of absentee ballot fraud in Texas, but no such evidence of in-person voter impersonation.[253]  During the consideration of predecessor bills, the Legislature similarly received evidence indicating that, to the extent voter fraud was occurring in the State, it generally involved absentee voting.[254]

---

[248] Trial Tr. 371:8-17 (Hernandez) (Day 4).

[249] PL758 ¶ 91 (Burden Corr. Rep.); PL773 at 4 (Minnite Rep.); *see also* PL006 at 486-87 (Sen. Comm. of the Whole, Tr. 190:17-191:24, Jan. 25, 2011); PL031 at 3:5-11 (House Fl. Debate, Mar. 21, 2011).

[250] Trial Tr. 141:17-142:10 (Minnite) (Day 5).

[251] Trial Tr. 159:10-160:3 (Minnite) (Day 5).

[252] PL758 ¶ 95 (Burden Corr. Rep.).

[253] *Supra* ¶¶ 150-158; *infra* ¶¶ 180-182.

[254] PL054 at 151 (Sen. Comm. of the Whole, Vol. 1A Tr. 140:1-141:25 March 10, 2009); PL 765 ¶ 29 (Davidson Supp. Rep.).

178.	Counter-intuitively, SB 14 imposes new burdens on in-person voting—which is disproportionately used by minority voters but where fraud is less likely—while excluding absentee voting from ID requirements.[255]

179.	Former Elections Division Director Wood has found significant mail voter fraud over the course of his career.[256]  Mr. Wood testified that the likely rationale for excluding absentee voting from enhanced ID requirements is that Anglo voters disproportionately cast ballots by mail.[257]

180.	Major Forrest Mitchell testified on behalf of the Office of the Texas Attorney General that after the enactment of SB 14, anyone who wanted to engage in voter impersonation could just as easily do so through absentee ballot fraud.[258]  Major Mitchell also testified that SB 14 would not prevent a group from attempting to affect an election outcome through voter coercion, absentee ballot fraud, and vote buying.[259]

181.	Notwithstanding Representative Harless's purported concern that voter fraud would cancel legitimate votes, she had never proposed legislation to address absentee ballot fraud.[260] Moreover, SB 14 would not address lowered confidence in elections caused by mail-in ballot fraud.[261]  During the House debate, Representative Harless repeatedly rebuffed questions

---

[255] Trial Tr. 319:17-320:21 (Burden) (Day 3); PL758 ¶¶ 80-82 (Burden Corr. Rep.); *see also infra* ¶ 410.

[256] Trial Tr. 200:4-204:1; 209:12-19 (Wood) (Day 2); PL776 at 4 (Wood Rep.).

[257] Trial Tr. 241:20-242:1 (Wood) (Day 2); PL776 at 4 (Wood Rep.); *see also infra* ¶ 410.

[258] Trial Tr. 174:23-175:13 (Mitchell) (Day 5); Mitchell Dep. 158:22-159:11, Aug. 12. 2014.

[259] Trial Tr. 175:14-176:24 (Mitchell) (Day 5).

[260] PL031 at 20:24-22:1 (House Fl. Debate, Mar. 21, 2011).

[261] PL031 at 21:5-22:15 (House Fl. Debate, Mar. 21, 2011).

concerning mail-in ballot fraud by stating that debate over SB 14 was not an appropriate "venue" to address that issue.[262]

182.   Data establishing that Anglo voters are more likely than African-American and Hispanic voters to vote by mail was available to the Legislature during consideration of SB 14.[263]

### 5.  Non-Citizen Voting and Shifting Justifications

183.   The Texas Legislature was unable to gather substantial evidence of non-citizen voting.[264] Although proponents of earlier voter ID bills expressly invoked the purported problem of non-citizen voting, proponents of SB 14 deemphasized non-citizen voting.  Moreover, non-citizens may hold the most common forms of SB 14 ID.  Therefore, the elimination of non-citizen voting does not credibly explain the purpose of SB 14.

### i.   Predecessor Bills Focused Primarily on Non-Citizen Voting

184.   In earlier sessions, legislators asserted that non-citizen voting was the principal purpose behind tightening voter ID requirements.  In 2007, for example, Representative Betty Brown explained that HB 218 was "designed to keep illegal aliens, no[n] citizens and people otherwise not qualified from voting and diluting the legitimate votes cast by citizens."[265]

185.   In a 2007 hearing, voter ID proponents, including representatives from the Immigration Reform Coalition of Texas and Citizens for Immigration Reform, expressed only generalized concerns about non-citizen voting, without credible evidence.  Senator Lucio, former Texas

---

[262] PL031 at 21-22 (House Floor Debate, Mar. 21, 2011).

[263] Trial Tr. 66:19-67:12 (Lichtman) (Day 4).

[264] PL021 at 55 (Select Comm. on Voter Identification and Voter Fraud, Vol. 1, Tr. 55:6-25, Mar. 11, 2011); Williams Dep. 148:25-150:4, June 1, 2012; Straus Dep. 100:12-101:1, June 11, 2012; PL765 ¶ 16 (Davidson Supp. Rep.).

[265] PL085 at 9 (House Fl. Debate, Vol. 1, Tr. 9:2-10:11, 14:13-24, Apr. 23, 2007); PL765 ¶ 16 (Davidson Supp. Rep.).

Elections Director Wood, and other witnesses provided specific, reliable, and credible evidence that non-citizen voting is extremely rare in Texas's elections.[266]

186.     In 2008, Lieutenant Governor Dewhurst continued to express support for voter ID legislation and ran a series of campaign ads stressing the need to stop non-citizens from voting.[267]   He asserted that "with eight to 12 million illegal aliens currently living in the U.S., the basic American principle of one person, one vote, is in danger," without citing evidence of undocumented immigrants or any other non-citizens participating in U.S. elections.[268]

187.     In 2009, Senator Fraser asserted that the purpose of SB 362 was to ensure that "illegal aliens, non-citizens and people otherwise not qualified do not dilute the legitimate votes cast by citizens."[269]   However, SB 362 would not have prevented non-citizens from voting because some of the IDs permitted by SB 362 did not require proof of citizenship and because SB 362 did not address absentee voting.[270]

188.     In 2008 and 2009, public support for requiring photo ID at the polls was likely a direct response to sponsors' misleading claims of non-citizen voting and conflation of immigration issues and voter ID requirements.   Many constituents wrote their elected officials to ask them to

---

[266] PL096 at 32:8-33:18, 35:5-13, 77:11-18, 78:1-4, 96:13-97:21 (Sen. Comm. on State Affairs, Apr. 30, 2007); Williams Dep. 148:25-150:4, June 1, 2012; PL765 ¶ 21 (Davidson Supp. Rep.).

[267] PL765 ¶ 24 (Davidson Supp. Rep.); Hebert Dep. 29:17-20, June 17, 2014; Williams Dep. 148:25-150:4, June 1, 2012.

[268] PL765 ¶ 21 (Davidson Supp. Rep.).

[269] PL264 (bill history for SB 362); PL842 (SB 362 as introduced); PL1013 (SB 363 bill history); PL238 (SB 363 as introduced); PL273 (Fraser press release, Dec. 15, 2008); Fraser Dep. 203:8-18, 206:5-12, 210:20-211:8, July 23, 2014.

[270] Hebert Dep. 54:12-19, June 17, 2014; Fraser Dep. 44:18-20, 51:3-5, 55:7-10, July 23, 2014; Dewhurst Dep. 77:20-78:1.

vote for voter ID to stop "illegal aliens," immigrants, or non-citizens from voting in Texas elections.[271]

189.    After the failure of SB 362, Senator Dan Patrick sent an email to colleagues addressing a recent meeting of senators at which voter ID and immigration were discussed and noted that "several" senators "thought the two issues were one in the same or at a minimum connected."[272]

190.    These concerns were not grounded in reality.  As Representative Hernandez explained, undocumented immigrants living in the United States were "living in the shadows" and too fearful of deportation to risk getting caught "grocery shopping much less attempt[ing] to voter illegally."[273]

### ii.    SB 14 Shifts Emphasis Away from Non-Citizen Voting

191.    On November 9, 2010, the day after filing SB 178 (later renumbered SB 14), Senator Fraser issued a press release asserting that the purpose of the bill was to prevent voter impersonation and restore voter confidence.  He made no mention of non-citizen voting.[274]

192.    Early in the 2011 legislative session, Bryan Hebert (deputy general counsel to Lieutenant Governor Dewhurst) sent an email to Senate staff to provide talking points in support of SB 14; a chart comparing SB 14 with Texas's current law, the Indiana photo ID law, and the Georgia photo ID law (which illustrated that SB 14 was much stricter than laws in Indiana and Georgia);

---

[271] Trial Tr. 325:10-326:11, 334:14-335:3 (Smith) (Day 5); *see also, e.g.*, PL704 (Constituent Email); PL709 (Constituent Letter); PL712 (Constituent Email); PL733 (Constituent Email); PL734 (Constituent Fax); PL736 (Constituent Email); PL737 (Constituent Email); PL748 (Constituent Email).PL749 (Constituent Email); PL745 (Constituent Email); PL746 (Constituent Email); PL747 (Constituent Email).

[272] PL329 (email from Patrick to Spence); Duncan Dep. 172:22-173:13, Aug. 28, 2014.

[273] Trial Tr. 373:5-14 (Hernandez) (Day 4).

[274] PL1014 (Fraser press release Nov. 9, 2010).

and an overview of preclearance under Section 5 of the Voting Rights Act.[275]  In a later email, he expressed concern that bill proponents should "avoid talking about illegals" in concert with support for SB 14 and responded to a memo from the Texas Conservative Coalition that expressed support for SB 14 based on its impact on undocumented immigrants.  Hebert argued that the purpose of SB 14 was not "to crack down on illegals but to generally strengthen the security and integrity of the voting process."[276]  In the debate that followed in the Senate Committee of the Whole, bill proponents avoided direct references to voting by undocumented immigrants or other non-citizens.[277]

193.    In his deposition, Mr. Hebert acknowledged that some supporters of SB 14 characterized the bill as anti-immigrant, anti-"illegals" legislation, designed to target persons who are not U.S. citizens.  However, he was not aware of any non-citizens participating in Texas elections.[278]

194.    SB 14 cannot prevent hypothetical voting by non-citizens.  Individuals who are not U.S. citizens are able to obtain several forms of SB 14 ID—including a Texas driver license, personal ID card, and concealed handgun license—and lack of U.S. citizenship is not apparent on the face of these documents.[279]

195.    Grassroots supporters of SB 14 did not mirror the Legislature's sudden shift in justifications for stricter voter ID requirements and continued to express concerns about non-

---

[275] Trial Tr. 198:220-199:5 (Hebert) (Day 8); PL271 at 2 (email from Hebert).

[276] PL275 (email from Hebert); PL276 (email from Baxter); PL765 ¶ 45 (Davidson Supp. Rep.); Hebert Dep. 198:16-19, 199:1-200:23, June 17, 2014.

[277] *See, e.g.*, PL006 at 3-4 (Sen. Comm. of the Whole, Vol. 2, Tr. 26:2-29:13, Jan. 25, 2011).

[278] Hebert Dep. 200:12-201:16, 204:13-205:1, June 17, 2014.

[279] Tex. Transp. Code §§ 521.101, 121(e), 142; Trial Tr. 141:4-142:2 (Peters) (Day 6); Trial Tr. 319:22-320:3 (Burden) (Day 3); Gipson Dep. 13:4-8, June 9, 2014; Zgabay Dep. 13:1-3, 50:20-51:3.

citizen voting in correspondence to their elected officials.[280]  Moreover, during the House Select Committee on Voter Identification and Voter Fraud hearing on SB 14, a voter who claimed that a photo ID bill was necessary to prevent non-citizens from voting asserted that SB 14 would "fix the problem whether it exists or not."[281]

196.    In their responses to constituent mail during and after consideration of SB 14, Representatives Tom Craddick and Linda Harper-Brown, among others, directly conflated illegal immigration with voter ID.[282]  Representative Charles Anderson also regularly linked his support for voter ID laws to constituents' frustrations about illegal immigration.[283]

197.    Representative Todd Smith, Chairman of the House Elections Committee, also introduced legislation in the 82nd Legislature to require voter registration applicants to provide documentary proof of citizenship, even though he had not received facts showing need for this legislation.[284]

198.    During debate over SB 14, Senator Fraser briefly and obliquely raised the issue of non-citizen voting, asserting that SB 14 ID confirms a person's identity, eligibility to vote, and U.S. citizenship.  He later admitted that SB 14 ID does not confirm citizenship or Texas residency.[285]

---

[280] PL704 (email from Harless); PL732 (email from Frank); PL739 (email from Lee); PL740 (email from Ellington); PL741 (Incoming correspondence); PL878 (Governor website email); PL879 (Senate website email); PL880 (Senate website email); PL881 (Governor website email).

[281] PL666 (SB 14 bill history); PL021 at 55 (Select Comm. on Voter Identification and Voter Fraud Hearing, Vol. 1, Tr. 55:6-25, Mar. 1, 2011).

[282] PL875 (letter from Harper-Brown); PL877 (email from Craddick).

[283] PL726 (letter from Bradley); PL876 (letter from Bradley); PL730 (email from Bradley).

[284] PL1027 (HB 1338 as filed); Smith Dep. 132:13-133:16, 133:25-134:17, June 1, 2012.

[285] See PL006 at 6 (Sen. Comm. of the Whole, Vol. 2, Tr. 40:19-24, Jan. 25, 2011); Fraser Dep. 193:22-194:25, 195:10-15, July 23, 2014; see also Trial Tr. 122:15-124:16, 195:1-6 (Williams) (Day 8).

199.    Lieutenant Governor Dewhurst issued a press release on the day that SB 14 passed stating that the bill would "increase public confidence in our election process by ensuring only U.S. citizens—who are legally eligible—vote in Texas elections."[286]

### E.  Contemporary Statements: Anticipation of a Discriminatory Impact

#### 1.  Warnings in the Legislative Record

200.    Voter ID proponents ignored the repeated warnings of Hispanic and African-American legislators that minority voters were less likely to possess requisite ID under SB 14.  Moreover, the Secretary of State's office conducted an analysis of Texas voters who lacked a state driver license or personal ID card during consideration of SB 14 and provided that analysis to Lieutenant Governor Dewhurst.[287]

201.    In the 2005 and 2007 sessions, witnesses testified at length about how requiring photographic voter ID would disenfranchise voters who lack access to vehicles, about the costs of obtaining underlying documents necessary to obtain photographic ID, and specifically about the anticipated disproportionate and discriminatory effects on Hispanic and African-American voters.[288]

202.    During debate over SB 362 (2009), Senator Fraser shared data he had obtained from the Office of the Secretary of State estimating that 809,000 individuals—or 12 percent of registered voters—had registered to vote without submitting a driver license or ID card number.[289]  House

---

[286] PL279 (Lt. Gov. press release, Jan. 26. 2011); Dewhurst Dep. 221:4-222:12.

[287] *Supra* ¶¶ 101-112; *infra* ¶¶ 201-207, 227.

[288] PL101 at 13:2-16:15, 66:10-20, 94:1-96:12, 101:2-5 (House Elections Subcomm. Tr., Mar. 17, 2005); PL764 ¶ 10 (Davidson Rep.); PL082 at 115:14-24 (House Comm. on Elections Tr., Feb. 28, 2011); PL096 at 6:14-7:18, 12:2-7, 82:13-85:2, 94:5-96:10 (Sen. Comm. on State Affairs Tr., Apr. 30, 2007); PL765 ¶ 19 (Davidson Supp. Rep.).

[289] PL054 at 81-82 (Sen. Comm. of the Whole, Vol. 1A, Tr. 70:16-71:11, Mar. 10, 2009).

sponsor Todd Smith similarly estimated that roughly 700,000 Texas voters lack a driver license.[290]  Witnesses and bill opponents raised concerns that these voters were more likely to be minorities, and Representative Smith later admitted that this racial disparity was "common sense."[291]

203.    Also in 2009, an expert witness presented estimates that, nationwide, African Americans are three times as likely as Anglos to lack photo ID and that people who earn less than $35,000 a year are twice as likely as those earning more than $35,000 a year to lack photo ID.[292]

204.    On the day that Governor Perry designated voter ID as a legislative emergency, Lieutenant Governor Dewhurst told senators that the Committee of the Whole would take up SB 14 the following week.  At that time, at least one bill supporter, Senator Craig Estes, expressed concern that SB 14 was not compliant with the Voting Rights Act.[293]

205.    Several bill opponents testified during consideration in the Committee of the Whole that it was difficult for their constituents to travel to a DPS office to obtain compliant photo ID. Senator Carlos Uresti, who represented a heavily Hispanic district, stated that some of his

---

[290] PL054 at 81-82 (Sen. Comm. of the Whole, Vol. 1A, Tr. 70:16-71:11, Mar. 10, 2009); PL765 ¶ 19 (Davidson Supp. Rep.); Trial Tr. 327:11-328:7 (Smith) (Day 5).

[291] Trial Tr. 327:11-328:7 (Smith) (Day 5); PL069 at 9:10-10:25 (House Comm. on Elections Tr., Apr. 6, 2009); Smith Dep. 116:21-117:8; PL054 at 439-441 (Sen. Comm. of the Whole, Vol. 1B, Tr. 417:13-419:9, Mar. 10, 2009); PL054 at 79-86, 97-99, 122-124, 144-146, 155-156, 158-160, 180-186 (Sen. Comm. of the Whole, Vol. 1A, Tr. 68:13-75:7 (Watson), 86:25-88:13 (Shapleigh), 111:9-113:6 (Zaffirini), 133:1-135:15, 144:23-145:15 (Ellis), 147:1-149:22 (Davis), 169:12-175:14 (West), Mar. 10, 2009); Fraser Dep. 198:22-199:19, 213:1-10, May 17, 2012; Williams Dep. 173:2-14, June 1, 2012; Trial Tr. 21:13-22:6 (Davis) (Day 4).

[292] PL054 at 439-44 (Sen. Comm. of the Whole, Vol. 1B, Tr. 417:13-419:9, Mar. 10, 2009); PL 765 ¶ 30 (Davidson Supp. Rep.).

