IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

MARC VEASEY, *et al.*,

        Plaintiffs,

   v.

GREG ABBOTT, *et al.*,

        Defendants.

Civil Action No. 2:13-cv-193 (NGR)
[Lead Case]

**<u>UNITED STATES'S BRIEF CONCERNING DISCRIMINATORY INTENT</u>**

## **Table of Contents**

I.   Introduction .................................................................................................................. 1

II.  Background ................................................................................................................... 2

   A.  The Strict Requirements of SB 14 ......................................................................... 2

   B.  Failed Request for Preclearance ............................................................................ 4

   C.  Litigation History .................................................................................................. 5

III. Legal Standard ............................................................................................................. 6

   A.  Intentional Discrimination Under Section 2 of the Voting Rights Act ................. 6

   B.  Proving Intentional Discrimination ....................................................................... 8

   C.  The Law of the Case and the Mandate Rule ........................................................ 11

IV.  Argument ................................................................................................................... 11

   A.  Texas Enacted SB 14 with a Discriminatory Purpose ......................................... 11

      1.  SB 14 Had an Inevitable Discriminatory Impact. ........................................... 12

      2.  The Texas Legislature Shaped SB 14 to Ensure a Discriminatory Impact. ..... 20

      3.  SB 14 Is Only Tenuously Related to the Pretextual Purposes Asserted by
          Texas Legislators. ........................................................................................... 24

      4.  SB 14 Was Subject to Radical Departures from Ordinary Legislative Procedures. ...... 28

      5.  A Seismic Demographic Shift and Racially Polarized Voting Provide a Motive
          for Intentional Discrimination ........................................................................ 31

      6.  SB 14 Is Part of Texas's Ongoing History of Official Discrimination. ........... 33

   B.  The Texas Legislature Would Not Have Enacted SB 14 Absent a
       Discriminatory Purpose. ....................................................................................... 36

V.   Conclusion ................................................................................................................. 36

i

## Table of Authorities

**Cases**

*Allstate Ins. Co. v. Abbott*, 495 F.3d 151 (5th Cir. 2007) ........................................ 29, 30

*Arizona v. California*, 460 U.S. 605 (1983)................................................................. 11

*Barnett v. Daley*, 32 F.3d 1196 (7th Cir. 1994) ........................................................... 8

*Beare v. Smith*, 321 F. Supp. 1100 (S.D. Tex.1971)................................................... 34

*Busbee v. Smith*, 549 F. Supp. 494 (D.D.C. 1982) (three-judge court) ........................ 19

*Bush v. Vera*, 517 U.S. 952 (1996) ............................................................................ 6

*Carrington v. Rash*, 380 U.S. 89 (1965)................................................................. 8, 32

*Chisom v. Roemer*, 501 U.S. 380 (1991) .................................................................... 6

*Crowe v. Smith*, 261 F.3d 558 (5th Cir. 2001).......................................................... 11

*Dayton Bd. of Ed. v. Brinkman*, 443 U.S. 526 (1979) ................................................ 12

*Dews v. Town of Sunnyvale*, 109 F. Supp. 2d 526 (N.D. Tex. 2000) .......................... 35

*Diaz v. Pan Am. Airways, Inc.*, 442 F.2d 385 (5th Cir. 1971) .................................... 25

*Dominguez-Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424 (1st Cir. 2000) ........................ 28

*Esperanza Peace & Justice Ctr. v. City of San Antonio*, 316 F. Supp. 2d 433
    (W.D. Tex. 2001)..................................................................................................... 29

*Exodus Refugee Immigration, Inc. v. Pence*, 838 F.3d 902 (7th Cir. 2016) .................. 7

*Fish v. Kobach*, No. 16-3147, 2016 WL 6093990 (10th Cir. Oct. 19, 2016) ............... 28

*Flowers v. Wiley*, 675 F.2d 704 (5th Cir. 1982) ........................................................ 34

*Gaffney v. Cummings*, 412 U.S. 735 (1973) ............................................................... 8

*Garza v. Cnty. of L.A.*, 918 F.2d 763 (9th Cir. 1990) ............................................. 7, 32

*Gomillion v. Lightfoot*, 167 F. Supp. 405 (M.D. Ala. 1958)...................................... 33

*Gomillion v. Lightfoot*, 364 U.S. 339 (1960) ........................................................ 8, 33

*Goosby v. Town Bd.*, 180 F.3d 476 (2d Cir. 1999) ...................................................... 32

*Hunter v. Underwood*, 471 U.S. 222 (1985)..................................................... 7, 16, 19, 36

*Ketchum v. Byrne*, 740 F.2d 1398 (7th Cir. 1984)......................................................... 8

*Keyes v. Sch. Dist. No. 1*, 413 U.S. 189 (1973) ...................................................... 33, 35

*Lane v. Wilson*, 307 U.S. 268 (1939)....................................................................... 33

*League of Women Voters v. Newby*, 838 F.3d 1 (D.C. Cir. 2016)................................. 28

*LULAC v. Clements*, 999 F.2d 831 (5th Cir. 1993) (en banc) ...................................... 10

*LULAC v. Perry*, 548 U.S. 399 (2006) ................................................................... 6, 8

*Med. Ctr. Pharm. v. Holder*, 634 F.3d 830 (5th Cir. 2011) ........................................ 11

*Miller v. Johnson*, 515 U.S. 900 (1995)................................................................... 10

*Miss. State Chapter, Operation PUSH, Inc. v. Mabus*, 932 F.2d 400 (5th Cir. 1991) ................ 28

*Musselman v. Warden*, 456 Fed. App'x 520 (6th Cir. 2012)........................................ 22

*N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204 (4th Cir. 2016) ................................ passim

*Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142 (9th Cir. 2013) ............. 26, 29

*Perez v. Perry*, No. 5:11-cv-360, Slip Op. (W.D. Tex. Mar. 19, 2012) (three-judge court)
    (ECF No. 690)......................................................................................... 35

*Perez v. Texas*, 891 F. Supp. 2d 808 (W.D. Tex. 2012) (three-judge court) ................................ 31

*Perkins v. City of W. Helena*, 675 F.3d 201 (8th Cir. 1982)........................................ 31

*Personnel Adm'r v. Feeney*, 442 U.S. 256 (1979) ....................................... 7, 12, 19, 20

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000)................................. 25

*Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471 (1997)........................................... 8, 12

*Resident Advisory Bd. v. Rizzo*, 564 F.2d 126 (3d Cir. 1977)..................................... 30

*Reynolds v. Sims*, 377 U.S. 533 (1964) .................................................................. 1

*Rogers v. Lodge*, 458 U.S. 613 (1982) ............................................................... 8, 9

*Shaw v. Reno*, 509 U.S. 630 (1993) ...................................................................... 19

*Shelby Cnty. v. Holder*, 133 S. Ct. 2612 (2013) .................................... 4, 6, 33, 34

*St. Mary's Honor Ctr. v. Hicks*, 409 U.S. 502 (1993) ...................................... 25

*Staten v. New Palace Casino, LLC*, 187 Fed. App'x 350 (5th Cir. 2006) ................... 28

*Terrazas v. Clements*, 581 F. Supp. 1329 (N.D. Tex. 1984) (three-judge court) ........ 24

*Texas v. Holder*, 133 S. Ct. 2612 (2013) .............................................................. 5

*Texas v. Holder*, 888 F. Supp. 2d 113 (D.D.C. 2012) (three-judge court) ................ 4

*Texas v. United States*, 887 F. Supp. 2d 133 (D.D.C. 2012) (three-judge court) ........ 35

*Thornburg v. Gingles*, 478 U.S. 30 (1986) .................................................... 10, 16

*Tollett v. City of Kemah*, 285 F.3d 357 (5th Cir. 2002) ................................... 11

*United States v. Brown*, 561 F.3d 420 (5th Cir. 2009) ................................... 6, 8, 9

*United States v. Pineiro*, 470 F.3d 200 (5th Cir. 2006) .................................... 11

*United States v. Teel*, 691 F.3d 578 (5th Cir. 2012) ...................................... 11

*United States v. Texas*, 601 F.3d 354 (5th Cir. 2010) ................................... 35

*United States v. Texas*, 793 F.2d 636 (5th Cir. 1986) ................................... 10

*United States v. Thomas*, 167 F.3d 299 (6th Cir. 1999) ................................. 11

*Veasey v. Abbott*, 796 F.3d 487 (5th Cir. 2015) ........................................... 5

*Veasey v. Abbott*, 815 F.3d 958 (5th Cir. 2016) ........................................... 5

*Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016) (en banc) ...................... passim

*Veasey v. Perry*, 71 F. Supp. 3d 627 (S.D. Tex. 2014) ........................... passim

*Vill. of Bellwood v. Dwivedi*, 895 F.2d 1521 (7th Cir. 1990) ...................... 7

*Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977).................. passim

*Washington v. Davis*, 426 U.S. 229 (1976)............................................................. 8

*Weinberger v. Wiesenfeld*, 420 U.S. 636 (1975) ..................................................... 10

*White v. Regester*, 412 U.S. 755 (1973)................................................................ 34

*Zimmer v. McKeithen*, 485 F.2d 1297 (5th Cir. 1973) (en banc)................................. 9

**Constitutions and Statutes**

2011 S.C. Laws Act 27 ..................................................................................... 14

52 U.S.C. § 10301 ...................................................................................... 2, 6

52 U.S.C. § 10304 ......................................................................................... 20

52 U.S.C. § 10304 ........................................................................................... 4

52 U.S.C. § 10310 ........................................................................................... 6

Ala. Code § 17-9-30....................................................................................... 18

Ga. Code § 21-2-417.1 ............................................................................... 16, 18

Kan. Stat. § 65-2418 ...................................................................................... 16

Miss. Code § 25-15-7...................................................................................... 18

N.H. Rev. Stat. § 652:26 ................................................................................. 15

R.I. Gen. Laws § 17-6-13................................................................................. 15

S.C. Code § 7-5-675........................................................................................ 18

Tex. Const. art. III, § 5 ................................................................................... 29

Tex. Elec. Code § 13.142 (2010) ........................................................................ 2

Tex. Elec. Code § 15.005 ................................................................................. 15

Tex. Elec. Code § 3.074 .................................................................................. 13

Tex. Elec. Code § 31.012 ................................................................................. 15

Tex. Elec. Code § 63.001 (2010) ............................................................................. 2, 3

Tex. Elec. Code § 63.0101 ..................................................................................... 3, 25

Tex. Elec. Code § 65.054 ............................................................................................ 4

Tex. Elec. Code §§ 82.001-.004 ................................................................................ 25

Tex. Elec. Code §63.0101 (2010) ............................................................................... 3

Tex. Health & Safety Code § 191.0046 ..................................................................... 16

Tex. Sen. Bill 983 (2015) .......................................................................................... 16

Tex. Transp. Code § 521A.001 ....................................................................... 4, 16, 17

**Regulations**

37 Tex. Admin. Code § 15.182 ................................................................................. 16

**Legislative History**

H.R. Rep. No. 109-478 (2006) .................................................................................. 32

S. Rep. No. 97-417 (1982) ............................................................................... 6, 8, 10

**Rules**

5th Cir. R. 41.3 ........................................................................................................... 5

**Treatises**

J. Wigmore, *Evidence* (3d ed. 1940) ......................................................................... 33

## I.   INTRODUCTION

When the Texas Legislature enacted SB 14 (2011), it imposed substantial burdens on hundreds of thousands of Texas voters who lack narrowly defined forms of ID—voters who are disproportionately Hispanic or African-American—denying many of these voters the fundamental right "to exercise the franchise in a free and unimpaired manner."  *Reynolds v. Sims*, 377 U.S. 533, 562 (1964).  This discriminatory impact was not merely an unintended consequence of SB 14.  It was, in part, SB 14's purpose.

