**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

|  |  |
|---|---|
| MARC VEASEY, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 2:13-cv-193 (NGR) |
| GREG ABBOTT, *et al.*, | |
| Defendants. | |

**BRIEF OF PRIVATE PLAINTIFFS IN SUPPORT OF A
FINDING OF INTENTIONAL DISCRIMINATION**

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ................................................................................................................. I

TABLE OF AUTHORITIES ........................................................................................................ II

INTRODUCTION ........................................................................................................................ 1

LEGAL STANDARD .................................................................................................................. 3

ARGUMENT ................................................................................................................................ 5

I.  SB 14 WAS ENACTED, AT LEAST IN PART, WITH DISCRIMINATORY INTENT ................................................................. 5

    A.  The Texas Legislature Acted on an Incentive to Suppress Minority Votes ........................................................................................ 5

    B.  SB 14's Proponents Knew SB 14 Would Disproportionately Deny or Abridge the Rights of Latino and Black Voters .................................. 7

    C.  Despite Knowledge of Disproportionate Impact on Minority Voters, SB 14 Proponents Rejected Ameliorative Amendments and Chose to Make the Law More Racially Discriminatory ........................... 9

    D.  The Texas Legislature Hid Its Real Agenda to Suppress Black and Latino Political Participation Behind Tenuous and Unsubstantiated Rationales ............................................................................. 11

    E.  Texas Political Leaders Have a Long and Consistent History of Unconstitutionally Discriminating Against Minority Voters to Maintain Political Power .......................................................... 15

    F.  The Legislature's Departures from Normal Procedures Support a Finding of Discriminatory Intent ........................................... 19

    G.  The Foreseeable Racially Discriminatory Impact Did Come to Pass and the Legislature Did Nothing to Cure It ............................... 20

II.  THE TEXAS LEGISLATURE WOULD NOT HAVE ENACTED SB 14 ABSENT DISCRIMINATORY PURPOSE .................................. 21

CONCLUSION ........................................................................................................................... 22

-

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Burton v. City of Belle Glade*,
178 F.3d 1175 (11th Cir. 1999) ............................................................21

*Bush v. Vera*,
517 U.S. 952 (1996).............................................................................18

*Coggeshall v. United States*,
69 U.S. 383 (1864)................................................................................4

*Columbus Bd. of Educ. v. Penick*,
443 U.S. 449 (1979)............................................................................21

*Foster v. Chatman*,
136 S. Ct. 1737 (2016)..........................................................................4

*Garza v. Cnty. of L.A.*,
918 F.2d 763 (9th Cir. 1990) .................................................................7

*Holland v. United States*,
348 U.S. 121 (1954)..............................................................................4

*Hunter v. Underwood*,
471 U.S. 222 (1985).........................................................................7, 21

*Lodge v. Buxton*,
639 F.2d 1358 (5th Cir. 1981) .............................................................10

*LULAC v. Perry*,
548 U.S. 399 (2006).........................................................................7, 18

*N.C. State Conf. of NAACP v. McCrory*,
831 F.3d 204 (4th Cir. 2016) .......................................................6, 7, 14

*OCA Greater Houston v. Texas*,
No. 15-cv-679, 2016 WL 4597636 (W.D. Tex. Sept. 2, 2016) .............18

*Perez v. Perry*,
No. 5:11-cv-360, Slip Op. (W.D. Tex. Mar. 19, 2012)........................16

*Perez v. Texas*,
891 F. Supp. 2d 808 (W.D. Tex. 2012)..................................................6

*Perkins v. City of W. Helena, Ark.,*
    675 F.2d 201 (8th Cir. 1982) ........................................................................................7

*Reno v. Bossier Parish Sch. Bd.,*
    520 U.S. 471 (1997)....................................................................................................20

*Rogers v. Lodge,*
    458 U.S. 613 (1982)..................................................................................................3, 4

*Texas v. United States,*
    887 F. Supp. 2d 133 (D.D.C. 2012) ..........................................................................16

*United States v. Brown,*
    561 F.3d 420 (5th Cir. 2009) ...............................................................................3, 4, 6

*United States v. Vargas-Ocampo,*
    747 F.3d 299 (5th Cir. 2014) ......................................................................................5

*Veasey v. Abbott,*
    830 F.3d 216 (5th Cir. 2016) ............................................................................. *passim*

*Veasey v. Perry,*
    71 F. Supp. 3d 627 (S.D. Tex. 2014) ...................................................7, 9, 20, 22

*Village of Arlington Heights v. Metropolitan Housing Development Corp.,*
    429 U.S. 252 (1977)............................................................................................ *passim*

# INTRODUCTION

A super-majority of the Fifth Circuit, sitting en banc, concluded that the evidence in this case can support a finding that Senate Bill 14 (2011) ("SB 14") was enacted with racially discriminatory intent. The Fifth Circuit identified no fewer than a dozen separate, substantial pieces of evidence, which, when weighed in accordance with the standards set forth in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), support that conclusion. *Veasey v. Abbott*, 830 F.3d 216, 234-41 (5th Cir. 2016) (en banc).

The Fifth Circuit further stressed that "context matters" and underscored that this Court should analyze the "circumstantial totality of evidence" and the "link[s]" between distinct, but related, pieces of evidence. *Id.* at 237. This Court already had the opportunity to weigh the credibility of the testimony of a veritable army of qualified expert witnesses and dozens of lay witnesses that Plaintiffs offered at trial—the substance of which was largely unchallenged and never directly controverted by the State—against that of the few witnesses that Defendants offered, the substance of which Plaintiffs vigorously challenged. The quantity and quality of Plaintiffs' evidence overwhelmed the State's evidence (or lack thereof) and fully supports a finding of discriminatory intent.[1]

---

[1] The Fifth Circuit expressed concerns about certain aspects of the Court's previous consideration of evidence. In particular, the Fifth Circuit said that the Court placed undue weight on (1) older instances of voting discrimination, (2) "post-enactment speculation by opponents of SB 14," and (3) other post-enactment statements of individual legislators. *Veasey*, 830 F.3d at 230-34. Although Private Plaintiffs do not believe the Court's opinion, fairly read, raised these concerns, for purposes of this briefing, Private Plaintiffs adopt the Fifth Circuit's position and emphasize that the evidence the Fifth Circuit deemed relevant supports a finding of discriminatory intent.

