UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

MARC VEASEY, *et al.*,                    §
                                          §
            Plaintiffs,                   §
                                          §
v.                                        §          CIVIL ACTION NO. 2:13-CV-00193
                                          §
GREG ABBOTT, *et al.*,                    §
                                          §
            Defendants.                   §


**DEFENDANTS' PROPOSED**
**FINDINGS OF FACTS AND CONCLUSIONS OF LAW**
**(REDACTED)**

TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. vii

INTRODUCTION ............................................................................ 1

PROPOSED FINDINGS OF FACT ....................................................... 4

I.     TEXAS VOTER-IDENTIFICATION REQUIREMENTS PRIOR TO THE ENACTMENT
       OF S.B. 14 ........................................................................... 4

II.    S.B. 14'S PROVISIONS AND IMPLEMENTATION ............................... 6

       A.     S.B. 14 Generally Requires Voters to Prove Their Identity Via
              Photo ID ...................................................................... 6

       B.     The Texas Legislature Sought to Mitigate Potential Burdens on
              Eligible Voters ............................................................... 7

              1.     SB 14 creates free Election Identification Certificates. ............... 7

              2.     S.B. 14 preserves certain voters' ability to vote by mail
                     without a photo ID. ............................................... 7

              3.     S.B. 14 created exceptions to accommodate the disabled,
                     religious objectors, and those affected by natural
                     disasters. ....................................................... 8

              4.     Provisional ballots ............................................. 8

              5.     S.B. 14 Provides an Accommodation for Voters Whose
                     Photo ID Shows a Name that Differs from the Voter's
                     Name as Listed on the Voting Rolls. ........................... 9

              6.     Training and voter outreach ................................... 9

       C.     Texas Diligently Implemented S.B. 14 to Ensure that Every
              Texan Voter Had an Opportunity to Vote and to Obtain a Free
              Election Identification Certificate. ..................................... 9

              1.     Plaintiffs' inability to find a single voter who was
                     disenfranchised by S.B. 14 confirms that any potential
                     negative impact was severely limited. ........................ 12

2. Results from elections following S.B. 14's implementation confirm that any potential negative impact was significantly limited.................................................. 17

III. THE ORIGINS OF THE TEXAS LEGISLATURE'S INTEREST IN REQUIRING VOTERS TO IDENTIFY THEMSELVES VIA A PHOTO ID. ......................................... 21

A. The Contested Presidential Election of 2000. ........................................ 22

B. The Help America Vote Act .................................................................. 23

C. The Carter-Baker Commission on Federal Election Reform................ 25

D. The Adoption of Voter ID Requirements by Other States................... 28

E. Broad Public Support for a Voter-ID Requirement Throughout the Nation and Texas ........................................................................... 31

IV. THE LONG LEGISLATIVE ROAD TO S.B. 14 ................................................ 35

A. In the 2001 Legislative Session, a Democrat Introduces the First Voter-ID Bill Following the 2000 Election. ........................................... 38

B. In the 2003 Legislative Session, the Texas Legislature Enacts Various Laws that Continue to Strengthen and Modernize Texas's Electoral System—Including a Bill that Addresses Mail-in Ballot Fraud in Various Ways. ............................................................ 39

C. In the 2005 Legislative Session, a Voter ID Bill Is Pressed by Republicans and Blocked by Democrats in the Senate......................... 41

D. In the 2007 Legislative Session, Democrats Get an Extraordinary Concession, Which They Use to Kill the Voter-ID Bill........................................................................................................ 46

E. In the 2009 Legislative Session, the Senate Sets Aside the Two-Thirds Rule to Pass a Voter ID Law, but the Bill is "Chubbed to Death" by Democrats in the House.......................................................... 49

F. In the 2011 Legislative Session, After Republicans Obtain an Overwhelming Majority in Both Houses—and with Many of Voter ID's Opponents Voted out of Office—a Majority of the Texas Legislature Adopts S.B. 14 in Line with the Preferences of Their Constituents. .................................................................................. 54

1. The Senate passes S.B. 14.......................................................... 59

2. The House passes a modified version of S.B. 14. ...................... 66

3.      Both the House and Senate pass the conference report of
        S.B. 14. ...................................................................... 73

V.  THE TEXAS LEGISLATURE ENACTED S.B. 14 FOR THE EXPRESS PURPOSE OF
    COMBATING VOTER FRAUD AND PRESERVING PUBLIC CONFIDENCE IN
    ELECTIONS. ................................................................................. 75

    A.  The Legislative Record Reveals that S.B. 14 Was Enacted to
        Combat In-person Voter Fraud and Preserve Confidence in the
        Electoral System, Not to Discriminate Against Minorities. ................ 75

    B.  The Texas Legislature Concluded that S.B. 14 Would Not Have
        a Disparate Impact on Minorities. ........................................ 77

    C.  Promoting Confidence in Elections Is a Genuine Concern. .................. 84

    D.  In-person Voter Fraud Exists and Is a Genuine Concern. .................. 87

        1.      Evidence of voter fraud exists. .................................... 88

        2.      In-person voter fraud is very hard to detect. ...................... 95

        3.      Conditions ripe for voter fraud exist in Texas. .................... 96

                a.      Texas's inflated voter rolls create a risk of voter
                        fraud. ...................................................... 96

                b.      Non-citizens on the voter rolls create a risk of
                        fraud. ...................................................... 98

    E.  Plaintiffs' Extensive Discovery Into the Private Thoughts and
        Communications of Legislators Confirmed that the Purpose of
        S.B. 14 Was to Prevent Fraud and Increase Confidence in the
        Electoral System. ........................................................ 99

PROPOSED CONCLUSIONS OF LAW ....................................................... 103

I.  S.B. 14 WAS NOT ENACTED WITH A DISCRIMINATORY PURPOSE. ..................... 104

    A.  Under Well-Established Supreme Court Precedent, Plaintiffs
        Bringing a Discriminatory-Purpose Claim Bear the Burden to
        Show that a Facially Neutral Law Is "Obvious Pretext" for
        Racial Discrimination—that the Law Is "Unexplainable on
        Grounds Other Than Race." ............................................... 105

    B.  The Stated Purposes of S.B. 14 Were Protecting the Sanctity of
        Voting, Avoiding Voter Fraud, and Promoting Public Confidence
        in the Voting System. ................................................... 108

iv

C.     Direct Evidence Obtained from Legislators Confirmed that S.B. 14 Was Not Enacted for a Discriminatory Purpose. ........................... 110

D.     Circumstantial Evidence Confirms that S.B. 14 Was Not Enacted for a Discriminatory Purpose. ................................ 114

     1.     The Texas Legislature believed, based on the evidence before it, that S.B. 14 would not have a disparate impact on minority voters...................................................... 115

     2.     Plaintiffs' database-matching studies are not circumstantial evidence of discriminatory purpose. ............... 118

     3.     The events leading up to the enactment of S.B. 14 further support the conclusion that it was enacted for legitimate purposes. ................................................................. 122

     4.     The historical background of the enactment of S.B. 14 does not detract from its legitimate purpose........................... 124

     5.     The principle of parsimony supports the conclusion that the Texas Legislature was not operating with a discriminatory purpose............................................................. 128

E.     Plaintiffs Have Failed to Show that the Legislature's Stated Purposes Were Pretextual. ................................................... 130

     1.     The drive to enact voter-ID legislation is most plausibly explained as part of the nationwide push to modernize and secure electoral systems, rather than as a reaction to a growing minority population in Texas.................................. 132

     2.     The rejection of some Democratic amendments by S.B. 14 proponents is more plausibly explained by a purpose to deter voter fraud and protect voter confidence, plus the give-and-take of the legislative process, rather than by an intent to discriminate. ............................................................. 134

     3.     The procedural maneuvers associated with the passage of S.B. 14 are most plausibly explained as a reaction to Democratic legislators' intransigence in blocking voter-ID bills in three prior legislative sessions, rather than as the product of discriminatory purpose. ........................................... 136

     4.     Plaintiffs' complaint that the Texas Legislature failed to address other forms of election fraud is built on a false premise and is irrelevant. ....................................................... 140

5.      Plaintiffs' complaint that the Texas Legislature did not
        have sufficient evidence of in-person voter fraud or lack of
        confidence in elections is meritless. ......................................... 142

6.      The opinions of Plaintiffs' experts on discriminatory
        purpose are not credible and cannot establish the intent of
        the Legislature.......................................................................... 143

II.     THE TEXAS LEGISLATURE WAS GOING TO ENACT S.B. 14 REGARDLESS OF
        ANY PURPORTED SECRET PURPOSE.................................................. 152

CONCLUSION ............................................................................................... 154

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Acorda Therapeutics Inc. v. Mylan Pharm. Inc.*,
  817 F.3d 755 (Fed. Cir. 2016) ................................................................. 128

*Asgeirsson v. Abbott*,
  696 F.3d 454 (5th Cir. 2012) .................................................................. 125

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .................................................... 128, 129, 130, 138

*Brown v. Califano*,
  627 F.2d 1221 (D.C. Cir. 1980) .............................................................. 114

*Brown v. Vance*,
  637 F.2d 272 (5th Cir. 1981) .................................................................. 128

*Bryant v. Yellen*,
  447 U.S. 352 (1980) ................................................................................ 135

*Bush v. Gore*,
  531 U.S. 98 (2000) (per curiam) ......................................................... 21-22

*Castaneda-Gonzalez v. Immigration & Naturalization Serv.*,
  564 F.2d 417 (D.C. Cir. 1977) ................................................................ 121

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
  508 U.S. 520 (1993) ................................................................................ 122

*Citizens to Preserve Overton Park v. Volpe*,
  401 U.S. 402 (1971) ................................................................................ 111

*City of Mobile, Ala. v. Bolden*,
  446 U.S. 55 (1980) ......................................................................... 105, 124

*Clements v. Fashing*,
  457 U.S. 957 (1982) ................................................................................ 106

*Common Cause/Georgia v. Billups*,
  554 F.3d 1340 (11th Cir. 2009) ........................................................ 30, 47

*Crawford v. Bd. of Educ. of City of L.A.*,
  458 U.S. 527 (1982) ................................................................................ 114

*Crawford v. Marion County Election Board*,
  553 U.S. 181 (2008) ...........................................................................*passim*

*Darensburg v. Metro. Transp. Comm'n*,
  636 F.3d 511 (9th Cir. 2011) .................................................................. 114

*Doe ex rel. Doe v. Lower Merion Sch. Dist.*,
 665 F.3d 524 (3d Cir. 2011) .................................................................... 119

*Easley v. Cromartie*,
 532 U.S. 234 (2001) ........................................... 106, 107, 118, 140

*F.C.C. v. Beach Commc'ns, Inc.*,
 508 U.S. 307 (1993) ............................................................................ 110

*Flemming v. Nestor*,
 363 U.S. 603 (1960) ............................................................................ 110

*Fletcher v. Peck*,
 10 U.S. (6 Cranch) 87 (1810) ............................................................ 111

*Florida v. United States*,
 885 F. Supp. 2d 299 (D.D.C. 2012) (per curiam) ................................. 121

*Frank v. Walker*,
 768 F.3d 744 (7th Cir. 2014) ............................................................. 142

*Goswami v. DePaul Univ.*,
 8 F. Supp. 3d 1004 (N.D. Ill. 2014) ................................................... 149

*Hunt v. Cromartie*,
 526 U.S. 541 (1999) ............................................................................ 106

*Hunter v. Underwood*,
 471 U.S. 222 (1985) ........................................................... 104, 130, 152

*Kansas v. Hendricks*,
 521 U.S. 346 (1997) ............................................................................ 110

*Kelley v. Am. Heyer-Schulte Corp.*,
 957 F. Supp. 873 (W.D. Tex. 1997), *appeal dismissed*,
 139 F.3d 899 (5th Cir. 1998) ............................................................. 128

*Loan Syndications & Trading Ass'n v. S.E.C.*,
 818 F.3d 716 (D.C. Cir. 2016) ........................................................... 128

*McCleskey v. Kemp*,
 481 U.S. 279 (1987) ............................................................................ 106

*Miller v. Johnson*,
 515 U.S. 900 (1995) ............................................................. 107, 118, 140

*Minnesota v. Clover Leaf Creamery Co.*,
 449 U.S. 456 (1981) ............................................................................ 110

*MSM Indus., Inc. v. Zurich Am. Ins. Cos.*,
 1997 WL 260059 (D. Mass. Mar. 25, 1997), *aff'd*,
 125 F.3d 841 (1st Cir. 1997) .............................................................. 128

*N. Carolina State Conference of NAACP v. McCrory,*
    831 F.3d 204 (4th Cir. 2016) ............................................................. 139

*Ne. Ohio Coal. for the Homeless v. Husted,*
    837 F.3d 612 (6th Cir. 2016) ............................................................. 139

*Pers. Adm'r of Mass. v. Feeney,*
    442 U.S. 256 (1979) ................................................................*passim*

*Price v. Austin Ind. Sch. Dist.,*
    945 F.2d 1307 (5th Cir. 1991) .......................................................... 113

*Purcell v. Gonzalez,*
    549 U.S. 1 (2006) (per curiam) ............................................ 26, 84, 107

*Reynolds v. Sims,*
    377 U.S. 533 (1964) ......................................................................... 84

*Session v. Perry,*
    298 F. Supp. 2d 451 (E.D. Tex. 2004), *vacated sub nom. on other*
    *grounds, Henderson v. Perry,* 543 U.S. 941 (2004)........................ 45, 104, 105, 109

*Shaw v. Reno,*
    509 U.S. 630 (1993) ........................................................................ 106

*Shelby County v. Holder,*
    133 S. Ct. 2612 (2013) ............................................................. 29, 125

*Smith v. Doe,*
    538 U.S. 84 (2003) ......................................................................... 109

*State v. Briseno,*
    No. 2006-8-6465 (24th Dist. Court, Calhoun County, Tex., June 9,
    2009)................................................................................................ 99

*Tenney v. Brandhove,*
    341 U.S. 367 (1951) ........................................................................ 104

*Tex. v. United States,*
    133 S. Ct. 2885 (2012) ................................................................... 125

*Tex. v. United States,*
    887 F. Supp. 2d 133 (D.D.C. 2012), *vacated and remanded on other*
    *grounds,* 133 S. Ct. 2885 (2013) ................................................... 124

*United States v. Navarro-Camacho,*
    186 F.3d 701 (6th Cir. 1999) .................................................... 128, 130

*United States v. O'Brien,*
    391 U.S. 367 (1968) ........................................................................ 121

*United States v. Windsor,*
    133 S. Ct. 2675 (2013) ................................................................... 125

ix

*Veasey v. Abbott*,
796 F.3d 487 (5th Cir. 2015), *vacated in granting reh'g en banc*,
815 F.3d 958 (5th Cir. 2016) ............................................................................ 113

*Veasey v. Abbott*,
830 F.3d 216 (5th Cir. 2016) (en banc) ...........................................*passim*

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
429 U.S. 252 (1977) ........................................................................*passim*

*Voting for Am., Inc. v. Steen*,
732 F.3d 382 (5th Cir. 2013) ................................................... 107, 142

*Washington v. Davis*,
426 U.S. 229 (1976) ....................................................... 105, 106, 120

**Statutes and Rules**

18 U.S.C.
§ 611 ................................................................................................ 91
§ 911 ................................................................................................ 91
§ 1015 .............................................................................................. 91

42 U.S.C.
§ 1973i(c) ............................................................................. 89, 91, 94
§ 15481 ........................................................................................... 23

52 U.S.C.
§ 20507(d)(1) .................................................................................. 97
§ 21084 ........................................................................................... 25

Fed. R. Evid. 201(b)(2) .................................................................... 38

Help America Vote Act of 2002, Pub. L. No. 107-252, 116 Stat. 1666 ..................... 23

Act of May 15, 2001, 77th Leg., R.S., ch. 500 ............................................. 39

Act of May 15, 2001, 77th Leg., R.S., ch. 556, § 1(a) ................................. 39

Act of May 17, 2001, 77th Leg., R.S., ch. 1054 ......................................... 39

Act of May 28, 2001, 77th Leg., R.S., ch. 1178, § 1 .................................... 39

Act of May 24, 2003, 78th Leg., R.S., ch. 1165, § 1 .................................... 41

Act of May 26, 2003, 78th Leg., R.S., ch. 393 .................................... 40, 141

Act of May 27, 2003, 78th Leg., R.S., ch. 1315, §§ 25, 27, 2003 Tex.
Gen. Laws 4819 ............................................................................. 40

Act of May 28, 2003, 78th Leg., R.S., ch. 638, § 1, 2003 Tex. Gen. Laws
2043 ............................................................................................. 41

Act of May 28, 2003, 78th Leg., R.S., ch. 1012, 2003 Tex. Gen. Laws
2955 ............................................................................................. 40

Act of May 28, 2003, 78th Leg., R.S., ch. 1315 ........................................... 24

Act of May 28, 2003, 78th Leg., R.S., ch. 1316, § 9, 2003 Tex. Gen. Laws 4832 ............................................................................................ 41

Act of May 23, 2005, 79th Leg., R.S., ch. 470, 2005 Tex. Gen. Laws 1329 ............................................................................................ 46

Act of May 25, 2005, 79th Leg., R.S., ch. 1105, 2005 Tex. Gen. Laws 3666 ............................................................................................ 46

Act of May 27, 2005, 79th Leg., R.S., ch. 1189, 2005 Tex. Gen. Laws 3903 ............................................................................................ 46

Act of Apr. 12, 2007, 80th Leg., R.S., ch. 6, 2007 Tex. Gen. Laws 6 ......................... 49

Act of May 14, 2007, 80th Leg., R.S., ch. 238, 2007 Tex. Gen. Laws 347 .................. 49

Act of May 23, 2007, 80th Leg., R.S., ch. 697, 2007 Tex. Gen. Laws 1323 ............................................................................................ 49

Act of May 14, 2009, 81st Leg., R.S., ch. 91 Tex. Sess. Law Serv. 396 ..................... 54

Act of May 27, 2009, 81st Leg., R.S., ch. 682 Tex. Sess. Law Serv. 1735 .................. 54

Act of May 16, 2011, 82d Leg., R.S., ch. 123 § 14 ........................................ 6

Act of May 24, 2011, 82d Leg., R.S., ch. 1159 Tex. Gen. Laws 3008 ........................ 70

Act of May 24, 2011, 82d Leg., R.S., ch. 683, 2011 Tex. Gen. Laws 1644 ................. 71

Act of May 25, 2011, 82d Leg., R.S., ch. 1002 Tex. Gen. Laws 2541 ........................ 71

Act of May 25, 2011, 82d Leg., R.S., ch. 953, 2011 Tex. Gen. Laws 2405 ................. 71

Act of May 25, 2015, 84th Leg., R.S., ch. 130, 2015 Tex. Gen. Laws 1134 ............................................................................................ 10, 63

Ga. Code Ann.
§ 21-2-417(a) ........................................................................ 29
§ 21-2-417.1(a) ..................................................................... 29
§ 21-2-419(c)(1) .................................................................... 29

Ind. Code Ann.
§ 3-5-2-40.5(a) ..................................................................... 30
§ 3-10-1-7.2(a) ..................................................................... 30
§ 3-11.7-5-2.5(a)-(c) ............................................................... 30

Tex. Admin. Code § 181.22(t) ...................................................... 10

Tex. Elec. Code

    § 1.015 ................................................................................................. 65

    § 11.001-02 ....................................................................................... 65

    § 11.002(a)(2) ................................................................................... 98

    § 13.002(i) ........................................................................................... 8

    § 31.012(a) ........................................................................................... 9

    § 32.111(c) ........................................................................................... 9

    § 63.001(b) ........................................................................................... 4

    § 63.001(c) ........................................................................................... 9

    § 63.001(h) ........................................................................................... 8

    § 63.008(a) ........................................................................................... 4

    § 63.008(b) ........................................................................................... 4

    § 63.009 ............................................................................................... 5

    § 63.011(a)(1) ..................................................................................... 8

    § 63.0101 ........................................................................................ 5, 6

    § 63.0541 ............................................................................................. 9

    § 65.054(b)(2)(B) ............................................................................... 8

    § 65.054(b)(2)(C) ............................................................................... 8

    § 65.0541 ........................................................................................... 26

    § 82.001-004 ....................................................................................... 5

    § 82.002 ............................................................................................... 7

    § 82.003 ............................................................................................... 7

    § 82.004 ............................................................................................... 7

Tex. Health & Safety Code § 191.0045 ................................................ 10

Tex. S. Rule 5.13, S. Res. 39 § 5(c), 84th Leg., R.S., 2015 S.J. of Tex. 47,
    *reprinted in* Rules of the Senate, Texas Legislative Manual 27
    (2015) ................................................................................................. 45

Tex. Transp. Code § 521A.001 ............................................................... 7

**Other Authorities**

148 Cong. Rec. S10488 (2002) ............................................................... 24

Bryan A. Garner, A Dictionary of Modern American Usage at 565
    (2003) ............................................................................................... 128

Help America Vote Act of 2001, Hearing on H.R. 3295 Before the H.
    Comm. on the Judiciary, 107th Cong. (2001) ................................... 24

Restatement (Second) of Judgments § 27 ............................................ 125

Samuel Issacharoff, *Ballot Bedlam*, 64 Duke L.J. 1363, 1380 (2015) ........... 120

Tex. Att'y Gen. Op. GA-0141, 2004 WL 228527 (2004) ....................... 65

Tex. H.B. 744, 77th Leg., R.S. (2001) ................................................. 133

Tex. H.B. 1706, 79th Leg., R.S. (2005) ................................................ 42

Tex. H.B. 218, 80th Leg., R.S. (2007) .................................................. 47

Tex. H.B. 744 § 1(b), 77th Leg., R.S. (2001) ...................................... 38

Tex. S.B. 11, 81st Leg., R.S. (2009) .................................................... 54

Tex. S.B. 12, 81st Leg., R.S. (2009) .................................................... 54

Tex. S.B. 16, 81st Leg., R.S. (2009) .................................................... 54

### INTRODUCTION

This case presents an exceptional scenario. Plaintiffs claim that Senate Bill 14 ("S.B. 14"), a law supported by a majority of Texans—including a majority of Republicans, of Democrats, of African-Americans, and of Hispanics—and adopted with the votes of some minority legislators, was enacted for the purpose of discriminating against racial minorities. Plaintiffs demanded and obtained a treasure trove of privileged legislative material—thousands of internal legislative documents and hours of legislator depositions—access usually denied in even the most extraordinary cases. But despite their unlimited access to the confidential and privileged communications of Texas legislators who supported S.B. 14, plaintiffs could proffer no evidence that any legislator harbored even a private intention to disenfranchise minority voters by enacting a facially neutral voter-ID law, much less that the full Legislature enacted the law for the purpose of discriminating on the basis of race. The legislative record—public and private—only confirmed that the Legislature passed S.B. 14 for reasons recognized as legitimate by the Supreme Court, Congress, the Carter-Ford and Carter-Baker Commissions, and many other States.

Nevertheless, Plaintiffs have pushed a false narrative in this case that Republicans in the Texas Legislature, fearful of a rise in the political power of Democratic-leaning minority voters in the State, turned to photo-ID requirements to entrench Republican power by disenfranchising minority voters. To shore up that narrative, Plaintiffs relied on (1) historical instances of discrimination, (2) discriminatory acts by persons outside the Legislature, (3) legislative support for unrelated, allegedly discriminatory bills involving immigration and border security, and (4) speculation by

some S.B. 14 opponents that the bill's proponents acted for a discriminatory purpose. The Fifth Circuit has now held conclusively that this evidence is not probative of the Legislature's purpose in passing S.B. 14. It may not be considered. Without that evidence, which is irrelevant, Plaintiffs' narrative unravels. They have no evidence that any legislator acted with a racially discriminatory purpose, let alone that S.B. 14's proponents engaged in a silent conspiracy to discriminate against minority voters. On the contrary, the record confirms that the Texas Legislature acted to combat voter fraud and safeguard voter confidence.

The baseless narrative promoted by Plaintiffs ignores not only the legislative record but also the historical context of S.B. 14, which begins with the 2000 election—a watershed moment when many citizens questioned the confidence they had in American electoral systems, in light of that year's hotly contested presidential election. In the aftermath, a consensus developed that numerous changes needed to be made, including changes to address potential voter fraud. A common-sense way to prevent one form of potential fraud—impersonation—is to require identification. Thus, between 2001 and 2011, "nearly 1,000" voter ID "bills [were] introduced in a total of 46 states." DEF0053 (National Conference of State Legislatures, *Voter Identification Requirements* (April 7, 2012)) at 5 (ROA.78671).[1] While this was occurring, a strong majority of Americans expressed support for requiring a photo ID to vote.

---

[1]    DEF0053 is a summary of nationwide voter identification requirements prepared by the National Conference of State Legislatures (ROA.78667-85).

As one would expect, when voter ID became "a national issue," it also "became a political issue in the State of Texas." Smith Dep. 69:23-25 (ROA.59509). Accordingly, the Texas Legislature, like those in many other States, sought to enact voter-ID legislation. At first, Republicans in the Texas Legislature looked to compromise with Democrats. They proposed a law that allowed certain photo and non-photo IDs to be used, despite their preference to enact a photo-voter-ID law that would have a greater potential to deter and prevent voter fraud. But Democrats blocked these compromises in three straight legislative sessions (2005, 2007, and 2009) by using procedural maneuvers. Meanwhile, support for photo ID laws was growing, and Republicans continued to gain additional seats in the Texas Legislature.

After the 2009 legislative session, it had become clear that Democrats were not going to support any compromise. Republicans then secured an overwhelming majority of the seats in the Texas Legislature in the 2010 elections. With a newly won supermajority, Republicans in the 2011 Legislature chose to pursue the preferences of those who had voted them into office and could vote them out. The result was a voter ID law that required voters to produce widely available and widely held photo identification—including free voter IDs provided by the State—in order to confirm voters' identity.

By enacting S.B. 14, the Texas Legislature honored the will of the majority of Texans, regardless of race, ethnicity, or political affiliation. In doing so, the Legislature acted to prevent and deter voter fraud and to safeguard confidence in the electoral

system—legitimate policy concerns which are reflected throughout the legislative record and which have been recognized by the Supreme Court. S.B. 14 is not a law that "can plausibly be explained only as a [race]-based classification"—the standard required to establish a discriminatory purpose in violation of the Fourteenth Amendment. *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 275 (1979).

## PROPOSED FINDINGS OF FACT

### I. TEXAS VOTER-IDENTIFICATION REQUIREMENTS PRIOR TO THE ENACTMENT OF S.B. 14

1. Prior to the enactment of S.B. 14, Texas Election Code Section 63.001(b) provided that an in-person voter may cast a regular ballot upon presentation of only a voter registration certificate, which did not have a photo. Tex. Elec. Code § 63.001(b) (2010).

2. Registered voters who did not present a voter registration certificate at the polls could still vote upon executing an affidavit stating that they did not have a voter registration certificate at the polling place and presenting an acceptable form of alternative identification. *Id.* § 63.008(a). If a voter appearing at the polls failed to execute an affidavit or provide acceptable identification, then the voter could cast a provisional ballot. *Id.* § 63.008(b).

3. The law recognized several acceptable alternative forms of identification for voting:

> (1) a driver's license or personal identification card issued to the person by the Department of Public Safety or a similar document issued to the person by an agency of another state, regardless of whether the license or card has expired;
>
> (2) a form of identification containing the person's photograph that establishes the person's identity;

(3) a birth certificate or other document confirming birth that is admissible in a court of law and establishes the person's identity;

(4) United States citizenship papers issued to the person;

(5) a United States passport issued to the person;

(6) official mail addressed to the person by name from a governmental entity;

(7) a copy of a current utility bill, bank statement, government check, paycheck, or other government document that shows the name and address of the voter; or

(8) any other form of identification prescribed by the Secretary of State.

*Id.* § 63.0101 (2010).

4.    In some circumstances, voters were required to present identification even if they presented their voter registration certificate at the polls. For example, if a voter did not provide a Texas driver's license number, a Texas personal identification card number, or the last four digits of their Social Security number on the voter registration application, the voter could receive a voter registration certificate, but was later required to present a qualifying form of identification when voting. If the voter provided a driver's license, personal identification card, or Social Security number that did not match Texas Department of Public Safety (DPS) or Social Security Administration records, the voter was registered to vote, so long as the voter confirmed that the information was correct, but the voter was required to submit proof of identification to vote. *Id.* § 63.009 (2010).

5.    Pre-S.B.-14 law permitted qualified voters who expected to be absent from their county of residence on Election Day, were disabled, were 65 or older on Election Day, or were confined in jail to vote early by mail without presenting identification. *See id.* §§ 82.001-004 (2010).

5

## II.    S.B. 14'S PROVISIONS AND IMPLEMENTATION

6.    S.B. 14 is a facially neutral statute that, in addition to generally requiring a photo ID in order to vote, seeks to minimize the burden faced by eligible voters in casting their ballot while protecting the integrity of elections in Texas.

### A.    S.B. 14 Generally Requires Voters to Prove Their Identity Via Photo ID

7.    The central change made by S.B. 14 to then-existing law was the requirement that in-person voters provide a government-issued photo ID when voting.

8.    S.B. 14 amended the law to require that voters present one of the following forms of identification when voting in person:

> (1) a driver's license, election identification certificate, or personal identification card issued to the person by the Department of Public Safety that has not expired or that expired no earlier than 60 days before the date of presentation;
>
> (2) a United States military identification card that contains the person's photograph that has not expired or that expired no earlier than 60 days before the date of presentation;
>
> (3) a United States citizenship certificate issued to the person that contains the person's photograph;
>
> (4) a United States passport issued to the person that has not expired or that expired no earlier than 60 days before the date of presentation; or
>
> (5) a license to carry a concealed handgun issued to the person by the Department of Public Safety that has not expired or that expired no earlier than 60 days before the date of presentation.

Act of May 16, 2011, 82d Leg., R.S., ch. 123 § 14 ("S.B. 14") (codified at Tex. Elec. Code § 63.0101).

B.     **The Texas Legislature Sought to Mitigate Potential Burdens on Eligible Voters**

9.    S.B. 14 contains many mitigating provisions aimed at preventing any disproportionate impact on those of lower socioeconomic status.

### 1.     SB 14 creates free Election Identification Certificates.

10.    S.B. 14 requires the Department of Public Safety to issue an Election Identification Certificate ("EIC") to a registered voter who does not have another form of identification required by the bill to vote. Because those with less means may find it marginally harder to obtain S.B. 14-compliant ID, S.B. 14 prohibits the DPS from charging a fee for an EIC. S.B. 14 § 20 (codified at Tex. Transp. Code § 521A.001).

11.    By offering a free EIC, the Legislature intended to ensure that any voter who is potentially affected by the photo ID requirement can obtain a free photo ID from the DPS.

### 2.     S.B. 14 preserves certain voters' ability to vote by mail without a photo ID.

12.    S.B. 14 leaves in place the ability of those 65 or over on Election Day to vote by mail without photo ID. Tex. Elec. Code § 82.003.

13.    S.B. 14 leaves intact the provision allowing voters with "a sickness or physical condition that prevents [them] from appearing at the polling place on Election Day without a likelihood of needing personal assistance or of injuring [their] health" to vote by mail without photo ID. *Id.* § 82.002.

14.    S.B. 14 does not disturb the ability of persons confined to a county jail to vote by mail without photo ID. *Id.* § 82.004.

7

### 3. S.B. 14 created exceptions to accommodate the disabled, religious objectors, and those affected by natural disasters.

15. Persons determined to have a disability by the United States Social Security Administration or determined to have a disability rating of at least 50 percent by the United States Department of Veterans Affairs may continue to vote at the polls by presenting only a voter registration certificate. S.B. 14 §§ 1, 9 (codified at Tex. Elec. Code §§ 13.002(i), 63.001(h)).

16. A voter need not present a photo ID if he executes an affidavit stating that "the voter has a religious objection to being photographed and the voter has consistently refused to be photographed for any governmental purpose from the time the voter has held this belief." *Id.* § 17 (codified at Tex. Elec. Code § 65.054(b)(2)(B)).

17. A voter need not present a photo ID if he executes an affidavit stating that the voter does not have the required identification "as a result of a natural disaster that was declared by the president of the United States or the governor, occurred not earlier than 45 days before the date the ballot was cast, and caused the destruction of or inability to access the voter's identification." *Id.* (codified at Tex. Elec. Code § 65.054(b)(2)(C)).

### 4. Provisional ballots

18. Voters who do not present the required identification may cast a provisional ballot if they execute an affidavit stating that the voter "(1) is a registered voter in the precinct in which the person seeks to vote; and (2) is eligible to vote in the election." *Id.* § 15 (codified at Tex. Elec. Code § 63.011(a)(1)).

19.    For the provisional ballot to be counted, the voter must present identification or prove their eligibility for an exemption within six days of the election. *Id.* § 18 (codified at Tex. Elec. Code § 63.0541).

      **5.**      **S.B. 14 Provides an Accommodation for Voters Whose Photo ID Shows a Name that Differs from the Voter's Name as Listed on the Voting Rolls.**

20.    Section 9(c) of S.B. 14 provides that a poll worker must accept a voter, even if the voter's name on his or her registration differs slightly from his or her identification, if the voter avers that the voter is the person on the list of registered voters. *Id.* § 9(c) (codified at Tex. Elec. Code § 63.001(c)).

      **6.**      **Training and voter outreach**

21.    S.B. 14 mandates a statewide effort led by the Secretary of State to educate voters concerning S.B. 14's new requirements. *Id.* § 5 (codified at Tex. Elec. Code § 31.012(a)).

22.    S.B. 14 increases funding for voter registration activities. *Id.* § 24.

23.    S.B. 14 requires that poll voters be trained in the acceptance and handling of acceptable forms of ID. *Id.* § 6 (codified at Tex. Elec. Code § 32.111(c)).

      **C.**      **Texas Diligently Implemented S.B. 14 to Ensure that Every Texan Voter Had an Opportunity to Vote and to Obtain a Free Election Identification Certificate.**

24.    Texas's effort to ensure that all eligible voters can vote did not end with the enactment of S.B. 14. *See, e.g.*, Trial Tr. 25:10-17 (Sept. 10, 2014) (Dewhurst) (ROA.100787).

25.    The State took additional steps to reduce any burden imposed by the need to obtain an EIC:

1) In 2015, the Texas Legislature enacted S.B. 983—in conformance with its intent to offer free EICs—that prohibited the charging of *any* fee connected with obtaining documents to obtain a free EIC. Act of May 25, 2015, 84th Leg., R.S., ch. 130, 2015 Tex. Gen. Laws 1134. Birth certificates requested to obtain an EIC had cost between $2 and $3 instead of the normal fee of $22. Tex. Admin. Code § 181.22(t); Tex. Health & Safety Code § 191.0045; Trial Tr. 323:2-9 (Sept. 9, 2014) (Farinelli) (ROA.100676). These fees had been imposed before 2015 by statutes separate from S.B. 14, and those separate statutes predated S.B. 14.

2) Local registrars have been trained to issue EIC birth certificates. Trial Tr. 326:21-327:13 (Sept. 9, 2014) (Farinelli) (ROA.100679-80). There are more than 400 local registrars in the State. *Id.* at 318:17-319:8 (ROA.100671-72).

3) If someone is 75 years or older, he may send family or friends to get his birth certificate. *Id.* at 329:5-13 (ROA.100682).

4) County officials are flexible about the forms of ID they accept for birth certificates. *See, e.g.*, Trial Tr. 136:12-25 (Sept. 3, 2014) (Mora) (ROA.99068) (explaining that clients of the StewPot shelter can use a StewPot-issued ID to obtain a birth certificate at Dallas Vital Stats office).

