**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

MARC VEASEY, *et al.*,

                Plaintiffs,

        v.

GREG ABBOTT, *et al.*,

                Defendants.

Civil Action No. 2:13-cv-193 (NGR)

**BRIEF OF PRIVATE PLAINTIFFS IN RESPONSE TO
DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................ 1

ARGUMENT .................................................................................................................. 4

    I.    THE FIFTH CIRCUIT REJECTED TEXAS'S LEGAL ARGUMENTS............. 4

        A.    The Fifth Circuit Rejected Texas's "Heightened" Standard
             Requiring That  Conduct Must Be "Unexplainable On Grounds
             Other Than Race" To Support A Finding Of Discriminatory Intent ......... 4

        B.    The Fifth Circuit Ruled That Circumstantial Evidence Was No
             Less Probative Than Direct Evidence Under The Facts Of This
             Case ...................................................................................................... 6

    II.    TEXAS'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF
        LAW RAISE FACTUAL ISSUES ALREADY DECIDED AGAINST IT
        AND CONTRARY TO THE EVIDENCE.......................................................... 8

        A.    The Fifth Circuit Ruled That There Was More Than Sufficient
             Evidence To Justify A Finding Of Discriminatory Intent ........................ 9

        B.    SB14's Discriminatory Effect Is Evidence Of A Discriminatory
             Intent ..................................................................................................... 9

        C.    The Redistricting Decision Is A Contemporary Example Of
             Discrimination ...................................................................................... 11

        D.    Dr. Lichtman's And Other Experts' Opinions Were Credible And
             Supportive Of The Court's Findings As To Intent ................................. 12

        E.    Texas's Rewriting Of The Legislative History Defies Evidence
             And Logic ............................................................................................. 14

CONCLUSION.............................................................................................................. 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Coggeshall v. United States,*
    69 U.S. 383 (1864)................................................................................................17

*Easley v. Cromartie,*
    532 U.S. 234 (2001)..........................................................................................5, 6

*Foster v. Chatman,*
    136 S. Ct. 1737 (2016).......................................................................................19

*Holland v. United States,*
    348 U.S. 121 (1954).............................................................................................7

*Hunt v. Cromartie,*
    526 U.S. 541 (1999).............................................................................................5

*Lee v. Virginia State Bd. of Elections,*
    No. 16-1605, 2016 WL 7210103 (4th Cir. Dec. 13, 2016)..................................24

*Pers. Adm'r of Mass. v. Feeney,*
    442 U.S. 256 (1979)..........................................................................................4, 5

*Price v. Austin Ind. Sch. Dist.,*
    945 F.2d 1307 (5th Cir. 1991) ............................................................................7

*Rogers v. Lodge,*
    458 U.S. 613 (1982).............................................................................................7

*Shaw v. Reno,*
    509 U.S. 630 (1993)..........................................................................................5, 6

*Texas v. United States,*
    887 F. Supp. 2d 133 (D.D.C. 2012) ..................................................................11

*United States v. Brown,*
    561 F.3d 420 (5th Cir. 2009) ............................................................................4, 7

*United States v. Vargas-Ocampo,*
    747 F.3d 299 (5th Cir. 2014) ...........................................................................17

*Veasey v. Abbott,*
    830 F.3d 216 (5th Cir. 2016) ................................................................... *passim*

*Veasey v. Perry*,
   71 F. Supp. 3d 627 (S.D. Tex. 2014) ............................................................. *passim*

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
   429 U.S. 252 (1977) ...................................................................................... *passim*

*Washington v. Davis*,
   426 U.S. 229 (1976) ...............................................................................................4

**Statutes**

TEXAS ELECTION CODE § 64.012 (2003) .................................................................15

TEXAS PENAL CODE 12.34 (2003) ..........................................................................15

**Other Authorities**

Tex. H.B. 744, 77th Leg., R.S. (2001) ....................................................................21

Tex. H.B. 1549, 78th Leg., R.S., House Comm. Rep. (2003) ....................................20

## INTRODUCTION

Texas's Proposed Findings of Fact and Conclusions of Law ("TFOF" and "TCOL," respectively) constitute an unsupportable counterfactual view of the world as Texas wishes it might have been. They are based, on the one hand, on legal arguments and factual assertions already rejected by both this Court and the Fifth Circuit, and, on the other, by arguments Texas apparently wishes it had made previously, but did not. In short, Texas tries to justify the indefensible proposition that there was no discriminatory intent behind SB14—the strictest photo identification law in the nation—by engaging in the same rationale-shifting tactics used by proponents of SB14 to pass that misbegotten law in the first place.

First, Texas advances an incorrect view of the overarching legal standard—one that is directly at odds not only with the law of the case as provided by the Fifth Circuit but also with Supreme Court precedent. Plaintiffs need not prove, as Texas argues, that SB14 is unexplainable on any grounds but race, but only that discrimination was *a* motivating factor, not necessarily the only one, behind the law. Texas disregards the Fifth Circuit's specific holdings: (1) that circumstantial evidence is as probative as so-called "direct evidence" in proving discriminatory intent; and (2) that the degree of access afforded to litigants is legally irrelevant to the basis for a discriminatory intent finding. Without the benefit of the erroneous legal and evidentiary standards Texas invents, its entire defense crumbles, and even without those contrived standards, the evidence is clear that SB14 was passed with discriminatory intent.

In its presentation of facts, Texas also ignores the Fifth Circuit's decision. The Fifth Circuit specifically ruled that there was ample record evidence to support a finding by this Court of discriminatory intent, not merely "shreds" of evidence, as Texas alleges. In remanding the issue of discriminatory intent, the Fifth Circuit did not direct this Court to revisit all of its findings anew, but rather to assess whether this Court's original calculus of intentional

discrimination stands absent the evidence that the Fifth Circuit found "infirm."  Accordingly, Plaintiffs demonstrated in their opening submissions that the record evidence, without that which the Fifth Circuit deemed "infirm," easily supports a finding of discriminatory intent.  Texas, however, deviates from the Fifth Circuit's rulings, attacking findings of fact that the Fifth Circuit already ruled are supported by the record evidence and are not implicated by evidence deemed "infirm"—including that Plaintiffs' database analyses are relevant, that Plaintiffs' experts are credible, that there is history of recent discrimination in Texas, that the Texas Legislature's procedures in passing SB14 were unprecedented, that there is evidence that the proffered justifications for SB14 are pretextual, and that Texas did not adequately ameliorate the burdens imposed by SB14.  There is no basis for this Court to retreat from its original view of these facts, now validated by the Fifth Circuit.

