UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| MARC VEASEY, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 2:13-CV-00193 |
| | § | |
| GREG ABBOTT, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**DEFENDANTS' RESPONSE TO PLAINTIFFS'
BRIEFS CONCERNING DISCRIMINATORY INTENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iii

INTRODUCTION ............................................................................................ 1

BACKGROUND ............................................................................................. 3

ARGUMENT ................................................................................................ 4

I.   THE LAW-OF-THE-CASE DOCTRINE AND MANDATE RULE DO NOT PERMIT
     THE COURT TO RELY ON ITS PREVIOUS FACTUAL FINDINGS CONCERNING
     DISCRIMINATORY INTENT. ..................................................................... 5

II.  PLAINTIFFS HAVE FAILED TO PROVE THAT THE TEXAS LEGISLATURE
     ENACTED S.B. 14 FOR THE PURPOSE OF BURDENING MINORITY VOTERS. ............. 7

     A.   The Texas Legislature Enacted S.B. 14 for Legitimate Purposes. .......... 8

          1.   The history of voter ID confirms S.B. 14's legitimate
               purposes. ........................................................................... 9

          2.   Contemporary legislative statements show that the Texas
               Legislature enacted S.B. 14 to enhance election integrity
               and improve public confidence in elections. ................................ 11

          3.   The unprecedented internal legislative discovery provided
               Plaintiffs further confirms that the Texas Legislature
               enacted S.B. 14 to enhance election integrity and improve
               public confidence in elections. ................................................. 15

     B.   Plaintiffs Have Failed to Carry their Heavy Burden to Show
          that the Texas Legislature's Legitimate Purposes were Obvious
          Pretext and that S.B. 14 can Plausibly Be Explained Only as a
          Race-Based Classification. ..................................................... 16

          1.   The Texas Legislature relied on studies and the
               experiences of other states to legitimately conclude that
               voter ID laws would not disparately impact minority
               voters. ............................................................................. 17

          2.   Too many white voters are purportedly burdened by S.B.
               14 to permit a conclusion of discriminatory intent. ..................... 26

          3.   The historical background of S.B. 14 does not suggest that
               the Legislature's stated purposes were pretext. ......................... 27

4.   The sequence of events leading up to S.B. 14 does not suggest that the Legislature's stated purposes were pretext. ..................................................................... 33

    a.   S.B. 14 was not a substantive departure from the concerns of the Texas Legislature. ................................ 34

    b.   The procedures used to get S.B. 14 to debate and an up-or-down vote do not suggest a discriminatory purpose. ........................................................ 36

5.   Plaintiffs' remaining circumstantial evidence is insufficient to meet their demanding burden. ........................... 41

    a.   Plaintiffs' theory of motive is not supported by the evidence. ........................................................ 41

    b.   S.B. 14's provisions and amendments do not evidence discriminatory purpose. .................................... 44

    c.   The Legislature's reaction to disputed court decisions does not evidence discriminatory purpose. ...... 49

III.   THE TEXAS LEGISLATURE WAS GOING TO ENACT S.B. 14 REGARDLESS OF ANY PURPORTED SECRET PURPOSE. ................................................................... 50

CONCLUSION ........................................................................... 51

TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bush v. Gore,*
  531 U.S. 98 (2000) (per curiam) .................................................................... 10,34

*Chapman v. NASA,*
  736 F.2d 238 (5th Cir. 1984) ............................................................................. 7

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
  508 U.S. 520 (1993) ............................................................................................ 27

*Crawford v. Marion Cnty. Elec. Bd.,*
  553 U.S. 181 (2008) .....................................................................................*passim*

*Doe ex rel. Doe v. Lower Merion Sch. Dist.,*
  665 F.3d 524 (3d Cir. 2011)............................................................... 11,27,34

*Easley v. Cromartie,*
  532 U.S. 234 (2001) ........................................................................... 3,7,15

*Esperanza Peace & Justice Ctr. v. City of San Antonio,*
  316 F. Supp. 2d 433 (W.D. Tex. 2001) ................................................... 37

*Feiger v. U.S. Attorney Gen.,*
  542 F.3d 1111 (6th Cir. 2008) ................................................................. 25

*Frank v. Walker,*
  768 F.3d 744 (7th Cir. 2014) ...........................................................*passim*

*Hayden v. Paterson,*
  594 F.3d 150 (2d Cir. 2010).................................................... 11,28,43

*Hunter v. Underwood,*
  471 U.S. 222 (1985) ..............................................................................*passim*

*Jefferson v. Hackney,*
  406 U.S. 535 (1972) ................................................................................. 15

*Lee v. Va. State Bd. of Elec.,*
  --- F.3d ----, 2016 WL 7210103 (4th Cir. Dec. 13, 2016) ................................*passim*

*LULAC v. Clements,*
  999 F.2d 831 (5th Cir. 1993) (en banc) ................................................. 42

*LULAC v. Perry,*
  548 U.S. 399 (2006) ................................................................................. 29

*Massachusetts v. EPA,*
  549 U.S. 497 (2007) ................................................................................. 44

*McCleskey v. Kemp,*
    481 U.S. 279 (1987) ........................................................................ 8

*Miller v. Johnson,*
    515 U.S. 900 (1995) .................................................................... 7,15

*Moore v. Detroit Sch. Reform Bd.,*
    293 F.3d 352 (6th Cir. 2002) ..................................................... 38,40

*N. Carolina State Conference of NAACP v. McCrory,*
    831 F.3d 204 (4th Cir. 2016) ......................................................... 37

*Ne. Ohio Coal. for the Homeless v. Husted,*
    837 F.3d 612 (6th Cir. 2016) ................................................ 14,37,38

*OCA Greater Houston v. Texas,*
    2016 WL 4597636 (W.D. Tex. Sept. 2, 2016) ............................... 30

*Pacific Shores Properties, LLC v. City of Newport Beach,*
    730 F.3d 1142 (9th Cir. 2013) ..................................................... 37

*Perez v. Perry,*
    No. 5:11-cv-360 (W.D. Tex. Mar. 19, 2012) ................................. 30

*Pers. Adm'r of Mass. v. Feeney,*
    442 U.S. 256 (1979) ................................................................*passim*

*Price v. Austin Indep. Sch. Dist.,*
    945 F.2d 1307 (5th Cir. 1991) ..................................................... 16

*Purcell v. Gonzalez,*
    549 U.S. 1 (2006) ....................................................................... 9,14

*Raytheon Co. v. Hernandez,*
    540 U.S. 44 (2003) ....................................................................... 17

*Richardson v. Honolulu,*
    802 F. Supp. 326 (D. Haw. 1992),
    *aff'd,* 124 F.3d 1150 (9th Cir. 1997) ........................................... 27

*Scantek Medical, Inc. v. Sabella,*
    693 F. Supp. 2d 235 (S.D.N.Y. 2008) .......................................... 29

*Session v. Perry,*
    298 F. Supp. 2d 451 (E.D. Tex. 2004),
    *vacated sub nom. on other grounds,*
    *Henderson v. Perry,* 543 U.S. 941 (2004) ................................*passim*

*Spurlock v. Fox,*
    716 F.3d 383 (6th Cir. 2013) ................................................... 34,37

*Texas v. Holder,*
    888 F. Supp. 2d 113 (D.D.C. 2012),
    *vacated,* 133 S. Ct. 2886 (2013) ............................................... 3,49

*Texas v. United States,*
   887 F. Supp. 2d 133 (D.D.C. 2012),
   *vacated*, 133 S. Ct. 2885 (2013) ............................................................ 30

*United States v. Cherry,*
   50 F.3d 338 (5th Cir. 1995) .................................................................... 7

*United States v. Matthews,*
   312 F.3d 652 (5th Cir.2002) ................................................................... 5

*United States v. McCrimmon,*
   443 F.3d 454 (5th Cir. 2006) .................................................................. 5

*United States v. Pineiro,*
   470 F.3d 200 (5th Cir. 2006) (per curiam) ............................................. 5

*United States v. Teel,*
   691 F.3d 578 (5th Cir. 2012) ............................................................ 5,6,7

*United States v. Windsor,*
   133 S. Ct. 2675 (2013) ........................................................................... 30

*Veasey v. Abbott,*
   830 F.3d 216 (5th Cir. 2016) (en banc) .......................................*passim*

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,*
   429 U.S. 252 (1977) .......................................................................*passim*

*Voting for Am., Inc. v. Steen,*
   732 F.3d 382 (5th Cir. 2013) .................................................................. 9

*Washington v. Davis,*
   426 U.S. 229 (1976) .......................................................................... 7,17

*Williamson v. Lee Optical Co.,*
   348 U.S. 483 (1955) ............................................................................... 15

*Wright v. Farouk Sys., Inc.,*
   701 F.3d 907 (11th Cir. 2012) ............................................................... 29

*Ziegler v. Ziegler,*
   28 F. Supp. 2d 601 (E.D. Wash. 1998) ................................................. 27

v

## INTRODUCTION

This Court must reject Plaintiffs' grave charge that the Texas Legislature enacted S.B. 14 with the invidious intent to burden minority voters, for the reasons set forth in Defendants' Proposed Conclusions of Law (ECF Nos. 965-966). Plaintiffs' intentional-discrimination claims fail for at least four independent reasons: (1) Plaintiffs offer no direct evidence of discrimination despite their unprecedented access to the internal private papers, emails, and thoughts of legislators and their staffs (*see* Defs.' Proposed Conclusions of Law ¶¶ 23-31); (2) the record shows that the Texas Legislature was *not* aware that S.B. 14 would disparately impact minority voters and thus Plaintiffs cannot show that the Legislature intended that result (*see id.* ¶¶ 34-54); (3) "[t]oo many" white voters "are affected by" S.B. 14 "to permit the inference that the statute is but a pretext for preferring" white voters "over" minority voters (*Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 275 (1979); *see* Defs.' Proposed Conclusions of Law ¶ 47); and (4) "the circumstantial totality of evidence" (*Veasey v. Abbott*, 830 F.3d 216, 237 (5th Cir. 2016) (en banc)) shows that the Plaintiffs' discriminatory-intent theory is not a plausible explanation for S.B. 14, let alone the requisite *most* plausible explanation (*See* Defs.' Proposed Conclusions of Law ¶¶ 32-145).

Nothing in Plaintiffs' briefs concerning discriminatory intent or their proposed findings of fact undermines these conclusions. Plaintiffs rely in large measure on dis-

puted impact evidence presented at trial that was never before the Texas Legislature.[1] But this evidence does not change the fact that before enacting S.B. 14, the Legislature validly believed that voter ID laws would *not* disparately impact minorities. And on examination, Plaintiffs' remaining purported evidence of discriminatory purpose turns out to be nothing of the sort. The "totality of evidence" (*Veasey*, 830 F.3d at 237) admits of only one conclusion: S.B. 14 was part of decade-long effort to modernize and secure Texas's election system and the culmination of a six-year-long legislative process during which voter ID opponents used every procedural maneuver they could to block the will of the majority of the Legislature and the majority of Texans. The result was the product of "the give-and-take inherent in the legislative process" (*Session v. Perry*, 298 F. Supp. 2d 451, 471 (E.D. Tex. 2004), *vacated sub nom. on other grounds*, *Henderson v. Perry*, 543 U.S. 941 (2004))—not discriminatory intent.

