IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | |
|---|---|
| MARC VEASEY, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 2:13-cv-193 (NGR) [Lead Case] |
| GREG ABBOTT, *et al.*, | |
| Defendants. | |

## UNITED STATES'S RESPONSE BRIEF CONCERNING DISCRIMINATORY INTENT

## **Table of Contents**

I.   Introduction ................................................................................................................. 1

II.  Texas Misstates the Established Legal Standard. .................................................... 2

   A.  Discriminatory Purpose Claims Are Not Subject to Heightened Proof Requirements. ....... 3

   B.  Direct Evidence Is Not Required to Prove Discriminatory Intent ........................................ 6

   C.  *Arlington Heights* and *Rogers v. Lodge* Contemplate a Broad Range of Relevant
       Evidence. ............................................................................................................................... 8

      1.  A Foreseen Racial Impact Is Powerful Evidence of Discriminatory Intent. .................... 9

      2.  Historical Background Is Not Limited to Acts of the Same Legislature. ...................... 12

      3.  Statements of Leading Proponents Evince Overall Legislative Aims. ......................... 13

      4.  Substantive Deviations May Illustrate the Tenuous and Incomplete Relationship
         Between a Bill and Its Public Purpose. ....................................................................... 14

      5.  Procedural Deviations Silence the Minority and May Reflect an Unspoken Intent. ..... 15

III. Texas Disregards this Court's Factual Findings to Revise SB 14's History. ......................... 16

   A.  Texas's Brand New "Modernization" Rationale for SB 14 Must Be Rejected ................. 17

      1.  Texas Cannot Advance New Arguments on Remand. .................................................. 17

      2.  SB 14 Was Not an Effort to "Modernize" Elections. .................................................. 17

   B.  Racially Polarized Voting Provides a Motive for SB 14 ................................................... 19

   C.  SB 14's Proponents Anticipated Its Discriminatory Result on Minority Voters. .............. 22

      1.  Texas Cannot Contest SB 14's Actual Discriminatory Impact ..................................... 23

      2.  Bill Proponents Anticipated that SB 14 Would Have a Discriminatory Impact. ........... 25

   D.  Passing SB 14 Required Substantial Deviations from Ordinary Legislative Procedure. ... 26

i

E.  The Link Between SB 14 and the Legislative Interests Asserted by Proponents Is Tenuous and Inadequate to Explain the Bill. ...................................................................................... 28

1.  No Evidence Suggests That Texas's Previous Voter Identification Law Failed to Deter In-Person Voter Impersonation. ...................................................................................... 28

2.  SB 14's Most Restrictive Provisions Are Unique to Texas. .......................................... 30

3.  No Broad Support Existed for SB 14's Most Restrictive Provisions. ............................ 32

IV. Evidence Deemed Infirm by the Fifth Circuit Was Inessential to this Court's Ultimate Finding of a Discriminatory Purpose ...................................................................................... 34

V.  Texas Has Failed to Prove That It Would Have Enacted SB 14 Absent a Discriminatory Purpose.  37

VI. Conclusion ...................................................................................................................... 38

## Table of Authorities

**Cases**

*Ala. Legis. Black Caucus v. Alabama*, 135 S. Ct. 1257 (2015) ...................................................... 4

*Arthur v. Nyquist*, 573 F.2d 134 (2d Cir. 1978) ............................................................................. 10

*Baxter v. Palmigiano*, 425 U.S. 308 (1976) ................................................................................... 14

*Bone Shirt v. Hazeltine*, 336 F. Supp. 2d 976 (D.S.D. 2004) ........................................................ 26

*Bryant v. Yellen*, 447 U.S. 352 (1980) ........................................................................................... 15

*Bush v. Gore*, 531 U.S. 98 (2000) ............................................................................................. 17, 18

*Bush v. Vera*, 517 U.S. 952 (1996) ................................................................................................. 35

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993) ................. 12, 14

*Columbus Bd. of Ed. v. Penick*, 443 U.S. 449 (1979) .................................................................. 9, 10

*Common Cause/Georgia v. Billups*, 554 F.3d 1340 (11th Cir. 2009) ........................................... 32

*Connecticut v. Teal*, 457 U.S. 440 (1982) ..................................................................................... 21

*Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181 (2008) ...................................................... 14

*Crawford-El v. Britton*, 523 U.S. 574 (1998) .............................................................................. 2, 7

*Davis v. Schnell*, 81 F. Supp. 872 (S.D. Ala. 1949) ...................................................................... 12

*Easley v. Cromartie*, 532 U.S. 234 (2001) ...................................................................................... 4

*FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307 (1993) ....................................................................... 5

*Flemming v. Nestor*, 363 U.S. 603 (1960) ....................................................................................... 5

*Foster v. Chapman*, 136 S. Ct. 1737 (2016) .................................................................................. 19

*Gaffney v. Cummings*, 412 U.S. 735 (1973) .................................................................................. 10

*Garza v. Cnty. of L.A.*, 918 F.2d 763 (9th Cir. 1990) ................................................................... 11

*Garza v. Cnty. of L.A.*, 756 F. Supp. 1298 (C.D. Cal. 1990) .................................................... 8, 14

*Hunt v. Cromartie*, 526 U.S. 541 (1999) ................................................................. 6

*Hunter v. Underwood*, 471 U.S. 222 (1985)....................................................... 12, 23

*Johnson v. California*, 543 U.S. 499 (2005) ........................................................... 5

*Justiss Oil Co. v. Kerr-McGee Refining Corp.*, 75 F.3d 1057 (5th Cir. 1996) .............. 9

*Kansas v. Hendricks*, 521 U.S. 346 (1997)............................................................. 5

*Lane v. Wilson*, 307 U.S. 268 (1939).................................................................. 12

*Lee v. Va. State Bd. of Elections*, No. 16-1605, 2016 WL 7210103 (4th Cir. Dec. 13, 2016) .............................................................................................. 26, 31

*Lodge v. Buxton*, 639 F.2d 1358 (5th Cir. Unit B Mar. 1981)..................................... 6

*LULAC v. Perry*, 548 U.S. 399 (2006) ............................................................... 35

*McCarty v. Henson*, 749 F.2d 1134 (5th Cir. 1984) ............................................... 9

*McCleskey v. Kemp*, 481 U.S. 279 (1987) ............................................................. 5

*Med. Ctr. Pharm. v. Holder*, 634 F.3d 830 (5th Cir. 2011) ....................................... 2

*Michael M. v. Super. Ct.*, 450 U.S. 464 (1981) ...................................................... 22

*Miller v. Johnson*, 515 U.S. 900 (1995)................................................................ 4

*Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456 (1981) ................................... 5

*Miss. State Chapter, Operation PUSH, Inc. v. Mabus*, 932 F.2d 400 (5th Cir. 1991) ....... 36

*N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204 (4th Cir. 2016) ............... 12, 27, 35

*Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75 (1998)................................ 21

*Palmore v. Sidoti*, 466 U.S. 429 (1984)............................................................... 33

*Perez v. Perry*, No. 5:11-cv-1303 (W.D. Tex. Mar. 19, 2012) (three-judge court)........... 8

*Personnel Adm'r v. Feeney*, 442 U.S. 256 (1979) ..................................... 3, 5, 9, 23

*Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471  (1997)............................................... 9

*Robinson v. Comm'rs Ct.*, 505 F.2d 674 (5th Cir. 1974) ........................................ 15, 22

*Rogers v. Lodge*, 458 U.S. 613 (1982).................................................................... 3, 9

*Russell v. McKinney Hosp. Venture*, 235 F.3d 219 (5th Cir. 2000)............................ 21

*Session v. Perry*, 298 F. Supp. 2d 451 (E.D. Tex. 2004) (three judge court) .............. 20

*Shaw v. Reno*, 509 U.S. 630 (1993) ...................................................................... 3, 4

*Smith v. Doe*, 538 U.S. 84 (2003) ............................................................................ 5

*Smith v. Town of Clarkton*, 682 F.2d 1055 (4th Cir. 1982) .................................... 6, 33

*State Indus., Inc. v. Mor-Flo Indus., Inc.*, 948 F.2d 1573 (Fed. Cir. 1991) ................. 16

*Texas v. United States*, 887 F. Supp. 2d 133 (D.D.C. 2012) (three-judge court) .......... 13, 22

*Thornburg v. Gingles*, 478 U.S. 30 (1986) ............................................................... 21

*United States v. Brown*, 561 F.3d 420 (5th Cir. 2009)......................................... 4, 9, 35

*United States v. Cherry*, 50 F.3d 338 (5th Cir. 1995) ............................................ 5, 6

*United States v. Lee*, 358 F.3d 315 (5th Cir. 2004) ................................................... 5

*United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546 (11th Cir. 1984) ................ 15

*United States v. Osamor*, 271 Fed. App'x 409 (5th Cir. 2008) .................................. 17

*United States v. Pineiro*, 470 F.3d 200 (5th Cir. 2006) ............................................ 16

*United States v. Schaffer*, 600 F.2d 1120 (5th Cir. 1979) ........................................ 25

*United States v. Teel*, 691 F.3d 578 (5th Cir. 2012) ........................................ 2, 16, 25

*United States v. Texas Educ. Agency*, 564 F.2d 162 (5th Cir. 1977)........................... 12

*United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181 (2d Cir. 1987).......................... 33

*Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016) (en banc).................................... passim

*Veasey v. Perry*, 71 F. Supp. 3d 627 (S.D. Tex. 2014)......................................... passim

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977) ...................... passim

*Whitcomb v. Chavis*, 403 U.S. 124 (1971).......................................................................... 31

*White v. Regester*, 412 U.S. 755 (1973)........................................................................... 31

*Wiseman v. New Breed Logistics, Inc.*, 72 F. Supp. 3d 672 (N.D. Miss. 2014) ............................. 19

*Yick Wo v. Hopkins*, 118 U.S. 356 (1886) ......................................................................... 3

**Statutes**

52 U.S.C. § 10301 ......................................................................................................... 1

52 U.S.C. § 21084 ....................................................................................................... 15

52 U.S.C. § 21145 ....................................................................................................... 15

HB 1549 (2003) .......................................................................................................... 18

HB 2449 (2011) .......................................................................................................... 18

HB 54 (2003) ............................................................................................................. 18

HB 744 (2001) ........................................................................................................... 18

Help America Vote Act of 2002, Pub. L. No. 107-252, 116 Stat. 166 ........................................ 18

Tex. Elec. Code § 63.0101 (2001) ................................................................................... 18

**Legislative Materials**

S. Rep. No. 97-417 (1982) ......................................................................................... 2, 6

**Rules**

5th Cir. Civil Pattern Jury Instr. 3.3............................................................................... 8

**Secondary Sources**

John Hart Ely, *Legislative and Administrative Motivation in Constitutional Law*, 79 Yale L.J.

    1205 (1970)........................................................................................................ 15

Samuel Issacharoff, *Ballot Bedlam*, 64 Duke L.J. 1363 (2015) .............................................. 10

## I.    INTRODUCTION

The State of Texas enacted SB 14 (2011) to be the strictest, least forgiving voter identification bill in the country.  After a nine-day trial, this Court issued a 147-page opinion, including 87 pages of factual findings, and ultimately found that "proponents of SB 14 within the 82nd Texas Legislature were motivated, at the very least in part, *because of* and not merely *in spite of* the voter ID law's detrimental effects on the African-American and Hispanic electorate," in violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301.  *Veasey v. Perry* (*Veasey I*), 71 F. Supp. 3d 627, 633-679, 703 (S.D. Tex. 2014), *aff'd in part, rev'd in part, and vacated in part*, 830 F.3d 216 (5th Cir. 2016) (en banc).  Nothing in Texas's Proposed Findings of Fact and Conclusions of Law (ECF No. 966) disturbs this Court's ultimate conclusion that the State of Texas enacted SB 14, at least in part, for a discriminatory purpose.  Nor should Texas be permitted to substitute its preferred (and already rejected) fact findings for those so carefully made by this Court and upheld by the Fifth Circuit.

