UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| MARC VEASEY, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 2:13-CV-00193 |
| | § | |
| GREG ABBOTT, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**DEFENDANTS' RESPONSE TO PLAINTIFFS'
JOINT PROPOSED FINDINGS OF FACTS
(REDACTED)**

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Arthur v. Nyquist,*
904 F. Supp. 112 (W.D.N.Y. 1995) ......................................................................... 11

*Beer v. United States,*
425 U.S. 130 (1976) .................................................................................................. 8

*Berry v. Sch. Dist. of City of Benton Harbor,*
195 F. Supp. 2d 971 (W.D. Mich. 2002),
*order clarified,* 206 F. Supp. 2d 899 (W.D. Mich. 2002)....................................... 11

*Biener v. Calio,*
361 F.3d 206 (3d Cir. 2004)................................................................................... 123

*Castaneda-Gonzalez v. Immigration & Naturalization Serv.,*
564 F.2d 417 (D.C. Cir. 1977) ................................................................................ 56

*City of Mobile, Ala. v. Bolden,*
446 U.S. 55 (1980) ........................................................................................... 42, 43

*Coal. to Save Our Children v. State Bd. of Educ. of State of Del.,*
90 F.3d 752 (3d Cir. 1996)...................................................................................... 11

*Crawford v. Marion Cnty. Election Bd.,*
553 U.S. 181 (2008) ........................................................................................*passim*

*Doe ex rel. Doe v. Lower Merion Sch. Dist.,*
665 F.3d 524 (3d Cir. 2011).................................................................................... 76

*Florida v. United States,*
885 F. Supp. 2d 299 (D.D.C. 2012) (per curiam) ................................................... 56

*Flowers v. Wiley,*
675 F.2d 704 (5th Cir. 1982) ................................................................................. 6, 7

*Frank v. Walker,*
768 F.3d 744 (7th Cir. 2014) ............................................................................ 39, 45

*Hoots v. Penn.,*
272 F. Supp. 2d 539 (W.D. Pa. 2003) ..................................................................... 11

*LULAC v. Clements,*
   999 F.2d 831 (5th Cir. 1993) (en banc) ............................................................ 3, 4

*McDonald v. Bd. of Election Comm'rs of Chi.,*
   394 U.S. 802 (1969) ................................................................................... 123

*Ne. Ohio Coal. for the Homeless v. Husted,*
   837 F.3d 612 (6th Cir. 2016) ............................................... 86, 105, 123

*OCA Greater Houston v. Texas,*
   2016 WL 4597636 (W.D. Tex. Sept. 2, 2016) ....................................... 10

*Perez v. Texas,*
   No. 5:11-cv-360, slip. op. (W.D. Tex. Mar. 19, 2012) ............................... 7

*Pers. Adm'r of Mass. v. Feeney,*
   442 U.S. 256 (1979) ...................................................... 4, 35, 75, 76

*Purcell v. Gonzalez,*
   549 U.S. 1 (2006) (per curiam) ........................................................ 44

*Scantek Med., Inc. v. Sabella,*
   693 F. Supp. 2d 235 (S.D.N.Y. 2008) ................................................... 9

*Shelby Cnty. v. Holder,*
   133 S. Ct. 2612 (2013) ................................................................ 61

*Tasby v. Moses,*
   265 F. Supp. 2d 757 (N.D. Tex. 2003) ................................................ 11

*Tasby v. Woolery,*
   869 F. Supp. 454 (N.D. Tex. 1994) ................................................... 12

*Texas v. Holder,*
   133 S. Ct. 2886 (2013) ............................................................ 10, 32

*Texas v. United States,*
   887 F. Supp. 2d 133 (D.D.C. 2012), *vacated and remanded on other
   grounds*, 133 S. Ct. 2885 (2013) ............................................... 5, 6, 7, 9

*United States v. O'Brien,*
   391 U.S. 367 (1968) .................................................................. 55

*United States v. Yonkers Bd. of Educ.,*
   123 F. Supp. 2d 694 (S.D.N.Y. 2000) ................................................ 11

*Vaughns v. Bd. of Educ. of Prince George's Cnty.*,
   941 F. Supp. 579 (D. Md. 1996) ............................................................ 11

*Veasey v. Abbott*,
   830 F.3d 216 (5th Cir. 2016) (en banc) .........................................*passim*

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
   429 U.S. 252 (1977) ............................................................................ 79

*Voting for Am., Inc. v. Steen*,
   732 F.3d 382 (5th Cir. 2013) ......................................................... 39, 45

*Washington v. Davis*,
   426 U.S. 229 (1976) ............................................................................ 77

*Wright v. Farouk Systems, Inc.*,
   701 F.3d 907 (11th Cir. 2012) ........................................................... 10

## Statutes

Act of May 25, 2015, 84th Leg., R.S., ch. 130,
   2015 Tex. Gen. Laws 1134 ............................................................... 115

Colo. Rev. Stat. § 1-5-401 ................................................................... 123

Or. Rev. Stat. § 254.465 ...................................................................... 123

Tex. Bus. & Com. Code § 506.001(a) .................................................. 70

Wash. Rev. Code § 29A.40 ................................................................. 123

1.   Defendants do not dispute this fact.

2.   Defendants do not dispute this fact.

3.   Defendants do not dispute this fact. The Fifth Circuit did not, however, remand merely "to reweigh the discriminatory purpose evidence" in this case "in the first instance." It is also instructed this Court that critical elements of Plaintiffs' case may not be considered as evidence of the Texas Legislature's purpose in enacting S.B. 14. In trying to prove discriminatory purpose, Plaintiffs are not permitted to rely on (1) historical instances of discrimination by long-dead legislators, (2) discriminatory acts or statements by persons outside the Legislature, (3) legislative support for unrelated bills that have not been found to be discriminatory, (4) speculation by S.B. 14 opponents that the bill's proponents acted for a discriminatory purpose, and (5) isolated and ambiguous statements made by legislative proponents after enactment. *Veasey v. Abbott*, 830 F.3d 216, 229-34 & n.16 (5th Cir. 2016) (en banc).

4.   Plaintiffs' proposed conclusion is wrong for the reasons set forth in Defendants' Proposed Conclusions of Law. Plaintiffs have not identified any proponent of SB 14 whom they allege supported or voted for SB 14 because he or she believed it would have a detrimental effect on Hispanic or African-American voters, and the record contains no evidence to support a finding that *every* proponent of SB 14 supported or voted for SB 14 as a deliberate attempt to deny or abridge the rights of Hispanic or African-American voters. Plaintiffs' proposed finding that "proponents of SB 14" acted for a racially discriminatory purpose requires the Court to engage in speculation.

5.   Plaintiffs' proposed conclusion is wrong for the reasons set forth for Defendants' Proposed Conclusion of Law.

6.     Defendants do not dispute that the minority population in Texas is growing. More relevant, however, the Texas Legislature considered the issue of voter ID at a time when then there was a national movement to ensure the integrity of elections and to promote public confidence in the electoral system. *See* Defendants' Proposed Findings of Fact ¶¶ 52-92. The voter ID bills considered by the Texas Legislature between and 2005 and 2011 were among the "nearly 1,000" voter ID "bills introduced in a total of 46 states" between 2001 and 2011. DEF0053 (National Conference of State Legislatures, *Voter Identification Requirements* (April 7, 2012)) at 5 (ROA.78671). At the same time, as Plaintiffs point out, the demographics of Texas were changing.

7.     Defendants do not dispute that the minority population in Texas grew substantially between 2000 and 2010. Plaintiffs, however, have failed to produce any evidence that any Republican legislator was the least bit concerned with the demographic changes occurring in Texas. In fact, while these demographic changes were occurring, Republicans in Texas were achieving historic political gains. *See* Defendants' Proposed Findings of Fact ¶ 150.

8.     Defendants do not dispute that the minority population in Texas grew substantially between 2000 and 2010.

9.     Although Texas became a majority-minority state in 2004, that fact was not known until August 2005, after the close of the 79th Legislature, which considered the Republicans' first voter ID bill, H.B. 1706. *See* Defendants' Proposed Conclusions of Law ¶ 89. This timing rebuts Plaintiffs' suggestion that the State's changing demographics motivated the Legislature to enact a voter ID law.

10.     Plaintiffs' proposed finding has no basis in the record. That other courts have found racial polarization in other cases based on specific claims and elections does

not support a finding that voting is racially polarized in any part of the State, let alone that voting is racially polarized as a matter of law in every part of the State and in every election. Plaintiffs cannot meet their burden of proof in this case by citing opinions rendered in other cases.

11.   Texas has not conceded, in this or other pending litigation, that racially polarized voting exists in any part of the State. Texas has acknowledged that in partisan general elections, a majority of non-Hispanic white voters tend to favor Republican candidates, a majority of Hispanic voters tend to favor Democratic candidates, and a majority of African-American voters tend to support Democratic candidates. That does not prove that racially polarized voting exists in the State. The tendency of general-election voters to favor candidates of a particular party persists regardless of the race of the candidates. Plaintiffs have introduced no evidence, and the State has certainly not conceded in any pending case, that voting patterns are motivated by race as opposed to partisan preference. There is no evidence, for instance, that non-Hispanic white Republican voters will not support Hispanic or African-American Republican candidates. Without evidence that voting patterns are motivated by race and not by partisan preference, the Court has no basis to find that racially polarized voting exists. *See, e.g., LULAC v. Clements*, 999 F.2d 831, 852-61 (5th Cir. 1993) (en banc). Plaintiffs' proposed finding has no evidentiary support.

12.   Plaintiffs' proposed finding is not supported by the cited documents. The cited statistical analyses of voting patterns in Texas elections were conducted for the purpose of litigation to assist in identifying voting patterns in past elections and determining whether and to what extent racially polarized voting may have occurred in specific elections held in specific districts. That the documents are titled "Racially Polarized Voting Analysis" does not amount to a concession that racially polarized voting exists as a matter of fact or law.

3

13.   The cited statistics do not support a finding of racially polarized voting because they indicate that voting patterns are motivated by partisan preference, not racial considerations. *See Clements*, 999 F.2d at 852-61. Defendants do not dispute that more Anglo voters have supported Republican candidates for President and Governor. Anglo support for Republicans, however, confirms that the Texas Legislature could not have enacted S.B. 14 with a discriminatory purpose, because Plaintiffs' experts' analyses included a finding that more Anglo voters lack S.B. 14 ID than African-American and Hispanic voters *combined* (*see* Defendants' Proposed Findings of Fact ¶¶ 218-220). *See Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 275 (1979); Defendants' Proposed Conclusions of Law ¶ 47.

14.   This proposed finding is not supported by the cited quotations. Neither Ken Emanuelson nor Kenny Marchant were members of the Texas Legislature in 2011. The unsworn hearsay statements attributed to them do not support any statement about the views of "Republican Party leaders and activists." These statements were made by persons outside the Texas Legislature and, therefore, are not relevant to this Court's analysis. *See supra*, ¶ 3.

15.   Defendants do not dispute that while demographic changes Plaintiffs point to were occurring, Republicans in Texas were achieving historic political gains. *See* Defendants' Proposed Findings of Fact ¶ 150.

16.   Plaintiffs' recitation of the facts is misleading. Plaintiffs provide no evidence that proponents of voter ID supported the legislation for race-based reasons. Even opponents of voter-ID legislation rejected that proposition. *See id.* ¶¶ 162-163. Support for voter ID in the Texas Legislature was divided along political—not racial—lines. Republicans in the Senate uniformly supported S.B. 14; Democrats uniformly opposed it. S.J. of Tex., 82d Leg., R.S. 2084 (May 9, 2011) (ROA.71816). S.B. 14 was

supported by all Republican Members of the Texas House, including Hispanic and African-American Republicans. *Id.* (reporting that Representatives Aaron Peña, Jose Aliseda, John Garza, Dee Margo, James White, and Stefani Carter voted for S.B. 14); *see also* Trial Tr. 291: 20-293:6 (Sept. 2, 2014) (Golando) (ROA.98923-25) ("Q: Did any members of [the Mexican American Legislative Caucus] vote for S.B. 14? A: Yes."). Democrats overwhelmingly opposed the bill, although two Democratic House Members voted for the bill—Representatives Craig Eiland and Joe Pickett. Confirming that support for S.B. 14 was divided along political and not racial lines, three Republicans who voted in favor of S.B. 14, including one Hispanic representative, only began to support voter ID after they switched parties. *See* Defendants' Proposed Findings of Fact ¶ 92.

17.   Plaintiffs' recitation of the facts is misleading. Plaintiffs ignore that it was not just the Texas Legislature that recognized that requiring voters to identify themselves can prevent fraud. This was also recognized by numerous other States, the federal government, two bipartisan commissions, and large majorities of the public. *See* Defendants' Proposed Findings of Fact ¶¶ 54-85. In any event, acts by long-dead legislators are not relevant to this Court's analysis. *See supra*, ¶ 3.

18.   Plaintiffs' recitation of the facts is misleading. As the Fifth Circuit instructed, only recent judicial findings of racial discrimination are relevant to this Court's analysis. *Veasey*, 830 F.3d at 231-33. That leaves Plaintiffs with one purportedly helpful data point: in *Texas v. United States*, 887 F. Supp. 2d 133, 159-66 (D.D.C. 2012), *vacated and remanded on other grounds*, 133 S. Ct. 2885 (2013), a vacated opinion from a three-judge district court purported to find that the 2011 Texas Legislature created two redistricting plans with a discriminatory purpose. But that case cannot possibly

support a discriminatory-purpose finding here for the reasons discussed in Defendants' Proposed Conclusions of Law. *See* Defendants' Proposed Conclusions of Law ¶¶ 66-68.

19.   Plaintiffs' recitation of the facts is misleading. The Fifth Circuit has already rejected reliance on the redistricting plan enacted by the Texas Legislature in 2003, which was *not* found to be intentionally discriminatory. *Veasey*, 830 F.3d at 232-33. In addition, the opinion of the three-judge court in *Texas v. United States*, 887 F. Supp. 2d 133, cannot possibly support a discriminatory-purpose finding here for the reasons discussed in Defendants' Proposed Conclusions of Law. *See* Defendants' Proposed Conclusions of Law ¶¶ 66-68. Finally, a redistricting plan enacted by the Texas Legislature 40 years before it enacted S.B. 14 is not relevant to this Court's analysis. *See supra*, ¶ 3.

20.   Defendants do not dispute that in 1975, the Texas Legislature enacted Senate Bill 300, which included a requirement that all voters reregister. *See Flowers v. Wiley*, 675 F.2d 704, 705 (5th Cir. 1982). Nor do Defendants dispute that the Department of Justice ("DOJ") objected and denied preclearance of the law. Defendants dispute the implication, however, that SB 300 could be taken as an indication that SB 14, or any other bill, was motivated by intentional racial discrimination. The DOJ objected to SB 300 only "insofar as [it] requires a purge of all currently registered voters." ECF No. 670-20 at 25 (ROA.42029). But it expressly stated, "Our analysis has revealed nothing to suggest a discriminatory purpose to the purge involved here." *Id.* at 26 (ROA.42030). The DOJ denied preclearance based on the possibility that the provision might have a discriminatory effect. *Id.* at 27-28 (ROA.42031-32). A federal court enjoined the law because it had not been precleared. A three-judge district court in Texas considered whether the bill "was subject to preclearance under Section 5 of the Voting Rights Act and, if so, whether an injunction should issue preventing its

implementation until it was precleared." *Flowers*, 675 F.2d at 705-06. The Fifth Circuit noted, "This was an issue on which it is hardly conceivable that the plaintiffs could possibly lose." *Id.* at 706. The Fifth Circuit explained that the plaintiffs were "undoubtedly correct" that "the substantive issue concerning the effect of [the bill] was solely within the province of the District of Columbia district court or the Attorney General of the United States." *Id.* at 705. The cited sources thus indicate that SB 300 was enjoined by a federal court because it had not been precleared and that preclearance was denied based on potential discriminatory effect, not because of a discriminatory purpose. In any event, actions by long-dead legislators are not relevant to this Court's analysis. *See supra*, ¶ 3. As Defendants have explained, the most recent and relevant history of the Texas Legislature is further evidence that S.B. 14 was *not* enacted with a discriminatory purpose. *See* Defendants' Proposed Conclusions of Law ¶¶ 63-73.

21.   Plaintiffs' recitation of the facts is misleading. The opinion of the three-judge court in *Texas v. United States*, 887 F. Supp. 2d 133, cannot possibly support a discriminatory-purpose finding here for the reasons discussed in Defendants' Proposed Conclusions of Law. *See* Defendants' Proposed Conclusions of Law ¶¶ 66-68. If that vacated opinion retained any continuing force, which it does not, it would be undermined by the United States' confession in the United States Supreme Court that the district court clearly erred in purporting to find that the State's Senate redistricting plan was intentionally discriminatory. *See* Motion to Affirm in Part at 28, *Texas v. United States*, No. 12-496, 2012 WL 6131636, at *28 (U.S. Dec. 7, 2012) *Texas v. United States*, 133 S. Ct. 2885 (2013) (No. 12-496), 2012 WL 6131636, at *28. Meanwhile, Plaintiffs take the statement of the three-judge court in *Perez v. Texas* that the Texas Legislature "*may* have focused on race to an impermissible degree by targeting low-turnout Latino precincts" when drawing a single Texas House District (*Perez v.*

*Texas*, No. 5:11-cv-360, slip. op. at 6 (W.D. Tex. Mar. 19, 2012) (emphasis added))
wildly out of context. The only question before the court was whether plaintiffs' claim
of discrimination was "insubstantial." *Id.* The court never found that the Texas Leg-
islature had, in fact, acted with discriminatory intent in drawing the contested House
district. This statement, therefore, cannot support Plaintiffs' claim. *See Veasey*, 830
F.3d at 233 (rejecting reliance on a decision that rejected a congressional district be-
cause "the [c]ourt did not base its decision on a conclusion that the legislature inten-
tionally discriminated based upon ethnicity").

22.   Defendants do not dispute that these lawsuits were filed, but they provide no
evidence of intentional racial discrimination by the State. The cases cited by Plaintiffs
relate to acts by those outside the Texas Legislature. Accordingly, they are irrelevant
to this Court's inquiry. *See supra*, ¶ 3.

23.   For the purposes of the Court's determination as to whether the Texas Leg-
islature acted with discriminatory purpose when it enacted S.B. 14, Defendants do
not dispute these facts, but they provide no evidence of intentional racial discrimina-
tion by the State. The cases cited by Plaintiffs relate to acts by those outside the Texas
Legislature. Accordingly, they are irrelevant to this Court's inquiry. *See supra*, ¶ 3.

24.   Plaintiffs' recitation of the facts is misleading. Defendants do not dispute that
the DOJ has objected to preclearance of laws enacted by the Texas Legislature, in-
cluding three objections since 2000, one of which concerned S.B. 14. An objection by
DOJ is not evidence that a jurisdiction acted for a racially discriminatory purpose.
Regardless, none of the three recent DOJ objections cited by Plaintiffs accused the
Texas Legislature of enacting a law with a racially discriminatory purpose, as that is
not the standard under which DOJ decides whether to object. *See, e.g.*, *Beer v. United
States*, 425 U.S. 130, 141 (1976) ("[T]he purpose of [preclearance under Section 5 of

the Voting Rights Act] has always been to insure that no voting-procedure changes would be made that would lead to a retrogression in the position of racial minorities with respect to the effective exercise of the electoral franchise."). *See* PL1130 (ROA.56411-16, 56426-28, 56455-60). Indeed, even DOJ's objection to S.B. 14 was limited to its purported retrogressive effect; DOJ did not contend at the time that S.B. 14 was enacted with a discriminatory purpose. *See id.* (ROA. 56455-60). The remaining objection letters concern Texas sub-jurisdictions and are, therefore, irrelevant. *See supra*, ¶ 3. The only judgment that Plaintiffs can point to in the last 40 years purporting to find that the Texas Legislature enacted a law with a racially discriminatory purpose (*Texas v. United States*, 887 F. Supp. 2d 133) was vacated by the Supreme Court. *See Texas v. United States*, 133 S. Ct. 2885 (2013); *see* Defendants' Proposed Conclusions of Law ¶¶ 66-68. This leaves Plaintiffs with no "support for a finding of 'relatively recent' discrimination." *Veasey*, 830 F.3d at 233.

25.   Plaintiffs' recitation of the facts is misleading. Defendants do not dispute that the DOJ has objected to laws enacted by the Texas Legislature. In *none* of the cited instances involving the Texas Legislature, however, did DOJ accuse the Texas Legislature of enacting a law with a racially discriminatory purpose. *See* PL1130 (ROA.56411-16, 56426-28); PL673 (ROA.41977-80). The remaining objection letters cited by Plaintiffs concern Texas sub-jurisdictions and are, therefore, irrelevant. *See supra*, ¶ 3.

26.   For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts. The lawsuits cited by Plaintiffs, however, relate to acts by those outside the Texas Legislature. Accordingly, they are irrelevant to this Court's inquiry. *See supra*, ¶ 3. Moreover, "[i]t is fundamental that unproven allegations are not proof of their content." *Scantek Med., Inc. v. Sabella*, 693 F. Supp. 2d 235, 241 n.1

(S.D.N.Y. 2008); *accord, e.g.*, *Wright v. Farouk Systems, Inc.*, 701 F.3d 907, 911 n.8 (11th Cir. 2012) (rejecting reliance on "complaints . . . from other lawsuits," "because pleadings are only allegations, and allegations are not evidence of the truth of what is alleged").

27.   Defendants do not dispute that the court so held. The case cited, however, has nothing to with racial discrimination (*see OCA Greater Houston v. Texas*, 2016 WL 4597636 (W.D. Tex. Sept. 2, 2016)) and, therefore, is not "support for a finding of 'relatively recent' discrimination." *Veasey*, 830 F.3d at 233.

28.   Defendants do not dispute that Texas began enforcing S.B. 14 after the decision denying preclearance to the law was vacated by the Supreme Court. *See Texas v. Holder*, 133 S. Ct. 2886 (2013). The other acts cited by Plaintiffs were purportedly undertaken by Texas sub-jurisdictions and are, therefore, irrelevant. *See supra*, ¶ 3.

29.   For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute that socioeconomic disparities persist between Anglo Texans and Hispanic Texans and between Anglo Texans and African-American Texans.

30.   Plaintiffs have not carried their burden to prove that socioeconomic disparities in the State are the result of racial discrimination against Hispanic or African-American individuals in any area of public life, whether by state law, state officials, or non-state actors. The general notion that racial discrimination causes socioeconomic disparity, even if true, does not provide any basis to evaluate Plaintiffs' claims of intentional racial discrimination by the Texas Legislature in enacting S.B. 14. Without more explanation of the causal link, if one exists, between particular acts of discrimination and particular results, allegations by Plaintiffs and their experts that past discrimination by the State caused current socioeconomic conditions amounts to

10

speculation. Acts by those outside the Texas Legislature are irrelevant to this Court's analysis. *See supra*, ¶ 3.

31.   Defendants do not dispute that in Texas, as in other States, local school districts continued to oppose integration of schools after the end of de jure school segregation. *See, e.g.*, *Coal. to Save Our Children v. State Bd. of Educ. of State of Del.*, 90 F.3d 752 (3d Cir. 1996); *Hoots v. Penn.*, 272 F. Supp. 2d 539 (W.D. Pa. 2003); *Berry v. Sch. Dist. of City of Benton Harbor*, 195 F. Supp. 2d 971 (W.D. Mich. 2002), *order clarified*, 206 F. Supp. 2d 899 (W.D. Mich. 2002); *United States v. Yonkers Bd. of Educ.*, 123 F. Supp. 2d 694 (S.D.N.Y. 2000); *Vaughns v. Bd. of Educ. of Prince George's Cnty.*, 941 F. Supp. 579 (D. Md. 1996); *Arthur v. Nyquist*, 904 F. Supp. 112 (W.D.N.Y. 1995). Acts by those outside the Texas Legislature, however, are irrelevant to this Court's analysis. *See supra*, ¶ 3.

32.   Defendants do not dispute the existence of the cited cases, but the facts stated do not support a claim that the Texas Legislature engaged in intentional racial discrimination when it enacted S.B. 14. To the extent Plaintiffs' proposed finding refers to acts by those outside the Texas Legislature, it is irrelevant to this Court's analysis. *See supra*, ¶ 3. To the extent Plaintiffs refer to statements or decisions regarding the State made in 1970 and 1983, they fail to explain how those statements are relevant to the purpose of S.B. 14.

33.   Defendants do not dispute that Austin and Houston resolved desegregation lawsuits in 1983, but Defendants dispute the relevance and accuracy of the proposed finding that Dallas "did not fully eliminate the vestiges of racial discrimination in its school system until 2003." The cited case indicates that the Dallas Independent School District achieved unitary status in 1994. *See Tasby v. Moses*, 265 F. Supp. 2d 757, 764 (N.D. Tex. 2003). To obtain unitary status, a school district must "prove that

it has complied in good faith with this Court's desegregation orders for a reasonable period of time, and has eliminated the vestiges of prior discrimination to the extent practicable." *Tasby v. Woolery*, 869 F. Supp. 454, 456 (N.D. Tex. 1994). That federal courts monitor the "desegregation obligations" of the Texas Education Agency and local school districts does not inform the Court's determination whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14. Plaintiffs do not identify any act by the Texas Education Agency, and acts by those outside the Texas Legislature are irrelevant to this Court's analysis. *See supra*, ¶ 3.

34.    Defendants do not dispute the general proposition that segregation and racial discrimination in education impaired racial minorities' educational opportunity in the past, but that general proposition does not inform the Court's determination whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14. To the extent Plaintiffs refer to acts by those outside the Texas Legislature, those acts are irrelevant to this Court's analysis. *See supra*, ¶ 3. Even to the extent Plaintiffs refer to discrimination by the State, they do not explain the causal connection, if any, between impairment of educational opportunity by past discrimination and current disparities in educational performance.

