UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION


MARC VEASEY, ET AL.,           )      CASE NO: 2:13-CV-00193
                               )
            Plaintiffs,        )           CIVIL
                               )
     vs.                       )      Corpus Christi, Texas
                               )
RICK PERRY, ET AL.,            )      Tuesday, February 28, 2017
                               )      ( 8:59 a.m. to 11:12 a.m.)
            Defendants.        )      (11:34 a.m. to 12:04 p.m.)


ORAL ARGUMENTS

BEFORE THE HONORABLE NELVA GONZALES RAMOS,
UNITED STATES DISTRICT JUDGE



Appearances:              See Next Page

Court Recorder:           Genay Rogan

Clerk:                    Brandy Cortez

Court Security Officer:   Jay Longley

Transcriber:              Exceptional Reporting Services, Inc.
                          P.O. Box 18668
                          Corpus Christi, TX 78480-8668
                          361 949-2988




Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

<u>**APPEARANCES FOR:**</u>


Plaintiffs:                        CHAD W. DUNN, ESQ.
                                   Brazil and Dunn
                                   4201 Cypress Creek Parkway, Suite 530
                                   Houston, TX 77068

                                   ARMAND DERFNER, ESQ. (via phone)
                                   P.O. Box 600
                                   Charleston, SC 29402

                                   DANIELLE LANG, ESQ. (via phone)
                                   Campaign Legal Center
                                   1411 K. St. NW, Suite 1400
                                   Washington, DC 20005

                                   J. GERALD HEBERT, ESQ. (via phone)
                                   Attorney at Law
                                   191 Somervelle Street #405
                                   Alexandria, VA 22304

                                   NEIL G. BARON, ESQ. (via phone)
                                   914 FM 517 Rd. W., Suite 242
                                   Dickinson, TX 77539

Mexican American                   EZRA D. ROSENBERG, ESQ.
Legislative Caucus,                Dechert, LLP
et al.:                            902 Carnegie Center, Suite 500
                                   Princeton, NJ 08540-6531

Mexican American                   JENNIFER CLARK, ESQ.
Legislative Caucus,                MYRNA PEREZ, ESQ.
et al.:                            WENDY WEISER, ESQ.
                                   Brennan Ctr. for Justice
                                   161 Avenue of the Americas
                                   12th Floor
                                   New York, NY 10013

United States                      JOHN GORE, ESQ.
of America:                        U.S. Department of Justice
                                   950 Pennsylvania Ave. NW
                                   Washington, DC 20530

**APPEARANCES FOR:**              (CONTINUED)


Ortiz Plaintiffs,              MARINDA VAN DALEN, ESQ.
et al.:                        Texas RioGrande Legal Aid, Inc.
                               531 E. St. Francis
                               Brownsville, TX 78520


                               JOSE GARZA, ESQ.
                               Texas Rio Grande Legal Aid
                               1111 N. Main Ave.
                               San Antonio, TX 78212


Texas League of Young          DEUEL ROSS, ESQ.
Voters Education Fund:          JANAI NELSON, ESQ.
                               NAACP Legal Def. and Educational Fund
                               40 Rector St., 5th Floor
                               New York, NY 10006


                               TANIA C. FARANSSO, ESQ.
                               Wilmer Cutler Pickering, et al.
                               1875 Pennsylvania Avenue, NW
                               Washington, DC 20006


State of Texas:                MATTHEW H. FREDERICK, ESQ.
                               ANGELA V. COLMENERO, ESQ.
                               JASON LA FOND, ESQ.
                               Office of the Attorney General
                               P.O. Box 12548
                               Austin, TX 78711

4

1    <u>**Corpus Christi, Texas; Tuesday, February 28, 2017; 8:59 a.m.**</u>

2         <u>**(Courtroom and telephonic appearances)**</u>

3              <u>**(Call to Order)**</u>

4         **THE COURT:**  Court calls Cause Number 2:13-cv-193,

5    *Veasey, et al. versus Abbott, et al.*  If the plaintiffs will

6    announce for the record.

7         **MR. ROSENBERG:**  Ezra Rosenberg from the Lawyers'

8    Committee of Civil Rights Under Law on behalf of the Texas

9    State Conference of NAACP Branches and the Mexican American

10   Legislative Caucus of the Texas House of Representatives.

11        **THE COURT:**  Okay.

12        **MR. DUNN:**  Good morning.  Chad Dunn in the courtroom

13   on behalf of the Veasey plaintiffs and some of my co-counsel

14   will be listening by phone.

15        **THE COURT:**  All right.

16        **MS. NELSON:**  Good morning, your Honor.  Janai Nelson

17   of the NAACP Legal Defense and Educational Fund, with my

18   colleague, Deuel Ross, and our co-counsel Wilmer-Hale,

19   represented by Tania Faransso.

20        **THE COURT:**  Okay.

21        **MS. PEREZ:**  Your Honor, Myrna Perez.  I represent the

22   Texas NAACP and the Mexican American Legislative Caucus.  I'm

23   here with Jen Clark and I have a number of colleagues on the

24   phone.

25        **THE COURT:**  All right.

1            **MR. GARZA:**  Jose Garza with the Taylor plaintiffs,

2   together with Marinda Van Dalen.

3            **THE COURT:**  All right.  Any other one here for the

4   plaintiffs?  Yes, sir?

5            **MR. GORE:**  John Gore on behalf of the United States.

6            **THE COURT:**  Yes.  I did receive the Motion for

7   Admission Pro Hac Vice and I signed that yesterday.

8            **MR. GORE:**  Thank you, your Honor.

9            **MS. COLMENERO:**  Your Honor, Angela Colmenero on

10  behalf of the State defendants and I'm here with Matthew

11  Frederick and Jason LaFond.

12           **THE COURT:**  Okay.  Anyone else?

13        **(No audible response)**

14           All right.  And who's appearing by phone?

15           **MR. HEBERT:**  Your Honor, this is Jerry Hebert and

16  Danielle Lang on behalf of the Veasey LULAC plaintiffs.

17           **THE COURT:**  All right.

18           **MR. SPEAKER:**  (indiscernible).

19           **MR. BARON:**  Your Honor, Neil Baron also appearing by

20  phone on behalf of the Veasey LULAC plaintiffs.

21           **MR. DERFNER:**  Armand Derfner on the phone for the

22  Veasey LULAC plaintiffs.

23           **MS. WEISER:**  Wendy Weiser by phone for the Texas

24  NAACP and MALC plaintiff.

25           **THE COURT:**  Anyone else appearing by phone?

1       **(No audible response)**

2            All right.  I know yesterday, Mr. Gore, the

3    Government -- the United States filed a motion for voluntary

4    dismissal of the discriminatory purpose claim without

5    prejudice, and I saw where Texas consented to that motion, and

6    I guess the plaintiffs had no position on the motion, and they

7    didn't agree with the reasoning, but stated they might be

8    filing a response.  So, I'm not sure where we are on that.

9            **MR. ROSENBERG:**  Your Honor, Ezra Rosenberg.  Yes, we

10   received a motion at the time many of us were flying to Corpus

11   Christi, and, therefore, we were unable to reach a firm

12   position on the ultimate relief on the motion and are not --

13   were not taking a position at the time.  Mr. Dunn is going to

14   be addressing some of the issues raised by the motion.  The

15   private plaintiffs would request an opportunity to brief a

16   response to the motion, because they vehemently oppose the

17   reasoning behind the motion on, really, every ground that's set

18   forth in it, but we've not had a chance, given the logistics,

19   to sit down and talk about whether we would agree to the motion

20   under certain conditions or -- or some other position.

21           **THE COURT:**  Okay.  Mr. Gore, any comments on that?

22           **MR. GORE:**  I think the motion speaks for itself, your

23   Honor.

24           **THE COURT:**  Okay.  So, it sounds, though, at this

25   point, it was just filed yesterday, plaintiffs are wanting to

1   file a response, so --

2           **MR. GORE:**  That's correct, your Honor, and -- and

3   we're happy to allow the plaintiffs to do that --

4           **THE COURT:**  Okay.

5           **MR. GORE:**  -- in the appropriate time within the

6   rules.

7           **THE COURT:**  All right.  So, then, speaking to that,

8   though, there is the issue of there is a new voter ID bill that

9   has been filed, so if it's enacted into law, how does that

10  affect our proceeding?

11          **MR. GORE:**  Well, we think that the mere consideration

12  of that law at this point, your Honor, requires the Court to

13  forbear and to wait until the end of the legislative session

14  before taking any further action.  We think that's the clear

15  directive of the Fifth Circuit in this case --

16          **THE COURT:**  But what does it do to this case, though?

17  What does it do to the *Veasey* case?

18          **MR. GORE:**  If it's enacted?  Or if it's -- you know,

19  if it's --

20          **THE COURT:**  If it's enacted.

21          **MR. GORE:**  If it's enacted, I think you could have

22  all kinds of ramifications for the *Veasey* case.  We don't know

23  yet exactly what the Texas legislature might enact, but the

24  Fifth Circuit made a couple of things clear.  It made clear,

25  first, that any new law would bear on the merits of a purpose

8

1    claim.  It would also, obviously, bear on the remedy and all

2    the other issues that remain in the case.  The Fifth Circuit

3    said that the record on remand must be supplemented by any

4    intervening legislative action, and it also specifically

5    directed the Court to bear in mind the effect of any interim

6    legislation when it reexams the purpose claim.  And, so, the

7    reason for that I think is very clear; because a new law might

8    fix some of the issues that the Fifth Circuit identified and

9    relied upon in ordering a remand in this case.

10              For example, a new law might eliminate the

11   discriminatory effect that the Fifth Circuit identified in its

12   opinion; it might insert ameliorative provisions into Texas's

13   voter ID law; it might be enacted without procedural

14   irregularities or departures.  So, if the Court forges ahead on

15   the purpose claim or any other issue at this time, including

16   remedy or -- or any other issue in the case, on the current

17   record, it might have to do its work all over again.  It might

18   have to consider all of those issues again on a new record, on

19   new briefing, and on new argument.  And that's why we jointly

20   moved with Texas last week to postpone today's hearing, so that

21   the Court would have the benefit of any intervening legislative

22   action and could move efficiently to resolving the case only

23   once and not, potentially, twice.  And, moreover, the law in

24   the Fifth Circuit and the Supreme Court for decades has been

25   that where a federal court finds a voting rights violation it

1   must refer the remedy to the legislature in the first instance

2   so that the legislature has the first opportunity to consider

3   the appropriate remedy.

4         **THE COURT:**  So, it only goes to remedies?

5         **MR. GORE:**  I -- no, I don't believe that it does in

6   this case, your Honor, first of all, for the reason I just laid

7   out, which is the Fifth Circuit specifically said that it would

8   go to the merits of the purpose claim in this case.  Second of

9   all, here in this case, Texas wants to get an early start on

10  addressing this legislatively.  That's all the more reason the

11  Court ought to defer, so that the Court doesn't have to do

12  unnecessary work.

13        **THE COURT:**  But how does it go to the intent, the

14  discriminatory purpose, if we're looking at what happened when

15  SB 14 was passed?

16        **MR. GORE:**  A couple of responses on that, your Honor.

17  First of all, a major component of the intent argument so far

18  has been that SB 14 or the current voter ID statute has a

19  discriminatory effect.  The Texas legislature may enact a

20  reasonable impediment exception or some other exception to the

21  law that removes that discriminatory effect entirely.  So, that

22  takes out that particular basis for the ruling.  It also might

23  enact ameliorative provisions to the law, like I've just

24  mentioned, that would lessen its impact.  So, regardless of

25  whether there -- what the record was at that time, the record

1  is currently evolving in light of this intervening legislative

2  action.  And if Texas follows through, as we are hopeful that

3  it will, and enacts an appropriate legislative amendment to its

4  voter ID law, that could resolve the entire case, potentially,

5  under the Fifth Circuit's own reasoning.

6          **THE COURT:**  All right.

7          **MR. GORE:**  So, we -- we encourage the Court to follow

8  that course and to allow the Texas legislative process to play

9  out before addressing anything in this case.

10         **THE COURT:**  It does not moot the *Veasey* case, is what

11 you're saying.  If there's a new -- if this bill -- voter ID

12 bill is enacted into law, I still have to proceed and make

13 findings as requested by the Fifth Circuit, right?

14         **MR. GORE:**  I don't necessarily believe that the Court

15 would have to.  I think at that point we would have a new

16 record on which to address that, and the United States is no

17 longer pursuing a purpose claim.

18         **THE COURT:**  So, all of a sudden the new law now

19 becomes the case I'm dealing with?

20         **MR. GORE:**  I -- I think it's highly relevant to the

21 analysis in this -- in this case, your Honor, under the Fifth

22 Circuit's own directions.  And it would be -- and it would

23 certainly be relevant to the question of remedy on the

24 discriminatory effect claim.

25         **THE COURT:**  Right.  And I'm kind of separating

1   remedies, because we're not even there yet as to what it might

2   do with remedies.

3          **MR. GORE:**  Okay.

4          **THE COURT:**  I'm just talking about what effect does

5   it have on the *Veasey* case in terms of what we're here doing

6   today, the discriminatory purpose claim.

7          **MR. GORE:**  Sure.  And I think that it's impossible to

8   say one way or the other, because we don't know yet what the

9   legislation is going to be.  The legislation has been

10  introduced, it has super majority support in the senate, it has

11  the support of the Texas Attorney General, but we don't know

12  yet whether it's going to be amended, whether there are going

13  to be other provisions added to it or taken from it, before

14  it's ultimately enacted into law.

15         **THE COURT:**  Which would affect the remedies,

16  potentially, right?  How does it affect the Court's ruling on

17  discriminatory purpose?

18         **MR. GORE:**  As -- as the Fifth Circuit --

19         **THE COURT:**  On SB 14.

20         **MR. GORE:**  No, I understand that.  As the Fifth

21  Circuit -- the Fifth Circuit explained that it affects the

22  intent question because it might address some of the

23  deficiencies in the law.  Once a new law is enacted to amend

24  SB 14, you have to look at the total picture of the complete

25  law, both SB 14 and any intervening legislative remedies.  So,

1    it's almost like you have to look -- the Court has to look at

2    the entire package of legislation there in light of the

3    intervening changes that have been made.  And if Texas steps up

4    to the plate and says, "We're addressing the issues that have

5    been identified by the Fifth Circuit," and follows through and

6    does that, we have a new legislative mosaic that paints a new

7    picture of the legislature's overarching intent with respect to

8    voter ID  And that's what I think the Fifth Circuit was getting

9    at when it said that the Court should bear in mind the effect

10   of any intervening legislative remedy or legislative action on

11   the intent question.  So, we think that this is -- given this

12   posture, it's premature.

13          Now, let me just point out that we're in a very

14   unique position to be able to do this.  This doesn't always

15   happen in these voting rights cases, because there is no

16   urgency and no harm to Texas voters from forbearing for just a

17   couple of months during the legislative session.  The

18   legislative session will end at the end of May; the Governor's

19   signature would have to be appended to any new law by June

20   18th; and, of course, the Court's interim remedy continues to

21   govern any elections and to protect any Texas voters who

22   participate in those elections between now and then.

23          **THE COURT:**  Which sounds like that interim remedy may

24   have caused a lot of problems, right?

25          **MR. GORE:**  Well, I think that any time there are --

13

1   there are changes to an election system close to an election,

2   there can be some confusion as the state election authorities

3   work that out.  But now we don't have -- the 2016 election was

4   a -- was a large federal and statewide general election.  We

5   have no election of that scope or scale coming up in Texas,

6   number one; number two, the State now has the benefit of the

7   experience of the 2016 general election, and I would imagine

8   can much more smoothly implement this Court's interim remedy

9   for any remaining -- any elections that are coming up.  My

10  understanding is that there are a few municipal elections in

11  the next couple of months, but, obviously, no statewide

12  elections and no federal elections.  So, both the scope of what

13  the State has to do has been dramatically changed, and it has

14  the benefit of its experience of going through the 2016 general

15  elections.

16          So, the interim remedy tracked also what the Fifth

17  Circuit said.  The Fifth Circuit suggested, without

18  distinguishing between the purpose and effect claims, that a

19  reasonable impediment exception would be an appropriate remedy

20  here, or potentially an appropriate remedy, and the SB 5 that

21  has been introduced into the Texas senate, with super majority

22  support, largely tracks that remedy and puts it in place.  The

23  Fifth Circuit's case law, its directions in this case are

24  clear, its directions in prior cases are clear, the decisions

25  of the Supreme Court are clear, that deference is owed to allow

1    a state legislature or governing body the first opportunity to

2    address the issues raised in the Fifth Circuit's opinion.

3    We're at a unique juncture, as well, because the Texas

4    legislature actually is in session.  It's in its regular

5    biennial session.  All of this is different from what happened

6    back in the fall.  When the Fifth Circuit issued its opinion on

7    July 20th, it determined that it was not feasible to refer the

8    matter to the Texas legislature in the first instance.  The

9    2016 statewide and federal general elections were impending,

10   the Texas legislature wasn't in session, and Texas had not

11   asked the courts to defer to its legislative prerogatives.  All

12   three of those circumstances have now changed dramatically.

13   They have all completely flipped; because there are no

14   impending statewide or federal elections, Texas legislature is

15   in session, does have a unique opportunity to address this, and

16   it has, in fact, introduced a bill that's got a lot of

17   political support, and it's asked the Court to forbear for just

18   a couple of months so that it can complete its legislative

19   task.  Once that task is completed, we'll then have a full

20   picture for all of the parties and the Court to determine the

21   questions that remain in this case, if any.

