UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| MARC VEASEY, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 2:13-CV-00193 |
| | § | |
| GREG ABBOTT, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**DEFENDANTS' BRIEF REGARDING THE EFFECT OF VOTER-ID LEGISLATION ON
PLAINTIFFS' CLAIMS OF INTENTIONAL RACIAL DISCRIMINATION**

# TABLE OF CONTENTS

Table of Authorities ..................................................................................ii

Introduction .............................................................................................. 1

Argument .................................................................................................. 3

    I.    Legislative Action to Amend the State's Voter-ID Law Will Deprive the Court of Subject Matter Jurisdiction over the Plaintiffs' Intentional-Discrimination Claims. ..................................... 3

        A.    If SB 5 Becomes Law, Plaintiffs' Lawsuit, Including Their Intentional-Discrimination Claims, Will Be Moot. ..................... 4

        B.    The Voluntary-cessation Doctrine Would Not Apply and Cannot Prevent the Plaintiffs' Claims from Becoming Moot. .................................................................................... 9

        C.    Plaintiffs' Request for Preclearance Bail-In Cannot Preserve the Court's Subject-Matter Jurisdiction..................... 15

    II.    The Court Must Take into Account The Texas Legislature's Enactment of a Reasonable-Impediment Affidavit in Considering the Plaintiffs' Intentional-Discrimination Claims. .............................. 21

        A.    Statutory Amendments Are Relevant to the Purpose of a Statute as Originally Enacted and as Amended. ...................... 22

        B.    A Statutory Amendment that Eliminates Discriminatory Effect Precludes Liability on a Discriminatory-Purpose Claim. ...................................................................................... 24

Conclusion............................................................................................... 27

Certificate of Service............................................................................... 29

TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ansell v. Green Acres Contracting Co.,*
    347 F.3d 515 (3d Cir. 2003) ..................................................................... 23-24

*Backus v. South Carolina,*
    857 F. Supp. 2d 553 (D.S.C. 2012), *aff'd*, 133 S. Ct. 156 (2012) .......................... 25

*Beer v. United States,*
    425 U.S. 130 (1976) ...................................................................................... 20

*Bench Billboard Co. v. City of Cincinnati,*
    675 F.3d 974 (6th Cir. 2012) ......................................................................... 10

*Brown v. Califano,*
    627 F.2d 1221 (D.C. Cir. 1980) ...................................................................... 27

*Camfield v. City of Oklahoma City,*
    248 F.3d 1214 (10th Cir. 2001) ...................................................................... 12

*Chafin v. Chafin,*
    133 S. Ct. 1017 (2013) ................................................................................... 4

*Chem. Producers & Distribs. Ass'n v. Helliker,*
    463 F.3d 871 (9th Cir. 2006) ..................................................................... 6, 12

*Chen v. City of Houston,*
    206 F.3d 502 (5th Cir. 2000) .......................................................................... 23

*Chi. & Grand Trunk Ry. v. Wellman,*
    143 U.S. 339 (1892) ....................................................................................... 9

*Chi. United Indus., Ltd. v. City of Chicago,*
    445 F.3d 940 (7th Cir. 2006) .......................................................................... 11

*City of Erie v. Pap's A.M.,*
    529 U.S. 277 (2000) ........................................................................................ 5

*City of Los Angeles v. Lyons,*
    461 U.S. 95 (1983) .......................................................................................... 8

*City of Mesquite v. Aladdin's Castle, Inc.,*
    455 U.S. 283 (1982) ................................................................................. 11, 12

*Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.,*
    447 U.S. 102 (1980) ...................................................................................... 24

*Cotton v. Fordice,*
    157 F.3d 388 (5th Cir. 1998) ..................................................................... 22, 23

*Crawford v. Bd. of Educ. of City of L.A.,*
    458 U.S. 527 (1982) ...................................................................................... 26

*Crawford v. Marion County Election Board*,
  553 U.S. 181 (2008) ................................................................. 2

*Darensburg v. Metro. Transp. Comm'n*,
  636 F.3d 511 (9th Cir. 2011) ................................................. 27

*Davis v. Abbott*,
  781 F.3d 207 (5th Cir. 2015) ................................................. 18

*De la O v. Hous. Auth. of City of El Paso*,
  417 F.3d 495 (5th Cir. 2005) ................................................... 9

*Diffenderfer v. Central Baptist Church*,
  404 U.S. 412 (1972) (per curiam) ............................... 5, 6, 7, 16

*Fed'n of Advert. Indus. Reps., Inc. v. City of Chicago*,
  326 F.3d 924 (7th Cir. 2003) ..................................... 5, 6, 10

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*,
  528 U.S 167 (2000) ............................................................... 10

*Fusari v. Steinberg*,
  419 U.S. 379 (1975) ............................................................... 14

*Golden v. Zwickler*,
  394 U.S. 103 (1969) ............................................................... 16

*Hunter v. Underwood*,
  471 U.S. 222 (1985) ............................................................... 23

*Knox v. Serv. Emps. Int'l Union, Local 1000*,
  132 S. Ct. 2277 (2012) .......................................................... 10

*Kremens v. Bartley*,
  431 U.S. 119 (1977) ................................................................. 6

*Ky. Right to Life, Inc. v. Terry*,
  108 F.3d 637 (6th Cir. 1997) ................................................. 12

*Lewis v. Cont'l Bank Corp.*,
  494 U.S. 472 (1990) ......................................................... 4, 5, 6

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ............................................................. 8, 9

*LULAC v. NE Ind. Sch. Dist.*,
  903 F. Supp. 2d 1071 (W.D. Tex. 1995) ................................. 25

*Mass. v. Oakes*,
  491 U.S. 576 (1989) ................................................................. 6

*McCorvey v. Hill*,
  385 F.3d 846 (5th Cir. 2004) ............................................... 5, 6

*Mississippi State Chapter, Operation PUSH v. Mabus,*
  932 F.2d 400 (5th Cir. 1991) ............................................................. 21

*Moore v. Hosemann,*
  591 F.3d 741 (5th Cir. 2009) ............................................................... 7

*Ne. Fla. Ch. of Assoc. Gen. Contractors of Am. v. Jacksonville,*
  951 F.2d 1217 (11th Cir. 1992) .......................................................... 13

*Ne. Fla. Ch. of Assoc. Gen. Contractors of Am. v. City of Jacksonville,*
  *Fla.,* 508 U.S. 656 (1993) ................................................... 11, 13, 14, 15

*Palmer v. Thompson,*
  403 U.S. 217 (1971) .......................................................................... 25

