# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### CORPUS CHRISTI DIVISION

MARC VEASEY, *et al.*,

                Plaintiffs,

      v.

GREG ABBOTT, *et al.*,

                Defendants.

Civil Action No. 2:13-cv-193 (NGR)

## REPLY BRIEF OF PRIVATE PLAINTIFFS REGARDING
## EFFECT OF NEW VOTER ID LEGISLATION ON THIS CASE

## INTRODUCTION

Texas argues that, if it passes a law that, in its view, ameliorates some of SB 14's future discriminatory effects, this Court does not have jurisdiction to evaluate the sufficiency of that law as a remedy to established Section 2 violations.  Texas also argues that SB 5's passage would negate the invidious intent with which SB 14 was passed and the more sinister injuries that discriminatory intent imposed—and continues to impose—on Black and Latino voters, denying this Court of jurisdiction to adjudicate the claim of intentional discrimination and determine the appropriate remedy.  Of course, the decision as to whether any new law is sufficient to remedy the effects of SB 14 is a question to be decided by this Court, not Texas. That was made clear by the Fifth Circuit.  Texas's jurisdictional arguments turn constitutional and Section 2 jurisprudence on its head.  Under Texas's theory, its legislature could purposefully enact discriminatory law after discriminatory law and never face a court-ordered remedy or adjudication of liability for its invidious intent, simply by passing a new law each time it is challenged.

This is not and cannot be the law.  Texas's argument is based on the incorrect premise that potentially reducing SB 14's discriminatory effect would erase Private Plaintiffs' injury. But Texas seems to have forgotten that the harm caused by SB 14 has already been visited on Texas voters.  The law has been in effect for several elections—because Texas chose to implement it even after a three-judge panel found it to be discriminatory—and its effects have injured and continue to injure Private Plaintiffs.

This Court and the Fifth Circuit Court of Appeals have now ruled conclusively that SB 14 *has* had discriminatory effects, and Private Plaintiffs' pending claim is based on the discriminatory intent that fostered *those* established discriminatory effects.  No *post hoc* legislative act can deprive this Court of jurisdiction to determine the sufficiency of any proposed

remedy to violations it has already found, nor can it eliminate the original invidious intent behind SB 14 or deprive Private Plaintiffs of the opportunity to seek full relief for that injury—relief that may be substantially broader than that imposed to remedy SB 14's discriminatory effects, and that is certainly broader than SB 5.

If this Court finds that SB 14 was enacted with discriminatory intent, its determination of the appropriate remedy will include *both* whether any remedial legislation completely cures all discriminatory effects *and* whether any new legislation carries the taint of the unlawful intent behind the prior legislation.  It would also determine whether the finding of intentional discrimination in the original enactment of SB 14 warrants relief under Section 3(c) of the Voting Rights Act.  Were Texas's arguments correct, jurisdictions found to have intentionally discriminated on the basis of race could avoid Section 3(c) relief simply by enacting new (and potentially discriminatory) laws on the eve of bail-in, forcing the victims of those laws to engage in endless, *ex post* litigation rather than giving them the prophylactic benefit that this preclearance provision was intended to provide.  Every court to decide a similar question has held that the intent claim before it was not moot while this relief remained available.

Texas also argues that a decision by the 2017 Legislature to pass an ameliorative law is somehow relevant to determining whether the 2011 Legislature passed SB 14 with invidious intent.  Texas points to no case law to support this counterintuitive proposition, and this Court should reject it.

There is, therefore, no reason to delay.  As the United States concedes, judicial economy counsels this Court to rule on intent as soon as possible and defer the remedy proceedings until the conclusion of the current legislative session, giving the Legislature the benefit of the Court's decision as it considers any remedial legislation, and the Court the benefit of that new law when

determining the appropriate remedy.[1]  But under no circumstances can SB 5 or any other legislative action deprive this Court of subject-matter jurisdiction over this case.

## ARGUMENT

## I.   SUBSEQUENT LEGISLATION CANNOT MOOT PRIVATE PLAINTIFFS' CLAIMS OR DEPRIVE THEM OF STANDING

Texas argues that, if SB 5 is enacted, this Court would lack subject-matter jurisdiction over both Private Plaintiffs' discriminatory purpose and discriminatory effects claims because they will no longer be injured.  Defs.' Br. Regarding the Effect of Voter-ID Legislation on Pls.' Claims of Intentional Racial Discrimination (Dkt. 1015) ("Tex. Br.") at 4.  But this Court and the Fifth Circuit have conclusively ruled that Private Plaintiffs have already been injured by the discriminatory effects of SB 14, and this Court retains subject-matter jurisdiction to rule on the remedy for that injury.  It also retains jurisdiction to rule on the discriminatory intent behind the law, which has also already injured Private Plaintiffs and numerous other Texas voters, and which entails unique and broader remedies.  After six years of determined defense of this discriminatory law, Texas cannot now avoid the consequences of its decision to pass that law.

