IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| MARC VEASEY, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. 2:13-cv-193 (NGR) |
| | § | |
| GREG ABBOTT, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**BRIEF OF PRIVATE PLAINTIFFS**
**REGARDING THE PROPER REMEDIES FOR SB 14'S RACIAL DISCRIMINATION**

## I.      Introduction

Pursuant to this Court's June 20, 2017 order, Doc. 1044, Private Plaintiffs submit this brief addressing the appropriate remedies for the constitutional and statutory violations of SB 14 and SB 5.[1] On April 10, 2017, this Court held, again, that SB 14 was enacted with the intent to discriminate against Black and Latino voters. Doc 1023. The Fifth Circuit, likewise, had previously concluded that there was sufficient evidence to support a conclusion that SB 14 was passed with discriminatory intent. *See Veasey v. Abbott* 830 F.3d 216, 241 (5th Cir. 2016) (en banc) (*Veasey II*).

Supreme Court precedent is clear that laws enacted with discriminatory purpose have "no credentials whatsoever . . . ." *City of Richmond v. United States*, 422 U.S. 358, 378 (1975). In *Veasey II,* the en banc court explained that the appropriate remedy for discriminatory intent is ordinarily broader than the remedy solely for discriminatory results under the Voting Rights Act ("VRA"). *Veasey II*, 830 F.3d at 268 n. 66 (distinguishing between the appropriate remedy for discriminatory intent and results).

Therefore, Private Plaintiffs submit that the appropriate remedy mirrors the remedy that this Court initially imposed based on its initial finding of discriminatory intent: (1) a declaratory judgment that SB 14 violates Section 2 of the VRA and the Fourteenth and Fifteenth Amendments; (2) a permanent injunction against enforcement of the photo identification ("ID") provisions of SB 14; and (3) retention of jurisdiction to "review [any] legislation to determine whether it properly remedies the violations," *Veasey v. Perry*, 71 F. Supp. 3d 627, 702, 707 (S.D. Tex. 2014). In addition, and pursuant to this Court's retained jurisdiction, the remedy must also

---

[1] Private Plaintiffs included much of their substantive argument regarding the appropriate remedy for discriminatory intent in their initial brief proposing a briefing procedure and schedule to address remedies. Doc. 1040. This brief repeats those arguments but also expands upon the support for enjoining SB 5 as a mere amendment to, and continuation of, SB 14 and discusses, in the alternative, SB 5's failure to remedy the discriminatory results VRA violation.

include (4) an injunction against SB 5. SB 5 does not cure the discriminatory intent of SB 14 because it cannot stand on its own without the discriminatory provisions of SB 14, and because it continues to place a burden upon the very group of Black and Latino voters that SB 14 intentionally discriminated against.[2] At its core, SB 5 maintains the same unexplained picking and choosing of "acceptable" photo IDs for in-person voting—accepting IDs disproportionately held by Anglo voters and rejecting IDs disproportionately held by minority voters—that led the Court, in part, to its discriminatory intent finding. In the alternative, the Court should enjoin SB 5 because Texas cannot meet its burden to demonstrate that SB 5 fully remedies the discriminatory results of SB 14.

## II. Declaratory and Injunctive Relief is Appropriate.

First, the Court should enter a declaratory judgment—consistent with its finding that SB 14 "was passed with discriminatory purpose," Doc. 1023 at 10—that Defendants violated Section 2 of the Voting Rights Act and the Fourteenth and Fifteenth Amendments. This remedy necessarily flows from the Court's April 10 ruling since the "rubric for making a determination of a discriminatory purpose is the same" under Section 2 of the VRA and the Fourteenth and Fifteenth Amendments. *Veasey*, 71 F. Supp. 3d at 698-99 n. 525 (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-68 (1977) (constitutional test) and *United States v. Brown*, 561 F.3d 420, 433 (5th Cir. 2009) (Section 2 test; quoting *Arlington Heights*)).

Second, the Court should enter a permanent and final injunction against enforcement of SB 14's voter photo ID provisions, Sections 1 through 15 and 17 through 22. This injunction adopts the order entered by this Court in 2014 as a remedy for its intentional discrimination finding. *Veasey*, 71 F. Supp. 3d at 707. "[T]he nature of the violation determines the scope of the

---

[2] Private Plaintiffs also seek preclearance relief under Section 3 of the VRA based upon this Court's finding of discriminatory intent. Per its June 20, 2017 order, the Court will address the appropriate relief pursuant to Section 3 of the VRA after resolving the issue of the proper permanent remedy for SB 14. Doc. 1044.

remedy." *Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1, 16 (1971). A full and permanent injunction is the *only* appropriate remedy when a court finds that a law was motivated by discriminatory intent because such laws have "no legitimacy at all under our Constitution." *City of Richmond*, 422 U.S. at 378; *see also Hunter v. Underwood*, 471 U.S. 222 (1985) (affirming invalidation of state constitutional provision adopted with discriminatory intent); *Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457, 465-66 (1982) (affirming permanent injunction of state initiative that was adopted with discriminatory intent).

