IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| MARC VEASEY, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No. 2:13-cv-193 (NGR) |
| v. | ) | [Lead Case] |
| | ) | |
| GREG ABBOTT, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

### UNITED STATES'S BRIEF REGARDING REMEDIES

The United States filed its complaint in this case to ensure that Texas's voter ID law comports with "Section 2 of the Voting Rights Act" and the Constitution and preserves the rights of all Texas voters to free and fair elections.  Compl. Prayer ¶ 1.  That result has now been achieved, as the Texas Legislature has accepted the *en banc* Fifth Circuit's invitation to adopt a legislative remedy "to cure the infirmities" that this Court found in Texas's 2011 voter ID statute, S.B. 14.  *Veasey v. Abbott*, 830 F.3d 216, 269 (5th Cir. 2016) (en banc).  Texas's "appropriate amendment[]," S.B. 5, codifies a "reasonable impediment" procedure that tracks the Court's interim remedy to which all parties agreed and which was used in the 2016 general election.  *Id.* at 270.  As amended by S.B. 5, Texas's voter ID law both guarantees to Texas voters the opportunity to cast an in-person ballot and protects the integrity of Texas's elections.  S.B. 5 thus removes any "discriminatory effect" or intent the Court found in S.B. 14 and advances Texas's legitimate "policy objectives" in adopting a voter ID law.  *Veasey*, 830 F.2d at 269.

Moreover, the State has publicly committed to undertake a comprehensive statewide effort to implement S.B. 5's protection of Texas voters.  In the first place, the State has committed to

1

notify and educate all Texas voters regarding the new voter ID requirements. This voter education campaign goes beyond what the agreed interim remedy required and provides written notice of the new requirements *to every active registered Texas voter* by the end of 2017. *Compare* Defs.' Proposal For A Briefing Schedule 3 (ECF No. 1039), *with* Order ¶¶ 10–11 (ECF No. 895). The State will also spend $4 million over two years—above and beyond the $2.5 million that Texas expended in 2016 as part of the interim remedy *see* ECF No. 895 ¶ 10—to "implement voter information and outreach strategies" across "multiple formats," ECF No. 1039 at 2. And the State will train county election officials, "update VoteTexas.gov and its training materials for election officials and poll workers to reflect the requirements of S.B. 5," and "continue to make . . . mobile units available" to issue photographic election identification certificates (EICs) to all interested Texas voters free of charge. ECF No. 1039 at 1–2.

As a matter of bedrock principles of federalism and comity, the United States (in bringing enforcement actions) and this Court (in deciding cases) must defer to any "constitutionally and legally valid" legislative remedy that was "enacted by the appropriate state government unit" to address the violations that the Court found. *Miss. State Chapter, Operation Push, Inc. v. Mabus*, 932 F.2d 400, 406 (5th Cir. 1991); *see also Wise v. Lipscomb*, 437 U.S. 535, 540 (1978); *Westwego Citizens for Better Gov't v. City of Westwego*, 946 F.2d 1109, 1124 (5th Cir. 1991). Here, because S.B. 5 eradicates any discriminatory effect or intent in S.B. 14, it is "constitutionally and legally valid," *Operation Push*, 932 F.2d at 407, and leaves no ongoing violation of federal law for the United States to pursue or the Court to remedy. The Court therefore has no basis to substitute the remedies of an injunction, declaratory judgment, or retention of jurisdiction to review future legislative action for the Legislature's preferred remedy of S.B. 5. *See, e.g.*, *Operation Push*, 932 F.2d at 406–07; *Veasey*, 830 F.3d at 269–72; *see also* Br. of Private Plaintiffs at 4–9 (ECF No.

2

1040).  The Court should therefore vacate the agreed interim remedy as of January 1, 2018, SB 5's

implementation date, and decline any further remedies.

