# EXHIBIT

# 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION


MARC VEASEY, ET AL.,           )        CASE NO: 2:13-CV-00193
                               )
              Plaintiffs,      )            CIVIL
                               )
     vs.                       )        Corpus Christi, Texas
                               )
GREG ABBOTT, ET AL.,           )        Wednesday, June 7, 2017
                               )
              Defendants.      )        (9:00 a.m. to 9:40 a.m.)


STATUS CONFERENCE

BEFORE THE HONORABLE NELVA GONZALES RAMOS,
UNITED STATES DISTRICT JUDGE


<u>APPEARANCES</u>:            CONTINUED ON PAGE 2


For Plaintiffs:          CHAD W. DUNN, ESQ.
                         Brazil and Dunn
                         4201 Cypress Creek Parkway, Suite 530
                         Houston, TX 77068

                         ARMAND DERFNER, ESQ.
                         P.O. Box 600
                         Charleston, SC 29402

Court Recorder:          Genay Rogan

Clerk:                   Brandy Cortez

Court Security Officer:  Adrian Perez

Transcriber:             Exceptional Reporting Services, Inc.
                         P.O. Box 18668
                         Corpus Christi, TX 78480-8668
                         361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

<u>**APPEARANCES FOR:**</u>          (CONTINUED)


Plaintiffs:                DANIELLE LANG, ESQ.
                           Campaign Legal Center
                           1411 K. St. NW, Suite 1400
                           Washington, DC 20005


                           J. GERALD HEBERT, ESQ.
                           Attorney at Law
                           191 Somervelle Street #405
                           Alexandria, VA 22304

Texas Association of       ROLANDO L. RIOS, ESQ.
Hispanic County Judges     115 E. Travis
and County                 Suite 1645
Commissioners:             San Antonio, TX 78205

Mexican American           EZRA D. ROSENBERG, ESQ.
Legislative Caucus,        Dechert, LLP
et al.:                    902 Carnegie Center, Suite 500
                           Princeton, NJ 08540-6531

Mexican American           ADAM GITLIN, ESQ. (via phone)
Legislative Caucus,        MYRNA PEREZ, ESQ. (via phone)
et al.:                    Brennan Ctr. for Justice
                           161 Avenue of the Americas
                           12th Floor
                           New York, NY 10013

United States              JOHN GORE, ESQ.
of America:                RICHARD DELHEIM, ESQ.
                           JOHN SMITH, ESQ.
                           U.S. Department of Justice
                           950 Pennsylvania Ave. NW
                           Washington, DC 20530

Taylor Plaintiffs,         JOSE GARZA, ESQ. (via phone)
et al.:                    Texas Rio Grande Legal Aid
                           1111 N. Main Ave.
                           San Antonio, TX 78212

State of Texas:            MATTHEW H. FREDERICK, ESQ.
                           ANGELA V. COLMENERO, ESQ.
                           Office of the Attorney General
                           P.O. Box 12548
                           Austin, TX 78711

3

**APPEARANCES FOR:**          (CONTINUED)


Texas League of Young      JANAI NELSON, ESQ.
Voters Education Fund:     NAACP Legal Def. and Educational Fund
                          40 Rector St., 5th Floor
                          New York, NY 10006

                          LEAH ADEN, ESQ. (via phone)
                          TANIA C. FARANSSO, ESQ. (via phone)
                          Wilmer Cutler Pickering, et al.
                          1875 Pennsylvania Avenue, NW
                          Washington, DC 20006

4

1       **Corpus Christi, Texas; Wednesday, June 7, 2017; 9:00 a.m.**

2          **(Courtroom and telephonic appearances)**

3                      **(Call to Order)**

4          **THE COURT:**  Cause Number 2:13-cv-193, *Veasey, et al.*

5   *versus Abbott, et al.*  We have several plaintiffs.  I guess if

6   you-all will announce for the record.

7          **MR. DUNN:**  Good morning, your Honor.  Chad Dunn on

8   behalf of the Veasey/LULAC plaintiffs, and with me in the

9   courtroom is Gerry Hebert, Armand Derfner and Danielle Lang.

10         **MR. RIOS:**  Good morning, your Honor.  Rolando Rios

11  for the Texas Association of Hispanic Judges and Commissioners.

12         **THE COURT:**  All right.

13         **MR. ROSENBERG:**  Good morning, your Honor.  Ezra

14  Rosenberg from the Lawyers' Committee for Civil Rights Under

15  Law on behalf of the Texas State Conference and NAACP and MALC.

16         **THE COURT:**  All right.

17         **MR. ROSENBERG:**  Also on the phone are Myrna Perez and

18  I believe Adam Gitlin from the Brennan Center.

19         **THE COURT:**  Okay.

20         **MS. NELSON:**  Good morning, your Honor.  Janai Nelson

21  from the NAACP Legal Defense Fund, attorney for Imani Clark.

