## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## CORPUS CHRISTI DIVISION

|  |  |
|---|---|
| MARC VEASEY, *et al.*,<br><br>　　　　　　　Plaintiffs,<br><br>　　　　v.<br><br>GREG ABBOTT, *et al.*,<br><br>　　　　　　　Defendants. | Civil Action No. 2:13-cv-193 (NGR) |

## PRIVATE PLAINTIFFS' RESPONSE TO
## TEXAS'S AND THE UNITED STATES' BRIEFING REGARDING THE
## PROPER REMEDIES FOR SB 14'S INTENTIONAL DISCRIMINATION

## INTRODUCTION

Offering only inapposite authority and ignoring the most direct precedent, Texas and the United States seek to convince this Court of two mistruths:  first, that SB 5 cures the discriminatory effects of SB 14; and second, that Private Plaintiffs, therefore, are not entitled to *any* further relief on *either* their intent or results claim.[1]  To reach this remarkable result, Texas and the United States misrepresent the Fifth Circuit's en banc opinion and Supreme Court precedent mandating that the remedy for intentional discrimination is to place the victims of intentional discrimination in the position that they would have been had that pernicious conduct never occurred.  SB 5 utterly fails that test *and* does not cure the discriminatory effects of SB 14.

As Private Plaintiffs demonstrated in their opening brief, SB 5 is infirm because it adopts the architecture of SB 14, and is built on the same discriminatory choices made by the legislature in its enactment of SB 14.  It imposes on the victims of Texas's intentional discrimination additional burdens to vote that would have been unnecessary had Texas not decided to discriminate in the first place.  Therefore, it continues the intentional discrimination behind SB 14 instead of remedying it, and this Court should so find.

The appropriate remedy for the discriminatory purpose violation will necessarily encompass the remedy for the discriminatory results violation.  In any event, Texas has failed to

---

[1] Although the United States has withdrawn its discriminatory purpose claim (Docs. 1001, 1022), and therefore has no business addressing it, fully half of the United States' brief is devoted to championing Texas's defense on that claim.  Indeed, the United States makes arguments on Texas's behalf which Texas itself does not deem fit to argue.  This is improper advocacy not sanctioned by court rules and procedure.  Private Plaintiffs will not burden this Court with a motion to strike, however, and will address the arguments of the United States on these issues, reserving their right to object to the United States' participation on issues relating to the intentional discrimination claim in any forum in this litigation.  The impropriety of the United States' arguments is underscored further by their inconsistency with positions previously taken by the United States before this Court and the Fifth Circuit in this case.  For example, the United States previously asserted that the "appropriate remedy" for the intent violation is a "permanent and final injunction precluding implementation of the voter identification provisions of SB 14," which should lead to Texas's "enforcing the voter identification requirements for in-person voting in effect immediately prior to the enactment and implementation of SB 14."  Doc. 610 at ¶¶ 176, 179.  Also, contrary to the position that it presses now, the United States unequivocally stated that the Court had the inherent power to retain jurisdiction to review future legislative action.  USA Br. at 71, *Veasey v. Abbott*, No. 14-21127 (5th Cir. Mar. 3, 2015).

meet its burden of proving that SB 5 completely cures the results violation, because SB 5 fails to address the crucial education and training deficiencies of SB 14 and increases to the point of felony penalty the intimidating effect of the purportedly curative reasonable impediment protocol.[2]

For the reasons set forth below and in their opening brief, Private Plaintiffs respectfully submit that they are entitled to the full set of remedies that they request.

## I.  PRIVATE PLAINTIFFS ARE ENTITLED TO DECLARATORY RELIEF

Contrary to the United States' repeated assertions (*see* Doc. 1052 at 9-11), *Green v. Mansour*, 474 U.S. 64 (1985), does not say that this Court cannot enter declaratory relief against Texas if there is no ongoing federal violation.  The requirement of an "ongoing federal violation" is an element of injunctive, not declaratory relief, and the Court in *Green* expressly stated that "declaratory relief may be available even though an injunction is not," leaving the decision whether to issue a declaratory judgment to the "discretion" of the trial court.  *Id*. at 72.[3]

Here, a declaration that Texas violated Section 2 of the Voting Rights Act and the Fourteenth and Fifteenth Amendments flows naturally from this Court's determinations as to discriminatory results and discriminatory intent.  *See* Doc. 1051 at 3.  It is also a prerequisite to

---

[2] Curiously, the United States opposes any judicial remedy for the Section 2 results violation, including protections to ensure proper voter education and training, even though its results claim is still active.  It is strange, indeed, for a party to disclaim its right to significant and substantive relief to which it is clearly entitled.  This Court should defer to the position of the Private Plaintiffs, who have consistently sought the same relief throughout this litigation, and continue to seek the relief necessary to provide a meaningful remedy to Texas voters.

