# EXHIBIT 1

# In the United States District Court
## for the
## Western District of Texas

SHANNON PEREZ, ET AL.          §
                               §
v.                             §          SA-11-CV-360
                               §
GREG ABBOTT, ET AL.            §


## ORDER ON PLAN C235

Before Circuit Judge SMITH, Chief District Judge GARCIA, and District Judge RODRIGUEZ

This Order addresses Plaintiffs' statutory and constitutional claims against Plan C235, enacted by the 83rd Texas Legislature in 2013.

The following Plaintiffs assert claims against Plan C235 in this consolidated case: the Mexican American Legislative Caucus ("MALC"),[1] the NAACP Plaintiffs,[2] the African-American Congresspersons Plaintiffs,[3] the

---

[1] MALC is a non-profit Latino legislative caucus established to serve the members of the Texas House of Representatives and their staffs in matters of interest to the Mexican American community of Texas. Docket no. 897 ¶ 18. MALC-1 is a list of current MALC members.

[2] The NAACP Plaintiffs include the Texas State Conference of NAACP Branches, an association of local chapters of the NAACP, Howard Jefferson, and Rev. Bill Lawson. Individual Plaintiff Juanita Wallace passed away in 2016. According to the affidavit of Carmen Watkins, Regional Director for Region VI of the National NAACP, the Texas NAACP has well over 10,000 members and members who are registered to vote in almost every county. NAACP-1. She further attests that "the NAACP has at least one branch in each of the implicated counties," 884 members in Tarrant County, 320 members in Bell County, 1,232 members in Harris County, and 147 members in Fort Bend County. *Id.* She further states that she reviewed the official membership lists in each of those counties and determined that there are members who reside in CD9, CD18, CD30, CD33, and House districts 100, 109, 110, and 111 (Dallas County), 95 and 101 (Tarrant County), 54 and 55 (Bell County), and 26 and 27 (Fort Bend County). *Id.*

[3] Eddie Bernice Johnson (CD30), Sheila Jackson Lee (CD18), and Alexander Green (CD9).

League of United Latin American Citizens ("LULAC") Plaintiffs,[4] the Rodriguez Plaintiffs,[5] the Quesada Plaintiffs,[6] and Congressman Henry Cuellar.

Plaintiffs assert statutory claims under § 2 of the Voting Rights Act ("VRA") and constitutional claims under the Fourteenth and Fifteenth Amendments to the United States Constitution.

## Procedural History and Background

Plaintiffs initially filed several lawsuits in 2011 challenging Plan C185 and Plan H283 enacted by the 82nd Legislature, and the various cases were consolidated. At the time, Texas was subject to preclearance requirements under § 5 of the VRA, and Texas filed a simultaneous action seeking preclearance in the United States District Court for the District of Columbia—*Texas v. United States*, No. 11-1303 (D.D.C.).[7] Plaintiffs presented

---

[4] The LULAC Plaintiffs include LULAC and individual members Gabriel Rosales, Belen Robles, Ray Velarde, Johnny Villastrigo, Bertha Urteaga, Baldomero Garza, Marcelo H. Tafoya, Raul Villaronga, Asenet T. Armadillo, Elvira Rios, and Patricia Mancha. LULAC has members who are registered to vote in most counties in Texas, including Dallas, Tarrant, Harris, Bexar, Nueces, and Fort Bend Counties. Docket no. 1302-1. LULAC submitted the affidavit of Elia Mendoza, Texas LULAC State Director, who attested that "there are multiple members of LULAC who are eligible voters in each of the Congressional and State Legislative Districts involved in this litigation." *Id.*

[5] Eddie Rodriguez, Milton Gerard Washington, Bruce Elfant, Balakumar Pandian, Alex Serna, Sandra Serna, Betty F. Lopez, David Gonzalez, Beatrice Saloma, Lionor Sorola-Pohlman, Eliza Alvarado, Juanita Valdez-Cox, Jose Martinez, Nina Jo Baker, Travis County, and the City of Austin.
The LULAC Plaintiffs, Perez Plaintiffs, and Rodriguez Plaintiffs have submitted joint briefing as "Joint Plaintiffs" on the congressional plan. Accordingly, the Court will consider their claims together unless necessary to consider them individually. The Perez Plaintiffs include Shannon Perez, Gregory Tamez, Sergio Salinas, Carmen Rodriguez, Nancy Hall, Dorothy DeBose, Jessica Farrar, Wanda F. Roberts, Richard Nguyen Le, and TJ Carson.

[6] Margarita V. Quesada, Romeo Munoz, Marc Veasey, Jane Hamilton, Lyman King, John Jenkins, Kathleen Maria Shaw, Debbie Allen, Jamaal R. Smith, and Sandra Puente.

[7] Texas could have sought administrative preclearance by the Attorney General, but instead sought a declaratory judgment from the D.C. District Court. In *Texas v. United States*, Texas bore the burden of proving that its enacted plans had neither the effect nor the purpose of abridging minority voting rights. 887 F. Supp. 2d 133, 139 (D.D.C. 2012) (citing 42 U.S.C. § 1973c(a)).

numerous claims in this Court under § 2 of the VRA and the Fourteenth and Fifteenth Amendments, and raised numerous challenges to the plans in the related preclearance litigation in the District of Columbia.  The D.C. Court held a trial in January 2012 but had not yet issued a ruling in February 2012.

Faced with impending election deadlines and un-precleared plans that could not be used in the election, this Court was faced with the "unwelcome obligation" of implementing interim plans so that the primaries could proceed. *See* docket no. 690 at 2 (quoting *Connor v. Finch*, 431 U.S. 407, 415 (1977)).  This Court considered compromise plans (Plan C226 and Plan H303) proposed by certain parties.  Although the plans were supported by some parties, including Defendants, most parties contended that they maintained statutory and constitutional infirmities challenged in Plan C185 and Plan H283.  The Court adopted Plan C235 (which was Plan C226 as modified for purely technical reasons) and Plan H309, a plan similar to Plan H303 but with changes in Harris County, Bexar County, Webb County, and Nueces County.

This Court found that adoption of these plans as the interim plans for the 2012 elections was consistent with the deferential standards set forth in *Perry v. Perez*, 565 U.S. 388 (2012) and would significantly benefit the voters, candidates, election administrators, counties, and political parties.  Docket nos. 690, 691.  The Court noted that its analysis had been expedited and curtailed and that it had been able to make only preliminary conclusions that might be revised upon full analysis.  Docket no. 690 at 3 ("[W]e emphasize the preliminary

nature of this order and that, except for the fact that PLAN H309 sets the districts for the 2012 elections, nothing in this opinion reflects this Court's final determination of any legal or factual matters in this case or the case pending in the D.C. Court."); docket no. 691 at 1 (noting that "this interim map is a result of preliminary determinations" and "is not a final ruling on the merits of any claims").

As directed by the Supreme Court, this Court in adopting an interim map attempted to determine which claims pending in the D.C. Court preclearance litigation were "not insubstantial" because the D.C. Court had exclusive jurisdiction over the § 5 claims but had not yet ruled.  That Court issued its decision denying preclearance of Plan C185 and Plan H283 on August 28, 2012. *Texas v. United States*, 887 F. Supp. 2d 133 (D.D.C. 2012).  The panel majority found that Plan C185 increased the "representation gap" from three districts to four districts[8] and thus increased the degree of discrimination and was retrogressive.  Because the panel did not agree on the appropriate rationale for finding retrogression, they considered the issue of discriminatory intent and unanimously found that "the plan was enacted with discriminatory purpose." *Id.* at 159.  The Court specifically noted that unnecessary changes were made to the three African-American ability districts that raised serious concerns about what motivated the Congressional plan, and that Texas failed to explain the

---

[8] Minority representation fell from 10/32 ability districts (when proportionality would be 13/32) to 10/36 ability districts (when proportionality would be 14/36), thus increasing the representation gap from three districts to four.

changes as anything other than "coincidence." *Id.* at 159-61.

With regard to Plan H283, the D.C. Court found that it would have the effect of abridging minority voting rights in benchmark ability districts 33, 35, 117, and 149, and that Texas did not create any new ability districts to offset those losses. Accordingly, the plan was retrogressive and could not be precleared.

Having found retrogressive effect, the D.C. Court did not need to reach whether Plan H283 was drawn with a discriminatory purpose, but it did "note record evidence that cause[d] concern." 887 F. Supp. 2d at 177. This evidence included that the process for drawing the plan "showed little attention to, training on, or concern for the VRA" and the failure to create any new minority ability districts among 150 relatively small House districts despite the dramatic Hispanic population growth concentrated primarily in three geographic areas. *Id.* at 177-78. The D.C. Court further stated, "These concerns are exacerbated by the evidence we received about the process that led to enacted HD 117," specifically that "mapdrawers modified HD 117 so that it would elect the Anglo-preferred candidate yet would look like a Hispanic ability district on paper," showing "a deliberate, race-conscious method to manipulate not simply the Democratic vote but, more specifically, the *Hispanic* vote." *Id.* at 178 (emphasis in original).

The D.C. Court also found incredible the testimony of primary House mapdrawer Gerardo Interiano that he was unaware of the capability of Texas's

redistricting software (RedAppl) to display racial data at the census block level, which reinforced evidence suggesting that mapdrawers split voter tabulation districts ("VTDs") along racial lines to dilute minority voting power. *Id.* The D.C. Court concluded,

> This and other record evidence may support a finding of discriminatory purpose in enacting the State House Plan. Although we need not reach this issue, at minimum, the full record strongly suggests that the retrogressive effect we have found may not have been accidental.

*Id.* Texas appealed the D.C. Court's decision denying preclearance to the Supreme Court.

The Court's interim maps, H309 and C235, were used for elections in 2012. Despite urging from the Texas Attorney General to adopt the Court's interim maps during the regular session in 2013,[9] the Texas Legislature's regular session ended in May 2013 with no redistricting action. However, Governor Rick Perry called a special session directing the Legislature to consider "legislation which ratifies and adopts the interim redistricting plans ordered by the federal district court as the permanent plans for districts used to elect members of the Texas House of Representatives, Texas Senate and United States House of Representatives." D-684.

The Legislature reconvened and undertook this redistricting task. During the special session, some changes were made to Plan H309, and it was adopted as Plan H358. By June 23, 2013, the Legislature had passed SB3 and SB4 to

---

[9] *See* Quesada-57 (Attorney General Greg Abbott letter to Speaker Straus urging the Legislature to adopt the interim maps during the session).

enrollment. SB4 "ratified and adopted" this Court's interim congressional map, Plan C235, without change, and repealed SB4 from the 2011 first special session, which had adopted Plan C185. SB3 adopted Plan H358 as the plan for the Texas House of Representatives and repealed HB150 from the 2011 regular session, which had adopted Plan H283. SB3 and SB4 were sent to the Governor on June 24, 2013.

On June 25, 2013, while Texas's appeal of the D.C. Court's decision was pending, the United States Supreme Court issued its decision in *Shelby County v. Holder*, 133 S. Ct. 2612 (2013), holding that the § 4(b) coverage formula of the VRA that determined which jurisdictions were subject to § 5 preclearance was unconstitutional. Accordingly, Texas was no longer automatically subject to preclearance requirements. The Governor signed SB3 and SB4 on June 26, 2013.[10]

On June 27, 2013, the Supreme Court vacated the D.C. Court's judgment and remanded for further consideration in light of its intervening decision in *Shelby County v. Holder*, 133 S. Ct. 2612 (2013) and the suggestion of mootness filed by defendant Wendy Davis. *Texas v. United States*, 133 S. Ct. 2885 (June 27, 2013). On remand, the D.C. Court dismissed the preclearance litigation as moot.[11]

---

[10] The 2013 plans for the Texas House and U.S. House became law on September 24, 2013. *See* TEX. CONST. ART. III § 39.

[11] Although the Supreme Court did not rule on § 5 itself, the effect of its ruling was to release Texas from the preclearance requirement and render the D.C. preclearance proceedings moot. On remand, Texas moved to dismiss the case as moot, and the United States did not oppose the motion. Some defendants in the case sought leave to amend to assert counterclaims for relief under § 3(c) of the

On June 28, 2013, Defendants filed a motion to dismiss for lack of subject matter jurisdiction (docket no. 768) in this case, arguing that the case had become moot and should be dismissed. This Court held a status conference on July 1, at which Plaintiffs expressed a desire to amend their complaints to challenge the 2013 plans, and some Plaintiffs stated their intent to amend their existing claims related to the 2011 plans to seek relief under § 3(c) of the VRA.[12] After the hearing, the Court issued an order summarily denying the motion to dismiss for lack of jurisdiction without prejudice (docket no. 771) and issued an order directing Plaintiffs to file motions for leave to amend pleadings.

Plaintiffs filed their motions, and the State responded in opposition and with a motion to dismiss as moot all claims related to the 2011 plans. This Court entered an order on September 6, 2013 on the pending motions (docket no. 886) permitting Plaintiffs to amend their claims with regard to the 2011 plans to assert requests for equitable relief under § 3(c) and to assert claims against the 2013 plans. The Court rejected Defendants' mootness argument, for the reasons explained in that Order and in docket no. 1104. In sum, this Court found that the claims against the 2011 plans C185 and H283 were not moot because Plaintiffs alleged that they were continuing to be harmed by the

---

VRA. On December 3, 2013, the D.C. Court granted Texas's motion to dismiss proceedings in that court and denied the motions to amend.

[12] Section 3(c), known as the VRA's "bail-in" provision, states, "If in any proceeding instituted by the Attorney General or an aggrieved person under any statute to enforce the voting guarantees of the fourteenth or fifteenth amendment in any State or political subdivision the court finds that violations of the fourteenth or fifteenth amendment justifying equitable relief have occurred within the territory of such State or political subdivision, the court, in addition to such relief as it may grant, shall retain jurisdiction for such period as it may deem appropriate and during such period [may impose preclearance requirements]." 52 U.S.C. § 10302(c) (formerly 42 U.S.C. § 1973a(c)).

Legislature's actions in enacting Plan C185 and Plan H283, Texas had refused to concede any of Plaintiffs' claims, and Plaintiffs had alleged claims for which meaningful relief was available. The Court further ordered that the 2013 enacted plans, C235 and H358, be used for the 2014 elections.

Thereafter, Plaintiffs filed their amended complaints. Plaintiffs generally maintained their claims against Plan C185 and Plan H283 and sought relief under § 3(c) of the VRA. Most Plaintiffs amended their Complaints to assert claims against Plan C235. Specifically, Congressman Cuellar filed a Second Amended Complaint in Intervention (docket no. 893) asserting claims under § 2 of the VRA and the Fourteenth and Fifteenth Amendments; LULAC filed a Third Amended Complaint (docket no. 894) asserting claims under § 2 of the VRA and the Fourteenth and Fifteenth Amendments; the Rodriguez Plaintiffs filed a Second Amended Complaint (docket no. 896) asserting claims under § 2 of the VRA and the Fourteenth and Fifteenth Amendments; the Quesada Plaintiffs filed a Third Amended Complaint (docket no. 899) asserting claims under § 2 of the VRA and the Fourteenth and Fifteenth Amendments; the NAACP filed a Third Amended Complaint (docket no. 900) asserting claims under § 2 of the VRA and the Fourteenth and Fifteenth Amendments; the African-American Congressperson Intervenors filed a Second Amended Complaint (docket no. 901) asserting claims under § 2 of the VRA and the Fourteenth and Fifteenth Amendments; the Perez Plaintiffs filed a Sixth Amended Complaint (docket no. 960) asserting intentional discrimination claims

under § 2 of the VRA and the Constitution; and MALC filed a Third Amended Complaint (docket no. 897) asserting claims under § 2 of the VRA.

Some Plaintiffs also amended their complaints to assert claims against Plan H358: the Task Force filed a Fourth Amended Complaint asserting statutory and constitutional claims based on changes to HD90 from the Court's interim plan (docket no. 891); MALC asserted claims under § 2 of the VRA and the Fourteenth and Fifteenth Amendments (docket no. 897); the NAACP asserted claims under § 2 of the VRA and the Fourteenth and Fifteenth Amendments (docket no. 900); and the Perez Plaintiffs filed a Sixth Amended Complaint (docket no. 960) asserting intentional discrimination claims under § 2 of the VRA and the Fourteenth and Fifteenth Amendments, and those claims were joined by LULAC.

The Texas Latino Redistricting Task Force and the United States did not assert claims against Plan C235, and the Task Force claims are limited to HD90 in Plan H358. The Texas Democratic Party ("TDP") and Gilberto Hinojosa filed a First Amended Cross-claim (docket no. 902) to assert partisan gerrymandering claims under the Equal Protection Clause and the First Amendment against the 2013 plans. Individual Plaintiff John Morris also asserted partisan gerrymandering claims against Plan C235 (docket no. 784). This Court granted Defendants' motion to dismiss the political gerrymandering claims against the 2011 and 2013 plans in docket no. 886 and docket no. 1104, and thus all of TDP's and Morris's claims were dismissed. The Court also granted summary judgment

on the Fifteenth Amendment claims against the 2011 and 2013 plans in docket
no. 275 and docket no. 1108. *See* docket no. 1387.

This Court held a trial on Plan H283 in July 2014 and on Plan C185 in
August 2014 and later issued extensive fact findings and rulings on Plaintiffs'
claims. The Court found that certain aspects of those plans violated § 2 of the
VRA and the Fourteenth Amendment. Docket no. 1365 (Order on Plan H283);
docket no. 1364 (Fact Findings related to Plan H283); docket no. 1390 (Amended
Order on Plan C185); docket no. 1340 (Fact Findings).[13]

Plaintiffs contend that certain aspects of Plan C185 and Plan H283 that
the Court found to be the product of discriminatory intent or constitutional and
statutory violations were maintained in Plan C235 and Plan H358, rendering
them infirm. In addition, Plaintiffs bring various statutory and constitutional
challenges against Plan C235 and Plan H358. This Court held a trial on Plan
C235 and Plan H358 in July 2017 and now issues rulings on Plaintiffs' claims
against Plan C235.

## I. Legal Standards

At this stage, this case involves claims under § 2 of the VRA and the
Fourteenth Amendment. The right to vote can be affected by a dilution of voting
power as well as by an absolute prohibition on casting a ballot. *Allen v. State
Bd. of Elections*, 393 U.S. 544, 569 (1969). Under § 2, Plaintiffs assert both

---

[13] Judge Garcia and Judge Rodriguez adopt the prior fact findings and opinions and incorporate
them into this Order because they are relevant to the 2013 plan claims. In this Order, Judge Smith
agrees that the Court's orders on the 2011 plans are law of the case. The findings and conclusions in this
order are therefore not inconsistent with what this district court panel has already decided.

11

"results" vote dilution and intentional discrimination/vote dilution claims. Under the Fourteenth Amendment, Plaintiffs assert both intentional discrimination/vote dilution and *Shaw*-type racial gerrymandering claims. The Court discussed these claims previously in its decisions on the 2011 plans, and will briefly summarize the applicable standards here.

## A. § 2 of the Voting Rights Act

Section 2 of the VRA "was designed as a means of eradicating voting practices that minimize or cancel out the voting strength and political effectiveness of minority groups." *Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 479 (1997) (internal quotations omitted). In its current form, § 2(a) provides that no voting standard, practice, or procedure "shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color . . . as provided in subsection (b)." 52 U.S.C. § 10301(a). Under section 2(b), a state violates § 2 "if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State . . . are not equally open to participation by members of a class of citizens protected by [§ 2(a) of the VRA] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b). Section 2 prohibits all race discrimination in voting,[14] but claims under § 2 generally assert vote denial

---

[14] *Thornburg v. Gingles*, 478 U.S. 30, 45 n.10 (1986).

or vote dilution injuries.

The Supreme Court held in *Mobile v. Bolden*, 446 U.S. 55 (1980),that a race-based vote dilution claim under the Fourteenth Amendment required racially discriminatory intent, not simply dilutive results.[15] In passing the 1982 amendments to the VRA, Congress reacted to that decision. *Velasquez v. City of Abilene, Tex.*, 725 F.2d 1017, 1021 (5th Cir. 1984). As the Fifth Circuit noted in *LULAC v. Clements*, 999 F.2d 831, 849-51 (5th Cir. 1993), "the 1982 Amendments [to § 2] 'codify' the 'results test' articulated in" constitutional voting discrimination cases prior to *Mobile v. Bolden*, making clear that a § 2 violation could be proved without discriminatory intent.[16] However, the legislative history of § 2 and case law also make clear that voters may bring a claim based on discriminatory voting practices using either the results test or an intentional discrimination test.[17] The Senate Report further states that, if a § 2 plaintiff

---

[15] *Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 481 (1997) ("Since 1980, a plaintiff bringing a constitutional vote dilution challenge, whether under the Fourteenth or Fifteenth Amendment, has been required to establish that the State or political subdivision acted with a discriminatory purpose.").

[16] The Supreme Court noted in *Gingles* that the Senate Report states that amended § 2 was designed to restore the "results test"—the legal standard that governed voting discrimination cases prior to *Mobile v. Bolden* and that in pre-*Bolden* cases such as *White v. Regester* plaintiffs could prevail by showing that, under the totality of circumstances, a challenged election law or procedure had the effect of denying a protected minority an equal chance to participate in the electoral process. *Gingles*, 478 U.S. at 44 n.8; *see also Jones v. City of Lubbock*, 727 F.2d 364, 379 (5th Cir. 1984) (the amended § 2 codifies pre-*Bolden* vote dilution law).

[17] S. REP. NO. 97-417 ("The Amendment to the language of section 2 is designed to make clear that plaintiffs need not prove a discriminatory purpose in the adoption or maintenance of the challenged system of practice in order to establish a violation. Plaintiffs must either prove such intent, or, alternatively, must show that the challenged system or practice, in the context of all the circumstances in the jurisdiction in question, results in minorities being denied equal access to the political process.") (footnote omitted); *United States v. Brown*, 561 F.3d 420, 432 (5th Cir. 2009) ("To violate the statute, however, these practices must be undertaken with an intent to discriminate or must produce discriminatory results."); *Garza v. Cty. of Los Angeles*, 918 F.2d 763, 766 (9th Cir. 1990) ("[A]fter the 1982 amendment, the Voting Rights Act can be violated by both intentional discrimination in the drawing of district lines and facially neutral apportionment schemes that have the effect of diluting minority

chooses to prove discriminatory intent, "direct or indirect circumstantial evidence, including the normal inferences to be drawn from the foreseeability of defendant's actions" would be relevant evidence of intent. *McMillan*, 748 F.2d at 1046-47 (quoting S. REP. NO. 97-417 at 27 n.108).

