UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| MARC VEASEY, *et al*, | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. 2:13-CV-193 |
| | § | |
| GREG ABBOTT, *et al*, | § | |
| | § | |
| Defendants. | § | |

## ORDER GRANTING SECTION 2 REMEDIES
## AND TERMINATING INTERIM ORDER

In its Opinion of October 9, 2014 (D.E. 628), this Court held that Texas Senate Bill 14 (SB 14)[1] had an impermissible discriminatory effect against Hispanics and African-Americans and was passed with a discriminatory purpose in violation of Section 2 of the Voting Rights Act (VRA) and the 14th and 15th Amendments to the United States Constitution. *Veasey v. Perry*, 71 F. Supp. 3d 627 (S.D. Tex. 2014) (*Veasey I*). On appeal, the Fifth Circuit, sitting en banc, affirmed the discriminatory effect claim and remanded the discriminatory purpose claim for reconsideration. *Veasey v. Abbott*, 830 F.3d 216, 241 (5th Cir. 2016) (en banc) (*Veasey II*).[2]

In the meantime, the Fifth Circuit instructed this Court to issue an interim remedy to eliminate—or at least reduce—the discriminatory effects of SB 14 for the 2016 general

---

[1]  Texas Senate Bill 14, Act of May 16, 2011, 82d Leg., R.S., ch. 123, 2011 Tex. Gen. Laws 619.

[2]  In *Veasey I*, this Court also found in favor of Plaintiffs with respect to two constitutional claims. The claim that SB 14 constituted an unconstitutional burden on the right to vote under the 1st and 14th Amendments was vacated and dismissed under the principle that the VRA provided a remedy and thus those constitutional claims need not be reached. The claim that SB 14 constituted a poll tax under the 14th and 24th Amendments was vacated and rendered on the merits.

election and any other elections to take place before final disposition. As part of its mandate, the Fifth Circuit directed that this Court fashion the interim remedy so as to give effect, if possible, to the Texas legislature's stated interest in securing the integrity of its election process. In that regard, the interim remedy was to include a requirement that those in possession of qualifying SB 14 ID produce it before voting in person. *Veasey II*, at 271.

With the Fifth Circuit's parameters in mind, the parties conferred and presented the Court with an agreed interim order. It required those with SB 14 ID to show it and it instituted a Declaration of Reasonable Impediment (DRI) process for those who did not. Any qualified voter who did not have SB 14 ID was required, under penalty of perjury, to state that he or she did not have qualified ID and was then required to check a box to indicate the reason, including a box for "other," with a line for the "other" explanation. Upon completing the DRI, the individual was permitted to vote a regular ballot. The voter's reason could not be questioned.

The Court approved the interim order, which was a stop-gap measure instituted with a general election, including a United States presidential contest, less than three months away. The remedy was formulated in conformity with the powers and parameters of a VRA Section 2 discriminatory "results" claim. Because of the procedural posture of the case, it did not purport to provide any remedy for the still-pending Section 2/Fourteenth and Fifteenth Amendment discriminatory "purpose" claim.

On remand, this Court again found that SB 14 was passed with a discriminatory purpose. D.E. 1023. Thus Plaintiffs are now entitled to a remedy under VRA Section 2

for both the discriminatory effect and discriminatory purpose of SB 14. To determine the necessary injunctive relief, the Court offered the parties an evidentiary hearing, which they all declined. Instead, they agreed to rely on simultaneously-filed opening and responsive briefing and the existing record. *See* D.E. 1039-41, 1044. Before the Court are the parties' briefs. D.E. 1048, 1049, 1051, 1052, 1056, 1058, 1059, 1060.[3] Also before the Court are Defendants' Motion for Reconsideration of Discriminatory Purpose Ruling in Light of SB 5's[4] Enactment (D.E. 1050) and Private Plaintiffs' Response (D.E. 1066).[5]

For the reasons set out below, the Court DENIES Defendants' motion for reconsideration (D.E. 1050), and GRANTS declaratory and injunctive relief for the Section 2 violations, superseding and terminating the Order Regarding Agreed Interim Plan for Elections (D.E. 895).

## MOTION FOR RECONSIDERATION
## OF DISCRIMINATORY PURPOSE

The Fifth Circuit, noting that the record included sufficient evidence to find that SB 14 was passed with a discriminatory purpose, mandated that this Court reconsider its initial purpose finding in light of the appellate critique of the probative value of certain

---

[3] In competing advisories, Private Plaintiffs and the United States have sparred over whether the United States may be heard on issues related to the discriminatory purpose claim. D.E. 1064, 1065. The United States withdrew its discriminatory purpose claim and now supports the State Defendants in that regard and takes positions inconsistent with positions previously taken in this case. The Court recognizes that the United States remains a party and has a right to be heard on every issue in this case.

[4] Texas Senate Bill 5, Act of June 1, 2017, 85th Leg., R.S., 2017 Tex. Sess. Laws. ch. 410 (SB 5).

[5] Defendants filed their Motion to Issue Second Interim Remedy or to Clarify First Interim Remedy (D.E. 1047), to which the other parties responded (D.E. 1057, 1061, and 1062). Defendants have since withdrawn that motion. D.E. 1063.

evidence. Defendants now present their third request[6] that this Court defer to the Texas Legislature and treat SB 5 as retroactively purging SB 14 of its discriminatory purpose.

