United States Courts
Southern District of Texas
FILED

JUN 19 2018

David J. Bradley, Clerk of Court

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

————

No. 17-40884

————

United States Court of Appeals
Fifth Circuit

**FILED**

April 27, 2018

Lyle W. Cayce
Clerk

MARC VEASEY; JANE HAMILTON; SERGIO DELEON; FLOYD CARRIER; ANNA BURNS; MICHAEL MONTEZ; PENNY POPE; OSCAR ORTIZ; KOBY OZIAS; LEAGUE OF UNITED LATIN AMERICAN CITIZENS; JOHN MELLOR-CRUMMEY; DALLAS COUNTY, TEXAS; GORDON BENJAMIN; KEN GANDY; EVELYN BRICKNER,

Plaintiffs - Appellees

v.

GREG ABBOTT, in his Official Capacity as Governor of Texas; ROLANDO PABLOS, in his Official Capacity as Texas Secretary of State; STATE OF TEXAS; STEVE MCCRAW, in his Official Capacity as Director of the Texas Department of Public Safety,

Defendants - Appellants

--------------------------------------------------------

UNITED STATES OF AMERICA,

Plaintiff - Appellee

TEXAS LEAGUE OF YOUNG VOTERS EDUCATION FUND; IMANI CLARK,

Intervenor Plaintiffs - Appellees

v.

STATE OF TEXAS; ROLANDO PABLOS, in his Official Capacity as Texas Secretary of State; STEVE MCCRAW, in his Official Capacity as Director of the Texas Department of Public Safety,

Defendants - Appellants

No. 17-40884

-----------------------------------------------------

TEXAS STATE CONFERENCE OF NAACP BRANCHES; MEXICAN
AMERICAN LEGISLATIVE CAUCUS, TEXAS HOUSE OF
REPRESENTATIVES,

       Plaintiffs - Appellees

v.

ROLANDO PABLOS, in his Official Capacity as Texas Secretary of State;
STEVE MCCRAW, in his Official Capacity as Director of the Texas
Department of Public Safety,

       Defendants - Appellants

-----------------------------------------------------

LENARD TAYLOR; EULALIO MENDEZ, JR.; LIONEL ESTRADA; ESTELA
GARCIA ESPINOSA; MAXIMINA MARTINEZ LARA; LA UNION DEL
PUEBLO ENTERO, INCORPORATED,

       Plaintiffs - Appellees

v.

STATE OF TEXAS;  ROLANDO PABLOS, in his Official Capacity as Texas
Secretary of State; STEVE MCCRAW, in his Official Capacity as Director of
the Texas Department of Public Safety,

       Defendants - Appellants

---------------------

Appeal from the United States District Court
for the Southern District of Texas

---------------------

Before HIGGINBOTHAM, JONES, and GRAVES, Circuit Judges.

EDITH H. JONES, Circuit Judge:

No. 17-40884

This appeal by the state of Texas follows remand from the en banc court concerning the state's former photo voter ID law ("SB 14"). During the remand, the Texas legislature passed a law designed to cure all the flaws cited in evidence when the case was first tried. The legislature succeeded in its goal. Yet the plaintiffs were unsatisfied and successfully pressed the district court to enjoin not only SB 14, but also the new ameliorative law ("SB 5"). Because the district court's permanent injunction and order for further relief abused its discretion, we reverse and render.

Senate Bill 14 ("SB 14") was enacted in 2011 and generally required voters to present one of five forms of government-issued identification in order to vote at the polls. Several Private Plaintiffs ("Plaintiffs") and the Department of Justice challenged SB 14 on the grounds the bill: (1) was a poll tax; (2) purposefully abridged the right to vote on account of race, in violation of Section 2 of the Voting Rights Act (the "VRA"); (3) resulted in abridgment of the right to vote on account of race, in violation of Section 2 of the VRA; and (4) unconstitutionally burdened the right to vote.

In 2014, the district court held: (1) SB 14 had a discriminatory result because it provided African American and Hispanic voters less opportunity to participate in the political process and elect their candidates of choice, and (2) Texas enacted SB 14 at least in part because of its adverse effect on minority voters. *Veasey v. Perry*, 71 F. Supp. 3d 627, 694 (S.D. Tex. 2014). The district court permanently enjoined Texas from enforcing SB 14's voter-ID provisions and reinstated Texas's preexisting voter-ID law, which required in-person voters to present either a voter registration certificate or execute an eligibility affidavit and produce another form of identification. *See id.* at 702-03. In *Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016) (en banc), *cert. denied*, 137 S. Ct. 612 (2017) ("*Veasey II*"), this court affirmed the district court's finding that SB 14 had an unlawful disparate impact on African American and

3

No. 17-40884

Hispanic voters in violation of § 2 of the VRA.  However, the en banc court reversed the district court's determination SB 14 was enacted with a discriminatory purpose, and remanded the case for further proceedings and for entry of an interim remedy before the 2016 general election.

In August 2016, the district court entered an interim remedy agreed to by all parties.  In fashioning an interim remedy, this court directed the district court to "take special care" to honor the State's policy preferences to implement a photo-ID system and emphasized that a remedy that "[s]imply revert[ed] to the system in place before SB 14's passage would not fully respect these policy choices."  *Veasey II*, 830 F.3d at 269, 271. The parties worked together to develop a remedy whereby in-person voters who lacked an SB 14 ID could cast a regular ballot upon completing a Declaration of Reasonable Impediment ("DRI") and presenting a specified form of identification.  The seven possible impediments were: (1) lack of transportation, (2) lack of documents necessary to obtain acceptable ID, (3) work schedule, (4) lost or stolen ID, (5) disability or illness, (6) family responsibility, and (7) ID applied for but not yet received.

The DRI also offered an "other" box, allowing voters to write anything in the blank space to be able to vote.  The declaration further provided that the reasonableness of the voter's impediment or difficulty could not be questioned by election officials, and the voter signed the declaration "upon penalty of perjury." The specified forms of ID a voter was required to present in order to take advantage of the reasonable impediment declaration were the same documents required to vote under pre-SB 14 law: a valid voter-registration certificate, a certified birth certificate, a copy or original of a current utility bill, bank statement, government check, paycheck, or other government document showing the voter's name and address.  The interim remedy was used for the November 2016 general election and remained in place pending

No. 17-40884

further order of the district court, with the understanding that all parties "preserve[d] their right to seek or oppose future relief."

In February and March 2017, the Texas Legislature informed the district court about legislation being considered during the 2017 session "to adjust SB 14 to comply with the Fifth Circuit's decision." Both Texas and the United States asked the district court to postpone further liability proceedings until the end of the 2017 legislative session. Indeed, in *Veasey II*, this court directed the district court to reexamine the discriminatory purpose claim, "bearing in mind the effect any interim legislative action taken with respect to SB-14 may have." *Veasey II*, 830 F.3d at 272. Nonetheless, the district court proceeded to issue an opinion on the SB 14 discriminatory purpose claim on April 1, 2017. In its 10-page opinion, the district court simply incorporated most of its prior findings, excluded most of those findings that this court found inadmissible, and reiterated the conclusion that SB 14 was enacted, at least in part, for a racially discriminatory purpose. The district court also ordered a hearing on remedial procedures to be conducted after the close of the legislative session.

Senate Bill 5 ("SB 5") was enacted on May 31, 2017 as a legislative remedy to cure and replace SB 14. SB 5 is fashioned after the interim remedy and codifies a reasonable impediment procedure for voters who lack and cannot reasonably obtain a form of SB 14 identification. *See* S.B. 5, §§ 1-2. The same seven impediments listed in the interim remedy are provided to voters by SB 5. *See id.* § 2. Notably, these seven impediments cover every burden alleged by the 27 voters relied on by Plaintiffs at trial of their initial suit. Like the interim remedy, SB 5 requires a voter to swear or affirm under penalty of perjury that he has a reasonable impediment preventing the obtaining of compliant photo

No. 17-40884

ID, and it prohibits election officials from questioning the reasonableness of the impediments sworn to by the voter. *See* S.B. 5 §§ 2-3.

SB 5 differs from SB 14 in the following additional ways: (1) SB 5 extends the period within which an expired form of identification will be accepted for voting, (2) SB 5 expands the list of acceptable forms of identification, (3) SB 5 requires the implementation of mobile locations for obtaining election identification certificates, and (4) SB 5 removes the "other" option offered in the interim remedy. *See id.* §§ 2-3; *see also* Texas claims the open-ended "other" option was removed in SB 5 to address abuses from the November 2016 election.[1]

Although SB 5 was not set to take effect until January 1, 2018, Texas agreed to implement the reasonable impediments provision laid out in the district court's interim remedy until then. Texas also publicly committed to provide written notice of the new requirement to all active registered voters by the end of 2017, train its election officials on SB 5 procedures, and spend $4 million over two years on voter education and outreach

Following passage of SB 5, the State moved for reconsideration of the district court's discriminatory purpose finding in light of the amendments to SB 14. All parties agreed to rely on the existing record and forego an evidentiary hearing.[2] Indeed, Plaintiffs never sought leave to amend their Complaint to add claims specifically challenging SB 5.

The district court denied the State's motion. On August 23, 2017, the court entered a remedial order permanently enjoining SB 14 as well as SB 5,

---

[1] Explanations such as "Have Procrastinated", "Protest of Voter ID Law", "Because I didn't bring it", and "It's unconstitutional," were given in reasonable impediment declarations in the November 2016 election.

[2] The district court relied on "the evidence already of record in this case," noting "the existing record addresses much of the Section 2 analysis that must be applied to SB 5."

No. 17-40884

vacating the interim remedy, and reinstating the pre-SB 14 law that lacked any photo voter ID requirement. The district court held that the interim remedy was "limited to addressing the discriminatory results claim," and in light of its finding of a discriminatory purpose, the interim remedy was no longer appropriate and broader relief was warranted. The court placed the burden on the State, holding Texas failed to show SB 5 "fully ameliorates the discriminatory purpose or result of SB 14." Although the district court refused to find SB 5 violated § 2 of the VRA or the Constitution,[3] it nevertheless reasoned, "the Court's finding of discriminatory intent strongly favors a wholesale injunction against the enforcement of any vestige of the voter photo ID law," and SB 5 "is built upon the 'architecture' of SB 14

The district court ordered the commencement of a VRA § 3(c) preclearance bail-in hearing and issued broad relief enjoining the State from enforcing SB 14 and SB 5.[4]  On September 5, 2017, this court granted the

---

Nevertheless, at least *eleven* times in its order, the district court stated there was "no evidence in the record" to support its reasoning.

[3] *See Veasey v. Abbott*, 265 F. Supp. 3d 684, 691 n. 9 (S.D. Tex. 2017) ("It would be premature to try and evaluate SB 5 as the existing voter ID law in Texas because there is no pending claim to that effect before the Court, which claim would place the burden of proof elsewhere–on the claimant.").

[4] This court stayed the district court's injunction pending appeal, noting the State "has made a strong showing that th[e] reasonable-impediment procedure remedies plaintiffs' alleged harm and thus forecloses plaintiffs' injunctive relief." *Veasey*, 870 F.3d at 391-92.

7

No. 17-40884

State's emergency motion and stayed the district court's orders until the final disposition of this appeal. *Veasey v. Abbott*, 870 F.3d 387, 392 (5th Cir. 2017).

## STANDARDS OF REVIEW

This court reviews questions of jurisdiction *de novo*, including arguments that a case or controversy has become moot. *See In re Scruggs*, 392 F.3d 124, 128 (5th Cir. 2004).

A district court's issuance of a permanent injunction to remedy a violation of § 2 of the VRA is reviewed for abuse of discretion. *See United States v. Brown*, 561 F.3d 420, 435 (5th Cir. 2009). However, where an injunction is "grounded in erroneous legal principles," injunctive relief is not warranted and the district court's decision will be reviewed *de novo*. *See Janvey v. Alguire*, 647 F.3d 585, 592 (5th Cir. 2011) (quoting *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009)). Additionally, under this Circuit's precedent, a district court's interpretation of this court's remand order, "including whether the law-of-the-case doctrine or mandate rule forecloses any of the district court's action on remand," is reviewed *de novo*. *United States v. Elizondo*, 475 F.3d 692, 695 (5th Cir. 2007).

