## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| MARC VEASEY, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. 2:13-cv-193 (NGR) |
| | § | |
| GREG ABBOTT, *et al.*, | § | |
| | § | |
| Defendants. | § | |

### Private Plaintiffs' Motion and Memorandum of Law In Support of Motion for Attorneys' Fees and Costs

## I.      Preliminary Statement

Pursuant to 42 U.S.C. § 1988 ("Section 1988") and 52 U.S.C. § 10310(e), Private Plaintiffs move this Court for an award of attorneys' fees and costs.[1] In 2013, Private Plaintiffs brought this action seeking to enjoin Senate Bill 14 of 2011 ("SB 14") as a violation of Section 2 of the Voting Rights Act ("Section 2") and the U.S. Constitution. In 2016, following trial and several appeals, Private Plaintiffs prevailed on their claim that SB 14 violated Section 2 and this Court ordered appropriate relief. Private Plaintiffs' request seeks attorneys' fees for time reasonably spent on this case. As explained below, this time is billed at reasonable hourly rates that are recoverable in this district and are cabined to the time period of the litigation for which Private Plaintiffs are plainly the prevailing parties.

---

[1] Counsel for Plaintiffs conferred with counsel for Defendants, who indicated they oppose Private Plaintiffs' motion for fees and costs.

Due in part to the complexity of the case and in part to Texas's insistence on appealing at every level, the litigation resources dedicated to this lawsuit have been significant. This case has been pending for six years, including the production of thousands of documents, dozens of depositions, a nine-day bench trial, two appeals, an *en banc* appeal, and a petition for certiorari. As the first case to hold that a state voter photo ID law violated Section 2, it is unsurprising that this case required more resources than the ordinary case.[2] The expert analyses necessary for this case were complex and the "totality of the circumstances" analysis required proof of a broad sweep of factual issues. In light of the tremendous resources invested in this case, Private Plaintiffs have exercised very conservative billing in submitting their individual fee applications.  And although there were a number of private plaintiffs groups involved in this case,[3] Private Plaintiffs achieved efficiencies by coordinating their activities among each other and with the Department of Justice ("DOJ"). Accordingly, the Motion should be granted and Private Plaintiffs should be awarded their attorneys' fees and costs, as outlined in their individual fee applications.

---

[2] Although this case was unique in some respects, Texas should not have been surprised by its legal liability for enacting SB 14 under Section 2. The Legislature was advised by counsel during the legislative process that the law would disproportionately impact racial minority voters and, thus, raise concerns under the Voting Rights Act. *Veasey,* 830 F.3d at 236. Moreover, at the time of passage, SB 14 also violated Section 5 of the Voting Rights Act. *See Texas v. Holder*, 888 F. Supp. 2d 113 (D.D.C. 2012).

[3] The number of plaintiffs is in part due to the consolidation of this case with *United States v. Texas*, No. 2:13-cv-263, early in the proceedings.  ECF No. 14.

## II.    Factual and Procedural Background

In 2011, Texas (the "State") passed Senate Bill 14 ("SB 14"), which required individuals to present one of a limited set of acceptable forms of photo identification to vote. *See* Act of May 16, 2011, 82d Leg., R.S., ch. 123, 2011 Tex. Gen. Laws 619. SB 14 was initially blocked by the Voting Rights Act's preclearance mechanism. *See Texas v. Holder*, 888 F. Supp. 2d 113 (D.D.C. 2012). On June 25, 2013, after the Supreme Court decided *Shelby County, Alabama v. Holder*, Texas began enforcing SB 14. Shortly thereafter, Private Plaintiffs filed this action challenging the law under the First, Fourteenth, Fifteenth, and Twenty-Fourth Amendments to the United States Constitution and the Section 2 Voting Rights Act of 1965.[4] Private Plaintiffs alleged, *inter alia*, that SB 14 was enacted with a racially discriminatory purpose, had racially discriminatory results, placed an undue burden on the fundamental right to vote, and constituted a poll tax.

After a nine-day bench trial featuring both live and deposition testimony from dozens of expert and lay witnesses, this Court issued a comprehensive opinion holding:

> SB 14 creates an unconstitutional burden on the right to vote [under the First and Fourteenth Amendments], has an impermissible discriminatory effect against Hispanics and African-Americans [under Section 2], and was imposed with an unconstitutional discriminatory purpose [in violation of the Fourteenth and Fifteenth Amendments and Section 2]. [SB 14 constitutes an unconstitutional poll tax [in violation of the Fourteenth and Twenty-Fourth Amendments].

