**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| MARC VEASEY, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. 2:13-cv-193 (NGR) |
| | § | |
| GREG ABBOTT, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**Private Plaintiffs' Consolidated Reply Brief
in Support of Motion for Attorneys' Fees, Costs, and Expenses**

Private Plaintiffs respectfully submit this consolidated reply brief addressing the generally applicable issues raised in State Defendants' opposition brief. Each plaintiff group is simultaneously filing individual submissions addressing issues specific to them.

**ARGUMENT**

**I.    PLAINTIFFS ARE PREVAILING PARTIES.**

Private Plaintiffs are prevailing parties entitled to a fee award. A plaintiff is a prevailing party if she (1) "achieve[s] judicially-sanctioned relief" that (2) "materially alter[s] the legal relationship between the parties" and (3) "benefits the plaintiff at the time the relief is entered." *Petteway v. Henry*, 738 F.3d 132, 137 (5th Cir. 2013). A plaintiff prevails so long as she "succeed[s] on any significant issue in litigation which achieves some of the benefit [she] sought in bringing suit." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983) (internal quotation marks omitted). That success triggers prevailing party status regardless of whether it occurs "*pendente lite* or at the conclusion of the litigation." *Tex. State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 791 (1989). Although a final judgment on the merits and a consent decree are

1

sufficient judicially-sanctioned relief to support a fee award, "these examples are not exclusive." *Dearmore v. City of Garland*, 519 F.3d 517, 521 (5th Cir. 2008). Private Plaintiffs satisfy each of the three requirements for prevailing party status.

*First*, after a full trial on the merits and an appeal culminating in a favorable *en banc* decision of the Fifth Circuit, Private Plaintiffs prevailed on their Section 2 of the Voting Rights Act ("Section 2") discriminatory results claim. The *en banc* court affirmed this Court's finding that SB 14 violated Section 2 and directed this Court to swiftly impose relief in time for the then-approaching 2016 election. *Veasey v. Abbott*, 830 F.3d 216, 272 (5th Cir. 2016) (*en banc*) ("*Veasey I*"). This Court did so, ordering Texas to, *inter alia*, implement a reasonable impediment declaration option that would permit Private Plaintiffs and other affected voters to cast ballots without showing photo ID. That order governed the conduct of the 2016 elections and (hundreds of) subsequent elections across Texas through 2017. The Supreme Court denied State Defendants' petition for a writ of certiorari seeking to undo the *en banc* court's Section 2 holding. *Abbott v. Veasey*, 137 S. Ct. 612 (2017) (Mem.). After the district court proceedings on remand in 2017 and the State's subsequent appeal, Texas could have sought Supreme Court review of the Section 2 *en banc* decision. *See Abbott v. Veasey*, 137 S. Ct. at 613 (Roberts, C.J., statement regarding denial of certiorari) (noting that Texas could seek review of all issues after remand). It chose not to do so. Instead the legislature abandoned its legal defense of SB 14 and enacted SB 5, which a panel of the Fifth Circuit characterized as "essentially mirror[ing] [the] agreed interim order." *Veasey v. Abbott*, 888 F.3d 792, 804 (5th Cir. 2018) ("*Veasey II*"). Private Plaintiffs plainly obtained "judicially-sanctioned-relief" following a final decision—affirmed by the *en banc* court—on the merits of their Section 2 claim.

*Second*, the relief Private Plaintiffs obtained altered the parties' legal relationship. Plaintiffs

prevailed on their Section 2 results claim, State Defendants lost, and the State could no longer enforce SB 14 as enacted. This indisputably altered the parties' legal relationship.

*Third*, the interim order "benefit[ted] the plaintiff[s] at the time the relief [was] entered." *Petteway*, 738 F.3d at 137. Pursuant to the interim order, Private Plaintiffs and any other affected Texan could declare a reasonable impediment and vote in the 2016 and subsequent elections without showing photo ID, notwithstanding SB 14's contrary requirements. Private Plaintiffs thus satisfy each of the three requirements the Fifth Circuit has identified as necessary to trigger prevailing party status.

All of the State Defendants' arguments to the contrary misrepresent the record and misunderstand the governing case law.

*First*, State Defendants contend that Private Plaintiffs do not satisfy the three *Petteway* requirements because "[t]he Fifth Circuit . . . reversed all injunctions against SB 14 and SB 5" and "[t]here were no ultimate findings of liability that survived." State Defs. Response Br., Doc. 1196 at 7. But this is plainly not true. The *en banc* Fifth Circuit's opinion *was* an "ultimate finding[ ] of liability" on Plaintiffs' Section 2 results claim and it survives to this day. The *en banc* court affirmed this Court's final liability determination (which came following a full trial on the merits) with respect to the Section 2 results claim. This Court then ordered injunctive relief to remedy the violation, affirmed by the *en banc* court, and the Supreme Court denied State Defendants' petition for a writ of certiorari. State Defendants then abandoned their legal defense of SB 14 and instead adopted a new law (SB 5) amending the invalidated law (SB 14) to, as the Fifth Circuit indicated, largely mirror this Court's remedial scheme. The Fifth Circuit never reversed the interim injunctive relief (nor could a panel undo the ultimate liability determination of the *en banc* court); indeed it viewed it (and its mirror provisions in subsequently enacted law) as both necessary and sufficient

to remedy Texas's violation of Section 2. *See Veasey II*, 888 F.3d at 804.[1]

Indeed, the litigation that followed entry of this Court's 2016 interim order has no bearing on Private Plaintiffs' entitlement to fees. First, Private Plaintiffs do not seek fees for that phase of the litigation.[2] Second, that phase of the litigation was about a discrete issue—whether *additional* relief invalidating *more* of SB 14 was needed to remedy a finding of intentional discrimination on remand. A panel of the Fifth Circuit determined that additional relief was unnecessary—the court concluded that this Court's interim order, later mirrored by SB 5, had eliminated all the illegal elements of SB 14. *Veasey II*, 888 F.3d at 804. The panel did not purport to overrule the *en banc* court's finding of liability on the Section 2 results claim, something it obviously could not do. And the panel rejected State Defendants' argument that the case was moot. *Id*. at 799.

*Second,* State Defendants emphasize that this Court's relief was "interim" and contend that because it was entered "*prior*" to SB 5's enactment, Private Plaintiffs are not prevailing parties. Doc. 1196 at 7 (emphasis in original). But as noted above, the law is settled that a party is entitled to fees for relief obtained before a case ends, even if the case is later dismissed on other grounds. *See, e.g.*, *Staley*, 485 F. 3d at 314; *Garland Indep. Sch. Dist.*, 489 U.S. at 791; *Common Cause/Georgia v. Billups*, 554 F. 3d 1340, 1356 (11th Cir. 2009) (holding that the plaintiffs who

---

[1] Moreover, a similar argument was already rejected by the Fifth Circuit, when it rejected State Defendants' argument that SB 5 rendered the case moot. *Veasey II*, 888 F.3d at 799. And even if the case had been rendered moot, Private Plaintiffs would be entitled to fees: "'[A] determination of mootness neither precludes nor is precluded by an award of attorneys' fees. The attorneys' fees question turns instead on a wholly independent consideration: whether plaintiff is a 'prevailing party.'" *Staley v. Harris County*, 485 F.3d 305, 314 (5th Cir. 2007) (*en banc*) (quoting *Doe v. Marshall*, 622 F.2d 118, 120 (5th Cir. 1980)). As noted above, to qualify as a prevailing party, "[a]ll that is required is that the plaintiff obtain the primary relief sought." *Id.* at n.7.

[2] The only exceptions are the time one or more counsel teams for Private Plaintiffs spent defending their win in the Supreme Court, securing compliance with the interim remedial order, defeating State Defendants' effort to undo their victory with their unwarranted 2018 "motion to dismiss," and preparing their fee applications.

4

had obtained a preliminary injunction against a voter ID law were prevailing parties even though

the state had later amended the law).[3] Moreover, the only reason the relief on Private Plaintiffs'

Section 2 results claim victory was "interim" was because the *en banc* court thought there was a

very real possibility this Court on remand would order more expansive relief, not less, to remedy

the intentional discrimination claim, and wanted this Court to wait to do so until after the

November 2016 election. *Veasey I*, 830 F.3d at 268, 272.

   *Third*, Defendants contend that no fee is due to Private Plaintiffs because they "'failed to

secure judicially-sanctioned relief' but instead 'achieved the desired result because the lawsuit

brought about a voluntary change in the defendant's conduct,' is not a 'prevailing party.'" Doc.

1196 at 7 (quoting *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human

Resources*, 532 U.S. 598, 600 (2001)).

   But the relief that Private Plaintiffs obtained was far from voluntary; it was forced on them

by this Court's decision and the *en banc* Court's decision. By the time the legislature enacted SB

5, Plaintiffs had won the Section 2 results claim following a full trial on the merits, won on appeal

---

[3] In their opening brief, Private Plaintiffs cited *Dearmore v. City of Garland*, 519 F.3d 517 (5th
Cir. 2008), as an example of a case where the plaintiffs received a fee even though the relief they
obtained was never finalized because the defendants passed a law enacting the relief, thus
rendering the case moot. Bizarrely, State Defendants attempt to use this case to limit fees only to
cases where plaintiffs obtained a preliminary injunction. But *Dearmore* stands for no such
proposition, it simply allowed fees under the facts of that case; it did not limit fees only to such a
case. To the contrary, the court expressly stated that its test was "applicable in the limited factual
circumstances" before it. *Id*. at 526 n.4. State Defendants' contention that a party can only prevail
if there is a (1) *preliminary* merits determination and (2) a mooted case, makes no sense. The fact
that Private Plaintiffs achieved a *final* merits determination and their case was *not* mooted makes
their entitlement to fees more obvious than was the case in *Dearmore*.

Nor is there any basis for State Defendants' reading of *Dearmore* as being limited to cases in which
the named defendant caused the law to change post-preliminary relief. Doc. 1169 at 10-11. The
cases cited by State Defendants are not about prevailing party status, but rather whether a district
court's order should be vacated when a case becomes moot on appeal, which turns in part on
whether the mootness was caused by a party to the case. Moreover, the governor's signature is
what made SB 5 law, so it is attributable to the defendant here.

before a panel of the Fifth Circuit, won before the *en banc* court, the interim remedial order was issued by this Court as the specific remedial vehicle ordered by the Fifth Circuit, and the Supreme Court denied State Defendants' petition for certiorari. Texas did not voluntarily change its law; it fought in appeal after appeal to maintain it.[4] Private Plaintiffs' claim for fees is based on the Section 2 results violation and the issuance of an order to remedy that violation. These successes were not voluntarily; they were hard won.

In State Defendants' view, this legislative action—taken nearly a year after SB 14 was invalidated and enjoined—somehow erased history and transformed Private Plaintiffs' victory into a defeat. But that is not the way the law works. *See Petteway*, 738 F.3d at 137 (noting that relief must "benefit[] the plaintiff *at the time the relief is entered*") (emphasis added); *Garland Indep. Sch. Dist.*, 489 U.S. at 791) (explaining that party may prevail "*pendente lite* or at the conclusion of the litigation"). If it were, Congress's grant of fee awards to prevailing plaintiffs in civil rights cases would be dead letter. All a state would have to do is wait to see whether it loses—and loses on appeal—and loses *en banc*—and loses in the Supreme Court—and if it does, simply enact the injunction as law a year later and declare victory.

