United States District Court
Southern District of Texas

**ENTERED**

May 27, 2020

David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| MARC  VEASEY, *et al*, | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. 2:13-CV-193 |
| | § | |
| GREG  ABBOTT, *et al*, | § | |
| | § | |
| Defendants. | § | |

## <u>ORDER ON MOTIONS FOR ATTORNEY'S FEES</u>

Plaintiffs brought this case against the State of Texas[1] to preserve the right to vote for hundreds of thousands of Texas citizens potentially disenfranchised by Texas Senate Bill 14 (2011) (SB 14), the most restrictive photo identification law passed in the United States.  This dispute involved protracted litigation through all levels of the federal court system, multiple times.  After trial,[2] application of a Fifth Circuit stay of wholesale injunctive relief,[3] Supreme Court refusal to vacate the stay,[4] appeal on the merits,[5] en banc rehearing,[6] petition for certiorari,[7] partial remand,[8] another stay of the wholesale

---

[1]  Defendants are the State of Texas, along with its Governor and Secretary of State in their official capacities.  The elected officials have changed during the course of this case and Defendants are referred to jointly as the State or Texas.

[2]  *Veasey v. Perry (Veasey I)*, 71 F. Supp. 3d 627 (S.D. Tex. 2014), finding violations of § 2 of the Voting Rights Act (discriminatory result and discriminatory purpose) and violations of United States Constitution, Amends. XIV, XV and XXIV (discrimination, poll tax) and issuing a wholesale injunction against enforcement of SB 14.

[3]  *Veasey v. Perry (Veasey II)*, 769 F.3d 890 (5th Cir. 2014), issuing a stay against the wholesale injunctive relief as having been entered too close to scheduled elections.

[4]  *Veasey v. Perry (Veasey III)*, 135 S. Ct. 9 (2014).

[5]  *Veasey v. Abbott (Veasey IV)*, 796 F.3d 487 (5th Cir. 2015) (panel decision), affirming the VRA discriminatory effect decision and remanding for a remedy, remanding the discriminatory purpose finding, vacating the unconstitutional discrimination decision under the doctrine of constitutional avoidance, and reversing and rendering the poll tax decision.

[6]  *Veasey v. Abbott (Veasey V)*, 830 F.3d 216 (5th Cir. 2015) (en banc) (echoing the panel's decision).

injunction,[9] and a remedy decision,[10] the final determination was that SB 14 had racially discriminatory results in violation of § 2 of the Voting Rights Act (VRA) and Plaintiffs were entitled to a remedy that would ameliorate its draconian limits.[11]

Now before the Court are motions filed by each of the five sets of Plaintiffs,[12] seeking awards of attorney's fees and expenses as prevailing parties.  In total, they seek:

---

[7]   *Abbott v. Veasey (Veasey VI)*, 137 S. Ct. 612 (2017) (denying the State's petition for cert.).

[8]   *Veasey v. Abbott (Veasey VII)*, 249 F. Supp. 3d 868 (S.D. Tex. 2017) (re-weighing evidence and re-finding a violation of the VRA with respect to discriminatory purpose).

[9]   *Veasey v. Abbott (Veasey VIII)*, 870 F.3d 387 (5th Cir. 2017) (staying wholesale injunction that would have prevented enforcement of SB 14 and additional legislation).

[10]   *Veasey v. Abbott (Veasey IX)*, 888 F.3d 792 (5th Cir. 2018) (leaving discriminatory purpose determination undisturbed, but reversing wholesale injunctive remedy).  When a court defers to a legislative change, it may issue a "remedy decision" to determine whether the legislature's action cured the violation.  *See Miss. State Chapter, Operation Push, Inc. v. Mabus*, 932 F.2d 400, 409 (5th Cir. 1991) (describing the court's decision as to whether a legislative response to a VRA violation was adequate as a "remedy decision").  In such circumstances, the plaintiff remains the prevailing party.  *Staley v. Harris Cnty., Tex.*, 485 F.3d 305, 314 (5th Cir. 2007) (a defendant's post-judgment action that moots the remedy does not prevent the successful plaintiff from being the "prevailing party").

[11]   While the Fifth Circuit did not reverse this Court's finding that SB 14 also violated VRA § 2 on the basis of its discriminatory purpose, the court made a "remedy decision" that no further relief was appropriate on that basis, once the Texas legislature passed Senate Bill 5 (2017).  SB 5 adopted ameliorative provisions largely mirroring this Court's interim order for relief.  Plaintiffs' request for attorney's fees is limited to the portion of the case resulting in the discriminatory results determination.  They do not request fees or expenses for work done after remand on the discriminatory purpose issue.

[12]   Texas Association of Hispanic County Judges and County Commissioners (HJ&C) (D.E. 1142); Marc Veasey and the League of Latin American Citizens (LULAC) (together, Veasey-LULAC) (D.E. 1143, 1175); La Union del Pueblo Entero (LUPE), Lenard Taylor, Eulalio Mendez, Jr., Lionel Estrada, Estela Garcia Espinosa, and Maximina Lara (together, LUPE-Taylor) (D.E. 1144); Texas State Conference of NAACP Branches (Texas NAACP) and the Mexican American Legislative Caucus (MALC) (together, NAACP-MALC) (D.E. 1145, 1174, 1187); and Imani Clark (Clark) (D.E. 1146, 1172).

| AMOUNTS REQUESTED | | | | | |
|---|---|---|---|---|---|
| Plaintiff Group | Firm | Firm Fees | Firm Expenses | Total Fees | Total Expenses |
| Veasey-LULAC | Campaign Legal Ctr | $768,733.14 | $111,003.27 | | |
| | Brazil & Dunn | 663,834.55 | 300,215.29 | | |
| | Derfner & Altman | 714,512.80 | 13,623.82 | | |
| | Baron | 164,078.12 | 2,115.83 | | |
| | SUBTOTALS | | | $2,311,158.61 | $426,958.21 |
| NAACP-MALC | Lawyers Committee | 583,962.19 | 16,883.09 | | |
| | Dechert LLP | 1,484,304.60 | 267,418.95 | | |
| | Brennan Center for Justice | 246,689.90 | 51,405.95 | | |
| | Texas NAACP | 67,812.95 | 898.75 | | |
| | MALC | 50,817.70 | 2,016.04 | | |
| | SUBTOTALS | | | 2,433,587.34 | 338,622.78 |
| Clark | NAACP LDF | 932,075.72 | 136,635.97 | | |
| | WilmerHale | 982,787.50 | 25,000.00 | | |
| | SUBTOTALS | | | 1,914,863.22 | 161,635.97 |
| HJ&C | Rolando L. Rios & Assoc. | 220,269.29 | 654.37 | 220,269.29 | 654.37 |
| LUPE-Taylor | Tex. RioGrande Legal Aid | 1,004,353.30 | 44,273.62 | 1,004,353.30 | 44,273.62 |
| | | | | | |
| | TOTALS | | | $7,884,231.76 | $972,144.95 |
| | | | | | |
| | GRAND TOTAL | | | $8,856,376.71 | |

The State, in a single response (D.E. 1196), has challenged each request, claiming that Plaintiffs did not prevail as that term is interpreted in civil rights litigation and that the amounts requested are inappropriate with respect to hours, rates, the type of work or expenses claimed, and results obtained.  In sum, the State argues that the total fee award should not exceed $4,977,419.50, not including expenses.  D.E. 1196, p. 37.

Plaintiffs replied,[13] defending their prevailing party status and, in addition to countering the State's arguments regarding the types of fees and expenses that are compensable, pointed out multiple methodological mistakes and errors of arithmetic in

---

[13]   Private Plaintiffs' joint reply (D.E. 1207); Intervenor-Plaintiff Texas Association of Hispanic Judges (D.E. 1205); Veasey-LULAC Plaintiffs (D.E. 1210); Taylor-LUPE Plaintiffs (D.E. 1206); NAACP-MALC Plaintiffs (D.E. 1208); and Intervenor-Plaintiff Clark (D.E. 1209).

the State's requested deductions. For the reasons set out below, the Court GRANTS the motions, HOLDS that Plaintiffs are prevailing parties entitled to awards of attorney's fees and expenses, and ORDERS that Plaintiffs shall recover against the State their reasonable attorney's fees and expenses, in the amounts detailed and modified below.

## FACTS

In *Veasey V*, the Fifth Circuit affirmed the finding that the State violated VRA § 2 because SB 14 produced discriminatory results. That holding was not appealed and has not been disturbed. The Court remanded the case to this Court for an appropriate interim remedy for that violation. The relief was to be interim in order to provide immediate relief for the established violation, while completing the balance of the case—the reconsideration of the discriminatory purpose violation and the entry of permanent relief. On August 10, 2016, this Court issued its Order Regarding Agreed Interim Plan for Elections (the Interim Remedial Order or "IRO"). The IRO, among other things, contained the following terms:

1. It expanded the acceptable methods of identification to include ID that had expired less than four years;

2. It allowed voting with a reasonable impediment declaration for those persons who did not have an SB 14-qualified ID, but who had a valid voter registration certificate, a certified birth certificate, a current utility bill, a bank statement, a government check, a paycheck, or any other government document that displayed the voter's name and address;

3. It prescribed the form, content, and appearance of the reasonable impediment declaration;

4. It required the State to translate the reasonable impediment declaration into Spanish, Chinese, and Vietnamese;

5. It prevented the rejection of ID on the basis of an address that did not match the official list of registered voters;

6. It required the State to develop a detailed voter education effort for the November 2016 general election with a budget of no less than $250,000.00;

7. It required the State to continue voter education efforts to explain both qualified ID and the reasonable impediment procedure; and

8. It required the State to develop a detailed election official training program by August 15, 2016.

D.E. 895. On September 20, 2016, the Court issued a clarifying order enforcing specific requirements regarding voter education. D.E. 943. The IRO was later applied to elections beyond the November 2016 election. D.E. 1077; *see also* D.E. 1196, p. 8 (State's admission that the IRO governed "the 2016 general election and subsequent elections").

At the next legislative session—after this Court's discriminatory results decision and IRO and after the Fifth Circuit affirmed that portion of the case—Texas enacted Senate Bill 5 (2017) (SB 5), which in large part adopted the expanded ID and reasonable impediment declaration-related terms of the IRO as the new law.

## CLAIM

Plaintiffs seek attorney's fees and expenses for their work vindicating voters' rights pursuant to 42 U.S.C. § 1988 and the Voting Rights Act, 52 U.S.C. § 10301, et seq. Specifically,

> In any action or proceeding to enforce the voting guarantees of the fourteenth or fifteenth amendment, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee, reasonable expert fees, and other reasonable litigation expenses as part of the costs.

52 U.S.C. § 10310(e).  There is no dispute that these laws permit an attorney's fee award in this case so long as (1) Plaintiffs are prevailing parties and (2) the fees and expenses are reasonable.

## I.
## PREVAILING PARTY STATUS

### A. Standard of Review

"If successful plaintiffs were routinely forced to bear their own attorneys' fees, few aggrieved parties would be in a position to advance the public interest by invoking the injunctive powers of the federal courts."  *Newman v. Piggie Park Enterprises, Inc*., 390 U.S. 400, 402 (1968) (plaintiffs addressed racial discrimination at drive-in restaurants). While the award of fees is discretionary, "a prevailing party should recover attorneys' fees unless special circumstances would render such an award unjust."  *Riddell v. Nat'l Democratic Party*, 624 F.2d 539, 543 (5th Cir. 1980) (citing *Morrow v. Dillard*, 580 F.2d 1284, 1300 (5th Cir. 1978)).

Courts apply the same standards to the right to recover attorney's fees in both the civil rights statute and in the VRA. *Davis v. Abbott*, 781 F.3d 207, 213 n.6 (5th Cir. 2015) (the statutes are "identically construed"); *Coal. to Pres. Hous. & the Hous. Indep. Sch. Dist. v. Interim Bd. of Trustees of Westheimer Indep. Sch. Dist.*, 494 F. Supp. 738, 742 (S.D. Tex. 1980), *aff'd sub nom.*, *Interim Bd. of Trustees of the Westheimer Indep. Sch. Dist. v. Coal. to Pres. Hous. & Hous. Sch. Dist.*, 450 U.S. 901 (1981). Whether a party is a prevailing party entitled to fees is a question of law. *Davis,* 781 F.3d at 213 (citing *Petteway v. Henry*, 738 F.3d 132, 136–37 (5th Cir. 2013)).

## B. Rubric for Decision

The parties agree that the Fifth Circuit described the current test for determining whether Plaintiffs are prevailing parties as follows:

> The [Supreme] Court held that to achieve prevailing party status, a party must achieve some judicially sanctioned relief that either creates or materially alters a legal relationship between the parties. Building on *Buckhannon*, this court has established three requirements that must be satisfied for a plaintiff to demonstrate prevailing party status: (1) the plaintiff must achieve judicially-sanctioned relief, (2) the relief must materially alter the legal relationship between the parties, and (3) the relief must modify the defendant's behavior in a way that directly benefits the plaintiff at the time the relief is entered.

*Petteway*, 738 F.3d at 137 (citing *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 604 (2001) and *Dearmore v. City of Garland*, 519 F.3d 517, 521 (5th Cir. 2008)); *see* D.E. 1143, p.6; D.E. 1196, p. 6; D.E. 1207, p. 1.

"A plaintiff's success, however, need not address the central claim of the case; instead, a party may attain prevailing status by succeeding on 'any significant issue in

litigation which achieves some of the benefit the parties sought in bringing suit.'" *Petteway,* 738 F.3d at 137 (quoting *Tex. State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 789 (1989) (internal quotation marks omitted)).   "Under this test, a plaintiff need not receive a final judgment in its favor, but if the plaintiff's success on a claim is purely technical or *de minimis*, it is not a prevailing party."   *Petteway*, 738 F.3d at 137.   Neither is a plaintiff a prevailing party if the defendant voluntarily changes its conduct—without judicial imprimatur—to afford the plaintiff the relief sought.   *Id.*

## C. Plaintiffs are Prevailing Parties

Plaintiffs have met the *Petteway* test and qualify as prevailing parties.

### 1. Judicially-Sanctioned Relief

The State argues that the judicially-sanctioned relief element is not met because "no ultimate findings of liability [] survived."   D.E. 1196, p. 7.   This is not the test. Neither is it a true statement of these proceedings.   Through evidence offered at trial, Plaintiffs obtained this Court's holding that SB 14 had racially discriminatory results in violation of VRA § 2.   The Fifth Circuit affirmed that holding on appeal and remanded that matter to this Court solely to fashion appropriate relief.

> We conclude that the district court did not clearly err in determining that SB 14 has a discriminatory effect on minorities' voting rights in violation of Section 2 of the Voting Rights Act.   As discussed below, we remand for a consideration of the appropriate remedy in light of the impending general election.

*Veasey V*, 830 F.3d at 265.   That decision remains good law.   While there was no relief on the basis of other claims, Plaintiffs need only succeed on one significant issue to

justify the award of attorney's fees.  And here, the relief obtained was the same relief that Plaintiffs sought through the assertion of Plaintiffs' additional causes of action.

After noting that the Texas legislature would likely not be able to address the matter prior to the November 2016 election, the Fifth Circuit wrote, "It would be untenable to permit a law with a discriminatory effect to remain in operation for that election." *Veasey V*, 830 F.3d at 270.  It further suggested that this Court should consider other previously acceptable forms of ID, an indigency exception, and voter education and election official training initiatives.

> In light of the impending election, we order the district court to file its order regarding the proper discriminatory effect remedy as soon as possible. The parties have expressed a willingness to work cooperatively with the district court to provide a prompt resolution of this matter, and we urge them to do so to avoid election eve uncertainties and emergencies.

*Id*. at 272.  Issuance of the IRO followed, as a remedy fully consistent with the final determination of a VRA § 2 discriminatory results violation.  It was an interim remedy only insofar as the case remained pending with respect to the additional issue of a discriminatory purpose violation that may have justified additional relief.

***Dearmore***.  Anticipating the State's argument that the IRO was only an interim measure and that the passage of SB 5 superseded the IRO's remedial function, Plaintiffs cite *Dearmore*, 519 F.3d at 524.   In *Dearmore*, the plaintiffs challenged the constitutionality of an ordinance.  After the district court issued a preliminary injunction against enforcement of the ordinance, the city council amended the ordinance to eliminate its constitutional infirmities.   The Fifth Circuit held that the preliminary

injunction satisfied the requirement for judicially-sanctioned relief because it was based on an unambiguous indication of the plaintiffs' probable success on the merits and the defendant mooted the case before trial in direct response to the district court's preliminary injunction order.  The State argues that *Dearmore* does not apply for two reasons.

**Dearmore** **and Preliminary Injunctions**.  First, the State argues that the IRO was not a preliminary injunction against SB 14 that triggers *Dearmore's* application.  Yet the lesson from *Dearmore* need not be limited to cases involving preliminary injunctive relief.  The Court reads the decision broadly as announcing that preliminary, temporary, or interim relief that is sufficiently merits-based may be considered judicially-sanctioned relief, supporting prevailing party status.

This is consistent with the Supreme Court's determination, "A prevailing party must be one who has succeeded on any significant claim affording it some of the relief sought, either *pendente lite* or at the conclusion of the litigation."  *Tex. State Teachers Ass'n*, 489 U.S. at 791.  Ordinarily, such relief is injunctive and provisional, awaiting full trial on the merits.  Plaintiffs here have a stronger case in that the relief was not provisional, but simply temporary, issued post-trial on the merits and after liability was affirmed on appeal.  It was temporary injunctive relief, preventing the most draconian effects of SB 14, issued with the expectation that permanent relief of the same measure or more would follow on the same basis as the temporary relief.

The State emphasizes that the Fifth Circuit vacated the only injunctive relief that this Court had ordered.  This fails to recognize that the IRO was injunctive in nature and

was neither appealed nor vacated.  The blanket injunctions that this Court issued after the trial and after reconsideration on remand are different issues.

The Fifth Circuit's decision to vacate the wholesale injunction issued pending the first appeal was not because of any decision regarding the Plaintiffs' likelihood of success on appeal.  Rather, it was because it believed that the status quo should be maintained pending appeal.  The next election (and early voting) were just days and weeks away and the court sought to prevent last-minute voter confusion.  *Veasey II*, 769 F.3d at 895-96.  After considering the merits, the Fifth Circuit held that a wholesale erasure of the terms of SB 14 was not necessary and would negate the legislature's salutary goal of election integrity.  But relief from its unnecessarily strict provisions was required.

The Fifth Circuit remanded the remedy so that Plaintiffs could be afforded necessary relief from SB 14's harsh effects by the use of ameliorating provisions, which were ultimately manifested in the IRO.  The wholesale injunctive relief that this Court issued after remand against the enforcement of SB 14 and SB 5 was vacated, but not for the reason that Plaintiffs failed to prove the State's VRA violations.  As noted, the discriminatory results finding had already been affirmed in the first appeal on the merits and that liability had been temporarily remedied.  At the second appeal on the merits, the finding of the State's discriminatory purpose was not disturbed.  Rather, the Fifth Circuit made a remedy decision that SB 5 was a sufficient cure for the ills of SB 14 and its VRA violations.  So further judicial relief was not necessary.

For these reasons, the Court rejects the State's argument that the scope of the *Dearmore* holding is limited to cases involving only preliminary injunctive relief.   In *Dearmore*, the challenge presented was relief granted on a pre-trial assessment of the plaintiffs' ***probability*** of success.   The Fifth Circuit announced a measure for granting prevailing party status even when the issue justifying relief was not fully litigated.   Here, the argument in Plaintiffs' favor is stronger because the relief granted was based on post-trial ***actual*** success, affirmed on appeal.   *Dearmore* is instructive because it applied prevailing party status in cases involving preliminary relief based on an assessment of the merits.   Nothing about its holding need be limited to cases issuing preliminary injunctive relief.

***Dearmore* and Mooted Cases**.   Second, the State argues that it is undisputed that passage of SB 5 did not moot the case.   *See Veasey IX*, 888 F.3d at 799.   It suggests that *Dearmore* is fully distinguishable because it involved a scenario in which the voluntary act of the defendant fully mooted the case.   Rather than taking this case out of the scope of *Dearmore*, this argument simply reflects that Plaintiffs' claim to prevailing party status is that much stronger than that of the *Dearmore* plaintiffs.   The defendant's act in mooting the case in *Dearmore* prevented the plaintiffs from proceeding to obtain final relief on the merits.   And the defendant argued that the plaintiffs thus could not prevail.

