# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
September 3, 2021

Lyle W. Cayce
Clerk

No. 20-40428

MARC VEASEY; JANE HAMILTON; SERGIO DELEON; FLOYD
CARRIER; ANNA BURNS; MICHAEL MONTEZ; PENNY POPE;
OSCAR ORTIZ; KOBY OZIAS; LEAGUE OF UNITED LATIN
AMERICAN CITIZENS; JOHN MELLOR-CRUMLEY; GORDON
BENJAMIN; KEN GANDY; EVELYN BRICKNER,

*Plaintiffs—Appellees,*

*versus*

GREG ABBOTT, *in his Official Capacity as Governor of Texas;* STATE OF
TEXAS; RUTH R. HUGHES, *in her Official Capacity as Texas Secretary of
State,*

*Defendants—Appellants,*

UNITED STATES OF AMERICA,

*Plaintiff—Appellee,*

TEXAS LEAGUE OF YOUNG VOTERS EDUCATION FUND, IMANI
CLARK,

*Intervenors Plaintiffs—Appellees,*

*versus*

STATE OF TEXAS,

No. 20-40428

*Defendant—Appellant,*

---

TEXAS STATE CONFERENCE OF NAACP BRANCHES; MEXICAN
AMERICAN LEGISLATIVE CAUCUS, TEXAS HOUSE OF
REPRESENTATIVES,

*Plaintiffs—Appellees,*

*versus*

GREG ABBOTT, *in his Official Capacity as Governor of Texas*; RUTH R.
HUGHS, *in her Official Capacity as Texas Secretary of State*;  STATE OF
TEXAS,

*Defendants—Appellants,*

---

EULALIO MENDEZ, JR.; LIONEL ESTRADA; ESTELA GARCIA
ESPINOSA;  MAXIMINA MARTINEZ LARA; LA UNION DEL
PUEBLO ENTERO, INCORPORATED,

*Plaintiffs—Appellees,*

*versus*

STATE OF TEXAS; RUTH R. HUGHS, *in her Official Capacity as Texas
Secretary of State*,

*Defendants—Appellants.*

---

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 2:13-CV-193
USDC No. 2:13-CV-263

2

No. 20-40428

USDC No. 2:13-CV-291
USDC No. 2:13-CV-348

---

Before KING, DENNIS, and HO, *Circuit Judges*.

JAMES C. HO, *Circuit Judge*:

By a sharply divided vote and over multiple spirited dissents, our en banc court held unlawful a Texas statute requiring voters to present photo ID in order to vote. *See Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016) (en banc). We are of course bound by that decision. The only question in this appeal is whether Plaintiffs are "prevailing parties" and thereby entitled to recover attorneys' fees under 42 U.S.C. § 1988(b) and 52 U.S.C. § 10310(e).

It seems obvious that they are. Plaintiffs successfully challenged the Texas photo ID requirement before our en banc court, and used that victory to secure a court order permanently preventing its enforcement during the elections in 2016 and 2017. That court order substituted the photo ID requirement with a mere option—which of course defeats the whole purpose of a mandate. And those elections are now well in the past. The State of Texas obviously cannot go back in time and re-run the 2016 and 2017 elections under a photo ID requirement. *Cf. Stringer v. Whitley*, 942 F.3d 715, 726 (5th Cir. 2019) (Ho, J., concurring) ("Plaintiffs have indeed endured an injury in the past. They were unable to exercise their right to vote in past election cycles. And it is a right they will never be able to recover.").

Not surprisingly, then, the State readily admits that any suggestion that Plaintiffs did not prevail in these proceedings would be "counterintuitive," to say the least. We agree and accordingly affirm.

No. 20-40428

## I.

Texas enacted Senate Bill 14 (SB 14) in 2011 and began enforcing it in 2013. Act of May 16, 2011 82nd Leg., R.S., ch. 123, 2011 Tex. Gen. Laws. 619. SB 14 required voters in Texas to present one of six forms of government-issued photo identification at the polls in order to vote. *See Veasey*, 830 F.3d at 225 (listing the acceptable forms of photo identification).

Plaintiffs sued to enjoin the enforcement of SB 14, alleging, *inter alia*, that the photo identification requirement violated the Fourteenth and Fifteenth Amendments of the Constitution and § 2 of the Voting Rights Act. The district court concluded that SB 14 had an impermissible discriminatory effect on certain minority voters in Texas and permanently enjoined the enforcement of SB 14 accordingly. *See Veasey v. Perry*, 71 F. Supp. 3d 627, 633, 707–08 (S.D. Tex. 2014).

This court sitting en banc affirmed the district court's discriminatory effect finding, while reversing and remanding on other aspects of the district court's decision, such as the finding that SB 14 was enacted with a discriminatory purpose. *Veasey*, 830 F.3d at 264, 272. We directed the district court to enter an "interim remedy for SB 14's discriminatory effect that disrupts voter identification rules for the 2016 election season as little as possible, yet eliminates the Section 2 discriminatory effect violation." *Id.* at 272. The court's "primary concern" was to "ensure that SB 14's discriminatory effect [was] ameliorated as Section 2 requires in time for the November 2016 election." *Id.* at 242–43.

On remand in August 2016, the district court entered an order, agreed to by all parties, for an interim remedy for that November's elections. Under the order,

> voters who lacked an SB 14 ID could cast a regular ballot upon completing a Declaration of Reasonable Impediment ("DRI")

4

No. 20-40428

and presenting a specified form of identification. The seven possible impediments were: (1) lack of transportation, (2) lack of documents necessary to obtain acceptable ID, (3) work schedule, (4) lost or stolen ID, (5) disability or illness, (6) family responsibility, and (7) ID applied for but not yet received.

The DRI also offered an "other" box, allowing voters to write anything in the blank space to be able to vote. The declaration further provided that the reasonableness of the voter's impediment or difficulty could not be questioned by election officials, and the voter signed the declaration "upon penalty of perjury." The specified forms of ID a voter was required to present in order to take advantage of the reasonable impediment declaration were the same documents required to vote under pre-SB 14 law: a valid voter-registration certificate, a certified birth certificate, a copy or original of a current utility bill, bank statement, government check, paycheck, or other government document showing the voter's name and address.