[293] PL268 (Talking Points); Dewhurst Dep. 150:17-151:8, 151:18-153:6; PL267 (Hebert email); Hebert Dep. 109:3-110:5, June 17, 2014; PL765 ¶ 45 (Davidson Supp. Rep.).

constituents must travel 175-200 miles round trip to a DPS office and that his district included

eight counties without DPS offices and several more counties with only part-time offices.[294]

206.     Senator Gallegos also testified concerning the difficulties that voters lacking necessary

photo ID would face in accessing a driver license office, such as those in urban areas of Houston,

where there is no DPS office.  Senator John Whitmire, an Anglo representing a majority-

minority district in Houston, spoke of hours-long waits to obtain a driver license in his district.[295]

207.     When the House Select Committee on Voter Identification and Voter Fraud held a

hearing on SB 14, witnesses explained that ID requirements would adversely impact minority

voters and that such voters were unlikely to travel to a county office to validate provisional

ballots within the six-day cure period.[296]

### 2.  Admissions of Bill Proponents and Absence of Candid Records

208.     During Senate debate, Senator Fraser questioned the notion that SB 14 should aim not to

be unduly restrictive while preventing voter fraud.[297]

209.     As noted above, during consideration of SB 362 (2009), House sponsor and Elections

Committee Chairman Representative Todd Smith believed that minority Texans were less likely

to have a photo ID and that it was "a matter of common sense" that the hundreds of thousands of

people without a driver license would be "disproportionately poor, and, therefore, minority."[298]

---

[294] PL006 at 13-14 (Sen. Comm. of the Whole, Vol. 2, Tr. 67:13-73:2, Jan. 25, 2011); D.D.C. Trial Tr. 103:3-7 (Williams) (Day 1, P.M. Sess.).

[295] PL006 at 12-13, 17 (Sen. Comm. of the Whole, Vol. 2, Tr. 64:13-66:2, 83:5-84:24, Jan. 25, 2011); PL765 ¶ 49 (Davidson Supp. Rep.).

[296] PL666 (SB 14 bill history); Bonnen Dep. 44:24-45:2; PL021 at 55:8-23, 123:7-127:12 (House Comm. on Voter Identification and Voter Fraud Hearing Tr., Mar. 1, 2011).

[297] PL006 at 38-39 (Sen. Comm. of the Whole, Vol. 2, Tr. 168:1-169:2, Jan. 25, 2011).

[298] Trial Tr. 345:22-346:6 (Smith) (Day 5); Smith Dep. 164:8-6.

He also acknowledged that allowing the use of non-photo ID would "significantly lessen any marginal additional burden" that voter ID requirements placed on some voters.[299]

210.    The restrictiveness of SB 14 led Bryan Hebert, General Counsel to Lieutenant Governor Dewhurst, to conclude that it was "doubtful" SB 14 would be precleared under Section 5 of the Voting Rights Act.[300]  He recommended that the leadership revise SB 14 to reflect Georgia's statute by allowing any federal, state, or local government-issued ID, but that suggestion was ignored.[301]  Mr. Hebert had previously written that SB 362 (2009), which included both photo and non-photo ID options, "improves security in [the] election process" but creates "less chance of disenfranchising elderly, poor, or minority voters" and was therefore more likely to be precleared.[302]

211.    Mr. Hebert was involved in crafting the EIC provision but was unable to recall in his deposition any analysis of the practical costs (*e.g.*, transportation to an office that issues EICs) and fees that a voter would need to pay (*e.g.*, the costs of underlying documents) to obtain an EIC.[303]  Speaker Straus conceded in his deposition that the underlying documents are not free and that a $22 fee for a birth certificate burdens the right to vote.[304]  Similarly, Senator Williams later agreed that to obtain an EIC, a voter must take time to go to a DPS office (which may

---

[299] Smith Dep. 202:1-5; PL765 ¶ 34 (Davidson Supp. Rep.).

[300] PL272 (Hebert email); Trial Tr. 203:5-13 (Hebert) (Day 8).

[301] Trial Tr. 204:11-15 (Hebert) (Day 8).

[302] Trial Tr. 189:7-17, 191:1-193:19 (Hebert) (Day 8); PL205 at 2 (email from Hebert to ,McCoy); PL765 ¶ 28 (Davidson Supp. Rep.); Hebert Dep. 87:19-88:13, 261:24-262:9, June 17, 2014.

[303] Trial Tr. 213:21-23, 215:4-14 (Hebert) (Day 8).

[304] Straus Dep. 129:19-25, 133:23-134:10, June 23, 2014.

include time off from work) and that voters will incur a cost to get to a DPS location, be it gasoline or public transportation, which some voters may not be able to afford.[305]

212.    Although Representative Jose Aliseda would not acknowledge the substantial burden SB 14 would impose on many low-income voters in his majority-Latino district when he spoke in favor of the bill in the Legislature, he later acknowledged under oath that only four of the seven counties in his district have DPS offices, that many voters in his district would find it difficult to get to a DPS office to obtain SB 14 ID, and that many of his constituents would find it burdensome to pay $22.00 for a birth certificate.[306]

213.    When asked in his deposition whether he was surprised that DPS collected fingerprints from EIC applicants, Senator Dan Patrick, a cosponsor of SB 14, testified that he was not surprised.[307] Asked whether it was appropriate to collect fingerprints as a condition of obtaining an EIC, Senator Patrick testified, "You could back that down and say, 'Is it appropriate to make someone give a fingerprint to get a driver's license?'  We're trying to establish to be sure that we have integrity at the ballot box."[308]

214.    Senator Fraser's chief of staff admitted that Republicans would support tightening voter ID requirements but Democrats warned that the bill would "reduce voter turnout among those individuals who typically vote [D]emocratic like the poor and elderly."[309]

215.    Texas legislators and staff must take affirmative steps to retain an email.  If the legislator does not take an action such as printing, the email will be deleted.[310]

---

[305] Williams Dep. 170:24-171:8, 174:22-175:2, 176:13-20, July 29, 2014.

[306] D.D.C. Trial Tr. 14:24-16:14 (Aliseda) (Day 1, P.M. Sess.).

[307] Trial Tr. 304:17-21 (Patrick) (Day 7).

[308] Trial Tr. 304:22-305:13 (Patrick) (Day 7).

[309] McCoy Dep. 49:14-17, 51:2-12, July 9, 2014.

216.     With an automatic deletion policy in place, few emails authored by primary bill proponents existed long after the 2011 legislative session ended.  The State asserted a state legislative privilege over all emails containing legislators' thoughts and mental impressions regarding SB 14, but it then withheld as privileged—and ultimately produced—only one email from Senator Fraser to other legislators, three emails from Representative Harless to other legislators, and no emails sent by Lieutenant Governor Dewhurst.[311]

217.     Some legislators seldom use email for substantive discussions, so few emails concerning the substance of SB 14—as opposed to strategy and tactics—likely ever existed.[312]

### 3.  Unsupported Assertions and the Lack of Meaningful Debate

218.     Senator Fraser was aware that responses and floor statements that he made during Senate debate would be included as part of the record in any administrative or judicial review of SB 14 under the Voting Rights Act.[313]  Nonetheless, he divulged during preclearance proceedings that he believed "that the Voting Rights Act has outlived its useful life."[314]

219.     During legislative debate, Senator Fraser claimed that SB 14 simply required voters to prove their identity at the polls, notwithstanding that Texas already had a voter ID law.[315]

220.     When Senator Uresti raised concerns during the Committee of the Whole debate, he received dismissive responses, such as "I'm not advised" or "You need to ask that question of

---

[310] *See, e.g.*, McCoy Dep. 155:9-13, May 16, 2012.

[311] *See* Rev. Privilege Log (May 11, 2012) (ECF No. 162-3); Supp. Privilege Log (May 21, 2012) (ECF Nos. 162-4 & 162-5); Tex. Leg. Council Privilege Log (May 23, 2012) (ECF No. 162-14).

[312] *See, e.g.*, Duncan Dep. 33:15-34:10, June 7, 2012.

[313] Trial Tr. 417:25-418:9 (Fraser) (Day 7).

[314] Fraser Dep. 45:23-46:5, May 17, 2014.

[315] PL006 at 11, 20, 36, 44 (Sen. Comm. of the Whole, Vol. 2, Tr. 60:5-11, 95:14-25, 158:13-25, 159:21-25, 191:1-3, Jan. 25, 2011).

the Secretary of the State."  However, once the bill left committee, Senators would not have a further opportunity to question outside resource witnesses.[316]

221.    Asked during debate whether any studies had been conducted on the impact of SB 14 on Hispanic and African-American voters, Senator Fraser said only that SB 14 was based on models approved by the U.S. Supreme Court and precleared by the Department of Justice, which was both nonresponsive and inaccurate.[317]

222.    Similarly, when Senator Rodney Ellis asked for specific data on the effects of SB 14, Senator Fraser responded with something to the effect of "I'm not advised, ask the Secretary of State."  When Senator Ellis requested information from the Secretary of State, he did not receive a meaningful response.[318]

223.    When Senator Royce West asked whether Senator Fraser was aware of research finding that the burdens of photo ID requirements fall on racial minorities disproportionately, Senator Fraser pointed to general public opinion polling as indicating that African-American and Hispanic Texans support photo ID requirements, as well as to public support in other states with less stringent requirements.[319]

224.    During debate in the Committee of the Whole, Senator Fraser responded to at least 27 questions by stating that he was "not advised," including about the following subjects:

- the extent of in-person voter impersonation in Texas;

---

[316] Trial Tr. 212:2-16 (Uresti) (Day 3).

[317] PL006 at 7-8 (Sen. Comm. of the Whole, Vol. 2, Tr. 44:24-45:10, Jan. 25, 2011); Dewhurst Dep. 175:2-176:14.

[318] Trial Tr. 184:15-22 (Ellis) (Day 4).

[319] PL006 at 37-38 (Sen. Comm. of the Whole, Vol. 2, Tr. 162:11-166:23, Jan. 25, 2011); Dewhurst Dep. 175:2-12, 177:19-180:10, 180:24-181:12.

- the impact of excluding particular forms of ID on minority voters;

- prior studies of the impact of photo voter ID requirements;

- funding for voter education, DPS implementation, and local implementation;

- impediments to obtaining a Texas driver license;

- whether Georgia or Indiana accept student IDs under their voter ID laws;

- whether SB 14 incorporated specified recommendations of the Carter-Baker Commission on Federal Election Reform; and

- the impact of SB 14 on the state budget.[320]

225.   Some proponents of SB 14, when speaking in support of the bill, invoked forms of voting fraud that SB 14 could not prevent, such as absentee ballot fraud.[321]  This was part of a strategy advanced by the Lieutenant Governor's deputy general counsel, Bryan Hebert, to publicly defend SB 14 on the ground "that fraud exists generally in the system."[322]  Other bill proponents had no knowledge of the amount of in-person voter impersonation that had occurred in Texas.[323]

226.   During the House floor debate, Representative Harless also responded that she was "not advised" concerning the extent of in-person voter impersonation, the availability of funding for voter education, the impact of SB 14 on minority voters, and the ability of DPS to produce ID during the six-day provisional ballot cure period.[324]

---

[320] *E.g.*, PL006 at 7-8, 15, 19-20, 23-24, 27, 29-30, 35, 46, 49, 54-57 (Sen. Comm. of the Whole, Vol. 2, Tr. 44:19-45:10, 74:4-11, 92:1-14, 96:1-5, 109:4-111:23, 123:13-21, 132:8-133:14, 170:13-171:1, 211:2-23, 232:4-233:11, 240:6-241:18, Jan. 25, 2011).

[321] PL758 ¶¶ 93-96 (Burden Corr. Rep.); PL689 (Office of the Att'y Gen. press release).

[322] PL275 (Hebert Email).

[323] PL758 ¶ 96 (Burden Corr. Rep.); PL006 at 56 (Sen. Comm. of the Whole, Vol. 2, Tr. 240:6-24, Jan. 25, 2011).

[324] PL031 at 7:13-23, 26:14-15, 35:6-19, 61:16-24 (House Chambers Fl. Debate, Mar. 21, 2011).

227.     During House floor debate, Representative Anchía also asked whether any studies had been conducted to estimate the number of voters who lack approved photo ID and the percentage of these voters who are African-American or Hispanic.[325]  Although Representative Harless responded that she was "not advised," the Secretary of State's office—as discussed above—had by that time already undertaken a general analysis of voters who lacked state-issued photo ID and could easily have conducted a Spanish surname analysis of those voters.[326]

228.     When SB 14 proponent Representative Jose Aliseda delivered the closing remarks in favor of SB 14, he highlighted the voter fraud cases he had prosecuted when he served as a county prosecutor.  He failed to mention, however, that those cases had nothing to do with voter impersonation at the polls.[327]

229.     Representative Aliseda also claimed that many in the public believe noncitizen voting is "a big problem," but he failed to mention that he personally does not believe that noncitizen voting is a significant problem or that a photo ID requirement at the polls would do anything to stop the problem, even if it existed.[328]

230.     During his concluding remarks, Representative Aliseda claimed that the Select Committee for Voter Identification and Voter Fraud had received testimony from someone who had witnessed in-person voter fraud.  He later admitted under oath that in fact no such person had appeared before the committee.[329]

---

[325] PL031 at 35:6-19, 45:11-46:17 (House Chambers Fl. Debate, Mar. 21, 2011).

[326] *See supra* ¶¶ 100-101.

[327] D.D.C. Trial Tr. 12:4-18, 13:7-14:16 (Aliseda) (Day 1, P.M. Sess.).

[328] D.D.C. Trial Tr. 12:16-23; 14:7-8; 27:13-23 (Aliseda) (Day 1, P.M. Sess.).

[329] D.D.C. Trial Tr. 22:4-19 (Aliseda) (Day 1, P.M. Sess.).

231.    Representative Aliseda asserted incorrectly during his concluding remarks that individuals must have a photo ID to rent a video, cash a check, or engage in a host of other common activities.  He later acknowledged that these assertions were untrue.[330]

232.    Thus, by the time the House voted on the bill, proponents had managed to avoid answering most questions raised regarding SB 14's predictable and significant negative impact on minority voters, and the few answers they gave were false, evasive, or nonresponsive.[331]

233.    This nonresponsiveness was consistent with earlier legislative sessions.  For example, in 2007, the chair of the House Elections Committee stopped African-American Representative Marc Veasey from questioning a witness about the adverse impact of HB 218 (2007) on African Americans and removed Representative Veasey from the hearing.[332]

### F.  Shaping the Impact: Rejection of Non-Discriminatory and Ameliorative Alternatives

234.    Legislators proposed a variety of amendments that would have reduced the impact of SB 14 on poor and minority voters by expanding the forms of qualifying photo ID, waiving the cost of documents necessary to obtain state photo ID, or increasing access to driver license offices.[333] Senator Dan Patrick acknowledged that these amendments could have alleviated burdens on minority voters yet did not recall why he voted to table them.[334]  The Legislature rejected those ameliorative amendments.

---

[330] D.D.C. Trial Tr. 8:12-9:18 (Aliseda) (Day 1, P.M. Sess.).

[331] Trial Tr. 338:16-339:3 (Anchía) (Day 4).

[332] Trial Tr. 236:10-17, 237:7-16 (Veasey) (Day 1).

[333] *Infra* ¶¶ 235-244.

[334] Trial Tr. 288:19-295:6 (Patrick) (Day 7).

235.    Dr. Chandler Davidson noted that the Legislature rejected almost all ameliorative amendments, including multiple amendments that would have expanded the types of acceptable photo IDs.  The Legislature even rejected amendments that would have made it easier to obtain the limited forms of SB 14 ID—such as extending the hours of operation at DPS offices and waiving fees for documents needed to obtain ID such as birth certificates—or would have required a study of the impact of SB 14 on minority voters.[335]

236.    Senators proposed 37 amendments to SB 14, of which 28 were tabled and 9 were adopted.[336]  Representatives proposed 53 amendments to SB 14, of which 35 were tabled, 3 failed, and 15 were adopted, although some were later removed.[337]

237.    When later asked about several House amendments to SB 14—including an exemption for elderly voters, an affidavit alternative for voters without photo ID, and an amendment that would have prohibited charging for issuance of state ID acceptable for voting—Representative Harless could not explain her votes or what the amendments were supposed to accomplish.  In fact, she could not even state her position on the amendments.[338]

238.    Representative Rafael Anchía testified that SB 14 appeared to be "baked," meaning that it was "a done deal" and that virtually no ameliorative amendments would be considered.[339]

### 1.    Amendments to Facilitate Obtaining Required Identification

239.    One rejected amendment would have prohibited state agencies from charging a fee for issuance of documents used to obtain a photo ID, thereby reducing the burden of SB 14 on

---

[335] PL765 ¶ 51 (Davidson Supp. Rep.).

[336] PL013 (Sen. Journal, Jan. 26, 2011); PL765 ¶ 50 (Davidson Supp. Rep.).

[337] PL760 at 57 (Burton Rep.).  *See generally* PL031 (House Fl. Debate, Mar. 21, 2011).

[338] Harless Dep. 66:24-76:10, June 20, 2014.

[339] Trial Tr. 339:8-16 (Anchía) (Day 4).

indigent voters, who are disproportionately African-American or Hispanic.  Senator Ellis remarked that Indiana's photo ID law permits indigent voters to obtain underlying documents to obtain a photo ID for voting free of charge, and SB 14 proponents conceded that the amendment would not have interfered with the purpose of SB 14.[340]

240.    A set of rejected amendments offered by Senator Wendy Davis were designed to ensure low-income and indigent voters had access to photo ID at no additional cost.  For example, Senate Amendment 2 would have required DPS to notify all photo ID applicants that they could obtain an EIC for free, and Senate Amendment 12 would have allowed indigent applicants to receive underlying documents necessary to obtain an SB 14 photo ID at no cost.[341]  Senator Patrick, in explaining why he voted to table Amendment 12, testified that he wanted the cost of obtaining underlying documentation to be imposed on voters rather than on the State.[342]

241.    Other rejected amendments offered by Senator Davis were designed to ensure that minor or common discrepancies between an approved photo ID and the voter rolls (such as surnames with misspellings, changed after marriage, or multiple Spanish surnames) did not prevent voters from casting a regular ballot.[343]

242.    Senator Gallegos offered amendments that would have required DPS offices to be open during evenings and Saturdays and to be accessible by bus in counties with bus service, to mitigate the effects of poverty and lack of vehicle access in minority communities.  These

---

[340] Williams Dep. 264:12-24, 265:15-266:21, July 29, 2014; Trial Tr. 289:15-25 (Patrick) (Day 7); PL014 at 32 (House Chambers Fl. Debate, Tr. sec. I at 32, Jan. 26, 2011).