A wealth of record evidence makes that clear: a stark and foreseeable impact on Hispanic and African-American voters exacerbated by unexplained choices in SB 14's design, a contemporaneous history of discrimination and a long-standing pattern of pretextual voter fraud claims, a seismic demographic shift that—due to persistent racially polarized voting—threatened incumbent legislators, an extraordinary degree of procedural irregularities undertaken to target a nearly nonexistent problem, refusal to consider measures that would have ameliorated the bill's impact without impairing its ostensible purpose, and bill proponents' persistent refusal to answer public questions about SB 14's obvious discriminatory impact—paired with private concessions of that precise impact.  Along with Texas's proven willingness to shape the electorate by disenfranchising or disempowering minority voters, the evidence establishes a decisive inference of discriminatory intent.

Thus, after a nine-day trial that included testimony from legislators, state officials, historians, social scientists, service providers, and citizens deprived of the opportunity to vote without a serious impediment, this Court found that "discriminatory purpose was at least one of the motivating factors for the passage of SB 14."  *Veasey v. Perry* (*Veasey I*), 71 F. Supp. 3d 627, 702 (S.D. Tex. 2014), *aff'd in part, rev'd in part, and vacated in part*, 830 F.3d 216 (5th Cir. July 20, 2016) (en banc).  And while the en banc Fifth Circuit held that a slim subset of

1

underlying evidence was infirm or not entitled to substantial weight, it acknowledged that "the record also contained evidence that could support a finding of discriminatory intent." *Veasey v. Abbott* (*Veasey II*), 830 F.3d 216, 234-35 (5th Cir. 2016) (en banc), *cert. pending*, No. 16-393 (U.S. Sept. 27, 2016). Not only did the Court of Appeals affirm this Court's judgment that SB 14 "has a discriminatory effect on minorities' voting rights" and thus violates Section 2 of the Voting Rights Act, 52 U.S.C. § 10301, it accepted specific findings at the heart of this Court's purpose inquiry. *See Veasey II*, 830 F.3d at 230-43, 250-65.

The Court of Appeals remanded for this Court to reweigh this evidence. *See id.* at 230, 241-42. Because the Court of Appeals upheld this Court's core conclusions supporting a discriminatory purpose finding, and because that evidence is weighty and compelling, this Court should find that SB 14's proponents were motivated, at least in part, "because of and not merely in spite of the voter ID law's detrimental effects on the African-American and Hispanic electorate," and that Texas failed to prove that the law's "discriminatory features were necessary components to a voter ID law" such that it would have enacted SB 14 absent this discriminatory purpose. *Veasey I*, 71 F. Supp. 3d at 702-03. SB 14 violates Section 2's prohibition against purposeful discrimination in voting.

## II.    BACKGROUND

### A.    The Strict Requirements of SB 14

From 1997 until 2013, most in-person voters in Texas could cast a regular ballot by presenting a registration certificate, which is mailed to them upon successful registration and then reissued biennially. Tex. Elec. Code §§ 13.142, 63.001(b) (2010). Voters appearing without that certificate could cast a regular ballot by executing an eligibility affidavit and presenting alternate ID, such as a current or expired driver's license, an employee or student ID,

or a utility bill, paycheck, bank statement, or government document showing the voter's name and address.  *Id.* §§ 63.001, 63.0101 (2010); *see also Veasey II*, 830 F.3d at 225; PFOF ¶¶ 58-62.

During that time, Texas's minority population grew explosively.  Between 2000 and 2010, African Americans and Hispanics accounted for 78.7% of Texas's overall growth; by 2004, Texas had become a majority-minority state.  PFOF ¶ 7; *see also Veasey II*, 830 F.3d at 241.[1]  Voting throughout Texas remains sharply racially polarized, with African Americans and Hispanics voting overwhelmingly for Democratic candidates and Anglos heavily favoring Republican candidates.  PFOF ¶¶ 10-13; *see also Veasey II*, 830 F.3d at 258.  Amid this seismic demographic shift, Republican legislators repeatedly proposed stricter ID requirements for in-person voting.  PFOF ¶¶ 73-80.  In 2005, 2007, and 2009, photo-ID proponents introduced increasingly restrictive bills, ostensibly to prevent in-person voter impersonation and non-citizen voting.  PFOF ¶¶ 73-80.  Opponents explained that these proposals would unduly and adversely impact minority voters and blocked the legislation.  PFOF ¶¶ 201-203.

After Republicans gained sizeable majorities in the Texas House and Senate in 2010, PFOF ¶ 15, the 82nd Texas Legislature enacted SB 14, which requires in-person voters to present one of five then-existing types of photo ID:  (1) a driver's license or ID card issued by the Texas Department of Public Safety (DPS); (2) a DPS-issued license to carry a concealed handgun; (3) a U.S. passport; (4) a U.S. citizenship certificate; or (5) U.S. military ID.  The ID must be unexpired or have expired within 60 days.  Tex. Elec. Code § 63.0101.  SB 14 also created a new form of qualifying photo ID:  the election identification certificate (EIC).  *Id.*

---

[1] As used herein, the term "Anglo" refers to non-Hispanic white individuals; the term "Hispanic" is used interchangeably with Latino or Latina; the term "African American" refers to non-Hispanic black individuals; and the term "minority" means Hispanic, African-American, or both.  *See also Veasey II*, 830 F.3d at 250 n.43 (adopting the same terminology).

§ 63.0101(a).[2]  SB 14 authorized DPS to issue EICs to voters who otherwise lack SB 14 ID and

permitted DPS to require EIC applicants to present the same information and underlying

documentation required of driver license applicants.  Tex. Transp. Code § 521A.001.  Although

voters who fail to present qualifying ID may cast a provisional ballot, Texas counts that ballot

only if the voter appears in person at his or her county registrar within six days and either

presents SB 14 ID or executes an affidavit attesting to either a religious objection to being

photographed or loss of a photo ID in a recent natural disaster.  Tex. Elec. Code § 65.054(b)(2);

*see also Veasey II*, 830 F.3d at 225-26; PFOF ¶¶ 62-68.  Absentee voting procedures, favored by

Anglo voters but more susceptible to fraud, were left untouched.  PFOF ¶¶ 71, 182, 409-411.

### B.   Failed Request for Preclearance

When Texas enacted SB 14, the State was subject to preclearance requirements under

Section 5 of the Voting Rights Act, 52 U.S.C. § 10304, and could not enforce SB 14 unless and

until the State established that the law had neither a discriminatory purpose nor a discriminatory

effect.  PFOF ¶ 113.  The Attorney General denied administrative preclearance, and a three-

judge court denied judicial preclearance after concluding that Texas failed to meet its burden of

demonstrating that SB 14, if implemented, lacked a retrogressive effect.  *See Texas v. Holder*,

888 F. Supp. 2d 113, 115, 117, 138 (D.D.C. 2012) (three-judge court).[3]  The Supreme Court

vacated that decision in light of *Shelby County v. Holder*, 133 S. Ct. 2612 (2013), which held that

---

[2] Persons with disabilities who are able to provide their county voter registrar with written documentation of their disability from the Social Security Administration or the U.S. Department of Veterans Affairs may obtain exemptions from these requirements.  *See* Tex. Elec. Code § 13.002(i).

[3] The court went farther:  "Significantly, however, this case does not hinge merely on Texas's failure to prove a negative.  To the contrary, record evidence suggests that SB 14, if implemented, would in fact have a retrogressive effect on Hispanic and African American voters."  *Id.*  Because the court denied preclearance based on this retrogressive effect, however, it did not "consider whether Texas ha[d] satisfied [S]ection 5's purpose element."  *Id.* at 115, 144.

Section 4(b) of the Act could no longer be used as a basis to impose Section 5's preclearance requirements. *Texas v. Holder*, 133 S. Ct. 2612 (2013).

### C.   Litigation History

Immediately following *Shelby County*, Texas announced that SB 14 would take effect as enacted, PFOF ¶ 115, and the United States and private plaintiffs responded by filing challenges to SB 14, *see, e.g.*, Compl., *United States v. Texas*, 2:13-cv-263 (S.D. Tex. Aug. 22, 2013) (ECF No. 1). The United States alleged that SB 14 violates Section 2 because of its racially discriminatory purpose and its discriminatory result. U.S. Compl. ¶¶ 68-69. After an extensive trial, this Court issued a detailed opinion concluding that SB 14 had both a discriminatory purpose and result. *See Veasey I*, 71 F. Supp. 3d at 698, 702. Most notably, this Court found that "demographic trends and polarized voting patterns" gave the governing party a powerful incentive to "gain partisan advantage by suppressing" the "votes of African-Americans and Latinos" and that proponents could not adequately explain SB 14's restrictive provisions. *Id.* at 700. This Court thereafter found the Legislature would not have enacted SB 14 absent that discriminatory purpose. *See id.* at 702.

The Court of Appeals, sitting en banc, affirmed this Court's finding that SB 14 has a discriminatory result and vacated this Court's judgment as to SB 14's discriminatory purpose. *Veasey II*, 830 F.3d at 230, 264-65.[4] Although the Court of Appeals disapproved of a few discrete findings underlying this Court's purpose finding, the Court of Appeals concluded that "there is evidence that could support [this Court's] finding of discriminatory purpose." *Id.* at 230

---

[4] A unanimous three-judge panel had earlier affirmed this Court's finding that SB 14 has a discriminatory result and vacated this Court's finding that SB 14 also was enacted for a discriminatory purpose. *See Veasey v. Abbott*, 796 F.3d 487, 499-504 (5th Cir. 2015). That decision was vacated upon the grant of rehearing en banc. *See Veasey v. Abbott*, 815 F.3d 958 (5th Cir. 2016); *see also* 5th Cir. R. 41.3.

(internal quotation marks and citation omitted).[5]  The Court of Appeals went on at length to lay

out "evidence to support a finding that the cloak of ballot integrity could be hiding a more

invidious purpose," *id.* at 234-43, and to affirm numerous findings of fact in the course of

holding that SB 14 has a discriminatory result, *id.* at 250-65.  The Court of Appeals then

remanded to this Court for "a reweighing of the evidence" concerning the purpose claim, in light

of the guidance provided.  *Id.* at 230, 242.