For example, this brief cites substantial evidence of very recent discrimination against minority voters by the State and by local governments throughout Texas. Likewise, testimony of SB 14's opponents is used to describe certain events that point to SB 14's discriminatory purpose, not to give weight to their opinions as to the bill's purpose. The same is true of other post-enactment

The evidence reveals that the 2011 Texas Legislature—the same Legislature that passed other discriminatory laws, including discriminatory electoral laws—enacted SB 14 because it was motivated by a perceived threat to the ruling political party posed by seismic racial and ethnic changes that made Texas a majority-minority state.  The entrenched legislative leadership, keenly aware of SB 14's anticipated discriminatory impact on minority voters in Texas, steamrolled the bill through both houses with unprecedented procedural machinations, summarily dismissing protests that it would have a racially discriminatory impact.  The bill's proponents also asserted a series of shifting justifications for the law, each of which this Court found to be at best tenuous, if not wholly fabricated—a finding with which the Fifth Circuit agreed.  Despite the Legislature's claims that the law was intended to prevent voter fraud—a pretext Texas officials have used to justify discriminatory voting laws throughout the State's history—SB 14 targets virtually non-existent in-person voter impersonation fraud and fails to address mail-in ballot fraud, which the Legislature knew was an actual concern.  *See id.* at 238-39.  Similarly, despite the Legislature's claims that the law was intended to stop noncitizen persons from voting, noncitizen persons can readily obtain at least two of the seven forms of SB 14-compliant ID.  *Id.* at 241.  Although it claimed that the law was meant to mirror voter ID laws in Georgia and Indiana, the Legislature stripped the bill of those other laws' comparatively ameliorative provisions.  *Id.* at 263.  Aware that the law would have a disproportionate impact on Black and Latino voters, the Legislature nonetheless rejected amendment after amendment that would have lessened that harm, while accepting changes that made the law increasingly stringent and discriminatory.  Indeed, whenever SB 14's proponents had a choice between designing the

---

statements, which, again, are considered strictly in accordance with the Fifth Circuit's opinion as to what they may be used to prove.

law in a way that disproportionately burdens minorities and designing it in a way that minimizes its disparate impact, they chose the former.  The bill's chief proponents and other supporters provided no explanation during legislative consideration for these choices.  Rather, they avoided direct questions and, when asked under oath to explain their actions, conveniently could "not recall."

As Judge Haynes, writing for the en banc court, counseled, "we must . . . face the sad truth that racism continues to exist in our modern American society despite years of laws designed to eradicate it."  *Id.* at 231.  As the "strictest" photo ID law in the country, *id*. at 256 n.52, SB 14 is a modern voting barrier intended to suppress, specifically and discriminatorily, the growing Black and Latino voting strength in Texas.  It must be struck down.

## LEGAL STANDARD

Laws "conceived or operated as purposeful devices to further racial discrimination" violate the Fourteenth and Fifteenth Amendments and Section 2 of the Voting Rights Act. *Rogers v. Lodge*, 458 U.S. 613, 617 (1982) (internal quotations omitted).  Demonstrating intentional discrimination "does not require a plaintiff to prove that the challenged action rested solely on racially discriminatory purposes."  *Arlington Heights*, 429 U.S. at 265.  Instead, "'[r]acial discrimination need only be one purpose, and not even a primary purpose,' of an official action for a violation to occur."  *Veasey*, 830 F.3d at 230 (quoting *United States v. Brown*, 561 F.3d 420, 433 (5th Cir. 2009)).

Because a discriminatory motive may hide behind legislation that "appears neutral on its face," the Supreme Court has articulated several non-exhaustive factors to inform trial courts' analysis of discriminatory intent:  whether the impact "bears more heavily on one race"; "[t]he historical background of the decision"; "[t]he specific sequence of events leading up [to] the challenged decision"; "[d]epartures from the normal procedural sequence"; "[s]ubstantive

3

departures" from the normal decision-making process; and the relevant legislative history. *Arlington Heights*, 429 U.S. at 266-68 (internal quotations omitted).

Discriminatory intent does not require proof "by direct evidence." *Rogers*, 458 U.S. at 618; *Veasey*, 280 F.3d at 235. This Court may consider either "direct or indirect circumstantial evidence, including the normal inferences to be drawn from the foreseeability of defendant's actions." *Brown*, 561 F.3d at 433 (internal quotations omitted). As the Fifth Circuit recognized, "[t]o require direct evidence of intent would essentially give legislatures free rein to racially discriminate so long as they do not overtly state discrimination as their purpose and so long as they proffer a seemingly neutral reason for their actions. This approach would ignore the reality that neutral reasons can and do mask racial intent . . . ." *Veasey*, 830 F.3d at 235-36. It is the strength, quality, and quantity of the evidence and the reasonableness of the inferences that can be drawn from the evidence that matter.[2]

Furthermore, the evidence must not be viewed in isolation, but as part of the "circumstantial totality of evidence." *Veasey*, 830 F.3d at 237. The Court must consider "all of the circumstances that bear upon the issue" of discriminatory intent. *Foster v. Chatman*, 136 S. Ct. 1737, 1748 (2016); *see also Coggeshall v. United States*, 69 U.S. 383, 401 (1864) ("Circumstances altogether inconclusive, if separately considered, may, by their number and joint operation, especially when corroborated by moral coincidences, be sufficient to constitute

---

[2]  Contrary to Defendants' steadfast assertions throughout this litigation, there is not a preference for direct evidence over circumstantial evidence, either in law or in fact. "Circumstantial evidence . . . is intrinsically no different from testimonial evidence. Admittedly, circumstantial evidence may in some cases point to a wholly incorrect result. Yet this is equally true of testimonial evidence." *Holland v. United States*, 348 U.S. 121, 140 (1954) (affirming jury's finding of intent based on circumstantial evidence).

conclusive proof."); *United States v. Vargas-Ocampo*, 747 F.3d 299, 303 (5th Cir. 2014) (en

banc) (same).  As the Fifth Circuit declared, "[c]ontext matters."  *Veasey*, 830 F.3d at 236.

Applying the *Arlington Heights* guidelines to the evidence in this case, the Court should

find that SB 14 was enacted, at least in part, with a discriminatory intent, and permanently enjoin

its enforcement.