26.   At the time of trial, the Department of Public Safety operated 225 driver's license offices throughout the State. Trial Tr. 149:23-150:7 (Sept. 9, 2014) (Peters) (ROA.100502-03).

27.   At the time of trial in October 2014, approximately 99.95% of the Texas population lived less than 50 miles from a Texas DPS office, and approximately 98.7% lived less than 25 miles from a Texas DPS office. DEF1170; Trial Tr. 214:4-215:10 (Sept. 9, 2014) (Rodriguez) (ROA.100567-68); Trial Tr. 335:5-25 (Sept. 4, 2014) (Burden) (ROA.99567).

28.   Free EICs are available at every DPS driver's license office. Trial Tr. 214:4-215:10 (Sept. 9, 2014) (Rodriguez) (ROA.100567-68); Trial Tr. 335:5-25 (Sept. 4, 2014) (Burden) (ROA.99567).

29.   DPS has a "homebound program" to issue IDs to people with disabilities on demand. Trial Tr. 162:18-163:22 (Sept. 9, 2014) (Peters) (ROA.100515-16).

30.   The Secretary of State's office, the Department of Public Safety, and the counties themselves have implemented a mobile EIC unit program, to issue EICs on a full-time basis in counties that do not have a DPS office. Trial Tr. 146:4-146:8 (Sept. 9, 2014) (Peters) (ROA.100499); Trial Tr. 220:8-222:12 (Sept. 9, 2014) (Rodriguez) (ROA.100573-75); Ingram Dep. 47:1-48:13 (ROA.61446); Cesinger Dep. 15:13-19 (ROA.59945); DEF2738 (ROA.97237-39) (listing county locations issuing EICs). If local officials request a mobile unit, one will be dispatched. Trial Tr. 162:8-13 (Sept. 9, 2014) (Peters) (ROA.100515).

31.   Because of these efforts, every county in the State has had a physical location where a voter could obtain a free EIC. DEF2739 (ROA.97240) (EIC State and County Participation Map); Trial Tr. 263:6-21 (Sept. 9, 2014) (Rodriguez) (ROA.100616). These locations were publicized extensively through press releases, media interviews, social media, and local press statements. Trial Tr. 146:12-146:21, 160:10-161:2 (Sept. 9, 2014) (Peters) (ROA.100513-14); Trial Tr. 246:11-247:16 (Sept. 9, 2014) (Rodriguez) (ROA.100599-600); Cesinger Dep. 56: 7-13; 56:25-57:2 (ROA.59955) ("[T]he goal is to make sure that anyone who is eligible for one of these EICs knows about it and about the availability.").

32.   In addition, anticipating an increased demand for identification, the Texas Legislature appropriated significant funds to improve driver's license services. Trial Tr. 92:1-16 (Sept. 11, 2014) (Williams) (ROA.101277). At the time of trial, the Driver's License Division of the DPS has increased its staff by hundreds of employees, and the DPS had opened six new "Mega Centers." Trial Tr. 212:19-213:1 (Sept. 9, 2014) (Rodriguez) (ROA.100565-66).

11

33.   The Texas Secretary of State also instructed DPS offices in the top 13 counties where the Secretary of State thought that there may be potential voters who do not possess S.B. 14 ID to remain open on Saturdays as an election approached. Trial Tr. 234:15-235:22 (Sept. 9, 2014) (Rodriguez) (ROA.100587-88). Overtime for DPS workers was also authorized. *Id.*

34.   Plaintiffs observed that at the time of trial only a few hundred EICs had been issued, but this might suggest that either (1) there is not much demand for EICs or (2) voters prefer to pay for a State-issued ID card or driver's license, which can be used for more than voting. ████████████████████

████████████████████████████████████

██████ ██ ███████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████

> ### 1.   Plaintiffs' inability to find a single voter who was disenfranchised by S.B. 14 confirms that any potential negative impact was severely limited.

35.   Texas's efforts at mitigating the burden of S.B. 14 on eligible voters can be seen in the fact that plaintiffs found no evidence of a single identifiable voter whom S.B. 14 will prevent from voting.

36.   Prior to the enactment of S.B. 14, the Texas Legislature considered empirical, real-world studies—as opposed to statistical estimates—showing that requiring voters to prove their identity with a photo ID did not negatively affect the ability of those entitled to vote to do so. *See, e.g.*, DEF0001 (Debate on S.B. 362 in the Senate Committee of the Whole, 81st Leg., R.S., Exhibits 7, 9, and 10 (Mar. 11, 2009) (ROA.73466-

81, 73417-22, 73423-45));[2] Dewhurst Dep. 76:22-77:9 (ROA.61014-15); Fraser Dep. 72:9-21, 74:13-22 (ROA.61180-81). The Texas Legislature also learned that similar voter ID laws did not result in disenfranchisement, as the opponents of those laws—just like opponents of S.B. 14—had predicted. *See, e.g.*, DEF0001 (Debate on S.B. 362 in the Senate Committee of the Whole, 81st Leg., R.S., Exhibits 23, 25, and 28 (Mar. 11, 2009) (ROA.73665-71, 73679-84, 73703-04)).[3]

37.     One of the academic studies on this issue considered by the Texas Legislature was published by Plaintiffs' own expert. Dr. Ansolabehere examined a number of questions related to turnout and voter ID laws like S.B. 14 and found that "an almost immeasurably small number of people" were negatively affected by such laws. DEF0001 (Debate on S.B. 362 in the Senate Committee of the Whole, 81st Leg., R.S., Exhibit 7, at 8 (Mar. 11, 2000) (ROA.73378) (quoting Stephen Ansolabehere, Access Versus Integrity in Voter Identification Requirements, Working Paper No. 58 in the Caltech/MIT Voting Technology Project (Feb. 2007) (ROA.78203))). In other words, the number was "too small to be of practical concern." *Id.* Exhibit 9, at 121 (ROA.73417) (citing Ansolabehere's 2007 study).

---

[2]     Exhibit 7 is Jeffrey Milyo, The Effects of Photographic Identification on Voter Turnout in Indiana: A County-Level Analysis, Institute of Public Policy Publication Report 10-2007 (Dec. 2007), which can be also be found at DEF0024 (ROA.78267-82); Exhibit 9 is Jason D. Mycoff, et al., The Empirical Effects of Voter ID Laws: Present or Absent, 42 PS: Political Science and Politics 121 (2009); which can also be found at DEF0025 (ROA.78283-87); and Exhibit 10 is David B. Muhlhausen and Keri Weber Sikich, New Analysis Shows Voter Identification Laws Do Not Reduce Turnout, The Heritage Center for Data Analysis (Sept. 10, 2007), which can be also be found at DEF0412 (ROA.84142-64).

[3]     Exhibit 23 is the written testimony of Frank B. Strickland; Exhibit 25 is the written testimony of Robert A. Simms, Georgia Deputy Secretary of State; and Exhibit 28 is a letter to Senator Troy Fraser from the Todd Rokita, Indiana Secretary of State.

38.   Texas began enforcing S.B. 14 on June 25, 2013. Trial Tr. 328:17-329:10 (Sept. 10, 2011) (Ingram). It was in effect for three statewide elections, multiple special elections, and many local elections before trial in October 2014. *See* Trial Tr. 329:5-6 (Sept. 4, 2014) (Burden) (ROA.101090-91); Trial Tr. 86:10-14 (Sept. 10, 2014) (Hood) (ROA.100848). Yet at trial, plaintiffs' experts could not identify a single person whom S.B. 14 will prevent from voting. This was not for lack of effort. DOJ went to great lengths to try to find persons harmed by S.B. 14: its lawyers crisscrossed Texas, traveling to homeless shelters looking for anyone disenfranchised by the law. *See* Trial Tr. 143:24-145:6 (Sept. 3, 2014) (Mora) (ROA.99075-77). Plaintiff organizations made similar efforts. *See* Trial Tr. 267:7-13 (Sept. 3, 2011) (Green) (ROA.99199); Lydia Dep. 126:15-128:22 (ROA.64201); LULAC Stipulation (ECF No. 547) (ROA.24727-31); LUPE Stipulation (ECF No. 550) (ROA.24741-44).

39.   Even the named plaintiffs could not show that S.B. 14 prevented them from voting. Nine of the fourteen individual plaintiffs could vote by mail without photo ID. Trial Tr. 90:22-91:1 (Sept. 2, 2014) (F. Carrier) (ROA.98722-23); 291:25-292:3 (Sept. 3, 2014) (Benjamin) (ROA.99223-24); 98:2:-5 (Mendez, Jr.) (ROA.99030); 146:7-12 (Sept. 4, 2014) (Taylor) (ROA.99378); 207:10-11 (Sept. 5, 2014) (Gandy) (ROA.99824); 219:18-19 (Mr. Lara) (ROA.99836); 247:2-5 (Ms. Lara) (ROA.99864); ███████████ ████████████████████████████████████████████████. And of these nine, at least two actually had voted after S.B. 14 took effect. Trial Tr. 216:12-21 (Sept. 5, 2014) (Gandy) (ROA.99833); Trial Tr. 102:16-22 (Sept. 3, 2014) (Mendez, Jr.) (ROA.99034).[4]

---

[4]    As the Fifth Circuit noted, Mr. Carrier and Mr. Benjamin were unsuccessful in obtaining an S.B. 14 ID shortly after enforcement of the law began. *Veasey*, 830 F.3d at 254-55. But they both *did not need* such ID, because they could have voted by mail without it.

40.   Although the Fifth Circuit noted that Plaintiff Floyd Carrier had unsuccessfully tried to get an S.B. 14 ID prior to the enforcement of the law because of trouble with his birth certificate (*Veasey v. Abbott*, 830 F.3d 216, 254-55 (5th Cir. 2016) (en banc)),[5] he not only could have voted by mail, but he also could have received a disability exemption, which would have allowed him to vote in-person without an ID. *See* Trial Tr. 73:1-9 (Sept. 2, 2014) (C. Carrier) (ROA.98705). Not only that, Mr. Carrier regularly visits a Veterans Administration ("VA") hospital, where he could renew his S.B.-14-compliant VA ID. *See id.* 73:10-13 (ROA.98705). Plaintiffs' counsel recruited Mr. Carrier for this lawsuit because of his problems obtaining certain forms of S.B. 14, but they failed to tell him about the numerous other options available to him. *See id.* 74:17-21. Mr. Carrier testified that, having learned that he can use a VA ID to vote, he was "going to go get it." *Id.* 91:10 (F. Carrier) (ROA.98723).

41.   The Fifth Circuit also noted that Plaintiff Gordon Benjamin had unsuccessfully tried to get an S.B. 14 ID because he did not have a birth certificate. *Veasey*, 830 F.3d at 252-55; ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ . To the extent some individuals may have difficulty obtaining a birth certificate, the only relevant evidence in the record indicates that they are elderly and therefore able to vote without a photo ID. There is no evidence of any voter who was unable to obtain a birth certificate but also ineligible for an exception to the photo-ID requirement.

---

[5]      "Q: [A]ll of that work you did back in early January or early 2013 to get an ID and get a birth certificate, all of that was for the purposes of you trying to get a personal ID to take care of your personal business, correct? A: My business, yeah. Unhuh." Trial Tr. 88:17-21 (Sept. 2, 2014) (F. Carrier) (ROA.98720).

42.    Among the remaining five individual plaintiffs, three already had an S.B. 14-compliant ID. ██████████████████████████████████████████████████ ████████████████████████████████████████████; *see also* Opinion 79 (Oct. 9, 2014), ECF No. 628 (ROA.27104). Another chose to get a California driver's license instead of a Texas license because she planned to return to California after college. Trial Tr. 185:10-17; 190:11-191:6; 193:19-21 (Sept. 9, 2014) (Clark) (ROA.100538, 100543-44, 100546). And the last had the documentation necessary to obtain a number of S.B. 14 IDs, including a commercial driver's license if he paid outstanding fines for driving without insurance. *See* Trial Tr. 135:4-20 (Sept. 4, 2014) (Estrada) (ROA.99367) (discussing the fines), 143:6-9 (ROA.99375) (testifying that he could obtain an S.B. 14-compliant personal identification card); *id.* 346:7-19 (Sept. 9, 2014) (Farinelli) (ROA.100699) (testifying that Lionel Estrada can get a birth certificate with his social security card, a copy of his temporary driver's license, and workers' compensation correspondence from 2004).

43.    Nor could Plaintiffs show that S.B. 14 prevented any of the thirteen additional voters Plaintiffs called as witnesses from voting. Eight of the thirteen could vote by mail without photo ID. Bates Dep. 48:7-8 (ROA.97450); Barber Dep. 14:3-6 (ROA.97471); Eagleton Dep. 8:6-10 (ROA.97466); Gholar Dep. 9:3-4 (ROA.97454); ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████. Of the remaining five, two already had an S.B. 14-compliant ID. *See* Bingham Dep. 37:9-10 (ROA.97456); ██████████████████████████████████████████. And the three remaining witnesses had the documentation necessary to obtain an EIC. ██████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████.

44.   Incorrectly identifying Ms. Bates as a plaintiff, the Fifth Circuit observed that she could not vote because she did not have her birth certificate. *Veasey*, 830 F.3d at 255. But in addition to being able to vote by mail, ██████████████████ ███████████████████████████████████████████████████████████████.

### 2.   Results from elections following S.B. 14's implementation confirm that any potential negative impact was significantly limited.

45.   Despite the numerous elections that took place during full enforcement of S.B. 14, reports of voters being unable to present ID or experiencing other problems were "vanishingly small." Ingram Dep. 53:25-54:2 (ROA.64028); Trial Tr. 309:17-18 (Sept. 10, 2014) (Ingram) (ROA.101071); *see also* Ingram Dep. 55:8-24 (ROA.64018) ("We have realtime feedback from the public, and we get thousands of phone calls every month, and there has been absolutely almost no phone calls, emails, problems related to lack of an ID. The few that we've had primarily related to elderly folks who have been using an expired driver license but don't drive anymore. That has been— we've had maybe three or four of those who have been unable to have an ID, and obviously they can vote by mail. But as far as a pattern of people who said, 'I don't have an ID, I don't know what to do, how can I get one,' doesn't exist. Thousands of phone calls every month. We've got a public hotline that is on the back of every voter registration card, and we get all kinds of calls. We get calls because my name doesn't match. We get calls because of a lot of reasons, but not that I don't have an ID."); Trial Tr. 255:11-21 (Sept. 10, 2014) (Patrick) (ROA.101017) ("When voters aren't happy, you hear from them. They call your office. They find a reporter. They show up on a news station. And, again, there may have been a report somewhere, or a news story— or, you know, somewhere, but I'm just not aware of any. And, again, we're talking about millions of people. Could there have been a handful? I mean, I don't know, but I'm sure not aware of anyone."); *see also id.* at 253:19-254:22; 256:10-259:23

17

(ROA.101015-16, 101018-21); Patrick Dep. 253:3-254:5 (ROA.62154); Trial Tr. 335:10-336:1 (Sept. 10, 2014) (Ingram) (ROA.101097-98).

46.   Plaintiffs deposed several county clerks, probing for the number of voter complaints concerning S.B. 14's requirements, but these clerks reported almost no complaints whatsoever. *See, e.g.*, Newman Dep. 43:14-15 (Jasper County) (ROA.62054) ("Q: Have you ever had complaints from constituents about the photo ID law? A: No."); Guidry Dep. 127:10-131:10 (Jefferson County) (ROA.63712-16); Stanart Dep. 109:19-24 (Harris County) (ROA.65424). The population of Jefferson County, Texas (whose county seat is Beaumont, Texas), for example, has a population that is over 10 percent Hispanic and over 30 percent African American. The county clerk of Jefferson County was elected to office as "a Democrat" and testified that she was formerly "a union official" who was "very, very involved" in politics and political campaigns from "a very, very young age." Trial Tr. 139:4-13 (Sept. 11, 2014) (Guidry) (ROA.101324). Furthermore, as county clerk, her office is responsible for administering elections, and if something goes wrong, she is often the first to know. *Id.* 139:17-141:25 (ROA.101324-26). Under questioning from plaintiffs, the Jefferson County Clerk reported that she received only one complaint about the implementation of S.B. 14, and it concerned an election worker's failure to check someone's photo ID:

> Q: Alright, now did you hear any complaints from anyone that they were not allowed to vote in the March [2014] primary because of a similar name issue?
>
> A: No, sir.
>
> Q: And I guess it would have been more a dissimilar name.
>
> A: Right.
>
> Q: Did anyone complain to you, "Hey, I was not allowed to vote because my name did not match my ID"?
>
> A: No.

Q: Okay. Did anyone complain … to anyone in your office that they were not allowed to vote in the March 2014 primary because the name on the voter roll did not match exactly the name on their—the ID that they presented?

A: No.

Q: Okay. Did anyone complain to you after the 2014 March primary that for any reason S.B. 14 prevented them from being able to vote?

A: No, sir.

* * *

Q: Okay. So that letter is the only complaint you're aware of in

March for the 2014 primary related to S.B. 14, correct?

A: Yes.

Q: And the gentleman who made that complaint was not complaining that he was not allowed to vote because of the photographic requirement, correct?

A: No, he was allowed to vote. He was complaining why was he not asked for his photo ID.

Trial Tr. 156:18-158:19 (Sept. 10, 2014) (Guidry) (ROA.101341-43). Guidry also testified that she attends the county commissioners meetings every Monday. Guidry Dep. at 111:22-25 (ROA.63696). Guidry reported that no citizen has ever complained to the county commissioners about S.B. 14's requirements and that, in fact, the issue has never come up. *Id.* at 112:3-12 (ROA.63697).

47.   Moreover, voter turnout was generally unaffected in the two general elections conducted under the requirements of S.B. 14. Trial Tr. 335:10-336:1 (Sept. 10, 2014) (Ingram) (ROA.101097-98) ("The [November 2013] turnout was up substantially over the 2011 turnout"); *id.* 335:16-17 (ROA.101097) ("The turnout was up quite a bit, not quite double, and the process was very smooth."); *see also* Ingram Dep. 54:9-11

19

(ROA.64028) ("[T]here's not any evidence we've seen in the turnout pattern that indicates anybody has been deterred from voting. To the contrary."); Patrick Dep. 84:6-85:23 (ROA.64585-86) (testifying that a purpose of S.B. 14 was to increase turnout, and that turnout has indeed increased).

48.    Numerous news stories confirmed that S.B. 14 had no deleterious effects. *See, e.g.*, DEF2500 (ROA.95011), DEF2503-2515 (ROA.95012-61).

49.    Finally, a statistical analysis of elections held during the full enforcement of S.B. 14 confirmed that it had little, if any, real-world impact on the ability of those eligible to vote to do so. For example, an analysis of provisional ballots cast in Harris County during the 2013 constitutional amendment election and the 2014 primaries showed that only .04 percent of ballots cast in the 2013 constitutional amendment election and .02 percent of the 2014 primary were rejected because of a lack of S.B. 14 ID. Trial Tr. 101:16-103:4 (Sept. 10, 2014) (Hood) (ROA.100863-65). When a similar analysis was done for the constitutional amendment election of 2013 in nine of the ten largest counties in Texas—accounting for 53 percent of the total ballots cast—only .03 percent of ballots cast were rejected because of a lack of S.B. 14. *Id.* 103:20-105:14 (ROA.100865-67).[6]

50.    There is no reason to believe, or record evidence to support a finding, that these small numbers represent eligible voters turned away, as opposed to the proper rejection of *in*eligible voters.

---

[6]    The Director of Elections in Texas testified that the day before his testimony, a special election was held in which over 43,000 ballots were cast. Trial Tr. 392:3-11 (Sept. 10, 2014) (Ingram) (ROA.101154). Of those, only 127 were provisional. *Id.* Although no analysis of the provisional ballots was done, even if all were eventually rejected for lack of an S.B. 14 ID, that would amount to only .2 percent of total ballots cast. *Id.*

51.   Plaintiffs have previously asserted that S.B. 14 prevented "dozens of primarily Hispanic voters without S.B. 14 compliant photo ID" in Hidalgo County "from casting ballots during early voting and on Election Day" in November 2013. Pls.' Proposed Findings of Fact and Conclusions of Law ¶ 155 (ECF No. 610) (ROA.26508). There is no support for this assertion: Plaintiffs cited the testimony of Daniel Guzman, an Edcouch city council member who claimed to have been present at a polling place on Election Day. *See id.* (citing Trial Tr. 361:1-24, 363:8-364:1 (Sept. 4, 2014) (Guzman) (ROA.99593, 99595-96)). At trial, Plaintiffs attempted to elicit testimony from Mr. Guzman about what people had told them about their voting experience, but Mr. Guzman's response was properly excluded as hearsay. *See* Trial Tr. 362:7-364:15 (Sept. 4, 2014) (ROA.99594-96); *see also* DEF0014 (ROA.78119) (Feb. 7, 2014 Email from Yvonne Ramón, Elections Administrator for Hidalgo County, to Lindsey Cohan) (stating that no provisional ballots in Hidalgo County had been rejected for ID reasons). Plaintiffs presented no evidence that any eligible voter in Hidalgo County (or anywhere else) was unable to vote as a result of S.B. 14.

## III.   THE ORIGINS OF THE TEXAS LEGISLATURE'S INTEREST IN REQUIRING VOTERS TO IDENTIFY THEMSELVES VIA A PHOTO ID.

52.   In 2000, a watershed moment occurred: citizens questioned the confidence they had in American electoral systems, in light of that year's hotly contested presidential election and Florida recount. *See, e.g., Bush v. Gore*, 531 U.S. 98 (2000) (per curiam). In the aftermath, a consensus developed that numerous changes needed to be made, including changes to address potential voter fraud. A common-sense way to prevent one form of potential fraud—impersonation—is to require identification. Thus, between 2001 and 2011, "nearly 1,000" voter ID "bills [were] introduced in a total of 46 states." DEF0053 at 5 (ROA.78671). While this was occurring, a significant majority of Americans expressed support for requiring a photo ID to vote. As one

would expect, when Voter ID became "a national issue" it also "became a political issue in the State of Texas." Smith Dep. 69:23-25 (ROA.68601).

### A.   The Contested Presidential Election of 2000.

53.   The contested 2000 presidential election—with its recounts, hanging and dimpled chads, and ultimate resolution by the Supreme Court—began a nationwide focus on the integrity of the U.S. electoral system, including the prevention of voter fraud.

54.   As Plaintiffs' expert, Dr. Minnite, observed, concerns about voter fraud "really c[a]me to the fore" following the 2000 election. Trial Tr. 131:16-18 (Sept. 8, 2014) (Minnite) (ROA.100125); *accord, e.g.*, DEF0035 at 2 (ROA.78417) ("In recent years, especially in the wake of the disputed 2000 presidential election, there has been much debate about imposing . . . new requirements for voter identification.").

55.   As described in the 2001 report published by the National Commission on Federal Election Reform—a commission chaired by former Presidents Jimmy Carter and Gerald Ford—the 2000 election "shook American faith in the legitimacy of the democratic process." The National Commission on Federal Election Reform, *To Assure Pride and Confidence in the Electoral Process* at 17 (Aug. 2001) ("Carter-Ford Commission Report"), http://web1.millercenter.org/commissions/comm_2001.pdf.

56.   One of the primary concerns identified by the Carter-Ford Commission was that then-current procedures "let unqualified voters vote." Carter-Ford Commission Report at 17. An approach "favored by several Commissioners" as a way to combat such impropriety was

> to require those who are registering to vote and those who are casting their ballot to provide some form of official identification, *such as a photo ID issued by a government agency (e.g., a driver's license)*. A photo ID is

already required in many other transactions, such as check-cashing and using airline tickets. These Commissioners point out that those who register and vote should expect to identify themselves. *If they do not have photo identification then they should be issued such cards from the government* or have available alternative forms of official ID. They believe *this burden is reasonable, that voters will understand it, and that most democratic nations recognize this act as a valid means of protecting the sanctity of the franchise.*

*Id.* at 31 (emphasis added); *cf., e.g., See* DEF0001 (Debate on S.B. 14 on the Floor of the House, 82d Leg., R.S., vol. III, at 113:1-8 (March 23, 2011) (ROA.71567)) (Representative Aliseda: "I am a Mexican immigrant. I came to this country at the age of four and became a United States citizen at the age of 17. I want to show you what they use in Mexico to vote. This is a Mexican federally issued biometric. It has on the front a picture, on the back, a magnetic strip containing additional information, and a fingerprint."). In other words, the Carter-Ford Commission's report recommended what the Texas Legislature eventually enacted—a photo-voter ID law that included provisions for the State to issue free photo-voter IDs. There is no record of anyone ever accusing the Carter-Ford Commission of operating with a discriminatory purpose.

### B.    The Help America Vote Act

57.    Responding to the recommendations of the Carter-Ford Commission, Congress enacted the Help America Vote Act of 2002 ("HAVA"), Pub. L. No. 107-252, 116 Stat. 1666 (codified in scattered sections of 2, 5, 10, 36, and 42 U.S.C. § 15481), with broad bipartisan support. HAVA was intended to "change the system to make it easier to vote and tougher to cheat." 148 Cong. Rec. S10488 (2002) (statement of Senator Bond). The legislation's "twin goals [were] making it easier to vote and harder to corrupt our Federal election system." *Id.* at S710 (statement of Senator Dodd); *see also id.* S2527 (statement of Senator McCain) (HAVA "included provisions that would both

include mandatory Federal standards to make the election process easier for legitimate voters and prevent voter fraud.").

58.   HAVA demonstrated, among other things, bipartisan recognition that safeguards to assure that the person casting a ballot is reliably identified as the individual registered are essential to any fair and honest election.

59.   HAVA was an important signal to legislatures in the States, including Texas. *See* DEF0001 (Debate on S.B. 14 in the Senate Committee of the Whole, 82d Leg., R.S., 261:16-21 (Jan. 25, 2011) (ROA.69493)); DEF0001 (Hearing on S.B. 14 Before the House Select Committee on Voter ID and Voter Fraud, 82d Leg., R.S., vol. I, 9:10-14 (Mar. 1, 2011) (ROA.70338)); *see also* Act of May 28, 2003, 78th Leg., R.S., ch. 1315. Indeed, discussions concerning "enacting" a "photo ID . . . voter identification requirement in Texas . . . began . . . around the same [time] as HAVA." McGeehan Dep. 81:4-9 (ROA.59010).

60.   Among other things, HAVA Section 15483(a)(5)(A)(ii) was specifically included to address vote fraud, and provides minimum requirements for identification of voters who register by mail, including presentation of photographic identification. *See* Help America Vote Act of 2001, Hearing on H.R. 3295 Before the H. Comm. on the Judiciary, 107th Cong. (2001), available at 2001 WL 1552086 (statement of Representative F. James Sensenbrenner, Jr.) (identifying vote fraud as a significant motive behind HAVA's anti-fraud provisions); Remarks by President Bush at Signing of H.R. 3295, Help America Vote Act of 2002 (Oct. 29, 2002), 2002 WL 31415995, at *2.

61.   HAVA provides that the relevant provisions "are minimum requirements," and must not "be construed to prevent a State from establishing election technology and administration requirements that are more strict than" provided in HAVA, "so

long as such State requirements are not inconsistent with the Federal requirements." 52 U.S.C. § 21084.

### C.   The Carter-Baker Commission on Federal Election Reform

62.   Just before the 2004 election, a majority of American voters believed that "there was 'a lot' or 'some' fraud in U.S. elections." DEF0003 (The Commission on Federal Election Reform, *Building Confidence in U.S. Elections* at 49 n.60 (Sept. 2005) ("Carter-Baker Commission Report") (ROA.77881, 77908)). And after the election, "more than a quarter of Americans worried that" the presidential vote count was unfair. *Id.*

63.   Following the 2004 election, a new commission was convened to succeed the Carter-Ford Commission. This commission was chaired by former President Carter and former Secretary of State James Baker.

64.   The Carter-Baker Commission found that, although "[t]here is no evidence of extensive fraud in U.S. elections or of multiple voting, . . . both occur, and it could affect the outcome of a close election." Carter-Baker Commission Report at 18 (ROA.77850). The Commission went on to observe that "the perception of possible fraud contributes to low confidence in the system." *Id*. Therefore, the commission concluded,

> The electoral system cannot inspire public confidence if no safeguards exist to deter or detect fraud or to *confirm the identity of voters*. Photo IDs currently are needed to board a plane, enter federal buildings, and cash a check.

*Id.* (emphasis added).

65.   This sentiment was echoed by the Supreme Court the next year:

> A State indisputably has a compelling interest in preserving the integrity of its election process. Confidence in the integrity of our electoral

> processes is essential to the functioning of our participatory democracy.
> Voter fraud drives honest citizens out of the democratic process and
> breeds distrust of our government. Voters who fear their legitimate
> votes will be outweighed by fraudulent ones will feel disenfranchised.

*Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam) (internal quotation marks and

citation omitted).

66.   The Carter-Baker Commission recommended that states require voters to

prove their identities via a standardized secure photo ID. Carter-Baker Commission

Report at 19. The Commission further recommended that states provide photo ID free

of charge. *Id.* (ROA.77851).

67.   Notably, the Carter-Baker Commission's bipartisan photo identification rec-

ommendation is more stringent than that imposed by S.B. 14, requiring validation of

provisional ballots within 48 hours of an election (*id.* at 19 (ROA.77851)), as opposed

to S.B. 14's six-day validation period (S.B. 14 § 18 (codified at Tex. Elec. Code

§ 65.0541)). There is no record of anyone ever accusing the Carter-Baker Commission

of operating with a discriminatory purpose.

68.   The Supreme Court in *Crawford v. Marion County Election Board*, 553 U.S.

181 (2008), relied on the Carter-Baker Commission's report and recommendations in

upholding Indiana's Voter ID law. The controlling opinion of the Court, authored by

Justice Stevens, discussed the Carter-Baker report as authoritative, *id.* at 193-94,

197 (plurality opinion)[7]—as did Justice Breyer's dissenting opinion:

> Like Justice Stevens, I give weight to the fact that a national commis-
> sion, chaired by former President Jimmy Carter and former Secretary
> of State James Baker, studied the issue and recommended that States
> should require voter photo IDs. See Report of the Commission on Fed-
> eral Election Reform, Building Confidence in U.S. Elections § 2.5

---

[7] All further citations to *Crawford* will cite the controlling plurality opinion, unless
otherwise indicated.

(Sept.2005) (Carter-Baker Report), App. 136-144. Because the record does not discredit the Carter-Baker Report or suggest that Indiana is exceptional, I see nothing to prevent Indiana's Legislature (or a federal court considering the constitutionality of the statute) from taking account of the legislatively relevant facts the report sets forth and paying attention to its expert conclusions.

*Crawford*, 553 U.S. at 237-38 (Breyer, J., dissenting).

69.   Participating in the *Crawford* case, the Department of Justice echoed much of what the Carter-Baker Commission found. In supporting Indiana's law, the federal government announced its view that "voting fraud impairs the right of legitimate voters to vote by diluting their votes—dilution being recognized to be an impairment of the right to vote"; that "[t]he State's interest in deterring voter fraud before it happens is evident from the monumental harm that can come from such fraud"; that alternatives to a photo ID, like "affidavits" and "utility bills" are not "as reliable as a photo ID"; and, therefore, that voter ID laws like Indiana's "serve[]" a "State's compelling interest in preserving the integrity of the electoral process." DEF0036 (Brief of United States as Amicus Curiae Supporting Respondents at 18-31, *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181 (2008) (Nos. 07-21, 07-25) (ROA.78469-82) (emphasis omitted; capitalization altered; quotation mark omitted)).

70.   The Texas legislature was also influenced by the Carter-Baker Commission Report, as well as *Crawford* and *Purcell*. *See, e.g.*, Fraser Dep. 74:13-18 (ROA.61161), DEF0001 (Debate on S.B. 14 in the Senate Committee of the Whole, 82d Leg., R.S., 26:2-27:13, 35:9-14 (Jan. 25, 2011) (ROA.69258-59, 69267)); DEF0001 (Debate on S.B. 362 in the Senate Committee of the Whole, 81st Leg., R.S., 45:24-48:23 (Mar. 10, 2009) (ROA.72212-15)). In fact, requiring that voters prove their identity was only the latest in a series of reforms enacted by Texas to "improve and modernize election procedures" (*Crawford*, 553 U.S. at 191), many of which were recommended by the

Carter-Baker Commission's Report. *See* DEF0001 (Debate on S.B. 362 in the Senate Committee of the Whole, 81st Leg., R.S., 312:13-313:7 (Mar. 10, 2009) (ROA.72490-91) (discussing provisional balloting and statewide voter registration database)); *see also, e.g.,* S.B. 14 § 24 (increasing funding for voter registration activities); *infra* FOF ¶¶ 104-111, 127, 137, 149, 187-188.

### D.    The Adoption of Voter ID Requirements by Other States

71.    Following the recommendations of the Carter-Baker Commission, a number of States adopted election reforms including requirements that a voter provide photo identification before a ballot is counted. *See* DEF0053 at 4-5 (ROA.78670-71). States adopted a variety of approaches:

> (1) In 2005, Georgia and Indiana adopted laws requiring that voters identify themselves via a photo ID.
>
> (2) In 2006, Missouri and Ohio also adopted voter ID laws. Missouri's law was eventually invalidated on state constitutional grounds. Ohio's law did not mandate the use of photo ID.
>
> (3) In 2009, Utah adopted a voter ID law, which did not mandate the use of photo ID.
>
> (4) In 2010, voters in Oklahoma approved by referendum a law requiring voters to identify themselves via a photo ID.
>
> (5) "Voter ID was the hottest topic of legislation in the field of elections in 2011, with legislation introduced in 34 states." That year, a number of states in addition to Texas adopted laws requiring voters to identify themselves via a photo ID: Kansas, South Carolina, Tennessee, South Carolina, and Wisconsin. In addition, the legislatures of Minnesota, Missouri, Montana, New Hampshire, and North Carolina also passed laws requiring voters to identify themselves via a photo ID, only to have those laws vetoed by their states' respective governors.

*Id.* at 4-19 (ROA.78670-85).

72.    Unsurprisingly, no two voter ID laws are identical. *See id.* at 3 (ROA.78669) ("In half, the ID must include a photo of the voter; in the remaining half, non-photo

forms of ID are acceptable."). In early iterations, the Texas Legislature passed bills that allowed the use of photo and non-photo ID. Later, in crafting S.B. 14, the Texas Legislature was particularly influenced by the voter ID laws adopted in Georgia and Indiana. *See, e.g.*, DEF0387 (ROA.83664-78) (Senator Fraser's voter ID talking points).

73.   Georgia's voter ID law requires voters to present one of the following forms of identification to vote: a Georgia driver's license; an identification card issued by any Georgia state entity or the United States; a valid United States passport; an employee identification card issued by any Georgia state entity, the United States, or a local political entity; a United States military identification; or a tribal identification card. *See* Ga. Code Ann. § 21-2-417(a). Like S.B. 14, Georgia law provides for free voter identification cards. *See id.* § 21-2-417.1(a). Georgia voters who fail to present the required identification may cast a provisional ballot, which will be counted if the voter presents identification to the voter registrar within three days of the election. *See id.* § 21-2-419(c)(1).

74.   Before the preclearance coverage formula was invalidated by *Shelby County v. Holder*, 133 S. Ct. 2612 (2013), the United States Department of Justice precleared Georgia's voter identification law after concluding that it complied with section 5 of the Voting Rights Act. *See Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1347 (11th Cir. 2009).