The Fifth Circuit also expressly ruled that the issue of intentional discrimination be decided on the record evidence, without the introduction of new evidence.  Texas also ignores this directive, and peppers its Proposed Findings of Fact and Conclusions of Law with new theories of its case and new rationales for SB14 supposedly supported by new evidence, as to which it asks this Court to take judicial notice.  Texas has never before argued that SB14 was merely the last chapter in a movement to "modernize" election laws that resulted from the 2000 presidential election—an argument that is now the centerpiece of its defense.  Texas's shifting rationale at this stage of litigation, much like the Legislature's shifting rationales in 2011, is simply another post-hoc justification to mask discriminatory intent.

Texas's Proposed Findings of Fact and Conclusions of Law also rely on gross distortions of the record.  Texas tries to paint a counterfactual view of history in which SB14 proponents were always willing to compromise, had no idea that the law might violate the rights of Black

and Latino voters, and passed the most stringent voter ID law in the country only because their constituents told them to do so.  Accepting this history requires that SB14 proponents were not aware of the exponential growth of the Latino population in Texas and the concomitant threat to their political power from that growth, or of the probable effects on minority populations of SB14's draconian provisions.  This despite being contemporaneously warned of these effects by the Lieutenant Governor's office and despite expert testimony—already accepted by this Court—that the Legislature had to have understood SB14's probable effects as they made choice after choice that made the bill more and more discriminatory.  Accepting this argument requires rejecting this Court's well-founded findings—all of which were untouched by the Fifth Circuit— that the unprecedented procedural machinations and the shifting and tenuous justifications for the law support a finding of discriminatory intent.  Ultimately, Texas is left to fall back on the nonsensical argument that, because proponents of SB14 once tried to pass a less discriminatory bill than SB14, they could not possibly have had a discriminatory intent when they passed a more discriminatory bill.

This Court's decision on remand must be grounded in the Fifth Circuit's roadmap of the evidence, not in Texas's twice-rejected view of the facts, and not in Texas's never-before-seen narratives relying on scant facts that are not in the record.  For the reasons set forth in Plaintiffs' Proposed Findings of Fact, in Private Plaintiffs' Brief, in this brief, and in the prior and response submissions of the United States, which Private Plaintiffs rely on and incorporate herein, this Court should find that SB14 was enacted with discriminatory intent and, therefore, should be struck down.

**ARGUMENT**

**I.    THE FIFTH CIRCUIT REJECTED TEXAS'S LEGAL ARGUMENTS**

Despite consistent guidance from the Supreme Court, Texas has repeatedly sought to distort and dramatically raise the burden for proving discriminatory intent, arguing that Plaintiffs must show that a legislative decision is "unexplainable by grounds other than race" (*see* TCOL ¶ 10), and to create new rules regarding the adequacy of circumstantial evidence. The Fifth Circuit decisively rejected Texas's attempts to so constrict the law against racial discrimination. Remarkably, Texas makes these same arguments still. They are no longer subject to debate.

**A.    The Fifth Circuit Rejected Texas's "Heightened" Standard Requiring That Conduct Must Be "Unexplainable On Grounds Other Than Race" To Support A Finding Of Discriminatory Intent**

The Fifth Circuit clearly outlined the well-established Supreme Court standard for analyzing and finding discriminatory intent: "'[r]acial discrimination need only be one purpose, *and not even a primary purpose*' of an official action for a violation to occur." *Veasey v. Abbott*, 830 F.3d 216, 230 (5th. Cir. 2016) (en banc) (quoting *United States v. Brown*, 561 F.3d 420, 433 (5th Cir. 2009)) (emphasis added). This law of the case unequivocally precludes Texas's proposed "heightened" standard.

Nonetheless, Texas persists in its misrepresentation of Supreme Court precedent. *See* TCOL ¶¶ 7-11. First, Texas argues that "[t]he Supreme Court, through a trio of well-established precedents, has imposed significantly heightened standards for finding that any public actor—but particularly a State legislature—has acted with a racially discriminatory purpose." TCOL ¶ 7. But nowhere in the three cases Texas cites—*Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256 (1979); *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977); *Washington v. Davis*, 426 U.S. 229 (1976)—does the

4

Court establish either a "heightened standard" for discriminatory intent or a special standard for state legislatures.

Next, Texas argues that Plaintiffs must show that the law is "unexplainable on grounds other than race," citing *Feeney* for the proposition that Plaintiffs must show "that the justification for the law is 'obvious pretext' for racial discrimination—that is, the law 'can plausibly be explained only as a [race]-based classification.'"  TCOL ¶ 10.  But that quote from *Feeney* is not from the Court's application of the *Arlington Heights* factors, but from its preliminary discussion of whether a statutory classification—in that case "veterans"—was gender-neutral on its face, or if there was an "obvious pretext" that could be explained only on the grounds of race or gender. *Feeney*, 442 U.S. at 272-73.  Because the definition of "veterans" in the statute "has always been neutral as to gender" and "inclusive of women," the Court held that the law could not "plausibly be explained only as a gender-based classification."  *Id*. at 275.

After ruling that the law was gender-neutral on its face, the Court in *Feeney* proceeded to the second step of discriminatory purpose analysis, using language, which Texas ignores, that is diametrically opposite to a standard of "unexplainable on grounds other than race":  "The dispositive question, then, is whether the appellee has shown that a gender-based discriminatory purpose has, *at least in some measure*, shaped the Massachusetts veterans' preference legislation."  *Id*. at 276 (emphasis added).  This standard is dramatically lower than that which Texas proposes.

Texas also cites inapposite racial gerrymandering cases as requiring that Plaintiffs show that the legislative decisions is "unexplainable on grounds other than race."  TCOL ¶ 10 (citing *Easley v. Cromartie*, 532 U.S. 234 (2001) ("*Cromartie II*"); *Hunt v. Cromartie*, 526 U.S. 541, 546 (1999); *Shaw v. Reno*, 509 U.S. 630, 644 (1993) (collectively "*Shaw* cases").  These cases

are entirely distinct from ordinary racial discrimination cases.  Under *Shaw* cases, a constitutional injury is suffered as a result of racial gerrymandering when a "reapportionment plan . . .  includes in one district individuals who belong to the same race, but who are otherwise widely separated by geographical and political boundaries, and who may have little in common with one another but the color of their skin," because such a scheme "bears an uncomfortable resemblance to political apartheid."  *Shaw*, 509 U.S. at 647.  That race is the predominant factor *is* the injury.  Thus, unlike this case, where discriminatory intent may be found where race is "a" motivating factor, and not necessarily the primary purpose, *Veasey,* 830 F.3d at 231, in *Shaw* cases, "[r]ace must not simply have been *a* motivation for the drawing of a majority-minority district, but the *predominant* factor motivating the legislature's districting decision."  *Cromartie II*, 532 U.S. at 241 (internal citations and quotations omitted).  *Shaw* cases are therefore inapplicable to Plaintiffs' claims in this litigation.