Therefore, "given the fact that" Plaintiffs, as "the party attacking the legislature's decision," bear "the burden of proving" discriminatory purpose—and "given the demanding nature of that burden of proof, and given the sensitivity, the extraordinary caution, that district courts must show to avoid treading upon legislative pre-

---

[1]    Defendants continue to preserve the arguments, for appellate and certiorari review, made before this Court, the Fifth Circuit, and the Supreme Court that S.B. 14 does not have a discriminatory effect under Section 2 of the Voting Rights Act. A petition for a writ of certiorari to review the Fifth Circuit's decision on the discriminatory-effect issue, among others, is currently pending at the Supreme Court. *See* Pet. for Writ of Cert., *Abbott v. Veasey*, No. 16-393 (U.S. Sept. 23, 2016).

rogatives"— Plaintiffs have "not successfully shown that race, rather than" the legitimate concern for election integrity and voter confidence, was the purpose for enacting S.B. 14. *Easley v. Cromartie*, 532 U.S. 234, 257 (2001) (citation and internal quotation marks omitted).

BACKGROUND

The Texas Legislature enacted S.B. 14 at the end of 2011 legislative session after the Legislature had debated voter ID bills for six years. At the time, Sections 4(b) and 5 of the Voting Rights Act required that Texas's election laws be precleared by the Department of Justice ("DOJ") before going into effect. The DOJ refused to preclear S.B. 14 because DOJ believed it would have a retrogressive effect on the ability of minorities to vote. *See* Defs.' Resp. to Pls' Proposed Findings of Fact ¶ 24. DOJ did not at that time accuse Texas of enacting S.B. 14 with discriminatory intent. *See id.*

Texas then sought judicial preclearance. *See Texas v. Holder*, 888 F. Supp. 2d 113 (D.D.C. 2012), *vacated*, 133 S. Ct. 2886 (2013). But a three-judge district court refused to preclear S.B. 14, concluding that Texas had not affirmatively shown that the law would not have a retrogressive effect on the ability of minorities to vote. *See id.* Texas disagreed with the court's conclusion and appealed to the Supreme Court. *See* Appellant's Jurisdictional Statement, *Texas v. Holder*, No. 12-1028 (U.S. Feb. 19, 2013). Texas, however, never got a chance to vindicate its arguments because, before its appeal could be heard, the Supreme Court ruled that the preclearance requirement was unconstitutional and vacated the decision Texas was appealing. *See* 133 S. Ct. 2886.

3

Texas therefore began enforcing S.B. 14. Defs.' Resp. to Pls.' Proposed Findings of Fact ¶ 24. Plaintiffs challenged the law in this Court shortly thereafter and this Court ruled for Plaintiffs on all of their claims, including claims that the Texas Legislature enacted S.B. 14 with the purpose to discriminate against minority voters. On appeal, the Fifth Circuit, among other things, vacated this Court's finding on discriminatory intent, with instructions to "to reevaluate the evidence and determine anew whether the Legislature acted with a discriminatory intent in enacting SB 14." *Veasey*, 830 F.3d at 243. Specifically, the Fifth Circuit expressly held that the following categories of evidence could not be considered in assessing this discriminatory-purpose claim:

1) Acts of discrimination by long-deceased legislators;

2) Acts by persons outside the Legislature;

3) Speculation on intent by legislative *opponents*;

4) Isolated and ambiguous statements made by legislative proponents after enactment;

5) Support for legislation aimed at securing the border or limiting immigration.

*Id.* 229-34 & n.16. In turn, this Court instructed the parties to submit new proposed factual findings and conclusions of law and responses.

## ARGUMENT

After holding that this Court's discriminatory-purpose finding was infirm, the Fifth Circuit instructed this Court to "reevaluate the evidence relevant to discriminatory intent," and to "determine anew whether the Legislature acted with a discriminatory intent in enacting SB 14." *Veasey*, 830 F.3d at 272. This Court should conclude

that Plaintiffs have failed to carry their heavy burden to show that the Texas Legis-
lature enacted S.B. 14 as "obvious pretext" for racial discrimination and that the law
can be "plausibly . . . explained only as a [race]-based classification." *Feeney*, 442 U.S.
at 272, 275. In the alternative, this Court should conclude that the Texas Legislature
would have enacted S.B. 14 notwithstanding any secret purpose.

## I.   THE LAW-OF-THE-CASE DOCTRINE AND MANDATE RULE DO NOT PERMIT THE COURT TO RELY ON ITS PREVIOUS FACTUAL FINDINGS CONCERNING DISCRIMINATORY INTENT.

In its brief, DOJ discusses the law-of-the-case doctrine and the mandate rule
in general terms. *See* DOJ Br. 11. "Under that doctrine, the district court on re-
mand . . . abstains from reexamining an issue of fact or law that has already been
decided on appeal." *United States v. Teel*, 691 F.3d 578, 582 (5th Cir. 2012). "A facet
or corollary of the law-of-the-case doctrine is the mandate rule." *Id.* at 583. "Under
the mandate rule, 'a district court on remand "must implement both the letter and
the spirit of the appellate court's mandate and may not disregard the explicit direc-
tives of that court."'" *Id.* (alterations omitted) (quoting *United States v. McCrimmon*,
443 F.3d 454, 459 (5th Cir. 2006), in turn quoting *United States v. Matthews*, 312
F.3d 652, 657 (5th Cir. 2002)). "Accordingly, the mandate rule 'prohibits a district
court on remand from reexamining an issue of law or fact previously decided on ap-
peal and not resubmitted to the trial court on remand.'" *Id.* (quoting *United States v.
Pineiro*, 470 F.3d 200, 205 (5th Cir. 2006) (per curiam)).

DOJ does not overtly seek to apply the law-of-the-case doctrine or mandate
rule to any particular point made in its brief. But DOJ does occasionally cite the Fifth
Circuit's en banc majority opinion in this case and quote the Fifth Circuit's recitation

of some of this Court's factual findings. *See, e.g.*, DOJ Br. 14, 18, 20-28. To the extent that by doing so DOJ means to imply that this Court on remand may rest on previous factual findings not explicitly rejected by the Fifth Circuit, DOJ is incorrect. In fact, the mandate rule bars such a shortcut.

"[T]he mandate rule prohibits a district court on remand from reexamining an issue of law or fact previously decided on appeal *and not resubmitted to the trial court on remand*." *Teel*, 691 F.3d at 583 (emphasis added) (internal quotation marks omitted). The Fifth Circuit's mandate in this case, which the DOJ ignores, vacated this Court's "judgment that SB 14 was passed with a racially discriminatory purpose" and remanded for this Court "to consider this claim in light of the guidance we have provided in this opinion." *Veasey*, 830 F.3d at 272. In doing so, the Fifth Circuit instructed that the Court could not consider most of the evidence it previously relied on in finding discriminatory purpose, and the Fifth Circuit then ordered this Court to "*reevaluate* the evidence relevant to discriminatory intent," and to "determine *anew* whether the Legislature acted with a discriminatory intent in enacting SB 14." *Id.* (emphases added).[2] After determining that much of the evidence this Court initially relied upon was infirm and could not be considered, the Fifth Circuit then expressly

---

[2]   While DOJ omitted this language from its discussion of the mandate rule in this Court, it quoted the same language to the Supreme Court in arguing that this Court's ongoing review of its discriminatory-purpose claim counsels against granting certiorari. *See* Br. of United States in Opp. 31, *Abbott v. Veasey*, No. 16-393 (U.S. Nov. 28, 2016); *see also* Br. of Marc Veasey, et al., in Opp. 26-27, *Abbott v. Veasey*, No. 16-393 (U.S. Nov. 28, 2016) (suggesting that this Court may need to issue new factual findings concerning the impact of S.B. 14).

"resubmitted to the trial court" (*Teel*, 691 F.3d at 583 (quotation marks omitted)) the remaining factual questions related to discriminatory intent. For this Court to rest on its previous factual findings would be to "disregard the explicit directives of" the Fifth Circuit, which the mandate rule does not permit. *Id.*[3]

## II.   PLAINTIFFS HAVE FAILED TO PROVE THAT THE TEXAS LEGISLATURE EN-ACTED S.B. 14 FOR THE PURPOSE OF BURDENING MINORITY VOTERS.

There is and can be no dispute that S.B. 14 "is neutral on its face and rationally may be said to serve a purpose the Government is constitutionally empowered to pursue." *Washington v. Davis*, 426 U.S. 229, 246 (1976). Proving that lawmakers worked together collectively to pass a facially neutral law because of discriminatory motives is not a small task. *See United States v. Cherry*, 50 F.3d 338, 343 (5th Cir. 1995) ("[D]emonstrating a racially discriminatory intent is a difficult burden to bear."). The task grows ever more "problematic" as "we move from an examination of" small, local boards "to a body the size of the" Texas Legislature. *Hunter v. Underwood*, 471 U.S. 222, 228 (1985). Adding to this difficulty is the need to "to eschew guesswork" (*id.* (quotation marks omitted)) and to "exercise *extraordinary caution* in adjudicating claims that a State has" enacted a facially neutral law on a topic within the legislature's competence "on the basis of race." *Easley*, 532 U.S. at 242 (quoting *Miller v. Johnson*, 515 U.S. 900, 916 (1995)).

---

[3]     Even if the mandate rule did not foreclose DOJ's implication, the implication would still be incorrect. Although "[a] factual issue . . . could become the law of the case . . . if previously appealed and affirmed as not being clearly erroneous" (*Chapman v. NASA*, 736 F.2d 238, 242 n.2 (5th Cir. 1984)), the Fifth Circuit reviewed and reversed as clear error this Court's ultimate determination on discriminatory intent.

Plaintiffs have a very high hurdle to overcome, but their evidence is nowhere near sufficient. The record shows that the Texas Legislature enacted S.B. 14 for the legitimate purposes of combating voter fraud and promoting public confidence in elections. In turn, Plaintiffs' tenuous circumstantial evidence—much of it distorted and taken of context—does not come close to demonstrating that the Legislature's professed purposes were "obvious pretext" for racial discrimination and that the law can be "plausibly . . . explained only as a [race]-based classification." *Feeney*, 442 U.S. at 272, 275.

A.    **The Texas Legislature Enacted S.B. 14 for Legitimate Purposes.**

Courts "will not infer a discriminatory purpose" where there were "legitimate reasons" to enact a law. *McCleskey v. Kemp*, 481 U.S. 279, 298-99 (1987). Texas enacted S.B. 14—after the Legislature debated voter ID bills for six years–for the purposes of ensuring election integrity and increasing voter confidence in elections. *See* Defs' Proposed Findings of Fact ¶¶ 203-206; Defs.' Proposed Conclusions of Law ¶¶ 13-22. These purposes are indisputably legitimate and explain why S.B. 14 was supported by a number of minority legislators. *See* Defs.' Proposed Findings of Fact ¶ 200.

Plaintiffs question the legitimacy of the Texas Legislature's push for voter ID. *See* DOJ Br. 24-28; Private Pls.' Br. 11-14. But as the Supreme Court has held, "[t]here is *no question* about the legitimacy or importance of the State's interest in counting only the votes of eligible voters," which necessitates "carefully identifying all voters participating in the election process." *Crawford v. Marion Cnty. Elec. Bd.*,

553 U.S. 181, 196 (2008)[4]; *see also id.* at 237 (Breyer, J., dissenting) (crediting Indiana's legitimate need "to prevent fraud, to build confidence in the voting system, and thereby to maintain the integrity of the voting process"). The Fifth Circuit has been just as clear, instructing that the "state's paramount obligation" is "to ensure the integrity of the voting process." *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 394 (5th Cir. 2013); *accord Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) ("A State indisputably has a compelling interest in preserving the integrity of its election process. Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy.") (internal quotation marks and citation omitted). With these pronouncements, it is not open to Plaintiffs or this Court to reach a different conclusion. *See, e.g.*, *Frank v. Walker*, 768 F.3d 744, 750 (7th Cir. 2014).

But even if it were open to question, that question is susceptible to the only answer that the history of Texas' voter-ID bills, as well as the contemporaneous statements and post-enactment testimony of legislators, allow: the Texas Legislature was legitimately concerned with election integrity and public confidence, and S.B. 14 was one part of a decade-long effort to address those concerns.