Although the Fifth Circuit vacated this Court's purpose determination, the Court of Appeals did not reject any individual finding as clearly erroneous and deemed "infirm" only a scant few, classifying them as not legally relevant or unable to bear substantial weight.  *Veasey v. Abbott* (*Veasey II*), 830 F.3d 216, 230-34 (5th Cir. 2016) (en banc), *cert. pending*, No. 16-393 (U.S. Sept. 27, 2016).  The Court of Appeals then held that the record "contained evidence that could support a finding of discriminatory intent" and remanded for this Court "to reweigh the factors" without "tak[ing] additional evidence" and potentially even without "entertain[ing] additional oral argument."  *Id.* at 234-35, 242.

In its brief on remand, Texas reiterates arguments already rejected by the Court of Appeals and contrives new narratives that ignore earlier findings.  But the law of the case and the narrow mandate prohibit Texas's attempts to re-litigate established facts and undo settled legal

1

holdings.  *See, e.g.*, *United States v. Teel*, 691 F.3d 578, 582-83 (5th Cir. 2012); *Med. Ctr. Pharm. v. Holder*, 634 F.3d 830, 834 (5th Cir. 2011).

"[D]rafters and proponents of SB 14 were aware of the likely disproportionate effect of the law" on minority voters.  *Veasey II*, 830 F.3d at 236.  The principal issue that remains is whether the Texas Legislature enacted SB 14, even in part, because of that discriminatory impact or whether bill proponents were merely (and entirely) apathetic to the rights of minority voters.  To the extent they are true, Texas's revisionist narratives provide rationales for voter ID requirements generally.  But they do not explain why Texas imposed stricter requirements than those in Georgia, Indiana, or any other state, despite the likely impact on Hispanic and African-American voters.  The evidence establishes that discrimination was more likely an intended result than an undesired side-effect.  This Court should again find that enactment of SB 14 was motivated, at least in part, by a discriminatory purpose.

## II.   TEXAS MISSTATES THE ESTABLISHED LEGAL STANDARD.

The State's proposed conclusions of law distort established legal standards and reiterate arguments already rebuffed by the Court of Appeals.  They should be rejected again here.  Texas's latest attempt to coin a heightened proof requirement should, like those before it, be rejected.  *See Veasey II*, 830 F.3d at 230 n.12 (rejecting "clearest proof" standard); *see also* S. Rep. No. 97-417, at 132 (1982) (Subcomm. Rep.) ("In the context of civil rights violations, it is only necessary that an inference of intent be raised 'by a preponderance of the evidence.'"); *cf. Crawford-El v. Britton*, 523 U.S. 574, 584-85, 594-97 (1998) (rejecting "clear and convincing evidence" requirement for claims that turn on the motive of government officials").  The State's demand that this Court require or defer to direct evidence also conflicts with the decision of the Court of Appeals.  *See Veasey II*, 830 F.3d at 235, 241.  Finally, the State's cramped reading of the range of evidence probative of discriminatory intent cannot be squared with the decisions of

the Supreme Court in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*,

429 U.S. 252 (1977), or *Rogers v. Lodge*, 458 U.S. 613 (1982), and misreads the narrow

categories of evidence deemed "infirm" by the Court of Appeals, *Veasey II*, 830 F.3d at 229.

    **A.    Discriminatory Purpose Claims Are Not Subject to Heightened Proof Requirements.**

       Texas's attempts to impose heightened proof requirements should, as before, be rejected.

First, the State claims that plaintiffs must "prove that the justification for [a challenged] law is

'obvious pretext' for racial discrimination."  Tex. PCOL ¶ 10 (quoting *Personnel Adm'r v.

Feeney*, 442 U.S. 256, 272, 275 (1979)) (alteration in original); *see also* Tex. PCOL ¶¶ 17, 33, 84

(repeating erroneous standard).  But Texas misreads *Feeney*, in which the Supreme Court merely

observed that "a classification that is ostensibly neutral but is an obvious pretext for racial

discrimination" is just as "presumptively invalid" as a racial classification.  *Feeney*, 442 U.S. at

272.  The Court later clarified that cases of "obvious pretext" are the same "'rare' statutes that,

although race neutral, are on their face, 'unexplainable on grounds other than race.'"  *Shaw v.

Reno*, 509 U.S. 630, 643-44 (1993) (quoting *Arlington Heights*, 429 U.S. at 266); *cf. Yick Wo v.

Hopkins*, 118 U.S. 356, 374 (1886) (striking down ordinance under which 200 Chinese

launderers were prohibited from operating a business while "80 others, not Chinese subjects,

[we]re permitted to carry on the same business under similar conditions") (cited in *Arlington

Heights*).

       The absence of such stark evidence does not of course end the discriminatory purpose

inquiry.  Rather, absent obvious pretext, courts "must look to other evidence" before determining

whether discriminatory purpose underlies a facially neutral statute.  *Arlington Heights*, 429 U.S.

at 266-67; *see also Feeney*, 442 U.S. at 275 (continuing a purpose inquiry after holding that a

challenged law was neither a gender-based classification nor "explain[able] only as a gender-based" pretext).  "[O]ther evidence" is abundant here, and this Court should consider it.

The State next errs by asking this Court to require proof "that the challenged law 'is unexplainable on grounds other than race.'"  Tex. PCOL ¶ 10 (quoting *Easley v. Cromartie*, 532 U.S. 234, 241-42 (2001)).  The State grafts this latest plea for a heightened standard of proof from *Shaw v. Reno*, 509 U.S. 630 (1993).[1]  Tex. PCOL ¶ 10.  But *Shaw* claims brought under the Equal Protection Clause are "analytically distinct" from claims brought under Section 2 of the Voting Rights Act.  *Miller v. Johnson*, 515 U.S. 900, 911 (1995) (discussing vote dilution claims).  While the predominance of another purpose (such as the desire to protect incumbents of a particular political party) precludes a *Shaw* claim, *see, e.g.*, *Miller*, 515 U.S. at 913, 916, it does not thwart an allegation of discriminatory purpose, which "need only be one purpose, and not even a primary purpose,' of an official action for a [Section 2] violation to occur," *Veasey II*, 830 F.3d 230 (quoting *United States v. Brown*, 561 F.3d 420, 433 (5th Cir. 2009)) (alteration in original); *see also Arlington Heights*, 429 U.S. at 265 ("Rarely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern."); U.S. Br. 6-7 (ECF No. 962).  Of course, if a court finds the proffered evidence insufficient to prove discriminatory intent, it may then—after rejecting a claim of intentional discrimination—defer to a rational means of addressing a problem.  *See McCleskey v. Kemp*, 481

---

[1] Under *Shaw*, "electoral districting violates the Equal Protection Clause when (1) race is the 'dominant and controlling' or 'predominant' consideration in deciding to place a significant number of voters within or without a particular district, and (2) the use of race is not narrowly tailored to serve a compelling state interest."  *Ala. Legis. Black Caucus v. Alabama*, 135 S. Ct. 1257, 1264 (2015) (internal quotation marks and citations omitted).  In contrast to a discriminatory purpose claim, *Shaw* does not require allegations that officials tried to diminish the voting strength of any racial or ethnic group.  Rather, the alleged injury is racial segregation, which "reinforces racial stereotypes and threatens to undermine our system of representative democracy by signaling to elected officials that they represent a particular racial group rather than their constituency as a whole."  *Shaw*, 509 U.S. at 650, 657.

U.S. 279, 298-299 (1987); *see also Feeney*, 442 U.S. at 272-73; *United States v. Cherry*, 50 F.3d 338, 343 (5th Cir. 1995).

Texas points out that it has "discretion to exercise . . . political judgment" in pursuit of legitimate state interests.  Tex. PCOL ¶ 12.  But the discretion to shape policy to further those interests does license intentional discrimination.  *See Veasey II*, 830 F.3d at 248-49 ("[W]e reject the argument that *Crawford* mandates upholding SB 14 simply because the State expressed legitimate justifications for passing the law.").  Thus, even if bill proponents aimed to eliminate in-person voter impersonation and increase voter confidence, Tex. PCOL ¶¶ 113-115, this Court must nonetheless determine whether those purposes fully explain SB 14's terms.  *See Veasey II*, 830 F.3d at 231.[2]

Finally, the State resuscitates its moribund claim that "clearest proof" is required to establish a discriminatory purpose.  Although Texas now seeks a marginally distinct "clear and compelling evidence" requirement, it relies once again on the same *ex post facto* cases requiring "the clearest proof" to establish that a civil remedy is in fact a criminal penalty.  Tex. PCOL ¶ 21 (citing *Smith v. Doe*, 538 U.S. 84 (2003), *Kansas v. Hendricks*, 521 U.S. 346 (1997), and *Flemming v. Nestor*, 363 U.S. 603 (1960)).  The Court of Appeals "decline[d] to apply the State's proposed standard" to this case.  *Veasey II*, 830 F.3d at 230 n.12.  This Court should do the same, especially as that holding is the law of this case.  *See, e.g.*, *United States v. Lee*, 358 F.3d 315, 320-21 (5th Cir. 2004).

---

[2] As a result, reliance on *FCC v. Beach Communications, Inc.*, 508 U.S. 307 (1993), and *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456 (1981), is misplaced.  Tex. PCOL ¶ 22.  Those decisions merely accepted legislators' representations when determining whether classifications could survive rational basis review.  *See Beach Commc'ns*, 508 U.S. at 315-15; *Clover Leaf Creamery*, 449 U.S. at 464-65.  Considerations of race trigger a less deferential inquiry.  *See, e.g.*, *Johnson v. California*, 543 U.S. 499, 505-515 (2005); *see also Veasey II*, 830 F.3d at 236 ("[N]eutral reasons can and do mask racial intent.").

### B.     Direct Evidence Is Not Required to Prove Discriminatory Intent.

Texas asks this Court to draw a "dispositive" adverse inference from the absence of a "smoking gun."  Tex. PCOL ¶¶ 25-29, 32.  But the Court of Appeals' has already held that "the absence of direct evidence such as a 'let's discriminate' email cannot be and is not dispositive." *Veasey II*, 830 F.3d at 241; *see also id.* at 231 n.13 (holding that this Court was "not required to find[] that th[e] lack of a smoking gun supports the State's position"); U.S. Br. 8.  Requiring direct evidence of intent "would essentially give legislatures free rein to racially discriminate so long as they do not overtly state discrimination as their purpose and so long as they proffer a seemingly neutral reason for their actions."  *Veasey II*, 830 F.3d at 235-36; *see also Lodge v. Buxton*, 639 F.2d 1358, 1373 (5th Cir. Unit B Mar. 1981) ("Clearly, the right to relief cannot depend on whether or not public officials have created inculpatory documents."), *aff'd*, 458 U.S. 613 (1982).[3]  Thus, when assessing a discriminatory purpose claim, "[c]ourts must perform a 'sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Veasey II*, 830 F.3d at 230-31 (quoting *Arlington Heights*, 429 U.S. at 266-68).  Texas's request for an adverse inference must be rejected.

---

[3] That bill proponents denied that SB 14 had a discriminatory purpose, Tex. PFOF ¶ 280, and did not say that SB 14 was intended to harm minority voters, Tex. PFOF ¶ 281, is not dispositive. *See, e.g., Smith v. Town of Clarkton*, 682 F.2d 1055, 1064 (4th Cir. 1982).  "Outright admissions of impermissible racial motivation are infrequent and plaintiffs often must rely on other evidence." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999); *see also, e.g., Cherry*, 50 F.3d at 343 (noting the rarity of legislators "willing to declare racially motivated reasons for their legislative action"); *Lodge v. Buxton*, 639 F.2d at 1363 (finding that in modern times, discriminatory motives are usually "cleverly cloaked in the guise of propriety.").  Indeed, in amending Section 2, the Senate Judiciary Committee recognized that States may "plant[] a false trail of direct evidence in the form of official resolutions, sponsorship statements and other legislative history eschewing any racial motive, and advancing other governmental objectives."  S. Rep. No. 97-417, at 37.