35.    Defendants do not dispute the general proposition that disciplinary procedures are linked, to some unspecified degree, to drop-out rates, but Defendants dispute the proffered statistics regarding removal and disciplinary procedures. Plaintiffs do not explain what they mean by "comparable low-level infractions," and they provide no context for the allegation that African-American students are "31% more likely to face school disciplinary procedures." Even if accurate, these statistics do not inform the Court's determination whether the Texas Legislature acted with a discriminatory purpose when it enacted S.B. 14. Plaintiffs do not identify any acts by

12

the State with respect to school discipline, and they do not identify any actor responsible for the "re-segregation" of schools. Acts by those outside the Texas Legislature are irrelevant to this Court's analysis. *See supra*, ¶ 3.

36.   Defendants have no basis to dispute the statistics offered by Plaintiffs, but those statistics do not inform the Court's determination whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14. Acts by those outside the Texas Legislature are irrelevant to this Court's analysis. *See supra*, ¶ 3. Plaintiffs do not attribute the cited statistics to any particular actor or any particular cause, and they do not explain how they relate to S.B. 14. Without more information about the characteristics of individuals who lack a high school diploma or equivalent, it is not possible to draw any inference from the statistics.

37.   Defendants do not dispute that racial discrimination in employment, to the extent it exists, disadvantages African-American and Latino residents, but Plaintiffs' proposed finding does not indicate the extent of alleged racial discrimination in employment by state or local agencies. That a state agency, a county, and certain cities have entered into consent decrees or settlements to remedy race-based employment discrimination does not support an inference of intentional racial discrimination by any of the agencies involved, much less by the Texas Legislature in enacting S.B. 14. Acts by individuals or agencies other than the Texas Legislature are irrelevant to this Court's analysis. *See supra*, ¶ 3. Without more specific information about the particular practices and claims, it is not possible to draw any inference. In any case, entry into a consent decree or settlement of a claim "to remedy employment discrimination on the basis of race" demonstrates an effort to avoid and prevent race-based discrimination, not a desire to engage in it. That a city police chief admitted nearly 20 years ago to using unspecified racially derogatory language in the workplace is not relevant to the Texas Legislature's purpose in enacting S.B. 14 in 2011.

38.   Defendants do not dispute that race-based employment discrimination tends to impair employment opportunities for members of racial minorities; however, Plaintiffs' unsupported, nonspecific statement does not inform the Court's determination whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14.  Plaintiffs do not explain how race-based employment discrimination—either generally or in the instances referred to by Plaintiffs—relates to the cited unemployment statistics, and they have not proven that any causal connection exists. Any connection between the cited unemployment statistics and employment discrimination, generally or in specific instances, would rest purely on speculation. To the extent Plaintiffs intend to imply any such connection, Defendants dispute it. And to the extent Plaintiffs rely on acts of discrimination by those outside the Texas Legislature, those acts are irrelevant to this Court's analysis. *See supra*, ¶ 3. The cited statistics do not support Plaintiffs' proposed finding.

39.   For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute that race is correlated with housing patterns in certain parts of Texas (as in the rest of the country). But Plaintiffs cite no evidence demonstrating how this affects access to state offices and the services they provide. Plaintiffs also do not explain how this relates to any action by the State, nor do they explain how this informs the question whether the Texas Legislature engaged in intentional racial discrimination when it enacted S.B. 14.  Acts by those outside the Texas Legislature are irrelevant to this Court's analysis. *See supra*, ¶ 3.

40.   For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute that, in 1927, the Texas Legislature enacted a zoning statute that facilitated housing segregation. But Plaintiffs attribute the fact that race still correlates

14

with housing patterns in certain parts of Texas to "local zoning, restrictive covenants, and policies of municipal housing authorities," yet they do not explain how this relates to any action by the State, nor do they explain how this informs the question whether the Texas Legislature engaged in intentional racial discrimination when it enacted S.B. 14. Acts by those outside the Texas Legislature are irrelevant to this Court's analysis. *See supra*, ¶ 3.

41.   Defendants do not dispute that a federal district court so found. Discriminatory zoning decisions by the town of Sunnyvale are not relevant to the Texas Legislature's purpose when it enacted S.B. 14. *See supra*, ¶ 3.

42.   Defendants do not dispute the general proposition that housing discrimination, to the extent it occurs, can contribute to racial disparities in home ownership, nor do Defendants dispute the home-ownership statistics offered by Plaintiffs. But Plaintiffs do not explain how the cited home-ownership statistics result from race-based housing discrimination, if they do at all, and they offer no proof of any causal relationship. The cited statistics provide no support for the proposed finding.

43.   Plaintiffs' recitation of the facts is misleading. Plaintiffs cite no evidence suggesting that any Texas legislator has used "code words" to secretly espouse racist views. Any actions by those outside the Texas Legislature are irrelevant. *See supra*, ¶ 3.

44.   Plaintiffs' recitation of the facts is misleading. Even if the 2008 mailer could be interpreted as making a racial appeal, which is not at all clear from the description or the exhibit, the conduct of a political action committee cannot be attributed to the Texas Legislature. Acts by those outside the Texas Legislature are irrelevant to this Court's analysis. *See supra*, ¶ 3.

45.   These facts are irrelevant to the question before the Court, and Plaintiffs' reliance on them ignores the Fifth Circuit's decision in this case. Plaintiffs cite no evidence that any part of the 2014 Republican platform was the result of racial animus, and they do not explain what connection selected elements of a party platform from 2014 have, if any, with the Texas Legislature's purpose when it enacted S.B. 14 in 2011. The Fifth Circuit rejected the notion that support for policies—immigration reform was the example cited by the court—with legitimate objectives can be evidence of racial animus simply because *opponents* of such policies, like Plaintiffs, speculate that those polices are the product of racial animus. *Veasey*, 830 F.3d at 233-34 & n.16. Plaintiffs' bootstrapping is not a substitute for evidence.

46.   Plaintiffs' recitation of the facts is misleading, and it ignores the Fifth Circuit's decision in this case. Plaintiffs point to no evidence—and there is none—that any member of the Texas Legislature attempted to link voter fraud with the poor or the "inner city." And, concerning statements made about unlawful immigration, as the Fifth Circuit stated, there is no support for the "premise that a legislator concerned about border security or opposed to the entry into Texas of undocumented immigrants is also necessarily in favor of suppressing voting by American citizens of color." *Id.* at 233 n.16.

In support of this proposed factual finding as it relates to then-Lieutenant Governor Dewhurst, Plaintiffs cite an expert report. *See* PL760 at 39-40 (Burton Rep.) (ROA.44025-26). But Dr. Burton's assertion about Dewhurst relies on nothing more than a *proposed* finding of fact filed in the Section 5 case. *See id.* at 39 n.133 (ROA.44025). Plaintiffs cite no actual evidence to support their assertion. Any citation by Plaintiffs to one of their experts' reports in support of a proposed factual finding should be viewed with suspicion by the Court.

16

47.   Have no knowledge whether or not the King Street Patriots posted the referenced photograph. But statements made by persons outside the Texas Legislature do not reflect the views of the Legislature and are irrelevant to this Court's analysis. *See supra* ¶ 3. Furthermore, a photograph posted in 2012 cannot inform the question whether the Texas Legislature engaged in intentional racial discrimination when it enacted S.B. 14 in 2011. Isolated and ambiguous statements made by legislative proponents after enactment are irrelevant to this Court's analysis. *See supra* ¶ 3.[1]

48.   Defendants recognize that this Court and the Fifth Circuit have concluded that S.B. 14 has a discriminatory effect on minority voters under Section 2 of the Voting Rights Act. Defendants, however, continue to maintain that that conclusion is based on an incorrect interpretation of Section 2 and clearly erroneous findings of fact. *See* Pet. for Writ of Cert., *Abbott v. Veasey*, No. 16-393 (U.S. Sept. 23, 2016). In any event, the Texas Legislature, relying on academic studies and the experiences of other states, concluded that S.B. 14 would *not* have a discriminatory effect. *See* Defendants' Finding of Fact ¶¶ 207-215. None of the evidence Plaintiffs cite in support of their findings concerning the impact of S.B. 14 was before the Texas Legislature when it considered S.B. 14. Accordingly, this evidence—which the Texas Legislature would have been entitled to reject in favor of contrary evidence—is irrelevant. *See* Defendants' Proposed Conclusions of Law ¶¶ 34-43.

49.   For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts. These facts, however, are not relevant for the reasons stated above in paragraph 48.

---

[1]     In any event, as Plaintiffs concede, the complained-of photo included a white individual as well.

50.   For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts. These facts, however, are not relevant for the reasons stated above in paragraph 48.

51.   For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts. These facts, however, are not relevant for the reasons stated above in paragraph 48.

52.   Defendants do not dispute that Drs. Burden, Barreto, and Sanchez so found. The Texas Legislature, however, relying on academic studies and the experiences of other states, legitimately concluded that S.B. 14 would *not* have a discriminatory effect. *See* Defendants' Finding of Fact ¶¶ 207-215. In any event, these analyses were not before the Texas Legislature at the time it was considering S.B. 14. Accordingly, they are not relevant for the reasons stated above in paragraph 48.

53.   For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts. These facts, however, are not relevant for the reasons stated above in paragraph 48.

54.   For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts. These facts, however, are not relevant for the reasons stated above in paragraph 48.

55.   For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do

not dispute these facts. These facts, however, are not relevant for the reasons stated above in paragraph 48.

56. Defendants do not dispute that Reverend Johnson so testified.

57. Defendants do not dispute that Reverend Johnson so testified.

58. For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts.

59. For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts.

60. For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts.

61. For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts.

62. For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts.

63. For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute that Ingram so testified. Defendants dispute that the fact of his testimony had any legal effect.

64.   Defendants do not dispute SB 14 requires nearly all in-person voters to present specified valid photo ID or ID expired within 60 days to cast a valid ballot. Defendants dispute the statement that statutory exemptions are "narrow in scope" or "burdensome," which is not supported by the evidence.

65.   For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts.

66.   For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts.

67.   For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts.

68.   For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts.

69.   For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute that voters who qualify for a disability exemption under the Texas Election Code may vote in person without a photo ID.

70.   For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts.

71.   For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts.

72.   For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts.

73.   Defendants do not dispute that the Texas Legislature considered and debated the issue of voter ID for six years before the passage of S.B. 14. The voter ID bills considered and supported by Republicans in 2005, 2007, and 2009 each allowed for a mix of photo and non-photo ID. *See* Defendants' Proposed Findings of Fact ¶¶ 112-148. Defendants dispute Plaintiffs' characterization of any bill as "restrictive."

74.   For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts.

75.   For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts.

76.   For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts.

77.   For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts.

78.  For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts.

79.  For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts.

80.  Defendants do not dispute that Republicans in the Texas House attempted to compromise with Democrats by "add[ing] ameliorative provisions—including $7.5 million to encourage voter registration—"to S.B. 362 (Pls.' Proposed Findings of Facts ¶ 80), but that these efforts to compromise were rejected by Democrats, who instead hurled accusations of racial discrimination at Republicans and shut down the legislative process through an extraordinary procedural maneuver in order to block the will of a majority of Texans and the majority of the Texas Legislature. *See* Defendants' Proposed Findings of Fact ¶¶ 144-148.

81.  Plaintiffs' recitation of the facts is misleading. There is only one truly radical departure from the ordinary procedural sequence by proponents of voter ID in the entire record: Lieutenant Governor Dewhurst gave the Democrats a do-over after the voter-ID bill had passed the Senate. The Democrats took advantage of that unheard-of courtesy by killing the bill. *See id.* ¶¶ 134-136. In 2011, proponents of S.B. 14, including the Governor, worked within the rules to make sure that opponents of voter-ID legislation could not abuse the legislative process and prevent a vote on a popular bill, which would have had serious political costs for S.B. 14's proponents. *See id.* ¶¶ 89-90, 152-56.

22

82.   For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts.

83.   For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts.

84.   For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts. Both parties believed that it was in everyone's best interest to get voter ID out of the way so that other important legislative business could be conducted. *See* Defendants' Proposed Findings of Fact ¶¶ 153-155.

85.   Plaintiffs' recitation of the facts is misleading. As Plaintiffs acknowledge, the governor's designation of the issue of voter ID as "emergency" was not done to suggest that there was imminent danger to the administration of elections in Texas any more than the governor's designation of the issue of a resolution regarding a federal balanced budget amendment as "emergency" at the same time was meant to suggest that there was imminent danger to the country's finances. *See id.* ¶ 154; Plaintiffs' Proposed Findings of Fact ¶ 84; *see also* Dewhurst Dep. 153:7-13 (ROA.60391) ("Q. Was [S.B. 14] the first piece of business—first piece of legislation that the Senate was taking up in 2011? A. . . . I recall that the first bill I moved was not a bill but a resolution on the balanced budget amendment for the U.S. Congress."). The purpose was to express a legislative priority and help avoid a repeat of the legislative shutdown perpetrated by Democrats in 2009. *See id.*

86.   For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts.

87.   Defendants do not dispute that the quote from Senator Lucio is correct. Senator Lucio was mistaken, however. Discarding the two-thirds rule did not silence his constituents: Senator Lucio spoke extensively against S.B. 14 during debate on the bill. *See, e.g.*, DEF0001 (Debate on S.B. 14 in the Senate Committee of the Whole, 82d Leg., R.S., 174:10-186:23 (Jan. 25, 2011) (ROA.68976-79)); *id.*, (Debate on S.B. 14 in the Senate Committee of the Whole, 82d Leg., R.S., Vol. I, pp. 14-16 (Jan. 26, 2011)) (ROA.70160-62)); *id.*, (Debate on S.B. 14 in the Senate Committee of the Whole, 82d Leg., R.S., Vol. II, pp. 16-18, 23-26 (Jan. 26, 2011)) (ROA.70202-04, 70209-12)); *id. id.*, (Debate on S.B. 14 in the Senate Committee of the Whole, 82d Leg., R.S., Vol. III, p. 15 (Jan. 26, 2011)) (ROA.70245)). This debate would have not have been possible if Democrats were permitted to continue to block consideration of voter ID. It was Senator Lucio and his fellow Democrats who sought to silence their opponents. Not vice versa.

88.   Plaintiffs' recitation of the facts, which relies on the self-serving characterizations of voter ID opponents, is misleading. The two-thirds rule was regularly discarded when necessary to overcome the intransigence of the minority in the Texas Senate. *See* Defendants' Proposed Findings of Fact ¶¶ 121-125.

89.   Plaintiffs' recitation of the facts is misleading. Republicans in 2005 and 2007 did not attempt to "circumvent" the two-thirds rule (Pls.' Proposed Findings of Fact ¶ 89); rather, they used common legislative practices to work within the confines of the rule in an attempt to have open debate and an up-or-down vote on a voter ID bill. *See* Defendants' Proposed Findings of Fact ¶¶ 134-136.

Moreover, it was the absence of Senator Whitmire, *not* Senator Gallegos, that allowed Republicans to achieve the two-thirds' support necessary to debate and vote on H.B. 218. *See id.* When Senator Whitmire belatedly returned to the Senate floor and profanely protested, Lt. Gov. Dewhurst, "knowing that this [was] an important bill to the Democrats," "bent over backwards to respect" the opposition, and allowed another vote. On the second vote, Democrats blocked H.B. 218 from coming up for a vote. Dewhurst Dep. 48:23-49:19 (ROA.60364-65). This was an extraordinary concession never before seen in the Texas Senate. *See* Defendants' Proposed Findings of Fact ¶ 136.

Finally, contrary to Plaintiffs' suggestion, it was a *Republican* Senator—Dr. Bob Deuell—who set up a hospital bed for Senator Gallegos so that Gallegos would have the opportunity to vote on all legislation. As Democratic Senator Eliot Shapleigh acknowledged: "Some Republicans who favor the voter ID bill have been considerate of Gallegos, including Greenville Republican Sen. Bob Deuell. Deuell, a physician, *ordered the hospital bed delivered for his Democratic colleague*. And Lt. Gov. David Dewhurst *didn't push for a vote when Gallegos was absent one day for a biopsy on his liver*." Press Release, Senator Eliot Shapleigh (May 23, 2007) (emphases added), http://shapleigh.org/news/1303-hospital-bed-handy-for-gallegos-senate-ill-will.

90.   Defendants do not dispute that Republicans, after years of intransigence by Democrats, followed a long line of precedent and worked within the rules in discarding the two-thirds rule in order to allow full debate and an up-or-down vote on the issue of voter ID. *See* Defendants' Proposed Findings of Fact ¶¶ 122-125.

91.   Plaintiffs' recitation of the facts is misleading. Although S.B. 14 called for $2 million to be spent on voter outreach, the money for this effort was already available from the federal government "and would offset the fiscal note." DEF0001 (Debate on S.B. 14 in the Senate Committee of the Whole, 82d Leg., R.S., 47:19-48:23 (Jan. 25, 2011) (ROA.68944)); *see also id.* 437:1-441:44 (ROA.69042-43) (Secretary of State's testimony on funding).

92.   Defendants do not dispute that in order to focus consideration of S.B. 14 in the House, the Speaker of the House established a Select Committee to consider the bill. *See* Defendants' Proposed Findings of Fact ¶ 177. The Select Committee considered testimony from nearly 40 witnesses on the merits of S.B. 14. DEF0001 (Tex. Leg., House Select Committee on Voter Identification and Voter Fraud, Minutes, 82d Leg., R.S. (Mar. 1, 2011) (ROA.70327-29)). Consideration by the Select Committee thus did not "prevent[] meaningful negotiation" on an issue that had been debated for six years. Pls.' Proposed Findings of Fact ¶ 92. Democrats had shown for years that they were uninterested in negotiation or compromise on voter ID.

93.   Defendants do not dispute that Speaker Straus appointed the members of the Select Committee, including appointing then-Representative and now Plaintiff Marc Veasey, a Democrat and vocal opponent of voter-ID laws, as vice-Chair of the Select Committee on Voter Fraud, where then-Representative Veasey was able to voice his concerns and propose changes to legislation. Trial Tr. 237:19-239:2; 248:14-16 (Sept. 2, 2014) (Veasey) (ROA.98869-71; ROA.98880).

94.   For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts.

95.  Plaintiffs' recitation of the facts is misleading. Although S.B. 14 called for $2 million to be spent on voter outreach, the money for this effort was already available from the federal government "and would offset the fiscal note." DEF0001 (Debate on S.B. 14 in the Senate Committee of the Whole, 82d Leg., R.S., 47:19-48:23 (Jan. 25, 2011) (ROA.68944)); *see also id.* 437:1-441:44 (ROA.69042-43) (Secretary of State's testimony on funding). Accordingly, S.B. 14 would require no new expenditure.

96.  For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts.

97.  Plaintiffs' recitation of the facts is misleading. The best evidence of the validity of Representative Martinez Fischer's point of order was Speaker Strauss's decision overruling it.

98.  Plaintiffs' recitation of the facts is misleading. The inclusion of the EIC provision was necessary to resolve differences between the House and Senate versions of S.B. 14. The Senate version of S.B. 14 included an exception to the photo-ID requirement for people who are indigent. *See* Defendants' Proposed Findings of Fact ¶ 168. After the Senate's indigency provision was excised at Democratic Representative Anchia's suggestion and with Democratic legislators' votes, the conferees resolved the difference by adding a provision creating EICs, which would be free of charge. *See* DEF0001 (Conference Committee Report, Section-by-Section Analysis at 6-7 (ROA.71765-66)); Trial Tr. 98:14-18 (Sept. 11, 2014) (Williams) (ROA.101283) ("Q: [T]here is no exception in SB 14 for people who are indigent in Texas, correct? A: [T]he Election Identification Certificate is free of charge. That is the exception.").

99.  Plaintiffs' recitation of the facts is misleading. It was *Democrats* in the House who first criticized the indigency provision in S.B. 14 and later voted with Republicans to remove it. *See* Defendants' Proposed Findings of Fact ¶¶ 184-185. The Conferees then added the EIC provision to reconcile the House and Senate versions while making sure that those with less means would not face obstacles to voting. *See* DEF0001 (Conference Committee Report, Section-by-Section Analysis at 6-7 (ROA.71765-66)); Trial Tr. 98:14-18 (Sept. 11, 2014) (Williams) (ROA.101283) ("Q: [T]here is no exception in SB 14 for people who are indigent in Texas, correct? A: [T]he Election Identification Certificate is free of charge. That is the exception."). In addition, the final version of S.B. 14 "require[d] the secretary of state to conduct a statewide effort to educate voters regarding the identification requirements for voting." DEF0001 (Conference Committee Report, Section-by-Section Analysis at 2 (ROA.71761)).

100. Plaintiffs' recitation of the facts is misleading. Although someone in the Secretary of State's office may have communicated an estimate of the number of Texas voters who did not have a Texas driver license or personal ID to a member of Lt. Gov. Dewhurst's staff, that same person warned that the estimate was unreliable because the Secretary of State's office was having problems matching the list of driver's licenses to the list of registered voters. *See* Trial Tr. 72:13-73:2 (Sept. 10, 2014) (Dewhurst) (ROA.100834-35). In any event, Plaintiffs concede that no matching analysis relating to race was performed by the Secretary of State's office until long after the passage of S.B. 14. *See* Pls.' Proposed Findings of Fact ¶ 103.

101. For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts.

28

102. For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts.

103. For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts.

104. For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts. In addition, the Texas Legislature received expert testimony that warned against relying upon this type of database-matching technique. Dr. Toby Moore, the former geographer of the voting section of the Civil Rights Division of the DOJ and a project manager for the Carter-Baker Commission on Election Reform, explained:

> There have been kind of three approaches to trying to identify those without IDs and to determine their demographics. The first approach has been to try to match between data bases, between voter registration databases and Department of Motor Vehicle databases, for example. That has generally not proven to be successful. Those databases are very difficult to match between. There is some interesting information to come out of those attempts. But in general, *I would encourage you to avoid any kind of database matching to arrive at your information.*

DEF0001 (Tex. Leg., Senate Committee of the Whole, 81st Leg., R.S., at 338:17-339:2 (Mar. 10, 2009) (ROA.72516-17) (emphasis added)).

105. For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts.

106. For the purposes of the Court's determination as to whether the Texas Leg-islature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts.

107. For the purposes of the Court's determination as to whether the Texas Leg-islature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts. But, again, the Texas Legislature received expert testimony that warned against relying upon this type of database-matching technique. *See su-pra*, ¶ 104. In any event, Plaintiffs concede that no matching analysis relating to race was performed by the Secretary of State's office until long after the passage of S.B. 14. *See* Pls.' Proposed Findings of Fact ¶ 103.

108. Plaintiffs' recitation of the facts is misleading. Although someone in the Sec-retary of State's office may have communicated an estimate of the number of Texas voters who did not have a Texas driver license or personal ID to a member of Lt. Gov. Dewhurst's staff, that same person warned that the estimate was unreliable because the Secretary of State's office was having problems matching the list of driver's li-censes to the list of registered voters. *See* Trial Tr. 72:13-73:2 (Sept. 10, 2014) (Dewhurst) (ROA.100834-35). In any event, Plaintiffs concede that no matching anal-ysis relating to race was performed by the Secretary of State's office until long after the passage of S.B. 14. *See* Pls.' Proposed Findings of Fact ¶ 103.

109. Defendants do not dispute that the Texas Legislature never received evi-dence regarding the number of Texas voters who lacked S.B. 14 ID. Plaintiffs concede that no matching analysis relating to race was performed by the Secretary of State's office until long after the passage of S.B. 14. *See* Pls.' Proposed Findings of Fact ¶ 103.

110. For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts.

111. Plaintiffs' recitation of the facts is misleading. The cited portion of the record shows that the Secretary of State's analysis was not released for a specific reason: it was still being reviewed and was not ready for release. McGeehan testified that she "probably" asked if the matching analysis could be released, and "probably the response was no, you know, we're still analyzing this." Trial Tr. 303:2-4 (Sept. 8, 2014) (ROA.100297). In response to a question whether Mr. Shorter and Mr. Sepehri had "concerns about the different results from the different queries," McGeehan responded, "We didn't really have a substantive conversation about it, so all I knew was they were still looking at it." *Id.* at 303:10-14 (ROA.100297). That she was not given "any substantive reason as to why it couldn't be released," *id.* at 304:9-11 (ROA.100298), is consistent with her testimony that the analysis was not provided at the time because it was not ready. The cited testimony does not support Plaintiffs' implication that Mr. Shorter and Mr. Sepehri refused to release the analysis without giving a reason.

112. Plaintiffs' recitation of the facts appears to be inaccurate. The cited source does not indicate that the analysis to which McGeehan was referring was given to the Office of the Lieutenant Governor. *See* Trial Tr. 304:21-25 (Sept. 8, 2014) (McGeehan) (ROA.100298).

113. Defendants do not dispute that the court in *Texas v. Holder* rejected preclearance of S.B. 14 on the basis of the law's purportedly retrogressive effect. Texas, however, disputed that S.B. 14 has a retrogressive effect (*see* Appellant's Jurisdictional

Statement, *Texas v. Holder*, No. 12-1028 (U.S. Feb. 19, 2013)), and continues to contend that S.B. 14 does not have a disparate impact on minorities (*see* Pet. for Writ of Cert., *Abbott v. Veasey*, No. 16-393 (U.S. Sept. 23, 2016)). Moreover, the Texas Legislature, relying on academic studies and the experiences of other states, concluded that S.B. 14 would *not* disparately affect minorities. *See* Defendants' Proposed Findings of Fact ¶¶ 207-216. Nonetheless, the Texas Legislature remained open to adjusting the law if future elections demonstrated such a need. *See id.* ¶ 172. But the elections that followed implementation of S.B. 14 only *confirmed* that it would not negatively impact Texas voters, including minorities. *See id.* ¶¶ 45-51. Accordingly, the Texas Legislature had no need to adjust the law.