22          So, all of the benefit would be to forbear.  It would

23   serve the interests of judicial economy to avoid having to

24   decide this case twice; it can be decided once, it can be

25   decided in a couple of months, because Texas's voters are being

1     protected by the interim remedy.  That's why we asked the Court

2     to follow this course last week when we filed the joint motion

3     to postpone this hearing.  In light of the Court's decision to

4     proceed, we filed our motion yesterday, because we think that

5     that course gives full effect to the Fifth Circuit's opinion

6     and allows Texas the first opportunity that is requested and

7     that the governing case law from the Fifth Circuit and Supreme

8     Court accord it to address the issues raised in the Fifth

9     Circuit's opinion legislatively.

10          **THE COURT:**  Okay.  Ms. Colmenero, do you want to add

11    anything to that?

12          **MR. GORE:**  Thank you, your Honor.

13          **MS. COLMENERO:**  Thank you.

14          Just a couple of points, your Honor.  We agree with

15    the reasons expressed by the United States as to why this Court

16    should defer ruling on the issue of discriminatory intent.  We

17    also want to alert the Court that as of yesterday there was a

18    companion piece of legislation filed in the Texas house, that

19    is, HB 2481, which is an identical bill to SB 5, which was

20    filed last week in the Texas senate.  That Texas house bill has

21    five joint authors, which is the maximum number of joint

22    authors that you can have for legislation in the house, and

23    with a low bill number in the senate, over 20 joint authors for

24    the senate bill, five joint authors in the house bill, this

25    reflects a broad array of house leadership and senate

16

1    leadership support, and we anticipate that the legislature will

2    adopt new legislation this session that is similar to the

3    Court's interim remedy order that is -- that is being

4    considered now before the Court.

5          So, we also agree that there is no harm to Texas

6    voters if there is a delay for several months before this Court

7    considers the discriminatory intent issue again in light of the

8    interim remedy order that remains in place.

9          **THE COURT:**  All right.  Thank you.

10         Mr. Dunn, I believe you're speaking for the

11   plaintiffs on that issue?

12         **MR. DUNN:**  Yes.  Thank you, your Honor.

13         Last fall, of course, the parties came to the Court

14   upon remand to schedule argument, this argument today, in this

15   case.  And at that point the private plaintiffs and the United

16   States each filed briefs suggesting that the decision on intent

17   needed to come before the decision on remedy.  In fact, the

18   State made the same argument that's been advanced here, which

19   is that the legislature would soon be meeting.  And, indeed,

20   that was considered by the en banc court when it referenced

21   when the legislature meets and the necessity of the legislature

22   giving a review to the en banc decision and addressing a

23   potential remedy.  But what the Fifth Circuit did not say is

24   that this Court should delay its actions or that this Court

25   should wait for the actions of the legislature, when and if

1    they ever come.

2              So, we believe that the United States and its

3    original briefing in the fall and the private plaintiffs'

4    briefing stands for the same reasoning today and ought to be

5    affirmed by the Court, which is, in order to address the remedy

6    in this case, we must first identify and describe the depth of

7    the violation.  Now, we hear from the United States today that

8    perhaps Senate Bill 5 or some other measure the legislature

9    considers and passes may, as I heard, deal with some of the

10   discriminatory effect of Senate Bill 14.  But that's precisely

11   the purpose of 3(c) of the Voting Rights Act, is to create a

12   condition where an Article III Court doesn't just deal around

13   the edges with some of the harm of a purposefully

14   discriminatory act, but, instead, strikes it down in all of its

15   tentacles and all of its application.  The U.S. Supreme Court

16   has said that a bill or a law passed by a state with a

17   discriminatory intent is due no deference whatsoever.    And

18   although the court remedy entered in this case was a giant leap

19   forward for my clients and so many voters in the state, it,

20   nevertheless, retains the discriminatory architecture of Senate

21   Bill 14.  And although Senate Bill 5, when and if it passes,

22   under what provisions it ends up containing, may ultimately

23   change the staging of address of Senate Bill 14, the underlying

24   architecture, nevertheless, remains.  And, as the Court knows,

25   the plaintiffs have argued consistently throughout this case

1 that Senate Bill 14 was crafted with a picking and choosing of

2 approved ID's; ID's that were disproportionately chosen in

3 favor of Anglo citizens and against the interests of African-

4 American, Latinos, elderly, and other citizens.  That basic

5 architecture remains in place.  People who are subjected to the

6 reasonable impediment process, the additional questioning by

7 election officials, and the stigma that's involved in

8 participating in the process are, nevertheless, today singled

9 out for that undertaking because of what the legislature chose

10 to do in 2011 and the reasons it chose to do it.

11          Now, this Court's work in an intent case is -- is,

12 unlike so many other cases, surprisingly less difficult than

13 normal.  The en banc court, the Fifth Circuit, no one knows

14 better than I the Fifth Circuit's skepticism in some cases of

15 voting rights cases, but, nevertheless, they easily came to the

16 conclusion that there was substantial evidence of intent in

17 this case.

18          The Court should undertake, as it decided to do in

19 the fall, at the urging of the United States and the private

20 plaintiffs, the analysis today as to whether or not there was a

21 discriminatory intent, and that analysis can be produced to the

22 Court when its facilities allow, and ultimately, when and if

23 the legislature adopts some type of remedy, that remedy can be

24 weighed against the complete weight of the violation that has

25 been proven by the evidence in this case.

1               The last point I would like to make, or, actually,

2    the final two points I would like to make, is that there is

3    this notion that there is no coming federal election.  And

4    although that's an unassailable point on its own, there are a

5    number of elections that proceed.  And under state law there

6    are four uniform election dates for which jurisdictions can

7    schedule elections.  There's no doubt in my mind this upcoming

8    May that there are school districts and local municipal utility

9    districts undertaking elections; there will be additional

10   elections come November.  And although it may be that fewer

11   people are subjected to the architecture of Senate Bill 14 in

12   those elections, it's, nevertheless, true that people will

13   still be subjected to Senate Bill 14 in the weeks and months

14   ahead.  Also, we've learned throughout the litigation, from

15   2011 to present, that time is always of the essence, because

16   there always seems to be another appeal or another argument,

17   another step in the advancement of the process in order to get

18   to the final goal of justice.

19               So, although it has been necessary and, no doubt,

20   helpful to the Court that the parties have briefed this

21   thoroughly up until now, it is, nevertheless, time to make a

22   decision on discriminatory intent, if for no other reason than

23   to state what happened in 2011 with Senate Bill 14, and address

24   whether and how, under the Voting Rights Act, Section 3(c), the

25   State of Texas should be supervised in its changes to election

20

1    laws moving forward.  We think the motion, then, ought to be

2    denied, insofar it asks for delay of this action, and proceed

3    to argument and decision on this issue.

4         **THE COURT:**  All right.  Anything else from any other

5    plaintiffs?

6         **MR. ROSENBERG:**  Well, the only additional point I

7    will make, and then I -- I guess it might be my turn to just

8    stand up here and argue, is that whatever happens with SB 5 has

9    no bearing on what the intent was behind SB 14 in 2011.

10        And if your Honor wishes, I can proceed with my

11   argument on the merits.

12        **THE COURT:**  Yeah, anything further on the issue of

13   SB 5?

14        **MR. GORE:**  Yeah.

15        **THE COURT:**  Yes.

16        **MR. GORE:**  A brief response on a couple of points,

17   your Honor.  First of all, the Fifth Circuit said exactly the

18   opposite with respect to the effect of interim legislative

19   relief.  I'll just read from the opinion on page 271.  It says:

20             "Any new law would present a new circumstance not

21             addressed here.  Such a new law may cure the

22             deficiencies addressed in this opinion.  Neither our

23             ruling here, nor any ruling of the district court,

24             should prevent the legislature from acting to

25             ameliorate the issues raised in this opinion, thus

21

```
 1              limit those issues to discriminatory effect or any

 2              other theory."

 3         Then it says, in the final paragraph -- this is on

 4    page 272:

 5              "The district court will need to reexamine the

 6              discriminatory purpose claim in accordance with the

 7              proper legal standards we have described bearing in

 8              mind the effect any interim legislative action taken

 9              with respect to SB 14 may have."

10         The Fifth Circuit should not have been clearer that

11    any interim legislative action bears on the discriminatory

12    purpose claim.  And the reason is that it paints a complete

13    legislative mosaic of the legislature's intent with respect to

14    the voter ID issue and SB 14 and SB 5 or whatever law is

15    enacted as a complete package.  Moreover, the Fifth Circuit did

16    say that in the appropriate case, where there is not an

17    impending statewide or federal election, the court should defer

18    to the legislature to give it the first opportunity.  That's on

19    page 270 of the opinion, and it even went so far as to say:

20              "When feasible, our practice" -- the Fifth Circuit --

21              "has been to offer governing bodies the first pass at

22              devising remedies for Voting Rights Act violations."

23         It then goes on to say that a reasonable impediment

24    exception would be potentially an appropriate amendment here.

25    And, finally, there was a suggestion that Texas voters today
```

1   are being subjected to the architecture of SB 14.  I think

2   counsel used that phrase a couple of times.  That is

3   inaccurate, because the Court has entered an interim legis- --

4   interim judicial remedy that's governed the elections.  It

5   governed the 2016 general election; it was agreed to by all of

6   the parties; there is no evidence to suggest that it had any

7   discriminatory effect in its application; and it is precisely

8   the kind of remedy that the Fifth Circuit invited the Court to

9   enter.  The Court entered it, elections have been conducted

10  under it, and elections will continue to be conducted under it

11  until a new remedy is entered.  So, there is no harm to Texas

12  voters at this -- at this time, because the interim remedy

13  protects them.

14          The Texas legislature has asked for an opportunity

15  over the next couple of months to make permanent and by

16  legislation some kind of reasonable impediment exception.  The

17  house has now picked up this effort, as well.  We are hopeful

18  that Texas will follow through on that.  We think that is the

19  quickest way to resolve this case.  It is the best approach for

20  the Court to avoid deciding issues unnecessarily and on an

21  evolving record.

22          Thank you.

23          **THE COURT:**  Okay.  And does the bill as filed -- and

24  either you, Ms. Colmenero -- address any additional ID's that

25  would be allowed?

1          **MS. COLMENERO:**  No, your Honor.  The bill

2    virtually -- it's virtually identical to the Court's interim

3    remedy order and prescribes the use of an indigency affidavit

4    or reasonable impediment affidavit like the kind the Court

5    ordered in its interim remedy order back in August.  And --

6    and, so that -- that is really what the purpose is of SB 5, as

7    well as the house companion bill.

8          **THE COURT:**  All right.  Thank you.

9          So, shall we then move to argument on --

10         **MR. ROSENBERG:**  Thank you, your Honor.  If I -- can I

11   address -- make one response to something Mr. Gore just said?

12         **THE COURT:**  Okay.

13         **MR. ROSENBERG:**  That any reference to deficiencies

14   that could be cured by legislation in the Fifth Circuit opinion

15   were necessarily limited to deficient -- the only deficiencies

16   that it found, which were the Section 2 results deficiencies,

17   because it had not yet ruled that there were, in fact, so-

18   called "intent" deficiencies, and that's the purpose of today's

19   hearing.  Virtually all of that discussion has to do with

20   remedies or the Section 2 effects, has nothing to do with the

21   purpose.

22         May it please the Court, your Honor.  The private

23   plaintiffs have tried to divide the argument among themselves

24   in order to eliminate redundancies.  I'm going to be addressing

25   primarily the meaning and effect of the Fifth Circuit opinions,

1    the inferences that the Court can draw from what is now the

2    irrefutable overarching facts, the inferences that this Court

3    should not draw because Texas is precluded from making

4    arguments and because the record does not support them; and

5    Ms. Nelson is going to dive a little more deeply into some of

6    the more important facts that support our intentional

7    discrimination claim; Mr. Garza and Mr. Dunn will offer short

8    statements on behalf of their clients; and Ms. Perez will

9    present the rebuttal for the private plaintiffs.

10           My primary theme, your Honor, is fairly simple.  And

11   that is that your Honor got it right the first time around and

12   that there is nothing in the Fifth Circuit's opinion that

13   suggests that your Honor cannot reach or should not reach the

14   same conclusion upon remand.  In fact, the Fifth Circuit's

15   opinion was largely an affirmation of your Honor's approach and

16   reasoning in support of her initial conclusion.  The Fifth

17   Circuit specifically confirmed the legal standards that your

18   Honor used, confirmed the approach that your Honor used in

19   terms of the categories of evidence that your Honor felt fit to

20   review subject to the *Arlington Heights* standard.  Though it

21   found that there may have been some inordinate reliance on a

22   handful of subsidiary facts, there was not a single finding of

23   fact by this Court that the Fifth Circuit questioned as

24   unsupported by record evidence, and, in fact, as we shall talk

25   about, virtually every important finding of fact that your

1   Honor made was specifically discussed by the Fifth Circuit as

2   being supported by record evidence, and, similarly, the Fifth

3   Circuit did not question as unsupported by record evidence the

4   overall conclusion that your Honor reached that SB 14 was, in

5   fact, enacted with a discriminatory intent.  In fact, in order

6   for the Fifth Circuit to take the position that it took, that

7   under the *Pullman-Standard* doctrine it would be remanding this

8   case to the Fifth Circuit -- to this Court, it did so because

9   it specifically and expressly found that there was sufficient

10  evidence in the record to support the conclusion that SB 14 was

11  enacted with discriminatory intent.  Indeed, after reviewing

12  all of the evidence, the Fifth Circuit described its choice not

13  as one between reversal or remand, but between affirmance or

14  remand, and said it could just simply affirm your Honor's

15  decision on intent.  The reason it did it was because it also

16  recognized that the district court has the exclusive province

17  to make inferences from the record.  In fact, in footnote 22 it

18  acknowledged that multiple inferences might be drawn from the

19  record but it was only the district court's job to draw those

20  inferences.

21          So, the only issue on remand at this hearing is

22  whether the few pieces of subsidiary evidence that the Fifth

23  Circuit found, in its words, to be "infirm," made the

24  difference between your Honor's initial decision that SB 14 was

25  enacted with discriminatory intent or that it was not.  And

```
 1    while I think it's a little presumptuous for any of the parties
 2    to suggest to the Honor -- to your Honor what -- what weight
 3    you gave to specific pieces of evidence, an objective view of
 4    your Honor's opinion and of the record concludes, without any
 5    doubt, that this Court did not need the few instances of older
 6    examples of state-sponsored discrimination or the instances of
 7    discrimination in Waller County or the stray statements by
 8    opponents of SB 14 that were deemed speculative, or by the
 9    post-enactment statements by proponents of SB 14, or the Bush
10    versus Vera case to tip the scales from this finding of
11    discriminatory intent to a finding of no discriminatory intent.
12            Looking at your Honor's opinion, for example, there
13    are perhaps only two or three sentences in the entire
14    discussion that your Honor gave to discriminatory intent that
15    were in any way affected by the Fifth Circuit's opinion.  And
16    nowhere in the opinion did your Honor ascribe any sort of great
17    weight to any of the so-called "infirm" evidence as compared to
18    what your Honor did when she described, for example,
19    Dr. Lichtman's testimony, that the combination of demographics
20    and racially polarized voting were instrumental in his
21    conclusion that SB 14 was enacted with discriminatory intent,
22    and as to that evidence your Honor specifically stated that she
23    was giving, quote, "great weight," end quote.  Nothing like
24    that occurred in terms of any of the other shards of evidence
25    that the Fifth Circuit questioned.
```

1          And because Texas has stated in its brief that our

2     entire case, in its word, "unravels" without those few pieces

3     of evidence, I -- I did go back and -- and look at the closing

4     that I had the honor of giving a little more than two years

5     ago, and it was devoted entirely to the issue of discriminatory

6     intent.  And out of the some 5,000 words that I uttered -- and

7     I know Genay took them down accurately -- only 60 of them were

8     in any way connected with any of the evidence that the Fifth

9     Circuit questioned.  That -- those few pieces of evidence have

10    never been the crux of our case, and they were not essential to

11    your Honor's decision in the first place.

12         So, the issue before this Court, in the words of the

13    Fifth Circuit, is for your Honor to decide how those pieces of

14    evidence weighed in its original calculus.  It is not, as Texas

15    would have it, for this Court to revisit issues of law or fact,

16    findings of fact, that have been definitively established, and

17    it's certainly not the time for Texas to throw into the record

18    new theories or new evidence, particularly when the Fifth

19    Circuit specifically said no new evidence will be admitted at

20    this proceeding.

21         So, Texas can no longer argue, as it persists to,

22    that there is a heightened standard applicable to cases of this

23    sort where only the clearest evidence can be used or that the

24    plaintiffs must prove that SB 14 was enacted -- enacted

25    unexplainable by anything but race, when the standard is that

1    plaintiffs need only prove that discrimination was a motivating

2    factor, not even a primary one, behind SB 14.  Or that

3    plaintiffs must prove that SB 14 resulted in diminished voter

4    turnout; or that plaintiffs must prove that SB 14 made it

5    impossible for people to vote; or that the *Crawford* case

6    somehow gives Texas a free pass not to have to defend against

7    allegations of pretext.  Every one of these legal issues has

8    been concluded by the Fifth Circuit adversely to Texas, and it

9    cannot argue otherwise in this forum, on this remand, by virtue

10   of the doctrines of the law of the case and the mandate

11   doctrine.