*Perez v. Texas,*
  970 F. Supp. 2d 593 (W.D. Tex. 2013) ......................................... 17, 18

*Pers. Adm'r of Mass. v. Feeney,*
  442 U.S. 256 (1979) .......................................................................... 14

*Princeton Univ. v. Schmid,*
  455 U.S. 100 (1982) (per curiam) ....................................................... 6

*Red Lion Broad. Co. v. FCC,*
  395 U.S. 367 (1969) .......................................................................... 24

*Reno v. Bossier Parish Sch. Bd.,*
  528 U.S. 320 (2000) .......................................................................... 25

*Richmond v. J.A. Croson Co.,*
  488 U.S. 469 (1989) .......................................................................... 13

*Rodriguez v. Harris Cnty.,*
  964 F. Supp. 2d 686 (S.D. Tex. 2013) ................................................ 25

*Shaw v. Reno,*
  509 U.S. 630 (1993) .......................................................................... 14

*Sossamon v. Lone Star State of Texas,*
  560 F.3d 316 (5th Cir. 2009) ........................................................ 10, 11

*South Carolina v. Katzenbach,*
  383 U.S. 301 (1966) ..................................................................... 20, 21

*Summers v. Earth Island Inst.,*
  555 U.S. 488 (2009) ............................................................................ 8

*Thompson v. N. Am. Stainless, LP,*
  562 U.S. 170 (2011) .......................................................................... 16

*United Public Workers of America (C.I.O.) v. Mitchell,*
  330 U.S. 75 (1947) ............................................................................ 16

iv

*United States Parole Comm'n v. Geraghty,*
   445 U.S. 388 (1980) ........................................................................ 7

*United States v. O'Brien,*
   391 U.S. 367 (1968) ...................................................................... 25

*Valero Terrestrial Corp. v. Paige,*
   211 F.3d 112 (4th Cir. 2000) ...................................................... 12

*Valley Forge Christian Coll. v. Ams. United for Separation of Church &*
   *State, Inc.,* 454 U.S. 464 (1982) .................................................. 9

*Veasey v. Abbott,*
   830 F.3d 216 (5th Cir. 2016) (en banc) ...................... 1, 2, 8, 21, 22, 26

*Veasey v. Perry,*
   71 F. Supp. 3d 627 (S.D. Tex. 2014).......................................... 26

*Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens,*
   529 U.S. 765 (2000) ................................................................ 17, 19

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,*
   429 U.S. 252 (1977) ...................................................................... 24

*Voter Info. Project, Inc. v. City of Baton Rouge,*
   612 F.2d 208 (5th Cir.1980) ...................................................... 25

*Washington v. Davis,*
   426 U.S. 229 (1976) ...................................................................... 25

*Westwego Citizens for Better Gov't v. City of Westwego,*
   946 F.2d 1109 (5th Cir. 1991) .................................................... 21

*White v. Regester,*
   412 U.S. 755 (1973) ...................................................................... 25

## Other Authorities

H.R. Rep. No. 94-196 (1975) .......................................................... 20

Henry P. Monaghan, *Constitutional Adjudication: The Who and When,*
   82 Yale L.J. 1363, 1384 (1973)...................................................... 7

History of SB 5 in 85th Legislature, Texas Legislature Online, http://
   www.capitol.state.tx.us/BillLookup/History.aspx?LegSess=85R&
   Bill=SB5 (last visited March 14, 2017)...................................... 1

http://www.capitol.state.tx.us/BillLookup/History.aspx?LegSess=85R&
   Bill=SB5................................................................................ 10

Order at 5, *Perez v. Abbott,* No. 5:11-cv-360 (Mar. 10, 2017), ECF No.
   1339................................................................................ 18, 19

v

## INTRODUCTION

When the Fifth Circuit vacated this Court's judgment on the plaintiffs' claims of intentional racial discrimination, it gave the following instruction:

> The district court will need to *reexamine the discriminatory purpose claim* in accordance with the proper legal standards we have described, *bearing in mind the effect any interim legislative action taken with respect to SB 14 may have.*

*Veasey v. Abbott*, 830 F.3d 216, 272 (5th Cir. 2016) (en banc) (emphases added). The meaning of that statement is clear: reconsider the discriminatory purpose claim, taking any subsequent legislative action into account.[1] The plaintiffs' effort to obscure that unequivocal command denies the plain language of the Fifth Circuit's opinion. The Fifth Circuit told this Court that subsequent legislative action is relevant to the discriminatory purpose claim.

The Fifth Circuit was correct. The Legislature's amendment of the State's voter-ID law will have a direct impact on this Court's subject-matter jurisdiction over the plaintiffs' intentional-discrimination claims. To the extent an amendment provides an alternative means of casting a regular in-person ballot for voters who lack, and cannot reasonably obtain, a qualifying photo ID, it will remedy any alleged discriminatory effect of SB 14's photo-ID requirement. In that case, no plaintiff will face a concrete threat of injury, so their claims will be moot.

---

[1] On Monday, March 13, 2017, the Texas Senate State Affairs Committee passed SB 5 out of committee by a unanimous, bipartisan vote. The entire Senate will now take up the bill. History of SB 5 in 85th Legislature, Texas Legislature Online, http://www.capitol.state.tx.us/BillLookup/History.aspx?LegSess=85R&Bill=SB5 (last visited March 14, 2017).

Indeed, throughout this entire case, plaintiffs have not argued that all photo-voter-ID laws are somehow invalid—which would contradict *Crawford v. Marion County Election Board*, 553 U.S. 181 (2008). Rather, their entire theory has been that photo-voter-ID laws are invalid if they fail to accommodate voters who, for reasons of poverty, cannot reasonably comply with photo-ID requirements. In other words, even their theory of discriminatory purpose was not that the Legislature harbored such a purpose because it passed some form of a photo-voter-ID law; rather, their argument was the Legislature had a discriminatory purpose because it did not enact a safeguard, such as a reasonable-impediment declaration. *See Veasey*, 830 F.3d at 264. So if the Legislature enacts a reasonable-impediment-affidavit procedure—which it is poised to do soon, in light of its active consideration of SB 5—then not only would there be no potential injury to plaintiffs from any discriminatory effect, but also there would be no basis to invalidate Texas's photo-voter-ID law facially because the crux of their discriminatory-purpose claim would cease to exist. In short, the case would be moot.