## A.   Private Plaintiffs Have Been, And Continue To Be, Injured

The injury caused to Private Plaintiffs by SB 14 has already occurred and will continue until such time as this Court issues, and Texas complies with, its final remedial order.  The issue is not, as Texas would have it, whether Private Plaintiffs face "no threat of injury."  Tex. Br. at 20.  Private Plaintiffs are not required to prove an ongoing injury in order for this Court to have

---

[1]  The United States, however, persists in maintaining, wrongly, that the Fifth Circuit's opinion directs this Court to defer to the Legislature on the issue of liability for intentional discrimination, still relying on language focused on the discriminatory effects remedy.  Private Plaintiffs rely on their discussion of that issue in their opening brief.  Br. of Private Pls. Regarding Effect of New Voter ID Legislation on This Case (Dkt. 1010) ("Priv. Pls. Br.") at 5-9.

subject-matter jurisdiction over its Section 2 discriminatory intent claim.  They need prove only "that they have been injured as a result" of an intentionally discriminatory law.  *Garza v. City of L.A.*, 918 F.2d 763, 771 (9th Cir. 1990); *see White v. Regester*, 412 U.S. 755, 766 (1973).  These past injuries do not vanish with the enactment of a replacement law, however ameliorative it may be, and the ongoing injuries imposed by SB 14's discriminatory intent will continue until full relief is provided.  If enacted, SB 5 could not rewrite history and erase that injury, and could not immunize Texas from the uniquely broad relief appropriate for victims of intentional discrimination.

Texas's brief conflates the injuries that *SB 14* has *already* caused with the *future* injuries that *SB 5* may prevent.  As the Fifth Circuit has held, a legislature's passage of remedial legislation to cure a judgment of unlawful discrimination[2] does not moot a case as to the original law.  *Miss. State Chapter, Operation PUSH, Inc. v. Mabus (Operation PUSH)*, 932 F.2d 400, 409 (5th Cir. 1991) (holding that the legislature's enactment of a 1988 bill curing the deficiencies of a 1984 law did not moot an appeal of a district court decision concerning the 1984 law).  SB 14's discriminatory effect and intent have harmed and will continue to harm Private Plaintiffs.  It is that injury that this Court must remedy, and it is that remedy that constitutes the "legally cognizable interest in the outcome" of the case that precludes mootness.  *Already, LCC v. Nike, Inc.*, 133 S. Ct. 721, 726-27 (2013) (quoting *Murphy v. Hunt*, 455 U.S. 478, 481 (1982)).

---

[2]  Texas concedes that SB 5 is an attempt to cure the deficiencies in SB 14, as found by the courts.  Attorney General Paxton said in reference to SB 5:  "The updates to Voter ID that Senator Huffman proposes will make the changes necessary to comply with the Fifth Circuit ruling while ensuring the integrity of the voting process."  Press Release, Attorney General of Texas, AG Paxton Applauds Leadership of Lt. Governor Patrick and Senator Huffman to Preserve Voter ID (Feb. 21, 2017) (attached hereto as Exhibit A).  The Court and Private Plaintiffs are unable to review the adequacy of SB 5 as remedy for the infirmities of SB 14 unless and until it passes and its final form is known.

Texas's standing argument fails for the same reasons.  Texas acknowledges that "[d]octrinal labels ultimately make no difference to the jurisdictional question . . . ."  Tex. Br. at 8.  Regardless of any new laws, Private Plaintiffs have standing to pursue a remedy for the discriminatory effects violation, as well as a finding of intentional discrimination and the appropriate remedy flowing from that violation.[3]

**B.     If This Court Finds Again That SB 14 Was Enacted With Discriminatory Intent, Private Plaintiffs Will Be Entitled To Relief Beyond That Which SB 5 Purportedly Provides**

 "A case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party."  *Knox v. Serv. Emps. Int'l Union, Local 1000*, 132 S. Ct. 2277, 2287 (2012) (internal quotations omitted).  A finding of discriminatory intent would open the door to much greater substantive relief than either the finding of discriminatory effects or SB 5.[4]

First, the Fifth Circuit expressly recognized that the remedy for a discriminatory purpose violation against SB 14 is "potentially broader than the one to which Plaintiffs would be entitled if only the discriminatory effect claim were considered."  *Veasey v. Abbott*, 830 F.3d 216, 268 (5th Cir. 2016) (en banc).   Potential remedies after a finding of purposeful discrimination include striking down the offensive law in its entirety.  *Id.* at 268 (noting that "[a]n official action