### III. The Court Should Also Enjoin SB 5 Because It Hinges on the Intentionally Discriminatory SB 14 Voter ID Law and Continues The Harms of SB 14's Purposeful Discrimination.

Once a court determines that a state actor has engaged in purposeful discrimination, the "racial discrimination [must] be eliminated root and branch." *Green v. Cnty. Sch. Bd.*, 391 U.S. 430, 437-38 (1968). A remedy offered by Defendants is "constitutionally impermissible as racially discriminatory if it is [itself] racially motivated . . . or if it perpetuates an existent denial of access by the racial minority to the political process." *Kirksey v. Bd. of Sup'rs of Hinds Cnty., Miss.*, 554 F.2d 139, 142 (5th Cir. 1977) (en banc); *see also United States v. Dallas Cnty. Comm'n*, 850 F.2d 1433, 1438 (11th Cir. 1988); *Ketchum v. Byrne*, 740 F.2d 1398, 1417-18 (7th Cir. 1984). In contrast, a proper remedy for a constitutional violation "aims to 'eliminate [so far as possible] the discriminatory effects of the past' and to 'bar like discrimination in the future.'" *United States v. Virginia*, 518 U.S. 515,547 (1996) (quoting *Louisiana v. United States*, 380 U.S. 145, 154 (1965)).

Here, by its terms and on its face, SB 5 fails to eliminate either SB 14's racially discriminatory origins or results and, therefore, SB 5 must fall with SB 14. Not only does SB 5 fail to repeal SB 14 in its entirety, but also it fails specifically to remove or meaningfully modify

4

*any* of the offending voter identification provisions of SB 14, which this Court must enjoin. Indeed, SB 5 relies upon those same discriminatory provisions to give SB 5 full effect, thereby carrying forward SB 14's purposeful discrimination in the form of a "new" law. *See N.C. State Conference of NAACP v. McCrory*, 831 F.3d 204, 240 (4th Cir. 2016) ("Here, the amendment creating the reasonable impediment exception does not invalidate or repeal the photo ID requirement. It therefore falls short of the remedy that the Supreme Court has consistently applied in cases of this nature."). SB 5's only substantive change to SB 14's voter identification provisions is to extend the time period past expiration for which SB 14 IDs are acceptable from 60 days to 4 years. 2017 Tex. Sess. Law. Serv. Ch. 410 ("SB 5") at § 5. SB 5 also appends a reasonable impediment declaration procedure (with a felony criminal enforcement provision) for those individuals who lack SB 14 ID—individuals who this Court and the Fifth Circuit have acknowledged are disproportionately Black and Latino Texans and were the targets of SB 14's intentional discrimination. *Id*. at § 2. This procedure has surface similarities to, but is more restrictive than, the protocol of this Court's Interim Remedial Order, which was entered solely as an interim remedy to this Court's Section 2 discriminatory *results* finding.[3]

Thus, SB 5 leaves unremedied the core provisions of SB 14 that the Court has held to be intentionally discriminatory. This has two necessary consequences. First, as a matter of law, SB 5 cannot be enforced absent the intentionally discriminatory provisions of SB 14 that must be enjoined. Thus, eliminating the discriminatory provisions of SB 14 renders SB 5 meaningless. Without the prop of SB 14, SB 5 falls of its own weight.

---

[3] The Court entered the agreed upon interim order solely as a stop gap "interim" remedy for a *results* violation. *See* Interim Remedial Order, Doc. 895 (recognizing that "[t]his is an agreed interim remedy *only* and the parties preserve their rights to seek or oppose future relief") (emphasis added). A results remedy does not necessarily cure an intent violation especially because a results remedy must be tailored to maintain legislative priorities, *Veasey II* 830 F.3d at 268 n. 66, whereas a remedy based on intent should give the offending law no deference whatsoever.

Second, and more important, SB 5 does not remedy the intentional discrimination of SB 14 because it incorporates the discriminatory provisions of SB 14. Therefore, it does not "place persons unconstitutionally denied an opportunity or advantage in 'the position they would have occupied in the absence of [discrimination].'" *Virginia*, 518 U.S. at 547 (quoting *Milliken v. Bradley,* 433 U.S. 267, 280 (1977)). This Court has ruled that SB 14 was discriminatorily designed, at least in part, to visit disparate burdens on minority voters who disproportionately lack the limited forms of photo ID accepted by SB 14 and who have more difficulty obtaining such ID. The Texas Legislature largely accomplished this goal in SB 14 by picking and choosing the "acceptable" IDs that are disproportionately held by Anglo voters and excluding IDs disproportionately held by minority voters. *Veasey*, 71 F. Supp. 3d at 658 ("When the legislature rejected student IDs, state government employee IDs, and federal IDs, they rejected IDs that are disproportionately held by African-Americans and Hispanics."); Order on Claim of Discriminatory Purpose, Doc. 1023, at 8; *see also Veasey II*, 830 F.3d at 236 ("[D]rafters and proponents of SB 14 were aware of the likely disproportionate effect of the law on minorities, and that they nonetheless passed the bill without adopting a number of proposed ameliorative measures that might have lessened this impact."). By the time the legislators considered SB 5, their obvious awareness of the disproportionate impact of the underlying bill had been multiplied by repeated findings and conclusions of multiple courts.