## ARGUMENT

Federal courts "clearly defer to the legislature in the first instance to undertake remedies

for violations of § 2" of the Voting Rights Act or the Constitution.  *Operation Push*, 932 F.2d at

406; *Wise*, 437 U.S. at 540.  Indeed, a federal court in a voting rights case may reject or alter a

state's or political subdivision's proposed remedy "only in those ways necessary to remedy a

constitutional or statutory vice."  *Cook v. Luckett*, 735 F.2d 912, 920 (5th Cir. 1984).  Thus,

although any legislative remedy "must be fashioned to address the constitutional violation

established," a court may not "substitut[e]" even an "objectively superior" judicial remedy for an

"otherwise constitutionally and legally valid" remedy "enacted by the appropriate state

governmental unit."  *Operation Push*, 932 F.2d at 406–07.

This requirement of federal judicial deference to state legislative prerogatives makes

perfect sense: "since the nature of the violation determines the scope of the remedy," *Milliken v.

Bradley*, 418 U.S. 717, 749 (1974), there is no basis for an exercise of federal judicial remedial

power where a legislative body already has fixed the violation, *e.g.*, *Wise*, 437 U.S. at 540;

*Operation Push*, 932 F.2d at 406.  This rule of deference applies equally to effect and purpose

violations and to statutory and constitutional claims.  *E.g.*, *Wise*, 437 U.S. at 540; *Perry v. Perez*,

565 U.S. 388 (2012) (per curiam); *Veasey*, 830 F.3d at 269–72; *Operation Push*, 932 F.2d at 406–

08; *Cook*, 735 F.2d at 920.  And it applies with particular force where, as here, the Fifth Circuit

explicitly and specifically invited the Legislature to enact a "legislative fix" to "cure the

deficiencies" and "ameliorate the issues" identified in its opinion.  *Veasey*, 830 F.3d at 271.

S.B. 5's "legislative fix" cures the discriminatory effect and intent that the Court found in S.B. 14, *id.*, and, thus, eliminates any ongoing violation of federal law.  Accordingly, the Court should vacate the agreed interim remedy and decline to "substitut[e]" any of Private Plaintiffs' requested remedies for S.B. 5.  *Operation Push*, 932 F.2d at 406–07.

## I.      S.B. 5 FULLY REMEDIES ANY DISCRIMINATORY EFFECT IN TEXAS'S VOTER ID LAW

S.B. 5 codifies a reasonable impediment procedure that largely tracks the procedure in the Court's interim remedy, which Private Plaintiffs agreed was sufficient to cure any discriminatory effect in S.B. 14.  Moreover, the record demonstrates that S.B. 5 removes any discriminatory effect from Texas's voter ID law.  Therefore, the Legislature's chosen remedy supersedes the agreed interim remedy and precludes additional remedies.  *See Veasey*, 830 F.3d at 269–72; *Operation Push*, 932 F.2d at 406–07.

### A.      S.B. 5 Adopts A Reasonable Impediment Procedure That Mirrors The Court's Agreed Interim Remedy And Eradicates Any Discriminatory Effect In S.B. 14

At the time of the *en banc* Fifth Circuit's decision on July 20, 2016, this Court was unable to adhere to the rule of federal judicial deference to state legislative remedies: the 2016 federal and statewide general elections were impending; the Texas Legislature was not in session; and the State had not asked the federal courts to "defer to the Legislature in the first instance."  *Veasey*, 830 F.3d at 270.  Accordingly, the Fifth Circuit directed this Court to undertake the "unwelcome obligation" of devising an interim judicial remedy.  *Id.*  Thus, on remand, the parties agreed to, and the Court entered, the interim remedy that created a reasonable impediment exception.  ECF No. 895.  The agreed interim remedy was used statewide for the 2016 general elections.

The Fifth Circuit, however, also went to great lengths to emphasize that the obligation "to cure the infirmities" that this Court had found or might find in S.B. 14 rested with the "state legislature" in the first instance.  *Veasey*, 830 F.2d at 269.  The Fifth Circuit therefore invited the

Texas Legislature to adopt a "legislative fix" to "ameliorate the issues raised in this opinion." *Id.* at 271. The Fifth Circuit further noted that "appropriate amendments might include a reasonable impediment or indigency exception similar to those adopted, respectively, in North Carolina or Indiana." *Id.* at 270; *see also id.* at 271.