22  On the phone I'm joined by my colleague, Leah Aden and Tania

23  Faransso from the law firm of Wilner Hale.

24         **THE COURT:**  Okay.  Any other plaintiffs?

25         **MR. GARZA:**  Good morning, your Honor.  Jose Garza for

5

1    the Taylor Plaintiffs and for MALC.

2            **THE COURT:**  All right.

3            **MR. GORE:**  Good morning, your Honor.  John Gore for

4    the United States.  With me at counsel table are Richard

5    Delheim --

6            **THE COURT:**  Good morning.

7            **MR. GORE:**  -- and John Smith.

8            **THE COURT:**  Okay.  So you-all are still here.

9            **MR. GORE:**  Yes, we are.

10            **THE COURT:**  Okay.  State --

11            **MR. FREDERICK:**  Good morning, your Honor.  Matt

12    Frederick for the defendants, and with me at counsel table is

13    Angela Colmenero.

14            **THE COURT:**  Good morning.  Is that everybody?  I

15    think so.

16            So the court has set this for a status hearing to

17    discuss just how to proceed next for the remedies issue and I

18    did receive the State's advisory regarding Senate Bill 5.  Have

19    you-all had a chance to discuss how best to proceed on the

20    remedies issue among yourselves?

21            **MR. ROSENBERG:**  May I approach, your Honor?

22            **THE COURT:**  Yes.

23            **MR. ROSENBERG:**  Your Honor, Ezra Rosenberg from the

24    Lawyers' Committee.

25            We have, in fact, within minutes of SB-5 being

1    passed, we reached out to the State and to the United States

2    and held a series of conferences.  I would like to -- I wish I

3    could advise the court that we have agreement but we do not.

4    There is a distinct difference in approach between what the

5    Private Plaintiffs believe is the appropriate way to proceed, a

6    way that we believe tees up a couple of issues that we think

7    may dispose of many other issues in this case and which are not

8    fact-intensive and would obviate the necessity for an

9    evidentiary hearing -- and will -- if I can, I'll get into that

10   a little and Mr. Dunn is going to address it more substantively

11   -- while the State has pressed for an approach that we believe

12   will necessarily lead to an evidentiary hearing and perhaps the

13   need for discovery.

14           With your Honor's permission, I think it's helpful to

15   -- for your Honor for us to set forth the relief that we will

16   be asking for in this case.

17           Initially, of course, consistent with your Honor's

18   position -- your Honor's opinion on intentional discrimination,

19   we would ask your Honor to issue a declaratory judgment that

20   SB-14, because it was an act with discriminatory intent,

21   violated Section 2 of the Voting Rights Act and the

22   Constitution.

23           Second, we harken back to the remedy that your Honor

24   initially issued in her first opinion and we would really

25   pattern our request here precisely along those lines, which are

1    pursuant to the court's equitable powers and to address the VRA

2    claims, constitutional claims, that your Honor would enter a

3    permanent and final injunction against enforcement of the voter

4    identification provisions, Sections 1 through 15 and 17 through

5    22 of SB-14.

6            As your Honor indicated in her opinion, in her

7    original opinion, that means that Texas would return to

8    enforcing the voter identification requirements for in-person

9    voting in effect immediately prior to the enactment and

10   implementation of SB-14.  And further -- and this is important

11   in the context of what we are going to propose as an

12   approach -- should the Texas legislature enact a different

13   remedy for the statutory and constitutional violations, this

14   court would retain jurisdiction to review the legislation to

15   determine whether it properly remedies the violations.  Any

16   remedial enactment by the Texas legislature, as well as any

17   remedial changes by Texas' administrative agencies, must come

18   to the court for approval, both as to the substance of the

19   proposed remedy and the timing of implementation of the

20   proposed remedy.

21           And additionally, your Honor, Private Plaintiffs

22   would seek relief under Section 3(c) of the Voting Rights Act,

23   but we would suggest that the issues that we want to tee up

24   first should take precedence over the hearing on 3(c) relief.

25           The issue that we -- the issues that we wish to --

1    the court to address and we could do this under a very

2    expedited briefing schedule, is simply whether, on its face,

3    SB-5 does not remedy the discriminatory intent violation.  And

4    as Mr. Dunn will get into in a little more detail with your

5    Honor's permission, it does not for two major reasons.  One, it

6    is, on its face, an amendment of SB-14, and once SB-14 is

7    enjoined, it will fall of its own weight.  There's nothing --

8    the statute will not make any sense whatsoever.

9            Second, in accordance with the decision in North

10   Carolina NAACP vs. McCrory, the Fourth Circuit decision --

11   which the United States Supreme Court only, I think, two weeks

12   ago refused to review -- SB-5 still bears the intent, the

13   discriminatory intent of SB-14 because it still visits burdens

14   on those groups which your Honor has found have been

15   intentionally discriminated against which are not visited

16   against other groups.  And Mr. Dunn will address that in more

17   detail.