[3] *Green* was a class action, in which the plaintiffs claimed that Michigan had miscalculated payments under the federal Aid to Families with Dependent Children (AFDC) program in violation of federal law.  Before the case was concluded, Congress amended the relevant provisions of the AFDC program to completely remedy the issues raised by the plaintiffs; Michigan complied with those changes, and plaintiffs stipulated that their claims for prospective relief were mooted.  474 U.S. at 66.  However, the plaintiffs pressed for "notice relief," i.e., an order allowing notice to the class that the state had violated the law (to serve as a predicate for money damages for the class) which could be ordered only if ancillary to declaratory relief.  *Id*. at 69.  The Court ruled that declaratory relief was not permitted in *Green* because the issuance of a declaratory judgment there would have been an "end run" around the Eleventh Amendment prohibition against awarding damages against a state in federal court retrospectively.  *Id*. at 73.  Those circumstances do not, of course, exist here.

relief under Section 3(c) of the Voting Rights Act.  52 U.S.C § 10302(c).  Further, the Fifth

Circuit has recognized the need for a clear record of past discrimination adjudications in

subsequent racial discrimination litigation.  *See Veasey v. Abbott* (*Veasey II*), 830 F.3d 216, 232-

33 & nn.14-15, 239-40 & nn.27-29 (5th Cir. 2016) (en banc).  The issuance of declaratory relief

in this case furthers this judicial policy.

II.     **THE COURT SHOULD ENJOIN SB 14 AND SB 5 TO ENSURE THAT
        INTENTIONALLY DISCRIMINATORY PROVISIONS ARE NOT ENFORCED
        AGAINST VICTIMS OF DISCRIMINATION**

        Private Plaintiffs have requested an injunction against further implementation of the

photo ID requirements of SB 14—a remedy that flows naturally from this Court's discriminatory

intent ruling—and an injunction against implementation of SB 5 because it is based on the core

intentionally discriminatory components of SB 14, and cannot be enforced absent them.  These

are proper remedies tailored to the Court's finding of discriminatory purpose.  A law designed

with discriminatory intent offends our most basic constitutional principles and cannot stand.

        A.      **The Appropriate Remedy Must Eliminate the Discriminatory Law "Root
                and Branch"**

        Relying on inapposite authority, Texas and the United States argue that the relief

requested by Private Plaintiffs violates the principles that injunctive relief must be "narrowly

tailored" and that "deference" must be given to legislative attempts to cure violations.  Doc. 1049

at 6-9, 13-14, 18-22; Doc. 1052 at 1-4, 9-12.   None of the cases that they rely on for this

proposition discusses "narrow tailoring" or "legislative deference" in the context of curing a

discriminatory *intent* violation, and many of them have nothing to do with discrimination claims

at all.[4]

_____

[4] *See* cases cited by United States at Doc. 1052 at 2-3 (*Wise v. Lipscomb,*  437 U.S. 535 (1978) (two Justice opinion
dealing with deferral to legislature in apportionment plan following Section 2 vote dilution finding; no finding of
discriminatory intent); *Westwego Citizens for Better Gov't v. City of Westwego*, 946 F.2d 1109 (5th Cir. 1991)

3

Inexplicably, the United States also cites to *Veasey II* for support.  Doc. 1052 at 3 citing *Veasey II*, 830 F.3d at 269-72).  But the Fifth Circuit's discussion on those pages concerns only the remedy for discriminatory *results*.  The United States neglects to cite to the only page in the Fifth Circuit's opinion where it discusses the appropriate remedy for discriminatory *intent*, noting that the intent remedy is potentially broader than that for results, relying on Supreme Court intent cases that call for invalidation of the entire statute, and that describe conduct such as Texas's enactment of SB 14 as having "no legitimacy at all."  *Veasey II*, 830 F.3d at 268 (quoting *City of Richmond v. United States*, 422 U.S. 358, 278 (1975)).

Legislative deference is decisively *not* appropriate in cases of discriminatory intent.  As the Supreme Court has observed, "[w]hen there is a proof that a discriminatory purpose has been a motivating factor in the decision . . . judicial deference [to the legislature] is no longer justified."  *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-66 (1977).  As such, the settled remedy to cure official conduct undertaken with discriminatory intent is to eliminate all vestiges of that pernicious act "root and branch."  *Green v. Cnty. Sch. Bd.*, 391 U.S. 430, 437-38 (1968); *see also* Doc. 1051 at 4.  Measured against this benchmark, SB 5 obviously fails.