### 1. Results Claims

As noted, Congress amended § 2 of the VRA in 1982 "to prohibit legislation that *results* in the dilution of a minority group's voting strength, regardless of the legislature's intent." *Shaw v. Reno*, 509 U.S. 630, 641 (1993) (emphasis in original). Such results claims are governed by the framework established in *Thornburg v. Gingles*, 478 U.S. 30 (1986). *Gingles* identified three threshold conditions for establishing a § 2 results violation: (1) the racial group is sufficiently large and geographically compact to constitute a majority in a single-member district; (2) the racial group is politically cohesive; and (3) the majority votes sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate. *Johnson v. De Grandy*, 512 U.S. 997, 1006-07 (1994); *see also Cooper v. Harris*, 137 S. Ct. 1455, 1470 (2017).

"When applied to a claim that single-member districts dilute minority votes, the first *Gingles* condition requires the possibility of creating more than the existing number of reasonably compact districts with a sufficiently large minority population to elect candidates of its choice." *Johnson v. De Grandy*, 512

---

votes."); *McMillan v. Escambia Cty., Fla.*, 748 F.2d 1037, 1046 (5th Cir. 1984) ("Congress intended that fulfilling *either* the more restrictive intent test or the results test would be sufficient to show a violation of section 2.")(emphasis in original).

U.S. 997, 1008 (1994). A minority population (either singly or combined in coalition with other minorities[18]) is sufficiently large when it constitutes greater than 50% of the citizen voting age population of the district. *Bartlett v. Strickland*, 556 U.S. 1, 11 (2009) (plurality); *Valdespino v. Alamo Heights Indep. Sch. Dist.*, 168 F.3d 848, 853 (5th Cir. 1999). Because the decennial census data does not include CVAP data, the Court has instructed the parties to use the five-year 2011-2015 ACS survey data to best approximate the CVAP in 2013, when the maps were enacted.[19]

Generally, to evaluate § 2 results claims, it must be determined how many "reasonably compact districts" exist in the enacted plan, and whether Plaintiffs have demonstrated that more were required, which is usually done through presentation of demonstration maps. *LULAC v. Perry*, 548 U.S. 399, 430 (2006) ("*De Grandy* requires a comparison between a challenger's proposal and the 'existing number of reasonably compact districts.'"). When evaluating compactness, the Court focuses on the compactness of the minority population (in terms of its size and concentration), not the compactness of the contested district or necessarily the precise shape of its boundaries, though the shape of the district is relevant insofar as it provides evidence concerning the

---

[18] As discussed at length in the Court's opinion on plan H283 (and not repeated here), the Court finds that § 2 can require the creation of coalition districts.

[19] Because the § 2 results test is concerned only with whether the districting scheme *results* in vote dilution, and not the Legislature's knowledge or intent, *Shaw*, 509 U.S. at 641, the Court has concluded that evidence that best reflects the population at the time of redistricting should be considered to determine whether vote dilution resulted from the districting plans, regardless of whether the evidence or data was available to the Legislature at the time of redistricting.

compactness of the minority population. *LULAC v. Perry*, 548 U.S. 399, 433 (2006); *Houston v. Lafayette Cty., Miss.*, 56 F.3d 606, 611 (5th Cir. 1995).[20]

If, because of the dispersion of the minority population, a reasonably compact majority-minority district cannot be created, § 2 does not require a majority-minority district, and a district that reaches out to grab small and apparently isolated minority communities is not reasonably compact. *Bush v. Vera*, 517 U.S. 952, 979 (1996); *LULAC*, 548 U.S. at 432. However, members of a racial group in different areas could share similar interests and therefore form a compact district "if the areas are in reasonably close proximity." *LULAC*, 548 U.S. at 435. "A district would not be sufficiently compact if it was so convoluted that there was no sense of community, that is, if its members and its representative could not easily tell who actually lived in the district." *Rodriguez v. Harris Cty., Tex.*, 964 F. Supp. 2d 686, 737-38 (S.D. Tex. 2013) (citing *Clark v. Calhoun Cty., Miss.*, 21 F.3d 92, 96 (5th Cir. 1994) (noting that "[a] number of courts have concluded that the first *Gingles* precondition is not satisfied if the proposed district does not retain a natural sense of community such that it can be effectively represented")).

Further, the § 2 compactness inquiry must take into account traditional districting principles such as maintaining communities of interest and traditional boundaries. *Abrams v. Johnson*, 521 U.S. 74, 92 (1997) (citing *Bush*

---

[20] In its most recent decision, the Supreme Court phrased the requirement as being that the minority population must be sufficiently large and geographically compact to constitute a majority "in some reasonably configured legislative district." *Harris*, 137 S. Ct. at 1470.

*v. Vera*, 517 U.S. 952, 977 (1996)); *Montes v. City of Yakima*, 40 F. Supp. 3d 1377, 1391-92 (E.D. Wa. 2014) ("The compactness inquiry under § 2 . . . focuses more generally on whether the proposed minority district reasonably comports with 'traditional districting principles' such as contiguousness, population equality, maintaining communities of interest, respecting traditional boundaries, and providing protection to incumbents."). "The recognition of nonracial communities of interest reflects the principle that a State may not assume from a group of voters' race that they think alike, share the same political interests, and will prefer the same candidates at the polls." *LULAC*, 548 U.S. at 433 (internal quotations and alterations omitted).

Thus, to evaluate compactness, the Court considers the dispersion of the relevant minority population, the shape of the proposed district (as measured by a visual evaluation and by statistical measures of compactness) and the causes underlying its shape, and the district's compliance with traditional redistricting principles (such as respect for communities of interest and traditional boundaries). *See Rodriguez*, 964 F. Supp. 2d at 737-54; *see also Vera v. Richards*, 861 F. Supp. 1304, 1341 (S.D. Tex. 1994) (noting that a district's compactness must be a relative measure based on location and population density and that "[i]n a major urban county, compactness makes little sense if considered in terms of geographic sprawl alone, but it seems far more probative when viewed in terms of a city's or county's neighborhoods, geopolitical subdivisions, and

business location"), *aff'd sub nom. Bush v. Vera*, 517 U.S. 952 (1996).[21]

The second and third *Gingles* preconditions are referred to collectively as "racially polarized voting." Defendants conceded the existence of racially polarized voting across Texas, except in Nueces and Kleberg Counties, in terms of the fact that minority voters and Anglo voters tend to vote differently. The fact that minority voters and Anglo voters tend to support different candidates in Texas is essentially undisputed and is supported by all the expert testimony in the case, regardless of the methodology used (except with regard to Travis County).[22] However, Defendants dispute whether such racially polarized voting is legally significant in terms of the degree of minority cohesion and Anglo crossover voting, and in terms of whether such racially polarized voting is the result of race as opposed to politics.[23]

---

[21] If the proposed demonstration district is bizarrely shaped because the minority population within it is not reasonably compact, then § 2 generally will not require the district. However, § 2 does not require compact districts, and bizarre shape may be the result of non-racial factors such as geographical constraints and respecting precinct and city boundaries. Thus, the shape of the district is relevant, but the Court must examine the reasons for the district's shape.

[22] Racial bloc voting and minority-group political cohesion never can be assumed, but must be proved in each case in order to establish that a redistricting plan dilutes minority voting strength in violation of § 2. *Shaw v. Reno*, 509 U.S. 630, 653 (1993) (citing *Growe v. Emison*, 507 U.S. 25, 40-41 (1993)). However, there is ample evidence in the record to support Defendants' concession, at least concerning Latino voter cohesion, African-American voter cohesion, and Anglo bloc voting. Defendants do not concede that minority voters are cohesive with each other for purposes of coalition districts because they often vote for different candidates in primary elections, though they vote cohesively in general elections for the candidates who emerge from the Democratic primaries. In addition, the Court previously found in its Opinion on Plan C185 that there is not racially polarized voting in Travis County because Anglo voters do not typically vote sufficiently as a bloc to usually defeat minority-preferred candidates.

[23] In this regard, Defendants rely on the Fifth Circuit's decision in *LULAC v. Clements*, 999 F.2d 831, 850 (5th Cir. 1993) (en banc), in which the court accepted the argument that "[w]hen the record indisputably proves that partisan affiliation, not race, best explains the divergent voting patterns among minority and white citizens," vote dilution is not "on account of race or color" as required by the VRA. The court noted that the question was "not whether white residents tend to vote as a bloc, but whether such bloc voting is 'legally significant.'" *Id.* The district court held that plaintiffs "need only demonstrate that whites and blacks generally support different candidates to establish legally significant white bloc

If all three *Gingles* preconditions are satisfied, § 2 requires consideration of the "totality of circumstances" to determine whether members of a racial group have less opportunity than do other members of the electorate. *LULAC v. Perry*, 548 U.S. 399, 425-26 (2006). The Supreme Court has referred to the Senate Report on the 1982 amendments to the VRA, which identifies factors typically relevant to a § 2 claim, including:

> the history of voting-related discrimination in the State or political subdivision; the extent to which voting in the elections of the State or political subdivision is racially polarized; the extent to which the State or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group . . .; the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process; the use of overt or subtle racial appeals in political campaigns; and the extent to which members of the minority group have been elected to public office in the jurisdiction.

*Id.* at 426 (quoting S. REP. NO. 97-417 at 117, 206). The Report notes also that evidence demonstrating that elected officials are unresponsive to the particularized needs of the members of the minority group, and that the policy underlying the State's or the political subdivision's use of the contested practice or structure is tenuous, may have probative value. *LULAC*, 548 U.S. at 426.

Last, although § 2 does not guarantee proportional representation,

---

voting." *Id.* Defendants argued that the district court erred in refusing to consider the nonracial causes of voting preferences they offered. The Fifth Circuit agreed, holding that "[i]n holding that the failure of minority-preferred candidates to receive support from a majority of whites on a regular basis, without more, sufficed to prove legally significant racial bloc voting, the district court loosed § 2 from its racial tether and fused illegal vote dilution and political defeat," in violation of *Whitcomb v. Chavis*, 403 U.S. 124 (1971) and the consensus of a majority of justices in concurring opinions in *Thornburg v. Gingles*, 478 U.S. 30 (1986) (specifically Justices Powell, Rehnquist, O'Connor, Burger, and White). *Clements*, 999 F.2d at 850-51.

proportionality—whether the number of districts in which the minority group forms an effective majority is roughly proportional to its share of the population in the relevant area—is always a relevant consideration. *LULAC*, 548 U.S. at 426; *Johnson v. De Grandy*, 512 U.S. 997, 1000 (1994).

### 2. § 2 Intentional Discrimination/Intentional Vote Dilution

As discussed in this Court's opinion on Plan C185, the Supreme Court has declined to decide whether the *Gingles* preconditions apply to intentional vote dilution/discrimination claims under § 2. Docket no. 1390 at 116 ("[T]he Supreme Court expressly stated in *Bartlett v. Strickland*, 556 U.S. 1, 20 (2009), that it did not consider 'whether intentional discrimination affects the *Gingles* analysis' and that its holding (setting forth the majority-minority requirement to satisfy the first *Gingles* factor for a § 2 results claim) 'does not apply to cases in which there is intentional discrimination against a racial minority.'"). This Court previously concluded that Plaintiffs are not required to satisfy the first *Gingles* precondition to prove discriminatory racial gerrymandering and intentional vote dilution, but that the other § 2 factors, including the existence of racially polarized voting and the totality of circumstances, remain relevant to such claims. Docket no. 1390 at 118. The ultimate § 2 inquiry remains whether minority voters have less opportunity to participate in the political processes and to elect candidates of their choice. *See Rogers v. Lodge*, 458 U.S. 613, 624 (1982).

Further, the rubric for analyzing discriminatory purpose under § 2 is the same as under the Equal Protection Clause of the Constitution. Discriminatory

intent is shown when racial discrimination was a motivating factor in the governing body's decision to adopt or maintain a voting practice or procedure. *Brown*, 561 F.3d at 433 ("Under the intent-based approach, '[r]acial discrimination need only be one purpose, and not even a primary purpose, of an official act' for a violation [of § 2] to occur.")[24]; *Garza*, 918 F.2d at 766 ("To the extent that a redistricting plan deliberately minimizes minority political power, it may violate both the Voting Rights Act and the Equal Protection Clause of the fourteenth amendment.").

## B. Fourteenth Amendment claims

Plaintiffs bring two types of claims under the Equal Protection Clause of the Fourteenth Amendment, the central purpose of which "is to prevent the States from purposefully discriminating between individuals on the basis of race." *Shaw v. Reno*, 509 U.S. 630, 642 (1993). The first claim is a racial discrimination claim, which requires racially discriminatory intent and discriminatory effect. The second claim is a *Shaw*-type racial gerrymandering claim, the essence of which is that mapdrawers have separated voters into districts on the basis of race, and which does not require racially discriminatory

---

[24] In *United States v. Brown*, the Fifth Circuit noted that the Senate factors supply a source of circumstantial evidence regarding discriminatory intent, as do the factors set forth in *Arlington Heights*. 561 F.3d at 433. As this Court previously concluded, these factors are a relevant source of evidence to be considered as part of the totality of circumstances. However, discriminatory results remain insufficient by themselves to establish discriminatory intent. *Mobile*, 446 U.S. at 71 n.17 ("Discriminatory purpose . . . implies more than intent as volition or intent as awareness of consequences. . . . It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite or,' its adverse effects upon an identifiable group.") (quoting *Personnel Administrator of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)).

intent.[25]

## 1. Intentional Racial Discrimination/Intentional Vote Dilution

Legislative apportionment schemes may violate the Fourteenth Amendment if "conceived or operated as purposeful devices to further racial discrimination by minimizing, cancelling out or diluting the voting strength of racial elements in the voting population." *Rogers v. Lodge*, 458 U.S. 613, 617 (1982) (internal quotations omitted) (affirming district court's finding that at-large voting scheme, although racially neutral when adopted, was being maintained for the invidious purpose of diluting the voting strength of the black population).[26] A showing of racially motivated discrimination is a necessary element for a successful claim of unconstitutional vote dilution under the Fourteenth Amendment. *Reno v. Bossier Barish Sch. Bd.*, 520 U.S. 471, 481 (1997) (citing *Mobile v. Bolden*, 446 U.S. 55, 66 (1980)).

Discriminatory intent need not be proved by direct evidence. *Rogers*, 458 U.S. at 618. "Necessarily, an invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another." *Id.* (quoting

---

[25] *Miller v. Johnson*, 515 U.S. 900, 910 (1995) (noting that a *Shaw*-type claim is "analytically distinct" from a vote dilution claim because a vote dilution claim "alleges that the State has enacted a particular voting scheme as a purposeful device 'to minimize or cancel out the voting potential of racial or ethnic minorities,' an action disadvantaging voters of a particular race[, while] the essence of the equal protection claim recognized in *Shaw* is that the State has used race as a basis for separating voters into districts" regardless of motive) (internal citations omitted).

[26] *See also Shaw v. Reno*, 509 U.S. 630, 641 (1993) (electoral schemes "violate the Fourteenth Amendment when they are adopted with a discriminatory purpose and have the effect of diluting minority voting strength"); *Mobile v. Bolden*, 446 U.S. 55, 66 (1980) (legislative apportionment scheme is unconstitutional if its purpose was "invidiously to minimize or cancel out the voting potential of racial or ethnic minorities").

*Arlington Heights*, 429 U.S. at 265).[27]   Determining the existence of a discriminatory purpose "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id.*

Courts should look to the Supreme Court's decision in *Arlington Heights* for guidance in analyzing whether invidious discriminatory purpose was a motivating factor in a government body's decisionmaking. *Bossier Parish*, 520 U.S. at 488.  The important starting point for assessing discriminatory intent is "the impact of the official action whether it 'bears more heavily on one race than another.'"  *Id.* at 489.  Other relevant considerations include: the historical background of the jurisdiction's decision, the specific sequence of events leading up to the challenged decision, departures from the normal procedural sequence, and the legislative history, especially any contemporary statements by members of the decisionmaking body.  *Id.*; *Arlington Heights*, 429 U.S. at 268.

### 2. *"Shaw*-type" Racial Gerrymandering Claim

Although a "legislature always is *aware* of race when it draws district lines," *Shaw v. Reno*, 509 U.S. 630, 646 (1993) (emphasis in original), it may not use race as the predominant factor in drawing district lines unless it has a compelling reason.  *Cooper v. Harris*, 137 S. Ct. 1455, 1463 (2017).  A *Shaw*-type racial gerrymandering claim[28] is "that race was improperly used in the drawing

---

[27] As noted, disproportionate effects alone are insufficient to establish a claim of unconstitutional vote dilution.

[28] The Court refers to these claims as *Shaw*-type claims because the Supreme Court first recognized the viability of such a claim under the Equal Protection Clause in *Shaw v. Reno*, 509 U.S. 630 (1993).

of the boundaries of one or more specific electoral districts." *Alabama Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257, 1265 (2015) (emphasis omitted). In such a claim, the plaintiff's evidentiary burden is "to show, either through circumstantial evidence of a district's shape and demographics or more direct evidence going to legislative purpose, that race was the predominant factor motiving the legislature's decision to place a significant number of voters within or without a particular district." *Id.* at 1267.[29] The Court's decision in *Bethune-Hill v. Virginia State Bd. of Elections*, 137 S. Ct. at 799, additionally made clear that "a conflict or inconsistency between the enacted plan and traditional redistricting criteria is not a threshold requirement or a mandatory precondition in order for a challenger to establish a claim of racial gerrymandering" and that courts should evaluate the predominant motive for the design of the district as a whole.

If race predominates, strict scrutiny applies. To survive strict scrutiny, the challenged districting plan must be narrowly tailored to serve a compelling governmental interest. *Bush v. Vera*, 517 U.S. 952, 959, 976 (1996). For a racial classification to serve a compelling interest, the Legislature must have a

---

[29] Laws that classify citizens on the basis of race are constitutionally suspect, regardless of whether the reason for the classification is benign or the purpose remedial. *Shaw v. Hunt*, 517 U.S. 899, 904-05 (1996); *see also id.* at 907 ("Racial classifications are antithetical to the Fourteenth Amendment . . . ."). The essence of a *Shaw*-type equal protection claim is that the State has used race as a basis for separating voters into districts. *Miller*, 515 U.S. at 911. Such use of race "reinforces racial stereotypes and threatens to undermine our system of representative democracy by signaling to elected officials that they represent a particular racial group rather than their constituency as a whole." *Shaw v. Reno*, 509 U.S. 630, 650 (1993). Further, such use of race reinforces the belief "that individuals should be judged by the color of their skin" and "[r]acial gerrymandering, even for remedial purposes, may balkanize us into competing racial factions" and "threatens to carry us further from the goal of a political system in which race no longer matters." *Id.* at 657.

strong basis in evidence to support that interest before it implements the classification. *Shaw v. Hunt*, 517 U.S. 899, 910 (1996). Further, the means chosen to accomplish the State's asserted purpose must be specifically and narrowly tailored to accomplish that purpose. *Id.* at 908. To be narrowly tailored, the legislative action must substantially address, if not achieve, the avowed purpose. *Id.* at 915.

This Court previously concluded that compliance with § 2 of the VRA constitutes a compelling governmental interest. Docket no. 1390 at 42 (citing *Bush*, 517 U.S. at 994 (O'Connor, J., concurring); *Clark v. Calhoun Cty., Miss.*, 88 F.3d 1393, 1405-06 (5th Cir. 1996)). When a State invokes the VRA to justify race-based districting, it "must have a strong basis in evidence for concluding that the three *Gingles* preconditions exist in order to claim that its redistricting plan is reasonably necessary to comply with § 2." *Clark*, 88 F.3d at 1405-06; *see also Shaw*, 517 U.S. at 915; *Bush*, 517 U.S. at 978 ("The State must have a 'strong basis in evidence' for finding that the threshold conditions for § 2 liability [*i.e.*, the *Gingles* preconditions] are present."); *Harris*, 137 S. Ct. at 1471.[30] "If a State has good reason to think that all the '*Gingles* preconditions' are met, then so too it has good reason to believe that § 2 requires drawing a majority-minority district. But if not, then not." *Harris*, 137 S. Ct. at 1470 (citation omitted).

---

[30] "[The] 'strong basis' (or 'good reasons') standard gives States 'breathing room' to adopt reasonable compliance measures that may prove, in perfect hindsight, not to have been needed." *Harris*, 137 S. Ct. at 1464.

The legislative action must, at a minimum, remedy the anticipated violation or achieve compliance to be narrowly tailored. *Shaw v. Hunt*, 517 U.S. at 915. "If a § 2 violation is proved for a particular area, it flows from the fact that individuals in this area 'have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.'" *Id.* at 917 (quoting 42 U.S.C. § 1973(b)). The State may "use one majority-minority district to compensate for the absence of another only when the racial group in each area had a § 2 right and both could not be accommodated." *LULAC v. Perry*, 548 U.S. 399, 429 (2006).

Compliance with § 5 of the VRA was also a compelling state interest at the time these plans were enacted. However, "a reapportionment plan would not be narrowly tailored to the goal of avoiding retrogression if the State went beyond what was reasonably necessary to avoid retrogression." *Shaw v. Reno*, 509 U.S. 630, 655 (1993); *see also Alabama LBC*, 135 S. Ct. at 1274 (noting that the proper question for § 5 nonretrogression is, "To what extent must we preserve existing minority percentages in order to maintain the minority's present ability to elect the candidate of its choice?").

## II. Claims based on legislative intent

This case is unusually complex given the Legislature's enactment in 2013 of the Court's interim plans. As noted, the 2013 enactment raised questions of mootness in the 2011 plan phase, and now raises difficult questions concerning the proper resolution of Plaintiffs' *Shaw*-type and intentional vote dilution

claims in the 2013 plan case.