As previously found, the Texas Legislature's subsequent action in passing SB 5—after years of litigation to defend SB 14—does not govern a finding of intent with respect to the previous enactment. Even if such a turning back of the clock were possible, the provisions of SB 5 fall far short of mitigating the discriminatory provisions of SB 14, as detailed more fully below. Along with continued provisions that contribute to the discriminatory effects of the photo ID law, SB 5 on its face embodies some of the indicia of discriminatory purpose—particularly with respect to the enhancement of the threat of prosecution for perjury regarding a crime unrelated to the stated purpose of preventing in-person voter impersonation fraud.

SB 5 does not negate SB 14's discriminatory purpose. The Court DENIES the request (D.E. 1050) to reconsider the discriminatory purpose finding.

## SECTION 2 REMEDIES

Among the Private Plaintiffs' requested remedies are (1) a declaratory judgment that SB 14 was passed with a discriminatory purpose and engendered a discriminatory result in violation of the Voting Rights Act and the United States Constitution; (2) injunctive relief in the form of a prohibition against the enforcement of SB 14 and SB 5;

---

[6] Before the 2017 Texas legislative session convened, Defendants' Proposed Briefing Schedule (D.E. 916) argued that this Court should delay reconsideration of the purpose finding until after that legislative session. The Court rejected that argument when setting the briefing schedule. D.E. 922. During the 2017 legislative session, Defendants and the United States filed their "Joint Motion to Continue February 28, 2017 Hearing on Plaintiffs' Discriminatory Purpose Claims" (D.E. 995). In that motion, they argued that SB 5, then pending, would alter or moot any disposition of the discriminatory purpose claim if and when it was passed into law. The Court denied that motion. D.E. 997. Now that the 2017 legislative session has ended and SB 5 has been enacted and signed into law, Defendants reiterate their argument that the new law purges the old law of its unconstitutionally discriminatory purpose.

and (3) retention of jurisdiction. The United States and the State Defendants request that this Court deny injunctive relief on the basis that SB 5 constitutes an adequate remedy for any violation of law that SB 14 presents. They further oppose retention of jurisdiction on the basis that there is nothing further for this Court to monitor or review. The issue of Section 3 remedies has been reserved for later briefing and decision.

## A. Declaratory Relief

The request for declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202 is a natural result of the disposition of the claims made. *See also*, Fed. R. Civ. P. 57. It is further an appropriate foundation for the consideration of Section 3 relief. The Court's Opinion of October 9, 2014 (D.E. 628) and Order on Claim of Discriminatory Purpose of April 10, 2017 (D.E. 1023) effectively grant that request for declaratory relief, which will be included in the Court's final judgment. The Court GRANTS declaratory relief and holds that SB 14 violates Section 2 of the Voting Rights Act and the 14th and 15th Amendments to the United States Constitution.

## B. Injunctive Relief

### 1. Manner of Evaluating Injunctive Relief

Private Plaintiffs seek an injunction completely barring implementation and enforcement of SB 14, Sections 1 through 15 and Sections 17 through 22,[7] as well as SB 5 in order to eliminate the discriminatory law "root and branch." D.E. 1051, p. 4. Defendants and the United States contend that this Court's hands are tied because the

---

[7] SB 14, § 16, which Private Plaintiffs would leave intact, increased the penalty for voting when ineligible, voting more than once in an election, knowingly impersonating another person so as to vote as that person, and marking another voter's ballot without that person's consent to a second degree felony. *See generally*, Tex. Elec. Code § 64.012(a).

remedies imposed by SB 5 are sufficient to ameliorate SB 14's ills and the Court is bound to defer to that state remedy. Thus the Court's first task is to determine to what extent, if any, the Court must defer to the state's choice of remedy and how, if at all, the Court's jurisdiction extends to interference with SB 5, which was enacted after this Court's determination of the voting rights liability issues on their merits.

Federal courts have broad equitable powers to remedy voting rights violations that implicate constitutional rights. *See Swann v. Charlotte-Mecklenberg Bd. of Educ.*, 402 U.S. 1, 15-16 (1971). The Court must fashion its remedy, taking into account "obvious" considerations such as "the severity and nature of the particular constitutional violation, the extent of the likely disruption to the ordinary processes of governance, . . . what is necessary, what is fair, and what is workable." *North Carolina v. Covington*, 137 S. Ct. 1624, 1625 (2017) (quoting *New York v. Cathedral Academy*, 434 U.S. 125, 129 (1977)). Additionally, the Court must act with proper restraint when intruding on state sovereignty. *Covington, supra* at 1626.

What constitutes proper restraint from intrusion is not clear. In *Operation Push*, the Fifth Circuit noted that proper deference to the state meant giving the government the first opportunity to institute its own cure for the VRA § 2 violation. *Mississippi State Chapter, Operation Push, Inc. v. Mabus*, 932 F.2d 400, 405–06 (5th Cir. 1991). In the prior appeal of this case (*Veasey II*), after discussing the need to fashion an interim remedy, the Fifth Circuit wrote:

> [S]hould a later Legislature again address the issue of voter identification, any new law would present a new circumstance not addressed here. Such a new law may cure the

6

deficiencies addressed in this opinion. Neither our ruling here nor any ruling of the district court on remand should prevent the Legislature from acting to ameliorate the issues raised in this opinion.