## DISCUSSION

On appeal, the state of Texas and the United States raise complementary arguments. The state contends initially that this case has become moot, requiring vacatur of the court's remand finding of intentional discrimination, by the passage of SB 5 in 2017. The State also seeks reversal of the district court's renewed finding of unconstitutional discrimination. Together, the state and the United States contend that the district court's remedial injunction must be reversed and SB 5 reinstated as a valid remedy for the Plaintiffs' claims. We consider each of these issues in turn.

No. 17-40884

## A. Mootness

Ordinarily, a lawsuit challenging a statute would become moot by the legislature's enactment of a superseding law. *Diffenderfer v. Cent. Baptist Church of Miami, Fla., Inc.*, 404 U.S. 412, 414, 92 S. Ct. 574, 575 (1972). In such a case, no live controversy remains concerning the old law, because it is no longer in force. Any federal court ruling on the old law would have no practical effect and the court's conclusions would constitute an advisory opinion. Further, dismissing as moot in light of the superseding statute would require the court to vacate its prior ruling. *U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 29, 115 S. Ct. 386, 393 (1994).

This is not the archetypal case. *Veasey II* remanded to the district court with instructions to (a) assume the "unwelcome obligation" of devising an interim remedy to eliminate the Section 2 Voting Rights Act violations pending the 2016 elections; (b) reconsider the finding of unconstitutional intentional discrimination without "facts" the en banc court held inapposite; and (c) be mindful that any new photo voter ID law subsequently passed by the state would "present a new circumstance not addressed here" and "concerns about a new bill would be the subject of a new appeal for another day." 830 F.3d at 270-71. The parties heatedly dispute the extent to which the district court properly carried out this court's mandate, but without doubt, the court's post-remand rulings touch each of these instructions.

Consequently, this appeal arrives in a posture similar to *Operation PUSH*, in which this court affirmed the district court's conclusion that the state's legislative remedy for Section 2 violations was adequate. *Miss. State Chapter, Operation PUSH, Inc. v. Mabus*, 932 F.2d 400, 412-13 (5th Cir. 1991). This court evaluated both the liability findings and the new law pertinent to the question whether the district court abused its discretion. There was no suggestion of mootness arising from the passage of the responsive legislation,

which was analyzed for its effectiveness as a proposed remedy. *Id.* at 409 (finding the challenge against the Section 2 violations "not moot" because the lower court's decision under the remedial legislation "was the remedy decision growing out of the holding under" the original legislation). While the sequence of events on remand differs from *Operation PUSH*, the same issues are before us on appeal: the status of the state's liability for intentional discrimination against indigent minority voters, and whether the district court abused its discretion in rejecting SB 5 as a remedy for the Plaintiffs' claims. This appeal is not moot.

### B. Scope of the State's Liability

The Plaintiffs' claims, framed as violations of both Section 2 of the Voting Rights Act and the Fourteenth Amendment, attacked the alleged racial disparity in indigent minority voters' possession of and access to SB 14-required photo voter IDs. The Plaintiffs could not condemn the principle of requiring some type of photo ID, a principle upheld by the Supreme Court in *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 191, 128 S. Ct. 1610, 1616-17 (2008). Nor could Plaintiffs refute that over 95% of all Texas voters, irrespective of race, already possess ID satisfactory under SB 14. Their evidence thus targeted racially disparate indigency, the lack of indigents' ready access to drivers' licenses or birth certificates or EICs ("election identity cards"), and the law's limited exceptions to the photo ID requirement. Aside from expert testimony, 27 Plaintiffs' witnesses testified to their specific difficulties in complying with SB 14 on these grounds.

Whatever the strength of the district court's renewed finding of purposeful discrimination by the Texas legislature, the discrimination has to be gauged by its impact on indigent minority Texas voters according to the evidence presented at trial. In any discrimination case, the proof of the extent of disparate impact or disparate treatment defines the scope of the defendant's

No. 17-40884

liability. Thus focused, we need not review the court's liability findings because even if we were to affirm, the court's overreach in its remedial injunction and proceedings was an abuse of discretion meriting reversal.

## C. The Remedial Order

The remedy for violations of voting rights is governed by traditional equitable standards. *North Carolina v. Covington*, 137 S. Ct. 2211 (2017) (per curiam) ("Relief in redistricting cases is 'fashioned in the light of well-known principles of equity.'") (citation omitted)). Even if the violation is founded on the Fourteenth Amendment, "[a]s with any equity case, the nature of the violation determines the scope of the remedy." *Swann v. Charlotte Mecklenburg Bd. of Educ.*, 402 U.S. 1, 17, 91 S. Ct. 1267, 1276 (1971). In voting rights cases, the Supreme Court has cautioned that federal courts' equitable powers are broad but not unlimited. *Whitcomb v. Chavis*, 403 U.S. 124, 161, 91 S. Ct. 1858, 1878 (1971). Relief must be tailored to avoid undue interference with a legislature's judgment in order to appropriately reconcile constitutional requirements and legislative goals. *Cook v. Luckett*, 735 F.2d 912, 917 (5th Cir. 1984). *Operation PUSH* relied on these rules, *see* 932 F.2d at 406, as reiterated in our case law. *See id.* (citing *Haitian Refugee Ctr. v. Smith*, 676 F.2d 1023, 1041 (5th Cir. 1982) for the principle that an equitable remedy must be fashioned to address the constitutional violation established). *Operation PUSH* also noted that unless remedial legislation designed to address voting rights violations is itself infected with a discriminatory purpose, federal courts are obliged to defer to the legislative remedy. 932 F.2d at 406-07. *See Upham v. Seamon*, 456 U.S. 37, 40-41, 102 S. Ct. 1518, 1521 (1982); *Westwego Citizens for Better Gov't v. City of Westwego*, 946 F.2d 1109, 1123-24 (5th Cir. 1991); *Wright v. City of Houston, Miss.*, 806 F.2d 634, 635 (5th Cir.

11

No. 17-40884

1986); *Kirksey v. Bd. of Supervisors of Hinds Cty.*, 554 F.2d 139, 142 (5th Cir. 1977) (en banc), *cert. denied*, 434 U.S. 968 (1977).[5]

The district court here held that because SB 14 was enacted with a discriminatory purpose, its effects must be eliminated "root and branch." Because SB 5 retains characteristics of SB 14's photo voter ID requirements, the district court did not defer to the state. Indeed, the district court acknowledged it was "not clear" what would constitute a proper restraint from legislative intrusion but then held that "[e]ven if some measure of deference were required ... that deference yields if SB 5 is not a full cure of the terms that render SB 14 discriminatory." The court burdened the state to prove that the new remedial statute lacks any residual discriminatory effect. After concluding that the state did not meet its burden, the court imposed the previously described injunction against both SB 14 and SB 5 and ordered a proceeding to determine the state's potential liability for Section 3(c) preclearance.

---

[5] Only at the end of the dissent is there an attempt to distinguish our controlling authority, *Operation PUSH*, based on whether the challenged state voting statute had merely a discriminatory impact rather than invidious intent. The distinction is inapposite for several reasons. First, *Operation PUSH* evolved from a system of dual voter registration in Mississippi, the remedy for which was challenged on constitutional and VRA Section 2 grounds, leading this court ultimately to sanction deference to a further curative state statute unless the plaintiffs proved constitutional or statutory infirmities in that legislation. Second, *Operation PUSH* relies on general equitable principles, including those in the desegregation context, see 932 F.2d at 406 n.5, in requiring both "proper respect for the integrity and function of local government institutions," *id.*, quoting *Missouri v. Jenkins*, 110 S.Ct. 1651, 1663 (1990), and authorizing judicial remedies "only if" local authorities fail to proffer acceptable remedies, *id.*, citing *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15, 91 S.Ct. 1267, 1276 (1971). The reasoning of *Operation PUSH* is governing precedent in our circuit and precludes application of *NC State Conf. of NAACP v. McCrory*, 831 F.3d 204, 239-241 (4th Cir. 2016), *cert. denied sub nom. N. Carolina v. N. Carolina State Conference of NAACP*, 137 S. Ct. 1399 (2017), which invalidated, without deference or separate findings of unconstitutional intent or effect, a curative voter ID provision enacted by the state legislature after the earlier legislation had been found discriminatory.

No. 17-40884

This injunction and order far exceed the scope of the actual violations found by the court. Under the circumstances of this case, the court had no legal or factual basis to invalidate SB 5, and its contemplation of Section 3(c) relief accordingly fails as well. The remedial order constitutes an abuse of discretion. In contrast, until a plaintiff pleads and proves some constitutional or statutory infirmity in SB 5, that law must be reinstated, and it affords a generous, tailored remedy for the actual violations found.

The court erred first in concluding that SB 5 must be invalidated as the tainted fruit of SB 14, which the court again found unconstitutionally discriminatory. As noted above, equitable remedies must be tailored to and may not exceed the scope of a defendant's violation. While the "root and branch" description required eliminating the vestiges of segregation that permeated entire school systems, *Green v. County School Board of New Kent County, Virginia*, 391 U.S. 430, 88 S. Ct. 1689 (1968), or were not remedied by continued segregation, *United States v. Virginia*, 518 U.S. 515, 116 S. Ct. 2264 (1996), the court here was not required to annul the legislature's intent for a photo voter ID protection of ballot integrity, nor did this court's remand order foreordain such relief.[6] The district court erroneously relied on that rule although, according to the evidence, SB 14 was racially discriminatory against only the subset of indigent minority voters and did not affect the vast majority of Texas voters of all races. In such situations, we are bound by the requirement to tailor injunctive relief, examining whether the new statute had a discriminatory purpose or effect. *See United States v. Virginia,* 518 U.S. at 546-47, 116 S. Ct. at 2282-83; *Wise v. Lipscomb*, 437 US 535, 540, 98 S. Ct. 2493, 2497 (1978); *Westwego Citizens*, 946 F.2d at 1123-24.

---

[6] To the contrary, the *Veasey II* majority stated a "primary concern" of the district court was to respect the policy choices made by the Legislature in passing SB 14. 830 F.3d at 242-43.

13

No. 17-40884

The court also erred in apparently presuming, without proof, that any invidious intent behind SB 14 necessarily carried over to and fatally infected SB 5. This case is unlike *Hunter v. Underwood*, 471 U.S. 222, 105 S. Ct. 1916 (1985), which overturned an intentionally discriminatory, yet facially neutral, felon disenfranchisement law that had been on the books for a hundred years without substantial alteration. *Id.* at 1923. As this court has noted, substantial, race-neutral alterations in an old unconstitutional law may remove the discriminatory taint. *Cotton v. Fordice*, 157 F.3d 388, 391-92 (5th Cir. 1998). And in any event, because intervening legislation "with meaningful alterations may render the current law valid" notwithstanding the previous drafter's intent, the "state of mind of the [subsequent legislature] must also be considered." *Chen v. City of Houston*, 206 F.3d 502, 521 (5th Cir. 2000). The court here overlooked SB 5's improvements for disadvantaged minority voters and neither sought evidence on nor made any finding that the Texas legislature in 2017 intentionally discriminated when enacting SB 5. In fact, no evidence was offered to show that the agreed interim remedy, in place for the full panoply of elections in a Presidential year, was insufficient—and that remedy served as the model for SB 5.

Having relied on incorrect presumptions of taint and invalidity, the district court then failed to defer to the legislature's proffered remedy. As *Operation PUSH* made clear, a federal court is "precluded from substituting even what it considers to be an objectively superior plan for an otherwise constitutionally and legally valid plan ... enacted by the appropriate state governmental unit." 932 F.2d at 406-07. "[T]he fact that broader relief was possible did not authorize the court to invalidate the proffered solution." *Id.* at 407. Courts must defer to [the government's proposed remedy] unless the newly enacted plan is itself unconstitutional or violates federal law. *Id.* And it is the duty of the plaintiff/objectors to challenge the superseding legislation,

14

should the new legislation fail to correct "unreasonably distorted" voter registration rates. *Id.* The district court, however, placed the burden on the state without any intimation that SB 5 itself was a product of unconstitutional discrimination or any statutory violation. Finally, the court never considered ordering relief less stringent than wholesale invalidation of SB 5.

Because the court misapplied the governing legal standards, its remedial order represents an abuse of discretion. Moreover, the court declined to make any finding on whether SB 5 has a discriminatory intent or purpose. To the contrary, all of the evidence supports that SB 5 was designed to remedy every defect claimed in the Plaintiffs' evidence and to supply indigent voter protections recommended by this court's remand order.