---

[4] Although they brought differing legal theories, all Private Plaintiffs raised a common Section 2 discriminatory results cause of action and prevailed on that claim, thus achieving their common goal of enjoining SB 14 from enforcement against voters without the requisite ID.

3

*Veasey v. Perry*, 71 F. Supp. 3d 627, 633 (S.D. Tex. 2014) (footnote omitted). Pursuant to that opinion, the Court entered "a permanent and final injunction against enforcement of the voter identification provisions" of SB 14 and directed the State to "return to enforcing the voter identification requirements for in-person voting in effect immediately prior to the enactment and implementation of SB 14." *Id.* at 707.

Texas appealed that decision to the Fifth Circuit. The Fifth Circuit panel affirmed this finding that SB 14 had discriminatory results in violation of Section 2 and remanded for consideration of the proper remedy. *Veasey v. Perry*, 796 F.3d 490, 493, 498 (5th Cir. 2014). The State filed a petition for rehearing en banc, which was granted. *Veasey v. Abbott*, 815 F.3d 958 (5th Cir. 2016) (granting rehearing en banc). Upon rehearing, the full Fifth Circuit again affirmed this Court's finding that SB 14 violated Section 2 because of its discriminatory results and remanded to this Court to determine the appropriate remedy. *Veasey v. Abbott*, 830 F.3d 216, 272 (5th Cir. 2016) (en banc decision). It also vacated the discriminatory intent finding and remanded for this Court to reweigh the evidence regarding that finding. *Id.* at 230. On September 23, 2016, the State filed a petition for a writ of certiorari before the U.S. Supreme Court. Private Plaintiffs opposed that petition, and on January 23, 2017, the Supreme Court denied the petition.

On August 10, 2016, following the instructions of the full Fifth Circuit, this Court ordered interim relief for the November 8, 2016 election (as well as prior and subsequent state and local elections) directing, *inter alia*, the state and its election officials to accept several forms of identification in addition to those mandated by SB

4

14 upon the completion and signing of a reasonable impediment declaration by the voter. This relief remained in place until SB 14 was amended to largely incorporate this Court's interim relief into state law. The Fifth Circuit held that this amendment did not moot the case but, by "essentially mirror[ing the] agreed interim order," constituted an acceptable remedy under the Fifth Circuit's 2016 ruling that SB 14 violated Section 2. *Veasey v. Abbott*, 888 F.3d 792, 804 (5th Cir. 2018).

## III.   Argument

### A.   Private Plaintiffs are Entitled to an Award of Attorneys' Fees as Prevailing Parties in a Voting Rights Act Case

Section 10310, the Voting Rights Act enforcement provision states, in relevant part: "In any action or proceeding to enforce the voting guarantees of the fourteenth or fifteenth amendment, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee, reasonable expert fees, and other reasonable litigation expenses as part of the costs." 52 U.S.C. § 10310(e).[5] To qualify as a prevailing party, a civil rights plaintiff must obtain at least some relief on the merits; an injunction or declaratory judgment suffices to show that a party has prevailed. *See Farrar v. Hobby*, 506 U.S. 103, 111-12 (1992); *Lefemine v. Wideman,* 133 S.Ct. 9, 11 (2012). The Fifth Circuit has recognized three requirements for prevailing party attorneys' fees: "the plaintiff must (1) obtain actual relief, such as an

---

[5] Because the Voting Rights Act attorneys' fees provision and Section 1988 are similar in "language and purpose," the Fifth Circuit has held that they should be "identically construed." *See Davis v. Abbott*, 781 F.3d 207, 213 n.6 (5th Cir. 2015). Therefore, in this brief, Private Plaintiffs rely on precedent based on Section 1988 as well as the Voting Rights Act.

enforceable judgment or a consent decree; (2) that materially alters the legal relationship between the parties; and (3) modifies the defendant's behavior in a way that directly benefits the plaintiff at the time of the judgment or settlement." *Walker v. City of Mesquite*, 313 F.3d 246, 249 (5th Cir. 2002) (interpreting *Farrar*, 506 U.S. 103).

There can be no dispute that Private Plaintiffs are prevailing parties under these standards. Private Plaintiffs successfully obtained a finding of liability in their favor that led to the issuance of this Court's interim remedial order. That interim relief was implemented during the 2016 general election and subsequent elections. Private Plaintiffs also successfully opposed Defendants' petition for certiorari at the United States Supreme Court. *Abbott v. Veasey*, 137 S.Ct. 612 (Mem.) (2017) (denying cert.). That interim relief remained in place until the Texas Legislature implemented an ID law in 2018 that incorporated aspects of the interim remedial relief ordered by this Court.