*Fourth*, State Defendants contend that "SB 5 [was] an *ameliorative* change" that "is the precise provision that [ ] plaintiffs have sought all along in this litigation," that "[t]he *ameliorative* changes to SB 14 were implemented to eliminate all of the alleged injuries in this lawsuit," and

---

[4] In its unsuccessful petition for certiorari to the Supreme Court, State Defendants specifically conceded that the change in SB 14's enforcement occasioned by the interim remedial order was not voluntary: "The Fifth Circuit then directed the district court to implement an interim remedy for the 2016 election season addressing the VRA sec. 2 discriminatory-effect claim (which the court has entered . . . .)." State Defendants' Petition for Writ of Certiorari, U.S. Supreme Court, No. 16-393, Sept. 23, 2016.

"[t]hus, the enactment of SB 5 cannot support prevailing party status." Doc. 1196 at 10 (emphasis in original).

As an initial matter, Private Plaintiffs seek fees on the basis of the Fifth Circuit's en banc, final merits determination and the subsequent remedial order, which meets the requirements of *Petteway* and governed many elections before SB 5 was enacted. Private Plaintiffs are entitled to fees with or without SB 5.

Moreover, SB 5 was the legislature's remedial response to the finding of liability that Private Plaintiffs obtained. There is a big difference between legislation that is voluntarily enacted before a plaintiff obtains any judicial imprimatur and legislation that is enacted in response to an unfavorable final adjudication on the merits. As the *en banc* court explained in this case, "when feasible, our practice has been to 'offer governing bodies the first pass at devising' remedies for Voting Rights Act violations." *Veasey I*, 830 F.3d at 270. This deference to the legislature at the remedial phase does not and cannot eliminate the Plaintiffs' prevailing party status.

When a court defers to the legislature in such circumstances, it has the power to issue a "remedy decision" to determine whether the legislation cured the violation. *Mississippi State Chapter, Operation Push, Inc. v. Mabus*, 932 F.2d 400, 409 (5th Cir. 1991). Indeed, that is *exactly* what the Fifth Circuit concluded this Court was doing when it assessed SB 5, and that is why the court rejected State Defendants' mootness argument. *See Veasey II*, 888 F.3d at 799. When legislation follows a final judicial determination and is subject to such a remedy decision, the plaintiff is still the prevailing party, even though the legislature devised the remedy in the first instance. *Staley*, 485 F.3d at 314. Here, the Fifth Circuit held that the post-SB 5 proceedings were remedial decisions, and concluded that "SB 5 constitutes an effective remedy for the only deficiencies testified to in SB 14, and it essentially mirrors an agreed interim order for the same

purpose." *Veasey II*, 888 F.3d at 804. Its decision *underscores* that Private Plaintiffs prevailed on their Section 2 claim.

The judicial decision approving (or modifying) the legislative remedy provides the necessary "judicial *imprimatur* on the change" caused by that remedial legislation. *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Resources*, 532 U.S. 598, 605 (2001). Were it otherwise, the Voting Rights Act's fee-shifting provision would become meaningless in most cases, given that it is the practice of courts to defer to legislatures to devise remedies for violations of law found by the courts. *See Veasey I*, 830 F.3d at 270. States cannot evade paying fees simply because they are granted deference in fashioning remedies for violations in the first instance.

*Fifth*, State Defendants contend that Private Plaintiffs cannot be prevailing parties based upon their "successful opposition to State Defendants' petition for certiorari to the United States Supreme Court." Doc. 1196 at 12. Private Plaintiffs are entitled to fees for the time spent on the Supreme Court litigation because it was necessary to *defend* their prevailing status, which they achieved when the *en banc* court affirmed this Court's Section 2 results liability determination and this Court ordered injunctive relief.

As noted above, State Defendants lost the Section 2 claim after a full trial on the merits in this Court, lost on appeal before a Fifth Circuit panel, lost before the *en banc* Fifth Circuit, were ordered to comply with an order benefiting Plaintiffs, and then lost their effort to have the Supreme Court reverse the Fifth Circuit's decision. Only nearly a year after that order was entered—and many elections conducted under that order—did they abandon their legal defense and adopt legislation mirroring the injunction. Private Plaintiffs achieved a historic victory. State

Defendants' contention that Congress did not intend this victory to count as "prevailing" is contrary to the case law and any common sense understanding of the word "prevail."

## II.   PLAINTIFFS ARE ENTITLED TO FEES FOR ALL OF THEIR RELATED CLAIMS AND A DOWNWARD ADJUSTMENT IS UNWARRANTED.

Private Plaintiffs are entitled to fees for counsel's work on all claims related to the claim they prevailed upon.[5] Indeed, the Supreme Court has specifically held that legal work on related legal theories seeking similar relief is compensable even if not all distinct theories are successful. *Hensley*, 461 U.S. at 434-35. As the Court explained, civil rights cases often involve claims with "a common core of facts" or that are "related" and so "[m]uch of counsel's time will be devoted generally to the litigation as a whole." *Id.* at 435. "Such a lawsuit cannot be viewed as a series of discrete claims." *Id.*

State Defendants contend that Private Plaintiffs should not be compensated for time spent on their Section 2 and constitutional intentional discrimination, constitutional undue burden, or constitutional poll tax claims because they say the claims are unrelated. Doc. 1196 at 13. For that reason, they ask the Court to apply a 75 percent downward adjustment. Their argument is without merit.

*First*, State Defendants cite a Western District of Texas case to contend that there is rule requiring segregation of successful and unsuccessful claims. *Id.* at 14-15 (citing *Lear Siegler Servs. v. Ensil Int'l Corp.*, CIVA SA05-CV-679-XR, 2009 WL 5195884 (W.D. Tex. Dec. 18, 2008). But that case was a diversity suit, and the court was applying a state law fee-shifting statute. *Lear Siegler*, 2009 WL 5195884, at *1. The court was thus applying the general rule of "[t]he Texas

---

[5] Private Plaintiffs are not seeking fees for time spent when the *only* issue was the intent claim, and thus proof of the intent claim was no longer intertwined with proof of the results claim, *i.e.*, on the briefing and hearing on the intent claim on remand and the subsequent appeal from this Court's order on remand in 2017 and 2018.

Supreme Court." *Id.* at *2. The rule set forth by the Supreme Court in *Henlsey* governs this federal law suit. In any event, Texas law recognized the same exception—omitted by State Defendants in their brief: "[c]auses are inextricably intertwined when discrete legal services advance both successful and unsuccessful claims; such services need not be separated when calculated attorney's fees." *Id.*

*Second*, State Defendants argue that Private Plaintiffs' Section 2 claim "centered on the allegedly cost prohibitive factor of obtaining an SB 14-compliant ID" and that "the evidence needed to develop this claim involved the determination of the costs of the underlying documents." Doc. 1196 at 13. State Defendants also contend that evidence of intent was irrelevant to this claim, because "[i]ntent is not required to show a discriminatory result." *Id.* State Defendants' blinkered view of Private Plaintiffs' Section 2 claim is directly foreclosed by the *en banc* court's decision in this case.

As the *en banc* court held, the Section 2 claim in this case required evidence satisfying a two part framework: (1) evidence of a discriminatory burden on members of a protected class resulting in "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice" and (2) evidence that the burden is "in part . . . . caused by or linked to social and historical conditions that have or currently produce discrimination against members of the protected class." *Veasey I*, 830 F.3d at 244. The court drew on the *Gingles* factors for the second part of this test, including the history of official discrimination, racially polarized voting, discriminatory electoral practices, whether members of the group "bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process," whether political campaign "have been characterized by overt or subtle racial appeals," whether minority members

10

have been elected in the jurisdiction, whether there is "a significant lack of responsiveness on the part of elected officials" to the needs of the minority group, and whether the policy underlying the challenged law is "tenuous." *Id.* at 245-46. The court noted that these factors were not exclusive. *Id.* at 246. Indeed, it is well-established that Section 2 claims require an analysis of the "totality of the circumstances." *Thornburg v. Gingles*, 478 U.S. 30, 46-51 (1986); *see also Johnson v. De Grandy*, 512 U.S. 997, 1010-18 (1994).

Thus, the relevant evidence for the Section 2 claim was not limited to the cost of the IDs, as State Defendants wrongly contend. Indeed, the *en banc* court carefully addressed all these factors, and specifically discussed evidence offered by Private Plaintiffs showing discriminatory intent in this and other recent and historic laws. The court cited the discriminatory 2011 redistricting plans, which it cited as "factually relevant as a contemporary example of State-sponsored discrimination." *Veasey I*, 830 F.3d at 257 n.54. The court noted that the legislature offered the same justification for SB 14 that it offered for other discriminatory laws in its history: voter fraud. "The Texas Legislature relied on that same justification in passing SB 14, even though the evidence showed that in-person voter fraud is very rare." *Id.* at 258 (internal quotation marks omitted). The court also relied upon the evidence of "State-sponsored discrimination" in education, employment, housing, and transportation. *Id.* at 259. In addition, the *en banc* court noted that "the provisions of SB 14 fail to correspond in any meaningful way to the legitimate interests the State claims to have been advancing through SB 14." *Id.* at 263. While this evidence was supportive of Plaintiffs' intentional discrimination claim, it was also supportive of Plaintiffs' discriminatory results claim and is therefore compensable.

State Defendants are likewise incorrect in claiming that the undue burden and poll tax claims were unrelated to the Section 2 claim. Doc. 1196 at 14. Evidence of whether a burden is

undue and whether that burden results in a disparate impact on a particular group is self-evidently related. Indeed, whether the burden is discriminatory is a factor considered as part of the *Anderson-Burdick* undue burden framework. *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (noting relevance of whether burden is nondiscriminatory). And the *en banc* court avoided deciding the undue burden claim because a victory would result in "the same relief" as Private Plaintiffs' Section 2 claim. *Veasey I*, 830 F.3d at 265. Finally, State Defendants' own argument shows why the poll tax claim and the Section 2 claim are intertwined—they both involve consideration of the cost of obtaining an ID.

Private Plaintiffs' claims were plainly related and involved overlapping evidence, and State Defendants' contention that the only relevant evidence was the cost of the IDs is absurd in light of the *en banc* court's detailed recitation of the evidence supporting the Section 2 claim, extending far beyond the cost of the IDs.

*Third*, State Defendants contend that Private Plaintiffs achieved "limited overall success," warranting a 75% downward adjustment to account for the other claims in the case. Doc. 1196 at 16. Not only is the breadth of Private Plaintiffs' victory self-evident from the remedy imposed and the decisions of this Court and the *en banc* Court, but it is recognized by State Defendants themselves earlier in their brief. State Defendants contend that SB 5—which nearly mirrors the relief Private Plaintiffs won from this Court—"is the precise provision that [ ] plaintiffs have sought all along in this litigation" and that it "eliminate[s] all of the alleged injuries in this lawsuit." *Id*. at 10. State Defendants cannot have it both ways.

Because Private Plaintiffs' claims are all interrelated and because they achieved a significant overall voting rights victory, no downward adjustment is appropriate.