Here, however, because SB 5 did not moot the case, the function of the IRO (which came after the Plaintiffs had already prevailed) was that much more of a judicially-sanctioned remedy that remained in place, providing relief, until the case was fully disposed of.   Nothing in the final disposition could retroactively negate the relief

that the IRO had already supplied.  And the final remedy was undeniably consistent with the provisional remedy.  D.E. 1196, p. 9 (acknowledging the "obvious connection" between the IRO and SB 5).

SB 5 did not prevent a final disposition.  It was simply accepted by the court as a sufficient remedy for the case that Plaintiffs had won.  In a sense, SB 5 became the permanent judicially-sanctioned remedy to which Plaintiffs were held entitled.[14] Contrary to the State's representation, this is not an instance of the disfavored catalyst theory.  *See Buckhannon*, 532 U.S. at 605, 608 (refusing to give plaintiffs credit for a defendant's purely voluntary action to end litigation before any materially adverse judicial decision).  Plaintiffs sought and obtained judicially-sanctioned relief on an issue central to their case.

### 2.  Material Alteration of Parties' Relationship

As detailed above, the interim remedial order was issued as a remedy for the post-trial judicial determination that SB 14 had discriminatory results, in violation of VRA § 2.  The IRO established that Plaintiffs had prevailed on that claim, regardless of what had happened with respect to other claims or what was yet to occur in connection with the remand for reconsideration of the discriminatory intent claim.  This represents a material alteration of the parties' relationship in that Plaintiffs had prevailed on a claim in a manner that became final as to the State.

---

[14]  The State argues that SB 5 cannot be attributed to the State because it was enacted by the legislative branch and was not a voluntary act of the executive branch that had been sued.  D.E. 1196, pp. 10-11.  Because SB 5 did not moot this case, the argument about which branch was responsible for it is an immaterial technicality.

### 3. Modification of Defendant's Behavior

The IRO modified the State's behavior by ameliorating the strict terms of SB 14 such that the State had to allow all qualified voters to exercise their franchise in the November 2016 and subsequent elections even if they did not have SB 14-compliant ID. It required the State to accept additional forms of identification for voting, limited the authority of election workers to interfere with individuals voting under the authority of a reasonable impediment declaration, and mandated voter-education and election worker training efforts, complete with a minimum budget expenditure. This was a substantial modification of the State's behavior.

### 4. Conclusion

Plaintiffs have met all of the requirements of *Petteway* and *Dearmore* on the basis of the judicial issuance of the IRO in their favor. Plaintiffs' defense of its victory in response to the State's petition for writ of certiorari to the Supreme Court is part and parcel of the work done as prevailing parties obtaining relief. Plaintiffs are entitled to prevailing party status even without separately considering their successful defense against that petition. Therefore, the Court need not, and does not, address the State's argument that denial of the petition cannot represent independent judicially-sanctioned relief. *See* D.E. 1196, pp. 12-13.

## II.
## REASONABLE FEES AND EXPENSES

### A. Standard of Review

According to the Supreme Court, when applying a fee-shifting statute, there is "A strong presumption that the lodestar figure—the product of reasonable hours times a reasonable rate—represents a 'reasonable' fee . . . ." *Pennsylvania v. Del. Valley Citizens' Council for Clean Air*, 478 U.S. 546, 565 (1986) (Clean Air Act's provisions analogized to § 1988); *OCA Greater Hous. v. Texas*, 1:15-CV-679-RP, 2017 WL 401275, at *3 (W.D. Tex. Jan. 30, 2017) (VRA). The court's job is to "(1) ascertain the nature and extent of the services supplied by the attorney; (2) value the services according to the customary fee and quality of the legal work; and (3) adjust the compensation on the basis of the other *Johnson* factors that may be of significance in the particular case." *Leroy v. City of Hous.*, 831 F.2d 576, 583 n. 11 (5th Cir. 1987), *cert. denied*, 486 U.S. 1008 (1988)); *see Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974).

The burden is on the fee applicant to produce satisfactory evidence that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation. *McClain v. Lufkin Indus., Inc.*, 649 F.3d 374, 381 (5th Cir. 2011) (citing *Blum v. Stenson*, 465 U.S. 886, 896, n.11 (2011)). Courts further require applicants to provide contemporaneous billing records or other documents, which are examined to determine which hours are compensable and which are not. *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 586 F. Supp. 2d 732, 755 (S.D. Tex. 2008). "Using this [recorded] time as a benchmark, the

court should exclude all time that is excessive, duplicative, or inadequately documented." *Watkins v. Fordice*, 7 F.3d 453, 457 (5th Cir. 1993).

Parties seeking attorney's fees have the burden of showing the reasonableness of the hours billed and also of proving that they exercised billing judgment. *Hensley v. Eckerhart*, 461 U.S. 424, 433–34 (1983).   Counsel exercises billing judgment by documenting hours charged and the hours written off as unproductive, excessive, or redundant. *Id*. at 434.

"Courts must review fee applications carefully to ensure that taxpayers only reimburse prevailing parties for reasonable fees and expenses that contributed to the results achieved . . . ." *Ctr. for Biological Diversity v. Norton*, CIV.A. 04-0156JDB, 2005 WL 6127286, at *1 (D.D.C. Jan. 26, 2005).   In sum, the Court exercises its discretion to award fees for all time reasonably expended on the case based on the record of the case and knowledge of the litigation. *Watkins*, 7 F.3d at 457-60.

## B.  Hourly Rates for Attorneys' Time

### 1.  Rubric for Decision

Plaintiffs must show "that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Blum*, 465 U.S. at 895 n.11.   Plaintiffs do not purport to have fee agreements by which the Court may evaluate a standard rate in the community.   Rather, they rely on the fee-shifting statutes to provide compensation to their counsel, if successful, because clients in such civil rights cases often do not have the means to finance this type of complex litigation. *E.g.*, Declarations of Hebert, D.E. 1143-4, p. 9;

Rosenberg, D.E. 1174-2, p. 7; Perez, D.E. 1174-11, p. 4; Aden, D.E. 1172-1, p. 5; Rios, D.E. 1142-1, pp. 4, 6.

The inability to compensate counsel is an essential reason for fee-shifting statutes being part of the remedial nature of the civil rights litigation framework.

> There are very few provisions in our Federal laws which are self-executing.  Enforcement of the laws depends on governmental action and, in some cases, on private action through the courts.  If the cost of private enforcement actions becomes too great, there will be no private enforcement.  If our civil rights laws are not to become mere hollow pronouncements which the average citizen cannot enforce, we must maintain the traditionally effective remedy of fee shifting in these cases.

S.Rep. No. 94–1011, p. 6 (1976), U.S. Code Cong. & Admin. News 1976, p. 5908 (incident to the amendment of § 1988 to allow fee-shifting in response to an adverse Supreme Court decision).  Therefore, the Court must look to the rates established by the marketplace in the relevant community.

The State argues, without citation of authority, that it is the division (Corpus Christi), rather than the district (Southern District of Texas), that is the "community" from which the Court should derive the relevant market data.  Indeed, a number of cases refer to a rate that is reasonable "in this District and Division."[15]  Yet when it comes to parsing between divisions, it appears that it is the district, rather than the division, that should govern the decision.  One sister court has written:

---

[15]    *E.g., Michels Corp. v. EMS USA, Inc.*, CV H-16-2370, 2018 WL 2995637, at *1 (S.D. Tex. Feb. 5, 2018); *La'Tiejira v. Facebook, Inc.*, CV H-16-2574, 2017 WL 6949295, at *2 (S.D. Tex. Nov. 15, 2017), *report and recommendation adopted*, 4:16-CV-02574, 2017 WL 6949276 (S.D. Tex. Dec. 4, 2017).

Attorneys' fees are to be calculated at the "prevailing market rates in the relevant community." *Blum v. Stenson*, 465 U.S. 886, 895 (1984).    The Court considers the relevant community to be the judicial district in which the litigation occurred (the Southern District of Texas), not the particular division in which the case was pending.    *Comar Marine Corp. v. Raider Marine Logistics, LLC*, 2016 WL 99208, at *4 (W.D. La. Jan. 7, 2016); see *Schlieper v. City of Wichita Falls*, 2003 WL 21355982, at *3 (N.D. Tex. June 6, 2003) ("[T]he Northern District of Texas ... is the relevant community.    It takes the same degree of skill, same time, same talents and same abilities for a Wichita Falls located attorney to prepare and try a federal civil case in the Dallas Division as it does for a Dallas located attorney to try such a case in the Wichita Falls Division.").

*Bear Ranch, LLC v. Heartbrand Beef, Inc*., 6:12-CV-14, 2016 WL 3549483, at *5 (S.D. Tex. June 30, 2016) (Costa, J.), *aff'd*, 885 F.3d 794 (5th Cir. 2018); *Ramirez v. Lewis Energy Group, L.P.*, 197 F. Supp. 3d 952, 956 (S.D. Tex. 2016); *cf.*, *Gill v. Bullzeye Oilfield Servs., LLC*, SA-15-CV-1166-DAE, 2018 WL 4677902, at *2 n.1 (W.D. Tex. July 19, 2018) (suggesting that the market is the city where the court sits), *report and recommendation adopted*, 5:15-CV-1166-DAE, 2018 WL 4770853 (W.D. Tex. Sept. 25, 2018).

At the very least, it is a matter for the court, using its expertise and considering the totality of the circumstances, to determine whether evidence of fees in a different division are probative of fees in the division where the action is pending.    *See generally, Yoes v. Barnhart*, 467 F.3d 426, 427 (5th Cir. 2006) (the uniformity required in awarding fees under the Equal Access to Justice Act need not, but can, vary among divisions of the same district but cannot vary within a division, based on the comparative cost of living); *Davis v. Bd. of Sch. Com'rs of Mobile Cnty.*, 526 F.2d 865, 868 (5th Cir. 1976) (federal

trial judges are, themselves, experts on attorney's fee matters); *cf., League of United Latin Am. Citizens No. 4552 (LULAC) v. Roscoe Indep. Sch. Dist*., 119 F.3d 1228, 1234 (5th Cir. 1997) (judge's experience, alone, is not a sufficient basis for a fee award).

In the absence of widespread evidence of the ordinary forces of supply and demand to generate standard fees in this market for voting rights act work, the parties have offered competing reference points.  Plaintiffs advocate the use of the most recent rates published by the United States Attorneys' Office as "USAO Attorney's Fees Matrix—2015-2019"[16] (USAO Matrix), using a top hourly rate of $613.  Their attorney's fee expert also discusses local rates for highly specialized work, deemed consistent with the USAO Matrix.  And the State advocates a top hourly rate of $400, using the State Bar of Texas Department of Research and Analysis Hourly Fact Sheet, published August, 2016 (Fact Sheet).[17]  The Court then considers the import and weight to be given to each of these perspectives in the context of the *Johnson*[18] factors that the Fifth Circuit has adopted for evaluating a reasonable fee.  Last, the Court considers the parties' competing caselaw.

### 2.  Plaintiffs' Proposed Rate Structure; USAO Matrix Current Rates

Plaintiffs, uniformly, have proposed hourly rates based on the most recent rates published as the USAO Matrix.  The Matrix is based on a survey of standard hourly rates in the District of Columbia metropolitan area.  D.E. 1143-2, p. 1, n.2.  And its purpose is

---

[16]   https://www.justice.gov/usao-dc/file/796471/download.

[17]   2015 Hourly Fact Sheet:  https://www.texasbar.com/AM/Template.cfm?Section=demographic_and_economic_trends&Template=/CM/ContentDisplay.cfm&ContentID=34182 (last visited May 26, 2020).

[18]   *Johnson,* 488 F.2d at 717–19.

to provide a guideline to be used for awards under certain federal fee-shifting statutes. *Id.*, n.1. The USAO Matrix does not, by its terms, apply to the fee-shifting statutes at issue here. And it has not been adopted by the USAO for use outside of the D.C. area. *Id.* Thus, on its face, the USAO Matrix has no automatic application here.

The Fifth Circuit has not addressed the role of the USAO Matrix or its predecessor Laffey Matrix[19] in determining an appropriate hourly rate. Absent a Fifth Circuit pronouncement either way, trial court treatment of the matrices in this region is largely negative. Most courts have noted the Fifth Circuit's silence and rejected the Laffey Matrix as limited to the D.C. area.[20] However, at least one court considered it favorably, noting that it was supported by additional testimony that the rates in D.C. were equivalent to the rates in Dallas. *Mick Haig Productions, E.K. v. Does 1-670*, 3:10-CV-1900-N, 2012 WL 213701, at *2 (N.D. Tex. Jan. 24, 2012).

Each of the Texas attorneys who worked on this case and provided declarations in support of their claims for fees have endorsed the current USAO Matrix fee schedule as appropriate compensation for their time. However, none of the claiming attorneys—not even those headquartered in Texas—have expressly attested that they are familiar with the market rates in this community and that they are commensurate with the USAO

---

[19] *Laffey v. Nw. Airlines, Inc.*, 572 F. Supp. 354, 371 (D.D.C. 1983), *aff'd in part, rev'd in part on other grounds*, 746 F.2d 4 (D.C. Cir. 1984).

[20] *See Novick v. Shipcom Wireless, Inc.*, 4:16-CV-00730, 2018 WL 6079348, at *2 (S.D. Tex. Nov. 21, 2018); *Moreno v. Perfection Collection, LLC*, CV H-18-2757, 2018 WL 6334837, at *4 (S.D. Tex. Dec. 5, 2018); *SCA Promotions, Inc. v. Yahoo! Inc.*, 3:14-CV-957-O, 2016 WL 8223206, at *7 n.15 (N.D. Tex. Nov. 21, 2016); *report and recommendation adopted*, 3:14-CV-00957-O, 2017 WL 514545 (N.D. Tex. Feb. 8, 2017); *Alex v. KHG of San Antonio, LLC*, 125 F. Supp. 3d 619, 624 (W.D. Tex. 2015); *Malick v. NCO Fin. Services, Inc.*, No. H-14-1545, 2015 WL 4078037, at *4 (S.D. Tex. July 6, 2015); *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 586 F. Supp. 2d 732, 819 (S.D. Tex. 2008); *Kiva Kitchen & Bath, Inc. v. Capital Distrib., Inc.*, CV H-06-2562, 2008 WL 11452433, at *9 n.15 (S.D. Tex. Apr. 22, 2008), *aff'd*, 319 Fed. Appx. 316 (5th Cir. 2009).

Matrix rates or any approximation of those rates.  The only testimony in that regard was offered by independent experts, which will be discussed below.

The State complains that, whether or not the USAO Matrix schedules apply, *current* rates should not be used for *historical* time.  Plaintiffs respond that using current rates is appropriate as compensation for the time value of the money, given the long delay between the time the work was done and this Order.  The Court agrees.

The Supreme Court has ruled in favor of Plaintiffs' argument in construing the award of fees under § 1988:

> Clearly, compensation received several years after the services were rendered—as it frequently is in complex civil rights litigation—is not equivalent to the same dollar amount received reasonably promptly as the legal services are performed, as would normally be the case with private billings.  We agree, therefore, that an appropriate adjustment for delay in payment—whether by the application of current rather than historic hourly rates or otherwise—is within the contemplation of the statute.

*Missouri v. Jenkins*, 491 U.S. 274, 283–84 (1989) (footnote omitted).

The State argues that compensation for delay in this regard requires a showing of the attorney's hardship.  It is true that the *Jenkins* opinion footnoted that the attorneys in that case had indeed suffered hardship by taking out loans to keep their practices afloat and had incurred interest on the debt while awaiting a fee award.  *Id*. at 283, n.6.  But the principle of compensation for delay was not conditioned on hardship in the opinion.  Its justification for using current rates was only that of delay.

In arguing that hardship is a factor, the State relies on *Huber v. Wal-Mart Stores*, 04-2145, 2006 WL 1674306, at *3 (W.D. Ark. Mar. 31, 2006).  But they have misread

the case.  The delay between the work and the attorney's fee award was only two years.
The court had already determined that the current rate should apply, even for that short
delay.  But the attorneys asked for an additional thirty percent (30%) enhancement to
their current hourly rates to compensate for having taken the case on a contingency basis,
the "substantial" delay, and the difficulty of taking on a large corporation.  After denying
the other bases for the enhancement request, the court noted that the attorneys had not
suffered any hardship and concluded that the use of current rates (or adjusting an
historical rate for present value) was sufficient to compensate for delay.  Nothing in
*Huber* supports adding a showing of hardship to the attorney's burden of proof to obtain
current rates.

The State also suggests that using current rates allows the attorneys to receive a
windfall, citing *McClain*, 649 F.3d at 383.  While the *McClain* opinion recognizes that
windfalls should not be awarded, it did so in the context of determining an overall
appropriate fee based on the skills necessary for the litigation and whether out-of-town
counsel should be awarded home fees.  *McClain* did not address the issue of using current
fees to compensate for delay.  And the *Jenkins* opinion distinguished between an award
of current rates to compensate for delay and an award that enhances the fee to
compensate for risk.  Only the latter is prohibited as a windfall.  *Jenkins*, 491 U.S. at 282.

Compensating for delay is part of a reasonable fee.  And a reasonable fee does not
require showing anything other than that the work was done, the fees were generated, and
the bill was not timely paid as it would have been in an ordinary commercial context.
Therefore, regardless of the reference points used, the Court seeks to determine the

current rates in South Texas for voting rights litigation. The current USAO Matrix is a useful reference, but is not determinative of the appropriate rates.

### 3. Expert Evidence

The Veasey-LULAC motion offered the Plaintiffs' joint briefing and evidence on each of the issues involved in the attorney's fees decision. D.E. 1143. Attached to that motion is the declaration of William Edwards, supplying expert testimony on hourly rates. D.E. 1143-3. The HJ&C motion offered the additional declaration of Ricardo Cedillo. D.E. 1142-2. The State did not offer any controverting expert testimony.

### a. William Edwards

The testimony directly addressing the prevailing market rates in South Texas comes from Plaintiffs' attorney's fees expert, William (Billy) R. Edwards, III. D.E. 1143-3. Edwards, who is familiar with complex litigation and appeals in Corpus Christi as well as in Houston more generally, stated that the current prevailing hourly rate for senior lawyers in Corpus Christi is $400 to $750, for mid-level lawyers is $300 to $350, and for younger lawyers is $250 to $275. *Id*., p. 2. He further stated that attorneys of the caliber who command hourly rates of $400 to $450 in Corpus Christi expect rates double that in the Houston area. And lawyers with specialized skill sets, such as most of those litigating this voting rights case, would charge in the upper ranges of the fees he testified to.

Overall, Edwards testified that the rates the attorneys seek in their respective motions (derived from the USAO Matrix) are consistent with—if not lower than—the rates that apply to specialized voting rights litigation in Corpus Christi. *Id*. Thus he

supports the requested rates without the necessity of referring to out-of-town lawyers' "home" rates. *See generally, McClain*, 649 F.3d at 382 (holding that, if a matter cannot be handled by qualified counsel in the market where the litigation is filed, then the qualified out-of-town lawyer's rate in his home market should be the starting point for analyzing a reasonable rate). The State lodges two criticisms of Mr. Edward's declaration: (1) caselaw, including that on which Edwards relies, counsels in favor of much lower rates than those requested; and (2) Edwards, himself a senior lawyer with complex litigation experience, charged a rate much lower than the USAO Matrix would allow.

**Cases Discussed**. The State complains that the cases on which Edwards relies involved awards below the levels he supports. This argument might have traction if those cases were voting rights cases tried in Corpus Christi. However, because there are no such directly comparable case opinions to draw on, it is appropriate to consider less specialized cases and extrapolate from them what would be appropriate for a more complex and specialized case.

For instance, the $400 rate for attorney's fees awarded in *Edwards v. 4JLJ, LLC*, No. 15-CV-299, 2019 WL 1382983, at *4 (S.D. Tex. Mar. 27, 2019), was the full rate requested by counsel. That rate was discounted from the attorney's regular rate of $475 per hour for work done pursuant to the Fair Labor Standards Act (FLSA). And the rate was not challenged. Furthermore, the fees were awarded as sanctions for discovery abuse. In other words, the work generating those fees was not particularly complex. Such fees were not incurred in the context of the merits of highly specialized litigation.

In *Rodriguez v. City of Corpus Christi*, 2:13-CV-134, 2016 WL 6683603, at *1 (S.D. Tex. June 13, 2016), *rev'd on other grounds*, 687 Fed. App'x 386 (5th Cir. 2017), the $450 rate was in an employment case related to the exercise of free speech, granted nearly four years ago.  The rate had been adopted in a previous proceeding and thus the basis for its determination cannot be blindly analogized to the circumstances of this case.  The skill set needed to litigate a voting rights case is materially different from that needed for employment discrimination, even when that discrimination implicates the First Amendment.  And the supply and demand for attorneys with those comparative skill sets is markedly different.