*Veasey v. Abbott*, 888 F.3d 792, 796 (5th Cir. 2018). The order also expanded the range of acceptable photo IDs from those effective within sixty days of the election to those effective within four years of the election. The interim remedy would govern the November 2016 general election and remain in effect pending further order of the district court.

After the district court on remand again concluded that SB 14 was enacted with a discriminatory purpose, *Veasey v. Abbott*, 249 F. Supp. 3d 868, 876 (S.D. Tex. 2017), a motions panel of this court stayed the district court's order pending appeal and instructed that the "Interim Order and its reasonable impediment procedures will remain in effect for elections in 2017." *Veasey v. Abbott*, 870 F.3d 387, 391–92 (5th Cir. 2017).

Then, in May 2017, Texas enacted Senate Bill 5 (SB 5) "as a legislative remedy to cure and replace SB 14." *Veasey*, 888 F.3d at 797.

No. 20-40428

Texas modeled SB 5 after the interim order. In particular, it codified the reasonable impediment procedure for voters who could not obtain the photo identification required under SB 14. *Id.* SB 5 also "(1) . . . extend[ed] the period within which an expired form of identification [would] be accepted for voting, (2) . . . expand[ed] the list of acceptable forms of identification, (3) . . . require[d] the implementation of mobile locations for obtaining election identification certificates, and (4) . . . remove[d] the 'other' option offered in the interim remedy." *Id.*

Following the enactment of SB 5, Defendants moved for reconsideration of the district court's discriminatory purpose finding. The district court denied the motion, granted Plaintiffs declaratory relief that SB 14 violates § 2 of the VRA and the Fourteenth and Fifteenth Amendments, permanently enjoined enforcement of SB 14 and SB 5, vacated the interim remedy, and reinstated the pre-SB 14 law that did not require voters to present photo identification at the polls. *Veasey v. Abbott*, 265 F. Supp. 3d 684, 698, 700 (S.D. Tex. 2017). Defendants appealed.

We reversed and rendered the district court's permanent injunction and order for potential further relief. *Veasey*, 888 F.3d at 804. We observed that SB 5 "affords a generous, tailored remedy for the actual violations found," *id.* at 801, "was designed to remedy every defect claimed" by the Plaintiffs, *id.* at 802, and "constitutes an effective remedy for the only deficiencies testified to in SB 14," *id.* at 804. We added that SB 5 "essentially mirrors an agreed interim order for the same purpose" and that "the State has acted promptly following this court's mandate." *Id.* Plaintiffs neither sought en banc review nor petitioned for certiorari.

On September 17, 2018, the district court entered a final judgment stating that, "[f]or the reasons set forth by the Fifth Circuit . . . , the Court enters final judgment dismissing this case." Neither side filed an appeal.

No. 20-40428

Plaintiffs moved for attorneys' fees under 42 U.S.C. § 1988(b) and 52 U.S.C. § 10310(e), seeking $8,856,376.71. They argued that they qualified as prevailing parties because they "successfully obtained a finding of liability in their favor that led to the . . . interim remedial order"; the "interim relief was implemented during the 2016 general election and subsequent elections"; they "successfully opposed Defendants' petition for certiorari"; and "the interim relief remained in place until [Texas] implemented an ID law . . . that incorporated aspects of the interim remedial relief."

The district court granted the motion and ordered Defendants to pay Plaintiffs $6,790,333.31 in attorneys' fees and expenses. It held that Plaintiffs obtained judicially sanctioned relief in the form of the interim order that followed this court's affirmance of the district court's discriminatory effect ruling, which was never disturbed. It concluded that "Plaintiffs have met all of the requirements [for prevailing-party status] on the basis of the judicial issuance of the [interim order] in their favor."

Defendants timely appealed the district court's conclusion that Plaintiffs are prevailing parties. They do not challenge the reasonableness of the amount awarded by the district court.

A district court's award of attorneys' fees is reviewed for abuse of discretion. *Petteway v. Henry*, 738 F.3d 132, 137 (5th Cir. 2013). Whether a party is a "prevailing party" for the purposes of attorneys' fees is a legal question that is reviewed de novo. *Id.*

## II.

Under the "American Rule," litigants pay for their own attorneys' fees, and the prevailing party is not entitled to collect attorneys' fees from the loser. *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 247 (1975). However, Congress has created statutory exceptions to this general rule. One such exception is 42 U.S.C. § 1988(b), which provides that "the

No. 20-40428

court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs" for private actions brought under 42 U.S.C. § 1983 and other civil rights statutes. Similarly, 52 U.S.C. § 10310(e) provides that "[i]n any action or proceeding to enforce the voting guarantees of the fourteenth and fifteenth amendment, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee." These provisions are "identically construed" because they share similar "language and purpose." *Davis v. Abbott*, 781 F.3d 207, 213 n.6 (5th Cir. 2015).

Plaintiffs contend that they are "prevailing parties" entitled to an award of attorneys' fees under these statutes. They argue that each of the following events alone is enough to confer status as a prevailing party: the district court's interim order relieving Plaintiffs from complying with SB 14 during the November 2016 elections, the district court's declaratory judgment as to the § 2 violation, and this court's approval of SB 5 as a legislative remedy. *See Veasey*, 888 F.3d at 804 (noting that "SB 5 constitutes an effective remedy for the only deficiencies testified to in SB 14"). The district court determined that Plaintiffs are prevailing parties based on the interim order alone. We agree and accordingly need not examine Plaintiffs' alternative theories of relief.

## A.

The fee-shifting statutes do not define "prevailing party." But the Supreme Court set forth the requirements for earning status as a prevailing party in *Buckhannon Board and Care Home, Inc. v. West Virginia Department of Health and Human Resources*, 532 U.S. 598, 604 (2001). There the Court held that a prevailing party "must achieve some judicially sanctioned relief that either creates or materially alters a legal relationship between the parties." *Petteway*, 738 F.3d at 137 (citing *Buckhannon*, 532 U.S. at 604).