[341] Trial Tr. 22:18-23:24 (Davis) (Day 4).

[342] Trial Tr. 289:15-25 (Patrick) (Day 7).

[343] Trial Tr. 30:22-31:8 (Davis) (Day 4).

amendments, too, were rejected.[344]  Senator Williams conceded that this amendment would not have interfered with the purpose of SB 14.[345]

243.    Even ameliorative amendments proposed by SB 14 proponents and likely to mitigate the impact on minority voters were rejected by the Legislature.  For example, the Senate unanimously adopted an amendment offered by Senator Duncan (an SB 14 proponent) that would have counted provisional ballots cast by voters who attested that they are indigent and lack SB 14 ID, but this provision was stripped from SB 14 in the conference committee.  Senator Duncan offered this amendment because it tracked the Indiana voter ID law.[346]

244.    The House rejected amendments that would have waived all fees for documents needed to obtain a driver license or personal ID for voting purposes and reimbursed low-income Texans for travel costs related to obtaining photo ID for voting purposes.[347]

### 2.    Amendments to Expand Acceptable Identification

245.    Other tabled amendments would have added certain forms of ID permitted under Indiana or Georgia's voter ID laws to SB 14, including federal, state, and county-issued IDs.[348]

246.    One tabled amendment would have allowed students at public universities to use their student ID at the polls.[349]  African-American and Hispanic Texans possess student IDs from

---

[344] PL013 at 127, 129 (Sen. Journal, Jan. 26, 2011) (Amendments No. 26 and 29); PL014 at 62-63, 67-68 (House Chambers Fl. Debate, Tr. sec. II at 22-23, 27-28, Jan. 26, 2011).

[345] Williams Dep. 264:12-24, 275:21-276:3, 278:21-279:2, July 29, 2014.

[346] Trial Tr. 196:11-197:23 (Hebert) (Day 8); PL013 at 137 (Sen. Journal, Jan. 26, 2011); Duncan Dep. 202:17-203:19, 202:22-25, 204:3-205:1, Aug. 28, 2014; Hebert Dep. 220:4-10, 220:24-221:6, 221:21-23, June 17, 2014.

[347] PL034 at 969-70, 1009 (House Journal Mar. 23, 2011).

[348] PL013 at 123-24, 126 (Sen. Journal, Jan. 26, 2011); PL014 at 51-52, 55-56, 58-59 (House Chambers Fl. Debate, Tr. sec. II at 11-12, 15-16, 18-19, Jan. 26, 2011).

[349] Trial Tr. 177:22-178:14 (Ellis) (Day 4).

public institutions at significantly higher rates than Anglo Texans.[350]  Senator Patrick later conceded that student ID may in fact verify the identity of the holder.[351]  The director of Texas's Elections Division was also unaware of any allegations that student ID had been used to commit voter fraud.[352]

247.    In response to other amendments to expand the accepted forms of ID under SB 14, Senator Fraser raised concerns about the burden that permitting additional forms of photo ID would place on election administrators.  However, that concern did not prevent him from voting to add a concealed handgun license—a form of ID disproportionately held by Anglos—to the list of acceptable photo ID.[353]

248.    The House tabled amendments to include student photo IDs among acceptable SB 14 ID;[354] to include photo IDs issued by the federal government or an agency, institution, or political subdivision of the state (a form of ID that African-American and Hispanic Texans are more likely than Anglo Texans to possess);[355] to allow voters to sign an affidavit confirming the voter's identity and cast a regular ballot;[356]and to allow for the use of expired IDs.[357]

---

[350] *See infra* ¶ 312.

[351] Patrick Dep. 74:13-23, July 11, 2014.

[352] McGeehan Dep. 142:11-14, June 18, 2014.

[353] PL013 at 123 (Sen. Journal, Jan. 26, 2011); PL014 at 51, 56 (House Fl. Debate, Tr. sec. II at 11, 16, Jan. 26, 2011); *see also infra* ¶ 313.

[354] Trial Tr. 105:23-106:2 (Martinez Fischer) (Day 1); PL034 at 979 (House Journal Mar. 23, 2011).

[355] Trial Tr. 105:20-23, 246:16-247:4, 255:5-13 (Martinez Fischer, Veasey) (Day 1); Trial Tr. 372:11-19 (Hernandez) (Day 4); PL034 at 980-81 (House Journal Mar. 23, 2011); *see infra* ¶ 311.

[356] Trial Tr. 242:22-243:6 (Veasey) (Day 1); Trial Tr. 372:3-9 (Hernandez) (Day 4).

[357] PL034 at 976-77 (House Journal, Mar. 23, 2011).

249.     The House also rejected a proposed amendment to SB 14 to allow voters to use the temporary, non-photo driving permit that is issued when a driver license is confiscated.[358] Because that amendment was rejected, a voter whose license is confiscated and who does not possess other SB 14 ID must obtain another form of qualifying photo ID to vote during the period of confiscation.

250.     Speaker Straus later could not identify any reason for the exclusion of federal and state employee IDs from SB 14.[359]  He had no concerns with the use of federal employee IDs or student IDs issued by Texas higher educational institutions to establish identity at the polls.[360] He was also unaware of a student ID ever having been used for fraudulent purposes for voting in any election in Texas,[361] and he could not explain how the expiration date on a photo ID might be relevant to establishing the cardholder's identity.[362]

### 3.     Refusal to Engage in Prospective Impact Analysis

251.     Senator Fraser and other bill supporters did not undertake any analysis of the impact of SB 14 on minority voters to refute the contentions of bill opponents and witnesses that minority voters were less likely than Anglo voters to possess SB 14 ID; nor were they aware of any such analysis.[363]

252.     Senator Ellis asked Senator Fraser whether he would object to adding a provision in the bill requiring the Secretary of State to report annually on whether SB 14 has had a racially

---

[358] PL034 at 997 (House Journal, Mar. 23, 2011); PL035 at 26:1-11 (House Fl. Debate, Mar. 23, 2011).

[359] Straus Dep. 116:4-8, June 23, 2014; *see also infra* ¶ 311.

[360] Straus Dep. 46:10-47:4, 115:14-116:8, 116:21-117:2, June 23, 2014.

[361] Straus Dep. 117:3-6, June 23, 2014.

[362] Straus Dep. 122:6-13, June 23, 2014.

[363] Fraser Dep. 167:18-168:9, July 23, 2014; Patrick Dep. 120:10-21, July 11, 2014.

disparate impact, but Senator Fraser declined and asserted without further explanation that the U.S. Supreme Court and the U.S. Department of Justice would report on that issue.[364]

253.    The Senate also tabled an amendment that would have required the Secretary of State to produce an annual report on the impact of SB 14's photo ID requirements on minority voters, the number of eligible voters without requisite SB 14 ID, and the average wait time to obtain a photo ID at a driver license office.[365]  Senator Ellis, who offered the amendment, testified that the amendment would not have delayed the implementation of SB 14, weakened the requirements of SB 14, or had an independent fiscal impact absent a separate funding bill.[366]

254.    Representative Anchía offered an amendment directing the Secretary of State to conduct an analysis regarding the impact of SB 14 on minority voters, an amendment that "didn't even quarrel . . . with the substance of the bill" but was nonetheless tabled.[367]

### 4.    The Fiscal Note and Funding of Education and Training Efforts

255.    Although an amendment was initially adopted to provide voter education targeted at low-income and minority voters regarding SB 14's requirements, it was removed without explanation in the Conference Committee.[368]

256.    The fiscal note for the first five years for SB 14 contemplated spending just $2 million on voter education in fiscal year 2012—$500,000 to research and develop ways to inform the public

---

[364] PL006 at 46-47 (Sen. Comm. of the Whole, Vol. 2, Tr. 200:19-202:3, Jan. 25, 2011); *see also* Trial Tr. 211:4-22, 222:16-25.

[365] PL013 at 130 (Sen. Journal, Jan. 26, 2011); Trial Tr. 183:8-13 (Ellis) (Day 4).

[366] Trial Tr. 183:16-184:3 (Ellis) (Day 4).

[367] Trial Tr. 331:22-332:21 (Anchia) (Day 4).

[368] PL034 at 982 (House Journal Mar. 23, 2011); PL040 at 4, 18-19 (Conference Report).

of the new ID requirements and $1.5 million for mass media advertisements—and then $0 for the following four years.[369]

257.     Senator Uresti, Senator Davis, Senator Watson and other legislators questioned the adequacy of that funding plan.  Among other matters, they noted that the bill set no funds aside for the training of poll workers or providing free IDs for voters without the ID required to vote (who were more likely to be African-American or Hispanic).[370]

258.     During the hearing on the bill, Senator Davis questioned then-Director of Elections McGeehan as to how she would adequately train poll workers for such a significant change in election law, given that no money had been set aside for training and the Legislature was planning to cut 14.5% from the Elections Division's budget.[371]  Ms. McGeehan admitted to Senator Davis that, while only $1.5 million had been set aside for the education program, the average costs for education programs related to less consequential changes than SB 14 was $3 million.[372]

259.     Senator Gallegos emphasized that when Missouri enacted its voter ID bill, its Secretary of State concluded the State would have to spend $6 million on implementation in the first year and $4 million in the second.  Senator Gallegos calculated that because Texas' population was almost five times greater than Missouri's, the true cost of adequately implementing the voter ID bill in Texas would be much closer to $30 million in the first year.[373]

---

[369] PL046 at 1-3 (Fiscal Note for SB 14, May 11, 2011).

[370] PL006 at 9, 14-15, 23-25 (Sen. Comm. of the Whole, Tr. 49:3-52:4; 72:18-74:8; 105:5-17;112:10-114:13, Jan. 25, 2011).

[371] PL006 at 109 (Sen. Comm. of the Whole, Vol. 2, Tr. 451:11-23, Jan. 25, 2011).

[372] PL006 at 106 (Sen. Comm. of the Whole, Vol. 2, Tr. 437:5-12, Jan. 25, 2011).

[373] PL006 at 16-17 (Sen. Comm. of the Whole, Vol. 2, Tr. 79:12-82:3, Jan. 25, 2011).

260. The fiscal note also set no money aside for the numerous expenditures that it acknowledged Texas's 254 counties would incur because of SB 14. For example, according to the fiscal note, "Bexar County stated that due to limited space on current registration certificates, larger cards would be necessary resulting in additional costs of $381,256 for cards, printing and postage."[374]

261. The fiscal note also set no money aside for providing no-fee IDs, even though the fiscal note for HB 218 (2007), a voter ID law that was less restrictive and would have affected fewer voters, had estimated that more than $4 million would be necessary for no-fee IDs.[375]

## VI.   IMPACT OF THE OFFICIAL ACT: REALIZATION OF AN ANTICIPATED EFFECT

262. This Court previously found that SB 14 results in denial or abridgment of the right to vote on account of race, in violation of Section 2 of the Voting Rights Act, and the Court of Appeals affirmed that finding.[376] That ultimate results finding and the findings underlying it are undisturbed and incorporated here.

263. This Court specifically found "that approximately 4.5% of all registered voters" in Texas lack SB 14 ID and that "a disproportionate number of African-Americans and Hispanics populate that group of disenfranchised voters."[377] Those findings are undisturbed.

264. This Court also found that "SB 14 specifically burdens Texans living in poverty, who are less likely to possess qualified photo ID, are less able to get it, and may not otherwise need it"; that "a disproportionate number of Texans living in poverty are African-Americans and

---

[374] PL046 at 2 (Fiscal Note for SB 14).

[375] PL091 at 1-2 (Fiscal Note for HB 218, Apr. 29, 2007).

[376] *See Veasey*, 71 F. Supp. 3d at 694-98 (S.D. Tex. 2014).

[377] *Id.* at 659.

Hispanics"; and that "African-Americans and Hispanics are more likely than Anglos to be living in poverty because they continue to bear the socioeconomic effects caused by decades of racial discrimination."[378]  Those findings are also undisturbed.

265.    Finally, this Court then found that "SB 14's voter ID requirements interact with social and historical conditions in Texas to cause an inequality in the electoral opportunities enjoyed by African–Americans and Hispanic voters as compared to Anglo voters."[379]  That finding is undisturbed.

266.    In the course of reaching those findings, this Court credited the testimony and analysis of Dr. Steven Ansolabehere, Dr. Matthew Barreto, Dr. Coleman Bazelon, Dr. Barry Burden, Dr. Daniel Chatman, Dr. Jane Henrici, Kevin Jewell, Dr. Michael Herron, and Dr. Gabriel Sanchez, among others.[380]  Those findings are undisturbed.

267.    This discriminatory impact is the direct and expected result that the statutory provisions of SB 14 were designed, at least in part, to achieve.

## A.  Voters Impacted By SB 14

### 1.  Voters Who Lack SB 14 ID and the Racial Disparity

268.    Approximately 608,470 registered voters in Texas do not possess SB 14 ID, 4.5% of all registered voters in the State.[381]  This finding is based on a database matching analysis

---

[378] *Id.* at 664.

[379] *Id.* at 698.

[380] *See id.* at 638, 659-60, 662-63, 665, 672, 705 n.570.

[381] PL752R at ¶ 7 (Ansolabehere Corr. Supp. Rep.).  Dr. Ansolabehere testified at trial that 786,727 Texas voters lack SB 14 ID.  Trial Tr. 144:9-13 (Ansolabehere) (Day 1); *see also* PL752 at ¶ 7 (Ansolabehere Supp. Rep.).  A week after Dr. Ansolabehere testified, DPS served amended answers to written deposition questions, revising whether certain records indicated that an individual had been issued ID.  Trial Tr. 7:3-24, 10:23-11:5 (Day 6).  Dr. Ansolabehere's September 16, 2014 Report corrected certain figures and confirmed that his conclusions remained the same.  PL752R ¶ 4 (Ansolabehere Corr. Supp. Rep.).

performed by Dr. Ansolabehere, who compared Texas's voter registration database to the Texas

DPS records, various federal identification databases, and the relevant federal disability

databases.[382]  Algorithmic database matching is accepted and "very widely used" in fields

including political science, public health, sociology, and social sciences, and even the State's

expert admitted that algorithmic database matching is a well-accepted methodology among

political scientists.[383]

269.    Ecological regression analysis, performed by Dr. Ansolabehere, found that an estimated

5.9% of Hispanic registered voters and 8.1% of African-American registered voters lack SB 14

ID, whereas only 2.0% of Anglo registered voters in Texas lack SB 14 ID.[384]  These disparities

are statistically significant and highly unlikely to have arisen by chance.[385]

270.    Additional forms of statistical analysis confirm this racial disparity.  Looking only at all

voters who reside in racially homogeneous areas (defined as Census block groups at least 80%

Anglo, Hispanic, or African-American), approximately 11.5% registered voters in homogenous

African-American neighborhoods lack SB 14 ID and 8.6% of registered voters in homogenous

Hispanic neighborhoods lack SB 14, whereas only 3.1% of registered voters in homogenous

Anglo neighborhoods lack SB 14 ID.[386]  Based on individualized racial estimates provided by

Catalist LLC, an election data utility company, approximately 7.5% of African-American

registered voters, 5.7% of Hispanic registered voters, and 3.6% of Anglo registered voters lack

---

[382] Trial Tr. 129:11-20 (Ansolabehere) (Day 1); PL752R ¶ 15 (Ansolabehere Corr. Supp. Rep.).

[383] Trial Tr. 131:20-132:1; (Ansolabehere) (Day 1); Trial Tr. 175:23-176:8 (Hood) (Day 7).

[384] PL752R ¶¶ 67, 68, tbl. VI.1 (Ansolabehere Corr. Supp. Rep.).

[385] PL752R ¶ 70 (Ansolabehere Corr. Supp. Rep.).

[386] PL1100R (Racial Disparity Comparative Chart); PL752R ¶ 69, tbl. VI.1 (Ansolabehere Corr. Supp. Rep.).

SB 14 ID.[387]  Finally, using Texas's own Spanish surname identifier, voters with a Spanish

surname are 41% more likely to lack SB 14 ID than those who do not have a Spanish surname

(including Anglos, African Americans, and other voters).[388]  These disparities are statistically

significant, and the consistent pattern confirms the validity and reliability of the racial disparity

estimates.[389]

271.    Dr. Ansolabehere's estimates of racial disparities among registered voters who lack SB

14 ID are further confirmed by the analyses of Dr. Herron, Dr. Bazelon, and Dr. Webster.[390]

272.    Approximately 534,512 voters, or 4.0% of registered voters in Texas, neither possess SB

14 ID nor qualify to apply for a disability exemption.[391]  Applying ecological regression analysis

to this population, an estimated 6.4% of African-American registered voters, 5.3% of Hispanic

registered voters, and 1.8% of Anglo registered voters lack SB 14 ID and do not qualify to apply

for a disability exemption.[392]  Therefore, even if every voter who is eligible to apply for a

disability exemption from the ID requirements of SB 14 were to do so, the racial disparity in

possession of SB 14 ID needed to cast a regular ballot at the polls would persist.

273.    Approximately 429,769 registered voters in Texas, or 3.2% of registered voters, do not

possess an acceptable SB 14 ID and are under the age of 65 (and therefore ineligible to vote by

---

[387] PL752R ¶¶ 71-73, tbl. VI.2 (Ansolabehere Corr. Supp. Rep.); PL1100R (racial disparity chart)

[388] *See* PL694 at 10 (Tex. Leg. Council data for 2011 redistricting); PL752R ¶¶ 109-10, tbl. VII.3 (Ansolabehere Corr. Supp. Rep.); Trial Tr. 157:2-15 (Ansolabehere) (Day 1).