## III.   LEGAL STANDARD

Section 2 of the Voting Rights Act imposes a "permanent, nationwide ban on racial

discrimination in voting."  *Shelby Cnty.*, 133 S. Ct. at 2631.  It prohibits any "voting qualification

or prerequisite to voting or standard, practice, or procedure" that "results in denial or

abridgement" of the right to vote "on account of race or color."  52 U.S.C. § 10301(a).  The

terms "vote" and "voting" encompass "all action necessary to make a vote effective," including

"casting a ballot, and having such ballot counted properly and included in the appropriate totals

of votes cast."  *Id.* § 10310(c)(1).  Section 2 thus forbids the adoption or enforcement of a voting

law or practice with a racially discriminatory purpose.  *See United States v. Brown*, 561 F.3d

420, 433 (5th Cir. 2009); *see also Chisom v. Roemer*, 501 U.S. 380, 394 n.21 (1991) (quoting S.

Rep. No 97-417, at 27 (1982)); *Veasey II*, 830 F.3d at 229.

### A.   Intentional Discrimination Under Section 2 of the Voting Rights Act

To prove discriminatory intent under Section 2, plaintiffs must show that a discriminatory

purpose was "a motivating factor" behind enactment of the challenged law.  *Village of Arlington*

*Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264-66 (1977); *see also Veasey II*, 830 F.3d

---

[5] The Court of Appeals disapproved reliance on evidence of State-sponsored discrimination "dating back
hundreds of years," evidence of "reprehensible actions" in a single county, "post-enactment speculation
by opponents," and "stray statements made by a few individual legislators" after voting in favor of SB 14
and disapproved the weight placed on *Bush v. Vera*, 517 U.S. 952, 976 (1996), and *LULAC v. Perry*, 548
U.S. 399 (2006).  *See Veasey II*, 830 F.3d at 230-34 (plurality opinion).

at 230 ("We apply the [*Arlington Heights*] framework . . . to determine whether SB 14 was passed with a discriminatory purpose.").  Mere "awareness of consequences" is not enough.  Rather, discriminatory purpose means that the legislature acted at least in part "because of," and not merely "in spite of," a law's "adverse effects upon an identifiable group."  *Personnel Adm'r v. Feeney*, 442 U.S. 256, 279 (1979).  That said, a discriminatory purpose "need only be one purpose, and not even a primary purpose," of the challenged law, *Veasey II*, 830 F.3d at 230 (quoting *Brown*, 561 F.3d at 433), as any additional purpose "would not render nugatory the purpose to discriminate."  *Hunter v. Underwood*, 471 U.S. 222, 232 (1985); *see also Arlington Heights*, 429 U.S. at 265.  Once a discriminatory purpose is shown, "the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor."  *Hunter*, 471 U.S. at 228.

A discriminatory purpose claim is not an allegation of "racial hatred or animosity toward any minority group."  *N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 233 (4th Cir. 2016), *stay denied*, No. 16A168, 2016 WL 4535259 (U.S. Aug. 31, 2016).  Under Section 2, "there can be intentional discrimination without an invidious motive."  *Garza v. Cnty. of L.A.*, 918 F.2d 763, 778 & n.1 (9th Cir. 1990) (Kozinski, J., concurring in relevant part); *see also Veasey II*, 830 F.3d. at 336 (Costa, J., dissenting in relevant part) ("If [a] desire for partisan advantage (or any other underlying motivation) leads a legislature to select a course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group, that is enough.") (internal citation and quotation marks omitted).[6]  For instance, taking away political

---

[6] *Cf. Exodus Refugee Immigration, Inc. v. Pence*, 838 F.3d 902, 904 (7th Cir. 2016) (Posner, J.) (noting that a policy that disadvantages African Americans "not because they're black but because [the State is] afraid of them . . . of course would be racial discrimination"); *Vill. of Bellwood v. Dwivedi*, 895 F.2d 1521, 1531 (7th Cir. 1990) (Posner, J.) ("Discrimination may be instrumental to a goal not itself discriminatory.").

opportunity just as a minority group is about to exercise it "bears the mark of intentional

discrimination." *LULAC v. Perry*, 548 U.S. 399, 440 (2006); *see also Veasey II*, 830 F.3d at 241

n.30 ("[A]cting to preserve legislative power in a partisan manner can also be impermissibly

discriminatory."); *McCrory*, 831 F.3d at 222 ("[I]ntentionally targeting a particular race's access

to the franchise because its members vote for a particular party, in a predictable manner,

constitutes discriminatory purpose."); *Barnett v. Daley*, 32 F.3d 1196, 1199 (7th Cir. 1994);

*Ketchum v. Byrne*, 740 F.2d 1398, 1408 (7th Cir. 1984).[7]

### B.   Proving Intentional Discrimination

Determining whether a facially neutral law has a discriminatory purpose demands a

sensitive inquiry into such "circumstantial and direct evidence of intent as may be available,"

*Arlington Heights*, 429 U.S. at 264-66; *see also Veasey II*, 830 F.3d at 230-31, including the

"normal inferences to be drawn from the foreseeability of defendant's actions," *Brown*, 561 F.3d

at 433 (quoting S. Rep. No. 97-417, at 27 n.108); *see also Reno v. Bossier Parish Sch. Bd.*, 520

U.S. 471, 481 (1997).  Because "neutral reasons can and do mask racial intent,"

"[d]iscriminatory intent need not be proved by direct evidence."  *Veasey II*, 830 F.3d at 235-36

(internal quotation marks and citation omitted); *see also id.* at 235 ("In this day and age we rarely

have legislators announcing an intent to discriminate based upon race, whether in public

speeches or private correspondence.").  Thus, discriminatory purpose "may often be inferred

from the totality of the relevant facts."  *Rogers v. Lodge*, 458 U.S. 613, 617-18 (1982) (quoting

*Washington v. Davis*, 426 U.S. 229, 242 (1976)).

---

[7] "Fencing out" voters, or placing additional burdens on them because of how they are predicted to vote,
cannot provide a legitimate interest for a state's election laws.  *Carrington v. Rash*, 380 U.S. 89, 94
(1965); *see also Gaffney v. Cummings*, 412 U.S. 735, 751-54 (1973); *Gomillion v. Lightfoot*, 364 U.S.
339, 347-48 (1960).

In *Arlington Heights*, the Supreme Court set out a non-exhaustive list of five categories of evidence that are probative of discriminatory purpose: (1) a law's discriminatory impact; (2) its historical background; (3) the sequence of events preceding its enactment; (4) substantive and procedural departures from normal legislative processes; and (5) a law's legislative or administrative history, including contemporaneous statements by decisionmakers.  *See* 429 U.S. at 260-61; *see also Veasey II*, 830 F.3d at 230 (applying to Section 2).  The categories of evidence known as the Senate Factors—due to their inclusion in the Senate Report that accompanied the 1982 amendments to the Voting Rights Act—also "supply a source of circumstantial evidence regarding discriminatory intent."  *Brown*, 561 F.3d at 433; *see also Lodge*, 458 U.S. at 620-21 (including similar evidence previously catalogued in *Zimmer v. McKeithen*, 485 F.2d 1297 (5th Cir. 1973) (en banc), *aff'd sub nom. E. Carroll Parish Sch. Bd. v. Marshall*, 424 U.S. 636 (1976)).  The Senate Factors include seven numbered categories and two additional categories of evidence:

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;
2. the extent to which voting in the elections of the state or political subdivision is racially polarized;
3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;
4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;
5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;
6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction. . . .

- whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group[; and]

- whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

*Thornburg v. Gingles*, 478 U.S. 30, 44-45 (1986) (quoting S. Rep. No. 97-417, at 28-29); *see also McCrory*, 831 F.3d at 221 (describing racially polarized voting as "one of the critical background facts" of a Section 2 "discriminatory intent analysis").

In assessing discriminatory purpose, "it is essential to determine the genuineness of the state interests asserted, their nature and strength, and the degree to which they are served by the challenged action." *United States v. Texas*, 793 F.2d 636, 646 (5th Cir. 1986); *see also Miller v. Johnson*, 515 U.S. 900, 919 (1995) (holding that a district court "was justified in rejecting the various alternative explanations" offered for electoral districts); *LULAC v. Clements*, 999 F.2d 831, 871 (5th Cir. 1993) (en banc) ("[W]hether the adoption or maintenance of a system is a pretext for racial discrimination may present a question of fact" that can "turn on credibility."); *cf. Weinberger v. Wiesenfeld*, 420 U.S. 636, 648 (1975) ("[T]he mere recitation of a benign, compensatory purpose is not an automatic shield which protects against any inquiry into the actual purposes underlying a statutory scheme.").  "When there is proof that a discriminatory purpose has been a motivating factor in the decision," judicial deference to legislative prerogative "is no longer justified." *Arlington Heights*, 429 U.S. at 265-66.  Therefore, to establish that legislation would have been enacted even without a discriminatory purpose, a jurisdiction must prove that "*actual* non-racial motivations . . . *alone* can justify the legislature's choices." *McCrory*, 831 F.3d at 221 (emphasis in original).

### C.     The Law of the Case and the Mandate Rule

Under the law of the case doctrine, when a court decides a rule of law, "that decision should continue to govern the same issue in subsequent stages in the same case.'" *Med. Ctr. Pharm. v. Holder*, 634 F.3d 830, 834 (5th Cir. 2011) (quoting *Arizona v. California*, 460 U.S. 605, 618 (1983)).  The doctrine also extends to findings of fact, such that "[d]isturbing findings from earlier[ stages of] litigation requires more than a litigant's assertion that the previous findings were 'just wrong.'" *United States v. Thomas*, 167 F.3d 299, 307 (6th Cir. 1999); *see also, e.g.*, *Arizona v. California*, 460 U.S. at 618 (refusing to reexamine factual findings under the "general principles of finality and repose").

A corollary to the law of the case doctrine is the mandate rule, which "prohibits a district court on remand from reexamining an issue of law or fact previously decided on appeal and not resubmitted to the trial court on remand." *United States v. Teel*, 691 F.3d 578, 583 (5th Cir. 2012).  The rule "applies regardless of whether the issue was decided explicitly or by necessary implication," *Crowe v. Smith*, 261 F.3d 558, 562 (5th Cir. 2001), and "exceptions apply only when substantially different evidence comes out in the course of a subsequent trial authorized by the mandate," *Tollett v. City of Kemah*, 285 F.3d 357, 365-66 (5th Cir. 2002) (quotation marks, citation and emphasis omitted).  The mandate rule is "essential to the orderly administration of justice, as it is aimed at preventing obstinate litigants from repeatedly reasserting the same arguments." *United States v. Pineiro*, 470 F.3d 200, 205 (5th Cir. 2006).