## ARGUMENT

## I.   SB 14 WAS ENACTED, AT LEAST IN PART, WITH DISCRIMINATORY INTENT

### A.   The Texas Legislature Acted on an Incentive to Suppress Minority Votes

In 2004, Texas became a majority-minority state.  Plaintiffs' Joint Proposed Findings of

Fact (Dkt. 961) ("PFOF") ¶ 7.  Within months, the first photo voter ID bill, HB 1706, was

introduced in the Texas Legislature.  PFOF ¶ 74.  Over the next several years, the Legislature

repeatedly attempted to pass similar legislation, culminating in the successful passage of SB 14.

PFOF ¶ 73.  This sequence of events was far from coincidental.

Defendants do not dispute that Texas experienced a "seismic demographic shift" leading

up to the enactment of SB 14.  *Veasey*, 830 F.3d at 241; PFOF ¶¶ 7-8.  Nor do they dispute that

racially polarized voting—when voters of different racial and ethnic groups consistently and

overwhelmingly have different candidate preferences from each other—exists in Texas.  *Veasey*,

830 F.3d at 258; PFOF ¶¶ 10-16.  As Texas Republican Congressman Kenny Marchant put it:

"If you give the legal right to vote to 10 Hispanics in my district, seven to eight of them are

going to vote Democrat."  PFOF ¶ 14.  After the 2010 census, the same Legislature that passed

SB 14 was tasked with redistricting, which, for a covered jurisdiction like Texas, necessarily

involved the Legislature's detailed analysis and, therefore, knowledge of minority population

growth and candidate preferences, and the existence of racially polarized voting.  PFOF ¶ 9; *see*

*also Perez v. Texas*, 891 F. Supp. 2d 808, 812-13 (W.D. Tex. 2012).  Thus, as matters of political necessity and common sense, the legislative leadership that pushed SB 14 through was fully aware of the disproportionate and rapid growth of the Latino and Black Texan populations (as compared to the Anglo population) and the existence of racially polarized voting, and the consequential threat to their remaining in power.

Because Latino and Black voters overwhelmingly supported candidates that did not belong to the party in power, their rapid population growth presented an obvious threat to the party in power.  The majority party, therefore, had a strong motivation—maintaining its own political power—to reduce the number of eligible Latino and Black voters.  *See N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 214 (4th Cir. 2016) [hereinafter *N.C. NAACP*] (noting that "polarization renders minority voters uniquely vulnerable to the inevitable tendency of elected officials to entrench themselves by targeting groups unlikely to vote for them"); *see also Brown*, 561 F.3d at 420 ("[T]he racial polarization of elections in Noxubee County indicates that the goal of placing more black candidates in elected positions may be accomplished by obtaining additional black votes and invalidating white votes.").

On these facts, the Fifth Circuit unsurprisingly confirmed that the fact that SB 14 was passed "in the wake of a 'seismic demographic shift,' as minority populations rapidly increased in Texas, such that . . . the party currently in power [was] 'facing a declining voter base and [could] gain partisan advantage' through a strict voter ID law" could support a finding of discriminatory intent.  *Veasey*, 830 F.3d at 241 (citing *Veasey v. Perry*, 71 F. Supp. 3d 627, 700 (S.D. Tex. 2014)).  As the Fifth Circuit recognized, when racial discrimination is the means to a partisan end, it is no less unlawful than racial discrimination for its own sake.  *Veasey*, 830 F.3d at 241 n. 30 ("Intentions to achieve partisan gain and to racially discriminate are not mutually

exclusive. . . .  [A]cting to preserve legislative power in a partisan manner can also be impermissibly discriminatory.").[3]

### B.  SB 14's Proponents Knew SB 14 Would Disproportionately Deny or Abridge the Rights of Latino and Black Voters

As the Fifth Circuit held, "[t]he evidence supports the district court's finding that 'the legislature knew that minorities would be most affected by the voter ID law.'"  *Veasey*, 830 F.3d at 261-62.  Specifically, when passing SB 14, the Legislature was alerted to the disproportionate impact that the law would have on Black and Latino Texan voters.  Compounded by inequality in incomes and the known costs associated with obtaining compliant photo ID, SB 14's disproportionate adverse consequences on Black and Latino voters were inevitable.  The Legislature's awareness that SB 14 would suppress minority voting rights in Texas, together with its political motive to suppress minority voting rights, strongly supports the inference that it intended exactly that outcome.

---

[3]  Other courts have also consistently rejected states' attempts to excuse their racial discrimination by pointing to their ultimately partisan goals.  *See Hunter v. Underwood*, 471 U.S. 222, 231 (1985) (holding that, even if Alabama passed a law for the purpose of disenfranchising Black and poor Anglo voters because of their support for a minority party, the "explanation concedes both that discrimination against blacks, as well as against poor whites, was a motivating factor for the provision and that [it] would not have been adopted . . . in the absence of the racially discriminatory motivation"); *N.C. NAACP*, 831 F.3d at 222 ("[I]ntentionally targeting a particular race's access to the franchise because its members vote for a particular party, in a predictable manner, constitutes discriminatory purpose."); *Garza v. Cnty. of L.A.*, 918 F.2d 763, 771 (9th Cir. 1990) (upholding a finding of discriminatory intent where the intent "to create the very discriminatory result that occurred" was "coupled with the intent to preserve incumbencies"); *Perkins v. City of W. Helena, Ark.*, 675 F.2d 201, 216 (8th Cir.), *aff'd mem.*, 459 U.S. 801 (1982) (finding discriminatory intent where at-large elections were retained "not to promote citywide interests, but rather to protect the white incumbents on the council" who could not otherwise be elected); *see also LULAC v. Perry*, 548 U.S. 399, 440-41 (2006) (finding that the Texas Legislature's exclusion of some Latino voters from redrawn district because they were likely to vote against incumbent bore "the mark of intentional discrimination").