75.   The proportion of minorities in Georgia was substantially the same as Texas. Fraser. Dep. 72:22-73:22 (ROA.63039-40); *see also* Dewhurst Dep. 193:8-21 (ROA.60401).

76.   Indiana's voter ID law requires in-person voters to present identification that contains the person's name, photograph, and an expiration date. *See* Ind. Code. Ann.

§§ 3-5-2-40.5(a), 3-10-1-7.2(a). The identification must be issued by the State of Indiana or the United States, and it must be current or have expired after the most recent general election. *See id.* § 3-5-2-40.5(a). A voter who does not present qualifying identification may cast a provisional ballot, which will be counted if, within 10 days of the election, the voter provides proof of identification, attests to indigency, or attests to a religious objection to being photographed. *See id.* § 3-11.7-5-2.5(a)-(c).

77.   The Supreme Court upheld Indiana's voter ID law against constitutional challenge. *See Crawford*, 553 U.S. 181. In doing so, the Court validated Indiana's underlying purposes in enacting a photo-voter ID law:

1)   "[D]eterring and detecting voter fraud,"

2)   "[P]articipating in a nationwide effort to improve and modernize election procedures that have been criticized as antiquated and inefficient,"

3)   Responding to the problem of "voter registration rolls include a large number of names of persons who are either deceased or no longer live in" the State, and

4)   "[S]afeguarding voter confidence."

*Id.* at 191; *see also Veasey*, 830 F.3d at 249 ("*Crawford* clearly established that states have strong interests in preventing voter fraud and increasing voter confidence by safeguarding the integrity of elections.").

78.   The Court also confirmed that HAVA shows "that Congress believes that photo identification is one effective method of establishing a voter's qualification to vote and that the integrity of elections is enhanced through improved technology," a conclusion also supported by the Carter-Baker Commission. *Crawford*, 553 U.S. at 193. The Court went on to brush aside any suggestion that a state must wait for definitive proof of a certain amount of in-person fraud before it can be justified in enacting a photo-voter ID requirement:

> There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters. Moreover, the interest in orderly administration and accurate recordkeeping provides a sufficient justification for carefully identifying all voters participating in the election process. While the most effective method of preventing election fraud may well be debatable, *the propriety of doing so is perfectly clear*.

*Id.* at 196 (emphasis added). Finally, the Court observed that "public confidence in the integrity of the electoral process has independent significance, because it encourages citizen participation in the democratic process." *Id.* at 197. The Court concurred with the Carter-Baker Commission's conclusion that an "electoral system cannot inspire public confidence if no safeguards exist to deter or detect fraud or to confirm the identity of voters." *Id.* at 194 (quotation marks omitted).

### E.   Broad Public Support for a Voter-ID Requirement Throughout the Nation and Texas

79.   Opponents maintained that voter ID was bad for voters and bad for Texas. The evidence—and the voters—said otherwise.

80.   In the 2000s, support for laws requiring voters to present a photo ID in order to cast a ballot was consistently high.

81.   In 2005, a poll of Americans showed that a clear majority of the country—57 percent—favored voter ID laws. DEF0001 (Tex. Leg., House Committee on Elections, 81st Leg., R.S., vol. II at 322:6-10 (Apr. 6, 2009) (ROA.74933)). In 2008, that support had increased to 67 percent, with a majority of Republicans, Democrats, whites, African-Americans, and other minorities supporting a photo ID requirement. DEF0001 (Tex. Leg., Senate Committee of the Whole, 81st Leg., R.S., at 787:17-23 (Mar. 10, 2009) (ROA.72976); *see also id.* 338:14-16 (ROA.72516) (expert testimony before the Texas Senate that "it is clear from public opinion surveys that most Americans support requiring a photo ID in order to vote").

82.   In fact, Plaintiffs' own expert, Dr. Ansolabehere, found that "persons who were asked to show identification when voting in 2006 were *even more supportive* of voter identification requirements than other respondents." DEF0001 (Debate on S.B. 362 in the Senate Committee of the Whole, 81st Leg., R.S., Exhibit 7, at 8 (March 11, 2000) (ROA.73378) (citing Stephen Ansolabehere, Access Versus Integrity in Voter Identification Requirements, Working Paper No. 58 in the Caltech/MIT Voting Technology Project (Feb. 2007))) (emphasis added). Dr. Ansolabehere's conclusion in this paper is quite telling: "Voter identification is the controversy that isn't. . . . These findings undercut much of the heated rhetoric that has inflated the debate over voter identification requirements in the United States. . . . ID requirements in practice bear absolutely no resemblance to [past] discriminatory practices. This is simply not a case of voter intimidation." Ansolabehere, *supra*, at 9.

83.   The story was the same in Texas. In 2010, 86 percent of Texans—including majorities of both Republicans and Democrats—supported requiring voters to prove their identities via photo ID. DEF0001 (Debate on S.B. 14 in the Senate Committee of the Whole, 82d Leg., R.S., 27:14-18 (Jan. 25, 2011) (ROA.69259)).

84.   A Fall 2010 Lighthouse Poll found that 82 percent of African-Americans and 83 percent of Hispanics favored "requiring a valid photo ID before a person is allowed to vote." DEF0004 (Debate on S.B. 14 in the Senate Committee of the Whole, 82d Leg., R.S., Exhibit 8 (Jan. 25, 2011) (ROA.77940)).

85.   In February 2011, that support remained "overwhelming." Ross Ramsey, *UT/TT Poll: Texans Are Ready to Roll the Dice*, Texas Tribune (Feb. 23, 2011) (cited at Trial Tr. 401:25-402:24 (Sept. 10, 2011) (Fraser) (ROA.101163-64)), https://www.texastribune.org/2011/02/23/uttt-poll-texans-are-ready-to-roll-the-dice.   According to this poll, 75 percent of Texans supported a photo voter ID law. A majority

of Latinos (68%), African-Americans (63%), and Democrats (58%) favored a photo-voter-ID law. DEF0723 (ROA.87386-88).

86.   Legislative opponents of S.B. 14 did not cite any polling to the contrary. *Cf.* Trial Tr.  277:11-16 (Sept. 10, 2014) (Patrick) (ROA.101039) ("Very often, if we have a contentious issue, where—not the . . . legislators . . . but the citizens . . . are divided on an issue, they show up at the Capitol and rally for and against. . . . I don't recall anyone.").

87.   Then-Senator Dan Patrick recalled that support for S.B. 14 among Texas voters was overwhelming based on "all the people I had talked to over a period of time" and "looking at all the polls." Trial Tr. 277:7-9, 278:1 (Sept. 10, 2014) (Patrick) (ROA.101039); *id.* at 276:4-8 (ROA.101038) ("[I]t seems to me I remember a number where 96 percent of the Republicans and 74 percent of Democrats supported . . . photo voter ID.").

88.   The strength—and electoral power—of this growing support was reflected in the voting patterns for voter ID in the Texas House of Representatives. Two *Democratic* members of the Texas House—Representatives Craig Eiland and Joe Pickett—who voted against voter ID in the 2005 and 2007 sessions switched their positions the next time the issue made it to a vote in 2011, voting in favor of S.B. 14. *Compare* H.J of Tex., 79th Leg., R.S., 2254-55 (May 3, 2005) (ROA.77781-82), *and* H.J. of Tex., 80th Leg., R.S., 2246 (Apr. 24, 2007) (ROA.76888), *with* H.J. of Tex., 82d Leg., R.S., 4054-55 (May 16, 2011) (ROA.71968-69); *see also* DEF0044 (ROA.78642-47) (listing party affiliation of members of the House in 2011).

89.   Particularly relevant to S.B. 14, support for a photo ID requirement was most fervent among Republican primary voters. Plaintiffs' own witness described the pressure on Republican legislators in Texas:

Q: Was there pressure on members of the legislature in 2011 to vote for Senate Bill 14?

A: Oh, enormous.

Q: How would a member of the legislature know that they, you know, needed to look real hard in supporting this bill or they might face consequences?

A: There was pressure from political action committees. There was pressure from the Republican Party. This pressure can come in a number of different ways and this is not uncommon in lobbying. I mean, this—you know, you can be told that if you don't vote for a particular bill, in this case, Senate Bill 14, that this political group is going to find you an opponent and finance them and they have done that.

Q: Did that, in fact, happen to some members in 2009 that either opposed the measure or weren't diligent enough in getting it passed?

A: Todd Smith was chairman of the Elections Committee in the House, I believe, in 2009 and—it might have been 2007. I'm not sure about that but I know this. He didn't get the bill out of committee. That drew him an opponent and a bunch of money against him . . . .

Trial Tr. 207:2-22 (Sept. 3, 2014) (Wood) (ROA.99139).

90.    Testimony from Representative Smith confirmed that legislators feared that their constituents would have voted them out of office if a voter-ID law were not enacted. He testified that "continu[ing] demand from the grassroots that this bill be passed" was "building political pressure." Trial Tr. 325:12-14 (Sept. 8, 2014) (Smith) (ROA.100319). He further testified that

I think everybody understands why non-photo ID was taken out of Senate Bill 362 [in 2009] because it was just a demand by our constituents that we require a photo ID in order for people to vote and they were very cynical about the notion of allowing non-photo IDs . . .. [M]y [primary] opponent used [my support for non-photo ID] against me in the most recent election politically without mentioning that he too had voted for that same version of the bill. So this notion of letting people vote with their library cards feeds the perception that you're in favor of liberal laws allowing people to vote even under circumstances where they were not legally entitled to do so.

34

*Id.* 339:10-22 (ROA.100333). Putting it in exaggerated terms, Representative Smith said that that "every Republican member of the legislature would have been lynched if" S.B. 14 "had not passed." *Id.* 340:1-3 (ROA.100334).

91.   As Senator Davis—an opponent of S.B. 14—conceded, "members of the Texas legislature have a duty to represent their constituents"; it is "an important duty of any elected official to represent constituents and represent policy that constituents favor"; and there is nothing "wrong with a representative voting for a policy that's favored by his or her constituents." Trial Tr. 39:7-18 (Sept. 5, 2014) (Davis) (ROA.99656).

92.   The importance of Republican grassroots pressure was reflected in the voting patterns for voter ID in the Texas House. Three members of the Texas House—Representatives Chuck Hopson, Aaron Peña, Jr., and Allan Ritter—who opposed voter ID in 2005 and 2007 when they were Democrats, switched parties in 2011 and as Republicans voted for S.B. 14. *Compare* H.J. of Tex., 79th Leg., R.S. 2254-55 (May 3, 2005) (ROA.77781-82), H.J. of Tex., 80th Leg., R.S., 2246 (Apr. 24, 2007) (ROA.76888), *and* DEF0041 (ROA.78622-28) (listing party affiliation of members of the House in 2005), DEF0042 (ROA.78629-34) (listing party affiliation of members of the House in 2007), *with* H.J. of Tex., 82d Leg., R.S., 4054-55 (May 16, 2011) (ROA.71968-69), *and* DEF0044 (ROA.78642-47) (listing party affiliation of members of the House in 2011).

## IV.   THE LONG LEGISLATIVE ROAD TO S.B. 14

93.   The Texas Legislature meets every two years, with each regular session lasting only 140 days from January until May. *See* Trial Tr. 160:3, 173:12 (Sept. 5, 2014)

(Ellis) (ROA.99777, 99790). The Governor may call a special legislative session following the conclusion of the regular session. *See id.* 357:2-13 (Sept. 5, 2014) (Anchia) (ROA.99974).

94.   S.B. 14 was not the first bill considered by the Texas Legislature that sought to establish a system for verifying that voters are who they claim to be. To understand why S.B. 14 included the provisions that did, and to understand why the Texas Legislature used the legislative procedures that it did in enacting S.B. 14, one must look to events that preceded the 2011 legislative session.

95.   S.B. 14 was enacted after *more than six years* of debate and consideration by the Texas Legislature of whether voters should be required to prove their identity with a photo ID.

96.   The legislative record for consideration of voter ID during those six years encompasses *more than 4,500 pages* of transcripts and hundreds of pages of exhibits and written testimony. *See* DEF0001-02 (ROA.68878-77825) (legislative histories of S.B. 14, S.B. 362, H.B. 218, and H.B. 1706). Few laws have received more deliberation.

97.   During the nationwide push to ensure the integrity of elections, the Texas Legislature, like those in many other States, sought to enact voter ID legislation in addition to many other laws to modernize elections. At first, Republicans in the Texas Legislature looked to compromise with Democrats on the ID issue, offering bills that would have allowed a certain photo and non-photo IDs be used, despite the preferences of Republican legislator and primary voters for a photo requirement. When it became clear that Democrats were not interested in compromise, and after Republicans had obtained overwhelming majorities in both Houses of the Texas Legislature, Republicans chose to pursue the preferences of those who had voted them into office—

and who could vote them out. The result was S.B. 14's photo ID requirement for many voters.

98.   Rather than compromise, Democrats manipulated procedural rules in an effort to thwart the will of the majority of Texans and the majority of the Texas Legislature. After enduring years of this intransigence through three legislative sessions (2005, 2007, and 2009), Republicans in 2011 used procedural rules to ensure that a photo-voter-ID bill would get an up-or-down vote. As then-Senator Patrick explained, "they used the rules to stop the bill and we used the rules to pass the bill." Trial Tr. 286:9-10 (Sept. 10, 2014) (Patrick) (ROA.101048).

99.   In addition, opponents who had no intention of supporting any voter ID law repeatedly offered amendments they knew would fail solely in order to build a favorable record for this lawsuit. *See* Trial Tr. 172:7 (Sept. 5, 2014) (Ellis) (ROA.99789) (acknowledging that amendments were offered just to "make a point"), 203:10-21 (ROA.99820) (discussing email from Ellis's Chief of Staff referring to plan to use the expected vote against an Ellis amendment in future legal proceedings against S.B. 14); *see also* DEF0001 (Debate on S.B. 362 in the Senate Committee of the Whole, 81st Leg., R.S., 102:21-22 (March 10, 2009) (ROA.72269)) (Democratic Senator Zaffirini suggesting that those who oppose voter ID were "making a record . . . because a lawsuit is expected"). Nonetheless, those who supported voter ID did adopt a number of Democratic amendments to S.B. 14 in order to address some concerns raised by the opposition.

### A.    In the 2001 Legislative Session, a Democrat Introduces the First Voter-ID Bill Following the 2000 Election.

100. At the beginning of the legislative session that followed the 2000 presidential election, Representative Tracy King, a Democrat, introduced H.B. 744, "AN ACT relating to requiring to requiring a voter to present proof of identification." Tex. H.B. 744, 77th Leg., R.S. (2001); *see also* DEF0041 at 4 (ROA.78625) (showing that Tracy King was a Democrat in 2001).[8]

101. If adopted, the bill would have required voters to prove their identity in order to vote. Tex. H.B. 744 § 1(b), 77th Leg., R.S. (2001).

102. The list of acceptable identification included photo and non-photo ID. *Id.*

103.  The bill was referred to the Elections Committee, but no further action was taken. *See* History of H.B. 744, Texas Legislature Online, http://www.capitol.state.tx.us/BillLookup/history.aspx?LegSess=77R&Bill=HB744 (last visited Nov. 18, 2016).

104. Although Representative King's bill was not enacted, other laws inspired by the 2000 election were enacted. For example, H.B. 1419 required the Secretary of State to conduct a study of voting systems, technologies, and strategies; H.B. 1856 prohibited, among other things, the new acquisition or adoption of a voting system that uses a punch-card ballot or similar form of tabulating card and established procedures for the use of electronic voting machines; H.B. 2922 established a toll-free telephone number to allow a person to report an existing or potential abuse of voting

---

[8]    The contents, history, and authors of state legislation "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned," and are therefore subject to judicial notice. Fed. R. Evid. 201(b)(2); *see, e.g.*, *Crawford*, 553 U.S. at 199 (plurality op.) (considering judicially noticeable facts when evaluating Indiana's voter ID law).

rights; and H.B. 3181 established various procedures to ensure accurate voter rolls. H.B. 1419, Act of May 15, 2001, 77th Leg., R.S., ch. 500, 2001 Tex. Gen. Laws 950; H.B. 1856, Act of May 17, 2001, 77th Leg., R.S., ch. 1054, 2001 Tex. Gen. Laws 2329; H.B. 2922, Act of May 15, 2001, 77th Leg., R.S., ch. 556, § 1(a), 2001 Tex. Gen. Laws 1074; H.B. 3181, Act of May 28, 2001, 77th Leg., R.S., ch. 1178, § 1, 2001 Tex. Gen. Laws 2647.

> **B.** **In the 2003 Legislative Session, the Texas Legislature Enacts Various Laws that Continue to Strengthen and Modernize Texas's Electoral System—Including a Bill that Addresses Mail-in Ballot Fraud in Various Ways.**

105. In the 2002 election, Republicans took control of the Texas House for the first time since Reconstruction and thus controlled both houses of the State Legislature and all major state offices. Section 5 Trial Tr. 56:21-24 (July 10, 2012) (Kousser) (ROA.66447). In the next legislative session, in 2003, the Texas Legislature adopted numerous laws aimed at strengthening Texas's electoral system.

106. H.B. 54, for example, addressed mail-in ballot fraud in various ways. For example:

1) The law defined, by means of specific examples, conduct that constitutes assisting the voter while the person providing the assistance is in the presence of the voter's ballot or state-issued carrier envelope.

2) The law expanded the offense of illegal voting to include knowingly marking or attempting to mark another person's ballot without that person's consent.

3) The law expanded the offense of unlawfully assisting a voter to include preparing a voter's ballot without direction from the voter and providing assistance to a voter who either has not requested assistance or has not designated that person to provide the assistance.

4) The law prohibited anyone from possessing another person's ballot or carrier envelope without appropriate authority.

5) The law prohibited the acceptance of carrier envelopes originating from an office of a political party or candidate

6) The law made it a state jail felony for anyone to buy, offer to buy, sell, or offer to sell an official ballot, ballot envelope, carrier envelope, signed application for an early-voting mail ballot, or any other election record.

7) The law made it a Class B misdemeanor for a voter to sell his or her ballot.

Act of May 26, 2003, 78th Leg., R.S., ch. 393, 2003 Tex. Gen. Laws 1633.

107. H.B. 402 established a pilot program to evaluate the use of an electronic registration system to confirm a voter's registration when the voter appears in person to vote. Act of May 28, 2003, 78th Leg., R.S., ch. 1012, 2003 Tex. Gen. Laws 2955.

108. H.B. 1549 amended provisions of the Election Code to bring Texas into compliance with HAVA. Among other things, it strengthened identification requirements by removing preprinted checks containing the person's name from the list of acceptable documentation under then-current section 63.0101 and adding to the list a current utility bill, bank statement, government check, paycheck, or other government document that shows the name and address of the voter. Act of May 27, 2003, 78th Leg., R.S., ch. 1315, §§ 25, 27, 2003 Tex. Gen. Laws 4819, 4824-25.

109. H.B. 1695, among other things, sought to enhance the integrity of Texas's voter rolls by requiring registered voters who have been excused from jury service on the basis of not being U.S. citizens to provide proof of U.S. citizenship to their local registrar. Act of May 28, 2003, 78th Leg., R.S., ch. 1316, § 9, 2003 Tex. Gen. Laws 4832, 4834.

110. H.B. 2085 increased the availability of Spanish-speaking election clerks. Act of May 28, 2003, 78th Leg., R.S., ch. 638, § 1, 2003 Tex. Gen. Laws 2043.

111. S.B. 196 made it more difficult to challenge another person's voter registration, requiring a sworn statement of the grounds for the challenge that identifies the voter whose registration is being challenged and that states a specific qualification for registration that the challenged voter has not met, based on personal knowledge of the voter making the challenge. Act of May 24, 2003, 78th Leg., R.S., ch. 1165, § 1, 2003 Tex. Gen. Laws 3306.

### C.   In the 2005 Legislative Session, a Voter ID Bill Is Pressed by Republicans and Blocked by Democrats in the Senate.

112. Following up on their modernization of Texas's electoral system in the 2003 session—including efforts to prevent mail-in ballot fraud—the Texas Legislature sought to enact a voter ID law (H.B. 1706) of the sort recommended by the Carter-Ford and Carter-Baker Commissions in order to prevent in-person voter fraud.

113. While 11 States required voter ID in 2001, that number grew to 24 in 2005. DEF0003, Carter-Baker Commission Report, at 18 (ROA.77850). And in 2005, bills to introduce or strengthen voter ID requirements were under consideration in 11 other States in addition to Texas. *Id.*

114. H.B. 1706, like H.B. 744 in 2001, allowed photo and non-photo IDs. Tex. H.B. 1706, 79th Leg., R.S. (2005).

115. At the same time, Indiana and Georgia were enacting photo-only voter ID laws. *See supra*, Findings of Fact ("FOF") ¶¶ 71-78.

116. Like several of the election laws enacted in the 2003 session, H.B. 1706 was introduced with the expressly stated purpose of preventing voter fraud and enhancing the integrity of elections. *See, e.g.*, DEF0002 (Debate on Tex. H.B. 1706 on the

Floor of the House, 79th Leg., R.S., 2:4-9, 9:22-10:1, 19:17-21, 46:14-21 (May 2, 2005) (ROA.77446, 77453, 77463, 77490)).

117. Notwithstanding H.B. 1706's provisions allowing the use of non-photo ID and its similarity to previous legislation supported by Democrats, Democrats viewed H.B. 1706 "very suspiciously" and "there was . . . an instant reaction" in opposition to the legislation. Trial Tr. 101:2-5 (Sept. 2, 2014) (Martinez Fischer) (ROA.98733).

118. Democrats immediately took a "defensive perspective," looking for procedural mechanisms to block the will of the majority. *Id.* 101:2-102:12 (ROA.98733-34).

119. The Texas House passed H.B. 1706 on May 3, 2005. H.J. of Tex., 79th Leg., R.S., 2554-55 (2005) (ROA.77781-82).

120. Confirming that voter ID was becoming a politicized issue for Democratic legislators, Representative King voted against H.B. 1706—notwithstanding its similarity to the bill he had sponsored four years earlier (H.B. 744 in the 2001 session). *See id.*; *supra*, FOF ¶¶ 100-102.

121. Democrats in the Texas Senate vowed to use that chamber's then-existing "two-thirds rule"—a rule that effectively prevented consideration of bills in the absence of the suspension of the regular order of business in the Senate, which required the assent of two-thirds of present Senators—to block the bill. Davidson Corrected Rpt. ¶ 12 (ROA.102468-69).

122. The two-thirds rule had been a legislative calendar-management tool utilized through the discretion of the Lieutenant Governor, committee members, and other Senators to control the flow of legislation to the Senate floor and to manage the day-to-day operations of the Senate. Trial Tr. 166:1-3 (Sept. 5, 2014) (Ellis) (ROA.99783), *id.* 261:17-262:22 (Sept. 10, 2014) (Patrick) (ROA.101023-24). The two-thirds rule

42

originated in the 1950s, when Democrats overwhelmingly controlled both houses of the Texas Legislature. *See id.* 261:17-265:5 (Sept. 10, 2014) (Patrick) (ROA.101023-24). It was designed to prevent *intra*-party squabbling, foster an orderly consideration of competing priorities, and prevent legislators from having to go on the record with tough votes. *See id.* In other words, its purpose was to promote comity *within the Democratic Party*, not between Republicans and Democrats. *See id.* The two-thirds rule was never intended to give the minority party in the Texas Senate veto power over bills supported unanimously by the majority party. *See* Dewhurst Dep. 161:21-23 (ROA.60393); Trial Tr. 264:16-265:22 (Sept. 10, 2014) (Patrick) (ROA.101026-27).

123.  Because of its limited purpose, there were "various ways to work around" the two-thirds rule if it was abused. Trial Tr. 267:4-5 (Sept. 10, 2014) (Patrick) (ROA.101029). For the two-thirds rule to operate, a "blocker bill" must be introduced and passed through committee as quickly as possible, putting it at the top of the Senate's calendar, and the Senate must not pass the bill. *See* Trial Tr. 216:5-24 (Sept. 4, 2014) (Uresti) (ROA.99448); *id.* 263:21-264:7 (Sept. 10, 2014) (Patrick) (ROA.101025-26). It then takes a two-thirds vote to consider a bill out of order, that is, to consider a bill before the blocker bill is considered. Whether a blocker bill is considered, however, is at the discretion of the Lieutenant Governor, who decides when and where to refer bills. Dewhurst Dep. 26:15-25, 31:10-13 (ROA.60359-60). The blocker bill must also be passed out of committee, and whether a blocker bill makes it out of committee is obviously up to that committee, which could refuse to pass it out. And, finally, there must be the assent of the majority of the Senate for the two-thirds rule to operate because (1) the Senate rules are determined by majority vote, and (2) if the Senate passes the blocker bill, then the two-thirds rule would no longer be operative. *See* Trial Tr. 263:17-21 (Sept. 10, 2014) (Patrick) (ROA.101025); Dewhurst Dep. 79:23-80:8, 161:9-16 (ROA.60372, 60393).

124. When the minority party had previously sought to thwart the will of the majority—Democrat or Republican—on priority legislation, the two-thirds rule was repeatedly abandoned:

> [T]he legislative history of the Texas Senate is replete with the example after example, since World War II, of Lieutenant Governors abandoning the two-thirds rule during regular session to pass bills they wanted to pass and then putting [blocker] bills back in to recreate the two-thirds rule.
>
> ***
>
> [T]he last 30 or 40 years has numerous cases where Lieutenant Governors . . . passed the Blocker Bill, meaning there was no bill in front, there was no requirement to suspend the rules in order to – or to suspend the rules in order to move a bill forward – had done that many times.
>
> ***
>
> [I]t was a practice that was used to pass bills the Lieutenant Governor wanted to and where a small minority did not want to pass it.

Dewhurst Dep. 160:1-161:23 (ROA.60392-93); *accord, e.g.*, Trial Tr. 266:23-267:8 (Sept. 10, 2014) (Patrick) (ROA.101028-29) ("A: . . . [D]uring special sessions—and we've had 15 special sessions, I think is the number, I could be one or two off, in the last decade or so—we don't use the 21-vote rule. So on the special sessions we don't use the 21-vote rule. And on occasion in regular sessions—in regular session it's been set aside or—there are various ways to work around it, so it's—it's not unprecedented. Q: But it's not unusual in regular sessions? A: It's not unusual, but it's not unprecedented either."); Dewhurst Dep. 109:1-6 (ROA.60380) ("I frequently did not recognize the two-thirds rule during special sessions. . . . [I]n June 2011, I did not have a blocker bill, meaning, we passed all the legislation on the call with a simple majority."); *Session v. Perry*, 298 F. Supp. 2d 451, 458 (E.D. Tex. 2004) ("To break the impasse [on redistricting], Lieutenant Governor Dewhurst announced that he would suspend operation of the two-thirds rule in any future special session considering congressional

redistricting legislation."), *vacated sub nom. on other grounds*, *Henderson v. Perry*, 543 U.S. 941 (2004).[9] In fact, after the passage of S.B. 14 in 2011, the two-thirds rule was again abandoned so that the Senate could pass a budget, among other bills. *See, e.g.*, Dewhurst Dep. 109:18-110:23 (ROA.60380); S.J. of Tex., 82d Leg., 1st C.S., 1563 (2011).

125. The Texas Senate has since abandoned the two-thirds rule entirely. *See* Tex. S. Rule 5.13, S. Res. 39 § 5(c), 84th Leg., R.S., 2015 S.J. of Tex. 47, 50-51, *reprinted in* Rules of the Senate, Texas Legislative Manual 27 (2015).

126. But in the 2005 legislative session, with the Democrats' threatened use of the two-thirds rule looming, H.B. 1706 died in the Senate. Davidson Corrected Rpt. at ¶ 13 (ROA.102469).

127. Although unable to enact voter ID legislation, the Texas Legislature was able to continue its efforts to modernize and secure Texas's electoral system in other ways. For example, H.B. 56 made it a felony to tamper with a voting machine; H.B. 178 authorized election officers to access electronically readable information on a driver's license or a personal identification card when determining whether to accept a person for voting; and H.B. 2280, among other things, required the Secretary of State to prescribe a uniform system for assigning voter registration numbers, authorized a voter who continues to reside in the same county to correct incorrect or outdated information on his or her voter registration card by digital transmission, required the Secretary of State to prescribe procedures to ensure that when a voter registers in an-

---

[9]     In *Session*, Democrats similarly tried to overcome legislative defeat by resort to charges of racism. The *Session* Court properly rejected plaintiffs' claim that Texas had enacted its redistricting plan with a discriminatory purpose. 298 F. Supp. 2d at 469-73.

other county the statewide computerized voter list is updated to reflect the registra-
tion in the new county, and makes other changes relating to the frequency and timing
of periodic updates to voter registration data. H.B. 56, Act of May 23, 2005, 79th Leg.,
R.S., ch. 470, 2005 Tex. Gen. Laws 1329 (codified at Tex. Penal Code § 33.05); H.B.
178, Act of May 27, 2005, 79th Leg., R.S., ch. 1189, 2005 Tex. Gen. Laws 3903 (codified
at Tex. Elec. Code § 63.0102 and Tex. Transp. Code § 521.126(d)(5)); H.B. 2280, Act
of May 25, 2005, 79th Leg., R.S., ch. 1105, 2005 Tex. Gen. Laws 3666 (codified at Tex.
Elec. Code §§ 13.072(a), 13.141, 15.021(d)-(f), 16.001(c), 16.003, 18.041, 18.061,
20.065(b)-(c), 20.066)).

### D.   In the 2007 Legislative Session, Democrats Get an Extraordinary Concession, Which They Use to Kill the Voter-ID Bill.

128. The 2007 Legislative Session saw the one truly radical departure from the
ordinary procedural sequence in the entire record: Lieutenant Governor Dewhurst
gave the Democrats a do-over after the voter-ID bill had passed the Senate. The Dem-
ocrats took advantage of that unheard-of courtesy by killing the bill.

129. While the Democrats were blocking H.B. 1706 in the 2005 legislative session,
Georgia and Indiana both enacted voter ID laws that each required voters to present
a photo ID. *See supra*, FOF ¶¶ 71-78. The Department of Justice precleared Georgia's
law under the Voting Rights Act. *See Billups*, 554 F.3d at 1347. In addition, the
Carter-Baker Commission had released its report examining the 2004 election, which
recommended that a secure photo ID be required for voting. *See supra*, FOF ¶¶ 62-
70.

130. Following this lead, the Texas Legislature in 2007 again attempted to adopt
a voter ID bill. The proposed law allowed certain photo ID and two forms of non-photo
ID. Tex. H.B. 218, 80th Leg., R.S. (2007).

131. Just like H.B. 1706 in 2005, the express purpose of H.B. 218 was to help prevent voter fraud and increase public confidence in elections. *See, e.g.*, DEF0002 (Debate on Tex. H.B. 218 on the Floor of the House, 80th Leg., R.S., vol. I at 2:7-4:11, 8:20-9:5 (ROA.76456-58, 76462-43)).

132. Prior to the 2007 legislative session, then-Lieutenant Governor Dewhurst had numerous conversations with Democrats and believed that a version of a voter ID law could pass with bipartisan support. Trial Tr. 41:19-43:6 (Sept. 10, 2014) (Dewhurst) (ROA.100803-05).

133. Lieutenant Governor Dewhurst turned out to be incorrect. Just like H.B. 1706 before it, H.B. 218 was passed in the House and died in the Senate with Democrats blocking the bill through the Senate's two-thirds rule. In fact, before the Senate could consider H.B. 218, Senate Democrats sent a letter to Lieutenant Governor Dewhurst informing him "that they would vote against any procedural motion to" even "debate voter ID legislation." Davidson Corrected Rpt. ¶ 20 (ROA.102473).

134. First, however, proponents of H.B. 218 in the Senate attempted to thwart the Democrats' abuse of the two-thirds rule by using the "common legislative practice" of "mov[ing] your bill when you have the votes on the floor"—*i.e.*, when opponents were absent from the floor, thereby making it easier to achieve two-thirds' support. Trial Tr. 15:4-6 (Sept. 10, 2014) (Dewhurst) (ROA.100777). This was not a departure from normal legislative procedure. *See id.* 15:7-9 (ROA.100777) (this occurs "monthly" during a legislative session). At the time, there were 19 Republicans and 9 Democrats on the floor. *See* DEF0002 (Debate on Tex. H.B. 218 on the Floor of the Senate, 80th

Leg., R.S., 12:12-13:1 (May 15, 2007) (ROA.77187-88)). And by a vote of 19-9, H.B. 218 received the necessary two-thirds support. *Id.*[10]

135. Senator Whitmire, a Democrat, was absent when the vote was taken. When he returned, he protested (*see id.* 14:3-15:9 (ROA.77189-90)).[11] Lt. Gov. Dewhurst, "knowing that this [was] an important bill to the Democrats," "bent over backwards to respect" the opposition, and allowed another vote. On the second vote, Democrats blocked H.B. 218 from coming up for a vote. Dewhurst Dep. 48:23-49:19 (ROA.60365).

136. Lieutenant Governor Dewhurst's allowance of a re-vote was an extraordinary concession by the majority party, and an extraordinary departure from normal procedures that benefited the Democrats in the Senate. As then-Senator Patrick explained:

> We passed the bill. Senator Whitmire objected and—and said that he was in the restroom and was not aware of the vote and—and protested. And there was another Democrat who was not there that day. And the protest went—and the protest went on quite a while from Senator Whitmire, that it wasn't right, it wasn't fair, it was an important bill, he should have been able to vote.

> And so the lieutenant governor, David Dewhurst at the time, said, "Okay, we'll—we'll have another vote." Not everyone agreed with that, but we respected his decision.

> I've never seen in my entire time of over 16,000 votes a vote be—the gavel—the gavel come down—bless you—the gavel come down and a senator complain and a—and the lieutenant governor give them a mulligan. I've never seen that. But the lieutenant governor did.

---

[10]    Plaintiffs' expert, Dr. Davidson, incorrectly characterized this as a "change" of "the two-thirds rule." Davidson Corrected Rpt. ¶ 22 (ROA.102475).

[11]    Plaintiffs suggest that this vote was taking advantage of Senators Uresti and Gallegos absence due to illness. *See* Davidson Corrected Rpt. ¶ 22 (ROA.102475). As the record demonstrates, however, it was *Senator Whitmire*'s absence that provided the opportunity to allow for consideration H.B. 218.

Trial Tr. 280:6-23 (Sept. 10, 2014) (Patrick) (ROA.101042). Because the Lieutenant
Governor "bent over backwards" to accommodate the Democrats, the Democrats were
able to kill the bill.

137. Although unable to enact voter-ID legislation, the Texas Legislature was able
to continue its efforts to modernize and secure Texas's electoral system in other ways.
For example, H.B. 1921 prohibited the use of wireless communication devices as well
as any mechanical or electronic means of recording images and sounds in polling
places; H.B. 1987 addressed prosecutions for mail-in ballot fraud; and S.B. 90 estab-
lished a pilot program to evaluate the use of electronic mail to provide a ballot to
military personnel who are voting from overseas. H.B. 1921, Act of May 23, 2007,
80th Leg., R.S., ch. 697, 2007 Tex. Gen. Laws 1323 (codified at Tex. Elec. Code
§ 61.013); H.B. 1987, Act of May 14, 2007, 80th Leg., R.S., ch. 238, 2007 Tex. Gen.
Laws 347 (codified at Tex. Elec. Code § 86.006(f), (i)); S.B. 90, Act of Apr. 12, 2007,
80th Leg., R.S., ch. 6, 2007 Tex. Gen. Laws 6, 6-7.