Finally, Texas relies on the Court's description in *Arlington Heights* of the "rare" case where a "clear pattern" or "stark" discriminatory effect makes clear that the conduct was "unexplainable on grounds other than race," *Arlington Heights,* 429 U.S. at 266, to suggest that this is the legal standard for all discrimination cases.  *See* TCOL ¶¶ 10, 33.  But the whole purpose of the *Arlington Heights* factors is to deal with the typical case where, as here, the discriminatory motive is not expressly stated.  The controlling Supreme Court precedent is unambiguous:  racial discrimination need not be the only motivating factor behind an intentionally discriminatory law, or even the principal factor.

### B.     The Fifth Circuit Ruled That Circumstantial Evidence Was No Less Probative Than Direct Evidence Under The Facts Of This Case

Before the Fifth Circuit, Texas argued both for a "clearest proof" standard for the discriminatory intent claim, as well as an evidentiary rule requiring the court to consider only

direct evidence.  The Fifth Circuit flatly rejected these arguments, holding that they had no basis

in the established law on discriminatory purpose:

> The State argues that, instead of applying the *Arlington Heights* standard,
> we should apply a "clearest proof" standard grafted from cases involving
> the determination of whether a legislature meant to impose criminal
> punishment through a civil law when the law faces an ex post facto
> challenge. . . .  The Supreme Court has not applied this standard in the voting
> rights context. . . .  Instead, we have noted that discriminatory intent in this
> context may be shown through circumstantial evidence, as discriminatory
> motives are often "cleverly cloaked in the guise of propriety."  We decline
> to apply the State's proposed standard in this context.

*Veasey*, 830 F.3d at 230 n.12 (internal citations omitted); *see also Rogers v. Lodge*, 458 U.S.

613, 618 (1982) ("[D]iscriminatory intent need not be proved by direct evidence."); *Brown*, 561

F.3d at 433 ("To find discriminatory intent, direct *or* indirect circumstantial evidence, including

the normal inferences to be drawn from the foreseeability of defendant's actions may be

considered.") (internal quotations omitted).

       Nevertheless, Texas persists in arguing that circumstantial evidence cannot support a

finding of discriminatory intent, pulling a new proposition of law out of thin air:  "Although

discriminatory intent may be proved by circumstantial evidence in certain cases . . . , the courts'

acceptance of circumstantial evidence is based on the assumption that litigants will not have

access to direct evidence."  TCOL ¶ 31.

       First, there is no support for the proposition that "circumstantial evidence" is any less

probative than "direct evidence."  "Circumstantial evidence in this respect is intrinsically no

different from testimonial evidence.  Admittedly, circumstantial evidence may in some cases

point to a wholly incorrect result.  Yet this is equally true of testimonial evidence."  *Holland v.

United States*, 348 U.S. 121, 140 (1954).  The principal case upon which Texas relies, *Price v.

Austin Independent School District*, 945 F.2d 1307 (5th Cir. 1991) (*see* TCOL ¶ 31), does not

deviate from this principle.  Indeed, Texas ignores the Fifth Circuit's express distinguishing of

7

*Price* from this case on this very point: "Neither *Arlington Heights* nor our decision in *Price* requires direct evidence." *Veasey*, 830 F.3d at 231 n.13 (internal citations omitted).

Second, no court has ever held or even suggested that lack of "access" to direct evidence is a condition precedent to the "acceptance" of circumstantial evidence in intentional discrimination cases. Again, the law is to the contrary. As the Fifth Circuit observed, a direct evidence requirement would needlessly hamstring enforcement of anti-discrimination statutes and the Fourteenth Amendment, with no evidentiary benefit: "In this day and age we rarely have legislators announcing an intent to discriminate based upon race, whether in public speeches or private correspondence." *Veasey,* 830 F.3d at 235; *see also id.* at 235 n.19 (noting that "there is evidence that the proponents of SB 14 were careful about what they said and wrote about the purposes of SB 14").

## II.  TEXAS'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW RAISE FACTUAL ISSUES ALREADY DECIDED AGAINST IT AND CONTRARY TO THE EVIDENCE

Throughout its recent submission, Texas asks this Court to revisit findings of fact the Court made in 2014 that the Fifth Circuit did not disturb. But the Fifth Circuit remanded the issue of intentional discrimination for this Court to assess only "how much the evidence found infirm weighed in the district court's calculus." *Veasey*, 830 F.3d at 241. If a finding of fact made by this Court did not implicate "infirm" evidence, there is no basis for the Court to deviate from that original finding. As detailed below, this Court decided virtually every factual issue raised by Texas based on evidence not deemed "infirm" by the Fifth Circuit. Any other factual issues raised by Texas are unsupported, illogical, or directly refuted by the record.

**A.  The Fifth Circuit Ruled That There Was More Than Sufficient Evidence To Justify A Finding Of Discriminatory Intent**

Texas describes the Fifth Circuit's decision as leaving this Court with only "shreds" of evidence, "insufficient" to overcome the evidence that purportedly "dispel[s] any notion of a discriminatory motive." TCOL ¶ 2. That is a gross misstatement of the Fifth Circuit's view of the evidence. The Fifth Circuit expressly held that "the record also contained evidence that could support a finding of discriminatory intent," thus meeting the standard for remand set forth in *Pullman-Standard*. *Veasey*, 830 F.3d at 234-35. "Shreds" of evidence would obviously be insufficient to meet that standard. In fact, the Fifth Circuit indicated that the remaining evidence did not simply meet the bare minimum threshold for remand, but that there was sufficient "evidence to support a finding that the cloak of ballot integrity could be hiding a more invidious purpose." *Id*. at 241. Describing this evidence as "shreds" misrepresents the Fifth Circuit's plain language and the very justification for remand.

**B.  SB14's Discriminatory Effect Is Evidence Of A Discriminatory Intent**

1. The database analysis is credible and relevant to intent.

Texas argues that Plaintiffs' experts' database analyses, showing disparate possession of SB14 ID by minority voters as compared to Anglo voters, "are irrelevant to evaluating discriminatory purpose." TCOL ¶ 44. But disparate impact is the "starting point" for analysis of discriminatory intent. *Arlington Heights*, 429 U.S. at 266. On that basis alone, the database analyses are relevant to this Court's intent determination.

The Fifth Circuit upheld this Court's findings of disparate impact based on the database analyses and rejected Texas's argument that the relevant statistic is the gross number of affected voters, not the relative percentages. *Compare* TCOL ¶ 47 *with Veasey*, 830 F.3d at 250-51, 252 n.45 ("Courts have never required the gross number of affected minority voters to exceed the

gross number of affected Anglo voters.").  The Fifth Circuit also decisively rejected Texas's

argument that only outright denial of the right to vote is cognizable (*see* TCOL ¶ 48), noting that

the Constitution and Section 2 "explicitly prohibit *abridgement* of the right to vote."  *Veasey*,

830 F.3d at 253 (describing Texas's argument as "short sighted" and ignoring "the history and

text of the Fifteenth Amendment").