### 1. The history of voter ID confirms S.B. 14's legitimate purposes.

The 2000 Presidential election and its recount process drew national attention to the problem of antiquated and ineffective voting procedures. As the Supreme Court

---

[4]     All cites to *Crawford* are to the controlling plurality opinion unless otherwise noted.

predicted at the time: "After the current counting, it is likely legislative bodies nationwide will examine ways to improve the mechanisms and machinery for voting." *Bush v. Gore*, 531 U.S. 98, 104 (2000) (per curiam). And indeed that occurred on both the state and federal level. *See* Defs.' Proposed Findings of Fact ¶¶ 57-78. One of the earliest voter ID bills was introduced in Texas in 2001, by a Democratic legislator. *Id.* ¶¶ 100-103. And between that first bill and the enactment of S.B. 14, the Texas Legislature passed numerous laws to secure its voting machines, its voter rolls, its mail-in ballot procedures, and other aspects of election procedure. *See id.* ¶¶ 104-111, 127, 137, 149, 187-188.

Concern about in-person voter fraud was a natural outgrowth of this nationwide effort. *See id.* ¶ 52, 54. Contrary to the implication of Plaintiffs' claim, the push for voter ID did not spring forth from the dark recesses of racism; it sprang from the recommendations of bipartisan commissions of experts. *See id.* ¶¶ 55-56, 62-70. Between 2001 and 2011, nearly 1,000 voter ID bills were introduced across the country, and numerous legislatures passed such laws. *See id.* ¶¶ 52-92. Meanwhile, public support for requiring voters to identify themselves with a photo ID was growing across the country and in Texas. *See id.* ¶¶ 79-88.

Given (1) *Bush v. Gore*, (2) *Crawford*, (3) *Steen*, (4) the recommendations of bipartisan commissions, (5) the numerous voter ID laws introduced and enacted in other states, and (6) the widespread public support for requiring a photo ID to vote, "the legitimate noninvidious purposes of" S.B. 14 "cannot be missed." *Feeney*, 442 U.S. at 275; *see also Lee v. Va. State Bd. of Elec.*, --- F.3d ---, 2016 WL 7210103, at *7 (4th

Cir. Dec. 13, 2016) (affirming rejection of discriminatory-intent claim where legislature enacted voter-ID law on the basis of "some evidence of voter fraud," the Carter-Baker report, and public support for voter ID laws); *Doe ex rel. Doe v. Lower Merion Sch. Dist.*, 665 F.3d 524, 553 (3d Cir. 2011) (explaining that the fact that "[t]he decision to redistrict was born of a capital improvement program intended to modernize every school in the district" suggested that it was not the result of discriminatory intent); *Hayden v. Paterson*, 594 F.3d 150, 167 (2d Cir. 2010) (explaining that a voting law's adoption in numerous other states "and its widespread support" show that it "is more likely the product of legitimate motives than invidious discrimination") (internal quotation marks omitted).

Plaintiffs ignore this historical evidence, so they have no explanation for it.

### 2. Contemporary legislative statements show that the Texas Legislature enacted S.B. 14 to enhance election integrity and improve public confidence in elections.

The Supreme Court has instructed that "contemporary statements by members of the decisionmaking body" are "highly relevant" to the question of discriminatory purpose. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 (1977). The contemporary statements of voter ID proponents show that S.B. 14 was enacted for "legitimate noninvidious purposes." *Feeney*, 442 U.S. at 275.

Over the six years that voter ID was under consideration by the Legislature, proponents consistently cited the need for a voter ID law to enhance election integrity and promote public confidence in elections. Defs.' Proposed Findings of Fact ¶ 205. Even voter ID *opponents* at the time recognized that proponents had no hidden agenda. *See id.* ¶¶ 161-162, 206.

11

**a.** Plaintiffs try to undermine this evidence with supposed inconsistencies by legislators regarding the relationship between voter ID laws and voting by non-citizens. *See* DOJ Br. 27-28, Private Pls.' Br. 13. But even if statements by a handful of individual legislators in 2011 shifted away from stressing the risks of non-citizen voting, this would only serve to highlight the continued consistency of the legislators' concern about election integrity and public confidence. *See* Defs.' Proposed Findings of Fact ¶¶ 161-162, 205-206. In any event, as Plaintiffs themselves acknowledge, there actually was *no* inconsistency, as concerns regarding non-citizen voting—which S.B. 14 can help to prevent (*see id.* ¶¶ 269-274)—*were* expressed during and immediately after the consideration of S.B. 14. *See* Pls.' Proposed Findings of Fact ¶¶ 196, 198-199; DOJ Br. 28. Not surprisingly then, the evidence relied on by Plaintiffs (*see* Pls.' Proposed Findings of Fact ¶ 192 (citing PL271 and PL275)) for their assertion that legislators were "instructed . . . to no longer rely on this rationale" (DOJ Br. 28) shows no such thing. The Bryan Hebert email from PL275 states that "[w]e are not doing this to crack down on illegals" (ROA.38994) but says nothing about the separate topic of non-citizen voting. And the other Hebert email relied on by Plaintiffs provided talking points that hit on, among other things, the problem of "non-citizen[]" registrants. PL271 (ROA.38982). Non-citizen voting continued to be a concern of legislators, although never reaching the level of their concern over in-person voter fraud and voter confidence.

**b.** Plaintiffs also question the veracity of legislators' concerns based on what Plaintiffs assert was insufficient evidence of voter fraud or lack of confidence in the

election system to justify a change in the law. *See* DOJ Br. 24-25, Private Pls.' Br. 11-12. Plaintiffs' argument, however, rests on the false premise that the Texas Legislature needed concrete evidence before it could act. The Supreme Court in *Crawford* rejected an identical argument, confirming Indiana's legitimate interest in preventing in-person voter fraud despite "[t]he record contain[ing] *no evidence* of any such fraud actually occurring in Indiana at any time in its history." 553 U.S. at 194 (emphasis added). And the Supreme Court further concluded that despite the absence of evidence, Indiana's voter ID law served its legitimate interest in increasing public confidence in elections. *Id.* at 197. "[T]here is no way [voter ID laws] could promote public confidence in Indiana (as *Crawford* concluded) and not in [Texas]." *Frank*, 768 F.3d at 750.

Plaintiffs' argument fails for the additional reason that the Legislature did, in fact, have significant evidence of in-person voter fraud and of vulnerabilities that made its system more susceptible to in-person voter fraud. *See* Defs.' Proposed Findings of Fact ¶¶ 238-246, 265. In addition, as Plaintiffs acknowledge, the Legislature had evidence that there exists fraud generally in the election system. *See* Pls.' Proposed Findings of Fact ¶¶ 176-177; DOJ Br. 25. The Supreme Court explained that fraud other than in-person voter fraud justifies a voter-ID law because it "demonstrate[s] that not only is the risk of voter fraud real but that it could affect the outcome of a close election." *Crawford*, 553 U.S. at 196. On top of this evidence of fraud, the Texas Legislature had the conclusion of the bipartisan Carter-Baker Commission—endorsed by the Supreme Court in *Crawford*—that fraud does occur, that it

13

could affect the outcome of a close election, and that requiring photo ID can prevent such fraud. *See* Defs.' Proposed Findings of Fact ¶¶ 62-70; *Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 636 (6th Cir. 2016) (fact that contours of legislation arose from the recommendation of a bipartisan commission suggests that there was no discriminatory intent). The Legislature likewise had before it the Supreme Court's pronouncements in *Purcell* that "[v]oter fraud drives honest citizens out of the democratic process and breeds distrust of our government," and "[v]oters who fear their legitimate votes will be outweighed by fraudulent ones will feel disenfranchised." 549 U.S. at 4 (internal quotation marks and citation omitted); *see* Defs.' Proposed Findings of Fact ¶ 70. The Legislature was entitled to rely on these conclusions and was justified in acting to prevent in-person voter fraud based upon the evidence before it. *See Lee*, 2016 WL 7210103, at *7 (affirming rejection of discriminatory-intent claim where legislature enacted voter-ID law on the basis of "some evidence of voter fraud," the Carter-Baker report, and public support for voter ID laws).

**c.**   Finally, Plaintiffs question the veracity of legislators' concern with voter fraud because S.B. 14 addressed only in-person voter fraud and did not also address mail-in ballot fraud. DOJ Br. 4, 25-26; Private Pls.' Br. 2, 12-13.

First off, if the Texas Legislature had chosen to prioritize in-person voter fraud over mail-in ballot fraud, that was its legitimate choice to make without second-guessing by Plaintiffs or the courts: "A legislature may address a problem 'one step at a time,' or even 'select one phase of one field and apply a remedy there, neglecting

the others.'" *Jefferson v. Hackney*, 406 U.S. 535, 546 (1972) (rejecting claim of discriminatory intent) (quoting *Williamson v. Lee Optical Co.*, 348 U.S. 483, 489 (1955)). "So long as its judgments are rational, and not invidious, the legislature's efforts to tackle the problems of" election integrity "are not subject to a constitutional straitjacket. The very complexity of the problems suggests that there will be more than one constitutionally permissible method of solving them." *Id.* at 546-47. Moreover, questioning the Legislature's priorities would not comport with the "extraordinary caution" courts must "exercise . . . in adjudicating claims that a State has" enacted a facially neutral law on a topic within the legislature's competence "on the basis of race." *Easley*, 532 U.S. at 242 (quoting *Miller*, 515 U.S. at 916); *see also Session*, 298 F. Supp. 2d at 473 ("[F]ederal judges are not legislative players.").

In fact, however, the Texas Legislature *did* prioritize mail-in ballot fraud, addressing that issue *before* it addressed in-person voter fraud. *See* Defs.' Proposed Findings of Fact ¶ 106. The Texas Legislature went on to address it twice more before the end of the 2011 session. *See id.* ¶¶ 137, 187. Accordingly, this imagined discrepancy by Plaintiffs does not undermine the veracity of legislators' concern with voter fraud.

> **3.    The unprecedented internal legislative discovery provided Plaintiffs further confirms that the Texas Legislature enacted S.B. 14 to enhance election integrity and improve public confidence in elections.**

This Court provided Plaintiffs unprecedented access to the internal private papers, emails, and thoughts of legislators and their staffs in Plaintiffs' effort to under-

mine the contemporaneous statements of legislators showing that S.B. 14 was enacted for a legitimate purpose. *See* Defs.' Findings of Fact ¶¶ 275-276. The Court did so on the basis of Plaintiffs' insistence that such direct evidence was vital to their case. *Id.* ¶ 277. In turn, these thousands of pages of documents and hours and hours of depositions confirmed that the Texas Legislature did *not* enact S.B. 14 in order to burden minority voters. *Id.* ¶¶ 278-281. Plaintiffs' concession that their accusation of discriminatory intent rises or falls based upon direct evidence, along with the Fifth Circuit's common-sense instruction that such direct evidence, when available, "is actually stronger than . . . circumstantial evidence" (*Price v. Austin Indep. Sch. Dist.*, 945 F.2d 1307, 1318 (5th Cir. 1991)), mandates rejection of Plaintiffs' intent claims. *See* Defs.' Proposed Conclusions of Law ¶¶ 23-31. In other words, given that this sweeping discovery occurred—the opposite of what happens in most cases, as the Supreme Court recognized in *Arlington Heights* (429 U.S. at 268 & n.18)—Plaintiffs should be held to what it proved: that the Texas Legislature enacted S.B. 14 for the valid reasons of deterring voter fraud and safeguarding voter confidence.