The argument that common discovery mechanisms used in this case warrant a heightened proof requirement similarly lacks support.  Tex. PCOL ¶ 29.  When a civil rights claim survives initial procedural hurdles, "the plaintiff ordinarily will be entitled to some discovery." *Crawford-El*, 523 U.S. at 598.  Proof requirements do not vary in proportion to discovery, and Section 2 plaintiffs need not choose between ordinary proof requirements and taking discovery to which they are otherwise entitled.  Neither Texas nor any legislator appealed this Court's discovery rulings, and the State cannot re-litigate privilege issues at this time, Tex. PCOL ¶¶ 25-27; Tex. PFOF ¶¶ 275-282, particularly when it refused to represent its legislators.[4]

In any event, Texas exaggerates the completeness of document productions.  The United States did not "g[e]t everything," as the State contends.  Tex. PCOL ¶ 29.  Document discovery in this case was limited by the Texas Legislature's automatic email deletion policy and the fact that legislators rarely use email for substantive matters, limitations compounded by bill proponents' knowledge that SB 14 would be subject to legal scrutiny.  *See Veasey II*, 830 F.3d at 231 n.13; Pls. Jnt. PFOF ¶¶ 215-217; *see also Veasey II*, 830 F.3d at 236 (noting that Senator Fraser was "careful with his comments about the legislation").  The United States met its burden of proof *despite* the limited documents that legislators created and the limited evidence that survived automated deletion.[5]

---

[4] As anticipated, the United States has relied extensively on documents obtained in discovery, both in drawing out testimony and through direct submission to the Court.  *See, e.g.*, Pls. Jnt. PFOF ¶¶ 101, 105, 107, 109, 118, 188-189, 192, 195-196, 204, 210, 225 (ECF No. 961).  Texas's claim that legislative discovery yielded "no evidence supporting a discriminatory-purpose finding," Tex. PFOF ¶¶ 278-279, 282, is contradicted by the decision of the Court of Appeals, *see, e.g.*, *Veasey II*, 830 F.3d at 236 (relying on an email produced in discovery); *id.* at 237 (relying on deposition testimony).

[5] Reliance on the vacated panel opinion of the Court of Appeals for the suggestion that a discriminatory purpose is likely to "yield . . . private memos or emails," Tex. PCOL ¶ 30, is unavailing.  If they ever existed, such inculpatory emails were likely destroyed by the Texas Legislative Council's automatic email deletion policy.  Moreover, "the granting of a rehearing en banc vacates the panel opinion," which is

Finally, the State's suggestion that the consideration of circumstantial evidence in discriminatory purpose cases "is based on the assumption that litigants will not have access to direct evidence," Tex. PCOL ¶ 31, is baseless and contradicted by decades of cases relying on both circumstantial and direct evidence.  *See, e.g.*, *Perez v. Perry*, No. 5:11-cv-1303 (W.D. Tex. Mar. 19, 2012) (three-judge court) (ECF No. 690); *Garza v. Cnty. of L.A.* (*Garza I*), 756 F. Supp. 1298, 1303-05, 1349-50 (C.D. Cal.), *aff'd*, 918 F.2d 763 (9th Cir. 1990); *cf.* 5th Cir. Civil Pattern Jury Instr. 3.3 ("As a general rule, the law makes no distinction between direct and circumstantial evidence, but simply requires that you find the facts from a preponderance of all the evidence, both direct and circumstantial.").  Texas's theory would effectively require courts to credit any direct testimony of bill supporters denying the existence of a discriminatory purpose against circumstantial evidence to the contrary.  But direct testimony is only helpful "to the extent that the justifications advanced in legislators' testimonies do not demonstrate a pretext for intentionally discriminatory actions."  *Veasey II*, 830 F.3d at 231 n.13 (quoting *Price v. Austin Ind. Sch. Dist.*, 945 F.2d 1307, 1318 (5th Cir. 1991)) (original alteration marks omitted). Without credibility, direct evidence bears no weight.

### C.   *Arlington Heights* and *Rogers v. Lodge* Contemplate a Broad Range of Relevant Evidence.

 Texas's portrayal of *Arlington Heights*—which set out "nonexhaustive factors" to help guide the "'sensitive inquiry into such circumstantial and direct evidence of intent as may be available,'" *Veasey II*, 830 F.3d at 230-31 (quoting *Arlington Heights*, 429 U.S. at 266-68)—is cramped and incomplete.  In its description of the *Arlington Heights* rubric, the State initially

---

thereafter "of no precedential value."  *Comer v. Murphy Oil USA, Inc.*, 718 F.3d 460, 468 (5th Cir. 2013) (internal citations and quotation marks omitted).

omits departures from the normal procedural sequence, Tex. PCOL ¶ 33, and entirely omits substantive departures. *But see Arlington Heights*, 429 U.S. at 267; *Veasey II*, 830 F.3d at 231. Texas also ignores the import of Senate Factor evidence. *See Brown*, 561 F.3d at 433; *see also Rogers v. Lodge*, 458 U.S. at 620-22; *McCarty v. Henson*, 749 F.2d 1134, 1136 (5th Cir. 1984); U.S. Br. 9-10. Thus, the State would constrain this Court's inquiry improperly.[6]

### 1. A Foreseen Racial Impact Is Powerful Evidence of Discriminatory Intent.

Texas claims that the overwhelming evidence of SB 14's disparate racial impact is "irrelevant to evaluating discriminatory purpose" because such evidence was "not before the Texas Legislature." Tex. PCOL ¶ 44.[7] That argument is wrong. As the Supreme Court has explained, the disparate impact of a legislative action "is often probative of why the action was taken in the first place since people usually intend the natural consequences of their actions." *Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 487 (1997) (citing *Arlington Heights*, 429 U.S. at 266); *see also Feeney*, 442 U.S. at 279 n.24 ("What a legislature or any official entity is 'up to' may be plain from the results its actions achieve, or the results they avoid."); *Columbus Bd. of Ed. v. Penick*, 443 U.S. 449, 464 (1979) ("[A]ctions having foreseeable and anticipated disparate impact are relevant evidence to prove the ultimate fact, forbidden purpose."); U.S. Br. 12. Foreseeability of a discriminatory impact is assessed using an objective standard. *See Arthur v.*

---

[6] Texas invokes Occam's Razor—an adage positing that the simplest answer is often correct—to undermine the required discriminatory purpose inquiry as "indulging in needless complexity." Tex. PCOL ¶¶ 74-75. But philosophical musings are no substitute for evidence or thorough analysis. *See Justiss Oil Co. v. Kerr-McGee Refining Corp.*, 75 F.3d 1057, 1061 (5th Cir. 1996). A non-discriminatory rationale is not necessarily "simpler" than a racial motive, particularly where discrimination fits a persistent pattern. *See Veasey II*, 830 F.3d at 236.

[7] This Court found that SB 14 bore more heavily on African-American and Hispanic voters, and the Court of Appeals affirmed the finding of a "stark, racial disparity between those who possess or have access to SB 14 ID, and those who do not." *Veasey II*, 830 F.3d at 264. Although the State quibbles with that finding, it refrains from a direct challenge. *See* Tex. PCOL ¶¶ 47-49.

*Nyquist*, 573 F.2d 134, 142-43 (2d Cir. 1978).   Regardless of what legislators actually announced

or considered during debates on SB 14, the actual and predictable disparate racial impact "makes

it 'more probable' that the [Legislature] . . . acted with an intent" to bring about that very result.

*Id.* (quoting Fed. R. Evid. 401); *cf. Gaffney v. Cummings*, 412 U.S. 735, 752-53 (1973) ("[I]t

requires no special genius to recognize the political consequences" of changes in election laws.)

The discriminatory impact is particularly meaningful in this case because "drafters and

proponents of SB 14 were aware of the likely disproportionate effect of the law on minorities."

*Veasey II*, 830 F.3d at 236; *cf. Columbus Bd. of Ed.*, 443 U.S. at 465 (upholding purpose finding

based in part on "[a]dherence to a particular policy or practice, with full knowledge of the

predictable effects" (internal citation and quotation marks omitted)).[8]

　　　　Texas's attempts to rewrite the law regarding impact evidence in intent cases are

similarly incorrect.   First, the State posits opaquely that "predilection does not constitute proof."

Tex. PCOL ¶¶ 48, 54 (quoting Samuel Issacharoff, *Ballot Bedlam*, 64 Duke L.J. 1363, 1380

(2015)).   By this, Texas apparently means that, even if the Legislature had known of

disproportionate SB 14 ID possession rates by race, it could not have anticipated a disparate

impact on African Americans' and Hispanics' "ability to vote."  Tex. PCOL ¶ 48.  Under this

theory—for which Texas offers no support—there could be no "proof" that an arsonist who sets

a house on fire intends to burn the house down without additional proof that the arsonist knew

that the fire department would not arrive in time to put the fire out.   It is sufficient to prove

_____

[8] Remarkably, Texas persists in arguing that the Legislature "did not know or anticipate that S.B. 14
would prevent anyone from voting, much less that it would disproportionately harm minority voters."
Tex. COL ¶ 35; *see also* Tex. PFOF ¶¶ 207-220.  Even if the law of the case and the mandate rule did not
bar Texas from re-litigating this issue (and they do), substantial evidence supports the finding that SB
14's proponents anticipated its likely disparate racial impact.  *See infra* Section III.C.

discriminatory intent by proving a desire, at least in part, to impose a disparate degree of difficulty in voting, without needing also to prove that the Legislature knew its action would finish the job.  This latest attempt to warp accepted evidentiary standards should be rejected.

Second, Texas resurrects its argument that minority voters' disproportionate likelihood to lack SB 14 ID and to face greater impediments to obtaining ID needed to vote cannot constitute a discriminatory impact absent proof of a diminished minority voter turnout.  Tex. PCOL ¶ 48. But the Court of Appeals "decline[d] to require a showing of lower turnout to prove a Section 2 violation" under the results test, *Veasey II*, 830 F.3d at 260, and Texas has presented no valid basis to require turnout evidence to establish only a discriminatory impact under *Arlington Heights*, which is a distinct and lesser standard.  *See Garza v. Cnty. of L.A.* (*Garza II*), 918 F.2d 763, 771 (9th Cir. 1990) (holding that redistricting had intentional discriminatory impact despite contemporaneous inability to meet Section 2 results test).[9]  The State similarly implies that *Arlington Heights* requires proof that it is absolutely impossible for affected voters to overcome SB 14.  Tex. PFOF ¶ 38.  Again, the Court of Appeals rejected that unrealistic standard under Section 2's results test, *Veasey II*, 380 F.3d at 254-56, and—all the more so—the standard should not apply under the lesser threshold of discriminatory impact evidence relevant as an indication of discriminatory intent.