114. For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts. Plaintiffs, however, continue to ignore that Texas disputes that S.B. 14 has a retrogressive effect. *See supra*, ¶ 113.

115. Defendants do not dispute that Texas began enforcing S.B. 14 after the decision denying preclearance to the law was vacated by the Supreme Court. *See Texas v. Holder*, 133 S. Ct. 2886.

116. Defendants do not dispute that for years Republicans attempted to compromise with Democrats on the issue of voter ID by sacrificing the Republican preference for the security of allowing only photo ID, and that in 2011, with no compromise in sight, Republicans pursued their and their constituents' preference for a law that required voters to produce widely available and widely held photo identification. *See* Defendants' Proposed Findings of Fact ¶¶ 93-99, 112-151, 182-183. The Texas Legislature heard substantial evidence that photo-only voter ID bills do not disparately impact minority voters. *See id.* ¶¶ 207-214.

117. Defendants do not dispute that for years Republicans attempted to compromise with Democrats on the issue of voter ID by sacrificing the Republican preference for the security of allowing only photo ID, and that in 2011, with no compromise in sight, Republicans pursued their and their constituents' preference for a law that required voters to produce widely available and widely held photo identification. *See* Defendants' Proposed Findings of Fact ¶¶ 93-99, 112-151, 182-183. The Texas Legislature heard substantial evidence that photo-only voter ID bills do not disparately impact minority voters. *See id.* ¶¶ 207-214.

118. Defendants do not dispute that for years Republicans attempted to compromise with Democrats on the issue of voter ID by sacrificing the Republican preference for the security of allowing only photo ID, and that in 2011, with no compromise in sight, Republicans pursued their and their constituents' preference for a law that required voters to produce widely available and widely held photo identification. *See* Defendants' Proposed Findings of Fact ¶¶ 93-99, 112-151, 182-183. The Texas Legislature heard substantial evidence that photo-only voter ID bills do not disparately impact minority voters. *See id.* ¶¶ 207-214.

119. Plaintiffs' recitation of the facts is misleading. Although years later, a legislative aide could not give a specific, comprehensive explanation why S.B. 14 contained fewer categories of acceptable ID than S.B. 362, the contemporaneous legislative record shows why. During the House's consideration of S.B. 14, Democratic Representative Anchia inquired as to why "the identification requirements of SB 14 are more restrictive than SB 362 from last session?" DEF0001 (H.J. of Tex., 82d Leg., R.S. 918 (Mar. 21, 2011) (ROA.70855)). The primary sponsor of S.B. 14 in the House responded that:

> We've had two additional years to see that photo ID is working in other
> states. We've also had two additional years to hear from the public on

33

their concerns of the integrity of the ballot box. Only a true photo ID bill
can deter and detect fraud at the polls and can protect the public's con-
fidence in the election.

*Id.* (ROA.70855). As Representative Smith later recounted:

I think everybody understands why non-photo ID was taken out of Sen-
ate Bill 362 [in 2009] because it was just a demand by our constituents
that we require a photo ID in order for people to vote and they were very
cynical about the notion of allowing non-photo IDs . . .. [M]y [primary]
opponent used [my support for non-photo ID] against me in the most
recent election politically without mentioning that he too had voted for
that same version of the bill. So this notion of letting people vote with
their library cards feeds the perception that you're in favor of liberal
laws allowing people to vote even under circumstances where they were
not legally entitled to do so.

Trial Tr. 339:10-22 (Sept. 8, 2014) (Smith) (ROA.100333). Moreover, S.B. 362 allowed

for less reliable ID because Republicans were trying to compromise with Democrats.

By 2011, it was clear that no compromise was possible:

[F]or then six long years, [Dewhurst] had been meeting regularly with
the Democrat Senators to [try to get them to] agree on a bipartisan bill,
because . . . a super majority of, not only Anglo, but Hispanic and African
American voters, during that time period from 2008 through 2011, were
in favor of a Voter ID, and that we really ought to work together and
come up with a bill. [But despite] [a]ll of the flexibility afforded in [H.B.]
218 and [S.B.] 362[, they were] voted against time after time by — by
the Democrat[s] . . . . [So, Dewhurst] discussed with Senator Fraser [S.B.
14's sponsor] that maybe it's time to focus . . . on a bill . . . model[ed]
after the Indiana and Georgia bills.

Dewhurst Dep. 112:11-113:3 (ROA.60380-81). The result was S.B. 14, with its photo

ID requirement.

Likewise, although years later a legislative aide could not give a specific expla-

nation why S.B. 14 did not allow employee IDs, legislators explained that they were

worried that increasing the variety of IDs would lead to confusion at the polls. *See* Defendants' Proposed Findings of Fact ¶¶ 173-174.

120.  For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts. *See supra*, ¶ 119.

121. Plaintiffs' recitation of the facts is misleading. Although years later Representative Harless could not give a specific explanation why particular provisions of S.B. 14 were written as they were, legislators explained their reasoning at the time S.B. 14 was considered. *See supra*, ¶ 119; Defendants' Proposed Findings of Fact ¶¶ 173-174.

122. Plaintiffs' recitation of the facts is misleading. Although this information may have been theoretically "available" to the Texas Legislature, there is no evidence that any legislator was aware of the information. *See* Defendants' Proposed Conclusions of Law ¶ 132. And if the Legislature was not aware of this information, it could not have been a factor in its decision. *See Feeney*, 442 U.S. at 278-79 (analyzing whether disparate impact was intentional only *after* determining that the legislature was, in fact, aware that such an impact would result). In fact, Democrats conceded at the time that they had no evidence that S.B. 14 would disparately impact minorities. *See* DEF0001 (Debate on S.B. 14 in the Senate Committee of the Whole, 82d Leg., R.S., 29 (Jan. 26, 2011)) (ROA.70215) (Senator Ellis: "I can no more prove, without this bill being in effect, that it has the disparate impact that folks on my side are afraid of."). Plaintiffs' own expert had earlier offered a similar concession. *See* DEF0022 (Robert S. Erikson & Lorraine C. Minnite, Modeling Problems in the Voter Identification-Voter Turnout Debate, 8 Election Law Journal 85, 98 (2009)) (ROA.78232) ("It should

be evident that our sympathies lie with the plaintiffs in the voter ID cases. Yet we see the existing science regarding vote suppression as incomplete and inconclusive.").

123. Defendants do not dispute that S.B. 14 allowed voters six days to cure provisional ballots. This was longer than that provided by Georgia in its precleared voter ID bill and longer than the period recommended by the Carter-Baker Commission. *See* Defendants' Proposed Findings of Fact ¶¶ 67, 73.

124. Defendants do not dispute that S.B. 14 was modeled after voter ID bills enacted in Georgia and Indiana. The Texas Legislature concluded that S.B. 14 would not disparately impact minorities and voter ID opponents conceded that they could not prove otherwise. *See id.* ¶¶ 163, 207-214.

125. Defendants do not dispute that S.B. 14 does not allow the use of student IDs. Legislators expressed concern with this type of amendment on the basis that expanding the number of acceptable IDs would cause too much confusion among election officials. *See, e.g.* DEF0001 (Debate on S.B. 14 in the Senate Committee of the Whole, 82d Leg., R.S., 10-12 (Jan. 26, 2011)) (ROA.70196-98; ROA.70201-02); Williams Dep. 47:20-23 (ROA.62696) (expressing worry that allowing many forms of ID "makes it very difficult for the person who's working at the polls—they have so many things that they have to look at—and they don't know whether it's a valid document or not."); *id.* 45:19-22 (ROA.62696); *see also* Patrick Dep. 327:10-13 (ROA.64646) ("Q: . . . To your knowledge, do all those state-issued state employment IDs, are – do they all look alike? A: No, they all look – they're actually different."); Bueck Dep. 143:5-18 (ROA.57921). This was particularly true regarding student IDs:

> [T]here are arguably hundreds of different community colleges and universities, and every student ID from a different university or college or a community college would have been different, and it would have been virtually impossible for election officials to be able to know which ones

were valid and which ones weren't, which ones had been forged, which
ones had not.

Dewhurst Dep. 200:21-201:02 (ROA.61045-46); *see also* Williams Dep. 45:9-18
(ROA.62696).

126. Defendants do not dispute that Indiana had few problems implementing its
law. Texas, however, is a much larger and more populous State with many more in-
stitutions. *See* Dewhurst Dep. 200:21-201:02 (ROA.61045-46); *see also* Williams Dep.
45:9-18 (ROA.62696).

127. Defendants do not dispute that Republicans in the Texas Legislature be-
lieved that increasing confidence in elections integrity would increase voter partici-
pation.

128. For the purposes of the Court's determination as to whether the Texas Leg-
islature acted with discriminatory purpose when it enacted S.B. 14, Defendants do
not dispute these facts.

129. Defendants do not dispute that no two voter ID bills are identical. *See supra*,
¶ 125. The Texas Legislature legitimately concluded that expanding the number of
acceptable IDs would cause too much confusion among election officials. *See supra*,
¶ 125.

130. Defendants do not dispute that no two voter ID bills are identical. Plaintiffs
ignore, however, that during the implementation of S.B. 14, Texas assured that every
county contained a location where EICs could be obtained and reduced the cost of
documents necessary to obtain an EIC. *See* Defendants' Proposed Findings of Fact ¶¶
24-34.

131. For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts.

132. Defendants do not dispute that no two voter ID bills are identical. The Texas Legislature legitimately concluded that expanding the number of acceptable IDs would cause too much confusion among election officials. *See supra* ¶ 125.

133. Defendants do not dispute that S.B. 14's indigency provision, which was modeled after Indiana's, was excised at the behest of *Democrats* and with Democrats' votes and was replaced by the EIC provision. *See* Defendants' Proposed Findings of Fact ¶¶ 184, 195.

134. Prior to the enactment of S.B. 14, the risk of in-person voter fraud, as well as the threat to public confidence in elections posed by that risk, had been recognized by the federal government, the Supreme Court, the Carter-Baker Commission, and other states. *See id.* ¶¶ 221-224. Indeed, even Plaintiffs themselves conceded that requiring photo ID increased their confidence in elections. *See id.* ¶ 225.

135. For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute this fact.

136. Plaintiffs misrepresent the facts. The Texas Legislature believed that in-person voter fraud was a real problem in Texas and was very difficult to detect. *See id.* ¶¶ 221-230, 232-237, 239, 242-245; DEF0001 (Tex. Leg., Senate Committee of the Whole (82d Leg.) (Jan. 25, 2011), at 26:6-27:4, 507:23-508:22) (ROA.68939, 69059)); *id.* (Tex. Leg., House Select Committee on Voter Identification Voter Fraud Hearing (82d Leg.) (March 1, 2011), at Vol. I 20:5-13, 22:7-10, 22:22-23:8, 26:13-15)

(ROA.70349, 70351, 70355)); *id.* (Tex. Leg., House Floor Debate (82d Leg.) (March 23, 2011)), Vol. II pp. 23:19-24:1 (ROA.71233-34)); *id.* (Debate on S.B. 362 in the Senate Committee of the Whole, 81st Leg., R.S., 211:10-214:10, 281:10-13 (March 10, 2009) (ROA.72389-92, 72459)). In fact, one of the Hispanic members of the House who voted in favor of S.B. 14 testified that his "campaign worker's father" had voted despite that worker's father being "deceased." DEF0001 (Tex. Leg., House Floor Debate (82d Leg.) (March 23, 2011)), at Vol. III pp. 117:7-9 (ROA.71571). And the House heard evidence from Harris County's Tax Assessor and acting Voter Registrar of ballots cast in the name of dead people who remained on the voting rolls—an example of registration and impersonation fraud that would have been prevented by a photo-ID requirement. *See* Defendants' Proposed Findings of Fact ¶ 191.

The Supreme Court found the same in *Crawford*, and the Fifth Circuit did so in *Veasey* and *Steen*. *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 194-97 (2008); *Veasey*, 830 F.3d at 249; *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 394 (5th Cir. 2013). It is therefore not open to Plaintiffs or this Court to reach a different conclusion on this legislative fact:

> To put this in legalese, whether [voter fraud is a problem and whether] a photo ID requirement promotes public confidence in the electoral system [are] "legislative fact[s]"—[] proposition[s] about the state of the world, as opposed to . . . proposition[s] about these litigants or about a single state. Judges call the latter propositions "adjudicative facts." On matters of legislative fact, courts accept the findings of legislatures and judges of the lower courts must accept findings by the Supreme Court.

*Frank v. Walker*, 768 F.3d 744, 750 (7th Cir. 2014) (citations omitted).

137. Plaintiffs' recitation of the facts is misleading. The Texas Legislature limited the forms of acceptable ID to avoid confusion at the polls. *See supra*, ¶ 125.

138. Defendants do not dispute that Ms. Trotter was able to vote. To extent that Plaintiffs are suggesting that a poll worker is as capable as the Department of Public Safety ("DPS") of verifying the propriety of the supporting documents necessary to obtain EIC, Defendants disagree. Plaintiffs point to no evidence in support of this contention, and the Texas Legislature was permitted to conclude that DPS was better suited to this task.

139. Plaintiffs' recitation of the facts is misleading for the reasons stated above in paragraph 136.

140. Plaintiffs' recitation of the facts is misleading for the reasons stated above in paragraph 136.

141. Plaintiffs' recitation of the facts is misleading for the reasons stated above in paragraph 136. In addition, Plaintiffs are incorrect that requiring ID can only prevent impersonation. For example, vote harvesters use the registrations of the elderly, blind, and disabled to vote. *See* Trial Tr. 221:17-222:9 (Sept. 3, 2014) (Wood) (ROA.99153-54). But unless these voters have *also* signed up to vote by mail or gone through the process to obtain an exemption from S.B. 14, they would have to vote in person, at which point they would have to show photo ID. S.B. 14 thus helps eliminate some portion of effective vote harvesting. And the Texas Legislature heard evidence that requiring voters to prove their identity with an ID could render registration fraud ineffective. *See* Defendants' Proposed Findings of Fact ¶¶ 245-246.

142. Plaintiffs' recitation of the facts is misleading for the reasons stated above in paragraph 136.

143. Plaintiffs' recitation of the facts is misleading for the reasons stated above in paragraph 136.

144. Plaintiffs' recitation of the facts is misleading for the reasons stated above in paragraph 136.

145. Plaintiffs' recitation of the facts is misleading for the reasons stated above in paragraph 136.

146. Plaintiffs' recitation of the facts is misleading for the reasons stated above in paragraph 136. The experts on the Carter Baker Commission further refute Plaintiffs' suggestion with their conclusion that, although "[t]here is no evidence of extensive fraud in U.S. elections or of multiple voting, . . . both occur, and it could affect the outcome of a close election." Carter-Baker Commission Report at 18 (ROA.77850). The Commission went on to observe that "the perception of possible fraud contributes to low confidence in the system." *Id.*

147. Plaintiffs' recitation of the facts is misleading for the reasons stated above in paragraph 136.

148. Plaintiffs' recitation of the facts is misleading for the reasons stated above in paragraph 136.

149. Plaintiffs' recitation of the facts is misleading for the reasons stated above in paragraph 136.

150. Plaintiffs' recitation of the facts is misleading for the reasons stated above in paragraph 136.

151. Plaintiffs' recitation of the facts is misleading for the reasons stated above in paragraph 136.

152. Plaintiffs' recitation of the facts is misleading for the reasons stated above in paragraph 136.

153. Plaintiffs' recitation of the facts is misleading for the reasons stated above in paragraph 136.

154. Plaintiffs' recitation of the facts is misleading for the reasons stated above in paragraph 136.

155. Plaintiffs' recitation of the facts is misleading for the reasons stated above in paragraph 136.

156. Plaintiffs' recitation of the facts is misleading for the reasons stated above in paragraph 136.

157. Plaintiffs' recitation of the facts is misleading for the reasons stated above in paragraph 136.

158. Plaintiffs' recitation of the facts is misleading for the reasons stated above in paragraph 136.

159. Prior to the enactment of S.B. 14, the risk of in-person voter fraud, as well as the threat to public confidence in elections posed by that risk, had been recognized by the federal government, the Supreme Court, the Carter-Baker Commission, and other states. *See* Defs.' Proposed Findings of Fact ¶¶ 221-228, 231-237. Indeed, even Plaintiffs themselves conceded that requiring photo ID increased their confidence in elections. *See id.* ¶ 225. Plaintiffs' own expert, Dr. Minnite, explained, "we want to believe that our elections truly reflect the will of the voter and that are free of corruption. So, it's a very, very important issue that there not be any voter fraud." Trial Tr. 137:14-17 (Sept. 8, 2014) (Minnite) (ROA.100131). In any event, the use of voter fraud by long-dead legislators as a pretext for discrimination "cannot, in the manner of original sin, condemn" S.B. 14. *City of Mobile, Ala. v. Bolden*, 446 U.S. 55, 74 (1980) (plurality op.); *see supra* ¶ 3.

42

160. For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts. But the use of voter fraud by long-dead legislators as a pretext for discrimination "cannot, in the manner of original sin, condemn" S.B. 14. *Bolden*, 446 U.S. at 74 (plurality op.); *see supra*, ¶ 3.

161. For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts. But the use of voter fraud by long-dead legislators as a pretext for discrimination "cannot, in the manner of original sin, condemn" S.B. 14. *Bolden*, 446 U.S. at 74 (plurality op.); *see supra*, ¶ 3.

162. For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts. But the use of voter fraud by long-dead legislators as a pretext for discrimination "cannot, in the manner of original sin, condemn" S.B. 14. *Bolden*, 446 U.S. at 74 (plurality op.); *see supra*, ¶ 3.

163. For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts. But the use of voter fraud by long-dead legislators as a pretext for discrimination "cannot, in the manner of original sin, condemn" S.B. 14. *Bolden*, 446 U.S. at 74 (plurality op.); *see supra*, ¶ 3.

164. For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts. But the use of voter fraud by long-dead legislators as a pretext for discrimination "cannot, in the manner of original sin, condemn" S.B. 14. *Bolden*, 446 U.S. at 74 (plurality op.); *see supra*, ¶ 3.

165. These purported acts by persons outside the Texas Legislature are irrelevant to this Court's inquiry. *See supra*, ¶ 3.

166. Plaintiffs are incorrect. The Texas Legislature concluded that passing S.B. 14 would increase public confidence in elections. *See* Defendants' Proposed Findings of Fact ¶¶ 205-206. It did so on the basis of evidence that passing a voter identification law could increase participation in the electoral process by enhancing public confidence in elections. Trial Tr. 397:25-398:8 (Sept. 10, 2014) (Fraser) (ROA.101159-60). Among other things, the legislature was informed that,

> [S]cholars of American politics generally agree that voter turnout is determined largely by idiosyncratic factors, such as an individual's intrinsic value of voting (i.e., does the individual feel a duty to vote) as opposed to political institutions. For this reason, factors that influence trust and confidence in the integrity of the electoral process are generally thought to be important determinants of an individual's decision to vote. For all these reasons, it is theoretically plausible that photo identification requirements increase turnout.

DEF0001 (Tex. Leg., Senate Committee of the Whole (81st Leg.) (Mar. 11, 2009), Exhibit 7, at 2 (ROA.73372) (citations omitted)). The Texas Legislature also had before it the Carter-Baker Commission Report, which announced that "the perception of possible fraud contributes to low confidence in the system" and, therefore, "[t]he electoral system cannot inspire public confidence if no safeguards exist to deter or detect fraud or to *confirm the identity of voters*." Carter-Baker Commission Report at 18 (emphasis added) (ROA.77850). The Texas Legislature also considered the Supreme Court's pronouncement in *Purcell* that "[v]oter fraud drives honest citizens out of the democratic process and breeds distrust of our government." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam).

The Supreme Court found the same in *Crawford*, and the Fifth Circuit did so in *Veasey* and *Steen*. *Veasey*, 830 F.3d at 249; *Steen*, 732 F.3d at 394. It is not open to Plaintiffs or this Court to reach a different conclusion on this legislative fact:

> To put this in legalese, whether a photo ID requirement promotes public confidence in the electoral system is a "legislative fact"—a proposition about the state of the world, as opposed to a proposition about these litigants or about a single state. Judges call the latter propositions "adjudicative facts." On matters of legislative fact, courts accept the findings of legislatures and judges of the lower courts must accept findings by the Supreme Court.

*Frank*, 768 F.3d at 750.

Plaintiffs themselves agreed that requiring photo ID increased their confidence in elections. *See* Defendants' Proposed Findings of Fact ¶ 225. And Plaintiffs' own expert, Dr. Minnite, explained that "we want to believe that our elections truly reflect the will of the voter and that are free of corruption. So, it's a very, very important issue that there not be any voter fraud." Trial Tr. 137:14-17 (Sept. 8, 2014) (Minnite) (ROA.100131).

167. Defendants do not dispute that this is Dr. Burden's view. But Dr. Burden's view is contrary to evidence received and credited by the Texas Legislature. *See supra*, ¶ 166.

168. Defendants do not dispute that this is Dr. Burden's view. But the Texas Legislature received and credited evidence that requiring voters to prove their identity would increase confidence in elections and, in turn, turnout. *See supra*, ¶ 166.

169. For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do

not dispute these facts. The Texas Legislature did not, however, need to find individual voters who sat out elections due to concerns of voter fraud. The Texas Legislature had ample evidence, which it credited, that requiring voters to prove their identity would increase confidence in elections and, in turn, turnout. *See supra*, ¶ 166.

170. For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts. The Texas Legislature did not, however, need to find individual voters who sat out elections due to concerns of voter fraud. The Texas Legislature had ample evidence, which it credited, that requiring voters to prove their identity would increase confidence in elections and, in turn, turnout. *See supra*, ¶ 166.

171. For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts. The Texas Legislature did not, however, need to find individual voters who sat out elections due to concerns of voter fraud. The Texas Legislature had ample evidence, which it credited, that requiring voters to prove their identity would increase confidence in elections and, in turn, turnout. *See supra*, ¶ 166.

172. Plaintiffs' recitation of the facts is misleading. During debate of S.B. 14, Senator Fraser unambiguously rejected the suggestion that he was relying solely on polls and the experience of other states in coming to the conclusion that S.B. 14 would not disparately impact minorities. *See* DEF0001 (Tex. Leg., Senate Committee of the Whole, 82d Leg., R.S., at 164:15-166:23 (Jan. 25, 2011) (ROA.68973-74)). The Texas Legislature not only had before it opinion polls showing large support for requiring photo ID and the experience of other states, it also empirical studies concluding that voter ID laws did not disparately impact minorities and the Democrats' concession

that they had no contrary evidence. *See* Defendants' Proposed Findings of Fact ¶¶ 163, 207-214.

173.  Plaintiffs' recitation of the facts is misleading. None of the evidence cited by Plaintiffs even suggests that public opinion polls were influenced by politicians rather than vice versa. Moreover, Plaintiffs' supposition is refuted by the fact that (1) public opinion polls in Texas matched polls taken nationwide (*see id.* ¶¶ 79-86), (2) concern about voter fraud and the need for voter ID was echoed by the Carter-Baker Commission, the federal government, and other states (*see id.* ¶¶ 113, 115, 231-237), and (3) the finding of Plaintiffs' own expert that "persons who were asked to show identification when voting in 2006 were *even more supportive* of voter identification requirements than other respondents." DEF0001 (Debate on S.B. 362 in the Senate Committee of the Whole, 81st Leg., R.S., Exhibit 7, at 8 (March 11, 2000) (ROA.73378) (citing Stephen Ansolabehere, Access Versus Integrity in Voter Identification Requirements, Working Paper No. 58 in the Caltech/MIT Voting Technology Project (Feb. 2007))) (emphasis added). In fact, S.B. 14 was just one of "nearly 1,000" voter ID "bills . . . introduced in a total of 46 states" between 2001 and 2011. DEF0053 (National Conference of State Legislatures, *Voter Identification Requirements* (June 27, 2012)) at 5 (ROA.78671). Public concern about voter fraud and support for voter ID was substantial and real.

174. Defendants do not dispute that the Texas Legislature relied on public opinion polls that were available and that showed overwhelming support for voter ID. *See* Defendants' Proposed Findings of Fact ¶¶ 79-87. Plaintiffs point to no other alternative polls conducted. Representative Ana Hernandez's anecdotal hearsay is no substitute for the neutral polling relied on by the Texas Legislature.

175. Plaintiffs' recitation of the facts is misleading. No one in the Texas Legislature claimed that requiring voter ID would solve all election problems. Rather, S.B. 14 was just one step of many taken by the Texas Legislature to ensure the integrity of Texas elections. In addition to requiring photo ID at the polls, the Texas Legislature enacted laws aimed at preventing mail-in ballot fraud, enhance the integrity of voter rolls, ensure the accuracy of vote counts, and protect the security of voting machines. *See id.* ¶¶ 104-11, 127, 137, 149, 187-188.

176. Defendants do not dispute that mail-in ballot fraud is a serious concern, which is why the Texas Legislature has acted to prevent mail-in ballot fraud on multiple occasions. *See id.* ¶¶ 106, 137, 187.

177. Defendants do not dispute that mail-in ballot fraud is a serious concern, which is why the Texas Legislature has acted to prevent mail-in ballot fraud on multiple occasions. *See id.* ¶¶ 106, 137, 187. In-person voter fraud is also a serious concern. *See supra*, ¶ 136.