12           Similarly, Texas can no longer argue against a

13   baker's dozen of overarching facts which, taken together, fully

14   support this Court's original conclusion and will support this

15   Court's ultimate conclusion that SB 14 was enacted with

16   discriminatory intent; because each of these facts have been

17   found, not only by this Court, but have been discussed by the

18   Fifth Circuit as supported by record evidence.  And these

19   include that the -- there had been a -- that SB 14 was enacted

20   in the background of a seismic demographic change in Texas that

21   showed the exponential growth of minority populations.  That

22   racially prevalent -- racially polarized voting is prevalent

23   throughout Texas.  That the drafters and proponents of SB 14

24   had full knowledge of the potential for a disparate impact on

25   the voting rights of African-American and Latino voters by

1    virtue of SB 14.  That, despite this knowledge, the drafters

2    and proponents of SB 14 made choice after choice to make the

3    ID's that were acceptable under SB 14, those that were less

4    likely to be possessed by Black and Latino voters, and more

5    likely to be possessed by Anglo voters, and to reject those

6    sorts of ID's that were more likely to be possessed by Black

7    and Latino voters.  That, armed with this knowledge, the

8    drafters and proponents of SB 14 rejected ameliorative

9    amendment after ameliorative amendment, and that the drafters

10   and proponents of SB 14 refused largely to explain the reasons

11   for their conduct.  That while stating that SB 14 had been

12   modeled after the laws of Georgia and Indiana, the drafters and

13   proponents of SB 14 removed from SB 14 all of the ameliorative

14   provisions of those state statutes.  That the drafters and

15   proponents of SB 14 tried to justify that bill with a series of

16   rationales that have been found by this Court and the Fifth

17   Circuit to be shifting and tenuous.  That the same legislature

18   that passed SB 14, as Ms. Nelson will go into in greater

19   detail, passed other discriminatory legislation.  That the

20   drafters and proponents of SB 14 used radical and unprecedented

21   procedures to steamroll the statute through the house -- both

22   houses.  That SB 14, in fact, did have a discriminatory impact

23   in terms of both possession and burden of ID's, which impact

24   was exacerbated by the poor implementation of the law.  And,

25   finally, that there is no record evidence to support the

1    specific provisions of SB 14 that made it so discriminatory,

2    which is a fundamental basis for your Honor's finding that

3    Texas has not met its burden to prove that SB 14 would have

4    been enacted even absent the discriminatory intent.

5             Now, this is aside from your Honor's having conducted

6    a multi-day trial, having listened to some 30 witnesses, I

7    believe, live, having accepted the expert testimony of Doctors

8    Lichtman and Dr. Minnite and Dr. Burton and Dr. Burden and

9    Dr. Davidson and George Korbel.  Every one but one of them

10   testified live, so your Honor had the ability to assess the

11   credibility of those witnesses, whose opinions were crucial to

12   your Honor's finding.  So, it's no surprise that the Fifth

13   Circuit thought that the issue was not one of reversal or

14   remand, but one of affirmance or remand, and thought that this

15   court is the only court to be able to draw the appropriate

16   inferences.

17            And we'll talk about those inferences.  But I want to

18   emphasize and embrace that those inferences are largely based

19   on circumstantial evidence.  And note I did not say "just"

20   circumstantial evidence or "only" circumstantial evidence,

21   as -- as Texas seems to say, because all of us trained as

22   lawyers know that circumstantial evidence is not a lesser

23   species of evidence.  We're taught in law school that the

24   classic example of circumstantial evidence where before you go

25   to bed and you look out the window, it's dry outside; you wake

1  up, you look out the window it's wet outside; the

2  circumstantial evidence is that it rained.  In many cases,

3  circumstantial evidence is as robust and as probative, if not

4  more so, than direct evidence, and in many cases, such as cases

5  where plaintiffs are trying to prove discriminatory intent, it

6  may be the only possible evidence, and that's been recognized

7  by the courts.

8          So, another thing that Texas is not able to argue

9  today in this hearing on this remand is that plaintiffs are not

10  able to prove their case solely by circumstantial evidence.

11  And plaintiffs are not -- I mean, I'm sorry -- Texas is not

12  able to argue, as it does, still, that this Court must infer

13  something against plaintiffs because they did not produce a so-

14  called "smoking gun."  Both of those conclusions were firmly

15  rejected by the Fifth Circuit and cannot be raised by Texas

16  now.

17          The beauty of circumstantial evidence is that it

18  allows the finder of fact to draw strands of inferences from

19  the record evidence and combine them into a mosaic of, you

20  know, picture of discriminatory intent, as is the case here.

21  So, for example, here the Court can infer intent from the

22  result that SB 14 engendered.  The Supreme Court in the *Bossier*

23  *Parish* (phonetic) case, in the *Dayton Board of Education* case,

24  indicated that this is a fair inference to be drawn.  The

25  Supreme Court in the *Feeney* case stated that what a legislature

1    is up to may be plain from the results it achieves.  And here,

2    of course, we not only have the results, but we have actual

3    evidence of actual knowledge by the drafters and proponents of

4    SB 14 of the potential for disparate impact.

5              The Court may also infer from the shifting and

6    tenuous rationales that were given that there was pretext at

7    work.  And pretext indicates discriminatory intent, as the

8    Fifth Circuit specifically stated.  And this Court may infer

9    from the numerous substantive and procedural departures from

10   the way you would think a legislature would act that something

11   else was going on; and in the words of the *Arlington Heights*

12   court, that there were "improper purposes" at play.  And we

13   know what happened with SB 14.  What did it need to get passed?

14   Well, first, you had to have Governor Perry issue an executive

15   order declaring a legislative emergency when no one could

16   testify as to the existence of an emergency.  Then you had the

17   senate bypassing usual committee procedures.  Then you had the

18   senate suspending for voting rights -- voting ID laws only the

19   hallowed and century-old two-thirds rule.  Then you had the

20   house bypassing usual house committee procedures.  And you had

21   the house getting rid of the filibuster rule.  And you had the

22   conference committee bypassing its usual procedures and

23   enacting substantive changes in the law.  And you had the

24   $2 million fiscal note attached to the bill at a time when

25   there was a $27 million budget deficit.  As the Fifth Circuit

1  also said, that one would think that when a legislature is

2  acting with such speed and unprecedented procedures there would

3  be something really major going on, such as a $27 million

4  budget shortfall, not the nonexistent issue -- the issue of

5  nonexistent voter fraud.  But there's more.

6           As Texas likes to remind us, there was context.

7  There were six years that preceded SB 14, and Texas likes to

8  use those six years to show that, well, that's why it was okay

9  for the legislature in 2011 to bypass procedures and to speed

10 up the process, because everyone knew what was going on.  Well,

11 first of all, never in those six years were the specific

12 provisions of SB 14 ever discussed.  But beyond that, Texas

13 can't have it both ways.  Knowing the history of what preceded

14 it in those six years, one would think, as your Honor did state

15 in her original opinion, that the legislature would ask for an

16 impact study in 2011.  The 2011 legislature did not do that,

17 and, in fact, the only such study that was done by the State

18 was mysteriously buried.  One would think, given the fact that

19 the 2011 legislature knew that past legislatures had been

20 unable to pass voter ID laws with strict provisions, that they

21 would seek ways to negotiate, to compromise, to build

22 consensus.  Not only did they not do that, but they eliminated

23 the very vehicles that would build consensus, that would allow

24 for negotiation.  And not only did they not compromise, but

25 they made choice after choice to make SB 14 more and more

1   discriminatory, not less discriminatory.

2           And one would think that with this history of six

3   years of discussions, when asked questions in 2011, the leaders

4   who were pushing this legislation would be able to answer them.

5   But Senator Fraser, the senate sponsor of SB 14, 27 times said

6   he was not advised when asked questions as to why certain

7   things were in or not in the bill.  And Representative Harless,

8   the house sponsor of SB 14, could not in testimony in this case

9   recall answers to most basic questions as to SB 14.  She could

10  not explain why SB 14 contained -- found acceptable military

11  and -- ID's and passports but not other federal, state, and

12  municipal ID's.  She could not explain why she personally

13  tabled any number of ameliorative amendments.  She could not

14  recall whether or not she thought voter fraud existed in 2011.

15  She could not recall why -- she could not recall why she found

16  acceptable, in a bill that she proposed in the same session as

17  SB 14, a voter ID bill which included many more ID's that were

18  acceptable than SB 14, but she could not recall why.  The same

19  way Senator Patrick could not recall why he tabled any number

20  of ameliorative amendments; the same way Speaker Straus could

21  not explain why employee ID's were not acceptable; the same way

22  Bryan Hebert, the general counsel to the lieutenant governor,

23  could not explain why in 2009 any number of ID's, such as

24  employee ID's and student ID's, a broad range of ID's were

25  acceptable in 2009 but not acceptable in 2011.

1                Your Honor has a right to infer from this mountain of

2    evidence that from these -- from these -- the selective memory,

3    from this evasiveness, that there were improper purposes at

4    play.  And your Honor has a basis to infer precisely what that

5    improper purpose was, and the Fifth Circuit has said so in no

6    uncertain terms, and this is on page 241 of its opinion, where

7    it says that:

8                    "Faced with diminished voter turnout, the power in

9                    party saw an opportunity to gain partisan advantage

10                   by enacting a strict voter ID law that would limit

11                   the rights of Black and Latino voters."

12               That is a -- that is conduct, as I think Ms. Nelson

13   will go into in greater detail, that has been used by the State

14   of Texas to stop minority advancement in voting in the past,

15   and it is a fair inference from this record for this Court to

16   find that the exponential growth of the minority voting

17   population, taken together with the cohesiveness of that

18   voting, I guess the party in power, was a motivating factor in

19   SB 14.

20               So, how does Texas respond to this?  Well, first of

21   all, they try to present a new theory, the modernization

22   theory, that SB 14 was a culmination of a decades-long attempt

23   to modernize voting laws in Texas.  Well, as I said earlier,

24   the Fifth Circuit absolutely precluded the introduction of any

25   new evidence, and that entire argument is supported -- to the

1   extent it's supported, which is a different issue -- by an

2   array of evidence which they've asked your Honor to take

3   judicial notice of.  That's impermissible.  It's impermissible

4   under jurisprudential tenets, even irrespective of the Fifth

5   Circuit's decision, because they have been litigating this case

6   for five years, in a number of different courts, and have never

7   presented that theory before, and they are not allowed to

8   present it for the first time here.  And even if they were,

9   there is no basis for it.  There is not a single witness who

10  has ever testified to it in depositions or at trial, and there

11  is not a single statement in the record of SB 14 that supports

12  that proposition.

13          Then they say that, oh, this is just partisanship,

14  not race.  Well, the Fifth Circuit answered that also.  The

15  Fifth Circuit said that preserving power through partisan means

16  can also be discriminatory.

17          Then they say, well, these procedural machinations,

18  everyone's done it.  Well, the testimony of Senator Williams

19  and Senator Davis and any other number of witnesses was,

20  perhaps they have been done singly, but never in this

21  combination, two or three or four, let alone seven or eight of

22  them.

23          Then they say, well, there's a whole bunch of

24  arguments that we can show that would dispel any notion of

25  discriminatory intent.  So, first they say that, look, the

1    proponents of SB 14 adopted an indigency affidavit exemption.

2    And that was removed only because Representative Anchia and the

3    democrats waned it removed.  Well, first of all, as we showed

4    in our papers, that that is false; Representative Anchia voted

5    against it, and it was -- it was voted the -- taking out the

6    indigency affidavit was at the control of the party in power.

7    But, secondly, it doesn't matter.  We're not talking about the

8    bill -- prior versions of the bill here; we're talking about

9    the intent -- intent behind the final bill that was enacted in

10   law, and that final bill did not have an indigency affidavit.

11         Then they say that, well, the proponents of SB 14

12   agree to some ameliorative amendments.  Well, the -- the key

13   word, of course, is "some."  And the only major category of

14   additional acceptable ID's which they agreed to was the license

15   to carry.

16         Then they say, well, there were a number of minority

17   republican representatives and former democrats who are now

18   republicans, and they voted for SB 14.  Well, that is probably

19   an artifact, if important at all, of the racially polarized

20   voting, but, as your Honor also recognized in her opinion, in

21   assessing the legislative intent, it is not the job of the

22   Court to assess the individual motivations of individual

23   representatives.

24         And, finally, they say, well, what is proof

25   positive -- and that's their language, "proof positive" -- is

1    that the proponents of SB 14 voted in the past, those who were

2    in the 2005 or 2007 or 2009 legislators -- legislatures -- they

3    voted for less discriminatory bills.  Well, as the Fifth

4    Circuit also made clear, the only issue in this case is the

5    intent of the legislature that passed SB 14 in 2011, and the

6    choices that that legislature made that made it more

7    discriminatory than HB 218 or HB 1706 or SB 362 or Georgia or

8    Indiana's statute or, in fact, any other voter ID law in the

9    country.  In that connection, it's never been the issue in this

10   case whether voter ID laws generally are good or bad or whether

11   the voters in Texas generally want voter ID laws or do not.

12   The only issue are the specific choices made by the legislature

13   that made the specific provisions of SB 14 more discriminatory.

14   And if the prior legislators were satisfied with the provisions

15   of SB -- of HB 218 or HB 1706 or SB 362, then why did they make

16   SB 14 so much more discriminatory?  If they were satisfied with

17   the laws of Georgia and Indiana, then why did they strip from

18   SB 14 the very provisions that made those laws more

19   ameliorative?  And the answer that Texas gives is very

20   interesting.  The answer is:  Well, we had an election in 2010,

21   and it was a landslide in favor of the republicans, and there

22   was a super majority now in the house of republicans, and we

23   could pass it; we could pass SB 14.  It cannot be an answer to

24   a claim of discriminatory intent that a legislature was not

25   able to pass a law that was less discriminatory when it did not

 1    have the votes, but was able to pass a law that was more

 2    discriminatory when it did have the votes.

 3            And, finally, your Honor, I'll talk a little bit

 4    about impact.  And the only reason I'm going to talk about

 5    impact is because Texas persists in raising an issue which the

 6    Fifth Circuit has said was demonstrably false.  And that is

 7    that plaintiffs were not able to produce a single person who

 8    was adversely affected by SB 14.  They cannot raise that issue

 9    now.  And as I did when I closed a couple of years ago, I would

10    just want to pay tribute to the people who we all are fighting

11    for:  To the searing testimony of Sammie Louise Bates, who

12    talked about counting pennies with her grandmother in order to

13    pay a poll tax and discussed how she could not afford a birth

14    certificate because the $22 was the difference between her

15    family having food or not, and they could not eat birth

16    certificates.  The eloquence of Elizabeth Gholar, who insisted

17    that she had earned the right to vote.  The heroism of Leonard

18    Taylor, who overcame physical disabilities to walk into this

19    court and press his claim for a right to vote.  The dignity of

20    the late Margarito Lara and his sister, Maximina, who bared

21    before this court the most private details of their finances in

22    order to press their claim for the right to vote.  And, of

23    course, the bravery of Reverend Peter Johnson, who talked about

24    the friends that he has in graveyards who died for the right to

25    vote.

1          As I said then, I would like to think that the good

2    men and women of the Texas legislature might have acted

3    differently if they heard this testimony.  But reviewing this

4    record, your Honor, I am sorry to say it's not so.  Because

5    they did hear this testimony, and the more they heard that sort

6    of testimony, the more discriminatory they made the law,

7    because they were driven by an impermissible and discriminatory

8    purpose to stifle the votes of Black and Latino voters and deny

9    them the equal opportunity to participate in the electoral

10   process.  And that's wrong, and it's illegal, and it's

11   unconstitutional, and this Court should grant appropriate

12   relief.

13          Thank you.

14        **THE COURT:**  Thank you.

15      **(Pause)**

16        **MS. NELSON:**  Good morning, your Honor.

17        **THE COURT:**  Good morning.

18        **MS. NELSON:**  May it please the Court.

19        **THE COURT:**  Yes.

20        **MS. NELSON:**  Again, my name is Janai Nelson, I'm the

21   Associate Director-Counsel of the NAACP Legal Defense and

22   Educational Fund, and I'm appearing on behalf of our client,

23   Imani Clark.

24          If I may make two very brief points on the matter

25   that was discussed earlier regarding the United States' motion

1    for voluntary dismissal of the discriminatory impact claim --

2    intent claim.  The question before this Court is whether Texas

3    acted with intentional discrimination in the enactment of SB

4    14; not whether SB 5 is a better law than SB 14 and not whether

5    it has less of a discriminatory effect than SB 14.

6            Second, to the extent that SB 5 has any relevance at

7    all, or any other law for that matter that comes before the

8    State legislature, it bears only upon remedy, and it bears only

9    upon the remedy for the effects claim.  It has nothing to do

10   with this Court's charge to determine whether the legislature

11   acted with discriminatory intent.

12           And your Honor asked about whether SB 5 contains

13   expanded forms of identification, and the State acknowledged

14   that it does not.  I might also add that while it is an

15   improvement on SB 14, it contains nonetheless very concerning

16   provisions, including one that creates a third degree felony of

17   potentially false statements on the declaration.  So I just add

18   that to the discussion that was had earlier concerning the

19   United States' motion.

20           On the matter of intent specifically, the

21   overwhelming majority of factual findings in your meticulous

22   147-page opinion firmly support, unassailably support, a

23   finding of intent in this case.  There's sufficient evidence as

24   the Fifth Circuit stated to support a finding that a cloak of

25   ballot integrity could be hiding a more invidious purpose.  The

1    Court questioned only a slim subset of the evidence relied upon

2    from this Court among a voluminous record of evidence, and it

3    asked this Court to simply re-weigh the evidence, excluding or

4    reconsidering the particular pieces of evidence that it

5    questioned.  It's also important to underscore that we're not

6    here to debate the merits of voter ID laws more generally,

7    which is what the State's filings on remand largely defend.