Even if an amendment that eliminated any alleged discriminatory effect did not deprive the Court of subject-matter jurisdiction, the plaintiffs' intentional-discrimination claims would necessarily fail on the merits. A claim of unconstitutional invidious racial discrimination requires proof of two elements: discriminatory intent and discriminatory effect. If the State's voter-ID law were amended to provide a safety valve for individuals without qualifying photo ID, the plaintiffs could not prove a constitutional violation because the amended statute would not threaten their right

to vote even if they lacked photo ID. Moreover, without a discriminatory effect, a discriminatory-purpose finding based on circumstantial evidence is foreclosed as a matter of law.

Assuming for the sake of argument that the plaintiffs could still identify a discriminatory effect, a substantial amendment to the State's voter-ID law would change the question before the Court. To determine whether the law threatened to cause a discriminatory effect, the Court would have to consider the law as written—not just SB 14 as originally passed, but the voter-ID law with the amended provisions. The focus of the inquiry into legislative purpose would also change for two reasons. First, the Legislature's effort to remedy alleged deficiencies in SB 14 is relevant, at least in part, to the Legislature's purpose in enacting the law in the first place. And second, the inquiry would have to account for the legislative purpose behind the existing law, including the Legislature's purpose in passing any amendment.

## ARGUMENT

### I. LEGISLATIVE ACTION TO AMEND THE STATE'S VOTER-ID LAW WILL DEPRIVE THE COURT OF SUBJECT MATTER JURISDICTION OVER THE PLAINTIFFS' INTENTIONAL-DISCRIMINATION CLAIMS.

If the Texas Legislature modifies the State's voter-ID law to eliminate any discriminatory effect,[2] the Court will lack subject-matter jurisdiction over plaintiffs' in-

---

[2] Texas does not concede that SB 14 results in the denial or abridgment of the right to vote on account of race or membership in a language-minority group, and it reserves the right to seek review of the Fifth Circuit's decision in the United States Supreme Court. Because this Court is bound by the Fifth Circuit's decision, however, Texas assumes for present purposes that SB 14, as enacted, has a discriminatory effect under Section 2 of the Voting Rights Act.

tentional-discrimination claims. Under SB 5, which is currently pending in the Legislature, a voter who lacks an acceptable form of photo ID and faces a reasonable impediment to obtaining photo ID can cast a regular ballot upon execution of a declaration affirming that he or she faces a reasonable impediment to obtaining the requisite photo ID. If SB 5 or a similar provision becomes law, SB 14 will not present any threat of injury to the plaintiffs in this case—as plaintiffs' entire theory of injury throughout this case is that SB 14's photo-ID requirement would impermissibly burden their right to vote because they did not possess and could not reasonably obtain a form of photo ID required by the law. With the law amended to eliminate that threat of injury, the plaintiffs would no longer have a cognizable Article III injury—which is precisely when the mootness doctrine applies. As a result, the Court would lack subject-matter jurisdiction over their claims alleging discriminatory purpose and discriminatory effect.

### A. If SB 5 Becomes Law, Plaintiffs' Lawsuit, Including Their Intentional-Discrimination Claims, Will Be Moot.

1. The existence of a live case or controversy is a constitutional prerequisite to federal court jurisdiction:

> Article III of the Constitution restricts the power of federal courts to "Cases" and "Controversies." Accordingly, "[t]o invoke the jurisdiction of a federal court, a litigant must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision."

*Chafin v. Chafin*, 133 S. Ct. 1017, 1023 (2013) (quoting *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990)). "This case-or-controversy requirement subsists through all stages of federal judicial proceedings, trial and appellate. To sustain . . . jurisdiction

4

in the present case, it is not enough that a dispute was very much alive when suit was filed." *Lewis*, 494 U.S. at 477. "[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000).

Applying this framework, "the [Supreme] Court has [consistently] upheld the general rule that repeal, expiration, or significant amendment to challenged legisla- tion ends the ongoing controversy and renders moot a plaintiff's request for injunctive relief." *Fed'n of Advert. Indus. Reps., Inc. v. City of Chicago,* 326 F.3d 924, 930 (7th Cir. 2003) (citing *Lewis*, 494 U.S. at 474), cited in *McCorvey v. Hill*, 385 F.3d 846, 849 (5th Cir. 2004). The Supreme Court's opinion in *Diffenderfer v. Central Baptist Church*, 404 U.S. 412 (1972) (per curiam), established the general rule that repeal of a statute moots a case, as binding Fifth Circuit precedent recognizes. *See McCorvey*, 385 F.3d at 849 ("Suits regarding the constitutionality of statutes become moot once the statute is repealed.") (citing *Diffenderfer* and *Fed'n of Advert. Indus. Reps., Inc.*). *Diffenderfer* concerned an Establishment Clause challenge to a Florida statute grant- ing a tax exemption to church property that was used as a commercial parking lot. 404 U.S. at 413. The statute had been interpreted to permit church lots to retain full exempt status despite their use for both commercial and religious purposes. After the Supreme Court noted probable jurisdiction, the legislature repealed the statute and replaced it with new legislation exempting only property used "predominantly for re- ligious purposes" and only to the extent of its religious use. *Id.* at 413-14.

Observing that it must review the judgment "in light of Florida law *as it now stands*," the Supreme Court held that the replacement mooted the case of its "character as a present, live controversy." *Id.* at 414 (emphasis added); *see also Kremens v. Bartley*, 431 U.S. 119, 128-29 (1977) (constitutional challenge moot following change to statutory involuntary commitment scheme). Critically, the request for declaratory relief in *Diffenderfer* was moot even though the new statute did not guarantee plaintiffs all relief sought. *See* 404 U.S. at 413-14. *Diffenderfer* also confirmed that the mere potential for a new constitutional challenge to the amended statute does not prevent mootness. It remanded the case so that the plaintiffs could replead an "attack [on] the new[] . . . legislation." *Id.* at 415.

The Supreme Court has applied the same logic to hold that a statutory challenge becomes moot when the legislature amends the relevant statute. *See Lewis*, 494 U.S. at 474 (amendments to banking statutes rendered moot a Commerce Clause challenge); *Mass. v. Oakes*, 491 U.S. 576, 582-83 (1989) (overbreadth challenge to a child pornography law rendered moot by statutory amendment); *Princeton Univ. v. Schmid*, 455 U.S. 100, 103 (1982) (per curiam) (challenge to university regulation moot following substantial amendment). Courts interpreting *Diffenderfer* and its progeny have correctly read these cases to establish a "near categorical rule of mootness" in "cases of statutory amendment." *Chem. Producers & Distribs. Ass'n v. Helliker*, 463 F.3d 871, 878 (9th Cir. 2006); *accord, e.g.*, *McCorvey*, 385 F.3d at 849; *Fed'n of Advert. Indus. Reps., Inc.,* 326 F.3d at 930.