---

[3]  Texas's heavy reliance on *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765 (2000), in its standing argument (Tex. Br. at 17, 19), is odd, because there the Court found that the relator *had* standing to bring a *qui tam* action for injuries sustained by the United States.  The excerpt quoted by Texas from *Stevens* had to do with an issue not relevant to this case, i.e., that an interest which is "merely a 'byproduct' of the suit" cannot be the basis for standing (e.g., a suit for the cost of bringing suit).  *Stevens*, 529 U.S. at 773.  Thus, the relator in *Stevens* did not have standing to sue solely on the basis of the bounty he would receive if successful, because that had nothing to do with any injury that he suffered.  *Id.* at 772-73.  But that is not, as Texas would have it, equivalent with resting standing on the right to a remedy flowing directly from Private Plaintiffs' injuries, as is the case with Section 3(c) and other relief that would flow from a finding of intentional discrimination in this case.

[4]  Private Plaintiffs rely on and incorporate herein the argument in their opening brief on this issue.  Priv. Pls. Br. at 9-13.

. . . taken for the purpose of discriminating . . . on account of . . . race has no legitimacy at all"

(quoting *City of Richmond v. United States*, 422 U.S. 358, 378 (1975))).  Second, Private

Plaintiffs also seek relief under Section 3(c) of the Voting Rights Act, which specifically

provides for preclearance relief even where officials are no longer intentionally discriminating,

52 U.S.C. § 10302(c), and which remains available regardless of any later legislation.[5]  Third,

Private Plaintiffs also seek a declaration of intentional discrimination, which, by itself, is a

significant prophylactic remedy against future discrimination and because it is an important

factor in the adjudication of future discrimination claims.  *See Thornburg v. Gingles*, 478 U.S.

30, 44-45 (1986) (listing the Senate Factors).  Because these forms of relief would remain

---

[5]  Section 3(c) of the Voting Rights Act, 52 U.S.C. § 10302(c), provides:

> (c) Retention of jurisdiction to prevent commencement of new devices to deny or abridge the right to vote

> If in any proceeding instituted by the Attorney General or an aggrieved person under any statute to enforce the voting guarantees of the fourteenth or fifteenth amendment in any State or political subdivision the court finds that violations of the fourteenth or fifteenth amendment justifying equitable relief have occurred within the territory of such State or political subdivision, the court, in addition to such relief as it may grant, shall retain jurisdiction for such period as it may deem appropriate and during such period no voting qualification or prerequisite to voting or standard, practice, or procedure with respect to voting different from that in force or effect at the time the proceeding was commenced shall be enforced unless and until the court finds that such qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, or in contravention of the voting guarantees set forth in section 10303(f)(2) of this title:  *Provided*, That such qualification, prerequisite, standard, practice, or procedure may be enforced if the qualification, prerequisite, standard, practice, or procedure has been submitted by the chief legal officer or other appropriate official of such State or subdivision to the Attorney General and the Attorney General has not interposed an objection within sixty days after such submission, except that neither the court's finding nor the Attorney General's failure to object shall bar a subsequent action to enjoin enforcement of such qualification, prerequisite, standard, practice, or procedure.

available even if SB 5 were enacted, that law simply cannot moot the discriminatory intent claim.

Texas argues that "a plaintiff's requested *remedy* has no bearing on whether an Article III *injury* persists." Tex. Br. at 17.  But its argument is belied by the very cases upon which it relies. Each of those cases discusses mootness in terms relating to whether there was any further relief that the plaintiff could seek after the amendment, and in each case there was no further relief available.[6]  The opposite is true here.

Moreover, every court to address directly whether later ameliorative amendments moot challenges to prior laws where further relief remains available has held that they do not.  In *North Carolina State Conference of NAACP v. McCrory*, the Fourth Circuit struck down North Carolina's voter ID law as having been enacted with discriminatory intent, even though the legislature had amended the law to include a reasonable impediment exception, noting that the exception "falls short of the remedy that the Supreme Court has consistently applied in cases of this nature."  831 F.3d 204, 240 (4th Cir. 2016); *see also* Transcript of Proceedings at 48:22-54:10, 64:13-65:3, *N.C. State Conf. of NAACP v. McCrory*, No. 1:13-cv-658 (M.D.N.C. Oct. 28,