SB 5 contains the exact same core provisions held to discriminate intentionally against Black and Latino voters. As a result, minority voters will necessarily be disproportionately compelled to take multiple additional steps related to the execution of a reasonable impediment

declaration[4] and will pay the additional price of subjecting themselves to the threat of criminal investigations, felony charges, and up to two years of imprisonment if they make a misstatement.[5]

Although some of these steps were necessarily required in the Interim Remedy—which was adopted for the results violation only and on an interim basis—SB 5 actually escalates these discriminatory burdens by increasing the penalty for a false statement on a reasonable impediment declaration to a "state jail felony" and requiring the declaration to include "a notice that a person is subject to prosecution for perjury . . . for a false statement or false information." SB 5 at §§ 2, 3. As this Court explained:

> Minorities continue to have to overcome fear and intimidation when they vote. Reverend Johnson testified that there are still Anglos at the polls who demand that minority voters identify themselves, telling them that if they have ever gone to jail, they will go to prison if they vote.
>
> *       *       *       *
>
> Because of past discrimination and intimidation, there is a general pattern by African-Americans of not having the power to fully participate. Other than to assert today that today is a different time, Defendants made no effort to dispute the accuracy of the expert historians' analyses and other witnesses' accounts of racial discrimination in Texas voting laws – its length, its severity, its effects, or even its obstinacy.

*Veasey*, 71 F. Supp. 3d at 636-37; *see also id.* at 675 ("Fear of law enforcement by this population [of minority voters] is widespread and justified."); *see also McIntosh Cnty. Branch of the NAACP v. City of Darien*, 605 F.2d 753, 758 (5th Cir. 1979) (remanding for reconsideration

---

[4] While a reasonable impediment declaration process, if properly drafted and implemented, may provide a partial cure to a discriminatory results violation, *see infra*, given the context of the history of SB 14, it cannot provide a complete cure to the discriminatory intent violation.

[5] In addition to potential imprisonment, many other collateral consequences would flow from a felony conviction and be borne by the very communities that Texas intentionally discriminated against in enacting SB 14 and SB 5. *See* Texas State Law Library, *Restriction on Convicted Felons in Texas*, https://www.sll.texas.gov/library-resources/collections/restrictions-on-convicted-felons/ (last updated Mar. 15, 2017).

of the "intimidation" and "fear" experienced by some Black voters); *Common Cause/Georgia v. Billups*, 406 F. Supp. 2d 1326, 1369 (N.D. Ga. 2005) (finding that voters without photo ID would be "reluctant" to sign an affidavit that may contain a misstatement); *Harris v. Siegelman*, 695 F. Supp. 517, 525-26 (M.D. Ala. 1988) (finding that a provision requiring a disproportionately Black class of undereducated voters to swear before poll officials that they are illiterate created an atmosphere of "intimidation").

Thus, the process produced by SB 5 and SB 14 enforced together would continue to visit burdens on the very populations against which Texas has been found to have intentionally discriminated. This does not put the victims of discrimination in the position that they would have been absent the discrimination, *Virginia*, 518 U.S. at 547; only Private Plaintiffs' proposed remedy of a permanent injunction can accomplish that goal.

This was precisely the holding of the Fourth Circuit in a similar case challenging an intentionally racially discriminatory voter photo ID law that the North Carolina Legislature later amended to include a reasonable impediment affidavit procedure. The Court correctly observed, "even if the State were able to demonstrate that the amendment lessens the discriminatory effect of the photo ID requirement, it would not relieve us of our obligation to grant a complete remedy in this case." *N.C. State Conf. of NAACP*, 831 F.3d at 240. The Court then explained why the amendment did not fundamentally alter the original law or cure the discriminatory intent behind the original statute:

> For example, the record shows that under the reasonable impediment exception, if an in-person voter cannot present a qualifying form of photo ID—which "African Americans are more likely to lack"—the voter must undertake a multi-step process. First, the voter must complete and sign a form declaring that a reasonable impediment prevented her from obtaining such a photo ID, and identifying that impediment. In addition, the voter must present one of several alternative types of identification required by the exception. Then, the voter may fill out a provisional ballot, which is subject to challenge by any registered voter in the county. On its

face, this amendment does not fully eliminate the burden imposed by the photo ID requirement.

*Id.* at 240-41 (internal citations omitted). Because the reasonable impediment exception did not "invalidate or repeal the photo ID requirement," the Fourth Circuit found that it "f[ell] short of the remedy that the Supreme Court has consistently applied in cases of this nature." *Id.* at 240.