The Texas Legislature accepted that invitation when it enacted S.B. 5, which is modelled on the reasonable impediment procedure in the agreed interim remedy. In particular, S.B. 5:

- Extends the cut-off period for acceptable photo identification to the same "four years" past the expiration date that the agreed interim remedy adopted. *Compare* S.B. 5 § 5, *with* ECF No. 895 ¶ 1.

- Allows voters over the age of 70 to use any form of acceptable photo identification regardless of expiration date, while the agreed interim remedy subjected these older voters to the four-year cut-off period. *Compare* S.B. 5 § 5, *with* ECF No. 895 ¶ 1.

- Creates a reasonable impediment procedure. *Compare* S.B. 5 §§ 1–2, *with* ECF No. 895 ¶¶ 2–9.

- Permits Texas voters utilizing the reasonable impediment procedure to present the same general categories of non-photographic identification as the agreed interim remedy. *Compare* S.B. 5 § 5, *with* ECF No. 895 at 7.

- Recognizes the same seven predetermined impediments to trigger the reasonable impediment procedure as the agreed interim remedy (although omitting the option for a voter to write in a different impediment). *Compare* S.B. 5 § 2, *with* ECF No. 895 at 6.

S.B. 5 addresses the impact that the Court found in S.B. 14 by dramatically reducing the number of voters who lack acceptable photographic identification. This Court found that, at the time of trial, approximately "608,470 registered voters, or 4.5% of all registered voters in Texas, lack[ed]" an S.B. 14 identification. *Veasey*, 830 F.3d at 250. S.B. 5 decreases this number because it extends the cut-off period for acceptable photographic identification to four years for voters under the age of 70, and indefinitely for voters over the age of 70. *See* S.B. 5 § 5.

S.B. 5 addresses the remaining discriminatory effect that the Court found in S.B. 14 by adopting a reasonable impediment procedure that allows Texas voters to cast an in-person ballot even if they lack S.B. 14 identification.  That procedure consists of two steps, both of which track the agreed interim remedy and neither of which imposes any "significant and disparate burdens on the right to vote."  *Veasey*, 830 F.3d at 256.  First, like the agreed interim remedy, S.B. 5 requires that a voter "execute[] a declaration declaring that the voter has a reasonable impediment to meeting the requirement" to present acceptable photographic identification.  S.B. 5 § 2; ECF No. 895 ¶ 2.  S.B. 5 codifies the seven predetermined impediments identified in the agreed interim remedy.  *Compare* S.B. 5 § 2, *with* ECF No. 895 at 6.

Second, S.B. 5, like the agreed interim remedy, requires a voter using the reasonable impediment procedure to present an acceptable form of non-photographic identification.  *Compare* S.B. 5 § 5, *with* ECF No. 895 at 7.  Those forms of non-photographic identification include a voter registration certificate, a copy of a current utility bill, a bank statement, a government check, a paycheck with the voter's name and address, or a birth certificate.  *Compare* S.B. 5 § 5, *with* ECF No. 895 at 7.  This requirement also imposes no material or discriminatory burden on any Texas voter: Texas voters automatically receive—free of charge—a voter registration certificate within 30 days of registration, and active voters receive a renewed voter registration certificate in every odd-numbered year.  *See* Tex. Elec. Code § 14.001; ECF No. 1039 at 3.  A voter whose registration card is lost or destroyed may obtain a replacement free of charge by informing the registrar in writing, by electronic notification, or by telephone, after which the registrar must deliver a replacement certificate within 30 days.  Tex. Elec. Code § 15.004(a), (c).  Thus, the process of obtaining a voter registration certificate is automatic and universal, carries no fees, requires no

underlying documentation, and does not even impose a travel burden.  *See, e.g.*, Tex. Elec. Code §§ 13.144(a), 15.044.

Obtaining the other forms of non-photographic identification recognized in S.B. 5 and the agreed interim order likewise presents no material burden on Texas voters.  Indeed, in passing the Help America Vote Act (HAVA), Congress deemed a similar set of documents to be available to nearly all voters as a means to establish identity.  *See* 52 U.S.C. § 21083(b)(2)(A)(i)(II), (ii)(II) ("copy of a current utility bill, bank statement, government check, or other government document").