18           The reasons we're asking this court to deal with

19   those issues first are several fold.  First, we think it is

20   necessary for this court to essentially set the benchmark as to

21   which any Section 3(c) relief will be judged against in terms

22   of whether or not there is retrogression.  And we believe that

23   benchmark has to be the pre-SB-14 status quo.  In order to get

24   there we think that teeing up these two issues will allow that

25   benchmark to be set without the necessity of having the 3(c)

1    relief hearing in advance.

2            And second, and particularly given that the State has

3    indicated that it wants to add to the record matters beyond the

4    trial record -- and we have not had a chance to review the full

5    legislative record of SB-5 as to whether it will be necessary

6    for and what the parties want to rely on in terms of SB-5 if

7    we're going beyond its facial challenge -- we do not know today

8    whether or not an evidentiary hearing would be necessary.  If

9    we were forced to make that choice, I think we would say, yes,

10   your Honor, we're going to have an evidentiary hearing.  We do

11   have an alternative schedule if your Honor does not agree with

12   the position we are pressing which would allow the parties to

13   exchange exhibits and decide perhaps with a status conference

14   sometime midsummer as to whether or not an evidentiary hearing

15   would be necessary, but we think all of that, including what

16   will probably be discovery and an evidentiary hearing can be

17   avoided by the teeing up of these -- this threshold facial

18   challenge as to SB-5.

19           And one last point before -- with your Honor's

20   permission -- I turn the podium over to Mr. Dunn, your Honor

21   averted to the advisory that the State submitted to your Honor

22   in SB-5.

23           The State is taking some strange positions -- and we

24   will deal with that advisory and whatever briefing ensues --

25   but on the one hand, the State is saying that SB-5 is not in

1  this case -- and we've heard that over and over from them --

2  that's not before this court -- and on the other hand we hear

3  from the State and the advisory that SB-5 somehow miraculously

4  clears the discriminatory intent violation.  And we submit that

5  the State cannot have it both ways; as a matter of fact, it

6  can't have it either way.

7         The State, in its advisory, completely

8  mischaracterizes the private plaintiffs' position as to

9  discriminatory intent.  It's not based simply on discriminatory

10  effect as the State sets forth in its advisory.  There is an

11  injury that flows from having been intentionally discriminated

12  which has to be completely cured and it has not been cured at

13  all by SB-5.

14         If your Honor has some questions, I'll take them now

15  or wait.  If not, with your Honor's permission, Mr. Dunn would

16  like to address the substantive issue.

17         **THE COURT:**  That's fine.

18         **MR. DUNN:**  Good morning.  Chad Dunn on behalf of the

19  Veasey/LULAC plaintiffs.

20         Obviously, there'll come a time and a place to argue

21  the merits of what remains to be considered in the case.  I

22  rise today not to give a closing argument but I do think it's

23  important for the court to understand the crux of the

24  plaintiffs' position as it makes decisions on procedure in

25  terms of how this case will be finalized in the district court.

1    And there are important principles now at play in light of the

2    passage of Senate Bill 5 that are over and above what was

3    already a critically important case.  And unfortunately, what

4    the court is in the midst of is a larceny in progress.  When

5    this case came to this court in 2013, the rights of individuals

6    in the state had been taken by its legislature.  And although a

7    considerable step in the right direction was made with the

8    court's interim remedy, that was a remedy to a different claim

9    that remains now before the court.  And it, by its nature and

10   by the nature of the court's order and the order of the Fifth

11   Circuit, was an interim and partial remedy to a different claim

12   than what remains to be considered by the court.

13           Now that the court has found intentional

14   discrimination and did so in the context of an ongoing

15   legislative session, Texas has had the benefit of the court's

16   final findings with respect to Senate Bill 14.  But, just as we

17   saw so much information presented to the legislature in Senate

18   Bill 14 that made no difference, the court's finding of

19   racially discriminatory intent made no difference to the

20   State's strategy in terms of passing Senate Bill 5.

21           And let's not beat around the bush here as to what

22   Senate Bill 5 is.  It is a litigation strategy masquerading as

23   a legitimate legislative function.  And it was nevertheless an

24   effort by this state to adopt what was an interim remedy to try

25   to resolve but a small amount of the harm that Senate Bill 14

1  caused.  And it's not a unique strategy the State has adopted,

2  it's doing it up the street in the San Antonio redistricting

3  case by adopting what was an interim court order in the hopes

4  of gaining the maximum amount of benefit from an originally

5  intentional discriminatory law.  It's as if Texas has been

6  caught with a mouthful of cookies.  They're not allowed to

7  steal anymore but they're chewing and swallowing as fast as

8  they can to absorb as much as they can.  And that is sort of

9  the intent behind having an intent claim.  And unfortunately,

10  although we all must agree that things have improved in our

11  nation, the strategy that this state has taken in this case is

12  no different than jurisdictions took in the 50s and 60s.  And

13  it's no different than the reasons Congress came up with

14  Section 5 to begin with, to review decisions by a state, enjoin

15  them in advance of their being put into effect, and force the

16  State to prove that they are in fact for the benefit of

17  citizens and not for the basis of discrimination.