---

(Section 2 vote dilution finding; no finding of discriminatory intent); *Miss. State Chapter, Operation Push, Inc. v. Mabus*, 932 F.2d 400 (5th Cir. 1991) (challenge to dual registration system; no finding of discriminatory intent); *Cook v. Luckett*, 735 F.2d 912 (1984) (reapportionment case; no finding of discriminatory intent); *Milliken v. Bradley*, 418 U.S. 717 (1974) (appeal of district court decision, *Bradley v. Milliken*, 338 F. Supp. 582 (E.D. Mich. 1971), specifically declining to determine discriminatory intent); *Perry v. Perez*, 565 U.S. 388 (2012) (deferral to legislature for drawing of interim districting plan during pendency of Section 5 hearings; no finding of discriminatory intent)); *see also* cases cited by Texas at Doc. 1049 at 1 n.2 & 6 (*N.E. Ohio Coal. for the Homeless v. Husted*, 831 F.3d 686 (6th Cir. 2016) (evaluating injunctive relief solely for undue-burdens on fundamental right to vote claim); *Lytle v. U.S. Dep't of Health & Human Servs.*, 612 F. App'x 861 (8th Cir. 2015) (evaluating injunctive relief issued under the Food, Drug, and Cosmetic Act—no discrimination claim); *Skydive Ariz., Inc. v. Quattrocchi*, 673 F.3d 1105 (9th Cir. 2012) (evaluating injunctive relief for an intentional trademark infringement); *State of Neb. Dep't of Health & Human Servs. v. Dep't of Health & Human Servs.*, 435 F.3d 326 (D.C. Cir. 2006) (evaluating injunctive relief for HHS failure to follow notice-and-comment rulemaking); *Brooks v. Giuliani*, 84 F.3d 1454 (2d Cir. 1996) (evaluating injunctive relief for potential due process violation in transfer of institutionalized persons)).

4

**B.      SB 5 Does Not Cure the Discriminatory Purpose Violation**

Texas and the United States argue that SB 5 provides a "complete remedy" for both the discriminatory purpose and results violations and therefore insist that there is no "ongoing violation" of federal law.  Doc. 1049 at 9-12; Doc. 1052 at 18-21.  They are absolutely wrong.[5]

As Private Plaintiffs demonstrated in their opening brief (Doc. 1051 at 4-8), if SB 5 were to go into effect on January 1, 2018, it would visit lingering and discriminatory burdens on Black and Latino voters against whom the Texas legislature purposefully discriminated because they will be forced to take additional steps to vote that would not have been required absent the discriminatory provisions of SB 14.  Moreover, as structured, the reasonable impediment provision subjects those classes of voters to the threat of criminal investigation and felony liability.  SB 5 simply does not place the victims of discrimination in the position that they would have been had there been no purposeful discrimination by Texas.

This is precisely the reasoning adopted by the Fourth Circuit in *N.C. State Conference of NAACP v. McCrory*, when it ruled that North Carolina's amendment of its photo ID law to include a reasonable impediment process still carried the prior law's discriminatory intent.  831 F.3d 204, 240 (4th Cir. 2016), *cert. denied*, 137 S. Ct. 1399 (2017).  *N.C. State Conf. of NAACP* is the singular case most analogous to this case.  Yet both Texas and the United States fail to address this ruling. Their silence speaks volumes

---

[5] At its most basic level, SB 14 is still the law of Texas today, prevented from implementation only by virtue of this Court's Interim Remedial Order.  Were this Court to follow the suggestion of the United States and "vacate the agreed interim remedy and decline to enter any further judicial remedy," (Doc. 1052 at 7), elections in Texas would immediately be subject to SB 14, a law passed with discriminatory intent (and imposing discriminatory effects).  That result clearly violates *Veasey II* as well as this Court's ruling on discriminatory purpose.

Instead, Texas and the United States rehash a series of arguments already rejected by this Court in its opinion on Texas's "mootness" claim.  Doc. 1022.[6]  First, they argue that, because a plaintiff has to prove both results and intent to prove an intent claim, and because SB 5 supposedly cures the results violation, there is no longer an intent violation to cure.  Doc. 1049 at 18-19; Doc. 1052 at 9.[7]  Once again, they fail to support their argument with a single case dealing with the *remedy* for intentional discrimination.  All of their authority discusses proving *liability* for intentional discrimination.[8]  However, this Court has already found, applying the *Arlington Heights* standards, including the disproportionate impact of SB 14, that the law was enacted with the intent to discriminate against Black and Latino Texans.  That intent and that disproportionate impact do not disappear, even if SB 5 did fully remedy the discriminatory effect of SB 14 (which it does not, *see* Point IV, *infra*).  As this Court has already ruled:

---

[6] In this regard, in addition to the availability of injunctive relief on the basis that there is an ongoing violation of federal law, the possibility of recurrence of the illegal behavior also provide a basis for that relief.  *City of Mesquite v. Aladdin's Castle, Ind.*, 455 U.S 283, 289 (1982); *see* Point III, *infra*.