Although Plaintiffs' claims focus on specific areas where they have suffered harm, as they must given that racial discrimination and vote dilution claims belong to individuals and not the minority group as a whole,[31] the redistricting plans are statewide plans, and Plaintiffs contend that the statewide plans were adopted with discriminatory intent. In addition, with regard to specific areas in which this Court found *Shaw*-type violations and intentional discrimination, Plaintiffs contend that such violations remain in the 2013 plans. Defendants contend that the 2013 Legislature could have no discriminatory intent because it simply relied on this Court's judgment that the plans contained no legal infirmities, despite the interim nature of the plans and the Court's warnings that its decisions were necessarily hasty and not based upon a full review of the facts or the law. Defendants assert that the 2013 Legislature's lack of intent to discriminate in 2013 and the fact that it did not actually draw any districts subject to *Shaw*-type challenges in the interim plans in 2013 mean that all such claims must fail for lack of the necessary intent.[32]

Defendants' position incorrectly assumes that the intent inquiry must be

---

[31] *See LULAC v. Perry*, 548 U.S. 399, 437 (2006) ("A local appraisal is necessary because the right to an undiluted vote does not belong to the 'minority as a group,' but rather to 'its individual members.'"); *Alabama LBC v. Alabama*, 135 S. Ct. 1257, 1265-66 (2015) (noting that the harms that underlie a racial gerrymandering claim are personal, including being personally subjected to a racial classification and being represented by a legislator who believes his primary obligation is to represent only the members of a particular racial group, though noting that voters could make the claim that every individual district in a state suffers from racial gerrymandering).

[32] Defendants refer specifically to district lines that remain unchanged from the interim plans; the Task Force Plaintiffs have raised a new *Shaw* claim against changes made to HD90 in Plan H358 during the 2013 special session. This discussion does not involve that claim.

limited to the drawing of district lines in 2013. The Fifth Circuit has rejected

such a position: "[C]ases of this circuit emphasize that the search for improper

motivation does not end at the enacting stage." *Nevett v. Sides*, 571 F.2d 209,

221 (5th Cir. 1978). Rather, the Fifth Circuit has proposed three means by

which a plaintiff could meet the purpose standard: A plaintiff could demonstrate

either through direct or circumstantial evidence that the government body

*adopted* the electoral scheme with a discriminatory purpose, that the

government body *maintained* the scheme with discriminatory purpose,[33] or that

the system *furthered* pre-existing intentional discrimination.[34] *Jones v. City of*

*Lubbock*, 727 F.2d 364, 377 (5th Cir. 1984) (discussing *Nevett*, 571 F.2d at 217-

21).[35] Thus, under these precedents, although the 2013 Legislature did not draw

---

[33] *McMillan v. Escambia Cty., Fla.*, 688 F.2d 960 (1982) (affirming district court's holding that at-large voting scheme was being maintained for a discriminatory purpose), *vacated on other grounds* 466 U.S. 48 (1984) (vacating judgment on constitutional grounds and remanding for consideration of whether § 2 claims would support the judgment); *see also Mobile v. Bolden*, 446 U.S. 55 (1980) (considering whether maintenance of Mobile's at-large system for election of City Commissioners violated the Fourteenth Amendment as purposefully racially discriminatory).

[34] *See Kirksey v. Bd. of Sup'rs of Hinds Cty., Miss.*, 554 F.2d 139, 142 (5th Cir. 1977) ("A redistricting plan is constitutionally impermissible as racially discriminatory if it is a racially motivated gerrymander or if it perpetuates an existent denial of access by the racial minority to the political process."). In *Kirksey*, the court stated:

> Where a plan, though itself racially neutral, carries forward intentional and purposeful discriminatory denial of access that is already in effect, it is not constitutional. Its benign nature cannot insulate the redistricting government entity from the existent taint. If a neutral plan were permitted to have this effect, minorities presently denied access to political life for unconstitutional reasons could be walled off from relief against continuation of that denial. The redistricting body would only need to adopt a racially benign plan that permitted the record of the past to continue unabated. Such a rule would sub silentio overrule *White v. Regester*. It would emasculate the efforts of racial minorities to break out of patterns of political discrimination.

*Id.* at 146-47. The Court acknowledged that the Supreme Court had required discriminatory purpose in *Washington v. Davis* and in *Arlington Heights*, but reasoned that "nothing in these cases suggests that, where purposeful and intentional discrimination already exists, it can be constitutionally perpetuated into the future by neutral official action." *Id.* at 148.

[35] In *Nevett v. Sides*, 571 F.2d 209, 221 (5th Cir. 1978), the Fifth Circuit recognized that a plan, racially neutral at its adoption, may further preexisting intentional discrimination, or it may be maintained for invidious purposes. Whether invidious discrimination motivates the adoption or

the challenged districts in Plan C235 and Plan H358 (other than HD90), Plaintiffs could nevertheless establish their claim by showing that the Legislature adopted the plans with a discriminatory purpose, maintained the district lines with a discriminatory purpose, or intentionally furthered pre-existing intentional discrimination.

In addition, the Supreme Court case of *Hunter v. Underwood*, 471 U.S. 222 (1985), refutes Defendants' position. In *Hunter*, the Supreme Court held that a felon disenfranchisement provision adopted with discriminatory intent in 1901 violated the Equal Protection Clause in 1985, regardless of the fact that certain of the more blatantly discriminatory selections had been struck down by the courts, because "its original enactment was motivated by a desire to discriminate against blacks on account of race and the section continues to this day to have that effect." *Id.* at 233. With regard to those areas in Plan C185 and Plan H283 where the Court found that district lines were drawn with impermissible motive and those lines remain unchanged in Plan C235 and Plan H358 such that discrimination continues to have its intended effect, *Hunter* indicates that those portions of the plans remain unlawful. In those areas, the district lines were

---

maintenance of a districting scheme or whether the plan furthers preexisting purposeful discrimination, the intent requirement may be satisfied by direct or circumstantial evidence. *Nevett* was decided before the Supreme Court's decision in *Mobile v. Bolden*, but as the Supreme Court noted in *Rogers v. Lodge*, the Fifth Circuit held in *Nevett* that a showing of racially motivated discrimination is a necessary element in an equal protection vote dilution claim. *Rogers*, 458 U.S. at 621 (quoting *Nevett*, 571 F.2d at 219). In *Jones v. City of Lubbock*, 727 F.2d 364, 377 (1984), the Fifth Circuit stated that *Mobile v. Bolden* "cast doubt on the viability of this court's analysis in *Nevett II*." What it cast doubt on, however, is what proof suffices to establish discriminatory purpose, as the Fifth Circuit had relied on the "objective factors endorsed in *Zimmer*" and post-*Bolden* cases "differed in their evaluation of the extent to which the *Zimmer* analysis survived *Bolden*." *Id.* at 378; *see also Corder v. Kirksey*, 639 F.2d 1191, 1194 (5th Cir. 1981) ("Our failure, however, appears to have turned on the quantum of evidence required for such a finding [of discriminatory intent], rather than upon the substance of the approach itself.").

motivated by a desire to discriminate on account of race, and they continue to have that effect; thus, they violate § 2 and the Constitution.

Defendants contend that the Legislature's adoption of the Court's interim plans nevertheless removed any such illegality from the plans; they assert that their enactment of the plans in 2013 with no improper motive removes any discriminatory intent. *Hunter* involved the passage of time and a narrowing of the discriminatory legislation by the courts; it did not involve a later re-enactment of the narrowed disenfranchisement law, which is what Defendants now claim cleanses the plans. Other courts have considered the effect of subsequent legislative enactments on the legislative intent inquiry. The most relevant case, because it comes from the Fifth Circuit and involves redistricting, is *Chen v. City of Houston*, 206 F.3d 502 (5th Cir. 2000).

In *Chen*, the plaintiffs mounted a *Shaw*-type racial gerrymandering claim against the City of Houston's districting, and contended that "the 1997 plan substantially maintained the borders of previous plans, and that those borders were set by a process in which race—specifically, the desire to create two black and two Hispanic single member districts—predominated." *Id.* at 513. The plaintiffs argued "that the City violated *Shaw* by failing to make substantial changes in a districting structure that was originally designed in a manner that race predominated over traditional districting concerns." *Id.* at 518.

The Fifth Circuit rejected the City's assertion and the district court's conclusion that the intent behind the creation of the prior plans was not properly

30

before the court. *Id.* It noted that, in the context of the VRA, "evidence that impermissible racial intent had tainted the plan upon which the challenged plan was based has been allowed, even when enough time has elapsed for a substantial degree of familiarity and political reliance to emerge." *Id.* The Court then considered Plaintiffs' evidence concerning the earlier redistricting process, but found that its quality fell "far short of that introduced in the cases examined by the Supreme Court," and the Court did not find that race predominated in the drawing of earlier plans (*i.e.*, there was no prior impermissible reliance on race). *Id.* Later in the opinion, the Court stated that,

> while the district court erred in categorically and totally dismissing evidence of intent garnered from prior plans, it was correct to point out that the state of mind involved in the prior plans is not of itself what is precisely and directly the ultimate issue before the Court in this case. We have noted in a different context that while under *Hunter* the discriminatory intent of the original drafter may carry forward despite subsequent judicial invalidation of the most obviously discriminatory provisions, intervening reenactment with meaningful alterations may render the current law valid.

*Id.* at 521 (citing *Cotton v. Fordice*, 157 F.3d 388, 391 (5th Cir. 1998)).[36] It

---

[36]  The Court included the following parenthetical to describe *Cotton*: "while [the] disenfranchisement constitutional provision originated in an attempt to discriminate, subsequent reenactment with alterations approved by voters added categories of crimes originally excluded because they were not considered 'Black' crimes and subtracted a less serious offense that had been considered a 'Black' crime." In *Cotton*, the Fifth Circuit noted that *Hunter* "left open the possibility that by amendment, a facially neutral provision . . . might overcome its odious origin." 157 F.3d at 391. Although the disenfranchisement provision at issue was originally enacted in 1890 with discriminatory intent, it was amended in 1950 and 1968 through a deliberative process, which the court held could "supersede" the previous provision and "remove[] the discriminatory taint associated with the original version" unless the amendments "were adopted out of a desire to discriminate against blacks." *Id.* at 391-92. Because the Court found no such evidence and because the amended statute sought "to penalize all criminals convicted of certain crimes, *Hunter* [did] not condemn" the law. *Id.* at 392. Thus, the Court based its holding on the lack of new discriminatory intent during re-enactment and the fact that the amended statute no longer targeted "black" crimes.

The Court notes that there is an important distinction between a felon disenfranchisement law and a district that violates *Shaw*. According to *Cotton*, a law disenfranchising convicted felons is unconstitutional only if it has the intent and effect of racial discrimination, making discriminatory

continued, "We do not suggest that the changes implemented in 1993, 1995, and 1997 to the original framework were as dramatic as those in *Cotton*. However, that case broadly stands for the important point that when a plan is reenacted—as opposed to merely remaining on the books like the provision in *Hunter*—the state of mind of the reenacting body must also be considered." *Id.*

Plaintiffs argue that the taint of discriminatory intent is generally removed from amended legislation only where a fact-specific inquiry reveals that the new statute was enacted significantly later than the discriminatory one,[37] legislators underwent a "deliberative process" prior to amendment or reenactment, and the new statute does not continue the same adverse racially disparate impact. *E.g.*, docket no. 1524 at 9-10. While the Court does not agree that the presence or absence of any of these factors is necessarily dispositive, it agrees that these are relevant considerations for analysis. Based on

purpose the paramount consideration. Discriminatory purpose is not an element of a *Shaw*-type claim. As this Court has discussed, a district drawn in violation of the *Shaw* principles is illegitimate regardless of whether it was drawn with racially discriminatory purpose because its illegality turns on whether race predominated in the decision of which voters to include and exclude in the district, whenever that decision is made, and whether there was a strong basis in evidence for such use of race. The passage of time or the re-enactment of a plan including the identical district does not typically change any facts concerning which voters were placed within or without the district when it was drawn, unlike discriminatory intent, which can change over time. Thus, the original decisions concerning which voters to place in and out of a district should remain the focus for inquiry in a *Shaw* claim, regardless of a later re-enactment of the identical district, unless there is a showing that the legislature specifically considered who should be in the district during the later re-enactment. Similarly, whether the legislature had a strong basis in evidence for the use of race originally should remain the operative inquiry. However, to the extent a subsequent legislature may have a strong basis in evidence for a previous use of racially predominant criteria that did not exist at the time of the initial enactment, that legislative intent would be relevant in determining whether a district that was an unconstitutional gerrymander when drawn remains so.

[37] The 2013 plans were enacted by a substantially similar Legislature with the same leadership only two years after the original enactment. This factor weighs in Plaintiffs' favor. In addition, the *Arlington Heights* factor of the history of discrimination continues to support a finding of discrimination, bolstered by this Court's finding of discriminatory intent by the 2011 Legislature in passing the 2011 plans themselves. Further, there is no indication that the Legislature mitigated its hostility to minority districts.

*Chen/Cotton* and *Hunter*, the Court finds the most important consideration is whether the 2011 plans continue to have discriminatory or illegal effect, and whether the reenactment furthers that existing discrimination: "A state law prohibiting exercise of the vote . . . is unconstitutional if 'its original enactment was motivated by a desire to discriminate against blacks on account of race and the section *continues to this day to have that effect.*'" *Cotton*, 157 F.3d at 391 (citing *Hunter*, 471 U.S. at 233) (emphasis added).

In *Chen*, the Fifth Circuit found no *Shaw* violation in the original enactment; thus, there was no issue of a continuing harm. Similarly, in *Cotton*, the Fifth Circuit noted that the amendments to the felon disenfranchisement statute meant that it no longer targeted "black" crimes and that it "now seeks only to penalize all criminals convicted of certain crimes" such that there was no longer any unconstitutional harm flowing from the statute. *Cotton*, 157 F.3d at 392.

Here, in contrast, specific portions of the 2011 plans that this Court has found to be discriminatory or unconstitutional racial gerrymanders continue unchanged in the 2013 plans, their harmful effects "continu[ing] to this day." *Hunter*, 471 U.S. at 233. The fact that this Court made changes to the statewide plans and the Legislature then adopted the Court's plans does not change this fact. Further, the Legislature did not engage in a deliberative process to ensure that the 2013 plans cured any taint from the 2011 plans. No changes were made to the congressional plan, and changes to the House plan were subject to severe

constraints, rendering them largely cosmetic.  Although this Court did not rule out the possibility that coalition districts could be required or that the County Line Rule would have to yield to the VRA, the Legislature continued its steadfast refusal to consider either possibility.  And despite the findings of discriminatory intent by the D.C. Court, there is no indication that the Legislature looked to see whether any discriminatory taint remained in the plans.  Instead, the Legislature pushed the redistricting bills through quickly in a special session.[38]  Rep. Martinez Fischer testified that necessary resources were not allocated to support a true deliberative process.[39]

Moreover, the adoption of the interim plans intentionally furthered and continued any discrimination that might be found in the 2011 plans and incorporated into the 2013 plans.  The Legislature did not adopt the Court's plans with the intent to adopt legally compliant plans free from discriminatory taint, but as part of a litigation strategy.  Defendants had steadfastly maintained that their 2011 plans had no legal infirmities—throughout this litigation in 2011, when sponsoring the compromise plans in 2012 that became the interim plans, and thereafter.  Although the D.C. Court found that the 2011 plans violated § 5 of the VRA and cited evidence of discriminatory intent, Defendants did not accept those rulings and instead appealed to the Supreme

---

[38] The special session did not have a two-thirds rule in the Senate or a calendar rule in the House.

[39] The HRC did not have counsel when the session started, and later Darby announced his intent to hire counsel only for himself.  The attorneys later asked to withdraw and the committee was then directed to the TLC.  JX-13.4 at 4-5.

Court. Yet upon the urging of the Attorney General, who was responsible for the litigation in this court, they decided to adopt the interim maps.

The decision to adopt the interim plans was not a change of heart concerning the validity of any of Plaintiffs' claims[40] in either this litigation or the D.C. Court litigation and was not an attempt to adopt plans that fully complied with the VRA and the Constitution—it was a litigation strategy designed to insulate the 2011 or 2013 plans from further challenge, regardless of their legal infirmities.[41] The letter from then-Attorney General Abbott to Speaker Joe Straus makes the strategy clear: Abbott advised that the "best way to avoid further intervention from federal judges in the Texas redistricting plans" and "insulate the State's redistricting plans from further legal challenge" was to adopt the interim maps. Quesada-57; DX-858. Thus, Defendants sought to avoid any liability for the 2011 plans by arguing that they were moot, and sought to ensure that any legal infirmities that remained in the 2013 plans were immune from any intentional discrimination and *Shaw*-type racial gerrymandering claims.

---

[40] *E.g.*, JX-5 (Bill Analysis of SB 1524 introduced by Sen. Seliger in the regular session) ("Though the Texas Legislature remains confident that the legislatively-drawn maps adopted in 2011 are fair and legal and comply with all provisions of federal law, there remain several outstanding legal questions regarding these maps that undermine the stability and predictability of the electoral process in Texas.")

[41] The evidence indicates that not only did the strategy originate in the Attorney General's office, but also the legislative fact findings accompanying the plans, before the Legislature had engaged in any fact findings on the bills. Tr1558 (Darby). The fact findings in the introduced versions of the bills included that the interim plans complied "with all federal and state constitutional provisions or laws applicable to redistricting plans." Later, when Sen. Zaffirini offered an amendment to remove the legislative findings, Seliger objected, asserting that the amendment "guts the bill." JX-24.4 at § I p. 13. The amendment failed. The Senate later agreed to remove the language from the Senate plan, which everyone agreed was lawful, but refused to eliminate it from the House and congressional plan bills. Tr1558 (Darby).

Defendants knew that most Plaintiffs would maintain claims against the interim plans if adopted, despite the changes, and that such challenges might indicate that further changes to the maps were required. With regard to the interim plans, Abbott's letter does not say that the plans cure legal infirmities in the plan, only that they "have the approval from the federal judges overseeing this litigation." *Id.* Although this Court had "approved" the maps for use as interim maps, given the severe time constraints it was operating under at the time of their adoption, the Court clearly warned that its preliminary conclusions, which were based on the preliminary injunction "likelihood of success" standard, were not based on a full examination of the record or the governing law and were subject to revision.[42]

The Legislature's own attorney, Jeff Archer, advised them accordingly. JX-14.4 at 6-19; *id.* at 11 (noting that this Court was "in a little bit [of a] tricky [position] because the Court had not made full determinations, . . . had not made fact findings on every issue, had not thoroughly analyzed all the evidence but they had to make some best case guesses . . . ."); *id.* at 11-12 (the Court's caveats were "as if to say this is the best we can do now. We haven't gotten to the bottom of things."); *id.* at 12 (noting that the Court was not making final determinations, that the Court noted unsettled and difficult legal issues and

---

[42] The Court noted, "It is especially difficult to determine whether a claim has a likelihood of success when the law is unsettled, as many areas of § 2 are." Docket no. 691 at 1-2. In addition, this Court was required to defer substantially to the legislative choices and district lines in Plan C185 and Plan H283, and emphasized that its determinations were preliminary and made on an expedited basis. Although the Court endeavored under the time constraints to ensure that the plan contained no legal defects, it did not guarantee that to be the case, and in fact warned repeatedly that its determinations could change after a full trial on the merits.

factual disputes, and "essentially made it explicitly clear that this was an interim plan to address basically first impression of voting rights issues").[43] Given the remaining legal challenges and this Court's warnings that the interim maps were enacted without a full review of the facts or the law, a reasonable construction of this Court's orders leaves the definite possibility that, upon full review, additional changes would be required to the interim plans in response to legal infirmities.

Moreover, given the D.C. Court's findings of intentional discrimination, Defendants saw a very real possibility that this Court would likewise find that the 2011 plans were the product of discriminatory intent.[44] Rather than trying to cleanse the plans of continuing discriminatory intent or legal defect, Defendants' strategy involved adopting the interim maps, however flawed, arguing that the 2011 plans would never go into effect and thus could have no harmful effects, and arguing that the 2013 plans could have no impermissible intent such that, whatever possible or likely discriminatory or unconstitutional effects remained in those plans, Plaintiffs would have no remedy, and Defendants would maintain the benefit of such discrimination or unconstitutional effects. By arguing that there may have been intent but no

---

[43] At a later committee hearing, Archer correctly explained this Court's position: this Court faced "a tension there between what they thought the Voting Rights Act required and what they thought the deference they had to give until they were sure what the Voting Rights Act required." JX-15.3 at 52. He also noted that "they could go into a lot more issues than they already have." *Id.* at 49.

[44] And they were aware that, even if the Supreme Court ruled in *Shelby County* that § 4's preclearance coverage formula was unconstitutional, such a finding of intentional discrimination could result in Texas being placed under § 5 through bail in.

effect in 2011 and there may have been effect but no intent in 2013, despite the fact that there is unquestionably both intent and ongoing effect, Defendants' actions in 2013 were attempting to prevent Plaintiffs from obtaining relief for purposeful racial discrimination.

In Defendants' view, Plaintiffs could obtain no relief for the Legislature's past discrimination in 2011, and any discriminatory intent and effects remaining in the 2013 plans, however harmful, would be safe from challenge.[45] This strategy is discriminatory at its heart and should not insulate either plan from review. *Cf. Kirksey v. Bd. of Sup'rs of Hinds Cty., Miss.*, 554 F.2d 139, 146-47 (5th Cir. 1977) ("Where a plan, though itself racially neutral, carries forward intentional and purposeful discriminatory denial of access that is already in effect, it is not constitutional. Its benign nature cannot insulate the redistricting government entity from the existent taint. If a neutral plan were permitted to have this effect, minorities presently denied access to political life for

---

[45] The Legislature did not believe that passing the interim maps would end the litigation. They knew that Plaintiffs would pursue claims against the interim maps, and they were informed by TLC attorney Jeff Archer that they had not realistically removed legal challenges to the plans apart from those areas remedied by the interim plans. JX-14.4 at 18; *id.* at 19 (explaining that "challenges to both the Court drawn fixes as well as to the background districts that were not changed in any of the plans will go forward" and "the parties to the case will continue to press issues"); JX-15.3 at 56 ("I think it's fair to say by enacting the Court-ordered plan, you've put to bed . . . those issues that the Court identified so far. But I don't know that you put the rest to bed."). Despite knowing that Plaintiffs would continue to pursue relief, they sought to deprive Plaintiffs of a potential remedy. Further, because they felt their strategy would preclude any remedy and they wanted to maintain any partisan advantage obtained regardless of whether it was the result of intentional racial discrimination, they were not truly interested in fixing any remaining discrimination in the plan. Thus, although Darby kept stating that he wanted to be informed of legal deficiencies so he could fix them, he did not himself seek to have the plan evaluated for deficiencies and he willfully ignored those who pointed out deficiencies, continuing to emphasize that he had thought "from the start" that the interim plans were fully legal. JX-17.3 at S5. Defendants' strategy would leave Plaintiffs with § 2 effects claims only, and Defendants intended to continue vigorously opposing any plan with coalition districts, despite Fifth Circuit case law holding that such districts could be required. Tr1576-78 (Darby).

unconstitutional reasons could be walled off from relief against continuation of that denial.").