*Veasey II*, 830 F.3d at 271. Consistent with these holdings, this Court delayed its remedies decision until after the Texas Legislature's 2017 General Session to give the legislature an opportunity to act. Texas passed SB 5 and it is now this Court's job to determine whether SB 5 cured the unconstitutional discrimination in SB 14.

Nothing further is required in the nature of deference to legislative choices when this Court reviews the substance of SB 5.

> [I]t is because legislators and administrators are properly concerned with balancing numerous competing considerations that courts refrain from reviewing the merits of their decisions, absent a showing of arbitrariness or irrationality. But racial discrimination is not just another competing consideration. When there is a proof that a discriminatory purpose has been a motivating factor in the decision, this judicial deference is no longer justified.

*Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977). Even if some measure of deference were required (for instance, if relief were being considered only for the discriminatory results claim), that deference yields if SB 5 is not a full cure of the terms that render SB 14 discriminatory.

> "The federal district court is precluded from substituting even what it considers to be an objectively superior plan for an otherwise **constitutionally and legally valid plan** that has been proposed and enacted by the appropriate state governmental unit." The district court must accept a plan offered by the local government **if it does not violate statutory provisions or the Constitution.**

*Operation Push*, 932 F.2d at 406–07 (a voter registration case, quoting *Seastrunk v. Burns*, 772 F.2d 143, 151 (5th Cir. 1985) (a reapportionment case) and citing *Wright v. City of Houston, Miss.*, 806 F.2d 634, 635 (5th Cir. 1986) (a redistricting case)) (emphasis added).[8]

"It is clear that any proposal to remedy a Section 2 violation must itself conform with Section 2." *Dillard v. Crenshaw Cty., Ala.*, 831 F.2d 246, 249 (11th Cir. 1987) (citing *Edge v. Sumter Cty. Sch. Dist.*, 775 F.2d 1509, 1510 (11th Cir. 1985)). The *Dillard* court stated that an element of an election proposal that "will not with certitude *completely* remedy the Section 2 violation" cannot be authorized. *Dillard, supra* at 252. This is consistent with the Fifth Circuit's holding, referencing Supreme Court jurisprudence, that no VRA remedy is permitted if it would allow the perpetuation of an existent denial of VRA rights. *Kirksey v. Bd. of Sup'rs of Hinds Cty., Miss.*, 554 F.2d 139, 143 (5th Cir. 1977).

While there appears to be no dispute that the remedy must pass constitutional muster, each side of this action places the burden of proof on the other. Private Plaintiffs state that "Texas cannot meet its burden to demonstrate that SB 5 fully remedies the discriminatory results of SB 14." D.E. 1051, p. 3. State Defendants and the United

---

[8]     The United States is mistaken when it argues that *Operation Push* placed the burden of proof on those challenging the state's preferred remedy. D.E. 1060, p. 5 (citing *Operation Push*, 932 F.2d at 407). *Operation Push* addressed the state's new statute on two levels:  as a remedy for the ills of the old statute and as an imposition of new measures that went beyond remedial concerns. As a remedy, the burden was on the state as the proponent of the measure. That burden was easily met by compliance with the trial court's directives after making findings of discrimination. Because the state's new law went beyond what the trial court had required and because plaintiffs wanted to raise complaints not previously addressed in the liability phase, any such challenge was premature— without proof directed at the consequences of the law's new features. The language the United States relies upon was extracted from the portion of the opinion addressing the placement of the burden with respect to the new (premature) claims.

States rely on the rule of deference to legislative action (addressed above) and the implication that Private Plaintiffs have not satisfied their burden to allege and prove that SB 5 imposes a burden on minority voters. D.E. 1049; 1052, pp. 2-3; 1058, pp. 6, 8 n.3, 14; 1060, pp. 3, 5.

Because Private Plaintiffs have already demonstrated that they are entitled to a remedy that eliminates SB 14's VRA violations, and because the remedy must comply with the requirements of VRA § 2, the burden of proof is on the proponents of SB 5 to show that SB 5 is an appropriate remedy in this case.[9] *United States v. Virginia*, 518 U.S. 515, 547 (1996); *Green v. Cty. Sch. Bd. of New Kent Cty., Va*., 391 U.S. 430, 439 (1968) ("The burden on a school board today is to come forward with a plan that promises realistically to work, and promises realistically to work now."); *North Carolina State Conference of NAACP v. McCrory*, 831 F.3d 204, 240 (4th Cir. 2016), *cert. denied sub nom., North Carolina v. North Carolina State Conference of NAACP*, 137 S. Ct. 1399 (2017). If SB 5 does not cure the Section 2 violations, then this Court may enjoin the enforcement of SB 14 and SB 5 pursuant to the Court's equitable power to protect Private Plaintiffs' rights.

SB 5—as a proposed remedy—is "in part measured by the historical record, in part measured by difference from the old system, and in part measured by prediction." *Dillard*, 831 F.2d at 250. Thus the Court's decision is based on the evidence already of

---

[9]  It would be premature to try to evaluate SB 5 as the existing voter ID law in Texas because there is no pending claim to that effect before the Court, which claim would place the burden of proof elsewhere—on the claimant. Consideration of SB 5 in the context of a remedy for SB 14's ills places the burden on SB 5's proponents. *See Operation Push*, 932 F.2d at 407 (declining to evaluate the remedial statute as raising new VRA claims). To require the Private Plaintiffs to bear the burden on every legislative remedy that might be passed would present Plaintiffs with a "moving target," preventing any final resolution of this case.

record in this case,[10] an evaluation of the parties' respective arguments as to the curative nature of SB 5 as compared to SB 14, and the Court's prospective conceptualization of the impact of SB 5's requirements. This inquiry has been facilitated by the legislature's choice to build on the existing SB 14 framework rather than begin anew with an entirely different structure.