The deficiencies in the court's remedial findings came about not only because of its erroneous presumptions, but because the Plaintiffs never actually challenged SB 5 in pleadings or evidence during the remedial phase. It is undisputed that SB 5's DRI enumerates seven grounds for a voter's inability to show compliant ID, and these grounds cover every one of the difficulties related in the testimony of Plaintiffs' 27 individual fact witnesses. Any voter who executes a DRI, checks one of the boxes, and produces some alternative form of ID may cast a ballot -- not a provisional ballot but a definitive ballot -- with no questioning permitted by election officials.[7] SB 5 provides for education of the public and election officials concerning the

---

[7] Because there is no evidence about the alleged disparate impact of SB 5's expanded availability of a DRI, the dissent must speculate. Its farfetched hypothetical, fn. 15, posits a voter who "arrives at the polls and is told that the names on her ID and on the rolls are not 'substantially similar' and who has not brought with her secondary forms of ID..." Note that, far from implying a situation that could disproportionately embroil indigent minority voters, a discrepancy in the voter rolls creates a wholly race-neutral situation. The dissent, like the district court, may not invent criticisms of SB 5 where no evidence was introduced to sustain them.

standards for DRIs, and it allows mobile voter units to issue EICs so that official alternative photo voter IDs are more readily available.

SB 5 more generously offers a DRI alternative to producing compliant photo voter ID than the statutes analyzed by the courts in *Crawford*, 553 U.S. at 186 (upholding Indiana's photo-ID law, which required voters who could not afford IDs to execute indigency affidavits) or *Frank v. Walker*, 768 F.3d 744 (7th Cir. 2014) (upholding a Wisconsin photo-ID law requiring voters to cast provisional ballots and whose list of acceptable identification documents was less inclusive than SB 5's), or *N.C. State Conference of NAACP v. McCrory*, 831 F.3d 204, 240-41 (4th Cir. 2016) (enjoining a North Carolina photo-ID law that required voters to cast a provisional ballot subject to challenge), *cert. denied sub nom. N.C. v. N.C. State Conference of NAACP*, 137 S. Ct. 1399 (2017).

In the face of these obvious improvements over SB 14, Plaintiffs neither allude to nor adduce any proof that SB 5 has a discriminatory effect on indigent minority voters. To a large extent, SB 5 replicates the terms to which both parties agreed as an interim measure to cure SB 14's Section 2 deficiencies in advance of the national 2016 election. Although the interim remedy was without prejudice to any party's asserting its legal rights at a later date, one must wonder why the features the Plaintiffs agreed to only a year ago yielded an insufficient remedy when enacted into law. No explanation is forthcoming in their briefs.

To be fair, Plaintiffs criticize two features of SB 5 that the district court found insufficient for remedial purposes. SB 5 has no check box on the DRI form for "other" reasons a voter does not have a compliant ID, although the parties' interim DRI had that alternative. Further, the SB 5 DRI must be signed under penalty of perjury, a warning of which appears on the bottom of the form. Neither of these features is reasonably assailable, however. The

state explained that in more than a dozen cases during the 2016 election season, prospective voters checked the "other" box with express statements that flouted the law's purpose. The state also pointed out that the seven broad enumerated grounds to excuse producing a photo ID still cover all of the objections raised in Plaintiffs' evidence. Plaintiffs offered nothing concrete to rebut these explanations. As for executing a DRI under penalty of perjury, the state noted that this requirement appeared in the interim DRI with Plaintiffs' counsels' approbation. In any event, many official government papers signed by individuals are subject to false statement laws, which are enforceable only against knowingly false declarations. Plaintiffs' concern that this warning would intimidate voters who need to avail themselves of a DRI is wholly speculative.

That Plaintiffs' factual critique boils down to speculation demonstrates the prematurity of the court's decision to invalidate SB 5 in 2017, well before the law took effect in 2018. Nothing we conclude today disposes of any potential challenges to SB 5 in the future. *See Operation PUSH*, 932 F.2d at 407("We emphasize that nothing in this opinion prevents PUSH from bringing a future challenge to Mississippi's voter registration procedures...."). Plaintiffs may file a new lawsuit, and bear the burden of proof, if the promise of the law to remedy disparate impact on indigent minority voters is not fulfilled. They did not challenge SB 14, for instance, for several years after its effective date. As a remedy for the deficiencies found by this court in *Veasey II*, however, there is no evidentiary or legal basis for rejecting SB 5, and the district court was bound not to take the drastic step of enjoining it. Further, because SB 5 constitutes an effective remedy for the only deficiencies testified to in SB 14, and it essentially mirrors an agreed interim order for the same purpose, the State has acted promptly following this court's mandate, and there is no equitable basis for subjecting Texas to ongoing federal election scrutiny under

No. 17-40884

Section 3(c). *See McCrory*, 831 F.3d at 241 (declining to impose relief under Section 3 of the Voting Rights Act and noting "[s]uch remedies '[are] rarely used'. . . .").

For the foregoing reasons, we **REVERSE** and **RENDER** the district court's permanent injunction and order for potential further relief.

No. 17-40884

PATRICK E. HIGGINBOTHAM, Circuit Judge, concurring:

I join Judge Jones in reversing the district court's injunction of SB 5 enforcement, but I travel a somewhat different path, as I will explain.

## I.

I find the alternative path of mootness put forth by the state to possess considerable force. As I am alone in this view, I only pause to describe it briefly. The lower courts in *Operation PUSH* and in this case took polar opposite approaches to the remedial phase. The district court in *Operation PUSH* halted its proceedings upon liability, inviting the state to respond.[1] In short, the district court in that case took a classic restrained posture in order to allow the legislature a chance to solve the underlying problems. This Court in *Operation PUSH* then accepted the district court's continuing jurisdiction and authority to consider the reach of the remedial law.[2] The new law had full force, and if by its terms it ended the state conduct found impermissible, the district court was obliged to accede—to defer.

In contrast, the district court here excluded the state from participation in the remedial phase, declining the urging of both the state and this Court. The district court instead entered judgment and sent it on appeal. Here, we have a case in which prospective relief is at issue and the controlling law has changed. The remedy is no more than applying the new law.[3] And when that new law supplies the sought relief, the case is moot.[4] Of course, even if we had

---

[1] *Mississippi State Chapter, Operation PUSH, Inc. v. Mabus*, 932 F.2d 400, 404 (5th Cir. 1991).

[2] *Id.* at 409 (describing the enactment of the legislative amendment as "the remedy decision" growing out of the district court's holding).

[3] Indeed, in earlier pleadings, the private plaintiffs specifically noted that, as an alternative to the framework SB 14 established, "Texas could have provided a 'reasonable impediment' exemption, as South Carolina has done." Texas has provided just that. And in doing so, it has also provided all twenty-seven of the individual voters identified by the plaintiffs with the ability to vote.

[4] *See, e.g., United States v. Microsoft Corp.*, No. 17-2, slip op. at 3 (U.S. Apr. 17, 2018) (per curiam) ("No live dispute remains between the parties over the issue with respect to which certiorari

19

No. 17-40884

found this case to be moot, it bears repeating Judge Jones's point that nothing stands in the way of the plaintiffs' ability to mount a new attack on the operation of SB 5 itself.

## II.

The district court enjoined SB 5 without any suggestion of its independent invalidity, in part by attempting to recast this case in the all-too-familiar mold of school desegregation.[5] In doing so, it passed by why those cases were not closed but remained under the supervision of district judges for years—district judges dismissing them only upon the achievement of unitary status, which often took decades. The underlying constitutional right enjoyed by the student was to attend a racially integrated school—a status to be achieved by rooting out segregated schools "root and branch." While this became a mantra in the Civil Rights movements—one of great rhetorical force—it has no role in this play, where the validity of discrete state rules are at issue. Nor, despite its historic role, can it be cast here as an understudy to fill in for an absent Section 5 of the Voting Rights Act.[6]

## III.

The district court's finding that SB 14's legislative purpose was in part racial rests on a jurisprudential fault line, one that it passed over. The

---

was granted."); *Hall v. Beals*, 396 U.S. 45, 48–49 (1969) ("[U]nder the statute as currently written, the appellants could have voted in the 1968 presidential election. The case has therefore lost its character as a present, live controversy of the kind that must exist if we are to avoid advisory opinions on abstract propositions of law."); *see also Farrakhan v. Gregoire*, 623 F.3d 990, 994 (9th Cir. 2010) (en banc) (Thomas, J., concurring) ("[T]he legal landscape has materially changed. Plaintiffs sought to enjoin operation of the prior statute. That prospective relief is no longer available."); *Bradley v. Work*, 154 F.3d 704, 710 (7th Cir. 1998) ("We agree that given the extent and timing of the change in statutory scheme any challenge the Voters might have had to the former system is now moot, and that the district court appropriately found that the record was too thin to support declaratory relief against the new system." (citation omitted)).

[5] *See, e.g., Green v. Cty. Sch. Bd. of New Kent Cty., Va.*, 391 U.S. 430 (1968).

[6] *See Shelby Cty., Ala. v. Holder*, 570 U.S. 529, 557 (2013).

No. 17-40884

difficulty lies in disentangling partisan advantage and racial purpose when a party controls the legislature and racial minorities are heavily invested in the opposite party.[7] Sections 2 and 5 of the Voting Rights Act operating in tandem faded much of this difficulty. Now, with Section 2 no longer at issue here and without Section 5 in full force, we turn to the denial of equal protection at its constitutional source, guided by basic principles set forth by *Davis*[8] and *Feeney*.[9] Together these cases shed light on the difficulty, the first demanding a racial purpose,[10] and the second guiding the analysis when a facially neutral law impacts a minority.[11] We are to ask if the legislature acted "in spite of" or "because of" that impact.[12] While a bit question-begging, this inquiry brings concrete utility to the determination of purpose demanded by *Davis* and *Feeney*—it can expose purpose in a relevant way. It is fair to ask whether Texas's new restraints on voting would have been enacted to begin with if African Americans were heavy Republican voters (as they were when it was the party of Lincoln).

I repair to this difficulty not to suggest an answer—rather to suggest that a confessed purpose to gain partisan advantage may well be fatal under a traditional equal protection analysis, race aside. Race, as a suspect criterion, always triggers strict scrutiny. But so do regulatory classifications that

---

[7] *See* Richard L. Hasen, *Race or Party?: How Courts Should Think About Republican Efforts to Make it Harder to Vote in North Carolina and Elsewhere*, 127 HARV. L. REV. F. 58, 61 (2014) ("When party and race coincide, as they did in 1900 and they do today, it is much harder to separate racial and partisan intent and effect."); *see also, e.g.*, *Veasey*, 830 F.3d at 336 (Costa, J., dissenting in part); *Garza v. Cty. of Los Angeles*, 918 F.2d 763, 778 (9th Cir. 1990) (Kozinski, J., concurring) ("[T]he record here illustrates a more general proposition: Protecting incumbency and safeguarding the voting rights of minorities are purposes often at war with each other.").

[8] *Washington v. Davis*, 426 U.S. 229 (1976).

[9] *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256 (1979).

[10] 426 U.S. at 247–48.

[11] 442 U.S. at 279.

[12] *Id.*

21

No. 17-40884

demean fundamental constitutional rights. Though they are few, these rights include the right to vote.[13] To be sure, the High Court's characterization of voting as a fundamental right is context-dependent, and it has given rise to various scholarly writings attempting to tender some cohesive force to the field.[14] At the least, where the state action *denies* the right to individual voters, and where that denial concerns state ballots for public office, its validity must meet the close attention of strict scrutiny.[15]

This is not the precise issue now before the High Court, where the question is how much partisanship is too much in the apportionment context.[16] Where, as here, the state cannot show that its hurried pursuit of a so recently arrived fear of voter fraud exists beyond the fantasy of political spin, its efforts can only be described in terms of race or the pursuit of political advantage.[17] Either way, strict scrutiny is triggered—when the answer to the charge of racial purpose is a claim that the true purpose was partisan advantage, the state action fails for want of a legitimate purpose. This, because we have not a dilution but an *outright denial* of the right to vote.

---

[13] *See, e.g.*, *Kramer v. Union Free Sch. Dist. No. 15*, 395 U.S. 621, 627–28 (1969) ("[W]hen we are reviewing statutes which deny some residents the right to vote, the general presumption of constitutionality afforded state statutes and the traditional approval given state classifications if the Court can conceive of a 'rational basis' for the distinctions made are not applicable." (citations omitted)).