Indeed, this case was dismissed only because the Fifth Circuit found that the Legislature's passage in 2017 of Senate Bill 5 ("SB 5"), specifically characterized by the Legislature as a legislative implementation of the interim remedial order, provided a complete remedy for the Section 2 violations. Significantly, the Fifth Circuit, as did this Court, rejected Texas's argument that the case was moot. Fifth Circuit precedent unequivocally supports an award of attorneys' fees under these circumstances. In *Dearmore v. City of Garland*, the Fifth Circuit upheld an attorneys' fee award where "the district court's grant of the preliminary injunction directly

6

caused the City to amend the offending portion of the Ordinance." 519 F.3d 517, 525 (5th Cir. 2008) ("[The City amended the law] *in direct response to* the district court's preliminary injunction order. There is an obvious and direct causal link between the district court's issuance of the preliminary injunction and the City's subsequent amendment of the Ordinance . . ." (emphasis in original)); *see also Black Heritage Soc. v. City of Houston*, No. CIVA H-07-0052, 2008 WL 2769790, at *5 (S.D. Tex. July 11, 2008) ("The TRO was issued based on the finding that the plaintiffs had 'a substantial likelihood of success on the merits of their claims.' . . . The plaintiffs prevailed on their challenge to the arbitration provision of the parade ordinance under *Dearmore*. That the City subsequently voluntarily amended this provision does not negate the plaintiffs' prevailing party status on this issue." (citing *Dearmore*, 519 F.3d at 521)).

As in *Dearmore*, Texas plainly amended SB 14 *in direct response* to this Court's remedial order. Defendants' Brief on Remedies, Doc. 1049 (July 15, 2017) ("The reasonable-impediment procedure added to Texas law by SB 5 is virtually identical to the agreed reasonable-impediment procedure of the interim remedy order, and SB 5 remedies any alleged disparate impact of SB 14's photo-ID requirement."). Moreover, in this case, Texas did not do so after a preliminary ruling but rather only after this Court held a trial, issued a decision on the merits, and ordered relief for the Section 2 violation, and only after Texas had exhausted *every avenue of potential appeal* of the Section 2 liability finding, including *en banc* review and a petition for certiorari. Private Plaintiffs are plainly prevailing parties.

Private Plaintiffs have properly limited the scope of their attorneys' fees to the stages of the action wherein Private Plaintiffs were the prevailing party. Within that time period, Plaintiffs committed years of resources to this litigation—from the filing of the first complaint on June 16, 2013[6] through the entry, monitoring, and enforcement of this Court's interim remedial order—to obtain the relief that now entitles them to attorneys' fees.[7] Beyond this Court's entry of the 2016 interim remedial order, Private Plaintiffs seek their attorneys' fees and costs for the tasks related to: (1) litigating this case through the denial of Texas's petition for certiorari from the *en banc* decision; (2) negotiating, implementing, and monitoring the 2016 interim remedial order; 3) time spent defending against Texas's unwarranted 2018 "motion to dismiss," which asked this Court to re-litigate merits' determinations and overturn the Fifth Circuit's ruling on mootness, Doc. 1107,[8] and/or (4) the instant attorneys' fees motion.

---

[6] Private Plaintiffs note that they have not sought their attorneys' fees for time spent on discovery in the prior 2012 preclearance case, on which Private Plaintiffs relied heavily (and therefore did not replicate in this case). Absent this prior record, Private Plaintiffs would have had to create that record in this case. Under the Fifth Circuit's rule allowing compensation for "work that [is] both useful and of a type ordinarily necessary to advance the civil rights litigation," that time should be compensable. *See Webb v. Board of Educ. of Dyer Cnty, Tenn.,* 471 U.S. 234, 243 (1985). Nonetheless, given the sizeable resources committed in this lengthy litigation alone, Private Plaintiffs have declined to include that time in their request.

[7] Private Plaintiffs' have *not* included time spent on this Court's second discriminatory intent determination in 2017 or the challenge to SB 5 as an adequate remedy.

[8] This Court correctly declined that invitation and merely acknowledged that the Fifth Circuit's most recent opinion ended all outstanding merits and remedial questions in the case. ECF No. 1125.