## III.     PRIVATE PLAINTIFFS' REQUESTED RATES ARE REASONABLE.

### A.     State Defendants' Proposed Hourly Rates Ignore the Lack of Voting Rights Expertise in Corpus Christi and Fall Far Below Rates Previously Awarded for Similarly Complex Litigation.

State Defendants insist that this Court should begin the lodestar analysis by using hourly rates they argue are most representative of the Corpus Christi market. Doc. 1196 at 21. State Defendants have failed to show that their proposed rates are more appropriate for this case.

State Defendants argue that their proposed Corpus Christi rates must be used because "the suit was filed and tried" in Corpus Christi. *Id*. But State Defendants' argument willfully ignores a critical fact – this case was not, and could not have been adequately litigated solely by counsel in Corpus Christi. Indeed, Private Plaintiffs' expert, Bill Edwards, an attorney who has practiced in Corpus Christi for 33 years, specifically testified that "the attorneys in this litigation bring a specialized expertise in voting-rights and civil-rights cases that *is not matched in Corpus Christi*." Edwards Decl., Doc. 1143-3 at ¶ 6 (emphasis added); *see also Dillard v. City of Elba*, 863 F. Supp. 1550, 1553 (M.D. Ala. 1993) ("It cannot be questioned that voting rights litigation requires a highly skilled attorney . . . even the simplest voting rights case would be daunting to an attorney who had not specialized in voting rights law."). Mr. Edwards continued, testifying that he is "aware of no attorney in Corpus Christi who has focused his or her professional energy and time pursuing this type of litigation in the Corpus Christi area." Doc. 1143-3 at ¶ 6. Private Plaintiffs' evidence on this point is uncontradicted. At no point in their response brief do State Defendants maintain that Corpus Christi attorneys could have effectively litigated this case.[6]

---

[6] State Defendants correctly assert that "Plaintiffs were represented by several experienced lead Texas counsel." Doc. 1196 at 19. But each one of those attorneys is based outside of Corpus Christi.

The law requires that attorneys' fees should be "in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984). If the "community," as Defendants suggest, is narrowly defined as Corpus Christi, such an analysis is impossible. *See, e.g.*, *Brooks v. Georgia State Bd. of Elections*, 997 F.2d 857, 869 (11th Cir. 1993) ("Although the State suggested that the relevant community was Brunswick, Georgia, where the suit was tried, the court accepted affidavit evidence that there were no Brunswick attorneys familiar with voting rights actions who could have handled this case."). Indeed, given the lack of voting rights expertise in Corpus Christi, it would have been unreasonable, and likely adverse to their cause, for Private Plaintiffs to retain counsel exclusively from Corpus Christi. *See In re Lopez*, 576 B.R. 84, 98-100 (Bankr. S.D. Tex. 2017).

In light of the inability to perform the *Blum* analysis with Corpus Christi rates, Private Plaintiffs employed an available matrix that corresponds to prevailing rates in the San Antonio market.[7] That matrix, created by the United States Attorney's Office ("USAO"), provides the Court with an objective, consistent basis for determining fees—complete with nine distinct brackets based on years of legal experience—and is reflective of rates recently awarded to attorneys in the Southern District. *See* Private Plfs. Memo. of Law in Support of Mtn. for Attys' Fees, Doc. 1143-1 at 14. The rates in that matrix fall far short of the rates that the private firms in this case, based in Washington D.C. and New York, traditionally charge clients.[8] Private Plaintiffs

---

[7] Even *that* market lacks a sufficient pool of attorneys qualified to litigate this case. *See* Garza Decl., Doc. 1145-7 at 4 (stating that the San Antonio market contains no more than *four* attorneys, including Mr. Garza, with expertise in voting rights litigation). Yet, in an effort to be reasonable, attorneys here nonetheless seek rates in line with those in the San Antonio market.

[8] *See, e.g.*, Steiner Decl. at 1 (filed Feb. 7, 2020) (revealing that attorneys like Mr. Steiner and Mr. Rosenberg would be compensated at a minimum of $1,200 per hour from fee-paying clients). The

also seek rates that pale in comparison to those charged by large law firms in Houston. While the USAO matrix's top rate is $613, "billing up to $840 per hour is customary at large firms in Houston" and can sometimes exceed $1,000 per hour. *See* Edwards Declaration, Doc. 1143-3 at 5 (citing *N. Atl. Operating Co. v. Mike's Worldwide, LLC,* No. H-16-3685, 2018 U.S. Dist. LEXIS 115753, at *6 (S.D. Tex. 2018)).

Moreover, there have been awards in the Corpus Christi Division that exceed the rates requested by Private Plaintiffs in this case. For example, in *In re SQLC Senior Living Center*, the rates awarded ranged up to $735 per hour. *In re SQLC Senior Living Center*, No. 19-20063, Docs. 217-2, 223 (Bankr. S.D. Tex. 2019) (Ex. 1). Likewise, in *In re Autoseis, Inc.,* the court awarded rates up to $975 per hour for lead counsel. *In re Autoseis, Inc.*, No. 14-20130, Docs. 504, 553 (Bankr. S.D. Tex. 2014) (Ex. 2). And in *In re Sherwin Alumina Co.*, the court awarded fees at rates of more than $1,000 per hour.[9] *In re Sherwin Alumina Co.*, No. 16-20012, Docs. 917-2, 977 (Ex. 3).

The lawyers in this case, who possess unique subject-matter expertise and have extensive experience at all levels of the state and federal judicial system, are surely not less qualified than the attorneys who were awarded fees at far higher rates than those requested here. *See* P. Lombard & C. Krafka, Federal Judicial Center, *District Court Case Weighting Study*, 60 (2003-04), *available at* https://www.fjc.gov/sites/default/files/2012/CaseWts0.pdf (publishing a study

---

non-profit legal organizations in this case represent virtually all of their clients on a *pro bono* basis. *See*, *e.g.*, Aden Decl., ECF No. 1172-1 ¶ 14.

[9] In these bankruptcy cases, attorneys' fees are awarded under 11 U.S.C. § 330(a)(1)(A), which is analogous to the congressional fee-shifting statute at issue here. For both statutes, fees are determined based on the factors in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974). *See In re Wormer*, 783 F.3d 266, 274 n.4 (5th Cir. 2015). Apart from bankruptcy cases, more than a decade ago a court in this district awarded all partners an *average* rate of $630 per hour, a higher rate than is sought by *any* lawyer in this case. *In re Enron Corp. Sec., Derivative & "ERISA" Litig.,* 586 F. Supp. 2d 732, 781 n.62 (S.D. Tex. 2008).

comparing the complexity of various types of cases and revealing that voting rights lawsuits are ranked sixth overall); S. Rep. No. 1011, 94th Cong., 2d Sess. 6 (1976), 1976 U.S. Code Cong. & Admin. News p. 5908, 5913 ("It is intended that the amount of fees awarded under [§ 1988] be governed by the same standards which prevail in other types of equally complex Federal litigation, such as antitrust cases[,] and not be reduced because the rights involved may be nonpecuniary in nature."); *Dillard*, 863 F. Supp. at 1553 n.3 ("Indeed, if upon completion of law school, plaintiffs' attorneys chosen to devote themselves to commercial rather than public interest law, they would today, in light of their abilities, be able to command a substantially higher hourly rate.").

### B.     Compensating Private Plaintiffs Based upon 2018-2019 Rates Is Appropriate.

State Defendants also argue that this Court should not award fees based upon 2018-2019 rates because Private Plaintiffs did not demonstrate that delayed payment resulted in a "hardship" and because doing so might result in a "windfall." Doc. 1196 at 27-29. This argument deserves short shrift. The U.S. Supreme Court has held that application of current, rather than historical hourly rates, compensates attorneys for the effect of inflation and the time-value of money. *Missouri v. Jenkins by Agyei*, 491 U.S. 274, 283-84 (1989).

In a half-hearted attempt to distinguish that holding, State Defendants rely on one case from the Missouri Court of Appeals and a single footnote from a Western District of Arkansas decision. Doc. 1196 at 28. This is nothing more than a distraction. Even before the decision in *Jenkins*, the Fifth Circuit fully embraced the view that attorneys should be compensated based upon current rates. *See Matter of Lawler*, 807 F.2d 1207, 1212 (5th Cir. 1987) ("It already has been determined [] that attorneys' fees may be calculated at the rate prevailing at the time of the application . . . Application of [attorneys'] present rates in this case compensates them for the delay in payment."); *Graves v. Barnes*, 700 F.2d 220, 224 (5th Cir. 1983). The Fifth Circuit reaffirmed

16

that holding after *Jenkins*. *See Blanchard v. Bergeron*, 893 F.2d 87, 91 (5th Cir. 1990) ("The Supreme Court and this court have authorized payment at billing rates effective after judgment was entered as a means to compensate an attorney in a civil rights case for his delay in compensation . . . The trial court did not explain its failure to permit a stepped-up rate here [and] [o]n remand, [] should consider the factor of delay."). There is no serious dispute as to whether 2018-2019 rates should apply here.

C.     **State Defendants' Proposed Hourly Rates are Illogical, Indecipherable, and Misapplied.**

In the face of a reasonable, objective basis for determining hourly rates here, State Defendants endeavored to manufacture their own fee structure. The illogical basis for that structure—combined with a bevy of errors in their attempt to apply it to this case—renders it useless. State Defendants maintain that this Court should begin by using the State Bar of Texas's Rate Report ("Rate Report" or "Report").[10] That Report, which appears not to have been updated since 2015, does not even mention civil rights cases, much less complex voting rights suits like the one here. The Report is irrelevant on that basis alone. Additionally, the Report's Corpus Christi data is based on only 50 total attorneys. Six of those attorneys had two or fewer years of experience while 24 had more than 25 years of experience. The Report included data on fewer than six attorneys in the experience brackets between three and 24 years' experience—sample sizes too small to display. *See* Rate Report at 12. In any event, for the reasons stated above, Corpus Christi is not the appropriate community for this analysis and such rates are far below those awarded for similarly complex litigation in the Southern District.

_____

[10] *See* State Bar of Texas Department of Research and Analysis 2015 Hourly Fact Sheet, *available at*     https://www.texasbar.com/AM/Template.cfm?Section=Archives&Template=/CM/Content Display.cfm&ContentID=34182 (last accessed February 6, 2020).

Even State Defendants appear to give the Rate Report little weight as they conveniently ignore the Report's use of seven distinct brackets to measure attorneys' experience, not to mention the USAO's use of nine, and instead propose that this Court use just three – one for "lower-level associates" at $250 per hour, one for "mid-level associates" at $300, and one for "senior-level attorneys" at $400.[11] *See* Doc. 1196 at 33. The State Defendants provide no basis for this arbitrary and vague structure.