The Court will address additional hourly rate decisions below.  In the meantime, however, the caselaw on which Edwards relied supports hourly rates as low as $450 and as high as $613—or much more—for attorneys with over thirty (30) years of experience.  Thus, the Court rejects the State's first objection to Edwards' declaration based on the lower rates awarded in less complex and older cases.  The Court views the caselaw he cited as consistent with the opinions Edwards gave.

**Edwards' Own Fee**.  In its second complaint regarding the expert opinion, the State points out that Edwards charged an hourly rate of only $450 for his work on the case.  However, this rate is consistent with the subject matter he addressed.  His work and his testimony pertain to the rather mundane issue of attorney's fees.  He was not working as an experienced voting rights litigator employing an advanced and highly specialized skill set with all the responsibilities to the client attendant to that representation.  The fact

that his own rate for this type of testifying expert work is lower than that claimed by Plaintiffs' counsel does not detract from his opinion.

### b. Ricardo Cedillo

The HJ&C motion was accompanied by the declaration of Ricardo G. Cedillo, specifically supporting the fees claimed by attorney Rolando L. Rios. D.E. 1142-2. Cedillo testifies that he is familiar with rates in the Southern District of Texas for voting rights work. He states that the appropriate current hourly rate for Rios, who has over 35 years of experience in voting rights litigation,[21] is $525. In the next paragraph, where the fees are calculated, he applies a rate of $613. While internally inconsistent, the declaration supports hourly rates for the top echelon of attorneys working on this case at a figure of at least $525.

### 4. Texas Fact Sheet

The State argues that, rather than consult the USAO Matrix or any other evidence or precedent, the Court should determine fees according to the State Bar of Texas Fact Sheet.[22] Courts have taken judicial notice of this source, with varying approaches as to how to apply it, often enhancing the rate pursuant to case circumstances. *See Gill*, 2018 WL 4677902, at *5 (collecting cases). According to the 2015 Fact Sheet, a statewide survey of Texas attorneys rendered a statewide average hourly rate of $288 and a range of $200 to $350 (for the 25th to 75th percentiles). At the same time, roughly five percent (5%) reported hourly rates that exceeded $500.

---

[21] *See* D.E 1142-1 (Rios declaration addressing his experience).
[22] *See* State Bar of Texas Department of Research and Analysis 2015 Hourly Fact Sheet, *available at* https://www.texasbar.com/AM/Template.cfm?Section+Demographic_and_Economic_Trends&Template=/CM/contentDisplay.cfm&ContentID=34182 (last accessed May 26, 2020).

These findings are based on an overall 12.5% response rate for surveys sent to State Bar of Texas attorneys who did not opt out of taking surveys. *Id*. With respect to the Corpus Christi area, there was statistically insufficient data for the vast majority of practice areas tracked. And none of the practice areas expressly covered voting rights litigation in particular or even civil rights litigation in general.

Even if the practice area were included, courts need not apply the given rate at face value. *See Hoffman v. L & M Arts*, 3:10-CV-0953-D, 2015 WL 3999171, at *2 (N.D. Tex. July 1, 2015) (using the 2013 Hourly Fact Sheet to justify an hourly rate of $810); *Geophysical Serv., Inc. v. TGS-NOPEC Geophysical Co.*, CV H-14-1368, 2020 WL 821879, at *10 (S.D. Tex. Feb. 19, 2020) (copyright infringement case, considering the Fact Sheet and awarding rates up to $600). Rather, the Fact Sheet is nothing more than a starting point, after which issues such as the nature of the litigation, the billing attorney's specific credentials, and the size of the attorney's firm must be considered before arriving at a reasonable rate. "Capping Class Counsel's rates based entirely upon the median market rates identified in the Rate Report and Paralegal Survey would be inappropriate and unsupported by relevant legal authority." *City of San Antonio, Tex. v. Hotels.com, L.P.*, 5-06-CV-381-OLG, 2017 WL 1382553, at *9 (W.D. Tex. Apr. 17, 2017) (acknowledging the Fact Sheet and awarding rates up to $625 for complex, specialized litigation by highly qualified counsel, from large firms, with higher ordinary rates, all based on additional evidence).

The Court finds that the generic average rates set out in the 2015 Hourly Fact Sheet are facially insufficient to overcome the far more direct testimony in the Edwards

and Cedillo declarations and actual attorney's fee awards in this district and division, discussed below. Even if considered, the average rates would have to be enhanced to compensate for the special circumstances of this case and the five years that have passed since they were published. In that manner, rates starting from the Fact Sheet would end up at a level similar, if not equivalent, to that arrived at through the application of the other evidence already described.

### 5. *Johnson* Analysis

Instead of using the USAO or Laffey Matrix or the 2015 Hourly Rate Sheet at face value, courts continue to apply the considerations identified in *Johnson*, 488 F.2d at 717–19[23] when assessing the reasonableness of a fee. The *Johnson* analysis discusses twelve factors, each of which is set out below. The lodestar rate "may not be adjusted due to a *Johnson* factor, however, if the creation of the lodestar award already took that factor into account. Such reconsideration is impermissible double-counting." *Heidtman v. Cnty. of El Paso*, 171 F.3d 1038, 1043 (5th Cir. 1999) (citations omitted).

The Court addresses the factors as they apply globally to this case. Because there are no standard rates from which to make adjustments, these factors will be taken into consideration in the determination of individual rates, in the first instance, below.

**The time and labor required**. Because this case involved multiple different types of plaintiffs and multiple attorneys for each group of plaintiffs, coordination of Plaintiffs and their counsel was crucial for reducing duplication and the smooth presentation of the

---

[23] *Johnson* was abrogated on other grounds by *Blanchard v. Bergeron*, 489 U.S. 87 (1989) (holding that the fee award is not capped by the client's contingency fee agreement).

case.  The Court notes that counsel worked well together in streamlining their work and, in some cases, making the Court's workload easier.  At the same time, however, the Court recognizes that presentation of this type of case, with specialized expert witnesses as well as presenting the Plaintiffs, themselves, is more work than any one attorney or small team can accomplish.  The size, varied skills, and division of labor within Plaintiffs' coordinated team were appropriate to the tasks.  This was a complex case requiring much time and organization.

**The novelty and difficulty of the questions**. A case that challenges photo identification restrictions on voting is not a common type of case for which there is a tried-and-true template.  While this case was certainly not the first of its kind, the area of law is rapidly evolving, requiring proactive approaches to case presentation.  In that regard, the case was more demanding than sophisticated commercial litigation or even oft-litigated voting rights redistricting cases.  This case demanded all of counsel's experience and ingenuity.

**The skill requisite to perform the legal service properly**. Counsel were well-qualified, highly competent, properly prepared, and worked well together and with opposing counsel.  The type of evidence required to prove the case required a full understanding of such specialized concepts as ecological regression analysis, polling methods, and statistical data compilation and systems comparisons.  *See generally, Veasey I*, 71 F. Supp. 3d 627 *passim*.

**The preclusion of other employment by the attorney due to acceptance of the case**.  Some of the attorneys testified that this case was so demanding of their time because of both its scope and its fast-track to trial, that they could not take other work.

**The customary fee**.  The Court has considered the parties' competing evidence and authorities regarding customary fees for highly specialized work in this community.

**Whether the fee is fixed or contingent**.  As noted, this work was done pursuant to the promise of a fee for successful work through the fee-shifting statutes.  Pursuant to *Jenkins*, there is no fee enhancement for the contingent nature of recovery of fees.

**Time limitations imposed by the client or the circumstances**.  This was a time-sensitive case, due to the potential impact of SB 14 on impending elections.  This Court managed the docket to ensure a trial at an early date so as to resolve the matter before SB 14, if found to be infirm, applied to confuse voters and prejudice contests.  This naturally meant that the attorneys were required to develop the case for trial within a compressed period of time.

**The amount involved and the results obtained**.  Plaintiffs' objective was to ensure that all qualified Texas voters would be able to cast their ballots in election contests held in the State, negating the strict restrictions of SB 14.  Plaintiffs achieved that objective by virtue of the reasonable impediment declaration, first imposed by this Court's IRO and then accepted by the Texas legislature.  Counsel's skill in achieving the VRA § 2 victory and negotiating for the IRO—a decision that affected hundreds of thousands of Texas voters beyond the individual Plaintiffs appearing in this case— justifies fees exceeding the average.

**The experience, reputation, and ability of the attorneys**.   According to the *Johnson* opinion,

> Most fee scales reflect an experience differential with the more experienced attorneys receiving larger compensation. An attorney specializing in civil rights cases may enjoy a higher rate for his expertise than others, providing his ability corresponds with his experience.  Longevity per se, however, should not dictate the higher fee.  If a young attorney demonstrates the skill and ability, he should not be penalized for only recently being admitted to the bar.

*Johnson*, 488 F.2d at 718-19.  Plaintiffs' application of the USAO Matrix fee structure involves only tenure as a licensed attorney.  It does not differentiate between voting rights or civil rights experience and the general practice of law.  And it does not take into account each attorney's particular contribution to the case.  For that reason, the Court must take an individualized approach to the fee requests.

**The "undesirability" of the case**.   Civil rights cases are generally undesirable because clients cannot pay and the attorney bears the risk of nonpayment if the claim does not succeed, including not only time, but out of pocket expenses.

**The nature and length of the professional relationship with the client**.   There is no evidence here regarding a particular relationship between lawyer and client.

**Awards in similar cases**.   As set out below, the Court considers awards in other cases in formulating an appropriate rate structure.

**6.  Caselaw**

In addition to the cases discussed in connection with the Edwards declaration, the State has cited three of this Court's decisions in advocating a rate much lower than that

sought by Plaintiffs.   In *American GI Forum of Texas v. Normanna Cemetery Association*, 2:16-CV-135, 2017 WL 7731228, at *3 (S.D. Tex. June 28, 2017), the Court accepted hourly rates between $175 and $400, depending on experience, as appropriate awards to a prevailing party.   But that racial discrimination case was relatively clear-cut, with an offer of judgment having been made and accepted almost immediately after the case was filed.   It did not involve nearly the litigation complexity or skill in the subject matter that was required here.

The Court awarded hourly rates of $300 to $350 against the losing parties and their attorney in a protracted copyright infringement case that was resolved by summary judgment, finding that the losing parties' claims were spurious and that the litigation had been vexatious.   *Hacienda Records, LP v. Ramos*, 2:14-CV-19, 2019 WL 93306, at *8 (S.D. Tex. Jan. 3, 2019).

This Court approved rates of $250 to $400 in *Martinez v. Refinery Terminal Fire Co.*, 2:11-CV-00295, 2016 WL 4594945, at *8 (S.D. Tex. Sept. 2, 2016).   That was another FLSA case, concluded four years ago.   There are several firms that regularly prosecute such cases in this Court, making the supply and demand much different from that for sophisticated voting rights cases.

It is relevant that our sister court in Houston recently awarded attorney's fees ranging from $315 to $840.   Those fees were awarded under a fee-shifting statute after the defendants' pleadings were struck as a sanction, resulting in a default judgment.   *N. Atl. Operating Co., Inc. v. Mike's Worldwide, LLC*, CV H-16-3685, 2018 WL 3388299, at *2 (S.D. Tex. July 11, 2018).   The complexity in that case came not from the

intricacies of the subject matter, but from the contumacious conduct of the defendant and its counsel. *Id*. Certainly, the *Mike's Worldwide* rate structure is probative of the range of rates available here in light of the complexity of the subject matter.

The Court also notes that decisions in the bankruptcy court in this division during the years this case has been pending support fees above the range of those sought here. *In re SQLC Senior Living Ctr. at Corpus Christi, Inc*., NO. 19-20063 (Bankr. S.D. Tex. September 16, 2019) (authorizing hourly rates up to $735) (D.E. 1207-1); *In re Sherwin Alumina Co., LLC*, No. 16-20012 (Bankr. S.D. Tex. November 30, 2016) (authorizing hourly rates up to $1,065) (D.E. 1207-3); *In re Autoseis, Inc*., No. 14-20130 (Bankr. S.D. Tex. August 26, 2014) (authorizing hourly rates up to $975) (D.E. 1207-2).

The State has cited a number of Texas voting rights cases in support of its argument that lower rates should apply. Some are so dated that they support a current hourly rate of over $100 more than the amounts awarded, due to the inflation factor alone.[24] *E.g., Balderas v. Texas*, 6:01CV158, 2002 WL 32113829, at *2 (E.D. Tex. May 21, 2002) (awarding $325/hour to attorneys Garza and Rios in a redistricting case, which is $472 in current dollars); D.E. 1142-1, p. 8 (attorney Rios testifying to a rate of $350/hour in a 2007 order in *LULAC v Perry,* issued in the Western District of Texas, equivalent to $434 now).

Slightly more recently, counsel in redistricting cases were awarded hourly rates between $252 and $425. *Davis v. Perry*, 991 F. Supp. 2d 809, 848 (W.D. Tex. 2014)

---

[24] Inflation-related differentials can be calculated through the United States Bureau of Labor Statistics, https://www.bls.gov/data/inflation_calculator.htm (last visited May 26, 2020). But the passage of time not only triggers inflation adjustments, it represents additional time in which the attorney has gained more experience and skill, justifying higher rates.

(awarding attorney Hebert a rate of $418/hour), *supplemented,* CIV. SA-11-CA-788, 2014 WL 172119 (W.D. Tex. Jan. 15, 2014), *rev'd sub nom., Davis v. Abbott*, 781 F.3d 207 (5th Cir. 2015); *Petteway v. Galveston, Tex*., 3:11-CV-511, 2012 WL 12877651, at *1 (S.D. Tex. May 22, 2012) (redistricting case awarding stipulated rate of $425), *rev'd sub nom.*, *Petteway*, 738 F.3d at 132; *Vasquez-Lopez v. Medina Cnty., Tex*., 11-cv-00945-OLG (W.D. Tex. 2012) ($425/hour).

In the context of dates issued and types of cases generating the awards, these cases indicate that rates of at least $470 are commonplace for experienced counsel prosecuting the cases in Texas.

### 7.  The State's Proposed Rate Structure

Contrary to rates awarded in its own cited authorities, the State advocates hourly rates in three brackets: $250 for lower-level associates; $300 for mid-level associates; and $400 for senior level attorneys.  D.E. 1196, p. 33.  As advocated, this structure is based only on tenure as an attorney.  And the scope of years contained within a single bracket fails to distinguish between material differences of legal experience and effort.

As applied, the State's methodology is inconsistent, at best.  It injects a few rates that diverge from the three brackets and, in some instances, allows higher rates for less experienced attorneys.  *See* D.E. 1196, pp. 35-37 (applying $275 to the time of attorney Rudd while her less experienced colleagues are allotted $300/hour and inexplicably injecting a $350 rate for attorneys Covich and Notzon).  Overall, the State's rates are too low, given the caselaw discussed above.  And they do not take into consideration the comparable contribution of the different attorneys and firms.

### 8.  Conclusion

Neither party has proposed a workable rate structure for the demands of this case in this community.  To the extent the evidence allows, the Court looks at the request for each attorney on an individual basis—bracketed by the range of rates suggested by the State's lower levels and Plaintiffs' higher levels—and tempered by past awards for similar cases.   Within that tempered bracket, the Court considers the attorney's qualifications, the role of the firm or the attorney in the prosecution of the case, and the nature of the work done.  Throughout this analysis, the Court is aware of the quality of the presentations in the pleadings, briefing, and trial of this case and considers that work product favorably.

### C. Categorical Objections to Billable Time

### 1.  Parsing Time for Unsuccessful Claims

The State objects that Plaintiffs are not entitled to fees and expenses related to unsuccessful claims.  As already noted, Plaintiffs need not prevail on all claims or even on their central claim to be considered prevailing parties.  All that is required is that they prevail on a significant issue that achieves some benefit sought in the litigation. *Petteway,* 738 F.3d at 137.  Here, Plaintiffs are only claiming prevailing party status on the basis of achieving the favorable adjudication of the § 2 discriminatory results claim, which provided the result for which all claims were brought:   the elimination of enforcement of the strict limitations on SB 14 ID as a prerequisite to voting.

Plaintiffs seek fees and expenses associated only with trying the case to that successful conclusion, defending the findings of fact and conclusions of law on appeal,

negotiating and obtaining the IRO relief, defending collateral challenges to that win, and prosecuting their respective motions for attorney's fees and expenses. Absent from the claims are fees associated with (a) the preclearance action that was the precursor of this case[25] and (b) the proceedings attendant to this Court's reconsideration of the discriminatory purpose finding on remand (seeking additional relief) and subsequent appellate efforts to defend that finding. While Plaintiffs did prevail on the discriminatory purpose issue at the trial level and the finding was not reversed on appeal, the Fifth Circuit reversed Plaintiffs' remedy in light of the legislature's adoption of SB 5. So Plaintiffs have voluntarily excluded that phase of their work from their claims for attorney's fees here.[26]

The State, narrowly construing Plaintiffs' victory, suggests that the fee requests are overbroad because they do not parse the work on a claim-by-claim basis. The State argues that the Court should also eliminate work done on the causes of action that were denied or did not result in additional relief. In particular, they seek to exclude work done with respect to the claims for violation of the Fourteenth, Fifteenth, and Twenty-Fourth Amendments to the United States Constitution, as well as the discriminatory purpose determination under the VRA.[27] They seek this in the form of a blunt across-the-board cut of 75% of the fees requested.

---

[25] Such work is arguably compensable in this case. *See Pennsylvania,* 478 U.S. at 561.

[26] While the State has pointed out that some isolated charges relating to the discriminatory purpose proceedings on remand slipped into Plaintiffs' requests, the Court assumes that the inclusion was inadvertent and has disallowed any recovery for that time as set out below.

[27] The Fifth Circuit vacated the Fifteenth Amendment finding (that SB 14 represented racial discrimination that denied or abridged the right to vote) on the basis of the doctrine of constitutional avoidance. The § 2 violations were deemed to provide sufficient relief for the same conduct regarding discrimination in voting without having to

While relief was not granted in the name of those legal theories, it cannot be said that the work on each was discreet, irrelevant, and extractable vis-à-vis Plaintiffs' successful claim regarding discriminatory results.  Neither is a global reduction of the majority of the fees warranted.

> Many civil rights cases will present only a single claim. In other cases the plaintiff's claims for relief will involve a common core of facts or will be based on related legal theories. Much of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis. Such a lawsuit cannot be viewed as a series of discrete claims. Instead the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation.

*Hensley*, 461 U.S. at 434.  "Litigants in good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing a fee. The result is what matters."  *Id*.

Here, the claims were inextricably intertwined and the facts had global relevance. A single result was sought, albeit using different theories of recovery:  the elimination or amelioration of the burden imposed by SB 14 so that all eligible voters could exercise their franchise.   And the discriminatory results finding that supported that relief was based on the totality of the circumstances, not a few particular discreet facts.  *Veasey I*, 71 F. Supp. 3d at 694-95 & n.508; *Veasey V*, 830 F.3d at 264.

---

consider the constitutional claim.  It further reversed and rendered the unconstitutional poll tax finding on the merits. But its decision in that regard was not because of a failure to find that the financial impact of SB 14 was burdensome.  The Fifth Circuit simply concluded that the judicial construction of what constitutes a poll tax did not encompass the type of burden imposed.  And, again, the discriminatory purpose determination was not reversed, but no additional relief was granted on that basis.

It would be impossible to separate what work was done on the VRA claims as opposed to the constitutional claims because the same evidence and most of the same arguments pertain to both.  Likewise, it would be inappropriate to try to split work between the discriminatory results and discriminatory purpose claims, both of which arise under the VRA.  Proof of one strengthens the proof of the other and thus both contribute to a finding of either violation.

Plaintiffs have exercised billing judgment to eliminate from their claims the additional work that was done after remand on the discriminatory purpose claim.  That work is capable of segregation from the discriminatory results claim that had already been affirmed.  The only work that the State has identified as inappropriately included is "all the time and effort Plaintiffs expended in pursuing deposition of individual legislators and hundreds of thousands of pages of documents."  D.E. 1196, p. 14.  But the State has not cited any authority that would exclude fees incurred in discovery simply because it does not render admissible evidence or because it was more relevant to an unsuccessful claim than to the successful claim.  The work was within the scope of discovery for both claims and was designed to accomplish the same objective:  the elimination of the harsh effects of SB 14.

The Court rejects this categorical objection to the fee requests regarding the inclusion of work done on related, but ultimately moot or unsuccessful, claims.