No. 20-40428

Following *Buckhannon*, we established three requirements that must be satisfied for a plaintiff to demonstrate prevailing party status: "(1) the plaintiff must achieve judicially-sanctioned relief, (2) the relief must materially alter the legal relationship between the parties, and (3) the relief must modify the defendant's behavior in a way that directly benefits the plaintiff at the time the relief is entered." *Id.* (citing *Dearmore v. City of Garland*, 519 F.3d 517, 521 (5th Cir. 2008)).  A prevailing party is "one who has been awarded . . . at least some relief on the merits," and there must be "judicial *imprimatur* on the change" in the legal relationship between the parties. *Buckhannon*, 532 U.S. at 603, 605.

A plaintiff can satisfy these three requirements without "receiv[ing] a final judgment in its favor," as long as the plaintiff's "success on a claim is [not] purely technical or de minimis." *Petteway*, 738 F.3d at 137.  And "[a] plaintiff's success . . . need not address the central claim of the case; instead, a party may attain prevailing status by succeeding on 'any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit.'" *Id.* (quoting *Tex. State Tchrs. Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 789 (1989)).  The relief need not be awarded at the conclusion of the case—a prevailing party is simply "one who has succeeded on any significant claim affording it some of the relief sought, either *pendente lite* or at the conclusion of the litigation." *Davis v. Abbott*, 781 F.3d 207, 214 (5th Cir. 2015) (quoting *Tex. State Tchrs. Ass'n*, 489 U.S. at 791).

The interim order governing the 2016 and 2017 election cycles demonstrably satisfies this three-part test.  Indeed, the State of Texas acknowledged during oral argument that Plaintiffs have satisfied *Buckhannon*. We agree.

First, the order is indisputably a form of judicially sanctioned relief. The parties ultimately agreed to the order, but only after the en banc court

No. 20-40428

affirmed the district court's finding of discriminatory effect, over the State's vigorous opposition and multiple dissents. *See Veasey*, 830 F.3d at 272; *id.* at 303–17 (Jones, J., concurring in part and dissenting in part) (dissenting from the en banc majority's affirmance of the district court's discriminatory effect finding); *id.* at 326–28 (Elrod, J., concurring in part and dissenting in part) (same). The order enjoined enforcement of the Texas photo ID requirement during the November 2016 elections. And as Defendants acknowledged at oral argument, they "[ha]ve never disputed that it was a decision on the merits." *See Buckhannon*, 532 U.S. at 603 (a prevailing party is "one who has been awarded . . . at least some relief on the merits").

Second, the order materially altered the legal relationship between the parties—the "touchstone of the prevailing party inquiry." *Davis*, 781 F.3d at 214 (quoting *Sole v. Wyner*, 551 U.S. 74, 82 (2007)). After all, without the order, Plaintiffs seeking to vote in the November 2016 elections would have been required to present photo ID under SB 14. Defendants' counsel admitted as much at oral argument, stating that "we would have enforced SB 14 but for the interim relief." Because the order relieved Plaintiffs from the burdens of SB 14 for the November 2016 elections, it materially altered the relationship between the parties.

Third, the order benefited Plaintiffs in a manner that was neither "purely technical" nor "de minimis." *Petteway*, 738 F.3d at 137. Defendants do not dispute that the order meaningfully altered the force and effect of Texas law. Nor can Defendants dispute that this change benefitted Plaintiffs during the November 2016 elections, as well as additional elections in 2017. Under SB 14, voters in Texas were required to present one of six forms of government-issued photo identification at the polls to vote. *See Veasey*, 830 F.3d at 225 (listing the acceptable forms of photo identification). By contrast, the interim order permitted voters to cast their ballots without complying with SB 14—they could simply complete a Declaration of

No. 20-40428

Reasonable Impediment and present identification in accordance with preexisting Texas law. *Veasey*, 888 F.3d at 796. Voters could either choose from among seven possible enumerated impediments, or write in their own explanation—and election officials were bound to accept the voter's declaration, no questions asked. *Id.*

Accordingly, we agree with the district court that the interim order alone is enough to confer prevailing party status on Plaintiffs. The interim order was judicially sanctioned relief, ordered by the district court at the directive of this court, that materially altered the legal relationship between the parties and directly benefited Plaintiffs during the November 2016 elections. That cannot be undone—the November 2016 elections have come and gone—and the merits ruling on Plaintiffs' discriminatory effects claim has not been disturbed. *Cf. Stringer*, 942 F.3d at 726 (Ho, J., concurring). The interim order prohibited the State from enforcing SB 14 and permitted Plaintiffs to vote without the photo identification required by that law. Plaintiffs are accordingly prevailing parties under *Buckhannon*.

**B.**

Defendants contend that, although Plaintiffs satisfy the three-part test under *Buckhannon*, their claim is ultimately foreclosed by *Sole v. Wyner*, 551 U.S. 74 (2007). In *Sole*, the Court considered whether "[p]revailing party status . . . attend[s] achievement of a preliminary injunction that is reversed, dissolved, or otherwise undone by the final decision in the same case." *Id.* at 83. The Court concluded that it does not. It held that "a final decision on the merits denying permanent injunctive relief ordinarily determines who prevails in the action for purposes of [42 U.S.C.] § 1988(b)." *Id.* at 78, 83.

*Sole* involved the display of Wyner's artwork—nude individuals assembled into a peace sign—on a Florida state beach. That display ran afoul of the state's "Bathing Suit Rule." *Id.* at 78. But Wyner claimed that the

No. 20-40428

rule violated the First Amendment. She won a preliminary injunction that permitted her display behind a barrier that would shield other beachgoers from viewing it. *Id.* at 79–80. But the court ultimately denied permanent injunctive relief and granted summary judgment to the state. *Id.* at 80.