[389] Trial Tr. 135:16-21 (Ansolabehere) (Day 1); PL752R ¶ 80 (Ansolabehere Corr. Supp. Rep.); Trial Tr. 151:1-15 (Ansolabehere) (Day 1).

[390] Trial Tr. 256:19-260:13 (Webster) (Day 4); Trial Tr. 95:23-96:14 (Bazelon) (Day 6); Trial Tr. 13:24-14:9 (Herron) (Day 2); PL775R ¶¶ 66-74 & tbl. 9-10 (Webster Supp. Rep.); PL755 ¶¶ 29-33, tbl 1(Bazelon Rep.); PL769 at 7-9, 55 (Herron Supp. Rep.).

[391] PL752R ¶ 63, tbl V.4.B & VI.3.B (Ansolabehere Corr. Supp. Rep.).

[392] PL752R ¶ 25, tbl. VI.3.A (Ansolabehere Corr. Supp. Rep.).

mail on the basis of age).[393]  Applying ecological regression analysis to this population, an estimated 6.4% of African-American registered voters, 4.8% of Hispanic registered voters, and only 1.2% of Anglo registered voters lack SB 14 ID and are under the age of 65.[394]  Therefore, even if every voter who is eligible to vote by mail on account of age did so—notwithstanding the burdens of absentee voting in Texas—the racial disparity in possession of SB 14 ID needed to cast a regular ballot at the polls would persist.[395]

274.    Finally, approximately 376,985 registered voters in Texas, or 2.8% of registered voters, do not possess an acceptable SB 14 ID, do not qualify to apply for a disability exemption, and are under the age of 65.[396]  Applying ecological regression analysis to this population, it includes an estimated 5.1% of African-American registered voters, 4.3% of Hispanic registered voters, and just 1.1% of Anglo registered voters.[397]  Therefore, although almost 99% of Anglo voters either possess SB 14 ID or are eligible to cast a ballot without presenting SB 14 ID (if they overcome administrative impediments to doing so), the share of African-American voters and Hispanic voters who must obtain SB 14 ID to cast a ballot that will be counted is between three and four times as high.

275.    Dr. Barreto and Dr. Sanchez separately conducted a scientific telephone survey of voting-age citizens in Texas, the approximate set of eligible voters, which further confirmed the discriminatory impact of SB 14.  Dr. Barreto and Dr. Sanchez found that 7.2% of eligible voters

---

[393] Trial Tr. 159:7-16 (Ansolabehere) (Day 1); PL752R tbl. VI.3.B (Ansolabehere Corr. Supp. Rep.).

[394] PL752R tbl. VI.3.A (Ansolabehere Corr. Supp. Rep.).

[395] Trial Tr. 159:20-160:1 (Ansolabehere) (Day 1); PL752R ¶ 270, tbl. VI.B (Ansolabehere Corr. Supp. Rep.); *see also supra* ¶¶ 71-72.

[396] PL752R tbl. VI.3.B (Ansolabehere Corr. Supp. Rep.).

[397] PL752R tbl. VI.3.A (Ansolabehere Corr. Supp. Rep.).

in Texas do not possess SB 14 ID.  Extrapolating to the entirety of the State, they estimated that 1.2 million eligible voters in Texas do not possess SB 14 ID.[398]

276.    According to the survey, 8.4% of African-American eligible voters, 11.4% of Hispanic eligible voters, and 4.7% of Anglo eligible voters do not possess SB 14 ID.  Extrapolating to the entirety of the State, Dr. Barreto and Dr. Sanchez estimated that approximately 555,000 Hispanic and 180,000 African-American eligible voters in Texas lack SB 14 ID.[399]

277.    Although the survey focused on eligible voters, it is also possible to analyze the subset of respondents who self-reported to be registered to vote.  According to the survey, SB 14 also has a greater impact on Hispanic and African-American registered voters than on Anglo registered voters.  The survey found that approximately 6.8% of Hispanic registered voters lack SB 14 ID and that 4.9% of African-American registered voters lack SB 14 ID, in comparison to 2.1% of Anglo registered voters.[400]

### 2.  Socioeconomic Characteristics of Voters Who Lack SB 14 ID

278.    As explained above, Hispanic and African-American registered voters disproportionately lack SB 14 ID.[401]  Hispanic and African-American Texans also bear the effects of discrimination in education, employment, and health, which results in greater poverty rates, lower median incomes, greater rates of unemployment, reduced rates of educational attainment, poor health outcomes, and lack of access to motor vehicles.[402]  As explained below, these disparities interact

---

[398] PL753 at 1, 17 (Barreto/Sanchez Rep.); Trial Tr. 29:17-20 (Barreto) (Day 3).

[399] PL753 at 18 (Barreto/Sanchez Rep.); Trial Tr. 56:22-25, 60:17-21 (Barreto) (Day 3).

[400] PL753 at 19 (Barreto/Sanchez Rep.); Trial Tr. 58:6-13 (Barreto) (Day 3).

[401] *Supra* ¶¶ 259-277.

[402] *Supra* ¶¶ 29-42; *infra* ¶¶ 279-286.

with SB 14 to produce a discriminatory impact on the voting rights of Hispanic and African-American citizens.

279.    Texans who lack SB 14 also disproportionately experience poverty and low socioeconomic status.  For example, 44.7% of eligible voters in Texas who lack SB 14 ID earn less than $20,000 annually, compared to only 12.8% of eligible voters who possess SB 14 ID.[403]

280.    Even within the set of eligible voters in Texas who lack SB 14 ID, 61% of African-American eligible voters and 51% of Hispanic eligible voters earn less than $20,000 annually, compared to only 23% of Anglo eligible voters who lack SB 14 ID.[404]  As a result, African Americans and Hispanics are substantially overrepresented in the set of eligible voters who lack SB 14 ID and earn less than $20,000 per year: 41% are African-American, 40% are Latino, and only 16% are Anglo.[405]

281.    Geographic areas in which a disproportionate percentage of registered voters lack SB 14 ID also have a higher poverty rate and a lower rate of access to a motor vehicle, which leads to impediments to obtaining the needed ID.[406]

282.    Registered voters without SB 14 in Houston, San Antonio, and Dallas are also disproportionately concentrated in areas with low rates of household access to a motor vehicle. These areas also have overwhelmingly minority populations.[407]

---

[403] PL753 at 21 (Barreto/Sanchez Rep.).

[404] PL753 at 21 (Barreto/Sanchez Rep.).

[405] PL753 at 22 (Barreto/Sanchez Rep.).

[406] Trial Tr. 281:12-19 (Webster) (Day 4); PL775R ¶¶ 9-14, 71-72 & tbl.1, 10 (Webster Supp. Rep.).

[407] PL775R ¶¶ 38, 50, 60, 67, 71-72 & tbl.9-10 (Webster Supp. Rep.); Trial Tr. 258:5-22, 267:11-16, 271:20-272:3, 275:18-276:3, 281:12-19 (Webster) (Day 4).

283.    Social service providers and a local elected official testified that a significant number of low-income individuals reside in Texas without possessing SB 14 ID or the documents needed to obtain SB 14 IDs.[408]  Those low-income individuals are disproportionately African-American or Hispanic.[409]

284.    Several witnesses explained that they have lived for years without SB 14 ID, and some testified that they lack the underlying documentation needed to apply for SB 14 ID.[410]

285.    Many low-income Texans do not have access to credit or to formal banking accounts and therefore do not require SB 14 ID for that purpose.  Check cashing through local businesses and informal loans often do not require photo ID.[411]

286.    Witnesses also revealed the relationship between socioeconomic conditions and lack of SB 14 ID.[412]  For example, Ramona Bingham went without a Texas driver license for roughly four years because of outstanding tickets and insurance fees that she could not afford to pay.[413]

---

[408] Trial Tr. 361:4-24, 363:8-364:1, 376:4-14 (Guzman) (Day 3); Trial Tr. 286:12-287:17 (White) (Day 2); H. Davis Dep. 52:3-21, 58:18-60:13, 62:3-65:12, 73:3-12, July 16, 2014; Buchanan Dep. 39:2-40:2, 49:21-52:3, 57:18-59:25, 118:12-21, July 15, 2014.

[409] Trial Tr. 358:11-21 (Guzman) (Day 3); Trial Tr. 270:8-13; 284:9-285:11 (White) (Day 2); Buchanan Dep. 92:9-93:4, 121:6-21.

[410] Trial Tr. 105:25-107:4, 108:21-23 (Mendez) (Day 2); Trial Tr. 21:12-22:5 (H. Davis) (Day 4); Trial Tr. 166:3-18, 169:1-3, 169:16-170:10, 171:16-22, 174:9-17 (Espinoza) (Day 6); E. Martinez Dep. 586-18, 58:24-59:3, 59:16-18, 60:4-25, 62:17-22, Aug. 5, 2014; H. Sanchez Dep. 8:17-9:21, 10:6-20, Aug. 6, 2014; Eagleton Dep. 18:6-21:5, 27:10-28:13, 45:16-45:14, 88:22-89:6, 106:5-19, 121:22-123:14, July 11, 2014; PL1095 (Eagleton Video Excerpts); Holmes Dep. 9:5-12:4, 18:13-22, 34:10-35:15, July 10, 2014; PL1094 (Holmes Video Excerpts); Bingham Dep. 8:8-11:18, 12:1-6, 14:14-16:16, July 29, 2014; PL1091 (Bingham Video Excerpts); Taylor Dep. 18:8-12, July 18, 2014; Estrada Dep. 11:16-19, June 26, 2014; Mar. Lara Dep. 32:11-13, May 30, 2014; H. Davis Dep. 63:4-64:2.

[411] PL767 ¶ 37 (Henrici Rep.); Trial Tr. 188:11-24 (Henrici) (Day 3).

[412] Eagleton Dep. 18:6-21:5; PL1095 (Eagleton Video Excerpts); Bingham Dep. 16:10-16; PL1091 (Bingham Video Excerpts); Sanchez Dep. 8:13-10:20; Mendez Dep. 16:3-16, June 20, 2014.

[413] Bingham Dep. 14:6-16:16; PL1091 (Bingham Video Excerpts).

Similarly, Lionel Estrada has been unable to renew his expired driver license because he has been unable to pay outstanding surcharges.[414]

### B.  The Discriminatory Impact Results from Legislative Decisions

287.    A voter who does not possess SB 14 ID must obtain it to cast a regular ballot at the polls or to validate a provisional ballot cast due to lack of required ID.  However, obtaining SB 14 ID is burdensome due to lack of voter education, documentation requirements, eligibility limitations, travel burdens, potential loss of income, and limited business hours at offices that issue SB 14 ID, and these impediments directly result from the legislative design of SB 14. These general impediments establish the material burden of SB 14 on the disproportionately Hispanic and African-American registered voters who lack required ID.  They also increase the degree to which the impact is discriminatory, due to the greater likelihood that Hispanic and African-American Texans lack resources needed to overcome these impediments.[415]

288.    Under the widely accepted "calculus of voting" approach to analyzing and explaining voter participation, increasing the costs—both monetary and non-monetary—associated with voting reduces the likelihood that voters will participate in an election, particularly those who lack the resources to bear such costs.[416]  Because of socioeconomic disparities across racial groups, minority voters are particularly unlikely to overcome the impediment posed by SB 14.[417]

---

[414] Estrada Dep. 69:2-6; Trial Tr. 134:24-135:20 (Estrada) (Day 3).

[415] *Infra* ¶¶ 288-305.

[416] PL758 ¶¶ 7-12 (Burden Corr. Rep.); PL759 ¶¶ 5-12 (Burden Reply Rep.); PL760 at 48-49 (Burton Rep.); Trial Tr. 295:25-299:14, 331:8-332:9 (Burden) (Day 3).

[417] Trial Tr. 295:10-17, 299:15-22 (Burden) (Day 3); PL760 at 48-49 (Burton Rep.).

289.   Obtaining SB 14 ID imposes substantial difficulties and burdens, including potential travel to multiple government offices,[418] challenges paying for ID or even obtaining the necessary supporting documents,[419] wait times at DPS offices,[420] lost income from having to take time off from work,[421] and specific costs associated with maintaining a driver license, including insurance, tickets, fines, and fees.[422]

290.   A quantitative analysis of the costs that SB 14 imposes on several individual plaintiffs illustrates the total cost associated with SB 14, particularly as these costs are imposed on individuals with low socioeconomic status.[423]   Because these low-income plaintiffs have low total and discretionary income—and because they face high credit costs and lack of emergency savings—the expected out-of-pocket cost represents a large portion of their available income, and they lack ready access to credit or the emergency funds that could cover those costs.[424]

291.   The process of obtaining photo ID and the required underlying documents (such as a birth certificate) is sufficiently complicated, expensive, and labor-intensive that many low-income individuals cannot obtain ID without assistance.[425]

---

[418] Holmes Dep. 8:7-10, 27:24-33:13.

[419] Trial Tr. 129:12-24 (Mora) (Day 2); Bingham Dep. 6:17-19, 37:7-38:1; PL1091 (Bingham Video Excerpts); Holmes Dep. 8:7-10, 35:16-36:7; PL1094 (Holmes Video Excerpts); Buchanan Dep. 58:5-17.

[420] Trial Tr. 101:8-102:15 (Mendez) (Day 2).

[421] Buchanan Dep.122:25-123:2.

[422] Bingham Dep. 14:6-16:16; PL1091 (Bingham Video Excerpts).

[423] Trial Tr. 31:15-32:11 (Jewell) (Day 5); *see* PL770 (Jewell Rep.); *Veasey I*, 71 F. Supp. 3d at 627, 705 n. 570 (crediting Mr. Jewell's "uncontroverted" expert report).

[424] Trial Tr. 48:1-49:19, 50:2-24 63:5-24, 74:16-75:3 (Jewell) (Day 5); PL770 ¶¶ 7-10 (Jewell Rep.); PL1157 at 17 (Jewell demonstrative).

[425] Trial Tr. 278:21-279:16, 281:3-282:23 (White) (Day 2).

292.    In San Antonio, Christian Assistance Ministry, a local social service provider, faces demand for assistance in obtaining photo ID that exceeds available resources.  They see about 10,000 individuals annually seeking assistance obtaining ID but must turn away about half and only successfully assist about a quarter.[426]  The typical cost to assist a client through the entire process of obtaining a photo ID is approximately $100, which includes direct financial assistance to cover out-of-pocket expenses.[427]

293.    The Stewpot, a Dallas-based non-profit resource center established to help alleviate hunger and homelessness, each year serves 4,000 to 5,000 individuals experiencing homelessness, most of whom are African-American.  The typical cost associated with obtaining an SB 14 ID is the equivalent to the cost of housing for two weeks at a shelter.[428]  The Stewpot must also turn away individuals seeking assistance in obtaining identifying documents—some of whom line up as early as 5:00 a.m.[429]

294.    Low-income minorities in Texas disproportionately face some combination of the following impediments to obtaining photo ID: loss of wages, lack of access to transportation, health problems, and lack of accurate underlying documents.[430]

295.    Low-income Texans face greater difficulty obtaining photo ID because they cannot readily free up time by sacrificing paid work or by paying to outsource responsibilities.[431]

---

[426] Trial Tr. 276:11-279:4, 280:25-281:2 (White) (Day 2).

[427] Trial Tr. 278:6-26, 279:25-280:11 (White) (Day 2).

[428] Trial Tr. 113:13-21, 115:9-11, 118:11-119:3 (Mora) (Day 2).

[429] Trial Tr. 131:3-13 (Mora) (Day 2).

[430] Trial Tr. 185:10-186:3; 190:16-191:20 (Henrici) (Day 3); PL767 ¶¶ 58-99 (Henrici Rep.).

[431] PL761 ¶ 16 (Chatman Corr. Rep.); PL767 ¶ 48 (Henrici Rep.).

296.    Poorer Texans also face significant difficulty obtaining photo ID if they do not already have one. [432]  Because Hispanics and African Americans are disproportionately represented among Texans living in poverty, Hispanics and African Americans who do not already possess an acceptable and current photo ID face greater burdens in obtaining SB 14 ID than Anglo voters.[433]

297.    Texans who live in poverty often do not have reliable incomes, and most job opportunities available to poorer Texans pay relatively low hourly wages, have few if any accompanying benefits, and are part-time or temporary.  Thus, many poorer Texans must work multiple jobs (with no paid leave) and are subject to unreliable schedules and income. [434]  These circumstances make planning for appointments—such as applying in person for SB 14 ID—problematic, particularly during regular business hours.[435]  Most job opportunities for poorer Texans do not include paid leave.  Therefore, taking time off of work to obtain ID during business hours is also likely to result in lost income.[436]

298.    Many low-income Texans do not own a vehicle, own a vehicle that does not run reliably, or cannot afford to maintain and insure their vehicle.  Some low-income Texans must also forgo vehicle ownership to qualify for means-tested benefits.[437]

---

[432] Trial Tr. 180:2-23 (Henrici) (Day 3); PL767 ¶ 32 (Henrici Rep.).

[433] Trial Tr. 185:10-16 (Henrici) (Day 3); PL767 ¶¶ 32, 60 (Henrici Rep.).

[434] Trial Tr. 185:22-186:16 (Henrici) (Day 3); PL767 ¶ 35-36 (Henrici Rep.).

[435] Trial Tr. 186:17-187:1 (Henrici) (Day 3); Trial Tr. 52:4-20 (Burton) (Day 6); PL767 ¶ 36 (Henrici Rep.); *see also* PL760 at 45 (Burton Rep.).

[436] Trial Tr. 186:17-187:1 (Henrici) (Day 3); PL767 ¶ 38 (Henrici Rep.).

[437] Trial Tr. 188:11-189:8 (Henrici) (Day 3); PL767 ¶¶ 41-42, 44 (Henrici Rep.).