## IV.   ARGUMENT

### A.     Texas Enacted SB 14 with a Discriminatory Purpose.

Compelling evidence establishes that Texas enacted SB 14 at least in part because of its detrimental effects on African-American and Hispanic voters.  Not only did the Court of Appeals leave undisturbed this Court's central findings and credibility determinations, the Fifth Circuit

11

characterized a range of this Court's findings as "circumstantial evidence of discriminatory intent." *Veasey II*, 830 F.3d at 239-43.  Applying the well-established *Arlington Heights* framework and the Fifth Circuit's guidance in *Veasey II*, this Court should reaffirm that Texas enacted SB 14 with discriminatory purpose.

### 1. SB 14 Had an Inevitable Discriminatory Impact.

SB 14's discriminatory "impact" on Hispanic and African-American voters is the "important starting point" for this Court's analysis, *Arlington Heights*, 429 U.S. at 266, because "people usually intend the natural consequences of their actions," *Bossier Parish*, 520 U.S. at 487; *see also Dayton Bd. of Ed. v. Brinkman*, 443 U.S. 526, 536 n.9 (1979) ("[P]roof of foreseeable consequences is one type of quite relevant evidence of racially discriminatory purpose.").  In particular, "when the adverse consequences of a law upon an identifiable group are . . . inevitable . . . , a strong inference that the adverse effects were desired can reasonably be drawn." *Feeney*, 442 U.S. at 279 n.25.  This Court previously found—and the Court of Appeals affirmed—that SB 14 results in denial or abridgment of the right to vote on account of race.  *See Veasey II*, 830 F.3d at 264-65; *see also Veasey I*, 71 F. Supp. 3d at 698.  This discriminatory impact was inevitable, and SB 14's proponents knew it and described it as such.

### a. The Narrow Range of Acceptable Identification Under SB 14 Imposes a Discriminatory Impact.

At the time of its enactment, SB 14 was the "strictest law in the country" governing in-person voter identification.  *Veasey II*, 830 F.3d at 241 n.31; PFOF ¶ 128.[8]  It created an

---

[8] The availability of absentee ballots to some voters who lack SB 14 ID does not eliminate the law's impact, even on those voters.  Rather, it relegates SB14-affected voters from the State's primary and preferred method of voting—in-person voting—to a system rife with administrative and procedural hurdles.  Forcing voters to vote absentee "is not an acceptable substitute" because mail balloting requires voters to meet "complex procedures" far in advance of the election and deprives them of assistance at the polls.  *Veasey II*, 830 F.3d at 255 & n.51; PFOF ¶¶ 71-72, 413.  Eliminating the choice of casting an in-person ballot also burdens voters who do not have ready access to where they receive mail, are "reluctant

impediment to voting for individuals who do not possess a small subset of government issued identification required to cast a regular ballot, and approximately "608,470 registered voters, or 4.5% of all registered voters in Texas, lack SB 14 ID." *Veasey II*, 830 F.3d at 250; PFOF ¶ 269. Local registrars determined each of these individuals to be eligible to vote. *See* Tex. Elec. Code § 3.074(a). They comprised 1.5% of all registered voters who cast a ballot in the November 2012 election. PFOF ¶ 417.[9]

Hispanic and African-American voters are substantially more likely than Anglo voters to lack SB 14 ID, as legislators knew. Specifically, ecological regression analysis estimates that "Hispanic registered voters and [b]lack registered voters [are] respectively 195% and 305% more likely than their Anglo peers to lack SB 14 ID." *Veasey II*, 830 F.3d at 250; PFOF ¶ 269.[10] Additional methods of analysis confirm this substantial disparity. *See Veasey II*, 830 F.3d at 251; PFOF ¶¶ 269-277. Ecological regression estimated that only 0.6% of Anglo voters who cast a ballot in the November 2012 election lack SB 14 ID, compared to 2.0% of Hispanic voters and 4.2% of African-American voters. PFOF ¶ 418. In other words, among voters who

---

to vote by mail due to the increased risk of fraud," or wish to follow political developments through Election Day. *Veasey II*, 830 F.3d at 255-56; PFOF ¶ 413. To the extent that the availability of absentee ballots reduces the impact of SB 14 on some voters, the ameliorative impact disproportionately benefits Anglo voters. PFOF ¶ 409-411; *see also* Section IV.C, *infra*.

[9] Even removing individuals who are eligible to overcome SB 14 by gathering documentation of a federally recognized disability and applying for an exemption, 534,512 registered voters, or 4.0% of all registered voters in Texas, lack SB 14 ID and must obtain it to cast an in-person ballot that will count under SB 14. PFOF ¶ 272. Similarly removing individuals who are eligible to vote absentee on account of age and thereby avoid SB 14's requirements, 429,769 registered voters, or 3.2% of all registered voters in Texas, lack SB 14 ID and must obtain it to cast a ballot that will count under SB 14. PFOF ¶ 274. These figures do not include the many eligible Texas citizens who are not registered to vote and do not possess SB 14 ID.

[10] Excluding individuals who are eligible to apply for a disability exemption from ID requirements does not substantially alter the discriminatory impact. Ecological regression analysis estimates Hispanic registered voters and African-American registered voters are respectively 194% and 256% more likely than Anglo registered voters to lack SB 14 ID and to be ineligible for a disability exemption. PFOF ¶ 272.

participated in the last federal election before SB 14 went into effect, Hispanic voters are more than three times as likely as Anglo voters to lack SB 14 ID, and African-American voters are roughly seven times as likely as Anglo voters to lack SB 14 ID.  PFOF ¶ 418.

> **b.   SB 14 Imposes a Substantial and Disproportionate Burden on Affected Voters that Exacerbates Its Discriminatory Impact.**

Beyond the disproportionate burdens imposed by the narrow range of approved identification, minority voters without SB 14 ID also face "excessive burdens" to obtaining such identification.  *Veasey II*, 830 F.3d at 254.  Nearly all voters who lack SB 14 ID must overcome three categories of burdens before they can cast an in-person ballot that will count:  (1) learning about ID requirements and the least burdensome means by which to obtain SB 14 ID, (2) obtaining underlying documentation required to obtain SB 14, and (3) traveling to a location that issues SB 14 ID.  *See Veasey II*, 830 F.3d at 254; PFOF ¶ 287.  These burdens are substantial and exacerbate SB 14's discriminatory impact on minority voters, independent of ID possession disparities.  *Veasey II*, 830 F.3d at 251 (recognizing that "SB 14 disproportionately impacts the poor, who are disproportionately minorities" and who "face greater obstacles in obtaining photo identification"); PFOF ¶¶ 279-305.

"[T]he record is replete with evidence that the State devoted little funding or attention to educating voters about the new voter ID requirements, resulting in many Plaintiffs lacking information about . . . supposed accommodations until they were informed about them during the course of this lawsuit."  *Veasey II*, 830 F.3d at 256; PFOF ¶¶ 325-330.  "Texas's poor implementation," *Veasey II*, 830 F.3d at 254, was directly traceable to the lack of funding and to voter education provisions that ignored voters who lack required ID.  PFOF ¶ 324, 331-335.[11]

---

[11] These "lackluster efforts stand[] in stark contrast to those of other states."  *Veasey II*, 830 F.3d at 256 n.52; *see also, e.g.*, 2011 S.C. Laws Act 27, § 7 (requiring "an aggressive voter education program" including notice to "each registered elector who does not have a South Carolina issued driver's license or

SB 14 mandates that the Texas Secretary of State must "conduct a statewide effort to educate voters regarding . . . identification requirements," Tex. Elec. Code § 31.012(b), but does not require education regarding the EIC program.  PFOF ¶ 324.[12]  Similarly, SB 14 requires notice of identification requirements on voter registration certificates, on websites, and outside of polling places, Tex. Elec. Code §§ 15.005(a), 31.012(a), 31.012(c), and requires poll worker training to incorporate "the acceptance and handling of the identification presented by a voter," *id.* §§ 32.111(c), 32.114(a).  But SB 14 does not require the Texas Secretary of State to educate voters regarding what the newly-created EIC is—let alone that it is available without paying a fee to DPS—or to train poll workers to inform voters who arrive at a polling place without SB 14 ID regarding the availability of EICs.  PFOF ¶ 324.

These failures harmed voters.  For instance, Floyd Carrier and his adult son undertook lengthy efforts to obtain acceptable voter ID without anyone telling them that an EIC was available without paying a fee to DPS.  *Veasey II*, 830 F.3d at 254-55; PFOF ¶ 330.  Overall, inadequate voter education imposes a greater burden on voters with lower educational attainment; in Texas, those voters are—and are widely known to be—disproportionately African-American and Hispanic.  PFOF ¶ 329.[13]

---

identification card"); N.H. Rev. Stat. § 652:26(I) (requiring education concerning "all the permissible methods of proving identity"); R.I. Gen. Laws § 17-6-13 (requiring the Secretary of State to "identify communities within the state in need of electoral process education by outreaching community organizations").

[12] Even regarding these narrowly defined voter education requirements, the fiscal note attached to SB 14 estimated zero expenditures after the first year.  PFOF ¶ 256.

[13] Similarly, SB 14 does not require the Secretary of State to educate voters concerning the disability exemption, PFOF ¶ 405, and Marvin Holmes testified that—although he possesses the documentation required to obtain a disability exemption—he was unaware that the exemption existed until he learned of it from counsel.  PFOF ¶ 406.  As of January 2014, only 18 voters had successfully applied for a disability exemption, out of over 70,000 who lacked SB 14 ID and were eligible to apply.  PFOF ¶ 403.

Even voters who learn that EICs exist—or who accept the burden of paying for another form of SB 14 ID—often struggle to obtain underlying documents due to cost or difficulties obtaining an accurate birth record.  *See Veasey II*, 830 F.3d at 254; PFOF ¶¶ 368-397.  Again, SB 14 imposes these burdens directly.[14]  It authorizes DPS to require EIC applicants to provide the same set of underlying documents required of driver license applicants, Tex. Transp. Code § 521A.001(f), and DPS accepted the Legislature's invitation, although DPS further limited the set of acceptable documents because EIC applicants (by definition) lack some documents that may be used by driver license applicants, *see* 37 Tex. Admin. Code § 15.182; PFOF ¶¶ 368-370. Eligible voters without SB 14 ID who wish to obtain an acceptable Texas ID must present a certified birth certificate, unless they possess a Texas driver's license or ID card expired within two years, citizenship documents without a photograph, or a court order changing their name or gender.  PFOF ¶¶ 370-372.  A certified copy of an ordinary Texas birth certificate costs at least $22.  PFOF ¶ 378.[15]  Voters born outside of Texas must overcome bureaucratic impediments and pay between $5 and $34 for a U.S. birth certificate or $345 for replacement citizenship documents.  PFOF ¶ 378.  And even voters able to shoulder the cost and effort to obtain a birth certificate needed to obtain an EIC may still be thwarted by "difficulties with delayed,

---

[14] Other states have ensured that voters are not required to pay fees to obtain underlying documents.  *See, e.g.*, Ga. Code § 21-2-417.1(e) (minimal documentation requirements); Kan. Stat. § 65-2418(3), (15) (waiving birth certificate fees and requiring designation of offices in every county to assist in obtaining underlying documentation for voter ID purposes); PFOF ¶ 397.