The record is replete with evidence supporting the conclusion that the Legislature knew that SB 14 would have a disparate impact on Black and Latino voters. For example, Representative Todd Smith, Chairman of the Texas House Elections Committee and a major supporter of strict photo ID laws, including SB 14, publicly estimated that about 700,000 Texans lacked a driver's license. PFOF ¶ 202. The Fifth Circuit found particularly persuasive that he later called it "common sense" that minority voters would be disproportionately harmed by a strict photo ID bill. *Veasey*, 830 F.3d at 236 & n.21, 262; PFOF ¶¶ 202, 209. The Fifth Circuit also emphasized that the Lieutenant Governor's own aide warned in an email that SB 14 would result in less opportunity for political participation by Black and Latino voters. *Veasey*, 830 F.3d at 236 n.21, 262; PFOF ¶ 210. Senator Estes, another of SB 14's proponents, expressed a similar concern. PFOF ¶ 204. This evidence is especially probative given that SB 14's proponents were aware that everything they said would be reviewed by the United States Department of Justice or a three-judge court pursuant to Section 5 of the Voting Rights Act, and so were "careful about what they said and wrote about the purposes of SB 14." *Veasey*, 830 F.3d at 235 n.19.[4]

The record is also replete with warnings to the Legislature that the law would have a discriminatory impact. In response to every photo ID law proposed in Texas since 2005, members of the public and legislators representing minority districts testified contemporaneously with debate on those bills that the legislation as written would severely burden voting for many Latino and Black Texans. For example, the Legislature heard testimony regarding minority voters facing 150-mile trips to the nearest Department of Public Safety ("DPS") office because

---

[4] In this regard, the Fifth Circuit considered relevant to the issue of discriminatory intent that Senator Fraser, the Senate sponsor of SB 14, testified that "he believe[s] today the Voting Rights Act has outlived its useful life." *Veasey*, 803 F.3d at 236-37 (internal quotations omitted); PFOF ¶ 218.

there are many Texas counties with no or only part-time DPS offices, long wait times in busy urban DPS locations, and the difficulty of travelling to a county office within the six-day cure period for votes cast without the required ID.  PFOF ¶¶ 205-07.  Legislators raising these serious concerns received only non-responsive answers.  As the Fifth Circuit noted, "[w]hen other legislators asked Senator Fraser questions about the possible disparate impact of SB 14, he simply replied 'I am not advised.'"  *Veasey*, 830 F.3d at 237 (quoting *Veasey v. Perry*, 71 F. Supp. 3d at 646-47); PFOF ¶¶ 220, 222, 224.

### C.   Despite Knowledge of Disproportionate Impact on Minority Voters, SB 14 Proponents Rejected Ameliorative Amendments and Chose to Make the Law More Racially Discriminatory

"[L]egislative or administrative history may be highly relevant" to assessing discriminatory legislative purpose.  *Arlington Heights*, 459 U.S. at 268.  In addition, "[s]ubstantive departures too may be relevant, particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached."  *Id.* at 267.  Here, the legislative history reveals that, as the Legislature considered voter ID legislation over four consecutive sessions, the bills became increasingly strict, culminating in the strictest photo ID requirement in the country.  PFOF ¶¶ 73, 117-118, 128.  There was no attempt to compromise with opponents.  To the contrary, the more opponents objected to the provisions of the proposed legislation, the stricter and more discriminatory proponents made the bill.  At every turn, where SB 14's proponents had a choice between designing the law in a way that would disproportionately burden minorities and designing it in a way that would minimize this disparate impact, they chose the former.  *See Veasey*, 830 F.3d at 237; PFOF ¶ 236.

"Against a backdrop of warnings that SB 14 would have a disparate impact on minorities and would likely fail the (then extant) preclearance requirement, amendment after amendment was rejected."  *Veasey*, 830 F.3d at 239.  Amendments seeking to introduce additional forms of

acceptable photo ID were accepted only if those forms of ID were disproportionately held by Anglos (concealed handgun licenses), and were rejected if those forms of ID were disproportionately held by Blacks and Latinos (government employee IDs and public university IDs).  PFOF ¶¶ 245-47.  The Legislature also voted to reject or permanently table a whole host of ameliorative amendments, including ones that would:  extend the hours of operation at DPS offices to make obtaining IDs more feasible (PFOF ¶¶ 234, 243); waive fees for underlying documents so that obtaining a photo ID would not be cost-prohibitive to low-income minority communities (PFOF ¶¶ 234, 244, 373); permit expired IDs (PFOF ¶ 248); and require an impact analysis of the effect of SB 14 on minority Texans (PFOF ¶¶ 253-54), among other things (PFOF ¶¶ 234-54).  Furthermore, the Conference Committee eliminated many important ameliorative features from the bill, including provisions passed by the Senate, such as an indigency exception and a provision targeting education for low-income and minority voters.  PFOF ¶ 99.  The Legislature did not reintroduce these provisions to the bill.

"It is likewise relevant that SB 14's proponents refused to answer why they would not allow amendments to ameliorate the expected disparate impact of SB 14."  *Veasey*, 830 F.3d at 241; *see also* PFOF ¶ 237.  For example, Representative Patricia Harless, SB 14's House sponsor, could not explain why federal, state, and municipal photo IDs are not acceptable under SB 14 while military IDs and U.S. passports are, nor why a separate voter ID bill that *she introduced the very same session* included forms of ID that were not accepted under SB 14.  PFOF ¶ 121.  The lone on-the-record reason is damning:  Senator Patrick testified that he voted to table a proposed amendment to allow indigent applicants to receive underlying documentation for "free" because he wanted voters to have to pay to get ID to vote.  PFOF ¶ 240.  *See Lodge v. Buxton*, 639 F.2d 1358, 1363 (5th Cir.), *aff'd sub nom.*, *Rogers*, 458 U.S. 613 (1982) ("The most

10

obvious purpose for the creation or maintenance of [wealth or property requirements for voting] is clearly discrimination.")

Significantly, none of the changes that the Conference Committee made that increased the burden on minority voters furthered the Legislature's purported goals of preventing voter fraud, deterring noncitizen voting, or increasing voter confidence, and none of the rejected amendments put forward to lighten that burden would have impeded those purported goals. Texas put on no evidence that a university ID or government employee ID is any easier to forge than a driver's license or that an expired driver's license is any easier to fake than a current driver's license. Expanding DPS hours makes it no more likely that a noncitizen person votes. Educating poor and minority voters about the photo ID requirements would, if anything, *increase* voter confidence in the electoral system. Rejecting these provisions is not consistent with the stated goals of the bill. It is, however, perfectly consistent with a desire to abridge the right to vote of Black and Latino Texans.