### E. In the 2009 Legislative Session, the Senate Sets Aside the Two-Thirds Rule to Pass a Voter ID Law, but the Bill is "Chubbed to Death" by Democrats in the House.

138. Following the demise of H.B. 1706 in the 2007 legislative session, the Su-
preme Court upheld Indiana's photo-voter ID law against a constitutional challenge.
*See Crawford*, 553 U.S. 181. In doing so, the Court validated Indiana's underlying
purposes in enacting a photo-voter ID law:

1) "[D]eterring and detecting voter fraud,"

2) "[P]articipating in a nationwide effort to improve and modernize election
procedures that have been criticized as antiquated and inefficient,"

3) Responding to the problem of "voter registration rolls include a large num-
ber of names of persons who are either deceased or no longer live in" the
State, and

49

4) "[S]afeguarding voter confidence."

*Id.* at 191 (plurality op.). The Court also confirmed that HAVA shows "that Congress believes that photo identification is one effective method of establishing a voter's qualification to vote and that the integrity of elections is enhanced through improved technology," a conclusion also supported by the Carter-Baker Commission. *Id.* at 193. The Supreme Court went on to brush aside any suggestion that a state must wait for definitive proof of a certain amount of in-person fraud before it can be justified in enacting a photo-voter ID requirement:

> There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters. Moreover, the interest in orderly administration and accurate recordkeeping provides a sufficient justification for carefully identifying all voters participating in the election process. While the most effective method of preventing election fraud may well be debatable, *the propriety of doing so is perfectly clear.*

*Id.* at 196 (emphasis added). Finally, the Court observed that "public confidence in the integrity of the electoral process has independent significance, because it encourages citizen participation in the democratic process." *Id.* at 197. The Court concurred with the Carter-Baker Commission's conclusion that an "electoral system cannot inspire public confidence if no safeguards exist to deter or detect fraud or to confirm the identity of voters." *Id.* at 194 (quotation marks omitted).

139. Bolstered by *Crawford*, the Texas Legislature continued in its efforts to prevent voter fraud and increase public confidence in elections.

140. Senator Fraser introduced S.B. 362, which was designed as a compromise bill that was more lax than the Indiana law upheld by the Supreme Court because it provided for the use of certain non-photo ID. *See* Dewhurst Dep. 69:12-71:12 (ROA.60370), Davidson Corrected Rpt. ¶ 28 (ROA.102478). This bill was proposed—

50

despite the preferences of many Republicans for a photo-voter-ID law—as another attempt at compromising with voter ID opponents. *See* Dewhurst Dep. 61:5-64:10 (ROA.60638); McCoy Dep. 74:10-75:10 (ROA.61557).

141.  In 2009, with voter ID legislation having been under active consideration for four years in the previous two legislatives sessions—and with no end to Democratic intransigence in sight—Republicans in the Senate followed decades of precedent and set aside the two-thirds rule for consideration of this priority legislation, by designating it a special calendar item. *See* Davidson Corrected Rpt. ¶ 25 (ROA.102476); *see also* Trial Tr. 263:17-21 (Sept. 10, 2014) (Patrick) (ROA.101025) ("[E]very year we vote on the rules. The senators, Democrats and Republican, we get in a room and we all vote—and we vote all the rules. We can vote any rule we want."). Republicans did so because they considered the way Democrats were using the two-third rule an abuse of procedure. *See* Trial Tr. 284:18-285:24 (Sept. 10, 2014) (Patrick) (ROA.101046-47).

142. Notwithstanding that the voter ID issue had been under active debate for four years including in the previous two legislative sessions, the Senate held a 23-hour hearing on the topic. Davidson Corrected Rpt. ¶ 32 (ROA.102480). The hearing was held in the Committee of the Whole, which involved the entire Senate. Using the Committee of the Whole to hold a hearing rather than a smaller a committee "is a relatively common tool where you have a lot of information" that needs to be disseminated to the entire Senate. Trial Tr. 13:18-22 (Sept. 10, 2014) (ROA.100775) (Dewhurst). In the Committee of the Whole, any Senator may introduce evidence and any Senator may question witnesses. Trial Tr. 36:9-12 (Sept. 5, 2014) (ROA.99653) (Davis).

143. Because the two-thirds rule was set aside, a voter ID law was finally able to receive an up-or-down vote in Senate; S.B. 362 was passed by the Senate by a 19-to-12 margin. S.J. of Tex., 81st Leg., R.S. 589 (2009).

144. In the House, the Republican leadership undertook great efforts to try to compromise with Democrats on this issue. *See* Davidson Corrected Rpt. ¶¶ 25, 33 (ROA.102476; ROA.102480-81). The Chair of the House Elections Committee, Representative Todd Smith, sought to increase the variety of acceptable identification, provide a $7.5 million fund for voter registration, and delay implementation of the ID requirement for four years. *Id*. ¶¶ 33, 35 (ROA.102480-81, ROA.102482). The Republican leadership made these offers of compromise despite the growing demand among their constituents for a photo-ID requirement. *See id*. ¶ 35 (ROA.102482).

145. House Democrats refused to negotiate. In response to Republican House legislators' attempts at further compromise to reach an agreement on the voter-ID bill, then-Representative Marc Veasey, a Democrat, accused House Republicans of racial discrimination. He alleged that "this is a racial issue—make no mistake about it. This is about skimming enough minority votes so some people can't get elected." *Id*. (ROA.102482) (internal quotation marks omitted).

146. Supporting the effort to inject charges of racial discrimination into the legislative record, one of the lawyers who currently represents the lead plaintiff in this case testified before the Senate in 2009 and introduced the narrative that voter-ID legislation was nothing more than an attempt by Republicans to curb the political power of Democratic-leaning voters. He alleged that voter-ID legislation would "make it harder for senior citizens, younger voters, poor people, people of color, women in general, to exercise their right to vote," and he argued "that most, if not all, of these groups are growing as a percentage of Texas' voting population, and most of them

tend to vote Democratic." DEF0001 (Debate on S.B. 362 in the Senate Committee of the Whole, 81st Leg., R.S., 445:8-14 (March 11, 2009)) (ROA.72623). He concluded, "So that skew tends to explain to me the urgency of Republican leadership in pushing this bill. This is about partisan politics and protecting political power and marginalizing your opposition . . . ." *Id.* at 445:14-17 (ROA.72623).

147. Because Democrats were unwilling to work toward a compromise, the House considered the Senate version of S.B. 362 without any changes. Davidson Corrected Rpt. ¶ 35 (ROA.102482).

148. At this point, Democrats resorted to an extreme measure to thwart the will of the majority of Texans and the majority of the Texas Legislature: "chubbing." *Id.* Chubbing is a "parliamentary tactic" that involves "talking a bill to death" in the Texas House. Trial Tr. 258:4-19 (Sept. 5, 2014) (Veasey) (ROA.98890). To chub, House members speak for the maximum possible time about legislation calendared ahead of the bill they oppose so time will run out before the bill can come up for a vote. As intended, time ran out on the 2009 session before S.B. 362 could receive an up-or-down vote in the House. S.B. 362 was not the only bill that died in the House due to this chubbing, however. The Democrats in the House "brought the" entire "legislative process to a grinding halt on everything in order to" to kill S.B. 362. *Id.* 283:3-4 (Sept. 10, 2014) (Patrick). Thus, bills calendared for consideration after S.B. 362 were also killed by the Democrats' obstinacy. *See* Dewhurst Dep. 106:16-22 (ROA.61022). For example, the House received a number of bills from the Senate that it could not act on before the session expired. Among these were:

1) S.B. 11, a bill aimed at preventing gang activity. *See* Tex. S.B. 11, 81st Leg., R.S. (2009), http://www.capitol.state.tx.us/BillLookup/BillStages.aspx?LegSess=81R&Bill=SB11.

2) S.B. 12, a bill aimed at improving Texas's disaster preparedness. *See* Tex. S.B. 12, 81st Leg., R.S. (2009), http://www.capitol.state.tx.us/BillLookup/ BillStages.aspx?LegSess=81R&Bill=SB12.

3) S.B. 16, a bill aimed at improving Texas's air quality. *See* Tex. S.B. 16, 81st Leg., R.S. (2009), http://www.capitol.state.tx.us/BillLookup/BillStages. aspx?LegSess=81R&Bill=SB16.

149. Before House Democrats shut down the legislative session in order to block an up-or-down vote on a voter ID law, the Texas Legislature was able to continue its efforts to modernize and secure Texas's electoral system in other ways. For example, H.B. 2524 was enacted to ensure the integrity of electronic voting machines, and H.B. 536 made it easier for certain persons to register to vote. H.B. 2524, Act of May 27, 2009, 81st Leg., R.S., ch. 682 Tex. Sess. Law Serv. 1735; H.B. 536, Act of May 14, 2009, 81st Leg., R.S., ch. 91 Tex. Sess. Law Serv. 396.

**F.    In the 2011 Legislative Session, After Republicans Obtain an Overwhelming Majority in Both Houses—and with Many of Voter ID's Opponents Voted out of Office—a Majority of the Texas Legislature Adopts S.B. 14 in Line with the Preferences of Their Constituents.**

150. Following the demise of S.B. 362 in the 2009 legislative session, Republicans achieved historic electoral gains, sweeping out many voter ID opponents and sweeping in the largest Republican House majority since Reconstruction. Davidson Corrected Report ¶ 37 (ROA.102483-84). Since 2001, Republicans had been steadily increasing the number of seats they held in the Texas Legislature—from a minority party to an overwhelming majority. In 2001, Republicans held 72 House seats and 16 Senate seats. In 2003, Republicans held 88 House seats and 19 Senate seats. In 2005, Republicans held 86 House seats and 19 Senate seats. In 2007, Republicans held 80 House seats and 20 Senate seats. In 2009, Republicans held 76 House seats and 19 Senate seats. And in 2011, Republicans held 101 House seats and 19 Senate seats. See Legislative Reference Library of Texas, Member Statistics, http://www.lrl.texas.

gov/legeLeaders/members/memberStatistics.cfm (last visited Nov. 10, 2016). They achieved these gains in the midst of growing minority populations in Texas. Davidson Corrected Report ¶ 7.

151. Meanwhile, support for voter-ID requirements continued to increase around the country, and Republicans felt intense pressure from constituents to enact a photo-voter ID bill. *See supra*, FOF ¶¶ 71-92; Davidson Corrected Rpt. ¶ 40 (ROA.102485); *see also* DEF0053 ("Twenty-one states … passed major [voter ID] legislation during the period 2003-2011."). As Lt. Gov. Dewhurst explained:

> [F]or then six long years, [Dewhurst] had been meeting regularly with the Democrat Senators to [try to get them to] agree on a bipartisan bill, because . . . a super majority of, not only Anglo, but Hispanic and African American voters, during that time period from 2008 through 2011, were in favor of a Voter ID, and that we really ought to work together and come up with a bill. [But despite] [a]ll of the flexibility afforded in [H.B.] 218 and [S.B.] 362[, they were] voted against time after time by — by the Democrat[s] . . . . [So, Dewhurst] discussed with Senator Fraser [S.B. 14's sponsor] that maybe it's time to focus . . . on a bill . . . model[ed] after the Indiana and Georgia bills.

Dewhurst Dep. 112:11-113:3 (ROA.61023-24). The result was S.B. 14, with its photo ID requirement.

152. Anticipating that Democrats would again use the Senate's two-thirds rule to block an up-or-down vote on a voter-ID bill, Republicans pretermitted that maneuver by designating S.B. 14 as a special calendar item—as they had done with a voter ID bill in 2009. *See* Davidson Corrected Rpt. ¶ 42 (ROA.102486).

153. In addition, having learned from S.B. 362's death by chubbing in the House in 2009, Governor Perry, who was also a strong supporter of voter ID, designated the issue as an "emergency," which had the effect of allowing earlier consideration of a voter ID bill in the House. Trial Tr. 397:3-8 (Sept. 10, 2014) (Fraser) (ROA.101159).

154. Designating a matter as "emergency" often has more to do with structuring the legislative calendar than it does with denoting an actual "emergency" in the common use of the word:

> Q: . . . What does the term "legislative emergency" mean within the Texas Legislature?
>
> A: It means that we can take it outside of its normal 60 day—60 days prior—I mean, 60 days after the session began. That's all it means. It doesn't mean it's a high priority. What it does do—and this is something that a lay person may not understand—is because everything tends to pile up at the end in the session when you only have a 140-day session and you only meet once every two years—what it does allow you to do is to keep it from ending up in that pile at the end and allow you to consider it and debate it and flesh it out and amend it and do whatever you need to do so that it can be voted on . . . .
>
> ***
>
> So what it did is allow you to take it up earlier. And actually, I think it's better that way, because you actually get to debate it. It doesn't end up with a bunch of the crap at the end.

Aliseda Dep. 235:12-236:10 (ROA.57757). In 2011, Governor Perry designated two other matters as "emergency" legislation: "Legislation that will provide for a federal balanced budget amendment to the United States Constitution" and "Legislation that requires a sonogram before a woman elects to have an abortion so that she may be fully medically informed." DEF0001 (S.J. of Tex., 82d Leg., R.S. 55 (Jan. 24, 2011) (ROA.68923)).

155. Early consideration of voter ID carried two benefits. First, it ensured that the bill could be considered before the end of the session, thus precluding an effort to "chub" the bill and allowing an up-or-down vote on this priority legislation. Dewhurst Dep. 107:23-108:7 (ROA.61022). Second, it helped achieve both sides' goal of getting

the issue of voter ID behind them quickly in 2011, so that they could turn to other pressing matters, such as the State budget:

> Q: Senator, are you aware that the Texas Constitution prohibits the passage of a bill within the first 60 days of a legislative session unless it has been designated as an emergency item?
>
> A: That is my understanding of the Texas Constitution.
>
> Q: Thank you. Was there an urgency in your mind requiring the expeditious passage of Senate Bill 14?
>
> A: It's interesting that the Democratic caucus took a position that it would like to go ahead and get this out of the way. So the answer is yes, that it was a general consensus of the Senate as a whole. We didn't make an official decision of that because you can't do that. But the—both caucuses agreed that it would be nice to go ahead and deal with this issue early.

Trial Tr. 397:3-19 (Sept. 10, 2014) (Fraser) (ROA.101159); *accord id.* Trial Tr. 33:2-6 (Dewhurst) (ROA.100795) ("I wanted to put this issue behind us so we wouldn't have a spillover on other issues that—that I believe we had an—we had a[n] excellent chance of working together on a bipartisan basis."); *see id.* 358:18-360:3 (Sept. 5, 2014) (Anchia) (ROA.99975-77) (testifying that 2011 was going to be a very busy session, with issues such as the budget, transportation, and redistricting on the docket in addition to voter ID); Davidson Corrected Rpt. ¶ 44 (ROA.102487); *see also supra*, FOF ¶ 149 (noting that the chubbing of S.B. 362 shut down the legislative process for numerous bills). And after S.B. 14 was passed, the important issues regarding the State's finances, redistricting, and transportation were addressed. *See, e.g.*, Texas Legislative Council, Summary of Enactments 82nd Legislature at 13-21 (Nov. 2011), http://www.tlc.state.tx.us/docs/sessions/82soe.pdf (listing laws enacted addressing

appropriations and state finances); *id.* at 107 (discussing laws enacted addressing redistricting); *id.* at 451-69 (discussing laws enacted addressing transportation).

156. Aside from public support, the majority's desire to pass a voter-ID bill, the press of other legislative business, and the legislative minority's past resort to extraordinary measures to derail voter-ID legislation, the 2011 Legislature had an independent and compelling reason to ensure passage of a photo-voter-ID bill: if they did not pass it in the regular session, they would be called back for a special session. Before the 2011 legislative session began, then-Governor Perry stated: "This next session of the legislature . . . [o]ne thing [legislators] do understand and that is the governor has the ability to keep them in town until they address some issues. So I guess I might as well put them on notice today: We're going to do voter ID in 2011. We can either do it early, or we can do it late. Their call." Politifact Texas, *Perry-O-Meter: Ensure Legislature acts on a proposal requiring voters to present photo IDs*, http://www.politifact.com/texas/promises/perry-o-meter/promise/892/ensure-legislature-acts-proposal-requiring-voters-/.

157. Had Governor Perry called a special session to address photo-voter-ID legislation, a majority vote would have been sufficient for the Senate to pass the bill. During a special session, the Senate considers bills without requiring a two-thirds vote to suspend the regular order of business. Trial Tr. 266:23-267:8 (Sept. 10, 2014) (Patrick) ("So on the special sessions we don't use the 21-vote rule."). Indeed, that was the case in the special session Governor Perry called in 2011. Dewhurst Dep. 109:1-6 ("[I]n June 2011, I did not have a blocker bill, meaning, we passed all the legislation on the call with a simple majority.").

### 1.    The Senate passes S.B. 14.

158. To help expedite consideration of S.B. 14, the Senate resolved into the Committee of the Whole, as it had done in 2009. Davidson Corrected Rpt. ¶ 44 (ROA.102487); *see supra*, FOF ¶ 142 (discussing the Committee of the Whole).

159. As voter ID bills had been proposed and actively debated for six years and in the three previous legislative sessions by that point, there was little new discussion regarding the issue in the 2011 legislative session. Democratic Representative Martinez Fischer, for example, explained that in "2011, this is not a brand new piece of legislation. So I would suffice it to say that when voter ID was filed in 2011, I think many of us picked up the conversation of '09." Trial Tr. 102:17-19 (Sept. 2, 2014) (Martinez Fischer) (ROA.98734). Likewise, Democratic Senator Davis testified as follows:

> Q: [D]id you have some time to prepare for the Senate Bill 14 debate?
>
> A: Well, we had debated this bill in prior sessions so yes, in that sense. We certainly understood and had had testimony in prior sessions about the pros and cons of such a bill and were prepared from that perspective.

*Id.* 11:1-7 (Sept. 5, 2014) (Davis) (ROA.99628). Democratic Senator Rodney Ellis concurred, testifying that because the bill had come up so many times in previous sessions, he was well prepared to offer amendments. *Id.* 171:18-172:11 (Ellis) (ROA.99788-89). Recognizing the thorough debate on the voter-ID bill in 2009, there was bipartisan agreement that "[e]verything that was in the record from the previous debate two years earlier would be in the record again . . . so everything was included." *Id.* 184:9-14 (ROA.99801); *accord* DEF0001 (Debate on S.B. 14 in the Senate Committee of the Whole, 82d Leg., R.S., 31:-33:16 (Jan. 25, 2011)).

160. Despite the already voluminous record, the Committee of the Whole heard additional testimony from numerous witnesses, both for and against the bill. Davidson Corrected Rpt. ¶¶ 46-49 (ROA.102489-91).

161. Senator Whitmire, an opponent of S.B. 14, acknowledged during the debate that the proponents of S.B. 14 in the Senate did not intend "to disenfranchise anybody." DEF0001 (Debate on S.B. 14 in the Senate Committee of the Whole, 82d Leg., R.S., 64:5-8 (Jan. 25, 2011)) (ROA.68948).

162. Senator Ellis, another opponent, agreed that the intent of the sponsor of S.B. 14 was to ensure that everyone has the right to vote. *Id*. 201:6-10 (ROA.68983) (Senator Fraser: "I want to make sure that the groups you're talking about, you know, women, minority, elderly, that they all have the right to vote; and I believe my bill does that." Senator Ellis: "Okay. And I know that's your intent.").

163. Senator Ellis also conceded that there was no evidence that S.B. 14 would have a disparate impact on minorities. DEF0001 (Debate on S.B. 14 in the Senate Committee of the Whole, 82d Leg., R.S., 29 (Jan. 26, 2011)) (ROA.70215) ("I can no more prove, without this bill being in effect, that it has the disparate impact that folks on my side are afraid of."). Plaintiffs' own expert had earlier offered a similar concession. *See* DEF0022 (Robert S. Erikson & Lorraine C. Minnite, Modeling Problems in the Voter Identification-Voter Turnout Debate, 8 Election Law Journal 85, 98 (2009)) (ROA.78232) ("It should be evident that our sympathies lie with the plaintiffs in the voter ID cases. Yet we see the existing science regarding vote suppression as incomplete and inconclusive.").

164. Senators proposed 37 amendments to S.B. 14, 28 of which were rejected, and 9 of which were adopted. Davidson Corrected Rpt. ¶ 50 (ROA.102491).

165. Most of the amendments offered by Democrats were offered just "to make a point" and to build a record for this lawsuit. Trial Tr. 172:7 (Sept. 5, 2014) (Ellis) (ROA.99789); *id.* 203:10-21 (ROA.99820) (discussing email from Ellis's Chief of Staff referring to plan to use expected vote against an Ellis amendment in future legal proceedings against S.B. 14). One amendment, for example, sought to prevent the enforcement of S.B. 14 unless a certain of amount of funding for schools was appropriated. DEF0001 (Debate on S.B. 14 in the Senate Committee of the Whole, 82d Leg., R.S., 34-35 (Jan. 26, 2011)) (ROA.70220-21).

166. Confirming their symbolic nature, most Democratic amendments were not "given to the author of" S.B. 14 "24 hours in advance," in violation of "the general rule in the Senate and the rule that [was] placed on" S.B. 14. Fraser Dep. 310:17-21 (ROA.63277). This failure occurred notwithstanding that voter ID had been under debate for six years and notwithstanding that Democrats had two weeks between the filing of S.B. 14 and its consideration by the Committee of the Whole to prepare amendments. *See* Texas Legislature Online, History of S.B. 14, http://www.capitol. state.tx.us/BillLookup/History.aspx?LegSess=82R&Bill=SB 14 (last visited Nov. 9, 2016).

167. In response, Republicans, knowing none of the Democratic senators were going to support the bill in any circumstance, tabled many Democratic amendments. *See* Trial Tr. 29:2-5 (Sept. 5, 2014) (Davis) (ROA.99646).

168. Several Democratic amendments were nevertheless adopted. An amendment offered by Democratic Senator Hinojosa "to allow concealed handgun permits to be used as" voter ID (Trial Tr. 177:7-8 (Sept. 5, 2014) (Ellis) (ROA.99794)) was adopted unanimously (S.J. of Tex., 82d Leg., R.S. 123 (Jan. 26, 2011) (ROA.70125)). Democratic Senator Lucio offered an amendment to allow the use of certain expired IDs,

which was adopted unanimously. *Id.* at 125 (ROA.70129). Democratic Senator Davis's amendment to accommodate voters whose names differed slightly between their ID and voter registration was adopted unanimously. *Id.* at 139 (ROA.70141). In addition, Senator Davis proposed an amendment to allow a person who was indigent and who swears in an affidavit that he cannot afford S.B. 14-compliant ID to vote. Trial Tr. 28:12-18 (Sept. 5, 2014) (Davis) (ROA.99645). Senator Davis withdrew this amendment, but it was immediately incorporated into a more comprehensive amendment offered by Senator Duncan. *See* S.J. of Tex., 82d Leg., R.S. 136-37 (Jan. 26, 2011) (ROA.70138-39). Senator Duncan's amendment was adopted unanimously. *Id.* at 138 (ROA.70140). Senator Davis's indigency provision was excised in the House at the behest of *Democrats. See infra*, FOF ¶¶ 184, 195.

169. One of the tabled amendments would have required evening and weekend hours at driver's license offices to make it easier for voters to acquire ID. Davidson Corrected Rpt. ¶ 50 (ROA.102491). This raised an issue of implementation, which is generally left to the responsible agency in the first instance, with legislative oversight. *See* Trial Tr. 25:14-17 (Sept. 10, 2014) (Dewhurst) (ROA.100787); Dewhurst Dep. 138:5-15 (ROA.61030); *see also* DEF0001 (Debate on S.B. 14 in the Senate Committee of the Whole, 82d Leg., R.S., 22, 28 (Jan. 26, 2011)) (ROA.70206) ("I don't think Senate Bill 14 is the appropriate vehicle to debate DPS operations."). In any event, driver's license's offices expanded their hours during the implementation of S.B. 14. *See supra*, FOF ¶ 33.

170. Another tabled amendment would have prohibited state agencies from charging a fee for issuing documents used to obtain a photo ID, such as a birth certificate. Dewhurst Dep. 197:18-24 (ROA.61045). This was likewise an issue of implementation (*see* Trial Tr. 25:14-17 (Sept. 10, 2014) (Dewhurst) (ROA.100787) ("[I]t was my intent during the implementation, once the bill had passed – during the implementation of

the bill by the agencies to  reduce that cost"); Dewhurst Dep. 192:17-22 (ROA.61043)

("I had already communicated with Senator Fraser on—on making this . . . no cost to

people that want to obtain photo voter ID, that the agencies, DPS and Health and

Human Services, would implement what we wanted, and they did. And therefore,

the—that was not going to be a problem.")).

171. The fee for an EIC birth certificate was greatly reduced during implementa-

tion (*see supra*, FOF ¶ 25). Then-Lieutenant Governor Dewhurst explained that this

was never going to be a problem:

> Q: That reduction in the cost of the underlying documents, that was not
> within the text of Senate Bill 14, was it?
>
> A: It was not because, as we talked a few moments ago, and I hope I
> didn't sound like I was preaching, but in the Texas legislative example,
> we frequently don't spell out every single detail, but it was left to the
> implementing agencies to—to reduce the cost, as was done by the Health
> and Human Services on the question of birth certificates and DPS on
> the cost behind the election identification card.
>
> Q: . . . How does the Legislature ensure that the agencies will do what
> the Legislature wants the agencies to do as a general matter?
>
> A: The agencies are well advised to do what the Legislature wants them
> to do and what the leadership in the Legislature wants them to do be-
> cause they're all subject to the next appropriation.

Dewhurst Dep. 138:5-23 (ROA.61030). Furthermore, the Legislature in 2015 re-

sponded to the agency's implementation of S.B. 14 by enacting a law removing any

fees for obtaining government documents needed to get a free EIC voter ID. Act of

May 25, 2015, 84th Leg., R.S., ch. 130, 2015 Tex. Gen. Laws 1134.

172. Another tabled amendment would have required the Secretary of State to

analyze annually S.B. 14's impact on voters. Davidson Corrected Rpt. ¶ 50

(ROA.102491). Republicans opposed this amendment because they believed that the

better course was for the Legislature to examine the impact of S.B. 14 after it had been in place for a couple of years, and then consider whether to place this annual mandate on the Secretary of State. DEF00001 (Debate on S.B. 14 in the Senate Committee of the Whole, 82d Leg., R.S., 29 (Jan. 26, 2011)) (ROA.70215). In any event, the study requested was not feasible given the data held by the Secretary of State (*see* Shorter Dep. 78:2-80:22 (ROA.62351); Dewhurst Dep. 193:2-7 (ROA.61044) ("I didn't feel like, at that point, knowing that they having problems marrying the databases and knowing that there was a continuing problem with – with accessing the data, that it would be worth the time spent, since I didn't believe it was going to be at that point in time in 2011 productive.")), and such a study was inevitably going to be required anyway in order to achieve preclearance under Section 5 of the Voting Rights Act (Trial Tr. 203:16-20 (Sept. 5, 2014) (Ellis) (ROA.99820)). In fact, such a study was completed during the preclearance process. *See* Section 5 Trial Tr. 136:5-137:14 (July 9, 2012 P.M. Session) (Sager) (ROA.66358-59).

173. Another tabled amendment would have expanded the forms of photo ID that could serve as voter ID. Legislators expressed concern with this type of amendment on the basis that expanding the number of acceptable IDs would cause too much confusion among election officials. *See, e.g.* DEF0001 (Debate on S.B. 14 in the Senate Committee of the Whole, 82d Leg., R.S., 10-12 (Jan. 26, 2011)) (ROA.70196-98; ROA.70201-02); Williams Dep. 47:20-23 (ROA.62696) (expressing worry that allowing many forms of ID "makes it very difficult for the person who's working at the polls—they have so many things that they have to look at—and they don't know whether it's a valid document or not."); *id.* 45:19-22 (ROA.62696); *see also* Patrick Dep. 327:10-13 (ROA.64646) ("Q: . . . To your knowledge, do all those state-issued

state employment IDs, are – do they all look alike? A: No, they all look – they're actually different."); Bueck Dep. 143:5-18 (ROA.57921). This was particularly true regarding student IDs:

> [T]here are arguably hundreds of different community colleges and universities, and every student ID from a different university or college or a community college would have been different, and it would have been virtually impossible for election officials to be able to know which ones were valid and which ones weren't, which ones had been forged, which ones had not.

Dewhurst Dep. 200:21-201:02 (ROA.61045); *see also* Williams Dep. 45:9-18 (ROA.62696).

174. Student IDs have an additional disadvantage in that they cannot be used to verify age or residency. *See* Patrick Dep. 326:5-23 (ROA.64646). The lone student-plaintiff in this lawsuit is a good example of this problem. ███████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████ ██ ████████████████████████████ ████████████████████ These facts suggest that she does not meet the residency requirement necessary to vote in Texas, as opposed to California. *See* Tex. Att'y Gen. Op. GA-0141, 2004 WL 228527, at *9 (2004) (citing, among other authorities, Tex. Elec. Code §§ 1.015, 11.001-02).

175. On January 26, 2011, the Senate passed S.B. 14 by a vote of 19 to 11. S.J. of Tex., 82d Leg., R.S. 146 (Jan. 26, 2011) (ROA.70251).

## 2.    The House passes a modified version of S.B. 14.

176. S.B. 14 was under consideration in the House for nearly two months—which is half of the duration of a regular legislative session. *See* Texas Legislature Online, History of S.B. 14, http://www.capitol.state.tx.us/BillLookup/History.aspx?LegSess= 82R&Bill=SB 14 (last visited Nov. 9, 2016).

177. To focus consideration of S.B. 14 in the House, the Speaker of the House established a Select Committee to consider the bill. Davidson Corrected Rpt. ¶ 52 (ROA.102492). The Republican Speaker chose then-Representative Veasey, a Democrat and vocal opponent of voter ID laws, as vice-Chair of the Select Committee on Voter Fraud, where then-Representative Veasey was able to voice his concerns and propose changes to legislation. Trial Tr. 237:19-239:2; 248:14-16 (Sept. 2, 2014) (Veasey) (ROA.98869-71; ROA.98880).

178. The Select Committee considered testimony from nearly 40 witnesses on the merits of S.B. 14. DEF0001 (Tex. Leg., House Select Committee on Voter Identification and Voter Fraud, Minutes, 82d Leg., R.S. (Mar. 1, 2011) (ROA.70327-29)).

179. S.B. 14 was reported favorably out of the Select Committee on March 21, 2011, and considered by the Calendars Committee that evening. *See* DEF0001 (H.J. of Tex., 82d Leg., R.S. 952 (Mar. 23, 2011)) (ROA.70959); Texas Legislature Online, History of S.B. 14, http://www.capitol.state.tx.us/BillLookup/History.aspx?LegSess= 82R&Bill=SB 14 (last visited Nov. 9, 2016). The meeting of the Calendars Committee was scheduled to begin at 9 p.m., but did not come to order until 10:07 p.m. DEF0001 (H.J. of Tex., 82d Leg., R.S. 952 (Mar. 23, 2011) (ROA.70959)); *see also* Tex. Leg., House Calendars Committee, Notice of Mar. 21, 2011 Formal Meeting, 82d Leg., R.S., http://www.legis.state.tx.us/tlodocs/82R/schedules/pdf/C0502011032121001.PDF. The Calendars Committee reported out S.B. 14 for consideration by the whole House

on March 23, 2011. *See* Tex. Leg., House Calendars Committee, Minutes, 82d Leg., R.S. (March 21, 2011), http://www.legis.state.tx.us/tlodocs/82R/minutes/pdf/C0502011032121001.PDF. Contrary to the representation made by Plaintiffs' expert, Dr. Davidson (*see* Davidson Corrected Rpt. ¶ 58 (ROA.102495-96)), no amendments were considered or adopted during this meeting, which lasted less than three minutes (*see* Tex. Leg., House Calendars Committee, Minutes, 82d Leg., R.S. (March 21, 2011), http://www.legis.state.tx.us/tlodocs/82R/minutes/pdf/C0502011032121001.PDF).

180. The whole House debated S.B. 14 on March 23, 2011. *See* Texas Legislature Online, History of S.B. 14, http://www.capitol.state.tx.us/BillLookup/History.aspx?LegSess=82R&Bill=SB 14 (last visited Nov. 9, 2016). In an attempt to once again block consideration of voter ID, House Democrats raised a half-dozen points of order objecting to consideration of S.B. 14. *See* H.J. of Tex., 82d Leg., R.S. 951-58 (Mar. 23, 2011) (ROA.70958-65). Each was overruled. *See id.*

181. Democratic Representative Anchia testified that S.B. 14 opponents were "given ample opportunity" to express their concerns and "engage in debate about SB14 during its consideration." Trial Tr. 363:18-21 (Sept. 5, 2014) (Anchia) (ROA.99980).

182. During the House's consideration of S.B. 14, Democratic Representative Anchia inquired as to why "the identification requirements of SB 14 are more restrictive than SB 362 from last session?" DEF0001 (H.J. of Tex., 82d Leg., R.S. 918 (Mar. 23, 2011) (ROA.70855)). The primary sponsor of S.B. 14 in the House responded that:

> We've had two additional years to see that photo ID is working in other states. We've also had two additional years to hear from the public on their concerns of the integrity of the ballot box. Only a true photo ID bill

can deter and detect fraud at the polls and can protect the public's confidence in the election.

*Id.* (ROA.70855).

183. As Representative Smith later recounted:

> I think everybody understands why non-photo ID was taken out of Senate Bill 362 [in 2009] because it was just a demand by our constituents that we require a photo ID in order for people to vote and they were very cynical about the notion of allowing non-photo IDs . . .. [M]y [primary] opponent used [my support for non-photo ID] against me in the most recent election politically without mentioning that he too had voted for that same version of the bill. So this notion of letting people vote with their library cards feeds the perception that you're in favor of liberal laws allowing people to vote even under circumstances where they were not legally entitled to do so.

Trial Tr. 339:10-22 (Sept. 10, 2014) (Smith) (ROA.100333).

184. During the House's consideration of S.B. 14, Democratic Representative Anchia criticized the provision of the Senate version of S.B. 14 that allowed the indigent to vote without a photo ID by swearing an affidavit to their indigency:

> Representative Anchia: I fear that your bill is worse than current law and really undermines the argument that this is about ballot integrity because suddenly you have a mechanism where people can come in and never show anything and not be on the list and the ballot board shall accept their . . . ballot. It's not even a "may" anymore. You changed it to "shall."
>
> Representative Harless: They have six days to prove who they are, and the ballot board at that point --
>
> Representative Anchia: But they don't have to prove who they are. They just say they have a religious objection or are indigent. They never really prove who they are do they?

DEF0001 (Debate on Tex. S.B. 14 on the Floor of the House, 82d Leg., R.S. vol. I at 57:2-14 (March 23, 2011) (ROA.71136)). Accepting Democratic Representative Anchia's criticism of the indigency-affidavit procedure, this provision was subsequently excised:

> Representative Anchia: [C]ould you discuss what your amendment does?
>
> Representative Harper-Brown: Yes. Representative Anchia, this is the section of the Code or the section of the bill that you discussed earlier that talks about how someone could actually go in and vote without showing an ID at all if they sign an affidavit saying that they have a problem due to the religious objection or the indigence. And so, it takes those two provisions out and just says you can vote provisionally and then you have the six days to bring the photo ID in to prove that you—that you have—that you can vote.
>
> Representative Anchia: Okay. So it just removes indigence exception and religious objection?
>
> Representative Harper-Brown: That's it.
>
> Representative Anchia: Those are the exceptions right now. And what you have to do after six days is come in and cure only with a photo ID?
>
> ***
>
> Representative Harper-Brown: Right. Right. Thank you.
>
> ***
>
> Speaker: . . . By vote of 107 ayes 40 nays 2 present not voting, the amendment is passed.