2.    Plaintiffs identified voters who were burdened by SB14.

At trial, Plaintiffs presented no fewer than seventeen witnesses facing a burden to their

right to vote because of SB14.  Plaintiffs' Joint Proposed Findings of Fact (Dkt. 961) ("PFOF")

¶¶ 138, 284, 286, 289, 330, 376, 393-96, 413, 419-22.  Despite this evidence, Texas once again

asserts that there is "no evidence of a single identifiable voter whom S.B. 14 will prevent from

voting."  TFOF ¶ 35; *see also id.* ¶¶ 38-44.  As discussed *supra,* the Fifth Circuit rejected the

legal proposition that absolute vote denial is the appropriate standard in this case.  Further, the

Fifth Circuit expressly found that "the record evidence disproves the State's claim that 'the

plaintiffs have failed to identify a single individual who faces a substantial obstacle to voting

because of SB 14.'"  *Veasey*, 830 F.3d at 254.  These proposed findings are inconsistent with the

law of the case as set forth in the Fifth Circuit's opinion (and the overwhelming evidence) and

should be rejected.

Texas also argues that some plaintiffs faced no burden because they could vote by mail.

*See* TFOF ¶¶ 12-14, 39-41, 43-44, 131; TCOL ¶ 131.  But the Fifth Circuit ruled that "[t]he

district court did not clearly err in finding that mail-in voting is not an acceptable substitute for

in-person voting."  *Veasey*, 830 F.3d at 255.  Texas argues that other voters may have been

eligible for a disability exemption (*see* TFOF ¶ 40), but the Fifth Circuit noted that the strict

disability exemption does not mitigate SB14's burden and instead "evidences the increased

10

burden" the law places on voters due to Texas's paltry public education plan. *Veasey*, 830 F.3d at 254 n.48.

> 3.    Texas's efforts to ameliorate the burdens of SB14 were insufficient.

Texas offers Proposed Findings of Fact in support of its argument that the Legislature took steps to mitigate the burdens SB14 imposed on voters. *See* TFOF ¶¶ 9-11 (SB14 provides for EICs); ¶¶ 12-14 (SB14 allows voting by mail); ¶¶ 15-17 (disability and other exemptions in SB14); ¶¶ 18-19 (voters without SB14 may cast a provisional ballot); ¶¶ 21-23 (SB14 provides for training and voter outreach); ¶¶ 24-34 (implementation of EIC program). But the Fifth Circuit specifically endorsed this Court's findings regarding the failure of the EIC program to alleviate SB14's burdens.[1] Moreover, as discussed *supra*, the Fifth Circuit found "no clear error in the district court's finding that mail-in voting . . . does not sufficiently mitigate" those burdens and that the disability exemption only further "evidence[s] the increased burden" SB14 places on voters. *Veasey*, 830 F.3d at 254 n.48, 256. The Fifth Circuit also found no error in this Court's finding that Texas's "lackluster educational efforts resulted in additional burdens on Texas voters." *Id.* at 256. Texas's Proposed Findings of Fact are directly in conflict with the settled findings of this Court, undisturbed by "infirm" evidence, and, thus, should be rejected.

**C.    The Redistricting Decision Is A Contemporary Example Of Discrimination**

Texas argues that *Texas v. United States*, 887 F. Supp. 2d 133 (D.D.C. 2012), *vacated and remanded on other grounds*, 133 S. Ct. 2885 (2013), in which a three-judge panel held that

---

[1] This Court previously outlined some of the many costs associated with getting a "free" EIC. *Veasey v. Perry*, 71 F. Supp. 3d 627, 669-73 (S.D. Tex. 2014). Further intensifying the burden, this Court found that the EIC program is "obscure" and "insufficient" and that Texas made "[n]o real effort" to educate the public about the program. *Id.* at 667-68. The Fifth Circuit found no error with any of these findings, and in fact reiterated the wealth of evidence supporting them. *Veasey*, 830 F.3d at 256 ("[T]he record is replete with evidence that the State devoted little funding or attention to educating voters about the new voter ID requirements . . . .").

Texas failed to meet its burden to show that the 2011 Texas Legislature did not enact two redistricting plans with a discriminatory purpose, "cannot possibly support a discriminatory-purpose finding here."  TCOL ¶ 66.  But the Fifth Circuit highlighted this precise case as a "contemporary example[] of State-sponsored discrimination in the record" that "augment[s]" the circumstantial evidence of discriminatory intent in this case.  *Veasey*, 830 F.3d at 239-40 ("[T]he same Legislature that passed SB 14 also passed two [different redistricting plans] found to be passed with discriminatory purpose.").

> **D.    Dr. Lichtman's And Other Experts' Opinions Were Credible And Supportive Of The Court's Findings As To Intent**

This Court already specifically accepted and relied on the opinions of Dr. Alan Lichtman, Dr. Chandler Davidson, and others to support its finding of discriminatory intent:

> The fact that past discrimination has become present in SB 14 is apparent from both the obvious nature of the impact and the manner in which the legislature chose options that would make it harder for African-Americans and Hispanics to meet its requirements. This was demonstrated by the analysis of Dr. Alan Lichtman, Distinguished Professor of History at American University, who is an expert in quantitative and qualitative historical analysis of voting, political, and statistical data. His report documents "intentional discrimination against minorities to achieve a partisan political advantage." Dr. Davidson and Mr. Korbel echo Dr. Lichtman's opinions.

*Veasey v. Perry*, 71 F. Supp. 3d at 658.  There is no indication that the evidence the Fifth Circuit found "infirm" implicated the opinions of Dr. Lichtman, Dr. Davidson, or any of Plaintiffs' other experts, whose testimony this Court accepted as reliable on the issue of intent.

Nevertheless, Texas mounts a broadside attack on Dr. Lichtman's and Dr. Davidson's credibility.  TCOL ¶ 116-45.[2]  Dr. Lichtman presented exhaustive factual details pointing toward

---

[2]  Private Plaintiffs rely on and incorporate herein the United States' response to Texas's challenge to Dr. Davidson.

a finding that SB14 was infected with a discriminatory purpose, including that the pattern of picking and choosing categories of IDs that disadvantaged minority voters, especially as compared to Georgia's and Indiana's laws, which SB14's supporters falsely claimed was the model for SB14.  Trial Tr. 58:14-75:11 (Lichtman, Alan) (Day 4); PL772 at 23-42; *see also* PFOF ¶¶ 116-33, 310-13.  Most importantly, Dr. Lichtman testified that every one of Texas's deviations injured minority voters or advantaged white/Anglo voters.  Trial Tr. 71:12-23 (Lichtman, Alan) (Day 4).