**B.    Plaintiffs Have Failed to Carry their Heavy Burden to Show that the Texas Legislature's Legitimate Purposes were Obvious Pretext and that S.B. 14 can Plausibly Be Explained Only as a Race-Based Classification.**

The Supreme Court has set forth certain factors that may be considered in an ordinary case when assessing whether circumstantial evidence can prove discriminatory purpose: the legislature's awareness of a resulting disparate impact, the sequence of events leading up to the decision, and the historical background of the decision. *Arlington Heights*, 429 U.S. at 266-67. But this is no ordinary case. Because

16

"the legitimate noninvidious purposes of" S.B. 14 "cannot be missed" (*Feeney*, 442 U.S. at 275), and because the "highly relevant" contemporaneous statements of S.B. 14 proponents (*Arlington Heights*, 429 U.S. at 268) and the direct evidence obtained during legislative discovery show that these noninvidious purposes drove the enactment of S.B. 14, Plaintiffs face an insurmountable hurdle in trying make these legitimate purposes out to be "obvious pretext" and show that S.B. 14 can be "plausibly . . . explained only as a [race]-based classification." *Feeney*, 442 U.S. at 272, 275.

In any event, none of the *Arlington Heights* factors support Plaintiffs—even the scraps of evidence that Plaintiffs selectively pluck from a century of Texas history and six years of legislative consideration of voter ID lose their persuasiveness under the slightest scrutiny.

> **1.** **The Texas Legislature relied on studies and the experiences of other states to legitimately conclude that voter ID laws would not disparately impact minority voters.**

The Supreme Court has made clear that a law's disparate impact is not sufficient to show that such impact was intended. *See Feeney*, 442 U.S. at 278-79; *Arlington Heights*, 429 U.S. at 266; *Washington*, 426 U.S. at 242; *see also Arlington Heights*, 429 U.S. at 266 n.15 ("In many instances, to recognize the limited probative value of disproportionate impact is merely to acknowledge the heterogeneity of the Nation's population.") (internal quotation marks omitted). Rather, to prove discriminatory intent, Plaintiffs must show that the Texas Legislature enacted S.B. 14 "'because of,' not merely 'in spite of,' its adverse effects upon" minority voters. *Feeney*, 442 U.S. at 279. But the evidence in this case shows that the Texas Legislature was *not* aware that S.B. 14 would disparately impact minority voters. Because it is not possible to

act "because of" (*id.*) knowledge one does not have (*see Raytheon Co. v. Hernandez*, 540 U.S. 44, 54 n.7 (2003) (there was no possibility of disability discrimination where the decisionmaker was unaware of plaintiff's disability)), Plaintiffs' failure to prove that the Texas Legislature believed that S.B. 14 would disparately impact minority voters dooms their claims.

a.  To the extent that the Texas Legislature had evidence of S.B. 14's likely impact, the Legislature had reason to believe that it would not prevent any person from voting. The evidence shows that the Texas Legislature relied on multiple studies and the experiences of other States to conclude that S.B. 14 would *not* disparately impact minorities. *See* Defs.' Proposed Findings of Fact ¶¶ 207, 214; Defs.' Proposed Conclusions of Law ¶ 37. Whether or not the Legislature was ultimately correct about this state of the world is irrelevant in assessing discriminatory purpose. *See Feeney*, 442 U.S. at 278-79 (analyzing whether disparate impact was intentional only *after* determining that the legislature was, in fact, aware that such an impact would result); *see also Lee*, 2016 WL 7210103, at *9 (affirming rejection of discriminatory-intent claim against voter ID law where "legislature did not call for, nor did it have, . . . data" regarding rates of ID possession by race in the State). Even if the Legislature were mistaken about any potential disparate impact, having a mistaken belief about how a law will operate is not evidence that the Legislature harbored a discriminatory purpose.

b.  Plaintiffs contend that S.B. 14's disparate impact on minorities was "inevitable." DOJ Br. 19; Private Pls.' Br. 7. But this view was rejected by Plaintiffs' *own*

expert, who testified that, at worst, there is no "consensus regarding the effects of voter ID laws." Trial Tr. 328:8-10 (Sept. 4, 2014) (Burden) (ROA.99560). Another of Plaintiffs' experts authored a study, which came to the attention of the Legislature, and which concluded that the effect of voter ID laws, even strict ones, was "too small to be of practical concern." Defs.' Proposed Findings of Fact ¶ 37. And yet another of Plaintiffs' experts has conceded that although her "sympathies lie with the plaintiffs in the voter ID cases," she had to admit that "the existing science regarding vote suppression is incomplete and inconclusive." DEF0022 (Robert S. Erikson & Lorraine C. Minnite, Modeling Problems in the Voter Identification-Voter Turnout Debate, 8 Election Law Journal 85, 98 (2009)) (ROA.78232). Indeed, there remains legitimate disagreement *in this case* over whether S.B. 14 does, in reality, disparately impact minority voters. *See, e.g.*, Defs.' Proposed Findings of Fact ¶¶ 45-51; Pet. for Writ of Cert., *Abbott v. Veasey*, No. 16-393 (U.S. Sept. 23, 2016).[5] Nothing was inevitable, and the Texas Legislature was entitled to believe, as it did, that S.B. 14 would not disproportionately harm minority voters.

---

[5]     *Cf. Frank*, 768 F.3d at 748 (finding that the suggestion that 300,000 Wisconsin registered voters lacked acceptable ID to be "questionable; the district judge who tried the Indiana case rejected a large estimate as fanciful in a world in which photo ID is essential to board an airplane, enter Canada or any other foreign nation, drive a car (even people who do not own cars need licenses to drive friends' or relatives' cars), buy a beer, purchase pseudoephedrine for a stuffy nose or pick up a prescription at a pharmacy, open a bank account or cash a check at a currency exchange, buy a gun, or enter a courthouse to serve as a juror or watch the argument of this appeal. Could 9% of Wisconsin's voting population really do *none* of these things?"); Defs.' Proposed Findings of Fact ¶ 218 (testimony to the Texas Legislature warning against database matching).

19

**c.** Plaintiffs rely on a smattering of cherry-picked evidence from six years of legislative consideration, which they claim shows that the Texas Legislature knew that S.B. 14 would disparately affect minorities. *See* DOJ Br. 19-20; Private Pls.' Br. 7-8. But on review, none of this evidence supports Plaintiffs' assertion. Indeed, that this is the best Plaintiffs could gather confirms that they have failed to prove that the Texas Legislature believed that S.B. 14 would have a disparate impact.

*First*, Plaintiffs place heavy reliance on the post-enactment testimony of a single legislator—Representative Todd Smith—that at some point between 2005 and 2011, he had publicly estimated that 700,000 Texans lacked a driver's license. DOJ Br. 19; Private Pls.' Br. 8. There are numerous problems with this piece of evidence that sap it of any value. Most troublingly, having scoured the entire legislative history, there is no record of Representative Smith actually having said this. *See* Defs.' Proposed Conclusions of Law ¶ 51. This suggests that Representative Smith's recollection is mistaken, thus demonstrating the danger of relying on isolated statements made by legislators after the enactment of a law. *See Veasey*, 830 F.3d at 234.

Even if Representative Smith *had* made this statement in public to other legislators, however, it would still be of little value because it gives no indication of the racial makeup of the group of voters supposedly lacking driver's licenses or other S.B. 14-compliant ID. *See Lee*, 2016 WL 7210103, at *9 (affirming rejection of discriminatory-intent claim against voter ID law where "legislature did not call for, nor did it have, . . . data" regarding rates of ID possession by race in the State). Although Representative Smith years later suggested that it was "common sense" that minorities

would be more likely to be in this group than whites (Private Pls.' Br. 8), there is no indication that this view was shared, at the time the Legislature considered S.B. 14, by other proponents. *See* Defs.' Proposed Conclusions of Law ¶ 52. And indeed it turned out that Representative Smith's "common sense" was incorrect: Plaintiffs' numbers suggest that those lacking S.B. 14 ID are at least as likely (if not more) to be white rather than Hispanic or African-American. *See* Defs.' Proposed Findings of Fact ¶¶ 219-220.

Moreover, Representative Smith's statement, even if given the most plaintiff-friendly gloss, tells one nothing about *voting*. Many people without ID may not be voters in any event. As the court in *Frank* observed:

> A more plausible inference would be that people who do not plan to vote also do not go out of their way to get a photo ID that would have no other use to them. This does not imply that a need for photo ID is an obstacle to a significant number of persons who otherwise would cast ballots.

*Frank*, 768 F.3d at 749; *see* Defs.' Proposed Conclusions of Law ¶ 48; *see also Lee*, 2016 WL 7210103, at *7 (explaining that "leap[ing] from *the disparate inconveniences* that voters face when voting to *the denial or abridgement of the right to vote*" is "un-justified"). For this reason, even if Representative Smith had made this observation to every legislator and every legislator had believed it, and even if every legislator also believed (incorrectly) that more minorities than whites lacked drivers' licenses—and there is no evidence that any of those propositions are true—legislators could still legitimately conclude, as they did, that S.B. 14 would not have a disparate impact on minority voting.

*Second*, Plaintiffs cite two emails from a legislative aide which they contend "warned . . . that SB 14 would result in less opportunity for political participation by Black and Latino voters." Private Pls.' Br. 8 (citing Pls.' Proposed Findings of Fact ¶ 210, in turn citing PL205 and PL272); *see also* DOJ Br. 20. But the emails cited contain no such warning.

In the first email, which was sent only from one legislative aide to another legislative aide—and no legislators—Bryan Hebert states the unremarkable proposition that a law that allows non-photo ID places less of a burden on voters in general and therefore has less of a "chance" of burdening minorities. PL205 (ROA.38397). This is not the same, however, as suggesting that the exclusion of non-photo IDs *will* disproportionately burden minorities. In fact, the law that he was comparing was Georgia's *photo-ID-only* law, which DOJ concluded did *not* disproportionately burden minorities. *See id.* The point of the email was the prediction that DOJ would have to preclear (under the separate, now-inapplicable Section 5 retrogression standard) a voter ID law that imposed less of a burden than Georgia's. To read this email as anything more would require prohibited "guesswork." *Hunter*, 471 U.S. at 228 (quotation marks omitted).

In the second email, which was sent to only a handful of other legislative aides, Hebert opined that it was "doubtful" that the "Obama DOJ" would preclear S.B. 14 as originally written. PL272 (ROA.38985). But "context matters." *Veasey*, 830 F.3d at 237. Hebert's belief that the "Obama DOJ" was unlikely to preclear S.B. 14 was based on his belief that the Presidential Administration was "aggressively interpreting and

enforcing the Voting Rights Act," and not a belief that S.B. 14 would disparately impact minorities. Hebert 2014 Dep. 169:14-20 (ROA.63927) ("[M]y reasoning was that the Obama DOJ had been aggressively interpreting and enforcing the Vot[ing] Rights Act through preclearance and didn't seem to particularly like Texas."). And there is no evidence that Hebert shared his view with legislators (*see id.* 170:9-17), so in no event could his view have been a "warning[]" (Private Pls.' Br. 8) to legislators that S.B. 14 would have a disparate impact on minorities. Moreover, Hebert was commenting on the initial version of S.B. 14, prior to the adoption of various ameliorative provisions. *See* PL272 (email dated Jan. 22, 2011) (ROA.38985); Defs.' Proposed Findings of Fact ¶¶ 168, 195.

*Third*, Senator Estes's "concern[]" about whether S.B. 14 "complied with the Voting Rights Act" (PL267 (ROA.38976); *see* Private Pls.' Br. 8) does not reflect his belief that the law would disparately impact minorities. Under the preclearance regime, any legislator in a covered jurisdiction looking to change an election law needed to be concerned with Voting Rights Act preclearance. Senator Estes was simply performing his due diligence, "want[ing] to make sure" that S.B. 14 "passe[d] and [was] precleared." Hebert 2014 Dep. 110:2-5 (ROA.63912). If anything, the concern that Senator Estes had about preclearance would be evidence that he intended for S.B. 14 *not* to disparately impact minorities, as that would be required for preclearance. And his vote for S.B. 14 is evidence that he believed it would not disparately impact minorities, as there is little reason to vote for a law that one knows will be never be enforced. In any event, this "stray statement[] made by [a single] legislator[] voting

for SB 14" is "not . . . the best indicia of the Texas Legislature's" belief. *Veasey*, 830 F.3d at 234.