The State's claim that discriminatory impact must be measured by the number of individuals affected by an impediment to voting, rather than the percentage share of a group, should fare no better.  *See* Tex. PCOL ¶ 47.  Discriminatory impact is a measure of "racially

---

[9] Even if voter turnout were relevant to the impact inquiry (and it is not), this Court has found that the Legislature had before it "some evidence that photo ID laws suppress voter turnout and no competent evidence that any photo ID law has improved voter turnout."  *Veasey I*, 71 F. Supp. 3d at 692.

disproportionate impact." *Arlington Heights*, 429 U.S. at 265-66; *see also Veasey II*, 830 F.3d at 272 (addressing disproportionate impact). Minority voters are in most cases a minority of the electorate, and jurisdictions may not disenfranchise minority voters so long as they disenfranchise a comparable number—but a far lesser share—of majority voters as well. *See Hunter v. Underwood*, 471 U.S. 222, 230-31 (1985) (rejecting the defense that a law was intended "to disenfranchise poor whites as well as blacks"). Moreover, where growth of the minority community poses a political threat, as in Texas, *see* Pls. Jnt. PFOF ¶¶ 6-9, the affected share of the minority population is far more meaningful than the raw number of voters that share currently represents.

### 2. Historical Background Is Not Limited to Acts of the Same Legislature.

Texas also tries to blunt the import of the "historical background of the decision" in an *Arlington Heights* analysis, asserting that it is "limited to actions taken by the decisionmaker whose action is under review" and "limited temporally" to the time of the challenged action. Tex. PCOL ¶ 64. But acts by a jurisdiction's other officials and predecessors to those who took the challenged action have long proved probative of discriminatory intent, particularly when they evince a persistent pattern of discrimination. *See, e.g.*, *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 540-42 (1993) (plurality op.) (addressing intent of ordinance and relying on actions of police chaplain, city attorney, and deputy city attorney).[10]

---

[10] *Accord Lane v. Wilson*, 307 U.S. 268, 277 (1939) (addressing registration requirement and relying on past legislature's enactment of a "grandfather clause") (cited in *Arlington Heights*, 429 U.S. at 266); *N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 225 (4th Cir. 2016) (noting efforts by "state officials" from "1980 and up to the present day"); *United States v. Texas Educ. Agency*, 564 F.2d 162, 171-73 (5th Cir. 1977) (citing multi-decade history); *Davis v. Schnell*, 81 F. Supp. 872, 878-80 (S.D. Ala. 1949), *aff'd*, 336 U.S. 933 (1949) (relying on activities and statements of political party leadership and editorials by "distinguished Alabama lawyer[s]") (cited in *Arlington Heights*, 429 U.S. at 266).

Thus, the Court of Appeals has already rejected the State's argument, holding that evidence of "discriminatory intent is augmented by contemporary examples of State-sponsored discrimination in the record," including Texas's attempts "to suppress minority voting through purging the voter rolls" as late as 1975 and to enact racial gerrymanders in every redistricting cycle since 1970.  *Veasey II*, 830 F.3d at 239-40.  This Court should continue to rely on the persistent pattern of official discrimination by State and local officials.  *Cf. Texas v. United States*, 887 F. Supp. 2d 133, 161 (D.D.C. 2012) (three-judge court) ("While a losing streak alone does not control our decision, Texas's history of failures to comply with the VRA is one of the circumstantial factors that *Arlington Heights* instructs us to consider."), *vacated and remanded on other grounds*, 133 S. Ct. 2885 (2013).[11]

### 3.   Statements of Leading Proponents Evince Overall Legislative Aims.

Although Texas acknowledges that "contemporary statements by members of the decisionmaking body" are "especially important" to the *Arlington Heights* inquiry, Tex. PCOL ¶ 19, the State attacks statements evincing discriminatory intent by suggesting that the Court of Appeals "has cautioned against relying on isolated ambiguous statements made by legislators," Tex. PCOL ¶ 51.  But the State fails to note that the unambiguous statements of leading proponents and staff who shaped SB 14 were not dismissed by the Court of Appeals and should not be dismissed now.  *See Veasey II*, 830 F.3d at 236 (relying on Representative Smith's statement that it was "'common sense' the law would have a disproportionate effect on minorities"); *id.* at 236 & n.21 (relying on statement of the Lieutenant Governor's deputy general

---

[11] Texas is also wrong to ask the Court to disregard *Texas v. United States*, which found that the same Legislature that enacted SB 14 created two redistricting plans with a discriminatory purpose.  887 F. Supp. 2d at 161-62, 166.  The underlying facts—found by a unanimous three-judge court to indicate a discriminatory purpose—do not disappear due to vacatur on unrelated grounds, and this Court may take those facts into account, even if the findings lack precedential weight.  *See Veasey II*, 830 F.3d at 240.

counsel); *see also* U.S. Br. 18-19.  Although Texas claims that Representative Smith spoke only for himself, Tex. PCOL ¶ 52, "while each legislator casts his or her own vote, these votes are often cast in blocs and along party lines."  *Veasey II*, 830 F.3d at 236 n.20.  Thus, a slip of the tongue—particularly by a leading proponent of stricter voter ID requirements—may also evince general purpose.  *See, e.g.*, *Church of the Lukumi*, 508 U.S. at 540-42 (plurality op.) (statements of city council members and other city officials provided evidence that ordinances were enacted "because of" not "in spite of" suppression of religious group); *Garza I*, 756 F. Supp. at 1313-18.  What legislative sponsors did not say, namely their refusal to discuss the likely disparate impact of SB 14 or their reasons for rejecting ameliorative amendments, also factors into the analysis.  *See Veasey II*, 830 F.3d at 237, 241; *cf. Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976) (permitting an adverse inference in civil cases when a witness "refuse[s] to testify in response to probative evidence offered against them").

### 4.  Substantive Deviations May Illustrate the Tenuous and Incomplete Relationship Between a Bill and Its Public Purpose.

Texas cites *Crawford v. Marion County Election Board*, 553 U.S. 181 (2008), to argue yet again that "States are not required to present evidence that in-person voter impersonation has occurred at their polls to justify a photo identification requirement for voting."  Tex. PCOL ¶ 113.  But the Court of Appeals has already rejected this argument as "inapposite."  *Veasey II*, 830 F.3d at 248 n.39.  "*Crawford* did not deal with either discriminatory intent or effect under Section 2," but instead "simply noted the weight of the State's interests in the First and Fourteenth Amendment balancing analysis, which differs from Section 2."  *Id.  Crawford* does not stand for the "principle that the State may invidiously discriminate or impermissibly disparately burden minorities so long as it articulates 'preventing voter fraud' as one purpose of a restrictive law."  *Id.*; *see also id.* (holding that non-racial reasons are not "a talisman against

14

objection that SB 14 does not appear even remotely well tailored to suit its stated purposes");

*Robinson v. Comm'rs Ct.*, 505 F.2d 674, 680 (5th Cir. 1974) (holding that the "mere fact" that a

law "may satisfy some legitimate governmental goals does not automatically immunize it from

constitutional attack on the ground that it has offended more fundamental criteria").  Texas may

not use *Crawford* to block the requisite judicial inquiry into the "fit" between SB 14 and asserted

race-neutral interests.  *See, e.g.*, *Arlington Heights*, 429 U.S. at 267; *United States v. Marengo*

*Cnty. Comm'n*, 731 F.2d 1546, 1571 (11th Cir. 1984); U.S. Br. 24-25.

Texas resurrects yet another argument already rejected by the Fifth Circuit.  This time,

the State claims that that reliance on rejected ameliorative amendments as evidence of pretext is

"misplaced." Tex. PCOL ¶ 93.  The Court of Appeals, however, held that rejection of

"amendment after amendment" "[a]gainst a backdrop of warnings that SB 14 would have a

disparate impact on minorities" is in fact circumstantial evidence of discriminatory intent.

*Veasey II*, 830 F.3d at 236-37, 239.  Texas's argument fails.[12]

### 5.  Procedural Deviations Silence the Minority and May Reflect an Unspoken Intent.

Texas's arguments about "procedural deviations" are similarly misguided.  The point is

not that procedural maneuvers themselves are inherently nefarious or unfair.  *See* Tex. PCOL

¶ 105.  Rather, "[d]epartures from the normal procedural sequence . . . afford evidence that

improper purposes are playing a role."  *Arlington Heights*, 429 U.S. at 267; U.S. Br. 28-29.

---

[12] Undeterred, Texas quotes *Bryant v. Yellen*, 447 U.S. 352 (1980), for the proposition that "a failure to enact suggested amendments . . . [is] not the most reliable indication[] of legislative intention."  Tex. PCOL ¶ 94 (original brackets omitted).  This too fails.  Texas omits that portion of the quoted sentence making clear that the failure to enact amendments carries "some weight."  *Yellen*, 447 U.S. at 376. Moreover, *Yellen*—which asked whether certain reclamation laws limited irrigation water deliveries to specific private lands—addressed a statute's interpretation; it was not a roadmap for determining a legislature's potentially discriminatory purpose.  These are substantially different undertakings.  *See* John Hart Ely, *Legislative and Administrative Motivation in Constitutional Law*, 79 Yale L.J. 1205 (1970).

Unprecedented legislative tactics, such as those deployed here, may be used to eliminate the negotiating power of minority legislators or may reflect a drive out of proportion to the gravity of proponents' stated aims.  As Texas notes, both parties break procedural traditions when they deem it necessary to achieve legislative goals.  *See* Tex. PCOL ¶ 97.  But it is one thing to take extraordinary legislative action to address a critical need and another to break legislative tradition to address an exceedingly rare problem.  *See Veasey II*, 830 F.3d at 238.

## III.   TEXAS DISREGARDS THIS COURT'S FACTUAL FINDINGS TO REVISE SB 14'S HISTORY.

Texas's proposed findings of fact contradict this Court's undisturbed findings and craft new narratives never presented in this case.  The Court of Appeals remanded "for a reweighing of the evidence" in light of appellate holdings, *Veasey II*, 830 F.3d at 230, 235, and the remand is limited by the Court of Appeals' reliance on specific facts already found by this Court, *see id.* at 235-42, 250-64.  Thus, the facts as found are bound up in the mandate and not subject to reexamination.  *See, e.g.*, *Teel*, 691 F.3d at 583; *see also State Indus., Inc. v. Mor-Flo Indus., Inc.*, 948 F.2d 1573, 1576 (Fed. Cir. 1991) ("[F]indings of fact reviewed in and relied upon in an appellate court's decision become the law of the case and, absent certain exceptional circumstances, may not be disturbed by a trial court on remand.").  Moreover, because the Court of Appeals foreclosed taking additional evidence, *Veasey II*, 830 F.3d at 242, there is no basis for this Court to revise earlier factual findings or credibility determinations unrelated to the Court of Appeals' concerns with the weight of certain, limited evidence.  *See United States v. Pineiro*, 470 F.3d 200, 205-06 (5th Cir. 2006) (holding that exceptions to the mandate rule are limited to (1) the introduction of "substantially different" evidence at a subsequent trial, (2) a change in controlling authority, or (3) a determination that an earlier decision was "clearly erroneous and would work a manifest injustice").

16

Because no exceptions to the mandate rule are present in this case, this Court should reject Texas's novel "modernization" narrative. Rather, this Court should continue to recognize the motive created by Texas's growing minority population and persistent racially polarized voting. Only the latter motive fits the facts, as SB 14 proponents anticipated its discriminatory result and engaged in remarkable procedural deviations to ensure that the bill became law. Links to other legislative interests put forward by the State are tenuous, and the unexplained decision to go far beyond purported model bills evince a further purpose: to harm minority voters.

### A. Texas's Brand New "Modernization" Rationale for SB 14 Must Be Rejected.

Texas claims for the first time that SB 14 sprang from the State's interest in "modernizing" election procedures after *Bush v. Gore*, 531 U.S. 98 (2000). Tex. PFOF ¶¶ 52-56. In this novel "modernization" narrative, Texas now claims that SB 14 was simply "the latest in a series of reforms enacted by Texas to improve and modernize election procedures . . . recommended" by the Carter-Ford and Carter-Baker Commissions. Tex. PFOF ¶ 70 (quotation marks and citation omitted). This argument fails as a matter of law and logic.