178. Defendants agree that S.B. 14 did not address mail-in ballots. The Texas Legislature has, however, acted to prevent mail-in ballot fraud on multiple occasions. *See* Defendants' Proposed Findings of Fact ¶¶ 106, 137, 187.

179. Plaintiffs' recitation of the facts is misleading. Most of the plaintiffs and voter-witnesses in this case who complained about having difficulty obtaining S.B-14-compliant ID were *elderly*. *See id.* ¶¶ 39, 43. Preserving the ease of mail-in voting for the elderly goes a long way towards remedying and mitigating the minimal negative impact Plaintiffs have been able to show in the case. *See id.*; *see also* PL273 (ROA.38989) (noting that desire of voter ID proponents to lessen the burden on the elderly "who may not have access to a birth certificate"). In any event, Plaintiffs have no evidence suggesting that the Texas Legislature was aware that Anglos were more

likely to vote by mail than minorities. Accordingly, that fact, even if true, is irrelevant to this Court's analysis. *See supra*, ¶ 122; Defendants' Proposed Conclusions of Law ¶ 132.

180. Defendants do not dispute that mail-in ballot fraud is a serious concern, which is why the Texas Legislature has acted to prevent mail-in ballot fraud on multiple occasions. *See* Defendants' Proposed Findings of Fact ¶¶ 106, 137, 187.

181. Defendants do not dispute that mail-in ballot fraud is a serious concern, which is why the Texas Legislature has acted to prevent mail-in ballot fraud on multiple occasions. *See* Defendants' Proposed Findings of Fact ¶¶ 106, 137, 187.

182. Plaintiffs' recitation of the facts is misleading. Whether or not this information was theoretically "available," Plaintiffs have no evidence suggesting that the Texas Legislature was aware that Anglos were more likely to vote by mail than minorities. And if the Legislature was not aware of this information, it could not have been a factor in its decision. *See supra*, ¶ 122; Defendants' Proposed Conclusions of Law ¶ 132.

183. Plaintiffs' recitation of the facts is misleading. Requiring voters to confirm their identity with government-issued photo ID can reduce the incidence of non-citizen voting. *See* Defendants' Proposed Findings of Fact ¶¶ 269-274.

184. Plaintiffs' recitation of the facts is misleading. While some legislators linked voter ID with non-citizen voting, no legislator ever stated "that non-citizen voting was the *principal* purpose behind tightening voter ID requirements." Pls.' Proposed Findings of Fact ¶ 184 (emphasis added). The principal purpose was always to prevent voter fraud and increase public confidence in elections. *See* Defendants' Proposed Findings of Fact ¶¶ 205-206.

185. For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts. Statements by persons outside the Texas Legislature, however, are irrelevant to this court's analysis. *See supra*, ¶ 3.

186. Defendants do not dispute that Lt. Gov. Dewhurst was concerned with voting by non-citizens.

187. Plaintiffs' recitation of the facts is misleading. Requiring voters to confirm their identity with government-issued photo ID can reduce the incidence of non-citizen voting. *See* Defendants' Proposed Findings of Fact ¶¶ 269-274. In addition, Senator Fraser also stated that the purpose of S.B. 362 was to prevent voter fraud. *See id.* ¶ 205.

188. Plaintiffs' speculation is not evidence. None of the evidence cited by Plaintiffs even suggests that public opinion polls were influenced by politicians rather than vice versa. Moreover, Plaintiffs' supposition is refuted by the fact that (1) public opinion polls in Texas matched polls taken nationwide (*see id.* ¶¶ 79-86), (2) concern about voter fraud and the need for voter ID was echoed by the Carter-Baker Commission, the federal government, and other states (*see id.* ¶¶ 113, 115, 231-237), and (3) the finding of Plaintiffs' own expert that "persons who were asked to show identification when voting in 2006 were *even more supportive* of voter identification requirements than other respondents." DEF0001 (Debate on S.B. 362 in the Senate Committee of the Whole, 81st Leg., R.S., Exhibit 7, at 8 (March 11, 2000) (ROA.73378) (citing Stephen Ansolabehere, Access Versus Integrity in Voter Identification Requirements, Working Paper No. 58 in the Caltech/MIT Voting Technology Project (Feb. 2007))) (emphasis added). In fact, S.B. 14 was just one of "nearly 1,000" voter ID "bills introduced in a total of 46 states" between 2001 and 2011. DEF0053 (National Conference

of State Legislatures, *Voter Identification Requirements* (April 7, 2012)) at 5 (ROA.78671). Public concern about voter fraud and support for voter ID was substantial and real.

189. Defendants do not dispute that various senators were concerned with voting by non-citizens.

190. Plaintiffs' recitation of the facts is misleading. The speculation by a voter ID opponent notwithstanding, non-citizen voting is a legitimate concern. *See See* Defendants' Proposed Findings of Fact ¶ 271.

191. Defendants do not dispute that the purpose of S.B. 14 was to prevent voter fraud and increase public confidence in elections.

192. Defendants do not dispute that the purpose of S.B. 14 was to prevent voter fraud and increase public confidence in elections. Defendants do dispute, however, any implication that the failure of proponents of voter ID to focus on non-citizen voting can be construed as evidence that the Legislature enacted S.B. 14 for a racially discriminatory purpose.

193. Defendants do not dispute that some supporters of voter ID were concerned with voting by non-citizens. The "supporters" referred to by Plaintiffs here are persons outside the Texas Legislature. *See* Hebert 2014 Dep. 200:12-201:4 (ROA.61417-18). Accordingly, their motivation for supporting S.B. 14 is irrelevant. *See supra*, ¶ 3.

194. Plaintiffs' recitation of the facts is misleading. Requiring voters to confirm their identity with government-issued photo ID can reduce the incidence of non-citizen voting. *See* Defendants' Proposed Findings of Fact ¶¶ 269-274.

195. For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts. The views of persons outside the Texas Legislature, however, are irrelevant to this Court's analysis. *See supra*, ¶ 3.

196. Defendants do not dispute that some supporters of voter ID were concerned with voting by non-citizens.

197. For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute this fact, which is irrelevant. Plaintiffs cite no evidence that Representative Smith's bill was motivated by racial animus. The Fifth Circuit has rejected the notion that support for policies with legitimate objectives can be evidence of racial animus simply because *opponents* of such policies, like Plaintiffs, speculate that those polices are the product of racial animus. *Veasey*, 830 F.3d at 233-34 & n.16; *see supra*, ¶ 45.

198. Defendants do not dispute that some supporters of voter ID were concerned with voting by non-citizens.

199. Defendants do not dispute that some supporters of voter ID were concerned with voting by non-citizens.

200. Plaintiffs' recitation of the facts is misleading. The Legislature did not know or anticipate that S.B. 14 would have a negative impact on legitimate voters, much less that it would disproportionately harm minority voters. To the extent it had evidence of S.B. 14's likely impact, the Legislature had reason to believe that it would not prevent any person from voting. The evidence shows that the Texas Legislature

relied on multiple studies and the experiences of other States to conclude that S.B.

14 would *not* disparately impact minorities:

- Democrats conceded that there was no evidence before the Legislature suggesting that S.B. 14 would have a disparate impact on minorities. *See* DEF0001 (Tex. Leg., Senate Committee of the Whole, 82d Leg., R.S., at 28 (Jan. 26, 2011) (ROA.70215)).

- The Texas Legislature considered real-world empirical studies—as opposed to statistical estimates—showing that requiring voters to prove their identity with a photo ID did not negatively affect the ability those entitled to vote to do so. *See, e.g.*, DEF0001 (Tex. Leg., Senate Committee of the Whole, 81st Leg., R.S., Exhibits 7, 9, and 10 (Mar. 10, 2009) (ROA.73369, 73417, 73423)); Fraser Dep. 72:9-21, 74:13-22 (ROA.63039, 63041).

- The Legislature learned from Plaintiff's own expert, Dr. Ansolabehere, that "exclusions from voting" resulting from Voter ID laws "are exceptionally rare." DEF0001 (Tex. Leg., Senate Committee of the Whole, 81st Leg., R.S. Exhibit 9, at 124 (Mar. 11, 2009) (ROA.73420) (citing Stephen Ansolabehere, Access Versus Integrity in Voter Identification Requirements, Working Paper No. 58 in the Caltech/MIT Voting Technology Project (Feb. 2007)).

- The Texas Legislature also learned that similar voter ID laws did not result in disenfranchisement as the opponents of those laws—just like opponents of S.B. 14—predicted. *See, e.g.*, DEF0001 (Tex. Leg., Senate Committee of the Whole, 81st Leg., R.S., Exhibits 23, 25, and 28 (Mar. 10, 2009) (ROA.73665, 73685, 73703)).

- The Elections Division Director for the Secretary of State of Georgia testified that in the 16 elections that Georgia had held since implementing its voter ID law his office has never received a single complaint that anyone was disenfranchised or turned away from the polls because they lacked photo ID. DEF0001 (Tex. Leg., House Committee on Elections, 81st Leg., R.S., vol. II, at 364:1-365:8 (Apr. 6, 2009) (ROA.74975-76)). He also testified that, despite four years of federal lawsuits, no single individual had alleged that he was substantially burdened by Georgia's voter ID law. *Id.* 367:21-24 (ROA.74978).

- The Indiana Secretary of State testified that "[i]n the five years and eight statewide primary general elections" that he's "been involved with" since the passage of Indiana's voter ID law, "there's been scant evidence of disenfranchisement or discrimination in Indiana." DEF0001 (Tex.

Leg., Senate Committee of the Whole, 82d Leg., R.S., at 272:9-12 (Jan. 25, 2011) (ROA.69000)).

- The Texas Legislature also received evidence that passing a voter identification law could increase participation in the electoral process by enhancing public confidence in elections. Trial Tr. 397:25-398:8 (Sept. 10, 2014) (Fraser) (ROA.101159-60); DEF0001 (Tex. Leg., Senate Committee of the Whole, 81st Leg., R.S., Exhibit 7, at 2 (Mar. 10, 2009) (ROA.73372)) (concluding that it is "plausible that photo identification requirements actually increase voter turnout").

Plaintiffs' own expert witness testified that, at worst, there is no "consensus regarding the effects of voter ID laws." Trial Tr. 328:8-10 (Sept. 4, 2014) (Burden) (ROA.99560).

The Legislature's decision not to give greater weight to speculation by opponents who had proved themselves willing to thwart voter-ID legislation by any means necessary does not suggest that the Legislature harbored a discriminatory purpose.

Finally, Plaintiffs' suggestion that Lt. Gov. Dewhurst received a matching analysis from the Secretary of State is mistaken. Although someone in the Secretary of State's office may have communicated an estimate of the number of Texas voters who did not have a Texas driver license or personal ID to a member of Lt. Gov. Dewhurst's staff, there is no evidence that a full analysis was provided, and that same person warned that the estimate was unreliable because the Secretary of State's office was having problems matching the list of driver's licenses to the list of registered voters. *See* Trial Tr. 72:13-73:2 (Sept. 10, 2014) (Dewhurst) (ROA.100834-35). In any event, Plaintiffs concede that no matching analysis relating to race was performed by the Secretary of State's office until long after the passage of S.B. 14. *See* Pls.' Proposed Findings of Fact ¶ 103.

201. Defendants do not dispute that opponents of voter ID complained that even bills that would have allowed multiple forms of non-photo ID would disparately impact minorities. Nonetheless, the Texas Legislature had significant contrary evidence and was entitled to credit and rely on that evidence. *See supra*, ¶ 200.

202. Defendants do not dispute that Senator Fraser made that observation, but he did so in commenting that that number was not helpful because "a great many of those now have a photo ID people." DEF0001 (Debate on S.B. 362 in the Senate Committee of the Whole, 81st Leg., R.S., 70:16-72:12 (March 10, 2009) (ROA.72237-39). In any event, the Texas Legislature had no evidence concerning the racial makeup of those who registered to vote without listing a driver's license number.

Plaintiffs' reliance on Representative Smith's post-hoc estimate is misguided. There is no evidence that any other legislator received this estimate. Representative Smith testified that he "probably would have mentioned it in committee hearings" (Trial Tr. 329:7-8 (Sept. 8, 2014) (ROA.100323)), but Plaintiffs have never pointed to a transcript evidencing such a mention and Defendants have been unable to locate one. The Fifth Circuit has cautioned against relying on isolated ambiguous statements made by legislators after the enactment of a law. *See Veasey*, 830 F.3d at 234. Moreover, this estimate says nothing about the racial makeup of the group of voters supposed to lack driver's licenses. Although Representative Smith years later suggested that it was "common sense" that minorities would be more likely to be in this group than whites, this "stray statement[] made by [a single] legislator[] voting for S.B. 14" is "not . . . the best indicia of the Texas Legislature's intent." *Veasey*, 830 F.3d at 234, 236; *cf. United States v. O'Brien*, 391 U.S. 367, 384 (1968) ("What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guess-

work."); *Florida v. United States*, 885 F. Supp. 2d 299, 354-55 (D.D.C. 2012) (per curiam) (holding that single legislator's statement, during floor debate, "that it should be harder to vote—as it is 'in Africa'" was "not enough to suggest that his purpose, whatever it was, represented the purpose of the Florida legislature as a whole"); *Castaneda-Gonzalez v. Immigration & Naturalization Serv.*, 564 F.2d 417, 424 (D.C. Cir. 1977) ("Statements by individual legislators should generally be given little weight when searching for the intent of the entire legislative body."). And it turned out Representative Smith's "common sense" was incorrect: Plaintiffs' numbers suggest that those lacking S.B. 14 ID are at least as likely (if not more) to be white rather than Hispanic or African-American. *See* Defendants' Proposed Findings of Fact ¶¶ 219-220.

203. Defendants do not dispute that this witness so testified. The Texas Legislature, however, heard significant evidence that voter ID laws do not disparately impact minorities, and it was entitled to credit and rely on that evidence. *See supra*, ¶ 200.

204. Plaintiffs' recitation of the facts is misleading. There is no evidence that Senator Estes was "concern[ed] that SB 14 was not compliant with Voting Rights Act." Plaintiffs' Proposed Findings of Fact ¶ 204. As Bryan Hebert explained, it is at least as likely that Senator Estes was simply performing his due diligence, "want[ing] to make sure" that S.B. 14 "passe[d] and [was] precleared." Hebert 2014 Dep. 110:2-5 (ROA.61396). Moreover, this "stray statement[] made by [a single] legislator[] voting for S.B. 14" is "not . . . the best indicia of the Texas Legislature's intent." *Veasey*, 830 F.3d at 234. In any event, because preclearance requires that voting laws not have a retrogressive effect on minorities' ability to vote, any concern that Senator Estes had about preclearance would be evidence that he intended for S.B. 14 *not* to disparately impact minorities.

205. Defendants do not dispute that these opponents of voter ID so stated. The Texas Legislature, however, heard significant evidence that voter ID laws do not disparately impact minorities, and it was entitled to credit and rely on that evidence. *See supra*, ¶ 200. According to the 2010 Census, 98.52% of the Texas population lives within 25 miles of a DPS driver's license office, PL 394 at 2 (ROA.39770), and 99.87% of the Texas population lives within 50 miles of a DPS driver's license office, *id.* at 3 (ROA.39771). Speculation by opponents of S.B. 14 is not evidence, and there is no evidence that any voter has been required to travel 175 to 200 miles to reach a DPS office or that such a requirement, if it exists, has prevented any voter from obtaining ID or casting a ballot. Moreover, the Texas Legislature intended for the relevant agencies to address access issues during implementation (*see* Defendants' Proposed Findings of Fact ¶¶ 169-171), which, in fact, occurred (*see id.* ¶¶ 24-34).

206. Defendants do not dispute that these opponents of voter ID so stated. The Texas Legislature, however, heard significant evidence that voter ID laws do not disparately impact minorities, and it was entitled to credit and rely on that evidence. *See supra*, ¶ 200. Moreover, the Texas Legislature intended for the relevant agencies to address access issues during implementation (*see* Defendants' Proposed Findings of Fact ¶¶ 169-171), which, in fact, occurred (*see id.* ¶¶ 24-34).

207. Defendants do not dispute that these opponents of voter ID so stated. The Texas Legislature, however, heard significant evidence that voter ID laws do not disparately impact minorities, and it was entitled to credit and rely on that evidence. *See supra*, ¶ 200. Moreover, the Texas Legislature intended for the relevant agencies to address access issues during implementation (*see* Defendants' Proposed Findings of Fact ¶¶ 169-171), which, in fact, occurred (*see id.* ¶¶ 24-34).

208. Plaintiffs' recitation of the facts is mistaken. Senator Fraser never "questioned the notion that SB 14 should not aim to be unduly restrictive while preventing voter fraud." Pls.' Proposed Findings of Fact ¶ 208. In the colloquy cited by Plaintiffs, it is clear that Senator Fraser was not entirely sure what Senator West was asking, so rather than agree with Senator West, Senator Fraser assured Senator West that the intent behind S.B. 14 was to allow for the use of the "most readily available" "type of [photo] identification" and that Senator Fraser believed the types of identification set forth in S.B. 14 were the "easiest" to acquire. DEF0001 (Debate on S.B. 14 in the Senate Committee of the Whole, 82d Leg., R.S., 168:1-169:7 (Jan. 25, 2011) (ROA.68974-75). The full colloquy directly refutes Plaintiffs' suggestion.

209. Defendants do not dispute that Representative Smith so stated years after the Texas Legislature passed S.B. 14. Plaintiffs' reliance on this statement by Representative Smith, however, is misguided for the reasons explained above, in paragraph 202.

For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute that it is easier to acquire certain non-photo ID as compared to photo ID. Non-photo ID, however, is necessarily less secure than photo ID. Republicans sought for years to compromise their desire for security to accommodate Democrats' concerns regarding photo ID. *See* Defendants' Proposed Findings of Fact ¶¶ 112-148. When it became clear that Democrats were not interested in compromising, Republicans focused on maximizing security while assuring eligible voters could continue to vote. *See id.* ¶¶ 151, 182-183, 207.

58

210. For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute that Bryan Hebert believed that it was "doubtful" that the "Obama DOJ" would preclear S.B. 14. PL272 (ROA.38985). But "context matters." *Veasey*, 830 F.3d at 237. First, Hebert made clear that his belief that the "Obama DOJ" was unlikely to preclear S.B. 14 was based on his observation that the administration was "aggressively interpreting and enforcing the Voting Rights Act through preclearance and didn't seem to particularly like Texas," not a belief that S.B. 14 would disparately impact minorities. Hebert 2014 Dep. 169:14-20 (ROA.63927) ("my reasoning was that the Obama DOJ had been aggressively interpreting and enforcing the Vot[ing] Rights Act through preclearance and didn't seem to particularly like Texas"). Second, there is no evidence that Hebert shared his view with legislators (*see id.* 170:9-17), so in no event could his view have affected their conclusion that S.B. 14 would not have disparate impact on minorities. Third, Hebert was commenting on the initial version of S.B. 14, prior to the adoption of various ameliorative provisions. *See* PL272 (email dated Jan. 22, 2011) (ROA.38985); Defendants' Proposed Findings of Fact ¶¶ 168, 195.

The other Hebert email cited by Plaintiffs contains the unremarkable proposition that a law that allows non-photo ID places less of a burden on voters in general and therefore has less of a *chance* of burdening minorities. PL205 (ROA.38397) (emphasis added). This is not the same, however, as suggesting that the exclusion of non-photo IDs *will* disproportionately burden minorities. In fact, the law that he was comparing was Georgia's photo-ID-only law, which DOJ concluded did *not* disproportionately burden minorities. *Id.* The idea being that if a law imposes even less of a burden than that law, it will certainly be precleared.

211. Defendants do not dispute that some effort is necessary to obtain an EIC. Plaintiffs ignore, however, that the Texas Legislature intended that issues of access to ID would be addressed in implementing S.B. 14 (*see id.* ¶¶ 169-171), and that such issues were, indeed, addressed during implementation (*see id.* ¶¶ 24-34).

212. Defendants do not dispute that some effort is necessary to obtain an EIC. Plaintiffs ignore, however, that the Texas Legislature intended that issues of access to ID would be addressed in implementing S.B. 14 (*see id.* ¶¶ 169-171), and that such issues were, indeed, addressed during implementation (*see id.* ¶¶ 24-34).

213. Plaintiffs' recitation of the facts is misleading. Although early in the implementation of S.B. 14, DPS requested fingerprints from EIC applicants because that was the process for other IDs, it quickly abandoned that practice. *See, e.g.*, Trial Tr. 282:1-19 (McGeehan) (Sept. 8, 2014) (ROA.100276); *id.* 217:4-23 (Rodriguez) (Sept. 9, 2014) (ROA.100570). This is further evidence that the implementation of S.B. 14 was focused on limiting any potential negative impact of the law on eligible voters.

214. Defendants do not dispute that, in 2007—the year referred to in the evidence cited by Plaintiffs—Republicans supported tightening voter ID requirements and that opponents claimed that requiring voters to identify themselves would reduce turnout among the poor and the elderly.

215. For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute that a single legislative staff member so testified. But, as Plaintiffs later concede, these facts had little effect on their ability to collect direct evidence because many legislators "seldom use email for substantive discussions." Pls.' Proposed Findings of Fact ¶ 217.

216. For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants dispute that there existed emails concerning S.B. 14 that were later deleted. Plaintiffs offer no evidence that this is the case. Defendants do not dispute that among the thousands of pages of documents produced to Plaintiffs were emails from Senator Fraser and Representative Harless concerning S.B. 14.

217. Defendants do not dispute that it is not likely that that there existed emails concerning S.B. 14 that were later deleted.

218. Defendants do not dispute that all participants in the debate over voter ID, including opponents, were aware that statements made during that debate could be used in legal proceedings. *See* Defendants' Proposed Findings of Fact ¶ 99. Defendants also do not dispute that Senator Fraser believed, as the Supreme Court does, that the Voting Rights Act, as it provided in 2012, had outlived its useful life. *See Shelby Cnty. v. Holder*, 133 S. Ct. 2612 (2013). To the extent that Plaintiffs are attempting to use Senator Fraser's widely held policy belief as evidence of racial animus, they are misguided. The Fifth Circuit has rejected the notion that support for policies with legitimate objectives can be evidence of racial animus simply because *opponents* of such policies, like Plaintiffs, speculate that those polices are the product of racial animus. *Veasey*, 830 F.3d at 233-34 & n.16; *see supra*, ¶ 45.

219. Defendants do not dispute that S.B. 14 required voters to prove their identity in order to vote with a photo ID. Defendants dispute Plaintiffs' implication that Texas already required voters to prove their identity in order to vote with a photo ID. As Plaintiffs themselves concede, "[p]rior to the enactment of SB 14, the State of Texas did not require photo ID to vote in person." Pls.' Proposed Findings of Fact ¶ 58.

220. Plaintiffs' recitation of the facts is misleading. Senator Fraser was not dismissive. Although Senator Fraser did advise Senator Uresti to direct certain questions to the Secretary of State, he did so because the Secretary of State was going to be testifying—and did, in fact, testify—before the Committee of the Whole. *See* DEF0001 (Debate on S.B. 14 in the Senate Committee of the Whole, 82d Leg., R.S., 435:16-491:13 (Jan. 25, 2011) (ROA.69041-55).

221. Defendants do not dispute that no studies had been conducted on the effect of S.B. 14, which was not even law yet. Defendants do, however, dispute Plaintiffs' implication that S.B. 14 was not modeled on Indiana and Georgia's voter ID laws, which had, respectively, been approved by the Supreme Court and precleared by DOJ. The evidence is clear that S.B. 14 was so modeled. *See* Defendants' Proposed Findings of Fact ¶¶ 73-76, 151.

222. Defendants do not dispute that no studies had been conducted on the effect of S.B. 14, which was not even law yet. As Democrats conceded, they had no evidence that S.B. 14 would disparately impact minorities. *See supra*, ¶ 200. Moreover, there was significant evidence in the legislative record at the time Senator Ellis posed his question showing that requiring voters to prove their identities via photo ID does not disparately impact minorities. *See id.*

223. Defendants do not dispute that public opinion polls and the experiences of other states that required photo ID to vote supported the conclusion that S.B. 14 would not disparately impact minorities. There was significant additional evidence in the legislative record at the time Senator West posed his question showing that requiring voters to prove their identities via photo ID does not disparately impact minorities. *See id.*

224. Defendants do not dispute that in the 2011 debate over voter ID, Senator Fraser was not able to answer every question opponents posed. But "context matters." *Veasey*, 830 F.3d at 237. By 2011, voter ID had been under consideration for *six years*, with thousands of pages of debate, testimony, and evidence having already been considered. *See* Defendants' Proposed Findings of Fact ¶ 96. Democrats conceded that they were well prepared to debate S.B. 14 based upon the years of debate that preceded. *See id.* ¶ 159.

225. Plaintiffs' recitation of the facts is misleading. None of the evidence cited by Plaintiffs documents a Republican legislator invoking forms of fraud other than in-person voter fraud. Dr. Burden's report cites a press release by the Attorney General's office and a reference to registration fraud by a *Democrat*. *See* PL758 ¶¶ 93-96 (Burden Corr. Rep.) (ROA.43950-51).[2] And the other piece of evidence cited by Plaintiffs is the same press release by the Attorney General's office cited by Dr. Burden. *See* PL689 (ROA.42358).