8    We're here because there's no credible evidence to justify the

9    exacting, strict, and stringent photo ID law that Texas enacted

10   in which race played at least a part in its decisions.

11   Instead, the record firmly establishes what Justice Ginsburg

12   appropriately called a sharply disproportionate impact on Black

13   and Latino voters.  That impact was foreseeable, that impact

14   was avoidable.  That impact was unjustifiable.  And, it was

15   intended.

16           I'd like to use my time here to address some of the

17   new arguments that Texas raises on remand and also to highlight

18   the limited pieces of evidence that the Court questioned,

19   especially balanced against the overwhelming evidence that

20   remains.

21           In addition to the radical procedural departures that

22   Mr. Rosenberg described, there are really two broad categories

23   of evidence that cement the intent finding.  The first is the

24   contemporary history of discrimination, and the second is the

25   actions of the legislature as opposed to the post-enactment

1    statements that the Fifth Circuit suggested you rely less upon.

2    Of course your Honor is intimately familiar with this record so

3    I will try to limit my discussion to a summary of the pieces of

4    evidence that stand in for the limited evidence question by the

5    Fifth Circuit, so I'll begin with a contemporary history of

6    discrimination.  And let me start off by saying that neither

7    *Shelby County versus Holder*, *McCleskey versus Kemp*, or the

8    Fifth Circuit's decision in this case suggest that historical

9    discrimination is irrelevant.  Instead the Fifth Circuit's

10   opinion limits the consideration of such discrimination and

11   says that we should not rely as much on long-ago history or

12   history dating back hundreds of years.  For better or for

13   worse, this Court does not need to look back to history dating

14   back hundreds of years.  The history of Texas's discrimination

15   against minority voters is long and it is living.  In its *en*

16   *banc* opinion, the Fifth Circuit identifies several examples of

17   contemporary discrimination in Texas's elections process that

18   in its words augmented the circumstantial evidence of

19   discriminatory intent.  These examples include Texas's purging

20   of minority voters from the voter rolls, its decennial racial

21   gerrymanders for the past 40 plus years in violation of the

22   Voting Rights Act, and Texas's ignoble distinction as the only

23   state with a consistent record of DOJ objections to at least

24   one of its statewide redistricting plans from 1980 up through

25   the *Shelby County* decision.  In addition, as we note in our

1   findings of fact in paragraphs 24 and 25, during the 38 years

2   that Texas was covered under Section 5, DOJ issued over 200

3   objection letters blocking discriminatory voting changes that

4   Texas would have undertaken but for preclearance.  These

5   include voting changes in more than 100 Texas counties ranging

6   from racially discriminatory candidate qualifications to

7   preregistration proof of citizenship requirements.  The record

8   also shows that since at least as recently as 2000, DOJ issued

9   three objections to the State and 13 objections to local

10  jurisdictions, eight of which were explicitly based on Texas's

11  failure to prove that the changes were not motivated by

12  discriminatory intent.  And finally, as the Fifth Circuit

13  remarked, the same legislature that passed SB 14 also passed

14  two laws found to be passed with discriminatory purpose.  So

15  even if this Court puts aside Waller County as the Fifth

16  Circuit instructs, and even *Bush versus Vera* and *LULAC versus

17  Perry*, there still is copious evidence of historical

18  discrimination that in the Fifth Circuit's words provides

19  context to modern day events.  Now, Texas tries to cast doubt

20  on the probative value of this history by arguing that it must

21  be tied directly to this legislature.  But this contradicts

22  *Arlington Heights*, this also contradicts decades of case law in

23  which the actions of legislative bodies spanning decades and

24  even the actions of non-lawmakers has been used to establish

25  intent.  And as noted, some of these acts were in fact

1    committed by the very same legislature that enacted SB 14.

2           Now, the second limited area of evidence that I'd

3    like to focus on is the actions of the legislature in lieu of

4    post-enactment statements by proponents and opponents which is

5    a category of evidence questioned by the Fifth Circuit.  So

6    focusing only on those actions and omissions of SB 14

7    proponents, we could consider three categories of evidence that

8    fall roughly into these three buckets.  One is the suspect

9    selection and rejection of various forms of voter ID.  The

10   other is the legislature's failure to address SB 14's

11   foreseeable impact.  And, finally, the myriad shifting and

12   tenuous rationales that the State proffered to justify SB 14.

13   I'll take each of these briefly in turn.

14          The record firmly establishes that the legislature

15   designed SB 14 with surgical precision to disproportionately

16   harm minority voters.  Not only did Texas craft a law that

17   limited acceptable forms of ID to those that African Americans

18   were 305 percent less likely and Latinos 195 percent less

19   likely than Anglos to possess, it made very specific choices

20   that broadened Anglo voting.  And these choices were not

21   justified by policy.  Even Republican Senator Robert Duncan, an

22   SB 14 proponent, acknowledged that it was not necessary to

23   exclude student IDs or Government-issued employee IDs to serve

24   the stated goal of preventing voter fraud.  The State

25   nonetheless asserts several new theories, first time on remand,

1    in an attempt to justify the legislature's choices.  The State

2    argues that the legislature's narrow and limited choices under

3    SB 14 were made so that the law would be easier to administer.

4    But nowhere in the record is there any proof that any

5    legislature considered administrability as a justification for

6    SB 14's stringent provisions.

7            Moreover, it's not clear that SB 14 is even easier to

8    administer.  The State also suggests, again for the first time

9    on remand, that SB 14's opponents were complicit in designing a

10   law in a manner that discriminated against Black and Latino

11   voters.  And this is something that Mr. Rosenberg also

12   referenced but I'd like to go into a bit more detail.  This

13   argument's not only untimely raised, it's also patently false

14   and misleading.  Yes, Representative Ruben Hinojosa, a

15   Democrat, a Latino, introduced the gun carry permit ID.  But

16   what the State ignores is that he introduced the gun carry

17   permit ID as part of a menu of various exceptions -- or

18   additional forms of ID, rather, to SB 14 that would make it

19   less onerous.  The Republicans chose only the form of ID that

20   Anglos were more likely to possess and they affirmatively

21   rejected any of the other forms of ID that African Americans

22   and Latinos were more likely to possess.  This demonstrates

23   that SB 14's proponents were only willing to accept amendments

24   that advanced their goal of discrimination.  Even an indigency

25   affidavit that was introduced by Senator Duncan in the Senate

and that had passed in the Senate ultimately was stripped from

the law before it was passed and went through the conference

committee.  The State also vastly asserts that SB 14 opponent

representative Rafael Anchia removed the indigency provision.

Again, as Mr. Rosenberg already established, that is in fact an

error.  Mr. Anchia in fact voted against the removal of the

indigency affidavit.  It was rather Representative Linda Harper

Brown and 42 other proponents who removed it and Mr. Anchia's

vote was misrecorded and ultimately corrected.  That was not

disclosed by the State to this Court.

So as the Fifth Circuit noted, proponents of SB 14

have largely refused to explain the rejection of the amendments

and -- both at the time and in subsequent litigation.  So

despite the State's best efforts to create a new narrative

around the design of SB 14, there's simply nothing in the

record to justify the upward departures and strictness that

characterize SB 14, other than the Republicans newfound super

majority that enabled them to pass what the Fifth Circuit

called, and I quote, "the strictest and perhaps most poorly

implemented voter ID law in the country."

The second bucket of evidence that demonstrates the

legislature's actions or omissions has to do with its awareness

of SB 14's impact and its failure to mitigate it.  As the Fifth

Circuit held, the evidence supports the district court's

finding that the legislature knew that minorities would be most

1   affected by SB 14, and that SB 14's drafters nonetheless passed

2   the bill without adopting a number of proposed ameliorative

3   measures that might have lessened this impact.  In response,

4   the State tries to plead ignorance here.  For example, it says

5   that the State could not rely on the numbers that estimated the

6   number of Texans that did not possess driver's licenses or

7   personal IDs because that data could not be matched properly.

8   Even if this were true, it does not refute the abundant

9   evidence from which to infer awareness, as we detail in our

10  findings of fact in paragraphs 200 to 233, including the

11  testimony of SB 14 sponsor Representative Todd Smith who, for

12  example, stated that it was common sense that this would have a

13  disproportionate impact on minority voters, he did not need a

14  study to tell him this.  And this is reinforced by the Supreme

15  Court's findings in *Reno versus Bossier Paris* (sic) where the

16  court held that the disparate impact of a legislative action is

17  often probative of why the action was taken in the first place

18  since people usually intend the natural consequences of their

19  actions.  Nor does this erase the institutional knowledge that

20  the legislature gained starting with the legislative hearings,

21  continuing through the Section Five proceedings, up through the

22  passage of SB 14.  The State nonetheless insists on several

23  very unlikely scenarios in which the legislature could have

24  somehow avoided knowledge of SB 14's impact.  But to believe

25  this leap in logic would be to subscribe to a dereliction of

```
 1    duty on the part of the legislature.  It would also be to

 2    suspend reality.  As this Court held -- as the circuit held in

 3    United States versus Shafer (phonetic), deliberate ignorance is

 4    the equivalent of knowledge.

 5              Finally, the State disputes that SB 14's proponents

 6    were aware of its likely impact by saying that as a matter of

 7    raw numbers, SB 14 impacts Anglo voters more than it does

 8    African Americans and Latinos.  So as a preliminary matter,

 9    this is an improper attempt to relitigate the effects finding

10    that this Court found, the en banc Fifth Circuit found, and

11    that the Supreme Court has declined to review pending the

12    outcome of this proceeding.  Here again the State is also

13    backwards on the facts.  As we show in paragraphs 268 to 77 of

14    our findings of fact, a greater number of minority registered

15    voters lack SB 14-compliant ID as compared to Anglo voters who

16    comprise a larger portion of the electorate.  Indeed,

17    Dr. Ansolabehere (phonetic) found that Latinos are three times

18    as likely and African Americans are four times as likely to

19    lack SB 14-compliant ID.  Other experts and analyses that were

20    introduced at trial also confirm this and similar disparate

21    impacts.  So not only does the State's argument completely

22    misunderstand proportionality, it also does not address the

23    question of whether SB 14 bears more heavily on one race.  This

24    Court has found unequivocally that it does, and so has the

25    Fifth Circuit.
```

1           The final bucket of evidence that I'd like to focus

2    on are the tenuous and shifting rationales that the State has

3    proffered in support of SB 14.  Again, without relying on any

4    of the post-enactment statements that were questioned by the

5    Fifth Circuit, the legislature's intent here is vividly

6    demonstrated by the dizzying array of rationales in support of

7    SB 14, starting with voter fraud to noncitizen voting, and then

8    the most recent issue of election modernization that as my

9    colleague Mr. Rosenberg established should be rejected out of

10   hand as new evidence.  It's well-established and does not bear

11   repeating here that the impersonation fraud that SB 14 targets

12   is largely mythical.  And most important that there was no

13   threat of such fraud in Texas at the time of SB 14's enactment.

14   The absence of this impersonation fraud not only supports your

15   original finding that Texas's aggressive fixation on this

16   elusory problem is proof of pretext, but it also is reinforced

17   by Texas's hands-off approach when it comes to mail-in ballot

18   voting.  And with respect to mail-in ballot voting, we know

19   that is a method that is largely used by Anglo voters and also

20   the only sort of voter fraud for which there is any significant

21   amount of evidence.  Indeed, the *en banc* opinion states that SB

22   14 did nothing to combat mail-in ballot fraud; although record

23   evidence shows that the potential and reality of fraud is much

24   greater in the mail-in context than with in-person voting.

25   Now, to explain why Texas did not address mail-in voting fraud

1    in SB 14, Texas says, well, it was addressed in 2011.  Well, so

2    was impersonation fraud, it was addressed in 2011 as well.  But

3    curiously it saw a reprise in the form of SB 14 just as

4    minority voting power was burgeoning.  And it precipitated

5    Texas's six-year slog to ratchet up its voter ID laws.  And

6    while the State can arguably choose to address the issue of

7    voter integrity seriatim or even preemptively, what it cannot

8    do is impose the harshest photo ID regime in the nation to

9    address what the Fifth Circuit called "the nonexistent problem

10   of voter fraud."  That evinces an impermissible purpose.

11           The State also attempts to rationalize SB 14 now by

12   referring to isolated, unverified incidences of voter fraud.

13   Even if these singular anecdotal claims were true, they're

14   inconsequential in number and they do not undermine the

15   substantial data supporting disparate ID possession and the

16   foreseeable and avoidable harm to African American and Latino

17   voters.  The State also offers as a variant voter fraud

18   rationale the notion that it was trying to prevent noncitizen

19   voting.  However, SB 14 fails to address noncitizen voting

20   fully -- actually more than half of the IDs accepted under SB

21   14 can be lawfully obtained by noncitizens:  the driver's

22   license, the personal ID, the gun carry permit, and the

23   military ID.  So at bottom, preventing voter fraud is simply

24   not a credible justification amid all of these questionable and

25   tenuous justifications, particularly those that have been used

1    historically as pretexts for racially motivated devices.  In

2    fact, the *en banc* opinion instructs that this Court is not

3    required "to accept that legislators were really so concerned

4    with this almost nonexistent problem."

5            Finally, again at the eleventh hour as we've

6    established, Texas offers the justification of election

7    modernization.  And I want to address this -- even though the

8    Court should not consider it, I want to address this simply for

9    the fact that it actually supports a finding of discrimination.

10   For example, Texas points to the Carter-Baker Commission report

11   which supposedly catalyzed its interest in modernizing its

12   elections.  But that report clearly warns that voter ID

13   requirements may present a barrier to voting by traditionally

14   marginalized groups, particularly the minorities and the poor.

15   In addition, the legislature failed to take up any of the

16   prophylactic measures suggested in the report that would

17   alleviate this disproportionate impact.  So not only does the

18   State offer an ahistorical version of events, nothing in this

19   supposed effort to modernize Texas's elections or in the

20   growing trend of voter ID laws justifies SB 14's exceptionally

21   harsh provisions.  Indeed, as the Fifth Circuit has already

22   held, the provisions of SB 14 fail to correspond in a

23   meaningful way to the legitimate interest that the State claims

24   to have been advancing through SB 14.  It further held there's

25   evidence that can support a finding that the legislature's race

1    neutral reason of ballot integrity offered by the State is

2    pretextual.  This is especially true when we consider Texas's

3    history of using poll taxes and literacy tests and other race

4    neutral reasons in the guise of ballot integrity to

5    discriminate against African America and Latino voters.  This

6    was expressly cited by the Fifth Circuit, this was established

7    through the Plaintiffs' witness, Dr. Vernon Burton, which the

8    Fifth Circuit's opinion cites to directly.

9            I'd be remiss if I did not also underscore here the

10   overarching context of SB 14's enactment.  To quote the *en banc*

11   court, "context matters."  Sometimes there is a swirling

12   climate of racial antagonism behind an action that is relevant

13   to an examination of historical background.  SB 14 was designed

14   in a context of severe socioeconomic racial disparities and a

15   deeply rooted history of discrimination by the State.  It was

16   also designed against the backdrop of the seismic shift in

17   demographics that transformed Texas to a majority minority

18   state.  The State would now like to suggest, again for the

19   first time on remand, that somehow the legislature was unaware

20   of this change in demographics, it was unaware until this

21   information was ultimately announced by the Census Bureau.  The

22   implausibility of this suggestion is not only insulting to the

23   legislature, but also to the factfinder.  The idea that

24   legislatures were somehow in the dark about the fact that Texas

25   was becoming only the fourth majority minority state in this

 1   country in the twenty-first century defies common sense.  It's

 2   precisely the existential threat to Texas's political power

 3   structure that motivated the legislature at least in part to

 4   abridge and in too many cases deny the right to vote of African

 5   American and Latino voters.

 6          So to conclude, your Honor, the radical procedural

 7   departures, the surgical precision in crafting SB 14, the

 8   shifting and tenuous rationales, the foreseeable and avoidable

 9   impact are all substantial proof of unlawful intent.  This

10   intent is even more evident in the context of the seismic shift

11   in demographics and against the historical backdrop of state-

12   sponsored discrimination.  This overwhelming proof includes

13   none -- and I repeat, none -- of the evidence that the Fifth

14   Circuit questioned in its *en banc* opinion.  Rather, it leads to

15   the ineluctable conclusion that SB 14 was enacted at least in

16   part with race in mind.  And the State has failed to show that

17   SB 14 would have been enacted otherwise.

18          What's more, your Honor, in a climate where voter

19   fraud and vote rigging is thrown about to justify infringements

20   on the right to vote without any check, we cannot afford to let

21   stand a law that was enacted, at least purported to be enacted,

22   on these sorts of falsehoods, let alone a law that has such a

23   clear intent to diminish the ripening political power of

24   African Americans and Latinos, just as they were beginning to

25   exercise it.  This Court has the benefit of a full record and a

1   clear road map from an *en banc* court to guide its decision to

2   once again find that SB 14 violates the Fourteenth and

3   Fifteenth Amendments of the Constitution, and also of Sections

4   2 and 3(c) of the <u>Voting Rights Act</u>.  Thank you.