6

2. Mootness is even more apparent here (assuming the Texas Legislature enacts a reasonable-impediment-affidavit procedure to its photo-voter-ID law) because the plaintiffs have not obtained a final judgment. In *Diffenderfer* and *Northeast Florida*, the statutes were amended on appeal, after final judgment in the district court. Here, by contrast, there is no final judgment on the plaintiffs' intentional-discrimination claims. An appellate court must consider the statute as amended, even when the district court entered final judgment on a preexisting version of the law, so it follows that a district court cannot artificially limit its review to a statutory scheme that no longer exists. The Supreme Court's observation in *Diffenderfer*—that an appellate court must review the challenged law "as it now stands"—applies *a fortiori* in a district court before final judgment. 404 U.S. at 414.

Because the plaintiffs are still seeking a judgment rather than defending a judgment on appeal, the jurisdictional defect presented by the Legislature's amendment of SB 14 could also be characterized as a lack of standing. Standing and mootness are closely related. "Mootness is 'the doctrine of standing in a time frame. The requisite personal interest that must exist at the commencement of litigation (standing) must continue throughout its existence (mootness).'" *Moore v. Hosemann*, 591 F.3d 741, 744 (5th Cir. 2009) (quoting *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 397 (1980)); *see* Henry P. Monaghan, *Constitutional Adjudication: The Who and When*, 82 Yale L.J. 1363, 1384 (1973) (noting that "these two doctrines share the same root").

Each plaintiff "bears the burden of showing that he has standing for each type of relief sought." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983)). And like the elements of a substantive claim, Article III standing must be supported by evidence. The elements of standing "are not mere pleading requirements but rather an indispensable part of the plaintiff's case." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). "[E]ach element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Id.* If the Legislature amends its voter-ID law to provide a safeguard for citizens who cannot reasonably obtain a prescribed form of photo ID, then the plaintiffs could not identify any concrete threat of injury to their right to vote—as the theory of discriminatory-effect liability is that a photo-voter-ID law that does not include a safeguard, such as reasonable-impediment-affidavit or indigency-affidavit procedure, imposes an unlawful burden on "Texans living in poverty, who are less likely to possess qualified photo ID, are less able to get it, and may not otherwise need it." *Veasey*, 830 F.3d at 264. As a result, if the Texas Legislature enacts a reasonable-impediment procedure, the plaintiffs would cease to have any possible Article III injury, so they could not prove standing, and this court would then lack subject matter jurisdiction.

Doctrinal labels ultimately make no difference to the jurisdictional question that will arise when the Legislature amends the State's voter-ID law to add a reasonable-impediment-affidavit procedure. Viewed prospectively, the plaintiffs' claim will

necessarily fail because they cannot meet their burden to prove standing. *See Lujan*, 504 U.S. at 560. Viewed retrospectively, changes to the law will eliminate the plaintiffs' personal stake in the controversy, rendering their claims moot. *De la O v. Hous. Auth. of City of El Paso*, 417 F.3d 495, 499 (5th Cir. 2005) ("[A] request for injunctive relief remains live only so long as there is some present harm left to enjoin."). Either way, the plaintiffs would not present a justiciable case or controversy if the Texas Legislature enacted a reasonable-impediment-affidavit procedure, so the court would lack subject-matter jurisdiction.

If the State's voter-ID law is amended to add a reasonable-impediment-affidavit procedure, the case will become moot, and any adjudication of plaintiffs' intentional-discrimination claim against SB 14 will be an unnecessary and improper advisory opinion. The Constitution does not confer "an unconditioned authority to determine the constitutionality of legislative or executive acts. The power to declare the rights of individuals and to measure the authority of governments . . . 'is legitimate only in the last resort, and as a necessity in the determination of real, earnest and vital controversy.'" *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 471 (1982) (quoting *Chi. & Grand Trunk Ry. v. Wellman*, 143 U.S. 339, 345 (1892)).

### B.   The Voluntary-cessation Doctrine Would Not Apply and Cannot Prevent the Plaintiffs' Claims from Becoming Moot.

The voluntary-cessation exception to mootness cannot prevent the plaintiffs' intentional-discrimination claims from becoming moot. The voluntary-cessation doctrine makes a crucial distinction between private parties versus governmental actors:

While cessation maneuvers by private parties are "viewed with a critical eye," *Knox v. Serv. Emps. Int'l Union, Local 1000*, 132 S. Ct. 2277, 2287 (2012), governmental bodies are presumed to act in good faith such that courts will not presume that they will reenact a replaced law once litigation ends, *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 325 (5th Cir. 2009). Here, there is no evidence to undermine the Legislature's good faith in considering SB 5, and there is no evidence whatsoever that the Legislature would repeal a reasonable-impediment-affidavit procedure after litigation ends. To the contrary, 20 of the Texas Senate's 31 members were original co-authors of SB 5, which adds a reasonable-impediment-affidavit procedure to Texas's photo-voter-ID law.[3]

In contrast to governmental actors, private defendants must meet the heavy or "formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur," *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.,* 528 U.S 167, 190 (2000). That "heavy" burden provides "the appropriate standard for cases between private parties"—but it is "not the view . . . taken toward acts of voluntary cessation by government officials." *Fed'n of Advert. Indus. Reps., Inc.,* 326 F.3d at 929; *Bench Billboard Co. v. City of Cincinnati*, 675 F.3d 974, 982 (6th Cir. 2012).

Unlike private defendants, "government actors in their sovereign capacity and in the exercise of their official duties are accorded a presumption of good faith because

---

[3] *See* http://www.capitol.state.tx.us/BillLookup/History.aspx?LegSess=85R&Bill=SB5.

they are public servants, not self-interested private parties." *Sossamon*, 560 F.3d at 325. Courts have thus recognized that the "comity . . . that the federal government owes state and local governments[] requires us to give some credence to the solemn undertakings of local officials." *Chi. United Indus., Ltd. v. City of Chicago*, 445 F.3d 940, 947 (7th Cir. 2006). Even when the change is less momentous than a legislature's enactment of a statute, the "presumption of good faith" translates to a "lighter burden" that is satisfied by the government's cessation, absent "evidence" that the change is mere litigation posturing and that the replaced law will be reenacted after litigation ends. *Sossamon*, 560 F.3d at 325.