---

[6]  *See, e.g.*, *Diffenderfer v. Cent. Baptist Church of Miami, Fla., Inc.*, 404 U.S. 412, 414-15 (1972) (finding that where only declaratory relief was sought by the plaintiffs, no other relief was available after the challenged statutory provision was completely rescinded); *Kremens v. Bartley*, 431 U.S. 119, 128-29 (1977) (finding that where plaintiffs challenged constitutionality of a law, no further remedy was available after the complete repeal of that law); *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 478 (1990) (holding that plaintiff's Commerce Clause challenge to a state law that resulted in state's denial of plaintiff's application to operate a bank was mooted by changes to federal law "which make it clear that no matter how the Commerce Clause issues in this suit are resolved the application can constitutionally be denied"); *Massachusetts v. Oakes*, 491 U.S. 576, 582-84 (1989) (finding overbreadth challenge to criminal statute mooted where amendment to challenged statute eliminated "the special concern that animates the overbreadth doctrine"); *Princeton Univ. v. Schmid*, 455 U.S. 100, 103 (1982) (finding that university's appeal of lower court decision striking down regulation restricting certain speech activities was mooted where lower court's ruling was based on lack of standards governing regulations, and university had since amended regulation to include such standards).

2015) (Dkt. 363) (denying motion to dismiss for lack of subject-matter jurisdiction and holding that the newly enacted reasonable impediment amendment did not moot intentional discrimination claims) (relevant excerpts of which are attached hereto as Exhibit B); *Blackmoon v. Charles Mix Cty.*, 505 F. Supp. 2d 585 (D.S.D. 2007) (holding plaintiffs' VRA claims not mooted by elimination of challenged districts because of availability of relief under Section 3(a)); *Miss. State Chapter, Operation PUSH v. Allain*, 674 F. Supp. 1245, 1247-48 (N.D. Miss. 1987) (noting prior denial of motion to dismiss for mootness because amended statutes did not completely eliminate the challenged discriminatory practices).  More recently, as brought to this Court's attention (*see* Dkt. 1012), a three-judge district court in the Western District of Texas rejected Texas's argument that the re-drawing of redistricting plans mooted plaintiffs' intentional discrimination claim against the original map, on the basis that "Plaintiffs are still being harmed by the districts drawn with that intent, and Plaintiffs have potential relief available under § 3(c) for that harm."  *Perez v. Abbott*, No. SA-11-cv-360, 2017 WL 962947, at *3 (W.D. Tex. Mar. 10, 2017).[7]

---

[7]  As did the dissenting jurist in *Perez,* Texas here argues that *Davis v. Abbott,* 781 F.3d 207 (5th Cir. 2015), compels a different result.  Tex. Br. at 18; *Perez v. Abbott*, 2017 WL 962947, **81-82 (Smith, J., dissenting).  However, as the majority in *Perez* pointed out, *Davis* was not about mootness, but rather about plaintiffs' right to attorneys' fees after they admitted that some of their claims had been rendered moot.  *Id.* at *2.  Furthermore, other portions of Judge Smith's dissent in *Perez* argue against a finding of mootness in this case.  Judge Smith emphasized that the case concerned plaintiffs "who have never been, and cannot be, injured by the 2011 plans":

> The 2011 plans were never used for any election; they never had any effect on anyone beyond precipitating this lawsuit.  It is a logical impossibility for a plan that never went into effect for any election, and never will be used for any purpose, to be a "violation," in the words of Section 3(c), or to have had an "actual discriminatory effect."

*Id.* at **85-86.  Here, of course, SB 14 was in effect for several elections and had a detrimental effect on Private Plaintiffs and hundreds of thousands Texas voters, who are disproportionately Black and Latino.

In sum, under Texas's theory, its legislature could, as it did, intentionally pass a discriminatory law; implement it, as it did; be found liable of discriminatory results, as it has been—but then escape liability for discriminatory intent, including Section 3(c) relief, by passing a new law that purports to ameliorate the discriminatory effects nearly six years later. Private Plaintiffs do not argue, as Texas claims, that "the Voting Rights Act was intended to *prevent* States from acting to cure alleged deficiencies in their laws." Tex. Br. at 20 (emphasis in original). Rather, Private Plaintiffs argue that the Voting Rights Act was not intended to allow states to perpetually escape liability for their enactment of a law that intentionally discriminates on the basis of race by providing only partial ameliorative relief directed at that law's future effects alone.[8]

---

[8] Indeed, if Texas were correct that the passage of a bill curing the effects violation moots the discriminatory effects claim, then it would lose its right to appeal from the discriminatory effects liability judgment upon the passage of SB 5. Yet it expressly purports to reserve its right to appeal from the finding of an effects violation. Tex. Br. at 3 n.2. Private Plaintiffs would, of course, retain their right to attorneys' fees as the prevailing party on that claim in any event.