The Supreme Court in *Hunter v. Underwood* similarly invalidated a state constitutional provision denying the franchise to any person convicted of "any crime . . . involving moral turpitude," even after the provision's "more blatantly discriminatory" portions were removed. 471 U.S. at 223, 232-33 (observing that the provision's "original enactment was motivated by a desire to discriminate against blacks on account of race and the section continues to this day to have that effect").

Here, just like the law in North Carolina, SB 5 does not invalidate or repeal the photo ID requirement that this Court found to be intentionally discriminatory; instead, SB 5 is predicated upon its continued enforcement. Moreover, SB 5's reasonable impediment exception does not and cannot "fully eliminate the burden imposed by" SB 14's photo ID requirement. *N.C. State Conf. of NAACP*, 831 F.3d at 241. Instead, "it requires voters to take affirmative steps to justify to the state why they failed to comply with a provision that [this Court has] declared was enacted with racially discriminatory intent and is unconstitutional." *Id.*; *see also City of Port Arthur v. United States*, 459 U.S. 159, 168 (1982) (affirming the invalidation of *both* a purposefully discriminatory redistricting plan *and* the majority vote requirement in the defendant's later enacted remedial plan as a "reasonable hedge against the possibility that the [remedial] scheme contained a purposefully discriminatory element."); *Louisiana v. United States*, 380 U.S. 145, 154-155, n.17 (1965) (enjoining an unconstitutional literacy test and a new subsequently enacted test, which was apparently non-discriminatory standing alone, because the new law perpetuated

the discriminatory burdens placed on Black voters by the prior test); *Perez v. Abbott*, ___ F. Supp. 3d ____, No. SA-11-cv-360, 2017 WL 1787454, at *1, 78-79 (W.D. Tex. May 2, 2017) (finding some of Texas's redistricting plans to be intentionally discriminatory, despite the enactment of new plans, because "the [new] 2013 plans [were] heavily derived from the 2011 plans" and "disadvantage[d] [Plaintiffs] in the same fundamental way such that Plaintiffs are still suffering injury from the 2011 plans," even though the new plans "disadvantage[d] Plaintiffs to a lesser degree" than the 2011 plans). Texas enacted SB 14 with the purpose of discriminating against Texas voters on account of race, and the law, as amended by SB 5, "continues to this day to have that effect." *Hunter*, 471 U.S. at 233.

Texas' reliance on *Cotton v. Fordice* in its Motion to Issue Second Interim Remedy is inapposite. 157 F.3d 388 (5th Cir. 1998). *Cotton* was a case addressing the 1968 reenactment and substantial amendment of a felon disenfranchisement law initially passed in 1890, nearly 80 years earlier. The enacting bodies in 1968 were wholly different than those of the 1890 law and the plaintiff offered "no . . . proof" that the 1968 enacting bodies acted "out of a desire to discriminate against blacks." *Id.* at 391-92. In addition, unlike SB 5, the 1968 law was not offered as a legislative remedy after a judicial finding of discrimination. Under markedly different circumstances than those here, the Fifth Circuit concluded that the reenactment of the 1890 law in 1968 "removed the discriminatory taint associated with the original version." *Id.* at 391. By contrast, SB 5 does not even reenact SB 14, but merely amends it by adding the reasonable impediment exception and otherwise leaving in place the discriminatory provisions of SB 14. The Legislature enacted these amendments just six years after the passage of the initial law as remedial legislation, while still in the midst of this ongoing litigation, and only after it had exhausted all potential legal options for maintaining its discriminatory law in its original form.

10

*See Abbott v. Veasey*, 137 S.Ct. 612 (2017) (denying Texas' petition for certiorari on the issue of discriminatory results of SB 14). In so doing, the Legislature did not attempt to remedy the hallmarks of the intentional discrimination at the core of SB 14—the picking and choosing of acceptable IDs to disproportionately burden minority voters—but instead adopted the bare minimum measures of the agreed upon interim remedy (with the addition of an intimidating criminal penalty), a temporary measure directed at the *results* violation only. SB 5 cannot be analyzed outside this context, a context materially different from that of an 80-year lag in reenacting a law not formulated in response to a legal finding of discrimination. *See McCreary Cnty. v. American Civil Liberties Union of Ky.*, 545 U.S. 844, 866 (2005) ("[Defendants] argue that purpose . . . should be inferred, if at all, only from the latest news about the last in a series of governmental actions, however close they may be in time and subject. But the world is not made brand new every morning, and the [Defendants] are simply asking us to ignore perfectly probative evidence [of purpose] . . . .").

## IV. Alternatively, the Court Should Enjoin SB 5 Because It Does Not Completely Cure the Discriminatory Results Violation.

Should this Court agree that SB 5 must be enjoined in its entirety because it carries forward the intentional discrimination of SB 14 and cannot function independently of the provisions of SB 14, this Court need not address any remedy for the discriminatory results violation. If, however, this Court chooses to address the results remedy, Private Plaintiffs respectfully submit that Texas has failed to meet its burden to show that SB 5 *completely* cures the results violation.