In sum, S.B. 5's reasonable impediment procedure—which tracks the agreed interim remedy and which the Legislature adopted at the Fifth Circuit's specific invitation—cures any discriminatory effect in Texas's voter ID law.  *See Veasey*, 830 F.3d at 269–72; *Operation Push*, 932 F.2d at 406–07.  Accordingly, the United States has no basis to seek, and Court has no basis to "substitut[e]," a judicial remedy for S.B. 5 on the Section 2 results claims.  The Court should therefore vacate the agreed interim remedy and decline to enter any further judicial remedy.  *Operation Push*, 932 F.2d at 406–07.

### B. The State Has Committed To Conduct A Comprehensive Statewide Voter Education And Training Program

The *en banc* Fifth Circuit directed this Court, in fashioning an interim remedy on remand, to "consider the necessity of educational and training efforts to ensure that both voters and workers at polling places are capable of making use of whatever remedy" the Court selected.  *Veasey*, 830 F.3d at 271–72.  The State performed such voter education and training under the agreed interim order.  *See* ECF 895 ¶¶ 10–11.  Following enactment of S.B. 5, the State has publicly committed to conduct a comprehensive statewide voter education and training program to ensure that Texas voters and election officials properly implement S.B. 5's protections of Texas voters.  Indeed, the

State's program exceeds the relief provided in the agreed interim remedy.  In particular, the State will:

- Provide written notice of the new voter ID requirements *to every active registered Texas voter* with the voter registration certificates to be sent by the end of 2017 or to be issued thereafter.  *See* ECF No. 1039 at 3.  The agreed interim remedy did not require any individualized notice, and the State did not provide such notice in the compressed time frame leading up to the 2016 general elections.  *See* ECF No. 895.

- Expend $4 million over two years (above and beyond the $2.5 million that the State expended in 2016 as part of the interim remedy, *see* ECF No. 895) to "implement voter information and outreach strategies to inform the electorate of the voter identification requirements."  ECF No. 1039 at 2.  Such strategies will include "voter education and outreach events," materials produced "in multiple formats, possibly including television, print, radio, and electronic formats," and "social media opportunities."  *Id.*

- Train county election officials, "update VoteTexas.gov and its training materials for election officials and poll workers to reflect the requirements of S.B. 5," and "continue to make . . . mobile units available" to issue photographic EICs to all interested Texas voters free of charge.  ECF No. 1039 at 1–2.

These efforts are designed to "ensure that both voters and workers at polling places are capable of making use of" S.B. 5's remedy.  *Veasey*, 830 F.3d at 271–72.  Given the posture of this case and Texas's fiscal-year budgeting calendar, the State has not yet fully implemented its voter education and training program.  *See, e.g.*, ECF No. 1039 at 1–3.  The United States, however, has no basis to question that the State will honor its public commitment to Texas's voters and this Court.   Indeed, state law requires the State to provide written notice of the new identification requirements with each new or renewal voter registration certificate—and to send renewal certificates to every registered Texas voter by the end of 2017.  *See* Tex. Elec. Code §§ 14.001(a); 15.005(a).  But even if the Court has any doubts regarding the State's completion of its voter education and training efforts, those doubts would provide no occasion to "substitut[e]" a judicial remedy for S.B. 5.  *Operation Push*, 932 F.2d at 406–07.  Instead, the only possible remedy would be for the Court to retain jurisdiction for a limited time and for the sole purpose of ensuring

that the State performs appropriate voter education and training.  *See, e.g.*, *Veasey*, 830 F.3d at

271–72; ECF No. 895 ¶¶ 10–12.

## II.     S.B. 5 PRECLUDES ENTRY OF AN INJUNCTION OR DECLARATORY JUDGMENT ON THE DISCRIMINATORY PURPOSE CLAIM

Private Plaintiffs have indicated that they seek two remedies on their discriminatory-

purpose claim: "a permanent and final injunction against enforcement of SB 14" and "SB 5" and

"a declaratory judgment . . . that Defendants violated Section 2 of the Voting Rights Act and the

14th and 15th Amendments" when they enacted SB 14.  ECF No. 1040, at 4–5.  Once again, S.B.