18       So we come to this court with the initial opinion

19  that Senate Bill 14 does not exist in a vacuum.  And indeed,

20  Senate Bill 5, on its face, merely amends Senate Bill 14.  It

21  did not withdraw it; it does not anew consider which ID should

22  be allowed and it does not anew consider the scheme that ought

23  to be used by Texas in qualifying voters.  Instead, the picking

24  and the choosing that existed under Senate Bill 14 remains

25  exactly and precisely the same.  And what the State is asking

1    is that since it adopted the court's order, in spite of a

2    ruling in intent, that individuals that were targeted on the

3    basis of their race ought to continue to go through additional

4    set of hoops and standards solely because of their race.

5    Because of the intent behind the original Senate Bill 14

6    architecture, the court should continue on its course and

7    strike it down.  And when it's so, if we are able to convince

8    it to issue an order to enjoin Senate Bill 14, Senate Bill 5

9    makes no sense.  It's a nullity.  It is an amendment to a law

10   that has given, as the Supreme Court says, no credibility

11   whatsoever.

12          Senate Bill 14 doesn't exist any longer.  Senate Bill

13   14 was the result of intentional discriminatory conduct and its

14   scheme and its architecture must be struck down.

15          Now, the State, I'm sure, will respond to this

16   argument that the Supreme Court in Crawford have said we're

17   entitled to have a voter ID law.  No one here denies that.  And

18   no one here denies that the legislature can -- in a

19   deliberative process that includes following its own

20   legislative rules, that includes serious deliberative

21   consideration by -- of amendments by bill opponents and bill

22   supporters, and after concluding that process develops a

23   non-discriminatory law, both in intent and effect -- that it

24   can have an ID law.  But it can't just simply duck tape the

25   Senate Bill 14 that it passed in 2011, rush through the

14

 1    legislature on an emergency basis under the Governor's

 2    direction, what was an interim remedy to only an effects claim

 3    -- and come into the court and say, we are done.

 4         Now, there's no question that this case has made

 5    progress and there's no question the voters of Texas are

 6    indebted to your Honor, the Court of Appeals, and all the

 7    others who have lended a hand to it.  Progress has been made.

 8    Senate Bill 14 has been adjusted to the extent that voting

 9    rights have been improved but work remains to be done.

10         And on the point of 3(c) relief, it is an out-of-the-

11    ordinary remedy.  It hasn't been invoked much because, frankly,

12    Senate Bill 5 was working.  We don't have Senate Bill 5 any

13    longer.  But the reason that the architects of that important

14    legislation, the Voting Rights Act and 3(c) in particular, came

15    up with that provision is because it knew about these games.

16    It knew that plaintiffs won in litigation and got an interim

17    remedy and it knew that jurisdictions would try to just do a

18    little bit less than that remedy and call it good enough.  And

19    that we would be back here arguing things such as mootness and

20    amended pleadings and other games that are designed nothing

21    more than to avoid the merits.  And the court should reject it

22    out of hand, not just because of what happened here and what

23    it's found, but because we have to put a stop to this behavior

24    in a world that exists post-Section 5.  And that's why we

25    suggested the schedule Mr. Rosenberg laid out which is that we

15

1   brief the individual legal issue of whether or not Senate Bill
2   5, on its face, on its language, without consideration of any
3   evidence, had anything to do with repairing the Senate Bill 14
4   intent.  And if the language says as I've suggested, that it's
5   nothing more than an amendment to Senate Bill 14 and makes no
6   sense independently, then that is all the court needs to know
7   and an injunction should issue.  And if the State so wishes,
8   and unfortunately probably will, can take its appeal.  Later
9   on, if necessary, the parties can consider what the effects
10  remain after Senate Bill 5's implementation, but only after all
11  of the intent has been remedied.
12          If there are no questions --
13          **THE COURT:**  No, thank you.
14          Any other plaintiffs or the government wish to say
15  anything?
16          **MR. GORE:**  Good morning, your Honor.
17          **THE COURT:**  Good morning.
18          **MR. GORE:**  The United States remains in this case on
19  the effect claim.  And the dispute between the private
20  plaintiffs and the State of Texas at this point relates to
21  remedial proceedings with respect to the intent claim.  So
22  we'll defer to allow Texas to respond to the points that were
23  just made and address our points later as necessary.
24          **THE COURT:**  All right.  Mr. Frederick then?
25          **MR. FREDERICK:**  Good morning, your Honor.  Matt

16

 1    Frederick for the defendants and may it please the court.

 2            Mr. Dunn has told you a story this morning.  He's

 3    painted a caricature of the State, a caricature of the

 4    legislature and a caricature of SB-5, and has tried to portray

 5    this as some kind of nefarious, unique strategy.  It's not.