[7] Texas's argument that a discriminatory effect is necessary to prove discriminatory intent is wrong, but, for purposes of this case, it is not necessary for the Court to reach that issue because the Court has already found Texas liable for both discriminatory results and discriminatory purpose.  Nevertheless, it is worth noting that Texas's argument on this point is wrong-headed.  While discriminatory impact is often probative of intent, it is not a necessary element.  A plaintiff may prove *either* discriminatory effects or discriminatory intent because legislation targeted at minorities is injurious *per se*.  *See, e.g.*, *Rogers v. Lodge*, 458 U.S. 613, 617 (1982) (holding that laws "conceived or operated as purposeful devices to further racial discrimination" violate the Fourteenth Amendment) (internal quotations omitted); *City of Port Arthur v. United States*, 459 U.S. 159, 168 (1982) ("[E]ven if the [challenged] electoral scheme might otherwise be said to reflect the political strength of the minority community, the plan would nevertheless be invalid if adopted for racially discriminatory purposes."); *City of Richmond*, 422 U.S. at 372 (explaining in a Section 5 case that a voting law with no discriminatory effect could still be invalid if passed for a discriminatory purpose); *United States v. Brown*, 561 F.3d 420, 433 (5th Cir. 2009) ("To violate the statute, however, these practices must be undertaken with an intent to discriminate *or* must produce discriminatory results." (emphasis added)); *McMillan v. Escambia County*, 748 F.2d 1037, 1046 (5th Cir. 1984) (finding that, even absent the court's later determination that an at-large election system had a discriminatory result, its earlier finding of discriminatory intent was "sufficient to constitute a violation of section 2"); *Patino v. City of Pasadena*, No. H-14-3241, 2017 WL 68467, at *48 (S.D. Tex. Jan. 6, 2017) (finding that disproportionate impact is not "the sole touchstone of an intentional discrimination claim" and that other facts can "establish circumstances evidencing discriminatory intent"); *see also* Sen. Rep. No. 97-417, at 27 (1982) ("Plaintiffs must either prove such intent, or, alternatively, must show that the challenged system or practice, in the context of all the circumstances in the jurisdiction in question, results in minorities being denied equal access to the political process.").

[8] *See, e.g.*, Texas and United States' reliance on *Palmer v. Thompson*, 403 U.S. 217 (1971), for the proposition that "state action cannot be nullified 'solely because of the motivations of the [legislators] who voted for it.'"  Doc. 1049 at 19; *accord* Doc. 1052 at 10.

> Here, Plaintiffs allege that they were intentionally discriminated against when the Texas legislature passed SB 14. In that event, they suffered injuries with respect to voting in elections that have already closed and can never be reopened. While the only relief they can obtain is prospective, the injuries are not eliminated as a result of a single provision that ameliorates the harshest effect of the law.

Doc. 1022 at 6.

Further, under SB 5, voters who lack SB 14 ID – who are, by design, disproportionately Black and Latino voters – are subjected to different and intimidating requirements to vote. No burden, however slight, is acceptable if it is imposed on voters because of their race. Next, Texas and the United States rely on a series of inapposite cases for the proposition that "reenactment of a constitutional provision vitiates the harm from a previous law intended as racial discrimination." Doc. 1049 at 21; *see also* Doc. 1052 at 10. Yet again, none of these cases is remotely similar to the circumstances here. None of them discusses the effect of subsequent legislation on the remedy for a violation of intentional discrimination. The only case dealing directly with this issue is *N.C. State Conference of NAACP*, which Texas and the United States studiously ignore on this issue.[9] Texas and the United States have not provided any meaningful

---

[9] Indeed, none of the cases relied upon by Texas or the United States are remedy cases at all. As previously discussed, *Cotton v. Fordice*, 157 F.3d 388 (5th Cir. 1998), is irrelevant here. *See* Doc. 2051 at 10. It concerned two laws enacted 80 years apart, not six; the previous law was not adjudicated to be discriminatory; the legislature therefore did not reenact the law despite a ruling of intentional discrimination; and it was not reenacted in direct response to failed attempts to defend the initial law in court against claims of discrimination. Further, in *Cotton*, the Fifth Circuit deemed it significant to proof of removal of prior discriminatory intent that the law in question was reenacted, and not simply left standing. Here, the legislature left in place virtually every one of the specific discriminatory choices that it had made in 2011.

In *Chen v. City of Houston*, 206 F.3d 502 (5th Cir. 2000), a challenge to the constitutionality of a 1997 districting plan, there had never been a challenge to the prior plans on which the 1997 plan was based and, therefore, there was no judicial finding that race predominated in the prior plans. The court noted that the state of mind involved in the prior plans "is not of itself what is precisely and directly the ultimate issue before the Court in this case." *Id.* at 521. By contrast, the discriminatory intent of SB 14 is at the heart of the case must be remedied in full.

*Ansell v. Green Acres Contracting Co., Inc.*, 347 F.3d 515 (3d Cir. 2003), is an employment discrimination case, which Texas cites for the irrelevant proposition that an employer's subsequent acts may be relevant to prior intent if the acts are not remote in time. Finally, Texas relies on *Red Lion Broad. Co. v. F.C.C.*, 395 U.S. 367 (1969), to argue that the 2017 Legislature's actions are relevant to the 2011 Legislature's intent in enacting SB 14. Doc. 1049 at 22. *Red Lion*—which was not a discriminatory intent case, but a question of statutory construction—simply held that courts should give weight to new legislation instructing courts on how to interpret the *meaning* of an old law. 395 U.S. at 380-81.

response to the compelling reasoning of the Fourth Circuit, reasoning which should guide this Court in enjoining SB 14 *and* SB 5 to ensure that no discriminatory portion of SB 14 is enforced against its intended victims.