In sum, the Court concludes that the racially discriminatory intent and effects that it previously found in the 2011 plans carry over into the 2013 plans where those district lines remain unchanged. The discriminatory taint was not removed by the Legislature's enactment of the Court's interim plans, because the Legislature engaged in no deliberative process to remove any such taint, and in fact intended any such taint to be maintained but be safe from remedy. The Legislature in 2013 intentionally furthered and continued the existing discrimination in the plans.

### III. Dallas-Fort Worth area ("DFW") Claims

Plaintiffs brought § 2 results claims and intentional vote dilution claims, as well as Fourteenth Amendment racial discrimination claims against the DFW districts in Plan C185. Interim Plan C235 made significant changes to the DFW area to address the "not insubstantial" § 5 discriminatory purpose claims of packing and cracking. Plaintiffs alleged that CD30, the only minority district, was packed, while "fingers" from surrounding Anglo-majority districts reached into urban and suburban Dallas and Tarrant County areas to crack minority communities and subsume them in Anglo-dominated districts. As a result, despite its substantial minority population, the DFW metroplex had only one minority opportunity district (CD30) that performed for African Americans, and none for Latino voters.

To address the § 5 discrimination claims, Plan C235 included new CD33, spanning Dallas and Tarrant Counties. Plan C235 withdrew many of the encroachments into minority communities from the Anglo districts surrounding DFW, and the population left behind in DFW from the removed encroachments was placed in new CD33, while accommodating congressional incumbents and taking into account population growth. Docket no. 691 at 36-37. In addition, the minority population of CD30 was decreased somewhat to address the packing allegations, with the Court noting that the H+BVAP of CD30 was 76.7% in the benchmark, 81.5% in Plan C185, and 75.9% in Plan C235. *Id.* at 37 & n.83.[46] Given the unsettled law and the inability to look at all the necessary factual evidence, the Court was unable to conclude at the time that Plaintiffs were likely to succeed on their § 2 claims premised upon coalition districts. It also found that the Task Force Plaintiffs were not likely to succeed on their claim that a Latino opportunity district was required because their proposed HCVAP-majority district (CD6 in Plan C190) was not compact.

In the Opinion on Plan C185, this Court found that Plaintiffs failed to prove their § 2 results claims in DFW because they failed to satisfy the first *Gingles* precondition for the Latino and coalition districts insofar as none of the proposed districts were compact. Docket no. 1390 at 58-92.[47] The Court did find

---

[46] CD30 was also altered to address the intentional discrimination claims brought by African-American Congressperson Eddie Bernice Johnson, who represented CD30.

[47] However, Plaintiffs were not precluded from bringing § 2 results claims against Plan C235 based on the *Gingles* preconditions and the totality of circumstances in 2013.

that mapdrawers violated the Equal Protection Clause by improperly using race in drawing CD26 in violation of the *Shaw* line of cases. And, it found that mapdrawers acted with racially discriminatory intent and intentionally diluted minority voting strength in DFW by intentionally packing and cracking minorities. Docket no. 1390 at 146. Specifically, the Court found that minorities were moved into CD30 to waste their votes, while Anglo voters were moved out of CD30 and into neighboring districts to shore them up as Republican districts, and that mapdrawers drew and then divided a proposed minority district in the DFW area to minimize current and future minority voting power.

The Plaintiffs' packing and cracking intentional discrimination/dilution claim in this case is essentially the same "not insubstantial" § 5 discriminatory purpose claim that the Court attempted to remedy in Plan C235, but certain Plaintiffs complain that the discrimination is not fully remedied. They contend that packing and cracking remain, intended to prevent the emergence of an additional minority district or districts. Plaintiffs assert that two or three minority opportunity districts are required in addition to CD30 and that the DFW configuration intentionally limits minority opportunity to two districts when more opportunity districts can easily be drawn. The Quesada Plaintiffs further contend that the Legislature intentionally discriminated by knowingly reaffirming discriminatory features identified by the D.C. Court, including specifically the cracking of minority populations in Arlington and Grand Prairie.

As explained in the Court's order adopting Plan C235, CD33 was not

intentionally drawn as a minority coalition district under § 2. Rather, it was created to remedy the alleged intentional discrimination (cracking) claims by removing the fingers from the Anglo-majority districts that reached into Dallas and Fort Worth. However, it is majority-minority CVAP when Black and Hispanic CVAP are combined, and it has elected an African-American, Marc Veasey. It has thus performed as a minority coalition district under most Plaintiffs' view that such districts require minority cohesion only in the general elections.[48] On this basis, the Court concluded in its Order on Plan C185 that Plaintiffs' claims that one minority coalition district was required in DFW (in addition to African-American district CD30) were moot.

However, Plaintiffs continue to assert that more minority opportunity districts are required in DFW, especially one that can elect a Latino candidate of choice in the primary and general elections, to reflect the Latino growth in the area. Certain Plaintiffs contend that CD33 does not provide Latino opportunity because of its failure to elect the Latino-preferred candidate in the primary despite its HCVAP.[49]

---

[48] The Task Force does not share this view, but the Task Force also has not sought the creation of any coalition districts in DFW. Rather, the Task Force sought only the creation of an HCVAP-majority Latino opportunity district. However, the Task Force's proposed district (CD6 in Plan C190) was not compact, and because of the dispersion of Latinos among African Americans, a compact HCVAP-majority district cannot be drawn in DFW using 2011-2015 ACS data.

Other Plaintiffs did seek the creation of a coalition district in DFW, however. And although several of these Plaintiffs (except the Rodriguez Plaintiffs) now contend that CD33 is not a coalition opportunity district but an African-American opportunity district because African-American voters are controlling the Democratic primaries, these Plaintiffs also contend that coalition opportunity for purposes of a *Gingles* results claim should be determined by the general elections, not primaries. Thus, their prior claim that one coalition district was required in DFW under the § 2 results test was mooted by the drawing of a district that performs as a coalition district in the general election.

[49] The Rodriguez Plaintiffs do not challenge CD33 itself, but contend that its configuration "demonstrates the tortured lines the State had to draw in order to avoid creating an additional

Defendants contend that (1) there is no evidence of dilutive intent in 2013, (2) no single-minority-majority-CVAP district can be drawn and coalition districts are not required by § 2, and (3) even if coalition districts were required, the record refutes the existence of cohesive voting between Hispanic and African-American voters in the DFW area, as shown primarily by the results of Democratic primaries. Docket no. 1526 at 81-82. The Court has already rejected Defendants' position that coalition districts can never be required by § 2, and does not repeat its analysis here. And the doctrine of constitutional avoidance counsels that this Court should address the statutory § 2 effects claim before analyzing Plaintiffs' constitutional claim. The Court thus considers whether Plaintiffs have satisfied the *Gingles* criteria.

Plaintiffs[50] agree that, despite the strong minority population growth in DFW, it is not possible to draw an additional compact single minority-majority CVAP district. This is due primarily to the fact that minority populations are interspersed with each other, although these mixed minority populations are geographically concentrated. As a result, each of the proposed demonstration maps creates new minority coalition districts. The Court did not reach the issue of minority cohesion in proposed coalition districts in its prior orders because

opportunity district for minorities in Texas." Docket no. 1524 at 24 n.21. They assert that it does not fix the cracking and packing this Court found in DFW under Plan C185 or "mask the hallmarks of intentional discrimination that persist in DFW under Plan C235," but "only highlights and perpetuates the State's consistent approach of cracking minority populations in DFW to avoid what would otherwise be inevitable: increased electoral opportunities for minority voters." *Id.*

[50] In this section, "Plaintiffs" generally refers to Plaintiffs other than the Task Force. Presumably the Task Force Plaintiffs, who previously argued that their proposed HCVAP-majority district was compact, do not agree that no compact HCVAP-majority can be drawn in DFW. In addition, the Task Force Plaintiffs have asserted no claims against DFW in Plan C235.

Plaintiffs did not clear the first *Gingles* hurdle. But the issue is now squarely presented. The Court acknowledges that the evidence presented in this case cuts both ways and the decision is close, but the Court concludes that Plaintiffs have not proved the necessary cohesion.

## A. § 2 Results Claims

*Gingles* 1

Plaintiffs' demonstration plans C284 (NAACP), C273 (Quesada), and C286 (Rodriguez) generally take the same approach and create one additional minority coalition district (in addition to maintaining CD30 and CD33 as minority opportunity districts). Existing CD33, which spans Dallas and Tarrant Counties, is pushed entirely into Tarrant County and made much more compact. It remains a B+HCVAP-majority district, but its HCVAP is decreased and its BCVAP increased.[51] CD30, the existing BCVAP-majority opportunity district, generally maintains a similar location wholly within Dallas County, and its BCVAP remains above or near 50%.[52] The maps create the new coalition district in between CD30 and CD33, and each district has a combined H+BCVAP above 50%.[53] Thus, each district satisfies the numerosity threshold, and all three

---

[51] In Plan C235, it is 43.6% HCVAP and 23.7% Black Alone CVAP. In Plan C273, it is 23.4% HCVAP and 30.8% Black Alone CVAP. In Plan C284, it is 22.8% HCVAP and 29.4% Black Alone CVAP. In Plan C286, it is 24.6% HCVAP and 30% Black Alone CVAP.

[52] In Plan C235, CD30 is 53.2% BCVAP. In Plan C273, it is 49.8% Black Alone CVAP but 50.4% combined BCVAP. In Plan C284, it is 50% Black Alone CVAP and 50.6% combined BCVAP. In Plan C286, it is 54% BCVAP.

[53] In Plan C273, proposed CD3 is 38.4% HCVAP and 19.6% Black Alone CVAP. In Plan C284, proposed CD24 is 39.8% HCVAP and 19.1% Black Alone CVAP. In Plan C286, proposed CD24 is 36.1% HCVAP and 18.7% Black Alone CVAP.

demonstration maps contain one more minority-majority district in DFW than does Plan C235.[54] In addition, based on a review of all the evidence, the Court finds that these districts reflect compact minority communities, including the various mixed-minority cities and neighborhoods within the DFW metroplex and respecting traditional redistricting principles and non-racial communities of interest.[55] *See LULAC v. Perry*, 548 U.S. 399, 433 (2006) (recognition of nonracial communities of interest reflects the principle that a state may not assume that members of the same race will share the same political interests and prefer the same candidates).

### 2. *Gingles* 2

Minority political cohesion is the second *Gingles* precondition, and is the focus of the parties' disagreement in this phase of the litigation. The purpose of this inquiry is "to ascertain whether minority group members constitute a politically cohesive unit." *Gingles*, 478 U.S. at 56. *Gingles* states that "[a] showing that a significant number of minority group members usually vote for

---

[54] MALC Plan C285 creates an additional coalition district to the east of CD30.

[55] Given its conclusion on cohesion, the Court finds it unnecessary to detail all of the evidence here. But it notes that Dr. Ansolabahere did not set out to draw minority districts in Plan C286, but sought to adhere to municipal boundaries and compactness principles and to avoid dividing minority populations; as a result, his CD24 encompasses the adjacent, majority-minority cities of Irving and Grand Prairie and adds western Dallas and the City of Farmers Branch. CD30 retains its relatively compact shape and includes southern and eastern Dallas and all of the smaller municipalities to the south inside Dallas County. CD33 respects county lines by remaining wholly within Tarrant County and includes population from Fort Worth and Arlington. Its northwestern protrusion somewhat tracks that in Plan C235 but widens the neck and avoids splitting Sansom Park. The northeastern portion is widened and eliminates the protrusion into Forth Worth, and includes all of eastern Arlington rather than the precisely cut out areas in Plan C235. Further, it follows the general contours of CD33 in Plan C235 along the eastern edge of Fort Worth, but follows the Fort Worth municipal boundary on the eastern side instead of leaving small areas out of the district as in Plan C235. The Court further relies on Dr. Fairfax's analysis of NAACP Plan C284 and testimony from lay witnesses Franklin Moss and Rep. Toni Rose.

the same candidates is one way of proving the political cohesiveness necessary to a vote dilution claim, and, consequently, establish[ing] minority bloc voting within the context of § 2." *Gingles*, 478 U.S. at 56 (citation omitted). The Supreme Court in *Gingles* did not say that primary cohesion was required, but did note that political cohesiveness of black voters was clearly established where "black voters' support for black candidates was overwhelming in almost every election. In all but 5 of 16 primary elections, black support for black candidates ranged between 71% and 92%; and in the general elections, black support for black Democratic candidates ranged between 87% and 96%." *Id.* at 59.

The Supreme Court has not offered specific guidance on proving cohesion in a coalition context, other than to say that "when dilution of the power of such an agglomerated political bloc is the basis for an alleged violation, proof of minority political cohesion is all the more essential" and there is a "higher-than-usual need for the second of the *Gingles* showings." *Growe v. Emison*, 507 U.S. 25, 41 (1993). This indicates that proof of cohesion is essential for coalition claims, but does not indicate that the standard for proving such cohesion is necessarily any different for coalitions than for single minorities.

In *Campos v. City of Baytown, Tex.*, 840 F.2d 1240, 1244 (5th Cir. 1988), the Fifth Circuit held that, "[t]o prove the fact of their electoral dilution, plaintiffs must prove that the minorities so identified actually vote together and are impeded in their ability to elect their own candidates by all of the circumstances, including especially the bloc voting of a white majority that

usually defeats the candidate of the minority." It noted that "the central focus"
for the cohesion inquiry is upon voting patterns, and a minority group is
politically cohesive if it votes together. *Id.* The court continued,

> the proper standard is the same as *Gingles*: whether the minority
> group together votes in a cohesive manner for the minority
> candidate. . . . The key is the minority group as a whole. Of course,
> if one part of the group cannot be expected to vote with the other
> part, the combination is not cohesive. If the evidence were to show
> that the Blacks vote against a Hispanic candidate, or *vice versa*,
> then the minority group could not be said to be cohesive. But if the
> statistical evidence is that Blacks and Hispanics together vote for
> the Black or Hispanic candidate, then cohesion is shown.

*Id.* at 1245 (footnote omitted). *Campos* does not specify in which election this
voting pattern is relevant or necessary, and it does not mention primaries.

In *Overton v. City of Austin*, 871 F.2d 529, 544 (5th Cir. 1989), the Fifth
Circuit looked at whether black and Mexican-American voters "usually
combine[d] to support candidates who were usually disfavored by Anglo voters,"
but there was no discussion of primary elections.

In *Brewer v. Ham*, 876 F.2d 448 (5th Cir. 1989), the court considered
cohesion among Hispanics, African Americans, and Asians in school board
member elections and stated, "The determinative question is whether
black-supported candidates receive a majority of the Hispanic and Asian vote;
whether Hispanic-supported candidates receive a majority of the black and
Asian vote; and whether Asian-supported candidates receive a majority of the
black and Hispanic vote in most instances in the KISD area." *Id.* at 453 (citing
*Campos*, 840 F.2d at 1244-45). There was no statistical evidence from the

plaintiffs, and lay witness testimony differed on political cohesion among these groups. One expert's multivariate regression analysis showed African Americans and Hispanics were in direct opposition in most KISD elections in which minority candidates ran, and this evidence was unrebutted. The Court found that cohesion was lacking. This case sheds no specific light on the primary issue, however.

In *Session v. Perry*, 298 F. Supp. 2d 451, 478 (E.D. Tex. 2004), the district court rejected plaintiffs' coalition claim in DFW because "there is no serious dispute but that Blacks and Hispanics do not vote cohesively in primary elections, where their allegiance is free of party affiliation."[56] On appeal, the Supreme Court did not consider whether such lack of primary cohesion was important, instead "[a]ccepting . . . that African-Americans do not vote cohesively with Hispanics." *LULAC v. Perry*, 548 U.S. 399, 443 (2006). It accepted this fact to decide the question presented on appeal, which was not whether African Americans and Hispanics were politically cohesive, but whether African Americans had effective control of CD24, even though African Americans made up only 25.7% of the district's CVAP. The plaintiffs argued that they could control the district because they were 64% of voters in the Democratic primary, and that their control of the primary translated into effective control of the

---

[56] The district court also stated that, even assuming Blacks and Hispanics vote cohesively, they must disprove partisanship as the driving force behind the bloc voting, citing *LULAC v. Clements*, 999 F.2d 831, 850 (1993) (en banc). *Session*, 298 F. Supp. 2d at 478 n.88. The parties in this case vigorously dispute the application of *LULAC v. Clements* and whether the role of partisanship must be disproved as a cause of racial voting behavior. Because the Court does not find cohesion, it does not address this dispute.

entire election.

The district court rejected the argument that African Americans could control the primary because the district was drawn for an Anglo Democrat (Frost), who had no opposition in any primary since his incumbency began, and CD24's demographics were similar to another district where an African-American candidate failed when he ran against an Anglo.  Instead, the district court found that the district was controlled by Anglo Democrats.  On appeal, the Supreme Court found no clear error in this finding, stating that the lack of any contested Democratic primary over the last 20 years left "no obvious benchmark . . . for deciding whether African-Americans could elect their candidate of choice." *LULAC*, 548 at 444.  It continued,

> The fact that African-Americans voted for Frost—in the primary and general elections—could signify he is their candidate of choice.  Without a contested primary, however, it could also be interpreted to show (assuming racial bloc voting) that Anglos and Latinos would vote in the Democratic primary in greater numbers if an African-American candidate of choice were to run, especially given Texas's open primary system.  The District Court heard trial testimony that would support both explanations, and we cannot say that it erred in crediting the testimony that endorsed the latter interpretation.

*LULAC*, 548 U.S. at 444.  The Court continued,

> The opportunity "to elect representatives of their choice," requires more than the ability to influence the outcome between some candidates, none of whom is their candidate of choice.  There is no doubt African-Americans preferred Martin Frost to the Republicans who opposed him. The fact that African-Americans preferred Frost to some others does not, however, make him their candidate of choice.  Accordingly, the ability to aid in Frost's election does not make the old District 24 an African-American opportunity district for purposes of § 2.  If § 2 were interpreted to protect this kind of influence, it would unnecessarily infuse race into virtually every

49

redistricting, raising serious constitutional questions.

*Id.* at 445-46 (internal citations omitted).

Defendants contend that this language is dispositive of the issue of the role of primaries in cohesion, and that without evidence of cohesion in contested primaries, no coalition claim can be proved. But the Supreme Court did not consider the issue of minority cohesion at all. The Court looked only to the factual question of whether African-Americans actually had the ability to control outcomes in the district, and that fact could not be determined without showing ability to control the primaries. African-American voters were turning out in greater numbers than others in the primary. While this was de facto control, it did not translate into actual control of the primary, because the primary was uncontested—Anglo voters who controlled the district and originally sponsored Frost simply did not feel the need to turn out in the primary because their preferred candidate would emerge regardless. If an African-American (or presumably, African-American-sponsored but not necessarily African-American) candidate did run in the primary, there was no guarantee that candidate would win because African-American voters could be easily outnumbered.

Thus, even though African Americans were voting for Frost in both the primary and the general elections, this did not automatically make Frost their candidate of choice. The evidence credited by the courts showed it was likely that they were merely voting for the candidate they were permitted to vote for by the Anglos who controlled the district. Thus, because they could not show

that they actually controlled the district, as opposed to simply voting along with Anglos who in fact controlled the district, their claim failed.

This discussion in *LULAC* highlights the intensely local and factual appraisal required by § 2 claims, and it indicates that primaries can aid courts in determining voters' candidates of choice—not only by considering who voters are voting for in the primaries (which is relevant to which candidates they prefer), but considering all the relevant circumstances. *LULAC* supports the conclusion that primaries should not be excluded from the minority cohesion analysis, but it does not answer the question of the weight to be given particular primary voting patterns in determining cohesion in this case.

Thus, the current case law from the Fifth Circuit and Supreme Court confirms that primaries are relevant, but provides little guidance on their probative value. Cases outside the Fifth Circuit take conflicting views. In *Rodriguez v. Pataki*, 308 F. Supp. 2d 346, 421 (S.D.N.Y.), *aff'd*, 543 U.S. 997 (2004), the court held that when the two minority groups are generally affiliated with the same party and vote for that party's candidates at high rates, primaries are by far the most probative evidence of cohesion. The court relied on lack of primary cohesion and "the fact that the plaintiffs have presented cohesion evidence for a very limited portion of their proposed district" to find that plaintiffs failed to prove Black-Hispanic political cohesion. *Id.* at 422.