State Defendants and the United States rely heavily on a comparison between SB 5 and the interim remedy. However, the Court notes that, because of the agreed, interim nature of that remedy and the parties' waiver of an evidentiary hearing on the full and permanent remedy to be imposed, the record holds no evidence regarding the impact of the interim Declaration of Reasonable Impediment (DRI), either in theory or as applied. So while the Court acknowledges that Private Plaintiffs were willing to accept a DRI remedy on an interim basis as a partial remedy, the Court does not treat that temporary compromise as a binding determination that a DRI will cure the Section 2 violations.

## 2. SB 5 Does Not Render SB 14 a Constitutional and Legally Valid Plan

Pursuant to the scope and standard of review set out above, the Court revisits SB 14's failings and then compares them to SB 5's terms. The Court's Section 2 findings are based on several features of SB 14, which alone or in combination unconstitutionally discriminate against African-Americans and Hispanics with respect to the right to vote.

---

[10] As Private Plaintiffs have observed, SB 5 is built upon the "architecture" of SB 14. SB 5 brings forward many of SB 14's terms, such that the existing record addresses much of the Section 2 analysis that must be applied to SB 5.

While detailed more fully in the Court's previous Orders,[11] those features may be categorized as:

    a. **Type of ID**:  The limited number and type of photo IDs that can be used to vote, along with the prohibition on the use of photo IDs that have been expired more than 60 days prior to the election;

    b. **Obstacles to Obtaining ID**:  The financial, geographic, and institutional obstacles to obtaining qualifying photo ID or the underlying documentation necessary to obtain qualifying photo ID;

    c. **Exemptions:**  The limitations on the sources that may be used to support an exemption for a disability;

    d. **Alternative Proof**:  The onerous provisional ballot process, requiring that the voter cure the ID issue within six days of voting before the vote may be counted; and

    e. **Education**:  Educational provisions that (1) fail to provide voters with timely notice of what is required and instructions regarding how to obtain qualified SB 14 ID, if possible, and (2) fail to train poll workers so that they do not deny the right to vote to qualified voters.

*Veasey I*, 71 F. Supp. 3d at 641-42.  The Court evaluates SB 5's provisions with respect to each of these troubling features, below:

    a. **Type of ID**:

        o Under SB 5, "United States passport" is amended to state "United States passport book or card."

        o SB 5 enlarges the amount of time a qualifying ID may be expired from 60 days to 4 years.  Voters over 70 years of age do not have a limit on the amount of time their ID may be expired.

---

[11]    The Court made extensive fact findings on these issues in its initial decision, which findings are incorporated into this Order by reference.

The clarification that both passport books and cards are accepted does not necessarily expand the reach of qualifying IDs because (a) there is no evidence that only passport books were permitted under SB 14, which permitted the use of "passports," and (b) the requirements for obtaining either form of passport include underlying documents of the type likely to exclude minorities, along with the requirement of the payment of a substantial fee.[12]  This feature remains discriminatory because SB 5 perpetuates the selection of types of ID most likely to be possessed by Anglo voters and, disproportionately, not possessed by Hispanics and African-Americans.  Those findings were set out in the Court's prior Opinion.

SB 5 does not meaningfully expand the types of photo IDs that can qualify, even though the Court was clearly critical of Texas having the most restrictive list in the country.  *Veasey I*, 71 F. Supp. 3d at 642-43.  For instance, Texas still does not permit federal or Texas state government photo IDs—even those it issues to its own employees.  SB 5 permits the use of the free voter registration card mailed to each registered voter and other forms of non-photo ID, but only through the use of a Declaration of Reasonable Impediment (DRI) more fully addressed below.  Because those who lack SB 14 photo ID are subjected to separate voting obstacles and procedures, SB 5's methodology remains discriminatory because it imposes burdens disproportionately on Blacks and Latinos.

SB 5's expansion of the amount of time a prescribed form of identification may be used—from sixty (60) days to four (4) years before the date of the election—is one way

---

[12]     *See*,  https://travel.state.gov/content/passports/en/passports/information/fees.html  (passport  cards,  the  less expensive of the two forms of passport, carry a $30 application fee and a $25 execution fee).

to reduce the draconian aspect of the photo ID requirement. However, there is no evidence that it appreciably reduces the comparative discriminatory effect of the law. Instead, the provision may actually exacerbate the discrimination. The greatest benefit from SB 5's liberalized requirements is conferred on voters over the age of 70, for whom there is no limit to the use of expired (but still qualified types of) photo ID. According to the evidence at trial, that class of voters is disproportionately white. Lichtman, PX 772, pp. 64-65.

The Court concludes that SB 5's limited provisions addressing the types of photo IDs that may be used for voting and their expiration dates do not ameliorate the discriminatory effects or the discriminatory purpose of SB 14 with respect to the limited forms of qualified SB 14 ID.

### b. **Obstacles to Obtaining ID**:

- o SB 5 provides for free mobile units that can travel the state and issue Election ID Certificates (EICs) upon request by constituent groups or at special events.

- o Any request for a mobile unit can be denied if required security or other "necessary elements of the program" cannot be ensured. The Secretary of State is empowered to adopt rules to implement the mobile unit program.