[14] *See, e.g.*, Joshua Douglas, *Is the Right to Vote Really Fundamental?*, 18 CORNELL J. L. & PUB. POL'Y 143 (2008).

[15] *See Dunn v. Blumstein*, 405 U.S. 330, 336 (1972) ("[A]s a general matter, 'before that right (to vote) can be restricted, the purpose of the restriction and the assertedly overriding interests served by it must meet close constitutional scrutiny.'" (quoting *Evans v. Cornman*, 398 U.S. 419, 422 (1970)).

[16] *See generally Gill v. Whitford*, No. 16-1161 (U.S. argued Oct. 3, 2017).

[17] *See Kramer*, 395 U.S. at 627. At oral argument, for instance, Texas noted that there have been only four prosecutions for in-person voter fraud in Texas over the past decade—four prosecutions out of "millions and millions" of votes cast. *Cf.* Patrick Marley, *Attorney General Brad Schimel Suggests Donald Trump Won Wisconsin Because of the State's Voter ID Law*, MILWAUKEE J. SENTINEL (Apr. 13, 2018, 3:02 PM), https://www.jsonline.com/story/news/politics/2018/04/13/attorney-general-brad-schimel-suggests-donald-trump-won-wisconsin-because-states-voter-id-law/514628002/ ("Attorney General Brad Schimel this week suggested Donald Trump won Wisconsin in 2016 because the state had its voter ID law in place.").

No. 17-40884

In any particular case, claims of voter fraud and racial purpose may both be attenuated. But the right to vote remains fundamental and cannot be easily frustrated, whether it affects poor African American voters or poor Caucasian voters. That is the direction we ought to take.

No. 17-40884

JAMES E. GRAVES, JR., Circuit Judge, concurring in part and dissenting in part:

### *"A hog in a silk waistcoat is still a hog."*[1]

S.B. 14 is an unconstitutional disenfranchisement of duly qualified electors. S.B. 5 is merely its adorned alter ego. The Texas Legislature enacted S.B. 14 with an intent to suppress minority voting. Because the thread of discriminatory intent runs through both S.B. 14 and S.B. 5, the district court's judgment and remedial order should be affirmed. I concur in Judge Jones's conclusion that this appeal is not moot. But from the remainder of the majority's opinion, I respectfully dissent.

### I

The majority cites no authority that allows it to ignore the district court's decision on S.B. 14 in favor of addressing the district court's decision on S.B. 5 alone. When this case was first tried, the district court found not only that S.B. 14 had a discriminatory *effect* on Black and Latino voters, but also that it was enacted with a discriminatory *purpose*. *Veasey v. Perry*, 71 F. Supp. 3d 627 (S.D. Tex. 2014) (*Veasey I*). This court, sitting en banc, affirmed the district court's discriminatory effect finding. *Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016) (en banc) (*Veasey II*), *cert. denied*, 580 U.S. —, 137 S. Ct. 612 (2017). However, because the district court relied on infirm evidence in finding discriminatory intent, we remanded for the district court to "reexamin[e] . . . the probative evidence underlying Plaintiffs' discriminatory purpose claims weighed against the contrary evidence." *Id.* at 242 (citation and internal quotation marks omitted). On remand, the district court reweighed the evidence—excluding the evidence we deemed infirm—and held again that S.B. 14 was passed with a

---

[1] Charles H. Spurgeon, 1 *The Salt-Cellars: Being a Collection of Proverbs, together with Homely Notes Thereon* 18 (1889).

discriminatory purpose. *See Veasey v. Abbott*, 249 F. Supp. 3d 868 (S.D. Tex. 2017) (*Veasey III*). Review of our decision in *Veasey II* and the district court's ruling in *Veasey III* reveals that the district court properly followed our mandate in making its renewed finding. In the absence of clear error, that finding should be affirmed.

## A

I begin with a look back to *Veasey II*—how we conducted our initial review of the district court's discriminatory purpose finding, as well as what we instructed the district court in light of that review.

"Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Veasey II*, 830 F.3d at 230 (quoting *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977)). But "'[r]acial discrimination need only be one purpose, and not even a primary purpose,' of an official action for a violation to occur." *Id.* (quoting *United States v. Brown*, 561 F.3d 420, 433 (5th Cir. 2009)). Against this backdrop, our analysis of whether S.B. 14 violated the Voting Rights Act and the Fourteenth and Fifteenth Amendments proceeded via the framework established by the Supreme Court in *Arlington Heights*:

> [T]he Supreme Court set out five nonexhaustive factors to determine whether a particular decision was made with a discriminatory purpose, and courts must perform a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *See* 429 U.S. at 266–68. "Those factors include: (1) the historical background of the decision, (2) the specific sequence of events leading up to the decision, (3) departures from the normal procedural sequence, (4) substantive departures, and (5) legislative history, especially where there are contemporary statements by members of the decision-making body." *Overton v. City of Austin*, 871 F.2d 529, 540 (5th Cir. 1989) (citing *Arlington Heights*, 429 U.S. at 267–68). Legislators' awareness of a disparate impact on a protected group is not enough: the law must be passed ***because***

No. 17-40884

*of* that disparate impact. *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). The challengers bear the burden to show that racial discrimination was a "'substantial' or 'motivating' factor behind enactment of the law"; if they meet that burden, "the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor." *Hunter* [*v. Underwood*, 471 U.S. 222, 228 (1985)] (citation omitted).

*Veasey II*, 830 F.3d at 230–31 (footnotes omitted).

We made the following findings regarding the infirm evidence upon which the district court relied:

First, the district court relied too heavily on evidence of Texas's state-sponsored discrimination from a bygone era—specifically, its use of all-white primaries from 1895–1944, literacy tests and secret ballot restrictions from 1905–1970, and poll taxes from 1902–1966. "The historical background of the decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes," *Arlington Heights*, 429 U.S. at 267, but "unless historical evidence is reasonably contemporaneous with the challenged decision, it has little probative value," *McCleskey v. Kemp*, 481 U.S. 279, 298 n.20 (1987). *See Veasey II*, 830 F.3d at 232.

Second, the district court gave too much probative weight to the actions of county officials in Walter County by imputing the motives of those officials onto the Texas Legislature. *Id.*

Third, two of the more recent redistricting cases the district court relied on as historical evidence of discrimination, "taken alone, form[ed] a thin basis for drawing conclusions regarding contemporary State-sponsored discrimination." *Id.* at 232–33 (discussing *Bush v. Vera*, 517 U.S. 952 (1996), and *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399 (2006)).

Fourth, the district court improperly relied on statements by opponents of S.B. 14 speculating as to the proponents' motives. *Id.* at 233–34.

No. 17-40884

And fifth, the district court improperly relied on stray post-enactment statements of individual legislators. *Id.* at 234.

In spite of that infirm evidence, we acknowledged that the record contained "circumstantial evidence that could support a finding of discriminatory purpose such that the record does not permit of only one resolution of the factual issue of intent," *id.* at 236, namely:

First, drafters and proponents of S.B. 14 were aware of the likely disproportionate effect of the law on minorities, but they passed the bill anyway without adopting a number of proposed ameliorative measures that might have lessened this impact. The district court cited testimony that this likely disproportionate impact was "common sense." *Id.*

Second, one of S.B. 14's authors testified that he "believe[s] today the Voting Rights Act has outlived its useful life." *Id.* at 236–37. Other legislators asked this Senator about the possible disparate impact of the law, to which he replied, "I am not advised." *Id.* at 237.

Third, a proponent testified that he and other proponents voted to table amendments that would have expanded the types of accepted IDs, expanded the operating hours of Department of Public Safety stations that issued voter IDs, and delayed implementation of S.B. 14 until an impact study could be completed. These proponents, with an attitude that "was out of character for sponsors of major bills," largely refused to explain why they rejected these amendments at the time and in subsequent litigation. *Id.*

Fourth, evidence and testimony revealed that S.B. 14 was "only tenuously related to the legislature's stated purpose of preventing voter fraud." *Id.* A race relations expert, Dr. Vernon Burton, testified that Texas has stated "voter fraud" as the rationale for its previous discriminatory voting practices—all-white primaries, secret ballot provisions, poll taxes, re-registration requirements,

No. 17-40884

and voter purges—none of which actually responded to sincere incidences of voter fraud. *Id.* In this instance there was also "evidence that could support a finding that the Legislature's race-neutral reason of [promoting] ballot integrity . . . is pretextual." *Id.* "The bill was subjected to radical departures from normal procedures," which "provides one potential link in the circumstantial totality of evidence the district court must consider" and "may lend credence to an inference of discriminatory intent." *Id.* at 237–38. These departures included: (1) getting special permission to file the bill under a low number (*i.e.*, "S.B. 14") reserved for the Lieutenant Governor's legislative priorities, rather than the S.B. 178 number it was assigned upon its filing; (2) then-Governor Perry's decision to designate the bill as emergency legislation so that it could be considered during the first sixty days of the legislative session, even though no one explained what the "emergency" was; (3) suspending a rule that would have required a two-thirds vote in the Texas Senate to make S.B. 14 a "special order";[2] (4) allowing the bill to bypass the ordinary committee process in the House and Senate; (5) passing S.B. 14 with an unverified $2 million fiscal note despite the prohibition on doing so in the 2011 legislative session due to a $27 million budget shortfall; (6) cutting debate short to enable a three-day passage through the Senate; and (7) passing resolutions to add provisions to S.B. 14, contrary to the Legislature's rules and

---

[2] "Under Senate Rule 5.11(a), a two-thirds majority vote is required to make a bill or resolution a 'special order.' When designated as a 'special order,' the bill is considered prior to other business of the Senate. The Senate of the 2009 Texas Legislature had adopted a significant rules change to Rule 5.11 providing that a bill relating to voter ID requirements that was reported favorably from the Committee of the Whole Senate could be set as a special order at least 24 hours after a motion to set it was adopted by a majority of the members of the Senate. That rule change, made solely for voter ID legislation, followed the 2007 session when the two-thirds rule blocked predecessor HB 218 from being taken up out of the ordinary order of business and the rule remained in place for the 2011 Texas Senate." *Veasey I*, 71 F. Supp. 3d at 647–48 (footnotes omitted).

28

No. 17-40884

normal practice. *See id.* at 238. The district court noted that these departures were odd, given that S.B. 14 was addressed earlier in priority than, and without the same special solicitude as, "critically important issues such as the $27 million budget shortfall and transportation funding." *Id.* (quoting *Veasey I*, 71 F. Supp. 3d at 657). We noted that "one might expect that when the Legislature places a bill on an expedited schedule and subjects it to such an extraordinary degree of procedural irregularities, . . . such a bill would address a problem of great magnitude." *Id.* While ballot integrity is a "worthy goal," the evidence before the Legislature showed that in-person voting, the sole concern addressed by S.B. 14, resulted in just two convictions for in-person voter impersonation fraud out of the 20 million votes cast in the decade before S.B. 14 was passed. *Id.* We also noted that the law did nothing to address mail-in ballots, which are much more vulnerable to fraud. *Id.* at 238–39. Thus, we "c[ould] not say that the district court had to simply accept that legislators were really so concerned with this almost nonexistent problem." *Id.* at 239.

Fifth, the "extraordinary measures" accompanying S.B. 14's passage occurred in the wake of a rapid increase in Texas's minority population—a "seismic demographic shift"—which led the district court to find that the party currently in power "face[d] a declining voter base and [could] gain partisan advantage" through a strict voter ID law. *Id.* at 241 (quoting *Veasey I*, 71 F. Supp. 3d at 700).

Sixth, the proponents of S.B. 14 "cloak[ed] themselves in the mantle of following Indiana's voter ID law, which had been upheld against a (different) challenge" in *Crawford v. Marion County Election Board*, 553 U.S. 181 (2008), yet proceeded to take out all the ameliorative provisions of the Indiana law, including an indigency exception. *Veasey II*, 830 F.3d at 239.

Seventh, the record contained contemporary examples of State-sponsored

29

No. 17-40884

discrimination. As late as 1975, Texas attempted to suppress minority voting through voter-roll purges. In every redistricting cycle since 1970, Texas has been found to have violated the Voting Rights Act with racially gerrymandered districts. And between 1980 and 2013—when *Shelby County v. Holder*, 570 U.S. 529 (2013), heralded the end of Section 5—the Department of Justice objected to at least one of Texas's statewide redistricting plans in each period. *See Veasey II*, 830 F.3d at 239–40.