As is common in most cases, Private Plaintiffs advanced several legal theories for the relief they sought. And although Private Plaintiffs did not achieve distinct judicial relief for *every* cause of action that they brought—indeed, the Fifth Circuit found it unnecessary to reach every legal claim[9]—all of Plaintiffs legal theories were aimed at the relief they obtained: an injunction against SB 14. Therefore, Private Plaintiffs are entitled to attorneys' fees incurred from filing until the entry of the interim remedial order and its enforcement, as well as fees resulting from the subsequent work to defend that victory.  The Supreme Court has held that, while work on entirely unrelated unsuccessful claims "based on different facts and legal theories" is not compensable, legal work on *related* legal theories seeking similar relief is compensable even if not all the distinct theories are successful. *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983). The Court explained in *Hensley* that civil rights cases often involve several claims "involv[ing] a common core of facts" or "based on related legal theories," and as such "[m]uch of counsel's time will be devoted generally to the litigation as a whole." *Id.* at 435. "Such a lawsuit cannot be viewed as a series of discrete claims." *Id.*

This case is "such a lawsuit." All of Private Plaintiffs' claims had one goal: ensuring that SB 14 does not disenfranchise eligible Texas voters. The legal theories were intrinsically intertwined and interdependent. Indeed, given the nature of the "totality of the circumstances" analysis under Section 2, nearly all of the evidence

---

[9] *See Veasey*, 830 F.3d at 265 (applying the doctrine of constitutional avoidance and declining to decide the First and Fourteenth Amendment claims).

relevant to other claims was also relevant to the Section 2 claim. For example, evidence of the cost of obtaining an SB 14 compliant ID was necessary to the Veasey Plaintiffs' poll tax claim but was also relevant to the analysis under all Private Plaintiffs' discriminatory results claim. *See Veasey,* 830 F.3d at 254 (noting the "cost of underlying documents necessary to obtain an EIC or other SB 14 ID"), as was the evidence of the burden on voters that supported the First and Fourteenth Amendment claims. *Id.* [10] Likewise, the evidence presented on the issue of discriminatory intent was plainly relevant to several *Gingles* factors including history of official discrimination, racially polarized voting, effects of past discrimination, responsiveness to the needs of minority voters, and the tenuousness of the policies underlying SB 14.   *Id.* at 257-264 (analyzing *Gingles* factors); *see Thornburg v. Gingles,* 478 U.S. 30 (1986). Because Private Plaintiffs' claims were based on a common set of facts and sought a singular goal—which they largely achieved—any attempt to reduce their recovery of attorneys' fees based on parsing which precise claims prevailed is contrary to Supreme Court precedent.

Instead, "[w]here a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee," including "all hours reasonably expended on the litigation." *Hensley*, 461 U.S. at 435. Private Plaintiffs have obtained "excellent results." *Id.* Prior to this litigation, over 600,000 registered voters—disproportionately Black and Latino voters—did not have the required photo ID to

---

[10] *Id.* at 830 F.3d at 265 (dismissing the First and Fourteenth Amendment claims because the Section 2 relief will provide "the same relief [Plaintiffs] could access if they prevailed on" these constitutional claims).

cast a ballot and were at risk of being disenfranchised by SB 14. As a result of Private Plaintiffs' hard-fought success in this litigation, *no* eligible voter can be turned away from the polls because they lack the required ID pursuant to SB 14. *See* Texas Brief on Remedies, Doc. 1049 at 8 (arguing that "a reasonable impediment procedure is a complete remedy).[11]

Private Plaintiffs' efforts in this case directly resulted in judicial action that provided a remedy that addressed the discriminatory results of SB 14 and provided access to the ballot for hundreds of thousands of eligible Texas voters. Accordingly, this Court should find that Private Plaintiffs are prevailing parties and are therefore entitled to their attorneys' fees and expenses under the Voting Rights Act.

### B. Private Plaintiffs' Requested Attorneys' Fees Are Reasonable Under the Lodestar Method

Applications for attorneys' fees in the Fifth Circuit are analyzed using the "lodestar" method, a multi-step analysis to determine (1) the reasonable hourly rate for the attorneys who worked on the case; (2) the number of hours reasonably expended on the litigation by each attorney; and (3) adjustment of the amount based on a number of relative factors. *See Rouse v. Target Corp.*, 181 F. Supp. 3d 379, 384 (S.D. Tex. 2016). The court begins by establishing the reasonable hourly rates and the number of hours reasonably expended; the court then calculates the "lodestar"

---

[11] Although Private Plaintiffs argued for a broader remedy on the basis of their discriminatory intent claims—the striking of SB 14 in its entirety—Private Plaintiffs have always recognized that the reasonable impediment declaration option is a crucial victory for Texas voters. Private Plaintiffs would not have *agreed* to the interim order—and this Court would not have approved it—were it not a meaningful remedy for the Section 2 violation.

amount by multiplying the reasonable hourly billing rate for each attorney by the number of hours reasonably expended on the litigation by that attorney. *Rouse*, 181 F. Supp. 3d at 384; *Heidtman v. Cnty. of El Paso*, 171 F.3d 1038, 1043 (5th Cir. 1999).