At no point do State Defendants define each of those levels, leaving Plaintiffs and this Court to reverse-engineer definitions based upon their proposed attorney-specific rates. *Id.* at 35-37. Yet, that exercise demonstrates an improper and incoherent approach. State Defendants appear to define attorneys who graduated nearly twenty years ago (2001) as "lower-level." This blunt instrument captures lead attorneys in this matter, including Myrna Pérez, who graduated from law school in 2003, and Ryan Haygood, who graduated in 2001. *Id.* at 36. But the State Defendants are not even consistent in applying this unusual definition of "low-level."  At the same time, they suggest that attorney Leah Aden who graduated in 2006—*after* Ms. Pérez, Mr. Haygood, and three other attorneys in the $250 "bracket"—should be awarded a rate of $300. *Id.* at 36-37. The same issues appear throughout the State's proposed rates, rendering them indecipherable and unreliable. State Defendants' chart indicates that attorneys who graduated from law school from 1990 to 2006, a 17-year span, should be awarded a rate of $300 per hour (notwithstanding the foregoing application of the $250 tier to Ms. Pérez and Mr. Haygood, who would fall within that timespan). But State Defendants at the same time suggest that an attorney graduating from law school in 2000 should receive $275 per hour, an additional bracket not discussed anywhere in the text of their

---

[11] This is, by itself, an implicit acknowledgment that the Rate Report's rates fall far short of what is reasonable here.

brief. *Id.* at 35 (Amy Rudd at $275 per hour). Further, a proposed $350 bracket (which is also not described in the text of Defendants' brief), includes two attorneys who graduated from law school in 1987 and 1997. *Id*. at 36. Why those attorneys would not fall into the $400 and $300 brackets, respectively, is also unexplained.[12]

In short, State Defendants' rates are not only undefined and misapplied, but are based upon dated and scant data specific to Corpus Christi attorneys, none of whom practice civil rights or voting rights law. As a result, State Defendants' proposed rates should be rejected.

**IV.     PLAINTIFFS FEE REQUEST DEMONSTRATES BILLING JUDGMENT.**

In opposition to Private Plaintiffs' fee request, State Defendants ignore counsels' detailed declarations, the trial and depositions transcripts, and well-known litigation practices to question the reasonableness of the requested fee award. State Defendants also repeatedly misstate the law to argue that Plaintiffs' counsel should not be reimbursed for time expended on matters that courts have ruled are compensable.

This Court should reject State Defendants' attempt to rewrite the history of this litigation and the law. This Court has broad discretion to award fees for all time reasonably expended on this case following its clear-eyed review of the evidence and court records and based on its knowledge of this specific litigation and common sense. *See Watkins v. Fordice,* 7 F.3d 453, 457-60 (5th Cir. 1993).

**A.  Plaintiffs Provided Adequate Evidence of Billing Judgment.**

In their initial brief and the accompanying declarations, Plaintiffs explained in detail the manner in which Plaintiffs' counsel exercised reasonable billing judgment by excluding significant

---

[12] Additionally, Defendants state that paralegals in this case should be awarded a rate of $115 per hour. *Id.* at 33. Yet the State's chart calculates a paralegal's rate at $100 per hour. *Id.* at 36.

amounts of attorney time that was potentially duplicative or excessive. *See*, *e.g.*, Doc. 1143-1 at 15-19.

Nonetheless, Texas disputes Plaintiffs' billing judgement. Texas cites several declarations, including those of Mr. Rosenberg and Ms. Pérez, to boldly contend that it is "impossible to determine" the reason hours were excluded or if Plaintiffs used billing judgment. Doc. 1196 at 38.

This is incorrect. First, the extent of the excluded time itself demonstrates modest billing by Plaintiffs. For example, the Lawyers' Committee and Brennan Center included less than 45% of their compensable hours, cutting more than 5000 hours. Furthermore, the Veasey-LULAC attorneys cut over 1000 hours of their compensable time.  Private Plaintiffs engaged in deep cuts to their compensable time—far beyond what might be considered necessary—in order to avoid accusations of duplicative or excessive billing and avoid embroiling this Court in needless quarrels over individual time entries. Unfortunately, those efforts were futile.

Moreover, Plaintiffs' declarations clearly explain their billing judgment choices. For example, Mr. Rosenberg states that he "personally read each time entry and decided whether and how much of it to bill." Rosenberg Decl., Doc. 1174-2 at ¶ 17. In so doing, he considered "the nature, complexity, and importance of the task, the role of the time-keeper in performing the task (e.g., primary drafter, reviewer, etc.), and whether and how many other attorneys were performing similar tasks." *Id*. Among other judgments, Mr. Rosenberg excluded entirely the meaningful work of two well-regarded voting rights experts (Kengle and Greenbaum) and only requested 50% of time spent traveling and 80% for time spent on this fee petition. *Id.* ¶¶ 17-18. These hours were reasonably excluded or reduced to avoid accusations of duplicative or excessive billing. *Id.* ¶¶ 16-18.  Other Private Plaintiffs' counsel similarly excluded numerous hours and, as noted above, have

offered or are filing today sworn declarations detailing their exclusions and explaining billing judgment choices.

Likewise, Ms. Pérez's declaration explains that the hours of two very senior voting rights litigators, three junior attorneys and all non-lawyer staff, were not included in the fee petition. Pérez Decl., Doc. 1174-11 at ¶¶ 4-6, 9. Her declaration also includes a chart entitled "USAO Rates (Time Not Charged)," which documents the time that she did not charge for herself and the junior attorneys. *Id.* ¶ 9. This eliminated half of the hours that Brennan Center could have charged Texas. Again, while these attorneys offered important contributions to this case, Ms. Pérez reasonably determined that the Brennan Center would seek fees only for a portion of her own time. *Id.* ¶ 6.

Other declarations offer similarly detailed explanations of the reasonable billing judgment used by various Plaintiffs' counsel. *See*, *e.g.*, Aden Decl., Doc. 1172-1 at ¶¶ 16-21; Garza Decl., Doc. 1174-16 at ¶ 2; Hebert Decl., Doc. 1143-4 at ¶¶ 28-44; Notzon Decl., Doc. 1174-24 at ¶¶ 3, 7.

## B.  Plaintiffs' Time and Staff Allocations were Reasonable for Complex Litigation.

Texas argues that Plaintiffs are not entitled to fees for attorney time spent attending hearings or depositions in only "passive roles." Doc. 1196 at 46. Texas also argues that Plaintiffs' counsel "double-billed" time where multiple lawyers were involved in a moot, where an attorney served as a "second chair" in a deposition, or where multiple attorneys contributed to a large brief. Doc. 1196 at 49, 51.

This Court should employ "appropriate inquiry and evidence" to decide the appropriateness of staffing levels at various stages of the litigation and whether supporting attorneys were acting in a "passive role of an observer." *Flowers v. Wiley,* 675 F.2d 704, 705-06 (5th Cir. 1982). In deciding this issue, the Court should look to the "time and labor required," "novelty and difficulty

of the questions," and the "skill requisite to perform the legal service properly," among other factors. *Johnson v. Georgia Highway Exp., Inc.,* 488 F.2d 714, 717-18 (5th Cir. 1974) (abrogated in part on other grounds by *Blanchard v. Bergeron*, 489 U.S. 87, 91-93 (1989)).

Here, many of Texas's examples of overstaffing are either nonsensical or incorrectly describe the role played by the identified attorneys. For example, Texas complains that "Janai Nelson and Natasha Korgaonkar both billed for mooting the same Fifth Circuit oral argument." Doc. 1196 at 49. But, Ms. Nelson was the oralist in that argument and an attorney cannot moot herself. Likewise, Texas says that Deuel Ross's presence at the deposition of Keith Ingram was duplicative, *id*. at 48-49, but Mr. Ross took a portion of Mr. Ingram's deposition. Texas further complains that it took three attorneys to draft nearly 120-pages of complex appellate and *en banc* briefing. *Id*. at 51-52. But it is reasonable that Ms. Nelson, Ms. Korgaonkar, and Mr. Ross, who billed their hours at reduced hours, would bill for their time as the primary drafters of the appellate and en banc briefs for Plaintiff Imani Clark.

Texas also objects that Myrna Pérez, Natasha Korgaonkar, Ryan Haygood, Deuel Ross, and Armand Derfner "billed for participating in trial, even though only a handful of the attorneys that attended trial actually presented a witness." Doc. 1196 at 49. But Ms. Korgaonkar presented Mr. Blake Green and Dr. Vernon Burton at trial, as well as played an active role in preparing other witnesses. Her direct examination of Dr. Burton was quoted at length by the en banc Fifth Circuit. *See Veasey I*, 830 F.3d at 237. At trial, Mr. Haygood made closing arguments, as well as managed and actively prepared expert and fact witness testimony and trial strategy and presented Elizabeth Gholar's video testimony. Ms. Pérez and Mr. Derfner likewise presented arguments, examined trial witnesses, shaped trial strategy, and prepared other lawyers. Mr. Ross also played an active role in preparing witnesses, exhibits, deposition designations, and, along with Mr. Derfner and

others, drafted large portions of the 124-paged proposed findings of fact and conclusions of law. *See* Dkt. No. 961.

Moreover, as described in the preceding section, counsel used their judgment to exclude entirely the time of dozens of attorneys and excluded a significant number of the hours to avoid double-billing for passive roles. *See, e.g.,* Aden Decl., Doc. 1172-1 at ¶¶ 16(ii)(2) and (4); Hebert Decl., Doc. 1143-4 ¶¶ 37-40; Rosenberg Decl., Doc. 1174-2 ¶ 14; Paikin Decl., Doc. 1146-6 ¶ 7(b). While Texas ignores Plaintiffs' billing judgment, this Court cannot ignore the hundreds of hours of work excluded from the fee petition in assessing the overall reasonableness of the fee request. Because Texas offers only irrational or unsupported objections to Plaintiffs' hours, this Court should not credit its concerns.

To address staffing concerns and reduce costs, Plaintiffs also employed paralegals to perform legal work, while also, in some cases entirely excluding paralegal time.[13] *See Jenkins*, 491 U.S. at 285 (holding that attorney's fees are not meant to compensate only attorneys' work, but may also compensate for the work of "secretaries, messengers, librarians, janitors, and others whose labor contributes to the work product for which an attorney bills her client; and it must also take account of other expenses"); *see also e.g*., Aden Decl. Doc. 1172-1 at ¶ 16(2)(i). Troublingly, however, State Defendants also criticize Plaintiffs for the cost-saving attempt to use paralegals to perform certain legal tasks. Doc. 1196 at 43. They cannot have it both ways.

---

[13] For example, Dechert did not bill for any of the 362.2 hours of paralegal time expended on this matter. *See* Steiner Decl. ¶ 10.

### C.  Plaintiffs May Recover Fees for Time Spent on Fee Petition and Travel.

State Defendants next complain that Plaintiffs added time spent on the fee petition and time spent traveling after the attorney's fees deadline and that these hours must be reduced by set amounts.

First, the Court has discretion to acknowledge hours logged after the deadline. *See Dolan v. United States,* 560 U.S. 605, 611 ("[A] deadline seeks speed by creating a time-related directive that is legally enforceable but does not deprive a judge or other public official of the power to take the action to which the deadline applies if the deadline is missed.").

Second, Texas correctly states that "time spent for preparing fee applications is generally compensable." Doc. 1196 at 57. Nonetheless, Texas requests a 20% reduction from the standard hourly rates for time spent on the fee petition. *Id.* at 57-59. While such time may require a lower rate than time dedicated to the merits, there is no *per se* standard that requires a 20% reduction. *See generally Leroy v. City of Houston*, 906 F.2d 1068, 1079 (5th Cir. 1990).