## 2.  Billing Judgment

The State complains that Plaintiffs have not made a sufficient showing of their claimed exercise of billing judgment.  In particular, the State contends that Plaintiffs must

itemize the number of hours and categories of work deducted from their requests pursuant to their claim of using billing judgment.  The Court declines to adopt such a strict reporting requirement.  The Court notes that some of Plaintiffs' submissions have included full copies of time logs, including no-charge time entries for the full review of the State and the Court.

Plaintiffs also discuss in their declarations how they exercised their billing judgment.  For instance, no paralegal time has been requested even though paralegals performed billable work[28] and it is routinely compensable.  *E.g., Walker v. U.S. Dep't of Hous. & Urban Dev.*, 99 F.3d 761, 773 (5th Cir. 1996) (citing *Jenkins*, 491 U.S. at 288); *Humphrey v. United Way of Tex. Gulf Coast*, 802 F. Supp. 2d 847, 863 (S.D. Tex. 2011).  Plaintiffs also excluded any request for attorneys outside of their core teams, even though the excluded attorneys made valuable contributions to the effort.  And they excluded hundreds of hours logged by their core team attorneys.

Plaintiffs contend that they have intentionally underbilled this case in an effort to preempt allegations of overstaffing, duplication, and excessive charges.  Nonetheless, the State has subjected every charge to its strictest scrutiny, prompting additional reply declarations addressing billing judgment with increased particularity.  The Court rejects the State's claim that Plaintiffs have failed to demonstrate billing judgment.

The Court credits Plaintiffs with having voluntarily engaged in copious deductions from their fee applications, which offsets much of the minutiae challenged—but not

---

[28]   The NAACP-MALC initial motion included time for paralegal Antonella Capobianco.  D.E. 1154-4.  But the request was withdrawn in the revised motion.  D.E. 1174-6, p. 8.

explained—in the State's response.  While the Court acknowledges Plaintiffs' exercise of billing judgment, it declines to consider their generosity as entitling them to an automatic "free pass" regarding complaints directed to the remaining individual time entries.

The Court's obligation is to be fair to the taxpayers who will fund the attorney's fee award.  *Ctr. for Biological Diversity*, 2005 WL 6127286, at *1.   Therefore, the Court will not second-guess Plaintiffs and assume that unbilled time should have been billed— simply because the State has not been equally generous with respect to even the smallest of alleged infirmities in the billed time.   Any articulated objections directed at the requests will be addressed on their merits, separately, below.

### 3.  Adjustments After Meet-and-Confer

The State complains that Plaintiffs increased certain claims for fees and expenses after they met with the State to confer regarding any opposition to the claims.  Plaintiffs claim that the adjustments were consistent with the authorities on which the State relied. The State responds, without authority, that any adjustments after the meet-and-confer must be reductions in the claims, not increases.   Yet the parties agreed to permit revisions.

There is no claim of prejudice.   And the Court has granted every request for extension of time the parties have sought.  The Court, in its power to manage its docket, has the broad discretion to relieve parties from any deadlines it has ordered.  *See Sims v. ANR Freight Sys., Inc*., 77 F.3d 846, 849 (5th Cir. 1996).   The Court thus allows Plaintiffs to make what they believe to be a fully accurate claim despite the fact that some modifications were made with the State's consent after the extended deadline for filing

their motions.   The Court rejects the State's request to strike all increases in the fee requests between the initial motions and the amended, supplemental, or revised motions.

### 4.   Travel Time

The State requests that the Court permit travel time at only fifty percent of the attorney's regular rate.   Courts have addressed travel time in multiple ways, including allowing it at full value, deducting a percentage, or disallowing it in full.   *Hopwood v. Texas*, 999 F. Supp. 872, 914 (W.D. Tex. 1998) (allowing travel at 50%), *aff'd in part, rev'd in part on other grounds*, 236 F.3d 256 (5th Cir. 2000); *Watkins,* 7 F.3d at 457-58 (affirming trial court's disallowance of all travel time as inadequately documented work); *In re Zepecki*, 224 B.R. 907, 911 (Bankr. E.D. Ark. 1998) (travel that is necessary can be compensated at the full hourly rate).

Plaintiffs largely concede this point, as many of the fee requests have already eliminated travel time altogether or have reduced the charge by fifty percent. Nonetheless, they argue that any travel time that has not been voluntarily reduced can and should be compensated at full value or can otherwise be compensated at more than fifty percent.   Recognizing that the Court has the discretion to award fees for travel time at any percentage, it is this Court's practice to allow such fees at fifty percent (50%), unless there is evidence that the attorney worked while in transit.   The Court will therefore apply a fifty percent reduction to charges for any unexplained travel time that the State challenges and which has not already been so reduced.

### 5.  Time Spent on the Fee Requests[29]

Plaintiffs are entitled to recover reasonable fees for time spent establishing a fee claim in addition to time spent prosecuting the merits of a civil rights action.  *Cruz v. Hauck*, 762 F.2d 1230, 1233 (5th Cir. 1985).  Yet the State asks the Court to cut the hours or the hourly rate expended on preparing the fee requests because they do not involve novel or complex legal issues, are largely clerical, and should not result in a second major litigation.  *Hensley*, 461 U.S. at 437; *Prater v. Commerce Equities Mgmt. Co., Inc.*, CIV.A. H-07-2349, 2008 WL 5140045, at *7 (S.D. Tex. Dec. 8, 2008).  The State argues that no more than 80% of the charge for time spent on a fee request is appropriate.  D.E. 1196, pp. 58-59 (citing *Leroy*, 906 F.2d at 1086 (reducing the hourly rate for work done on the fee application to 80% because it was a simple motion, largely mechanical, and the time entries were clearly excessive, consistent with the rest of the billing in the case); *In re Int'l. Sys. & Controls Corp. Sec. Litig.*, 94 F.R.D. 640, 642 (S.D. Tex. 1982) (citing *Flowers v. Wiley*, 675 F.2d 704, 707 (5th Cir. 1982) (awarding 80% for work on the fee application as a matter of course))).

While these arguments are compelling on their face, the fee requests here are not mundane.  Not only is the quantity and quality of the time billed at issue, but the State has challenged Plaintiffs' right to recover as prevailing parties—an issue involving a command of the merits of the litigation.  Moreover, the State has employed every

---

[29]  On the basis stated for the reduction of hourly rates for attorney time spent on a fee application, the State suggests that the $2,700 expert witness charge for Edwards should also be reduced.  D.E. 1143-3; D.E. 1196, p. 59.  The Court notes that Edwards testifies in his affidavit that an hourly rate for a lawyer of his caliber is $750.  Even using the top rates allowed here, the $450 rate he used for his expert testimony on this issue already represents more than a 20% reduction.

possible attack on counsel's time and expenses and has made significant errors in its own arithmetic and method. This approach has multiplied the hours that the parties and this Court have had to expend in this effort—contrary to the *Hensley* admonition against turning a fee request into a second litigation.

For these reasons, the time Plaintiffs request in prosecuting their fee motions is remarkably small. A large number of hours have already been excluded. And the effort required was neither simple nor mechanical. Most of the Plaintiffs declined to request additional time expended after the State's response, which caused a third round of briefing and documentation. Ordinarily, this is compensable time. *Cruz*, 762 F.2d at 1234 (failing to compensate for time spent on a reply improperly dilutes the attorney's fee award). Furthermore, some counsel voluntarily charged only 80% of their regular rate for what little time was billed. *See, e.g.,* D.E. 1174-2 at ¶ 18.

The Court finds that Plaintiffs' omissions and voluntary reductions are, for the most part, sufficient to account for the less skilled or controversial nature of some aspects of the attorney's fee phase of this case. The Court finds that the remainder of the approved time spent on the fee requests is compensable at full value because of the amount of briefing related to the merits that it required as well as responding to the State's extensive challenges and mathematical errors. *Cf., Prater*, 2008 WL 5140045, at *7 (reducing a 46.8 hour request to 30 hours in a routine matter that resulted in a favorable settlement). It is also appropriate given the State's unwillingness to confer in any meaningful way to avoid additional protracted litigation. *See* D.E. 1210, p. 2. Only

where the time requested was devoted to the exercise of determining what hours are properly billable does the Court reduce the charges.

### 6.  Overstaffing and Duplication

The State argues that too many lawyers attended depositions, hearings, and appellate arguments, citing *Flowers*, 675 F.2d at 705 (time spent in the passive role of an observer while others worked is not compensable) and *Leroy*, 906 F.2d at 1079 (same). While there are five groups of Plaintiffs, separately represented, the State suggests that the proceedings did not necessarily require full attendance.   It specifically seeks to eliminate time for the attorneys who did not take lead roles, claiming that they were "passive observers" who did not meaningfully contribute to the representation.   D.E. 1196, pp. 45-47, 1196-40.

The State treats speaking on the record as the only measure of a meaningful contribution.  Yet the practice of law is not that simplistic.  There is a reason for second chairs as additional listeners to make sure all bases are understood and covered.  There is value in having lawyers who find materials in the briefing and the record to bring to the attention of lead counsel and the Court.  There is an efficiency in teamwork with different lawyers focused on different issues or phases of the case, all of whom may need to be aware of the Court proceedings.  The Court refuses to measure the reasonableness of a time charge at a court proceeding by the number of words spoken.  Neither does the Court assume that a silent role is a passive role—as a mere observer.  It is this Court's experience that, in many cases, less is more when it comes to expounding a position in the courtroom.

The Court has reviewed the attendance of attorneys that the State has challenged. D.E. 1196, p. 47; D.E. 1196-40. Given the nature of this case and Plaintiffs' counsel's explanation of the team approach, the value of multiple attorneys' involvement in particular phases, and the masterful coordination of the various teams, the Court declines to exclude hours simply because an attorney did not speak or get his or her name recorded as entering an appearance, especially when many of the hearings were conducted by phone and the attorneys did not find it useful to state their appearance aloud.

### 7.  Excessive Charges

The State makes blanket allegations that Plaintiffs' counsel's billings are excessive. It cites three reasons: (1) for court appearances, they charge time in excess of the time actually spent on the record; (2) they charge for preparatory work done for proceedings in which the attorney claiming preparation time did not handle the execution of the task; and (3) multiple attorneys charge for working on the same documents. These allegations are without merit on this record.

First, it is essential to effective representation that an attorney prepares for a hearing. Particularly in this case, where there are multiple separately represented Plaintiff groups, coordination is to be encouraged. In the examples given in their brief, Dunn and Rosenberg charged the most time for the hearings. D.E. 1196, p. 51. That is to be expected because they were most responsible for both coordinating the prosecution of the case and for speaking in Court. It is to be expected that they would have spent the most time preparing and conferring for the time spent in court.

The Court is aware of its sister court's sua sponte reduction of hours for court time based on the record time, set out in *Davis*, 991 F. Supp. 2d at 840.  However, this Court's review of the timesheets supports the time charges as logged.  For instance, Chad Dunn's time entry for October 4, 2013, states "prepare for and attend" the hearing.  D.E. 1175-2, p. 9.  And Ezra Rosenberg's time entry for October 18, 2013, recites, "prepare for and participate in" the hearing, also listing telephone calls and emails related to the matter that are included in the time set out.  D.E. 1174-7, p. 6.  If the attorneys' time were not posted as time spent at the hearing, it would have been appropriately charged to client communications, document review, and preparation—distinctions without a difference for our purposes.  The Court cannot say that the time spent on the record is probative of the reasonable and necessary time charges logged in this regard, negating counsel's claimed fees.

Second, it is not uncommon for one attorney to do valuable leg work to prepare another attorney to first chair a matter.  That work can result in useful outlines, memos, charts, briefs, and other documents and oral presentations that other attorneys carry with them as they handle the case.  Without more to undercut the work done by Emma Simson, the Court cannot accept the suggestion that the work done preparing for a deposition would only have value if she personally attended the deposition.

Third, the Court has appreciated every bit of effort Plaintiffs expended in coordinating their work and, for instance, filing a single motion, response, or brief that represents their joint position.  To achieve this, multiple attorneys have to review the documents to ensure that their interests are properly represented.  The Court will not

penalize, as excessive, this coordination of work.   Each client is entitled to its own attorney's participation.   Unless otherwise addressed in the individual objections, the Court rejects the State's contention that the charges are excessive.

### 8.  Block-Billing

The State raises multiple objections to alleged block-billing.   There is a distinction to be made between a charge for a day-long chunk of time with a single comprehensive, nondescript label as opposed to time that is lumped into a single entry that lists several tasks completed during that time.   The former is objectionable because it is vague and the Court cannot determine whether the time spent was reasonable for the task(s) completed. The latter is not objectionable because the tasks are discernable and nothing is to be gained by requiring them to be separated.  *See generally, Ragan v. C.I.R.*, 135 F.3d 329, 336 (5th Cir. 1998) (accepting a summary, as opposed to an itemization, stating the hours billed and by whom where it was obvious the attorney had participated extensively in the case); *Leroy v. City of Hous.*, 906 F.2d 1068, 1080 (5th Cir. 1990) (disapproving of records reflecting only one undivided total amount of time on any one date, using a nondescript label).

It is the Court's job to determine whether terse entries are sufficient, viewing the time records as a whole, building on the Court's familiarity with this case, with an eye on the quality of the attorneys' work over a period of several years.  *La. Power & Light Co. v. Kellstrom*, 50 F.3d 319, 327 (5th Cir. 1995); *see also, Martinez,* 2016 WL 4594945, at *5-6 (discussing the gray areas in block-billing and related evidence to substantiate

entries).  Except where separately addressed, the Court rejects the State's allegations of any impropriety or excess in the identified time entries as block-billed.

### 9.  Business Development

The State objects repeatedly to time spent contacting and interviewing prospective clients as business development.  However, in this type of case, that time is not invested in order for the firms to get new, lucrative business.  Instead, it is expended to evaluate claims and strengthen those that are viable with additional facts and fact witnesses who may become parties.  In a fee-shifting context, it makes no sense to penalize attorneys for ethically investigating the case with this type of leg work.

> There is certainly nothing in § 1988 that limits fee awards to work performed after the complaint is filed in court.  For example, it is settled that a prevailing party may recover fees for time spent before the formal commencement of the litigation on such matters as attorney-client interviews, investigation of the facts of the case, research on the viability of potential legal claims, drafting of the complaint and accompanying documents, and preparation for dealing with expected preliminary motions and discovery requests.  This time is "reasonably expended on the litigation," in part because careful prefiling investigation of the facts and law is required by the ethical rules of our profession, the Federal Rules of Civil Procedure, and the realities of civil rights litigation.

*Webb v. Bd. of Educ. of Dyer Cnty., Tenn*., 471 U.S. 234, 250 (1985) (Brennan, J., concurring) (citations and footnotes omitted); *Bratcher v. United States*, 136 Fed. Cl. 786, 793-94 (2018); *Foley v. Univ. Med. Ctr*., 211 F.3d 592 (5th Cir. 2000) (approving hours spent in an EEOC proceeding that was a prerequisite to the litigation).  The Court

rejects all of the State's allegations of time being used for the attorneys' personal business gain.

### 10. Media Contacts

The State objects to billings for the time spent on press releases and media interviews.  While the time is not automatically excluded, the Fifth Circuit has indicated that its value to the litigation must be demonstrated for it to be recoverable under the fee-shifting statute:

> This circuit has not yet decided whether prevailing parties may recover attorneys' fees for time spent holding press conferences.  The district court opined that time spent on press conferences is not spent "on the litigation."  The Ninth Circuit, however, has allowed recovery when a prevailing party shows that the press conferences "contributed, directly and substantially, to the attainment of [the party's] litigation goals."  Without considering the merits of either position, we find no abuse of discretion in the district court's exclusion of the press-conference hours, because Appellants did not present any evidence regarding the efficacy of the press conferences, nor did they offer to present such evidence in their request for an evidentiary hearing.

*Watkins*, 7 F.3d at 458 (citations omitted).  Therefore, the Court will determine, on an individual basis, whether such time charges are appropriate, based on the justifications Plaintiffs offer, if any.

### D.  Categorical Objections to Expenses

### 1.  Billable Expenses Versus Taxable Costs

The State seeks to distinguish between the attorneys' billable expenses and taxable costs.  While both are generally recoverable, the deadline for submitting the bill of costs has passed.  Fed. R. Civ. P. 54(d)(1) (deadline is 14 days after the judgment).  The State

argues that the Court should exclude as untimely any expenses that could have been taxed as costs, but were not.

This argument presents a distinction without a difference. The Fifth Circuit has noted that the deadline for taxation of costs is not jurisdictional and the Court may rule on such a motion, even if tardy. *United States v. Kolesar*, 313 F.2d 835, 837 n.1 (5th Cir. 1963). Both "costs" and "expenses," encompassing the same charges, can be awarded against the State in this case. 28 U.S.C. § 1920; 52 U.S.C. § 10310(e). Therefore, it is immaterial whether they are taxed as costs or awarded as expenses. Either way, the 14-day deadline does not bar any action on the requests and the Court exercises its discretion to include reasonable expenses, whether or not they can be classified as taxable costs.

## 2. Legislative Discovery

The State objects to certain deposition costs because the testimony did not lead to a judgment of discriminatory purpose. D.E. 1196, p. 79. As explained above, the Court does not parse and exclude efforts that apply to unsuccessful claims when they also contribute to the prosecution of successful claims. All of the proof offered at trial was important to the totality of the circumstances in determining whether SB 14 had discriminatory results. And it is not entirely accurate to suggest that Plaintiffs did not succeed on the discriminatory intent claim.[30]

The discovery directed at legislators was not exclusively related to intent. It was reasonably calculated to lead to evidence of discriminatory burdens and results. For that

---

[30]    After this Court made its initial finding of discriminatory purpose, the Fifth Circuit remanded for reconsideration. *Veasey I, Veasey V*. This Court again found a discriminatory purpose and that finding was not disturbed on appeal. *Veasey VII, Veasey IX*. Rather, the Fifth Circuit held that no additional relief was warranted because of the intervening legislative changes.

reason, these expenses are reasonably included in the attorney's fee awards.  However, where the State lodges independent objections to the charges for these efforts, the Court considers them in connection with the attorneys' individual requests, below.

### 3.  Remaining Objections

The State's remaining objections to particular entries are more suited to treatment in the context of the individual fee requests, to which the Court now turns.  There are multiple complaints in the replies that the State's summary calculations accompanying their objections do not match up with the sum of the individually challenged entries in its exhibits.  The Court does not entertain summary calculations but rather attends only to the specific time and expense entries segregated in the State's exhibits.  *See* D.E. 1196-1 to 1196-39.

### E.  Evaluation of Individual Fee and Expense Requests

#### 1.  Veasey-LULAC Plaintiffs

##### a.  Campaign Legal Center
(Hebert, Bone, Simson, Lang, and Gaber)

**Rates.**   J. Gerald Hebert has demonstrated that he has over forty years of experience, specializing in voting rights law and handling significant cases addressing voting rights and election law at the highest levels.  He has taught voting rights law in law schools and has written extensively on the subject.  Working with Chad Dunn, he agreed to manage the Veasey-LULAC team of lawyers so as to assemble complementary skill sets, avoid unnecessary duplication of work, and assign the bulk of time-consuming work to recent law graduates who could bill at a lower rate.  He also agreed to add Texas-

based attorneys to the team to handle much of the discovery and trial work to minimize the necessity of long-distance travel.  D.E. 1143-4.

Both Plaintiffs and the State put Hebert in their highest category, with suggested hourly rates of $613 and $400, respectively.  D.E. 1196, p. 35.  Given his qualifications and his managerial role, the Court FINDS that he is fully entitled to the highest hourly rate the Court will award in this case:  $600.  He seeks compensation for a total of 484.6 hours.

Both Emma Simson and Josh Bone graduated from Yale Law School in 2013, the year this case was initially filed.  Simson worked on the case in 2013 and 2014, whereas Bone worked on the case in 2014 and 2015.  While newly-graduated, they appear to have demonstrated high levels of skill in research and writing both before and after their work at the Campaign Legal Center (CLC).  D.E. 1143-4, pp. 10-11.  Plaintiffs seek hourly rates of $307 for each of them.  The State suggests that their hourly rates should be $250.  D.E. 1196, p. 35.  Given their lack of specialized training or experience in voting rights cases, the Court FINDS that an hourly rate of $250 for each of them is appropriate.  They seek compensation for a total of 1022.8 and 325 hours, respectively.