Wyner sought attorneys' fees on the ground that she qualified as a prevailing party because she obtained a preliminary injunction. *Id.* at 81. But the Supreme Court rejected her claim. The Court reasoned that "the preliminary injunction hearing was necessarily hasty and abbreviated," and "the provisional relief granted terminated only the parties' opening engagement." *Id.* at 84. "Of controlling importance to [the] decision, the eventual ruling on the merits for defendants . . . superseded the preliminary ruling. Wyner's temporary success rested on a premise the District Court *ultimately rejected.*" *Id.* at 84–85 (emphasis added). "The final decision . . . *rejected* the same claim [Wyner] advanced in her preliminary injunction motion," and Florida's Bathing Suit Rule "remained intact" at the end of the litigation, resulting in "no enduring 'chang[e] [in] the legal relationship'" between the parties. *Id.* at 86 (quoting *Tex. State Tchrs. Ass'n*, 489 U.S. at 792) (emphasis added and remaining alterations in original).

*Sole* is distinguishable from this case for multiple reasons. Unlike the preliminary relief in *Sole*, which was granted after a "hasty and abbreviated" hearing, the order here was granted after a nine-day trial, a ruling on the merits, and an en banc decision affirming Plaintiffs' win on their discriminatory effects claim. 551 U.S. at 84. Whereas the preliminary relief in *Sole* was based on the plaintiff's "*likelihood* of success on the merits," *Wyner v. Struhs*, 254 F. Supp. 2d 1297, 1303 (S.D. Fla. 2003) (emphasis added), the district court here ordered relief based on Plaintiffs' *actual* success on the merits.

No. 20-40428

And most notably, in *Sole*, the denial of the plaintiff's request for a permanent injunction "superseded the preliminary ruling," and the plaintiff's "temporary success rested on a premise the District Court *ultimately rejected*." 551 U.S. at 84–85 (emphasis added). As the Court there emphasized: "The final decision [denying permanent injunctive relief] rejected the same claim [plaintiff] advanced in her preliminary injunction motion . . . . At the end of the fray, [the challenged law] remained intact." *Id.* at 86. Here, by contrast, the premise of the interim order—Plaintiffs' discriminatory effect claim—was *never* rejected by either the district court or this court. SB 14 was not implemented during the November 2016 elections, and it has since been discarded.

Defendants' reliance on *Sole* is unavailing.

## C.

Finally, Defendants argue that, because the district court's final judgment dismissed Plaintiffs' claims and awarded no additional relief, any claim for attorneys' fees fails under *Dearmore v. City of Garland*, 519 F.3d 517 (5th Cir. 2008).

In *Dearmore*, we examined whether a plaintiff is a prevailing party when it wins a preliminary injunction based on a finding of probable success on the merits, and the defendant subsequently moots the case in direct response to the preliminary injunction. *Id.* at 521. We set out a three-prong test for determining prevailing party status "[u]nder these facts": "the plaintiff (1) must win a preliminary injunction, (2) based on an unambiguous indication of probable success on the merits of the plaintiff's claims as opposed to a mere balancing of the equities in favor of the plaintiffs, (3) that causes the defendant to moot the action," thereby preventing the plaintiff from obtaining final relief on the merits. *Id.* at 524. Notably, we made clear that this test is "only applicable in [these] limited factual circumstances . . . .

13

No. 20-40428

[I]t only applies when a plaintiff obtains a preliminary injunction based on an unambiguous indication of probable success on the merits, which causes the defendant to moot the action." *Id.* at 526 n.4. *See also Davis*, 781 F.3d at 217 (recognizing that this test "is only applicable in [*Dearmore*'s] limited factual circumstances").

*Veasey* never became moot. Defendants contend that *Dearmore* forecloses an award of attorneys' fees for that reason. But their *Dearmore* theory suffers the same defect as their *Sole* theory: Whereas *Dearmore* (like *Sole*) involved a preliminary injunction based on probable success on the merits, the district court here ordered relief based on Plaintiffs' *actual* success on the merits. The court effected permanent relief that governed the administration of the November 2016 elections, following confirmation on appeal of Plaintiffs' successful discriminatory effect claim. And that relief cannot be undone, as Defendants acknowledge—nothing can change the fact that Plaintiffs were not required to comply with SB 14 during the November 2016 elections. *Cf. Stringer*, 942 F.3d at 726 (Ho, J., concurring). So *Dearmore* does not bar the award of attorneys' fees challenged here.

\* \* \*

Far from leaving the courthouse empty-handed, Plaintiffs won on a "significant issue in [the] litigation which achieve[d] some of the benefit [they] sought in bringing suit." *Petteway*, 738 F.3d at 137 (citation omitted). The district court therefore correctly held that Plaintiffs are prevailing parties under *Buckhannon* and awarded attorneys' fees. We affirm.

No. 20-40428

JAMES C. HO, *Circuit Judge*, concurring:

I concur because, under the en banc decision in this case, the plaintiffs plainly prevailed. I write separately to explain why they shouldn't have.

The plaintiffs convinced the en banc court to enjoin the Texas photo ID requirement under Section 2 of the Voting Rights Act. *See Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016) (en banc) (*Veasey I*). Under that decision, Texas voters can completely ignore the photo ID law any time they want to. Just come up with any excuse, no matter how baseless—and election officials have no choice but to count your ballot. *See Veasey v. Abbott*, 888 F.3d 792, 796 (5th Cir. 2018) (*Veasey II*).

And that's exactly what happened during the 2016 election cycle. Voters were able to avoid presenting photo ID simply by asserting such flimsy explanations as "because I didn't bring it," "[I] procrastinated," "it's unconstitutional," "protest of voter ID law," "do not agree with law," "did not want to 'pander' to government requirement," and "lack of trust that this law is valid." *See, e.g., id.* at 797 n.1.

So the plaintiffs effectively emasculated the Texas photo ID law. What Texas law once required, the en banc court made merely voluntary.

This was a substantial win for the plaintiffs—and a substantial loss for the State of Texas. As Texas acknowledged during oral argument, it would be "counterintuitive" to deny that the plaintiffs were "prevailing parties" in this suit. So we have no choice but to concur in the award of attorneys' fees to the plaintiffs.