299.     Many low-income Texans must travel on foot or rely on limited mass transit options, leaving them both less likely to need a driver license and more likely to face mobility challenges when seeking to apply in person for an SB 14 ID.[438]

300.     Poor Texans may not always have the option to rely on a car owner for a ride to a location that accepts EIC applications.  In urban areas, poorer families making use of housing assistance have been scattered across Texas cities; in rural and small-town Texas, geographic distances can pose a substantial obstacle.  Many low-income Hispanic and African-American families experience frequent and abrupt relocation when they are unable to afford rent or utility payments, cutting them off from individuals who might otherwise provide assistance.[439]

301.     Hispanic and African-American Texans, particularly those who are low-income, experience higher levels of health impairment than Anglo Texans, although many Texans with disabilities lack federal disability status due to the onerous process to obtain it.  Hispanic and African-American Texans also disproportionately struggle with managing family members' disabilities.  These health burdens often restrict low-income minority Texans' ability to obtain and maintain documents, even ones that relate to government benefits.[440]

302.     In some public discourse, poverty and public assistance have become associated with Hispanic and African-American communities.  Awareness of stigma and prejudice discourages low-income minority individuals in Texas from seeking out documentation or replacing documents that have been lost, destroyed, or stolen.[441]

---

[438] Trial Tr. 188:25-189:4 (Henrici) (Day 3); PL767 ¶ 41 (Henrici Rep.).

[439] PL767 ¶ 47 (Henrici Rep.).

[440] Trial Tr. 187:15-188:10 (Henrici) (Day 3); PL767 ¶ 51 (Henrici Rep.); *see also* Bingham Dep. 12:11-13:12; PL1091 (Bingham Video Excerpts); Holmes Dep. 11:20-12:2; PL1094 (Holmes Video Excerpts).

[441] Trial Tr. 189:20-190:15 (Henrici) (Day 3); PL767 ¶ 53 (Henrici Rep.).

303.    Low-income minorities are also more likely than other Texans to struggle with the need to care for their families, stay employed, afford transportation, and deal with health problems. These factors inhibit their ability to obtain SB 14 ID, even without a direct fee.[442]

304.    Individuals experiencing homelessness and extreme poverty, a disproportionate number of whom are minorities, face particularly onerous burdens in obtaining photo ID and required underlying documentation for many reasons, including the need to focus on basic needs.[443]  Most lack the basic requirements to navigate the application process on their own, such as internet access, telephone service, financial resources, and a permanent mailing address.[444]

305.    In sum, SB 14 eliminates the ability of a disproportionate number of Hispanic and African-American voters to cast a ballot that will be counted unless they obtain required ID. However, SB 14 ID is burdensome to obtain, particularly for voters who experience socioeconomic disadvantages, who are disproportionately Hispanic or African-American. Therefore, SB 14 disproportionately diminishes the opportunity for Hispanic and African-American voters in Texas to cast a ballot that will be counted.

### 1.    Limits on Existing Forms of Identification

306.    In crafting SB 14, the Texas Legislature chose existing forms of ID that were likely to— and in fact did—disproportionately burden low-income and minority voters.

307.    Texas driver licenses, personal ID cards, and concealed handgun licenses can be difficult to obtain and to renew.  In each case, first-time applicants must travel to a DPS office to apply

---

[442] Trial Tr. 191:4-20 (Henrici) (Day 3); PL767 ¶ 56 (Henrici Rep.).

[443] Trial Tr. 116:13-117:2, 128:14-24, 130:2-12 (Mora) (Day 2); Trial Tr.  271:5-16, 271:23-7, 278:24-279:4, 282:1-283:9 (White) (Day 2).

[444] Trial Tr. 117:3-120:24 (Mora) (Day 2);  Trial Tr. 277:6-279:4, 281:3-282:23 (White) (Day 2).

for an ID, pay a fee, provide underlying documents that are not free to obtain, and overcome a variety of other procedural and substantive barriers.[445]

308.   DPS charges at least $24 to first-time applicants for a non-commercial Texas driver license, at least $15 to first time applicants for a Texas personal ID card under age 60, and at least $6 to first time applicants for a Texas personal ID card who are 60 or older.[446]  DPS does not waive driver license or personal ID card fees due to indigence.[447]

309.   Texas's program of applying surcharges to traffic offenses and suspension of licenses for unpaid surcharges further exacerbates poor and minority voters' lack of access to SB 14 ID. Between 1.2 and 1.3 million Texas drivers have had their driver license suspended under this program, and the ZIP codes with the greatest concentration of outstanding surcharges are predominantly in minority communities.  The Legislature was aware of the significant impact of surcharges on access to DPS-issued ID during consideration of SB 14.[448]

310.   On the other hand, the Legislature chose not to include several common and secure forms of ID that many Texans—disproportionately African-American and Latino Texans—already possess.[449]

311.   For example, the Legislature's choice not to allow voters to present government employee ID sharpened the racial impact of SB 14.  There are approximately 1.5 million government employees in the State of Texas, and they are disproportionally African-American

---

[445] *Supra* ¶¶ 211-212, 244, *infra* ¶¶ 308, 372-379, 385-391.

[446] Gipson Dep. 11:15-12:13, 55:13-56:5; PL443 (Application for DL/ID); PL444 (DL Division Fees Webpage).

[447] Gipson Dep. 11:22-25.

[448] Trial Tr. 89:9-95:16 (Lichtman) (Day 4).

[449] *See infra* ¶¶ 311-312.

and Latino, compared to the general population.[450]  The disparity holds among registered voters: 16.2% of Black registered voters and 12.0% of Latino registered voters are government employees, while only 6.3% of white registered voters are government employees.[451]

312.    The choice not to accept student IDs also sharpened the racial impact.  African Americans and Latinos are overrepresented among students in Texas, as compared to Anglos.[452] For example, public university students make up 7.9% of the Black voting-age population and 8.6% of the Latino voting-age population in Texas but only 5.9% of the Anglo voting-age population.  Moreover, 4.7% of African-American registered voters and 4.6% of Hispanic registered voters are public university students, as compared to only 2.2% of Anglo registered voters.[453]  A majority of students in the Texas public primary and secondary education system are Latino, so this disparity is likely to increase as those students reach voting age.[454]

313.    On the other hand, the Legislature added concealed handgun licenses to SB 14 as an acceptable form of ID.  The State does not differentiate between Hispanics and Anglos in the data it publishes on concealed handgun license holders, but that data shows that African Americans make up only 5.9% of license to carry holders, whereas they make up 11.6% of the voting-age population of Texas.[455]  Dr. Ansolabehere's analysis confirms that approximately

---

[450] Trial Tr. 62:9-17, 143:18-145:6 (Lichtman) (Day 4).

[451] PL772 at 27-29 (Lichtman Rep.); Trial Tr. 60:18-62:17 (Lichtman) (Day 4).

[452] Trial Tr. 62:18-63:13; 126:24-127:4 (Lichtman) (Day 4); PL772 at 29-32 (Lichtman Rep.).

[453] PL772 at 29-32 (Lichtman Rep.).

[454] Trial Tr. 97:11-25 (Martinez Fischer) (Day 1); Trial Tr. 64:5-18 (Lichtman) (Day 4).

[455] Trial Tr. 59:15-60:17; 130:18-22 (Lichtman) (Day 4); PL772 at 25 (Lichtman Rep.).

7.1% of Anglo registered voters possess a license to carry, whereas only 2.4% of Hispanic and 3.3% of African-American registered voters have been issued a license to carry.[456]

314.    The three forms of federal ID that voters may use to establish identity under SB 14—a U.S. military ID card that contains the person's photograph, a U.S. citizenship certificate that contains the person's photograph, or a U.S. passport—are either expensive or unavailable to most voters.[457]

315.    The Office of the Texas Secretary of State interprets SB 14 to include four types of military photo ID cards: Department of Defense Common Access Cards, Uniformed Services ID Cards, Department of Defense Civilian Retiree Cards, and Veterans Affairs ID Cards.[458]

316.    Common Access Cards are available only to active-duty uniformed service personnel, Selected Reserve, Defense Department civilian employees, and eligible contractor personnel.[459] Uniformed Services ID cards are only available to military members and retirees and their family members.[460]  Department of Defense Civilian Retiree Cards are available only to civilian employees retired from a Defense Department Service or Component.[461]  Only 4.7% of registered voters in Texas have been issued one of these three forms of military identification.[462]

---

[456] PL751 tbl. V.2 (Ansolabehere Corr. Rep.).

[457] Tex. Elec. Code § 63.0101(2)-(4).

[458] PL466 at 10 (Acceptable Forms of Identification PowerPoint).

[459] PL889 at 1 (Common Access Card).

[460] PL894 (Uniformed Services ID Card).

[461] PL894 at 3 (Uniformed Services ID Card).

[462] PL751 tbl. V.2 (Ansolabehere Corr. Rep.).

317.    Veterans Identification Cards and Veterans Health Identification Cards are issued only to veterans who are enrolled in the Veterans Affairs Health System.[463]  Only 2.2% of registered voters in Texas have been issued a Veteran Identification Card or Veterans Health Identification Card.[464]

318.    Approximately 8.6% of the voting-age population (VAP) in Texas is made up of military veterans.  This includes 12.0% of Anglos of voting age but only 4.1% of Hispanics of voting age and 9.7% of African Americans of voting age.[465]

319.    Citizenship certificates issued by the U.S. Citizenship and Immigration Services are only available to individuals who were born abroad but are U.S. citizens at birth through their parents, or who became citizens after birth but before the age of 18.[466]  Certificates of naturalization issued by the U.S. Citizenship and Immigration Services are likewise available only to naturalized U.S. citizens.[467]  Only 5.4% of registered Texas voters have been issued either document.[468]  The fee for obtaining a replacement copy of either document is $345.[469]

320.    A U.S. passport costs $135 to obtain, and a U.S. passport card costs $55 to obtain.[470]  An application for a passport or passport card must be submitted in person to an acceptance agent authorized by the U.S. Department of State.[471]

---

[463] PL895 at 1 (Veterans Health Identification Card).

[464] PL751 tbl. V.2; Ex. B (Ansolabehere Corr. Rep.).

[465] PL454 ¶ 19 (U.S. Req. for Judicial Notice).

[466] PL892 at 1 (N-600 Frequently Asked Questions).

[467] PL890 (USCIS N-400).

[468] PL752R ¶ 61, tbl. V.2 (Ansolabehere Corr. Supp. Rep.).

[469] Trial Tr. 367:9-17 (Hernandez) (Day 4); PL891 (USCIS N-565).

[470] PL893 (Passport Fees).

[471] PL882 (Form DS-11, Application for a U.S. Passport).

321.    An application for a passport or passport card must include documentary proof of citizenship or status as a non-citizen national, which in most cases must be a previous U.S. passport or certified birth certificate.  If no birth record exists, an applicant may submit alternative documentation such as hospital or baptismal records.[472]

322.    An applicant for a passport or passport card must also provide documentary proof of identity or be accompanied by a U.S. citizen, non-citizen national, or lawful permanent resident who is able to serve as an identifying witness.[473]

### 2.    Failure to Fund Voter Education

323.    The legislature's failure to pair SB 14 with funding for voter education predictably resulted in the disenfranchisement of voters who did not understand the law's provisions.[474]

324.    SB 14 mandates that the Texas Secretary of State must "conduct a statewide effort to educate voters regarding . . . identification requirements," but does not require the Texas Secretary of State to educate voters regarding what the newly-created EIC is—let alone that it is available without paying a fee to DPS.  Similarly, SB 14 requires poll worker training regarding "the acceptance and handling of the identification presented by a voter" but does not require training to inform voters who lack SB 14 ID regarding the availability of EICs.[475]

---

[472] *Id.*

[473] *Id.*

[474] *Infra* ¶¶ 324-335.

[475] Tex. Elec. Code §§ 15.005(a), 31.012, 32.111(c), 32.114(a); *see also* PL001 (SB 14).

325.    Many voters who lack SB 14 ID have never heard of an EIC.[476]  Even individuals who work for organizations that assist Texans in obtaining photo IDs and other necessary underlying documentation had never heard of an EIC before involvement in this lawsuit.[477]

326.    Eligible Texas voters without a high school degree are less likely than voters with greater educational attainment to have heard of an EIC.[478]

327.    Hispanic and African-American Texans are approximately twice as likely to believe that they have SB 14 ID when they do not: 9.1% of Hispanics and 7.0% of African Americans compared to 3.8% of Anglos.[479]

328.    Education efforts concerning EICs are not targeted to reach those minority voters who are likely to need them or to reach the elected officials and candidates who expend resources to ensure registered voters are able to cast ballots.[480]

329.    On average, minority voters have less education and fewer financial resources than Anglo voters, and are thus less likely to understand voting requirements under SB 14, including the complex process to obtain an EIC.[481]

330.    Individual voters who do not possess SB 14 ID have experienced difficulty in understanding the requirements of SB 14 and complying with those requirements.[482]  For

---

[476] Trial Tr. 172:10-14 (Espinoza) (Day 6); Washington Dep. 107:16-109:1, July 23, 2014; PL1093 (Washington Video Excerpts); Eagleton Dep. 28:6-29:3; PL1095 (Eagleton Video Excerpts); Holmes Dep. 19:3-5; PL1094 (Holmes Video Excerpts); Espinoza Dep. 35:4-6; Margarito Lara Dep. 46:17-22, 101:19-21; PL1090 (Bates Video 13:10-13:44); Bates Dep. 19:17-20:12.

[477] Buchanan Dep. 66:1-67:19, 69:9-70:25; Trial Tr. 283:18-25 (White) (Day 2); Trial Tr. 131:14-21 (Mora) (Day 2).

[478] PL753 at 23 (Barreto/Sanchez Rep.).

[479] PL753 at 19-20 (Barreto/Sanchez Rep.).

[480] *Infra* ¶¶ 329-335; Trial Tr. 374:21-375:8 (Guzman) (Day 3).

[481] PL760 at 48-49 (Burton Rep.); Trial Tr. 45:3-46:3 (Burton) (Day 6).

example, Naomi Eagleton, who is African-American and does not have SB 14 ID or a birth certificate, recently traveled to her local metro card office to obtain a new metro card with a photograph because she believed, incorrectly, that the card would enable her to vote in person in a coming election.[483]  Floyd Carrier is a veteran who lacks SB 14 ID and attempted to vote in November 2013; he was not offered a regular or provisional ballot and was not told that he could obtain an EIC without paying a fee.  Mr. Carrier and his son undertook a lengthy effort to obtain SB 14 ID and spent between $34 and $36 but have not successfully obtained an accurate birth record, let alone photo ID.[484]  Service providers similarly testified about the informational and financial costs that their clients were forced to incur in seeking to obtain SB 14 ID.[485]

331.    As noted above, the Texas House of Representatives passed an amendment requiring voter education targeted at low-income and minority voters.[486]  This amendment was removed in the conference committee and was not included in the enacted bill.[487]

332.    In March 2009, Bryan Hebert, Deputy General Counsel in the Office of the Lieutenant Governor, circulated talking points for legislators to use in support of SB 362, a prior voter ID bill.  The talking points emphasized that "to ensure every eligible voter can vote and that only

---

[482] Buchanan Dep. 88:24-90:2, 108:3-9; Washington Dep. 23:14-24:10; PL1093 (Washington Video Excerpts); E. Martinez Dep. 100:3-104:8.

[483] Eagleton Dep. 27:8-28:13, 30:7-32:4, 44:1-12, 52:9-53:25, 88:22-89:6, 106:5-19, 121:22-123:14; PL1095 (Eagleton Video Excerpts).

[484] Trial Tr. 9:22-27:8 (Carrier, C) (Day 1); Trial Tr. 75:20-21, 79:13-80:12 (Carrier, F.) (Day 1); Carrier, C. Dep. 24:21-28:23, 46:4-52:12, July 25, 2014; Carrier, F. Dep. 65:4-67:14, 95:8-96:2, July 25. 2014.

[485] Trial Tr. 116:11-119:3 (Mora) (Day 2); Trial Tr. 276:11-277:11, 281:3-282:9 (White) (Day 2).

[486] PL034 at 982 (House Journal, Mar. 23, 2011).

[487] PL001 (SB 14).

legitimate voters are counted," SB 362 "requires months of statewide voter education efforts before [the] law takes effect."[488]  No similarly specific requirement was included in SB 14.[489]

333.    In the absence of a statutory directive, DPS takes the position that it is under no legal obligation to publicize the availability of EICs and has no plans to target such efforts towards communities—such as minority voters—that may have a greater need for EICs.[490]

334.    DPS has no budget for publicizing information about EICs and has not bought any paid media to advertise where and when EICs are available.[491]  DPS has largely used press releases and messages broadcast to individuals who already follow DPS on social media.[492]

335.    Other state legislatures have incorporated substantially more voter education in photo voter ID laws.  For example, South Carolina required "an aggressive voter education program," including individual notice to "each registered elector who does not have a South Carolina issued driver's license or identification card."[493]

### 3.  Failure to Craft an Effective EIC Program

336.    The EIC originated in the conference committee as a no-fee form of ID acceptable for voting.  However, legislative limitations on EIC issuance prevent the EIC from effectively mitigating the burden imposed by SB 14.

---

[488] PL205 at 3 (SB 362 talking points).

[489] *See supra* ¶¶ 58-72.

[490] Peters Dep. 294:2-12, Apr. 30, 2014; Cesinger Dep. 49:23-50:6, May 20, 2014.

[491] Cesinger Dep. 50:7-50:22, 109:3-109:9; Trial Tr. 259:1-11 (Cornish) (Day 3) (testifying that "DPS received no additional funding relating to the issuance of the EICs" and that funding to assist in the issuance of EICs through mobile units came from their general funds).

[492] Cesinger Dep. 37:23-38:7, 40:23-41:5, 43:4-43:25, 52:3-53:10, 55:25-56:13, 61:21-62:6.

[493] 2011 S.C. Laws Act 27, § 7; *see also* N.H. Rev. Stat. § 652:26(I) (requiring education concerning "all the permissible methods of proving identity); R.I. Gen. Laws § 17-6-13 (requiring the Secretary of State to "identify communities within the state in need of electoral process education by outreach[] [to] community organizations").