[15] More than two years after the Texas Legislature enacted SB 14, the Texas Department of State Health Services (DSHS) created a reduced cost Texas birth certificate that can only be obtained in person—by individuals who by definition do not have a driver's license—and can only be used to obtain an EIC. PFOF ¶ 431.  SB 14 did not authorize creation of this reduced-cost EIC birth certificate, and neither DPS nor DSHS has educated voters that EIC birth certificates are available.  PFOF ¶¶ 431-432.  SB 983 (2015) eliminated remaining fees for EIC birth certificate applicants who know to "state[] that [they are] requesting the record for the purpose of obtaining an election identification certificate," Tex. Health & Safety Code § 191.0046(e); *see also* Tex. Sen. Bill 983 (2015) (failing to require voter education or to fund outreach), but that later bill does not reflect the original purpose of SB 14.  *See Hunter*, 471 U.S. at 232-33; *McCrory*, 831 F.3d at 239-40; *see also Gingles*, 478 U.S. at 76 (holding that courts may discount abatement of discrimination during the pendency of litigation).

16

nonexistent, out-of-state, or amended birth certificates." *Veasey II*, 830 F.3d at 254; PFOF

¶¶ 368-397.  For example, Margarito Lara visited three offices in two counties and paid a $22

search fee, only to confirm that his birth in the Rio Grande Valley had never been recorded,

PFOF ¶ 376.  And Estela Garcia Espinoza accepted the assistance of Texas Rio Grande Legal

Aide to pay for a birth certificate, only to receive a useless document that misstated her date of

birth and included only her maiden name, PFOF ¶ 290.  These impediments magnify SB 14's

discriminatory impact because "[t]he poor, who are disproportionately minorities, . . . [a]re also

more likely to lack the underlying documents to get an EIC." *Veasey II*, 830 F.3d at 251; PFOF

¶¶ 368-397.

Even if a voter without SB 14 ID manages to learn about acceptable ID and obtain

necessary documentation, that voter must still travel to a location that issues SB 14 ID, which

may include "long distances and other travel issues that make getting [to such a location]

problematic." *Veasey II*, 830 F.3d at 254; PFOF ¶¶ 349-367.  SB 14 authorizes only DPS to

issue EICs.  Tex. Transp. Code § 521A.001(a).  Approximately 46 counties in Texas have part-

time DPS offices, and approximately 78 counties have no DPS office at all.  PFOF ¶ 349.  Even

taking into account county officials who have agreed to issue EICs,[16] an estimated 4.7% of

Texas citizens of voting age face more than 90 minutes of roundtrip travel to apply for an EIC, as

do 13.8% of citizens of voting age who live in poverty.  PFOF ¶ 356.  Voters who live in urban

areas with low vehicle access must take lengthy public transit journeys to permanent DPS

offices, with average one-way travel times of 66.7 minutes, 36.2 minutes, and 59.7 minutes

---

[16] DPS did not enter into agreements with county offices until after the commencement of litigation, and
SB 14 does not contemplate, let alone authorize, this ameliorative arrangement.  PFOF ¶ 352.  Similarly,
Texas legislators rejected a proposed amendment to require DPS offices to remain open on evenings and
weekends to reduce the burdens related to voter ID.  PFOF ¶ 242.  Thus, the State's decision during
litigation to increase operating hours prior to elections does not reflect the intent of SB 14.

respectively in Houston, San Antonio, and Dallas. PFOF ¶ 362. In Corpus Christi, for example,

Kenneth Gandy "faces an hour-long, one-way trip to reach the nearest DPS office" by public

transit. *Veasey II*, 830 F.3d at 255; PFOF ¶ 363. Once voters arrive, they must wait in lines and

may need to return if their underlying documents are insufficient. PFOF ¶¶ 365-367, 371-373.

Travel burdens also exacerbate SB 14's discriminatory impact because Hispanic and African-

American Texans are more likely than Anglo Texans to lack access to a motor vehicle or to face

at least a 90 minute roundtrip journey to a location that issues EICs—as bill proponents were

well aware. *See Veasey II*, 830 F.3d at 251; PFOF ¶¶ 205-207, 357.[17] Thus, it is no surprise that

as of trial, only 279 EICs had been issued to the more than 600,000 voters who lack SB 14 ID.

PFOF ¶ 428.

### c.   Contemporaneous Statements Illustrate that SB 14's Discriminatory Impact Was Obvious to Bill Proponents.

"The record shows that drafters and proponents of SB 14 were aware of the likely

disproportionate effect of the law on minorities." *Veasey II*, 830 F.3d at 236; *see also id.* at 261-

62 ("The evidence supports the district court's finding that 'the legislature knew that minorities

would be most affected by the voter ID law.'" (quoting *Veasey I*, 71 F. Supp. 3d at 657-58));

PFOF ¶¶ 201-219. They were also "aware that everything that [they were] saying was part of a

public record" that would be reviewed in proceedings under the Voting Rights Act. *Veasey II*,

---

[17] Other states have ensured that identification needed to vote is available in all counties. *See, e.g.*, Ga. Code § 21-2-417.1(a); Miss. Code § 25-15-7(2); PFOF ¶ 350. Other voter identification statutes have also entrusted election officials with issuing voter identification, *see, e.g.*, Ala. Code § 17-9-30(f); S.C. Code § 7-5-675, whereas the Texas Legislature's decision to require some voters to visit a law enforcement agency imposes an additional burden. SB 14 authorized DPS to collect fingerprints from EIC applicants, *see* Tex. Transp. Code § 521A.001(f) (authorizing requests for information required by Section 521.142); *see also id.* § 521.142(b)(1) (requiring fingerprinting), and DPS regulations require fingerprinting of EIC applicants, 37 Tex. Admin. Code § 15.183(a)(3), although DPS has suspended this practice. PFOF ¶¶ 344-345. Voters with outstanding tickets or who do not wish to submit to a warrant check are intimidated by the prospect of visiting DPS offices. PFOF ¶ 342. Finally, other states issue an ordinary personal identification card as no-fee identification, so that the costs of obtaining ID will provide additional value to the voter. *See* Ind. Code § 9-24-16-10(b)-(c); Kan. Stat. § 8-1324(g)(2); PFOF ¶ 399.

830 F.3d at 235 n.19.  Nonetheless, key admissions are found in "contemporary statements by members of the decisionmaking body" and their agents.  *Arlington Heights*, 429 U.S. at 268.  Because individuals with critical roles in SB 14's development made these admissions, they are particularly probative of the discriminatory intent behind legislation enacted by a strict party-line vote.  *See Busbee v. Smith*, 549 F. Supp. 494, 509-10 (D.D.C. 1982) (three-judge court) (emphasizing the role of a single legislator who controlled key votes), *aff'd*, 103 S. Ct. 809 (1983); *see also Hunter*, 471 U.S. at 229.  Legislators' decision to enact SB 14—notwithstanding its inevitable discriminatory impact—gives rise to a "strong inference" of purposeful discrimination.  *Feeney*, 442 U.S. at 279 n.25.

Representative Todd Smith, chairman of the House Elections Committee and a joint sponsor of SB 14, publicly estimated during consideration of a predecessor voter ID bill that up to 700,000 voters lack a driver's license.  PFOF ¶ 202.  He later admitted under oath that, "[I]f the question is[,] are the people that do not have photo IDs more likely to be minority than those that are not, I think it's a matter of common sense that they would be.  I don't need a study to tell me that."  PFOF ¶ 209.  His candor simply states what all legislators knew.  The "history of State-sponsored discrimination" in Texas has led to broad racial "disparities in education, employment, housing, and transportation," *Veasey II*, 830 F.3d at 259; PFOF ¶ 29, and lawmakers may be presumed to be familiar with the demographics and socioeconomics of their state, *see, e.g.*, *Shaw v. Reno*, 509 U.S. 630, 646 (1993) (recognizing that a "legislature always is *aware* of race when it draws district lines, just as it is aware of age, economic status, religious and political persuasion, and a variety of other demographic factors").

Because African-American and Hispanic citizens are more likely to lack photo ID, legislators and their staff also knew that restricting the range of acceptable identification would

disenfranchise minority voters.  Bryan Hebert, then-Deputy General Counsel to Lieutenant Governor Dewhurst, explained in a 2009 email that a particular voter ID proposal that allowed use of non-photo identification achieved the ostensible purpose of "improv[ing] security in election process" while creating "less chance of disenfranchising elderly, poor, or minority voters."  PFOF ¶ 210; *see also Veasey II*, 830 F.3d at 236 n.21.[18]  He explained that including additional forms of identification "[i]ncreases chances of federal pre-clearance" under Section 5 of the Voting Rights Act.  PFOF ¶ 210.  Hebert thus recognized that including non-photo ID increased the chance that Texas would be able to prove that the voter ID law had neither the "purpose [nor] the effect of diminishing the ability of any citizens of the United States on account of race or color," 52 U.S.C. § 10304(b), while maintaining the purported public benefit. In the next legislative session, SB 14 excluded precisely those features previously deemed necessary to prevent disenfranchisement of minority voters.  PFOF ¶¶ 64-72.  Analysis provided by the Texas Secretary of State's Office to Lieutenant Governor Dewhurst during consideration of SB 14 confirmed this racially discriminatory impact.  PFOF ¶ 100-112.

### 2.     The Texas Legislature Shaped SB 14 to Ensure a Discriminatory Impact.

Bill proponents introduced SB 14 in 2011 without measures they knew were essential to reduce its known discriminatory impact.  PFOF ¶ 116.  The Texas Legislature then enacted SB 14 "without adopting a number of ameliorative measures that might have lessened this impact" and without "explain[ing] the rejection of those amendments."  *Veasey II*, 830 F.3d at 236; PFOF ¶¶ 234-250.  "What a legislature or any official entity is 'up to' may be plain from the results its actions achieve, or the results they avoid."  *Feeney*, 442 U.S. at 279 n.24.  Throughout the amendment and conference process, bill proponents ignored the particularized needs of minority

---

[18] Lieutenant Governor Dewhurst favored strict photo voter ID requirements and played an active role in SB 14's passage.  PFOF ¶¶ 83-84, 89, 91, 96, 108, 114, 186, 199-200, 204, 437.

voters and actively avoided changes that would limit SB 14's discriminatory impact on African-American and Hispanic citizens.