### D.   The Texas Legislature Hid Its Real Agenda to Suppress Black and Latino Political Participation Behind Tenuous and Unsubstantiated Rationales

The utter disconnect between the provisions of the law as passed and the problems it was purportedly meant to solve strongly supports the inference that the proffered justifications were pretext for an impermissible motive. The evidence of pretext here is overwhelming. As the Fifth Circuit explained, the fact that "many rationales were given for a voter identification law, which shifted as they were challenged or disproven by opponents," is "probative" of discriminatory intent. *Veasey*, 830 F.3d at 240-41. The Fifth Circuit also acknowledged the evidence that "SB 14 is only tenuously related to the legislature's stated purpose of preventing voter fraud," and recognized that the rationales provided for SB 14 "fail[ed] to correspond *in any meaningful way*" to the actual legislation. *Id.* at 237, 263 (emphasis added); PFOF ¶ 134.

11

Texas already had a voter ID law in place before the Legislature passed SB 14, and it was working fine. The principal legislative purpose asserted by SB 14's proponents was protection against voter fraud. PFOF ¶ 134. The undisputed record shows that in-person voter impersonation is exceedingly rare both in Texas and as a general matter. PFOF ¶ 139; *see also Veasey*, 830 F.3d at 238. In the fourteen years before SB 14, there were only two credible claims of voter impersonation fraud in Texas out of more than 20 million votes cast. *Veasey*, 830 F.3d at 238; PFOF ¶¶ 139-40.

The Legislature was aware of these facts and heard testimony on the near non-existence of in-person voter impersonation and the relatively higher incidence rate of mail-in ballot fraud. *Veasey*, 830 F.3d at 238-39; PFOF ¶¶ 150-57. Yet SB 14's sponsors made little to no effort to attempt to align the bill's purported goal of preventing voter fraud with the reality of the virtual absence of in-person voter fraud. During debate on SB 14, the Senate and House sponsors both stated that they were "not advised" about the extent of in-person voter impersonation in Texas, and the House sponsor testified that, even though in-person voter fraud was the only legislative purpose for SB 14 that she remembered, she could not recall whether she even believed that in-person voter fraud was a problem in Texas. PFOF ¶ 158. Moreover, as the Fifth Circuit detailed, despite hearing evidence that "the potential and reality of fraud is much greater in the mail-in ballot context than with in-person voting," the Legislature chose to pass SB 14, which "did nothing to combat mail-in ballot fraud." *Veasey*, 830 F.3d at 238-39; *see also* PFOF ¶¶ 176-81. The refusal to legislate mail-in voting procedures to address mail-in ballot fraud further confirms that the Legislature enacted SB 14 with discriminatory intent, as Anglo voters are substantially more likely than Black and Latino voters to qualify to vote by mail on the basis of

age and comprise a disproportionate share of absentee voters who vote by mail in Texas.  PFOF ¶¶ 410-11.

Other various and shifting justifications for SB 14 were similarly belied by the actual content of the legislation.  Proponents of SB 14 claimed that it would prevent noncitizen persons from voting, but there was scant evidence of noncitizen voting in Texas, and at least driver's licenses and concealed handgun licenses, "two forms of identification approved under SB 14[,] are available to noncitizens."  *Veasey*, 830 F.3d at 241; PFOF ¶ 194.  Proponents also claimed that SB 14 and its predecessor bills would promote "voter confidence."  PFOF ¶ 166.  Yet the Legislature conducted no analysis indicating whether concerns about election fraud actually affected voter turnout, and the bill's proponents were not aware of any external analysis supporting that proposition, nor could they identify a single individual who had not voted due to concerns about in-person voter fraud.  PFOF ¶¶ 169-70.  Instead, SB 14's proponents claimed to have relied upon polls regarding support for voter ID.  But those polls provided no specifics about SB 14's restrictive provisions and were conducted only after members of the majority political party made widespread, false allegations that voter fraud is an epidemic in Texas, despite there being no evidence to support such claims.  PFOF ¶¶ 172-74.  As the Fifth Circuit accurately summarized, "[h]ere, too, there is evidence that could support a finding that the Legislature's race-neutral reason of ballot integrity offered by the State is pretextual."  *Veasey*, 830 F.3d at 237.

Proponents further claimed that SB 14 was modeled on Indiana and Georgia's respective voter ID laws, which had survived legal challenges.  But SB 14 was far more restrictive than both.  PFOF ¶¶ 116, 129-33.  Senator Fraser, who authored SB 14, conceded that SB 14 permits fewer photo IDs than Indiana and that he was unaware of whether the Indiana law permitted use

of student IDs.  PFOF ¶ 125.  Senator Fraser's Chief of Staff, SB 14's principal drafter, testified

that she never even reviewed the Indiana or Georgia laws while drafting SB 14.  *Id*.[5]  As the

Fifth Circuit concluded, "[w]hile cloaking themselves in the mantle of following Indiana's voter

ID law, which had been upheld against a (different) challenge in *Crawford*, the proponents of SB

14 took out all the ameliorative provisions of the Indiana law" and "rejected many ameliorative

amendments that would have brought SB 14 in line with [Indiana's] voter ID law[]."  *Veasey*,

830 F.3d at 239, 263.

SB 14 was always a solution in search of a problem.  As the Fifth Circuit advised, this

Court need not "simply accept that legislators were really so concerned with this almost

nonexistent problem" of in-person voter impersonation.  *Id*. at 239.  There was no need for a

more stringent voter ID law in Texas, unless it was intended to do something other than address

in-person voter fraud.[6]

---

[5]  Particularly relevant to the question of the law's intended impact on minority citizens, Georgia does not charge for one of the compliant IDs, for which the underlying documents also do not cost anything.  PFOF ¶ 130.  Indiana provides an indigency exception.  PFOF ¶ 133.  Both also accept a number of other photographic IDs, such as public college IDs, which SB 14 proponents have repeatedly been unable to articulate any reason for excluding from Texas's law.  PFOF ¶¶ 129, 132, 245-46, 250.

[6]  Addressing a remarkably similar record, the Fourth Circuit recently held that a North Carolina voting law, also ostensibly targeting voter fraud, was purposefully discriminatory:

> In sum, the array of electoral 'reforms' the General Assembly pursued in SL 2013-381 were not tailored to achieve its purported justifications, a number of which were in all events insubstantial.  In many ways, the challenged provisions in SL 2013-381 constitute solutions in search of a problem.  The only clear factor linking these various 'reforms' is their impact on African American voters.  The record thus makes obvious that the 'problem' the majority in the General Assembly sought to remedy was emerging support for the minority party.  Identifying and restricting the ways African Americans vote was an easy and effective way to do so.  We therefore must conclude that race constituted a but-for cause of SL 2013-381, in violation of the Constitutional and statutory prohibitions on intentional discrimination.