*Id.* 103:13-105:1 (ROA.71313-15). Representative Anchia, and seven other Democrats, voted for this amendment to eliminate an indigency-affidavit procedure. *See* H.J. of Tex., 82d Leg., R.S. 983 (March 23, 2011) (ROA.70990).[12]

---

[12]    Senator Wendy Davis was thus mistaken when she testified that the indigency provision "was stripped out by a Republic[an] House Member . . . on a Republican to Democratic vote." Trial Tr. 29:21-30:1 (Sept. 5, 2014) (Davis) (ROA.99646-47).

185. The House excised the provision of the Senate version of S.B. 14 that would have exempted those over 70 from the ID requirement, under the rationale that the exemption for the disabled would cover all people, of any age, who were physically unable to obtain an ID. *See* H.J. of Tex., 82d Leg., R.S. 965 (March 23, 2011) (ROA.70972).

186. The Democratic legislators in the House offered amendments related to S.B. 14's implementation that were similar to those offered in the Senate. *See* Davidson Corrected Rpt. ¶ 59 (ROA.102496); *supra*, FOF ¶¶ 169-170; *see also* DEF0001 (Debate on Tex. S.B. 14 on the Floor of the House, 82d Leg., R.S., Vol. II at 34:4-11 (March 21, 2011) (ROA.70895). Each was rejected. Davidson Corrected Rpt. ¶ 59 (ROA.102496).

187. During consideration of S.B. 14, House Democrats complained that Republicans had failed to address mail-in ballot fraud. *See, e.g.*, H.J. of Tex., 82d Leg., R.S. 914 (March 21, 2011) (ROA.70851). In doing so, they ignored that, prior to attempting to address in-person fraud for the first time in 2005, the Texas Legislature did, in fact, address mail-in ballot fraud in 2003. *See supra*, FOF ¶ 106. They also ignored H.B. 2449, a bill introduced by Republican Representative Jose Aliseda before consideration of S.B. 14 and later enacted in the 2011 session, which enhanced penalties for certain mail-in ballot fraud and restricted pubic access to mail-in ballot applications in order to help prevent mail-in ballot fraud. *See* Act of May 24, 2011, 82d Leg., R.S., ch. 1159 Tex. Gen. Laws 3008; H.J. of Tex., 82d Leg., R.S. 780 (March 14, 2011); *see also* DEF0001 (Debate on Tex. S.B. 14 on the Floor of the House, 82d Leg., R.S., vol. III at 117:23-25 (March 23, 2011) (ROA.71571) (Representative Aliseda noting his legislation).

188. S.B. 14 and H.B. 2449 were not the only laws enacted by the Texas Legislature in 2011 aimed at modernizing and strengthening Texas's electoral system. H.B.

70

2194 addressed voter registration fraud by prohibiting performance-based compensation for registering voters. H.B. 174 addressed inflated voter rolls by revising procedures for verifying persons who are deceased or not citizens of the United States for purposes of establishing a person's ineligibility to vote or canceling a person's voter registration. And H.B. 1046 also addressed inflated voter rolls by requiring the Secretary of State to obtain quarterly from the Social Security Administration available information specified by the Secretary of State relating to deceased residents of Texas and compare the information received to the statewide computerized voter registration list. Act of May 25, 2011, 82d Leg., R.S., ch. 1002 Tex. Gen. Laws 2541; Act of May 24, 2011, 82d Leg., R.S., ch. 683, 2011 Tex. Gen. Laws 1644; Act of May 25, 2011, 82d Leg., R.S., ch. 953, 2011 Tex. Gen. Laws 2405.

189. During consideration of S.B. 14, House Democrats complained about the lack of evidence of voter fraud. *See, e.g.*, DEF0001 (Debate on Tex. S.B. 14 on the Floor of the House, 82d Leg., R.S., vol. II at 18:13-16 (Mar. 21, 2011) (ROA.70879). In doing so, House Democrats ignored the Supreme Court's admonition that a State is fully justified in acting to prevent fraud even though there may be "*no evidence of any such fraud actually occurring in [the state] at any time in its history.*" *Crawford*, 553 U.S. at 194 (emphasis added).

190. House Democrats also ignored evidence before the Legislature that registration and in-person voter fraud not only exist, but that they are hard to detect. *See, e.g.*, DEF0001 (Debate on S.B. 14 in the Senate Committee of the Whole, 82d Leg., R.S., 26:6-27:4, 507:23-508:22 (Jan. 25, 2011)) (ROA.68939, 69059); *id.* (Tex. Leg., House Select Committee on Voter Identification & Voter Fraud Hearing on S.B. 14, 82d Leg., R.S., vol. I at 20:5-13, 22:7-10, 22:22-23:8, 26:13-15 (March 1, 2011) (ROA.70349, 70351-52, 70355)); *id.* (Debate on Tex. S.B. 14 on the Floor of the House, 82d Leg., R.S., vol. II at 23:19-24:1 (March 23, 2011) (ROA.71233-34)); *id.* (Debate on

71

S.B. 362 in the Senate Committee of the Whole, 81st Leg., R.S., 211:10-214:10, 281:10-13 (May 10, 2009)) (ROA.72389-92, 72459).

191. The Legislature heard evidence of fraudulent ballots cast in the name of deceased voters.  The House Elections Committee had advised the whole House of very troubling testimony from Paul Bettencourt, Harris County's Tax Assessor and acting Voter Registrar:

> Mr. Bettencourt . . . had an interesting case citing 24 examples of people who had passed away, but had voted after the dates of their deaths. This case involved a state representative who had a church member fill out 175 fraudulent registration cards with the intent of voter impersonation. One person used had died in 1983 and were still voting 13 years later. All of these registration cards were turned into to former D.A. Johnny Holmes who said they were obviously impersonating these voters, but was difficult to determine who was doing the impersonating. Mr. Bettencourt believed if Harris County had not been able to successfully detect this scam the only way to catch it would have been through some form of photo ID. He felt they were lucky to catch these cases before the election.

House Elections Committee, Interim Report to the 81st Texas Legislature at 40 (Jan. 2009), http://www.lrl.state.tx.us/scanned/interim/80/EL25he.pdf.

192. During the House's consideration of S.B. 14, House Democrats complained about the possible effects of S.B. 14 on minorities. *See, e.g.*, DEF0001 (Debate on Tex. S.B. 14 on the Floor of the House, 82d Leg., R.S., vol. II at 26:16-22 (March 21, 2011) (ROA.70887)). In doing so, House Democrats ignored the studies showing that photo-ID requirements do not negatively affect the ability of minorities to vote. *See supra,* FOF ¶¶ 36-37; *infra*, FOF ¶¶ 207-215.

193. On March 24, 2011, the House passed its modified version of S.B. 14 by a vote of 101 to 48. H.J. of Tex., 82d Leg., R.S. 1082 (March 24, 2011) (ROA.71644)).

### 3. Both the House and Senate pass the conference report of S.B. 14.

194. Because the House and Senate versions of S.B. 14 differed, a conference committee was convened where changes were made to reconcile the differences. *See* DEF0001 (Tex. Leg., S.B. 14 Conference Committee Report, 82d Leg., R.S. (May 4, 2011) (ROA.71744)).

195. The most notable change was the inclusion of the provision providing for free EICs that satisfied the photo-voter ID requirement. After the Senate's indigency provision was excised at Democratic Representative Anchia's suggestion and with Democratic legislators' votes, the conferees added a provision creating EICs, which would be free of charge. *See id.* (Conference Committee Report, Section-by-Section Analysis at 5, 8 (ROA.71748, 71751)); Trial Tr. 98:14-18 (Sept. 11, 2014) (Williams) (ROA.101283) ("Q: [T]here is no exception in SB 14 for people who are indigent in Texas, correct? A: [T]he Election Identification Certificate is free of charge. That is the exception.").

196. On May 9, 2011, in the final month of the legislative session, the Senate adopted the Conference Report of S.B. 14 by a vote of 19 to 12. S.J. of Tex., 82d Leg., R.S. 2084 (May 9, 2011) (ROA.71816).

197. All but one of the Senators who voted for the final version of S.B. 14 had previously shown a willingness—by voting for S.B. 362 in 2009—to compromise and allow the use of non-photo IDs to verify a voter's identity. *Compare id.*, *with* S.J. of Tex., 81st Leg., R.S. 589 (Mar. 18, 2009). The remaining senator, Senator Birdwell, was not a senator in 2009.

198. On May 16, 2011, in the final month of the legislative session, the House adopted the Conference Report of S.B. 14 by a vote of 98 to 46. H.J. of Tex., 82d Leg., R.S. 4054-55 (May 16, 2011) (ROA.71968-69).

199. Of the 98 representatives who voted for S.B. 14, 55 had previously shown a willingness—by voting for H.B. 1706 in 2005, H.B. 218 in 2007, or both—to compromise and allow the use of non-photo IDs to verify a voter's identity. *Compare id. with* H.J. of Tex., 79th Leg., R.S. 2554-55 (May 3, 2005), *and* H.J. of Tex., 80th Leg., R.S. 2246 (Apr. 24, 2007). All but five of the remaining representatives did not have the opportunity to record a vote on earlier voter ID legislation. *See id.* The five who did— Representatives Eiland, Hopson, Peña, Pickett, and Ritter—voted against voter-ID bills in 2005 and 2007, but then voted for S.B. 14. *See supra*, FOF ¶¶ 88, 92. Notably, all five of these representatives were Democrats when they voted against the more permissive voter-ID bills in 2005 and 2007. *See id.*

200. Overall, support for S.B. 14 in the Texas Legislature was divided among political—not racial—lines. Republicans in the Senate uniformly supported S.B. 14; Democrats uniformly opposed it. S.J. of Tex., 82d Leg., R.S. 2084 (May 9, 2011) (ROA.71816). S.B. 14 was supported by all Republican Members of the Texas House, including Hispanic and African-American Republicans. *Id.* (reporting that Representatives Aaron Peña, Jose Aliseda, John Garza, Dee Margo, James White, and Stefani Carter voted for S.B. 14); *see also* Trial Tr. 291: 20-293:6 (Sept. 2, 2014) (Golando) (ROA.98923-25) ("Q: Did any members of [the Mexican American Legislative Caucus] vote for S.B. 14? A: Yes."). Democrats overwhelmingly opposed the bill, although two Democratic House Members voted for the bill—Representatives Craig Eiland and Joe Pickett. Confirming that support for S.B. 14 was divided among political and not racial lines, three Republicans who voted in favor of S.B. 14, including one Hispanic

representative, only began to support voter ID after they switched parties. *See supra*, FOF ¶ 92.

201. S.B. 14 was signed into law by the Governor on May 27, 2011, at the end of the 2011 legislative session. H.J. of Tex., 82d Leg., R.S. 4526 (May 27, 2011). Although S.B. 14 became law in 2011, it was not enforced until 2013, when the Supreme Court's decision in *Shelby County v. Holder* effectively eliminated the requirement that Texas preclear its election laws with the federal government. *See* Trial Tr. 328:17-329:10 (Sept. 10, 2011) (Ingram) (ROA.101090-91).

## V.   THE TEXAS LEGISLATURE ENACTED S.B. 14 FOR THE EXPRESS PURPOSE OF COMBATING VOTER FRAUD AND PRESERVING PUBLIC CONFIDENCE IN ELECTIONS.

202. The legislative record establishes that S.B. 14 was enacted for the purposes of detecting and deterring voter fraud, as well as preserving public confidence in the electoral system.

### A.   The Legislative Record Reveals that S.B. 14 Was Enacted to Combat In-person Voter Fraud and Preserve Confidence in the Electoral System, Not to Discriminate Against Minorities.

203. There is not a single comment in the legislative record that could be interpreted as suggesting a discriminatory purpose.

204. Rather, the legislative record establishes that S.B. 14 was enacted for the purposes of detecting and deterring voter fraud, as well as preserving public confidence in the electoral system.

205. Voter ID bills were passed by at least one of the Houses of the Texas Legislature in each regular legislative session from 2005 to 2011, and the rationale for these bills was consistent: to deter voter fraud and safeguard voter confidence. *See,*

*e.g.*, DEF0002 (Tex. Leg., House Elections Committee Hearing on H.B. 1706, 79th Leg., at 107:8-12 (March 17, 2005) (ROA.77390)) ("Chairwoman Denny: [I]t is so important that we safeguard the integrity of the vote and that—that people are assured that their vote will be counted and that no one usurped their authority to cast their own vote."); DEF0002 (Debate on Tex. H.B. 218 on the Floor of the House, 80th Leg., R.S., at 53:11-18, 81:11-16 (April 23, 2007) (ROA.76507, 76535)) ("Representative Brown: The integrity of the process. As people are more and more disillusioned with the integrity of the process, we have less participation. And in a number of states, as they have tightened up on their requirements to be able to vote, they have had greater participation. And that's what we hope for. . . . The intent of our bill is to increase the integrity of the voting process and thereby to increase confidence that every persons' vote will count. One man, one vote is what we've stood behind for a long time and we need to make it effective."); DEF0001 (Debate on S.B. 362 in the Senate Committee of the Whole, 81st Leg., R.S., 52:19-53:3 (May 10, 2009)) (Senator Fraser explaining that S.B. 362 "goes a long ways" towards preventing fraud and increasing voter confidence); DEF0001 (H.J. of Tex., 82nd Leg., R.S., 918 (Mar. 21, 2011) (ROA.70855)) (Representative Harless: "Only a true photo ID bill can deter and detect fraud at the polls and can protect the public's confidence in the election.").

206. This was recognized by Democrats at the time:

> Representative Giddings: To Representative Brown and my good friend, Leo Berman, and my committee members, Mr. Bohac and others who have worked on this bill, let me say from the very beginning that I know that your intentions here are good and honorable, and I want to say that again.
>
> I truly believe that your intentions are good and honorable, and I believe it is a sincere attempt on your part to stop voter fraud.

DEF0002 (Debate on Tex. H.B. 218 on the Floor of the House, 80th Leg., R.S., 3:5-13 (April 24, 2007) (ROA.76853).

### B. The Texas Legislature Concluded that S.B. 14 Would Not Have a Disparate Impact on Minorities.

207. S.B. 14 was enacted on the expressed belief that it would not have a disparate impact on minorities and was not intended to disenfranchise any voter:

> Senator Ellis: Are you confident, Senator, that your bill would not have a disparate impact . . . on racial ethnic minorities?
>
> Senator Fraser: I am –
>
> Senator Ellis: Are you confident?
>
> Senator Fraser: – absolutely sure. I would not have filed the bill if I had thought it—I want to make sure that every person in the state has a right to vote. . . . [A]nd I do not believe that in any way we're impacting that and that—that—you know, I want to make sure that the groups you're talking about, you know women, minority, elderly, that they all have the right to vote and I believe my bill does that.
>
> Senator Ellis: Okay. And I know that's your intent.
>
> Senator Fraser: Yes.
>
> Senator Ellis: But you're confident that it will have no impact?
>
> Senator Fraser: I'm very confident.

DEF0001 (Debate on S.B. 14 in the Senate Committee of the Whole, 82d Leg., R.S., 200:19-201:14 (Jan. 25, 2011) (ROA.68982-83)).

> Representative Harless: We've had two additional years to see that photo ID is working in other states. . . .
>
> Representative Anchia: Is it . . . it possible that Latinos and African Americans in Texas will be put in a worse position in terms of electoral power as a result of Senate Bill 14?
>
> Representative Harless: I believe with all my heart this bill will increase turnout of all voters in the State of Texas. . . . In the two states that have

passed this type of voter—similar bills that—to our bill, they have
showed increased in election for the minorities And I think that we will
see the same results in Texas. This will increase turnout of all voters
because of the restored confidence that their vote counts

DEF0001 (Debate on Tex. S.B. 14 on the Floor of the House, 82d Leg., R.S., vol. II,

36:5-37:4 (Mar. 21, 2011) (ROA.70897-98)); *see also, e.g.*, *supra*, FOF ¶¶ 163; Trial Tr.

24:5-10 (Sept. 10, 2014) (Dewhurst) (ROA.100786) ("I categorically oppose that state-

ment . . . . All the empirical data that I've seen has shown that there is no—no exam-

ple that I'm aware of where in any jurisdiction with a photo voter I.D. requirement

that individuals have not been able to obtain access to acceptable documents.");

McCoy Dep. 76:12-17 (ROA.61557) ("[W]e did not have the resources to do an analysis

of Texas voters. What we did have, as we entered the 2009 session, were three studies

that were done about Indiana and Georgia that showed there was no impact after

those photo ID [laws were] implemented."). One legislator's assumption that minority

voters were less likely to have drivers' licenses (*see* Davidson Report ¶ 34

(ROA.102008)), even if valid, would have said little in 2011 about the ultimate effect

that S.B. 14 would have given (1) the other IDs that satisfy S.B. 14, (2) the provision

of free EICs, and (3) the common-sense notion that requiring a photo ID to vote would

encourage those without an S.B. 14-compliant ID to obtain one. *See* Dewhurst Dep.

192:13-193:2 (ROA.61043-44). This is especially true given the evidence before the

Legislature of the limited impact of similar laws. *See supra*, FOF ¶¶ 36-37; *infra*, FOF

¶¶ 209-210.

208. In reaching the conclusion that S.B. 14 would not have a disparate impact on minorities, the Legislature relied on academic studies and the experiences of other States with photo-voter ID laws.

209. For example, the Texas Legislature considered real-world empirical studies—as opposed to statistical estimates—showing that requiring voters to prove their identity with a photo ID did not negatively affect the ability of those entitled to vote to do so. *See, e.g.*, DEF0001 (Tex. Leg., Senate Committee of the Whole, 81st Leg., R.S., Exhibits 7, 9, and 10 (Mar. 11, 2009) (ROA.72286)); Fraser Dep. 72:9-21, 74:13-22 (ROA.61180-81).

210. The Legislature learned from Plaintiff's *own expert*, Dr. Ansolabehere, that "exclusions from voting" resulting from voter ID laws "are exceptionally rare." DEF0001 (Tex. Leg., Senate Committee of the Whole, 81st Leg., R.S., Exhibit 9 at 124 (Mar. 11, 2009) (ROA.73420) (citing Stephen Ansolabehere, Access Versus Integrity in Voter Identification Requirements, Working Paper No. 58 in the Caltech/MIT Voting Technology Project (Feb. 2007)).

211. The Texas Legislature also learned that similar voter ID laws did not result in disenfranchisement as the opponents of those laws—just like opponents of S.B. 14—predicted. *See, e.g.*, DEF0001 (Tex. Leg., Senate Committee of the Whole, 81st Leg., R.S., Exhibits 23, 25, and 28 (Mar. 11, 2009) (ROA.72551, 72613, 72691)). Georgia's Deputy Secretary of State testified:

> [O]pponents of photo identification requirements [in Georgia] have long argued—quite vocally and emphatically—that these laws would lead to the disenfranchisement of, in Georgia's case, hundreds-of-thousands of voters.
>
> But, when the State of Georgia finally had its day in court and evidence was proffered and considered, it became clear that the emotional and

hyperbolic arguments used to argue against the state's photo identifica-
tion law was simply empty rhetoric.

DEF0001 (Tex. Leg., Senate Committee of the Whole, 81st Leg., R.S., Exhibit 25 at 3
(Mar. 11, 2009) (ROA.73681)) (written testimony of Robert A. Simms, Georgia Deputy
Secretary of State).

212. Among this other evidence, the House Committee on Elections also heard
testimony from the Elections Division Director for the Secretary of State of Georgia
about the 16 elections that Georgia had held since implementing its voter ID law in
August 2007. DEF0001 (Tex. Leg., House Committee on Elections, 81st Leg., R.S.,
vol. II, at 364-67 (Apr. 6, 2009) (ROA.74975-78)). He testified that his office has never
received a single complaint that anyone was disenfranchised or turned away from the
polls because they lacked photo ID. *Id* at 364:1-365:8 (ROA.74975-76). He also testi-
fied that, despite four year of federal lawsuits, no single individual had alleged that
he was substantially burdened by Georgia's voter ID law. *Id.* at 367:21-24
(ROA.74978).[13]

213. The Legislature heard testimony from a representative of the Brennan Cen-
ter for Justice, an opponent of voter ID, indicating that there was no evidence that
voter ID requirements adversely affect voter turnout for minorities, indigent, or el-
derly voters. *Id.*, vol. I, at 88 (ROA.74635).

214. The Indiana Secretary of State testified that "[i]n the five years and eight
statewide primary general elections" that he's "been involved with" since the passage

---

[13] ████████████████████████████████████████████████

of Indiana's voter ID law, "there's been scant evidence of disenfranchisement or discrimination in Indiana." DEF0001 (Debate on S.B. 14 in the Senate Committee of the Whole, 82d Leg., R.S., 272:9-12 (Jan. 25, 2011) (ROA.69000)).

215. The Texas Legislature also received evidence that passing a voter identification law could increase participation in the electoral process by enhancing public confidence in elections. Trial Tr. 397:25-398:8 (Sept. 10, 2014) (Fraser) (ROA.101159-60); DEF0001 (Tex. Leg., Senate Committee of the Whole, 81st Leg., R.S., Exhibit 7 at 2 (Mar. 11, 2009) (ROA.73372) (concluding that it is "plausible that photo identification requirements increase turnout")).

216. As it turned out, the supporters of S.B. 14 were right. In the elections that followed the enforcement of S.B. 14, there was no discernable impact on political participation. *See supra*, FOF ¶¶ 35-51.

217. It is true that this Court and the Fifth Circuit concluded that S.B. 14 had a discriminatory *effect* on the right to vote on account of race, under Section 2 of the Voting Rights Act.[14] This conclusion, however, was based on statistical studies done *after* the enactment of S.B. 14, estimating racial disparities in possession of S.B. 14-compliant identification and the ability to obtain such identification. The Texas Legislature, however, was not presented evidence of this disparity before it passed S.B. 14. It therefore has no bearing on whether the Texas Legislature had a discriminatory

---

[14]    Defendants continue to preserve the arguments, for appellate and certiorari review, made before this Court, the Fifth Circuit, and the Supreme Court that S.B. 14 does not have a discriminatory effect under Section 2 of the Voting Rights Act. A petition for a writ of certiorari to review the Fifth Circuit's decision on the discriminatory-effect issue, among others, is currently pending at the Supreme Court. *See* Pet. for Writ of Cert., *Abbott v. Veasey*, No. 16-393 (U.S. Sept. 23, 2016).

purpose in enacting S.B. 14, particularly in light of the Legislature's belief to the contrary based on empirical studies.

218. In fact, the Texas Legislature received expert testimony that warned against relying upon the very same database-matching technique employed by Plaintiffs' experts in predicting racial disparities regarding preexisting ID possession. Dr. Toby Moore, the former geographer of the voting section of the Civil Rights Division of the Department of Justice and a project manager for the Carter-Baker Commission on Election Reform, explained:

> There have been kind of three approaches to trying to identify those without IDs and to determine their demographics. The first approach has been to try to match between data bases, between voter registration databases and Department of Motor Vehicle databases, for example. That has generally not proven to be successful. Those databases are very difficult to match between. There is some interesting information to come out of those attempts. But in general, *I would encourage you to avoid any kind of database matching to arrive at your information.*

DEF0001 (Tex. Leg., Senate Committee of the Whole, 81st Leg., R.S., at 338:17-339:2 (Mar. 10, 2009) (ROA.72516-17) (emphasis added)).[15] Even if that technique was accepted in subsequent judicial proceedings, the Legislature's reticence to rely upon any

---

[15]   It is true that this witness also criticized studies of turnout in Georgia and Indiana following the adoption of photo ID requirements in those states. *See* DEF0001 (Tex. Leg., Senate Committee of the Whole, 81st Leg., R.S., at 340:7-18 (Mar. 10, 2009) (ROA.72516-17)). But he did so on the basis that the candidacy of President Obama in 2008 skewed those results. *Id.* (ROA.72518). This criticism, however, does not apply to the University of Missouri study, for example, because it evaluated county-level turnout data in Indiana in 2006, and was published *before* the 2008 election. *See* DEF0024 (Jeffrey Milyo, The Effects of Photographic Identification of Voter Turnout in Indiana: A County-Level Analysis, Institute of Public Policy Publication Report 10-2007 (Nov. 2007) (ROA.78267)); *see also* DEF0001 (Tex. Leg., Senate Committee of the Whole, 81st Leg., R.S., at 259:16-22 (Mar. 10, 2009) (ROA.72437) (Senator Williams, discussing Milyo's study: "Now what's interesting about this report to me as I reviewed it is, there's been a lot that's been said on this floor about the effect of President Obamas election on the turnout . . . . But this report

such technique when empirical studies showed that voter ID laws did not produce a disparate impact on minorities does not show any discriminatory purpose.

219. Moreover, even if the Texas Legislature would have had access to Plaintiffs' matching studies, those studies would have shown that more non-Hispanic whites lacked S.B. 14-eligible IDs than African-Americans and Hispanics combined. For example, Plaintiffs' expert, Dr. Barreto, testified that the number of white registered voters without acceptable forms of ID under S.B. 14 was 62 percent higher than that of African-American registered voters; for eligible voters, that number was more than *100 percent higher*. Trial Tr. 59:21-60:20 (Sept 4, 2014) (Barreto) (ROA.99291-92).



220. The studies would also have shown that among those who voted in recent elections, S.B. 14's photo-ID requirement would impact more non-Hispanic white voters than African-American and Hispanic voters combined. Dr. Ansolabehere's analysis showed that of those who voted in 2010, 39,940 non-Hispanic white voters lacked a qualifying ID, compared to 13,324 African-American voters and 12,381 Hispanic voters. *See* Declaration of Stephen D. Ansolabehere 98 tbl. IV.4.B (Sept. 16, 2014) (ROA.43324). And of those who voted in 2012, 58,502 non-Hispanic white voters

---

is actually—the time period, as I understand it, includes two election cycles. In neither one of those, Mr. Obama wasn't running for president during either one of those election cycles, so this report wouldn't be influenced by that."). It also does not undermine the concession of the Brennan Center, an opponent of voter ID. *See* DEF0001 (Tex. Leg., House Committee on Elections, 81st Leg., R.S., vol. 1, at 88 (Apr. 6, 2009) (ROA.74635)).

lacked a qualifying ID, compared to 31,218 African-American voters and 23,881 His-panic voters. *Id.* That disparity existed even after controlling for voters eligible for an exemption from the photo-ID requirement. Dr. Ansolabehere concluded that in 2010, 35,047 non-Hispanic white voters lacked a photo ID and did not qualify for an exemp-tion—more than the combined total of similarly situated African-American voters (10,733) and Hispanic voters (10,259), and more than three times the total of either group alone. *See id.* Similarly, Dr. Ansolabehere determined that in 2012, 49,428 non-Hispanic white voters did not have a photo ID or qualify for an exemption, compared to 24,871 African-American voters and 19,932 Hispanic voters. *See id.*

## C.    Promoting Confidence in Elections Is a Genuine Concern.

221. As the Supreme Court stated in 2006, in the midst of Texas's effort to enact a voter-ID law:

> Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy. *Voter fraud drives honest citizens out of the democratic process and breeds distrust of our govern-ment.* Voters who fear their legitimate votes will be outweighed by fraud-ulent ones will feel disenfranchised. "[T]he right of suffrage can be de-nied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise."

*Purcell*, 549 U.S. at 4 (emphasis added) (quoting *Reynolds v. Sims*, 377 U.S. 533, 555 (1964)); *see* DEF0002 (Debate on H.B. 218 on the Floor of the House, 80th Leg., R.S., vol. I, at 8:20-9:5 (April 23, 2007) (ROA.76462-63) (quoting *Purcell*)).

222. This concern was echoed by the Carter-Ford Commission, which observed that the 2000 election "shook American faith in the legitimacy of the democratic pro-cess." Carter-Ford Commission Report at 17.

223. The same concern was repeated by the Carter-Baker Commission, which con-cluded that "[t]he electoral system *cannot inspire public confidence* if no safeguards

exist to deter or detect fraud or to *confirm the identity of voters*." Carter-Baker Commission Report at 18 (ROA.73515) (emphasis added).

224. Proponents of voter-ID legislation in Texas were well aware of these concerns, which they shared during consideration of S.B. 14. *See* DEF0001 (Debate on S.B. 14 in the Senate Committee of the Whole, 82d Leg., R.S., 26:7-27:1 (Jan. 25, 2011) (ROA.68939) (S.B. 14's sponsor, Senator Fraser, relying on the Carter-Baker Commission's conclusion in his opening statement)).

225. This concern was even echoed by certain plaintiffs in this case, who testified that a photo-ID requirement gives them more confidence in the electoral process. Trial Tr. 180:6-18 (Sept. 9, 2014) (Espinoza) (ROA.100533); *Id.* at 194:13-17 (Clark) (ROA.100547).

226. Texas voters have expressed their concern with the integrity of the electoral system to their elected representatives, and there is evidence that election fraud in Texas has diminished voter confidence to the point that some individuals have been discouraged from voting at all. Trial Tr. 15:13-24 (Sept. 10, 2014) (Dewhurst) (ROA.100777) ("When we first looked at passing voter I.D., the reason I did that was because I had been concerned for many, many years about low voter turnout in Texas. And I have heard consistently over the last 10 to 12 years that—that many Texans either hesitate to vote or don't vote because they don't think their vote will count because they're concerned about voter fraud.").

227. Legislators who had heard concerns about the integrity of elections understood that their constituents wanted the Legislature to take measures to combat corruption and voter fraud. DEF0001 (Debate on Tex. S.B. 14 on the Floor of the House, 82d Leg., R.S., vol. III, at 116-18 (Mar. 23, 2011) (ROA.71570-72)). Statements on the

floor of the House of Representatives indicate that supporters of the bill were moti-
vated by a desire to combat corruption in the electoral system. *Id.* at 112-16
(ROA.71566-70).

228. Moreover, the Legislature received evidence that "the widespread popularity
of voter [identification requirements] suggests [that] the general public is concerned
about voter dilution for ineligible voters." DEF0001 (Tex. Leg., Senate Committee of
the Whole, 81st Leg., R.S., 786:23-25 (Mar. 10, 2009) (ROA.72975)); *id.* Exhibit 7 (Mi-
lyo Report at 2 (ROA.73372) (citing Stephen Ansolabehere, Access Versus Integrity
in Voter Identification Requirements, Working Paper No. 58 in the Caltech/MIT Vot-
ing Technology Project (Feb. 2007)).

229. As Plaintiffs' own expert, Dr. Minnite, explained, "we want to believe that
our elections truly reflect the will of the voter and that are free of corruption. So, it's
a very, very important issue that there not be any voter fraud." Trial Tr. 137:14-17
(Sept. 9, 2014) (Minnite) (ROA.100131).

230. The Legislature received evidence that passing a voter identification law
could increase participation in the electoral process by enhancing public confidence
in elections. Trial Tr. 397:25-398:8 (Sept. 10, 2014) (Fraser) (ROA.101159-60). Among
other things, the legislature was informed that,

> [S]cholars of American politics generally agree that voter turnout is de-
> termined largely by idiosyncratic factors, such as an individual's intrin-
> sic value of voting (i.e., does he feel a duty to vote) as opposed to political
> institutions. For this reason, factors that influence trust and confidence
> in the integrity of the electoral process are generally thought to be im-
> portant determinants of an individual's decision to vote. For all these
> reasons, it is theoretically plausible that photo identification require-
> ments increase turnout.

DEF0001 (Tex. Leg., Senate Committee of the Whole (81st Leg.) (Mar. 11, 2009), Exhibit 7, at 2 (ROA.73372) (citations omitted)).

### D.    In-person Voter Fraud Exists and Is a Genuine Concern.

231. In 2001, the Carter-Ford Commission recognized that voters should be required to present government-issued identification in order to protect the sanctity of the franchise. *See supra,* FOF ¶¶ 55-56.

232. In 2002, the HAVA demonstrated bipartisan recognition in Congress that safeguards to assure that the person casting a ballot is reliably identified as the individual registered are essential to any fair and honest election. *See supra,* FOF ¶¶ 57-61.

233. In 2005, the expert Carter-Baker Commission concluded that, although "[t]here is no evidence of extensive fraud in U.S. elections or of multiple voting, but *both occur, and it could affect the outcome of a close election.*" Carter-Baker Commission Report at 18 (ROA.73515) (emphasis added); *cf.* Trial Tr. 216:18-217:5 (Sept. 3, 2014) (Wood) (ROA.99148-49) (testimony of Plaintiffs' witness that he once represented a candidate in Llano county who won an election on a coin flip, and that there were documented cases of ineligible voters casting ballots in that election).

234. In 2007, the Department of Justice announced that "whatever its exact incidence, even the prospect of voter fraud may undermine the integrity of the voting process." DEF036 (ROA.78481) (Brief of United States as Amicus Curiae Supporting Respondents at 30, *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181 (2008) (Nos. 07-21, 07-25)).

235. In 2008, the Supreme Court accepted the Carter-Baker's conclusion that in-person voter fraud is genuine concern. *See Crawford*, 553 U.S. at 195-97. The Texas

Legislature did the same. In fact, Texas's experience with voter fraud was cited to the Supreme Court in justifying Indiana's voter ID law. *See* DEF0001 (Brief of Texas, et al., as Amicus Curiae Supporting Respondents at 3, *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181 (2008) (Nos. 07-21, 07-25) (ROA.74228)).

236. Between 2005 and 2011, numerous state legislatures across the country demonstrated their concern about in-person voter fraud by adopting voter ID laws. *See supra*, FOF ¶¶ 71-78.

237. In addition, the record demonstrates that voter fraud is a well-recognized problem in Texas and the rest of the country. S.B. 14 was designed to help detect unlawful conduct at polling places, deter those who attempt to unlawfully interfere with the democratic process, and prevent election fraud in the future. Trial Tr. 17:14-18:10 (Sept. 10, 2014) (Dewhurst) (ROA.100779-80); *see also* DEF0001 (Tex. Leg., Senate Committee of the Whole, 81st Leg., R.S., Exhibit 14 at 3 (March 10, 2009) (ROA.73454) (written testimony by former election official Hans A. von Spakovsky that "[t]here are enough incidents of voter fraud to make it very clear that we must take the steps necessary to make it hard to commit. Requiring voter ID is just one such common sense step")).

### 1.   Evidence of voter fraud exists.

238. Nevertheless, there is ample evidence in the record in this case that voter fraud has been documented in Texas, and outside of Texas. Multiple instances of election fraud have been referred to the Texas Attorney General and the United State Attorney General for investigation, and multiple instances of election fraud, including cases involving in-person voter fraud, have been successfully prosecuted. *See, e.g.*, DEF2537 (Dep't of Justice, Elections Crimes Branch, Federal Prosecution of Election Offenses at 41-43 (7th ed. May 2007) (ROA.95242-44)) (describing prosecutions of in-

person and non-citizen voter fraud under 42 U.S.C. § 1973i(c), and noting that federal prosecutors have no jurisdiction to prosecute fraud where there is no federal official on the ballot); Trial Tr. 196:24-197:6 (Sept. 3, 2014) (Wood) (ROA.99128-29) (describing the "scores" of election contests involving illegal voting he has litigated in Texas); *id.* at 216:3-217:18 (ROA.99148-49) (describing illegal and ineligible votes cast in an election that was decided by a coin flip).