Texas failed to present any evidence at trial that contradicted Dr. Lichtman's testimony. Instead, Texas complains that Plaintiffs should have shown the Legislature was "aware" of these facts, or was "presented" with them.  TCOL ¶¶ 132, 144.  But these data were *publicly available* before or at the time when the Legislature considered SB14.  Trial Tr. 60:8-17, 63:14-20, 67:10-12 (Lichtman, Alan) (Day 4).  His report contained numerous tables showing, not only the particular damning statistics, but also the public sources of the data from which those statistics were drawn, including published Census reports and reports from Texas state agencies like the Department of Public Safety (handgun possession data by race) and the Texas Higher Education Coordinating Board (student enrollment data by race and ethnicity).  PL772 at 24-25, 29-33; *see also* PFOF ¶¶ 312-13.  The notion that the Legislature, whose 181 members and staff live and die by census and other population figures, was not "aware" of these data cannot be seriously credited.

In any event, Dr. Lichtman *did* cite evidence that the proponents of SB14 were aware of these basic, demographic facts.  Bryan Hebert, the Lieutenant Governor's counsel sent an email expressing concern that SB14 would not be approved under the Voting Rights Act because of its probable disparate impact.  Trial Tr. 73:5-75:11 (Lichtman, Alan) (Day 4); PL313.  Nowhere in

its submission does Texas address this crucial piece of evidence, specifically cited by the Fifth

Circuit as evidence of discriminatory intent.  *See Veasey*, 830 F.3d at 236 n.21.[3]

### E.     Texas's Rewriting Of The Legislative History Defies Evidence And Logic

#### 1.     Texas's stated rationales for SB14 were pretextual and shifting.

Texas argues that Plaintiffs have failed to show that the Legislature's stated purposes for

enacting SB14 were pretextual, asserting that Plaintiffs "have cobbled together . . . shreds of

circumstantial evidence" to show pretext.  *See* TCOL ¶ 85.  Texas ignores that the Fifth Circuit

specifically found that there was substantial record evidence in support of this Court's finding

that the Legislature's stated purposes for enacting SB14 *were* pretextual.  *Veasey*, 830 F.3d at

237-38.  As the Fifth Circuit explained, this Court's finding that the Legislature's "stated policies

behind SB 14 are only tenuously related to its provisions" was supported by the fact that  "the

provisions of SB 14 fail to correspond in any meaningful way to the legitimate interests the State

claims to have been advancing through SB 14."  *Veasey*, 830 F.3d at 263.   And, citing this

Court's findings regarding the Legislature's shifting justifications for SB14, the Fifth Circuit

held that evidence of the "many rationales [that] were given for a voter identification law, which

---

[3]  Texas seeks to raise other small challenges to Dr. Lichtman's Report and testimony, but these are either wrong or irrelevant.  Texas claims that seniors have been voting by mail since before SB14 (*see* TCOL ¶ 131), but Dr. Lichtman's point was not about the enactment of that previous law, but that SB14 proponents claimed that the law's effects would be mitigated by mail-in balloting—a procedure that disproportionately favors Anglos as they are more likely to be over the age of 65 and qualify for absentee voting.  *See* PL772 at 64-65.  Texas also complains of some of Dr. Lichtman's references to non-legislative or post-legislative facts.  *See* TCOL ¶ 133.  But experts and courts are not precluded from relying on such facts; rather, they are advised to avoid undue reliance on them—and Dr. Lichtman did not give undue weight to these facts.  Finally Texas generally complains that Dr. Lichtman did not interpret various events as Texas would have wished.  *See* TCOL ¶¶ 134, 139-44.  This is a meaningless complaint, and dressing it up with big words (e.g, "confirmation bias") (*see* TCOL ¶ 134) does not change that.

shifted as they were challenged or disproven by opponents" is probative of the question of whether the Legislature had a discriminatory purpose in enacting SB14. *Id.* at 240-41.

Similarly, the Fifth Circuit specifically agreed with this Court's findings that the Legislature's failure to address the presence of fraud in absentee ballots in SB14 and that SB14 was not actually modeled after the laws of Georgia and Indiana further support a finding that the SB14's proponents' proffered reasons were pretextual. *Veasey*, 830 F.3d at 238-39 (SB14 "did nothing to combat mail-in ballot fraud, although record evidence shows that the potential and reality of fraud is much greater in the mail-in ballot context than with in-person voting"); *Veasey*, 830 F.3d at 239 (SB14's proponents "cloak[ed] themselves in the mantle of following Indiana's voter ID law, [but] took out all the ameliorative provisions" of that law).

For all of these reasons, the Fifth Circuit held that the evidence "could support a finding that the Legislature's race-neutral reason of ballot integrity offered by the State is pretextual." *Id.* at 237.   Texas's Proposed Findings of Fact and Conclusions of Law regarding pretext ask the Court to reconsider its previous findings despite the fact that those findings are unaffected by the evidence that the Fifth Circuit deemed "infirm." *See, e.g.*, TFOF ¶¶ 202-74; TCOL ¶¶ 84-115.

        2.   <u>Prior legislation concerning absentee ballots does not explain why SB14 dealt only with in-person voter fraud.</u>

Texas's brand new argument that it had addressed absentee ballot fraud prior to 2011, and that, therefore, its absence from SB14 is of no moment (TFOF ¶¶ 106, 187; TCOL ¶¶ 109-11), is unconvincing.  In-person voting requirements were strengthened at the same time as the absentee ballot requirements, but still made their way into SB14, even though absentee ballot

fraud still persisted in 2011, while in-person fraud did not.[4]  Similarly, that the Legislature increased the penalties for absentee ballot fraud in 2011 does not change the fact that Texas already had harsh penalties for in-person impersonation fraud before the passage of SB14 and nonetheless instituted further, burdensome measures to prevent it, despite there being no evidence that it existed.  TEX. ELEC. CODE § 64.012 (2003) & TEX. PENAL CODE 12.34 (2003) (third degree felony punishable up to ten years imprisonment and a fine of up to $10,000). Against this backdrop, it strains credulity for Texas to argue that in-person voter identification was an "emergency," but absentee ballot fraud had been sufficiently handled.

3.     The procedures used by the Legislature were aberrational.

The Fifth Circuit called the treatment SB14 received "virtually unprecedented," *Veasey*, 830 F.3d at 238, echoing this Court's finding that SB14's proponents engaged in "extraordinary departures from the normal procedural sequences," *Veasey v. Perry*, 71 F. Supp. 3d at 700.  The Fifth Circuit noted that these departures "may lend credence to an inference of discriminatory intent."  *Veasey*, 830 F.3d at 238.  This is because, as was the case here, these machinations precluded debate and prevented the dissemination of information about and investigation into the major changes from earlier bills.  These findings did not implicate any of the evidence found "infirm" by the Fifth Circuit.[5]  Accordingly, Texas's Proposed Findings of Fact and Conclusions of Law to the contrary (TFOF ¶¶ 152-60, 177-79; TCOL ¶¶ 98-106), which encourage this Court

---

[4]  Under the 2003 voter ID requirements in place until SB14 was implemented in 2013, there were just two incidents of in-person impersonation fraud, out of 20 million votes cast.  *Veasey*, 830 F.3d at 238; PFOF ¶ 139.  By contrast, even after the changes to Texas's absentee ballot law in 2003, absentee ballot fraud remained a top security concern of election officials.  *See* PFOF ¶¶ 141, 152, 157; *Veasey v. Perry*, 71 F. Supp. 3d at 641 n.59.