*Fourth*, and finally, Plaintiffs misrepresent the record when they assert that an "[a]nalysis provided by the Texas Secretary of State's Office to Lieutenant Governor Dewhurst during consideration of SB 14 confirmed" that the law would have a "racially discriminatory impact." DOJ Br. 20. This assertion is misleading for a number of reasons. Lieutenant Governor Dewhurst received no "[a]nalysis." *Id.* The only thing that Dewhurst was provided was an unsourced estimate from one of his staff about the percentage of registered voters who lacked a driver's license or personal ID. *See* Trial Tr. 71:5-25 (Sept. 10, 2014) (Dewhurst) (ROA.100833). And even if that number came from the Secretary of State, Plaintiffs' concede that the Secretary of State's office had not broken down ID possession rates by race or voting history. *See* Pls.' Proposed Findings of Fact ¶ 103; *cf. Lee*, 2016 WL 7210103, at *9; *Frank*, 768 F.3d at 749. Moreover, although someone in the Secretary of State's office may have communicated an estimate of the number of Texas registered voters who did not have a Texas driver license or personal ID to a member of Lieutenant Governor Dewhurst's staff, the Secretary of State's office also warned that its matching data were unreliable because the Secretary of State's office was having problems matching the list of driver's licenses to the list of registered voters. See Trial Tr. 72:13-73:2 (Sept. 10, 2014) (Dewhurst) (ROA.100834-35); *see also* Defs.' Proposed Findings of Fact ¶ 218 (the Legislature heard expert testimony that it should not rely on matching data).

24

Lastly, Plaintiffs concede that no legislator knew about this analysis (Pls.' Proposed Findings of Fact ¶¶ 100, 108).[6]

**d.** Next, Plaintiffs point to speculative warnings by *opponents* of voter ID that such laws would "burden voting for many Latino and Black Texans" because of the difficulties inherent in obtaining ID. Private Pls.' Br. 8; *see also* DOJ Br. 32. But "[i]n their zeal to defeat a bill," opponents "understandably tend to overstate its reach." *Feiger v. U.S. Attorney Gen.*, 542 F.3d 1111, 1119 (6th Cir. 2008) (citation and quotation marks omitted). Thus, "[t]he fears and doubts of the opposition are no authoritative guide." *Id.* (citation and quotation marks omitted). And it was well known that voter ID opponents were preparing for a legal challenge from the beginning (*see* Defs.' Proposed Findings of Fact ¶ 99); thus their charges of disparate impact were suspect. As another court has observed: "The incentive to couch partisan disputes in racial terms bleeds back into the legislative process," "as members of the 'out' party—believing they can win only in court, and only on a race-based claim—may be tempted to spice the legislative record with all manner of racialized arguments, to lay the foundation for an eventual court challenge." *Session*, 298 F. Supp. 2d at 473 n.69 (quotation marks omitted). Finally, the Legislature's decision not to give greater weight to speculation by opponents who had proved themselves willing to thwart

---

[6]    The Lieutenant Governor is not an ordinary "legislator." Similar to the Vice President of the United States, the Lieutenant Governor may only vote in the case of a tie and when he participates in Committee of the Whole. *See* Dewhurst Dep. 29:2-4 (ROA.60360).

voter ID legislation by any means necessary for years does not suggest that the Legislature harbored a discriminatory purpose.

In any event, the Texas Legislature was entitled to credit contrary evidence and come to a contrary conclusion. This is particularly so in the face of (1) Democrats' concessions that they had no evidence to support their claims of disparate impact (*see* Defs.' Proposed Findings of Fact ¶ 163); (2) the Supreme Court's pronouncement in 2008 that the inconveniences faced in obtaining ID were justified by the importance of preventing voter fraud and promoting public confidence in elections (*Crawford*, 553 U.S. at 198 (concluding that "the inconvenience of making a trip to [a government office], gathering the required documents, and posing for a photograph surely does not qualify as a substantial burden on the right to vote, or even represent a significant increase over the usual burdens of voting")); and (3) the experiences of other States, which showed that voter ID opponents' concerns were unfounded (*see* Defs.' Proposed Findings of Fact ¶¶ 211-212).

## 2.   Too many white voters are purportedly burdened by S.B. 14 to permit a conclusion of discriminatory intent.

Even assuming arguendo that the Texas Legislature did have the knowledge of S.B. 14's impact that Plaintiffs seek to impute to it, Plaintiffs' claims would still fail because this purported impact fell heavily on whites. According to Plaintiffs, hundreds of thousands of white registered voters—by some measures, more than similarly situated African-American and Hispanic registered voters *combined*—were also impacted by S.B. 14. *See* Defs.' Proposed Findings of Fact ¶¶ 219-220; *see also* Defs.' Resp. to Pls.' Proposed Findings of Fact ¶ 337.

Just as too many men were adversely affected by the statute challenged in *Feeney* "to permit the inference that the statute is but a pretext for preferring men over women," "[t]oo many" white voters "are affected by" S.B. 14 "to permit the inference that the statute is but a pretext for preferring" white voters "over" minority voters. 442 U.S. at 275; *see also Lower Merion Sch. Dist.*, 665 F.3d at 552 (rejecting claim of discriminatory purpose where minorities and whites were both adversely affected by the policy at issue); *Ziegler v. Ziegler*, 28 F. Supp. 2d 601, 616 (E.D. Wash. 1998) ("[I]t is recognized that most victims of gender-motivated violence are women, but some are men. The non-victim class includes too many women also 'affected' by the statute . . . to infer that the statute is a pretext for favoring women over men."); *Richardson v. Honolulu*, 802 F. Supp. 326, 343 (D. Haw. 1992) (rejecting claim of discrimination against native Hawaiians because "[t]he impact of the ordinance is shared by all lessors, many of which, if not the majority, are not Native Hawaiian"), *aff'd*, 124 F.3d 1150 (9th Cir. 1997); *cf. Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 536 (1993) (law drafted in such a way that "the burden . . ., in practical terms, falls on" one religion "but almost no others" suggests that the religion was targeted).

### 3. The historical background of S.B. 14 does not suggest that the Legislature's stated purposes were pretext.

If the "historical background of the decision . . . reveals a series of official actions taken for invidious purposes," this may suggest that a non-invidious rationale offered by a decisionmaker is pretext. *Arlington Heights*, 429 U.S. at 267. As the Fifth Circuit made clear, however, only recent acts of racial discrimination by the Texas

27

Legislature are relevant to this Court's analysis. *Veasey*, 830 F.3d at 231-33. And there are none.

    **a.**  Plaintiffs assert that S.B. 14 was part of an ongoing history of racial discrimination in Texas (DOJ Br. 33-36; Private Pls.' Br. 16-18, Cnty. Comm'rs' Br. 3-8), but much of that history is far too old to be probative. *See, e.g.*, DOJ Br. 34 (citing 1966 and 1975 purge laws and 1973 redistricting case); Private Pls.' Br. 17 (citing laws enacted prior to 1975). Acts by long-dead legislators occurring decades ago cannot be probative of the intent of the Texas Legislature in 2011. *Veasey*, 830 F.3d at 231-33; *see Hayden*, 594 F.3d at 165 (concession that a nearly identical provision was enacted with discriminatory intent 20 years prior did not support finding of intentional discrimination by later legislature).

    Meanwhile, most of the more recent history cited by Plaintiffs has nothing to do with the Texas Legislature and is therefore not "probative of the intent of legislators in the Texas Legislature." *Veasey*, 830 F.3d at 232. For instance, DOJ asserts that "Texas and jurisdictions across the State have engaged in widespread official discrimination" (DOJ Br. 35), but it cites only examples of purported discrimination by local jurisdictions and private entities in Texas—not the Texas Legislature. *See* Pls.' Proposed Findings of Fact ¶¶ 31-42; Defs.' Resp. to Pls.' Proposed Findings of Fact ¶¶ 31-42. For their part, the Private Plaintiffs rely on various consent decrees entered into by local Texas jurisdictions—not the Texas Legislature. Private Pls.' Br. 18; *see also* Cnty. Comm'rs' Br. 5 n.4, 7 n.6. None of this evidence is helpful to this Court's inquiry, because none of it reflects on the Texas Legislature.

Even when Plaintiffs focus on the proper target and timeframe, they still come up short. DOJ, for example, cites various voting-related lawsuits filed since 2000. DOJ Br. 35. But even the few lawsuits that actually target an act by the Texas Legislature are not proper evidence because "[i]t is fundamental that unproven allegations are not proof of their content." *Scantek Medical, Inc. v. Sabella*, 693 F. Supp. 2d 235, 240 n.1 (S.D.N.Y. 2008); *accord, e.g.*, *Wright v. Farouk Sys., Inc.*, 701 F.3d 907, 911 n.8 (11th Cir. 2012) (rejecting reliance on "complaints . . . from other lawsuits," "because pleadings are only allegations, and allegations are not evidence of the truth of what is alleged"). Plaintiffs also rely on various DOJ objections to election laws "since 2000." DOJ Br. 34-35; Private Pls.' Br. 17-18, Cnty. Comm'rs' Br. 6 & n.5. But even if these were any better than allegations in a complaint—and they are not—only three of the cited objections since 2000 involve laws passed by the Texas Legislature (one was to S.B. 14), and *none* so much as suggests that the Texas Legislature enacted a law with a racially discriminatory purpose. See PL1130 (ROA.56411-16, 56426-28, 56455-60).[7] These lawsuits and objection letters are not evidence of "official actions taken for invidious purposes." *Arlington Heights*, 429 U.S. at 267; *see Veasey*, 830 F.3d at 233 (decisions not based on a finding of intentional discrimination "do not lend support for a finding of 'relatively recent' discrimination").

Finally, Plaintiffs cite relatively recent court decisions that have partially invalidated certain aspects of Texas election laws. *See* DOJ Br. 34-35 (citing *LULAC v.*

---

[7]     Indeed, even DOJ's preclearance objection to S.B. 14 was limited to its purported retrogressive effect; DOJ did not contend, as it does now, that S.B. 14 was enacted with a discriminatory purpose. *See* PL1130 (ROA. 56455-60).

*Perry*, 548 U.S. 399 (2006); *Perez v. Perry*, No. 5:11-cv-360 (W.D. Tex. Mar. 19, 2012);

*Texas v. United States*, 887 F. Supp. 2d 133 (D.D.C. 2012), *vacated*, 133 S. Ct. 2885

(2013)); Private Pls.' Br. 18 (citing *OCA Greater Houston v. Texas*, 2016 WL 4597636

(W.D. Tex. Sept. 2, 2016)). None of these cases help Plaintiffs:

- As the Fifth Circuit explained, *LULAC* "do[es] not lend support for a finding of 'relatively recent' discrimination" because "the [Supreme] Court did not base its decision on a conclusion that the legislature intentionally discriminated based upon ethnicity." *Veasey*, 830 F.3d at 233.

- In *Perez*, the only question before the court was whether plaintiffs' claims of discrimination were "insubstantial." *Perez*, slip op. at 6. Although the court said that the Texas Legislature "*may* have focused on race to an impermissible degree by targeting low-turnout Latino precincts" when drawing a single Texas House district, it never found that the Texas Legislature had, in fact, acted with discriminatory intent in drawing the contested House district because that question was not before it. *Id.* (emphasis added). This inchoate finding, therefore, cannot support Plaintiffs' claim. *See Veasey*, 830 F.3d at 233 (rejecting reliance on a decision that rejected a congressional district because "the [c]ourt did not base its decision on a conclusion that the legislature intentionally discriminated based upon ethnicity").