#### 1. Texas Cannot Advance New Arguments on Remand.

Because Texas has never before asserted that SB 14 was enacted to further a broader state election modernization effort, it has forfeited that argument. *See United States v. Osamor*, 271 Fed. App'x 409, 410 (5th Cir. 2008) (arguments raised for the first time after remand that could have been raised in first appeal are "deemed abandoned"); *Brooks v. United States*, 757 F.2d 734, 739 (5th Cir. 1985) (deeming argument not "briefed and discussed" in earlier appeal "to have been waived"). That ends the matter.

#### 2. SB 14 Was Not an Effort to "Modernize" Elections.

But even if permitted, Texas's broad "modernization" narrative, Tex. PFOF ¶¶ 52-56, 70, 97, 105-112, 127, 137, 149, 188; Tex. PCOL ¶¶ 18, 57-58, still fails. Nothing in the record

17

supports it.  No witness testified to it.  Texas never argued it.  And while Texas now cites *Bush v. Gore*, the Carter-Ford Commission, and other election administration bills to support its "modernization" rationale, *see* Tex. PFOF ¶¶ 53-56, 104, 127, 137, 149, none were previously mentioned to this Court.  That other election-related legislation previously existed says nothing about whether the particular contours of SB 14 were solely driven by non-discriminatory motives.   That is especially so, given that Texas cites this other legislation for the first time on remand.[13]

The State's related claim that in enacting SB 14 the "Texas legislature was . . . influenced by the Carter-Baker Commission Report" is belied by the Legislature's refusal to adopt safeguards recommended by the Commission to avoid disproportionate burdens on minority voters.[14]  The Legislature's failure to address "serious and legitimate concerns" that voter ID

---

[13] The chronology of voter ID legislation in Texas undermines the State's new theory that SB 14 was "inspired by the 2000 election."  Tex. PFOF ¶ 104.  To be sure, Texas enacted legislation to comply with the Help America Vote Act of 2002 (HAVA), Pub. L. No. 107-252, 116 Stat. 166, but that change was complete in 2003.  Tex. PFOF ¶ 108 (citing HB 1549 (2003)).  That HAVA established only minimum ID requirements for some new registrants, 52 U.S.C. § 21084, does not mandate further limitations.  In fact, HAVA makes clear that any stricter election administration requirements must comply with the Voting Rights Act.  *See id.* §§ 21084, 21145(a)(1).  Similarly, HB 744 (2001) is no basis for a proposal favoring strict photographic voter ID requirements.  Tex. PFOF ¶ 100.  HB 744—which is not in evidence and has never before been mentioned in this litigation—received no consideration after referral to the House Elections Committee.  Moreover, HB 744 did not eliminate any acceptable forms of voter ID under Texas's existing law; it only would have required that voters present one of the myriad forms of identification acceptable at that time *alongside* a voter registration certificate.  *See* Tex. Elec. Code § 63.0101 (2001).  Finally, despite Texas's claims, Tex. PFOF ¶¶ 106, 187; Tex. PCOL ¶¶ 109-111, HB 54 (2003) and HB 2449 (2011) did not fully address the "far more prevalent issue" of absentee ballot fraud.  *Veasey II*, 830 F.3d at 263.

[14] As the Commission explained, "[t]he introduction of voter ID requirements has raised concerns that they may present a barrier to voting, particularly by traditionally marginalized groups, such as the poor and minorities, some of whom lack a government-issued photo ID."  DEF0003 at 27 (Carter-Baker Comm'n Rep.).  To mitigate any disparate racial impact, the Commission recommended "procedural and institutional safeguards to make sure that the rights of citizens are not abused and that voters will not be disenfranchised because of an ID requirement" and specifically recommended that "voters who do not have a photo ID during a transitional period receive a provisional ballot that would be counted if their signature is verified."  *Id.* at 5.  The Commission also recommended that states (1) ensure that

laws "could disenfranchise eligible voters" and "have an adverse effect on minorities," DEF0003 at 26 (Carter-Baker Comm'n Rep.), undermines the State's reliance on the Commission report as a spark for SB 14.

In sum, Texas's freshly-minted modernization story is merely a post-hoc rationale. *See, e.g.*, *Wiseman v. New Breed Logistics, Inc.*, 72 F. Supp. 3d 672, 683 (N.D. Miss. 2014) ("Justifications . . . provided after litigation has commenced may be sufficient to constitute pretext.") (collecting cases). And perhaps more fatally, this latest in a litany of ever-shifting justifications bolsters the inference of invidious motive. As the Court of Appeals explained, it is "probative that many rationales were given for a voter identification law, which shifted as they were challenged or disproven by opponents." *Veasey II*, 830 F.3d at 240; *see also Foster v. Chapman*, 136 S. Ct. 1737, 1751 (2016) (where proffered race-neutral reasons "shift[] over time," it "suggest[s] that those reasons may be pretextual"). Accordingly, Texas's new "modernization" rationale evinces pretext, and not vindication. It should be rejected.

### B.  Racially Polarized Voting Provides a Motive for SB 14.

SB 14 was intended in part to accomplish its actual impact: reduction of the share of Hispanic and African-American voters in the Texas electorate. U.S. Br. 31-33. Racially polarized voting patterns in Texas help explain SB 14's purpose because the voters most likely to

---

"government-issued photo identification is available without expense to any citizen" and (2) "ensure that all voters are provided convenient opportunities to obtain" accepted photo identification, including by "reaching out with mobile offices . . . to help [people without photo ID] register to vote and obtain an ID card." *Id.* at 27. Yet the Legislature rejected amendments that would have acted upon those recommendations. Pls. Jnt. PFOF ¶¶ 235, 255-56. During debate on SB 14, Senator Fraser was asked why the bill did not follow the Carter-Baker recommendations to prevent a disparate racial impact, to which he replied "I'm not advised." PL006 at 132:19-134:25 (Sen. Comm. of the Whole Tr., Jan. 25, 2011).

be inhibited from casting a valid ballot were also the least likely to support bill proponents. Texas's attempts to dull the import of that evidence miss the mark.

To start, Texas's "timeline," Tex. PFOF ¶ 89, misleads.  Although the Census Bureau did not formally announce that Texas had become a majority-minority state until August 2005 (five months after the introduction of HB 1706), the 2000 Census had shown that the Anglo population share of Texas had fallen from 60.6% to 52.4% since 1990.  *See* U.S. Mot. for Judicial Notice ¶¶ 1, 3 (ECF No. 252).  Changes in Texas were obvious before a formal announcement by the Census Bureau.  *See, e.g.*, *Session v. Perry*, 298 F. Supp. 2d 451, 523 (E.D. Tex. 2004) (three judge court) (Ward, J., dissenting) ("Latino voter registration as well as overall population growth is *rising.*"), *vacated on other grounds*, 543 U.S. 941 (2004).  The idea that broad, statewide demographic trends took the Legislature by surprise is not plausible, let alone credible.

Texas's claim that SB 14 could not have been motivated by racially polarized voting because bill proponents "also voted for less stringent versions of voter ID legislation prior to S.B. 14," Tex. PCOL ¶¶ 71, 77, and—in the Senate—for a provision that would have allowed a person who "swears an affidavit that he cannot afford S.B. 14-compliant ID to vote," Tex. PCOL ¶ 70, fares no better.[15]  This litigation does not challenge those earlier bills, or even the version

---

[15] Texas also misstates the legislative record regarding the indigency exemption, Tex. PFOF ¶¶ 168, 184 & n.13, 195, which was not removed by bill opponents.  On the floor, Representative Anchía noted that while SB 14's restrictive limitations made an indigency affidavit provision necessary, the affidavit provided less ballot security than Texas's existing voter ID law.  PL035 at 44:17-45:8 (House Fl. Debate, Mar. 23, 2011).  The amendment to remove an indigency affidavit and affidavit concerning religious objections—House Amendment 28—was proposed by Representative Linda Harper-Brown and 42 other bill proponents.  PL034 at 982-83 (House Journal Mar. 23, 2011).  Contrary to the State's assertion, Representative Anchía voted against this amendment, as did nearly all other bill opponents.  PL034 at 984 (House Journal Mar. 23, 2011) (correcting the record).  The conference committee later restored the religious objection provision but omitted the indigency affidavit.  PL040 at 23 (Conference Comm. Rep.).

of SB 14 that first passed the Texas Senate.  But more importantly, a vote for an earlier bill or even an ultimately failed amendment to SB 14 does not establish that SB 14 lacked a discriminatory purpose.  *See, e.g.*, *Connecticut v. Teal*, 457 U.S. 440, 455 (1982) ("Congress never intended to give an employer license to discriminate against some employees on the basis of race or sex merely because he favorably treats other members of the employees' group.").[16] SB 14 proponents who supported less restrictive bills or even individual provisions may have done so for any number of reasons.  Those earlier votes do not weaken evidence that racially polarized voting motivated enactment of SB 14, particularly when those earlier votes suggest that a less restrictive bill would have fulfilled proponents' legitimate public purposes.

The State also suggests that a discriminatory purpose is implausible because some Hispanic and African-American legislators, as well as a few members and former members of the minority party, supported SB 14.  Tex. PFOF ¶¶ 88, 92, 200; Tex. PCOL ¶¶ 78-81.  But where minority legislators are not the candidates of choice of minority voters, their support for SB 14 is perfectly consistent with a racial bloc voting motivation.  *See Thornburg v. Gingles*, 478 U.S. 30, 68 (1986) (plurality op.) ("Under § 2, it is the *status* of the candidate as the *chosen representative of a particular racial group*, not the race of the candidate, that is important."); *see also Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998) ("Because of the many facets of human motivation, it would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of their group.").  The votes

_____

[16] *See also Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 228 n.16 (5th Cir. 2000) (noting that the fact that the individual who "allegedly discriminated against the plaintiff was the same individual who hired the plaintiff" does "not rule out the possibility that an individual could prove a case of discrimination").

of two Anglo members of the minority party were not necessary to passage of SB 14, and the reasons for their idiosyncratic support may not reflect the general purposes of SB 14. *See Michael M. v. Super. Ct.*, 450 U.S. 464, 470 (1981) ("[I]ndividual legislators may have voted for the statute for a variety of reasons."). Finally, racially polarized voting may also explain the motivation of legislators who switched parties to support SB 14. When a Texas legislator changes parties, alignment with racial voting blocs may change as well. *See Texas v. United States*, 887 F. Supp. 2d at 169-170, 178 (describing a district drawn for a Hispanic representative who had switched parties in which 17 of 42 precincts were divided by district lines and later finding that map-drawers likely split precincts "along racial lines to dilute minority voting power").

In sum, Texas fails to undermine the powerful, logical inference that SB 14 was designed, at least in part, to curb growing minority voting strength in the face of racially polarized voting. *See, e.g.*, *Robinson*, 505 F.2d at 680 (rejecting attempts to perpetuate an unrepresentative governing body challenged by the "rising political consciousness of the black population").

### C. SB 14's Proponents Anticipated Its Discriminatory Result on Minority Voters.

Texas argues that SB 14 did not significantly harm minority voters, Tex. PCOL ¶¶ 44-54, and that the Legislature was not aware of any potential impact, Tex. PCOL ¶¶ 35-43. Not so. The Court of Appeals has already concluded that "drafters and proponents of SB 14 were aware of the likely disproportionate effect of the law" on minority voters. *Veasey II*, 830 F.3d at 236. And this likely effect became reality: all three Plaintiffs' experts who addressed the issue found credibly "that SB 14 disparately impacts African-American and Hispanic registered voters in Texas." *Id.* at 251; *see also Veasey I*, 71 F. Supp. 3d at 663. That foreseeable disparate impact is

highly probative of discriminatory intent, *see* Section II.C.1, *supra,* and Texas's counter-narrative does not disturb this Court's earlier findings.