Plaintiffs reference to Bryan Hebert's statement "that fraud exists generally in the system" (Pls.' Proposed Findings of Fact ¶ 225 (quoting PL275 (ROA.38994)) is also misleading. Proponents of S.B. 14 repeatedly referred publicly to the need to prevent in-person voter fraud and increase public confidence in elections. *See* Defendants' Proposed Findings of Fact ¶¶ 205-207. Referring to fraud in the system generally is appropriate when considered in the context of Texas's ongoing effort to address all weaknesses in the election system. *See id.* ¶ 112. It is also appropriate because evidence that one form of fraud occurs is a legitimate indication that other forms of fraud may also be occurring. *See Crawford*, 553 U.S. at 195-96 (instances of absentee ballot fraud support need for voter ID bill because they "demonstrate that not only is

---

[2]   This is yet another example of why this Court should be wary of Plaintiffs' references to their own experts' reports as support for purported historical facts.

the risk of voter fraud real but that it could affect the outcome of a close election"). In addition, requiring voters to identify themselves with a photo ID *can* reduce the effectiveness of registration fraud. *See* Defendants' Proposed Findings of Fact ¶ 246. Finally, if a "stray statement[] made by [a single] legislator[] voting for S.B. 14" is "not . . . the best indicia of the Texas Legislature's intent" (*Veasey*, 830 F.3d at 234), *a fortiori*, a stray statement by a *staffer* is not strong evidence either.

Defendants do not dispute that it is difficult to determine the exact incidence of in-person voter fraud in Texas. Nonetheless, the Texas Legislature's concern about in-person voter fraud was fully justified. *See supra*, ¶ 136.

226. Defendants do not dispute that in the 2011 debate over voter ID, Representative Harless was not able to comprehensively answer every question opponents posed. But "context matters." *Veasey*, 830 F.3d at 237. By 2011, voter ID had been under consideration for *six years*, with thousands of pages of debate, testimony, and evidence having already been considered. *See* Defendants' Proposed Findings of Fact ¶ 96. Democrats conceded that they were well prepared to debate S.B. 14 based upon the years of debate that preceded. *See id.* ¶ 159.

227. Defendants do not dispute that the Texas Legislature was unaware in 2011 of "the number of voters who lack approved photo ID and the percentage of these voters who are African-American or Hispanic." Pls.' Proposed Findings of Fact ¶ 227; *see also supra* ¶¶ 100, 108-109.

228. For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts. Evidence that one form of fraud occurs, however, is a legitimate indication that other forms of fraud may also be occurring. *See Crawford*, 553

U.S. at 195-96 (instances of absentee ballot fraud support need for voter ID bill because they "demonstrate that not only is the risk of voter fraud real but that it could affect the outcome of a close election").

229. This proposed finding is not supported by the cited source. In the cited portion of the transcript, Representative Aliseda acknowledged his personal belief that non-citizen voting is "not a big problem." Section 5 Trial Tr. 12:18 (Aliseda) (July 9, 2012 P.M. Session) (ROA.89697) As Defendants have shown, however, S.B. 14 can reduce the incidence of non-citizen voting. *See* Defendants' Proposed Findings of Fact ¶¶ 269-274.

230. Defendants do not dispute that Representative Aliseda mistakenly referred to committee testimony when he was, in fact, remembering something said to him "in preparation for" debate on S.B. 14. Section 5 Trial Tr. 22:8-12 (Aliseda) (July 9, 2012 P.M. Session) (ROA.89707). In any event, the Texas Legislature had before it significant evidence of voter fraud. *See supra*, ¶ 136.

231. Plaintiffs' recitation of the facts is misleading. The point Representative Aliseda was conveying was that photo ID is necessary for numerous daily activities. This undisputed fact is supported by Plaintiffs' own testimony (*see* Defendants' Proposed Findings of Fact ¶ 40 n.6) and is undisputed. As the Carter-Baker Commission noted, "Photo IDs currently are needed to board a plane, enter federal buildings, and cash a check." Carter-Baker Commission Report at 18 (ROA.77850).

232. Plaintiffs' recitation of the facts is misleading. Plaintiffs' generalization rests on misconstrued evidence, the selective citation to innocent misstatements, and the fact that individual legislators are not founts of encyclopedic knowledge. *See supra*, ¶¶ 218-231. Plaintiffs ignore that by the time S.B. 14 was finally enacted, the issue of voter ID had been under consideration for *six years*, resulting in *more than 4,500*

*pages* of transcripts and hundreds of pages of exhibits and written testimony. *See* DEF0001-02 (ROA.68878-77825) (legislative histories of S.B. 14, S.B. 362, H.B. 218, and H.B. 1706). Few laws have received more deliberation. And on the specific topic of the "impact on minority voters" (Pls.' Proposed Findings of Fact ¶ 232), the Texas Legislature considered a significant amount of evidence in coming to the conclusion that requiring voters to identify themselves would not disparately impact minorities. *See supra*, ¶ 200.

233. Plaintiffs' recitation of the facts is misleading. Plaintiffs ignore that by the time S.B. 14 was finally enacted, the issue of voter ID had been under consideration for *six years*, resulting in *more than 4,500 pages* of transcripts and hundreds of pages of exhibits and written testimony. *See* DEF0001-02 (ROA.68878-77825) (legislative histories of S.B. 14, S.B. 362, H.B. 218, and H.B. 1706).

234. Defendants do not dispute that many Democratic amendments were rejected. Defendants also do not dispute that, years later, Senator Patrick could not give specific reasons why particular amendments were rejected. But Plaintiffs ignore that Republicans *did* explain why amendments were rejected *at the time they were rejected*. *See* Defendants' Proposed Findings of Fact ¶¶ 165-174. Plaintiffs also ignore that Democrats, who were never going to support any voter ID bill, offered amendments they knew would fail solely in order to build a favorable record for this lawsuit. *See* Trial Tr. 172:7 (Sept. 5, 2014) (Ellis) (ROA.99789) (acknowledging that amendments were offered just to "make a point"), 203:10-21 (ROA.99820) (discussing email from Ellis's Chief of Staff referring to plan to use the expected vote against an Ellis amendment in future legal proceedings against S.B. 14); *see also* DEF0001 (Debate on S.B. 362 in the Senate Committee of the Whole, 81st Leg., R.S., 102:21-22 (March 10, 2009) (ROA.72269)) (Democratic Senator Zaffirini suggesting that those who oppose voter ID were "making a record . . . because a lawsuit is expected"). Finally,

Plaintiffs' focus on amendments only highlights the fact that many ameliorative amendments by Democrats *were* adopted. *See* Defendants' Proposed Findings of Fact ¶ 168. If S.B. 14 proponents were rejecting Democratic amendments in an effort to discriminate, there is no plausible explanation for their decision to adopt or incorporate Democratic amendments that, among other things, expanded the categories of acceptable IDs, provided for the acceptance of expired IDs, and would have allowed an indigency exception to the ID requirement—had Democrats not later objected to and criticized this exception.

235. Plaintiffs' recitation of the facts is misleading. Plaintiffs ignore that Republican legislators explained that they were worried that increasing the variety of IDs would lead to confusion at the polls. *See* Defendants' Proposed Findings of Fact ¶ 173. Plaintiffs also ignore that amendments concerning DPS operations and the fees for documents were rejected because the traditional practice in Texas is to leave issues of implementation to the agencies under the oversight of the Legislature. *See id.* ¶¶ 169-171; *see also id.* ¶ 25 (explaining that DPS hours were extended and fees for documents were reduced). Finally, Plaintiffs ignore that Republicans had legitimate reasons to reject the amendment cited by Plaintiffs that would have required the Secretary of State to study the impact of S.B. 14. *See id.* ¶ 172.

236. Defendants do not dispute that many Democratic amendments were rejected. Plaintiffs' focus on amendments only highlights the fact that many ameliorative amendments by Democrats *were* adopted. *See supra*, ¶ 234.

237. Defendants do not dispute that, years later, Representative Harless could not give specific explanations why particular amendments were opposed. But Plaintiffs ignore that Republicans *did* explain why amendments were rejected *at the time they were rejected*. *See* Defendants' Proposed Findings of Fact ¶¶ 165-174.

238. Defendants do not dispute that Representative Anchia so testified. Plaintiffs' "reliance on post-enactment speculation by opponents of SB 14," however, is "misplaced." *Veasey*, 830 F.3d at 233. In any event, Representative Anchia's speculation is belied by various Democratic amendments that Republicans *did* adopt. *See supra*, ¶ 234.

239. Defendants do not dispute that Senator Ellis's amendment was rejected. Republicans legitimately believed that issue of fees for documents should be addressed by expert agencies during implementation of S.B. 14. *See* Defendants' Proposed Findings of Fact ¶¶ 169-171. And during implementation, fees were reduced. *See id.* ¶ __.

240. Defendants do not dispute that Senator Davis's amendment was rejected. Republicans legitimately believed that the issue of fees for documents should be addressed by expert agencies during implementation of S.B. 14. *See* Defendants' Proposed Findings of Fact ¶¶ 169-171. And during implementation, fees were reduced. *See id.* ¶ 25. Moreover, S.B. 14, as enacted, provided for a "photo ID at no additional cost." Pls.' Proposed Findings of Fact ¶ 240; *see* Defendants' Proposed Findings of Fact ¶ 10-11.

241. Plaintiffs' recitation of the facts is mistaken. Senator Davis's amendment to accommodate voters whose names differed slightly between their ID and voter registration was adopted unanimously. DEF0001 (S.J. of Tex., 82d Leg., R.S. 139 (Jan. 26, 2011) (ROA.70141)).

242. Defendants do not dispute that Senator Gallegos's amendment was rejected. Republicans legitimately believed that the issue of DPS operations should be addressed by expert agencies during implementation of S.B. 14. *See* Defendants' Pro-

posed Findings of Fact ¶¶ 169-171. And during implementation, DPS hours were extended and mobile EIC units were made available to assist those who had trouble reaching DPS offices. *See id.* ¶¶ 26-33.

243. Defendants do not dispute that Republican Senators unanimously approved an amendment inserting an indigency exception into S.B. 14, thus confirming that they did not intend to unnecessarily burden poor voters. Plaintiffs are incorrect, however, that this provision "was stripped from SB 14 in the conference committee." Pls.' Proposed Findings of Fact ¶ 243. This provision was removed from S.B. 14 in the House at the insistence of *Democrats* and with Democratic support. *See* Defendants' Proposed Findings of Fact ¶ 184. With the indigency exception removed, the Conference Committee sought to ensure that S.B. 14 did not unnecessarily burden poor voters by adding in the EIC provision. *See id.* ¶ 195.

244. Defendants do not dispute that these amendments were rejected. Republicans legitimately believed that issues of DPS operations and fees for documents should be addressed by expert agencies during implementation of S.B. 14. *See id.* ¶¶ 169-171. And during implementation, mobile EIC units were made available to assist those who might have trouble reaching DPS offices, and fees for documents were reduced. *See id.* ¶¶ 24-33.

245. Defendants do not dispute that certain amendments seeking to expand the category of acceptable IDs were rejected. Republicans legitimately believed that increasing the variety of IDs would lead to confusion at the polls. *See* Defendants' Proposed Findings of Fact ¶¶ 173-174.

246. Defendants do not dispute that certain amendments seeking to expand the category of acceptable IDs were rejected. Republicans legitimately believed that in-

creasing the variety of IDs would lead to confusion at the polls. *See* Defendants' Proposed Findings of Fact ¶¶ 173-174. This concern was particularly legitimate with respect to student IDs, which are issued by a large number of institutions, which are not standardized, which may not include an address, and which are much less secure than the forms of ID accepted under S.B. 14.

Plaintiffs have offered no evidence that the Texas Legislature was aware that "African-American and Hispanic Texans possess student IDs from public institutions at significantly higher rates than Anglo Texans." Pls.' Proposed Findings of Fact ¶ 246; *see* Defendants' Proposed Conclusion of Law ¶ 132. Accordingly, this fact is irrelevant. *See supra*, ¶ 122.

247. Defendants do not dispute that the Senate unanimously approved an amendment offered by a Democratic legislator to add handgun licenses to the list of acceptable IDs in S.B. 14. *See* Defendants' Proposed Findings of Fact ¶ 168. Plaintiffs seek to have it both ways: opposing Democratic amendments is evidence of racially discriminatory purpose, and supporting Democratic amendments is *also* evidence of racially discriminatory purpose. These two contradictory propositions cannot both be right (in fact, they are both *wrong*). In any event, Plaintiffs offer no evidence that Texas handgun licenses pose the same risk of confusion as the other IDs Democrats sought to add. The Legislature's approval was reasonable since handgun licenses look very similar to other forms of DPS-issued identification and are at least as secure. *Cf.* Tex. Bus. & Com. Code § 506.001(a) (establishing that Texas handgun licenses are acceptable identification in Texas for "access to goods, services, or facilities").

248. Plaintiffs' recitation of the facts is misleading. Although Defendants do not dispute that certain amendments seeking to expand the category of acceptable IDs were rejected in order to reduce confusion at the polls, Plaintiffs offer no evidence

70

that the Texas Legislature was aware that "African-American and Hispanic Texans are more likely than Anglo Texans to possess" such IDs. Pls.' Proposed Findings of Fact ¶ 248; *see* Defendants' Proposed Conclusion of Law ¶ 132. Accordingly, this fact is irrelevant. *See supra*, ¶ 122. Plaintiffs have offered no evidence that individuals who possess other federal, state, or local photo IDs (or even student IDs) do not also possess a form of S.B. 14 ID, that they are somehow not able to obtain it, or that any such person has been prevented from voting by the lack of an S.B. 14 ID or the inability to reasonably obtain it.

Defendants do not dispute that they rejected an amendment that would have allowed persons to vote without a photo ID.

Although Defendants do not dispute that they rejected an amendment to allow the use of certain expired IDs, Plaintiffs ignore that Republicans *did* adopt an amendment to accept other expired IDs. *See* Defendants' Proposed Findings of Fact ¶ 168.

249. Defendants do not dispute that they rejected an amendment that would have allowed persons to vote without a photo ID.

250. Defendants do not dispute that, years later, Speaker Straus could not give specific explanations why particular amendments were opposed. Failure to prove the wisdom or correctness of a legislative judgment is not evidence of racially discriminatory purpose. In any case, it is clear from the legislative record that amendments seeking to expand the kinds of IDs were rejected for legitimate reasons. *See id.* ¶¶ 173-174.

251. Defendants do not dispute that the Texas Legislature was not aware of any analysis of the potential impact of S.B. 14, specifically. The Texas Legislature did, however, have significant evidence before it showing that requiring voters to prove

their identity with photo ID does not disparately impact minorities. *See supra*, ¶ 200. As Plaintiffs' own expert witnesses conceded, there is no conclusive answer to the question of the effect of voter ID laws. *See* Trial Tr. 328:8-10 (Sept. 4, 2014) (Burden) (ROA.99560); *See* DEF0022 (Robert S. Erikson & Lorraine C. Minnite, Modeling Problems in the Voter Identification-Voter Turnout Debate, 8 Election Law Journal 85, 98 (2009)) (ROA.78232). The Texas Legislature was entitled to credit the significant evidence before it and conclude that requiring voters to prove their identity with photo ID does not disparately impact minorities.

252. Plaintiffs' recitation of the facts is misleading. Defendants do not dispute that Republicans opposed Senator Ellis' amendment to require the Secretary of State to annually review the effect of S.B. 14. Republicans opposed this amendment because they legitimately believed that the better course was for the Legislature to examine the impact of S.B. 14 after it had been in place for a couple of years, and then consider whether to place this annual mandate on the Secretary of State. DEF00001 (Debate on S.B. 14 in the Senate Committee of the Whole, 82d Leg., R.S., 29 (Jan. 26, 2011)) (ROA.70215). In any event, the study requested was not feasible given the data held by the Secretary of State (*see* Shorter Dep. 78:2-80:22 (ROA.62351); Dewhurst Dep. 193:2-7 (ROA.60401) ("I didn't feel like, at that point, knowing that they [were] having problems marrying the databases and knowing that there was a continuing problem with—with accessing the data, that it would be worth the time spent, since I didn't believe it was going to be at that point in time in 2011 productive.")), and such a study was inevitably going to be required anyway in order to achieve preclearance under Section 5 of the Voting Rights Act (Trial Tr. 203:16-20 (Sept. 5, 2014) (Ellis) (ROA.99820)). In fact, such a study was completed during the preclearance process. *See* Pls.' Proposed Findings of Fact ¶ 103.

253. Plaintiffs' recitation of the facts is misleading for the reasons stated above in paragraph 252.

254. Plaintiffs' recitation of the facts is misleading for the reasons stated above in paragraph 252.

255. Defendants do not dispute that the final version of S.B. 14 left the details of voter education to the State's expert agency on the topic, the Secretary of State.

256. Defendants do not dispute that S.B. 14 provided $2 million for voter education, split between research and advertising.

257. Defendants do not dispute that S.B. 14 provided $2 million only for voter education. The Secretary of State trains election workers on a regular basis without special funding, and such training occurred. *See, e.g.*, Trial Tr. 161:3-6 (Sept. 9, 2014) (Peters) (ROA.100514); *id.* 210:25-211:11 (Rodriguez) (ROA.100563-64); *id.* 324:21-327:13 (Farinelli) (ROA.100677-80); *id.* 321:3-323:25 (Sept. 10, 2014) (Ingram) (ROA.10183-85).

258. Plaintiffs' recitation of the facts is misleading.

First, The Secretary of State trains election workers on a regular basis without special funding, and such training occurred. *See, e.g.*, Trial Tr. 161:3-6 (Sept. 9, 2014) (Peters) (ROA.100514); *id.* 211:25-212:11 (Rodriguez) (ROA.100563-64); *id.* 324:21-327:13 (Farinelli) (ROA.100677-80); *id.* 321:3-323:25 (Sept. 10, 2014) (Ingram) (ROA.10183-85).

Second, the Secretary of State did not testify, as Plaintiffs imply, that the "average costs for education programs related to less consequential changes than SB 14 was $3 million." Pls.' Proposed Findings of Fact ¶ 258. What the Secretary of State

said was that her agency engages in voter outreach and election-worker training every election cycle, and each cycle it spends, on average, $3 million doing so. *See* DEF0001 (Debate on S.B. 14 in the Senate Committee of the Whole, 82d Leg., R.S., 437:1-6, 440:5-18 (Jan. 25, 2011) (ROA.69042)). The Secretary of State further testified that training and outreach related to S.B. 14 would be folded into that regular effort. *See id.* 438:23-439:8, 441:10-24 (ROA.69042-43). As a result, because there was going to be training and education anyway, the Secretary of State testified that it was likely that her agency would not even "need 2 million just for the voter ID" education. *Id.* 441:15-18. (ROA.69043).

Plaintiffs also ignore that the Secretary of State testified that, beyond the $2 million that S.B. 14 directed the Secretary of State to spend on voter education, there was an additional $3 to $5 million in federal funds that Texas had with which to educate voters and train election workers. *See id.* 439:16-44:10 (ROA.69042-43)).

259. The speculation of voter ID opponents is not helpful to this Court's analysis. *See Veasey*, 830 F.3d at 233. The Secretary of State, who is far more versed on this topic than Senator Gallegos, told the Texas Legislature that it was likely that her agency would not even "need 2 million just for the voter ID" education, given the regular efforts that it makes each election cycle. *See* DEF0001 (Debate on S.B. 14 in the Senate Committee of the Whole, 82d Leg., R.S., 441:15-18. (Jan. 25, 2011) (ROA.69043)).

260. Defendants do not dispute that S.B. 14 provided $2 million only for voter education. Plaintiffs have offered no evidence that any voter in the State was unable to obtain ID or that any county was not able to conduct an election as a result of insufficient funding.

261. Defendants do not dispute that S.B. 14 provided $2 million only for voter education. Plaintiffs have offered no evidence that any voter in the State was unable to obtain ID as a result of insufficient funding.

262. Defendants do not dispute that this Court and the Fifth Circuit concluded that S.B. 14 had a discriminatory effect on the right to vote on account of race, under Section 2 of the Voting Rights Act. Defendants continue to challenge that conclusion. *See* Pet. for Writ of Cert., *Abbott v. Veasey*, No. 16-393 (U.S. Sept. 23, 2016).

In any event, that conclusion does not support the allegation that the Texas Legislature was acting with a discriminatory purpose when it enacted S.B. 14. This is is because the effects conclusion was based on statistical studies done *after* the enactment of S.B. 14, estimating racial disparities in possession of S.B. 14-compliant identification. The Texas Legislature, however, was not presented evidence of this disparity before it passed S.B. 14. It therefore has no bearing on whether the Texas Legislature had a discriminatory purpose in enacting S.B. 14, particularly in light of the Legislature's belief to the contrary based on empirical studies. *See Feeney*, 442 U.S. at 278-79 (analyzing whether disparate impact was intentional only *after* determining that the legislature was, in fact, aware that such an impact would result). In fact, the Texas Legislature received expert testimony that warned against relying upon the very same database-matching technique employed by Plaintiffs' experts in predicting racial disparities regarding preexisting ID possession. Dr. Toby Moore, the former geographer of the voting section of the Civil Rights Division of the DOJ and a project manager for the Carter-Baker Commission on Election Reform, explained:

> There have been kind of three approaches to trying to identify those
> without IDs and to determine their demographics. The first approach
> has been to try to match between data bases, between voter registration
> databases and Department of Motor Vehicle databases, for example.
> That has generally not proven to be successful. Those databases are very

difficult to match between. There is some interesting information to
come out of those attempts. But in general, *I would encourage you to
avoid any kind of database matching to arrive at your information.*

DEF0001 (Tex. Leg., Senate Committee of the Whole, 81st Leg., R.S., at
338:17-339:2 (Mar. 10, 2009) (ROA.72516-17) (emphasis added)). Even if that tech-
nique was accepted in subsequent judicial proceedings, the Legislature's reticence to
rely upon any such technique when empirical studies showed that voter ID laws did
not produce a disparate impact on minorities does not show any discriminatory pur-
pose.

Moreover, even if Plaintiffs' matching studies had been available to the Texas
Legislature, those studies would have shown that more non-Hispanic white voters
lacked S.B. 14-eligible IDs than African-American and Hispanic voters combined. *See*
Defendants' Proposed Findings of Fact ¶¶ 219-220. Assuming that the rate of ID pos-
session provides a relevant measure of S.B. 14's impact, this fact forecloses a discrim-
inatory-purpose finding under binding Supreme Court precedent: "Too many" white
voters "are affected by" S.B. 14 "to permit the inference that the statute is but a pre-
text for" discrimination. *Feeney*, 442 U.S. at 275. In *Feeney*, the Court stated that the
challenged law could not be explained as a pretext for preferring men over women
because significant numbers of those disadvantaged by the law were men. *Id*. The
same holds here: S.B. 14's photo ID requirement cannot be explained as a pretext for
harming minorities compared to whites because, according to Plaintiffs, hundreds of
thousands of white registered voters—by some estimates, more than similarly situ-
ated African-Americans and Hispanics *combined*—were also negatively impacted by
S.B. 14. *See Doe ex rel. Doe v. Lower Merion Sch. Dist.*, 665 F.3d 524, 553 (3d Cir.
2011) (rejecting claim of discriminatory purpose where minorities and whites were
both adversely affected by the policy at issue). To put it another way, Plaintiffs can
"no more successfully claim that" S.B. 14 "denied them equal protection than could

76

white [voters] who also" lacked S.B. 14 ID. *Washington v. Davis*, 426 U.S. 229, 246 (1976).

263. Defendants do not dispute that this Court and the Fifth Circuit concluded that S.B. 14 had a discriminatory effect on the right to vote on account of race, under Section 2 of the Voting Rights Act. But this conclusion does not support the claim currently before the Court for reasons set forth in paragraph 262 above. *See also* Defendants' Proposed Conclusions of Law ¶¶ 44-54. It is also inaccurate to characterize every voter who lacked an S.B. 14 ID as "disenfranchised." *See* Defs' Proposed Conclusions of Law ¶ 48.

264. Defendants do not dispute that this Court and the Fifth Circuit concluded that S.B. 14 had a discriminatory effect on the right to vote on account of race, under Section 2 of the Voting Rights Act. But this conclusion does not support the claim currently before the Court for reasons set forth in paragraph 262 above. *See also* Defendants' Proposed Conclusions of Law ¶¶ 44-54.

265. Defendants do not dispute that this Court and the Fifth Circuit concluded that S.B. 14 had a discriminatory effect on the right to vote on account of race, under Section 2 of the Voting Rights Act. But this conclusion does not support the claim currently before the Court for reasons set forth in paragraph 262 above. *See also* Defendants' Proposed Conclusions of Law ¶¶ 44-54.

266. Defendants do not dispute that this Court and the Fifth Circuit concluded that S.B. 14 had a discriminatory effect on the right to vote on account of race, under Section 2 of the Voting Rights Act. But this conclusion does not support the claim currently before the Court for reasons set forth in paragraph 262 above. *See also* Defendants' Proposed Conclusions of Law ¶¶ 44-54.

267. The evidence does not support this proposed finding of fact. Plaintiffs have not proven that S.B. 14 caused African-American, Hispanic voters, or impoverished voters to enjoy less opportunity or an unequal opportunity to participate in the political process. Despite their unprecedented access to privileged legislative materials, Plaintiffs have no evidence that any member of the Texas Legislature, let alone the body as a whole, intended or expected S.B. 14 to have that result. The record shows that the Texas Legislature reasonably relied on evidence before it to conclude that S.B. 14 would not have any discriminatory impact on minority voters. The evidence of purported discriminatory impact offered by Plaintiffs in this litigation was not before the Legislature when it enacted S.B. 14, and even if it had been, it would not have supported the conclusion that S.B. 14 would deprive minority voters of an equal opportunity to vote. Only by assuming the worst and ignoring the evidence can Plaintiffs allege that the Texas Legislature deliberately set out to diminish the electoral opportunities available to minority voters. *See supra* ¶ 262; Defendants' Proposed Conclusions of Law ¶¶ 44-54.