5           **THE COURT:**  Thank you.  Mr. Dunn, are you next or

6   Mr. Garza?

7           **MR. DUNN:**  Yes, your Honor.  May it please the Court,

8   I just want to take a few moments before the Court not to

9   rehash the evidence that's been discussed, but to address this

10  issue that comes up not just in the motion presented today but

11  in the briefing filed on intent in this case that somehow or

12  another our work here is done.  Justice exists in the ether for

13  us to discover, and whether it's natural law or, if it's your

14  inclination, God's law, it's all of our duties to go and find

15  it.  And we have searched for it in this case.  The United

16  States has an entire department named after justice, and

17  nevertheless we are here today looking for it everywhere we can

18  find it.  Justice has one safe harbor of last resort, and that

19  is an Article Three District Court.  And we are here today

20  asking that it be imposed, not to be mean, not to call names,

21  but to improve our community and to improve our State.  Now,

22  justice is something that Texas hasn't always found its way to;

23  and although I, a product of this State, am proud of its

24  existence and proud of its strengths, and I can still recognize

25  its weaknesses.  I know your Honor is also a product of this

1   State.  And we can recognize the soft underbelly of the

2   mistakes that our State sometimes makes.  But in this case,

3   there is a harm to be repaired and it left -- and it has been

4   left unrepaired.  In 2011, the State of Texas crashed through

5   the barrier of protection for voters' rights in Texas, and it

6   did so both in harm and in process.  And although as a result

7   of this litigation in this Court, higher courts, some of the

8   advancement of the State against the rights of individuals to

9   cast the franchise has been pushed back may nevertheless remain

10  in the walls of the mission, and they do so because they

11  remedy.  Although entered up to date is a vast improvement over

12  what the legislature sought out to do, it nevertheless subjects

13  people, as I stated before, to the architecture of Senate Bill

14  14.  Now, we stand here as participants in democracy.  And we

15  stand here at a point in time in our nation and as a people

16  where we again take two steps forward, yet one step back.  And

17  we note how the cut and thrust of politics often harms and

18  tears apart families and regular citizens who go about their

19  business living their lives participating in democracy the one

20  way they know how, that's casting a vote.  Texas must be fully

21  removed from the mission and the process must be restored to

22  something the Voting Rights Act protects.  That has to be done

23  in two ways.

24          First, there has to be a remedy put in place that

25  fully addresses the harm and the architecture that Senate Bill

1    14 sets apart.  For example, individuals who have student IDs

2    are nevertheless subjected to the declaration process.  People

3    who have Government IDs are nevertheless subjected to the

4    declaration process.  And now would Senate Bill 5 become law,

5    they'd be subjected to a whole new round of criminal offenses,

6    criminal investigation, and voter intimidation.  That result

7    must be repaired.  But what often doesn't get much attention in

8    the course of this case is the process.  The process has to be

9    respected, because what happened in 2011 is the elected

10   leadership of this State was hijacked.  People who had been

11   chosen by citizens of this State through democracy to serve

12   their interest, to vote for their position, to argue their

13   points of view, were quieted.  They were locked out of the

14   room.  They were excluded from the amendments.  They were fed

15   garbage and they were told wrongful answers to questions.  In

16   fact, they went so far as to even tell members of the

17   legislature that the Secretary of State's office hadn't

18   analyzed the effect of the bill, when in fact they fully had

19   and knew what the effect of the bill would be.

20         Three-C relief, the relief that comes from a finding

21   of intentional discrimination gets at fully repairing the harm,

22   which is critically important.  But it also gets at fully

23   repairing the process.  We don't know -- because certain

24   leadership members deprived us of this opportunity, we don't

25   know what the legislature would do in the regular order of

1    business, in the regular consideration of facts and

2    circumstances, and in the free and fair debate that our

3    democracy demands.  We don't know that.  But we will when this

4    Court finds discriminatory intent.  Now, Mr. Rosenberg and

5    Ms. Nelson and others have artfully laid out the underlying

6    facts that support this finding of intent.  The *en banc* court

7    of appeals as has been noted has found that there's substantial

8    evidence of discriminatory intent, and we suggest as I

9    mentioned earlier that the Court's task is not altogether that

10   difficult to this stage.  If I may suggest, an opinion need

11   only outline the facts as recognized by the Fifth Circuit that

12   support discriminatory intent, note that this Court has no

13   longer considered the few pieces of evidence the Fifth Circuit

14   has found to be infirmed, and that nevertheless having sat here

15   for days on end, looked in the faces of individual witnesses,

16   saw the refusal of legislatures to explain or otherwise

17   describe what it is and why they did it, the volumes of

18   testimony by experts in reviewing the hundreds and thousands of

19   pages in evidence, this Court was in a unique condition to know

20   exactly what happened here because of the evidence, because of

21   the site is here in Texas, and because of the experience of

22   this State, this Court knows what happened with Senate Bill 14.

23   It ought to be declared so we can get to the business of

24   resolving all of the harm that this legislature in 2011

25   required.  We appreciate the Court continuing to put forth the

```
 1  hard effort to reach that conclusion.

 2            THE COURT:  Thank you.

 3            MR. GARZA:  Jose Garza for the Taylor Plaintiffs.

 4            THE COURT:  Morning.

 5            MR. GARZA:  May it please the Court, in the words of

 6  the United States in this case, the State of Texas enacted SB

 7  14 to be the strictest, least forgiving identification bill in

 8  the country.  At trial in this case, Margarito Lara testified

 9  about the importance of voting in his life, about getting up

10  early on election day and walking to the polling place where

11  people knew him, where he knew them, and where he was allowed

12  to vote every day, every election, until SB 14 was fully

13  enforced in this case.  Unfortunately, in June of 2015,

14  Margarito Lara passed away and never was able to cast a vote in

15  Texas again.  While the Taylor Plaintiffs stand by the

16  presentations of Mr. Rosenberg and Ms. Nelson, we would urge

17  the Court to recall that testimony and find that Texas enacted

18  SB 14 to abridge the ability of Hispanics and African American

19  Texans to exercise their constitutional right.  Thank you, your

20  Honor.

21            THE COURT:  Thank you.  Is that all from the

22  Plaintiffs at this point?

23        (No audible response)

24            Okay, Ms. Colmenero, are you going to proceed for

25  Texas?
```

1          (Pause)

2          **MS. COLMENERO:**  May it please the Court, this Court

3   should reject the Plaintiffs' charge that the Texas legislature

4   enacted SB 14 with the invidious intent to burden minority

5   voters.  The evidence in the record demonstrates that SB 14 was

6   enacted because the Texas legislature wanted to prevent voter

7   fraud and protect the public's confidence in elections.

8   Plaintiffs' theory during trial, and as you heard here today,

9   has been that Republicans and the Texas legislature, fearful of

10  a rise in the political power of Democratic-leaning minority

11  voters in the State, turned to photo ID requirements to

12  entrench Republican power by disenfranchising minority voters.

13  But there is no evidence in the record to support this theory.

14  In fact, it is based on nothing more than rank speculation.  To

15  prove their claim of discriminatory purpose, Plaintiffs have

16  the burden to show that the Texas legislature enacted SB 14

17  because of, not merely in spite of, its adverse effects upon

18  minority voters.  This means that the Plaintiffs have to

19  actually show that the legislature's agenda was to suppress

20  minority political participation, not that it was just a

21  possibility.  Even with unprecedented discovery into

22  legislators' communications and personal files you would think

23  that the Plaintiffs would have something to show this Court

24  today.  Instead, this theory continues to fall apart in the

25  face of the public justifications that were provided at the

 1   time of the passage of SB 14.  Between 2005 and 2011 dozens of

 2   Texas senators and representatives considered and voted in

 3   favor of voter ID legislation.  The Plaintiffs have no evidence

 4   that a single legislator, let alone a majority of them, acted

 5   for racial discriminatory purpose through the passage of SB 14.

 6   And it is unlikely that such an elicit motive would permeate

 7   the legislature yet remain hidden over the course of four

 8   legislative sessions.  As a result, a full consideration of the

 9   evidence leads to only one conclusion here today, and that is

10   that the Texas legislature did not enact SB 14 with an

11   invidious purpose.

12          The Fifth Circuit remanded this case in order to

13   allow the Court to reconsider the issue of whether SB 14 was

14   enacted with a discriminatory purpose.  The Fifth Circuit held

15   that this Court cannot rely on historical instances of

16   discrimination, it cannot rely on discriminatory acts of

17   persons outside the legislature, it cannot rely on legislative

18   support for unrelated allegedly discriminatory bills and,

19   finally, it cannot rely on speculation by some SB 14 opponents

20   that the bill proponents acted for discriminatory purpose.

21   This means that the State here today is not precluded from

22   making any argument on remand.  The Plaintiffs have made a

23   claim of discriminatory intent.  We oppose that claim, and that

24   means we can make any argument in support of it in opposition.

25   And the Fifth Circuit said that this Court must consider the

1    evidence in the record anew on remand and cannot rely on any of

2    the inferred evidence the Fifth Circuit has discredited.

3            Courts presume the constitutionality of legislative

4    actions, and to overcome the presumption of constitutionality

5    to invalidate a statute is no small task.  And this task is

6    even more problematic when you consider examining whether a

7    body the size of the Texas legislature worked together to pass

8    a facially neutral law because of discriminatory motives.  The

9    Plaintiffs evidence is nowhere sufficient to overcome this

10   hurdle.  The record in this case doesn't contain any evidence

11   of contemporaneous statements by any decision-maker which

12   suggests discriminatory purpose or intent.  In fact, the record

13   demonstrates just the opposite.  During the 2011 session, bill

14   sponsors and bill proponents for SB 14 repeatedly stated that

15   its purpose was to deter and detect voter fraud and safeguard

16   voter confidence in the election system.  You see that through

17   the statements from Senator Fraser, the Senate sponsor of the

18   bill, who stated that the purpose of the law was to protect the

19   integrity of the ballot box.  Lieutenant Governor Dewhurst

20   stated that it was the intent of the legislature and his intent

21   to pass a voter ID bill which reduced fraud and improved voter

22   confidence.  And Representative Harless, the House sponsor of

23   the bill, stated that a voter ID bill would deter and detect

24   fraud in the polls and protect voter confidence.

25            There is no evidence in the legislative record that

```
1   SB 14 was enacted to harm minorities.  This evidence is

2   confirmed by Plaintiffs' own witnesses in this case.

3   Representative Anchia testified at trial that he did not hear

4   anyone make a statement in public or private suggesting that SB

5   14 had a discriminatory intent.  Senator Davis testified

6   similarly at trial.  And so did Representative Veasey, the lead

7   Plaintiff in this case, who admitted he had no evidence that

8   any House member, other than a single person, voted for SB 14

9   for the purpose of harming minority voters.  But Representative

10  Veasey only points the finger at one member, and he offers no

11  explanation for why he does so.  He also indicated that he had

12  no evidence that any member of the Senate voted for SB 14 for

13  discriminatory purpose.  And voter ID opponents conceded on the

14  record during legislative debates that voter ID proponents had

15  valid purposes.  You see that through the testimony of Senator

16  Whitmire who stated during a committee hearing that he didn't

17  believe it was anyone's intent to disenfranchise voters.

18  Senator Ellis agreed with Senator Fraser that he wanted to

19  ensure that minority and elderly voters all have the right to

20  vote under SB 14.  And Representative Giddings stated during

21  the 2007 debates that the intentions of voter ID proponents

22  were good and honorable and that she believed it was a sincere

23  attempt on their part to stop voter fraud.  We are unaware of a

24  single case where opponents of the legislation openly confirmed

25  the proper purpose of proponents of the legislation.  And this
```

64

1    evidence is important because it offers no support to the

2    Plaintiffs' theory that the legislature, the Lieutenant

3    Governor, the Governor, and agency officials conspired together

4    to enact a law that would disenfranchise minority voters.

5            As we go through the evidence here today, we will

6    examine it using the lens of the *Arlington Heights* factors.

7    These factors are not as the Plaintiffs suggest elements of

8    their claim.  They are not intended to allow parties to draw

9    inferences of discrimination from neutral facts without a

10   complete analysis.  Procedural departures, for example,

11   standing alone are not inherently discriminatory.  Plaintiffs

12   still have the burden here today to demonstrate that the

13   legislature used such procedural departures because it had an

14   invidious purpose.  *Arlington Heights* and *Feeney* also tell us

15   that even if the decision-maker was aware of the disparate

16   impact on a particular group, that is still not enough to

17   demonstrate discriminatory intent.  And here in this case we

18   don't even have knowledge by the legislature of that impact.

19   And that is not enough to find discriminatory purpose,

20   especially with the presumption of constitutionality.

21           So let's look at the evidence that the legislature

22   had before it on SB 14's impact.  Election officials from

23   Georgia and Indiana testified that there was little evidence of

24   disenfranchisement in their respective states.  Moreover, the

25   legislature heard testimony that similar voter ID laws did not

1    result in disenfranchisement.  And significantly the

2    legislature heard from Plaintiffs' own expert,

3    Dr. Ansolabehere, that exclusions from voting resulting from

4    voter ID laws are exceptionally rare.  The legislature also

5    considered real-world empirical studies showing that voter ID

6    did not negatively affect the ability of those entitled to

7    vote.  The legislature was entitled to credit this testimony

8    and other evidence before it during the history of SB 14.  It

9    is true that this Court and the Fifth Circuit concluded that SB

10   14 had a discriminatory effect on the right to vote on account

11   of race under Section 2.  This conclusion, however, was based

12   on statistical studies done after the enactment of SB 14.  No

13   one presented this evidence to the legislature before it passed

14   SB 14.  In fact, the Texas legislature received testimony that

15   warned against relying upon the very same database matching

16   techniques employed by Plaintiffs' experts in this case.  And

17   the facts here are unlike those that are present in the *McCroy*

18   *and North Carolina* where the legislature asked for evidence of

19   disparate impact and then passed legislation because of that

20   information.  Further, contemporaneous statements made by the

21   legislators during the legislative debates on SB 14 demonstrate

22   that legislators were not aware of the alleged disparate impact

23   SB 14 would have.  This is abundantly clear from the statement

24   where bill opponents like Senator Ellis made on the record

25   where he stated he could not prove SB 14 would have a disparate

66

1    impact.  But even in the face of this evidence from their own

2    witnesses, Plaintiffs suggest that somehow the legislature knew

3    of the alleged discriminatory impact because SOS provided an

4    analysis to Lieutenant Governor Dewhurst that confirmed the law

5    would have such an impact.  But this is not true because

6    Dewhurst received no such analysis.  As the Lieutenant Governor

7    explained, the Secretary of State provided to his office an

8    unsourced estimate about the percentage of registered voters

9    who lacked a driver's license or personal ID.  The Secretary of

10   State also warned that its matching data was unreliable because

11   they were having problems matching the list of driver's

12   licenses to the list of registered voters.  The legislature was

13   under no obligation to credit this information which did not

14   accurately show the current rates of ID possession in the

15   State.

16          Plaintiffs also point to the testimony of

17   Representative Smith, one of the co-sponsors of voter ID

18   legislation, suggesting that he had a database analysis

19   performed showing the discriminatory impact of SB 14.  But the

20   Plaintiffs' reliance on his testimony is misguided.  There is

21   no evidence that this analysis was public or that any other

22   legislator received the same estimate.  Although Representative

23   Smith said he probably would have mentioned it at a committee

24   hearing, we've combed the record.  There's no evidence in 4,500

25   pages of legislative hearings of such a mention by him.  And

1   although years later Representative Smith testified in a

2   deposition that it was common sense minorities would be likely

3   to be in this group, this stray statement made by a single

4   member of the legislator voting for SB 14 is not the best

5   indicia of the entire legislature's intent.  And that's because

6   contemporaneous statements made at the time SB 14 was

7   considered by the legislature indicate that members of the

8   Senate and the Texas House concluded that SB 14 would not have

9   such a disparate impact.  Under questioning from Senator Ellis

10  regarding the discriminatory impact, Senator Fraser testified

11  that he was confident it would not have such an impact.  And

12  the same is true with Representative Harless who also testified

13  during a floor debate she believed the bill would not put

14  minorities in a worse position in terms of electoral power.

15  Without knowledge of the disparate impact, this case is not

16  even close to the facts in *Feeney*.  And without evidence of

17  knowledge or awareness, this means that the Plaintiffs cannot

18  overcome the presumption of constitutionality to demonstrate

19  that the legislature enacted the legislation because of the

20  disparate impact.

21          The Fifth Circuit also made clear that when

22  considering the historical background of SB 14 for purposes of

23  the *Arlington Heights* analysis, this Court should only consider

24  recent acts of racial discrimination by the legislature.

25  Plaintiffs continue to ignore this instruction.  They continue

1    to rely on purging laws from the seventies and laws enacted

2    prior to 1975.

3             **THE COURT:**  But didn't the Fifth Circuit rely on some

4    of that, or no?

5             **MS. COLMENERO:**  Your Honor, they mentioned it in

6    their opinion but they cautioned this Court that when you are

7    looking at the evidence again on remand, you have to look at

8    only recent acts of racial discrimination.  And Plaintiffs here

9    continue to rely on discrimination by local jurisdictions.