In cases involving legislative amendment, the Supreme Court has recognized an exception to the rule of mootness in only two circumstances: (1) when there is evidence that the legislature will reenact "precisely the same provision" once litigation ends, *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982), and (2) when there is evidence that replacement legislation has not "changed substantially" or "significantly revised" the challenged provisions of the repealed provisions, thereby disadvantaging the plaintiffs in the same "fundamental way," *Ne. Florida Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 662 & n.3 (1993). Neither exception would apply here if SB 5—or a bill substantially similar to it with a reasonable-impediment-affidavit procedure—is enacted.

In *Aladdin's Castle*, the Supreme Court recognized an exception to the general rule of mootness where the defendant *openly announced* its intention to reenact "*pre-*

11

*cisely the same provision*" held unconstitutional below. 455 U.S. at 289 & n.11 (emphasis added). This exception is limited to those unusual circumstances. Federal courts of appeals "have . . . interpreted *Aladdin's Castle* as precluding a mootness determination in cases challenging a prior version of a state statute *only when the legislature has openly expressed its intent to reenact the challenged law*." *Camfield v. City of Oklahoma City*, 248 F.3d 1214, 1223-24 (10th Cir. 2001) (emphasis added); *see id.* ("We join these circuits and hold that *Aladdin's Castle* is inapposite in [a case] such as this where there is no evidence in the record to indicate that the legislature intends to reenact the prior version of the disputed statute."); *Chem. Producers & Distributors Ass'n*, 463 F.3d at 878 (finding case moot where there was "no reason to think the California legislature enacted the amendment with a mind to restoring the old law later"); *Valero Terrestrial Corp. v. Paige*, 211 F.3d 112, 116 (4th Cir. 2000) ("Based on our review of the post-[*Aladdin's Castle*] caselaw, however, we are convinced that [*Aladdin's Castle*] is generally limited to the circumstance, and like circumstances, in which a defendant openly announces its intention to reenact 'precisely the same provision' held unconstitutional below"); *Ky. Right to Life, Inc. v. Terry*, 108 F.3d 637, 645 (6th Cir. 1997) (explaining that "critical to the [Supreme] Court's decision . . . was the City's announced intention to reenact the unconstitutional ordinance if the case was dismissed as moot" and finding that the *Aladdin's Castle* exception applies only to a "recalcitrant legislature" (citations omitted)). Unless there is evidence that the Texas Legislature will revert to the previous voter-ID law after litigation ends, the *Aladdin's Castle* exception will not apply. And there is no evidence

12

whatsoever that the Texas Legislature will do so; the only evidence indicates that it will not.

In *Northeastern Florida*, the Supreme Court applied the *Aladdin's Castle* exception where a facially discriminatory law was repealed (after the Supreme Court granted a writ of certiorari) but replaced with a materially indistinguishable statute. *Ne. Fla.*, 508 U.S. at 662. There, the plaintiffs brought facial and as-applied challenges to a municipal ordinance creating a race-based set-aside program for city contracts. *Id.* at 658-59. The district court entered summary judgment for the plaintiffs and permanently enjoined the ordinance, holding that it violated the Equal Protection Clause. *See Ne. Fla. Ch. of Assoc. Gen. Contractors of Am. v. Jacksonville*, 951 F.2d 1217, 1218 (11th Cir. 1992) (citing *Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989)). The Eleventh Circuit vacated and remanded with instructions to dismiss for lack of subject matter jurisdiction, holding that the plaintiffs lacked standing. *Ne. Fla.*, 508 U.S. at 660. After the Supreme Court granted certiorari, the city repealed the challenged ordinance and enacted a new ordinance that replaced the "set aside" with a "Sheltered Market Plan" that was "*virtually identical to the prior ordinance's 'set aside.*" *Id.* at 661 (emphasis added). The city claimed that repeal of the ordinance mooted the case, but the Supreme Court disagreed. Reasoning that the Court should not permit "a defendant [to] moot a case by repealing the challenged statute and replacing it with one that differs only in some insignificant respect," the Court held that the case was not moot. *Id.* at 662-63.

13

The Court held that the case remained live because both the repealed ordinance and the amended ordinance contained an express racial classification. The opinion defined the "wrongful conduct" in question as the "set aside" itself:

> The gravamen of petitioner's complaint is that its members are disadvantaged in their efforts to obtain city contracts. The new ordinance may disadvantage them to a lesser degree than the old one, but *insofar as it accords preferential treatment to black- and female-owned contractors—and in particular, insofar as its "Sheltered Market Plan" is a "set aside" by another name—it disadvantages them in the same fundamental way.*

*Id.* at 662 (emphasis added). The case fell into the *Aladdin's Castle* exception to mootness—indeed, it was "an *a fortiori* case," *id.*—because the city had already repeated its allegedly wrongful conduct by enacting a new racial set-aside. The disadvantage imposed by the ordinance—and the constitutional infirmity—was apparent on its face. *See Shaw v. Reno*, 509 U.S. 630, 642 (1993) ("No inquiry into legislative purpose is necessary when the racial classification appears on the face of the statute.") (citing *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272 (1979))); *id.* at 643-44 ("A racial classification, regardless of purported motivation, is presumptively invalid and can be upheld only upon an extraordinary justification.").

*Northeastern Florida* did not purport to overrule *Diffenderfer*. On the contrary, the majority distinguished *Diffenderfer* and its progeny on the grounds that they addressed statutes that "were changed substantially, and . . . there was therefore no basis for concluding that the challenged conduct was being repeated." 508 U.S. at 662 at n.3. It recognized that a claim is moot where the infirm provisions in the old legislation are "significantly revised" by the new legislation. *Id.* (quoting *Fusari v. Steinberg*, 419 U.S. 379, 380 (1975)). The exception to mootness applies only when the

14

repeal and amendment of challenged legislation effects a "change" in name only. *Id.* at 662 & n.3. That exception to mootness would not apply here because SB 5, if enacted, will substantially change Texas's voter-ID law—by adding a reasonable-impediment-affidavit procedure—in response to the Fifth Circuit's decision.

Any amendment to the State's voter-ID law is entitled to a presumption of good faith, and it must be presumed that the State will not revert back to the old voter-ID law after amending the law to include a reasonable-impediment-affidavit procedure.[4] The plaintiffs cannot avoid this settled law by denying reality. They argue that SB 14 was somehow not a legislative act, because proponents purportedly acted as "self-interested private parties . . . to counter threats to their personal political power." Plaintiffs' Br. 13. That theory has no basis in evidence or law, and it would not undermine an amendment to SB 14 even if it did. If the Legislature passes an amendment to the State's voter-ID law, it will have undertaken a sovereign legislative act.