**C.      This Court Must Review SB 5 Before The Law Can Be Implemented**

The enactment of SB 5 or any other purported ameliorative legislation also would not

moot the discriminatory effects claim because this Court has already indicated its intent to retain

jurisdiction over this case in order to review any purportedly remedial litigation: "Any remedial

enactment by the Texas Legislature, as well as any remedial changes by Texas's administrative

agencies, must come to the Court for approval, both as to the substance of the proposed remedy

and the timing of implementation of the proposed remedy." *Veasey v. Perry*, 71 F. Supp. 3d 627,

707-08 (S.D. Tex. 2014), *aff'd in part and remanded in part sub nom. Veasey v. Abbott*, 830 F.

3d 216.  Nothing in the Fifth Circuit's opinion suggests that this is an improper course, and

indeed, in addressing the remedy for the discriminatory effects claim, that court anticipated that

there would be judicial review of such legislative action by this Court: "Any concerns about a

new bill would be the subject of a new *appeal* for another day." *Veasey v. Abbott*, 830 F.3d at

271 (emphasis added).  The Fifth Circuit did not suggest that it would be the subject of a new

*lawsuit*.

It is certainly premature for this Court to decide whether the yet-to-be enacted SB 5

would cure SB 14's discriminatory effects.[9]  But there is no basis for this Court to accept Texas's

---

[9]  While SB 5 appears to share some of the terms of the Interim Remedial Order (Dkt. 895), that
Order was negotiated and entered in the compressed "short timeframe" necessitated by the
approaching November election.  *Veasey v. Abbott*, 830 F.3d at 269.  Private Plaintiffs never
asserted that the Declaration of Reasonable Impediment provided in the Interim Remedial Order
constituted all relief to which they would be entitled ultimately.  To the contrary, all parties
"preserve[d] their rights to seek or oppose future relief."  Dkt. 895 at 4.  Events after the entry of
the Interim Remedial Order proved the wisdom of this reservation of rights.  As implemented,
the Declaration of Reasonable Impediment was too often confusing for voters and even was used
as a tool by the Attorney General and some county officials to intimidate voters with threats of
perjury prosecutions.  *See* Priv. Pls. Mot. for Further Relief to Enforce Interim Remedial Order
(Dkt. 926).  Further, SB 5 does not track the Interim Remedial Order in several key respects,
including in its disallowance of certain IDs allowed under the Interim Remedial Order and in its
elevating to a third-degree felony false statements on the Declaration of Reasonable Impediment.
The point here is not to argue the pros or cons of this bill, but rather to underscore the need for

self-serving conclusion that SB 5 *ipso facto* eliminates "any alleged discriminatory effect." Tex.

Br. at 1.[10]

Further, this Court's decision on discriminatory intent is necessary for it to assess fully

whether any legislative attempts at amelioration are lawful. Specifically, the Court must

determine whether any subsequent legislation is still tainted with pre-existing discriminatory

intent.[11] "A remedy for a § 2 violation must not itself grow out of a discriminatory intent."

*Operation Push*, 932 F.2d at 408. The facts here point firmly to the need for such examination,

as SB 5 appears to retain much of the original architecture of SB 14. Texas cannot unilaterally

take that issue out of this Court's hands when the injury to plaintiffs has already occurred.

### D. Texas Has Not Proved That Its Offensive Conduct Is Not Susceptible To Repetition

A further defect in Texas's position is that any attempt to prove mootness would require

Texas to carry its burden of proving that its voluntary cessation of the offensive conduct was

---

further review and decision by this Court in the context of a comprehensive remedy proceeding at the appropriate time.

[10]   In this context, Texas mischaracterizes Private Plaintiffs' claims, suggesting that their "entire theory" is "that photo-voter-ID laws are invalid if they fail to accommodate voters who, for reasons of poverty, cannot reasonably comply with photo-ID requirements," and that "their argument was the Legislature had a discriminatory purpose because it did not enact a safeguard, such as a reasonable-impediment declaration." Tex. Br. at 2. Never have Private Plaintiffs argued that SB 14 would have been lawful and constitutional if it only had a reasonable-impediment-declaration. To the contrary, Private Plaintiffs' case has rested on a multitude of serious concerns with SB 14, including the need for the law in the first place, its restriction to IDs less likely to be possessed by Black and Latino voters than Anglo voters and more likely to be burdensome to get by Black and Latino voters than Anglo voters, its woefully poor implementation, and, of course, its discriminatory intent.