### A. Texas Must Show that It Has Completely Eliminated the Offending Practices.

The Fifth Circuit, in its en banc opinion, set forth the primary criterion that guides consideration of the remedy for the discriminatory results violation. "[F]irst and foremost," the

remedy must "'correct the Section 2 violation." *Veasey II,* 830 F. 3d at 269 (quoting *United States v. Brown*, 561 F.3d 420, 435 (5th Cir. 2009)). Any proper remedy must eliminate the offending practice that arbitrarily operates to discriminate invidiously on the basis of race. *Veasey II,* 830 F.3d at 269 (citing *Texas Dept. Hous. & Comty. Affairs v. Inclusive Comtys. Project, Inc.*, 576 U.S. ---, 135 S.Ct. 2507, 2524 (2015)). SB 5 does not meet these baseline requirements.

This Court has defined, and the Fifth Circuit has affirmed, the particular ways that SB 14 discriminates against minority voters. Most significant, of course, are that Latino and Black Texans are two to three times more likely to lack the narrow category of acceptable SB 14 IDs; that SB 14 disproportionately impacts poor people, who in turn, are disproportionately Black and Latino Texans; and that these populations collectively face greater obstacles in obtaining SB 14 IDs, including Election Identification Certificates ("EIC"). *Veasey II,* 830 F.3d at 250-251. Any remedy must cure all aspects of this disproportionate impact, and specifically rectify "the discriminatory effect on those voters who do not have SB 14 ID or are unable to reasonably obtain such ID." *Id.* at 271.

Additionally, the Fifth Circuit highlighted other components of this Court's ruling on discriminatory results, which it found evidenced "the increased burden SB 14 places on Plaintiffs and others on the No-Match List because of the lack of funding devoted to educating voters," *id.* at 254 n. 48:

> (1) The difficulty of obtaining EIC and voting with proper ID because of Texas's poor implementation of this program; (2) the cost of underlying documents necessary to obtain an EIC or other SB 14 ID; (3) difficulties with delayed, non-existent, out-of-state, or amended birth certificates due to nontraditional births and errors on birth certificates; (4) long distances and other travel issues that made getting to a registrar and DPS office problematic for many Plaintiffs; (5) a strict disability exemption; and (6) a burdensome alternative of voting absentee.

*Id.* at 254. The Fifth Circuit specifically directed this Court to "consider the necessity of educational and training efforts to ensure that both voters and workers at polling places are capable of making use of" the remedy. *Id.* at 271-272. A complete remedy must address and cure all of these deficiencies.

### B.  SB 5 Makes No Change in the Basic Forms of SB 14 Identification.

With one exception,[6] SB 5 makes no change in the basic forms of photo ID that would allow those discriminated against to vote a regular ballot without going through an additional (and intimidating) process of executing a sworn statement under threat of criminal prosecution.[7] This Court has found, and the Fifth Circuit has affirmed, that Black and Latino Texans are significantly less likely than are Anglo Texans to possess SB 14 IDs. This is, in part, the result of the Legislature's unjustified picking and choosing of acceptable forms of ID and rejection of ameliorative amendments. At a minimum, any remedial law should include provision for alternative forms of ID that cure the discriminatory results without disturbing "SB 14's effect on those voters" who possess SB 14 ID. *Veasey II*, 830 F.3d at 271.

### C.  Allowing Voter Registration Cards as Additional SB 14 IDs Can Reduce the Discriminatory Impact Further Without Impairing Legitimate Legislative Policy.

The Fifth Circuit posited that there might be "some portion of prior state law that can reduce the discriminatory effect SB 14 has on minority voters without proper identification," and specifically highlighted the following potential solution: allow voters who do not possess SB 14 photo ID to vote a regular ballot by showing their voter registration card. *Id.* at 270-71. As the Fifth Circuit explained, even though the voter registration card does not contain a photo, it is a

---

[6] The one exception is that SB 5 extends from 60 days to 4 years the period of expiration of acceptable SB 14 IDs. SB 5 at § 5.
[7] *See* subsection E below (explaining why the Declaration of Reasonable Impediment protocol in SB 5 does not completely remedy the results violation.)