5 forecloses the United States from supporting, and the Court from entering, these remedies.

As a general matter, where "there is no ongoing violation of federal law," a federal court

may not issue either a permanent injunction prospectively invalidating a state law or practice or "a

declaratory judgment that state officials violated federal law in the past."  *Green v. Mansour*, 474

U.S. 64, 67 (1985).  A discriminatory-purpose claim under the Constitution or Section 2 of the

Voting Rights Act requires a showing of both discriminatory impact and discriminatory intent.

*See, e.g.*, *Hunter v. Underwood*, 471 U.S. 222, 233 (1985) (State law prohibiting exercise of the

right to vote held invalid where "its original enactment was motivated by a desire to discriminate

against blacks on account of race and the section continues to this day to have that effect"); *Cotton*

*v. Fordice*, 157 F.3d 388, 391–92 & n.8 (5th Cir. 1998) (discriminatory-purpose claim requires

"effects as well as motive"); *see also* ECF No. 1040, at 4–5 (conceding that "the rubric for making

a determination of discriminatory purpose is the same under Section 2 of the VRA and the

constitutional provisions").  Indeed, "the impact of the official action" and whether "it bears more

heavily on one race or another" is typically the "starting point" in a discriminatory-purpose

analysis.  *Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 266 (1977).  After

all, a "discriminatory purpose" claim requires proving that the decisionmaker "selected or

9

reaffirmed a particular course of action at least in part 'because of' . . . its *adverse effects* upon an identifiable group." *Personnel Adm'r v. Feeney*, 442 U.S. 256, 279 (1979) (emphasis added); *Veasey*, 830 F.3d at 231 ("the law must be passed *because of* [a] disparate impact" on a protected group) (emphasis added); *see also Palmer v. Thompson*, 403 U.S. 217, 224 (1971) ("[N]o case in this Court has held that a legislative act may violate equal protection solely because of the motivations of the men who voted for it.").

Accordingly, proof of an "ongoing violation of federal law" as required to support the requested declaratory judgment and permanent injunction prospectively invalidating S.B. 5, *Green*, 474 U.S. at 67, would require a showing that Texas's voter ID law, as amended by S.B. 5, continues to have a discriminatory effect and is tainted by discriminatory intent, *see, e.g.*, *Arlington Heights*, 429 U.S. at 266; *Hunter*, 471 U.S. at 233; *Feeney*, 442 U.S. at 279; *Veasey*, 830 F.3d at 231.  As explained, however, S.B. 5 removes any discriminatory effect that the Court found in Texas's voter ID law.  *See supra* Part I.  For this reason alone, there is no "ongoing" discriminatory-purpose "violation," and the Court cannot enter an injunction or declaratory judgment in Private Plaintiffs' favor.  *Green*, 474 U.S. at 67; *see, e.g.*, *Arlington Heights*, 429 U.S. at 266; *Hunter*, 471 U.S. at 233; *Feeney*, 442 U.S. at 279; *Veasey*, 830 F.3d at 231.

Moreover, a legislative amendment that makes "meaningful alterations" to a law allegedly enacted with discriminatory purpose "may render the [amended] law valid" and foreclose judicial remedies against it.  *Chen v. City of Houston*, 206 F.3d 502, 521 (5th Cir. 2000).  Thus, where a plaintiff brings a discriminatory-purpose claim against a state law, "the state of mind of the reenacting" or amending "body also must be considered" in determining whether a violation has occurred and whether the court may enter prospective relief.  *Id.*  Accordingly, no remedy is

10

available where a legislative amendment "superseded the previous provision and removed the discriminatory taint associated with the original version." *Cotton*, 157 F.3d at 391.

S.B. 5 made more than "meaningful alterations" to Texas's voter ID law. *Chen*, 206 F.3d at 521. S.B. 5's reasonable impediment procedure largely tracks the Court's interim remedy to which all parties agreed and which was used in the 2016 general elections as well as other local and special elections in Texas. *See supra* Part I. The S.B. 5 procedure is also similar to reasonable impediment procedures in other states that have adopted photographic voter ID laws. *See Operation Push*, 932 F.2d at 402; *see also Veasey*, 830 F.2d at 270.