 6    It's just a bill that's trying to do what the court said we

 7    should do and to fix the problems that the court found with

 8    SB-14 and our state's voter right law.

 9            The charge that SB-5 is exactly like the kind of

10    ingenious, pervasive, flagrant defiance of the Constitution

11    that jurisdictions resorted to in the 1960s and that led to

12    passage of Section 5 of the Voting Rights Act is preposterous,

13    is willfully ignorant of history, and it is simply not

14    credible.  When jurisdictions tried to stay one step ahead of

15    the court, they did not obey court orders.  They passed slight

16    variations that did not remedy the harm that courts had found

17    because they wanted to keep inflicting it.  That is not what

18    SB-5 does and that's not what Texas is trying to do.  We are

19    trying to have a reasonable, fair, photo voter ID law that

20    allows everybody to vote.

21            Now, what I didn't hear from the plaintiffs this

22    morning is a suggestion, a concrete suggestion for how to go

23    forward.  So I'd like to explain to the court what the State

24    thinks can happen and what needs to happen.

25            To prevent disruption of the 2018 election cycle, the

1    Secretary of State needs a conclusive determination of what

2    rules are going to apply and it needs to have that

3    determination by the end of August.  To allow that to happen,

4    we would need a ruling by this court at the beginning of August

5    or no later than August 10th.  To make that possible, I think

6    it is possible --

7             **THE COURT:**  No, you're doing this to me again.

8             **MR. FREDERICK:**  No, no, but I'm going to explain how

9    we can do it.

10            We believe that the parties are fully capable of

11   explaining their positions in a single brief.  We think the

12   parties could file that in three weeks on June 28th.  The

13   parties know their arguments about the remedy.  We think

14   they're fully capable of making them in a reasonably concise

15   fashion so that the court has the arguments and can make a

16   decision.

17            There's no need for an extended briefing schedule and

18   there's no need for an evidentiary hearing.  We think the court

19   should consider two things that are not currently in the trial

20   record.  One is the legislative record.  I don't think there's

21   disagreement about that.  The only other thing that we believe

22   the court should be able to consider, if it thinks it's

23   relevant, is the set of reasonable impediment declarations that

24   were executed by voters in 2016.  And I'm -- quite frankly,

25   we're a little bit confused why that has caused such a pushback

1   from the plaintiffs because the reason that we think the court

2   should be able to consider them is pretty obvious.  We think

3   we've said it in a couple of briefs.

4          We expect the plaintiffs will argue that SB-5 is an

5   insufficient remedy, in part because it does not include an

6   "other" box with a blank for voters to fill in an impediment.

7   We disagree with that because the enumerated impediments cover

8   every possible situation that could prevent a voter from

9   reasonably containing a photo ID.  And we have to remember that

10  the Fifth Circuit said that to the extent a voter has ID, they

11  should have to show it.  There's nothing wrong with that.

12         And the reason that the reasonable impediment

13  affidavits or declarations are relevant to that, in our view,

14  is that they show that the other category, it didn't add

15  anything and what it did was invite abuse from people who just

16  wanted to protest against the law or not comply with the spirit

17  of the court's order and just not (indiscernible).  So it's not

18  adding anything but it's creating, frankly, a problem for

19  election administrators and for people who go to vote.

20         We think that with that limited supplemental evidence

21  and the existing record, and one brief from each side or two

22  briefs, one from the DOJ if they wish to file one, the court

23  has everything it needs to make a decision.  The parties will

24  have a sufficient chance to make their argument.  And anything

25  more than that: discovery, multiple rounds of briefing will

19

1    only cause unnecessary delay.

2            The Secretary of State is prepared to do everything

3    it can to implement whatever the procedures are that will be in

4    place but they just -- you know, if at all possible -- and we

5    think it is possible -- they just need to know what the rules

6    are going to be.  And so we would ask the court to set a

7    reasonably quick schedule.  We think the parties can meet that.

8            And I will say, I want to add that, to the extent the

9    court has misgivings about moving quickly on all issues of

10   remedy, as an alternative, I think the proper procedural

11   mechanism here to take a first step would be a motion --

12        **(Loud banging sounds heard)**

13           The proper procedural mechanism would be a motion by

14   the State to dissolve the interim order.  We believe that is

15   consistent with Paragraph 14 of the Interim Order.  We believe

16   that will allow the court to consider what the rules should be

17   going forward.  And we think that the court can decide

18   everything by August but if the court does not think so, we

19   would suggest as an alternative, that's the right way to

20   proceed.  A motion to dissolve.  The plaintiffs will have a

21   chance to respond.  We would suggest a slightly truncated

22   period, maybe 14 days, but we can have that motion on file as

23   soon as possible.