### C.    Return to Pre-SB 14 Law Furthers the Efficacy of 3(c) Relief

Because of the structure of Section 3(c) relief as a statutory remedy for intentional discrimination, a return to pre-SB 14 law is required.  Pursuant to 28 C.F.R. §51.8, the Attorney General's procedures for Section 5 preclearance also apply to jurisdictions subject to Section 3(c) preclearance.  The Attorney General's Section 5 preclearance rules provide that the jurisdiction must demonstrate that any change in voting practices is not "retrogressive," i.e., it will not make members of a racial or language minority group "worse off than they had been before the change."  28 C.F.R. §51.54(b).  The Section 3(c) relief would make little sense if the benchmark for retrogression were a law based upon the discriminatory provisions that gave rise to the Section 3(c) relief.  The benchmark for the retrogressive analysis must be the law in effect before the discriminatory law.  Thus, the appropriate remedy for Texas's intentional discrimination is to place Private Plaintiffs where they would have been were it not for Texas's intentional discrimination: governed by the law that was in place prior to SB 14. [10]

## III.    THE COURT SHOULD RETAIN JURISDICTION

The United States—but not Texas—argues that the Court should not retain jurisdiction to review future legislation.  First, without cite to any authority, the United States claims that "such

---

[10] This is not to suggest that Texas is permanently bound by the pre-SB 14 law.  The Texas legislature is free to return to the drawing board and create a new voter ID law that does not contain any of the provisions that were found to be intentionally discriminatory and is not itself a result of intentional discrimination.  *See N.C. State Conference of NAACP*, 831 F.3d at 241 (Injunction "does not freeze North Carolina election law in place . . . . ").  Assuming that this Court grants Section 3(c) relief, the legislature could then submit that proposed law to the Department of Justice for preclearance and to this Court pursuant to its retained jurisdiction.  But the benchmark for the retrogression analysis must be pre-SB 14 law, not, as Texas would have it in light of SB 5, SB 14 itself.

relief is available only under Section 3(c) of the Voting Rights Act." Doc. 1052 at 12.[11]  Then, immediately contradicting its first premise, the United States notes that "a retention of jurisdiction is common in voting rights cases" to give legislatures the opportunity to remedy the violation.  *Id.*  Then, in the last sentence of its brief, the United States at last recognizes the existence of the on-point decision of *McCrory*.  Unfortunately, the United States inaccurately states that the Fourth Circuit "unanimously denied a request for similar relief," *id.*, when the Fourth Circuit never mentioned the issue of retention of jurisdiction as a matter of inherent equitable power.  Rather, after permanently enjoining all of the challenged provisions of North Carolina's omnibus voting law, including its newly-enacted photo ID law that included a reasonable impediment process, the Fourth Circuit declined to order relief under Section 3(c) of the Voting Rights Act, because that remedy was "not necessary here in light of our injunction," restoring the voting system to that which was in place prior to the challenged laws.  *N.C State Conf. NAACP*, 831 F.3d at 241.  The court's reference to not wanting to "bind[] the State's hands," the phrase highlighted by the United States, had nothing to do with declining to retain jurisdiction, but, rather, was an explanation of the effect of its injunction.  Here, Private Plaintiffs' request for this Court to retain jurisdiction is made independently of any request for relief under Section 3(c), and is addressed to this Court's inherent equitable jurisdiction.

It is particularly appropriate for the Court to retain jurisdiction here, because Texas cannot meet its burden of proving that its conduct will not recur.[12]  Moreover, there is abundant

---

[11] This position is directly contrary to that which the United States assumed before the Fifth Circuit when it told the appellate Court that retention of jurisdiction by this Court was not "an order imposing preclearance."  USA Br. at 71, *Veasey v. Abbott*, No. 14-21127 (5th Cir. Mar. 3, 2015).

[12]  Although governmental entities may be held to a more lenient standard as to whether their unlawful conduct would recur, that standard is based on the belief that government actors are "not self-interested" parties.  *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 325 (5th Cir. 2009), *aff'd sub nom. Sossamon v. Texas*, 563 U.S. 277 (2011).  Where, as here, there is "evidence to the contrary," there is no basis to grant the government this "solicitude."  *Id.*

evidence to suggest that Texas' conduct may recur.  The mountain of factual findings made by this Court and already affirmed by the Fifth Circuit indicate that the legislature acted discriminatorily and in its own self-interest, because the political party in power believed that it could gain partisan advantage by a strict voter ID law that would limit the growing political power of minority voters.  *Veasey v. Perry*, 71 F. Supp. 3d 627, 700 (S.D. Tex. 2014); *Veasey II*, 830 F.3d at 241.  Those demographic changes persist and provide increasing incentive for racial discrimination.  Indeed, Texas's years-long resistance to making ameliorating revisions to it voter ID law and its doing so only after a contrary *en banc* ruling by the Fifth Circuit and the denial of its bid for review by the Supreme Court make it difficult to accept any claim that repetition is unlikely.[13]

## IV.   ALTERNATIVELY, SB 5 DOES NOT COMPLETELY CURE THE RESULTS VIOLATION

Texas's position on remedies for the results violation is based on the demonstrably false statement that the "only real dispute on the remedy for [the results] claim" is whether SB 5 can replace the "virtually identical court-ordered remedy."  Doc. 1049 at 7.  This is not so.  SB 5 differs in meaningful ways from the court-ordered remedy, and the interim order was never intended to be this Court's final resolution of the Section 2 results remedy.