In contrast, the D.C. Court in the § 5 preclearance litigation rejected Texas's reliance on primaries in considering HD149 in the Houston area. It

noted that there was persuasive evidence of both concerted efforts among a coalition to elect its preferred candidates and a pattern of success extending across multiple election cycles. *Texas v. United States*, 887 F. Supp. 2d 133, 174 (D.D.C. 2012). Texas argued that the minority groups "do not vote cohesively in primaries and only come together to agree on a second- or third-best candidate in time for the general election" and "this does not prove an effective coalition district." *Id.* The D.C. Court stated,

> We agree that evidence of shared voting preferences at the primary level would be powerful evidence of a working coalition, but it is not needed to prove cohesion. In the first place, there is little support for Texas's focus on primary elections. Texas cites *LULAC* for this point, but *LULAC*, a section 2 case, only talks about primaries as a method to determine one minority group's candidate of choice; it says nothing about the need for two groups in a putative coalition to vote cohesively in a primary. More importantly, it does not hold that evidence of cohesion in a primary is necessary to identify a candidate of choice. The same is true here, where there has been no contested endogenous Democratic primary since 2004, when Rep. Vo first won his seat. Texas also cites two district court cases that rely on primary cohesion, *Rodriguez v. Pataki*, 308 F. Supp. 2d 346, 421 (S.D.N.Y. 2004); and *Session v. Perry*, 298 F. Supp. 2d 451, 478 (E.D.Tex. 2004), but these cases represent the minority view. Most courts to address this issue have expressed no preference about the election level at which voting cohesion must be shown. *See, e.g., Lewis v. Alamance Cnty.*, 99 F.3d 600, 615 (4th Cir. 1996); *LULAC, Council No. 4434 v. Clements*, 999 F.2d 831, 886 (5th Cir. 1993) (en banc); *Bridgeport Coal. for Fair Representation v. City of Bridgeport*, 26 F.3d 271, 276 (2d Cir. 1994), *vacated and remanded on other grounds*, 512 U.S. 1283, 115 S.Ct. 35, 129 L.Ed.2d 931 (1994).
>
> We agree with the majority view. Courts regularly consider general election data to demonstrate voter cohesion in traditional majority-minority districts, without any indication that such a showing is insufficient without evidence of voter cohesion in the primary as well. Additionally, requiring cohesion in the primary election distorts the role of the primary. Although minority groups sometimes coalesce around a candidate at that point in time,

minority voters, like any other voters, use the primary to help develop their preferences. We refuse to penalize minority voters for acting like other groups in a political party who do not coalesce around a candidate until the race is on for the general election. *See Alamance Cnty.*, 99 F.3d at 614-16 ("We reject the proposition that success of a minority-preferred candidate in a general election is entitled to less weight when a candidate with far greater minority support was defeated in the primary.... [S]uch a view is grounded in the belief that minority voters essentially take their marbles and go home whenever the candidate whom they prefer most in the primary does not prevail, a belief about minority voters that we do not share." (citation and internal quotation marks omitted)). "Pull, haul, and trade" describes the task of minority and majority voters alike, and candidates may be minority "candidates of choice" even if they do not "represent perfection to every minority voter."

*Texas*, 887 F. Supp. 2d at 174-75 (some citations omitted).[57]

Plaintiffs argue that they have shown the required cohesion in DFW through expert and lay testimony. Plaintiffs and their experts assert that the relevant focus is on which party primaries minorities choose and their general election cohesion, and that a lack of cohesion in the primaries should be considered irrelevant or, if relevant, should not undermine a finding of cohesion. They note that Defendants' expert, Dr. Alford, admitted that one way for minorities to show that they are politically cohesive is to coalesce around a major political party. Tr1443. Defendants, on the other hand, argue that focusing on

---

[57] The Court notes that *Lewis v. Alamance County*, 99 F.3d 600 (4th Cir. 1996) was not a case about minority cohesion. Rather, the Fourth Circuit was evaluating whether the district court properly determined that the plaintiffs had failed to show that black-preferred candidates were usually defeated. In that regard, the plaintiffs argued that Democrats should be treated as black-preferred only if they were also black-preferred in the primary. The Fourth Circuit rejected that argument, holding that candidates who receive strong black support in general elections are the black-preferred candidate in that election, regardless of their level of support in the primary, and the elections should be counted accordingly in the determination of whether black-preferred candidates were usually defeated. *Id.* at 615. The Court also held that primary elections and general elections must be analyzed separately to determine whether black-preferred candidates were usually successful, to be sure that the regular defeat in one of these phases would not be masked by repeated successes in the other. *Id.* at 615. If anything, this case supports the argument that a court considering cohesion should also look at primaries.

the Democratic primaries is essential, and that Plaintiffs cannot establish minority political cohesion without proof of primary cohesion. Their expert, Dr. Alford, has consistently opined that "Blacks and Hispanics do not vote cohesively in either party [primary], and in fact are more likely than not to oppose each other's preferred candidates." Alford 2014 Supp. Report at 15.

Plaintiffs' experts offered various bases for their positions that the key focus should be on general election cohesion. These were generally that: (1) the general elections are the "key" or operative contests for electing candidates of choice; (2) the general elections involve many more voters and primary participation is small; (3) primary voters do not accurately reflect the voting population and are "skewed," and may even involve members of the other party because Texas has open primaries; (4) primary voting may be strategic wherein voters vote for second or third choice candidates because they believe they have a better chance at success in the general election. *See* docket no. 1340 ¶¶ 700-702; Tr1052, Tr1203-05 (Ansolabahere); Tr410-11 (Chervenak); Tr98, Tr114-15 (Brischetto). All of these factors affect the probative value of primary elections, but they do not require us to ignore primary elections altogether. As Dr. Alford explains, primaries reflect actual voting behavior, still involve a significant number of voters, and are an integral part of the process leading to election of candidates. Tr1364, Tr1461. Because the most pertinent indicator of political behavior is voting behavior, this Court finds that primary elections should be considered as part of the minority group's overall voting behavior, but will give

54

the primaries the weight the evidence shows that they deserve.

This Court previously made certain fact findings relevant to the issue of cohesion. The Court noted that there is a strong correlation between partisanship and ethnicity in current Texas politics, and that African Americans and Latinos have tended to identify with the Democratic party in recent years due to shared issues, lack of Republican vote courting, and the rise of the Tea Party, while more Anglos have shifted to the Republican party. Docket no. 1340 ¶¶ 678, 681. This has been more true for Latinos in recent years because Republicans have not done a very good job of reaching out to Latinos and some party positions on immigration do not attract Latinos. *Id.* ¶ 680. African Americans and Latinos share many common interests and generally feel that the Democratic party is more responsive to those interests.

Evidence from prior phases of this litigation consistently showed that, statewide, African Americans and Latinos choose to participate in Democratic primaries rather than Republican primaries[58] and consistently support the Democratic candidates in general elections, regardless of their race. Docket no. 1340 ¶¶ 688, 696, 697, 706.[59] However, in the Democratic primaries originally studied by Dr. Engstrom (primaries for statewide offices in 2008 and 2010), he

---

[58] Docket no. 1340 ¶ 683 ("There is almost no African-American voter participation in the Republican primaries, and very little Hispanic participation."); *id.* ¶ 684 ("Dr. Lichtman found that Latino and African-American voters in Texas are cohesive in that both voter groups overwhelmingly choose to participate in Democratic rather than Republican primaries.").

[59] This trend was so strong that Dr. Alford assessed whether districts were minority opportunity districts by looking at Democrat wins/losses and noted that in Texas, minority candidates of choice means Democrats. Docket no. 1340 ¶ 688. In this phase of the litigation, many of Plaintiffs' experts have taken a similar approach in assessing performance for minority districts.

found that non-Latinos (which included both African American and Anglo voters) did not consistently share the candidate preferences of Latino voters. African-American voters shared support for only one of five primary candidates preferred by Latinos in Dallas and Tarrant Counties. Docket no. 1340 ¶ 685.

In his corrected Rebuttal report, Engstrom found that Latino voters were very cohesive in their preferences for Latino candidates in Democratic primaries but African-American support for Latino-preferred candidates was not typically present in primaries and, in fact, African-American voters had "a distinct tendency to vote for candidates competing with the candidates preferred by Latinos in primary elections." *Id.* ¶ 686. Dr. Alford also concluded that African-American and Hispanic voters are not generally cohesive in the Democratic primary, and that the polarization is based on the ethnicity of the candidates such that a "Black candidate will not typically be the candidate of choice of Hispanic voters in the Democratic primary" and "the Hispanic candidate will typically not be the candidate of choice of Black voters in the Democrat primary." *Id.* ¶ 687. Kousser also found that Latinos and African Americans were not cohesive in the Democratic primary, with Latinos voting for Latino candidates but African Americans not tending to support Latino candidates in the 2010 Democratic primaries. *Id.*

Based on all the prior evidence, this Court found that in general, Hispanic voters are politically cohesive in general and primary elections, African-American voters are politically cohesive in general and primary elections,

Latinos and African Americans are often *not* cohesive within the Democratic primary, and African-American and Latino voters are politically cohesive in general elections in support of the Democratic candidate, regardless of the candidate's race. Docket no. 1340 ¶¶ 703-706. However, *Gingles* requires a local appraisal for minority cohesion. *See Brewer v. Ham*, 876 F.2d 448, 453 (5th Cir. 1989) ("Our recent opinion in *Overton v. City of Austin* cautions against reaching conclusions about inter-minority cohesion absent a diligent inquiry into the political dynamics of the particular community.").

It is undisputed that African-American and Latino voters show very high rates of cohesion in general elections in Texas in general and specifically in Dallas and Tarrant Counties. Dr. Ansolabahere testified that, based on his analysis, African-American and Latino voters vote cohesively in the general elections to elect their preferred candidates. Tr1201; Rod-955 (Table 9) (in Dallas County and Tarrant County Black support for Democratic candidates was estimated at 100%, while Latino support ranged from 68.4% to 81.7% in Dallas County and 71.5% to 80.6% in Tarrant County). Dr. Lichtman's ecological regression analysis found near-perfect cohesion in support of the Democratic candidate between African American and Latino voters in the five 2008 and 2010 general elections he studied: In Tarrant County both estimates were 100% and in Dallas County both estimates were 99%. Joint Expert Ex. E-3 Table 2.

Dr. Engstrom previously found that Latinos in Dallas County supported the Latino candidate at high levels, between 81.1 and 88% and African-American

support was over 90% in all general elections. Docket no. 307-1 at 13. In Tarrant County, Dr. Engstrom found that Latinos supported the Latino candidate at high levels, between 84.3 and 98.3%, and African-American support was above 90% in all elections. Docket no. 307-1 at 18-19. Dr. Engstrom's 2017 analysis reveals that this trend generally continued in 2014 and 2016. TF-19. In Dallas County, Latinos supported Latino Democrat candidates at rates of 78.3, 73.4, and 87.2% and African Americans at 95.5, 94.9, and 92.9%. In Tarrant County, Latinos supported Latino Democrat candidates at rates of 81.2, 78.6, and 88.1%, and African Americans at 92.7, 92, and 92.4%. TF-19.

Chervenak's racially polarized voting analysis of recent elections within Dallas County and Tarrant County also found high levels of cohesion, with each group supporting candidates from both racial groups, and other voters not sharing their preferences. NAACP-2 at 6-8; Tr105 (Brischetto) ("The minority candidate of choice in the general elections have been the Democratic candidate in each case.").

It is also undisputed that African Americans and Latinos primarily choose to participate in Democratic primaries. With regard to choice of primary, Dr. Lichtman previously looked at individual counties. Joint Expert Ex. E-3. In Dallas County, he found that African Americans participated in the 2008 Democratic Primary at a rate of 97.52% and Latinos at a rate of 88.72%. African Americans participated in the 2010 Democratic Primary at a rate of 90.43% and Latinos at a rate of 59.21%. In Tarrant County, he found that African

Americans participated in the 2008 Democratic Primary at a rate of 96.33% and Latinos at a rate of 83.54%. In the 2010 Democratic Primary, African Americans participated at a rate of 81.25% and Latinos at a rate of 31.66%. Lichtman noted that the lower Latino participation in 2010 was likely due to relatively small numbers of Latino voters participating at all, and there was much lower Hispanic participation in Democratic primaries in 2010 than 2008, while Hispanic participation in Republican primaries remained relatively constant. Joint Expert Ex. E-3 at 5-6, Table 1. Dr. Engstrom also noted that "[t]he number of Latinos receiving ballots in the 2014 Democratic primary substantially exceeded those in the Republican primary that year." TF-19 at 6 n.2 (in Dallas County, 6,859 Democrat and 3,579 Republican, in Tarrant County 5,816 Democrat and 4,108 Republican).[60]

However, Defendants contend that, without proving cohesion in the Democratic primaries, Plaintiffs cannot establish *Gingles* 2 for coalition districts. As noted, though African Americans and Latinos are choosing to vote in the Democratic primaries, they are often not cohesive in Democratic primaries, and that remains true in certain Democratic primaries in Tarrant and Dallas Counties. Dr. Engstrom previously analyzed statewide elections in 2006, 2008, and 2010, and found that African Americans were "the least likely group

---

[60] Dr. Lichtman's analysis of participation in the 2008 and 2010 Democratic primaries showed that many more African Americans vote in the primaries than do Latinos: In 2008 in Dallas County, 37,859 Hispanics voted while 86,528 African Americans voted. In 2010, 6,771 Hispanics voted while 23,522 African Americans voted. In 2008 in Tarrant County, 24,472 Hispanics voted while 36,116 African Americans voted. In 2010, 2,239 Hispanics voted, while 6,988 African Americans voted. Joint Expert Ex. E-3 Table 1.

[between African Americans and 'others'] to support Latino candidates in Democratic primaries" in Dallas County and that African Americans supported the Latino candidate in only one of six primaries in Tarrant County. Docket no. 307-1 at 15, 20-21, Tables 5 & 7. There were no Democratic primaries in 2012 that met his inclusion criteria. Dr. Engstrom performed an updated primary analysis in 2017, but it includes only the 2010 Democratic primary for Governor with two candidates, Latino Reynaldo Madrigal and Anglo Wendy Davis. Madrigal was not the choice of Latino voters or African-American voters in either Dallas or Tarrant County, though he received higher Latino support (30.9% in Dallas County and 26.5% in Tarrant County) than African-American support (1.9% in Dallas County and .2% in Tarrant County). TF-19. Dr. Alford casts this primary as non-competitive and suggesting "at most that in a very non-competitive contest, the winning Anglo candidate was the choice of Anglos, Blacks, and Hispanics." D-878 (Alford 2017 Report) at 10.

The results of Dr. Engstrom's analyses for Democratic primaries in Dallas and Tarrant Counties are set forth in the following tables:

## Dallas County

|  | African American voters | Latino voters | Other voters |
|---|---|---|---|
| 2006 Dem. Primary Lt. Gov. (Alvarado) | 27.2 24.5 - 29.9 | 50.5 46.6 - 54.5 | 43.2 41.4 - 45.0 |

| | | | |
|---|---|---|---|
| 2006 Dem. Primary Lt. Gov. Runoff (Alvarado) | 34.8 31.8 - 37.6 | 60.2 52.2 - 68.7 | 43.4 40.6 - 46.3 |
| 2008 Dem. Primary US Senate (Noriega) | 44.1 42.6 - 45.6 | 73.8 71.2 - 76.4 | 54.0 52.8 - 55.2 |
| 2008 Dem. Primary Sup. Ct. Pl. 7 (Cruz) | 27.6 26.3 - 28.8 | 75.8 73.6 - 78.0 | 30.6 29.6 - 31.7 |
| 2008 Dem. Primary Sup. Ct. Pl. 8 (Yanez) | 52.7 51.4 - 53.9 | 87.8 85.9 - 89.7 | 44.3 43.1 - 45.4 |
| 2010 Dem. Primary Lt. Gov. (Chavez-Thompson) | 47.0 45.3 - 48.8 | 77.6 74.3 - 81.0 | 31.5 30.0 - 32.9 |
| 2010 Dem. Primary Land Comm'r (Uribe) | 27.2 25.1 - 29.2 | 64.6 60.6 - 68.9 | 51.7 50.0 - 53.4 |
| 2014 Dem. Primary Governor (Madrigal) | 1.9 0.8 - 3.2 | 30.9 26.4 - 34.7 | 2.7 1.5 - 4.0 |

## Tarrant County

| | African American voters | Latino voters | Other voters |
|---|---|---|---|
| 2006 Dem. Primary Lt. Gov. (Alvarado) | 30.8 25.5 - 35.8 | 46.2 39.0 - 53.5 | 45.3 43.1 - 47.5 |
| 2006 Dem. Primary Lt. Gov. Runoff (Alvarado) | 30.4 25.5 - 35.1 | 66.1 56.4 -76.6 | 47.5 44.9 - 50.1 |

| 2008 Dem. Primary US Senate (Noriega) | 66.0 | 72.4 | 51.5 |
|---|---|---|---|
|  | 63.4 - 68.7 | 68.2 - 76.9 | 50.5 - 52.5 |
| 2008 Dem. Primary Sup. Ct. Pl. 7 (Cruz) | 27.6 | 79.4 | 31.2 |
|  | 24.2 - 30.9 | 74.2 - 85.1 | 30.0 - 32.4 |
| 2008 Dem. Primary Sup. Ct. Pl. 8 (Yanez) | 42.2 | 85.0 | 40.5 |
|  | 38.9 - 45.5 | 80.6 - 89.6 | 39.4 - 41.7 |
| 2010 Dem. Primary Lt. Gov. (Chavez-Thompson) | 42.9 | 73.3 | 39.6 |
|  | 38.5 - 47.2 | 67.3 - 79.7 | 38.3 - 41.0 |
| 2010 Dem. Primary Land Comm'r (Uribe) | 24.1 | 64.3 | 35.4 |
|  | 19.1 - 28.8 | 57.1 - 72.0 | 33.8 - 36.9 |
| 2014 Dem. Primary Governor (Madrigal) | 0.2 | 26.5 | 1.7 |
|  | 0.1 - 0.5 | 22.9 - 29.9 | 1.0 - 2.5 |

Dr. Chervenak examined the 2012 Democratic primary for HD 101 in Tarrant County. NAACP-2 at 8, 17. His analysis showed that the black candidate (Barnett) "was not the preferred candidate of either black or Latino voters." *Id*. at 8. At trial, Plaintiffs' counsel elicited testimony from Dr. Alford that neither group preferred the black candidate and "they're voting for the same candidate." Tr1477-78 (Alford); NAACP-2 at 8, 17. However, Dr. Chervenak's analysis does not indicate whether and to what extent black and Latino voters coalesced in support of a candidate because there were two other candidates in addition to the black candidate.

The NAACP and African-American congresspersons note that, as shown

in NAACP-46, there were many Democratic primary races in Dallas County in 2016 where Latino and African-American candidates were uncontested by members from the other race.

Dr. Alford notes that, in the current phase, the evidence relevant to minority cohesion in the Democratic primaries comes primarily from Dr. Engstrom. Reviewing that evidence, he concludes, as did Engstrom in his earlier report, that "they do not show Black-Hispanic cohesion, but instead, if anything, suggest opposition." D-878 at 10. He further notes that, aside from Engstrom's reports, there is "very little from the remaining [experts] that informs the question of cohesion in proposed coalition districts." *Id.* at 11. While Dr. Chervenak did include endogenous primaries, despite his position that only statewide general elections should be considered (due to a lack of sufficient elections), Alford notes that these only examine existing districts, and do not purport to demonstrate cohesion in primary elections in proposed districts.

Defendants further focus heavily on the primaries in HD90 in Tarrant County and CD33. Dr. Engstrom examined the 2012 HD90 Democratic primary using multivariate ecological inference. PL-967 at 7. He found 65.7% Latino support, 37.7% African-American support, and 30.2% non-minority support for the Latino candidate Carlos Vasquez against Anglo incumbent Lon Burnam. *Id.* at 7-8. There were 3,987 votes cast in the primary, and Vasquez lost by 159 votes: 2,073 to 1,914. *Id.* at 8. In the 2014 Democratic primary in HD90, Dr. Engstrom found Latino support for Romero was 78.2%, while African-American

support was 12.6% (and other voters 24.3%). TF-19 at 11, Table 4. There were 5,078 votes cast in the primary, and Romero won with 51.08% (2,594 votes). This race did not show cohesion between Latinos and African Americans. Tr433-34 (Chervenak). HD90 overlaps significantly with Plaintiffs' proposed CD33 in Tarrant County.

Defendants note that Hispanic and African-American voters did not support the same candidate in the 2012, 2014, or 2016 Democratic primaries in CD33. Tr1368-71 (Alford). Current CD33 areas would be included in Plaintiffs' proposed coalition districts. In the 2012 primary, CD33 was an open seat, and African-American Marc Veasey and Hispanic Domingo Garcia both sought the nomination. It appears undisputed that both were viable candidates. CD33 spans Dallas and Tarrant Counties; Veasey was from Fort Worth/Tarrant County, and Garcia was from Dallas. TrA1401 (Murray). Alford estimated that 77.9% of Hispanic voters supported Garcia, while 85% of African-American voters supported Veasey, "exhibiting fairly cohesive support for opposite candidates." Tr1367-68 (Alford); D-424 at 17; DX-883. Dr. Murray felt that both race and the county "home factor" affected voting in the runoff because each candidate won his home county, and Veasey did not receive much black support in Dallas County. TrA1401 ("There wasn't much turnout, and he didn't win it by much; whereas, he did very, very well in his home county of Tarrant. So there's this home factor. But, unquestionably, in this primary there's a good deal of voting for somebody that looks like you or has the same last name or your

ethnic or racial group"). Korbel thought the district would have a high probability of electing a Hispanic but did not anticipate the home-county rivalry. Tr830-31.

However, despite the split in the primary, Murray noted that Black and Hispanic voters coalesced around Veasey in the general election, including those heavily Hispanic precincts that voted for Garcia in the primary. He compared the top four performing heavily Hispanic precincts for Garcia in the primary in Dallas County to see if they supported Veasey in the general election, and found that they did—the average support for Garcia in the primary was 91.3% but these same precincts had an average support for Veasey in the general election of 81%. NAACP-64 (Murray Feb. 28, 2014 Supplemental Report on Plan C235) at 20.

In the 2014 Democratic primary, Veasey (now the incumbent) received over 90% of the Black vote, while Hispanics split their vote almost evenly between Veasey and Sanchez. Tr1369-71 (Alford); DX-883. Thus, although half of Hispanic voters now supported Veasey, half did not.

And in the 2016 Democratic primary, Veasey again received over 90% support from Black voters, but his Hispanic support fell (from 49.6% in 2014 to 32.9% in 2016), and 67% of Hispanic voters supported Carlos Quintanilla. Tr1370-71; DX-883. Alford noted that, even after a considerable period of time in which we have an incumbent who's had a chance to effectively represent everyone in the district, Hispanic voters still would prefer that there be an

Hispanic representative in that district. Tr1370-71.

Dr. Lichtman performed an ecological regression analysis of the percentage of Anglos, African Americans, and Latinos among voters participating in the Democratic primaries for CD33. Tr956-58; Quesada-1 (Lichtman report) at 50 (Table 2). In the 2012 primary, 2.4% of Latino VAP turned out, making them 36% of voters in the primary; 14.8% of African American VAP turned out, making them 64% of voters, and Anglos were 0% of voters. In the 2012 runoff, 3.4% of Latino VAP turned out, making them 47% of voters, and 13% of African American VAP turned out, making them 53% of voters. In the 2014 primary, 2.3% of Latino VAP turned out, making them 35% of voters, and 15% of African American VAP turned out, making them 65% of voters. In the 2016 primary, 4.4% of Latino VAP turned out, making them 39% of voters, and 20.5% of African American VAP turned out, making them 53% of voters (Anglos were 8% of voters). This demonstrates how low primary turnout is overall, and especially for Latinos, whose highest turnout percentage was 4.4% of voting age population. It also confirms that African-American voters dominate the primary based on their relative turnout. Tr957-58.