Mobile EIC units were originally offered with SB 14. However, the evidence at trial was that they were too few and far-between to make a difference in the rates of qualifying voters. Their mobile nature made notice and duration major factors in their effectiveness. *See Veasey I*, 71 F. Supp. 3d at 679 & n.398, 687. Yet nothing in SB 5 addresses the type of advance notice that would be given in order to allow voters to

assemble the necessary documentation they might need in time to make use of the units. And the idea that the units be made available at "special events" or upon request of "constituent groups" (undefined terms) implies a limited duration appearance at limited types of events.

Moreover, SB 5 contains no provisions regarding the number of mobile EIC units to be furnished or the funding to make them available. Requests for them can be denied for undefined, subjective reasons, placing too much control in the discretion of individuals. The Court concludes that the provision for mobile EIC units does not appreciably ameliorate the discriminatory effects or purpose of SB 14 with respect to the obstacles to obtaining qualified photo ID.

c. **Exemptions**:

o SB 5's reasonable impediment declaration provision allows listing a disability or illness as a reason to vote without qualifying ID.

This provision eliminates the objection regarding the limited sources needed to support a disability exemption from the strict requirements of SB 14. However, its amelioration is dependent upon the DRI procedure, which has its own limitations, as addressed below.

d. **Alternative Proof**:

o SB 5 allows the use of a Declaration of Reasonable Impediment (DRI) that supplants the provisional ballot procedure for those who are registered, but do not have qualified SB 14 photo ID.

o SB 5 requires that any DRI include a threat of criminal penalties for perjury and it increases those penalties with respect to a DRI to a state jail felony.

SB 5 uses the DRI procedure in place of the SB 14 provisional ballot/cure procedure. Defendants and the United States argue that the DRI procedure should eliminate the complaints of discrimination because it offers voters a way to vote a regular ballot if they do not have and cannot reasonably obtain SB 14 photo ID for one or more of six reasons: lack of transportation; lack of birth certificate or other documents needed to obtain the prescribed identification; work schedule; lost or stolen ID; disability or illness; family responsibilities; and the ID has been applied for, but not received. They further argue that the DRI's acceptability should not be questioned because it was the procedure the Private Plaintiffs agreed to as the interim remedy previously imposed by this Court. However, the interim remedy was never intended to be the final remedy and it did not address the discriminatory purpose finding. Additionally, SB 5 imposes some material departures from the interim remedy.

The interim DRI remedy was a negotiated stop-gap measure addressing a quickly-advancing general election, pending the final resolution of additional issues in this case. It was formulated as a counterpart to the Fifth Circuit's directive that those who had SB 14 photo ID be required to produce it in order to vote. The DRI was negotiated as, and intended to be, only a partial, temporary remedy. Its use under those circumstances does not pretermit the question whether it is appropriate full and final relief in this case—or that it was the choice the Court would have imposed had the parties not agreed.

Because of the posture of the case, the interim DRI remedy was limited to addressing the discriminatory results claim. This Court is now considering a remedy for both the results and the discriminatory purpose claim. The breadth of relief available to redress a discriminatory purpose claim is greater than that for a discriminatory results claim. *See Veasey II*, 830 F.3d at 268 & n.66 (citing *City of Richmond v. United States*, 422 U.S. 358, 378 (1975) and *Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457, 465–66, 471, 487 (1982) for the proposition that the discriminatory purpose finding, as opposed to the results finding, supports enjoining the entire offending statute).

Moreover, SB 5's DRI differs materially from the interim DRI. Initially, Private Plaintiffs complain that SB 5 allows the use of only a "domestic" birth certificate, eliminating the ability of naturalized citizens—disproportionately Hispanics—to use their foreign birth certificates to prove identity. D.E. 1051, p. 15. Private Plaintiffs do not cite to any evidence upon which they base their representation that Hispanics in Texas are disproportionately impacted by this provision. While very likely true, the Court's decision must be supported by the record, which the parties declined to expand for this remedy phase. The Court has not been directed to any evidence regarding the proportion of naturalized citizens who are Hispanic and does not recall any such evidence. The Court's decision does not rest on this assertion or this particular complaint.

The most concerning difference between the interim DRI and the SB 5 DRI is the elimination of the "other" category as the basis for the voter's lack of SB 14 ID. Defendants complain that this open alternative permitted 19 voters who used the DRI

procedure to simply protest SB 14.  D.E. 1049, p. 16, D.E. 1049-2.[13]  However, it was also used for reasonable excuses related to the issues supporting Private Plaintiffs' challenge to SB 14, including financial hardship and the misunderstanding or misapplication of SB 14 or the prerequisites for obtaining SB 14 photo ID.[14]

Giving registered voters an opportunity to explain their impediment in their own words reduces the chance that a misunderstanding of the law or its requirements will deprive them of their franchise.  And there is no evidence in this record that any of the persons using the "other" category were not the registered voters they said they were.  Eliminating this alternative is a material change to the interim DRI remedy.  It does not necessarily advance the state's interest in secure elections.  And the change takes on added meaning because of the increased penalties for perjury instituted by SB 5.