And eighth, Texas's rationale undergirding the voter ID law shifted as each previous rationale was challenged or disproven by its opponents. At first, it was preventing voter fraud. Then, it was guarding against voting by undocumented immigrants. Then, it was increasing public confidence and voter turnout. *See id.* at 240–41 (citing *Foster v. Chatman*, 578 U.S. —, —, —, 136 S. Ct. 1737, 1751–52, 1754–55 (2016) (reasoning that the government's "principal reasons" for its action "shift[ing] over time . . . suggest[ed] that those reasons may [have been] pretextual")).

\*    \*    \*

We summed up our view of the evidence and instructed the district court:

> [A]lthough some of the evidence on which the district court relied was infirm, there remains evidence to support a finding that the cloak of ballot integrity could be hiding a more invidious purpose. As we have explained, the absence of direct evidence such as a "let's discriminate" email cannot be and is not dispositive. ***Because we do not know how much the evidence found infirm weighed in the district court's calculus***, we cannot simply affirm the decision. . . . We therefore remand this claim to the district court ***to re-examin[e] . . . the probative evidence underlying Plaintiffs' discriminatory purpose claims weighed against the contrary evidence, in accord with the appropriate legal standards we have described***.

*Id.* at 241–42 (emphases added) (citation and internal quotation marks omitted).

We further instructed that the district court "should not take additional

30

evidence," but could hear additional oral argument prior to issuing its new findings, if it decided to do so. *Id.* at 242. Finally, we directed that "[t]he district court on remand should make its discriminatory purpose findings based on the record we have, guided by this opinion and the instructions we have given the district court about the legal infirmities in its initial findings," *id.*, and "bearing in mind the effect any interim legislative action taken with respect to SB 14 may have," *id.* at 272.

## B

Our instructions were clear. We acknowledged that the district court relied on infirm evidence, but we also acknowledged that evidence apart from that infirm evidence could support a finding of discriminatory intent. So we remanded to the district court and told it to take no new evidence—rather, the district court was simply to reweigh the discriminatory purpose claim without the infirm evidence and make a ruling thereon.

On remand, the district court undertook anew its analysis of the discriminatory purpose claim using the *Arlington Heights* framework. It paraphrased that framework as requiring consideration of six factors:

> (1) The disparate impact of the legislation; (2) Whether there is a clear pattern, unexplainable on grounds other than race, which emerges from the effect of the state action even when the governing legislation appears neutral on its face; (3) The historical background of the decision; (4) Whether the decision departs from normal procedural practices; (5) Whether the decision departs from normal substantive concerns of the legislature, such as whether the policy justifications line up with the terms of the law or where that policy-law relationship is tenuous; and (6) Contemporaneous statements by the decisionmakers and in meeting minutes and reports.

*Veasey III*, 249 F. Supp. 3d at 872 (citing *Arlington Heights*, 429 U.S. at 266). Keeping in mind our instructions, the district court made several findings.

No. 17-40884

As to the disparate impact of the legislation, the district court first noted that we did not disturb its findings and conclusions relating to discriminatory result (disparate impact)—in parts IV(B) and VI(B)(1) of *Veasey I*[3]—with one exception: we found that anecdotal evidence of racial appeals in campaigns did not show that S.B. 14 denied or abridged the right to vote. *Id*. at 872–73 & 873 n.5 (citing *Veasey II*, 830 F.3d at 261). Assigning no weight to that anecdotal evidence, the court adopted its prior findings and conclusions and found that Plaintiffs satisfied this factor. *Id*. at 873 & n.5.

As to the clear pattern, unexplainable on nonracial grounds, the district court recognized that in parts IV(A)(4) and (5) of *Veasey I*,[4] it had described the ameliorative amendments that were suggested to soften the racial impact of S.B. 14 and the Legislature's rejection of those amendments, and it noted in part IV(A)(6)[5] that the Legislature offered no substantive justifications for the bill's "draconian terms." *Id*. at 873. The court also reiterated its conclusion from part VI(B) that "these efforts revealed a pattern of conduct unexplainable on non-racial grounds to suppress minority voting." *Id*. Because we had deemed that evidence appropriate, probative, and reliable for consideration, the court was free to adopt its previous findings and conclusions with respect to this factor. *Id*. (citing *Veasey II*, 830 F.3d at 236).

As to the historical background, the court affirmatively stated that it "did not, and does not, assign distant history any weight in the discriminatory purpose analysis," and that it "does not rely on the evidence of Waller County officials' efforts to suppress minority votes and the redistricting cases for the discriminatory purpose analysis." *Id*. at 873–74. However, it did adopt its post-

---

[3] *See Veasey I*, 71 F. Supp. 3d at 660–79, 694–95.
[4] *Veasey I*, 71 F. Supp. 3d at 651–53.
[5] *Veasey I*, 71 F. Supp. 3d at 653.

32

No. 17-40884

2000 historical evidence (found in part VI(B)(2) of *Veasey I*[6]), as well as the 1970s-and-onward historical evidence we credited in the en banc opinion. *Id.* at 874 (citing *Veasey II*, 830 F.3d at 239–40). The court found, consistent with our opinion, that the reasonably contemporaneous history of discriminatory practices supported a discriminatory purpose finding. *Id.*

As to the departures from normal practices, the court explained that in part IV(A) of *Veasey I* (specifically, parts IV(A)(1)–(5)), it "detailed the extraordinary procedural tactics used to rush SB 14 through the legislative process without the usual committee analysis, debate, and substantive consideration of amendments." *Id.* (citing *Veasey I*, 71 F. Supp. 3d at 645–53). Given that we agreed that the district court could "credit these 'virtually unprecedented' radical departures from normal practices," the court adopted its previous findings and conclusions with regard to this factor. *Id.* (quoting *Veasey II*, 830 F.3d at 238).

As to the legislative drafting history, the court cited our statement that "the evidence before the Legislature was that in-person voting, the only concern addressed by SB 14, yielded only two convictions for in-person voter impersonation fraud out of 20 million votes cast in the decade leading up to SB 14's passage." *Id.* (quoting *Veasey II*, 830 F.3d at 240). The court then noted that in parts III(B) and IV(A)(4) of *Veasey I*,[7] it detailed the "unduly strict" terms of the bill—the categories of photo IDs accepted by other states that Texas rejected, the period of time in which IDs could be expired, the limited exceptions made available, and the heavier burdens imposed for taking advantage of an exception—and how Texas failed to demonstrate that these

---

[6] *Veasey I*, 71 F. Supp. 3d at 700.
[7] *Veasey I*, 71 F. Supp. 3d at 642–45, 651–52.

features were consistent with its purported interest in preventing voter fraud or increasing public confidence in elections. *Id.* at 875. The court also reiterated its previous finding in part IV(A)(6) of *Veasey I*[8] that Texas's rationales for S.B. 14 had shifted over time and were pretextual, and its findings in parts IV(A)(2) and (3)[9] that S.B. 14 was passed with a fiscal note, despite the Legislature's stated prohibition against such bills.[10] Given our "approv[al] of the consideration of the tenuousness of the relationship between the legislature's policies and SB 14's terms," and our findings that the fiscal note issue was relevant and that the district court could credit evidence of pretext, the district court adopted its previous findings and conclusions with respect to this factor. *Id.* (citing *Veasey II*, 830 F.3d at 237–41).

Finally, as to the contemporaneous statements, the district court stated that it "assign[ed] no weight" to the evidence previously offered in part VI(B)(2) of *Veasey I*[11] "regarding legislator observations of the political and legislative environment at the time SB 14 was passed," with two exceptions: the statement by Senator Fraser, one of S.B. 14's authors, that the Voting Rights Act had "outlived its useful life," and the evidence that the Legislature failed to adopt ameliorative measures without explanation, which was out of character with other major bills (evidence we had deemed appropriate). *Id.* (citing *Veasey II*, 830 F.3d at 236–37). But even as to those exceptions we approved of, the court

---

[8] *Veasey I*, 71 F. Supp. 3d at 653–59.

[9] *Veasey I*, 71 F. Supp. 3d at 649.

[10] Texas claims that the district court erred by "adopt[ing] its reasoning from Part IV(A)" of *Veasey I*, which, in part, had relied on an expert report by Dr. Alan Lichtman who had himself relied on evidence we considered infirm. But the district court was exacting in detailing which portions of its previous opinion it readopted; it did not simply readopt wholesale an entire section that it recognized was infected by infirm evidence without excising that infirm evidence from its consideration.

[11] *Veasey I*, 71 F. Supp. 3d at 702.

No. 17-40884

assigned the evidence "little weight." *Id.*

Having outlined the evidence it would and would not consider, the court concluded:

> Because the Fifth Circuit found that some of the evidence in this case was not probative of a discriminatory purpose in the Texas Legislature's enactment of SB 14, this Court was tasked with re-examining its conclusion on the discriminatory purpose issue. Upon reconsideration and a re-weighing of the evidence in conformity with the Fifth Circuit's opinion, the Court holds that the evidence found "infirm" did not tip the scales. Plaintiffs' probative evidence—that which was left intact after the Fifth Circuit's review—establishes that a discriminatory purpose was at least one of the substantial or motivating factors behind passage of SB 14. Consequently, the burden shifted to the State to demonstrate that the law would have been enacted without its discriminatory purpose. *Hunter*, 471 U.S. at 228. The State has not met its burden. Therefore, this Court holds, again, that SB 14 was passed with a discriminatory purpose in violation of Section 2 of the Voting Rights Act.

*Id.* at 875–76.

## C

We should affirm the district court's finding that S.B. 14 was enacted with a discriminatory purpose. That finding of fact—which the district court made following a full trial on the merits—may be reversed only if it is clearly erroneous. *Pullman-Standard v. Swint*, 456 U.S. 273, 290 (1982); *see also Veasey II*, 830 F.3d at 229–30 ("If the district court's findings are plausible in light of the record viewed in its entirety, we must accept them . . . ." (quoting *Price v. Aus. Indep. Sch. Dist.*, 945 F.2d 1307, 1312 (5th Cir. 1991))). A reviewing court "oversteps the bounds of its duty under [Federal Rule of Civil Procedure] 52(a) if it undertakes to duplicate the role of the lower court." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985). "[T]he very premise of clear error review is that there are often 'two permissible'—because two 'plausible'—'views of the evidence.'" *Cooper v. Harris*, 581 U.S. —, —, 137 S. Ct. 1455, 1468

35

No. 17-40884

(2017) (quoting *Anderson*, 470 U.S. at 574). Thus, the factfinder's choice between those two permissible views "***cannot be*** clearly erroneous . . . even when the district court's findings . . . are based . . . on physical or documentary evidence or inferences from other facts." *Anderson*, 470 U.S. at 574 (emphasis added). And "if the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Id.* at 573–74; *see also GIC Servs., L.L.C. v. Freightplus USA, Inc.*, 866 F.3d 649, 663 (5th Cir. 2017) (same); *Veasey II*, 830 F.3d at 238 n.22 ("We acknowledge that multiple inferences could reasonably be drawn from the record evidence, but we must leave the drawing of those inferences to the district court.").

The district court affirmatively stated that it accorded the infirm evidence no weight in its decision, and it then adopted the appropriate findings and conclusions from its previously written, meticulously supported 147-page opinion to conclude once again that racial discrimination was a substantial motivating factor behind S.B. 14. And, adopting its previous finding that Texas had not demonstrated that the law would have been enacted without this motivating factor, the court held that S.B. 14 was passed with a discriminatory purpose. Our instruction that the district court "reevaluate" the discriminatory intent evidence and "determine anew" whether S.B. 14 was passed with a discriminatory intent did not mean that the district court was required to scrap the work it had done up to that point, rewrite its opinion on discriminatory purpose, or retry the case. Nor was the district court required to accept any additional briefing on the subject, though it did.