After calculating the lodestar, the court may enhance or decrease the amount of fees based on the relative weights of the twelve factors set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974). The lodestar amount is "presumptively reasonable and should only be modified in exceptional cases." *Rouse*, 181 F. Supp. 3d at 384 (citing *Watkins v. Fordice*, 7 F.3d 453, 457 (5th Cir. 1993)).

### 1. Private Plaintiffs' Requested Hourly Rates are Reasonable and Consistent with the Prevailing Market Rate for Similar Services in the Community.

As the first step in the process, a court in this circuit must determine the reasonable hourly rate for the work performed on the matter. *Rouse*, 181 F. Supp. 3d at 384. A party seeking attorneys' fees bears the burden of justifying the reasonableness of its requested hourly rate. *Blum v. Stenson*, 465 U.S. 886, 895 n. 11 (1984). The reasonable hourly rate is established by showing the "prevailing market rate for similar services by similarly situated trained and experienced lawyers in the relevant legal community." *Rouse*, 181 F. Supp. 3d at 384; *see also Heidtman*, 171 F.3d at 1043 (A reasonable hourly rate should accord with rates "prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation"). "The hourly fee awarded must be supported by the record[.]" *League of United Latin Am. Citizens v. Roscoe I.S.D.*, 119 F.3d 1228, 1234 (5th Cir. 1997).

12

In order to provide the Court with a consistent matrix for awarding attorneys' fees to Private Plaintiffs' counsel, Private Plaintiffs sought to identify a publicly available matrix based on years of experience that corresponded with prevailing rates in the San Antonio market. Private Plaintiffs determined that the rates published by the United States Attorneys' Office meet those requirements.[12]

| | |
|---|---|
| 31+ years | 613 |
| 21-30 years | 572 |
| 16-20 years | 544 |
| 11-15 years | 491 |
| 8-10 years | 417 |
| 6-7 years | 358 |
| 4-5 years | 351 |
| 2-3 years | 340 |
| Less than 2 years | 307 |
| Paralegals & law clerks | 166 |

The official USAO matrix is attached as Exhibit A and available at https://www.justice.gov/usao-dc/file/796471/download. Private Plaintiffs used the rates identified by the USAO for 2018-2019[13] and applied them to the years of

[12] The official USAO matrices for the relevant years are attached as Exhibit A.
[13] The Supreme Court has held that the application of current, rather than historic, hourly rates is appropriate to fully compensate counsel in multi-year cases given the time value of money. *Missouri v. Jenkins by Agyei,* 491 U.S. 274, 283–84 (1989)("Clearly, compensation received several years after the services were

experience of counsel for Private Plaintiffs at the time of the case event. For example, an attorney who graduated in 2013 would apply the "less than two years" rate for worked performed May 2013-May 2015, and apply the 2-3 year rate for work performed May 2015-May 2017.

This matrix was chosen because it provides a consistent basis for applying fees to Private Plaintiffs' counsel based on years of experience *and* accords with local market rates. *See* Declaration of Billy Edwards. These rates fall well within the range accepted by this Court as reasonable market rates in this district. *See, e.g., Rouse*, 181 F. Supp. 3d at 385 (awarding hourly rates of $500 for lead attorney and $300 for associate attorney); *Jane Roe/Rachel V. Rose v. BCE Tech. Corp.*, No. 4:12–CV–1621, 2014 WL 1322979, at *3 (S.D. Tex. Mar. 28, 2014) (awarding hourly rates of $475, $420, $350, and $65 for attorneys based on respective experience, areas of expertise, and prevailing rates in the area); *Preston Exploration Company, LP v. GSP, LLC*, No. H–08–3341, 2013 WL 3229678, at *5–6 (Jun. 25, 2013) (awarding hourly rates of $250–600 for partners, $185–440 for associates, and $90–145 for legal assistants); *Whitney Bank v. Hancock*, No. H–11–2164, 2013 WL 1404822, at *3–5 (S.D. Tex. Apr. 5, 2013) (awarding hourly rates of $450-530 for partners, $255-380 for associates, and $195-215 for paralegals). These rates fall below the market rates in New York and

---

rendered—as it frequently is in complex civil rights litigation—is not equivalent to the same dollar amount received reasonably promptly as the legal services are performed, as would normally be the case with private billings. We agree, therefore, that an appropriate adjustment for delay in payment—whether by the application of current rather than historic hourly rates or otherwise—is within the contemplation of the statute.").