Here, for the work related to the fee petition, this Court should reduce an attorney's hourly rate by no more than 11% of the rate awarded for time spent on the merits.[14] An 11% reduction would account for the complexity of the work required to coordinate, compile, document, and draft the fee petition and declarations. Texas itself cites precedent that supports Plaintiffs on this point. Doc. 1196 at 57-59. In *Hopwood v. Tex*as, the Fifth Circuit affirmed a district court ruling that had reduced the hourly rate for time spent on the motion for attorney's fees by only 11%—from $225 to $200 an hour. *See* 999 F. Supp. 872, 918 (W.D. Tex. 1998), *aff'd* 236 F.3d 256 (5th Cir. 2000).

---

[14] In response to Texas's concerns, some of Plaintiffs' counsel have voluntarily billed the time spent on the fee petition at 80% of their rate. *See*, *e.g.*, Rosenberg Decl., Doc. 1174-2 at ¶ 18.

In addition, although State Defendants claim that this Court must reduce travel time by 50%—a reduction that some Plaintiffs' counsel have already employed in exercising billing judgment—this Court need not be wedded to this percentage and could, for example, reimburse at minimum 65% of their normal hourly rate for travel time. "[T]here is no rule that an attorney can only be compensated for half of their travel time." *Portillo v. Permanent Workers, LLC*, No. 6:15-CV-01048, 2018 WL 4517798, at *7 (W.D. La. Mar. 7, 2018). Rather, where reasonable, courts will award higher rates. *See, e.g., Minter-Smith v. Mukasey*, No. 303-CV-1057, 2008 WL 2164565, at *14 (S.D. Miss. May 22, 2008) (awarding 65% or $125 over usual $200 hourly rate); *In re Zepecki*, 224 B.R. 907, 912 (Bankr. E.D. Ark. 1998) (awarding 100%); *In re C & J Oil Co., Inc*., 81 B.R. 398, 405 (Bankr. W.D. Va. 1987) (awarding 75%).

### D. Plaintiffs May Recover for Pre-Suit Case Development.

Pre-litigation work, including case development, the identification of clients and witnesses and any related media work, are also compensable. Development of a viable civil rights case requires pre-suit investigation, outreach to clients, and interviews with potential witnesses, including fact and experts. These efforts are plainly "reasonably expended on the litigation." *Hensley*, 461 U.S. at 433. They are also necessary pre-filing "work associated with the development of the theory of the case," including understanding and discerning the impact of SB 14 in anticipation of filing a challenge on behalf of the named clients. *See Webb v. Bd. of Educ. of Dyer Cty., Tenn*., 471 U.S. 234, 243 (1985).

Texas attempts to rebrand routine pre-suit activities as "business development." Doc. 1196 at 65. This invented terminology cannot mask precedent, which favors compensation for pre-suit efforts that advance the ultimate litigation. *See Webb*, 471 U.S. at 243. Counsels' pre-filing investigation, outreach, and interviews with witnesses and clients fall well-within the boundaries of practices necessary to advance a complex civil rights action. *Id*.; *cf. Walker v. U.S. Dep't of*

25

*Hous. & Urban Dev.*, 99 F.3d 761, 769 (5th Cir. 1996) (holding that the district court did not clearly err in awarding counsel fees for interviewing class members and investigating complaints).

Because it is "directly relevant" to the "successful prosecution" of Plaintiffs' claims, pre-litigation investigative work is fully compensable. *McDonald v. Armontrout*, 860 F.2d 1456, 1462 (8th Cir. 1988). It is left in the sound "discretion of the district court" to award attorneys' fees for these essential pre-filing activities. *See Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 560-61 (1986); *Foley v. Univ. Med. Ctr.*, 211 F.3d 592 (5th Cir. 2000) (awarding fees for required pre-filing work).

The Supreme Court has acknowledged that "factual investigation, including locating and interviewing witnesses" often fall into a difficult "gray area of tasks that might appropriately be performed either by an attorney or a paralegal." *Jenkins*, 491 U.S. at 288 n.10. But, even if this Court were to determine that some of this pre-litigation or investigative work constituted non-legal work, Plaintiffs may still be entitled to compensation for this work at a reduced hourly rate. *See Walker*, 99 F.3d at 771.

Time dedicated to media relations is likewise "directly relevant," to Plaintiffs' ultimately successful resolution of this case. The Fifth Circuit has affirmed the award of time for media efforts that prove valuable to the parties' litigation objectives. *See DeLeon v. Abbott*, No. SA-13-CA-00982-OLG, 2015 WL 13308902, at *4 (W.D. Tex. Nov. 30, 2015), *aff'd* 687 F. App'x 340, 343 (5th Cir. 2017); *see also Watkins v. Fordice*, 7 F.3d 453, 458 (5th Cir. 1993) (leaving open the possibility of recovery for media work if a prevailing party can show that such work "'contributed, directly and substantially, to the attainment of [the party's] litigation goals.'" (citation omitted)). There is no real distinction between client and witness outreach or investigative work done through the media and similar compensable work done through other means. *Cf. Walker*, 99 F.3d at 769.

Here, counsels' media efforts were directly aimed at achieving Plaintiffs' litigation goals and it helped to uncover evidence that proved integral to the success of Plaintiffs and, thus, are reimbursable.[15] For example, counsels' responses to the media inquiries and efforts to increase public awareness via the press about the discriminatory effect of SB 14 assisted Plaintiffs in identifying voters, state officials, and others with relevant information or experiences that revealed the burdens of S.B. 14. *See, e.g.*, *Stout v. Jefferson Cty. Bd. of Educ.*, No. 2:65-CV-00396, 2019 WL 7811389, at *26 (N.D. Ala. Dec. 23, 2019) (permitting attorney's fees for media work that contributed to counsel's communication with clients and witnesses); *Potter v. Blue Cross Blue Shield of Michigan*, 10 F. Supp. 3d 737, 750-51 (E.D. Mich. 2014) (same); *David C. v. Leavitt*, 900 F. Supp. 1547, 1557-58 (D. Utah 1995) (same); *Keyes v. Sch. Dist. No. 1, Denver, Colorado*, 439 F. Supp. 393, 408 (D. Colo. 1977) (same).

### E.  Plaintiffs May Recover for Time Spent Coordinating Amicus Briefs.

Plaintiffs are entitled to full reimbursement for time spent in relation to coordinating amici. Both the U.S. Supreme Court and the Fifth Circuit have affirmed the award of attorneys' fee for work done on amicus briefs that proved important to furthering the goals of the litigation. *See Delaware Valley Citizens' Council for Clean Air*, 478 U.S. at 553 n.1 (awarding fees for amicus work); *DeLeon v. Abbott*, 687 F. App'x 340, 343 (5th Cir. 2017); *see also id.* at 347 & n.6 (Elrod, J., concurring in part, dissenting in part) (noting that the majority had awarded fees for time spent supporting amici and agreeing that some amici work is compensable).

State Defendants are wrong to suggest otherwise. Doc. 1196 At 64. Courts have "reject[ed] [Defendants'] apparent belief that there is something unseemly about discussions between

---

[15]     Indeed, counsel have already exercised billing judgment in removing certain hours related to media work. *See, e.g.*, Pérez Decl., Doc. 1174-11 at 4 n.1.

[Plaintiffs] and supportive amici, and conclude[d] that this time is compensable." *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 195 F. App'x 93, 99 n.8 (3d Cir. 2006) (citing *Neonatology Associates, P.A. v. Comm'r of Internal Revenue*, 293 F.3d 128, 131 (3d Cir. 2002) (Alito, J., in chambers)).

### F.   Plaintiffs Provided Adequate Specificity for Time Entries.

State Defendants argue that the descriptions for some logged hours are vague or block-billed. They claim that these issues make it difficult to determine whether these billed hours and costs are reasonable. State Defendants' complaints are overstated and do not merit the reductions they seek.

As State Defendants acknowledge, a finding that time entries are vague or use block billing "does not automatically lead to a reduction in the time billed." Doc. 1196 at 54. As long as the entries describe the accomplished tasks and the total hours represent a reasonable time expenditure, this Court has broad discretion to award fees for time that is purportedly "vague" or "block bill[ed]." *See Louisiana Power & Light Co. v. Kellstrom*, 50 F.3d 319, 325–27 (5th Cir. 1995) (affirming a fee award even where the Court agreed that the time entries were vague); *see also Davis v. Perry*, 991 F. Supp. 2d 809, 836-37 (W.D. Tex. 2014) (three-judge court) (awarding fees for hours that were block-billed), *rev'd. on other grounds sub nom Davis v. Abbott*, 781 F.3d 207 (5th Cir. 2015).

The irrationality of State Defendants' approach on so-called "block billing" is evidenced by their characterization of every minute of time Mr. Rosenberg, one of the lead trial counsel, spent at trial as block-billing, and to use that as a basis for a 20% across-the-board deduction. Mr. Rosenberg's trial time entries are not block-billed. Mr. Rosenberg never recorded more than 12.5 hours on any of the trial days, even though the trial days typically were 10 hours or longer, and

Mr. Rosenberg's time recording precisely describes, each day, the multiple tasks that he performed at trial, including meeting with witnesses, and negotiating evidence and witness issues with the State itself. State Defendants go so far as to characterize all of Mr. Rosenberg's 9.0 billed hours for the last day of trial as block-billing, when trial that day was itself 9.7 hours (separate and apart from any work performed before and after it was in session).[16]

Even more irrationally, Defendants identify fewer than 1% of Brennan Center's time as "block" or "vague" billed and 0% of Lawyers' Committee time as "block" or "vague" billed, yet seek a 20% across-the-board haircut on that basis.

To the extent this Court has concerns about block-billing, it "should analyze whether particular hours were reasonably expended rather than mak[e] an across-the-board reduction based on inadequate documentation." *LULAC No. 4552 v. Roscoe Indep. Sch. Dist.*, 119 F.3d 1228, 1233 (5th Cir. 1997). For example, State Defendants flag 100 hours logged by Ryan Haygood for "[p]reparing, taking, and/or defending depositions of clients, experts, and/or fact witnesses." Doc. 1196 at 56. But, based on deposition transcripts and other records equally available to Texas, Mr. Haygood took, defended, or participated in multiple depositions, including that of Dr. Vernon Burton, Blake Green, Tony Rodriguez, and Janice McCoy. He also oversaw the work of three other attorneys who took or defended the depositions for multiple witnesses. *See* Haygood Decl., Doc. 1146-3 at ¶ 8(f). One hundred hours is a reasonable amount of time to expend on the identified activities.

---

[16] Moreover, Defendants' proposed 20% across-the-board deduction is taken off the total of Plaintiffs' fee application, not the reduced amount that Defendant proposes after deductions for alleged "Excessive" and "Duplicate" billing, but then added to those latter deductions. Even were there a basis for Defendants' proposed 20% haircut, it would be applied *after* any deductions to the base amount of the fee, not before.