Danielle Lang joined the team in 2016 and logged time through 2019.  She is a 2012 Yale Law School graduate and had clerked at the Ninth Circuit Court of Appeals, followed by three years working in the field of labor law in Los Angeles, prior to joining the CLC.  D.E. 1143-4, p. 11.  Plaintiffs seek an hourly rate of $351 for her time. The State argues that her hourly rate should be $250.  D.E. 196, p. 35.  Plaintiffs have not demonstrated that Lang, while a highly qualified attorney, had any special expertise in

voting rights law at the time that she worked on this case.  The Court FINDS that an hourly rate of $275 for her time is appropriate.  She seeks compensation for a total of 190.6 hours.

Only in its reply to the State's objections does CLC include time billed by a Mr. Gaber, listing an hourly rate of $417.  D.E. 1210, pp. 14, nn.9, 15.  There is no explanation of who Mr. Gaber is, when he became a licensed attorney, or what experience he has that was applied to his work in responding to the fee objections. Neither is there an explanation as to why the reply work done by other attorneys was billed at half the hours expended whereas his time is billed in full.  Consequently, the Court disallows this claim as inadequately documented.

**Hours**.   In exercising billing judgment, the CLC core team attorneys have excluded nearly 350 hours of what they believe to be properly billable time.  In addition, they have voluntarily excluded hundreds of hours logged by other attorneys, legal fellows, law interns, paralegals, and administrative staff who were not on the core legal team.  They have excluded travel time and administrative tasks, as well as significant drafting, timesheet review, and briefing time related to the fee motion.  D.E. 1143-4, p. 12.  In keeping with the need to coordinate counsel within the CLC and among the multiple Plaintiff-teams working the case, they agreed that only one attorney would bill for communications among them.  After conferring with counsel for the State, Hebert submitted a supplemental declaration and revised billing documentation to replace the original filing.  In so doing, the CLC has voluntarily excluded time spent on pro hac vice

motions, substitutions of counsel, and time related to the attempted intervention of True the Vote.  D.E. 1175-4.

At this time, the State's objections to the CLC billings are for clerical work, duplication, excessive charges, and vague billing.  D.E. 1196-25, -26, -27, -28.[31]  In large part, those objections target matters reported as relating to teamwork and team coordination, as well as telephone communications throughout the case and trial preparation in the week prior to trial.  The Court has reviewed the billing and the Hebert declarations.   The Court finds Hebert's explanations of the charges credible and reasonable.  The Court thus finds that the charges complained of are appropriate, both with respect to the subject matter and the time allotted.  The Court rejects the State's objections.

**Expenses**.  CLC requests $113,231.86 in expenses.  The State objects to many, broadly suggesting that CLC overstaffed hearings and depositions and thus its expenses in that regard should be disallowed.  This argument, stated in the most general terms, does not overcome the assertions in the Hebert declaration regarding the efficient manner in which they approached their teamwork structure.   Additionally, as discussed more fully above, it is not unusual or inappropriate at hearings or depositions for one attorney to take the lead and the other to second-chair the matter.  The State's complaint regarding specific hotel room receipts (D.E. 1174-4, pp. 72-73) in the total amount of $1,301.51 is moot, as CLC has withdrawn them from its application.  *See* D.E. 1210, pp. 12, 15.

---

[31]   The State objects to billing related to pro hac vice motions, the True the Vote intervention, and amicus brief coordination.  However, Hebert has testified that those charges were removed from CLC's revised request and that the State's objection is working from the wrong set of billing documents.  *See, e.g.*, D.E. 1175-4, pp. 5, 7 (showing the complained of billing as "no charge").  Thus the Court need not adjudicate that objection.

The State objects to certain expenses that are documented by receipts in the names of the attorneys' spouses.  Hebert made clear in his deposition that the spouses handled some of the logistics, such as room reservations for Plaintiffs' attorneys and witnesses. The mere fact that the receipts are in a spouse's name does not negate the fact that they represent appropriate expenses for the case, chargeable to a client or, in this case, to the opposing party under the fee-shifting statute.

The State challenges CLC's printing and production costs amounting to $6,987.09. The summary entry indicates that these costs were incurred for "open records request costs, printing, transcripts, briefs, etc."  D.E. 1175-4, p. 69.  It appears that the State's complaint is with respect to the daily copy rate included in the charges for transcripts. D.E. 1175-4, pp. 152-60; D.E. 1196, p. 78; D.E. 1210, pp. 13-14.  The Court is satisfied that, as Hebert explains, these costs were incurred to comply with the speed with which the Court tried the case and the quick turnaround necessary for Plaintiffs to submit proposed findings of fact and conclusions of law for the Court's reference in drafting its opinion—all to address issues prior to the next general election.  While such costs might represent a mere convenience in the context of other cases, the Court finds them to have material significance here.  The State has also objected to $115.00 in postage costs.  D.E. 1196, p. 77.  The Court rejects the State's complaints regarding these expenses.  *See Miller v. Carson*, 628 F.2d 346, 349 (5th Cir. 1980) (expenses such as postage and phone calls are not necessarily part of overhead and may be billed in appropriate cases).

In sum, the Court ORDERS the State to pay the Veasey-LULAC Plaintiffs the following fees and expenses incurred for the work of the CLC:

| CAMPAIGN LEGAL CENTER | | | | | |
|---|---|---|---|---|---|
| Attorney | Total Hours | Hourly Rate | Amount Allowed | Total Fees | Total Expenses |
| Hebert | 484.6 | $600 | $290,760.00 | | |
| Lang | 190.6 | $275 | 52,415.00 | | |
| Bone | 325.0 | $250 | 81,250.00 | | |
| Simson | 1022.8 | $250 | 255,700.00 | | |
| Gaber | 0 | $0 | 0.00 | | |
| **SUBTOTALS** | | | | **$680,125.00** | **$113,231.86** |

### b. Brazil & Dunn

**Rates**.  Chad Dunn testified that he was licensed in Texas in 2002 and, since that time, has represented parties in state and federal voting rights actions in Texas and in Washington, D.C.  His work has addressed local, state, and federal elections, including legislative redistricting and candidate qualifications.  He has taught and lectured on voting rights at major universities and serves as co-director of the UCLA Voting Rights Clinic.  D.E. 1143-5.  He has extensive civil and criminal trial experience and he filled a lead role in the prosecution of this case.  He requests an hourly rate of $491.  The State argues that it should be $300.  D.E. 1196, p. 35.  The Court FINDS that an appropriate hourly rate for his services is:  $485.

K. Scott Brazil testified that he was licensed to practice law in Texas in 1984.  He has tried a variety of civil rights, personal injury, commercial, and federal white-collar crime cases.  He has experience with over 50 jury trials in his more than thirty years of practice.  D.E. 1143-6.  He has also been involved in many voting rights actions at the state and federal levels.  He seeks compensation at an hourly rate of $572.

Brazil's declaration does not explain the role he played in this litigation. But a review of his timesheet shows that he monitored the case at no charge and was primarily responsible for preparing for, and attending, witness depositions, consistent with team assembly described in Hebert's and Dunn's declarations. He also attended hearings and the trial. While such work certainly calls on him to have some command of the issues involved in this voting rights action and to play an active part in the prosecution of the case, he did not occupy a leadership role. The State argues that his hourly rate should be $400. D.E. 1196, p. 35. The Court FINDS that a reasonable hourly rate for his tenure, experience, and services performed is $550.

**Hours**. Exercising billing judgment, Dunn seeks compensation for 1,360.3 hours, having voluntarily eliminated charges for over 450 hours, such as time that could be considered duplicative because of its involvement of other attorneys, additional briefing time, and time spent strategizing. He further ensures the Court that, despite the value of the work done in the previous Section 5 preclearance case, the products of which were applied to this case, he does not seek compensation for that work. D.E. 1143-5, pp. 5-6; 1210, p. 15.

Brazil seeks compensation for 265.40 hours. Using billing judgment, this figure represents a significant reduction from the charges he had logged on the case and it does not include other hours, such as the time spent on the Section 5 preclearance case that added value to the prosecution of this case. D.E. 1143-6, p. 3.

The State challenges the Dunn and Brazil time charges on a number of bases. First, it claims that multiple charges were for strictly clerical work, totaling 61.5 hours.

D.E. 1196-25.  After review, Dunn has agreed to withdraw 15.3 hours with respect to this complaint.  The Court has reviewed each of the challenged time entries and concludes that the 15.3-hour concession is generous.  The Court will not reduce the hours further under this challenge, as the vast majority of the time entries were clearly related to legal, as opposed to clerical, work.  Based on its own review of the comparative number of hours subject to an appropriate challenge, the Court allocates 14 of the conceded hours to the charges for Dunn's work and 1.3 to Brazil's work.

Under the description of duplication, the State seeks to eliminate a total of 139.5 hours logged by Dunn and Brazil.  D.E. 1196-26.  The complaint is that multiple attorneys attended hearings and contributed to the same briefing.  As more fully described above, this is a natural function of the teamwork that was necessary to prosecute this case.  After reviewing the challenged time entries, the Court does not find the overlap of work to be excessive or unrelated to the reasonable need to coordinate multiple lawyers working toward the same goal.  The Court rejects the State's complaint regarding duplication.

Claiming that the billing is excessive, the State challenges a total 266 hours of Dunn and Brazil time.  D.E. 1196-27.  The Court has reviewed the challenged time entries and Dunn & Brazil's response.  D.E. 1210, pp. 17-18.  The Court does not find the charges excessive, given that counsel needed to coordinate among themselves, prepare for court hearings and trial, and attend so as to offer valuable support for the team, even if they did not speak on the record.  The Court rejects the State's claim of excessiveness of the charges.

The State challenges as non-compensable 23 hours of Dunn's time and .3 hours of Brazil's time.  First, the Court notes that 1.8 hours of time entries included in the list of Dunn's challenged time were listed as "no charge" under the revised Dunn & Brazil request.  *Compare* D.E. 1196-28 *with* D.E. 1175-2.  Thus, only 21.2 hours of Dunn's time are at issue.  Of that remaining time, 0.9 hours are related to the addition and subtraction of counsel in the earlier part of the case—a matter that was no-charged later in the case. For the sake of consistency and because monitoring the attorney appearances and substitutions are largely a clerical matter, the Court disallows those 0.9 hours.

Another 0.9 hours are for pre-trial tracking of the parties (as opposed to counsel). Knowing which Plaintiffs remain in the case is important to knowing what evidence must be marshaled, what witnesses will be called, and what findings of fact and conclusions of law will be necessary.  The Court does not exclude this time spent keeping the record clean.

The State challenges 1.1 hours of Dunn's time attending to amicus curiae matters. Dunn's response does not specifically address the nature of those time entries.  The Court acknowledges that it is routine to charge for participating in a certificate of conference and that an attorney should be aware of amici filings and court orders addressing amici requests.  The Court thus approves of 0.4 of that time and disallows the remaining 0.7. The Court finds the State's challenge to 18.3 hours spent drafting, negotiating, and obtaining the Court's IRO as non-compensable to be wholly without merit.

The Court finds the 0.3 hours of Brazil's time that are challenged as non-compensable to be excludable as addressing clerical matters or as duplicative.  The Court

has reviewed the entries that the State challenges as block-billing and as vague.  D.E. 1196-29, 1196-30.  The Court rejects the challenges.  Last, the State objects to 3.7 hours of Dunn's time as business development.  As set out above, this argument is rejected.

**Expenses**.  With respect to Dunn & Brazil's expenses, the State first objects to them in their entirety, based on the failure to break down the expenses and attach legible proof.  D.E. 1196, p. 70.  The Court has reviewed the submission and finds that the expenses are itemized with the time records and the attached invoices and receipts are legible and self-explanatory.  Therefore, it is unclear what the State is seeking in terms of a "breakdown."  The State has offered no authority that expenses must be presented in any particular format.  Neither has it presented any evidence to controvert Brazil and Dunn's individual declarations that the expenses were incurred in the process of prosecuting this case and were paid as represented.  The State also complains that there are "multiple duplicates" in the expense receipts.  However, it has not identified any specific duplicate receipts and has not shown that duplicate receipts equate to duplicate charges, as opposed to a belt-and-suspenders approach to documentation.  The Court rejects the State's global objections.

With respect to the challenge to deposition costs, the Court does not find an ex post facto review of the usefulness of discovery efforts appropriate.  Such an approach would make attorneys strictly liable for the expense of seeking evidence that would have been relevant, but was either not substantiated or rendered moot by unrelated circumstances.  Nonetheless, the Court does find that the expense for Exceptional Reporting Services for $118.63 is insufficiently documented in that there is no

identification of the deponent in the time records, the receipt, or the firm's reply. This expense is deducted.

As for the remaining deposition charges, the State objects to the amount of $939.82 as a charge that duplicates a charge submitted by Baron. *See* D.E. 1196, p. 79 and *compare* D.E. 1175-1, p. 104 *with* D.E. 1175-2, p. 212. However, Baron has testified that he did not include this charge in his expense request because he did not pay the bill. Therefore, the Court rejects the State's objection to this charge.

The State objects to, and Court does not discern an explanation for, the rush charges for the Sanchez and Barreto transcripts. *See* D.E. 1175-2, pp. 213, 214; D.E. 1196, p. 79; D.E. 1210, pp. 22-23. Without an explanation, such charges are generally excluded. *Fogleman v. ARAMCO (Arabian Am. Oil Co.)*, 920 F.2d 278, 286 (5th Cir. 1991). The invoices do not itemize these extra charges. Consequently, the Court reduces those charges by 15%, for a deduction of $223.97.

The State also objects to charges for an extra copy of the Trotter transcript. D.E. 1196, p. 79. The State did not direct the Court to a particular invoice and the only invoice the Court has found does not appear to include any extra copies. D.E. 1175-2, p. 223. Therefore, the Court rejects the objection. The State objects to the recovery of $514.64 in postage as it should be a part of the firm's overhead expenses. However, the number of parties involved in this case and its document-heavy nature led to what Dunn has described as "outsize postage requirements." D.E. 1210, p. 23. The Court rejects this challenge. *See Miller*, 628 F.2d at 349.

As a result of the objections to time entries, the Court disallows a total of 15.6 of Dunn's hours and 1.6 of Brazil's hours.  Of the $299,915.29 total of expenses submitted, the Court disallows $342.60.  In sum, the Court ORDERS the State to pay the Veasey-LULAC Plaintiffs the following fees and expenses incurred for the work of Brazil & Dunn:

| BRAZIL & DUNN | | | | | |
|---|---|---|---|---|---|
| Attorney | Total Hours | Hourly Rate | Amount Allowed | Total Fees | Total Expenses |
| Dunn | 1,344.7 | $485 | $652,179.50 | | |
| Brazil | 263.8 | $550 | 145,090.00 | | |
| **SUBTOTALS** | | | | **$797,269.50** | **$299,572.69** |

### c.  Derfner & Altman

**Rate**.  Armand Derfner was licensed to practice law in 1965.  His practice has included civil rights litigation in general and voting rights litigation in particular.  He also serves as a constitutional law scholar at the Charleston School of Law and has published works on voting rights.  He began work on this case shortly after the original complaint was filed and drafted the first amended complaint.  His role in the litigation was primarily to plan trial strategy and see it through in drafting pleadings, memoranda, discovery, proposed findings of fact and conclusions of law, and appellate briefing.  He took responsibility for researching Texas law regarding the permitted SB-14-approved IDs. He was also instrumental in coordinating the data discovery and analysis and he participated in presenting witnesses at trial.  The respective hourly rate requests for Derfner's time are $613 and $400.  D.E. 1196, p. 35.  The Court FINDS that a rate of $585 is appropriate for his qualifications and responsibility.

**Hours**.   Derfner originally sought compensation for 1,165.60 hours.   After reviewing the State's objections, Derfner has offered a concession of 93 hours.   The Court finds that the concession is generous, given the explanations Derfner has offered, as discussed below.

The State challenges 4.0 hours of travel time.  D.E. 1196-24.  In his declarations, Derfner indicated that he intended to delete all travel time from his requests.  Claiming the time is duplicative, the State challenges 100.5 hours of Derfner's work on the proposed findings of fact and conclusions of law and participating in two moot courts.  D.E. 1196-26.  The Court is well-aware of the content of the proposed findings of fact and conclusions of law and the amount of work that was obviously necessary to both state the right propositions and to document them in the record.  The Court found this work to be of significant assistance in drafting the Court's opinion.  The entries are not inconsistent with the labor required.

The State also challenges as excessive 88 hours of time that was primarily devoted to trial preparation and trial.  D.E. 1196-27.  Derfner attended trial for the purpose of presenting witnesses and observing the proceedings in anticipation of drafting proposed findings of fact and conclusions of law.  D.E. 1210, p. 33.  The time appears appropriate.  The State suggests that 81 of Derfner's hours are non-compensable.  Those hours were primarily devoted to highlighting the facts supporting related, but failed, claims in the proposed findings of fact and conclusions of law.  As set out above, the Court has determined that time spent on related claims that are based upon a common nucleus of operative fact need not be parsed and excluded.  However, because Derfner has listed 77

hours-worth of these entries as exclusively devoted to those failed issues, it is possible to deduct a portion of those hours (to continue to allow compensation for efforts partially devoted to useful facts under VRA § 2).

Derfner billed eight 40-hour blocks of time between August 2013 and April 2014 for:  (1) initial review and complaint-drafting; (2) coordinating the efforts of multiple stake-holders to determine and ensure that the evidence could be ready for a 2014 trial date; (3) working with experts on data gathering and comparison; (4) developing the overall strategy and meeting with co-counsel to coordinate; (5) drafting the opposition to the State's motion to dismiss; (6) drafting written discovery requests and responses, along with memoranda to defend positions; (7) working with experts on presenting statistical and factual data regarding the effect of SB 14; and (8) research of Texas regulations and administrative issues regarding SB 14-qualified ID.  He did this because his contemporaneous time records have been lost due to technological difficulties.  The State seeks a percentage discount of Derfner's entire billing on this basis.  However, Derfner had already deducted 20% of this block-billed time in formulating his request.  D.E. 1175-3, p. 19.  The State also objects to 16.5 hours as vague, when they represent generally appropriate legal services.  D.E. 1196-30.

**Expenses**.  Derfner originally sought reimbursement of expenses in the amount of $13,623.82.   D.E. 1143-7, 1175-3.   Because he is unable to provide detailed documentation for his expenses due to the passage of time, he has withdrawn that request in its entirety.  In sum, the Court ORDERS the State to pay the Veasey-LULAC Plaintiffs the following fees and expenses incurred for the work of Derfner & Altman:

64 / 106

| DERFNER & ALTMAN | | | | | |
|---|---|---|---|---|---|
| Attorney | Total Hours | Hourly Rate | Amount Allowed | Total Fees | Total Expenses |
| Derfner | 1110.7 | $585 | $649,759.50 | | |
| **SUBTOTALS** | | | | **$649,759.50** | **$0.00** |

### d. Baron

**Rate**.   Neil G. Baron testified that he is a 1986 law school graduate with a litigation practice in which he has done some redistricting and voting rights work.   He also served on the 2012 Charter Review Committee for the City of League City, Texas, chairing a redistricting sub-committee regarding a proposal to create single-member districts.   Without describing the role he played in this litigation, he asserts that an hourly rate of $572 is appropriate for his work.   The State argues that his hourly rate should be $400.  D.E. 1196, p. 35.   While Baron has some election law experience, he did not take a lead role in this case.   His work was largely devoted to discovery.   The Court FINDS that a reasonable hourly rate for his work is $450.

**Hours**.   After exercising billing judgment, Baron seeks fees for 254.60 hours at his full rate.   He also seeks 64.50 hours of travel time at 50% of his rate, which the court treats as 32.25 hours.   The State objects to Baron's hours as follows:   14.7 hours as clerical;  4.3 hours as duplicative;  10.6 hours as excessive;  4.85 hours as non-compensable; and 1.2 hours as vague.   D.E. 1196-25, -26, -27, -28, -30.   Thus a total of 35.65 hours have been challenged and Baron concedes that 1.2 hours should be deleted, resulting in 34.45 hours at issue. *See* D.E. 1210, p. 29.

The Court has reviewed Baron's declarations and response, as well as the time charges the State has called into question.  The Court FINDS that Baron's exercise of billing judgment was generous, particularly with respect to the time he spent at trial for which he did not bill.  While the Court does not find any time entries to be improper, it considers the few matters that may be questioned to have been offset by unbilled time for which Baron was unquestionably entitled.  Therefore, Baron is entitled to compensation for 285.65 hours.

**Expenses**.  Baron seeks his expenses in the amount of $2,115.83.  The only Baron expense that the State objected to was $939.82 for transcripts.  D.E. 1196, p. 79.  As Baron explained in his response, that figure was not included in his expense request because he did not pay that bill.  D.E. 1210, pp. 29-30.  *See* discussion of Brazil & Dunn expenses, above.  Therefore, Baron's full expense claim is payable.