That said, I write separately to explain why none of this should have happened in the first place—why we should have upheld Texas law and put an end to this litigation five years ago.

No. 20-40428

## I.

The right to vote is "fundamental to our constitutional democracy." *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 413 (5th Cir. 2020) (Ho, J., concurring). But "it means nothing if your vote doesn't count." *Id.* "And it won't count if it's cancelled by a fraudulent vote—as the Supreme Court has made clear in case after case." *Id.* "Every voter's vote is entitled to be counted," and that means that every vote must be "protected from the diluting effect of illegal ballots." *Gray v. Sanders*, 372 U.S. 368, 380 (1963). "[P]rotection of the integrity of the ballot box is surely a legitimate state concern." *O'Brien v. Skinner*, 414 U.S. 524, 534 (1974) (Marshall, J., concurring). There should be "no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 196 (2008) (plurality op. of Stevens, J.).

Not surprisingly, then, there is broad support for requiring voters to present photo identification to ensure the integrity of the ballot box—and broad consensus that the absence of such measures endangers the perception, if not also the reality, of secure and uncorrupted elections. As former President Jimmy Carter and former Secretary of State James Baker observed, "Americans are losing confidence in the fairness of elections." Comm'n on Fed. Election Reform, Building Confidence in U.S. Elections ii (2005). "Our Commission on Federal Election Reform was formed to recommend ways to raise confidence in the electoral system." *Id.* And in the signed letter that opens the Commission's official report, President Carter and Secretary Baker specifically "recommend[ed] a photo ID system for voters" to restore voter confidence in our election system. *Id. See also id.* at iii (preface by the executive director) (same). Requiring photo ID was also one of the "five pillars" recommended in the Carter-Baker Commission's official report to "[b]uild[] confidence in U.S.

No. 20-40428

elections" "[a]t a time when there is growing skepticism with our electoral system." *Id.* at iv. *See also id.* at 6 (same).

As the report explained, "election officials . . . need to make sure that the person arriving at a polling site is the same one that is named on the registration list." *Id.* at 18. "In the old days and in small towns where everyone knows each other, voters did not need to identify themselves. But in the United States, where 40 million people move each year, and in urban areas where some people do not even know the people living in their own apartment building let alone their precinct, some form of identification is needed." *Id.*

Accordingly, "[t]he electoral system cannot inspire public confidence if no safeguards exist to deter or detect fraud or to confirm the identity of voters." *Id.* "[W]e believe that citizens should identify themselves as the correct person on the registration list when they vote." *Id.*

Notably, the Commission specifically rejected claims that "the evidence of multiple voting is thin" or that "ID requirements . . . are 'a solution in search of a problem.'" *Id.*

To begin with, the Commission determined that "there is no doubt" that voting fraud not only "occur[s]" but "could affect the outcome of a close election." *Id.* "In close or disputed elections, and there are many, a small amount of fraud could make the margin of difference." *Id.*

And for good reason. As Justice Stevens observed, "flagrant examples of such fraud in other parts of the country have been documented throughout this Nation's history by respected historians and journalists." *Crawford*, 553 U.S. at 195 (plurality op. of Stevens, J.). He noted various historical examples that "demonstrate that not only is the risk of voter fraud real but that it could affect the outcome of a close election." *Id.* at 196. *See id.* at 195–96 & nn. 11–13 (noting examples in New York, California, Washington, Maryland,

No. 20-40428

Wisconsin, Georgia, Illinois, Pennsylvania, Missouri, Florida, and Indiana). *See also* JOHN FUND, STEALING ELECTIONS: HOW VOTER FRAUD THREATENS OUR DEMOCRACY 87–88, 137–38 (2004) (noting examples in South Dakota and Louisiana).

Moreover, even setting aside concerns about actual voter fraud, "the perception of possible fraud contributes to low confidence in the system." BUILDING CONFIDENCE, *supra*, at 18. "A good ID system could deter, detect, or eliminate several potential avenues of fraud—such as multiple voting or voting by individuals using the identities of others or those who are deceased—and thus it can enhance confidence." *Id.* at 18–19.

The Commission addressed concerns that voter ID requirements "could disenfranchise eligible voters" or "have an adverse effect on minorities." *Id.* at 19. It concluded that such concerns weigh in favor of implementing a *fair* photo ID requirement—not eliminating photo ID requirements altogether. It observed that "[v]oters in nearly 100 democracies use a photo identification card without fear of infringement of on their rights." *Id.* at 5. *See also id.* at 20 ("most advanced democracies have fraud-proof voting or national ID cards, and their democracies remain strong"); STEALING ELECTIONS, *supra*, at 4–5 (discussing photo ID requirements in Mexico and many other countries).

After all, photo ID requirements are ubiquitous in our daily lives. You need a photo ID to travel, to enter public buildings, to cash a check, to make credit card purchases of everyday goods and services, to consume alcohol, and to purchase a firearm. Yet we do not accuse merchants of customer suppression if they insist on photo ID as a condition of using a credit card. We do not charge airports with traveler suppression when they require photo ID as a condition of clearing security. We do not claim that bars and restaurants are racist just because they ask for photo ID to ensure one's

18

No. 20-40428

eligibility to drink. And we certainly do not criticize our own court security officials for requiring photo ID to enter the John Minor Wisdom Building.

Nor is there cause to condemn the Carter–Baker Commission for engaging in voter suppression, just because it would require photo ID as a condition of voting. As the Commission put it, "[p]hoto IDs currently are needed to board a plane, enter federal buildings, and cash a check. Voting is equally important." BUILDING CONFIDENCE, *supra*, at 18.

Surely no one who believes in democracy would support any measure that unduly burdens the exercise of the franchise for any citizen. As the Carter–Baker Commission put it, "[t]he vigor of American democracy rests on the vote of each citizen. Only when citizens can freely and privately exercise their right to vote and have their vote recorded correctly can they hold their leaders accountable." *Id.* at 1.