337.    Ninety-one percent of eligible voters in Texas who lack SB 14 ID face at least one impediment to obtaining an EIC, such as difficulty visiting a DPS office during limited operating hours, getting a ride or accessing public transportation, or paying the costs to acquire the underlying documents necessary to obtain an EIC.[494]

### i.    Entrusting a Law Enforcement Agency with Issuing EICs

338.    The Legislature vested responsibility for the EIC program in DPS, a law enforcement agency with no mission or experience related to voting.[495]  The Secretary of State has no authority over EIC implementation, and DPS did not coordinate with the Secretary of State before promulgating EIC regulations.[496]  Elections Director Keith Ingram testified, "The very day that we can tell DPS to do anything and they do it will be a very good day."[497]

339.    Predictably, DPS officials have administered this new responsibility without the purpose of ensuring that voters who need an EIC will be able to obtain one.[498]

340.    Unlike election offices that comply with the language minority provisions of Section 203 of the Voting Rights Act, 52 U.S.C. § 10503, DPS has no policy or requirements to ensure that employees who speak Spanish are present to assist voters with limited English proficiency.[499]

---

[494] PL753 at 18, 29 (Barreto/Sanchez Rep.).

[495] Tex. Elec. Code § 63.0101; Tex. Transp. Code §§ 521.001(a)(1-a), 521A.001; Cesinger Dep. 46:7-47:12, 62:20-62:22, 111:1-111:12.

[496] Tex. Transp. Code §§ 521.001(a)(a-1), 521A.0001; Trial Tr. 355:17-21, 386:23-387:1 (Ingram) (Day 7); Trial Tr. 285:23-25, 287:14-288:1 (Rodriguez) (Day 6).

[497] Trial Tr. 307:21-308:1, 355:17-21 (Ingram) (Day 7).

[498] Gipson Dep. 73:15-17; Ingram Dep. 35:16-36:25; Cesinger Dep. 46:7-47:12, 62:20-62:22, 111:1-111:12.

[499] Peters Dep. 245:16-21; Rodriguez Dep. 49:12-50:3, May 8, 2014.

Applications for an EIC were not available in Spanish until more than two months after SB 14 went into effect.[500]

341.    Law enforcement officers are generally present at DPS driver license offices, particularly in urban areas.[501]  Even when DPS offices have been open only for the purpose of issuing EICs, DPS officials have requested that troopers be on site "for presence."[502]  Historically, some law enforcement officers in Texas have intimidated minority voters by threatening to arrest those who attempted to exercise the franchise.[503]

342.    DPS runs a warrant check when individuals apply for driver licenses or personal ID cards.  If any outstanding warrant is found, DPS will typically take the applicant into custody as soon as the applicant steps outside of the office.[504]

343.    DPS has offered conflicting information to the public concerning warrant checks on EIC applicants.[505]  DPS is aware of a public perception that any interaction with DPS will trigger a warrant check and that some Texans are afraid to visit a DPS office because they do not know whether they have an outstanding warrant.[506]  Although acknowledging that this public perception exists among potential EIC applicants, DPS has taken no official steps to combat this perception.[507]

---

[500] Rodriguez Dep. 46:2-5; Cesinger Dep. 71:8-71:10.

[501] Trial Tr. 145:10-15 (Peters) (Day 6); Trial Tr. 357:12-14 (Ingram) (Day 7); Trial Tr. 257:12-259:10 (Rodriguez) (Day 6); Rodriguez Dep. 93:22-94:3; Peters Dep. 67:5-67:24.

[502] Trial Tr. 258:11-259:1 (Rodriguez) (Day 6); PL396 (Rodriguez Email).

[503] Trial Tr. 15:24-18:24 (Johnson) (Day 3); PL760 at 23 (Burton Rep.).

[504] PL699 (Bodisch Email); PL445 (Peters email); Gipson Dep. 34:12-22, 72:25-73:14.

[505] PL345 (Fort Worth Star Telegram article); Peters Dep. 60:18-64:6.

[506] Peters Dep. 61:1-63:8; Trial Tr. 145:5-12 (Peters) (Day 6); Gipson Dep. 74:12-20.

[507] Trial Tr. 144:17-22 (Peters) (Day 6); Peters Dep. 63:9-15.

344.    SB 14 authorized DPS to collect fingerprints from EIC applicants, and DPS regulations require fingerprinting of EIC applicants.[508]  DPS fingerprinted EIC applicants until approximately September 2013, solely for the purpose of collecting and storing the information in a law enforcement database.[509]  In September 2013, officials from the Office of the Secretary of State requested that DPS stop fingerprinting EIC applicants, but DPS resisted suspending the practice because it wished to collect the data.[510]

345.    DPS has now suspended fingerprinting EIC applicants, but it has not revised its regulations and has the discretion to start fingerprinting EIC applicants again.[511]  Moreover, DPS has not informed the public that it has stopped collecting fingerprints from EIC applicants, and it does not post signage informing EIC applicants that their fingerprints will not be taken.[512]

346.    Voters testified that they were intimidated or fearful of going to DPS offices to obtain ID.[513]  In-person visits to a law enforcement agency such as DPS may cause considerable anxiety among individuals who have had negative experiences with law enforcement or fear arrest because of unpaid tickets and fines.[514]

347.    Edcouch City Councilman Daniel Guzman, who represents a predominantly Latino and socioeconomically depressed community in Hidalgo County, testified that when he offered to

---

[508] *See* Tex. Transp. Code §§ 521A.001(f), 521.142(b)(1); 37 Tex. Admin. Code § 15.183(a)(3).

[509] Trial Tr. 286:4-13 (Rodriguez) (Day 6); Trial Tr. 355:11-16 (Ingram) (Day 7); Peters Dep. 57:23-25, 58:1-4; Rodriguez Dep. 85:2-13.

[510] Ingram Dep. 36:3-25, 38:16-40:15.

[511] Trial Tr. 144:23-145:4 (Peters) (Day 6); Peters Dep. 65:6-66:11.

[512] Rodriguez Dep. 84:6-14; Gipson Dep. 35:3-36:3.

[513] Trial Tr. 368:15-22, 372:2-9 (Guzman) (Day 3); Bingham Dep. 39:5-23; PL1091 (Bingham Video Excerpts); H. Sanchez Dep. 8:23-9:21, 30:4-31:3, 31:11-17, Aug. 6, 2014.

[514] Trial Tr. 120:5-24 (Mora) (Day 2).

transport voters who did not have SB 14 ID to DPS, many refused to go with him for fear of what would happen to them at DPS.[515]  He explained, "Some people are hesitant to step into a Department of Public Safety office where you have state troopers.  Some people are afraid that they might owe citations.  Some people are afraid that they owe child support and their names are going to get run once they go get an I.D. card and get arrested on the spot."[516]  Similarly, Hector Sanchez, who is Hispanic, testified that for years, he has avoided interacting with DPS and its employees for fear of being arrested for an outstanding traffic-related warrant.[517]

348.    Voter ID statutes in other states—including Georgia—have entrusted election officials with issuing no-fee voter ID.  Other states—including Indiana—have authorized other non-law enforcement agencies to issue no-fee ID cards.[518]

### ii.    In-Person Application Requirements at DPS Offices

349.    By establishing that DPS would issue EICs, the Texas Legislature effectively required EIC applicants—who by definition do not have a driver license—to travel to DPS locations. However, approximately 78 of Texas's 254 counties do not have a permanent DPS office. Approximately 46 additional counties have a "scheduled office" that is open fewer than five days a week, and in some cases these offices are not even open one day each week.[519]  The Texas Legislature was well aware of the limited availability of DPS offices around the State.[520]

---

[515] Trial Tr. 368:4-22, 357:9-358:2, 358:14-21, 371:13-372:9 (Guzman) (Day 3).

[516] Trial Tr. 368:15-22 (Guzman) (Day 3).

[517] H. Sanchez Dep. 29:3-31:3, 31:11-17.

[518] *See, e.g.*, Ala. Code § 17-9-30(f); Ga. Code § 21-2-417.1(a); S.C. Code § 7-5-675; *see also* Ind. Code 9-24-16-10(b)-(c); Kan. Stat. § 8-1324(g)(2).

[519] Trial Tr. 106:8-11, 106:16-18 (Martinez Fischer) (Day 1); PL352 (DPS office spreadsheet); Peters Dep. 190:16-191:15, Apr. 30, 2014.

[520] PL006 at 64-73, 82-83 (Sen. Comm. of the Whole Tr., Jan. 25, 2011); PL765 ¶ 49 (Davidson Supp.

350.    Other states—including Georgia—have enacted voter ID laws that require no-fee ID to be available in every county in the state.[521]

351.    There are only 225 driver license offices in Texas.[522]

352.    SB 14 does not authorize or fund offices of agencies other than DPS to issue SB 14 ID.[523] After this litigation began—more than three years after passage of SB 14—DPS began entering into agreements authorizing county offices in some counties without DPS offices to issue EICs.[524]  This late accommodation by an agency is not part of the legislative structure of SB 14.

353.    Many neighborhoods with concentrated minority communities have no DPS office, such as Dallas's southeast quadrant, and minority legislators highlighted this concern during consideration of SB14.  Often such neighborhoods with significant minority population concentrations reflect the legacy of housing segregation.  To travel by public transit between Dallas's southeast quadrant and the DPS office in downtown Dallas, it takes one to two hours each way.[525]

354.    Although DPS tracks whether "public transportation" is available at its driver license offices, it defines public transportation to include paid ride services, such as private taxis costing as much as $80.  These services may be unaffordable for affected voters.[526]

---

Rep.).

[521] *See, e.g.*, Ga. Code § 21-2-417.1(a); Miss. Code § 23-15-7(1)-(2).

[522] PL775R ¶ 16 (Webster Corr. Rep.).

[523] Tex. Elec. Code § 63.0101; Tex. Transp. Code § 521.009; Trial Tr. 366:9-367:8 (Ingram) (Day 7); Peters Dep. 81:20-83:23, 91:24-25; PL282 (Interlocal Cooperation Contract).

[524] PL 282 (Interlocal Cooperation Contract); Ingram Dep. 84:3-84:21; 86:20-87:2, 87:9-19.

[525] PL006 at 17 (Sen. Comm. of the Whole Tr., Jan. 25, 2011); PL760 at 45-46 (Burton Rep.); PL779 at 12-13; Trial Tr. 45:3-19 (Burton) (Day 6).

[526] Trial Tr. 149:24-151:8 (Peters) (Day 6).

355.    In some areas with significant Hispanic populations along the border with Mexico, the nearest permanent DPS facility is 100 to 125 miles away, a problem highlighted during legislative debate.[527]

356.    Across Texas, an estimated 4.7% of voting-age citizens (an approximation of eligible voters) face a roundtrip travel burden of more than 90 minutes to access a location that issues EICs (including county offices not contemplated or authorized by SB 14) and 13.8% of impoverished voting-age citizens face that travel burden.[528]

357.    SB 14 places a disproportionate and significant travel burden on Hispanic and African-American eligible voters in comparison to Anglo eligible voters.[529]  African-American eligible voters are 3.3 times more likely than Anglo eligible voters to travel more than 90 minutes to obtain an EIC, and Hispanic eligible voters are 1.5 times more likely than Anglo eligible voters to travel more than 90 minutes to obtain an EIC.[530]

358.    In part, this disparity results from the fact that Hispanics and African Americans are much more likely to need to travel by public transportation or on foot, due to relative lack of vehicle access.[531]  Approximately 3.9% of Texas households headed by an Anglo have no vehicle available, whereas 7.0% of households headed by a Hispanic and 12.9% of households headed by an African American have no access to a vehicle.[532]  From nearly any location in

---

[527] PL006 at 13-14 (Sen. Comm. of the Whole Tr., Jan. 25, 2011); PL760 at 46-47 (Burton Rep.); *see also* PL779 at 9.

[528] Trial Tr. 97:13-99:3 (Chatman) (Day 5); PL761 ¶¶ 53-54, 60. tbl. 5, 9, & fig. 7 (Chatman Corr. Rep.).

[529] Trial Tr. 82:9-23, 97:20-99:11 (Chatman) (Day 5); PL761 ¶¶ 55, 58-60 (Chatman Corr. Rep.).

[530] Trial Tr. 97:13-98:1 (Chatman) (Day 5); PL761 ¶ 55 & tbl. 5 (Chatman Corr. Rep.).

[531] Trial Tr. 95:14-23 (Chatman) (Day 5); PL761 ¶¶ 52-54 & tbl. 4 (Chatman Corr. Rep.).

[532] Trial Tr. 312:11-19 (Burden) (Day 3); PL454 ¶ 15 (U.S. Req. for Judicial Notice); PL758 ¶ 48 (Burden Corr. Rep.).

Texas, it is faster to travel by private vehicle than to take public transportation or walk to a location that issues an EIC.[533]

359.    Racial disparities in travel burdens persist even after controlling for socioeconomic conditions.  Looking only at eligible voters living in poverty, African-American eligible voters experiencing poverty are 2.7 times more likely than Anglo eligible voters experiencing poverty to travel more than 90 minutes to obtain an EIC, and Hispanic eligible voters experiencing poverty are 1.2 times more likely.[534]

360.    Statewide differences in travel burdens between Hispanics and Anglos and between African Americans and Anglos are statistically significant.[535]

361.    For example, in Houston, San Antonio, and Dallas, the burden to obtain an EIC will fall most heavily on Hispanic and African-American voters.[536]  Within those cities, the share of Hispanic households that lacked access to a vehicle consistently exceeds the share of Anglo households lacking vehicle access, and the share of African-American households lacking vehicle access is at least twice the share of Anglo households lacking vehicle access.[537]

362.    In Houston, San Antonio, and Dallas neighborhoods where at least 25% of households lack access to a motor vehicle, the public bus system increases trip travel time several-fold. From these low vehicle-access areas, the average one-way bus travel time to a DPS office was 66.7 minutes in Houston, 36.2 minutes in San Antonio, and 59.7 minutes in Dallas.[538]  Average

---

[533] Trial Tr. 94:5-95:13 (Chatman) (Day 5); PL761 ¶ 47 (Chatman Corr. Rep.).

[534] Trial Tr. 98:5-99:3 (Chatman) (Day 5); PL761 ¶¶ 60-61 (Chatman Rep.).

[535] Trial Tr. 98:2-3, 99:4-5 (Chatman) (Day 5); PL761 ¶ 40 (Chatman Corr. Rep.).

[536] Trial Tr. 281:20-282:19 (Webster) (Day 4); PL775R ¶¶ 8, 44, 55, 65 (Webster Corr. Rep.).

[537] PL775R ¶¶ 36, 48, 58 (Webster Corr. Rep.).

[538] Trial Tr. 267:25-268:5, 272:11-13, 276:7-10 (Webster) (Day 4); PL775R ¶¶ 28, 40, 52, 62 & tbl. 2, 4,

travel times from the same areas by car was 10.5 minutes, 7.5 minutes, and 12.8 minutes respectively.[539]

363.    Marvin Holmes, who is African-American, personally experienced this burden and testified that he spent hours on two separate days traveling by multiple public buses to obtain SB 14 ID:  first between his home in Houston and his local Office of Vital Statistics to obtain a certified copy of his birth certificate and then between his home and the nearest DPS office.[540] Similarly, Kenneth Gandy does not possess SB 14 ID, and the closest DPS office to his home is an hour away by bus.  By contrast, his polling place is only four to five blocks from his home.[541]

364.    Voters must arrive at a DPS office during operating hours, which are largely limited to normal weekday business hours.  DPS offices do not ordinarily offer weekend hours, and in approximately 141 of 176 counties with a DPS office, that office is never open past 5:00 p.m.  In 23 counties, one or more DPS offices are open until 5:30, 6:00, or 7:00 p.m. one day per week, and six "mega centers" are open until 6 p.m. on multiple days per week.[542]  As noted above, the Texas Legislature rejected a proposed amendment to SB 14 that would have required expanded DPS operating hours.[543]

365.    Once a voter arrives at DPS, he or she may need to wait to be served.  As of October 2011, wait times in metropolitan areas could be as long as three hours during busy months.[544]

---

6, 8 (Webster Corr. Rep.).

[539] Trial Tr. 267:17-24, 272:4-10, 276:4-10 (Webster) (Day 4); PL775R ¶¶ 37, 40, 52, 62 & tbl. 4, 6, 8 (Webster Corr. Rep.).

[540] Holmes Dep. 8:7-10, 28:14-33:13.

[541] Trial Tr. 209:10-12 (Gandy) (Day 4); Gandy Dep. 12:12-19, 54:24-55:3, June 11, 2014.

[542] PL352 (DPS office spreadsheet); *see also* Peters Dep. 95:23-96.

[543] *Supra* ¶¶ 235, 242.

[544] PL549 (Let. from DPS to Senator Ellis).

366.     None of the new DPS "Mega Centers" are located within the inner freeway loops surrounding Houston, Dallas, San Antonio, or Fort Worth or the urban core of Austin, where Texas's African-American voters and Hispanic voters are concentrated.[545]  Substantial wait times have persisted in Houston DPS offices, even after the opening of a suburban Mega Center.[546]

367.     DPS acknowledges that "the typical driver license customer complaint is about uncomfortable, long wait times before they get to the counter to be helped."[547]  DPS also admits a "service gap" caused by additional mandates placed on the driver license division combined with an increasing population.[548]  DPS conceded that SB 14 could lengthen wait times at driver license offices, particularly surrounding major voting times like a Presidential election.[549]

### iii.     Underlying Document Requirements

368.     SB 14 authorized DPS to require an EIC applicant to verify his or her name, birthplace, and date of birth by presentation of proof satisfactory to DPS.[550]

369.     Pursuant to that authorization, DPS promulgated regulations that require most of the same underlying documentation to apply for an EIC as is necessary driver license, while disallowing documents, such as a passport, that EIC applicants lack by definition.[551]

---

[545] PL692 (New Mega Centers website).

[546] PL685 (DPS customer wait times); Davio Dep. 162:25-163:11; 165:9-167:11; 171:5-23, June 15, 2012.

[547] PL684 at 3 (DPS study).

[548] PL684 at 9-11 (DPS study); PL1035 at 6-8 (DPS study).

[549] PL690 at 1 (DPS legislative analysis).

[550] *See* Tex. Transp. Code § 521A.001(f); *see also id.* § 521.142(a).

[551] 37 Tex. Admin. Code § 15.182; *see also id.* § 15.24 (driver license).