Over three prior legislative sessions, voter ID proponents introduced increasingly harsh bills that threatened minority voting rights, a sequence of events that "shed[s] some light on the decisionmaker's purposes." *Arlington Heights*, 429 U.S. at 267; PFOF ¶¶ 73-80.  In 2005, for instance, the Texas House passed a voter ID bill that allowed voters to present one form of photo ID or two forms of non-photo identification—over the protests of minority legislators and advocates—but the bill failed in the Texas Senate.  PFOF ¶¶ 74-75.  In 2007, the House passed a bill with similar identification requirements—over similar opposition—and this bill again failed to pass the Senate.  PFOF ¶¶ 76-77.  And in 2009, the Senate passed a voter ID bill with fewer forms of acceptable photo ID—over additional objections—but the proposal this time failed in the House.  PFOF ¶¶ 78-80.  After three failures, legislative leadership simply ignored opposition concerns over minority disenfranchisement, concerns that voter ID proponents privately conceded were valid.  PFOF ¶¶ 208-233; *see also* Section IV.A.3, *supra*.  And in 2011, the Texas Legislature fast-tracked SB 14, a bill that further narrowed the set of acceptable photo identification and eliminated non-photo identification entirely.  PFOF ¶¶ 82-95.

When advocating for SB 14's passage, bill proponents "cloak[ed] themselves in the mantle of following Indiana's voter ID law," but, significantly, "the proponents of SB 14 took out all the ameliorative provisions of the Indiana law."  *Veasey II*, 830 F.3d at 239; PFOF ¶¶ 124-126, 132-33.  The same is true with respect to SB 14's relationship to Georgia's voter ID law.  *See Veasey II*, 830 F.3d at 263; PFOF ¶¶ 129-131; *see also Arlington Heights*, 429 U.S. at 267 (addressing "[s]ubstantive departures [from] factors usually considered important by the decisionmaker").  Indiana and Georgia accept a broad range of documents issued by the United

States or the State—including an employee or student ID—and accept ID that has been expired for a longer period.  PFOF ¶¶ 129,132.  Indiana also allows voters without ID to cast a ballot that will count after completing an indigency affidavit, PFOF ¶ 133, and Georgia allows voters to present ID issued by Georgia, its counties, its municipalities, native tribes, and even ID from all 50 states, as well as ensuring that no-fee voter identification is available in every county with minimal underlying documentation requirements.  PFOF ¶¶ 129-30.  The refusal by SB 14 proponents to recognize and correct for "the obvious differences" between these laws and their own, *Veasey II*, 830 F.3d at 239 n.26; PFOF ¶ 124, substantially undermines their credibility on the full range of purposes motivating SB 14.  *See, e.g.*, *Musselman v. Warden*, 456 Fed. App'x 520, 524 (6th Cir. 2012) (holding that refusal to acknowledge the obvious taints credibility).

Legislators concerned with the potential discriminatory impact of a strict voter identification requirement pointed out these differences and proposed "ameliorative amendments that would have brought SB 14 in line with" the voter identification laws on which SB 14 was purportedly modeled, along with other ameliorative proposals.  *Veasey II*, 830 F.3d at 263; PFOF ¶¶ 124,239,243,245.  "[M]inority legislators and constituents testified about the likely disparate impact of SB 14, yet their amendments to ameliorate that impact were rejected without explanation."  *Veasey II*, 830 F.3d at 262; PFOF ¶¶ 204-207, 224-238.  Specifically, "proponents of SB 14 voted to table numerous amendments meant to expand the types of accepted IDs, expand the operating hours of DPS stations issuing voter IDs, delay implementation of SB 14 until an impact study had been completed," expand public education, and adequately fund implementation.  *Veasey II*, 830 F.3d at 237; *see also Veasey I*, 71 F. Supp. 3d at 708 app'x (listing amendments); PFOF ¶¶ 234-235.  While the Legislature ultimately rejected forms of identification more likely to be held by minority voters (such as student IDs and public employee

IDs) and a proposal to focus voter education on low-income and minority voters, legislators agreed to amend SB 14 to allow voters to establish identity using a license to carry a concealed firearm—a document that Anglo registered voters are more than twice as likely as Hispanic or African-American registered voters to possess.  PFOF ¶¶ 240-249, 311-313.  Not only do these choices "support[] a conclusion of lack of responsiveness" to minority concerns, *Veasey II*, 830 F.3d at 262; they also evince a desire to sharpen SB 14's discriminatory impact.  *Cf. McCrory*, 831 F.3d at 214 (describing the targeting of minority voters "with almost surgical precision").[19]

"[P]roponents of SB 14 have largely refused to explain the rejection of those amendments, both at the time and in subsequent litigation," which "was out of character for sponsors of major bills."  *Veasey II*, 830 F.3d at 237; PFOF ¶¶ 121, 239, 242, 250.  During legislative debate, when minority senators asked Senate sponsor Troy Fraser "questions about the possible disparate impact of SB 14, he simply replied 'I am not advised.'"  *Veasey II*, 830 F.3d at 237; PFOF ¶ 224.  And Senator Fraser avoided numerous other questions concerning the need for SB 14 and its impact by responding to at least 27 questions that he was "not advised."  PFOF ¶ 224.  Senator Dan Patrick, a leading SB 14 proponent, later acknowledged that he had rejected an amendment to eliminate costs related to obtaining ID because he wanted voters, not the State, to bear those costs.  PFOF ¶ 240.  Representative Patricia Harless, SB 14's House sponsor, mirrored Senator Fraser's talking points and similarly told minority representatives she was not "advised" about SB 14's impact; she later testified that she could not explain her votes or what the amendments purported to accomplish.  PFOF ¶ 226, 237.  The persistent rejection of ameliorative amendments, without any explanation, further supports the inference that SB 14

---

[19] The Legislature's failure to mitigate—or even formally study—SB 14's discriminatory impact after the denial of judicial preclearance further suggests that the Legislature had produced its desired outcome. PFOF ¶¶ 433-438.

was designed, at least in part, to produce a discriminatory impact on Hispanic and African-American voters in Texas.

### 3. SB 14 Is Only Tenuously Related to the Pretextual Purposes Asserted by Texas Legislators.

While SB 14 abridges minority voting rights, its provisions "fail to correspond in any meaningful way to the legitimate interests the State claims to have been advancing." *Veasey II*, 830 F.3d at 263; PFOF ¶ 134. Under *Arlington Heights*, when "factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached," that constitutes a substantive departure probative of a discriminatory purpose. 429 U.S. at 267; *see also Terrazas v. Clements*, 581 F. Supp. 1329, 1345 n.24 (N.D. Tex. 1984) (three-judge court) ("The principal probative weight of a tenuous state policy is its propensity to show pretext."). Texas advanced two purported purposes for SB 14: eliminating voter fraud and promoting public confidence in elections. In earlier legislative sessions, the Legislature had focused on the supposed need to curb non-citizen voting. Because SB 14 is only tenuously connected to the Legislature's announced purposes, the resulting inference is that SB 14 had an additional, unstated purpose (namely, countering minority voters' emerging voting strength) that bill proponents declined to admit.

There is "evidence that SB 14 is only tenuously related to the [L]egislature's stated purpose of preventing voter fraud," which "could support a finding that the Legislature's race-neutral reason of ballot integrity offered by the State is pretextual." *Veasey II*, 830 F.3d at 237; PFOF ¶¶ 137-138. "[T]he only concern addressed by SB 14" is in-person voter impersonation. *Veasey II*, 830 F.3d at 238; PFOF ¶ 136. Although "[b]allot integrity is undoubtedly a worthy goal," "the evidence before the Legislature was that in-person voting . . . yielded only two convictions for in-person voter impersonation fraud out of 20 million votes cast in the decade

24

leading up to SB 14's passage." *Veasey II*, 830 F.3d at 238 & n.24; PFOF ¶ 139; *see also Veasey II*, 830 F.3d at 238 (observing that in-person voter impersonation is not "a problem of great magnitude"); PFOF ¶¶ 150-158 (describing legislative studies of election fraud that failed to uncover evidence of voter impersonation beyond convictions).  In support of SB 14, bill proponents deliberately blurred the distinction between in-person voter impersonation and other, more common, election crimes that SB 14 was not designed to prevent.  PFOF ¶¶ 226-228.  Such transparent use of pretext can be "quite persuasive" evidence of intentional discrimination. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000); *see also St. Mary's Honor Ctr. v. Hicks*, 409 U.S. 502, 511 (1993) ("The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination."). Because bill proponents and supporters argued—without evidence—that African Americans and undocumented immigrants were committing in-person voter impersonation, PFOF ¶¶ 46, 199, 225, the link between pretext and racial discrimination is particularly acute here.  *Cf. Diaz v. Pan Am. Airways, Inc.*, 442 F.2d 385, 389 (5th Cir. 1971) (prohibiting airline from taking discriminatory actions that fulfill "preferences and prejudices of the customers").

On the other hand, "SB 14 does nothing to address the far more prevalent issue of fraudulent absentee ballots."  *Veasey II*, 830 F.3d at 238-39; PFOF ¶¶ 175-182; *see also Veasey II*, 830 F.3d at 239 ("[R]ecord evidence shows that the potential and reality of fraud is much greater in the mail-in ballot context than with in-person voting.").  In Texas, voting by mail is available to a limited set of voters, most notably voters age 65 or older, *see* Tex. Elec. Code §§ 82.001-.004, and SB 14 does not require absentee voters to provide proof of identity, *see* Tex. Elec. Code § 63.0101; *see also* PFOF ¶¶ 63-72.  Thus, purportedly for the purpose of preventing

voter fraud, "the State has pushed more vulnerable elderly voters away from in-person voting—a form of voting with little proven incidence of fraud—and toward mail-in voting, which the record shows is far more vulnerable to fraud, particularly among the elderly." *Veasey II*, 830 F.3d at 263; PFOF ¶ 178. This once again "showcases the dubious connection between the State's interests and SB 14's provisions." *Veasey II*, 830 F.3d at 263; PFOF ¶ 177. Moreover, Texas voters age 65 and older are more likely than the general voter population to be Anglo, and Anglo voters are more likely than Hispanic and African-American voters to cast a mail-in ballot. PFOF ¶¶ 409-411. Thus, although eliminating a voter's opportunity to vote in person on Election Day abridges the right to vote, *see Veasey II*, 830 F.3d at 256 & n.51; *see also supra* note 8, the unwarranted focus on in-person voting also disproportionately affords Anglo voters greater opportunity to avoid outright denial of the right to vote, once again sharpening the disproportionate impact on Hispanic and African-American voters.