*N.C. NAACP*, 831 F.3d at 238.

**E.    Texas Political Leaders Have a Long and Consistent History of Unconstitutionally Discriminating Against Minority Voters to Maintain Political Power**

A tenuous rationale is even more indicative of discriminatory intent when it has cloaked not just one, but "a series of official actions taken for invidious purposes." *Arlington Heights*, 429 U.S. at 267.  As the Fifth Circuit detailed, "the record shows that Texas has a history of justifying voter suppression efforts such as the poll tax and literacy tests with the race-neutral reason of promoting ballot integrity," and in fact the prevention of voter fraud was the stated rationale for the illegal all-white primary, literacy tests, poll taxes, the annual re-registration requirement, and voter purges.  *Veasey*, 830 F.3d at 237; PFOF ¶¶ 159-64.

Beyond these historic practices, in applying the *Arlington Heights* factor of "the historical background of the decision," the Fifth Circuit recognized that "there were some more contemporary examples of discrimination identified by the Plaintiffs in the district court" that are probative of the question of discriminatory intent.  *Veasey*, 830 F.3d at 232.  The court emphasized that "'[r]elatively recent' does not mean immediately contemporaneous."  *Id*. at 232 n.14.  Nor did the court impose any particular bright line cut-off for what constitutes a "contemporaneous" example that would suffice to demonstrate a history of state-sponsored discrimination.  *Id*. at 239-40.  The evidence includes many contemporaneous examples of discrimination that support a finding that SB 14 was motivated by a racially discriminatory purpose.

1.    The same Legislature passed other discriminatory laws.

The same Legislature that passed SB 14 passed several other discriminatory laws.  As the Fifth Circuit emphasized, "the same Legislature that passed SB 14 also passed two [different redistricting plans] found to be passed with discriminatory purpose."  *Veasey*, 830 F.3d at 240. In defense of those redistricting plans, Texas argued that the intent of Republican members of the

Legislature was to dilute the votes of Democrats, not Black or Latino voters.  A three-judge

court, however, held that the totality of the circumstances did "not support Texas's case" and that

"the full record strongly suggests that the retrogressive effect . . . may not have been accidental."

*Texas v. United States*, 887 F. Supp. 2d 133, 164, 178 (D.D.C. 2012), *vacated on other grounds*,

133 S. Ct. 2885 (2013).

The District Court for the Western District of Texas (also sitting as a three-judge court)

similarly concluded that the Legislature "may have focused on race to an impermissible degree

by targeting low-turnout Latino precincts."  *Perez v. Perry*, No. 5:11-cv-360, Slip Op. at 6 (W.D.

Tex. Mar. 19, 2012); *see also* PFOF ¶ 21.  The same Legislature that passed SB 14—facing the

seismic demographic shift and aware of Texas's racially polarized voting—thus has twice been

found to have intentionally suppressed the votes of minority voters most likely to vote against

them.

> 2.   Texas legislatures have a history of passing discriminatory laws to
>      maintain power.

As the Fifth Circuit also recognized, political leaders in Texas have a long and consistent

history of using racially discriminatory voting schemes to maintain power, regardless of the party

in power.  *Veasey*, 830 F.3d at 241 n.30 (quoting plaintiffs' expert Dr. Burton's testimony that

"every time that African-Americans have, in fact, been perceived to be increasing their ability to

vote and participate in the process[,] there has been State legislation to either deny them the vote

or at least dilute the vote or make it much more difficult for them to participate on an equal basis

as Whites in the State of Texas").  This history is hardly confined to the distant past.  Indeed, the

Fifth Circuit specifically identified "contemporary examples of State-sponsored discrimination"

in the record that "augment[]" other evidence of discriminatory intent.  *Veasey*, 830 F.3d at 239;

*see, e.g.*, PFOF ¶¶ 17-27.

16

For example, the Fifth Circuit found it notable that "[i]n *every* redistricting cycle since 1970, Texas has been found to have violated the [Voting Rights Act] with racially gerrymandered districts." *Veasey*, 830 F.3d at 240 (emphasis added) (internal quotations omitted); *see also* PFOF ¶¶ 18-19. The Fifth Circuit further highlighted that, for each period between 1980 and the present, the Department of Justice has objected to at least one of Texas's statewide redistricting plans under Section 5 of the Voting Rights Act—and, moreover, that Texas "is the *only* state with this consistent record of objections to such statewide plans." *Veasey*, 830 F.3d at 240 (emphasis added) (internal quotations omitted); *see also* PFOF ¶¶ 24-25. The Fifth Circuit also recognized that Texas attempted to suppress minority voting "as late as 1975" by purging the voter rolls after the poll tax and re-registration requirements that it previously had in place were ruled unconstitutional. *Veasey*, 830 F.3d at 239-40. These discriminatory purges were only ultimately blocked because the Department of Justice objected under Section 5 of the Voting Rights Act. PFOF ¶¶ 20, 163.

In addition to the redistricting plans and discriminatory voter purges acknowledged by the Fifth Circuit, the Department of Justice has objected to myriad other discriminatory voting practices by Texas. Between 1975 and 2013—while Texas was covered by Section 5—the Department of Justice issued *over 200* objection letters blocking proposed discriminatory voting changes in the state because of their discriminatory purpose or retrogressive effect on minority voters' ability to participate equally in the political process. PFOF ¶ 24. These objections were directed both to Texas itself and to 100 of its 254 counties. The Department of Justice objected to, among other things, Texas's enactment and enforcement of racially discriminatory property-ownership qualifications for candidates (2008); pre-registration proof of citizenship requirements (1996); and inadequate bilingual assistance programs (1995). PFOF ¶ 25. Among the sixteen

objection letters issued to Texas after the year 2000 alone, eight were explicitly based on Texas's failure to prove that the changes were not motivated by discriminatory intent.  PFOF ¶ 24.