239. In 2011, the House Select Committee on Voter Identification and Voter Fraud heard testimony from individuals who had personally witnessed instances of people voting more than once at a single polling place in Texas. DEF0001 (Tex. Leg., House Select Committee on Voter ID and Voter Fraud Hearing, 82d Leg., R.S., vol. II at 181-83, 260-61 (Mar. 1, 2011) (ROA.70559-61, 70638-39)). The House Select Committee heard testimony in 2011 that the Texas Attorney General's Office had investigated approximately 12 cases of voter impersonation since 2002. *Id.* at 323-26 (ROA.70701-04).

240. Major Forrest Mitchell testified in the section 5 lawsuit that he has investigated multiple instances of election fraud that were referred to the Texas Attorney General's Office for investigation since 2005. Mitchell Sec. 5 Dep. 216:17 (ROA.68304).

241. Plaintiffs own voter-fraud expert, Dr. Minnite, found evidence of four instances of in-person voter fraud in Texas since 2011. Trial Tr. 135:1-6 (Sept. 8, 2014) (Minnite) (ROA.100129).

242. Representative Aaron Peña, who voted in favor of S.B. 14 testified that his "campaign worker's father" had "voted against" him despite that worker's father being "deceased." DEF0001 (Debate on S.B. 14 on the Floor of the House, 82d Leg., R.S., vol. III, at 117:7-9 (March 23, 2011) (ROA.71571)).

243. The Texas Legislature was also aware that:

> a grand jury in New York released a report in the mid-1980's detailing a widespread voter fraud conspiracy involving impersonation fraud at the polls that operated successfully for 14 years in Brooklyn without detection. That fraud resulted in thousands of fraudulent votes being cast in state and congressional elections and involved not only impersonation of legitimate voters at the polls, but voting under fictitious names that had been successfully registered without detection by local election officials. This fraud could have been easily stopped and detected if New York had required voters to authenticate their identity at the polls.

DEF0001 (Tex. Leg., Senate Committee of the Whole, 81st Leg., R.S., Exhibit 14 at 2 (March 10, 2009) (ROA.73453) (written testimony by former election official Hans A. von Spakovsky)).

244. The Texas Legislature also took notice of the Carter-Baker Commission's observation that:

> In Milwaukee, Wisconsin, investigators said they found clear evidence of fraud, including more than 200 cases of felons voting illegally and more than 100 people who voted twice, used fake names or false addresses, or voted in the name of a dead person. Moreover, there were 4,500 more votes cast than voters listed.

*Id.*, Exhibit 18 at 4 (ROA.73501).

245. The House Elections Committee heard testimony from Paul Bettencourt, Harris County's Tax Assessor and Acting Voter Registrar, about registration fraud and voting by the deceased in Harris County. House Elections Committee, Interim Report to the 81st Texas Legislature at 40 (Jan. 2009), *available at* http://www.lrl.state.tx.us/scanned/interim/80/EL25he.pdf; *supra* FOF ¶ 191.

246. In addition, it is undisputed that vote harvesting and registration fraud are prevalent in Texas. *See id.*; Trial Tr. 221:17-222:9 (Sept. 3, 2014) (Wood) (ROA.99152-53). While S.B. 14 cannot directly prevent these frauds, it does make them much more

difficult to perpetrate. For example, vote harvesters use the registrations of the elderly, blind, and disabled to vote. *See id.* (ROA.99152-53). But unless these voters have *also* signed up to vote by mail or gone through the process to obtain an exemption from S.B. 14, they would have to vote in person, at which point they would have to show photo ID. S.B. 14 thus helps eliminate some portion of effective vote harvesting. And as Mr. Bettencourt told the House Elections Committee, voter ID would have prevented the voter registration fraud he witnessed from being effective.

247. Both the Criminal Division of the Public Integrity Section of the United States Department of Justice, and the various United States Attorneys' Offices, have prosecuted election fraud crimes, including instances of non-citizen voting (under 18 U.S.C. §§ 611, 911 and 1015) and providing false information to vote (42 U.S.C. § 1973i(c)),

248. ███████████████████████████████████████████
████████████████████████████████████████████████
████████████████████ there may be more instances of voter fraud than is apparent
from the face of the exhibits. ████████████████████████
████████████████████████████████████████████████
███████████████ ██ █████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████ ██ ███████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████ ██ ███████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████ ██ ███████████████████████

249. ███████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████████████ ███████
████████████████████████████████████████████████



250.

251.



252. The Chief of the Public Integrity Section, Richard Pilger, submitted a declaration regarding what he asserted to be a lack of in-person voter fraud nationwide. Reply in Support of Motion for Protective Order, Exhibit 2, *Veasey v. Perry*, 71 F. Supp. 3d 627 (S.D. Tex. 2014), ECF No. 390. This declaration, however, suffers from the same database deficiencies as the LIONS and ACTS reports themselves, as Mr. Pilger did nothing but rely on publicly available court records, and the ACTS and LIONS databases.



Thus, the door is wide open to the possibility that in-person voter fraud has occurred, and there was a perception it was occurring, had a more thorough review been completed by Mr. Pilger.

253. This evidence of in-person voter fraud far exceeds the evidence, or lack thereof, that the Supreme Court held to be sufficient in *Crawford*, which recognized that photo-voter ID laws are justified by evidence of even other types of voting fraud in the enacting State and instances of in-person ballot fraud in other States. *See Crawford*, 553 U.S. at 194-95 (holding that Indiana's law, which addressed only in-person voter fraud, was justified by the threat of voter fraud even though the record contained "no evidence of any such fraud actually occurring in Indiana at any time in

94

its history"); *id.* at 195 n.12 (alluding to "scattered instances of in-person voter fraud" in other states as justification for Indiana's in-person voter identification requirement).

## 2.   In-person voter fraud is very hard to detect.

254. During the consideration of S.B. 14, Democratic legislators pointed to a lack of a documented cases of in-person voter fraud to argue that any concern about such fraud is mere pretext. *See, e.g.*, *supra*, ¶ 189. This ignores two crucial points:

    a.  In *Crawford*, the Supreme Court instructed that Indiana's law, which addressed only in-person voter fraud, was justified by the threat of voter fraud even though the record contained "no evidence of any such fraud actually occurring in Indiana at any time in its history." 553 U.S. at 194-95.

    b.  In-person voting fraud is "incredibly difficult to detect." Mitchell Sec. 5 Dep. 216:21 (ROA.59107); *see also* DEF0001 (Tex. Leg., House Committee of Elections Hearing, 81st Leg., R.S., 51:5-7 (June 14, 2010)); *id.* (Tex. Leg., Senate Committee of the Whole, 81st Leg., R.S., 235:7-11 (March 10, 2009) (ROA.72413)).

255. Major Mitchell testified that in his experience, the only way to detect in-person voter fraud is if someone inside the polling place recognizes the individual attempting to cast a fraudulent ballot. Mitchell Sec. 5 Dep. 216:23-217:2 (ROA.59107-08).

256. In other words:

> [I]n the absence of a photo I.D. requirement, . . . someone can come to vote with a certificate, a voter registration certificate, and say that they're the person on that certificate and vote with it, and that the only way that it would get caught is if the person who's behind the table

> knows either the name on the voter certificate or knows the person
> standing in front of the table and knows they're not the same person. So,
> *absent serendipity, voter impersonation fraud would not be caught.*

Trial Tr. 327:22-328:8 (Sept. 10, 2014) (Ingram) (emphasis added) (ROA.101089-90).

257. A report by the New York Inspector General documenting that 61 out 63 attempts at in-person voter fraud were successful confirms this fear. *See* Trial Tr. 326:17-327:14 (Sept. 10, 2014) (Ingram) (ROA.101088-89).

258. Without requiring some sort of photo identification, it would be nearly impossible to detect impersonation fraud. *See* DEF0001 (Tex. Leg., Senate Committee of the Whole, 81st Leg., R.S., Exhibit 14 (March 10, 2009) (ROA.72388-455) (written testimony by former election official Hans A. von Spakovsky).

### 3.   Conditions ripe for voter fraud exist in Texas.

259. The Carter-Baker Report noted the risk of fraud posed by inflated voter rolls: "Invalid voter files, which contain ineligible, duplicate, fictional, or deceased voters, are an invitation to fraud." Carter-Baker Commission Report at 10 (ROA.73507).

260. The condition of Texas's voter rolls present many opportunities for in-person voter fraud.

### a.   Texas's inflated voter rolls create a risk of voter fraud.

261. The State's voter registration list includes thousands of ineligible voters. *See, e.g.*, Section 5 Trial Tr. 112:11-19 (July 12, 2012) (Ansolabehere) (ROA.66825) (50,000 deceased voters on registration roll).

262. The Supreme Court has held that finding ways to deal with inflated voter rolls is a neutral, nondiscriminatory state interest in passing voter-identification laws. *See Crawford*, 553 U.S. at 196-97 ("[T]he fact of inflated voter rolls does provide

a neutral and nondiscriminatory reason supporting the State's decision to require photo identification.").

263. The National Voter Registration Act (NVRA) hinders the ability of States to promptly remove persons who have moved out of state from the list of registered voters. Trial Tr. 311:6-25 (Sept. 10, 2014) (Ingram) (ROA.101073). Under the NVRA, a State "shall not" remove a person from the list of registered voters on the ground that he has moved unless the registrant "confirms in writing" that he has moved outside the jurisdiction in which he is registered, or unless the registrant fails to respond to a notice mailed to him and fails to vote in two consecutive federal elections following the notice. *See* 52 U.S.C. § 20507(d)(1).

264. Although the Secretary of State's list of registered voters is the State's official voter-registration roll, voter registration is conducted at the county level. Trial Tr. 312:10-17 (Sept. 10, 2014) (Ingram) (ROA.101074). Counties must update voter registrations, both to add new registrants and remove deceased people. Trial Tr. 313:10-15; 313:25-314:21 (Sept. 10, 2014) (Ingram) (ROA.101075-76). Communications between the Secretary of State's Office and counties are electronic in most cases, but not all, so this process creates the potential for inaccuracies on the State's official list of registered voters. Trial Tr. 315:8-20 (Sept. 10, 2014) (Ingram) (ROA.101077); Trial Tr. 228:1-22 (Sept. 3, 2014) (Wood) (ROA.99160) (discussing "off-line" counties).

265. The Texas voter-registration rolls include names of persons who have died, persons who have moved out of the State, and felons and noncitizens ineligible to vote. *See, e.g.*, DEF0001 (Tex. Leg., Senate Committee of the Whole, 81st Leg., R.S., 563-66 (Mar. 11, 2009) (ROA.72752-55) (Testimony of Harris County official); DEF0001 (Tex. Leg., House Committee on Elections, 82d Leg., R.S. 53:9-20 (June 14,

2010) (Testimony of Ann McGeehan) (ROA.72059); Trial Tr. 318:7-21 (Sept. 10, 2014) (Ingram) (ROA.101080).

266. Counties do not necessarily make an effort to remove ineligible voters. Travis County, for example, refused for many years to remove deceased registrants from its voter rolls. Trial Tr. 318:24-319:5 (Sept. 10, 2014) (Ingram) (ROA.101080-81).

267. When voter-registration rolls contain names of persons who have died and persons who have moved out of the State, an opportunity arises for persons to fraudulently impersonate deceased or non-resident voters absent a requirement that the voter present photo identification when appearing to vote at the polls. Trial Tr. 316:17-18 (Sept. 10, 2014) (Ingram) (ROA.101078).

268. A voter-identification law that permits poll workers to accept non-photo identification, such as utility bill or the voter registration certificate that the Secretary of State mails to each voter's residence, does not detect or deter voter impersonation as effectively as a photo-identification requirement. Trial Tr. 18:11-25 (Sept. 10, 2014) (Dewhurst) (ROA.100780); *accord* DEF036 (Brief of United States as Amicus Curiae Supporting Respondents at 31, *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181 (2008) (Nos. 07-21 & 07-25) (ROA.78482)).

### b.    Non-citizens on the voter rolls create a risk of fraud.

269. Texas law prohibits non-citizens from voting. Tex. Elec. Code § 11.002(a)(2).

270. Texas has a large non-citizen population comprising persons from all over the world. Today, Texas is experiencing unprecedented immigration—both lawful and unlawful.

271. The presence of non-citizens on the voting rolls also creates the opportunity for voter fraud because non-citizens are not eligible to vote. There is evidence that non-citizens register to vote in Texas and do in fact vote in Texas (and outside of Texas). Judgment of Conviction, *State v. Briseno*, No. 2006-8-6465 (24th Dist. Court, Calhoun County, Tex., June 9, 2009); Trial Tr. 278:8-17 (Sept. 10, 2014) (Patrick) (ROA.101040).

272. Texas law requires evidence of citizenship or other lawful status from persons seeking a state driver's license, consistent with the requirements of the federal REAL ID Act. Trial Tr. 141:16-24 (Sept. 9, 2014) (Peters) (ROA.100494); Trial Tr. 204:14-22 (Sept. 9, 2014) (Rodriguez) (ROA.100557).

273. Texas law prohibits unlawfully present aliens, including those who entered the country but have overstayed their visas, from obtaining any type of driver's license. Trial Tr. 141:16-141:24 (Sept. 9, 2014) (Peters) ROA.100494; Peters Dep. 144:2-5 (ROA.64737). Because a U.S. birth certificate is required, S.B. 14 prohibits non-citizens from obtaining EICs available to citizens free of charge. And although Texas law permits lawful, non-citizen residents to obtain driver's licenses, these licenses expire on the same day as the non-citizen's visa. Trial Tr. 141:25-142:2 (Sept. 9, 2014) (Peters) (ROA.100494-95).

274. Thus, while S.B. 14 may not stop all voter fraud by non-citizens, it limits the opportunities to do so. This is a valid goal of the Texas Legislature.

### E. Plaintiffs' Extensive Discovery Into the Private Thoughts and Communications of Legislators Confirmed that the Purpose of S.B. 14 Was to Prevent Fraud and Increase Confidence in the Electoral System.

275. This Court granted plaintiffs unprecedented discovery into the confidential, internal communications of hundreds of current and former legislators and their

staffs. *See, e.g.*, ECF No. 226 (ROA.6502-09) (Order granting motion to compel); ECF No. 182-1 (ROA.5500-12) (United States' first request for document production).

276. There is no dispute that in response to the requests, members of the Texas Legislature produced thousands upon thousands of internal documents and sat for numerous depositions. *See, e.g.*, ECF No. 740-12, at 4-5 (ROA.83316-17) (exemplar subpoena requesting from legislator "[a]ll documents related to communications between, among, or with you, the office of the Governor, the office of the Lieutenant Governor, the office of the Secretary of State, the Department of Public Safety, the office of the Texas Attorney General, any Legislator or Legislators, their staff or agents, lobbyists, groups, associations, organizations, or members of the public concerning the State of Texas's consideration of a requirement that voters present identification to cast a ballot, from January 1, 2005, through November 30, 2010"); ECF No. 254 at 4 (ROA.7229) (United States confirming that its legislator subpoenas "mirror[ed] the United States' First Set of Requests for Production"); ECF No. 251 at 2 (ROA.7143) (noting that prior to any production by individual legislators, "[t]he Office of the Attorney General (OAG)" had already "produced thousands of legislatively privileged documents to the Department of Justice"); Dewhurst Dep. (ROA.60353-421); Patrick Dep. (ROA.64565-647); Duncan Dep. (ROA.61062-127, ROA.67396-459); Fraser Dep. (ROA.67569-648); Williams Dep. (ROA.68804-70); Smith Dep. (ROA.68584-646); Straus Dep. (ROA.68648-98); Bonnen Dep. (ROA.57951-8011); Riddle Dep. (ROA.59381-427, ROA.62219-49); Harless Dep. (ROA.58683-760, ROA.61343-72); Hebert Dep. (ROA.61373-437, 67877-969); McCoy Dep. (ROA.61542-607, ROA.68103-68177); and Beuck Dep. (ROA.57889-950, ROA.59826-94).

277. This Court granted that unprecedented discovery at Plaintiffs' urging that these private communications would be dispositive of whether the Defendants acted with a discriminatory purpose. *See* Hr'g of February 12, 2014, at 29:14-22 (ECF No.

168) (Ms. Baldwin: ". . . and also the legislative documents, which are documents that are at the heart of the United States' claim that this law was passed in part based on a discriminatory intent"); Hr'g of May 1, 2014, at 28:4-10 (ECF No. 263) ("Mr. Rosenberg: . . . [T]hat evidence is going to be very, very important in this case dealing with the intent behind SB 14 itself."); U.S. Opp'n to Mtn to Quash, at 1 (ECF No. 254) (demanding this "vital discovery from current and former legislators").

278.  That unprecedented discovery revealed no evidence supporting a discriminatory-purpose finding. After deposing numerous state legislators and legislative staff members, and after reviewing the record of this case, the Plaintiffs are unable to identify any statement made by any Texas legislator or staffer—even internal, private statements that no legislator or staffer could have expected to be disclosed to Plaintiffs—that evinces a desire to harm racial minorities.

279.  To the contrary, proponents of S.B. 14 confirmed that they harbored no discriminatory purpose for passing the law.

280.  Legislators and their staff uniformly denied that the bill was enacted for the purpose of decreasing the number of voters from any racial, ethnic, or language minority group. Senator Troy Fraser, the sponsor of S.B. 14, and the bill's supporters in the House and Senate, repeatedly stated that their purposes in supporting S.B. 14 were to deter and detect voter fraud and safeguard voter confidence in the electoral system. *See* Trial Tr. 416:5-6 (Sept. 10, 2014) (Fraser) (ROA.101178) ("The purpose was to protect the integrity of the voting box."); Trial Tr. 39:19-40:6 (Sept. 10, 2014) (Dewhurst) (ROA.100801-02) ("It was the intent of the Legislature—it was the intent of the Lieutenant Governor, to pass . . . a photo voter I.D. bill which reduced fraud; and not to repeat myself, I apologize, but to improve the confidence by the voters in Texas in our election process, because I warrant to you, most voters didn't have a lot

101

of confidence in the validity of their vote . . . because in Texas we have a real problem with low voter turnout."); Harless Dep. 85:19-22 (ROA.61359) ("to provide for the integrity of the in-person voting by showing a photo ID"); Patrick Dep. 56:6-9 (ROA.62109) ("[T]he purpose of the bill was to protect the integrity of the ballot box."); Straus Dep. 49:14-15 (ROA.62533) ("to be certain that those who were casting votes were doing so legitimately"); Dewhurst Dep. 48:22-51:17; 69:3-8; 106:11-15; 122:14-23; 222:2-12; 208:22-209:6 (ROA.60364-65, 60370, 60379, 60383, 60408, 60404-05); McCoy Dep. 37:14-39:18; 138:13-22 (ROA.61548, 61573).

281. Not a single legislator or staff member recalls hearing any statement suggesting that S.B. 14 was enacted to harm racial minorities—or even to give a partisan advantage to the Republican Party. Trial Tr. 355:17-356:1 (Sept. 5, 2014) (Anchia) (ROA.99972-73) (Representative Anchia did not hear anyone make a statement, in public or private, suggesting that S.B. 14 had a discriminatory intent); Trial Tr. 38:23-39:6 (Sept. 5, 2014) (Davis) (ROA.99655-56) (Senator Davis did not hear anyone make a statement, in public or private, suggesting that S.B. 14 had a discriminatory intent); *cf.* McCoy Dep. 37:23-38:5 (ROA.61548) ("Q: [W]ere you ever part of or hear about any conversations about whether the bill would give either party a partisan advantage in elections? . . . A: No.").

282. After reading through every relevant legislators' bill books and office files, and after reading thousands of confidential email communications between legislators, their staff, and their constituents—including emails from legislators' personal accounts and work accounts at their personal places of business outside the Legislature—the plaintiffs have not identified any statement made by any legislator or staff member that evinces a desire to harm racial minorities or to suppress voter turnout in any political or demographic group.

PROPOSED CONCLUSIONS OF LAW

1.     Without any evidence of invidious intent from statements made by legislators (even in internal, private communications), Plaintiffs have no choice but to fall back on tenuous circumstantial evidence: discriminatory acts of bygone generations, views of opponents of voter ID laws, past misdeeds by persons unconnected to the Texas Legislature, and the procedures used by S.B. 14 proponents to overcome years of gridlock in the Texas Legislature and enact a voter ID law supported by the great majority of Texans. Much of that evidence, in turn, was rejected by the Fifth Circuit as "infirm," "unreliable," and "speculati[ve]"—in other words, "not probative." *Veasey*, 830 F.3d at 229-30, 232-34. Specifically, the Fifth Circuit expressly held that the following categories of evidence could not be considered in assessing this discriminatory-purpose claim:

> 1) Acts of discrimination by long-deceased legislators;
>
> 2) Acts by persons outside the Legislature;
>
> 3) Speculation on intent by legislative *opponents*;
>
> 4) Isolated and ambiguous statements made by legislative proponents after enactment;
>
> 5) Support for legislation aimed at securing the border or limiting immigration.

*Id.* 229-34 & n.16.

2.     The remaining shreds of circumstantial evidence not already discredited are insufficient to overcome the mountain of direct as well as circumstantial evidence dispelling any notion of a discriminatory motive. Accordingly, this Court will reject the grave charge that the Texas Legislature acted with a racially invidious purpose in enacting S.B. 14.

3.    In any event, given the decade-long drive by the Texas Legislature to enhance election integrity and promote Texans' confidence in elections, the overwhelming support for a photo-only voter ID law, the enormous pressure on Republicans from their constituents to enact such a law, and Democratic legislators' refusal to accept a compromise bill allowing for some form of non-photo ID, it was inevitable that S.B. 14 was going to be enacted. Thus, even if a particular legislator or legislators harbored a secret desire to harm voters on account of their race—and there is no proof that any legislator did—such illicit motivation was not necessary to S.B. 14's passage and therefore cannot support a conclusion that the Texas Legislature violated the Fourteenth Amendment when it enacted S.B. 14. *See Veasey*, 830 F.3d at 231 (citing *Hunter v. Underwood*, 471 U.S. 222, 228 (1985)).

## I.    S.B. 14 WAS NOT ENACTED WITH A DISCRIMINATORY PURPOSE.

4.    S.B.14 was not enacted with a racially discriminatory purpose under the Constitution or the Voting Rights Act.

5.    "In times of political passion, dishonest or vindictive motives are readily attributed to legislative conduct and as readily believed." *Tenney v. Brandhove*, 341 U.S. 367, 378 (1951). Moreover, in issues concerning voting, "there are large incentives to reach for the seeming certainty of the Equal Protection Clause's familiar condemnation of purposeful racial discrimination and draw upon its comforting moral force, rather than confront the task of developing proper standards or concede their ephemeral political character." *Session*, 298 F. Supp. 2d at 473, *vacated sub nom. on other grounds*, *Henderson v. Perry*, 543 U.S. 941 (2004). In turn, "[t]he incentive to couch partisan disputes in racial terms bleeds back into the legislative process," "as members of the 'out' party—believing they can win only in court, and only on a race-

based claim—may be tempted to spice the legislative record with all manner of racialized arguments, to lay the foundation for an eventual court challenge." *Id.* at 473 n.69 (quotation marks omitted).

6.    To avoid indulging and encouraging these pernicious incentives, the Judiciary is most wary of "inject[ing] the federal courts into a political game for which they are ill-suited, and indeed in which they are charged not to participate under the most basic principles of federalism and separation of power." *Id.* at 473. "[F]ederal judges are not legislative players"; they "are only the guardians of the boundaries." *Id.*

**A.    Under Well-Established Supreme Court Precedent, Plaintiffs Bringing a Discriminatory-Purpose Claim Bear the Burden to Show that a Facially Neutral Law Is "Obvious Pretext" for Racial Discrimination—that the Law Is "Unexplainable on Grounds Other Than Race."**

7.    The Supreme Court, through a trio of well-established precedents, has imposed significantly heightened standards for finding that any public actor—but particularly a State legislature—has acted with a racially discriminatory purpose. *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256 (1979); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977); *Washington v. Davis*, 426 U.S. 229 (1976).

8.    Here, it must be emphasized that what the Court is looking for is *invidious discrimination*; the question is not whether the legislation was the product of bad policy or even partisanship, but rather whether the challenged legislation "was conceived or operated as a purposeful device to further racial discrimination." *City of Mobile, Ala. v. Bolden*, 446 U.S. 55, 66 (1980) (plurality op.) (internal quotation marks and alterations omitted); *accord, e.g., Feeney*, 442 U.S. at 274 ("[P]urposeful discrimination is the condition that offends the Constitution.") (internal quotation marks

omitted); *cf. Clements v. Fashing*, 457 U.S. 957, 967 (1982) ("[O]nly those classifications which are invidious, arbitrary, or irrational offend the Equal Protection Clause of the Constitution.").

9.     *Davis* upheld an employment test that white applicants passed in proportionately greater numbers than African-Americans, because plaintiffs failed to adduce any proof that racial discrimination entered into the formulation of the test. 426 U.S. at 245-47. Similarly, *Arlington Heights* upheld a zoning board decision denying permission to build low- and moderate-income housing projects because there was no evidence that the decision was racially motivated. 429 U.S. at 269-71. And in *Feeney*, the Court upheld an employment preference for veterans, despite its substantial disparate impact on the basis of sex, because nothing in the record demonstrated that the preference was originally devised or reenacted to harm women's job prospects. 442 U.S. at 279.

10.     Non-invidious classifications like those at issue in *Davis*, *Arlington Heights*, and *Feeney* are upheld unless plaintiffs can prove that the justification for the law is "obvious pretext" for racial discrimination—that is, the law "can plausibly be explained only as a [race]-based classification." *Id.* at 272, 275. To carry their burden, Plaintiffs must show that the challenged law "is 'unexplainable on grounds other than race.'" *Easley v. Cromartie*, 532 U.S. 234, 241-42 (2001) (quoting *Hunt v. Cromartie*, 526 U.S. 541, 546 (1999), in turn quoting *Shaw v. Reno*, 509 U.S. 630, 644 (1993), in turn quoting *Arlington Heights*, 429 U.S. at 266)). Simply put, the Court "will not infer a discriminatory purpose" where there were "legitimate reasons" to enact a law. *McCleskey v. Kemp*, 481 U.S. 279, 298-99 (1987).

11.   Under these precedents, even proof that a State legislature passed a law knowing it would cause a discriminatory effect is insufficient to establish a discriminatory purpose. As the Supreme Court made clear decades ago:

> Discriminatory purpose . . . implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part *because of*, not merely in spite of, its adverse effects upon an identifiable group.

*Feeney*, 442 U.S. at 279 (citation, internal quotation marks, and footnote omitted) (emphasis added).

12.   The Supreme Court has also "made clear that the underlying . . . decision" of how to protect the integrity and reliability of the electoral process and inspire public confidence in elections—*see Crawford*, 553 U.S. 191-200, 204—"is one that ordinarily falls within a legislature's sphere of competence" (*Easley*, 532 U.S. at 242). *See also Voting for Am., Inc. v. Steen*, 732 F.3d 382, 394 (5th Cir. 2013) (characterizing the duty "to ensure the integrity of the voting process" as the "state's paramount obligation"). "Hence, the legislature 'must have discretion to exercise the political judgment necessary to balance competing interests,' . . . and courts must 'exercise *extraordinary caution* in adjudicating claims that a State has" made the underlying decision "on the basis of race." *Easley*, 532 U.S. at 242 (quoting *Miller v. Johnson*, 515 U.S. 900, 915-16 (1995)); *see also Purcell*, 549 U.S. at 4 ("A State indisputably has a compelling interest in preserving the integrity of its election process. Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy.) (internal quotation marks and citation omitted).

### B.   The Stated Purposes of S.B. 14 Were Protecting the Sanctity of Voting, Avoiding Voter Fraud, and Promoting Public Confidence in the Voting System.

13.   Plaintiffs have failed in their efforts to prove that the Texas Legislature enacted S.B. 14 in order to discriminate against minorities: The stated purposes of S.B. 14 were (1) protecting the sanctity of voting, (2) avoiding voter fraud, and (3) promoting public confidence in the voting system.

14.   The stated purposes of S.B. 14 are unquestionably legitimate and important. *Crawford*, 553 U.S. at 196 ("There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters. Moreover, the interest in orderly administration and accurate recordkeeping provides a sufficient justification for carefully identifying all voters participating in the election process.").

15.   Although the Legislature is not required to prove that its policy determinations are justified or that the underlying factual findings are correct, the record shows a clear and legally sufficient basis for the Texas Legislature's decision to enact a photo-voter-ID bill. Even without proof of in-person voter fraud—and there is some proof here—the State has a legitimate interest in taking steps to prevent it. *Crawford*, 553 U.S. at 196 ("While the most effective method of preventing election fraud may well be debatable, the propriety of doing so is perfectly clear."). The fact that the State's voter rolls are inflated, as shown by the record and by the Legislature's attempts to remedy that very problem (*see supra*, FOF ¶¶ 188, 261-268), "provide[s] a neutral and nondiscriminatory reason supporting the State's decision to require photo identification." *Crawford*, 553 U.S. at 196-97.

16.   Texas has an independent, and equally legitimate, interest in safeguarding confidence in the electoral process. *Id.* at 197 ("[P]ublic confidence in the integrity of

the electoral process has independent significance, because it encourages citizen participation in the democratic process.").

17.   Plaintiffs were unable to meet their substantial burden of showing that the stated justifications for S.B. 14 were "obvious pretext" for racial discrimination. *Feeney*, 442 U.S. at 272.

18.   To the contrary, the record only confirmed the Legislature's stated purposes. The 2000 election shook Americans' confidence in electoral systems and brought the issue of election integrity to the fore of the public consciousness. The Texas Legislature immediately set to modernizing and securing its own electoral system. After years of addressing numerous related issues—including mail-in ballot fraud, the security of voting machines, and inflated voter rolls—the Texas Legislature in 2005 turned to the problem of in-person voter fraud. The Texas Legislature's objective was to prevent and deter in-person voter fraud by requiring voters to prove who they are, and "all that happened thereafter flowed from this objective, with the give-and-take inherent in the legislative process along the way." *Session*, 298 F. Supp. 2d at 471.

19.   In *Arlington Heights*, the Supreme Court instructed that "contemporary statements by members of the decisionmaking body" are "especially" important in assessing whether a law was enacted with a discriminatory purpose. 429 U.S. at 268.

20.   Throughout the Texas Legislature's six-year long consideration of voter ID laws, S.B. 14's proponents publicly, repeatedly stressed that the primary purpose of the law was to prevent and deter voter fraud. *See, e.g.*, *supra*, FOF ¶¶ 205-207.

21.   Courts have no authority to second-guess a legislature's stated purpose, absent clear and compelling evidence to the contrary. *See, e.g.*, *Smith v. Doe*, 538 U.S. 84, 92 (2003) (courts "defer to the legislature's stated intent," and "only the clearest

109

proof will suffice to override" that deference) (internal quotation marks omitted); *Kansas v. Hendricks*, 521 U.S. 346, 361 (1997) ("[W]e ordinarily defer to the legislature's stated intent."); *Flemming v. Nestor*, 363 U.S. 603, 617 (1960) ("[O]nly the clearest proof could suffice to establish the unconstitutionality of a statute on [the] ground [of improper legislative motive].").

22.   Nor does the Court have authority to discount the Legislature's purpose based on its own determination that S.B. 14 will not adequately achieve the State's articulated policy goals. *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993) ("[A] legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data."); *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 464 (1981) ("States are not required to convince the courts of the correctness of their legislative judgments.").

### C.   Direct Evidence Obtained from Legislators Confirmed that S.B. 14 Was Not Enacted for a Discriminatory Purpose.

23.   Private statements by S.B. 14's proponents confirm their public statements: the Texas Legislature passed S.B. 14 to prevent and deter voter fraud and safeguard voter confidence. *See, e.g.*, *supra*, ¶¶ FOF 280-282.

24.   Recognizing that the legislative history of S.B. 14 was devoid of any mention of a discriminatory purpose, Plaintiffs insisted that their case hinged on the private thoughts and communications of Texas legislators. *E.g.*, United States' Opposition to Texas Legislators' Motion to Quash Subpoenas 1 (Apr. 29, 2014), ECF No. 254 (ROA.7226) ("vital discovery"); Status Conference, Tr. at 29:19-22 (Feb. 12, 2014), ECF No. 168 (ROA.97657) (stating that "the legislative documents . . . are documents that are at the heart of the United States' claim that this law was passed in part based on a discriminatory intent"); Civil Motion Hearing, Tr. at 28:8-9 (May 1, 2014),

ECF No. 263 (ROA.97938) ("[T]hat evidence is going to be very, very important in this case dealing with the intent behind SB 14 itself.").

25.   Plaintiffs' demand for access to non-public information—including confidential and legislatively privileged materials held by individual legislators—conflicted with basic principles of separation of powers and federalism. The Supreme Court "has recognized . . . that judicial inquiries into legislative or executive motivation represent a substantial intrusion into the workings of other branches of government." *Arlington Heights*, 429 U.S. at 268 n.18 (citing *Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 130-31 (1810)). Although the Court has identified "legislative or administrative history" as a "subject[] of proper inquiry in determining whether racially discriminatory intent existed," it made clear that the inquiry should ordinarily be limited to public sources—"contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports." *Id.* at 268.

26.   By demanding sworn testimony from individual members of the Texas Legislature, Plaintiffs insisted that this Court intrude on the State's legislative process to the greatest possible degree. The Supreme Court cautioned in *Arlington Heights* that "[p]lacing a decisionmaker on the stand is therefore 'usually to be avoided.'" *Id.* at 268 n.18 (quoting *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 420 (1971)). And while members of the governmental body might be called to testify in "extraordinary instances," even then, testimony about the purpose of government action "frequently will be barred by privilege." *Id.* at 268.

27.   This Court acceded to Plaintiffs' demands, overriding well-founded concerns about judicial restraint and abrogating legislative privilege, because Plaintiffs insisted that unrestricted access to confidential and privileged materials was essential to their "ability to present a complete record." Status Conference, Tr. at 30:13-14 (Feb.

111

14, 2014), ECF No. 168 (ROA.97658). Over the objection of Defendants, members of the Texas Legislature, legislators' staff, and the Lieutenant Governor produced thousands of documents containing their confidential communications and impressions concerning S.B. 14. Legislators—including the Lieutenant Governor and the Speaker of the House—and legislative staff members were also forced to sit for depositions, where the United States and private plaintiffs asked about their conversations with other legislators, their mental impressions, and their motives for passing S.B. 14. Plaintiffs who received these once-privileged documents included legislators who had opposed S.B. 14, along with counsel for the Texas Democratic Party.

28.   Plaintiffs insisted that this extensive discovery was essential to uncover the Legislature's true purpose in passing S.B. 14. But after getting thousands of privileged documents and weeks of intrusive depositions, plaintiffs could not identify a single document or statement expressing an intention to suppress minority voting through S.B. 14. Quite the opposite. This privileged and confidential material—presumably (at least according to Plaintiffs) the most probative evidence of the Legislature's purpose—only confirmed the Legislature's publicly stated purpose and underscored that race had nothing to do with the enactment of S.B. 14. *See supra*, FOF ¶¶ 280-282.

29.   Given their unlimited access to legislative materials, Plaintiffs cannot attribute their failure of proof to a successful cover-up. Plaintiffs got everything. Even if legislators tailored their public statements, knowing that a later court challenge was inevitable, Plaintiffs had every opportunity to look behind the public statements and sift through privileged legislative records—material to which plaintiffs in most lawsuits are never given access. But even those private papers and correspondence did not produce *any* evidence that the Legislature enacted S.B. 14 for the purpose of harming minority voters. If there were hidden evidence of discriminatory purpose,

Plaintiffs would have found it. That they found no such evidence requires the Court to conclude that none exists.