[5]  The Fifth Circuit specifically rejected the argument that testimony of legislators could not be used to explain the irregularity of these procedures.  *Veasey*, 830 F.3d at 238 n.22.

to find that these irregularities are commonplace or otherwise justified as a matter of politics, must be rejected.

Texas improperly views these procedural deviations in isolation, rather than acknowledging that their combination was without precedent.  *See, e.g.*, TFOF ¶¶ 121-26 & TCOL ¶¶ 99-102 (elimination of two-thirds rule); TFOF ¶ 152 (special designation); TFOF ¶¶ 153-55 & TCOL ¶ 103 (emergency declaration).  "Circumstances altogether inconclusive, if separately considered, may, by their number and joint operation, especially when corroborated by moral coincidences, be sufficient to constitute conclusive proof."  *Coggeshall v. United States*, 69 U.S. 383, 401 (1864); *United States v. Vargas-Ocampo*, 747 F.3d 299, 303 (5th Cir. 2014) (en banc) (same).  As the Fifth Circuit noted with regards to *the very issue* of procedural irregularities, "context matters."  *Veasey*, 830 F.3d at 237.  This Court's prior view that the combination of many procedural irregularities is relevant to intent was not disturbed—and, indeed was buttressed—by the Fifth Circuit.

        4.    <u>Texas's implausible new argument that SB14 was part of a single, decade-long "modernization" movement is not based on record evidence and is contrary to the evidence.</u>

For over four years, before a three-judge tribunal in Washington, D.C., before this Court, and twice before the Fifth Circuit, Texas has justified SB14 as having been enacted to prevent voter fraud and noncitizen voting.  *See* Private Plaintiffs' Br. (Doc. 963) at 11-14.  But this Court and the Fifth Circuit found those goals to be only tenuously related to the particulars of the bill.  *See Veasey v. Perry*, 71 F. Supp. 3d at 701; *Veasey*, 830 F.3d at 239.  In response to these decisions, Texas has once again shifted its rationales for SB14, repackaging the rejected rationales by repositioning SB14 as part of a previously unarticulated, decade-long "massive effort to modernize and secure its electoral system" in response to fallout from the 2000 election.  TCOL ¶¶ 58, 92, 111; TFOF ¶¶ 104–11, 127, 137, 149, 187-88.  Much of this

legislative history is not part of the record evidence, and Texas requests that this Court take

"judicial notice" of various portions of it, for the first time, at this stage of the case.  *See* TFOF

¶ 100 n.9.  The Court should reject Texas's proposed "findings" as improperly raised on remand,

factually unsupported, and irrelevant to the question of whether SB14 was passed with

discriminatory intent.  Indeed, Texas's latest argument is simply another unsupported, post-hoc

justification for SB14's intentionally discriminatory enactment.

> a.   *Texas's "modernization" theory is based on alleged evidence not in the record which cannot be considered by this court on remand.*

The Fifth Circuit expressly circumscribed the evidence that may be considered by this

Court on remand, directing that "the district court should not take additional evidence."  *Veasey*,

830 F.3d at 242.  Texas cites no record evidence in support of its new theory.  Rather, it cites a

legislative history not previously offered to this Court, as to which it requests the Court take

judicial notice.  *See* TFOF ¶ 100 n.9; TFOF ¶¶ 100-14.  This Court stopped accepting evidence

on September 22, 2014, the day of closing argument.  In the months preceding, the parties made

several motions for this Court to take judicial notice of various facts.[6]  Texas never moved for

judicial notice of the facts upon which it bases its new theory.  It is precluded by the directive of

the Fifth Circuit from offering that evidence now.

> b.   *Texas's "modernization" argument is just another shifting rationale for SB14.*

Texas had months of discovery, almost three full weeks of trial, post-trial submissions,

and several rounds of briefing on appeal to put forward arguments supporting this theory.  It did

---

[6]  These included the United States' motion on April 25, 2014 for judicial notice of Census and ACS data (Dkt. 252), granted on the record on May 28; Plaintiff Texas NAACP/MALC's motion on July 10, 2014 for judicial notice of Census data (Dkt. 394), granted on July 10, 2014 (Dkt. 396); and Texas's own motion on September 11, 2014 for judicial notice of two convictions for election fraud (Dkt. 590), granted on the record on September 22.

not.  In fact, Texas has never before mentioned the 2000 election, any of the other election laws passed between 2001 and 2011, or this alleged overriding motivation to "modernize" Texas's voting procedures.  The absence of evidence from trial, and the absence of this argument from previous briefing, reflects that this new story of a single, "modernizing" intent—one that purportedly covered every vaguely election-related law over the course of a decade—is only the latest in a series of purported rationales for SB14 that, as the Fifth Circuit noted, shift "as they [are] challenged or disproven by opponents."  *Veasey*, 830 F.3d at 240-41.  And this pretext is either so feeble that Texas chose not to raise it when it could have been tested through discovery and at trial, or of such recent invention that Texas simply had not thought of it yet when it was previously before this Court (and the three other courts that have heard challenges to SB14).  The fact that Texas's "principal reasons" for enacting SB14 continue to "shift[ ] over time, suggest[s] that those reasons may be pretextual."  *Foster v. Chatman*, 136 S. Ct. 1737, 1751 (2016).

       c.    *Texas's "modernization" theory is not credible and does not weigh against a finding of discriminatory intent.*

What evidence Texas does cite in support of its new theory is flimsy.  Texas cites to no legislator who justified SB14 by pointing to the 2000 election or comparing SB14 to these various other election laws passed since 2001, either during contemporaneous debate or in deposition testimony.  Instead, Texas relies on a number of string cites to election-related laws on a variety of topics that were passed between 2001 and 2011.  *See* TCOL ¶¶ 58, 104-11, 127, 137, 149, 187-88.  These various laws do not actually support the existence of a heretofore undisclosed, decade-long movement to modernize election law.  Nor do they suggest, even if there were such a movement, that the existence of that movement would preclude or even weigh against a finding of discriminatory intent for SB14 in particular.  Once again, the question is whether discriminatory intent was one factor in the passage of SB14, not the only one.