- Defendants addressed *Texas v. United States* at length in their Proposed Conclusions of Law. *See* Defs.' Proposed Conclusions of Law ¶¶ 66-68. The opinion was vacated before Texas had a chance to challenge it, meaning that (1) "its ruling and guidance" were "erased" (*United States v. Windsor*, 133 S. Ct. 2675, 2688 (2013)), and (2) it would be wholly unfair to hold the court's conclusion against Texas where the State was denied full process. Indeed, on appeal, DOJ *agreed* that "the district court's conclusion as to discriminatory purpose" regarding the State's Senate redistricting plan "amounts to clear error." Motion to Affirm in Part at 28, *Texas v. United States*, No. 12-496 (U.S. Dec. 7, 2012), 2012 WL 6131636, at *28.

- *OCA Greater Houston* involved no allegation of discriminatory purpose. *See* 2016 WL 4597636, at *1 ("Plaintiffs argued that" the law's provisions "violate Section 208 of the Voting Rights Act") (emphasis added). Because the court could not have based "its decision on a conclusion that the legislature intentionally discriminated based upon ethnicity," the

decision "do[es] not lend support for a finding of 'relatively recent' discrimination." *Veasey*, 830 F.3d at 233.

Plaintiffs have stretched to find anything that could possibly be cited to manufacture a charge of recent discrimination by the Texas Legislature. They have come up empty, further undermining their charge of pretext.

**b.**  In contrast to the paucity of probative historical background evidence suggesting that the Texas Legislature harbored discriminatory motives, there is a substantial amount of evidence dispelling any such notion. Each member of the Senate, for example, voted for amendments to expand the variety of acceptable IDs, accept expired identification, and to provide an exception to the ID requirement for the indigent. *See* Defs.' Proposed Findings of Fact ¶ 168. These votes do not make sense if, as Plaintiffs charge, "the Texas Legislature" was intent on "shap[ing] SB 14 to ensure a discriminatory impact." DOJ Br. 20 (emphasis omitted; capitalization altered). These same Senators had, in 2009, voted to enact a voter ID law that allowed a wide variety of photo and non-photo ID. *See* Defs.' Proposed Findings of Fact ¶ 197. They did this notwithstanding that, by this point, Indiana's photo-voter-ID law had been upheld by the Supreme Court and Georgia's photo-voter-ID law had received DOJ preclearance. These Senators could easily have justified a bill requiring only photo ID, and yet they drafted and passed a bill in 2009 that allowed certain forms of non-photo ID. This is strong evidence that these Senators harbored no discriminatory motives.

The same is true of Texas House members. Every member of the House who voted for the final version of S.B. 14 also voted to excise from the Senate version a

provision that exempted those over 70 from the law. *See id.* ¶ 185. If, as Plaintiffs suggest, the elderly are more likely to be white and vote Republican (Pls.' Proposed Findings of Fact ¶ 410), it would make little sense for those seeking to discriminate to excise such a provision. And most of the House members who voted to enact S.B. 14 had previously voted to enact a voter ID law that allowed a wide variety of photo and non-photo ID. *See* Defs.' Proposed Findings of Fact ¶ 199. For the reasons explained above, this is strong evidence that these legislators harbored no discriminatory motives.

    **c.**  Plaintiffs take the evidence of S.B. 14 proponents' attempts to compromise in previous legislative sessions and try to turn it on its head as proof of discriminatory purpose because, they say, between 2005 and 2011 "voter ID proponents introduced increasingly harsh bills." DOJ Br. 21; Pls.' Br. 9. Plaintiffs' reasoning is never made clear, and it is not readily apparent how the evolution of these voter ID proposals suggests an invidious purpose. In any case, Plaintiffs are mistaken. First, the 2005, 2007, and 2009 bills all allowed for a combination of non-photo and photo ID, so none of them was "harsh[er]" than the other in any meaningful way. And it was obvious to all at the time—even Plaintiffs' own expert—that the reason S.B. 14 was a photo-only law was because there was increasing demand for such a law and because Democrats had taken compromise off the table. *See* Defs.' Proposed Findings of Fact ¶¶ 83-92, 150-151. When it became clear that Democrats were not interested in compromise, and after Republicans had obtained overwhelming majorities in both houses of the

Texas Legislature, Republicans chose to pursue their policy preference and the preferences of those who had voted them into office—and who could vote them out. The result was S.B. 14's photo ID requirement for many voters.

Aside from the direct evidence supporting this view of the world, there is strong circumstantial evidence as well in the form of the voting behavior of select legislators. Two Democrats who opposed more lax voter ID bills in 2005 and 2007, switched their votes and supported a stricter voter ID bill in 2011. *See id.* ¶ 88. The only plausible explanation for this switch is that support for requiring a photo ID to vote was strong and growing. Three other legislators who opposed more lax voter ID bills in 2005 and 2007 when they were Democrats later supported a photo-voter-ID law in 2011 after they had switched to the Republican Party. See *id.* ¶ 92. The only plausible explanation for this switch is that Democratic opposition to voter ID was a matter of politics, and that the support for a photo-voter-ID bill—particularly among Republican constituents—was strong, and these legislators felt it.

### 4.   The sequence of events leading up to S.B. 14 does not suggest that the Legislature's stated purposes were pretext.

"The specific sequence of events leading up the challenged decision"—particularly substantive and procedural departures from the norm—"also may shed some light on the decisionmaker's purposes." *Arlington Heights*, 429 U.S. at 267. But S.B. 14 did not involve substantive departures: it was one part of a long effort by the Texas Legislature to modernize and secure its election system. And there was no procedural departure that suggests discriminatory purpose: voter ID was debated in the open for six years before a law was enacted by a majority vote in both houses of the Texas

Legislature, and each procedural move by voter ID proponents was solely to get the law through the democratic process to an up-or-down vote.

### a.   S.B. 14 was not a substantive departure from the concerns of the Texas Legislature.

S.B. 14 was "the culmination of longstanding official efforts to address" in-person voter fraud (*Spurlock v. Fox*, 716 F.3d 383, 397 (6th Cir. 2013)) and part of a much larger and even longer-standing effort to modernize and secure Texas's electoral system. "The present case therefore represents the *opposite* of a '[s]ubstantive departure[]' where 'the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached.'" *Id.* (quoting *Arlington Heights*, 429 U.S. at 267); *see also Lower Merion Sch. Dist.*, 665 F.3d at 553 (explaining that the fact that "[t]he decision to redistrict was born of a capital improvement program intended to modernize every school in the district" suggested that it was not the result of discriminatory intent).

The 2000 Presidential election and *Bush v. Gore* issued a clarion call to "legislative bodies nationwide" to "examine ways to improve the mechanisms and machinery for voting." *Bush*, 531 U.S. at 104; *see also* Defs.' Proposed Findings of Fact ¶¶ 52-92. Texas answered that call with a decade-long effort to modernize and secure its election system. *See id.* ¶¶ 104-111, 127, 137, 149, 187-188. In doing so, Texas demonstrated that "the factors usually considered important by the" Texas Legislature (*Arlington Heights*, 429 U.S. at 267) were those identified by the Supreme Court in *Crawford*: the need to ensure "orderly administration" of elections, to "prevent[] voter fraud," and to "inspire public confidence" in "the electoral system." 553 U.S. at 196-

34

97 (internal quotation marks omitted). S.B. 14 was consistent with each of these factors. *See supra*, pp. 9-15; *infra*, pp. 44-48.

Plaintiffs contend that S.B. 14 was a "substantive departure" because it was not identical to the Indiana and Georgia laws on which proponents claimed to have modeled it. DOJ Br. 21-22. Plaintiffs are mistaken. No two voter ID bills are identical, not even Georgia's and Indiana's. *See* Defs.' Proposed Findings of Fact ¶¶ 71-73, 76. Nothing in the way S.B. 14 differs from Georgia's or Indiana's law suggests an invidious, substantive departure from the policy factors important to the Texas Legislature.

Plaintiffs first point to the relatively limited variety of IDs allowed by S.B. 14. DOJ Br. 21-22; Private Pls.' Br. 13-14. But this choice comports with the Texas Legislature's interest in the "orderly administration" of elections. *Crawford*, 553 U.S. at 196. These IDs were chosen because they were the most "readily available" and "easiest" to acquire and use. Defs.' Response to Pls.' Findings of Fact ¶¶ 208, 306-307. And the universe of IDs was limited to avoid confusion at the polls; *i.e.*, to ensure orderly administration. *See* Defs.' Proposed Findings of Fact ¶ 173; *see also* Defs.' Response to Pls.' Proposed Findings of Fact ¶¶ 246, 248 (rebutting the implication that minority rates of possession of various IDs was known to the Texas Legislature).

Plaintiffs also point to S.B. 14's lack of an indigency exception, which differs from Indiana's law. DOJ Br. 22; Private Pls.' Brief 14 n.5. This is disingenuous, at best. In an attempt to ameliorate S.B. 14's possible effects on poorer voters and com-

promise with Democrats, Republicans in the Texas Senate added an Indiana-like in-
digency exception to S.B. 14. *See* Defs.' Proposed Findings of Fact ¶ 168. After it
passed in the Senate, S.B. 14 was reported out of committee in the House with this
exception intact. *See id.* ¶¶ 179, 184. It was not until House Democrats argued that
the indigency-affidavit compromise was hypocritical—*i.e.*, that it was a substantive
departure from the "factors usually considered important by" voter ID proponents
(*Arlington Heights*, 429 U.S. at 267)—that an amendment was offered to eliminate
the exception. *See* Defs.' Proposed Findings of Fact ¶ 184. The amendment eliminat-
ing the indigency exception was supported by Democrats who opposed S.B. 14. *See id*.
Thus, contrary to Plaintiffs' assertion, the exception was not "stripped from SB 14 in
conference, without . . . debate or explanation." DOJ Br. 29-30. Rather, S.B. 14's con-
ferees were faced with the prospect of no provision to ameliorate possible effects on
the poor on the one hand, and bipartisan opposition to the indigency exception on the
other. The result of this "give-and-take inherent in the legislative process" (*Session*,
298 F. Supp. 2d at 471) was the provision of free voter ID cards (Defs.' Proposed Find-
ings of Fact ¶ 195), *just as Georgia law provides* (*see* Private Pls.' Br. 14 n.5). Thus,
the legislators replaced an Indiana-inspired provision with a Georgia-inspired provi-
sion. Nothing in this sequence suggests an invidious, substantive departure.

> **b.    The procedures used to get S.B. 14 to debate and an
>         up-or-down vote do not suggest a discriminatory
>         purpose.**

"The procedure used to arrive at" S.B. 14—*i.e.*, the democratic process with
open debate followed by passage by majority vote—"was well-defined, well-regulated,

and transparent." *Spurlock*, 716 F.3d at 398; *see Lee*, 2016 WL 7210103, at *9 (procedure did not suggest invidious intent where there was "full and open debate" "and no evidence was presented of untoward external pressures or influences affecting the debate"); Defs.' Proposed Conclusions of Law ¶¶ 97-106. For a total of six years, the issue of voter ID was exhaustively debated in legislative proceedings "open to the public." *Spurlock*, 716 F.3d at 397.[8] The more than 4,500 pages of open debate over six years confirm that there was nothing "abnormal or pernicious about" the way the Texas Legislature finally enacted a voter ID law. *Id.*; *see also Husted*, 837 F.3d at 636 (no evidence of discriminatory purpose where legislature "considered [election law's] provisions" in the open "for several months before their passage"); *N. Carolina State Conference of NAACP v. McCrory*, 831 F.3d 204, 229 (4th Cir. 2016) (procedural departures are suggestive of discriminatory purpose if they show an "eagerness" to rush legislation through with limited opportunity for debate and review).