### 1. Texas Cannot Contest SB 14's Actual Discriminatory Impact.

Texas attempts to downplay SB 14's discriminatory impact, Tex. PCOL ¶¶ 44-54, but yet again the Court of Appeals has settled that issue.  *See Veasey II*, 840 F.3d at 250-56.  And, in any event, Texas's arguments are incorrect and unpersuasive.  First, the State argues that the precise evidence Plaintiffs presented at trial had not been presented to the legislature.  Tex. PCOL ¶ 44.  True enough.  But proven discriminatory impact is still legally relevant evidence of a discriminatory purpose.  *See* Section II.C.1, *supra*; *see also* Pls. Jnt. PFOF ¶¶ 268-277.  Second, Texas argues that SB 14 impacts too many Anglo voters to evince a discriminatory purpose.  Tex. PCOL ¶¶ 47, 52.  Not only is that argument legally incorrect, *see* Section II.C.1, *supra*, but a greater number of minority registered voters lack SB 14 ID than Anglo voters, despite the fact that Anglo voters make up a substantial majority of the registered electorate.  PL752R tbl. VI.2 (Ansolabehere Corr. Supp. Rep.).[17]  As time passes, the increasing minority share of the Texas electorate and lesser minority access to SB 14 ID will only widen the racial gap in the number of voters harmed by SB 14.  *See* Pls. Jnt. PFOF ¶¶ 6-9.[18]

---

[17] The State cites Dr. Ansolabehere's June 2014 report to suggest that a majority of voters without SB 14 ID are Anglo.  Tex. PFOF ¶ 219.  However, the figures are incorrect (because the State initially erred in explaining the meaning of particular fields in state databases).  *See* Trial Tr. 7:3-24 (Day 6); Trial Tr. 7:4-9:5 (Day 7).  The State supplied corrected information, which Dr. Ansolabehere used to estimate that a majority of registered voters without SB 14 ID are Hispanic or African-American.  Curiously, Texas relies on Dr. Ansolabehere's corrected report elsewhere in its proposed findings.  *See* Tex. PFOF ¶ 220.

[18] This case is also unlike *Feeney*, where "significant numbers of potential job applicants—both men and women—were put at a disadvantage" by a veteran's preference.  442 U.S. at 275.  More akin to the fraction of the Alabama electorate affected by the felon disenfranchisement provision at issue in *Hunter*, 471 U.S. at 227, SB 14 impacted 4.5% of all registered voters in Texas at the time of trial.  *See Veasey II*, 830 F.3d at 250.  Therefore, it is far more plausible here than in *Feeney* that a purpose of SB 14 was discriminatory, to impede minority access to the franchise, even though the law also disenfranchised

Texas also contests this Court's affirmed findings derived from fact witnesses describing SB 14's discriminatory impact. *See, e.g.*, Tex. PFOF ¶¶ 38-44. The State repeats its "demonstrably false" claim, *Veasey II*, 830 F.3d at 254 & n.49, that Plaintiffs have failed to identify any voter prevented from voting by SB 14. Tex. PFOF ¶ 38.[19] First, Texas attempts to minimize SB 14's impact by pointing out that some witnesses could vote by mail. *See* Tex. PFOF ¶¶ 39-41, 43-44. That ignores this Court's affirmed finding that mail voting is not an acceptable substitute for casting a ballot at a polling place. *See Veasey II*, 830 F.3d at 255; *Veasey I*, 71 F. Supp. 3d at 688-90.[20] Furthermore, as the Court of Appeals noted, individual voters testified they could not cast a ballot that counted as a direct result of SB 14. *See Veasey II*, 830 F.3d at 254-55. Texas ignores that many of these voters were unable to obtain underlying documents necessary to obtain SB 14 ID, were unable to travel to obtain ID, or did not know about the new ID requirement and were thus unable to vote because "the State devoted little funding or attention to educating voters." *Veasey II*, 830 F.3d at 254-56; *see also Veasey I*, 71 F. Supp. 3d 667-76; Pls. Jnt. PFOF ¶¶ 278-286, 323-330.[21] Finally, although Texas claims that this

---

students, the poor, the elderly, and other vulnerable Anglo voters.

[19] Texas also repeats the false claim that attorneys for the United States "crisscrossed Texas, traveling to homeless shelters looking for anyone disenfranchised by the law." Tex. PFOF ¶ 38. In fact, while interviewing a social worker at a single shelter, an attorney for the United States simply asked whether any individuals present lacked ID. Trial Tr. 143:24-145:6 (Mora) (Day 2).

[20] Texas also asserts that voters with a disability "may continue to vote at the polls by presenting only a voter registration certificate," Tex. PFOF ¶ 15, ignoring the fact that SB 14's "strict disability exemption" requires prior submission of documentation, *Veasey II*, 830 F.3d 254 n.48.

[21] The State's broader claim that implementation effectively reduced any burden imposed by SB 14, Tex. PFOF ¶¶ 24-33, cannot be reconciled with the Court of Appeals' determinations that "Texas's poor implementation" of SB 14 contributed to the law's discriminatory impact and that SB 14 was perhaps the "most poorly implemented voter ID law in the country." *Veasey II*, 830 F.3d at 254 & n.48, 256 & n.52. Similarly, the State's proposed findings concerning voter education, Tex. PFOF ¶¶ 21-23, conflict with the Court of Appeals' holding that "the lack of funding devoted to educating voters" increased the burden of strict voter ID requirements, *Veasey II*, 830 F.3d at 254 n.48.

Court did not accept evidence of SB 14's discriminatory impact from Councilman Daniel
Guzman of the City of Edcouch, Tex. PFOF ¶ 51, that is simply not so.  *See Veasey I*, 71 F.
Supp. 3d at 663-64, 668 nn.267 & 269; *see also* Trial Tr.  360:24-361:24, 363:8-22, 368:4-370:5
(Guzman) (Day 3).

This Court should reject Texas's attempts unravel this Court's affirmed finding of SB
14's discriminatory impact on Texas voters.

### 2. Bill Proponents Anticipated that SB 14 Would Have a Discriminatory Impact.

Although SB 14's stark discriminatory impact is itself probative of discriminatory intent,
Texas continues to claim that the "Legislature did not know or anticipate that S.B. 14 would
prevent anyone from voting, much less that it would disproportionately harm minority
voters."  Tex. PCOL ¶ 35.  But the Court of Appeals has already found that bill proponents
"*were aware* of the likely disproportionate effect of the law on minorities."  *See Veasey II*, 830
F.3d at 236 (emphasis added); *see also* U.S. Br. 20-24.  Even if Texas's argument were not
barred by the mandate rule, *see, e.g.*, *Teel*, 691 F.3d at 582-83, it is undermined by record
evidence.  *See* Pls. Jnt. PFOF ¶¶ 103-108, 200-201, 205-207, 209-210.

Texas argues that that the Legislature did not know of SB 14's discriminatory impact
because bill proponents did not heed the warnings of their colleagues or the Lieutenant
Governor's counsel, did not see the Secretary of State's analysis of SB 14's likely impact, relied
on racial impact data from other states with materially different demographics and voter ID laws,
and failed to commission a racial impact study of their own.  Tex. PCOL ¶¶ 36-43.  Willful
avoidance of inconvenient information does not preclude knowledge of such facts, particularly
when they are a matter of "common sense."  *See, e.g.*, *United States v. Schaffer*, 600 F.2d 1120,
1122 (5th Cir. 1979) ("[D]eliberate ignorance is the equivalent of knowledge.").  Texas cannot

now disclaim the Legislature's advance knowledge of SB 14's disparate impact simply because some bill proponents avoided available evidence of what many already knew to be true. And, finally, while the State claims "it was not feasible" to conduct a racial impact study, Tex. PFOF ¶ 172, it in fact concedes "such a study was completed during the preclearance process," *id.*; *see also* Pls. Jnt. PFOF ¶ 103.

### D.  Passing SB 14 Required Substantial Deviations from Ordinary Legislative Procedure.

Texas claims that the Legislature's procedures used to pass SB 14 were "commonplace." Tex. PCOL ¶ 97.  But the Legislature's "virtually unprecedented" combination of procedural deviations from commonplace legislative procedure—or any deviation alone—"lend[s] credence to an inference of discriminatory intent." *Veasey II*, 830 F.3d at 238; U.S. Br. 28-31; *cf. Lee v. Va. State Bd. of Elections*, No. 16-1605, 2016 WL 7210103, at *8-9 (4th Cir. Dec. 13, 2016) (holding that a "normal" legislative process weighs against a finding of discriminatory intent and that deviations may "spark suspicion" (internal quotation marks and citation omitted)).[22]

Texas downplays its dramatic deviations by noting that bill opponents had blocked voter ID bills in the past.  Tex. PCOL ¶¶ 97-106; *see also* Tex. Br. 3, Tex. PFOF ¶¶ 97-98.  That is

---

[22] While repeatedly relying upon the vast research found in the corrected report of the United States' intent expert, Dr. Chandler Davidson, *see* Tex. PFOF ¶¶ 160, 164, 169, 172, 177, 186, Texas also quibbles with some of Dr. Davidson's statements concerning these legislative deviations. This Court has already relied on Dr. Davidson's testimony.  *See, e.g.*, *Veasey I*, 71 F. Supp. 3d at 633-34, 658.  And although Texas argues that Dr. Davidson should have applied a partisan lens to SB 14, Tex. PCOL ¶ 136, it is no error to acknowledge the presence of race in Texas politics.  *See also* Tex. PCOL ¶ 134 (making unsupported claims of "confirmation bias").  Nor is it error to point out that a meeting that was technically open was "in practice . . . closed."  Tex. PCOL ¶ 119; *see also* Tex. PCOL ¶ 120 (complaining of focus on an amendment's ultimate importance, rather than nomenclature in use during consideration).  Finally, although Dr. Davidson did not interview individual members of the legislature or "other government officials," Tex. PCOL ¶ 126, he did review legislator deposition transcripts.  Permission for out-of-court interviews was unlikely to be granted during litigation, and such interviews may also be entitled to little weight.  *See Bone Shirt v. Hazeltine*, 336 F. Supp. 2d 976, 1005-06 (D.S.D. 2004).

true.  But deploying procedural tactics to defeat a bill with a possible discriminatory impact differs from using extreme procedural tactics to ensure that an even more discriminatory bill passes—especially when the latter bill's ostensible intent is to eliminate an "almost nonexistent problem."  *Veasey II*, 830 F.3d at 239 (describing in-person voter impersonation in Texas); *cf. N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 226 (4th Cir. 2016) ("When a legislature dominated by one party has dismantled barriers to African American access to the franchise, even if done to gain votes, 'politics as usual' does not allow a legislature dominated by the other party to re-erect those barriers.").  Bill proponents' insistence on passing the nation's strictest voter ID law over the vehement opposition of most minority legislators indicates that some other motivation drove SB 14's passage.

Texas also argues that the Legislature's unusually hurried passage of SB 14 did not matter because the Legislature had spent time debating earlier voter ID bills.  Tex. PFOF ¶ 181; Tex. PCOL ¶ 105.  But SB 14 was not the same as earlier voter ID proposals that were more fully debated.  Pls. Jnt. PFOF ¶¶ 117-133.  What little opportunity opposing legislators had to discuss SB 14 was stymied by proponents' consistent responses that they were "not advised" about the bill or its impact.  PFOF ¶ 224; U.S. Br. 23.  Moreover, the conference committee significantly modified the bill, a radical departure from normal legislative procedure that deprived opponents in both chambers of the opportunity to debate new provisions in depth.  PFOF ¶¶ 96-99; U.S. 29-30.  These dramatic deviations from the ordinary legislative process suggest that SB 14 was enacted with a discriminatory purpose.[23]

---

[23] The State's position regarding adequate debate also contradicts its earlier argument that this Court may consider only the actions of the 82nd Texas Legislature, which enacted SB 14.  *See* Tex. PCOL ¶ 64.