268. Defendants do not dispute that Dr. Ansolabehere so found. But this analysis was not before the Texas Legislature, which had, in any event, been warned against reliance on the type of database matching analysis used by Dr. Ansolabehere. *See* Defendants' Proposed Findings of Fact ¶¶ 217-218; Defendants' Proposed Conclusions of Law ¶¶ 44-54.

269. Defendants do not dispute that Dr. Ansolabehere so found. But this analysis was not before the Texas Legislature, which had, in any event, been warned against reliance on the type of database matching analysis used by Dr. Ansolabehere. *See* Defendants' Proposed Findings of Fact ¶¶ 217-218; Defendants' Proposed Conclusions of Law ¶¶ 44-54. The statement that disparities in ID possession "are statisti-

cally significant and highly unlikely to have arisen by chance" is a non-sequitur. Defendants have never asserted that rates of ID possession are determined by chance—photo IDs are not randomly distributed. And Plaintiffs cannot support the implicit assumption that rates of ID possession, or any other statistic, should be expected to reflect a perfectly equal distribution among all social or economic categories. *Cf., e.g.*, *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 n.15 (1977) ("In many instances, to recognize the limited probative value of disproportionate impact is merely to acknowledge the heterogeneity of the Nation's population.") (internal quotation marks omitted). Rates of ID possession do not imply disenfranchisement, and there is no evidence that the Legislature selected particular forms of ID to include in S.B. 14 because it intended—even in part—to burden African-American or Hispanic voters.

270. Defendants do not dispute that Dr. Ansolabehere so found. But this analysis was not before the Texas Legislature, which had, in any event, been warned against reliance on the type of database matching analysis used by Dr. Ansolabehere. *See* Defendants' Proposed Findings of Fact ¶¶ 217-218; Defendants' Proposed Conclusions of Law ¶¶ 44-54.

271. Defendants do not dispute that other Plaintiffs' experts agreed with Dr. Ansolabehere. But this analysis was not before the Texas Legislature, which had, in any event, been warned against reliance on the type of database matching analysis used by Dr. Ansolabehere. *See* Defendants' Proposed Findings of Fact ¶¶ 217-218; Defendants' Proposed Conclusions of Law ¶¶ 44-54.

272. Defendants do not dispute that Dr. Ansolabehere so found. But this analysis was not before the Texas Legislature, which had, in any event, been warned against reliance on the type of database matching analysis used by Dr. Ansolabehere. *See*

Defendants' Proposed Findings of Fact ¶¶ 217-218; Defendants' Proposed Conclusions of Law ¶¶ 44-54.

273. Defendants do not dispute that Dr. Ansolabehere so found. But this analysis was not before the Texas Legislature, which had, in any event, been warned against reliance on the type of database matching analysis used by Dr. Ansolabehere. *See* Defendants' Proposed Findings of Fact ¶¶ 217-218; Defendants' Proposed Conclusions of Law ¶¶ 44-54.

274. Defendants do not dispute that the statistics listed reflect Dr. Ansolabehere's findings. But this analysis was not before the Texas Legislature, which had, in any event, been warned against reliance on the type of database matching analysis used by Dr. Ansolabehere. *See* Defendants' Proposed Findings of Fact ¶¶ 217-218; Defendants' Proposed Conclusions of Law ¶¶ 44-54. It is misleading, however, to state that "the share of African-American voters and Hispanic voters who must obtain SB 14 ID to cast a ballot that will be counted is between three to four times as high" as the share of Anglo voters. Dr. Ansolabehere's data indicate that of the 376,985 registered voters he identified, 166,220 are Anglo, 121,312 are Hispanic, and 82,525 are African-American. Improperly dividing percentages masks the fact, as found by Dr. Ansolabehere, that more white registered voters than either African-American or Hispanic registered voters did not have an S.B. 14, did not qualify to vote by mail, and did not qualify for a disability exemption. Even if the Texas Legislature had considered these findings, they would not support an inference that it deliberately set out to disadvantage African-American or Hispanic voters. By Plaintiffs' logic, the same data would support an inference that the Legislature deliberately set out to disadvantage Anglo voters in favor of "Other" voters, only 1.4% (6,928) of whom fell into the same category.

275. Defendants do not dispute that Drs. Barreto and Sanchez so found. But these analyses were not before the Texas Legislature and are, therefore, irrelevant to this Court's analysis. *See supra*, ¶ 262.

276. Defendants do not dispute that Drs. Barreto and Sanchez so found, but the proposed finding is incomplete. Drs. Barreto and Sanchez also found that approximately 395,000 white voters in Texas lacked S.B. 14 ID. Baretto-Sanchez Report, Appx. A tbl.1 (ROA.43605). But these analyses were not before the Texas Legislature and are, therefore, irrelevant to this Court's analysis. *See supra*, ¶ 262.

277. Defendants do not dispute that Drs. Barreto and Sanchez so found. But these analyses were not before the Texas Legislature and are, therefore, irrelevant to this Court's analysis. *See supra*, ¶ 262.

278. Defendants do not dispute that Plaintiffs' experts so found. But these analyses were not before the Texas Legislature and are, therefore, irrelevant to this Court's analysis. *See supra*, ¶ 262.

279. Defendants do not dispute that Drs. Barreto and Sanchez so found. But these analyses were not before the Texas Legislature and are, therefore, irrelevant to this Court's analysis. *See supra*, ¶ 262.

280. Defendants do not dispute that Drs. Barreto and Sanchez so found. But these analyses were not before the Texas Legislature and are, therefore, irrelevant to this Court's analysis. *See supra*, ¶ 262.

281. Defendants do not dispute that Drs. Barreto and Sanchez so found. But these analyses were not before the Texas Legislature and are, therefore, irrelevant to this Court's analysis. *See supra*, ¶ 262.

282. Defendants do not dispute that Dr. Webster so found. But these analyses were not before the Texas Legislature and are, therefore, irrelevant to this Court's analysis. *See supra*, ¶ 262.

283. Defendants do not dispute that these witness so testified at trial. Nonetheless, the Texas Legislature was entitled to rely on the substantial evidence before it that showed that requiring voters to prove their identities with a photo ID does not disparately impact minorities. *See supra*, ¶ 200.

284. Defendants do not dispute that these plaintiffs/witness so testified at depositions and at a trial. Nonetheless, the Texas Legislature was entitled to rely on the substantial evidence before it that showed that requiring voters to prove their identities with a photo ID does not disparately impact minorities. *See supra*, ¶ 200. Indeed, each of these plaintiffs/witnesses can vote notwithstanding S.B. 14. *See* Defendants' Proposed Findings of Fact ¶¶ 39-44.

285. Defendants do not dispute that Dr. Henrici so testified. But Dr. Henrici's view was not only *not* before the legislature at the time it considered S.B. 14, it was rebutted by the testimony of a *plaintiff*, Floyd Carrier, who testified that he had been trying to obtain ID since before S.B. 14 in order to handle his personal finances. *See* Trial Tr. 88:17-21 (Sept. 2, 2014) (F. Carrier) (ROA.98720).

286. Defendants do not dispute that these plaintiffs/witness so testified at depositions and at a trial. The testimony does not establish, however, that Ms. Bingham or Mr. Estrada (or any other voter) cannot get an S.B. 14 ID. Ms. Bingham had an S.B. 14 ID, Bingham Dep. 37:9-10 (ROA.97456), and the proposed finding does not allege that she could not have obtained an ID other than a driver's license in the past. Mr. Estrada conceded on cross-examination that he could obtain a personal ID card. Es-

trada testified that he had held a commercial driver's license with a hazmat endorsement since 1997. Trial Tr. 137:4-12 (Sept. 4, 2014) (Estrada) (ROA.99369). To maintain his hazmat endorsement, Estrada had to verify his citizenship or residency with the Transportation Security Administration, which he did by presenting a birth certificate and baptismal papers, most recently in 2011. *Id.* at 137:13-138:2 (ROA.99369-70). He testified that he obtained his birth certificate from the Karnes County courthouse, which is about six miles from his home, and which is also where the Karnes County elections office is located. *Id.* at 138:3-22. To maintain his commercial driver's license, Mr. Estrada had to pay fees of up to $100 over the years. *Id.* at 139:8-16 (ROA.99371). His commercial driver's license expired in January, 2013. *Id.* at 140:11-14 (ROA.99372). To renew it, he had to pay surcharges resulting from a ticket for failure to carry insurance. *Id.* at 135:4-19 (ROA.99367). He was aware that he could obtain a personal identification card from the DPS for $16, he was interested in obtaining one, and he confirmed that he could afford the fee. *Id.* at 142:8-143:13 (ROA.99374-75). These witnesses indicate that socioeconomic conditions do not necessarily correlate with lack of S.B. 14 ID. In any event, the Texas Legislature was entitled to rely on the substantial evidence before it that showed that requiring voters to prove their identities with a photo ID does not disparately impact minorities. *See supra*, ¶ 200. Indeed, each of these plaintiffs/witnesses can vote notwithstanding S.B. 14. *See* Defendants' Proposed Findings of Fact ¶¶ 39-44.

287. Plaintiffs' view was not shared by the Texas Legislature, which was entitled to rely on the substantial evidence before it that showed that requiring voters to prove their identities with a photo ID does not disparately impact minorities. *See supra*, ¶ 200. The record does not support the proposed finding that obtaining S.B. 14 ID imposes a general burden on any segment of the population, much less that it burdens

minority voters on account of race. Plaintiffs have identified various "general imped-iments" that could impose a burden in particular circumstances. But they have not proven that those general impediments "establish the material burden of S.B. 14" on voters who lack ID, nor have they proven that those general impediments "increase the degree to which the impact is discriminatory, due to the greater likelihood that Hispanic and African-American Texans lack resources needed to overcome these im-pediments." At most, Plaintiffs have outlined a theory that certain factors might com-bine to impose a burden on individual voters, and that those factors might impose a particular burden on Hispanic and African-American voters because they are more likely to lack resources to overcome them. According to that theory, the requirements of S.B. 14 (or any voting requirement that imposes a greater marginal burden on economically disadvantaged voters) will interact with "general impediments" to im-pose a general burden on African-American and Hispanic voters who lack ID, thereby abridging or denying their right to vote. But they have not proven their theory. They have not established that S.B. 14 has had or will have a general impact on any group of voters. To the extent they have attempted to prove it, their theory does not stand up to the evidence—it indicates that Hispanic and African-American voters who lack ID are no less able to obtain it than similarly situated white voters. *See, e.g.*, ¶ 337, *infra*.

288. Defendants do not dispute that Drs. Burden and Burton so found regarding the "calculus of voting" approach, nor do Defendants dispute the general proposition that monetary and non-monetary costs may, at some point, reduce the likelihood that voters will participate. But Defendants dispute, and the evidence does not show, that socioeconomic disparities across racial groups make "minority voters . . . particularly unlikely to overcome the impediment" allegedly created by SB 14. *See supra* ¶ 287.

The view reflected in the proposed finding, moreover, is directly contrary to the evidence received and credited by the Texas Legislature, showed that requiring voters to prove their identities with a photo ID does not disparately impact minorities. *See supra*, ¶ 200. The view of the Texas Legislature was confirmed by the results of elections following implementation of S.B. 14. *See* Defendants' Proposed Findings of Fact ¶¶ 45-51.

289. Defendants do not dispute that these plaintiffs/witness so testified at depositions and at a trial, but Plaintiffs' recitation of the facts is misleading. The Supreme Court in *Crawford* concluded that "[f]or most voters who need them, the inconvenience of making a trip to [a government office], gathering the required documents, and posing for a photograph surely does not qualify as a substantial burden on the right to vote, or even represent a significant increase over the usual burdens of voting." 553 U.S. at 198. That Plaintiffs have been able to find a handful of voters for whom the burdens may be more severe than average does not support a finding that "[o]btaining SB 14 ID imposes substantial difficulties and burdens" on voters. Pls.' Proposed Findings of Fact ¶ 289. The Texas Legislature was entitled to rely on the substantial evidence before it that showed that requiring voters to prove their identities with a photo ID does not disparately impact minorities. *See supra*, ¶ 200. Indeed, each of these plaintiffs/witnesses can vote notwithstanding S.B. 14. *See* Defendants' Proposed Findings of Fact ¶¶ 39-44.

290. Defendants do not dispute that Dr. Jewell so found. Nonetheless, the Texas Legislature was entitled to rely on the substantial evidence before it that showed that requiring voters to prove their identities with a photo ID does not disparately impact minorities. *See supra*, ¶ 200. Indeed, each of these plaintiffs/witnesses can vote notwithstanding S.B. 14. *See* Defendants' Proposed Findings of Fact ¶¶ 39-44. This is consistent with the results of elections held following implementation of S.B. 14,

which showed that S.B. 14 had a negligible impact on voting. *See id.* ¶¶ 45-51. The difficulties faced by these carefully selected individuals—most of whom could vote by mail without ID—are not evidence of "the total cost associated with SB 14," Pls.' Proposed Findings of Fact ¶ 290. *Crawford*, 553 U.S. at 198 ("For most voters who need them, the inconvenience of making a trip to [a government office], gathering the required documents, and posing for a photograph surely does not qualify as a substantial burden on the right to vote, or even represent a significant increase over the usual burdens of voting."); *cf. Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 631 (6th Cir. 2016) ("Zeroing in on the abnormal burden experienced by a small group of voters is problematic at best, and prohibited at worst."). Moreover, Plaintiffs ignore that S.B. 14 provided for a free EIC, and did not specify what documents would be necessary for the EIC or their cost. See Trial Tr. 282:1-6 (Sept. 8, 2014) (McGeehan) (ROA.100276). During implementation of S.B. 14, the agencies with that responsibility lowered the cost significantly. See Defendants' Proposed Findings of Fact ¶ 25.

291. Defendants do not dispute that Ms. White so testified. Nonetheless, the Texas Legislature was entitled to rely on the substantial evidence before it that showed that requiring voters to prove their identities with a photo ID does not disparately impact minorities. *See supra*, ¶ 200. The bare statement that "many" low-income individuals cannot obtain ID without assistance does not provide any indication how severe the burden is, how many people it affects, and what kind of assistance they require. Whatever they may be, those burdens affect voters on account of their low-income status, not their race—there is no evidence that the cited burdens affect low-income minority voters more severely than they affect low-income white voters. Plaintiffs' focus on the testimony of a single worker at a homeless shelter only highlights the fact that, despite crisscrossing the State, they could not produce a single homeless person who intended to vote but was unable to cast a ballot. *See* Defendants' Proposed

86

Findings of Fact ¶ 38. In addition, the Supreme Court in *Crawford* concluded that "[f]or most voters who need them, the inconvenience of making a trip to [a government office], gathering the required documents, and posing for a photograph surely does not qualify as a substantial burden on the right to vote, or even represent a significant increase over the usual burdens of voting." 553 U.S. at 198. Finally, Plaintiffs ignore that S.B. 14 provided for a free EIC, and did not specify what documents would be necessary for the EIC or their cost. See Trial Tr. 282:1-6 (Sept. 8, 2014) (McGeehan) (ROA.100276). During implementation of S.B. 14, the agencies with that responsibility lowered the cost significantly. See Defendants' Proposed Findings of Fact ¶ 25.

292. Defendants do not dispute that Ms. White so testified, but her testimony does not indicate a disparate impact on minority voters. The proposed finding does not state what percentage, if any, of the individuals seeking assistance are minorities. Nor does it state that individuals seeking assistance obtaining ID do so because they need ID to vote. Plaintiffs' statement regarding the typical cost to assist a client is not specific enough to formulate a response, as it does not indicate what "the entire process" entails, how long it lasts, or what services are provided. The Supreme Court in *Crawford* concluded that "[f]or most voters who need them, the inconvenience of making a trip to [a government office], gathering the required documents, and posing for a photograph surely does not qualify as a substantial burden on the right to vote, or even represent a significant increase over the usual burdens of voting." 553 U.S. at 198. The Texas Legislature was entitled to rely on the substantial evidence before it that showed that requiring voters to prove their identities with a photo ID does not disparately impact minorities. *See supra*, ¶ 200.

293. Defendants do not dispute that Ms. Mora so testified, but Defendants dispute Plaintiffs' characterization of the cost of obtaining an S.B. 14 ID. The Supreme Court in *Crawford* concluded that "[f]or most voters who need them, the inconvenience of

making a trip to [a government office], gathering the required documents, and posing for a photograph surely does not qualify as a substantial burden on the right to vote, or even represent a significant increase over the usual burdens of voting." 553 U.S. at 198. The Texas Legislature was entitled to rely on the substantial evidence before it that showed that requiring voters to prove their identities with a photo ID does not disparately impact minorities. *See supra*, ¶ 200. The burdens faced by homeless individuals who seek services from organizations such as the Stewpot do not fairly represent the usual burdens of voting for any individual. Homeless individuals who seek assistance from the Stewpot in obtaining identification do so because identification is frequently required to receive other services, such as residency in a homeless shelter. Trial Tr. 137:15-22 (Sept. 3, 2014) (Mora) (ROA.99069). Plaintiffs' focus on the aggregate population of homeless individuals served by the Stewpot only highlights their failure to identify a single homeless person who intended to vote but was unable to cast a ballot. Ms. Mora testified that a DOJ attorney visited the Stewpot and offered to speak to "anybody who was a registered voter and had the intention to be able to vote and was experiencing difficulties and was not able to due to not having a Texas I.D. or acceptable form of identification." *Id.* at 144:24-145:2 (ROA.99076-77). Ms. Mora testified that there were "[l]ess than five" takers, *id.* at 145:6 (ROA.99077), and Plaintiffs have not identified any of them as individuals who intended to vote but were prevented from doing so because they could not obtain S.B. 14 ID.

294. Plaintiffs' proposed finding is not supported by the evidence cited. Dr. Henrici never testified that low-income minorities face more numerous or more severe impediments to obtaining photo ID than similarly situated low-income white voters. Defendants do not dispute that low-income individuals face burdens on account of their socioeconomic status, but there is no evidence to support a finding that those burdens are imposed on account of race. The Texas Legislature was entitled to rely on the

substantial evidence before it that showed that requiring voters to prove their identities with a photo ID does not disparately impact minorities. *See supra*, ¶ 200.

295. Defendants do not dispute that Drs. Chatman and Henrici so found or that low-income Texans face certain burdens on account of their socioeconomic status, but those burdens do not establish a disparate impact on account of race. The Texas Legislature was entitled to rely on the substantial evidence before it that showed that requiring voters to prove their identities with a photo ID does not disparately impact minorities. *See supra*, ¶ 200.

296. Plaintiffs' proposed finding is not supported by the evidence. Defendants do not dispute that poorer Texans may face burdens not faced by Texans of greater means. Nor do Defendants dispute the relative rates of poverty in particular segments of the Texas population. It does not follow, however, that "Hispanics and African-Americans who do not already possess . . . photo ID face greater burdens in obtaining S.B. 14 ID than Anglo voters" (Plaintiffs' FoF ¶ 296). There is no evidence that Hispanic and African-American voters who do not already have an acceptable form of ID face greater burdens in obtaining S.B. 14 ID than Anglo voters who do not already have an acceptable form of ID. The Texas Legislature was entitled to rely on the substantial evidence before it that showed that requiring voters to prove their identities with a photo ID does not disparately impact minorities. *See supra*, ¶ 200.

297. Defendants do not dispute that Drs. Burton and Henrici so found or that Texans who live in poverty experience certain burdens on account of poverty that Texans of greater means either do not face or find it easier to overcome. The general propositions in Plaintiffs' proposed finding, however, do not tend to prove or disprove any claim about the purpose or effect of S.B. 14.

298. Defendants do not dispute that Dr. Henrici so found or that Texans who live in poverty experience certain burdens on account of poverty that Texans of greater means either do not face or find it easier to overcome. The general propositions in Plaintiffs' proposed finding, however, do not tend to prove or disprove any claim about the purpose or effect of S.B. 14.

299. Defendants do not dispute that Dr. Henrici so found or that Texans who live in poverty experience certain burdens on account of poverty that Texans of greater means either do not face or find it easier to overcome. The general propositions in Plaintiffs' proposed finding, however, do not tend to prove or disprove any claim about the purpose or effect of S.B. 14.

300. Defendants do not dispute that Dr. Henrici so found or that Texans who live in poverty experience certain burdens on account of poverty that Texans of greater means either do not face or find it easier to overcome. Nor do Defendants dispute the general proposition that "[m]any low-income Hispanic and African-American families" experience difficulties related to housing. But Defendants dispute that low-income voters of other races or ethnicities do not face similar difficulties. The general propositions in Plaintiffs' proposed finding do not tend to prove or disprove any claim about the purpose or effect of S.B. 14.

301. Plaintiffs' proposed finding is not supported by the cited sources. Defendants do not dispute the general proposition that low-income individuals disproportionally suffer from health problems or that Dr. Henrici so testified.  The cited evidence does not support the proposition that Hispanic and African-American Texans generally suffer disproportionally from health impairments, difficulty managing family members' disabilities, or inability to obtain and maintain documents. The cited sources

support the proposition that low-income Texans disproportionately face these diffi-

culties; they do not support the proposition that Hispanic and African-American Tex-

ans disproportionately face these difficulties compared to similarly situated Texans

of other races or ethnicities. To the extent these burdens fall on low-income minority

Texans, there is no support in the cited sources for the proposition that the same

burdens do not fall equally on other low-income Texans. Defendants'

302. Defendants do not dispute that Dr. Henrici so stated in her report, but the

cited trial testimony is limited to the general stigma associated with poverty. None-

theless, the Texas Legislature was entitled to rely on the substantial evidence before

it that showed that requiring voters to prove their identities with a photo ID does not

disparately impact minorities. *See supra*, ¶ 200.

303. Defendants do not dispute that Dr. Henrici so found. Nonetheless, the Texas

Legislature was entitled to rely on the substantial evidence before it that showed that

requiring voters to prove their identities with a photo ID does not disparately impact

minorities. *See supra*, ¶ 200.

304. Defendants do not dispute that Ms. White and Ms. Mora so testified or that

individuals who are homeless or extremely impoverished face burdens on account of

their circumstances or socioeconomic status that individuals in better circumstances

or with greater means either do not face or find it easier to overcome. Nor do Defend-

ants dispute the relative rates of poverty in particular segments of the Texas popula-

tion. It does not follow, however, that the burdens of homelessness or extreme poverty

are imposed on account of race, and the general propositions in Plaintiffs' proposed

finding does not tend to prove or disprove any claim about the purpose or effect of

S.B. 14. The Texas Legislature was entitled to rely on the substantial evidence before

it that showed that requiring voters to prove their identities with a photo ID does not disparately impact minorities. *See supra*, ¶ 200.

305. Defendants dispute this proposed finding. Plaintiffs have not proven that S.B. 14 "eliminates the ability of a disproportionate number of Hispanic and African-American voters to cast a ballot that will be counted" or that it "disproportionately diminishes the opportunity" to do so. To the extent S.B. 14 imposes any burden on account of socioeconomic disadvantage, that burden is not imposed on account of race. Plaintiffs' view was not shared by the Texas Legislature, which was entitled to rely on the substantial evidence before it that showed that requiring voters to prove their identities with a photo ID does not disparately impact minorities. *See supra*, ¶ 200.

306. Plaintiffs' view was not shared by the Texas Legislature, which included in SB 14 readily available ID that the Legislature concluded would "be the easiest to use." *See* DEF0001 (Debate on S.B. 14 in the Senate Committee of the Whole, 82d Leg., R.S., 168:12-21 (Jan. 25, 2011) (ROA.68974)).

307. Plaintiffs' view was not shared by the Texas Legislature, which included in SB 14 readily available ID that the Legislature concluded would "be the easiest to use." *See id*.

308. Defendants do not dispute that DPS charges fees to obtain certain IDs. This is why S.B. 14 provided for free EICs and why state agencies reduced the cost of documents necessary to obtain an EIC. *See* Defendants' Proposed Findings of Fact ¶ 25; *see also* Trial Tr. 98:14-18 (Sept. 11, 2014) (Williams) (ROA.101283) ("Q: [T]here is no exception in SB 14 for people who are indigent in Texas, correct? A: [T]he Election Identification Certificate is free of charge. That is the exception.").

309. Defendants do not dispute that Dr. Lichtman so testified, but his testimony is based on an unsupported inference. According to Lichtman, an unidentified blogger speculated that surcharges were "a major contributor to Texas' voter ID law being challenged" because it might account for a large number of individuals who lacked a current ID. Trial Tr. 92:1-5 (Sept. 5, 2014) (ROA.99709). After DOJ denied preclearance, one Republican staff member referred to the blog post in a message to another Republican staff member, who responded that "this came up in the debate. Thanks for passing it along." *Id.* at 92:7-8. Lichtman considered this to be "direct evidence" that the Legislature was aware of a "racial impact" from surcharges. *Id.* at 91:12-17 (ROA.99708). But there is no mention of race in the blog post or the communication between two staffers. And Plaintiffs cannot point to anywhere in the legislative debate where the Legislature was informed of the racial makeup of this population. *See* DEF0001 (Debate on S.B. 14 in the Senate Committee of the Whole, 82d Leg., R.S., 197:2-199:6 (Jan. 25, 2011) (discussing the surcharge issue) (ROA.68982)). In addition, Plaintiffs ignore that anyone without a driver's license could obtain an EIC. *See* Defendants' Proposed Findings of Fact ¶¶ 10-11.

310. Plaintiffs are referencing possession rates of certain IDs by minorities. None of the information was before the Texas Legislature when it considered S.B. 14 and, therefore, it is irrelevant. *See supra*, ¶ 122; Defendants' Proposed Conclusions of Law ¶ 132. In any event, the Texas Legislature legitimately concluded that limiting the forms of acceptable ID was necessary to avoid confusion at the polls. *See supra*, ¶ 125. This proposed finding does not specify what types of IDs it refers to, what information they contain, and how they qualify as "secure."