10   They also rely on DOJ objection letters directed to local

11   jurisdictions which are not evidence of official acts taken for

12   invidious purpose by the Texas legislature.  Plaintiffs also

13   rely on *LULAC versus Perry*, *Perez versus Perry*, and a new case,

14   *OCA Greater Houston* (phonetic), but none of those cases are

15   discriminatory purpose cases.  And the Plaintiffs also cannot

16   rely on the now-vacated opinion from the Section 5 preclearance

17   redistricting case, which is *Texas versus U. S.*, which

18   purported to find that the 2011 legislature created two

19   redistricting plans with a discriminatory purpose.  The *Texas*

20   *versus U. S.* was a declaratory judgment action brought under

21   Section 5 of the Voting Rights Act, and this meant that the

22   State went in with the presumption under the statute that --

23   and Texas had the burden to disprove discriminatory intent.  In

24   ruling against Texas, the court was not asked to make an

25   affirmative finding on the issue of discriminatory intent.  And

1   as the case citation indicates, this decision was vacated

2   following *Shelby County*.  So none of these examples that the

3   Plaintiffs point to qualify as recent acts of discrimination by

4   the legislature.

5           And this Court must also look at the sequence of

6   events leading up to SB 14, and the sequence of events support

7   the legislature's stated purpose.  There was a direct

8   explanation for the push for voter ID legislation and it was

9   the 2000 presidential election that spurred a nationwide drive

10  to enhance election integrity.  The 2000 election and its

11  recount process drew national attention to the problem of

12  antiquated and ineffective voting procedures.  Thus, there were

13  significant, influential events that occurred during this

14  timeframe that motivated the legislature to address the issue

15  of voter fraud.  The first significant change following the

16  2000 presidential election was the introduction of HAVA; then

17  the Carter-Baker Commission convened in 2004 and noted that the

18  electoral system cannot inspire public confidence and no

19  safeguards exist to deter or detect fraud or to confirm the

20  identity of voters.  *Purcell* and *Crawford* were both issued by

21  the Supreme Court and echoed much of what was expressed in the

22  Carter-Baker Commission report.  And at the same time as these

23  changes were occurring, a number of states began adopting laws

24  that followed the recommendation of the Carter-Baker Commission

25  and require that a voter provide a photo ID before casting a

1   ballot.  Georgia and Indiana adopted voter identification laws

2   in 2005.  And in 2011, legislation had been introduced in

3   nearly 34 states.

4           Finally, public opinion in the nation and in Texas

5   supported voter ID legislation.  In February, 2011, the support

6   for voter ID laws remained overwhelming.  Seventy-five percent

7   of Texans supported voter ID, and 58 percent of Democrats

8   favored a photo voter ID law.

9           **THE COURT:**  But there can be public support for

10  things that are unconstitutional, correct?

11          **MS. COLMENERO:**  Your Honor, there could be, but what

12  the legislature was seeing at the time that they were

13  considering the 2011 legislation was out there was a vast

14  majority of Texans, as well as a nation, who were in favor of

15  voter ID legislation, and that is part of the sequence of

16  events that went behind the legislature moving to consider that

17  legislation.

18          And Plaintiffs' own witnesses described the pressure

19  on Republican legislators in Texas to enact a voter ID bill.

20  Mr. Wood testified that there was enormous pressure on members

21  of the legislature in 2011 to vote for SB 14.  Representative

22  Smith also testified that Republican members were concerned

23  that if they did not pass a voter ID bill, they would lose

24  their seats.

25          **THE COURT:**  But that's okay if you're doing the right

1    thing, right?  You can't do something unconstitutional or that

2    might have a discriminatory effect or something that's not

3    proper just because your constituents want you to vote a

4    certain way, right?  I mean, I get your argument but we --

5    yeah, it's kind of a fine line there.

6           **MS. COLMENERO:**  And, your Honor, we mention these

7    instances because it's this sequence of events that put into

8    context the landscape that the legislature was facing in 2011,

9    and not just in 2011 but when they tried to pass voter ID

10   legislation in 2005, 2007, 2009, and then finally in 2011.

11          And what's significant is that the Plaintiffs ignore

12   these events that were occurring while the legislature

13   considered voter ID legislation and continued to suggest that

14   the real motivation for SB 14 was to thwart the voting power of

15   minority voters.  But there is no evidence to support this

16   theory, and that's because the recognition of Texas's status as

17   a majority minority state was given months after the 2005 voter

18   ID legislation was introduced, and more than three months after

19   it was passed by the Texas House.  And this is evidence that

20   supports the legislature's stated purpose of improving

21   confidence in the electoral system because it sought to pass

22   this legislation during its election modernization effort.

23          The Plaintiffs contend that SB 14 was also subject to

24   numerous and radical procedural departures.  But the history

25   leading up to the passage of SB 14 explains that there were

1    legitimate, nondiscriminatory reasons for certain procedural

2    maneuvers.  But to understand why the legislature did certain

3    things and took certain actions, this Court must look at the

4    decade-long effort to pass a voter ID statute.  In 2001, the

5    first voter ID bill was introduced by a Democrat in the House

6    and this bill was referred to committee, but no further action

7    was taken.  In 2003, although the legislature did not consider

8    a voter ID bill, that session was important because the

9    legislation adopted laws aimed at strengthening the Texas

10   election system.  In fact, the legislature acted by passing

11   legislation to prevent mail-in ballot fraud during the session.

12   During the 2003 session, the legislature passed HB 54 which

13   amended provisions of the Election Code and Penal Code relating

14   to election fraud and early voting by mail procedures.  This is

15   an important fact because the Plaintiffs have argued that the

16   legislature's concern with in-person fraud was pretext because

17   there is a bigger problem with mail-in voter fraud and the

18   legislature never addressed it.  But the Plaintiffs are wrong

19   because the legislature addressed mail-in fraud in 2003, 2007,

20   and in 2011.  In the 2005 legislative session the legislature

21   proposed HB 1706.  This voter ID bill was modeled after the

22   recommendations of the Carter-Baker Commission's and sought to

23   prevent in-person voter fraud.  HB 1706 allowed photo and non-

24   photo ID.  Democrats opposed the legislation immediately and

25   looked for procedural mechanisms to block the bill.  After the

bill passed the Texas House, Democrats threatened to kill the

bill by using the two-thirds rule and the bill ultimately died

in the Senate.  Voter ID was reintroduced in the 2007

legislative session and HB 218 was passed in the Texas House.

The proposed legislation allowed for photo and non-photo ID,

and this bill died in the Texas Senate when Democrats blocked

the bill from being debated on the floor through the Senate's

two-thirds rule.  The 2009 session brought a new voter ID bill

which was SB 362.  Senator Fraser introduced the bill and this

bill was far more lax than the Indiana law upheld by the

Supreme Court because it provided for the use of non-photo ID.

The bill was proposed despite the preferences of many

Republicans for a photo-only voter ID law as an attempt to

compromise with the Democrats.  The Senate set aside the two-

thirds rule for consideration of the bill and sent the bill to

the Committee of the Whole.  The Senate passed the bill but

then it died in the House after it was chubbed to death for 26

hours over five days.  When the 2011 session came about, the

legislation had evolved.  The 2005, 2007, and 2009 bills

allowed for a combination of non-photo and photo ID.  SB 14 had

evolved into a photo-only law because there was increasing

demand for such a law and because Democrats had taken the

compromise off the table in past sessions.  When it became

clear that the Democrats were not interested in compromise, and

after Republicans had obtained overwhelming majorities in both

1    houses of the Texas legislature, Republicans chose to pursue

2    their policy preference.  And while the Plaintiffs focus on

3    several procedural departures from which they contend this

4    Court can infer discriminatory intent, the Plaintiffs are wrong

5    as the evidence shows that all of the alleged departures were

6    done to help further the democratic process and get SB 14 to an

7    up or down vote.

8          The Governor designated SB 14 as an emergency item in

9    order to avoid the chubbing incident that occurred during the

10   2009 session with SB 362.  Designating an item as an emergency

11   is not unusual in the Texas legislature.  It is a calendaring

12   tool that has the effect of allowing earlier consideration of

13   the voter ID bill in the House.  In fact, in 2011, two other

14   matters were also designated as emergency items, and the

15   emergency designation helped achieve the goal of getting the

16   issue of voter ID behind the legislature in 2011 so they could

17   turn to other matters.  Because the Senate anticipated that

18   Democrats would again use the Senate's two-thirds rule to block

19   consideration of the bill, Republicans designated SB-14 as a

20   special calendar item.  The Senate disbanded the two-thirds

21   rule in order to allow the Senate to actually consider the

22   bill.  And the two-thirds rule is a legislative calendar

23   management tool utilized to control the flow of legislation to

24   the Senate floor.  Because Democrats had either threatened or

25   utilized the two-thirds rule to kill previous voter ID bills,

1   this procedural workaround was used to get SB 14 to an up or

2   down vote in both houses of the legislature.  And the record

3   evidence reveals that the legislature also disbanded the two-

4   thirds rule in the same session to secure the passage of a

5   budget, which shows that there was nothing unusual or

6   discriminatory about working around the rule when it was being

7   abused by the minority party, in this case the Democrats.  The

8   Senate resolved into the Committee of the Whole to help

9   expedite consideration of SB 14.  The Committee of the Whole

10  allows any Senator to introduce evidence and to question

11  witnesses and help expedite consideration of legislation.

12  Despite the already voluminous record, the Committee of the

13  Whole heard testimony from numerous witnesses in favor and

14  against the bill.  This was not an unusual procedure but is

15  regularly used in the Texas Senate, and was particularly

16  appropriate for voter ID given the past six years it had been

17  debated.  And the same is true with the House's use of a select

18  committee to hear SB 14.  The use of this procedure did not

19  limit participation by minority members to the benefit of SB-14

20  supporters.  In fact, the opposite was true.  The Speaker chose

21  Representative Veasey as the Vice-Chair of the Committee which

22  allowed him the opportunity to voice his concerns and directly

23  influence the legislation.

24          Plaintiffs also contend that SB-14 contained a fiscal

25  note despite the State budget shortfall that year, but there is

1   no procedural rule that barred fiscal notes from being attached

2   to bills and Plaintiffs ignore that $2 million that SB-14

3   directed the Secretary of State to spend on voter education was

4   already in the possession of the agency and no additional State

5   expenditures were necessary.

6           These procedural maneuvers had nothing to do with

7   discrimination and they had everything to do with ensuring that

8   the democratic process remained at work in the Legislature in

9   2011.  Nor do these procedures suggest that there was an

10  eagerness to rush legislation through with limited debate and

11  review.

12          The exact opposite is present in the record here.

13  When the 2011 Legislature took up SB-14 it had been debated for

14  six sessions and a record was created that spanned more than

15  4,500 pages.  In fact, Democratic members testified at trial

16  that SB-14 opponents had ample opportunity to express their

17  concerns and engage in debate about SB-14.  So there is no

18  evidence to support the idea that radical procedural departures

19  were even present in 2011.

20          Plaintiffs also argue that the Legislature's failure

21  to adopt amendments by Democratic members is evidence of

22  discriminatory purpose.  This is not true for several reasons.

23          First, the Plaintiffs failed to recognize that many

24  -- many amendments proposed by Democrats were adopted in the

25  Texas Senate.  For example, Senator Hinojosa proposed an

amendment to allow concealed hand gun permits to be used as

voter ID and this amendment was unanimously adopted.

Senator Lucio offered an amendment to allow the use

of certain expired IDs and this amendment was also unanimously

adopted.

And Senator Davis proposed an indigent affidavit

exception and although she withdrew this amendment it was

incorporated into a more comprehensive amendment offered by

Senator Duncan, and this amendment was adopted unanimously by

the Texas Senate.

So there's no evidence that the Legislature chose

certain IDs based on rates of possession by different racial

groups in terms of their consideration of amendments.

And the Plaintiffs also ignore that other amendments

were rejected by the Legislature for legitimate reasons.  The

Senate considered the issue of EIC implementation in the

context of an amendment that would have required evening and

weekend hours at drivers license offices around the State.

Senator Fraser stated during the floor debates that

he rejected this amendment because he did not believe SB-14 was

the proper place to debate DPS operations.

Another tabled amendment would have prohibited State

agencies from charging fees for issuing documents used to

obtained photo IDs such as a birth certificate.  Lieutenant

Governor Dewhurst indicated that it was his preference that the

1    issue of implementation be left to the responsible agency and

2    that is why that amendment was rejected.

3            Another tabled amendment would have required the

4    Secretary of State to analyze annually SB-14's impact on

5    voters.  The Legislature rejected this amendment because it

6    felt the better course was to examine the impact of SB-14 after

7    it had been in place for a couple of years and in any event

8    this study would not have been feasible given the data that

9    then held by SOS.

10            Another tabled amendment in the Senate would have

11   expanded the form of ID that could serve as SB-14 compliant ID,

12   and the Legislature rejected this amendment because it was

13   based on the practical concern that in a State as big as Texas

14   many forms of ID would have made it difficult for the person

15   who is working at the polls.

16            Now one can disagree with the policy assessments made

17   with the legislature in the rejection of these amendments, but

18   there is nothing inherently invidious about them and the record

19   evidence supports it.

20            Plaintiffs also contend that SB-14 was a substantive

21   departure because the bill was not identical to the Indiana and

22   Georgia statutes on which bill proponents claim to have modeled

23   it.  But nothing in the way SB-14 differs from those bills

24   suggests an invidious substantive departure from the policy

25   factors important to the Legislature.

1          Plaintiffs are quick to point out that SB-14 did not

2     have an indigency exception making it different from Indiana's

3     law.  The Plaintiffs narrative glosses over the story of how

4     the indigent affidavit exception came to be removed from SB-14.

5          The Senate's version of SB-14 contained the affidavit

6     exception, but when the House debated the bill it removed the

7     exception and we see here from the testimony from the House

8     floor debates in the legislative record and they reveal that

9     the removal of the provision was done because Representative

10    Anchia criticized it and blew it up by opposing the affidavit

11    exception in the Senate version.  Accepting Representative

12    Anchia's criticism of the indigent fee affidavit procedure the

13    affidavit exception was subsequently excised from the House

14    version.

15         No one in this case has ever argued that

16    Representative Anchia had an invidious intent when he made

17    these statements on the House Floor, and with the elimination

18    of this provision in the House version the Legislature had to

19    replace the indigent exception with the Georgia-inspired

20    provision that would allow for free EICs in order to ameliorate

21    the possible effects on disadvantaged voters.  There's no way

22    these actions by the Legislature can be classified as

23    substantive departures.

24         Plaintiffs also suggest that the Legislature had

25    shifting rationales when it came to voter ID.  For instance,

1    they focused on an email sent by a staffer for the Lieutenant

2    Governor to suggest that the Legislature moved away from the

3    rationale that voter ID was meant to curb the problem of non-

4    citizen registrants which was one of the original purposes

5    expressed when voter ID was first introduced.

6         And then they claimed that the Legislature created a

7    different rationale that was never its true intent, but that's

8    not true when you look at the documents in this case.  This

9    exhibit did not demonstrate a shifting rationale by the

10   Legislature which is located at ROA-38994.  This email from a

11   staffer from the Lieutenant Governor states that the

12   Legislature is not doing this, passing SB-14, to crack down on

13   illegals, but it says nothing about the separate topic of non-

14   citizen voting.

15        And the other email the Plaintiffs point to they --

16   they are talking about -- these are talking points that a

17   staffer from the Lieutenant Governor sent to other legislative

18   aides which highlights the problem of non-citizen registrants.

19   Thus, the rationale regarding non-citizen voting continue to

20   exist, but it never reached the level of the Legislature's

21   concern like voter confidence and in person voter fraud did.

22        The Plaintiffs also make much about the Legislature's

23   concerns regarding the pre-clearance of SB-14.  They point to

24   an email from Senator Estes voicing concerns whether SB-14

25   complied with the Voting Rights Act.  They contend that this is

1    evidence that the Legislature knew the law would

2    disproportionately impact minorities.  But this evidence merely

3    demonstrates that Senator Estes was performing his due

4    diligence by asking about pre-clearance as Texas was a covered

5    State at the time they considered SB-14 and a concern regarding

6    the statute would pass pre-clearance review is actually

7    evidence that Senator Estes and the Legislature acted for

8    proper purposes and not with a discriminatory purpose.

9          The same is true of the other emails Plaintiffs point

10   to.  Plaintiffs rely on an email which was sent from one

11   Legislative aide to another where the Lieutenant Governor

12   staffer states the unremarkable proposition that a law that

13   allows non-photo ID places less of a burden on voters in

14   general and, therefore, has less of a chance to burden any

15   minorities.

16         This is not the same as suggesting that the exclusion

17   of non-photo ID will disproportionately burden minorities and

18   the point of this email was that the Department of Justice

19   would have to pre-clear a voter ID law that imposed less of a

20   burden than Georgia's.

21         And in a second email the same staffer opined to

22   other aides that it was doubtful that the Obama Department of

23   Justice would pre-clear SB-14 as written, and the staffer

24   explained that it was his reasoning that the Obama DOJ had been

25   aggressively interpreting and enforcing the Voting Rights Act

1    through pre-clearance.  But he never stated that it was his

2    belief SB-14 would disparately impact minorities.

3         There's nothing in this email or the other documents

4    demonstrating the illicit motive that Plaintiffs contend the

5    Legislature had with SB-14.  Instead, the evidence merely

6    suggests that the Legislature was concerned about pre-clearance

7    because it wanted its law to become effective in order to

8    prevent voter fraud and improve confidence in the elections.

9         The Plaintiffs' complained also that the Legislature

10   must have had another motive other than its stated purposes in

11   the public record because there is no evidence of in person

12   voter fraud.  This argument falls apart for two different

13   reasons.