## C.    Plaintiffs' Request for Preclearance Bail-In Cannot Preserve the Court's Subject-Matter Jurisdiction.

The fact that the plaintiffs requested the *remedy* of preclearance bail-in under Section 3(c) of the Voting Rights Act says nothing about whether plaintiffs would continue to have a cognizable Article III *injury* if the Texas Legislature enacted a reasonable-impediment-affidavit procedure. With a reasonable-impediment-affidavit procedure in effect, plaintiffs would have no cognizable injury to their right to vote. Indeed, throughout this entire lawsuit, plaintiffs' claim of injury was not that all

---

[4] Regardless of that presumption, the evidence shows that the State would not. *See supra* nn.1, 3.

photo-voter-ID laws are inherently unlawful; rather, it has been that photo-voter-ID laws *without a reasonable-impediment or indigency-affidavit procedure* are unlawful. So if a photo-voter-ID law were changed to include a reasonable-impediment-affidavit procedures—which is what SB 5 would provide—then plaintiffs would no longer have an Article III injury so the case would be moot. As *Diffenderfer* held, it makes no difference to the mootness inquiry that plaintiffs requested a *remedy* that would have been broader in scope—what matters is whether the cognizable *injury* no longer exists. 404 U.S. at 413-14.

Like any plaintiff in federal court, a plaintiff seeking the remedy of section 3(c) preclearance bail-in must, at an absolute minimum, present a claim that satisfies Article III's case-or-controversy requirement. *See, e.g.*, *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 175-78 (2011). The power of federal courts "to pass upon the constitutionality" of a state or federal statute "arises only when the interests of litigants require the use of this judicial authority for their protection against actual interference." *Golden v. Zwickler*, 394 U.S. 103, 110 (1969) (quoting *United Public Workers of America (C.I.O.) v. Mitchell*, 330 U.S. 75, 89-90 (1947)). Plaintiffs' request for the remedy of section 3(c) preclearance bail-in cannot keep the case alive because the question whether to impose the remedy of preclearance bail-in cannot possibly arise unless the plaintiffs' prevail on the merits of their constitutional claim, which can only be reached by a federal court if the plaintiffs continue to possess a cognizable Article III *injury*.

The Supreme Court in *Vermont Agency* made clear that a plaintiff's requested *remedy* has no bearing on whether an Article III *injury* persists. The Court held that "an interest that is merely a 'byproduct' of the suit itself cannot give rise to a cognizable injury in fact for Article III standing purposes." *Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 773 (2000). In *Vermont Agency*, the Court held that a *qui tam* relator's interest in recovering a monetary reward could not provide Article III standing because the possibility of that remedy was not tied to any existing concrete injury in fact. It explained that in order to provide standing, "[t]he interest must consist of obtaining compensation for, or preventing, the violation of a legally protected right." *Id.* at 772. A *qui tam* relator's potential bounty cannot provide standing because it does not remedy an invasion of his personal legal rights—"the 'right' he seeks to vindicate does not even fully materialize until the litigation is completed and the relator prevails." *Id.* at 772-73.

The district court's decision in *Perez v. Texas*, 970 F. Supp. 2d 593 (W.D. Tex. 2013), does not help the plaintiffs. First, the decision conflicts with settled Supreme Court law requiring plaintiffs to maintain a concrete, personal stake in the controversy at all stages of litigation. The court did not cite any authority for the proposition that claims can remain live when the challenged law is amended before final judgment. Nor did the court cite any authority for the proposition that, after the challenged statute is amended, a plaintiff can continue to pursue claims against the pre-amendment statute rather than the statute as amended. In any event, the plaintiffs

17

in *Perez* maintained that they still suffered injuries resulting from the repealed re-districting plans because certain features were carried over to the revised plans. *See id.* at 602. Plaintiffs cannot make that argument here (though it lacks merit, in any event) because an exception to the photo-ID requirement would provide a complete remedy for their alleged injuries.

Moreover, later decisions demonstrate that claims against the 2011 redistrict-ing plans are moot. In *Davis v. Abbott*, 781 F.3d 207 (5th Cir. 2015), the Fifth Circuit held that the adoption of a modified redistricting plan for the Texas Senate in 2013 rendered claims against the 2011 redistricting plan moot. *Davis* establishes that mod-ification of the challenged statute moots claims against the previous version, and un-like the three-judge district court's opinion in *Perez*, it binds this Court. And *Davis*, like this case, also involved claims of discriminatory purpose,[5] but the Fifth Circuit in *Davis* expressly stated multiple times that the new legislatively-enacted redistrict-ing maps mooted that entire case. *See Davis*, 781 F.3d at 215, 217, 218-19, 220; Order at 176, *Perez v. Abbott*, No. 5:11-cv-360 (Mar. 10, 2017), ECF No. 1339 (Smith, J., dissenting) ("*Davis* involved the same claims and nearly the same parties, was in the same procedural posture, and examined the same potentially mooting measures taken by the state"—as the 2011-map redistricting claims, which included discrimi-natory-purpose claims) (footnote omitted)).

---

[5] Complaint at 2, 10-11, 13, *Davis v. Abbott*, No. 5:11-cv-788 (Sept. 22, 2011), ECF No. 1.

In its most recent opinion, the *Perez* court conceded that discriminatory-effect claims against the 2011 congressional redistricting plan were moot to the extent the challenged districts were modified by the Legislature in 2013. Order at 5, *Perez*. The majority refused to find the remaining claims moot because doing so would remove any possibility a remedy under section 3(c) of the Voting Rights Act. *Id.*; *contra id.* at 168 (Smith, J., dissenting) ("Once *Davis v. Abbott* . . . was announced two years ago, reversing the decision of this panel, and more certainly after the Supreme Court denied certiorari in November 2015, mootness was obvious.").[6] Although the majority purported to distinguish *Davis*, it cited no new authority for the proposition (which was unsupported in its previous order) that a plaintiff's desire for a particular remedy, if he were to prevail on a claim, could keep the claim itself alive. *See id.* at 167 (Smith, J., dissenting). The Supreme Court's decision in *Vermont Agency* and the Fifth Circuit's decision in *Davis* prove otherwise.

The plaintiffs' desire for a particular remedy cannot preserve Article III jurisdiction when they no longer have a concrete injury in fact. Like the *qui tam* relator's personal interest in obtaining a bounty in *Vermont Agency*, the plaintiffs' interest in subjecting a State to the remedy of preclearance bail-in "does not fully materialize until the litigation is completed." 529 U.S. at 772-73. The remedy of bail-in cannot possibly create an Article III injury in the underlying legal merits of a claim, nor does it replace something lost as a result of the defendant's acts. A voting-rights plaintiff

---

[6] The State will be challenging, at the appropriate time, the district court's 2-1 ruling that all of the claims regarding the 2011 redistricting maps were not moot.