[11]   For example, in *Hunter v. Underwood*, the state tried to defend the constitutionality of its felony disenfranchisement statute on the ground, *inter alia*, that "events occurring in the succeeding 80 years had legitimated the provision." 471 U.S. 222, 232-33 (1985). The Court rejected this defense, observing that the provision's "original enactment was motivated by a desire to discriminate against blacks on account of race and the section continues to this day to have that effect. As such, it violates equal protection under *Arlington Heights*." *Id.* at 233.

permanent, and not susceptible to repetition.[12]  While Texas notes that the Fifth Circuit holds

governmental entities to a more lenient standard for demonstrating that their conduct will not

recur, such entities still bear the burden of proof on the issue.  Moreover, the presumption of

good faith is based on the belief that government actors are "not self-interested" parties.

*Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 325 (5th Cir. 2009), *aff'd sub nom. Sossamon

v. Texas*, 563 U.S. 277 (2011).  Where there is "evidence to the contrary," there is no basis to

grant the government this "solicitude."  *Id.*

> Here, there is abundant evidence to the contrary:  the mountain of factual findings made

by this Court and affirmed by the Fifth Circuit indicating that the Legislature acted

discriminatorily and in its own self-interest.  The political party in power in the Legislature,

facing a diminishing voter base, believed that it could gain partisan advantage by a strict voter ID

law that would limit the growing political power of minority voters.  *Veasey v. Perry*, 71 F.

Supp. 3d at 700; *Veasey v. Abbott*, 830 F.3d at 241.  Indeed, its years-long resistance to making

ameliorating revisions and its purported willingness to do so now only after an en banc ruling by

the Fifth Circuit and the denial of certiorari by the Supreme Court compel it to do so, make it

difficult to accept any claim that repetition is unlikely.  Moreover, as the Supreme Court has

observed, "[w]hen there is a proof that a discriminatory purpose has been a motivating factor in

the decision . . . judicial deference [to the legislature] is no longer justified."  *Vill. of Arlington

Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-66 (1977).  Texas cannot carry its burden

of showing that the offensive behavior is unlikely to recur.

---

[12]  Private Plaintiffs rely on and incorporate herein their argument on the voluntary cessation
doctrine in their opening brief.  Priv. Pls. Br. at 12-13.

## II.   SUBSEQUENT LEGISLATION WOULD NOT IMPACT THIS COURT'S RULING ON DISCRIMINATORY INTENT

Texas argues, in the alternative, that:  (1) "subsequent legislative acts are relevant to the purpose of the statute as amended, and they are relevant to the purpose of the statute as originally enacted," and (2) "legislative amendments that eliminate the alleged discriminatory effect of a challenged statute preclude relief on a claim of unconstitutional intentional discrimination."  Tex. Br. at 22.  Texas is wrong on both counts.

### A.   Subsequent Legislation Is Irrelevant To Determinations Of Prior Discriminatory Intent

Texas argues that what the Legislature does in 2017 may somehow erase ("overcome") the discriminatory intent of the Legislature that passed SB 14.  Tex. Br. at 22-24.  The amendment of a statute is relevant only to the purpose of that statute *as amended*.  It is not, as Texas argues, relevant to the purpose of the original statute.[13]

All the authorities upon which Texas relies for this point involve challenges to amended or reenacted statutes or constitutional provisions, not to the original statutes themselves.  Thus, in *Cotton v. Fordice*, the issue was not whether Mississippi's *original* 1890 constitutional provision providing for felony disenfranchisement was enacted with discriminatory intent (the court assumed it was), but rather whether *subsequent* reenactments of the provision, 60 years later, still bore the original's "discriminatory taint."  157 F. 3d 388, 391 (5th Cir. 1998); *see also Chen. v. City of Houston*, 206 F.3d 502, 521 (5th Cir. 2000) (considering challenge to reenacted districting plan); *Ansell v. Green Acres Contracting Co., Inc.*, 347 F.3d 515, 525 (3d Cir. 2003)

---

[13]   In fact, as discussed above, in the remedy proceedings, it will be the task of this Court to determine whether, should the Legislature adopt remedial legislation, there is any remaining discriminatory intent behind that action.  *See Hunter*, 471 U.S. at 233; *Operation PUSH*, 932 F.2d at 409.

(noting that "changed circumstances" bear on whether "subsequent" conduct is probative of intent).