"more secure document" than other documents accepted prior to the passage of SB 14, such as bank statements. *Id.* at 271 n. 72. It is (1) not "as easily obtained," (2) sent in a "nondiscriminatory fashion, free of charge," to every registered voter, and (3) "therefore avoids any cost issues." *Id.* Adding voter registration cards to the list of acceptable SB 14 IDs avoids many of the problems identified by this Court and the Fifth Circuit. The cost of underlying documents and the problems of non-traditional and out-of-state birth certificates is avoided, as is the disproportionate burden on minority voters to travel long distances to motor vehicle facilities. In short, allowing the voter registration card as an acceptable SB 14 ID potentially provides a substantial cure[8] for the discriminatory and disproportionate impact that SB 14 has on Black and Latino voters, while at the same time paying due deference to any legitimate legislative policy behind SB 14.[9]

### D.  SB 5 Makes No Provision for Education and Training.

The Fifth Circuit described SB 14 as "perhaps the most poorly implemented voter ID law in the country," *Veasey II,* 830 F.3d at 256 n.52, affirming this Court's finding "that the State's lackluster educational efforts resulted in additional burdens on Texas voters." *Id.* at 257. The record evidence in support of this finding includes lack of adequate funding, lack of attention by officials, voters' lack of information, and inconsistencies in enforcement of SB 14 by DPS and other Texas officials. SB 5 makes no attempt to address this overarching deficiency.

---

[8] This Court also found that, in enacting SB 14, the Legislature "chose options that would make it harder for African-Americans and Hispanics to meet its requirements, " identifying "student IDs, state government employee IDs, and federal IDs," as "disproportionately held by African-Americans and Hispanics," but rejected by the Legislature. *Veasey I,* 71 F. Supp. 3d at 658 (relying on report of Dr. Alan Lichtman, D.E. 374, 24-29).

[9] The Fifth Circuit advised the Court to, "the extent possible . . . respect a legislature's policy objectives when crafting a [results] remedy." *Veasey II,* 830 F.3d at 269. The Fifth Circuit defined those policies as reducing "the risk of in-person voter fraud by strengthening the forms of identification presented for voting," *id.* at 271, and "the concern that a voter present proper identification that cannot easily be counterfeited or used by another," *id.* at 269. As discussed above, the Court does not owe the same deference to legislative policy in crafting a remedy for discriminatory intent.

Specifically, there is no provision in SB 5 for the education and training of election workers and voters, and no provision for the expenditure of money to cover implementation of the law. Reliance on the discretion of the Secretary of State to implement the law diligently is not, of course, an acceptable remedy in light of this Court's findings. No remedy for the results violation is complete without detailed and adequately funded education and training plans, approved by this Court after notice and an opportunity to be heard are provided to Private Plaintiffs.

### E. SB 5's Declaration of Reasonable Impediment Provision Is Not a Complete Remedy.

SB 5's partial remedy of providing for execution of a Declaration of Reasonable Impediment ("DRI") by those who lack SB 14 photo ID and cannot reasonably obtain one is not a complete cure of the results violation. Indeed, as drafted, it increases the risk of intimidation and criminal prosecution of the very voters SB 14 has been found to discriminate against.

As an initial matter, SB 5's DRI procedure departs from the procedure in the interim remedial order in significant ways. While the interim remedial order allowed any certified birth certificate to be used as proof of identification, SB 5 allows only "domestic" birth certificates, which is likely to discriminate against Latino voters who are disproportionately naturalized citizens born outside of the United States. While the interim remedial order allowed a voter to check an "Other" box, and set forth a reason for not obtaining the SB 14 ID that is not contemplated by one of the handful of specifically identified reasons on the form, SB 5 eliminates that option. Most important, SB 5 increases the consequences for giving false information on the form to a "state jail felony" and requires prominent notice to voters of this penalty. SB 5 at §§ 2, 3. It therefore increases the fears that can be exploited to discourage minority voters, long victims of discriminatory law enforcement, from voting. *See supra* at 7-8.

Finally, unlike the interim remedial order, which contained requirements for the training of election workers and the education of voters, and a minimum budget of $2,500,000 for those purposes, SB 5 contains no such provisions.

In any event, any similarity to the interim remedial order is largely irrelevant. The interim remedial order was negotiated, at the Fifth Circuit's behest, under exigent circumstances, as "at least an interim remedy." *Veasey II,* 830 F.3d at 269. At the time, Private Plaintiffs specifically reserved their right to seek further final relief—a reservation approved by this Court as part of the interim remedial order. Order Regarding Agreed Interim Plan for Elections, Doc. 895. While the interim remedial order is an improvement over SB 14, it is not the complete and final cure to which Private Plaintiffs are entitled. For purposes of this proceeding, SB 5 must be able to survive this Court's thorough review separate from the interim remedial order, and the only question is whether that statute completely cures the violations found by this Court. For the reasons stated above and below, it does not. Instead, SB 5 establishes a structure that is likely to intimidate the very voters who must be protected by this Court's remedy.