Finally, Private Plaintiffs have nowhere suggested that the Texas Legislature enacted S.B. 5 with discriminatory intent, *see* ECF No. 1040, at 1–5, and there is no evidence that the Texas Legislature harbored such a discriminatory "state of mind," *Chen*, 206 F.3d at 521. Nor could the Court conclude that S.B. 5 reflects a discriminatory intent without implying that the agreed interim remedy—which S.B. 5 is modelled on—was itself tainted with discriminatory intent.

Here, the Texas Legislature adopted in S.B. 5 a legislative remedy "responsive to" the "order[s]" of this Court and the *en banc* Fifth Circuit. *Operation Push*, 932 F.2d at 409; *Veasey*, 830 F.3d at 269–72. The "[r]easonable choice" to adopt this remedy belonged to "the legislature not the courts," even if it is possible to imagine a broader remedy. *Operation Push*, 932 F.2d at 409. Accordingly, S.B. 5 removed any "discriminatory taint" in Texas's voter ID law, "render[s] the current [voter ID] law valid," and forecloses an injunction and a declaratory judgment. *Chen*, 206 F.3d at 521; *see also Green*, 474 U.S. at 67.

## III.   THE COURT SHOULD DECLINE TO RETAIN JURISDICTION TO REVIEW FUTURE VOTER ID LEGISLATION

Private Plaintiffs' final remedial request asks the Court, "as the Court did in 2014[,] to retain jurisdiction to review any future legislation on voter identification procedures enacted by

the Texas Legislature to determine whether it properly remedies the violations." ECF No. 1040, at 9. The Court should decline this request. To the extent that Private Plaintiffs seek judicial preclearance of future Texas voter ID laws, such relief is available only under Section 3(c) of the Voting Rights Act, which the Court has agreed, at Private Plaintiffs' request, to address at a later time. *See* ECF No. 1044 at 2. The United States reserves the right to present a position regarding the issue of Section 3(c) relief at that time.

Moreover, to the extent that Private Plaintiffs seek a retention of jurisdiction similar to the one the Court ordered "in 2014," ECF No. 1040, at 9, that remedy is unavailable here. The Court retained jurisdiction then in deference to the Texas Legislature's primary jurisdiction to "enact a different remedy for the statutory and constitutional violations" that the Court found in S.B. 14. *Veasey v. Perry*, 71 F. Supp. 3d 627, 707 (S.D. Tex. 2014), *aff'd in part and rev'd in part*, *Veasey*, 830 F.3d 216. Such a retention of jurisdiction is common in voting rights cases because it preserves and defers to the legislative body's first opportunity to remedy the violation. *E.g.*, *Wise*, 437 U.S. at 540; *Westwego Citizens*, 946 F.2d at 1124 (retaining jurisdiction while board of aldermen considered legislative remedy). But it is unavailable when the legislature or the court *already* has remedied the violation. Thus, the Fourth Circuit panel in *N.C. State Conference of NAACP v. McCrory*, 831 F.3d 204 (4th Cir. 2016), unanimously denied a request for similar relief because that relief would unduly "bind[] the State's hands" to exercise its constitutional authority to enact new voting and election laws without judicial oversight. *Id.* at 241.

## CONCLUSION

The Court should vacate the agreed interim remedy as of the January 1, 2018 effective date for S.B. 5 and should decline to enter an injunction, declaratory judgment, or retention of jurisdiction to review future legislation.

Date: July 5, 2017

Respectfully submitted,

ABE MARTINEZ
Acting United States Attorney
Southern District of Texas

JOHN M. GORE
Deputy Assistant Attorney General
Civil Rights Division

/s/ John M. Gore
T. CHRISTIAN HERREN, JR.
RICHARD DELLHEIM
DANIEL J. FREEMAN
Attorneys, Voting Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Ave. NW
Washington, D.C. 20530

*Counsel for the United States*

13

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 5, 2017, a true and correct copy of the foregoing document was served via the Court's ECF system to all counsel of record.

*/s/ Daniel J. Freeman*
Daniel J. Freeman
U.S. Department of Justice
950 Pennsylvania Ave. NW
Washington, D.C. 20530