24           And if there are no other questions, that's our

25   position, your Honor.

1          **THE COURT:**  All right.  Do you want to follow up,

2     Mr. Gore, at this point or anything from the government?

3          **(Pause)**

4          **MR. GORE:**  Your Honor, as I mentioned, the United

5     States maintains its effect claim in this -- remains in the

6     case on the effect claim at this point.  We agree that there's

7     unlikely to be a need for an evidentiary hearing with respect

8     to that particular claim.

9          The issue that we had been discussing with the State

10    is its implementation plan with respect to SB-5, which I take

11    from Mr. Frederick's comments, that they're working on and it's

12    something that -- and it's the implementation of SB-5 that

13    requires the Secretary of State to have certainty with respect

14    to the rules for the 2018 election but I'll defer to him on

15    that point.

16         We, at least with respect to the effect claim -- and

17    I think we'll comment on the intent claim to the extent that

18    the court is trying to come up with a single schedule for that.

19    We don't think -- from our perspective, we think that the

20    interest of judicial economy would be served from having a

21    single integrated remedial proceeding, rather than phase

22    briefing like the private plaintiffs are asking for.

23    Everything the private plaintiffs have asked for could be

24    accommodated through a single briefing schedule.  There's no

25    need to decide certain issues first and other issues later.  I

1    think all of those issues could be combined into a single round

2    of briefing and argument, and the court could  make a

3    determination as to the remedies that it believes are

4    appropriate based on that briefing and argument.

5          We also think that one brief may not be adequate

6    given the scope of the issues in this case.  We think it would

7    be better if there were simultaneous briefing, opening briefs

8    filed by all the parties and perhaps simultaneous response

9    briefs four weeks later.  I believe that that is a proposal

10   that has been floated around by some of the parties.  That will

11   give a little bit more time for the parties to continue to

12   discuss these issues, also to brief them up and present them to

13   the court in a way that is hopefully useful and helpful to the

14   to the court.  But that's our advice as to how to go.  And we

15   await hearing more from the State about its implementation

16   plans and its needs with respect to SB-5 and how that affects

17   the calendar for this particular proceeding.  We would think

18   that doing the simultaneous opening briefs sometime in July and

19   the response briefs about a month later would be still a very

20   robust schedule but one that the parties could meet and would

21   give the parties more opportunity to lay out the issues for the

22   court and to provide assistance to the court in resolving these

23   issues.

24          THE COURT:  All right.  But then you-all are going to

25   want a turnaround by August 10th from the court?  I mean, you-

1    all need to consider me too in all this, right?  And the heavy

2    docket and the continued vacancy here after six years.  Okay.

3              Response to the proposal from the defendants, state?

4              **MR. DUNN:**  Thank you, Judge.  Chad Dunn again.

5              I'll just hit a few issues and I'll start with the

6    schedule and certainly the court's recognition of the

7    difficulties of the timetable left.

8              We don't agree with the position of the State that

9    this matter needs to be decided by August the 10th.  And in

10   fact, Senate Bill 5 was just passed by the legislature with a

11   January 1 effective date.  So apparently the legislature wasn't

12   persuaded that the Secretary of State needed to have some

13   resolution to its rules by August the 10th.

14             And I would just add that perhaps the view of the

15   parties are different on scheduling because their views of the

16   case are different -- which is not all together unreasonable.

17   But if the notion of the case is that there is an intent claim

18   and an intent claim remains to be resolved, and that the case

19   law says that when you have a finding of intent, the original

20   law as a nullity is as if it doesn't exist, then there's no

21   sense to go through the time and effort and the court's -- and

22   tax the court's resources with a lengthy proceeding on the

23   effects of Senate Bill 5 and the effects of the remaining

24   portions of Senate Bill 14.  This is why we've suggested that

25   the court ought to take up the legal issue first on intent.

1    Intent has never been remedied in the course of this

2    litigation.  And the Fifth Circuit en banc opinion instructed

3    the court to receive the case back, enter an interim effects

4    remedy and then consider intent.  And so we should conclude the

5    intent part before we go back and again grade our papers on the

6    effects part.  And so we think that's why it makes sense to do

7    two separate briefings.  Why have an evidentiary whatever it

8    is, whether it's the filing of stipulations, declarations or a

9    trial.  Why do any of that if it's unnecessary in light of the

10   intent ruling.