Private Plaintiffs have already explained why SB 5 fails to cure completely the results violation, focusing on the intimidating effects of the reasonable impediment process and the

---

[13]  In this regard, the reliance by the United States on *Green v. Mansour*, 474 U.S. 64 (1985), is again inapposite. There, the reason plaintiffs stipulated that the mootness of their claim against a *state* for prospective injunctive relief to force the state to comply with *federal* law was that *Congress* had amended the law to clarify it to meet plaintiffs' construction.  There was no longer a possibility for the *state's* offensive conduct to recur.

failure of the law to cure the education and training deficiencies of SB 14.  Doc. 1051 at 11-17.[14]

Nothing in Texas's or the United States' opening briefs on remedies alleviates those concerns.

### A.   The Fifth Circuit Did Not Rule That a Reasonable Impediment Protocol Completely Cures the Results Violation

First, contrary to Texas's argument, nowhere did the Fifth Circuit opine that a reasonable

impediment protocol "remedies" "*any* disparate impact."  Doc. 1049 at 8, 16 (emphasis added).

Rather, the Fifth Circuit merely said that "appropriate amendments *might* include a reasonable

impediment or indigency exception . . . ."  *Veasey II*, 830 F.3d at 270 (emphasis added).  Indeed,

the Fifth Circuit's reference to a reasonable impediment protocol did not contain the stronger

endorsement that the Fifth Circuit gave to the reinstatement of voter registration cards as a

potential remedy.  *Id.* at 272 & n.72.  And certainly, nowhere did the Fifth Circuit opine on the

propriety of the specifics of a reasonable impediment process, such as whether it should include

a box so that voters might provide a reasonable impediment "other" than those specifically

delineated,[15] and whether there should be any chance of criminal prosecution, let alone a felony

penalty, for the providing of false information on the DRI.

---

[14] Texas and the United States repeatedly emphasize that "all parties" had agreed to the reasonable impediment declaration as an interim remedy.  However, that agreement was forged (1) under exigent circumstances, (2) in the context of the Fifth Circuit's strict admonitions as to the contours of an interim remedy to address the results violation only, (3) without the benefit of this Court's finding of an intent violation, and (4) with a complete reservation of rights to seek broader relief.

[15] Texas argues that deletion of the "Other" box "promotes election integrity" because some 19 voters apparently exercised their First Amendment right to express their opposition to an unconstitutional, discriminatory law on the DRI.  Doc. 1049 at 10-12.  Leaving aside that Texas has flouted this Court's prohibition against introducing any evidence into the record on remedies other than the trial record evidence and the face of SB 5, there is no evidence that any of these voters, in fact, did not have a reasonable impediment to getting SB 14 ID, and certainly no evidence that any of these voters was ineligible to vote.  That 19 out of roughly 16,000 voters who used the DRI process voiced their objections in this manner has nothing to do with "election integrity."  Moreover, Texas suggests that the inability to invalidate votes under Texas law based on the reasonableness of the impediment requires the omission of the "Other" option on the DRI.  This argument is unpersuasive.  It has not been shown to be the case that any of the persons who used the "Other" option were ineligible to vote.

**B.      SB 5 Does Not Cure the Education and Training Deficiencies**

Significantly, the Fifth Circuit specified that a complete remedy for the results violation must address serious educational and training deficiencies in the implementation of SB 14:  "in fashioning a remedy, the district court should also consider the necessity of educational efforts to ensure that both voters and workers at polling places are capable of making use of whatever remedy the district court selects."  *Veasey II*, 830 F.3d at 272.  SB 5 fails in this regard.

Nonetheless, making an argument that even Texas has not made, the United States claims that the State has committed to notify and educate all *active*[16] registered Texas voters regarding the new voter ID requirements, claiming that Texas will spend $4 million over two years for voter outreach.  Doc. 1052 at 1-2, 7-8.  In fact, Texas has not "committed" itself to anything.  The United States' assumptions are based on Texas's lawyers' arguments in Texas's Proposal for a Briefing Schedule (Doc. 1039), in which (unsupported by affidavit), Texas's lawyers said that the State "intends" to seek vendor services to assist with voter education for the November 2017 election, that it "expects" to spend $400,000 in 2017 out of its $4 million appropriation for voter education, that it is "anticipated" that the vendor would implement strategies to educate voters, and that it "plans" to use the remainder of the funds for voter education during 2018.  Doc. 1039 at 2.

This Court and the Fifth Circuit have already found that Texas's abysmally poor education and training programs exacerbated the discriminatory effects of SB 14.  *See, e.g.*, *Veasey II*, 830 F.3d at 256 (finding "no clear error in the district court's finding that the State's lackluster educational efforts resulted in additional burdens on Texas voters").  Texas's lawyers' unverified, unsworn, vague, and hedged statements as to what Texas intends to do come nowhere

---

[16] Texas does not even define the term "active registered Texas voter," which may exclude persons who did not participate in recent elections as a result of Texas racially discriminatory voter ID law.

near the sort of detailed, court-vetted and court-ordered education and training program, complete with an order for sufficient funds to support it, which would be a necessary part of a complete cure of the results violation.  Rather, all is left to the discretion of Texas's officials.