All experts agree that both Latino and African-American voters strongly supported Veasey in the general election. Lichtman found 99% African-American support and 95% Latino support in 2012 and 100% African-American support and 98% Latino support in 2016. Tr959 ("[G]iven those degrees of cohesion, this is pretty safely a district where African Americans and Hispanics

66

in the general election can elect candidates of their choice. And as I said, this is when you really get the verdict of voters, not in those low turnout primaries."); Lichtman Report at 52 (Table 4).

Lichtman's analysis showed that 55.7% of African-American VAP turned out in the 2012 general election, making them 41% of the voters, 10.8% of the Latino VAP turned out, making them 27% of the voters, and 41.2% of the Anglo VAP turned out, making them 32% of the voters. Lichtman Report at 53 (Table 5). In 2016, 45.6% of the African-American VAP turned out, making them 31% of the voters, 14% of the Latino VAP turned out, making them 33% of the voters, and 49.6% of the Anglo VAP turned out, making them 35% of the voters. *Id.* Lichtman noted that this demonstrates that turnout in general elections is vastly higher than turnout in primaries, and that combined African Americans and Latinos comprise a majority of the electorate. Tr959. Dr. Alford felt that "partisan voting reunited Black and Hispanics in voting for the Democratic candidate" in the general election; he found that the evidence "does not support the assertion that there is a cohesive, geographically compact coalition that can be treated as a single group." D-424 at 18-19.[61]

Based on an analysis of primary elections in CD33, Alford's opinion is that black and Hispanic voters in the district are not cohesive in their choice of minority candidates in the primary in the district. Tr1371. He notes that this

---

[61] Dr. Alford also concluded that Anglo voters were not cohesive or at least "not polarized in a way that would enable the Anglo vote to block the nomination of a Black- or Hispanic-preferred candidate." D-424 at 18.

is why some Plaintiffs' experts characterize the current CD33 as a black opportunity district and not a coalition district. Tr1371-72.[62] He further notes this is why the *Gingles* proposals do not truly propose minority coalition opportunity districts, but either African-American or Hispanic opportunity districts. Plaintiffs' *Gingles* proposals, in one form or another, shift decidedly in the direction of increasing the black CVAP proportion of CD33, not seeking to make the district work as a combined majority district, but seeking to make the district more securely a black opportunity district. Tr1374.[63] Similarly, the new coalition district placed between CD30 and CD33 is proposed to perform for Latinos, helping to cure the Latino representation gap in DFW. Although Alford agrees that black and Hispanic voters come together in the general election because of partisanship, he feels that whether they can get a representative of choice from their ethnic group is of critical value. Tr1382-83.

Dr. Alford admitted that in CD33, the general election turnout ranged from 28.2% in 2014 to 53.6% in 2016, while the Democratic primary turnout ranged from 1.3% in 2014 to 8.6% in 2016. Tr1454. He further admitted that the number of Hispanics who chose to vote for Veasey in the general election far surpassed the number that even turned out for the primary. Tr1460. For those Hispanic voters who did not vote in the primary, Quesada Plaintiffs contend that

---

[62] Dr. Lichtman not only stated that CD33 is an African-American opportunity district, he stated that Hispanics are "shut out" in CD33 due to high African-American primary turnout. Tr955, Tr963.

[63] Alford feels that many of the proposed coalition districts will turn out to be African-American districts, thus giving more representation to a group that is not significantly under-represented, while not fixing the underlying problem of Hispanic under-representation. Tr1380-81.

Veasey was their first and only choice, such that he was the first choice of 65.6% of Hispanic voters and the second choice of 17.9% of Hispanic voters, and not the choice of 16.4% of Hispanic voters. Docket no. 1527 at 47. Dr. Alford admits that he reaches his conclusion concerning the lack of cohesion solely on the primary elections and not general elections. Tr1448.

In addition to primaries, Defendants cite to lay witness testimony indicating a lack of cohesion, including specifically: (1) the testimony of Tarrant County commissioner Roy Brooks, who stated that in the CD33 primary and other elections, Black and Hispanic voters have supported different candidates, Tr1237[64]; (2) Franklin Moss's testimony that in Democratic primary elections in Tarrant County, Black and Hispanic voters are less likely to vote for the same candidates, Tr1307[65]; (3) Alex Jimenez's testimony that in Tarrant County, Black voters would rather support Anglo candidates than Hispanic candidates, Tr359[66]; (4) Rep. Anchia's testimony concerning tension between black and Hispanic school board members on the Dallas School Board, Tr136; (5) Elizabeth Alvarez Bingham's deposition testimony that minority groups do not vote

---

[64] Brooks agreed that, in his experience in Tarrant County, sometimes African-American and Hispanic voters prefer different candidates in Democratic primary elections, such as in CD33 in 2012. Tr1237. The majority of African-American voters in Tarrant County supported Veasey and the majority of Hispanic voters in Tarrant County supported Garcia in the runoff. Tr1237. In general elections in Tarrant County, African-American voters and Hispanic voters coalesce to vote for the same candidate; they both tend to be Democrats. Tr1239 (Brooks).

[65] Moss had "been informed" that Latino and African-American voters do not always support the same candidates and agreed that would be more likely to occur in Democratic primaries. Tr1307. He also agreed that, in Tarrant County, all things being equal, African-American voters would prefer to have an African American represent them. Tr1307.

[66] "Q. In your experience in Tarrant County do you believe that African Americans would rather support Anglos than a Hispanic candidate? A. Yes."

69

cohesively in Dallas County (docket no. 1460-6 at 77-78[67]).  Docket no. 1526 at

83-84.

Plaintiffs, on the other hand, offered testimony from lay witnesses to show

cohesion.  Franklin Moss is an African-American NAACP member who has been

a Fort Worth resident for 72 years.  He testified that he endorses Latino

candidates, and he cited a recent Fort Worth City council election for District 2

as an example where African-American and Latino residents of Tarrant County

worked together to elect a Latino candidate they both support.  He testified that

"a group of persons inside of the loop, 820," which is an area that is

predominantly black and Hispanic, worked together to ensure that they elected

a city council representative from District 2, and they have been successful in

electing a Latino representative. Tr1297-98.

Rep. Toni Rose (HD110) from Dallas County testified that the Latino

community came out in protest and support for a recent African-American police

shooting victim.  Tr1310.  She also testified that the issues that face the African-

American community and the Latino community are melded together; they both

have issues with and are affected by access to health care, issues with poverty,

issues with immigration, racial profiling. Tr1311.  Rose stated that, in Dallas

County, after the passage of SB4 (the sanctuary cities bill), the Latino

---

[67] "Hispanics in Dallas County do not all vote the same even within political parties.  African-Americans as well.  Even within political parties, there is a generational gap in the democratic party between older Hispanics and African-Americans and younger Hispanics and African-Americans.  And within the democratic party there is a large disconnect and substantial infighting, cross-party accusations and claims of racism between the Hispanics and African-Americans in a democratic party as against each other."

community and the African-American communities came together to support the Latinos' efforts to have the City of Dallas join in the lawsuit in opposition to the bill. Tr1315-16. Rose testified that there is a political coalition between African Americans and Latinos in Dallas County, and that quite a few Latino judicial candidates who ran in county-wide races would not succeed without the coalition and African-American support.[68] Similarly, she felt that African-American county-wide officials would have the same difficulty without Latino support. Tr1311-12.

Rep. Johnson, an African American, long-time resident of Dallas County, and representative of HD100, testified that "when there are races that are conducted in districts where you have African-Americans and Latinos living together, which is a lot of my district and, frankly, most of the southern portion of Dallas before you get to the southern Dallas suburbs," then "voters of color" would coalesce around the same candidates. Tr518-19. He also testified that he receives Latino support in his elections and that they have never talked of running a candidate against him, because he is responsive to their interests. Tr519-20. He testified that Dallas County Sheriff Lupe Valdez "gets a lot of support across communities" and that she would not continually win without support from Latinos and African Americans. Tr520. He further testified that his mother "loves" Rep. Anchia and "we have all kinds of crossover appeal like

---

[68] Rose was aware that some had run in contested primaries, including Hector Garcia and Maricela Moore. She was not aware of Garcia's primary opponent, but she testified that Moore's opponent was Monica Purdy. Tr1321-22. She testified that Hispanics and African Americans voted for Moore, and assumed that because Moore won, she received a large amount of African American support, but she did not have specific knowledge of the voting patterns. Tr1322.

that in our districts because we've lived together for so long, those two communities." Tr520-21.

Rep. Anchia testified that MALC's proposed CD6 located in Irving and Grand Prairie roughly mirrored the county commissioner district in Dallas County represented by Elba Garcia, that Korbel's analysis indicated it would perform for the Democrat in general elections, and that it was likely that a Latino would win. Tr713-17. However, Rep. Anchia specifically stated at trial that he was not providing testimony on African-American and Latino cohesion. Tr719-20. Nevertheless, in his deposition, he testified that he had seen examples of Latinos and African Americans being cohesive in Dallas, and that he believes they are cohesive more often than not. Anchia depo. at 117, 163. And former Plaintiff Juanita Wallace, a long-time Dallas resident, offered testimony that Black and Latino voters work together to elect candidates, noting specifically Elba Garcia, who got significant support from Black voters, though she had not specifically reviewed election data for the race. TrJ568-59, TrJ582.

Raul Magdaleno testified that there is a coalition in Dallas between Latinos and African Americans, and that they tend to vote together based on issues important to them that they have in common, such as education, health care, and economic disparities. TrJ1134.

Both lay witness testimony concerning cooperation between the minority groups and statistical evidence can be used to prove cohesion. *See Brewer v. Ham*, 876 F.2d 448, 453-54 (5th Cir. 1989). Statistical evidence is not a legal

requirement or the "sine qua non to establishing cohesion," but Plaintiffs "must still satisfy their burden of proof." *Id*. at 454. Lay witnesses testified generally about black and Hispanic coalitions and shared political identity stemming from shared community concerns. Certainly it is undisputed that black and Hispanic voters choose primarily to vote in the Democratic primary, and that they vote cohesively for the Democratic candidate who emerges from the general election, regardless of the candidate's race, and regardless of whether they supported them in the primary.

Lay witness testimony concerning primary cohesion was mixed. And the statistical analyses of Democratic primaries in Dallas and Tarrant Counties consistently demonstrates that black and Latino voters are not cohesive. It seems undisputed that, all things being equal, each group would prefer a candidate that looks like them. *E.g.* Tr1307 (Moss) ("And in Tarrant County, all things being equal, you would agree with me that African American voters would prefer to have an African American represent them, right? A. Yes."). That is why Dr. Murray and the African-American Congresspersons have testified that, when there are roughly equal numbers of black and Latino population in a district, they will develop "tension" as each group vies to elect candidates of their own in the primaries. While it was explained that this was more likely when the groups were not consulted in drawing the districts or when representation for one or both groups was proportionately low, it indicates that these groups cannot functionally be treated as one in terms of voting behavior. And whether

minority groups have the opportunity to elect candidates of their choice is the
operative inquiry for *Gingles*.  Primaries inform the analysis of whether each
minority group in the coalition has the opportunity to elect candidates of their
choice, or whether, as Dr. Alford put it, one group is acting as "filler."  Most
Plaintiffs' experts agree that, in CD33, Latino voters are not able to elect their
candidate of choice.[69]

Also troubling is the fact that African-American voters do not act
cohesively in support of Latino candidates against Anglo candidates. While the
probative value of the HD90 primaries is diminished by the fact that only
approximately 5,000 voters or fewer are involved and the Anglo candidate was
a long-time incumbent favored by the black community, Dr. Engstrom's primary
analyses of statewide elections in Tarrant and Dallas Counties demonstrate that
African Americans are even less likely to support Latino candidates than are
Anglo voters.  The consistent lack of cohesion severely undermines Plaintiffs'

---

[69] It is especially interesting that Latinos are not having success in CD33, given the expectation
when it was drawn that it would perform for Latinos in light of its proportionately higher HCVAP.
Contrasting the situation to that in CD24 in Dallas County considered in *LULAC v. Perry*, it cannot be
said that Hispanic voters are simply allowing African-American voters to vote for their candidate of
choice in the primary, because unlike CD24, where there was no contested primary, Hispanics have
sponsored a candidate in the CD33 primaries. Although it need not decide the issue, the Court does not
necessarily agree that Latinos lack opportunity in CD33.  In *LULAC*, the Supreme Court noted that
"[t]he opportunity 'to elect representatives of their choice,' 42 U.S.C. § 1973(b), requires more than the
ability to influence the outcome between some candidates, none of whom is their candidate of choice."
548 U.S. at 445.  The African-American voters in CD24 could only ever influence the outcome of the
primary given their low HCVAP% and lack of cohesion with Latinos (as found by the district court).  In
this case, black and Latino voters together can control the outcome of primaries in CD33, based on their
numbers, if they vote together, and could thus demonstrate the opportunity required by *Gingles*.  But
they have not voted together in the primaries, and black voters have controlled the primaries based on
relative turnout.  But there are 142,637 citizen voting age Hispanics (327,150 multiplied by .436) and
only 78,516 citizen voting age African Americans (327,150 multiplied by .24) in CD33, meaning that
Hispanic voters should easily be able to defeat African-American voters if they increase their relative
turnout.  Regardless, unless they vote cohesively in the primaries, it is not a minority coalition
opportunity district.

claims, as does their assertion that their new proposed coalition districts would perform for one group or the other, and not both cohesively.

Considering all of the lay witness and statistical evidence as a whole, the Court finds that Plaintiffs have failed to establish the necessary minority cohesion to satisfy *Gingles* 2. Accordingly, the *Gingles* results claims must fail.

## B. Intentional Discrimination/Vote Dilution Claims

As noted, several Plaintiffs contend that the configuration of DFW and the addition of CD33 in DFW did not remedy the cracking and packing and intentional discrimination found by this Court concerning Plan C185. As discussed above, Plaintiffs complained generally that in Plan C185, minority communities in DFW were cracked (primarily within urban areas where fingers reached in from Anglo-dominated suburban districts). They also complained that CD30 was packed with minorities. This Court addressed those claims in Plan C235 by removing the fingers from minority areas, and what was left was CD33. The Court noted that CD33 was "appropriate to remedy the alleged race-based discrimination that occurred" but "goes no further than required under *Perry v. Perez*." Docket no. 691 at 38. When this Court later analyzed the entire record, it found that Downton had intentionally drawn and cracked a proposed minority district. CD33 looks significantly like the proposed minority coalition district that this Court found was drawn and then intentionally cracked. Thus, CD33 in Plan C235 is an appropriate remedy for that cracking, without going further.

The Court also addressed Plaintiffs' claims that CD30 was packed in Plan C235 by reducing the combined minority population to near benchmark levels.[70] When this Court later analyzed the entire record, it found that Downton had moved Anglo voters out of CD30 and minority voters into CD30, increasing the minority population above benchmark levels. Because Plan C235 returned these population levels to slightly below benchmark levels, it appropriately remedied that packing.

Plaintiffs complain that Plan C235 does not remedy all of the cracking because minority communities in other portions of DFW remain divided, and they contend that it does not remedy all of the packing in CD30 because CD30 needs far fewer minority votes to continue functioning as an African-American ability district, and those excess minority votes are thus being wasted. They contend that, together, the remaining cracking and packing prevents the creation of additional minority opportunity districts. The Court has already found, however, that Plaintiffs failed to demonstrate that additional minority opportunity districts with cohesive minority communities could be drawn. In addition, the fact that CD30 has a higher-than-necessary minority population is not itself unlawful packing. That higher-than-necessary minority population was in CD30 in the benchmark, thus Downton did not put those voters into CD30 with a discriminatory purpose when he drew Plan C185. And while

---

[70] This Court noted that the combined H+BVAP was increased from 76.7% in the benchmark to 81.5% in Plan C185, but reduced to 75.9% in Plan C235. Docket no. 691 at 37 n.83. The D.C. Court also noted that CD30 was packed insofar as the combined minority voting age population was increased from the benchmark district by 4.8%. *Texas v. United States*, 887 F. Supp. 2d at 222 (fact finding 120). This packing was remedied by Plan C235.

Plaintiffs contend that those voters could be placed into other districts to create additional opportunity districts, the failure of their *Gingles* claims shows that removing these voters would not create additional single-minority or minority-coalition districts. Thus, the Court finds that Plan C235 adequately remedies the cracking and packing found by this Court.

Last, the Quesada Plaintiffs further indicate that this Court should fix the cracking of southeast Arlington/Grand Prairie found by the D.C. Court because it remains in Plan C235. Quesada Plaintiffs note that, in the section of its fact findings and conclusions of law entitled "Discriminatory Purpose in the Congressional Plan," the D.C. Court included the following finding:

> 112. CD 33 is one of the State's newly apportioned congressional districts. In the Congressional Plan, this district includes all of Parker County and parts of Wise County, both of which are predominantly comprised of Anglo, suburban areas. Anglos make up 85.3% of the population in Parker County and the portion of Wise County included in CD 33 is 78.7% Anglo. Pl.'s Ex. 12. In addition to those Anglo areas, CD 33 cuts into Tarrant County to include Tarrant County's fast-growing minority populations. Representative Veasey testified that enacted CD 33 "goes around southwest—underneath southeast Ft. Worth in the unincorporated Tarrant County, and then moves into Arlington, into the heavily Anglo part of Arlington, and then picks up the fast minority growth area in southeast Tarrant County, Arlington—southeast Arlington–Grand Prairie area." Trial Tr. 23, Jan. 18, 2012 PM (Rep. Veasey).

887 F. Supp. 2d at 220. The D.C. Court did not find that this particular cracking was unlawful, however. In an area with many minority communities, it is inevitable that some minority communities will remain cracked, and they cannot all be placed into a minority opportunity district. Because cracking this community has not been shown to intentionally or in effect prevent the creation

of an additional opportunity district or to minimize minority influence, uncracking is not required.

As a result, the Court finds that Plaintiffs' intentional discrimination/vote dilution claims as to Dallas County fail as to Plan C235. No additional remedies are required in the DFW area.

## IV. Houston area

Plaintiffs asserted § 2 results and statutory and constitutional discrimination claims in the Houston area with regard to Plan C185. With regard to the § 2 results claims, the Court found that Plaintiffs had failed to establish the first *Gingles* precondition for their proposed districts , but this did not preclude Plaintiffs from pursuing these claims with regard to Plan C235 with population data reflecting the minority population in 2013, when Plan C235 was adopted. Docket no. 1390 at 146-158. The Court did not find sufficient evidence of racial gerrymandering or racially discriminatory motive. *Id.* at 158-163. Though there was some circumstantial evidence consistent with racial discrimination, the Court ultimately found that Plaintiffs failed to sufficiently distinguish the role of race and politics in the drawing of district lines in Houston. *Id.* at 162.

The NAACP Plaintiffs and MALC bring § 2 results claims in the Houston area with regard to Plan C235. Docket no. 897 (MALC) ¶¶ 60-61. MALC proposes new coalition districts in Plan C285, and NAACP joins in MALC's plan.

Dr. Murray testified in 2011 that there is Latino growth outside of CD9

and CD18 in Houston, which would have an impact on the ability to draw a new Latino opportunity district because "there's a lot of raw material to work with." Tr1283. He testified that there was growth in the southeastern part of the county, some in the present CD29, but there was also a lot of growth in CD22 and CD36. He also testified that districts 2 and 7 contain substantial areas of heavily Latino voter concentrations. Tr1283-84. He felt that a functional Latino opportunity district could be added, though he had not seen a plan creating a new HCVAP-majority district. Tr1273-74.

In Plan C235, CD29 is an HCVAP-majority (61.6%) district that consistently elects an Anglo Democrat, and CD9 and CD18 are near majority-BCVAP (48.5% and 47%, respectively) districts that consistently elect African-American Democrats. MALC offers the only demonstration plan for the Houston area in this phase, Plan C285, which proposes two additional minority opportunity districts—it maintains the existing African-American districts as ability districts, creates a new HCVAP-majority district, reworking CD29 into a coalition district, and creates an additional coalition district. JX-104. Expert George Korbel drew Plan C285, and he testified that he tried to simplify the existing minority districts while creating two additional minority opportunity districts. Tr736.

He created new HCVAP-majority (50.7%) district CD36 that he characterized as a "ship channel district" that includes Galena Park and Pasadena, South Houston, Baytown, and Channelview. Tr736-37. CD34 is a

79

new B+HCVAP coalition district (53.3%) dominated by Acres Homes, Studemont, and Oak Forest and the areas in the Spring Branch Independent School District that are north of I-10. Tr736-37. CD18 is the "traditional black district" that was "simplified" and includes Third Ward, Fifth Ward, Montrose, Kashmere Gardens, and black neighborhoods all throughout the center part of Houston. Tr737. Both its BCVAP and HCVAP are reduced from Plan C235 and it becomes 40.2% BCVAP and 18.2% HCVAP. JX-104.3. CD29 includes Aldine and parts of Spring Branch and Sharpstown and Gulfton. Tr737. It is no longer majority-HCVAP but is a 37.6% HCVAP + 16.5% BCVAP coalition district. JX-104.3; Tr738, Tr742. CD9 was then modified "slightly" to fit in with the other districts as a south Harris County district with virtually all the neighborhoods that were in CD9. Tr737-38. Both its BCVAP and HCVAP are reduced from Plan C235 to 41.4% BCVAP and 18.4% HCVAP.

Korbel testified that he tried to put these districts entirely within the urban areas, and in doing that, created five minority districts; all of the districts consistently functioned over the test period for Democrats in the exogenous elections. Tr738; Tr742 (new CD34 and CD36 perform consistently for minority voters); MALC-25.

As with DFW, the minority population (this time also significantly more Asians) grew in the Houston area, and Anglo population declined. But as in DFW, no party has proposed additional single-minority-majority-CVAP districts in the Houston area. Although Plan C285 does create a new HCVAP-majority

district, CD29 loses its HCVAP-majority status.  Thus, as in DFW, Plaintiffs

must rely on proposed coalition districts to meet the first *Gingles* precondition.