Listing a limited number of reasons for lack of SB 14 is problematic because persons untrained in the law and who are subjecting themselves to penalties of perjury may take a restrictive view of the listed reasons.  Because of ignorance, a lack of confidence, or poor literacy, they may be unable to claim an impediment to which they are entitled for fear that their opinion on the matter would not comport with a trained prosecutor's legal opinion.  Consequently, the failure to offer an "other" option will have

---

[13]   As previously noted, the parties declined an evidentiary hearing in connection with the remedies phase of this case.  Nonetheless, no party has objected to the submission of these DRIs.  In fairness, the Court considers these DRIs as well as those offered by the Private Plaintiffs in connection with motion briefing.

[14]   In connection with motion briefing, Private Plaintiffs submitted DRIs that listed the following reasonable impediments:  just moved to Texas; just became resident of Texas and don't drive in Texas; just moved to Texas, haven't gotten license yet; financial hardship; unable to afford Texas Driver's License; lack of funds; out of state college student; and attempted to get Texas EIC but they wanted a long form birth certificate.  D.E. 1061-1.

a chilling effect, causing qualified voters to forfeit the franchise out of fear, misunderstanding, or both.[15]

The State Defendants claim that a DRI insulates a voter photo ID law from complaints of discrimination. D.E. 1049, p. 13 (citing *South Carolina v. United States*, 898 F. Supp. 2d 30 (D.D.C. 2012) (mem. op.) (preclearance decision). However, the court in *South Carolina* repeatedly emphasized the fact that the DRI procedure offered there included a voter's ability to claim any reason whatsoever—as long as it was true— in order for his or her vote to be counted.[16]

The State Defendants suggest that the loss of the "other" option under SB 5 is a fair trade-off for the fact that Texas does not have a mechanism for rejecting votes tendered by a voter using a DRI for identification. D.E. 1049, p. 15. Defendants have offered no evidence to support this assertion. Neither have they offered evidence that the reason a voter has no qualified ID makes any difference in identifying a voter so as to prevent fraud. In the *South Carolina* case, the state was to follow up with voters who did not have qualified ID to assist in getting ID so there was a logical reason to identify the impediment. Texas has offered no reason to identify a voter's reasonable impediment. Without evidence to justify the trade-off, this Court will not allow defects in Texas's

---

[15]   The Court is sympathetic to the state's frustration with voters who used the "other" box to list questionable reasons or to protest SB 14. However, elimination of all other conceivable explanations for a lack of qualified ID, thus relegating voters to cryptic explanations that may or may not be properly understood, is a harsh response that does not necessarily make elections more secure.

[16]   It should also be noted that the South Carolina voter photo ID law expanded the types of IDs that could be used, made getting the IDs much easier than had been the case prior to the law's enactment, included a wide-open DRI process, and contained detailed provisions for educating voters and poll workers regarding all new requirements.

election system to justify disproportionate burdens on Hispanic and African-American voters.

The prescribed form of the DRI addresses two separate issues, only one of which relates to the stated purpose of the statutes: to prevent in-person voter impersonation fraud. When a person signs the DRI prescribed by SB 5, that person first attests to being a particular registered voter on the Secretary of State's list. The DRI then inquires into why that registered voter does not have one of the limited forms of photo ID the state is willing to accept. Nothing in the record explains why the state needs to know that a person suffers a particular impediment to obtaining one of the qualified IDs. The impediments do not address whether the persons are who they say they are and the impediments are not being used to assist in obtaining qualified ID. There is no legitimate reason in the record to require voters to state such impediments under penalty of perjury and no authority for accepting this as a way to render an unconstitutional requirement constitutional.

Requiring a voter to address more issues than necessary under penalty of perjury and enhancing that threat by making the crime a state jail felony appear to be efforts at voter intimidation. SB 5, § 3. The record reflects historical evidence of the use of many kinds of threats and intimidation against minorities at the polls—particularly having to do with threats of law enforcement and criminal penalties. *Veasey I*, 71 F. Supp. 3d at 636-37, 675.

Thus the DRI procedure does not represent a remedy that puts victims of discrimination in the position they would have occupied absent discrimination.

> A remedial decree, [the Supreme] Court has said, must closely fit the constitutional violation; it must be shaped to place persons unconstitutionally denied an opportunity or advantage in "the position they would have occupied in the absence of [discrimination]." *See Milliken v. Bradley*, 433 U.S. 267, 280, 97 S.Ct. 2749, 2757, 53 L.Ed.2d 745 (1977) (internal quotation marks omitted). . . . A proper remedy for an unconstitutional exclusion, we have explained, aims to "eliminate [so far as possible] the discriminatory effects of the past" and to "bar like discrimination in the future." *Louisiana v. United States*, 380 U.S. 145, 154, 85 S.Ct. 817, 822, 13 L.Ed.2d 709 (1965).

*United States v. Virginia*, 518 U.S. 515, 547 (1996).

As to the severity of the penalty of perjury, the United States argues that the increase to a state jail felony cannot be discriminatory because that penalty is less than the maximum penalty permitted for perjury in connection with registering or voting in a federal election under federal law, citing 52 U.S.C. §§ 10307(c) and 20507(a)(5)(B). But the falsity punished by § 10307(c) about which the voter must be notified under § 20507(a)(5)(B) is "information as to his name, address or period of residence in the voting district." These are clear, objective facts. There is no federal penalty associated with any tangential issue, such as mistakenly claiming a particular impediment to possession of qualified ID—information that is subjective, may not always fit into the State's categories, and could easily arise from misinformation or a lack of information from the State itself as to what is required.