Given *Veasey III*'s finding that S.B. 14 was at least one substantial or motivating factor behind S.B. 14's enactment, the burden shifted to Texas to

No. 17-40884

demonstrate that the law would have been enacted without its discriminatory purpose. *See Hunter*, 471 U.S. at 228. The district court impliedly adopted its previous finding from *Veasey I*—a finding disturbed by no infirm evidence—that Texas

> did not provide that the discriminatory features of S.B. 14 were necessary to accomplish any fraud prevention effort. They did not provide evidence that the discriminatory features were necessary to prevent non-citizens from voting. They did not provide any evidence that would link these discriminatory provisions to any increased voter confidence or voter turnout. As the proponents who appeared (only by deposition) testified, they did not know or could not remember why they rejected so many ameliorative amendments, some of which had appeared in prior bills or in the laws of other states. There is an absence of proof that SB 14's discriminatory features were necessary components to a voter ID law.

*Veasey I*, 71 F. Supp. 3d at 702.

This remains a plausible view of the evidence in light of the record and is therefore not clearly erroneous. *See Washington v. Davis*, 426 U.S. 229, 242 (1976) ("Necessarily, an invidious discriminatory purpose may often be inferred from the totality of the relevant facts . . . ."). The district court was not required to apply any presumption of "good faith" to the Texas Legislature's enactment.[12] *Arlington Heights*, the controlling decision on this issue, does not require such deference to the Legislature once a finding of intentional discrimination is made.

---

[12] The district court was also not required to wait for Texas to pass S.B. 5 prior to making a ruling on the discriminatory purpose claim, and Texas overreads our instructions in claiming as much. We explained that the district court "should not take additional evidence" and should "make its discriminatory purpose findings based on the record we have." *Veasey II*, 830 F.3d at 242. We did instruct the district court to "bear[] in mind the effect any interim legislative action taken with respect to SB 14 may have," *id.* at 272, but at the time the district court ruled on the discriminatory purpose claim, no new legislation had been enacted. Whether the enactment of S.B. 5 affected the *remedy* the district court ordered for the discriminatory purpose violation is a separate issue from whether S.B. 14 was enacted with a discriminatory purpose.

No. 17-40884

*See* 429 U.S. at 265–66 ("[I]t is because legislators and administrators are properly concerned with balancing numerous competing considerations that courts refrain from reviewing the merits of their decisions, absent a showing of arbitrariness or irrationality. But racial discrimination is not just another competing consideration. When there is a proof that a discriminatory purpose has been a motivating factor in the decision, . . . judicial deference is no longer justified."); *Miller v. Johnson*, 515 U.S. 900, 915 (1995) (explaining that the "good faith of a state legislature must be presumed" ***only*** "until a claimant makes a showing sufficient to support" an allegation of "race-based decisionmaking," which in and of itself is "inherently suspect"); *accord N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 235 (4th Cir. 2016) (ruling that legislative deference did not apply because the evidence established that, at least in part, a discriminatory purpose motivated the North Carolina legislature in passing voter ID legislation), *cert. denied sub nom. North Carolina v. N.C. State Conf. of NAACP*, 581 U.S. —, 137 S. Ct. 1399 (2017).

Neither the district court nor this court need credit Texas's new theory, based on new evidence, that S.B. 14 "was intended to be one piece of a considered response to a decade-long and nationwide push to improve election integrity and increase public confidence in elections." Texas raised this argument for the first time in its proposed new findings of fact on remand. It cited no record evidence in advancing this argument; instead, it cited to historical legislative documents that were not in the record and sought to have the district court judicially notice those documents. The district court was correct to ignore this argument and evidence, given our instruction that no new evidence be admitted (which would necessarily include evidence admitted by way of judicial notice). If anything, that Texas has supplied yet another rationale behind the enactment of S.B. 14 lends further credence to our observation that the State's many,

No. 17-40884

shifting rationales for a voter identification law were probative of discriminatory intent.[13] *Veasey II*, 830 F.3d at 241; *cf. Bethune-Hill v. Va. State Bd. of Elec.*, 580 U.S. —, —, 137 S. Ct. 788, 799 (2017) (explaining in racial gerrymandering challenge that the inquiry into the legislative intent behind the drawing of a district's lines "concerns the actual consideration that provided the essential basis for the lines drawn, not *post hoc* justifications the legislature in theory could have used but in reality did not").

At bottom, our decision in *Veasey II* left the district court with a not-so-high hurdle to clear before ruling, for a second time, that S.B. 14 was enacted with a discriminatory purpose. It bears repeating that had we determined that the only resolution of the factual issues arising from the record evidence was

---

[13] While it is true that the Supreme Court has described safeguarding public confidence in the integrity of the electoral process as a state interest of "independent significance," *Crawford v. Marion Cty. Elec. Bd.*, 553 U.S. 181, 197 (2008) (opinion of Stevens, J.), the question remains whether Texas genuinely holds this interest, considering that neither S.B. 14 nor S.B. 5 seeks to ameliorate or reduce voter fraud in the area where, by most accounts, it is more likely to occur: mail-in ballots. *See, e.g.*, Gromer Jeffers Jr., *Dallas County DA Investigating More than 1,200 Mail-in Ballot Applications for Potential Voter Fraud*, Dall. Morning News (Mar. 12, 2018), https://www.dallasnews.com/news/2018-elections/2018/03/12/dallas-county-da-investigating-1200-mail-ballot-applications-potential-voter-fraud. Given its apparent lack of interest in guarding against "voter fraud" ***wherever*** it may arise, it seems more accurate to say that Texas, having itself stoked the fires of voter fraud in the mind of the electorate, now purports to have a genuine interest in increasing public confidence in the firefighters. *See* Note, *Of Ballot Boxes and Bank Accounts: Rationalizing the Jurisprudence of Political Participation and Democratic Integrity*, 131 Harv. L. Rev. 1443, 1462 (2018) ("Somewhat ironically, proponents of voter identification laws have begun to offer public perception of in-person fraud as a rationale for further restrictions, having convinced many voters that such fraud does indeed exist as part of campaigns to enact earlier restrictions."); Danielle Lang & J. Gerald Hebert, *A Post-*Shelby *Strategy: Exposing Discriminatory Intent in Voting Rights Litigation*, 127 Yale L.J. F. 779, 784 (2018) ("Legislators have promoted a myth of widespread voter fraud, stoking mistrust in our electoral system, to support these restrictions." (footnote omitted)); Michael Wines, *In Absence of Voter Fraud, Targeting the Fear of It*, N.Y. Times, Mar. 24, 2017, at A11 ("[W]hile [proponents of restrictive voting legislation] have traditionally argued that such laws are needed to police rampant voter fraud—a claim most experts call unfounded—some are now saying the perception of fraud, real or otherwise, is an equally serious problem, if not worse.").

39

No. 17-40884

that no discriminatory intent was present in enacting S.B. 14—as Texas here suggests—then, following *Pullman-Standard*, we would have rendered judgment in Texas's favor rather than remanded. *See Veasey II*, 830 F.3d at 229 ("[W]hen the district court's 'findings are infirm because of an erroneous view of the law, a remand is the proper course unless the record permits only one resolution of the factual issue.'" (quoting *Pullman-Standard*, 456 U.S. at 292)). But we decidedly did not render judgment, because the evidence at least raised the question whether a finding of a discriminatory purpose was plausible.

The district court correctly found that S.B. 14 was passed with a discriminatory purpose, in contravention of both constitutional and statutory prohibitions on intentional discrimination. And because this finding is not clearly erroneous, I would affirm the district court's grant of declaratory relief and its holding that S.B. 14 violates Section 2 of the Voting Rights Act and the Fourteenth and Fifteenth Amendments to the U.S. Constitution.[14]

## II

I turn now to the district court's permanent injunctions of S.B. 14 and S.B. 5, which we review for abuse of discretion. *SEC v. Life Partners Holdings, Inc.*, 854 F.3d 765, 784 (5th Cir. 2017). "A trial court abuses its discretion when its ruling is based on an erroneous view of the law or a clearly erroneous assessment of the evidence." *United States v. Murra*, 879 F.3d 669, 678 (5th Cir. 2018) (citation omitted).

"An injunction is an exercise of a court's equitable authority, to be ordered only after taking into account all of the circumstances that bear on the need for

---

[14] *See Veasey III*, 249 F. Supp. 3d at 576; *Veasey v. Abbott*, 265 F. Supp. 3d 684, 689 (S.D. Tex. 2017).

prospective relief." *Salazar v. Buono*, 559 U.S. 700, 714 (2010) (opinion of Kennedy, J.). And when a court finds that a law has been passed with a discriminatory purpose, it may exercise that equitable authority to invalidate that law. *See Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457 (1982) (affirming a permanent injunction of a state statute, passed by voter initiative, that was motivated by a racially discriminatory purpose in violation of the Fourteenth Amendment); *see also Anderson v. Martin*, 375 U.S. 399, 404 (1964) ("Race is the factor upon which the statute operates and its involvement promotes the ultimate discrimination which is sufficient to make it invalid."). Indeed, "[a]n official action . . . taken for the purpose of discriminat[ion] . . . on account of [] race has no legitimacy at all under our Constitution or under the [Voting Rights Act]." *City of Richmond v. United States*, 422 U.S. 358, 378 (1975); *see also id.* at 378-79 ("[Official actions] animated by [a discriminatory] purpose have no credentials whatsoever; for [a]cts generally lawful may become unlawful when done to accomplish an unlawful end." (last alteration in original) (citation and internal quotation marks omitted)).

## A

An examination of S.B. 5 reveals how little of S.B. 14 it actually changed. *See Veasey v. Abbott*, 265 F. Supp. 3d 684, 691–97 (S.D. Tex. 2017) (*Veasey IV*) (detailing S.B. 5's provisions). S.B. 5 made a number of small changes. It clarified that both a U.S. passport book and U.S. passport card would be considered acceptable forms of identification; S.B. 14 referred only to "passport[s]." It enlarged the amount of time an acceptable form of identification may be expired from sixty days to four years and provided that voters seventy years of age or older do not have a limit on the amount of time their ID may be expired. *Id.* at 692. It also provided for free mobile units that can travel the state and issue Election Identification Certificates (EIC) upon

request from constituent groups or at special events; it, however, does not provide how much notice must be, should be, or is to be given before these mobile units arrive in a particular location so that voters can gather the necessary documentation needed to obtain an EIC. *Id.* at 693.

The largest change within S.B. 5 was its creation of the Declaration of Reasonable Impediment (DRI) procedure, which was derived from (but, critically, is not identical to) the interim remedy put in place after our decision in *Veasey II* in time for the 2016 presidential election. The procedure provides that a voter can vote a regular ballot by completing a DRI if she does not have and cannot reasonably obtain one of S.B. 14's acceptable forms of identification. Before a voter can be permitted to complete a DRI, she must present either (1) one of an exhaustive list of documents that shows her name and address (a government document, a copy of a current utility bill, a bank statement, a government check, or a paycheck), or (2) a certified copy of a domestic birth certificate. She then must check which of seven listed reasons explains her inability to obtain acceptable photo ID: lack of transportation, lack of birth certificate or other documents needed to obtain the sanctioned photo ID, work schedule, lost or stolen ID, disability or illness, family responsibilities, and ID applied for but not received. The interim remedy had contained another check box—labeled "other"—which allowed a voter to write in her own explanation for why she had not been able to obtain one of the sanctioned IDs. But because nineteen people used the "other" box during the 2016 election for no other purpose than to protest S.B. 14, the Legislature eliminated the box in S.B. 5's codification of the procedure. Finally, the form of the DRI contains a notice to voters that they fill out the form under penalty of perjury, and S.B. 5 mandates that a voter who intentionally includes a false statement or false information commits a state jail felony.

42

No. 17-40884

S.B. 5 is not a replacement for S.B. 14. S.B. 5 retains much of S.B. 14's original structure. *See* Appendix. S.B. 5 does not eliminate S.B. 14's photo ID requirement. It does not expand S.B. 14's list of acceptable photo IDs (other than the change from "passport" to "passport book or card" that reads more as a clarification than an expansion), thereby "perpetuat[ing] the selection of types of ID most likely to be possessed by Anglo voters and, disproportionately, not possessed by Hispanics and African Americans." *Veasey IV*, 265 F. Supp. 3d at 692. S.B. 5 does not change S.B. 14's requirement that an election officer must compare the name on a voter's ID with the registered name to determine whether they are "substantially similar," and, if they are not, refuse to permit the voter to cast a regular ballot.[15] S.B. 5 does not meaningfully alleviate the "financial, geographic, and institutional obstacles," occasioned by S.B. 14, "to obtaining qualifying photo ID or the underlying documentation necessary to obtain qualifying photo ID." *Id.* And S.B. 5 neither addresses what the district court found to be S.B. 14's "discriminatory features . . . regarding education and training," *id.* at 697, nor contains provisions identifying the programs necessary to educate voters in the second-most populous state in the nation about the litany of voter ID requirements and contingencies, nor provides funding to implement any such programs.