Washington, D.C. (where many of Private Plaintiffs' counsel practice) as well as the rates in the commonly used adjusted Laffey matrix. *See* Laffey Matrix, http://www.laffeymatrix.com/see.html. Private Plaintiffs' counsel do not concede that they are not entitled to their full market rate,[14] and Private Plaintiffs' counsel only seek these lower rates in this specific matter.

## 2. Private Plaintiffs Have Established a Reasonable Number of Hours Billed and Exercised Billing Judgment

A court must also determine the reasonable number of hours that the attorneys spent on the case by reviewing the attorneys' time records. *Alberti v. Klevenhagen*, 896 F.2d 927, 930 (5th Cir. 1990), *vacated in part on other grounds*, 903 F.2d 352 (5th Cir. 1990). When analyzing counsel's time, the court should consider whether the attorneys demonstrated proper billing judgment by "writing off unproductive, excessive, or redundant hours." *Walker v. U.S. Dep't of Housing & Urban Dev.*, 99 F.3d 761, 769 (5th Cir. 1996).

Each group of Private Plaintiffs' counsel will submit its own fee application using the agreed upon rates and applying them to their reasonable hours spent on the litigation. While each fee application will discuss billing judgment in greater detail, all counsel exercised substantial billing judgment in their requested fees. In

---

[14] Indeed, Texas is on notice of the ordinary hourly rates of attorneys in this matter. In 2014, in *Texas v. United States,* the district court awarded J. Gerald Hebert a rate of $650 per hour. 49 F. Supp. 3d 27 (D.D.C. 2014). The D.C. Court of Appeals upheld that award. *Texas v. United States,* 798 F.3d 1108 (2015). In conformance with the parties' agreement to seek fees on a consistent basis based on years of experience, Mr. Hebert is only seeking $613 per hour for his work on this case.

particular, Private Plaintiffs' counsel sought to eliminate duplication from their time entries given the large number of counsel involved.

The time spent on this case was reasonably and necessarily incurred. Not only did the Private Plaintiffs coordinate their efforts amongst themselves and with DOJ to reduce inefficiencies, but they also added necessary evidentiary proofs that were essential to the Court's determination—upheld by the *en banc* court and the basis for the interim remedial order—that SB 14 violated the Section 2 results prong.  These include the plaintiff and third-party witnesses, upon which this Court heavily relied in reaching its "results" ruling, such as Gordon Benjamin, 71 F. Supp. 3d at 671, Sammie Lee Bates, *id.* at 665, Elizabeth Gholar, *id.* at 670, 690, Imani Clark, *id.* at 667, 673, and Margarito and Maxima Lara, *id.* at 669-70. It also includes experts such as Dr. Michael Herron, whose separate analysis of databases was important corroboration of DOJ's expert Stephen Ansolabehere, *id.* at 662-63;  Drs. Matthew Barreto and Gabriel Sanchez, whose survey of voters provided further corroboration of both Drs. Herron and Ansolabehere, but from a completely different expert perspective, *id.*; Dr. Vernon Burton, whose testimony as to the "totality of the circumstances" factors such as Texas's record of voting discrimination, racially polarized voting, and racial appeals was extensively cited by this Court, *id.* at 633-35; Dr. Lorraine Minnite, whose analysis regarding the paucity of in-person voter impersonation fraud was also extensively cited by this Court, *id.* at 640; Dr. Daniel Chatman and Coleman Bazelon, whose detailed analyses of the travel burdens on minority voters to get SB 14-compliant ID was also heavily relied upon by this Court

16

in reaching its decision of discriminatory impact, *id.* at 672;  Dr. Allan Lichtman, *id.* at 700 and George Korbel, *id.* at 637-38, who extensively addressed both the Section 2 Senate factors, and the history of discrimination in Texas, essential to this Court's Section 2 findings. And it included important fact witnesses, such as numerous legislators (Ana Hernandez-Luna, *id.* at 654-55, Martinez-Fischer, *id.* at 656, and Marc Veasey, *id.*) who testified as to the effect of SB 14; Councilman David Guzman, *id.* at 663-64, and social worker Kristina Mora, *id.* at 675, who testified as to the difficulties that minority voters faced because of SB 14; and the Reverend Peter Johnson, whose testimony on the continuing racial discrimination in voting in Texas this Court quoted in the opening of its opinion:

> This uncontroverted and shameful history was perhaps summed up best by Reverend Peter Johnson, who has been an active force in the civil rights movement since the 1960s. 'They had no civil rights towns or cities in the State of Texas because of the brutal, violent intimidation and terrorism that still exists in the State of Texas; not as overt as it was yesterday. But east Texas is Mississippi 40 years ago.'

*Id.* at 633.