### G. Plaintiffs May Recover for Time Spent on *Pro Hac Vice* and Withdrawal Motions.

Finally, Texas alleges that attorney's fees associated with time spent on withdrawal and *pro hac vice* admission are preluded by law. There is "no consensus" among the federal courts concerning costs or fees associated with withdrawal or *pro hac vice* fees may be recovered by a prevailing party. *Davis,* 991 F. Supp. 2d at 840. Federal courts may award costs and fees where the court deems it appropriate. *See, e.g., Fenton v. Colvin*, No. 3:13-CV-29-N-BK, 2014 WL 1664233, at *1 (N.D. Tex. Apr. 25, 2014) (awarding costs associated with pro hac vice admission).

Texas cites an inapposite state case for the incorrect proposition that withdrawal motions are not compensable. Doc. 1196 at 60 (citing *Lee v. Daniels & Daniels*, 264 S.W.3d 273, 281 (Tex. App. 2008)). The case simply held that attorneys cannot charge their client for non-legal services, including time spent in an adversarial relationship with the client. *See Lee,* 264 S.W.3d at 280-81. The state court said nothing about whether time spent on a withdrawal motion is compensable.

## V.   PLAINTIFFS ARE ENTITLED TO ALL REASONABLE COSTS.

"All reasonable out-of-pocket expenses, including charges for photocopying, paralegal assistance, travel, and telephone, are plainly recoverable . . . because they are part of the costs normally charged to a fee-paying client." *Associated Builders & Contractors of Louisiana, Inc. v. Orleans Parish Sch. Bd.*, 919 F.2d 374, 380 (5th Cir. 1990).

Nonetheless, Texas quibbles with certain costs related to video recording, duplication and purchasing deposition transcripts, and online research, as well as postage, couriers, and document retrieval. Texas also bemoans the legibility of certain credit card receipts. Doc. 1169 at 69-70. As discussed below, however, the requested costs are costs ordinarily recoverable in litigation from private clients.

**A.  Plaintiffs are Entitled to Costs for Necessary Video Recording and Duplication.**

As prevailing parties, Plaintiffs are entitled to costs for video depositions and transcripts and paper duplications that are reasonable and necessary for use in the litigation and at trial. Fed. R. Civ. P. 54(d)(1); *see also* 28 U.S.C. § 1920 (listing compensable costs, including costs of "printed or electronically recorded transcripts" and for "making copies of any material").

Copies of deposition transcripts "obtained for use during trial or for trial preparation, rather than for the mere convenience of counsel, may be included in taxable costs." *Fogelman v. ARAMCO*, 920 F.2d 278, 285 (5th Cir. 1991). "Whether a deposition or copy was necessarily obtained for use in the case is a factual determination to be made by the district court." *Id*. at 285-86. This Court is accorded "great latitude in this determination." *Id* at 286.

Here, the merits opinions in this case and the declarations of counsel demonstrate the necessity of the video depositions and the copying of paper transcripts and documents. *See*, *e.g.*, *Baisden v. I'm Ready Prods., Inc*., 793 F. Supp. 2d 970, 977 (S.D. Tex. 2011) (reimbursing the prevailing party for both video depositions and copies of transcripts); *Nilesh Enterprises, Inc. v. Lawyers Title Insurance, Corp*., 2010 WL 2671728, at *3 (W.D. Tex. July 1, 2010) (same). For example, on the merits, this Court repeatedly cited the depositions of Plaintiffs and witnesses like Ms. Bates, Ms. Ghloar, and Ms. Barber, to demonstrate the significant burdens that elderly or low-income voters of color face, *see*, *e.g., Veasey v. Perry*, 71 F. Supp. 3d 627, 665, 669-70, 690 (S.D. Tex. 2014), as well as the depositions of state officials and legislators who were unable to attend trial. *See, e.g*., *id*. at 648-49 & nn.95-103 (crediting the deposition testimony of various legislators).

This Court and State Defendants could reasonably observe from trial that video recordings and printed transcripts were necessary because many Plaintiffs, other affected voters, and witnesses who provided crucial testimony via depositions could not appear at trial because they

were "more than 100 miles from the place of the hearing," were unable to travel due to "age, illness, [or] infirmity," or faced other burdens that lead them to be "unavailable" under Rule 32. *See* Fed. R. Civ. P. 32(a)(4) (permitting the use of depositions for unavailable witnesses). Because these costs were reasonable and proper, Plaintiffs should be fully compensated for these copying and video deposition costs.

### B.  Plaintiffs Are Entitled to Recover for Research Costs.

Courts have long rejected State Defendants' argument, Doc. 1196 at 72-74, that online research costs like Pacer, Westlaw, or LexisNexis costs are unrecoverable overhead. *See*, *e.g.*, *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany*, 369 F.3d 91, 98 (2d Cir. 2004); *Role Models America, Inc. v. Brownlee*, 353 F.3d 962, 975 (D.C. Cir. 2004); *Case v. Unified Sch. Dist. No. 233*, 157 F.3d 1243, 1257-58 (10th Cir. 1998); *Johnson v. University College of the Univ. of Ala. in Birmingham,* 706 F.2d 1205, 1209 (11th Cir.1983). Rather, because "paying" clients "reimburse[ ] lawyers' Lexis and Westlaw expenses, just as [they] reimburse[ ] their paralegal expenses," these costs are compensable as fee awards. *In re Continental Illinois Securities Lit.*, 962 F.2d 566, 570 (7th Cir. 1992). The only question is whether the requested costs are reasonable.

Here, this Court should determine that the $50,256.76 in research costs billed by Dechert is reasonable given that this case has lasted for seven years, required hundreds of briefs and other filings in this court, has a lengthy docket sheet, and led to multiple appeals to the Fifth Circuit and U.S. Supreme Court. There is no *per se* rule requiring that counsel keep detailed notes of the research done to prove reasonableness. And courts have awarded online research costs for litigation of similar length and complexity without requiring counsel to provide extensive documentation. *See*, *e.g.*, *Structural Metals, Inc. v. S & C Elec. Co.*, No. SA-09-CV-984-XR, 2013

WL 3790307, at *12 (W.D. Tex. July 19, 2013), *aff'd,* 590 F. App'x 298 (5th Cir. 2014); *In re Frazin*, 413 B.R. 378, 437 (Bankr. N.D. Tex. 2009), *aff'd in part, rev'd in part*, 732 F.3d 313 (5th Cir. 2013); *John G. Raymond, Inc. v. Blair*, No. CIV.A. 09-5507, 2012 WL 1135778, at *8 (E.D. La. Jan. 10, 2012), *report and recommendation approved*, 2012 WL 1135911 (E.D. La. Apr. 4, 2012); *Fluor Corp. v. Citadel Equity Fund Ltd.*, No. 3:08-CV-1556, 2011 WL 3820704, at *6 (N.D. Tex. Aug. 26, 2011); *Camargo v. Trammell Crow Interest Co.*, 318 F. Supp. 2d 448, 451 (E.D. Tex. 2004).

The Court should also determine that the contested $37,361.02 in research costs billed by the Brennan Center is reasonable. These costs were incurred to hire contractors to research and assess the impact of the voter identification law on Texas voters. Contrary to Texas's contention, they are adequately documented and explained in the papers the Brennan Center has submitted in support of the motion for attorneys' fees.

### C.  Postage Costs are Compensable.

State Defendants argue that postage costs are not compensable. Doc. 1196 at 77. This is inaccurate. Postage costs specific to the litigation are routinely compensated. *See, e.g., Miller v. Carson*, 628 F.2d 346, 349 (5th Cir. 1980) (affirming award of costs, including postage, in civil rights case); *Jordan v. Allain*, 619 F.Supp. 98, 115 (N.D. Miss. 1985) (awarding costs, including postage, in Voting Rights Act case); *Major v. Treen*, 700 F. Supp. 1422, 1452 (E.D. La. 1988) (awarding costs, including postage, in a voting rights case); *Beamon v. City of Ridgeland*, 666 F. Supp. 937, 946 (S.D. Miss. 1987) (awarding costs, including postage, in Voting Rights Act case).

### D.  Credit Card Receipts Provide Adequate Proof of Compensable Costs.

Despite State Defendants' complaints, courts do accept credit card receipts as sufficient proof of compensable costs incurred. *See, e.g., Lighthouse Rescue Mission, Inc. v. City of Hattiesburg, Miss.*, No. 2:12–CV–184–KS–MTP, 2014 WL 1653108, at *5 (S.D. Miss. April 23,

2014) (awarding costs based on credit card billing statements); *see also Martin v. Mabus*, 734 F.Supp. 1216, 1231 n.7 (S.D. Miss. 1990) (awarding costs despite lack of any receipts but noting credit card receipts as acceptable form of proof). State Defendants cite no authority to the contrary.

\* \* \*

Private Plaintiffs achieved a major voting rights victory—beating back a voter photo identification law that the Fifth Circuit agreed was the "strictest" ID law in the nation, *Veasey I*, 830 F.3d at 256 n.52—entitling them, as prevailing parties, to their requested fees. As explained above, and in the accompanying filings for the individual Plaintiff groups in response to State Defendants' specific arguments, the fees sought are reasonable, and indeed reflect the exercise of substantial billing judgment. To the extent the fees incurred by Private Plaintiffs are large, it is because of State Defendants' litigation choices. Having protracted the litigation at every step, State Defendants cannot now complain that the litigation was costly.

## CONCLUSION

For the foregoing reasons, Private Plaintiffs' motion for attorneys' fees and costs should be granted.

February 7, 2020                                   Respectfully submitted,


                                                  /s/ J. Gerald Hebert
                                                  J. GERALD HEBERT
                                                  DANIELLE M. LANG
                                                  Campaign Legal Center
                                                  1101 14th St. NW, Suite 400
                                                  Washington, DC 20005

                                                  CHAD W. DUNN
                                                  K. SCOTT BRAZIL
                                                  BRAZIL & DUNN
                                                  4407 Bee Caves Road
                                                  Building 1, Suite 111
                                                  Austin, TX 78746

34

ARMAND G. DERFNER
Derfner & Altman
575 King Street, Suite B
Charleston, S.C. 29403

NEIL G. BARON
Law Office of Neil G. Baron
914 FM 517 W, Suite 242
Dickinson, Texas 77539

DAVID RICHARDS
Richards, Rodriguez & Skeith, LLP
816 Congress Avenue, Suite 1200
Austin, Texas 78701

*Counsel for Veasey/LULAC Plaintiffs*

/s/ Lindsey B. Cohan
JON M. GREENBAUM
EZRA D. ROSENBERG
BRENDAN B. DOWNES
Lawyers' Committee for
Civil Rights Under Law
1401 New York Avenue NW Suite 400
Washington, D.C. 20005
WENDY WEISER
MYRNA PÉREZ
The Brennan Center for Justice at NYU Law School
120 Broadway, Suite 1750
New York, New York 10271

SIDNEY S. ROSDEITCHER
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019-6064

LINDSEY B. COHAN
Dechert LLP
500 W. 6th Street, Suite 2010
Austin, Texas 78701

NEIL STEINER
DECHERT LLP
1095 Avenue of the Americas

35

New York, New York 10036-6797

JOSE GARZA
Law Office of Jose Garza
7414 Robin Rest Drive
San Antonio, Texas 98209

DANIEL GAVIN COVICH
Covich Law Firm LLC
802 N Carancahua, Ste 2100
Corpus Christi, Texas 78401

GARY BLEDSOE
Potter Bledsoe, LLP
316 W. 12th Street, Suite 307
Austin, Texas 78701