In sum, the Court ORDERS the State to pay the Veasey-LULAC Plaintiffs the following fees and expenses incurred for the work of Baron:

| NEIL G. BARON | | | | | |
|---|---|---|---|---|---|
| Attorney | Total Hours | Hourly Rate | Amount Allowed | Total Fees | Total Expenses |
| Baron | 285.65 | $450 | $128,542.50 | | |
| **SUBTOTALS** | | | | **$128,542.50** | **$2,115.83** |

## 2.  NAACP-MALC Plaintiffs

### a.  Lawyers' Committee for Civil Rights Under Law
(Rosenberg, Posner)

**Rates**.  Ezra Rosenberg was first licensed in 1974 and had a complex litigation practice over the decades with public employers and private firms, including heading the

Special Projects Section of the New Jersey Public Defender's office and Senior Trial Attorney and Trial Team Leader with the Land and Natural Resources Division of the Department of Justice.  He has been involved in many public interest cases, including civil rights work, and his efforts have earned him many prestigious accolades.  When this case was tried, Rosenberg was a partner with Dechert LLP.  After the trial, he retired from Dechert and joined the Lawyers' Committee, where he continued to work on this case.  D.E. 1174-2.

Whether in his capacity as a Dechert partner or as Senior Special Counsel and Co-Director of the Voting Rights Project for the Lawyers' Committee, Rosenberg played a critical role, readily apparent to the Court, in coordinating this complex case.  He was one of the lead counsel directing the execution of Plaintiffs' joint strategy.  As he testified, he ensured that Plaintiffs spoke with a single voice in briefs, hearings, and trial.  And the Court recalls that Plaintiffs did not waste any time during the concentrated trial of this case.  Rosenberg seeks an hourly rate of $613 for his work and the State argues that he should be limited to $400.  D.E. 1196, p. 35.  Given his qualifications, expertise, and the role he played in the litigation, the Court FINDS that an appropriate hourly rate for his services is $600.

Mark Posner is a 1980 law school graduate who served 23 years in the Civil Rights Division of the Department of Justice, including 15 years in the Voting Section.  D.E. 1174-2.  He also served as Senior Special Counsel for the Lawyers' Committee, working on voting rights enforcement.  He acted as a key strategist and brief writer for Plaintiffs until his 2015 retirement.  *Id.*  Posner seeks compensation at an hourly rate of

$613.  The State argues that his rate should be $400.  D.E. 1196, p. 35.  Because he is highly qualified, but does not appear to have taken a lead responsibility, the Court FINDS a reasonable hourly rate for his services to be $585.

**Hours**.   The Lawyers' Committee originally sought compensation for 502.03 hours of Rosenberg's time and 450.6 hours of Posner's time.  Both figures represent an adjustment of 50% for travel time and 80% for work on the fee application.  D.E. 1174-2, 1208-1.  Nonetheless, the State challenges 16.95 of Posner's hours as travel time.  D.E. 1196-9.  That challenge is rejected.  Without any elaboration, the State further challenges time billed by the Lawyers' Committee as follows:

- 2.4 hours of Rosenberg's time as clerical, merely because it involved coordinating with court clerks;

- 83.7 hours of Posner's and 174.2 of Rosenberg's time as duplicative, apparently because it, in part, involved communications with co-counsel;

- 183.8 hours of Posner's and 177.9 hours of Rosenberg's time as excessive, much of which is also part of the duplication challenge; and

- 63.4 hours of Rosenberg's time as non-compensable, largely dealing with negotiating and obtaining the IRO.

D.E. 1196-10, -11, -12, -13.   First, the Court notes that the itemized time in the challenged entries is often significantly more time than is actually claimed in the fee motion, as the Lawyers' Committee exercised extraordinary billing judgment and

substantially reduced the time requested before filing its motion so as to preempt the type of attack the State has leveled at them.

In his extensive reply declaration, Rosenberg documents the effort he had to make to verify his time entries in response to the State's unarticulated, arithmetically flawed, over-reaching objections to the billings. And while he offers to concede 21.66 hours, he also notes that he spent more than 30 hours of time responding to the State's challenge and is not seeking additional fees for that effort. Noting the lack of specificity in the State's challenge, the Court has reviewed the time entries and Rosenberg's response. D.E. 1208-1. The Court rejects the challenges and declines Rosenberg's concession. Fee applications are not intended to spur satellite litigation and the State's challenge to this particular application does not exhibit good faith. *See Hensley*, 461 U.S. at 437.

**Expenses**. The State did not challenge any of the Lawyers' Committee's expenses. Therefore, they are awarded in full. In sum, the Court ORDERS the State to pay the NAACP-MALC Plaintiffs the following fees and expenses incurred for the work of the Lawyers' Committee:

| LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER THE LAW | | | | | |
|---|---|---|---|---|---|
| Attorney | Total Hours | Hourly Rate | Amount Allowed | Total Fees | Total Expenses |
| Rosenberg | 502.03 | $600 | $301,218.00 | | |
| Posner | 450.6 | $585 | 263,601.00 | | |
| **SUBTOTALS** | | | | **$564,819.00** | **$16,883.09** |

### b.  Dechert LLP
(Rosenberg, Rudd, Yeary, Cohan)

**Rates**.  When Rosenberg left Dechert to go to the Lawyers' Committee, Neil A. Steiner took his place supervising the Dechert lawyers assigned to this case.  While Steiner spent some time on the case, he did not include any of his time in the fee application.  However, he supplied the declaration to prove up the time of the core team of attorneys for whose time Dechert seeks compensation.  D.E. 1174-6.  Steiner testified that the ordinary hourly rates for the attorneys who worked on this case are from $885 to $1,200.  D.E. 1174-6, p. 7.  Rosenberg's qualifications and rate, set out above, are incorporated here for purposes of the Dechert fee motion.

Amy Rudd is a 2000 graduate of the University of Texas School of Law.  She joined Dechert in 2008, becoming a partner in 2013 before going to another firm in 2018.  Her expertise is complex commercial litigation.  D.E. 1174-6.  Her responsibilities included preparing and putting on witnesses at trial and assisting with the supervision of other Dechert lawyers working on the case.  D.E. 1174-2.  Dechert seeks compensation for her time at hourly rates of $491 and $544, depending on the date of the work done, as Ms. Rudd graduated between tenure-based categories on the USAO Matrix during the course of the case.  The State argues that her hourly rate should be $275.  D.E. 1196, p. 35.  Given her qualifications and her role in the case, the Court allows an hourly rate of $375.

Michelle Yeary is a 1995 graduate of Rutgers Law School.  She joined Dechert in 2002 and has extensive experience in coordinating discovery in complex commercial and

mass tort litigation in both federal and state court.  D.E. 1174-6.  Her responsibilities included document review and management and supervising responses to discovery. Dechert seeks an hourly rate for her time at $544.  The State argues that her rate should be $300.  D.E. 1196, p. 35.  Given her qualifications and her important supporting role in this matter, the Court allows an hourly rate of $375.

Lindsay Cohan is a 2009 graduate of the University of Texas School of Law and joined Dechert in 2012.  She has extensive trial and case management experience.  D.E. 1174-6.  Cohan's responsibility was to act as primary local counsel in Austin, Texas, preparing and filing papers and coordinating Plaintiffs' efforts to depose experts and fact witnesses.  D.E. 1174-2.  Dechert seeks compensation at an hourly rate of $351 and $358, depending on the date of the work done.  The State argues that her rate should be $250. D.E. 1196, p. 36.  Given her qualifications and her supporting role, the Court allows an hourly rate of $300.

**Hours**.  The State seeks deduction of 24 hours of travel time for Rosenberg and 12 hours for Yeary.  D.E. 1196-9, pp. 5-6.  Steiner responds that Dechert did not charge for travel time, even when the attorneys were actively working during transit.  D.E. 1208-6, pp. 4-5.  It is difficult to reconcile these positions because the entries clearly reflect that some travel was involved in the hours stated, along with some work, and that they were included in the fee application at full value.  The Court thus treats three hours of each entry as non-working travel time and allows it at 50%.  Thus Rosenberg's time will be reduced by 4.5 hours and Yeary's time will be reduced by 1.5 hours.

The State challenges as clerical two hours of Yeary's time, 0.5 hours of Rudd's time, and seven hours of Rosenberg's time. D.E. 1196-10.  After reviewing the time entries and Steiner's response, the Court rejects those requested deductions.  The State also challenges 186.3 hours of Cohan's time as clerical.  After reviewing the entries, the Court agrees that some reflect attending to admissions and substitutions of counsel.  For that reason, the Court accepts Dechert's concession of 22.2 hours of Cohan's time as clerical and deducts it from her compensable hours.  The Court rejects any challenge relating to the time of paralegal Capobianco, as those hours have not been submitted for payment.[32]  D.E. 1174-6, pp. 3, 7, D.E. 1208-6, p. 5.

The Dechert hours challenged as duplicative, excessive, block billing, and vague are not accompanied by any explanation as to how they are infirm and nothing on their face indicates that they are inappropriate.  Each timekeeper's explanation of the time is sufficient.  The Dechert declarations further state how the fee application was formulated, using billing judgment to avoid duplicate time by having only one attorney involved bill the time, where appropriate.  The State has not demonstrated that representation to be untrue.  Neither has the State submitted any authority to suggest that it is improper per se for more than one attorney on a team to bill for communications necessary to coordinate efforts involving multiple Plaintiffs who are separately represented.  Indeed, the Court encourages such coordination.  The Court will not eliminate time simply because the entry mentions the involvement of another attorney.

---

[32]   It appears that the billing record attached to Dechert's application (D.E. 1174-7) includes time charges for Capobianco-Renallo's time and that the total billing figure of $1,550,448.80 includes those charges.  However, the Court awards fees on the basis of the attorney hours submitted and adjusts the award accordingly.

Under the "Non-Compensable" heading, the State objects to 16.3 hours of Yeary's time involving the use of the Crivella West document management platform.  Given the document-heavy nature of this case and the multiple sources from which documents were obtained, there is no reason to fault Plaintiffs' counsel for using technology to assist with managing the information.  Any time spent training to get up to speed on the use of a such a technological platform will easily be returned in greater efficiencies.  The State has provided no authority for finding this time to be non-compensable.

Also under the non-compensable objection, the State lists 16.4 hours of Rudd's time, part of which involves understanding the Fifth Circuit decision, part of which concerns communications with the media, and part of which was devoted to briefing the discriminatory intent issue in the phase of litigation.  The parties represented that the post-remand phase of the litigation would be excluded from their request and the Court excludes those hours.  D.E. 1196-13, p. 7.  Plaintiffs' brief argues that media efforts were intended to increase public awareness about the discriminatory effect of SB 14 and assisted Plaintiffs in identifying voters, state officials, and others with relevant information or experiences.  D.E. 1207, p. 27.  However, there are no corresponding representations in the declarations to support this abstract benefit.  Plaintiffs have not attempted to demonstrate how any media interviews contributed to the parties' litigation objectives.  Therefore, the Court excludes those hours.

The Court does not, however, exclude time necessary for digesting a court opinion on the case.  And the Fifth Circuit's en banc decision to which the July 20, 2016 entry applies, was long and involved, such that allocation of five hours to its understanding is

well within the parameters of appropriate legal representation.   The Court does not exclude that time.   Therefore, with respect to the 16.4 challenged hours, the Court excludes from Rudd's time 11.4 hours as non-compensable.

Plaintiffs have further represented that time addressed to the attempted intervention of True the Vote was to be excluded from their requests.   Therefore, the Court disallows 3.1 hours of Rosenberg's Dechert time devoted in large part to that issue, which the Court considers inadvertently included.  D.E. 1196-13, p. 8.

With respect to Cohan's time entries, the State objects to many of the entries already addressed with respect to the clerical objection as additionally non-compensable. The Court's prior deductions are sufficient for those entries.   And the Court rejects the complaints regarding time spent on obtaining the IRO.   In addition, however, the State's objection includes 7.5 hours of briefing on the intentional discrimination phase of the case.   D.E. 1196-13, p. 10.  The Court excludes those hours.

**Expenses**.  The State objects to a number of Dechert's expenses.   The complaint regarding $206.89 in telephone charges as possibly unrelated to the case is rejected. Dechert has explained that these charges were for internet service during travel and are documented in the hotel receipts.  The State seeks a wholesale deduction of $19,121.22 for duplication charges and miscellaneous expenses suggesting that Dechert does not itemize the documents duplicated and the charges are not supported by receipts. However, Dechert's submission is replete with invoices that, in fact, document the charges.  They include deposition and court transcripts, as well as a number of briefs. Additionally, Steiner's reply declaration states that Dechert handled the copying for all

Plaintiffs' counsel and engaged in this work prior to the trial so as to avoid unnecessary duplication and maintain their coordinated effort.   The Court rejects this requested deduction in this complex and coordinated, document-heavy case.

The State challenges various categories of research expenses.   Dechert's receipts, supplemented by Steiner's reply declaration, demonstrate that $45,297.40 was paid for the groundwork underlying the expert opinions presented in this case.   Dechert's receipts also show that sums were paid in connection with Freedom of Information Act requests and the purchase of legal materials related to the issues in this case.   Those charges will not be excluded.

"'[C]omputer-assisted research should be . . . reimbursed under attorney's fee statutes like section 505, so long as the research cost is in fact paid by the firm to a third-party provider and is customarily charged by the firm to its clients as a separate disbursement.'"   *Hacienda*, 2019 WL 93306, at *11 (quoting *InvesSys, Inc. v. McGraw-Hill Co., Ltd.*, 369 F.3d 16, 22 (1st Cir. 2004) and allowing fully detailed Lexis, Westlaw, and PACER charges).   Otherwise, they are regularly rejected as recoverable expenses. *E.g., Honestech, Inc. v. Sonic Sols.*, 725 F. Supp. 2d 573, 581 (W.D. Tex. 2010), *aff'd*, 430 Fed. Appx. 359 (5th Cir. 2011).

Dechert does not direct the Court to any invoices or receipts for these charges and the Court did not find any in the Dechert submission.   D.E. 1174-10.   Neither did any of Steiner's declarations offer any explanation or authority supporting the following charges:

| | |
|---|---|
| Lexis: | $   494.67 |
| Westlaw: | $2,394.34 |
| Pacer: | $   787.50 |
| **TOTAL:** | **$3,676.51** |

Without assurances that these charges were actually paid and normally billed to regular clients, the Court excludes them.

The State complains of a number of hotel bills and a few meal expenses because there is no explanation as to why the stay was required or whether the meals were associated with this case.  Ordinarily, no additional explanation is necessary when hotel and meal charges coincide with out-of-town work documented in the attorney's billing records.  Dechert has pointed out that the billing records confirm the necessity of Rosenberg's hotel and meal expenses.  D.E. 1208-6, pp. 7-8.  Nonetheless, Dechert has agreed to concede $476.10 (one night's room charge with taxes) for a two-night Washington, D.C. stay, resulting in a revised total expense request of $266,942.85.  Therefore, the Court accepts this deduction and the revised total before making other deductions addressed herein.

The State objects to the expenses for Cohan's hotel, internet, and meals when she second-chaired the deposition of Debbie Riddle on June 18, 2014, on the basis that, if she did not bill for her time due to her passive role, she should not recover her expenses either.  The Court does not agree.  The State has not shown that an attorney has to take a vocal role in a deposition for it to be billable.  Thus, Dechert's willingness to forego Cohan's time expense (in the exercise of billing judgment and as an incentive for the

State to accept the charges) is no reason to require Dechert to further suffer its out-of-pocket expenses incurred for the value that Cohan added to the deposition effort.

Also with respect to hotel charges, the State objects to the Dechert attorneys' choices of hotels as extravagant, challenging $5,776.81.  *See generally, Curtis v. Bill Hanna Ford, Inc.*, 822 F.2d 549, 553 (5th Cir. 1987) (noting that extravagant and unnecessary charges, in general, should not be allowed); *Cypress-Fairbanks Indep. Sch. Dist. v. Michael F. by Barry F.*, 118 F.3d 245, 257 (5th Cir. 1997) (reducing air fare charge because it exceeded the published seven-day advance purchase price and there was no evidence that the flight could not have been purchased seven days in advance).

The amount to which the State objects exceeds, by more than $500, the total hotel charges (room, taxes, parking, and dining) for the invoices listed in the State's complaint.  D.E. 1174-10, pp. 126, 229, 230, 231, 241, 303, 305.[33]  Moreover, two of the receipts are for the same stay.  D.E. 1174-10, pp. 229, 230.  The room charges, alone, are only $3,696.20.  Of those charges, two are for less than $250 per night, which does not strike the Court as unreasonable.  In fact, the State fails to supply any evidence of what would be a reasonable figure to contradict Dechert's general assertions.

Dechert has failed to provide specific assurances regarding these particular charges.  The total for room charges that exceed $250 per night is $2,325.10, for an average of $465.02 for the five nights at issue.  The Court reduces the average to $350

---

[33]   The Court has reviewed the pages that the State has cited for its complaint regarding extravagance and notes that those pages do not include the hotel charge prompting Dechert's $476.10 deducted above.  Therefore, there is no deduction overlap between these issues.

per night for a total deduction of $575.10 ($2325.10 – $1750.00) from Dechert's expenses.

Claiming they represent overhead, the State objects to the charges for courier, document storage/retrieval, and supplies in the total amount of $1,065.33. D.E. 1196, p. 77. Dechert has not responded to this complaint and the Court's review of the expense records did not yield an explanation of these charges. The Court therefore deducts $1,065.33 as non-compensable overhead.

The State objects to deposition charges of $1,481.75. D.E. 1196, p. 79 (referring to Dechert summary of charges, D.E. 1174-8). Dechert has not responded to this complaint and the Court has reviewed the 22 invoices for depositions in its submission and nothing appears to represent this charge. The charge is deducted from the Dechert expense claim. Last, the State objects to the inclusion of rush charges in the invoice for the deposition of Martin Golando for $901.14. D.E. 1196, p. 80 (referring to D.E. 1174-10, p. 461). Because Dechert does not explain the reasonableness of this unspecified charge, the Court deducts 50% of the charge and excludes $ 450.57 ($901.14 ÷ 2).

Dechert's revised request seeks 1,042.7 hours for Rosenberg's time. D.E. 1174-6. As set out above, the Court deducts 7.6 hours. Dechert seeks 460.1 of Rudd's time and the Court deducts 11.4 hours. Of the 630.3 hours of Yeary's time, the Court deducts 1.5 hours. And, finally, the Court deducts 29.7 hours of the 752.2 hours sought for Cohan's time.

With respect to expenses, the Court deducts $6,798.69 ($3,676.51 + 575.10 + 1,065.33 + 1,481.75) from the revised request for $266,942.85. D.E. 1208-6. In sum, the

Court ORDERS the State to pay the NAACP-MALC Plaintiffs the following fees and expenses incurred for the work of Dechert LLP:

| DECHERT LLP | | | | | |
|---|---|---|---|---|---|
| Attorney | Total Hours | Hourly Rate | Amount Allowed | Total Fees | Total Expenses |
| Rosenberg | 1035.1 | $600 | $621,060.00 | | |
| Rudd | 448.7 | $375 | $168,262.50 | | |
| Yeary | 628.8 | $375 | $235,800.00 | | |
| Cohan | 722.5 | $300 | $216,750.00 | | |
| SUBTOTALS | | | | $1,241,872.50 | $259,693.59 |

### c. Brennan Center for Justice
(Perez)

**Rate**. Myrna Perez was first licensed in Texas in 2003 and she has spent the bulk of her career focused on voting rights litigation, advocacy, and research. She is currently Deputy Director of the Democracy Program at the Brennan Center for Justice at NYU School of Law, heading the Voting Rights and Elections project. Among her many qualifications, she has served as lead counsel in a number of voting rights cases in state and federal courts and has written extensively on various election law subjects. She also teaches complex civil rights litigation and policy at Columbia Law School. D.E. 1174-11.

Perez acted as one of the lead counsel for Plaintiffs MALC and Texas NAACP, participating in all substantive proceedings. She defended the deposition of expert Lorraine C. Minnite and led the development of rebuttal arguments to the State's race-neutral justifications for SB 14, providing extensive analysis of the legislative history,

which was critical to the decision in this case.  She led a team of lawyers at the Brennan Center, none of whom are seeking compensation for their time.