But it is not asking too much of voters to undertake the modest duty of securing photo ID in order to help ensure the integrity of the ballot box. Indeed, in any free society, we ask citizens to accept certain modest obligations to secure our liberties and the effective operation of democratic governance. We demand that our citizenry be educated. We impose taxes to support essential government services. We compel citizens to serve on juries. We require registration with the selective service in case of a military draft.

Requiring citizens to present photo ID to vote is not an unreasonable burden. If anything, it is less burdensome than other basic obligations of citizenship that everyone accepts and no one questions. Indeed, it is not meaningfully greater than the burden of going to the polls to vote in the first place. To quote Justice Stevens: "For most voters who need them, the inconvenience of making a trip to the [Bureau of Motor Vehicles], gathering the required documents, and posing for a photograph surely does not qualify

No. 20-40428

as a substantial burden on the right to vote, or even represent a significant increase over the usual burdens of voting." *Crawford*, 553 U.S. at 198 (plurality op. of Stevens, J.). And even if "we assume" that "a somewhat heavier burden may be placed on a limited number of persons," "[t]he severity of that burden is, of course, mitigated by the fact that, if eligible, voters without photo identification may cast provisional ballots that will ultimately be counted." *Id.* at 199. *See also Veasey I*, 830 F.3d at 226 ("If a voter is unable to provide SB 14 ID at the poll, the voter can cast a provisional ballot").

So it's no surprise that the Carter–Baker Commission endorsed photo ID requirements—or that the Supreme Court quoted the Commission report extensively in affirming the necessity and validity of photo ID laws against constitutional challenge. *See Crawford*, 553 U.S. at 193–94, 197 (plurality op. of Stevens, J.) (quoting BUILDING CONFIDENCE, *supra*, at 18).

## II.

The Commission report also featured prominently when the Seventh Circuit addressed—and rejected—a challenge to Wisconsin's photo ID law under Section 2 of the Voting Rights Act. *See Frank v. Walker*, 768 F.3d 744, 745 (7th Cir. 2014) (citing BUILDING CONFIDENCE, *supra*, at 18). We should have followed the Seventh Circuit's lead and upheld the Texas photo ID requirement as well.

### A.

The Seventh Circuit began its analysis by first acknowledging that the record evidence in that case "document[ed] a disparate outcome" based on race. *Id.* at 753. In Wisconsin, much like in Texas, "white registered voters are more likely to possess qualifying photo IDs, or the documents necessary to get them." *Id.* at 752. *See also Veasey I*, 830 F.3d at 264 (endorsing district court findings that "Texans living in poverty . . . are less likely to possess

No. 20-40428

qualified photo ID" and that "a disproportionate number of Texans living in poverty are African–Americans and Hispanics").

This evidence is notable, the court acknowledged, because disparate impact can be actionable under Section 2, even in the absence of clear evidence of discriminatory intent. As the Supreme Court has stated, "certain practices and procedures that result in the denial or abridgment of the right to vote are forbidden even though the absence of proof of discriminatory intent protects them from constitutional challenge." *Chisom v. Roemer*, 501 U.S. 380, 383–84 (1991). Section 2 "proscribes practices with discriminatory effect whether or not intentional." *Id.* at 406 (Scalia, J., dissenting).

But as the Supreme Court has also repeatedly warned, disparate impact alone cannot be enough to establish liability. To the contrary, "[s]erious constitutional questions . . . might arise" if "liability were imposed based solely on a showing of a statistical disparity." *Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 540 (2015). *See also Ricci v. DeStefano*, 557 U.S. 557, 594–96 (2009) (Scalia, J., concurring) (same).

After all, "the Fourteenth Amendment guarantees equal laws, not equal results." *Personnel Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 273 (1979) (describing this principle as the "settled rule" under our Constitution). And the same is true under the Fifteenth Amendment. "'[A]ction by a State that is racially neutral on its face violates the Fifteenth Amendment only if motivated by a discriminatory purpose.'" *Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 481 (1997) (quoting *City of Mobile v. Bolden*, 446 U.S. 55, 62 (1980) (plurality op.)).

So when Congress takes action to enforce the promise of equality of opportunity guaranteed by the Fourteenth and Fifteenth Amendments, it

No. 20-40428

must be careful to enact laws that are "congruent and proportional" to that promise. *City of Boerne v. Flores*, 521 U.S. 507, 520 (1997). Indeed, if disparate impact alone were enough to violate Section 2, that would "dismantle every state's voting apparatus." *Frank*, 768 F.3d at 754. And that is precisely the kind of "serious federalism cost[]" that Justice O'Connor has specifically cautioned courts to avoid in Section 2 cases. *Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 480 (1997).

Not surprisingly, then, "[s]everal courts of appeal have rejected § 2 challenges based purely on a showing of some relevant statistical disparity between minorities and whites." *Smith v. Salt River Project Agricultural Improvement and Power District*, 109 F.3d 586, 595 (9th Cir. 1997). "[A] bare statistical showing of disproportionate *impact* on a racial minority does not satisfy the § 2 'results' inquiry." *Gonzalez v. Arizona*, 677 F.3d 383, 407 (9th Cir. 2012) (en banc) (quoting *Salt River*, 109 F.3d at 595). As the Seventh Circuit put it, "§ 2(a) does not condemn a voting practice just because it has a disparate effect on minorities." *Frank*, 768 F.3d at 753.

## B.

So if discriminatory intent is not required—but evidence of disparate impact is insufficient—then what is the standard that courts should apply in Section 2 cases, consistent with both Section 2 and the Constitution?

In other contexts, the Supreme Court has noted that disparate impact theory can help "uncover[] discriminatory intent" and "counteract unconscious prejudices and disguised animus" or "covert and illicit stereotyping" that "escape easy classification as disparate treatment." *Inclusive Cmtys.*, 576 U.S. at 521, 540. It can serve as "an evidentiary tool . . . to identify genuine, intentional discrimination—to 'smoke out[]' . . . disparate treatment." *Ricci*, 557 U.S. at 595 (2009) (Scalia, J., concurring). *See also Rollerson v. Brazos River Harbor*, 6 F.4th 633, 648 (5th Cir. 2021) (Ho,

22

No. 20-40428

J., concurring in part and concurring in the judgment) (disparate impact theory may operate as "a legal presumption that evidence of racial imbalance is evidence of racial discrimination—at least until the defendant can prove otherwise").