370.    Under these rules, an original applicant for an EIC must present one piece of "primary identification," two pieces of "secondary identification," or one piece of "secondary identification" and two pieces of "supporting identification."[552]

371.    Primary ID means a Texas driver license or personal ID card that has been expired for 60 days or more but for less than two years.[553]  Logically, no voter who does not already possess one of these documents can obtain one in order to apply for an EIC.

372.    Secondary ID means an original or certified copy of a birth certificate issued by the appropriate State Bureau of Vital Statistics or equivalent agency of one of the 50 states, a United States territory, or the District of Columbia; an original or certified copy of a United States Department of State certification of birth; an original or certified copy of a court order of a U.S. court with name and date of birth (DOB) indicating an official change of name or gender; or U.S. citizenship or naturalization papers without an identifiable photo.[554]

373.    At the time SB 14 was passed, none of the forms of primary or secondary ID could be obtained free of direct costs or fees.[555]  Even though the state had in other contexts waived costs for acquiring a certified copy of a birth record,[556] SB 14 did not provide for waiver of fees to obtain a certified copy of a Texas birth record needed to apply for an EIC.[557]  Both chambers of the Legislature rejected amendments that would have provided for such a waiver.[558]

---

[552] 37 Tex. Admin. Code § 15.182(1).

[553] 37 Tex. Admin. Code § 15.182(2).

[554] 37 Tex. Admin. Code § 15.182(3).

[555] *Supra* ¶¶ 211-212, *infra* ¶¶ 377-379; 389-391.

[556] Trial Tr. 372:22-25 (Farinelli) (Day 6).

[557] Trial Tr. 372:8-20 (Farinelli) (Day 6); PL001 (SB 14).

[558] Trial Tr. 372:8-11, 372:15-20 (Farinelli) (Day 6); PL011 at 35 (Sen. Journal, Jan. 25, 2011); PL034 at 16-99 (House Journal, Mar. 23, 2011).

374.   Approximately 26% of Texas eligible voters who currently lack SB 14 ID do not possess the documents needed to obtain an EIC.[559]

375.   Approximately 23% of Hispanic and 30% of African-American eligible voters do not have documents needed to obtain SB 14 ID, compared with 21% of Anglo eligible voters.[560]

376.   Many elderly African Americans and Hispanics from the rural South were born at home to midwives who did not register the birth.  For example, Margarito Lara, who is Hispanic, visited three offices in two counties and paid a $22 search fee, only to confirm that his birth in the Rio Grande Valley had never been recorded.[561]  Moreover, a recent study also found that 26.7% of African-American 18 to 29 year-olds lack a birth certificate, compared to only 15.7% of Anglo youth.[562]

377.   Approximately 68% of U.S. citizens in Texas were born in the State and—absent a name change or possession of an expired Texas ID—any such individuals who apply for an EIC must present a certified copy of a Texas birth certificate.[563]  In Texas, parents do not automatically receive a certified copy of a child's birth certificate when the child is born, and there is no public assistance available with regard to obtaining a birth certificate.[564]  Moreover, although Texas requires that births be registered with the State, not every child born in Texas is actually registered within one year of birth.  After one year, parents are required to go through the

---

[559] PL753 at 17, 20 (Barreto/Sanchez Rep.).

[560] PL753 at 20, Table 7 (Barreto/Sanchez Rep.).

[561] Trial Tr. 219:10-220:8, 221:23-223:10 (Day 4) (Mar. Lara); PL989 (correspondence to Mr. Lara).

[562] PL755 ¶ 45 (Bazelon Rep.).

[563] 37 Tex. Admin Code § 15.182; Trial Tr. 395:20-396:15 (Farinelli) (Day 6); PL228 (American Community Survey data).

[564] Trial Tr. 317:23-318:4, 363:24-364:4 (Farinelli) (Day 6).

Delayed Birth Certificate process, which costs a total of $47 and requires the submission of documents.[565]  Even after going through this process, an individual would still need to purchase a certified copy of the birth record.[566]

378.   The basic fee to obtain a certified copy of a Texas birth record is $22, including $20 in search and copy fees and a $2 statutory surcharge.[567]  An additional fee of $5 is charged for expedited service and a small credit processing fee is charged for online requests.[568]

379.   If an individual requests a certified birth record from a local registrar or county clerk, that office may charge an additional $1 fee.[569]

380.   Requests for a certified copy of a Texas birth record may be made online, by mail, in person at the Austin Office of the Department of State Health Services, in person at a remote issuance site, or in person at the office of the local birth registrar with jurisdiction over the location of the individual's birth.[570]

381.   An online application for a certified Texas birth record requires a valid driver license or personal ID issued by Texas or another state.[571]

382.   A mail or in-person application for a certified Texas birth record requires one of an enumerated set of valid government-issued photo IDs (which does not include student ID) or multiple forms of secondary and supporting ID.[572]

---

[565] Trial Tr. 364:5-18 (Farinelli) (Day 6).

[566] Trial Tr. 364:24-365:7 (Farinelli) (Day 6).

[567] 25 Tex. Admin. Code § 181.22(a), (c), (g); Trial Tr. 366:12-16 (Farinelli) (Day 6).

[568] 25 Tex. Admin. Code § 181.22(q); Trial Tr. 366:17-367:1 (Farinelli) (Day 6).

[569] Tex. Health & Safety Code § 191.0045(h); Trial Tr. 367:7-13 (Farinelli) (Day 6).

[570] Trial Tr. 367:14-368:4, 375:7-12, 375:18-22, 376:21-24 (Farinelli) (Day 6).

[571] Trial Tr. 367:15-24 (Farinelli) (Day 6).

383. It is not possible to apply for a copy of a Texas birth record online or by mail and receive it in time to cure a provisional ballot during the six-day cure period.[573]

384. Eighty-five Texas counties do not have an office at which a voter can obtain a birth certificate for a birth recorded outside of that county, and there are no more than five such sites in any county, although some sites have sub-offices not listed online by the State.[574]

385. Voters who apply for a birth certificate to obtain an EIC often will not possess documents needed to apply for a birth certificate, leaving them unable to obtain SB 14 ID.[575]

386. If a voter does not possess required documents and cannot rely on an immediate family member with documents to request a birth certificate on the voter's behalf, the State recommends that the voter engage a third-party vendor or attorney, which comes at substantial cost.[576]

387. Approximately 25% of U.S. citizens in Texas were born in a U.S. state or territory other than Texas, and most such individuals who apply for an EIC must present a birth certificate from that state or territory.[577] The cost of a certified copy of a birth certificate from other U.S. states or territories ranges in price from $5 to $34; the states bordering Texas charge between $10 and $15.[578] Eighteen states require a valid photo ID to apply for a birth certificate.[579]

---

[572] 25 Tex. Admin. § 181.28(i); Trial Tr. 121:5-122:22 (Mora) (Day 2); Trial Tr. 367:25-370:4 (Farinelli) (Day 6).

[573] Farinelli Dep. 75:16-19, 77:8-11, May 9, 2014.

[574] Trial Tr. 375:23-376:10 (Farinelli) (Day 6); PL223 (remote access sites).

[575] PL758 ¶ 87 (Burden Corr. Rep.); Trial Tr. 315:24-317:9 (Burden) (Day 3).

[576] Trial Tr. 121:5-122:11, 122:16-21 (Mora) (Day 2).

[577] PL228 (American Community Survey data); Trial Tr. 395:20-396:25 (Farinelli) (Day 6).

[578] PL474 at 3-17 (Nat'l Ctr. for Health Stats. guide).

[579] *Id.*

388.    Approximately 1% of U.S. citizens in Texas were born abroad to a citizen parent, and most such individuals who apply for an EIC must present a U.S. Department of State Consular Report of Birth Abroad, which costs $50 and must be requested via a notarized application.[580]

389.    Approximately 6% of U.S. citizens residing in Texas are naturalized U.S. citizens, and most such individuals who apply for an EIC must present a citizenship certificate without a photo.[581]   A replacement copy of a certificate of citizenship costs $345.[582]

390.    A voter's name and gender must match the name to be placed on an EIC, meaning that individuals who have changed their name or gender—including individuals who took their spouse's name when they married—cannot present a birth certificate alone to establish identity independently.[583]   For example, Estela Garcia Espinoza obtained the assistance of Texas Rio Grande Legal Aid to pay for a copy of her birth certificate, only to receive a document that contains her maiden name (and misstates her date of birth).[584]   Such voters must provide a court order to establish identity, which may cost $30 or more.   The cost of obtaining a court order from another state varies by state. [585]

391.    For voters who have changed their name or gender without taking official steps, the required court petition must be notarized and accompanied by a complete set of the petitioner's fingerprints and appears to require at least $152 in fees.[586]

---

[580] PL228 at 1 (American Community Survey data); PL467 (Dept. of State website).

[581] PL228 at 1 (American Community Survey data).

[582] PL891 (USCIS N-565 Instructions).

[583] 37 Tex. Admin. Code § 15.182; DEF0732 at 2 (DPS website).

[584] Trial Tr. 165:17-22, 166:3-167:14, 174:9-15 (Espinoza) (Day 6); PL996 (Birth certificate, Espinoza)

[585] Rodriguez Dep. 88:4-25; 37 Tex. Admin. Code § 15.182; PL795 (Carson County Clerk Fees for Official Public Records); PL836 (Walker County Clerk Vital Records Fee Schedule).

[586] Tex. Fam. Code §§ 45.101-.102; Tex. Gov't Code § 51.317(b)(1), (4); Tex. Local Gov't Code §§

392.    DPS has rejected numerous EIC applicants for failure to present sufficient documentation, including a voter who informed DPS that he never had a birth certificate.[587]

393.    Individual voters testified directly about the burden imposed by these requirements. Sammie Bates, who is African-American, attempted to vote in November 2013 but was unable to do so with her Illinois ID card and Texas voter registration certificate.  She cast a provisional ballot that was not counted.[588]  To obtain a copy of her Mississippi birth certificate, Ms. Bates had to pay $42, which she could not immediately afford on her limited fixed income.[589]  She testified, "we couldn't eat the birth certificate . . . and we couldn't pay rent with the birth certificate."[590]

394.    Elizabeth Gholar, who is African-American, was unable to obtain SB 14 ID because her Louisiana birth certificate incorrectly lists her last name as her mother's maiden name rather than her father's last name, which she used prior to marriage and is the name listed on her marriage certificate.  DPS has twice refused to issue her ID because she does not have a document connecting the two names.  Ms. Gholar retained an attorney in Louisiana to attempt to amend her birth certificate, but she expects the process to be burdensome.  Ms. Gholar does not consider voting by mail equivalent to voting in person, which she considers "a celebration" and a right she has "earned." [591]

---

133.151, .152, .154.

[587] PL386 (List of Invalid EIC Applications); PL475 (9/16/13 Email from Silva to Rodriguez).

[588] Bates Dep. at 12:19-13:6, 13:19-14:8, 22:3-15; PL1090 (Bates Video Excerpts).

[589] Bates Dep. at 15:4-16:17; PL1090 (Bates Video 9:30-11:52).

[590] Bates Dep. at 16:13-17:3; PL1090 (Bates Video Excerpts).

[591] Gholar Dep. at 10:23-11:9, 60:16-61:9, 61:13-63:25, 66:20-67:25, 72:10-72:23, 73:5-74:19, 76:23-77:3, 78:5-79:5, 79:10-80:6; PL 1092 (Gholar Video Excerpts).

395.    Lenard Taylor, also African-American, was denied an SB 14 ID by DPS and told he needed to produce his social security card, his birth certificate, and his voter registration card. He then went to the social security office, where he was told that he needed a Texas ID to obtain a social security card.  Mr. Taylor, who has experienced periods of homelessness, spent $23 to obtain a birth certificate—a significant amount to him.[592]

396.    Ruby Barber, who was 93 years old at the time of trial, knew she needed a photo ID but did not know what type was required.  She possessed an expired driver license but never had a birth certificate because she was born in Guys, Tennessee and her birth was never recorded except in the family Bible.  Ms. Barber went to the local DPS office in an attempt to obtain a voter ID she could use to vote.  She showed a DPS employee her expired driver license, social security card, Medicare card, and insurance card, but the employee refused to issue her a photo ID she could use for voting because she did not have a birth certificate.[593]

397.    Voter ID statutes passed by other states—including Georgia—establish more lenient documentation requirements to obtain a no-fee ID required for voting.[594]  Kansas's photographic voter ID statute waives birth certificate fees and requires designation of offices in every county to assist voters who need to obtain underlying documentation for voter ID purposes.[595]

       **iv.    Limitations on Use of an EIC**

398.    The application for an EIC states, "FOR ELECTION PURPOSES ONLY; CANNOT BE USED AS AN IDENTIFICATION CARD," and EICs bear the notation "FOR ELECTION

---

[592] Trial Tr. 147:22-148:21, 147:22-148:21, 149:15-150:12 (Taylor) (Day 3); PL1000 (Taylor Decl.).

[593] Barber Dep. 6:9-22, 24:18-25:18,29:15-32:21, 34:18-36:5; PL830 (Ruby Barber FamilySearch.org Page).

[594] *See, e.g.*, Ga. Code § 21-2-417.1(e); Ala. Code § 17-9-30(g).

[595] Kan. Stat. § 65-2418(a)(3).

PURPOSES ONLY CANNOT BE USED AS IDENTIFICATION."[596]  Thus, in contrast to a

voter who obtains a driver license, a concealed carry permit, a passport, or any of the other forms

of SB 14 ID, a voter who obtains an EIC receives no additional benefits from possessing that ID,

which increases the direct cost of voting.

399.    Other states issue an ordinary personal ID card as no-fee ID, so that the costs of obtaining

ID will provide additional value to the voter.[597]

400.    While the EIC can only be used for voting, the documentary proof requirements make it

just as difficult for low-income voters to obtain as a Texas ID card.[598]

### 4.  Procedural Requirements for the Disability Exemption

401.    The narrow scope of the statutory disability exemption, along with the failure to require

or fund voter education regarding this exemption, has ensured that voters who lack SB 14 ID are

unable to overcome the discriminatory burden by applying for a disability exemption.  As noted

above, minority voters disproportionately face health problems and would therefore

disproportionately benefit from an effective disability exemption.[599]

402.    To apply for a disability exemption from SB 14's requirements, a voter must possess

documentation of a disability from the Social Security Administration or documentation from the

Department of Veterans Affairs showing a disability rating of at least 50%.  The voter must

declare that he or she does not possess SB 14 ID and submit with that declaration a copy of the

disability determination and then must do the same upon each move to a new county.  A voter

---

[596] PL556 (Application for Texas Election Certificate); PL192 (Image of Election Identification
Certificate).

[597] *See, e.g.*, Ind. Code § 9-24-16-10(b)-(c); Kan. Stat. § 8-1324(g)(2).

[598] Trial Tr. 131:22-133:12 (Mora) (Day 2).

[599] *See, e.g.*, *supra* ¶¶ 278, 294, 301.

who has proper documentation and brings it to the polls on Election Day will still need to cast a provisional ballot then apply for an exemption from the county election official during the cure period.[600]

403.   As of January 15, 2014, only 18 voters had successfully applied for a disability exemption out of the 73,958 voters who lack SB 14 ID and have a qualifying disability determination.[601]

404.   Several voters who testified have disabilities but would not meet the statutory requirements for the SB 14 disability exemption.  For example, Phyllis Washington is an amputee who suffers from circulatory problems and diabetes, but she does not have documentation of disability status from either the Social Security Administration or the Department of Veterans Affairs.[602]  Ramona Bingham has suffered from crippling arthritis, memory loss, and depression since she was violently assaulted in 1998, but she too cannot meet the documentation requirements for a disability exemption.[603]

405.   Other voters testified that they were entirely unaware of the SB 14 disability exemption and what they would need to show to qualify for the exemption, which illustrates the interplay between strict documentation requirements and inadequate voter education.[604]  SB 14 does not require voter education concerning the disability exemption.[605]

---

[600] Trial Tr. 344:21-345:18, 346:9-349:13 (Ingram) (Day 7).

[601] PL752R ¶ 7(a) (Ansolabehere Corr. Supp. Rep.); *see also* Trial Tr. 349:19-350:1 (Ingram) (Day 7).

[602] Washington Dep. 7:4-10:4, 83:8-84:12, 117:21-118:1, 119:16-18, July 23, 2014; PL1093 (Washington Video Excerpts).

[603] Bingham Dep. 8:18-9:18, 15:15-16:3, 74:8-75:2; PL1091 (Bingham Video Excerpts).

[604] Trial Tr. 150:20-151:8 (Taylor) (Day 3); Trial Tr. 375:2-4 (Guzman) (Day 3).

[605] *See* Tex. Elec. Code § 31.012.

406.     Individual voters who possess the disability documentation required for the exemption testified that they were unaware that they could apply or how they could do so until they learned about the exemption from counsel.[606]

407.     County election offices that receive a request for a disability exemption are not required to respond within any specific timeframe, and there is no guarantee that an application submitted within thirty days of an election will be processed before the election.[607]

408.     Voters who have already received a disability exemption must reapply for the exemption when they move to another county, even if the disability exemption is recorded in the voter registration database.[608]

### 5.  Exemption of Mail-In Ballots

409.     The limitation of SB 14's requirements to in-person voting only exacerbates the law's discriminatory impact.  Anglo voters are more likely than Hispanic voters and African-American voters to be eligible to vote absentee based on age, affording a greater opportunity to avoid the requirements of SB 14.  Anglo voters are also more likely to actually cast absentee ballots.

410.     Anglo Texans are substantially more likely than Hispanic or African-American Texans to be 65 or older.[609]  Therefore, Anglo voters are far more likely to qualify to vote by mail on the basis of age—and thus able to vote without presenting SB 14 ID—than Hispanic or African-American voters.  While approximately 40% of Anglo voters who lack SB 14 ID are 65 or older,

---

[606] *E.g.*, Holmes Dep. 9:5-21, 64:22-65:8; PL1094 (Holmes Video Excerpts).

[607] Ingram Dep. 151:7-153:19.

[608] Ingram Dep. 153:20-155:15.