The State's purported interest in promoting voter confidence and voter turnout fares no better. "[Senator Fraser, Senator Patrick,] and the Director of the Elections Division at the Texas Secretary of State's office were all unaware of anyone abstaining from voting out of concern for voter fraud," as was the House sponsor of SB 14, "and the Director testified that implementing SB 14's provisional ballot process might actually undermine voter confidence." *Veasey II*, 830 F.3d at 263; PFOF ¶¶ 169-171. Texas legislators and political leaders had repeatedly told constituents that an epidemic of voter fraud had overtaken the State—focusing on in-person fraud for which there was no evidence—and opinion polls favoring voter identification requirements reflected public adoption of those misleading claims. PFOF ¶¶ 172-174; *see also Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1164 & n.28 (9th Cir. 2013) (holding that legislative reliance on public opinion surveys rather than "objective measures" is a

"notable" irregularity).  But even relying on public opinion polls that favor requiring voter identification does not justify SB 14, which strictly limited the forms of acceptable ID beyond laws passed in Indiana and Georgia and beyond prior proposals in the Texas Legislature.  *See Veasey II*, 830 F.3d at 263-64 (relying on this Court's findings); *Veasey I*, 71 F. Supp. 3d at 656; PFOF ¶¶ 116, 124-133, 174.  In fact, taking into account the myriad other factors that affect turnout in individual elections, SB 14 could be expected to reduce voter turnout in Texas, the opposite outcome of the Legislature's professed goal.  *See Veasey II*, 830 F.3d at 263 (relying on this Court's findings); *Veasey I*, 71 F. Supp. 3d at 655-56; PFOF ¶ 166-178.  "According to a well-established formula employed by political scientists to assess individuals' likelihood of voting in an election, increasing the cost of voting decreases voter turnout—particularly among low-income individuals, as they are most cost sensitive."  *Veasey II*, 830 F.3d at 263; PFOF ¶¶ 51-52, 288.  And in Texas, those low-income individuals are disproportionately likely to be African-American or Hispanic.  *See Veasey II*, 830 F.3d at 251; PFOF ¶¶ 52-57, 278-286.

Finally, claims that stricter voter identification requirements were necessary to curb non-citizen voting illustrate both the tenuous link between voter ID proposals and their purported rationales and the State's willingness to shift ostensible purposes for enhancing voter ID requirements "as they were challenged or disproven by opponents."  *Veasey II*, 830 F.3d at 240-41.  SB 14 and its predecessor bills could not prevent non-citizens from voting because non-citizens may lawfully obtain several forms of acceptable ID that do not indicate the bearer's citizenship status.  PFOF ¶ 174.  Despite no evidence in the legislative record of substantial non-citizen voting or voter impersonation by non-citizens, Lieutenant Governor Dewhurst—a driving force behind SB 14—asserted in support of a predecessor bill that "with eight to 12 million illegal aliens currently living in the U.S., the basic American principle of one person, one vote, is

in danger." PFOF ¶ 186.[20]  In the 2011 session, the Lieutenant Governor's office instructed Senators to no longer rely on this rationale, although it was once again raised in the closing speech of the House debate and the Lieutenant Governor's post-passage press release.  PFOF ¶¶ 192, 199.  Even the legislator who gave the House closing speech later conceded under oath that noncitizen voting is neither a significant problem nor addressed by SB 14.  PFOF ¶ 229. When a decisionmarker "offers inconsistent explanations for its . . . decision at different times" the factfinder "may infer" that "proffered reasons are pretextual."  *Staten v. New Palace Casino, LLC*, 187 Fed. App'x 350, 359 (5th Cir. 2006).

In effect, Texas legislators had the same solution to every purported problem:  enact strict voter ID.  This changing rationale for a single decision is significant evidence of an additional, unspoken, and discriminatory purpose.  *See, e.g.*, *Dominguez-Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424, 432 (1st Cir. 2000).

### 4.    SB 14 Was Subject to Radical Departures from Ordinary Legislative Procedures.

"SB 14 was subject to numerous and radical procedural departures that may lend credence to an inference of discriminatory intent."  *Veasey II*, 830 F.3d at 238.  A "legislature need not break its own rules to engage in unusual procedures."  *McCrory*, 831 F.3d at 228. Although an "objection to typical aspects of the legislative process" does not evince discriminatory intent, *Miss. State Chapter, Operation PUSH, Inc. v. Mabus*, 932 F.2d 400, 408-09 & n.6 (5th Cir. 1991), departure "from usual procedures in its consideration or enactment of the bill" may support a discriminatory purpose claim, *Allstate Ins. Co. v. Abbott*, 495 F.3d 151,

---

[20] *See also Fish v. Kobach*, No. 16-3147, 2016 WL 6093990, at *33 (10th Cir. Oct. 19, 2016) ("The assertion that the 'number of aliens on the voter rolls is likely to be in the hundreds, if not thousands' is pure speculation."); *League of Women Voters v. Newby*, 838 F.3d 1, 13 (D.C. Cir. 2016) (recognizing that "only a tiny fraction of one percent of registered voters" in Arizona and Kansas are non-citizens who have unlawfully registered to vote).

161 (5th Cir. 2007).  Procedural irregularities may be probative of discriminatory purpose because they suggest that "improper purposes are playing a role" beneath the legislative surface. *Arlington Heights*, 429 U.S. at 267.

To ensure SB 14's the passage over the objection of most minority legislators, the Texas Legislature deviated often from usual procedures.  *First*, Governor Perry declared voter identification legislation to be an "emergency matter," allowing consideration in the first sixty days of the legislative session, which is ordinarily prohibited by the Texas Constitution.  Tex. Const. art. III, § 5(b); PFOF ¶ 85; *see also McCrory*, 831 F.3d at 228 (addressing a "rushed process").  *Second*, the Texas Senate reenacted a controversial 2009 rule change that exempted voter identification legislation from the ordinary committee process and from the Senate rule requiring a two-thirds vote to raise a bill for consideration, passed SB 14 through the Committee of the Whole, and then raised and passed the bill by simple majority votes.  PFOF ¶¶ 86-90; *see also Esperanza Peace & Justice Ctr. v. City of San Antonio*, 316 F. Supp. 2d 433, 462 (W.D. Tex. 2001) (finding procedural deviation when decision was singled out and ordinary deliberative procedures would have yielded a different outcome).  *Third*, the Texas House passed SB 14 through a hand-picked "fast track" Select Committee on Voter Identification and Voter Fraud, to which the Speaker did not refer other bills concerning voter identification or voter fraud.  PFOF ¶¶ 92-93; *see also Pac. Shores Props.*, 730 F.3d at 1164 (holding that passage through a unique, ad hoc committee may constitute a procedural deviation under *Arlington Heights*).  *Fourth*, the Senate and House refused to engage in substantive debate, and active consideration of amendments was largely limited to those that did not ameliorate the discriminatory impact of SB 14.  Moreover, in two instances in which one chamber or the other accepted a major ameliorative amendment, that provision was stripped from SB 14 in

29

conference, without further debate or explanation.  PFOF ¶¶ 91, 99; *cf. Allstate Ins. Co.*, 495 F.3d at 161 (holding that major responsive reforms evince an absence of procedural departures). *Fifth*, the Conference Committee went "outside the bounds" of reconciling the Senate or House bills and crafted the EIC program, eliminating the opportunity for debate or refinement.  PFOF ¶ 98; *see also Resident Advisory Bd. v. Rizzo*, 564 F.2d 126, 144 (3d Cir. 1977) (holding that bypassing a mechanism that requires discussion of intent is a "striking" procedural departure). The combined treatment of SB 14 was "virtually unprecedented."  *Veasey II*, 830 F.3d at 238.

Outside of the public process, the Office of the Secretary of State provided an impact analysis to the Office of the Lieutenant Governor and then withheld it from other legislators, yet another unprecedented deviation from ordinary procedures.  At the request of Senator Williams, the Office of the Secretary of State engaged in a database matching analysis between the Texas voter registration database and the database containing records of individuals with a Texas driver's license or personal ID.  PFOF ¶¶ 104-109.  This analysis identified between 678,560 and 844,713 registered voters who did not match an identification record, and the Lieutenant Governor received a briefing including the estimate.  PFOF ¶¶ 105, 108.  Nonetheless, the Office of the Secretary of State declined to provide the data to most legislators and misrepresented during the expedited legislative process that the analysis was not yet complete.  PFOF ¶¶ 109-110.  Notably, the Office of the Secretary of State routinely uses Spanish surname data, and if bill opponents had been informed that an impact analysis existed, they could have requested an estimate of the share of voters without Texas identification who are Hispanic.  PFOF ¶¶ 101, 228.  Instead, the Office of the Secretary of State embargoed the impact analysis and allowed proponents of SB 14 to respond that they were "not advised" concerning the bill's discriminatory impact, even though proponents recognized the predictable impact to be "common sense."

30

PFOF ¶¶ 111-112, 209, 227, 224; *see also Perkins v. City of W. Helena*, 675 F.3d 201, 213 (8th Cir. 1982) (acknowledging that withholding guidance until after a vote constitutes a "departure[] from the normal procedural process" and "evidence of a discriminatory purpose").

This panoply of "radical" and "virtually unprecedented" procedural departures, *Veasey II*, 830 F.3d at 238, undertaken to combat an "almost nonexistent problem," *id.* at 239, underscore that SB 14 is only "tenuously related to the legislature's stated purpose of preventing voter fraud," *id.* at 237.

### 5.   A Seismic Demographic Shift and Racially Polarized Voting Provide a Motive for Intentional Discrimination.

"The fact that . . . passage of SB 14 occurred in the wake of a 'seismic demographic shift,'" "[f]urther support[s] the district court's [discriminatory purpose] finding." *Veasey II*, 830 F.3d at 241 & n.30 (quoting *Veasey I*, 71 F. Supp. 3d at 700). Efforts to tighten voter identification requirements began immediately after Texas became a minority-majority State, and the Legislature engaged in procedural deviations to ensure the passage of SB 14 after the release of 2010 Census data. PFOF ¶¶ 7-9, 73, 82-87. Although Anglos remain a majority of Texas's citizen voting-age population, they account for only a quarter of recent growth in that population. PFOF ¶ 8. Because the 2011 Texas Legislature was responsible for enacting statewide redistricting plans, its members were keenly aware of those demographic changes. PFOF ¶ 9; *see also, e.g.*, *Perez v. Texas*, 891 F. Supp. 2d 808, 812-13 (W.D. Tex. 2012) (three-judge court).

Changes in the racial composition of the electorate threatened the political power of the majority party because "racially polarized voting exists throughout Texas." *Veasey II*, 830 F.3d at 258; PFOF ¶¶ 9-16; *see also LULAC v. Perry*, 548 U.S. at 422 (noting a "troubling blend of politics and race" in Texas). "Racially polarized voting is not, in and of itself, evidence of racial

discrimination.  But it does provide an incentive for intentional discrimination in the regulation

of elections." *McCrory*, 831 F.3d at 222; *see also* H.R. Rep. No. 109-478, at 35 (2006) ("The

potential for discrimination in environments characterized by racially polarized voting is great.").