Moreover, between 2005 and 2009, ten Texas jurisdictions entered into consent decrees after the Department of Justice sued them for violating Voting Rights Act provisions requiring assistance for limited-English proficient voters.  PFOF ¶ 26.  And, in 2016, a federal court held that Texas election laws restricting limited-English proficient voters' use of an interpreter of their choice at the polls violated the Voting Rights Act.  PFOF ¶ 27; *see OCA Greater Houston v. Texas*, No. 15-cv-679, 2016 WL 4597636, at *2 (W.D. Tex. Sept. 2, 2016).

The Fifth Circuit also acknowledged that even "long-ago history"—that is, examples of discrimination in voting that pre-date those that it considered most relevant to the issue of the Legislature's intent—"provides context to modern-day events." *Veasey*, 830 F.3d at 232 n.14 (internal quotations omitted).  As the Supreme Court noted in 2006, "'Texas has a long, well-documented history of discrimination that has touched upon the rights of African-Americans and Hispanics to register, to vote, or to participate otherwise in the electoral process.'" *LULAC v. Perry*, 548 U.S. at 439 (quoting *Bush v. Vera*, 517 U.S. 952, 981-82 (1996)); *see also Veasey*, 830 F.3d at 240 n.28.  That history stretches back to the time when Black voters were first enfranchised and then effectively disenfranchised by the institution of purportedly race-neutral voting practices.  *See* PFOF ¶¶ 159-61.  Here, the Legislature's history of enacting purportedly race-neutral discriminatory voting practices—including white primary laws, poll taxes, secret ballots, and re-registration requirements (PFOF ¶ 17)—contextualizes and further illuminates its motivations in enacting SB 14.

18

### F.   The Legislature's Departures from Normal Procedures Support a Finding of Discriminatory Intent

To pass SB 14, the Legislature used "numerous and radical procedural departures," each of which was highly unusual, and, when combined, were unprecedented.  *Veasey*, 830 F.3d at 238.  "Departures from the normal procedural sequence . . . might afford evidence that improper purposes are playing role."  *Arlington Heights*, 429 U.S. at 267.  As the Fifth Circuit instructed, "evidence of procedural departures provides one potential link in the circumstantial totality of evidence the district court must consider."  *Veasey*, 830 F.3d at 237.

First, after it was initially filed, the bill was re-classified with a lower number to ensure that it would be heard earlier in the legislative session.  PFOF ¶ 83.  Soon thereafter, then-Governor Rick Perry designated it as "emergency legislation," guaranteeing that it would be considered in the first 60 days of the session, despite the fact that neither the bill's proponents nor Texas election officials could identify any emergency warranting this treatment.  PFOF ¶ 84-85.  SB 14's proponents then used radical procedural maneuvers to short-circuit debate, including:  suspending the century-old two-thirds rule in the Senate for bringing up legislation (PFOF ¶ 86); bypassing the ordinary committee process in the House and Senate and sending the bill to a special House committee hand-picked by SB 14 supporters (PFOF ¶¶ 92-93); and allowing the Conference Committee to substantively amend SB 14 (PFOF ¶¶ 98-99).  Finally, SB 14 was taken up and passed despite its $2 million fiscal note, even though the Legislature was operating with a $27 million budget shortfall and with strict instructions not to advance any legislation with a fiscal note.  PFOF ¶¶ 91, 95.

SB 14's path to passage deviated so extremely from normal procedure that the Fifth Circuit called it "virtually unprecedented."  *Veasey*, 830 F.3d at 238.  And, as the Fifth Circuit emphasized, no other issue that the 2011 Legislature faced—not the $27 million budget shortfall,

not transportation funding, nothing—was designated as a legislative emergency, got its own select committee, or was passed with an exception to the two-thirds rule.  *Id.*  These drastic procedural departures that cut off meaningful debate are alone strong evidence that the bill was passed with a discriminatory intent, and are even more so in light of the complete lack of evidence that the problems the bill purported to address even existed and the misfit between those purported problems and the bill's strict provisions.

### G.   The Foreseeable Racially Discriminatory Impact Did Come to Pass and the Legislature Did Nothing to Cure It

Finally, because "people usually intend the natural consequences of their actions," *Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 487 (1997), evidence of the racially discriminatory impact of SB 14—that is, whether it "bears more heavily on one race than another," *Arlington Heights*, 429 U.S. at 266 (internal quotations omitted)—is an important factor in determining whether discriminatory intent motivated the Legislature's enactment of SB 14.  This Court previously found, and the Fifth Circuit affirmed, that SB 14 has a discriminatory effect on minorities' voting rights in violation of Section 2 of the Voting Rights Act.  *Veasey*, 830 F.3d at 264-65.  More than 600,000 registered voters and one million eligible Texans, a disproportionate number of whom are Black and Latino, are negatively impacted by SB 14.  PFOF ¶¶ 268-69, 275-76.  Indeed, the Fifth Circuit found that the evidence supported a "finding that 'the legislature knew that minorities would be most affected by the voter ID law'" and that "amendments to ameliorate that impact were rejected without explanation."  *Veasey*, 830 F.3d at 261-62 (quoting *Veasey v. Perry*, 71 F. Supp. 3d at 657-58).  Thus, this Court's findings regarding SB 14's discriminatory impact are undisturbed.  And the incontrovertible evidence of the Legislature's prior knowledge of SB 14's effects, the rejection of ameliorative amendments, and the realization of SB 14's actual discriminatory effects, all support the conclusion that the

Legislature intended to discriminate against minority voters when it enacted SB 14.  *See Burton v. City of Belle Glade*, 178 F.3d 1175, 1189 (11th Cir. 1999) ("Indeed, all actions having foreseeable and anticipated disparate impact are relevant evidence to prove the ultimate fact, forbidden purpose." (quoting *Columbus Bd. of Educ. v. Penick*, 443 U.S. 449, 464 (1979))); *cf. Hunter*, 471 U.S. at 226-29 (finding that a state legislature's selection of certain crimes for inclusion in a felon disfranchisement law, which increased that law's discriminatory effect, was strong evidence of intentional discrimination).