30.   Between 2005 and 2011, dozens of Texas Senators and Representatives considered and voted in favor of a voter-ID bill. Plaintiffs have no evidence that a single one acted for a racially discriminatory purpose, let alone that a majority did. It is highly "unlikely that such a motive would permeate a legislative body and not yield any private memos or emails." *Veasey v. Abbott*, 796 F.3d 487, 503 n.16 (5th Cir. 2015), *vacated in granting reh'g en banc*, 815 F.3d 958 (5th Cir. 2016), *and on reh'g en banc*, 830 F.3d 216 (5th Cir. 2016) (en banc). It is even less likely that an illicit motive would permeate the Legislature yet remain hidden over the course of four legislative sessions.

31.   Although discriminatory intent may be proved by circumstantial evidence in certain cases (*see Arlington Heights*, 429 U.S. at 266), the courts' acceptance of circumstantial evidence is based on the assumption that litigants will not have access to direct evidence. That was not the case here.  Plaintiffs were provided with unprecedented access to legislative materials and testimony after insisting that such evidence was essential to their discriminatory-purpose claim. The Fifth Circuit has explained that where legislators provide direct evidence without privilege protections—in contrast to what *Arlington Heights* presumed would occur—"the logic of *Arlington Heights* suggests that the [direct evidence] is actually stronger than the circumstantial evidence." *Price v. Austin Ind. Sch. Dist.*, 945 F.2d 1307, 1318 (5th Cir. 1991). And here, where Plaintiffs conceded that such evidence was at the heart of their claims, the failure of such evidence to reveal even the slightest indication of discriminatory purpose is dispositive.

### D.    Circumstantial Evidence Confirms that S.B. 14 Was Not Enacted for a Discriminatory Purpose.

32.    Even if Plaintiffs' failure to come forth with direct evidence from the unprecedented discovery they obtained were not dispositive, it casts serious doubt on their claims, and it precludes a finding of intentional discrimination absent compelling circumstantial evidence that the Legislature passed S.B. 14 in order to harm minority voters. The record contains no such compelling circumstantial evidence. Plaintiffs' claim of discriminatory purpose must fail because the legislative record, the direct evidence, and substantial circumstantial evidence all confirm that S.B. 14 was not enacted with a discriminatory purpose.[16]

33.    In addition to legislative history, the Supreme Court in *Arlington Heights* identified three sources of circumstantial evidence that may be helpful in discovering a legislature's purpose in enacting a policy: the legislature's awareness of a resulting disparate impact, the sequence of events leading up to the decision, and the historical background of the decision. 429 U.S. at 266-67. These three sources of circumstantial evidence, along with others, all support the conclusion the S.B. 14 was not enacted with a discriminatory purpose. Plaintiffs' purported circumstantial evidence of discriminatory purpose is legally and factually insufficient to support their claim of intentional racial discrimination under any standard. It falls far short of meeting their burden to establish that S.B. 14 can only be characterized as "obvious pretext,"

---

[16]    Defendants continue to preserve, for appellate and certiorari review, the arguments that circumstantial evidence cannot even be examined here because there was no discriminatory effect. *See, e.g., Crawford v. Bd. of Educ. of City of L.A.*, 458 U.S. 527, 544 n.31 (1982) ("Absent discriminatory effect, judicial inquiry into legislative motivation is unnecessary, as well as undesirable." (quoting *Brown v. Califano*, 627 F.2d 1221, 1234 (D.C. Cir. 1980))); *Darensburg v. Metro. Transp. Comm'n*, 636 F.3d 511, 523 (9th Cir. 2011) ("failure to establish . . . discriminatory impact prevents any inference of intentional discrimination").

*Feeney*, 442 U.S. at 272—that is, as "unexplainable on grounds other than race," *Arlington Heights*, 429 U.S. at 266.

> **1.    The Texas Legislature believed, based on the evidence before it, that S.B. 14 would not have a disparate impact on minority voters.**

34.   In *Arlington Heights* and *Feeney*, the Supreme Court found that, despite a decisionmaker's awareness of disparate impact on a particular group, there was no showing of discriminatory intent in the formulation or adoption of the actions at issue. *Feeney*, 442 U.S. at 278-79; *Arlington Heights*, 429 U.S. 270-71.

35.   Here, Plaintiffs have not even reached that step of the analysis because the Texas Legislature did not have knowledge of S.B. 14's purported impact on minority voters. The Legislature did not know or anticipate that S.B. 14 would prevent anyone from voting, much less that it would disproportionately harm minority voters.

36.   To the extent it had evidence of S.B. 14's likely impact, the Legislature had reason to believe that it would not prevent any person from voting. The evidence shows that the Texas Legislature relied on multiple studies and the experiences of other States to conclude that S.B. 14 would *not* disparately impact minorities. *See, e.g.*, DEF0001 (Tex. Leg., Senate Committee of the Whole, 82d Leg., R.S., at 200:19-201:14 (Jan. 25, 2011) (ROA.68982)); Trial Tr. 24:1-10 (Sept. 10, 2014) (Dewhurst) (ROA.100786); McCoy Dep. 76:12-17 (ROA.61557).

37.   In enacting S.B. 14, the Texas Legislature relied on multiple studies as well as the experiences of other states with photo-voter ID laws to conclude that enacting its own photo-voter ID law would not result in disenfranchisement or disproportionately harm minorities:

- Democrats conceded that there was no evidence before the Legislature suggesting that S.B. 14 would have a disparate impact on minorities. *See* DEF0001 (Tex. Leg., Senate Committee of the Whole, 82d Leg., R.S., at 28 (Jan. 26, 2011) (ROA.70215)).

- The Texas Legislature considered real-world empirical studies—as opposed to statistical estimates—showing that requiring voters to prove their identity with a photo ID did not negatively affect the ability those entitled to vote to do so. *See, e.g.,* DEF0001 (Tex. Leg., Senate Committee of the Whole, 81st Leg., R.S., Exhibits 7, 9, and 10 (Mar. 10, 2009) (ROA.73369, 73417, 73423)); Fraser Dep. 72:9-21, 74:13-22 (ROA.63039, 63041).

- The Legislature learned from Plaintiff's own expert, Dr. Ansolabehere, that "exclusions from voting" resulting from Voter ID laws "are exceptionally rare." DEF0001 (Tex. Leg., Senate Committee of the Whole, 81st Leg., R.S. Exhibit 9, at 124 (Mar. 11, 2009) (ROA.73420) (citing Stephen Ansolabehere, Access Versus Integrity in Voter Identification Requirements, Working Paper No. 58 in the Caltech/MIT Voting Technology Project (Feb. 2007)).

- The Texas Legislature also learned that similar voter ID laws did not result in disenfranchisement as the opponents of those laws—just like opponents of S.B. 14—predicted. *See, e.g.,* DEF0001 (Tex. Leg., Senate Committee of the Whole, 81st Leg., R.S., Exhibits 23, 25, and 28 (Mar. 10, 2009) (ROA.73665, 73685, 73703)).

- The Elections Division Director for the Secretary of State of Georgia testified that in the 16 elections that Georgia had held since implementing its voter ID law his office has never received a single complaint that anyone was disenfranchised or turned away from the polls because they lacked photo ID. DEF0001 (Tex. Leg., House Committee on Elections, 81st Leg., R.S., vol. II, at 364:1-365:8 (Apr. 6, 2009) (ROA.74975-76)). He also testified that, despite four years of federal lawsuits, no single individual had alleged that he was substantially burdened by Georgia's voter ID law. *Id.* 367:21-24 (ROA.74978).

- The Indiana Secretary of State testified that "[i]n the five years and eight statewide primary general elections" that he's "been involved with" since the passage of Indiana's voter ID law, "there's been scant evidence of disenfranchisement or discrimination in Indiana." DEF0001 (Tex. Leg., Senate Committee of the Whole, 82d Leg., R.S., at 272:9-12 (Jan. 25, 2011) (ROA.69000)).

- The Texas Legislature also received evidence that passing a voter identification law could increase participation in the electoral process by enhancing public confidence in elections. Trial Tr. 397:25-398:8 (Sept. 10, 2014) (Fraser) (ROA.101159-60); DEF0001 (Tex. Leg., Senate Committee of the Whole, 81st Leg., R.S., Exhibit 7, at 2 (Mar. 10, 2009) (ROA.73372)) (concluding that it is "plausible that photo identification requirements actually increase voter turnout").

38.   These facts conclusively show that the Legislature believed that S.B. 14 would not harm minorities. Whether or not the Legislature was ultimately correct about this state of the world is irrelevant in assessing discriminatory purpose. *See Feeney*, 442 U.S. at 278-79 (analyzing whether disparate impact was intentional only *after* determining that the legislature was, in fact, aware that such an impact would result). Even if the Legislature were mistaken about any potential disparate impact, having a mistaken belief about how a law will operate is not evidence that the Legislature harbored a discriminatory purpose.

39.   No discriminatory purpose can be inferred from the Texas Legislature's legitimate decision to rely upon expert testimony and the experience of other States over the unsupported speculation of legislative opponents. Plaintiffs' own expert witness testified that, at worst, there is no "consensus regarding the effects of voter ID laws." Trial Tr. 328:8-10 (Sept. 4, 2014) (Burden) (ROA.99560), and the Legislature was aware that opponents of Georgia's photo-voter ID law had issued the same dire warnings and were proven incorrect. *See supra*, FOF ¶¶ 211-212.

40.   The Legislature's decision not to give greater weight to speculation by opponents who had proved themselves willing to thwart voter-ID legislation by any means necessary does not suggest that the Legislature harbored a discriminatory purpose. Democratic legislators conceded that they had no evidence to support their claims of disparate impact. *See supra*, FOF ¶ 163.

117

41.   Speculative "warnings" by S.B. 14's opponents have not been borne out by subsequent events. The number of provisional ballots rejected for ID reasons in the elections following enforcement of S.B. 14 was miniscule. *See supra*, FOF ¶¶ 45-49. Plaintiffs have not identified a single voter in the entire State of Texas whom S.B. 14 will prevent from voting. *See supra*, FOF ¶¶ 39-44. And Plaintiffs supplied no proof of a decline in political participation among any group of voters after S.B. 14's implementation.

42.   In any event, as already noted, it is not whether the Legislature was *correct* in assessing any future disparate impact that matters in analyzing this discriminatory-purpose claim. What matters in analyzing the Legislature's purposes for enacting S.B. 14 is what the Legislature *believed* to be true. Here, the Legislature had a good-faith basis, supported by lay and expert testimony, to believe that S.B. 14 would not have a disparate impact on minority voters.

43.   Moreover, second-guessing the veracity of the Texas Legislature's belief that photo voter ID laws do not disparately impact minorities is antithetical to the "*extraordinary caution*" courts must "exercise . . . in adjudicating claims that a State has" enacted a facially neutral law on a topic within the legislature's competence "on the basis of race." *Easley*, 532 U.S. at 242 (quoting *Miller*, 515 U.S. at 916).

### 2.   Plaintiffs' database-matching studies are not circumstantial evidence of discriminatory purpose.

44.   The matching studies provided by Plaintiffs' experts regarding disparities in preexisting ID possession are irrelevant to evaluating discriminatory purpose because those studies were not before the Texas Legislature. *See Feeney*, 442 U.S. at 278-79 (analyzing whether disparate impact was intentional only *after* determining that the legislature was, in fact, aware that such an impact would result). In fact, no

matching studies of any sort were presented to the Legislature, so they cannot establish anything about the Legislature's purpose when it enacted S.B. 14.

45.   But even if the Legislature would have had access to the very studies conducted by Plaintiffs' experts concerning possession of S.B. 14 ID, that would not help Plaintiffs for several reasons.

46.   First, the Texas Legislature would still have been entitled to credit the information it relied on over studies purporting to show current rates of ID possession. At a minimum, the Legislature's decision to credit that competing testimony does not establish any discriminatory purpose.

47.   Second, Plaintiffs' matching evidence showed that just as many (if not more) white registered voters lacked S.B. 14 ID as African-American and Hispanic registered voters. *See supra*, FOF ¶¶ 219-220. Assuming that the rate of ID possession provides a relevant measure of S.B. 14's impact, this fact forecloses a discriminatory-purpose finding under binding Supreme Court precedent: "Too many" white voters "are affected by" S.B. 14 "to permit the inference that the statute is but a pretext for" discrimination. *Feeney*, 442 U.S. at 275. In *Feeney*, the Court stated that the law there could not be explained as a pretext for preferring men over women because significant numbers of those placed at a disadvantage by the law were men. *Id*. The same holds here: S.B. 14's photo ID requirement cannot be explained as a pretext for harming minorities compared to whites because, according to Plaintiffs, hundreds of thousands of white registered voters—more than similarly situated African-Americans and Hispanics *combined*—were also negatively impacted by S.B. 14. *See Doe ex rel. Doe v. Lower Merion Sch. Dist.*, 665 F.3d 524, 552 (3d Cir. 2011) (rejecting claim of discriminatory purpose where minorities and whites were both adversely affected by the policy at issue). To put it another way, Plaintiffs can "no more successfully claim

119

that" S.B. 14 "denied them equal protection than could white [voters] who also" lacked S.B. 14 ID. *Davis*, 426 U.S. at 246.

48.     Third, even if minority voters, prior to the enactment of S.B. 14, were dispro-portionately less likely to have S.B. 14 ID, and therefore predisposed to be negatively impacted by S.B. 14, "[p]redilection does not constitute proof." Samuel Issacharoff, *Ballot Bedlam*, 64 Duke L.J. 1363, 1380 (2015). Possession or non-possession of an S.B. 14 ID at a given point in time is only one of many factors that determines whether S.B. 14 causes an actual negative impact on any person's ability to vote. Lack of a qualifying ID prevents a person from voting only if that person also (a) lacks the underlying documents necessary to obtain an ID, (b) lacks the means to obtain the underlying documents necessary to obtain an ID, (c) is not able to vote without a photo ID, and (d) would have voted but for the lack of a qualifying photo ID. In other words, "[t]he fact that restrictions on the franchise in general—and voter-ID laws in particular—"may "play to the vulnerabilities of discrete communities does not estab-lish that there is any discernible impact, either on overall turnout or on differential turnout among various groups." *Id.* At the very least, it means that an invidious pur-pose by the Legislature cannot be inferred from rates of preexisting ID possession (which the Legislature was unaware of, in any event).

49.     Accordingly, even if the Legislature had known that minority voters were less likely to have an S.B. 14 ID—which it did not—that knowledge would not be evidence of a discriminatory purpose because the lack of ID at one point in time does not imply inability to vote in the future. The Legislature would still have been justified in con-cluding that S.B. 14 would not have a negative impact on minorities.

50.     Representative Smith's statement, years after the enactment of S.B. 14, that he remembered estimating that roughly 700,000 Texas voters lacked a driver license,

Trial Tr. 327:11-329:7 (Sept. 8, 2014) (Smith) (ROA.100321-23), does not help Plaintiffs for at least four reasons.

51.  First, there is no evidence that any other legislator received this estimate. Representative Smith testified that he "probably would have mentioned it in committee hearings" (Trial Tr. 329:7-8 (Sept. 8, 2014) (ROA.100323)), but Plaintiffs have never pointed to a transcript evidencing such a mention and Defendants have been unable to locate one. The Fifth Circuit has cautioned against relying on isolated ambiguous statements made by legislators after the enactment of a law. *See Veasey*, 830 F.3d at 234.

52.  Second, this estimate says nothing about the racial makeup of the group of voters supposed to lack driver's licenses. Although Representative Smith years later suggested that it was "common sense" that minorities would be more likely to be in this group than whites, this "stray statement[] made by [a single] legislator[] voting for S.B. 14" is "not . . . the best indicia of the Texas Legislature's intent." *Veasey*, 830 F.3d at 234, 236; *cf. United States v. O'Brien*, 391 U.S. 367, 384 (1968) ("What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork."); *Florida v. United States*, 885 F. Supp. 2d 299, 354 (D.D.C. 2012) (per curiam) (holding that single legislator's statement, during floor debate, "that it should be harder to vote—as it is 'in Africa'" was "not enough to suggest that his purpose, whatever it was, represented the purpose of the Florida legislature as a whole"); *Castaneda-Gonzalez v. Immigration & Naturalization Serv.*, 564 F.2d 417, 424 (D.C. Cir. 1977) ("Statements by individual legislators should generally be given little weight when searching for the intent of the entire legislative body."). And it turned out Representative Smith's "common sense" was incorrect: Plaintiffs' numbers suggest that

those lacking S.B. 14 ID are at least as likely (if not more) to be white rather than Hispanic or African-American. *See supra*, FOF ¶¶ 219-220.

53.   Third, a driver's license is only one type of S.B. 14 ID. Knowing that a certain number of people lack one of many compliant forms of ID is of limited use in estimating the impact of S.B. 14.

54.   Finally, as discussed above, "[p]redilection does not constitute proof." Issacharoff, *supra*, at 1380. Possessing or not possessing one form of S.B. 14 ID at a given point in time is only one step of many on the way to actually suffering a negative impact on voting. *See also supra*, FOF ¶ 207 n.16.

### 3.   The events leading up to the enactment of S.B. 14 further support the conclusion that it was enacted for legitimate purposes.

55.   The Supreme Court has suggested that courts look to "[t]he specific sequence of events leading up the challenged decision" to "shed some light on the decisionmaker's purposes." *Arlington Heights*, 429 U.S. at 267. The events leading up to the adoption of S.B. 14 confirm that the Legislature's purposes were legitimate.

56.   The Texas Legislature's push to enact a voter-ID law was not an isolated event either in time or place. The Texas Legislature did not shift from showing no interest in election integrity and then "suddenly . . . change[]" course to enact S.B. 14. *Id.*; *see also Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 541 (1993) (finding invidious purpose where "the city council made no attempt to address the supposed problem before its meeting in June 1987, just weeks after the Church announced plans to open").

57.   The enactment of S.B. 14 was part of a long-running nationwide effort to modernize and secure elections. As documented above (*supra*, FOF ¶¶ 52-92), concerns over election integrity and public confidence in elections increased significantly after the 2000 presidential election. The concerns were expressed by citizens, by experts, and by the federal government.

58.   In response, Texas embarked on a massive effort to modernize and secure its electoral system: from voting machines, to voter rolls, to mail-in ballot fraud, Texas addressed nearly every aspect of elections. *See supra*, FOF ¶¶ 104-111, 127, 137, 149, 187-188. S.B. 14 was just one part of this effort.

59.   Even if S.B. 14 is taken out of context and considered in isolation from other ballot-integrity measures pursued by the Texas Legislature, the sequence of events leading to its passage does not suggest a deliberate act of discrimination. S.B. 14 was itself the product of a *six-year long* effort. *See supra*, FOF ¶¶ 112-201.

60.   Moreover, S.B. 14 was just one of hundreds of voter ID bills introduced across the country and one of dozens passed. *See supra*, FOF ¶¶ 52, 71-78.

61.   Finally, in the lead-up to the enactment of S.B. 14, there was majority support among Texas citizens identifying as Republicans, Democrats, African-Americans, and Hispanics for requiring a photo ID to vote. *See supra*, FOF ¶¶ 81-92.

62.   All of the relevant facts strongly rebut Plaintiffs' baseless suggestion that S.B. 14 was a knee-jerk reaction designed to hurt minorities.

### 4.   The historical background of the enactment of S.B. 14 does not detract from its legitimate purpose.

63.   The Supreme Court in *Arlington Heights* also suggested that "a series of official actions taken for invidious purposes" could evidence invidious purpose underlying the action challenged. 429 U.S. at 267.

64.   This evidentiary source is limited, however. First, it is limited to actions taken by the decisionmaker whose action is under review. *See Bolden*, 446 U.S. at 74 n.20 (plurality op.); *Veasey*, 830 F.3d at 232. Second, it is limited temporally. "[P]ast discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful. The ultimate question remains whether a discriminatory intent has been proved in a given case. More distant instances of official discrimination in other cases are of limited help in resolving that question." *Bolden*, 446 U.S. at 74 (plurality op.); *accord Veasey*, 830 F.3d at 232.

65.   Accordingly, discriminatory acts by local Texas officials and acts by long-deceased legislators are irrelevant to this inquiry.

66.   That leaves Plaintiffs with one purportedly helpful data point: in *Texas v. United States*, 887 F. Supp. 2d 133, 159-66 (D.D.C. 2012), *vacated and remanded on other grounds*, 133 S. Ct. 2885 (2013), a vacated opinion from a three-judge district court purported to find that the 2011 Texas Legislature created two redistricting plans with a discriminatory purpose. That case cannot possibly support a discriminatory-purpose finding here.

67.   First, that case was a declaratory judgment action under Section 5 of the Voting Rights Act. Accordingly, the burden was placed on Texas to *disprove* discriminatory intent. *Id.* at 151. In ruling against Texas, the court could only conclude that

Texas failed to carry its burden. Any affirmative finding on discriminatory purpose is nothing more than dicta.

68.   Second, as the case citation indicates, the court's decision was vacated. The Supreme Court vacated the decision when it issued *Shelby County*, 133 S. Ct. 2612, which held unconstitutional the coverage formula in Section 4(b) used to determine which jurisdictions were subject to the preclearance requirement in Section 5 of the Voting Rights Act. The State vigorously contested the court's conclusion on discriminatory purpose, but because of *Shelby County*, Texas was unable to take an appeal on the merits of that decision. *See* Appellant's Jurisdictional Statement at 27-33, *Texas v. United States*, 133 S. Ct. 2885 (2012) (No. 12-496) (mem.), 2012 WL 5267659. It would be wholly unfair to hold the court's conclusion against Texas where the State was denied full process. Moreover, the vacatur of the court's judgment deprived the decision of preclusive effect. *See, e.g.*, *United States v. Windsor*, 133 S. Ct. 2675, 2688 (2013) (explaining that when a case is vacated on appeal, "its ruling and guidance [are] then erased"); *Asgeirsson v. Abbott*, 696 F.3d 454, 459 (5th Cir. 2012) ("[V]acated opinions are not precedent."); *see generally* Restatement (Second) of Judgments § 27. Plaintiffs have no independent evidence that Texas's redistricting decisions in 2011 were made with a discriminatory purpose; thus, those redistricting decisions do not support finding a discriminatory purpose behind S.B. 14.

69.   In contrast to the paucity of probative historical background evidence suggesting that the Texas Legislature harbored discriminatory motives, there is a substantial amount of such evidence dispelling any such notion.

70.   First, several votes taken during consideration of S.B. 14 are unexplainable if S.B. 14's proponents harbored a discriminatory motives:

a. Every member of the Senate who voted for the final version of S.B. 14 also voted to enact an earlier version of S.B. 14 with a provision allowing a person who is indigent and who swears an affidavit that he cannot afford S.B. 14-compliant ID to vote. *See supra*, FOF ¶ 168. If, as this Court found, indigent persons are more likely to be minorities, it would make little sense for those seeking to discriminate to vote for such a law. When this provision was later excised at the behest of *Democrats*, it was replaced with a provision for free EICs that satisfy S.B. 14's photo ID requirement.

b. Every member of the Senate who voted for the final version of S.B. 14 also voted for some ameliorative amendments proposed by Democrats to expand the categories of acceptable IDs and to accept expired IDs in some situations. *See supra*, FOF ¶ 168.

c. Every member of the House who voted for the final version of S.B. 14 also voted to excise from the Senate version a provision that exempted those over 70 from the law. *See supra*, FOF ¶ 185. If, as one of Plaintiff's experts concluded (Lichtman Report at 64-65 (ECF No. 374) (ROA.102133-34)), the elderly are more likely to be white and vote Republican, it would make little sense for those seeking to discriminate to vote to excise such a provision.

71. Second, several votes taken on precursor bills to S.B. 14 are unexplainable if vast numbers of Texas legislators were harboring discriminatory motives:

a. All but one of the senators who voted for the final version of S.B. 14 had previously shown a willingness—by voting for S.B. 362 in 2009—to compromise and allow the use of a variety non-photo IDs to verify a voter's identity. The remaining senator was not a senator in 2009. *See supra*, FOF ¶¶ 197. This breakdown is even more notable when one considers that by this point

126

Indiana's photo-voter ID law had been upheld by the Supreme Court and Georgia's photo-voter ID law had received DOJ preclearance. *See supra*, FOF ¶¶ 74, 77-78. Texas senators in 2009 could easily have justified a bill requiring only photo ID, and yet they drafted and passed a bill that allowed certain forms of non-photo ID. This is strong evidence that these senators harbored no discriminatory motives.

b. Of the 98 representatives who voted for S.B. 14, 55 had previously shown a willingness—by voting for H.B. 1706 in 2005, H.B. 218 in 2007, or both—to compromise and allow the use of non-photo IDs to verify a voter's identity. *See supra*, FOF ¶¶ 199. All but five of the remaining representatives did not have the opportunity to record a vote on earlier voter ID legislation. *See id.* This breakdown is even more notable when one considers that by 2007 Indiana and Georgia had both enacted photo-voter ID laws. Georgia's voter ID law had received DOJ preclearance. Texas representatives in 2007 could easily have justified a bill requiring only photo ID, and yet they drafted and passed a moderate bill. This is strong evidence that these representatives harbored no discriminatory motive.

72.    These votes are proof positive that the goal of voter ID proponents was to get *some* form of fraud-prevention in place, even if that meant sacrificing their preference for a photo-voter ID law to forge a compromise with Democrats. If Plaintiffs are correct that these legislators were on a mission to disenfranchise minorities, it is inexplicable that they did so only after attempting to do exactly what Plaintiffs now say they should have done.

73.    The historical evidence overwhelmingly confirms that the Texas Legislature was not harboring a secret discriminatory purpose when it enacted S.B. 14.

5.   **The principle of parsimony supports the conclusion that the Texas Legislature was not operating with a discriminatory purpose.**

74.   "In the law, as in life, the simplest explanation is sometimes the best one. So it is here." *Loan Syndications & Trading Ass'n v. S.E.C.*, 818 F.3d 716, 718 (D.C. Cir. 2016) (citation omitted); *see also Acorda Therapeutics Inc. v. Mylan Pharm. Inc.*, 817 F.3d 755, 765 (Fed. Cir. 2016) ("As Ockham's Razor advises, the simpler path is usually best."); *United States v. Navarro-Camacho*, 186 F.3d 701, 708 (6th Cir. 1999) (applying Occam's Razor to pick between competing theories); *Brown v. Vance*, 637 F.2d 272, 281 (5th Cir. 1981) (same).

75.   The preference for explanations of observable data that are simple over those that are more complicated is known as the principle of parsimony. *See* Bryan A. Garner, A Dictionary of Modern American Usage at 565 (2003) (defining Occam's Razor, or the law of parsimony, as positing that "the simplest of competing theories is preferable to the more complex ones"); *see also Kelley v. Am. Heyer-Schulte Corp.*, 957 F. Supp. 873, 882 n.12 (W.D. Tex. 1997) (applying "the rule of parsimony not to establish a new standard of proof for the Plaintiff to surmount, but rather as a device to be used after a careful and proper weighing of the evidence"), *appeal dismissed*, 139 F.3d 899 (5th Cir. 1998). A corollary is that a theory must be judged in part on "the extent to which the theory explains, fails to explain, or is inconsistent with other facts that are known to be true." *MSM Indus., Inc. v. Zurich Am. Ins. Cos.*, 1997 WL 260059, at *13 (D. Mass. Mar. 25, 1997), *aff'd*, 125 F.3d 841 (1st Cir. 1997).

76.   In this case, there are too many facts that Plaintiffs' discriminatory-purpose theory cannot explain without indulging in needless complexity—while the "obvious alternative" non-discriminatory theory (*Ashcroft v. Iqbal*, 556 U.S. 662, 682 (2009)

(quotation marks omitted); *see supra* Conclusion of Law ("COL") ¶¶ 70-71), does explain them. Accordingly, "[a]s between that obvious alternative explanation for" S.B. 14, "and the purposeful, invidious discrimination" Plaintiffs "ask[] [this Court] to infer," the Court chooses the former. *Iqbal*, 556 U.S. at 682 (internal quotation marks omitted).

77.   For example, as just noted above, many of the same legislators who voted for S.B. 14 also voted for less stringent versions of voter ID legislation prior to S.B. 14. Plaintiffs' theory of invidious purpose cannot possibly explain this.

78.   Also, proponents went out of their way in the conference committee to add into S.B. 14 a section providing for *free* EICs that satisfy the photo-voter ID requirement. If S.B. 14 proponents were targeting the poor because they were more likely to be minorities, the addition of this provision makes no sense.

79.   As another example, a half-dozen minority legislators in the Texas House joined their colleagues in supporting S.B. 14. *See supra*, FOF ¶ 200. Plaintiffs' theory cannot explain why minority legislators would vote for a purportedly discriminatory bill. What can explain this, however, is that preventing voter fraud and enhancing public confidence in elections were genuine concerns that motivated the passage of S.B. 14.

80.   Likewise, Plaintiffs' theory cannot explain why two Democrats who opposed more lax voter ID bills in 2005 and 2007, switched their votes and supported a stricter voter ID bill in 2011. *See supra*, FOF ¶ 88. What can explain this, however, is that the support for a photo-voter ID bill was strong, and these legislators felt pressure from constituents.

81.   Similarly, Plaintiffs' theory cannot explain why three legislators who opposed more lax voter ID bills in 2005 and 2007 when they were Democrats then supported a photo-voter ID law in 2011 after they had switched to the Republican Party. *See supra*, FOF ¶ 92. What can explain this, however, is that Democratic opposition to voter ID was a matter of politics, and that the support for a photo-voter ID bill— particularly among Republican constituents—was strong, and these legislators felt it.

82.   Plaintiffs' theory can also not explain why the first voter ID bill after the 2000 presidential election was introduced by a Democrat—a Democrat who went on to oppose similar bills introduced by Republicans. *See supra*, FOF ¶¶ 100-102, 120. What can explain this, however, is that Democratic opposition to voter ID became a political matter.

83.   Given its numerous holes, "[t]he conspiratorial theory offered by" Plaintiffs "simply does not make much sense." *Navarro-Camacho*, 186 F.3d at 708. "[T]he stakes are sufficiently high" in judging the motivations of the Texas Legislature in this case that the Court must "eschew guesswork." *Hunter v. Underwood*, 471 U.S. 222, 228 (1985) (quotation marks omitted). Accordingly, the Court finds comfort in the more easily supported "obvious alternative" non-discriminatory theory. *Iqbal*, 556 U.S. at 682 (quotation marks omitted).

## E.   Plaintiffs Have Failed to Show that the Legislature's Stated Purposes Were Pretextual.

84.   Given the mountain of direct and circumstantial evidence showing that the Texas Legislature did not enact S.B. 14 for an invidious purpose, Plaintiffs bear a heavy burden to show that the Legislature's neutral reasons for enacting the law were

"obvious pretext" for racial discrimination. *Feeney*, 442 U.S. at 272. Plaintiffs' evidence falls far short.

85.   Plaintiffs have cobbled together the following shreds of circumstantial evidence with which they try to show to pretext:

   a.  acts of discrimination in Texas's history;

   b.  modern acts of discrimination in Texas by persons outside the Legislature;

   c.  the belief of S.B. 14's opponents that its proponents harbored discriminatory intent;

   d.  support by S.B. 14 proponents for legislation to restrict immigration and increase border security;

   e.  the timing of support for voter ID coinciding with an increase in Texas's minority population;

   f.  the rejection of ameliorative amendments offered by Democrats;

   g.  procedural irregularities in the consideration of S.B. 14;

   h.  the failure of the Texas Legislature to address other forms of voter fraud;

   i.  the paucity of evidence that in-person voter fraud and public confidence in elections were serious problems; and

   j.  the opinions of their experts.

86.   The first category of circumstantial evidence has already been addressed above. *See supra*, COL ¶¶ 63-73. Actions by long-deceased legislators are not probative (*Veasey*, 830 F.3d at 231-33), and more recent legislative activities in Texas confirm that the Legislature is not acting with invidious purposes.

87.   The Fifth Circuit has concluded that the second, third, and fourth categories of circumstantial evidence are not probative on this issue. *See Veasey*, 830 F.3d at 229-30, 232-34.

88.   None of the evidence in the remaining six categories comes close to satisfying the standard for proving a claim of invidious racial discrimination. Moreover, points five through nine either depend on a false premise, are more plausibly accounted for by non-discriminatory reasons, or both. Finally, the opinions of Plaintiffs' expert witnesses at trial are wholly unreliable in determining the Legislature's purpose when it enacted the law, for a number of similar reasons.

       1.     **The drive to enact voter-ID legislation is most plausibly explained as part of the nationwide push to modernize and secure electoral systems, rather than as a reaction to a growing minority population in Texas.**

89.   One of the most glaring holes in Plaintiffs' narrative is its timeline. According to Plaintiffs, Republicans were spurred into action to enact a voter ID law, first, by the 2005 announcement by the United States Census Bureau that Texas had that year become a majority-minority state, and, later, by subsequent reports that the minority population was continuing to grow. *See, e.g.*, Trial Tr. 97:11-98:3 (Sept. 2, 2014) (Martinez Fischer) (ROA.98729-30); *id.* 252:16-253:8 (Veasey) (ROA.98884-85); *id.* 36:13-37:5 (Sept. 9, 2015) (Burton) (ROA.100389-90); Davidson Corrected Rpt. ¶¶ 7, 95 (ROA.102464-65, 102514); Lichtman Rpt. at 8-9 (ROA.102077-78). This purported timeline ignores several salient facts:

    a.  Most notably, this timeline ignores the fact that the Census Bureau's first announcement regarding Texas's status as a majority-state state was made in August 2005. *See* "Texas now a majority-minority state," Austin Business Journal, http://www.bizjournals.com/austin/stories/2005/08/08/daily29.html (Aug. 11, 2005) ("Texas is the newest state to have a majority of its population composed of 'minority' races, the U.S. Census Bureau said Thursday."). This was more than *five months after* H.B. 1706—the first Republican-backed voter ID bill blocked by Democrats—was introduced and

132

more than *three months after* H.B. 1706 was passed by the Texas House and blocked by Senate Democrats. *See* History of H.B. 1706, Texas Legislature Online, http://www.capitol.state.tx.us/BillLookup/History.aspx?LegSess= 79R&Bill=HB1706 (last visited Nov. 17, 2016).

b. This timeline also ignores the fact that the first modern voter ID bill was introduced by a *Democrat* in *2001*. *See* Tex. H.B. 744, 77th Leg., R.S. (2001) (introduced by Representative King). The forms of ID that would have been acceptable under H.B. 744 are similar to those in H.B. 1706.

c. In addition, this timeline ignores the fact that as the minority population grew in Texas, Republicans were achieving *more* electoral success. In 2001, Republicans were in the minority in the Texas House. By 2011—when, according to Plaintiffs, Republicans were fretting about their coming demise—they had achieved historic majorities in both houses of the Texas Legislature and controlled nearly every statewide office.

d. Finally, given this purported concern, one would expect some hint of worry expressed by Republicans in the Texas Legislature, whether in public or in private. And yet Plaintiffs have found none notwithstanding their invasive discovery.

90.   Plaintiffs have developed a theory that (unspecified) Texas Republicans pushed voter-ID legislation to thwart the political power of growing populations, including minorities and women, who tend to vote for Democrats. To promote this theory, they have enlisted the aid of expert witnesses and counsel for the Veasey Plaintiffs. *See* DEF0001 (Tex. Leg., Senate Committee of the Whole, 81st Leg., R.S., at 445 (March 10, 2009) (testimony of J. Gerald Hebert) (ROA.72623)).