Standing alone, the laws that Texas cites do not suggest that the Texas legislature operated with a single, decade-long, exclusive "modernization" motive, or that SB14 was passed exclusively for that reason.  For example, according to Texas, the decision to pass SB14 was part of the same movement that passed HB1549 in the immediate aftermath of the 2000 election.  TFOF ¶¶ 105, 108.  But, in fact, Texas passed HB1549 largely to comply with the Help America Vote Act and receive federal funding, not as part of an independent effort to modernize anything.  *See* PFOF ¶ 58; Tex. H.B. 1549, 78th Leg., R.S, House Comm. Rep. at 1 (2003) ("CSHB 1549 makes the necessary changes in the Election Code required for successful implementation of HAVA.").  Furthermore, HB1549 was far less burdensome than SB14, as it specified that current utility bills, bank statements, government checks, paychecks, or other government documents that show the name and address of the voter were acceptable to confirm voters' identity.  *See* PFOF ¶ 58.  Contrary to the limited forms of SB14 accepted photo ID— many of which Anglo Texans disproportionately possess—HB1549 provided for a wide range of acceptable documents that most Texans possess, such as utility bills, and some that Black and Latino Texans are more likely than Anglo Texans to possess, such as paychecks from the government.  *See* PFOF ¶¶ 247-48.  It is therefore difficult to believe that this law and SB14 were driven by the same legislative motivation.  Furthermore, as previously discussed and found by this Court, there were virtually no incidents of in-person voter fraud between 2000 and 2011. It is therefore unclear what "modernizing" purpose making the ID requirements vastly more stringent, indeed more stringent than any other state in the nation, was meant to serve.[7]

---

[7]  Nor is other new evidence that Texas offers relevant, specifically that Democratic Representative King introduced voter ID legislation in 2001.  *See* TFOF ¶¶ 100-02.  To the extent that Representative King's 2001 legislation has *any* relevance, it shows that opponents of SB14 were not, as Defendants claim, universally opposed to "supporting any voter ID law." TFOF ¶ 99.  Instead, they were opposed to the unduly restrictive photo ID laws introduced by the

The various other laws that Texas cites were passed in different political contexts and involved wildly different aspects of voting.   Absent any evidence connecting them to SB14, beyond the fact that they relate to elections, the mere facts that Texas, in 2001, moved away from punch card ballots and toward electronic voting machines (*see* TFOF ¶ 104), or in 2003 decided to permit some voters to correct information on their registration online (*see* TFOF ¶ 127), or in 2005 experimented with emailing ballots to military personnel overseas (*see* TFOF ¶ 137), is simply irrelevant to the question of whether *SB14* was passed, at least in part, with a discriminatory intent in 2011.  Texas had the opportunity to provide evidence linking these laws to their alleged, decade-long, single "modernizing" motivation and to SB14.  They did not do so.

And regardless of whether these laws are linked by a general motive to modernize election law or whether legislators who passed SB14 in fact also wanted to "modernize" the voting system, that motive certainly does not explain why the Legislature radically departed from the usual legislative procedure to pass a law that would "solve" a problem it knew did not exist, why it excised all the ameliorative aspects of the Indiana and Georgia ID laws on which SB14 was purportedly based, or why it included IDs disproportionately owned by and available to Anglo voters, but excluded those disproportionately owned by and available to Black and Latino voters.  Texas's attempt to introduce a new, unsupported theory regarding the Legislature's

---

majority in subsequent legislative sessions that would result in a disproportionate burden on Blacks' and Latinos' ability to vote.  The legislation introduced by Representative King was not a photo ID law and in fact did not give any preferential treatment to photo IDs in establishing a voter's identity at the polls.  Representative King's proposed legislation would have required only that, where a voter presented a voter registration certificate at the polls, the voter also had to present one of the forms of photo or non-photo ID already allowed under existing law.  Tex. H.B. 744, 77th Leg., R.S. (2001); *see also* PFOF ¶¶ 61-62.

motive in passing SB14 is another shift to another tenuous rationale for this racially discriminatory law.

>    5.    That some proponents of SB14 backed less stringent photo ID bills does not weigh against a finding of discriminatory intent.

Finally, blocked at every point by the still valid findings of this Court, Texas offers another new slant on the legislative history leading up to the passage of SB14, which reduces to this argument: because proponents of SB14 previously tried to pass a less discriminatory bill than SB14, they could not possibly have had a discriminatory intent when they passed a more discriminatory bill. *See* TCOL ¶¶ 71-73, 77. The patent illogic of this argument is underscored by Texas's acknowledgement of the obvious: after the 2009 session photo voter ID proponents "achieved historic electoral gains, sweeping out many voter ID opponents," TFOF ¶ 150, giving SB14 proponents the numbers needed to undertake the "radical" and "unprecedented" procedural deviations that allowed them to pass the bill they wanted all along. *See Veasey*, 830 F.3d at 237-38. In short, Texas's attempt to rewrite legislative history proves nothing more than that the proponents of SB14 were unable to pass a less discriminatory bill when they had less political clout, and able to pass a more discriminatory bill when they had more political clout. This is only further support for a finding of discriminatory intent.

Texas also claims that the proponents of SB14 could not have harbored a discriminatory intent because they also voted for some ameliorative amendments. TCOL ¶¶ 70, 78, 95, 96. This simply means that the law could have been worse than it is, which is perfectly explicable, given that, at the time, the law had to be pre-cleared under Section 5 of the Voting Rights Act.[8]

---

[8]  Indeed, one of the amendments was to create an indigency affidavit exemption, which the proponents of SB14 later deleted from the final bill. *See* PFOF ¶ 99; TCOL ¶ 70a. Texas repeatedly claims that the deletion of this amendment was at the behest of Democratic Representative Anchia. TFOF ¶¶ 168, 184, 195; TCOL ¶¶ 95, 130. This is patently false. While Representative Anchia did criticize the indigency-affidavit procedure, he did so because it was

Finally, Texas argues that there could not be discriminatory intent because a handful of minority and Democratic legislators voted for SB14.  TFOF ¶¶ 88, 200; TCOL ¶¶ 79-80.  But, of course, a person can act in a racially biased way against his or her own race.  The race and ethnicity of those who are being discriminated against and the intent of the discriminators are what matters.  Furthermore, Plaintiffs need not prove that each and every person who voted for SB14 harbored a discriminatory intent.  Discrimination must have been "a motivating factor" behind the bill's passage.  *Arlington Heights*, 429 U.S. at 266-67.