---

[8]    Complaining of the use of a select committee—vice-chaired by a vocal opponent of voter ID (*see* Defs.' Proposed Findings of Fact ¶ 177)—to consider S.B. 14 in the House, Plaintiffs cite the Ninth Circuit's decision in *Pacific Shores Properties, LLC v. City of Newport Beach*, 730 F.3d 1142, 1164 (9th Cir. 2013), and suggest that it held that use of such committees suggests discriminatory purpose. DOJ Br. 29. Plaintiffs misread *Pacific Shores*. The Ninth Circuit was not concerned with the "ad hoc" nature of the committee in that case, it was concerned that the committee "*met privately and off the record.*" 730 F.3d at 1164 (emphasis added); *see id.* at 1164 n.27; *see also Esperanza Peace & Justice Ctr. v. City of San Antonio*, 316 F. Supp. 2d 433, 471 (W.D. Tex. 2001) (cited at DOJ Br. 29) (only procedural departure noted by the court was consideration in a *closed* meeting). The consideration of S.B. 14 by the select committee, like every other part of S.B. 14's consideration, was done in the open. The reasoning of *Pacific Shores* further undermines Plaintiffs' case for discrimination.

**a.**  Plaintiffs do not and cannot seriously contend that voter ID did not receive open and careful consideration between 2005 and 2011, or even in 2011 alone—S.B. 14 was introduced at the very beginning of the session and was not enacted until the very end. *See* Defs.' Proposed Findings of Fact ¶¶ 153, 196, 198; *Husted*, 837 F.3d at 636-37. Instead, Plaintiffs are left to complain about the measures taken by voter ID proponents simply to get S.B. 14 to debate and an up-or-down vote. DOJ Br. 29-30; Private Pls.' Br. 19-20.[9] "These complaints," however, which amount to nothing more than complaining that a minority of legislators was not able to block the will of the majority, "rather than constituting evidence of a discriminatory motive, indicate a general dissatisfaction with the legislative process." *Moore v. Detroit Sch. Reform Bd.*, 293 F.3d 352, 369 (6th Cir. 2002); *see also id.* at 369-70 (explaining that "Legislature's (1) speedy passage of" law, "(2) disrespectful treatment of" certain legislators, "(3) failure to gather and analyze relevant information before voting on the" law, "(4) refusal to hold" certain hearings, "(5) rejection of" purportedly ameliorative "amendments . . ., (6) selection of reform measures that allegedly fail to address the real problems" raised by the legislature, "and (7) reliance on a scandal that occurred many

---

[9]  Plaintiffs' contention that these procedures "short-circuit[ed] debate" (Private Pls. Br. 19) gets it backwards. S.B. 14 *opponents* misused the two-thirds rule and the House calendar ("chubbing") to prevent debate on voter ID bills for years over three previous legislative sessions. *See* Defs.' Response to Pls.' Proposed Findings of Fact ¶ 87; *see also* Davidson Corrected Rpt. ¶ 20 (ROA.102473) (noting that Senate Democrats sent a letter to Lieutenant Governor Dewhurst informing him "that they would vote against any procedural motion to" even "*debate* voter ID legislation") (emphasis added). All that the proponents' procedural moves allowed for was open debate and an up-or-down vote.

years before to justify its actions" might justify "a legitimate and even a valid critique of its behavior, but it does not lead to an inference of racial discrimination").

Plaintiffs misinterpret the *Arlington Heights* factors as elements of their claim, treating them as boxes to be checked rather than evidence to be examined. This leads Plaintiffs to draw inferences of discrimination from neutral facts without a complete analysis. For example, Plaintiffs treat departures from the normal procedural sequence as though they necessarily signal racial discrimination. But *Arlington Heights* did not establish that procedural departures are inherently race-based or discriminatory—legislatures may depart from standard procedure for any number of reasons. As Defendants have already demonstrated, each one of the purported procedural "departures" relied on by Plaintiffs was not only well grounded in precedent, it was in direct response to the unprecedented obstruction by voter ID opponents. *See* Defs.' Proposed Conclusions of Law ¶¶ 98-100. "[C]ontext matters." *Veasey*, 830 F.3d at 237. This context not only rebuts Plaintiffs' suggestion that there was anything invidious about the procedures used to get S.B. 14 to debate and an up-or-down vote, it also requires caution on the part of this Court.

The Court would set a dangerous precedent if it allowed legislative opponents to bootstrap a claim of discrimination by using obstruction to force proponents into procedural maneuvers—requiring a legislative majority to either acquiesce to an intransigent minority or face defeat in court. It is the desire of the Judiciary to avoid creating such pernicious incentives that makes it most wary of "inject[ing] the federal courts into a political game for which they are ill-suited, and indeed in which they are

charged not to participate under the most basic principles of federalism and separation of power." *Session*, 298 F. Supp. 2d at 473. "[F]ederal judges are not legislative players"; they "are only the guardians of the boundaries." *Id.*

**b.** Plaintiffs also object to aspects of S.B. 14's consideration that were not procedural departures at all. Plaintiffs claim, for example, that the failure of the Secretary of State's office to timely share a flawed matching analysis with the Legislature is a procedural departure. DOJ Br. 30-31. To make this claim is to defeat it. The Secretary of State is not the Legislature, and the Legislature had nothing to do with the Secretary of State's decision.

Plaintiffs further complain that "the Senate and House refused to engage in substantive debate, and active consideration of amendments was largely limited to those that did not ameliorate the discriminatory impact of SB 14." DOJ Br. 29. These are also facially not procedural issues but rather reflect "a general dissatisfaction with the legislative process." *Moore*, 293 F.3d at 369. Plaintiffs' accusation is unsupported in any event. Consideration of S.B. 14 in the House and Senate spans well over *1,500* transcript pages. *See* DEF0001 (Legislative history of S.B. 14). And proponents, in fact, explained the rejection of each proposal voted down. *See* Defs.' Proposed Findings of Fact ¶¶ 169-173. While it is true that proponents did not give in-depth answers to all of opponents' questions (*see* DOJ Br. 23; Defs.' Response to Pls.' Proposed Findings of Fact ¶ 232), this is not evidence of discriminatory purpose. *See Moore*, 293 F.3d at 369-70. The legislative record was replete with information that could have answered opponents' questions.

There is no evidence that proponents were hiding anything from opponents. To the contrary, after six years of consideration, the issue had been thoroughly considered and deserved an up-or-down vote.

Finally, Plaintiffs point out that S.B. 14 contained a fiscal note despite the State's budget shortfall. Private Pls.' Br. 19. But once again, Plaintiffs are off base. There was no procedural rule that barred fiscal notes. And Plaintiffs have again ignored the record. The $2 million that S.B. 14 directed the Secretary of State to spend on voter education was already in the possession of the agency; no state expenditure was necessary, so the budget shortfall did not come into play. *See* Defs.' Response to Pls.' Proposed Findings of Fact ¶¶ 91, 95. This was explained during S.B. 14's debate both by Senator Fraser, the bill's sponsor, and by the Secretary of State. *See id.*

### 5. Plaintiffs' remaining circumstantial evidence is insufficient to meet their demanding burden.

As shown, none of the *Arlington Heights* factors support a finding that S.B. 14 was enacted for a discriminatory purpose. Plaintiffs' remaining circumstantial evidence cannot prove their discriminatory-purpose claims.

### a. Plaintiffs' theory of motive is not supported by the evidence.

Looking for a motive to explain why the Texas Legislature would purportedly seek to burden minority voters, Plaintiffs conjure up a theory that Texas Republicans, fearful of a rise in the population of Democratic-voting minorities, enacted S.B. 14 as means of keeping these minorities from the polls in order to protect Republican power. DOJ Br. 31-33; Private Pls.' Br. 5-7. The only evidence Plaintiffs cite in support of their fanciful conjecture is (1) Texas's purportedly racially polarized voting,

and (2) the timing of the Texas Legislature's concern with voter ID. *See id.* On closer inspection, however, this evidence does not exist.

Plaintiffs assert that Texas experiences racially polarized voting and that this phenomenon gave Republicans reasons to fear a growing minority population. DOJ Br. 9-10, 31-32, Private Pls.' Br. 5-6. Racially polarized voting means that voting patterns are motivated by race and not by partisan preference. *See, e.g., LULAC v. Clements*, 999 F.2d 831, 852-61 (5th Cir. 1993) (en banc). But although Texas has acknowledged that in partisan general elections, a majority of non-Hispanic white voters tend to favor Republican candidates, a majority of Hispanic voters tend to favor Democratic candidates, and a majority of African-American voters tend to support Democratic candidates (*see* Pls.' Proposed Findings of Fact ¶ 11), that does not prove that *racially* polarized voting exists in the State. The tendency of general-election voters to favor candidates of a particular party persists regardless of the race of the candidates. In other words, it is a *partisan* preference, not a *racial* preference. Plaintiffs have introduced no evidence, and the State has certainly not conceded in any pending case, that voting patterns are motivated by race as opposed to partisan preference. There is no evidence, for instance, that non-Hispanic white Republican voters will not support Hispanic or African-American Republican candidates. Accordingly, the Court has no basis to find that racially polarized voting exists. *Clements*, 999 F.2d at 852-61.

Plaintiffs' second piece of supposed evidence is no more extant than their first. Plaintiffs claim that "[i]n 2004, Texas became a majority-minority state" and

"[w]ithin months, the first photo voter ID bill, HB 1706, was introduced in the Texas Legislature." Private Pls.' Br. 5; *see also* DOJ Br. 3. But in fact, the first Texas voter-ID bill was introduced by a Democratic legislator in 2001. *See* Defs.' Proposed Findings of Fact ¶¶ 100-102. And while Texas became a majority-minority state in 2004, this fact was not known to the public—the Texas Legislature included—until August 2005. *See* Defs.' Proposed Conclusions of Law ¶ 89. That was after H.B. 1706 was introduced, after it was passed by House, and after it was blocked in the Senate. *See id.* Indeed, it was after the 2005 legislative session had entirely concluded. When the facts are laid out accurately, the timing of H.B. 1706 is actually evidence that voter ID proponents *could not* have been motivated by Texas's demographic shift.

In addition to relying on nonexistent evidence, Plaintiffs wholly ignore the evidence that actually shows why Texas took up voter ID in 2005 in the course of its election-modernization effort: the issue of voter ID was percolating in States around the country and in voters' minds. While 11 States required voter ID in 2001, that number grew to 24 in 2005. Defs.' Proposed Findings of Fact ¶ 113. And in 2005, bills to introduce or strengthen voter ID requirements were under consideration in 11 other States in addition to Texas. *Id.* Meanwhile, in 2005, a poll of Americans showed that a clear majority of the country—57 percent—favored voter ID laws. *Id.* ¶ 81. Texas's push for a voter ID law "is more likely the product of legitimate motives than invidious discrimination, as demonstrated by its adoption in" numerous other States "and its widespread support" among the public. *Hayden*, 594 F.3d at 167 (internal quotation marks omitted).

Plaintiffs' theory of motive is nothing more than "guesswork," which this Court must "eschew." *Hunter*, 471 U.S. at 228 (quotation marks omitted).

### b.   S.B. 14's provisions and amendments do not evidence discriminatory purpose.

Plaintiffs next turn to a series of complaints over various substantive decisions that were made during "the give-and-take inherent in the legislative process" (*Session*, 298 F. Supp. 2d at 471). *See* DOJ Br. 14-15, 20-24; Private Pls.' Br. 9-11. In familiar fashion, on closer inspection, none of Plaintiffs' complaints actually suggest any discriminatory motive.