27

E.   **The Link Between SB 14 and the Legislative Interests Asserted by Proponents Is Tenuous and Inadequate to Explain the Bill.**

Texas insists that SB 14 furthers the State's interests in preventing voter fraud and restoring public confidence—based on models enacted in Georgia and Indiana—and vindicates the will of Texas's electorate.  Tex. PFOF ¶¶ 202-206, 221-274.  In fact, "the provisions of SB 14 fail to correspond in any meaningful way to the legitimate interests the State claims to have been advancing through SB 14."  *Veasey II*, 830 F.3d at 263; *see also Veasey I*, 71 F. Supp. 3d at 652-59, 698.  Texas's attempt to re-litigate this core finding violates the mandate rule and the law of the case doctrine and should be rejected yet again.

1.   **No Evidence Suggests That Texas's Previous Voter Identification Law Failed to Deter In-Person Voter Impersonation.**

Texas once again argues that it enacted SB 14 to "detect[] and deter[] voter fraud, as well as preserv[e] public confidence in the electoral system."  Tex. PFOF ¶ 202.  It thus ignores the Court of Appeals' conclusion that this Court "heard evidence that SB 14 is only tenuously related to the legislature's stated purpose of preventing voter fraud."  *Veasey II*, 830 F.3d at 237.

Before enacting SB 14, Texas required voters to present documentary proof of identity prior to voting, unless a poll-worker could personally attest to the voter's identity, *see Veasey II*, 830 F.3d at 225; Pls. Jnt. PFOF ¶¶ 58-62, and in-person voter impersonation was not "a problem of great magnitude," *Veasey II*, 830 F.3d at 238; *see also id.* at 239 (describing the issue as "almost nonexistent"); Pls. Jnt. PFOF ¶¶ 135-158.  Thus the State's contrary claim that "S.B. 14 was designed to help detect unlawful conduct at polling places, deter those who attempt to unlawfully interfere with the democratic process, and prevent election fraud in the future," Tex. PFOF ¶ 237—and the suggestion that those aims fully explain the law's provisions—do not square with the record, prior findings, or *Veasey II*.

To be sure, extremely rare instances of voter impersonation have occurred at Texas polling places.  Pls. Jnt. PFOF ¶¶ 139-149; Tex. PFOF ¶ 241.  Nonetheless, Senator Fraser and Representative Harless, the Senate and House sponsors of SB 14, each stated that he or she was "not advised" concerning the extent of in-person voter impersonation in Texas, Pls. Jnt. PFOF ¶ 158, indicating little if any bona fide tie between such fraud and tightening of Texas's existing voter ID regime.  Moreover, expert testimony "made clear [that] in-person voter impersonation fraud is difficult to perpetrate with success."  *Veasey I*, 71 F. Supp. 3d at 640.  But, even assuming (counterfactually) that photo voter ID requirements are needed to detect in-person voter impersonation, Tex. PFOF ¶¶ 255-256, 258, that justification cannot explain the State's decision to impose a far more exacting law than the Indiana and Georgia statutes on which it claims to have modeled SB 14.  *See Veasey II*, 830 F.3d at 263; *see also* Section III.E.2, *infra*.

This Court should reject Texas's attempts to buttress the scant record of in-person voter impersonation.  Invoking the rare phenomenon of in-person voter impersonation in the abstract, Tex. PFOF ¶¶ 231-235, does not establish the extent of the issue in Texas or whether Texas's existing voter ID requirements sufficed to address it.  And neither the fact that other election crimes have occurred in Texas, Tex. PFOF ¶¶ 238, 240, and other states, Tex. PFOF ¶¶ 237, 243-244, 247-252, nor the fact that Texas voter rolls contain some out-of-date records, Tex. PFOF ¶ 261, would establish the existence of widespread in-person voter impersonation, which is "the only concern addressed by SB 14," *Veasey II*, 830 F.3d at 238.[24]

---

[24] Thus, for example, the State's reliance on the testimony of Randall Buck Wood is misplaced, Tex. PFOF ¶¶ 233, 238, 246, because Mr. Wood has "never seen" an election contest involving "a voter trying to vote impersonating another voter."  Trial Tr. 198:12-199:10 (Day 2) (Wood); *see also* Tex. PFOF ¶¶ 242, 245 (relying on allegations unrelated to in-person voting).

Texas's claim that SB 14 aimed to prevent non-citizen voting, Tex. PFOF ¶¶ 269-274, is

yet another shifting rationale—and thus another indication of discriminatory intent.  *See Veasey*

*II*, 830 F.3d at 240-41.  That is because "[t]wo forms of identification approved under SB 14 are

[already] available to noncitizens," *id.* at 241, who are lawfully present in the United States, Tex.

PFOF ¶¶ 272-273; Pls. Jnt. PFOF ¶ 194.  Thus, the only non-citizens that SB 14 deters from

engaging in fraud are undocumented immigrants, who are "unlikely to vote . . . for fear of being

deported." *Veasey II*, 830 F.3d at 263 (relying on this Court's finding); *see also id.* (noting that a

bill proponent had "no evidence to substantiate his fear of undocumented immigrants voting").[25]

And, importantly, bill proponents mostly avoided citing "non-citizen voting" in

contemporaneous justifications of SB 14.  Pls. Jnt. PFOF ¶¶ 191-192.  This Court's inquiry

concerns the actual purpose of SB 14, and not post-hoc rationales.  *See, e.g.*, *Veasey II*, 830 F.3d

at 230; *see also* U.S. Br. 10 (collecting cases).

### 2.   SB 14's Most Restrictive Provisions Are Unique to Texas.

Texas revives its discredited argument that it modeled SB 14 on Georgia and Indiana's

voter ID laws, Tex. PFOF ¶¶ 36, 71-73, 76, 115, 129-130, 140, 151, 207, 211-212, 214, 218;

Tex. PCOL ¶¶ 37, 39, 71, despite the fact that those laws "included many more forms of

acceptable identification, plus indigency exceptions and far more extensive educational

campaigns." *Veasey II*, 830 F.3d at 263; *see also id.* at 239 n.26, 256 n.52 (noting "obvious

differences"); U.S. Br. 21-22 (setting out acceptable ID, implementation, and fail-safe

provision).  SB 14's deviations from Indiana and Georgia "model[s]," Tex. PFOF ¶ 72, 151,

---

[25] The State's suggestion to the contrary, Tex. PFOF ¶ 271, relies on the prosecution of Debra Briseno, who wrongly told lawfully present non-citizens (who possessed Texas driver licenses) that they were eligible to vote.  D.D.C. Trial Tr. 56:15-57:3, 60:3-23 (Day 1 p.m. session) (Mitchell); *see also id.* at 58:16-59:25 (testifying to the lack of prosecutions of non-citizens for illegal voting, let alone voter impersonation).

remain unexplained.  If the Texas Legislature credited testimony lauding successful implementation in Georgia and Indiana, Tex. PFOF ¶¶ 212, 214-215, it only raises the critical question why Texas chose to make SB 14 far harsher than the ID laws in those states.  *Cf. Lee v. Va. State Bd. of Elections*, 2016 WL 7210103, slip op. at *9 (rejecting Section 2 challenge to a voter ID law "that went out of its way to make its impact as burden-free as possible" by "allow[ing] a broad scope of IDs to qualify"—including college and university IDs disproportionately held by minority voters—and "issu[ing] free IDs without any requirement of presenting documentation" at "numerous locations throughout the State").

Moreover, these departures undercut the State's claimed reliance on studies suggesting a lack of discriminatory impact in Georgia and Indiana, Tex. PFOF ¶¶ 36-37, 192, 207-215, because, when assessing SB 14, there were no "similar voter ID laws" to study, Tex. PFOF ¶ 211; *see also* DEF0020 (Ansolabehere, *Access Versus Integrity in Voter Identification Requirements*); D.D.C. Trial Tr. 105:15-109:6 (Day 3 a.m. session) (Shaw) (explaining that earlier studies primarily concerned non-photo ID laws).  Regardless whether "no two voter ID laws are identical," Tex. PFOF ¶ 72, these meaningful distinctions evince a discriminatory purpose because "[a]gainst a backdrop of warnings that SB 14 would have a disparate impact on minorities . . . , amendment after amendment [to bring SB 14 in line with Georgia and Indiana] was rejected."  *Veasey II*, 830 F.3d at 239.[26]

Although Texas followed Georgia's and Indiana's examples by including a form of no-fee ID in SB 14, this absence of further deviation does not undermine the purpose claim, as the

_____

[26] Even if SB 14 mirrored Georgia and Indiana's laws, it would still violate the Voting Rights Act if Texas adopted its voter ID law in order to harm minority voters.  *Compare Whitcomb v. Chavis*, 403 U.S. 124 (1971) (upholding Indiana's multi-member districts), *with White v. Regester*, 412 U.S. 755 (1973) (striking down Texas's multi-member districts).

State suggests.  Tex. PCOL ¶ 78; Tex. PFOF ¶¶ 10-11.  Rather, inclusion of a form of no-fee ID

in Texas reflected the injunction against Georgia's first photographic voter ID law as a poll tax,

after which Georgia enacted a second voter ID law that "requires each county to issue free of

charge a 'Georgia voter identification card,' with a photograph of the voter, to any registered

voter who does not have another acceptable form of identification."  *Common Cause/Georgia v.*

*Billups*, 554 F.3d 1340, 1346 (11th Cir. 2009).  Nor did the creation of the EIC reduce the burden

imposed by SB 14, as Texas implies.  Tex. PFOF ¶ 195; Tex. PCOL ¶ 78.  Quite the opposite is

true.  Before the creation of the election identification certificate (EIC), SB 14 required the

Department of Public Safety to issue an ordinary personal ID card free of charge to any voter

who needed identification to vote.  *See* PL40 at 25 (Conference Comm. Rep.) (comparing pre-

conference and post-conference versions of Section 20 of SB 14).  By creating the EIC, Texas

maintained the burden to obtain a document needed to vote and concentrated costs on voting,

rather than providing a document that "can be used for more."  *See* Tex. PFOF ¶ 34.[27]

### 3.  No Broad Support Existed for SB 14's Most Restrictive Provisions.

SB 14 is not "a law supported by a majority of Texans—including a majority of

Republicans, of Democrats, of African-Americans, and of Hispanics," Tex. Br. 1; nor does SB

14 "honor[] the will of the majority of Texans, regardless of race, ethnicity, or political

affiliation," *id.* at 3.  This case does not turn on whether, generally, "voter ID was bad for

voters."  Tex. PFOF ¶ 79.  The United States here challenges a particular voter ID law enacted to

---

[27] The change was made to address a potential legal challenge related to issuance of personal ID cards
without a fee, rather than to mitigate the discriminatory impact of SB 14 on minority voters.  Issuance of
personal ID cards without a fee would deprive the Texas Mobility Fund of committed resources,
potentially breaching existing credit agreements in violation of Article III, Section 49-k of the Texas
Constitution.  *See* Trial Tr. 109:20-111:13 (Day 1) (Martinez Fischer); *see also* PL35 at 34:22-37:19
(House Fl. Debate, Mar. 23, 2011); Pls. Jnt. PFOF ¶¶ 97-98 (rejection of earlier point of order).

be the strictest in the nation.  *See Veasey II*, 830 F.3d at 256 n.52.  Thus, polls showing general

support for photo voter ID requirements, Tex. PFOF ¶¶ 80-81, 83-85, 87, or even non-photo

voter ID requirements, Tex. PFOF ¶ 82, do not establish broad support for SB 14's harsher

provisions.  *See Veasey II*, 830 F.3d at 263-64.  Moreover, reliance on public opinion polls at the

expense of actual evidence may itself be a deviation from legislative norms.  *See Smith v. Town

of Clarkton*, 682 F.2d 1055, 1066 (4th Cir. 1982).  Regardless whether Senator Patrick

remembers the Texans who rallied against strict voter ID, Tex. PFOF ¶ 86, the vast majority of

public witnesses spoke out against SB 14, as well as SB 362, *see* DEF0001 at 179-189 (Sen.