311. Defendants do not dispute that Dr. Lichtman so found, but the assertion that excluding government employee IDs "sharpened the racial impact of S.B. 14" is un-

founded. Even if Plaintiffs had proven a "racial impact," the relative number of African-American and Hispanic voters who have a government employee ID would "sharpen" that impact only if those voters also lacked an S.B. 14 ID. There is no evidence to support that conclusion, and the notion that government employees lack a driver's license or other state-issued identification is not plausible. In any case, Plaintiffs have not proven that S.B. 14 had a "racial impact"; they have provided estimates of the number of people who did not have an S.B. 14 at the time of trial, and they have attempted to show the effect of existing rates of ID possession by identifying a handful of voters, most of whom are elderly and therefore eligible to vote without a photo ID, and none of whom cannot vote because of S.B. 14. Even if rates of ID possession are taken as evidence of "racial impact," the evidence shows that the number of white voters without ID was greater than the number of Hispanic or African-American voters without ID and, by some measures, greater than the combined number of Hispanic and African-American voters without ID. None of the information, however, was before the Texas Legislature when it considered S.B. 14 and, therefore, it is irrelevant. *See supra*, ¶ 122; Defendants' Proposed Conclusions of Law ¶ 132. In any event, the Texas Legislature legitimately concluded that limiting the forms of acceptable ID was necessary to avoid confusion at the polls. *See supra*, ¶ 125.

312. This proposed finding is not supported by the evidence. Plaintiffs have not proven that the choice not to accept student IDs had any impact at all. The only student Plaintiffs have identified chose to get a California driver's license instead of a Texas driver's license. Even on Plaintiffs' theory of "racial impact," excluding student IDs would "sharpen" the alleged racial impact of S.B. 14 only if voters who have a student ID do not also have an S.B. 14 ID, if the voters with a student ID and not an S.B. 14 cannot reasonably obtain an S.B. 14 ID, and if the lack of an S.B. 14 ID prevented those voters from voting, and if the voters who could not vote because of their

inability to obtain an S.B. 14 ID were disproportionately African-American or Hispanic. None of this has been proven by Plaintiffs. And no such information was before the Texas Legislature when it considered S.B. 14, making it irrelevant. *See supra*, ¶ 122; Defendants' Proposed Conclusions of Law ¶ 132. In any event, the Texas Legislature legitimately concluded that limiting the forms of acceptable ID was necessary to avoid confusion at the polls. *See supra*, ¶ 125. Unlike the forms of ID accepted under S.B. 14, student IDs are issued by a large number of different institutions, they are not standardized, they may not include an address, and they are much less secure.

313. Plaintiffs' recitation of the facts is misleading. The Senate *unanimously* approved a Democratic legislator's amendment to add handgun licenses to the list of acceptable IDs in S.B. 14. *See* Defendants' Proposed Findings of Fact ¶¶ 168. That amendment was reasonable because a concealed handgun license is at least as secure as other forms of state-issued identification. Plaintiffs seek to have it both ways: opposing Democrats' amendments is evidence of racial animus and supporting Democrats' amendments is also evidence of racial animus. These two contradictory propositions cannot both be right (in fact, they are both wrong). In any event, none of this information was before the Texas Legislature when it considered S.B. 14 and, therefore, it is irrelevant. *See supra*, ¶ 122; Defendants' Proposed Conclusions of Law ¶ 132.

314. Defendants do not dispute that fewer persons have the ability to obtain a military ID, a U.S. citizenship certificate, or a U.S. Passport, as compared to a drivers' license, personal ID card, or free EIC.

315. For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts.

316. For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts.

317. For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts.

318. For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts.

319. For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts. The cited report indicates, however, that a substantially greater percentage of registered Hispanic voters (12.2%) than Anglo voters (1.3%) or African-American voters (2.6%) held certificates of citizenship and naturalization. *See* Ansolabehere Corr. Supp. Rep. ¶ 61, tbl.V.2 (ROA.43258-59).

320. For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts.

321. For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts.

322. For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts.

323. Plaintiffs' proposed factual finding rests on a false premise. Contrary to the Plaintiffs' assumption, the Secretary of State had substantial funding to educate voters. *See supra*, ¶ 258.

324. For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts. The evidence shows, however, that the availability of EICs was widely publicized. *See* Defendants' Proposed Findings of Fact ¶ 31.

325. Defendants do not dispute that these plaintiffs/witnesses so testified. The evidence shows, however, that the availability of EICs was widely publicized. *See* Defendants' Proposed Findings of Fact ¶ 31. ████████████████ ████████████████████████████████████████████ ██ ██ ████ In any event, even assuming that many people had not heard of EICs, Plaintiffs have produced no evidence suggesting that such was the Legislature's intention.

326. Defendants do not dispute that Drs. Barreto and Sanchez so found. The evidence shows, however, that the availability of EICs was widely publicized. *See* Defendants' Proposed Findings of Fact ¶ 31. ████████████████ ████████████████████████████████████████████ ██ ████ In any event, even assuming that many people had not heard of EICS Plaintiffs have produced no evidence suggesting that such was the Legislature's intention.

327. Plaintiffs do not dispute that Drs. Barreto and Sanchez so found. This analysis was not before the Texas Legislature, however, and is therefore irrelevant. *See supra*, ¶ 122; Defendants' Proposed Conclusions of Law ¶ 132. In any event, the Texas Legislature was entitled to rely on the significant evidence before it showing that

requiring voters to prove their identities with a photo ID does not disparately impact minorities. *See supra*, ¶ 200. 

328. Plaintiffs' proposed factual finding is unsupported. Plaintiffs point to no evidence that the Secretary of State's voter education efforts each cycle do not reach or target minority voters who are likely to need such education or to officials who could educate voters. The fact that a few people did not know of certain S.B. 14 provisions is not evidence of a deficient education program. In any event, Plaintiffs can point to no evidence that the Texas Legislature intended a deficient voter-education program when it enacted S.B. 14. Indeed, the only evidence on that point suggests that opponents of voter-ID legislation hoped to keep voters ignorant. *See id.* ¶ 34.

329. Defendants do not dispute that Dr. Burton so found. This analysis was not before the Texas Legislature, however, and is therefore irrelevant. *See supra*, ¶ 122; Defendants' Proposed Conclusions of Law ¶ 132. In any event, the Texas Legislature was entitled to rely on the significant evidence before it showing that requiring voters to prove their identities with a photo ID does not disparately impact minorities. *See supra*, ¶ 200. Defendants dispute the claim that the process to obtain an EIC is "complex."

330. Defendants do not dispute that Mr. Carrier and Ms. Eagleton so testified. Both Mr. Carrier and Ms. Eagleton, however, could have voted by mail. Defendants' Proposed Findings of Fact ¶¶ 39, 43. Mr. Carrier also could have received a disability exemption or renewed his S.B.14-compliant Veterans Administration ID. *Id.* ¶ 40. In

any event, the Texas Legislature was entitled to rely on the significant evidence before it showing that requiring voters to prove their identities with a photo ID does not disparately impact minorities. *See supra*, ¶ 200. ████████████████████████████

███████████████████████████████████████████████

████ ██ ████████████████████████████████

331. Defendants do not dispute that final version of S.B. 14 left the details of voter education to the State's expert agency on the topic, the Secretary of State. In any event, Plaintiffs can point to no evidence that the Texas Legislature intended a deficient voter-education program when it enacted S.B. 14. Indeed, the only evidence on that point suggests that opponents of voter-ID legislation hoped to keep voters ignorant. *See id.* ¶ 34.

332. Defendants do not dispute that S.B. 14 was different from S.B. 362. S.B. 14 provided for millions of dollars of voter education and outreach. *See id.* ¶ 21-23. In any event, Plaintiffs can point to no evidence that the Texas Legislature intended a deficient voter-education program when it enacted S.B. 14. Indeed, the only evidence on that point suggests that opponents of voter-ID legislation hoped to keep voters ignorant. *See id.* ¶ 34.

333. For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts. The Secretary of State, however, does have a mandate to educate voters about S.B. 14's provisions. *See id.* ¶ 21. In any event, Plaintiffs can point to no evidence that the Texas Legislature intended a deficient voter-education program when it enacted S.B. 14. Indeed, the only evidence on that point suggests that opponents of voter-ID legislation hoped to keep voters ignorant. *See id.* ¶ 34.

334. For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts. The Secretary of State, however, does have a mandate and a budget to educate voters about S.B. 14's provisions. *See id.* ¶ 21. In any event, Plaintiffs can point to no evidence that the Texas Legislature intended a deficient voter-education program when it enacted S.B. 14. Indeed, the only evidence on that point suggests that opponents of voter-ID legislation hoped to keep voters ignorant. *See id.* ¶ 34.

335. For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts. Plaintiffs, however, point to no evidence that the Secretary of State's voter education efforts each cycle do not reach or target minority voters who are likely to need such education or to officials who could educate voters. The fact that a few people did not know of certain S.B. 14 provisions is not evidence of a deficient education program. In any event, Plaintiffs can point to no evidence that the Texas Legislature intended a deficient voter-education program when it enacted S.B. 14. Indeed, the only evidence on that point suggests that opponents of voter-ID legislation hoped to keep voters ignorant. *See id.* ¶ 34.

336. Defendants do not dispute that S.B. 14's EIC provision originated in the conference committee as a replacement provision for S.B. 14's indigency exception, which was excised in the House at the urging—and with the support—of Democrats. *See id.* ¶¶ 184, 195. As Plaintiffs concede that the EIC provision was an eleventh-hour addition to the bill, the Court should reject any suggestion that the EIC provision was designed with the intention of burdening minorities. There is no evidence whatsoever that the Texas Legislature's effort to provide a no-cost ID to voters was part of a last-minute plan to make it harder for minorities to vote. The provision of a no-cost ID to

100

replace the indigency exemption shows that voter ID proponents were intent on easing potential burdens on voters of limited means.

337. Defendants do not dispute that Drs. Baretto and Sanchez so found, but Plaintiffs ignore the many efforts made by the State—reducing the cost of documents, deployment of mobile EIC units, expanding DPS hours, etc.—to assure access to IDs for those who sought them. *See id.* ¶¶ 24-33; *see also* Peters Dep. 274:1-2 (ROA.64770) ("The Whole EIC process is constantly being update[d] and improved"). In any event, S.B. 14 did not specify what the process to obtain an EIC would be (Trial Tr. 282:1-6 (Sept. 8, 2014) (McGeehan) (ROA.100276)); accordingly, these issues regarding implementation do not shed light on the Legislature's intent. Likewise, none of this information was before the Legislature when it considered S.B. 14; accordingly, it is irrelevant to this Court's inquiry. *See supra*, ¶ 122; Defendants' Proposed Conclusions of Law ¶ 132.

Had the Baretto-Sanchez study come before the Legislature, it would have provided further support for the conclusion that requiring voters to prove their identities with a photo ID would *not* disparately impact minorities. *See supra*, ¶ 200. The study showed that among eligible voters without an unexpired photo ID, an almost equal percentage of white voters (78.8%) and Latino voters (76.6%) had proof of citizenship; an almost equal percentage of white voters (80.3%) and Latino voters (77.7%) had proof of identification; and a higher percentage of black voters had proof of identification (81.8%) than white or Latino voters. *See* Baretto-Sanchez Report, Appx. A tbl.7 (ROA.43607). Among eligible voters without an unexpired photo ID, a higher percentage of white voters (100%) than black voters (80%) or Latino voters (86.7%) faced at least one problem getting a free ID, *id.* tbl.8; an almost equal percentage of white voters (37.7%), black voters (38.1%), and Latino voters (36.1%) would have a problem using or paying for public transit to get to a DPS office, *id.* tbl.16

(ROA.43609); and a higher percentage of white voters (55.7%) than black voters (45%) or Latino voters (43.4%) would have a problem going to a Texas DPS office on a week-day during normal business hours to obtain an EIC, *id.* tbl.18 (ROA.43610).

338. Plaintiffs' recitation of the facts is misleading. Although DPS—as the State agency with the most expertise in issuing IDs and verifying identity (*see* Peters Dep. 243:4-244:19 (ROA.64762) (describing the thousands of DPS employees involved in issuing IDs and the regular training they receive)—is tasked with issuing EICs, it consults with the Secretary of State on the operation of the program (*see id.* 274:18-275:14 (assistant director of DPS describing being trained by the Secretary of the State's office on the topic of EICs); Trial Tr. 282:11-19 (Sept. 8, 2014) (McGeehan) (discussing consulting with DPS on the EIC process.)) In any event, S.B. 14 did not specify what the process to obtain an EIC would be (Trial Tr. 282:1-6 (Sept. 8, 2014) (McGeehan) (ROA.100276)); accordingly, these issues regarding implementation do not shed light on the Legislature's intent.

339. Plaintiffs' recitation of the facts is misleading, and their vague speculation that unnamed DPS officials have acted "without the purpose of ensuring" availability of EICs has no basis in the evidence. DPS and other agencies have, in fact, taken steps to ensure that voters who need an EIC will be able to obtain one. *See* Defendants' Proposed Findings of Fact ¶¶ 24-33; *see also* Trial Tr. 164:23-165:1 (Sept. 9, 2014) (Peters) ("There is . . . an ongoing effort to keep the public apprised of the availability of EICs and where they can obtain them and when they can obtain them and what they need to obtain one."); Peters Dep. 88:5-13, 94:25-95:4) (ROA.64723, 64725) (noting that efforts are made to reach Spanish-speaking citizens); Defendants' Proposed Findings of Fact ¶ 31.  Implementation by agencies after S.B. 14 was enacted does not shed light on the Legislature's purpose, and there is no evidence that the Legislature assigned responsibility to the DPS to undermine the EIC program.

102

340. For the purposes of the Court's determination as to whether the Texas Leg-islature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts. Nonetheless, there have been no "instances in which someone with limited English proficiency wanted to apply for an EIC but was unable to due to the unavailability of a Spanish translation." Rodriguez Dep. 46:9-47:5 (ROA.64885-86). In any event, S.B. 14 did not specify what the process to obtain an EIC would be (Trial Tr. 282:1-6 (Sept. 8, 2014) (McGeehan) (ROA.100276)); accordingly, these is-sues regarding implementation do not shed light on the Legislature's intent.

341. Plaintiffs' recitation of the facts is misleading, and Plaintiffs suggestion that law enforcement officers will threaten to arrest minority voters for attempting to vote is incredible, and it is not supported by the cited sources.  Although law enforcement officers are present at DPS offices because DPS is a law enforcement agency, Plain-tiffs have no evidence that any DPS employee has ever attempted to intimidate a voter.

342. Plaintiffs' recitation of the facts is misleading. While discussing EICs, Plain-tiffs shift to other forms of ID and suggest that DPS does a warrant check for persons applying for those IDs. This is incorrect. *See* Rodriguez Dep. 94:16-18 (ROA.64933 ("Q: So warrant checks would not be something that the employee could see on the screen? A: We don't have access to that, no."). And DPS does not do any warrant check for EIC applicants:

> Q: Okay. Does DPS do any background checks with the information that is obtained from the EIC application?
>
> . . .
>
> A: No.
>
> Q: Do they check for any outstanding tickets?

A: No.

Q: Do they check against the Texas Criminal Information Center?

A: No.

Q: Against the National Criminal Information Center?

A: No.

. . .

Q: Do they check against the Interagency Border Inspection System?

A: No.

Q: Do they check for warrants?

A: No.

Q: Have they, at any time, checked for warrants?

A: Driver license [customer service representatives] don't have the ability to check for warrants.

*Id.* 92:13-93:15 (ROA.64931-32).

In any event, S.B. 14 did not specify what the process to obtain an EIC would be (Trial Tr. 282:1-6 (Sept. 8, 2014) (McGeehan) (ROA.100276)); accordingly, these issues regarding implementation do not shed light on the Legislature's intent.

343. DPS does not and cannot perform warrant checks on EIC applicants. *See supra*, ¶ 342. In any event, these issues regarding implementation do not shed light on the Legislature's intent.

344. Defendants do not dispute that, for a short time, DPS collected fingerprints from EIC applicants just as it does for all other ID applicants. Defendants also do not dispute that the Secretary of State, demonstrating its influence over the EIC program, worked to end this practice.

345. Defendants do not dispute that DPS has suspended fingerprinting EIC applicants or that it might do so again in the future. The evidence in the trial record does not support the statement that DPS has not informed the public of its decision not to fingerprint EIC applicants or that it has not posted signs informing EIC applicants that their fingerprints will not be taken. Assuming those facts are true, however, it is not obvious why they would provide that information or why they would be expected to do so. Not one of these proposed findings has anything to do with the Texas Legislature's purpose in enacting S.B. 14.

346. Plaintiffs' recitation of the facts is misleading. The evidence Plaintiffs cite for this proposition is (1) the excluded hearsay testimony of a voter ID opponent (*see* Trial Tr. 364:5-15 (Sept. 4, 2014) (Guzman) (ROA.99596)); (2) the testimony of Ramona Bingham (who has an S.B. 14 ID, ¶ 286, *supra*), which expresses no fear of going to a DPS office (*see* Bingham Dep. 37:9-39:22 (ROA.113602)); and one voter out of millions who thought that he could get arrested for tickets at the DPS (*see* Sanchez Dep. 9:1-11 (ROA.112703)).[3] This evidence is woefully insufficient to establish that minority voters in general "were intimidated or fearful of going to DPS offices." Pls.' Proposed Findings of Fact ¶ 346; *cf. Ne. Ohio Coal. for the Homeless*, 837 F.3d at 631 ("Zeroing in on the abnormal burden experienced by a small group of voters is problematic at best, and prohibited at worst."). Speculation that unidentified individuals may experience anxiety when visiting a DPS office is not evidence, and it cannot support the proposed finding.

347. As already noted above, this Court excluded Guzman's testimony about what voters supposedly told him as hearsay. *See* Trial Tr. 364:5-15 (Sept. 4, 2014) (Guzman) (ROA.99596). And the lone experience of Mr. Sanchez, ███████████████████

---

3 ███████████████████████████████████████████████████
███████████████████████████████████████████████████

████████████████████   ████████████████████████ is not evi-
dence that minority voters in general feared the DPS, and it cannot possibly support
the proposed finding.

348. For the purposes of the Court's determination as to whether the Texas Leg-
islature acted with discriminatory purpose when it enacted S.B. 14, Defendants do
not dispute these facts.

349. Plaintiffs' recitation of the facts is misleading. The Texas Legislature did not
require that EICs be issued only at established DPS offices. During implementation
of the law, DPS began using mobile EIC units and other county offices to issue EICs.
*See* Defendants' Proposed Findings of Fact ¶¶ 30-31; Pls.' Proposed Findings of Fact
¶ 352. There is no evidence whatsoever that the Texas Legislature's effort to provide
a no-cost ID to voters was part of a last-minute plan to make it harder for minorities
to vote. The provision of a no-cost ID to replace the indigency exemption shows that
Voter ID proponents were intent on easing potential burdens on voters of limited
means.

350. That Georgia and Mississippi passed particular statutes says nothing about
the purpose of the Texas Legislature when it enacted S.B. 14 ID. Plaintiffs ignore
that DPS has worked to assure that every county in the state has an office to issue
EICs. *See* Defendants' Proposed Findings of Fact ¶¶ 30-31; Pls.' Proposed Findings of
Fact ¶ 352. And "[t]he whole EIC process is constantly being up-date[d] and im-
proved." Peters Dep. 274:1-2 (ROA.64770). Plaintiffs have not identified any voter
who was or will be prevented from voting because he tried to get an EIC but did not
have access to a DPS location in his county.

351. This proposed finding is not accurate, even if it is consistent with facts as
they existed at the time of trial, and it does not support Plaintiffs' claim in any event.

Plaintiffs ignore that DPS has worked to assure that every county in the state has an office to issue EICs. *See* Defendants' Proposed Findings of Fact ¶¶ 30-31; Pls.' Proposed Findings of Fact ¶ 352. Plaintiffs have not identified any voter who was or will be prevented from voting because he tried to get an EIC but did not have access to a DPS location in his county.

352. Defendants do not dispute that, as the Legislature expected (*see* Defendants' Proposed Findings of Fact ¶¶ 169-171), the agencies tasked with implementing S.B. 14 would work to ensure that every eligible voter has the opportunity to vote. Contrary to Plaintiffs' proposed finding, accommodations by agencies in the process of implementation are part of the legislative structure of S.B. 14, but their particular success or failure is not relevant to the Legislature's purpose when it enacted the law.

353. For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute the general proposition that, like most neighborhoods, many neighborhoods with concentrated minority communities have no DPS office, nor do they dispute that Plaintiffs' experts so wrote or testified. But the experts' opinions and testimony were not before the Legislature and are therefore irrelevant to the question of its purpose. Plaintiffs' proposed finding ignores that DPS dispatches mobile EIC units to wherever they are requested. *See id.* ¶ 30. In any event, there is no evidence whatsoever that the Texas Legislature's effort to provide a no-cost ID to voters was part of a last-minute plan to make it harder for minorities to vote. The provision of a no-cost ID to replace the indigency exemption shows that voter ID proponents were intent on easing potential burdens on voters of limited means.

354. For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do

not dispute these facts, but Plaintiffs do not allege that they were before the Legislature, and they are not probative of the Legislature's purpose. Plaintiffs also ignore that DPS dispatches mobile EIC units to wherever they are requested. *See id.* ¶ 30. In any event, there is no evidence whatsoever that the Texas Legislature's effort to provide a no-cost ID to voters was part of a last-minute plan to make it harder for minorities to vote. The provision of a no-cost ID to replace the indigency exemption shows that voter ID proponents were intent on easing potential burdens on voters of limited means.

355. Plaintiffs do not explain what "significant" means, and the use of the qualifying word "permanent" deprives the statement of any meaning. It also raises the question how people who drive in these unspecified areas obtain driver's licenses, which they presumably do, casting further doubt about the significance of the statement. Plaintiffs ignore that DPS dispatches mobile EIC units to wherever they are requested. *See id.* ¶ 30. Plaintiffs also ignore that DPS has worked to assure that every county in the state has an office to issue EICs. *See* Defendants' Proposed Findings of Fact ¶¶ 30-31; Pls.' Proposed Findings of Fact ¶ 352. And "[t]he whole EIC process is constantly being up-date[d] and improved." Peters Dep. 274:1-2 (ROA.64770). Plaintiffs have not identified any voter who was or will be prevented from voting because he tried to get an EIC but did not have access to a DPS location in his county.

356. Defendants do not dispute that Dr. Chatman offered this estimate, but it does not establish that any person in this population does not have an S.B. 14 ID, nor does it say anything about the proportion of registered voters who face a similar travel requirement to reach a DPS office. This estimate also conflicts with the Census data showing that 98.5% of all Texas residents live within 25 miles, and 99.87% live within

50 miles, of a DPS driver's license office. PL 394 at 2-3 (ROA.39770-71). Even if accurate, this estimate identifies a hypothetical burden that cannot support any inference without impermissible speculation. Regardless, none of the information was before the Texas Legislature when it considered S.B. 14 and, therefore, it is irrelevant. *See supra*, ¶ 122; Defendants' Proposed Conclusions of Law ¶ 132.

357. Defendants do not dispute that Dr. Chatman offered this opinion, but Defendants dispute the assertion that S.B. 14 places a disproportionate and significant travel burden on Hispanic and African-American eligible voters compared to Anglo eligible voters, and Chatman's opinion does not inform the question before the Court in any case. (If it is intended to be taken literally, it is also completely unfounded—there is no evidence that any voter has traveled more than 90 minutes to obtain an EIC, let alone that 3.3 times more African-American eligible voters and 1.5 times more Hispanic eligible voters have done so than Anglo eligible voters.) Even if accurate, these estimates about voters alleged to face more than 90 minutes of travel to obtain an EIC do nothing more than identify a hypothetical burden that cannot support any inference without impermissible speculation. The statistics prove nothing about S.B. 14 without some evidence connecting them to individual voters, and Plaintiffs offer none. Regardless, none of the information was before the Texas Legislature when it considered S.B. 14 and, therefore, it is irrelevant. *See supra*, ¶ 122; Defendants' Proposed Conclusions of Law ¶ 132.

358. Defendants do not dispute that Dr. Chatman offered this opinion, but it does not inform the question before the Court. Even if true, Chatman's estimates do nothing more than identify a hypothetical burden that cannot support any inference without impermissible speculation. The statistics prove nothing about S.B. 14 without some evidence connecting them to individual voters, and Plaintiffs offer none. Regardless, none of the information was before the Texas Legislature when it considered

109

S.B. 14, however, and, therefore, it is irrelevant. *See supra*, ¶ 122; Defendants' Proposed Conclusions of Law ¶ 132.

359. Defendants do not dispute that Dr. Chatman offered this opinion, but it does not inform the question before the Court. Even if true, Chatman's estimates do nothing more than identify a hypothetical burden that cannot support any inference without impermissible speculation. (Assuming they are meant to be taken literally, the proposed findings are completely unfounded—there is no evidence that any voter has traveled more than 90 minutes to obtain an EIC.) The statistics prove nothing about S.B. 14 without some evidence connecting them to individual voters, and Plaintiffs offer none. Regardless, none of the information was before the Texas Legislature when it considered S.B. 14, however, and, therefore, it is irrelevant. *See supra*, ¶ 122; Defendants' Proposed Conclusions of Law ¶ 132.

360. Defendants do not dispute that Dr. Chatman offered this opinion, but this vague statement does not inform the question before the Court. Even if true, it proves nothing about S.B. 14, and it is irrelevant to purpose because it was not before the Texas Legislature when it considered S.B. 14. *See supra*, ¶ 122; Defendants' Proposed Conclusions of Law ¶ 132.