14        First, Plaintiffs theory is unsupported by the

15   Supreme Court's reasoning in *Crawford* which found that the law

16   was justified by the threat of voter fraud even though the

17   record contained no evidence that any such fraud existed.

18        Second, the Legislature had evidence before it that

19   voter fraud existed and that it is hard to detect.  In 2011 the

20   House Select Committee on voter identification and voter fraud

21   heard testimony from individuals who had personally witnessed

22   instances of people voting more than once at a single polling

23   location.

24        **THE COURT:**  But why wasn't that evidence brought

25   forward during the trial?

1          **MS. COLMENERO:**  This evidence was contained in the

2    legislative record, your Honor --

3          **THE COURT:**  But during the trial?

4          **MS. COLMENERO:**  Your Honor, on remands now that we

5    are --

6          **THE COURT:**  No, no, I know we can't go there now, but

7    I'm just saying I think I specifically asked during the trial

8    can't you prove X or wouldn't it be maybe not super easy but

9    you could easily get some information and it -- as I recall the

10   State of Texas did not present any evidence about any of these

11   things that were said.

12         **MS. COLMENERO:**  Well, your Honor, I --

13         **THE COURT:**  And I may be wrong, it's been a long

14   time, but do you recall any evidence in the record presented

15   regarding people voting twice?

16         **MS. COLMENERO:**  Your Honor, I was not present at the

17   trial several years ago --

18         **THE COURT:**  Ms. Wolf was.  Do you remember, Ms. Wolf,

19   if there was any evidence of that?

20         **MS. WOLF:**  I'm just looking at that right now, your

21   Honor.

22         **THE COURT:**  Yeah.  I mean, you can go on, I just -- I

23   remember specifically asking about it because there were these

24   statements that somebody's grandfather voted and he had died,

25   you know, 20 years ago, and I said "Well, where's that

1    evidence?  Couldn't you find that and present it to the Court,"

2    and I don't remember that being presented, but anyway you can

3    move on.

4            **MS. COLMENERO:**  Well, and on remand, your Honor, the

5    Fifth Circuit has instructed this Court to look at the entire

6    record again, and this evidence that we are discussing here is

7    located at ROA-7 --

8            **THE COURT:**  I understand you're saying this is

9    evidence that the Legislature considered and said that goes to

10   their intent or whatever it may be, but I think the Fifth

11   Circuit also realized there's really no evidence of this voter

12   fraud that is the concern here, so that's what I'm getting at

13   still two years later.  I don't think the State ever presented

14   any evidence of that but, you know, it's been awhile.

15           **MS. COLMENERO:**  Well, and look -- and the evidence

16   that we are referencing here is evidence that is part of the

17   Court's record that was presented not only to this Court, but

18   to the Fifth Circuit --

19           **THE COURT:**  But that's all hearsay, right?  Yes, I

20   understand you're saying the Legislature had this before, you

21   had people were saying X, Y and Z, that's not evidence for a

22   trial court, so I'm saying I don't think there was any evidence

23   ever presented by the State of Texas that these people were

24   voting more than once.  Right?  There may have been one or two

25   instances -- I don't -- I don't remember exactly, but I

1   remember inquiring about that, or so I thought, and it was not

2   presented which I understand, a little different than here, but

3   we can talk about "Oh, so and so's grandfather voted and he's

4   been dead" and all this stuff, that was not Court evidence that

5   I recall, no one ever presented that, right?

6          **MS. COLMENERO:**  Okay.

7          **THE COURT:**  You weren't here --

8          **MS. COLMENERO:**  We will confirm for that --

9          **THE COURT:**  -- it's been a long time.

10         **MS. COLMENERO:**  -- and we will clarify that on the

11   record, but we do want to point out that when the Legislature

12   was considering SB-14 they had before it certain evidence that

13   they heard regarding the incidents of voter fraud and that

14   evidence is within the legislative record that is part of the

15   evidence before this Court, and that included testimony before

16   a House Select Committee from the -- in the 2011 where the

17   Texas Attorney General's office had investigated approximately

18   12 cases of voter impersonation since 2002, and the

19   Legislature, in the legislative record, took notice of the

20   Carter-Baker Commission observation of voter fraud in other

21   States.

22          And this evidence of in person voter fraud that the

23   Texas Legislature heard at the time they were considering SB-14

24   exceeds the evidence or the lack thereof that the Supreme Court

25   held to be sufficient in the *Crawford* case.

1          And so in conclusion, your Honor, we contend that the

2     overwhelming evidence in the record demonstrates that the Texas

3     Legislature enacted SB-14 for a proper purpose and not for the

4     secret purpose that the Plaintiffs suggest here today.

5          After getting a treasure trove of documents in this

6     case and weeks of intrusive discovery Plaintiffs cannot

7     identify a single document or statement expressing an invidious

8     intent by any legislator or their staff to suppress minority

9     voting through SB-14, and the evidence only confirmed that the

10    Legislature's publicly stated purposes showed that race had

11    nothing to do with it, and without the ability to rely on this

12    evidence Plaintiffs have no choice but to fall back on tenuous

13    circumstantial evidence.  And you heard here today, they want

14    this Court to infer that there is evidence of discriminatory

15    intent from various pieces of circumstantial evidence, but this

16    is evidence that the Fifth Circuit has discredited and these

17    are evidence of discriminatory acts by Texas in the past, as

18    well as procedural maneuvers used by SB-14 proponents that were

19    simply done to get the bill to an up or down vote and none of

20    this evidence is probative or sufficient to overcome the

21    mountain of direct as well as circumstantial evidence

22    dispelling any notion of discriminatory motive.  As a result

23    the Plaintiffs have failed to show that the Legislature's

24    reasons were pretextual and none of this evidence allows the

25    Court to overcome the presumption of constitutionality of the

1    Legislature's actions to invalidate the statute.

2            The Court must presume that the Legislature acted

3    with good faith here, and there's -- the Plaintiffs' theories

4    really only make sense if you presume that the Legislature

5    acted with bad faith, but there's no evidence to support that.

6    And for these reasons the Court should reject the Plaintiffs'

7    claim that SB-14 was enacted with a discriminatory purpose and

8    they should enter judgment on this claim in favor of the

9    Defendants.

10           And one side note, your Honor, to address the Motion

11   to Dismiss by the United States.  While the Court went forward

12   with the hearing today and heard evidence and statements on the

13   issue of discriminatory intent the State believes that this

14   Court should refrain from issuing a ruling on the issue of

15   discriminatory intent until after June 18th in order to give

16   the Legislature time to consider the new legislation that is

17   before it.

18           **THE COURT:**  Okay.  And after hearing argument on that

19   I'm still not clear how that new law affects this Veasey case

20   because I heard again from the Defense, I believe Ms. Nelson

21   argued, that goes to remedies and Mr. Gore said no, it goes to

22   beyond remedies, and so I don't know -- I think there is still

23   a question, at least in my mind, and maybe it's just opposite

24   positions, but I don't know that anyone has kind of cited law

25   on that or what has happened in the past in these situations,

1    and I may be wrong, I'd have to go back and look at the prior

2    Motion for Continuance to see what was in there.  How did a new

3    -- if a bill's enacted and it addresses the situation before

4    the Court how it affects the pending case.  I mean, you can

5    argue all you want, both sides, but I'm not real clear on --

6    based on your argument exactly how it affects what this Court

7    should do.  I'm going to have to rule on the intentional issue

8    anyway and consider what the intent was in 2011 but, no, as

9    Mr. Gore said, you consider the new bill when you're taking all

10   the factors into account.

11          I believe I heard -- I thought I heard Ms. Nelson

12   say, no, it only goes to remedies, so it's still kind of across

13   the board for me here.

14          We're going to take -- are you finished?

15          **MS. COLMENERO:**  Yes, your Honor.

16          **THE COURT:**  Okay, we're going to take about a 10-15

17   minute break, and then did the Government want to say

18   something?  I thought you-all wanted a few minutes of argument

19   or no?

20          **MR. GORE:**  I think we're satisfied with the time the

21   Court has given us, your Honor.

22          **THE COURT:**  Okay, then rebuttal from the Plaintiffs

23   when we come back.

24          **THE CLERK:**  All rise.

25          **(Recess taken from 11:12 to 11:34 a.m.)**

1          **THE COURT:**  You can have a seat.  So, Ms. Perez, I

2     believe you were going to do the rebuttal.

3          **MS. PEREZ:**  Good afternoon, your Honor, Myrna Perez

4     from the Brennan Center representing the Texas NAACP and the

5     Mexican American Legislative Caucus.

6          Texas has spent the last 40 minutes or so distorting

7     facts, misrepresenting the factual standard, the legal standard

8     and misrepresenting and mangling what the Fifth Circuit found.

9     They are doing so with the hope of trying to cast doubt on this

10    Court's earlier finding of discriminatory intent.

11          We maintain that it is improper for them to do so,

12    that they have not successfully done so, and I'd like to

13    respond to a few of their points, but before I do that I want

14    to note what is not in dispute.

15          What is not in dispute is that it is, in fact, hard

16    work to find discriminatory intent, especially with the

17    legislative body.  We submit that this Court did that hard

18    work.  We had a very extensive and lengthy trial, we had

19    numerous credible and compelling witnesses.  The Court used the

20    tools afforded to it, _Arlington Heights_, to meet the standard,

21    and despite the fact that in this day and age people are smart

22    enough not to be naked about their discriminatory intent, in

23    spite of the fact that Senator Fraser and others noted that

24    everything they said was going to be on the record, there was

25    ample evidence to reach a conclusion of discriminatory intent.

1    And their mischaracterization of what the Fifth Circuit demands

2    in terms of reassessing the evidence doesn't change that.

3              The Fifth Circuit was very aware of the standard,

4    they set it for us.  They affirmed that *Arlington Heights* and

5    circumstantial evidence was all appropriate and there are no

6    fewer than seven places, your Honor, in the Fifth Circuit

7    Opinion in which they, after considering all of the evidence

8    and the appropriate legal standard, concluded that there was

9    enough evidence to support a finding of discriminatory intent.

10   I'm, in fact, going to quote from just part of it in Footnote

11   13:

12              "We conclude that there is evidence that could

13              support a finding that the Legislature's

14              justification of valid integrity was protectoral in

15              relation to the specific stringent provisions of SB-

16              14."

17              So much of what we heard was new and a distortion of

18   the record, but not actually a factual dispute.  It's rather,

19   instead, your Honor, a dispute with what this Court has weighed

20   and the inferences that it has drawn.  They want this Court to

21   re-weigh the evidence and come up with inferences more

22   favorable to them.  But, your Honor, the inferences they want

23   to draw from the evidence are, frankly, implausible.

24              I'd first like to respond to their point that they

25   had a nondiscriminatory explanation for SB-14.

1          My colleague, Ms. Nelson, pointed out in detail that

2    it keeps shifting, it shifted on the legislative floor and it

3    shifted in the litigation.  Their grand modernization wave

4    that, you know, compelled a look at SB-14 was not so much of a

5    wave, but maybe a drip.

6          Prior to the passage of SB-14 there were a grand

7    total of four States that passed strict photo ID law, four

8    States out of 50.  That is hardly a modernization wave; that is

9    hardly a level, an outpouring of support that commands and

10   demands a law as strict as what we saw in SB-14; and, more

11   importantly, it didn't look like Georgia and Indiana, the other

12   bills that it purported to model itself on.  It departed from

13   them in very significant ways, ways that would have ameliorated

14   some of its impact and ways that would have buttressed its

15   constitutionality.

16         In fact, Janice McCoy, who was Senator Fraser's

17   Chief-of-Staff, admitted that she didn't even review Georgia or

18   Indiana before writing this bill, so it strains the imagination

19   to be able to suggest that -- that Georgia, Indiana and this

20   sort of, you know, clamor in some very small parts of the

21   Legislature were compelling a law as stringent and as over the

22   top as SB-14 was.

23         And because your Honor is interested in this I want

24   to remind your Honor of the record that we have that the

25   Legislature knew that there was no problem with fraud that

1   would be resolved by SB-14.  We had the 2009 testimony by

2   Deputy Attorney General Nichol before the Senate Committee as a

3   whole, that said that not a single voter fraud prosecution

4   conducted by the Attorney General's office since 2002 would

5   have been prevented by photo ID.

6          We have the 2010 hearing before the House Committee

7   on Elections in which Ms. McGee, head of the Elections

8   Division, testified that the Election Division had referred to

9   the Attorney General 24 potential violations of the Election

10  Code, but only two of them involved allegations of an in person

11  voter impersonation, so we have both Chambers hearing this.

12         But what happened with respect to the sponsors is

13  very revealing.  We had Senator Fraser and Representative

14  Harless during the debates on SB-14, not be able to revive any

15  evidence as to the scope of in person impersonation fraud.

16  They kept saying they weren't advised and it is incredulous to

17  suggest that the bill sponsors had an earnest and pure motive

18  of combating in person impersonation when they, themselves, had

19  no idea of whether it was even a problem.

20         The -- Texas tries to maintain that they had a number

21  of really good explanations for some of the choices that

22  they've made, but they have not provided a sufficient -- a

23  sufficient explanation for why there is an ID exemption to the

24  absentee ballot process.

25         Now this is important for two reasons because there's

1    two inferences of discriminatory intent that can be found from

2    exclusion of absentee ballots.

3            The first is that there is actually some record

4    evidence that absentee ballots were a source of insecurity and

5    they did nothing to address it.

6            The second is that absentee ballot usage is

7    overwhelmingly by older Anglos with respect to how it is used

8    by African-Americans and Latinos.  I want to take the first

9    part of the known fraud that exists with absentee ballots.

10           We have a 2006 study of election fraud by the Texas

11   Legislative Counsel concluding that State and Local officials,

12   these are the ones that are closest to the administration of

13   elections, concluded that absentee -- absentee voting was the

14   largest vulnerability in the State voting system.  Even when

15   Attorney General himself, Abbott, announced a voter fraud

16   initiative in 2006 he only noted four potential offenders, none

17   of which would have been resolved by photo ID law, but two of

18   which were for mail ballots.

19           Now the 2000 -- the argument that they make about the

20   2003 legislation, in addition to being new, doesn't help them

21   very much because the legislative council study occurred in

22   2006.  Three years after they supposedly addressed the problem

23   of mail balloting we still had that being consistently the

24   Number 1 concern from State and Local election administrators.

25           And then they tried to argue again new that the 2007

94

1    and 2011 mail ballot law also addresses the problem of mail

2    balloting, and I think what these bills do is actually very

3    revealing that there was something going on more with SB-14.

4            Both of these bills address how someone can be

5    prosecuted for mail ballot.  You know, in one instance they may

6    get -- you're allowed to bundle the crimes together so someone

7    can get a harder penalty.  It is solely prosecutorial side.  It

8    doesn't deal with detection, it doesn't deal with prevention,

9    and that is in an area where they know that they have a

10   problem.

11           Compare that to SB-14 where they don't have a

12   problem.  There they're putting all sorts of barriers to access

13   so that people actually can't vote in person.  They didn't

14   choose to take the same sort of steps with the 2007 or the 2011

15   bill.  It was never declared an emergency, nobody suspended the

16   two-thirds rule, so here we have two bills addressing different

17   kinds of fraud, one which there's record evidence was more

18   severe and one that wasn't, and then they were willing to rely

19   solely on after the fact prosecutorial punishment in terms of

20   dealing with it.

21           So these kinds of policy choices, your Honor, are so

22   incongruous with the stated purposes of what SB-14 is that

23   Deputy General Counsel Hebert had to send people an email in

24   his own words "to remind people what the point of the bill

25   was," and urging them to emphasize detection of deterrence of

1  fraud and protecting public confidence in elections.

2          This is not an action that would have been necessary

3  with an earnest and pure motive of ballot integrity.  In fact,

4  and this has been mentioned before, Representative Harless, who

5  was one of SB-14's sponsors, had her own ID bill and she

6  allowed non-photo IDs in that bill, and she couldn't remember

7  why in her bill it was acceptable to have non-photo IDs, but

8  not in SB-14.  She didn't even know whether or not she thought

9  that student IDs were to be acceptable for voting as a form of

10  showing identification.

11          Again, it strains imagination to argue that she could

12  have had an earnest and pure motive of combating fraud and

13  promoting ballot integrity when such basic questions as to why

14  she pushed for a policy like SB-14 couldn't be answered.

15          And then there's the mail ballot exemption.  It's

16  worth reminding this Court that the legislature had a ready

17  option of ameliorating the kind of burdens that would be on

18  elder Texans.  They had an exemption for people over 70, and

19  instead of picking the in person exemption for people over 70

20  they picked the mail ballot exemption.

21          Why?

22          Well, in 2008, 2010 and 2012 Anglo use of absentee

23  voting in Texas had exceeded Latino and African-American use.

24  And the context of this is super important because it is not

25  plausible that legislators who live and die by votes, live and

1    die on whether or not they understand who their constituents

2    are, how they're voting and why they're voting would not know a

3    fact like that.  But let's pretend, even for a second, that

4    they didn't.

5            Well, Representative Veasey and Representative Alonzo

6    said as much, they actually testified that we needed this over

7    70 exemption, and yet they elected, instead, to go with the

8    mail ballot exemption where, again, there were known

9    vulnerabilities.

10           So as has been mentioned before the Fifth Circuit

11   emphasized on Page 27 of its Opinion that this Court simply

12   does not have to blindly accept Texas's proposition that

13   legislators were really so concerned with this nonexistent

14   problem.