19

who faces no threat of denial of his right to vote has no personal stake in the controversy. Because he faces no threat of injury, the court has no subject matter jurisdiction over his claim, regardless of the remedy he seeks.

The plaintiffs' attempt to tarnish the Legislature's attempt to amend SB 14 as "gamesmanship" is factually and historically inaccurate. The Texas Legislature's attempt to eliminate any alleged discriminatory results by amending its voter-ID law bears no resemblance to the notorious practices that led Congress to devise the pre-clearance regime in 1965. Congress devised preclearance to thwart the "common practice in some jurisdictions of staying one step ahead of the federal courts by passing new discriminatory voting laws as soon as the old ones had been struck down." *Beer v. United States*, 425 U.S. 130, 140 (1976) (quoting H.R. Rep. No. 94-196, at 57-58 (1975)); *see also South Carolina v. Katzenbach*, 383 U.S. 301, 314 (1966) ("Even when favorable decisions have finally been obtained, some of the States affected have merely switched to discriminatory devices not covered by the federal decrees or have enacted difficult new tests designed to prolong the existing disparity between white and Negro registration."). The preclearance regime under Section 5 of the Voting Rights Act—which implemented "legislative measures not otherwise appropriate"— was warranted only as a response to "unremitting and ingenious defiance of the Constitution" and the decrees of federal courts. *South Carolina*, 383 U.S. at 309.

It is absurd to suggest, as plaintiffs do, that the Voting Rights Act was intended to *prevent* States from acting to cure alleged deficiencies in their laws. *Cf.* Plaintiffs' Br. 11. Congress did not devise preclearance to thwart the States' efforts to comply

with federal court judgments. *Cf.* Plaintiffs' Br. 11. The Legislature's effort to adopt a reasonable-impediment-affidavit procedure into the State's voter-ID law is the complete opposite of the "unremitting and ingenious defiance" necessary to justify preclearance. *South Carolina*, 383 U.S. at 309.

Far from trying to "stay one step ahead" of this Court and enact additional unlawful election provisions, the Texas Legislature is acting to cure all the potential deficiencies in its photo-voter-ID law that plaintiffs have raised throughout this litigation. Allowing a State to fix alleged legal defects in its statutes does not "invite gamesmanship." *Cf.* Plaintiffs' Br. 14. It invites States to provide their own remedies through the legislative process, and the Fifth Circuit has repeatedly made clear that State Legislatures generally should be able to have the first opportunity to fix their election laws. *Veasey*, 830 F.3d at 269-70; *Mississippi State Chapter, Operation PUSH v. Mabus,* 932 F.2d 400, 405-06 (5th Cir. 1991). That is fully consistent with the purpose of the Voting Rights Act. *See, e.g.*, *Westwego Citizens for Better Gov't v. City of Westwego*, 946 F.2d 1109, 1123-24 (5th Cir. 1991). By asking the Court to interfere with the Legislature's efforts, the plaintiffs turn basic principles of federalism and the Voting Rights Act on their head.

## II.   THE COURT MUST TAKE INTO ACCOUNT THE TEXAS LEGISLATURE'S ENACTMENT OF A REASONABLE-IMPEDIMENT AFFIDAVIT IN CONSIDERING THE PLAINTIFFS' INTENTIONAL-DISCRIMINATION CLAIMS.

Even assuming arguendo that the Legislature's enactment of a reasonable-impediment-affidavit procedure for the State's voter-ID law did not moot the plaintiffs' discriminatory purpose claim, this enactment would bear directly on the resolution

21

of that claim for at least two reasons—even beyond the Fifth Circuit's clear instruction to that effect. *See Veasey*, 830 F.3d at 272. First, subsequent legislative acts are relevant to the purpose of the statute as amended, and they are relevant to the purpose of the statute as originally enacted. Second, whether or not subsequent legislative acts inform the intent behind earlier legislation, legislative amendments that eliminate the alleged discriminatory effect of a challenged statute preclude relief on a claim of unconstitutional intentional discrimination.

### A.   Statutory Amendments Are Relevant to the Purpose of a Statute as Originally Enacted and as Amended.

The Legislature's amendment of the statutory scheme would be relevant to the question whether the Legislature intended to discriminate on the basis of race when it originally enacted SB 14. For all the reasons provided in defendants' separate briefing on the discriminatory-purpose claim, there is nothing close to sufficient evidence supporting a finding that the Texas Legislature acted with a discriminatory purpose in enacting SB 14. But even if the court were to disagree, the passage of a reasonable-impediment-affidavit procedure would necessarily negate any purported discriminatory purpose.

The intent behind an amendment can substantially alter the overall intent of the statute. The Fifth Circuit has held, for instance, that reenactment of a constitutional provision can overcome previous discriminatory intent. In *Cotton v. Fordice*, 157 F.3d 388 (5th Cir. 1998), the court considered an amendment to the Mississippi Constitution's felon-disenfranchisement provision, which was motivated by racial

discrimination when originally enacted. The court recognized that in *Hunter v. Underwood*, the Supreme Court held Alabama's felon-disenfranchisement provision to be unconstitutional because "its original enactment was motivated by a desire to discriminate against blacks on account of race and the section continues to this day to have that effect." *Id.* at 391 (quoting *Hunter v. Underwood*, 471 U.S. 222, 233 (1985)). But it held that *Hunter* "left open the possibility that by amendment, a facially neutral provision . . . might overcome its odious origin." *Id.* Despite the acknowledged discriminatory intent behind the Mississippi provision, the Fifth Circuit held that subsequent amendments "superseded the previous provision and removed the discriminatory taint associated with the original version." *Id.* at 391. It distinguished *Hunter* on the ground that the Alabama provision was amended only involuntarily through judicial invalidation, whereas Mississippi voluntarily amended its own provision. *See id.* at 391 n.8; *cf.* Plaintiffs' Br. 4 (citing *Hunter* as "declining to take into account later ameliorative changes to a discriminatory law"). The Fifth Circuit explained that the statute "as it presently exists is unconstitutional only if the amendments were adopted out of a desire to discriminate." 157 F.3d at 392. In *Chen v. City of Houston*, the Fifth Circuit cited *Cotton* "for the important point that when a plan is reenacted—as opposed to merely remaining on the books like the provision in *Hunter*—the state of mind of the reenacting body must also be considered." *Chen v. City of Houston*, 206 F.3d 502, 521 (5th Cir. 2000); *see also Ansell v. Green Acres Con-*

*tracting Co.*, 347 F.3d 515, 524 (3d Cir. 2003) (holding, in an employment-discrimination case, that an employer's subsequent acts "may still be relevant to intent" if the acts are not "remote in time").