Texas also relies on *Red Lion Broadcasting Co. v. F.C.C.*, 395 U.S. 367 (1969), (Tex. Br. at 24), to argue that the 2017 Legislature's actions are relevant to the 2011 Legislature's intent in enacting SB 14.  But *Red Lion*—which was not a discriminatory intent case, but a question of statutory construction—simply held that courts should give weight to new legislation instructing courts on how to interpret the *meaning* of an old law.  *Id.* at 380-81.  Private Plaintiffs do not deny that a later legislature can clarify what an old statute means, or that courts should accord some deference to that clarification.  Neither *Red Lion* nor any other case, however, stands for the proposition that a later legislature can go back in time and change whether prior legislation was passed with an *invidious* intent.  That intent, under *Arlington Heights*, is judged by the circumstances leading up to enactment of the original law under review (here, SB 14), not by how subsequent legislatures try to color their predecessors' bad acts in an attempt to escape liability for past conduct.[14]

### B.   Private Plaintiffs Have Already Proved That SB 14 Has Discriminatory Effects, Which Subsequent Legislation Cannot Erase

Texas's argument that the absence of any discriminatory effect after the passage of SB 5 prevents a finding of discriminatory intent as to SB 14 again confuses the statute at issue.  This Court has already found, and the Fifth Circuit sitting en banc has already agreed, that SB 14 has the effect of discriminating against Black and Latino voters on the basis of race.  Texas wholly ignores this fact in arguing that SB 5 will have no discriminatory effect, which it claims is a necessary underpinning of any discriminatory intent claim.  Tex. Br. at 25.  Texas's argument

---

[14]   In this regard, Private Plaintiffs note that the composition of the 2017 Legislature is different from that of the 2011 Legislature that passed SB 14.  Members of the House of Representatives are elected to two-year terms; Senators are elected, on a staggered basis, to four-year terms.

that a discriminatory effect is necessary to prove discriminatory intent is wrong,[15] but for the purposes of this case, it is not necessary for the Court to reach that issue.

Private Plaintiffs' claim is that SB 14 was passed in 2011 with discriminatory intent, not that SB 5 will be passed in 2017 with discriminatory intent (although that question will need to be resolved at the remedy phase, as discussed above).  Private Plaintiffs' claim is thus properly based on evidence that includes, as per *Arlington Heights*, the discriminatory effect that SB 14 has had on the voting rights of Black and Latino voters.  That intent and that disproportionate impact do not disappear, even if the current Legislature were to pass a law that fully remedies the discriminatory effect of SB 14 (and subjects that law to this Court for approval).  Private Plaintiffs have already been injured by both the discriminatory effect and the discriminatory intent of SB 14.

---

[15] A plaintiff may prove *either* discriminatory effects or discriminatory intent, because legislation targeted at minorities is injurious *per se*.  *See, e.g.*, *Rogers v. Lodge*, 458 U.S. 613, 617 (1982) (holding that laws "conceived or operated as purposeful devices to further racial discrimination" violate the Fourteenth Amendment (internal quotations omitted)); *City of Port Arthur v. United States*, 459 U.S. 159, 168 (1982) ("[E]ven if the [challenged] electoral scheme might otherwise be said to reflect the political strength of the minority community, the plan would nevertheless be invalid if adopted for racially discriminatory purposes."); *City of Richmond v. United States*, 422 U.S. 358, 372 (1975) (explaining in a Section 5 case that a voting law with no discriminatory effect could still be invalid if passed for a discriminatory purpose); *United States v. Brown*, 561 F.3d 420, 433 (5th Cir. 2009) ("To violate the statute, however, these practices must be undertaken with an intent to discriminate *or* must produce discriminatory results." (emphasis added)); *McMillan v. Escambia County*, 748 F.2d 1037, 1046 (5th Cir. 1984) (finding that, even absent the court's later determination that an at-large election system had a discriminatory result, its earlier finding of discriminatory intent was "sufficient to constitute a violation of section 2"); *Patino v. City of Pasadena*, No. H-14-3241, 2017 WL 68467, at *48 (S.D. Tex. Jan. 6, 2017) (finding intentional discrimination even where effect was not as great as intended); *see also* Sen. Rep. No. 97-417, at 27 (1982): "Plaintiffs must either prove such intent, or, alternatively, must show that the challenged system or practice, in the context of all the circumstances in the jurisdiction in question, results in minorities being denied equal access to the political process."

## CONCLUSION

For the reasons set forth above, and in Private Plaintiffs' opening brief on this issue, Private Plaintiffs submit that the passage of SB 5 or of any other legislation enacted in an attempt to cure the discriminatory effects violations found by this Court and the Fifth Circuit would not deprive this Court of subject-matter jurisdiction over any of the claims in this case. As previously suggested, Private Plaintiffs respectfully urge this Court to render its decision on discriminatory intent as soon as practicable before the close of the current legislative session, in order to give the Legislature the benefit of this Court's findings and analysis as it considers the enactment of any remedial legislation. Private Plaintiffs also respectfully suggest that the Court then schedule remedy proceedings for a time shortly after the close of the legislative session but sufficiently before the next election cycle to avoid further harm, which would include consideration of whether and to what extent any legislative action completely responds to the deficiencies identified by this Court and the Fifth Circuit, both as to discriminatory effect and discriminatory intent.