First, the statute adds a protocol under which voters who lack SB 14 ID can vote a regular ballot only by swearing that they cannot reasonably obtain SB 14 ID for one of the reasons contemplated by Texas.[10] It specifies that the making of a false statement or the providing of false information on the DRI subjects the voter to "prosecution for perjury under Chapter 37, Penal Code, or Section 63.0013." SB 5 at § 2. Moreover, SB 5 increases the penalty under Section 63.0013 from a Class B misdemeanor to a Class A misdemeanor, which is "a state jail

---

[10] SB 5's DRI sets forth specific reasons that Texas contemplates may cause a Texan to lack and be impeded from obtaining acceptable SB 14 photo ID, including (1) lack of transportation, (2) lack of birth certificate or other documents needed to obtain acceptable photo ID, (3) work schedule, (4) lost or stolen photo ID, (5) disability or illness, (6) family responsibilities, or (7) SB 14 ID applied for but not received. Doc. 895. By removing the "other" box on the RI declaration, which is contained in the interim remedial order and allows an eligible voter to identify any other reasonable impediment or difficulty to possessing one of SB 14's limited forms of photo ID, Texas is unnecessarily foreclosing voters with impediments other than those listed—who are disproportionately Latino and Black voters—from using the DRI process.

felony." *See* SB 5 at §§ 3 and 6. Members of minority groups who have been repeatedly victimized by official discrimination to stop them from voting are likely to feel intimidated by this process. Indeed, this Court has already found that facing "any type of law enforcement" presents a barrier to getting the necessary ID to vote. *Veasey I*, 71 F. Supp. 3d at 675; *see supra* at 7-8. SB 5's DRI protocol, as drafted, is likely to have a chilling effect on voting by minority voters who lack SB 14 ID.

Second, the problems with SB 5's DRI process are exacerbated by the Legislature's failure to provide for any education or training plan. Nowhere in SB 5 is there an enforceable commitment to develop a detailed voter education plan or election official training program, let alone to fund the plans at a specific amount. Given Texas' prior failure to properly and thoroughly educate voters and officials, this remedial gap in SB 5 threatens not only to confuse voters as to their rights, but also to increase the intimidating effect of the DRI process.

While, in tandem with other changes—such as the addition of voter registration cards as acceptable SB 14 ID, elimination of the felony criminal enforcement provision, and a detailed implementation plan vetted and approved by the Court—the DRI process may help reduce the discriminatory results of SB 14, SB 5 as written does not completely eliminate the discriminatory results of SB 14.[11]

---

[11] The DRI protocol might be acceptable as *part* of a complete remedy for the results violation (in addition to Texas's addressing the other issues described above, such as the addition of categories of SB 14 ID and the education and training plan) if (1) the possibility of prosecution for perjury or any false information charge was limited to instances where the declarant is not the person the voter says he or she is, thereby deferring to the legislative policy of protecting against in-person fraud; (2) any government-issued birth certificates was acceptable as proof of identification, not just "domestic" birth certificates; and (3) an "Other" box was provided on the DRI for explaining why the voter cannot get SB 14 ID.

**V.     The Court Should Resolve Texas' Pending Motion Alongside Its Permanent Remedial Order.**

Private Plaintiffs intend to respond to Texas' pending Motion to Issue Second Interim Remedy, Doc. 1047, in the time provided by the Rules. However, Private Plaintiffs suggest here that the Court should resolve this motion at the same time as its permanent remedial order.

On June 28, 2016, Texas filed a motion that is nothing more than an attempted end-run around this Court's order on procedure for addressing remedies. Doc. 1047. There are no pending issues presented in Texas' pending motion. All parties agree (and no one may seriously dispute) that this Court's August 2016 interim remedial order governs 2017 elections. Paragraph 14 of the Court's interim remedial order makes this plain. Doc. 895 ("These procedures shall remain in place until further order of this Court."). Indeed, Texas has implemented the procedures in the Court's order for every election thereafter, including various local elections throughout the State prior to and after November 8, 2016. Therefore, those requests for relief present no live dispute for this Court's resolution.

Texas' remaining requests for relief concern the implementation of SB 5, the validity of which is at the core of these ongoing proceedings on remedies. They also do not present any urgent issue because SB 5, by its own terms, cannot go into effect until 2018. The 2018 elections are not imminent. The "exigency" Texas presents is its desire to train officials now regarding 2018 procedures. This exigency is entirely self-created and is, in fact, by Texas's own admission no exigency at all since Texas submits that it already "intend[s] to train their election officials on SB 5, in the alternative, beginning in July 2017." Doc. 1047 at 5.

Thus, the motion is nothing more than a thinly veiled attempt to upend the Court's proposed schedule for addressing remedies by filing ahead of schedule and seeking immediate relief, namely implementation of SB 5 before this Court addresses its relation to SB 14's

intentional discrimination. The Court need not jump at the State's command. It has set a reasonable and expedited schedule for addressing remedies that will provide Texas with notice of the permanent remedy for SB 14's violations in short order. Moreover, the motion is also an attempt to evade the Court's order that the remedial proceedings will proceed without accepting any additional evidence. Doc. 1044. Private Plaintiffs have been careful to abide by the Court's order that this brief rely solely on the current record and the face of SB 5. Meanwhile, Texas's pending motion includes extra-record evidence that, for the reasons described above, the Court should not consider.

Since the pending motion and the current briefing address precisely the same issue, the Court should resolve the pending motion at the same time as its order on a permanent remedy.