11           But on top of that, I think the reason you're not

12   seeing crystal clarity from the parties as to what it is that

13   would need to be done on an effects claim is because there has

14   been, as there all too often has been with Texas, very little

15   disclosure of information.  For example, the court just heard

16   that the State wants to offer the reasonable impediment

17   declarations.  And so there's been discussion among counsel

18   about that subject and there's been a request, turn them over,

19   so let's look at the body of them.  And the State has said that

20   it's working on that and trying to figure out when it can get

21   that done.  I expect it will happen but until the parties and

22   specifically the plaintiffs know what it is that the State

23   wants to offer into evidence without any testimony, it's

24   difficult for the plaintiffs to say, well, we'll just accept

25   you filing documents.  I mean, after all, out-of-court

1    documents are hearsay.  The parties are entitled to

2    cross-examine them.  Certainly when there's a case of pretext

3    on intent, as here, it is common for there to be oral

4    testimony.  Maybe that needs to happen, maybe it doesn't but

5    that's why Mr. Rosenberg laid out a process wherein the parties

6    exchange their exhibits and information.  And if necessary, if

7    the court says I'm not going to just resolve intent and deal

8    with that and leave effects for later if even necessary.  If it

9    says, as the United States has now suggested, let's do it all

10   at the same time, then the parties need to exchange back and

11   forth what it wants to file.  It's possible they could agree

12   we're just going to file some things and try to help the court

13   sort through it.  It's possible that the plaintiffs say, no,

14   look, these are out-of-court statements, they need to be tested

15   or cross-examined.  Maybe some expert testimony is needed.

16   It's just there's no way to know that now.

17          The -- a few more proceedings or a few more points

18   I'd like to make on the education plan.

19          Senate -- there were a number of deviations.  And

20   sometimes I think we presume the court knows things, perhaps it

21   doesn't.  I know it focuses on a lot of cases.  But Senate

22   Bill 5 is not the court's interim remedy.  It's not it

23   verbatim.  And it has several important changes, one of which

24   has been mentioned here, the omission of the "other" box and

25   the reasonable impediment declaration affidavit.  It also has

1    heightened penalties with respect to criminal offense for

2    people who don't tell the truth on the reasonable impediment

3    declaration.  And there were a number of events that occurred

4    during the debate on Senate Bill 5 that were remarkably similar

5    or the same as Senate Bill 14: bill authors being unadvised,

6    lack of analysis of racial impact, minority legislators'

7    amendments being overruled or rejected.  There's a lot of

8    things that happened in the Senate Bill 5 debate that the court

9    ought to be made aware of when and if we even have to get to a

10   debate over what Senate Bill 5 is.

11          And -- but it's important to also understand what the

12   State's education plan is, not the least of which because it's

13   important for voters but because this court has -- in prior

14   orders, told the State it must exercise a reasonable education

15   plan, and the Fifth Circuit talked extensively about a lack of

16   education plan.  So the private plaintiffs -- and it sounds

17   like perhaps as well with the Department of Justice -- have yet

18   to see what the State intends to do with Senate Bill 5.  And

19   the exchange of that information informs the decision, if

20   there's going to be another effects' trial, what -- what it

21   looks like.

22          And so the last thing that I want to address is the

23   State's proposal in its argument here today that the court

24   ought to somehow dissolve its earlier injunction.  And I just

25   want to make sure it's clear on the record that the private

```
 1   plaintiffs -- or at least the Veasey/LULAC plaintiffs -- I
 2   think I speak for them all -- absolutely they oppose (s/l)
 3   dissolving the court record.  And until the intent issue is
 4   decided and until Senate Bill 5 has been tested and the State
 5   has proven that it is sufficient to overcome the discriminatory
 6   effects that the interim remedy was originally designed to
 7   address.  And so were the court to -- I think I understand from
 8   communications of counsel that were the court to dissolve its
 9   earlier injunction ruling, I believe the State's position would
10   be Senate Bill 5 would go into effect January 1, absent any
11   other activity.  And we believe that at this stage of the
12   proceeding, in light of the court's findings and the Fifth
13   Circuit's affirmance, that the State is now in the position of
14   proffering Senate Bill 5, if it comes to it, and proving that
15   it is effective.  But we nevertheless, as I've said, believe
16   that it can be resolved on the legal issue of intent.
17           MR. ROSENBERG:  May I just say add a few points, your
18   Honor?
19           THE COURT:  Yes.
20           MR. ROSENBERG:  And I agree with everything that
21   Mr. Dunn said.
22           I would add, it really underscores the importance of
23   that part of the relief that we are asking for, which is this
24   court's retention of jurisdiction over any legislation that is
25   supposedly or purportedly set forth as remediating the
```

1    violations found by this court.