As the Fifth Circuit explained, it has upheld a discriminatory result judgment where the district court "found the law delegated too much discretion to local officials," *Veasey II*, 830 F.3d at 251 n.44 (citing *Miss. State Chapter, Operation Push, Inc. v. Mabus*, 932 F.2d 400, 404 (5th Cir. 1991)).  The same necessarily holds for the remedy for a results violation:  it cannot be based on lawyers' arguments as to what their clients "intend," "plan," "anticipate," or "expect." The remedial order as to education and training must have details and teeth.  While Texas's lawyers' vague statements may suffice for the United States today,[17] they do not for Private Plaintiffs and they should not for this Court.

### C.     SB 5's Limited "Expansion" of the Discriminatory SB 14 Categories Does Not Help Cure the Discriminatory Results

Texas claims that SB 5 "expands" and "broadens" the range of SB 14 IDs (Doc. 1049 at 11-12) in three ways. In their opening brief, Private Plaintiffs credit one of these: the expansion of the expiration period from 60 days to 4 years for SB 14 IDs.  The other two ways in which the legislature purportedly "expanded" and "broadened" SB 14 IDs, however, are choices that do nothing to alleviate the discriminatory impact of SB 14.

First, Texas touts that, under SB 5, "voters 70 years of age or older can use an accepted form of photo ID that has been expired for any length of time."  Doc. 1049 at 11-12.  While this provision may increase the total number of persons who possess SB 14 ID, there is substantial

---

[17] The United States says that it "has no basis to question that the State will honor its public commitment to Texas's voters and this Court."  Doc. 1052 at 8.  That is not the position the United States took when it applied to this Court for strict guidelines to govern the State's implementation of its promises to educate voters and train officials under the Interim Remedial Order.  Docs. 924, 938.

13

record evidence that Black and Latino voters will not benefit as much from this change as will Anglo voters.  As Dr. Allan Lichtman explained, in addressing Texas's claim that the effects of SB 14 would be mitigated because persons 65 years or older will be able to vote by mail without providing a reason:

> African-Americans and Hispanics are underrepresented among seniors in Texas, whereas whites are overrepresented.  According to 2010 U.S. Census data, 19.4 percent of voting age whites are 65 years or older, compared to 8.7 percent of voting age Latinos, and 10.5 percent of voting age African-Americans. This represents another decision by the Texas legislature that favors whites and disproportionately burdens African Americans and Latinos who have less opportunity than whites to take advantage of this exception to the absentee voting rules.

PL772 at 64-65 (Lichtman Rep.) (internal citations omitted).[18]

The second example of the Legislature's "expanding" the scope of available SB 14 IDs also fails to eliminate the discrimination of SB 14:  the addition of "passport cards" as an SB 14 ID.  To get a passport card, one must pay at least $30.00 to the federal government.  *See* www.passportinfo.com.  This Court's results ruling was based in large part on the disproportionate burden placed on poor people in Texas who are themselves disproportionately Black and Latino, because of the ongoing effects of longstanding discrimination.  Adding another ID that can be obtained only by the payment of a substantial amount of money increases, rather than decreases, the disproportionate access to the right to vote pursuant to SB 14.

### D.    The Court Is Not Substituting Its Judgment for the Legislature's Judgment

Contrary to the argument of the United States (Doc. 1052 at 2, 4, 7, 8), this is not a situation where the legislature has adopted a plan that does, in fact, completely cure the results

---

[18] While the United States indicates that the expansion of the cut-off period of SB 14 IDs "decreases" the 608,470 registered voters found to lack SB 14 ID, Doc. 1052 at 5, it does not indicate the size of this decrease, and, more important, it does not indicate that the decrease would affect the discriminatory disproportionality of SB 14 ID possession.  As Dr. Lichtman explains, if anything, it would increase that disproportionality.

violation, and the Court is being asked whether there is a "superior" way of accomplishing the cure.  Rather, this is a case where the cure offered by the legislature is *prima facie* partial, because it does not address the crucial education and training elements of this Court's findings and, on its face, imposes consequences that fail to eliminate and may exacerbate the existing discriminatory effects.  Correcting the legislature's "remedy" so as to (1) diminish the chances for intimidation of the victims of discrimination by removing any unnecessary criminal penalty; (2) reduce the harmful and discriminatory effects of SB 14 and SB 5 by supplementing the SB 14 IDs with the universally-held and secure voter registration cards; and (3)  prescribe a judicially-sanctioned, detailed, comprehensive, and fully funded educational and training plan would cure the discriminatory results violation, while deferring to legislative policy.[19]

## CONCLUSION

For the reasons set forth above and in Private Plaintiffs' opening brief on remedies (Doc. 1051), Private Plaintiffs respectfully submit that this Court order the below-listed relief to provide a complete and permanent remedy for defendants' constitutional and statutory violations in enacting and implementing SB 14: (a) a declaratory judgment that SB 14 violates Section 2 of the Voting Rights Act and the 14th and 15th Amendments; (b) a permanent injunction against enforcement of the voter identification provisions of SB 14; (c) retention of jurisdiction to "review [any] legislation to determine whether it properly remedies the violations," *Veasey*, 71 F. Supp. 3d at 707; (d) an injunction against SB 5, which does not cure the discriminatory intent of SB 14; and (e) a schedule to address Section 3(c) relief.