Defendants contend that Plaintiffs have failed to prove cohesion in the

Democratic primaries, and thus cannot meet their burden under the second

*Gingles* precondition.

In 2011, several witnesses testified generally about a "Black and Brown

coalition" in Houston.  *E.g.*, docket no. 1340 at 373 n.52.  Congressman Green

testified that African-American and Latino communities within his district had

worked together to elect Sheriff Adrian Garcia, the first Latino sheriff.  Docket

no. 1340 ¶ 564.  Rep. Senfronia Thompson, an African American, testified that

African Americans, Latinos, and Asians work in cooperation together politically.

Docket no. 1364 ¶ 503.  She testified that she receives Latino support and that

she has supported many Latinos.  *Id.*

It is generally undisputed that, here, as elsewhere, African Americans and

Latinos choose primarily to participate in the Democratic primaries.  In Harris

County, Dr. Lichtman found that 86.76% of Hispanic and 97.87% of Black voters

participated in the 2008 Democratic primaries, and 53.46% of Hispanic and

94.12% of Black voters participated in the 2010 Democratic primary.  Joint

Expert Ex. E-3 at 5; *see also* docket no. 1364 ¶ 502 (noting that Murray found

"almost zero black population voting in the Republican primaries and very, very

little Hispanic population").  It also undisputed that African-American and

Latino voters coalesce around the Democratic candidate in the general election,

81

as shown through both lay witness and statistical evidence.

But Dr. Murray and the African-American Congressperson Intervenors were concerned about the C185 configuration in Houston's African-American districts creating "tension," where African Americans and Latinos would compete for control over districts as Latino population increased in the African-American districts. Docket no. 1340 ¶ 566. Dr. Murray testified that such tension is more likely when representatives are not consulted in the drawing of the districts. Tr1284-85. Congressman Green testified that, when one group has a plurality, the two groups can work well together through a "gentle person's agreement" to back candidates from the plurality, but when there is no plurality, tension may develop because both groups want representation. Docket no. 1340 ¶ 567.

Murray agreed that, if Hispanic and African-American populations were balanced about evenly in a district, "you are going to get some tension in Democratic primaries." *Id.* ¶ 566 n.52. He agreed that, in the primary, African Americans tend to vote for African Americans and Hispanics for Hispanics. *Id.*

Dr. Alford notes that in proposed CD34 in Plan C285, the combined BCVAP is at 25% and HCVAP is at 28.6%, and MALC has not offered primary analysis for this proposed district. He testified,

> If we had no other information, we might assume that it reflected a kind of perfect combined minority district because the population numbers suggest that it's pretty evenly divided between the two groups. If they're politically cohesive, that might be just the right way to draw that district.
> We know from the Harris County primary analysis, Dr.

Engstrom, that the two groups are not politically cohesive, and we know from the experience in CD33 how that typically would play out. So this is a district that's . . . if it was implemented, likely to be characterized a few years from now as black opportunity district.

Tr1378.

As noted by Dr. Alford, Dr. Engstrom's statistical analysis indicates a lack of Democratic primary cohesion between African-American and Latino voters, with African Americans sharing support for the Latino candidate with Latinos for only two of six candidates in Harris County between 2006 and 2010. Docket no. 307-1 at 16. In several primaries, African-American support for the Latino candidate was lower than "others." Docket no. 307-1 at 17-18. Dr. Engstrom's results are set forth in the following table:

## Harris County

|  | African American voters | Latino voters | Other voters |
|---|---|---|---|
| 2006 Dem. Primary Lt. Gov. (Alvarado) | 28.0 24.9 - 31.0 | 39.5 36.1 - 42.7 | 38.3 36.5 - 40.2 |
| 2006 Dem. Primary Lt. Gov. Runoff (Alvarado) | 34.8 31.8 - 37.6 | 43.5 39.0 - 47.9 | 43.4 40.6 - 46.3 |
| 2008 Dem. Primary US Senate (Noriega) | 44.1 42.6 - 45.6 | 73.8 71.2 - 76.4 | 54.0 52.8 - 55.2 |
| 2008 Dem. Primary Sup. Ct. Pl. 7 (Cruz) | 27.6 26.3 - 28.8 | 75.8 73.6 - 78.0 | 30.6 29.5 - 31.7 |

| 2008 Dem. Primary Sup. Ct. Pl. 8 (Yanez) | 52.7 | 87.8 | 44.3 |
|---|---|---|---|
| | 51.7 - 53.9 | 85.9 - 89.7 | 43.1 - 45.4 |
| 2010 Dem. Primary Lt. Gov. (Chavez-Thompson) | 37.8 | 67.6 | 31.1 |
| | 36.4 - 39.2 | 64.5 - 70.7 | 29.6 - 32.6 |
| 2010 Dem. Primary Land Comm'r (Uribe) | 69.6 | 59.0 | 46.3 |
| | 68.2 - 70.9 | 55.5 - 62.6 | 44.7 - 47.9 |
| 2014 Dem. Primary Governor (Madrigal) | 1.7 | 31.8 | .1 |
| | 0.2 - 2.9 | 29.0 - 34.8 | 0.0 - 0.3 |

Dr. Chervenak only looked at one primary election in Harris County, the 2016 HD149 Democratic primary, where he measured support from various groups for the Asian candidate Hubert Vo. He found that all the various groups shared similar levels of support for Vo: African Americans at 56.4%, Latinos at 60.6%, Asians at 62%, and White voters at 55.4%. NAACP-2 at 20. Thus, this does not tell us much about a particular African American and Latino coalition.

While there may not be as much evidence indicating a lack of primary cohesion in Houston as there is in DFW, neither is there much evidence proving primary cohesion. Considering all the evidence, Plaintiffs have failed to satisfy the burden of proving minority group cohesion in Houston. The § 2 results claim in the Houston area fails.

## V. CD23

Several Plaintiffs challenged the configuration of CD23 in Plan C185, arguing that it was racially gerrymandered by applying the "nudge factor," in

84

which Hispanic population and turnout were manipulated to make CD23 appear to be a Latino opportunity district when in fact it was not. The Task Force also asserted a *Shaw*-type racial gerrymandering claim against CD23.

In the § 5 preclearance litigation, plaintiffs asserted retrogression and discriminatory purpose claims. Plan C235 incorporated changes to CD23 that attempted to address the "not insubstantial" claims that CD23 was impermissibly retrogressed from the benchmark in Plan C185. Docket no. 691 at 31. At the time the Court considered adopting Plan C235, the parties disputed whether CD23 was effectively adjusted to avoid retrogression, with MALC and certain other Plaintiffs arguing that its performance was below benchmark levels because in almost all elections, the choice of Hispanic voters did slightly more poorly.[71]

Dr. Ansolabahere compared the proposed CD23 in Plan C226 to CD23 in the benchmark in February 2012 as this Court was evaluating the proposed compromise plan. Rod-916 (Analysis of CD23 under Plans C100 and C226). He noted that the HCVAP increased from 59.3 to 60.6%, but that performance for Hispanic-preferred candidates decreased by about one-to-two percentage points in every election he studied, with an average reduction of 1.5%, although the number of wins did not change. Although CD23 was better than in Plan C185,

---

[71] The Task Force Plaintiffs stated that CD23 as altered in Plan C226 "restore[d] CD 23 as a Latino opportunity district" and noted that the win-loss record of Latino-preferred candidates was similar to the benchmark. Docket no. 638 at 35. The Task Force stated that "[t]he restoration of CD23 in C226 addresses the Latino Task Force claim of intentional discrimination under the Constitution and §§ 2 and 5 of the Voting Rights Act." *Id.* The Task Force did not assert claims against CD23 in Plan C235, and the Court denied the Task Force's motion for leave to amend to pursue such claims shortly before this trial in 2017.

he viewed it as reducing ability to elect from Plan C100.

However, because CD23 in Plan C235 maintained comparable win-loss records on various election indices,[72] the Court concluded that it had been sufficiently restored to benchmark performance levels to avoid retrogression, even if the margin of victory slightly decreased. Docket no. 691 at 31-32. Further, because Plaintiffs argued that CD23 in the benchmark was an opportunity district and its performance on the various indices was similar in Plan C235, the Court found that Plaintiffs' § 2 claims were resolved, and the Court also did not need to decide the discriminatory purpose claims related to CD23. *Id.* at 32.

In its Order on Plan C185, this Court found that the Task Force Plaintiffs succeeded on their *Shaw*-type racial gerrymandering claim as to CD23, that CD23 was no longer an opportunity district despite its HCVAP-majority status, and that mapdrawers intentionally discriminated against Latino voters and diluted their vote in violation of § 2 of the VRA and the Fourteenth Amendment through the use of the nudge factor. Docket no. 1390 at 11-32.

MALC, the Rodriguez Joint Plaintiffs, and Congressman Cuellar assert claims against CD23 in Plan C235 on the basis that it did not fully remedy the intentional vote dilution and intentional discrimination behind the district lines in Plan C185. The Rodriguez Joint Plaintiffs contend that CD23 continues to run afoul of § 2 despite the adjustments made in Plan C235. Docket no. 1524 at

---

[72] This included the OAG 10, Dr. Handley's index, and Dr. Engstrom's index.

15. The Court must thus determine whether CD23 as reconfigured in Plan C235 is a Latino opportunity district and whether the harms inflicted in 2011 are remedied.

First, however, the Court considers Defendants' assertion that these Plaintiffs lack standing to challenge CD23.[73]  *See* Docket no. 1526 at 74 n.14. MALC has identified "multiple members of its organization who reside in CD 23 or who have districts within the geographic constraints of CD 23." Docket no. 1532 at 1. MALC notes that it previously identified Rep. King as a resident and voter in CD23 in docket no. 258 and also identified additional MALC members who were residents of CD23. *Id.* at 2. Further, MALC member Poncho Nevarez represents and resides in HD74, which is entirely contained within CD23. MALC-1.

MALC has proven its standing to assert claims against CD23.[74]  "[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Com'n,*

---

[73] Between closing argument and their closing briefs, CD23 is the only area in which Defendants raise a specific challenge to the standing of any Plaintiff.

[74] To the extent that other Plaintiffs also assert these claims, the standing of MALC is a sufficient basis for this Court's analysis. *Nat'l Solid Waste Mgmt. Ass'n v. Pine Belt Reg'l Solid Waste Mgmt. Auth.*, 389 F.3d 491, 501 n.18 (5th Cir. 2004) ("[W]hen one of multiple co-parties raising the same claims and issues properly has standing, we do not need to verify the independent standing of the other co-plaintiffs."); *see also* docket no. 1365 at 116 n.72 ("[T]he Court rests its analysis of the merits on the standing of LULAC, which covers all of the *Larios* claims in the lawsuit.").

432 U.S. 333, 343 (1977). First, as noted, at least one MALC member would have standing to sue in his or her own right as a resident of CD23.

Second, the interests sought to be protected—Latino voter strength and representation in Texas's congressional districts—are germane to MALC's purpose. Tr145 (testimony of Rep. Martinez Fischer that MALC looks to develop membership that will take into account the views of the minority community when it comes to public policy and voting rights). Because MALC is an association of Texas House members, Defendants argue that "the configuration of congressional districts is not germane to the organization's purpose." Docket no. 1526 at 74 n.14. Although the configuration of congressional districts is not *itself* MALC's purpose, that is not what the law requires. The interest to be protected need only be *germane* (*i.e.*, relevant) to MALC's purpose, which is a "low threshold"—"the germaneness requirement is 'undemanding' and requires 'mere pertinence' between the litigation at issue and the organization's purpose." *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550 n.2 (5th Cir. 2010) (quoting *Bldg. & Constr. Trades Council of Buffalo v. Downtown Dev., Inc.*, 448 F.3d 138, 148 (2d Cir. 2006)). Here, the configuration of congressional districts overlaps in important ways with MALC's purposes of growing membership and representing Latinos in Texas. MALC's ability to accomplish both of its goals is strengthened by increased Latino political power in congressional districts, even though the strengthening of Latino political power in congressional districts is not itself

MALC's purpose. At the very least, MALC's challenges are "pertinent" to the purposes identified by Representative Anchia.

Third and finally, participation of individual MALC members is not necessary and Defendants do not argue otherwise. Accordingly, MALC has standing to assert its claims in CD23, and as a result, the Court finds it unnecessary to conduct a detailed standing analysis for other Plaintiffs.[75]

The parties are in agreement that the Hispanic voters in CD23 have a right under § 2 that the State must accommodate, but they disagree on whether CD23 as configured in Plan C235 is a Latino opportunity district. In Dr. Alford's March 2014 Supplemental Report (D-424), he opined that CD23 "is a politically competitive district that nonetheless provides an opportunity for Latinos to elect

---

[75] The Fifth Circuit has recognized various Supreme Court decisions that give courts "license to *avoid* complex of questions of standing in cases where the standing of others makes a case justiciable." *Nat'l Rifle Ass'n of Am. v. McGraw*, 719 F.3d 338, 344 n.3 (5th Cir. 2013) (emphasis original) (citing *Massachusetts v. EPA*, 549 U.S. 497, 518, 127 S. Ct. 1438, 167 L.Ed.2d 248 (2007) and *Bowsher v. Synar*, 478 U.S. 714, 721, 106 S. Ct. 3181, 92 L.Ed.2d 583 (1986). The Fifth Circuit has cautioned, however, that "it does not follow that these cases permit a court that *knows* that a party is without standing to nonetheless allow that party to participate in the case." *Id* (emphasis original). The procedural posture of this case and Defendants' standing challenge permits the Court to rest its analysis of multiple plaintiffs' claims on the standing of a single plaintiff. This case has been pending for six years, but after Defendants challenged standing at the motion to dismiss stage, they have not formally re-asserted their challenges by seeking summary judgment or specifically seeking dismissal as to any particular plaintiff on specific grounds. Thus, so long as a single party has standing to assert a particular challenge, the Court will assess the record as to that claim, regardless of whether other plaintiffs have standing to assert the same claim.

However, the Court notes that, even if MALC lacked standing here, LULAC also has a strong case for associational standing. This Court has admitted a declaration from LULAC's Texas State Director, Elia Mendoza, who states that LULAC has councils in Maverick and Val Verde Counties (which are in CD23), that each council has an officer and a contact person, and that there are multiple LULAC members who are registered voters in CD23 (though none are identified by name). Docket no. 1365 at 118 (2011 House Plan Opinion); docket no. 1342-1 (Mendoza declaration). In addition, Congressman Cuellar is the elected representative of CD28, which borders CD23 to the southeast, but is not a voter in CD23. However, elected officials may have standing to protect their interests as district representatives, including "the 'ability to protect their continued tenure,'" and restructuring of CD23 could affect Cuellar's district. *LULAC Council No. 4434 v. Clements*, 884 F.2d 185, 188 (5th Cir. 1989) (quoting *Williams v. State Bd. of Elections*, 696 F. Supp. 1563, 1572 (N.D. Ill. 1988)); *LULAC Council No. 4434 v. Clements*, 999 F.2d 831, 844 (5th Cir. 1993). In any event, the Court again reiterates that it need not decide this question of Congressman Cuellar's standing individually because he asserts the same claims as MALC, which has standing for the reasons described above.

their candidate of choice." D-424 at 26; *id.* Table 6 (in C100 CD23 was 2 Democrat wins, 4 Republican wins; in C185 it was 0 Democrat wins, 6 Republican wins; in C235 it was back to 2 Democrat wins, 4 Republican wins). He asserts that, throughout its modern history, CD23 has been a highly competitive congressional district, producing victories for Hispanic Republicans during Republican tides, and producing victories for Hispanic Democrats during Democratic tides. He further notes that, if opportunity requires a demonstrated opportunity for Hispanic voters to elect a candidate of choice, then that has been empirically demonstrated for CD23 because in 2012, Pete Gallego defeated incumbent Francsico Canseco with 50.3% of the vote.

Dr. Alford's more recent analysis reflects an endogenous success rate of 33% (1/3 elections) and a success rate of 12% (3/25) on reconstituted statewide elections. D-878 at 16-17, 20; Tr1431 (Alford). Dr. Alford agreed that the district will more often than not elect the Anglo-preferred candidate in endogenous elections, favors the Anglo-preferred candidate in 88% of exogenous elections, and is designed to tilt in favor of Anglo-preferred candidates. Tr1389, 1402, 1430-31. But he still believes that CD23 provides the opportunity required by § 2. Plaintiffs contend that CD23 does not perform for Hispanic voters by electing their candidate of choice in a legally significant number of elections.

A majority-minority district must provide "real electoral opportunity" to the minority group in order for the § 2 right to be fulfilled. *See LULAC*, 548 U.S. at 428. "A 'real opportunity' is not a guarantee of success, as the Court is

mindful that § 2 does not guarantee electoral success for minority-preferred candidates." *Perez*, 2017 WL 1787454, at *8 (citing *LULAC*, 548 U.S. at 428). CD23 satisfies § 2 if it offers Hispanic voters the real opportunity to elect their candidate of choice. We are in a unique position to evaluate that question with actual election data because of the peculiar posture of this case. Three endogenous elections have taken place in the district under the Plan C235.

When the current configuration of CD23 was adopted, the HCVAP was 61.3%, an increase from 58.5% HCVAP in the 2011 plan. The most recently available ACS five-year survey data (2011-2015) places the HCVAP at 62.1%. The SSVR in CD23 was stable across all three elections for which C235 has been in place: 55.6 , 55.9, and 55.3%, respectively.

From the 2012 to the 2016 election, Hispanic turnout increased from 46% to 48.2% of the turned-out vote, with a dip in the 2014 midterm election to 40.9%. This increase in Hispanic turnout led to a decrease in the vote gap between Hispanic and non-Hispanic voters from 16,075 in 2012 to 8,506 in 2016. Looked at another way, it reflects a 20.7% increase in the number of Hispanic voters and a 10.7% increase in the number of non-Hispanic voters.

Dr. Ansolabehere analyzed the Democratic vote totals in the areas moved in, moved out, and kept in the CD23 when compared to C185. He concluded that the areas that were brought into the district, while Democratic, contained insufficient votes to overcome the vote totals for Republicans in the areas that were kept in the district. This left Democrats with a vote deficit of

approximately 8,000 votes. Rod-955 (Ansolabehere report) at 15. Such analysis has limited value for reviewing CD23's performance because we can look to the actual election results in three endogenous elections, which in this case demonstrate the opportunity Hispanic voters have to elect their candidate of choice in CD23.

The Hispanic candidate of choice—Democrat Pete Gallego in all three elections—was elected in 2012, but was narrowly defeated by African-American Republican Will Hurd in 2014 and 2016. Gallego won in 2012 by a margin of over 9,000 votes. Gallego's margin of defeat in 2014 was about 2,000 votes and his margin of defeat in 2016 was about 3,000 votes. Both Dr. Engstrom's bivariate and Dr. Alford's multivariate ecological inference analyses of CD23 demonstrate that Gallego lost Hispanic vote share from 2012 to 2016. Engstrom's bivariate analysis shows his Hispanic support declining from 86.9 to 82%. Alford's multivariate analysis shows Gallego's Hispanic support declining from 82.6 to 76.2%. Dr. Alford testified that a 4% drop in support among Hispanics, smaller than either Engstrom or Alford's analyses demonstrate, would result in a more than 3,000 vote decrease for Gallego. Had Gallego retained his support among Hispanic voters, particularly in an election in which Hispanics were also gaining vote share over 2012, Gallego would have defeated Rep. Hurd.[76] The competitiveness of these elections is sufficient to find

---

[76] Dr. Alford disagreed with Dr. Flores's conclusion that Gallego lost because of increased racial polarization in the district. Tr1400. Dr. Alford noted that Gallego's Anglo support increased from 23.9 in 2012 to 26.85% in 2014, which is not unexpected since he was the incumbent, but Hispanic turnout dropped more dramatically than Anglo turnout in the non-presidential election year. Tr1393-96. Thus, although both Latino and non-Latino support for Gallego increased, the relative proportions in the

that CD23, as currently configured, is a Hispanic opportunity district.

The exogenous elections over the previous three cycles show less success for the Hispanic candidate of choice in the district. Under the current plan, the Hispanic candidate of choice was successful in three of twenty-five exogenous elections in CD23.[77] The Rodriguez Plaintiffs contend that "an abysmal 12% success rate is far below any of the indices this Court cited in its discussion of benchmark CD23" and, unlike CD23 in Plan C100, the endogenous success rate is also low (33% compared to 66% in Plan C100). Docket no. 1254 at 16. But exogenous elections are far less probative than the actual endogenous election data we have. We have also rejected a pre-set success rate for the minority preferred candidate in exogenous elections. *Perez*, 2017 WL 1787454, at *8. Such a requirement is not compatible with the Supreme Court's directives that § 2 requires a searching, practical inquiry specific to the facts of each case. *Id.*

---

electorate that are Hispanic and Anglo are different in that midterm, and "it's an electorate that's less helpful to an Hispanic candidate," such that Gallego loses. Tr1397. Alford further noted that, in 2016, Gallego is not the incumbent, and Hurd is. Hurd is getting 74.8% of the Anglo vote; Gallego is down at 22.4%. Gallego is at 76.2% Hispanic support and Hurd at 19.1%. Tr1394. In terms of Hispanic support, Gallego is down from 2014, which Alford did not think was unusual because Gallego was running as a challenger rather than as an incumbent and Hurd, the incumbent, has had some time to move from being a candidate to being someone who actually represents the district. Tr1394. Although the proportion Hispanic in the turned-out vote went up by a couple of percentage points, Gallego still lost, and that is where Alford felt the EI analysis explained why—Gallego's support among *both* Hispanics and Anglos dropped. Tr1398-1400. Alford felt this was not increased racially polarized voting because Gallego was defeated in 2014 in an election when his level of support increased in both Anglos and Hispanics, and he was defeated again in 2016 when his level of support decreased in both Anglos and Hispanics. Tr1400-01. Thus, Alford indicated, the 2014 defeat was due to a decrease in relative turnout, and the defeat in 2016 was due to a decrease in Hispanic cohesion in support of Gallego (as well as a decrease in Anglo support). *See also* Tr1065 (Ansolabehere) (noting that if there is a small difference in turnout in the favor of the Hispanic-preferred candidate, then the district polarization will kind of help cement that as a Hispanic district, but if there is a small deficit in the opposite direction, that will help cement it as a non-Hispanic district).