The United States further argues that there is no evidence that there have been prosecutions for perjury under the interim DRI or that the process has had a chilling effect. Yet current restraint does not preclude future prosecutions or intimidation.

The Court has found that SB 14 was enacted with discriminatory intent—knowingly placing additional burdens on a disproportionate number of Hispanic and African-American voters. The DRI procedure trades one obstacle to voting with another—replacing the lack of qualified photo ID with an overreaching affidavit threatening severe penalties for perjury. While the DRI requires only a signature and other presumably available means of identification, the history of voter intimidation counsels against accepting SB 5's solution as an appropriate or complete remedy to the purposeful discrimination SB 14 represents. *See McCrory,* 831 F.3d at 240-41 (refusing to accept the obstacles represented by a DRI procedure as a remedy for another set of obstacles created by a voter photo ID law; instead, the offending law was enjoined).

The Court concludes that SB 5 is insufficient to remedy the discriminatory purpose and effects of SB 14's alternative proof requirements.

e. **Education**:

- o SB 5 is silent on the type or extent of any necessary educational or training programs.

- o SB 5 provides no funding or budget for any such programs.

In its prior Opinion, the Court noted that SB 14's sea change in the requirements for voting could not be accomplished in a fair and effective manner without widespread education for voters and training for poll workers. *See Veasey I*, 71 F. Supp. 3d at 642, 649. And the Fifth Circuit recognized that educational efforts were necessary to ensure that any change to the voting rights is effective as to both voters and poll workers. *Veasey II*, 830 F.3d at 271-72. Yet SB 5 does not address this issue at all.

Texas claims that it has publicly stipulated to a four million dollar education and training program, but this stipulation is not part of SB 5 or any other statute.[17] And there is no evidence that the legislature has budgeted the funds, earmarked for that purpose. The Court concludes that the terms of SB 5 do not create an effective remedy for the discriminatory features of SB 14 regarding education and training.

Not one of the discriminatory features of SB 14 is fully ameliorated by the terms of SB 5. The SB 5 DRI process is superior to the provisional ballot process of SB 14 in addressing those who have impediments to obtaining the necessary photo ID. But it leaves out an important feature of the interim DRI. And even the interim DRI was not a full remedy for either the discriminatory effects or discriminatory purpose of SB 14 to be remedied under VRA Section 2. The Court rejects SB 5 as an adequate remedy for the findings of discriminatory purpose and discriminatory effect in SB 14.

### 3. Injunctive Relief is Appropriate as to Both SB 14 and SB 5

Defendants and the United States have failed to sustain their burden of proof that SB 5 fully ameliorates the discriminatory purpose or result of SB 14. They have not shown that SB 5, together with SB 14, constitutes a constitutional and legally valid plan. Therefore, the question becomes whether the Court can and should craft and institute a different voter photo ID plan in an attempt to salvage some of the intent of the photo ID effort. In contrast, the Court can permanently enjoin the enforcement of SB 14 and SB 5,

---

[17] *See* D.E. 1039, 1051, 1058, p. 18. The Court does not credit this unsworn suggestion on this record, in which all parties eschewed the opportunity to present additional evidence.

returning Texas to the law that preceded the 2011 enactment. The Texas legislature can then address anew any voter ID measures it may feel are required.

Counseling against this Court's formulation of its own voter ID plan are several issues. First, the Court's finding of discriminatory intent strongly favors a wholesale injunction against the enforcement of any vestige of the voter photo ID law. Second, the lack of evidence of in-person voter impersonation fraud in Texas belies any urgency for an independently-fashioned remedy from this Court at this time.[18] There is no apparent harm in the delay attendant to allowing the Texas legislature to go through its ordinary processes to address the issues in due legislative course. Third, making informed choices regarding the expansion of the types of IDs or the nature of any DRI would require additional fact-findings on issues not currently before the Court. These matters, regarding reliable accuracy in photo ID systems, are better left to the legislature.

Consequently, the only appropriate remedy for SB 14's discriminatory purpose or discriminatory result is an injunction against enforcement of that law and SB 5, which perpetuates SB 14's discriminatory features. With respect to the VRA § 2 discriminatory purpose finding, elimination of SB 14 "root and branch" is required, as the law has no legitimacy. *E.g., City of Richmond, Virginia v. United States*, 422 U.S. 358, 378-79

---

[18] The State Defendants submitted their Advisory Regarding Record Evidence on Voter Fraud in response to the Court's inquiry regarding record evidence of actual fraud. D.E. 1011. That Advisory is replete with accounts of allegations and investigations, but not of any findings or convictions for in-person voter impersonation fraud. As this Court previously found, there were only two votes cast that resulted in fraud convictions in the ten years prior to passage of SB 14 and the rate of referrals, investigations, and convictions (detection and deterrence) did not increase during the time SB 14 was in place. *Veasey I*, 71 F. Supp. 3d at 639.

(1975); *Green v. Cty. Sch. Bd. of New Kent Cty., Va.*, 391 U.S. 430, 437-38 (1968).[19]
This is consistent with the result in *McCrory,* 831 F.3d at 239-41.  There, the Fourth
Circuit found that the voter photo ID law had been passed with a discriminatory purpose.
While different in details, the North Carolina law was faulted, in part, for its
discriminatory selection of qualified IDs.  The North Carolina DRI—different in its
details—was held to simply trade one set of obstacles for another and was not considered
sufficient to offset the discriminatory purpose of the law.  Neither did it place those who
were impacted by the law back in the place they occupied prior to its enactment.  "[T]he
proper remedy for a legal provision enacted with discriminatory intent is invalidation."
*McCrory*, 831 F.3d at 239.  This remedy prevents any lingering burden on African-
Americans and Hispanics.  *Id*. at 240.