**B**

The district court did not abuse its discretion in enjoining S.B. 5. On this

---

[15] While this aspect of S.B. 14 has theoretically been remedied by the DRI procedure, the situation is almost certain to arise where a voter arrives at the polls and is told that the name on her ID is not "substantially similar" to a name on the rolls, but she does not have on her person one of the secondary forms of ID which allows her to fill out a DRI. She therefore either would not be permitted to vote via a DRI or would have to file a provisional ballot and follow S.B. 14's (seemingly unchanged) provisional ballot procedure, requiring her to go to the voter registrar with additional documentation to verify her identity within six days of the election.

No. 17-40884

issue, the Fourth Circuit's decision in *North Carolina State Conference of NAACP v. McCrory* is instructive. There, the court invalidated North Carolina's voter ID law after finding that the law was enacted with a racially discriminatory purpose. During the litigation, the legislature amended one of the law's provisions to add a reasonable impediment exception—much like S.B. 5's DRI procedure. The Fourth Circuit refused to consider the amendment and enjoined the entire law to remedy its underlying discriminatory purpose, explaining:

> [E]ven if the State were able to demonstrate that the amendment lessens the discriminatory effect of the photo ID requirement, it would not relieve us of our obligation to grant a complete remedy in this case. That remedy must reflect our finding that the challenged provisions were motivated by an impermissible discriminatory intent and must ensure that those provisions do not impose any lingering burden on African American voters. . . .

> While remedies short of invalidation may be appropriate if a provision violates the Voting Rights Act *only* because of its *discriminatory effect*, laws passed with *discriminatory intent* inflict a broader injury and cannot stand.

*N.C. State Conference*, 831 F.3d at 240. As support for that proposition, the court cited our observation in *Veasey II* that a remedy for a discriminatory *intent* claim is broader than the remedy for a discriminatory *effect* claim. *See* 830 F.3d at 268 & n.66. The Fourth Circuit reasoned that because the North Carolina voter ID law was passed with a discriminatory intent, it had to be "eliminated root and branch." *N.C. State Conference*, 831 F.3d at 239 (quoting *Green v. Cty. Sch. Bd.*, 391 U.S. 430, 438 (1968)). And since the reasonable impediment amendment neither invalidated nor repealed the photo ID requirement, it "f[ell] short of the remedy that the Supreme Court has consistently applied in cases of this nature." *Id.* at 240.

The same result should obtain here. S.B. 14 is legislation borne out of a

44

discriminatory purpose. Even if S.B. 5 were, as Texas and the majority both claim, ostensibly to remove or otherwise lessen the discriminatory impacts of S.B. 14, it still does not change the reason—the ***discriminatory*** reason—why the State enacted a voter ID law in the first place. Should S.B. 5 be allowed to govern, its congenital defect would persist. Texas argues that the Legislature passed voter ID legislation to rid the state of voter fraud. But Texas produced no significant evidence of voter fraud, no empirical data regarding voter fraud, and no pattern of successful prosecutions for voter fraud (indeed, the evidence revealed only two prosecutions out of twenty million votes cast in Texas in the decade prior to S.B. 14's enactment). *See also, e.g.*, Justin Levitt, *A Comprehensive Investigation of Voter Impersonation Finds 31 Credible Incidents Out of One Billion Votes Cast*, Wash. Post, Aug. 6, 2014, http://www.washingtonpost.com/news/wonk/wp/2014/08/06/a-comprehensive-investigation-of-voter-impersonation-finds-31-credible-incidents-out-of-one-billion-ballots-cast (detailing thirty-one possible incidents of in-person voter impersonation throughout the United States between 2000 and 2014).

So if ridding the state of voter fraud is the beginning premise, it is unsupported. And everything the State does in furtherance of that premise is undermined by the fact that the premise is not based on any evidence. Enter S.B. 5. If Texas seeks to protect against in-person voter fraud, how does the statute's DRI procedure in any way contribute? As the district court aptly observed, how does the ***reason*** a voter lacks a form of sanctioned photo identification "make[] any difference in identifying a voter so as to prevent fraud"? *Veasey IV*, 265 F. Supp. 3d at 695. Texas belies its own stated mission when it refuses to implement protections against anything other than nearly nonexistent, in-person voter impersonation. It completely fails to address mail-in ballot fraud, for example. In my view, when a proposed solution to a problem

No. 17-40884

doesn't even target where the problem is most likely to arise, a claimed interest in solving that problem is, at best, illusory. *See supra* note 13.

## C

### 1

The majority is mistaken in claiming that ***the Plaintiffs*** bear the burden to show that S.B. 5 ***is not*** a sufficient remedy. Rather, it is Texas that bears the burden of proving that S.B. 5 ***is*** a sufficient remedy. This issue is foreclosed by the Supreme Court's decision in *United States v. Virginia*. There, the Court found unconstitutional Virginia's state policy of excluding women from the Virginia Military Institute. After it did so, it considered whether ***Virginia***, not the plaintiffs, had satisfied its burden to show that its proposed remedy was sufficient. *See Virginia*, 518 U.S. at 547–48 ("Having violated the Constitution's equal protection requirement, Virginia was obliged to show that its remedial proposal 'directly address[ed] and relate[d] to' the violation, *i.e.*, the equal protection denied to women ready, willing, and able to benefit from educational opportunities of the kind VMI offers." (citation omitted) (quoting *Milliken v. Bradley*, 433 U.S. 267, 282 (1977))); *see also Green*, 391 U.S. at 439 ("The burden on a school board today is to come forward with a plan that promises realistically to work, and promises realistically to work now.").[16] Here, it is Texas's statute that violates the Constitution; thus, it is Texas that must show that it has remedied the violation.

### 2

The majority attempts to bind the Plaintiffs to S.B. 5 because "no evidence was offered to show that the agreed interim remedy . . . was insufficient—and

---

[16] Nothing is so unique about school desegregation litigation that the teachings of those cases cannot reasonably be applied to discrimination affecting the right to vote, an equally invidious affront to constitutional rights.

46

No. 17-40884

that remedy served as the model for SB 5." *Ante* at 14. But two unique circumstances fundamental to the interim remedy's adoption cannot be neglected. First, the remedy was approved as a stop-gap measure with a presidential election only three months away. Second, at the time the interim remedy was implemented, this Court had found only that S.B. 14 had a discriminatory impact, so the remedy had to be formulated from the options available to remedy a discriminatory impact violation—not the broader options available to remedy a discriminatory purpose violation. Once the district court reaffirmed its discriminatory purpose finding, any justification behind continuing the interim remedy—or behind fashioning new legislation out of the interim remedy—fell away.

### 3

The majority claims that S.B. 5 cures all of S.B. 14's potential ills because the DRI's seven listed impediment options "cover every burden" alleged by the individual voter Plaintiffs. *Ante* at 5. But S.B. 5 does not fully remove the burden disproportionately placed on poor and minority voters; it just creates a new and different burden. The existence of the DRI may mean that the Plaintiffs—and others like them—no longer have to obtain one of S.B. 14's acceptable forms of photo ID before being permitted to vote. But in place of that burden, they must enter a separate line, fill out a separate declaration and state, under threat of a state jail felony for perjury, which of an exhaustive list of reasons explains *exactly* why they were unable to obtain one of the acceptable forms of photo ID. The district court saw the danger in this:

> Listing a limited number of reasons for lack of S.B. 14 [identification] is problematic because persons untrained in the law and who are subjecting themselves to penalties of perjury may take a restrictive view of the listed reasons. Because of ignorance, a lack of confidence, or poor literacy, they may be unable to claim an impediment to which

47

they are entitled for fear that their opinion on the matter would not comport with a trained prosecutor's legal opinion. Consequently, the failure to offer an "other" option will have a chilling effect, causing qualified voters to forfeit the franchise out of fear, misunderstanding, or both.

*Veasey IV*, 265 F. Supp. 3d at 695. And this danger is precisely why the Fourth Circuit rejected the North Carolina legislature's DRI remedy. The court explained that even if North Carolina could show that the remedy would lessen the discriminatory ***effect*** of the state's photo ID requirement, it was obliged to grant a complete remedy that would remove "***any lingering burden*** on African American voters." *N.C. State Conference*, 831 F.3d at 240 (emphasis added). Because the record failed to reflect that a reasonable impediment exception would "fully cure[] harm from the photo ID provision," the court did not entertain it. *Id.* If S.B. 5, in amending the discriminatory S.B. 14, does not "place persons unconstitutionally denied an opportunity or advantage in 'the position they would have occupied in the absence of [discrimination],'" and does not "eliminate [so far as possible] the discriminatory effects of the past' and . . . 'bar like discrimination in the future,'" then it should not be permitted to stand. *Virginia*, 518 U.S. at 547 (alterations in original) (quoting *Milliken*, 433 U.S. at 280, and *Louisiana v. United States*, 380 U.S. 145, 154 (1965)).

4

Next, the majority's reliance on both *Cotton v. Fordice*, 157 F.3d 388 (5th Cir. 1998), and *Chen v. City of Houston*, 206 F.3d 502 (5th Cir. 2000), for the proposition that the seemingly "race-neutral" alterations of S.B. 5 removed S.B. 14's discriminatory intent, is misplaced. In *Cotton*, we addressed a provision of the Mississippi Constitution, enacted in 1890, which was written intentionally to disenfranchise any person convicted of what were commonly considered to be "black" crimes: bribery, burglary, theft, arson, false pretenses, perjury, forgery,

embezzlement or bigamy. Miss. Const., art. XII, § 241 (1890); *see also Ratliff v. Beale*, 20 So. 865, 868 (Miss. 1896). Section 241 was amended in 1950 to remove burglary from the list of crimes and again in 1968 to add murder and rape (which were not considered to be "black" crimes). Both amendments involved, first, a deliberative process that required two-thirds votes of both houses of the state legislature and, second, assent of the majority of Mississippi voters to "the entire provision, including the revision." *Cotton*, 157 F.3d at 391–92. In light of that process, we explained that section 241 in its then-present form could be considered unconstitutional only if the amendments were themselves adopted with discriminatory purpose. But the plaintiff provided no evidence that the legislators and voters who "re-enacted" section 241 sixty and seventy-eight years, respectively, after it was first enacted were motivated by any such purpose. As a result, we held that the provision was not unconstitutional. *Id.*

In *Chen*, the City of Houston was required by ordinance to redraw its city council districts every two years. The 1991 redistricting plan was denied pre-clearance, and though the City never implemented the plan it drafted in response, which created additional concentrations of minorities, that draft plan formed the template for the 1993, 1995, and 1997 redistricting plans. The plaintiffs sued on the 1997 plan, arguing that race predominated over the City's drawing of districts. We acknowledged that while under *Hunter v. Underwood* "the discriminatory intent of the original drafter may carry forward despite subsequent judicial invalidation of the most obviously discriminatory provisions, intervening reenactment with meaningful alterations may render the current law valid." *Chen*, 206 F.3d at 521 (citing *Hunter*, 471 U.S. at 232–33). In rejecting the plaintiffs' claim, we relied on *Cotton*, which we stated "broadly stands for the important point that when a plan is reenacted—as opposed to merely remaining on the books like the provision in

No. 17-40884

*Hunter*—the state of mind of the reenacting body must also be considered." *Id.*

These cases seem to be the grounds upon which the majority found it unnecessary to address the district court's discriminatory intent finding. That is, the majority must have reasoned that any taint of S.B. 14 was cleansed simply because a new legislature passed new legislation. Not so.

Each of the three cases—*Cotton*, *Chen*, and the instant case—has a thread of discriminatory intent running through it. The passage of time and the actions of intervening parties cut that thread of intent in *Cotton*: two legislatures, acting eighteen years apart (with the first acting sixty years after the offending constitutional provision was enacted) approved the amendments by two-thirds majorities, and then the entire sections—not just the amendments—were subject to statewide votes in favor of full reenactment. The two-year redistricting ordinance cut the thread in *Chen*: whatever the City's intent vis-à-vis race predominance in 1991, the City was required to reenact the plan and redraw the districts with "meaningful alterations" in 1993, 1995, and 1997. 206 F.3d at 521.