The presentation of this evidence was carefully coordinated both among Private Plaintiffs and with the DOJ.  Much of the evidence was presented by Private Plaintiffs, who presented 42 witnesses compared to DOJ's 13 witnesses. Private Plaintiffs' evidence was rarely redundant and, judging from this Court's opinion, essential to the final result.  To the extent the evidence appeared in any way to be cumulative, this was in response to the State's continual insistence that SB 14 had no discriminatory effect (or effect at all on voters' access to the ballot). *See Veasey*, 830 F.3d at n. 49 ("Before the panel that initially heard this case, the State made an

even bolder claim—that the Plaintiffs 'failed to show that SB 14 prevented a single person from voting.' This claim is demonstrably false, as the experiences of Plaintiffs Floyd Carrier and Sammie Louise Bates show, see infra."). The mountain of testimony was necessary to refute Texas's baseless assertions.

This case had a significant impact on over 600,000 Texans' access to the ballot. The district court and appellate briefing covered multiple complex issues including sophisticated data analysis, the proper standard for Section 2 in vote denial cases, and an analysis of the "totality of the circumstances" including Texas's history of discrimination and the effects of that history of discrimination. Texas's defenses were broad, including an attack on the constitutionality of Section 2 as applied in this case, and required substantial rebuttal. Defendants expended considerable resources to defend SB 14; the time and resources spent by Private Plaintiffs to extensively research and vigorously litigate this case were both reasonable and justified.[15] After multiple appeals by Texas that resulted in multiple trips to the Fifth Circuit and Supreme Court, Private Plaintiffs prevailed in their claim that SB 14 violated Section 2 of the Voting Rights Act. This merits ruling was the first of its kind at the appellate level.

---

[15] Over the course of this litigation, 16 attorneys entered appearances in this Court on behalf of the State. In large part due to Texas's obstruction of discovery and resistance to a streamlined litigation process, this case had over 600 docket entries between the time of its filing in 2013 and when this Court entered its initial determination on the merits in 2014. By the time that the State abandoned its defense of SB 14 in June 2017, there were more than 1,000 docket entries.

This Court should find that the time expended by Private Plaintiffs' counsel was reasonable.

### 3. The *Johnson* Factors Confirm that the Requested Fee is Fair and Reasonable

After the lodestar amount has been established, the court may adjust the amount based on consideration of the *Johnson* factors: (1) the time and labor required to represent the client or clients; (2) the  novelty and difficulty of the issues in the case; (3) the skill required to perform the legal services properly; (4) the preclusion of other employment by the attorney; (5) the customary fee charged for those services in the relevant community; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or circumstances; (8) the amount involved and results obtained; (9) the experience, reputation, and ability of the attorney; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. 488 F.2d at 717–19.

 "Of the *Johnson* factors, the court should give special heed to the time and labor involved, the customary fee, the amount involved and the result obtained, and the experience, reputation and ability of counsel." *Saizan v. Delta Concrete Prods. Co.*, 448 F.3d 795, 800 (5th Cir. 2006). The most important factor to consider is the result obtained. *Giles v. GE*, 245 F.3d 474, 491 n.31 (5th Cir. 2001). Applying the *Johnson* factors, the Court should find that the requested award is fair and reasonable, and that no further reduction is necessary.

Here, Private Plaintiffs were successful in challenging SB 14 at both the district court and appellate levels, and secured relief for all Texan voters in advance

of the 2016 general election and for future elections. As a result, hundreds of thousands of eligible Texan voters were able to exercise their right to vote and cast ballots.

Analysis of the remaining *Johnson* factors supports Private Plaintiffs' fee request. As counsel's billing records show, significant time and labor were involved in this case. As discussed above, the importance of the case and the complexity of the issues required Private Plaintiffs' counsel to expend substantial time to ensure that every issue was carefully researched and presented; however, Private Plaintiffs have also been judicious in reducing the number of hours requested. The Fifth Circuit has stated that a *Johnson* factor already incorporated in the lodestar calculation should not be considered a second time. *Saizan*, 448 F.3d at 800. Private Plaintiffs have already considered the time and labor expended, experience of counsel, and complexity of the case in determining their lodestar amount; however, should the Court reduce the hourly rates or the total hours in the lodestar calculation, those factors would then weigh in favor of an increased award.

### C. The Court Should Award Private Plaintiffs Their Costs

As the prevailing party in this case, Private Plaintiffs are not limited to the costs set forth in 28 U.S.C. § 1920. "All reasonable out-of-pocket expenses, including charges for photocopying, paralegal assistance, travel, and telephone, are plainly recoverable . . . because they are part of the costs normally charged to a fee-paying client." *Associated Builders & Contractors of Louisiana, Inc. v. Orleans Parish School Bd.*, 919 F.2d 374, 380 (5th Cir. 1990).