VICTOR GOODE
NAACP
4805 Mt. Hope Drive
Baltimore, Maryland 21215

ROBERT NOTZON
The Law Office of Robert Notzon
1502 West Avenue
Austin, Texas 78701

*Counsel for the Texas State Conference of NAACP Branches and the Mexican American Legislative Caucus of the Texas House of Representatives*

/s/ Leah Aden
SHERRILYN IFILL
JANAI NELSON
LEAH C. ADEN
DEUEL ROSS
NAACP Legal Defense and Educational Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006

JONATHAN PAIKIN
KELLY P. DUNBAR
TANIA FARANSSO
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006

36

*Counsel for Imani Clark*

LUIS ROBERTO VERA, JR.
Law Office of Luis Roberto Vera Jr.
111 Soledad, Ste 1325
San Antonio, TX 78205

*Counsel for LULAC*

/s/ Rolando L. Rios
ROLANDO L. RIOS
115 E. Travis, Suite 1645
San Antonio, Texas 78205

*Counsel for the Texas Association of Hispanic County Judges and County Commissioners*

/s/ Robert W. Doggett
ROBERT W. DOGGETT
SHOSHANA J. KRIEGER
Texas RioGrande Legal Aid
4920 N. IH-35
Austin, Texas 78751

JOSE GARZA
Texas RioGrande Legal Aid
1111 N. Main Ave.
San Antonio, Texas 78212

*Counsel for Lenard Taylor, Eulalio Mendez Jr., Lionel Estrada, Estela Garcia Espinoza, Margarito Martinez Lara, Maximina Martinez Lara, and La Union Del Pueblo Entero, Inc.*

37

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 7, 2020, a true and correct copy of the foregoing document was served via the Court's ECF system to all counsel of record.


<u>/s/ J. Gerald Hebert</u>
Counsel for Plaintiffs

**Exhibit B**
**Timekeeper Summary**

**EXHIBIT B**

THOMPSON & KNIGHT LLP
TIMEKEEPER SUMMARY
February 8, 2019-May 28, 2019

| Name of Professional | Position with T&K and Date Admitted to Practice | Practice Area | Hourly Billing Rate | Hours | Fee |
|---|---|---|---|---|---|
| Demetra L. Liggins | Partner- 2000 | Bankruptcy | $640.00 | 206.40 | $128,256.00 |
| Cassandra S. Shoemaker | Counsel- 2009 | Bankruptcy | $540.00 | 406.00 | $212,760.00 |
| Christopher A. Bailey | Associate- 2018 | Bankruptcy | $355.00 | 381.20 | $135,326.00 |
| Terri Helge | Counsel- | Tax | $470.00 | 14.00 | $6,580.00 |
| Amy Curtis | Partner- 1998 | Corporate & Securities | $735.00 | 110.30 | $81,070.50 |
| Tonya Maksimenko | Associate- 2017 | Corporate & Securities | $430.00 | 33.60 | $14,448.00 |
| Matthew Alexander | Associate- 2016 | Bankruptcy/Finance | $430.00 | 13.50 | $5,805.00 |
| Monica Hart | Associate- 2015 | Real Estate & Banking | $430.00 | 19.10 | $8,213.00 |
| Jean Anderson | Paralegal | Bankruptcy | $310.00 | 93.90 | $29,109.00 |
| Other Professionals (each with less than 10 hours of time) | Various | Various | $517.72 (Average) | 48.70 | $25,213.00 |
| **TOTAL** | | | | **1326.7** | **$646,780.50** |



**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**CORPUS CHRISTI DIVISION**

ENTERED
09/16/2019

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO. 19-20063** |
| **SQLC SENIOR LIVING CENTER** | § | |
| **AT CORPUS CHRISTI, INC. d/b/a** | § | **CHAPTER 11** |
| **MIRADOR** | § | |
| | § | |
| Debtor. | § | |

**ORDER APPROVING FIRST AND FINAL FEE APPLICATION OF**
**THOMPSON & KNIGHT LLP**
(Docket No. 217)

The Court has considered the First and Final Fee Application of Thompson & Knight LLP

("TK").  The Court finds that (a) it has jurisdiction over this matter pursuant to 28 U.S.C. §§157

and 1334; (b) this matter is a core proceeding pursuant to 28 U.S.C. § 157(b); (c) notice of the

Application and hearing thereon was adequate, no objections were filed, and no other and further

notice is required; (d) the fees and expenses requested are reasonable, necessary, and beneficial to

estate; and (e) the services performed by TK were of a direct, tangible, and identifiable benefit to

the estates.  Therefore, it is

**ORDERED** that the Application is **APPROVED** on a final basis as provided herein.  It is

further

**ORDERED** that TK shall be allowed on a final basis compensation of $646,780.50 and

reimbursement of expenses in the amount of $16,496.91 for services rendered on behalf of the

Debtor for the period of February 8, 2019 through May 28, 2019.  It is further

**ORDERED** that the Debtor pay TK $401,263.30 in unpaid fees and $2,692.18 in unpaid

expenses.  It is further

**ORDERED** that the Liquidating Trustee is authorized to pay all outstanding amounts owing to TK on account of the fees and expenses approved by this Order within (5) calendar days from the date this Order becomes final and non-appealable. It is further

**ORDERED** that this Court shall retain jurisdiction to hear and consider all matters arising from the interpretation or implementation of this Order.

Signed:  **September 16, 2019**

**DAVID R. JONES**
**UNITED STATES BANKRUPTCY JUDGE**

**SUMMARY OF COMPENSATION REQUESTED BY PROFESSIONAL**

| Name of Professional | Position | Department | Date of Admission | Hourly Rate | Total Billed Hours | Total Compensation |
|---|---|---|---|---|---|---|
| Lonczak, Don J. | Partner | Tax, Income Tax | 1992 | 975.00 | 1.1 | 1,072.50 |
| Sterling, David D. | Partner | Litigation | 1984 | 900.00 | 4.8 | 4,320.00 |
| Weston, Rubin | Partner | Corporate, Finance | 1995 | 900.00 | 1.0 | 900.00 |
| Poff, Joe S. | Partner | Global Projects, Corporate / Securities | 1980 | 850.00 | 280.9 | 237,490.00 |
| Prince, James R. | Partner | Bankruptcy | 1992 | 850.00 | 114.4 | 96,560.00 |
| Cuomo, Paul C. | Partner | Litigation / Antitrust and Competition Law Group | 1995 | 850.00 | 0.8 | 680.00 |
| Fowler, II, J. Rob | Partner | Tax, Employee Benefits and Executive Compensation | 1996 | 800.00 | 16.0 | 12,800.00 |
| Stutts, William F. | Partner | Corporate / Finance | 1976 | 775.00 | 104.1 | 80,677.50 |
| Bisch, Mark | Partner | Corporate | 1994 | 775.00 | 31.1 | 24,102.50 |
| Korney, Sean J. | Partner | Global Projects | 1994 | 775.00 | 2.9 | 2,247.50 |
| Florey, Tull R. | Partner | Corporate / Securities | 1995 | 775.00 | 27.3 | 21,157.50 |
| Rodriguez, Cristina E. | Partner | Litigation, Securities and Professional Liability Litigation Group, Labor and Employment Group | 1995 | 775.00 | 34.1 | 26,427.50 |
| Kline, Samara L. | Partner | Litigation, Appellate Group | 1989 | 750.00 | 30.0 | 22,500.00 |
| Elsayed, Hassan | Partner | Corporate | 1985 | 725.00 | 28.5 | 20,662.50 |
| Mountz, Timothy W. | Partner | Litigation | 1979 | 700.00 | 139.6 | 97,720.00 |
| Reilly, Paul J. | Partner | Intellectual Property / Trademark | 1995 | 700.00 | 0.8 | 560.00 |
| Moore, Bridget M. | Partner | Litigation, White Collar and Corporate Investment Group Securities and Professional Liability Litigation Group | 2000 | 700.00 | 7.0 | 4,900.00 |
| Trulock, Jennifer M. | Partner | Litigation, Labor and Employment Group, White Collar and Corporate Investment Group | 1997 | 650.00 | 12.3 | 7,995.00 |
| McDowell, C. Luckey | Partner | Bankruptcy | 2002 | 650.00 | 696.8 | 433,712.50 |
| O'Brien, Tom E. | Partner | Litigation, Securities and Professional Liability Litigation Group | 2004 | 650.00 | 49.0 | 31,850.00 |

| Name of Professional | Position | Department | Date of Admission | Hourly Rate | Total Billed Hours | Total Compensation |
|---|---|---|---|---|---|---|
| | | | | | | |
| Foster, J. Gail | Special Counsel | Litigation | 1984 | 575.00 | 14.9 | 8,567.50 |
| Alaniz, Omar J. | Special Counsel | Bankruptcy | 2003 | 575.00 | 485.6 | 272,693.75 |
| | | | | | | |
| Tiller, Patricia M. | Senior Associate | Global Projects | 2005 | 575.00 | 10.3 | 5,922.50 |
| Hefley, Amy P. | Senior Associate | Litigation, Appellate Group Technology & IP Litigation Group, Securities and Professional Liability Litigation Group | 2004 | 550.00 | 2.4 | 1,320.00 |
| Bristow, James W. | Senior Associate | Litigation, Technology and IP Litigation Group | 2005 | 550.00 | 56.2 | 30,910.00 |
| Roberts, Ian E. | Associate | Bankruptcy | 2006 | 550.00 | 405.4 | 219,037.50 |
| Hunsaker, Matt C. | Senior Associate | Tax (State) | 2005 | 550.00 | 3.9 | 2,145.00 |
| Thomison, Andrew L. | Senior Associate | Corporate / Finance | 2007 | 550.00 | 140.5 | 77,275.00 |
| Essigmann, Brandon J. | Senior Associate | Tax, Employee Benefits and Executive Compensation | 2007 | 550.00 | 13.4 | 7,370.00 |
| Ryan, Katie J. | Senior Associate | Corporate / Securities | 2007 | 550.00 | 15.7 | 8,635.00 |
| Stanley, Elizabeth K. | Senior Associate | Intellectual Property / Trademark | 2007 | 550.00 | 4.8 | 2,640.00 |
| Christensen, Guillermo S. | Associate | Global Projects | 2007 | 550.00 | 1.6 | 880.00 |
| Voyce, Jessica L. | Associate | Bankruptcy | 2010 | 475.00 | 400.8 | 190,380.00 |
| Allen, Hunter T. | Associate | Litigation | 2010 | 475.00 | 7.0 | 3,325.00 |
| Zhang, Jenny X. | Associate | Corporate / Finance | 2011 | 450.00 | 80.5 | 36,225.00 |
| Gilstrap, Meggie | Associate | Litigation | 2011 | 400.00 | 192.2 | 76,000.00 |
| Cuenin, Ari | Associate | Litigation | 2011 | 400.00 | 59.5 | 23,800.00 |
| Carter, Caroline Nan | Associate | Litigation | 2011 | 400.00 | 113.4 | 45,360.00 |
| White, Kim Tuthill | Associate | Environmental | 2011 | 400.00 | 1.5 | 600.00 |
| Caballero, Josue | Associate | Litigation | 2012 | 400.00 | 1.5 | 600.00 |
| Culpepper, Clint W. | Associate | Corporate / Finance | 2012 | 400.00 | 0.5 | 200.00 |
| Herman, Russ G. | Associate | Litigation | 2012 | 400.00 | 49.5 | 19,800.00 |
| Dinur, Alex E. | Associate | Corporate | 2013 | 325.00 | 9.1 | 2,957.50 |
| Bloch-Wehba, Hanna C. | Associate | Litigation | 2013 | 325.00 | 2.9 | 942.50 |
| Davis, Charles M. | Associate | Corporate | 2013 | 325.00 | 107.7 | 35,002.50 |
| Andersen, Wicki | Trainee Lawyer | Global Projects | N/A | 300.00 | 21.3 | 6,390.00 |