Perez seeks hourly rates of $417 and $491 for her time, based on the USAO Matrix rate structure that establishes categories by tenure.  The average hourly rate for her time, based on the fees requested, is $478.  D.E. 1174-11, p. 4 ($246,689.90 total fees ÷ 516.5 hours).  The State argues that her rate should be limited to $250.  D.E. 1196, p. 36.  Given her qualifications and her role in this case, the Court FINDS that an appropriate hourly rate for her time is $475.

**Hours**.  The Brennan Center seeks compensation for 516.5 hours, representing roughly half of the hours expended by its attorneys on this case.  D.E. 1174-11, pp. 4-5.  The State objects to 141 of those hours as duplicative.  However, it does not explain why it believes the identified entries are duplicative.  While some recount communications with other attorneys, the Court finds nothing untoward in this effort to coordinate multiple attorney teams for a unified prosecution of the case in the interests of all Plaintiffs and the efficient use of judicial resources.

The State challenges 87.5 hours as non-compensable.  Many of those hours appear to have been targeted because they mention, in part, work on the constitutional and discriminatory intent claims on which no new relief was ordered.  However, to the extent that this work occurred in the initial trial and appeal phase of the case, the Court has determined that it is not subject to parsing.  However, two of the entries include time on the discriminatory intent issue after the Fifth Circuit decision remanding that claim.  But on close inspection, it is clear that the total time charge excludes the combined 2 hours

spent on the intent issue.  Therefore, the Court rejects any claim that Perez billed for non-compensable time with respect to the theories on which Plaintiffs did not succeed.

Also in the State's non-compensable category is a time entry that includes the attempted intervention of True the Vote.  The Court accepts Perez's reply, stating that the time spent on that issue was not charged.  D.E. 1208-7.  This is confirmed by the itemization of the tasks within the entry, which assigns 0.3 hours to True the Vote, which is not included in the total amount of hours charged for that entry.  With respect to the time spent with respect to fee applications, the challenged entries include only one entry of 0.1 hours.  As discussed above, the Court allows that *de minimis* charge at full value.

In her reply, Perez clarifies that the Brennan Center charged 7.8 hours of her time in the non-compensable category coordinating on amicus briefs.  While other Plaintiffs' counsel chose not to bill for this time, the Brennan Center's stand calls up a potential circuit split.   As the State asserts, the Eleventh Circuit rejected compensation for coordinating on amicus briefs.

> An organization or group that files an amicus brief on the winning side is not entitled to attorney's fees and expenses as a prevailing party, because it is not a party. We will not allow that result to be changed by the simple expedient of having counsel for a party do some or all of the amicus work. To pay a party for such work would encourage the practice, which we are loathe to do. The district court should not award plaintiffs any attorney's fees or expenses for work done in connection with supporting amicus briefs. (A reasonable amount of time spent reading and responding to opposing amicus briefs is, of course, compensable.)

*Glassroth v. Moore*, 347 F.3d 916, 919 (11th Cir. 2003); *cf., Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 195 Fed. Appx. 93, 99 n.8 (3d Cir. 2006) (prior to *Glassroth*, finding amicus coordination compensable in the absence of an articulated objection).

In one case since *Glassroth*, cited by Plaintiffs, the Fifth Circuit affirmed an attorney's fee award that included, among the time charges, some amicus brief coordination. The trial court had issued an across-the-board cut of 35 percent of the time claimed so as to address any complaints regarding non-compensable time. The Fifth Circuit majority chose not to disturb that approach, noting that trial courts should not be placed in the position of being "green-eyeshade accountants." *DeLeon v. Abbott*, 687 Fed. Appx. 340, 343 (5th Cir. 2017) (per curiam) (quoting *Fox v. Vice*, 563 U.S. 826, 838 (2011)).

In a concurring opinion, Judge Elrod noted that this approach potentially conflicted with *Glassroth* and that the Court should distinguish between non-compensable fees incurred in soliciting, coordinating, and briefing prior to filing an amicus from compensable fees incurred in reviewing an amicus brief that has already been filed and participating in a certificate of conference. *DeLeon*, 687 Fed. Appx. at 346 (Elrod, J. concurring). Plaintiffs' suggestion that *DeLeon* supports the award of fees incurred prior to the filing of an amicus brief misunderstands the case. While the majority and concurring opinions disagreed on the manner of cutting such fees, both can be read to disallow them. Therefore, the Court disallows 7.8 hours of Perez's time as non-compensable work on the solicitation and preparation of amicus briefs.

The Court rejects the remaining objections to the Brennan Center's time as non-compensable because it addresses work on the IRO.  D.E. 1196-13.  This work is fully compensable.  After reviewing the challenged time entries, the Court also rejects the State's objection to 14.9 hours of Perez's time as vague.  D.E. 1196-15.  For the same reasons outlined above, and consistent with Perez's reply declaration, the Court rejects the State's argument that 24.3 of her hours are impermissible business development rather than the exercise of due diligence in the development of the facts of this public interest lawsuit.  D.E. 1196-16.

**Expenses.**   With respect to the Brennan Center's claim for $51,405.95 in expenses, the State objects to the Brennan Center's charge of $37,361.02 for research as insufficiently explained.  D.E. 1196, p. 74.  As set out in Perez's reply declaration, those expenses were incurred for developing the facts regarding SB 14's actual impact on voters.  D.E. 1208-7.  The Court rejects the requested deduction of these expenses.  The State objects to $5,216.57 in travel expenses for Perez, her assisting attorney, and expert Minnite as overstaffing.  As explained in the reply, these expenses were associated with travel and appearance at the trial of this case.  Having a second chair attorney who does not bill for her time is not overstaffing and her expenses are appropriate.  The Court rejects the State's argument.  Perez does not address the complaint that a charge for $725.46 is exorbitant.  D.E. 1174-13, p. 3, 1196, p. 76.  The Court did not find a detailed invoice for this charge among the Brennan Center's expense records and thus disallows it.

In sum, the Court ORDERS the State to pay the NAACP-MALC Plaintiffs the following fees and expenses incurred for the work of the Brennan Center:

| BRENNAN CENTER FOR JUSTICE | | | | | |
|---|---|---|---|---|---|
| Attorney | Total Hours | Hourly Rate | Amount Allowed | Total Fees | Total Expenses |
| Perez | 508.7 | $475 | $241,632.50 | | |
| **SUBTOTALS** | | | | **$241,632.50** | **$50,680.49** |

### d. Texas State Conference of NAACP Branches (Bledsoe, Notzon, Covich)

**Rates.** Gary Bledsoe was licensed in 1976 and has worked on voting rights cases as an Assistant Texas Attorney General and Special Assistant Attorney General as well as in private practice, with respect to local, state, and federal elections issues. He has also been invited to speak to the Texas legislature as well as a Congressional committee regarding voting rights, voter ID, and voting irregularities in Texas. He also teaches voting rights at the Thurgood Marshall School of Law. A review of his time entries and reply declaration indicates that he provided practical insights to the team of lawyers, as well as assisting with the marshalling of evidence. D.E. 1174-22, 1208-9. He testified that he played a supporting role in this case and he seeks an hourly rate of $613. The State argues that his rate should be $400. D.E. 1196, p. 36. The Court FINDS that an appropriate hourly rate for his time is $525.

Robert Notzon, a 1996 graduate of the University of Texas School of Law, has been involved with the NAACP since his first year of law school. In 2000, he became the Legal Redress Committee Chairman for the Texas State Conference of NAACP Branches. His practice is devoted primarily to employment law, but he has represented

the NAACP in each of its voting rights cases against the State of Texas since 2001. He does not detail the substantive nature of his past voting rights litigation.

Notzon testified that he deferred to other more experienced lawyers in this case and he thus had limited involvement in the litigation. D.E. 1174-24. He seeks an hourly rate of $544 and $572, based on his tenure under the USAO Matrix. The State argues for a rate of $350. D.E. 1196, p. 36. Given his failure to demonstrate substantive experience in voting rights cases and his largely non-substantive duties, the Court holds that a reasonable hourly rate for his services is $350.

Daniel Covich was licensed in 1987 and has worked for a number of private law firms in central and south Texas, as well as for the Office of Texas Attorney General, Natural Resources and Tort Litigation Divisions. He does not claim any experience or training in voting rights, but served as local counsel for Plaintiff, Texas State Conference of NAACP Branches (Texas NAACP). His timesheet reflects that his duties were largely related to monitoring the case and providing feedback during the trial and immediate post-trial work. Based on his tenure, he seeks an hourly rate under the USAO Matrix of $572. D.E. 1187-1. According to the State, his rate should be $350. D.E. 1196, p. 36. Given the lack of stated relevant experience and his passive involvement, the Court allows an hourly rate of $350.

**Hours.** Bledsoe seeks compensation for 74.35 hours. D.E. 1174-22. The State has objected to eight hours as travel time. In response, Bledsoe explained that travel only made up three of those hours, with the rest engaged in the substantive work for which travel was required. In addition, Bledsoe testified that he traveled with staff and was able

to prepare for the deposition while in transit.  Because the travel time was used for substantive work, the Court rejects the State's travel objection in its entirety.

The State also objects to 23.1 hours of Bledsoe's time as duplicative and 30.5 hours as vague.  D.E. 1196-11, -15.  After review of the time entries and Bledsoe's additional explanations of the services rendered and his very conservative billing, the Court rejects the requested deductions.  *See* D.E. 1208-9.

Because his role was largely as a liaison between the client and the other attorney teams, Notzon billed only for the time he claims to have spent providing valuable input into the proceedings.  This represents 40.85[34] of the 147.15 hours he devoted to the case.  D.E. 1174-24.  The State objects to 1.25 hours as duplicative, 1.25 hours as non-compensable, 1.8 hours as vague, and 2.75 hours as business development.  D.E. 1196-11, -13, -15, -16.  Notzon did not supply a reply declaration.  After reviewing the time entries and Notzon's declaration, and crediting his conservative billing judgment, the Court disallows 0.4 hours as non-compensable (devoted to the discriminatory intent phase and communications with the media) and 0.3 hours as vague for a total deduction of 0.7 hours.  The Court rejects the remaining objections.

Covich seeks compensation for 40 hours of work.  The State objects to all of his time as block-billed.  D.E. 1196-14.  Covich did not supply a reply declaration, but explained in his initial application that he had closed his office soon after the 2014 trial and his billing statement is based on his recollection.  His request explains that he

---

[34]   His declaration first states that he seeks compensation for 42.3 hours, but when he sets out the calculation of the total fees, he uses the figure 40.85.  *See also*, D.E. 1174-26, detailing 40.85 hours.  The Court uses the calculated figure.  D.E. 1174-24.

attended the bench trial in this case, which exceeded 40 hours.   He exercised billing judgment to bill for only 25 of those hours.   The remaining 15 hours of his claim were devoted primarily to pre-trial monitoring.   While the request is block-billed and cryptic, he has clearly justified 40 hours of work for this case.   Therefore, the Court rejects the State's request to reduce his time.

**Expenses**.   Bledsoe seeks $1,250.72 in expenses, to which the State did not object. They are awarded in full.   Neither Notzon nor Covich seek to recover any expenses.

In sum, the Court ORDERS the State to pay the NAACP-MALC Plaintiffs the following fees and expenses incurred for the work of Bledsoe, Notzon, and Covich on behalf of Texas NAACP:

| TEXAS NAACP | | | | | |
|---|---|---|---|---|---|
| Attorney | Total Hours | Hourly Rate | Amount Allowed | Total Fees | Total Expenses |
| Bledsoe | 74.35 | $525 | $39,033.75 | | $1,250.72 |
| Notzon | 40.15 | $350 | $14,052.50 | | 0.00 |
| Covich | 40 | $350 | $14,000.00 | | 0.00 |
| **SUBTOTALS** | | | | **$67,086.25** | **$1,250.72** |

### e.  MALC
(Garza)

**Rate**.   Jose Garza has submitted his time, divided between his work for MALC and the NAACP-MALC Plaintiffs and the Texas RioGrande Legal Aid (TRLA) representation of the LUPE-Taylor Plaintiffs.   An attorney for 41 years, he has represented parties in a large array of voting rights cases at the state and federal levels. D.E. 1174-16.   He has established expertise in at-large election challenges, Section 5 enforcement actions, and gerrymandering.   He testified before a Congressional

subcommittee on the renewal of the VRA and has taught voting rights in Texas law schools.  He is obviously well-qualified in voting rights.  However, Garza does not claim to have filled any specific role within the Plaintiffs' teams of lawyers in his declaration. The number of hours logged and the services detailed in his time entries indicate that his efforts were sporadic and supportive, divided between monitoring the case, assisting with discovery responses, and consulting on trial strategy and execution.  D.E. 1174-18.

Garza's time in previous cases has been compensated at an hourly rate of $325 in 2002 (by stipulation) and $425 in 2012.  He now seeks an hourly rate of $613, based entirely upon the USAO Matrix and his legal tenure.  The State argues that his rate should be $400.  D.E. 1196, p. 36.  Considering the relatively limited role he played in this litigation, the Court FINDS that his hourly rate should be $500.

**Hours**.  Garza seeks compensation for 82.9 hours, after exercising billing judgment to eliminate 34.7 hours from his request.  The State challenges 11.8 of those hours as travel time.  D.E. 1196-9.  As Garza explains, the State fails to separate out the travel time from the time spent on substantive work in each entry.  In reality, only 5.8 hours were for travel time.  Consistent with its treatment of other requests for travel time, the Court allows this at 50%, resulting in a deduction of 2.9 hours.  After review of the challenged time entries and Garza's reply, the Court rejects the State's objections to 5.8 hours as clerical and 26.2 hours as duplicative.  D.E. 1196-10, -11.

With respect to the 3.3 hours the State challenges as non-compensable, the Court notes that 1.3 hours were devoted to the discriminatory intent phase on remand, which the Plaintiffs, generally, have appropriately excluded.  D.E. 1196-13.  The Court disallows

this time entry.  The remaining two hours were addressed to the fees motion, which the Court allows at full value.

**Expenses**.  The State has not objected to Garza's expenses.  D.E. 1174-16, p. 7. Therefore, the Court awards them in full.  In sum, the Court ORDERS the State to pay the NAACP-MALC Plaintiffs the following fees and expenses incurred for the work of Garza on behalf of MALC:

| MALC | | | | | |
|---|---|---|---|---|---|
| Attorney | Total Hours | Hourly Rate | Amount Allowed | Total Fees | Total Expenses |
| Garza | 78.7 | $500 | $39,350.00 | | |
| **SUBTOTALS** | | | | **$39,350.00** | **$2,016.04** |

### 3.  Clark Intervenor-Plaintiff

On its face, the Clark application for attorney's fees appears outsized in comparison to those of the other parties.  Each of the previously analyzed groups (Veasey-LULAC and NAACP-MALC) had total claims for fees approved here in the neighborhood of $2 million.  Clark seeks an amount approaching that level despite her attorneys having substantially less experience in voting rights litigation and a far lighter share of the litigation burden.  In comparison to the proof provided by other attorney teams, her proof regarding the qualifications of attorneys contains gaps and the billing records reflect entirely too much overlap, duplication, and excess.  The Court addresses these matters, specifically, below.

### a. NAACP Legal Defense and Educational Fund, Inc.
(Nelson, Haygood, Korgaonkar, Aden, and Ross)

**Rates**.   With the exception of Janai Nelson, the NAACP Legal Defense & Educational Fund, Inc. (LDF) attorneys do not claim individual specialized experience in voting rights cases, but rather appear to rely on LDF's reputation since 1965 in advocating for the voting rights of people of color, along with its involvement in precedent-setting litigation since its founding in 1940.   D.E. 1172-1, p. 3.   While the Court respects LDF's work, its concern is with the specific qualifications of the attorneys for whom Clark seeks fees and expenses.

While Leah Aden notes that the hourly rates reflected in LDF's billing is "reduced," she does not state what the rates are reduced from.   Instead, she admits that LDF does not bill clients but seeks compensation only through fee-shifting statutes.   D.E. 1172-1, p. 5.   Thus LDF does not appear to have regular rates.   And while she testifies that the rates billed are derived from the USAO Matrix, absent from her declaration is any assertion that the Matrix reflects the prevailing market rate for LDF's work.   And with the manner in which the billing records are supplied, it is impossible to adjust rates individually without this Court becoming a green-eyeshade accountant, developing a separate spreadsheet, a role this Court need not adopt.   *See DeLeon*, 687 Fed. Appx. at 343.

Aden claims that LDF played a "leading role in all phases of this litigation."   D.E. 1172-1, p. 3.   However, the summary of contributions and the detailed billing records attached do not reflect a leading role.   Rather, the lead was clearly supplied by attorneys

for the Veasey-LULAC and NAACP-MALC attorneys.   While the LDF attorneys participated in "multiple depositions" of fact and expert witnesses, Aden's only claim of any key role is with respect to Dr. Burton.  D.E. 1172-1, pp. 3-4.

According to Aden's testimony, the fee application excludes numerous timekeepers who worked on the case, leaving the work of five core team members.  *Id*. at 6.  She asserts that unnecessary duplication, defined as time claimed by more than two attorneys for the same task, has been eliminated.  However, there are instances of billing by three attorneys simultaneously and the Court is not satisfied that it is never duplicative when two attorneys work on the same task at the same time.  Despite Aden's testimony that the time entries are very conservative, the time allocations often appear to be two to three times that of comparable billings by other attorneys in this case.

With respect to qualifications, Aden testifies that she graduated from Howard University School of Law in 2006.  At the time this case was tried, she served as Deputy Director of Litigation for LDF.  Her prior experience included a federal district court clerkship, Education Fellow at the UNC Center for Civil Rights at the UNC School of Law, and work as a litigation associate through the NAACP LDF/Fried Frank Fellowship at Fried, Frank, Harris, Shriver & Jacobson LLP.  D.E. 1172-1, pp. 1-2.  Aden does not describe any work experience relating to voting rights prior to her involvement in this case and no resume is attached to fill in any blanks.

Natasha Korgaonkar is a 2007 graduate of Columbia Law School.  Prior to joining LDF, she worked in private practice and was involved in the Corporation for Civil Action and Education in Puerto Rico.  Nothing in the description of her experience indicates an

expertise in voting rights litigation.  She served as LDF's lead counsel for Intervenor-Plaintiff Clark and was actively involved in depositions and the trial presentation of her client, fact witnesses, and expert testimony.  D.E. 1172-1, pp. 8-9.  However, according to the time sheets and the absence of additional information in Aden's declaration, Korgaonkar does not appear to have taken any lead vis-à-vis the other Plaintiffs' attorneys.

Ryan Haygood graduated in 2001 from the University of Colorado School of Law and at the time that this case was tried, he was the Director of the Political Participation Group and then Deputy Director of Litigation at LDF.  He claims active investigation and litigation of all aspects of federal civil rights litigation during his LDF tenure, but does not explain any training or experience between his graduation and his participation in this case, beginning in 2013.  D.E. 1146-3.  And, again, no resume is attached.

Deuel Ross is a 2009 graduate of the University of Pennsylvania Law School and he served in clerkships at the federal trial and appellate levels.  He was a Marvin M. Karpatkin Fellow at the American Civil Liberties Union's Racial Justice Program.  He was also an LDF/Fried Frank Fellow.  D.E. 1172-1, p. 9.  Aden recites no voting rights experience for Ross prior to his work on this case.

On behalf of these four attorneys, the LDF claims hourly rates between $351 and $491.  The State argues for rates between $250 and $300.  D.E. 1196, p. 36.   The Court finds the requested rates to be excessive for the qualifications and work performed by these attorneys.  Without individual summaries, the Court cannot effectively apply a rate reduction to this claim.

According to Aden, Janai Nelson is a 1996 graduate of UCLA School of Law and she started her career serving two legal clerkships and was a Fulbright Scholar.  She was a litigation associate at Fried Frank and claims extensive experience in complex litigation, including voting rights actions.  Prior to her stint with LDF beginning in 2014, she had served as the Associate Dean for Faculty Scholarship and Associate Director of the Ronald H. Brown Center for Civil Rights and Economic Development at St. John's University School of Law, where she also served as a full professor of law, teaching civil rights courses that included voting rights.  She has also authored articles on voting rights. D.E. 1172-1, pp. 7-8.

Ms. Nelson first billed time on this case on the date this Court issued its initial opinion in *Veasey I*.  D.E. 1172-2, p. 17.  Thus she played no leadership role in formulating or executing Plaintiffs' trial strategy.  She presented a portion of the oral arguments at the Fifth Circuit and occasionally appeared before this Court in subsequent proceedings.  However, her time log includes quite a bit of what appears largely to be case monitoring and review of the work of others.  Her claimed hourly rates varied from $544 to $572.  The State claims that she should receive compensation at an hourly rate of only $300.  D.E. 1196, p. 36.   While the Court believes that Nelson had significant experience to lend to this case, it does not appear that the structure of Plaintiffs' coordinated representation and the timing of her involvement required her participation at these rates for the number of hours she logged.