This same logic could presumably apply in Section 2 cases as well. *See, e.g.*, *Chisom*, 501 U.S. at 406 (Scalia, J., dissenting) ("This new 'results' criterion [under Section 2] provides a powerful, albeit sometimes blunt, weapon with which to attack even the most subtle forms of discrimination."); *Hayden v. Pataki*, 449 F.3d 305, 333 (2nd Cir. 2006) (Walker, C.J., concurring) (Voting Rights Act "can serve to invalidate measures with disparate racial impact only if there is evidence in the congressional record that those measures are part of a history and practice of unconstitutional intentional discrimination").

This appears to be the approach taken by the en banc majority in our court. The en banc majority opinion essentially concluded that Texas policymakers enacted a photo ID requirement to suppress racial minorities, not to strengthen ballot security. *See, e.g.*, 830 F.3d at 250–65.

But it is not clear how one can condemn the State of Texas for engaging in voter suppression, without also condemning the Carter–Baker Commission for the very same thing. The en banc majority is no help—it does not even mention the Commission, despite its prominence in Supreme Court and circuit precedent upholding photo ID laws in other states against legal challenge. *See, e.g.*, *Crawford*, 553 U.S. at 193–94, 197 (plurality op. of Stevens, J.) (quoting BUILDING CONFIDENCE, *supra*, at 18); *id.* at 237–38 (Breyer, J., dissenting) ("Like Justice STEVENS, I give weight to the fact that a national commission, chaired by former President Jimmy Carter and former Secretary of State James Baker, studied the issue and recommended that States should require voter photo IDs."); *id.* at 241 ("[the

23

No. 20-40428

Commission's] findings are highly relevant to both legislative and judicial determinations of the reasonableness of a photo ID requirement"); *Frank*, 768 F.3d at 745 (citing BUILDING CONFIDENCE, *supra*, at 18). But the logic employed by the en banc majority would indicate that the Carter-Baker Commission's work is racially discriminatory as well.

The en banc majority condemned Texas for adopting "the strictest law in the country" because it would have accepted only six forms of photo ID in order to vote—fewer than in Wisconsin and other states. *See* 830 F.3d at 247 n.37, 248 n.38 (cleaned up); *see also id.* at 225 (describing the six forms of photo ID permitted under SB 14). Moreover, the en banc majority repeatedly called out Texas for refusing to expand the number of acceptable forms of photo ID. It concluded that the State's unwillingness to enact such "ameliorative amendments" ultimately supported the finding of a Section 2 violation. *See, e.g., id.* at 237 ("proponents of SB 14 voted to table numerous amendments meant to expand the types of accepted IDs"); *id.* at 261 ("the Legislature's response to ameliorative amendments[] demonstrated a lack of responsiveness to minority needs by elected officials"); *id.* at 263 ("the Legislature rejected many ameliorative amendments that would have brought SB 14 in line with those states' voter ID laws").

But the Carter–Baker Commission recommended an even stricter photo ID requirement than Texas law. It unapologetically advocated for "a *single*, uniform ID" to vote. BUILDING CONFIDENCE, *supra*, at iv (emphasis added). As President Carter and Secretary Baker explained, "we recommended a standard for the entire country, the Real ID card, the standardized driver's licenses mandated by federal law last May. With that law, a driver's license can double as a voting card." Jimmy Carter and James A. Baker III, *Voting Reform Is in the Cards*, N.Y. TIMES (Sept. 23, 2005), *available at* https://www.nytimes.com/2005/09/23/opinion/voting-reform-is-in-the-cards.html. *See also* BUILDING CONFIDENCE, *supra*, at

No. 20-40428

19 ("the Commission recommends that states use 'REAL ID' cards for voting purposes"); *id.* ("our Commission recommends that states use the REAL ID and/or an [Election Assistance Commission] template for voting, which would be a REAL ID card without reference to a driver's license"). The Commission even suggested that "[t]here is likely to be less discrimination against minorities if there is a single, uniform ID, than if poll workers can apply multiple standards." *Id.* at iv. *See also Voting Reform, supra* ("Our concern was that the differing requirements from state-to-state could be a source of discrimination.").

So if the State of Texas is guilty of suppressing the votes of racial minorities because it repeatedly rejected proposals to allow more than *six* forms of photo ID, then *a fortiori* President Carter and Secretary Baker are guilty of suppressing the votes of racial minorities because they would have allowed only "a *single,* uniform ID." BUILDING CONFIDENCE, *supra,* at iv (emphasis added).

## C.

There is, of course, another way to go. The Seventh Circuit solved the quandary of holding disparate impact insufficient, yet discriminatory intent unnecessary, by starting where we always should—with the governing legal text.

Under Section 2(a), "[n]o voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which *results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color.*" 52 U.S.C. § 10301(a) (emphasis added). Invoking that language, the Seventh Circuit concluded that evidence of disparate impact alone "do[es] not show a 'denial' of anything by Wisconsin, as § 2(a)

No. 20-40428

requires." *Frank*, 768 F.3d at 753. "[U]nless Wisconsin makes it *needlessly hard* to get photo ID, it has not denied anything to any voter." *Id.*

The Seventh Circuit also examined the text of Section 2(b). It states that "'[a] violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes . . . are *not equally open* to participation by members of a class of citizens protected by subsection (a) in that its members have *less opportunity* than other members of the electorate to participate in the political process.'" 768 F.3d at 753 (quoting 52 U.S.C. § 10301(b)).