[609] PL759 ¶ 15 & n.17 (Burden Supp. Rep.).

approximately 21% of African-American voters who lack SB 14 ID and approximately 19% of Hispanic voters who lack SB 14 ID are 65 or older.[610]

411.    Anglos comprise a disproportionate share of absentee voters in Texas.  In the last three federal general elections before trial, Anglo mail voting rates exceeded both Hispanic and the African-American mail voting rates by statistically significant degrees.[611]

412.    Many voters in Texas who lack SB 14 ID and may qualify to vote by mail are unaware that they are eligible to do so or that SB 14 does not apply to absentee voting.[612]

413.    Mail ballots also do not eliminate the burden of SB 14 on voters who lack required ID. Some voters who are eligible to vote by mail strongly prefer to vote in person for a variety of reasons including the availability of poll worker assistance, distrust of mail ballots, the desire to see their vote being cast, the habit of voting at the polls, and the enjoyment of fulfilling a civic duty in the company of family and community.[613]  SB 14 abridges the rights of voters who lack SB 14 ID by preventing them from casting an in-person ballot without overcoming the burden to obtain photo ID.

---

[610] PL 752R tbls.VI.1, VI.3.A (Ansolabehere Corr. Supp. Rep.).

[611] PL758 ¶¶ 81-82 & tbl.3 (Burden Corr. Rep.).

[612] Holmes Dep. 14:10-19:24, 65:9-11, 87:14-18; PL1094 (Holmes Video Excerpts); H. Sanchez Dep. 6:7-8, 8:13-16, 9:24-25, 10:23-11:20, 32:21-24; Taylor Dep. 33:22-34:14.

[613] Trial Tr. 251:16-252:11 (Veasey) (Day 1); Trial Tr. 100:24-101:7 (Mendez) (Day 2); Trial Tr. 18:25-19:22 (Johnson) (Day 3); Eagleton Dep. 10:8-12:21; Benjamin Dep. 54:8-17, June 26, 2014; Washington Dep. 12:9-25, 16:4-17:15, 75:8-76:21; PL1093 (Washington Video Excerpts); PL1092 (Gholar Video Excerpts).

414.    For example, Sammie Bates testified that she prefers to vote at the polls because she always wants "to see my ballot go into the box where I'm voting . . . at least I want to see it go as far towards where it's supposed to go as I possibly can."[614]

415.    Senator Ellis, an African-American who has represented a majority-minority district for approximately 25 years, testified that "[i]n the African-American community, there is a strong tradition of showing up on election day."[615]

416.    Civil rights leader Reverend Peter Johnson explained, "[I]f there's voting fraud . . . , it's from people gathering old people's votes and manipulating . . . absentee ballots.  But if you understand Black America in the time of Blacks in the south . . . , going to vote and standing in line to vote is a big deal.  It's much more important for an 80-year old Black woman to go to the voting poll, stand in line, because she remembers when she couldn't do this."[616]

## C. The Electoral Impact of SB 14

417.    Voters who lack SB 14 ID have voted in substantial numbers in elections prior to the implementation of SB 14, including 1.5% of all registered voters in the Texas voter registration database who voted in 2012 and 1.4% of voters who voted in 2010.[617]

418.    SB 14 impacts Hispanic and African-American eligible voters who voted in previous elections at statistically significant higher rates than Anglo eligible voters.  Ecological regression

---

[614] Bates Dep. 21:18-25; PL1090 (Bates Video 14:10-14:44).

[615] Trial Tr. 156:23-157:22 (Ellis) (Day 4).

[616] Trial Tr. 19:6-13 (Johnson) (Day 3).

[617] PL752R ¶ 81 (Ansolabehere Corr. Supp. Rep.).

analysis estimates that only 0.6% of Anglos who voted in 2012 lack SB 14, while 2.0% of Hispanic voters and 4.2% of African-American voters who voted in 2012 lack SB 14 ID.[618]

419.    Several minority voters testified to voting provisionally during the November 2013 election—and having their provisional ballot rejected—because they lacked SB 14 ID.[619]

420.    Several of these voters were unable to cure their provisional ballots.  Some were unaware or confused about the necessary steps, and others were unable to complete those steps within six days of the election.[620]  All of these voters testified that they were bitterly disappointed when their ballots were not counted because of SB 14.[621]  As Marvin Holmes testified, "I was very upset.  I was crying.  I was hurt. . . . I'm taking out my precious time to come up here and do my civic duty and y'all just throw my vote in the trash."[622]

421.    It can take months for low-income individuals to acquire SB 14 ID, even with the assistance of social services providers, rendering the six-day cure period inadequate.[623]

422.    The record further indicates that some voters without SB 14 IDs were simply turned away from the polls without having been given an opportunity to vote a provisional ballot.[624]

---

[618] PL752R ¶¶ 82 & tbl.VI.4.A (Ansolabehere Corr. Supp. Rep.).

[619] *See* Bates Dep. 12:19-13:6, 14:2-8; PL1090 (Bates Video Excerpts); Benjamin Dep. 42:16-22; Eagleton Dep. 21:18-21, 32:5-33:11, 42:9-43:8; PL1095 (Eagleton Video Excerpts); Holmes Dep. 17:10-20:11, 20:21-23:1, 23:15-24:2; PL1094 (Holmes Video Excerpts); Washington Dep. 16:4-8, 22:1-25:25; PL1093 (Washington Video Excerpts).

[620] Trial Tr. 364:25-365:11, 368:1-3 (Guzman) (Day 3); Eagleton Dep. 32:5-33:11, 42:9-43:8; PL1095 (Eagleton Video Excerpts); Holmes Dep. 17:10-20:11, 20:21-23:1, 23:15-21; PL1094 (Holmes Video Excerpts); Washington Dep. 22:21-25:25; PL1093 (Washington Video Excerpts); Bingham Dep. 33:22-39:1; *see also* Trial Tr. 358:13-19 (Farinelli) (Day 6).

[621] Washington Dep. 22:1-19; PL1093 (Washington Video Excerpts); Bingham Dep. 39:12-39:22, 138:20-139:11; PL1091 (Bingham Video Excerpts); Eagleton Dep. 32:15-33:11; PL1095 (Eagleton Video Excerpts); Holmes Dep. 115:21-116:11; PL1094 (Holmes Video Excerpts).

[622] Holmes Dep. 21:1-10; PL1094 (Holmes Video Excerpts).

[623] Trial Tr. 279:5-16 (White) (Day 2); Trial Tr. 126:16-24 (Mora) (Day 2); Davis Dep. 62:3-13.

423.     Provisional ballot records from 29 Texas counties indicate that 281 provisional ballots were cast due to the voters' failure to present qualifying SB 14 ID in the November 2013 general election.  Early voting ballot boards rejected 250 of the 281 provisional ballots cast because the voter failed to provide SB 14 ID.[625]

424.     The November 2013 general election was a low-turnout constitutional amendment election with no statewide elected offices on the ballot.  Compared to a presidential election, voters in such low-turnout elections are disproportionately Anglo, more educated, wealthier, and have more consistent histories of voter participation.  Consequently, they tend to possess traits that make them least likely to be affected by SB 14.[626]

425.     Notwithstanding low turnout in November 2013, SB 14 impacted minority political participation in places like Edcouch, a small city in Hidalgo County.[627]  Most residents of Edcouch are Hispanic and poor; nearly half do not possess a car.[628]  During the November 2013 election, dozens of primarily Hispanic voters without SB 14 ID were prevented from casting ballots.[629]  Because the city has no public transportation, voters without SB 14 ID and underlying documents needed to obtain it found it extremely difficult to make the 17 mile round trip journey to the nearest DPS office or the 30 mile round trip journey to the county courthouse.[630]  Given

---

[624] Trial Tr. 368:1-3 (Guzman) (Day 3); Bingham Dep. 33:4-7, 33:22-34:11; PL1091 (Bingham Video Excerpts) (Day 2); Carrier, F. Dep. 95:3-97:25.

[625] PL789 (public record request responses from 29 counties for Nov 2013 election); *see also* Trial Tr. 252:23-253:1-3; 253:13-19; 254:2-5; 256:5-16, 290:7-291:4 (Cornish) (Day 3).

[626] PL759 ¶¶ 22-25 (Burden Supp. Rep.); Trial Tr. 328:23-329:17 (Burden) (Day 3).

[627] Trial Tr. 357:10-11, 358:11-13 (Guzman) (Day 3).

[628] Trial Tr. 358:18-25 (Guzman) (Day 3).

[629] Trial Tr.  360:24-361:24, 363:8-22, 368:4-370:5 (Guzman) (Day 3).

[630] Trial Tr. 359:1-3, 359:16-21, 376:4-14 (Guzman) (Day 3).

the low turnout in that election, the number of individuals denied the opportunity to vote due to SB 14 could have changed the outcome in four city council races on the ballot, which were decided by 50 or fewer votes.[631]

426.    It is not reasonably possible to know how many voters were aware of SB 14 and did not even attempt to vote in November 2013 because they lacked the necessary ID or underlying documents needed to obtain it.[632]

### D.  Failure to Reduce a Proven Impact

#### 1.  The Failing EIC Program

427.    The EIC program has failed to adequately ameliorate the effects of SB 14's strict ID requirement on Texas's most vulnerable voters.  Texas has issued vanishingly few EICs relative to the population that needs them.[633]

428.    Between June 2013 and early September 2014 (over 14 months), DPS issued only 279 EICs.[634]  As of May 2014, 62 of those EICs had been issued to voters over the age of 65, who are eligible to early vote by mail.[635]

429.    By contrast, Georgia—a state less than half the size of Texas—issued 2,182 voter ID cards in the latter half of 2006, after the state began implementation of its voter ID law in June 2006.[636]

---

[631] Trial Tr. 375:20-376:3 (Guzman) (Day 3).

[632] *See* Washington Dep. 14:11-17:6; PL1093 (Washington Video Excerpts); *see also* Stanart Dep. 127:17-129:7, 130:22-131:6, June 17, 2014.

[633] *Infra* ¶ 428.

[634] Trial Tr. 262:13-263:3 (Rodriguez) (Day 6); DEF2739 (EIC State and County Participation, Sep. 5, 2014).

[635] PL1052 at Column R (EIC applicants data).

[636] PL691 at 9 (Georgia PowerPoint); *Common Cause/Georgia v. Billups*, 504 F. Supp. 2d 1333, 1346

430.    Despite these failures, the State of Texas failed to appropriate separate funding for the EIC program, which is currently supported by the DPS general fund.[637]

431.    Although the Texas Legislature acted in 2015 to eliminate remaining fees to obtain a birth certificate that can be used only to obtain an EIC, SB 14 did not create the reduced-fee, EIC-only birth certificate and did not require voter education concerning its existence.[638]  In fact, as noted above, the Legislature specifically rejected amendments that would have eliminated costs for indigent voters to obtain underlying documents needed to apply for an EIC.[639]

432.    As a result, few if any voters are aware that the Texas Department of State Health Services created the EIC birth certificate (yet again during the pendency of this litigation), and almost no EIC birth certificates have actually been issued.  The public-facing website concerning birth certificates did not even note the existence of the EIC birth certificate until mid-trial.[640]

## 2.  No Response to Judicial Finding of Discrimination

433.    House Speaker Straus does not know if the Texas Legislature gave any consideration to the denial of judicial preclearance to SB 14 under Section 5 of the Voting Rights Act.[641]

434.    On June 25, 2013—the day on which the U.S. Supreme Court issued its decision in *Shelby County v. Holder*, 133 S. Ct. 2612, invalidating the formula that placed Texas under Section 5 preclearance coverage—Texas started to enforce SB 14.[642]

---

(N.D. Ga. 2007), *order vacated on other grounds and reentered*, 554 F.3d 1340 (11th Cir. 2009).

[637] Trial Tr. 259:1-11 (Cornish) (Day 3).

[638] Trial Tr. 80:19-81:5 (Lichtman) (Day 4); Tex. Health & Safety Code § 191.0046 (e) (2015).

[639] *Supra* ¶¶ 240, 243-244.

[640] Trial Tr. 155:18-156:17 (Peters) (Day 2); Trial Tr. 390:15-392:24 (Farinelli) (Day 6).

[641] Straus Dep. 70:4-8, June 23, 2014; *see also* Riddle Dep. 125:17-126:1.

[642] Trial Tr. 328:10-329:10 (Ingram) (Day 7); Dewhurst Dep. 219:4-6.

435.    Speaker Straus is also unaware of any state-sponsored assessment of the impact of SB 14, as implemented since June 2013, on minority voters.[643]

436.    Texas does not collect statewide data on provisional ballots cast in statewide elections, such as provisional ballots cast by voters who lacked SB 14 ID.[644]  Election Director Ingram testified that he is unaware of the number of provisional ballots cast due to lack of SB 14 photo ID.[645]

437.    Lieutenant Governor Dewhurst testified that the Senate planned to examine the implementation of SB 14 during an interim session.  The examination as planned, however, did not attempt to identify the impact of SB 14 on voters disaggregated by race.[646]  There is no evidence that Lieutenant Governor Dewhurst actually issued an interim charge to examine SB 14 implementation.

438.    Intensive examination of the impact of SB 14 has occurred in federal courts, and the Texas Legislature has taken no major action to address the widespread disenfranchisement that has been found.

---

[643] Straus Dep. 41:7-42:7, 43:6-13, 77:6-23, June 23, 2014.

[644] Trial Tr. 390:4-12 (Ingram) (Day 7); Trial Tr.  254:2-15, 255:9-12, 255:20-22, 257:1-25 (Cornish) (Day 3); PL763 at 6 (Cornish Rep.); PL901 at 54 (Defs.' Resps. to Pls.' First Interrogs.).

[645] Trial Tr. 307:21-308:1, 353:19-23 (Ingram) (Day 7).

[646] Dewhurst Dep. 219:7-220:23.

Date: November 18, 2016

Respectfully submitted.

KENNETH MAGIDSON
United States Attorney
Southern District of Texas

VANITA GUPTA
Principal Deputy Assistant Attorney General
Civil Rights Division

*/s/ Daniel J. Freeman*
T. CHRISTIAN HERREN, JR.
MEREDITH BELL-PLATTS
RICHARD A. DELLHEIM
DANIEL J. FREEMAN
BRUCE I. GEAR
AVNER SHAPIRO
SAMUEL OLIKER-FRIEDLAND
ZACHARY JONES
Attorneys, Voting Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Ave. NW
Washington, D.C. 20530

*Counsel for the United States*

*/s/ Armand Derfner*
CHAD W. DUNN
K. SCOTT BRAZIL
Brazil & Dunn
4201 Cypress Creek Pkwy.
Houston, Texas 77068

NEIL G. BARRON
Law Office of Neil G. Barron
914 FM 517 W, Suite 242
Dickinson, Texas 77539

DAVID RICHARDS
Richards, Rodriguez, and Skeith, LLP
816 Congress Avenue, Suite 1200
Austin, Texas 78701

J. GERALD HEBERT
DANIELLE LANG
Campaign Legal Center
1411 K Street NW, Suite 1400
Washington, D.C. 20005

ARMAND G. DERFNER
Derfner & Altman
575 King Street, Suite B
Charleston, South Carolina 29403

LUIS ROBERTO VERA, JR.
LULAC National General Counsel
The Law Offices of Luis Vera Jr. and Associates
1325 Riverview Towers, 111 Soledad
San Antonio, Texas 78205

*Counsel for the Veasey-LULAC Plaintiffs*

*/s/ Lindsey B. Cohan*

JON M. GREENBAUM
EZRA D. ROSENBERG
BRENDAN B. DOWNES
Lawyers' Committee for
Civil Rights Under Law
1401 New York Avenue NW Suite 400
Washington, D.C. 20005

WENDY WEISER
MYRNA PEREZ
JENNIFER CLARK
The Brennan Center for Justice at NYU Law School
161 Avenue of the Americas, Floor 12
New York, New York 10013-1205

AMY L. RUDD
LINDSEY B. COHAN
Dechert LLP
500 W. 6th Street, Suite 2010
Austin, Texas 78701

JOSE GARZA
Law Office of Jose Garza
7414 Robin Rest Drive
San Antonio, Texas 98209

DANIEL GAVIN COVICH
Covich Law Firm LLC
Frost Bank Plaza
802 N. Carancahua, Ste. 2100
Corpus Christi, TX 78401

GARY BLEDSOE
Potter Bledsoe, LLP
316 W. 12th Street, Suite 307
Austin, Texas 78701

VICTOR GOODE
NAACP
4805 Mt. Hope Drive
Baltimore, Maryland 21215

ROBERT NOTZON
The Law Office of Robert Notzon
1502 West Avenue
Austin, Texas 78701

*Counsel for the Texas State Conference of NAACP Branches and the Mexican American Legislative Caucus of the Texas House of Representatives*

*/s/ Marinda Van Dalen*
ROBERT W. DOGGETT
SHOSHANA J. KRIEGER
Texas Rio Grande Legal Aid
4920 N. IH-35
Austin, Texas 78751

MARINDA VAN DALEN
Texas Rio Grande Legal Aid
1206 E. Van Buren Street
Brownsville, Texas 78520

JOSE GARZA
Texas Rio Grande Legal Aid
1111 N. Main Avenue
San Antonio, Texas 78212

*Counsel for Lenard Taylor, Eulalio Mendez Jr., Lionel Estrada, Estela Garcia Espinoza, Maximina Martinez Lara, and La Union Del Pueblo Entero, Inc.*

*/s/ Leah Aden*
SHERRILYN IFILL
JANAI NELSON
CHRISTINA A. SWARNS
COTY MONTAG
LEAH C. ADEN
DEUEL ROSS
NAACP Legal Defense and Education Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006

JONATHAN PAIKIN
KELLY DUNBAR
TANIA FARANSSO
THADDEUS C. EAGLES
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006

*Counsel for Imani Clark*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 18, 2016, a true and correct copy of the foregoing document was served via the Court's ECF system to all counsel of record.

*/s/ Daniel J. Freeman*
Daniel J. Freeman
U.S. Department of Justice
950 Pennsylvania Ave. NW
Room 7123 NWB
Washington, D.C. 20530
daniel.freeman@usdoj.gov