The fact that racial "appeals still exist in Texas" elections, *Veasey II*, 830 F.3d at 261, starkly

illustrates the continued salience of race in some electoral contests in Texas.  *See* PFOF ¶¶ 43-

47; *see also Goosby v. Town Bd.*, 180 F.3d 476, 488 (2d Cir. 1999) (linking racial appeals to

"heightened racial tension").  Because Anglo voters in Texas overwhelmingly prefer the party in

power and minority voters—particularly African-American voters—principally prefer the

minority party, growth in the number of minority voters who successfully cast a ballot will erode

support for the majority of incumbents unless racially polarized voting abates.

While legislators cannot easily slow demographic change, they can erect barriers to the

franchise that slow or stop the impact of those changes on the shape of the electorate by

disproportionately burdening minority voters.  *Cf. Carrington v. Rash*, 380 U.S. 89, 93 (1965)

(striking down provision aimed to prevent "'takeover' of the civilian community resulting from

concentrated voting by large numbers of military personnel in bases placed near Texas towns and

cities").  Anglo legislators continue to make up a disproportionate share of elected officials

generally and in the Texas Legislature specifically.  *See Veasey II*, 830 F.3d at 261; PFOF ¶¶ 48-

50.  Many Anglo-preferred incumbents (whether Anglo or minority) therefore have strong

incentives to take away African-American and Hispanic voters' growing electoral opportunities

before they can be exercised.  *Cf. LULAC v. Perry*, 548 U.S. at 440 (holding that Texas took

away Latino voters' "opportunity because Latinos were about to exercise it"); *Garza*, 918 F.2d at

778 & n.1 (Kozinski, J., concurring in relevant part).  Although "[d]iscrimination today is more

subtle than the visible methods used in 1965," H.R. Rep. No. 109-478, at 6, efforts to

disproportionately block minority voters from casting valid ballots because of political potential and opposition to incumbent interests constitute intentional racial discrimination. *Cf. Gomillion v. Lightfoot*, 364 U.S. 339, 342 (1960); *see also Gomillion v. Lightfoot*, 167 F. Supp. 405, 407 (M.D. Ala. 1958) (noting that, prior to discriminatory redrawing of municipal boundaries, African Americans were a minority of registered voters but a majority of residents), *rev'd on other grounds*, 364 U.S. 339 (1960).

###### 6. SB 14 Is Part of Texas's Ongoing History of Official Discrimination.

Texas is "a State with a fairly extensive history of official discrimination." *Veasey II*, 830 F.3d at 247 n.37; PFOF ¶¶ 17-42.  This history does not forever single out the State, *see Shelby Cnty.*, 133 S. Ct. at 2628-29, and "the most relevant 'historical' evidence is relatively recent history, not long-past history." *Veasey II*, 830 F.3d at 232.  Nonetheless, Texas's pattern of racial discrimination in voting is critical "historical background" indicating that SB 14 is only the latest in "a series of official actions taken for invidious purposes." *Arlington Heights*, 429 U.S. at 267.  History matters because "the prior doing of other similar acts, whether clearly a part of a scheme or not, is useful as reducing the possibility that the act in question was done with innocent intent." *Keyes v. Sch. Dist. No. 1*, 413 U.S. 189, 207 (1973) (quoting 2 J. Wigmore, *Evidence* 200 (3d ed. 1940)).  That is, it matters not because long-ago acts taint present ones, but because a historical pattern of race-based reaction to political threat may help put present action into context.  Laws that are not discriminatory on their face may also deliberately build on historical discrimination.  *See, e.g.*, *Lane v. Wilson*, 307 U.S. 268, 275-77 (1939) (striking down registration law that perpetuated the impact of a "grandfather clause," which had benefited descendents of individuals eligible to vote before ratification of the Fifteenth Amendment); *see also Veasey II*, 830 F.3d at 232 ("[H]istory provides context and . . . historical discrimination (for example, in education) can have effects for many years.").

Texas has a long history of attempting to justify discriminatory voting laws based on a purported needed "to prevent voter fraud." *Veasey II*, 830 F.3d at 237; PFOF ¶¶ 159-165. Federal intervention eliminated some of these laws—including white primaries, secret ballot provisions limiting voter assistance, and the poll tax—more than fifty years ago. PFOF ¶¶ 160-161, 164. But while "history did not end" with the 1965 passage of the Voting Rights Act, *Shelby Cnty.*, 133 S. Ct. at 2628, Texas's history of discrimination did not end either. In 1966 and 1975, Texas enacted purge laws requiring re-registration of the entire electorate, purportedly to root out voter fraud. A federal court struck down the first as racially discriminatory, and the U.S. Attorney General objected to the second under Section 5 of the Voting Rights Act. *See Flowers v. Wiley*, 675 F.2d 704, 705-06 (5th Cir. 1982); *Beare v. Smith*, 321 F. Supp. 1100 (S.D. Tex.1971), *aff'd sub nom. Beare v. Briscoe*, 498 F.2d 244 (5th Cir. 1974); PFOF ¶¶ 162-163; *see also Veasey II*, 830 F.3d at 239-40 & n.27. This history reinforces that purported voter fraud concerns behind SB 14 were merely pretextual. *See Veasey II*, 830 F.3d at 258.

The "contemporary examples of State-sponsored discrimination in the record" recognized by the Court of Appeals, *Veasey II*, 830 F.3d at 239, are not limited to discriminatory restrictions on the franchise enacted in the name of rooting out voter fraud. The Supreme Court has twice held that Texas redistricting plans were intentionally discriminatory or bore the mark of intentional discrimination aimed at minority citizens. *See LULAC v. Perry*, 548 U.S. at 440; *White v. Regester*, 412 U.S. 755 (1973); *see also Veasey II*, 830 F.3d at 240 n.28; PFOF ¶ 19. Over the 38 years that Texas was subject to Section 5, the U.S. Attorney General issued over 200 other objection letters blocking discriminatory voting changes enacted by the State and its subjurisdictions—including 16 objections since 2000—and blocked at least one statewide redistricting plan each decade. PFOF ¶¶ 24-25; *see also Veasey II*, 830 F.3d at 240 & n.29. And

the United States and private litigants have brought dozens of successful suits across Texas under Section 2 and Section 203 of the Voting Rights Act to remedy the discriminatory use of at-large elections and failures to provide required assistance for Spanish-speaking limited-English-proficient voters, including at least 13 suits since 2000.  PFOF ¶ 23, 26-27; *see also McCrory*, 831 F.3d at 224 (holding that successful Voting Rights Act litigation is probative of later discriminatory intent).  Most recently, two courts found that the same Texas Legislature that enacted SB 14 adopted redistricting plans with a racially discriminatory purpose or "may have focused on race to an impermissible degree."  *See Perez v. Perry*, No. 5:11-cv-360, Slip Op. at 5-6 (W.D. Tex. Mar. 19, 2012) (three-judge court) (ECF No. 690); *Texas v. United States*, 887 F. Supp. 2d 133, 159-62, 164-65 & n.32 (D.D.C. 2012) (three-judge court), *vacated on other grounds*, 133 S. Ct. 2885 (2013); *see also* PFOF ¶ 21.  Although consideration of history is not limited to "immediately contemporaneous" acts, *Veasey II*, 830 F.3d at 232 n.14, a finding of intentional discrimination by the 82nd Texas Legislature "is highly relevant to the issue of the [same Legislature's] intent with respect to" SB 14.  *Keyes*, 413 U.S. at 207; *see also Veasey II*, 830 F.3d at 257-58 (same).

In other areas including education, employment, and housing, Texas and jurisdictions across the State have engaged in widespread official discrimination.  *See, e.g.*, *United States v. Texas*, 601 F.3d 354, 373-74 (5th Cir. 2010); *Dews v. Town of Sunnyvale*, 109 F. Supp. 2d 526, 571-73 (N.D. Tex. 2000); PFOF ¶¶ 31-42.  Socioeconomic disparities resulting from official discrimination across all facets of life in Texas "have hindered the ability of African-Americans and Hispanics to effectively participate in the political process."  *Veasey II*, 830 F.3d at 259 & n.56 (quoting *Veasey I*, 71 F. Supp. 3d at 697).  As described above, the socioeconomic disadvantages experienced by African-American and Hispanic voters renders them particularly

35

vulnerable to facially neutral laws intended to place unjustified and unjustifiable impediments between voters and the franchise.  *See* Sections IV.A-.B, *supra*.  The 82nd Texas Legislature was also well aware of this history of discrimination and its impact.

**B.    The Texas Legislature Would Not Have Enacted SB 14 Absent a Discriminatory Purpose.**

Although a law enacted with a discriminatory purpose may not be subject to a judicial remedy if "the law would have been enacted without this factor," *Hunter*, 471 U.S. at 228, Texas has not proven and cannot prove that the Texas Legislature would have enacted SB 14 without the underlying discriminatory intent.  Because there is little to no fit between SB 14 and the State's purported rationales for it—including combating voter fraud, increasing voter confidence and voter participation, and preventing non-citizen voting—these rationales simply do not and cannot explain SB 14's passage.  PFOF ¶¶ 136, 166, 183; *see also* Section IV.C, *supra*.  And because this analysis focuses on the actual motivations for legislation, and does not apply "a rational-basis-like lens," *McCrory*, 831 F.3d at 234, the State cannot now avoid a finding of discrimination by advancing justifications not present in the legislative record, *see Hunter*, 471 U.S. at 232.  Absent proof that SB 14's discriminatory features were necessary components to a voter ID law, Texas has no defense to a finding that SB 14 was enacted with discriminatory intent.  This Court already once found "an absence of proof that SB 14's discriminatory features were necessary components to a voter ID law," *Veasey I*, 71 F. Supp. 3d at 702, and there is no basis in the record to disturb that finding.

**V.    CONCLUSION**

For the foregoing reasons, this Court should find that proponents of SB 14 were motivated, at least in part, by SB 14's detrimental effects on the African-American and Hispanic electorate, in violation of Section 2 of the Voting Rights Act.

Date: November 18, 2016

Respectfully submitted.

KENNETH MAGIDSON
United States Attorney
Southern District of Texas

VANITA GUPTA
Principal Deputy Assistant Attorney General
Civil Rights Division

*/s/ Daniel J. Freeman*
T. CHRISTIAN HERREN, JR.
MEREDITH BELL-PLATTS
RICHARD DELLHEIM
DANIEL J. FREEMAN
BRUCE I. GEAR
AVNER SHAPIRO
SAMUEL OLIKER-FRIEDLAND
ZACHARY P. JONES
Attorneys, Voting Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Ave. NW
Washington, D.C. 20530

*Counsel for the United States*

## CERTIFICATE OF SERVICE

I hereby certify that on November 18, 2016, a true and correct copy of the foregoing document was served via the Court's ECF system to all counsel of record.

*/s/ Daniel J. Freeman*
Daniel J. Freeman
U.S. Department of Justice
950 Pennsylvania Ave. NW
Room 7123 NWB
Washington, D.C. 20530
daniel.freeman@usdoj.gov