Even when a three-judge court denied judicial preclearance under Section 5 of the Voting Rights Act in 2012, concluding that SB 14 was the strictest photo ID law in the nation and finding that SB 14 likely would have a retrogressive effect on minorities' voting rights, Texas took no action to mitigate or prevent that foreseeable impact.  The Senate held no hearings and issued no interim changes related to SB 14 during the 83rd Legislature, and there is no evidence that the House even considered the preclearance denial.  PFOF ¶¶ 113-14.  Instead, Texas announced its intention to begin enforcing SB 14, as enacted, on the same day, and within three hours of the Supreme Court decision that invalidated the formula that placed Texas under Section 5 preclearance review.  PFOF ¶ 115.  The Legislature's refusal to address the foreseeable impact of SB 14, even when faced with a preclearance denial based on the law's likely retrogressive effect, is further evidence that the Legislature enacted the law with the intent to discriminate against minority voters.

## II.    THE TEXAS LEGISLATURE WOULD NOT HAVE ENACTED SB 14 ABSENT DISCRIMINATORY PURPOSE

Under the Fourteenth Amendment, once the Court determines that SB 14 was enacted, at least in part, with a discriminatory purpose, the burden shifts to Defendants to prove that SB 14 would have been enacted absent that discriminatory purpose.  *Hunter*, 471 U.S. at 228.  Texas

cannot carry that burden.  As this Court has already ruled, in findings that the en banc court

credited and are fully supported by the evidence:

> [The State] did not provide evidence that the discriminatory features of SB
> 14 were necessary to prevent non-citizens from voting.  They did not
> provide any evidence that would link these discriminatory provisions to any
> increased voter confidence or voter turnout.  As the proponents who
> appeared (only by deposition) testified, they did not know or could not
> remember why they rejected so many ameliorative amendments, some of
> which had appeared in prior bills or in the laws of other states.  There is an
> absence of proof that SB 14's discriminatory features were necessary
> components to a voter ID law.

*Veasey v. Perry*, 71 F. Supp. 3d at 702.

## CONCLUSION

For the reasons set forth above and in the accompanying Plaintiffs' Proposed Findings of

Fact, Private Plaintiffs respectfully request that this Court enter judgment on their claims brought

under Section 2 of the Voting Rights Act and the Equal Protection Clause of the United States

Constitution and issue a declaratory judgment that SB 14 was enacted, at least in part, with

discriminatory intent and that Defendants did not prove that SB 14 would have been enacted

without that intent.  Private Plaintiffs further respectfully request that this Court permanently

enjoin the enforcement of SB 14 and conduct proceedings on other remedies sought by Plaintiffs,

including bail-in under Section 3(c) of the Voting Rights Act.


Date:  November 18, 2016                              Respectfully submitted,


                                                     /s/ Lindsey B. Cohan
                                                     JON M. GREENBAUM
                                                     EZRA D. ROSENBERG
                                                     BRENDAN B. DOWNES
                                                     Lawyers' Committee for
                                                     Civil Rights Under Law
                                                     1401 New York Avenue NW Suite 400
                                                     Washington, D.C. 20005

WENDY WEISER
MYRNA PÉREZ
JENNIFER CLARK
The Brennan Center for Justice at NYU Law School
161 Avenue of the Americas, Floor 12
New York, New York 10013-1205

SIDNEY S. ROSDEITCHER
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019-6064

AMY L. RUDD
LINDSEY B. COHAN
Dechert LLP
500 W. 6th Street, Suite 2010
Austin, Texas 78701

NEIL STEINER
DECHERT LLP
1095 Avenue of the Americas
New York, New York 10036-6797

JOSE GARZA
Law Office of Jose Garza
7414 Robin Rest Drive
San Antonio, Texas 98209

DANIEL GAVIN COVICH
Covich Law Firm LLC
Frost Bank Plaza
802 N Carancahua, Ste 2100
Corpus Christi, TX 78401

GARY BLEDSOE
Potter Bledsoe, LLP
316 W. 12th Street, Suite 307
Austin, Texas 78701

VICTOR GOODE
NAACP
4805 Mt. Hope Drive
Baltimore, Maryland 21215

ROBERT NOTZON
The Law Office of Robert Notzon
1502 West Avenue
Austin, Texas 78701

*Counsel for the Texas State Conference of NAACP
Branches and the Mexican American Legislative
Caucus of the Texas House of Representatives*

/s/ Leah Aden
SHERRILYN IFILL
JANAI NELSON
CHRISTINA A. SWARNS
COTY MONTAG
LEAH C. ADEN
DEUEL ROSS
NAACP Legal Defense and Educational Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006

JONATHAN PAIKIN
KELLY P. DUNBAR
TANIA FARANSSO
THADDEUS C. EAGLES
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006

*Counsel for Imani Clark*

/s/ Chad W. Dunn
CHAD W. DUNN
K. SCOTT BRAZIL
BRAZIL & DUNN
4201 Cypress Creek Pkwy., Suite 530
Houston, Texas 77068

J. GERALD HEBERT
DANIELLE M. LANG
Campaign Legal Center
1411 K Street NW Suite 1400
Washington, DC 20005

24

ARMAND G. DERFNER
Derfner & Altman
575 King Street, Suite B
Charleston, S.C. 29403

NEIL G. BARON
Law Office of Neil G. Baron
914 FM 517 W, Suite 242
Dickinson, Texas 77539

DAVID RICHARDS
Richards, Rodriguez & Skeith, LLP
816 Congress Avenue, Suite 1200
Austin, Texas 78701

*Counsel for Veasey/LULAC Plaintiffs*

LUIS ROBERTO VERA, JR.
Law Office of Luis Roberto Vera Jr.
111 Soledad, Ste 1325
San Antonio, TX 78205

*Counsel for LULAC*

/s/ Marinda van Dalen
ROBERT W. DOGGETT
SHOSHANA J. KRIEGER
Texas RioGrande Legal Aid
4920 N. IH-35
Austin, Texas 78751

MARINDA VAN DALEN
Texas RioGrande Legal Aid
531 East St. Francis St.
Brownsville, Texas 78529

JOSE GARZA
Texas RioGrande Legal Aid
1111 N. Main Ave.
San Antonio, Texas 78212

*Counsel for Lenard Taylor, Eulalio Mendez Jr.,
Lionel Estrada, Estela Garcia Espinoza, Margarito
Martinez Lara, Maximina Martinez Lara, and La
Union Del Pueblo Entero, Inc.*

25

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 18, 2016, a true and correct copy of the foregoing document was served via the Court's ECF system to all counsel of record.

/s/ Lindsey B. Cohan
Lindsey B. Cohan
Dechert LLP
300 W. 6th Street, Suite 2010
Austin, Texas 78731
lindsey.cohan@dechert.com

26