91.   At most, Plaintiffs' theory identifies a hypothetical motive that *might* explain the passage of a voter-ID law. But they have produced no evidence tending to prove that that particular motive, out of all the potential reasons for passing voter-ID legislation, actually *does* explain why the Texas Legislature passed S.B. 14. The record contains no evidence that the Texas Legislature in fact passed S.B. 14 for the purpose—even in part—of thwarting the voting power of minority voters (or any other group of voters) and entrenching themselves in power.

92.   In contrast to the holes in Plaintiffs' plot, there exists a much more direct explanation for the push for voter ID. As described above, the 2000 presidential election spurred a nationwide drive to enhance election integrity and the public's confidence in elections. *See supra*, FOF ¶¶ 52-61. Texas was a major player in these efforts and enacted numerous laws to combat fraud, protect the integrity of elections, and boost public confidence. *See supra*, FOF ¶¶ 104-111, 127, 137, 149, 187-188. Between 2005 and 2011, the drive for voter ID was becoming a major part of this larger effort, and was endorsed by the Carter-Baker Commission and the federal government. *See supra*, FOF ¶¶ 62-78. In addition to Texas, States around the country enacted, or tried to enact voter ID laws. While this was occurring, the popular support for these laws was increasing significantly across racial and political lines. *See supra*, FOF ¶¶ 71-78.

> **2.    The rejection of some Democratic amendments by S.B. 14 proponents is more plausibly explained by a purpose to deter voter fraud and protect voter confidence, plus the give-and-take of the legislative process, rather than by an intent to discriminate.**

93.   Much like Plaintiffs' reliance on the timing of S.B. 14, their reliance on the fact that some of S.B. 14 opponents' amendments were rejected is also misplaced.

94. At outset, this portion of Plaintiffs' theory is infirm because a "failure to enact suggested amendments . . . are not the most reliable indications of [legislative] intention." *Bryant v. Yellen*, 447 U.S. 352, 376 (1980).

95. In any event, Plaintiffs' complaint concerning the fate of Democrats' amendments only highlights the fact that many ameliorative amendments by Democrats *were* adopted. *See supra*, ¶ 168. If S.B. 14 proponents were rejecting Democratic amendments in an effort to discriminate, there is no plausible explanation for their decision to adopt or incorporate Democratic amendments that, among other things, expanded the categories of acceptable IDs, provided for the acceptance of expired IDs, and would have allowed an indigency exception to the ID requirement—had Democrats not later objected to and criticized this exception.

96. Moreover, the same legislators who rejected Democrats' amendments in 2011 previously demonstrated a willingness to compromise and enact any number of ameliorative provisions in previous sessions. *See supra*, FOF ¶¶ 197. 199. By 2011, they had learned their lesson. Rather than attempt to compromise only to see Democrats block another voter ID bill with procedural maneuvers, Republican legislators rejected amendments that they viewed as bad policy, unnecessary, or unduly complicating. *See supra*, FOF ¶¶ 165-166, 169-174, 186. With compromise off the table, these legislators could focus on enacting a photo-voter ID law, not because they harbored invidious purposes, but because they viewed it as a good law with strong support from their constituents. *See supra*, FOF ¶¶ 151, 161-162, 182-183, 205-207.

135

>    3.    **The procedural maneuvers associated with the passage of S.B. 14 are most plausibly explained as a reaction to Democratic legislators' intransigence in blocking voter-ID bills in three prior legislative sessions, rather than as the product of discriminatory purpose.**

97.    Plaintiffs invoke *Arlington Heights*' consideration of "[d]epartures from the normal procedural sequence" (429 U.S. at 267), but the record shows that use of legislative procedural maneuvers was commonplace in the Texas Legislature's consideration of voter-ID bills—as Democrats had used extraordinary tactics to block voter-ID bills for three consecutive legislative sessions before S.B. 14 was passed. As then-Senator Patrick explained, "they used the rules to stop the bill and we used the rules to pass the bill." Trial Tr. 286:9-10 (Sept. 10, 2014) (Patrick) (ROA.101048). Such a response is far from rare—and has been employed by legislators from both major political parties. *See, e.g.*, Paul Kane, *Reid, Democrats trigger 'nuclear' option; eliminate most filibusters on nominees*, Wash. Post (Nov. 21, 2013) ("[Senator Harry] Reid said the chamber 'must evolve' beyond parliamentary roadblocks.").

98.    The specific procedures used to pass S.B. 14 directly reflect experience gained over the previous three legislative sessions. In 2011, the Texas Legislature used procedural workarounds—such as avoiding the Senate's two-thirds rule and moving up the House's consideration of S.B. 14 by months to prevent "chubbing"—to prevent Democratic opponents from killing the bill with parliamentary maneuvers as they had done in 2005, 2007, and 2009. Procedural steps taken in 2011 resulted in an up-or-down vote by both Houses of the Texas Legislature, after a thorough public debate, on a voter-ID law supported by the significant majority of Texas citizens.

99.    "[C]ontext matters." *Veasey*, 830 F.3d at 237. For six years, Democrats in the Texas Legislature took advantage of procedural rules supposedly designed to promote

comity—not to seek compromise, but to obstinately stonewall efforts to enact the will of the great majority of Texans:

- In 2005, Democratic Senators killed H.B. 1706—a bill that provided for numerous forms of photo and non-photo ID—by threatening to use the two-thirds rule to block consideration. *See supra*, FOF ¶¶ 121, 126.

- In 2007, Democratic Senators again used the two-thirds rule to block consideration of a bill—H.B. 218—that provided for numerous forms of photo and non-photo ID. *See supra*, FOF ¶ 135.

- In 2009, Democrats in the House "chubbed to death" S.B. 362, which provided for numerous forms of photo and non-photo ID. *See supra*, FOF ¶ 148. In doing so, they completely shut down the legislative process, adversely affecting numerous unrelated pieces of legislation. *See id.*

100.  Faced with this intransigence and strategic use of procedural rules, the majority of the Texas Legislature had no choice but to respond in kind. These procedural maneuvers had nothing to with discrimination and had everything to do with the getting the job of the Legislature done and finally allowing both Houses to have an up-or-down vote on a voter-ID bill.

101. In any event, Plaintiffs' complaint that S.B. 14 proponents utilized unusual procedural gambits to pass S.B. 14 rests on a false premise. The evidence in this case showed the two-thirds rule—not really a rule at all, but a calendar management tool[17]—was repeatedly set aside to overcome minority intransigence, including *later that same legislative session in 2011* to secure passage of a budget. *See supra*, FOF

---

[17]     Democrats contended that the purpose of the two-thirds rule was to "slow[] stuff down until the issue is ripe, until . . . you do your best to find consensus." Trial Tr. 166:3-5 (Sept. 5, 2014) (Ellis) (ROA.99783). But even if this were true, voter ID had been under consideration for *six years* and it was clear that consensus was not going to be reached. The two-thirds rule had served its purpose and it was time for the issue to receive an up-or-down vote.

¶¶ 123-124. In other words, there was nothing unusual about working around the two-thirds rule when it was being abused.

102. Moreover, this part of Plaintiffs' theory, too, has big holes. For one, the Senate utilized the same workaround in 2009 for S.B. 362, which provided for some forms of non-photo ID. This confirms the "obvious alternative explanation" (*Iqbal*, 556 U.S. at 682 (quotation marks omitted)) that voter ID proponents worked around the two-thirds rule because they were intent on addressing an issue that they and most other Texans considered important. For another, Plaintiffs ignore that opponents of voter ID were the *beneficiaries* of so-called procedural irregularities in 2007 before any work was done on the two-thirds rule. *See supra*, FOF ¶¶ 134-136 (describing the extraordinary re-vote Republicans gifted Democrats in 2007). Plaintiffs have no explanation for either of these inconsistencies.

103. Designating legislation as "emergency" is also not unusual. Every session, the Governor designates bills that he or she wants to assure consideration of, and the mechanism under existing Texas legislative rules to accomplish that is to designate a bill as an "emergency." *See supra*, FOF ¶¶ 153-154. Indeed, in 2011, Governor Perry designated two other matters as "emergency": "Legislation that will provide for a federal balanced budget amendment to the United States Constitution" and "Legislation that requires a sonogram before a woman elects to have an abortion so that she may be fully medically informed." DEF0001 (S.J. of Tex., 82d Leg., R.S. 55 (Jan. 24, 2011) (ROA.68923)). This designation, which allowed for early consideration, was particularly necessary for S.B. 14, because a lot needed to get done in the 2011 session and Democrats proved in 2009 that were willing to shut down the legislative process through "chubbing" at the end of the legislative session in order to block the will of the majority—on the voter-ID bill and all other remaining bills. *See supra*, ¶ 148. In 2011, both political parties agreed that they wanted to get the issue of voter ID behind

138

them (*see supra*, FOF ¶ 155); that was facilitated by the Governor's emergency designation of S.B. 14.

104. The same is true of the Committee of the Whole in the Senate, which is a regular feature of Senate procedure and was particularly appropriate for consideration of voter ID, an issue that had been discussed repeatedly over the past six years. *See supra*, ¶ 142.

105. Finally, and most importantly, Plaintiffs' complaints about procedure miss the forest for the trees. The inquiry into procedural deviations is actually trying to analyze whether there was an "eagerness" to rush legislation through with limited opportunity for debate and review. *N. Carolina State Conference of NAACP v. McCrory*, 831 F.3d 204, 229 (4th Cir. 2016); *accord, e.g.*, *Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 636-37 (6th Cir. 2016). The exact opposite happened here. Voter ID had been actively debated by the Texas Legislature in the 2005, 2007, and 2009 legislative sessions. And the entire record of the 2009 debate was included in the 2011 legislative record. *See supra*, FOF ¶ 159. In total, the consideration of voter ID between 2005 and 2011 encompasses more than 4,500 pages of transcripts and hundreds of pages of exhibits and written testimony. *See* DEF0001-02 (ROA.68878-77825) (legislative histories of S.B. 14, S.B. 362, H.B. 218, and H.B. 1706). The Republican majority did not use procedural maneuvers to sneak S.B. 14 past potential opponents or avoid public scrutiny. Few laws have received more deliberation.

106. Not only was S.B. 14 enacted only after the Texas Legislature "considered [its] provisions" in the open "for several months before their passage" in the 2011 legislative session alone (*Husted*, 837 F.3d at 636-37; *see supra*, FOF ¶¶ 150-198), the issue of voter ID had received years of debate, with full participation by opponents,

until finally it was put to an up-or-down vote, and passed by a majority of both houses of the Legislature. Indeed, S.B. 14 was not finally passed by the Texas Legislature until May 2011—the final month of that legislative session. This is how democracy is supposed to work. There is nothing about the mode in which S.B. 14 was considered and passed that suggests an ulterior, invidious motive in its adoption.

> **4.   Plaintiffs' complaint that the Texas Legislature failed to address other forms of election fraud is built on a false premise and is irrelevant.**

107. Plaintiffs assert racial discrimination based on the 2011 Texas Legislature's focus on in-person voter fraud and not mail-in ballot fraud. *See supra*, FOF ¶¶ 187-189.

108. At the outset, this Court cannot second guess the priorities of the Texas Legislature. Such second-guessing would be antithetical to the "*extraordinary caution*" courts must "exercise . . . in adjudicating claims that a State has" enacted a facially neutral law "on the basis of race." *Easley*, 532 U.S. at 242 (quoting *Miller*, 515 U.S. at 916).

109. This Court need not even approach this thicket because, in fact, the Texas Legislature *did* address mail-in ballot fraud, and, just as Plaintiffs recommend, it did so the session *before* it began to actively debate voter ID bills to address impersonation fraud. In 2003, the Texas Legislature passed H.B. 54, which addressed mail-in ballot fraud in various ways. For example:

   a. The law defined, by means of specific examples, conduct that constitutes assisting the voter while the person providing the assistance is in the presence of the voter's ballot or state-issued carrier envelope.

b.  The law expanded the offense of illegal voting to include knowingly marking or attempting to mark another person's ballot without that person's consent.

c.  The law expanded the offense of unlawfully assisting a voter to include preparing a voter's ballot without direction from the voter and providing assistance to a voter who either has not requested assistance or has not designated that person to provide the assistance.

d.  The law prohibited anyone from possessing another person's ballot or carrier envelope without appropriate authority.

e.  The law prohibited the acceptance of carrier envelopes originating from an office of a political party or candidate

f.  The law made it a state jail felony for anyone to buy, offer to buy, sell, or offer to sell an official ballot, ballot envelope, carrier envelope, signed application for an early-voting mail ballot, or any other election record.

g.  The law made it a Class B misdemeanor for a voter to sell his or her ballot.

Act of May 26, 2003, 78th Leg., R.S., ch. 393, § 19, 2003 Tex. Gen. Laws 1633, 1638 (codified at Tex. Elec. Code § 276.010(c)).

110. In addition, in the *same* session that the Texas Legislature enacted S.B. 14, it addressed mail-in ballot fraud *again*. *See supra*, ¶ FOF 187.

111. The Texas Legislature's decision to address mail-in ballot fraud before addressing in-person voter fraud suggests that the Legislature's concern with in-person voter fraud was not pretext. Rather, it was the continuation of the process started after the 2000 presidential election to modernize electoral systems, thus deterring voter fraud and safeguarding voter confidence.

5. **Plaintiffs' complaint that the Texas Legislature did not have sufficient evidence of in-person voter fraud or lack of confidence in elections is meritless.**

112. Plaintiffs also find evidence of discrimination in the Legislature's focus on in-person voter fraud and boosting public confidence in elections when there was purportedly little evidence justifying the Legislature's concern.

113. This complaint fails out of the gate. First, under *Crawford*, States are not required to present evidence that in-person voter impersonation has occurred at their polls to justify a photo identification requirement for voting. *See Crawford*, 553 U.S. at 194-96.

114. Second, the Texas Legislature concluded that in-person voter fraud and relatively low public confidence in elections were, in fact, problems. The Supreme Court found the same in *Crawford*, and the Fifth Circuit did so in *Veasey* and *Steen*. *Veasey*, 830 F.3d at 249; *Steen*, 732 F.3d at 394 It is therefore not open to Plaintiffs or this Court reach a different conclusion on this legislative fact:

> To put this in legalese, whether [voter fraud is a problem and whether] a photo ID requirement promotes public confidence in the electoral system [are] "legislative fact[s]"—[] proposition[s] about the state of the world, as opposed to . . . proposition[s] about these litigants or about a single state. Judges call the latter propositions "adjudicative facts." On matters of legislative fact, courts accept the findings of legislatures and judges of the lower courts must accept findings by the Supreme Court.

*Frank v. Walker*, 768 F.3d 744, 750 (7th Cir. 2014) (citations omitted).

115. In any event, there is significant evidence to support both findings of the Legislature. *See, e.g.*, *supra*, ¶¶ 221-230, 232-237, 239, 242-245; DEF0001 (Tex. Leg., Senate Committee of the Whole (82d Leg.) (Jan. 25, 2011), at 26:6-27:4, 507:23-508:22); *id.* (Tex. Leg., House Select Committee on Voter Identification Voter Fraud

Hearing (82d Leg.) (March 1, 2011)), at Vol. I 20:5-13, 22:7-10, 22:22-23:8, 26:13-15); *id.* (Tex. Leg., House Floor Debate (82d Leg.) (March 23, 2011)), Vol. II pp. 23:19-24:1; *id.* (Debate on S.B. 362 in the Senate Committee of the Whole, 81st Leg., R.S., 211:10-214:10, 281:10-13 (May 10, 2009)). In fact, one of the Hispanic members of the House who voted in favor of S.B. 14 testified that his "campaign worker's father" had "voted against" him despite that worker's father being "deceased." DEF0001 (Tex. Leg., House Floor Debate (82d Leg.) (March 23, 2011)), at Vol. III pp. 117:7-9. And the House heard evidence from Harris County's Tax Assessor and acting Voter Registrar of ballots cast in the name of dead people who remained on the voting rolls—an example of registration and impersonation fraud that would have been prevented by a photo-ID requirement. *See supra*, FOF ¶ 191 (citing House Elections Committee, Interim Report to the 81st Texas Legislature at 40 (Jan. 2009), http://www.lrl.state.tx.us/scanned/interim/80/EL25he.pdf.).

### 6.   The opinions of Plaintiffs' experts on discriminatory purpose are not credible and cannot establish the intent of the Legislature.

116. The final pieces of evidence offered by Plaintiffs are the opinions of their experts, Dr. Davidson and Dr. Lichtman. The reports offered by these experts are little more than rehashes of Plaintiffs' arguments, with the added imprimatur of "experts" on Plaintiffs' desired conclusion. Thus, the opinions of Drs. Davidson and Lichtman are unpersuasive for the same reasons that the Court finds Plaintiffs' other evidence unpersuasive.

117. For example, both experts repeatedly rely on suspect evidence—actions by long-deceased legislators, actions by those outside the Texas Legislature, the opinions

of S.B. 14 opponents, and legislation addressing immigration reform and border se-curity and other issues[18]—in order to reach their respective desired conclusions. *See, e.g.*, Davidson Corrected Rpt. ¶¶ 4-5, 27, 35, 39-40, 46, 57, 72-93 (ROA.102214-15, 102226, 102229, 102231, 102234, 102240-41, 102247-55); Lichtman Rpt. at 5-7, 19, 65-70 (ROA.102074-76, 102088, 102134-39). As the Fifth Circuit instructed, this evi-dence is not probative. *Veasey*, 830 F.3d at 229-34 & n.16. It is no more appropriate for Plaintiffs' experts to rely on this evidence than it is for Plaintiffs. Importantly, Plaintiffs' experts explicitly based their respective ultimate opinions on this infirm evidence. *See* Davidson Corrected Rpt. ¶¶ 99, 103-06 (ROA.102256-57, 102258-59); Lichtman Rpt. at 70 (ROA.102139). These opinions are fatally undermined by these errors.

118. Each expert's analysis also incorporates errors that betray a misunderstand-ing of the facts, the operation of the Texas Legislature, or both.

119. For instance, Dr. Davidson found support for his conclusion on discrimina-tory purpose in his erroneous belief that proponents of S.B. 14 in the House had re-jected a proposed amendment to add student IDs to S.B. 14 in a "closed" committee meeting. Davidson Corrected Rpt. ¶ 58 (ROA.102495-96). The meeting to which he refers was open and, more importantly, no amendments were considered at that meeting, which lasted all of three minutes. *See supra*, FOF ¶¶ 179.

120. Likewise, Dr. Davidson considered it important that S.B. 14 proponents in the House rejected "amendments that would have waived all fees for indigent persons who needed documents *to obtain an EIC*." Davidson Corrected Rpt. ¶ 59 (ROA.102496) (emphasis added). But no such amendment was rejected because no

---

[18]   Dr. Lichtman also relies on the 2012 redistricting opinion discussed *supra*, COL ¶¶ 66-68.

such amendment was offered. It would have made no sense to introduce such an amendment because the bill did not provide for EICs at the time amendments were proposed. The EIC provision was added to S.B. 14 in the conference committee, after the House considered amendments. *See supra*, FOF ¶ 195.

121.   Dr. Davidson found support for his conclusion on discriminatory purpose in his erroneous belief that "[t]he vote on final passage of [S.B. 14] in the House reflected the same pattern of racial polarization as in the Senate vote." Davidson Corrected Rpt. ¶ 60 (ROA.102496). But a number of minority House legislators voted for S.B. 14. *See supra*, FOF ¶ 200.

122.   Dr. Davidson got the facts wrong yet again when he erroneously stated that the Texas Senate "change[d]" the two-thirds rule in 2007. *See* Davidson Rpt. ¶ 22 (ROA.102001). In fact, the Senate *applied* the two-thirds rule in 2007. Initially, the Senate passed a voter-ID bill with the two-thirds rule in place. But when Lieutenant Governor Dewhurst acquiesced to Democratic Senators' demand for a do-over—the only true departure from normal legislative procedures over the course of voter-ID legislation—that the two-thirds rule spelled the demise of a voter ID bill in that session. *See supra*, FOF ¶¶ 134-136.

123.   Dr. Davidson ignored another crucial fact when he tried to link the Legislature's concern with voter ID to the growing minority population in Texas. Dr. Davidson notes that the first Republican voter ID bill was introduced the same year that Texas became a majority-minority state, thereby insinuating that Texas Republicans were spurred into action on voter-ID legislation by the threat of a growing minority population. Davidson Corrected Rpt. ¶ 7 (ROA.102464-65). But Davidson's imagined

causal relationship does not line up with the facts. The Census Bureau did not announce this development until after the 2005 legislative session was over. *See supra*, COL ¶¶ 89.

124. Dr. Davidson's participation in this litigation and in the preceding legislative process further undermines his testimony in two ways: (1) it reveals substantial bias; and (2) it casts doubt on his competence to render an opinion on the Texas Legislature's purpose.

125. Davidson's participation in this case and in the legislative process shows clear bias against voter-ID legislation and in favor of its opponents. To begin with, Davidson testified in the Texas Legislature *on behalf of opponents* of voter ID. *See* DEF0001 (Tex. Leg., Senate Committee of the Whole, 81st Leg., R.S., Witness List (March 10, 2009) (ROA.72139) (listing Dr. Davidson as a witness against S.B. 362)). In his report to this Court, Dr. Davidson lauded the efforts of voter ID opponents to block the will of a majority of Texans and their representatives as "*heroic*." Davidson Corrected Rpt. ¶ 96 (ROA.102515) (emphasis added). Dr. Davidson was not a neutral arbiter of the policy goals of S.B. 14, much less the Legislature's purpose in enacting the law. Dr. Davidson's lack of neutrality severely detracts from his credibility in opining on the Texas Legislature's purpose in enacting a voter-ID law.

126. While writing his expert report, Dr. Davidson did not interview any members of the Texas Legislature or any other government officials. Davidson Dep. 73:13–23 (ROA.60154). He did, however, consult with a historian in the Voting Rights Section of the Department of Justice. *Id.* at 56:2–17 (ROA.60137). Dr. Davidson shared at least a dozen drafts of his report with the DOJ's historian, who made suggestions, most of which Dr. Davidson incorporated into his report. *Id.* at 59:2–20 (ROA.60140).

146

127. Davidson's legislative testimony also undermines his claimed expertise in divining the Legislature's purpose. When he testified before the Legislature in opposition to voter ID, he conceded that "it is *impossible* to know the motives of those lawmakers who support" voter ID. *See* DEF0001 (Tex. Leg., Senate Committee of the Whole, 81st Leg., R.S., Exhibit 29, at 6 (March 10, 2009) (ROA.73710) (Dr. Davidson's written testimony) (emphasis added).[19] The impossible apparently became possible once Plaintiffs challenged S.B. 14 in court. Consistent with his personal opposition to voter-ID laws, Davidson offered his opinion that the Texas Legislature intended to discriminate against minority voters when it passed S.B. 14.

128. Dr. Lichtman engages in similarly loose treatment of the facts. For example, he also seems to not know that the EIC provision was added to S.B. 14 in conference. *See* Lichtman Rpt. at 54 (ROA.102123).

129. Dr. Lichtman also places heavy weight on the fact that S.B. 14 allows for the use of handgun licenses to prove identity. *See, e.g.*, *id.* at 24-32, 42-44 (ROA.102093-102101, 102111-13). But handgun licenses were added to the list of qualifying IDs by a Democratic Senator's amendment, which the Senate adopted unanimously. *See supra*, FOF ¶ 168. That decision provides no support for an inference of discriminatory purpose from that decision.

130. Likewise, Dr. Lichtman faults the Texas Legislature for failing to include a provision in S.B. 14 allowing an indigency affidavit to substitute for an ID. *See* Lichtman Rpt. at 40 (ROA.102109). But Republicans in the Senate amended S.B. 14 to

---

[19]   In a preview of his report to the Court, Dr. Davidson could not get his facts straight in his testimony before the Legislature. *See, e.g.*, DEF0001 (Tex. Leg., Senate Committee of the Whole, 81st Leg., R.S., vol. II, at 536:2-538:15 (March 11, 2009) (ROA.72725-27) (Senator Williams correcting Dr. Davidson's erroneous view that S.B. 362 permitted only photo ID)).

*include* such a provision at the suggestion of Democratic Senator Wendy Davis. That provision was included in the version of S.B. 14 reported out of committee in the House. It was only excised later in the House, at the insistence of Democrats, who voted for an amendment eliminating an indigency-affidavit provision. *See supra*, FOF ¶¶ 184.

131. Dr. Lichtman also faults the Texas Legislature for allowing voters over the age of 65 to vote by mail, which does not require an ID. *See, e.g.*, Lichtman Rpt. at 64-65 (ROA.102133-34). But he ignores that this was already the law long before photo-voter ID was ever an issue in the Texas Legislature. *See supra* FOF ¶ 12. In addition to blaming the wrong Legislature, Dr. Lichtman fails to consider that most of the plaintiffs and voter-witnesses in this case who complained about having difficulty obtaining S.B-14-compliant ID were *elderly*. *See supra*, FOF ¶¶ 39, 43. Preserving mail-in voting for the elderly goes a long way towards remedying the minimal negative impact Plaintiffs have been able to show in the case. *See id.*

132. Dr. Lichtman also relies on irrelevant facts. He repeatedly cites information that was not before the Texas Legislature when it considered S.B. 14. For example, Dr. Lichtman spends an inordinate amount of space addressing statistics showing that various IDs not included in S.B. 14 are more likely to be held by minorities than certain IDs that were included, such as handgun licenses. *See* Lichtman Rpt. at 27-35 (ROA.102096-104). Yet there is no evidence that the Legislature was aware of any of these alleged statistics. And if the Legislature was not aware of this information, it could not have been a factor in its decision. *See Feeney*, 442 U.S. at 278-79 (analyzing whether disparate impact was intentional only *after* determining that the legislature was, in fact, aware that such an impact would result).

148

133. Similarly, Dr. Lichtman somehow finds support for discriminatory intent in post-enactment events occurring outside the Legislature. *See* Lichtman Rpt. at 59-63 (ROA.102128-32). Exemplifying the lengths that Dr. Lichtman went to find some support for his desired conclusion, he attributed the views expressed by *musician Ted Nugent* to the Texas Legislature. *See id.* at 69 (ROA.102138). Lichtman cites negative statements about President Obama made by Nugent in 2012 during then-Attorney General Greg Abbott's campaign for governor. Statements by an individual who did not vote on S.B. 14, made long after S.B. 14 had been enacted, while campaigning with another individual who did not vote on S.B. 14, are facially irrelevant to the Texas Legislature's purpose in enacting the law. *See Feeney*, 442 U.S. at 278-79.

134. Finally, both Dr. Davidson and Dr. Lichtman ignore, rather than attempt to explain, evidence that undermines their conclusions. This suggests that both of their opinions suffer from confirmation bias. *See, e.g.*, *Goswami v. DePaul Univ.*, 8 F. Supp. 3d 1004, 1018 n.11 (N.D. Ill. 2014) ("Confirmation bias is the well-documented tendency, once one has made up one's mind, to search harder for evidence that confirms rather than contradicts one's initial judgment.") (internal quotation marks omitted).

135. Dr. Davidson, for example, regularly brings up (and exaggerates) the racial divide of S.B. 14 opponents and proponents in the Texas Legislature, but he ignores the consistent support for voter ID among Texas citizens regardless of race or ethnicity. *See* Davidson Corrected Rpt. ¶¶ 37-38, 51, 60 (ROA.102483-84, 102491, 102496; *supra*, FOF ¶¶ 81, 83-85.

136. Davidson also highlights racial information while ignoring more relevant partisan data. For example, he states that "no minority senators voted in favor of [S.B. 14], and almost all Anglo senators voted in favor." Davidson Corrected Report at ¶ 51 (ROA.102491). His decision to frame the vote in racial terms is odd since the

split in the Senate tracked partisan affiliation perfectly—all Republicans voted for S.B. 14; all Democrats voted against it, regardless of race.

137. Dr. Davidson finds additional support for his conclusion in the rejection of various Democratic amendments, but fails to explain why a Legislature determined to discriminate against minority voters would nonetheless adopt a number of ameliorative amendments proposed by Democrats for the stated purpose of helping minority voters. *See id.* ¶¶ 50, 58-60, 94 (ROA.102491, 102495-96); *see also supra*, FOF ¶¶ 168.

138. Dr. Davidson also finds support for his conclusion in the relatively accelerated pace of consideration of S.B. 14. *See* Davidson Corrected Rpt. ¶ 44 (ROA.102487). But Dr. Davidson fails to account for the fact that the issue of voter ID had been under consideration for *six years* and for the fact that voter ID opponents conceded that, given the years of previous debate on the topic, they were prepared to debate and offer amendments notwithstanding the schedule. *See supra*, FOF ¶¶ 169. Indeed, both political parties wanted to get the voter-ID debate past them early in the 2011 session. *See supra*, FOF ¶¶ 155-156.

139. Both Dr. Davidson and Dr. Lichtman train their focus on the procedural maneuvers that became necessary to allow S.B. 14 to have an up-or-down vote, but make no effort to account for the possibility that proponents of voter ID were left with no other choice than to use these maneuvers given the obstinacy and abuse of procedural rules by opponents in previous legislative sessions. *See* Davidson Corrected Rpt. ¶¶ 42-44, 97-98 (ROA.102486-87, 102515-16); Lichtman Rpt. at 21-23 (ROA.102090-92). Indeed, while Davidson cites proponents' use of procedural maneuvers as evidence of racial discrimination, he lauds opponents' use of procedural maneuvers as "heroic." Davidson Corrected Rpt. ¶ 96 (ROA.102515).

150

140. Dr. Lichtman, meanwhile, found evidence of bias in the fact that the elderly, who are disproportionately white, are allowed to vote by mail, but he failed to explain why, if the Legislature were biased in favor of elderly white voters, it would eliminate an exemption from the ID requirement for those over 70. *See* Lichtman Rpt. at 64-65 (ROA.102133-34); *supra*, FOF ¶¶ 185. Dr. Davidson went further, somehow concluding that the elimination of this provision, which was to the disproportionate detriment of whites, was *evidence of bias against minorities*. Davidson Corrected Rpt. ¶ 60 (ROA.102496).

141. Both experts also find support for their conclusions in the fact that voter ID became an issue as Texas's minority population was growing. *See* Davidson Corrected Rpt. ¶¶ 7, 95 (ROA.102464-65, 102514); Lichtman Rpt. at 8-9 (ROA.102077). But neither addressed the alternative and more obvious explanation for the timing of voter-ID legislation in Texas: the nationwide push and growing support among Texans for voter-ID laws. *See supra*, FOF ¶¶ 52-92.

142. Similarly, these experts found support for their conclusion in the strictness of S.B. 14, but failed to account for or address the fact that the same legislators who voted for S.B. 14 had previously voted for more lax voter ID bills—thus confirming these legislators had no invidious purposes. *See* Davidson Corrected Rpt. ¶ 41 (ROA.102485-86); Lichtman Rpt. at 20-21, 23-24 (ROA.102089-90, 102092-93); *see also supra*, FOF ¶¶ 197, 199.

143. Both experts also found support for their conclusion in the failure of S.B. 14 to address issues of implementation of the voter ID requirement, but they failed to account for the traditional practice in Texas of leaving issues of implementation to the agencies under the oversight of the Legislature. *See* Davidson Corrected Rpt.

¶¶ 47-49, 59 (ROA.102489-91, 102496); Lichtman Rpt. at 56-57 (ROA.102125-26); *see also supra*, FOF ¶¶ 169-171.

144. Finally, both Dr. Davidson and Dr. Lichtman chose to rely on information not presented to the Texas Legislature that purportedly shows that S.B. 14 will have a disparate impact of minorities, while they chose to ignore information that *was* presented to the Texas Legislature that showed the opposite. *See* Davidson Corrected Rpt. ¶¶ 68-71 (ROA.102499-500); Lichtman Rpt. at 25-35 (ROA.102094-104); *see also supra*, FOF ¶¶ 36-37, 207-215; COL ¶¶ 36-43.

145. Numerous flaws permeate the reports of Drs. Davidson and Lichtman. The Court, therefore, rejects these opinions as unreliable. Regardless, they cannot possibly overcome the direct and circumstantial evidence showing that S.B. 14 was enacted for legitimate purposes and not a racially discriminatory purpose.

## II.  THE TEXAS LEGISLATURE WAS GOING TO ENACT S.B. 14 REGARDLESS OF ANY PURPORTED SECRET PURPOSE.

146. Even assuming for the sake of argument—contrary to the overwhelming evidence—that Plaintiffs had shown that the Texas Legislature enacted S.B. 14 in some small part on the basis of a secretly held discriminatory purpose, their claim would still fail because Defendants have "demonstrate[d] that the law would have been enacted without this factor." *Hunter*, 471 U.S. at 228.

147. The push for a photo-voter ID law, which began following the 2000 election, was hitting its peak in 2011. By then, nearly 1,000 voter ID bills had been introduced across the country and numerous legislatures had passed such laws. *See supra*, FOF ¶¶ 52-92.

148. In Texas, voter ID was just one additional mechanism in the Legislature's corresponding decade-long push to enhance election integrity and public confidence in elections in Texas. *See supra*, FOF ¶¶ 100-188.

149. By 2011, Republicans exhibited electoral dominance in every part of state government in Texas. *See supra*, FOF ¶¶ 150. And Republican voters were vocally demanding what the population at-large supported: a photo-only voter ID law with minimal loopholes. *See supra*, FOF ¶¶ 89-92. As Plaintiffs' own witness conceded, there was "enormous" "pressure on members of the legislature in 2011 to vote for Senate Bill 14." Trial Tr. 207:2-4 (Sept. 3, 2014) (Wood) (ROA.99139). As Representative Smith put it, "every Republican member of the legislature would have been lynched if" S.B. 14 "had not passed." Trial Transcript 340:1-3 (Sept. 9, 2014) (Smith) (ROA.100334).

150. There is an irony floating just under the surface of this case: if Democrats had been at all interested in compromise as opposed to obstruction from 2005 through 2009, the Texas Legislature almost certainly would have passed a compromise version of a voter ID law that included some forms of non-photo ID. *See supra*, FOF ¶¶ 112-147. But after Democratic legislators had used extraordinary procedural maneuvers to block voter-ID bills in three consecutive legislative sessions, Republicans—who had overwhelming legislative majorities by 2011—had given up on trying to placate Democratic legislators and instead listened to their constituents and voted in line with their policy preference to enact a photo-voter-ID law that would have a greater ability to deter voter fraud and safeguard voter confidence. The result was S.B. 14, and the bill would have been enacted regardless of any other alleged secretly held legislative purpose.

## CONCLUSION

S.B. 14 was not enacted with a discriminatory purpose. Judgment will enter for Defendants.

Date: November 18, 2016          Respectfully submitted.

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant
  Attorney General

BRANTLEY D. STARR
Deputy First Assistant
  Attorney General

JAMES E. DAVIS
Deputy Attorney General
  for Litigation

/s/ Angela V. Colmenero
ANGELA V. COLMENERO
Chief, General Litigation Division

MATTHEW H. FREDERICK
Deputy Solicitor General

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC 059)
Austin, Texas  78711-2548
Tel.: (512) 936-6407
Fax: (512) 474-2697

*Counsel for Defendants*

154

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 18, 2016, a true and correct copy of the foregoing document was served via the Court's ECF system to all counsel of record.

<u>/s/ Angela V. Colmenero</u>
ANGELA V. COLMENERO

155