In this context, Texas's rewriting of SB14's legislative history does not answer the most fundamental questions.  Why, when the Legislature finally got the numbers it needed to pass photo ID in 2011 did it make the bill much more stringent than any prior attempt, and much more stringent than Georgia's or Indiana's laws, which it was supposedly modeled after?  Why, when faced with even greater opposition to the bill by minority legislators and when it learned from the office of the Lieutenant Governor that the bill would disparately impact minority voters, did it reject ameliorative amendment after ameliorative amendment that would have lessened its impact?  In the words of the Senate sponsor of SB14, when he was asked these questions, apparently Texas was "not advised."  In the words of the House sponsor of SB14, when she was

---

contrary to SB14's alleged purpose of ballot integrity.  As Representative Anchia explained, under the proposed indigency-affidavit provision, an individual without ID could cast a provisional ballot and then cure that ballot within 6 days by simply executing an indigency affidavit—thereby never having to show any ID, photo or non-photo, to cast a ballot.  *See* PL035 (March 23, 2011, Vol. I) at 53:18-58:21.  Representative Anchia suggested that the legislature could "come up with a good photo identification bill" by expanding the scope of IDs that people can provide and refining the affidavit procedure.  *Id.* at 58:22-59:8.  But instead of attempting to close the loophole created by the indigency-affidavit provision, proponents of SB14 simply removed the entire indigency-affidavit procedure from the legislation.  See PL035 (March 23, 2011, Vol. II) at 103:11-104:12.  Contrary to Texas's claim (*see* TCOL ¶ 184), Representative Anchia opposed this amendment:  his vote was mis-recorded as a "yea" and he entered a statement of vote on the record correcting that error.  PL034 at 983-84 (House Journal, Mar. 23, 2011 House Journal).

asked these questions, apparently Texas "cannot recall."  The simplest, most logical, and truest

answer is that discriminatory intent motivated the law's passage.[9]

## CONCLUSION

For the reasons stated above, in Private Plaintiffs' original brief, in the United States'

original brief, in the United States' response brief, and in Plaintiffs' Joint Proposed Findings of

Fact, this Court should render judgment, declaring that SB14 was enacted with discriminatory

intent, enjoining permanently the implementation of SB14, and schedule a hearing for further

remedies in accordance with Section 3 of the Voting Rights Act.

Date:  December 16, 2016                              Respectfully submitted,

                                                     /s/ Lindsey B. Cohan
                                                     JON M. GREENBAUM
                                                     EZRA D. ROSENBERG
                                                     BRENDAN B. DOWNES
                                                     Lawyers' Committee for
                                                     Civil Rights Under Law
                                                     1401 New York Avenue NW Suite 400
                                                     Washington, D.C. 20005

                                                     WENDY WEISER
                                                     MYRNA PÉREZ
                                                     JENNIFER CLARK
                                                     The Brennan Center for Justice at NYU Law
                                                     School
                                                     161 Avenue of the Americas, Floor 12
                                                     New York, New York 10013-1205

---

[9]  *See Lee v. Virginia State Bd. of Elections*, No. 16-1605, 2016 WL 7210103, at *9 (4th Cir. Dec. 13, 2016) (finding lack of discriminatory intent behind Virginia's much less stringent photo ID law, because the legislature had provided for a "broad scope of IDs," including public university IDs "disproportionately possessed by . . . African Americans," "went out of its way to make [the law's] impact as burden-free as possible," provided "free IDs without any requirement of presenting documentation," and where the "legislative process . . . was normal, with full debate").  Each of the factors that the Fourth Circuit found significant in proving lack of discriminatory intent is missing from the record of SB14's history.

SIDNEY S. ROSDEITCHER
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019-6064

AMY L. RUDD
LINDSEY B. COHAN
Dechert LLP
500 W. 6th Street, Suite 2010
Austin, Texas 78701

NEIL STEINER
DECHERT LLP
1095 Avenue of the Americas
New York, New York 10036-6797

JOSE GARZA
Law Office of Jose Garza
7414 Robin Rest Drive
San Antonio, Texas 98209

DANIEL GAVIN COVICH
Covich Law Firm LLC
Frost Bank Plaza
802 N Carancahua, Ste 2100
Corpus Christi, TX 78401

GARY BLEDSOE
Potter Bledsoe, LLP
316 W. 12th Street, Suite 307
Austin, Texas 78701

VICTOR GOODE
NAACP
4805 Mt. Hope Drive
Baltimore, Maryland 21215

ROBERT NOTZON
The Law Office of Robert Notzon
1502 West Avenue
Austin, Texas 78701

*Counsel for the Texas State Conference of
NAACP Branches and the Mexican American
Legislative Caucus of the Texas House of
Representatives*

25

/s/ Leah Aden
SHERRILYN IFILL
JANAI NELSON
CHRISTINA A. SWARNS
COTY MONTAG
LEAH C. ADEN
DEUEL ROSS
NAACP Legal Defense and Educational
Fund,  Inc.
40 Rector Street, 5th Floor
New York, NY 10006

JONATHAN PAIKIN
KELLY P. DUNBAR
TANIA FARANSSO
THADDEUS C. EAGLES
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006

*Counsel for Imani Clark*


/s/ Chad W. Dunn
CHAD W. DUNN
K. SCOTT BRAZIL
BRAZIL & DUNN
4201 Cypress Creek Pkwy., Suite 530
Houston, Texas 77068

J. GERALD HEBERT
DANIELLE M. LANG
Campaign Legal Center
1411 K Street NW Suite 1400
Washington, DC 20005

ARMAND G. DERFNE
Derfner & Altman
575 King Street, Suite B
Charleston, S.C. 29403

NEIL G. BARON
Law Office of Neil G. Baron
914 FM 517 W, Suite 242
Dickinson, Texas 77539

DAVID RICHARDS
Richards, Rodriguez & Skeith, LLP
816 Congress Avenue, Suite 1200
Austin, Texas 78701

*Counsel for Veasey/LULAC Plaintiffs*

LUIS ROBERTO VERA, JR.
Law Office of Luis Roberto Vera Jr.
111 Soledad, Ste 1325
San Antonio, TX 78205

*Counsel for LULAC*


/s/ Marinda van Dalen
ROBERT W. DOGGETT
SHOSHANA J. KRIEGER
Texas RioGrande Legal Aid
4920 N. IH-35
Austin, Texas 78751

MARINDA VAN DALEN
Texas RioGrande Legal Aid
531 East St. Francis St.
Brownsville, Texas 78529

JOSE GARZA
Texas RioGrande Legal Aid
1111 N. Main Ave.
San Antonio, Texas 78212

*Counsel for Lenard Taylor, Eulalio Mendez Jr.,
Lionel Estrada, Estela Garcia Espinoza,
Margarito Martinez Lara, Maximina Martinez
Lara, and La Union Del Pueblo Entero, Inc.*

27

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on December 16, 2016, a true and correct copy of the foregoing document was served via the Court's ECF system to all counsel of record.

/s/ Lindsey B. Cohan
Lindsey B. Cohan
Dechert LLP
300 W. 6th Street, Suite 2010
Austin, Texas 78731
lindsey.cohan@dechert.com