**i.**   Plaintiffs first point to the various funding decisions by the Texas Legislature (DOJ Br. 14-15; Private Pls.' Br. 10-11), but each has a legitimate explanation. Plaintiffs complain, for instance, that, although the Legislature directed the Secretary of State to spend $2 million on voter education efforts, it did not *require* that funding to be targeted at educating poor and minority voters or educating voters about the availability of the free EIC voter IDs. *See* DOJ Br. 14-15. Plaintiffs ignore, however, that neither did the Texas Legislature *prohibit* such spending. The entire administrative state in this country is built on the assumption that experts in an agency will often know "how best to marshal . . . limited resources . . . to carry out . . . delegated responsibilities." *Massachusetts v. EPA*, 549 U.S. 497, 527 (2007). It is, therefore, the traditional practice in Texas to leave issues of implementation to the agencies. *See* Defs.' Proposed Findings of Fact ¶¶ 169-171. The fact that the Texas

Legislature did what most legislatures typically do is not evidence of invidious purpose. *See Arlington Heights*, 429 U.S. at 267 (courts should consider whether "factors usually considered important by the decisionmaker" support the decision made).

Plaintiffs also complain that funding was insufficient. DOJ Br. 14. But whatever hindsight may show, the record before the Texas Legislature suggested that the funding was adequate. *See* Defs.' Response to Pls.' Proposed Findings of Fact ¶¶ 258-259. A witness from the Secretary of State's office testified in the Senate and explained that the agency engages in voter outreach and election-worker training every election cycle, and each cycle it spends, on average, $3 million doing so. See DEF0001 (Debate on S.B. 14 in the Senate Committee of the Whole, 82d Leg., R.S., 437:1-6, 440:5-18 (Jan. 25, 2011) (ROA.69042)). The witness further testified that training and outreach related to S.B. 14 would be folded into that regular effort. *See id*. 438:23-439:8, 441:10-24 (ROA.69042-43). As a result, because there was going to be training and education anyway, the Secretary of State's office indicated that it was likely that the agency would not even "need 2 million just for the voter ID" education. *Id.* 441:15-18. (ROA.69043). Further, the Secretary of State's office informed the Legislature that beyond the $2 million that S.B. 14 directed it to spend on voter education, there was an additional $3 to $5 million in federal funds that Texas had with which to educate voters and train election workers. *See id*. 439:16-44:10 (ROA.69042). Nothing in the record suggests that the Texas Legislature knew or intended funding to be inadequate. Thus, there is no evidence that the Texas Legislature made its funding decisions with the purpose of hurting minorities.

**ii.** Plaintiffs also complain about the alleged ineffectiveness of the free EIC voter ID provision and the purported difficulty in obtaining an EIC. *See* DOJ Br. 14-17. Plaintiffs' complaints about the EIC provision, however, are misplaced for the obvious reason that the provision can only be explained as an attempt to ameliorate any potential burden that S.B. 14's ID requirement would place on poorer voters. *See* Defs.' Proposed Findings of Fact ¶ 195. As already explained, after House Democrats had led a push to eliminate S.B. 14's indigency exception, the conferees were left with few options. *See supra*, pp. 35-36. They chose to resolve the difference between the House and Senate version by inserting a Georgia-like provision for a free ID, and left the implementation of that provision up to the Texas Department of Public Safety, with its expertise in issuing IDs, and other agencies. *See* Defs.' Response to Pls.' Proposed Findings of Fact ¶¶ 138, 239-240, 242, 244. Whatever problems may have crept up during this implementation, there is absolutely no evidence that the Texas Legislature foresaw them, let alone intended them. Any suggestion that this *ameliorative* provision was intended to *hurt* minorities is less than "guesswork" (*Hunter*, 471 U.S. at 228 (quotation marks omitted))—it is untenable.

**iii.** Plaintiffs next complain about the adoption of certain amendments and the rejections of others. Each of these actions, however, have legitimate explanations and are not evidence of discriminatory purpose.[10]

---

[10]   Plaintiffs make much of the fact that certain voter ID proponents were unable to explain certain decisions to the satisfaction of plaintiffs years later. *See* DOJ Br. 23; Private Pls.' Br. 10. But the "contemporary statements by members of the decisionmaking body," which are "highly relevant" to the question of discriminatory purpose (*Arlington Heights*, 429 U.S. at 268), *do* explain these decisions.

Plaintiffs observe that the Senate added handgun licenses, which are supposedly more widely held by whites, to the list of acceptable ID, but rejected other IDs—student IDs, employee IDs, etc.—which are supposedly more likely to be held by minorities. *See* DOJ Br. 22-23; Private Pls.' Br. 10. Plaintiffs, however, ignore several salient facts. First, the handgun license amendment was offered by a Democrat (who ultimately opposed S.B. 14) and adopted unanimously. *See* Defs.' Proposed Findings of Fact ¶ 168. Compromise with voter ID opponents is not evidence of invidious purpose. Second, there is no evidence that the Legislature was aware of the racial breakdown of ID possession. *See* Defs.' Response to Pls.' Proposed Findings of Fact ¶¶ 247-248; Defs.' Proposed Conclusions of Law ¶ 132. And third, the other IDs were rejected in an effort to ensure the orderly administration of elections and avoid confusion. *See* Defs.' Proposed Findings of Fact ¶ 173; *see also* Defs.' Response to Pls.' Proposed Findings of Fact ¶ 247 (Plaintiffs have no evidence that a Texas handgun license is not nearly identical to a Texas driver's license, thus presenting no risk of confusion to poll workers); *see supra*, p. 35.

Plaintiffs also note that the Texas Legislature rejected various amendments that sought to micromanage the implementation of the voter ID law. *See* DOJ Br. 22; Private Pls.' Br. 10. But at the time, and later, legislators explained that it was their preference to leave issues of implementation up to the expert agencies. *See* Defs.' Proposed Findings of Fact ¶¶ 169-171; Defs.' Response to Pls.' Proposed Findings of Fact ¶¶ 239-240, 242, 244. In turn, those agencies did just what voter ID opponents were asking for. *See* Defs.' Proposed Findings of Fact ¶¶ 24-33. The Texas Legislature's

47

decision to leave implementation to agencies—something that happens in legislatures across the country every day—is not evidence of invidious purpose. *See Arlington Heights*, 429 U.S. at 267 (courts should consider whether "factors usually considered important by the decisionmaker" support decision made).

Finally, Plaintiffs complain that voter ID's proponents rejected costly and dilatory amendments that would have required an impact study before S.B. 14 could be enacted and similar studies to be performed annually. DOJ Br. 22. The obvious explanation for the rejection of the pre-enforcement-impact-study amendment is that studies had not shown a voter ID law to have any negative impact on voting. *See supra*, p. 18. Even Democratic legislators admitted that there was no evidence that S.B. 14 would have a negative impact on minorities. *See* Defs.' Proposed Findings of Fact ¶ 163. The Texas Legislature had already concluded that S.B. 14 would not negatively affect minorities (*see supra*, pp. 17-18); accordingly, no pre-enforcement impact study was necessary. And the other impact studies were rejected for the legitimate reason that the Legislature was wary of adding additional mandates to the Secretary of State's efforts. If problems arose from the enforcement of the law, they could be brought to the attention of the Legislature, and the Legislature could investigate those problems itself and decide what action to take. *See* Defs.' Proposed Findings of Fact ¶ 172. One can disagree with this policy assessment, but there is nothing inherently invidious about it. The rejection of these amendments cannot be evidence of discriminatory purpose without prohibited "guesswork" concerning the veracity of

legislators' facially legitimate rationales. *Hunter*, 471 U.S. at 228 (quotation marks omitted).

### c. The Legislature's reaction to disputed court decisions does not evidence discriminatory purpose.

The final piece of evidence on which Plaintiffs rely is the absence of a response from the Texas Legislature to the now-vacated findings of the court in *Texas v. Holder* that Texas had failed to prove that S.B. 14 will not have a retrogressive effect. 888 F. Supp. 2d 113, *vacated*, 133 S. Ct. 2886; *see* DOJ Br. 23 n.19; Private Pls.' Br. 21. This is not evidence of invidious purpose, but rather evidence that the Texas Legislature disagreed with the conclusion of the court—a conclusion that was subsequently vacated by the Supreme Court. In that case, Texas disputed that S.B. 14 has a retrogressive effect (*see* Appellant's Jurisdictional Statement, *Texas v. Holder*, No. 12-1028 (U.S. Feb. 19, 2013)), and it continues to contend that S.B. 14 does not have a disparate impact on minorities (*see* Pet. for Writ of Cert., *Abbott v. Veasey*, No. 16-393 (U.S. Sept. 23, 2016)). Moreover, the Texas Legislature, relying on academic studies and the experiences of other States, concluded that S.B. 14 would *not* disparately affect minorities. *See* Defs.' Proposed Findings of Fact ¶¶ 207-216. Nonetheless, the Texas Legislature remained open to adjusting the law if future elections demonstrated such a need. *See id.* ¶ 172. But the elections that followed implementation of S.B. 14 only confirmed that it would not negatively impact Texas voters, including minorities. *See id.* ¶¶ 45-51. Accordingly, the Texas Legislature had no need to adjust the law.

### III.   THE TEXAS LEGISLATURE WAS GOING TO ENACT S.B. 14 REGARDLESS OF ANY PURPORTED SECRET PURPOSE.

Defendants explained in their Proposed Conclusions of Law that the nation-wide push for voter ID, combined with the overwhelming support for such a law and the threat of a constituent backlash if a photo-only voter ID law with minimal loop-holes were not enacted, made it inevitable that the Texas Legislature was going to enact S.B. 14. Defs.' Proposed Conclusions of Law ¶¶ 146-150. Nothing that Plaintiffs argue undermines this conclusion.

Plaintiffs' sole argument in response is that because S.B. 14, in their view, would not be effective in preventing ineligible voters from voting or promoting public confidence, it would not have been enacted absent a discriminatory purpose. DOJ Br. 36; Private Pls.' Br. 21-22. But even accepting arguendo Plaintiffs' view of the world, this does not support their conclusion because they ignore that Georgia and Indiana also enacted photo-only voter ID bills. There is no suggestion—let alone proof—that those laws were enacted with a discriminatory purpose. If such a law is not effective in preventing ineligible voters from voting or promoting public confidence in Texas, it would not be effective in Indiana or Georgia, either, and yet the laws in those States were still enacted. So, even in Plaintiffs' version of reality, there must be additional reasons why a State would enact such a law. Defendants have explained what those reasons are: public demand and the nationwide momentum behind such laws. These reasons would have inevitably led to the enactment of S.B. 14.

Moreover, the primary difference between the Indiana and Texas laws that Plaintiffs point to is the lack of an indigency exception in S.B. 14. *See* DOJ Br. 22;

Private Pls.' Br. 14 n.5. But in the Texas Legislature, the excision of the indigency exception was driven by voter ID *opponents* (*see supra*, pp. 35-36), which suggests that any voter ID law to come out of the Texas Legislature would inevitably not include that exception, but would instead apply the Georgia approach of providing free voter IDs. This is further support for the conclusion that S.B. 14—a photo-only voter ID law with minimal loopholes that created free voter ID—was inevitably going to be enacted, regardless of any secret purpose.

## CONCLUSION

Plaintiffs have failed to carry their heavy burden of proving that the Texas Legislature enacted S.B. 14 with a racially discriminatory purpose.

Date: December 16, 2016                    Respectfully submitted.

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant
   Attorney General

BRANTLEY D. STARR
Deputy First Assistant
   Attorney General

JAMES E. DAVIS
Deputy Attorney General
   for Litigation

/s/ Angela V. Colmenero
ANGELA V. COLMENERO
Chief, General Litigation Division

MATTHEW H. FREDERICK
Deputy Solicitor General

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC 059)
Austin, Texas  78711-2548
Tel.: (512) 936-6407
Fax: (512) 474-2697

*Counsel for Defendants*

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 16, 2016, a true and correct copy of the foregoing document was served via the Court's ECF system to all counsel of record.

/s/ Angela V. Colmenero
ANGELA V. COLMENERO