Comm. of the Whole Hearing Tr. 494:1-535:18, Jan. 25, 2011); DEF0001 at 4083-4172 (Sen.

Comm. of the Whole Hearing Tr. 771:1-860:21, Mar. 10, 2009).

Grassroots advocates who favored strict voter ID requirements, Tex. PFOF ¶ 89-90, 92,

cannot be separated from their racially tinged messages.  For example, one constituent wrote

Representative Harless to say that she "was told of a democratic Hispanic group jumping for

joy" because SB 14 was not sufficiently strict and would ostensibly allow them to "continue"

committing fraud.  PL 704 (Constituent Letter).  Another wrote to his representative that he was

"sick of voter fraud from illegal Mexicans."  PL 733 (Constituent Letter).  And a third suggested

that without strict ID requirements, voters would cast ballots for then-President of Mexico

Vincente Fox.  PL 748 (Constituent Email).  Even assuming that state officials only responded to

constituents, *but see* Pls. Jnt. PFOF ¶ 46, Section 2 does not permit acting upon constituent urges

when "racial animus is a significant factor in the community position to which the [State] is

responding."  *United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181, 1224 (2d Cir. 1987); *see

also Palmore v. Sidoti*, 466 U.S. 429, 433 (1984) ("Public officials sworn to uphold the

Constitution may not avoid a constitutional duty by bowing to the hypothetical effects of private

racial prejudice that they assume to be both widely and deeply held." (internal quotation marks and citation omitted)).

## IV. EVIDENCE DEEMED INFIRM BY THE FIFTH CIRCUIT WAS INESSENTIAL TO THIS COURT'S ULTIMATE FINDING OF A DISCRIMINATORY PURPOSE

Imagining that *Veasey II* rejected "much of" the evidence this Court found probative of discriminatory intent, Texas dismisses the remainder as "cobbled together . . . shreds of circumstantial evidence." Tex. PCOL ¶¶ 1-2, 85. In fact, the opposite is true. The vast majority of this Court's findings withstood appellate review, and the Court of Appeals held that "there remains evidence to support a finding that the cloak of ballot integrity could be hiding a more invidious purpose," namely the racially discriminatory objective of deterring African-American and Hispanic voter participation. *Veasey II*, 830 F.3d at 241; *see also id.* at 235 (noting significant evidence "that could support a finding of discriminatory intent"). The State's inability to adhere to the letter and spirit of the mandate reflects the limited extent to which the Court of Appeals disturbed this Court's findings and the large extent to which those findings have been affirmed. *See also id.* at 330 (Costa, J., dissenting in part). There is no other explanation for the State's resurrection of factual and legal disputes that by now are long settled.

This Court's finding that the Texas Legislature enacted SB 14 with a discriminatory purpose rested on nearly a hundred pages of fact findings, a narrow subset of which the Fifth Circuit found to be "infirm." *Veasey II*, 830 F.3d at 230-34. Specifically, the Court of Appeals clarified that this Court should not rely on evidence of State-sponsored discrimination "dating back hundreds of years," *id.* at 231, evidence of "reprehensible actions" in a single county, *id.* at 232, "post-enactment speculation by opponents," *id.* at 233, and "stray statements made by a few individual legislators" *after* voting in favor of SB 14, *id.* at 234. The Fifth Circuit also limited

the weight this Court can place on *Bush v. Vera*, 517 U.S. 952 (1996), and *LULAC v. Perry*, 548 U.S. 399 (2006).  *Veasey II*, 830 F.3d at 232-33.

Texas mischaracterizes these holdings as broader directives barring consideration of wide categories of evidence.  *See* Section II.C, *supra*.  But this Court can and should follow the guidance of the Court of Appeals and once again find that Texas enacted SB 14 with a discriminatory purpose.

Beyond the flagrant examples of official discrimination through much of the twentieth century, the record "contains more contemporary examples" of official discrimination, *Veasey II*, 830 F.3d at 231, most critically a record of intentional discrimination by the same Legislature that enacted SB 14, Pls. Jnt. PFOF ¶¶ 17-42.  The Fifth Circuit also acknowledged that "history (even 'long-ago history') provides context to modern-day events."  *Veasey II*, 830 F.3d at 232 n.14.  SB 14 fits in a persistent pattern of racial discrimination in voting, Pls. Jnt. PFOF ¶¶ 17-28, and pretextual voter fraud claims, *id.* ¶¶ 159-165.  Although the Fifth Circuit held that *LULAC v. Perry*, "taken alone, form[s] a thin basis for drawing conclusions regarding contemporary State-sponsored discrimination," *Veasey II*, 830 F.3d at 232, the "sensitive inquiry" required under *Arlington Heights*, 429 U.S. at 266, does not call for consideration of any particular evidence in isolation.  *See also McCrory*, 831 F.3d at 214 (cautioning against "miss[ing] the forest in carefully surveying the many trees").  Moreover, the Fifth Circuit acknowledged that *LULAC v. Perry* "does evidence a history of discrimination that is relevant to" the Senate Factors analysis, *id.* at 233 n.15, which is in turn relevant to intent considerations, *see Brown*, 561 F.3d at 433; *see also Veasey II*, 830 F.3d at 240 n.28 (outlining holding and importance of *LULAC v. Perry*).  *See generally LULAC v. Perry*, 548 U.S. at 438-41 (describing

division of a cohesive minority community to benefit an incumbent from minority voters "increasingly voting against him").[28]

Similarly, although standing alone "the reprehensible actions of county officials" in Waller County are not "probative of the intent of legislators in the Texas Legislature," *Veasey II*, 830 F.3d at 232, a broader pattern of discrimination across the State lends credence to a statewide claim of discriminatory intent, *see Miss. State Chapter, Operation PUSH, Inc. v. Mabus*, 932 F.2d 400, 410 (5th Cir. 1991) (recognizing that while the district court "was not required to make individual findings of disparate registration rates in individual counties, it did evaluate the evidence as part of its consideration"). Waller County is not an isolated example: litigation and preclearance objections under the Voting Rights Act have occurred across dozens of counties, municipalities, and subjurisdictions in Texas. *See* Pls. Jnt. PFOF ¶¶ 22-28. This Court may properly rely on that pattern without drawing an impermissible inference based on Waller County alone.

Finally, this Court can and should conclude that SB 14 was motivated by a discriminatory purpose without relying on post-enactment characterizations by opponents or placing undue weight on post-enactment statements by proponents of the bill. *See Veasey II*, 830 F.3d at 233-34. There is no need to rely on characterizations of the intent of SB 14 by bill opponents; this Court need only consider bill proponents' failure to answer legitimate questions. *See, e.g.*, Pls. Jnt. PFOF ¶¶ 154, 158, 220-224, 226-227. Similarly, this Court need not place undue weight on post-enactment statements because key legislative figures recorded concessions regarding the

---

[28] This Court need not rely on *Bush v. Vera* at all to find that Texas's persistent pattern of discrimination to protect threatened incumbents supports a finding that SB 14 has a discriminatory purpose. *See Veasey I*, 71 F. Supp. 3d at 636 n.23, 637 n.32 (relying on *Bush v. Vera* only as duplicative evidence).

obvious racial impact of a strict voter ID law in Texas before SB 14 was considered or passed. *See* Pls. Jnt. PFOF ¶¶ 208-210.  Moreover, sufficient evidence may be gleaned from what supporters of SB 14 refused to say or do—to acknowledge critical differences between SB 14 and earlier laws in Indiana or Georgia, to openly debate the merits of the bill, or to pass ameliorative amendments—that this Court has little need to rely on post-enactment admissions.

## V.     TEXAS HAS FAILED TO PROVE THAT IT WOULD HAVE ENACTED SB 14 ABSENT A DISCRIMINATORY PURPOSE.

Even assuming for the sake of argument that SB 14 was enacted with a discriminatory intent, Texas insists that it would have enacted the nation's strictest voter ID law regardless of that prohibited purpose.  Tex. PCOL ¶ 147.  The State fails to recognize that it carries the burden of proof to prove this counterfactual, and it cannot bear that heavy burden.  Texas does not even attempt to connect the complete, specific provisions of SB 14 to a non-discriminatory purpose. Tex. PCOL ¶¶ 146-150.  Rather it reiterates generalized arguments regarding election modernization and partisanship that this Court should once again reject.

The fact that many other state legislatures considered voter ID laws while Texas considered SB 14, Tex. PFOF ¶ 148, does not justify the State's enactment of the nation's most restrictive law.  Texas's attempt to tie SB 14 to election "modernization," Tex. PCOL ¶ 147, fares no better as an alternative rationale than it does as a primary one.  *See* Section III.A, *supra*. And although Texas acknowledges an underlying partisan motivation, Tex. PCOL ¶ 149, in the context of a complex bill, a partisan vote on final passage does not prove that "the *same decision* would have resulted even had the impermissible purpose not been considered."  *Arlington Heights*, 429 U.S. at 270 n.21 (emphasis added).

In any event, Texas closes its submission with a substantial admission.  The State argues that if bill opponents "had been at all interested in compromise as opposed to obstruction from

2005 through 2009 . . . the Texas Legislature almost certainly would have passed . . . a voter ID law that included some forms of non-photo ID." Tex. PCOL ¶ 150.  Texas thus concedes that a less restrictive, less discriminatory law would have satisfied its legitimate interests.  Instead, bill proponents "voted in line with their policy preference" and needlessly enacted a far harsher voter ID law, the strictest in the country.  Tex. PCOL ¶ 150.

In sum, Texas's asserted concerns regarding in-person voter impersonation and low voter confidence, the model of Georgia and Indiana's voter identification laws, and general public support for photographic voter ID requirements cannot explain SB 14's specific terms.  *See* Section III.E, *supra*.  The persistent pattern of voting discrimination in Texas also helps explain the gap between more reasonable photo voter ID requirements and the unforgiving restrictions of SB 14.  Texas would not have enacted SB 14 absent the purpose, at least in part, to abridge the ability of Hispanic and African-American Texans to exercise their constitutional right to vote.

## VI.   CONCLUSION

For the reasons set out in the United States' Brief Concerning Discriminatory Intent (ECF No. 962) and herein, this Court should find that proponents of SB 14 were motivated, at least in part, by SB 14's detrimental effects on the African-American and Hispanic electorate, in violation of Section 2 of the Voting Rights Act.

Date: December 16, 2016

Respectfully submitted.

KENNETH MAGIDSON
United States Attorney
Southern District of Texas

VANITA GUPTA
Principal Deputy Assistant Attorney General
Civil Rights Division

*/s/ Daniel J. Freeman*
T. CHRISTIAN HERREN, JR.
MEREDITH BELL-PLATTS
RICHARD DELLHEIM
DANIEL J. FREEMAN
BRUCE I. GEAR
AVNER SHAPIRO
SAMUEL OLIKER-FRIEDLAND
ZACHARY P. JONES
Attorneys, Voting Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Ave. NW
Washington, D.C. 20530

*Counsel for the United States*

## CERTIFICATE OF SERVICE

I hereby certify that on December 16, 2016, a true and correct copy of the foregoing document was served via the Court's ECF system to all counsel of record.

*/s/ Daniel J. Freeman*
Daniel J. Freeman
U.S. Department of Justice
950 Pennsylvania Ave. NW
Room 7123 NWB
Washington, D.C. 20530
daniel.freeman@usdoj.gov