361. Defendants do not dispute that Dr. Webster offered this opinion, but it does not inform the question before the Court. Even if true, Webster's estimates do nothing more than identify a hypothetical burden that cannot support any inference without impermissible speculation. (Assuming they are meant to be taken literally, the proposed findings are completely unfounded—there is no evidence that any voter has traveled more than 90 minutes to obtain an EIC.) The statistics prove nothing about S.B. 14 without some evidence connecting them to individual voters, and Plaintiffs offer none. Regardless, none of the information was before the Texas Legislature

when it considered S.B. 14, however, and, therefore, it is irrelevant. *See supra*, ¶ 122; Defendants' Proposed Conclusions of Law ¶ 132.

362. Defendants do not dispute that Dr. Webster offered this opinion, but it does not inform the question before the Court. Even if true, Webster's estimates do nothing more than identify a hypothetical burden that cannot support any inference without impermissible speculation. (Assuming they are meant to be taken literally, the proposed findings are completely unfounded—there is no evidence that any voter has traveled more than 90 minutes to obtain an EIC.) The statistics prove nothing about S.B. 14 without some evidence connecting them to individual voters, and Plaintiffs offer none. Regardless, none of the information was before the Texas Legislature when it considered S.B. 14, however, and, therefore, it is irrelevant. *See supra*, ¶ 122; Defendants' Proposed Conclusions of Law ¶ 132.

363. Defendants do not dispute that these witnesses so testified, but Mr. Gandy is eligible to vote by mail without S.B. 14 ID and has done so, and Mr. Holmes's testimony indicates that the time he spent traveling to obtain S.B. 14 ID was not necessary.



364. Plaintiffs' recitation of the facts is misleading. Plaintiffs ignore that during election season, many DPS offices have extended and Saturday hours. *See* Defendants' Proposed Findings of Fact ¶ 33. In any event, there is no evidence whatsoever that the Texas Legislature's effort to provide a no-cost ID to voters was part of a last-minute plan to make it harder for minorities to vote. The provision of a no-cost ID to replace the indigency exemption shows that voter ID proponents were intent on easing potential burdens on voters of limited means.

365. For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts. Plaintiffs ignore, however, that, anticipating an increased demand for identification, the Texas Legislature appropriated significant funds to improve driver's license services. Trial Tr. 92:1-16 (Sept. 11, 2014) (Williams) (ROA.101277). At the time of trial, the Driver's License Division of the DPS had increased its staff by hundreds of employees, and the DPS had opened six new "Mega Centers." Trial Tr. 212:19-213:1 (Sept. 9, 2014) (Rodriguez) (ROA.100565-66). In any event, there is no evidence whatsoever that the Texas Legislature's effort to provide a no-cost ID to voters was part of a last-minute plan to make it harder for minorities to vote. The provision of a no-cost ID to replace the indigency exemption shows that voter ID proponents were intent on easing potential burdens on voters of limited means.

366. For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts. Plaintiffs ignore, however, that, anticipating an increased demand for identification, the Texas Legislature appropriated significant funds to improve driver's license services. Trial Tr. 92:1-16 (Sept. 11, 2014) (Williams)

(ROA.101277). At the time of trial, the Driver's License Division of the DPS had increased its staff by hundreds of employees. Trial Tr. 212:19-213:1 (Sept. 9, 2014) (Rodriguez) (ROA.100565-66). In any event, there is no evidence whatsoever that the Texas Legislature's effort to provide a no-cost ID to voters was part of a last-minute plan to make it harder for minorities to vote. The provision of a no-cost ID to replace the indigency exemption shows that voter ID proponents were intent on easing potential burdens on voters of limited means.

367. For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts. Plaintiffs ignore, however, that, anticipating an increased demand for identification, the Texas Legislature appropriated significant funds to improve driver's license services. Trial Tr. 92:1-16 (Sept. 11, 2014) (Williams) (ROA.101277). Plaintiffs also ignore that during election season, many DPS offices have extended and Saturday hours. *See* Defendants' Proposed Findings of Fact ¶ 33. At the time of trial, the Driver's License Division of the DPS had increased its staff by hundreds of employees, and the DPS had opened six new "Mega Centers." Trial Tr. 212:19-213:1 (Sept. 9, 2014) (Rodriguez) (ROA.100565-66). In any event, there is no evidence whatsoever that the Texas Legislature's effort to provide a no-cost ID to voters was part of a last-minute plan to make it harder for minorities to vote. The provision of a no-cost ID to replace the indigency exemption shows that voter ID proponents were intent on easing potential burdens on voters of limited means.

368. For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts.

369. For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts.

370. For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts.

371. For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts. Plaintiffs ignore, however, that a Texas driver's license or personal ID card that has been expired for more 60 days but for less than two years cannot be used to vote pursuant to S.B. 14, but can be used to obtain an EIC. *See* Pls.'s Proposed Findings of Fact ¶ 371; Defendants' Proposed Findings of Fact ¶ 8. These issues regarding implementation do not shed light on the Legislature's intent.

372. For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts.

373. For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts. Plaintiffs ignore, however, that it was the intent of the Texas Legislature that the costs of necessary documents be addressed during implementation of S.B. 14, and that such costs were addressed. *See* Defendants' Proposed Findings of Fact ¶¶ 25, 169-171. Moreover, in 2015, the Texas Legislature enacted S.B. 983—in conformance with its intent to offer free EICs—that prohibited the charging of *any* fee connected with obtaining documents to obtain a free EIC. Act of May 25,

2015, 84th Leg., R.S., ch. 130, 2015 Tex. Gen. Laws 1134. This is further evidence that the Texas Legislature did not intend, through S.B. 14, to burden the poor.

374.  Defendants do not dispute that Drs. Baretto and Sanchez so found. None of the information was before the Texas Legislature when it considered S.B. 14, however, and, therefore, it is irrelevant. *See supra*, ¶ 122; Defendants' Proposed Conclusions of Law ¶ 132. Had the report been before the Legislature, however, it would have provided further support for the conclusion that requiring voters to prove their identities with a photo ID would *not* disparately impact minorities. *See supra*, ¶¶ 200, 337.

375. Defendants do not dispute that Drs. Baretto and Sanchez so found. None of the information was before the Texas Legislature when it considered S.B. 14, however, and, therefore, it is irrelevant. *See supra*, ¶ 122; Defendants' Proposed Conclusions of Law ¶ 132. Had the report been before the Legislature, however, it would have provided further support for the conclusion that requiring voters to prove their identities with a photo ID would *not* disparately impact minorities. *See supra*, ¶¶ 200, 337.

376. For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts. This proposed fact supports the Legislature's decision to provide elderly voters the option to vote by mail to eliminate any potential burdens imposed by S.B. 14.

377. For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts. Plaintiffs ignore, however, that it was the intent of the Texas

Legislature that the costs of necessary documents be addressed during implementation of S.B. 14, and that such costs were addressed. *See* Defendants' Proposed Findings of Fact ¶¶ 25, 169-171.

378. For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts. Plaintiffs ignore, however, that it was the intent of the Texas Legislature that the costs of necessary documents be addressed during implementation of S.B. 14, and that such costs were addressed. *See id.* ¶¶ 25, 169-171.

379. For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts. Plaintiffs ignore, however, that it was the intent of the Texas Legislature that the costs of necessary documents be addressed during implementation of S.B. 14, and that such costs were addressed. *See id.* ¶¶ 25, 169-171.

380. For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts.

381. For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts.

382. For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts. Plaintiffs ignore, however, that county officials are flexible about the forms of ID they accept for birth certificates. *See, e.g.*, Trial Tr. 136:12-25

(Sept. 3, 2014) (Mora) (ROA.99068) (explaining that clients of the StewPot shelter can use a StewPot-issued ID to obtain a birth certificate at Dallas Vital Stats office).

383. For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts.

384. For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts.

385. Plaintiffs' recitation of the facts is misleading. County officials are flexible about the forms of ID they accept for birth certificates. *See, e.g.*, Trial Tr. 136:12-25 (Sept. 3, 2014) (Mora) (ROA.99068) (explaining that clients of the StewPot shelter can use a StewPot-issued ID to obtain a birth certificate at Dallas Vital Stats office).

386. For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts. Plaintiffs ignore, however, that county officials are flexible about the forms of ID they accept for birth certificates. *See, e.g.*, Trial Tr. 136:12-25 (Sept. 3, 2014) (Mora) (ROA.99068) (explaining that clients of the StewPot shelter can use a StewPot-issued ID to obtain a birth certificate at Dallas Vital Stats office).

387. For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts, but these issues regarding implementation do not shed light on the Legislature's intent.

388. For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do

not dispute these facts, but these issues regarding implementation do not shed light on the Legislature's intent.

389. For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts, but these issues regarding implementation do not shed light on the Legislature's intent.

390. For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts, but there is no evidence that issues regarding name disparities, which could reasonably be expected to primarily affect women, impose a heavier burden on minority women than on non-minority women or that the Legislature deliberately set out to discriminate against women by passing S.B. 14.

391. For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts, but these issues regarding implementation do not shed light on the Legislature's intent.

392. For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts.

393. Defendants do not dispute that Ms. Bates so testified. But in addition to being able to vote by mail, ███████████████████████████████████████████
████████████████████████████████

394. Defendants do not dispute that Ms. Gholar so testified. As Plaintiffs concede, however, Ms. Gholar may vote by mail.

395. Defendants do not dispute that Mr. Taylor so testified. Mr. Taylor, however, may vote by mail and thus did not need to obtain his birth certificate. *See* Trial Tr. 146:7-12 (Sept. 4, 2014) (Taylor) (ROA.99378).

396. Defendants do not dispute that Ms. Barber so testified. Ms. Barber, however, was able to vote by mail. Barber Dep. 14:3-6 (ROA.97471)

397. Plaintiffs' recitation of the facts is misleading. It was the intent of the Texas Legislature that the costs of necessary documents be addressed during implementation of S.B. 14, and such costs were addressed at that time. *See* Defendants' Proposed Findings of Fact ¶¶ 25, 169-171.

398. Defendants do not dispute that EICs are intended to be used as identification only for voting.

399. For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts.

400. Defendants dispute these facts. Documents needed for an EIC are available for much lower cost that than those needed to obtain other ID. *See* Defendants' Proposed Findings of Fact ¶ 25. In addition, local registrars have been trained to issue EIC birth certificates. Trial Tr. 326:21-327:13 (Sept. 9, 2014) (Farinelli) (ROA.100679-80). There are more than 400 local registrars in the State. *Id.* at 318:17-319:8 (ROA.100671-72). These facts directly refute Plaintiffs' assertion, which is based on nothing more than the opinion of one person running a homeless shelter. *Cf. Crawford*, 553 U.S. at 201 (concluding that "depositions of two case managers at a day shelter for homeless persons" did "not provide any concrete evidence of the burden imposed on voters").

401. Defendants do not dispute that the disability exception does not apply widely. Any analysis concerning the rates of disability among different races was not before the Texas Legislature at the time it considered S.B. 14, and is therefore irrelevant. *See supra*, ¶ 122; Defendants' Proposed Conclusions of Law ¶ 132.

402. For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts.

403. Defendants do not dispute that "[a]s of January 15, 2014, only 18 voters had successfully applied for a disability exemption," but this evidence does not support Plaintiffs' claim of intentional racial discrimination.

404. Defendants do not dispute the Ms. Washington and Ms. Bingham so testified. Ms. Bingham, however, had S.B. 14 ID and thus did not need a disability exception. *See* Defendants' Proposed Findings of Fact ¶ 43. And Ms. Washington is able to vote by mail and thus does not need a disability exception. *See id.*

405. Defendants do not dispute that these witnesses so testified. Defendants also do not dispute that the Texas Legislature left the details of voter education to the State's expert agency on the topic, the Secretary of State.

406. Defendants do not dispute that these witnesses so testified.

407. For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts. Plaintiffs, however, have pointed to no voter who could not vote because his or her disability exemption application was not processed in a timely manner.

408. For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute this fact.

409. Plaintiffs' recitation of the facts is misleading. Plaintiffs fail to consider that most of the plaintiffs and voter-witnesses in this case who complained about having difficulty obtaining S.B 14-compliant ID were elderly. *See* Defendants' Proposed Findings of Fact ¶¶ 39, 43. Preserving mail-in voting for the elderly goes a long way towards remedying the minimal negative impact Plaintiffs have been able to show in the case. *See id.* In any event, the racial composition of absentee voters was not known to the Texas Legislature when it was considering S.B. 14 and thus is irrelevant to this Court's analysis. *See supra*, ¶ 122; Defendants' Proposed Conclusions of Law ¶ 132.

410. Defendants do not dispute that Drs. Burden and Ansolabehere so found. But this information was not before the Texas Legislature when it was considering S.B. 14 and thus is irrelevant to this Court's analysis. *See supra*, ¶ 122; Defendants' Proposed Conclusions of Law ¶ 132. Even if it were relevant, if allowing elderly voters to vote by mail without S.B. 14 ID could be taken as evidence that the Legislature intended to benefit elderly Anglo voters, it would necessarily constitute evidence that the Legislature also intended to benefit elderly minority voters such as the individual plaintiffs and witnesses in this case.

411. Defendants do not dispute that Dr. Burden so found. But this information was not before the Texas Legislature when it was considering S.B. 14 and thus is irrelevant to this Court's analysis. *See supra*, ¶ 122; Defendants' Proposed Conclusions of Law ¶ 132. Even if it were relevant, if allowing absentee voting without S.B.

14 ID could be taken as evidence that the Legislature intended to benefit Anglo absentee voters, it would necessarily constitute evidence that the Legislature also intended to benefit minority absentee voters.

412. Defendants do not dispute that Plaintiffs found three voters who were "unaware that they are eligible" to vote by mail "or that SB 14 does not apply to absentee voting." Pls.' Proposed Findings of Fact ¶ 412. This is not sufficient evidence, however, that "many voters" who are eligible to vote by mail are similarly ignorant. *Id.*

413. Defendants dispute Plaintiffs' contention, which depends on a conception of the right to vote that is unsupported. There is no authority that voters must be able to vote in the precise method that each prefers. *See Crawford*, 553 U.S. at 197-203 (considering the *burden on voting*, not the burden on a voter's preferred method of voting); *McDonald v. Bd. of Election Comm'rs of Chi.*, 394 U.S. 802 (1969) (upholding a statute allowing some, but not other, citizens to vote absentee). Laws that require voters to cast different kinds of ballots are valid so long as there is "some rational relationship to a legitimate state end." *McDonald*, 394 U.S. at 809; *see also Biener v. Calio*, 361 F.3d 206, 215 (3d Cir. 2004). *cf. Ne. Ohio Coal. for the Homeless*, 837 F.3d at 631 ("Zeroing in on the abnormal burden experienced by a small group of voters is problematic at best, and prohibited at worst."). Indeed, three states—Oregon, Washington and Colorado—conduct voting exclusively by mail. *See* Colo. Rev. Stat. § 1-5-401; Or. Rev. Stat. § 254.465; Wash. Rev. Code § 29A.40. In any event, there is no evidence that the Texas Legislature held the same view as Plaintiffs and sought to burden minorities in this unusual way.

414. Defendants do not dispute that Ms. Bates so testified.

415. Defendants do not dispute that Senator Ellis so testified.

416. Defendants do not dispute that Reverend Johnson so testified.

417. Defendants do not dispute that Dr. Ansolabehere so found. But this information was not before the Texas Legislature when it was considering S.B. 14 and thus is irrelevant to this Court's analysis. *See supra*, ¶ 122; Defendants' Proposed Conclusions of Law ¶ 132.

418. Defendants do not dispute that Dr. Ansolabehere so found. But this information was not before the Texas Legislature when it was considering S.B. 14 and thus is irrelevant to this Court's analysis. *See supra*, ¶ 122; Defendants' Proposed Conclusions of Law ¶ 132. Had Dr. Ansolabehere's data been before the Legislature, however, they would have provided further support for the conclusion that S.B. 14 would not have a discriminatory effect on minority voters. They show that among those who voted in 2010 and 2012, S.B. 14's photo-ID requirement would impact more non-Hispanic white voters than African-American and Hispanic voters combined. *See* Defs' Proposed Findings of Fact ¶ 220.

419. Defendants do not dispute that these witnesses so testified. Each of the witnesses, however, could have voted by mail without the need for S.B. 14 ID. *See* Defendants' Proposed Findings of Fact ¶ 43.

420. Defendants dispute Plaintiffs' assertion to the extent it relies on Mr. Guzman's excluded hearsay testimony. *See* Trial Tr. 364:5-15 (Sept. 4, 2014) (Guzman) (ROA.99596). Defendants do not dispute that Ms. Eagleton so testified. Ms. Eagleton, however, could have voted by mail without the need for S.B. 14 ID. *See* Defendants' Proposed Findings of Fact ¶ 43. Defendants do not dispute Mr. Holmes so testified. Mr. Holmes, however, had the documents necessary to obtain an EIC, and his testimony indicates that he either could have gotten it or did not need it to vote. *Id.*; *see also supra* ¶ 363.

421. Defendants do not dispute that these witnesses so testified. Ms. Eagleton and Ms. Washington, however, could have voted by mail without the need for S.B. 14 ID. *See* Defendants' Proposed Findings of Fact ¶ 43. In any event, the testimony of three voters is insufficient to establish the burden placed on thousands of others. *See Crawford*, 553 U.S. at 201-02.

422. Defendants do not dispute that a single voter so testified. This is not sufficient evidence, however, that such occurrences were widespread, *see Crawford*, 553 U.S. at 201-02, or that they imposed a particular burden on minority voters, and the proposed finding does not support Plaintiffs' claim of intentional racial discrimination because there is no evidence that the Texas Legislature intended this to happen to any voter.

423. Defendants do not dispute that only .04 percent of ballots cast in the 2013 constitutional amendment election were rejected because of a lack of S.B. 14 ID. *See* Defendants' Proposed Findings of Fact ¶ 49. There is no reason to believe, or record evidence to support a finding, that these small numbers represent eligible voters turned away, as opposed to the proper rejection of *in*eligible voters. This conforms to other evidence, which showed that reports of voters being unable to present ID or experiencing other problems during the elections in which S.B. 14 was in force were "vanishingly small." Ingram Dep. 53:24-54:2 (ROA.64028).

424. Defendants do not dispute that Dr. Burden offered this opinion. But "[t]he [November 2013] turnout was up substantially over the 2011 turnout." Trial Tr. 335:10-336:1 (Sept. 10, 2014) (Ingram) (ROA.101097-98). And if the effect of S.B. 14 was as dire as Plaintiffs claim, one would still expect something more than the miniscule amount of rejected provisional ballots seen in 2013.

425. Defendants reject Plaintiffs' assertion that persons in Edcouch had problems voting. This assertion is based on the excluded hearsay testimony of Mr. Guzman. *See* Trial Tr. 364:5-15 (Sept. 4, 2014) (Guzman) (ROA.99596). It is also contrary to the report of the Elections Administrator for Hidalgo County, which stated that no provisional ballots in Hidalgo County had been rejected for ID reasons. DEF0014 (ROA.78119) (Feb. 7, 2014 Email from Yvonne Ramón, Elections Administrator for Hidalgo County, to Lindsey Cohan).

426. For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute this fact.

427. Plaintiffs' recitation of the facts is misleading. It is true that, at the time of trial, only a few hundred EICs had been issued, but this supports the inference that either (1) there is not much demand for EICs or (2) voters prefer to pay for a State-issued ID card or driver's license, which can be used for more than voting. ███████████

██████████████████████████████████████████████████

████████████████████████████████████ ██ █████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████

428. For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts.

429. For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do

not dispute these facts, but they do not support the claim that the Texas Legislature intentionally discriminated on the basis of race by enacting S.B. 14.

430. For the purposes of the Court's determination as to whether the Texas Legislature acted with discriminatory purpose when it enacted S.B. 14, Defendants do not dispute these facts. Plaintiffs point to no evidence, however, that DPS has been unable to engage in activities that it otherwise would have because of a lack of funding. Plaintiffs also ignore that, anticipating an increased demand for identification, the Texas Legislature appropriated significant funds to improve driver's license services. Trial Tr. 92:1-16 (Sept. 11, 2014) (Williams) (ROA.101277).

431. Defendants do not dispute that it was the intent of the Texas Legislature that the costs of necessary documents be addressed during implementation of S.B. 14, and that such costs were addressed. *See* Defendants' Proposed Findings of Fact ¶¶ 25, 169-171.

432. Plaintiffs' recitation of the facts is misleading. Neither Mr. Peters nor Mr. Farnelli testified that few voters are aware of the existence of EIC birth certificates, let alone opined on a cause of that hypothetical fact. Even assuming that a limited number of EIC birth certificates had been issued at the time of trial, this could indicate that either (1) there is not much demand for EICs or (2) voters prefer to pay for a State-issued ID card or driver's license, which can be used for more than voting. ██████████████████████████████████████████████ ███████████████████████ ██ ████████████████████████████ In any event, there is no evidence whatsoever that the Texas Legislature's effort to provide a no-cost ID to voters was part of a last-minute plan to make it harder for minorities to vote. The provision of a no-cost ID to replace the indigency exemption

shows that voter ID proponents were intent on easing potential burdens on voters of limited means.

433. Defendants do not dispute that Speaker Straus so testified, but the relevance of this proposed finding is unclear. Texas disputed that S.B. 14 has any racially discriminatory or retrogressive effect (*see* Appellant's Jurisdictional Statement, *Texas v. Holder*, No. 12-1028 (U.S. Feb. 19, 2013)), and continues to contend that S.B. 14 does not have a disparate impact on minorities (*see* Pet. for Writ of Cert., *Abbott v. Veasey*, No. 16-393 (U.S. Sept. 23, 2016)). Moreover, the Texas Legislature, relying on academic studies and the experiences of other states, concluded that S.B. 14 would *not* disparately affect minorities. *See* Defendants' Proposed Findings of Fact ¶¶ 207-216. Nonetheless, the Texas Legislature remained open to adjusting the law if future elections demonstrated such a need. *See id.* ¶ 172. But the elections that followed implementation of S.B. 14 only *confirmed* that it would not negatively impact Texas voters, including minorities. *See id.* ¶¶ 45-51. Accordingly, the Texas Legislature had no need to adjust the law.

434. Defendants do not dispute that Texas treated S.B. 14 as governing law after the decision denying preclearance was vacated by the Supreme Court and the statute that enjoined implementation of the Legislature's duly enacted law no longer applied.

435. Defendants do not dispute that Speaker Straus so testified. Plaintiffs ignore, however, that Texas disputes any finding that S.B. 14 has any racially discriminatory or retrogressive effect. *See supra*, ¶ 434. That Speaker Straus was unaware of a State-sponsored assessment of the impact of S.B. 14 has little significance given that S.B. 14 had been the subject of continued litigation since its enactment in 2011. Plaintiffs also ignore that the elections that followed implementation of S.B. 14 *confirmed* that

it would not negatively impact Texas voters, including minorities. *See* Defendants' Proposed Findings of Fact ¶¶ 45-51.

436. Defendants do not dispute that the State does not collect statewide data on provisional ballots, as elections are conducted by the counties. Defendants have no reason to dispute that Ingram was not aware of the number of provisional ballots cast across the State for lack of S.B. 14 ID at the time of trial. Nonetheless, an examination of provisional ballots conducted in this case shows that S.B. 14 did not negatively impact Texas voters, including minorities. *See id.*

437. This proposed finding is misleading. Whether or not then-Lieutenant Governor Dewhurst planned to examine the impact of S.B. 14 during the legislative interim, that opportunity never came about because S.B. 14 did not take effect until after Dewhurst left office. Lieutenant Governor Dewhurst had no reason to issue an interim charge to examine the impact of S.B. 14 before it was implemented.

438. Plaintiffs' proposed finding has no basis in fact or in the record. Plaintiffs have consistently alleged that S.B. 14 has caused or will cause "widespread disenfranchisement," as they do here, but no such widespread disenfranchisement has ever been found. Instead, Plaintiffs have consistently relied on a handful of individuals who, even though carefully selected after an intensive statewide search, are predominantly elderly voters who either have S.B. 14 ID, can obtain S.B. 14 ID, or can vote without it. Texas continues to dispute that S.B. 14 has any racially discriminatory or retrogressive effect. *See* Pet. for Writ of Cert., *Abbott v. Veasey*, No. 16-393 (U.S. Sept. 23, 2016). At the time it enacted S.B. 14, the Texas Legislature, relying on academic studies and the experiences of other states, concluded that it would *not* disparately affect minorities. *See* Defendants' Proposed Findings of Fact ¶¶ 207-216. Nonetheless, the Texas Legislature remained open to adjusting the law if future elections

demonstrated such a need. *See id.* ¶ 172. But the elections that followed implementation of S.B. 14 only *confirmed* that it would not negatively impact Texas voters, including minorities. *See id.* ¶¶ 45-51. Accordingly, the Texas Legislature has had no need to adjust the law.

Date: December 16, 2016                    Respectfully submitted.

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant
  Attorney General

BRANTLEY D. STARR
Deputy First Assistant
  Attorney General

JAMES E. DAVIS
Deputy Attorney General
  for Litigation

/s/ Angela V. Colmenero
ANGELA V. COLMENERO
Chief, General Litigation Division

MATTHEW H. FREDERICK
Deputy Solicitor General

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC 059)
Austin, Texas  78711-2548
Tel.: (512) 936-6407
Fax: (512) 474-2697

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on December 16, 2016, a true and correct copy of the foregoing document was served via the Court's ECF system to all counsel of record.

/s/ Angela V. Colmenero
ANGELA V. COLMENERO