15           And now Texas is trying to say that the Legislature

16   had no reason to believe that there was a discriminatory

17   effect.  I would respectfully disagree with that and like to

18   point a few places on the record.

19           We have evidence on the record and the 2009 Senate

20   Committee on the Whole (phonetic) transcript of Senator Fraser

21   sharing information he obtained from the SOS estimating that

22   809,000 Texans lacked DPS ID and that he assumed the racial

23   breakdown of those lacking IDs would be the same in Texas and

24   elsewhere in the country; in other words, minorities are

25   disproportionately most likely to have these IDs.

1          And then the legislators were advised by Lieutenant

2   Governor Deputy General Counsel Brian Hebert that SB-14 would

3   not be pre-cleared as written.

4          Now what does that mean?

5          It means that Texas would not be able to prove its

6   standard that it would not make minority voters worse off.

7          Then we had Senator Todd Smith who noted that it was

8   common sense that SB-14 would disproportionately impact

9   minorities, and Texas is trying to push this into the category

10  of a stray remark by a proponent.

11         I want to be very clear that the Fifth Circuit said

12  that comments about actions and about what people did was

13  acceptable, it was merely like speculation about what other

14  people did.  Senator -- Representative Smith said in his own

15  deposition that he was telling people about this DPS report.

16  This -- this is perfectly sound ground to consider and has not

17  been made infirm by the Fifth Circuit.

18         Moreover, in every single session in which strict ID

19  was raised, 2005, 2007, 2009, 2011, there was expert and lay

20  testimony that requiring photo IDs would disproportionately

21  affect African-American and Latino Texas.

22         There was also witnesses in 2011 explaining that

23  strict ID requirements would adversely impact minority voters.

24  But to be clear we're not claiming solely that the Legislatures

25  knew, even though they did.  They didn't try to soften the

98

1    discriminatory blow, and this is important and this is

2    important to the Fifth Circuit.   In all Senators proposed 37

3    amendments to SB-14, 28 of them were tabled.   Representatives

4    proposed 53 amendments to SB-14, 35 of them were tabled, three

5    failed and 15 were adopted, although some of them were later

6    removed.

7              Some of the ameliorative amendments that SB-14 voted

8    to table:

9              Expanding the types of accepted IDs;

10             Expanding DPS hours;

11             Delaying implementation until after an impact study;

12             Waiving costs for underlying documents;

13             Providing an affidavit alternative.

14             And they didn't just reject these amendments, your

15    Honor, they actually stripped certain ameliorative components

16    like the indigency exemption and the over 70 exemption.

17             I'm going to spend a little bit of time on the

18    indigency exemption because Representative Anchia is my client

19    and he is in this courtroom, and Texas repeatedly says that he

20    voted to strip the indigency section from the bill.   It is

21    simply not true, you can ask him yourself if you have any

22    questions and we've made this clear on the record.

23             And, importantly, the proponents have declined to

24    explain both contemporaneously and in subsequent litigation why

25    they took any of these steps.

1          We had Senator Patrick conceding that some of these

2    amendments would have ameliorated the burden, but he couldn't

3    recall why he voted for them or why he didn't vote for them

4    which this Court noted was really out of character for a

5    sponsor of a major bill.

6          And then Senator Fraser, the Senate sponsor,

7    basically admitted on the Senate floor that SB-14 wasn't

8    intended to be the least restrictive means of combating fraud.

9    I want to read this part from the transcript.

10          You have Senator West asking:

11          "So the list of identifications that you use as is

12          that the least restrictive options you could come up

13          with?

14          Senator Fraser's response:

15          "Well, I don't -- I'm not sure, the bill that you're

16          using, I don't know that that's the intent."

17          The Fifth Circuit has approved an inference from the

18    fact that the record shows that drafters and proponents of SB-

19    14 were aware of the likely disproportionate effect of the law

20    on minorities and that they nonetheless passed the bill without

21    adopting a number of these proposed ameliorative measures that

22    might have lessened this impact.

23          And then, finally, your Honor, I want to talk to the

24    claim that Texas is trying to purport that this was just like

25    brass knuckle politics and that explains all of the procedural

1   departures.

2           First of all, the Fifth Circuit wasn't buying it.

3   They said that SB-14 was subject to numerous and radical

4   procedural departures that may lend credence to an inference of

5   discriminatory intent.

6           What were some of those?

7           Getting special permission to file the bill in real

8   low number reserved for priorities.

9           Designating the bill as emergency legislation.

10          Allowing the bill to bypass ordinary committee

11  process.

12          Passing resolutions to allow the Conference Committee

13  to add provisions to SB-14 contrary to the normal rules and

14  practices.

15          Passing SB-14 with a fiscal note.

16          And suspending the two-thirds rule regarding the

17  number of votes required.

18          Now, Texas is trying to argue that this two-thirds

19  rule was merely calendaring and it was like routinely

20  suspended, but that contradicts the record.  We have Senator

21  Davis and Janice McCoy who was Fraser's Chief-of-Staff, both

22  testify that few, if any, bills are voted on each session

23  without a two-thirds rule.

24          We had Senator Uresti testify that creating a

25  category-wide exemption to the two-thirds rule, like was done

1    for photo ID, was aberrational.

2              And then we had Lieutenant Governor Dewhurst himself

3    testify that he could think of no other special rule that

4    specifically exempted a particular subject matter of the case.

5              Context matters, of course, your Honor, but -- and

6    this evidence of procedural departures provides an important

7    potential link in the circumstantial totality of the evidence

8    the District Court must consider.

9              So, in summation, none of these facts, the

10   nonexistent problem to solve, the ignoring of the

11   discriminatory effect, the failure to adopt ameliorative

12   measures, the procedural departures have occurred in isolation

13   or in a vacuum; but rather they have occurred together and

14   they've interacted with each other to produce a persuasive and

15   powerful set of inferences that at least part of what was

16   happening in the Legislature was an intent to minimize the

17   political influence of minority voters.

18             Contrary to what Texas has said, we only need to

19   prove that racial discrimination was one purpose, and we don't

20   even need to prove that it was a primary purpose, but we

21   respectfully submit that we have done that and that this Court

22   can and should enter a finding that SB-14 was enacted in part

23   with discriminatory intent and violation of the Voting Rights

24   Act and the Constitution.

25             **THE COURT:**  Thank you.

1        **MR. DUNN:**  Your Honor, I rise to just briefly to

2   address the Court's question posed right before the break.  The

3   Court was asking for some authority on the issue of waiting for

4   the passage of Senate Bill 5 and I take responsibility for not

5   having provided that earlier.

6        I do want to reference first some specific

7   authorities and then some more general authorities.

8        One, in this case I would note that the Legislature,

9   after the trial and after this Court's conclusion and judgment,

10  passed a bill finally making it free to get a birth certificate

11  in Texas.  That -- that bill, I believe it was 685, was

12  referenced by the Circuit in its Opinion and there wasn't any

13  allegation by the en banc Court or anybody at that point that

14  "Look, the bill has changed in some material respect and so we

15  have to start over or delay, or that the Legislators' actions

16  have mooted the controversy."

17       I will also point out a case called *Perez v Perry*

18  which is pending at the moment in San Antonio, some of us are

19  involved in, there is an Opinion at 970 F. Supp 2(d)593 and

20  then specifically Page 603, Judge -- Circuit Judge Smith who,

21  as the Court knows, was the dissenting Judge in the en banc

22  Opinion in this case, wrote a Decision joined by his two

23  colleagues in the three-Judge District Court in

24  *Perez v Perry* finding that the fact that the Legislature in

25  that re-districting case had come in after trial and adopted a

1    remedy plan, essentially a plan that had been developed through

2    the Court system, did not moot the controversy as to whether

3    the original re-districting plan was adopted with a

4    discriminatory intent.  And, indeed, the process there in *Perez*

5    *v Perry* and the consideration of that evidence continues.  That

6    Court is now balancing the -- the testimony as we asked your

7    Honor to do in this case, as to whether the 2011 Legislature

8    acted with a discriminatory intent.

9           I'll also note that the North Carolina challenge to

10   its voter ID law went to the Fourth Circuit.  In the interim

11   the Legislature there changed the ID law and the Circuit

12   addressed the issue of whether that change prevents them from

13   considering the question of whether the original bill was

14   passed with a discriminatory intent, and the Circuit reached

15   the opinion that it was still necessary to decide the intent

16   question.

17          Indeed, the Supreme Court Decision in *Knox versus*

18   *Service Employees International Union* says "A case becomes moot

19   only when it is impossible for a Court to grant any effectual

20   relief whatsoever to the prevailing party."

21          There's also a couple of other specific authorities

22   I'd like to address with the Court.  One of them is a re-

23   districting case, *Blackmoor versus Charles Mix City*, it's 505

24   F. Supp. 2(d) 585.  This is a -- it was a Voting Rights Act and

25   a malapportionment challenge to a re-districting plan.

1           The District Court found that there was

2    malapportionment and posed a remedy, and the State there argued

3    that now that the remedy also addresses the Voting Rights Act

4    violation remedy, then we shouldn't consider that claim, and

5    that three-Judge District Court also denied that position and

6    said "we, nevertheless, have to consider the Voting Rights Act

7    challenge whether or not it's been remedied by the

8    malapportionment remedy."

9           I'd also note that 3(c) of the Voting Rights Act

10   itself states that:  "The Court shall retain jurisdiction for

11   such period as it may deem necessary," so it seems that there

12   is specific statutory language in favor of continuing the

13   proceedings.

14          And then, finally, I would also note the Voluntary

15   Cessation Doctrine which is also discussed at length by Judge

16   Schmidt in *Perez v Perry* which gives it this notion of a

17   wrongdoer, in this case the State, voluntarily ceasing to do

18   harm.  In this case, of course, we submit that the State is

19   voluntarily ceasing to eliminate only part of the harm and it's

20   not really voluntary either because the Fifth Circuit has

21   ordered it to be done, as has this Court, but in any event,

22   when -- even were the State to have stepped forward and said

23   Bill 5, even if it had been constructed in such a way to fully

24   remedy the harm that's been alleged in this case, the Voluntary

25   Cessation Doctrine requires the Court to continue to maintain

1    jurisdiction and to give effect to its Order.  The cite for

2    that is *Sossamon versus the Lone Star State of Texas*, 560 F3d

3    316, specifically Page 324, and that was affirmed by the US

4    Supreme Court.

5            The last point I want to make is that in this very

6    case the United States filed a document at ECF 920, and in that

7    paper filed back in August of last year the United States said

8    to be sure the Fifth Circuit instructed that "any interim

9    legislative action taken with respect to Senate Bill 14" should

10   be taken into account by the District Court.

11           But that's a far cry from requiring this Court to lay

12   reposed until the Texas Legislature acts.

13           And the United States goes onto cite the en banc

14   decision in this case and also the US Supreme Court Decision of

15   *City of Richmond versus United States* for the proposition that

16   an official action taken for the purpose of discriminating on

17   the account of race has no legitimacy at all.

18           The United States' position, they got it right the

19   first time, and the Court ruled correctly in the Fall that this

20   proceeding should continue, and the Motion filed late yesterday

21   shouldn't disturb that already well-founded Decision.

22           **THE COURT:**  All right.  Anything further?

23           **MR. FREDERICK:**  Your Honor, Matt Frederick for the

24   State of Texas.  May I very briefly address the question you

25   raised about mootness and a suggestion?

1          **THE COURT:**  All right.

2          **MR. FREDERICK:**  Thank you.  May it please the Court,

3    I want to talk about the mootness issue that your Honor raised

4    earlier, but first I want to talk about how the existence of

5    the potential passage of Senate Bill 5 and its companion bill

6    are relevant to the question of legislative purpose.

7          I'll first note that throughout this case the

8    Plaintiffs themselves have continually pointed out the

9    Legislature's failure to take any action after this Court's

10   decision and after previous Court decisions as further evidence

11   of a -- of a negative discriminatory purpose, for example,

12   their Findings of Fact at Page 123 and their Brief, their

13   opening Brief in this Court on remand at Page 21.

14         They criticize the State Legislature for failing to

15   take action after the denial of pre-clearance.  There's, of

16   course, an obvious reason why they didn't act because we tried

17   to appeal that decision, which was wrong and our appeal was

18   mooted out.

19         But the Plaintiffs can hardly stand before the Court

20   now and say that post -- that later action by the Legislature

21   is completely irrelevant.  It's also relevant because how the

22   Legislatures respond to a conclusive Court ruling that their

23   law did, in fact, had a discriminatory effect as the Fifth

24   Circuit that is relevant to what they intended to do,

25   especially here where we have evidence where the Legislators

1    rightly or wrongly consistently said "We just do not think this

2    is going to have a discriminatory impact on the basis of race."

3    Once the Court decides otherwise it's relevant to see what they

4    do about it, and right now they're trying to do something about

5    it.

6           The second point is on mootness.  If SB-5 or its

7    companion pass the discrimination claim, the intentional

8    discrimination claim here could and very likely would become

9    moot.  The authority for that proposition mostly comes from

10   cases where a case becomes moot on appeal.  One is *Diffenderfer*

11   *versus Central Baptist Church*, 404 US 412, *Northeast Florida*

12   *Chapter of Associated General Contractors versus City of*

13   *Jacksonville,* 508 US 656, and *Hayden versus Patterson,* 594 F3d

14   165, that's a Second Circuit Decision from 2010.

15          The Fourteenth Amendment to find an equal protection

16   violation requires proof of both discriminatory intent and a

17   discriminatory effect, and they're seeking prospective

18   injunctive relief.

19          If the discriminatory provisions are replaced and

20   repealed then that changes the analysis necessarily because

21   there is no longer a basis to impose liability on the strength

22   of provisions that have been vacated or replaced.  In that case

23   were the Court to issue an Opinion on provisions that no longer

24   exist that would be an advisory Opinion.  And that's even more

25   so here where we don't have the Final Judgment from the

1    District Court yet, so this is even a further step removed from

2    the cases involving mootness on appeal where there is a

3    judgment of the District Court and the Courts stills say "We

4    have to consider the law as it is now."  That is all the more

5    true where there is no judgment in the District Court and

6    that's what we have here.

7            The Voluntary Cessation Doctrine would not prevent

8    this Court from finding the claim moot and I would encourage

9    the Court to go read *Sossamon*, the Fifth Circuit's Opinion,

10   because what that Opinion says is that "Yes, while the

11   Voluntary Cessation Doctrine exists and it applies, when it's a

12   Governmental entity that acts in that case a prison

13   administrator making a policy change then we afford them a

14   presumption of good faith."  And that is all the more true when

15   it's a Legislature that actually goes through the process of

16   passing a bill, and so that's why it is relevant to the

17   question of intent.

18           And, of course, it is also relevant to the question

19   of a remedy that the Plaintiffs seek under Section 3(c) of the

20   Voting Rights Act.  It's critical to that inquiry because the

21   question there is whether an extraordinary remedy is necessary

22   and in order to justify that remedy there must be pervasive

23   discrimination, there have to be exceptional conditions,

24   particularly there has to be a situation where a State

25   Legislature is acting in defiance of the Constitution and

1    taking steps to stay one step ahead of the Federal Courts.

2           It doesn't -- the justification for that remedy

3    cannot exist when the State is not staying one step ahead, but

4    it's following the lead of the Courts, and if the State

5    Legislature passes SB-5 and its companion that's exactly what

6    they would be doing, and that's why we would urge the Court to

7    forebear on a ruling.

8           **THE COURT:**  All right.  Anything further on that

9    point?

10          **MR. ROSENBERG:**  Yes, your Honor.  As we said we'd

11   like to reserve our -- we have reserved our right to file a

12   response to the United States Motion and we'd like to ask when

13   your Honor would like to see our response?

14          **THE COURT:**  Okay.  Well, actually, let's do this, I'm

15   going to ask for a briefing on that issue we've been discussing

16   regarding the enactment of -- of Senate Bill 5.  If it's

17   enacted into law how that would -- how it would affect the

18   current proceedings before this Court?  So instead of maybe

19   responding to the Government's Motion withdrawing their claim

20   regarding discriminatory purpose, why don't I give the

21   Plaintiffs a week to file some briefing on that issue; then the

22   Defense can have a week after that; and then maybe a week after

23   that for the Plaintiffs to reply?

24          **MR. ROSENBERG:**  That would be fine, your Honor.

25          **THE COURT:**  On that issue.  So in terms -- do you

110

1    need to file a response to the Government's Motion or do you-

2    all just want to handle it in this way?

3              **MR. ROSENBERG:**  We can handle it -- we can combine

4    our response to the Government's Motion in that briefing.

5              **THE COURT:**  Okay.  So then I'll hold that Motion then

6    until the response is filed.

7              Regarding the remainder of the discriminatory

8    purpose, I'll take that under advisement and await further

9    briefing on the issue of the effects of any possible change in

10   the law regarding voter ID.

11             Is there anything further from the Plaintiffs this

12   morning?

13             **MR. ROSENBERG:**  No, there is not.  Thank you, your

14   Honor.

15             **THE COURT:**  Okay.  No one here.  Defense?

16             **MS. COLMENERO:**  Nothing, your Honor.

17             **THE COURT:**  Texas?  The Government?  The United

18   States?

19        **(No audible response)**

20             **THE COURT:**  All right, thank you very much for your

21   time and you are excused.

22        **(This proceeding was adjourned at 12:04 p.m.)**

23

24

25

## <u>CERTIFICATION</u>

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____                    <u>February 28, 2017</u>

       Signed                                                    Dated


*TONI HUDSON, TRANSCRIBER*