Plaintiffs argue that an exclusively backward-looking focus is required because the Supreme Court has held that "the views of a subsequent [legislature] form a hazardous basis for inferring the intent of an earlier one." Plaintiffs' Br. 3 (quoting *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 117 (1980)). But the Supreme Court has distinguished mere *statements* from legislative *acts*: "Subsequent legislation declaring the intent of an earlier statute is entitled to great weight in statutory construction." *Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 380-81 (1969). That *Arlington Heights* did not mention subsequent legislative acts proves nothing. *Cf.* Plaintiffs' Br. 3. There, the Court explained that in identifying "subjects of proper inquiry," it did not "purport[] to be exhaustive." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 (1977). The acts of the 2017 Legislature, many of whose members were part of the 2011 Legislature, are directly relevant to whether the Texas Legislature acted with a discriminatory purpose.

## B.   A Statutory Amendment that Eliminates Discriminatory Effect Precludes Liability on a Discriminatory-Purpose Claim.

Regardless of whether a statutory amendment can be considered in analyzing a Legislature's purpose, such an amendment may directly affect the merits of a constitutional challenge to the statute. In this case, an amendment addressing SB 14's alleged discriminatory effect would preclude a judgment on the merits against the amended voter-ID law.

1. Discriminatory purpose alone cannot establish a constitutional violation. *See Palmer v. Thompson*, 403 U.S. 217, 224 (1971) ("[N]o case in this Court has held that a legislative act may violate equal protection solely because of the motivations of the men who voted for it."); *United States v. O'Brien*, 391 U.S. 367, 383 (1968) (citing the "familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive").

To secure a judgment on their constitutional claim of intentional racial discrimination, the plaintiffs must prove both discriminatory purpose and a discriminatory effect. *E.g.*, *Backus v. South Carolina*, 857 F. Supp. 2d 553, 567 (D.S.C. 2012), *aff'd*, 133 S. Ct. 156 (2012); *cf. Reno v. Bossier Parish Sch. Bd.*, 528 U.S. 320, 337 (2000) ("At the time *Beer* was decided, it had not been established that discriminatory purpose as well as discriminatory effect was necessary for a constitutional violation, compare *White v. Regester*, 412 U.S. 755, 765-766 (1973), with *Washington v. Davis*, 426 U.S. 229, 238-245 (1976).")); *LULAC v. NE Ind. Sch. Dist.*, 903 F. Supp. 2d 1071, 1093 (W.D. Tex. 1995) ("To prevail on their claim under the Fourteenth Amendment, plaintiffs must show: (1) intentional discrimination; and (2) a resultant discriminatory effect."); *Rodriguez v. Harris Cnty.*, 964 F. Supp. 2d 686, 800 (S.D. Tex. 2013) ("To obtain relief on a constitutional vote dilution claim such as this, the plaintiffs must 'prove that the purpose and operative effect' of the challenged election scheme 'is to dilute the voting strength of [minority] citizens.'" (quoting *Voter Info. Project, Inc. v. City of Baton Rouge*, 612 F.2d 208, 212 (5th Cir.1980)).

The question before the Court is whether the plaintiffs are entitled to a judgment that SB 14 violates the Constitution because it satisfies both elements of discriminatory purpose and effect. This requires proof that the challenged law currently denies or abridges—or threatens to deny or abridge—their right to vote. The Legislature is in the process of enacting a bill that would remove any threat of denial or abridgment of the plaintiffs' right to vote as a result of SB 14's photo-ID requirements—by enacting a reasonable-impediment-affidavit procedure. Enacting such a procedure would eliminate any possible discriminatory effect, thus negating one of the necessary elements for finding a constitutional violation based on a discriminatory purpose. Defendants respectfully request that the Court allow the Legislature to complete its efforts—as the legislative session ends in just 2.5 months, at the end of May 2017—before judging the merits of the plaintiffs' intentional-discrimination claim.

2.For an independent reason, the passage of a reasonable-impediment-affidavit that alleviates any discriminatory effect would necessarily foreclose any claim of discriminatory purpose on this record—because there is no *direct* evidence of discriminatory purpose, as both the Fifth Circuit and this court have noted. *See Veasey*, 830 F.3d at 235; *Veasey v. Perry*, 71 F. Supp. 3d 627, 702 (S.D. Tex. 2014). Supreme Court precedent provides that without a showing of discriminatory effect, *circumstantial* evidence cannot establish discriminatory purpose. *See Crawford v. Bd. of Educ. of City of L.A.*, 458 U.S. 527, 544 n.31 (1982) ("Absent discriminatory effect, judicial inquiry into legislative motivation is unnecessary, as well as undesirable." (quoting

26

*Brown v. Califano*, 627 F.2d 1221, 1234 (D.C. Cir. 1980)); *accord Darensburg v. Metro. Transp. Comm'n*, 636 F.3d 511, 523 (9th Cir. 2011) ("failure to establish . . . discriminatory impact prevents any inference of intentional discrimination"). Thus, if the Legislature adopts a reasonable-impediment-affidavit procedure that cures any alleged discriminatory effect, a discriminatory-purpose finding based on mere circumstantial evidence—which is all that plaintiffs have here—is barred as a matter of law.

## CONCLUSION

For the reasons stated above, Defendants respectfully request that the Court withhold judgment on the plaintiffs' intentional-discrimination claims until the Texas Legislature has had the chance to fully consider amendments to the State's voter-ID law, that the Court find the enactment of a reasonable-impediment-affidavit procedure would moot this case, and that the Court in all events account for any such amendments in determining the justiciability and merits of the plaintiffs' claims.

27

Date: March 14, 2017                Respectfully submitted,

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant
  Attorney General

BRANTLEY D. STARR
Deputy First Assistant
  Attorney General

JAMES E. DAVIS
Deputy Attorney General
  for Litigation

/s/ Angela V. Colmenero
ANGELA V. COLMENERO
Chief, General Litigation Division

MATTHEW H. FREDERICK
Deputy Solicitor General

JASON R. LAFOND
Assistant Solicitor General

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC 059)
Austin, Texas  78711-2548
Tel.: (512) 936-6407
Fax: (512) 474-2697

*Counsel for Defendants*

### CERTIFICATE OF SERVICE

I hereby certify that on March 14, 2017, a true and correct copy of the foregoing document was served via the Court's ECF system to all counsel of record.

/s/ Angela V. Colmenero
ANGELA V. COLMENERO

29