Date:  March 21, 2017                          Respectfully submitted,

                                               /s/ Lindsey B. Cohan
                                               JON M. GREENBAUM
                                               EZRA D. ROSENBERG
                                               BRENDAN B. DOWNES
                                               Lawyers' Committee for
                                               Civil Rights Under Law
                                               1401 New York Avenue NW Suite 400
                                               Washington, D.C. 20005

                                               WENDY WEISER
                                               MYRNA PÉREZ
                                               JENNIFER CLARK
                                               The Brennan Center for Justice at NYU Law School
                                               120 Broadway, Suite 1750
                                               New York, New York 10271

SIDNEY S. ROSDEITCHER
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019-6064

AMY L. RUDD
LINDSEY B. COHAN
Dechert LLP
500 W. 6th Street, Suite 2010
Austin, Texas 78701

NEIL STEINER
DECHERT LLP
1095 Avenue of the Americas
New York, New York 10036-6797

JOSE GARZA
Law Office of Jose Garza
7414 Robin Rest Drive
San Antonio, Texas 98209

DANIEL GAVIN COVICH
Covich Law Firm LLC
Frost Bank Plaza
802 N Carancahua, Ste 2100
Corpus Christi, Texas 78401

GARY BLEDSOE
Potter Bledsoe, LLP
316 W. 12th Street, Suite 307
Austin, Texas 78701

VICTOR GOODE
NAACP
4805 Mt. Hope Drive
Baltimore, Maryland 21215

ROBERT NOTZON
The Law Office of Robert Notzon
1502 West Avenue
Austin, Texas 78701

*Counsel for the Texas State Conference of NAACP Branches and the Mexican American Legislative Caucus of the Texas House of Representatives*

/s/ Janai Nelson
SHERRILYN IFILL
JANAI NELSON
CHRISTINA A. SWARNS
COTY MONTAG
LEAH C. ADEN
DEUEL ROSS
NAACP Legal Defense and Educational Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006

JONATHAN PAIKIN
KELLY P. DUNBAR
TANIA FARANSSO
THADDEUS C. EAGLES
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006

*Counsel for Imani Clark*

/s/ Chad W. Dunn
CHAD W. DUNN
K. SCOTT BRAZIL
BRAZIL & DUNN
4201 Cypress Creek Pkwy., Suite 530
Houston, Texas 77068

J. GERALD HEBERT
DANIELLE M. LANG
Campaign Legal Center
1411 K Street NW Suite 1400
Washington, DC 20005

18

ARMAND G. DERFNER
Derfner & Altman
575 King Street, Suite B
Charleston, S.C. 29403

NEIL G. BARON
Law Office of Neil G. Baron
914 FM 517 W, Suite 242
Dickinson, Texas 77539

DAVID RICHARDS
Richards, Rodriguez & Skeith, LLP
816 Congress Avenue, Suite 1200
Austin, Texas 78701

*Counsel for Veasey/LULAC Plaintiffs*

LUIS ROBERTO VERA, JR.
Law Office of Luis Roberto Vera Jr.
111 Soledad, Ste 1325
San Antonio, TX 78205

*Counsel for LULAC*

/s/ Rolando L. Rios
ROLANDO L. RIOS
115 E. Travis, Suite 1645
San Antonio, Texas 78205
*Counsel for the Texas Association of Hispanic County Judges and County Commissioners*

/s/ Marinda van Dalen
ROBERT W. DOGGETT
SHOSHANA J. KRIEGER
Texas RioGrande Legal Aid
4920 N. IH-35
Austin, Texas 78751

MARINDA VAN DALEN
Texas RioGrande Legal Aid
531 East St. Francis St.
Brownsville, Texas 78529

19

JOSE GARZA
Texas RioGrande Legal Aid
1111 N. Main Ave.
San Antonio, Texas 78212

*Counsel for Lenard Taylor, Eulalio Mendez Jr., Lionel Estrada, Estela Garcia Espinoza, Margarito Martinez Lara, Maximina Martinez Lara, and La Union Del Pueblo Entero, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 21, 2017, a true and correct copy of the foregoing document was served via the Court's ECF system to all counsel of record.

/s/ Lindsey B. Cohan
Lindsey B. Cohan
Dechert LLP
300 W. 6th Street, Suite 2010
Austin, Texas 78731
lindsey.cohan@dechert.com