## VI.   Conclusion

For the foregoing reasons, the Court should order the below-listed relief to provide a complete and permanent remedy for the constitutional and statutory violations of SB 14.

(1) A declaratory judgment that SB 14 violates Section 2 of the Voting Rights Act and the 14th and 15th Amendments;

(2) A permanent injunction against enforcement of the voter identification provisions of SB 14;

(3) Retention of jurisdiction to "review [any] legislation to determine whether it properly remedies the violations," *Veasey*, 71 F. Supp. 3d at 707;

(4) An injunction against SB 5, which does not cure the discriminatory intent of SB 14;

(5) A schedule to address Section 3(c) relief.

Date:  July 5, 2017                         Respectfully submitted,

                                            /s/ Danielle M. Lang
                                            J. GERALD HEBERT
                                            DANIELLE M. LANG
                                            Campaign Legal Center
                                            1411 K Street NW Suite 1400
                                            Washington, DC 20005

                                            CHAD W. DUNN
                                            K. SCOTT BRAZIL
                                            Brazil & Dunn
                                            4201 Cypress Creek Pkwy., Suite 530
                                            Houston, Texas 77068

                                            ARMAND G. DERFNER
                                            Derfner & Altman
                                            575 King Street, Suite B
                                            Charleston, S.C. 29403

                                            NEIL G. BARON
                                            Law Office of Neil G. Baron
                                            914 FM 517 W, Suite 242
                                            Dickinson, Texas 77539

                                            DAVID RICHARDS
                                            Richards, Rodriguez & Skeith, LLP
                                            816 Congress Avenue, Suite 1200
                                            Austin, Texas 78701

                                            *Counsel for Veasey/LULAC Plaintiffs*

                                            LUIS ROBERTO VERA, JR.
                                            Law Office of Luis Roberto Vera Jr.
                                            111 Soledad, Ste 1325
                                            San Antonio, TX 78205

                                            *Counsel for LULAC*

                                            /s/ Ezra D. Rosenberg
                                            JON M. GREENBAUM

EZRA D. ROSENBERG
BRENDAN B. DOWNES
Lawyers' Committee for
Civil Rights Under Law
1401 New York Avenue NW Suite 400
Washington, D.C. 20005

WENDY WEISER
MYRNA PÉREZ
The Brennan Center for Justice at NYU Law School
120 Broadway, Suite 1750
New York, New York 10271

SIDNEY S. ROSDEITCHER
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019-6064

AMY L. RUDD
LINDSEY B. COHAN
Dechert LLP
500 W. 6th Street, Suite 2010
Austin, Texas 78701

NEIL STEINER
DECHERT LLP
1095 Avenue of the Americas
New York, New York 10036-6797

JOSE GARZA
Law Office of Jose Garza
7414 Robin Rest Drive
San Antonio, Texas 98209

DANIEL GAVIN COVICH
Covich Law Firm LLC
Frost Bank Plaza
802 N Carancahua, Ste 2100
Corpus Christi, Texas 78401

GARY BLEDSOE
Potter Bledsoe, LLP
316 W. 12th Street, Suite 307

Austin, Texas 78701

VICTOR GOODE
NAACP
4805 Mt. Hope Drive
Baltimore, Maryland 21215

ROBERT NOTZON
The Law Office of Robert Notzon
1502 West Avenue
Austin, Texas 78701

*Counsel for the Texas State Conference of NAACP*
*Branches and the Mexican American Legislative*
*Caucus of the Texas House of Representatives*

/s/ Janai Nelson
SHERRILYN IFILL
JANAI NELSON
CHRISTINA A. SWARNS
COTY MONTAG
LEAH C. ADEN
DEUEL ROSS
NAACP Legal Defense and Educational Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006

JONATHAN PAIKIN
KELLY P. DUNBAR
TANIA FARANSSO
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006

*Counsel for Imani Clark*

/s/ Rolando L. Rios
ROLANDO L. RIOS
115 E. Travis, Suite 1645
San Antonio, Texas 78205

*Counsel for the Texas Association of Hispanic*
*County Judges and County Commissioners*

/s/ Jose Garza
ROBERT W. DOGGETT
SHOSHANA J. KRIEGER
Texas RioGrande Legal Aid
4920 N. IH-35
Austin, Texas 78751

JOSE GARZA
Texas RioGrande Legal Aid
1111 N. Main Ave.
San Antonio, Texas 78212

*Counsel for Lenard Taylor, Eulalio Mendez Jr., Lionel Estrada, Estela Garcia Espinoza, Margarito Martinez Lara, Maximina Martinez Lara, and La Union Del Pueblo Entero, Inc.*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on July 5, 2017, a true and correct copy of the foregoing document was served via the Court's ECF system to all counsel of record.

/s/ Danielle M. Lang
Danielle M. Lang
Campaign Legal Center
1411 K Street NW Suite 1400
Washington, DC 20005
dlang@campaignlegalcenter.org