2           I'd also suggest that, as Mr. Dunn indicated, the

3    alternative schedule that can be put in place really does allow

4    for the parties -- even perhaps while your Honor is considering

5    this threshold legal issue -- to at least begin the process of

6    identifying exhibits.  That could speed up the process a bit

7    but it makes abundant sense for your Honor to first deal with

8    this threshold, non-fact based issue of whether, on its face,

9    SB-5, because it is based on a statute which essentially is

10   void and of no effect, and therefore its terms don't even make

11   sense without (s/l) SB-14 -- and because it continues to burden

12   those populations which your Honor has found have been

13   intentionally discriminated against, cannot be enforced under

14   any -- under any measure.

15          Thank you.

16          **THE COURT:**  All right.  Any other plaintiff?

17   Mr. Frederick?

18          **MR. FREDERICK:**  Thank you, your Honor.

19          I should clarify.  I should have explained earlier

20   that when I mentioned the potential motion to dissolve, that

21   would be a motion to dissolve effective January 1st, 2018 which

22   is when SB-5 becomes effective by its terms.  We are not

23   suggesting that the court dissolve its interim order right now

24   leaving -- leaving nothing in its place.  So that would be the

25   request.

1          As for the need for some clarity, the reason that we

2     have the August deadlines is for the voter registration

3     certificates because those have to be finalized and then sent

4     out to the counties to be printed.  And so what the Secretary

5     of State's office needs is, they just need to know what

6     language needs to go on those to advise voters about the

7     procedures that will be in place.  And it may be that because

8     of the similarity in terms of how one votes under the interim

9     order and SB-5, it may be that that does not become such a big

10    issue.  But we think if at all possible, that we should have

11    some clarity on that point so there's no disruption later.

12         On the documents, I need to correct the record.  It

13    is not accurate to say that the plaintiffs have asked us to

14    produce reasonable impediment declarations and we have not done

15    so.  We have always been willing to do that.  They haven't

16    asked for them.  They've said, no, we're not willing to even

17    talk about introducing that with --

18         **THE COURT:**  Do you-all want them or not?

19         **MR. DUNN:**  Yes, Judge.

20         **MR. FREDERICK:**  And we -- we are prepared to produce

21    them within a week.

22         **THE COURT:**  There you go.

23         **MR. FREDERICK:**  And just so your Honor is fully aware

24    of what our plans are for training and education, as far as

25    training, as you may recall, we have the annual county worker

1    training in the summer.  The current plan, as I'm advised by

2    the Secretary of State, is that they plan to train people on

3    this court's interim order and also on SB-5 because this is the

4    time when they have everybody together.

5         As far as an education plan, they have been allocated

6    four million dollars by the legislature for the bi-anium

7    (phonetic).  And so they can't actually go out and secure

8    contractors until after the new fiscal year starts and they get

9    the money.  So they will do that, they just can't do it now.

10        And to be very clear, under the terms of this court's

11   interim order, we are -- we plan to comply with that as far as

12   sharing information.  But just as a timing issue, the Secretary

13   of State's office can't move forward on the complete education

14   plan at the moment.

15        And so I understand that we are asking -- that it's a

16   big ask to ask your Honor to resolve everything by August 10th

17   and that's why we proposed in the alternative the right

18   procedural way to do this is a motion to dissolve.  I am not at

19   all surprised that the plaintiffs oppose that but that's the

20   right way to get it before this court and then get a decision

21   in a timely manner so that we may appeal, if necessary.  And so

22   that's what we would ask the court to do.

23        **THE COURT:**  All right.  Thank you.

24        I think what I'm going to do at this point, I'm going

25   to have you-all brief your positions on the scheduling issue

30

1  for the remedies, limited to 10 pages.  I suggest everyone file

2  something by Monday, June 12th.  If that doesn't work, let me

3  know but I think you already know what your positions are.

4  You-all can --

5          **MR. ROSENBERG:**  That works for Private Plaintiffs,

6  your Honor.

7          **THE COURT:**  Okay.  Everyone?

8          **MR. FREDERICK:**  And for Defendants.

9          **THE COURT:**  And I did say limited to 10 pages, right?

10         **MR. ROSENBERG:**  You did.

11         **MR. FREDERICK:**  Yes.

12         **THE COURT:**  Okay.  And just one more time, limited to

13  10 pages.  So I will await that and see how we'll proceed.

14         Is there anything else to address this morning?

15         **MR. ROSENBERG:**  No, your Honor.  Thank you very much.

16         **THE COURT:**  Nothing else?

17         **MR. FREDERICK:**  Nothing from the State.  Thank you,

18  your Honor.

19         **THE COURT:**  Anything else?

20         **MR. GORE:**  Thank you, your Honor.

21         **THE COURT:**  All right.  Thank you.  You can be

22  excused.

23     **(Proceeding adjourned at 9:40 a.m.)**

24

25

31

## <u>CERTIFICATION</u>

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____                    <u>June 15, 2017</u>

          Signed                                                    Dated


*TONI HUDSON, TRANSCRIBER*