---

[19] The United States' attempt to apply the cautions of the court in *Miss. State Chapter, Operation Push, Inc.*, 932 F.2d at 406-07, against a court's substituting its judgment for the legislature's as to remedy on the issue of education and training (Doc. 1052 at 8) is even more strained, as *Operation Push* dealt solely with a concrete legislative plan, which, on its face, addressed all of the results violation.  As noted above, there is no education and training plan in SB 5.

Date:  July 17, 2017                      Respectfully submitted,

/s/ Lindsey B. Cohan
JON M. GREENBAUM
EZRA D. ROSENBERG
BRENDAN B. DOWNES
Lawyers' Committee for
Civil Rights Under Law
1401 New York Avenue NW Suite 400
Washington, D.C. 20005

WENDY WEISER
MYRNA PÉREZ
The Brennan Center for Justice at NYU Law School
120 Broadway, Suite 1750
New York, New York 10271

SIDNEY S. ROSDEITCHER
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019-6064

AMY L. RUDD
LINDSEY B. COHAN
Dechert LLP
500 W. 6th Street, Suite 2010
Austin, Texas 78701

NEIL STEINER
DECHERT LLP
1095 Avenue of the Americas
New York, New York 10036-6797

JOSE GARZA
Law Office of Jose Garza
7414 Robin Rest Drive
San Antonio, Texas 98209

DANIEL GAVIN COVICH
Covich Law Firm LLC
Frost Bank Plaza
802 N Carancahua, Ste 2100
Corpus Christi, Texas 78401

GARY BLEDSOE
Potter Bledsoe, LLP
316 W. 12th Street, Suite 307
Austin, Texas 78701

VICTOR GOODE
NAACP
4805 Mt. Hope Drive
Baltimore, Maryland 21215

ROBERT NOTZON
The Law Office of Robert Notzon
1502 West Avenue
Austin, Texas 78701

*Counsel for the Texas State Conference of NAACP Branches and the Mexican American Legislative Caucus of the Texas House of Representatives*

/s/ Janai Nelson
SHERRILYN IFILL
JANAI NELSON
CHRISTINA A. SWARNS
COTY MONTAG
LEAH C. ADEN
DEUEL ROSS
NAACP Legal Defense and Educational Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006

JONATHAN PAIKIN
KELLY P. DUNBAR
TANIA FARANSSO
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006

*Counsel for Imani Clark*

/s/ Chad W. Dunn
CHAD W. DUNN
K. SCOTT BRAZIL
BRAZIL & DUNN
4201 Cypress Creek Pkwy., Suite 530
Houston, Texas 77068

17

J. GERALD HEBERT
DANIELLE M. LANG
Campaign Legal Center
1411 K Street NW Suite 1400
Washington, DC 20005

ARMAND G. DERFNER
Derfner & Altman
575 King Street, Suite B
Charleston, S.C. 29403

NEIL G. BARON
Law Office of Neil G. Baron
914 FM 517 W, Suite 242
Dickinson, Texas 77539

DAVID RICHARDS
Richards, Rodriguez & Skeith, LLP
816 Congress Avenue, Suite 1200
Austin, Texas 78701

*Counsel for Veasey/LULAC Plaintiffs*

LUIS ROBERTO VERA, JR.
Law Office of Luis Roberto Vera Jr.
111 Soledad, Ste 1325
San Antonio, TX 78205

*Counsel for LULAC*

/s/ Rolando L. Rios
ROLANDO L. RIOS
115 E. Travis, Suite 1645
San Antonio, Texas 78205

*Counsel for the Texas Association of Hispanic County Judges and County Commissioners*

/s/ Robert W. Doggett
ROBERT W. DOGGETT
SHOSHANA J. KRIEGER
Texas RioGrande Legal Aid
4920 N. IH-35
Austin, Texas 78751

18

JOSE GARZA
Texas RioGrande Legal Aid
1111 N. Main Ave.
San Antonio, Texas 78212

*Counsel for Lenard Taylor, Eulalio Mendez Jr.,
Lionel Estrada, Estela Garcia Espinoza, Margarito
Martinez Lara, Maximina Martinez Lara, and La
Union Del Pueblo Entero, Inc.*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on July 17, 2017, a true and correct copy of the foregoing document was served via the Court's ECF system to all counsel of record.

/s/ Lindsey B. Cohan

Lindsey B. Cohan
Dechert LLP
300 W. 6th Street, Suite 2010
Austin, Texas 78731
lindsey.cohan@dechert.com