[77] Korbel's analysis showed that CD23 performed in exogenous elections 0/10 in 2010, 0/5 in 2012, 0/12 in 2014, and 2/8 in 2016. Tr726; Tr743; MALC-25.

93

We know that CD23 may still perform for minority-preferred candidates even when its performance on statewide indices is equal to or less than 50%. Although a 33% endogenous success rate is undoubtedly less than the 66% we considered to provide opportunity in CD23 in Plan C100, as Dr. Alford noted, with only three endogenous elections, one change in win/loss results in a large change in percentage. And the fact that endogenous wins are less than 50% is not dispositive.[78] The evidence indicates that Latinos *can* win elections in the district, and whether they can win in the future is largely within their control.

On the whole, CD23 is a highly competitive district for U.S. Representative candidates. Hispanics have an opportunity to elect a candidate of their choice where merely small changes in cohesion, turnout, candidate quality, or a host of other factors could tip the election in their favor. Section 2 is not meant to be a guarantor of political success and we will not further tinker with the boundaries of CD23 to achieve that end.

Last, the Court considers whether the intentional harms found with regard to Plan C185 continue in Plan C235, despite the changes to the district.[79] In finding that mapdrawers applied the "nudge factor" in CD23 in Plan C185, the Court noted that the Legislature intentionally split Maverick County and the City of Eagle Pass to exclude politically active Hispanics who would not support

---

[78] "The circumstance that a group does not win elections does not resolve the issue of vote dilution." *LULAC*, 548 U.S. at 428.

[79] As to the *Shaw* claim, to the extent race predominated in Plan C185, the district was redrawn in Plan C235. Even if race predominated in that redrawing, changes to the district were necessary to address intentional discrimination, and thus any use of race served a compelling state interest.

Canseco, increased the turnout gap between Latinos and Anglos, and increased SSVR while simultaneously decreasing Latino cohesion (and performance) by selectively including high SSVR districts with worse performance for Latino-preferred candidates.[80] The Court found that the increases in SSVR and HCVAP were not intended to and did not maintain or improve Latino voting strength. Docket no. 1390 at 22.

In Plan C235, no changes were made to El Paso or the northern border, but Maverick County was made whole and placed within CD23, and Atascosa County was made whole and placed within CD28. Changes were also made to CD20, CD23, and CD28 in Bexar County. The Task Force, one of the principal Plaintiffs groups pursuing the nudge factor claim in CD23, stated that "[t]he restoration of CD 23 in C226 [which became C235] addresses the Latino Task Force claim of intentional discrimination under the Constitution and §§ 2 and 5 of the Voting Rights Act." Docket no. 638 at 35.

Dr. Ansolabahere looked at the alterations made to CD23 in Plan C235 and the available information at the time to determine how the district was being reconfigured and if the changes "were fixing specific problems" in terms of increasing turnout or SSVR. Tr1060-61. He noted that although HCVAP was increased, the actual number of Spanish surnamed registered voters barely increased. Tr1061; Rod-955 ¶ 27 (the changes resulted in a net increase of only

---

[80] As the Court noted, although Downton claimed to be trying to include more Hispanic Republicans, his method could also include precincts with low Hispanic turnout and high Anglo Republican turnout or higher Anglo bloc voting levels, and he failed to consider the Hispanic incumbent's chances in the Republican primary. Docket no. 1390 at 21 n.19.

243 SSVRs).  He noted that this was an indication that maybe the areas being moved in were not going to perform to the level that they needed to in terms of participation.  Tr1061.  He further found that the areas moved into CD23 had lower turnout than the areas moved out of CD23, and that the movement of lower turnout areas into CD23 did not improve, and may have worsened, the electoral opportunities afforded to Hispanics in the district.  Rod-955 ¶¶ 28, 30.

Dr. Ansolabahere acknowledged that Plan C235 fixed the Maverick County split and moved the entire County back into CD23, and that both HCVAP and SSVR were increased.  Further, although he notes that areas moved into CD23 had lower turnout than areas moved out, his turnout analysis looked only at total turnout, not Hispanic or SSVR turnout, and did not compare Hispanic and non-Hispanic turnout differences.  Tr1153.[81]

Dr. Flores's analysis examined the change in SSVR in Latino opportunity districts from 2008 to 2016, and found that the SSVR decreased slightly in CD23 (-0.2%).  TF-20 at 3.  But he found that it similarly decreased in CD20 (-0.5%) and CD35 (-0.9%).  TF-20 at 2.  Flores also found that "Latinos were more successful in increasing their number of votes cast when compared to non-Latino voters" but they "could not overcome the total turnout numbers of non-Latino voters."  TF-20 at 7.  He also found, based on the difference in turnout rates between Latinos and non-Latinos in the 2012 and 2016 general elections, that

---

[81] Dr. Ansolabahere looked at 2010 election turnout because that was the data available to the mapdrawer, but he agreed that Defendants' 2016 election turnout analysis showed an overall increase in turnout.  Tr1154-57; DX-808.

"[a]lthough Latinos have made gains closing the turnout gap in 2016 compared to 2012, the participation gap is still substantial at 15.8%." TFX-20 at 7-8.

In his conclusions, Dr. Flores notes that he previously pointed out the "difficulties that Latino candidates of choice would encounter because of the manner in which CD 23 was constructed by the Texas Legislature" in terms of turnout, and that Plan C235 "made some modifications to CD23 in Bexar County as an interim remedy." TF-20 at 12. He then states, "However, since 2012 the challenges facing Latino voters in CD23 have worsened with the increased level of bloc voting by non-Latinos against the Latino candidate of choice." *Id.*[82] But this fails to tie any of the current problems he identifies in CD23 to specific lines drawn in Plan C185. It is not enough to point to problems with CD23 in Plan C185 and problems with CD23 in Plan C235, without connecting the problems in Plan C235 to decisions made in Plan C185 and demonstrating specific continuing harms flowing from Plan C185. While Flores shows that Latinos continue to have a turnout gap compared to Anglo voters, that fact is true in most areas, if not statewide, and there is simply no evidence for the Court to conclude that the turnout gap in Plan C235 is the result of intentional discrimination in the mapdrawing process or carryover from Plan C185. And

---

[82] As noted above, non-Latino bloc voting actually decreased between 2012 and 2014. Dr. Engstrom's analyses show that, between 2012 and 2014, both Latino and non-Latino support increased for Gallego. TF-19. In addition, both Anglo support and Latino support for the Hispanic-preferred candidate were higher in 2012 under Plan C235 than they were in 2010 under Plan C100. In 2010, Engstrom found 84.7% Latino and 18.1% non-Latino support for Rodriguez. Docket no. 307-1 at 25. In 2012, he found 86.9% Latino and 20.8% non-Latino support for Gallego. TF-19. Engstrom also estimated Latinos at 40.77% of the turned-out vote in 2010, while Flores found Latinos to be 46% of the turned-out vote in 2012. Docket no. 307-1 at 25-26; Flores Table 4 (92,997 Latino votes cast in 2012); Flores Table 5 (109,072 non-Latino votes cast in 2012).

while the district may not perform as desired for Hispanic-preferred candidates, the Court finds no persuasive evidence that the lack of performance is the result of intentional discrimination in either 2011 or when the interim map was drawn in 2012.

Based on the foregoing, the Court finds that no changes are required to CD23.

## VI. CD35 and CD27

The Rodriguez Plaintiffs contended that CD35 in Plan C185 was an impermissible racial gerrymander in violation of the *Shaw*-line of cases. And several Plaintiffs asserted that the removal of Nueces County from the "envelope" of South and West Texas Latino opportunity districts violated § 2 because Nueces County Hispanic votes were deprived of their opportunity to elect candidates of their choice. Hispanic voters in Nueces County who had been in benchmark Latino opportunity district CD27 asserted § 2 and Fourteenth Amendment claims based on the reconfiguration of CD27 in Plan C185, which placed them in an Anglo-majority CD27 oriented toward the north that was unquestionably no longer a Latino opportunity district.

The Court agreed that CD35 was an impermissible racial gerrymander because race predominated in its creation without furthering a compelling state interest. Although a new Latino opportunity district was required in South and West Texas, the Court found that mapdrawers' placement of significant population from Travis County into CD35 was not to substantially address the

§ 2 requirement, but to use race as a tool for partisan goals. Travis County does not have Anglo bloc voting and thus does not meet the third *Gingles* precondition, which mapdrawers knew, and placement of CD35 there was not to address § 2 concerns, but to intentionally destroy an existing district with significant minority population (both African American and Hispanic) that consistently elected a Democrat (CD25).[83]

Simultaneously, mapdrawers removed Nueces County and its substantial Hispanic population from the South/West Texas configuration of districts, and placed it in an Anglo-dominated district going northward, not because they wanted these Hispanic voters to have influence in CD27 or because their rights could not be accommodated without other voters' § 2 rights failing to be accommodated, but because they would not vote for the newly elected Anglo Republican incumbent.[84] Placing them in the new Anglo-dominated CD27 would

---

[83] Relatedly they intended that the CD25 incumbent, Lloyd Doggett, would lose any subsequent election in either CD25, which became a safe Republican district, or in a CD35 primary. Accordingly, they were willing to accommodate requests from Hispanic Democrat legislators from Bexar County to weight the district more heavily toward Bexar County. The result was the least compact district in the plan, designed not for a cohesive Hispanic voting bloc, but to allow Bexar County Hispanics to control elections, hopefully ousting Doggett, an Anglo, if he chose to run in the district. Defendants' plan was not realized, however, since Doggett secured re-election in CD35 despite it being designed to elect a Latino from Bexar County.

Several Plaintiffs also brought intentional discrimination claims based on the alleged intentional destruction of CD25 as a functioning crossover district. Because the *Shaw* equal protection violation would require district lines to be redrawn in Travis County, the Court did not reach that specific claim. Relatedly, Defendants have argued that Plaintiffs cannot establish a § 2 claim in Travis County related to the intentional destruction of alleged crossover district CD25 because the Court found no racially polarized voting in Travis County such that a crossover district would not be required to be drawn there. That argument misunderstands the nature of Plaintiffs' *Bartlett* claim, however. No party has asserted that § 2 requires a crossover district to be created in Travis County. Rather, certain plaintiffs are arguing that the intentional destruction of an existing crossover district, when done with racially discriminatory purpose, violates the Fourteenth and Fifteenth Amendments. While § 2 does not require states to draw crossover districts, a remedy for the purposeful destruction of an existing crossover district could include recreating the destroyed crossover district.

[84] Even Defendants' expert Dr. Alford agreed in the 2011 trial that CD27 was flipped from a Latino opportunity district to an Anglo-majority district to protect a candidate who was not preferred

ensure that Anglo bloc voting would prevent them from electing their preferred candidate. Thus, although these Nueces County Hispanic voters had a § 2 right, had been in an opportunity district, and could have remained in one, they were intentionally deprived of their right to elect candidates of their choice.

In sum, the Court found that the Legislature violated § 2 in both result and intent, as well as the Fourteenth Amendment, by racially gerrymandering CD35 to replace CD25 and simultaneously impermissibly trading the § 2 rights of Nueces County Hispanic voters for those in Travis County, who lacked a § 2 right to a Latino opportunity district. The Court found that seven Latino opportunity districts were required in South and West Texas, and while the Legislature enjoys some discretion in creating such districts and not every voter who demonstrates a § 2 right has a corresponding right to be placed into an opportunity district,[85] the Legislature intentionally did not substantially address

---

by the Hispanic voters. Tr1829, Tr1832, Tr1837. In *LULAC v. Perry*, 548 U.S. 399, 441 (2006), the Supreme Court noted that "incumbency protection can be a legitimate factor in districting," but "not all of [its forms are] in the interests of the constituents." Thus, "If . . . incumbency protection means excluding some voters from the district simply because they are likely to vote against the officeholder, the change is to benefit the officeholder, not the voters. . . . This policy, whatever its validity in the realm of politics, cannot justify the effect on Latino voters." *Id.*

[85] In its Order on Plan C185, this Court stated that, "Where the rights of voters who have demonstrated § 2 violations can be accommodated through the use of compact districts that do not subordinate traditional redistricting principles more than necessary to address the § 2 liability, those voters' § 2 rights must be accommodated." Docket no. 1390 at 56. This was not meant to imply that any voter with a § 2 right must be placed into a § 2 district, or that Nueces County Hispanics would have had a right to be included in a Latino opportunity district under any circumstances. Rather, Plaintiffs demonstrated that seven compact Latino opportunity districts could be drawn and that § 2 required seven such districts, and the Legislature was required to accommodate those rights. If the Legislature had substantially addressed the requirement for seven Latino opportunity districts while still not including Nueces County, and there was no evidence of improper intent, this would be a different case, and Nueces County Hispanics would not have a right to inclusion in a Latino opportunity district. That is why, at the time the Court adopted the interim maps and had not yet found improper intent with regard to CD27 and CD35 and improper racial gerrymandering in CD35, it concluded that Nueces County Hispanics did not have a right to be placed into a Latino opportunity district. However, with the benefit of examination of the full record, that is not the case.

the § 2 violation.

The exact same configuration of CD35 and CD27 remains in Plan C235. At the time the Court adopted Plan C235 as the interim plan, it did not alter the configuration of CD35 because it did not have the benefit of the full record and did not find that race predominated. In light of all the evidence and a full consideration of the record, the Court found that its preliminary conclusion concerning race predominance was erroneous. In conducting strict scrutiny review, the Court then determined that the placement of CD35 in Travis County was far from benign.

In addition, at the time the Court adopted Plan C235, it stated that the failure to place Nueces County Hispanics in a South Texas district did not diminish Hispanic voter opportunity for § 2 effects purposes, since whether they were included or not, no additional compact Latino opportunity district could be drawn. While this remains true, the Court's opinion on Plan C185 did not base its holdings on the mere failure to include Nueces County Hispanics in a § 2 Latino opportunity district, nor on a § 2 effects claim based on the failure to create additional Latino opportunity districts, the claim to which that statement was directed. Rather, the Court found that the Legislature intentionally diluted the vote of Nueces County Hispanics who would not support incumbent Farenthold, while simultaneously trading their § 2 rights to Travis County voters without a § 2 right.

The fact that seven HCVAP-majority districts were drawn in South and

West Texas and that no more could be drawn simply does not resolve the issues. The Legislature racially gerrymandered to create the seven districts, yet *intentionally* failed to substantially address the § 2 violation that required those seven districts.  The same facts exist and the same harms continue.  Updated evidence indicates that there still is no Anglo bloc voting in Travis County, yet Travis County population makes up almost 31% of CD35.  Tr1167 (Ansolabahere); JX-100.2.   Using 2010 Census data, there are 215,626 individuals from Travis County included in CD35, about 140,800 of whom are Hispanics.  JX-100.2.   Dr. Ansolabahere testified that 220,000 Nueces County Hispanics are stranded in CD27, a district with 44.6% HCVAP.  Tr1162-63.[86]

The Rodriguez Plaintiffs maintain their *Shaw*-type claim against CD35, and their intentional discrimination claim related to the destruction of CD25. Docket no. 1524 at 3 & n.8.[87]   The Rodriguez Plaintiffs note that the lines of CD35 have not changed, that it remains the least compact district in the state, and that the same population suffers from the State's unjustified race-based classification in Plan C235.  Docket no. 1254 at 13.  The Rodriguez Plaintiffs also correctly point out that discriminatory intent is not an element of a *Shaw*-type racial gerrymandering claim, and thus the only inquiry remains whether race predominated in the decision to place a significant number of voters within and

---

[86] Nueces County is now 57.55% HCVAP; there are 218,400 Hispanics in Nueces County, 205,990 Hispanic citizens, and 142,230 HCVAP.  Tr1163; D-702.

[87] Other Plaintiffs, including MALC and the NAACP Plaintiffs, also maintain claims related to the intentional destruction of CD25.

without the district and, if so, whether strict scrutiny is satisfied. Because the lines of CD35 remain identical to the lines in CD35, Rodriguez Plaintiffs note that the evidence is largely the same. Docket no. 1254 at 14.

Defendants contend that, although this Court found CD35 to be an unconstitutional racial gerrymander in Plan C185 and CD35 remains unchanged in Plan C235, there is no unconstitutional racial gerrymander in Plan C235 because the Legislature "did not draw the boundaries of any district" and "did not make a 'decision to place a significant number of voters within or without a particular district.'" Docket no. 1526 at 85. As discussed above, this argument lacks merit, as it improperly focuses on the re-enactment of a plan containing CD35, rather than the decision as to which voters to place within and without the district at the time that decision was made (in 2011).

Although Plan C235 was enacted in 2013, the decision as to which voters to include within CD35 was made in 2011, and that remains the proper time for evaluating the district under *Shaw*. Otherwise, a Legislature could always insulate itself from a *Shaw*-type challenge simply by re-enacting its plan and claiming that it made no decisions about who to include in the district at the time of re-enactment. There is no evidence that the Legislature again considered in 2013 which persons to include within CD35 (and Defendants deny that any such decisions were made in 2013), or that it considered any evidence to provide a strong basis in evidence that did not previously exist in 2011. Rather, as the Court found above, it maintained these aspects of Plan C235 in spite of the

possibility that such infirmities remained. Thus, this Court's prior findings and conclusions concerning CD35 remain equally applicable to Plan C235.

With regard to the Nueces County and CD27 claims,[88] the Court found that these Hispanic voters were intentionally deprived of their opportunity to elect a candidate of their choice, which they likely would have done in the next election given that Hispanic turnout is greater in presidential election years, and that their rights were essentially traded to Hispanics in Travis County without a § 2 right. There is no evidence that the Legislature engaged in any meaningful deliberation in 2013 to cleanse away such discriminatory intent, and in fact they intended to maintain any such discrimination, purposefully intending to deprive plaintiffs of any remedy.[89]

Therefore, the Court holds that the Plan C235 configurations of CD35 and Nueces County/CD27 remain violations of § 2 and the Fourteenth Amendment and must be remedied.

## Plan C235 Summary and Conclusions

In Part II, the Court concludes that the racially discriminatory intent and effects that it previously found in the 2011 plans carry over into the 2013 plans where those district lines remain unchanged. The discriminatory taint was not

---

[88] MALC, the Perez Plaintiffs, the Quesada Plaintiffs, LULAC, and the Rodriguez Plaintiffs maintain claims against CD27 in Plan C235 on behalf of Nueces County Hispanic voters. MALC's membership includes Abel Herrero, who represents and lives in HD34 in Nueces County. MALC-1.

[89] Plaintiffs' most recent demonstration plans split Nueces County to accommodate the Legislature's goal of protecting incumbent Farenthold within CD27. All of Nueces County can be placed into a Latino opportunity district, but the county is split to place Farenthold in an Anglo-majority district. To the extent such a split might be objected to as failing to respect county boundaries, that traditional redistricting principle is not being subordinated to race, but to the Legislature's goal of protecting Farenthold.

removed by the Legislature's enactment of the Court's interim plans, because the Legislature engaged in no deliberative process to remove any such taint, and in fact intended any such taint to be maintained but be safe from remedy. The Legislature in 2013 intentionally furthered and continued the existing discrimination in the plans.

In Part IIIA, the Court concludes that Plaintiffs' § 2 results claims in the DFW area fail for lack of proof of African-American and Hispanic cohesion. In Part IIIB, the Court finds that the intentional discrimination found in DFW in Plan C185 is remedied in Plan C235, and that Plaintiffs failed to prove that any alleged cracking and packing that remains in DFW was intentionally dilutive.

In Part IV, the Court concludes that Plaintiffs' § 2 results claims in the Houston area fail for lack of proof of African-American and Hispanic cohesion.

In Part V, the Court finds that CD23 is a Latino opportunity district and there is no evidence of intentional discrimination/dilution.

In Part VI, the Court concludes that the Plan C235 configurations of CD35 and Nueces County/CD27 violate § 2 and the Fourteenth Amendment. These statutory and constitutional violations must be remedied by either the Texas Legislature or this Court.

It is therefore ORDERED that the Office of the Attorney General file a written advisory within three business days stating whether the Legislature intends to take up redistricting in an effort to cure these violations and, if so, when the matter will be considered.

If the Legislature does not intend to take up redistricting, the Court will hold a hearing to consider remedial plans beginning on **September 5, 2017 at 8:30 a.m.** in Courtroom 1. In preparation for the hearing, the parties must take immediate steps to consult with their experts and mapdrawers and prepare statewide congressional plans that remedy the violations found in CD35 and CD27 yet minimize the effect on adjoining districts.

The parties must confer and address objections and concerns, to the extent possible, prior to the hearing. If both sides agree upon a remedial plan, they should notify the Court, but the hearing will nevertheless proceed so the parties can present the plan on the record. If the parties cannot agree, they should be prepared to offer, support, and defend their proposed remedial plan(s) at the hearing. Plaintiffs and Defendants will be permitted to offer up to four alternative remedial plans per side, and Plaintiffs may (but are not required) to jointly offer plan(s). The plaintiffs who asserted and prevailed on their claims against CD35 and Nueces County/CD27 (MALC and the Rodriguez plaintiffs (proceeding jointly with the LULAC and Perez plaintiffs)) should take the lead in drawing and proposing any remedial plans, and the remaining plaintiffs (NAACP, Latino Redistricting Task Force, Congressman Cuellar, and the Quesada plaintiffs) may participate in an advisory role and assert any objections or concerns they may deem appropriate.

The parties should consult with Texas Legislative Council, to the extent necessary, to upload their proposed remedial plans into DistrictViewer and

ensure that all relevant data is available to all parties and the Court. If the parties intend to rely on data or analysis that is not available through TLC, they must provide that data to all other parties as soon as that data is available.

It is further ORDERED that Texas Legislative Council staff be present at the remedial hearing for technical assistance in the parties' presentation of their proposed plans through DistrictViewer or other available means.

Because this order only partially addresses the issues herein – the violations in C235 – it is interlocutory. The Court bifurcated the remedial phase, which will commence as scheduled herein. The Court must also address the alleged violations in H358 and, if necessary, a remedial plan for the Texas House.

SIGNED this 15th day of August, 2017.


_____/s/_____

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE
*on behalf of the panel*