That is not to say that invalidation is always required.  The parties have identified
some cases in which the remedy accepted some part of the discriminatory law.  For
instance, *City of Port Arthur v. United States*, 459 U.S. 159, 168 (1982), involved a new
election plan for a city council, necessitated by the city's annexations that expanded its
boundaries.  Practically speaking, then, there was no status quo ante to return to.

The *City of Port Arthur* trial court had been presented with a series of plans
regarding at-large and single member districts.  By the time the third evolution of the plan
was proposed, the Court had identified a single remaining flaw:  the majority rule, which
required that the successful candidate in a multi-candidate contest receive more than fifty

---

[19]  The parties disagree on whether an ongoing federal violation must be demonstrated in order to issue injunctive
relief.  Because the Court has found that a continuing violation exists despite the enactment of SB 5, this argument is
moot.

percent of the vote. The trial court eliminated that feature in order to make the plan comply with Section 2 and the Constitution. On appeal, the Court held that the decision was within the trial court's equitable discretion.

The Supreme Court delayed the implementation of a new election provision in *Louisiana v. United States*, 380 U.S. 145, 154 n.17 (1965), so that all previously registered voters would be on the same page when the new provision went into effect. Delay of SB 5 would do nothing here to make the Texas plan less discriminatory. SB 5 is an improvement over SB 14, but it does not eliminate the discrimination in the choice of photo IDs, which disproportionately continues to impose undue burdens on Hispanics and African-Americans.

*Operation Push*, 932 F.2d 400, also cited as a case taking a hands-off approach to new legislation, is distinguishable. Insofar as the new legislation was evaluated as a remedy for violations previously found, it succeeded and was accepted. Insofar as it instituted new provisions that had not previously been challenged, there was no jurisdictional basis upon which to take action. In contrast, SB 5 fails to cure certain SB 14 discriminatory features that have been adjudicated. Consequently, as a remedy, it does not ameliorate SB 14's violations. Its new features do not function without the discriminatory features it perpetuates. Therefore, the remedy of the SB 14 issues necessarily invalidates SB 5 for all purposes.

Defendants argue that the discriminatory taint of SB 14 can no longer control the remedy because SB 5 stripped SB 14 of its discriminatory purpose, citing *Cotton v. Fordice*, 157 F.3d 388, 391 (5th Cir. 1998). In *Cotton*, the issue was the

disenfranchisement of convicted criminals. In 1890, the measure was passed as a way to suppress the Black vote. The crimes that triggered disenfranchisement were only those crimes thought to be committed primarily by Blacks. In that respect, it originally omitted murder and rape. In 1950 and 1968, the statute was amended to first remove burglary and then include murder and rape. Cotton, convicted of armed robbery, sued on the basis that the statute was discriminatory, based on the original motivation in 1890.

The Fifth Circuit held that the original taint of discrimination had subsided over the hundred years the statute had been in place—amended in ways that validated its facial neutrality and eliminated some discriminatory terms. The same dissipation of discrimination cannot be said to have occurred here, where only six years have passed, SB 5 was passed only after SB 14 was held to be unconstitutionally discriminatory and while the remedies phase of this case remained pending, and a large part of what makes SB 14 discriminatory—placing a disproportionate burden on Hispanics and African-Americans through the selection of qualified photo IDs—remains essentially unchanged in SB 5.

The Court's injunctive power extends to SB 5, consistent with the Court's power to prevent repetition of unlawful conduct. *City of Mesquite v. Aladdin's Castle, Inc*., 455 U.S. 283, 289 & n.10 (1982). The Court has found that the SB 5 DRI process does not fully relieve minorities of the burden of discriminatory features of the law. Thus the Court has the power to enjoin SB 5 as a continuing violation of the law as determined in this case. The Court thus issues injunctive relief to prevent ongoing violations of federal law and the recurrence of illegal behavior. *Id*.

26

## C. Retention of Jurisdiction

Because the permanent injunction against enforcement of SB 14 and SB 5 does not require any continued monitoring, the Court DENIES the request that it retain jurisdiction over this matter. *See generally, McCrory*, 831 F.3d at 241. The need, if any, for continued supervision of Texas election laws under the preclearance provisions of the Voting Rights Act is reserved for, and will be considered in, the Court's consideration of Section 3(c) relief.

## CONCLUSION

For the reasons set out above, the Court

- DENIES the request (D.E. 1050) to reconsider the discriminatory purpose finding;

- GRANTS declaratory relief and holds that SB 14 violates Section 2 of the Voting Rights Act and the 14th and 15th Amendments to the United States Constitution;

- GRANTS a permanent injunction against enforcement of SB 14, Sections 1 through 15 and Sections 17 through 22;

- GRANTS a permanent injunction against enforcement of SB 5;

- DENIES the request for continuing post-judgment jurisdiction as to relief under VRA Section 2;

- ORDERS the parties to confer and file on or before August 31, 2017, memoranda—not to exceed 7 pages—stating whether an evidentiary hearing is requested for the consideration of VRA § 3(c) relief and the preferred briefing schedule for same.

ORDERED this 23rd day of August, 2017.

Nelva Gonzales Ramos
United States District Judge