Nothing cuts the thread of intent here. No passage of time cuts the thread: a mere six years passed between the enactment of S.B. 14 and the enactment of S.B. 5. No intervening parties cut the thread: the voters had no say, and many of the original legislators who passed S.B. 14 were still in office to pass S.B. 5. And no statutory reenactment requirement cut the thread: the State of Texas was not required to periodically enact voter ID legislation. In fact, what happened in the interim was that two federal courts ruled that S.B. 14 had a discriminatory impact on poor and minority voters, and the district court twice ruled that S.B. 14 was passed with a discriminatory purpose.

We need not consider the "state of mind of the reenacting body," as we did in *Chen*, because there is no reenacting body here. There was no reenactment.

50

No. 17-40884

Contrary to *Cotton*'s twice-reenacted constitutional provision and *Chen*'s thrice-reenacted redistricting plan, the 2017 Texas Legislature did not ***reenact*** S.B. 14, and S.B. 5 did not ***replace*** S.B. 14. The new legislation just added new provisions to the discriminatory framework of the former legislation—modifications which, as previously discussed, continue to burden the franchise of poor and minority voters. The old legislation "remain[s] on the books" and is still the law in Texas.

## 5

Finally, I disagree with the majority's determination that our decision in *Mississippi State Chapter, Operation PUSH, Inc. v. Mabus*, 932 F.2d 400 (5th Cir. 1991), should control here. On first blush, it might appear so, given that both that case and this involve legislative remediation of a statute found to violate the Voting Rights Act. In *Operation PUSH*, we explained that a district court "is precluded from substituting even what it considers to be an objectively superior plan for an otherwise constitutionally and legally valid plan that has been proposed and enacted by the appropriate state governmental unit," and it "must accept a plan offered by the local government if it does not violate statutory provisions or the Constitution." *Id.* at 406–07 (quoting *Seastrunk v. Burns*, 772 F.2d 143, 151 (5th Cir. 1985)); *accord Wise v. Lipscomb*, 437 U.S. 535, 540 (1978) (stating that a legislative remedy is "the governing law unless it, too, is challenged ***and found to violate*** the Constitution" (emphasis added)); *Westwego Citizens for Better Gov't v. City of Westwego*, 946 F.2d 1109, 1123 (5th Cir. 1991) ("[J]udicial relief becomes appropriate only when a legislature fails to reapportion according to federal constitutional requisites in a timely fashion after having had an adequate opportunity to do so." (quoting *White*, 412 U.S. at 794–95)). But it cannot be understated that *Operation PUSH* dealt only with legislation that was found to have had a discriminatory

51

No. 17-40884

*impact* under Section 2. Had the district court's sole finding here been that S.B. 14 had a discriminatory impact, then it *would* be required to wait, per *Operation PUSH*, for the legislative remedy to be given time to operate before it could determine that it too had a discriminatory impact. But there was no finding of discriminatory intent in *Operation PUSH* as there is here. In light of that finding, the district court need not have given S.B. 5 any time at all before acting.

### III

The district court did not take its duty here lightly. It scrutinized the provisions of S.B. 5 against the record to see whether that legislation could work as a proper remedy. *See Veasey IV*, 265 F. Supp. 3d at 691–97. That scrutiny correctly resulted in a finding that Texas failed to meet its burden on that issue. As in *North Carolina State Conference*, the record here "establishe[d] that the reasonable impediment exception amendment does not so fundamentally alter the photo ID requirement as to eradicate its impact or otherwise 'eliminate the taint from a law that was originally enacted with discriminatory intent.'" 831 F.3d at 240 (quoting *Johnson v. Gov'r of Fla.*, 405 F.3d 1214, 1223 (11th Cir. 2005) (en banc)). The only appropriate relief, then, was the relief the district court chose to impose—the invalidation of both S.B. 14 and S.B. 5.[17]

The scant changes implemented through S.B. 5 do not alter the district court's finding that S.B. 14 was enacted with a discriminatory purpose. Instead, S.B. 5 merely carries forward the discriminatory strain of its predecessor, and for that reason it should be quarantined. I would therefore find that the district

---

[17] To borrow from the Fourth Circuit's succinct conclusion, "If in the future the [Texas Legislature] finds that legitimate justifications counsel modification of its election laws, then the [Texas Legislature] can certainly so act. Of course, legitimate justifications do not include a desire to suppress [minority] voting strength." *N.C. State Conference*, 831 F.3d at 240.

No. 17-40884

court did not abuse its discretion in enjoining both S.B. 14 and S.B. 5. Because the majority does not do so, I respectfully dissent.

No. 17-40884

# APPENDIX

| S.B. 14 | S.B. 5 |
|---|---|
| (1) Provided the following list of "acceptable form[s] of photo identification" (all of which must be current or, if expired, must not have expired earlier than sixty days before presentation at the polls):<br><br>• Department of Public Safety–issued driver's license, or personal identification card<br>• U.S. military identification card with photograph<br>• U.S. citizenship certificate with photograph<br>• U.S. passport<br>• Department of Public Safety–issued license to carry a concealed handgun[1] | (1) Changed in three respects:<br><br>• Amended "United States passport" to "United States passport book or card"<br>• Acceptable forms of identification, if expired, must not have expired earlier than **four years** before presentation at the polls<br>• Persons age 70 or older may use acceptable form of identification that has been expired for any length of time, as long as identification is otherwise valid[2] |
| (2) Eliminated the following as acceptable forms of identification:<br><br>• Long-expired DPS–issued driver's license or personal identification card<br>• Driver's license or personal identification card issued from agency of another state (whether or not expired)<br>• Any other form of identification containing the person's photograph that establishes the person's identity | (2) Unchanged |

---

[1] S.B. 14 § 14.

[2] S.B. 5 § 5.

No. 17-40884

- A birth certificate or other document confirming birth that is admissible in the court of law and that establishes the person's identity
- Other U.S. citizenship papers
- Long-expired U.S. passport
- Official mail addressed to the person by name from a governmental agency
- Copy of a current utility bill, bank statement, government check, paycheck, or other government document that shows the voter's name and address of the voter
- Any other form of identification prescribed by the secretary of state[3]

| | |
|---|---|
| (3) Established Election Identification Certificate procedure[4] | (3) Unchanged |
| (4) Established requirement that voter must present valid photo ID to an election officer at polling place in order to vote[5] | (4) Unchanged, except as provided by Declaration of Reasonable Impediment procedure |
| (5) Established that a disabled voter seeking to be exempted from photo ID requirement must provide: <br> • Written documentation from the U.S. Social Security Administration evidencing the voter has been determined to | (5) Superseded by Declaration of Reasonable Impediment procedure |

---

[3] S.B. 14 § 14.
[4] *Id.* § 20.
[5] *Id.* § 9.

55

have a disability; or

- Written documentation from the U.S. Department of Veterans Affairs evidencing the voter has a disability rating of at least 50 percent; and
- A statement in a form prescribed by the secretary of state that the voter does not have an "acceptable" form of identification[6]

| | |
|---|---|
| (6) Established requirement that election officer determine whether voter's registered name and name on photo ID are "substantially similar" to each other[7] | (6) Unchanged |
| (7) Provided that if registered name and name on the photo ID are not deemed by election officer to be "substantially similar," or if the voter does not have the necessary photo ID, the voter may cast a provisional ballot that will be counted only if the voter, within six days of the election, goes to the voter registrar with additional documentation to verify his or her identity[8] | (7) Superseded in part by Declaration of Reasonable Impediment procedure (for voters who have approved documentation that allows them to complete a DRI) |
| (8) Directed secretary of state to "conduct a statewide effort to educate voters regarding the identification requirements"[9] | (8) Unchanged |

---

[6] *Id.* § 1.
[7] *Id.* § 9.
[8] *Id.*
[9] *Id.* § 5.

No. 17-40884

| | |
|---|---|
| (9) Directed county voter registrar to provide notice of the photo ID law when issuing registration certificates and post requirements in county clerk's office and online[10] | (9) Unchanged |
| | (10) Established Declaration of Reasonable Impediment procedure:<br>• If a voter does not have one of the "acceptable forms of identification," an election officer shall notify the voter that the voter may be accepted for voting if the voter has:<br>   ○ A government document showing voter's name and address (including voter's voter registration certificate)<br>   ○ A copy of a current utility bill that shows the name and address of the voter<br>   ○ A bank statement that shows the name and address of the voter<br>   ○ A government check that shows the name and address of the voter<br>   ○ A paycheck that shows the name and address of the voter<br>   ○ A certified copy of a domestic birth certificate or other document confirming birth that is admissible in a court of law and establishes the |

---

[10] *Id.* §§ 3 & 5.

person's identity

- The voter must execute a declaration attesting that he or she has a reasonable impediment to meeting the requirement to have one of the acceptable forms of identification
- The declaration must include a notice to the voter that he or she is subject to prosecution for perjury if he or she intentionally makes a false statement or provides false information on the declaration
- The voter must indicate one or more of a defined set of impediments:
  - Lack of transportation
  - Lack of birth certificate or other documents needed to obtain one of the acceptable forms of identification
  - Work schedule
  - Lost or stolen information
  - Disability or illness
  - Family responsibilities
  - Identification applied for but not received[11]

(11) Established criminal penalty (state jail felony) for voter who intentionally makes false statement or provides false information on Declaration of

---

[11] S.B. 5 §§ 2 & 5(b).

58

No. 17-40884

            Reasonable Impediment[12]

(12) Provided that secretary of state shall establish a program to provide mobile units to provide Election Identification Certificates[13]

---

[12] *Id.* § 3.
[13] *Id.* § 1.

# *United States Court of Appeals*

### FIFTH CIRCUIT
### OFFICE OF THE CLERK

LYLE W. CAYCE
CLERK

TEL. 504-310-7700
600 S. MAESTRI PLACE
NEW ORLEANS, LA 70130

June 19, 2018

United States Courts
Southern District of Texas
**FILED**

**JUN 1 9 2018**

David J. Bradley, Clerk of Court

Mr. David J. Bradley
Southern District of Texas, Corpus Christi
United States District Court
1133 N. Shoreline Boulevard
Corpus Christi, TX 78401-0000

    No. 17-40884    Marc Veasey, et al v. Greg Abbott, et al
                   USDC No. 2:13-CV-193
                   USDC No. 2:13-CV-263
                   USDC No. 2:13-CV-291
                   USDC No. 2:13-CV-348

Dear Mr. Bradley,

Enclosed is a copy of the judgment issued as the mandate and a
copy of the court's opinion.

                        Sincerely,

                        LYLE W. CAYCE, Clerk

                        *Sabrina B. Short*
                        By:
                        Sabrina B. Short, Deputy Clerk
                        504-310-7817

cc:
    Ms. Leah Camille Aden
    Ms. Anna Marks Baldwin
    Mr. J. Campbell Barker
    Mr. Neil G. Baron
    Mr. Gary Lynn Bledsoe
    Mr. Thomas Evans Chandler
    Ms. Lindsey Beth Cohan
    Mrs. Angela Veronica Colmenero
    Mr. Daniel Gavin Covich
    Mr. Armand G. Derfner
    Mr. Robert Wayne Doggett
    Mr. Kelly Patrick Dunbar
    Mr. Chad Wilson Dunn
    Ms. Tania Faransso

Mr. Thomas Molnar Fisher
Mr. Matthew Hamilton Frederick
Mr. Gregory Bryan Friel
Mr. Mark P. Gaber
Mr. Jose Garza
Mr. Bruce I. Gear
Mr. John Matthew Gore
Mr. Jon Marshall Greenbaum
Mr. J. Gerald Hebert
Mr. Scott A. Keller
Ms. Shoshana J. Krieger
Mr. Jason R. LaFond
Ms. Danielle Marie Lang
Mr. Jeffrey Carl Mateer
Ms. Cara McClellan
Ms. Janai S. Nelson
Mr. Jonathan Edward Paikin
Ms. Myrna Perez
Mr. Sidney Samuel Rosdeitcher I
Mr. Ezra D. Rosenberg
Mr. Deuel Ross
Mr. John Albert Smith III
Mr. Paul March Smith
Mr. Neil A. Steiner
Mr. Luis Roberto Vera Jr.
Ms. Michelle Yeary