Accordingly, Private Plaintiffs will submit their costs in their individual fee applications. The bulk of costs requested were incurred for expert witnesses, court costs, and travel by counsel to conduct discovery and appear in this Court and the Fifth Circuit. The remaining costs include filing fees, courier services, printing and copying costs, and other similar costs customarily charged to paying clients. Consequently, Private Plaintiffs are entitled to recover them under the Voting Rights Act.

## IV.  Conclusion

For the foregoing reasons, Private Plaintiffs respectfully request that this Court award their requested attorneys' fees and costs.

Respectfully submitted,

/s/ J. Gerald Hebert
J. GERALD HEBERT
DANIELLE M. LANG
Campaign Legal Center
1411 K Street NW Suite 1400
Washington, DC 20005

CHAD W. DUNN
K. SCOTT BRAZIL
BRAZIL & DUNN
4201 Cypress Creek Pkwy., Suite 530
Houston, Texas 77068

ARMAND G. DERFNER
Derfner & Altman
575 King Street, Suite B
Charleston, S.C. 29403

NEIL G. BARON
Law Office of Neil G. Baron
914 FM 517 W, Suite 242
Dickinson, Texas 77539

21

DAVID RICHARDS
Richards, Rodriguez & Skeith, LLP
816 Congress Avenue, Suite 1200
Austin, Texas 78701

*Counsel for Veasey/LULAC Plaintiffs*

/s/ Lindsey B. Cohan
JON M. GREENBAUM
EZRA D. ROSENBERG
BRENDAN B. DOWNES
Lawyers' Committee for
Civil Rights Under Law
1401 New York Avenue NW Suite 400
Washington, D.C. 20005
WENDY WEISER
MYRNA PÉREZ
The Brennan Center for Justice at NYU Law
School
120 Broadway, Suite 1750
New York, New York 10271

SIDNEY S. ROSDEITCHER
Paul, Weiss, Rifkind, Wharton & Garrison
LLP
1285 Avenue of the Americas
New York, New York 10019-6064

LINDSEY B. COHAN
Dechert LLP
500 W. 6th Street, Suite 2010
Austin, Texas 78701

NEIL STEINER
DECHERT LLP
1095 Avenue of the Americas
New York, New York 10036-6797

JOSE GARZA
Law Office of Jose Garza
7414 Robin Rest Drive
San Antonio, Texas 98209

DANIEL GAVIN COVICH
Covich Law Firm LLC
802 N Carancahua, Ste 2100
Corpus Christi, Texas 78401

GARY BLEDSOE
Potter Bledsoe, LLP
316 W. 12th Street, Suite 307
Austin, Texas 78701

VICTOR GOODE
NAACP
4805 Mt. Hope Drive
Baltimore, Maryland 21215

ROBERT NOTZON
The Law Office of Robert Notzon
1502 West Avenue
Austin, Texas 78701

*Counsel for the Texas State Conference of NAACP Branches and the Mexican American Legislative Caucus of the Texas House of Representatives*

/s/ Leah Aden
SHERRILYN IFILL
JANAI NELSON
LEAH C. ADEN
DEUEL ROSS
NAACP Legal Defense and Educational Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006

JONATHAN PAIKIN
KELLY P. DUNBAR
TANIA FARANSSO
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006

*Counsel for Imani Clark*

23

LUIS ROBERTO VERA, JR.
Law Office of Luis Roberto Vera Jr.
111 Soledad, Ste 1325
San Antonio, TX 78205

*Counsel for LULAC*

/s/ Rolando L. Rios
ROLANDO L. RIOS
115 E. Travis, Suite 1645
San Antonio, Texas 78205

*Counsel for the Texas Association of Hispanic
County Judges and County Commissioners*

/s/ Robert W. Doggett
ROBERT W. DOGGETT
SHOSHANA J. KRIEGER
Texas RioGrande Legal Aid
4920 N. IH-35
Austin, Texas 78751

JOSE GARZA
Texas RioGrande Legal Aid
1111 N. Main Ave.
San Antonio, Texas 78212

*Counsel for Lenard Taylor, Eulalio Mendez
Jr., Lionel Estrada, Estela Garcia Espinoza,
Margarito Martinez Lara, Maximina
Martinez Lara, and La Union Del Pueblo
Entero, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 11, 2019, a true and correct copy of the foregoing document was served via the Court's ECF system to all counsel of record.


<u>/s/ J. Gerald Hebert</u>
Counsel for Plaintiffs