| Name of Professional | Position | Department | Date of Admission | Hourly Rate | Total Billed Hours | Total Compensation |
|---|---|---|---|---|---|---|
| Doyle, Rachel J. | Document Review Lawyer | Litigation | 1985 | 275.00 | 1.8 | 495.00 |
| Howard, Cheryl J. | Document Review Lawyer | Litigation | 1989 | 275.00 | 4.0 | 1,100.00 |
| Mwine, K.E. Sas | Document Review Lawyer | Litigation | 2000 | 275.00 | 1.8 | 495.00 |
| Saleski, Adam B. | Document Review Lawyer | Litigation | 2003 | 275.00 | 1.0 | 275.00 |
| | | | | | | |
| Pacifici, Eric B. | Summer Associate | Corporate | N/A | 250.00 | 25.8 | 6,450.00 |
| Smith, Sarah A. | Summer Associate | Litigation | N/A | 250.00 | 11.5 | 2,875.00 |
| Fontenla, Rory M. | Senior Paralegal | Bankruptcy | N/A | 250.00 | 76.2 | 19,050.00 |
| Caine, Robert M. | Senior Paralegal | Corporate | N/A | 250.00 | 4.6 | 1,150.00 |
| Buenzow, Leslie L. | Senior Paralegal | Litigation | N/A | 250.00 | 0.3 | 75.00 |
| Porterfield, Ceciley K. | Senior Paralegal | Intellectual Property / Trademark | N/A | 250.00 | 2.8 | 700.00 |
| Little, Lynn A. | Paralegal | Corporate | N/A | 250.00 | 5.1 | 1,275.00 |
| Avery, Deborah | Senior Paralegal | Litigation | N/A | 250.00 | 5.4 | 1,350.00 |
| Coleman, Sarah M. | Law Clerk | Finance | N/A | 250.00 | 9.5 | 2,375.00 |
| Lowe, Mary R. | Paralegal Clerk | Corporate | N/A | 150.00 | 1.0 | 150.00 |
| Montalvo, Cynthia | Research Librarian | Library Services | N/A | 150.00 | 3.1 | 465.00 |
| Pravata, Richard | Research Librarian | Library Services | N/A | 150.00 | 4.4 | 660.00 |
| | | | | | 3,942.9 | $2,246,253.75 |

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### CORPUS CHRISTI DIVISION

ENTERED
08/26/2014

|  |  |  |
|---|---|---|
| In re | § | Chapter 11 |
|  | § |  |
| AUTOSEIS, INC., *et al.*,[1] | § | Case No. 14-20130 |
|  | § |  |
| Debtors. | § | Jointly Administered |
|  | § |  |
|  | § |  |

### ORDER GRANTING FIRST INTERIM FEE APPLICATION OF BAKER BOTTS L.L.P., COUNSEL TO DEBTORS, FOR ALLOWANCE AND PAYMENT OF COMPENSATION FOR SERVICES RENDERED AND REIMBURSEMENT OF EXPENSES INCURRED FOR THE PERIOD MARCH 25, 2014 THROUGH JUNE 30, 2014

The Court considered the First Interim Fee Application of Baker Botts L.L.P.,
Counsel to Debtors, for Allowance and Payment of Compensation for Services Rendered and
Reimbursement of Expenses Incurred for the Period March 25, 2014 through June 30, 2014
(the "Application") dated August 1, 2014. The Court, having considered the Application and
arguments of counsel, and no objections having been filed or such objections having been
overruled or otherwise resolved by entry of this Order, hereby finds and concludes for the
purposes of this interim order that the fees and expenses documented by the Application are
reasonable and necessary, represent a benefit to the estate and should be allowed.

On April 25, 2014, the Court entered the Agreed Order Establishing
Procedures for Interim Compensation and Reimbursement of Expenses for Case
Professionals [Doc #246] (the "Interim Compensation Order"). Pursuant to the Interim
Compensation Order, Applicant submitted the following monthly interim statements of
professional fees and expenses to the Debtor, the United States Trustee, counsel for the
lenders of the debtor in possession credit facility and the Official Committee of Unsecured

---

[1] The Debtors in these chapter 11 cases are: Autoseis, Inc. (5224); Global Geophysical Services, Inc. (4281); Global Geophysical EAME, Inc. (2130); Global International Holdings, Inc. (2420); Accrete Monitoring, Inc. (2256); and Autoseis Development Company (9066).

Creditors and received the 80% payment of fees and 100% payment of expenses as set forth in the Interim Compensation Order as follows:

| Invoice Date | Billing Period | Total Fees Requested (100%) | Expenses Requested (100%) | Payment Received and Date Received | Remaining Balance (Unpaid fees and expenses) |
|---|---|---|---|---|---|
| 5/15/2014 | March 2014 | $239,467.50 | $12,570.05 | $204,144.05; 6/4/2014 | $47,893.50 |
| 5/19/2014 | April 2014 | $1,162,506.25 | $18,760.86 | $948,765.82; 6/4/2014 | $232,501.29 |
| 6/17/2014 | May 2014 | $446,415.00 | $14,266.23 | $371,398.23; 7/7/2014 | $89,283.00 |
| 7/18/2014 | June 2014 | $397,865.00 | $14,920.50 | $333,212.50; 8/5/2014 | $79,573.00 |
| **Total** | | **$2,246,253.75** | **$60,517.64** | **$1,857,520.60** | **$449,250.79** |

After consultation with the U.S. Trustee, Baker Botts announced at the hearing on the Application the following revisions to its fee application:

- Baker Botts voluntarily reduced the fees requested in its Application by $3,770.00; and

- Baker Botts voluntarily reduced certain expenses requested in its Application by $4,515.51 (the "Prepetition Expenses") because such expenses were incurred prior to the petition date.

IT IS THEREFORE

**ORDERED** that the fees and expenses requested by Baker Botts L.L.P. ("Baker Botts"), totaling $2,242,483.75 and $56,002.13 respectively, covering the period of time from March 25, 2014 through June 30, 2014 is hereby approved and allowed on an interim basis; it is further

**ORDERED** that upon entry of the this order, or within five business days thereafter, the Debtors shall pay to Baker Botts $440,965.28, which represents the 20% withheld amount of fees allowed and approved less the reductions announced by Baker Botts at the hearing and reflected above; and it is further

**ORDERED** that Baker Botts is authorized and directed to immediately set off the Prepetition Expenses against its prepetition retainer, reducing the balance of the retainer by $4,515.51.

Dated: Aug. 26, 2014

RICHARD S. SCHMIDT
UNITED STATES BANKRUPTCY JUDGE

<u>**EXHIBIT B**</u>

**SHERWIN ALUMINA COMPANY, LLC, ET AL.**
**ORDINARY COURSE PROFESSIONAL FOR THE DEBTOR**
**SUMMARY OF TIMEKEEPERS**
<u>**FROM MARCH 25, 2016 THROUGH OCTOBER 31, 2016**</u>

| Professional | Position/Department/ Admission Date | Hourly Billing Rate | Total Hours | Total Fees |
|---|---|---|---|---|
| Marshall B. Babson | Counsel/Labor & Employment Admitted 1975 | $1,065.00 | 655.20 | $697,788.00 |
| Gus A. Paloian | Partner/Bankruptcy Admitted 1984 | $825.00 | .80 | $660.00 |
| John L. Collins | Partner/Labor and Employment - Complex Discrimination Litigation Admitted 1980 | $710.00 | 31.50 | $22,365.00 |
| Joshua L. Ditelberg | Partner/Labor and Employment Admitted 1991 | $705.00 | 1.20 | $846.00 |
| Adam Smiley | Associate/ Labor & Employment Admitted 2005 | $565.00 | 207.40 | $117,181.00 |
| Kay Hazelwood | Senior Counsel/Litigation Commercial Litigation Admitted | $490.00 | 3.30 | $1,617.00 |
| Jade Gilstrap | Associate/Labor & Employment Admitted 2014 | $455.00 | 3.80 | $1,729.00 |
| Bret M. Harper | Associate/Bankruptcy Admitted 2009 | $445.00 | 1.50 | $667.50 |
| Jennifer M. McManus | Paralegal Bankruptcy | $370.00 | 20.60 | $7,622.00 |
| Yan Deng | Library Supervisor | $240.00 | .10 | $24.00 |
| **TOTAL** | | | **925.40** | **$850,499.50** |

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

ENTERED
11/30/2016

|  |  |  |
|---|---|---|
| In re: | § | Chapter 11 |
|  | § |  |
| SHERWIN ALUMINA COMPANY, LLC, *et al.*,[1] | § | Case No. 16-20012 |
|  | § |  |
| Debtors. | § | (Jointly Administered) |
|  | § | **David R. Jones** |

**ORDER GRANTING FIRST INTERIM APPLICATION OF SEYFARTH SHAW LLP
AS ORDINARY COURSE PROFESSIONAL FOR THE DEBTORS AND
DEBTORS IN POSSESSION FOR ALLOWANCE OF COMPENSATION
FOR SERVICES RENDERED AND REIMBURSEMENT OF EXPENSES
FOR THE PERIOD OF MARCH 25, 2016 THROUGH OCTOBER 31, 2016**
(Docket No. 917)

Upon the fee application (the "Fee Application")[2] of the above-captioned debtors and

debtors in possession (collectively, the "Debtors") for entry of an order (this "Order"):

(a) approving payment to Seyfarth of compensation for professional services rendered to the

Debtors and for reimbursement of actual and necessary expenses incurred in connection with

such services from March 25, 2016 through and October 31, 2016; and (b) granting related relief,

all as more fully set forth in the Fee Application; and after due deliberation, it is HEREBY

ORDERED THAT:

1.      The Fee Application is granted as set forth herein.

2.      Compensation to Seyfarth for professional services rendered during the

Compensation Period is allowed on an interim basis in the amount of $850,499.50.

---

[1]    The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal
tax identification number, are: Sherwin Alumina Company, LLC (2376); and Sherwin
Pipeline, Inc. (9047).  The debtors' service address is:  4633 Highway 361, Gregory, Texas
78359.

[2]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them
in the Fee Application.

3.     Reimbursement to Seyfarth for expenses incurred during the Compensation Period is allowed on an interim basis in the amount of $32,204.70.

4.     The Debtors are authorized ~~and directed~~ to pay Seyfarth all fees and expenses allowed pursuant to this Order.

**Signed:  November 30, 2016**

**DAVID R. JONES**
**UNITED STATES BANKRUPTCY JUDGE**