**Hours**.  LDF's total request is for $795,439.75 in fees.  D.E. 1172-1, p. 5.  The total appearing on the LDF combined billing record is $554,849.75.  D.E. 1172-2.  While

that record contains contemporaneous time entries for Haygood, he has provided a separate declaration and summary of time in block form, claiming an additional $240,590.  D.E. 1146-4.  There is no explanation for this separate submission.

The State has lodged significant objections to the LDF time entries with respect to the treatment of travel time, duplication, excessive time, non-compensable time, block billing, and vague descriptions.  D.E. 1196-17, -18, -19, -20, -21, and -22.  After reviewing the billing record, the Court finds these objections to have merit, infecting every page of the time entries.  Having also determined that lower rates should apply and given the difficulty of making specific reductions due to the manner in which the data has been presented, the Court believes that a substantial across-the-board reduction is appropriate.  *See Deleon*, 687 Fed. Appx. at 343.  Because the Court is concerned with both the hourly rate and the number of hours, along with the relatively limited role the LDF appears to have played, the Court assesses a 60% reduction, resulting in an award of fees in the amount of $318,175.90.

**Expenses**.  Additionally, LDF seeks its expenses in the amount of $136,635.97.  D.E. 1172-1, -3.  The State objects to the entire figure for airfare ($16,603.80), complaining that the supporting records are illegible as to date.  The Court finds the records sufficiently legible and rejects that argument.  For the reasons described above, the Court also rejects the additional complaint based on alleged business development.  However, the State also complains that the airfare expenses are excessive due to overstaffing and because the purpose of some travel is not sufficiently explained.  D.E. 1196, p. 70.

The State also objects to $10,108.27 of the hotel expenses, apparently for the same reasons and because one stay was exorbitant in that Ross rented the expensive executive suite without explanation. *Id.* LDF has not replied to these complaints, but rather stands on its claim as originally made. D.E. 1209. Given the State's citations to specific pages in the expense records in conjunction with these objections, the Court is of the opinion that a specific reply was warranted. Absent that, the Court cuts the complained-of expenses by 20% for a deduction of $3,320.76 on airfare and $2,884.22 on hotels.

As set out above, the Court rejects the State's objection to deposition and transcript costs to the extent that it is based solely on the fact that the discovery related to SB 14's discriminatory purpose. However, the State more specifically objects to extra costs for shipping, binding, and handling of depositions, citing *United States ex rel. Long v. GSDMIdea City, L.L.C.*, 807 F.3d 125, 133 (5th Cir. 2015) (disallowing such expenses as taxable costs under 28 U.S.C. § 1920). While the limits on taxable costs do not necessarily apply to an award of attorney's expenses under a fee-shifting statute,[35] the objection is sufficiently specific to require a response from LDF as to why rush, shipping, and handling charges were reasonable in this case. No response has been forthcoming.

At issue are the following charges: an invoice for $691.18 for the deposition of Elizabeth Gholar, which included unspecified rush, binding, and shipping and handling charges (D.E. 1172-3, p. 6); an invoice for $2,292.80 for the deposition of Orville Burton, including an unspecified rush charge (D.E. 1172-3, p. 7); and itemized charges of

---

[35]   *See generally, Gros v. New Orleans City*, CIV.A. 12-2322, 2014 WL 3894371, at *4 (E.D. La. Aug. 8, 2014); *Hannon v. Nevitt*, 3:09-CV-66-N, 2013 WL 12290978, at *15 (N.D. Tex. Mar. 14, 2013).

$1,162.00 and $25.00 for one-day expedited service on Robert Duncan's deposition transcript and processing and handling (D.E. 1172-3, p. 9).[36]  Without an explanation of the reasonableness of these charges, the Court deducts the itemized charges and further deducts 50%, for a total of $1,491.99 ($2,983.98 ÷ 2), on the un-itemized invoices.

In sum, the Court ORDERS the State to pay Intervenor-Plaintiff Clark the following fees and expenses incurred for the work of LDF:

| LDF | | |
|---|---|---|
| | Fees | Expenses |
| **SUBTOTALS** | **$318,175.90** | **$127,752.00** |

### b. WilmerHale
(Paikin, Conley, Dunbar, Lebsack, Aguilar, Ali, Eagles, Eisenberg, Faransso, Robinson, Shordt, Sinzdak, and Thome)

**Rates.**  Jonathan E. Paikin, a partner in the law firm Wilmer Cutler Pickering Hale and Dorr LLP (WilmerHale), supplied the testimony to support the firm's claim for the time of thirteen attorneys who worked on this case.  D.E. 1146-6.  Other than describing the firm as having expertise in civil rights enforcement actions and the fact that he had been in practice twenty years, Paikin supplies no information regarding any individual attorney's qualifications.  There is no mention of any particular training or experience, much less experience with respect to voting rights litigation.

The attorneys are described only as Partners, Senior Associates, or Associates. And the Court would have to refer to the USAO Matrix and the rates billed to infer the range of experience in the practice of law for each—an exercise that the Court is not

---

[36]   The State lists this as a $270 charge.  However, there is no charge for $270 on that invoice and it appears that the the State misread the invoice and used a separate line item referencing a 270-page exhibit in its complaint.

inclined to engage in.  Paikin represents that the normal WilmerHale rates are "generally more than twice" the USAO Matrix rates, but he fails to state what those rates are or what they are based on.  The State argues that the attorneys should have a rate of only $250 per hour, with the exception of Paikin, at $300 per hour.  D.E. 1196, pp. 36-37.

**Hours**.  Paikin further represents that the hours billed have been reduced to exclude the time of even more WilmerHale attorneys, summer associates, paralegals, and technical support staff.  Yet he does not state the number of hours excluded or their alleged value.  And WilmerHale seeks fees for more than twice the number of attorneys any other firm has requested.

Paikin assures the Court that the hours billed have been trimmed to very conservative levels.  However, the Court's review found a number of entries for multiple attorneys involved in the same task, including conference calls and hearings.  And no fewer than three attorneys contributed to billing more than 130 hours for the response to the State's motion to dismiss, not including the 2.5 hours billed to incorporate the simultaneous work of the LDF attorneys on the same task.  *See* D.E. 1146-7, pp. 3-4.  And a large number of entries are identical, such as "Prepare for 30(b)(6) depositions," which fail to list the parties or deponents such that it is impossible to determine whether multiple attorneys were preparing for the same deposition and whether the total amount of preparation time was appropriate.

The State has objected to much of the billing as duplicative, excessive, and vague.  D.E. 1196-18, -19, -22.  Paikin filed a reply declaration that stands on its billing practices and complains that the request is modest, foregoing "millions" of dollars.  D.E. 1209-1.

The Court is not satisfied with the reasonableness of the original billing or its defense. WilmerHale has not presented its individual attorneys' qualifications, rate, or time in a manner that allows the Court to address them individually. For instance, there is no summary collating the billing by attorney or task.

Consequently, the Court's only recourse, particularly given the generic nature of the entries, is to estimate the value of WilmerHale's contribution to the prosecution of the case in a macro sense. It appears that WilmerHale took a laboring oar on the discovery directed to the Texas legislators. Otherwise, its contributions were largely matched by the LDF attorneys and other firms coordinating the representation of the Plaintiffs. The Court therefore cuts the WilmerHale fees from the requested amount of $982,787.50 by 65% to a total of $343,975.63.

**Expenses**. WilmerHale requests $25,000 in expenses to which the State did not object. Therefore, the Court ORDERS the State to pay Intervenor-Plaintiff Clark the following fees and expenses incurred for the work of WilmerHale:

| WILMERHALE | | |
|---|---|---|
|  | Fees | Expenses |
| **SUBTOTALS** | **$343,975.63** | **$25,000.00** |

### 4. Texas Association of Hispanic County Judges and County Commissioners Intervenor-Plaintiff
(Rios)

**Rate**. Rolando L. Rios has 35 years of experience handling cases addressing federal civil rights in general and voting rights in particular. After graduating from the Georgetown University Law Center, he began litigating a legislative reapportionment

scheme in New Mexico in 1980.  He has testified before Congress in support of the VRA and has been involved in over 250 voting rights cases throughout Texas, New Mexico, Colorado, Arizona, and California.  Many of the decisions in those cases have announced landmark rulings.  He further testifies to his expertise in understanding and presenting election and census data with regression analysis to demonstrate racial impact.

**Hours**.  Rios seeks compensation for 359.33 hours, which includes the specific work necessary to represent his particular client:  drafting a motion to intervene, drafting a complaint in intervention, and presenting his client for deposition.  The balance of his time appears to be monitoring the efforts of other counsel and consulting on issues as necessary and appropriate, given his expertise.  He notes that he was awarded fees at an hourly rate of $350 in a redistricting case ten years ago and now requests an hourly rate of $613.  D.E. 1142-1, -2.  The State argues that his rate should be $400.  D.E. 1196, p. 35.  Given his experience and his role in this case, the Court allows fees at an hourly rate of $500.

The State has objected to 58.5 hours of travel time.  D.E. 1196-2.  In his reply declaration, Rios notes that the time entries included in that objection did not segregate travel time from substantive work time.  As corrected, only 33.5 hours were for travel time.  Consistent with the treatment of this issue with respect to the other claimants, and Rios's concession, the Court allows this time at 50% and thus cuts the hours by 16.75 hours.  See D.E. 1205, p. 5 (agreeing to 50% treatment).

The State objects to 27.8 hours as clerical.  D.E. 1196-3.  Rios does not respond to this objection.  After review of the time entries, the Court excludes 0.9 hours as clerical.

The State also objects to 79.9 hours as excessive.  D.E. 1196-4.  Rios has responded to that objection and the Court accepts his explanations, rejecting any claim for a reduction on this basis.  D.E. 1205.  As non-compensable, the State objects to 10.6 hours, including time spent on the post-trial discriminatory intent issue, section 3 remedies, and monitoring the clerical filing of the record and withdrawal of counsel.  Rios does not respond to these objections and, after reviewing the entries, the Court excludes 10.1 hours on this basis.

The State's objection to entries based on vagueness and block-billing are rejected. The tasks performed were consistent with monitoring and contributing to this case and Rios has laudably used brief communications with other counsel—rather than duplicating that work—as an appropriate method for representing his client in this case.  The Court also rejects the objection to time as business development, as addressed above.

**Expenses**.  Rios seeks expenses of $654.37.  Of that amount, the State objects to $50 for copies and faxes.  Rios has not responded to this objection.  Given that Rios apparently worked alone, the Court does not accept the State's suggestion that some of those copies may have been merely for the convenience of counsel.  The Court does not reduce Rios's expenses.

In sum, the Court ORDERS the State to pay Intervenor-Plaintiff HJ&C the following fees and expenses incurred for the work of Rolando L. Rios & Associates:

| ROLANDO L. RIOS & ASSOCIATES | | | | | |
|---|---|---|---|---|---|
| Attorney | Total Hours | Hourly Rate | Amount Allowed | Total Fees | Total Expenses |
| Rios | 331.58 | $500 | $165,790.00 | | |
| **SUBTOTALS** | | | | **$165,790.00** | **$654.37** |

### 5. Plaintiffs La Union del Pueblo Entero (LUPE), Taylor, Mendez, Estrada, and Martinez Lara

Texas RioGrande Legal Aid, Inc. (TRLA)
(Garza, van Dalen, and Doggett)

**Rates.**   Three attorneys working for TRLA seek compensation for their fees and have filed separate declarations in that regard.  Jose Garza's qualifications and rate have been established, above. *See also*, D.E. 1144-1, pp. 5-6, 8.  He appeared on behalf of the LUPE-Taylor Plaintiffs in his part-time capacity as Litigation Director for TRLA.  A review of Garza's time entries indicates that he was primarily involved in coordinating the representation of his clients with the other parties to the case by communicating with other counsel.  He did substantive work on drafting the complaint and defending against the motion to dismiss.  But his work appears otherwise to be relatively passive.  The Court has found his appropriate hourly rate to be $500.

Marinda van Dalen is a 1993 graduate of the City University of New York School of Law.  Throughout her career, she has held positions in a number of public interest organizations concerned with civil rights issues.  D.E. 1144-2, pp. 7-8.  However, she does not list any particular experience with voting rights cases.  She worked on this case partly in her capacity as a Managing Attorney for the TRLA and partly in her private practice, representing MALC.  D.E. 1144-2, p. 1 n.1.

Van Dalen does not describe her part in the litigation.  And her time entries are difficult to read as they are replete with undefined abbreviations and are cryptic.  It appears, however, that her primary role was in identifying and working with clients and fact witnesses, as well as researching the practices of different counties' voter registration

and election practices. At the trial level, she concentrated on discovery, as opposed to drafting documents and memoranda or making court appearances. She seeks an hourly rate of $544. The State suggests an hourly rate of $300. D.E. 1196, p. 35. Given her qualifications and the role she played, the Court finds that an appropriate hourly rate for her work is $300.

Robert Doggett is a 1990 graduate of Southern Methodist University Law School and he became the Executive Director of TRLA in 2018 in recognition of his extensive experience litigating cases on behalf of the poor. He has worked for several organizations providing legal services to low income individuals and was Section Chief in the Dallas City Attorney's Office for two years. He has received a number of awards for his work. D.E. 1144-5. He does not, however, claim any expertise in voting rights cases.

Doggett's declaration indicates that his primary role in the prosecution of this case was to prepare the expert testimony of Kevin Jewell. D.E. 1144-1, p. 2. He also did some research on the standing issue for his clients and engaged in discovery. Doggett requests a rate of $572. The State argues that his hourly rate should be $300. D.E. 1196 p. 35. Given his qualifications and the role he played in the case, the Court holds that an appropriate hourly rate for him is $300.

**Hours**. Jose Garza seeks compensation for 472.9 of the 789.9 hours he logged on this case. Van Dalen seeks compensation for 1,159 of 1,400 hours. And Doggett seeks compensation for 146.8 of 300 hours. As with each of the requests Plaintiffs have made, the State objects to the TRLA time based on claims that the hours are for travel time,

clerical, duplicative, excessive, non-compensable, block-billed, and vague.  D.E. 1196-32 to -38.  Garza has supplied a detailed response to each objection and concedes a number of hours.  After a review of the disputed time charges, the Court largely accepts Garza's explanations of the time charges and their billable nature.

With respect to the travel charges, the State objects to entries totaling 131.3 hours. Garza has explained that the entries in which travel time appears also include substantive legal work, such that the travel portion of those entries is significantly less than the total amount to which the State objects.  Garza faults the State for failing to filter out the travel time versus the substantive time.  Yet that is the movant's job and only highlights the problematic nature of the TRLA billing entries.

Even in reply, Garza does not suggest the amount of time in those entries that was substantive as opposed to travel and the Court declines to do so.  While Garza testifies that the request already excluded 212 hours of travel time—more than the entire amount of the disputed entries—the Court does not credit the applicants with time they chose to exclude in their billing judgment.  Instead, the Court has taken into account the travel-intensive nature of the work done by the TRLA in this case when determining the appropriate hourly rate.  Consequently, the Court does not further reduce the hours billed on the basis of travel time.

The Court excludes 1.7 hours of Garza's time and 11.8 hours of van Dalen's time as clerical.[37]   As vague, the Court excludes 1.2 hours of Doggett's time.  The Court

---

[37]   Consistent with the treatment of the other fee applications, the Court does not compensate this time at paralegal rates as Garza requests, but rather excludes it in its entirety.

rejects the complaint about block-billing and Garza's concessions in that regard.  The Court excludes two hours of Doggett's billings on which the objection is business development, but only because the entry is vague.  D.E. 1196-39, p. 2.  In addition, the court excludes 1.5 hours of Garza's time spent on an unexplained media interview with CNN.  D.E. 1196-36, p. 2.  With respect to work done for the fee application, the Court generally agrees that the legal work to make and defend the applications is fully compensable, given the State's aggressive litigation approach.   However, the Court excludes 18.2 hours of Garza's time spent in that regard because it was expended in the review and reduction of the fee request based on billing judgment and duplication.  This is contrasted with legal research, documentation, and securing an expert, which is fully compensable.

As a result, Garza is entitled to compensation of 451.5 hours (472.9 − 1.7 − 1.5 − 18.2).  Van Dalen is entitled to compensation of 1,147.2 hours (1,159 − 11.8).  And Doggett is entitled to compensation of 143.6 hours (146.8 − 1.2 − 2.0).

**Expenses.**  The TRLA also seeks its expenses.  Those were first requested in the sum of $44,273.62 and the State objected to all of TRLA's expenses as undocumented.  With its reply, TRLA submitted invoices and receipts and reduced its request to $40,094.35.  D.E. 1206, p. 11.  The State also specifically objected to $2,120.44 in expenses incurred for client outreach and communication.  D.E. 1196, p. 72.  The Court rejects that complaint because of the public interest nature of this case and the need to develop facts and fact witnesses, as discussed above.  Therefore, the Court awards the full value of the revised request for expenses.

In sum, the Court ORDERS the State to pay the LUPE-Taylor Plaintiffs the following fees and expenses incurred for the work of TRLA:

| TRLA | | | | | |
|---|---|---|---|---|---|
| Attorney | Total Hours | Hourly Rate | Amount Allowed | Total Fees | Total Expenses |
| Garza | 451.5 | $500 | $225,750.00 | | |
| Van Dalen | 1,147.2 | $300 | 344,160.00 | | |
| Doggett | 143.6 | $300 | $43,080.00 | | |
| **SUBTOTALS** | | | | **$612,990.00** | **$40,094.35** |

## CONCLUSION

For the reasons set out above, the Court HOLDS that Plaintiffs are prevailing parties and are entitled to judgment against the State for reasonable attorney's fees incurred in the phase of the case resulting in the finding, affirmed by the Fifth Circuit en banc and not further appealed, that SB 14 violated VRA § 2 (results prong), which was redressed by the issuance of the IRO. The Court GRANTS the parties' motions (D.E. 1142, 1143, 1144, 1145, 1146, 1172, 1174, 1175, 1187) and HOLDS that Plaintiffs are entitled to recover their reasonable attorney's fees and expenses.

As set out above, the Court has evaluated each individual request to determine whether the time and expense charges are appropriate. The Court has evaluated each attorney's qualifications and contribution to the litigation and has determined appropriate hourly rates for their fees. The Court has further taken a big-picture look at the relief Plaintiffs sought and obtained and the work required to obtain that result. The Court FINDS that the following are reasonable on both an individual basis and as combined for each Plaintiff-group:

| AMOUNTS AWARDED | | | | |
|---|---|---|---|---|
| **Plaintiff Group** | **Firm** | **Firm Fees** | **Firm Expenses** | **Total Fees** | **Total Expenses** |
| **Veasey-LULAC** | Campaign Legal Ctr | $680,125.00 | $113,231.86 | | |
| | Brazil & Dunn | 797,269.50 | 299,572.69 | | |
| | Derfner & Altman | 649,759.50 | 0.00 | | |
| | Baron | 128,542.50 | 2,115.83 | | |
| | SUBTOTALS | | | $2,255,696.50 | $414,920.38 |
| **NAACP-MALC** | Lawyers Committee | $564,819.00 | $16,883.09 | | |
| | Dechert LLP | 1,241,872.50 | 259,693.59 | | |
| | Brennan Center for Justice | 241,632.50 | 50,680.49 | | |
| | Texas NAACP | 67,086.25 | 1,250.72 | | |
| | MALC | 39,350.00 | 2,016.04 | | |
| | SUBTOTALS | | | $2,154,760.25 | $330,523.93 |
| **Clark** | NAACP LDF | $318,175.90 | $127,752.00 | | |
| | WilmerHale | 343,975.63 | 25,000.00 | | |
| | SUBTOTALS | | | $662,151.53 | $152,752.00 |
| **HJ&C** | Rolando L. Rios & Assoc. | $165,790.00 | $654.37 | **$165,790.00** | **$654.37** |
| **LUPE-Taylor** | Tex. RioGrande Legal Aid | $612,990.00 | $40,094.35 | **$612,990.00** | **$40,094.35** |
| | | | | | |
| | TOTALS | | | **$5,851,388.28** | **$938,945.03** |
| | | | | | |
| | GRAND TOTAL | | | **$6,790,333.31** | |

ORDERED this 27th day of May, 2020.

_Nelva Gonzales Ramos_
NELVA GONZALES RAMOS
UNITED STATES DISTRICT JUDGE