Under that text, the Wisconsin photo ID law is lawful because it "does not draw any line by race." *Id.* "[T]he district judge did not find that blacks or Latinos have less 'opportunity' than whites to get photo IDs." *Id.* "Instead the judge found that, because they have lower income, these groups are less likely to *use* that opportunity. And that does not violate § 2." *Id.*

The Seventh Circuit illustrated this point by noting the contrast between racially gerrymandered districts that effectively deprive voters of one race of an equal opportunity to elect officials of their choice—giving rise to claims of vote dilution, on the one hand—and voting laws that apply in the same manner to all voters, such as photo ID requirements, on the other hand. "In voting-dilution cases, citizens lumped into a district can't extricate themselves except by moving, so clever district-line drawing can disadvantage minorities." *Id.* The Wisconsin photo ID law, by contrast, "extends to every citizen an equal opportunity to get a photo ID." *Id.* "[I]n Wisconsin everyone has the same opportunity to get a qualifying photo ID." *Id.* at 755.

The Ninth Circuit applied the same logic, rejecting a Section 2 challenge to Arizona's photo ID law because there was "no evidence that Latinos' ability or inability to obtain or possess identification for voting

26

No. 20-40428

purposes (whether or not interacting with the history of discrimination and racially polarized voting) resulted in Latinos having *less opportunity* to participate in the political process and to elect representatives of their choice." *Gonzalez*, 677 F.3d at 407 (emphasis added).

Our en banc court should have reached the same conclusion. We should have followed the principles articulated in *Crawford*, *Frank*, and *Gonzalez*, and upheld the Texas photo ID requirement accordingly.

### D.

What's more, these same principles were recently reinforced by the Supreme Court in *Brnovich v. Democratic National Committee*, 141 S. Ct. 2321 (2021).

In *Brnovich*, just as in *Crawford*, the Court heeded the Carter-Baker Commission's warnings about election fraud. *Id.* at 2347–48. It acknowledged the state's "indisputably . . . compelling interest in preserving the integrity of its election process." *Id.* at 2347 (quotations omitted). And it found that interest compelling, and sufficient to defeat a claim under Section 2, "[e]ven if the plaintiffs had shown a disparate burden." *Id.*

The Court reaffirmed that Section 2 does not impose a "freewheeling disparate-impact regime." *Id.* at 2341. To the contrary, Section 2(b) "directs us to consider 'the totality of circumstances'" that "have a bearing on whether a State makes voting 'equally open' to all and gives everyone an equal 'opportunity' to vote"—and not "the totality of just one circumstance," namely, "disparate impact." *Id.*

So that means taking into account common-sense observations about our electoral system, such as the fact that "voting necessarily requires some effort"—it "takes time and, for almost everyone, some travel"—and it "requires compliance with certain rules." *Id.* at 2338. It means

No. 20-40428

acknowledging that voters "must tolerate the 'usual burdens of voting'" —
and that having to endure such burdens does not mean that our electoral
system is no longer "'equally open'" or fails to "furnish[] an equal
'opportunity' to cast a ballot." *Id.* Put simply, "[m]ere inconvenience
cannot be enough to demonstrate a violation of § 2." *Id.*

These principles confirm that our en banc court erred in enjoining the
Texas photo ID requirement.

## III.

My concern with our en banc decision in *Veasey* is not just limited to
the fact that it wrongly blocks an important tool for strengthening voter
confidence in our democracy. I also fear that it undermines our Nation's
commitment to civil rights, by dividing us over a cause that should powerfully
unite us.

Nearly seven decades ago, before he joined the Court, Justice
Thurgood Marshall proclaimed it his "dedicated belief" "[t]hat the
Constitution is color blind." Brief for Appellants in Nos. 1, 2 and 4 and for
Respondents in No. 10 on Reargument, at 65, *Brown v. Board of Education*,
347 U.S. 483 (1954). He called on the Court to embrace the vision that
"'[o]ur Constitution . . . is color-blind, and neither knows nor tolerates
classes among citizens.'" *Id.* at 41 (quoting *Plessy v. Ferguson*, 163 U.S. 537,
559 (1896) (Harlan, J., dissenting). *See also University of California v. Bakke*,
438 U.S. 265, 416–18 (1978) (Stevens, J., concurring in part and dissenting in
part) (authors of 1964 Civil Rights Act intended to codify their understanding
of the Constitution as "colorblind").

We disserve that vision when we treat race neutrality, rather than
racism, as the enemy. *See, e.g.*, IBRAM X. KENDI, HOW TO BE AN ANTI-
RACIST 20 (2019) ("The most threatening racist movement is not the alt
right's unlikely drive for a White ethnostate but the regular American's drive

No. 20-40428

for a 'race-neutral' one.''). We discredit the cause when we ignore the fundamental difference ''between securing equality of opportunity regardless of race and guaranteeing equality of outcome based on race''—''between color blindness and critical race theory.'' *Rollerson*, 6 F.4th at 648 (Ho, J., concurring in part and concurring in the judgment). We dishonor our commitment to civil rights when we disparage everyone and everything in America as racist.

Photo ID requirements are ubiquitous. They're widely accepted in countless areas outside voting. And they're race neutral. Disparaging voter ID laws as irredeemably racist does nothing to bolster voter confidence in our democracy. It may even exacerbate voter suspicion about the sincerity of our efforts to ensure the integrity of our democracy—not to mention our commitment to racial equality. ''Citizens are understandably skeptical when government officials claim that they're just here to help—but then declare that up is down, left is right, race consciousness is good, and race neutrality is bad.'' *Id.* at 650 (Ho, J., concurring in part and concurring in the judgment).

\* \* \*

We should all agree about the importance of protecting our democracy against those who would threaten to overturn the results of an election. So we shall see whether courts in the future will respect or overturn the will of the voters when it comes to their support for photo ID requirements and other ballot security policies that are designed to ''build[] confidence in U.S. elections.'' BUILDING CONFIDENCE, *supra*, at 69.

Until then, we are bound by our previous en banc decision in this case. That decision resulted in a court order that essentially gutted the Texas photo ID law during the 2016 election cycle. Today our court concludes that that was obviously a significant win for the plaintiffs. I concur.

29